# EXHIBIT A-3

10/14/2022 5:15 PM
Marilyn Burgess - District Clerk Harris County
Envelope No. 69254287
By: Chandra Lawson
Filed: 10/14/2022 5:15 PM

# 2022-67757 / Court: 133

## CAUSE NO. _____

| | | |
|---|---|---|
| **DAINIUS BARYSAS** | § | **IN THE DISTRICT COURT** |
| | § | |
| *Plaintiff* | § | |
| | § | |
| **vs.** | § | **____ JUDICIAL DISTRICT** |
| | § | |
| **UBER TECHNOLOGIES, INC.** | § | |
| *Defendant* | § | **HARRIS COUNTY, TEXAS** |

## PETITION AND MOTION TO VACATE ARBITRATION AWARD

Under the Federal Arbitration Act, 9 U.S.C. § 10, Plaintiff, Dainius Barysas, files this Petition requesting that the Court vacate an arbitration award for the reasons set forth below:

### INTRODUCTION

1.     Plaintiff brought claims in arbitration against Defendant, Uber Technologies, Inc., for its failure to compensate him properly under the Fair Labor Standards Act as an employee. The Arbitrator issued a Final Award on July 19, 2022, against Plaintiff, finding that he was an "independent contractor," not an "employee," under the FLSA.

2.     Although Plaintiff believes that the Arbitrator fundamentally erred in issuing an award in Uber's favor, and that the Arbitrator manifestly disregarded the law in that process, Plaintiff recognizes that courts may only vacate an award on limited grounds. Plaintiff therefore does not ask this Court to vacate the award simply because the Arbitrator engaged in faulty analysis, or because she completely ignored various facts in evidence, or because she made her rulings and findings in a completely arbitrary and capricious manner—even though she committed all those errors. Instead, Plaintiff asks the Court to vacate the award because the Arbitrator deprived Plaintiff of a fair hearing through her patent misconduct, evident partiality, repeated exclusion of material and pertinent evidence, and by exceeding her powers. Each of those grounds, either singularly or in combination, warrant vacatur of the Final Award.

3.     The Court may vacate an award when an Arbitrator refuses to hear evidence material and pertinent to the controversy. The Arbitrator excluded substantial evidence here.

4.     The Arbitrator refused to hear any testimony from a witness employed by the Defendant whose testimony Plaintiff repeatedly sought. The Arbitrator denied Plaintiff's request to depose that witness and later denied Plaintiff's request for the witness's trial testimony. Plaintiff explained that the witness could offer testimony—as an Uber employee—directly contradicting the testimony of Uber's corporate representative. Yet, the Arbitrator refused to hear the evidence. That refusal, alone, constitutes grounds for vacating the award.

5.     But there's more. During the arbitration, Uber accused the Plaintiff of engaging in fraudulent activity by allegedly "spoofing" his GPS location at the airport. Plaintiff discovered that Uber's only evidence in support were two videos depicting Plaintiff's GPS location. The Arbitrator excluded the Uber-generated videos from entering evidence, even though Uber already admitted they served as the sole basis for its accusation of fraudulent activity. The Arbitrator also prohibited discovery related to the videos, preventing Plaintiff from rebutting the basis for Uber's fraud allegation. The Arbitrator then struck *all* testimony related to the videos at issue. In other words, the moment that Uber became vulnerable on a major issue in the case, the Arbitrator shielded Uber by first refusing to allow Plaintiff any discovery on the issue, then excluding all related concessions Uber had made under oath, and then excluding the evidence itself. These exclusions also constitute sufficient grounds for vacating the unjust award.

6.     The Arbitrator further excluded evidence—without considering the admissibility of such evidence—whenever Uber claimed confidentiality. One of the key issues in this arbitration was the extent of Uber's control over Plaintiff, as the degree of Uber's control could indicate the degree of Plaintiff's economic dependence on Uber. One important method by which Uber exerted

2

control was through its hidden algorithms that operated all major functions of the business. But whenever Plaintiff sought even the most basic information underlying Uber's technology, Uber refused production, claiming it was "trade secret," "confidential," or "proprietary." Perhaps these objections would make sense during a public trial, but not in a private arbitration where the parties had *already entered into a confidentiality agreement and protective order*. The entire purpose of such protective order was to permit discovery while protecting sensitive information. And yet, every time such information was sought, Uber objected on the grounds of confidentiality. Even worse, the Arbitrated *sustained* Uber's objections *solely* on grounds of confidentiality.

7.      Under no circumstances is it appropriate for an arbitrator in a private arbitration to refuse hearing evidence based on a confidentiality objection when the parties entered into a protective order covering the information sought. *See In re K & L Auto Crushers, LLC*, 627 S.W.3d 239, 256 (Tex. 2021), reh'g denied (Sept. 3, 2021) (holding that the trial court abused its discretion by denying defendants' requests on ground that requested information was privileged, confidential, proprietary, and constituted trade secrets). Because the Arbitrator sustained every objection based on information being allegedly confidential, she denied the Plaintiff a fair opportunity to present evidence supporting his claims. Such gross misconduct warrants vacatur of the Final Award.

8.      Additionally, or alternatively, the Arbitrator exceeded her powers. The arbitration agreement between the parties defined the limits of the Arbitrator's power. It expressly stated, "The Arbitrator shall **not** have the **power to commit errors of law or legal reasoning**, and the award **may be vacated** or corrected on appeal to a court of competent jurisdiction *for any such error*." *See* Exhibit A (emphasis added). Here, the Arbitrator ignored legal precedent, instead applying inapplicable guidelines, and committed undeniable errors of legal reasoning. Her role as

3

arbitrator required adjudication of claims under proper substantive law. She exceeded the bounds of that role by refusing to apply that law in accordance with the arbitration agreement.

9.     Additionally, or alternatively, the Court should vacate the award because the Arbitrator was evidently partial against Plaintiff. Uber fostered this bias by submitting evidence of unrelated arbitration awards with its pre-hearing brief for the purpose of swaying the Arbitrator as to the merits of its defense, even though those awards lacked any precedential value. The effect was apparent, as the Arbitrator's analysis in the award suffers from being the product of a results-oriented approach, rather than a good faith consideration of the evidence and applicable law.

## PARTIES

10.     Plaintiff Dainius Barysas is an individual residing in Montgomery County, Texas.

11.     Defendant, Uber Technologies, Inc., is a Delaware corporation with its principal place of business located in San Francisco, California. At all relevant times, it was authorized to do business in the State of Texas. Uber Technologies, Inc. may be served with process by serving its registered agent in Texas, CT Corporation System, at 1999 Bryan St., Ste. 900, Dallas, Texas 75201-3136, or by serving Uber's counsel in the arbitration, should such counsel agree to receiving service.

## JURISDICTION AND VENUE

12.     This Court has subject-matter jurisdiction because of the relief sought and because the amount in controversy is within the jurisdictional limits of the Court. *See also* TEX. CIV. PRAC. & REM. CODE §§ 171.081-82. Venue is proper in Harris County because the arbitration proceeding was conducted via video conference in Houston, Harris County, Texas. *See* TEX. CIV. PRAC. & REM. CODE 15.002(a).

4

## FACTS

### A. How the Uber App Operates

13.     Uber is a ride-hailing company that dispatches drivers to customers on demand. Riders use the Uber mobile phone app to request a driver who can transport them by private car from one point to another. In response to a request, a rider receives a fare quote and estimated wait time. Once the rider submits the request, Uber assigns a driver to that request through the driver mobile app (the "Driver App"). The driver assignment is based on some combination of the driver's current location, the rider's current location, whether the driver's vehicle is appropriate for the request, and other factors known only to Uber.

14.     All major terms of the transaction between the driver and rider are dictated by Uber. Uber receives the request from the rider, it determines the price of the trip, it assigns the driver for the trip, it determines the amount of pay the driver receives, it accepts and processes the payment from the rider, it determines the amount Uber will take from the transaction, and it provides payment to the driver. Uber exclusively controls every one of those steps.

15.     Uber also varies consumer prices via hidden algorithms during certain times of day and in certain locations. Uber calls this "surge" pricing. Uber does not disclose to anyone, including its drivers, how the algorithm determines what surges or incentives are being offered and to whom. This prevents drivers from understanding the value of their labor, reducing the ability to demand better terms from Uber and to assess what a competitive price would be for customers. Unlike any other "independent business," drivers depend entirely on Uber to set, control, and constantly update the pricing structure and fee structure of the business.

5

### B. Plaintiff Dainius Barysas's Claims Against Uber

16. Plaintiff, Dainius Barysas, worked as an Uber driver for five years, serving the needs of Uber's transportation business by providing rides to Uber's customers. Barysas first began working for Uber in New York and then continued when he moved to Houston, Texas.

17. During his five years as an Uber driver, Uber willfully failed to pay Barysas sufficient wages under the Fair Labor Standards Act ("FLSA"), which requires employers to pay employees minimum wages and overtime compensation.

18. Uber did not dispute the amount that Barysas was paid (or not paid) over the course of his tenure with the company; rather, Uber argued that it was entitled to pay substandard wages because Barysas was an "independent contractor," not an "employee" under the FLSA. Accordingly, the central dispute here was whether Barysas must be considered an "employee" under the FLSA, thereby entitling him to basic wage protections.

19. Barysas demonstrated that he was an employee under the FLSA because he economically depended on Uber for the work. Uber deprived Barysas of economic independence by, among other things, fixing all prices that Barysas had to charge to customers for rides, controlling all work assignments offered to Barysas, withholding important fare and destination data when presenting him with ride assignments, relying on hidden algorithms to operate all major facets of the business, and controlling the manner of his work through threats of deactivation related to minimum acceptance rates, maximum cancellation rates, and minimum star-ratings.

20. Additionally, Uber controlled the territory of Barysas's work by prohibiting him from providing rides to or from the Houston airport. Uber tracked Barysas through GPS technology, stored that information, and analyzed it to determine whether Barysas complied with Uber's various policies and procedures. When Uber began to believe that Barysas was engaging

in conduct prohibited by its deactivation policy, Uber unilaterally restricted Barysas's area of work. Uber did not disclose the data used to make such decisions and refused to explain to Barysas the basis for its decision. Although Barysas asked for a specific reason for Uber's restriction on his area of work, Uber never provided him one. It was not until Barysas brought his claims in arbitration that Uber, for the first time, manufactured a basis for the restriction. Still, it failed to offer any evidence in support of the alleged policy violation until the start of the final hearing.

### C.  Barysas Commenced Arbitration as Required by the Employment Agreement

21.     Per the terms of his employment agreement with Uber, Barysas could not sue Uber except through arbitration. *See* Exhibit A. Accordingly, Barysas filed his demand for arbitration and commenced arbitration proceedings with the former Texas District Judge Susan Soussan (the "Arbitrator") on October 28, 2020. Barysas brought claims under the FLSA seeking proper compensation of minimum and overtime wages as an employee, plus other damages.

22.     The Parties attended the Final Arbitration Hearing via remote video conference on March 29 and May 2-3, 2022, in Houston, Texas.

23.     The Arbitrator issued her Final Award on July 19, 2022. *See* Exhibit B.

### D.  The Arbitrator Haphazardly Applied a Novel Legal Theory Combining the Economic Realities Test with Selective Portions of a Department of Labor Guideline

24.     The employment agreement that Uber drafted, and to which Barysas agreed, required that Barysas pursue his claims in arbitration. That agreement also stated, in Section 15.3(vii), "[t]he Arbitrator shall ***not*** have the ***power to commit errors of law or legal reasoning***, and the award ***may be vacated*** or corrected on appeal to a court of competent jurisdiction ***for any such error***." *See* Exhibit A (emphasis added). Thus, per the arbitration agreement, an error of law or legal reasoning is considered beyond the scope of the Arbitrator's powers.

7

25.     During the arbitration the parties agreed that the Fifth Circuit's five-factor "economic realities" test applied to determine whether Barysas was "employed" by Uber as that term is defined by the FLSA. *See Halferty v. Pulse Drug Co.*, 821 F.2d 261, 265 (5th Cir. 1987), *opinion modified on reh'g,* 826 F.2d 2 (5th Cir. 1987). The economic realities test helps the factfinder assess whether the worker was economically dependent upon the putative employer. *Id.* The five factors considered by the Fifth Circuit in assessing economic dependence are (1) the degree of control exercised by the alleged employer; (2) the extent of the relative investments of the employer and the alleged employee; (3) the degree to which the alleged employer determines the alleged employees' opportunity for profits and losses; (4) the skill and initiative required to perform on the job; and (5) the permanence of the relation. *Halferty*, 821 F.2d at 265.

26.     However, just before the final hearing began in March 2022, Uber argued in its Pre-Hearing Brief that a decision handed down earlier in that week changed the law. Uber cited to the Eastern District of Texas's reinstatement of a Trump-era Department of Labor ("DOL") guideline setting forth differing considerations for whether a worker qualifies as an employee under the FLSA (the "DOL Guideline"). *CWI v. Walsh*, No. 1:21-CV-130, at *41 (E.D. Tex. Mar. 14, 2022). The court reinstated the DOL Guideline not based on merits, but because of a procedural error that occurred when the new Biden-led department attempted to vacate the guidelines. The DOL Guideline did not change any applicable precedent, but rather served as the method by which the Department was required to conduct its enforcement actions by the Wage & Hour Division. It did not change affect the law to be applied in private actions against employers. The temporary nature of the guideline, and its limited applicability, was never in doubt.

27.     Uber failed to present any legal basis for the Arbitrator to apply the temporarily reinstated DOL Guideline to this private adjudication rather than the Fifth Circuit's long-

8

established economic realities test, which had not been overturned and remained in effect as the proper precedent and authority. Nonetheless, Uber argued during the final hearing that *both* tests governed, asking the Arbitrator to apply whichever test would be more favorable to Uber.

28.     Indeed, the Arbitrator relied on the DOL Guideline, in part, in her Final Award. She failed, however, to clarify to what extent she relied on the DOL Guideline with respect to each element discussed. The Arbitrator's Final Award set forth a framework of analysis under the Fifth Circuit's five-factor economic realities test, but the Award also cited to the DOL Guideline for certain specific factors—even when the DOL Guideline contradicted the Fifth Circuit's factors.

29.     For example, the Arbitrator quoted the DOL Guideline's language on its version of the "opportunity for profit and loss" factor, but she did not do so in the Award's section analyzing Barysas's "opportunity for profit and loss." *See* Exhibit B. Rather, the Arbitrator applied that language in the section analyzing the "relative investment" factor, which is completely different under Fifth Circuit precedent. *Id.* In some parts of the award, she relied upon the DOL Guideline as its basis, but in other parts of the Award she ignored the Guideline entirely. The Arbitrator therefore did not choose to apply the DOL Guideline over the economic realities test; instead, she created some strange hybrid of the economic realities test and DOL Guideline that resulted in a cryptic hodgepodge of both.

30.     This novel approach lacked any basis in the law. The Arbitrator did not have authority to apply the law in this manner, as this was not within the bounds of the arbitration the parties agreed upon.

31.     The impropriety of the Arbitrator's sporadic reliance on the DOL Guideline becomes even more apparent when considering the Guideline's context and the current state of the Guideline. The DOL Guideline has always been an ill-fated remnant of a previous administration

9

that passed the Guideline in the waning days of January 2021. The DOL quickly vacated the Guideline after its enactment and before it officially became effective.[1] The Eastern District of Texas only reinstated the DOL Guideline in March 2022 because of a *procedural flaw* in the administration's vacatur. Although the DOL then had to conduct its enforcement proceedings in accordance with the Guideline, that same mandate did not apply to courts. Because of the procedural error, DOL intended to supplant the Trump-era Guideline with a new version as soon as practicable.

32.      Indeed, the DOL recently announced that a new guideline will be enacted shortly. *See* Exhibit C. The goal of the new guideline is to align the DOL's approach with the courts' long-standing interpretation of the FLSA and application of the economic realities test. *See* Exhibit C.

33.      The Arbitrator engaged in misconduct and exceeded her powers by applying the DOL Guideline in direct contradiction of the Fifth Circuit's well-established interpretation of the FLSA. The Arbitrator's misconduct here also prejudiced Barysas's rights.

**E. Uber's Pre-Hearing Brief Attached Evidence that Poisoned the Well of Impartiality**

34.      Prior to the start of the final hearing, Uber advanced inappropriate arguments by submitting irrelevant evidence that would corrupt the Arbitrator's impartiality before the Final Hearing ever began.

35.      Specifically, Uber's Pre-Hearing Brief cited to—and attached as evidence—certain unrelated awards in arbitrations filed by *other claimants* against Uber for wage misclassification claims. Uber cherry-picked awards in its favor and presented them to the Arbitrator as though they were precedent, and Uber presented the awards for the sole purpose of persuading the Arbitrator

---

[1] The Rule was set to go into effect on March 8, 2021, but the DOL delayed its effect as of March 4, 2021, and then it withdrew the rule on May 6, 2021.

as to the merits of *Barysas's* case. Uber's argument and evidence prejudiced Barysas because those arbitrations bore no relation to the current action, they involved different facts and evidence, and they were presented to different arbitrators. Uber submitted the final awards for those cases, but none of the hearing transcripts, briefing, evidence, or testimony that served as the basis for the awards. Those irrelevant decisions held zero precedential value and operated only to inject bias into the proceedings prior to opening statements.

36.      Uber gave the Arbitrator an incomplete picture of its claimed success in other cases to sway the Arbitrator as to the merits of its defense in this unrelated arbitration. Unfortunately, Uber's gamesmanship worked because it improperly biased the Arbitrator against Barysas before the final hearing ever began, thereby prejudicing Barysas's rights.

**F.  The Arbitrator Excluded Barysas's Material Evidence**

37.      Both prior to and during the final hearing, the Arbitrator made numerous rulings disallowing Barysas to obtain discovery from Uber, excluding Barysas from presenting key witness testimony, prohibiting Barysas from questioning witnesses as to certain topics, and refusing to hear material and pertinent evidence in the case.

*The Arbitrator Excluded Alex Rosenblat as a Witness:*

38.      The first example of this involves the Arbitrator's decision to exclude all testimony of a material witness who worked for Uber.

39.      During the discovery period, Barysas sought to depose an Uber employee named Alex Rosenblat who had been newly hired as Uber's Head of Marketplace Policy, Fairness and Research based on her experience investigating Uber and its practices related to drivers. *See* Exhibit D. Rosenblat is the author of *Uberland: How Algorithms are Rewriting the Rules of Work* (2018). Rosenblat had the unique experience of studying Uber as an outside investigator for several

11

years and later working for Uber to effect change within the company as an inside employee. Barysas sought her testimony because she studied Uber's practices for the period of time that Barysas drove for Uber, she studied Uber drivers on a mass scale during that time, and she was hired by Uber—while Barysas was employed by Uber—to implement change in its policies with respect to its treatment of drivers.

40.     Uber filed a motion for protection asking the Arbitrator to prohibit Barysas from deposing Rosenblat, arguing that she was a high-level executive, and therefore an apex witness. *See* Exhibit E. Although Claimant provided the Arbitrator with substantial evidence that Rosenblat was *not* a high-level executive by any definition, the Arbitrator still prohibited Barysas from deposing her. *See* Exhibit F. (Uber has since disavowed the argument that she is an apex executive).

41.     Although the Arbitrator refused to allow Alex Rosenblat's deposition, Barysas still sought to obtain her testimony at the final hearing. On March 18, 2022, Barysas filed a brief in support of calling Rosenblat as a trial witness. *See* Exhibit G. Three days later, the Arbitrator denied Barysas's motion and excluded Rosenblat from testifying. *See* Exhibit H. Ultimately, the Arbitrator excluded *all* testimony from Rosenblat without ever hearing a single word from her under oath as to her personal knowledge (or perhaps lack thereof). The Arbitrator's improper exclusion of this pertinent evidence negatively affected Barysas's ability to present his case against Uber.

42.     Anticipating that this exclusion would prejudice Barysas, his counsel submitted the following offer of proof during the final hearing:

> If I may just make a brief offer of proof. With respect to the cross-examination of Mr. Rosenthal [Uber's corporate representative], early on in the cross-examination, my full intention was to ask questions about some of the statements made by a now

employee, Alex Rosenblatt. She wrote a book called *Uber Land: How Algorithms are Rewriting the Rules of Work.* Chris Hughes, co-founder of Facebook and co-chair of the Economic Security Project said it was a must read. Alex Rosenblatt was a researcher at the Data and Society of Research Institute at the time of the book publishing. She -- in the statement about the book on the back cover, it says, "*Uber Land* upends our understanding of work in the digital age and paints a future where any of us might be managed by a faceless boss." I think Ms. Rosenblatt has many factual statements that cut directly against the sworn testimony of Mr. Rosenthal, and I think it was prejudicial not to be able to ask questions about that, as well as being told that there was some confusion about what we were doing or not doing.

*See* Exhibit J at 268:6-269:3. The Arbitrator refused to hear *any* evidence from this witness, despite Barysas's repeated requests and offer of proof on the significance of the witness.

### *The Arbitrator Excluded Evidence of Two Videos Demonstrating Uber's Control and Excluded All Testimony Related Thereto:*

43.     On the first day of the final hearing, the Parties gave opening statements and Claimant Barysas began questioning his first witness—Brad Rosenthal, Uber's corporate representative. Rosenthal admitted that Uber restricted Barysas's territory by prohibiting him from using the Driver App at the Houston airport. Rosenthal justified such extreme control over Barysas by testifying that Barysas had violated company policies through the "fraudulent" act of "geo-spoofing" his location to jump the airport line. *See* Exhibit I. Prior to the final hearing, Uber never presented physical evidence to support this claim. But suddenly, on the first day of the final hearing, Rosenthal claimed to have seen videos allegedly showing that Barysas was "spoofing his location at the airport."

44.     The significance of this issue cannot be understated.

     a.  First of all, an accusation that Barysas engaged in fraud goes to his credibility as a witness—a key part of Barysas's case, considering how much of the case hinged on his own testimony.

13

b.  Second, Uber's control over Barysas was an important (if not the most important) element of the economic-realities test. Uber unequivocally demonstrated such control by prohibiting Barysas from working at the airport in Houston indefinitely. Uber defended this control by pointing to an alleged violation of company policies against fraudulent conduct.

For both of those reasons, Barysas should have been permitted to discover and present evidence refuting Uber's claim of fraudulent conduct. This is especially true considering that up until the final hearing, the only support for the alleged "spoofing" was the corporate representative's testimony—the same witness whose credibility was criticized in the Final Award. *See* Exhibit B at 9.

45.  Immediately following the exposure of this new evidence, Barysas requested a continuance of the hearing so that he could conduct discovery related to the videos. After initially refusing the request, and after much argument about the refusal, the Arbitrator eventually granted Barysas's request and required Uber to produce the videos. *See* Exhibit I. The videos depicted a map with geolocation data points moving in time, which supposedly represented Barysas's vehicle. The videos also included numerous details and tabs on the screen, but very little context for that information. The videos raised more questions than they answered.

46.  Barysas filed a motion to compel information regarding the creation of the videos, the full screen for various hidden tabs shown, information regarding the differences between the two videos, and GPS data in native format. *See* Exhibit L. Uber refused to produce the requested information. Uber claimed that the requests sought proprietary and confidential information.

47.  The Arbitrator relied on Uber's claim of confidentiality and ***denied*** Barysas's motion to compel. *See* Exhibit M. The Arbitrator prohibited ***any*** further discovery related to the

videos and **sustained** all of Uber's objections simply based on the data being proprietary and confidential. *See* Exhibits B, M.

48.     The Arbitrator's decision to prohibit such discovery lacked any basis in the law. The Arbitrator purposely ignored the fact that the parties had already entered into a protective order preventing the public dissemination of anything marked as "confidential" in the hearing. So, to the extent Uber sought to protect confidentiality, it just had to mark the evidence as "confidential." Accordingly, confidentiality was not a proper excuse for refusing discovery. *See In re K & L Auto Crushers, LLC*, 627 S.W.3d 239, 256 (Tex. 2021) (holding that the trial court abused its discretion by denying defendants' requests on ground that requested information was privileged, confidential, proprietary, and constituted trade secrets). Still, the Arbitrator improperly allowed confidentiality to serve as a basis for the exclusion of evidence that directly impacted a key element of Barysas's claim.

49.     To make matters worse, the Arbitrator **excluded the videos from being entered into evidence**. Those videos had just formed the basis of Uber's belief that Barysas engaged in fraudulent behavior—thereby causing Uber to restrict his access to certain territory. Yet, the Arbitrator excluded that key evidence, entirely, from the proceeding. As she wrote in the Final Award, "Video 1 and Video 2 were not admitted into evidence. Any testimony regarding same was stricken for all purposes." *See* Exhibit B. In other words, the Arbitrator prohibited Barysas from gathering and presenting any evidence to challenge Uber's claim that he engaged in "fraudulent activities," even though Uber relied on that claim as the basis for justifying its extreme control over Barysas's work.

50.     The egregiousness of this decision becomes clear upon review of the Final Award. In the Award, the Arbitrator stated, the "majority of the dispute" as to the control factor related to

15

Uber's restriction on Barysas's use of the Driver App at the airport. *See* Exhibit B at 11, n. 3. So, the Arbitrator is saying that on the one hand, the airport restriction is a very important issue and a central dispute, but on the other hand, Barysas cannot conduct any discovery as to the basis for that restriction and cannot present any evidence regarding the basis for that restriction.

51.    It is therefore indisputable that the Arbitrator refused to hear evidence that she conceded was pertinent and material to the controversy. This misconduct prevented Barysas from receiving a fair hearing, meaning the Final Award should be vacated.

*The Arbitrator Excluded Evidence of Uber's Proprietary and Confidential Data, Despite the Existence of a Protective Order:*

52.    On April 27, 2021, the parties entered into an agreed Confidentiality and Claw-Back Stipulation and Protective Order. *See* Exhibit N. Counsel for both Claimant Barysas and Respondent Uber signed the agreed order. The Arbitrator also signed the order. The nineteen-page order set forth extensive terms by which the parties could conduct discovery while maintaining the confidentiality of proprietary information. Under the order, either party could designate a wide array of documents, information, evidence, or testimony as "Confidential Information," "Highly Confidential Information," or "Highly Confidential Attorneys' Eyes Only Information." *See* Exhibit N. Thus, from April 27 onward, the confidentiality of Uber's proprietary or trade secret information was protected at all times.

53.    Nonetheless, the Arbitrator repeatedly denied Barysas from discovering, or refused to enter into evidence, any of Uber's claimed "proprietary or confidential" information *solely* on the basis that the information sought may have been proprietary to Uber. In other words, once Uber made an objection that the information, documents, data, or testimony sought was "confidential" or "proprietary," the Arbitrator automatically sustained the objection and excluded the evidence.

54.     For example, during the first day of the final hearing, the Arbitrator informed Barysas that he would not be entitled to discover the inner-workings of Uber's technology, even though Uber "opened the door" to the issue by relying on the videos: "That doesn't mean you're going to have the ability to turn Uber's algorithms upside down or their proprietary information which we've talked about before upside down." *See* Exhibit I at 162:23-163:2.

55.     The Arbitrator also sustained an objection based on confidentiality during an exchange on the second day of the final hearing when Barysas was examining Uber's corporate representative:

| | |
|---|---|
| MR. SANDAHL: | Objection, Your Honor. This is getting into the proprietary nature of the app. |
| MS. SOUSSAN: | *If it is proprietary, the objection is sustained.* |
| MR. MacLEOD: | Here's the problem, Judge. We're in arbitration. It's confidential. It is confidential. |
| MS. SOUSSAN: | I know that. *I've ruled so many times that you do not have access to trade secret or proprietary information.* |
| MR. MacLEOD: | We're trying to demonstrate how Uber is controlling these drivers, and we can't go and talk about their monitoring of GPS data and who is responsible for it? |
| MS. SOUSSAN: | Re-ask your question, please. |

*See* Exhibit J at 207:1-208:2.

56.     Barysas submitted this issue as an offer of proof, as well. Counsel stated on the record during the final hearing:

In addition, there was a lot of questions about the GPS data. The collection of that GPS data to us is a form of monitoring. Instead of being able to delve into that more, A, the corporate representative is not truly prepared about geo-mapping or geo-spoofing in a case where that's a large component of it, but *we were told that it's proprietary or calls for trade secret*. I confide that there's nothing about my client's GPS data -- his actual data that was taken from his phone that was

17

proprietary or trade secret. The fact that he's being monitored is not proprietary or trade secret. It's very, very well-known and public knowledge. Part of that public knowledge stems from an Uber operational program that's carried out by some of their top execs called Operation Hell. *It cuts against Uber's credibility -- and Uber's credibility is at stake here -- and we were not permitted to go in further about the monitoring and the nature of monitoring because we were told it was trade secret, even though I've been told many times that arbitration is confidential, protective orders*. There's no way that I presume that the people in this room -- and I certainly would not -- are going to go and compete or release any of this information about Uber. The last part is there were many times where it was clear that Mr. Rosenthal was willing to say whatever he wanted to say in response to questions. Whether or not there was any legally-admissible or competent evidence to support those statements, he would say, "I think" or "I believe." We had filed motions to compel in this case, including one after the start of the last arbitration that was summarily denied except for the videos that were created as part of this litigation. And so, it hampers the ability to effectively cross-examine a witness, especially in this case, an Uber corporate representative, especially given that he is the sole witness who has been presented here. That ends my offer of proof. Thank you, Judge.

*See* Exhibit J at 269:4-270:22.

## EXHIBITS

57.     Plaintiff attaches and incorporates herein by reference in support of his

Motion to Vacate the following exhibits:

**Exhibit A:**     The Arbitration Agreement between the parties;

**Exhibit B:**     The Final Award;

**Exhibit C:**     The Department of Labor's Notice of Proposed Rulemaking;

**Exhibit D:**     Barysas's Response to Motion for Protective Order to Prevent Deposition of Alex Rosenblat, and Motion to Compel Deposition;

**Exhibit E:**     Uber's Motion for Protective Order to Prevent the Apex Deposition of Alex Rosenblat;

**Exhibit F:**     Order Denying Motion to Compel Deposition of Rosenblat;

**Exhibit G:**     Barysas's Brief in Support of Calling Rosenblat as Witness;

**Exhibit H:**     Order Denying Rosenblat as Witness;

18

**Exhibit I:**     Arbitration Hearing Transcript, Day 1;

**Exhibit J:**      Arbitration Hearing Transcript, Day 2;

**Exhibit K:**     Arbitration Hearing Transcript, Day 3;

**Exhibit L:**     Barysas's Motion to Compel Discovery of Videos;

**Exhibit M:**     Order Denying Motion to Compel;

**Exhibit N:**     Confidentiality and Claw-Back Stipulation and Protective Order;

## ARGUMENTS AND AUTHORITIES

58.     Plaintiff incorporates all other paragraphs by reference here fully.

### A.  Legal Standard

59.     Under the Federal Arbitration Act, an arbitration award may be vacated under the following circumstances:

> (1) where the award was procured by corruption, fraud, or undue means;
>
> (2) where there was ***evident partiality*** or corruption in the arbitrators, or either of them;
>
> (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, ***or in refusing to hear evidence pertinent and material to the controversy***; or of any other misbehavior by which the rights of any party have been prejudiced; or
>
> (4) where the arbitrators ***exceeded their powers***, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C.A. § 10 (emphasis added).

### B.  The Arbitrator Refused to Hear Material Evidence

60.     Plaintiff incorporates all other paragraphs by reference here fully.

61.     The Arbitrator is guilty of misconduct because she refused to hear evidence pertinent or material to the controversy. *See* 9 U.S.C.A. § 10.

62.     The Arbitrator refused to allow Plaintiff to depose Uber's employee, Alex Rosenblat, and refused to allow Plaintiff to call her as a witness during the final hearing.

63.     Additionally, the Arbitrator refused to allow Plaintiff to seek discovery related to the two videos that were discovered on day one of the final hearing, refused to admit the videos as evidence, and excluded all testimony related to such videos. The Arbitrator first limited the discovery of information surrounding the videos, then excluded the videos and all related testimony, entirely. Uber's corporate representative, Brad Rosenthal, stated under oath that Uber believed Barysas engaged in fraudulent conduct because of the content on those videos. And yet, the Arbitrator excluded the videos from evidence, prohibited discovery pertaining to the videos, and struck all of Rosenthal's testimony about the videos. The Arbitrator single-handedly wiped out Barysas's ability to (1) attack Uber's claim that he engaged in fraudulent activities, (2) bolster his own credibility, and (3) use the videos as evidence of Uber's control. Undoubtedly, the Arbitrator's exclusion of evidence was material, pertinent, and prejudicial.

64.     Additionally, the Arbitrator refused to hear evidence if it touched upon any matter that Uber unilaterally claimed was "proprietary or confidential." Throughout the arbitration, Uber deployed an objection of "trade secret" or "proprietary information" as a trump card to halt any line of questioning or to stymy any attempt at discovery. And the Arbitrator caved to every such objection even though she signed a protective order that served the precise purpose of enabling discovery while protecting Uber's confidential information. Uber repeatedly exploited this advantage in the arbitration, preventing Barysas from obtaining any detailed information about how Uber exerted algorithmic control of his work. To be sure, the objections at issue were not based on any evidentiary ground—Uber objected *solely* on the grounds that the information sought was confidential, and the Arbitrator repeatedly sustained such requests. *See In re K & L Auto*

*Crushers, LLC*, 627 S.W.3d at 256. The Arbitrator's misconduct in excluding the evidence unfairly prejudiced Barysas, preventing him from receiving a fair hearing.

65.     The effect of such exclusion cannot be denied. The Arbitrator pointed to the "sophisticated algorithms that allow[ed] Uber to connect riders to drivers" as support for her final award, even though she never allowed Barysas to obtain discovery as to the inner workings of that technology. The Arbitrator allowed Uber to keep its method for controlling Barysas a mystery and then ruled against Barysas because he failed to present sufficient evidence that Uber controlled him. The Arbitrator's exclusion of this evidence materially affected his claims and prevented him from presenting pertinent evidence as to a key element.

66.     The Arbitrator's exclusion of this material evidence demands vacatur of the award.

## C.  The Arbitrator Exhibited Evident Partiality

67.     Plaintiff incorporates all other paragraphs by reference here fully.

68.     Additionally, or in the alternative, there was evident partiality by the Arbitrator in Uber's favor.

69.     The Arbitrator adopted a results-oriented approach in finding for Uber. She pre-determined the outcome and then applied the law only to serve that outcome. Uber fostered the Arbitrator's bias before the final hearing ever began by selectively submitting copies of prior arbitration awards that had no bearing on Barysas's claim. The submission of such irrelevant evidence prior to the hearing caused the Arbitrator to review prejudicial information that would taint the impartiality of any factfinder.

70.     For all the foregoing reasons outlined in this petition, the Arbitrator demonstrated partiality towards Uber and against Barysas. Accordingly, the final award should be vacated.

**D. The Arbitrator Exceeded her Powers**

71.     Plaintiff incorporates all other paragraphs by reference here fully.

72.     Additionally, or in the alternative, the Arbitrator exceeded her powers.

73.     The arbitration agreement stated, "[t]he Arbitrator shall **not** have the **power to commit errors of law or legal reasoning**, and the award **may be vacated** or corrected on appeal to a court of competent jurisdiction **for any such error**." *See* Exhibit A (emphasis added). Thus, per the arbitration agreement, an error of law or legal reasoning is considered beyond the scope of the Arbitrator's powers.  The Arbitrator committed numerous errors of law and legal reasoning here.

74.     The Supreme Court has construed the FLSA liberally to apply to as many instances as possible, consistent with statutory provisions. *Mitchell v. Lublin, McGaughy & Associates*, 358 U.S. 207, 211 (1959). The Arbitrator ignored this guidance from the Supreme Court and instead sought to apply the FLSA as narrowly as possible here.

75.     First, the Arbitrator exceeded her powers by improperly applying a DOL Guideline to the evidence without proper consideration of the Fifth Circuit's economic realities test. The Arbitrator repeatedly conflated the DOL Guideline with the economic realities test, resulting in a failure to apply either one correctly. Such failure resulted in prejudice to Barysas and prevented him from receiving a fair hearing.

76.     Second, the Arbitrator committed numerous errors of law and legal reasoning, as evidenced by her Final Award.

*Errors Regarding the Relative Investments Factor:*

77.     With respect to the "relative investments" factor, the Arbitrator applied the law incorrectly. She recognized in her Final Award, "there is no question that Uber has spent millions of dollars in the development of its technology and its world-wide company while Claimant may

22

have spent approximately $100,000.00 in his business." *See* Exhibit B at 17. However, she completely ignored Uber's "millions of dollars" of investment because "Uber did not invest in Claimant's business." *Id.*

78.     By setting aside the "millions of dollars" of Uber's investment into the overall business, the Arbitrator failed to compare the *relative* investments of the two parties as *required* for this factor.

79.     The Fifth Circuit uses "a side-by-side comparison method in evaluating this factor." *Parrish v. Premier Dir. Drilling*, 917 F.3d 369, 383 (5th Cir. 2019). It holds, "***[the employer's] greater overall investment in the business scheme***" ***must be considered***. *Id.* (where the pipeline company "invested more money at a drill site compared to each plaintiff's investments").

80.     This law is well-established. *See id.* at 383 (it is "long-accepted methodology"); *Hopkins v. Cornerstone Am.*, 545 F.3d 338, 344 (5th Cir. 2008) (comparing the individual's investment to the employer's "***overall investment*** in the business scheme"); *Brock v. Mr. W. Fireworks*, 814 F.2d 1042, 1044 (5th Cir. 1987) (holding, "the [trial] court erred as a matter of law by failing to make findings as to the ***absolute and relative investment of [employer]*** compared to that of the operators"); *Hobbs v. Petroplex Pipe and Const.*, 360 F.Supp. 3d 571, 580 (W.D. Tex. 2019) ("the Court ***must*** consider [Defendant's] ***overall investment*** in the pipe construction project"), *aff'd* at 946 F.3d 824, 831; *Carrell v. Sunland Const.*, 998 F.2d 330 (5th Cir. 1993) (comparing company's "***overall investment*** in each pipeline construction project" to welders' ***overall investment*** in their trucks/ equipment).

81.     The Fifth Circuit therefore requires consideration of Uber's overall investment into the business. The Arbitrator committed a plain error of law or legal reasoning by failing to apply this precedent.

82.     After committing that error, the Arbitrator then listed certain of Claimant's expenses, including his "car, phone, clothing, commercial insurance, and paid expenses…." The Arbitrator failed to conduct the proper legal analysis for those items, as the Fifth Circuit held that expenses incurred for non-business purposes are diluted by the personal use. *See Herman v. Express Sixty-Minute Del. Serv.*, 161 F.3d 299, 304 (5th Cir. 1998) (finding this factor **favored employment** because investment is "diluted when one considers that the vehicle is also used by most drivers for personal purposes"); *Brock*, 814 F.2d at 1052 ("These few, minor purchases, often for **nonbusiness** purposes, do **not** indicate **legally significant investment** by the operators."). The Arbitrator cannot bootstrap Barysas's personal purchases, such as phone and clothing, to the business to artificially inflate the amount of the investment.

83.     Also, ongoing expenses, such as maintenance, gas, and insurance should not be considered when looking at how much *capital risk* Barysas incurred for the business. *See Usery v. Pilgrim Equip. Co. Inc.*, 527 F.2d 1308, 1313 (5th Cir. 1976). The Fifth Circuit has repeatedly held that it looks to see what *capital* must be **placed *at risk* upfront on the part of the worker**. *Id.* ("risk capital"); *Brock*, 814 F2d at 1052 ("risky capital investments" and "up-front" money); *Herman*, 161 F.3d at 304-05 ("capital risk," "risk of investment loss," "risky capital investment"); *Parrish*, 917 F.3d at 383 ("risk capital"). The ongoing expenses listed by the Arbitrator were not appropriate considerations for capital risk investments, as they were only incurred as the business continued to operate. The Arbitrator erred in failing to apply the law as required by the Fifth Circuit.

84.     Further, in making this determination, the Arbitrator cited to the DOL Guideline regarding an entirely separate factor—the "opportunity for profit and loss" factor—as the basis for her decision. *Id.* The fact that she cited to the DOL Guideline and did not cite to a single Fifth

24

Circuit case in her analysis of this factor, may provide a clue as to why she ignored the entirety of Fifth Circuit precedent outlined above. Her inconsistent and improper application of the law constituted errors of law and legal reasoning. Accordingly, she exceeded the scope of her power, robbing Barysas of a fair hearing.

<u>*Errors Regarding the Opportunity for Profit & Loss Factor:*</u>

85.     Although the Arbitrator relied on the DOL Guidance's language related to the "opportunity for profit and loss" factor in the "relative investments" section, she did *not* cite to that analysis in her section analyzing Barysas's opportunity for profit and loss. Rather, she emphasized that Barysas "made the decision as to when and where to work," and he "decided how long to stay logged into the Uber Driver App." *See* Exhibit B at 16. In this section, the Arbitrator arbitrarily chose to ignore the DOL Guidance, likely because it expressly rejected her analysis. *See* 86 F.R. at 1247 ("This factor weighs towards the individual being an ***employee*** to the extent the individual is unable to affect his or her earnings or ***is only able to do so by working more hours or faster***."). In other words, that Barysas could affect his earnings by working more hours or more efficiently was not relevant to this factor. Yet, the Arbitrator ignored the DOL Guidance and considered those facts. This shows how the Arbitrator's inconsistently applied the law to serve whatever result she sought to achieve, despite the actual requirements of the law.

86.     The Arbitrator also failed to mention a single a one of the "major determinants" of profits and losses that the Fifth Circuit considers for this factor, which are prices, customer volume, location, and advertising. *See Usery*, 527 F.3d at 1312-13; *Brock*, 814 F.2d at 1050; *Reich v. Circle C Investments, Inc.*, 998 F.2d 324, 328 (5th Cir. 1993); *Herman*, 161 F.3d at 310 (King, J. dissenting). By ignoring the Fifth Circuit's holdings, the Arbitrator failed to apply the proper legal reasoning here.

*Errors Regarding the Skill & Initiative Factor:*

87.     The Arbitrator's straining of the law to fit her desired outcome becomes particularly apparent in her finding that this factor weighs in favor of independent contractor status.

88.     It is well-established that the Fifth Circuit looks for "some unique skill" or ability to exercise significant initiative within the business. *Eberline v. Media Net, L.L.C.*, 636 F.Appx. 225, 228-29 (5th Cir. 2016); *Hopkins*, 545 F.3d at 345 (inquiring whether the plaintiff had "some unique skill set"); *Halferty*, 821 F.2d at 267 ("Halferty needed no knowledge of any special equipment to perform her duties"); *Reich v. Priba Corp.*, 890 F.2d  586, 592 (5th Cir. 1995) ("There was no evidence that any specialized skills were a requirement to perform at the club even though some of the entertainers stated that they had participated in dance lessons."). Usually, the types of unique skill considered are those held by welders, electricians, plumbers, nurses, etc. Of course, driving a personal vehicle does not require any unique or specialized skill. *See Herman*, 161 F.3d at 305 (holding that driving a personal vehicle did not require specialized skill or initiative).

89.     With respect to "initiative," the inquiry is whether Barysas had "some ability to exercise *significant* initiative in the business." *Hopkins*, 545 F.3d at 345. The Fifth Circuit holds that where "routine work" is involved—like here—"industry and efficiency is ***not*** indicative of independence and nonemployee status." *See Usery*, 527 F.2d at 1314 ("***Customer rapport is not an initiative characteristic***"); *Brock*, 814 F.2d at 1053 ("we held that initiative, ***not efficiency***, determines independence and that customer rapport is not an initiative characteristic"); *Reich*, 890 F.Supp. at 593 ("The ***ability to converse*** with club clientele in an effort to generate a larger tip ***is not the type of initiative*** contemplated by *Silk*."). That type of initiative is not considered because

26

it does not distinguish an employee from a contractor.  Even employees can demonstrate initiative like that.

90.     The Arbitrator failed to apply the proper legal analysis here because she ignored the above case law in finding that Barysas could exercise significant initiative in the business. The Arbitrator relied on facts that the Fifth Circuit rejects as being proper bases for an initiative finding, such as customer rapport and efficiency.

91.     Further, to the extent that the Arbitrator applied Fifth Circuit law, she did so inconsistently and arbitrarily. At one point in the Award, the Arbitrator stated that the *Hargrave* case "is very instructive in the determination of whether Claimant is an employee or independent contractor." Exhibit B at 12; *see Hargrave v. AIM Directional Services, LLC*, No. 21-40496, 2022 WL 1487020 (5th Cir. May 11, 2022). But she conveniently forgot to consider *Hargrave* when applying the law to this factor. In *Hargrave*, the Fifth Circuit determined that the worker was "highly skilled" as a directional driller; nonetheless, the court determined that this factor point to employee status because the "major components" of the business open to initiative were not in the plaintiff's control. *See id.* at *4. The Court said, "[i]f anything, it seems that Hargrave's 'initiative was limited once on the job.'" *Id.* (quoting *Hobbs*, 946 F.3d at 834). The same was true for Barysas, but the Arbitrator conveniently ignored that language. She also failed to consider whether the "major components" of the business were in Barysas's control.

92.     Likewise, the Arbitrator selectively ignored the *Herman* case (which she relied upon elsewhere) in which the Fifth Circuit determined that delivery drivers did not have the type of skill and initiative required for this factor. *See Herman*, 161 F.3d at 305.

*Errors Regarding the Permanence Factor:*

93.      Again, the Arbitrator inconsistently applied the law with respect to this factor by selectively applying the DOL Guidelines only when it suited her pre-determined outcome. For example, she determined that the permanence factor weighed in favor of non-employment because "Claimant's relationship with Uber was non-exclusive." *See* Exhibit B at 18. Had she relied on the DOL Guidance for this portion of the opinion, she would have discovered that the DOL Guidance *rejected* consideration of exclusivity or non-exclusivity under this factor. *See* 86 F.R. at 1174. Of course, the Arbitrator abandoned her reliance on the DOL Guidance when applying the law for this factor. Such arbitrary inconsistency in the application of the law exceeded her power.

## CONCLUSION

94.      The Arbitrator's Final Award is chock-full of errors in legal reasoning and improper applications of inapplicable law. But the most prejudicial part of the arbitration was not the Arbitrator's reasoning; it was the Arbitrator's method for conducting the final hearing. The Arbitrator excluded a great deal of material and pertinent evidence that resulted in Plaintiff failing to receive a full and fair hearing. The Arbitrator excluded Alex Rosenblat from testifying even though Uber admits that she was never an apex witness; the Arbitrator excluded all evidence related to the two videos that supposedly showed how Claimant violated Uber's policies; and, the Arbitrator sustained any objection Uber made solely on the basis of confidentiality, despite the existence of a signed protective order. These exclusions forced Plaintiff to try his case with both arms tied behind his back. While arbitration is strongly favored, the law does not allow for such abuse of the alternative dispute resolution system. The Court should grant this motion to vacate the arbitration and require a new hearing in front of a new, impartial arbitrator.

## PRAYER

For all the foregoing reasons, Plaintiff respectfully requests this Court to:

    a.   Issue an Order vacating the Final Award;

    b.   Issue an Order for a new Arbitration with a new arbitrator; and

    c.   Order any such other and further relief, whether in law or equity, to which the Plaintiff may be entitled.

 

Respectfully submitted,

**KHERKHER GARCIA, LLP**

By: */s/  Eric A. Hawley*
      Bret Stanley
      State Bar No. 24075116
      BStanley@KherkherGarcia.com
      Ryan MacLeod
      State Bar No. 24068346
      RMacLeoad@KherkherGarcia.com
      Eric A. Hawley
      State Bar No. 24074375
      EHawley@KherkherGarcia.com
      Steven J. Kherkher
      State Bar No. 11375950
**E-Service:** SKherkher-Team@KherkherGarcia.com
      2925 Richmond Ave., Suite 1560
      Houston, TX  77098
      (713) 333-1030
      (713) 333-1029 (fax)

      **ATTORNEYS FOR PLAINTIFF**

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Steve Kherkher on behalf of Eric Hawley
Bar No. 24074375
skherkher-team@kherkhergarcia.com
Envelope ID: 69254287
Status as of 10/17/2022 8:22 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Steven Joseph Kherkher | 11375950 | SKherkher-Team@KherkherGarcia.com | 10/14/2022 5:15:27 PM | SENT |

2022-67757 / Court: 133

# Exhibit A

RASIER, LLC / RASIER-CA, LLC / RASIER-PA, LLC / RASIER-DC, LLC / RASIER-MT, LLC / HINTER-NM

**TECHNOLOGY SERVICES AGREEMENT**

Last update: December 11, 2015

This Technology Services Agreement ("*Agreement*") constitutes a legal agreement between you, an individual ("*you*") and Rasier-CA, LLC if your Territory (as defined below) is within the State of California, Rasier-PA, LLC if your Territory is within the State of Pennsylvania, Rasier-DC, LLC if your Territory is within the State of Florida, Rasier-MT, LLC if your Territory is within the State of Montana, Hinter-NM if your Territory is within the State of New Mexico, or Rasier, LLC if your Territory is anywhere else within the United States (as applicable, "*Company*").

Company, a subsidiary of Uber Technologies, Inc. ("*Uber*"), provides lead generation to independent providers of rideshare or peer-to-peer (collectively, "*P2P*") passenger transportation services using the Uber Services (as defined below). The Uber Services enable an authorized transportation provider to seek, receive and fulfill requests for transportation services from an authorized user of Uber's mobile applications. You desire to enter into this Agreement for the purpose of accessing and using the Uber Services.

**You acknowledge and agree that Company is a technology services provider that does not provide transportation services.**

In order to use the Uber Services, you must agree to the terms and conditions that are set forth below. Upon your execution (electronic or otherwise) of this Agreement, you and Company shall be bound by the terms and conditions set forth herein.

**IMPORTANT: PLEASE NOTE THAT TO USE THE UBER SERVICES, YOU MUST AGREE TO THE TERMS AND CONDITIONS SET FORTH BELOW. PLEASE REVIEW THE ARBITRATION PROVISION SET FORTH BELOW CAREFULLY, AS IT WILL REQUIRE YOU TO RESOLVE DISPUTES WITH THE COMPANY ON AN INDIVIDUAL BASIS, EXCEPT AS PROVIDED IN SECTION 15.3, THROUGH FINAL AND BINDING ARBITRATION UNLESS YOU CHOOSE TO OPT OUT OF THE ARBITRATION PROVISION.  BY VIRTUE OF YOUR ELECTRONIC EXECUTION OF THIS AGREEMENT, YOU WILL BE ACKNOWLEDGING THAT YOU HAVE READ AND UNDERSTOOD ALL OF THE TERMS OF THIS AGREEMENT (INCLUDING THE ARBITRATION PROVISION) AND HAVE TAKEN TIME TO CONSIDER THE CONSEQUENCES OF THIS IMPORTANT BUSINESS DECISION.  IF YOU DO NOT WISH TO BE SUBJECT TO ARBITRATION, YOU MAY OPT OUT OF THE ARBITRATION PROVISION BY FOLLOWING THE INSTRUCTIONS PROVIDED IN THE ARBITRATION PROVISION BELOW.**

UBER_BARYSAS_0000229

1.  **Definitions**

1.1   "*Affiliate*" means an entity that, directly or indirectly, controls, is under the control of, or is under common control with a party, where control means having more than fifty percent (50%) of the voting stock or other ownership interest or the majority of the voting rights of such entity.

1.2   "*City Addendum*" means an addendum or supplemental information to this Agreement setting forth additional Territory-specific terms, as made available and as updated by Company from time to time.

1.3   "*Company Data*" means all data related to the access and use of the Uber Services hereunder, including all data related to Users (including User Information), all data related to the provision of Transportation Services via the Uber Services and the Driver App, and the Driver ID.

1.4   "*Company Device*" means a mobile device owned or controlled by Company that is provided to you solely for your use of the Driver App to provide Transportation Services.

1.5   "*Device*" means a Company Device or Your Device, as the case may be.

1.6   "*Driver App*" means the mobile application provided by Company that enables transportation providers to access the Uber Services for the purpose of seeking, receiving and fulfilling on-demand requests for transportation services by Users, as may be updated or modified from time to time.

1.7   "*Driver ID*" means the identification and password key assigned by Company to you that enables you to use and access the Driver App.

1.8   "*Fare*" has the meaning set forth in Section 4.1.

1.9   "*Service Fee*" has the meaning set forth in Section 4.4.

1.10  "*Territory*" means the city or metro areas in the United States in which you are enabled by the Driver App to receive requests for Transportation Services.

1.11  "*Tolls*" means any applicable road, bridge, ferry, tunnel and airport charges and fees, including inner-city congestion, environmental or similar charges as reasonably determined by the Uber Services based on available information.

1.12  "*Transportation Services*" means your provision of P2P passenger transportation services to Users via the Uber Services in the Territory using the Vehicle.

1.13  "*Uber Services*" mean Uber's on-demand lead generation and related services licensed by Uber to Company that enable transportation providers to seek, receive and fulfill on-demand requests for transportation services by Users seeking transportation services; such Uber Services include access to the Driver App and Uber's software, websites, payment services as described in Section 4 below, and related support services systems, as may be updated or modified from time to time.

1.14  "*User*" means an end user authorized by Uber to use the Uber mobile application for the purpose of obtaining Transportation Services offered by Company's transportation provider customers.

1.15  "*User Information*" means information about a User made available to you in connection with such User's request for and use of Transportation Services, which may include the User's name, pick-up location, contact information and photo.

1.16    *"Vehicle"* means your vehicle that: (a) meets the then-current Company requirements for a vehicle on the Uber Services; and (b) Company authorizes for your use for the purpose of providing Transportation Services.

1.17    *"Your Device"* means a mobile device owned or controlled by you: (a) that meets the then-current Company specifications for mobile devices as set forth at www.uber.com/byod-devices; and (b) on which the Driver App has been installed as authorized by Company solely for the purpose of providing Transportation Services.

## 2.   Use of the Uber Services

2.1     **Driver IDs.** Uber will issue you a Driver ID to enable you to access and use the Driver App on a Device in accordance with this Agreement. Company reserves the right to deactivate your Driver ID if you have not fulfilled a request for Transportation Services using the Driver App at least once a month. **You agree that you will maintain your Driver ID in confidence and not share your Driver ID with any third party. You will immediately notify Company of any actual or suspected breach or improper use or disclosure of your Driver ID or the Driver App.**

2.2     **Provision of Transportation Services.** When the Driver App is active, User requests for Transportation Services may appear to you via the Driver App if you are available and in the vicinity of the User. If you accept a User's request for Transportation Services, the Uber Services will provide you with certain User Information via the Driver App, including the User's first name and pickup location. In order to enhance User satisfaction with the Uber mobile application and your Transportation Services, it is recommended that you wait at least ten (10) minutes for a User to show up at the requested pick-up location. You will obtain the destination from the User, either in person upon pickup or from the Driver App if the User elects to enter such destination via Uber's mobile application. You acknowledge and agree that once you have accepted a User's request for Transportation Services, Uber's mobile application may provide certain information about you to the User, including your first name, contact information, photo and location, and your Vehicle's make and license plate number. You shall not contact any Users or use any User's personal data for any reason other than for the purposes of fulfilling Transportation Services. As between Company and you, you acknowledge and agree that: (a) you shall be solely responsible for determining the most effective, efficient and safe manner to perform each instance of Transportation Services; and (b) except for the Uber Services or any Company Devices (if applicable), you shall provide all necessary equipment, tools and other materials, at your own expense, necessary to perform Transportation Services. You understand and agree that you have a legal obligation under the Americans with Disabilities Act and similar state laws to transport Users with Service Animals (as defined by applicable state and federal law), including guide dogs for the blind and visually impaired Users, and there is no exception to this obligation for allergies or religious objections. Your knowing failure to transport a User with a Service Animal shall constitute a material breach of this Agreement. You agree that a "knowing failure" to comply with this legal obligation shall constitute either: (1) a denial of a ride where you state the denial was due to a Service Animal; or (2) there is more than one (1) instance in which a User or the companion of a User alleges that you cancelled or refused a ride on the basis of a Service Animal.

2.3     **Your Relationship with Users.** You acknowledge and agree that your provision of Transportation Services to Users creates a direct business relationship between you and the User. Company is not responsible or liable for the actions or inactions of a User in relation to you, your activities or your Vehicle. You shall have the sole responsibility for any obligations or liabilities to Users or third parties that arise from your provision of Transportation Services. You acknowledge and

agree that you are solely responsible for taking such precautions as may be reasonable and proper (including maintaining adequate insurance that meets the requirements of all applicable laws including motor vehicle financial responsibility laws) regarding any acts or omissions of a User or third party. You acknowledge and agree that Company may release your contact and/or insurance information to a User upon such User's reasonable request. You acknowledge and agree that, unless specifically consented to by a User, you may not transport or allow inside your Vehicle individuals other than a User and any individuals authorized by such User, during the performance of Transportation Services for such User. You acknowledge and agree that all Users should be transported directly to their specified destination, as directed by the applicable User, without unauthorized interruption or unauthorized stops.

2.4     **Your Relationship with Company**. You acknowledge and agree that Company's provision to you of the Driver App and the Uber Services creates a direct business relationship between Company and you. Company does not, and shall not be deemed to, direct or control you generally or in your performance under this Agreement specifically, including in connection with your provision of Transportation Services, your acts or omissions, or your operation and maintenance of your Vehicle. You retain the sole right to determine when, where, and for how long you will utilize the Driver App or the Uber Services. You retain the option, via the Driver App, to attempt to accept or to decline or ignore a User's request for Transportation Services via the Uber Services, or to cancel an accepted request for Transportation Services via the Driver App, subject to Company's then-current cancellation policies. With the exception of any signage required by local law or permit/license requirements, Company shall have no right to require you to:  (a) display Company's or any of its Affiliates' names, logos or colors on your Vehicle(s); or (b) wear a uniform or any other clothing displaying Company's or any of its Affiliates' names, logos or colors. You acknowledge and agree that you have complete discretion to provide services or otherwise engage in other business or employment activities.  For the sake of clarity, you understand that you retain the complete right to; (i) use other software application services in addition to the Uber Services; and (ii) engage in any other occupation or business. Company retains the right to deactivate or otherwise restrict you from accessing or using the Driver App or the Uber Services in the event of a violation or alleged violation of this Agreement, your disparagement of Company or any of its Affiliates, your act or omission that causes harm to Company's or its Affiliates' brand, reputation or business as determined by Company in its sole discretion.

2.5     **Ratings**.

    2.5.1   You acknowledge and agree that:  (a) after receiving Transportation Services, a User will be prompted by Uber's mobile application to provide a rating of you and such Transportation Services and, optionally, to provide comments or feedback about you and such Transportation Services; and (b) after providing Transportation Services, you will be prompted by the Driver App to provide a rating of the User and, optionally, to provide comments or feedback about the User. You shall provide your ratings and feedback in good faith.

    2.5.2   You acknowledge that Company desires that Users have access to high-quality services via Uber's mobile application. In order to continue to receive access to the Driver App and the Uber Services, you must maintain an average rating by Users that exceeds the minimum average acceptable rating established by Company for your Territory, as may be updated from time to time by Company in its sole discretion ("*Minimum Average Rating*"). Your average rating is intended to reflect Users' satisfaction with your

UBER_BARYSAS_0000232

Transportation Services rather than your compliance with any of Company's policies or recommendations. In the event your average rating falls below the Minimum Average Rating, Company will notify you and may provide you, in Company's discretion, a limited period of time to raise your average rating above the Minimum Average Rating. If you do not increase your average rating above the Minimum Average Rating within the time period allowed (if any), Company reserves the right to deactivate your access to the Driver App and the Uber Services. Additionally, you acknowledge that your repeated failure to accept User requests for Transportation Services while you are logged in to the Driver App creates a negative experience for Users of Uber's mobile application. If you do not wish to accept User requests for Transportation Services for a period of time, you agree that you will log off of the Driver App.

2.5.3   Company and its Affiliates reserve the right to use, share and display your and User ratings and comments in any manner in connection with the business of Company and its Affiliates without attribution to you or your approval. You acknowledge and agree that Company and its Affiliates are distributors (without any obligation to verify) and not publishers of your and User ratings and comments, provided that Company and its Affiliates reserve the right to edit or remove comments in the event that such comments include obscenities or other objectionable content, include an individual's name or other personal information, or violate any privacy laws, other applicable laws or Company's or its Affiliates' content policies.

2.6   **Devices**.

2.6.1   Company encourages you to use Your Device in providing Transportation Services. Otherwise, if you elect to use any Company Devices, Company will supply you upon request with Company Devices and provide the necessary wireless data plan for such Devices, provided that Company will require reimbursement from you for the costs associated with the wireless data plan of each Company Device and/or request a deposit for each Company Device. You agree that:  (a) Company Devices may only be used for the purpose of enabling your access to the Uber Services; and (b) Company Devices may not be transferred, loaned, sold or otherwise provided in any manner to any party other than you. Company Devices shall at all times remain the property of Company, and upon termination of this Agreement or your termination or deactivation, you agree to return to Company the applicable Company Devices within ten (10) days. You agree that failure to timely return any Company Devices, or damage to Company Devices outside of "normal wear and tear," will result in the forfeiture of related deposits.

2.6.2   If you elect to use Your Devices: (i) you are responsible for the acquisition, cost and maintenance of Your Devices as well as any necessary wireless data plan; and (ii) Company shall make available the Driver App for installation on Your Device. Company hereby grants you a personal, non-exclusive, non-transferable license to install and use the Driver App on Your Device solely for the purpose of providing Transportation Services.  You agree to not provide, distribute or share, or enable the provision, distribution or sharing of, the Driver App (or any data associated therewith) with any third party.  The foregoing license grant shall immediately terminate and you will delete and fully remove the Driver App from the Driver-Provided Device in the event that you cease to provide Transportation Services using Your Device. You agree that: (i) use of the Driver App on Your Device requires an active data plan with a wireless carrier associated with Your Device, which data plan will be provided by you at your own

expense; and (ii) use of the Driver App on Your Device as an interface with the Uber Services may consume very large amounts of data through the data plan. **COMPANY ADVISES THAT YOUR DEVICE ONLY BE USED UNDER A DATA PLAN WITH UNLIMITED OR VERY HIGH DATA USAGE LIMITS, AND COMPANY SHALL NOT BE RESPONSIBLE OR LIABLE FOR ANY FEES, COSTS, OR OVERAGE CHARGES ASSOCIATED WITH ANY DATA PLAN.**

2.7     **Location Based Services**. You acknowledge and agree that your geo-location information must be provided to the Uber Services via a Device in order to provide Transportation Services. You acknowledge and agree that:  (a) your geo-location information may be obtained  by the Uber Services while the Driver App is running; and (b) the approximate location of your Vehicle will be displayed to the User before and during the provision of Transportation Services to such User. In addition, Company and its Affiliates may monitor, track and share with third parties Driver's geo-location information obtained by the Driver App and Device for safety and security purposes.

## 3.   You and Your Vehicle

3.1     **Your Requirements**. You acknowledge and agree that at all times, you shall:  (a) hold and maintain (i) a valid driver's license with the appropriate level of certification to operate your Vehicle, and (ii) all licenses, permits, approvals and authority applicable to you that are necessary to provide passenger transportation services to third parties in the Territory; (b) possess the appropriate and current level of training, expertise and experience to provide Transportation Services in a professional manner with due skill, care and diligence; and (c) maintain high standards of professionalism, service and courtesy. You acknowledge and agree that you may be subject to certain background and driving record checks from time to time in order to qualify to provide, and remain eligible to provide, Transportation Services. You acknowledge and agree that Company reserves the right, at any time in Company's sole discretion, to deactivate or otherwise restrict you from accessing or using the Driver App or the Uber Services if you fail to meet the requirements set forth in this Agreement.

3.2     **Vehicle Requirements**. You acknowledge and agree that your Vehicle shall at all times be:  (a) properly registered and licensed to operate as a passenger transportation vehicle in the Territory; (b) owned or leased by you, or otherwise in your lawful possession; (c) suitable for performing the passenger transportation services contemplated by this Agreement; and (d) maintained in good operating condition, consistent with industry safety and maintenance standards for a Vehicle of its kind and any additional standards or requirements in the applicable Territory, and in a clean and sanitary condition.

3.3     **Documentation**. To ensure your compliance with all requirements in Sections 3.1 and 3.2 above, you must provide Company with written copies of all such licenses, permits, approvals, authority, registrations and certifications prior to your provision of any Transportation Services. Thereafter, you must submit to Company written evidence of all such licenses, permits, approvals, authority, registrations and certifications as they are renewed. Company shall, upon request, be entitled to review such licenses, permits, approvals, authority, registrations and certifications from time to time, and your failure to provide or maintain any of the foregoing shall constitute a material breach of this Agreement. Company reserves the right to independently verify your documentation from time to time in any way Company deems appropriate in its reasonable discretion.

## 4.   Financial Terms

4.1 **Fare Calculation and Your Payment**. You are entitled to charge a fare for each instance of completed Transportation Services provided to a User that are obtained via the Uber Services ("*Fare*"), where such Fare is calculated based upon a base fare amount plus distance (as determined by Company using location-based services enabled through the Device) and/or time amounts, as detailed at www.uber.com/cities for the applicable Territory ("*Fare Calculation*"). You acknowledge and agree that the Fare provided under the Fare Calculation is the only payment you will receive in connection with the provision of Transportation Services, and that neither the Fare nor the Fare Calculation includes any gratuity. You are also entitled to charge User for any Tolls, taxes or fees incurred during the provision of Transportation Services, if applicable. You: (i) appoint Company as your limited payment collection agent solely for the purpose of accepting the Fare, applicable Tolls and, depending on the region and/or if requested by you, applicable taxes and fees from the User on your behalf via the payment processing functionality facilitated by the Uber Services; and (ii) agree that payment made by User to Company (or to an Affiliate of Company acting as an agent of Company) shall be considered the same as payment made directly by User to you. In addition, the parties acknowledge and agree that as between you and Company, the Fare is a recommended amount, and the primary purpose of the pre-arranged Fare is to act as the default amount in the event you do not negotiate a different amount. You shall always have the right to: (i) charge a fare that is less than the pre-arranged Fare; or (ii) negotiate, at your request, a Fare that is lower than the pre-arranged Fare (each of (i) and (ii) herein, a "*Negotiated Fare*"). Company shall consider all such requests from you in good faith. Company agrees to remit, or cause to be remitted, to you on at least a weekly basis: (a) the Fare less the applicable Service Fee; (b) the Tolls; and (c) depending on the region, certain taxes and ancillary fees. If you have separately agreed that other amounts may be deducted from the Fare prior to remittance to you (*e.g.*, vehicle financing payments, lease payments, mobile device usage charges, etc.), the order of any such deductions from the Fare shall be determined exclusively by Company (as between you and Company).

4.2 **Changes to Fare Calculation**. Company reserves the right to change the Fare Calculation at any time in Company's discretion based upon local market factors, and Company will provide you with notice in the event of changes to the base fare, per mile, and/or per minute amounts that would result in a change in the recommended Fare. Continued use of the Uber Services after any such change in the Fare Calculation shall constitute your consent to such change.

4.3 **Fare Adjustment**. Company reserves the right to: (i) adjust the Fare for a particular instance of Transportation Services (*e.g.*, you took an inefficient route, you failed to properly end a particular instance of Transportation Services in the Driver App, technical error in the Uber Services, etc.); or (ii) cancel the Fare for a particular instance of Transportation Services (*e.g.*, User is charged for Transportation Services that were not provided, in the event of a User complaint, fraud, etc.). Company's decision to reduce or cancel the Fare in any such manner shall be exercised in a reasonable manner.

4.4 **Service Fee**. In consideration of Company's provision of the Driver App and the Uber Services for your use and benefit hereunder, you agree to pay Company a service fee on a per Transportation Services transaction basis calculated as a percentage of the Fare determined by the Fare Calculation (regardless of any Negotiated Fare), as provided to you via email or otherwise made available electronically by Company from time to time for the applicable Territory ("*Service Fee*"). In the event regulations applicable to your Territory require taxes to be calculated on the Fare, Company shall calculate the Service Fee based on the Fare net of such taxes. Company reserves the right to change the Service Fee at any time in Company's discretion

based upon local market factors, and Company will provide you with notice in the event of such change. Continued use of the Uber Services after any such change in the Service Fee calculation shall constitute your consent to such change.

4.5  **Cancellation Charges**. You acknowledge and agree that Users may elect to cancel requests for Transportation Services that have been accepted by you via the Driver App at any time prior to your arrival. In the event that a User cancels an accepted request for Transportation Services, Company may charge the User a cancellation fee on your behalf. If charged, this cancellation fee shall be deemed the Fare for the cancelled Transportation Services for the purpose of remittance to you hereunder ("*Cancellation Fee*"). The parties acknowledge and agree that as between you and Company, this Cancellation Fee is a recommended amount, and the primary purpose of such Cancellation Fee is to act as the default amount in the event you do not negotiate a different amount. You shall always have the right to: (i) charge a cancellation fee that is less than the Cancellation Fee; or (ii) negotiate, at your request, a cancellation fee that is lower than the Cancellation Fee (each of (i) and (ii) herein, a "*Negotiated Cancellation Fee*"). If charged, the Cancellation Fee (regardless of any Negotiated Cancellation Fee) shall be deemed the Fare for the cancelled Transportation Services for the purpose of remittance to you hereunder.

4.6  **Receipts**. As part of the Uber Services, Company provides you a system for the delivery of receipts to Users for Transportation Services rendered. Upon your completion of Transportation Services for a User, Company prepares an applicable receipt and issues such receipt to the User via email on your behalf. Such receipts are also provided to you via email or the online portal available to you through the Uber Services. Receipts include the breakdown of amounts charged to the User for Transportation Services and may include specific information about you, including your name, contact information and photo, as well as a map of the route you took. Any corrections to a User's receipt for Transportation Services must be submitted to Company in writing within three (3) business days after the completion of such Transportation Services. Absent such a notice, Company shall not be liable for any mistakes in or corrections to the receipt or for recalculation or disbursement of the Fare.

4.7  **No Additional Amounts**. You acknowledge and agree that, for the mutual benefit of the parties, through advertising and marketing, Company and its Affiliates may seek to attract new Users to Uber and to increase existing Users' use of Uber's mobile application. You acknowledge and agree such advertising or marketing does not entitle you to any additional monetary amounts beyond the amounts expressly set forth in this Agreement.

4.8  **Taxes**. You acknowledge and agree that you are required to: (a) complete all tax registration obligations and calculate and remit all tax liabilities related to your provision of Transportation Services as required by applicable law; and (b) provide Company with all relevant tax information. You further acknowledge and agree that you are responsible for taxes on your own income arising from the performance of Transportation Services. Notwithstanding anything to the contrary in this Agreement, Company may in its reasonable discretion based on applicable tax and regulatory considerations, collect and remit taxes resulting from your provision of Transportation Services and/or provide any of the relevant tax information you have provided pursuant to the foregoing requirements in this Section 4.8 directly to the applicable governmental tax authorities on your behalf or otherwise.

5.  **Proprietary Rights; License**

5.1    **License Grant**. Subject to the terms and conditions of this Agreement, Company hereby grants you a non-exclusive, non-transferable, non-sublicensable, non-assignable license, during the term of this Agreement, to use the Uber Services (including the Driver App on a Device) solely for the purpose of providing Transportation Services to Users and tracking resulting Fares and Fees. All rights not expressly granted to you are reserved by Company, its Affiliates and their respective licensors.

5.2    **Restrictions**. You shall not, and shall not allow any other party to:  (a) license, sublicense, sell, resell, transfer, assign, distribute or otherwise provide or make available to any other party the Uber Services, Driver App or any Company Device in any way; (b) modify or make derivative works based upon the Uber Services or Driver App; (c) improperly use the Uber Services or Driver App, including creating Internet "links" to any part of the Uber Services or Driver App, "framing" or "mirroring" any part of the Uber Services or Driver App on any other websites or systems, or "scraping" or otherwise improperly obtaining data from the Uber Services or Driver App; (d) reverse engineer, decompile, modify, or disassemble the Uber Services or Driver App, except as allowed under applicable law; or (e) send spam or otherwise duplicative or unsolicited messages. In addition, you shall not, and shall not allow any other party to, access or use the Uber Services or Driver App to:  (i) design or develop a competitive or substantially similar product or service; (ii) copy or extract any features, functionality, or content thereof; (iii) launch or cause to be launched on or in connection with the Uber Services an automated program or script, including web spiders, crawlers, robots, indexers, bots, viruses or worms, or any program which may make multiple server requests per second, or unduly burden or hinder the operation and/or performance of the Uber Services; or (iv) attempt to gain unauthorized access to the Uber Services or its related systems or networks.

5.3    **Ownership**. The Uber Services, Driver App and Company Data, including all intellectual property rights therein, and the Company Devices are and shall remain (as between you and Company) the property of Company, its Affiliates or their respective licensors. Neither this Agreement nor your use of the Uber Services, Driver App or Company Data conveys or grants to you any rights in or related to the Uber Services, Driver App or Company Data, except for the limited license granted above. Other than as specifically permitted by the Company in connection with the Uber Services, you are not permitted to use or reference in any manner Company's, its Affiliates', or their respective licensors' company names, logos, products and service names, trademarks, service marks, trade dress, copyrights or other indicia of ownership, alone and in combination with other letters, punctuation, words, symbols and/or designs (the "UBER Marks and Names") for any commercial purposes. You agree that you will not try to register or otherwise use and/or claim ownership in any of the UBER Marks and Names, alone or in combination with other letters, punctuation, words, symbols and/or designs, or in any confusingly similar mark, name or title, for any goods and services.

6.   **Confidentiality**

6.1    Each party acknowledges and agrees that in the performance of this Agreement it may have access to or may be exposed to, directly or indirectly, confidential information of the other party ("*Confidential Information*"). Confidential Information includes Company Data, Driver IDs, User Information, and the transaction volume, marketing and business plans, business, financial, technical, operational and such other non-public information of each party (whether disclosed in writing or verbally) that such party designates as being proprietary or confidential or of which the other party should reasonably know that it should be treated as confidential.

6.2     Each party acknowledges and agrees that:  (a) all Confidential Information shall remain the exclusive property of the disclosing party; (b) it shall not use Confidential Information of the other party for any purpose except in furtherance of this Agreement; (c) it shall not disclose Confidential Information of the other party to any third party, except to its employees, officers, contractors, agents and service providers ("*Permitted Persons*") as necessary to perform under this Agreement, provided Permitted Persons are bound in writing to obligations of confidentiality and non-use of Confidential Information no less protective than the terms hereof; and (d) it shall return or destroy all Confidential Information of the disclosing party, upon the termination of this Agreement or at the request of the other party (subject to applicable law and, with respect to Company, its internal record-keeping requirements).

6.3     Notwithstanding the foregoing, Confidential Information shall not include any information to the extent it:  (a) is or becomes part of the public domain through no act or omission on the part of the receiving party; (b) was possessed by the receiving party prior to the date of this Agreement without an obligation of confidentiality; (c) is disclosed to the receiving party by a third party having no obligation of confidentiality with respect thereto; or (d) is required to be disclosed pursuant to law, court order, subpoena or governmental authority, provided the receiving party notifies the disclosing party thereof and provides the disclosing party a reasonable opportunity to contest or limit such required disclosure.

7.  **Privacy**

7.1     **Disclosure of Your Information**. Subject to applicable law, Company and its Affiliates may, but shall not be required to, provide to you, a User, an insurance company and/or relevant authorities and/or regulatory agencies any information (including personal information (*e.g.*, information obtained about you through any background check) and any Company Data) about you or any Transportation Services provided hereunder if:  (a) there is a complaint, dispute or conflict, including an accident, between you and a User; (b) it is necessary to enforce the terms of this Agreement; (c) it is required, in Company's or any Affiliate's sole discretion, by applicable law or regulatory requirements (*e.g.*, Company or its Affiliates receive a subpoena, warrant, or other legal process for information); (d) it is necessary, in Company's or any Affiliate's sole discretion, to (1) protect the safety, rights, property or security of Company or its Affiliates, the Uber Services or any third party; (2) to protect the safety of the public for any reason including the facilitation of insurance claims related to the Uber Services;  (3) to detect, prevent or otherwise address fraud, security or technical issues;  (4) to prevent or stop activity which Company or any of its Affiliates, in their sole discretion, may consider to be, or to pose a risk of being, an illegal, unethical, or legally actionable activity); or (e) it is required or necessary, in Company's or any Affiliate's sole discretion, for insurance or other purposes related to your ability to qualify, or remain qualified, to use the Uber Services. You understand that Company may retain your personal data for legal, regulatory, safety and other necessary purposes after this Agreement is terminated.

7.2     Company and its Affiliates may collect your personal data during the course of your application for, and use of, the Uber Services, or may obtain information about you from third parties. Such information may be stored, processed, transferred, and accessed by Company and its Affiliates, third parties, and service providers for business purposes, including for marketing, lead generation, service development and improvement, analytics, industry and market research, and such other purposes consistent with Company's and its Affiliates' legitimate business needs. You expressly consent to such use of personal data.

8.  **Insurance**

8.1     You agree to maintain during the term of this Agreement on all Vehicles operated by you under this Agreement automobile liability insurance that provides protection against bodily injury and property damage to third parties at levels of coverage that satisfy the minimum requirements to operate a private passenger vehicle on the public roads within the Territory. This coverage must also include any no-fault coverage required by law in the Territory that may not be waived by an insured. You agree to provide Company and its Affiliates a copy of the insurance policy, policy declarations, proof of insurance identification card and proof of premium payment for the insurance policy required in this Section 8.1 upon request. Furthermore, you must provide Company with written notice of cancellation of any insurance policy required by Company. Company shall have no right to control your selection or maintenance of your policy. You must be a named insured or individually rated driver, for which a premium is charged, on the insurance policy required in this Section 8.1 at all times.

8.2     **You agree to maintain during the term of this Agreement workers' compensation insurance as required by all applicable laws in the Territory. If permitted by applicable law, you may choose to insure yourself against industrial injuries by maintaining occupational accident insurance in place of workers' compensation insurance. Furthermore, if permitted by applicable law, you may choose not to insure yourself against industrial injuries at all, but do so at your own risk.**

8.3     You understand and acknowledge that your personal automobile insurance policy may not afford liability, comprehensive, collision, medical payments, personal injury protection, uninsured motorist, underinsured motorist, or other coverage for the Transportation Services you provide pursuant to this Agreement. If you have any questions or concerns about the scope or applicability of your own insurance coverage, it is your responsibility, not that of Company, to resolve them with your insurer(s).

8.4     Company may maintain during the term of this Agreement insurance related to your provision of Transportation Services as determined by Company in its reasonable discretion or as described in a City Addendum, provided that Company and its Affiliates are not required to provide you with any specific insurance coverage for any loss to you or your Vehicle. You are required to promptly notify Company of any accidents that occur while providing Transportation Services and to cooperate and provide all necessary information related thereto.

9.    **Representations and Warranties; Disclaimers**

9.1     **By You**. You hereby represent and warrant that: (a) you have full power and authority to enter into this Agreement and perform your obligations hereunder; (b) you have not entered into, and during the term will not enter into, any agreement that would prevent you from complying with this Agreement; and (c) you will comply with all applicable laws in your performance of this Agreement, including holding and complying with all permits, licenses, registrations and other governmental authorizations necessary to provide (i) Transportation Services using the Vehicles pursuant to this Agreement, and (ii) passenger transportation services to third parties in the Territory generally.

9.2     **Disclaimer of Warranties**. COMPANY AND ITS AFFILIATES PROVIDE, AND YOU ACCEPT, THE UBER SERVICES, DRIVER APP AND THE COMPANY DEVICES ON AN "AS IS" AND "AS AVAILABLE" BASIS. COMPANY AND ITS AFFILIATES DO NOT REPRESENT, WARRANT OR GUARANTEE THAT YOUR ACCESS TO OR USE OF THE UBER SERVICES, DRIVER APP OR THE COMPANY DEVICES: (A) WILL BE UNINTERRUPTED OR ERROR FREE; OR (B) WILL RESULT IN ANY REQUESTS FOR TRANSPORTATION

UBER_BARYSAS_0000239

SERVICES. COMPANY AND ITS AFFILIATES FUNCTION AS AN ON-DEMAND LEAD GENERATION AND RELATED SERVICE ONLY AND MAKE NO REPRESENTATIONS, WARRANTIES OR GUARANTEES AS TO THE ACTIONS OR INACTIONS OF THE USERS WHO MAY REQUEST OR RECEIVE TRANSPORTATION SERVICES FROM YOU, AND COMPANY AND ITS AFFILIATES DO NOT SCREEN OR OTHERWISE EVALUATE USERS. BY USING THE UBER SERVICES AND DRIVER APP, YOU ACKNOWLEDGE AND AGREE THAT YOU MAY BE INTRODUCED TO A THIRD PARTY THAT MAY POSE HARM OR RISK TO YOU OR OTHER THIRD PARTIES. YOU ARE ADVISED TO TAKE REASONABLE PRECAUTIONS WITH RESPECT TO INTERACTIONS WITH THIRD PARTIES ENCOUNTERED IN CONNECTION WITH THE USE OF THE UBER SERVICES OR DRIVER APP.NOTWITHSTANDING COMPANY'S APPOINTMENT AS THE LIMITED PAYMENT COLLECTION AGENT OF YOU FOR THE PURPOSE OF ACCEPTING PAYMENT FROM USERS ON YOUR BEHALF AS SET FORTH IN SECTION 4 ABOVE, COMPANY AND ITS AFFILIATES EXPRESSLY DISCLAIM ALL LIABILITY FOR ANY ACT OR OMISSION OF YOU, ANY USER OR OTHER THIRD PARTY.

9.3   **No Service Guarantee**. COMPANY AND ITS AFFILIATES DO NOT GUARANTEE THE AVAILABILITY OR UPTIME OF THE UBER SERVICES OR DRIVER APP. YOU ACKNOWLEDGE AND AGREE THAT THE UBER SERVICES OR DRIVER APP MAY BE UNAVAILABLE AT ANY TIME AND FOR ANY REASON (*e.g.*, DUE TO SCHEDULED MAINTENANCE OR NETWORK FAILURE). FURTHER, THE UBER SERVICES OR DRIVER APP MAY BE SUBJECT TO LIMITATIONS, DELAYS, AND OTHER PROBLEMS INHERENT IN THE USE OF THE INTERNET AND ELECTRONIC COMMUNICATIONS, AND COMPANY AND ITS AFFILIATES ARE NOT RESPONSIBLE FOR ANY DELAYS, DELIVERY FAILURES, OR OTHER DAMAGES, LIABILITIES OR LOSSES RESULTING FROM SUCH PROBLEMS.

10.   **Indemnification**. You shall indemnify, defend (at Company's option) and hold harmless Company and its Affiliates and their respective officers, directors, employees, agents, successors and assigns from and against any and all liabilities, expenses (including legal fees), damages, penalties, fines, social security contributions and taxes arising out of or related to:  (a) your breach of your representations, warranties or obligations under this Agreement; or (b) a claim by a third party (including Users, regulators and governmental authorities) directly or indirectly related to your provision of Transportation Services or use of the Uber Services. This indemnification provision shall not apply to your breach of any representations regarding your status as an independent contractor.

11.   **Limits of Liability.**  COMPANY AND ITS AFFILIATES SHALL NOT BE LIABLE UNDER OR RELATED TO THIS AGREEMENT FOR ANY OF THE FOLLOWING, WHETHER BASED ON CONTRACT, TORT OR ANY OTHER LEGAL THEORY, EVEN IF A PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES:  (i) ANY INCIDENTAL, PUNITIVE, SPECIAL, EXEMPLARY, CONSEQUENTIAL, OR OTHER INDIRECT DAMAGES OF ANY TYPE OR KIND; OR (ii) YOUR OR ANY THIRD PARTY'S PROPERTY DAMAGE, OR LOSS OR INACCURACY OF DATA, OR LOSS OF BUSINESS, REVENUE, PROFITS, USE OR OTHER ECONOMIC ADVANTAGE. EXCEPT FOR COMPANY'S OBLIGATIONS TO PAY AMOUNTS DUE TO YOU PURSUANT TO SECTION 4 ABOVE, BUT SUBJECT TO ANY LIMITATIONS OR OTHER PROVISIONS CONTAINED IN THIS AGREEMENT WHICH ARE APPLICABLE THERETO, IN NO EVENT SHALL THE LIABILITY OF COMPANY OR ITS AFFILIATES UNDER THIS AGREEMENT EXCEED THE AMOUNT OF SERVICE FEES ACTUALLY PAID TO OR DUE TO COMPANY HEREUNDER IN THE SIX (6) MONTH PERIOD IMMEDIATELY PRECEDING THE EVENT GIVING RISE TO SUCH CLAIM.

12.   **Term and Termination**

12.1   **Term**.  This Agreement shall commence on the date accepted by you and shall continue until terminated as set forth herein.

12.2 **Termination**. Either party may terminate this Agreement:  (a) without cause at any time upon seven (7) days prior written notice to the other party; (b) immediately, without notice, for the other party's material breach of this Agreement; or (c) immediately, without notice, in the event of the insolvency or bankruptcy of the other party, or upon the other party's filing or submission of request for suspension of payment (or similar action or event) against the terminating party. In addition, Company may terminate this Agreement or deactivate your Driver ID immediately, without notice, with respect to you in the event you no longer qualify, under applicable law or the standards and policies of Company and its Affiliates, to provide Transportation Services or to operate the Vehicle, or as otherwise set forth in this Agreement.

12.3 **Effect of Termination**. Upon termination of the Agreement, you shall:  (a) promptly return to Company all Company Devices; and (b) immediately delete and fully remove the Driver App from any of Your Devices. Outstanding payment obligations and Sections 1, 2.3, 2.5.3, 4.7, 4.8, 5.3, 6, 7, 9, 10, 11, 12.3, 13, 14 and 15 shall survive the termination of this Agreement.

13. **Relationship of the Parties**

13.1 **Except as otherwise expressly provided herein with respect to Company acting as the limited payment collection agent solely for the purpose of collecting payment from Users on your behalf, the relationship between the parties under this Agreement is solely that of independent contracting parties. The parties expressly agree that: (a) this Agreement is not an employment agreement, nor does it create an employment relationship, between Company and you; and (b) no joint venture, partnership, or agency relationship exists between Company and you.**

13.2 You have no authority to bind Company or its Affiliates and you undertake not to hold yourself out as an employee, agent or authorized representative of Company or its Affiliates. Where, by implication of mandatory law or otherwise, you may be deemed an agent or representative of Company, you undertake and agree to indemnify, defend (at Company's option) and hold Company and its Affiliates harmless from and against any claims by any person or entity based on such implied agency or representative relationship.

14. **Miscellaneous Terms**

14.1 **Modification**.  In the event Company modifies the terms and conditions of this Agreement at any time, such modifications shall be binding on you only upon your acceptance of the modified Agreement. Company reserves the right to modify any information referenced at hyperlinks from this Agreement from time to time. You hereby acknowledge and agree that, by using the Uber Services, or downloading, installing or using the Driver App, you are bound by any future amendments and additions to information referenced at hyperlinks herein, or documents incorporated herein, including with respect to Fare Calculations. Continued use of the Uber Services or Driver App after any such changes shall constitute your consent to such changes. Unless changes are made to the arbitration provisions herein, you acknowledge and agree that modification of this Agreement does not create a renewed opportunity to opt out of arbitration.

14.2 **Supplemental Terms**. Supplemental terms may apply to your use of the Uber Services, such as use policies or terms related to certain features and functionality, which may be modified from time to time ("*Supplemental Terms*"). You may be presented with certain Supplemental Terms from time to time. Supplemental Terms are in addition to, and shall be deemed a part of, this Agreement. Supplemental Terms shall prevail over this Agreement in the event of a conflict.

UBER_BARYSAS_0000241

14.3 **Severability**. If any provision of this Agreement is or becomes invalid or non-binding, the parties shall remain bound by all other provisions hereof. In that event, the parties shall replace the invalid or non-binding provision with provisions that are valid and binding and that have, to the greatest extent possible, a similar effect as the invalid or non-binding provision, given the contents and purpose of this Agreement.

14.4 **Assignment**. Neither party shall assign or transfer this Agreement or any of its rights or obligations hereunder, in whole or in part, without the prior written consent of the other party; provided that Company may assign or transfer this Agreement or any or all of its rights or obligations under this Agreement from time to time without consent:  (a) to an Affiliate; or (b) to an acquirer of all or substantially all of Company's business, equity or assets.

14.5 **Entire Agreement**. This Agreement, including all Supplemental Terms, constitutes the entire agreement and understanding of the parties with respect to its subject matter and replaces and supersedes all prior or contemporaneous agreements or undertakings regarding such subject matter. In this Agreement, the words "including" and "include" mean "including, but not limited to." The recitals form a part of this Agreement.

14.6 **No Third Party Beneficiaries**. There are no third party beneficiaries to this Agreement, except as expressly set forth in the Arbitration Provision in Section 15.3. Nothing contained in this Agreement is intended to or shall be interpreted to create any third-party beneficiary claims.

14.7 **Notices**.  Any notice delivered by Company to you under this Agreement will be delivered by email to the email address associated with your account or by posting on the portal available to you on the Uber Services. Any notice delivered by you to Company under this Agreement will be delivered by contacting Company at http://partners.uber.com in the "Contact Us" section. Additional Territory-specific notices may be required from time to time.

## 15. Governing Law; Arbitration

15.1 The choice of law provisions contained in this Section 15.1 do not apply to the arbitration clause contained in Section 15.3, such arbitration clause being governed by the Federal Arbitration Act. Accordingly, and except as otherwise stated in Section 15.3, the interpretation of this Agreement shall be governed by California law, without regard to the choice or conflicts of law provisions of any jurisdiction.  Any disputes, actions, claims or causes of action arising out of or in connection with this Agreement or the Uber Services that are not subject to the arbitration clause contained in Section 15.3 shall be subject to the exclusive jurisdiction of the state and federal courts located in the City and County of San Francisco, California. However, neither the choice of law provision regarding the interpretation of this Agreement nor the forum selection provision is intended to create any other substantive right to non-Californians to assert claims under California law whether that be by statute, common law, or otherwise. These provisions, and except as otherwise provided in Section 15.3, are only intended to specify the use of California law to interpret this Agreement and the forum for disputes asserting a breach of this Agreement, and these provisions shall not be interpreted as generally extending California law to you if you do not otherwise reside or provide services in California. The foregoing choice of law and forum selection provisions do not apply to the arbitration clause in Section 15.3 or to any arbitrable disputes as defined therein.  Instead, as described in Section 15.3, the Federal Arbitration Act shall apply to any such disputes.  The failure of Company to enforce any right or provision in this Agreement shall not constitute a waiver of such right or provision unless

acknowledged and agreed to by Uber in writing.

15.2    Other than disputes regarding the intellectual property rights of the parties and other claims identified in Section 15.3.ii, any disputes, actions, claims or causes of action arising out of or in connection with this Agreement or the Uber Services shall be subject to arbitration pursuant to Section 15.3.

**15.3    Arbitration Provision**

Important Note Regarding this Arbitration Provision:

- Except as provided below, arbitration does not limit or affect the legal claims you may bring against the Company.  Agreeing to arbitration only affects where any such claims may be brought and how they will be resolved.

- Arbitration is a process of private dispute resolution that does not involve the civil courts, a civil judge, or a jury.  Instead, the parties' dispute is decided by a private arbitrator selected by the parties using the process set forth herein.  Other arbitration rules and procedures are also set forth herein.

- Unless the law requires otherwise, as determined by the Arbitrator based upon the circumstances presented, you will be required to split the cost of any arbitration with the Company.

- IMPORTANT: This Arbitration Provision will require you to resolve any claim that you may have against the Company or Uber on an individual basis, except as provided below, pursuant to the terms of the Agreement unless you choose to opt out of the Arbitration Provision.  Except as provided below, this provision will preclude you from bringing any class, collective, or representative action (other than actions under the Private Attorneys General Act of 2004 ("PAGA"), California Labor Code § 2698 et seq. ("PAGA")) against the Company or Uber, and also precludes you from participating in or recovering relief under any current or future class, collective, or representative (non-PAGA) action brought against the Company or Uber by someone else.

    o ***Cases have been filed against Company or Uber and may be filed in the future involving claims by users of the Service, including by drivers.  You should assume that there are now, and may be in the future, lawsuits against the Company or Uber alleging class, collective, and/or representative (non-***

*PAGA) claims on your behalf, including but not limited to claims for tips, reimbursement of expenses, and employment status.  Such claims, if successful, could result in some monetary recovery to you.  (THESE CASES NOW INCLUDE, FOR EXAMPLE, YUCESOY ET AL. V. UBER TECHNOLOGIES, INC., ET AL., CASE NO. 3:15-CV-00262(NORTHERN DISTRICT OF CALIFORNIA); IN RE UBER FCRA LITIGATION, CASE NO. 14-CV-05200-EMC (NORTHERN DISTRICT OF CALIFORNIA); AND O'CONNOR  V. UBER TECHNOLOGIES, INC., ET AL., CASE NO. CV 13-03826-EMC (NORTHERN DISTRICT OF CALIFORNIA).The contact information for plaintiffs' counsel in the O'Connor matter is as follows: Shannon Liss-Riordan, Lichten & Liss-Riordan, P.C., 100 Cambridge Street, 20th Floor, Boston, MA 02114, Telephone: (617) 994-5800, Fax: (617) 994-5801, email: sliss@llrlaw.com.)*

o   The mere existence of such class, collective, and/or representative lawsuits, however, does not mean that such lawsuits will ultimately succeed.  But if you do agree to arbitration with the Company, you are agreeing in advance, except as otherwise provided, that you will not participate in and, therefore, will not seek to recover monetary or other relief under any such class, collective, and/or representative (non-PAGA) lawsuit, except as provided below.

o   However, as discussed above and except as provided below, if you agree to arbitration, you will not be precluded from bringing your claims against the Company or Uber in an individual arbitration proceeding. If successful on such claims, you could be awarded money or other relief by an arbitrator (subject to splitting the cost of arbitration as mentioned above).

WHETHER TO AGREE TO ARBITRATION IS AN IMPORTANT BUSINESS DECISION. IT IS YOUR DECISION TO MAKE, AND YOU SHOULD NOT RELY SOLELY UPON THE INFORMATION PROVIDED IN THIS AGREEMENT AS IT IS NOT INTENDED TO CONTAIN A COMPLETE EXPLANATION OF THE CONSEQUENCES OF ARBITRATION.  YOU SHOULD TAKE REASONABLE STEPS TO CONDUCT FURTHER

UBER_BARYSAS_0000244

**RESEARCH AND TO CONSULT WITH OTHERS — INCLUDING BUT NOT LIMITED TO AN ATTORNEY — REGARDING THE CONSEQUENCES OF YOUR DECISION, JUST AS YOU WOULD WHEN MAKING ANY OTHER IMPORTANT BUSINESS OR LIFE DECISION.**

      i.     <u>How This Arbitration Provision Applies</u>.

This Arbitration Provision is governed by the Federal Arbitration Act, 9 U.S.C. § 1 et seq. (the "FAA") and evidences a transaction involving interstate commerce.  This Arbitration Provision applies to any dispute arising out of or related to this Agreement or termination of the Agreement and survives after the Agreement terminates.  Nothing contained in this Arbitration Provision shall be construed to prevent or excuse you from utilizing any informal procedure for resolution of complaints established in this Agreement (if any), and this Arbitration Provision is not intended to be a substitute for the utilization of such procedures.

**Except as it otherwise provides, this Arbitration Provision is intended to apply to the resolution of disputes that otherwise would be resolved in a court of law or before any forum other than arbitration, with the exception of proceedings that must be exhausted under applicable law before pursuing a claim in a court of law or in any forum other than arbitration.  Except as it otherwise provides, this Arbitration Provision requires all such disputes to be resolved only by an arbitrator through final and binding arbitration on an individual basis only and not by way of court or jury trial, or by way of class, collective, or representative action.**

Except as provided in Section 15.3(v), below, regarding the Class Action Waiver, such disputes include without limitation disputes arising out of or relating to interpretation or application of this Arbitration Provision, including the enforceability, revocability or validity of the Arbitration Provision or any portion of the Arbitration Provision.  All such matters shall be decided by an Arbitrator and not by a court or judge. However, as set forth below, the preceding sentences shall not apply to disputes relating to the interpretation or application of the Class Action Waiver or PAGA Waiver below, including their enforceability, revocability or validity.

Except as it otherwise provides, this Arbitration Provision also applies, without limitation, to all disputes between You and the Company or Uber, as well as all disputes between You and the Company's or Uber's fiduciaries, administrators, affiliates, subsidiaries, parents, and all successors and assigns of any of them, including but not limited to any disputes arising out of or related to this Agreement and disputes arising out of or related to your relationship with the Company, including termination of the relationship.  This Arbitration Provision also applies, without limitation, to disputes regarding any city, county, state or federal wage-hour law, trade secrets, unfair competition, compensation, breaks and rest periods, expense reimbursement, termination, harassment and claims arising under the Uniform Trade Secrets Act, Civil Rights Act of 1964, Americans With Disabilities Act, Age Discrimination in Employment Act, Family Medical Leave Act, Fair Labor Standards Act, Employee Retirement Income Security Act (except for individual claims for employee benefits under any benefit plan sponsored by the Company and covered by the Employee Retirement Income Security Act of 1974 or funded by insurance), Genetic Information Non-Discrimination Act, and state statutes, if any, addressing the same or similar subject matters, and all other similar federal and state statutory and common law claims.

UBER_BARYSAS_0000245

This Agreement is intended to require arbitration of every claim or dispute that lawfully can be arbitrated, except for those claims and disputes which by the terms of this Agreement are expressly excluded from the Arbitration Provision.

Uber Technologies, Inc. is an intended, third party beneficiary of this Agreement.

ii.   <u>Limitations On How This Agreement Applies</u>.

The disputes and claims set forth below shall not be subject to arbitration and the requirement to arbitrate set forth in this Arbitration Provision shall not apply:

A representative action brought on behalf of others under the Private Attorneys General Act of 2004 ("PAGA"), California Labor Code § 2698 et seq., to the extent waiver of such a claim is deemed unenforceable by a court of competent jurisdiction;

Claims for workers compensation, state disability insurance and unemployment insurance benefits;

Regardless of any other terms of this Agreement, nothing prevents you from making a report to or filing a claim or charge with the Equal Employment Opportunity Commission, U.S. Department of Labor, Securities Exchange Commission, National Labor Relations Board, or Office of Federal Contract Compliance Programs, and nothing in this Agreement or Arbitration Provision prevents the investigation by a government agency of any report, claim or charge otherwise covered by this Arbitration Provision. Nothing in this Arbitration Provision shall be deemed to preclude or excuse a party from bringing an administrative claim before any agency in order to fulfill the party's obligation to exhaust administrative remedies before making a claim in arbitration;

Disputes that may not be subject to a predispute arbitration agreement pursuant to applicable Federal law or Executive Order are excluded from the coverage of this Arbitration Provision;

Disputes regarding your, the Company's, or Uber's intellectual property rights;

This Arbitration Provision shall not be construed to require the arbitration of any claims against a contractor that may not be the subject of a mandatory arbitration agreement as provided by section 8116 of the Department of Defense ("DoD") Appropriations Act for Fiscal Year 2010 (Pub. L. 111-118), section 8102 of the Department of Defense ("DoD") Appropriations Act for Fiscal Year 2011 (Pub. L. 112-10, Division A), and their implementing regulations, or any successor DoD appropriations act addressing the arbitrability of claims.

iii.   <u>Selecting The Arbitrator and Location of the Arbitration</u>.

The Arbitrator shall be selected by mutual agreement of the Company and you.  Unless you and the Company mutually agree otherwise, the Arbitrator shall be an attorney licensed to practice in the location where the arbitration proceeding will be conducted or a retired federal or state judicial officer who presided in the jurisdiction where the arbitration will be conducted.  If the Parties cannot agree on an Arbitrator, then an arbitrator will be selected using the alternate strike method from a list of five (5) neutral arbitrators provided by JAMS (Judicial Arbitration & Mediation Services).  You will have the option of making the first strike.  If a JAMS arbitrator is used, then the JAMS Streamlined Arbitration Rules & Procedures rules will apply; however, if there is a conflict between the JAMS Rules and this Agreement, this Agreement shall govern. Those rules are available here:

http://www.jamsadr.com/rules-streamlined-arbitration/

The location of the arbitration proceeding shall be no more than 45 miles from the place where you last provided transportation services under this Agreement, unless each party to the arbitration agrees in writing otherwise.

      iv.   Starting The Arbitration.

All claims in arbitration are subject to the same statutes of limitation that would apply in court.  The party bringing the claim must demand arbitration in writing and deliver the written demand by hand or first class mail to the other party within the applicable statute of limitations period.  The demand for arbitration shall include identification of the Parties, a statement of the legal and factual basis of the claim(s), and a specification of the remedy sought. Any demand for arbitration made to the Company or Uber shall be provided to Legal, Rasier, LLC, 1455 Market St., Ste. 400, San Francisco CA 94103.  The arbitrator shall resolve all disputes regarding the timeliness or propriety of the demand for arbitration. A party may apply to a court of competent jurisdiction for temporary or preliminary injunctive relief in connection with an arbitrable controversy, but only upon the ground that the award to which that party may be entitled may be rendered ineffectual without such provisional relief.

      v.   How Arbitration Proceedings Are Conducted.

In arbitration, the Parties will have the right to conduct adequate civil discovery, bring dispositive motions, and present witnesses and evidence as needed to present their cases and defenses, and any disputes in this regard shall be resolved by the Arbitrator.

**You and the Company agree to resolve any dispute that is in arbitration on an individual basis only, and not on a class, collective action, or representative basis ("Class Action Waiver"). The Arbitrator shall have no authority to consider or resolve any claim or issue any relief on any basis other than an individual basis. The Arbitrator shall have no authority to consider or resolve any claim or issue any relief on a class, collective, or representative basis.** Notwithstanding any other provision of this Agreement, the Arbitration Provision or the JAMS Streamlined Arbitration Rules & Procedures, disputes regarding the enforceability, revocability or validity of the Class Action Waiver may be resolved only by a civil court of competent jurisdiction and not by an arbitrator. In any case in which (1) the dispute is filed as a class, collective, or representative  action and (2) there is a final judicial determination that all or part of the Class Action Waiver unenforceable, the class, collective, and/or representative action to that extent must be litigated in a civil court of competent jurisdiction, but the portion of the Class Action Waiver that is enforceable shall be enforced in arbitration.

While the Company will not take any retaliatory action in response to any exercise of rights you may have under Section 7 of the National Labor Relations Act, if any, the Company shall not be precluded from moving to enforce its rights under the FAA to compel arbitration on the terms and conditions set forth in this Agreement.

**Private Attorneys General Act.**

Notwithstanding any other provision of this Agreement or the Arbitration Provision, to the extent permitted by law, (1) **You and Company agree not to bring a representative action on behalf of others under the Private Attorneys General Act of 2004 ("PAGA"), California Labor Code § 2698 et seq., in any court or in arbitration**, and (2) for any claim brought on a private attorney general basis—i.e., where

you are seeking to pursue a claim on behalf of a government entity—both you and Company agree that any such dispute shall be resolved in arbitration on an individual basis only (i.e., to resolve whether you have personally been aggrieved or subject to any violations of law), and that such an action may not be used to resolve the claims or rights of other individuals in a single or collective proceeding (i.e., to resolve whether other individuals have been aggrieved or subject to any violations of law) ("PAGA Waiver"). Notwithstanding any other provision of this Agreement or the Arbitration Provision, the validity of the PAGA Waiver may be resolved only by a civil court of competent jurisdiction and not by an arbitrator. If any provision of the PAGA Waiver is found to be unenforceable or unlawful for any reason, (1) the unenforceable provision shall be severed from this Agreement; (2) severance of the unenforceable provision shall have no impact whatsoever on the Arbitration Provision or the Parties' attempt to arbitrate any remaining claims on an individual basis pursuant to the Arbitration Provision; and (3) any representative action brought under PAGA on behalf of others must be litigated in a civil court of competent jurisdiction and not in arbitration. To the extent that there are any claims to be litigated in a civil court of competent jurisdiction because a civil court of competent jurisdiction determines that the PAGA Waiver is unenforceable with respect to those claims, the Parties agree that litigation of those claims shall be stayed pending the outcome of any individual claims in arbitration.

vi.    Paying For The Arbitration.

Each party will pay the fees for his, her or its own attorneys, subject to any remedies to which that party may later be entitled under applicable law (i.e., a party prevails on a claim that provides for the award of reasonable attorney fees to the prevailing party).  In all cases where required by law, the Company will pay the Arbitrator's and arbitration fees. If under applicable law the Company is not required to pay all of the Arbitrator's and/or arbitration fees, such fee(s) will be apportioned equally between the Parties or as otherwise required by applicable law. However, you will not be required to bear any type of fee or expense that you would not be required to bear if you had filed the action in a court of law.  Any disputes in that regard will be resolved by the Arbitrator as soon as practicable after the Arbitrator is selected, and Company shall bear all of the Arbitrator's and arbitration fees until such time as the Arbitrator resolves any such dispute.

vii.   The Arbitration Hearing And Award.

The Parties will arbitrate their dispute before the Arbitrator, who shall confer with the Parties regarding the conduct of the hearing and resolve any disputes the Parties may have in that regard.  Within 30 days of the close of the arbitration hearing, or within a longer period of time as agreed to by the Parties or as ordered by the Arbitrator, any party will have the right to prepare, serve on the other party and file with the Arbitrator a brief.  The Arbitrator may award any party any remedy to which that party is entitled under applicable law, but such remedies shall be limited to those that would be available to a party in his or her individual capacity in a court of law for the claims presented to and decided by the Arbitrator, and no remedies that otherwise would be available to an individual in a court of law will be forfeited by virtue of this Arbitration Provision.  The Arbitrator will issue a decision or award in writing, stating the essential findings of fact and conclusions of law.  A court of competent jurisdiction shall have the authority to enter a judgment upon the award made pursuant to the arbitration.  The Arbitrator shall not have the power to commit errors of law or legal reasoning, and the award may be vacated or corrected on appeal to a court of competent jurisdiction for any such error.

UBER_BARYSAS_0000248

viii.    **Your Right To Opt Out Of Arbitration.**

Arbitration is not a mandatory condition of your contractual relationship with the Company. If you do not want to be subject to this Arbitration Provision, you may opt out of this Arbitration Provision by notifying the Company in writing of your desire to opt out of this Arbitration Provision, either by (1) sending, within 30 days of the date this Agreement is executed by you, electronic mail to optout@uber.com, stating your name and intent to opt out of the Arbitration Provision or (2) by sending a letter by U.S. Mail, or by any nationally recognized delivery service (e.g, UPS, Federal Express, etc.), or by hand delivery to:

> Legal
> Rasier, LLC
> 1455 Market St., Ste. 400
> San Francisco CA 94103

In order to be effective, the letter under option (2) must clearly indicate your intent to opt out of this Arbitration Provision, and must be dated and signed. The envelope containing the signed letter must be received (if delivered by hand) or post-marked within 30 days of the date this Agreement is executed by you. Your writing opting out of this Arbitration Provision, whether sent by (1) or (2), will be filed with a copy of this Agreement and maintained by the Company. Should you not opt out of this Arbitration Provision within the 30-day period, you and the Company shall be bound by the terms of this Arbitration Provision. You have the right to consult with counsel of your choice concerning this Arbitration Provision. You understand that you will not be subject to retaliation if you exercise your right to assert claims or opt-out of coverage under this Arbitration Provision.

ix.    **Full and Complete Agreement Related to Formal Resolution of Disputes; Enforcement Of This Agreement.**

This Arbitration Provision is the full and complete agreement relating to the formal resolution of disputes arising out of this Agreement. Except as stated in subsection v, above, in the event any portion of this Arbitration Provision is deemed unenforceable, the remainder of this Arbitration Provision will be enforceable.

By clicking "I accept", you expressly acknowledge that you have read, understood, and taken steps to thoughtfully consider the consequences of this Agreement, that you agree to be bound by the terms and conditions of the Agreement, and that you are legally competent to enter into this Agreement with Company.

UBER_BARYSAS_0000249

**UBER USA, LLC**

**TECHNOLOGY SERVICES AGREEMENT**

Last update: December 11, 2015

This Technology Services Agreement ("*Agreement*") constitutes a legal agreement between an independent company in the business of providing transportation services ("*Customer*" or "*You*") and Uber USA, LLC, a limited liability company ("*Uber*").

Uber provides the Uber Services (as defined below) for the purpose of providing lead generation to transportation services providers. The Uber Services enable an authorized transportation provider to seek, receive and fulfill requests for transportation services from an authorized user of Uber's mobile application.

Customer is authorized to provide transportation services in the state(s) and jurisdiction(s) in which it operates, and it desires to enter into this Agreement for the purpose of accessing and using the Uber Services to enhance its transportation business.

**Customer acknowledges and agrees that Uber is a technology services provider that does not provide transportation services, function as a transportation carrier, nor operate as a broker for the transportation of passengers.**

In order to use the Uber Services, Customer must agree to the terms and conditions that are set forth below. Upon Customer's execution (electronic or otherwise) of this Agreement, Customer and Uber shall be bound by the terms and conditions set forth herein.

**IMPORTANT: PLEASE NOTE THAT TO USE THE UBER SERVICES AND THE ASSOCIATED SOFTWARE, YOU MUST AGREE TO THE TERMS AND CONDITIONS SET FORTH BELOW. PLEASE REVIEW THE ARBITRATION PROVISION SET FORTH BELOW IN SECTION 15.3 CAREFULLY, AS IT WILL REQUIRE YOU TO RESOLVE DISPUTES WITH UBER ON AN INDIVIDUAL BASIS, EXCEPT AS PROVIDED IN SECTION 15.3, THROUGH FINAL AND BINDING ARBITRATION UNLESS YOU CHOOSE TO OPT OUT OF THE ARBITRATION PROVISION.  BY VIRTUE OF YOUR ELECTRONIC EXECUTION OF THIS AGREEMENT, YOU WILL BE ACKNOWLEDGING THAT YOU HAVE READ AND UNDERSTOOD ALL OF THE TERMS OF THIS AGREEMENT (INCLUDING SECTION 15.3) AND HAVE TAKEN TIME TO CONSIDER THE CONSEQUENCES OF THIS IMPORTANT BUSINESS DECISION.  IF YOU DO NOT WISH TO BE SUBJECT TO ARBITRATION, YOU MAY OPT OUT OF THE ARBITRATION PROVISION BY FOLLOWING THE INSTRUCTIONS PROVIDED IN SECTION 15.3 BELOW.**

UBER_BARYSAS_0000196

## 1. Definitions

1.1.  *"Affiliate"* means an entity that, directly or indirectly, controls, is under the control of, or is under common control with a party, where control means having more than fifty percent (50%) of the voting stock or other ownership interest or the majority of the voting rights of such entity.

1.2.  *"City Addendum"* means an addendum to this Agreement or supplemental information setting forth additional Territory-specific terms, as made available and as updated by Uber from time to time.

1.3.  *"Device"* means an Uber Device or Driver-Provided Device, as the case may be.

1.4.  *"Driver"* means a principal, employee or contractor of Customer: (a) who meets the then-current Uber requirements to be an active driver using the Uber Services; (b) whom Uber authorizes to access the Uber Services to provide Transportation Services on behalf of Customer; and (c) who has entered into the Driver Addendum.

1.5.  *"Driver Addendum"* means the terms and conditions that Customer is required to enter into with a Driver prior to such Driver providing Transportation Services on behalf of Customer (as may be updated by Uber from time to time).

1.6.  *"Driver App"* means Uber's mobile application that enables transportation providers to access the Uber Services for the purpose of seeking, receiving and fulfilling on-demand requests for transportation services by Users, as may be updated or modified by Uber at its discretion from time to time.

1.7.  *"Driver ID"* means the identification and password key assigned by Uber to a Driver that enables a Driver to use and access the Driver App.

1.8.  *"Driver-Provided Device"* means a mobile device owned or controlled by Customer or a Driver: (a) that meets the then-current Uber specifications for mobile devices as set forth at www.uber.com/byod-devices; and (b) on which the Driver App has been installed as authorized by Uber solely for the purpose of providing Transportation Services.

1.9.  *"Fare"* has the meaning set forth in Section 4.1.

1.10.  *"Service Fee"* has the meaning set forth in Section 4.4.

1.11.  *"Taxi Services"* has the meaning set forth in Section 3.1.

1.12.  *"Territory"* means the city or metro areas in the United States in which Customer and its Drivers are enabled by the Driver App to receive requests for Transportation Services.

1.13.  *"Tolls"* means any applicable road, bridge, ferry, tunnel and airport charges and fees, including inner-city congestion, environmental or similar charges as reasonably determined by the Uber Services based on available information.

1.14.  *"Transportation Services"* means the provision of passenger transportation services to Users via the Uber Services in the Territory by Customer and its Drivers using the Vehicles.

1.15.  *"Uber Data"* means all data related to the access and use of the Uber Services hereunder, including all data related to Users (including User Information), all data related to the provision of Transportation Services via the Uber Services and the Driver App, and the Driver ID.

1.16.  *"Uber Device"* means a mobile device owned or controlled by Uber that is provided to Customer or a Driver for the sole purpose of such Driver using the Driver App to provide Transportation Services.

1.17.   "*Uber Services*" mean Uber's on-demand lead generation and related services that enable transportation providers to seek, receive and fulfill on-demand requests for transportation services by Users seeking transportation services; such Uber Services include access to the Driver App and Uber's software, websites, payment services as described in Section 4 below, and related support services systems, as may be updated or modified by Uber at its discretion from time to time.

1.18.   "*User*" means an end user authorized by Uber to use Uber's mobile application for the purpose of obtaining Transportation Services offered by Uber's transportation provider customers.

1.19.   "*User Information*" means information about a User made available to Customer or a Driver in connection with such User's request for and use of Transportation Services, which may include the User's name, pick-up location, contact information and photo.

1.20.   "*Vehicle*" means any vehicle of Customer that:  (a) meets the then-current Uber requirements for a vehicle on the Uber Services; and (b) Uber authorizes for use by a Driver for the purpose of providing Transportation Services on behalf of Customer.

2.   **Use of the Uber Services**

2.1.   **Driver IDs**. Uber will issue Customer a Driver ID for each Driver providing Transportation Services to enable Customer and each Driver to access and use the Driver App on a Device in accordance with the Driver Addendum and this Agreement. Uber reserves the right to deactivate the Driver ID of those Drivers who have not fulfilled a request for Transportation Services using the Driver App at least once a month. **Customer agrees that it will, and that it will ensure that its Drivers will, maintain Driver IDs in confidence and not share Driver IDs with any third party other than the Driver associated with such Driver ID for the purpose of providing Transportation Services. Customer will immediately notify Uber of any actual or suspected breach or improper use or disclosure of a Driver ID or the Driver App.**

2.2.   **Provision of Transportation Services**. When the Driver App is active, User requests for Transportation Services may appear to a Driver via the Driver App if the Driver is available and in the vicinity of the User. If a Driver accepts a User's request for Transportation Services, the Uber Services will provide certain User Information to such Driver via the Driver App, including the User's first name and pickup location. In order to enhance User satisfaction with the Uber mobile application and a Driver's Transportation Services, it is recommended that Driver waits at least ten (10) minutes for a User to show up at the requested pick-up location. The Driver will obtain the destination from the User, either in person upon pickup or from the Driver App if the User elects to enter such destination via Uber's mobile application. Customer acknowledges and agrees that once a Driver has accepted a User's request for Transportation Services, Uber's mobile application may provide certain information about the Driver to the User, including the Driver's first name, contact information, Customer entity name, photo and location, and the Driver's Vehicle's make and license plate number. Customer shall not, and shall ensure that all Drivers do not, contact any Users or use any User's personal data for any reason other than for the purposes of fulfilling Transportation Services. As between Uber and Customer, Customer acknowledges and agrees that:  (a) Customer and its Drivers are solely responsible for determining the most effective, efficient and safe manner to perform each instance of Transportation Services; and (b) except for the Uber Services or any Uber Devices (if applicable), Customer shall provide all necessary equipment, tools and other materials, at Customer's own expense, necessary to perform Transportation Services. Customer understands and agrees that Customer and each Driver have a legal obligation under the Americans with Disabilities Act and

similar state laws to transport Users with Service Animals (as defined by applicable state and federal law), including guide dogs for the blind and visually impaired Users, and there is no exception to this obligation for allergies or religious objections. Customer's or any Driver's knowing failure to transport a User with a Service Animal shall constitute a material breach of this Agreement. Customer agrees that a "knowing failure" to comply with this legal obligation shall constitute either: (1) a denial of a ride where the Customer/Driver states the denial was due to a Service Animal; or (2) there is more than one (1) instance in which a User or the companion of a User alleges that the Customer/Driver cancelled or refused a ride on the basis of a Service Animal.

2.3.    **Customer's Relationship with Users**. Customer acknowledges and agrees that Customer's provision of Transportation Services to Users creates a direct business relationship between Customer and the User. Uber is not responsible or liable for the actions or inactions of a User in relation to Customer or any Driver, the activities of Customer, a Driver or any Vehicle. Customer shall have the sole responsibility for any obligations or liabilities to Users or third parties that arise from its provision of Transportation Services. Customer acknowledges and agrees that it and each Driver are solely responsible for taking such precautions as may be reasonable and proper (including maintaining adequate insurance that meets the requirements of all applicable laws including motor vehicle financial responsibility) regarding any acts or omissions of a User or third party. Customer acknowledges and agrees that Uber may release the contact and/or insurance information of Customer and/or a Driver to a User upon such User's reasonable request. Customer acknowledges and agrees that, unless specifically consented to by a User, neither Customer nor Driver may transport or allow inside any Vehicle individuals other than a User and any individuals authorized by such User during the performance of Transportation Services for such User. Customer acknowledges and agrees, and shall ensure that its Drivers agree, that all Users should be transported directly to their specified destination, as directed by the applicable User, without unauthorized interruption or unauthorized stops.

2.4.    **Customer's Relationship with Uber**. Customer acknowledges and agrees that Uber's provision to Customer of the Driver App and the Uber Services creates a direct business relationship between Customer and Customer. Uber does not, and shall not be deemed to, direct or control Customer or its Drivers generally or in their performance under this Agreement specifically, including in connection with the operation of Customer's business, the provision of Transportation Services, the acts or omissions of Drivers, or the operation and maintenance of any Vehicles. Customer and its Drivers retain the sole right to determine when, where, and for how long each of them will utilize the Driver App or the Uber Services. Customer and its Drivers retain the option, via the Driver App, to attempt to accept or to decline or ignore a User's request for Transportation Services via the Uber Services, or to cancel an accepted request for Transportation Services via the Driver App, subject to Uber's then-current cancellation policies. With the exception of any signage required by local law or permit/license requirements, Uber shall have no right to require Customer or any Driver to:  (a) display Uber's or any of its Affiliates' names, logos or colors on any Vehicle(s); or (b) wear a uniform or any other clothing displaying Uber's or any of its Affiliates' names, logos or colors. Customer acknowledges and agrees that it has complete discretion to operate its independent business and direct its Drivers at its own discretion, including the ability to provide services at any time to any third party separate and apart from Transportation Services. For the sake of clarity, Customer understands that Customer retains the complete right to provide transportation services to its existing customers and to use other software application services in addition to the Uber Services. Uber retains the right to deactivate or otherwise restrict Customer or any Driver from accessing or

using the Driver App or the Uber Services in the event of a violation or alleged violation of this Agreement, a violation or alleged violation of a Driver Addendum, Customer's or any Driver's disparagement of Uber or any of its Affiliates, Customer's or any Driver's act or omission that causes harm to Uber's or its Affiliates' brand, reputation or business as determined by Uber in its sole discretion.

2.5.  **Customer's Relationship with Drivers**. Customer shall have the sole responsibility for any obligations or liabilities to Drivers that arise from its relationship with its Drivers (including provision of Transportation Services). Customer acknowledges and agrees that it exercises sole control over the Drivers and will comply with all applicable laws (including tax, social security and employment laws) governing or otherwise applicable to its relationship with its Drivers. Notwithstanding Customer's right, if applicable, to take recourse against a Driver, Customer acknowledges and agrees that it is at all times responsible and liable for the acts and omissions of its Drivers vis-à-vis Users and Uber, even where such vicarious liability may not be mandated under applicable law. Customer shall require each Driver to enter into a Driver Addendum (as may be updated from time to time) and shall provide a copy of each executed Driver Addendum to Uber. Customer acknowledges and agrees that Uber is a third party beneficiary of each Driver Addendum, and that, upon a Driver's acceptance of the terms and conditions of the Driver Addendum, Uber will have the right (and will be deemed to have accepted the right) to enforce the Driver Addendum against the Driver as a third party beneficiary thereof.

2.6.  **Ratings**.

2.6.1.  Customer acknowledges and agrees that:  (a) after receiving Transportation Services, a User will be prompted by Uber's mobile application to provide a rating of such Transportation Services and Driver and, optionally, to provide comments or feedback about such Transportation Services and Driver; and (b) after providing Transportation Services, the Driver will be prompted by the Driver App to provide a rating of the User and, optionally, to provide comments or feedback about the User. Customer shall instruct all Drivers to provide ratings and feedback in good faith.

2.6.2.  Customer acknowledges that Uber desires that Users have access to high-quality services via Uber's mobile application. In order to continue to receive access to the Driver App and the Uber Services, each Driver must maintain an average rating by Users that exceeds the minimum average acceptable rating established by Uber for the Territory, as may be updated from time to time by Uber in its sole discretion ("*Minimum Average Rating*"). A Driver's average rating is intended to reflect Users' satisfaction with the Driver's Transportation Services rather than any such Driver's compliance with any of Uber's policies or recommendations. In the event a Driver's average rating falls below the Minimum Average Rating, Uber will notify Customer and may provide the Driver in Uber's discretion, a limited period of time to raise his or her average rating above the Minimum Average Rating. If such Driver does not increase his or her average rating above the Minimum Average Rating within the time period allowed (if any), Uber reserves the right to deactivate such Driver's access to the Driver App and the Uber Services. Additionally, Customer acknowledges and agrees that repeated failure by a Driver to accept User requests for Transportation Services while such Driver is logged in to the Driver App creates a negative experience for Users of Uber's mobile application. Accordingly, Customer agrees and shall ensure that if a Driver does not wish to accept User requests for Transportation Services for a period of time, such Driver will log off of the Driver App.

2.6.3.   Uber and its Affiliates reserve the right to use, share and display Driver and User ratings and comments in any manner in connection with the business of Uber and its Affiliates without attribution to or approval of Customer or the applicable Driver. Customer acknowledges that Uber and its Affiliates are distributors (without any obligation to verify) and not publishers of Driver and User ratings and comments, provided that Uber and its Affiliates reserve the right to edit or remove comments in the event that such comments include obscenities or other objectionable content, include an individual's name or other personal information, or violate any privacy laws, other applicable laws or Uber's or its Affiliates' content policies.

2.7.   **Devices**.

2.7.1.   Uber encourages Customer to use Driver-Provided Devices in providing Transportation Services.  Otherwise, if Customer elects to use any Uber Devices, Uber will supply Uber Devices upon request to each authorized Driver and provide the necessary wireless data plan for such Devices, provided that Uber will require reimbursement from Customer for the costs associated with the wireless data plan of each Uber Device and/or request a deposit for each Uber Device. Customer acknowledges and agrees that:  (a) Uber Devices may only be used for the purpose of enabling Driver access to the Uber Services; and (b) Uber Devices may not be transferred, loaned, sold or otherwise provided in any manner to any party other than the Driver assigned to use such Uber Device. Uber Devices shall at all times remain the property of Uber, and upon termination of this Agreement or the termination or deactivation of a Driver, Customer agrees to return to Uber the applicable Uber Devices within ten (10) days. Customer acknowledges and agrees that failure to timely return any Uber Devices, or damage to Uber Devices outside of "normal wear and tear," will result in the forfeiture of related deposits.

2.7.2.   If Customer elects to use any Driver-Provided Devices:  (i) Customer and/or its Drivers are responsible for the acquisition, cost and maintenance of such Driver-Provided Devices as well as any necessary wireless data plan; and (ii) Uber shall make available the Driver App for installation on such Driver-Provided Devices. Uber hereby grants the authorized user of any Driver-Provided Device a personal, non-exclusive, non-transferable license to install and use the Driver App on a Driver-Provided Device solely for the purpose of providing Transportation Services. Customer agrees to not, and shall cause each applicable Driver to not, provide, distribute or share, or enable the provision, distribution or sharing of, the Driver App (or any data associated therewith) with any third party. The foregoing license grant shall immediately terminate and Driver will delete and fully remove the Driver App from the Driver-Provided Device in the event that Customer and/or the applicable Driver ceases to provide Transportation Services using the Driver-Provided Device. Customer agrees, and shall inform each applicable Driver that:  (i) use of the Driver App on a Driver-Provided Device requires an active data plan with a wireless carrier associated with the Driver-Provided Device, which data plan will be provided by either Customer or the applicable Driver at their own expense; and (ii) use of the Driver App on a Driver-Provided Device as an interface with the Uber Services may consume very large amounts of data through the data plan. **UBER ADVISES THAT DRIVER-PROVIDED DEVICES ONLY BE USED UNDER A DATA PLAN WITH UNLIMITED OR VERY HIGH DATA USAGE LIMITS, AND UBER SHALL NOT BE RESPONSIBLE**

**OR LIABLE FOR ANY FEES, COSTS, OR OVERAGE CHARGES ASSOCIATED WITH ANY DATA PLAN.**

2.8.    **Location Based Services**. Customer acknowledges and agrees that each Driver's geo-location information must be provided to the Uber Services via a Device in order to provide Transportation Services. Customer acknowledges and agrees, and shall inform and obtain the consent of each Driver, that:  (a) the Driver's geo-location information may be obtained by the Uber Services while the Driver App is running; and (b) the approximate location of the Driver's Vehicle will be displayed to the User before and during the provision of Transportation Services to such User. In addition, Company and its Affiliates may monitor, track and share with third parties Driver's geo-location information obtained by the Driver App and Device for safety and security purposes.

3.    **Drivers and Vehicles**

3.1.    **Driver Requirements**. Customer acknowledges and agrees that each Driver shall at all times:  (a) hold and maintain (i) a valid driver's license with the appropriate level of certification to operate the Vehicle assigned to such Driver, and (ii) all licenses, permits, approvals and authority applicable to Customer and/or Driver that are necessary to provide passenger transportation services to third parties in the Territory; (b) possess the appropriate and current level of training, expertise and experience to provide Transportation Services in a professional manner with due skill, care and diligence; and (c) maintain high standards of professionalism, service and courtesy. Customer acknowledges and agrees that each Driver may be subject to certain background and driving record checks from time to time in order for such Driver to qualify to provide, and remain eligible to provide, Transportation Services. In addition if Customer and/or Driver are using the Uber App to provide Transportation Services in conjunction with operating a taxi ("*Taxi Services*"), such Customer and/or Driver shall comply with all applicable laws with respect thereto. Customer acknowledges and agrees that Uber reserves the right, at any time in Uber's sole discretion, to deactivate or otherwise restrict a Driver from accessing or using the Driver App or the Uber Services if Customer or such Driver fails to meet the requirements set forth in this Agreement or the Driver Addendum.

3.2.    **Vehicle Requirements**. Customer acknowledges and agrees that each Vehicle shall at all times be:  (a) properly registered and licensed to operate as a passenger transportation vehicle in the Territory; (b) owned or leased by Customer, or otherwise in Customer's lawful possession; (c) suitable for performing the passenger transportation services contemplated by this Agreement; and (d) maintained in good operating condition, consistent with industry safety and maintenance standards for a Vehicle of its kind and any additional standards or requirements in the applicable Territory, and in a clean and sanitary condition.

3.3.    **Documentation**. To ensure Customer's and each of its Drivers' compliance with all requirements in Sections 3.1 and 3.2 above, Customer must provide Uber with written copies of all such licenses, permits, approvals, authority, registrations and certifications prior to Customer's and the applicable Drivers' provision of any Transportation Services.  Thereafter, Customer must submit to Uber written evidence of all such licenses, permits, approvals, authority, registrations and certifications as they are renewed. Uber shall, upon request, be entitled to review such licenses, permits, approvals, authority, registrations and certifications from time to time, and Customer's failure to provide or maintain any of the foregoing shall constitute a material breach of this Agreement. Uber reserves the right to independently verify Customer's and any Driver's documentation from time to time in any way Uber deems appropriate in its reasonable discretion.

UBER_BARYSAS_0000202

4.   **Financial Terms**

4.1.   **Fare Calculation and Customer Payment**. Customer is entitled to charge a fare for each instance of completed Transportation Services provided to a User that are obtained via the Uber Services ("*Fare*"), where such Fare is calculated based upon a base fare amount plus distance (as determined by Uber using location-based services enabled through the Device) and/or time amounts, as detailed at www.uber.com/cities for the applicable Territory ("*Fare Calculation*"). Customer acknowledges and agrees that the Fare provided under the Fare Calculation is the only payment Customer will receive in connection with the provision of Transportation Services, and that neither the Fare nor the Fare Calculation includes any gratuity. Customer is also entitled to charge User for any Tolls, taxes or fees incurred during the provision of Transportation Services, and, if applicable, Customer: (i) appoints Uber as Customer's limited payment collection agent solely for the purpose of accepting the Fare, applicable Tolls and, depending on the region and/or if requested by Customer, applicable taxes and fees from the User on behalf of the Customer via the payment processing functionality facilitated by the Uber Services; and (ii) agrees that payment made by User to Uber (or to an Affiliate of Uber acting as an agent of Uber) shall be considered the same as payment made directly by User to Customer. In addition, the parties acknowledge and agree that as between Customer and Uber, the Fare is a recommended amount, and the primary purpose of the pre-arranged Fare is to act as the default amount in the event Customer does not negotiate a different amount. Customer shall always have the right to: (i) charge a fare that is less than the pre-arranged Fare; or (ii) negotiate, at Customer's request, a Fare that is lower than the pre-arranged Fare (each of (i) and (ii) herein, a "*Negotiated Fare*"). Uber shall consider all such requests from Customer in good faith. Uber agrees to remit, or cause to be remitted, to Customer on at least a weekly basis: (a) the Fare less the applicable Service Fee; (b) the Tolls; and (c) depending on the region, certain taxes and ancillary fees. If Customer has separately agreed that other amounts may be deducted from the Fare prior to remittance to Customer (*e.g.*, vehicle financing payments, lease payments, mobile device usage charges, etc.), the order of any such deductions from the Fare shall be determined exclusively by Uber (as between Customer and Uber). Notwithstanding anything to the contrary in this Section 4.1, if Customer is providing Taxi Services, the following shall apply: (x) the Fare is calculated pursuant to local taxi regulations in the Territory; (y) Customer or Driver agrees to enter the exact Fare amount (as indicated by the official taxi meter in the Vehicle) into the Driver App upon completion of an instance of Transportation Services; and (z) in some jurisdictions, Users will pay such Customer or Driver directly rather than through Uber's mobile application (Uber will notify Customer if (z) is applicable in its Territory).

4.2.   **Changes to Fare Calculation**. Uber reserves the right to change the Fare Calculation at any time in Uber's discretion based upon local market factors, and Uber will provide notice to Customer in the event of changes to the base fare, per mile, and/or per minute amounts that would result in a change in the recommended Fare for each instance of completed Transportation Services. Continued use of the Uber Services after any such change in the Fare Calculation shall constitute Customer's consent to such change.

4.3.   **Fare Adjustment**. Uber reserves the right to: (i) adjust the Fare for a particular instance of Transportation Services (*e.g.*, Driver took an inefficient route, Driver failed to properly end a particular instance of Transportation Services in the Driver App, technical error in the Uber Services, etc.); or (ii) cancel the Fare for a particular instance of Transportation Services (*e.g.*, a User is charged for Transportation Services that were not provided, in the event of a User

UBER_BARYSAS_0000203

complaint, fraud, etc.). Uber's decision to reduce or cancel the Fare in any such manner shall be exercised in a reasonable manner.

4.4. **Service Fee**. In consideration of Uber's provision of the Driver App and the Uber Services for the use and benefit of Customer and its Drivers hereunder, Customer agrees to pay Uber a service fee on a per Transportation Services transaction basis calculated as a percentage of the Fare determined by the Fare Calculation (regardless of any Negotiated Fare), as provided to Customer and/or a Driver via email or otherwise made available electronically by Uber from time to time for the applicable Territory ("*Service Fee*"). In the event regulations applicable to Customer's Territory require taxes to be calculated on the Fare, Uber shall calculate the Service Fee based on the Fare net of such taxes. Uber reserves the right to change the Service Fee at any time in Uber's discretion based upon local market factors, and Uber will provide notice to Customer in the event of such change. Continued use of the Uber Services after any such change in the Service Fee calculation shall constitute Customer's consent to such change. In addition, with respect to Taxi Services in the applicable Territory, Customer agrees to pay Uber a booking fee in consideration of Uber's provision of the Driver App and the Uber Services.

4.5. **Cancellation Charges**. Customer acknowledges and agrees that Users may elect to cancel requests for Transportation Services that have been accepted by a Driver via the Driver App at any time prior to the Driver's arrival. In the event that a User cancels an accepted request for Transportation Services, Uber may charge the User a cancellation fee on behalf of the Customer. If charged, this cancellation fee shall be deemed the Fare for the cancelled Transportation Services for the purpose of remittance to Customer hereunder ("*Cancellation Fee*"). The parties acknowledge and agree that as between Customer and Uber, this Cancellation Fee is a recommended amount, and the primary purpose of such Cancellation Fee is to act as a default amount in the event Customer does not negotiate a different amount. Customer shall always have the right to: (i) charge a cancellation fee that is less than the Cancellation Fee; or (ii) negotiate, at your request, a cancellation fee that is lower than the Cancellation Fee (each of (i) and (ii) herein, a "*Negotiated Cancellation Fee*"). If charged, the Cancellation Fee (regardless of any Negotiated Cancellation Fee) shall be deemed the Fare for the cancelled Transportation Services for the purpose of remittance to Customer hereunder.

4.6. **Receipts**. As part of the Uber Services, Uber provides Customer a system for the delivery of receipts to Users for Transportation Services rendered. Upon the completion of Transportation Services for a User by a Driver, Uber prepares an applicable receipt and issues such receipt to the User via email on behalf of the Customer and applicable Driver. Such receipts are also provided via email or the online portal available to Customer through the Uber Services. Receipts include the breakdown of amounts charged to the User for Transportation Services and may include specific information about the Customer and applicable Driver, including the Customer's entity name and contact information and the Driver's name and photo, as well as a map of the route taken by the Driver. Customer shall inform Drivers that any corrections to a User's receipt for Transportation Services must be submitted to Uber in writing within three (3) business days after the completion of such Transportation Services. Absent such a notice, Uber shall not be liable for any mistakes in or corrections to the receipt or for recalculation or disbursement of the Fare.

4.7. **No Additional Amounts**. Customer acknowledges and agrees that, for the mutual benefit of the parties, through advertising and marketing, Uber and its Affiliates may seek to attract new Users to Uber and to increase existing Users' use of Uber's mobile application. Customer

acknowledges and agrees such advertising or marketing does not entitle Customer to any additional monetary amounts beyond the amounts expressly set forth in this Agreement.

4.8.   **Taxes**. Customer acknowledges and agrees that it is required to:  (a) complete all tax registration obligations and calculate and remit all tax liabilities related to its and its Drivers' provision of Transportation Services as required by applicable law; and (b) provide Uber with all relevant tax information. Customer further acknowledges and agrees that it is responsible for taxes on its own income (and that of its Drivers) arising from the performance of Transportation Services. Notwithstanding anything to the contrary in this Agreement, Uber may in its reasonable discretion based on applicable tax and regulatory considerations, collect and remit taxes resulting from its or its Drivers' provision of Transportation Services and/or provide any of the relevant tax information provided by Customer or any Driver pursuant to the foregoing requirements in this Section 4.8 directly to the applicable governmental tax authorities on your behalf or otherwise.

5.   **Proprietary Rights; License**

5.1.   **License Grant**. Subject to the terms and conditions of this Agreement, Uber hereby grants Customer a non-exclusive, non-transferable, non-sublicensable, non-assignable license, during the term of this Agreement, to use (and allows its Drivers to use) the Uber Services (including the Driver App on a Device) solely for the purpose of providing Transportation Services to Users and tracking resulting Fares and Fees. All rights not expressly granted to Customer are reserved by Uber, its Affiliates and their respective licensors.

5.2.   **Restrictions**. Customer shall not, and shall not allow any other party to:  (a) license, sublicense, sell, resell, transfer, assign, distribute or otherwise provide or make available to any other party the Uber Services, Driver App or any Uber Device in any way; (b) modify or make derivative works based upon the Uber Services or Driver App; (c) improperly use the Uber Services or Driver App, including creating Internet "links" to any part of the Uber Services or Driver App, "framing" or "mirroring" any part of the Uber Services or Driver App on any other websites or systems, or "scraping" or otherwise improperly obtaining data from the Uber Services or Driver App; (d) reverse engineer, decompile, modify, or disassemble the Uber Services or Driver App, except as allowed under applicable law; or (e) send spam or otherwise duplicative or unsolicited messages. In addition, Customer shall not, and shall not allow any other party to, access or use the Uber Services or Driver App to:  (i) design or develop a competitive or substantially similar product or service; (ii) copy or extract any features, functionality, or content thereof; (iii) launch or cause to be launched on or in connection with the Uber Services an automated program or script, including web spiders, crawlers, robots, indexers, bots, viruses or worms, or any program which may make multiple server requests per second, or unduly burden or hinder the operation and/or performance of the Uber Services; or (iv) attempt to gain unauthorized access to the Uber Services or its related systems or networks.

5.3.   **Ownership**. The Uber Services, Driver App and Uber Data, including all intellectual property rights therein, and the Uber Devices are and shall remain the property of Uber, its Affiliates or their respective licensors. Neither this Agreement nor Customer's use of the Uber Services, Driver App or Uber Data conveys or grants to Customer any rights in or related to the Uber Services, Driver App or Uber Data, except for the limited license granted above. Customer is not permitted to use or reference in any manner Uber's, its Affiliates', or their respective licensors' company names, logos, product and service names, trademarks, service marks or other indicia of ownership, alone or in combination with other letters, punctuation, words, symbols and/or designs (the "*UBER Marks and Names*"). Customer will not try to register or otherwise claim

ownership in any of the UBER Marks and Names, alone or in combination with other letters, punctuation, words, symbols and/or designs or in any confusingly similar mark or name.

## 6. Confidentiality

6.1.   Each party acknowledges and agrees that in the performance of this Agreement it may have access to or may be exposed to, directly or indirectly, confidential information of the other party ("*Confidential Information*"). Confidential Information includes Uber Data, Driver IDs, User Information, and the transaction volume, marketing and business plans, business, financial, technical, operational and such other non-public information of each party (whether disclosed in writing or verbally) that such party designates as being proprietary or confidential or of which the other party should reasonably know that it should be treated as confidential.

6.2.   Each party acknowledges and agrees that:  (a) all Confidential Information shall remain the exclusive property of the disclosing party; (b) it shall not use Confidential Information of the other party for any purpose except in furtherance of this Agreement; (c) it shall not disclose Confidential Information of the other party to any third party, except to its employees, officers, contractors, agents and service providers ("*Permitted Persons*") as necessary to perform under this Agreement, provided Permitted Persons are bound in writing to obligations of confidentiality and non-use of Confidential Information no less protective than the terms hereof; and (d) it shall return or destroy all Confidential Information of the disclosing party, upon the termination of this Agreement or at the request of the other party (subject to applicable law and, with respect to Uber, its internal record-keeping requirements).

6.3.   Notwithstanding the foregoing, Confidential Information shall not include any information to the extent it:  (a) is or becomes part of the public domain through no act or omission on the part of the receiving party; (b) was possessed by the receiving party prior to the date of this Agreement without an obligation of confidentiality; (c) is disclosed to the receiving party by a third party having no obligation of confidentiality with respect thereto; or (d) is required to be disclosed pursuant to law, court order, subpoena or governmental authority, provided the receiving party notifies the disclosing party thereof and provides the disclosing party a reasonable opportunity to contest or limit such required disclosure.

## 7. Privacy

7.1.   **Disclosure of Customer or Driver Information**. Subject to applicable law and regulation, Uber may, but shall not be required to, provide to Customer, a Driver, a User, an insurance company and/or relevant authorities and/or regulatory agencies any information (including personal information (*e.g.*, information obtained about a Driver through any background check) and any Uber Data) about Customer, a Driver, or any Transportation Services provided hereunder if:  (a) there is a complaint, dispute or conflict, including an accident, between Customer or a Driver on the one hand and a User on the other hand; (b) it is necessary to enforce the terms of this Agreement; (c) it is required, in Uber's or any Affiliate's sole discretion, by applicable law or regulatory requirements (*e.g.*, Uber or its Affiliate receives a subpoena, warrant, or other legal process for information); (d) it is necessary, in Uber's or any Affiliate's sole discretion, to (1) protect the safety, rights, property or security of Uber or its Affiliates, the Uber Services or any third party; (2) protect the safety of the public for any reason including the facilitation of insurance claims related to the Uber Services; (3) detect, prevent or otherwise address fraud, security or technical issues; and/or (4) prevent or stop activity Uber or its Affiliates, in their sole discretion, may consider to be, or to pose a risk of being, an illegal, unethical, or legally actionable activity); or (e) it is required or necessary, in Uber's or any of its Affiliate's sole

UBER_BARYSAS_0000206

discretion, for insurance or other purposes related to Customer's or any Driver's ability to qualify, or remain qualified, to use the Uber Services. Customer understands that Uber may retain and its Drivers' personal data for legal, regulatory, safety and other necessary purposes after this Agreement is terminated.

7.2.   Uber and its Affiliates may collect personal data from Customer or a Driver during the course of Customer's or such Driver's application for, and use of, the Uber Services, or obtain information about Customer or any Drivers from third parties. Such information may be stored, processed, transferred, and accessed by Uber and its Affiliates,  third parties and service providers, for business purposes, including for marketing, lead generation, service development and improvement, analytics, industry and market research, and such other purposes consistent with Uber's and its Affiliates' legitimate business needs. Customer (or Driver, through the Driver Addendum) expressly consents to such use of personal data.

## 8.   Insurance

8.1.   Customer agrees to maintain during the term of this Agreement on all Vehicles operated by Customer or its Drivers commercial automobile liability insurance that provides protection against bodily injury and property damage to third parties at levels of coverage that satisfy all applicable laws in the Territory. This coverage must also include any no-fault coverage required by law in the Territory that may not be waived by an insured. Customer agrees to provide Uber and its Affiliates a copy of the insurance policy, policy declarations, proof of insurance identification card and proof of premium payment for the insurance policy required in this Section 8.1 upon request. Furthermore, Customer must provide Uber with written notice of cancellation of any insurance policy required by Uber. Uber shall have no right to control Customer's selection or maintenance of Customer's policy.

8.2.   Customer agrees to maintain during the term of this Agreement commercial general liability insurance that provides protection against personal injury, advertising injury and property damage to third parties at levels of coverage required by all applicable laws in the Territory.

8.3.   **Customer agrees to maintain during the term of this Agreement workers' compensation insurance for itself and any of its subcontractors as required by all applicable laws in the Territory. If permitted by applicable law, Customer may choose to insure itself against industrial injuries by maintaining occupational accident insurance in place of workers' compensation insurance. Customer's subcontractors may also, to the extent permitted by applicable law, maintain occupational accident insurance in place of workers' compensation insurance.  Furthermore, if permitted by applicable law, Customer may choose not to insure itself against industrial injuries at all, but does so at its own risk.**

8.4.   Customer shall add Uber (or any Affiliate which may be designated by Uber from time to time) to Customer's insurance policies required in Sections 8.1 and 8.2 above as an additional insured, and shall, upon Uber's request, provide Uber with a copy of such insurance certificate(s) within seven (7) days of such request.

## 9.   Representations and Warranties; Disclaimers

9.1.   **By Customer**. Customer hereby represents and warrants that:  (a) it has full power and authority to enter into this Agreement and perform its obligations hereunder; (b) it is duly organized, validly existing and in good standing under the laws of the jurisdiction of its origin; (c) it has not entered into, and during the term will not enter into, any agreement that would prevent it from complying with this Agreement; (d) it will comply with all applicable laws in its performance of

UBER_BARYSAS_0000207

this Agreement, including holding and complying with all permits, licenses, registrations and other governmental authorizations necessary to provide (i) Transportation Services using the Drivers and Vehicles pursuant to this Agreement, and (ii) passenger transportation services to third parties in the Territory generally; and (e) it shall require all Drivers to comply with the Driver Addendum, the applicable terms and conditions set forth in this Agreement and all applicable laws.

9.2.   **Disclaimer of Warranties**.  UBER PROVIDES, AND CUSTOMER ACCEPTS, THE UBER SERVICES, DRIVER APP AND THE UBER DEVICES ON AN "AS IS" AND "AS AVAILABLE" BASIS. UBER DOES NOT REPRESENT, WARRANT OR GUARANTEE THAT CUSTOMER'S OR ANY DRIVER'S ACCESS TO OR USE OF THE UBER SERVICES, DRIVER APP OR THE UBER DEVICES:  (A) WILL BE UNINTERRUPTED OR ERROR FREE; OR (B) WILL RESULT IN ANY REQUESTS FOR TRANSPORTATION SERVICES. UBER FUNCTIONS AS AN ON-DEMAND LEAD GENERATION AND RELATED SERVICE ONLY AND MAKES NO REPRESENTATIONS, WARRANTIES OR GUARANTEES AS TO THE ACTIONS OR INACTIONS OF THE USERS WHO MAY REQUEST OR RECEIVE TRANSPORTATION SERVICES FROM CUSTOMER OR ANY DRIVER HEREUNDER, AND UBER DOES NOT SCREEN OR OTHERWISE EVALUATE USERS. BY USING THE UBER SERVICES AND DRIVER APP, CUSTOMER ACKNOWLEDGES AND AGREES THAT CUSTOMER OR A DRIVER MAY BE INTRODUCED TO A THIRD PARTY THAT MAY POSE HARM OR RISK TO CUSTOMER, A DRIVER OR OTHER THIRD PARTIES. CUSTOMER AND DRIVERS ARE ADVISED TO TAKE REASONABLE PRECAUTIONS WITH RESPECT TO INTERACTIONS WITH THIRD PARTIES ENCOUNTERED IN CONNECTION WITH THE USE OF THE UBER SERVICES OR DRIVER APP. NOTWITHSTANDING UBER'S APPOINTMENT AS THE LIMITED PAYMENT COLLECTION AGENT OF CUSTOMER FOR THE PURPOSE OF ACCEPTING PAYMENT FROM USERS ON BEHALF OF CUSTOMER AS SET FORTH IN SECTION 4 ABOVE, UBER EXPRESSLY DISCLAIMS ALL LIABILITY FOR ANY ACT OR OMISSION OF CUSTOMER, ANY USER OR OTHER THIRD PARTY.

9.3.   **No Service Guarantee**. UBER DOES NOT GUARANTEE THE AVAILABILITY OR UPTIME OF THE UBER SERVICES OR DRIVER APP. CUSTOMER ACKNOWLEDGES AND AGREES THAT THE UBER SERVICES OR DRIVER APP MAY BE UNAVAILABLE AT ANY TIME AND FOR ANY REASON (*e.g.*, DUE TO SCHEDULED MAINTENANCE OR NETWORK FAILURE). FURTHER, THE UBER SERVICES OR DRIVER APP MAY BE SUBJECT TO LIMITATIONS, DELAYS, AND OTHER PROBLEMS INHERENT IN THE USE OF THE INTERNET AND ELECTRONIC COMMUNICATIONS, AND UBER IS NOT RESPONSIBLE FOR ANY DELAYS, DELIVERY FAILURES, OR OTHER DAMAGES, LIABILITIES OR LOSSES RESULTING FROM SUCH PROBLEMS.

## 10.  Indemnification

10.1.   Customer shall indemnify, defend (at Uber's option) and hold harmless Uber and its Affiliates and their respective officers, directors, employees, agents, successors and assigns from and against any and all liabilities, expenses (including legal fees), damages, penalties, fines, social security contributions and taxes arising out of or related to:  (a) Customer's breach of its representations, warranties or obligations under this Agreement; or (b) a claim by a third party (including Users, regulators and governmental authorities) directly or indirectly related to Customer's provision of Transportation Services or use of the Uber Services. This indemnification provision shall not apply to Customer's or any Drivers' breach of any representations regarding their status as independent contractors.

10.2.   As between Customer and Uber, Customer is and shall be solely responsible for its Drivers' provision of Transportation Services. As such, Customer shall indemnify, defend (at Uber's option) and hold harmless Uber and its Affiliates and their respective officers, directors, employees, agents, successors and assigns from and against any and all liabilities, expenses

(including legal fees), damages, penalties, fines, social contributions and taxes directly or indirectly arising out of or related to its Drivers' provision of Transportation Services or use of the Uber Services.

11. **Limits of Liability**. UBER AND ITS AFFILIATES SHALL NOT BE LIABLE UNDER OR RELATED TO THIS AGREEMENT FOR ANY OF THE FOLLOWING, WHETHER BASED ON CONTRACT, TORT OR ANY OTHER LEGAL THEORY, EVEN IF A PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES:  (i) ANY INCIDENTAL, PUNITIVE, SPECIAL, EXEMPLARY, CONSEQUENTIAL, OR OTHER INDIRECT DAMAGES OF ANY TYPE OR KIND; OR (ii) CUSTOMER'S OR ANY THIRD PARTY'S PROPERTY DAMAGE, OR LOSS OR INACCURACY OF DATA, OR LOSS OF BUSINESS, REVENUE, PROFITS, USE OR OTHER ECONOMIC ADVANTAGE. EXCEPT FOR UBER'S OBLIGATIONS TO PAY AMOUNTS DUE TO CUSTOMER PURSUANT TO SECTION 4 ABOVE, BUT SUBJECT TO ANY LIMITATIONS OR OTHER PROVISIONS CONTAINED IN THIS AGREEMENT WHICH ARE APPLICABLE THERETO, IN NO EVENT SHALL THE LIABILITY OF UBER OR ITS AFFILIATES UNDER THIS AGREEMENT EXCEED THE AMOUNT OF SERVICE FEES ACTUALLY PAID TO OR DUE TO UBER HEREUNDER IN THE SIX (6) MONTH PERIOD IMMEDIATELY PRECEDING THE EVENT GIVING RISE TO SUCH CLAIM.

12. **Term and Termination**

12.1. **Term**. This Agreement shall commence on the date accepted by Customer and shall continue until terminated as set forth herein.

12.2. **Termination**. Either party may terminate this Agreement:  (a) without cause at any time upon seven (7) days prior written notice to the other party; (b) immediately, without notice, for the other party's material breach of this Agreement; or (c) immediately, without notice, in the event of the insolvency or bankruptcy of the other party, or upon the other party's filing or submission of request for suspension of payment (or similar action or event) against the terminating party. In addition, Uber may terminate this Agreement or deactivate Customer or a particular Driver immediately, without notice, with respect to Customer and/or any Driver in the event Customer and/or any Driver, as applicable, no longer qualifies, under applicable law or the standards and policies of Uber, to provide Transportation Services or to operate the Vehicle, or as otherwise set forth in this Agreement.

12.3. **Effect of Termination**. Upon termination of the Agreement, Customer and all Drivers, as applicable, shall:  (a) promptly return to Uber all Uber Devices; and (b) immediately delete and fully remove the Driver App from any applicable Driver-Provided Devices. Outstanding payment obligations and Sections 1, 2.3, 2.5, 2.6.3, 4.7, 4.8, 5.3, 6, 7, 9, 10, 11, 12.3, 13, 14 and 15 shall survive the termination of this Agreement.

13. **Relationship of the Parties**

13.1. **Except as otherwise expressly provided herein with respect to Uber acting as the limited payment collection agent solely for the purpose of collecting payment from Users on behalf of Customer, the relationship between the parties under this Agreement is solely that of independent contracting parties. The parties expressly agree that:  (a) this Agreement is not an employment agreement, nor does it create an employment relationship, between Uber and Customer or Uber and any Driver; and (b) no joint venture, partnership, or agency relationship exists between Uber and Customer or Uber and any Driver**.

13.2. Customer has no authority to bind Uber and undertakes not to hold itself out, and to ensure that each Driver does not hold himself or herself out, as an employee, agent or authorized

representative of Uber or its Affiliates. Where, by implication of mandatory law or otherwise, Customer or any Driver may be deemed an agent or representative of Uber, Customer undertakes and agrees to indemnify, defend (at Uber's option) and hold Uber and its Affiliates harmless from and against any claims by any person or entity based on such implied agency or representative relationship.

14. **Miscellaneous Terms**

14.1.   **Modification**. In the event Uber modifies the terms and conditions of this Agreement or Driver Addendum at any time, such modifications shall be binding on Customer only upon Customer's acceptance of the modified Agreement and/or Driver Addendum.  Uber reserves the right to modify any information referenced at hyperlinks from this Agreement from time to time. Customer hereby acknowledges and agrees that, by using the Uber Services, or downloading, installing or using the Driver App, Customer is bound by any future amendments and additions to information referenced at hyperlinks herein, or documents incorporated herein, including with respect to Fare Calculations.  Continued use of the Uber Services or Driver App after any such changes shall constitute Customer's consent to such changes. Unless changes are made to the arbitration provisions herein, Customer agrees that modification of this Agreement does not create a renewed opportunity to opt out of arbitration.

14.2.   **Supplemental Terms**. Supplemental terms may apply to Customer's and Driver's use of the Uber Services, such as use policies or terms related to certain features and functionality, which may be modified from time to time ("*Supplemental Terms*"). Customer may be presented with certain Supplemental Terms from time to time. Supplemental Terms are in addition to, and shall be deemed a part of, this Agreement. Supplemental Terms shall prevail over this Agreement in the event of a conflict.

14.3.   **Severability**. If any provision of this Agreement is or becomes invalid or non-binding, the parties shall remain bound by all other provisions hereof. In that event, the parties shall replace the invalid or non-binding provision with provisions that are valid and binding and that have, to the greatest extent possible, a similar effect as the invalid or non-binding provision, given the contents and purpose of this Agreement.

14.4.   **Assignment**. Neither party shall assign or transfer this Agreement or any of its rights or obligations hereunder, in whole or in part, without the prior written consent of the other party; provided that Uber may assign or transfer this Agreement or any or all of its rights or obligations under this Agreement from time to time without consent:  (a) to an Affiliate; or (b) to an acquirer of all or substantially all of Uber's business, equity or assets.

14.5.   **Entire Agreement**. This Agreement, including all Supplemental Terms, constitutes the entire agreement and understanding of the parties with respect to its subject matter and replaces and supersedes all prior or contemporaneous agreements or undertakings regarding such subject matter. In this Agreement, the words "including" and "include" mean "including, but not limited to." The recitals form a part of this Agreement.

14.6.   **No Third Party Beneficiaries**. There are no third party beneficiaries to this Agreement, except as expressly set forth in the Arbitration Provision in Section 15.3. Nothing contained in this Agreement is intended to or shall be interpreted to create any third party beneficiary claims.

14.7.   **Notices**. Any notice delivered by Uber to Customer under this Agreement will be delivered by email to the email address associated with Customer's account or by posting on the Customer portal available on the Uber Services. Any notice delivered by Customer to Uber under this

Agreement will be delivered by contacting Uber at http://partners.uber.com in the "Contact Us" section. Additional Territory-specific notices may be required from time to time.

## 15. Governing Law; Arbitration

15.1   The choice of law provisions contained in this Section 15.1 do not apply to the arbitration clause contained in Section 15.3, such arbitration clause being governed by the Federal Arbitration Act. Accordingly, and except as otherwise stated in Section 15.3, the interpretation of this Agreement shall be governed by California law, without regard to the choice or conflicts of law provisions of any jurisdiction. Any disputes, actions, claims or causes of action arising out of or in connection with this Agreement or the Uber Services that are not subject to the arbitration clause contained in this Section 15.3 shall be subject to the exclusive jurisdiction of the state and federal courts located in the City and County of San Francisco, California. However, neither the choice of law provision regarding the interpretation of this Agreement nor the forum selection provision is intended to create any other substantive right to non-Californians to assert claims under California law whether that be by statute, common law, or otherwise. These provisions, and except as otherwise provided in Section 15.3, are only intended to specify the use of California law to interpret this Agreement and the forum for disputes asserting a breach of this Agreement, and these provisions shall not be interpreted as generally extending California law to Customer if Customer does not otherwise operate its business in California. The foregoing choice of law and forum selection provisions do not apply to the arbitration clause in Section 15.3 or to any arbitrable disputes as defined therein. Instead, as described in Section 15.3, the Federal Arbitration Act shall apply to any such dispute. The failure of Uber to enforce any right or provision in this Agreement shall not constitute a waiver of such right or provision unless acknowledged and agreed to by Uber in writing.

15.2   Other than disputes regarding the intellectual property rights of the parties and other claims identified in Section 15.3.ii, any disputes, actions, claims or causes of action arising out of or in connection with this Agreement or the Uber Services shall be subject to arbitration pursuant to Section 15.3.

15.3   **Arbitration.**

Important Note Regarding this Section 15.3:

* Except as provided below, arbitration does not limit or affect the legal claims you may bring against Uber. Agreeing to arbitration only affects where any such claims may be brought and how they will be resolved.

* Arbitration is a process of private dispute resolution that does not involve the civil courts, a civil judge, or a jury. Instead, the parties' dispute is decided by a private arbitrator selected by the parties using the process set forth herein. Other arbitration rules and procedures are also set forth herein.

* Unless the law requires otherwise, as determined by the Arbitrator based upon the circumstances presented, you will be required to split the cost of any arbitration with Uber.

- IMPORTANT: This Arbitration Provision will require you to resolve any claim that you may have against Uber on an individual basis, except as provided below, pursuant to the terms of the Agreement unless you choose to opt out of the Arbitration Provision.  Except as provided below, this provision will preclude you from bringing any class, collective, or representative action (other than actions under the Private Attorneys General Act of 2004 ("PAGA"), California Labor Code § 2698 *et seq.* ("PAGA")) against Uber, and also precludes you from participating in or recovering relief under any current or future class, collective, or representative (non-PAGA) action brought against Uber by someone else.

  - ***Cases have been filed against Uber and may be filed in the future involving claims by users of Uber Services and Software, including by drivers.  You should assume that there are now, and may be in the future, lawsuits against Uber alleging class, collective, and/or representative (non-PAGA) claims on your behalf, including but not limited to claims for tips, reimbursement of expenses, and employment status.  Such claims, if successful, could result in some monetary recovery to you.*  *(THESE CASES NOW INCLUDE, FOR EXAMPLE, YUCESOY ET AL. V. UBER TECHNOLOGIES, INC., ET AL., CASE NO. 3:15-CV-00262 (NORTHERN DISTRICT OF CALIFORNIA);  IN RE UBER FCRA LITIGATION, CASE NO. 14-CV-05200-EMC (NORTHERN DISTRICT OF CALIFORNIA); AND O'CONNOR  V. UBER TECHNOLOGIES, INC., ET AL., CASE NO. CV 13-03826-EMC (NORTHERN DISTRICT OF CALIFORNIA). The contact information for counsel in the O'Connor matter is as follows: Shannon Liss-Riordan, Lichten & Liss-Riordan, P.C., 100 Cambridge Street, 20th Floor, Boston, MA 02114, Telephone: (617) 994-5800, Fax: (617) 994-5801, email: sliss@llrlaw.com.)***

  - **The mere existence of such class, collective, and/or representative lawsuits, however, does not mean that such lawsuits will ultimately succeed.  But if you do agree to arbitration with Uber, you are agreeing in advance, except as otherwise provided, that you will not participate in and,**

therefore, will not seek to recover monetary or other relief under any such class, collective, and/or representative (non-PAGA) lawsuit.

o   However, as discussed above and except as provided below, if you agree to arbitration, you will not be precluded from bringing your claims against Uber in an individual arbitration proceeding. If successful on such claims, you could be awarded money or other relief by an arbitrator (subject to splitting the cost of arbitration as mentioned above).

**WHETHER TO AGREE TO ARBITRATION IS AN IMPORTANT BUSINESS DECISION. IT IS YOUR DECISION TO MAKE, AND YOU SHOULD NOT RELY SOLELY UPON THE INFORMATION PROVIDED IN THIS AGREEMENT AS IT IS NOT INTENDED TO CONTAIN A COMPLETE EXPLANATION OF THE CONSEQUENCES OF ARBITRATION.  YOU SHOULD TAKE REASONABLE STEPS TO CONDUCT FURTHER RESEARCH AND TO CONSULT WITH OTHERS — INCLUDING BUT NOT LIMITED TO AN ATTORNEY — REGARDING THE CONSEQUENCES OF YOUR DECISION, JUST AS YOU WOULD WHEN MAKING ANY OTHER IMPORTANT BUSINESS OR LIFE DECISION.**

    i.    <u>How This Arbitration Provision Applies</u>.

This Arbitration Provision is governed by the Federal Arbitration Act, 9 U.S.C. § 1 et seq. (the "FAA") and evidences a transaction involving interstate commerce.  This Arbitration Provision applies to any dispute arising out of or related to this Agreement or termination of the Agreement and survives after the Agreement terminates.  Nothing contained in this Arbitration Provision shall be construed to prevent or excuse You from utilizing any informal procedure for resolution of complaints established in this Agreement (if any), and this Arbitration Provision is not intended to be a substitute for the utilization of such procedures.

**Except as it otherwise provides, this Arbitration Provision is intended to apply to the resolution of disputes that otherwise would be resolved in a court of law or before any forum other than arbitration, with the exception of proceedings that must be exhausted under applicable law before pursuing a claim in a court of law or in any forum other than arbitration. Except as it otherwise provides, this Arbitration Provision requires all such disputes to be resolved only by an arbitrator through final and binding arbitration on an individual basis only and not by way of court or jury trial, or by way of class, collective, or representative (non-PAGA) action.**

Except as provided in Section 15.3(v), below, regarding the Class Action Waiver, such disputes include without limitation disputes arising out of or relating to interpretation or application of this Arbitration Provision, including the enforceability, revocability or validity of the Arbitration

Provision or any portion of the Arbitration Provision.  All such matters shall be decided by an Arbitrator and not by a court or judge. However, as set forth below, the preceding sentences shall not apply to disputes relating to the interpretation or application of the Class Action Waiver or PAGA Waiver below, including their enforceability, revocability or validity.

Except as it otherwise provides, this Arbitration Provision also applies, without limitation, to all disputes between You and Uber, as well as all disputes between You and Uber's fiduciaries, administrators, affiliates, subsidiaries, parents, and all successors and assigns of any of them, including but not limited to any disputes arising out of or related to this Agreement and disputes arising out of or related to Your relationship with Uber, including termination of the relationship.  This Arbitration Provision also applies, without limitation, to disputes regarding any city, county, state or federal wage-hour law, trade secrets, unfair competition, compensation, breaks and rest periods, expense reimbursement, termination, harassment and claims arising under the Uniform Trade Secrets Act, Civil Rights Act of 1964, Americans With Disabilities Act, Age Discrimination in Employment Act, Family Medical Leave Act, Fair Labor Standards Act, Employee Retirement Income Security Act (except for individual claims for employee benefits under any benefit plan sponsored by Uber and covered by the Employee Retirement Income Security Act of 1974 or funded by insurance), Genetic Information Non-Discrimination Act, and state statutes, if any, addressing the same or similar subject matters, and all other similar federal and state statutory and common law claims.

This Agreement is intended to require arbitration of every claim or dispute that lawfully can be arbitrated, except for those claims and disputes which by the terms of this Agreement are expressly excluded from the Arbitration Provision.

Uber Technologies, Inc. is an intended, third party beneficiary of this Agreement.

ii.    <u>Limitations On How This Agreement Applies</u>.

The disputes and claims set forth below shall not be subject to arbitration and the requirement to arbitrate set forth in Section 15.3 of this Agreement shall not apply:

A representative action brought on behalf of others under the Private Attorneys General Act of 2004 ("PAGA"), California Labor Code § 2698 *et seq.*, to the extent waiver of such a claim is deemed unenforceable by a court of competent jurisdiction;

Claims for workers compensation, state disability insurance and unemployment insurance benefits;

Regardless of any other terms of this Agreement, nothing prevents you from making a report to or filing a claim or charge with the Equal Employment Opportunity Commission, U.S. Department of Labor, Securities Exchange Commission, National Labor Relations Board, or Office of Federal Contract Compliance Programs, and nothing in this Agreement or Arbitration Provision prevents the investigation by a government agency of any report, claim or charge otherwise covered by this Arbitration Provision.  Nothing in this Arbitration Provision shall be deemed to preclude or excuse a party from bringing an administrative claim before any agency in order to fulfill the party's obligation to exhaust administrative remedies before making a claim in arbitration;

UBER_BARYSAS_0000214

Disputes that may not be subject to a predispute arbitration agreement pursuant to applicable Federal law or Executive Order are excluded from the coverage of this Arbitration Provision;

Disputes regarding the Intellectual Property Rights of the parties;

This Arbitration Provision shall not be construed to require the arbitration of any claims against a contractor that may not be the subject of a mandatory arbitration agreement as provided by section 8116 of the Department of Defense ("DoD") Appropriations Act for Fiscal Year 2010 (Pub. L. 111-118), section 8102 of the Department of Defense ("DoD") Appropriations Act for Fiscal Year 2011 (Pub. L. 112-10, Division A), and their implementing regulations, or any successor DoD appropriations act addressing the arbitrability of claims.

  iii.    Selecting The Arbitrator and Location of the Arbitration.

The Arbitrator shall be selected by mutual agreement of Uber and You.  Unless You and Uber mutually agree otherwise, the Arbitrator shall be an attorney licensed to practice in the location where the arbitration proceeding will be conducted or a retired federal or state judicial officer who presided in the jurisdiction where the arbitration will be conducted.  If the Parties cannot agree on an Arbitrator, then an arbitrator will be selected using the alternate strike method from a list of five (5) neutral arbitrators provided by JAMS (Judicial Arbitration & Mediation Services).  You will have the option of making the first strike.  If a JAMS arbitrator is used, then the JAMS Streamlined Arbitration Rules & Procedures rules will apply; however, if there is a conflict between the JAMS Rules and this Agreement, this Agreement shall govern.  Those rules are available here:

http://www.jamsadr.com/rules-streamlined-arbitration/

The location of the arbitration proceeding shall be no more than 45 miles from the place where You last provided transportation services under this Agreement, unless each party to the arbitration agrees in writing otherwise.

  iv.    Starting The Arbitration.

All claims in arbitration are subject to the same statutes of limitation that would apply in court. The party bringing the claim must demand arbitration in writing and deliver the written demand by hand or first class mail to the other party within the applicable statute of limitations period. The demand for arbitration shall include identification of the Parties, a statement of the legal and factual basis of the claim(s), and a specification of the remedy sought. Any demand for arbitration made to Uber shall be provided to General Counsel, Uber Technologies, Inc., 1455 Market St., Ste. 400, San Francisco CA 94103.  The Arbitrator shall resolve all disputes regarding the timeliness or propriety of the demand for arbitration.  A party may apply to a court of competent jurisdiction for temporary or preliminary injunctive relief in connection with an arbitrable controversy, but only upon the ground that the award to which that party may be entitled may be rendered ineffectual without such provisional relief.

v.   <u>How Arbitration Proceedings Are Conducted</u>.

In arbitration, the Parties will have the right to conduct adequate civil discovery, bring dispositive motions, and present witnesses and evidence as needed to present their cases and defenses, and any disputes in this regard shall be resolved by the Arbitrator.

**You and Uber agree to resolve any dispute that is in arbitration on an individual basis only, and not on a class or collective action basis ("Class Action Waiver"). The Arbitrator shall have no authority to consider or resolve any claim or issue any relief on any basis other than an individual basis. The Arbitrator shall have no authority to consider or resolve any claim or issue any relief on a class, collective, or representative basis.** Notwithstanding any other provision of this Agreement, the Arbitration Provision or the JAMS Streamlined Arbitration Rules & Procedures, disputes regarding the enforceability, revocability or validity of the Class Action Waiver may be resolved only by a civil court of competent jurisdiction and not by an arbitrator. In any case in which (1) the dispute is filed as a class, collective, or representative action and (2) there is a final judicial determination that all or part of the Class Action Waiver is unenforceable, the class, collective, and/or representative action to that extent must be litigated in a civil court of competent jurisdiction, but the portion of the Class Action Waiver that is enforceable shall be enforced in arbitration.

While Uber will not take any retaliatory action in response to any exercise of rights You may have under Section 7 of the National Labor Relations Act, if any, Uber shall not be precluded from moving to enforce its rights under the FAA to compel arbitration on the terms and conditions set forth in this Agreement.

**<u>Private Attorneys General Act</u>.**

Notwithstanding any other provision of this Agreement or the Arbitration Provision, to the extent permitted by law, (1) **You and Uber agree not to bring a representative action on behalf of others under the Private Attorneys General Act of 2004 ("PAGA"), California Labor Code § 2698 et seq., in any court or in arbitration**, and (2) for any claim brought on a private attorney general basis—i.e., where you are seeking to pursue a claim on behalf of a government entity— both you and Uber agree that any such dispute shall be resolved in arbitration on an individual basis only (i.e., to resolve whether you have personally been aggrieved or subject to any violations of law), and that such an action may not be used to resolve the claims or rights of other individuals in a single or collective proceeding (i.e., to resolve whether other individuals have been aggrieved or subject to any violations of law) ("PAGA Waiver"). Notwithstanding any other provision of this Agreement or the Arbitration Provision, the validity of the PAGA Waiver may be resolved only by a civil court of competent jurisdiction and not by an arbitrator. If any provision of the PAGA Waiver is found to be unenforceable or unlawful for any reason, (1) the unenforceable provision shall be severed from this Agreement; (2) severance of the unenforceable provision shall have no impact whatsoever on the Arbitration Provision or the Parties' attempt to arbitrate any remaining claims on an individual basis pursuant to the Arbitration Provision; and (3) any representative action brought under PAGA on behalf of others must be litigated in a civil court of competent jurisdiction and not in arbitration. To the extent that there are any claims to be litigated in a civil court of competent jurisdiction because a civil court of competent jurisdiction determines that the PAGA Waiver is unenforceable with respect

UBER_BARYSAS_0000216

to those claims, the Parties agree that litigation of those claims shall be stayed pending the outcome of any individual claims in arbitration.

vi.   Paying For The Arbitration.

Each party will pay the fees for his, her or its own attorneys, subject to any remedies to which that party may later be entitled under applicable law (i.e., a party prevails on a claim that provides for the award of reasonable attorney fees to the prevailing party). In all cases where required by law, Uber will pay the Arbitrator's and arbitration fees. If under applicable law Uber is not required to pay all of the Arbitrator's and/or arbitration fees, such fee(s) will be apportioned equally between the Parties or as otherwise required by applicable law. However, You will not be required to bear any type of fee or expense that You would not be required to bear if You had filed the action in a court of law. Any disputes in that regard will be resolved by the Arbitrator as soon as practicable after the Arbitrator is selected, and Uber shall bear all of the Arbitrator's and arbitration fees until such time as the Arbitrator resolves any such dispute.

vii.   The Arbitration Hearing And Award.

The Parties will arbitrate their dispute before the Arbitrator, who shall confer with the Parties regarding the conduct of the hearing and resolve any disputes the Parties may have in that regard. Within 30 days of the close of the arbitration hearing, or within a longer period of time as agreed to by the Parties or as ordered by the Arbitrator, any party will have the right to prepare, serve on the other party and file with the Arbitrator a brief. The Arbitrator may award any party any remedy to which that party is entitled under applicable law, but such remedies shall be limited to those that would be available to a party in his or her individual capacity in a court of law for the claims presented to and decided by the Arbitrator, and no remedies that otherwise would be available to an individual in a court of law will be forfeited by virtue of this Arbitration Provision. The Arbitrator will issue a decision or award in writing, stating the essential findings of fact and conclusions of law. A court of competent jurisdiction shall have the authority to enter a judgment upon the award made pursuant to the arbitration. The Arbitrator shall not have the power to commit errors of law or legal reasoning, and the award may be vacated or corrected on appeal to a court of competent jurisdiction for any such error.

viii.   **Your Right To Opt Out Of Arbitration.**

**Arbitration is not a mandatory condition of your contractual relationship with Uber. If You do not want to be subject to this Arbitration Provision, You may opt out of this Arbitration Provision by notifying Uber in writing of Your desire to opt out of this Arbitration Provision, which writing must be dated, signed and delivered by electronic mail to optout@uber.com, by U.S. Mail, or by any nationally recognized delivery service (e.g, UPS, Federal Express, etc.), or by hand delivery to:**

General Counsel
Uber Technologies, Inc.
1455 Market St., Ste. 400
San Francisco CA 94103

UBER_BARYSAS_0000217

**In order to be effective, the writing must clearly indicate Your intent to opt out of this Arbitration Provision and the envelope containing the signed writing must be received (if delivered by hand) or post-marked within 30 days of the date this Agreement is executed by You. Your writing opting out of this Arbitration Provision will be filed with a copy of this Agreement and maintained by Uber. Should You not opt out of this Arbitration Provision within the 30-day period, You and Uber shall be bound by the terms of this Arbitration Provision. You have the right to consult with counsel of Your choice concerning this Arbitration Provision. You understand that You will not be subject to retaliation if You exercise Your right to assert claims or opt-out of coverage under this Arbitration Provision.**

ix.     <u>Full And Complete Agreement Related To Formal Resolution Of Disputes; Enforcement Of This Agreement</u>.

This Arbitration Provision is the full and complete agreement relating to the formal resolution of disputes arising out of this Agreement. Except as stated in subsection v, above, in the event any portion of this Arbitration Provision is deemed unenforceable, the remainder of this Arbitration Provision will be enforceable.

By clicking "I accept", Customer expressly acknowledge that Customer has read, understood, and taken steps to thoughtfully consider the consequences of this Agreement, that Customer agrees to be bound by the terms and conditions of the Agreement, and that Customer is legally competent to enter into this Agreement with Uber.

UBER_BARYSAS_0000218

2022-67757 / Court: 133

# Exhibit D

DAINIUS BARYSAS,                              §
                                             §
                                             §
          Claimant,                          §
                                             §        HON. SUSAN SOUSSAN,
vs.                                          §        ARBITRATOR
                                             §
UBER TECHNOLOGIES, INC.,                     §
                                             §
          Respondent.                        §
                                             §

**CLAIMANT'S RESPONSE TO RESPONDENT'S MOTION FOR PROTECTIVE
ORDER TO PREVENT THE DEPOSITION OF ALEX ROSENBLAT AND
CLAIMANT'S MOTION TO COMPEL THE DEPOSITION OF UBER EMPLOYEE
ALEX ROSENBLAT**

TO THE HONORABLE KATIE KENNEDY, ARBITRATOR:

Claimant, Dainius Barysas, files this Response to Respondent's Motion to Quash the

Deposition of Alex Rosenblat and Motion to Compel the Deposition of Alex Rosenblat, and will

respectfully show the Court as follows:

I.       SUMMARY OF POSITION

Alex Rosenblat is not an Apex Witness.

Alex Rosenblat is one of the world's foremost researchers of Uber and its practices

pertaining to Uber Drivers. Alex Rosenblat was hired by Uber as Head of Marketplace Policy,

Fairness & Research based on her experience investigating Uber and Uber's practices pertaining

to its Uber Drivers.  Alex Rosenblat was hired by Uber to implement change as it relates to Uber's

treatment of its Uber Drivers. Alex Rosenblat's testimony sought by deposition is relevant,

discoverable, and should be compelled.

II.      AUTHORITIES

1

Pursuant to Federal Rule of Civil Procedure 26(b)(1), a party may obtain discovery of any nonprivileged matter "relevant to any party's claim or defense." FED. R. CIV. P. 26(b)(1). "A discovery request is relevant when the request seeks admissible evidence or 'is reasonably calculated to lead to the discovery of admissible evidence.'" *Crosby v. La. Health Serv. & Indem. Co.*, 647 F.3d 258, 262 (5th Cir. 2011) (citations omitted). A party may, by oral questions, depose any person, including a party, without leave of court except as provided in Rule 30(a)(2). FED. R. CIV. P. 30(a)(1).

Federal courts permit the depositions of high-level executives, also known as apex executives, when conduct and knowledge at the highest levels of the corporation are relevant to the case. See, e.g., *Kimberly-Clark Corp. v. Cont'l Cas. Co.*, No. 3:05-CV-0475-D, 2006 U.S. Dist. LEXIS 86469, 2006 WL 3436064, at *2 (N.D. Tex. Nov. 29, 2006). However, "the Fifth Circuit has recognized the need for first utilizing less-intrusive means before taking an apex deposition, **by way of deposing lesser-ranking employees."** *Schmidt v. Goodyear Tire & Rubber Co.*, 2003 U.S. Dist. LEXIS 28130, at *3 (E.D. Tex. Jan. 7, 2003) (citing Salter v. Upjohn Co., 593 F.2d 649 (5th Cir. 1979)). (Emphasis added here.)

- *Barysas* **Scheduling Order**

On December 14, 2020, the Initial Scheduling Order was signed that allows the Claimant to take 4 fact witness depositions:

7. <u>Discovery Permitted</u>

   A. <u>Depositions</u>: The named party may take the deposition of the other named party. The party that is a corporation or business entity shall make available to its party-opponent, if requested, one or more corporate representatives having knowledge of those matters as may be specified in a Notice of Deposition. The party shall also be permitted to depose, without obtaining further leave from the Arbitrator, not more than 4 other fact witnesses, as well as any expert witness designated by a party-opponent. Each oral deposition shall not exceed 7 hours' duration. With respect to all depositions, there shall be no speaking objections or interference with the ability of counsel to elicit testimony from a witness subject to privilege objections and instructions.

*See* Initial Scheduling Order at 7(A), p. 3.

### III.   FACTS

#### a.   **Uber's High-Level Executives**

Uber's website maintains a "Leadership" tab that identifies its executive team. *See* Exhibit

1, Printout taken from https://www.uber.com/newsroom/leadership/).   According to Uber's

website. members of the Uber's Executive Team include:

1. Dara Khosrowshahi - Chief Executive Officer;
2. Nelson Chai - Chief Financial Officer;
3. Jill Hazelbaker - Senior Vice President, Marketing & Public Affairs;
4. Nikki Krishnamurthy - Chief People Officer;
5. Tony West - Chief Legal Officer;
6. Gus Fuldner - Vice President, Safety & Core Services;
7. Pierre-Dimitri Gore-Coty - Senior Vice President, Delivery;
8. Sundeep Jain - Chief Product Officer;
9. Bo Young Lee - Chief Diversity and Inclusion Officer;
10. Andrew Macdonald - Senior Vice President, Mobility & Business Operations; and
11. Sukumar Rathnam - Chief Technology Officer.

*See* Exhibit 1, Uber Executives and Board of Directors.

Ubers Leadership tab also identifies Uber's Board of Directors as:

1. David Trujillo – Partner, TPG Capital
2. Yasir Al-Rumayyan - Managing Director Saudi Arabia's Public Investment Fund
3. Wan Ling Martello - Former Executive Vice President Nestlé
4. Dara Khosrowshahi - CEO Uber
5. Ursula Burns - CEO and Chairman VEON
6. John Thain - Former Chairman and CEOCIT Group
7. Robert Eckert - Chairman Emeritus Mattel
8. Ronald Sugar (Chair) - Former Chairman and CEO Northrop Grumman
9. Mandy Ginsberg - Former CEO Match Group
10. Revathi Advaithi – CEO Flex
11. Alexander Wynaendts - Former CEO and Chairman Aegon NV

*See* Exhibit 1, Uber Executives and Board of Directors.

#### b.   **Uber's Position: Head of Marketplace Policy, Fairness & Research**

On or about October 10, 2020, Uber posted on its website a new job posting for the position of "Head of Policy, Marketplace, & Fairness." *See* Exhibit 2, Head of Policy, Marketplace & Fairness job posting. The posting **does not** seek an executive for the position.  This new Uber position sought an applicant who could "orchestrate the integration of policy considerations into product development, and strengthen the integrity and transparency of [Uber's] practices." *Id.* at 1, Para. 2.

Uber sought an applicant that could "work with cross functional partners to develop marketplace principles, as well as participate in processes that improve the operational functionality of [Uber's] pricing, matching and positioning." *Id,* Ex. 2 at p. 1, Para 2.  The position seeks an individual to "partner with product, legal, finance, compliance, comms, and policy teams to coordinate engaging tactics, and drive awareness of [Uber's] marketplace initiatives including current and future commitments." *Id* at 1, Para. 4.  Uber goes on to specifically bullet point four important objectives for the Head of Marketplace Policy, Fairness & Research.  Uber desires the applicant who accepts the position to:

- Develop and lead the policy strategy to drive trust, fairness, accountability and transparency into our marketplace product team;
- Work to deliver on Uber's principles and commitments as well as initiate new releases to build more credibility;
- Lead product counsel on policy issues in relation to marketplace, including coordinating efforts across the Central policy and local government relations/public affairs teams; and
- Own external communications with the policy and academic community broadly and specifically in the areas of focus. In this capacity, you might (1) facilitate a recurring publication, webinar series or roundtable highlighting specific success stories, use cases and/or future product functionality, or (2) develop a panel of leading specialists to contribute their findings and key insights to Uber's marketplace.

*See* Exhibit 2 at p. 1, Bulleted List.

In January of 2021, Uber hired Alex Rosenblat for the position of Head of Marketplace Policy, Fairness, & Research.

### c. **Who is Alex Rosenblat?**

Alex Rosenblat is a social scientific researcher, an academic author, and journalistic writer/blogger who authored the book *Uberland: How Algorithms are Rewriting the Rules of Work.  See* Exhibit 3, Cover of Alex Rosenblat, *Uberland: How Algorithms are Rewriting the Rules of Work* (2018); *See also* Exhibit 4, *Uberland: How Algorithms are Rewriting the Rules of Work* (2018) Appendix 1, Methodology, p. 209. In authoring *Uberland*, Ms. Rosenblat used a qualitative ethnography methodology, performing participant-observations with over four hundred drivers by riding as a passenger. *See* Ex. 4, *Uberland*, Appendix 1, Methodology at 210. Additionally, Ms. Rosenblat conducted research through online driver forums, which Ms. Rosenblat considered to be 'virtual field sites." *See Uberland*, Appendix 1, Methodology at 213. As part of Ms. Rosenblat's research for *Uberland*, "[t]he field sites that are subjects of deeper ethnographic and investigative analysis include Austin, Texas; Dallas and Forth Worth area in Texas… New York City and portion of New Jersey close to the city…" Appendix 1, Methodology at 212. Additionally, Ms. Rosenblat actively followed and researched Uber Driver forum groups, blogs, digital chats, and websites which had a combined total of three-hundred thousand members. *See Uberland*, Appendix 1, Methodology at 213-214.

To write *Uberland*, Alex Rosenblat studied Uber drivers from mid-2014 through the winter of 2018. *See* Exhibit 5, Excerpt from Alex Rosenblat, *Uberland*, Introduction, p. 6.

A simple review of the table of contents of Alex Rosenblat's *Uberland* identifies the relevance of Rosenblat's research to the Claimant's Claims.  Rosenblat's research in *Uberland* tackles Uber's treatment of drivers in chapters 1-3, Uber's management of the money exchange

between it and the Drivers in Chapter 4, Uber's use of algorithm to manage drivers in Chapter 5, and Uber's public policy / political tactics in Chapter 6. *See Uberland*, Table of Contents. *See* Exhibit 6, Excerpt from Alex Rosenblat, *Uberland*, Table of Contents.

According to Ms. Rosenblat's website (https://alexrosenblat.com/), in addition to her book *Uberland*, Ms. Rosenblat has authored the following Uber and/or Gig Economy works and participated in Uber related speeches:

- Authored or Co-Authored 17 published articles on Uber and/or Gig Economy;
- Authored or Co-Authored 7 Academic papers and Working Papers on Uber / Gig Economy,
- Lead dozens of "Talks" and/or Keynote Speeches related to Uber / Gig Economy at law schools universities / conferences / conventions;

*See* Alex Rosenblat's website, https://alexrosenblat.com/, Media tab; Articles tab; Working Papers tab; Academic tab; Talks tab.

Ms. Rosenblat has provided testimony relating to her ethnographical research of Uber to the United Nations. (*See* link of video of Ms. Rosenblat's Testimony at UN General Assembly, Second Committee, 74th Session – October 24, 2019 - *https://youtu.be/eOfBlwCFv4Q.*) According to her testimony given to the U.N. General Assembly Alex Rosenblat is a technology ethnographer who studied Uber Drivers over the course of several years. *See* U.N. General Assembly Testimony, *https://youtu.be/eOfBlwCFv4Q* at :01-:20.  Alex Rosenblat is a technology ethnographer and for four years she studied how Uber Drivers experience technology at work. *Id.*  In her research, Alex Rosenblat went across more than 25 cities in the United States and Canada and observed about 300,000 Uber Drivers online and in online forums. *See* U.N. General Assembly Testimony, *https://youtu.be/eOfBlwCFv4Q*, :20 – :43.) Ms. Rosenblat's research found that, "although Uber Driver's are promoted as entrepreneurs, they are actually managed by algorithms that enact the

rules and policies that Uber sets for how drivers should behave on the job." *See* U.N. General

Assembly Testimony, *https://youtu.be/eOfBhvCFv4Q*, :20 – :43.)

  When Ms. Rosenblat was hired by Uber, she posted the following on her Twitter social

media platform:



Twitter Post, Alex Rosenblat, January 13, 2021.

Likewise, in February of 2021, media outlets learned that Alex Rosenblat was hired by Uber.  In an article from the Seattle Times (that was also published by Bloomberg), it is reported that, "[i]n an emailed statement, Uber said it hired Rosenblat because the company wants "people at Uber who care about driver issues and who aren't afraid to challenge our thinking on any given issue."" *See*  Exhibit 7, Bloomberg, *Uber hires prominent critic to focus on treatment of drivers*, Seattle Times, Feb. 17, 2021, https://www.seattletimes.com/business/uber-hires-prominent-critic-to-focus-on-treatment-of-drivers/). According to the article, Rosenblat is quoted that she changed her mind about joining Uber and accepted the position because, "[t]here are new ways I can use my expertise now, inside the company." *Id.*

## IV.   ARGUMENT

Dainius Barysas drove for Uber from 2014 to 2019. From 2014 – 2017, Mr. Barysas drove in New York City.  In 2017 Mr. Barysas moved to Houston and continued driving for Uber until 2019.

Alex Rosenblat is one of the world's foremost researchers of Uber and its practices pertaining to Uber Drivers. Indeed, Ms. Rosenblat has performed methodical and scientific based research of Uber's practices and polices concerning Uber Drivers since at least 2014.   Alex Rosenblat's book *Uberland* is based on her ethnographical research of Uber from 2014-2018. Additionally, Alex Rosenblat has been published many times over relating to Uber's practices with Uber Drivers.

Ms. Rosenblat clearly maintains specific and unique, relevant knowledge and information pertaining to Uber Drivers like Dainius Barysas.  The periods that Alex Rosenblat researched Uber overlap completely with the period of time that Dainius Barysas drove for Uber. Additionally, Alex Rosenblat's research includes drivers from both New York and Texas, which is particularly

relevant because Claimant Barysas drove in both New York and Texas.  Finally, according to Alex Rosenblat, she was hired **during the pendency of Barysas's claims** to "bring research into practice around core fairness concerns" written about in *Uberland* by Rosenblat.

Ms. Rosenblat's research experience is highly unique and relevant to the claim here.  It is clear that Ms. Rosenblat was hired based on her knowledge as it relates to Uber's practices.

### a. Rosenblat is not an Apex Witness.

Uber's Motion for Protective Order relies on Alex Rosenblat receiving protections provided to a corporation's highest-level employees. In those circumstances, the so called "Apex Witness" is offered *some* protection from deposition unless it can be shown that the witness has unique and specific personal knowledge of discoverable information. **Uber offers zero evidence that Rosenblat is an Apex witness.**

Uber's executives and Board of Directors are identified on their website. *See* Exhibit 1, Uber Executives and Board of Directors. Alex Rosenblat is not listed as part of Uber's executive team and is not an employee at the "highest levels of the corporation." Indeed, Alex Rosenblat is not listed anywhere on Uber's website and a search of the "Uber Newsroom" for "Alex Rosenblat" generates zero results. *See* Exhibit 8 - Uber Newsroom Search Results.  But for the public statements made by both Uber and Alex Rosenblat when the initial hiring took place, the public would not know that Alex Rosenblat even works for Uber.

Finally, Uber's Job Posting for Head of Marketplace Policy, Fairness & Research (Exhibit 2) does not indicate that the position is for an executive position or high-level corporate official. As shown in the Job Posting, the position specifically seeks a "public policy manager" that performs cross functional tasks with other departments such as the product department, legal department, finance department, compliance department, comms department, and policy

department.  *See* Exhibit 2, Job Posting for Head of Marketplace Policy, Fairness & Research at 1.

> **b.  *In arguendo*, even if Rosenblat were an Apex witness, she maintains unique and specific personal knowledge relevant to Claimant Barysas's claims.**

As stated above, Alex Rosenblat is not an Apex Witness; however, even if she were, it is clear that Alex Rosenblat maintains a wealth of unique and specific personal knowledge of discoverable information relevant to the claims made by Claimant Barysas.  Both Alex Rosenblat's and Uber's public statements clearly show that Alex Rosenblat was hired based on her knowledge and research related to Uber with a goal to initiate change.

As the Arbitrator is well aware, in order for the Claimant to prove that he was misclassified as an independent contractor, he must show that Uber's right to control and exertion of actual control by Uber during the course and scope of employment renders the contractual classification of the Claimant as an independent contractor a sham.

Uber's right to control and exertion of actual control is exhibited by the way they treat their drivers.  Alex Rosenblat has spent a considerable amount of her career studying Uber's control.

Alex Rosenblat's research of Uber from 2014 up until she was hired by Uber in early 2021 provide unique and specific knowledge pertaining to Uber and Uber's practices.  Moreover, discovery related to Alex Rosenblat's position as Head of Marketplace Policy, Fairness & Research at Uber is relevant to the case.

 Both Uber and Ms. Rosenblat acknowledge that she was hired because of her unique experience in studying Uber to "challenge [Uber's] thinking." *See* Exhibit 7 Seattle Times Article. Also, Ms. Rosenblat claims she was hired to "bring [her] research into practice around core fairness concerns [she] wrote about for years in *Uberland*." *See supra* Rosenblat Twitter entry. In her

tweet, Ms. Rosenblat hoped her hiring would leverage her insights to "make things better." *See supra,* Rosenblat Twitter entry.

Alex Rosenblat's testimony related to her experience prior to and after being hired by Uber is highly relevant to the claims and defenses in the current arbitration.

### c. Uber's claim that testimony of Alex Rosenblat is not obtainable because she does not know Claimant Barysas is unsupported.

Uber finally attempts to shield Ms. Rosenblat from deposition because she has no specific knowledge of Dainius Barysas and did not interview Barysas for her book *Uberland*.

The Federal Rules of Civil Procedure do not require a showing that a corporate fact witness have personal knowledge of a claimant/plaintiff or require a corporate fact witness to have met the claimant/plaintiff in order to be deposed.  If this were the standard, corporate fact witnesses would rarely be deposed and the corporation would be unreasonably protected from tendering corporate fact witnesses.

As stated, Uber's treatment of Uber Drivers is central to the claims made by Claimant Barysas.  Alex Rosenblat's research over her career concerning Uber's treatment of Uber Drivers is overwhelmingly relevant to the claims made by Claimant Barysas. Additionally, the work done by Alex Rosenblat since being hired by Uber is overwhelmingly relevant as it directly impacts Uber's policies and procedures that were in practice when Barysas drove for Uber.

### V.    Conclusion

For the reasons stated herein, Claimant Barysas respectfully requests that the Arbitrator deny Respondent Uber's motion for protection and compel Alex Rosenblat's deposition to go forward on a date to be determined by the parties. Plaintiff further requests all other relief, in law or equity, to which she may be justly entitled.

KHERKHER GARCIA, LLP

By:     _____/s/ Bret Stanley_____
        Bret Stanley
        Steve Kherkher
        Kathryn Hiett

        2925 Richmond Ave., Suite 1560
        Houston, TX 77098
        (713) 333-1030 / (713) 333-1029 (fax)
        BStanley@KherkherGarcia.com
        skherkher@kherkhergarcia.com
        khiett@kherkhergarcia.com

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the above and foregoing document has been forwarded via certified mail, return receipt requested, on this the 7th day of June, 2021, to the following counsel:

Kimberly R. Miers
Allison Williams
Nicole S. LeFave
Abby Bochenek
Collin Quigley
LITTLER MENDELSON, P.C.
kmiers@littler.com
acwilliams@littler.com
nlefave@littler.com
abochenek@littler.com
cquigley@littler.com
sbehnia@littler.com
smendoza@littler.com
scornell@littler.com
preyes@littler.com

                        By:     _____/s/ Bret Stanley_____
                                Bret Stanley

12

# Exhibit E

DAINIUS BARYSAS, § §

§ Claimant, §

§

vs. § HON. SUSAN SOUSSAN, § ARBITRATOR

UBER TECHNOLOGIES, INC., §

§ Respondent. §

§

§

## RESPONDENT UBER TECHNOLOGIES, INC.'S MOTION FOR PROTECTIVE ORDER TO PREVENT THE APEX DEPOSITION OF ALEX ROSENBLAT

Respondent Uber Technologies, Inc. ("Uber") hereby files this Motion for Protective Order to Prevent the Apex Deposition of Alex Rosenblat (the "Motion"), and respectfully states as follows:

### I.
### SUMMARY OF ARGUMENT

Rather than obtaining information from a corporate representative deposition or the deposition of a witness who has personal knowledge of facts that are relevant to the claims and defenses asserted in this arbitration, Claimant sent Uber a deposition notice for Uber's newly hired Head of Marketplace Policy, Fairness and Research, Alex Rosenblat. Respondent moves for a protective order because as a high-level executive, Ms. Rosenblat does not possess unique and specific personal knowledge of Claimant's claims in this matter.

Notably, Ms. Rosenblat has never met Claimant, and she did not work at Uber during the relevant time period. In fact, Ms. Rosenblat did not, at any time, work for Uber when Claimant was utilizing the Uber App for transportation opportunities. Ms. Rosenblat is not identified as someone with knowledge in Claimant's discovery responses, nor is she being identified by Uber as a corporate representative. Her knowledge is wholly irrelevant. Even if Claimant could show relevance (which he cannot), he is required to first utilize less intrusive means to obtain the

information sought, which he has not done.  On May 11, 2021, Claimant served a *proposed* corporate representative deposition notice identifying 50 proposed topics of testimony.  The parties are in the process of conferring on the scope of those topics – which eclipse the issues presented in this single-claimant arbitration.  Seeking Ms. Rosenblat's deposition in this matter is a highly intrusive and burdensome strategy that serves no purpose other than to harass Respondent and Ms. Rosenblat.[1]

Rather than requesting the Arbitrator's assistance, Counsel for Claimant unilaterally noticed Ms. Rosenblat's deposition knowing that Uber opposes it and that Uber recently quashed Ms. Rosenblat's deposition in another pending arbitration.  Because Ms. Rosenblat has no personal knowledge of Claimant or his claims and because Claimant has yet to depose Uber's corporate representative, Uber respectfully requests that the Arbitrator grant its Motion, quash the deposition notice for Ms. Rosenblat, and issue an order protecting Uber from Claimant's intrusive, harassing discovery practices.

## II.
## FACTUAL BACKGROUND

In this arbitration, Claimant brings claims for compensation pursuant to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.* and Texas common law.  Specifically, Claimant brings three claims under the FLSA: (1) failure to pay minimum wage; (2) failure to pay overtime wages for hours worked over forty in a workweek; and (3) failure to maintain records as required by the FLSA. Claimant also brings claims for alleged unjust enrichment, unlawful retention of tips, and improper "kickbacks."  The relevant time period is March 12, 2017 to July 19, 2018, or

---

[1] Pursuant to the terms of the 2015 Raiser Technology Services Agreement that Claimant accepted, arbitration proceeds pursuant to the JAMS Streamlined Arbitration Rules and Procedures. *See* Exh. 4, Raiser Technology Services Agreement dated December 11, 2015, § 15.3 (iii). Pursuant to Rule 13 of the JAMS Rules, the necessity for additional information beyond the initial disclosure exchanges "shall be determined by the Arbitrator based upon the reasonable need for the requested information, the availability of other discovery options, and the burdensomeness of the request on the opposing Parties and the witness." *Id.*

the last date that Claimant used the Uber app to generate leads.[2]

Claimant served Uber with his Arbitration Demand via letter dated March 12, 2020. The present action was initiated before Arbitrator Susan Soussan on October 29, 2020. An initial conference was held before the Arbitrator on December 7, 2020. The Arbitrator entered a Scheduling Order on December 14, 2020, which permits each party to take up to four fact witness depositions. Claimant filed his Specification of Claims on January 15, 2021. Uber filed its response on February 5, 2021.

To date, the parties have engaged in extensive written discovery. Relevant to this Motion, Uber has continuously raised Claimant's failure to specify by name any witnesses other than himself and "various witnesses connected to Respondent Uber." On April 29, 2021, Uber deposed Claimant. During his deposition, Claimant did not disclose meeting with or speaking to Ms. Rosenblat.

Nonetheless, on May 11, 2021, Claimant informed Uber that he intended to depose Ms. Rosenblat as a fact witness. **Exhibit 1**, E-mail from B. Stanley dated May 11, 2021. Despite successfully quashing the deposition notice of Ms. Rosenblat in another pending arbitration, Claimant's counsel almost immediately thereafter unilaterally noticed Ms. Rosenblat's deposition for June 14, 2021 via ZOOM in this arbitration. **Exhibit 2**, Claimant's Notice of Oral and Videotaped Deposition of Alex Rosenblat; **Exhibit 3**, E-mail from B. Stanley dated May 20, 2021.

Ms. Rosenblat has been an employee of Uber for approximately four months, or since January 2021. She is currently located in California. Claimant stopped utilizing the Uber App to obtain transportation opportunities in July 2018, approximately 2 ½ years before Ms. Rosenblat started working for Uber. Any knowledge that Ms. Rosenblat has as the Head of Marketplace

[2] Uber does not concede that a three-year statute of limitations applies, but acknowledges for purposes of discovery only that the relevant time period extends to three years prior to when Claimant filed his Arbitration Demand.

3

Policy, Fairness, and Research in her short tenure with Uber has no bearing on Claimant's contractual relationship with Uber that ended 2 ½ years prior.

As Head of Marketplace Policy, Fairness and Research, Ms. Rosenblat is a high-level executive.  Her time is sought via numerous daily meetings and on high-profile projects, severely limiting her availability.  Prior to working for Uber, Ms. Rosenblat worked as a labor researcher and author, writing a 2018 book entitled "Uberland: How Algorithms Are Rewriting the Rules of Work."  Ms. Rosenblat interviewed drivers for her book. There is no evidence that Ms. Rosenblat met, much less interviewed, Claimant nor does Claimant make any arguments or even suggest that Ms. Rosenblat has personal knowledge of Claimant or his claims in this arbitration.

As demonstrated below, serving the Notice is a blatant fishing expedition and thinly veiled effort to harass Uber. Ms. Rosenblat's testimony would be wholly irrelevant to Claimant's Arbitration Demand, Claimant's Specification of Claims, and Respondent's Response to Claimant's Specification of Claims. Accordingly, Uber moves for a protective order protecting Uber from presenting Ms. Rosenblat.

## III.
## ARGUMENT & AUTHORITIES

**A.** **Claimant's Attempt to Depose Alex Rosenblat Violates the Parties' Agreement and the Arbitrator's Order.**

Pursuant to the terms of the 2015 Raiser Technology Services Agreement that Claimant accepted, arbitration proceeds pursuant to the JAMS Streamlined Rules and Procedures. **Exhibit 4**, Raiser Technology Services Agreement ("Agreement") dated December 11, 2015, § 15.3 (iii). Pursuant to Rule 13 of the JAMS Rules, the necessity for additional information beyond the initial disclosure exchanges "shall be determined by the Arbitrator based upon the reasonable need for the requested information, the availability of other discovery options, and the burdensomeness of the request on the opposing Parties and the witness." *Id.*  Here, while the Arbitrator's Order

4

permits four fact witnesses, Ms. Rosenblat is not a proper fact witness.  It is evident that Claimant seeks to unreasonably expand the discovery contemplated in the Agreement and the Order for no purpose other than to harass Uber and increase defense costs.

Pursuant to the Agreement, the parties agreed to streamline the dispute resolution procedure.  Claimant should not be permitted to abuse the discovery process by requesting frivolous apex depositions that will have no bearing on the outcome of this arbitration.

**B.**    **Uber Has Good Cause And A Specific Need To Protect Ms. Rosenblat From Deposition.**

1.    Legal Standard

While Federal Rule of Civil Procedure ("Rule") 26(b)(1) provides that "[p]arties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense," it also specifies that discovery must be "proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." FED. R. CIV. P. 26(b)(1).  The Arbitrator may limit discovery if the discovery sought is "unreasonably cumulative or duplicative," or is obtainable "from some other source that is more convenient, less burdensome, or less expensive." FED. R. CIV. P. 26(b)(2)(C) (i). The Arbitrator may also limit discovery when "the proposed discovery is outside the scope permitted by Rule 26(b)(1)," including when the discovery sought is irrelevant to any party's claim or defense. FED R. CIV. P. 26(b)(2)(C)(iii).

Relating to protective orders:

Under Federal Rule of Civil Procedure 26(c), the Court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense.  The burden is upon the party seeking the protective order to show the necessity of its issuance, which contemplates a particular and

specific demonstration of fact as distinguished from stereotyped and conclusory statements.  A protective order is warranted in those instances in which the party seeking it demonstrates good cause and a specific need for protection.  The Court has broad discretion in determining whether to grant a motion for a protective order.

*Oyekwe v. Rsch. Now Grp., Inc.*, No. 3:19-CV-1085-S-BN, 2020 WL 1064868, at *1 (N.D. Tex. Mar. 4, 2020) (omitting internal citations, quotations and alliterations) (granting protective order under Rule 26(c) preventing the depositions of high-level executives).

      2.    <u>Claimant Must First Utilize Less-Intrusive Means Before Deposing Ms. Rosenblat</u>

While the JAMS Rules apply, the Arbitrator may also be guided by the federal rules and federal precedent.  "[F]ederal courts permit the depositions of high-level executives, sometimes referred to as apex executives,[3] when conduct and knowledge at the highest levels of the corporation are relevant to the case" <u>and</u> when the high-level executive has unique personal knowledge of the plaintiff's claims. *Oyekwe*, 2020 WL 1064868 at *2-3.  However, the Fifth Circuit mandates using a less-intrusive means before taking a high-level executive deposition, recognizing the special burdens imposed by such depositions and their potential for harassment and abuse. *See Salter v. Upjohn Co.*, 593 F.2d 649 (5th Cir. 1979).  Therefore, "[u]nless the executive possesses 'unique personal knowledge' about the controversy, the court should regulate the discovery process to avoid 'oppression, inconvenience, and burden' to the executive and the corporation." *Oyekwe*, 2020 WL 1064868 at *2 (quoting *Robinson v. Nexion Health at Terrell, Inc.*, No. 3:12-cv-3853-L-BK, 2014 WL 12915533, at *2 (N.D. Tex. Apr. 16, 2014)).  The proper means to regulate such discovery is via a protective order. *Id.*

---

[3] If operating under Texas state law, the apex doctrine would apply and mandate quashing Ms. Rosenblat's deposition. *In re Alcatel USA, Inc.*, 11 S.W.3d 173, 175 (Tex. 2000) ("We held that the apex deposition guidelines apply '[w]hen a party seeks to depose a corporate president or other high level corporate official.'" (quoting *Crown Cent. Petroleum Corp. v. Garcia*, 904 S.W.2d 125, 128 (Tex. 1995)).

a.  *Ms. Rosenblat Does Not Have Unique, Personal Knowledge Relevant To The Case*

Claimant cannot demonstrate that Ms. Rosenblat has unique, personal knowledge of his claims in this arbitration.  "[U]nique personal knowledge must be truly unique—the deposition [will] not be allowed where the information could be had through interrogatories, deposition of a designated spokesperson, or deposition testimony of other persons." *Baine v. Gen. Motors Corp.*, 141 F.R.D. 332, 336 (M.D. Ala.1991) (granting defendant's motion for protective order concerning deposition of vice president of General Motors).  Here, Ms. Rosenblat began working for Uber in California in January 2021 as the Head of Marketplace Policy, Fairness and Research.  Claimant's claims involve his time as a rideshare driver generating leads via Uber's app in the Houston market, from March 2017 to July 2018.  Ms. Rosenblat will therefore have <u>no personal knowledge</u> of what occurred "at the highest levels" of Uber during the relevant time period because she did not work there until approximately 2 ½ years later.  It is further uncontested that Ms. Rosenblat and Claimant never met or interacted in any way.  As such, Ms. Rosenblat will also have <u>no personal knowledge</u> of any facts specific to his claims in this case.

Likely, Claimant seeks Ms. Rosenblat's deposition because of cynical statements she made regarding Uber prior to her employment. These statements are not unique or specific to Claimant, and to the extent Claimant believes that Ms. Rosenblat has knowledge of his experience as a driver based on her pre-2021 research related to Uber drivers generally, this belief still fails to establish that her knowledge is unique and specific to Claimant's claims.  There is no evidence that Ms. Rosenblat interviewed or otherwise interacted with Claimant for her research.  Any testimony concerning such research would, therefore, be outside of Ms. Rosenblat's role as an Uber employee and would be purely speculative and ultimately irrelevant to this arbitration.

Tellingly, throughout four months of discovery, Claimant did not even identify Ms. Rosenblat as an individual with knowledge of his claims, despite numerous requests by Uber seeking exactly that information. Uber's Interrogatory No. 1, for example, seeks the "[i]dentity of each person known or believed by you to have knowledge or information related to any of the allegations in your Arbitration Demand." **Exhibit 5**, Respondent's First Set of Interrogatories to Claimant dated January 22, 2021, at 12.  In his answer to this interrogatory, Claimant identifies "Claimant Barysas and various witnesses connected to Respondent Uber." **Exhibit 6**, Claimant's Responses to Respondent's First Set of Interrogatories dated February 22, 2021, at 16.  Respondent subsequently followed up seeking the identity of these "various witnesses connected to Respondent Uber" in a meet and confer letter, e-mails, and a telephonic meet and confer conference; Claimant did not identify Ms. Rosenblat in any supplemental interrogatory answers.

Ms. Rosenblat is not a proper fact witness given her lack of knowledge regarding Claimant and Uber's policies and practices during the relevant time period.  Rather, the proper witness for the information Claimant seeks is a corporate representative via Rule 30(b)(6).

      b.    *Claimant Must First Seek To Obtain Information Through Less Burdensome Means*

The Fifth Circuit and lower courts are clear that before noticing a high-level executive deposition, a party must first attempt to seek information through less burdensome means of discovery. *Salter*, 593 F.2d at 651 (affirming district court judgment granting protective order, opining that plaintiff would "very likely" abandon the request to take the executive's deposition after taking the depositions of individuals with direct knowledge of the relevant facts); *Robinson*, 2014 WL 12915533 at *3 (issuing protective order and recognizing that while the executive may have relevant knowledge, plaintiffs must first utilize less intrusive means); *Gauthier v. Union Pac. R. Co.,* No. CIVA1:07CV12(TH/KFG), 2008 WL 2467016, at *5 (E.D. Tex. June 18, 2008)

(quashing the deposition of defendant's executives because plaintiff did not "first attempt to [seek] information through less burdensome means of discovery . . .," including taking a Rule 30(b)(6) deposition); *c.f. Baine,* 141 F.R.D. at 335 (granting motion for protective order, stating that "deposing [the executive] at this time would be oppressive, inconvenient, and burdensome inasmuch as it has not been established that the information necessary cannot be had from [other individuals], interrogatories, or the corporate deposition.").

Here, Claimant noticed Ms. Rosenblat's deposition without first seeking information through less burdensome means.  Deposing Ms. Rosenblat would prove incredibly burdensome given her work demands, and would impose significant costs both via her time and monetarily on Uber. *See, e.g., Motion Games, LLC v. Nintendo Co.*, No. 6:12-CV-878-JDL, 2015 WL 11143486, at *2 (E.D. Tex. Mar. 18, 2015) (denying motion to compel executive deposition in part because deponent had limited availability and because key business planning and decision-making for the company would be negatively affected in his absence, with defendant incurring costs). Importantly, while Claimant has served Uber with a Rule 30(b)(6) notice, the parties are still conferring over Claimant's proposed 50 topics and Uber will designate an individual(s) deponent once the parties resolve the disputed topics through their meet and confer efforts.  Claimant should be required to first take the Rule 30(b)(6) deposition before deposing Ms. Rosenblat because Uber's corporate representative will presumably have the requisite knowledge of Uber that Claimant seeks from Ms. Rosenblat.  Only then, "should alternative discovery methods prove inadequate, the [arbitrator] may revisit the issue to determine whether the deposition of a high-ranking executive remains necessary." *Oyekwe*, 2020 WL 106868 at *2 (quoting *Robinson*, 2014 WL 12915533 at *2).

Therefore, because of Ms. Rosenblat's extremely tenuous connection to the Arbitration and

because Claimant has failed to exhaust less burdensome means, the deposition notice imposes an undue burden and annoyance on Uber and Ms. Rosenblat. *See* FED. R. CIV. P. 26(c)(1).  In addition, Ms. Rosenblat and counsel are not available on the date and time for which opposing counsel noticed Ms. Rosenblat's deposition. Uber therefore requests that the Arbitrator grant its Motion, protecting Uber from presenting Ms. Rosenblat for deposition.

## IV.
## CONCLUSION

In light of the foregoing, Uber respectfully asks the Arbitrator to order that Uber is entitled to a protective order and need not present Ms. Rosenblat for deposition.

Dated:  May 25, 2021

Respectfully submitted,

/s/ Nicole S. LeFave

Kimberly R. Miers
Texas State Bar No. 24041482
Nicole S. LeFave
Texas State Bar No. 24085432
LITTLER MENDELSON, P.C.
A PROFESSIONAL CORPORATION
100 Congress Avenue
Suite 1400
Austin, Texas  78701
512.982.7250 (Telephone)
512.982.7248 (Telecopier)
kmiers@littler.com
nlefave@littler.com

ATTORNEYS FOR DEFENDANT
UBER TECHNOLOGIES, INC.

Of Counsel:

Allison Clara Williams
State Bar No. 24075108
LITTLER MENDELSON, P.C.
A PROFESSIONAL CORPORATION
1301 McKinney Street, Suite 1900
Houston, Texas  77010
713.951.9400 (Telephone)
713.951.9212 (Facsimile)
acwilliams@littler.com

Collin Quigley
Texas State Bar No. 24100928
Abby Bochenek
Texas State Bar No. 24122709
LITTLER MENDELON, P.C.
A PROFESSIONAL CORPORATION
2001 Ross Avenue
Suite 1500, Lock Box 116
Dallas, Texas  75201-2931
214.880.8100 (Telephone)
214.880.0181 (Facsimile)
cquigley@littler.com
abochenek@littler.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the above and foregoing document has been forwarded via electronic service pursuant to the Parties' Electronic Service Agreement, on this the 25th day of May, 2021, to the following counsel:

Bret Stanley
Kherkher Garcia, LLP.
2925 Richmond Ave., Ste. 1560
Houston, TX 77098
Telephone: 713.333.0862
bstanley@kherkhergarcia.com
khiett@kherkhergarcia.com
khidalgo-monroy@kherkhergarcia.com.

# EXHIBIT 1

| From: | Bret Stanley |
|---|---|
| To: | Williams, Allison C.; Miers, Kim Rives |
| Cc: | Steve Kherkher; Kathryn Hiett; Kristen Hidalgo-Monroy; Quigley, M. Collin; LeFave, Nicole; Bochenek, Abby; Eric Hawley; Behnia, Sophia |
| Subject: | Barysas v. Uber Technologies, Inc. - Request for Deposition of Alex Rosenblat |
| Date: | Tuesday, May 11, 2021 2:57:49 PM |
| Attachments: | image001.png |
| | image002.png |

Allison and Kim,

On behalf of Claimant Barysas, we request to depose Alex Rosenblat in this matter as one of the four fact witness depositions allowed to the Claimant.

Please provide dates that Ms. Rosenblat is available for deposition.  Hearing nothing by May 17, 2021, we'll notice the deposition.

Sincerely,


Bret Stanley | Partner
**Kherkher Garcia, LLP**
2925 Richmond Ave., Suite 1560
Houston, Texas  77098
832.856.6486 - Direct
713.333.1030 - Main
713.333.1029 – Fax
BStanley@KherkherGarcia.com

Unless expressly stated otherwise, nothing contained in this message should be construed as a digital or electronic signature, nor is it intended to reflect an intention to make an agreement by electronic means.

NOTICE OF CONFIDENTIALITY:  The information contained in and transmitted with this electronic message is: (1) SUBJECT TO THE ATTORNEY-CLIENT PRIVILEGE; (2) ATTORNEY WORK PRODUCT; OR (3) CONFIDENTIAL.  It is intended only for the individual or entity designated above. You are hereby notified that any dissemination, distribution, copying or use of or reliance upon the information contained in and transmitted with this electronic message by or to anyone other than the recipient designated above by the sender is unauthorized and strictly prohibited.  If you have received this electronic message in error, please notify us at (713) 333-1030 immediately.  Any electronic message erroneously transmitted to you should be immediately deleted without copying or reading it.  Any dissemination, distribution, copying or other reproduction of this electronic message is strictly prohibited.

**From:** vicki@soussan-adr.com <vicki@soussan-adr.com>
**Sent:** Wednesday, May 5, 2021 1:34 PM
**To:** 'Quigley, M. Collin' <CQuigley@littler.com>; susan@soussan-adr.com
**Cc:** Bret Stanley <bstanley@kherkhergarcia.com>; Steve Kherkher <skherkher@kherkhergarcia.com>; Kathryn Hiett <khiett@kherkhergarcia.com>; Kristen Hidalgo-Monroy <khidalgo-monroy@kherkhergarcia.com>; 'Miers, Kim Rives' <KMiers@littler.com>; 'Williams, Allison C.' <ACWilliams@littler.com>; 'LeFave, Nicole' <NLeFave@littler.com>; 'Bochenek, Abby' <ABochenek@littler.com>
**Subject:** RE: Barysas v. Uber Technologies, Inc. & Harts v. Uber Technologies, Inc. - Proposed Protective Order

Counsel,

Attached is the Protective Order which has been signed by Judge Soussan.

Thank you,
Vicki

Vicki Aven
Administrative Assistant to Judge Susan S. Soussan
1330 Post Oak Blvd., Suite 2880
Houston, TX 77056
Telephone:  713-961-2880
Fax:  713-961-2886
Vicki@soussan-adr.com
www.soussan-adr.com

*Confidentiality Notice: The information contained in this email and any attachments is intended only for the recipient[s] listed above and may be privileged and confidential. Any dissemination, copying, or use of or reliance upon such information by or to anyone other than the recipient[s] listed above is prohibited. If you have received this message in error, please notify the sender immediately at the email address above and destroy any and all copies of this message.*

**From:** Quigley, M. Collin <CQuigley@littler.com>
**Sent:** Tuesday, April 27, 2021 11:21 AM
**To:** vicki@soussan-adr.com; susan@soussan-adr.com
**Cc:** 'Bret Stanley' <bstanley@kherkhergarcia.com>; 'Steve Kherkher' <skherkher@kherkhergarcia.com>; khiett@kherkhergarcia.com; 'Kristen Hidalgo-Monroy' <khidalgo-monroy@kherkhergarcia.com>; Miers, Kim Rives <KMiers@littler.com>; Williams, Allison C. <ACWilliams@littler.com>; LeFave, Nicole <NLeFave@littler.com>; Bochenek, Abby <ABochenek@littler.com>
**Subject:** Barysas v. Uber Technologies, Inc. & Harts v. Uber Technologies, Inc. - Proposed Protective Order

Judge Soussan,

Attached for your review and consideration is the Parties' proposed protective order for this matter.

Please let us know if you have any questions or comments.

Thank you,
Collin

**M. Collin Quigley**
Attorney at Law
214.880.8159 direct, 469.503.8455 mobile
CQuigley@littler.com



Fueled by ingenuity. Inspired by you.

Labor & Employment Law Solutions | Local Everywhere

2001 Ross Avenue, Suite 1500, Lock Box 116, Dallas, TX 75201-2931

-------------------------

This email may contain confidential and privileged material for the sole use of the intended recipient(s). Any review, use, distribution or disclosure by others is strictly prohibited. If you are not the intended recipient (or authorized to receive for the recipient), please contact the sender by reply email and delete all copies of this message.

Littler Mendelson, P.C. is part of the international legal practice Littler Global, which operates worldwide through a number of separate legal entities. Please visit www.littler.com for more information.

# EXHIBIT 2

| | | |
|---|---|---|
| **DAINIUS BARYSAS,** | § | |
| | § | |
| | § | |
| **Claimant,** | § | **HON. SUSAN SOUSSAN,** |
| | § | **ARBITRATOR** |
| **vs.** | § | |
| | § | |
| **UBER TECHNOLOGIES, INC.,** | § | |
| | § | |
| **Respondent.** | § | |
| | § | |

### CLAIMANT'S NOTICE OF ORAL AND VIDEOTAPED DEPOSITION OF ALEX ROSENBLAT

TO:     Uber Technologies, Inc., by and through its attorneys of record, Ms. Kimberly Miers, Ms. Nicole LeFave, Ms. Allison Williams, and Ms. Abby Bochenek, Littler Mendelson, P.C., 100 Congress Avenue, Suite 1400, Austin, TX 78701.

Pursuant to Rule 199 of the Texas Rules of Civil Procedure, Claimant hereby serves this Notice to Take the Oral and Videotaped Deposition of Alex Rosenblat starting at **11:00 a.m. Central Standard Time on Wednesday, June 14, 2021 via ZOOM** hosted by U.S. Legal Support. The Zoom Link will be provided by U.S. Legal Support 24 hours prior to the Deposition.

The witness will participate in the deposition remotely by videoconference. The witness shall participate in the Remote Deposition from a quiet, well-lit, indoor location, while seated in front of a neutral background, and facing the camera being used to record the witness.   At least 24 hours before the Remote Deposition is scheduled to start, counsel, the witness, and the Remote Deposition Vendor shall conduct a test of the system and equipment that will be used to conduct the Remote Deposition (the "Remote Deposition Technology").  The witness noticed for a Remote Deposition must have webcam-equipped tablet, desktop or laptop computer with appropriate audio, visual, webcam, and Wi-Fi connectivity needed to participate in the deposition.  To the

extent the witness does not have the appropriate audio, visual, webcam, and Wi-Fi connectivity, attorney representing the witness will notify the noticing attorney.

The deposition will be video recorded and transcribed by a court reporter who will participate in the deposition by remote video from another location. The deposition will continue from day to day until completed.

U.S. Legal Support will provide a duly authorized court reporter and videotaping services for the deposition.

Respectfully submitted,

KHERKHER GARCIA, LLP

By: _____/s/ Bret Stanley_____
Bret Stanley
State Bar No. 24075116
BStanley@KherkherGarcia.com
2925 Richmond Ave., Suite 1560
Houston, TX  77098
(713) 333-1030 / (713) 333-1029 (fax)

*Attorney for Claimant*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the above and foregoing document has been forwarded via electronic mail on this the 20th day of May 2021, to the following counsel:

LITTLER MENDELSON, P.C.

Kimberly R. Miers
Allison Williams
Nicole S. LeFave
Abby Bochenek
Collin Quigley

kmiers@littler.com
acwilliams@littler.com
nlefave@littler.com
abochenek@littler.com
cquigley@littler.com
sbehnia@littler.com
smendoza@littler.com
scornell@littler.com
preyes@littler.com
mbrantley@littler.com
hheckel@littler.com

_____ */s/ Bret Stanley* _____

# EXHIBIT 3

| | |
|---|---|
| **From:** | Bret Stanley |
| **To:** | Williams, Allison C.; Miers, Kim Rives |
| **Cc:** | skherkher@kherkhergarcia.com; khiett@kherkhergarcia.com; khidalgo-monroy@kherkhergarcia.com; Quigley, M. Collin; LeFave, Nicole; Bochenek, Abby; ehawley@kherkhergarcia.com; Behnia, Sophia; Mendoza, Sandra A.; Cornell, Staci; Reyes, Pia; Brantley, Maikieta; Heckel, Harriet T. |
| **Subject:** | Barysas v. Uber Technologies, Inc. - Notice of Deposition of Alex Rosenblat |
| **Date:** | Thursday, May 20, 2021 5:01:51 PM |
| **Attachments:** | ATT00001.png<br>ATT00002.png<br>2021.05.18_Barysas Depo Notice to Alex Rosenblat.pdf |

Allison and Kim,

Please see the attached Notice of Deposition of Uber employee Alex Rosenblat.

Bret Stanley | Partner
**Kherkher Garcia, LLP**
2925 Richmond Ave., Suite 1560
Houston, Texas 77098
832.856.6486 - Direct
713.333.1030 - Main
713.333.1029 – Fax
BStanley@KherkherGarcia.com

Unless expressly stated otherwise, nothing contained in this message should be construed as a digital or electronic signature, nor is it intended to reflect an intention to make an agreement by electronic means.

NOTICE OF CONFIDENTIALITY: The information contained in and transmitted with this electronic message is: (1) SUBJECT TO THE ATTORNEY-CLIENT PRIVILEGE; (2) ATTORNEY WORK PRODUCT; OR (3) CONFIDENTIAL. It is intended only for the individual or entity designated above. You are hereby notified that any dissemination, distribution, copying or use of or reliance upon the information contained in and transmitted with this electronic message by or to anyone other than the recipient designated above by the sender is unauthorized and strictly prohibited. If you have received this electronic message in error, please notify us at (713) 333-1030 immediately. Any electronic message erroneously transmitted to you should be immediately deleted without copying or reading it. Any dissemination, distribution, copying or other reproduction of this electronic message is strictly prohibited.

**From:** Bret Stanley
**Sent:** Tuesday, May 11, 2021 2:58 PM
**To:** 'Williams, Allison C.' <ACWilliams@littler.com>; 'Miers, Kim Rives' <KMiers@littler.com>
**Cc:** Steve Kherkher <sKherkher@KherkherGarcia.com>; Kathryn Hiett <khiett@kherkhergarcia.com>; Kristen Hidalgo-Monroy <khidalgo-monroy@kherkhergarcia.com>; 'Quigley, M. Collin' <CQuigley@littler.com>; 'LeFave, Nicole' <NLeFave@littler.com>; 'Bochenek, Abby' <ABochenek@littler.com>; Eric Hawley <ehawley@KherkherGarcia.com>; Behnia, Sophia <SBehnia@littler.com>
**Subject:** Barysas v. Uber Technologies, Inc. - Request for Deposition of Alex Rosenblat

Allison and Kim,

On behalf of Claimant Barysas, we request to depose Alex Rosenblat in this matter as one of the four fact witness depositions allowed to the Claimant.

Please provide dates that Ms. Rosenblat is available for deposition. Hearing nothing by May 17, 2021, we'll notice the deposition.

Sincerely,

Bret Stanley | Partner
**Kherkher Garcia, LLP**
2925 Richmond Ave., Suite 1560
Houston, Texas  77098
832.856.6486 - Direct
713.333.1030 - Main
713.333.1029 – Fax
BStanley@KherkherGarcia.com

Unless expressly stated otherwise, nothing contained in this message should be construed as a digital or electronic signature, nor is it intended to reflect an intention to make an agreement by electronic means.

NOTICE OF CONFIDENTIALITY:  The information contained in and transmitted with this electronic message is: (1) SUBJECT TO THE ATTORNEY-CLIENT PRIVILEGE; (2) ATTORNEY WORK PRODUCT; OR (3) CONFIDENTIAL.  It is intended only for the individual or entity designated above. You are hereby notified that any dissemination, distribution, copying or use of or reliance upon the information contained in and transmitted with this electronic message by or to anyone other than the recipient designated above by the sender is unauthorized and strictly prohibited.  If you have received this electronic message in error, please notify us at (713) 333-1030 immediately.  Any electronic message erroneously transmitted to you should be immediately deleted without copying or reading it.  Any dissemination, distribution, copying or other reproduction of this electronic message is strictly prohibited.

**From:** vicki@soussan-adr.com <vicki@soussan-adr.com>
**Sent:** Wednesday, May 5, 2021 1:34 PM
**To:** 'Quigley, M. Collin' <CQuigley@littler.com>; susan@soussan-adr.com
**Cc:** Bret Stanley <bstanley@kherkhergarcia.com>; Steve Kherkher <skherkher@kherkhergarcia.com>; Kathryn Hiett <khiett@kherkhergarcia.com>; Kristen Hidalgo-Monroy <khidalgo-monroy@kherkhergarcia.com>; 'Miers, Kim Rives' <KMiers@littler.com>; 'Williams, Allison C.' <ACWilliams@littler.com>; 'LeFave, Nicole' <NLeFave@littler.com>; 'Bochenek, Abby' <ABochenek@littler.com>
**Subject:** RE: Barysas v. Uber Technologies, Inc. & Harts v. Uber Technologies, Inc. - Proposed Protective Order

Counsel,

Attached is the Protective Order which has been signed by Judge Soussan.

Thank you,
Vicki

Vicki Aven
Administrative Assistant to Judge Susan S. Soussan
1330 Post Oak Blvd., Suite 2880
Houston, TX 77056
Telephone:  713-961-2880
Fax:  713-961-2886
Vicki@soussan-adr.com
www.soussan-adr.com

*Confidentiality Notice: The information contained in this email and any attachments is intended only for the recipient[s] listed above and may be privileged and confidential. Any dissemination, copying, or use of or reliance upon such information by or to anyone other than the recipient[s] listed above is prohibited. If you have received this message in error, please notify the sender immediately at the email address above and destroy any and all copies of this message.*

**From:** Quigley, M. Collin <CQuigley@littler.com>
**Sent:** Tuesday, April 27, 2021 11:21 AM
**To:** vicki@soussan-adr.com; susan@soussan-adr.com
**Cc:** 'Bret Stanley' <bstanley@kherkhergarcia.com>; 'Steve Kherkher' <skherkher@kherkhergarcia.com>; khiett@kherkhergarcia.com; 'Kristen Hidalgo-Monroy' <khidalgo-monroy@kherkhergarcia.com>; Miers, Kim Rives <KMiers@littler.com>; Williams, Allison C. <ACWilliams@littler.com>; LeFave, Nicole <NLeFave@littler.com>; Bochenek, Abby <ABochenek@littler.com>
**Subject:** Barysas v. Uber Technologies, Inc. & Harts v. Uber Technologies, Inc. - Proposed Protective Order

Judge Soussan,

Attached for your review and consideration is the Parties' proposed protective order for this matter.

Please let us know if you have any questions or comments.

Thank you,
Collin

**M. Collin Quigley**
Attorney at Law
214.880.8159 direct, 469.503.8455 mobile
CQuigley@littler.com



Fueled by ingenuity. Inspired by you.

Labor & Employment Law Solutions | Local Everywhere
2001 Ross Avenue, Suite 1500, Lock Box 116, Dallas, TX 75201-2931

-------------------------
This email may contain confidential and privileged material for the sole use of the intended recipient(s). Any review, use, distribution or disclosure by others is strictly prohibited. If you are not the intended recipient (or authorized to receive for the recipient), please contact the sender by reply email and delete all copies of this message.

Littler Mendelson, P.C. is part of the international legal practice Littler Global, which operates worldwide through a number of separate legal entities. Please visit www.littler.com for more information.

# EXHIBIT 4

RASIER, LLC / RASIER-CA, LLC / RASIER-PA, LLC / RASIER-DC, LLC / RASIER-MT, LLC / HINTER-NM

**TECHNOLOGY SERVICES AGREEMENT**

Last update: December 11, 2015

This Technology Services Agreement ("*Agreement*") constitutes a legal agreement between you, an individual ("*you*") and Rasier-CA, LLC if your Territory (as defined below) is within the State of California, Rasier-PA, LLC if your Territory is within the State of Pennsylvania, Rasier-DC, LLC if your Territory is within the State of Florida, Rasier-MT, LLC if your Territory is within the State of Montana, Hinter-NM if your Territory is within the State of New Mexico, or Rasier, LLC if your Territory is anywhere else within the United States (as applicable, "*Company*").

Company, a subsidiary of Uber Technologies, Inc. ("*Uber*"), provides lead generation to independent providers of rideshare or peer-to-peer (collectively, "*P2P*") passenger transportation services using the Uber Services (as defined below). The Uber Services enable an authorized transportation provider to seek, receive and fulfill requests for transportation services from an authorized user of Uber's mobile applications. You desire to enter into this Agreement for the purpose of accessing and using the Uber Services.

**You acknowledge and agree that Company is a technology services provider that does not provide transportation services.**

In order to use the Uber Services, you must agree to the terms and conditions that are set forth below. Upon your execution (electronic or otherwise) of this Agreement, you and Company shall be bound by the terms and conditions set forth herein.

**IMPORTANT: PLEASE NOTE THAT TO USE THE UBER SERVICES, YOU MUST AGREE TO THE TERMS AND CONDITIONS SET FORTH BELOW. PLEASE REVIEW THE ARBITRATION PROVISION SET FORTH BELOW CAREFULLY, AS IT WILL REQUIRE YOU TO RESOLVE DISPUTES WITH THE COMPANY ON AN INDIVIDUAL BASIS, EXCEPT AS PROVIDED IN SECTION 15.3, THROUGH FINAL AND BINDING ARBITRATION UNLESS YOU CHOOSE TO OPT OUT OF THE ARBITRATION PROVISION.  BY VIRTUE OF YOUR ELECTRONIC EXECUTION OF THIS AGREEMENT, YOU WILL BE ACKNOWLEDGING THAT YOU HAVE READ AND UNDERSTOOD ALL OF THE TERMS OF THIS AGREEMENT (INCLUDING THE ARBITRATION PROVISION) AND HAVE TAKEN TIME TO CONSIDER THE CONSEQUENCES OF THIS IMPORTANT BUSINESS DECISION.  IF YOU DO NOT WISH TO BE SUBJECT TO ARBITRATION, YOU MAY OPT OUT OF THE ARBITRATION PROVISION BY FOLLOWING THE INSTRUCTIONS PROVIDED IN THE ARBITRATION PROVISION BELOW.**

1. **Definitions**

1.1   "*Affiliate*" means an entity that, directly or indirectly, controls, is under the control of, or is under common control with a party, where control means having more than fifty percent (50%) of the voting stock or other ownership interest or the majority of the voting rights of such entity.

1.2   "*City Addendum*" means an addendum or supplemental information to this Agreement setting forth additional Territory-specific terms, as made available and as updated by Company from time to time.

1.3   "*Company Data*" means all data related to the access and use of the Uber Services hereunder, including all data related to Users (including User Information), all data related to the provision of Transportation Services via the Uber Services and the Driver App, and the Driver ID.

1.4   "*Company Device*" means a mobile device owned or controlled by Company that is provided to you solely for your use of the Driver App to provide Transportation Services.

1.5   "*Device*" means a Company Device or Your Device, as the case may be.

1.6   "*Driver App*" means the mobile application provided by Company that enables transportation providers to access the Uber Services for the purpose of seeking, receiving and fulfilling on-demand requests for transportation services by Users, as may be updated or modified from time to time.

1.7   "*Driver ID*" means the identification and password key assigned by Company to you that enables you to use and access the Driver App.

1.8   "*Fare*" has the meaning set forth in Section 4.1.

1.9   "*Service Fee*" has the meaning set forth in Section 4.4.

1.10   "*Territory*" means the city or metro areas in the United States in which you are enabled by the Driver App to receive requests for Transportation Services.

1.11   "*Tolls*" means any applicable road, bridge, ferry, tunnel and airport charges and fees, including inner-city congestion, environmental or similar charges as reasonably determined by the Uber Services based on available information.

1.12   "*Transportation Services*" means your provision of P2P passenger transportation services to Users via the Uber Services in the Territory using the Vehicle.

1.13   "*Uber Services*" mean Uber's on-demand lead generation and related services licensed by Uber to Company that enable transportation providers to seek, receive and fulfill on-demand requests for transportation services by Users seeking transportation services; such Uber Services include access to the Driver App and Uber's software, websites, payment services as described in Section 4 below, and related support services systems, as may be updated or modified from time to time.

1.14   "*User*" means an end user authorized by Uber to use the Uber mobile application for the purpose of obtaining Transportation Services offered by Company's transportation provider customers.

1.15   "*User Information*" means information about a User made available to you in connection with such User's request for and use of Transportation Services, which may include the User's name, pick-up location, contact information and photo.

1.16     "*Vehicle*" means your vehicle that:  (a) meets the then-current Company requirements for a vehicle on the Uber Services; and (b) Company authorizes for your use for the purpose of providing Transportation Services.

1.17     "*Your Device*" means a mobile device owned or controlled by you:  (a) that meets the then-current Company specifications for mobile devices as set forth at www.uber.com/byod-devices; and (b) on which the Driver App has been installed as authorized by Company solely for the purpose of providing Transportation Services.

## 2.   Use of the Uber Services

2.1     **Driver IDs**. Uber will issue you a Driver ID to enable you to access and use the Driver App on a Device in accordance with this Agreement. Company reserves the right to deactivate your Driver ID if you have not fulfilled a request for Transportation Services using the Driver App at least once a month. **You agree that you will maintain your Driver ID in confidence and not share your Driver ID with any third party. You will immediately notify Company of any actual or suspected breach or improper use or disclosure of your Driver ID or the Driver App.**

2.2     **Provision of Transportation Services**. When the Driver App is active, User requests for Transportation Services may appear to you via the Driver App if you are available and in the vicinity of the User. If you accept a User's request for Transportation Services, the Uber Services will provide you with certain User Information via the Driver App, including the User's first name and pickup location. In order to enhance User satisfaction with the Uber mobile application and your Transportation Services, it is recommended that you wait at least ten (10) minutes for a User to show up at the requested pick-up location. You will obtain the destination from the User, either in person upon pickup or from the Driver App if the User elects to enter such destination via Uber's mobile application. You acknowledge and agree that once you have accepted a User's request for Transportation Services, Uber's mobile application may provide certain information about you to the User, including your first name, contact information, photo and location, and your Vehicle's make and license plate number. You shall not contact any Users or use any User's personal data for any reason other than for the purposes of fulfilling Transportation Services. As between Company and you, you acknowledge and agree that:  (a) you shall be solely responsible for determining the most effective, efficient and safe manner to perform each instance of Transportation Services; and (b) except for the Uber Services or any Company Devices (if applicable), you shall provide all necessary equipment, tools and other materials, at your own expense, necessary to perform Transportation Services. You understand and agree that you have a legal obligation under the Americans with Disabilities Act and similar state laws to transport Users with Service Animals (as defined by applicable state and federal law), including guide dogs for the blind and visually impaired Users, and there is no exception to this obligation for allergies or religious objections. Your knowing failure to transport a User with a Service Animal shall constitute a material breach of this Agreement. You agree that a "knowing failure" to comply with this legal obligation shall constitute either: (1) a denial of a ride where you state the denial was due to a Service Animal; or (2) there is more than one (1) instance in which a User or the companion of a User alleges that you cancelled or refused a ride on the basis of a Service Animal.

2.3     **Your Relationship with Users**. You acknowledge and agree that your provision of Transportation Services to Users creates a direct business relationship between you and the User. Company is not responsible or liable for the actions or inactions of a User in relation to you, your activities or your Vehicle. You shall have the sole responsibility for any obligations or liabilities to Users or third parties that arise from your provision of Transportation Services. You acknowledge and

agree that you are solely responsible for taking such precautions as may be reasonable and proper (including maintaining adequate insurance that meets the requirements of all applicable laws including motor vehicle financial responsibility laws) regarding any acts or omissions of a User or third party. You acknowledge and agree that Company may release your contact and/or insurance information to a User upon such User's reasonable request. You acknowledge and agree that, unless specifically consented to by a User, you may not transport or allow inside your Vehicle individuals other than a User and any individuals authorized by such User, during the performance of Transportation Services for such User. You acknowledge and agree that all Users should be transported directly to their specified destination, as directed by the applicable User, without unauthorized interruption or unauthorized stops.

2.4     **Your Relationship with Company**. You acknowledge and agree that Company's provision to you of the Driver App and the Uber Services creates a direct business relationship between Company and you. Company does not, and shall not be deemed to, direct or control you generally or in your performance under this Agreement specifically, including in connection with your provision of Transportation Services, your acts or omissions, or your operation and maintenance of your Vehicle. You retain the sole right to determine when, where, and for how long you will utilize the Driver App or the Uber Services. You retain the option, via the Driver App, to attempt to accept or to decline or ignore a User's request for Transportation Services via the Uber Services, or to cancel an accepted request for Transportation Services via the Driver App, subject to Company's then-current cancellation policies. With the exception of any signage required by local law or permit/license requirements, Company shall have no right to require you to:  (a) display Company's or any of its Affiliates' names, logos or colors on your Vehicle(s); or (b) wear a uniform or any other clothing displaying Company's or any of its Affiliates' names, logos or colors. You acknowledge and agree that you have complete discretion to provide services or otherwise engage in other business or employment activities.  For the sake of clarity, you understand that you retain the complete right to; (i) use other software application services in addition to the Uber Services; and (ii) engage in any other occupation or business. Company retains the right to deactivate or otherwise restrict you from accessing or using the Driver App or the Uber Services in the event of a violation or alleged violation of this Agreement, your disparagement of Company or any of its Affiliates, your act or omission that causes harm to Company's or its Affiliates' brand, reputation or business as determined by Company in its sole discretion.

2.5     **Ratings**.

2.5.1     You acknowledge and agree that:  (a) after receiving Transportation Services, a User will be prompted by Uber's mobile application to provide a rating of you and such Transportation Services and, optionally, to provide comments or feedback about you and such Transportation Services; and (b) after providing Transportation Services, you will be prompted by the Driver App to provide a rating of the User and, optionally, to provide comments or feedback about the User. You shall provide your ratings and feedback in good faith.

2.5.2     You acknowledge that Company desires that Users have access to high-quality services via Uber's mobile application. In order to continue to receive access to the Driver App and the Uber Services, you must maintain an average rating by Users that exceeds the minimum average acceptable rating established by Company for your Territory, as may be updated from time to time by Company in its sole discretion ("*Minimum Average Rating*"). Your average rating is intended to reflect Users' satisfaction with your

Transportation Services rather than your compliance with any of Company's policies or recommendations. In the event your average rating falls below the Minimum Average Rating, Company will notify you and may provide you, in Company's discretion, a limited period of time to raise your average rating above the Minimum Average Rating. If you do not increase your average rating above the Minimum Average Rating within the time period allowed (if any), Company reserves the right to deactivate your access to the Driver App and the Uber Services. Additionally, you acknowledge that your repeated failure to accept User requests for Transportation Services while you are logged in to the Driver App creates a negative experience for Users of Uber's mobile application. If you do not wish to accept User requests for Transportation Services for a period of time, you agree that you will log off of the Driver App.

2.5.3   Company and its Affiliates reserve the right to use, share and display your and User ratings and comments in any manner in connection with the business of Company and its Affiliates without attribution to you or your approval. You acknowledge and agree that Company and its Affiliates are distributors (without any obligation to verify) and not publishers of your and User ratings and comments, provided that Company and its Affiliates reserve the right to edit or remove comments in the event that such comments include obscenities or other objectionable content, include an individual's name or other personal information, or violate any privacy laws, other applicable laws or Company's or its Affiliates' content policies.

2.6      **Devices**.

2.6.1   Company encourages you to use Your Device in providing Transportation Services. Otherwise, if you elect to use any Company Devices, Company will supply you upon request with Company Devices and provide the necessary wireless data plan for such Devices, provided that Company will require reimbursement from you for the costs associated with the wireless data plan of each Company Device and/or request a deposit for each Company Device. You agree that: (a) Company Devices may only be used for the purpose of enabling your access to the Uber Services; and (b) Company Devices may not be transferred, loaned, sold or otherwise provided in any manner to any party other than you. Company Devices shall at all times remain the property of Company, and upon termination of this Agreement or your termination or deactivation, you agree to return to Company the applicable Company Devices within ten (10) days. You agree that failure to timely return any Company Devices, or damage to Company Devices outside of "normal wear and tear," will result in the forfeiture of related deposits.

2.6.2   If you elect to use Your Devices:  (i) you are responsible for the acquisition, cost and maintenance of Your Devices as well as any necessary wireless data plan; and (ii) Company shall make available the Driver App for installation on Your Device. Company hereby grants you a personal, non-exclusive, non-transferable license to install and use the Driver App on Your Device solely for the purpose of providing Transportation Services.  You agree to not provide, distribute or share, or enable the provision, distribution or sharing of, the Driver App (or any data associated therewith) with any third party.  The foregoing license grant shall immediately terminate and you will delete and fully remove the Driver App from the Driver-Provided Device in the event that you cease to provide Transportation Services using Your Device. You agree that: (i) use of the Driver App on Your Device requires an active data plan with a wireless carrier associated with Your Device, which data plan will be provided by you at your own

expense; and (ii) use of the Driver App on Your Device as an interface with the Uber Services may consume very large amounts of data through the data plan. **COMPANY ADVISES THAT YOUR DEVICE ONLY BE USED UNDER A DATA PLAN WITH UNLIMITED OR VERY HIGH DATA USAGE LIMITS, AND COMPANY SHALL NOT BE RESPONSIBLE OR LIABLE FOR ANY FEES, COSTS, OR OVERAGE CHARGES ASSOCIATED WITH ANY DATA PLAN.**

2.7     **Location Based Services**. You acknowledge and agree that your geo-location information must be provided to the Uber Services via a Device in order to provide Transportation Services. You acknowledge and agree that:  (a) your geo-location information may be obtained  by the Uber Services while the Driver App is running; and (b) the approximate location of your Vehicle will be displayed to the User before and during the provision of Transportation Services to such User. In addition, Company and its Affiliates may monitor, track and share with third parties Driver's geo-location information obtained by the Driver App and Device for safety and security purposes.

3.   **You and Your Vehicle**

3.1     **Your Requirements**. You acknowledge and agree that at all times, you shall:  (a) hold and maintain (i) a valid driver's license with the appropriate level of certification to operate your Vehicle, and (ii) all licenses, permits, approvals and authority applicable to you that are necessary to provide passenger transportation services to third parties in the Territory; (b) possess the appropriate and current level of training, expertise and experience to provide Transportation Services in a professional manner with due skill, care and diligence; and (c) maintain high standards of professionalism, service and courtesy. You acknowledge and agree that you may be subject to certain background and driving record checks from time to time in order to qualify to provide, and remain eligible to provide, Transportation Services. You acknowledge and agree that Company reserves the right, at any time in Company's sole discretion, to deactivate or otherwise restrict you from accessing or using the Driver App or the Uber Services if you fail to meet the requirements set forth in this Agreement.

3.2     **Vehicle Requirements**. You acknowledge and agree that your Vehicle shall at all times be:  (a) properly registered and licensed to operate as a passenger transportation vehicle in the Territory; (b) owned or leased by you, or otherwise in your lawful possession; (c) suitable for performing the passenger transportation services contemplated by this Agreement; and (d) maintained in good operating condition, consistent with industry safety and maintenance standards for a Vehicle of its kind and any additional standards or requirements in the applicable Territory, and in a clean and sanitary condition.

3.3     **Documentation**. To ensure your compliance with all requirements in Sections 3.1 and 3.2 above, you must provide Company with written copies of all such licenses, permits, approvals, authority, registrations and certifications prior to your provision of any Transportation Services. Thereafter, you must submit to Company written evidence of all such licenses, permits, approvals, authority, registrations and certifications as they are renewed. Company shall, upon request, be entitled to review such licenses, permits, approvals, authority, registrations and certifications from time to time, and your failure to provide or maintain any of the foregoing shall constitute a material breach of this Agreement. Company reserves the right to independently verify your documentation from time to time in any way Company deems appropriate in its reasonable discretion.

4.   **Financial Terms**

4.1     **Fare Calculation and Your Payment**. You are entitled to charge a fare for each instance of completed Transportation Services provided to a User that are obtained via the Uber Services ("*Fare*"), where such Fare is calculated based upon a base fare amount plus distance (as determined by Company using location-based services enabled through the Device) and/or time amounts, as detailed at www.uber.com/cities for the applicable Territory ("*Fare Calculation*"). You acknowledge and agree that the Fare provided under the Fare Calculation is the only payment you will receive in connection with the provision of Transportation Services, and that neither the Fare nor the Fare Calculation includes any gratuity. You are also entitled to charge User for any Tolls, taxes or fees incurred during the provision of Transportation Services, if applicable. You:  (i) appoint Company as your limited payment collection agent solely for the purpose of accepting the Fare, applicable Tolls and, depending on the region and/or if requested by you, applicable taxes and fees from the User on your behalf via the payment processing functionality facilitated by the Uber Services; and (ii) agree that payment made by User to Company (or to an Affiliate of Company acting as an agent of Company) shall be considered the same as payment made directly by User to you. In addition, the parties acknowledge and agree that as between you and Company, the Fare is a recommended amount, and the primary purpose of the pre-arranged Fare is to act as the default amount in the event you do not negotiate a different amount. You shall always have the right to: (i) charge a fare that is less than the pre-arranged Fare; or (ii) negotiate, at your request, a Fare that is lower than the pre-arranged Fare (each of (i) and (ii) herein, a "*Negotiated Fare*"). Company shall consider all such requests from you in good faith. Company agrees to remit, or cause to be remitted, to you on at least a weekly basis:  (a) the Fare less the applicable Service Fee; (b) the Tolls; and (c) depending on the region, certain taxes and ancillary fees. If you have separately agreed that other amounts may be deducted from the Fare prior to remittance to you (*e.g.*, vehicle financing payments, lease payments, mobile device usage charges, etc.), the order of any such deductions from the Fare shall be determined exclusively by Company (as between you and Company).

4.2     **Changes to Fare Calculation**. Company reserves the right to change the Fare Calculation at any time in Company's discretion based upon local market factors, and Company will provide you with notice in the event of changes to the base fare, per mile, and/or per minute amounts that would result in a change in the recommended Fare. Continued use of the Uber Services after any such change in the Fare Calculation shall constitute your consent to such change.

4.3     **Fare Adjustment.** Company reserves the right to:  (i) adjust the Fare for a particular instance of Transportation Services (*e.g.*, you took an inefficient route, you failed to properly end a particular instance of Transportation Services in the Driver App, technical error in the Uber Services, etc.); or (ii) cancel the Fare for a particular instance of Transportation Services (*e.g.*, User is charged for Transportation Services that were not provided, in the event of a User complaint, fraud, etc.). Company's decision to reduce or cancel the Fare in any such manner shall be exercised in a reasonable manner.

4.4     **Service Fee**. In consideration of Company's provision of the Driver App and the Uber Services for your use and benefit hereunder, you agree to pay Company a service fee on a per Transportation Services transaction basis calculated as a percentage of the Fare determined by the Fare Calculation (regardless of any Negotiated Fare), as provided to you via email or otherwise made available electronically by Company from time to time for the applicable Territory ("*Service Fee*"). In the event regulations applicable to your Territory require taxes to be calculated on the Fare, Company shall calculate the Service Fee based on the Fare net of such taxes. Company reserves the right to change the Service Fee at any time in Company's discretion

based upon local market factors, and Company will provide you with notice in the event of such change. Continued use of the Uber Services after any such change in the Service Fee calculation shall constitute your consent to such change.

4.5     **Cancellation Charges**. You acknowledge and agree that Users may elect to cancel requests for Transportation Services that have been accepted by you via the Driver App at any time prior to your arrival. In the event that a User cancels an accepted request for Transportation Services, Company may charge the User a cancellation fee on your behalf. If charged, this cancellation fee shall be deemed the Fare for the cancelled Transportation Services for the purpose of remittance to you hereunder ("*Cancellation Fee*"). The parties acknowledge and agree that as between you and Company, this Cancellation Fee is a recommended amount, and the primary purpose of such Cancellation Fee is to act as the default amount in the event you do not negotiate a different amount. You shall always have the right to:  (i) charge a cancellation fee that is less than the Cancellation Fee; or (ii) negotiate, at your request, a cancellation fee that is lower than the Cancellation Fee (each of (i) and (ii) herein, a "*Negotiated Cancellation Fee*"). If charged, the Cancellation Fee (regardless of any Negotiated Cancellation Fee) shall be deemed the Fare for the cancelled Transportation Services for the purpose of remittance to you hereunder.

4.6     **Receipts**. As part of the Uber Services, Company provides you a system for the delivery of receipts to Users for Transportation Services rendered. Upon your completion of Transportation Services for a User, Company prepares an applicable receipt and issues such receipt to the User via email on your behalf. Such receipts are also provided to you via email or the online portal available to you through the Uber Services. Receipts include the breakdown of amounts charged to the User for Transportation Services and may include specific information about you, including your name, contact information and photo, as well as a map of the route you took. Any corrections to a User's receipt for Transportation Services must be submitted to Company in writing within three (3) business days after the completion of such Transportation Services. Absent such a notice, Company shall not be liable for any mistakes in or corrections to the receipt or for recalculation or disbursement of the Fare.

4.7     **No Additional Amounts**. You acknowledge and agree that, for the mutual benefit of the parties, through advertising and marketing, Company and its Affiliates may seek to attract new Users to Uber and to increase existing Users' use of Uber's mobile application. You acknowledge and agree such advertising or marketing does not entitle you to any additional monetary amounts beyond the amounts expressly set forth in this Agreement.

4.8     **Taxes**. You acknowledge and agree that you are required to:  (a) complete all tax registration obligations and calculate and remit all tax liabilities related to your provision of Transportation Services as required by applicable law; and (b) provide Company with all relevant tax information. You further acknowledge and agree that you are responsible for taxes on your own income arising from the performance of Transportation Services. Notwithstanding anything to the contrary in this Agreement, Company may in its reasonable discretion based on applicable tax and regulatory considerations, collect and remit taxes resulting from your provision of Transportation Services and/or provide any of the relevant tax information you have provided pursuant to the foregoing requirements in this Section 4.8 directly to the applicable governmental tax authorities on your behalf or otherwise.

5.     **Proprietary Rights; License**

5.1     **License Grant**. Subject to the terms and conditions of this Agreement, Company hereby grants you a non-exclusive, non-transferable, non-sublicensable, non-assignable license, during the term of this Agreement, to use the Uber Services (including the Driver App on a Device) solely for the purpose of providing Transportation Services to Users and tracking resulting Fares and Fees. All rights not expressly granted to you are reserved by Company, its Affiliates and their respective licensors.

5.2     **Restrictions**. You shall not, and shall not allow any other party to:  (a) license, sublicense, sell, resell, transfer, assign, distribute or otherwise provide or make available to any other party the Uber Services, Driver App or any Company Device in any way; (b) modify or make derivative works based upon the Uber Services or Driver App; (c) improperly use the Uber Services or Driver App, including creating Internet "links" to any part of the Uber Services or Driver App, "framing" or "mirroring" any part of the Uber Services or Driver App on any other websites or systems, or "scraping" or otherwise improperly obtaining data from the Uber Services or Driver App; (d) reverse engineer, decompile, modify, or disassemble the Uber Services or Driver App, except as allowed under applicable law; or (e) send spam or otherwise duplicative or unsolicited messages. In addition, you shall not, and shall not allow any other party to, access or use the Uber Services or Driver App to:  (i) design or develop a competitive or substantially similar product or service; (ii) copy or extract any features, functionality, or content thereof; (iii) launch or cause to be launched on or in connection with the Uber Services an automated program or script, including web spiders, crawlers, robots, indexers, bots, viruses or worms, or any program which may make multiple server requests per second, or unduly burden or hinder the operation and/or performance of the Uber Services; or (iv) attempt to gain unauthorized access to the Uber Services or its related systems or networks.

5.3     **Ownership**. The Uber Services, Driver App and Company Data, including all intellectual property rights therein, and the Company Devices are and shall remain (as between you and Company) the property of Company, its Affiliates or their respective licensors. Neither this Agreement nor your use of the Uber Services, Driver App or Company Data conveys or grants to you any rights in or related to the Uber Services, Driver App or Company Data, except for the limited license granted above. Other than as specifically permitted by the Company in connection with the Uber Services, you are not permitted to use or reference in any manner Company's, its Affiliates', or their respective licensors' company names, logos, products and service names, trademarks, service marks, trade dress, copyrights or other indicia of ownership, alone and in combination with other letters, punctuation, words, symbols and/or designs (the "UBER Marks and Names") for any commercial purposes. You agree that you will not try to register or otherwise use and/or claim ownership in any of the UBER Marks and Names, alone or in combination with other letters, punctuation, words, symbols and/or designs, or in any confusingly similar mark, name or title, for any goods and services.

6.  **Confidentiality**

6.1     Each party acknowledges and agrees that in the performance of this Agreement it may have access to or may be exposed to, directly or indirectly, confidential information of the other party ("*Confidential Information*"). Confidential Information includes Company Data, Driver IDs, User Information, and the transaction volume, marketing and business plans, business, financial, technical, operational and such other non-public information of each party (whether disclosed in writing or verbally) that such party designates as being proprietary or confidential or of which the other party should reasonably know that it should be treated as confidential.

6.2     Each party acknowledges and agrees that:  (a) all Confidential Information shall remain the exclusive property of the disclosing party; (b) it shall not use Confidential Information of the other party for any purpose except in furtherance of this Agreement; (c) it shall not disclose Confidential Information of the other party to any third party, except to its employees, officers, contractors, agents and service providers ("*Permitted Persons*") as necessary to perform under this Agreement, provided Permitted Persons are bound in writing to obligations of confidentiality and non-use of Confidential Information no less protective than the terms hereof; and (d) it shall return or destroy all Confidential Information of the disclosing party, upon the termination of this Agreement or at the request of the other party (subject to applicable law and, with respect to Company, its internal record-keeping requirements).

6.3     Notwithstanding the foregoing, Confidential Information shall not include any information to the extent it:  (a) is or becomes part of the public domain through no act or omission on the part of the receiving party; (b) was possessed by the receiving party prior to the date of this Agreement without an obligation of confidentiality; (c) is disclosed to the receiving party by a third party having no obligation of confidentiality with respect thereto; or (d) is required to be disclosed pursuant to law, court order, subpoena or governmental authority, provided the receiving party notifies the disclosing party thereof and provides the disclosing party a reasonable opportunity to contest or limit such required disclosure.

7.  **Privacy**

7.1     **Disclosure of Your Information**. Subject to applicable law, Company and its Affiliates may, but shall not be required to, provide to you, a User, an insurance company and/or relevant authorities and/or regulatory agencies any information (including personal information (*e.g.*, information obtained about you through any background check) and any Company Data) about you or any Transportation Services provided hereunder if:  (a) there is a complaint, dispute or conflict, including an accident, between you and a User; (b) it is necessary to enforce the terms of this Agreement; (c) it is required, in Company's or any Affiliate's sole discretion, by applicable law or regulatory requirements (*e.g.*, Company or its Affiliates receive a subpoena, warrant, or other legal process for information); (d) it is necessary, in Company's or any Affiliate's sole discretion, to (1) protect the safety, rights, property or security of Company or its Affiliates, the Uber Services or any third party; (2) to protect the safety of the public for any reason including the facilitation of insurance claims related to the Uber Services;  (3) to detect, prevent or otherwise address fraud, security or technical issues;  (4) to prevent or stop activity which Company or any of its Affiliates, in their sole discretion, may consider to be, or to pose a risk of being, an illegal, unethical, or legally actionable activity); or (e) it is required or necessary, in Company's or any Affiliate's sole discretion, for insurance or other purposes related to your ability to qualify, or remain qualified, to use the Uber Services. You understand that Company may retain your personal data for legal, regulatory, safety and other necessary purposes after this Agreement is terminated.

7.2     Company and its Affiliates may collect your personal data during the course of your application for, and use of, the Uber Services, or may obtain information about you from third parties. Such information may be stored, processed, transferred, and accessed by Company and its Affiliates, third parties, and service providers for business purposes, including for marketing, lead generation, service development and improvement, analytics, industry and market research, and such other purposes consistent with Company's and its Affiliates' legitimate business needs. You expressly consent to such use of personal data.

8.  **Insurance**

8.1     You agree to maintain during the term of this Agreement on all Vehicles operated by you under this Agreement automobile liability insurance that provides protection against bodily injury and property damage to third parties at levels of coverage that satisfy the minimum requirements to operate a private passenger vehicle on the public roads within the Territory. This coverage must also include any no-fault coverage required by law in the Territory that may not be waived by an insured. You agree to provide Company and its Affiliates a copy of the insurance policy, policy declarations, proof of insurance identification card and proof of premium payment for the insurance policy required in this Section 8.1 upon request. Furthermore, you must provide Company with written notice of cancellation of any insurance policy required by Company. Company shall have no right to control your selection or maintenance of your policy. You must be a named insured or individually rated driver, for which a premium is charged, on the insurance policy required in this Section 8.1 at all times.

8.2     **You agree to maintain during the term of this Agreement workers' compensation insurance as required by all applicable laws in the Territory. If permitted by applicable law, you may choose to insure yourself against industrial injuries by maintaining occupational accident insurance in place of workers' compensation insurance. Furthermore, if permitted by applicable law, you may choose not to insure yourself against industrial injuries at all, but do so at your own risk.**

8.3     You understand and acknowledge that your personal automobile insurance policy may not afford liability, comprehensive, collision, medical payments, personal injury protection, uninsured motorist, underinsured motorist, or other coverage for the Transportation Services you provide pursuant to this Agreement. If you have any questions or concerns about the scope or applicability of your own insurance coverage, it is your responsibility, not that of Company, to resolve them with your insurer(s).

8.4     Company may maintain during the term of this Agreement insurance related to your provision of Transportation Services as determined by Company in its reasonable discretion or as described in a City Addendum, provided that Company and its Affiliates are not required to provide you with any specific insurance coverage for any loss to you or your Vehicle. You are required to promptly notify Company of any accidents that occur while providing Transportation Services and to cooperate and provide all necessary information related thereto.

9.     **Representations and Warranties; Disclaimers**

9.1     **By You**. You hereby represent and warrant that:  (a) you have full power and authority to enter into this Agreement and perform your obligations hereunder; (b) you have not entered into, and during the term will not enter into, any agreement that would prevent you from complying with this Agreement; and (c) you will comply with all applicable laws in your performance of this Agreement, including holding and complying with all permits, licenses, registrations and other governmental authorizations necessary to provide (i) Transportation Services using the Vehicles pursuant to this Agreement, and (ii) passenger transportation services to third parties in the Territory generally.

9.2     **Disclaimer of Warranties**. COMPANY AND ITS AFFILIATES PROVIDE, AND YOU ACCEPT, THE UBER SERVICES, DRIVER APP AND THE COMPANY DEVICES ON AN "AS IS" AND "AS AVAILABLE" BASIS. COMPANY AND ITS AFFILIATES DO NOT REPRESENT, WARRANT OR GUARANTEE THAT YOUR ACCESS TO OR USE OF THE UBER SERVICES, DRIVER APP OR THE COMPANY DEVICES:  (A) WILL BE UNINTERRUPTED OR ERROR FREE; OR (B) WILL RESULT IN ANY REQUESTS FOR TRANSPORTATION

SERVICES. COMPANY AND ITS AFFILIATES FUNCTION AS AN ON-DEMAND LEAD GENERATION AND RELATED SERVICE ONLY AND MAKE NO REPRESENTATIONS, WARRANTIES OR GUARANTEES AS TO THE ACTIONS OR INACTIONS OF THE USERS WHO MAY REQUEST OR RECEIVE TRANSPORTATION SERVICES FROM YOU, AND COMPANY AND ITS AFFILIATES DO NOT SCREEN OR OTHERWISE EVALUATE USERS. BY USING THE UBER SERVICES AND DRIVER APP, YOU ACKNOWLEDGE AND AGREE THAT YOU MAY BE INTRODUCED TO A THIRD PARTY THAT MAY POSE HARM OR RISK TO YOU OR OTHER THIRD PARTIES. YOU ARE ADVISED TO TAKE REASONABLE PRECAUTIONS WITH RESPECT TO INTERACTIONS WITH THIRD PARTIES ENCOUNTERED IN CONNECTION WITH THE USE OF THE UBER SERVICES OR DRIVER APP.NOTWITHSTANDING COMPANY'S APPOINTMENT AS THE LIMITED PAYMENT COLLECTION AGENT OF YOU FOR THE PURPOSE OF ACCEPTING PAYMENT FROM USERS ON YOUR BEHALF AS SET FORTH IN SECTION 4 ABOVE, COMPANY AND ITS AFFILIATES EXPRESSLY DISCLAIM ALL LIABILITY FOR ANY ACT OR OMISSION OF YOU, ANY USER OR OTHER THIRD PARTY.

9.3     **No Service Guarantee**. COMPANY AND ITS AFFILIATES DO NOT GUARANTEE THE AVAILABILITY OR UPTIME OF THE UBER SERVICES OR DRIVER APP. YOU ACKNOWLEDGE AND AGREE THAT THE UBER SERVICES OR DRIVER APP MAY BE UNAVAILABLE AT ANY TIME AND FOR ANY REASON (*e.g.*, DUE TO SCHEDULED MAINTENANCE OR NETWORK FAILURE). FURTHER, THE UBER SERVICES OR DRIVER APP MAY BE SUBJECT TO LIMITATIONS, DELAYS, AND OTHER PROBLEMS INHERENT IN THE USE OF THE INTERNET AND ELECTRONIC COMMUNICATIONS, AND COMPANY AND ITS AFFILIATES ARE NOT RESPONSIBLE FOR ANY DELAYS, DELIVERY FAILURES, OR OTHER DAMAGES, LIABILITIES OR LOSSES RESULTING FROM SUCH PROBLEMS.

10.   **Indemnification**. You shall indemnify, defend (at Company's option) and hold harmless Company and its Affiliates and their respective officers, directors, employees, agents, successors and assigns from and against any and all liabilities, expenses (including legal fees), damages, penalties, fines, social security contributions and taxes arising out of or related to:  (a) your breach of your representations, warranties or obligations under this Agreement; or (b) a claim by a third party (including Users, regulators and governmental authorities) directly or indirectly related to your provision of Transportation Services or use of the Uber Services. This indemnification provision shall not apply to your breach of any representations regarding your status as an independent contractor.

11.   **Limits of Liability.**  COMPANY AND ITS AFFILIATES SHALL NOT BE LIABLE UNDER OR RELATED TO THIS AGREEMENT FOR ANY OF THE FOLLOWING, WHETHER BASED ON CONTRACT, TORT OR ANY OTHER LEGAL THEORY, EVEN IF A PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES:  (i) ANY INCIDENTAL, PUNITIVE, SPECIAL, EXEMPLARY, CONSEQUENTIAL, OR OTHER INDIRECT DAMAGES OF ANY TYPE OR KIND; OR (ii) YOUR OR ANY THIRD PARTY'S PROPERTY DAMAGE, OR LOSS OR INACCURACY OF DATA, OR LOSS OF BUSINESS, REVENUE, PROFITS, USE OR OTHER ECONOMIC ADVANTAGE. EXCEPT FOR COMPANY'S OBLIGATIONS TO PAY AMOUNTS DUE TO YOU PURSUANT TO SECTION 4 ABOVE, BUT SUBJECT TO ANY LIMITATIONS OR OTHER PROVISIONS CONTAINED IN THIS AGREEMENT WHICH ARE APPLICABLE THERETO, IN NO EVENT SHALL THE LIABILITY OF COMPANY OR ITS AFFILIATES UNDER THIS AGREEMENT EXCEED THE AMOUNT OF SERVICE FEES ACTUALLY PAID TO OR DUE TO COMPANY HEREUNDER IN THE SIX (6) MONTH PERIOD IMMEDIATELY PRECEDING THE EVENT GIVING RISE TO SUCH CLAIM.

12.   **Term and Termination**

12.1    **Term.**  This Agreement shall commence on the date accepted by you and shall continue until terminated as set forth herein.

12.2    **Termination**. Either party may terminate this Agreement:  (a) without cause at any time upon seven (7) days prior written notice to the other party; (b) immediately, without notice, for the other party's material breach of this Agreement; or (c) immediately, without notice, in the event of the insolvency or bankruptcy of the other party, or upon the other party's filing or submission of request for suspension of payment (or similar action or event) against the terminating party. In addition, Company may terminate this Agreement or deactivate your Driver ID immediately, without notice, with respect to you in the event you no longer qualify, under applicable law or the standards and policies of Company and its Affiliates, to provide Transportation Services or to operate the Vehicle, or as otherwise set forth in this Agreement.

12.3    **Effect of Termination**. Upon termination of the Agreement, you shall:  (a) promptly return to Company all Company Devices; and (b) immediately delete and fully remove the Driver App from any of Your Devices. Outstanding payment obligations and Sections 1, 2.3, 2.5.3, 4.7, 4.8, 5.3, 6, 7, 9, 10, 11, 12.3, 13, 14 and 15 shall survive the termination of this Agreement.

## 13.  Relationship of the Parties

13.1    **Except as otherwise expressly provided herein with respect to Company acting as the limited payment collection agent solely for the purpose of collecting payment from Users on your behalf, the relationship between the parties under this Agreement is solely that of independent contracting parties. The parties expressly agree that:  (a) this Agreement is not an employment agreement, nor does it create an employment relationship, between Company and you; and (b) no joint venture, partnership, or agency relationship exists between Company and you**.

13.2    You have no authority to bind Company or its Affiliates and you undertake not to hold yourself out as an employee, agent or authorized representative of Company or its Affiliates. Where, by implication of mandatory law or otherwise, you may be deemed an agent or representative of Company, you undertake and agree to indemnify, defend (at Company's option) and hold Company and its Affiliates harmless from and against any claims by any person or entity based on such implied agency or representative relationship.

## 14.  Miscellaneous Terms

14.1    **Modification**.  In the event Company modifies the terms and conditions of this Agreement at any time, such modifications shall be binding on you only upon your acceptance of the modified Agreement. Company reserves the right to modify any information referenced at hyperlinks from this Agreement from time to time. You hereby acknowledge and agree that, by using the Uber Services, or downloading, installing or using the Driver App, you are bound by any future amendments and additions to information referenced at hyperlinks herein, or documents incorporated herein, including with respect to Fare Calculations. Continued use of the Uber Services or Driver App after any such changes shall constitute your consent to such changes. Unless changes are made to the arbitration provisions herein, you acknowledge and agree that modification of this Agreement does not create a renewed opportunity to opt out of arbitration.

14.2    **Supplemental Terms**. Supplemental terms may apply to your use of the Uber Services, such as use policies or terms related to certain features and functionality, which may be modified from time to time ("*Supplemental Terms*"). You may be presented with certain Supplemental Terms from time to time. Supplemental Terms are in addition to, and shall be deemed a part of, this Agreement. Supplemental Terms shall prevail over this Agreement in the event of a conflict.

14.3 **Severability**. If any provision of this Agreement is or becomes invalid or non-binding, the parties shall remain bound by all other provisions hereof. In that event, the parties shall replace the invalid or non-binding provision with provisions that are valid and binding and that have, to the greatest extent possible, a similar effect as the invalid or non-binding provision, given the contents and purpose of this Agreement.

14.4 **Assignment**. Neither party shall assign or transfer this Agreement or any of its rights or obligations hereunder, in whole or in part, without the prior written consent of the other party; provided that Company may assign or transfer this Agreement or any or all of its rights or obligations under this Agreement from time to time without consent:  (a) to an Affiliate; or (b) to an acquirer of all or substantially all of Company's business, equity or assets.

14.5 **Entire Agreement**. This Agreement, including all Supplemental Terms, constitutes the entire agreement and understanding of the parties with respect to its subject matter and replaces and supersedes all prior or contemporaneous agreements or undertakings regarding such subject matter. In this Agreement, the words "including" and "include" mean "including, but not limited to." The recitals form a part of this Agreement.

14.6 **No Third Party Beneficiaries**. There are no third party beneficiaries to this Agreement, except as expressly set forth in the Arbitration Provision in Section 15.3. Nothing contained in this Agreement is intended to or shall be interpreted to create any third-party beneficiary claims.

14.7 **Notices**.  Any notice delivered by Company to you under this Agreement will be delivered by email to the email address associated with your account or by posting on the portal available to you on the Uber Services. Any notice delivered by you to Company under this Agreement will be delivered by contacting Company at http://partners.uber.com in the "Contact Us" section. Additional Territory-specific notices may be required from time to time.

15. **Governing Law; Arbitration**

15.1 The choice of law provisions contained in this Section 15.1 do not apply to the arbitration clause contained in Section 15.3, such arbitration clause being governed by the Federal Arbitration Act. Accordingly, and except as otherwise stated in Section 15.3, the interpretation of this Agreement shall be governed by California law, without regard to the choice or conflicts of law provisions of any jurisdiction.  Any disputes, actions, claims or causes of action arising out of or in connection with this Agreement or the Uber Services that are not subject to the arbitration clause contained in Section 15.3 shall be subject to the exclusive jurisdiction of the state and federal courts located in the City and County of San Francisco, California. However, neither the choice of law provision regarding the interpretation of this Agreement nor the forum selection provision is intended to create any other substantive right to non-Californians to assert claims under California law whether that be by statute, common law, or otherwise. These provisions, and except as otherwise provided in Section 15.3, are only intended to specify the use of California law to interpret this Agreement and the forum for disputes asserting a breach of this Agreement, and these provisions shall not be interpreted as generally extending California law to you if you do not otherwise reside or provide services in California. The foregoing choice of law and forum selection provisions do not apply to the arbitration clause in Section 15.3 or to any arbitrable disputes as defined therein.  Instead, as described in Section 15.3, the Federal Arbitration Act shall apply to any such disputes.  The failure of Company to enforce any right or provision in this Agreement shall not constitute a waiver of such right or provision unless

acknowledged and agreed to by Uber in writing.

15.2    Other than disputes regarding the intellectual property rights of the parties and other claims identified in Section 15.3.ii, any disputes, actions, claims or causes of action arising out of or in connection with this Agreement or the Uber Services shall be subject to arbitration pursuant to Section 15.3.

**15.3    Arbitration Provision**

Important Note Regarding this Arbitration Provision:

- Except as provided below, arbitration does not limit or affect the legal claims you may bring against the Company.  Agreeing to arbitration only affects where any such claims may be brought and how they will be resolved.

- Arbitration is a process of private dispute resolution that does not involve the civil courts, a civil judge, or a jury.  Instead, the parties' dispute is decided by a private arbitrator selected by the parties using the process set forth herein.  Other arbitration rules and procedures are also set forth herein.

- Unless the law requires otherwise, as determined by the Arbitrator based upon the circumstances presented, you will be required to split the cost of any arbitration with the Company.

- IMPORTANT: This Arbitration Provision will require you to resolve any claim that you may have against the Company or Uber on an individual basis, except as provided below, pursuant to the terms of the Agreement unless you choose to opt out of the Arbitration Provision.  Except as provided below, this provision will preclude you from bringing any class, collective, or representative action (other than actions under the Private Attorneys General Act of 2004 ("PAGA"), California Labor Code § 2698 et seq. ("PAGA")) against the Company or Uber, and also precludes you from participating in or recovering relief under any current or future class, collective, or representative (non-PAGA) action brought against the Company or Uber by someone else.

   o ***Cases have been filed against Company or Uber and may be filed in the future involving claims by users of the Service, including by drivers.  You should assume that there are now, and may be in the future, lawsuits against the Company or Uber alleging class, collective, and/or representative (non-***

*PAGA) claims on your behalf, including but not limited to claims for tips, reimbursement of expenses, and employment status.  Such claims, if successful, could result in some monetary recovery to you.  (THESE CASES NOW INCLUDE, FOR EXAMPLE, YUCESOY ET AL. V. UBER TECHNOLOGIES, INC., ET AL., CASE NO. 3:15-CV-00262(NORTHERN DISTRICT OF CALIFORNIA); IN RE UBER FCRA LITIGATION, CASE NO. 14-CV-05200-EMC (NORTHERN DISTRICT OF CALIFORNIA); AND O'CONNOR  V. UBER TECHNOLOGIES, INC., ET AL., CASE NO. CV 13-03826-EMC (NORTHERN DISTRICT OF CALIFORNIA).The contact information for plaintiffs' counsel in the O'Connor matter is as follows: Shannon Liss-Riordan, Lichten & Liss-Riordan, P.C., 100 Cambridge Street, 20th Floor, Boston, MA 02114, Telephone: (617) 994-5800, Fax: (617) 994-5801, email: sliss@llrlaw.com.)*

o  **The mere existence of such class, collective, and/or representative lawsuits, however, does not mean that such lawsuits will ultimately succeed.  But if you do agree to arbitration with the Company, you are agreeing in advance, except as otherwise provided, that you will not participate in and, therefore, will not seek to recover monetary or other relief under any such class, collective, and/or representative (non-PAGA) lawsuit, except as provided below.**

o  **However, as discussed above and except as provided below, if you agree to arbitration, you will not be precluded from bringing your claims against the Company or Uber in an individual arbitration proceeding. If successful on such claims, you could be awarded money or other relief by an arbitrator (subject to splitting the cost of arbitration as mentioned above).**

**WHETHER TO AGREE TO ARBITRATION IS AN IMPORTANT BUSINESS DECISION. IT IS YOUR DECISION TO MAKE, AND YOU SHOULD NOT RELY SOLELY UPON THE INFORMATION PROVIDED IN THIS AGREEMENT AS IT IS NOT INTENDED TO CONTAIN A COMPLETE EXPLANATION OF THE CONSEQUENCES OF ARBITRATION.  YOU SHOULD TAKE REASONABLE STEPS TO CONDUCT FURTHER**

**RESEARCH AND TO CONSULT WITH OTHERS — INCLUDING BUT NOT LIMITED TO AN ATTORNEY — REGARDING THE CONSEQUENCES OF YOUR DECISION, JUST AS YOU WOULD WHEN MAKING ANY OTHER IMPORTANT BUSINESS OR LIFE DECISION.**

       i.     <u>How This Arbitration Provision Applies</u>.

This Arbitration Provision is governed by the Federal Arbitration Act, 9 U.S.C. § 1 et seq. (the "FAA") and evidences a transaction involving interstate commerce.  This Arbitration Provision applies to any dispute arising out of or related to this Agreement or termination of the Agreement and survives after the Agreement terminates.  Nothing contained in this Arbitration Provision shall be construed to prevent or excuse you from utilizing any informal procedure for resolution of complaints established in this Agreement (if any), and this Arbitration Provision is not intended to be a substitute for the utilization of such procedures.

**Except as it otherwise provides, this Arbitration Provision is intended to apply to the resolution of disputes that otherwise would be resolved in a court of law or before any forum other than arbitration, with the exception of proceedings that must be exhausted under applicable law before pursuing a claim in a court of law or in any forum other than arbitration.  Except as it otherwise provides, this Arbitration Provision requires all such disputes to be resolved only by an arbitrator through final and binding arbitration on an individual basis only and not by way of court or jury trial, or by way of class, collective, or representative action.**

Except as provided in Section 15.3(v), below, regarding the Class Action Waiver, such disputes include without limitation disputes arising out of or relating to interpretation or application of this Arbitration Provision, including the enforceability, revocability or validity of the Arbitration Provision or any portion of the Arbitration Provision.  All such matters shall be decided by an Arbitrator and not by a court or judge. However, as set forth below, the preceding sentences shall not apply to disputes relating to the interpretation or application of the Class Action Waiver or PAGA Waiver below, including their enforceability, revocability or validity.

Except as it otherwise provides, this Arbitration Provision also applies, without limitation, to all disputes between You and the Company or Uber, as well as all disputes between You and the Company's or Uber's fiduciaries, administrators, affiliates, subsidiaries, parents, and all successors and assigns of any of them, including but not limited to any disputes arising out of or related to this Agreement and disputes arising out of or related to your relationship with the Company, including termination of the relationship.  This Arbitration Provision also applies, without limitation, to disputes regarding any city, county, state or federal wage-hour law, trade secrets, unfair competition, compensation, breaks and rest periods, expense reimbursement, termination, harassment and claims arising under the Uniform Trade Secrets Act, Civil Rights Act of 1964, Americans With Disabilities Act, Age Discrimination in Employment Act, Family Medical Leave Act, Fair Labor Standards Act, Employee Retirement Income Security Act (except for individual claims for employee benefits under any benefit plan sponsored by the Company and covered by the Employee Retirement Income Security Act of 1974 or funded by insurance), Genetic Information Non-Discrimination Act, and state statutes, if any, addressing the same or similar subject matters, and all other similar federal and state statutory and common law claims.

This Agreement is intended to require arbitration of every claim or dispute that lawfully can be arbitrated, except for those claims and disputes which by the terms of this Agreement are expressly excluded from the Arbitration Provision.

Uber Technologies, Inc. is an intended, third party beneficiary of this Agreement.

ii.    <u>Limitations On How This Agreement Applies</u>.

The disputes and claims set forth below shall not be subject to arbitration and the requirement to arbitrate set forth in this Arbitration Provision shall not apply:

A representative action brought on behalf of others under the Private Attorneys General Act of 2004 ("PAGA"), California Labor Code § 2698 et seq., to the extent waiver of such a claim is deemed unenforceable by a court of competent jurisdiction;

Claims for workers compensation, state disability insurance and unemployment insurance benefits;

Regardless of any other terms of this Agreement, nothing prevents you from making a report to or filing a claim or charge with the Equal Employment Opportunity Commission, U.S. Department of Labor, Securities Exchange Commission, National Labor Relations Board, or Office of Federal Contract Compliance Programs, and nothing in this Agreement or Arbitration Provision prevents the investigation by a government agency of any report, claim or charge otherwise covered by this Arbitration Provision. Nothing in this Arbitration Provision shall be deemed to preclude or excuse a party from bringing an administrative claim before any agency in order to fulfill the party's obligation to exhaust administrative remedies before making a claim in arbitration;

Disputes that may not be subject to a predispute arbitration agreement pursuant to applicable Federal law or Executive Order are excluded from the coverage of this Arbitration Provision;

Disputes regarding your, the Company's, or Uber's intellectual property rights;

This Arbitration Provision shall not be construed to require the arbitration of any claims against a contractor that may not be the subject of a mandatory arbitration agreement as provided by section 8116 of the Department of Defense ("DoD") Appropriations Act for Fiscal Year 2010 (Pub. L. 111-118), section 8102 of the Department of Defense ("DoD") Appropriations Act for Fiscal Year 2011 (Pub. L. 112-10, Division A), and their implementing regulations, or any successor DoD appropriations act addressing the arbitrability of claims.

iii.    <u>Selecting The Arbitrator and Location of the Arbitration</u>.

The Arbitrator shall be selected by mutual agreement of the Company and you.  Unless you and the Company mutually agree otherwise, the Arbitrator shall be an attorney licensed to practice in the location where the arbitration proceeding will be conducted or a retired federal or state judicial officer who presided in the jurisdiction where the arbitration will be conducted.  If the Parties cannot agree on an Arbitrator, then an arbitrator will be selected using the alternate strike method from a list of five (5) neutral arbitrators provided by JAMS (Judicial Arbitration & Mediation Services).  You will have the option of making the first strike.  If a JAMS arbitrator is used, then the JAMS Streamlined Arbitration Rules & Procedures rules will apply; however, if there is a conflict between the JAMS Rules and this Agreement, this Agreement shall govern. Those rules are available here:

http://www.jamsadr.com/rules-streamlined-arbitration/

The location of the arbitration proceeding shall be no more than 45 miles from the place where you last provided transportation services under this Agreement, unless each party to the arbitration agrees in writing otherwise.

      iv.     <u>Starting The Arbitration</u>.

All claims in arbitration are subject to the same statutes of limitation that would apply in court.  The party bringing the claim must demand arbitration in writing and deliver the written demand by hand or first class mail to the other party within the applicable statute of limitations period.  The demand for arbitration shall include identification of the Parties, a statement of the legal and factual basis of the claim(s), and a specification of the remedy sought. Any demand for arbitration made to the Company or Uber shall be provided to Legal, Rasier, LLC, 1455 Market St., Ste. 400, San Francisco CA 94103.  The arbitrator shall resolve all disputes regarding the timeliness or propriety of the demand for arbitration. A party may apply to a court of competent jurisdiction for temporary or preliminary injunctive relief in connection with an arbitrable controversy, but only upon the ground that the award to which that party may be entitled may be rendered ineffectual without such provisional relief.

      v.     <u>How Arbitration Proceedings Are Conducted</u>.

In arbitration, the Parties will have the right to conduct adequate civil discovery, bring dispositive motions, and present witnesses and evidence as needed to present their cases and defenses, and any disputes in this regard shall be resolved by the Arbitrator.

**You and the Company agree to resolve any dispute that is in arbitration on an individual basis only, and not on a class, collective action, or representative basis ("Class Action Waiver"). The Arbitrator shall have no authority to consider or resolve any claim or issue any relief on any basis other than an individual basis**. **The Arbitrator shall have no authority to consider or resolve any claim or issue any relief on a class, collective, or representative basis.**  Notwithstanding any other provision of this Agreement, the Arbitration Provision or the JAMS Streamlined Arbitration Rules & Procedures, disputes regarding the enforceability, revocability or validity of the Class Action Waiver may be resolved only by a civil court of competent jurisdiction and not by an arbitrator. In any case in which (1) the dispute is filed as a class, collective, or representative  action and (2) there is a final judicial determination that all or part of the Class Action Waiver unenforceable, the class, collective, and/or representative action to that extent must be litigated in a civil court of competent jurisdiction, but the portion of the Class Action Waiver that is enforceable shall be enforced in arbitration.

While the Company will not take any retaliatory action in response to any exercise of rights you may have under Section 7 of the National Labor Relations Act, if any, the Company shall not be precluded from moving to enforce its rights under the FAA to compel arbitration on the terms and conditions set forth in this Agreement.

**Private Attorneys General Act**.

Notwithstanding any other provision of this Agreement or the Arbitration Provision, to the extent permitted by law, (1) **You and Company agree not to bring a representative action on behalf of others under the Private Attorneys General Act of 2004 ("PAGA"), California Labor Code § 2698 et seq., in any court or in arbitration**, and (2) for any claim brought on a private attorney general basis—i.e., where

you are seeking to pursue a claim on behalf of a government entity—both you and Company agree that any such dispute shall be resolved in arbitration on an individual basis only (i.e., to resolve whether you have personally been aggrieved or subject to any violations of law), and that such an action may not be used to resolve the claims or rights of other individuals in a single or collective proceeding (i.e., to resolve whether other individuals have been aggrieved or subject to any violations of law) ("PAGA Waiver"). Notwithstanding any other provision of this Agreement or the Arbitration Provision, the validity of the PAGA Waiver may be resolved only by a civil court of competent jurisdiction and not by an arbitrator. If any provision of the PAGA Waiver is found to be unenforceable or unlawful for any reason, (1) the unenforceable provision shall be severed from this Agreement; (2) severance of the unenforceable provision shall have no impact whatsoever on the Arbitration Provision or the Parties' attempt to arbitrate any remaining claims on an individual basis pursuant to the Arbitration Provision; and (3) any representative action brought under PAGA on behalf of others must be litigated in a civil court of competent jurisdiction and not in arbitration. To the extent that there are any claims to be litigated in a civil court of competent jurisdiction because a civil court of competent jurisdiction determines that the PAGA Waiver is unenforceable with respect to those claims, the Parties agree that litigation of those claims shall be stayed pending the outcome of any individual claims in arbitration.

vi.    Paying For The Arbitration.

Each party will pay the fees for his, her or its own attorneys, subject to any remedies to which that party may later be entitled under applicable law (i.e., a party prevails on a claim that provides for the award of reasonable attorney fees to the prevailing party).  In all cases where required by law, the Company will pay the Arbitrator's and arbitration fees. If under applicable law the Company is not required to pay all of the Arbitrator's and/or arbitration fees, such fee(s) will be apportioned equally between the Parties or as otherwise required by applicable law. However, you will not be required to bear any type of fee or expense that you would not be required to bear if you had filed the action in a court of law.  Any disputes in that regard will be resolved by the Arbitrator as soon as practicable after the Arbitrator is selected, and Company shall bear all of the Arbitrator's and arbitration fees until such time as the Arbitrator resolves any such dispute.

vii.   The Arbitration Hearing And Award.

The Parties will arbitrate their dispute before the Arbitrator, who shall confer with the Parties regarding the conduct of the hearing and resolve any disputes the Parties may have in that regard.  Within 30 days of the close of the arbitration hearing, or within a longer period of time as agreed to by the Parties or as ordered by the Arbitrator, any party will have the right to prepare, serve on the other party and file with the Arbitrator a brief.  The Arbitrator may award any party any remedy to which that party is entitled under applicable law, but such remedies shall be limited to those that would be available to a party in his or her individual capacity in a court of law for the claims presented to and decided by the Arbitrator, and no remedies that otherwise would be available to an individual in a court of law will be forfeited by virtue of this Arbitration Provision.  The Arbitrator will issue a decision or award in writing, stating the essential findings of fact and conclusions of law.  A court of competent jurisdiction shall have the authority to enter a judgment upon the award made pursuant to the arbitration.  The Arbitrator shall not have the power to commit errors of law or legal reasoning, and the award may be vacated or corrected on appeal to a court of competent jurisdiction for any such error.

> **viii.** __Your Right To Opt Out Of Arbitration__.

Arbitration is not a mandatory condition of your contractual relationship with the Company.  If you do not want to be subject to this Arbitration Provision, you may opt out of this Arbitration Provision by notifying the Company in writing of your desire to opt out of this Arbitration Provision, either by (1) sending, within 30 days of the date this Agreement is executed by you, electronic mail to optout@uber.com, stating your name and intent to opt out of the Arbitration Provision or (2) by sending a letter by U.S. Mail, or by any nationally recognized delivery service (*e.g*, UPS, Federal Express, etc.), or by hand delivery to:

> Legal
> Rasier, LLC
> 1455 Market St., Ste. 400
> San Francisco CA 94103

In order to be effective, the letter under option (2) must clearly indicate your intent to opt out of this Arbitration Provision, and must be dated and signed. The envelope containing the signed letter must be received (if delivered by hand) or post-marked within 30 days of the date this Agreement is executed by you.  Your writing opting out of this Arbitration Provision, whether sent by (1) or (2), will be filed with a copy of this Agreement and maintained by the Company.  Should you not opt out of this Arbitration Provision within the 30-day period, you and the Company shall be bound by the terms of this Arbitration Provision.  You have the right to consult with counsel of your choice concerning this Arbitration Provision.  You understand that you will not be subject to retaliation if you exercise your right to assert claims or opt-out of coverage under this Arbitration Provision.

> **ix.** __Full and Complete Agreement Related to Formal Resolution of Disputes; Enforcement Of This Agreement__.

This Arbitration Provision is the full and complete agreement relating to the formal resolution of disputes arising out of this Agreement.  Except as stated in subsection v, above, in the event any portion of this Arbitration Provision is deemed unenforceable, the remainder of this Arbitration Provision will be enforceable.

By clicking "I accept", you expressly acknowledge that you have read, understood, and taken steps to thoughtfully consider the consequences of this Agreement, that you agree to be bound by the terms and conditions of the Agreement, and that you are legally competent to enter into this Agreement with Company.

# EXHIBIT 5

| | |
|---|---|
| **DAINIUS BARYSAS,** | § |
| | § |
| **Claimant,** | § |
| | § |
| **vs.** | §   **HON. SUSAN SOUSSAN,** |
| | §   **ARBITRATOR** |
| **UBER TECHNOLOGIES, INC.,** | § |
| | § |
| **Respondent.** | § |
| | § |
| | § |

## <u>RESPONDENT'S FIRST REQUESTS FOR PRODUCTION AND INTERROGATORIES TO CLAIMANT DAINIUS BARYSAS</u>

TO:  Dainius Barysas, by and through his attorneys of record, Bret Stanley, Kherkher Garcia, LLP, 2925 Richmond Ave., Ste. 1560, Houston, TX 77098

Pursuant to Arbitrator Susan Soussan's Order dated December 14, 2020, Respondent serves the following First Requests for Production and Interrogatories (collectively "Requests") to Claimant Dainius Barysas. You are required to serve complete written responses to the following within thirty (30) days following service of these Requests. You have an affirmative duty to supplement your responses.

Dated:  January 22, 2021                    Respectfully submitted,


                                            /s/ Allison C. Williams
                                            _____
                                            Kimberly R. Miers
                                            Texas State Bar No. 24041482
Of Counsel:                                 Nicole S. LeFave
                                            Texas State Bar No. 24085432
Allison Clara Williams                      LITTLER MENDELSON, P.C.
State Bar No. 24075108                      A PROFESSIONAL CORPORATION
LITTLER MENDELSON, P.C.                     100 Congress Avenue
A PROFESSIONAL CORPORATION                  Suite 1400
1301 McKinney Street, Suite 1900            Austin, Texas  78701
Houston, Texas  77010                       512.982.7250 (Telephone)
713.951.9400 (Telephone)                    512.982.7248 (Telecopier)
713.951.9212 (Facsimile)                    kmiers@littler.com
acwilliams@littler.com                      nlefave@littler.com


                                            ATTORNEYS FOR DEFENDANT
                                            UBER TECHNOLOGIES, INC.


## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document has been forwarded via email pursuant to the parties' Electronic Service Agreement, on January 22, 2021, to the following counsel:

Bret Stanley
Kherkher Garcia, LLP.
2925 Richmond Ave., Ste. 1560
Houston, TX 77098
Telephone: 713.333.0862
bstanley@kherkhergarcia.com


                                            /s/ Allison C. Williams
                                            _____
                                            Allison C. Williams


**Respondent's First Set of Requests for Production and Interrogatories to Claimant BARYSAS**        **2**

## DEFINITIONS

As used herein, the following terms shall have the meanings indicated below:

1.      "Documents," "Electronically Stored Information," and "Documents or Electronically Stored Information" shall mean any written, printed, typed, tape recorded or other graphic matter of any kind or nature, however produced or reproduced, whether or not sent or received, private or confidential, wherever located, including drafts and copies bearing notations or marks not found on the original and includes, but is not limited to, all memoranda, reports, financial reports, notes, transcripts, letters, facsimiles, envelopes, telegrams, telecopies, cables, telex messages, messages (including reports, notes, notations and memoranda of or relating to telephone conversations, telegrams, messages, conversations or any other oral communications), tabulations, studies, analyses, evaluations, projections, work papers, statements, summaries, opinions, journals, statistical records, calendars, appointment books, diaries, lists, comparisons, questionnaires, surveys, charts, graphs, books, articles, magazines, newspapers, booklets, circulars, bulletins, notices, instructions, manuals, minutes or transcriptions of meetings, written communications of any type, photographs, microfilms, punch cards, magnetic tapes, computers, computer printouts, computer diskettes, hard drives, devices capable of storing information electronically, electronic mail ("emails"), data cells, drums, printouts and other data compilations from which information can be obtained.

2.      The words "or" and "and" are to be construed as both disjunctive and conjunctive.

3.      "Communication" or "communications" means the transmission or transfer of information of any kind, orally, in writing, or in any other manner, at any time or place, and under any circumstances whatsoever, including without limitation telephone conversations, letters, memoranda, notes, summaries, telexes, photographs, motion pictures, audio tapes, video tapes, computer telecommunications, electronic or magnetic media, e-mail, voice-mail, instant messages, text messages, social media post, or other materials or memorials of communication, meetings or any occasion of joint or mutual presence, as well as the transfer of any document from one person to another.

4.      "Relate to," "related to," or "relates to" mean refer to, reflect, support, rebut, evidence, concern, describe, constitute, embody, identify, state, substantiate, or to be logically or factually connected with the matter discussed.

5.      "Claimant," "you," or "your," refers to the Claimant in the above-captioned matter, Dainius Barysas.

6.      "Arbitration Demand" means the Arbitration Demand served in the above-captioned matter on or about March 17, 2020 and any amendments thereto that either party contends are applicable to Claimant, including Claimant's Specification of Claims, served on January 15, 2021.

7.      "Respondent" or "Uber" refers to Respondent Uber Technologies, Inc., any of its subsidiaries, and its attorneys or agents.

8.      "Uber App" refers to the mobile software application developed by Uber to connect riders and third party transportation providers.

9.      Unless otherwise specified:

a.      "Identification" or "identify" as applied to documents shall mean stating the date, author, addressee, signatory, number of pages, subject matter (which shall be stated with particularity), and giving the name and address of the custodian thereof and the location of the document.  Alternatively, a legible copy may be produced and you shall disclose the Bates/production number.

b.      "Identification" or "identify" as applied to an individual person or entity, means to state, to the extent known, the person's full name, present or last known address, and when referring to a natural person, the present or last known place of employment.  Once a person has been identified in accordance with this subsection, only the person's name need be listed in response to subsequent discovery requesting the identification of that person.

c.      "Identification" or "identify" as applied to a communication means to state the identity of all persons present at the time of the communication, the date, time and location of the communication, the method and/or manner of communication used (written, verbal, etc.), and the identity of all documents recording or summarizing the communication.

d.      "Identification" or "identify" as applied to an incident or an occurrence, means to state its location; its date; and any witnesses who were present or who have knowledge of said incident or occurrence.

10.      "Time Period" means the period of time beginning on the date Claimant first signed up to provide transportation and/or delivery services using the Uber App through the present.

## INSTRUCTIONS

1.      You are required to produce not only those Documents, items of Electronically Stored Information and things in your own possession, custody, and control, but also those reasonably available to you, including those within your possession, custody or control or the possession, custody or control of attorneys, accountants, employees, subcontractors, family members, members of your household, agents and representatives acting on your behalf or retained by you.

2.      All information produced pursuant to these Requests For Production of Documents ("RFPs") must be Bates-stamped, branded for confidentiality pursuant to the Protective Order entered in this matter (if such designation is appropriate), and must indicate the custodian of record for each item being produced. If the original of a Document, item of Electronically Stored Information or thing is no longer extant or no longer in your possession, custody or control or is no longer reasonably available to you, you must produce the best copy or reproduction of that

Document, item of Electronically Stored Information or thing that is in your possession, custody or control or that is reasonably available to you.

3.     When producing documents responsive to the RFPs, indicate in your response to each RFP the Bates-stamp/production number of the document(s) that you contend is/are responsive to each RFP.

4.     If you properly object to the production of any information sought by one of the RFPs below, please indicate whether you are withholding documents subject to your objection(s) and produce all remaining information (or portions of information) called for by that RFP to which you do not object.

5.     If you claim that the attorney-client privilege, the attorney work product rule, or any other protection from disclosure is applicable to any information whose production is requested and which you are therefore withholding, in addition to producing any reasonably segregable part of that information, you are requested to expressly make that claim in writing, and describe the information being withheld with detail sufficient to allow Respondents, and the Arbitrator, to assess your claim that the withheld information is protected from disclosure.

6.     Each Document, item of Electronically Stored Information and thing requested herein of which Claimant has knowledge or information, but which is neither in Claimant's possession, custody or control nor reasonably available to Claimant must be described in your written response to these RFPs with detail sufficient to allow Respondents to identify the type, location, and custodian of the information and to assess its relevance.

7.     In answering Respondent's Interrogatories, you are requested to furnish all information available to you, not merely such information within your own personal knowledge. If you cannot answer the following Interrogatories in full after exercising due diligence to secure the information to do so, you are requested to answer to the extent possible.

8.     If an Interrogatory requires you to provide a date or number, and if you cannot recall the date or number, provide your best approximation and indicate that it is an approximation.

9.     Whenever a singular form of a word is used, it should be construed to include the plural, and vice versa. Likewise, if the masculine gender of a word is used, it should be construed to include the neuter and feminine.

10.    The words "or" and "and" are to be construed as both disjunctive and conjunctive.

11.    Identical information need not be produced in response to multiple RFPs below.

<u>**REQUESTS FOR PRODUCTION**</u>

**REQUEST FOR PRODUCTION NO. 1:**

Any and all Documents that you received from Respondent.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 2:**

Any and all non-privileged Documents that relate to your alleged "employment" with Respondent.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 3:**

Any and all non-privileged Documents that relate to any services, including, but not limited to transportation and/or delivery services, you performed during your alleged "employment" with Respondent.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 4:**

Any and all non-privileged Documents that relate to any money you received from Respondent or riders and/or end-user consumers who use the Uber App in connection with your alleged "employment" with Respondent, including tips or gratuities.

**RESPONSE**:

**REQUEST FOR PRODUCTION NO. 5:**

Any and all non-privileged Documents that relate to any written, oral, or implied agreements between you and Respondent pertaining to your alleged "employment" with Respondent.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 6:**

Any and all non-privileged Documents and communications that relate to all duties that you allegedly performed for Respondent's benefit, including any Documents reflecting a requirement that you work on the Uber App at any specific location, a requirement that you work a minimum number of hours on the Uber App, a requirement that you notify Respondent of any vacations or "time-off," a requirement to notify Respondent of your availability to work, or a requirement that you log-in to the Uber App at the direction of Respondent at any time.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 7:**

Any and all non-privileged Documents that relate to your daily activities as Respondent's alleged "employee," including documents that show the number of hours that you allege you used the Uber App each day during the period you were allegedly "employed" by Respondent including, but not limited to, invoices, time sheets, activity logs, journals, notes, calendars, and agendas.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 8:**

Any and all Documents that relate to any business-related transportation expenses that you incurred during the Time Period, including, but not limited to, expenses related to vehicle maintenance, fuel, tolls, and mileage, regardless of whether those expenses were incurred in the course of performing services for Respondent or riders or end-user consumers who use the Uber App.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 9:**

Any and all Documents that relate to your acquisition, purchase, rent, or lease of vehicles you used to provide transportation services and/or delivery services at any time beginning one year prior to the first day of your alleged employment with Respondent through the present.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 10:**

Any and all Documents that relate to any policies, procedures, rules, instructions, directions, guidelines or directives you claim were applicable to you during the period you allegedly performed services in any capacity for and/or were allegedly employed by Respondent.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 11:**

Any and all non-privileged Documents that relate to any communications, whether written or oral, between you and Respondent and/or any agent of Respondent and/or any employee of Respondent regarding your status as an independent contractor or alleged "employee," the subject matter of this arbitration, the injuries claimed and/or damages sought in this lawsuit, and/or any of the allegations contained in the Arbitration Demand beginning one year prior to the first day of your alleged "employment" with Respondent.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 12:**

Any and all non-privileged Documents that relate to services you provided as an alleged "employee" or independent contractor to or on behalf of any individual or business entity, other than Respondent, during the Time Period, including but not limited to, your job duties, services performed, work experience, resumes and/or Curricula Vitae that you have prepared or sent to others, all communications sent to prospective employers, all employment applications you have completed with prospective employers, all Internet postings you have created (including any LinkedIn pages), and any applications you have made for loans or lines of credits or housing in which you describe your duties or responsibilities or services.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 13:**

Any and all Documents that relate to any payments or income you received from any individual or business entity, other than through the use of the Uber App, beginning one year prior to the first day of your alleged employment with Respondent through the present.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 14:**

Any and all state and federal income tax returns (including all forms, schedules, attachments, exhibits, 1099s, W2s, 1098s, worksheets and/or supporting documentation) for tax years 2017, 2018, 2019, and, when available, 2020.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 15:**

Any and all non-privileged Documents that refer to any application for unemployment or workers' compensation benefits from March 12, 2017 through the present.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 16:**

Any and all Documents that reflect the date and time of any activity you performed (whether or not related to your alleged employment with Respondents) while you were while logged into the Uber App, including, by way of example and not limitation, paper or electronic receipts reflecting the date and time of purchases, cell phone records reflecting the date, time, and duration of telephone calls, or records sufficient to demonstrate the date and time that you sent text messages and/or emails.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 17:**

Any and all non-privileged Documents that relate to communications between you and any other individual or entity, including any government agency, which discusses, references, or relates to the subject matter of the Arbitration Demand.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 18:**

Any and all non-privileged Documents that relate to your prayer for damages, including any damage calculations, as set forth in the Arbitration Demand.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 19:**

Any and all non-privileged Documents that you referred to, used, or relied upon when preparing the Arbitration Demand.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 20:**

Any and all non-privileged Documents that relate to any advertising or marketing you have done in conjunction with any services you have offered to the public as an independent contractor at any time.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 21:**

Any and all non-privileged Documents that relate to any products or services you have offered to the public and/or to any entity at any time March 12, 2017 through the present.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 22:**

Any and all business licenses you have obtained at any time, including documents that relate to your establishment of membership in, partnership in, funding of, or any form of participation in any business entity, including but not limited to, a corporation, limited liability company or partnership, or partnership.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 23:**

Any and all licenses or certifications that you have obtained from any state or local agency to provide transportation and/or delivery services, including by not limited to licenses issued by the City of Houston or the Texas Department of Transportation or the State of Texas.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 24:**

Any and all Documents that relate to the total amount of time that you spent using another lead generation source or delivery lead generation source other than the Uber App, including, but not limited to, Lyft, Sidecar, Flywheel, Caviar, DoorDash, Postmates, Shipt, Favor, or any other electronic or non-electronic booking platforms, where you were available to receive requests to provide transportation or delivery services to any user who requested your services beginning one year prior to the first day of your alleged employment with Respondent through the present.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 25:**

Any and all Documents that relate to your provision of transportation services for private clients at any time beginning one year prior to the first day of your alleged employment with Respondent through the present.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 26:**

Any and all Documents that relate to any statements you have made or writings you have submitted to a media outlet, or any posting you have made on Facebook, Twitter, Instagram, LinkedIn, etc., regarding (1) Uber; (2) your transportation and/or delivery services; and/or (3) your use of the Uber App as a transportation provider and/or delivery provider.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 27:**

Copies of any communications to riders, including but not limited to business cards, flyers, and signs or placards placed inside our affixed to the outside of any vehicle, used in your provision of transportation services at any time beginning one year prior to the first day of your alleged employment with Respondent through the present.

**RESPONSE:**

## INTERROGATORIES

**INTERROGATORY NO. 1:**

Identify each person known or believed by you to have knowledge or information related to any of the allegations in your Arbitration Demand, and for each such person generally describe their knowledge or information regarding the allegations in your Arbitration Demand and whether you have obtained a statement, affidavit, declaration or other recording from such person regarding any of the facts, claims, defenses, allegations or issues in the Arbitration Demand.

**ANSWER:**

**INTERROGATORY NO. 2:**

If you have applied for, requested, or received payments or benefits for unemployment, workers' compensation, or any disability or injury at any time from March 12, 2017 through the present, identify each such application, request, payment or benefit received, and duration of the payment or benefit.

**ANSWER:**

**INTERROGATORY NO. 3:**

Identify (a) any claim, complaint, charge, or grievance you have submitted to any government agency (whether local, state, or federal) concerning Respondent, and (b) any complaint submitted to Respondent concerning the subject matter of this lawsuit, and for each include: the date it was submitted; the entity to which it was submitted; and the names of all representatives with whom you have had any contact concerning the claim, complaint or grievance; the substance of the claim, complaint or grievance; and the status of the claim, complaint or grievance.

**ANSWER:**

**INTERROGATORY NO. 4:**

Identify each lawsuit, criminal case, bankruptcy case, immigration action, arbitration, or other court or legal proceeding in which you have participated as a party or a witness, including: the date the action was filed or initiated; the full title of the action, including the names of all parties, court, jurisdiction, venue, and cause number; the name, mailing address, and contact information for counsel for each party to the action; and a description of the nature of the action, its current status or disposition, your involvement, and a description of any criminal convictions that you have received. This Interrogatory includes, but is not limited to, identifying whether you have been convicted of any crime that was, in the convicting jurisdiction, punishable by death or by imprisonment for more than one year, or any crime, regardless of punishment, involving proof of

a dishonest act or false statement as an element of the crime.

**ANSWER:**

**INTERROGATORY NO. 5:**

From March 12, 2017 through the present, identify and describe each and every company or individual for whom you have provided transportation services and/or delivery services either as an employee or independent contractor, including the dates and times of every trip you made for each respective company other than Respondent.

**ANSWER:**

**INTERROGATORY NO. 6:**

From March 12, 2017 through the present, identify all employers for whom you have worked and your scheduled hours for each employer, including any self-employment.

**ANSWER:**

**INTERROGATORY NO. 7:**

Identify each social or business network computer site which you are a member, user, or subscriber (including but not limited to Facebook, MySpace, ClassMates.com, LinkedIn, Instagram, Twitter, etc.), the URL of the site(s), your user name(s) for each site, and your login name(s) for each site.

**ANSWER:**

**INTERROGATORY NO. 8:**

For each trip for which you assert Uber retained tips or gratuities to which you were entitled, please provide the following information:

    (a)     Identification of each such trip, by the trip number and date and time of the trip;

    (b)    The amount of the tip or gratuity;

    (c)    Each person employed by Respondent who you notified of the improperly retained tip or gratuity;

    (d)    Respondent's response to your notification, including identification of the person and the substance of the response.

**ANSWER:**

**INTERROGATORY NO. 9:**

For each alleged cost or expense that Claimant asserts he was not "reimburse[d] … [with respect to] the use of [Claimant's] personal vehicle", please provide the following information:

    (a)    Identification of the alleged cost or expense that Claimant alleges was incurred as a result of his use of the Uber App and to which Claimant further alleges requires reimbursement;

    (b)    Identify what documents, if any, support Claimant's claim of cost or expense;

    (c)    The amount paid by Claimant and the method of payment for each cost or expense (i.e. cash, credit card, check, debit card, etc.);

    (d)    The date and approximate time the expense and/or cost was incurred;

    (e)    Each person employed by Respondent who you notified of the cost or expense;

    (f)    The date you requested reimbursement for each cost or expense from Respondent;

    (g)    Respondent's response to your request for reimbursement, including identification of the person and the substance of the response.

**ANSWER:**

**INTERROGATORY NO. 10:**

For each trip for which Claimant asserts he was not "reimbursed" toll charges, please provide the following information:

    (a)    Identification of the trip by the trip number wherein Claimant claims he paid a toll expense or incurred a toll charge while providing transportation services while logged into the Uber App;

    (b)    The name of the toll road traveled;

    (c)    The amount paid for use of the toll road;

    (d)    The date and approximate time the toll charge was incurred;

    (e)    Each person employed by Respondent who you notified of the toll charge;

    (f)      The date you requested reimbursement of the toll charge from Respondent;

    (g)      Respondent's response to your request for reimbursement, including identification of the person and the substance of the response.

**ANSWER:**

4827-0012-9752.1 073208.1763

# EXHIBIT 6

DAINIUS BARYSAS,                      §
                                      §
     Claimant,                      §
                                      §
vs.                                   §          HON. SUSAN SOUSSAN,
                                      §          ARBITRATOR
UBER TECHNOLOGIES, INC.,              §
                                      §
     Respondent.                    §
                                      §
                                      §

## CLAIMANT BARYSAS'S RESPONSE TO RESPONDENT'S FIRST REQUESTS FOR PRODUCTION AND INTERROGATORIES

TO:    Uber Technologies, Inc., by and through its attorneys of record, Ms. Kimberly Miers, Ms. Nicole LeFave and Ms. Allison Williams, Littler Mendelson, P.C., 100 Congress Avenue, Suite 1400, Austin, TX 78701.

      COMES NOW, Claimant Dainius Barysas and herewith propounds in writing and under oath, Answers and Objections to Respondent's First Requests for Production and Interrogatories, pursuant to the provisions of Rules 196 and 197 of the Texas Rules of Civil Procedure.

      Respectfully submitted,

      KHERKHER GARCIA, LLP

      By:      _____/s/ Bret Stanley_____
             Bret Stanley
             State Bar No. 24075116
             BStanley@KherkherGarcia.com
             2925 Richmond Ave., Suite 1560
             Houston, TX  77098
             (713) 333-1030 / (713) 333-1029 (fax)

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the above and foregoing document has been forwarded via certified mail, return receipt requested, on this the 22nd day of February 2021, to the following counsel:

Kimberly R. Miers
Allison Williams
Nicole S. LeFave
Abby Bochenek
LITTLER MENDELSON, P.C.
kmiers@littler.com
acwilliams@littler.com
nlefave@littler.com
abochenek@littler.com
cquigley@littler.com
sbehnia@littler.com
smendoza@littler.com
scornell@littler.com
preyes@littler.com

## **GENERAL OBJECTIONS**

Claimant Barysas generally objects to any Request for Production and Interrogatory that seeks documents or information concerning any communication or information between Respondent Uber Technologies, Inc. (Uber) and Claimant Barysas. Respondent Uber primarily communicates with Claimant Barysas through its Driver App.  Respondent Uber exhibits total control over the Driver App and removes communications and information between Respondent Uber and Claimant Barysas on a rolling basis. Uber's removal of data prevents Claimant Barysas from accessing much of the communication and information sought by these requests and interrogatories. Respondent Uber, however, maintains all communications and information between the Parties electronically.

Claimant Barysas globally objects to Respondent Uber's requests for production and interrogatories to the extent they seek information Respondent Uber maintains in its electronic files on the grounds that Respondent Uber can be obtain the information through less intrusive means by searching their own files.

Subject to this general objection, and in response to these Requests for Production and Interrogatories, Claimant Barysas produces herewith his first production of documents, bates labeled **Barysas_001 – Barysas_861.**

## REQUESTS FOR PRODUCTION

**REQUEST FOR PRODUCTION NO. 1:**

Any and all Documents that you received from Respondent.

**RESPONSE:**

Claimant Barysas objects that this request fails to identify the categories of items it seeks with reasonable particularity, *see, e.g.*, *In re EOG Res. Inc.*, No. 10–10–00455–CV, 2011 WL 455280, at *2–3 (Tex. App.—Waco Feb. 9, 2011 orig. proceeding) (mem. op.) and objects that Respondent Uber seeks information that can be obtained through less intrusive means.

Respondent Uber uses its Driver App to exchange correspondence, documents, and information with Claimant Barysas. Respondent Uber exhibits control over the Driver App by causing correspondence, documents, and information transmitted between the Parties to be removed from the Driver App on a rolling basis. Claimant Barysas is dependent on Respondent Uber for the storage of the documents requested due to Respondent Uber's policy to remove the documents from the Driver App. Respondent Uber maintains the requested documents in its electronic database.

Subject to these objections, Claimant Barysas produces limited documents in his possession, Bates Labeled Barysas_001 – Barysas_058.

**REQUEST FOR PRODUCTION NO. 2:**

Any and all non-privileged Documents that relate to your alleged "employment" with Respondent.

**RESPONSE:**

Claimant Barysas objects that this request fails to identify the categories of items it seeks with reasonable particularity, *see, e.g.*, *In re EOG Res. Inc.*, No. 10–10–00455–CV, 2011 WL 455280, at *2–3 (Tex. App.—Waco Feb. 9, 2011 orig. proceeding) (mem. op.) and objects that Respondent Uber seeks information that can be obtained through less intrusive means.

Respondent Uber uses its Driver App to exchange correspondence, documents, and information with Claimant Barysas. Respondent Uber exhibits control over the Driver App by causing correspondence, documents, and information transmitted between the Parties to be removed from the Driver App on a rolling basis. Claimant Barysas is dependent on Respondent Uber for the storage of the documents requested due to Respondent Uber's policy to remove the documents from the Driver App. Respondent Uber maintains the requested documents in its electronic database.

Subject to these objections, Claimant Barysas produces the limited documents in his possession, Bates Labeled Barysas_001 – Barysas_854.

**REQUEST FOR PRODUCTION NO. 3:**

Any and all non-privileged Documents that relate to any services, including, but not limited to transportation and/or delivery services, you performed during your alleged "employment" with Respondent.

**RESPONSE:**

Claimant Barysas objects that this request fails to identify the categories of items it seeks with reasonable particularity, *see, e.g.*, *In re EOG Res. Inc.*, No. 10–10–00455–CV, 2011 WL 455280, at *2–3 (Tex. App.—Waco Feb. 9, 2011 orig. proceeding) (mem. op.) and objects that Respondent Uber seeks information that can be obtained through less intrusive means.

Claimant Barysas performed services in accordance with the training and policies required by Respondent Uber. Documents associated to these services are exchanged between the parties through the Driver App. Respondent Uber exhibits control over the Driver App by causing transportation and / or delivery service documents transmitted between the Parties to be removed from the Driver App on a rolling basis. Claimant Barysas is dependent on Respondent Uber for the storage of the documents requested due to Respondent Uber's policy to remove the documents from the Driver App. Respondent Uber maintains the requested documents in its electronic database.

Subject to these objections, Claimant Barysas produces the limited documents in his possession, Bates Labeled Barysas_001 – Barysas_854.

**REQUEST FOR PRODUCTION NO. 4:**

Any and all non-privileged Documents that relate to any money you received from Respondent or riders and/or end-user consumers who use the Uber App in connection with your alleged "employment" with Respondent, including tips or gratuities.

**RESPONSE**:

Claimant Barysas objects that this request fails to identify the categories of items it seeks with reasonable particularity, *see, e.g.*, *In re EOG Res. Inc.*, No. 10–10–00455–CV, 2011 WL 455280, at *2–3 (Tex. App.—Waco Feb. 9, 2011 orig. proceeding) (mem. op.) and objects that Respondent Uber seeks information that can be obtained through less intrusive means.

Respondent Uber requires all monetary exchanges between Respondent Uber, riders, and/or end-user consumers to occur through the Driver App. Respondent Uber exhibits control over Claimant Barysas by controlling all monetary exchanges. Respondent Uber causes the monetary documents requested here to be removed from the Driving App on a rolling basis. Claimant Barysas is dependent on Respondent Uber for the storage of the documents requested due to Respondent Uber's control the storage of these records. Respondent Uber maintains the requested documents in its electronic database.

Subject to this objection, Claimant Barysas produces the limited documents in his possession, Bates Labeled Barysas_038 – Barysas_058.

**REQUEST FOR PRODUCTION NO. 5:**

Any and all non-privileged Documents that relate to any written, oral, or implied agreements between you and Respondent pertaining to your alleged "employment" with Respondent.

**RESPONSE:**

Claimant Barysas objects that this request fails to identify the categories of items it seeks with reasonable particularity, *see, e.g.*, *In re EOG Res. Inc.*, No. 10–10–00455–CV, 2011 WL 455280, at *2–3 (Tex. App.—Waco Feb. 9, 2011 orig. proceeding) (mem. op.) and objects that Respondent Uber seeks information that can be obtained through less intrusive means.

Respondent Uber requires Claimant Barysas to execute all agreements, including Platform Access Agreements (and addenda thereto), electronically through the Driver App. Respondent Uber does not send Claimant Barysas executed copies of any agreements executed outside of the Driver App. Documents associated to these agreements are exchanged by Respondent Uber through the Driver App. Respondent Uber exhibits control over the Driver App by causing agreements transmitted between the Parties to be removed from the Driver App on a rolling basis. Claimant Barysas is dependent on Respondent Uber for the storage of the documents requested due to Respondent Uber's policy to remove the documents from the Driver App. Respondent Uber maintains the requested documents in its electronic database concerning written, oral, or implied agreements.

Subject to these objections, Claimant Barysas does not have possession of any written, oral, or implied agreements entered into with Respondent Uber.

**REQUEST FOR PRODUCTION NO. 6:**

Any and all non-privileged Documents and communications that relate to all duties that you allegedly performed for Respondent's benefit, including any Documents reflecting a requirement that you work on the Uber App at any specific location, a requirement that you work a minimum number of hours on the Uber App, a requirement that you notify Respondent of any vacations or "time-off," a requirement to notify Respondent of your availability to work, or a requirement that you log-in to the Uber App at the direction of Respondent at any time.

**RESPONSE:**

Claimant Barysas objects that this request fails to identify the categories of items it seeks with reasonable particularity, *see, e.g.*, *In re EOG Res. Inc.*, No. 10–10–00455–CV, 2011 WL 455280, at *2–3 (Tex. App.—Waco Feb. 9, 2011 orig. proceeding) (mem. op.) and objects that Respondent Uber seeks information that can be obtained through less intrusive means.

Documents and communications that relate to all duties that Claimant Barysas performed for Respondent's benefit are exchanged between the parties through the Driver App. Respondent Uber

exhibits control over the Driver App by causing documents transmitted between the Parties to be removed from the Driver App on a rolling basis. Claimant Barysas is dependent on Respondent Uber for the storage of the documents requested due to Respondent Uber's policy to remove the documents from the Driver App. Respondent Uber maintains the requested documents in its electronic database.

Subject to these objections, Claimant Barysas produces the limited documents in his possession, Bates Labeled Barysas_001 – Barysas_037.

**REQUEST FOR PRODUCTION NO. 7:**

Any and all non-privileged Documents that relate to your daily activities as Respondent's alleged "employee," including documents that show the number of hours that you allege you used the Uber App each day during the period you were allegedly "employed" by Respondent including, but not limited to, invoices, time sheets, activity logs, journals, notes, calendars, and agendas.

**RESPONSE:**

Claimant Barysas objects that this request fails to identify the categories of items it seeks with reasonable particularity, *see, e.g.*, *In re EOG Res. Inc.*, No. 10–10–00455–CV, 2011 WL 455280, at *2–3 (Tex. App.—Waco Feb. 9, 2011 orig. proceeding) (mem. op.) and objects that Respondent Uber seeks information that can be obtained through less intrusive means.

Documents that relate to all Claimant Barysas's daily activities as an Uber employee are exchanged between the parties through the Driver App. Respondent Uber exhibits control over the Driver App by causing documents transmitted between the Parties to be removed from the Driver App on a rolling basis. Claimant Barysas is dependent on Respondent Uber for the storage of the documents requested due to Respondent Uber's policy to remove the documents from the Driver App. Respondent Uber maintains the requested documents in its electronic database. Claimant Barysas did not maintain documents outside of the Driver App relating to the number of hours used on the Driver App each day.

Subject to this objection, Claimant Barysas produces herewith documents responsive to this request (*see* Bates Labeled Barysas_001 – Barysas_847). Additional communications and documents evidencing that Claimant was an employee of Uber have been requested for production from Respondent Uber.

**REQUEST FOR PRODUCTION NO. 8:**

Any and all Documents that relate to any business-related transportation expenses that you incurred during the Time Period, including, but not limited to, expenses related to vehicle maintenance, fuel, tolls, and mileage, regardless of whether those expenses were incurred in the course of performing services for Respondent or riders or end-user consumers who use the Uber App.

**RESPONSE:**

Claimant Barysas objects that "any and all documents that relate to business-related transportation and/or delivery expenses" fails to identify the categories of items it seeks with reasonable particularity. Claimant Barysas objects to this request on the grounds that it is unduly burdensome and not proportional to the needs of the case.  Further, Claimant Barysas objects to this request to the extent Respondent Uber is attempting to require Claimant to produce facts and evidence beyond what is required by law. Neither the FLSA nor other applicable law and regulations require Claimant Barysas prove the actual cost of employment related expenses incurred. The law allows Claimant to present a "reasonable approximate" of an employee's employment related expenses as damages.

Subject to this objection, Claimant Barysas produces the limited documents in his possession responsive to this request, *see* Bates Labeled Barysas_059 – Barysas_847.

**REQUEST FOR PRODUCTION NO. 9:**

Any and all Documents that relate to your acquisition, purchase, rent, or lease of vehicles you used to provide transportation services and/or delivery services at any time beginning one year prior to the first day of your alleged employment with Respondent through the present.

**RESPONSE:**

Claimant Barysas used a 2014 Infiniti QX60 in connection to his duties as an Uber Driver. Claimant Barysas purchased the Infiniti QX60 in 2014 and sold it in 2019. *See* documents Bates Labeled Barysas_834 – Barysas_847.

**REQUEST FOR PRODUCTION NO. 10:**

Any and all Documents that relate to any policies, procedures, rules, instructions, directions, guidelines or directives you claim were applicable to you during the period you allegedly performed services in any capacity for and/or were allegedly employed by Respondent.

**RESPONSE:**

Claimant Barysas objects that this request fails to identify the categories of items it seeks with reasonable particularity, *see, e.g., In re EOG Res. Inc.*, No. 10–10–00455–CV, 2011 WL 455280, at *2–3 (Tex. App.—Waco Feb. 9, 2011 orig. proceeding) (mem. op.) and objects that Respondent Uber seeks information that can be obtained through less intrusive means.

Respondent Uber's policies, procedures, rules, instructions, directions, guidelines or directives that apply to Claimant Barysas are exclusively exchanged between the parties through the Driver App. Respondent Uber exhibits control over the Driver App by causing documents transmitted between the Parties to be removed from the Driver App on a rolling basis. Claimant Barysas is dependent on Respondent Uber for the storage of the documents requested due to Respondent Uber's policy

to remove the documents from the Driver App. Respondent Uber maintains the requested documents in its electronic database.

Subject to this objection, Claimant Barysas produces the limited documents in his possession responsive to this request, *see* Bates Labeled Barysas_001 – Barysas_037.

**REQUEST FOR PRODUCTION NO. 11:**

Any and all non-privileged Documents that relate to any communications, whether written or oral, between you and Respondent and/or any agent of Respondent and/or any employee of Respondent regarding your status as an independent contractor or alleged "employee," the subject matter of this arbitration, the injuries claimed and/or damages sought in this lawsuit, and/or any of the allegations contained in the Arbitration Demand beginning one year prior to the first day of your alleged "employment" with Respondent.

**RESPONSE:**

Claimant Barysas objects that this request fails to identify the categories of items it seeks with reasonable particularity, *see, e.g., In re EOG Res. Inc.*, No. 10–10–00455–CV, 2011 WL 455280, at *2–3 (Tex. App.—Waco Feb. 9, 2011 orig. proceeding) (mem. op.) and objects that Respondent Uber seeks information that can be obtained through less intrusive means.

The documents and communications that relate to this request are exchanged between the parties through the Driver App. Respondent Uber exhibits control over the Driver App by causing documents transmitted between the Parties to be removed from the Driver App on a rolling basis. Claimant Barysas is dependent on Respondent Uber for the storage of the documents requested due to Respondent Uber's policy to remove the documents from the Driver App. Respondent Uber maintains the requested documents in its electronic database.

Subject to this objection, Claimant Barysas produces the limited documents in his possession responsive to this request, *see* Bates Labeled Barysas_001 – Barysas_037.

**REQUEST FOR PRODUCTION NO. 12:**

Any and all non-privileged Documents that relate to services you provided as an alleged "employee" or independent contractor to or on behalf of any individual or business entity, other than Respondent, during the Time Period, including but not limited to, your job duties, services performed, work experience, resumes and/or Curricula Vitae that you have prepared or sent to others, all communications sent to prospective employers, all employment applications you have completed with prospective employers, all Internet postings you have created (including any LinkedIn pages), and any applications you have made for loans or lines of credits or housing in which you describe your duties or responsibilities or services.

**RESPONSE:**

Claimant Barysas objects that this request is overbroad as to time and subject matter, and not reasonably calculated to lead to the discovery of admissible evidence.

Subject to this objection, Claimant Barysas does not maintain documents that relate to this request.

**REQUEST FOR PRODUCTION NO. 13:**

Any and all Documents that relate to any payments or income you received from any individual or business entity, other than through the use of the Uber App, beginning one year prior to the first day of your alleged employment with Respondent through the present.

**RESPONSE:**

Claimant Barysas objects that this request is overly broad, unduly burdensome, and fails to identify the categories of items it seeks with reasonable particularity, *see, e.g.*, *In re EOG Res. Inc.*, No. 10–10–00455–CV, 2011 WL 455280, at *2–3 (Tex. App.—Waco Feb. 9, 2011 orig. proceeding) (mem. op.), seeks attorney work product, *see Tex. Tech Univ. Health Scis. Ctr. v. Schild*, 828 S.W.2d 502, 504 (Tex. App.—El Paso 1992, orig. proceeding).

Claimant Barysas is open to confer with Respondent Uber on this request and produce documents that are reasonably available and proportional to the needs of this case.

**REQUEST FOR PRODUCTION NO. 14:**

Any and all state and federal income tax returns (including all forms, schedules, attachments, exhibits, 1099s, W2s, 1098s, worksheets and/or supporting documentation) for tax years 2017, 2018, 2019, and, when available, 2020.

**RESPONSE:**

In response to this request, Claimant Barysas produces tax documents that were located after a reasonable search. *See* documents Bates Labeled Barysas_038 – Barysas_058.

**REQUEST FOR PRODUCTION NO. 15:**

Any and all non-privileged Documents that refer to any application for unemployment or workers' compensation benefits from March 12, 2017 through the present.

**RESPONSE:**

Claimant Barysas objects that this request is overbroad as to subject matter and is not reasonably calculated to lead to the discovery of admissible evidence. Additionally, all Documents that refer to any "application for unemployment or workers' compensation benefits" is vague and ambiguous.

Subject to this objection, *see* document Bates Labeled Barysas_857.

**REQUEST FOR PRODUCTION NO. 16:**

Any and all Documents that reflect the date and time of any activity you performed (whether or not related to your alleged employment with Respondents) while you were while logged into the Uber App, including, by way of example and not limitation, paper or electronic receipts reflecting the date and time of purchases, cell phone records reflecting the date, time, and duration of telephone calls, or records sufficient to demonstrate the date and time that you sent text messages and/or emails.

**RESPONSE:**

Claimant Barysas objects that this request is overbroad as to time and subject matter, is not reasonably calculated to lead to the discovery of admissible evidence, fails to enumerate the information it seeks with specificity, and essentially requires Claimant to create documents. Additionally, "all Documents that reflect the date and time of any activity performed" is vague and ambiguous, is overbroad as to time and subject matter, and is not calculated to lead to the discovery of admissible evidence.

Further, the documents and communications that relate to this request are exchanged between the parties through the Driver App. Respondent Uber exhibits control over the Driver App by causing documents transmitted between the Parties to be removed from the Driver App on a rolling basis. Claimant Barysas is dependent on Respondent Uber for the storage of the documents requested due to Respondent Uber's policy to remove the documents from the Driver App. Respondent Uber maintains the requested documents in its electronic database.

The documents sought here have been requested by Claimant Barysas from Respondent Uber.

**REQUEST FOR PRODUCTION NO. 17:**

Any and all non-privileged Documents that relate to communications between you and any other individual or entity, including any government agency, which discusses, references, or relates to the subject matter of the Arbitration Demand.

**RESPONSE:**

Claimant Barysas objects that this request is overbroad as to time and subject matter, not proportional to the needs of the case, is not reasonably calculated to lead to the discovery of admissible evidence, fails to enumerate the information it seeks with specificity, and essentially requires Claimant to create documents. Additionally, "documents that relate to communications between you and any other individual or entity" is vague and ambiguous, overbroad as to time and subject matter, and is not calculated to lead to the discovery of admissible evidence.

Subject to this objection, and without any additional specificity provided by Respondent Uber, Claimant Barysas does not have the documents requested.

**REQUEST FOR PRODUCTION NO. 18:**

Any and all non-privileged Documents that relate to your prayer for damages, including any damage calculations, as set forth in the Arbitration Demand.

**RESPONSE:**

Documents and communications that relate to all damages will are primarily exchanged between the parties through the Driver App. Respondent Uber exhibits control over the Driver App by causing documents transmitted between the Parties to be removed from the Driver App on a rolling basis. Claimant Barysas is dependent on Respondent Uber for the storage of the documents requested due to Respondent Uber's policy to remove the documents from the Driver App. Respondent Uber maintains the requested documents in its electronic database.

*See* documents Bates Labeled Barysas_001 – Barysas_847 generally. As discovery unfolds, Claimant Barysas will supplement production and/or identify documents produced by Uber more specifically related to damages sought in this Arbitration

**REQUEST FOR PRODUCTION NO. 19:**

Any and all non-privileged Documents that you referred to, used, or relied upon when preparing the Arbitration Demand.

**RESPONSE:**

Claimant objects that this request fails to identify the categories of items it seeks with reasonable particularity, *see, e.g., In re EOG Res. Inc.*, No. 10–10–00455–CV, 2011 WL 455280, at *2–3 (Tex. App.—Waco Feb. 9, 2011 orig. proceeding) (mem. op.), seeks attorney work product, *see Tex. Tech Univ. Health Scis. Ctr. v. Schild*, 828 S.W.2d 502, 504 (Tex. App.—El Paso 1992, orig. proceeding), and to the extent it seeks expert materials, *see* Tex. R. Civ. P. 195.1.  Additionally, this request is unduly burdensome and unreasonably overbroad.

Subject to these objections, *see* documents Bates Labeled Barysas_001 – Barysas_847 generally.

**REQUEST FOR PRODUCTION NO. 20:**

Any and all non-privileged Documents that relate to any advertising or marketing you have done in conjunction with any services you have offered to the public as an independent contractor at any time.

**RESPONSE:**

Claimant Barysas objects that this request is overbroad as to time and subject matter, is not reasonably calculated to lead to the discovery of admissible evidence, fails to enumerate the information it seeks with specificity, is vague and ambiguous pertaining to the terms "advertising

or marketing" and "services" and objects to any characterization that Claimant Barysas is an independent contractor.

Subject to this objection, and without additional specificity from Respondent Uber, Claimant Barysas does not have any documents requested.

**REQUEST FOR PRODUCTION NO. 21:**

Any and all non-privileged Documents that relate to any products or services you have offered to the public and/or to any entity at any time March 12, 2017 through the present.

**RESPONSE:**

Claimant Barysas objects that this request is overbroad as to time and subject matter, is not reasonably calculated to lead to the discovery of admissible evidence, fails to enumerate the information it seeks with specificity, and is vague and ambiguous pertaining to the terms "products" and "services."

Subject to this objection, and without additional specificity from Respondent Uber, Claimant Barysas does not have any documents requested.

**REQUEST FOR PRODUCTION NO. 22:**

Any and all business licenses you have obtained at any time, including documents that relate to your establishment of membership in, partnership in, funding of, or any form of participation in any business entity, including but not limited to, a corporation, limited liability company or partnership, or partnership.

**RESPONSE:**

Claimant Barysas objects that this request is overbroad as to time and subject matter, is not reasonably calculated to lead to the discovery of admissible evidence, fails to enumerate the information it seeks with specificity, and essentially requires Claimant to create documents. Additionally, "[a]ll Documents that relate to your establishment of membership in, partnership in, funding of, or any form of participation in any business entity" is vague and ambiguous, is overbroad as to time and subject matter, and is not calculated to lead to the discovery of admissible evidence.

Subject to these objections, *see* documents Bates Labeled Barysas_848 – Barysas_856.

**REQUEST FOR PRODUCTION NO. 23:**

Any and all licenses or certifications that you have obtained from any state or local agency to provide transportation and/or delivery services, including by not limited to licenses issued by the City of Houston or the Texas Department of Transportation or the State of Texas.

**RESPONSE:**

Claimant Barysas objects that this request is overbroad as to time and subject matter, is not reasonably calculated to lead to the discovery of admissible evidence, fails to enumerate the information it seeks with specificity, and essentially requires Claimant to create documents. Additionally, "[a]ny and all licenses or certifications that you have obtained from any state or local agency to provide transportation services" is vague and ambiguous, is overbroad as to time and subject matter, and is not calculated to lead to the discovery of admissible evidence.

Subject to these objections, *see* Bates Labeled Barysas_848 – Barysas_850.

**REQUEST FOR PRODUCTION NO. 24:**

Any and all Documents that relate to the total amount of time that you spent using another lead generation source or delivery lead generation source other than the Uber App, including, but not limited to, Lyft, Sidecar, Flywheel, Caviar, DoorDash, Postmates, Shipt, Favor, or any other electronic or non-electronic booking platforms, where you were available to receive requests to provide transportation or delivery services to any user who requested your services beginning one year prior to the first day of your alleged employment with Respondent through the present.

**RESPONSE:**

Claimant Barysas objects that this request is overbroad as to time and subject matter, is not reasonably calculated to lead to the discovery of admissible evidence, and essentially requires Claimant to create documents.

Claimant Barysas does not have any "Documents that relate to the total amount of time that you spent using another lead generation source or delivery lead generation source other than the Uber App". Much like Respondent Uber, documents from other lead generation or delivery lead generation sources that relate to total time on their platforms are maintained by the source.

Subject to this objection, *see* documents Bates Labeled Barysas_851 – Barysas_856.

**REQUEST FOR PRODUCTION NO. 25:**

Any and all Documents that relate to your provision of transportation services for private clients at any time beginning one year prior to the first day of your alleged employment with Respondent through the present.

**RESPONSE:**

Claimant Barysas objects that this request is overbroad as to time and subject matter, is not reasonably calculated to lead to the discovery of admissible evidence, and essentially requires Claimant to create documents.

Subject to this objection, *see* documents Bates Labeled Barysas_851 – Barysas_856.

**REQUEST FOR PRODUCTION NO. 26:**

Any and all Documents that relate to any statements you have made or writings you have submitted to a media outlet, or any posting you have made on Facebook, Twitter, Instagram, LinkedIn, etc., regarding (1) Uber; (2) your transportation and/or delivery services; and/or (3) your use of the Uber App as a transportation provider and/or delivery provider.

**RESPONSE:**

Claimant Barysas objects that this request is overbroad as to time and subject matter, is not reasonably calculated to lead to the discovery of admissible evidence, fails to enumerate the information it seeks with specificity, is vague and ambiguous pertaining to the documents it requests.

Subject to these objections, Claimant Barysas does not maintain documents related to this request.

**REQUEST FOR PRODUCTION NO. 27:**

Copies of any communications to riders, including but not limited to business cards, flyers, and signs or placards placed inside our affixed to the outside of any vehicle, used in your provision of transportation services at any time beginning one year prior to the first day of your alleged employment with Respondent through the present.

**RESPONSE:**

Claimant Barysas objects that this request is overbroad as to time and subject matter, is not reasonably calculated to lead to the discovery of admissible evidence, fails to enumerate the information it seeks with specificity, is vague and ambiguous pertaining to the documents it requests.

Subject to these objections, *see* documents Bates Labeled Barysas_851 – Barysas_852.

## INTERROGATORIES

### INTERROGATORY NO. 1:

Identify each person known or believed by you to have knowledge or information related to any of the allegations in your Arbitration Demand, and for each such person generally describe their knowledge or information regarding the allegations in your Arbitration Demand and whether you have obtained a statement, affidavit, declaration or other recording from such person regarding any of the facts, claims, defenses, allegations or issues in the Arbitration Demand.

### ANSWER:

Claimant Barysas and various witnesses connected to Respondent Uber.

Dainius Barysas
646-637-7154
Balticam@yahoo.com
info@newyorkpartybuslimos.com
EliteRide212@gmail.com

This is the only name and phone number used by Claimant Barysas in connection with his Uber Driving account. To his knowledge, Claimant Barysas used all three email addresses in connection with his Uber Driving account.

### INTERROGATORY NO. 2:

If you have applied for, requested, or received payments or benefits for unemployment, workers' compensation, or any disability or injury at any time from March 12, 2017 through the present, identify each such application, request, payment or benefit received, and duration of the payment or benefit.

### ANSWER:

Claimant Barysas applied for and received unemployment from March 22, 2020 through July 6, 2020. To this date, Claimant Barysas received a total amount of $11,505.00. Claimant Barysas has not sought unemployment benefits related to Uber employment.

Claimant Barysas has not applied for, requested, or received payments or benefits for worker's compensation, or any disability or injury at any time from March 12, 2017 to present. *See* Bates Labeled Barysas_857.

### INTERROGATORY NO. 3:

Identify (a) any claim, complaint, charge, or grievance you have submitted to any government agency (whether local, state, or federal) concerning Respondent, and (b) any complaint submitted to Respondent concerning the subject matter of this lawsuit, and for each include: the date it was

submitted; the entity to which it was submitted; and the names of all representatives with whom you have had any contact concerning the claim, complaint or grievance; the substance of the claim, complaint or grievance; and the status of the claim, complaint or grievance.

**ANSWER:**

None.

**INTERROGATORY NO. 4:**

Identify each lawsuit, criminal case, bankruptcy case, immigration action, arbitration, or other court or legal proceeding in which you have participated as a party or a witness, including: the date the action was filed or initiated; the full title of the action, including the names of all parties, court, jurisdiction, venue, and cause number; the name, mailing address, and contact information for counsel for each party to the action; and a description of the nature of the action, its current status or disposition, your involvement, and a description of any criminal convictions that you have received.  This Interrogatory includes, but is not limited to, identifying whether you have been convicted of any crime that was, in the convicting jurisdiction, punishable by death or by imprisonment for more than one year, or any crime, regardless of punishment, involving proof of a dishonest act or false statement as an element of the crime.

**ANSWER:**

Claimant Barysas objects that this interrogatory is overbroad as to time and subject matter, and not reasonably calculated to lead to the discovery of admissible evidence.  Additionally, Claimant objects on the grounds that this evidence is equally available to Uber as it is to the Claimant.

Subject to this objection, Claimant Barysas settled a breach of warranty claim against Nissan in August 2017. *See* Bates Labeled Barysas_858 – Barysas_861.

Claimant Barysas has not been convicted of a crime involving dishonest act or false statement within the last 10 years, nor has Claimant Barysas been convicted of a crime that is punishable by death or by imprisonment for more than one year.

**INTERROGATORY NO. 5:**

From March 12, 2017 through the present, identify and describe each and every company or individual for whom you have provided transportation services and/or delivery services either as an employee or independent contractor, including the dates and times of every trip you made for each respective company other than Respondent.

**ANSWER:**

Claimant Barysas objects that this interrogatory as overbroad as to subject matter,  not reasonably calculated to lead to the discovery of admissible evidence and disproportionate to the needs of the case.

Subject to this objection, Claimant Barysas provided transportation services as the owner and operator of DB Pedicabs LLC from 2006 through the present.

Claimant Barysas provided transportation services on a for Lyft from 2014 through 2019.

Claimant Barysas provided transportation services on a for Respondent Uber from 2014 through 2019.

Claimant Barysas provided transportation services as the owner and operator of DSK Logistics LLC from May 2020 through the present.

## INTERROGATORY NO. 6:

From March 12, 2017 through the present, identify all employers for whom you have worked and your scheduled hours for each employer, including any self-employment.

## ANSWER:

Claimant Barysas objects that this interrogatory is ambiguous and confusing as written and overbroad in its request.

Subject to this objection, Claimant Barysas is the owner and operator of DB Pedicabs LLC in New York, New York. This business operates as both a bike rental referral business and as private chauffeur business from 2006 through the present. This business also operated as a trucking company from 2018 through end of 2020.

Claimant Barysas worked for Lyft in New York, New York as a driver from 2014 through August 2017.

Claimant Barysas worked for Respondent Uber in New York, New York as a driver from 2014 through August 2017.

Claimant Barysas worked for Lyft on limited basis in Houston, Texas as a driver from August 2017 through 2019.

Claimant Barysas worked for Respondent Uber in Houston, Texas as a driver from August 2017 through 2019.

Claimant Barysas is the owner and operator of DSK Logistics LLC in Houston, Texas from May 2020 through the present. This business operates as a trucking company.

## INTERROGATORY NO. 7:

Identify each social or business network computer site which you are a member, user, or subscriber (including but not limited to Facebook, MySpace, ClassMates.com, LinkedIn, Instagram, Twitter, etc.), the URL of the site(s), your user name(s) for each site, and your login name(s) for each site.

**ANSWER:**

Claimant Barysas maintains a Facebook page under the name Dainius Barysas. The email address associated with Claimant Barysas's Facebook account is Balticam@yahoo.com.

Claimant Barysas maintains an Instagram account under the username danny_nyc_1982. The email address associated with Claimant Barysas's Facebook account is Balticam@yahoo.com.

**INTERROGATORY NO. 8:**

For each trip for which you assert Uber retained tips or gratuities to which you were entitled, please provide the following information:

> (a)    Identification of each such trip, by the trip number and date and time of the trip;
>
> (b)    The amount of the tip or gratuity;
>
> (c)    Each person employed by Respondent who you notified of the improperly retained tip or gratuity;
>
> (d)    Respondent's response to your notification, including identification of the person and the substance of the response.

**ANSWER:**

Claimant Barysas objects that this request is overly broad and unduly burdensome.

Uber maintains the information sought in this Interrogatory. Claimant Barysas will supplement this response as discovery unfolds.

**INTERROGATORY NO. 9:**

For each alleged cost or expense that Claimant asserts he was not "reimburse[d] … [with respect to] the use of [Claimant's] personal vehicle", please provide the following information:

> (a)    Identification of the alleged cost or expense that Claimant alleges was incurred as a result of his use of the Uber App and to which Claimant further alleges requires reimbursement;
>
> (b)    Identify what documents, if any, support Claimant's claim of cost or expense;
>
> (c)    The amount paid by Claimant and the method of payment for each cost or expense (i.e. cash, credit card, check, debit card, etc.);
>
> (d)    The date and approximate time the expense and/or cost was incurred;

(e)      Each person employed by Respondent who you notified of the cost or expense;

(f)      The date you requested reimbursement for each cost or expense from Respondent;

(g)      Respondent's response to your request for reimbursement, including identification of the person and the substance of the response.

**ANSWER:**

Claimant Barysas objects that this request is overly broad and unduly burdensome.

Uber maintains the information sought in this Interrogatory.  Claimant Barysas will supplement this response as discovery unfolds.

**INTERROGATORY NO. 10:**

For each trip for which Claimant asserts he was not "reimbursed" toll charges, please provide the following information:

(a)      Identification of the trip by the trip number wherein Claimant claims he paid a toll expense or incurred a toll charge while providing transportation services while logged into the Uber App;

(b)      The name of the toll road traveled;

(c)      The amount paid for use of the toll road;

(d)      The date and approximate time the toll charge was incurred;

(e)      Each person employed by Respondent who you notified of the toll charge;

(f)      The date you requested reimbursement of the toll charge from Respondent;

(g)      Respondent's response to your request for reimbursement, including identification of the person and the substance of the response.

**ANSWER:**

Claimant Barysas objects that this request is overly broad and unduly burdensome.

Uber maintains the information sought in this Interrogatory.  Claimant Barysas will supplement this response as discovery unfolds.

2022-67757 / Court: 133

# Exhibit F

## IN THE ARBITRATION BETWEEN

| | |
|---|---|
| **DAINUS BARYSAS** | § |
| | § |
| **Claimant** | § |
| | § |
| **VS.** | § |
| | § |
| **UBER TECHNOLOGIES, INC.** | § |
| | § |
| **Respondent** | § |

### ORDER NO. 1

On June 16, 2021 an Oral Hearing was conducted via telephone conference. Claimant appeared through his attorneys Steve Kherkher, Steve Stanley, Kathryn Hiett, and Ryan MacLeod. Respondent appeared through its attorneys Kim Miers and Nicole Lefave. The following Motions and Responses were heard: Claimant's First Motion to Compel Production, Respondent Uber Technologies, Inc.'s Response to Claimant's Motion to Compel Production, Respondent Uber Technologies, Inc.'s Motion for Protective Order to Prevent the Apex Deposition of Alex Rosenblat, and Claimant's Response to Respondent's Motion for Protective Order to Prevent the Deposition of Alex Rosenblat and Claimant's Motion to Compel the Deposition of Uber Employee Alex Rosenblat.

After reviewing the Motions and Responses thereto and having heard oral argument, the Arbitrator makes the following rulings: Claimant's First Motion to Compel Production is **GRANTED** in all respects. Respondent's Motion for Protective Order to Prevent the Apex Deposition of Alex Rosenblat is **GRANTED** in all respects at this time.

Signed this 16th day of June 2021

Susan S. Soussan
Arbitrator

2022-67757 / Court: 133

# Exhibit G

| | | |
|---|---|---|
| **DAINIUS BARYSAS,** | § | |
| | § | |
| **CLAIMANT,** | § | |
| | § | |
| **VS.** | § | **HON. SUSAN SOUSSAN,** |
| | § | **ARBITRATOR** |
| **UBER TECHNOLOGIES, INC.,** | § | |
| | § | |
| **RESPONDENT.** | § | |
| | § | |
| | § | |

## <u>CLAIMANT'S BRIEF IN SUPPORT OF CALLING FACT-WITNESS</u>
## <u>ALEX ROSENBLAT</u>

Claimant identified Alex Rosenblat, a current employee of Uber with the title, Head of Marketplace Policy, Fairness and Research. Ms. Rosenblat took this position in January 2021 to improve the design of Uber products to create more equitable outcomes for drivers.[1] Ms. Rosenblat handles policy product mapping for Uber products.[2] Uber has argued that Ms. Rosenblat is an apex employee. However, contrary to Uber's hollow claims, Ms. Rosenblat testified that she **is not a member of Uber's Executive Team** and **does not manage a single employee**.[3]

When announcing that Ms. Rosenblat was being hired, Uber issued a press statement that they hired Rosenblat because they want "people at Uber who care about driver issues and who aren't afraid to challenge our thinking on any given issue."[4]

In summer 2021, while an employee for Uber, Ms. Rosenblat provided testimony in a separate but similar arbitration related to wage claims by an Uber driver. Accordingly, Uber should not be surprised or prejudiced by her identification as a witness here.

---

[1] *See* Ex. A, Alex Rosenblat Tweets
[2] *See* Ex. B, Testimony Excerpt of Alex Rosenblat at 29:3-9
[3] *See Id.* at 26:8-14
[4] *See* Ex. C. Brody Ford, *Uber Hires Prominent Critic to Focus on Treatment of Drivers*, BLOOMBERG, February 17, 2021, at 1.

During her testimony, Ms. Rosenblat confirmed that she stands by the statements and contents of "Uberland," a book she authored and published in 2018.[5] Uberland was the result of her studying and researching the relationship of Uber and Uber drivers between mid-2014 and winter 2018.[6] The research she published in Uberland is squarely within the time period Claimant Barysas drove for Uber.

Ms. Rosenblat's many ethnographic studies and published works concerning Uber occur before she was invited to join the inner workings of the company; however, now as an Uber employee, she is influencing, creating, and implementing Uber's company policies. Testimony regarding Uber's policies, both past and present, is particularly relevant because it impacts the daily life of Uber drivers like Dainius Barysas. Ms. Rosenblat maintains firsthand knowledge of Uber policies pertaining to drivers and whether those policies have changed or remained status quo since her Uber employment commenced.

Ms. Rosenblat employment with Uber has bolstered her knowledge of how the company operates, how it manages its relationships with drivers, and how exactly drivers are controlled by Uber through algorithms and informational asymmetry. Claimant should be entitled to question Ms. Rosenblat about her particularly relevant knowledge of Uber's practices and policies.

The Arbitrator must weigh evidence regarding the five factors of the economic realities test, which includes evidence of Uber's control over Claimant Barysas through their policies and procedures. Ms. Rosenblat was hired by Uber because of her prior research, knowledge, and experience with Uber Drivers.  Ms. Rosenblat implements this knowledge at Uber on a daily basis to reform old Uber Driver Policies and implement new Uber Driver policies. Just as a prior arbitrator found this testimony relevant and admissible, it should be allowed here.

---

[5] *See* Ex. B, at 19:19-24
[6] *See generally,* Rosenblat, A., *UBERLAND*, Univ. of California Press 2018

Respectfully submitted,

**KHERKHER GARCIA, LLP**

By:    */s/ Bret Stanley*
      **Bret Stanley**
      State Bar No. 24075116
      BStanley@KherkherGarcia.com
      Steven J. Kherkher
      State Bar No. 11375950
      SKherkher@KherkherGarcia.com
      Ryan MacLeod
      State Bar No. 24068346
      RMacLeod@KherkherGarcia.com
      Eric Hawley
      State Bar No. 24074375
      EHawley@KherkherGarcia.com
      Kathryn Hiett
      State Bar No. 24118411
      KHiett@KherkherGarcia.com
      2925 Richmond Ave., Suite 1560
      Houston, TX 77098
      (713) 333-1030 / (713) 333-1029 (fax)

**ATTORNEYS FOR CLAIMANT**

## <u>CERTIFICATE OF SERVICE</u>

On this the 18th day of March 2022, I hereby certify that a true and correct copy of the foregoing document has been served on all counsel of record:

Allison Williams
Kim Miers
Sophia Behnia
Nicole LeFave
Abby Bochenek
Collin Quigley
Maikieta Brantley
Ben Sandahl

acwilliams@littler.com
kmiers@littler.com
sbehnia@littler.com
nlefave@littler.com
abochenek@littler.com
cquigley@littler.com
mbrantley@littler.com
smendoza@littler.com
scornell@littler.com
preyes@littler.com
hheckel@littler.com
bsandahl@littler.com
dridenour@littler.com

*/s/ Bret Stanley*_____
**Bret Stanley**

# EXHIBIT A



← **Thread**

**Alex Rosenblat**
@mawnikr

I have some news to share: after 7 amazing years @datasociety, I'm moving into a new role heading up marketplace policy, fairness & research @Uber. For me, it's a rare opportunity to bring my research into practice around core fairness concerns I wrote about for years in Uberland

10:46 AM · Jan 13, 2021 · Twitter Web App

**7** Retweets   **5** Quote Tweets   **144** Likes

**Alex Rosenblat** @mawnikr · Jan 13
Replying to @mawnikr
I'm deeply curious to learn how products & policies are developed. And I'm excited to work with a group of folks at the company who are doing the work to design products for more equitable outcomes.

   1                      3

**Alex Rosenblat** @mawnikr · Jan 13
This is a big change for me as someone who has critically observed the company's impact on drivers (and society) for many years. I'm hopeful I can leverage my insights & what I learn from within the org to make things better. And I think this is going to be really interesting :-)

   5                      16

# EXHIBIT B

```
 1              AMERICAN ARBITRATION ASSOCIATION
 2
 3   GILBERT CHIBELENGA,        *
                                *
 4   CLAIMANT,                  *
                                * HON. ROBERT JENEVEIN,
 5   VS.                        * ARBITRATOR
                                *
 6   UBER TECHNOLOGIES, INC.,   *
                                *
 7   RESPONDENT.                *
 8
 9
10
11       ******************************************
             ARBITRATION PROCEEDINGS
12                 AUGUST 30, 2021
                        DAY 1
13                (REPORTED REMOTELY)
         ******************************************
14
15
16            MET, pursuant to Agreement, on the on
17   AUGUST 30, 2021, from 10:34 A.M. to 5:39 P.M.,
18   reported remotely by stenographic means by AMY
19   PRIGMORE, Certified Shorthand Reporter in and for
20   the State of Texas.
21
22
23
24
25
                                              Page 1
```

```
 1                   A P P E A R A N C E S
 2
 3    ARBITRATOR:
           HON. ROBERT JENEVEIN,
 4
 5
 6    FOR CLAIMANT:
           Ryan MacLeod
 7         Bret Stanley
           Steve Kherkher
 8         Kathryn Hiett
           KHERKHER GARCIA FASS HAWLEY, LLP
 9         2925 Richmond Avenue Suite 1560
           Houston TX 77098
10         skherkher@kherkhergarcia.com
           rmacleod@kherkhergarcia.com
11         khiett@kherkhergarcia.com
           bstanley@kherkhergarcia.com
12
13
14    FOR RESPONDENT:
           Kimberly R. Miers
15         LITTLER MENDELSON PC
           100 Congress Ave Suite 1400
16         Austin TX 78701
           kmiers@littler.com
17         214-880-8100
18         M. Collin Quigley
           LITTLER MENDELSON PC
19         2001 Ross Ave, Ste 1500
           Dallas TX 75201
20         cquigley@littler.com
           214-880-8100
21
22
      ALSO PRESENT:
23    Angela Corridan
      Brad Rosenthal
24    Deborah Soh
      Kristen Hidalgo-Monroy
25    Don Ridenour
```

Page 2

```
1                         INDEX
                                                PAGE
2
3    REPORTER'S CERTIFICATE                      231
4
                   E X A M I N A T I O N S
5
                                                PAGE
6    ALEX ROSENBLAT
     DIRECT EXAMINATION                           15
7    BY MR. MacLEOD
     CROSS-EXAMINATION                            49
8    BY MS. MIERS
     GILBERT CHIBELENGA
9    DIRECT EXAMINATION                           52
     BY MR. STANLEY
10   CROSS-EXAMINATION                           177
     BY MS. MIERS
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                          Page  3
```

KG-Universal_001326

1   described.

2       Q.  And then you -- you have authored, and --

3   and Uberland tells us this.

4           But you have authored many different

5   articles and writings that have appeared in media

6   outlets such as the New York Times, the Harvard

7   Business Review, the Atlantic, Slate, Fast Company,

8   and others, correct?

9       A.  Correct.

10      Q.  One such article that you wrote was titled,

11  Algorithmic Labor and Information Asymmetries:  A

12  Case Study of Uber Drivers.  That was published in

13  2016, correct?

14      A.  Yes.  That's an academic publication.

15      Q.  And that was published as an academic

16  publication in the International Journal of

17  Communication, correct?

18      A.  Correct.

19      Q.  And -- and just like Uberland, you certainly

20  stand by the statements, and obviously the contents

21  of both Uberland, as well as that article,

22  Algorithmic Labor and Information Asymmetries,

23  correct?

24      A.  Correct.

25                  MR. MacLEOD:  Judge, at this time,

                                        Page 19

```
 1    Your Honor.
 2                     THE ARBITRATOR:  Overruled.
 3         A.  Anne Laven.
 4         Q.  (BY MR. MacLEOD)  And are you -- do you
 5    manage a group?  Are you in charge of managing a
 6    group?
 7         A.  I am not.
 8         Q.  Do you manage any employees at Uber that
 9    you're aware of today?
10         A.  I do not.
11         Q.  And is it true that you are not a member of
12    Uber's executive team, as Uber has published that
13    team to the public?
14         A.  I am not a member of Uber's executive team.
15         Q.  All right.  Is it -- do you also have, and
16    maintain, a website known as www.AlexRosenblat.com?
17         A.  I don't really maintain it.  I don't think
18    it's been updated in a quite a while.  In fact, I
19    have -- a colleague of mine is the one who created
20    it for me.  But yes, it does exist today.  But it
21    has not been updated.
22         Q.  Ma'am, do you have a Twitter account?
23         A.  I do.
24         Q.  And I've seen Alex Rosenblat as the -- I
25    guess it's the handle.  Is that the Twitter handle?
```

KG-Universal_001338

1      Q.   Right.

2      A.   But I am, indeed, curious.

3      Q.   And -- and let me just ask you.  Have you

4  been integral in developing policies relating to

5  what drivers, like Mr. Chibelenga, are able to see

6  in their driver app, since you started with Uber

7  earlier this year?

8      A.   I've primarily done policy product mapping

9  for products that are either --

10                 MS. MIERS:  Okay.  Wait.  I'm going

11  to stop.

12                 Just so you know, Ms. Rosenblat,

13  this -- this proceeding has not been sealed.  So

14  we're going to designate this as highly

15  confidential.

16                 If she's going to get into things

17  that are in the works, any strategies, or products,

18  or platforms, that are being developed, we believe

19  that that falls within our confidential information

20  and proprietary trade secrets.

21                 THE ARBITRATOR:  So I think you can

22  answer the question that was asked without getting

23  into that stuff, but Ms. Miers's warning is well

24  taken.  So you can answer the question.

25      A.   Okay.  It's worth noting that I have

Page 29

KG-Universal_001341

# EXHIBIT C

Technology

# Uber Hires Prominent Critic to Focus on Treatment of Drivers

*By*
*Brody Ford*
February 17, 2021, 7:00 AM CST

- The "Uberland" author will advocate for drivers internally
- The company has a strained relationship with academics



Alex Rosenblat Photographer: Rick Kern/Getty Images

Alex Rosenblat, an author and labor researcher, wrote for years about how Uber Technologies Inc. obscures pay structures, surveils drivers and creates systems that facilitate discrimination against those workers. Now she works for Uber.

The ride-hailing company hired Rosenblat last month as head of marketplace policy, fairness and research. Her appointment, which hasn't been previously reported, is part of an effort to reform Uber's treatment of, and relationship with, its drivers.

Rosenblat is best known for her 2018 book, "Uberland: How Algorithms Are Rewriting the Rules of Work," for which she interviewed hundreds of drivers about their working conditions. The book highlights driver stories of pay disparities, pervasive surveillance and the lopsided power dynamics in algorithm-mediated work.

As an Uber employee, Rosenblat said her responsibility is to "get the company to take into consideration the experiences and point of view of drivers, especially at the product level" and that her work will be informed by past research.

In an emailed statement, Uber said it hired Rosenblat because the company wants "people at Uber who care about driver issues and who aren't afraid to challenge our thinking on any given issue."

Before joining Uber, Rosenblat was a senior researcher at Data and Society, a nonprofit institute that seeks to "challenge the power and purpose of technology in society." Founded in 2014, the organization publishes research on artificial intelligence, the impact of technology on labor and health and online disinformation. The MacArthur Foundation and a philanthropic organization overseen by EBay co-founder Pierre Omidyar are among the 20 financial supporters named on the group's most recent annual report.

Uber has long had an adversarial relationship with many academics, who have criticized the company for restricting data access to select researchers. More than 70 gig economy academics wrote in an open letter after the publication of a 2020 study by Cornell University's Institute for Workplace Studies commissioned by Uber and Lyft Inc., calling its findings suspect.

What to know in tech
Get insights from reporters around the world in the Fully Charged newsletter.
Email
By submitting my information, I agree to the Privacy Policy and Terms of Service and to receive offers and promotions from Bloomberg.

Alexandrea Ravenelle was among those who signed the letter. In an interview, she expressed admiration for Rosenblat but a continued distrust of the company. Ravenelle, an assistant professor of sociology at the University of North Carolina at Chapel Hill, said she's concerned Uber will ignore Rosenblat's internal critiques and said the poor state of driver conditions has been public knowledge for years.

"When you interview the workers, the situation never seems to be improving for them," Ravenelle said. "If anyone can help them to make a difference, it will be Alex, but I think she's got a uphill battle ahead of her."

This isn't the first time Rosenblat considered trying to change things from the inside. In 2017, after three years of researching the company, Uber attempted to hire her. She pondered the offer but ultimately declined.

"This moment says a lot about what happens to experts: Once they know enough to be a threat, the companies they study will try to absorb them," Rosenblat wrote about the attempted recruitment in "Uberland."

That same year, Rosenblat co-authored a paper describing how Uber's use of customer reviews to evaluate performance could amount to workplace discrimination due to consumer biases. She is now working to apply these findings to service and policy design, as part of her goal to "encourage the company to assess product impact on drivers as individuals, rather than as part of an abstract group."

Rosenblat recently appeared at a speaker series about the ethics of algorithmic governance and co-authored a post about the disappearance of secure employment during recessions. She said she changed her mind about joining Uber because there are now many others conducting the kind of research she has championed and can carry her mantle.

"There are new ways I can use my expertise now, inside the company," Rosenblat said.

Have a confidential tip for our reporters?
GET IN TOUCH
Before it's here, it's on the Bloomberg Terminal.
LEARN MORE
LIVE ON BLOOMBERG
Watch Live TV Listen to Live Radio

## Most Read

1. markets

   Powell Holds Dovish Line as Fed Signals Zero Rates Through 2023

2. businessweek

   Combat Drones Made in China Are Coming to a Conflict Near You

3. markets

   Stocks Gain, Yields Pare Rise After Fed Stands Pat: Markets Wrap

4. technology

   Apple Nears Launch of New iPads After Stay-At-Home Sales Boost

5. markets

   ARKK Copycat Is Beating Cathie Wood's Original by 10-Fold

Terms of Service
Trademarks Privacy Policy ©2021 Bloomberg L.P. All Rights Reserved
Careers Made in NYC Advertise Ad Choices Contact Us Help

2022-67757 / Court: 133

# Exhibit J

1    DAINIUS BARYSAS,                )

     Claimant                        )

2                                    )

     vs.                             ) CASE NO. HON. SUSAN SOUSSAN

3                                    ) ARBITRATOR

     UBER TECHNOLOGIES, INC.,        )

4    Respondent                      )

5

6

7                        ARBITRATION DAY 2

8                         May 2, 2022

9

10        ARBITRATION DAY 2, was taken remotely by Zoom in

11   the above-styled and numbered cause on the 2nd day of

12   May, 2022, from 9:59 a.m. to 6:03 p.m., before Shauna

13   Foreman, Certified Shorthand Reporter in and for the

14   State of Texas, reported by computerized stenotype

15   machine, pursuant to the provisions stated on the

16   record or attached hereto.

17

18

19

20

21

22

23

24

25

                                            Page 198

```
 1                      A P P E A R A N C E S
 2
 3    FOR CLAIMANT:
 4         BRET STANLEY, ESQ.
           ERIC HAWLEY, ESQ.
 5         RYAN MacLEOD, ESQ.
           KATHERINE HIETT, ESQ.
 6         KHERKHER GARCIA FASS HAWLEY
           2925 Richmond Avenue
 7         Suite 1560
           Houston, Texas  77098
 8         E-mail: skherkher@kherkhergarcia.com
 9    FOR RESPONDENT:
10         BENJAMIN D. SANDAHL, ESQ.
           KIMBERLY R. MIERS, ESQ.
11         ALLISON C. WILLIAMS, ESQ.
           LITTLER MENDELSON
12         1301 McKinney Street
           Suite 1900
13         Houston, Texas  77010
           E-mail: acwilliams@littler.com
14
      ALSO PRESENT:
15
           Don Ridenour
16         Deborah Soh
           Jacob Stonecipher
17         Brad Rosenthal
           Angela Corridan
18         Lindsey Cameron
           Dainius Barysas
19
20    ARBITRATOR:
21         Hon. Susan Soussan
22
23
24
25

                                        Page 199
```

```
 1                          INDEX

 2                                              PAGE

 3   BRAD ROSENTHAL

 4   Examination Continued by Mr. MacLeod ............201

 5   DAINIUS BARYSAS

 6   Examination by Mr. Stanley .....................272

     Examination by Ms. Miers .......................344

 7   Further Examination by Mr. Stanley .............433

     Further Examination by Ms. Miers ...............443

 8

 9   BRAD ROSENTHAL

10   Examination by Mr. Sandahl .....................457

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    MS. SOUSSAN:  Good morning, everybody.
 2    I'm happy to see everyone.  Are there any preliminary
 3    matters that we take up before we start back up with
 4    testimony?
 5                    MR. MacLEOD:  No, ma'am.
 6                    MR. SANDAHL:  The only question I have
 7    is we have -- in the realtime, it's showing up with
 8    Ben Bireley and Kelli McDonald as perhaps being
 9    there, and could we understand who all is in the
10    room?
11                    (Discussion off the record)
12                    MS. SOUSSAN:  As far as realtime, is
13    there something I need to pull it up?
14                    (Discussion off the record)
15                    MS. SOUSSAN:  Is everyone ready to
16    proceed?
17                    MR. MacLEOD:  Claimant's ready.
18                    MR. SANDAHL:  Respondent is ready.
19                    BRAD ROSENTHAL,
20    having been previously duly sworn, testified as follows:
21                    EXAMINATION (Continued)
22        Q.   (BY MR. MacLEOD)  Good morning,
23    Mr. Rosenthal.  How are you?
24        A.   Good morning.  Doing well.  Thanks.
25        Q.   The last time we spoke, if I remember
```

Page 201

1    correctly, was in mid April -- I think it was

2    April 14th.

3                    Do you remember that?

4        A.    I do.  I don't remember the exact date;

5    but, yeah, I remember.

6        Q.    Just so we are kind of straight on the

7    record here, we are in another arbitration.  You

8    understand that we're continuing with your prior

9    testimony?

10       A.    I do, yeah.

11       Q.    And did you review your prior sworn

12   testimony that was recorded in this particular case?

13       A.    I did.

14       Q.    And when did you do that?

15       A.    I believe last week.

16       Q.    And before I go too far, just so I

17   understand the foundation and kind of your knowledge

18   base for this particular time to testify, did you

19   review any additional documents other than the

20   arbitration transcript to prepare for today's

21   testimony, sir?

22       A.    Did I review again some of the stuff that

23   we had produced?

24       Q.    Did you -- for example, did you review some

25   of the P1, P2, P3 data?

                                            Page 202

1        A.    No, I did not.

2        Q.    Did you review any of the support messages?

3        A.    I think I looked at -- through some of the

4    support messages, yeah.

5        Q.    And one of the things that we were talking

6    about last time was about how when a driver is logged

7    in or is on-line with the Uber app that Uber collects

8    GPS points -- I think what you've said is every

9    couple of seconds; is that right?

10       A.    That is right.  We collect every couple of

11   seconds.

12       Q.    And you have said that when a driver hits

13   the go on-line button until he hits the go off-line

14   button, Uber collects GPS points, correct?

15       A.    That is my understanding.

16       Q.    And Uber collects the actual data points in

17   P1 time, P2 time, and P3 time for drivers, correct?

18       A.    That is my understanding.

19       Q.    And what I want to try to figure out a

20   little bit better is how Uber does that.  First off,

21   is there a document -- you know, whether it's an

22   electronic document, a physical document -- whereby

23   Uber tells these Uber drivers what sort of monitoring

24   that Uber will be doing of the drivers?

25       A.    Well, I don't think collecting GPS points

Page 203

1    every couple of seconds would be monitoring, but I

2    believe --

3         Q.    That's not my question.

4         A.    -- services agreement we do say that we --

5    that we will -- that a driver has to have their

6    GPS -- their GPS on, or I forget -- the TSA outlines

7    it.

8         Q.    So my question was different than the one

9    you answered, but let's go with your answer.

10                You said the technology services

11   agreement provides that drivers will provide Uber

12   with access to their phone's GPS, right?

13        A.    Something along those lines.

14        Q.    Well -- that's what I'm trying to figure

15   out.

16                When a driver logs into the app, I'm

17   trying to find out exactly what Uber has access to on

18   that driver's phone.  Are you with me?

19        A.    Okay.

20        Q.    Can Uber -- can Uber monitor drivers when

21   they are not using the Uber app?

22        A.    I don't believe so.

23        Q.    And what is your sworn testimony based on

24   that you do not believe so?

25                MR. SANDAHL:  Object, Your Honor, that

Page 204

1    the testimony is evidence by itself.  Mr. Rosenthal

2    is here as a corporate representative.  He's here to

3    testify about what the company knew, the company

4    knowledge imputed to him, and this assumption that

5    there's no basis for it is unfounded.

6                    MS. SOUSSAN:  Overruled.

7         A.    My understanding is based on the technology

8    service agreement and then my understanding of how

9    the app works.

10        Q.    (BY MR. MacLEOD)  Here's what I'm trying to

11   find out.

12                   Who within the Uber world would be

13   responsible for collecting and maintaining this GPS

14   data?  Let's start there.

15                   MR. SANDAHL:  Objection.  Relevance,

16   Your Honor.

17                   MS. SOUSSAN:  Overruled.

18        A.    I'm not sure exactly who would be

19   responsible for collecting it.  It's collected from

20   the driver's device, right?  It's not something we

21   have to do.  Within Apple and within Google, there's

22   a publicly-available developer site on the Google and

23   Apple enabling companies to do that.  It's not unique

24   that we do it.  Other companies do it, as well.

25                   And my understanding is we built

                                        Page 205

```
 1    out -- I don't know exactly which team built that
 2    out, but we collect the GPS points and they sit in a
 3    database.
 4         Q.   (BY MR. MacLEOD)  I'm not deposing an Apple
 5    or a Google corporate representative today.  You're
 6    here for Uber, right?
 7         A.   I am.
 8         Q.   What we learned during the last time we
 9    were all conveniently gathered together -- what we
10    learned was Uber was monitoring the GPS for my
11    client.
12                   You know that's true, right?
13                   MR. SANDAHL:  Objection.  Misstates
14    the evidence.
15                   MS. SOUSSAN:  If he can answer the
16    question, he can answer the question.  Yes, counsel
17    is clearly using his words.  So the witness can hear
18    it and he can listen and he can answer to the best of
19    his ability.
20         A.   I do not believe that to be true, no.
21         Q.   (BY MR. MacLEOD)  Okay.  Somehow many
22    years -- even after my client stopped driving -- Uber
23    was still able to go back and look at GPS data that
24    had been collected by Uber years ago, correct?
25         A.   That is right.
```

Page 206

1       Q.   And so, what I'm trying to find out, then,

2   is within the Uber world -- the vision team, whoever

3   it may be -- who is specifically responsible for

4   collecting that data that was previously pulled by

5   Uber?

6       A.   I'm not sure which team built out the API

7   integration between Apple and Google and the driver's

8   device to collect the GPS points.

9       Q.   So is that how it collected, through some

10  Apple or some Google joint algorithm with Uber?

11              MR. SANDAHL:  Objection, Your Honor.

12  This is getting into the proprietary nature of the

13  app.

14              MS. SOUSSAN:  If it is proprietary,

15  the objection is sustained.

16              MR. MacLEOD:  Here's the problem,

17  Judge.  We're in arbitration.  It's confidential.  It

18  is confidential.

19              MS. SOUSSAN:  I know that.  I've ruled

20  so many times that you do not have access to trade

21  secret or proprietary information.

22              MR. MacLEOD:  We're trying to

23  demonstrate how Uber is controlling these drivers,

24  and we can't go and talk about their monitoring of

25  GPS data and who is responsible for it?

Page 207

1          MS. SOUSSAN:  Re-ask your question,

2     please.

3          Q.   (BY MR. MacLEOD)  Who within Uber is

4     actually collecting the GPS data from the drivers on

5     a daily basis?  Let's start there.

6          A.   To my understanding, no one.  Not one

7     person or not one team is just collecting this data.

8          Q.   So where -- who -- what -- is there a

9     device?  Is there a software?  What is actually

10     collecting this GPS from the drivers?

11          A.   So as I've described, there's information

12     that is publicly available on the Google and Apple

13     developer pages so that companies can go and build

14     and collect certain data from a driver's device or

15     from anyone's device.  Certain apps do this from our

16     devices on our phones, and we have built out the --

17     essentially the infrastructure to connect with the

18     Apple and Google developer pages and the -- and as a

19     result of that, the GPS data comes in and it sits in

20     our databases.  We collect it every two or three

21     seconds, GPS coordinate data, and the data sits in

22     our databases.

23          Q.   Let's say, for example, that Uber suspects

24     that there is a driver who is somehow manipulating

25     data or, you know, engaging in some type of fraud.

Page 208

1            Who within Uber would actually be

2    looking at that data that's been collected and make

3    that further determination?

4        A.    I'm not sure specifically who.

5        Q.    Do you know in this particular instance --

6    I mean, you understand that there's an allegation

7    that my client was engaging in some sort of

8    geo-spoofing or fraud, right?

9        A.    I do.

10        Q.    And so, without any input from him, without

11    him getting to make his case, Uber decided that --

12    that he would no longer be able to use the Uber

13    application at the airport, correct?

14        A.    We did make that decision, yeah.

15        Q.    And Uber retained that discretion to make

16    sure that my client could not use the Uber

17    application at the airport, correct?

18        A.    We did, yeah.

19        Q.    Now, are you familiar with an operating

20    program that was used by Uber that was in this case

21    named Hell?

22        A.    I'm not familiar with it, no.

23        Q.    Okay.  There was -- even the FBI stepped in

24    because they had to investigate this program, Hell,

25    because of the monitoring that --

Page 209

```
 1                    MR. SANDAHL:  Objection, Your Honor,
 2      to this whole line of questioning.
 3                    MS. SOUSSAN:  Sustained.  You're not
 4      the one who is testifying, Mr. MacLeod.
 5                    MR. MacLEOD:  This is
 6      cross-examination.
 7                    MS. SOUSSAN:  I know exactly what it
 8      is, sir.  He said he's not familiar with the program.
 9      You can ask him your next question and ask him if
10      he's familiar with the FBI stepping in.
11         Q.   (BY MR. MacLEOD)  Are you familiar with the
12      FBI stepping in to conduct an investigation of Uber
13      for using an operating program called Hell?
14                    MR. SANDAHL:  Objection.  Relevance.
15                    MS. SOUSSAN:  Overruled.
16         A.   I am not, no.
17         Q.   (BY MR. MacLEOD)  Were you aware that Uber
18      was monitoring the realtime locations of Uber drivers
19      who also drove for its competitor, Lyft?
20                    MR. SANDAHL:  Objection.  Lacks
21      foundation and relevance.
22                    MS. SOUSSAN:  Overruled.  He can
23      answer if he knows the answer.
24         A.   I was not, no.
25         Q.   (BY MR. MacLEOD)  Did you know that through
```

Page 210

1    the operating program Hell, Uber analyzed Lyft's

2    prices and used that information to undercut Lyft and

3    lure drivers over to the Uber application?

4                    MR. SANDAHL:  Same objections.

5                    MS. SOUSSAN:  Overruled.

6         A.   I'm not, no.

7         Q.   (BY MR. MacLEOD)  Now, through the Uber

8    monitoring -- through this GPS data collection, do

9    you understand that Uber can detect accelerations by

10   drivers?

11        A.   Yeah.  I don't know if it was through the

12   GPS collection that we were able to do that, but I

13   believe we were also collecting information from

14   gyroscope of a driver's device.

15        Q.   Can you explain?  What is gyroscope?

16        A.   It's something within a device, I believe,

17   that detects some sort of motion.  I'm not familiar

18   with the technicalities.  I'm not an engineer and I

19   don't have that sort of level of depth of knowledge

20   around that, but I do know that there is something

21   related to us collecting information from the

22   gyroscope.

23        Q.   And -- and where is that data that's

24   collected by the gyroscope maintained so that Uber

25   support or someone else with Uber can review that

                                            Page 211

1    information?

2              MR. SANDAHL:  I'll object to this also

3    as being proprietary, Your Honor.

4              MS. SOUSSAN:  The question is where is

5    the data.  I think he can answer that question if he

6    knows.

7         A.   I'm not sure -- it's just a program that we

8    had tested out.  I don't believe drivers found it

9    valuable, so I believe we stopped collecting the

10   data, to my knowledge.  I'm not exactly sure.

11        Q.   (BY MR. MacLEOD)  As Uber's corporate

12   representative, did you know that Uber also collected

13   data relating to when drivers would stop too quickly

14   instead of stopping gradually?

15        A.   That's part of the same data that was

16   collected around the accelerometer.  But, yeah, I

17   don't think we do it anymore.

18        Q.   Can you first off tell us when the

19   collection of that gyroscope -- the accelerometer

20   data was first collected by Uber?

21        A.   I don't know.

22        Q.   Can you tell us when Uber, in your words,

23   stopped collecting the gyroscope data that would

24   monitor acceleration, stopping, things like that?

25        A.   I don't know.

                                        Page 212

```
 1        Q.    Okay.  Let's go to exhibit Claimant's 7,

 2   please, and look at Barysas 954.

 3                    MS. SOUSSAN:  Claimant's Exhibit 7?

 4                    MR. MacLEOD:  It's going to be Barysas

 5   954.

 6                    MS. SOUSSAN:  I have it.

 7        Q.    (BY MR. MacLEOD)  All right, sir.  At the

 8   very top here, this is from Uber.  Noreply@uber.com,

 9   correct?

10        A.    It appears, yep.

11        Q.    Okay.  This message where it says

12   "fraudulent activity has been detected," where does

13   this message actually originate from?  Who is sending

14   this?

15        A.    I don't know who sends it.

16        Q.    Do you -- do you know if it -- if it's

17   within Uber support, if it's in Uber monitoring?  Do

18   you know, or do you just not have knowledge?

19        A.    I don't know where it comes from.

20        Q.    The subject line is "First notice.  Your

21   account has been flagged."

22                    What does it mean when an Uber

23   driver's account has been flagged?

24        A.    Well, in this particular instance, it means

25   that there's some sort of -- the driver had some sort
```

1    of fraud flag.

2        Q.    As you sit here today as Uber's corporate

3    representative, you have no evidence that Mr. Barysas

4    was actually engaging in any type of fraud.  We can

5    at least agree on that, correct?

6                    MR. SANDAHL:  Objection.  Relevance,

7    Your Honor.  This has been the subject of the motion

8    and the reasons for the deactivation.  We argued at

9    length about what the relevance was.

10                    MR. MacLEOD:  Judge, this goes again

11   to control.

12                    MS. SOUSSAN:  You're walking a fine

13   line.  I'll let you ask a couple of questions, and

14   then let's move on.

15       Q.    (BY MR. MacLEOD)  Yes, ma'am.

16   Mr. Rosenthal, can you please answer that question?

17       A.    Can you please re-ask?

18                    MR. MacLEOD:  Sorry.  Ms. Foreman, can

19   you please read the question back?

20                    (The record was read as requested.)

21       A.    I would not agree on that, no.

22       Q.    (BY MR. MacLEOD)  Okay.  And other than

23   evidence that has been specifically excluded in this

24   case -- and I trust you were advised by counsel on

25   that -- what evidence do you have, then, that my

                                        Page 214

1    client was engaged in fraud?

2        A.    I believe the text messages that your

3    client had with riders will show that he was engaging

4    in fraud as outlined in the first paragraph of this

5    document here.

6        Q.    Okay.  And so, specifically what text

7    messages is Uber relying upon today to -- to conclude

8    that Mr. Barysas was engaged in some sort of fraud?

9        A.    He was, if I remember correctly -- I think

10   this will come out later, but he -- he was at the

11   airport and he was accepting trips and then telling

12   riders he was pulled over by the police, and he was

13   doing so in an attempt to have riders to cancel their

14   trip because for whatever reason he did not want to

15   cancel.  That's sort of the first paragraph that this

16   document outlines.  He was engaging in some sort of

17   fraud.

18       Q.    What I want to make sure is -- before we go

19   too far -- is that the totality?  Is that everything

20   that Uber has today to conclude that Mr. Barysas was

21   engaged in fraud?

22       A.    Well, I mean, as you pointed out, there is

23   evidence that has been excluded from this matter that

24   also shows evidence of him engaging in fraud.

25              MR. MacLEOD:  We have an expert

                                        Page 215

```
 1    witness in the waiting room.  Can she please be

 2    admitted?

 3         Q.   (BY MR. MacLEOD)  Now, in the -- it says --

 4    here in the second paragraph, it says, "Additional

 5    fraudulent activities that violate Uber's policies or

 6    terms and conditions may result in loss of access to

 7    airport trip requests and/or deactivation of your

 8    Uber account," correct?

 9         A.   That's what it says.

10         Q.   All right.  And so, that was on May 22nd,

11    2018, right?

12         A.   That's correct.

13         Q.   Then if we fast forward and we go to

14    Barysas 956, now here we have -- there's a subject

15    line from a June 27th, 2018, e-mail that says, "Final

16    notice.  You are violating our policy," correct?

17         A.   That's what it says.

18         Q.   And -- and let me just, first off, say back

19    in June 27 of 2018, did Uber have copies or access to

20    any of Mr. Barysas' text messages?

21         A.   If he was texting using our application.

22         Q.   I'm asking you if during that time period

23    if you've seen any evidence that Uber either had them

24    or had access to Mr. Barysas' personal text messages.

25         A.   Outside of our app, no.
```

Page 216

1      Q.   And within the app, are there any text

2   messages within the driver app that Uber relies upon

3   here today in an arbitration that would conclude that

4   he was violating an Uber policy?

5              MR. SANDAHL:  I'll object, Your Honor.

6   At this point that we're getting into the same

7   territory.

8              MR. MacLEOD:  These are text messages,

9   my client's own text messages.

10             MS. SOUSSAN:  He can answer this

11  question if he knows the answer.

12     A.   All the text messages we have access to

13  have been produced.

14     Q.   (BY MR. MacLEOD)  Okay.  So then it says --

15  if we go down to the bottom -- the second paragraph

16  there, it says, "As a result of these activities,

17  you're no longer eligible to receive requests for

18  pickups and drop-offs at airports.  Moving forward,

19  you will only receive non-airport trip requests."

20             And that was a unilateral solely an

21  Uber decision, correct?

22     A.   I wouldn't know if it's solely an Uber

23  decision.  The airports require us, TNCs, to have a

24  policy preventing drivers from not being in a staging

25  area and accepting trip requests.  So we were

Page 217

1    complying with the airport policy.

2        Q.   Okay.   The TNC also says that a person like

3    Mr. Barysas, a driver, is not an independent

4    contractor but instead an employee if Uber limits the

5    territory within which he may provide digitally

6    pre-arranged rides, correct?

7        A.   I don't have the statute in front of me.

8    If what you're saying is reading the statute, then

9    okay.

10       Q.   You know that's true.   You have previously

11   testified to the exact same.   You know that, right?

12                   MR. SANDAHL:   Objection.

13   Argumentative.

14                   MS. SOUSSAN:   Overruled.

15       A.   You are providing a quote, and I don't have

16   the exact verbatim language in front of me.   As I

17   said in my answer, if you're reading it from the

18   statute, then okay.   I do know vaguely it says

19   something along those lines.

20       Q.   (BY MR. MacLEOD)   Let me ask you this:

21   When Uber says, "You know what?   You're violating our

22   policy," does Uber send any evidence, any

23   information, any data to a driver before Uber says,

24   "You know what?   You violated our policy.   We're now

25   going to limit the territory in which you can provide

1    these rides"?

2         A.   We might.  I'm not sure.

3         Q.   Well, let me ask you specifically for

4    Mr. Barysas.

5              Before Uber took the next step and

6    said "no more airport pickups or drop-offs," did Uber

7    provide any information or any data -- any GPS data,

8    anything -- to Mr. Barysas so that he could say,

9    "Wait, hold on.  That's not what happened here"?

10        A.   I believe we did inform him of this in the

11   support messages.

12        Q.   Sir, I'm not asking about the support

13   messages.  I'm asking whether or not he was given

14   access to this information, this data, whatever is

15   relied upon as evidence by Uber to say that he was

16   engaging in fraud.

17             Was anything like that provided?

18        A.   I don't think we provided him data, no.

19        Q.   Because when -- Mr. Barysas even reached

20   out and said, "I've been a top driver with high

21   ratings since 2014.  My family relies on my earnings

22   and, if I lose airport access, it's like a death

23   sentence to me."

24             Do you remember that?

25        A.   I don't remember the specific words.

Page 219

1      Q.   If we go to Uber_Barysas_1181 -- let's go

2    to the middle first where there's a message from

3    Princess -- perfect.  That's great.

4              So Princess, on June 29th, 2018, says,

5    "Hi, Dainius.  Thank you for reaching out about your

6    airport access privileges.  I've escalated this issue

7    to a specialized team.  They will review your request

8    and follow up via e-mail within five business days."

9              First off, when Princess said that to

10   Mr. Barysas, what's the specialized team?

11     A.   I don't know what team she was referring

12   to.

13     Q.   Are you -- are you personally aware as

14   Uber's corporate representative of a specialized team

15   within Uber support to which complaints or concerns

16   are escalated to for review?

17     A.   There are many different teams within our

18   support organization.  I don't know to which

19   specialized team this is referring.

20     Q.   And have you ever been involved in any

21   manner, in any capacity, with being on one of these

22   Uber specialized teams?

23     A.   Again, I don't know which specialized team

24   she's referring to.  I've been -- in 2014, some of

25   these issues were escalated to me.

                                              Page 220

1      Q.   Now, if we go down to the next message, it

2   says, "Thanks for checking in on your airport access

3   status.  After a careful review of your account, we

4   have determined" -- when it says "we have

5   determined," that means Uber has determined, right?

6      A.   That's right.

7      Q.   "Uber has determined that your actions were

8   associated with improper use of the Uber app at the

9   airport.  As a result, your ability to receive trip

10  requests for pickups and drop-offs at the airport

11  will remain restricted."

12            And so, at that point or at least even

13  now, Mr. Barysas has that restriction that he cannot

14  do pickups and drop-offs at the airport, right?

15     A.   That's my understanding.

16     Q.   The next message down right below that one,

17  he literally -- Dainius reaches back out and says,

18  "Please tell me exactly what I did wrong."

19            Do you see he's wanting to find out

20  what's going on?

21     A.   That's what it seems like.

22     Q.   If we go to the very top of this document,

23  you see where there's a message from Dainius that

24  says that it's via in-app support?

25     A.   I do.

Page 221

```
 1          Q.   And he was asking if there was a way to
 2     escalate the message to a supervisor, some sort of
 3     higher-up.
 4                    Do you see that?
 5          A.   I do.
 6          Q.   He says, "I've been a top driver with high
 7     ratings since 2014."
 8                    Do you agree that he was a -- that he
 9     was an excellent driver?
10          A.   I mean, I don't know how you're
11     characterizing "excellent."
12          Q.   Did Uber believe that he was an excellent
13     driver in this time period?
14          A.   I don't -- I don't know.
15          Q.   He even said, "I love working for Uber.  My
16     family relies on my earnings.  If I lose airport
17     access, it's like a death sentence to me.  Please
18     report my -- please restore my airport access,"
19     right?
20          A.   Yeah.
21          Q.   Okay.  Then if we go to the next page on
22     Page Uber_Barysas_1182, Dainius is asking if there's,
23     you know, anything to do.  And it says,
24     "Unfortunately" -- this is from Genesis James.
25     "Unfortunately, it appears that you have already
```

Page 222

1    requested a review of this issue once before.  A

2    specialized team" -- and you don't know anything

3    about the specialized team, right?

4         A.   I don't know to which team it's referring.

5         Q.   "-- have already reviewed your request for

6    appeal and sent you their final ruling"; is that

7    right?

8         A.   That's what it says.

9         Q.   Uber said the decision was final and cannot

10   be further appealed, correct?

11        A.   That's what it says.

12        Q.   And that decision to limit the ability for

13   Dainius to use the app for airport drop-offs and

14   pickups, that was a decision that was final and could

15   not be appealed that was made by Uber, right?

16        A.   That right, yeah.

17        Q.   And then he's told one more time by Genesis

18   James again, later that same day, on July 6th of

19   2018, "As discussed previously, the decision was

20   final and cannot be further appealed," right?

21        A.   That's what it says.

22        Q.   And that was July 6, 2018, right?

23        A.   That's right.

24        Q.   So then if we go forward three days to

25   Barysas 960 -- all right.  On the top of this, this

Page 223

1    is now e-mail@ET.uber.com.

2                 Whose e-mail is that?

3        A.   It's a generic e-mail.  ET, I believe,

4    stands for exact target, which is an e-mail platform

5    that is owned by sales force.

6        Q.   And you see that this e-mail's subject,

7    "just checking in" was sent on July 9, 2018.  So

8    three days after Dainius was told that the airport

9    decision was final and would not be appealed?

10       A.   I do.

11       Q.   And then in the body of the e-mail from

12   Uber to Dainius, the first paragraph, it says, "It's

13   already been -- it's already been three years and

14   nine months since you started driving with Uber."

15               That's a significant amount of time,

16   right?

17       A.   Sure.

18       Q.   And it says, "Your rating speaks for

19   itself-your riders think you're an excellent driver,"

20   right?

21       A.   That's what it says.

22       Q.   And so, just three days after he is told,

23   "Nope, no more airport rides.  You're restricted,"

24   he's told, "Your riders think you're an excellent

25   driver," correct?

                                        Page 224

1        A.    That's what it says.

2        Q.    At that point, you also know that Uber

3   believed that he was an incredible partner, right?

4        A.    I do know that?  Based on what?

5        Q.    Would you agree that Uber believed that at

6   this point, on July 9, 2018, three days after they

7   claimed that he was committing fraud, that Dainius

8   was an incredible partner?

9        A.    It's hard for me to say that without

10  looking at -- looking at anything.

11       Q.    Go to the next page.  You see there's a

12  name there, Janelle Sallenave.  Do you know her?

13       A.    I do.

14       Q.    Does she still work for Uber?

15       A.    No.

16       Q.    She was the head of Uber support back in

17  July of 2018, right?

18       A.    In North America.

19       Q.    Right.  And Janelle says to Dainius, "Thank

20  you for being an incredible partner," correct?

21       A.    That's what it says, yes.

22       Q.    And -- and it also -- what Ms. Sallenave is

23  saying is instead of just doing the phone support or

24  in-app support, you can also come visit us at your

25  local Greenlight hub for in-person support, right?

Page 225

1        A.    That's what it says, yeah.

2        Q.    And you understand that Dainius actually

3   did go visit a Greenlight hub to try to get the

4   airport restriction lifted?

5        A.    I don't recall that specifically.

6        Q.    And a Greenlight hub -- just so Judge

7   Soussan is with us here, there are about a hundred or

8   more Greenlight hubs, correct?

9        A.    Across the country, you mean?  Yeah, that

10  number sounds right in the U.S.

11       Q.    And that's where drivers like Dainius can

12  go and actually get person-to-person support from

13  Uber, correct?

14       A.    Drivers could go there, yeah.

15       Q.    And if we go to Uber_Barysas_1174, in the

16  top left-hand corner we have the title, "Your Uber

17  Greenlight Houston-North Visit," right?

18       A.    That's what it says.

19       Q.    And -- and Brandon, on July 30th, 2018, he

20  says, "Hi, Dainius.  Thanks for visiting Uber

21  Greenlight Houston-North today.  We appreciate your

22  partnership with Uber," right?

23       A.    That's what it says.

24       Q.    So you see that not only did Dainius engage

25  in discussions trying to get this restriction lifted,

Page 226

```
 1    trying to figure out why it was implemented in the
 2    first place, he also went in person to the Uber
 3    Greenlight Houston-North location, correct?
 4         A.   That's what it appears.
 5         Q.   If we go to the page before that,
 6    Uber_Barysas_1173, again, on July 9th, 2018, the day
 7    that he's told that his riders think he's excellent
 8    and Uber tells him "thank you for being an incredible
 9    partner," do you see where Dainius on the top of this
10    is again -- he's -- serious as he can, he says,
11    "Hello.  Today I received below e-mail from Uber
12    congratulating me on my seniority and excellent
13    ratings."
14                   Do you see that?
15         A.   That's what it says.
16         Q.   He says, "I need your help to remove a
17    restriction to work at Houston airports.  Please
18    reconsider banning me from the airports," right?
19         A.   That's what it says.
20         Q.   And then we know -- we go down, it looks
21    like Preshant -- it says, "tech issue," as well,
22    because it said there was a tech issue.  There's a
23    e-mail address that's team.uberinternal.com.
24                   What is that?
25         A.   Just an internal -- internal Wikipedia.
```

Page 227

1       Q.    Okay.  What's it used for?

2       A.    Employees to access information.

3       Q.    Then it comes -- if we go down to the next

4    one, it says, "Hi, Dainius.  Upon checking your

5    account, it appears that you have already requested a

6    review of this issue once before.  A specialized team

7    has already reviewed your request for appeal and sent

8    you their final decision via e-mail," correct?

9       A.    That's what it says.

10      Q.    So at this point, the second time now, on

11   July 9, 2018, Dainius is being told by Uber that his

12   freedom to use the driver app for airport drop-offs

13   and pickups has been restricted, correct?

14      A.    That's what hit seems like.

15      Q.    Uber is telling Dainius that he no longer

16   has the opportunity or the choice to do airport

17   drop-offs and pickups, correct?

18              MR. SANDAHL:  Objection.  Asked and

19   answered.

20              MS. SOUSSAN:  Overruled.

21      A.    That's what it seems like.

22      Q.    (BY MR. MacLEOD)  If we go forward to

23   Uber_Barysas_1435, again on July 30th, 2018, Dainius

24   reaches out again through the in-app support and

25   says, "I have been removed from the airports by

                                          Page 228

1    mistake.  Lately I've been getting messages that my

2    phone GPS is inaccurate and I've been deactivated for

3    a few times and I have no idea why.  I have an older

4    phone and a tablet, and I even upgraded software and

5    still kept getting inaccurate GPS messages."

6                    Do you see that?

7         A.    I do.

8         Q.    And now, it says, "Hi, Dainius."  This is

9    from Jed, if we go down a little bit.  Jed says, "Hi,

10   Dainius.  Sorry to hear about the trouble here.  I've

11   reviewed your account, and it appears your account

12   has been flagged for violation of Uber's terms and

13   policies," correct?

14        A.    That's what it says.

15        Q.    And then it follows up with "it could."  It

16   could be this, or it could be that.

17                    Do you see anywhere in these support

18   messages where Dainius is told specifically why Uber

19   decided that he can no longer do drop-offs or pickups

20   from the airport?

21        A.    Aside from the list of things that it could

22   be, no.

23        Q.    Right.  So -- that's what I'm saying.

24   There's a bunch of generalities, but no specific

25   action, correct?

                                          Page 229

1        A.    Not in this message, no.

2        Q.    Now, it continues on.  I mean, even in

3   February of 2019 -- if we look at Uber_Barysas_1388,

4   even in February -- this is February 11, 2019.

5   Dainius reaches out again and says, "Hello.  Please

6   forward this to a specialized department.  My airport

7   privileges have been suspended seven months ago.  I'm

8   an exemplary partner with the highest rating.  Please

9   reactivate my airport access, please.  Thanks,

10  Dainius."

11             And the response from Joan with Uber

12  support says, "Hi, Dainius.  Unfortunately, it

13  appears that you have already requested a review of

14  this issue once before.  A specialized team has

15  already reviewed your request for appeal and sent you

16  their final decision via e-mail.  The decision was

17  final and cannot be further appealed," right?

18       A.    That's what it says.

19       Q.    Okay.  Now, do you remember we talked

20  briefly about some of the videos that are published

21  by Uber, correct?

22       A.    We did.

23       Q.    And -- and I was asking you at one point if

24  those videos still existed in 2016, 2017, 2018, 2019,

25  and you said, "I'm not sure about that," correct?

                                          Page 230

1       A.    I don't have the transcript in front of me.

2       Q.    Let me just -- just so we're very clear, do

3  you know specifically when those Uber videos would

4  have been removed and no longer available to Uber

5  drivers like Dainius?

6       A.    I believe it's 2015 or 2016.

7       Q.    And specifically do you have -- do you have

8  an e-mail about that?  Do you have a document about

9  that?  What is your testimony based on?

10      A.    Discussions with counsel.

11      Q.    Okay.  So the only -- and I don't want to

12 get into at all your discussions with counsel.

13            The only basis that you have for when

14 videos would have been taken down is through counsel,

15 correct?

16            MR. SANDAHL:  Objection.  Asked and

17 answered, and seeks to invade the attorney-client

18 privilege.

19            MR. MacLEOD:  I specifically tried to

20 not do that.

21            MS. SOUSSAN:  I understand that, but

22 it was asked and answered.  Sustained.

23      Q.    (BY MR. MacLEOD)  Okay.  This would have

24 been -- I'm asking you if there's any other

25 knowledge.  And I heard that it was through counsel,

                                        Page 231

1    and I'm asking if there's anything else.

2         A.   Of the specific date when it was taken

3    down?  No.

4         Q.   Okay.  Do you know when these Uber

5    videos -- for example, if I wanted to know if an

6    Uber -- if an Uber driver says they can access these

7    videos still in 2017, do you have any evidence to the

8    contrary?

9         A.   With me or that I have seen produced, no.

10        Q.   What about in 2018?  Do you have any

11   evidence that you've seen that's been produced that

12   would contradict an Uber driver saying you could

13   still see these videos in 2018?

14        A.   With me or that I have seen, no.

15        Q.   Let's took a look at Claimant's 4 and a

16   transcript of one of these Uber videos.  That's

17   Uber_Barysas_592.

18                  MR. SANDAHL:  What's the name of the

19   video?

20                  MR. MacLEOD:  How to Use the Uber

21   Partner App.

22        Q.   (BY MR. MacLEOD)  If we go to Page 4, which

23   is -- the very last sentence there says -- I'm sorry.

24   The Lines 10 through 12.  I apologize.

25                  If you're an Uber driver and you watch

Page 232

1    this video, what you would hear Uber say is that if

2    your rating falls below your city standard, you may

3    lose access to the Uber system, correct?

4         A.   That's what it says.

5         Q.   Okay.  We also know that -- if we go to

6    Page 6, Lines 9 through 13.

7              Have you seen Uber give coaching and

8    training before on having a positive attitude as a

9    driver before, sir?

10        A.   Coaching or training?  Not specifically,

11   no.

12        Q.   So this video, if you're an Uber driver, it

13   says, "Being a professional also means maintaining a

14   positive attitude," correct?

15        A.   That's what it says.

16        Q.   Uber says that arguing with your rider is

17   never a good idea and can lead to low ratings, right?

18        A.   That's what it says.

19        Q.   Uber says the driver should try to stay

20   cheerful?

21        A.   Was that a question?

22        Q.   Does Uber say that drivers should try to

23   stay cheerful?

24        A.   That's what this video says.

25        Q.   And it says, "Both you and your rider will

Page 233

1   have a better experience," right?

2        A.   That's what it says.

3        Q.   Now, we talked about this a little bit last

4   time.  But you told us last time, as I appreciate it,

5   that Uber is a cashless app, right?

6        A.   Yes.  In 2014 and 2015, 2013, '12, yeah.

7        Q.   What evidence do you have that in 2016 Uber

8   was no longer a cashless app?

9             MR. SANDAHL:  Objection.  Misstates

10  evidence and testimony.

11            MS. SOUSSAN:  Let's get some support

12  for that question, please.

13            MR. MacLEOD:  He just said 2014 and

14  2013 and 2015, so I'm asking him if 2016 it was

15  different and that now all of a sudden Uber says, "We

16  do accept cash through the app."

17            MS. SOUSSAN:  He can answer that

18  question if he knows.

19       A.   In the U.S., I believe we piloted something

20  out around accepting cash, but I don't recall

21  specifically when, whether it was 2016 or '17.  But I

22  don't think the pilot was successful.  And we do that

23  in other countries.  We accept cash.  In the U.S., I

24  don't believe the pilot was successful and we didn't.

25       Q.   (BY MR. MacLEOD)  In Texas during the years

Page 234

1   2016, 2017, 2018, and 2019, isn't it true that Uber

2   was always a cashless app?

3        A.   There might have been a pilot; but for all

4   intents and purposes, I would say yeah, we were

5   cashless.

6             MR. MacLEOD:  I'm going to object as

7   nonresponsive.

8             MR. SANDAHL:  I think he answered the

9   question, Your Honor.

10            MS. SOUSSAN:  Overruled.

11       Q.   (BY MR. MacLEOD)  "I think that they

12  exercised a pilot."  How do you know that they

13  exercised a pilot, or why do you think that they did?

14       A.   I know we were piloting it in various

15  different parts of the country, so I answered your

16  question.  For all intents and purposes, I would say

17  yeah, we were cashless except for a pilot.

18       Q.   But you made the comment that you may have

19  been piloting, right?

20       A.   I know in those years we did pilot it

21  throughout various countries.  So yeah.

22       Q.   How long did the pilot last?

23       A.   I don't know exactly.

24       Q.   Did the pilot ever take place in Houston?

25       A.   I'm not sure.

Page 235

1        Q.    Did the pilot ever take place in any part

2   of Texas?

3        A.    I don't know.

4        Q.    You agree that cashless means -- in the

5   Uber app world, cashless means that all transactions

6   are handled electronically through the application,

7   correct?

8        A.    Yeah.

9        Q.    And that Uber tells their drivers to let

10  Uber handle any payment issues, correct?

11               MR. SANDAHL:  Object that this is

12  asked and answered at the first day of testimony,

13  Your Honor.

14               MS. SOUSSAN:  Overruled.

15       A.    Specific language?  I don't know where

16  you're quoting it from, but we do act as the driver's

17  limited payment collection agent.

18       Q.    (BY MR. MacLEOD)  As a limited collection

19  agent, you set the service fee, correct?

20       A.    The service fee -- yeah, the service fee is

21  set by us.

22       Q.    Right.  As the, quote/unquote, limited

23  collection agent, you set the multiplier for the time

24  fare, correct?

25       A.    I mean, that is really done by market

                                        Page 236

1    forces, as we discussed last time we spoke.

2         Q.   Are you being serious right now that it's

3    set by market forces?

4                   MR. SANDAHL:   Objection.

5    Argumentative, Your Honor.

6         Q.   (BY MR. MacLEOD)   I'm really asking.

7                   MS. SOUSSAN:   Overruled.

8         A.   The last time we spoke, as I said, it's

9    kind of like a stock price trade.  So where the -- if

10   the demand goes up and the supply doesn't change the

11   same capacity, then the prices will increase.

12        Q.   (BY MR. MacLEOD)   So does Uber set that

13   supply and demand algorithm?

14        A.   It is our algorithm, yeah.

15        Q.   Right.  If we go -- if we go to Page 9,

16   Lines 14 through 21 -- Line 14.

17                   When there are more requests for rides

18   coming in than the available drivers can accept,

19   prices go up to encourage drivers to go on-line,

20   right?

21        A.   That's what it says.

22        Q.   And it's not the drivers who can say

23   through the app, "Okay.  I was going to take 10, but

24   now I want $25."

25                   Instead, that is a unilateral decision

Page 237

1   from Uber.  True?

2       A.   There's no way for a driver to specifically

3   do that in the app.

4       Q.   That's because that is a function that Uber

5   controls, not the drivers, correct?

6       A.   Well, a driver doesn't have to accept a

7   trip.  So a driver can control whether or not they

8   want to accept a trip at a certain price.

9       Q.   Okay.  So let me get this straight.  So

10  let's say, for example, that I'm going to -- I'm a

11  driver, and I want to encourage drivers to go

12  on-line.

13                  Are you with me so far?

14      A.   If you're a driver and you want to

15  encourage drivers to go on-line?

16      Q.   If I'm a driver and I want riders to go

17  on-line.

18      A.   I'm with you.

19      Q.   Okay.  And now there's more -- there are

20  more rides coming in than the available drivers can

21  accept.  And in order for me to take advantage of

22  that, first off, I need to know that myself, right,

23  as a driver, right?

24      A.   Sorry.  You lost me.  Can you --

25      Q.   Yeah.  What I'm getting at is:  In order

Page 238

1    for me as a driver to say I want to charge more money

2    because of supply and demand issues, I have to know

3    what the actual supply and demands are.  I have to

4    see that, right?

5         A.   Yeah, okay.

6         Q.   Drivers don't see the supply and demand.

7    It's Uber that sees the supply and demand, correct?

8         A.   Within our app, we display to drivers where

9    there's areas of high demand so they can actually see

10   where they are and then where it's surging and

11   certain multipliers in specific areas.

12        Q.   Sir, do you have -- do you have a photo of

13   the app or something that you can show us that would

14   actually support your testimony?

15             MR. SANDAHL:  I'll object again, Your

16   Honor, that, for example, screen shots are things we

17   have objected to producing and you have sustained

18   those kind of objections.  He's testifying about the

19   use of his app, which he's more than familiar with.

20   I don't think that there's a need for a photo of the

21   app or other documentary evidence to demonstrate

22   that.

23             MR. MacLEOD:  I would object to

24   speaking objection.  What I'm trying to do is test

25   the foundation, the basis for his testimony.

                                        Page 239

1    Otherwise, it's bare testimony that's unsupported by

2    any actual documentary evidence.

3                    MS. SOUSSAN:  I think I heard it

4    differently, Mr. MacLeod.  Why don't you re-ask your

5    question?

6         Q.   (BY MR. MacLEOD)  What I'm trying to find

7    out is:  Is there a screen grab, is there a photo of

8    an app, is there some document that we can actually

9    look at today, this group, here under oath, to

10   actually support your testimony?

11        A.   Again --

12                   MS. SOUSSAN:  Hold on a minute.  I

13   doubt that Mr. Rosenthal brought any documents for

14   production to this session today.

15                   MR. MacLEOD:  He usually has binders

16   in front of him, Judge.  They usually put binders

17   that they stack in front of him.

18                   MS. SOUSSAN:  Okay.  Mr. Rosenthal, I

19   see you shaking your head.  What are you trying to

20   say?

21                   THE WITNESS:  First of all, I don't

22   usually have binders in front of me.  Second, to your

23   point, I didn't bring any documents with me today.

24                   MS. SOUSSAN:  So if he doesn't have

25   any such documents with him today, is there another

Page 240

1    question that you could ask, Mr. MacLeod?

2              MR. MacLEOD:  Judge, this is a

3    credibility fight.  It's telling to me that there's

4    no way that I'm going to be allowed to test this

5    gentleman's credibility because so far he can tell

6    you whatever he wants to tell you.  Counsel will

7    object and say, "How's he supposed to prove that or

8    show that?"  He's just going to testify.  That's not

9    how this goes.  There's a "what is the basis," and

10   that's the part that's not being allowed to be

11   explored.

12             MS. SOUSSAN:  Well, I disagree with

13   you because I'm sure you've had ample opportunity to

14   request documents during this arbitration proceeding.

15   So please move on, Mr. MacLeod.

16             MR. MacLEOD:  How should I move on,

17   Judge?  I'm literally trying to ask questions, and he

18   just says, "It's supply and demand."  Now I want to

19   have evidence.  We've sent many document requests.

20   For instance, we asked for a lot of GPS data.  That

21   was denied.  We asked for documents that were relied

22   upon for fraud.  That was denied.

23             MS. SOUSSAN:  Mr. MacLeod, move on and

24   ask your next question, please.

25        Q.   (BY MR. MacLEOD)  So I was trying to ask

                                          Page 241

 1    you a question about what a driver can see on the app

 2    with respect to other drivers on the road, correct?

 3         A.   I believe you were asking me about the

 4    supply and demand and the -- the -- like whether or

 5    not it's surging in various areas of the city.

 6         Q.   I was.  Instead of responding to that, what

 7    you wanted to do was you told me, "Well, I believe

 8    the drivers could see other drivers and then they

 9    could go to the surge area."

10              Do you remember that?

11         A.   No, I didn't say drivers could see other

12    drivers.

13              MS. SOUSSAN:  Excuse me.  I don't

14    believe that that was his testimony either.  I just

15    think if you ask your question, Mr. MacLeod, we're

16    going to eventually get an answer.

17              MR. MacLEOD:  We're not, Judge.

18    That's the problem.  I'm not going to get an answer

19    and counsel is going to object and we're going to

20    hear, "I doubt that he has anything."  I doubted he

21    was going to have videos last time, and he did.

22              MS. SOUSSAN:  Let's move on.  This

23    arguing just takes up your valuable time.  Ask your

24    question.

25              MR. MacLEOD:  It's not valuable

Page 242

1    when --

2               MS. SOUSSAN:  It wasn't that drivers

3    can see other drivers.

4               MR. MacLEOD:  If I was in a court

5    right now and I objected to nonresponsive, at some

6    point that would be sustained.  I've already learned

7    that you're not going to make that ruling because I

8    remember this.

9               MS. SOUSSAN:  Mr. MacLeod, you're not

10   gaining anything here by arguing with me.  I am

11   trying to listen diligently to your questions and to

12   the answers, and I have no preconceived idea of how

13   to rule on an objection before I hear the question

14   and the answer.  So rather than arguing with me,

15   which I think is not necessarily a good use of your

16   time, please move on, ask your question.

17              MR. MacLEOD:  So I tried to ask a

18   question during the first time about Uber Land, and

19   you've never read that book, and you told me, "Don't

20   even go there."  You're not confused.  That's what

21   I'm dealing with.

22       Q.   (BY MR. MacLeod)  Let's go, Mr. Rosenthal,

23   to Line 17.  Do you see where it says, "Adjusting

24   prices during times of high demand brings more

25   drivers onto the road"?

                                        Page 243

1     A.    That's what it says.

2     Q.    The actual entity that makes that decision

3  on whether or not to increase prices or adjust

4  prices, that's an Uber decision, correct?

5     A.    It is.

6     Q.    Can Dainius -- in 2016, was there a feature

7  in the app that he could go into and say, "You know

8  what?  Today I'm going to drive with all my

9  flexibility and all my freedom, and I'm going to have

10  the opportunity that I want to charge all the

11  potential riders who ride in my car $50 per ride"?

12     A.    There is no way to do that in our app.

13     Q.    Could he have done that in any day that he

14  drove through the Uber application?

15     A.    Not to my knowledge.

16     Q.    Is there a single time in which Dainius

17  logged into the Uber app where he could have said,

18  "You know what?  I've driven a lot this week.  I want

19  to charge less.  I want to charge $10 a ride.  I want

20  to be gratuitous.  I want to be helpful."

21            Is there any way that he can do that

22  through the Uber application?

23     A.    Not automatically.  He would have to

24  negotiate with riders.

25     Q.    And so, can you tell Judge Soussan is there

Page 244

1    a negotiation feature in the Uber application?

2         A.   Not a button or feature, no.

3         Q.   And so, what you're suggesting is that

4    after every single ride, Dainius would reach out to

5    someone with Uber support that he's never met before

6    and say, "I want to negotiate with this rider,"

7    correct?

8         A.   It doesn't have to be at the end of the

9    ride.  It could be before he even picked up a rider.

10        Q.   So let me walk through this.  There's an

11   estimated time of arrival that is provided to a

12   rider, correct?

13        A.   That is right, yeah.

14        Q.   And so, what you're suggesting here is that

15   to negotiate, somehow Dainius, as he's driving to try

16   to meet the ETA that's proceeded by Uber, is somehow

17   going to be negotiating the fare before he picks up

18   the rider?  Is that your sworn testimony, sir?

19        A.   You could do that, yeah.

20        Q.   And how would he do that?  Can you explain

21   how he's driving to pick up the rider that Uber's

22   told him to pick up and how is he negotiating during

23   that time period?  Explain to me a situation where

24   that's happened.

25        A.   So as you will see based on the documents

Page 245

1    that are produced that your claimant did text riders

2    oftentimes after he accepted a trip before he picked

3    them up.  He can text them and say, "I'll bring you

4    somewhere for whatever dollars."  You can do that.

5    That's nothing preventing that from happening.

6         Q.   How many times are you saying that Dainius,

7    during the thousands of trips he provided for Uber,

8    that he attempted -- negotiated with riders?

9         A.   I don't know how many times he did it.

10        Q.   Do you have an approximation?

11        A.   I don't know if he ever did it.

12        Q.   Okay.  So that's what I'm trying to make

13   sure.  You said that he could have done it, correct?

14        A.   You asked me to walk you through how he

15   could have done it, and that's exactly what I did.

16        Q.   My question is a situation where that has

17   actually happened.  Can you do that?

18        A.   I cannot do that with your claimant.

19        Q.   Can you tell me any Uber support message

20   that you've seen in this particular case involving

21   Dainius or any of the e-mails to Dainius where he was

22   ever encouraged to engage in direct negotiations with

23   the riders that he was assigned to by Uber?

24        A.   I haven't seen any.

25        Q.   Let me ask you this.  You were talking

Page 246

1  about -- we were talking about distance and time

2  multipliers earlier.

3               How often did distance and time

4  multipliers change based on market forces?

5       A.   All the time.

6       Q.   And -- and the actual changes that are made

7  in the Uber app system, are those distance and fare

8  multiplier changes -- those are not provided to

9  Dainius before he accepts or declines a ride.  True?

10      A.   They are provided.

11      Q.   Okay.  Again, now you're -- you're saying

12 that the market forces, these distance and time

13 multiplier that is going to change, that somehow in

14 the 15-second period that information is provided to

15 Dainius?

16      A.   Yeah.

17      Q.   Let me ask you this.  Who sets the

18 multiplier to begin the day?  Let's say the first

19 ride is at 6:00 a.m. that morning.

20               Who sets the distance and time

21 multipliers for the very first ride of the day?

22      A.   It just happens.  It's our marketplace.

23 It's like a stock trade and the prices are all fluid.

24 So for any trip, there could be a surge multiplier in

25 effect.

Page 247

1      Q.    Does the multiplier start -- start new or

2  fresh every day, or is it just always fluctuating

3  based upon Uber's marketplace?

4      A.    It's always fluctuating.

5      Q.    Let me -- if we could pull up Respondent's

6  51, which is the City of Houston ordinances, please.

7            As I appreciate it, this is a City of

8  Houston ordinance, Chapter 46, Vehicles for Hire.

9            Have you seen this before?

10     A.    Some of it.

11     Q.    Okay.  So we received what we were told was

12 a different version of this yesterday for the first

13 time from Uber and the City of Houston ordinances,

14 Chapter 46, Vehicles for Hire, right?

15     A.    That's what it says.

16     Q.    Okay.  If you go to Page 65 -- okay.  Let's

17 take a look at Section 46-243 there where it says

18 Schedule of Fares.

19            I know it's been some time now, but

20 Uber's counsel gave an opening statement in this case

21 where he talked about how Mr. Barysas was registered

22 by the City of Houston as a limousine driver.

23            Do you remember that?

24     A.    I do.

25     Q.    Do you see here it says, "Permittees shall

                                            Page 248

1    file with the director of schedule of fares or rates

2    to be charged"?

3                    Do you see that?

4        A.   I do.

5        Q.   First off, in order to be -- do you

6    understand then that to be a limo driver in the City

7    of Houston, you have to file a schedule of fares or

8    rates to be charged with the City of Houston?

9        A.    Is that what -- is a permittee a limo

10   driver?  I don't know the definition of permittee

11   here.

12       Q.   As Uber's corporate representative who is

13   here, Uber's sole witness, and Uber's relying upon

14   this document, City of Houston ordinance, do you know

15   whether or not a limo driver has to file with the

16   director a schedule of fares or rates to be charged

17   or do you not know that, sir?

18                    MR. SANDAHL:  I'll object to the

19   statement that we're relying on it.  We provided it.

20   That doesn't imply that we're necessarily relying on

21   it.

22                    MS. SOUSSAN:  Sustained.

23       Q.   (BY MR. MacLEOD)  Sir, do you understand

24   that I received this document yesterday?

25                    MR. SANDAHL:  Just to clarify --

                                              Page 249

1          MR. MacLEOD:  I'm asking your witness.

2     A.   Is this document publicly available?

3          MS. SOUSSAN:  That wasn't the

4  question, Mr. Rosenthal.

5     Q.   (BY MR. MacLEOD)  Mr. Rosenthal, do you

6  understand that we received this document in PDF form

7  by e-mail from your counsel yesterday?

8     A.   I don't know when you received it.

9     Q.   All right.  Now, first off, if -- if

10 Dainius wanted to file his fares or rates to be

11 charged when driving with Uber Black -- first off,

12 that's an impossibility.  That's not something that

13 he can do, correct?

14     A.   I don't know if he can do that or not.

15     Q.   Well, sir, with Uber Black, he's not going

16 to be able to say, "Hey, Uber, every time I go from

17 NRG to -- let's say from NRG to the Toyota center,

18 that area that I want to take $150."

19          He can't do that, right?

20     A.   Within our app, no.

21     Q.   Also within the app, even if he's Uber

22 Black and not UberX or Uber Select, there's no way,

23 then -- because he has no control or knowledge of the

24 fares or rates that he's going to -- that he's going

25 to receive until he actually drives through the Uber

Page 250

1    app on a daily basis, right?

2        A.    Until a trip is completed, he wouldn't know

3    the actual fare, that's right.

4        Q.    So he, therefore, cannot provide -- as a

5    permittee, you cannot provide the director a schedule

6    of fares or rates to be charged within the Uber Black

7    world, right?

8        A.    Presumably not.  I'm not sure exactly how

9    this document all ties together.

10       Q.    You can take that down.  So I want to hit

11   on just a few other things.  You remember how the

12   last time we talked you were discussing upfront

13   guaranteed minimum fares and when they were actually

14   provided to drivers like Dainius?

15       A.    I don't quite recall.

16       Q.    Do you remember how we were -- we were in

17   the middle of taking your testimony and all of a

18   sudden we received for the first time a screen grab

19   or screen shot of an Uber driver app?

20               MR. SANDAHL:  Objection.

21               (Simultaneous cross-talk.)

22       Q.    (BY MR. MacLEOD)  I didn't hear that.

23       A.    This arbitration?

24       Q.    During the Gilbert Washington.  I don't

25   want to talk about anything that was said during

Page 251

```
 1    that, other than it was your sworn testimony.  But

 2    during that Mr. Washington arbitration, do you

 3    remember that for the first time we were provided

 4    with a screen grab from the Uber driver app?

 5         A.   I do recall that, yes.

 6         Q.   And in this particular instance, do you

 7    remember that Uber said that starting September 1st,

 8    2020 -- which is long after Dainius stopped driving

 9    for Uber, right?

10         A.   I don't know when he stopped.

11         Q.   As Uber's corporate representative, you do

12    not know when Dainius stopped driving?

13         A.   Specifically, no, I don't.

14         Q.   Well, you said "specifically."  Do you know

15    the year?

16         A.   I thought it was 2020, but maybe it was

17    2019.

18         Q.   Okay.  What -- what we knew and what we

19    found out was that the earning structure and upfront

20    trip information changed as of November 12th, 2019,

21    in the City of Houston, correct?

22         A.   I would have to see it.

23         Q.   We can pull it up.  This is from your

24    testimony on April 14th, 2022.

25                    MR. SANDAHL:  Object, Your Honor, that
```

Page 252

```
 1    this is improper impeachment with use of another
 2    unrelated arbitration.
 3                    MR. MacLEOD:  It's his sworn
 4    testimony.
 5                    MS. SOUSSAN:  I'm rather confused,
 6    Mr. MacLeod.  I'm unaware of any testimony in another
 7    arbitration.  I'm going to let you go with this for a
 8    little while since it's sworn testimony, but -- you
 9    know, every arbitration stands on its own, but I'm
10    going to give you some leeway here.
11                    MR. MacLEOD:  With all due respect, I
12    don't even have to show it.  I can just make it
13    easier.
14         Q.   (BY MR. MacLEOD)  You literally
15    testified -- we don't have to talk about whether it
16    was arbitration, deposition testimony.
17                    Do you remember in the month of
18    April 2022, sir, testifying about earning structure
19    and upfront trip information that was going to change
20    specifically in the City of Houston?
21         A.   I would have to see the context.  I don't
22    quite recall.
23         Q.   Do you remember that Uber told their
24    drivers that as of November 12th, 2019, in the City
25    of Houston, "Rather than publishing base fare rates
```

Page 253

1    to explain earnings, we will be showing an upfront

2    guaranteed minimum amount that is inclusive of your

3    total trip earnings before you accept it"?

4         A.   I don't recall this, but -- I can't recall

5    the specifics of that arbitration, what was asked and

6    what was shown.  It seems like you're --

7         Q.   I'm just asking if you remember that.  I'm

8    not asking you to go back to 2019.  I'm just asking

9    from April if you remember that we discussed how

10   this -- this change was being made by Uber in

11   Houston.

12        A.   I don't recall.

13        Q.   Do you remember Uber communicating to

14   drivers in 2019 that Uber believed that that would

15   be -- the upfront minimum guaranteed amount,

16   publishing that before a driver has to accept or

17   decline a ride, that Uber believed that that was the

18   easiest way to understand how much drivers would earn

19   at the time of a request?

20              MR. SANDAHL:  Objection.  Asked and

21   answered.

22              MS. SOUSSAN:  Overruled.

23        A.   I would have to see what you're referring

24   to.

25        Q.   (BY MR. MacLEOD)  Let's take a look at

                                              Page 254

1    Claimant's 23.  Specifically, I want to look at

2    Uber_website_7520.  For the record, it ends at

3    Uber_Website_756.

4                Do you see where it says New Earnings

5    Structure and Upfront Trip Information?

6        A.    Okay.

7        Q.    It says, "Starting September 1st, 2020,

8    earnings structure and upfront trip information

9    changed in all U.S. cities," right?

10       A.    Yep.

11       Q.    Yes?

12       A.    That's what it says, yeah.

13       Q.    Okay.  If we go to the next page,

14    Uber_Website_753, at the bottom there in the last

15    full paragraph starting November 12th, it says,

16    "Starting November 12th, 2019, earnings structure and

17    upfront trip information changed," and it includes a

18    number of cities.  And one of those is Houston,

19    correct?

20       A.    That's what it says, yeah.

21       Q.    Now, if we go to Page 754 near the

22    bottom -- near the middle of the page, it says, "What

23    are my new base fare rates?  What are my new base

24    fare rates?  Rather than publishing base fare rates

25    to explain earnings, we will be showing an upfront

Page 255

```
 1    guaranteed minimum amount that is inclusive of your
 2    total trip earnings before you accept it," right?
 3         A.   That's what it says.
 4         Q.   And you would agree that if -- if someone
 5    like Dainius is going to be called an independent
 6    contractor, don't you believe that he should be told
 7    what the upfront guaranteed minimum amount is for a
 8    trip before he has to accept or decline it?
 9                   MR. SANDAHL:  Objection.
10    Argumentative.
11                   MS. SOUSSAN:  Overruled.
12         A.   I wouldn't necessarily believe that, no.
13         Q.   (BY MR. MacLEOD)  Okay.  If we go to the
14    bottom of this, there's a section that says, "What is
15    a guaranteed minimum amount, and how is it
16    calculated?"  It says, "This is the amount you now
17    see upfront on the trip screen request [sic].  It is
18    the amount you will earn for a completed delivery,"
19    right?
20         A.   Yeah.  Is this Uber Eats?
21         Q.   That's what I'm trying to ask you.  Do you
22    think, first off, that as an Uber driver -- if an
23    Uber driver is going to have freedom and flexibility
24    that an Uber driver should see the amount upfront on
25    the trip request screen before having to accept or
```

Page 256

1      decline a ride?

2          A.    Not necessarily.

3          Q.    Okay.  Let me switch gears on you just a

4      little bit here.

5                      You would agree with me that you have

6      seen no evidence in this case that Dainius is a

7      medical doctor, correct?

8          A.    I have not, no.

9          Q.    You've seen no evidence in this case that

10     he is a nurse, correct?

11         A.    Correct.

12         Q.    You have seen no evidence that he was a

13     welder, correct?

14         A.    That's correct.

15         Q.    You have seen no evidence that Dainius at

16     any time while he used the Uber application was an

17     electrician?

18         A.    That's correct.

19         Q.    And you also have seen no evidence during

20     the time that he used the Uber app that he was

21     employed in any manner as a plumber, correct?

22         A.    That's correct.

23         Q.    I'm sorry?

24         A.    That's correct.

25         Q.    Just so I make sure, have you seen any

Page 257

1    documents produced in this particular matter during

2    the time that Dainius drove through the Uber app that

3    would show what information Dainius was provided with

4    by Uber in the 15 seconds he had before he either

5    accepted or denied a ride?

6        A.   I guess what are you looking for?

7        Q.   I'm just asking if there's any documents,

8    any screen grabs, any information that you've seen in

9    your review of documents in this matter that would

10   tell you what information Dainius had available to

11   him from Uber during the 15 seconds before he could

12   either accept or deny a ride.

13       A.   I would have to look through all of the

14   things we produced on our web page.  Some might list

15   out some things.  I have not seen a screen grab in

16   this particular matter, if that's what you're

17   referring to.

18       Q.   You said there were many people working to

19   develop the Uber application, correct?

20       A.   That's right.

21       Q.   I'm sorry.  I didn't hear you.

22       A.   That's right.

23       Q.   And you would agree that there was a

24   significant investment by Uber to develop that

25   algorithm?

1        A.    To develop the app, yeah.

2        Q.    And we can agree that the investment in

3    developing the algorithm, the initial investment,

4    we're talking hundreds of millions of dollars,

5    correct?

6        A.    The algorithm specifically, I don't know.

7    But the app and all the technology, yeah.

8        Q.    Okay.  And you've said over time we've

9    invested hundreds of millions of dollars, if not

10   more, into development of the Uber application

11   software, correct?

12       A.    Yeah, that's right.

13       Q.    We also know that Uber spends a significant

14   amount of money on TV advertising.  True?

15       A.    I don't know what our budget is for TV ads,

16   but we have done some in the past and they haven't

17   been cheap.

18       Q.    We know that Uber spends millions of

19   dollars on TV advertising relating to the Uber driver

20   and rider application, correct?

21       A.    What application specifically, I don't

22   know.  But the brand, yeah.

23       Q.    We know that Uber also spends millions of

24   dollars in on-line web-based advertising in

25   furtherance of the Uber rider/driver application,

Page 259

1    correct?

2         A.   Brands, yeah.

3         Q.   Uber spends a significant amount of money

4    in sending both written brochures, materials, sales

5    information, as well as e-mail communications to

6    potential drivers and riders relating to use of the

7    Uber rider and driver app, correct?

8         A.   Yeah.

9         Q.   You talked before that there were at least

10   4,000 software engineers who were working at the time

11   to prepare the app and also who now help to maintain

12   the Uber rider/driver application, correct?

13        A.   4,000 is directionally correct, yeah.

14        Q.   You talked earlier about how Uber has the

15   physical locations, the Greenlight hubs, correct?

16        A.   Yeah.

17        Q.   You said you didn't know specifically about

18   how many of the Greenlight hubs were in the United

19   States, but you said that there were probably more

20   than a hundred, right?

21        A.   I believe that's what I said, yeah.

22        Q.   And each one of those is obviously invested

23   in by Uber in those Greenlight hubs, correct?

24        A.   Yeah.

25        Q.   You have to staff those Greenlight hubs.

Page 260

```
 1    You have to invest in the real estate, whether it's
 2    leased or owned, right?
 3         A.   Correct.
 4         Q.   We also know that there are a substantial
 5    number of people who work in the Uber support
 6    capacity, correct?
 7         A.   There are.
 8         Q.   My understanding was that as of
 9    December 31st, 2021, that Uber had approximately
10    29,300 employees globally; is that right?
11         A.   Seems a bit high, but not far off.
12         Q.   And that Uber, at least as of the last day
13    of 2021, had operations in approximately 72 countries
14    and approximately 10,500 cities around the world.
15                   Is that also right?
16         A.   72 seems high, but directionally it's
17    close.
18         Q.   Now -- and every year have you seen that
19    Uber will -- will publish its annual report?
20         A.   I'm aware of that, yeah.  Well, I shouldn't
21    say every year.  But since being a public company,
22    yeah.
23         Q.   Okay.  And -- and that -- in 2021, Uber
24    said that they were experiencing and expected to
25    continue to experience driver supply constraints as a
```

Page 261

 1    result of the COVID-19 pandemic.  That's true?

 2        A.   That is true generally, yeah.

 3        Q.   As part of an operational risk, do you know

 4    that Uber told their shareholders that Uber's

 5    business would be adversely affected if drivers were

 6    classified as employees, workers, or quasi-employees?

 7        A.   I haven't seen the risk outline -- the risk

 8    topics that you're referring to, but I would

 9    understand that we would do that.

10        Q.   And that Uber communicated to its

11    shareholders that reclassification of drivers to

12    employees or workers where those statutes exist could

13    lead to groups of drivers becoming represented by

14    labor unions and similar organizations?

15        A.   Again, I don't have the risk factors that

16    you're referring to in front of me, but -- but I

17    don't dispute or confirm nor deny that.

18        Q.   And did you know that Uber told its

19    shareholders that any such reclassification from

20    independent contractor status to employee or worker

21    status would require Uber to fundamentally change its

22    business and could consequently have an adverse

23    affect on its business, results of operations, its

24    financial position, and cash flows?

25        A.   Again, I don't have the risk factors in

```
 1    front of me, but that seems like a reasonable
 2    statement.
 3              MR. MacLEOD:  May we take a quick,
 4    five-minute break?
 5              MS. SOUSSAN:  Sure.  Let's go ahead
 6    and take our morning 15-minute break.  15 minutes,
 7    everyone.
 8              (Recess from 11:24 a.m. to 11:41 a.m.)
 9       Q.   (BY MR. MacLEOD)  If we can take a look at
10    Claimant's Number 8.  It's going to be
11    Uber_Barysas_1386.  We'll start at the very top here
12    so we can get a flavor of what's going on.
13              This is in June 8th of 2018.  This
14    is -- the title is "My driver refused my destination.
15    Details."  It says, "He sent me the following
16    message.  Hello, I was trying to call you, but it
17    goes straight to voicemail.  I've tried to cancel
18    this ride, but the system is not letting me.  I'm
19    currently pulled over by police.  You can cancel the
20    ride.  You will not get charged because I haven't
21    moved."
22              So when you said earlier when you were
23    testifying about evidence that you had of fraud or
24    geo-spoofing, is this the, quote/unquote, text
25    message that you were talking about, sir?
```

Page 263

1      A.   If I recall correctly, he sent the same

2 exact text message about 27 times or something like

3 that to different riders.

4      Q.   And did you review all of those before

5 today's testimony?

6      A.   I have, yeah.

7      Q.   Okay.  And where did you review those?

8      A.   I can't recall.  Counsel was sharing them

9 with me.

10      Q.   And did you review actual snapshots of

11 actual text messages, or did you actually review

12 support messages like the one that we're looking at

13 here?

14      A.   It wasn't the one we're looking at here, I

15 don't believe.  I can't recall them.

16      Q.   I guess what I'm trying to find out is:

17 What format were the messages that you say there were

18 about 27 of that you reviewed before today?

19      A.   The format?  I think it was, like, a

20 spreadsheet or something.  I can't remember.

21           MR. MacLEOD:  Counsel, do you have

22 that spreadsheet that he's talking about,

23 Mr. Sandahl?

24           MR. SANDAHL:  Yeah.  It's been

25 produced.

Page 264

```
 1              MR. MacLEOD:  Do you have the Bates
 2    number?  Do you know?
 3              MR. SANDAHL:  I don't have it in front
 4    of me.  Claimant's 5.
 5              MS. SOUSSAN:  Do I have any witnesses
 6    that have entered the room?
 7              (Discussion off the record)
 8        Q.   (BY MR. MacLEOD)  And so, this was the
 9    message from a rider to the in-app support, and then
10    the driver says something again on the same date.
11    And then at the bottom, we get the final result.  And
12    it says, "Thank you for taking the time to report
13    this situation, Dominic.  We want everyone to have a
14    safe and comfortable experience while using the Uber
15    app.  As a result of your report, we will be
16    conducting a review of our driver's account to
17    determine whether or not they should continue to have
18    an opportunity to partner with Uber.  Rest assured as
19    well that you are not charged for this trip request."
20              Then if we go to Uber_Barysas_1179 --
21    okay.  Now we've got 1179, and it's "Hi, Dainius" at
22    the top.  "A rider claimed that you were stopped by
23    law enforcement during a recent trip.  Help us better
24    understand the situation.  Can you please reply to
25    this e-mail to provide any additional context or
```

Page 265

1    details on this incident?"

2              And so, Uber is asking Dainius whether

3    or not he can provide additional information, right?

4         A.   That's what it says.

5         Q.   Okay.  On that same day, you see on Friday,

6    June 8, 2018, Dainius responds.  "Hello, I was

7    stopped by IAH airport security personnel, and they

8    checked my airport permit, as well as my driver's

9    license."

10             So first off, we know that Dainius

11   didn't just blow this off.  He responded, right?

12        A.   Is that a question?

13        Q.   You can see here Dainius just didn't blow

14   this off and say, "I'm not going to respond."  He was

15   asked for additional context or details, and he was

16   providing them here, right?

17        A.   Looks like he provided some additional

18   details, yeah.

19        Q.   He says, "That happened before my client

20   was in the car.  The reason this happened is because

21   the drivers are forced to double park in the IAH

22   staging lot.  The staging lot is way too small to

23   handle all the drivers wanting to park there.  It's a

24   shame that Uber is disregarding this terrible issue.

25   Please ask upper management to provide a bigger

                                        Page 266

1    staging lot for the drivers at IAH."  And then he

2    says his name, right?

3        A.    That's what it says.

4        Q.    Response from Uber same day.  "Thank you

5    for providing your perspective about this incident,

6    Dainius.  We will use this information to investigate

7    this matter."

8              First off, who specifically was tasked

9    with investigating this matter, if you know?

10       A.    I don't.

11       Q.    Then it says, "When we receive feedback of

12   this nature, for safety reasons we follow up and

13   gather as much information as possible to complete

14   our review," correct?

15       A.    That's what it says.

16       Q.    Do you have any personal knowledge or any

17   knowledge that you have -- any knowledge you've

18   gleaned preparing as Uber's corporate representative

19   about what information was collected by Uber?  You

20   know, they say, "as much as possible to complete

21   Uber's review."

22       A.    Aside from what we see here, I'm not aware

23   of anything.

24             MR. MacLEOD:  We'll pass the witness.

25             MS. SOUSSAN:  Thank you.

Page 267

```
 1              MR. SANDAHL:  Your Honor, we would
 2   reserve our questioning of Mr. Rosenthal for our case
 3   in chief, please.
 4              MS. SOUSSAN:  Thank you.  Mr. MacLeod,
 5   are you ready for your next witness?
 6              MR. MacLEOD:  We are.  If I may just
 7   make a brief offer of proof.
 8              With respect to the cross-examination
 9   of Mr. Rosenthal, early on in the cross-examination,
10   my full intention was to ask questions about some of
11   the statements made by a now employee, Alex
12   Rosenblatt.  She wrote a book called Uber Land:  How
13   Algorithms are Rewriting the Rules of Work.  Chris
14   Hughes, co-founder of Facebook and co-chair of the
15   Economic Security Project said it was a must read.
16              Alex Rosenblatt was a researcher at
17   the Data and Society of Research Institute at the
18   time of the book publishing.  She -- in the statement
19   about the book on the back cover, it says, "Uber Land
20   upends our understanding of work in the digital age
21   and paints a future where any of us might be managed
22   by a faceless boss."
23              I think Ms. Rosenblatt has many
24   factual statements that cut directly against the
25   sworn testimony of Mr. Rosenthal, and I think it was
```

Page 268

```
 1    prejudicial not to be able to ask questions about
 2    that, as well as being told that there was some
 3    confusion about what we were doing or not doing.
 4                  In addition, there was a lot of
 5    questions about the GPS data.  The collection of that
 6    GPS data to us is a form of monitoring.  Instead of
 7    being able to delve into that more, A, the corporate
 8    representative is not truly prepared about
 9    geo-mapping or geo-spoofing in a case where that's a
10    large component of it, but we were told that it's
11    proprietary or calls for trade secret.
12                  I confide that there's nothing about
13    my client's GPS data -- his actual data that was
14    taken from his phone that was proprietary or trade
15    secret.  The fact that he's being monitored is not
16    proprietary or trade secret.  It's very, very
17    well-known and public knowledge.
18                  Part of that public knowledge stems
19    from an Uber operational program that's carried out
20    by some of their top execs called Operation Hell.  It
21    cuts against Uber's credibility -- and Uber's
22    credibility is at stake here -- and we were not
23    permitted to go in further about the monitoring and
24    the nature of monitoring because we were told it was
25    trade secret, even though I've been told many times
```

Page 269

```
 1    that arbitration is confidential, protective orders.
 2    There's no way that I presume that the people in this
 3    room -- and I certainly would not -- are going to go
 4    and compete or release any of this information about
 5    Uber.
 6              The last part is there were many times
 7    where it was clear that Mr. Rosenthal was willing to
 8    say whatever he wanted to say in response to
 9    questions.  Whether or not there was any
10    legally-admissible or competent evidence to support
11    those statements, he would say, "I think" or "I
12    believe."
13              We had filed motions to compel in this
14    case, including one after the start of the last
15    arbitration that was summarily denied except for the
16    videos that were created as part of this litigation.
17    And so, it hampers the ability to effectively
18    cross-examine a witness, especially in this case, an
19    Uber corporate representative, especially given that
20    he is the sole witness who has been presented here.
21              That ends my offer of proof.  Thank
22    you, Judge.
23              JUDGE SOUSSAN:  Response?
24              MR. SANDAHL:  I think the Alex
25    Rosenblatt issue, you've already ruled for all the
```

Page 270

```
 1    reasons in our motion, but essentially she has no
 2    personal knowledge of the issues.  We have someone
 3    who can testify about the policies.  That is
 4    Mr. Rosenthal.  He's certainly has been
 5    cross-examined thoroughly, and you can make your own
 6    judgments about his credibility and about whether his
 7    testimony is credible.  There's no reason that
 8    Ms. Rosenblatt needs to testify here.  They did not
 9    depose Mr. Rosenthal at any point.
10                    And so, there's no -- you know, they
11    could have gotten this information, learned about
12    this information, the kind of answers he would give
13    at that point and decided not to do that.
14                    With respect to GPS data, we did
15    provide some GPS data, both prior to and after the
16    hearing last time.  The GPS data itself is not what
17    we've contended is proprietary.  Obviously you've
18    made the ruling, and it cuts a clear line of this
19    information is -- and you did this today.  This
20    information is proprietary and I'm not going to let
21    him testify about that.  This information is not
22    proprietary, and I will let him testimony about that.
23    A good, clear line has been drawn there.
24                    Project Hell is something that's been
25    brought up for the first time today.  There's no
```

Page 271

1    reason for that to be discussed in this arbitration.

2    Mr. Rosenthal didn't know anything about it.  Lack of

3    foundation.

4              And then the last piece just about

5    whether there's discovery issues and whether we

6    produced enough to sort of substantiate the

7    testimony.  His testimony is evidence.  You can

8    certainly give it the weight you want, evaluate the

9    credibility on your own.  You can make your own

10   decisions about whether to give credence to it.

11             MS. SOUSSAN:  Anything else,

12   Mr. MacLeod?

13             MR. MacLEOD:  Nothing further.

14   Mr. Stanley will call our next witness.

15             MR. STANLEY:  I would call Dainius

16   Barysas.  We're moving the microphone over now.

17             MS. SOUSSAN:  Are you going to join us

18   via video?

19             MR. SANDAHL:  Your Honor, Ms. Miers

20   will take the defense.

21             DAINIUS BARYSAS,

22   having been first duly sworn, testified as follows:

23                    EXAMINATION

24      Q.   (BY MR. STANLEY)  Can you please state your

25   name for the record?

                                        Page 272

1        A.    My name is Dainius Barysas.

2        Q.    And where are you from, Dainius?

3        A.    I'm originally was born in northern Europe.

4    I'm from Lithuania.

5        Q.    Can you tell the judge here about your life

6    and just -- when you came over here and when you

7    started, what you started to do once you came here?

8        A.    Well, I moved to the U.S. when I was 20.  I

9    came as an exchange student, decided to stay because

10   I met a girl.  Originally my plan was to come here

11   for the summer.  I had a job.  I had a contract.  I

12   was on a special visa.  And I didn't make any money

13   and decided to stay.  And then I got married, and --

14   and I've had numerous jobs throughout the years.  I

15   don't have a college degree.  I have a high school

16   diploma and I'm not a doctor, not an engineer.  So

17   I've had different jobs throughout my life from

18   driving, being an affiliate for a bike rental company

19   and, yeah, currently -- currently I have a trucking

20   company, one-man show, owner operator.  I drive all

21   across the country for a living delivering cars from

22   dealerships, from -- from dealership to dealership,

23   rail yards, bringing vehicles to dealerships.

24       Q.    Where did you move to when you moved to the

25   United States?

Page 273

 1          A.    I've always lived in New York.  Different

 2     addresses, different boroughs in New York City, and

 3     in 2018 I moved to Houston.

 4          Q.    What year did you move to New York?

 5          A.    New York?  2003.

 6          Q.    And at some point along the way, did you

 7     start driving for Uber?

 8          A.    Yes.  In 2014, I started driving for Uber.

 9          Q.    And how long did you drive for Uber?

10          A.    Up until the time that I moved to Houston.

11     So 2014 sometime -- from 2014 to 2017.  Sometime

12     September 2017, I believe.

13          Q.    When did you move to Houston?

14          A.    2017, in August or September, one of those

15     months.  I don't remember exactly.

16          Q.    And did you continue to drive for Uber once

17     you moved to Houston?

18          A.    Yes.

19          Q.    And about how long, if you recall, did you

20     continue to drive for Uber after you moved to

21     Houston?

22          A.    Up until 2019 around May, I would say.

23          Q.    And once you stopped driving for Uber, what

24     then did you start doing?

25          A.    So I -- I started a trucking -- driving for

                                          Page 274

```
 1    a trucking company.  I initially worked for them.
 2         Q.    What's the name of that company?
 3         A.    It was -- I can't remember right now.  TC
 4    Logistics, I believe, but that company is no longer
 5    operational.
 6         Q.    And you said you started your own company?
 7         A.    Yes, I have.
 8         Q.    What is the name of that company?
 9         A.    So the name of the company is DSK
10    Logistics, LLC.
11         Q.    From 2014 up until August of 2019, what was
12    your primary form of making money?
13         A.    Uber -- Uber was my primary source of
14    income.  I relied on it.
15         Q.    And along that time, did you ever have the
16    ability to dictate how much you would make on any
17    individual ride for Uber?
18         A.    No, sir.
19         Q.    Did you ever have control of the value of
20    the base fare that you could charge when driving for
21    Uber?
22         A.    No.  No, sir.
23         Q.    Did you ever have control of the distance
24    fare that you could charge when driving for Uber?
25         A.    No, never.
```

Page 275

1       Q.    Did you ever have control of the time fare

2    that you could charge when driving for Uber?

3       A.    No, sir.

4       Q.    Did you ever have control of the percentage

5    Uber could take from any individual trip that you

6    completed for Uber?

7       A.    No, sir.

8       Q.    Have you ever been able to choose the rider

9    that you might receive inside the Uber app?

10      A.    No, sir.

11      Q.    Have you been able to -- or could you while

12   using the app -- develop a list of preferred Uber

13   riders that you could provide services to?

14      A.    No, sir.

15      Q.    How were you able to receive a ride request

16   once you log onto the Uber app?

17      A.    It would just be offered through the app.

18      Q.    Do you control or have you ever had control

19   of the amount of rides that you would be offered

20   throughout a day?

21      A.    No, sir.

22      Q.    If you wanted to start a day and say, "My

23   goal is to complete 50 Uber rides in one day," could

24   you -- could you guarantee that that would occur in

25   any given day?

                                        Page 276

1          A.    No.

2          Q.    Why?

3          A.    Because Uber had control over the rides

4     offered to me.  I had no say in that.

5          Q.    How is a ride offered to you?

6          A.    In order to receive a ride request, you

7     would have to go on-line, on Uber's app, and you

8     would be offered a ride.  But my primary source of

9     income was the airport, and as soon as you enter the

10    staging lot, you would be put in a virtual queue.  So

11    it was never the same.  Some days you would wait, you

12    know, a lot longer than others, but most of the time

13    at the airport it would be hours and hours waiting

14    for one ride.  Then I guess when there's a customer,

15    it would be offered to you through the app and you

16    would hit accept and head to pick up the customer.

17         Q.    Can you tell the judge a little bit about

18    the information that would be shown to you before you

19    accept a ride request through Uber?

20         A.    So it would show the rating of the customer

21    and the name of the customer.

22         Q.    Were you able to set the level of customers

23    that you wanted to receive through the Uber app to

24    only receive a high-rated customer?

25         A.    No, sir.

                                          Page 277

```
 1        Q.   Were you able to set on the app any
 2   function that would only allow you to receive trips
 3   above $10?
 4        A.   No, sir.
 5        Q.   Was there any price function you could set
 6   that would only make the Uber app send you requests
 7   at a certain monetary level?
 8        A.   No.
 9             MR. STANLEY:  Jacob, could you bring
10   up Joint Exhibit 1, please?
11        Q.   (BY MR. STANLEY)  Dainius, do you know what
12   this document is?
13        A.   Yes, I do.
14        Q.   For purposes of the record, this is
15   Uber_Barysas_362.
16             Dainius, tell the judge what this
17   document is.
18        A.   I've read this document numerous times.
19   This is Uber's deactivation policy.
20        Q.   If we flip over to the very last page,
21   Jacob, the document says Last Updated -- tell the
22   judge when the document was last updated.
23        A.   July 26, 2016.
24        Q.   Were you driving at the time that this
25   policy came out?
```

Page 278

1         A.    Yes, sir, I have full-time.

2         Q.    Okay.  And if we can go back to the first

3    page, Jacob, please.

4               Can you tell the judge about drivers'

5    star ratings?

6         A.    Yes.  Your Honor, a star rating is the way

7    Uber rates customers and drivers.  So after every

8    trip, you are given an opportunity to rate your

9    customer.  And the same opportunity is given to a

10   rider to rate a driver and -- yeah.

11        Q.    And if we look up a little bit above that,

12   the document under Quality says, "There's several

13   ways we measure driver quality, with the most

14   important being star ratings and cancellation rate."

15   And then at the bottom there under What Leads to

16   Deactivation, it says, "There's a minimum average

17   rating in each city."

18               Do you know what the minimum average

19   rating in New York City was for star rating?

20        A.    I don't because it varies by city.  It's --

21   I don't remember what the minimum average star rating

22   was in New York City.  I don't remember this, but I

23   followed this very closely because I knew that

24   certain ratings would lead to deactivation and

25   removal from the app, but I can't recall exact

Page 279

1    numbers right now.

2        Q.    Do you know if Uber ever told you what the

3    minimum average rating in New York City was?

4        A.    I don't remember this right now.

5        Q.    If we go over to the next page, Jacob, it

6    says, "If your average rating still falls below the

7    minimum after multiple notifications, your account

8    will be deactivated."

9              What was your understanding at the

10   time of how your star rating could result in

11   deactivation?

12       A.    So there were numerous things that do lead

13   to deactivation, according to Uber.  If you -- if

14   your rating falls below a certain level or if you

15   don't accept all the trips that are given to you by

16   Uber, you would be deactivated.  That was my

17   understanding.

18       Q.    And if we move down to the next section on

19   cancellation rate, what is a cancellation, if you

20   know?

21       A.    So simple way to explain it, like, let's

22   say if I'm given 10 rides throughout the day and I

23   accept nine of those rides, it means my cancellation

24   would be, I believe, 10 percent.

25       Q.    It says, "A driver cancellation is when a

Page 280

1  driver accepts a trip request and then cancels the

2  trip."

3             Does that line up with what your

4  understanding of what a cancellation was when you

5  drove for Uber?

6       A.   Yeah.  I mean, my understanding is that if

7  you cancel, you will be deactivated.  That's my

8  understanding in simple --

9       Q.   If we look down to What Leads to

10  Deactivation, it says, "Each city has a maximum

11  cancellation rate based on the average cancellation

12  rate of drivers in that area."

13             Were you ever told at this time when

14  you drove in New York City what the cancellation rate

15  was that would allow you to maintain access to the

16  Uber driver app?

17       A.   No.

18       Q.   It says, "If your cancellation rate

19  continues to exceed the maximum limit, your account

20  may be deactivated."

21       A.   Yes.

22       Q.   How did the maximum limits of cancellations

23  put in place by Uber impact the way that you drove

24  for Uber?

25       A.   Well, I tried to follow Uber's cancellation

Page 281

```
 1   policy, as well as the community guidelines.  I've
 2   read this numerous times.  So I try not to cancel
 3   rides.
 4       Q.   A single canceled ride would not result in
 5   you being deactivated, would it?
 6       A.   No.
 7       Q.   And so, do you believe you could freely
 8   cancel rides without any limit and maintain access to
 9   the Uber driver app?
10       A.   No.
11       Q.   And did that impact the way that you drove
12   for Uber while using the app?
13       A.   Yes, it has.
14       Q.   Can you tell the judge about that?
15       A.   So I wasn't free to do what I wanted
16   because I didn't want to lose access to the app.  It
17   was my only source of income.  And so, I would do
18   everything possible not to cancel rides.
19       Q.   If we look at the next section here, it
20   says On Acceptance Rates.  It says, "High acceptance
21   rates are a critical part of reliable, high-quality
22   service, but not accepting a trip request does not
23   lead to permanent deactivation."
24            The question is:  Tell the judge what
25   an acceptance rate is.
```

Page 282

1      A.    An acceptance rate is -- is kind of like

2    the cancellation rate.  It's the amount of rides

3    canceled to the rides accepted.  It's unclear the way

4    it's calculated.

5      Q.    "If you are consistently not accepting trip

6    requests, we will notify you that your ability to

7    remain on-line may be at risk.  If your acceptance

8    rate does not improve or you are declining more trips

9    than other drivers in your city, you may not be able

10   to go on-line for a short period of time."

11                 How that did impact the way that you

12   would accept trips when offered to you?

13     A.    I would try to accept every trip given to

14   me.

15     Q.    Why?

16     A.    Because I didn't want to lose access to the

17   Uber app, like I mentioned.  I didn't want to be

18   deactivated.

19     Q.    If you had lost access to the Uber app for

20   a short period of time, would that have been

21   impactful to you?

22     A.    Yes, sir.  At the time when I moved to

23   Houston, Uber was my main source of income.  I had a

24   mortgage and other expenses, vehicle payment.  So

25   absolutely, it would.  I mean, I'm the only person

Page 283

```
 1    working in my family, so it would absolutely impact.
 2         Q.   What about before you moved to Houston?
 3    Would losing access to the Uber app have been
 4    impactful to you?
 5         A.   Yes, sir.  Uber was my main source of
 6    income while in New York and in Houston.
 7         Q.   Okay.  Moving down to fraud.  Under the
 8    fraud section, it says, "Fraudulent activity
 9    undermines the trust on which Uber is built.  That's
10    why we are constantly on the lookout for fraud by
11    drivers and riders who are gaming our systems."
12              And then What Leads to Deactivation?
13    "We will deactivate any account or accounts
14    (including permanently) associated with fraudulent
15    activity."
16              Did you ever commit fraudulent
17    activity on the Uber app while you drove for Uber?
18         A.   No, sir.
19         Q.   What was your understanding of what could
20    result if you committed fraud on the Uber app?
21         A.   So my understanding is if the fraud is
22    committed, you would be deactivated and lose access
23    to the Uber platform.
24         Q.   And if we look under the same section What
25    Leads to Deactivation, it says, "This activity may
```

Page 284

```
1    include deliberately increasing the time or distance

2    of a trip."

3               Did you ever do that?

4         A.   No, sir.

5         Q.   Onto the next page, it says, "Accepting

6    trips without the intention to complete, including

7    provoking riders to cancel."

8               Did you ever accept trips without the

9    intention to complete?

10        A.   No, sir.

11        Q.   Then it says, "Creating dummy rider or

12   driver accounts for fraudulent purposes."

13              Do you see that?

14        A.   Yes, I do.

15        Q.   Did you ever do that?

16        A.   No, sir.

17        Q.   "Claiming fraudulent fees or charges."

18              Do you see that?

19        A.   I do see this, yes.

20        Q.   Did you ever claim fraudulent fees or

21   charges?

22        A.   No, sir.

23        Q.   It says, "like false cleaning fees."

24              Did you ever claim a false cleaning

25   fee?
```

Page 285

1        A.    I never claimed false cleaning fees, no.

2        Q.    Did you ever intentionally accept or

3    complete fraudulent or falsified trips?

4        A.    No, sir.

5        Q.    If we go down to Safety, the next section

6    says, "Uber uses technology to keep riders and

7    drivers safe.  For instance, GPS tracking every

8    ride."

9                 Were you aware that Uber GPS tracked

10   every ride?

11       A.    Yes, sir.

12       Q.    How did that impact the way that you drove

13   for Uber?

14       A.    I mean, I just followed Uber's rules and, I

15   mean, I knew that they were tracking GPS -- GPS

16   tracking drivers.

17       Q.    Farther down on the deactivation policy

18   under Uber's community guidelines, at this time were

19   you aware that there were also a set of community

20   guidelines from Uber?

21       A.    Yes.

22       Q.    And did you follow those?

23       A.    Yes, sir.

24       Q.    It says, "What Leads to Deactivation?  Uber

25   may deactivate the account of any driver who does not

Page 286

1    follow the community guidelines."

2              Do you see that?

3        A.   Yes, I do.

4        Q.   What was your understanding of what could

5    happen if you didn't follow Uber's community

6    guidelines?

7        A.   Deactivation, losing access to Uber

8    platform.

9        Q.   If we go over to the next page, which is

10   365, at the bottom do you see the section that says

11   Unacceptable Activities?

12       A.   Give me a second.  Yes, I do see.  Yes,

13   yes.

14       Q.   It says, "To maintain the transparency and

15   the safety of the Uber platform for all users,

16   activities conducted outside of the monitored system

17   of the Uber app (like anonymous pickups) are

18   prohibited."

19              Do you see that?

20       A.   Yes, I do.

21       Q.   The next section, "Accepting illegal street

22   hails while using the Uber app."

23              Did you ever do that?

24       A.   No, sir.

25       Q.   It says, "Soliciting payment of fares

                                        Page 287

1   outside the Uber system."

2              Did you ever attempt to do that?

3      A.   No, sir.

4      Q.   Were you able to -- what's your

5   understanding of what might occur if you solicited

6   cash from an Uber rider to pay for an Uber ride?

7      A.   This was clear to me from the get-go this

8   was against all the Uber rules and community

9   guidelines.  I had never done.  You would absolutely

10  lose access to Uber app.  I've never done that.

11     Q.   And when you drove for Uber, do you recall

12  watching videos from Uber?

13     A.   Yes.

14     Q.   And do you recall getting e-mails from Uber

15  that discussed your performance?

16     A.   Yes.

17     Q.   And how did you receive that information

18  and how did that impact the way that you drove for

19  Uber?

20     A.   I tried to follow everything they suggested

21  and the videos.  I was also trained at the Uber

22  headquarters in New York where we were -- we had to

23  watch the video in order to be activated.  So it

24  impacted me big-time because I tried to follow

25  everything that they told me to.

Page 288

1        Q.    Can you please pull up Claimant's

2   Exhibit 1?  You know what this document is?

3        A.    It's Uber community guidelines.

4        Q.    If we go over to Page 10 of this document,

5   when does it say that it was last updated?

6        A.    December 8th, 2016.

7        Q.    And if we go to Uber_Universal_6, you see

8   Why Drivers Can Lose Access to Uber-U.S. Only.  For

9   purposes of the record, I'm not going to belabor this

10  a ton, but I want to point out a couple things as we

11  go so that you can see the facts and the evidence and

12  then try to get through it quickly.  So that's --

13            MS. MIERS:  I'm going to object to

14  counsel's testimony.  You have a witness on the stand

15  that can testify.

16            MS. SOUSSAN:  I'm not quite sure what

17  he's going to be testifying to.  He was just letting

18  me know what he's going to be doing, but -- I am

19  going to, you know, insist that you not testify, but

20  I'm not there yet with the objection.  So the

21  objection right now is overruled.

22        Q.    (BY MR. STANLEY)  Okay.  So if we look at

23  the quality section here on Page 6, the last sentence

24  of that section says, "There are several ways we

25  measure driver quality, with the most important being

Page 289

```
 1   star ratings and cancellation rate."
 2               Do you see that?
 3       A.   Yes, I do.
 4       Q.   Is that similar to what we saw in the
 5   driver deactivation policy?
 6       A.   Yes, it is.
 7       Q.   And then in this community guideline, if we
 8   move over to Page 7., under Star Rating, it says,
 9   "What leads to you losing access to your account?"
10               Do you see that?
11       A.   Yes, I do.
12       Q.   And in this section, again it says there's
13   a minimum average rating in each city.
14               Is that consistent with what you
15   recall the deactivation policy saying?
16       A.   Yes.
17       Q.   And when you say "cancellation," do you see
18   the cancellation rate section here?
19       A.   Yes, I do.  Yes.
20       Q.   And it says, "What leads to you losing
21   access to your account?  Each city has a maximum
22   cancellation rate."
23               Is that similar to what you recall
24   from the deactivation policy?
25       A.   Yes, sir.
```

Page 290

1     Q.   And the last sentence says, "If your

2  cancellation rate continues to exceed the maximum

3  limit, you may lose access to your account."

4           Do you see that?

5     A.   Yes, I do.

6     Q.   And while you drove for Uber, do you think

7  you had the freedom to cancel any trip that you

8  wanted?

9     A.   No, sir.

10     Q.   Why not?

11     A.   Because you would get deactivated.  You

12  would lose access to Uber app if you canceled too

13  many rides.

14     Q.   And the Acceptance Rate section below

15  that --

16     A.   Yes, I see it now.

17     Q.   Again, this document says, "But not

18  accepting trip requests does not lead to permanent

19  loss of your account."

20           Is that consistent with what you

21  recalled from the deactivation policy?

22     A.   Yes.

23     Q.   There is some language that says, "If you

24  consistently decline trips, we will assume that you

25  do not want to accept more trips and you may be

Page 291

1    logged out of the app."

2               Do you see that?

3        A.    Yes, I do.

4        Q.    Did you want to be logged out of the app by

5    Uber at any time?

6        A.    No, not at all.

7        Q.    When you started your day and logged into

8    the app for Uber, what was your desire for that day

9    when you worked?

10       A.    The desire would be to get maximum amount

11   of rides and to make the most money.

12       Q.    And if we go back to this document, Jacob,

13   it picks up on the bottom of Page 8 and carries over

14   to Page 9.  It says, "What leads to you losing access

15   for your account?"

16               Do you see that section, Dainius?

17       A.    I do see it.

18       Q.    And is that section similar to what we saw

19   in the deactivation policy?

20       A.    Yes, it is.

21       Q.    And below that, there's a fraud section.

22       A.    I do see it.

23       Q.    And do you see where it says, "What leads

24   to you losing access to your account"?

25       A.    I do see it.

Page 292

1          Q.    In reviewing this, does that look similar

2     to what was in the deactivation policy?

3          A.    Yes, sir.

4          Q.    Can you please pull up Claimant's 3?  If we

5     go to the back of Claimant's 3 -- this is already in

6     evidence -- we see that this document was last

7     updated April 6th.

8                    Do you see when this document was

9     last --

10         A.    I do see it.  April 6, 2017.

11         Q.    And if we go over now to Page 62 of this

12    community guideline, do you see the section on

13    quality?

14         A.    Yes, I do.

15         Q.    Do you see that last sentence, "There are

16    several ways we measure driver quality, with the most

17    important being star ratings and cancellation rate"?

18         A.    I do see it.

19         Q.    Is that similar to what you've seen in the

20    previous policies?

21         A.    Yes, it is similar.

22         Q.    If we flip through, you see a section on

23    star ratings; is that right?

24         A.    That is correct.

25         Q.    You see a section on cancellation rate?

Page 293

1        A.   I do.

2        Q.   Do you see a section on acceptance rate?

3        A.   I do.

4        Q.   Can you blow those up, those three sections

5   on Page 62, Jacob?  "Star rating" is good.

6             Reviewing this, does this look similar

7   or consistent with what you've seen in the past three

8   policies?

9        A.   Yes, it does.

10        Q.   If we look at the cancellation rate, is

11   that similar to what you've seen in the past

12   policies?

13        A.   Yes, it is.

14        Q.   If we look at acceptance rates -- and it

15   carries over to the next page -- is that similar?

16        A.   Yes, it is similar.

17        Q.   If you decided to not accept rides over and

18   over while being logged into the Uber app, would you

19   be allowed to maintain your access to the Uber app?

20        A.   No, sir.  Not at all.

21             MS. MIERS:  Objection.  Speculation.

22             MS. SOUSSAN:  Overruled.

23        Q.   (BY MR. STANLEY)  Sorry?

24        A.   No, you would not be able to continue

25   driving for Uber.

Page 294

1        Q.    What would happen?

2        A.    You would be logged off and deactivated.

3        Q.    Well, if we go back -- just so the record's

4   clear because I know this will be asked later --

5   under Acceptance Rate, it says, "High acceptance

6   rates are a critical part of reliable, high-quality

7   service, but not accepting trip requests does not

8   lead to permanent loss of your account."

9        A.    I see it.

10       Q.    What's your understanding of what would

11   occur if you chose to not accept rides above the rate

12   that Uber set for acceptance rate?

13       A.    My understanding is only one.  You would be

14   deactivated, lose access to Uber app.

15       Q.    And do you know how long you might be

16   deactivated if you chose to do that?

17       A.    I'm not sure.  It's up to Uber to decide.

18   I have no say in this.

19       Q.    If we go over to Page 64, do you see

20   Unacceptable Activities?

21       A.    I do see it.

22       Q.    And again, these are similar to what we saw

23   in the previous two policies?

24       A.    Yes, it is similar.  Yes.

25       Q.    Then we see Fraud there.

Page 295

```
 1                     Do you see that?
 2        A.   I do see "fraud."
 3        Q.   Is that similar to what we saw in the past
 4   policies?
 5        A.   Yes, it is similar.
 6        Q.   If we go over to 65 here, under Getting
 7   Back on the Road After Deactivation --
 8        A.   Yes.
 9        Q.   It says, the last sentence, "In addition,
10   we are exploring ways to create an appeals process
11   for the most contentious cases.  We will update this
12   document as and when we have that process in place."
13                     Do you see that?
14        A.   Yes, I do.
15        Q.   Are you aware of Uber ever informing you of
16   an appeal process?
17        A.   I don't remember anything else except by
18   contacting support, which I did numerous times.
19        Q.   And the next exhibit we'll look at is Joint
20   Exhibit 2.  If we go over to the last page of this
21   community guideline, you'll see it's last updated
22   when?
23        A.   October 17, 2017.
24        Q.   And if we move over to Page 70, Why Drivers
25   Can Lose Access to Uber --
```

Page 296

1        A.    I do see it.

2        Q.    And again under Quality, the same sentence,

3    "There are several ways we measure driver quality,

4    with the most important being star rating and

5    cancellation rate"?

6        A.    I do see it, yeah.

7        Q.    And based on your knowledge of this

8    document, is this document similar to what you've

9    seen and what you followed in the previous policies

10   from Uber?

11       A.    Yes, sir, it is.

12       Q.    So we'll move off of this so we don't

13   belabor the point, but it is in evidence at Joint

14   Exhibit 2.

15             The final one I want to point to is

16   Joint Exhibit 3.  And if we look at the last page of

17   that, please, Jacob.

18             What's the date there?

19       A.    May 29, 2019.

20       Q.    And again, when did you stop driving for

21   Uber, if you recall?

22       A.    I stopped driving in 2019, at around May.

23       Q.    Okay.  And if the records show that it

24   might have been a little bit after that -- what

25   general time frame did you stop driving in 2019?

                                        Page 297

1          A.     Sometime in the middle of the year.  So

2     could be June, July, maybe August.  One of those

3     months.

4          Q.     And what is this document, Dainius?

5          A.     That is Uber's community guidelines again.

6          Q.     And you know that this document -- let me

7     ask you this.  I was going to lead you.

8                      Does this document apply to riders

9     also?

10         A.     I do believe Uber has community guidelines

11    for riders, as well, yes.

12         Q.     And as far as this document goes, why is it

13    important that you follow this document?

14         A.     Well, Uber wants me to follow their

15    community guidelines.  They provided that to their

16    drivers and also wanted us to follow the deactivation

17    policy, lots of things.  So we just do what they say.

18         Q.     If a rider were to breach a community

19    guideline, could that cause you to lose your driving

20    access?

21         A.     If my rider breached community guidelines?

22         Q.     Let me ask it again because it's a nuanced

23    question.

24         A.     Sure.

25         Q.     If a rider breaches the community

                                          Page 298

1    guidelines, can that cause you, a driver, to lose

2    your access to the Uber app?

3        A.   No, sir.

4        Q.   If we flip over, then, to 164, you'll see a

5    fraud section.

6                 Do you see that?

7        A.   I do.

8        Q.   And based on the policies, what can happen

9    if you commit fraud on the system?

10       A.   Absolutely you would lose access to Uber

11   app.

12       Q.   And it says, "Fraud activity may include

13   but are not limited to" -- and some of these are

14   similar, right?  "Deliberately increasing the time or

15   distance of a trip for fraudulent purposes"?

16       A.   I see it.

17       Q.   Did you do that?

18       A.   No, sir.

19       Q.   "Accepting a trip order or delivery request

20   without intention to complete it."

21                 Did you ever do that?

22       A.   No, sir.

23       Q.   Did you ever provoke riders to cancel for

24   fraudulent purposes?

25       A.   No, sir.

Veritext Legal Solutions
346-293-7000

```
 1          Q.    Creating dummy accounts for fraudulent

 2     purposes, did you do that?

 3          A.    No, sir.

 4          Q.    Claiming fraudulent fees or charges, did

 5     you do that?

 6          A.    No.

 7          Q.    Did you ever complete fraudulent or

 8     falsified trips?

 9          A.    No, sir.

10          Q.    And if we go over to the next page, you'll

11     see a section on unacceptable activities.  One of

12     them is "Riders and customers should not pay for

13     trips or deliveries in cash."

14                     Do you see that?

15          A.    I do see it.

16          Q.    Did you follow that rule?

17          A.    Yes, I had.

18          Q.    Why?

19          A.    Because that is the rule that Uber wanted

20     us to follow, so I did.

21          Q.    If we go over to the next page on 166, we

22     see Ratings, and it's the last full paragraph on the

23     page.  It says, "If your rating is lower than the

24     minimum average rating in the city, we will let you

25     know, and drivers, riders, delivery partners, or
```

Page 300

1    restaurants that don't meet the minimum average

2    rating for their city may lose access to the app."

3                    Do you see that?

4         A.   Yes, I do.

5         Q.   Did that impact the way that you drove for

6    Uber in 2019?

7         A.   Yes, it did.

8         Q.   How?

9         A.   I tried to follow every rule that they

10   wanted me.

11        Q.   And how might not following the rules

12   impact your driver rating?

13        A.   You would lose access to Uber app.  It

14   would be deactivated.

15        Q.   If we go over to Page 168.  And picking up

16   here with "If we are made aware of potentially

17   problematic behavior, we may contact you so we can

18   look into it.  We may, at our sole discretion, put a

19   hold on your account or turn your account inactive

20   until our review is complete."

21                    Do you see that?

22        A.   Yes, I do.

23        Q.   Whose discretion were you at in order to

24   drive on the Uber app?

25        A.   Uber's discretion.

                                            Page 301

```
 1        Q.    And do you believe Uber had the ability to
 2   suspend or deactivate you while you drove for Uber?
 3        A.    Absolutely, yes.
 4        Q.    And did that happen?
 5        A.    Yes.
 6        Q.    And we've seen documents already about you
 7   losing access to the airport.
 8        A.    Yes.
 9        Q.    How did that impact the way that you were
10   able to make money on the Uber system?
11        A.    It basically took my livelihood away.
12        Q.    Can you tell the judge a little more about
13   that?
14        A.    I relied on airport because I found it to
15   be most profitable for me.  I specifically bought a
16   vehicle for Uber, and airport was my, so to say,
17   bread and butter.  I would only work at the airport
18   because I didn't have enough business otherwise.  I
19   was doing Uber Black, which is a more luxury service
20   that Uber offered.  Of course, it was a lot more
21   expensive.  I found the only way for me was to do
22   Uber Black, which I did.  So taking that away from
23   me, it was -- it was -- I mean, I couldn't remain on
24   the job.  That's why I found a new one.
25        Q.    And when did you start -- you just said you
```

Page 302

```
 1    couldn't remain on the job.  That's why you found a
 2    new one?
 3         A.   Yes.
 4         Q.   Tell the judge about that.
 5              MS. MIERS:  I've been giving a lot of
 6    leeway here, Judge, but I'm objecting to the
 7    narrative.
 8              MS. SOUSSAN:  Q&A, please.
 9         Q.   (BY MR. STANLEY)  Sure.  What did you do
10    next when you lost your access to the airport?  How
11    did that prompt your next action as it relates to
12    making money?
13         A.   You know, I contacted support many times,
14    and I was refused.  They refused to restore my
15    airport access, so I had no choice but to find a new
16    job.
17         Q.   So what -- what did you do?
18         A.   I got a commercial driver's license.  I
19    went to school, got a commercial driver's license.  I
20    got a new job as a truck driver.
21         Q.   And before you got the job as a truck
22    driver, did you have a commercial driver's license?
23         A.   No, sir.  I never had a commercial driver's
24    license or any experience driving a commercial
25    vehicle.
```

Page 303

1        Q.    And while you were using the Uber app, what
2   type of license did you have to have?
3        A.    No special license is required.  No special
4   skill was required.
5        Q.    Do you believe that a special skill is
6   required to drive for Uber?
7        A.    No.  No, not at all.  Anybody can do it.
8        Q.    Do you believe a special skill is required
9   to move cars commercially?
10       A.    Absolutely, yes.
11       Q.    How so?
12       A.    There are numerous federal requirements,
13  all kinds of filings, and you have to have a skill.
14  You have to go to school.  It's a huge vehicle.  60,
15  70 feet.  You need to have a special skill, you need
16  to have a special license, and it's a lot of
17  liability.  So absolutely.
18       Q.    To drive for Uber, were you required to
19  prove how well you could operate a vehicle?
20       A.    No.
21       Q.    What were you required to do in order to
22  drive for Uber for the very first time?
23       A.    You were required to have just a regular
24  driver's license and any vehicle that is registered.
25       Q.    Can you pull up C16, please?  This is a

                                        Page 304

1    document Bates labeled KG_Universal_1242, and it's
2    about getting a trip request.  It says, "When you
3    receive a trip request you'll see a box appear at the
4    bottom of the screen with a flashing blue button.  To
5    accept the trip, tap the button within 15 seconds."
6                   Do you see that?
7         A.   I do.
8         Q.   Tell the judge about what the 15 seconds is
9    there and what Uber required you to do within the
10   system in order to accept a trip?
11        A.   So --
12                   MS. MIERS:  Objection.  Compound and
13   narrative.
14                   MS. SOUSSAN:  Overruled.
15        A.   So when you go on-line within the Uber app
16   and you're ready to take trip requests and one is
17   given to you, you only have 15 seconds to accept the
18   trip.  If you don't, it will count against you.  It
19   would count against you, basically meaning if you get
20   too many strikes, you can lose access to Uber
21   platform.
22        Q.   (BY MR. STANLEY)  At the time of this 15
23   seconds, are you given the destination to where the
24   trip will end?
25        A.   No.

                                        Page 305

1        Q.    Were you ever given a fare estimate of the

2   approximate amount you could make before accepting?

3        A.    No, sir.

4        Q.    Were you ever given the approximate total

5   miles of the destination?

6        A.    No, sir.

7        Q.    Were you even given the rider's exact

8   location before you accept?

9        A.    Exact location?  Yes, yes, you were.  Yes,

10  you were.  You were given the address where to pick

11  up a customer, but that sometimes would be inaccurate

12  either because there's a poor GPS signal or the

13  customer entered it wrong.  You are given the

14  address, yes, sir.

15       Q.    Beyond the address to pick up the rider, do

16  you recall what other information you were given by

17  Uber before accepting?

18       A.    It would be the rider's star rating.

19       Q.    Okay.  Jacob, you can pull that down.

20  We're going to now dip into some support messages.

21  So could you please go to Claimant's 8?  The first

22  support message I would like to look at is 138.  This

23  is a document the judge has seen already.

24              At the top, the title is "I had a

25  different issue with my fare," and this is a document

Page 306

1    from you on June 19th, 2018.  Can you tell the judge

2    about what happened here?

3         A.   So I definitely confirm that this was my

4    message.  So it looks like Uber has taken 50 percent

5    as a commission, and it looks like I was outraged.

6    Yes, I'm familiar with this.

7         Q.   And is this -- why were you outraged here

8    with the percentage?

9         A.   Because it looks like Uber has taken

10   50 percent of -- of the fare.  I was always under the

11   impression that the fee was, I believe, 20 percent,

12   and here it looks like they have taken 50.

13        Q.   And if we look at the response in the

14   support message, Uber support responds and they say,

15   "Thank you for reaching out," and then below they

16   review the breakdown of base fare?

17        A.   Yeah.

18        Q.   And then do you see where they give you the

19   distance of --

20        A.   Distance of 14.52 miles, yes, I do.

21        Q.   Were you ever able to manipulate that

22   $1.3032 per mile number?

23        A.   No.  Uber controls the fares and the

24   structure.  I was never able to do anything about

25   this.

Veritext Legal Solutions
346-293-7000

 1      Q.    Does the same go for the point 18 per

 2  minute?

 3      A.    Absolutely the same goes for that, the

 4  time.

 5      Q.    Can we go over to Page 1187 now, please?

 6  "I have a different issue with my fare."  Do you see

 7  that?  "Hello.  My account was recently transferred

 8  from New York City, and it seems that I'm paying a

 9  higher commission percentage to Uber.  Please let me

10  know the current percentage I'm paying to Uber.

11  Thanks, Dainius."

12                Do you see that?

13      A.    Yes, I do see it.

14      Q.    Can you tell the judge what happened here?

15      A.    Because I moved to Houston -- I did Uber

16  full-time in New York.  It was always unclear to me

17  how much Uber is actually charging, you know.  What's

18  the percentage?  Like, it was -- I never understood

19  it, actually, because at some point it changed.

20                So I'm asking -- you know, it seemed

21  to me like after I moved to Houston that Uber's

22  percentage was higher than what I'm used to it being

23  in New York.

24      Q.    How did that impact your bottom line?

25      A.    I was making less money.

                                              Page 308

1    Q.   It says that -- in the second paragraph of

2    the response here from Swagata, it says, "Partner's

3    earnings will always be calculated using the fare

4    time and distance."

5              Do you see that?

6    A.   Yes.

7    Q.   Does that include the percentage that's

8    going to be removed by Uber?

9    A.   Can you ask once again, please?  So partner

10   earnings will always -- does that include a

11   percentage?  I mean, it seems like the fare time and

12   distance is their percentage.

13   Q.   So does Uber take away from the fare that's

14   calculated by fare time and distance?

15             MS. MIERS:  Objection.  Foundation.

16   A.   Yes, they do.

17             MS. SOUSSAN:  Hold on.  Let's get that

18   foundation.

19   Q.   (BY MR. STANLEY)  Okay.

20             MS. SOUSSAN:  From this witness.

21   Q.   (BY MR. STANLEY)  What's your understanding

22   of how a fare is calculated?

23   A.   So Uber measures time and distance

24   traveled, then adds everything up and takes their

25   fee.  That's my understanding.

Page 309

1        Q.    And does that come from the -- each trip

2   that you take --

3        A.    Yes.

4        Q.    So let me finish the question.

5              Does that come from each trip that you

6   perform on the Uber platform?

7        A.    Yes, sir.

8        Q.    Did you have a problem with the fee that

9   Uber was applying to the rides that you were given on

10  the Uber app?

11       A.    Yes.

12       Q.    Tell the judge about that.

13       A.    Because it was always unclear, so I've

14  written numerous support messages about this.  And

15  because there was some variables like traffic and

16  sometimes, you know, Uber's community guidelines and

17  I'm being professional, I would listen to the

18  customer's demands of taking a different route which

19  wouldn't be the best.  And due to -- due to that, I

20  would end up wasting a lot more time and not always

21  would I be compensated, as per my numerous messages.

22       Q.    Could you we go to Uber_Barysas_1180?  And

23  this is your Uber Greenlight Houston-North visit.

24              Do you see that?

25       A.    I do.

Page 310

1       Q.   This is a message from March 27, 2018.  And

2   below, it says, "Partner has a 20 percent service

3   fee, but I had to explain to him that XL and Select

4   fares belong under the 25 percent service fee.  He

5   also had several questions about Uber Black."

6                    Do you see that?

7       A.   I do see that.

8       Q.   Can you tell us about this occurrence at

9   the Greenlight hub?

10      A.   Sometimes I would get nowhere with support

11  because it would be a different rep.  I'm not sure if

12  they are U.S.-based or somewhere -- another country,

13  and I would be forced to go to a Greenlight hub to

14  actually talk to a real person.

15                   Again, it goes back to the same

16  confusion.  Here it states that my service fee was

17  20.  The other rep was telling me it's based on the

18  distance and time traveled.  So it's kind of

19  confusing.

20      Q.   Could you have changed that service fee

21  referenced below as it pertains to either XL or Uber

22  Select trips?

23      A.   No, sir.  Uber has full power of doing so,

24  not me.

25      Q.   What about Uber Black trips?  Could you

                                              Page 311

1    have changed or negotiated that service fee?

2        A.    No, sir.  I cannot do that.

3        Q.    And if we go now to 1271 -- before we get

4    into this, what did you have to do if you found out

5    there was a problem with the fare that was paid to

6    you on the Uber app?

7        A.    Yeah.  So you would have to go back on the

8    app and try to contact support.  There was a tab

9    where you can contact support, or you can always go

10   to a Greenlight hub.  Greenlight hub, there was one

11   that I used to go in Houston.  That usually takes

12   time because you have to make an appointment.

13       Q.    And if we look at this document from

14   April 3rd, 2017, can you review this message and tell

15   us about it?  So take a look at it and tell us about

16   it, please.

17       A.    Yes.  This looks like I was still in

18   New York before moving to Houston.  So looks like --

19   may I just read for a second?

20       Q.    Just read it to yourself.  Let me ask the

21   question so we're doing question/answer.

22             What were you asking Uber to do here?

23       A.    I wanted to be compensated properly

24   because, you know, I --

25       Q.    Did you feel like that you did not receive

Page 312

1    the fare that you should have received for this trip?

2        A.   Yes.  And it looks like I'm pretty upset

3    here.  There's got to be a reason for that.  Yes, I

4    was not compensated properly.

5                 MS. MIERS:  Objection.  Foundation.

6        Q.   (BY MR. STANLEY)  And if we look down --

7                 MS. SOUSSAN:  Overruled.

8        Q.   (BY MR. STANLEY)  If we look down at the

9    response, then, the response from Uber says, "Thanks

10   for letting us know, Dainius.  We're sorry to hear

11   your experience was less than excellent.  We've

12   reviewed your trip.  Based on the addresses you

13   provided, we've adjusted the fare to 48.77 to match

14   our estimate from pickup location to destination."

15                 Do you see that?

16       A.   I do.

17       Q.   So were you able to increase the fare in

18   this situation?

19       A.   No.

20       Q.   Do you know if you received the payment for

21   the time and distance that you undertook on the Uber

22   app?

23       A.   So in this situation, it looks like they

24   have adjusted it, but good that I caught it.  I'm not

25   sure how many trips I didn't catch it, but clearly I

                                        Page 313

 1    was compensated after that.

 2        Q.   And where it says they have adjusted it to

 3    match, quote, our estimate from pickup location to

 4    destination, what does that mean to you?

 5        A.   I mean, I don't know how they calculated

 6    it, but clearly they compensated what it should have

 7    been, but -- yeah.

 8        Q.   Did you have any ability to increase the

 9    fare with the rider under Uber's rules in order for

10    the rider to pay you directly at the time the

11    appropriate amount?

12        A.   No, sir.  No.  This was against the rules,

13    to collect any money from the customer, and I've

14    never done that.

15        Q.   Okay.  Can we go to 1560?  Here the title

16    of this document is "I had a different issue with my

17    fare."

18              Do you see that?

19        A.   I do.

20        Q.   Can you tell the judge why we see that and

21    how it is that you contact Uber when we see this sort

22    of message on a support message?

23        A.   Yeah.  So it's definitely my message.  I

24    don't remember if this was resolved or not.

25        Q.   I'm not asking about whether it was

                                              Page 314

1    resolved.

2                    How did you make these requests to

3    Uber when we see them in this form?

4         A.   Oh, it was through the app.  I wrote the

5    support.

6         Q.   And when you click on support, what do you

7    see or what does that look --

8         A.   I see your question.  So when you go to the

9    menu of the driver app, you are given choices of

10   support.  It has different options to choose from,

11   like fare adjustment or no tolls paid to the driver,

12   different problems.  So I clicked one of them, and I

13   was -- I reached out to support, basically.

14        Q.   So here you reach out and say, "Hi.  Why is

15   there a service fee adjustment of minus 18.47?  What

16   does that mean?"

17                   Do you see that?

18        A.   Yes, I do.

19        Q.   And the response that you get on

20   October 21st, 2018, is, "I would like to tell you

21   that service fee adjustments occur when your trip

22   earnings are greater than the rider payment excluding

23   taxes, surcharges, and fees.  Service fee adjustments

24   are not additional charges."

25                   Do you see that?

                                          Page 315

1        A.    I do see that.

2        Q.    And so, in this situation, based on the

3   response here, did you have to pay an additional

4   18.47 for a service fee?

5        A.    Yeah.  Looks like they charged me that,

6   yeah.

7        Q.    And -- and what is the response from Uber

8   about why that occurred?

9        A.    To this date, I don't understand this

10  response.  I don't understand what they mean.  All I

11  know is that I paid 18.47.  But I'm confused by this

12  to this day.  I don't understand.

13       Q.    Okay.  Can we move on to 1305?  Again, we

14  see a title "I had a different issue with my fare,"

15  and this is a January 18th, 2018, communication.  In

16  this situation, you say, "Hello.  I wanted to know if

17  I got paid for traveling approximately 20 miles to

18  pick up this customer in very dangerous, icy

19  conditions."

20                  Do you see that?

21       A.    Yes, I do.

22       Q.    Do you remember this trip?

23       A.    Yes, I do.

24       Q.    Tell the judge what you recall about this

25  trip.

1      A.    So it was one of those days -- the reason I

2   remember also was because it was one of those nights

3   where Houston got a lot of snow and icy road

4   conditions.  And so, from the time I got a ride

5   request I accepted it, of course, and I had to travel

6   20 miles to pick up a customer.  And at the end, I

7   don't think I was compensated -- as a matter of fact,

8   I was not compensated for traveling 20 miles to pick

9   up a customer, which takes time -- in icy conditions,

10  that took me a while.  And I reached out to Uber, and

11  I was told that for Uber Black, which I was at that

12  time, I was an Uber Black ride, there's no fee that

13  is paid to me to travel 20 miles to pick up a

14  customer.  It would only apply to UberX and Uber pool

15  trips, which I was not.

16      Q.    So if we look at the response here from

17  Uber, it says, "Long pickup fees will only apply on

18  UberX and Uber pool trips.  Because this was neither

19  an UberX nor Uber pool trip, the fee did not apply."

20      A.    Yes, I see that.

21      Q.    Were you able to get along pickup fee for

22  this trip?

23      A.    No, sir.

24      Q.    Who controls whether or not a long pickup

25  fee is assessed?

1          A.     Uber.

2          Q.     Driving for Uber Black, did you receive

3     long pickup fees?

4          A.     No, sir.

5          Q.     Okay.  Now we're going to move on to 1375.

6     Tell the judge about cancellation fees.  What is

7     that?

8          A.     Cancellation fee?  So I know on the rider

9     side of things if you cancel a ride that you

10    requested, they charge a cancellation fee.

11         Q.     Well, do you know how a driver is able to

12    qualify for a cancellation fee?  How does a driver

13    get a cancellation fee from the rider?

14         A.     Yes.  So if I recall correctly, the driver

15    gets paid a cancellation fee or receives a

16    cancellation fee from Uber after a certain time.  It

17    has to be a certain time.  So I don't remember now

18    how many minutes has to pass in order for you to

19    receive a fee, and it also depends on what kind of

20    tier you're in.  I believe Black or X.

21         Q.     Okay.  If we see Share Details, you say,

22    "Why didn't I receive the cancellation fee?  I

23    arrived and was waiting for the customer, but he

24    canceled after I waited for him."

25         A.     Yes, yes.  This is one of those frustrating

Page 318

```
 1   moments where -- like I said, in my case, I would

 2   wait at the airport sometimes four, five hours at a

 3   time for one customer.  And if I go to pick him up

 4   and he cancels, the least that I should receive is a

 5   cancellation fee because I've lost my place in line.

 6   That's the minimum that should be compensated by

 7   that.  It looks like I wasn't paid a cancellation

 8   fee.

 9        Q.   If we go down to the next section, we see

10   from Uber support that "We have reviewed this trip

11   and can confirm that a cancellation of 7.20 has been

12   successfully applied to this trip."

13        A.   Yes.

14        Q.   Who do you rely on in order to receive a

15   cancellation fee?

16        A.   Uber, of course.  Uber.

17        Q.   Can you be paid a cancellation fee without

18   Uber's intervention?

19        A.   No, sir.  No.

20        Q.   Who sets the time required for a

21   cancellation fee to then be allowable to the driver?

22        A.   Uber does.

23             MR. STANLEY:  Judge, we are getting to

24   the 1:00 o'clock hour.  What's your choice here?  I

25   have more to go, but I know we have a schedule we try
```

Page 319

```
 1    to stick to.

 2              MS. SOUSSAN:  I have from 1:15 to

 3    2:15.  If it's convenient to break now, that's fine

 4    with me.

 5              MR. STANLEY:  It's convenient now, if

 6    you would like to.

 7              MS. SOUSSAN:  Okay.  Then let's break

 8    now from 1:00 until 2:00 o'clock.

 9              (Recess from 1:00 p.m. to 1:59 p.m.)

10       Q.  (BY MR. STANLEY)  Jacob, can you continue

11    on in Claimant's Exhibit 8 to Page 1292?  Can you

12    blow up the top of that, please?

13              So Dainius, this is a message you sent

14    to Uber back in 2016.  "Fare adjustment.  My rider

15    damaged my vehicle."

16              Do you see that?

17       A.  I do see this.

18       Q.  Do you recall this?

19       A.  I do.

20       Q.  Can you tell the judge about this instance?

21       A.  I was trying to help the customer to load

22    his suitcase.  I think he was going to the airport, I

23    believe.  He wanted to do it himself, and he forced

24    the suitcase -- it was not one suitcase.  It was a

25    few suitcases, and he damaged the plastic handle,
```

Page 320

```
 1    requiring repairs.  I got the estimate from the
 2    dealership.
 3         Q.   So you can see there it says, "Repair cost
 4    estimate," how much?
 5         A.   Yep.  I believe it was a little over $300.
 6    Close to 400.
 7         Q.   What did you provide to Uber that the
 8    repair cost estimate would be?
 9         A.   I believe I provided the estimate to the
10    dealership, and it was around 400 bucks, I believe.
11         Q.   Okay.  And if we go over to 1294, you see a
12    response here.  It says, "Thanks so much for your
13    patience."  It's at the bottom, Jacob.
14              The response from Jennifer on May 7,
15    2016, says, "Thanks so much for your patience.
16    Again, I understand how important maintaining the
17    quality of your car is in this industry.  I have
18    approved the reimbursement and have put $215 to your
19    account.  No Uber fee is removed from this amount,
20    and it will be reflected in next week's payment
21    statement."
22              Do you see that?
23         A.   Yes, I do.
24         Q.   Were you able to get the amount of damage
25    that you thought you needed -- the amount of payment
```

Page 321

```
 1    to reimburse for the damage that you thought you
 2    needed in order to repair your car from Uber?
 3         A.   No, sir.
 4         Q.   And who decided how much you were going to
 5    receive back for that damage?
 6         A.   Uber.
 7         Q.   And what was the amount?
 8         A.   215.
 9         Q.   Were you able to contact the rider directly
10    and demand payment for this -- this damage under
11    Uber's community guidelines?
12         A.   No, sir.  There's no way to contact the
13    rider after the ride is done.
14         Q.   What was the requirement --
15              MS. MIERS:  I'm sorry, Bret.  I'm
16    sorry to interrupt, but we've got Mr. Rosenthal and
17    Ms. Corridan waiting in the waiting room.
18         Q.   (BY MR. STANLEY)  Did you have the freedom
19    to contact the rider and receive what you thought the
20    repair estimate needed was in order to repair your
21    vehicle?
22         A.   No, sir.
23         Q.   We're going to move to 1493 in this same
24    exhibit.  Okay.  This is a June 17th -- sorry --
25    June 24th, 2017, correspondence from you titled "A
```

Page 322

```
 1    Rider Made a Mess."  In the details, you say, "Riders
 2    were drunk and refused to leave alcohol outside the
 3    car and brought it in.  They left a mess" -- and the
 4    word here is "employ" -- "alcohol cups you spell and
 5    were very rude and aggressive.  I need to get
 6    reimbursed for cleaning my vehicle."
 7                    Do you see that?
 8         A.   I do.
 9         Q.   Do you recall this incident?
10         A.   Yes, I do.
11         Q.   Can you tell us about it?
12         A.   I remember the customers were super drunk
13    and I didn't want them to bring the alcohol inside
14    with all the cups, but they refused.  I tried to stay
15    professional and just continue on my way.  I didn't
16    want arguments or threats or stuff like that, so I
17    just didn't say anything and continued driving.  They
18    left a mess, yeah.
19         Q.   And what did you want to occur here?
20         A.   Just cleaning -- just to take it to get it
21    cleaned.
22         Q.   And if we go over to the next page, on
23    June 24th at the bottom there, 2017, Rodolfo says,
24    "Thank you for letting us know, Dainius.  We're sorry
25    to hear about this issue.  Safety for you and your
```

Page 323

1   vehicle is important to us.  Riders do occasionally

2   leave behind a minor mess.  Cleaning and damage fees

3   are reserved for specific messes left by a specific

4   rider."

5                   Were you able to get a cleaning fee

6   out of this trip based on the mess that was left

7   behind by the riders?

8        A.   No, sir.

9        Q.   Who determined whether or not you should

10  receive a cleaning fee here?

11       A.   Uber did.

12       Q.   Did you have the ability to contact the

13  rider and demand a cleaning payment from them

14  directly under Uber's rules?

15       A.   No, sir.

16       Q.   What would be the result if you had done

17  that, if you know?

18       A.    I would have demanded a cleaning fee, taken

19  the vehicle, gotten the receipt, and that's the

20  amount that I would have asked to be reimbursed.

21       Q.   And would Uber allow that to occur between

22  you and the rider directly?

23       A.   No, sir.

24       Q.   Okay.  Can we pull up 1426, please?  And

25  this is an October 28th, 2018, correspondence you

Page 324

```
 1    sent to Uber entitled "My Rider Made Me Feel Unsafe,"

 2    and you send a message in to Uber and say, "I wanted

 3    to report that this rider is a threat to society.

 4    The rider threatened me and verbally abused me for no

 5    reason at all, and it felt -- felt me feel unsafe.  I

 6    have this incident recorded and time stamped on my

 7    car's dash cam, which I can provide to you if

 8    necessary."

 9                    Do you recall this incident?

10        A.   Yes.

11        Q.   And what happened?

12        A.   So I'm not sure if the customer was

13    mentally ill or something, but it was pretty bad.

14    The customer threatening me was just terrible.  I

15    understand minor annoyances sometimes.  I wouldn't

16    have complained if it would be something minor, but

17    this was pretty scary.  So I don't know what happened

18    to that customer.

19        Q.   And you request in that last sentence, "but

20    this person should be removed from the Uber platform

21    because I'm afraid that he can even physically hurt

22    someone."

23                    Do you see that?

24        A.   Yes.  I do see that, yes.

25        Q.   Do you have any ability to remove someone
```

Page 325

```
 1    from the pool of riders that you might receive a
 2    request from?
 3         A.    No, sir.  I don't have this ability.
 4         Q.    And if we go to the bottom there, you
 5    ask -- bottom of the page, Sunday, October 28, 2018.
 6    "Can you please make sure I'm never paired with this
 7    rider again?"
 8         A.    I do see that, and I remember that.
 9         Q.    Why did you ask that?
10         A.    Because I really felt unsafe, and I just
11    didn't want to be matched with this customer again.
12         Q.    And do you have the ability to make that
13    change where you're not matched with a customer?
14         A.    No, sir.  I don't have this ability.
15         Q.    And on the next page, it says, "No worries.
16    We've already taken measures to minimize the chances
17    of you being paired with this rider in the future."
18                     Do you see that?
19         A.    I do see this, yes.
20         Q.    Do you know what those measures were?
21         A.    No, I don't.
22         Q.    And do you know if these measures resulted
23    in that rider never being able to be paired with you
24    again?
25         A.    No, sir.  I have no way of knowing that.
```

Page 326

1        Q.    Okay.  Can we go to 1382?  All right.  This

2    is another time you contacted Uber on April 5th,

3    2019.  You say, "Hello.  Please reactivate my

4    account.  My vehicle should remain eligible for Black

5    until January 1st, 2020, as explained here.  This

6    information can be found by clicking on the above

7    link and going to the vehicle shall remain active

8    until January 1st, 2021.  All my documents are active

9    and current, insurance, limo business license,

10   driver's license, registration.  Please escalate this

11   to the appropriate manager."

12              Do you see that?

13       A.    I do.

14       Q.    Do you recall this?

15       A.    Yes, I do.  Absolutely.

16       Q.    Can you tell the judge about it?

17       A.    Judge, this was an issue that I had

18   where -- so for Uber Black, the vehicle has to be a

19   certain year, make, and model and color to qualify to

20   be able to take Uber Black trips.  And I knew that

21   there was a limit, and -- where I would have to buy a

22   new vehicle, but my vehicle was still good enough

23   that I went to Uber's website and I clicked special

24   link where it would tell me that my vehicle is still

25   eligible until a certain date.  I wasn't ready to buy

Page 327

1    a new vehicle.

2                    At some point, they took me off of

3    Uber Black platform and I was only able to take the

4    cheapest rides where anybody could do that.

5        Q.   Let me ask you a question.  So if we go

6    over to the next page, 1382, we see -- there's a C360

7    specialist there.

8                    Do you see that?

9        A.   Give me one second.

10       Q.   It says, "Partner was erroneously wait

11   listed by another agent, and I have confirmed that

12   their documents are valid and active and partner

13   should not be wait listed."

14       A.   Yes, I see that.

15       Q.   It says, "I called the partner to inform

16   them of the activation."

17                   Do you see that?

18       A.   Yes, I do.

19       Q.   So were you unable to accept Uber Black

20   trips during this portion of time?

21       A.   Yes, sir.  That is correct.

22       Q.   And what's your understanding of why that

23   was?

24       A.   It seems to me that from the beginning that

25   somebody made --

                                        Page 328

```
 1              MS. MIERS:  Objection.  Foundation.

 2              MS. SOUSSAN:  It's his understanding,

 3    and it would be helpful to understand how's he

 4    getting his understanding.

 5         Q.   (BY MR. STANLEY)  Okay.  So let's back up

 6    one.  It says -- Lily says here -- this is Lily with

 7    the Uber team.  "Thank you for taking the time to

 8    speak with me today."

 9              Did you call in, or did you send

10    support messages?  How did you get information about

11    this?

12         A.   I definitely sent support messages through

13    Uber app.  I can't recall at this time.  There is a

14    huge chance that I might have went to the Greenlight

15    hub, as well, because it affected my earnings for

16    sure because Uber Black was the only thing I was

17    doing.

18         Q.   Let me ask you another question.  Lily

19    says, "I have reviewed your account and documents and

20    have activated your account.  You should be able to

21    go on-line shortly."

22              Do you see that?

23         A.   I do see this.

24         Q.   Before this time, before Lily reactivated

25    your account, did you know why you had been
```

Page 329

1    deactivated?

2         A.   No.

3         Q.   Did you intend to accept Uber Black rides

4    during this period?

5         A.   Yes.

6         Q.   Were you able to do that?

7         A.   No.

8         Q.   And then Uber says here, "To show our

9    appreciation of your hard work, we want you to have

10   lunch on us.  I've gone ahead and added $15 to your

11   account."

12                    Do you see that?

13        A.   I do see that.

14        Q.   Do you know if that $15 -- first of all,

15   did you request the $15?

16        A.   No, I have not.

17        Q.   Did you lose income during this period

18   because you were unable to drive for Uber Black?

19        A.   Yes, sir.

20        Q.   Do you know if this $15 covered that?

21        A.   No.

22        Q.   Did you know at the time that your account

23   was erroneously wait listed by Uber?

24        A.   No.  I found out that through the support

25   messages because I was seeking help, and that's what

                                        Page 330

1    it turned out to be.

2         Q.    Okay.  Jacob, could you please bring up

3    Claimant's 7?  We're going to look at 1181.

4    Actually, let's back up.  We're going to look at 956

5    just right in front.

6              So this was covered earlier with

7    Uber's corporate representative.  Is your e-mail

8    baltican@yahoo.com?

9         A.    Yes, that is correct.

10        Q.    Did you receive an e-mail from Uber

11   informing you that your -- that you would no longer

12   be eligible to receive requests for pickups and

13   drop-offs at the airport?

14        A.    Yes, I had.

15        Q.    If you go over to the next page on 1181,

16   you respond to Uber on June 29th, 2018.  "Hello.  Is

17   there a way to escalate this message to a supervisor

18   or higher up?  I want to be given another chance.  I

19   would like my airport access restored.  I've been a

20   top driver with high ratings since 2014, and I love

21   working for Uber.  My family relies on my earnings.

22   If I lose access, it's like a death sentence."

23              Why did you tell Uber that?

24        A.    That is true.  I relied on Uber earnings to

25   live.

Veritext Legal Solutions
346-293-7000

1       Q.    Then you go on to say, "The staging lot at

2    IAH is way too small, and we're constantly harassed

3    my police" -- is that what you meant there?

4       A.    I misspelled the word "my" or maybe iPhone

5    automatically corrected it.  I meant to say "by

6    police."

7       Q.    Okay.  You say, "We are constantly harassed

8    by police and security and told to leave the lot,

9    losing our place in line.  Please forward this

10   message to supervisors and manager."

11               Why did you tell them about the police

12   and security harassing you and told to leave the

13   line?

14      A.    Well, everybody who works at the airport

15   lot on a daily basis knows that the staging lot was

16   not meant for that.  It was really small.  And so,

17   waits are long.  If everybody is waiting for those

18   rides at the airport, it gets so crowded -- I'm

19   talking about hundreds of cars in a really small lot

20   that was not meant to be.

21               When it gets too crowded, airport

22   police come in and start kicking people out and you

23   lose access.  If you waited, like, three or four

24   hours in line, the moment you leave the line, you

25   lose your place in line.  I mean, security, police,

Page 332

```
 1   they don't care about it.  They just kick you out.
 2   Of course you come back because you want to earn
 3   money, but then you'll be put in the back of the
 4   line.  I shared that with Uber because it's a huge
 5   issue.
 6        Q.   At this time, did Uber ask you any more
 7   about the staging lot or the police kicking you out
 8   or the security kicking you out of that lot?
 9        A.   Have they asked me about this before ever
10   again?  Have they asked me about this again?  No,
11   they have not.
12        Q.   Did they provide you with a specific reason
13   that you were losing your airport access?
14        A.   No, sir.
15        Q.   And so, when we go back on Page 954, Uber
16   says, "Fraudulent activity has been detected.  This
17   may include activities tied to GPS manipulation,
18   disabling your location, fraudulent cancellations,
19   support abuse, or remaining on-line in the queue for
20   reasons other than accepting transcripts at an
21   airport."
22             Do you see that?
23        A.   Yes, I do.
24        Q.   Did anybody at Uber ever tell you which of
25   those that they allege you were doing that caused you
```

Page 333

1    to lose your access to the airport?

2        A.   No, sir.  I've asked this numerous times.

3    They never told me that.

4        Q.   Did anybody at Uber ever inform you what

5    each of these mean?

6        A.   No, sir.

7        Q.   And so, based on documents produced -- can

8    you now pull up Claimant's 5, Jacob?  It's a

9    spreadsheet, so -- just the top one.  Sorry.  Can

10   you -- oh, no.  Go to the next one.  That's not the

11   one.  Sorry.  Can you make Column C bigger, please?

12   Even bigger.  Okay.  Can you scroll down?  Stop right

13   there.  If we go up on Line 62 -- we need to be able

14   to see the whole thing.

15              MR. STANLEY:  Sorry about the sidebar,

16   Judge.

17       Q.   (BY MR. STANLEY)  So if we scroll through

18   this -- this is the second spreadsheet in Claimant's

19   Exhibit 5.  And we see several times where you send a

20   rider the text, "Hello.  I was trying to call you,

21   but it goes straight to voicemail.  I've tried to

22   cancel this ride, but the system is not letting me.

23   I am currently pulled over by the police.  You can

24   cancel the ride."

25              Why is it that we see this same text

Page 334

1   sent multiple times, the exact same language in the

2   spreadsheet?

3        A.   Well, a lot of times, you know, not once or

4   twice, we were kicked out of the staging lot.  That

5   happened.  And other times, there was a situation

6   where I would wait five hours in line for a customer

7   just to see that -- you know, once the rider request

8   comes in, it would show me that the customer is only

9   going a very short distance, and I didn't want to

10   cancel it -- accept it and cancel it because it would

11   affect my cancellation rate.  So that's why I would

12   ask the customer to do it.

13        Q.   Do you know if there were any penalties

14   associated with a customer canceling a ride for a

15   driver?

16        A.   Well, sometimes -- sometimes if the

17   customer cancels, they get charged a cancellation

18   fee.  Other times, they don't.  It depends on the

19   time.

20        Q.   Do you know if the customer was charged a

21   cancellation fee in these situations?

22        A.   I'm not sure.  Every time if I was given an

23   opportunity, I would choose the option not to charge

24   the customer.  Sometimes drivers have that

25   opportunity on the app.

Veritext Legal Solutions
346-293-7000

1      Q.   Why didn't you just cancel the ride

2   yourself?

3      A.   Because it would affect my cancellation

4   rate, and I didn't want to lose access to Uber app.

5   So --

6      Q.   And at times were you unable to cancel

7   rides yourself?

8      A.   There were many times where I was unable to

9   cancel rides because -- I'm not sure if it's because

10  of the crowded staging lot or what.  I mean, just

11  service was really bad.  So sometimes even if you try

12  to cancel or accept, the application would glitch.

13  It was a known issue.  I've changed phones.  I've

14  changed providers.  I've had better luck with Verizon

15  than TMobile, but service was bad.  Interference

16  maybe.  I don't know.  I can only guess.  I'm not an

17  engineer.  But there were times, yeah.

18     Q.   Were you intending to commit fraud when you

19  sent these messages?

20     A.   No, sir.

21     Q.   Did Uber ever tell you that this was a

22  fraudulent cancellation?

23     A.   No, sir.

24     Q.   Do you know what a fraudulent cancellation

25  is?

Page 336

1        A.    Not really.

2        Q.    Okay.  We're going to move on -- you can

3   pull that down -- to a little bit more about your

4   employment history, just to fill the judge in on it.

5        A.    Okay.

6        Q.    So can you tell me a little bit about DB

7   Pedicabs?

8        A.    Yeah.  So -- it was formed in 2006.  So DB

9   Pedicabs was an LLC -- single-member LLC that

10  belonged to me.  It's still active.  Like I said,

11  it's a New York entity, and I was basically a third

12  party -- I have a friend of mine who owns numerous

13  bicycle rental businesses in Central Park in

14  New York, and he was an affiliate.  I made a website.

15  I created it myself.  I advertised it on Google.  If

16  a customer wants to rent a bike or take a guided tour

17  of Central Park in New York City, he can go to my

18  website and the customer will be directed to the

19  payment page of my friend's business and I will get a

20  commission.  That's what it was.

21       Q.    Let me ask you this question.  Did you ever

22  give pedicab tours yourself in Central Park?

23       A.    I used to own a couple of pedicabs.  I used

24  to rent it out to other drivers.  Maybe on couple of

25  occasions, but that was not my main source of income,

                                        Page 337

```
 1   no.
 2        Q.   When might you have done pedicabs in
 3   Central Park?  Do you recall the years?
 4        A.   I don't recall the years because it was
 5   just, like, maybe one or two times that I drove one
 6   myself.  I was leasing them to other drivers.
 7        Q.   Between the years of 2017 and 2019, did you
 8   complete any pedicab trips yourself?
 9        A.   No, sir.  No, sir.  I don't have
10   any -- anymore, especially in Houston.  No.
11        Q.   In between the years 2017 and 2019, what
12   was the extent of the things you did as the sole
13   member of DB Pedicabs?
14        A.   So like I said, the LLC was still active.
15   So I was still an affiliate for a bike rental
16   company, as well as -- so I started doing trucking.
17   Before I formed DSK Logistics, I was advised by my
18   accountant to use DB Pedicabs for trucking to see how
19   it goes before I open a new company, but then it
20   became too complicated.  I don't know.  I just
21   followed his advice.
22        Q.   Okay.  We'll get to that part.
23        A.   Okay.
24        Q.   So for DB Pedicabs, when might you have
25   started using that entity for trucking?
```

Page 338

1       A.   So 2019, sometime in the -- sometime in the

2  beginning of 2019.

3       Q.   And how often did you use that entity for

4  trucking?

5       A.   So -- how often?  For the period that I was

6  employed with Carolina Logistics and TC Transports.

7  So that's probably around six months.

8       Q.   Okay.  Do you know when you started doing

9  work for TC transport?

10      A.   I would have to look at my e-mail, but, you

11 know, it was 2019.  Which month, I can't recall right

12 now.  I'm sorry.

13      Q.   Was it -- do you have any recollection of

14 the start date of TC --

15      A.   I should be able to find it through my

16 e-mail.  There was a contract that we signed at some

17 point.  I would have to go through my papers because

18 that's a requirement to be leased onto a company.

19      Q.   And how long did you offer services --

20 trucking services with TC Transport?

21      A.   It was for a period of three months

22 approximately before the company closed.

23      Q.   What's your understanding of the company

24 closing?

25      A.   They just decided to cease operations, and

Page 339

```
 1    they moved on to other ventures.
 2         Q.   Once TC Transport closed --
 3         A.   Yes.
 4         Q.   Once TC Transport closed, who did you work
 5    with next?
 6         A.   So at that point, I already had my truck
 7    and trailer.  I didn't have my own company.  So FMC
 8    rules, you have to get leased on in order to receive
 9    jobs.  So I started working with Carolina Logistics
10    for about three months, as well, before I decided to
11    go completely on my own and form my own company that
12    is strictly trucking because I was advised by the new
13    account to do so.
14         Q.   What was the company name that you formed?
15         A.   DSK Logistics.
16         Q.   Do you recall when that was formed?
17         A.   It was around May 2020.
18         Q.   Were you still driving for Uber when you
19    formed DSK Logistics?
20         A.   No.
21         Q.   During the time that you drove for Uber,
22    did you also drive for Lyft?
23         A.   Yes, I have.
24         Q.   Do you have a sense of the amount that you
25    drove for Uber compared to the amount that you drove
```

Page 340

```
 1    for Lyft?
 2         A.    I worked a lot more for Uber.  I would say
 3    at least four times more Uber rides versus Lyft
 4    rides.
 5         Q.    When you say "Uber rides versus Lyft
 6    rides," what do you mean by that?
 7         A.    I must have -- through the entire period
 8    that I worked for Lyft, I probably did, like, 200 --
 9    over 200 Lyft rides and definitely over a thousand
10    Uber rides.
11         Q.    Okay.  And so, are you talking about
12    completed Lyft --
13         A.    Oh, absolutely completed, yes.  Right.
14         Q.    So let me ask it again.
15              As far as completed Lyft rides versus
16    completed Uber rides, do you have a sense of how much
17    you did for Uber as compared to Lyft?
18         A.    Four times more.  I would say four times
19    more.
20              MR. STANLEY:  Judge, I'm close to
21    passing.  I just need a couple minutes to look at my
22    notes, if you don't mind.
23              MS. SOUSSAN:  Okay.
24         Q.    (BY MR. STANLEY)  Did you rely on the money
25    that you made off Uber to pay the car note for the
```

                                                    Page 341

1    cars that you drove using the Uber app?

2         A.   Yes, sir.

3         Q.   Could you have paid those car notes without

4    the money from Uber?

5         A.   No.  I would have not chosen that type of

6    make and model vehicle to begin with.

7         Q.   Can you tell the judge about that?

8         A.   So I purchased a vehicle to do Uber.  I

9    spoke at my previous testimony -- I don't know --

10   about that, but I can repeat that again.

11              So there was advertisements in New

12   York City all over the place with a guaranteed amount

13   of money to make.  So rough calculations made sense

14   for me.  The vehicle is expensive.  It's a luxury

15   vehicle.  I would not have purchased it otherwise.

16   It was expensive and -- yeah.

17        Q.   And can you tell the judge the difference

18   between UberX and Uber Black and why that matters for

19   your car?

20        A.   Yes, I can.  So in most cities, Houston

21   included, for Uber Black you have to have a certain

22   make and model vehicle, usually commercial insurance

23   and, depending on the city -- like Houston, for

24   example -- you also have to have a chauffeur's

25   license.  The fares are more expensive to the rider,

Page 342

1    and, of course, the driver receives more money, as

2    well.  The downside to that is you have less -- less

3    rides.  Uber Black is luxury.  UberX is a regular

4    vehicle.

5         Q.   And --

6         A.   Yeah.

7         Q.   Why did you choose to spend your time at

8    the airport?

9         A.   Because, you know, there was not enough

10   work in Houston for Uber Black.  I mean, you could

11   sometimes wait for hours and hours and hours and you

12   would not get -- I've tried it all.  I've tried to

13   position myself at fancy hotels, and it was just not

14   worth it for me financially.  I figured if I work at

15   the airport, the rides are going to be longer, 20

16   plus miles usually, and I calculated that I'm going

17   to make more money at the end and that was the only

18   way I could actually do UberX.

19              In New York, it was different.

20   There's people everywhere, business people, fashion

21   people, all kinds of people.  I didn't have to work

22   at the airport.  As a matter of fact, I never did.

23   Here, it was the only way I could actually make it

24   work with Uber Black, is the airport.

25        Q.   Do you have a recollection on how you chose

Page 343

1    to drive for Uber Black in the beginning?

2        A.    Yeah.   Well, that's -- like I said, I've

3    done that in New York City, so I was familiar with

4    the platform, I was familiar with what it takes.   And

5    like I said, I don't have a college degree or

6    anything like that, so that was the only option for

7    me in Houston and that's why I did it.

8        Q.    Off the Uber app, did you also have a

9    limousine company?

10       A.    A limousine company?   No.

11       Q.    Did you -- did you do limo drives off the

12   Uber app?

13       A.    Uber Black -- I mean, Uber Black is

14   considered luxury service, right?   Uber was the only

15   provider of these rides for me.

16              MR. STANLEY:   Judge, I'll pass the

17   witness.

18              MS. SOUSSAN:   Thank you very much.

19   Ms. Miers?

20              MS. MIERS:   Thank you, Judge.

21                   EXAMINATION

22       Q.    (BY MS. MIERS)   I'm going to start with

23   making sure that I can pronounce your name.   I tried

24   to write it down at the beginning when you pronounced

25   your name.   Barysas?

                                          Page 344

1       A.   You did great.  Very good.

2       Q.   Thank you.  I'm going to try not to mess

3   that up.  Just a few minutes ago -- sorry.  I

4   shouldn't have talked over you.  My apologies.

5                Just a few minutes ago, you were

6   talking about whether you had a college degree or

7   not.  When you were in New York -- you did graduate

8   from high school, right?

9       A.   Yes.  Yes, I have.

10      Q.   And then you completed two years of college

11  before coming to the States?

12      A.   Yes, but I never graduated.  So, you know,

13  I moved to the States, and I never graduated.  Yeah.

14           MS. MIERS:  Object to nonresponsive

15  and strike everything after "yes."  Move to strike

16  after "yes."

17           MS. SOUSSAN:  Overruled.  Continue,

18  please.

19      Q.   (BY MS. MIERS)  So then you came to

20  America, and you tried out a lot of entrepreneurial

21  pursuits; is that right?

22      A.   Yes.

23      Q.   And you actually described yourself as

24  having an entrepreneurial spirit?

25      A.   Yeah.  I wanted to become one.

Page 345

1        Q.   We talked a little bit about your company

2   DB Pedicabs, and I'm going to try not to go over what

3   you've already said.  We'll just cover things that I

4   think that you haven't covered already.

5                 You incorporated that company back in

6   2006; is that right?

7        A.   Yes, that is correct.

8        Q.   And you had 100 percent ownership in that

9   company?

10       A.   Yes, ma'am.

11       Q.   And is that company still active today?

12       A.   Yes, it is.

13       Q.   That's a business that you use and did use

14   back 2017 through 2019 for your different

15   entrepreneurial activities?

16       A.   Yes, ma'am.

17       Q.   For example, you mentioned this.  DB

18   Pedicabs has a business called Cycle Central Park?

19       A.   Yeah, it's just a website.  It's a domain,

20   yeah.  Correct.

21       Q.   And the domain is cyclecentralpark.com?

22       A.   That's correct.  Yes, ma'am.

23       Q.   And then in addition to bike rentals and

24   tour guides, you provided transportation services as

25   the owner and operator of DB Pedicabs, correct?

Page 346

```
 1        A.   Yes.  You mean, like, through Uber?  That's
 2   what you mean?
 3        Q.   In addition to bike rentals and tour
 4   guides, right, you provided transportation services
 5   as the owner and operator of DB Pedicabs?
 6        A.   Yes, that's correct.
 7        Q.   And that was from 2016 --
 8        A.   Yes.
 9        Q.   That was from 2016 to August 2019?
10        A.   Yes.
11        Q.   All right.  Mr. Ridenour, if you would pull
12   up Respondent's Exhibit 49, please.
13             I think you were about to testify that
14   you also provided transportation services through the
15   Uber driver app.  Am I correct in guessing that?
16        A.   Yes, ma'am.
17        Q.   If you take a look at Respondent's Exhibit
18   49 -- this is already admitted into evidence.
19             Do you recognize this as your 1099K
20   for Uber?
21        A.   Yes, I do.
22        Q.   And payee name is DB Pedicabs, LLC, right?
23        A.   That is correct.
24        Q.   And then -- you can take that down.  Thank
25   you.
```

Page 347

1               For tax filings, you reported your

2       income from using the Uber and Lyft app through DB

3       Pedicabs, right?

4          A.   Yes.  I believe so, yes.

5          Q.   And when you lived in New York back during

6       that time, your residence was actually the business

7       address for DB Pedicabs?

8          A.   Yes, correct.

9          Q.   You had a home office that was dedicated to

10      that business?

11         A.   No.  No home office.

12         Q.   You didn't have a home office that was

13      dedicated to DB Pedicabs?

14         A.   It's just a one-man operation.  I don't

15      need a home office.  I mean, I guess you can call it

16      home office, but I don't know.

17         Q.   So do you agree with me that you had a home

18      office dedicated to DB Pedicabs when you lived in

19      New York?

20               MR. STANLEY:  Objection.  Asked and

21      answered.

22         A.   I disagree with you.

23         Q.   (BY MS. MIERS)  Okay.  Do you remember

24      having your deposition taken back in April of 2021?

25         A.   Yes.

                                              Page 348

1        Q.    At the beginning of that deposition, just

2    like the beginning of your testimony today, you swore

3    to tell the truth?

4        A.    Yes, ma'am.

5        Q.    And you listened to the questions, and you

6    tried to answer them truthfully?

7        A.    Yes, ma'am.

8        Q.    And you understood you were under oath?

9        A.    Yes.

10       Q.    Let's take a look at your deposition from

11   that day.  Again, that was on April 29th in the Year

12   2021.  If we could take a look at Page 71.

13              Do you see you were asked, "Did you

14   have, like, a home office or a room that was

15   dedicated to the business?"  And you said yes,

16   correct?

17       A.    Correct.

18       Q.    Does that refresh your memory?

19       A.    Yes.

20       Q.    So did you have a home office for DB

21   Pedicabs in your residence?

22       A.    I guess you can call it that way.  I don't

23   know.

24       Q.    And you had office equipment that you

25   purchased?

Page 349

1      A.    Yes, yes.   There's computer and stuff,

2    printer, yeah, just like everyone else has.

3      Q.    And DB Pedicabs received PPP funds, right?

4      A.    Yes, correct.

5      Q.    Was it about $30,000?

6      A.    Yes.

7              MR. STANLEY:   Objection.   Foundation,

8    first of all.

9              MS. SOUSSAN:   I think he would know

10   whether PPP funds were received or not.   If he was

11   the --

12             MR. STANLEY:   Object to relevance.

13   Any funds that came were outside of the statutory

14   period of what claims could be made.   He stopped

15   driving in August of 2019 for Uber.

16             MS. SOUSSAN:   I agree with that.   I'll

17   sustain that objection.

18     Q.    (BY MS. MIERS)   Did DB Pedicabs receive an

19   economic injury disaster loan in the amount of

20   $78,000?

21             MR. STANLEY:   Same objection, Judge.

22             MS. SOUSSAN:   Hold on here.   I think

23   the point that's being made here is that the

24   testimony from -- I'm going to have a hard time

25   pronouncing your name because I've always said

                                        Page 350

1    Barysas -- that Uber was the sole -- that your income

2    was only from Uber.

3                  And so, I think what's coming out now

4    is that you received income from a PPP loan and

5    another type of loan.  And I'm not certain about the

6    time period for that, but it seems to me that that

7    must be the subject of the cross-examination.

8                  So if you could just clear that up,

9    Ms. Miers, that would help.

10        Q.   (BY MS. MIERS)  It's my understanding,

11   Mr. Barysas, that you provided transportation

12   services through the use of the Uber app by using the

13   name of an LLC called DB Pedicabs, LLC; is that

14   correct?

15        A.   Yes.

16        Q.   And that same company received an economic

17   injury disaster loan, correct?

18        A.   Yes, but the loan was --

19        Q.   It was about 78 --

20        A.   The loan was paid back in full immediately

21   after receiving because after I read the contract, I

22   said, "I don't want it," and I paid it back in full.

23   And I have a letter from SBA saying the loan was

24   immediately returned back.  It was never used.

25                  MR. STANLEY:  Judge, I'm still going

                                              Page 351

```
 1    to object to any of the PPP stuff because it came
 2    after.  He stopped driving in August of 2019.  He
 3    already testified he did other things using the DB
 4    Pedicabs, including trying to drive for a trucking
 5    company after the fact.  All of this is not relevant.
 6    It's after the fact he stopped driving for Uber.  His
 7    last ride was August 25th, 2019.
 8                MS. SOUSSAN:  What's your point here,
 9    Ms. Miers?
10                MS. MIERS:  My point is that he had a
11    company, an LLC, in which he provided several
12    different types of transportation services and other
13    types of businesses, and we don't know he wasn't
14    trying to receive those funds on behalf of DB
15    Pedicabs, which is a company he controlled, not Uber.
16                MS. SOUSSAN:  For what time period are
17    you talking about?
18                MS. MIERS:  This would have been
19    during the pandemic in 2020 for a company he owned
20    and operated.
21                MS. SOUSSAN:  Okay.  Let's move on.
22        Q.   (BY MS. MIERS)  Let's move on.  I want to
23    talk to you, Mr. Barysas, about your use of the Uber
24    app in the way that you chose to use it.
25                I think we're in agreement that you
```

Page 352

```
 1   started to use the driver app in around 2014,
 2   correct?
 3        A.   That is correct, ma'am.
 4        Q.   The reason you made that decision was
 5   because you were looking to make a better living?
 6        A.   Yes, yes, yes.  And part of it, as I
 7   mentioned before, heavy advertising by Uber at that
 8   time on every New York City school bus in the back
 9   saying -- guaranteeing at that time to make -- I
10   forget -- a couple thousand dollars a week.  So,
11   yeah, that's what made me switch.
12               MS. MIERS:  I'm going to object as
13   nonresponsive.
14               MS. SOUSSAN:  Sustained.
15        Q.   (BY MS. MIERS)  So when you made the
16   decision to start using the Uber driver app, you were
17   in New York, but then you made the decision to start
18   using it in Houston, right?
19        A.   That is correct, ma'am.
20        Q.   One of the favorite things for you about
21   using the Uber driver app was that you could quit
22   using it at any time?
23        A.   Yes.
24        Q.   And when you first started using the driver
25   app, you signed some agreements with Uber?
```

Page 353

1      A.    Yes.

2      Q.    And then throughout the years that you

3  chose to use the Uber driver app, you signed various

4  other agreements with Uber, right?

5      A.    Yeah.   There were many agreements that

6  would pop up on the driver app forcing you to sign or

7  otherwise you wouldn't be able to go on-line.

8            MS. MIERS:   Your Honor, I'm going to

9  object as nonresponsive again.

10            MS. SOUSSAN:   Carefully listen to the

11  question and answer the question.   I know you're

12  anxious to get your words in, but please answer her

13  question.

14            THE WITNESS:   No problem.   I'm not

15  trying to avoid it.

16            MS. SOUSSAN:   I understand.   Just

17  answer her questions.

18      Q.    (BY MS. MIERS)   Mr. Barysas, in addition to

19  the contracts that you executed with Uber, you

20  received things that we talked about earlier, like

21  community guidelines and deactivation policies; is

22  that right?

23      A.    Yes, ma'am.

24      Q.    In fact, earlier you testified that if you

25  didn't accept all the trips that were given to you by

                                            Page 354

```
 1    Uber, you would be deactivated.  That was your
 2    testimony earlier, right?
 3         A.   Yes, ma'am.
 4              MS. SOUSSAN:  Hold on.
 5              (Discussion off the record)
 6         Q.   (BY MS. MIERS)  I'm going to go back to my
 7    question because I did interrupt the flow here.  I'm
 8    referring to your testimony at 12:03 today.  Earlier
 9    you testified that if you didn't accept all the trips
10    that were given to you by Uber, you would be
11    deactivated.
12              That was your testimony earlier,
13    right?
14         A.   Yes.
15         Q.   Okay.  Let's take a look at the community
16    guidelines.
17         A.   Okay.
18         Q.   That's Joint Exhibit 2, Mr. Ridenour.
19              While we're pulling that up, you also
20    testified to something similar to that at your
21    deposition, right?
22         A.   I believe so.
23         Q.   Okay.  So let's take a look at Bates 71 at
24    the very bottom of the page.  Do you see with me
25    where it says Acceptance Rates right there?
```

Page 355

1        A.   Yes, I do, ma'am.

2        Q.   We're going to scroll down to the rest of

3   that section on the next page, Bates Page 72.  We're

4   going to highlight that.

5        A.   I see it perfectly.  Yeah.

6        Q.   You testified that you read these several

7   times, the community guidelines?

8        A.   Yes.

9        Q.   What the community guidelines actually say

10  are that not accepting trip requests does not lead to

11  permanent loss of your account, right?

12       A.   I see that.

13       Q.   And that's in the community guidelines?

14  You agree with me that that's a statement in the

15  community guidelines?

16       A.   I do.

17       Q.   So while we're looking at the community

18  guidelines, let's go to the top of Bates 68, if you

19  would.  I'm not going to go over what you've already

20  covered with your counsel.

21       A.   Okay.

22       Q.   You see at the top where it says, "We want

23  Uber" --

24       A.   I see.

25       Q.   It says, "We want Uber to be enjoyable and

Page 356

 1   safe for everyone."

 2           You understand that the community

 3   guidelines apply to both drivers and riders, right?

 4       A.   Yes.

 5       Q.   And if we scroll to the bottom of that same

 6   page in the Feedback Makes us Better section, you see

 7   with me where it says, "Whether you are a rider or

 8   driver, please rate your journey at the end of your

 9   trip."

10           Do you see that?

11       A.   I do see it.

12       Q.   And you talked about with your counsel how

13   the star rating program works, so we won't go over

14   that.

15       A.   Okay.

16       Q.   You do recognize that you had -- it was up

17   to you how to rate your riders, right?

18       A.   Yes, ma'am.

19       Q.   And you understood that both drivers and

20   riders had the ability to rate each other?

21       A.   I understand that, yes.

22       Q.   All right.  And we already talked about how

23   drivers can lose access to the Uber app, but what we

24   didn't talk about earlier was why riders can lose

25   access to Uber.

Page 357

1              MR. STANLEY:  Judge, I'm going to

2     object to relevance.  We're not bringing any claims

3     on behalf of any rider here.

4              MS. SOUSSAN:  Overruled.

5         Q.   (BY MS. MIERS)  You agree with me,

6     Mr. Barysas, that just like drivers can be

7     deactivated, riders can, too?  On here, you see some

8     of the reasons that riders can be deactivated, right?

9         A.   Yes, I believe so.  Yeah.  It's up to Uber

10    to decide.

11             MS. MIERS:  Objection.  Nonresponsive.

12             MS. SOUSSAN:  Overruled.  Please try

13    to answer the question, Mr. Barysas.

14             THE WITNESS:  Okay.

15        Q.   (BY MS. MIERS)  Reasons that riders can

16    lose access to the app are for -- if you could maybe

17    bring that up a little more in focus for us.

18             Riders can be deactivated for things

19    like damaging property, right?

20        A.   Yes.

21        Q.   Physical contact?

22        A.   I see it.

23        Q.   You agree with me that they can be

24    deactivated for physical contact?

25        A.   Yes.

1          Q.   And for abusive language, things like that?

2          A.   Yes.

3          Q.   If we go to the next page on Page 70, just

4     like drivers, riders can be deactivated for fraud,

5     right?

6          A.   Yes.

7          Q.   Okay.  Let's take a look at Joint Exhibit

8     1.  Mr. Barysas, this is the deactivation policy that

9     you testified about a little bit earlier?

10         A.   I'm familiar with this document.

11         Q.   Okay.  And you testified that you read this

12    document numerous times?

13         A.   Yes, ma'am.

14         Q.   Did you read it on your phone or on a

15    computer?  How was that?

16         A.   I read it on the phone and the computer,

17    both.

18         Q.   Did you download a copy to your computer?

19         A.   No, I think -- maybe -- I can't recall

20    this, actually.  Maybe at some point it was

21    downloaded to my computer, yes.

22         Q.   And do you still have that on your

23    computer?

24         A.   I doubt it.  I doubt it.

25         Q.   Did you look for it?

                                          Page 359

1      A.    No, I have not, but I doubt it that I would

2   have it.  I wouldn't even know how to look.

3      Q.    All right.  I want to talk about star

4   ratings for a little bit longer here.

5                During the time that you chose to use

6   the Uber driver app, you made the decision to give

7   your riders a one-star rating approximately 20, 30

8   times?

9      A.    Okay.  That's out of all the rides that I

10  have done?

11     Q.    Did you -- did you choose to give your

12  riders a one-star rating approximately 20 to 30 times

13  during the time that you used the Uber driver app?

14     A.    I wouldn't be surprised that I had, yes.  I

15  would agree with that.

16     Q.    In fact, that's how you testified at your

17  deposition, right?

18     A.    Yeah, sure.  I agree with that.

19     Q.    Generally when you made the decision to

20  rate one of your riders only a one star, it was

21  because you thought the rider was being obnoxious?

22     A.    Sure.

23     Q.    Sometimes because they left a mess in the

24  car?

25     A.    Yes, absolutely.

Page 360

1      Q.    Threw up in the car?

2      A.    Yes, absolutely.

3      Q.    Cursed?

4      A.    Yes.  I would give one star for that, yes.

5      Q.    When they felt like you were judging them?

6      A.    They were judging me?

7      Q.    Yes.

8      A.    Yes, absolutely.  One star guaranteed.

9      Q.    And also you would give them a one star

10   when you determined that their conduct was not

11   consistent with the community guidelines?

12     A.    Yes, ma'am.

13     Q.    And you could have chosen to give two- or

14   three-star ratings, but you didn't do that, right?

15     A.    Yes.

16     Q.    And around 90 percent of the time, you

17   rated your riders five stars?

18     A.    Yes, that's -- that's very accurate.  Yes,

19   ma'am.  That's me.

20     Q.    Regarding your own star ratings, you never

21   received an alert that your star rating was too low?

22     A.    I can't recall this right now.  I don't

23   remember.

24     Q.    Okay.  Let's see if we can refresh your

25   memory.

Page 361

1      A.    Okay.

2      Q.    If you wouldn't mind pulling up his

3  deposition, and we're going to go to Page 113.  We're

4  pulling that up for you.

5      A.    Thanks.

6      Q.    All right.  And if you'll start at Line 18

7  to 22, please.  You'll see here, "Have you ever

8  gotten an alert that said you were approaching the

9  minimum star rating for the area you were driving

10 in?"

11           You said, "I -- I don't think so, no.

12 I don't think.  No, I don't believe so.  Not for

13 that.  Not for that."

14           Does that refresh your memory?

15     A.    Yes.

16     Q.    Okay.  You understood that Uber didn't

17 require you to accept trips, right?

18     A.    They didn't require me, yes.  I do agree

19 with that.  But however --

20     Q.    Okay.  Thank you.

21           And we talked about the deactivation

22 policy having a section on fraud.  You recall that?

23     A.    Yes, ma'am.

24     Q.    And did you understand the deactivation

25 policy when you read it?  Did you have any trouble

Page 362

1   understanding the policy?

2        A.   No, I understood it.

3        Q.   Okay.  I'm going to switch gears a little

4   bit so we can keep this moving along.  I want to talk

5   about how you chose to run your transportation

6   business.

7        A.   Okay.

8        Q.   So when you began to use the Uber driver

9   app as part of your transportation services business,

10  you made the decision to use TMobile as your cell

11  phone provider, correct?

12       A.   Yes, ma'am.

13       Q.   Uber didn't tell you that that was the

14  phone service that you had to use?

15       A.   No.

16       Q.   They didn't tell you what data plan to use?

17       A.   No, ma'am.

18       Q.   Okay.  Now that you are a truck driver, you

19  choose instead to use Verizon, right?

20       A.   Correct.  May I add something that I just

21  remembered?  While I was --

22       Q.   Your counsel will have an opportunity to

23  ask you additional questions when I'm done, if we

24  could just keep going.  This way we'll get through

25  and you'll get off the hot seat sooner rather than

                                      Page 363

```
 1   later.
 2                So the Verizon plan is more expensive
 3   than TMobile, isn't it?
 4        A.   $20 a month extra, yes.
 5        Q.   But you chose to go ahead and spend that
 6   extra money because when you're driving a truck,
 7   you're driving in the middle of nowhere and, in your
 8   business judgment, you determined that Verizon
 9   offered more reliable services?
10        A.   Yes, ma'am.
11        Q.   Then when you -- you registered to use the
12   Uber driver app, you used at least three different
13   e-mails, correct?
14        A.   Yes.
15        Q.   They were business names, not your personal
16   name, right?
17        A.   Yeah.  They were -- one was a business
18   name.  Another one just random names that were
19   available.
20        Q.   Like New York Party Bus Limos?
21        A.   That's the one that I'm talking about.
22        Q.   And Elite 212?
23        A.   Gmail.com, yes.
24        Q.   Baltican@yahoo?
25        A.   These are all mine.
```

Page 364

1          Q.    Uber didn't assign any of those e-mail

2     addresses to you?

3          A.    No, ma'am.

4          Q.    You didn't create these e-mails in order to

5     use the Uber driver app?  You already had them?

6          A.    Yes, yes.  That is correct.  I already had

7     them.

8          Q.    Now, you personally made the decision to

9     use Uber's black platform.  We talked about that a

10    little bit?

11         A.    Yes, ma'am, I do agree with that.

12         Q.    You would agree with me that Uber didn't

13    require you to use that platform?

14         A.    I do agree with you on that.

15         Q.    When you were in New York, that meant that

16    up needed commercial insurance?

17         A.    Yes, yes.

18         Q.    And you needed a license from the New York

19    City tax and limousine commission?

20         A.    That is correct and accurate.

21         Q.    And you alluded to this at the very end

22    much your testimony with your counsel.  You provided

23    your own vehicle for the transportation services,

24    right?

25         A.    Yes, ma'am.

                                              Page 365

1      Q.   And you were the one who chose which

2   vehicle to purchase?

3      A.   Yes, ma'am, but I went on -- I chose the

4   vehicle based on the recommendation on their website

5   what qualifies for Black.  So I went from

6   approximately 10 cars that were eligible and, based

7   on that, I made my decision.

8                MS. MIERS:  Okay.  I'm going to object

9   as nonresponsive.

10                MS. SOUSSAN:  Overruled.  Keep going.

11      Q.   (BY MS. MIERS)  So you made the decision to

12   use the Uber Black platform and then you made the

13   decision which car to choose?

14      A.   Yes, ma'am.

15      Q.   The car you chose was a '24 [sic] Infinity

16   QX60?

17      A.   It's 2014 infinity QX60.

18      Q.   That's what I was meaning to say.  I

19   appreciate you listening carefully.

20                This was a car you purchased.  You

21   didn't lease it.  Somebody else didn't purchase it.

22   You purchased it?

23      A.   I financed the vehicle, yes.

24      Q.   You paid over $60,000?

25      A.   Sounds about right, yeah.

Page 366

1          Q.    Eventually you paid that loan off that you

2     took out?

3          A.    Yes.  I paid it off quickly.  We received

4     some help from my parents, in-laws.

5          Q.    Once you paid it -- sometime after you paid

6     it off, you sold that same car?

7          A.    Yes, ma'am.

8          Q.    And you made about 15 or $16,000?

9          A.    I made money?  There's no way to -- for me

10     to make money.  I mean, depreciation of the vehicle,

11     there's no way to make money.  I forgot what I sold

12     it for, but it was not 60,000.  It was, like, in the

13     20s.

14          Q.    You think you sold it for $20,000?

15          A.    Something like that.  I believe so.

16     Somewhere in that range, yeah.

17          Q.    Okay.

18          A.    Maybe a little less.  I don't remember

19     exactly.  I would have to --

20          Q.    What would you have to do?

21          A.    I would have to go try to -- I don't know

22     how I find it.  Maybe go to the bank statement or

23     something.  I don't remember.  But it was somewhere

24     around $20,000.  That's accurate.

25          Q.    Okay.  And then you paid commercial

Page 367

1   insurance for the Infinity?

2        A.   Yes.

3        Q.   While you were using the Uber driver app in

4   New York, you chose to have one of those light-up

5   Uber lights in your car, right?

6        A.   (Witness nods head affirmatively.)

7        Q.   Is that a yes?

8        A.   Yes, ma'am.

9        Q.   And you only used it when you chose to work

10  at night?

11       A.   Yes, correct.

12       Q.   One of the things that you liked about

13  using that light was that it was easy to take off

14  your car?

15       A.   Yes, yes, because -- correct, yes.

16       Q.   And then when you started driving in

17  Houston, though, you chose not to use the light?

18       A.   Correct, because that was a New York thing.

19  Yes.

20       Q.   You didn't have any kind of Uber logo on

21  your car when you drove in Houston?

22       A.   That is correct, yes.  The only thing that

23  I had which was required was the TNC permit at the

24  airport that went on the windshield, yes.

25       Q.   And your limo license, right?

Veritext Legal Solutions
346-293-7000

1        A.    Always in my pocket, of course.  But the

2   sticker had to be displayed on the windshield, which

3   I acquired at the airport.

4        Q.    The vehicle that you chose to purchase, at

5   some point you had an issue with the transmission,

6   right?

7        A.    Yes.

8        Q.    And you made the decision to contact a

9   lemon law firm, and they helped you get a payout on

10  that?

11       A.    Yeah, because they couldn't fix it and --

12  even though my vehicle was out of warranty, but the

13  breach of warranty -- I forgot.  We got, like, $5,000

14  for that.  It was never fixed.  It was a

15  manufacturing defect.  It was never fixed, but it was

16  usable still.

17            MS. MIERS:  Your Honor, I hate to keep

18  objecting.  Can we at least get some leeway on our

19  time constraints?

20            MR. STANLEY:  He did respond to the

21  question.

22            MS. SOUSSAN:  Let's tighten it up,

23  Mr. Barysas, okay?

24            THE WITNESS:  I'm not sure what you

25  mean, Judge.  I try to answer the questions

Page 369

1    truthfully.

2                    MS. SOUSSAN:  I understand.  I'm not

3    saying that you're not answering the questions

4    truthfully, but we need to narrow your response to

5    respond just to her question and not add anything to

6    it, okay?  Your lawyers are here to protect you.

7                    THE WITNESS:  All right.

8         Q.   (BY MS. MIERS)  So in all this process of

9    you going and finding a lemon law firm and helping

10   you get a payout for the transmission issues, Uber

11   didn't have any involvement in that, correct?

12        A.   No, ma'am.

13        Q.   You also used your Infinity for personal

14   use?

15        A.   Yes, ma'am.

16        Q.   That was usually on Saturdays and Sundays?

17        A.   Yes, yes, because I -- yes.

18        Q.   You didn't have another car for personal

19   reasons?

20        A.   Not at that time.

21        Q.   Uber didn't prohibit you from using that

22   car for personal reasons either, did it?

23        A.   No, ma'am.

24        Q.   All right.  When you made the decision to

25   move to Houston and start using the Uber driver app

                                            Page 370

1   there, you decided again to use the Uber Black

2   platform in Houston, right?

3        A.   Yes, ma'am.

4        Q.   And one of the reasons that you made that

5   business decision was that Houston is a large city

6   and you felt like you had the perfect car for the

7   Black platform?

8        A.   Yes.

9        Q.   Just like in New York, Houston also

10  requires a limo license?

11       A.   Yes.

12       Q.   So you went out and you got the City of

13  Houston limo license, right?

14       A.   Yes, ma'am.

15       Q.   All right.  Let's take a look at Claimant's

16  Exhibit 12.  Do you recognize Exhibit 12 as the limo

17  license that you chose to obtain in Houston?

18       A.   Yes, ma'am.

19       Q.   And you paid for this license?

20       A.   Yes, ma'am.

21       Q.   Not Uber?

22       A.   I paid for it.

23       Q.   If we could look at Respondent's Exhibit

24  11.  If you could highlight the cost.

25                    The cost of the Houston limousine

                                        Page 371

1     license that you chose to get was $638.50, correct?

2          A.   Yes, ma'am.

3          Q.   Could you go ahead and make that where he

4     can confirm it?

5                    Do you see that?

6          A.   I do see that, and I recognize it.

7          Q.   Thank you.

8                    Just like in New York, you also needed

9     commercial insurance in order to use the Uber

10    platform in Houston?

11         A.   Yes, ma'am.

12         Q.   If we could pull up Respondent's Exhibit

13    50.  Let's just take a look at your commercial

14    insurance.  If you could highlight the name of the

15    insured, please.

16                    On your commercial insurance card, the

17    name of the insured is your company name, DB

18    Pedicabs, LLC?

19         A.   That is correct.

20         Q.   Now, for just a short period of time in

21    Houston, you used the UberX platform?

22         A.   Yes.

23         Q.   Okay.  In your opinion, on the UberX

24    platform pretty much any vehicle will qualify?

25         A.   Yes, ma'am.  That is correct.

Veritext Legal Solutions
346-293-7000

1      Q.    The rates are lower?

2      A.    Yes.

3      Q.    In your opinion, more drivers choose to use

4   the UberX platform?

5      A.    Yes, ma'am.

6      Q.    And you think that's because they have

7   fewer qualifications?

8      A.    It's because there are less requirements

9   for the vehicle and no licensing requirements --

10  actual license is required from the City.

11     Q.    That's why once you got to Houston and you

12  began using the Uber Black platform instead of UberX,

13  you chose to continue using the Uber Black platform

14  95 percent or maybe even 100 percent of the time?

15     A.    Yes, ma'am.

16     Q.    But to be clear, both of those platforms

17  were available to you and you could choose to use

18  either?

19     A.    Yes, ma'am.

20     Q.    Okay.  You understood that your operating

21  expenses would be less if you chose to use the UberX

22  platform?

23     A.    Yes, ma'am.

24     Q.    But you decided not to use UberX because

25  you determined that the math didn't add up for you?

Page 373

 1          A.    Yes, ma'am.

 2          Q.    You also felt like UberX would take you to

 3    neighborhoods you didn't really want to work in?

 4          A.    Yes.

 5          Q.    Then you also made the decision to obtain

 6    the Houston airport systems permit?

 7          A.    Yes, ma'am.

 8          Q.    And that was so you could offer

 9    transportation to riders to and from the airport?

10          A.    Yes.  And that was a requirement, as well,

11    if you wanted to work at the airport.  So, yes, I

12    acquired the permit.

13          Q.    But you weren't required to work at the

14    airport?

15          A.    No, ma'am.

16          Q.    Okay.  You chose to use the Uber driver app

17    at the airport because you made the business decision

18    that it was the way the business would work for you?

19          A.    Yes, ma'am.

20          Q.    During opening statement, do you recall

21    your attorney stating that you could not say, "No, I

22    only want to do airport trips"?

23          A.    I don't recall the certain moment.  Sorry.

24          Q.    That's okay.  You don't agree with that

25    statement anyway because your business strategy was

                                             Page 374

 1    to work strictly at the airport?

 2         A.   Yes, correct.

 3         Q.   Even more specifically, you chose the Bush

 4    airport instead of Hobby about 99 percent of the

 5    time?

 6         A.   Yes, because it's close to my house.

 7         Q.   And Uber didn't require you to choose Bush

 8    over Hobby?

 9         A.   No, ma'am.

10         Q.   I want to talk about the staging area and

11    waiting in the staging area.

12              Which staging area at the airport did

13    you use?  Did you use the one for Uber Black or the

14    one for UberX?

15         A.   There was only one staging area at that

16    time when I was employed by Uber.  The staging area

17    in question is on the corner of Lee Road and Will

18    Clayton Parkway.

19         Q.   And you chose to go to the airport even

20    though you're claiming that you sometimes had to wait

21    as long as seven or eight hours at the airport in

22    order to get a trip request?

23         A.   Yes, ma'am.  That is correct.

24         Q.   And I think you said you typically had to

25    wait four or five hours to get a trip?

Page 375

1     A.   Yes.

2     Q.   The reason you made that decision is

3  because you determined that the trips were worth the

4  wait time?

5     A.   Yes.

6     Q.   At least for you?

7     A.   Yes.

8     Q.   And to use your own words, that's why you

9  chose that strategy?

10    A.   Yes.

11    Q.   To save gas, you also chose not to idle

12 your car while you were waiting?

13    A.   Yes.

14    Q.   And then you obviously had a lot of time to

15 kill during these wait times.  While you were waiting

16 for trips, you would take walks?

17    A.   Yeah.  Sometimes I would take walks,

18 correct, yeah.

19    Q.   Sometimes you would play video games?

20    A.   Yes.

21    Q.   Or browse the internet?

22    A.   Yes.

23    Q.   So when you were in New York, it was

24 completely different.  You rarely chose to go to the

25 airport?

Page 376

1          A.    Yes, ma'am.  That is correct.

2          Q.    You don't remember exactly what time of day

3     or what days you chose to work, but you think you

4     started later in the day and worked later at night?

5          A.    That's accurate, yeah.

6          Q.    In comparison to Houston?

7          A.    Yes.

8          Q.    All right.  Let's talk about how you

9     scheduled transportation services.  I'm going to talk

10    about Houston now.

11                You typically chose to turn the app on

12    around 8:00 a.m. after dropping your son off at

13    school?

14         A.    Yes.

15         Q.    Uber did not require you to do that?

16         A.    No.

17         Q.    You rarely chose to log off the Uber app

18    for lunchtime, right?

19         A.    Yes.

20         Q.    That's because you didn't want to pay to

21    park or lose your place in line at the airport?

22         A.    Yes, that's accurate.

23         Q.    And to use your own words, you found the

24    best strategy was to take your own food?

25         A.    Yes.

Page 377

1          Q.    Most of the time when you chose to drive,
2    you would decide to turn the app off around 7:00 p.m.
3    because you had a family?
4          A.    Yes.
5          Q.    Uber didn't tell you what time to log off?
6          A.    No.
7          Q.    The app -- the Uber driver app had a
8    feature that you referred to as the destination
9    filter.
10                    Do you remember that?
11         A.    I do.
12         Q.    Is that a yes?
13         A.    Yes, yes.
14         Q.    It would allow you to indicate that you
15   were kind of ready to head home.  And so, it would
16   make it possible for you to receive leads for trips
17   that were on the route back to your house, right?
18         A.    Yes.
19         Q.    And that's so that you could earn money on
20   your way home?
21         A.    Yes.
22         Q.    Now, you didn't choose to use that feature
23   because you thought it might take you to some of the
24   worst neighborhoods in Houston?
25         A.    Correct.

                                        Page 378

1          Q.   And Uber didn't require you to drive in

2     certain areas?

3          A.   No.

4          Q.   Now, Uber would send you e-mails letting

5     you know where they expected high demand would be,

6     but you didn't have to go to those high demand areas?

7          A.   Correct.

8          Q.   Uber also didn't require you to drive on

9     any particular days?

10         A.   Correct.

11         Q.   Or certain hours?

12         A.   Yes, ma'am.

13         Q.   Uber didn't tell you when to log onto the

14    app?

15         A.   No, they have not.

16         Q.   They didn't tell you when to log off?

17         A.   Nope.

18         Q.   They didn't require you to spend a certain

19    amount of time logged onto the app?

20         A.   No.

21         Q.   Now, on the weekends, you chose not to work

22    during the day?

23         A.   Yeah.

24         Q.   But on Saturdays, sometimes you would kind

25    of cruise around the area where you lived and you

                                                  Page 379

1    might pick up a ride or two?

2         A.   It would depend.  Sometimes I have.

3         Q.   But rarely did you choose to use the Uber

4    driver app on Sundays?

5         A.   Correct.

6         Q.   Now, if you had doctor's appointments

7    during the week, you could stop using the app to go

8    to the doctor.  Your discretion, right?

9         A.   Yes.

10        Q.   And on those days, what you would typically

11   decide to do was just not use the Uber app at all on

12   those days?

13        A.   Yes.

14        Q.   There were even times when you chose not to

15   use the Uber app for a week or so at a time?

16        A.   Yes.

17        Q.   You didn't have to get approval from Uber

18   in order to do that?

19        A.   No.

20        Q.   In fact, in 2017 you went to Lithuania for

21   two to three weeks and you didn't use the app at all

22   during that time?

23        A.   Yes, ma'am.  That is correct.

24        Q.   You also took trips that were even longer

25   than two to three weeks, right?

1        A.    Yes.

2        Q.    Let's take a look at Claimant's Exhibit 8.

3   So we've been through Claimant's Exhibit 8, and we're

4   going to pull out some of these communications in the

5   group of communications that your attorney went over

6   with you earlier.  And we're looking at Bates 117,

7   for the record, in Claimant's Exhibit 8.  If you look

8   at your message, it's from you to Uber.

9             Do you see that?

10       A.    Yes, I do.  I'm familiar with this e-mail.

11       Q.    Okay.  You stopped using the app for two

12  months, right?

13       A.    Yes.

14       Q.    And here you're stating that you're leaving

15  the country for two months and you want to cancel

16  your insurance?

17       A.    Yes.

18       Q.    So what's going on here is that you're

19  strategizing about how to reduce your loss during a

20  time when you were not going to be working?

21       A.    Yes.

22       Q.    So Uber gets your message, and they told

23  you that in order for your account to remain active,

24  you have to keep your insurance up to date and

25  active, right?

                                        Page 381

1          A.    Yes.

2          Q.    Is that a yes?

3          A.    Yes, ma'am.  Yeah.

4          Q.    But they offered -- they could put a

5     temporary hold on your account?

6          A.    Yes.

7          Q.    It was up to you to decide whether your

8     account was placed on hold?

9          A.    Yes.

10         Q.    It states right there, "Please let me know

11    if you wish to proceed in temporarily placing your

12    account on hold"?

13         A.    Yes.

14         Q.    You can take that down.  Thank you.

15               But just generally speaking, you

16    decided when to use the app?

17         A.    Yes.

18         Q.    And Uber didn't set a schedule for you?

19         A.    No.

20         Q.    You didn't have a supervisor?

21         A.    No, ma'am.

22         Q.    You could just stop utilizing the app any

23    time you wanted?

24         A.    Yes.

25         Q.    In fact, that's actually what happened,

                                        Page 382

1   right?

2       A.   Yeah.

3       Q.   You stopped using the app in August of

4   2019?

5       A.   Yes.

6       Q.   Even though you could have chosen to offer

7   delivery services through the app, you made the

8   decision not to do that, right?

9       A.   Yes.

10      Q.   When I say -- do you understand I'm talking

11  about Uber Eats?

12      A.   Yes.  I do understand it, yes.

13      Q.   Okay.  Uber didn't require you to use the

14  Uber Eats platform?

15      A.   No, ma'am.

16      Q.   Okay.  So with respect to transportation

17  services, which is what you chose to offer, you have

18  a personal belief that good service is important?

19      A.   Yes, I do.

20      Q.   Because you're a business owner and you

21  think good service makes sense?

22      A.   I agree with that.

23      Q.   And as part of the good service that you

24  chose to provide to your riders, you provided

25  amenities to them?

Page 383

1        A.    Yes.

2        Q.    Those amenities included keeping two

3    chargers in the back of the car, in the rear?

4        A.    Yes.

5        Q.    And you had at least four bottles of water

6    all the time?

7        A.    Yes.

8        Q.    And you provided tissues?

9        A.    Yes.

10       Q.    Uber didn't make you do that.  That was

11   your choice to do that?

12       A.    Yes.

13       Q.    And that's because you believed that if you

14   offered your passengers chargers and waters and

15   tissues, they were probably more likely to give you a

16   tip?

17       A.    Yes.

18       Q.    You also made the decision to dress

19   professionally when you offered transportation

20   services.  You wore a dress shirt and nice clothes?

21       A.    Yes.

22       Q.    And you did this on your own?

23       A.    Yes.

24       Q.    Uber didn't have a dress code?

25       A.    No.

                                        Page 384

1          Q.    Another one of your strategies was to have

2     business cards made for your transportation services,

3     right?

4          A.    Yes.

5          Q.    Let's take a look at Respondent's Exhibit

6     12.  Do you recognize this as a business card?

7          A.    Yes, ma'am.

8          Q.    All right.  And this is a business card

9     that you designed?

10         A.    Yes.  I designed them myself on-line.

11         Q.    The reason you designed it is because you

12    wanted to get more business?

13         A.    Yes.

14         Q.    And it's your personal opinion that

15    everyone should have a business card?

16         A.    Yes.

17         Q.    They cost you about 50 or $60, you think?

18         A.    Yes.  Somewhere in that range, total.

19         Q.    And then when you provided transportation

20    services to your riders, you handed these cards out

21    to your riders?

22         A.    No, ma'am.  I never handed the cards to my

23    riders.  They were in the back for everyone's taking

24    if they wanted.

25         Q.    You kept them in the back of your car?

Page 385

1      A.    Yes.   Kind of like where the water was,
2   there's a little pocket there on the seat.
3      Q.    What if they asked you for a card?   Would
4   you hand them a card then?
5      A.    Yes.
6      Q.    Okay.   The business cards might have
7   generated more business for you, but you don't really
8   know?
9      A.    Well, I received one call over the entire
10  time I worked for Uber that came from business cards.
11  So at some point -- I still probably have some in my
12  house.   So I stopped using them.   I don't think they
13  generated a lot of extra income for me.
14     Q.    You made the decision to stop using them?
15     A.    Yes.
16     Q.    Now, this card that you created has your
17  phone number, not Uber's, right?
18     A.    Yes, that is correct.
19     Q.    It's got your business e-mail address, not
20  an Uber e-mail?
21     A.    That is correct.
22     Q.    It has Lyft on the card?
23     A.    Yes.
24     Q.    And Lyft is actually listed above Uber.
25  It's listed first, right?

Page 386

1          A.    Yeah.  It was a design choice, yes.

2          Q.    And then if we want to flip to the other

3    side of the card -- and if you could make that just a

4    little bit easier for us all to read.

5                      You designed this part of the card, as

6    well?

7          A.    Yes.  It was a two-sided business card,

8    yes.

9          Q.    And the back of the business card indicates

10   you offered luxury transportation?

11         A.    Yes, ma'am.

12         Q.    You used the Uber mapping app, right?

13         A.    While being provided a rider?

14         Q.    While you were using the Uber driver app,

15   you used the Uber mapping app, right, to figure out

16   where to go, to get directions?

17         A.    Yes, yes, yes.

18         Q.    You actually think Waze is known to get you

19   there quicker?

20         A.    Yes, I do believe that.

21         Q.    And you would actually choose Waze, but you

22   stuck to the Uber mapping app because you were afraid

23   Uber would penalize you?

24         A.    Yes.

25         Q.    Do you recall earlier when you were going

Page 387

1    over some exhibits with your attorney that you

2    specifically discussed using the Waze app for

3    directions?

4         A.   Yes, ma'am.

5         Q.   If someone had used the Uber Black

6    platform, you had the option to accept what were

7    called hourly trip requests, right?

8         A.   I believe this is a feature that was

9    introduced when I stopped working for Uber.  So I'm

10   not familiar with this.

11        Q.   Okay.  Let's just make sure.  We're going

12   to pull up -- this is Claimant's Exhibit 26.  We'll

13   make that bigger, if you would, please.

14             Does this ring a bell as to whether

15   you had the option to accept hourly trip requests?

16        A.   Yes, but I guess I've never done those

17   rides so that's why I don't remember.  I guess I can

18   say I remember, yes.

19        Q.   So taking a look at this, this --

20   basically, this document is showing you how to opt in

21   for hourly trips, right?

22        A.   Okay.  Yes.

23        Q.   And then if we look at the next page --

24   that's Bates 1368.  In the first paragraph, we're

25   going to take a look at the second sentence.  And it

Page 388

1    says that the requests will show up as black hourly

2    on the offer card in the app.

3                    Do you see that?

4        A.   Yes, I do.

5        Q.   Then the rider's requested number of hours

6    and maximum trip mileage are shown at the bottom of

7    the offer card, right?

8        A.   Yes.

9        Q.   And then, finally, it states, "You can

10   cancel for any reason"?

11       A.   Yes.

12       Q.   Under the section that says Cities Where

13   Uber is Active, there's a question that asks, "How

14   long will Black/Premier hourly trips last?"

15                   Do you see that?

16       A.   Yes, I do.

17       Q.   It states, "That's between you and your

18   riders"?

19       A.   Yes.

20       Q.   We can take that down.  And if we could

21   replace it with Respondent's Exhibit 31.  Go to the

22   next page.  Actually, until you get to surge.

23                   So surge pricing is when the trip rate

24   goes up during the busiest times of the day because

25   the demands of drivers exceeds the supply, right?

Page 389

 1          A.    That's correct.

 2          Q.    Okay.  Your strategy for maximizing profits

 3     did not include intentionally driving to surge areas,

 4     right?

 5          A.    Yes.

 6          Q.    You didn't try to avoid them either,

 7     though?

 8          A.    No.

 9          Q.    In fact, you recall one New Year's Eve in

10     which you accidentally ended up in a surge area and

11     you felt like you basically got paid for doing

12     nothing?

13          A.    Yes.

14          Q.    At the end of the day, you weren't required

15     to provide services in surge areas?

16          A.    Correct.

17          Q.    All right.  We talked -- both me and

18     Mr. Stanley talked to you about the community

19     guidelines and we both talked to you about the

20     deactivated policies, but I want to talk to you --

21     just a few questions -- about how those policies

22     applied to you.

23          A.    Okay.

24          Q.    You understood that if a lot of drivers had

25     low acceptance rates, there would be fewer riders

                                        Page 390

1   because they wouldn't get reliable service?

2           MR. STANLEY:  Objection.  Speculation.

3       A.   Yes.

4       Q.   (BY MS. MIERS)  Okay.  And you understood

5   the reliability of the Uber app directly impacted

6   your ability to earn income when you were using the

7   Uber app?

8           MR. STANLEY:  Objection.  This calls

9   for speculation.

10          MS. SOUSSAN:  He can answer the

11  question if he knows the answer.

12      Q.   (BY MS. MIERS)  Would you like me to repeat

13  it?

14      A.   Yes, please.

15      Q.   You understood that the reliability of the

16  Uber app directly impacted your ability to earn

17  income when you were using the Uber app, right?

18      A.   Yes.

19      Q.   So you needed riders to want to use the

20  Uber app so that you could earn income as a driver

21  using the Uber app?

22      A.   Yes.

23      Q.   With respect to deactivation, you were

24  never deactivated for not accepting trips?

25      A.   Well, answer this question.  I'm not sure

                                        Page 391

```
 1    to this day because I've asked this question.  It was

 2    never specified.  It was, like, general answer.  So

 3    I'm not sure how to answer this.

 4         Q.   Okay.  Let's take a look at your deposition

 5    and see how you answered this question back in April

 6    of 2021.  Let's start, Mr. Ridenour, with Page 117,

 7    Lines 8 through 12.

 8                   You were asked, "But you've never been

 9    deactivated for not accepting trips, right?  You've

10    never lost your account because you didn't accept a

11    ride?"

12                   And you said, "No, I don't think I

13    have."

14                   Does that help you answer my question?

15                   MR. STANLEY:  I object.  This is

16    cumulative.  We've already talked about acceptance

17    rates not leading to permanent deactivation.  I even

18    covered that in my direct.

19                   MS. SOUSSAN:  Overruled.  Overruled.

20         Q.   (BY MS. MIERS)  Does that help refresh your

21    memory, Mr. Barysas?

22         A.   Yes.

23         Q.   So you -- we need to help Judge Soussan

24    understand.  You were never deactivated for not

25    accepting trips, right?
```

Page 392

1        A.   No, I don't think so.

2        Q.   You never lost access to the Uber app due

3    to cancellation either?

4        A.   No.

5        Q.   You were never required to take any quality

6    improvement courses?

7        A.   I think at some point I went through

8    something, but I can't recall.  I'm sorry.  My memory

9    is terrible.  At some point, I watched some video.

10   And I forgot who -- if it was at Uber's headquarters

11   in New York or if it was a link they sent me.  I

12   think I watched something.

13       Q.   Do you agree with me that you testified

14   differently at your deposition, or do I need to

15   refresh your memory?

16       A.   Can we refresh?  It's one more question I'm

17   trying to remember.

18       Q.   Sure.  Okay.  We're going to go to

19   Page 130.  We're going to start at Line 17.

20            You see here you testified, "But if

21   he's deactivated, he has a chance of improving

22   himself by -- I think it was some sort of reading or

23   some sort of video."  I'm going to let you read it,

24   okay?  "Just better himself if he made a mistake.  I

25   think that's what it is.  I've never had one."

                                        Page 393

```
 1                    You were asked, "You never had to take
 2     them?"
 3                    You said, "i don't think so, no."
 4                    Does that help you?  Does that refresh
 5     your memory?
 6          A.   Yes.
 7          Q.   Okay.  We can take that down, Don.
 8                    Did you ever lie to riders in order to
 9     get them to cancel a trip so you wouldn't have to
10     cancel it?
11          A.   I did on a few occasions, yes.
12          Q.   How many?
13          A.   I can't recall right now.  It will be hard
14     for me.
15          Q.   At one point you became a premium driver
16     that allowed you access to a feature that would
17     indicate the length of a trip you accepted, right?
18          A.   Yes.
19          Q.   You did not like short trips?
20          A.   No, ma'am.
21          Q.   You wanted long trips?
22          A.   Yes.
23          Q.   If the trip was short, you wouldn't accept
24     it?
25          A.   Yes.
```

Page 394

1        Q.    Did you ever try to cancel a ride but the

2   app just wouldn't let you?

3        A.    Yes.

4        Q.    How many times did that happen?

5        A.    I'm sorry.  It's hard for me to remember

6   this.  It happened a few times, quite a few times.

7        Q.    A few times?

8        A.    Yes.  Quite a few times.

9        Q.    When you say "quite a few times," what do

10  you mean?

11       A.    I would say at least 20 times.

12       Q.    But it could be more?

13       A.    Could be more.  Could be more.  I don't

14  think it -- I don't think it was less, but it could

15  be more.

16       Q.    Okay.  Let's go back to Claimant's

17  Exhibit 8, and we're going to take a look at Bates

18  1386.  You're going to recall going over this with

19  your attorney.  Do you remember going over this one

20  earlier?

21       A.    Yes, ma'am.

22       Q.    It's a rider complaining that you told the

23  rider that you were pulled over by the police.

24       A.    Yes.

25       Q.    The rider says, "he sent me the following

                                           Page 395

1    message:  Hello.  I was trying to call you, but it
2    goes straight to voicemail."
3                  Mr. Ridenour, could you make that
4    bigger, please?
5                  He says, "He sent me the following
6    message:  Hello.  I was trying to call you, but it
7    goes straight to voicemail.  I've tried to cancel
8    this ride, but the system is not letting me in.  I'm
9    currently pulled over by the police.  You can cancel
10   the ride.  You will not get charged because I haven't
11   moved."
12                  Do you understand that?
13   A.    Yes, I remember this.
14   Q.    Let's go two messages down.  The rider
15   says, "I am sure that his statement is not true
16   because the car was showing as being stationed at the
17   airport parking lot.  This is just another example of
18   drivers harassing customers to cancel rides.  I have
19   heard the whole lot at George Bush Airport -- tire
20   puncture, traffic jam, et cetera -- used by drivers
21   to make the customer cancel rides."
22   A.    Yes.
23   Q.    Did you ever send a message -- I think you
24   already said yes to this, so I'm going to change my
25   question.

Page 396

1              How many times did you send a message
2    to one of your riders indicating that you were pulled
3    over by the police?
4         A.   I can't recall exactly how many times.
5    There were a few times.  And a lot of these times
6    that it happened, it actually happened.  It was not a
7    lie.  We were harassed by police.  There was no good
8    service.  There were a few times that I lied because
9    I didn't want to get a cancellation to be put back in
10   line, to be honest with you.
11        Q.   How many times were you actually pulled
12   over by the police?
13        A.   It was the police and -- sometimes it was
14   police and sometimes it was airport security.  I
15   guess, to answer your question, I don't know.
16   Probably, like, six times, seven times.
17        Q.   Six or seven times you were actually pulled
18   over by the police?
19        A.   Yes, ma'am.
20        Q.   Okay.  Do you have any documents showing
21   that you were pulled over by the police?
22        A.   Oh, no.  All they do is tell you to leave
23   the staging lot.
24        Q.   How long does that take?
25        A.   To leave the staging lot?

                                        Page 397

 1        Q.    For the police to pull you over.

 2        A.    Oh.  I mean, it depends.  I mean, usually

 3   just very short.  They tell you to leave the staging

 4   lot because it's too crowded.  So less than a minute,

 5   I would say.

 6              MS. SOUSSAN:  Would you please find a

 7   good place to break?

 8              MS. MIERS:  That is an absolutely

 9   perfect time.  I actually started to suggest it.

10              MS. SOUSSAN:  15 minutes.

11              (Recess from 3:35 p.m. to 3:52 p.m.)

12              MS. SOUSSAN:  Now, this is our long

13   period here.  So my intent is to go until 6:00.  But

14   if anyone needs, like, a five-minute break once we

15   get this -- including you, Shauna -- please raise

16   your hand.  Don't put it in the chat.  I never look

17   at my chat.  I'm looking at you guys and the

18   documents.  So let me know that you need a quick

19   break and we will do it, okay?

20              Are we ready to continue?  Please

21   continue.

22        Q.    (BY MS. MIERS)  So we are really moving on

23   to another exhibit, but really quickly I just want to

24   refresh your memory, Mr. Barysas, that this e-mail

25   exchange that we were just talking about or this

                                        Page 398

1    communication -- I want to focus on the date really

2    quickly.

3         A.   Okay.

4         Q.   That communication is dated June 8th, 2018,

5    okay?

6         A.   All right.

7         Q.   So now we're going to move to a different

8    exhibit.  We're going to move to your Exhibit 5,

9    Claimant's Exhibit 5.  And this should look familiar

10   to you because you discussed this a bit with your

11   attorney.  Let's take a look specifically at Line 47.

12             And we see that this is a

13   communication on September 19th, '18, and it's the

14   same exact communication to a rider that was in the

15   previous exhibit, right?

16        A.   Yes, that is correct.

17        Q.   All right.  Let's look at Lines 55, 56, and

18   57.  It's also the same exact message to a rider,

19   right?

20        A.   Yes, ma'am.

21        Q.   And you're representing to the rider that

22   you tried to call them and it goes to voicemail?

23        A.   Correct.

24        Q.   You tried to cancel, but the system won't

25   let you?

Page 399

1        A.    Correct.

2        Q.    You're currently pulled over by the police?

3        A.    Yes.

4        Q.    You're telling them that they can cancel

5   the ride?

6        A.    Yeah.

7        Q.    And you're telling them, "You will not get

8   charged because I haven't moved"?

9        A.    Yes.

10       Q.    Let's take a look at the communication at

11   Line 60.  Here's another instance where you're

12   telling a rider that you aren't coming any time soon

13   because you got pulled over, correct?

14       A.    Yes.

15       Q.    Then let's look at 62 through 65.  Same

16   message, right?

17       A.    Yes.

18       Q.    Then 69 and 70, 74 through 76, 82 --

19             MS. MIERS:  Your Honor, I'm just

20   reading these in for the record.

21       Q.    (BY MS. MIERS)  Line 84 is the same

22   message, right?

23       A.    Yes.

24       Q.    87 is the same message?

25       A.    Yes.

Page 400

```
 1        Q.   Lines 89 through 91?

 2        A.   Correct.

 3        Q.   Same exact message, right?

 4        A.   Yes.

 5        Q.   Line 93, Line 100, Lines 104 through 106,

 6   Lines 108 through 110, Line 112.

 7             You agree all of these say the same

 8   exact message, right?

 9        A.   Yes.

10        Q.   Line 114, Line 116, Lines 119 through 120.

11   All the same exact message?

12        A.   Correct.

13        Q.   We're almost there.  Hang in with me.  Line

14   129?

15        A.   Yes.

16        Q.   Line 132?

17        A.   Yeah.

18        Q.   Line 134?

19        A.   I see it, yes.

20        Q.   And then Line 117?

21        A.   Correct.

22        Q.   171 is saying you're pulled over by the

23   police, right?

24        A.   Correct.

25        Q.   So that's more than six times.  Would you
```

Page 401

1    agree with me there?

2        A.   Yes.

3        Q.   Is that a yes?

4        A.   Yes.

5        Q.   Now I want to take a look at some other

6    messages in here before I just bore the room to

7    death.  Let's go from Lines 181 up to 173.  In order

8    to understand the timing, you have to go from the

9    bottom up, Mr. Barysas, okay?

10       A.   Okay.

11       Q.   This is a communication between you and a

12   rider, right?

13       A.   Uh-huh.

14       Q.   You again are saying you got pulled over by

15   the police, right?

16       A.   Yep.

17       Q.   And that you can't cancel?

18       A.   Yep.

19       Q.   And then the rider says, "Well, I'll get

20   charged if I can't cancel.  Why did you accept?"

21       A.   Yep.

22       Q.   "Please cancel," right?

23       A.   Yes, I see it.

24       Q.   Let's go down to Lines 125 through 128.

25   We're going to again work backwards.

                                            Page 402

1            Here is another instance where you
2    told the rider you're not coming, right?
3        A.   Yes.
4        Q.   So you say, "I'm not coming."  And you
5    said, "Cancel the trip," and you said, "I can't.
6    It's been too long."
7        A.   Yep.
8        Q.   And you again represent that the rider
9    wouldn't be charged?
10        A.   Correct.
11        Q.   All right.  Let's look at Lines 149 through
12    157.  Here's an instance where you're telling the
13    rider that the rider needs to cancel because you're
14    not going there?
15        A.   Yeah.
16        Q.   Right?
17        A.   Correct.
18        Q.   You said, "I don't have a license to pick
19    up outside the airport"?
20        A.   Yeah.
21        Q.   And then the rider says, "Well, I'm not
22    going to cancel because I'm going to get charged.
23    You cancel"?
24        A.   Correct.
25        Q.   And again you tell the rider that the rider

Page 403

1    won't get charged?

2         A.   Yes.

3         Q.   The rider won't agree with you.  It says,

4    "I have in the past, so I'm not doing this."

5              The rider notes that it's a short

6    ride, the kind of ride that you didn't agree to take,

7    right?

8         A.   Correct.

9         Q.   Then the rider says, "We'll stay connected

10   until another Uber picks up your ride"?

11        A.   Correct.

12        Q.   All right.  Let's take a look at Claimant's

13   Exhibit 14.  And specifically, we're going to take a

14   look at Bates 1231.  And if we look at Number 2,

15   Number 2 states, "You'll receive a cancellation fee

16   if your rider cancels after more than two minutes

17   (down from five minutes previously)," right?

18        A.   Correct.

19        Q.   Earlier when you couldn't how many minutes

20   went by before you would be the recipient of a

21   cancellation fee, does that refresh your memory?

22        A.   Yes, ma'am.

23        Q.   So two minutes?

24        A.   Yes.

25        Q.   Now, we've talked a lot about Uber, so I'm

                                              Page 404

1    going to give you a break for a little bit and let's

2    talk about Lyft.

3                Around the same time that you chose to

4    use the Uber driver app in 2014, you also started

5    using the Lyft app to provide transportation

6    services, right?

7        A.   Yes, ma'am.

8        Q.   You preferred actually to use the Uber app

9    rather than the Lyft app?

10       A.   Yes.

11       Q.   And that's because you received more ride

12   requests through the Uber app?

13       A.   Correct.

14       Q.   You were also happy using the Uber app and,

15   to use your words, that was your choice?

16       A.   Yes.

17       Q.   Okay.  There was a time where you tested

18   out an app called Juno?

19       A.   Yeah, I remember that.

20       Q.   But you didn't continue to use Juno?

21       A.   No.  That company, I believe, went

22   bankrupt.

23       Q.   And even though you also used the Lyft app

24   to provide transportation services to your riders,

25   you aren't suing Lyft?

Page 405

```
 1        A.    Correct.
 2        Q.    Now, it's your sworn testimony that you
 3   only used the Lyft app on rare occasions, right?
 4        A.    Yes.
 5        Q.    Okay.  Let's pull up Claimant's Exhibit 44.
 6   I'm being told that we might be having some technical
 7   difficulty, so this may take just a minute.  It looks
 8   like the technical difficulties have been resolved.
 9              We're going to pull up Claimant's
10   Exhibit 44.  I'll tell you what this is, Mr. Barysas.
11   This is what we call a demonstrative exhibit that
12   your attorneys submitted in this litigation.  It's
13   something I believe they created, okay?
14        A.    Okay.
15        Q.    And this shows trips that you completed.
16              Is there any way on the left-hand
17   side, the box with the numbers, that you could make
18   that bigger for us all?  We'll want the whole box.
19              All right.  Do you see how this shows
20   the trips that -- that you provided using either Lyft
21   or Uber?
22              MR. STANLEY:  Judge, I'm going to
23   object.  The witness lacks personal knowledge of this
24   document series.
25              MS. MIERS:  It's claimant's
```

Page 406

1    demonstrative exhibit of underlying evidence that's

2    been admitted into evidence in this matter.  I'm not

3    seeking to admit this actual document into evidence.

4    I'm just seeking to assist Mr. Barysas in answering

5    questions regarding the number of trips he provided

6    through the Lyft and Uber apps.

7              MS. SOUSSAN:  He can answer the

8    questions if he knows.

9         Q.   (BY MS. MIERS)  So Mr. Barysas, in the

10   first quarter of 2018, do you recall whether you

11   completed 69 trips using the Lyft app?

12        A.   I would have to look at the history; but

13   it's possible, yes.

14        Q.   Okay.  Do you recall in the first quarter

15   of 2018 providing only 42 trips using the Uber driver

16   app?

17        A.   Yes.

18        Q.   Okay.  In April of 2018, did you complete

19   45 trips using the Lyft app?

20        A.   I guess that's right, yeah.

21        Q.   Okay.  You see that line?  And in that same

22   month, you completed 48 trips using the Uber driver

23   app?

24        A.   Yes.

25        Q.   You can take that down.

                                        Page 407

```
 1                    But it's your sworn testimony that you
 2    didn't use the Uber driver app and Lyft driver app
 3    simultaneously, right?
 4         A.   Well, I did actually use Uber and Lyft at
 5    the same time many times.
 6         Q.   You used the Uber driver app and the Lyft
 7    driver app simultaneously many times?
 8         A.   Yeah.  Sometimes I would do that, yes,
 9    while at the airport, yes.
10         Q.   All right.
11         A.   Of course, I cannot provide a ride on two
12    platforms at the same time, so I would log off of one
13    if I get a request on the other.
14         Q.   So when you testified at your deposition
15    that when you used both apps at the same time it was
16    by accident, is that incorrect?
17         A.   Yeah, it's possible maybe I misunderstood
18    the question.  I can tell you right now that I did
19    use Uber and Lyft at the same time.  How many times,
20    I cannot recall right now, but there were many times
21    where I would use both at the same time.
22         Q.   So when you testified at your deposition
23    that you weren't allowed to have both apps open at
24    the same time, was that truthful?
25         A.   I remember at some point Uber was tracking
```

Page 408

1    the Lyft app -- existence of Lyft app at the same

2    time.  So based on that, I gave that answer.  But

3    what year was it, I don't remember.

4         Q.   Let's do it this way.  Do you believe that

5    you're not allowed to have both apps open at the same

6    time?

7         A.   At that time, yes, I do believe that.  I

8    don't think it's no longer the case right now.

9         Q.   What about back when you provided your

10   deposition testimony?

11        A.   Yeah.  I believed when we're talking about

12   that period of time, I think there was a lawsuit of

13   some sort.  I don't know.

14        Q.   What period of time were you referring to?

15        A.   That's a good question.  I don't remember

16   the date exactly when that was an issue between Uber

17   and Lyft.

18        Q.   What period of time did you believe that

19   you weren't allowed to have both apps open?

20        A.   I don't remember right now.  I'm sorry.

21        Q.   Okay.  Was it a few weeks or a few years?

22        A.   It's definitely couple years back, yeah.

23   Years, yeah.

24        Q.   But how long of a time period was it that

25   you believed that you could not -- you were not

Veritext Legal Solutions
346-293-7000

1   allowed to have both apps open?

2       A.   It's less than a year.  It's probably

3   months.

4       Q.   Probably months?  You didn't provide this

5   level of detail at your deposition, right?

6       A.   Yes.

7       Q.   Meaning you did not provide that level of

8   detail?

9       A.   Yes.

10      Q.   In fact, at your deposition, you said you

11  cannot have two apps open, right?

12      A.   Yes.

13      Q.   And you said that that was exactly the rule

14  you followed?

15      A.   Okay.

16      Q.   Right?

17      A.   Yes.

18      Q.   Okay.  You also testified that you believed

19  that if you used the Uber and Lyft apps at the same

20  time, it would impact your good standing and rating

21  on the Uber app?

22      A.   Yes.

23      Q.   Do you still believe that today, or are you

24  changing your mind?

25      A.   No, I believe that.

Page 410

1        Q.    But you can't identify a rule stating you

2    could not use both apps at the same time, right?

3        A.    Correct.

4        Q.    And you can't identify an Uber employee who

5    told you that?

6        A.    No, I cannot.

7        Q.    You don't remember anyone telling you that

8    you couldn't use both apps at the same time?

9        A.    No, ma'am.

10       Q.    You do admit that you could switch back and

11   forth between the Uber and Lyft apps?

12       A.    Yes.

13       Q.    But it's your sworn testimony that you

14   didn't switch back and forth between the Uber and the

15   Lyft apps, right?

16       A.    Yes.

17       Q.    Okay.  You decided to just stick with Uber

18   because that was your strategy for maximizing your

19   profits?

20       A.    Yes.

21       Q.    That was completely at your own discretion?

22       A.    Yes.

23       Q.    Uber never prohibited you from using the

24   Lyft app?

25       A.    No.

                                              Page 411

1        Q.    You did not have to pick one or the other?

2        A.    No.

3        Q.    Okay.  And you admit that there were times

4    when you were logged onto both apps at the same time?

5        A.    Yes.

6        Q.    In addition to using the Uber app and the

7    Lyft app to offer transportation services, you also

8    provided transportation services to one of your

9    customers in Houston without using either the Uber or

10   Lyft app, right?

11       A.    Yes, that is correct.  I had one customer.

12       Q.    Is that the instance you mentioned a few

13   minutes ago?

14       A.    Yes.

15       Q.    So in that instance, you took your customer

16   to the airport and he paid you cash?

17       A.    Yes.

18       Q.    How you got this customer was from another

19   one of your customers in New York?

20       A.    Yes, that is correct.

21       Q.    That customer in New York referred you to

22   the customer in Houston?

23       A.    Yes, that is correct.

24       Q.    And the customer in New York was someone

25   you also provided transportation services to?

                                          Page 412

```
1          A.    Yes, ma'am.

2          Q.    And the transportation services business,

3    you actually knew a lot of people?

4          A.    In New York, yes.

5          Q.    And you would get referrals from limo

6    drivers who couldn't cover a transportation request?

7          A.    Yes.

8          Q.    And these are transportation customers that

9    you didn't meet through using the lead-generation

10   services of the Uber driver app, right?

11         A.    That is correct.

12         Q.    That was actually the case in both New York

13   and Houston?

14         A.    Yes.

15         Q.    But it's your testimony that other than on

16   those one or two occasions, you didn't provide

17   transportation services to anyone outside of the Uber

18   and Lyft app?

19         A.    Yes.

20         Q.    Other than those two instances?

21         A.    Yes.

22         Q.    And that was your sworn testimony at your

23   deposition?

24         A.    Yes.

25         Q.    Okay.  You made the decision -- I think
```

Page 413

```
 1    we've clarified -- to stop using the driver app for
 2    Uber in August of 2019?
 3         A.   Yes, ma'am.
 4         Q.   And you've got your company called DSK
 5    Logistics, LLC?
 6         A.   Yes.
 7         Q.   When did you start transporting vehicles
 8    for DSK?
 9         A.   For DSK?  So shortly after the company was
10    established.  I would say when all the permits came
11    in, probably around September 2020.
12         Q.   September of 2020?
13         A.   Yes.
14         Q.   Okay.  And before that, I think that you --
15    well, actually, one more question on the DSK.
16                   You're an independent contractor for
17    DSK?
18         A.   Yes, ma'am.
19         Q.   And that's what you believe?
20         A.   Yes.
21         Q.   Okay.  So before DSK, I believe earlier you
22    testified about two companies.  One was called -- is
23    it TC Transport?
24         A.   Yes, ma'am.
25         Q.   And one was called Carolina Logistics?
```

Page 414

1        A.    Yes, ma'am.

2        Q.    What did you do for TC Transport?

3        A.    It's the same thing as for Carolina

4   Logistics and same thing I'm currently doing.

5   Transporting vehicles.  The only difference was I

6   leased onto their company.  Basically, they were the

7   carrier responsible for safety.  They were the one

8   providing jobs.

9        Q.    Were you an employee of TC Transport?

10        A.    No.

11        Q.    You were an independent contractor?

12        A.    Yes.

13        Q.    You were an independent contractor for

14   Carolina Logistics?

15        A.    Yes, ma'am.

16        Q.    Did you earn income from these two

17   entities?

18        A.    Yes.

19        Q.    Okay.  Let's pull up Respondent's Exhibit

20   40.  So what we're pulling up are your discovery

21   responses in this litigation matter, okay?

22        A.    All right.

23        Q.    Does this look familiar to you?

24        A.    Yes, ma'am.

25        Q.    All right.  Let's scroll to the very last

Page 415

1    page, and if you could make that bigger for us all to

2    see.

3                    Is that your signature?

4         A.   Yes, it is.

5         Q.   All right.  And did you sign -- could you

6    make that super big?

7                    Under -- right above your signature,

8    did you mean to represent that you were answering

9    these questions and declared that the statements

10   contained are true and correct?

11        A.   Yes, ma'am.

12        Q.   This was under penalty of perjury?

13        A.   Yes.

14        Q.   All right.  Let's go to Interrogatory --

15   actually, let's go to the very top, and let's

16   highlight the title.

17                    So this was your response the first

18   time to discovery requests, correct?

19        A.   Yes.

20        Q.   Okay.  Let's go to Interrogatory Number 5.

21   Let's see what that one says.  So you see

22   Interrogatory Number 5 is a question, right?  It asks

23   you to identify every company or individual for whom

24   you provided transportation services or delivery

25   services, right?

                                          Page 416

1          A.    Okay.

2          Q.    You see that?  You follow me with that?

3          A.    I do.

4          Q.    Either as employee or an independent

5     contractor.

6          A.    Okay.

7          Q.    Okay.  And you see at the very front it

8     says from March 12 to the present, right?

9          A.    Yes.

10         Q.    Now, if we could go to that -- the

11    objections.  If we could get to his answer at the top

12    of the -- there we go.

13               You didn't identify TC Transport or

14    Carolina Logistics?

15         A.    Correct.

16         Q.    Okay.  And I think you mentioned there was

17    a contract with TC Transport that you signed?

18         A.    Yes, I believe.  Yeah.

19         Q.    And you did not produce that in this

20    litigation, correct?

21         A.    Correct.

22         Q.    Okay.  Let's go to Respondent's Exhibit 41.

23    So, you know -- now, you know, how discovery goes,

24    Mr. Barysas, is, you know, you start to discover

25    things as the case move on, so sometimes you amend

                                        Page 417

```
 1    your responses.  What we're looking at now is the
 2    first time you amended these responses, okay?  So now
 3    let's go to the very last page.
 4                    Is that your signature there?
 5         A.   Yes, ma'am.
 6         Q.   And under penalty of perjury, you were
 7    verifying that the responses were true?
 8         A.   Yep.
 9         Q.   All right.  Let's go take a look at
10    Interrogatory Number 5.
11                    Okay.  Do you see it's the same
12    question we looked at before?
13         A.   Yes.
14         Q.   Let's look at his answer.  Still no TC
15    Transport or Carolina Logistics identified?
16         A.   Yes, ma'am.
17         Q.   Okay.  Let's take a look at Respondent's
18    Exhibit 42.  What we're looking at now is the second
19    time you amended your responses.  So now this is the
20    third time you're providing discovery responses to
21    us.  Let's just go straight to Interrogatory 5.
22                    You see it's the same question?
23         A.   Yes.
24         Q.   Okay.  And let's take a look at the answer.
25    Still no TC Transport or Carolina Logistics?
```

Page 418

1      A.   Yes.

2      Q.   Okay.  Let's take a look at Respondent's

3  Exhibit 8.  What we're pulling up now are your tax

4  returns.

5      A.   Yep.

6      Q.   Mr. Ridenour, I'm going to go to the middle

7  part where the tax preparer has clicked those Xs.

8  Let's just make that a little bigger.

9            You authorized Alex Advice, LLC, to

10  file this?

11     A.   Yes, ma'am.

12     Q.   Let's go above that, Mr. Ridenour, and

13  there's a statement above it, that big long thing.

14            When you authorized Alex Advice, LLC,

15  to file your 2017 tax return, you declared under

16  penalty of perjury that your tax returns -- that you

17  reviewed them and that they were true and correct,

18  right?

19     A.   Yes.

20     Q.   Okay.  Let's look at Line 12 of the tax

21  return.  In Line 12, you show $27,399 in business

22  income, right?

23     A.   Okay.

24     Q.   Is that correct?

25     A.   Yes.

                                      Page 419

1        Q.    Okay.  And in Line 27, you took a deduction

2   for self-employment tax.

3        A.    Okay.

4        Q.    Right?

5        A.    Yes.

6        Q.    Let's take a look at Bates 865 of

7   exhibit -- Respondent's Exhibit 8.

8              And this is the Schedule C that you

9   filed, right?

10       A.    Yes.

11       Q.    And if we zoom in on the top quarter of the

12  thing -- let's do the whole top quarter.

13             Okay.  You see the very top?  You are

14  listed as the proprietor, right?

15       A.    Yes, that is correct.

16       Q.    And the principal business listed is

17  on-line bike rentals and tours.

18       A.    Okay.

19       Q.    You agree with that?

20       A.    Yes.

21       Q.    Okay.  And then the business name is DB

22  Pedicabs, LLC?

23       A.    Correct.

24       Q.    You also filed another Schedule C, and

25  we'll go to Bates 867.  And this is also a Schedule C

                                        Page  420

1    for DB Pedicabs petroleum cabs, LLC, right?

2         A.   Correct.

3         Q.   This one is for Dainius Livery Service,

4    right?

5         A.   That is correct.

6         Q.   And you're identified as the proprietor?

7         A.   Yes.

8         Q.   Because you were the proprietor of DB

9    Pedicabs, which offered livery services?

10        A.   Correct.

11        Q.   This is the Schedule C that reflects your

12   income received by using -- by providing

13   transportation services, right?

14        A.   Yes.

15        Q.   And if we look at Line 1 -- that's perfect.

16   Thank you.

17             You see that there's $50,892 in gross

18   receipts?

19        A.   Okay.

20        Q.   And that includes income from using the

21   Uber and Lyft apps, right?

22        A.   I believe so, yes.

23        Q.   And then there may be some other sources

24   that play into that, but you're not sure?

25        A.   Yes, that is correct.

Page 421

1        Q.    Then if we go to Line 9, it shows a vehicle

2    deduction of $15,217?

3        A.    Yes.

4        Q.    Line 10 shows a deduction for commissions

5    and fees of $4,008?

6        A.    Yes.

7              MS. MIERS:  My apologies.  Shauna,

8    could we please let Ms. Corridan in?

9        Q.    (BY MS. MIERS)  So we saw Line 10 is $4,008

10   for commission and fees.  So what I want to do now is

11   scroll down to Bates 874, and I want to take a look

12   at what makes up that $4,008, 4008.  If you could

13   make that bigger.

14              We see $2,537 in Uber fees, right?

15       A.    Yes.

16       Q.    A black car fund of $283?

17       A.    Yes.

18       Q.    And credit card fees of $1,188?

19       A.    Yes.

20       Q.    Okay.  Do you have receipts for those

21   credit card fees?

22       A.    No, ma'am, I don't.

23       Q.    Did you have a -- one of those Square

24   things by which you could obtain credit card

25   payments?

Page 422

 1      A.   Yes.

 2      Q.   So this is just the fees.  This is not the

 3  income you collected, correct?

 4      A.   I would assume so.  I don't remember

 5  exactly.  I mean, to this day, I don't understand

 6  this -- you know, taxes.  That's why I gave it to the

 7  accountant.

 8      Q.   A few minutes ago you testified under oath

 9  that you offered one trip outside the app in New York

10  and one trip outside the app in Houston.

11           Was this the trip -- in 2017, was that

12  the trip in New York?

13      A.   I can't recall right now, ma'am.

14      Q.   Do you recall whether the trip was 1,000 --

15  was a 1,188-dollar trip?

16      A.   No, I don't think so.

17      Q.   It wouldn't make sense, would it?

18      A.   No.

19      Q.   Do you still have any evidence of the

20  credit card fees that you paid in 2017?

21      A.   No, ma'am, I don't.

22      Q.   Okay.  When did you destroy that evidence?

23           MR. STANLEY:  Object to the

24  characterization that he destroyed evidence.  Hold

25  on.

                                        Page 423

1              MS. SOUSSAN:   Sustained.   Rephrase

2      your question.

3          Q.   (BY MS. MIERS)   When did you dispose of the

4      receipts that support the credit card fees that you

5      paid in 2017 in the amount of $1,188?

6          A.   Never disposed, ma'am.   I never collected

7      them to begin with.

8          Q.   Are they with a certain service?

9          A.   I would assume so they were.   I don't know.

10     I don't have that service anymore.

11         Q.   What's the name of that service?

12         A.   Well, like you mentioned, I used Square

13     before.

14         Q.   Okay.   Is that account with Square still

15     active?

16         A.   No.

17         Q.   Do you still have the ability to access

18     information from Square?

19         A.   No.

20         Q.   And do you know that because you've tried?

21         A.   Yes.

22         Q.   When did you try?

23         A.   The last time I tried to accept a credit

24     card, it was, like, years ago, and it didn't work.

25     So -- I forgot for what exactly.   Years ago.   Years

                                          Page 424

```
 1    ago.

 2         Q.    In Line 20B -- we're going to go back up.

 3    There's a deduction for business property, but you

 4    don't know what that is?

 5         A.    No idea.

 6         Q.    Okay.  Then in 27A, you took a deduction

 7    for clothing.

 8         A.    Okay.

 9         Q.    Is that right?

10         A.    Yeah, that's -- sure.

11         Q.    You did that so that you could look

12    professional?

13         A.    Yes, ma'am.

14         Q.    Line 28, the total expenses deducted for

15    your transportation services business was $25,105?

16         A.    Okay.  Yes.

17         Q.    And then Line 44, you deducted 21,960

18    business miles?

19         A.    You know, to be with you, I have no idea

20    what this is.  I'm sorry.  Is it miles?  Is it an

21    amount?  I don't know how things work really.

22         Q.    Do you see in Line 44 where it says, "The

23    total number of miles you drove your vehicle during

24    in 2017.  Enter the number of miles for your

25    vehicle"?
```

Page 425

```
 1                      Do you see that?
 2          A.    Now I see that it says miles.
 3          Q.    For the other, where it's listed in C,
 4    5,450, you don't know what those are, right?
 5          A.    No idea, no, ma'am.
 6          Q.    Let's take a look at Respondent's Exhibit
 7    9.  We're going to move through these faster.
 8          A.    Okay.
 9          Q.    Respondent's Exhibit 9 is your 2018 tax
10    return.
11          A.    Okay.
12          Q.    Same thing.  You reviewed it?
13          A.    Yes.
14          Q.    Okay.  Under penalty of perjury?
15          A.    Yes.
16          Q.    And if we go to Bates 927, this is a
17    Schedule C for DB Pedicabs --
18          A.    Okay.
19          Q.    -- LLC, right?
20          A.    Correct.
21          Q.    And now it's you and Kremena, delivery
22    service.  Is that your wife?
23          A.    Yes.
24          Q.    And the name of the company is DB Pedicabs?
25          A.    Yeah.
```

Page 426

1      Q.    Kremena, when she used the Uber driver app,

2   she also used the Infinity that you used?

3      A.    Yes.

4      Q.    You don't know how many times she used the

5   app?

6      A.    No.

7      Q.    Okay.  For both of you, you identified this

8   Schedule C as livery service?

9      A.    Correct.

10      Q.    And then if we take a quick peek at Line 1,

11   you had gross receipts of 53,433, right?

12      A.    Yes.

13      Q.    All right.  Let's take a look at

14   Respondent's Exhibit 10.  This is your 2019 return.

15           Did you also review and approve the

16   filing of this under penalty of perjury?

17      A.    Yes, ma'am.

18      Q.    And if we go to Bates 903, once again we

19   see a Schedule C, and it's for Dainius and Kremena,

20   livery income, Lyft and Uber sources, right?

21      A.    Correct.

22      Q.    You identified Lyft first, right?

23      A.    Okay.  Yes.  Correct.

24      Q.    Well, you're getting close to being at the

25   finish line, Mr. Barysas, so hang in there with me.

Page 427

1    Let's talk about your specific claims against Uber.

2         A.   Okay.

3         Q.   You sued Uber because you want to get paid

4    for the time you spent waiting for customers?

5         A.   Yes.

6         Q.   Let's take a look at Claimant's Exhibit 41.

7    What we're going to take a look at here is your

8    expert's report, okay?  And I want to see if I

9    understand what you're asking for here.

10                 If we go to the appendix that's got

11   the lines, I want to go to 49.  You're going to have

12   to flip it.  You're going to have to rotate it.

13   Line 49.  If you could make that as big as possible.

14   We're only going to do this once.  All right.  Now,

15   can you move that up to where he can see the

16   headings?

17                 I know this is hard to read.  Can you

18   read this?

19        A.   Yes, I can see it.  Yes.

20        Q.   Move it a little to the left so they are

21   lined up.

22                 Do you see where it says On-line Time

23   Hours?

24        A.   On-line Time Hours.  Yes, I do see that.

25        Q.   It says 114 hours, right?

                                        Page 428

1              Do you see that?

2         A.   I do see that, ma'am.

3         Q.   Then under P2 hours for that work week of

4   July 16th, 2018, through July 22nd, 2018, the P2 time

5   shows you have 2.63 hours of P2 time, right?

6         A.   Yes.

7         Q.   So that's when you are on your way to pick

8   up one of your riders?

9         A.   I guess so.  I'm not sure.

10        Q.   Okay.  Fair enough.

11             And then P3 time, it shows you were in

12   P3 time for 5.84 hours?

13        A.   I see that number.

14        Q.   Do you see you provided 13 trips that week?

15        A.   Yes.

16        Q.   Okay.  And what you're asking for in this

17   litigation is to be paid for 114.09 hours?

18        A.   Yes.

19        Q.   Okay.  You can take that down.

20             Just for that week, right; is that

21   correct?

22        A.   Correct.

23        Q.   But you don't think Uber should have to

24   reimburse you for your personal mileage?

25        A.   Personal mileage, no.

Page 429

1        Q.   Or for mileage related to your use of the

2   Lyft app?

3        A.   Yes, I agree with you on that.  They should

4   not.

5        Q.   Do you understand that you're bringing a

6   claim against Uber for unlawfully retained tips?

7        A.   Yes.

8        Q.   But you don't believe Uber owes you any

9   tips, right?

10       A.   Yes, I don't believe that.

11            MS. MIERS:  All right.  Judge, I know

12  it seems quick, but if I could have a brief break, I

13  think I've got just one last thing to cover and I'll

14  be in a position to pass the witness.  Is that okay?

15            MS. SOUSSAN:  Sure.  Let's take five

16  minutes.

17            (Recess from 4:30 p.m. to 4:36 p.m.)

18       Q.   (BY MS. MIERS)  Mr. Barysas, you understood

19  that Uber is a technology company that referred

20  passengers to you?

21       A.   Yes.

22       Q.   And under the contract you had with Uber,

23  you were of the opinion that Uber was your primary

24  recourse if you had an issue with one of your riders?

25       A.   Yes.

Page 430

1    Q.   And you acknowledge that you had a

2    contractual agreement with Uber?

3    A.   Yes.

4    Q.   That you could enforce the terms of the

5    agreement?

6    A.   Yes.

7    Q.   And Uber could also enforce the terms of

8    the agreement?

9    A.   Yes.

10    Q.   Let's take a look at Claimant's Exhibit 8,

11    and we'll go to Bates 8292.  Now, you've seen this

12    particular communication exchange before, so we're

13    not going to go back into what was already covered on

14    this message.

15         By looking at the pictures, do you

16    recall talking about this message earlier?

17    A.   Yes, I do remember.

18    Q.   You remember sending these messages?

19    A.   Yes, I do.

20    Q.   There were several that went back and

21    forth?

22    A.   Yes.

23    Q.   All right.  I want to go to Bates 1294.

24    And at the top of the page in the bold letter -- you

25    can just do the first top.

Page 431

1                      Uber told you, "Please be advised that

2      being that you are a commercial partner, anything

3      above 250 should be hand by your commercial insurer,"

4      right?

5           A.   Okay.  Yes.

6           Q.   Do you remember that?

7           A.   Yes.

8           Q.   This was the instance earlier where you

9      were stating the fact that you thought that your loss

10     was more than the fee that you obtained from the

11     rider, correct?

12          A.   Correct.

13          Q.   And so, now we recognize that as a

14     commercial driver, rights as a business partner,

15     commercial driver, anything above $250 should be

16     handled by your commercial insurer, right?

17          A.   Yes.

18          Q.   Now I want to go back to Bates 1293, and

19     we're going to focus on the last message on this

20     page.

21          A.   Okay.

22          Q.   You see that it's -- it's from you to Uber,

23     right?

24          A.   Yes.

25          Q.   You say, "Dear Uber partner support, the

                                            Page 432

```
1    passenger that you as a technology company referred
2    to me" -- those are your words, right?
3         A.   Yes.
4         Q.   All right.  And then it says, "Under the
5    contract" -- do you see that?
6         A.   Yes.
7         Q.   "Under the contract with Uber, I agreed to
8    use you as my primary source of recourse."
9         A.   Yes.
10        Q.   Those are your words, right?  Those are
11   your words?
12        A.   Yes, ma'am.  Yes, yes.
13        Q.   And then following that, you state, "In the
14   event of a denial by Uber, I am entitled as an
15   independent contractor to make a secondary demand
16   upon the passenger in question."
17        A.   Yes.
18        Q.   Those were your words, right?
19        A.   Yes.
20             MS. MIERS:  All right.  I'll pass the
21   witness.
22                    FURTHER EXAMINATION
23        Q.   (BY MR. STANLEY)  Dainius, picking up right
24   there on that same exhibit, where did you get that
25   language?
```

Page 433

 1          A.   So this language -- so at some point, I

 2     followed this guy on-line.  I forget his name.   He

 3     has a website.  He was a former, like, Uber driver,

 4     and it was just basic copy and pasted from the

 5     website.

 6          Q.   So do you believe that you're an

 7     independent contractor for Uber, or do you believe

 8     you're an employee?

 9          A.   I believe I'm an employee.

10          Q.   And -- and that language that you had

11     there, do you recall the website that you got it

12     from?

13          A.   I don't remember right now, but -- no, I

14     don't remember right now the website.

15          Q.   Okay.  We're going to go back to the top

16     here to discuss some of the points that were covered

17     with you with respondent's counsel.

18               Do you remember talking about at the

19     very first the entrepreneurial spirit?

20          A.   Yes, I do.

21          Q.   When you first started driving for Uber --

22     before you started driving for Uber, did you believe

23     that Uber offered you the benefit to be an

24     entrepreneur under their system?

25          A.   No.

                                             Page  434

```
 1        Q.    And so, when you started driving for Uber,
 2   what was your hope?
 3        A.    To make as much money as possible and to --
 4   to have as much time -- a balance between time and
 5   money.
 6        Q.    Did you see advertisements in New York City
 7   before you started driving for Uber?
 8        A.    Yeah.  That's how it all started.  There
 9   was a guarantee of a certain amount of money and
10   freedom and stuff like that.
11        Q.    And you recall being asked about that by
12   Uber's counsel?
13        A.    Yes.
14        Q.    And did -- did you -- were you able to
15   receive a settlement because of the guarantee that
16   was made that enticed you to drive for Uber?
17               MS. MIERS:  Objection.  Relevance.
18        A.    Yes.
19               MS. MIERS:  Judge, you're muted.
20               MS. SOUSSAN:  The objection was
21   sustained.
22               MR. STANLEY:  Judge, she brought this
23   up, the reason why he started driving for Uber.  And
24   then the answer is -- well, okay.  I'll ask again and
25   then -- let me ask another question.
```

Page 435

```
 1        Q.   (BY MR. STANLEY)  Dainius, did you believe
 2   that you were going to make more money when you first
 3   started driving for Uber than what you actually were
 4   able to make?
 5        A.   Yes.
 6        Q.   And -- and why did you believe that?
 7        A.   Because I saw advertising.  I mean, it was
 8   a guarantee.  And I thought, you know, I'm going to
 9   make as much money as they said I will.
10        Q.   And did that impact whether or not you were
11   going to choose to drive as an Uber Black driver or
12   as an UberX driver?
13        A.   Yes, it did.  That's why I chose Uber
14   Black.
15        Q.   Do you remember us looking at -- in
16   Claimant's Exhibit 8 the correspondence at 1426?  Can
17   you bring that up, please?  Just the top.
18             This is what I call the bad actor
19   rider correspondence.  Do you remember going over
20   this?
21        A.   Yes.
22        Q.   And there was a lot of talk with counsel
23   about riders being required to follow community
24   guidelines, as well?
25        A.   I remember that, yes.
```

Page 436

1      Q.   And -- and do you know if this rider was

2  ever punished for the actions that you brought to

3  Uber's attention and removed from the Uber rider

4  platform?

5      A.   I have no way of knowing that.  I mean, I

6  don't have access to Uber's documents, and nobody has

7  ever informed me if the -- if this rider was removed

8  from the platform.  I don't know.

9      Q.   I want to talk a little bit about the Uber

10 Black requirements now.

11             What do you know about the

12 requirements that Uber has in place in order to drive

13 for Uber Black?

14     A.   So to drive for Uber Black, you have to

15 have a certain vehicle, meaning, you know, make and

16 model and year, have a certain star rating, and --

17 and also have -- depending on the city, you have to

18 have a commercial insurance and, like, a limousine

19 license.

20     Q.   Do Uber require you to have a professional

21 driver's commercial auto insurance policy to drive

22 Uber Black?

23     A.   Yes.

24     Q.   Does Uber require you to also sign up with

25 the City to operate a commercial livery -- under a

                                              Page 437

1  commercial livery license if you drive for Uber

2  Black?

3      A.   Yes.

4      Q.   Do you recall talking with counsel about

5  when you were in Period 1 time waiting that you might

6  take walks or play Video games or browse the

7  internet?

8      A.   Yes.

9      Q.   During that were you engaged on the

10 Uber app waiting to receive a trip?

11          MS. MIERS:   Objection.   Calls for a

12 legal conclusion.

13          MS. SOUSSAN:   Well, I know it goes to

14 an ultimate question, but he can answer the plain

15 understanding of "waiting."

16     A.   Can you please repeat the question one more

17 time?

18     Q.   (BY MR. STANLEY)   Were you waiting on Uber

19 to provide you a trip during that period that you may

20 have been walking or playing video games in the

21 parking lot?

22     A.   Yes, yes, yes.

23     Q.   Were you able to receive a trip from Uber

24 without waiting on them to provide it to you?

25     A.   No.

1        Q.    Can you bring up Claimant's 26, please?

2   Can you just show the whole page, please?

3               So this is a document that we included

4   in the exhibits, and do you recall talking with

5   Uber's counsel about Uber Black hourly trips?

6        A.    Yes, I remember that.  That's what I --

7        Q.    Let me ask the question.

8               Do you ever recall between 2014 up

9   until August of 2019 that hourly trips were an option

10   for an Uber Black driver?

11        A.    No, I really don't remember this.

12        Q.    Do you ever recall that being an option in

13   the Uber app up until August 2019?

14        A.    No, sir.

15        Q.    Do you ever recall a notice coming in on

16   the app informing you that hourly trips are not

17   available to Uber Black drivers?

18        A.    I don't recall that.  I don't remember.

19        Q.    When was the first time you learned that

20   hourly trips were an option on the Uber Black

21   platform?

22        A.    Actually, today.

23        Q.    There's been a lot of talk about you

24   canceling rides or asking riders to cancel rides.

25               Do you understand that?

Page 439

1        A.    Yes.

2        Q.    Were you scared to cancel rides on the Uber

3   platform?

4        A.    Yes.

5        Q.    Why?

6        A.    Because I know that there's a number --

7   there's a cancellation rate and, you know, it was my

8   job, basically.

9        Q.    If you had the option to cancel as many

10  rides as possible without being potentially

11  deactivated from the Uber driver app, would you have

12  wanted that option?

13       A.    Yes.

14       Q.    Were you ever given that option?

15       A.    No.

16       Q.    Can you pull up Claimant's Exhibit 44?

17  It's the demonstrative.  Just make the -- the left

18  side big, please.  We're just going to look at the

19  bottom, the very -- okay.  So scroll so we can see

20  what Columns B and C are.

21             So if we look at this, Column B is

22  completed trips for Lyft.  Column C is completed

23  trips for Uber.  Do those numbers, 247 for Lyft and

24  1134 for Uber, during the statutory period match up

25  with your recollection of about how many trips you

                                        Page 440

```
 1    would have completed during this time period?

 2         A.    Yes, sir, it does.

 3         Q.    There was also discussion about TC

 4    Transport and your interrogatory responses.

 5                    Do you remember that?

 6         A.    Yes.

 7         Q.    Can you bring up, Jacob, his deposition

 8    transcript from April 2021?  Can you go to Page 239,

 9    please?  For purposes of the record, this is

10    Lines 239, 23 through Page 240, 18.  And the question

11    in here is, "When did you get that trucking job?"

12                    And so, you say, "So I started in

13    2019.  I believe in March sometime, if I'm not

14    mistaken."

15                    And the question was, "And what was

16    the company you were working for?"

17                    "So I was leased into a company called

18    TC Transport, and I just don't remember if it's

19    incorporated or LLC."

20                    "Okay.  Were you an employee or

21    independent contractor for TC Transport?"

22                    And you say, "I was an independent

23    contractor, yeah."

24                    So at your deposition, did you tell

25    Uber that you drove for TC Transport?
```

                                                    Page 441

1      A.   Yes.

2      Q.   And if you go down to the last area that's

3  highlighted, it says, "Got it.  And when did you --

4  you lost that job approximately March of 2020 or

5  sometime later?"

6           You say, "No.  I lost that job with

7  them approximately December or November of 2019."

8           Do you see that?

9      A.   Yes.

10     Q.   And when did you do any work for Carolina

11 Logistics?

12     A.   So after I -- the company shut down, TC

13 Transport, I found another one.  And so, a few months

14 after, like two months after, two or three months

15 after, I quit with DC transport.

16     Q.   Would that have been after August of 2019?

17     A.   Yes.

18     Q.   Did you ever work for Carolina Logistics

19 during the period that you drove for Uber?

20     A.   No.

21     Q.   There was talk also about providing a

22 customer in Houston trips.

23           Do you remember that?

24     A.   Yes.

25     Q.   How many times between March of 2017 and

                                              Page 442

1    August of 2019 did you provide this Houston customer

2    a trip outside -- a ride outside of the Uber

3    platform?

4         A.    Twice maybe.

5         Q.    And same question.  When you were in

6    New York, there was a customer that you provided

7    off-app trips.

8                   How many times did that happen?

9         A.    That I can't recall exactly, but -- I don't

10   remember right now.

11        Q.    Was it all the time?

12        A.    No.

13                   MR. STANLEY:  Judge, I pass the

14   witness.

15                   MS. SOUSSAN:  Any further questions?

16                   MS. MIERS:  Just two.

17                   FURTHER EXAMINATION

18        Q.    (BY MS. MIERS)  Mr. Barysas, do you recall

19   that your deposition was on April 29th, 2021?

20        A.    Yes.

21        Q.    Okay.  And that you were under oath during

22   that deposition, correct?

23        A.    Yes.

24        Q.    Mr. Ridenour, could you please pull up

25   Respondent's Exhibit -- the first amended responses?

                                        Page 443

1    Do you -- they are coming up.

2                 Do you recall us speaking about these

3    just a few minutes ago, Mr. Barysas?

4         A.   Yes.

5         Q.   Let's scroll down to the next page, and if

6    you highlight the date.

7                 These were submitted on September 7th,

8    2021, right?

9         A.   Yes.

10        Q.   Would you agree with me that that was after

11   your deposition?

12        A.   Yes.

13        Q.   All right.  And then go to the very last

14   page really quickly.

15                And that's your signature right above

16   the date, September 7th, correct?

17        A.   Yes, ma'am.

18        Q.   Thank you.

19                MS. MIERS:  I pass the witness back.

20                MS. SOUSSAN:  Anything further?  I

21   have a couple of questions.

22                At one point today, Mr. Barysas, you

23   said that Uber was your only source -- the Uber app

24   was your only source of income, and then later you

25   said it was your main source of income.  So I don't

                                        Page 444

1    know whether it was only or main, but that was your

2    testimony earlier.

3              And then -- I'm just asking a series

4    here.  I'm going to get to my question, so don't

5    object that it wasn't a question, okay?  All right.

6    Here's my -- what I don't understand.

7              You said that you wanted airport and

8    airport only, and that you drove between 8:00 a.m.

9    when you dropped your son off until 7:00 when you

10   went home.  And then you said, "but I would have to

11   hang around four or five hours."  Sometimes I think

12   you even said seven hours.

13             How much could you have possibly drove

14   if you had to wait at the airport for four to five

15   hours or seven hours for a trip?  How many trips

16   could you possibly do between 8:00 a.m. and 7:00?

17   That was your choice.

18             THE WITNESS:  Yes, ma'am.  Normally,

19   Your Honor, I would do two if I'm lucky, sometimes

20   three trips.  Of course, those trips were about a

21   hundred dollars.  So, you know, two or three trips

22   per day.  It's mainly waiting because the majority of

23   people would order the cheapest service, right?

24   That's what it was.  You could probably see that in

25   my statements and detail stuff.  Two or three trips

Veritext Legal Solutions
346-293-7000

1    per day maximum when I would work.  That's the entire

2    day.

3                    MS. SOUSSAN:  Okay.  So you would

4    average close to about a hundred dollars per trip?

5                    THE WITNESS:  Yes, ma'am.

6                    MS. SOUSSAN:  That's how that makes

7    sense.  And that was your decision to wait at the

8    airport like that, correct?

9                    THE WITNESS:  Yes, it was because I've

10   tried, you know, to hang out and to receive trips.

11   Where I live, I tried different areas.  I tried being

12   near expensive hotels thinking that it might work.

13   Sometimes you would get a short trip, 10, $15 after

14   Uber takes their fee, and I just couldn't survive

15   with that.

16                    MS. SOUSSAN:  I understand better,

17   sir.  Thank you for answering that question.

18                    Are you ready to call your next

19   witness, Mr. Stanley?  I think it's your expert, but

20   go ahead.

21                    MR. STANLEY:  Plaintiffs will rest

22   now.  We believe we've offered the testimony

23   necessary in this case.

24                    MS. SOUSSAN:  Okay.  You rest?  All

25   right.

                                          Page 446

1           MS. MIERS:  Your Honor, now is as good

2     a time as any to take this up, but we are going move

3     to strike the expert reports of the individuals who

4     are no longer going to testify during this

5     proceeding.

6           We agreed to the pre-admission of

7     those reports based on counsel's representation to us

8     that they would be presenting these folks as

9     witnesses.  In the alternative, we request to admit

10    the prior sworn testimony of the experts that will no

11    longer be testifying in this proceeding.

12          And just to be clear about the

13    gamesmanship here, we have asked three times whether

14    they still intended to present these experts, and the

15    first two times we didn't get an answer.  The third

16    time we were told that they were waiting to see how

17    much time they have.  Well, we have plenty of time.

18    That was this morning at, like, 9:30, our third

19    request.  So we are going to move to strike their

20    reports from the record.

21          MS. SOUSSAN:  Response?

22          MR. STANLEY:  Judge, these reports

23    have been in since March or April of 2021, I believe.

24    There's been plenty of time that they could have

25    deposed these.  They have also had these experts on

Page 447

1   record many times, and we're fine with submitting all

2   prior sworn testimony.  That's no problem.  But

3   there's no reason for us to bring them in live when

4   the expert reports are already here and we can go on

5   the papers.

6            MS. MIERS:  From our perspective,

7   there is a need to bring him live.  Were they being

8   presented live, we would have the opportunity without

9   question to show you that none of the three experts

10  are proper experts.  They're all three biased.

11           Dr. Parrott's expert report is riddled

12  with errors that are inexplicable that will not

13  assist you in determining any alleged damages that

14  you may deem appropriate, which of course we don't

15  think are deserved here or warranted here anyway.

16  But there is testimony that we know we would elicit

17  that would demonstrate without question that their

18  testimony should bear no weight whatsoever in this

19  proceeding.  But we're happy to use their prior

20  testimony to do that.

21           MR. MacLEOD:  All of those comments

22  that counsel just made were purely gratuitous.  It's

23  not even worth responding.  It's just not worth it.

24           What she just provided was an

25  alternative.  She said either exclude them or we'll

                                    Page 448

```
 1    submit the testimony.  Bret just said we have no
 2    problem at all with submitting their testimony.  The
 3    reports are already in evidence.  They've been
 4    admitted.  And so, we have the burden of proof.  We
 5    believe we've already met that, but --
 6                    MS. SOUSSAN:  I will take this up
 7    under advisement.  Okay.  Is respondent ready to call
 8    its next witness?
 9                    MS. MIERS:  Yes, Your Honor.
10                    MS. SOUSSAN:  All right.  Who might
11    that be?
12                    MR. SANDAHL:  Your Honor, we call Brad
13    Rosenthal.
14                    MR. MacLEOD:  If you're saying that
15    you may -- you're taking it up on advisement, which
16    means you could exclude our experts, then we would
17    have to go ahead and call our experts.  We need a
18    ruling.  I don't think that I can rest, then -- I'm
19    just saying from a procedural standpoint, I'm not
20    sure we can rest until we have a ruling.  That's my
21    fear.
22                    MS. SOUSSAN:  I'm going to need it
23    briefed.  I'm going to need to know what
24    representations were made between you two, and I need
25    it briefed.  And I also need to -- I used to have a
```

Page 449

1    rule that no exhibit would be admitted unless it was

2    identified during the hearing.  I didn't do that in

3    this case, and I should have.  Had I, your expert

4    would have had to testify, but I don't have that

5    here.

6              I need to know if an expert report can

7    come in without the testimony.  Clearly, if you do

8    testimony via affidavit, which I've done before,

9    that's one thing, but that was not an agreement in

10   this case either.  So I want this issue briefed, and

11   I can't decide it without it being briefed.

12             MR. MacLEOD:  When should we submit

13   briefs, then, Your Honor?

14             MS. SOUSSAN:  I'm not going to delay

15   the hearing again.  And if you want, you can -- how

16   many pages do you-all need to brief it?  I want to

17   know specifically the conversation between you and

18   whether an expert report that was pre-admitted under

19   the -- if this is true -- under the expectation that

20   that expert would be testifying in order to allow

21   cross-examination and presentation to the arbitrator

22   can go forward if the expert's not called as a

23   witness.

24             MR. MacLEOD:  Judge, we certainly will

25   look at it.  I'm not sure as to pages.  But one thing

Page 450

 1   I will say is there have been no oral
 2   representations.  I can assure you of that.  What's
 3   in writing was that we might call an expert, we might
 4   not call an expert.  But at the same time, if we need
 5   to brief that, then we'll brief it.  The problem is
 6   we can't rest and then go on to respondent's case.
 7              MS. SOUSSAN:  We can because you can
 8   always reopen your case.  You know, that can happen.
 9   We can reopen your case.  So that absolutely can
10   happen with no prejudice to you.
11              I need to know specifically whether
12   the expert report alone can be tendered as an exhibit
13   without the expert testifying and without the ability
14   of one side to cross-examine the expert.  So I do
15   need to know that, and I don't think there's any
16   prejudice to going forward and letting you reopen
17   your case if necessary.
18              I need a brief.  And if you-all want
19   to work on that tonight and get it to me tonight,
20   that's one thing.  You know, I'll read it as quickly
21   as I can.
22              MR. MacLEOD:  Judge, this is a
23   frequent theme with Uber.  This is what it is.
24              MS. SOUSSAN:  This is not Uber.  This
25   is Susan Soussan talking.  I am surprised that there

                                        Page 451

1    would be an expert report without the expert

2    testifying to explain the report.  I don't have that

3    before me.  I don't have the expert's testimony

4    before me.

5              MR. MacLEOD:  They could have asked

6    for the depositions.  They never did once.  If they

7    wanted to depose any of our experts, they could have

8    done so.  They didn't object to any of the reports

9    coming into evidence.  They are now into evidence.

10   That's what we relied upon when we just said we

11   rested.  We have called two witnesses.  We believe

12   that we have proven our case.  And so, that's what we

13   are relying upon because the reports are already in

14   evidence.

15             MS. SOUSSAN:  This morning I

16   understood that your expert was, you know, in the

17   waiting room and then was admitted to the main room.

18   I fully expected you to have your expert.

19             MR. MacLEOD:  She was, and then we

20   heard the evidence from the corporate representative,

21   as well as our client, and decided that we had met

22   our burden.

23             MS. MIERS:  Then they should be

24   willing to withdraw their report from evidence if

25   that's the case.  We didn't need to depose these

Page 452

1    experts.  We've cross-examined them at multiple

2    hearings where we gained the admissions that we think

3    are crucial for you to hear.  Crucial.  And that's

4    why we object to the admissions of the reports

5    without the opportunity to cross-examine them in your

6    presence.

7                    MR. STANLEY:  Judge, they have the

8    prior arbitrations where the testimony is allowed to

9    come in from prior arbitrations and the expert

10   reports come in.

11                   MS. MIERS:  That was not the agreement

12   here.

13                   MR. STANLEY:  We didn't have the

14   agreement either way.

15                   MS. SOUSSAN:  I'll go ahead and make a

16   ruling.  If the expert report is going to stay in

17   evidence, the expert will testify and be available

18   for cross-examination in this proceeding.  So if you

19   want the expert reports to remain in evidence, then

20   the expert will testify in the arbitration hearing.

21                   And, honestly, that is from me.  That

22   is so that I can understand what your expert report

23   says, and I want to see the cross-examination.

24                   So you have a ruling.  The expert

25   report will remain -- it will not be included in

Page 453

1   evidence unless your expert testifies in this

2   proceeding.

3                MR. MacLEOD:  Understood.  Well, then

4   that's going to be -- obviously we have to plan

5   around that, Judge.  So we need to make a phone call.

6                MS. SOUSSAN:  Okay.  Is your expert

7   ready to proceed, assuming you can reach the expert

8   by phone, or do we need to go ahead and let the

9   respondent proceed and then we can interrupt the

10  respondent's case when your expert's available

11  tomorrow?  Or we can go late tonight, but I need to

12  talk to the court reporter about that.  We've got

13  some options here.

14                MR. MacLEOD:  If we can briefly

15  discuss, that would be great, Judge.

16                MS. SOUSSAN:  Why don't you-all take

17  five minutes, if that's long enough.  Do you need 10

18  minutes?

19                MR. MacLEOD:  Five minutes is long

20  enough.

21                (Recess from 5:08 p.m. to 5:12 p.m.)

22                MR. MacLEOD:  The only expert will be

23  Dr. Parrott, who is our economist.  He is only

24  available to testify tomorrow, but we will have him

25  ready to go.  I'm assuming it's 10:00 a.m., but --

                                        Page 454

```
 1              MS. SOUSSAN:  We are starting at
 2    10:00 a.m.  Let me -- you know, counsel for
 3    respondent?
 4              MS. MIERS:  I just want to make sure I
 5    understand.  So you're withdrawing the expert reports
 6    of Cameron and Cunningham-Parmeter?
 7              MR. MacLEOD:  Based on Judge Soussan's
 8    ruling, that's what we are doing.
 9              MS. SOUSSAN:  May I have that in
10    writing, please?  You-all can just write something up
11    and send it over.
12              MR. MacLEOD:  Shauna just typed it,
13    but we will do that again, yes.
14              MS. SOUSSAN:  I would appreciate it.
15    Thank you.
16              MR. MacLEOD:  I'll tell you what.  You
17    cross-examined my client, Judge, and you also told
18    him to continue to answer questions.  You didn't do
19    that with Mr. Rosenthal.  So I'm just --
20              MS. SOUSSAN:  Hold on.  I don't know
21    what the issue is here.  I often question witnesses
22    when I feel a need to, and it doesn't matter who the
23    witness is and it doesn't show any preconceived
24    notions that I have.  And I just think it's not a
25    good use of your time to challenge me on that because
```

Page 455

1   all arbitrators will ask questions when they feel
2   that they need to.

3                   MR. MacLEOD:  Right.

4                   MS. SOUSSAN:  Understand that.  It's
5   not tit for tat.  It's when I have an issue that I'm
6   going to ask the question.  That's all.

7                   MR. MacLEOD:  The Uber opening was on
8   choice.  Mr. Barysas, you agree that was your choice
9   when you worked that day and what time you worked.
10  And so, it's troubling, but we're going to move
11  forward.  Dr. Parrott will be the only expert we
12  have, and we'll put it in writing.

13                  MS. SOUSSAN:  Thank you, sir.  Okay.
14  So as far as the respondent's case in chief, where do
15  we stand on -- you're going to call, I take it,
16  Mr. Rosenthal right now.  I would -- do you think we
17  can get through with him today?

18                  MR. SANDAHL:  I couldn't get through
19  with him tonight.  I will try and shorten up my
20  outline based on what we heard today.

21                  MS. SOUSSAN:  What I would think would
22  be the best way going forward, if all counsel would
23  agree with me, is that we finish with Mr. Rosenthal
24  on direct and cross and redirect and recross and then
25  allow the expert for claimant to testify and then --

                                           Page 456

1    I don't know what else you have in your case.  I just

2    don't know what else respondent has in its case, who

3    else will testify.

4              MR. SANDAHL:  We just have one

5    witness, Mr. Rosenthal.

6              MS. SOUSSAN:  So after Mr. Rosenthal,

7    you're completed?

8              MR. SANDAHL:  That's right.

9              JUDGE SOUSSAN:  So let's finish with

10   Mr. Rosenthal today and tomorrow and then call

11   Dr. Parrott.  Is that okay with everyone?

12             MR. STANLEY:  Yes.

13             MS. SOUSSAN:  Okay.  Then let's go

14   forward.  Mr. Rosenthal, you continue to be sworn

15   under oath.

16             THE WITNESS:  Understood.

17             BRAD ROSENTHAL,

18   having been previously duly sworn, testified as follows:

19                   EXAMINATION

20      Q.   (BY MR. SANDAHL)  Good afternoon, Brad.

21   I'm just pulling up my outline here.  We all

22   understand you work for Uber.

23             Would you just tell us the name of

24   your position with Uber now?

25      A.   Director of M&A integration.

                                    Page 457

1      Q.   As the director of M&A integration, what
2  are your duties at Uber?
3      A.   We have acquired several companies in the
4  last 12, 24 months, and trying now to integrate those
5  companies into the Uber ecosystem.
6      Q.   Do you manage anyone at Uber?
7      A.   Right now, no.
8      Q.   Okay.  And how long have you been with
9  Uber?
10      A.   For a total of over seven years.
11      Q.   You talk about a total.  Can you tell us
12  your history with Uber over the years?
13      A.   Joined originally in January 2014 in Los
14  Angeles as an operations and logistics manager.  Did
15  that for about a year, and then I joined our
16  corporate risk team, which is where I stayed for two
17  and a half years.  And then in May 2017, took on a
18  role leading our international vehicle solutions
19  efforts.  Did that for six months.  Then I led our
20  business development efforts for Uber Health for
21  about a year.  And then in October 2018, I left Uber
22  for approximately 13 months.  And then I rejoined
23  Uber in November 2019 as a director of strategic
24  initiatives.  And then about seven months ago, I took
25  on a role as -- my current work on the M&A

Page 458

1    integration side.

2        Q.    When you left and came back, what made you

3    want to return to Uber?

4        A.    Ultimately, I enjoyed my experience the

5    first go-round.  I think the power of the platform is

6    unique in terms of it impacts a lot of people's

7    lives -- both riders, drivers, restaurants, delivery

8    people, et cetera -- and ultimately made a decision

9    to return to Uber.

10       Q.    Now, apparently Uber wanted you back

11   because you're back there now.

12             What is your understanding as to why

13   they wanted you to come back?

14       A.    They were -- I always was, I guess -- my

15   performance at Uber over my first stint was quite

16   strong and I have a pretty deep understanding of the

17   business, and they wanted me to come back to work on

18   various different issues.

19       Q.    Can you tell us some of the ways that Uber

20   has changed over your tenure since it began in 2014?

21             MR. MacLEOD:  Objection.  Vague and

22   ambiguous.

23             MS. SOUSSAN:  Okay.  You kind of

24   interrupted him.  What was your objection?

25             MR. MacLEOD:  Vague and ambiguous,

1   overly broad.  He asked him how Uber has changed over

2   a 10-year period of time.

3                    MS. SOUSSAN:  Why don't you re-ask

4   your question, Mr. Sandahl?

5        Q.   (BY MR. SANDAHL)  How has Uber grown in

6   terms of the number of people who work for Uber since

7   2014?

8        A.   When I started, there was about 600.  Now

9   there's over 25,000.

10       Q.   Okay.  And are you familiar with Uber's

11  business practices as it relates to drivers in

12  Houston, Texas, from 2017 to the present?

13       A.   I am.

14       Q.   All right.  So let's talk a little bit

15  about Uber's business generally.

16                    What type of business is Uber?

17       A.   We are a technology company that has built

18  software to enable digital marketplaces.  So a

19  digital marketplace such as our rides business that

20  connects buyers and sellers in transportation, as

21  well as a delivery business that connects consumers

22  with restaurants and delivery people to deliver the

23  food from the restaurant to the consumer, grocery,

24  alcohol, the Uber freight business which connects

25  commercial shippers with carriers to bring the goods

Page 460

```
 1    to where they need to go.  And then over the years
 2    we've had other platforms, as well, such as bikes,
 3    scooters, yeah.  So technology that's enabled those
 4    platforms to exist.
 5         Q.   I think you said there's over 25,000
 6    employees.  About how many of those are software
 7    engineers?
 8         A.   Yeah.  Several thousand.  4,000, I think
 9    Mr. MacLeod mentioned earlier.  I think that's about
10    right.
11         Q.   Why do you have several thousand software
12    engineers working for Uber?
13         A.   The tech we have built out is pretty
14    robust, and at the heart we are a technology company.
15    So we have thousands of engineers developing
16    software.
17         Q.   Does Uber employ any drivers to provide
18    transportation services?
19         A.   No.
20         Q.   Would you call Uber a transportation
21    services company?
22         A.   No.
23         Q.   Other than technology -- actually, we just
24    talked about those different lines of business.  So
25    we're going to focus a bit on Uber's rides business
```

Page 461

1      here because that's what Mr. Barysas did, but I do

2      want to touch a bit on the rider side of the rides

3      business, the Uber rider app.

4                   Can you tell us how the Uber rider app

5      works?

6          A.    Sure.  So riders would go to the Apple app

7      store or the Google Play store, and they would

8      download the rider version of the app.  Once they

9      have done that, they would enter in some personal

10     information:  Their name, their phone number, their

11     e-mail address.  It would open an account.  They also

12     have to enter in their payment information, so debit

13     or credit card, and then they also have to consent to

14     the terms and conditions with one of Uber's entities.

15         Q.    And what do people use the Uber rider app

16     for?

17         A.    So the -- once you have the app, they would

18     open the app and they would request a transportation

19     option to hopefully get matched with a driver to get

20     them from Point A to Point B.

21         Q.    Okay.  And are there different

22     transportation options in the app that the rider can

23     choose from?

24         A.    There are.

25         Q.    What are those called?

1         A.    Uber Pool, which is kind of a shared ride

2    in which if you're going one direction, you could get

3    matched with another rider who is going in a similar

4    direction.  There's UberX, Uber Select, UberX L, Uber

5    Black, Uber SUV.  Uber Lux.  There's different

6    options that are available to riders and drivers.

7         Q.    We'll look at Exhibit RX22.  We'll pull

8    that up.  It will be on the screen for you

9    momentarily.

10               Mr. Rosenthal, can you tell us what --

11   if you can just sort of highlight the name up there

12   at the top.

13               Mr. Rosenthal, can you tell us what

14   Exhibit RX22 is, please?

15        A.    Yeah.  This is the terms of use, which is

16   the legal agreement which riders enter into with one

17   of the Uber entities.

18        Q.    All right.  Is part of the rider terms of

19   use a guaranteed connection to a driver every time?

20        A.    There's no guarantee, no.

21        Q.    Do sometimes rider requests for a ride go

22   unfulfilled?

23        A.    They do.

24        Q.    And what does that mean, to be an

25   unfulfilled request?

Page 463

1       A.   It means that there's no drivers available

2   on our platform to transport the rider to wherever it

3   is the rider wants to go.

4       Q.   How often do requests by riders go

5   unfulfilled?

6       A.   Usually it's a couple percentage points.

7   Sometimes it can be a fraction of a percent.  But the

8   busier times of the day, such as usually the evening

9   rush hour or the morning rush hour, it could be a

10  couple of percentage points.

11      Q.   When you talk about percentage points,

12  would you be able to estimate numbers just, say, in

13  the City of Houston how many it would be?

14      A.   1 or 2 percent.

15      Q.   Would that amount to hundreds of rides per

16  week that go unfulfilled?

17      A.   That's right.

18      Q.   Does Uber require drivers using the Uber

19  driver app to remain on standby in order to ensure

20  that all riders get matched with a driver?

21      A.   We do not, no.

22      Q.   If there's a shortage of drivers, does Uber

23  call drivers like Mr. Barysas and ask them to pick up

24  a rider looking for a ride?

25      A.   No, we do not.

Page 464

1      Q.   If there's a shortage of drivers, do they

2  e-mail drivers to ask them to pick up a ride?

3      A.   No.

4      Q.   You're an Uber employee; is that right?

5      A.   That's right.

6      Q.   Do you get called in to start giving riders

7  rides when there are too few drivers to complete the

8  trips?

9      A.   No.

10     Q.   What about other Uber employees?  Do Uber

11  employees get called in to give rides when there's no

12  drivers?

13     A.   No.

14     Q.   When a rider can't get matched with a

15  driver, does Uber have any drivers on its payroll to

16  assign to those riders?

17     A.   No.

18     Q.   Mr. Ridenour, can you --

19     A.   Give me one second.  I have a leaf blower

20  outside.  I have to shut the window.

21     Q.   We're looking at Joint Exhibit Number 2,

22  and we've seen these before.

23          What is Joint Exhibit Number 2,

24  Mr. Rosenthal?

25     A.   That is the community guidelines.

1        Q.    Do they apply only to drivers?

2        A.    No.  Riders as well, in addition, delivery

3    people and consumers that use the Eats or delivery

4    platform.

5        Q.    Let's take a look at Page 2.  You'll see

6    Why Riders Can Lose Access to the -- to Uber-US Only.

7                Do you see that?

8        A.    I do.

9        Q.    If you could call out the bullets there.

10                Mr. Rosenthal, can you tell us some of

11    the reasons why a rider could lose access to the Uber

12    app?

13        A.    Yeah.  They are spelled out here, but

14    damaging personal property, contact with the driver

15    or other riders.  Other riders would be during pool

16    trips mostly.  Inappropriate language or gestures,

17    unwanted contact with a fellow driver or -- with a

18    driver or a fellow passenger once a trip is

19    completed, and then breaking the law.

20        Q.    And if we could turn to Page 3 of Exhibit

21    JX2.  If you can highlight terms of use.

22                Mr. Rosenthal, can a rider also be --

23    lose access to the Uber app for violating the terms

24    of use?

25        A.    That's correct.

Page 466

1          Q.    And if we can kind of make that one smaller

2     and then bring up the next few.  Yeah, that's great.

3                    Carrying firearms, is that a reason

4     why a rider could lose access to the Uber app?

5          A.    That's correct.

6          Q.    And could a rider lose access to the Uber

7     app for discriminating against other riders or

8     drivers?

9          A.    Yeah.

10         Q.    And then is there another reason why they

11    might --

12         A.    The fraudulent or illegitimate behavior,

13    yeah.

14         Q.    And are these similar reasons to why a

15    driver might lose access to the Uber driver app?

16         A.    Yes, similar.

17         Q.    So let's talk about the driver's side of

18    the rides business line.

19                    How do drivers obtain access to the

20    Uber driver app?

21         A.    Similarly, in which they would go to the

22    Apple app store or Google Play store and download the

23    app.  Once they have done that, they would enter in

24    their personal information such as their name, phone,

25    e-mail, address, and the city they want the account

                                              Page 467

1    associated with.  Once they have done that, they

2    would open the account, and then they would have to

3    provide some documentation to us that we are

4    obligated to collect per the state regulations.  That

5    information includes a driver's license, a proof of

6    vehicle registration, and that the driver is

7    allowed to -- I guess insured under that policy and

8    then a vehicle registration.

9              Once a driver has done that stuff, a

10   driver would then need to consent to the -- at the

11   time here, the technology services agreement with

12   Rasier, LLC, and then a driver would -- I forgot to

13   mention the background check.  The driver would need

14   to complete a background check and motor vehicle

15   record check, which are regulatory requirements.

16             Once those are all done, the driver

17   would then be able to go on-line and provide

18   transportation services.

19       Q.   You mentioned entering into a technology

20   services with Raisor, LLC.

21             Are there other technology services

22   agreements that some drivers might enter into?

23       A.   There is, yeah.  The sign-up flow process I

24   just outlined is for drivers that use our TNC

25   services.  Drivers that use the livery services, or

Page 468

```
 1    also known as commercial, have some different steps
 2    along the way, which are -- which are really
 3    predicated upon the regulations that govern livery
 4    drivers in any given jurisdiction.  Those might be --
 5    some of those steps -- particularly, I guess, in
 6    Texas -- would be to provide us with their commercial
 7    livery license, as well as their commercial auto
 8    insurance.  And then the driver would enter into an
 9    agreement with -- I shouldn't say the driver, but the
10    company would enter into an agreement with Uber USA,
11    LLC, which is a different subsidiary of Uber
12    Technologies, Inc. than Raisor, LLC is.
13         Q.   You talked about kind of a division -- some
14    difference between TNC and livery services.
15                   Could you explain that at a high
16    level?
17         A.   Sure.  The livery regulations are a
18    different set of regulations than TNC.  The livery
19    regulations have been around much longer than TNC
20    regulations, which the latter have been around since
21    2017, May or June or something like that.  Livery
22    regulations have been around for much longer.  The
23    City of Houston, I believe, has different set of
24    regulations specifically to livery drivers -- or I
25    guess livery companies is how we should think about
```

Page 469

1    it, whereas the TNC regulations are at a statewide

2    level.  There is differences in the requirements

3    for -- for the different -- different models.

4        Q.    All right.  And so, right now I want to

5    focus on TNC, okay?  Why are drivers required -- you

6    went through a list of things that drivers are

7    required to do.

8                  Why are drivers required to provide

9    those things?

10       A.    It's part of the regulations or the

11   statute.  Texas Occupational code, I believe it's

12   called, which is the TNC regulations.  And those

13   regulations require drivers who use TNC services to

14   do certain things.  It requires TNCs to collect

15   certain documents from drivers utilizing their

16   services.

17       Q.    When you say the TNC law or TNC, does that

18   stand for transportation network companies?

19       A.    That's right.

20                  MR. MacLEOD:  Objection.  Leading and

21   counsel testifying.

22                  MS. SOUSSAN:  Overruled.

23       Q.    (BY MR. SANDAHL)  Can you tell us the

24   difference between just what a TNC is -- and maybe

25   you did this already, but what a TNC -- just in kind

Page 470

1  of layman's terms what the difference between

2  somebody driving TNC and somebody driving in a livery

3  vehicle would be doing?

4      A.    I mean, they would be doing something

5  fairly similar, which is transporting a person from

6  Point A to Point B.  The difference is that under the

7  TNC, it just has different definitions of the

8  for-hire transportation market.  And drivers who do

9  not have a livery license, normal people, they cannot

10  just go transport someone from Point A to Point B

11  unless you have a livery license or you're utilizing

12  TNC services.  So I'm a person in Texas.  I can't go

13  transport someone for a fee.  That's illegal, based

14  on my knowledge, in the State of Texas.  If someone

15  has a livery license, they can go ahead and do that,

16  or if someone is utilizing a TNC service, meaning a

17  driver has signed up with a TNC.  Taxis also can do

18  that.  That's a different set of regulations, from my

19  understanding.

20          MR. MacLEOD:  Nonresponsive.  He's

21  also providing expert testimony at this point.

22          MS. SOUSSAN:  Could you re-ask your

23  question, Mr. Sandahl?

24          MR. SANDAHL:  I just was trying to get

25  the difference between what somebody who is -- if

Page 471

1    there's a division or a difference between TNC

2    drivers and livery drivers.  I was really just trying

3    to get at what the difference is.

4                    MS. SOUSSAN:  Right.  He can testify

5    to that if he has knowledge.

6                    MR. SANDAHL:  I think we've gotten the

7    information I want on it.

8        Q.   (BY MR. SANDAHL)  Do livery drivers and TNC

9    drivers -- might they drive different cars?

10       A.   They might, but they can also drive the

11   same cars.  It doesn't really matter.

12       Q.   Are livery drivers required to pick from a

13   certain level of car?

14       A.   They are not, no.

15       Q.   Okay.

16       A.   Well, take that back.  Per the regulations

17   to get a livery license, the City of Houston has an

18   approved vehicle list.  And I think that they set

19   parameters on vehicle age, as well.  I think the

20   vehicle has to be five years or newer.  So, yeah,

21   there is parameters that are established by the City

22   of Houston.

23       Q.   And do you understand that Mr. Barysas --

24   do you know if he was TNC or a livery driver?

25       A.   So he had two accounts with us.  Actually,

                                          Page 472

1    I think he had three.  But he had a livery account,

2    and then he also, I believe, had two TNC accounts, if

3    I remember correctly.

4         Q.   Could Mr. Barysas -- Barysas get his own

5    clients without using the Uber driver app?

6         A.   Yeah, he could.

7         Q.   And with his livery license, could he have

8    had multiple vehicles as a part of a fleet?

9         A.   He could, yeah.

10        Q.   And is Uber Black an example of the livery

11   model?

12        A.   Yeah.  So within our system, livery drivers

13   can use or, I guess, provide transportation for any

14   of the options that I mentioned earlier -- Pool, X,

15   XL, Select, Black, or SUV.  So a livery driver could

16   perform transportation services for any of those

17   options.

18        Q.   Okay.  Are there potential benefits or

19   drawbacks to using a TNC versus the livery model for

20   drivers?

21        A.   The one big benefit a driver could have --

22   I guess there's a couple, but the ones that come to

23   mind are -- number one is that the company can then

24   go get clients outside of just using a TNC software

25   and can perform transportation for hire totally

Page 473

```
 1    outside of TNCs and do so legally.
 2                   The other would be is they can go buy
 3    multiple vehicles and hire drivers to work for them
 4    starting a company, and you've got a whole fleet, say
 5    10 different vehicles, and you have 15 different
 6    drivers who use those 10 vehicles.  That is a real
 7    benefit of being a livery company.  It enables those
 8    companies to grow if they want to.
 9       Q.   Are the booking fees the same for TNC
10    versus livery drivers that use the Uber driver app?
11       A.   The booking fee is the same.  However,
12    the -- so the booking fee is paid by the rider.
13    We --
14                   MR. MacLEOD:  He's already answered
15    the question.  Nonresponsive.
16                   JUDGE SOUSSAN:  You interrupted him,
17    so I need to -- what's your objection?
18                   MR. MacLEOD:  He had already answered
19    the question, and then he flipped to "but" and he was
20    going to go on another one of his long narratives.
21    So he had already answered the question.  Just as
22    Ms. Miers did in cutting off my client many times, I
23    wanted to object nonresponsive so we didn't have to
24    get the whole narrative out.
25                   MS. SOUSSAN:  Okay.  Ask another
```

Page 474

1   question, Mr. Sandahl.

2       Q.   (BY MR. SANDAHL)  Sure.  So I think you

3   started saying the booking fee is the same, but is

4   there a difference in the way drivers get part of or

5   some of the booking fee when they drive as a TNC

6   driver versus a livery driver?

7       A.   Yeah.  The -- if a driver is a TNC driver,

8   that booking fee will come -- the driver will pay us

9   that booking fee.  If the driver is a livery driver,

10  the livery driver will keep that booking fee.

11      Q.   Now, are staging areas for livery drivers

12  at airports the same as TNC areas?

13      A.   It depends.  My understanding is that in

14  the City of Houston there was a separate staging area

15  as determined by IAH, the director of IAH.

16      Q.   Separate staging area?  One for livery, one

17  for TNC drivers?

18      A.   That is my understanding.

19      Q.   If we look at Exhibit RX18 -- and we'll go

20  to Section 2402.101.  This is a TNC statute that

21  we've been talking a little bit about.

22               Before I do that, are you generally

23  familiar with the statutory and regulatory framework

24  that Uber is subject to?  Sounds like you are.

25      A.   You mean the TNC Raisor or LLC?  Yeah.

Page 475

1          Q.    And how have you become familiar with those

2     regulatory frameworks?

3          A.    I have just over the years become familiar

4     with them and -- and what they consist of and how to

5     comply with them.

6          Q.    As part of your duties and responsibilities

7     with Uber?

8          A.    That's right.

9          Q.    And what is your understanding of who the

10    requirements of the TNC statutes of Texas apply to?

11         A.    TNCs, as well as TNC drivers.

12         Q.    Was Mr. Barysas required to have insurance?

13         A.    He was required to have insurance.

14         Q.    Was he required to have a four-door car?

15         A.    That is my understanding, yeah.

16         Q.    Do at least some of those requirements come

17    from the TNC?

18         A.    That is right.  Well, sorry.  Come from the

19    TNC or the TNC regulations?

20         Q.    Let's take a look at -- I think it's 101.

21    This is the TNC statute.

22                    What does this require?

23         A.    That the driver have insurance.

24         Q.    Okay.  Clear that off, please.  Let's go to

25    2402.107 and pull up the driver requirements.

Page 476

1              What does this TNC statute require

2    TNCs to confirm drivers using their digital network

3    have?

4        A.    So a driver's license and then 18 years or

5    older and then registration, the vehicle

6    registration, and then financial responsibility for

7    each motor vehicle, which means -- financial

8    responsibility is auto insurance that meets the

9    state's minimum financial responsibility.

10       Q.    Could you clear this off and go to

11   Subsection C of 107?

12              What is this requirement of the TNC?

13       A.    That is the background check requirement.

14       Q.    I'm just scrolling through a couple of

15   things here.  Don, could you go down to

16   Section 111(a)(2)?

17              I guess I'm just drawing your

18   attention, Mr. Rosenthal, to the Subsection 2(a).

19   What does Section 2402.111(a)(2)(a) require?

20       A.    That a vehicle that a driver uses have four

21   doors and that the max capacity is no more than

22   eight.

23       Q.    Go to Section 112(a)(1).

24              Mr. Rosenthal, what does

25   Section 112(a)(1) require?

Page 477

1       A.   That we have a policy that prohibits a

2    driver from discriminating based on a rider's

3    location or destination, race, color, national

4    origin, religious belief or affiliation, sex,

5    disability, age.

6       Q.   We can go down to the next section there.

7       A.   And refusing service animals.

8       Q.   Okay.  Does Uber have a policy that

9    prohibits refusing service animals?

10      A.   Yeah.  It's in the technology services

11   agreement, as well as I believe it's on our community

12   guidelines.

13      Q.   Don, could you pull up Exhibit RX35,

14   please?  And just highlight the second half there or

15   call out --

16            Mr. Rosenthal, what is RX35?

17      A.   This is -- it's literature from our Uber

18   help page or help website that describes pet-friendly

19   rides, which are -- they are not service animals, but

20   drivers have the ability to opt -- opt out of rides

21   that -- where someone might be bringing a non-service

22   animal pet.

23      Q.   And can drivers opt out of providing rides

24   to service animal pets or service animals?

25      A.   No.  That would be illegal.

Page 478

1        Q.    Okay.  But they can opt out of providing

2   pet-friendly rides?

3        A.    That's correct.

4        Q.    Could you turn to the second page and focus

5   in on how to opt out?  How Do I Opt Out?

6              Mr. Rosenthal, what does the called

7   out section of Exhibit RX35 here on the second page

8   of it show?

9        A.    It shows the process in which drivers can

10  follow to opt out of pet-friendly rides.

11       Q.    Does Uber -- does Uber prescribe specific

12  hours during which claimant would be required to be

13  logged into the app?

14       A.    No.

15       Q.    Can he log in whenever he wants?

16       A.    Yes.

17       Q.    Can he just decide not to log in some days

18  if he wants?

19       A.    Correct.

20       Q.    Does Uber restrict claimant -- or did Uber

21  restrict claimant when he was using the app from

22  using other apps like the Lyft app?

23       A.    No.

24       Q.    And did you see testimony today about

25  Mr. Barysas using the Lyft app?

                                          Page 479

1        A.   I did.

2        Q.   Let's take a look at JX4 again.  We're

3   going to turn to some agreements.  So this is one

4   that we've talked a little bit about the Rasier

5   agreement.  Is this something -- if you want to pull

6   up the top three lines there.

7              Can you explain generally what this

8   Exhibit 4 is?

9        A.   It is the agreement in which TNC drivers

10  enter into with Rasier, LLC.

11       Q.   Don, if you could pull up RX48.

12             And what is Exhibit RX48,

13  Mr. Rosenthal?

14       A.   That is the technology services agreement

15  in which livery drivers enter into with Uber USA,

16  LLC.

17       Q.   And I think based on your other testimony

18  you said that your understanding is that Mr. Barysas

19  or his company -- well, can you tell me who entered

20  into Exhibit RX48 with Uber in this case?

21       A.   So companies enter into the agreement.  And

22  then sometimes the company is the same as the driver,

23  but it's the company who enters into the agreement.

24       Q.   And in this case, is it your understanding

25  it was DB Pedicabs that entered into the Uber USA

                                          Page 480

1    agreement?

2              MR. MacLEOD:   Leading.

3         A.    That is my understanding.

4         Q.    (BY MR. SANDAHL)  So I do want to jump back

5    to Joint Exhibit 4 and talk to you a little bit about

6    that one.  Let's take a look at the definition of

7    transportation services under 1.12.

8              Mr. Rosenthal, how does this

9    agreement, JX4, define transportation services?

10        A.    "Your provision of P2P passenger

11   transportation services to users via the Uber

12   services in the territory using the vehicle."

13        Q.    And what does that phrase P2P mean?

14        A.    It's defined in the second paragraph of the

15   agreement, first or second agreement, but it means

16   peer to peer.

17        Q.    Is that roughly the same as TNC, or are

18   they different?

19        A.    Yes.  It's pretty much synonymous the way

20   we think about it.  This technology services

21   agreement was drafted in 2015 at a time in which --

22   in which TNC laws were not drafted or, I guess,

23   enacted in every state.  And also, not all states

24   call peer to peer transportation TNC.  Some states

25   have a different acronym or name for it.

Page 481

1        Q.    Let's look at the definition of territory

2    under Section 110.

3        A.    It means the city or metro areas in the

4    United States in which you are enabled by the driver

5    app to receive requests for transportation services.

6        Q.    If claimant decided tomorrow that he wanted

7    to move to Arkansas and continue using the Uber

8    driver app, could he do that?

9        A.    He could.

10        Q.    And you may have heard that Mr. Barysas

11    moved from New York City to Houston in 2017, and I

12    just want to -- did you hear that?

13        A.    I did.

14        Q.    Okay.  Mr. Barysas also took a trip in 2017

15    to go to his home country.  Did he need to tell

16    anyone at Uber that he was going to be going away to

17    Lithuania for a while?

18        A.    No, he did not.

19        Q.    Don, if we can pull up RX33.

20              What is Exhibit RX33, Mr. Rosenthal?

21        A.    It's -- it describes the process in which a

22    driver would follow to the extent that they want to

23    switch their city.

24        Q.    Do drivers who want to drive in a new city

25    need approval from Uber?

Page 482

1     A.    Approval, no.

2     Q.    Let's go back now to JX4.  Kind of jumping

3  back and forth.  I want to focus a little bit more on

4  this.  Let's go to Section 2.4 of JX4.  And I want to

5  focus in on the sixth line down where it starts in

6  the middle of the line, "You retain the sole" --

7  where is that?  It's above that one.  You almost have

8  it.  You have it.  Right there.

9              What does this section of JX4 provide,

10  Mr. Rosenthal?

11     A.    It provides him with the sole right to

12  determine when, where, and for how long to utilize

13  the driver app or the Uber services.

14     Q.    Does Uber have any -- retain any

15  contractual control over when, where, and for how

16  long the claimant uses the driver app?

17     A.    It's in the sole right of you here, you

18  meaning driver.

19     Q.    All right.  Let's look nine lines from the

20  bottom.  This is going to be counting up.  It starts

21  with "You acknowledge and agree."  And does this

22  provision -- yeah, all the way through -- yeah, right

23  about there.

24              Does this provision -- well, what does

25  this provision allow Mr. Barysas to do?

                                          Page 483

1        A.    It allows him --

2                MR. MacLEOD:  Objection to the

3    document.  Speaks for itself, Judge.

4                MS. SOUSSAN:  We've been reading from

5    documents all day.  I don't think you were with us in

6    the morning, so I'm going to go ahead and allow this

7    type of testimony.

8                MR. MacLEOD:  Who was with us in the

9    morning?

10               MS. SOUSSAN:  I didn't see you this

11   morning, not all morning.  You were clearly here some

12   part of the day, but we've been reading from

13   documents.

14               MR. MacLEOD:  Right.  Now we've got

15   contracts, and we're taking a Uber corporate

16   representative and we're saying that a non-lawyer and

17   someone who has not been proven up as an expert is

18   going to talk about what contractual language means.

19   There's no foundation for this.  I've been sitting

20   here all day, Judge, just like these other lawyers,

21   like Ms. Miers who doesn't have the video on.  I've

22   been sitting here all day.

23               MS. SOUSSAN:  I apologize.  When I

24   don't see you, I don't know that you're with us.  I'm

25   going to allow Mr. Sandahl to continue this type of

Page 484

1    testimony and reading from the document.

2        Q.    (BY MR. SANDAHL)   So, Mr. Rosenthal, what

3    is this --

4              MR. MacLEOD:   He's asking what the

5    contractual language means.   It's not the reading

6    from the document.

7              MS. SOUSSAN:   He may testify to his

8    understanding of what the language means.

9        Q.    (BY MR. SANDAHL)   Mr. Rosenthal, can you

10   tell us what the highlighted portion of

11   Section 2.4 -- the lower part of that in JX4

12   provides?

13       A.    Allows the driver the complete discretion

14   to provide services or otherwise engage in other

15   businesses or employment activities and makes it sort

16   of for the same of clarity that they have the

17   complete right to use other software, application

18   services in addition to Uber services and engage in

19   any other occupation or business.

20       Q.    All right.   Let's take a look at now at

21   Uber USA transportation services agreement,

22   Section 2.4.   Sorry.   We'll go seven lines down,

23   Customer and Its Drivers.

24              Mr. Rosenthal, this one starts with

25   "customer and its drivers," and it provides pretty

1    similar -- "retain the sole right."

2                    In this agreement, what does customer

3    mean or who is customer?

4         A.   So the company had -- it's defined on the

5    first page, the party that enters into the

6    agreement -- or the first couple paragraphs.  If my

7    recollection serves me, it's the company that enters

8    into the agreement.

9         Q.   We can look at the definition.  I don't

10   want to -- can we jump back to the first page.

11   Definition of customer.

12        A.   Very first page.  There you go.

13        Q.   Very first page of the technology

14   agreement.  Sorry.

15                    This is the definition of customer

16   that you were just talking about?

17        A.   It is.

18        Q.   And it says, "Independent company in the

19   business of providing transportation services"?

20        A.   That's correct.

21        Q.   Okay.  Going back to Section 2.4, Line 7 or

22   seven lines down, "Customer and its drivers retain

23   the sole right," what does "its drivers" mean when it

24   talks about customer and its drivers?

25        A.   It's the company and its drivers.  So the

Page 486

1    transportation company's drivers.

2         Q.    This also, like the Rasier agreement,

3    provides that the customer and its drivers have the

4    sole right to determine when, where, and for how long

5    to use the app; is that right?

6         A.    That is right.

7         Q.    Okay.  And again, nine lines up from the

8    bottom, "Customer acknowledge and agrees" -- is this

9    another provision that allows customer in this

10   agreement to provide other services other than the

11   use of the Uber driver app?

12        A.    That is right.

13        Q.    So setting the contractual agreements and

14   the TNC statute aside, does Uber consider drivers

15   like Mr. Barysas to be employees?

16        A.    No.

17        Q.    What does Uber consider drivers like

18   Mr. Barysas to be?

19              MR. MacLEOD:  Calls for a legal

20   conclusion.

21              MS. SOUSSAN:  I have to tell you,

22   Mr. MacLeod, but I think you already know this.  Your

23   client testified that he was an employee, not an

24   independent contractor.  So I'm going to allow like

25   questioning on the part of the respondent.

                                          Page 487

1          Q.    (BY MR. SANDAHL)   Mister --

2          A.    We consider them our customers or

3     independent businesses that utilize our services.

4          Q.    And when in the process of signing up would

5     claimant have accepted the agreements that we were

6     just looking at?

7          A.    Prior to being able to go on-line and

8     indicate his availability to provide transportation

9     services.

10         Q.    Do drivers who agree to these agreements

11    have the opportunity to review the agreements before

12    they enter into them?

13         A.    They do.

14         Q.    How much time do they have to review the

15    agreements?

16         A.    It is really unlimited.

17         Q.    Is there a deadline for them to accept

18    them?

19         A.    No.

20         Q.    Are they allowed to review them with an

21    attorney before accepting them?

22         A.    They could.

23         Q.    And after they accept the agreements, do

24    they receive a copy of them?

25         A.    There's a copy made available to them in

                                          Page 488

```
 1    their driver profile page, yeah.
 2         Q.   Can they visit those whenever they want
 3    when they are in the app?
 4         A.   At any time, yeah.
 5         Q.   Could they print a hard copy of the
 6    agreements?
 7         A.   They could, yeah.
 8         Q.   And is there another way to get a hard copy
 9    if a person doesn't have a printer or computer?
10         A.   They could go to our in-person Greenlight
11    hubs and ask for one there.  We have printers there.
12    They might not be open now, the Greenlight hubs, but
13    prior to COVID, they were.
14         Q.   I just have a couple more questions before
15    moving on to a new topic.
16              MS. SOUSSAN:  Okay.  It's 6:00
17    o'clock, so how much longer do you have?
18              MR. SANDAHL:  Two minutes.
19              JUDGE SOUSSAN:  Let's go.
20         Q.   (BY MR. SANDAHL)  What information do
21    drivers have access to in their driver portal in
22    addition to the agreements that they have entered
23    into?
24         A.   They have access to how they have -- like
25    their banking information and their tax information.
```

Page 489

1   So information related to how they have signed up or,

2   I guess, what type of entity they have -- they would

3   like to utilize.  So it could be, like, a C corp, an

4   S corp, an LLC, the different types of LLCs, et

5   cetera.  There's, like, 10 different options.

6              They would also have the access to all

7   of their previous trip history.  And within that,

8   they could basically click on each trip and see the

9   breakdown of the fees the rider paid and the fees

10  that the driver paid us.

11             They would have access to quarterly

12  summaries of all of that your -- and annual summaries

13  of all of their trips.  There's more, but those are

14  the things that come to mind.

15       Q.   Could they see the number of miles that

16  they have driven?

17       A.   They could, yeah, in their year-end tax

18  summaries.  The year-end tax summaries are kept there

19  and include all of the miles that a driver has driven

20  while they are logged into our platform.  By "logged

21  in," I mean from hitting the go on-line button all

22  the way to the go off-line button.

23       Q.   Can they receive information about tips in

24  the driver portal?

25       A.   They do have access to that.

```
 1              MR. SANDAHL:  That's a natural

 2    breaking point, if we could, Your Honor.

 3              THE COURT:  Are there any issues that

 4    we need to discuss before we end for the day?

 5              Okay.  Tomorrow -- and you can share

 6    this with your counsel -- whoever is going to be

 7    participating, please have your video available so I

 8    know who is in the room and who is not so we don't

 9    have the problems that I had earlier.  I did not mean

10    to insult you by saying you were not here.  So if

11    you're going to be joining us, please have your video

12    on so I can see who is here and who is not.  All day.

13              All right.  If there's nothing else,

14    then we'll start tomorrow at 10:00 o'clock.

15         (Whereupon at 6:03 p.m. the

16         arbitration was recessed.)

17

18

19

20

21

22

23

24

25

                                          Page 491
```

```
 1
 2    DAINIUS BARYSAS,            )
      Claimant                    )
 3                                )
      vs.                         )  CASE NO. HON. SUSAN SOUSSAN
 4                                )  ARBITRATOR
      UBER TECHNOLOGIES, INC.,    )
 5    Respondent                  )
 6
 7                 REPORTER'S CERTIFICATE
 8                  ARBITRATION DAY 2
 9                    May 2, 2022
10
11        I, Shauna Foreman, Certified Shorthand Reporter
12    in and for the State of Texas, hereby certify to the
13    following:
14        That the foregoing transcript of ARBITRATION DAY
15    2 is a true record of the proceedings;
16        That the original transcript was delivered
17    to Kimberly R. Miers.
18        That a copy of this certificate was served on
19    all parties and/or the witness shown herein on
20    _____.
21        I further certify that pursuant to FRCP Rule
22    30(f)(1), the signature of the deponent:
23        _____was requested by the deponent or a party
24    before the completion of the deposition and that the
25    signature is to be before any notary public and returned
```

                                          Page 492

```
1    within 30 days (or _____ days, per agreement of counsel)
2    from date of receipt of the transcript.  If returned, the
3    attached Changes and Signature page contains any changes
4    and the reasons therefor;
5         __x___was not requested by the deponent or a
6    party before the completion of the deposition;
7         I further certify that I am neither counsel for,
8    related to, nor employed by any parties or attorneys
9    in the action in which this testimony is taken, and
10   further that I am not financially or otherwise interested
11   in the outcome of this action.
12        Certified to by me on this the 12th day
13   of May, 2022.
14
15                         Shauna Foreman
16                         Shauna Foreman, CSR
                           Texas CSR 3786
17                         Expiration:  10/31/2023
                           Veritext Legal Solutions
18                         300 Throckmorton Street
                           Suite 1600
19                         Fort Worth, Texas  76102
                           Tel. (817)336-3042
20                         Firm No. 571
21
22
23
24
25
                                              Page 493
```

**[1 - 2014]**

| 1 |
|---|

**1** 278:10 289:2
359:8 421:15
427:10 438:5
464:14 477:23,25
492:22
**1,000** 423:14
**1,188** 422:18
423:15 424:5
**1.12.** 481:7
**1.3032** 307:22
**10** 232:24 237:23
244:19 278:3
280:22,24 289:4
366:6 422:4,9
427:14 446:13
454:17 460:2
474:5,6 490:5
**10,500** 261:14
**10/31/2023** 493:17
**100** 346:8 373:14
401:5
**101** 476:20
**104** 401:5
**106** 401:5
**107** 477:11
**108** 401:6
**1099k** 347:19
**10:00** 454:25
455:2 491:14
**11** 230:4 371:24
**110** 401:6 482:2
**111** 477:16
**112** 401:6 477:23
477:25
**113** 362:3
**1134** 440:24
**114** 401:10 428:25
**114.09** 429:17
**116** 401:10

**117** 381:6 392:6
401:20
**1173** 227:6
**1174** 226:15
**1179** 265:20,21
**1180** 310:22
**1181** 220:1 331:3
331:15
**1182** 222:22
**1187** 308:5
**119** 401:10
**11:24** 263:8
**11:41** 263:8
**12** 232:24 234:6
371:16,16 385:6
392:7 417:8
419:20,21 458:4
**120** 401:10
**1231** 404:14
**1242** 305:1
**125** 402:24
**1271** 312:3
**128** 402:24
**129** 401:14
**1292** 320:11
**1293** 432:18
**1294** 321:11
431:23
**12:03** 355:8
**12th** 252:20
253:24 255:15,16
493:12
**13** 233:6 429:14
458:22
**130** 393:19
**1301** 199:12
**1305** 316:13
**132** 401:16
**134** 401:18
**1368** 388:24

**1375** 318:5
**138** 306:22
**1382** 327:1 328:6
**1386** 263:11
395:18
**1388** 230:3
**14** 237:16,16
404:13
**14.52** 307:20
**14131** 493:15
**1426** 324:24
436:16
**1435** 228:23
**149** 403:11
**1493** 322:23
**14th** 202:2 252:24
**15** 247:14 258:4,11
263:6,6 305:5,8,17
305:22 330:10,14
330:15,20 367:8
398:10 446:13
474:5
**15,217** 422:2
**150** 250:18
**1560** 199:7 314:15
**157** 403:12
**16,000** 367:8
**1600** 493:18
**164** 299:4
**166** 300:21
**168** 301:15
**16th** 429:4
**17** 234:21 243:23
296:23 393:19
**171** 401:22
**173** 402:7
**17th** 322:24
**18** 308:1 362:6
399:13 441:10
477:4

**18.47** 315:15 316:4
**18.47.** 316:11
**181** 402:7
**18th** 316:15
**19** 262:1
**1900** 199:12
**19th** 307:1 399:13
**1:00** 319:24 320:8
320:9
**1:15** 320:2
**1:59** 320:9
**1st** 252:7 255:7
327:5,8

| 2 |
|---|

**2** 198:7,8,10
296:20 297:14
355:18 404:14,15
464:14 465:21,23
466:5 477:16,18
477:19 492:8,9,15
**2,537** 422:14
**2.4** 483:4 485:11
486:21
**2.4.** 485:22
**2.63** 429:5
**20** 273:8 307:11
311:2,17 316:17
317:6,8,13 343:15
360:7,12 364:4
395:11
**20,000** 367:14,24
**200** 341:8,9
**2003** 274:5
**2006** 337:8 346:6
**201** 200:4
**2013** 234:6,14
**2014** 219:21
220:24 222:7
234:6,13 274:8,11
274:11 275:11
331:20 353:1

Page 1

**[2014 - 50,892]**

366:17 405:4
439:8 458:13
459:20 460:7
**2015** 231:6 234:6
234:14 481:21
**2016** 230:24 231:6
234:7,14,21 235:1
244:6 278:23
289:6 320:14
321:15 347:7,9
**2017** 230:24 232:7
235:1 274:11,12
274:14 293:10
296:23 312:14
322:25 323:23
338:7,11 346:14
380:20 419:15
423:11,20 424:5
425:24 442:25
458:17 460:12
469:21 482:11,14
**2018** 216:11,15,19
220:4 223:19,22
224:7 225:6,17
226:19 227:6
228:11,23 230:24
232:10,13 235:1
263:13 266:6
274:3 307:1 311:1
315:20 316:15
324:25 326:5
331:16 399:4
407:10,15,18
426:9 429:4,4
458:21
**2019** 230:3,4,24
235:1 252:17,20
253:24 254:8,14
255:16 274:22
275:11 297:19,22
297:25 301:6

327:3 338:7,11
339:1,2,11 346:14
347:9 350:15
352:2,7 383:4
414:2 427:14
439:9,13 441:13
442:7,16 443:1
458:23
**2020** 252:8,16
255:7 327:5
340:17 352:19
414:11,12 442:4
**2021** 261:9,13,23
327:8 348:24
349:12 392:6
441:8 443:19
444:8 447:23
**2022** 198:8,12
252:24 253:18
492:9 493:13
**20b** 425:2
**20s** 367:13
**21** 237:16
**21,960** 425:17
**212** 364:22
**215** 321:18 322:8
**21st** 315:20
**22** 362:7
**22nd** 216:10 429:4
**23** 255:1 441:10
**239** 441:8,10
**24** 366:15 458:4
**240** 441:10
**2402.101.** 475:20
**2402.107** 476:25
**2402.111** 477:19
**247** 440:23
**24th** 322:25
323:23
**25** 237:24 311:4

**25,000** 460:9 461:5
**25,105** 425:15
**250** 432:3,15
**25th** 352:7
**26** 278:23 388:12
439:1
**27** 216:19 264:2,18
311:1 420:1
**27,399** 419:21
**272** 200:6
**27a** 425:6
**27th** 216:15
**28** 326:5 425:14
**283** 422:16
**28th** 324:25
**29** 297:19
**29,300** 261:10
**2925** 199:6
**29th** 220:4 331:16
349:11 443:19
**2:00** 320:8
**2:15** 320:3
**2nd** 198:11

**3**

**3** 293:4,5 297:16
466:20
**30** 360:7,12 492:22
493:1
**30,000** 350:5
**300** 321:5 493:18
**30th** 226:19
228:23
**31** 389:21
**31st** 261:9
**336-3042** 493:19
**344** 200:6
**362** 278:15
**365** 287:10
**3786** 493:16
**3:35** 398:11

**3:52** 398:11
**3rd** 312:14

**4**

**4** 232:15,22 480:8
481:5
**4,000** 260:10,13
461:8
**4,008** 422:5,9,12
**40** 415:20
**400** 321:6,10
**4008** 422:12
**41** 417:22 428:6
**42** 407:15 418:18
**433** 200:7
**44** 406:5,10 425:17
425:22 440:16
**443** 200:7
**45** 407:19
**457** 200:10
**46** 248:8,14
**46-243** 248:17
**47** 399:11
**48** 407:22
**48.77** 313:13
**49** 347:12,18
428:11,13
**4:30** 430:17
**4:36** 430:17

**5**

**5** 265:4 334:8,19
399:8,9 416:20,22
418:10,21
**5,000** 369:13
**5,450** 426:4
**5.84** 429:12
**50** 244:11 276:23
307:4,10,12
372:13 385:17
**50,892** 421:17

Page 2

[51 - acceptance]

**51** 248:6
**53,433** 427:11
**55** 399:17
**56** 399:17
**57** 399:18
**571** 493:20
**592** 232:17
**5:08** 454:21
**5:12** 454:21
**5th** 327:2

### 6

**6** 223:22 233:6
289:7,23 293:10
**60** 304:14 385:17
400:11
**60,000** 366:24
367:12
**600** 460:8
**62** 293:11 294:5
334:13 400:15
**638.50** 372:1
**64** 295:19
**65** 248:16 296:6
400:15
**68** 356:18
**69** 400:18 407:11
**6:03** 198:12
491:15
**6th** 223:18 293:7

### 7

**7** 213:1,3 290:8
321:14 331:3
486:21
**7.20** 319:11
**70** 296:24 304:15
359:3 400:18
**71** 349:12 355:23
**72** 261:13,16 356:3
**74** 400:18

**7520** 255:2
**753** 255:14
**754** 255:21
**756** 255:3
**76** 400:18
**76102** 493:19
**77010** 199:13
**77098** 199:7
**78** 351:19
**78,000** 350:20
**7:00** 378:2 445:9
445:16
**7th** 444:7,16

### 8

**8** 263:10 266:6
292:13 306:21
320:11 381:2,3,7
392:7 395:17
419:3 420:7
431:10 436:16
**817** 493:19
**82** 400:18
**8292** 431:11
**84** 400:21
**865** 420:6
**867** 420:25
**87** 400:24
**874** 422:11
**89** 401:1
**8:00** 377:12 445:8
445:16
**8th** 263:13 289:6
399:4

### 9

**9** 224:7 225:6
228:11 233:6
237:15 292:14
422:1 426:7,9
**90** 361:16

**903** 427:18
**91** 401:1
**927** 426:16
**93** 401:5
**95** 373:14
**954** 213:2,5 333:15
**956** 216:14 331:4
**960** 223:25
**99** 375:4
**9:30** 447:18
**9:59** 198:12
**9th** 227:6

### a

**a.m.** 198:12
247:19 263:8,8
377:12 445:8,16
454:25 455:2
**ability** 206:19
221:9 223:12
270:17 275:16
283:6 302:1 314:8
324:12 325:25
326:3,12,14
357:20 391:6,16
424:17 451:13
478:20
**able** 206:23
209:12 211:12
250:16 269:1,7
276:8,11,15
277:22 278:1
283:9 288:4
294:24 302:10
307:21,24 313:17
317:21 318:11
321:24 322:9
324:5 326:23
327:20 328:3
329:20 330:6
334:13 339:15
354:7 435:14

436:4 438:23
464:12 468:17
488:7
**absolutely** 283:25
284:1 288:9
299:10 302:3
304:10,17 308:3
327:15 341:13
360:25 361:2,8
398:8 451:9
**abuse** 333:19
**abused** 325:4
**abusive** 359:1
**acceleration**
212:24
**accelerations**
211:9
**accelerometer**
212:16,19
**accept** 234:16,23
237:18 238:6,8,21
254:3,16 256:2,8
256:25 258:12
277:16,19 280:15
280:23 283:12,13
285:8 286:2
291:25 294:17
295:11 305:5,10
305:17 306:8
328:19 330:3
335:10 336:12
354:25 355:9
362:17 388:6,15
392:10 394:23
402:20 424:23
488:17,23
**acceptance** 282:20
282:20,25 283:1,7
291:14 294:2,14
295:5,5,12 355:25
390:25 392:16

[accepted - affidavit]

| | | | |
|---|---|---|---|
| **accepted**  246:2<br>258:5 283:3 317:5<br>394:17 488:5<br>**accepting**  215:11<br>217:25 234:20<br>282:22 283:5<br>285:5 287:21<br>291:18 295:7<br>299:19 306:2,17<br>333:20 356:10<br>391:24 392:9,25<br>488:21<br>**accepts**  247:9<br>281:1<br>**access**  204:12,17<br>207:20 216:6,19<br>216:24 217:12<br>219:14,22 220:6<br>221:2 222:17,18<br>228:2 230:9 232:6<br>233:3 281:15<br>282:8,16 283:16<br>283:19 284:3,22<br>287:7 288:10<br>289:8 290:9,21<br>291:3,12 292:14<br>292:24 294:19<br>295:14 296:25<br>298:20 299:2,10<br>301:2,13 302:7<br>303:10,15 305:20<br>331:19,22 332:23<br>333:13 334:1<br>336:4 357:23,25<br>358:16 393:2<br>394:16 424:17<br>437:6 466:6,11,23<br>467:4,6,15,19<br>489:21,24 490:6<br>490:11,25 | **accident**  408:16<br>**accidentally**<br>390:10<br>**account**  213:21,23<br>216:8 221:3 228:5<br>229:11,11 265:16<br>280:7 281:19<br>284:13 286:25<br>290:9,21 291:3,19<br>292:15,24 295:8<br>301:19,19 308:7<br>321:19 327:4<br>329:19,20,25<br>330:11,22 340:13<br>356:11 381:23<br>382:5,8,12 392:10<br>424:14 462:11<br>467:25 468:2<br>473:1<br>**accountant**  338:18<br>423:7<br>**accounts**  284:13<br>285:12 300:1<br>472:25 473:2<br>**accurate**  361:18<br>365:20 367:24<br>377:5,22<br>**acknowledge**<br>431:1 483:21<br>487:8<br>**acquired**  369:3<br>374:12 458:3<br>**acronym**  481:25<br>**act**  236:16<br>**action**  229:25<br>303:11 493:9,11<br>**actions**  221:7<br>437:2<br>**activated**  288:23<br>329:20 | **activation**  328:16<br>**active**  327:7,8<br>328:12 337:10<br>338:14 346:11<br>381:23,25 389:13<br>424:15<br>**activities**  216:5<br>217:16 287:11,16<br>295:20 300:11<br>333:17 346:15<br>485:15<br>**activity**  213:12<br>284:8,15,17,25<br>299:12 333:16<br>**actor**  436:18<br>**actual**  203:16<br>239:3 240:2 244:2<br>247:6 251:3<br>264:10,11 269:13<br>373:10 407:3<br>**acwilliams**  199:13<br>**add**  363:20 370:5<br>373:25<br>**added**  330:10<br>**addition**  269:4<br>296:9 346:23<br>347:3 354:18<br>412:6 466:2<br>485:18 489:22<br>**additional**  202:19<br>216:4 265:25<br>266:3,15,17<br>315:24 316:3<br>363:23<br>**address**  227:23<br>306:10,14,15<br>348:7 386:19<br>462:11 467:25<br>**addresses**  274:2<br>313:12 365:2 | **adds**  309:24<br>**adjust**  244:3<br>**adjusted**  313:13<br>313:24 314:2<br>**adjusting**  243:23<br>**adjustment**<br>315:11,15 320:14<br>**adjustments**<br>315:21,23<br>**admissible**  270:10<br>**admission**  447:6<br>**admissions**  453:2<br>453:4<br>**admit**  407:3<br>411:10 412:3<br>447:9<br>**admitted**  216:2<br>347:18 407:2<br>449:4 450:1,18<br>452:17<br>**ads**  259:15<br>**advantage**  238:21<br>**adverse**  262:22<br>**adversely**  262:5<br>**advertised**  337:15<br>**advertisements**<br>342:11 435:6<br>**advertising**  259:14<br>259:19,24 353:7<br>436:7<br>**advice**  338:21<br>419:9,14<br>**advised**  214:24<br>338:17 340:12<br>432:1<br>**advisement**  449:7<br>449:15<br>**affect**  262:23<br>335:11 336:3<br>**affidavit**  450:8 |

Page 4

[affiliate - answer]

**affiliate** 273:18
337:14 338:15
**affiliation** 478:4
**affirmatively**
368:6
**afraid** 325:21
387:22
**afternoon** 457:20
**age** 268:20 472:19
478:5
**agent** 236:17,19
236:23 328:11
**aggressive** 323:5
**ago** 206:24 230:7
345:3,5 412:13
423:8 424:24,25
425:1 444:3
458:24
**agree** 214:5,21
222:8 225:5 236:4
256:4 257:5
258:23 259:2
348:17 350:16
356:14 358:5,23
360:15,18 362:18
365:11,12,14
374:24 383:22
393:13 401:7
402:1 404:3,6
420:19 430:3
444:10 456:8,23
483:21 488:10
**agreed** 433:7
447:6
**agreement** 204:4
204:11 205:8
352:25 431:2,5,8
450:9 453:11,14
463:16 468:11
469:9,10 478:11
480:5,9,14,21,23

481:1,9,15,15,21
485:21 486:2,6,8
486:14 487:2,10
493:1
**agreements**
353:25 354:4,5
468:22 480:3
487:13 488:5,10
488:11,15,23
489:6,22
**agrees** 487:8
**ahead** 263:5
330:10 364:5
372:3 446:20
449:17 453:15
454:8 471:15
484:6
**airport** 209:13,17
215:11 216:7
217:19 218:1
219:6,22 220:6
221:2,9,10,14
222:16,18 223:13
224:8,23 226:4
228:12,16 229:20
230:6,9 266:7,8
277:9,13 302:7,14
302:16,17 303:10
303:15 319:2
320:22 331:13,19
332:14,18,21
333:13,21 334:1
343:8,15,22,24
368:24 369:3
374:6,9,11,14,17
374:22 375:1,4,12
375:19,21 376:25
377:21 396:17,19
397:14 403:19
408:9 412:16
445:7,8,14 446:8

**airports** 217:18,23
227:17,18 228:25
475:12
**alcohol** 323:2,4,13
460:24
**alert** 361:21 362:8
**alex** 268:11,16
270:24 419:9,14
**algorithm** 207:10
237:13,14 258:25
259:3,6
**algorithms** 268:13
**allegation** 209:6
**allege** 333:25
**alleged** 448:13
**allison** 199:11
**allow** 278:2
281:15 324:21
378:14 450:20
456:25 483:25
484:6,25 487:24
**allowable** 319:21
**allowed** 241:4,10
294:19 394:16
408:23 409:5,19
410:1 453:8 468:7
488:20
**allows** 484:1
485:13 487:9
**alluded** 365:21
**alternative** 447:9
448:25
**ambiguous** 459:22
459:25
**amend** 417:25
**amended** 418:2,19
443:25
**amenities** 383:25
384:2
**america** 225:18
345:20

**amount** 224:15
254:2,15 256:1,7
256:15,16,18,24
259:14 260:3
276:19 283:2
292:10 306:2
314:11 321:19,24
321:25 322:7
324:20 340:24,25
342:12 350:19
379:19 424:5
425:21 435:9
464:15
**ample** 241:13
**analyzed** 211:1
**angela** 199:17
**angeles** 458:14
**animal** 478:22,24
**animals** 478:7,9
478:19,24
**annoyances**
325:15
**annual** 261:19
490:12
**anonymous**
287:17
**answer** 204:9
206:15,16,18
210:23,23 212:5
214:16 217:10,11
218:17 234:17
242:16,18 243:14
312:21 349:6
354:11,12,17
358:13 369:25
391:10,11,25
392:2,3,14 397:15
407:7 409:2
417:11 418:14,24
435:24 438:14
447:15 455:18

[answered - april]

| | | | |
|---|---|---|---|
| **answered** 204:9 | 276:16,17 277:7 | 430:2 438:10 | **apply** 298:8 |
| 228:19 231:17,22 | 277:15,23 278:1,6 | 439:13,16 440:11 | 317:14,17,19 |
| 235:8,15 236:12 | 279:25 281:16 | 443:7 444:23 | 357:3 466:1 |
| 254:21 348:21 | 282:9,12,16 | 462:3,4,6,8,15,17 | 476:10 |
| 392:5 474:14,18 | 283:17,19 284:3 | 462:18,22 464:19 | **applying** 310:9 |
| 474:21 | 284:17,20 287:17 | 466:12,23 467:4,7 | **appointment** |
| **answering** 370:3 | 287:22 288:10 | 467:15,20,22,23 | 312:12 |
| 407:4 416:8 | 291:12 292:1,4,8 | 473:5 474:10 | **appointments** |
| 446:17 | 294:18,19 295:14 | 479:13,21,22,25 | 380:6 |
| **answers** 243:12 | 299:2,11 301:2,13 | 482:5,8 483:13,16 | **appreciate** 226:21 |
| 271:12 | 301:24 304:1 | 487:5,11 489:3 | 234:4 248:7 |
| **anxious** 354:12 | 305:15 310:10 | **apparently** 459:10 | 366:19 455:14 |
| **anybody** 304:7 | 312:6,8 313:22 | **appeal** 223:6 | **appreciation** |
| 328:4 333:24 | 315:4,9 329:13 | 228:7 230:15 | 330:9 |
| 334:4 | 335:25 336:4 | 296:16 | **approaching** |
| **anymore** 212:17 | 342:1 344:8,12 | **appealed** 223:10 | 362:8 |
| 338:10 424:10 | 347:15 348:2 | 223:15,20 224:9 | **appropriate** |
| **anyone's** 208:15 | 351:12 352:24 | 230:17 | 314:11 327:11 |
| **anyway** 374:25 | 353:1,16,21,25 | **appeals** 296:10 | 448:14 |
| 448:15 | 354:3,6 357:23 | **appear** 305:3 | **approval** 380:17 |
| **api** 207:6 | 358:16 360:6,13 | **appearances** | 482:25 483:1 |
| **apologies** 345:4 | 363:9 364:12 | 199:1 | **approve** 427:15 |
| 422:7 | 365:5 368:3 | **appears** 213:10 | **approved** 321:18 |
| **apologize** 232:24 | 370:25 374:16 | 222:25 227:4 | 472:18 |
| 484:23 | 377:11,17 378:2,7 | 228:5 229:11 | **approximate** |
| **app** 203:7 204:16 | 378:7 379:14,19 | 230:13 | 306:2,4 |
| 204:21 205:9 | 380:4,7,11,15,21 | **appendix** 428:10 | **approximately** |
| 207:13 216:25 | 381:11 382:16,22 | **apple** 205:21,23 | 261:9,13,14 |
| 217:1,2 221:8,24 | 383:3,7 387:12,14 | 206:4 207:7,10 | 316:17 339:22 |
| 223:13 225:24 | 387:15,22 388:2 | 208:12,18 462:6 | 360:7,12 366:6 |
| 228:12,24 232:21 | 389:2 391:5,7,16 | 467:22 | 442:4,7 458:22 |
| 234:5,8,16 235:2 | 391:17,20,21 | **application** 209:13 | **approximation** |
| 236:5 237:23 | 393:2 395:2 405:4 | 209:17 211:3 | 246:10 |
| 238:3 239:8,13,19 | 405:5,8,9,12,14,18 | 216:21 236:6 | **apps** 208:15 407:6 |
| 239:21 240:8 | 405:23 406:3 | 244:14,22 245:1 | 408:15,23 409:5 |
| 242:1 244:7,12,17 | 407:11,16,19,23 | 257:16 258:19 | 409:19 410:1,11 |
| 247:7 250:20,21 | 408:2,2,6,7 409:1 | 259:10,20,21,25 | 410:19 411:2,8,11 |
| 251:1,19 252:4 | 409:1 410:21 | 260:12 336:12 | 411:15 412:4 |
| 257:20 258:2 | 411:24 412:6,7,10 | 485:17 | 421:21 479:22 |
| 259:1,7 260:7,11 | 413:10,18 414:1 | **applied** 319:12 | **april** 202:1,2 |
| 265:9,15 276:9,12 | 423:9,10 427:1,5 | 390:22 | 252:24 253:18 |

Veritext Legal Solutions
346-293-7000

[april - backwards]

254:9 293:7,10
312:14 327:2
348:24 349:11
392:5 407:18
441:8 443:19
447:23
**arbitration** 198:7
198:10 202:7,20
207:17 217:3
241:14 251:23
252:2 253:2,7,9,16
254:5 270:1,15
272:1 453:20
491:16 492:8,14
**arbitrations** 453:8
453:9
**arbitrator** 198:3
199:20 450:21
492:4
**arbitrators** 456:1
**area** 217:25 242:9
250:18 281:12
362:9 375:10,11
375:12,15,16
379:25 390:10
442:2 475:14,16
**areas** 239:9,11
242:5 379:2,6
390:3,15 446:11
475:11,12 482:3
**argued** 214:8
**arguing** 233:16
242:23 243:10,14
**argumentative**
218:13 237:5
256:10
**arguments** 323:16
**arkansas** 482:7
**arranged** 218:6
**arrival** 245:11

**arrived** 318:23
**aside** 229:21
267:22 487:14
**asked** 228:18
231:16,22 236:12
241:20,21 246:14
254:5,20 266:15
295:4 324:20
333:9,10 334:2
348:20 349:13
386:3 392:1,8
394:1 435:11
447:13 452:5
460:1
**asking** 216:22
219:12,13 222:1
222:22 230:23
231:24 232:1
234:14 237:6
242:3 250:1 254:7
254:8,8 258:7
266:2 308:20
312:22 314:25
428:9 429:16
439:24 445:3
485:4
**asks** 389:13
416:22
**assessed** 317:25
**assign** 365:1
465:16
**assigned** 246:23
**assist** 407:4
448:13
**associated** 221:8
284:14 335:14
468:1
**assume** 291:24
423:4 424:9
**assuming** 454:7,25

**assumption** 205:4
**assure** 451:2
**assured** 265:18
**attached** 198:16
493:3
**attempt** 215:13
288:2
**attempted** 246:8
**attention** 437:3
477:18
**attitude** 233:8,14
**attorney** 231:17
374:21 381:5
388:1 395:19
399:11 488:21
**attorneys** 406:12
493:8
**august** 274:14
275:11 298:2
347:9 350:15
352:2,7 383:3
414:2 439:9,13
442:16 443:1
**authorized** 419:9
419:14
**auto** 437:21 469:7
477:8
**automatically**
244:23 332:5
**availability** 488:8
**available** 205:22
208:12 231:4
237:18 238:20
250:2 258:10
364:19 373:17
439:17 453:17
454:10,24 463:6
464:1 488:25
491:7
**avenue** 199:6

**average** 279:16,18
279:21 280:3,6
281:11 290:13
300:24 301:1
446:4
**avoid** 354:15
390:6
**aware** 210:17
220:13 261:20
267:22 286:9,19
296:15 301:16

**b**

**b** 440:20,21
462:20 471:6,10
**back** 201:3 206:23
214:19 216:18
221:17 225:16
254:8 268:19
279:2 292:12
293:5 295:3 296:7
311:15 312:7
320:14 322:5
329:5 331:4 333:2
333:3,15 346:5,14
348:5,24 351:20
351:22,24 353:8
355:6 378:17
384:3 385:23,25
387:9 392:5
395:16 397:9
409:9,22 411:10
411:14 425:2
431:13,20 432:18
434:15 444:19
459:2,10,11,13,17
472:16 481:4
483:2,3 486:10,21
**background**
468:13,14 477:13
**backwards** 402:25

[bad - bit]

**bad**  325:13 336:11
336:15 436:18
**balance**  435:4
**baltican**  331:8
364:24
**bank**  367:22
**banking**  489:25
**bankrupt**  405:22
**banning**  227:18
**bare**  240:1
**barysas**  198:1
199:18 200:5
213:2,4 214:3
215:8,20 216:14
216:20,24 218:3
219:4,8,19 220:1
220:10 221:13
222:22 223:25
226:15 227:6
228:23 230:3
232:17 248:21
263:11 265:20
272:16,21 273:1
278:15 310:22
344:25 351:1,11
352:23 354:18
358:6,13 359:8
369:23 392:21
398:24 402:9
406:10 407:4,9
417:24 427:25
430:18 443:18
444:3,22 456:8
462:1 464:23
472:23 473:4,4
476:12 479:25
480:18 482:10,14
483:25 487:15,18
492:2
**base**  202:18
253:25 255:23,23

255:24 275:20
307:16
**based**  204:23
205:7 225:4 231:9
245:25 247:4
248:3 259:24
281:11 297:7
299:8 311:12,17
313:12 316:2
324:6 334:7 366:4
366:6 409:2 447:7
455:7 456:20
471:13 478:2
480:17
**basic**  434:4
**basically**  302:11
305:19 315:13
337:11 388:20
390:11 415:6
440:8 490:8
**basis**  205:5 208:5
231:13 239:25
241:9 251:1
332:15
**bates**  265:1 305:1
355:23 356:3,18
381:6 388:24
395:17 404:14
420:6,25 422:11
426:16 427:18
431:11,23 432:18
**bear**  448:18
**becoming**  262:13
**began**  363:8
373:12 459:20
**beginning**  328:24
339:2 344:1,24
349:1,2
**behalf**  352:14
358:3

**behavior**  301:17
467:12
**belabor**  289:9
297:13
**belief**  383:18
478:4
**believe**  202:15
204:2,22,24
206:20 211:13,16
212:8,9 215:2
219:10 222:12
224:3 231:6
234:19,24 242:3,7
242:14 256:6,12
260:21 264:15
270:12 274:12
275:4 280:24
282:7 298:10
302:1 304:5,8
307:11 318:20
320:23 321:5,9,10
348:4 355:22
358:9 362:12
367:15 387:20
388:8 405:21
406:13 409:4,7,18
410:23,25 414:19
414:21 417:18
421:22 430:8,10
434:6,7,9,22 436:1
436:6 441:13
446:22 447:23
449:5 452:11
469:23 470:11
473:2 478:11
**believed**  225:3,5
254:14,17 384:13
409:11,25 410:18
**bell**  388:14
**belong**  311:4

**belonged**  337:10
**ben**  201:8
**benefit**  434:23
473:21 474:7
**benefits**  473:18
**benjamin**  199:10
**best**  206:18 310:19
377:24 456:22
**better**  203:20
234:1 265:23
336:14 353:5
357:6 393:24
446:16
**beyond**  306:15
**biased**  448:10
**bicycle**  337:13
**big**  288:24 416:6
419:13 428:13
440:18 473:21
**bigger**  266:25
334:11,12 388:13
396:4 406:18
416:1 419:8
422:13
**bike**  273:18
337:16 338:15
346:23 347:3
420:17
**bikes**  461:2
**binders**  240:15,16
240:22
**bireley**  201:8
**bit**  203:20 229:9
234:3 257:4
261:11 277:17
279:11 297:24
337:3,6 346:1
359:9 360:4 363:4
365:10 387:4
399:10 405:1
437:9 460:14

Veritext Legal Solutions
346-293-7000

[bit - call]

461:25 462:2
475:21 480:4
481:5 483:3
**black** 250:11,15
250:22 251:6
302:19,22 311:5
311:25 317:11,12
318:2,20 327:4,18
327:20 328:3,19
329:16 330:3,18
342:18,21 343:3
343:10,24 344:1
344:13,13 365:9
366:5,12 371:1,7
373:12,13 375:13
388:5 389:1,14
422:16 436:11,14
437:10,13,14,22
438:2 439:5,10,17
439:20 463:5
473:10,15
**blow** 266:11,13
294:4 320:12
**blower** 465:19
**blue** 305:4
**body** 224:11
**bold** 431:24
**book** 243:19
268:12,18,19
**booking** 474:9,11
474:12 475:3,5,8,9
475:10
**bore** 402:6
**born** 273:3
**boroughs** 274:2
**boss** 268:22
**bottles** 384:5
**bottom** 217:15
255:14,22 256:14
265:11 279:15
287:10 292:13

305:4 308:24
321:13 323:23
326:4,5 355:24
357:5 389:6 402:9
440:19 483:20
487:8
**bought** 302:15
**box** 305:3 406:17
406:18
**brad** 199:17 200:3
200:9 201:19
449:12 457:17,20
**brand** 259:22
**brandon** 226:19
**brands** 260:2
**breach** 298:18
369:13
**breached** 298:21
**breaches** 298:25
**bread** 302:17
**break** 263:4,6
320:3,7 398:7,14
398:19 405:1
430:12
**breakdown**
307:16 490:9
**breaking** 466:19
491:2
**bret** 199:4 322:15
449:1
**brief** 268:7 430:12
450:16 451:5,5,18
**briefed** 449:23,25
450:10,11
**briefly** 230:20
454:14
**briefs** 450:13
**bring** 240:23
246:3 278:9
323:13 331:2
358:17 436:17

439:1 441:7 448:3
448:7 460:25
467:2
**bringing** 273:23
358:2 430:5
478:21
**brings** 243:24
**broad** 460:1
**brochures** 260:4
**brought** 240:13
271:25 323:3
435:22 437:2
**browse** 376:21
438:6
**bucks** 321:10
**budget** 259:15
**build** 208:13
**built** 205:25 206:1
207:6 208:16
284:9 460:17
461:13
**bullets** 466:9
**bunch** 229:24
**burden** 449:4
452:22
**bus** 353:8 364:20
**bush** 375:3,7
396:19
**busier** 464:8
**busiest** 389:24
**business** 220:8
262:5,22,23
302:18 327:9
337:19 343:20
346:13,18 348:6
348:10 349:15
363:6,9 364:8,15
364:17 371:5
374:17,18,25
383:20 385:2,6,8
385:12,15 386:6,7

386:10,19 387:7,9
413:2 419:21
420:16,21 425:3
425:15,18 432:14
458:20 459:17
460:11,15,16,19
460:21,24 461:24
461:25 462:3
467:18 485:19
486:19
**businesses** 337:13
352:13 485:15
488:3
**butter** 302:17
**button** 203:13,14
245:2 305:4,5
490:21,22
**buy** 327:21,25
474:2
**buyers** 460:20

| c |
|---|

**c** 199:11 334:11
420:8,24,25
421:11 426:3,17
427:8,19 440:20
440:22 477:11
490:3
**c16** 304:25
**c360** 328:6
**cabs** 421:1
**calculated** 256:16
283:4 309:3,14,22
314:5 343:16
**calculations**
342:13
**call** 263:16 272:14
272:15 329:9
334:20 348:15
349:22 386:9
396:1,6 399:22
406:11 436:18

Page 9

[call - change]

446:18 449:7,12
449:17 451:3,4
454:5 456:15
457:10 461:20
464:23 466:9
478:15 481:24
**called** 210:13
256:5 268:12
269:20 328:15
346:18 351:13
388:7 405:18
414:4,22,25
441:17 450:22
452:11 462:25
465:6,11 470:12
479:6
**calls** 269:11 391:8
438:11 487:19
**cam** 325:7
**cameron** 199:18
455:6
**cancel** 215:13,15
263:17,19 281:7
282:2,8,18 285:7
291:7 299:23
318:9 334:22,24
335:10,10 336:1,6
336:9,12 381:15
389:10 394:9,10
395:1 396:7,9,18
396:21 399:24
400:4 402:17,20
402:22 403:5,13
403:22,23 439:24
440:2,9
**canceled** 282:4
283:3 291:12
318:24
**canceling** 335:14
439:24

**cancellation**
279:14 280:19,19
280:23,25 281:4
281:11,11,14,18
281:25 283:2
290:1,17,18,22
291:2 293:17,25
294:10 297:5
318:6,8,10,12,13
318:15,16,22
319:5,7,11,15,17
319:21 335:11,17
335:21 336:3,22
336:24 393:3
397:9 404:15,21
440:7
**cancellations**
281:22 333:18
**cancels** 281:1
319:4 335:17
404:16
**capacity** 220:21
237:11 261:6
477:21
**car** 244:11 266:20
321:17 322:2
323:3 341:25
342:3,19 360:24
361:1 366:13,15
366:20 367:6
368:5,14,21
370:18,22 371:6
376:12 384:3
385:25 396:16
422:16 472:13
476:14
**car's** 325:7
**card** 372:16 385:6
385:8,15 386:3,4
386:16,22 387:3,5
387:7,9 389:2,7

422:18,21,24
423:20 424:4,24
462:13
**cards** 385:2,20,22
386:6,10
**care** 333:1
**careful** 221:3
**carefully** 354:10
366:19
**carolina** 339:6
340:9 414:25
415:3,14 417:14
418:15,25 442:10
442:18
**carried** 269:19
**carrier** 415:7
**carriers** 460:25
**carries** 292:13
294:15
**carrying** 467:3
**cars** 273:21 304:9
332:19 342:1
366:6 472:9,11
**case** 198:2 202:12
209:11,20 214:24
246:20 248:20
257:6,9 268:2
269:9 270:14,18
319:1 409:8
413:12 417:25
446:23 450:3,10
451:6,8,9,17
452:12,25 454:10
456:14 457:1,2
480:20,24 492:3
**cases** 296:11
**cash** 234:16,20,23
262:24 288:6
300:13 412:16
**cashless** 234:5,8
235:2,5,17 236:4,5

**catch** 313:25
**caught** 313:24
**cause** 198:11
298:19 299:1
**caused** 333:25
**cease** 339:25
**cell** 363:10
**center** 250:17
**central** 337:13,17
337:22 338:3
346:18
**certain** 208:14,15
238:8 239:11
278:7 279:24
280:14 318:16,17
327:19,25 342:21
351:5 374:23
379:2,11,18 424:8
435:9 437:15,16
470:14,15 472:13
**certainly** 270:3
271:4 272:8
450:24
**certificate** 492:7
492:18
**certified** 198:13
492:11 493:12
**certify** 492:12,21
493:7
**cetera** 396:20
459:8 490:5
**chair** 268:14
**challenge** 455:25
**chance** 329:14
331:18 393:21
**chances** 326:16
**change** 237:10
247:4,13 253:19
254:10 262:21
326:13 396:24

Page 10

[changed - collect]

**changed**  252:20
255:9,17 308:19
311:20 312:1
336:13,14 459:20
460:1
**changes**  247:6,8
493:3,3
**changing**  410:24
**chapter**  248:8,14
**characterization**
423:24
**characterizing**
222:11
**charge**  239:1
244:10,19,19
275:20,24 276:2
318:10 335:23
**charged**  249:2,8
249:16 250:11
251:6 263:20
265:19 316:5
335:17,20 396:10
400:8 402:20
403:9,22 404:1
**chargers**  384:3,14
**charges**  285:17,21
300:4 315:24
**charging**  308:17
**chat**  398:16,17
**chauffeur's**
342:24
**cheap**  259:17
**cheapest**  328:4
445:23
**check**  468:13,14
468:15 477:13
**checked**  266:8
**checking**  221:2
224:7 228:4
**cheerful**  233:20,23

**chief**  268:3 456:14
**choice**  228:16
303:15 319:24
384:11 387:1
405:15 445:17
456:8,8
**choices**  315:9
**choose**  276:8
315:10 335:23
343:7 360:11
363:19 366:13
373:3,17 375:7
378:22 380:3
387:21 436:11
462:23
**chose**  295:11,16
343:25 352:24
354:3 360:5 363:5
364:5 366:1,3,15
368:4,9,17 369:4
371:17 372:1
373:13,21 374:16
375:3,19 376:9,11
376:24 377:3,11
377:17 378:1
379:21 380:14
383:17,24 405:3
436:13
**chosen**  342:5
361:13 383:6
**chris**  268:13
**cities**  255:9,18
261:14 342:20
389:12
**city**  233:2 242:5
248:6,7,13,22
249:6,8,14 252:21
253:20,24 274:2
279:17,19,20,22
280:3 281:10,14
283:9 290:13,21

300:24 301:2
308:8 337:17
342:12,23 344:3
353:8 365:19
371:5,12 373:10
435:6 437:17,25
464:13 467:25
469:23 472:17,21
475:14 482:3,11
482:23,24
**claim**  285:20,24
430:6
**claimant**  198:1
199:3 246:1,18
456:25 479:12,20
479:21 482:6
483:16 488:5
492:2
**claimant's**  201:17
213:1,3 232:15
255:1 263:10
265:4 289:1 293:4
293:5 306:21
320:11 331:3
334:8,18 371:15
381:2,3,7 388:12
395:16 399:9
404:12 406:5,9,25
428:6 431:10
436:16 439:1
440:16
**claimed**  225:7
265:22 286:1
**claiming**  285:17
300:4 375:20
**claims**  350:14
358:2 428:1
**clarified**  414:1
**clarify**  249:25
**clarity**  485:16

**classified**  262:6
**clayton**  375:18
**cleaned**  323:21
**cleaning**  285:23
285:24 286:1
323:6,20 324:2,5
324:10,13,18
**clear**  231:2 270:7
271:18,23 288:7
295:4 351:8
373:16 447:12
476:24 477:10
**clearly**  206:17
313:25 314:6
450:7 484:11
**click**  315:6 490:8
**clicked**  315:12
327:23 419:7
**clicking**  327:6
**client**  206:11,22
209:7,16 215:1,3
231:17 266:19
452:21 455:17
474:22 487:23
**client's**  217:9
269:13
**clients**  473:5,24
**close**  261:17 321:6
341:20 375:6
427:24 446:4
**closed**  339:22
340:2,4
**closely**  279:23
**closing**  339:24
**clothes**  384:20
**clothing**  425:7
**coaching**  233:7,10
**code**  384:24
470:11
**collect**  203:10
206:2 207:8

[collect - conditions]

208:14,20 314:13
468:4 470:14
**collected**  205:19
206:24 207:9
209:2 211:24
212:12,16,20
267:19 423:3
424:6
**collecting**  203:25
205:13,19 207:4
208:4,7,10 211:13
211:21 212:9,23
**collection**  211:8
211:12 212:19
236:17,18,23
269:5
**collects**  203:7,14
203:16
**college**  273:15
344:5 345:6,10
**color**  327:19 478:3
**column**  334:11
440:21,22
**columns**  440:20
**come**  215:10
225:24 273:10
310:1,5 332:22
333:2 450:7 453:9
453:10 459:13,17
473:22 475:8
476:16,18 490:14
**comes**  208:19
213:19 228:3
335:8
**comfortable**
265:14
**coming**  237:18
238:20 345:11
351:3 400:12
403:2,4 439:15
444:1 452:9

**comment**  235:18
**comments**  448:21
**commercial**
303:18,19,22,23
303:24 342:22
365:16 367:25
372:9,13,16 432:2
432:3,14,15,16
437:18,21,25
438:1 460:25
469:1,6,7
**commercially**
304:9
**commission**  307:5
308:9 337:20
365:19 422:10
**commissions**
422:4
**commit**  284:16
299:9 336:18
**committed**  284:20
284:22
**committing**  225:7
**communicated**
262:10
**communicating**
254:13
**communication**
316:15 399:1,4,13
399:14 400:10
402:11 431:12
**communications**
260:5 381:4,5
**community**  282:1
286:18,19 287:1,5
288:8 289:3 290:7
293:12 296:21
298:5,10,15,18,21
298:25 310:16
322:11 354:21
355:15 356:7,9,13

356:15,17 357:2
361:11 390:18
436:23 465:25
478:11
**companies**  205:23
205:24 208:13
414:22 458:3,5
469:25 470:18
474:8 480:21
**company**  205:3,3
261:21 273:18,20
275:1,2,4,6,8,9
338:16,19 339:18
339:22,23 340:7
340:11,14 344:9
344:10 346:1,5,9
346:11 351:16
352:5,11,15,19
372:17 405:21
414:4,9 415:6
416:23 426:24
430:19 433:1
441:16,17 442:12
460:17 461:14,21
469:10 473:23
474:4,7 480:19,22
480:23 486:4,7,18
486:25
**company's**  487:1
**compared**  340:25
341:17
**comparison**  377:6
**compel**  270:13
**compensated**
310:21 312:23
313:4 314:1,6
317:7,8 319:6
**compete**  270:4
**competent**  270:10
**competitor**  210:19

**complained**
325:16
**complaining**
395:22
**complaints**  220:15
**complete**  267:13
267:20 276:23
285:6,9 286:3
299:20 300:7
301:20 338:8
407:18 465:7
468:14 485:13,17
**completed**  251:2
256:18 276:6
341:12,13,15,16
345:10 406:15
407:11,22 440:22
440:22 441:1
457:7 466:19
**completely**  340:11
376:24 411:21
**completion**  492:24
493:6
**complicated**
338:20
**comply**  476:5
**complying**  218:1
**component**  269:10
**compound**  305:12
**computer**  350:1
359:15,16,18,21
359:23 489:9
**computerized**
198:14
**concerns**  220:15
**conclude**  215:7,20
217:3
**conclusion**  438:12
487:20
**conditions**  216:6
316:19 317:4,9

Veritext Legal Solutions
346-293-7000

[conditions - correct]

462:14
**conduct**  210:12
  361:10
**conducted**  287:16
**conducting**  265:16
**confide**  269:12
**confidential**
  207:17,18 270:1
**confirm**  262:17
  307:3 319:11
  372:4 477:2
**confirmed**  328:11
**confused**  243:20
  253:5 316:11
**confusing**  311:19
**confusion**  269:3
  311:16
**congratulating**
  227:12
**connect**  208:17
**connected**  404:9
**connection**  463:19
**connects**  460:20
  460:21,24
**consent**  462:13
  468:10
**consequently**
  262:22
**consider**  487:14
  487:17 488:2
**considered**  344:14
**consist**  476:4
**consistent**  290:14
  291:20 294:7
  361:11
**consistently**  283:5
  291:24
**constantly**  284:10
  332:2,7
**constraints**  261:25
  369:19

**consumer**  460:23
**consumers**  460:21
  466:3
**contact**  301:17
  312:8,9 314:21
  322:9,12,19
  324:12 358:21,24
  369:8 466:14,17
**contacted**  303:13
  327:2
**contacting**  296:18
**contained**  416:10
**contains**  493:3
**contended**  271:17
**contentious**
  296:11
**context**  253:21
  265:25 266:15
**continue**  261:25
  265:17 274:16,20
  294:24 320:10
  323:15 345:17
  373:13 398:20,21
  405:20 455:18
  457:14 482:7
  484:25
**continued**  200:4
  201:21 323:17
**continues**  230:2
  281:19 291:2
**continuing**  202:8
**contract**  273:11
  339:16 351:21
  417:17 430:22
  433:5,7
**contractor**  218:4
  256:6 262:20
  414:16 415:11,13
  417:5 433:15
  434:7 441:21,23
  487:24

**contracts**  354:19
  484:15
**contractual**  431:2
  483:15 484:18
  485:5 487:13
**contradict**  232:12
**contrary**  232:8
**control**  214:11
  238:7 250:23
  275:19,23 276:1,4
  276:18,18 277:3
  483:15
**controlled**  352:15
**controlling**  207:23
**controls**  238:5
  307:23 317:24
**convenient**  320:3
  320:5
**conveniently**
  206:9
**conversation**
  450:17
**coordinate**  208:21
**copies**  216:19
**copy**  359:18 434:4
  488:24,25 489:5,8
  492:18
**corner**  226:16
  375:17
**corp**  490:3,4
**corporate**  205:2
  206:5 212:11
  214:2 220:14
  249:12 252:11
  267:18 269:7
  270:19 331:7
  452:20 458:16
  484:15
**correct**  203:14,17
  206:24 209:13,17
  213:9 214:5 216:8

216:12,16 217:21
  218:6 223:10
  224:25 225:20
  226:8,13 227:3
  228:8,13,17
  229:13,25 230:21
  230:25 231:15
  233:3,14 236:7,10
  236:19,24 238:5
  239:7 242:2 244:4
  245:7,12 246:13
  250:13 252:21
  255:19 257:7,10
  257:11,13,14,18
  257:21,22,24
  258:19 259:5,11
  259:20 260:1,7,12
  260:13,15,23
  261:3,6 267:14
  293:24 328:21
  331:9 346:7,20,22
  346:25 347:6,15
  347:23 348:8
  349:16,17 350:4
  351:14,17 353:2,3
  353:19 363:11,20
  364:13 365:6,20
  368:11,15,18,22
  370:11 372:1,19
  372:25 375:2,23
  376:18 377:1
  378:25 379:7,10
  380:5,23 386:18
  386:21 390:1,16
  399:16,23 400:1
  400:13 401:2,12
  401:21,24 403:10
  403:17,24 404:8
  404:11,18 405:13
  406:1 411:3
  412:11,20,23

[correct - dainius]

413:11 416:10,18
417:15,20,21
419:17,24 420:15
420:23 421:2,5,10
421:25 423:3
426:20 427:9,21
427:23 429:21,22
432:11,12 443:22
444:14 446:8
466:25 467:5
479:3,19 486:20
**corrected** 332:5
**correctly** 202:1
215:9 264:1
318:14 473:3
**correspondence**
322:25 324:25
436:16,19
**corridan** 199:17
322:17 422:8
**cost** 321:3,8
371:24,25 385:17
**counsel** 206:16
214:24 231:10,12
231:14,25 241:6
242:19 248:20
250:7 264:8,21
356:20 357:12
363:22 365:22
434:17 435:12
436:22 438:4
439:5 448:22
455:2 456:22
470:21 491:6
493:1,7
**counsel's** 289:14
447:7
**count** 305:18,19
**counting** 483:20
**countries** 234:23
235:21 261:13

**country** 226:9
235:15 273:21
311:12 381:15
482:15
**couple** 203:9,10
204:1 214:13
289:10 337:23,24
341:21 353:10
409:22 444:21
464:6,10 473:22
477:14 486:6
489:14
**course** 302:20
317:5 319:16
333:2 343:1 369:1
408:11 445:20
448:14
**courses** 393:6
**court** 243:4
454:12 491:3
**cover** 268:19
346:3 413:6
430:13
**covered** 330:20
331:6 346:4
356:20 392:18
431:13 434:16
**covid** 262:1
489:13
**create** 296:10
365:4
**created** 270:16
337:15 386:16
406:13
**creating** 285:11
300:1
**credence** 272:10
**credibility** 241:3,5
269:21,22 271:6
272:9

**credible** 271:7
**credit** 422:18,21
422:24 423:20
424:4,23 462:13
**critical** 282:21
295:6
**cross** 210:6 251:21
268:8,9 270:18
271:5 351:7
450:21 451:14
453:1,5,18,23
455:17 456:24
**crowded** 332:18
332:21 336:10
398:4
**crucial** 453:3,3
**cruise** 379:25
**csr** 493:16,16
**cumulative** 392:16
**cunningham**
455:6
**cups** 323:4,14
**current** 308:10
327:9 458:25
**currently** 263:19
273:19,19 334:23
396:9 400:2 415:4
**cursed** 361:3
**customer** 277:14
277:16,20,21,24
279:9 306:11,13
314:13 316:18
317:6,9,14 318:23
319:3 320:21
325:12,14,18
326:11,13 335:6,8
335:12,14,17,20
335:24 337:16,18
396:21 412:11,15
412:18,21,22,24
442:22 443:1,6

485:23,25 486:2,3
486:11,15,22,24
487:3,8,9
**customer's** 310:18
**customers** 277:22
279:7 300:12
323:12 396:18
412:9,19 413:8
428:4 488:2
**cut** 268:24
**cuts** 269:21 271:18
**cutting** 474:22
**cycle** 346:18
**cyclecentralpark...**
346:21

**d**

**d** 199:10
**daily** 208:5 251:1
332:15
**dainius** 198:1
199:18 200:5
220:5 221:17,23
222:22 223:13
224:8,12 225:7,19
226:2,11,20,24
227:9 228:4,11,15
228:23 229:8,10
229:18 230:5,10
230:12 231:5
244:6,16 245:4,15
246:6,21,21 247:9
247:15 250:10
251:14 252:8,12
256:5 257:6,15
258:2,3,10 265:21
266:2,6,10,13
267:6 272:15,21
273:1,2 278:11,16
292:16 298:4
308:11 313:10
320:13 323:24

[dainius - deliberately]

421:3 427:19
433:23 436:1
492:2
**damage** 321:24
322:1,5,10 324:2
**damaged** 320:15
320:25
**damages** 448:13
**damaging** 358:19
466:14
**dangerous** 316:18
**dash** 325:7
**data** 202:25
203:16 205:14
206:23 207:4,25
208:4,7,14,19,21
208:21,25 209:2
211:8,23 212:5,10
212:13,15,20,23
218:23 219:7,7,14
219:18 241:20
268:17 269:5,6,13
269:13 271:14,15
271:16 363:16
**database** 206:3
**databases** 208:20
208:22
**date** 202:4 232:2
265:10 297:18
316:9 327:25
339:14 381:24
399:1 409:16
444:6,16 493:2
**dated** 399:4
**day** 198:7,10,11
223:18 227:6
236:12 244:13
247:18,21 248:2
261:12 266:5
267:4 276:20,22
276:23,25 280:22

292:7,8 316:12
349:11 377:2,4
379:22 389:24
390:14 392:1
423:5 445:22
446:1,2 456:9
464:8 484:5,12,20
484:22 491:4,12
492:8,14 493:12
**days** 220:8 223:24
224:8,22 225:6
277:11 317:1
377:3 379:9
380:10,12 479:17
493:1,1
**db** 337:6,8 338:13
338:18,24 346:2
346:17,25 347:5
347:22 348:2,7,13
348:18 349:20
350:3,18 351:13
352:3,14 372:17
420:21 421:1,8
426:17,24 480:25
**dc** 442:15
**deactivate** 284:13
286:25 302:2
**deactivated** 229:2
280:8,16 281:7,20
282:5 283:18
284:22 291:11
295:2,14,16
301:14 330:1
355:1,11 358:7,8
358:18,24 359:4
390:20 391:24
392:9,24 393:21
440:11
**deactivation** 214:8
216:7 278:19
279:16,24 280:11

280:13 281:10
282:23 284:12,25
286:17,24 287:7
290:5,15,24
291:21 292:19
293:2 296:7
298:16 354:21
359:8 362:21,24
391:23 392:17
**deadline** 488:17
**dealership** 273:22
273:22 321:2,10
**dealerships**
273:22,23
**dealing** 243:21
**dear** 432:25
**death** 219:22
222:17 331:22
402:7
**debit** 462:12
**deborah** 199:16
**december** 261:9
289:6 442:7
**decide** 295:17
358:10 378:2
380:11 382:7
450:11 479:17
**decided** 209:11
229:19 271:13
273:9,13 294:17
322:4 339:25
340:10 371:1
373:24 382:16
411:17 452:21
482:6
**decision** 209:14
217:21,23 223:9
223:12,14,19
224:9 228:8
230:16,16 237:25
244:2,4 353:4,16

353:17 360:6,19
363:10 365:8
366:7,11,13 369:8
370:24 371:5
374:5,17 376:2
383:8 384:18
386:14 413:25
446:7 459:8
**decisions** 272:10
**declared** 416:9
419:15
**decline** 254:17
256:8 257:1
291:24
**declines** 247:9
**declining** 283:8
**dedicated** 348:9
348:13,18 349:15
**deducted** 425:14
425:17
**deduction** 420:1
422:2,4 425:3,6
**deem** 448:14
**deep** 459:16
**defect** 369:15
**defense** 272:20
**define** 481:9
**defined** 481:14
486:4
**definitely** 307:3
314:23 329:12
341:9 409:22
**definition** 249:10
481:6 482:1 486:9
486:11,15
**definitions** 471:7
**degree** 273:15
344:5 345:6
**delay** 450:14
**deliberately** 285:1
299:14

[deliver - discretion]

**deliver** 460:22
**delivered** 492:16
**deliveries** 300:13
**delivering** 273:21
**delivery** 256:18
299:19 300:25
383:7 416:24
426:21 459:7
460:21,22 466:2,3
**delve** 269:7
**demand** 237:10,13
239:2,6,7,9 241:18
242:4 243:24
322:10 324:13
379:5,6 433:15
**demanded** 324:18
**demands** 239:3
310:18 389:25
**demonstrate**
207:23 239:21
448:17
**demonstrative**
406:11 407:1
440:17
**denial** 433:14
**denied** 241:21,22
258:5 270:15
**deny** 258:12
262:17
**department** 230:6
**depend** 380:2
**depending** 342:23
437:17
**depends** 318:19
335:18 398:2
475:13
**deponent** 492:22
492:23 493:5
**depose** 271:9
452:7,25

**deposed** 447:25
**deposing** 206:4
**deposition** 253:16
348:24 349:1,10
355:21 360:17
362:3 392:4
393:14 408:14,22
409:10 410:5,10
413:23 441:7,24
443:19,22 444:11
492:24 493:6
**depositions** 452:6
**depreciation**
367:10
**depth** 211:19
**described** 208:11
345:23
**describes** 478:18
482:21
**deserved** 448:15
**design** 387:1
**designed** 385:9,10
385:11 387:5
**desire** 292:8,10
**destination** 263:14
305:23 306:5
313:14 314:4
378:8 478:3
**destroy** 423:22
**destroyed** 423:24
**detail** 410:5,8
445:25
**details** 263:15
266:1,15,18
318:21 323:1
**detect** 211:9
**detected** 213:12
333:16
**detects** 211:17
**determination**
209:3

**determine** 265:17
483:12 487:4
**determined** 221:4
221:5,5,7 324:9
361:10 364:8
373:25 376:3
475:15
**determining**
448:13
**develop** 258:19,24
259:1 276:12
**developer** 205:22
208:13,18
**developing** 259:3
461:15
**development**
259:10 458:20
**device** 205:20
207:8 208:9,14,15
211:14,16
**devices** 208:16
**dictate** 275:16
**difference** 342:17
415:5 469:14
470:24 471:1,6,25
472:1,3 475:4
**differences** 470:2
**different** 204:8
220:17 234:15
235:15 248:12
264:3 273:17
274:1,2 306:25
308:6 310:18
311:11 314:16
315:10,12 316:14
343:19 346:14
352:12 364:12
376:24 399:7
446:11 459:18
461:24 462:21
463:5 469:1,11,18

469:23 470:3,3
471:7,18 472:9
474:5,5 481:18,25
490:4,5
**differently** 240:4
393:14
**difficulties** 406:8
**difficulty** 406:7
**digital** 268:20
460:18,19 477:2
**digitally** 218:5
**diligently** 243:11
**dip** 306:20
**diploma** 273:16
**direct** 246:22
392:18 456:24
**directed** 337:18
**direction** 463:2,4
**directionally**
260:13 261:16
**directions** 387:16
388:3
**directly** 268:24
314:10 322:9
324:14,22 391:5
391:16
**director** 249:1,16
251:5 457:25
458:1,23 475:15
**disability** 478:5
**disabling** 333:18
**disagree** 241:12
348:22
**disaster** 350:19
351:17
**discover** 417:24
**discovery** 272:5
415:20 416:18
417:23 418:20
**discretion** 209:15
301:18,23,25

[discretion - driver]

380:8 411:21
485:13
**discriminating**
467:7 478:2
**discuss** 434:16
454:15 491:4
**discussed** 223:19
237:1 254:9 272:1
288:15 388:2
399:10
**discussing** 251:12
**discussion** 201:11
201:14 265:7
355:5 441:3
**discussions** 226:25
231:10,12
**display** 239:8
**displayed** 369:2
**dispose** 424:3
**disposed** 424:6
**dispute** 262:17
**disregarding**
266:24
**distance** 247:1,3,7
247:12,20 275:23
285:1 299:15
307:19,20 309:4
309:12,14,23
311:18 313:21
335:9
**division** 469:13
472:1
**doctor** 257:7
273:16 380:8
**doctor's** 380:6
**document** 203:21
203:22,22 215:5
215:16 221:22
231:8 240:8
241:19 249:14,24
250:2,6 251:9

278:12,17,18,21
278:22 279:12
289:2,4 291:17
292:12 293:6,8
296:12 297:8,8
298:4,6,8,12,13
305:1 306:23,25
312:13 314:16
359:10,12 388:20
406:24 407:3
439:3 484:3 485:1
485:6
**documentary**
239:21 240:2
**documentation**
468:3
**documents** 202:19
240:13,23,25
241:14,21 245:25
258:1,7,9 302:6
327:8 328:12
329:19 334:7
397:20 398:18
437:6 470:15
484:5,13
**doing** 201:24
203:24 215:13
225:23 269:3,3
274:24 289:18
302:19 311:23
312:21 329:17
333:25 338:16
339:8 390:11
404:4 415:4 455:8
471:3,4
**dollar** 423:15
**dollars** 246:4
259:4,9,19,24
353:10 445:21
446:4

**domain** 346:19,21
**dominic** 265:13
**don** 199:15 394:7
477:15 478:13
480:11 482:19
**door** 476:14
**doors** 477:21
**double** 266:21
**doubt** 240:13
242:20 359:24,24
360:1
**doubted** 242:20
**download** 359:18
462:8 467:22
**downloaded**
359:21
**downside** 343:2
**dr** 448:11 454:23
456:11 457:11
**drafted** 481:21,22
**drawbacks** 473:19
**drawing** 477:17
**drawn** 271:23
**dress** 384:18,20,24
**drive** 244:8 273:20
274:9,16,20
301:24 304:6,18
304:22 330:18
340:22 344:1
352:4 378:1 379:1
379:8 435:16
436:11 437:12,14
437:21 438:1
472:9,10 475:5
482:24
**driven** 244:18
490:16,19
**driver** 203:6,12
204:5,16 208:24
213:25 217:2
218:3,23 219:20

222:6,9,13 224:19
224:25 228:12
232:6,12,25 233:9
233:12,19 238:2,6
238:7,11,14,16,23
239:1 242:1
248:22 249:6,10
249:15 251:19
252:4 254:16
256:22,23,24
259:19,25 260:7
260:12 261:25
263:14 265:10
279:10,13 280:25
281:1,16 282:9
285:12 286:25
289:25 290:5
293:16 297:3
299:1 301:12
303:20,22 315:9
315:11 318:11,12
318:14 319:21
331:20 335:15
343:1 347:15
353:1,16,21,24
354:3,6 357:8
360:6,13 363:8,18
364:12 365:5
368:3 370:25
374:16 378:7
380:4 387:14
391:20 394:15
405:4 407:15,22
408:2,2,6,7 413:10
414:1 427:1
432:14,15 434:3
436:11,12 439:10
440:11 462:19
463:19 464:19,20
465:15 466:14,17
466:18 467:15,15

Veritext Legal Solutions
346-293-7000

[driver - eight]

467:20 468:6,9,10
468:12,13,16
469:8,9 471:17
472:24 473:5,15
473:21 474:10
475:6,6,7,7,8,9,9
475:10 476:23,25
477:20 478:2
480:22 482:4,8,22
483:13,16,18
485:13 487:11
489:1,21 490:10
490:19,24
**driver's** 204:18
205:20 207:7
208:14 211:14
213:23 236:16
265:16 266:8
303:18,19,22,23
304:24 327:10
437:21 467:17
468:5 477:4
**drivers** 203:17,23
203:24 204:11,20
207:23 208:4,10
210:18 211:3,10
212:8,13 217:24
226:11,14 231:5
233:22 236:9
237:18,19,22
238:5,11,15,20
239:6,8 242:2,8,8
242:11,12 243:2,3
243:25 251:14
253:24 254:14,18
260:6 262:5,11,13
266:21,23 267:1
279:4,7 281:12
283:9 284:11
286:7,16 289:8
296:24 298:16

300:25 335:24
337:24 338:6
357:3,19,23 358:6
359:4 373:3
389:25 390:24
396:18,20 413:6
439:17 459:7
460:11 461:17
463:6 464:1,18,22
464:23 465:1,2,7
465:12,15 466:1
467:8,19 468:22
468:24,25 469:4
469:24 470:5,6,8
470:13,15 471:8
472:2,2,8,9,12
473:12,20 474:3,6
474:10 475:4,11
475:17 476:11
477:2 478:20,23
479:9 480:9,15
482:24 485:23,25
486:22,23,24,25
487:1,3,14,17
488:10 489:21
**drives** 250:25
344:11
**driving** 206:22
224:14 245:15,21
250:11 252:8,12
273:18 274:7,8,23
274:25 275:20,24
276:2 278:24
294:25 297:20,22
297:25 298:19
303:24 318:2
323:17 340:18
350:15 352:2,6
362:9 364:6,7
368:16 390:3
434:21,22 435:1,7

435:23 436:3
471:2,2
**drop** 217:18 219:6
221:10,14 223:13
228:12,17 229:19
331:13
**dropped** 445:9
**dropping** 377:12
**drove** 210:19
244:14 258:2
281:5,14,23
282:11 284:17
286:12 288:11,18
291:6 301:5 302:2
338:5 340:21,25
340:25 342:1
368:21 425:23
441:25 442:19
445:8,13
**drunk** 323:2,12
**dsk** 275:9 338:17
340:15,19 414:4,8
414:9,15,17,21
**due** 253:11 310:19
310:19 393:2
**duly** 201:20
272:22 457:18
**dummy** 285:11
300:1
**duties** 458:2 476:6

**e**

**e** 199:8,13 216:15
220:8 224:1,2,3,4
224:6,11 227:11
227:23 228:8
230:16 231:8
246:21 250:7
260:5 265:25
288:14 331:7,10
339:10,16 364:13
365:1,4 379:4

381:10 386:19,20
398:24 462:11
465:2 467:25
**earlier** 247:2
260:14 263:22
331:6 354:20,24
355:2,8,12 357:24
359:9 381:6
387:25 395:20
404:19 414:21
431:16 432:8
445:2 461:9
473:14 491:9
**early** 268:9
**earn** 254:18
256:18 333:2
378:19 391:6,16
391:20 415:16
**earning** 252:19
253:18
**earnings** 219:21
222:16 254:1,3
255:4,8,16,25
256:2 309:3,10
315:22 329:15
331:21,24
**easier** 253:13
387:4
**easiest** 254:18
**easy** 368:13
**eats** 256:20 383:11
383:14 466:3
**economic** 268:15
350:19 351:16
**economist** 454:23
**ecosystem** 458:5
**effect** 247:25
**effectively** 270:17
**efforts** 458:19,20
**eight** 375:21
477:22

either  216:23
242:14 258:4,12
306:12 311:21
370:22 373:18
390:6 393:3
406:20 412:9
417:4 448:25
450:10 453:14
electrician  257:17
electronic  203:22
electronically
236:6
elicit  448:16
eligible  217:17
327:4,25 331:12
366:6
elite  364:22
employ  323:4
461:17
employed  257:21
339:6 375:16
493:8
employee  218:4
262:20 268:11
411:4 415:9 417:4
434:8,9 441:20
465:4 487:23
employees  228:2
261:10 262:6,6,12
461:6 465:10,11
487:15
employment  337:4
420:2 485:15
enable  460:18
enabled  461:3
482:4
enables  474:7
enabling  205:23
enacted  481:23
encourage  237:19
238:11,15

encouraged
246:22
ended  390:10
ends  255:2 270:21
enforce  431:4,7
enforcement
265:23
engage  226:24
246:22 485:14,18
engaged  215:1,8
215:21 438:9
engaging  208:25
209:7 214:4 215:3
215:16,24 219:16
engineer  211:18
273:16 336:17
engineers  260:10
461:7,12,15
enjoyable  356:25
enjoyed  459:4
ensure  464:19
enter  277:9 425:24
462:9,12 463:16
467:23 468:22
469:8,10 480:10
480:15,21 488:12
entered  265:6
306:13 480:19,25
489:22
entering  468:19
enters  480:23
486:5,7
enticed  435:16
entire  341:7 386:9
446:1
entities  415:17
462:14 463:17
entitled  325:1
433:14
entity  244:2
337:11 338:25

339:3 490:2
entrepreneur
434:24
entrepreneurial
345:20,24 346:15
434:19
equipment  349:24
eric  199:4
erroneously
328:10 330:23
errors  448:12
escalate  222:2
327:10 331:17
escalated  220:6,16
220:25
especially  270:18
270:19 338:10
esq  199:4,4,5,5,10
199:10,11
essentially  208:17
271:1
established  414:10
472:21
estate  261:1
estimate  306:1
313:14 314:3
321:1,4,8,9 322:20
464:12
estimated  245:11
et  224:3 396:20
459:8 490:4
et.uber.com.
224:1
eta  245:16
europe  273:3
evaluate  272:8
eve  390:9
evening  464:8
event  433:14
eventually  242:16
367:1

everybody  201:1
332:14,17
everyone's  385:23
evidence  205:1
206:14 214:3,23
214:25 215:23,24
216:23 218:22
219:15 232:7,11
234:7,10 239:21
240:2 241:19
257:6,9,12,15,19
263:23 270:10
272:7 289:11
293:6 297:13
347:18 407:1,2,3
423:19,22,24
449:3 452:9,9,14
452:20,24 453:17
453:19 454:1
exact  202:4 218:11
218:16 224:4
264:2 279:25
306:7,9 335:1
399:14,18 401:3,8
401:11
exactly  204:17
205:18 206:1
210:7 212:10
221:18 235:23
246:15 251:8
274:15 367:19
377:2 397:4
409:16 410:13
423:5 424:25
443:9
examination  200:4
200:6,6,7,7,10
201:21 210:6
268:8,9 272:23
344:21 351:7
433:22 443:17

[examination - fashion]

450:21 453:18,23
457:19
**examine** 270:18
451:14 453:5
**examined** 271:5
453:1 455:17
**example** 202:24
208:23 232:5
238:10 239:16
342:24 346:17
396:17 473:10
**exceed** 281:19
291:2
**exceeds** 389:25
**excellent** 222:9,11
222:12 224:19,24
227:7,12 313:11
**exchange** 273:9
398:25 431:12
**exclude** 448:25
449:16
**excluded** 214:23
215:23
**excluding** 315:22
**excuse** 242:13
**execs** 269:20
**executed** 354:19
**exemplary** 230:8
**exercised** 235:12
235:13
**exhibit** 213:1,3
278:10 289:2
296:19,20 297:14
297:16 320:11
322:24 334:19
347:12,17 355:18
359:7 371:16,16
371:23 372:12
381:2,3,7 385:5
388:12 389:21
395:17 398:23

399:8,8,9,15
404:13 406:5,10
406:11 407:1
415:19 417:22
418:18 419:3
420:7,7 426:6,9
427:14 428:6
431:10 433:24
436:16 440:16
443:25 450:1
451:12 463:7,14
465:21,23 466:20
475:19 478:13
479:7 480:8,12,20
481:5 482:20
**exhibits** 388:1
439:4
**exist** 262:12 461:4
**existed** 230:24
**existence** 409:1
**expectation**
450:19
**expected** 261:24
379:5 452:18
**expenses** 283:24
373:21 425:14
**expensive** 302:21
342:14,16,25
364:2 446:12
**experience** 234:1
261:25 265:14
303:24 313:11
459:4
**experiencing**
261:24
**expert** 215:25
446:19 447:3
448:4,11 450:3,6
450:18,20 451:3,4
451:12,13,14
452:1,1,16,18

453:9,16,17,19,20
453:22,24 454:1,6
454:7,22 455:5
456:11,25 471:21
484:17
**expert's** 428:8
450:22 452:3
454:10
**experts** 447:10,14
447:25 448:9,10
449:16,17 452:7
453:1
**expiration** 493:17
**explain** 211:15
245:20,23 254:1
255:25 280:21
311:3 452:2
469:15 480:7
**explained** 327:5
**explored** 241:11
**exploring** 296:10
**extent** 338:12
482:22
**extra** 364:4,6
386:13

**f**

**f** 492:22
**facebook** 268:14
**faceless** 268:22
**fact** 269:15 317:7
343:22 352:5,6
354:24 360:16
380:20 382:25
390:9 410:10
432:9
**factors** 262:15,25
**facts** 289:11
**factual** 268:24
**fair** 429:10
**fairly** 471:5

**falls** 233:2 280:6
280:14
**false** 285:23,24
286:1
**falsified** 286:3
300:8
**familiar** 209:19,22
210:8,10,11
211:17 239:19
307:6 344:3,4
359:10 381:10
388:10 399:9
415:23 460:10
475:23 476:1,3
**family** 219:21
222:16 284:1
331:21 378:3
**fancy** 343:13
**far** 201:12 202:16
215:19 238:13
241:5 261:11
298:12 341:15
456:14
**fare** 236:24 245:17
247:7 251:3
253:25 255:23,24
255:24 275:20,24
276:1 306:1,25
307:10,16 308:6
309:3,11,13,14,22
312:5 313:1,13,17
314:9,17 315:11
316:14 320:14
**fares** 248:18 249:1
249:7,16 250:10
250:24 251:6,13
287:25 307:23
311:4 342:25
**farther** 286:17
**fashion** 343:20

Page 20

[fass - force]

**fass** 199:6
**fast** 216:13
**faster** 426:7
**favorite** 353:20
**fbi** 209:23 210:10
  210:12
**fear** 449:21
**feature** 244:6
  245:1,2 378:8,22
  388:8 394:16
**february** 230:3,4
  230:4
**federal** 304:12
**fee** 236:19,20,20
  285:25 307:11
  309:25 310:8
  311:3,4,16,20
  312:1 315:15,21
  315:23 316:4
  317:12,19,21,25
  318:8,10,12,13,15
  318:16,19,22
  319:5,8,15,17,21
  321:19 324:5,10
  324:18 335:18,21
  404:15,21 432:10
  446:14 471:13
  474:11,12 475:3,5
  475:8,9,10
**feedback** 267:11
  357:6
**feel** 312:25 325:1,5
  455:22 456:1
**fees** 285:17,20,23
  286:1 300:4
  315:23 317:17
  318:3,6 324:2
  422:5,10,14,18,21
  423:2,20 424:4
  474:9 490:9,9

**feet** 304:15
**fellow** 466:17,18
**felt** 325:5,5 326:10
  361:5 371:6 374:2
  390:11
**fewer** 373:7
  390:25
**fight** 241:3
**figure** 203:19
  204:14 227:1
  387:15
**figured** 343:14
**file** 249:1,7,15
  250:10 419:10,15
**filed** 270:13 420:9
  420:24
**filing** 427:16
**filings** 304:13
  348:1
**fill** 337:4
**filter** 378:9
**final** 216:15 223:6
  223:9,14,20 224:9
  228:8 230:16,17
  265:11 297:15
**finally** 389:9
**financed** 366:23
**financial** 262:24
  477:6,7,9
**financially** 343:14
  493:10
**find** 204:17 205:11
  207:1 221:19
  240:6 264:16
  303:15 339:15
  367:22 398:6
**finding** 370:9
**fine** 214:12 320:3
  448:1
**finish** 310:4
  427:25 456:23

457:9
**firearms** 467:3
**firm** 369:9 370:9
  493:20
**first** 203:20
  212:18,20 213:20
  215:4,15 216:18
  220:2,9 224:12
  227:2 236:12
  238:22 240:21
  243:18 247:18,21
  248:12 249:5
  250:9,11 251:18
  252:3 256:22
  266:10 267:8
  271:25 272:22
  279:2 304:22
  306:21 330:14
  350:8 353:24
  386:25 388:24
  407:10,14 416:17
  418:2 427:22
  431:25 434:19,21
  436:2 439:19
  443:25 447:15
  459:5,15 481:15
  486:5,6,10,12,13
**five** 220:8 263:4
  319:2 335:6
  361:17 375:25
  398:14 404:17
  430:15 445:11,14
  454:17,19 472:20
**fix** 369:11
**fixed** 369:14,15
**flag** 214:1
**flagged** 213:21,23
  229:12
**flashing** 305:4
**flavor** 263:12

**fleet** 473:8 474:4
**flexibility** 244:9
  256:23
**flip** 278:20 293:22
  299:4 387:2
  428:12
**flipped** 474:19
**flow** 355:7 468:23
**flows** 262:24
**fluctuating** 248:2
  248:4
**fluid** 247:23
**fmc** 340:7
**focus** 358:17 399:1
  432:19 461:25
  470:5 479:4 483:3
  483:5
**folks** 447:8
**follow** 220:8
  267:12 281:25
  286:22 287:1,5
  288:20,24 298:13
  298:14,16 300:16
  300:20 301:9
  417:2 436:23
  479:10 482:22
**followed** 279:23
  286:14 297:9
  338:21 410:14
  434:2
**following** 263:15
  301:11 395:25
  396:5 433:13
  492:13
**follows** 201:20
  229:15 272:22
  457:18
**food** 377:24
  460:23
**force** 224:5

Veritext Legal Solutions
346-293-7000

[forced - given]

**forced** 266:21
311:13 320:23
**forces** 237:1,3
247:4,12
**forcing** 354:6
**foregoing** 492:14
**foreman** 198:13
214:18 492:11
493:16
**forget** 204:6
353:10 434:2
**forgot** 367:11
369:13 393:10
424:25 468:12
**form** 250:6 269:6
275:12 315:3
340:11
**format** 264:17,19
**formed** 337:8
338:17 340:14,16
340:19
**former** 434:3
**fort** 493:19
**forth** 411:11,14
431:21 483:3
**forward** 216:13
217:18 223:24
228:22 230:6
332:9 450:22
451:16 456:11,22
457:14
**found** 212:8
252:19 302:14,21
302:24 303:1
312:4 327:6
330:24 377:23
442:13
**foundation** 202:17
210:21 239:25
272:3 309:15,18
313:5 329:1 350:7

484:19
**founder** 268:14
**four** 319:2 332:23
341:3,18,18
375:25 384:5
445:11,14 476:14
477:20
**fraction** 464:7
**frame** 297:25
**framework**
475:23
**frameworks** 476:2
**fraud** 208:25
209:8 214:1,4
215:1,4,8,17,21,24
219:16 225:7
241:22 263:23
284:7,8,10,20,21
292:21 295:25
296:2 299:5,9,12
336:18 359:4
362:22
**fraudulent** 213:12
216:5 284:8,14,16
285:12,17,20
286:3 299:15,24
300:1,4,7 333:16
333:18 336:22,24
467:12
**frcp** 492:21
**free** 282:15
**freedom** 228:12
244:9 256:23
291:7 322:18
435:10
**freely** 282:7
**freight** 460:24
**frequent** 451:23
**fresh** 248:2
**friday** 266:5

**friend** 337:12
**friend's** 337:19
**friendly** 478:18
479:2,10
**front** 218:7,16
231:1 240:16,17
240:22 262:16
263:1 265:3 331:5
417:7
**frustrating** 318:25
**full** 255:15 268:10
279:1 300:22
308:16 311:23
351:20,22
**fully** 452:18
**function** 238:4
278:2,5
**fund** 422:16
**fundamentally**
262:21
**funds** 350:3,10,13
352:14
**further** 200:7,7
209:3 223:10,20
230:17 269:23
272:13 433:22
443:15,17 444:20
492:21 493:7,10
**furtherance**
259:25
**future** 268:21
326:17

**g**

**gained** 453:2
**gaining** 243:10
**games** 376:19
438:6,20
**gamesmanship**
447:13
**gaming** 284:11

**garcia** 199:6
**gas** 376:11
**gather** 267:13
**gathered** 206:9
**gears** 257:3 363:3
**general** 297:25
392:2
**generalities**
229:24
**generally** 262:2
360:19 382:15
460:15 475:22
480:7
**generated** 386:7
386:13
**generation** 413:9
**generic** 224:3
**genesis** 222:24
223:17
**gentleman's** 241:5
**geo** 209:8 263:24
269:9,9
**george** 396:19
**gestures** 466:16
**getting** 207:12
209:11 217:6
229:1,5 238:25
288:14 296:6
305:2 319:23
329:4 427:24
**gilbert** 251:24
**girl** 273:10
**give** 233:7 253:10
271:12 272:8,10
287:12 307:18
328:9 337:22
360:6,11 361:4,9
361:13 384:15
405:1 465:11,19
**given** 219:13
270:19 276:25

**[given - gotten]**

279:8,9 280:15,22
283:13 305:17,23
306:1,4,7,10,13,16
310:9 315:9
331:18 335:22
354:25 355:10
440:14 469:4
**giving**   303:5 465:6
**gleaned**   267:18
**glitch**   336:12
**globally**   261:10
**gmail.com**   364:23
**go**   202:16 203:13
203:13 204:9
206:23 207:24
208:13 213:1
215:18 216:13
217:15 220:1,1
221:1,22 222:21
223:24 225:11
226:3,12,14,15
227:5,20 228:3,22
229:9 232:22
233:5 237:15,15
237:19,19 238:11
238:15,16 242:9
243:20,22 244:7
248:16 250:16
253:7 254:8
255:13,21 256:13
263:5 265:20
269:23 270:3
277:7 279:2 280:5
283:10 286:5
287:9 288:7 289:4
289:7,11 292:12
293:5,11 295:3,19
296:6,20 300:10
300:21 301:15
304:14 305:15
306:21 308:1,5

310:22 311:13
312:3,7,9,11
314:15 315:8
319:3,9,25 321:11
323:22 326:4
327:1 328:5
329:21 331:15
332:1 333:15
334:10,13 337:17
339:17 340:11
346:2 354:7 355:6
356:18,19 357:13
359:3 362:3 364:5
367:21,22 372:3
375:19 376:24
379:6 380:7
387:16 389:21
393:18 395:16
396:14 398:13
402:7,8,24 416:14
416:15,20 417:10
417:12,22 418:3,9
418:21 419:6,12
420:25 422:1
425:2 426:16
427:18 428:10,11
431:11,13,23
432:18 434:15
441:8 442:2
444:13 446:20
448:4 449:17
450:22 451:6
453:15 454:8,11
454:25 457:13
459:5 461:1 462:6
463:21 464:3,4,16
467:21 468:17
471:10,12,15
473:24 474:2,20
475:19 476:24
477:10,15,23

478:6 482:15
483:2,4 484:6
485:22 486:12
488:7 489:10,19
490:21,22
**goal**   276:23
**goes**   214:10
237:10 241:9
263:17 298:12
308:3 311:15
334:21 338:19
389:24 396:2,7
399:22 417:23
438:13
**going**   213:4
218:25 221:20
235:6 237:23
238:10 241:4,8
242:16,18,19,19
242:21 243:7
244:8,9 245:17
247:13 250:15,24
250:24 253:7,10
253:19 256:5,23
263:10,12 266:14
270:3 271:20
272:17 289:9,13
289:17,18,19
298:7 306:20
309:8 318:5
320:22 322:4,23
327:7 331:3,4
335:9 337:2
343:15,16 344:22
345:2 346:2
350:24 351:25
353:12 354:8
355:6 356:2,4,19
358:1 362:3 363:3
363:24 366:8,10
370:9 377:9 381:4

381:18,20 387:25
388:11,25 393:18
393:19,23 395:17
395:18,18,19
396:24 399:7,8
402:25 403:14,22
403:22 404:13
405:1 406:9,22
419:6 425:2 426:7
428:7,11,12,14
431:13 432:19
434:15 436:2,8,11
436:19 440:18
445:4 447:2,4,19
449:22,23 450:14
451:16 453:16
454:4 456:6,10,15
456:22 461:25
463:2,3 474:20
480:3 482:16,16
483:20 484:6,18
484:25 486:21
487:24 491:6,11
**good**   201:1,22,24
233:17 243:15
271:23 294:5
313:24 327:22
345:1 383:18,21
383:23 397:7
398:7 409:15
410:20 447:1
455:25 457:20
**goods**   460:25
**google**   205:21,22
206:5 207:7,10
208:12,18 337:15
462:7 467:22
**gotten**   271:11
324:19 362:8
472:6

[govern - hey]

**govern** 469:3
**gps** 203:8,14,25
204:6,6,12 205:13
206:2,10,23 207:8
207:25 208:4,10
208:19,21 211:8
211:12 219:7
229:2,5 241:20
269:5,6,13 271:14
271:15,16 286:7,9
286:15,15 306:12
333:17
**grab** 240:7 251:18
252:4 258:15
**grabs** 258:8
**gradually** 212:14
**graduate** 345:7
**graduated** 345:12
345:13
**gratuitous** 244:20
448:22
**great** 220:3 345:1
454:15 467:2
**greater** 315:22
**greenlight** 225:25
226:3,6,8,17,21
227:3 260:15,18
260:23,25 310:23
311:9,13 312:10
312:10 329:14
489:10,12
**grocery** 460:23
**gross** 421:17
427:11
**group** 240:9 381:5
**groups** 262:13
**grow** 474:8
**grown** 460:5
**guarantee** 276:24
435:9,15 436:8
463:20

**guaranteed**
251:13 254:2,15
256:1,7,15 342:12
361:8 463:19
**guaranteeing**
353:9
**guess** 258:6
264:16 277:14
336:16 348:15
349:22 388:16,17
397:15 407:20
429:9 459:14
468:7 469:5,25
473:13,22 477:17
481:22 490:2
**guessing** 347:15
**guided** 337:16
**guideline** 290:7
293:12 296:21
298:19
**guidelines** 282:1
286:18,20 287:1,6
288:9 289:3 298:5
298:10,15,21
299:1 310:16
322:11 354:21
355:16 356:7,9,13
356:15,18 357:3
361:11 390:19
436:24 465:25
478:12
**guides** 346:24
347:4
**guy** 434:2
**guys** 398:17
**gyroscope** 211:14
211:15,22,24
212:19,23

**h**

**hails** 287:22
**half** 458:17 478:14
**hampers** 270:17
**hand** 226:16 386:4
398:16 406:16
432:3
**handed** 385:20,22
**handle** 236:10
266:23 320:25
**handled** 236:6
432:16
**hang** 401:13
427:25 445:11
446:10
**happen** 287:5
295:1 299:8 302:4
395:4 443:8 451:8
451:10
**happened** 219:9
245:24 246:17
266:19,20 307:2
308:14 325:11,17
335:5 382:25
395:6 397:6,6
**happening** 246:5
**happens** 247:22
**happy** 201:2
405:14 448:19
**harassed** 332:2,7
397:7
**harassing** 332:12
396:18
**hard** 225:9 330:9
350:24 394:13
395:5 428:17
489:5,8
**hate** 369:17
**hawley** 199:4,6
**head** 225:16
240:19 277:16

368:6 378:15
**headings** 428:16
**headquarters**
288:22 393:10
**health** 458:20
**hear** 206:17
229:10 233:1
242:20 243:13
251:22 258:21
313:10 323:25
453:3 482:12
**heard** 231:25
240:3 396:19
452:20 456:20
482:10
**hearing** 271:16
450:2,15 453:20
**hearings** 453:2
**heart** 461:14
**heavy** 353:7
**hell** 209:21,24
210:13 211:1
269:20 271:24
**hello** 227:11 230:5
263:16 266:6
308:7 316:16
327:3 331:16
334:20 396:1,6
**help** 227:16
260:11 265:23
320:21 330:25
351:9 367:4
392:14,20,23
394:4 478:18,18
**helped** 369:9
**helpful** 244:20
329:3
**helping** 370:9
**hereto** 198:16
**hey** 250:16

[hi - impossibility]

**hi** 220:5 226:20
228:4 229:8,9
230:12 265:21
315:14
**hiett** 199:5
**high** 219:20 222:6
239:9 243:24
261:11,16 273:15
277:24 282:20,21
295:5,6 331:20
345:8 379:5,6
469:15
**higher** 222:3
308:9,22 331:18
**highest** 230:8
**highlight** 356:4
371:24 372:14
416:16 444:6
463:11 466:21
478:14
**highlighted** 442:3
485:10
**hire** 248:8,14
471:8 473:25
474:3
**history** 337:4
407:12 458:12
490:7
**hit** 228:14 251:10
277:16
**hits** 203:12,13
**hitting** 490:21
**hobby** 375:4,8
**hold** 219:9 240:12
301:19 309:17
350:22 355:4
382:5,8,12 423:24
455:20
**home** 348:9,11,12
348:15,16,17
349:14,20 378:15

378:20 445:10
482:15
**hon** 198:2 199:21
492:3
**honest** 397:10
**honestly** 453:21
**honor** 204:25
205:16 207:11
210:1 212:3 214:7
217:5 235:9
236:13 237:5
239:16 252:25
268:1 272:19
279:6 354:8
369:17 400:19
445:19 447:1
449:9,12 450:13
491:2
**hope** 435:2
**hopefully** 462:19
**hot** 363:25
**hotels** 343:13
446:12
**hour** 319:24 464:9
464:9
**hourly** 388:7,15
388:21 389:1,14
439:5,9,16,20
**hours** 277:13,13
319:2 332:24
335:6 343:11,11
343:11 375:21,25
379:11 389:5
428:23,24,25
429:3,5,12,17
445:11,12,15,15
479:12
**house** 375:6
378:17 386:12
**houston** 199:7,13
226:17,21 227:3

227:17 235:24
248:6,8,13,22
249:7,8,14 252:21
253:20,25 254:11
255:18 274:3,10
274:13,17,21
283:23 284:2,6
308:15,21 310:23
312:11,18 317:3
338:10 342:20,23
343:10 344:7
353:18 368:17,21
370:25 371:2,5,9
371:13,17,25
372:10,21 373:11
374:6 377:6,10
378:24 412:9,22
413:13 423:10
442:22 443:1
460:12 464:13
469:23 472:17,22
475:14 482:11
**how's** 241:7 329:3
**hub** 225:25 226:3
226:6 311:9,13
312:10,10 329:15
**hubs** 226:8 260:15
260:18,23,25
489:11,12
**huge** 304:14
329:14 333:4
**hughes** 268:14
**huh** 402:13
**hundred** 226:7
260:20 445:21
446:4
**hundreds** 259:4,9
332:19 464:15
**hurt** 325:21

**i**

**iah** 266:7,21 267:1
332:2 475:15,15
**icy** 316:18 317:3,9
**idea** 229:3 233:17
243:12 425:5,19
426:5
**identified** 418:15
421:6 427:7,22
450:2
**identify** 411:1,4
416:23 417:13
**idle** 376:11
**illegal** 287:21
471:13 478:25
**illegitimate** 467:12
**immediately**
351:20,24
**impact** 281:23
282:11 283:11
284:1 286:12
288:18 301:5,12
302:9 308:24
410:20 436:10
**impacted** 288:24
391:5,16
**impactful** 283:21
284:4
**impacts** 459:6
**impeachment**
253:1
**implemented**
227:1
**imply** 249:20
**important** 279:14
289:25 293:17
297:4 298:13
321:16 324:1
383:18
**impossibility**
250:12

[impression - investigate]

**impression** 307:11
**improper** 221:8
  253:1
**improve** 283:8
**improvement**
  393:6
**improving** 393:21
**imputed** 205:4
**inaccurate** 229:2,5
  306:11
**inactive** 301:19
**inappropriate**
  466:16
**incident** 266:1
  267:5 323:9 325:6
  325:9
**include** 285:1
  299:12 309:7,10
  333:17 390:3
  490:19
**included** 342:21
  384:2 439:3
  453:25
**includes** 255:17
  421:20 468:5
**including** 270:14
  284:14 285:6
  352:4 398:15
**inclusive** 254:2
  256:1
**income** 275:14
  277:9 282:17
  283:23 284:6
  330:17 337:25
  348:2 351:1,4
  386:13 391:6,17
  391:20 415:16
  419:22 421:12,20
  423:3 427:20
  444:24,25

**incorporated**
  346:5 441:19
**incorrect** 408:16
**increase** 237:11
  244:3 313:17
  314:8
**increasing** 285:1
  299:14
**incredible** 225:3,8
  225:20 227:8
**independent** 218:3
  256:5 262:20
  414:16 415:11,13
  417:4 433:15
  434:7 441:21,22
  486:18 487:24
  488:3
**index** 200:1
**indicate** 378:14
  394:17 488:8
**indicates** 387:9
**indicating** 397:2
**individual** 275:17
  276:5 416:23
**individuals** 447:3
**industry** 321:17
**inexplicable**
  448:12
**infinity** 366:15,17
  368:1 370:13
  427:2
**inform** 219:10
  328:15 334:4
**information**
  207:21 208:11
  211:2,13,21 212:1
  218:23 219:7,14
  228:2 247:14
  252:20 253:19
  255:5,8,17 258:3,8
  258:10 260:5

  266:3 267:6,13,19
  270:4 271:11,12
  271:19,20,21
  277:18 288:17
  306:16 327:6
  329:10 424:18
  462:10,12 467:24
  468:5 472:7
  489:20,25,25
  490:1,23
**informed** 437:7
**informing** 296:15
  331:11 439:16
**infrastructure**
  208:17
**initial** 259:3
**initially** 275:1
**initiatives** 458:24
**injury** 350:19
  351:17
**input** 209:10
**inside** 276:9
  323:13
**insist** 289:19
**instance** 209:5
  213:24 241:20
  252:6 286:7
  320:20 400:11
  403:1,12 412:12
  412:15 432:8
**instances** 413:20
**institute** 268:17
**insult** 491:10
**insurance** 327:9
  342:22 365:16
  368:1 372:9,14,16
  381:16,24 437:18
  437:21 469:8
  476:12,13,23
  477:8

**insured** 372:15,17
  468:7
**insurer** 432:3,16
**integrate** 458:4
**integration** 207:7
  457:25 458:1
  459:1
**intend** 330:3
**intended** 447:14
**intending** 336:18
**intent** 398:13
**intention** 268:10
  285:6,9 299:20
**intentionally**
  286:2 390:3
**intents** 235:4,16
**interested** 493:10
**interference**
  336:15
**internal** 227:25,25
**international**
  458:18
**internet** 376:21
  438:7
**interrogatory**
  416:14,20,22
  418:10,21 441:4
**interrupt** 322:16
  355:7 454:9
**interrupted**
  459:24 474:16
**intervention**
  319:18
**introduced** 388:9
**invade** 231:17
**invest** 261:1
**invested** 259:9
  260:22
**investigate** 209:24
  267:6

Page 26

[investigating - know]

**investigating**
267:9
**investigation**
210:12
**investment** 258:24
259:2,3
**involved** 220:20
**involvement**
370:11
**involving** 246:20
**iphone** 332:4
**issue** 220:6 223:1
227:21,22 228:6
230:14 266:24
270:25 306:25
308:6 314:16
316:14 323:25
327:17 333:5
336:13 369:5
409:16 430:24
450:10 455:21
456:5
**issues** 220:25
236:10 239:2
271:2 272:5
370:10 459:18
491:3

**j**

**jacob** 199:16
278:9,21 279:3
280:5 292:12
294:5 297:17
306:19 320:10
321:13 331:2
334:8 441:7
**jam** 396:20
**james** 222:24
223:18
**janelle** 225:12,19
**january** 316:15
327:5,8 458:13

**jed** 229:9,9
**jennifer** 321:14
**joan** 230:11
**job** 273:11 302:24
303:1,16,20,21
440:8 441:11
442:4,6
**jobs** 273:14,17
340:9 415:8
**join** 272:17
**joined** 458:13,15
**joining** 491:11
**joint** 207:10
278:10 296:19
297:13,16 355:18
359:7 465:21,23
481:5
**journey** 357:8
**judge** 207:17
214:10 226:6
240:16 241:2,17
242:17 244:25
270:22,23 273:5
277:17 278:16,22
279:4 282:14,24
302:12 303:4,6
305:8 306:23
307:1 308:14
310:12 314:20
316:24 318:6
319:23 320:20
327:16,17 334:16
337:4 341:20
342:7,17 344:16
344:20 350:21
351:25 358:1
369:25 392:23
406:22 430:11
435:19,22 443:13
447:22 450:24
451:22 453:7

454:5,15 455:7,17
457:9 474:16
484:3,20 489:19
**judging** 361:5,6
**judgment** 364:8
**judgments** 271:6
**july** 223:18,22
224:7 225:6,17
226:19 227:6
228:11,23 278:23
298:2 429:4,4
**jump** 481:4
486:10
**jumping** 483:2
**june** 216:15,19
220:4 263:13
266:6 298:2 307:1
322:24,25 323:23
331:16 399:4
469:21
**juno** 405:18,20
**jurisdiction** 469:4
**jx2** 466:21
**jx4** 480:2 481:9
483:2,4,9 485:11

**k**

**katherine** 199:5
**keep** 286:6 363:4
363:24 366:10
369:17 381:24
475:10
**keeping** 384:2
**kelli** 201:8
**kept** 229:5 385:25
490:18
**kg** 305:1
**kherkher** 199:6
**kherkhergarcia.c...**
199:8
**kick** 333:1

**kicked** 335:4
**kicking** 332:22
333:7,8
**kill** 376:15
**kimberly** 199:10
492:17
**kind** 202:6,17
237:9 239:18
271:12 283:1
311:18 318:19
368:20 378:15
379:24 386:1
404:6 459:23
463:1 467:1
469:13 470:25
483:2
**kinds** 304:13
343:21
**knew** 205:3
252:18 279:23
286:15 327:20
413:3
**know** 203:21
206:1,12 207:19
208:25 209:5
210:7,25 211:11
211:20 212:12,21
212:25 213:15,16
213:18,19 217:22
218:10,11,18,21
218:24 220:11,18
220:23 222:10,14
222:23 223:2,4
225:2,4,12 227:20
231:3 232:4,5
233:5 235:12,14
235:20,23 236:3
236:15 238:22
239:2 244:7,18
246:9,11 248:19
249:10,14,17

Page 27

[know - license]

250:8,14 251:2
252:10,12,14
253:9 259:6,13,15
259:18,22,23
260:17 261:4
262:3,18 265:2
266:10 267:9,20
271:10 272:2
277:12 278:11
279:18 280:2,20
289:2,18,19 295:4
295:15 298:6
300:25 303:13
308:10,17,20
310:16 312:24
313:10,20 314:5
316:11,16 318:8
318:11 319:25
323:24 324:17
325:17 326:20,22
329:25 330:14,20
330:22 335:3,7,13
335:20 336:16,24
338:20 339:8,11
342:9 343:9
345:12 348:16
349:23 350:9
352:13 354:11
360:2 367:21
379:5 382:10
386:8 397:15
398:18 409:13
417:23,23,24
423:6 424:9,20
425:4,19,21 426:4
427:4 428:17
430:11 436:8
437:1,8,11,15
438:13 440:6,7
445:1,21 446:10
448:16 449:23

450:6,17 451:8,11
451:15,20 452:16
455:2,20 457:1,2
472:24 484:24
487:22 491:8
**knowing** 326:25
437:5
**knowledge** 202:17
205:4 211:19
212:10 213:18
231:25 244:15
250:23 267:16,17
267:17 269:17,18
271:2 297:7
406:23 471:14
472:5
**known** 269:17
336:13 387:18
469:1
**knows** 210:23
212:6 217:11
234:18 332:15
391:11 407:8
**kremena** 426:21
427:1,19

**l**

**l** 463:4
**labeled** 305:1
**labor** 262:14
**lack** 272:2
**lacks** 210:20
406:23
**land** 243:18
268:12,19
**language** 218:16
236:15 291:23
335:1 359:1
433:25 434:1,10
466:16 484:18
485:5,8

**large** 269:10 371:5
**late** 454:11
**lately** 229:1
**law** 265:23 369:9
370:9 466:19
470:17
**laws** 367:4 481:22
**lawsuit** 409:12
**lawyer** 484:16
**lawyers** 370:6
484:20
**layman's** 471:1
**lead** 233:17
262:13 279:24
280:12 282:23
291:18 295:8
298:7 356:10
413:9
**leading** 392:17
458:18 470:20
481:2
**leads** 279:15 281:9
284:12,25 286:24
290:9,20 292:14
292:23 378:16
**leaf** 465:19
**learned** 206:8,10
243:6 271:11
439:19
**lease** 366:21
**leased** 261:2
339:18 340:8
415:6 441:17
**leasing** 338:6
**leave** 323:2 324:2
332:8,12,24
397:22,25 398:3
**leaving** 381:14
**led** 458:19
**lee** 375:17

**leeway** 253:10
303:6 369:18
**left** 226:16 323:3
323:18 324:3,6
360:23 406:16
428:20 440:17
458:21 459:2
**legal** 438:12
463:16 487:19
493:17
**legally** 270:10
474:1
**lemon** 369:9 370:9
**length** 214:9
394:17
**letter** 351:23
431:24
**letting** 263:18
289:17 313:10
323:24 334:22
379:4 396:8
451:16
**level** 211:19
277:22 278:7
280:14 410:5,7
469:16 470:2
472:13
**liability** 304:17
**license** 266:9
303:18,19,22,24
304:2,3,16,24
327:9,10 342:25
365:18 368:25
371:10,13,17,19
372:1 373:10
403:18 437:19
438:1 468:5 469:7
471:9,11,15
472:17 473:7
477:4

Veritext Legal Solutions
346-293-7000

[licensing - long]

**licensing** 373:9
**lie** 394:8 397:7
**lied** 397:8
**life** 273:5,17
**lifted** 226:4,25
**light** 368:4,13,17
**lights** 368:5
**liked** 368:12
**lily** 329:6,6,18,24
**limit** 218:25
  223:12 281:19
  282:8 291:3
  327:21
**limited** 236:17,18
  236:22 299:13
**limits** 218:4
  281:22
**limo** 249:6,9,15
  327:9 344:11
  368:25 371:10,13
  371:16 413:5
**limos** 364:20
**limousine** 248:22
  344:9,10 365:19
  371:25 437:18
**lindsey** 199:18
**line** 203:7,13,13
  210:2 213:20
  214:13 216:15
  237:16,19 238:12
  238:15,17 243:23
  259:24 271:18,23
  277:7 281:3 283:7
  283:10 305:15
  308:24 319:5
  329:21 332:9,13
  332:24,24,25
  333:4,19 334:13
  335:6 354:7 362:6
  377:21 385:10
  393:19 397:10

399:11 400:11,21
401:5,5,6,10,10,13
401:16,18,20
407:21 419:20,21
420:1,17 421:15
422:1,4,9 425:2,14
425:17,22 427:10
427:25 428:13,22
428:24 434:2
467:18 468:17
483:5,6 486:21
488:7 490:21,22
**lined** 428:21
**lines** 204:13
  218:19 232:24
  233:6 237:16
  392:7 399:17
  401:1,5,6,10 402:7
  402:24 403:11
  428:11 441:10
  461:24 480:6
  483:19 485:22
  486:22 487:7
**link** 327:7,24
  393:11
**list** 229:21 258:14
  276:12 470:6
  472:18
**listed** 328:11,13
  330:23 386:24,25
  420:14,16 426:3
**listen** 206:18
  243:11 310:17
  354:10
**listened** 349:5
**listening** 366:19
**literally** 221:17
  241:17 253:14
**literature** 478:17
**lithuania** 273:4
  380:20 482:17

**litigation** 270:16
  406:12 415:21
  417:20 429:17
**little** 203:20 229:9
  234:3 253:8 257:4
  277:17 279:11
  297:24 302:12
  321:5 337:3,6
  346:1 358:17
  359:9 360:4 363:3
  365:10 367:18
  386:2 387:4 405:1
  419:8 428:20
  437:9 460:14
  475:21 480:4
  481:5 483:3
**littler** 199:11
**littler.com** 199:13
**live** 331:25 446:11
  448:3,7,8
**lived** 274:1 348:5
  348:18 379:25
**livelihood** 302:11
**livery** 421:3,9
  427:8,20 437:25
  438:1 468:25
  469:3,7,14,17,18
  469:21,24,25
  471:2,9,11,15
  472:2,8,12,17,24
  473:1,7,10,12,15
  473:19 474:7,10
  475:6,9,10,11,16
  480:15
**lives** 459:7
**living** 273:21
  353:5
**llc** 275:10 337:9,9
  338:14 347:22
  351:13,13 352:11
  372:18 414:5

419:9,14 420:22
421:1 426:19
441:19 468:12,20
469:11,12 475:25
480:10,16 490:4
**llcs** 490:4
**load** 320:21
**loan** 350:19 351:4
  351:5,17,18,20,23
  367:1
**local** 225:25
**location** 227:3
  306:8,9 313:14
  314:3 333:18
  478:3
**locations** 210:18
  260:15
**log** 276:16 377:17
  378:5 379:13,16
  408:12 479:15,17
**logged** 203:6
  244:17 292:1,4,7
  294:18 295:2
  379:19 412:4
  479:13 490:20,20
**logistics** 275:4,10
  338:17 339:6
  340:9,15,19 414:5
  414:25 415:4,14
  417:14 418:15,25
  442:11,18 458:14
**logo** 368:20
**logs** 204:16
**long** 235:22 252:8
  274:9,19 295:15
  317:17,24 318:3
  332:17 339:19
  375:21 389:14
  394:21 397:24
  398:12 403:6
  409:24 419:13

Veritext Legal Solutions
346-293-7000

[long - ma'am]

454:17,19 458:8
474:20 483:12,16
487:4
**longer**  209:12
217:17 228:15
229:19 231:4
234:8 275:4
277:12 331:11
343:15 360:4
380:24 409:8
447:4,11 469:19
469:22 489:17
**look**  206:23 213:2
230:3 232:15
240:9 248:17
254:25 255:1
258:13 263:9
279:11 281:9
282:19 284:24
289:22 293:1
294:6,10,14
296:19 297:16
301:18 306:22
307:13 312:13,15
313:6,8 315:7
317:16 331:3,4
339:10 341:21
347:17 349:10,12
355:15,23 359:7
359:25 360:2
371:15,23 372:13
381:2,7 385:5
388:19,23,25
392:4 395:17
398:16 399:9,11
399:17 400:10,15
402:5 403:11
404:12,14,14
407:12 415:23
418:9,14,17,24
419:2,20 420:6

421:15 422:11
425:11 426:6
427:13 428:6,7
431:10 440:18,21
450:25 463:7
466:5 475:19
476:20 480:2
481:6 482:1
483:19 485:20
486:9
**looked**  203:3
418:12
**looking**  209:2
225:10,10 258:6
264:12,14 353:5
356:17 381:6
398:17 418:1,18
431:15 436:15
464:24 465:21
488:6
**lookout**  284:10
**looks**  227:20
266:17 307:4,5,9
307:12 312:17,18
313:2,23 316:5
319:7 406:7
**los**  458:13
**lose**  219:22 222:16
233:3 282:16
283:16 284:22
288:10 289:8
291:3,12 295:14
296:25 298:19
299:1,10 301:2,13
305:20 330:17
331:22 332:23,25
334:1 336:4
357:23,24 358:16
377:21 466:6,11
466:23 467:4,6,15

**losing**  284:3 287:7
290:9,20 292:14
292:24 302:7
332:9 333:13
**loss**  216:6 291:19
295:8 356:11
381:19 432:9
**lost**  238:24 283:19
303:10 319:5
392:10 393:2
442:4,6
**lot**  241:20 244:18
266:22,22 267:1
269:4 277:10,12
302:20 303:5
304:16 310:20
317:3 332:1,8,15
332:15,19 333:7,8
335:3,4 336:10
341:2 345:20
376:14 386:13
390:24 396:17,19
397:5,23,25 398:4
404:25 413:3
436:22 438:21
439:23 459:6
**lots**  298:17
**love**  222:15 331:20
**low**  233:17 361:21
390:25
**lower**  300:23
373:1 485:11
**luck**  336:14
**lucky**  445:19
**lunch**  330:10
**lunchtime**  377:18
**lure**  211:3
**lux**  463:5
**luxury**  302:19
342:14 343:3
344:14 387:10

**lyft**  210:19 211:2
340:22 341:1,3,5,8
341:9,12,15,17
348:2 386:22,24
405:2,5,9,23,25
406:3,20 407:6,11
407:19 408:2,4,6
408:19 409:1,1,17
410:19 411:11,15
411:24 412:7,10
413:18 421:21
427:20,22 430:2
440:22,23 479:22
479:25
**lyft's**  211:1

---

m

**m&a**  457:25 458:1
458:25
**ma'am**  201:5
214:15 346:10,16
346:22 347:16
349:4,7 353:3,19
354:23 355:3
356:1 357:18
359:13 361:12,19
362:23 363:12,17
364:10 365:3,11
365:25 366:3,14
367:7 368:8
370:12,15,23
371:3,14,18,20
372:2,11,25 373:5
373:15,19,23
374:1,7,15,19
375:9,23 377:1
379:12 380:23
382:3,21 383:15
385:7,22 387:11
388:4 394:20
395:21 397:19
399:20 404:22

[ma'am - meant]

405:7 411:9 413:1
414:3,18,24 415:1
415:15,24 416:11
418:5,16 419:11
422:22 423:13,21
424:6 425:13
426:5 427:17
429:2 433:12
444:17 445:18
446:5
**machine**  198:15
**macleod**  199:5
200:4 201:5,17,22
205:10 206:4,21
207:16,22 208:3
210:4,5,11,17,25
211:7 212:11
213:4,7 214:10,15
214:18,22 215:25
216:3 217:8,14
218:20 228:22
231:19,23 232:20
232:22 234:13,25
235:6,11 236:18
237:6,12 239:23
240:4,6,15 241:1,2
241:15,16,23,25
242:15,17,25
243:4,9,17,22
249:23 250:1,5
251:22 253:3,6,11
253:14 254:25
256:13 263:3,9
264:21 265:1,8
267:24 268:4,6
272:12,13 448:21
449:14 450:12,24
451:22 452:5,19
454:3,14,19,22
455:7,12,16 456:3
456:7 459:21,25

461:9 470:20
471:20 474:14,18
481:2 484:2,8,14
485:4 487:19,22
**mail**  199:8,13
216:15 220:8
224:1,2,3,4,11
227:11,23 228:8
230:16 231:8
250:7 260:5
265:25 331:7,10
339:10,16 365:1
381:10 386:19,20
398:24 462:11
465:2 467:25
**mail's**  224:6
**mails**  246:21
288:14 364:13
365:4 379:4
**main**  283:23 284:5
337:25 444:25
445:1 452:17
**maintain**  260:11
281:15 282:8
287:14 294:19
**maintained**
211:24
**maintaining**
205:13 233:13
321:16
**majority**  445:22
**making**  275:12
303:12 308:25
344:23
**man**  273:20
348:14
**manage**  458:6
**managed**  268:21
**management**
266:25

**manager**  327:11
332:10 458:14
**manipulate**
307:21
**manipulating**
208:24
**manipulation**
333:17
**manner**  220:21
257:21
**manufacturing**
369:15
**mapping**  269:9
387:12,15,22
**march**  311:1
417:8 441:13
442:4,25 447:23
**market**  236:25
237:3 247:4,12
471:8
**marketplace**
247:22 248:3
460:19
**marketplaces**
460:18
**married**  273:13
**match**  313:13
314:3 440:24
**matched**  326:11
326:13 462:19
463:3 464:20
465:14
**materials**  260:4
**math**  373:25
**matter**  215:23
258:1,9,16 267:7,9
317:7 343:22
407:2 415:21
455:22 472:11
**matters**  201:3
342:18

**max**  477:21
**maximizing**  390:2
411:18
**maximum**  281:10
281:19,22 290:21
291:2 292:10
389:6 446:1
**mcdonald**  201:8
**mckinney**  199:12
**mean**  209:6
213:22 215:22
222:10 226:9
230:2 236:25
281:6 283:25
286:14,15 302:23
309:11 314:4,5
315:16 316:10
332:25 334:5
336:10 341:6
343:10 344:13
347:1,2 348:15
367:10 369:25
395:10 398:2,2
416:8 423:5 436:7
437:5 463:24
471:4 475:25
481:13 486:3,23
490:21 491:9
**meaning**  305:19
366:18 410:7
437:15 471:16
483:18
**means**  213:24
221:5 233:13
236:4,5 280:23
449:16 464:1
477:7 481:15
482:3 484:18
485:5,8
**meant**  332:3,5,16
332:20 365:15

Page 31

[measure - monitoring]

**measure** 279:13 289:25 293:16 297:3
**measures** 309:23 326:16,20,22
**medical** 257:7
**meet** 245:16 301:1 413:9
**meets** 477:8
**member** 337:9 338:13
**memory** 349:18 361:25 362:14 392:21 393:8,15 394:5 398:24 404:21
**mendelson** 199:11
**mentally** 325:13
**mention** 468:13
**mentioned** 283:17 346:17 353:7 412:12 417:16 424:12 461:9 468:19 473:14
**menu** 315:9
**mess** 323:1,3,18 324:2,6 345:2 360:23
**message** 213:11,13 220:2 221:1,16,23 222:2 230:1 246:19 263:16,25 264:2 265:9 306:22 307:4,14 311:1 312:14 314:22,22,23 320:13 325:2 331:17 332:10 381:8,22 396:1,6 396:23 397:1 399:18 400:16,22

400:24 401:3,8,11 431:14,16 432:19
**messages** 203:2,4 215:2,7 216:20,24 217:2,8,9,12 219:11,13 229:1,5 229:18 264:11,12 264:17 306:20 310:14,21 329:10 329:12 330:25 336:19 396:14 402:6 431:18
**messes** 324:3
**met** 245:5 273:10 449:5 452:21
**metro** 482:3
**microphone** 272:16
**mid** 202:1
**middle** 220:2 251:17 255:22 298:1 364:7 419:6 483:6
**miers** 199:10 200:6,7 272:19 289:13 294:21 303:5 305:12 309:15 313:5 322:15 329:1 344:19,20,22 345:14,19 348:23 350:18 351:9,10 352:9,10,18,22 353:12,15 354:8 354:18 355:6 358:5,11,15 366:8 366:11 369:17 370:8 391:4,12 392:20 398:8,22 400:19,21 406:25 407:9 422:7,9

424:3 430:11,18 433:20 435:17,19 438:11 443:16,18 444:19 447:1 448:6 449:9 452:23 453:11 455:4 474:22 484:21 492:17
**mile** 307:22
**mileage** 389:6 429:24,25 430:1
**miles** 306:5 307:20 316:17 317:6,8,13 343:16 425:18,20 425:23,24 426:2 490:15,19
**millions** 259:4,9 259:18,23
**mind** 341:22 362:2 410:24 473:23 490:14
**mine** 337:12 364:25
**minimize** 326:16
**minimum** 251:13 254:2,15 256:1,7 256:15 279:16,18 279:21 280:3,7 290:13 300:24 301:1 319:6 362:9 477:9
**minor** 324:2 325:15,16
**minus** 315:15
**minute** 240:12 263:4,6 308:2 398:4,14 406:7
**minutes** 263:6 318:18 341:21 345:3,5 398:10 404:16,17,19,23

412:13 423:8 430:16 444:3 454:17,18,19 489:18
**misspelled** 332:4
**misstates** 206:13 234:9
**mistake** 229:1 393:24
**mistaken** 441:14
**mister** 488:1
**misunderstood** 408:17
**model** 327:19 342:6,22 437:16 473:11,19
**models** 470:3
**moment** 332:24 374:23
**momentarily** 463:9
**moments** 319:1
**monetary** 278:7
**money** 239:1 259:14 260:3 273:12 275:12 292:11 302:10 303:12 308:25 314:13 333:3 341:24 342:4,13 343:1,17 364:6 367:9,10,11 378:19 435:3,5,9 436:2,9
**monitor** 204:20 212:24
**monitored** 269:15 287:16
**monitoring** 203:23 204:1 206:10 207:24 209:25

**[monitoring - new]**

210:18 211:8
213:17 269:6,23
269:24
**month** 253:17
339:11 364:4
407:22
**months** 224:14
230:7 274:15
298:3 339:7,21
340:10 381:12,15
410:3,4 442:13,14
442:14 458:4,19
458:22,24
**morning** 201:1,22
201:24 247:19
263:6 447:18
452:15 464:9
484:6,9,11,11
**mortgage** 283:24
**motion** 211:17
214:7 271:1
**motions** 270:13
**motor** 468:14
477:7
**move** 214:14
241:15,16,23
242:22 243:16
273:24 274:4,13
280:18 290:8
296:24 297:12
304:9 316:13
318:5 322:23
337:2 345:15
352:21,22 370:25
399:7,8 417:25
426:7 428:15,20
447:2,19 456:10
482:7
**moved** 263:21
273:8,24 274:3,10
274:17,20 283:22

284:2 308:15,21
340:1 345:13
396:11 400:8
482:11
**moving** 217:18
272:16 284:7
312:18 363:4
398:22 489:15
**multiple** 280:7
335:1 453:1 473:8
474:3
**multiplier** 236:23
247:8,13,18,24
248:1
**multipliers** 239:11
247:2,4,21
**muted** 435:19

**n**

**name** 225:12
232:18 267:2
272:25 273:1
275:2,8,9 277:21
340:14 344:23,25
347:22 350:25
351:13 364:16,18
372:14,17,17
420:21 424:11
426:24 434:2
457:23 462:10
463:11 467:24
481:25
**named** 209:21
**names** 364:15,18
**narrative** 303:7
305:13 474:24
**narratives** 474:20
**narrow** 370:4
**national** 478:3
**natural** 491:1
**nature** 207:12
267:12 269:24

**near** 255:21,22
446:12
**necessarily** 243:15
249:20 256:12
257:2
**necessary** 325:8
446:23 451:17
**need** 201:13
227:16 238:22
239:20 304:15,15
323:5 334:13
341:21 348:15
370:4 392:23
393:14 398:18
448:7 449:17,22
449:23,24,25
450:6,16 451:4,11
451:15,18 452:25
454:5,8,11,17
455:22 456:2
461:1 468:10,13
474:17 482:15,25
491:4
**needed** 321:25
322:2,20 365:16
365:18 372:8
391:19
**needs** 271:8
398:14 403:13
**negotiate** 244:24
245:6,15
**negotiated** 246:8
312:1
**negotiating** 245:17
245:22
**negotiation** 245:1
**negotiations**
246:22
**neighborhoods**
374:3 378:24

**neither** 317:18
493:7
**network** 470:18
477:2
**never** 233:17
243:19 245:5
275:25 277:11
286:1 288:9,10
303:23 307:24
308:18 314:14
326:6,23 334:3
343:22 345:12,13
351:24 361:20
369:14,15 385:22
388:16 391:24
392:2,8,10,24
393:2,5,25 394:1
398:16 411:23
424:6,6 452:6
**new** 248:1 255:4
255:23,23 274:1,2
274:4,5 279:19,22
280:3 281:14
284:6 288:22
302:24 303:2,15
303:20 308:8,16
308:23 312:18
327:22 328:1
337:11,14,17
338:19 340:12
342:11 343:19
344:3 345:7 348:5
348:19 353:8,17
364:20 365:15,18
368:4,18 371:9
372:8 376:23
390:9 393:11
412:19,21,24
413:4,12 423:9,12
435:6 443:6
482:11,24 489:15

[newer - okay]

**newer**  472:20
**nice**  384:20
**night**  368:10 377:4
**nights**  317:2
**nine**  224:14
   280:23 483:19
   487:7
**nods**  368:6
**non**  217:19 478:21
   484:16
**nonresponsive**
   235:7 243:5
   345:14 353:13
   354:9 358:11
   366:9 471:20
   474:15,23
**nope**  224:23
   379:17
**noreply**  213:8
**normal**  471:9
**normally**  445:18
**north**  225:18
   226:17,21 227:3
   310:23
**northern**  273:3
**notary**  492:25
**note**  341:25
**notes**  341:22 342:3
   404:5
**notice**  213:20
   216:16 439:15
**notifications**  280:7
**notify**  283:6
**notions**  455:24
**november**  252:20
   253:24 255:15,16
   442:7 458:23
**nrg**  250:17,17
**nuanced**  298:22
**number**  226:10
   255:18 261:5

263:10 265:2
   307:22 386:17
   389:5 404:14,15
   407:5 416:20,22
   418:10 425:23,24
   429:13 440:6
   460:6 462:10
   465:21,23 473:23
   490:15
**numbered**  198:11
**numbers**  280:1
   406:17 440:23
   464:12
**numerous**  273:14
   278:18 280:12
   282:2 296:18
   304:12 310:14,21
   334:2 337:12
   359:12
**nurse**  257:10

**o**

**o'clock**  319:24
   320:8 489:17
   491:14
**oath**  240:9 349:8
   423:8 443:21
   457:15
**object**  204:25
   212:2 217:5 235:6
   236:11 239:15,23
   241:7 242:19
   249:18 252:25
   289:13 345:14
   350:12 352:1
   353:12 354:9
   358:2 366:8
   392:15 406:23
   423:23 445:5
   452:8 453:4
   474:23

**objected**  239:17
   243:5
**objecting**  303:6
   369:18
**objection**  205:15
   206:13 207:11,15
   210:1,14,20 214:6
   218:12 228:18
   231:16 234:9
   237:4 239:24
   243:13 251:20
   254:20 256:9
   289:20,21 294:21
   305:12 309:15
   313:5 329:1
   348:20 350:7,17
   350:21 358:11
   391:2,8 435:17,20
   438:11 459:21,24
   470:20 474:17
   484:2
**objections**  211:4
   239:18 417:11
**obligated**  468:4
**obnoxious**  360:21
**obtain**  371:17
   374:5 422:24
   467:19
**obtained**  432:10
**obviously**  260:22
   271:17 376:14
   454:4
**occasionally**  324:1
**occasions**  337:25
   394:11 406:3
   413:16
**occupation**  485:19
**occupational**
   470:11
**occur**  276:24
   288:5 295:11

315:21 323:19
   324:21
**occurred**  316:8
**occurrence**  311:8
**october**  296:23
   315:20 324:25
   326:5 458:21
**offer**  268:7 270:21
   339:19 374:8
   383:6,17 389:2,7
   412:7
**offered**  276:17,19
   277:4,5,8,15
   283:12 302:20
   364:9 382:4
   384:14,19 387:10
   421:9 423:9
   434:23 446:22
**office**  348:9,11,12
   348:15,16,18
   349:14,20,24
**offs**  217:18 219:6
   221:10,14 223:13
   228:12,17 229:19
   331:13
**oftentimes**  246:2
**oh**  315:4 334:10
   341:13 397:22
   398:2
**okay**  204:19
   206:21 209:23
   213:1,11 214:22
   215:6 217:14
   218:2,9,18 222:21
   228:1 230:19
   231:11,23 232:4
   233:5 237:23
   238:9,19 239:5
   240:18 246:12
   247:11 248:11,16
   248:16 252:18

[okay - overly]

255:6,13 256:13
257:3 259:8
261:23 264:7
265:21 266:5
279:2 284:7
289:22 297:23
306:19 309:19
314:15 316:13
318:5,21 320:7
321:11 322:24
324:24 327:1
329:5 331:2 332:7
334:12 337:2,5
338:22,23 339:8
341:11,23 348:23
352:21 355:15,17
355:23 356:21
357:15 358:14
359:7,11 360:9
361:24 362:1,16
362:20 363:3,7,18
366:8 367:17,25
369:23 370:6
372:23 373:20
374:16,24 381:11
383:13,16 386:6
388:11,22 390:2
390:23 391:4
392:4 393:18,24
394:7 395:16
397:20 398:19
399:3,5 402:9,10
405:17 406:5,13
406:14 407:14,18
407:21 409:21
410:15,18 411:17
412:3 413:25
414:14,21 415:19
415:21 416:20
417:1,6,7,16,22
418:2,11,17,24

419:2,20,23 420:1
420:3,13,18,21
421:19 422:20
423:22 424:14
425:6,8,16 426:8
426:11,14,18
427:7,23 428:2,8
429:10,16,19
430:14 432:5,21
434:15 435:24
440:19 441:20
443:21 445:5
446:3,24 449:7
454:6 456:13
457:11,13 458:8
459:23 460:10
462:21 470:5
472:15 473:18
474:25 476:24
478:8 479:1
482:14 486:21
487:7 489:16
491:5
**older**   229:3 477:5
**once**   223:1 228:6
230:14 273:7
274:16,23 276:16
309:9 335:3,7
340:2,4 367:5
373:11 398:14
427:18 428:14
452:6 462:8,17
466:18 467:23
468:1,9,16
**ones**   473:22
**open**   338:19
408:23 409:5,19
410:1,11 462:11
462:18 468:2
489:12

**opening**   248:20
374:20 456:7
**operate**   304:19
437:25
**operated**   352:20
**operating**   209:19
210:13 211:1
373:20
**operation**   269:20
348:14
**operational**   262:3
269:19 275:5
**operations**   261:13
262:23 339:25
458:14
**operator**   273:20
346:25 347:5
**opinion**   372:23
373:3 385:14
430:23
**opportunity**
228:16 241:13
244:10 265:18
279:8,9 335:23,25
363:22 448:8
453:5 488:11
**opt**   388:20 478:20
478:20,23 479:1,5
479:5,10
**option**   335:23
344:6 388:6,15
439:9,12,20 440:9
440:12,14 462:19
**options**   315:10
454:13 462:22
463:6 473:14,17
490:5
**oral**   451:1
**order**   238:21,25
249:5 277:6
288:23 299:19

301:23 304:21
305:10 314:9
318:18 319:14
322:2,20 340:8
365:4 372:9
375:22 380:18
381:23 394:8
402:7 437:12
445:23 450:20
464:19
**orders**   270:1
**ordinance**   248:8
249:14
**ordinances**   248:6
248:13
**organization**
220:18
**organizations**
262:14
**origin**   478:4
**original**   492:16
**originally**   273:3
273:10 458:13
**originate**   213:13
**outcome**   493:11
**outline**   262:7
456:20 457:21
**outlined**   215:4
468:24
**outlines**   204:6
215:16
**outraged**   307:5,7
**outside**   216:25
287:16 288:1
323:2 350:13
403:19 413:17
423:9,10 443:2,2
465:20 473:24
474:1
**overly**   460:1

Page 35

[overruled - payout]

**overruled** 205:6
205:17 210:15,22
211:5 218:14
228:20 235:10
236:14 237:7
254:22 256:11
289:21 294:22
305:14 313:7
345:17 358:4,12
366:10 392:19,19
470:22
**owes** 430:8
**owned** 224:5
261:2 352:19
**owner** 273:20
346:25 347:5
383:20
**ownership** 346:8
**owns** 337:12

**p**

**p.m.** 198:12 320:9
320:9 378:2
398:11,11 430:17
430:17 454:21,21
491:15
**p1** 202:25 203:17
**p2** 202:25 203:17
429:3,4,5
**p2p** 481:10,13
**p3** 202:25 203:17
429:11,12
**page** 200:2 222:21
222:22 225:11
227:5 232:22
233:6 237:15
248:16 255:13,21
255:22 258:14
278:20 279:3
280:5 285:5 287:9
289:4,23 290:8
292:13,14 293:11

294:5,15 295:19
296:20,24 297:16
300:10,21,23
301:15 308:5
320:11 323:22
326:5,15 328:6
331:15 333:15
337:19 349:12
355:24 356:3,3
357:6 359:3,3
362:3 388:23
389:22 392:6
393:19 416:1
418:3 431:24
432:20 439:2
441:8,10 444:5,14
466:5,20 478:18
479:4,7 486:5,10
486:12,13 489:1
493:3
**pages** 208:13,18
450:16,25
**paid** 312:5 315:11
316:11,17 317:13
318:15 319:7,17
342:3 351:20,22
366:24 367:1,3,5,5
367:25 371:19,22
390:11 412:16
423:20 424:5
428:3 429:17
474:12 490:9,10
**paints** 268:21
**paired** 326:6,17,23
**pandemic** 262:1
352:19
**papers** 339:17
448:5
**paragraph** 215:4
215:15 216:4
217:15 224:12

255:15 300:22
309:1 388:24
481:14
**paragraphs** 486:6
**parameters**
472:19,21
**parents** 367:4
**park** 266:21,23
337:13,17,22
338:3 346:18
377:21
**parking** 396:17
438:21
**parkway** 375:18
**parmeter** 455:6
**parrott** 454:23
456:11 457:11
**parrott's** 448:11
**part** 212:15 236:1
241:10 262:3
269:18 270:6,16
282:21 295:6
338:22 353:6
363:9 383:23
387:5 419:7
463:18 470:10
473:8 475:4 476:6
484:12 485:11
487:25
**participating**
491:7
**particular** 202:12
202:18 209:5
213:24 246:20
252:6 258:1,16
379:9 431:12
**particularly** 469:5
**parties** 492:19
493:8
**partner** 225:3,8,20
227:9 230:8

232:21 265:18
309:9 311:2
328:10,12,15
432:2,14,25
**partner's** 309:2
**partners** 300:25
**partnership**
226:22
**parts** 235:15
**party** 337:12
364:20 486:5
492:23 493:6
**pass** 267:24
318:18 344:16
430:14 433:20
443:13 444:19
**passenger** 433:1
433:16 466:18
481:10
**passengers** 384:14
430:20
**passing** 341:21
**pasted** 434:4
**patience** 321:13
321:15
**pay** 288:6 300:12
314:10 316:3
341:25 377:20
475:8
**payee** 347:22
**paying** 308:8,10
**payment** 236:10
236:17 283:24
287:25 313:20
315:22 321:20,25
322:10 324:13
337:19 462:12
**payments** 422:25
**payout** 369:9
370:10

[payroll - platform]

**payroll** 465:15
**pdf** 250:6
**pedicab** 337:22
  338:8
**pedicabs** 337:7,9
  337:23 338:2,13
  338:18,24 346:2
  346:18,25 347:5
  347:22 348:3,7,13
  348:18 349:21
  350:3,18 351:13
  352:4,15 372:18
  420:22 421:1,9
  426:17,24 480:25
**peek** 427:10
**peer** 481:16,16,24
  481:24
**penalize** 387:23
**penalties** 335:13
**penalty** 416:12
  418:6 419:16
  426:14 427:16
**people** 258:18
  261:5 270:2
  332:22 343:20,20
  343:21,21 413:3
  445:23 459:8
  460:6,22 462:15
  466:3 471:9
**people's** 459:6
**percent** 280:24
  307:4,10,11 311:2
  311:4 346:8
  361:16 373:14,14
  375:4 464:7,14
**percentage** 276:4
  307:8 308:9,10,18
  308:22 309:7,11
  309:12 464:6,10
  464:11

**perfect** 220:3
  371:6 398:9
  421:15
**perfectly** 356:5
**perform** 310:6
  473:16,25
**performance**
  288:15 459:15
**period** 216:22
  222:13 245:23
  247:14 283:10,20
  330:4,17 339:5,21
  341:7 350:14
  351:6 352:16
  372:20 398:13
  409:12,14,18,24
  438:5,19 440:24
  441:1 442:19
  460:2
**perjury** 416:12
  418:6 419:16
  426:14 427:16
**permanent** 282:23
  291:18 295:8
  356:11 392:17
**permanently**
  284:14
**permit** 266:8
  368:23 374:6,12
**permits** 414:10
**permitted** 269:23
**permittee** 249:9
  249:10 251:5
**permittees** 248:25
**person** 208:7
  218:2 225:25
  226:12,12 227:2
  283:25 311:14
  325:20 471:5,12
  489:9,10

**personal** 216:24
  267:16 271:2
  364:15 370:13,18
  370:22 383:18
  385:14 406:23
  429:24,25 462:9
  466:14 467:24
**personally** 220:13
  365:8
**personnel** 266:7
**perspective** 267:5
  448:6
**pertains** 311:21
**pet** 478:18,22
  479:2,10
**petroleum** 421:1
**pets** 478:24
**phone** 204:18
  225:23 229:2,4
  269:14 359:14,16
  363:11,14 386:17
  454:5,8 462:10
  467:24
**phone's** 204:12
**phones** 208:16
  336:13
**photo** 239:12,20
  240:7
**phrase** 481:13
**physical** 203:22
  260:15 358:21,24
**physically** 325:21
**pick** 245:21,22
  277:16 306:10,15
  316:18 317:6,8,13
  319:3 380:1
  403:18 412:1
  429:7 464:23
  465:2 472:12
**picked** 245:9
  246:2

**picking** 301:15
  433:23
**picks** 245:17
  292:13 404:10
**pickup** 313:14
  314:3 317:17,21
  317:24 318:3
**pickups** 217:18
  219:6 221:10,14
  223:14 228:13,17
  229:19 287:17
  331:12
**pictures** 431:15
**piece** 272:4
**pilot** 234:22,24
  235:3,12,13,17,20
  235:22,24 236:1
**piloted** 234:19
**piloting** 235:14,19
**place** 227:2 235:24
  236:1 281:23
  296:12 319:5
  332:9,25 342:12
  377:21 398:7
  437:12
**placed** 382:8
**placing** 382:11
**plain** 438:14
**plaintiffs** 446:21
**plan** 273:10
  363:16 364:2
  454:4
**plastic** 320:25
**platform** 224:4
  284:23 287:8,15
  305:21 310:6
  325:20 328:3
  344:4 365:9,13
  366:12 371:2,7
  372:10,21,24
  373:4,12,13,22

Veritext Legal Solutions
346-293-7000

[platform - previously]

383:14 388:6
437:4,8 439:21
440:3 443:3 459:5
464:2 466:4
490:20
**platforms**  373:16
408:12 461:2,4
**play**  376:19
421:24 438:6
462:7 467:22
**playing**  438:20
**please**  208:2 213:2
214:16,17,19
216:1 221:18
222:17,18 227:17
230:5,8,9 234:12
241:15,24 243:16
248:6 265:24
266:25 268:3
272:24 278:10
279:3 289:1 293:4
297:17 303:8
304:25 306:21
308:5,9 309:9
312:16 320:12
324:24 326:6
327:3,10 331:2
332:9 334:11
345:18 347:12
354:12 357:8
358:12 362:7
372:15 382:10
388:13 391:14
396:4 398:6,15,20
402:22 422:8
432:1 436:17
438:16 439:1,2
440:18 441:9
443:24 455:10
463:14 476:24
478:14 491:7,11

**plenty**  447:17,24
**plumber**  257:21
**plus**  343:16
**pocket**  369:1
386:2
**point**  217:6 221:12
225:2,6 228:10
230:23 240:23
243:6 271:9,13
274:6 289:10
297:13,15 308:1
308:19 328:2
339:17 340:6
350:23 352:8,10
359:20 369:5
386:11 393:7,9
394:15 408:25
434:1 444:22
462:20,20 471:6,6
471:10,10,21
491:2
**pointed**  215:22
**points**  203:8,14,16
203:25 206:2
207:8 434:16
464:6,10,11
**police**  215:12
263:19 332:3,6,8
332:11,22,25
333:7 334:23
395:23 396:9
397:3,7,12,13,14
397:18,21 398:1
400:2 401:23
402:15
**policies**  216:5
229:13 271:3
293:20 294:8,12
295:23 296:4
297:9 299:8
354:21 390:20,21

**policy**  216:16
217:4,24 218:1,22
218:24 278:19,25
282:1 286:17
290:5,15,24
291:21 292:19
293:2 298:17
359:8 362:22,25
363:1 437:21
468:7 478:1,8
**pool**  317:14,18,19
326:1 463:1
466:15 473:14
**poor**  306:12
**pop**  354:6
**portal**  489:21
490:24
**portion**  328:20
485:10
**position**  262:24
343:13 430:14
457:24
**positive**  233:8,14
**possible**  267:13,20
282:18 378:16
407:13 408:17
428:13 435:3
440:10
**possibly**  445:13,16
**potential**  244:11
260:6 473:18
**potentially**  301:16
440:10
**power**  311:23
459:5
**ppp**  350:3,10
351:4 352:1
**practices**  460:11
**pre**  218:6 447:6
450:18

**preconceived**
243:12 455:23
**predicated**  469:3
**preferred**  276:12
405:8
**prejudice**  451:10
451:16
**prejudicial**  269:1
**preliminary**  201:2
**premier**  389:14
**premium**  394:15
**prepare**  202:20
260:11
**prepared**  269:8
**preparer**  419:7
**preparing**  267:18
**prescribe**  479:11
**presence**  453:6
**present**  199:14
417:8 447:14
460:12
**presentation**
450:21
**presented**  270:20
448:8
**presenting**  447:8
**preshant**  227:21
**presumably**  251:8
**presume**  270:2
**pretty**  313:2
325:13,17 372:24
459:16 461:13
481:19 485:25
**preventing**  217:24
246:5
**previous**  293:20
295:23 297:9
342:9 399:15
490:7
**previously**  201:20
207:4 218:10

Page 38

[previously - publish]

223:19 404:17
457:18
**price** 237:9 238:8
278:5
**prices** 211:2
237:11,19 243:24
244:3,4 247:23
**pricing** 389:23
**primary** 275:12
275:13 277:8
430:23 433:8
**princess** 220:3,4,9
**principal** 420:16
**print** 489:5
**printer** 350:2
489:9
**printers** 489:11
**prior** 202:8,11
271:15 447:10
448:2,19 453:8,9
488:7 489:13
**privilege** 231:18
**privileges** 220:6
230:7
**probably** 260:19
339:7 341:8
384:15 386:11
397:16 410:2,4
414:11 445:24
**problem** 207:16
242:18 310:8
312:5 354:14
448:2 449:2 451:5
**problematic**
301:17
**problems** 315:12
491:9
**procedural** 449:19
**proceed** 201:16
382:11 454:7,9

**proceeded** 245:16
**proceeding** 241:14
447:5,11 448:19
453:18 454:2
**proceedings**
492:15
**process** 296:10,12
296:16 370:8
468:23 479:9
482:21 488:4
**produce** 417:19
**produced** 202:23
217:13 232:9,11
246:1 258:1,14
264:25 272:6
334:7
**producing** 239:17
**production** 240:14
**professional**
233:13 310:17
323:15 425:12
437:20
**professionally**
384:19
**profile** 489:1
**profitable** 302:15
**profits** 390:2
411:19
**program** 209:20
209:24 210:8,13
211:1 212:7
269:19 357:13
**prohibit** 370:21
**prohibited** 287:18
411:23
**prohibits** 478:1,9
**project** 268:15
271:24
**prompt** 303:11
**pronounce** 344:23

**pronounced**
344:24
**pronouncing**
350:25
**proof** 268:7
270:21 449:4
468:5
**proper** 448:10
**properly** 312:23
313:4
**property** 358:19
425:3 466:14
**proprietary**
207:12,14,21
212:3 269:11,14
269:16 271:17,20
271:22
**proprietor** 420:14
421:6,8
**protect** 370:6
**protective** 270:1
**prove** 241:7
304:19
**proven** 452:12
484:17
**provide** 204:11
218:5,25 219:7
251:4,5 265:25
266:3,25 271:15
276:13 321:7
325:7 333:12
383:24 390:15
405:5,24 408:11
410:4,7 413:16
438:19,24 443:1
461:17 468:3,17
469:6 470:8
473:13 483:9
485:14 487:10
488:8

**provided** 219:17
219:18 245:11
246:7 247:8,10,14
249:19 251:14
252:3 258:3
266:17 298:15
313:13 321:9
346:24 347:4,14
351:11 352:11
365:22 383:24
384:8 385:19
387:13 406:20
407:5 409:9 412:8
412:25 416:24
429:14 443:6
448:24
**provider** 344:15
363:11
**providers** 336:14
**provides** 204:11
483:11 485:12,25
487:3
**providing** 218:15
266:16 267:5
407:15 415:8
418:20 421:12
442:21 471:21
478:23 479:1
486:19
**provision** 481:10
483:22,24,25
487:9
**provisions** 198:15
**provoke** 299:23
**provoking** 285:7
**public** 261:21
269:17,18 492:25
**publicly** 205:22
208:12 250:2
**publish** 261:19

[published - rates]

**published** 230:20
**publishing** 253:25
254:16 255:24
268:18
**pull** 201:13 248:5
252:23 289:1
293:4 304:25
306:19 324:24
334:8 337:3
347:11 372:12
381:4 388:12
398:1 406:5,9
415:19 440:16
443:24 463:7
476:25 478:13
480:5,11 482:19
**pulled** 207:4
215:12 263:19
334:23 395:23
396:9 397:2,11,17
397:21 400:2,13
401:22 402:14
**pulling** 355:19
362:2,4 415:20
419:3 457:21
**puncture** 396:20
**punished** 437:2
**purchase** 366:2,21
369:4
**purchased** 342:8
342:15 349:25
366:20,22
**purely** 448:22
**purposes** 235:4,16
278:14 285:12
289:9 299:15,24
300:2 441:9
**pursuant** 198:15
492:21
**pursuits** 345:21

**put** 240:16 277:10
281:23 301:18
321:18 333:3
382:4 397:9
398:16 456:12

**q**

**q&a** 303:8
**qualifications**
373:7
**qualifies** 366:5
**qualify** 318:12
327:19 372:24
**quality** 279:12,13
282:21 289:23,25
293:13,16 295:6
297:2,3 321:17
393:5
**quarter** 407:10,14
420:11,12
**quarterly** 490:11
**quasi** 262:6
**question** 201:6
204:3,8 206:16,16
208:1 210:9 212:4
212:5 214:16,19
217:11 233:21
234:12,18 235:9
235:16 240:5
241:1,24 242:1,15
242:24 243:13,16
243:18 246:16
250:4 266:12
282:24 298:23
310:4 312:21,21
315:8 328:5
329:18 337:21
354:11,11,13
355:7 358:13
369:21 370:5
375:17 389:13
391:11,25 392:1,5

392:14 393:16
396:25 397:15
408:18 409:15
414:15 416:22
418:12,22 424:2
433:16 435:25
438:14,16 439:7
441:10,15 443:5
445:4,5 446:17
448:9,17 455:21
456:6 460:4
471:23 474:15,19
474:21 475:1
**questioning** 210:2
268:2 487:25
**questions** 214:13
241:17 243:11
268:10 269:1,5
270:9 311:5 349:5
354:17 363:23
369:25 370:3
390:21 407:5,8
416:9 443:15
444:21 455:18
456:1 489:14
**queue** 277:10
333:19
**quick** 263:3
398:18 427:10
430:12
**quicker** 387:19
**quickly** 212:13
289:12 367:3
398:23 399:2
444:14 451:20
**quit** 353:21 442:15
**quite** 251:15
253:22 289:16
395:6,8,9 459:15
**quote** 218:15
236:22 263:24

314:3
**quoting** 236:16
**qx60** 366:16,17

**r**

**r** 199:10 492:17
**race** 478:3
**rail** 273:23
**raise** 398:15
**raisor** 468:20
469:12 475:25
**random** 364:18
**range** 367:16
385:18
**rare** 406:3
**rarely** 376:24
377:17 380:3
**rasier** 468:12
480:4,10 487:2
**rate** 279:8,10,14
280:19 281:11,12
281:14,18 282:25
283:1,2,8 290:1,18
290:22 291:2,14
293:17,25 294:2
294:10 295:5,11
295:12 297:5
335:11 336:4
357:8,17,20
360:20 389:23
440:7
**rated** 277:24
361:17
**rates** 249:1,8,16
250:10,24 251:6
253:25 255:23,24
255:24 279:7
282:20,21 294:14
295:6 355:25
373:1 390:25
392:17

Veritext Legal Solutions
346-293-7000

[rating - recross]

**rating** 224:18
  230:8 233:2
  277:20 279:6,17
  279:19,19,21
  280:3,6,10,14
  290:8,13 294:5
  297:4 300:23,24
  301:2,12 306:18
  357:13 360:7,12
  361:21 362:9
  410:20 437:16
**ratings** 219:21
  222:7 227:13
  233:17 279:5,14
  279:24 290:1
  293:17,23 300:22
  331:20 360:4
  361:14,20
**reach** 245:4
  315:14 454:7
**reached** 219:19
  315:13 317:10
**reaches** 221:17
  228:24 230:5
**reaching** 220:5
  307:15
**reactivate** 230:9
  327:3
**reactivated** 329:24
**read** 214:19,20
  243:19 268:15
  278:18 282:2
  312:19,20 351:21
  356:6 359:11,14
  359:16 362:25
  387:4 393:23
  428:17,18 451:20
**reading** 218:8,17
  393:22 400:20
  484:4,12 485:1,5

**ready** 201:15,17
  201:18 268:5
  305:16 327:25
  378:15 398:20
  446:18 449:7
  454:7,25
**real** 261:1 311:14
  474:6
**really** 236:25
  237:6 326:10
  332:16,19 336:11
  337:1 374:3 386:7
  398:22,23 399:1
  425:21 439:11
  444:14 469:2
  472:2,11 488:16
**realtime** 201:7,12
  210:18
**rear** 384:3
**reason** 215:14
  266:20 271:7
  272:1 313:3 317:1
  325:5 333:12
  353:4 376:2
  385:11 389:10
  435:23 448:3
  467:3,10
**reasonable** 263:1
**reasons** 214:8
  267:12 271:1
  333:20 358:8,15
  370:19,22 371:4
  466:11 467:14
  493:4
**recall** 226:5
  234:20 251:15
  252:5 253:22
  254:4,4,12 264:1,8
  264:15 274:19
  279:25 288:11,14
  290:15,23 297:21

306:16 316:24
318:14 320:18
323:9 325:9
327:14 329:13
338:3,4 339:11
340:16 359:19
361:22 362:22
374:20,23 387:25
390:9 393:8
394:13 395:18
397:4 407:10,14
408:20 423:13,14
431:16 434:11
435:11 438:4
439:4,8,12,15,18
443:9,18 444:2
**recalled** 291:21
**receipt** 324:19
  493:2
**receipts** 421:18
  422:20 424:4
  427:11
**receive** 217:17,19
  221:9 250:25
  267:11 276:9,15
  277:6,23,24 278:2
  288:17 305:3
  312:25 318:2,19
  318:22 319:4,14
  322:5,19 324:10
  326:1 331:10,12
  340:8 350:18
  352:14 378:16
  404:15 435:15
  438:10,23 446:10
  482:5 488:24
  490:23
**received** 227:11
  248:11 249:24
  250:6,8 251:18
  313:1,20 350:3,10

351:4,16 354:20
  361:21 367:3
  386:9 405:11
  421:12
**receives** 318:15
  343:1
**receiving** 351:21
**recess** 263:8 320:9
  398:11 430:17
  454:21
**recessed** 491:16
**recipient** 404:20
**reclassification**
  262:11,19
**recognize** 347:19
  357:16 371:16
  372:6 385:6
  432:13
**recollection**
  339:13 343:25
  440:25 486:7
**recommendation**
  366:4
**reconsider** 227:18
**record** 198:16
  201:11,14 202:7
  214:20 255:2
  265:7 272:25
  278:14 289:9
  355:5 381:7
  400:20 441:9
  447:20 448:1
  468:15 492:15
**record's** 295:3
**recorded** 202:12
  325:6
**records** 297:23
**recourse** 430:24
  433:8
**recross** 456:24

[redirect - representative]

**redirect** 456:24
**reduce** 381:19
**referenced** 311:21
**referrals** 413:5
**referred** 378:8
412:21 430:19
433:1
**referring** 220:11
220:19,24 223:4
254:23 258:17
262:8,16 355:8
409:14
**reflected** 321:20
**reflects** 421:11
**refresh** 349:18
361:24 362:14
392:20 393:15,16
394:4 398:24
404:21
**refused** 263:14
303:14,14 323:2
323:14
**refusing** 478:7,9
**regarding** 361:20
407:5
**registered** 248:21
304:24 364:11
**registration**
327:10 468:6,8
477:5,6
**regular** 304:23
343:3
**regulations** 468:4
469:3,17,18,19,20
469:22,24 470:1
470:10,12,13
471:18 472:16
476:19
**regulatory** 468:15
475:23 476:2

**reimburse** 322:1
429:24
**reimbursed** 323:6
324:20
**reimbursement**
321:18
**rejoined** 458:22
**related** 211:21
430:1 490:1 493:8
**relates** 303:11
460:11
**relating** 212:13
259:19 260:6
**release** 270:4
**relevance** 205:15
210:14,21 214:6,9
350:12 358:2
435:17
**relevant** 352:5
**reliability** 391:5
391:15
**reliable** 282:21
295:6 364:9 391:1
**relied** 219:15
241:21 275:14
302:14 331:24
452:10
**relies** 217:2
219:21 222:16
331:21
**religious** 478:4
**rely** 319:14 341:24
**relying** 215:7
249:13,19,20
452:13
**remain** 221:11
283:7 302:23
303:1 327:4,7
381:23 453:19,25
464:19

**remaining** 333:19
**remember** 201:25
202:3,4,5 215:9
219:24,25 230:19
242:10 243:8
248:23 251:11,16
252:3,7 253:17,23
254:7,9,13 264:20
274:15 275:3
279:21,22 280:4
296:17 314:24
316:22 317:2
318:17 323:12
326:8 348:23
361:23 367:18,23
377:2 378:10
388:17,18 393:17
395:5,19 396:13
405:19 408:25
409:3,15,20 411:7
423:4 431:17,18
432:6 434:13,14
434:18 436:15,19
436:25 439:6,11
439:18 441:5,18
442:23 443:10
473:3
**remembered**
363:21
**remotely** 198:10
**removal** 279:25
**remove** 227:16
325:25
**removed** 228:25
231:4 309:8
321:19 325:20
437:3,7
**rent** 337:16,24
**rental** 273:18
337:13 338:15

**rentals** 346:23
347:3 420:17
**reopen** 451:8,9,16
**rep** 311:11,17
**repair** 321:3,8
322:2,20,20
**repairs** 321:1
**repeat** 342:10
391:12 438:16
**rephrase** 424:1
**replace** 389:21
**reply** 265:24
**report** 222:18
261:19 265:12,15
325:3 428:8
448:11 450:6,18
451:12 452:1,2,24
453:16,22,25
**reported** 198:14
348:1
**reporter** 198:13
454:12 492:11
**reporter's** 492:7
**reports** 447:3,7,20
447:22 448:4
449:3 452:8,13
453:4,10,19 455:5
**represent** 403:8
416:8
**representation**
447:7
**representations**
449:24 451:2
**representative**
205:2 206:5
212:12 214:3
220:14 249:12
252:11 267:18
269:8 270:19
331:7 452:20
484:16

Page 42

[represented - reviewed]

**represented**
262:13
**representing**
399:21
**request** 220:7
223:5 228:7
230:15 241:14
254:19 256:17,25
265:19 276:15
277:6,19 281:1
282:22 299:19
305:2,3 317:5
325:19 326:2
330:15 335:7
375:22 408:13
413:6 447:9,19
462:18 463:25
**requested** 214:20
223:1 228:5
230:13 318:10
389:5 492:23
493:5
**requests** 216:7
217:17,19,25
221:10 237:17
241:19 278:6
283:6 291:18
295:7 305:16
315:2 331:12
356:10 388:7,15
389:1 405:12
416:18 463:21
464:4 482:5
**require** 217:23
262:21 362:17,18
365:13 375:7
377:15 379:1,8,18
383:13 437:20,24
464:18 470:13
476:22 477:1,19
477:25

**required** 304:3,4,6
304:8,18,21,23
305:9 319:20
368:23 373:10
374:13 390:14
393:5 436:23
470:5,7,8 472:12
476:12,13,14
479:12
**requirement**
322:14 339:18
374:10 477:12,13
**requirements**
304:12 373:8,9
437:10,12 468:15
470:2 476:10,16
476:25
**requires** 371:10
470:14
**requiring** 321:1
**research** 268:17
**researcher** 268:16
**reserve** 268:2
**reserved** 324:3
**residence** 348:6
349:21
**resolved** 314:24
315:1 406:8
**respect** 242:2
253:11 268:8
271:14 383:16
391:23
**respond** 266:14
331:16 369:20
370:5
**responded** 266:11
**respondent** 198:4
199:9 201:18
449:7 454:9 455:3
457:2 487:25
492:5

**respondent's**
248:5 347:12,17
371:23 372:12
385:5 389:21
415:19 417:22
418:17 419:2
420:7 426:6,9
427:14 434:17
443:25 451:6
454:10 456:14
**responding** 242:6
448:23
**responds** 266:6
307:14
**response** 230:11
267:4 270:8,23
307:13 309:2
313:9,9 315:19
316:3,7,10 317:16
321:12,14 370:4
416:17 447:21
**responses** 415:21
418:1,2,7,19,20
441:4 443:25
**responsibilities**
476:6
**responsibility**
477:6,8,9
**responsible**
205:13,19 207:3
207:25 415:7
**rest** 265:18 356:2
446:21,24 449:18
449:20 451:6
**restaurant** 460:23
**restaurants** 301:1
459:7 460:22
**rested** 452:11
**restore** 222:18
303:14

**restored** 331:19
**restrict** 479:20,21
**restricted** 221:11
224:23 228:13
**restriction** 221:13
226:4,25 227:17
**result** 208:19
216:6 217:16
221:9 262:1
265:11,15 280:10
282:4 284:20
324:16
**resulted** 326:22
**results** 262:23
**retain** 483:6,14
486:1,22
**retained** 209:15
430:6
**return** 419:15,21
426:10 427:14
459:3,9
**returned** 351:24
492:25 493:2
**returns** 419:4,16
**review** 202:11,19
202:22,24 203:2
211:25 220:7,16
221:3 223:1 228:6
230:13 258:9
264:4,7,10,11
265:16 267:14,21
301:20 307:16
312:14 427:15
488:11,14,20
**reviewed** 223:5
228:7 229:11
230:15 264:18
313:12 319:10
329:19 419:17
426:12

Page 43

[reviewing - right]

**reviewing** 293:1
294:6
**rewriting** 268:13
**richmond** 199:6
**riddled** 448:11
**ride** 244:11,11,19
245:4,9 247:9,19
247:21 254:17
257:1 258:5,12
263:18,20 275:17
276:15 277:5,6,8
277:14,19 282:4
286:8,10 288:6
317:4,12 318:9
322:13 334:22,24
335:14 336:1
352:7 380:1
392:11 395:1
396:8,10 400:5
404:6,6,10 405:11
408:11 443:2
463:1,21 464:24
465:2
**ridenour** 199:15
347:11 355:18
392:6 396:3 419:6
419:12 443:24
465:18
**rider** 233:16,25
245:6,9,12,18,21
259:20,25 260:7
260:12 265:9,22
276:8 279:10
285:11 288:6
298:18,21,25
306:15 314:9,10
315:22 318:8,13
320:14 322:9,13
322:19 323:1
324:4,13,22 325:1
325:3,4 326:7,17

326:23 334:20
335:7 342:25
357:7 358:3
360:21 387:13
395:22,23,25
396:14 399:14,18
399:21 400:12
402:12,19 403:2,8
403:13,13,21,25
403:25 404:3,5,9
404:16 432:11
436:19 437:1,3,7
462:2,3,4,8,15,22
463:3,18,21 464:2
464:3,24 465:14
466:11,22 467:4,6
474:12 490:9
**rider's** 306:7,18
389:5 478:2
**riders** 215:3,12,13
224:19,24 227:7
238:16 244:11,24
246:1,8,23 260:6
264:3 276:13
284:11 285:7
286:6 298:8,11
299:23 300:12,25
323:1 324:1,7
326:1 357:3,17,20
357:24 358:7,8,15
358:18 359:4
360:7,12,20
361:17 374:9
383:24 385:20,21
385:23 389:18
390:25 391:19
394:8 397:2
405:24 429:8
430:24 436:23
439:24 459:7
462:6 463:6,16

464:4,20 465:6,16
466:2,6,15,15
467:7
**rides** 218:6 219:1
224:23 237:17
238:20 276:19,23
277:3 280:22,23
282:3,8,18 283:2,3
291:13 292:11
294:17 295:11
310:9 328:4 330:3
332:18 336:7,9
341:3,4,5,6,9,10
341:15,16 343:3
343:15 344:15
360:9 388:17
396:18,21 439:24
439:24 440:2,10
460:19 461:25
462:2 464:15
465:7,11 467:18
478:19,20,23
479:2,10
**right** 203:9,10
204:12 205:20
206:6,12,25 209:8
213:7 216:10,11
218:11 221:5,6,14
221:16 222:19
223:3,7,15,16,20
223:22,23,25
224:16,20 225:3
225:17,19,25
226:10,17,22
227:18 229:23
230:17 233:17
234:1,5 235:19
236:22 237:2,15
237:20 238:22,23
239:4 243:5
245:13 248:14

250:9,19 251:1,3,7
252:9 255:9 256:2
256:19 258:20,22
259:12 260:20
261:2,10,15 266:3
266:11,16 267:2
275:3 280:1,4
289:21 293:23
299:14 327:1
331:5 334:12
339:11 341:13
344:14 345:8,21
346:6 347:4,11,22
348:3 350:3
353:18 354:4,22
355:2,13,21,25
356:11 357:3,17
357:22 358:8,19
359:5 360:3,17
361:14,22 362:6
362:17 363:19
364:16 365:24
366:25 368:5,25
369:6 370:7,24
371:2,13,15 377:8
377:18 378:17
380:8,25 381:12
381:25 382:10
383:1,8 385:3,8
386:17,25 387:12
387:15 388:7,21
389:7,25 390:4,17
391:17 392:9,25
394:13,17 399:6
399:15,17,19
400:16,22 401:3,8
401:23 402:12,15
402:22 403:2,11
403:16 404:7,12
404:17 405:6
406:3,19 407:20

Veritext Legal Solutions
346-293-7000

**[right - says]**

408:3,10,18,20
409:8,20 410:5,11
410:16 411:2,15
412:10 413:10
415:22,25 416:5,7
416:14,22,25
417:8 418:9
419:18,22 420:4,9
420:14 421:1,4,13
421:21 422:14
423:13 425:9
426:4,19 427:11
427:13,20,22
428:14,25 429:5
429:20 430:9,11
431:23 432:4,16
432:23 433:2,4,10
433:18,20,23
434:13,14 443:10
444:8,13,15 445:5
445:23 446:25
449:10 456:3,16
457:8 458:7
460:14 461:10
463:18 464:17
465:4,5 470:4,4,19
472:4 476:8,18
483:8,11,17,19,22
484:14 485:17,20
486:1,23 487:4,5,6
487:12 491:13
**rights** 432:14
**ring** 388:14
**risk** 262:3,7,7,15
262:25 283:7
458:16
**road** 242:2 243:25
296:7 317:3
375:17
**robust** 461:14

**rodolfo** 323:23
**role** 458:18,25
**room** 201:10
216:1 265:6 270:3
322:17 349:14
402:6 452:17,17
491:8
**rosenblatt** 268:12
268:16,23 270:25
271:8
**rosenthal** 199:17
200:3,9 201:19,23
205:1 214:16
240:13,18 243:22
250:4,5 268:2,9,25
270:7 271:4,9
272:2 322:16
449:13 455:19
456:16,23 457:5,6
457:10,14,17
463:10,13 465:24
466:10,22 477:18
477:24 478:16
479:6 480:13
481:8 482:20
483:10 485:2,9,24
**rotate** 428:12
**rough** 342:13
**roughly** 481:17
**round** 459:5
**route** 310:18
378:17
**rude** 323:5
**rule** 243:13 300:16
300:19 301:9
410:13 411:1
450:1 492:21
**ruled** 207:19
270:25
**rules** 268:13
286:14 288:8

301:11 314:9,12
324:14 340:8
**ruling** 223:6 243:7
271:18 449:18,20
453:16,24 455:8
**run** 363:5
**rush** 464:9,9
**rx18** 475:19
**rx22** 463:7,14
**rx33** 482:19,20
**rx35** 478:13,16
479:7
**rx48** 480:11,12,20
**ryan** 199:5

**s**

**s** 490:4
**safe** 265:14 286:7
357:1
**safety** 267:12
286:5 287:15
323:25 415:7
**sales** 224:5 260:4
**sallenave** 225:12
225:22
**sandahl** 199:10
200:10 201:6,18
204:25 205:15
206:13 207:11
210:1,14,20 211:4
212:2 214:6 217:5
218:12 228:18
231:16 232:18
234:9 235:8
236:11 237:4
239:15 249:18,25
251:20 252:25
254:20 256:9
264:23,24 265:3
268:1 270:24
272:19 449:12
456:18 457:4,8,20

460:4,5 470:23
471:23,24 472:6,8
475:1,2 481:4
484:25 485:2,9
488:1 489:18,20
491:1
**saturdays** 370:16
379:24
**save** 376:11
**saw** 290:4 292:18
295:22 296:3
422:9 436:7
**saying** 218:8
225:23 229:23
232:12 246:6
247:11 290:15
351:23 353:9
370:3 401:22
402:14 449:14,19
475:3 484:16
491:10
**says** 213:11 216:3
216:4,9,15,17
217:14,16 218:2
218:18,21,23
220:4 221:2,4,17
221:24 222:6,23
223:8,11,21
224:12,18,21
225:1,19,21 226:1
226:18,20,23
227:10,15,16,19
227:21 228:4,9,25
229:8,9,14 230:5
230:12,18 232:6
232:23 233:4,13
233:15,16,18,19
233:24,25 234:2
234:15 237:21
241:18 243:23
244:1 248:15,17

[says - see]

248:25 255:4,7,12
255:15,20,22
256:3,14,16
263:15 265:10,12
266:4,19 267:2,3
267:11,15 268:19
278:21 279:12,16
280:6,25 281:10
281:18 282:20,20
284:8,25 285:5,11
285:23 286:6,24
287:10,14,25
289:24 290:8,12
290:20 291:1,17
291:23 292:14,23
295:5 296:9
299:12 300:23
305:2 309:1,2
311:2 313:9 314:2
317:17 321:3,12
321:15 323:23
326:15 328:10,15
329:6,6,19 330:8
333:16 355:25
356:22,25 357:7
389:1,12 395:25
396:5,15 402:19
403:21 404:3,9
416:21 417:8
425:22 426:2
428:22,25 433:4
442:3 453:23
486:18

**sba** 351:23
**scared** 440:2
**scary** 325:17
**schedule** 248:18
249:1,7,16 251:5
319:25 382:18
420:8,24,25
421:11 426:17

427:8,19
**scheduled** 377:9
**school** 273:15
303:19 304:14
345:8 353:8
377:13
**scooters** 461:3
**screen** 239:16
240:7 251:18,19
252:4 256:17,25
258:8,15 305:4
463:8
**scroll** 334:12,17
356:2 357:5
415:25 422:11
440:19 444:5
**scrolling** 477:14
**seat** 363:25 386:2
**second** 216:4
217:15 228:10
240:22 247:14
287:12 309:1
312:19 328:9
334:18 388:25
418:18 465:19
478:14 479:4,7
481:14,15
**secondary** 433:15
**seconds** 203:9,11
204:1 208:21
258:4,11 305:5,8
305:17,23
**secret** 207:21
269:11,15,16,25
**section** 248:17
256:14 280:18
282:19 284:8,24
286:5 287:10,21
289:23,24 290:12
290:18 291:14
292:16,18,21

293:12,22,25
294:2 299:5
300:11 319:9
356:3 357:6
362:22 389:12
475:20 477:16,19
477:23,25 478:6
479:7 482:2 483:4
483:9 485:11,22
486:21
**sections** 294:4
**security** 266:7
268:15 332:8,12
332:25 333:8
397:14
**see** 201:2 221:19
221:23 222:4
224:6 225:11
226:24 227:9,14
229:6,17 232:13
239:4,6,9 240:19
242:1,8,11 243:3
243:23 245:25
248:25 249:3
252:22 253:21
254:23 255:4
256:17,24 266:5
266:13 267:22
285:13,18,19
287:2,10,12,19
289:7,11 290:2,10
290:17 291:4,16
292:2,16,17,22,23
292:25 293:6,8,10
293:12,15,18,22
293:25 294:2
295:9,19,21,25
296:1,2,13,21
297:1,6 299:4,6,16
300:11,14,15,22
301:3,21 305:3,6

307:18 308:6,12
308:13 309:5
310:24 311:6,7
313:15 314:18,20
314:21 315:3,7,8
315:17,25 316:1
316:14,20 317:20
318:21 319:9
320:16,17 321:3
321:11,22 323:7
325:23,24 326:8
326:18,19 327:12
328:6,8,14,17
329:22,23 330:12
330:13 333:22
334:14,19,25
335:7 338:18
349:13 355:24
356:5,12,22,24
357:6,10,11 358:7
358:22 361:24
362:7 372:5,6
381:9 389:3,15
392:5 393:20
399:12 401:19
402:23 406:19
407:21 416:2,21
416:21 417:2,7
418:11,22 420:13
421:17 422:14
425:22 426:1,2
427:19 428:8,15
428:19,22,24
429:1,2,13,14
432:22 433:5
435:6 440:19
442:8 445:24
447:16 453:23
466:5,7 479:24
484:10,24 490:8
490:15 491:12

Veritext Legal Solutions
346-293-7000

[seeking - sic]

**seeking** 330:25
407:3,4
**seeks** 231:17
**seen** 216:23 232:9
232:11,14 233:7
246:20,24 248:9
257:6,9,12,15,19
257:25 258:8,15
261:18 262:7
293:19 294:7,11
297:9 302:6
306:23 431:11
465:22
**sees** 239:7
**select** 250:22
311:3,22 463:4
473:15
**self** 420:2
**sellers** 460:20
**send** 218:22 278:6
325:2 329:9
334:19 379:4
396:23 397:1
455:11
**sending** 213:13
260:4 431:18
**sends** 213:15
**seniority** 227:12
**sense** 340:24
341:16 342:13
383:21 423:17
446:7
**sent** 223:6 224:7
228:7 230:15
241:19 263:15
264:1 320:13
325:1 329:12
335:1 336:19
393:11 395:25
396:5

**sentence** 219:23
222:17 232:23
289:23 291:1
293:15 296:9
297:2 325:19
331:22 388:25
**separate** 475:14
475:16
**september** 252:7
255:7 274:12,14
399:13 414:11,12
444:7,16
**series** 406:24
445:3
**serious** 227:10
237:2
**served** 492:18
**serves** 486:7
**service** 205:8
236:19,20,20
282:22 295:7
302:19 311:2,4,16
311:20 312:1
315:15,21,23
316:4 336:11,15
344:14 363:14
383:18,21,23
391:1 397:8 421:3
424:8,10,11
426:22 427:8
445:23 471:16
478:7,9,19,21,24
478:24
**services** 204:4,10
276:13 339:19,20
346:24 347:4,14
351:12 352:12
363:9 364:9
365:23 377:9
383:7,17 384:20
385:2,20 390:15

405:6,24 412:7,8
412:25 413:2,10
413:17 416:24,25
421:9,13 425:15
461:18,21 468:11
468:18,20,21,25
468:25 469:14
470:13,16 471:12
473:16 478:10
480:14 481:7,9,11
481:12,20 482:5
483:13 485:14,18
485:18,21 486:19
487:10 488:3,9
**session** 240:14
**set** 236:19,21,23
237:3,12 277:22
278:1,5 286:19
295:12 382:18
469:18,23 471:18
472:18
**sets** 247:17,20
319:20
**setting** 487:13
**settlement** 435:15
**seven** 230:7
375:21 397:16,17
445:12,15 458:10
458:24 485:22
486:22
**sex** 478:4
**shaking** 240:19
**shame** 266:24
**share** 318:21
491:5
**shared** 333:4
463:1
**shareholders**
262:4,11,19
**sharing** 264:8

**shauna** 198:12
398:15 422:7
455:12 492:11
493:16
**shippers** 460:25
**shirt** 384:20
**short** 283:10,20
335:9 372:20
394:19,23 398:3
404:5 446:13
**shortage** 464:22
465:1
**shorten** 456:19
**shorthand** 198:13
492:11
**shortly** 329:21
414:9
**shot** 251:19
**shots** 239:16
**show** 215:3 239:13
241:8 253:12
258:3 273:20
277:20 297:23
330:8 335:8 389:1
419:21 439:2
448:9 455:23
479:8
**showing** 201:7
254:1 255:25
388:20 396:16
397:20
**shown** 254:6
277:18 389:6
492:19
**shows** 215:24
406:15,19 422:1,4
429:5,11 479:9
**shut** 442:12
465:20
**sic** 256:17 366:15

Page 47

[side - soussan]

**side**  318:9 387:3
406:17 440:18
451:14 459:1
462:2 467:17
**sidebar**  334:15
**sided**  387:7
**sign**  354:6 416:5
437:24 468:23
**signal**  306:12
**signature**  416:3,7
418:4 444:15
492:22,25 493:3
493:15
**signed**  339:16
353:25 354:3
417:17 471:17
490:1
**significant**  224:15
258:24 259:13
260:3
**signing**  488:4
**similar**  262:14
290:4,23 292:18
293:1,19,21 294:6
294:11,15,16
295:22,24 296:3,5
297:8 299:14
355:20 463:3
467:14,16 471:5
486:1
**similarly**  467:21
**simple**  280:21
281:8
**simultaneous**
251:21
**simultaneously**
408:3,7
**single**  244:16
245:4 282:4 337:9
**sir**  202:21 210:8
213:7 219:12

233:9 239:12
245:18 249:17,23
250:15 253:18
263:25 275:18,22
276:3,7,10,14,21
277:25 278:4
279:1 283:22
284:5,18 285:4,10
285:16,22 286:4
286:11,23 287:24
288:3 290:25
291:9 293:3
294:20 297:11
299:3,18,22,25
300:3,9 303:23
306:3,6,14 310:7
311:23 312:2
314:12 317:23
318:4 319:19
322:3,12,22 324:8
324:15,23 326:3
326:14,25 328:21
330:19 333:14
334:2,6 336:20,23
338:9,9 342:2
439:14 441:2
446:17 456:13
**sit**  206:2 214:2
**site**  205:22
**sits**  208:19,21
**sitting**  484:19,22
**situation**  245:23
246:16 265:13,24
313:18,23 316:2
316:16 335:5
**situations**  335:21
**six**  339:7 397:16
397:17 401:25
458:19
**sixth**  483:5

**skherkher**  199:8
**skill**  304:4,5,8,13
304:15
**small**  266:22
332:2,16,19
**smaller**  467:1
**snapshots**  264:10
**snow**  317:3
**society**  268:17
325:3
**software**  208:9
229:4 259:11
260:10 460:18
461:6,11,16
473:24 485:17
**soh**  199:16
**sold**  367:6,11,14
**sole**  249:13 270:20
301:18 338:12
351:1 483:6,11,17
486:1,23 487:4
**solely**  217:20,22
**solicited**  288:5
**soliciting**  287:25
**solutions**  458:18
493:17
**somebody**  328:25
366:21 471:2,2,25
**son**  377:12 445:9
**soon**  277:9 400:12
**sooner**  363:25
**sorry**  214:18
229:10 232:23
238:24 257:23
258:21 294:23
313:10 322:15,16
322:24 323:24
334:9,11,15
339:12 345:3
374:23 393:8
395:5 409:20

425:20 476:18
485:22 486:14
**sort**  203:23 209:7
211:17,19 213:25
213:25 215:8,15
215:16 222:2
272:6 314:21
393:22,23 409:13
463:11 485:15
**sounds**  226:10
366:25 475:24
**source**  275:13
277:8 282:17
283:23 284:5
337:25 433:8
444:23,24,25
**sources**  421:23
427:20
**soussan**  198:2
199:21 201:1,12
201:15 205:6,17
206:15 207:14,19
208:1 210:3,7,15
210:22 211:5
212:4 213:3,6
214:12 217:10
218:14 226:7
228:20 231:21
234:11,17 235:10
236:14 237:7
240:3,12,18,24
241:11,23 242:13
242:22 243:2,9
244:25 249:22
250:3 253:5
254:22 256:11
263:5 265:5
267:25 268:4
270:23 272:11,17
289:16 294:22
303:8 305:14

[soussan - state]

309:17,20 313:7
320:2,7 329:2
341:23 344:18
345:17 350:9,16
350:22 352:8,16
352:21 353:14
354:10,16 355:4
358:4,12 366:10
369:22 370:2
391:10 392:19,23
398:6,10,12 407:7
424:1 430:15
435:20 438:13
443:15 444:20
446:3,6,16,24
447:21 449:6,10
449:22 450:14
451:7,24,25
452:15 453:15
454:6,16 455:1,9
455:14,20 456:4
456:13,21 457:6,9
457:13 459:23
460:3 470:22
471:22 472:4
474:16,25 484:4
484:10,23 485:7
487:21 489:16,19
492:3
**soussan's** 455:7
**speak** 329:8
**speaking** 239:24
382:15 444:2
**speaks** 224:18
484:3
**special** 273:12
304:3,3,5,8,15,16
327:23
**specialist** 328:7
**specialized** 220:7
220:10,14,19,22

220:23 223:2,3
228:6 230:6,14
**specific** 219:25
229:24 232:2
236:15 239:11
324:3,3 333:12
428:1 479:11
**specifically** 207:3
209:4 214:23
215:6 219:3 226:5
229:18 231:3,7,19
233:10 234:21
238:2 252:13,14
253:20 255:1
259:6,21 260:17
267:8 302:15
375:3 388:2
399:11 404:13
450:17 451:11
469:24
**specifics** 254:5
**specified** 392:2
**speculation**
294:21 391:2,9
**spell** 323:4
**spelled** 466:13
**spend** 343:7 364:5
379:18
**spends** 259:13,18
259:23 260:3
**spent** 428:4
**spirit** 345:24
434:19
**spoke** 201:25
237:1,8 342:9
**spoofing** 209:8
263:24 269:9
**spreadsheet**
264:20,22 334:9
334:18 335:2

**square** 422:23
424:12,14,18
**stack** 240:17
**staff** 260:25
**staging** 217:24
266:22,22 267:1
277:10 332:1,15
333:7 335:4
336:10 375:10,11
375:12,15,16
397:23,25 398:3
475:11,14,16
**stake** 269:22
**stamped** 325:6
**stand** 289:14
456:15 470:18
**standard** 233:2
**standby** 464:19
**standing** 410:20
**standpoint** 449:19
**stands** 224:4 253:9
**stanley** 199:4
200:6,7 272:14,15
272:24 278:9,11
289:22 294:23
303:9 305:22
309:19,21 313:6,8
319:23 320:5,10
322:18 329:5
334:15,17 341:20
341:24 344:16
348:20 350:7,12
350:21 351:25
358:1 369:20
390:18 391:2,8
392:15 406:22
423:23 433:23
435:22 436:1
438:18 443:13
446:19,21 447:22
453:7,13 457:12

**star** 279:5,6,14,19
279:21 280:10
290:1,8 293:17,23
294:5 297:4
306:18 357:13
360:3,7,12,20
361:4,8,9,14,20,21
362:9 437:16
**stars** 361:17
**start** 201:3 205:14
208:5 248:1,1
263:11 270:14
274:7,24 276:22
302:25 332:22
339:14 344:22
353:16,17 362:6
370:25 392:6
393:19 414:7
417:24 465:6
491:14
**started** 224:14
273:7,7 274:8,25
275:6 292:7
338:16,25 339:8
340:9 353:1,24
368:16 377:4
398:9 405:4
434:21,22 435:1,7
435:8,23 436:3
441:12 460:8
475:3
**starting** 252:7
255:7,15,16 455:1
474:4
**starts** 483:5,20
485:24
**state** 198:14
272:24 433:13
468:4 471:14
481:23 492:12

Veritext Legal Solutions
346-293-7000

[state's - support]

**state's** 477:9
**stated** 198:15
**statement** 248:20
  249:19 263:2
  268:18 321:21
  356:14 367:22
  374:20,25 396:15
  419:13
**statements** 268:11
  268:24 270:11
  416:9 445:25
**states** 260:19
  273:25 311:16
  345:11,13 382:10
  389:9,17 404:15
  481:23,24 482:4
**statewide** 470:1
**stating** 374:21
  381:14 411:1
  432:9
**stationed** 396:16
**status** 221:3
  262:20,21
**statute** 218:7,8,18
  470:11 475:20
  476:21 477:1
  487:14
**statutes** 262:12
  476:10
**statutory** 350:13
  440:24 475:23
**stay** 233:19,23
  273:9,13 323:14
  404:9 453:16
**stayed** 458:16
**stems** 269:18
**stenotype** 198:14
**step** 219:5
**stepped** 209:23
**stepping** 210:10
  210:12

**steps** 469:1,5
**stick** 320:1 411:17
**sticker** 369:2
**stint** 459:15
**stock** 237:9 247:23
**stonecipher**
  199:16
**stop** 212:13
  297:20,25 334:12
  380:7 382:22
  386:14 414:1
**stopped** 206:22
  212:9,23 252:8,10
  252:12 265:22
  266:7 274:23
  297:22 350:14
  352:2,6 381:11
  383:3 386:12
  388:9
**stopping** 212:14
  212:24
**store** 462:7,7
  467:22,22
**straight** 202:6
  238:9 263:17
  334:21 396:2,7
  418:21
**strategic** 458:23
**strategies** 385:1
**strategizing**
  381:19
**strategy** 374:25
  376:9 377:24
  390:2 411:18
**street** 199:12
  287:21 493:18
**strictly** 340:12
  375:1
**strike** 345:15,15
  447:3,19

**strikes** 305:20
**strong** 459:16
**structure** 252:19
  253:18 255:5,8,16
  307:24
**stuck** 387:22
**student** 273:9
**stuff** 202:22
  323:16 350:1
  352:1 435:10
  445:25 468:9
**styled** 198:11
**subject** 213:20
  214:7 216:14
  224:6 351:7
  475:24
**submit** 449:1
  450:12
**submitted** 406:12
  444:7
**submitting** 448:1
  449:2
**subsection** 477:11
  477:18
**subsidiary** 469:11
**substantial** 261:4
**substantiate** 272:6
**successful** 234:22
  234:24
**successfully**
  319:12
**sudden** 234:15
  251:18
**sued** 428:3
**suggest** 398:9
**suggested** 288:20
**suggesting** 245:3
  245:14
**suing** 405:25
**suitcase** 320:22,24
  320:24

**suitcases** 320:25
**suite** 199:7,12
  493:18
**summaries** 490:12
  490:12,18,18
**summarily** 270:15
**summer** 273:11
**sunday** 326:5
**sundays** 370:16
  380:4
**super** 323:12
  416:6
**supervisor** 222:2
  331:17 382:20
**supervisors**
  332:10
**supply** 237:10,13
  239:2,3,6,7 241:18
  242:4 261:25
  389:25
**support** 203:2,4
  211:25 213:17
  219:11,12 220:15
  220:18 221:24
  225:16,23,24,25
  226:12 228:24
  229:17 230:12
  234:11 239:14
  240:10 245:5
  246:19 261:5
  264:12 265:9
  270:10 296:18
  303:13 306:20,22
  307:14,14 310:14
  311:10 312:8,9
  314:22 315:5,6,10
  315:13 319:10
  329:10,12 330:24
  333:19 424:4
  432:25

Veritext Legal Solutions
346-293-7000

[supposed - tc]

**supposed** 241:7
**surcharges** 315:23
**sure** 205:18 207:6
  209:4,16 212:7,10
  215:18 219:2
  224:17 230:25
  235:25 241:13
  246:13 251:8
  257:25 263:5
  289:16 295:17
  298:24 303:9
  311:11 313:25
  325:12 326:6
  329:16 335:22
  336:9 344:23
  360:18,22 369:24
  388:11 391:25
  392:3 393:18
  396:15 421:24
  425:10 429:9
  430:15 449:20
  450:25 455:4
  462:6 469:17
  475:2
**surge** 242:9
  247:24 389:22,23
  390:3,10,15
**surging** 239:10
  242:5
**surprised** 360:14
  451:25
**survive** 446:14
**susan** 198:2
  199:21 451:25
  492:3
**suspects** 208:23
**suspend** 302:2
**suspended** 230:7
**sustain** 350:17
**sustained** 207:15
  210:3 231:22

239:17 243:6
249:22 353:14
424:1 435:21
**suv** 463:5 473:15
**swagata** 309:2
**switch** 257:3
  353:11 363:3
  411:10,14 482:23
**swore** 349:2
**sworn** 201:20
  202:11 204:23
  245:18 252:1
  253:3,8 268:25
  272:22 406:2
  408:1 411:13
  413:22 447:10
  448:2 457:14,18
**synonymous**
  481:19
**system** 233:3
  247:7 263:18
  287:16 288:1
  299:9 302:10
  305:10 334:22
  396:8 399:24
  434:24 473:12
**systems** 284:11
  374:6

---

t

**tab** 312:8
**tablet** 229:4
**take** 201:3 235:24
  236:1 237:23
  238:21 248:17
  250:18 251:10
  254:25 263:3,6,9
  272:20 276:5
  305:16 309:13
  310:2 312:15
  323:20 327:20
  328:3 337:16

347:17,24 349:10
349:12 355:15,23
359:7 368:13
371:15 372:13
374:2 376:16,17
377:24 378:23
381:2 382:14
385:5 388:25
389:20 392:4
393:5 394:1,7
395:17 397:24
399:11 400:10
402:5 404:6,12,13
406:7 407:25
418:9,17,24 419:2
420:6 422:11
426:6 427:10,13
428:6,7 429:19
430:15 431:10
438:6 447:2 449:6
454:16 456:15
466:5 472:16
476:20 480:2
481:6 485:20
**taken** 198:10
  231:14 232:2
  269:14 307:4,9,12
  324:18 326:16
  348:24 493:9
**takes** 242:23
  309:24 312:11
  317:9 344:4
  446:14
**talk** 207:24 251:21
  251:25 253:15
  311:14 352:23
  357:24 360:3
  363:4 375:10
  377:8,9 390:20
  405:2 428:1
  436:22 437:9

439:23 442:21
454:12 458:11
460:14 464:11
467:17 481:5
484:18
**talked** 230:19
  234:3 248:21
  251:12 260:9,14
  345:4 346:1
  354:20 357:12,22
  362:21 365:9
  390:17,18,19
  392:16 404:25
  461:24 469:13
  480:4
**talking** 203:5
  246:25 247:1
  259:4 263:25
  264:22 332:19
  341:11 345:6
  352:17 364:21
  383:10 398:25
  409:11 431:16
  434:18 438:4
  439:4 451:25
  475:21 486:16
**talks** 486:24
**tap** 305:5
**target** 224:4
**tasked** 267:8
**tat** 456:5
**tax** 348:1 365:19
  419:3,7,15,16,20
  420:2 426:9
  489:25 490:17,18
**taxes** 315:23 423:6
**taxis** 471:17
**tc** 275:3 339:6,9
  339:14,20 340:2,4
  414:23 415:2,9
  417:13,17 418:14

[tc - things]

418:25 441:3,18
441:21,25 442:12
**team** 206:1 207:2
207:6 208:7 220:7
220:10,11,14,19
220:23 223:2,3,4
228:6 230:14
329:7 458:16
**team.uberintern...**
227:23
**teams** 220:17,22
**tech** 227:21,22
461:13
**technical** 406:6,8
**technicalities**
211:18
**technologies** 198:3
469:12 492:4
**technology** 204:10
205:7 259:7 286:6
430:19 433:1
460:17 461:3,14
461:23 468:11,19
468:21 478:10
480:14 481:20
486:13
**tel** 493:19
**tell** 212:18,22
221:18 241:5,6
244:25 246:19
258:10 273:5
277:17 278:16,21
279:4 282:14,24
302:12 303:4
305:8 307:1
308:14 310:12
311:8 312:14,15
314:20 315:20
316:24 318:6
320:20 323:11
327:16,24 331:23

332:11 333:24
336:21 337:6
342:7,17 349:3
363:13,16 378:5
379:13,16 397:22
398:3 403:25
406:10 408:18
441:24 455:16
457:23 458:11
459:19 462:4
463:10,13 466:10
470:23 480:19
482:15 485:10
487:21
**telling** 215:11
228:15 241:3
311:17 400:4,7,12
403:12 411:7
**tells** 203:23 227:8
236:9
**temporarily**
382:11
**temporary** 382:5
**tendered** 451:12
**tenure** 459:20
**terms** 216:6
229:12 431:4,7
459:6 460:6
462:14 463:15,18
466:21,23 471:1
**terrible** 266:24
325:14 393:9
**territory** 217:7
218:5,25 481:12
482:1
**test** 239:24 241:4
**tested** 212:8
405:17
**testified** 201:20
218:11 253:15
272:22 352:3

354:24 355:9,20
356:6 359:9,11
360:16 393:13,20
408:14,22 410:18
414:22 423:8
457:18 487:23
**testifies** 454:1
**testify** 202:18
205:3 241:8 271:3
271:8,21 289:15
289:19 347:13
447:4 450:4
453:17,20 454:24
456:25 457:3
472:4 485:7
**testifying** 210:4
239:18 253:18
263:23 289:17
447:11 450:20
451:13 452:2
470:21
**testimony** 201:4
202:9,12,21
204:23 205:1
231:9 234:10
236:12 239:14,25
240:1,10 242:14
245:18 251:17
252:1,24 253:4,6,8
253:16 264:5
268:25 271:7,22
272:7,7 289:14
342:9 349:2
350:24 355:2,8,12
365:22 406:2
408:1 409:10
411:13 413:15,22
445:2 446:22
447:10 448:2,16
448:18,20 449:1,2
450:7,8 452:3

453:8 471:21
479:24 480:17
484:7 485:1 493:9
**texas** 198:14 199:7
199:13 234:25
236:2 460:12
469:6 470:11
471:12,14 476:10
492:12 493:16,19
**text** 215:2,6
216:20,24 217:1,8
217:9,12 246:1,3
263:24 264:2,11
334:20,25
**texting** 216:21
**thank** 220:5
225:19 227:8
265:12 267:4,25
268:4 270:21
307:15 323:24
329:7 344:18,20
345:2 347:24
362:20 372:7
382:14 421:16
444:18 446:17
455:15 456:13
**thanks** 201:24
221:2 226:20
230:9 308:11
313:9 321:12,15
362:5
**theme** 451:23
**therefor** 493:4
**thing** 329:16
334:14 368:18,22
415:3,4 419:13
420:12 426:12
430:13 450:9,25
451:20
**things** 203:5
212:24 229:21

Veritext Legal Solutions
346-293-7000

[things - times]

239:16 251:11
258:14,15 280:12
289:10 298:17
318:9 338:12
346:3 352:3
353:20 354:20
358:18 359:1
368:12 417:25
422:24 425:21
470:6,9,14 477:15
490:14
**think**   202:1 203:3
203:8,25 212:5,17
215:9 219:18
224:19,24 227:7
234:22 235:8,11
235:13 239:20
240:3 242:15
243:15 256:22
264:19 268:23,25
270:11,24 291:6
317:7 320:22
346:4 347:13
350:9,22 351:3
352:25 359:19
362:11,12 367:14
373:6 375:24
377:3 383:21
385:17 386:12
387:18 392:12
393:1,7,12,22,25
394:3 395:14,14
396:23 409:8,12
413:25 414:14
417:16 423:16
429:23 430:13
445:11 446:19
448:15 449:18
451:15 453:2
455:24 456:16,21
459:5 461:5,8,9

469:25 472:6,18
472:19 473:1
475:2 476:20
480:17 481:20
484:5 487:22
**thinking**   446:12
**third**   337:11
418:20 447:15,18
**thoroughly**   271:5
**thought**   252:16
321:25 322:1,19
360:21 378:23
432:9 436:8
**thousand**   341:9
353:10 461:8,11
**thousands**   246:7
461:15
**threat**   325:3
**threatened**   325:4
**threatening**
325:14
**threats**   323:16
**three**   208:20
223:24 224:8,13
224:22 225:6
294:4,7 332:23
339:21 340:10
361:14 364:12
380:21,25 442:14
445:20,21,25
447:13 448:9,10
473:1 480:6
**threw**   361:1
**throckmorton**
493:18
**tied**   333:17
**tier**   318:20
**ties**   251:9
**tighten**   369:22
**time**   201:25
202:18 203:6,17

203:17,17 206:8
216:22 222:13
223:17 224:15
228:10 234:4,4
236:23 237:1,8
242:21,23 243:16
243:18 244:16
245:11,23 247:1,3
247:5,12,20
248:13,19 250:16
251:12,18 252:3
254:19 257:16,20
258:2 259:8
260:10 265:12
268:18 271:16,25
274:10 275:15
276:1 277:12
278:24 279:1
280:10 281:13
283:10,20,22
285:1 286:18
288:24 292:5
297:25 299:14
304:22 305:22
308:4,16 309:4,11
309:14,23 310:20
311:18 312:12
313:21 314:10
317:4,9,12 318:16
318:17 319:3,20
325:6 327:2
328:20 329:7,13
329:24 330:22
333:6 335:19,22
340:21 343:7
348:6 350:24
351:6 352:16
353:8,9,22 360:5
360:13 361:16
369:19 370:20
372:20 373:14

375:5,16 376:4,14
377:2 378:1,5
379:19 380:15,22
381:20 382:23
384:6 386:10
398:9 400:12
405:3,17 408:5,12
408:15,19,21,24
409:2,6,7,12,14,18
409:24 410:20
411:2,8 412:4
416:18 418:2,19
418:20 424:23
428:4,22,24 429:4
429:5,11,12 435:4
435:4 438:5,9,17
439:19 441:1
443:11 447:2,16
447:17,17,24
451:4 455:25
456:9 460:2
463:19 468:11
481:21 488:14
489:4
**times**   207:20
229:3 243:24
246:6,9 264:2
269:25 270:6
278:18 282:2
296:18 303:13
334:2,19 335:1,3,5
335:18 336:6,8,17
338:5 341:3,18,18
356:7 359:12
360:8,12 376:15
380:14 389:24
395:4,6,6,7,8,9,11
397:1,4,5,5,8,11
397:16,16,17
401:25 408:5,7,19
408:20 412:3

[times - tried]

427:4 442:25
443:8 447:13,15
448:1 464:8
474:22
**timing** 402:8
**tip** 384:16
**tips** 430:6,9
490:23
**tire** 396:19
**tissues** 384:8,15
**tit** 456:5
**title** 226:16 263:14
306:24 314:15
316:14 416:16
**titled** 322:25
**tmobile** 336:15
363:10 364:3
**tnc** 218:2 368:23
468:24 469:14,18
469:19 470:1,5,12
470:13,17,17,24
470:25 471:2,7,12
471:16,17 472:1,8
472:24 473:2,19
473:24 474:9
475:5,7,12,17,20
475:25 476:10,11
476:17,19,19,21
477:1,12 480:9
481:17,22,24
487:14
**tncs** 217:23 470:14
474:1 476:11
477:2
**today** 206:5 214:2
215:7,20 217:3
226:21 227:11
240:9,14,23,25
244:8 264:18
271:19,25 329:8
346:11 349:2

355:8 410:23
439:22 444:22
456:17,20 457:10
479:24
**today's** 202:20
264:5
**told** 223:17 224:8
224:22,24 227:7
228:11 229:18
234:4 242:7
243:19 245:22
248:11 253:23
256:6 262:4,18
269:2,10,24,25
280:2 281:13
288:25 317:11
332:8,12 334:3
381:22 395:22
403:2 406:6 411:5
432:1 447:16
455:17
**tolls** 315:11
**tomorrow** 454:11
454:24 457:10
482:6 491:5,14
**ton** 289:10
**tonight** 451:19,19
454:11 456:19
**top** 213:8 219:20
221:22 222:6
223:25 226:16
227:9 263:11
265:22 269:20
306:24 320:12
331:20 334:9
356:18,22 416:15
417:11 420:11,12
420:13 431:24,25
434:15 436:17
463:12 480:6

**topic** 489:15
**topics** 262:8
**total** 254:3 256:2
306:4 385:18
425:14,23 458:10
458:11
**totality** 215:19
**totally** 473:25
**touch** 462:2
**tour** 337:16
346:24 347:3
**tours** 337:22
420:17
**toyota** 250:17
**tracked** 286:9
**tracking** 286:7,15
286:16 408:25
**trade** 207:20
237:9 247:23
269:11,14,16,25
**traffic** 310:15
396:20
**trailer** 340:7
**trained** 288:21
**training** 233:8,10
**transactions** 236:5
**transcript** 202:20
231:1 232:16
441:8 492:14,16
493:2
**transcripts** 333:20
**transferred** 308:7
**transmission**
369:5 370:10
**transparency**
287:14
**transport** 339:9
339:20 340:2,4
414:23 415:2,9
417:13,17 418:15
418:25 441:4,18

441:21,25 442:13
442:15 464:2
471:10,13
**transportation**
346:24 347:4,14
351:11 352:12
363:5,9 365:23
374:9 377:9
383:16 384:19
385:2,19 387:10
405:5,24 412:7,8
412:25 413:2,6,8
413:17 416:24
421:13 425:15
460:20 461:18,20
462:18,22 468:18
470:18 471:8
473:13,16,25
481:7,9,11,24
482:5 485:21
486:19 487:1
488:8
**transporting**
414:7 415:5 471:5
**transports** 339:6
**travel** 317:5,13
**traveled** 309:24
311:18
**traveling** 316:17
317:8
**tried** 231:19
243:17 263:17
281:25 288:20,24
301:9 323:14
334:21 343:12,12
344:23 345:20
349:6 396:7
399:22,24 424:20
424:23 446:10,11
446:11

Veritext Legal Solutions
346-293-7000

[trip - uber]

**trip**  215:14 216:7
217:19,25 221:9
238:7,8 246:2
247:24 251:2
252:20 253:19
254:3 255:5,8,17
256:2,8,17,25
265:19,23 276:5
279:8 281:1,2
282:22 283:5,13
285:2 291:7,18
295:7 299:15,19
305:2,3,5,10,16,18
305:24 310:1,5
313:1,12 315:21
316:22,25 317:19
317:22 319:10,12
324:6 356:10
357:9 375:22,25
388:7,15 389:6,23
394:9,17,23 403:5
423:9,10,11,12,14
423:15 438:10,19
438:23 443:2
445:15 446:4,13
466:18 482:14
490:7,8
**trips**  215:11 246:7
278:2 280:15
283:8,12 285:6,8
286:3 291:24,25
300:8,13 311:22
311:25 313:25
317:15,18 327:20
328:20 338:8
354:25 355:9
362:17 374:22
376:3,16 378:16
380:24 388:21
389:14 391:24
392:9,25 394:19

394:21 406:15,20
407:5,11,15,19,22
429:14 439:5,9,16
439:20 440:22,23
440:25 442:22
443:7 445:15,20
445:20,21,25
446:10 465:8
466:16 490:13
**trouble**  229:10
362:25
**troubling**  456:10
**truck**  303:20,21
340:6 363:18
364:6
**trucking**  273:19
274:25 275:1
338:16,18,25
339:4,20 340:12
352:4 441:11
**true**  206:12,20
218:10 235:1
238:1 247:9
259:14 262:1,2
331:24 396:15
416:10 418:7
419:17 450:19
492:15
**truly**  269:8
**trust**  214:24 284:9
**truth**  349:3
**truthful**  408:24
**truthfully**  349:6
370:1,4
**try**  203:19 226:3
233:19,22 245:15
282:2 283:13
289:12 312:8
319:25 336:11
345:2 346:2
358:12 367:21

369:25 390:6
395:1 424:22
456:19
**trying**  204:14,17
205:10 207:1,22
226:25 227:1
239:24 240:6,19
241:17,25 243:11
246:12 256:21
263:16 264:16
320:21 334:20
352:4,14 354:15
393:17 396:1,6
458:4 471:24
472:2
**tsa**  204:6
**turn**  301:19
377:11 378:2
466:20 479:4
480:3
**turned**  331:1
**tv**  259:14,15,19
**twice**  335:4 443:4
**two**  208:20 295:23
338:5 345:10
361:13 380:1,21
380:25 381:11,15
384:2 387:7
396:14 404:16,23
408:11 410:11
413:16,20 414:22
415:16 442:14,14
443:16 445:19,21
445:25 447:15
449:24 452:11
458:16 472:25
473:2 489:18
**type**  208:25 214:4
304:2 342:5 351:5
460:16 484:7,25
490:2

**typed**  455:12
**types**  352:12,13
490:4
**typically**  375:24
377:11 380:10

**u**

**u.s.**  226:10 234:19
234:23 255:9
273:8 289:8
311:12
**uber**  198:3 203:7,7
203:14,16,20,23
203:23,24 204:11
204:17,20,20,21
205:12 206:6,10
206:22,24 207:2,5
207:10,23 208:3
208:23 209:1,11
209:12,15,16,20
210:12,17,18
211:1,3,7,9,24,25
212:12,20,22
213:8,17,17,22
215:7,20 216:8,19
216:23 217:2,4,21
217:22 218:4,21
218:22,23 219:5,6
219:15 220:1,15
220:22 221:5,7,8
222:12,15,22
223:9,15 224:12
224:14 225:2,5,14
225:16 226:13,15
226:16,20,22
227:2,6,8,11
228:11,15,23
229:18 230:3,11
230:21 231:3,4
232:4,6,6,12,16,17
232:20,25 233:1,3
233:7,12,16,19,22

**[uber - uber's]**

234:5,7,15 235:1
236:5,9,10 237:12
238:1,4 239:7
243:18 244:4,14
244:17,22 245:1,5
245:16 246:7,19
246:23 247:7
248:13 250:11,15
250:16,21,22,25
251:6,19 252:4,7,9
253:23 254:10,13
254:14,17 255:2,3
255:14 256:20,22
256:23,24 257:16
257:20 258:2,4,11
258:19,24 259:10
259:13,18,19,23
259:25 260:3,7,12
260:14,23 261:5,9
261:12,19,23
262:4,10,18,21
263:11 265:14,18
265:20 266:2,24
267:4,19 268:12
268:19 269:19
270:5,19 274:7,8,9
274:16,20,23
275:13,13,17,21
275:24 276:2,5,6,9
276:12,16,23
277:3,19,23 278:6
278:15 279:7
280:2,13,16 281:5
281:16,23,24
282:9,12 283:17
283:19,23 284:3,5
284:9,17,17,20,23
286:6,9,13,20,24
287:7,15,17,22
288:1,6,6,8,10,11
288:12,14,19,21

289:3,7,8 291:6,12
292:5,8 294:18,19
294:25 295:12,14
295:17 296:15,25
297:10,21 298:10
298:14 299:2,10
300:19 301:6,13
301:24 302:1,2,10
302:16,19,20,22
304:1,6,18,22
305:9,15,20
306:17 307:4,9,14
307:23 308:9,10
308:15,17 309:8
309:13,23 310:6,9
310:10,22,23
311:5,21,23,25
312:6,22 313:9,21
314:21 315:3
316:7 317:10,11
317:12,14,17,18
317:19 318:1,2,16
319:10,16,16,22
320:14 321:7,19
322:2,6 324:11,21
325:1,2,20 327:2
327:18,20 328:3
328:19 329:7,13
329:16 330:3,8,18
330:23 331:10,16
331:21,23,24
333:4,6,15,24
334:4 336:4,21
340:18,21,25
341:2,3,5,10,16,17
341:25 342:1,4,8
342:18,21 343:3
343:10,24 344:1,8
344:12,13,13,14
347:1,15,20 348:2
350:15 351:1,2,12

352:6,15,23 353:7
353:16,21,25
354:3,4,19 355:1
355:10 356:23,25
357:23,25 358:9
360:6,13 362:16
363:8,13 364:12
365:1,5,12 366:12
368:3,5,20 370:10
370:21,25 371:1
371:21 372:9
373:12,13 374:16
375:7,13,16
377:15,17 378:5,7
379:1,4,8,13 380:3
380:11,15,17
381:8,22 382:18
383:11,13,14
384:10,24 386:10
386:20,24 387:12
387:14,15,22,23
388:5,9 389:13
391:5,7,16,17,20
391:21 393:2
404:10,25 405:4,8
405:12,14 406:21
407:6,15,22 408:2
408:4,6,19,25
409:16 410:19,21
411:4,11,14,17,23
412:6,9 413:10,17
414:2 421:21
422:14 427:1,20
428:1,3 429:23
430:6,8,19,22,23
431:2,7 432:1,22
432:25 433:7,14
434:3,7,21,22,23
435:1,7,16,23
436:3,11,13 437:3
437:9,12,13,14,20

437:22,24 438:1
438:10,18,23
439:5,10,13,17,20
440:2,11,23,24
441:25 442:19
443:2 444:23,23
446:14 451:23,24
456:7 457:22,24
458:2,5,6,9,12,20
458:21,23 459:3,9
459:10,15,19
460:1,5,6,16,24
461:12,17,20
462:3,4,15 463:1,4
463:4,5,5,17
464:18,18,22
465:4,10,10,15
466:6,11,23 467:4
467:6,15,20
469:10,11 473:5
473:10 474:10
475:24 476:7
478:8,17 479:11
479:11,20,20
480:15,20,25
481:11 482:7,16
482:25 483:13,14
484:15 485:18,21
487:11,14,17
492:4

**uber's**   212:11
214:2 216:5
220:14 229:12
245:21 248:3,20
249:12,13,13
252:11 262:4
267:18,21 269:21
269:21 277:7
278:19 281:25
286:14,18 287:5
298:5 301:25

Veritext Legal Solutions
346-293-7000

[uber's - value]

308:21 310:16
314:9 319:18
322:11 324:14
327:23 331:7
365:9 386:17
393:10 435:12
437:3,6 439:5
460:10,15 461:25
462:14
**uber.com**  213:8
**uberx**  250:22
317:14,18,19
342:18 343:3,18
372:21,23 373:4
373:12,21,24
374:2 375:14
436:12 463:4,4
**uh**  402:13
**ultimate**  438:14
**ultimately**  459:4,8
**unable**  328:19
330:18 336:6,8
**unacceptable**
287:11 295:20
300:11
**unaware**  253:6
**unclear**  283:3
308:16 310:13
**undercut**  211:2
**underlying**  407:1
**undermines**  284:9
**understand**  201:9
202:8,17 209:6
211:9 226:2
231:21 249:6,23
250:6 254:18
262:9 265:24
316:9,10,12
321:16 325:15
329:3 354:16
357:2,21 362:24

370:2 383:10,12
392:24 396:12
402:8 423:5 428:9
430:5 439:25
445:6 446:16
453:22 455:5
456:4 457:22
472:23
**understanding**
203:15,18 205:7,8
205:25 208:6
221:15 261:8
268:20 280:9,17
281:4,6,8 284:19
284:21 287:4
288:5 295:10,13
309:21,25 328:22
329:2,4 339:23
351:10 363:1
438:15 459:12,16
471:19 475:13,18
476:9,15 480:18
480:24 481:3
485:8
**understood**
308:18 349:8
357:19 362:16
363:2 373:20
390:24 391:4,15
430:18 452:16
454:3 457:16
**undertook**  313:21
**unfortunately**
222:24,25 230:12
**unfounded**  205:5
**unfulfilled**  463:22
463:25 464:5,16
**unilateral**  217:20
237:25
**unions**  262:14

**unique**  205:23
459:6
**united**  260:18
273:25 482:4
**universal**  289:7
305:1
**unlawfully**  430:6
**unlimited**  488:16
**unquote**  236:22
263:24
**unrelated**  253:2
**unsafe**  325:1,5
326:10
**unsupported**
240:1
**unwanted**  466:17
**update**  296:11
**updated**  278:21,22
289:5 293:7
296:21
**upends**  268:20
**upfront**  251:12
252:19 253:19
254:1,15 255:5,8
255:17,25 256:7
256:17,24
**upgraded**  229:4
**upper**  266:25
**upset**  313:2
**usa**  469:10 480:15
480:25 485:21
**usable**  369:16
**use**  209:12,16
221:8 223:13
228:12 232:20
239:19 243:15
253:1 260:6 267:6
338:18 339:3
346:13,13 351:12
352:23,24 353:1
354:3 360:5 363:8

363:10,14,16,19
364:11 365:5,9,13
366:12 368:17
370:14 371:1
372:9 373:3,17,21
373:24 374:16
375:13,13 376:8
377:23 378:22
380:3,11,15,21
382:16 383:13
391:19 405:4,8,15
405:20 408:2,4,19
408:21 411:2,8
430:1 433:8
448:19 455:25
462:15 463:15,19
466:3,21,24
468:24,25 470:13
473:13 474:6,10
485:17 487:5,11
**users**  287:15
481:11
**uses**  286:6 477:20
483:16
**usually**  240:15,16
240:22 312:11
342:22 343:16
370:16 398:2
464:6,8
**utilize**  483:12
488:3 490:3
**utilizing**  382:22
470:15 471:11,16

**v**

**vague**  459:21,25
**vaguely**  218:18
**valid**  328:12
**valuable**  212:9
242:23,25
**value**  275:19

Page 57

[variables - way]

**variables**  310:15
**varies**  279:20
**various**  235:14,21
   242:5 354:3
   459:18
**vehicle**  283:24
   302:16 303:25
   304:14,19,24
   320:15 322:21
   323:6 324:1,19
   327:4,7,18,22,22
   327:24 328:1
   342:6,8,14,15,22
   343:4 365:23
   366:2,4,23 367:10
   369:4,12 372:24
   373:9 422:1
   425:23,25 437:15
   458:18 468:6,8,14
   471:3 472:18,19
   472:20 477:5,7,20
   481:12
**vehicles**  248:8,14
   273:23 414:7
   415:5 473:8 474:3
   474:5,6
**ventures**  340:1
**verbally**  325:4
**verbatim**  218:16
**verifying**  418:7
**veritext**  493:17
**verizon**  336:14
   363:19 364:2,8
**version**  248:12
   462:8
**versus**  341:3,5,15
   473:19 474:10
   475:6
**video**  232:19
   233:1,12,24
   272:18 288:23

376:19 393:9,23
   438:6,20 484:21
   491:7,11
**videos**  230:20,24
   231:3,14 232:5,7
   232:13,16 242:21
   270:16 288:12,21
**violate**  216:5
**violated**  218:24
**violating**  216:16
   217:4 218:21
   466:23
**violation**  229:12
**virtual**  277:10
**visa**  273:12
**vision**  207:2
**visit**  225:24 226:3
   226:17 310:23
   489:2
**visiting**  226:20
**voicemail**  263:17
   334:21 396:2,7
   399:22
**vs**  198:2 492:3

**w**

**wait**  219:9 277:11
   319:2 328:10,13
   330:23 335:6
   343:11 375:20,25
   376:4,15 445:14
   446:7
**waited**  318:24
   332:23
**waiting**  216:1
   277:13 318:23
   322:17,17 332:17
   375:11 376:12,15
   428:4 438:5,10,15
   438:18,24 445:22
   447:16 452:17

**waits**  332:17
**walk**  245:10
   246:14
**walking**  214:12
   438:20
**walks**  376:16,17
   438:6
**want**  203:19
   215:14,18 231:11
   237:24 238:8,11
   238:14,16 239:1
   241:18 244:10,18
   244:19,19,20
   245:6 250:18
   251:10,25 255:1
   265:13 272:8
   282:16 283:16,17
   289:10 291:25
   292:4 297:15
   323:13,16,19
   326:11 330:9
   331:18 333:2
   335:9 336:4
   351:22 352:22
   356:22,25 360:3
   363:4 374:3,22
   375:10 377:20
   381:15 387:2
   390:20 391:19
   397:9 398:23
   399:1 402:5
   406:18 422:10,11
   428:3,8,11 431:23
   432:18 437:9
   450:10,15,16
   451:18 453:19,23
   455:4 459:3 462:2
   467:25 470:4
   472:7 474:8 480:5
   481:4 482:12,22
   482:24 483:3,4

486:10 489:2
**wanted**  232:5
   242:7 250:10
   270:8 276:22
   277:23 282:15
   291:8 298:16
   300:19 301:10
   312:23 316:16
   320:23 325:2
   345:25 374:11
   382:23 385:12,24
   394:21 440:12
   445:7 452:7
   459:10,13,17
   474:23 482:6
**wanting**  221:19
   266:23
**wants**  241:6
   298:14 337:16
   464:3 479:15,18
**warranted**  448:15
**warranty**  369:12
   369:13
**washington**
   251:24 252:2
**wasting**  310:20
**watch**  232:25
   288:23
**watched**  393:9,12
**watching**  288:12
**water**  384:5 386:1
**waters**  384:14
**way**  222:1 238:2
   241:4 244:12,21
   250:22 254:18
   266:22 270:2
   274:6 279:6
   280:21 281:23
   282:11 283:3,11
   286:12 288:18
   301:5 302:9,21

Veritext Legal Solutions
346-293-7000

[way - yeah]

322:12 323:15
326:25 331:17
332:2 343:18,23
349:22 352:24
363:24 367:9,11
374:18 378:20
406:16 409:4
429:7 437:5
453:14 456:22
469:2 475:4
481:19 483:22
489:8 490:22
**ways**  279:13
289:24 293:16
296:10 297:3
459:19
**waze**  387:18,21
388:2
**we've**  241:19
259:8 265:21
271:17 302:6
313:11,13 322:16
326:16 381:3
392:16 404:25
414:1 446:22
449:5 453:1
454:12 461:2
465:22 472:6
475:21 480:4
484:4,12,14
**web**  258:14 259:24
**website**  255:2,3,14
327:23 337:14,18
346:19 366:4
434:3,5,11,14
478:18
**week**  202:15
244:18 353:10
380:7,15 429:3,14
429:20 464:16

**week's**  321:20
**weekends**  379:21
**weeks**  380:21,25
409:21
**weight**  272:8
448:18
**welder**  257:13
**went**  227:2 303:19
327:23 329:14
366:3,5 368:24
371:12 380:20
381:5 393:7
404:20 405:21
431:20 445:10
470:6
**whatsoever**
448:18
**wife**  426:22
**wikipedia**  227:25
**williams**  199:11
**willing**  270:7
452:24
**window**  465:20
**windshield**  368:24
369:2
**wish**  382:11
**withdraw**  452:24
**withdrawing**
455:5
**witness**  206:17
216:1 240:21
249:13 250:1
267:24 268:5
270:18,20 272:14
289:14 309:20
344:17 354:14
358:14 368:6
369:24 370:7
406:23 430:14
433:21 443:14
444:19 445:18

446:5,9,19 449:8
450:23 455:23
457:5,16 492:19
**witnesses**  265:5
447:9 452:11
455:21
**word**  323:4 332:4
**words**  206:17
212:22 219:25
354:12 376:8
377:23 405:15
433:2,10,11,18
**wore**  384:20
**work**  225:14
227:17 261:5
268:13,20 302:17
330:9 339:9 340:4
343:10,14,21,24
368:9 374:3,11,13
374:18 375:1
377:3 379:21
402:25 424:21
425:21 429:3
442:10,18 446:1
446:12 451:19
457:22 458:25
459:17 460:6
474:3
**worked**  275:1
292:9 341:2,8
377:4 386:10
456:9,9
**worker**  262:20
**workers**  262:6,12
**working**  222:15
258:18 260:10
284:1 331:21
340:9 381:20
388:9 441:16
461:12

**works**  205:9
332:14 357:13
462:5
**world**  205:12
207:2 236:5 251:7
261:14
**worries**  326:15
**worst**  378:24
**worth**  343:14
376:3 448:23,23
493:19
**write**  344:24
455:10
**writing**  451:3
455:10 456:12
**written**  260:4
310:14
**wrong**  221:18
306:13
**wrote**  268:12
315:4

| x |
|---|

**x**  318:20 473:14
493:5
**xl**  311:3,21 473:15
**xs**  419:7

| y |
|---|

**yahoo**  364:24
**yahoo.com**  331:8
**yards**  273:23
**yeah**  202:5,10
203:4 209:14,18
211:11 212:16
222:20 223:16
226:1,9,14 234:6
235:4,17,21 236:8
236:20 237:14
238:25 239:5
245:13,19 247:16
255:12,20 256:20

Page 59

[yeah - zoom]

259:1,7,12,22
260:2,8,13,16,21
260:24 261:20,22
262:2 264:6,24
266:18 273:19
279:10 281:6
297:6 307:17
312:7 314:7,23
316:5,6 323:18
336:17 337:8
342:16 343:6
344:2 345:13,25
346:19,20 350:2
353:11 354:5
356:5 358:9
360:18 364:17
366:25 367:16
369:11 376:17,18
377:5 379:23
382:3 383:2 387:1
400:6 401:17
403:15,20 405:19
407:20 408:8,17
409:11,22,23
417:18 425:10
426:25 435:8
441:23 461:3,8
463:15 466:13
467:2,9,13 468:23
472:20 473:6,9,12
475:7,25 476:15
478:10 483:22,22
489:1,4,7 490:17
**year**   252:15
261:18,21 274:4
298:1 327:19
349:11 409:3
410:2 437:16
458:15,21 460:2
490:17,18

**year's**   390:9
**years**   206:22,24
224:13 234:25
235:20 273:14
338:3,4,7,11
345:10 354:2
409:21,22,23
424:24,25,25
458:10,12,17
461:1 472:20
476:3 477:4
**yep**   213:10 255:10
321:5 402:16,18
402:21 403:7
418:8 419:5
**yesterday**   248:12
249:24 250:7
**york**   274:1,2,4,5
279:19,22 280:3
281:14 284:6
288:22 308:8,16
308:23 312:18
337:11,14,17
342:12 343:19
344:3 345:7 348:5
348:19 353:8,17
364:20 365:15,18
368:4,18 371:9
372:8 376:23
393:11 412:19,21
412:24 413:4,12
423:9,12 435:6
443:6 482:11

**z**

**zoom**   198:10
420:11

2022-67757 / Court: 133

# Exhibit K

```
 1
 2   DAINIUS BARYSAS,              )
     Claimant                     )
 3                                )
     vs.                          )  CASE NO. HON. SUSAN SOUSSAN
 4                                )  ARBITRATOR
     UBER TECHNOLOGIES, INC.,     )
 5   Respondent                   )
 6
 7
 8                   ARBITRATION DAY 3
 9                     May 3, 2022
10
11       ARBITRATION DAY 3, was taken remotely by Zoom in
12   the above-styled and numbered cause on the 3rd day of
13   May, 2022, from 10:00 a.m. to 4:32 p.m., before
14   Shauna Foreman, Certified Shorthand Reporter in and
15   for the State of Texas, reported by computerized
16   stenotype machine, pursuant to the provisions stated
17   on the record or attached hereto.
18
19
20
21
22
23
24
25
                                           Page 494
```

```
 1                    A P P E A R A N C E S
 2
 3   FOR CLAIMANT:
 4        BRET STANLEY, ESQ.
          ERIC HAWLEY, ESQ.
 5        RYAN MacLEOD, ESQ.
          KATHERINE HIETT, ESQ.
 6        KHERKHER GARCIA FASS HAWLEY
          2925 Richmond Avenue
 7        Suite 1560
          Houston, Texas  77098
 8        E-mail: rmacleod@kherkhergarcia.com
 9   FOR RESPONDENT:
10        BENJAMIN D. SANDAHL, ESQ.
          KIMBERLY R. MIERS, ESQ.
11        ALLISON C. WILLIAMS, ESQ.
          LITTLER MENDELSON
12        1301 McKinney Street
          Suite 1900
13        Houston, Texas  77010
          E-mail: acwilliams@littler.com
14
     ALSO PRESENT:
15
          Don Ridenour
16        Deborah Soh
          Jacob Stonecipher
17        Brad Rosenthal
          Angela Corridan
18        Dainius Barysas
19
20   ARBITRATOR:
21        Hon. Susan Soussan
22
23
24
25
                                        Page 495
```

```
 1                         INDEX
 2                                              PAGE
 3    BRAD ROSENTHAL
 4    Examination Continued by Mr. Sandahl ...........497
      Examination by Mr. MacLeod ....................537
 5    Further Examination by Mr. Sandahl ............596
 6    DR. JAMES PARROTT
 7    Examination by Mr. Stanley ....................599
      Examination by Ms. Miers ......................629
 8    Further Examination by Mr. Stanley ............650
      Further Examination by Ms. Miers ..............656
 9
10    CLOSING STATEMENT
11    Closing Statement by Mr. Stanley ..............659
12    CLOSING STATEMENT
13    Closing Statement by Ms. Miers ................678
14    FURTHER CLOSING STATEMENT
15    Further Closing Statement by Mr. Stanley .......698
16
17
18
19
20
21
22
23
24
25
                                           Page 496
```

```
 1                    JUDGE SOUSSAN:  Is everyone ready to

 2    proceed?

 3                    MR. SANDAHL:  Respondent is, yes.

 4                    JUDGE SOUSSAN:  We are continuing with

 5    Mr. Rosenthal; is that correct?

 6                    MR. SANDAHL:  Yes, Your Honor.

 7                    JUDGE SOUSSAN:  Mr. Rosenthal, you

 8    continue to be under oath.  Let's please proceed.  I

 9    am ready.

10                    BRAD ROSENTHAL,

11    having been previously duly sworn, testified as follows:

12                    EXAMINATION (Continued)

13        Q.   (BY MR. SANDAHL)  Good morning, Brad.  So

14    today we'll pick up just with one topic that we left

15    off on yesterday, tax summaries.  If we can pull up

16    Exhibit JX9, Mr. Ridenour.

17                    And can you see this, Mr. Rosenthal?

18        A.   I can.  The text of it is small, so we may

19    have to blow it up a bit.

20        Q.   Can you go to Page 2, please, Mr. Ridenour?

21    Mr. Rosenthal, what is JX9?

22        A.   It is a tax summary for the year 2017 for

23    the claimant.

24        Q.   Okay.  And specifically, Page 2 of JX9 is

25    that 2017 summary.
```

Page 497

1           MR. SANDAHL:  I know Angela is in the

2   waiting room now, so if we could let her in.

3       Q.   (BY MR. SANDAHL)  And JX9 is a tax summary

4   for whom?

5       A.   This is the claimant's tax summary for

6   2017.

7       Q.   What does it show -- what are some of the

8   items shown on this exhibit?

9       A.   Sure.  So the gross earnings are the

10  earnings that the claimant -- sort of all the fares

11  that the claimant accrued while using our platform in

12  2017.  Then the fees and expenses are the fees and

13  expenses of $3200.  And then the net, which again the

14  driver could use for tax filing purposes, is

15  described as $10,000.

16      Q.   How much in 2017 were Mr. Barysas' gross

17  earnings?

18      A.   13,235.

19      Q.   All right.  Thank you.  You can pull that

20  one down, Mr. Ridenour.

21           Mr. Rosenthal, you've talked about

22  account creation and sign-up process.  I want to ask

23  you a few more questions about that.

24           Before a driver begins using the Uber

25  driver app, is a driver required to submit an

                                            Page 498

1    application?

2         A.   No.

3         Q.   Are they required to provide a resume?

4         A.   No.

5         Q.   References?

6         A.   No.

7         Q.   Before an Uber -- before a driver begins

8    using the Uber driver app, are they required to

9    provide Uber with previous employment history?

10        A.   No.

11        Q.   Are they required to provide compensation

12   history?

13        A.   No.

14        Q.   When drivers start using the Uber driver

15   app, do they fill out a W-4 form?

16        A.   No.

17        Q.   Do they fill out an I-9 form?

18        A.   No.

19        Q.   Do they go through interviews?

20        A.   No.

21        Q.   Are drivers who start using the Uber driver

22   app required to communicate with anyone at Uber

23   before they begin using the app?

24        A.   Not required, no.

25        Q.   And let's compare that to the hiring

Page 499

1    process for Uber employees.  In your role with Uber,

2    have you been or are you involved in hiring

3    employees?

4         A.   I am and have been, yeah.

5         Q.   What's the first thing you do when you have

6    a hiring need?

7         A.   The first thing we do is try to go and get

8    approval for the role.  So we have to go create a

9    justification to create a role, and then we have to

10   get approval from our finance and HR teams to sort of

11   open the role.  That's Step Number 1.

12        Q.   Do you review applications and resumes when

13   you're filling an employee role?

14        A.   Yeah.  So after we get the description

15   open, we then have to work with our recruiting team

16   to post the role, and then we have sourcers that

17   would go out and source candidates and we have

18   recruiters who speak with the candidates and then

19   hiring managers review the resume, speak with the

20   candidate, and then we have usually interview panels

21   involving multiple people that interview the person.

22   If we want to move forward with the candidate, we

23   will work with our compensation team to extend an

24   offer and will send an offer letter.  And then we --

25   we will negotiate that offer with the individual.

Page 500

```
1    And then if the individual wants to join, we will

2    then have them sign all the appropriate documents

3    such as the handbook, such as the confidentiality --

4    confidential information and invention assignment

5    agreements and other such agreements, and then we'll

6    on-board them, bring them to our headquarters for a

7    couple of days in San Francisco -- at least pre-COVID

8    that's what we would do -- and then we would manage

9    them ongoing.

10                   MR. MacLeod:  I would object to the

11   narrative.  I would ask that we do question and

12   answer.

13                   JUDGE SOUSSAN:  Overruled.

14        Q.   (BY MR. SANDAHL)  Mr. Rosenthal, does Uber

15   give new-hires a computer?

16        A.   We do, yeah.

17        Q.   Do they provide new-hires with an e-mail

18   address?

19        A.   We do have an e-mail address, yeah.

20        Q.   Once hired, do Uber employees receive

21   performance reviews?

22        A.   They do, yeah.  I think it used to be every

23   six months, and now it's every year.

24        Q.   And I want to compare that to drivers using

25   the Uber driver app.
```

Page 501

```
 1                   Does Uber provide -- you talked about
 2    a handbook, I think.  Does Uber provide drivers using
 3    the Uber driver app with a handbook?
 4         A.    No.
 5         Q.    Does it perform performance reviews on the
 6    drivers?
 7         A.    No.
 8         Q.    And we kind of covered some of these things
 9    already, but do drivers using the Uber driver app go
10    through an interview process?
11         A.    No.
12         Q.    Does Uber require drivers to take a minimum
13    number of trips per month?
14         A.    No.
15         Q.    Does Uber hold any required meetings with
16    drivers?
17         A.    No.
18         Q.    Does it send drivers e-mails?
19         A.    We do send drivers e-mails, yeah.
20         Q.    Does it send drivers text messages?
21         A.    We do.
22         Q.    If a driver wants to, can a driver opt out
23    of receiving e-mails and texts from Uber?
24         A.    They can.
25         Q.    And, Mr. Ridenour, if you would pull up
```

Page 502

1    RX36.

2              Mr. Rosenthal, do you recognize

3    Exhibit RX36?

4         A.   I do.

5         Q.   What is it?

6         A.   It is the process in which a driver would

7    follow to the extent they wanted to opt out of text

8    messages and e-mails from us.

9         Q.   You can pull that down.  Thanks, Don.

10             Is there a way that employees of Uber

11   can opt out of receiving work e-mails?

12        A.   No.

13        Q.   And drivers -- getting back to drivers, can

14   drivers have multiple vehicles available on an Uber

15   account?

16        A.   They can.

17        Q.   Are there drivers who exercise that right?

18        A.   There are.

19        Q.   Is there any limit on the number of

20   vehicles a driver can have on their account?

21        A.   No.

22        Q.   When a driver has multiple vehicles on

23   their account, does Uber dictate which vehicle the

24   driver can use on a given day?

25        A.   We do not.

1          Q.    I want to switch gears a little bit to trip

2     requests.  You've testified already some about this

3     so I don't want to retread all of that ground, but I

4     do have some additional questions.

5                    Once a driver is signed up to use the

6     Uber driver app, how does a driver start receiving

7     requests?

8          A.    A driver hits the go on-line button, and

9     that indicates their ability to accept trips or, I

10    guess, availability to -- for us to present them

11    offers for a trip.  So our -- we do have a matching

12    algorithm that takes a rider's request and then

13    matches it to a nearby driver.

14         Q.    You may have testified about this already,

15    but how much time once the driver is matched with a

16    rider do they have to accept the request?

17                    MR. MacLeod:  Object.  Asked and

18    answered.

19         A.    15 seconds.

20         Q.    (BY MR. SANDAHL)  What happens if a driver

21    just lets a trip request go?

22         A.    Then that trip request will go to another

23    nearby driver, to the extent there is one available

24    nearby.

25         Q.    Does a driver experience any negative

                                              Page 504

1    consequences for not accepting a trip request?

2        A.   No.

3        Q.   Is there any limit on how many trips a

4    driver can let go or just decline?

5        A.   There's no limit, though to the extent a

6    driver -- if three in a row come along and the driver

7    hasn't accepted one, then the driver will be signed

8    out, meaning they will be -- they will just be signed

9    off.  That said, the driver can immediately sign back

10   on or hit the go on-line button.

11       Q.   Is that explained in the community

12   guidelines that we've seen?

13       A.   I believe it is.  I would have to look at

14   the community guidelines.  I don't quite recall.

15       Q.   Sure.  Let's look at those.  Don, would you

16   bring up JX2?

17            Mr. Rosenthal, do you recognize

18   Exhibit JX2?

19       A.   I do.

20       Q.   And you see it's the Uber community

21   guidelines?

22       A.   That's right, yeah.

23       Q.   We'll turn to Page 5.  And do you see the

24   paragraph that Mr. Ridenour is highlighting on the

25   community guidelines, JX2, at the top of Page 5?

Page 505

1          A.   I do.

2          Q.   Does that reflect what you're talking

3     about, that you'll be logged out of the app?

4          A.   That's right.

5          Q.   Does the driver have to wait a certain

6     amount of time before a driver can log back in?

7          A.   Not that I'm aware of.

8          Q.   And is being logged out as is described

9     here in the community guidelines the same as being

10    deactivated?

11         A.   No.

12         Q.   What's deactivation?

13         A.   Deactivation is when someone can no longer

14    go on-line for whatever reason.  It might be -- it

15    might be temporary.  It might be permanent.  But they

16    can no longer -- when they hit the go on-line button,

17    they would not be able to.  It could be a temporary

18    or a permanent.

19         Q.   Okay.  And I know I asked about negative

20    consequences for not accepting a particular trip.

21              Are there negative consequences for

22    drivers having low acceptance rate of the rides that

23    come to them?

24         A.   No.

25         Q.   If a driver doesn't want to accept trip

Page 506

1    requests, can the driver just go off-line?

2         A.    They can.

3         Q.    And does going off-line impact the driver's

4    acceptance rate?

5         A.    No.

6         Q.    Are there other ways other than using the

7    Uber driver app that claimant could find riders that

8    need transportation services?

9         A.    There are, yeah.

10        Q.    What are those of some?

11        A.    Well, drivers can -- can market themselves.

12   They can create business cards.  They could -- they

13   could, you know, just go by the airport and try to

14   find clients.  They could go to hotels and try to

15   find clients, particularly drivers with livery

16   licenses who are able to transport passengers for a

17   fee outside of a transportation network company

18   platform.  That's something drivers do and have done.

19        Q.    Could drivers who use the Uber driver app

20   use a different app?

21        A.    They could, yeah.  There are multiple

22   different apps available.  There are -- in the State

23   of Texas, I know Lyft is available.  There's another

24   app called Alto that's available.

25        Q.    Now, we have heard about some of those

Page 507

```
 1    other apps, including through Mr. Barysas.
 2               While a driver is actively providing a
 3    trip to a rider that is secured through an app --
 4    let's say through Lyft -- can that driver still
 5    receive trip requests through Uber during those
 6    times?
 7         A.   Yeah.  To the extent they have -- they are
 8    on-line on our app, yeah, they could.
 9         Q.   And while a driver is logged into the Uber
10    driver app waiting for a trip request, are there any
11    restrictions on where the driver can go?
12         A.   No.
13         Q.   Are there any restrictions -- I think we
14    heard this referred to as P1 time.
15               Are there any restrictions at all on
16    what a driver can do during P1 time that Uber places
17    on them?
18         A.   No.
19         Q.   Can a driver be in P1 time on the Uber
20    driver app while also transporting a rider that they
21    secured through a different lead app?
22         A.   They could be, yeah.
23         Q.   I said "lead app."  I meant lead-generation
24    app like Lyft.
25         A.   Understood.
```

Page 508

1      Q.   All right.  Let's go on to accepting trips.

2   How does a driver accept a trip request once it's

3   been presented to them?

4      A.   Basically click anywhere on the screen

5   except for one little X in the top right corner.

6      Q.   What happens after a driver accepts a trip

7   request?

8      A.   Well, presumably the driver goes to pick up

9   the rider.  That doesn't happen in all scenarios, but

10   it's up to the driver what to do next.

11      Q.   And after the driver picks up a rider, then

12   what happens?

13      A.   Presumably the driver brings the rider to

14   where they want to go, but that doesn't happen in all

15   situations.

16      Q.   And after they have dropped the -- after a

17   driver has dropped a rider off, what do they do with

18   the Uber app?

19      A.   They could keep it on or they could hit the

20   go off-line button.  It's up to them.

21      Q.   Do they hit an end trip button or anything

22   like that when it's done?

23      A.   They do.  So when they want to end the

24   trip -- it could be -- it's usually at the rider's

25   destination, but it could be before.  It could be

Page 509

1    slightly after -- they hit the end trip button.

2         Q.    And we've heard some about drivers getting

3    in contact with riders.  Can drivers be deactivated

4    for contacting riders directly?

5         A.    To the extent it's unwanted, they could,

6    yeah.

7         Q.    Would they -- does Uber deactivate drivers

8    for consensual contact between drivers and riders?

9         A.    If the parties decides to share their

10   contact information, then no.  If it's con sense Al,

11   then no.

12        Q.    Are drivers able to pre-arrange rides with

13   riders directly outside of the -- sorry.  Let me

14   start over.

15              Can drivers pre-arrange rides with

16   riders directly outside of the Uber driver app?

17        A.    They can.

18        Q.    Does that happen?

19        A.    It does.

20        Q.    And does Uber deactivate drivers for

21   pre-arranging rides with riders outside of the app?

22        A.    No.

23        Q.    And do some drivers use the Uber driver app

24   to process the fare of a ride that was pre-arranged

25   outside of the app?

                                          Page 510

1       A.    They could do that, yeah.

2       Q.    How would that work?

3       A.    Yeah.  So let's say that a driver and a

4    rider arrange a ride.  They know each other and have

5    the contact information.  Then the driver goes to

6    that rider's pickup location.  Say a rider wants to

7    be picked up from the airport and calls the driver or

8    texts the driver.  They coordinate the trip using our

9    app.  So the rider is in the backseat, requests, it

10   goes to a nearby driver, which is -- if you're in the

11   back seat, it's more often than not the driver they

12   want to get matched with.

13      Q.    Why would a driver and rider do that, use

14   the Uber app to handle a pre-arranged trip?

15              MR. MacLeod:  Objection.  Calls for

16   speculation.

17              JUDGE SOUSSAN:  Overruled.

18      A.    We act as though the payment collection

19   agent, so we're taking the risk on payment issues.

20   So if the driver's credit card isn't working or is

21   stolen -- or it could be multiple different reasons.

22   That's the risk that we take as the payment

23   collection agent.  So there's that fundamental

24   reason.  And also while -- while a driver is using

25   our services, we do have insurance, third-party

                                          Page 511

1    liability insurance, that -- that we maintain on

2    behalf of drivers using our -- our app.

3        Q.   (BY MR. SANDAHL)  And after a driver

4    accepts a trip, can a driver cancel the trip?

5        A.   Yeah, they can.

6        Q.   Are there any negative consequences to a

7    driver for canceling any particular trip?

8        A.   No, there are not.

9        Q.   Can a driver lose access to the Uber driver

10   app for canceling trips?

11       A.   They can, yeah, or they used to be at

12   least.  But yeah.

13       Q.   Has that changed over time?

14       A.   It has, yeah.  Drivers are no longer

15   deactivated for canceling an excessive amount of

16   trips; but they used to be, yeah.

17       Q.   Would they be deactivated for canceling one

18   or two trips?

19       A.   Usually it was an excessive amount within

20   the highest sort of -- drivers were deactivated at a

21   highest cancellation rate within their respected

22   territory.  We looked at standard deviations above

23   the mean, the cancellation rate, and it was something

24   like canceling 50 percent of trips or something

25   along -- something in that general direction.

                                        Page 512

1          Q.   If a driver doesn't like a rider, can a

2     driver request not to be paired with a particular

3     rider?

4          A.   They do, yeah.

5          Q.   What does Uber do when a driver makes such

6     a request?

7          A.   On our end, we can -- sort of like checking

8     a box on the back end to make sure that they are no

9     longer matched again in the future.

10         Q.   When a driver accepts a trip request and

11    the rider isn't ready when the driver gets to the

12    location, is there any requirement that the driver

13    wait for the rider to come out of the building or

14    wherever they are?

15         A.   No.

16         Q.   If a driver makes a decision to wait, is

17    the driver paid for that time?

18         A.   The -- if a driver is waiting for over two

19    minutes then, yes, the rider will start paying them a

20    wait time.  That change was made at some point in

21    2017.  Prior to 2017, no, the driver would not have

22    been paid any wait time.

23         Q.   If a driver decides not to wait and cancels

24    a trip, can a driver then rate the rider?

25         A.   No.

Page 513

1        Q.    Could the rider rate the driver?

2        A.    No.

3        Q.    Does canceling a trip impact either party's

4    star rating?

5        A.    No.

6        Q.    If the rider cancels the trip, is there a

7    cancellation fee?

8        A.    There is if a certain time threshold has

9    passed.

10       Q.    And who pays the cancellation fee?

11       A.    The rider pays the cancellation fee, and

12   the cancellation fee is defined as the fare of the

13   trip.

14       Q.    And if a rider were to leave an item in the

15   driver's vehicle after a trip, what happens then?

16       A.    Well, if the driver finds that item or --

17   you know, if the driver finds the item, then the

18   driver could do a couple different things.  The

19   driver could return it to one of our Greenlight hubs

20   which we spoke about earlier.  A driver could also

21   coordinate directly with the rider to return the

22   item.

23       Q.    If the driver doesn't have the contact

24   information for the rider, is there a way that they

25   could get in contact with the rider?

1          A.    Yeah.  They can reach out to us, and our

2     support team will then reach out to the rider and

3     say, "Hey, a driver found a pair of gloves in your

4     car," and we would ask them for the rider's

5     permission for the driver to contact them and the two

6     parties could then coordinate together.

7          Q.    Do drivers receive anything for returning a

8     lost item to riders?

9          A.    There is a lost item award, yeah.  It's

10    like $10 or something like that.

11         Q.    Who pays that lost item award?

12         A.    The rider does.

13         Q.    I want to move on to routes and maps that

14    are used.  Mr. Barysas has testified about the map

15    that he used for routes, and I want to pull up

16    Exhibit RX29.

17              Mr. Rosenthal, can you tell us what

18    Exhibit RX29 is, please?

19         A.    This is part of our help page that

20    describes or, I guess, answers the question of

21    whether or not a driver needs to follow the GPS

22    route.

23         Q.    Are drivers required to follow GPS routes

24    provided by the Uber driver app?

25         A.    No.

1       Q.    Is there any negative consequence to a

2   driver for not following the GPS route provided on

3   the Uber driver app?

4       A.    No.

5       Q.    Was claimant ever deactivated for not

6   following the recommended route provided on the Uber

7   driver app?

8       A.    No.

9       Q.    If a driver were to go, say, 10 miles out

10  of his or her way to increase the rider's fare, would

11  there be a consequence for doing that?

12      A.    That could be considered fraud, per the

13  community guidelines.  If a driver has a habit of

14  doing that, they could be deactivated, yeah.

15      Q.    Setting that situation aside, what happens

16  to the final fare when a driver takes a reasonable

17  but different route from the recommended route on the

18  Uber driver app?

19      A.    The -- the fare is based on three

20  variables:  A base fare, a per minute rate, and per

21  mile rate.  The per mile rate and per minute rate are

22  based on actuals.  So the fare adjusts accordingly to

23  the route taken.

24      Q.    Is it adjusted for the additional time and

25  mileage that's taken, then?

Page 516

1        A.    Yeah.

2        Q.    Are there any circumstances when the fare

3    would be adjusted because a driver took a different

4    route other than the recommended route on the Uber

5    driver app?

6        A.    Yeah.  Oftentimes people -- rider and

7    driver will agree to a different route or a different

8    fare, and the -- the fare could get adjusted

9    accordingly.

10       Q.    Are fares ever adjusted without input from

11   the rider or driver?

12             MR. MacLeod:  Objection to lack of

13   foundation.

14             JUDGE SOUSSAN:  He can ask.  If he

15   doesn't know, he can answer.

16             MR. MacLeod:  The problem is yesterday

17   my client was directed -- you wanted to know the

18   basis for his understanding.  We've now heard a lot

19   of generalized testimony about, "Oh, sure, yeah,

20   maybe," and there's no basis for his understanding or

21   for his testimony.  It's just -- it's the exact same

22   deal.  It's just -- you've made your ruling.

23             JUDGE SOUSSAN:  Ask his understanding,

24   Mr. Sandahl.

25       Q.    (BY MR. SANDAHL)  Do you understand whether

Page 517

1  fares are ever adjusted without input from the rider

2  or driver at Uber?

3       A.   It's not something that we would normally

4  do.

5       Q.   Okay.  Are drivers required to use a

6  navigation system at all?

7       A.   No, they are not.

8       Q.   Don, would you pull up Exhibit RX37,

9  please?

10            Mr. Rosenthal, can you explain to us

11  what Exhibit RX37 is?

12       A.   This is the process by which a driver would

13  follow in order to turn off the auto navigation

14  feature, which the auto navigation feature is within

15  our app.  We do have proprietary navigation to the

16  extent a driver wants to use it, but a driver could

17  turn it off.  Also within our app the driver has the

18  ability to use Waze and Google Maps as default rather

19  than using our navigation.

20       Q.   Now I want to talk a little bit about

21  amenities.  Are drivers required to provide riders

22  with any type of amenity?

23       A.   No.

24       Q.   We heard Mr. Barysas say yesterday that he

25  provided things, I think, like phone chargers,

Page 518

 1    tissues, waters for riders.

 2                 Can a driver be deactivated for not

 3    offering such amenities to riders?

 4        A.    No.

 5        Q.    Are drivers allowed to create their own

 6    rules for riders?

 7        A.    They can, yeah.

 8        Q.    What kind of rules have you heard of or are

 9    you aware of drivers creating for the riders?

10        A.    No eating would be a pretty common one.  No

11    eating in the vehicle.  Another one being no smoking.

12    That's another common one.  No listening to -- like,

13    no music that would be sort of inappropriate levels.

14    Those are some of the more common ones that I hear

15    of.

16        Q.    And we saw that Mr. Barysas had business

17    cards in his car.  Does Uber try to stop drivers from

18    handing out business cards?

19        A.    No, we do not.

20        Q.    We also heard Mr. Barysas testify that he

21    underwent some training in New York.  I think

22    yesterday we established that your job requires you

23    to be familiar with some regulatory frameworks.

24                 Does New York City have certain

25    training requirements for drivers?

                                           Page 519

1          A.    It does, yeah.

2          Q.    What are you aware of?

3          A.    So in New York City -- New York City is the

4    most highly-regulated market in which we operate, and

5    the New York City Taxi and Limousine Commission has

6    very specific requirements for drivers in order to

7    obtain a TLC license.  And among those are a

8    three-day defensive driving course, followed by a

9    two-hour written test.  So that is not our

10   requirement.  That is the city's Taxi and Limousine

11   Commission's requirement in order to obtain a TLC

12   license.

13         Q.    You've spoken at length about fares and

14   fare calculation with opposing counsel, so I don't

15   want to belabor it, but I do want to ask some more

16   questions on that.

17               Can drivers negotiate their fares with

18   riders?

19         A.    They can.

20         Q.    Is there any negative consequence to

21   drivers who negotiate their fares with riders?

22         A.    There is not.

23         Q.    How would a driver go about negotiating

24   fares with riders?

25         A.    Well, to the extent a driver has accepted a

                                          Page 520

1    trip, the driver could get in touch with that rider

2    to negotiate a fare.  So a driver could text the

3    driver, say, if the driver is waiting at the airport

4    and the driver figures out where the rider is going

5    because they touch base.  They could negotiate a fare

6    other than the fare that is suggested in our

7    application.  That's one way they could do it.  Or

8    upon picking a rider up, they could negotiate a

9    different fare.

10              Sometimes what I've seen also is the

11   driver will end the trip early.  To the extent the

12   driver went on a circuitous route, sometimes the

13   driver ends the trip early.  That is a form of

14   negotiating the fare.  So drivers and riders do this.

15   There are negative consequences upon doing so.

16        Q.   If a driver ends a trip early, does that

17   reduce the amount of the fare then?

18        A.   That the driver could potentially get,

19   yeah.

20        Q.   Can a driver decide not to charge a rider

21   at all for a ride?

22        A.   They could.

23        Q.   Does a driver need approval from Uber to

24   not charge a rider for a ride?

25        A.   No, they do not.

Page 521

1      Q.    And can a driver refund a rider for a trip?

2      A.    They could.

3      Q.    Could a driver refund a rider's

4  cancellation fee?

5      A.    They could.

6      Q.    Do drivers need approval from Uber to

7  refund riders' fares or cancellation fees?

8      A.    No.

9      Q.    We'll pull up Exhibit RX34.  Mr. Rosenthal,

10 do you recognize Exhibit RX34?

11     A.    I do.

12     Q.    What is it?

13     A.    It is a section of our help page that

14 describes the process to a driver of how to refund a

15 rider.

16     Q.    In the middle paragraph, it looks like it

17 allows refund of riders' fares or cancellation fees;

18 is that right?

19     A.    That is correct.

20     Q.    And you've spoken about Uber collecting GPS

21 data from drivers' phones.  Why does Uber -- I'm

22 going -- why does Uber collect those GPS data points?

23     A.    There are two reasons.  The first is that

24 in order for us -- in order for our sort of system to

25 work, it relies upon proximity of riders and drivers

Page 522

```
 1    to match them to each other.  So we need to know
 2    where they are in order to be able to match people.
 3                   The second is the fare calculation, as
 4    I described earlier, it has two variables.  The
 5    variable fares, meaning the per minute and per mile
 6    rate --
 7                   MR. SANDAHL:  Is it just me frozen?
 8                   THE REPORTER:  No, he's frozen.
 9                   MR. MacLeod:  Did you get in touch
10    with him?  It looked like you just typed something.
11    That's why I was asking.
12                   JUDGE SOUSSAN:  I guess he's going to
13    log back on.
14                   (Recess from 10:33 a.m. to 10:36 a.m.)
15       Q.   (BY MR. SANDAHL)  Mr. Rosenthal, when we
16    were speaking, we last heard -- I asked you about why
17    Uber collects GPS data points.  You started
18    explaining about the app relying on the proximity of
19    riders and drivers, and you also said there's a
20    second reason about variable fares.
21                   Could you pick up there?
22       A.   So the fare calculation is based on three
23    things:  Base fare, per minute, and per mile rate.
24    The per minute is based on the actual distance
25    traveled.  In order to get the actual distance
```

Page 523

1    traveled, we rely on the GPS points.

2         Q.   So I want to talk now about some other

3    costs and fees and things.

4                   If a driver incurs a toll while

5    transporting a rider, is the driver paid for that

6    toll?

7         A.   They are.

8         Q.   Who pays the driver for the toll?

9         A.   The rider will.

10        Q.   And what about tolls that a driver incurs

11   on the way to pick up a rider?

12        A.   The rider will not pay those tolls.

13        Q.   Is there a way that a driver can avoid

14   tolls when they are going to pick up a rider?

15        A.   They could, yeah.  They could just not take

16   a toll road.

17        Q.   Once a driver completes a ride, when do

18   they receive payment?

19        A.   So the payment by default -- I guess the

20   rider will pay the driver the fare, and then the

21   fares will be remitted to a driver by default once a

22   week.  That said, a driver has the ability to opt

23   into something called InstaPay in which a driver

24   could opt to have that fare remitted to them

25   immediately.

```
 1          Q.    Who decides whether to opt into InstaPay?

 2          A.    That's the driver's decision.

 3          Q.    Is there a fee to use InstaPay?

 4          A.    There is a transaction fee that the bank

 5     charges, but the bank also offers some sort of debit

 6     card program.  And if the driver signs up for that,

 7     then there are -- the bank does not charge a service

 8     fee.

 9          Q.    And talking about tips, are riders able to

10     tip drivers through the Uber driver app?

11          A.    They can, yeah.

12          Q.    Can drivers receive tips only through the

13     Uber driver app or can they get tips in other ways?

14          A.    They -- (indiscernible) Venmo could be

15     something else.  I should note that the functionality

16     within our app to tip has not always been around.  We

17     launched that in 2017.

18          Q.    You cut out for a second.  I heard about

19     Venmo.  What was the other option?

20          A.    Venmo --

21          Q.    You cut out at exactly the wrong time.

22     Sorry.

23          A.    Square.

24          Q.    Got it.  What percentage of tips received

25     through the Uber driver app do drivers receive?
```

Page 525

1         A.     They receive 100 percent of the tip.

2         Q.     And both you and Mr. Barysas talked a bit

3    about surge pricing.  Would you just remind us what

4    is surge pricing?

5         A.     Yeah.  So the -- within our platform, there

6    are the three variables to the fair calculation I

7    mentioned earlier.  There are default amounts to

8    those.  There's a base amount, a default per minute

9    amount, and a default per mile amount.  And the

10   amounts fluctuate over that -- those default amounts

11   based on realtime supply and demand in the market

12   down to a pretty micro level, meaning, like, a couple

13   of city blocks.  To the extent supply or demand is

14   really high and the supply of drivers does not meet

15   that demand, prices will fluctuate.  And that's what

16   we in our system refer to as surge.

17                THE WITNESS:  I'm getting some

18   feedback on one of the lines.

19                JUDGE SOUSSAN:  Let's talk about that

20   feedback.  If you're not talking, please mute

21   yourselves.  That may help.  All right.  Let's go

22   forward.

23        Q.     (BY MR. SANDAHL)  How are drivers made

24   aware of surge pricing?

25        A.     Within the app, there are two things.

                                        Page 526

1    There are something called -- what we refer to as

2    heat maps in which if a driver is on-line in Period

3    1, they can see areas where it's surging, areas of

4    the city.  So it's determined by, essentially, color.

5    That's why it's called a heat map.

6                    And then also at the time a driver

7    sees a trip request, the offer card as we refer to it

8    will have a surge multiplier to the extent it's

9    surging.  Say it's 2.3X.  2.3X will be 2.3 times the

10   default amounts.  So at the time a driver has that

11   offer, they can determine whether or not they want to

12   accept the trip based on the -- the surge multiplier

13   if they want to choose to do that.

14       Q.   We'll pull up Exhibit RX31.

15                    Mr. Rosenthal, can you tell us what

16   Exhibit RX31 is?

17       A.   Yeah.  This describes surge.  This also

18   describes the maps which I was talking about.  The

19   second sentence describes the map will show areas

20   that are yellow, orange, or red and corresponding

21   surge amounts.

22       Q.   Does it also mention in the second

23   paragraph extra dollar amounts being shown at the

24   home screen?

25       A.   The extra dollar amount will be shown at

                                          Page 527

1    the bottom of your home screen when you're in a surge

2    area, yeah.

3         Q.   You can pull that down.

4              Mr. Rosenthal, are drivers required by

5    Uber to drive towards or use surge areas?

6         A.   No, they are not.

7         Q.   And what do drivers pay Uber for

8    transportation leads through the Uber driver app for?

9         A.   Drivers pay us a service fee for the

10   services which we provide to them.  The services are

11   lead generation -- so we essentially help them find

12   clients, which is the -- which is a meaningful part

13   of that service fee.  We also provide -- we act as a

14   limited payment collection agent.  So we have

15   constructed a whole payment structure, as well.  We

16   do take the credit risk, as I described earlier.

17             We also market our brand to enable

18   growth of rider demand, essentially, and we also

19   provide customer support 24/7 by e-mail and we have

20   the in-person Greenlight hubs which are open certain

21   hours.  We text message drivers.  These are things

22   that we provide 24/7 as a support function.

23        Q.   And when we're talking about drivers and

24   their ability to control profit and loss, are there

25   certain choices a driver can make that will impact

Page 528

1    their profit and loss?

2         A.   There are, yeah.

3         Q.   What are some of those choices?

4         A.   On the revenue side, a driver can use our

5    platform to go where they want to go, where they

6    think they will earn the highest amount of revenue,

7    such as some drivers will wait at the airport for

8    eight hours.  Some drivers will not do that.  Some

9    drivers make the decision to drive on Friday nights.

10   Some drivers don't want drunk people in their car.

11   Those are things drivers can do on the revenue side.

12              On the cost side, some drivers might

13   want a more economical vehicle.  It's five years old

14   or maybe it's an electric vehicle or plug-in.  At the

15   same time, some drivers will make the investment in a

16   more high-end vehicle and use the Uber Black

17   transportation option because they can earn higher

18   fees, but then that vehicle is more expensive so they

19   are going to pay the depreciation.  Generally those

20   vehicles have bigger engines and will get less miles

21   per gallon.

22              Those are things drivers can do on

23   both the revenue and cost side to optimize the

24   economic success while using our platform.

25        Q.   Are you aware of drivers who try to improve

Page 529

1    customer experience to improve their revenues?

2        A.    That's another one, actually.  Drivers can

3    try to -- try to provide really good customer service

4    and get higher tips.  So there are -- there are some

5    drivers who provide water and mints and gum, provide

6    phone chargers.  Those are certain things drivers can

7    do.

8                I was in a car one time, election

9    season six years ago, when a driver had two tip jars,

10   one that said Trump and one that said Clinton.  I saw

11   that as a cute thing to do for a driver to get more

12   tips.

13               MR. MacLeod:  Objection as

14   nonresponsive.

15               JUDGE SOUSSAN:  Sustained.

16       Q.   (BY MR. SANDAHL)  What about skill or

17   initiative?  Can that impact a driver's earning

18   abilities?

19       A.    Yeah.  I think so, yeah.  Absolutely.

20       Q.    What are some ways that that could happen?

21               MR. MacLeod:  Objection.  Speculation.

22               JUDGE SOUSSAN:  He can answer if he

23   knows, but he must know.

24       A.    In terms of -- can you repeat the question?

25       Q.   (BY MR. SANDAHL)  Yeah.  What are skills or

Page 530

1    initiatives that if a driver has them or that you are

2    aware of drivers having that they have taken that

3    have impacted their earning acts?

4                    MR. MacLeod:  Lacks foundation, it's

5    overly broad, and it's not limited in time or scope

6    to this matter.

7                    JUDGE SOUSSAN:  Overruled.

8        A.    So some drivers will provide really good

9    customer service.  There is a difference between

10   driving with paying passengers in your vehicle as

11   opposed to driving by yourself.  Some drivers will

12   drive much smoother and won't accelerate as much or

13   brake as hard.  Some drivers will open the door, help

14   you with your suitcase.  These are all things that

15   drivers can do in order to provide better customer

16   service, and customer service is a skill.  And that's

17   what drivers can do in order to try to increase their

18   earnings.

19                   MR. MacLeod:  Objection.

20   Nonresponsive.

21                   JUDGE SOUSSAN:  Overruled.

22       Q.    (BY MR. SANDAHL)  Are you aware of drivers

23   who are -- have learned of events or -- I guess

24   events that they have taken advantage of?

25       A.    Yeah.  Some drivers, particularly in more

                                         Page 531

 1   rural areas, can read their local Times, their local

 2   publication that comes out once a week, and figure

 3   out where the events are on a weekend.  There might

 4   be a beer fest getting out at 3:00 p.m. on a

 5   Saturday.  Some drivers might go over to that because

 6   there will be a lot of demand there.  Those are

 7   certain things I'm aware of drivers doing in order to

 8   optimize their own earnings in our platform.

 9        Q.   Let's talk about star ratings for a minute.

10   Mr. Ridenour, if you could pull up RX38.

11                  Mr. Rosenthal, what is Exhibit RX38?

12        A.   It is a -- it's part of our help web page

13   that describes how the rating system works.

14        Q.   Can you explain how the rating -- the star

15   rating system works on the Uber driver app?

16        A.   Yeah.  At the end of every trip, a rider

17   and driver have the option to rate each other one

18   through five stars.

19        Q.   Does Uber rate drivers?

20        A.   We do not, no.

21        Q.   Does Uber have control over how drivers and

22   riders rate each other?

23        A.   We do not.

24        Q.   Does Uber ever adjust or remove star

25   ratings?

                                        Page 532

1    A.    Only at the request of one of the other
2    parties.
3    Q.    Why does Uber use a star rating system?
4    A.    Well, there's really no way -- so there's
5    no way for us to -- to know what goes on during a
6    trip.  So what we do is we -- we do want to have
7    minimum business standards for both riders and
8    drivers.  And to the extent one of those parties has
9    a rating that's below a threshold, then we would no
10   longer want to provide them with services.
11   Q.    Are you aware of the average star rating
12   for drivers in Houston?
13   A.    I am.
14   Q.    What is that?
15            MR. MacLeod:  Objection.  Not limited
16   to time and scope to the statutory period.
17            JUDGE SOUSSAN:  Can you limit it,
18   please?
19   Q.    (BY MR. SANDAHL)  Are you aware of what it
20   was in 2017?
21   A.    A specific number, no.
22   Q.    Is it constantly changing?
23   A.    It changes, but usually not a tremendous
24   amount.
25   Q.    Let's look at Exhibit RX38 with the

Page 533

1    sentence starting "your overall."  Are you able to

2    read that?

3         A.   I am.  Do you want me to read it?

4         Q.   Yeah, would you do that?

5         A.   "Your overall star rating is an average of

6    the 500 most recent star ratings you've received from

7    riders."

8         Q.   And does that describe how star ratings are

9    calculated?

10        A.   Yeah.  It's a simple average of the last

11   500 trips that are rated.

12        Q.   And then, Don, if you can pull up the next

13   sentence, "If a rider rates."

14             And based on what we're seeing here in

15   Exhibit RX38, if a driver receives a rating of four

16   stars or below for a reason that's outside the

17   driver's control, is that rating included in the

18   overall rating?

19        A.   No.

20        Q.   All right.  Are you aware of the percentage

21   of drivers that lose access to the Uber driver app

22   for having a low star rating?

23             MR. MacLeod:  Objection.  Not limited

24   to time in scope for the statutory period.

25             JUDGE SOUSSAN:  Sustained.

Page 534

1      Q.    (BY MR. SANDAHL)  For the period 2017 to

2   2019, are you aware of what percentage drivers have

3   lost access to the Uber driver app through low star

4   ratings?

5      A.    Less than 1 percent.

6      Q.    If a driver decides not to take a trip

7   request does that impact a driver's star rating?

8      A.    No.

9      Q.    Can a rider's account be deactivated for

10  having a low star rating?

11     A.    No.  Can a rider's?  Yeah, a rider's can.

12     Q.    A rider.  And are riders required to rate

13  their driver after every trip?

14     A.    No.

15     Q.    Do you consider any individual driver to be

16  an integral part of Uber's business?

17     A.    Any individual driver?  No.

18     Q.    Do you consider drivers as a whole integral

19  to Uber's business?

20     A.    Our rides business, yeah.

21     Q.    Are riders also integral to Uber's

22  business?

23     A.    Our rides business, yeah.

24     Q.    And the rides business is just one of many

25  business lines, I think you explained yesterday; is

Page 535

1  that right?

2        A.   One of several, yeah.

3        Q.   Mr. Rosenthal, other than in this

4  arbitration, does Uber have any record of Mr. Barysas

5  complaining about being classified as an independent

6  contractor?

7        A.   Not that I'm aware of.

8        Q.   Other than in this arbitration, does Uber

9  have any record of claimant seeking any reimbursement

10  for mileage?

11        A.   Not that I'm aware of.

12        Q.   Other than in this arbitration, does Uber

13  have any record of claimant seeking reimbursement for

14  vehicle expenses?

15        A.   Not that I'm aware of.

16        Q.   For phone bills?

17        A.   Not that I'm aware of.

18        Q.   Other than in this arbitration, does Uber

19  have any record of claimant making a request that he

20  be classified as an employee?

21        A.   Not that I'm aware of.

22        Q.   And you heard claimant testify that he

23  stopped using the Uber app in 2019, the Uber driver

24  app.

25                  Who made the decision to stop using

```
 1   the Uber driver app?

 2       A.   It was the driver.

 3                MR. SANDAHL:  Your Honor, could I have

 4   just a short break?  I think I may be finished.

 5                JUDGE SOUSSAN:  How much time do you

 6   need?  Five minutes or longer?

 7                MR. SANDAHL:  Just five minutes.

 8                (Discussion off the record)

 9                (Recess from 10:54 a.m. to 11:05 a.m.)

10                MR. SANDAHL:  Your Honor, thank you.

11   I have no further questions for Mr. Rosenthal at this

12   time.  I pass the witness.

13                JUDGE SOUSSAN:  Thank you.

14                     EXAMINATION

15       Q.   (BY MR. MacLEOD)  Sir, you remember towards

16   the very end of questioning by Uber's counsel you

17   were asked about who made the decision to stop

18   driving through the Uber application, correct?

19       A.   That was a question, yeah.

20       Q.   Right.  And your answer, as I appreciate it

21   and as we know, was Dainius made that decision,

22   correct?

23       A.   That's right.

24       Q.   But prior to that decision, you would agree

25   that Uber made the unilateral decision to no longer
```

Page 537

```
1    allow him to perform pickups and drop-offs through

2    the Uber app at the airport, correct?

3         A.   That is a decision we made, yeah.

4         Q.   And you heard that that was a decision that

5    was -- it was made final and not appealable by Uber,

6    correct?

7         A.   I think that's what the evidence shows,

8    yeah.

9         Q.   And there was nothing in the Uber support

10   messages that said that Dainius could provide his own

11   evidence or his own defense.

12              You didn't see that in the support

13   messages, did you?

14        A.   Not that I saw, no.

15        Q.   And you heard about the effects of Uber's

16   decision to limit his ability to perform work through

17   the Uber app at the airport, correct?

18        A.   I saw the evidence, yeah.

19        Q.   And as I appreciate it, it would be your

20   testimony that Uber then, as a limited collection

21   agent -- because that's how you described Uber,

22   correct?

23        A.   Limited payment collection agent, yeah.

24        Q.   A limited payment collection agent made

25   this decision about the airport, correct?
```

Page 538

1        A.    It is a decision we made, yeah.

2        Q.    And you understand that Uber's counsel in

3    this case has stipulated that Uber did not allow the

4    claimant, being Dainius, in this arbitration to use

5    the Uber driver app at the airport, right?

6        A.    We didn't -- we made a decision not --

7              MR. SANDAHL:  I'll object to the

8    extent that he's asking for his opinion on counsel's

9    stipulations.

10             MR. MacLEOD:  I didn't ask for an

11   opinion.  I asked if he understood that on the

12   record -- it's actually going to be Page 175, Lines 3

13   through 8, that Uber's counsel, Ms. Miers, said Uber

14   stipulates that it did not allow the claimant in this

15   arbitration to use the Uber driver app at the

16   airport.

17             MR. SANDAHL:  I'll object to the

18   extent it misstates the stipulation because it was

19   after a certain period of time and there's no reason

20   the witness needs to testify about it.

21             MR. MacLEOD:  He was asked by counsel

22   about statements made in opening, and now we're going

23   to talk about the passage of time?  It was a

24   stipulation on the record, Your Honor.

25             JUDGE SOUSSAN:  He can answer the

                                              Page 539

```
 1    question if he can.  Let's go on.
 2         A.   I believe that's right.
 3         Q.   (BY MR. MacLeod)  Okay.  And -- and that's
 4    still -- as you appreciate it, that's still true
 5    today, right?
 6         A.   That what is still true today?
 7         Q.   All right.  You raised the issue of PayPal.
 8    Sometimes you will compare Uber as a limited payment
 9    collection agent to other companies, and one of those
10    you use is PayPal, right?
11         A.   I'm not sure I made the analogy to PayPal.
12         Q.   Do you know that there are numerous
13    instances in your sworn testimony where you have made
14    reference to PayPal when discussing how Uber conducts
15    business?
16              JUDGE SOUSSAN:  Hold on a second.
17    Counsel, which sworn testimony are you talking about
18    because I have not heard PayPal in this case?  Are
19    you talking about in other cases?
20              MR. MacLeod:  Yes, Judge.  He has
21    testified in many cases.  Under the Federal Rules of
22    Evidence --
23              JUDGE SOUSSAN:  I'm familiar with
24    that, Mr. MacLeod.  Thank you.  I just didn't know
25    what you were talking about.
```

Page 540

```
 1                    MR. MacLeod:  Yesterday I was told I

 2    could not use prior testimony, so that's why -- okay.

 3         Q.   (BY MR. MacLeod)  You understand how PayPal

 4    works?

 5         A.   PayPal is a massively complex company.  I

 6    cannot say I understand how PayPal works in totality,

 7    no.

 8         Q.   Have you ever heard of an instance where

 9    PayPal tells one of its customers that they can use

10    PayPal at Home Depot but they can't use PayPal at the

11    Lowe's near their house?

12                    MR. SANDAHL:  Objection.  Lacks

13    foundation.

14                    JUDGE SOUSSAN:  He can answer if he

15    knows the answer.  If he doesn't know, then he

16    doesn't know.  But he can answer if he knows the

17    answer.

18         A.   I'm not sure exactly how PayPal conducts

19    its business with its customers.

20         Q.   (BY MR. MacLeod)  Okay.  But you would hold

21    yourself out as knowing exactly how Uber was

22    conducting business in Houston during the statutory

23    period in this case, correct?

24         A.   Exactly how?  I mean, insofar as I can

25    answer questions if you have questions.  I'm familiar
```

                                                    Page 541

```
 1    with our business operations, yeah.
 2        Q.   Yesterday I was asking you questions, and I
 3    was saying that I was trying to find out the
 4    foundation.  I was trying to find out where the
 5    information was coming from.
 6                   Do you remember some of that?
 7        A.   I do.
 8        Q.   And you were here yesterday when my client
 9    was being cross examined.
10                   Do you remember that?
11        A.   I do.
12        Q.   And there was a statement about how I need
13    to know the basis for your client's understanding.
14                   Do you remember that?
15        A.   Not specifically, no.
16        Q.   Well, I want to try to find out the basis
17    for your understanding on some of these subjects.
18    Can we do that?
19        A.   Sure.
20        Q.   Because if you had to quantify -- in the
21    direct examination by Uber's counsel, if you had to
22    give a percentage of your testimony that you think
23    was actually specific to my client in this
24    arbitration during the statutory period, what do you
25    think the percentage would be?
```

Page 542

1     A.   I don't know exactly what you're

2  referencing here, what you're referring to.

3     Q.   What part of the question do you not

4  understand, Mr. Rosenthal?

5     A.   Well, my counsel had asked me some

6  questions, and I answered those questions.

7     Q.   And out of all those questions you were

8  asked, how many of those questions -- what percentage

9  would you estimate were actually specific to Dainius,

10  my client, and his use of the Uber application?

11           MR. SANDAHL:  I'll object, Your Honor,

12  that this is harassing and asking him to comment on

13  his own testimony.

14           JUDGE SOUSSAN:  If he can answer, let

15  him answer the question, please.

16     A.   I don't know exactly how your claimant used

17  the -- used our services.  He was a driver for many

18  years.  I don't know exactly the ins and outs of

19  every time he used the services or the, you know,

20  the -- over the many trips he provided.

21     Q.   (BY MR. MacLeod)  Do you know why, then,

22  you have provided now a couple of hours of testimony

23  generally about the Uber app instead of what my

24  client actually did based upon the evidence presented

25  in this case during the statutory period?

Page 543

 1                 JUDGE SOUSSAN:  Hold on a second.  The

 2     witness was asked questions from counsel, and he

 3     answered those questions.  If you have different

 4     questions, Mr. MacLeod, that would focus in on your

 5     client, I suggest that you ask those questions,

 6     please, sir.

 7                 MR. MacLeod:  Judge, this is the

 8     second time now I've tried to cross-examine this

 9     witness and I'm being directed exactly how it needs

10     to go, but I will do my best.

11         Q.   (BY MR. MacLeod)  So you just said you

12     didn't know how my client drove through the Uber app.

13                 Do you remember that?

14         A.   Aside from hearing his testimony and seeing

15     the evidence, no, sir.

16         Q.   You literally just testified "I'm not sure

17     how your client used the Uber app."

18                 Is that your testimony?

19                 MR. SANDAHL:  I'll object that it

20     misstates the testimony.

21                 JUDGE SOUSSAN:  The testimony is what

22     it is.  Move on, please.

23         Q.   (BY MR. MacLeod)  Did you --

24         A.   I'm not sure specifically in totality on

25     how he used the app over the number of years.  I have

                                                 Page 544

```
 1    seen the evidence and have heard his testimony.

 2        Q.    How many times did Dainius receive tips

 3    through the Venmo app?

 4        A.    You would have to ask him that.  I don't

 5    know.

 6        Q.    No, I'm asking you that because you

 7    volunteered that that normally happens, that people

 8    use the Venmo app.  I'm asking you because we're in

 9    an arbitration involving Dainius.

10              How many times, as Uber's corporate

11    representative, did Dainius receive tips through the

12    Venmo application?

13        A.    First of all, I'm not sure that it normally

14    happens.  Second of all, there's no way that I would

15    know how many -- if he accepted any tips or how much

16    he accepted via Venmo.

17        Q.    So is your answer simply "I don't know"?

18        A.    That is right.

19        Q.    Okay.  How many times did Dainius receive

20    tips through the square application?

21        A.    There's no way for me to know.

22        Q.    I don't know, correct?

23        A.    There is no way for me to know.

24        Q.    How many times using the Uber application

25    did Dainius help with suitcases?
```

Page 545

1        A.    I don't know.

2        Q.    How many times -- how many rides out of the

3   thousands of rides that Dainius provided did he

4   supply phone chargers?

5        A.    I can't recall his testimony on phone

6   chargers.  I don't know.

7        Q.    How many of the thousands of rides that

8   Dainius did through the Uber app did he provide

9   minutes?

10       A.    I don't know.

11       Q.    How many of the thousands of rides did

12  Dainius provide -- through the Uber app did he

13  provide gum?

14       A.    I don't know.

15       Q.    Just so I understand the basis of your

16  testimony, how many times did you drive as a driver

17  through the Uber application in Houston during 2017?

18       A.    I have not driven in the City of Houston in

19  2017.

20       Q.    What about in 2018?

21       A.    Same answer.

22       Q.    What about in 2019?

23       A.    Same.

24       Q.    How many times did my client in 2017 to

25  2019 -- let's just say how many times did my client

Page 546

```
 1    during the statutory period solicit rides at hotels?

 2         A.   I don't know.  I believe I recalled him

 3    saying he went to hotels, but it was not successful

 4    for him.  So I don't know.

 5         Q.   Your answer is, then, "I don't know,"

 6    correct?

 7         A.   That's right.

 8         Q.   Okay.  How many times did Dainius go and

 9    try to solicit rides at the airport?

10         A.   I don't know.

11         Q.   Let me ask you this.  In the City of

12    Houston, can livery drivers solicit rides at hotels?

13         A.   They can, yeah.

14         Q.   Is it against the law?

15         A.   No.  I don't think it is, no.

16         Q.   And what about in the City of Houston?  Can

17    livery drivers solicit rides at airports?

18         A.   I believe so.  I would have to check the

19    airport ordinance, but I believe so.

20         Q.   You've already testified about the City of

21    Houston ordinances, correct?

22         A.   Some of them, sure.

23         Q.   Do you know one way or another if it is

24    legal, permissible, for a livery driver to solicit

25    rides at an airport?
```

Page 547

1      A.    I don't know.  The ordinance is hundreds of

2  pages long.  I don't know.

3      Q.    So you don't know.  That's it, right?

4      A.    That's what I just said, yeah.

5      Q.    Now, you also talked in response to Uber's

6  counsel's questioning about negotiated fares.

7           Can you tell us the name -- the single

8  name of any rider through the Uber app that my client

9  negotiated a fare with?

10     A.    I don't know.

11     Q.    I just want to make sure.  There's not a

12  single name or single ride that you can identify in

13  this arbitration under oath in which my client

14  negotiated a fare with the rider.  True?

15     A.    Again, I don't know.

16     Q.    So is "I don't know" the same as "no, I

17  cannot"?

18     A.    I'm not aware of -- of any trips that he

19  negotiated with a rider.  Is that more clear?

20     Q.    That's exactly more clear.  That was

21  question and answer.  Thank you.

22           How many times did my client, Dainius,

23  negotiate a fare by ending a trip early?

24     A.    I don't know.

25     Q.    Can you tell the arbitrator a single time

Page 548

1   in which Uber is aware that Dainius ended a trip

2   early?

3        A.   I would have to go through his records.

4   I'm not aware off the top of my head, but I would

5   have to go through the records and potentially look

6   at that.

7        Q.   So let's take a look at Claimant's 10,

8   please.  And Claimant's 10 are the Uber responses to

9   claimant Dainius Barysas' second requests for

10  production and first interrogatories.  If we go to

11  the very last page, we get to -- Page 16 is the

12  verification, right?  We're finding them.  He's

13  working through it.  Yeah, that's it.  Perfect.

14  Thank you, Jacob.

15             Okay.  So if we go to the last page,

16  there's the verification page, the same kind of

17  verification we were looking at when Dainius was

18  verifying.  And you're the person who verified,

19  right?

20       A.   That's right.

21       Q.   As the director M&A for legal integration,

22  correct?

23       A.   That's right.

24       Q.   Can you tell us, what is that -- the phrase

25  legal integration?  What does that mean?

Page 549

1      A.    They work on integrating the companies that

2   we've acquired.

3      Q.    Okay.  And then you also serve as a

4   corporate representative for Uber throughout numerous

5   arbitrations, correct?

6      A.    I don't know how you define "numerous," but

7   from time to time, yeah.

8      Q.    Okay.  And as Ms. Miers pointed out

9   yesterday with my client, you said, "I declare under

10  penalty of perjury under the laws of the United

11  States of America that the foregoing is true and

12  correct," and it's executed on November 1st, 2021,

13  correct?

14     A.    That's what it says, yeah.

15     Q.    Is that -- is that your signature,

16  Mr. Rosenthal?

17     A.    It's a DocuSign signature, yeah.

18     Q.    That's how you sign your name?

19     A.    It's a DocuSign signature, yeah.

20     Q.    If we go to Page 13, I want to look at

21  Interrogatory Number 8.  You spent a substantial time

22  talking about negotiated fares, and this

23  interrogatory says, "Identify each trip provided by

24  claimant wherein Uber claims that he negotiated the

25  fare directly with the rider," right?

Page 550

1      A.    That's what the interrogatory says, yeah.

2      Q.    After the litany of objections, if we go to

3   the next page, what we learn is -- it says, "Uber

4   states it currently has no personal knowledge of when

5   claimant negotiated a fare directly with his

6   customer."

7                  And that was true back in November of

8   2021, correct?

9      A.    That's right.

10      Q.    And it remains true today, correct?

11      A.    That is right.

12      Q.    But this answer -- this response goes

13   further.  It says, we know he didn't negotiate a

14   fare, but we can tell you that he had the option to

15   negotiate a fare, right?

16      A.    That's correct.

17      Q.    And it directs us to the December 11, 2015,

18   TSA agreement, and it would be the -- the one we

19   looked at yesterday with your counsel, RX48.

20                  Do you remember that?

21      A.    I do.

22      Q.    And in that TSA, there's an entire section

23   on financial terms, correct?

24      A.    I believe that's one of the sections, yeah.

25      Q.    In your understanding when we look at the

                                          Page 551

```
 1    TSA under the financial terms, there is nothing in
 2    that section that would tell Dainius that he had the
 3    right to charge a fare that was higher than the
 4    Uber-established pre-arranged fare, correct?
 5          A.   Okay.
 6          Q.   I'm not asking if it's okay.  I'm saying is
 7    that true?
 8          A.   You're asking me to opine on something
 9    without showing it to me.  Perhaps it would be
10    helpful to show it to me so I can confirm or deny
11    that.
12          Q.   First off, I'm asking you -- this is the
13    document that you told us to go look at in your sworn
14    interrogatories, correct?
15          A.   That is correct.
16          Q.   You told us that Uber states that claimant
17    had the option to negotiate a different fare amount
18    with his customer, right?
19          A.   That's what it says here, yeah.
20          Q.   Have you seen a single document, any
21    evidence at all in this arbitration produced by Uber,
22    obtained by subpoena, or produced by us in which Uber
23    told Dainius that he could negotiate a higher fare
24    amount with a customer or a rider than the
25    pre-arranged fare established by Uber?
```

Veritext Legal Solutions
346-293-7000

1          A.    Specifically, no.

2          Q.    And if we take a look, then -- I want to

3     switch gears a little bit.  Let's look at Claimant's

4     3 real quick.

5                In the first paragraph here, it says,

6     "We want Uber to be enjoyable and safe for everyone."

7     It says, "These ground rules are designed to ensure

8     that riders and drivers have a five-star ride when

9     using Uber," correct?

10         A.    That's what it says.

11         Q.    And you understand that it actually uses

12    the word "ground rules," right?

13         A.    That's what it says.

14         Q.    And that is coming from Uber that you

15    described is a limited payment collection agent,

16    correct?

17         A.    That is one of the things -- one of the

18    services we provide, yeah.

19         Q.    So if we flip over, then, to

20    Uber_Universal_62, the first paragraph here, Why

21    Drivers Can Lose Access to Uber.  "If you are a

22    driver and your account is temporarily blocked or

23    deactivated, it limits your ability to earn income,"

24    correct?

25         A.    That's what it says.

Page 553

1      Q.    And the decision on whether or not to

2  temporarily block or deactivate an account is one

3  that is made solely by Uber that you described as

4  solely a limited payment collection agent, right?

5      A.    Did I solely describe Uber as a limited

6  payment collection agent?

7      Q.    When it comes to using the Uber driver app,

8  yes, sir, you did.

9      A.    I said solely a limited payment collection

10  agent?  I don't recall that.

11      Q.    Let's look at star ratings here.  And you

12  said earlier that you're not aware of what the

13  minimum star rating was for the City of Houston in

14  2017, 2018, or 2019.

15            That was your sworn testimony,

16  correct?

17      A.    That is right.

18      Q.    Okay.  And there's a section there, the

19  bottom paragraph, on What Leads to You Losing Access

20  to Your Account, correct?

21      A.    There is, yeah.

22      Q.    And -- and it talks about how -- how we

23  will alert you over time if your rating is

24  approaching this limit, and then you'll also get

25  information about quality improvement courses that

Page 554

 1    may help you improve.

 2              Do you see where it says that?

 3        A.    I do.

 4        Q.    Okay.  So part of the deal here is that if

 5    I'm an Uber driver and I read this, I'm going to

 6    learn that there are ways in which I can lose access

 7    to my account, and one of the ways is through the

 8    star rating, correct?

 9        A.    That is correct.

10        Q.    Can you tell me of another collection

11    agency in the world that you're aware of that tells

12    people that you can be kicked out, you can be

13    deactivated, you can be temporarily blocked other

14    than Uber that you have described as a limited

15    payment collection agent?

16        A.    Being a limited payment collection agent is

17    one of the things that we do.  I'm not aware of how

18    other businesses operate.

19        Q.    Okay.  And then, if we want to know more

20    about these quality improvement courses, we can look

21    at Uber_Universal_65, and we learn about getting back

22    on the road after deactivation, right?

23        A.    That's right.

24        Q.    It says that "If your account has been

25    deactivated for quality reasons like low star

                                            Page 555

1    ratings, you may have the opportunity to get back on

2    the road if you provide proof that you've

3    successfully taken a quality improvement course,"

4    right?

5        A.    That's what it says.

6        Q.    Okay.  Now, in this instance, Uber made a

7    final decision, not appealable, about Dainius not

8    being able to do airport pickups and drop-offs.

9              Did you see any evidence at all where

10   Uber said, "Okay.  You've been limited in that

11   manner, but now we're going to offer you to take a

12   quality improvement course"?

13       A.    That wouldn't make any sense.

14       Q.    Okay.  And first off, you said it didn't

15   make any sense.  But second off, you also don't know

16   who actually made that internal decision by Uber,

17   correct?

18       A.    Which internal decision are you referring

19   to?

20       Q.    Which internal decision do you think that

21   I'm referring to, sir?

22       A.    I don't know.  I'm trying to answer your

23   questions, but I'm asking a question to clarify.  I'm

24   sorry.  I'm trying to understand what you're asking.

25       Q.    What were we just talking about?

Page 556

1          JUDGE SOUSSAN:  Excuse me.  Please ask

2     your question again, Mr. MacLeod.

3          MR. MacLeod:  Judge, you literally

4     instructed my client yesterday numerous times.  This

5     witness is now testifying before you for the third

6     time, and this is what we're dealing with?

7          JUDGE SOUSSAN:  Mr. MacLeod, I just

8     asked you to repeat your question.  I think arguing

9     with me is not a good use of your time.  Just re-ask

10    your question.  That's all.

11        Q.   (BY MR. MacLeod)  Okay.  Let's take a look

12    at RX48.  Do you believe that you have been giving

13    straightforward responses in answer to my questions,

14    sir?

15        A.   I do.

16        Q.   RX48 is the technology services agreement.

17    This one was updated December 11, 2015.

18             Do you remember when this was actually

19    updated after December 11, 2015?

20        A.   I think it was November 2019.

21        Q.   Right.  And that was after the -- after

22    Dainius had already stopped driving through the Uber

23    application, right?

24        A.   I believe that's correct, yeah.

25        Q.   Okay.  So you understand that this

1    technology services agreement would have been the

2    effective technology services agreement for the

3    entire statutory period that we're talking about

4    here, right?

5        A.    That is my understanding.  I would probably

6    have to talk to the lawyers; but, yeah, that's my

7    understanding.

8        Q.    You talked about this agreement at length

9    yesterday, right?

10       A.    At length?

11       Q.    Let's go to Page 197.  I understand what

12   you're doing.  Let's go to definition 1.6.

13                   Do you see that?

14       A.    I do.

15       Q.    Okay.  The driver app means Uber's mobile

16   application.  Do you see where it says, "as may be

17   updated or modified by Uber at its discretion from

18   time to time"?

19       A.    I do.

20       Q.    Now, if we go to 2.2 -- we'll come back to

21   these definitions.  If we go to 2.2 on Page 198, this

22   is the provision of transportation services.  In the

23   second sentence, it says, "If a driver accepts a

24   user's request for transportation services, the Uber

25   services will provide certain user information to

Page 558

1    such driver via the driver app, including the user's

2    first" -- so Dainius would get the driver's [sic]

3    first name after he has made the decision within 15

4    seconds to accept a ride, correct?

5        A.   That is correct.

6        Q.   Okay.  And you would also get -- the other

7    piece of information that this document tells us is

8    that he would also get the pickup location, right?

9        A.   That is right.

10       Q.   Okay.  And -- and as we have it, based on

11   this technology services agreement that was in effect

12   the entire statutory period, the only user

13   information that is provided to a driver like Dainius

14   that we have actual evidence of in writing is that he

15   would get the user's first name and their pickup

16   location, correct?

17       A.   Yeah.  It says including the -- yeah, it

18   says including those two variables.

19       Q.   There's no other variables that were

20   provided to Dainius that you have evidence that you

21   can show in this arbitration were provided to him

22   after he accepted a user's request for transportation

23   services.

24                   Is that true or false?

25                   MR. SANDAHL:  I'll object that it

                                          Page 559

1    misstates the claimant's own testimony.

2                JUDGE SOUSSAN:  Let me see what he

3    says.  Hold on.  Overruled.  He can answer if he can.

4         A.   I'm not aware of what other information we

5    provided at the time.

6         Q.   (BY MR. MacLeod)  Is there a document that

7    we can look at that would actually contradict this

8    technologies services agreement and say, "You know

9    what?  More information than this would have been

10   provided after acceptance of a ride during the

11   statutory period"?

12        A.   I'm not sure.  I would have to go through

13   all of our help pages to figure out if there's

14   anything there.  In addition, I would have to listen

15   to all the testimony from previous witnesses.

16        Q.   You've been here for all the testimony,

17   correct?

18        A.   I didn't memorize it.  But, yeah, I was

19   here for it.

20        Q.   So then we also have -- if we go back to

21   Section 1.12 in Page 197, we have the word

22   "territory" defined, right?

23        A.   Yeah, we do.

24        Q.   "Territory means a city or metro areas in

25   the United States in which customer and its drivers

                                        Page 560

1   are enabled by the driver app to receive requests for

2   transportation services."

3               The actual entity that has to make the

4   decision on whether to enable or not enable a person

5   to receive a request for transportation services

6   would be Uber.

7               Is that true or false?

8       A.   Uber USA, LLC, which is the party to the

9   agreement.

10      Q.   Is that true, then?

11      A.   Just to be clear, you said was it Uber.  I

12  want to make sure we're defining the entity

13  correctly.  The entity is Uber USA, LLC.

14      Q.   Is there a single time in response to

15  Uber's questioning where you felt the need to define

16  Uber?

17      A.   Well, there's two agreements that your

18  client had signed.  There's one with Rasier, LLC, and

19  one with Uber USA, LLC.  I want to make sure that we

20  are very clear on that.

21      Q.   Sir, did you answer my question?

22      A.   I did, yes.

23      Q.   What was my question?

24      A.   You asked whether or not the entity is

25  Uber.  I said it is Uber USA, LLC.

Page 561

1      Q.   Actually, that wasn't my question at all.

2  My question was:  During the lengthy questioning by

3  your counsel when "Uber" was said over and over

4  again, did you ever feel a need to clarify and say

5  Uber USA, LLC?  Did that happen a single time?

6      A.   I don't know.  I don't think so.  But you

7  asked me for a specific entity, and I gave you the

8  answer just to clarify.

9      Q.   Well, I would say because I think you have

10  very -- a very difficult time answering questions.

11           JUDGE SOUSSAN:  Excuse me,

12  Mr. MacLeod.  You're not here to lecture the witness.

13  You're here to ask the question and get an answer,

14  and I'll be the judge of the question and answer.  So

15  please move on.

16           MR. MacLEOD:  Is he going to lecture

17  me, Judge?

18           JUDGE SOUSSAN:  Please move on,

19  Mr. MacLeod.

20      Q.   (BY MR. MacLEOD)  All right.  2.4.  Let's

21  go there, Page 199.  Customer's Relationship with

22  Uber.

23           Under this contract, this agreement,

24  who was the customer?

25      A.   The customer is defined in Section 1 as --

Page 562

1    I believe -- I don't have it memorized, but I believe

2    it says transportation company.

3        Q.   Let's go to the first paragraph again.

4    It's on Page 196.  How is "customer" defined?

5        A.   "Independent company in the business of

6    providing transportation services."

7        Q.   And what company -- what's the name of that

8    company?

9        A.   I think it was Pedicab, LLC.

10        Q.   Where do you see that in this agreement?

11        A.   That is the party that entered into the

12    agreement.

13        Q.   Sir, I'm asking you:  Where do you see that

14    business name in this technology services agreement?

15        A.   I don't believe it's written anywhere in

16    the agreement.

17        Q.   Do you see anywhere in this agreement --

18    the very last page talks about how you can -- you can

19    click accept -- so you just click a button, click a

20    mouse, and that you accept the agreement.

21              Have you seen any documentary evidence

22    that a button "I accept" was clicked and by who?

23        A.   I didn't see any evidence yet.  There might

24    be some in production that says when the agreement --

25    when the button was pressed.  I don't know by whom,

                                        Page 563

1  though.

2       Q.   Okay.  My question was:  Did you see it?

3  Yes or no?

4                 JUDGE SOUSSAN:  I believe he answered

5  the question.  Move on, Mr. MacLeod.

6                 MR. MacLeod:  Judge, I'm not sure how

7  in the world you can question my witness using Uber's

8  own words and you can direct my witness to answer

9  questions.  This -- this person is doing absolutely

10  everything to avoid answering questions, and I've

11  never -- I've never seen a proceeding like this,

12  but -- I'm going to stop objecting because I know

13  what that does, and we'll get through this.

14       Q.   (BY MR. MacLeod)  In Section 2.4 on

15  Page 199, there's Customer's Relationship with Uber.

16  And at the very bottom, it says, "Uber retains the

17  right to deactivate or otherwise restrict customer or

18  any driver from accessing or using the Uber driver

19  app or the Uber services in the event of a violation

20  or alleged violation of this agreement," right?

21       A.   That is right.  That's what it says.

22       Q.   And exactly what it says here in

23  Section 2.4, that's exactly what Uber did.  Uber

24  restricted Dainius from accessing or using the Uber

25  driver app by not allowing him to perform airport

```
 1    drop-offs or pickups.  True or false?
 2                    MR. SANDAHL:  Objection.  Asked and
 3    answered.
 4                    JUDGE SOUSSAN:  Overruled.
 5        A.   I don't think it's the same as restricting
 6    his access to the app.
 7                    (Simultaneous cross-talk.)
 8        A.   Sorry.  I wasn't finished.
 9        Q.   (BY MR. MacLeod)  My question was true or
10    false?  Your counsel will have plenty of time to ask
11    you questions.  I'm asking you true or false?
12                    JUDGE SOUSSAN:  The court reporter has
13    a very hard time taking both of you down at the same
14    time, so please let one person finish before the
15    other person starts back up.  Thank you.
16        Q.   (BY MR. MacLeod)  Can you answer true or
17    false, please?
18        A.   True or false to -- what was the specific
19    question?
20        Q.   You understand here that what happened in
21    Section 2.4, what's contemplated is that Uber can
22    restrict a driver, right?
23        A.   Well, the section says, "Restrict a
24    customer or any driver from accessing or using the
25    Uber services."
```

1     Q.    One of the ways in which Dainius provided

2     for his family, his livelihood, was accessing the

3     Uber driver app to perform airport pickups and

4     drop-offs?

5     A.    We did limit him from accessing the

6     airport, yeah.

7     Q.    Just as Section 2.4 contemplates, that is

8     exactly what Uber did when it restricted the right

9     for Dainius to use the Uber app to perform airport

10    pickups and drop-offs.

11               Is that true or false?

12    A.    I believe that's true.

13    Q.    Okay.  Section 2.6, Ratings.  If we go to

14    specifically Section 2.6.2, it says, "In order to

15    continue to receive access to the driver app and Uber

16    services, each driver must maintain an average rating

17    by users that exceeds the minimum average acceptable

18    rating established by Uber for the territory, as may

19    be updated from time to time by Uber in its sole

20    discretion," defined there as the minimum average

21    rating, right?

22    A.    You read that correctly.

23    Q.    And what this agreement tells us that was

24    in effect during the entire statutory period is that

25    Uber, in its sole discretion, could make the decision

Page 566

1    to deactivate a driver's access to the driver app if

2    a driver's average rating falls below the minimum

3    average rating.

4                  Is that true or false?

5        A.   It's true.

6        Q.   Okay.  If we go to Page 202, Section 2.8,

7    the Location-based Services.  Now, if we go to little

8    A there, it says, "The driver's geo-location

9    information may be obtained by Uber services while

10   the driver app is running," correct?

11       A.   That's correct.

12       Q.   What third parties does Uber share the

13   driver's geo-location with?

14              MR. SANDAHL:  Objection.  Relevance.

15              JUDGE SOUSSAN:  What is the relevance

16   with that, Mr. MacLeod.

17              MR. MacLEOD:  We know that they were

18   tracking him, and now I want to know through their

19   monitoring who they believe it's important to share

20   this data with.

21              JUDGE SOUSSAN:  Okay.  Overruled.

22       A.   I'm not sure what third parties, if any, we

23   share a driver's geo-location with.

24       Q.   (BY MR. MacLEOD)  Do you know if one of

25   them was Challenger?

                                            Page 567

1    A.    As I said, I'm not aware of any companies

2    that we may share a driver's geo-location with.

3    Q.    You've actually reviewed geo-location

4    information before, haven't you?

5    A.    I have.

6    Q.    And have you seen the name of those

7    companies that actually are written on the

8    geo-location information, the logos, the branding for

9    those companies?

10   A.    I didn't notice that, no.

11   Q.    And then it says, "In addition, company and

12   its affiliates may monitor, track, and share with

13   third parties driver's geo-location information

14   obtained by the driver app and device for safety and

15   security purposes," right?

16   A.    That's what it says.

17   Q.    Okay.  So under that sentence, under 2.8,

18   the last sentence, can you tell us from a monitoring

19   standpoint which third parties was Uber, that you

20   describe as a limited payment collection agent,

21   sharing the geo-location information of Dainius with

22   during the statutory period?

23   A.    Again, I'm not aware of any third parties

24   that we may or may not share driver's geo-location

25   with.

Page 568

1          Q.   If we go to Section 3.1 for Driver

2     Requirements -- if we go to little B there, it says,

3     "Possess the appropriate and current level of

4     training, expertise, and experience to provide

5     transportation services in a professional manner with

6     due skill, care, and diligence," correct?

7          A.   That's what it says.

8          Q.   Uber is telling Dainius that he must

9     possess, first off, the appropriate and current level

10    of training, expertise, and experience to provide

11    transportation services.   True?

12         A.   That he shall possess these things, yeah.

13         Q.   And Uber is also saying that in order to be

14    a driver through the Uber driver app, he has to be

15    able to provide those transportation services in a

16    professional manner with due skill, correct?

17         A.   That he shall do that.

18         Q.   Right.   He shall provide transportation

19    services in a professional manner, per Uber, with

20    care, right?

21         A.   That's what it says.

22         Q.   And that Uber also says he must provide

23    those transportation services in a professional

24    manner with diligence, right?

25         A.   That he shall.

1        Q.   He shall, right?

2        A.   That's what it says, shall.

3        Q.   And it's Uber that says he shall, right?

4        A.   Yeah.  That's the agreement, yep.

5        Q.   You talked about an employee handbook

6    earlier, right?

7        A.   I did, yeah.

8        Q.   In the Uber employee handbook, does it tell

9    Uber employees how they should conduct themselves in

10   a professional manner?

11       A.   I don't have the handbook memorized.

12       Q.   Your counsel asked you about the handbook,

13   and you testified about it.

14            Do you understand that?

15       A.   He asked if we had one.  Yeah, I do

16   remember.

17       Q.   Do you remember the Uber employee handbook

18   and whether or not it says that Uber employees should

19   maintain high standards of, like, professionalism,

20   for instance?

21       A.   Quite frankly, I don't remember.  I haven't

22   reviewed it in some time.

23       Q.   As Uber's corporate representative, do you

24   think Uber's handbook should say things that like

25   maintaining high standards of professionalism?

Page 570

1        A.    I haven't reviewed the handbook in quite

2    some time.  I have no idea what it says.

3        Q.    That wasn't my question.

4              Would you expect, as an Uber corporate

5    representative, that a handbook -- just a general

6    employee handbook would say you should maintain high

7    standards of professionalism?

8        A.    I have no idea what it would say.

9        Q.    You provided a lot of testimony earlier

10    about what you think other drivers do, other

11    situations.

12              Do you understand that?

13        A.    I do, sir, yeah.

14        Q.    What, for example, do you know whether or

15    not the Uber employee handbook would go so far as

16    saying that you, as an Uber employee, should maintain

17    a high standard of service?

18        A.    Sir, I haven't read the handbook in quite

19    some time.  I have no idea what it says.

20        Q.    Do you know Uber's written values?

21        A.    Yeah.  I don't have them memorized, but I'm

22    vaguely familiar with them.

23        Q.    You don't know?  Do you know Uber's mission

24    statement?

25        A.    It's changed over time.  It's kind of a

                                           Page 571

1    mouthful now.  I don't have it memorized, no.

2         Q.   In the driver requirements section, you

3    would agree with me that Uber says that a driver like

4    Dainius shall at all times maintain high standards of

5    professionalism, service, and courtesy, correct?

6         A.   That's what the doc says, yep.

7         Q.   And it also says that "Uber reserves the

8    right at any time in Uber's sole discretion to

9    deactivate or otherwise restrict a driver from

10   accessing or using the driver app or the Uber

11   services if customer or such driver fails to meet the

12   requirements set forth in this agreement or the

13   driver addendum," correct?

14        A.   That's what the doc says, yeah.

15        Q.   Do you think that that sentence is

16   consistent with the activities of a limited payment

17   collection agent, sir?

18        A.   I'm not sure all of the functions of a

19   limited payment collection agent.  I do not just

20   narrowly define Uber's business as a limited payment

21   collection agent.

22        Q.   When Uber collects money from a rider that

23   later you say will go to a driver, it goes to a bank,

24   correct?

25        A.   It does sit in a bank account, yeah.

Veritext Legal Solutions
346-293-7000

1      Q.   Is Uber drawing interest off of that money

2  as it sits in the bank before it's doled out to a

3  driver?

4      A.   I do not believe so, but I do not know.

5      Q.   What's the basis of your testimony so we

6  can understand it?

7      A.   That the money sits in a bank account that

8  is for the benefit of the driver.  I do not believe

9  it sits in our balance sheet.

10     Q.   But if I wanted to know one way or another

11 if that money is drawing interest, is it fair to say

12 that you just do not know?

13     A.   That is fair, yeah.

14     Q.   Okay.  If we go to Section 4, Financial

15 Terms, on Page 203 -- and we don't need to read the

16 top part.  You testified about that previously.

17          In the middle part of this, it says,

18 "Customer shall always have the right to" -- we'll

19 make it bigger.  "Customer shall always have the

20 right to charge a fare that is less than the

21 pre-arranged fare," correct?

22     A.   That's what it says.

23     Q.   It also says, "or negotiate a customer's

24 request for a fare that is lower than the

25 pre-arranged fare," correct?

Page 573

1      A.   That's what it says.

2      Q.   Do you see anything here in Section 4.1

3 that says the customer or the driver shall always

4 have a right to charge a fare that is higher than the

5 pre-arranged fare?

6      A.   Nothing specifically, no.

7      Q.   Okay.  And then it says -- if we go to

8 Section 4.2, it says Changes to Fare Calculation.

9 "Uber reserves the right to change the fare

10 calculation," which is defined above in 4.1, "at any

11 time in Uber's discretion," correct?

12      A.   That's what this part of the sentence says,

13 yeah.

14      Q.   Okay.  And -- and we know that it says that

15 Uber will provide notice to customer in the event of

16 changes to the base fare, per mile, and/or per minute

17 amounts that would result in a change in the

18 recommended fare for each instance of completed

19 transportation services.

20           Have you seen a single support message

21 or a single document in this case -- actually, strike

22 that.

23           For every trip that was provided by

24 Dainius, if there was a change in the base fare or

25 the per mile and/or per minute amounts, did you see

Page 574

1    any document or any communication from Uber notifying

2    Dainius of that?

3         A.    He received the surge multiplier, yeah.

4         Q.    That wasn't my question.  My question was:

5    It says it will provide notice to the customer in the

6    event of changes to the recommended fare for each

7    instance of completed transportation services, right?

8         A.    That's what it says.

9         Q.    So what if -- what if Uber decided to

10   change any of the recommended fares for a reason

11   other than surge fare?  At that point, was there any

12   notice given to Dainius for each instance of

13   completed transportation services where Uber had made

14   a change to the fare calculation?

15        A.    Well, the fare calculation is different

16   from the fare.  So I think you're conflating the

17   concepts here in your question.

18        Q.    Okay.  You understand what Section 4.2 is

19   saying, though?

20        A.    I think so.

21        Q.    Okay.  Section 4.3, then.  Fare Adjustment.

22   "Uber reserves the right to adjust the fare for a

23   particular instance of transportation services," and

24   then it gives some examples, right?

25        A.    Correct.

Page 575

1    Q.   And you would agree with me that Uber, in

2    its sole discretion, will make a decision whether or

3    not it wants to reduce or cancel any fare, correct?

4    A.   Where does it say "sole discretion"?

5    Q.   I'm asking you as Uber's corporate

6    representative.

7    A.   I'm just trying to read the document, and I

8    don't have the whole section in front of me so it's

9    hard for me.  You asked me "sole discretion," and I'm

10   trying to look to see if this document says "sole

11   discretion."

12   Q.   If we go to the next sentence, it says,

13   "Uber's decision" -- go to the next page.  It says

14   here that "Uber's decision to reduce or cancel the

15   fare in any such manner shall be exercised in a

16   reasonable manner," right?

17   A.   That's what it says.

18   Q.   Okay.  Is -- and you also told us earlier

19   that it was in Uber's discretion on whether or not

20   there were changes made to the fare calculation,

21   right?

22   A.   To the fare calculation, that's right.

23   Q.   Then in Section 4.4, we get to the service

24   fee on Page 204, and it says that "Customer agrees to

25   pay Uber a service fee on a per transportation

Page 576

1    services transaction basis calculated as a percentage

2    of the fare, determined by the fare calculation

3    regardless of any negotiated fare."

4                Do you see that?

5        A.   That's what it says.

6        Q.   You would agree with me as Uber's corporate

7    representative what that is saying is that if Dainius

8    had negotiated a fare with any rider, regardless of

9    that negotiated fare, Uber was going to collect its

10   service fee based on how Uber calculated the fare,

11   right?

12       A.   That's what it says.

13       Q.   I want to take a look at -- let's look at a

14   couple of exhibits here.  Respondent's Exhibit Number

15   39.

16                Do you see the top left-hand corner

17   there?  It says June 25th, 2021?

18       A.   I do.

19       Q.   Then next to it, it says Using a

20   Third-Party Navigation App, right?

21       A.   That's right.

22       Q.   And then right below that part, it says

23   Houston.  So City of Houston, right?

24       A.   That's what it says.

25       Q.   Okay.  Then if we go -- we can go to the

                                            Page 577

1   next page, and it says Using a Third-party Navigation

2   App, and that's what was shown to you by your

3   counsel, right?

4        A.   I don't believe my counsel showed me this

5   document.  I could be wrong.

6        Q.   He did, but we'll go to the next page.

7   Let's take a look at this.

8             At the middle left right there, we see

9   a copyright.  You see where it says 2021 Uber

10  Technologies, Incorporated?

11       A.   I see that.

12       Q.   So do you have any evidence that this

13  document that we're looking at as Respondent's 39 was

14  ever published on Uber's website during the statutory

15  period?

16       A.   This specific document, I'm not sure.

17       Q.   Is it fair to say that you do not?  The

18  answer is no?

19       A.   I don't know -- the answer is I don't know.

20  I didn't -- I wasn't the one who searched for

21  discovery, so I don't know.

22       Q.   Do you have, then -- I need to get to the

23  basis of your understanding.

24             Do you have a single document that you

25  can show us today in all of the production that would

                                        Page 578

1    tell us that this website and this posting on the

2    website was in effect during the statutory period?

3                     MR. SANDAHL:  Objection.  Asked and

4    answered.

5                     JUDGE SOUSSAN:  Sustained.  He said he

6    didn't know.

7                     MR. MacLEOD:  Right.  My question was

8    does he have a document.  To me, it should either be

9    a yes or no.  "I don't know" really doesn't tell us

10   that much.  You either know if you have a document or

11   you don't.  Is there something --

12                    JUDGE SOUSSAN:  Excuse me, Counsel.

13   "I don't know" is an answer to a question.

14                    MR. MacLEOD:  Is it a question to --

15   when we're asking about do you have a document that

16   supports your testimony of whether or not this was in

17   the statutory period or not in the statutory period,

18   the answer would be yes or no.  How is it "I don't

19   know"?

20                    JUDGE SOUSSAN:  The witness can answer

21   the question to the best of his ability.

22        A.   There are hundreds of documents that we

23   provided.  I don't remember all of them.  So,

24   therefore, I don't know if there's a document or not.

25        Q.   (BY MR. MacLeod)  And you understood that

                                        Page 579

1   as Uber's corporate representative, just like every

2   other time you testify, you're supposed to get

3   prepared, right?

4              MR. SANDAHL:  I'll object, Your Honor.

5   This is not a 30(b)(6) deposition.  To just guess at

6   what he was going to talk about today is, I think, an

7   unreasonable burden.

8              JUDGE SOUSSAN:  Sustained.

9              MR. MacLeod:  He was actually shown

10  these documents by Uber's counsel yesterday and

11  today.

12     Q.   (BY MR. MacLeod)  If we can please look at

13  Respondent's Exhibit Number 37.  This is another

14  document that you've looked at, and this is a

15  document -- another one that says 2021.

16             You see here now we're talking about

17  Wichita, right?

18     A.   I do, yeah.

19     Q.   Can you tell us a single time that Dainius

20  drove through the Uber app during the statutory

21  period in Wichita?

22     A.   I don't know.

23     Q.   And if we go to the last page, here in the

24  middle of the page, it says "Copyright 2021 Uber

25  Technologies, Incorporated," right?

                                      Page 580

1      A.    That's what it says.

2      Q.    Was this posting published on the website

3  during any time of the statutory period?

4      A.    Probably, yeah.

5      Q.    Okay.  What evidence do you have to support

6  your answer "probably" so that I can get the basis

7  for your understanding?

8      A.    Well, I know this functionality has been

9  available for a very long time.  As a result, our

10  help pages generally have been available throughout

11  the statute period.

12      Q.    You understand I was asking you for a

13  document, not some -- you know, there's a help page.

14  I'm asking you:  Do you have anything that would

15  actually suggest that "probably" is actually true?

16      A.     I thought you asked for my basis of

17  understanding, but I don't have a specific document.

18  I am not sure if we have one or not.

19      Q.    What if we go to Joint Exhibit Number 10?

20           MR. SANDAHL:  Can we pause just for a

21  second?  We've got someone in the waiting room.

22           JUDGE SOUSSAN:  Sure.

23      Q.    (BY MR. MacLeod)  Okay.  So now we're

24  looking at Uber_Website_839.  This one is -- at the

25  top left says June 23rd, 2021.

Page 581

1           This is for setting a driver

2    destination in Wichita, correct?

3         A.   That's what it says.

4         Q.   If we go over to Page 3 again, near the

5    bottom of the page, we see yet again that it says,

6    "Copyright 2021 Uber Technologies, Incorporated"?

7         A.   That's what it says.

8         Q.   Is there any documentary evidence that you

9    can provide in this arbitration or that Uber has

10   provided that would suggest that this posting, Set a

11   Driver Destination, was posted on the Uber website

12   during the applicable statutory period?

13        A.   A specific document, I don't know.

14        Q.   Let's go to Respondent's Exhibit Number 30.

15   Now we have top left, June 24, 2021.  This is a

16   posting of I Want to Drive in a New City in Wichita

17   again, right?

18        A.   That's what it says.

19        Q.   Okay.  If we go to the middle of the last

20   page here, again we have "Copyright 2021 Uber

21   Technologies, Incorporated," correct?

22        A.   That's what it says.

23        Q.   And do you have a single document -- does

24   Uber have a single document that would suggest that I

25   Want to Drive in a New city, Wichita, was posted or

                                        Page 582

1    published on the Uber website during the applicable

2    statutory period?

3         A.   A specific document that was produced in

4    discovery?  I'm not sure.

5         Q.   If we can go to Respondent's Exhibit Number

6    35.  Now we have, again, June 23rd, 2021.  And this

7    is a posting about pet-friendly rides for Wichita,

8    right?

9         A.   That's what it says, yeah.

10        Q.   And the very last page, it says, "Copyright

11   2021 Uber Technologies, Incorporated," correct?

12        A.   That's what it says, yeah.

13        Q.   Fair to say again you do not have a single

14   document that Uber has presented in this arbitration

15   to suggest that the pet-friendly rides posting for

16   Wichita was published during the applicable statutory

17   period, correct?

18        A.   It's fair to say that I don't know.

19        Q.   That's right.  If we could go to

20   Respondent's Exhibit Number 36.  This is now -- the

21   top, June 24th, 2021.  This is a posting for Wichita

22   again that's called Turn Off Text or E-mail Updates,

23   right?

24        A.   That is right.

25        Q.   Now, if we go to the next page, again what

Page 583

1    we see here is a copyright with "2021 Uber

2    Technologies, Incorporated," right?

3           A.    That's right.

4           Q.    And do you have any evidence -- any

5    evidence presented in this arbitration that Turn Off

6    Text or E-mail Updates was posted or published on the

7    Uber website during the statutory period?

8           A.    I can provide evidence.

9           Q.    That's what I'm asking you.

10          A.    Say that again.

11          Q.    I'm asking you for documentary evidence.

12          A.    Not that I can think of.

13          Q.    Let's look, lastly, at Respondent's Exhibit

14   Number 38.  For this one, we don't have a Page 1, and

15   we also don't have a Page 3.  The bottom right here,

16   the only document that was provided was Page 2 out of

17   3.

18                 You see that we're looking here at

19   Page 2 out of 3?

20          A.    That's what it appears.

21          Q.    Okay.  And do you see here at the top left,

22   common to the other documents, it says June 24th,

23   2021?

24          A.    That's what it says, yeah.

25          Q.    Okay.  Now, if we go back to your -- the

                                              Page 584

1   interrogatories that you verified with your DocuSign

2   signature -- okay.  If we go to Page 12,

3   Interrogatory Number 5, do you see here that back in

4   November of 2021 Uber was asked to identify by date

5   and provide information concerning every instance

6   Uber has suspended the claimant's driving account or

7   deactivated the claimant from the driver app?

8        A.   I see that.

9        Q.   And it also says, "For every instance

10  identified, please provide details related to the

11  reason the claimant's driving account was suspended

12  and/or deactivated."  It says, "For avoidance of

13  doubt, the claimant seeks information of any

14  instance, no matter how narrow in time, that Uber has

15  suspended the claimant's driving account or

16  deactivated the claimant from the driver app for any

17  purpose," right?

18        A.   That's what it says.

19        Q.   Then it says here -- the answer is that

20  "Uber states that on or about June 27, 2018,

21  claimant's account was restricted from receiving trip

22  requests for pickups and drop-offs at the George Bush

23  Intercontinental Airport due to claimant's fraudulent

24  use of the Uber driver app at that airport," and then

25  it tells us the specific documents to look at,

Page 585

1    correct?

2         A.   That's what it says.

3         Q.   And as of November 2021, that was your

4    sworn response as the Uber employee who verified this

5    interrogatory, right?

6         A.   That's right.

7         Q.   And then there was a motion to compel, and

8    in March we received some updated interrogatories.

9              Do you remember having to verify a set

10   of updated interrogatories in March?

11        A.   I don't recall, but I'm not saying it

12   didn't happen.

13        Q.   Do you remember that at some point you

14   provided a verification whereby you were changing the

15   answer that you previously provided on behalf of Uber

16   to Interrogatory Number 5?

17        A.   I don't recall, but I'm not saying it

18   didn't happen.

19        Q.   Before I even get there, between the time

20   of November and March, did Uber conduct an internal

21   investigation about geo-spoofing or fraudulent use of

22   the Uber app pertaining to Dainius Barysas?

23              MR. SANDAHL:  I'll object, Your Honor,

24   to relevance.  Again, this is getting into the

25   territory that we started to get into yesterday

Page 586

1  that's already been the subject of extensive

2  discussion and briefing, and we have already briefed

3  why it's not relevant.

4            JUDGE SOUSSAN:  Any response,

5  Mr. MacLeod?

6            MR. MacLeod:  This absolutely goes to

7  monitoring.  I mean, there's literally no way to

8  believe that -- they are changing the interrogatory

9  response from November to March, and to believe that

10 it wasn't an investigation -- it goes directly to how

11 they are monitoring these drivers.

12           JUDGE SOUSSAN:  Well, I -- go ahead.

13           MR. SANDAHL:  My response would be

14 that responding to discovery requests -- I think the

15 question was about an internal investigation that has

16 to do with monitoring.  That's very different from

17 the obligation to look into information to respond to

18 the discovery requests.  So he's kinds of conflating

19 two concepts there.  So I think that's the problem

20 and why it's not relevant.

21           MR. MacLeod:  I'm not conflating two

22 concepts.  I'm trying to get at the heart of this.

23 The heart is they were monitoring Dainius when he was

24 driving.  Now that we're in arbitration, they are

25 trying to hide that fact, and I'm trying to figure

Page 587

```
 1    out why it is, why we cannot get that information,
 2    why we cannot get that data.
 3                    There's nothing proprietary.  It is
 4    not a trade secret that they are monitoring him.  I'm
 5    at a loss for words to even understand the argument
 6    that counsel is making that we would not be entitled
 7    to know what this Uber corporate representative did
 8    between November and March in terms of an
 9    investigation to determine how this interrogatory was
10    changed as it relates to monitoring.
11                    JUDGE SOUSSAN:  I haven't seen the
12    interrogatory, the later interrogatory response in
13    March, to see how it was changed.  I would like to
14    see that and have testimony on that and then try to
15    understand the relevance of your question as to what
16    was done between November and March.
17                    So can we proceed along those lines so
18    I have a better understanding myself?
19                    MR. MacLEOD:  Yes.  We have published
20    here the supplemental response that we received in
21    March.
22        Q.   (BY MR. MacLEOD)  And do you see the
23    supplemental answer there at the bottom, sir?
24        A.   I do, yes.
25        Q.   So now, the original answer that you
```

Page 588

1    provided under oath subject to perjury, was that

2    first answer above that directed us to these certain

3    documents, right?

4         A.   That's right.

5         Q.   And then what you did in March was you came

6    back and you provided a supplemental answer to the

7    answer that you had previously provided, right?

8         A.   Seems like that's the case, yeah.

9         Q.   Okay.  And what you said now in March was

10   that "Uber states further that claimant's account was

11   restricted from receiving trip requests for pickups

12   and drop-offs at the George Bush Intercontinental

13   Airport due to detection of GPS spoofing or providing

14   fake location data by claimant," correct?

15        A.   That's what it says.

16        Q.   Prior to March 2022, two months ago, had

17   Uber determined that Dainius had engaged in GPS

18   spoofing?

19        A.   I'm not sure.

20        Q.   Prior to March 2022, had Uber determined

21   that Dainius was providing fake location data during

22   the time that he was using the Uber application?

23        A.   I'm not sure.

24        Q.   Can you explain to the arbitrator here what

25   you did on behalf of Uber that would allow you to

Page 589

1    change your verified response to another verified

2    sworn response that allowed you, between November and

3    March, to now say that there was a detection of GPS

4    spoofing or providing fake location data by claimant?

5                    MR. SANDAHL:  Object, Your Honor, that

6    this was asked and answered at the first day of the

7    hearing.  It's kind of what led to the whole pause in

8    the hearing, and everything that's been briefed on

9    this explains why there's no relevance to it.  And

10   also, of course, there was discussion about evidence

11   that's been stricken.

12                    JUDGE SOUSSAN:  Okay.  I think that

13   Mr. Rosenthal can answer this question without

14   getting into any evidence that I have not allowed in

15   this case.  We're not going to talk about those

16   videos again, but I think he can answer this

17   question.  "Due to detection of GPS spoofing or

18   providing fake location data by claimant."  If this

19   is going to go back to the video, we don't need to

20   cover that again because we've already covered that

21   once, but I would like Mr. MacLeod to restate his

22   question again and see if we can get an answer.  So

23   let's do it.

24        Q.   (BY MR. MacLeod)  Sir, you understand that

25   certain evidence has been excluded, correct?

                                        Page 590

1        A.    I do.

2        Q.    Okay.  And my understanding was that

3    that -- based on your testimony, that evidence that

4    was excluded was created about a week or two before

5    your last testimony, right?

6        A.    I'm not sure specifically when it was

7    created.

8        Q.    Well, based on your sworn testimony in this

9    same exact arbitration, the prior time, do you

10   remember your testimony as it related to when the

11   excluded evidence was created?

12       A.    It was clear when I viewed it -- I believe

13   I viewed it about a week before.  I'm not sure when

14   it was created.

15       Q.    Can we agree that -- when you signed the

16   verification for these objections and responses to

17   interrogatories and you provided this supplemental

18   answer, can we agree that you had not seen that

19   video.

20       A.    When I had provided this answer here?

21       Q.    Right.

22       A.    I don't think I had seen the video at this

23   point.

24       Q.    That's right.  So taking that out -- taking

25   that excluded evidence out, how did you, under oath,

Page 591

```
 1    subject to the penalty of perjury, decide to

 2    supplement the answer with "detection of GPS spoofing

 3    or providing fake location data by claimant"?

 4              What was the foundation for this

 5    answer before you had even seen that excluded

 6    evidence?

 7         A.   Counsel had informed me that they had

 8    looked into why he had been restricted from airport

 9    access.

10         Q.   Were you shown any documents, any data that

11    would support your answer?

12              MR. SANDAHL:  I'll object, Your Honor,

13    to the extent that it gets into excluded evidence.

14              JUDGE SOUSSAN:  No, we're not talking

15    about the video.  But we are talking about what was

16    the basis for this answer, and that is a legitimate

17    question.  I think I heard Mr. Rosenthal say, "My

18    counsel informed me."  And if that is the basis for

19    the answer, that's the basis for the answer.

20         Q.   (BY MR. MacLeod)  Did you have any -- at

21    this point when you signed the verification under

22    penalty of perjury under -- well, you didn't do it

23    under oath because it's not verified.

24              Under penalty of perjury when you

25    signed the verification, can you tell the arbitrator
```

Page 592

```
 1    what factual information that you had to provide that
 2    this answer was true and correct based on your own
 3    knowledge and/or information and belief?
 4                   MR. SANDAHL:  Objection.  Asked and
 5    answered.
 6                   JUDGE SOUSSAN:  Go ahead.
 7         A.   Discussions with counsel.  I can't remember
 8    specifically what I looked at at the time.  It all
 9    kind of blurs together in terms of the timeline.  But
10    I did have discussions with counsel, and I can't
11    remember exactly what I reviewed at the time.
12         Q.   (BY MR. MacLeod)  That's what I'm trying to
13    figure out.
14                   Did you review any documents, any
15    data, any information before you signed this
16    verification to say that there was detection of GPS
17    spoofing or providing fake location data by Dainius?
18                   MR. SANDAHL:  Objection.  Asked and
19    answered.
20                   JUDGE SOUSSAN:  I'll let it go one
21    more time, Mr. MacLeod, then we're going to move on.
22         A.   As I said, I had discussions with
23    counsel --
24         Q.   (BY MR. MacLeod)  I'm not asking you about
25    discussions.
```

Page 593

```
 1                 JUDGE SOUSSAN:  Excuse me,
 2   Mr. MacLeod.  Let him answer the question.  Go ahead,
 3   Mr. Rosenthal.
 4                 MR. MacLEOD:  That's not responsive to
 5   the question at all.
 6                 JUDGE SOUSSAN:  He was getting to it.
 7   You interrupted him, Mr. MacLeod.  Answer the
 8   question, Mr. Rosenthal.
 9        A.   As I said, I had discussions with counsel.
10   I can't remember specifically what I reviewed.
11        Q.   (BY MR. MacLeod)  There is -- there's a big
12   collection of payment statements that are marked as
13   Respondent's Exhibit Number 7.
14                 Have you seen those before?
15        A.   I believe I did review them a little over a
16   month or so ago when we did this the first go-round.
17        Q.   Now, in these pay statements that you were
18   talking about, are these what you're saying were
19   accessible through the driver portal?
20        A.   You'll have to show me what you're
21   referring to so I can confirm.  But generally, yeah,
22   the payment statements are available.
23        Q.   Okay.  And -- and what I'm trying to figure
24   out -- in those payment statements, based on your own
25   knowledge and understanding -- because that's how
```

                                        Page 594

1    you've been testifying today.  Based on your

2    long-standing knowledge, in those payment statements

3    is the way that Uber's fee is calculated provided to

4    Dainius?

5         A.   Within the payment statement, I believe

6    there's a hyperlink, and the driver can click on that

7    hyperlink and can see all of the fare and fee

8    structure.

9         Q.   Okay.  So that's what I want to make sure.

10             You're saying that in order to get

11   that information, there's a hyperlink that the driver

12   needs to click on, correct?

13        A.   I believe so.  If I remember correctly,

14   yeah.

15        Q.   All right.  And there are -- for example,

16   when we look at that, if we look at the payment

17   statements, the Uber fee -- I mean, if I look at a

18   single day, that Uber fee can fluctuate even in a

19   single day, right?

20        A.   That's right.

21        Q.   And -- and the decision on allowing that

22   Uber fee to fluctuate -- not just saying it's $5 or

23   $10 or $15 or $20 -- that is a unilateral decision

24   that Uber made, correct?

25        A.   That is a decision we make, yeah.

Page 595

1      Q.   I would continue to ask you questions, but

2  I think we know how this has gone, so I will pass the

3  witness.

4           MR. SANDAHL:  Your Honor, I do have a

5  couple of questions.  Is this an okay time for a

6  break or --

7           JUDGE SOUSSAN:  Yeah.  We've been

8  going for a long time.  It's 12:15.  I would like to

9  go -- you know, break for lunch a little bit later if

10  we can handle it, but I think taking another

11  10-minute break is appropriate.

12           (Recess from 12:18 p.m. to 12:30 p.m.)

13                FURTHER EXAMINATION

14      Q.   (BY MR. SANDAHL)  Mr. Rosenthal, you were

15  asked some questions about signatures to the Uber

16  USA, LLC agreement.

17           Do you remember that?

18      A.   I do.

19      Q.   Could claimant have accessed the Uber

20  driver app without first accepting the terms of that

21  agreement?

22      A.   He could have accessed the app, but he

23  could not have gone on-line to provide transportation

24  requests.

25      Q.   If Barysas had had someone else sign on his

                                          Page 596

1    behalf, would that have been fraudulent?

2         A.    Yes, I believe so.

3         Q.    And then you were also asked about

4    negotiated fares, and you were asked about what the

5    documents said about that.

6              Is there anything that you're aware of

7    in the documents saying that he could not have

8    negotiated the fare up or down?  Strike that.

9              Is there anything you're aware of in

10   the documents or in Uber's policies that would have

11   led him be deactivated whether he negotiated a fare

12   up or down?

13        A.    I'm not aware of anything of that nature.

14             MR. SANDAHL:  Thank you.  That's all I

15   have.

16             JUDGE SOUSSAN:  Anything further,

17   Mr. MacLeod?

18             MR. MacLeod:  Nothing further.

19             JUDGE SOUSSAN:  Okay.  Very good.  Are

20   you prepared to call your next witness?

21             MR. STANLEY:  Judge, Dr. Parrott --

22   this is Bret Stanley.

23             JUDGE SOUSSAN:  I didn't hear what you

24   said, Mr. Stanley.

25             MR. STANLEY:  Dr. Parrott is available

                              Page 597

```
 1   at 1:30.  We didn't know exactly what time, but
 2   assumed it would be right about that time.  I believe
 3   that's the last witness here to be taken in this
 4   matter.  Does that work?
 5            JUDGE SOUSSAN:  Sure.  Does that work
 6   for everyone?  It works for me.  Let's take our lunch
 7   break until 1:30.
 8            MR. STANLEY:  One more thing.  Do you
 9   anticipate closings or not?  I know we discussed this
10   before.  I just want to make sure we're ready one way
11   or the other.
12            JUDGE SOUSSAN:  I prefer a closing
13   brief as opposed to an argument today, but what would
14   you like to do?
15            MS. MIERS:  Respondent would like
16   closing argument.  We would also like to submit a
17   post-hearing brief.  In other words, if we have to
18   choose --
19            JUDGE SOUSSAN:  No, it would not be a
20   choice because I would require a post-hearing brief.
21   Are we talking about the argument today?
22            MS. MIERS:  Yes, for respondent.
23            JUDGE SOUSSAN:  Okay.  What do you
24   think about that, Mr. Stanley?  Are you prepared to
25   do that today?
```

Page 598

 1                    MR. STANLEY:  We can be ready, yes,

 2     Judge.

 3                    JUDGE SOUSSAN:  And how long will you

 4     be with your next witness?  I think it's Dr. Parrott.

 5                    MR. STANLEY:  I suspect Dr. Parrott

 6     will go about an hour or so.

 7                    JUDGE SOUSSAN:  All right.  Then what

 8     we can do is we're going to break for lunch now.

 9     You-all can work on your remarks during lunch.  We'll

10     hear from Dr. Parrott.  And then, if we need to break

11     for a while so that you can gather your further

12     thoughts before final argument, we can do that and

13     we'll proceed, okay?

14                    MR. STANLEY:  All right, Judge.

15                    JUDGE SOUSSAN:  Thank you very much.

16     Let's break for an hour.

17                    (Recess from 12:33 p.m. to 1:30 p.m.)

18                    JUDGE SOUSSAN:  Then it is Dr. Parrott

19     in the hot seat.  Shauna, would you please swear in

20     the witness?

21                    DR. JAMES PARROTT,

22     having been first duly sworn, testified as follows:

23                         EXAMINATION

24         Q.   (BY MR. STANLEY)  Good afternoon.  Could

25     you please state your name for the record?

                                            Page 599

1      A.   James Parrott.

2      Q.   Let's back up.  Dr. Parrott, we're going to

3   pull up your expert report that's been admitted into

4   evidence in this case already, and we're going to

5   look at your curriculum vitae at the back first.  And

6   I would like you to walk us through that, if you

7   don't mind.

8                Do you see this?

9      A.   I do.

10      Q.   Doctor, do you have a copy of your report

11   in front of you right now, as well?

12      A.   I do.

13      Q.   Okay.  Thank you.

14                Can you look through your -- your

15   resume or curriculum vitae and tell us if this is up

16   to date and correct?

17      A.   If you want to scroll through the pages --

18   thank you.  Yes, that looks like it's -- it's up to

19   date and correct.

20      Q.   And so, if we look at the second page here,

21   can you tell the judge a little bit about your

22   education?

23      A.   So I have a master's and a Ph.D. in

24   economics from the University of Massachusetts at

25   Amherst.  I received the Ph.D. in 1985.  I have been

Page 600

1    working as an economist since that time in various

2    capacities and have been in the think tank world for

3    the past 22 years.

4        Q.   Are you a member of any economic the

5    societies?

6        A.   Yes.

7        Q.   Can you tell us about that?

8        A.   The American Economic Association, where

9    I've been a member for many years, and it's now

10   called the Labor -- Labor and Employment Research

11   Association.  That's a professional association of

12   labor economists and people who study employment

13   relations and issues.  I've been a member of LERA, as

14   it's known, for many years, attended several

15   conferences and presented papers.

16       Q.   Can you tell the judge a little bit about

17   your background since becoming a professor -- not a

18   professor -- Ph.D. in economics?

19       A.   So the first position I had was at the

20   AFLCI in Washington in the economic research

21   department.  And then I worked in the research

22   department at the International Ladies Garment

23   Workers Union in New York City.  And in the last few

24   years of my time with the ILGWU, I was executive

25   assistant to the president of the union.

Page 601

```
 1                    I then worked for New York City as
 2   chief economist for economic development for two
 3   years.  Then worked for the state comptroller's
 4   office in the office that monitors the New York City
 5   economy and budget.
 6                    And since then, I've worked for two
 7   think tank organizations, first the Fiscal Policy
 8   Institute.  I opened the New York City office of that
 9   organization and was there for 18 years doing a range
10   of economic and fiscal analysis with a focus on New
11   York City and New York State.
12                    For the past five years, I've been the
13   director of economic and fiscal policies at the
14   Center for New York City Affairs at the New School,
15   continuing to work on labor and employment issues
16   affecting New York City and New York State workers.
17       Q.   Have you had any focuses in your career in
18   the economic world?
19       A.   I've done a lot of work on labor standards,
20   such things as workers' compensation, unemployment
21   insurance, a lot of work on the minimum wage.
22                    For the past four years now, I've
23   worked on various gig economy issues.  I was retained
24   along with a labor economist from the University of
25   California at Berkeley by the New York City Taxi and
```

Page 602

1    Limousine Commission to analyze the for-hire vehicle

2    industry that includes Uber and Lyft in New York City

3    for the purpose of informing the development of a

4    minimum compensation standard that the TLC put in

5    place beginning in early 2019.

6                    Professor Reich, my colleague from

7    University of California Berkeley, and I were also

8    retained by the City of Seattle for a similar purpose

9    and a study that we completed in July of 2020 that

10   led also to the City of Seattle instituting a minimum

11   compensation standard.

12                   With Professor Reich and a colleague

13   at the University of Chicago, Dmitri Koustas, we've

14   been funded by the Sloan Foundation to analyze the

15   implementation of the minimum pay standard in New

16   York City, and we've been doing that and have

17   generated working papers and -- and submitted two of

18   those for peer-reviewed article publication, and I

19   presented papers based on that research.

20                   I am currently working with a

21   colleague at the Center for New York City Affairs,

22   where I've been the last five years, on an update

23   report on gig and independent contract workers in

24   New York State.

25        Q.   And have you in your review of -- and study

                                              Page 603

1   of gig economy published on this area of economics?

2       A.   So we issued reports that were published by

3   our organizations, the Center for New York City

4   Affairs at the New School and Professor Reich's

5   organization at the University of California at

6   Berkeley, and those have been used by the -- by the

7   City of New York and the City of Seattle to support

8   their implementation of those pay standards.

9                We presented papers at several

10  academic conferences on this research.  And most

11  recently the Sloan Foundation-supported work, we've

12  submitted articles for peer-reviewed journals that

13  are under consideration.

14      Q.   If we look at your publication list, the

15  second one down, the one with Dmitri Koustas and

16  Michael Reich -- Doctor, let me ask the question and

17  then just try to answer it so we can get through

18  this, if you don't mind, before the judge admonishes

19  me, okay?

20               So the first one is entitled New York

21  City's Gig Driver Pay Standard:  Effects on Drivers,

22  Passengers, and the Companies, and it's from the

23  Center for New York City Affairs.

24               Did this include analysis of Uber?

25      A.   Yes, it did.

Page 604

1    Q.   Okay.  And tell me -- let me go through

2    these others, too.  The next one that I see is second

3    from the bottom with Michael Reich, A Minimum

4    Compensation Standard for Seattle TNC Drivers:

5    Report for the City of Seattle.

6              Did this include analysis of Uber

7    drivers?

8    A.   Yes, it did.

9    Q.   The next one below that is with Lena Moe

10   and Jason Rochford, The Magnitude of Low-paid Gig and

11   Independent Contract Work in New York State.

12             Did that paper include analysis of

13   Uber drivers?

14   A.   It didn't include analysis based on data

15   for Uber driving activity.  It was more general

16   analysis about gig workers more broadly.  So Uber was

17   one of the companies that was looked at, but we

18   didn't look specifically at data for Uber drivers.

19   Q.   If we go over to the next page --

20             JUDGE SOUSSAN:  It's very important,

21   Dr. Parrott, to let Mr. Stanley finish his question

22   before you start to answer because the court reporter

23   cannot take you both down at the same time.  And then

24   as Mr. Stanley suggested, please just answer his

25   question.

Page 605

1           THE WITNESS:  Okay.  Yes.

2           JUDGE SOUSSAN:  Thank you, sir.

3      Q.   (BY MR. STANLEY)  Okay.  If we go over to

4  the next page, Page 3 of your CV, there's another

5  paper that's halfway down the page with Michael

6  Reich, An Earning Standard for New York City's

7  App-Based Drivers:  Economic Analysis and Policy

8  Assessment, and that's from the report for the New

9  York City Taxi and Limousine Commission, Center for

10 New York City Affairs, July 2018.

11           Do you see that?

12     A.   Yes.

13     Q.   Did this include analysis of Uber driver

14 pay?

15     A.   Yes.

16     Q.   Okay.  And so, in these situations with the

17 three articles here that performed analysis of Uber

18 driver pay, can you tell the judge how it was that

19 you performed analysis on Uber driver pay in a

20 succinct way, and then I'll follow up with the

21 questions, please?

22     A.   So we had data for the -- for the New York

23 City report, we had data that the city's Taxi and

24 Limousine Commission had received from Uber directly

25 regarding the pay and the driving activity of

Page 606

1    individual drivers.  So we did analyze that.

2                   In the case of the Seattle study, we

3    received some aggregate data from Uber via the City

4    of Seattle that we analyzed, but we also relied on a

5    survey of drivers where we asked them to record data

6    from their Uber and Lyft apps.  So we looked at Uber

7    data in that manner.

8         Q.   Was the data similar or the same that you

9    looked at in the December 2020 paper as compared to

10   the July 2018 paper?

11        A.   Yes.

12        Q.   Okay.  And what did you do with that data

13   to come to your findings in the published paper on

14   New York City Uber drivers?

15        A.   So we -- we looked at data on an individual

16   driver basis to see if what they were paid translated

17   into sufficient pay per hour and per trip that they

18   provided for Uber.

19        Q.   Similar question to the Seattle drivers.

20                   What did you do with the data that you

21   had there?

22        A.   In a similar fashion, we looked to see what

23   the drivers were paid on a per trip and a per hour

24   basis.

25        Q.   Did you do something similar here in the

                                          Page  607

1    Barysas matter as you did in the published papers

2    from New York and Seattle data?

3        A.   Yes, although clearly we just had data on

4    one driver in this case.

5        Q.   Can you generally tell the judge what you

6    did in your expert report here that is similar to

7    what was done in the published works?

8        A.   So we looked at the working time of the --

9    of the driver, the total time they were -- they were

10   available for dispatch by Uber, and the time -- which

11   includes the time that they were actually en route to

12   pick up a passenger and the time that they were

13   carrying a passenger to the destination.  We looked

14   at the miles that they drove and estimated what

15   expenses would be for driving those miles.  And, you

16   know, looked at the -- the pay that they received,

17   separating out tips and tolls from that, in relation

18   to the amount of hours that they worked and the

19   expenses incurred in providing -- in terms of the

20   miles driven providing those services.

21       Q.   What was the reason to do that analysis in

22   the New York and Seattle papers?  What were you

23   looking for is the question?

24       A.   To determine what the after-expense hourly

25   pay was that the drivers were receiving.

Page 608

1      Q.   And what was -- in looking at the data that

2   you received in the Barysas matter, what was the

3   purpose?

4      A.   It was a similar purpose to look at what

5   the pay after expenses was per hour that the driver

6   worked for Uber.

7                MR. STANLEY:   Judge, this expert

8   report is already in evidence, but I would offer

9   Dr. Parrott as an expert economist to be able to give

10  testimony in this matter based on the review of

11  evidence that he's done.  I think you'll find that

12  we've already shown that his analysis is based on

13  published -- work that's been published,

14  peer-reviewed, and different articles.  The

15  foundation is there, so we would offer him as an

16  expert.

17               JUDGE SOUSSAN:  Any objection?

18               MS. MIERS:  We don't object to the

19  admission of this as an exhibit, but we do note that

20  we do not believe that this report is reliable or

21  unbiased so as to influence your ability to analyze

22  damages in any way.

23               JUDGE SOUSSAN:  Well, that will be

24  subject to cross.  Okay.  Dr. Parrott will be

25  admitted as an expert.

Page 609

1    Q.   (BY MR. STANLEY)  Okay.  Dr. Parrott, can

2  we go to the first page of your report, please?  So

3  we see that there's an assignment and a summary of

4  analysis.

5                Can you tell the judge what your

6  assignment was here?

7    A.   It was to analyze the compensation provided

8  by Uber to Mr. Barysas and assess its relation to the

9  statutory minimum wage and reasonable expenses that

10  he incurred in providing those services on behalf of

11  Uber.

12    Q.   And if we look at the summary of analysis,

13  what segment of data did you look at to make this

14  analysis?

15    A.   So we looked at all of the data that was

16  made available to us.  It was data on trips, on his

17  time worked, on his miles driven.  We pulled all of

18  this data together, analyzed it on a per-week basis,

19  and concluded that he was paid a total of $41,384

20  excluding tips and tolls, but that if he had been

21  paid the prevailing state minimum wage for his work,

22  whether in the New York City area or in Texas, that

23  he -- there was a -- that he would have been paid a

24  total of $67,356.

25    Q.   Okay.

                                      Page 610

```
1        A.    That being greater than the amount he was
2   paid, we concluded that there was a -- a payment
3   shortfall of $27,207.66.
4        Q.    Thank you.
5              And if we go to Page 4 -- we'll come
6   back to that in a second.  If we go to Page 4, do the
7   items on Page 4 and 5 show the judge the evidence you
8   reviewed in coming to your determination of the
9   shortfall?
10       A.    Yes.
11       Q.    And when you received the evidence that's
12  shown on Page 4 and 5 -- before you had time to
13  review it and provide analysis on it, had you already
14  come up in your mind with any outcome associated with
15  your opinions on this case?
16       A.    No.
17       Q.    Did you believe before you had reviewed a
18  scrap of data in this matter associated to
19  Mr. Barysas that he was underpaid by Uber?
20       A.    No.
21       Q.    And same goes for the work that you did
22  otherwise in the other published articles.
23              Did you believe before review of any
24  of that data that any of those drivers had been
25  underpaid?
```

Page 611

1          A.    No.   Our approach always was to analyze the

2     data first.

3          Q.    And just for the judge's knowledge, you

4     have listed your other experience in arbitration on

5     Page 2; is that correct?

6          A.    Yes.

7          Q.    Have you ever been excluded in any of these

8     cases, to your knowledge?

9          A.    No.

10         Q.    Okay.   And your total compensation -- or

11    your rate of compensation, what is that?

12         A.    $450 an hour for research analysis, and

13    $600 per hour while presenting testimony.

14         Q.    Okay.   So let's move on to Page 3 now, if

15    you don't mind.   And can you tell the judge what you

16    did with the data that we looked at on Page 4 and 5

17    and how you came to your opinions?

18         A.    So to determine the working time, we looked

19    at -- we analyzed the data that we were given in

20    terms of the three segments that working time is

21    divided into:   P1, P2, and P3.   P1 being the driver

22    waiting time, P2 being dispatch time, and P3 being

23    the time that the passenger is in the car.   So the

24    sum of these P segments, as we reference it, equals

25    the working time for Uber.

                                        Page 612

1      Q.   How did you use this working time, the sum

2    of the three segments, to come to your opinion here?

3      A.   So we -- we organized the data so that we

4    could look at an Uber pay week.  The Uber pay week

5    begins at 4:00 a.m. on Monday morning.

6           So we sorted -- we summed up the P

7    segments and then allocated that time on a weekly

8    basis and looked at the -- also looked at the miles

9    driven for each of those weeks and compared -- and

10   did an analysis where we looked at what he was paid

11   in relation to his working time and expenses.

12     Q.   Why did you include Period 1 and 2 in your

13   on-line working time definition?

14     A.   Those are indispensable parts of the total

15   working time for Uber.  P1 time is the time during

16   which a driver signifies that they are available and

17   waiting for a dispatch.  P2 time is the time that

18   they are actually traveling to pick up the passenger.

19   P3 time is when they are carrying the passenger.  You

20   can't have P3 without P1 and P2, and the business

21   model of Uber depends in an integral way on P1 and

22   P2, as well as P3.

23     Q.   When you did your published works, did you

24   include analysis of your drivers of P1 and P2?

25     A.   Yes.

Page 613

1      Q.    And where did you get the data for P1, P2,

2    and P3 time?

3      A.    It was Uber data provided to legal counsel,

4    and we received it via legal counsel.

5      Q.    If we move over now to Page 5, can you tell

6    the judge about the data cleaning and cross-checking

7    that you performed on the data in coming to your

8    opinions?

9      A.    Yeah.  So we -- since the data came from

10   various files, we need to, you know, carefully

11   understand and analyze the data to make sure that

12   we're being able to -- that the analysis that we have

13   in mind is going to be appropriate.

14              So it's important to harmonize the

15   time zones that are used.  On some occasions, the

16   time zones may be indicated differently.  So we need

17   to synchronize those.

18              We -- as I mentioned, we the data and

19   sort it by Uber pay week for analysis.  And, you

20   know, we do checks on it to see -- one of the files

21   we received is the on-line -- off-line time, which

22   indicates the -- the time that a driver turns their

23   app on, indicating their availability for work, until

24   the time that they -- that they turn that off.  And

25   in theory, we look to see if on-line time is equal to

Page 614

```
1    the sum of the P segments that we analyze.  So each
2    of those comes from a different data set.  Generally
3    those do line up pretty well, and that's a useful
4    check that we provide.
5              We did determine in the case of
6    Mr. Barysas that --
7        Q.   Dr. Parrott, I'm going to get to the next
8    question in a second.  I appreciate --
9        A.   Fine.
10       Q.   Thank you for your willingness to go
11   forward.  Let me get the next question out.
12             So this statement, "We analyzed the P
13   segment shares for each week and compared those over
14   time to ensure that we were not encountering a
15   anomalous or inconsistent data records."
16             Tell the judge about that, if you can.
17       A.   Well, we want to make sure that we're not
18   double counting the time, so we try and line up the
19   segments to make sure that that's the case.
20             In previous -- in some of the similar
21   arbitration cases we've been involved in, we have
22   from time to time, you know, incurred -- encountered
23   great inconsistencies between the on-line/off-line
24   data and the sum of the P segments.  We didn't find
25   that in this case.
```

Page 615

 1              So we do take great care in analyzing

 2     the data to make sure that it looks reasonable, that

 3     there don't appear to be any anomalies or

 4     inconsistencies in the data and so on.  So we do, you

 5     know, try and look at the data carefully and -- and

 6     do some cross-checks to determine that it seems to be

 7     in good order and there aren't any data -- any

 8     serious data gaps.  We have encountered those in the

 9     past, and then we seek to get those gaps corrected.

10          Q.   Okay.  If we look here below, the very last

11     paragraph, it says, "There were 12 weeks during which

12     Mr. Barysas worked a total of 45.3 hours and logged

13     517 miles but had no passenger trips and received no

14     payments from Uber.  We excluded these weeks from

15     analysis."

16              Can you tell the judge why you

17     excluded those weeks from analysis?

18          A.   Well, because he didn't receive any -- at

19     least from the data that we could tell, he didn't

20     receive a dispatch during those times.  He certainly

21     didn't receive any payments that we had the data for.

22     So it seemed that it would be overstating his P1 time

23     in that case to include that in the analysis.  It was

24     P1 time not connected to a trip.

25          Q.   And then, again, we see that -- on

                                        Page 616

```
1    May 25th, 2017, there was another payment received of
2    $1162.85 characterized on his driver pay statement as
3    miscellaneous payment.  Tell the judge about that.
4              So why does it say characterized on
5    the pay statement as, quote, miscellaneous payment?
6    What does that mean?
7         A.   Well, so -- on the pay statements, it
8    indicates whether it was for an Uber -- it indicates
9    the type of service that was provided on which that
10   payment was based, so if it's UberX or Uber Black or
11   Uber VIP and so on.
12             In this case, the explanation was
13   miscellaneous payment.  So, you know -- and given
14   that it was a fairly sizable payment, we did try and
15   understand what that represented.  We do know --
16        Q.   Let me stop you there.
17             MS. MIERS:  Could we please let
18   Mr. Rosenthal into the room?  I was trying to wait,
19   Mr. Stanley, until he finished his answer.
20        Q.   (BY MR. STANLEY)  Was that $1,162.85
21   included in your analysis here, Dr. Parrott?
22        A.   We didn't count it as a payment against the
23   services that he provided.  And my sense was that it
24   was really a payment that was part of a -- of a
25   broader agreement that Uber had made to compensate
```

Page 617

```
 1    drivers for previous underpayments.

 2              Since this payment was around the time

 3    of the -- the period for which this arbitration

 4    applies began, any payment for previous underpayments

 5    would have been before the beginning of the

 6    arbitration period.  So we excluded it for that

 7    reason.

 8         Q.   Okay.  And so, on the data analysis, tell

 9    the judge how many weeks that you looked at and then

10    how you came to your final analysis.  It might be

11    helpful to look at the appendix on Page 10 of your

12    report for this.

13         A.   Appendix A.  Thank you.

14              So we have -- we have the presentation

15    here separated into two pieces, one for his Houston

16    area trips and one for the New York City area trips.

17    We're looking at his pay in relation to the -- to the

18    applicable minimum wage.  It's different in Texas

19    than it is in the New York City area.

20              In the New York City area, it's not

21    uniform across the entire New York City metropolitan

22    area.  For this period of March through July of 2017,

23    there was a different minimum wage in New York City

24    than in New Jersey than in the suburbs of New York

25    City.
```

Page 618

1          So we looked at his trips and the

2    associated time and miles in relation to the area of

3    the trip so that we could connect the appropriate

4    minimum wage.

5          Q.   Okay.  And if we look to -- two pages

6    beyond this -- and the judge can go and look at this,

7    as well, in Appendix C?

8          A.   Yes.

9          Q.   Can you give a brief overview of what these

10   pages are that carry on for many pages after this?

11         A.   Yeah.  So this is a summary for each of the

12   payment weeks for his driving activity and payments

13   and then our estimates of what he should have been

14   paid, culminating in an estimate of the payment

15   shortfall.

16         Q.   Okay.  Thank you.

17              And so -- and where was all this data

18   gathered?

19         A.   So this data was gathered from the list of

20   files that we had looked at a minute ago on, I

21   believe, Pages 4 and 5 of my report.

22         Q.   Okay.  And if we -- if we go over -- back a

23   page, just one page, to Appendix B, can you tell the

24   judge what this is?

25         A.   So Appendix B has basically the same data

Page 619

1    as Appendix A, but it's presented in a more -- in a

2    manner that might be easier to -- to follow.  So it

3    shows the actual pay at the top, then number of

4    trips.  I mean, just the data is summarized here.

5    Number of trips, the total hours derived as the sum

6    of the P segments, the miles.

7                    We estimated expenses using the IRS

8    mileage rate, which changes each year.  So we applied

9    the appropriate mileage rate each year.  What we show

10   here is the weighted average of the IRS mileage rate.

11   So that gives us an estimate of his expenses over

12   this period.

13                    Then we looked at his straight-time

14   hours of 40 hours a week or less in the New York City

15   area -- again, because of the different minimum wage

16   structure there -- and straight-time hours in

17   Houston.  He only worked more than 40 hours a week

18   in -- when he was driving in Houston.  We didn't have

19   any overtime hours in the New York area.

20                    So we looked at what his pay would

21   have been on a straight-time basis, on an overtime

22   hours basis, and then estimated the payroll taxes

23   that would have been associated with that hourly

24   payment.  The payroll taxes would be the amount a

25   self-employed person has to pay on their federal

Page 620

1   income tax return.

2        Q.    Thank you.  If we go back to Page 6 of your

3   report, please, and we look at that last paragraph

4   starting with "we estimated."

5                  "We estimated vehicle expenses using

6   the IRS business mileage allowance for each year, a

7   widely-used metric to compensate for vehicle use."

8                  Do you see that?

9        A.    Yes.

10       Q.    What -- first of all, why did you use the

11   IRS business mileage rate?

12       A.    It's a widely-used measure.  It's been used

13   for tax purposes for 40 years.  The -- you know, a

14   well-regarded public institution compiles this.

15   Again, it's widely used for people to -- for tax

16   purposes to estimate expenses related to the business

17   use of a vehicle.

18       Q.    Have you ever seen the IRS business mileage

19   rate used in the economic field?

20       A.    Yes.

21       Q.    When?

22       A.    It's used on occasion in economics journals

23   by researchers who are trying to estimate automobile

24   expenses in connection with transportation expenses.

25       Q.    Do you know of any published works that

                                         Page 621

1    have used the IRS business mileage rate in the

2    economic field?

3         A.   Yes.  I know of at least two articles in

4    Transportation Journal in relatively recent years.

5    One is 2014, and one is 2016.

6         Q.   In your papers that you published on New

7    York City and Seattle data, did you use the IRS rate?

8         A.   We looked at the IRS rate, but in both of

9    those cases we -- we built up our own models of

10   expenses based upon looking at a lot of data, based

11   upon surveying drivers in both cases, Seattle and New

12   York City.

13        Q.   Let me ask you this.  How were you able to

14   come up with your model in either New York City or

15   Seattle for expenses?

16        A.   Well, we looked at the various expenses

17   that a driver would -- would incur and surveyed

18   drivers about their relevant expenses and then

19   estimated -- then we assigned a cost estimate to each

20   of those components and looked at that, how that

21   would average out over the useful life of an

22   automobile.

23             So in both of those cases, we compared

24   the rates that we derived to the IRS rate.  In both

25   cases, the rates we derived were a little bit above

Page 622

1    the IRS rate.  And, you know, I think there were, you

2    know, clear reasons for that to be the case.

3         Q.    Let me ask you this, Dr. Parrott.  In the

4    New York City article, how many drivers were there

5    included in that analysis?

6         A.    Well, overall for the earnings analysis,

7    there were 75 to 85,000 drivers.  We did a survey,

8    and we had about 9,000 responses from the survey.

9         Q.    And for Seattle, how many drivers did you

10   review in that article to come up with your expense

11   measures there?

12        A.    Well, we had survey responses from about --

13   from a little over a thousand drivers, and the total

14   universe of drivers in the Seattle case was something

15   like 15 to 18,000.

16        Q.    Did you use those responses from -- the

17   9,000 in the New York City article and the thousand

18   in the Seattle article, did you use those responses

19   collectively to come up with your analysis for

20   expenses?

21        A.    Yes.  We took an average for all of the --

22   for the survey results and the analysis overall.

23        Q.    And for Seattle, tell the judge what that

24   number looked like in relation to the IRS rate for

25   the thousand people that returned the survey that you

Page 623

1    took the average?

2         A.   Well, I don't recall the exact figure, but

3    it was a little bit above the IRS rate.

4         Q.   And in New York City for the analysis in

5    that article with the 9,000 responses to surveys you

6    received, did you also create an estimate of expenses

7    from those responses?

8         A.   Yes, we did.

9         Q.   And can you tell the judge what that

10   resulted in compared to the IRS rate?

11        A.   Yeah.  So that was also a little bit above

12   the IRS rate.  And there, it seemed that it was

13   fairly -- that it was likely due to the fact that

14   drivers in New York City were required to have

15   commercial insurance, which is higher than a private

16   user's car insurance.  And many of the drivers had

17   high cost leases that they were paying to use the

18   automobiles they used.

19              So -- so the -- the rates we derived

20   in New York City were higher, reflecting these higher

21   lease costs and higher insurance costs.

22        Q.   And when you reviewed the survey responses,

23   were you seeking similar information as what -- as

24   the data that makes up the IRS rate for expenses?

25        A.   Yes.

Page 624

1        Q.    Tell the judge about some of the data that

2   you were seeking that was similar to the IRS rate.

3        A.    So we looked at the purchase cost or in the

4   case of a driver who was leasing a car, what the

5   lease costs were.  We looked at insurance.  We looked

6   at maintenance and repair costs.  We analyzed average

7   fuel ratings for cars and estimated what their fuel

8   expenses would be in connection with that.  There

9   were -- and we looked at what their registration

10  and -- and license costs were.

11             There were a couple of areas where our

12  cost estimates went beyond the IRS, and these were to

13  reflect the particular circumstances of an Uber or

14  Lyft driver.  So we looked at the cost of having a

15  large-format cell phone with a large data plan, which

16  is necessary in order to use these apps for -- for

17  passenger car services.

18             So those were the -- and we factored

19  in cleaning costs because the drivers are -- you

20  know, it's -- it's fundamental to the way the

21  companies operate to have passengers rate the

22  drivers.  So a clean car is essential in order to try

23  and maximize the positive ratings.  So we factored in

24  cleaning costs, as well.

25        Q.    And so, the IRS rate does not include

Page 625

1    reimbursement for a data service plan for a phone or

2    for bottled water or other amenities; is that right?

3         A.    That's correct.

4         Q.    And the IRS rate does not include

5    reimbursement for expenses associated to cleaning the

6    cars?

7         A.    That's right.

8         Q.    So if we go back to Appendix B, when you

9    have your straight-time hours in New York City and

10   your straight-time hours in Houston, can you tell the

11   judge how you come up with that number?

12        A.    So we looked at the working time for each

13   week.  In the case of New York City, there were no

14   weeks that Mr. Barysas drove more than 40 hours.  So

15   the straight-time hours is basically the sum of all

16   of his working time.

17               In Houston, Mr. Barysas put in some

18   very long-houred weeks.  So the straight-time hours

19   was figuring a maximum of 40 in any given week.  So

20   for those weeks where he worked more than 40, the

21   straight-time hours was the sum of the weeks at 40

22   hours.  And then the overtime hours is the -- the sum

23   of all of the excess on a weekly basis over 40 hours.

24        Q.    Were you just adding up the segments of P1,

25   P2, and P3 during those weeks to come up with that

Page 626

1    number and then adding them all up?

2         A.    Yes.

3         Q.    And then is the same true for overtime, or

4    how is that different?

5         A.    Overtime is just the excess of hours on a

6    weekly basis exceeding 40.

7         Q.    And then we see that you have the miles

8    above.  Where did you get the mile figure of

9    43,998.8?

10        A.    So in the data that we -- in the data we

11   received, we could see his miles for each of the --

12   each of the segments of working time, P1, P2, and P3.

13   So for each week, we aggregated the miles driven

14   during the sum of the P segment times.  And the total

15   miles is the sum across all of the weeks, the sum

16   across the 103 weeks.

17        Q.    So when I look at this, to come up with the

18   number 24,556.14, is that just a simple

19   multiplication of miles times weighted average?

20        A.    Yes.

21        Q.    And then we see payroll taxes here at the

22   bottom.  How did you calculate those?

23        A.    So the payroll taxes was the payroll tax

24   rate of 7.65 percent times the sum of the three

25   dollar amounts shown above for the straight-time pay

Page 627

1    for New York, straight-time pay for Houston, and

2    overtime pay for Houston.

3        Q.   So when you add all of that up, what is the

4    shortfall that you saw result from your analysis?

5        A.   So in theory, the shortfall would be adding

6    up the expenses plus the straight-time pay plus the

7    payroll taxes and -- and then subtracting that -- so

8    that should have been his target pay.  That should

9    have been the pay he received, and then we subtracted

10   from that target pay the actual pay.

11             In practice, the numbers don't work

12   out exactly that way because this analysis is

13   conducted on a weekly basis and there were some weeks

14   in which his actual pay did exceed target pay.  And

15   in the case of those weeks, we show in the analysis

16   that there's zero pay shortfall.

17             So the total weekly shortfall is the

18   sum of the individual week's analysis looking at on a

19   weekly basis the difference between his actual pay

20   and what his target pay should have been.

21       Q.   And for those weeks where the actual pay

22   exceeded the target pay, did you count those weeks in

23   your analysis?

24       A.   We counted those weeks -- I mean, those

25   weeks are included in the 103 weeks.  The miles are

Page 628

```
 1    included in the total miles here, and so on.  We
 2    didn't include that in the payment shortfall because
 3    there was -- we showed for a week like that where
 4    actual pay exceeded target pay as a zero shortfall.
 5    So we included the zero in the total.
 6         Q.   Is your analysis based on the hard numbers
 7    received?
 8         A.   Yes.
 9         Q.   On Page 2, just to clear this up, I see
10    that there's a reference to a Mr. Ongwae at the
11    bottom of Page 2.
12              Can you tell the judge what that is?
13    Is that an error, just a typographical remember?
14         A.   Yes, I'm sorry.  It's a typographical
15    error.  That should be Mr. Barysas.
16              MR. STANLEY:  I will pass the witness.
17              JUDGE SOUSSAN:  Thank you.  Who is
18    taking the cross?
19              MS. MIERS:  I will be, Judge.
20                    EXAMINATION
21         Q.   (BY MS. MIERS)  Good afternoon.  Do you
22    remember me from a prior proceeding?
23         A.   You'll forgive me, but I'm not sure I do.
24         Q.   That's okay.  It's been a while.
25              I have a quick question about Page 2
```

Page 629

1    of your report.  With Mr. Stanley, you talked about

2    the fact that at the bottom of Page 2 you identified

3    some instances in which you served as an expert

4    witness.

5                     Do you recall that?

6        A.   Yes.

7        Q.   Do any of these matters involve you serving

8    as an expert witness to analyze damages under the

9    Fair Labor Standards Act?

10       A.   No.

11       Q.   Okay.  So is it accurate to say,

12   Dr. Parrott, that the only time that you've served as

13   an expert witness to provide damages analysis under

14   the Fair Labor Standards Act is in cases against

15   Uber?

16       A.   That's correct.

17       Q.   And there's a total of 10 of them?

18       A.   Yes, I believe so.

19       Q.   How much money have you earned for your

20   research, analysis, and testifying against Uber since

21   you began working with Kherkher Garcia?

22       A.   I don't have that number handy right now.

23       Q.   What's your best guess?

24       A.   $80,000.

25       Q.   Let's just jump right into your report.

Page 630

1    We're going to take a look at Claimant's Exhibit C41,

2    just for the record.

3                 And do you agree with me that the

4    report on the screen is the one that you were just

5    discussing with Mr. Stanley?

6         A.   Yes.

7         Q.   Okay.  Let's see.  I believe earlier -- I

8    just want to make sure I understood your prior

9    testimony in this matter, to be specific.

10                You said Uber depends in an integral

11   way on P1 and P2 as well as P3?

12        A.   That's correct.

13        Q.   That's your opinion?

14        A.   Yes.

15        Q.   Okay.  You aren't an attorney, right?

16        A.   That's correct.

17        Q.   Okay.  And you understand based on your

18   extensive work on this case and nine others against

19   Uber that there is a contested legal issue, which is

20   whether P1 time and the mileage are compensable,

21   right?

22        A.   That's right.

23        Q.   And you understand that that's actually an

24   issue for the arbitrator to decide?

25        A.   That is, but I testified --

                                        Page 631

1          MR. STANLEY:  Judge --

2               (Simultaneous cross-talk.)

3          MR. STANLEY:  I'm objecting to you.

4    It misstates the legal foundation of what we're

5    doing.  It's a misstatement of legal practice.

6          JUDGE SOUSSAN:  Well, you-all should

7    both know I'm well aware of what my legal obligations

8    in this case are.  I know that you're asking if the

9    witness understood, but let's move on.

10          MS. MIERS:  Okay.  Just to clarify for

11    the record, I'm asking -- I do agree and understand

12    that you know what your responsibilities are, but

13    we're attempting to demonstrate this witness' bias.

14    We'll definitely move on.

15          JUDGE SOUSSAN:  Okay.  Go forward.

16     Q.   (BY MS. MIERS)  Let's take a look at

17    Page 3.  Toward the middle of the page, you state the

18    sum of the P times -- P1 plus P2 plus P3 equals

19    on-line time, right?

20     A.   That's correct.

21     Q.   Then in the second-to-last paragraph --

22    we're going to specifically focus on the second

23    sentence.  You state, "Just as a driver should be

24    compensated for the entirety of their working time on

25    the app" -- and when you refer to entirety of their

                                        Page 632

1    working time, you mean to include P1 time, correct?

2         A.   That's correct.

3         Q.   So it's your opinion that Mr. Barysas

4    should be compensated for P1 time and mileage?

5         A.   That is part of their working time, which

6    is essential for Uber's service to be provided, yes.

7         Q.   So that's a yes?

8         A.   It's part of the business, yes.

9         Q.   Okay.  And you've held this opinion prior

10   to being hired to testify in this matter, right?

11        A.   Yes.  It was based on similar analysis.

12        Q.   Because you believe that P1 time and

13   mileage are compensable, you included P1 time in your

14   calculations, right?

15        A.   I was asked to include P1.

16        Q.   Was that a yes?

17        A.   Yes.

18        Q.   Okay.  So do you understand that if the

19   arbitrator determines that P1 time and P1 mileage are

20   not compensable, that your calculations overstate

21   Mr. Barysas' alleged damages?

22             MR. STANLEY:  Objection to speculation

23   of what the arbitrator would find.

24             JUDGE SOUSSAN:  That's an acceptable

25   question.  Go ahead.  It's hypothetical.  Go ahead.

                                      Page 633

1          A.   Could you restate the question, please?

2          Q.   (BY MS. MIERS)  Sure.  You've answered this

3     question for me several times before.

4               So do you understand that if the

5     arbitrator determines that P1 time and P1 mileage

6     aren't compensable, that your calculations overstate

7     Mr. Barysas' alleged damages?

8          A.   Yes.

9          Q.   Okay.  When you were calculating these

10    alleged damages, did you back out time from the P1

11    time when Mr. Barysas was providing rides through the

12    use of the Lyft app?

13         A.   I didn't have data on his time using the

14    Lyft app.

15         Q.   When you arrived at these calculations, did

16    you back out time from the P1 time for which

17    Mr. Barysas was providing transportation services

18    outside of the Uber or the Lyft apps?

19         A.   I don't see why that would be necessary

20    because I don't believe that he would be providing

21    services while he was on the Uber app.  I don't

22    believe he would be providing other -- I don't see

23    how he could do that.

24              MS. MIERS:  Objection.  Nonresponsive.

25              JUDGE SOUSSAN:  Sustained.

                                        Page 634

1    Q.   (BY MS. MIERS)  Did you take a look at the

2    P1 time for Mr. Barysas and back out any time that he

3    spent providing transportation services outside of

4    the app?

5             MR. STANLEY:  Objection.  Foundation.

6    It assumes that there's evidence.

7    Q.   (BY MS. MIERS)  Was that a no, Dr. Parrott?

8    A.   Well, it was a no because I didn't have

9    any --

10             (Simultaneous cross-talk.)

11             JUDGE SOUSSAN:  Hold on.  Hold on.

12   Let me just say this.  The court reporter didn't get

13   any of that down.  Dr. Parrott, you cannot speak when

14   others are speaking.  Counsel knows this, as well.

15             So there was a question asked, and

16   there was an objection.  Let's back up.  Let's get

17   the question asked, and then I want to hear

18   Mr. Stanley's objection without you answering,

19   Dr. Parrott, because you're not to answer until I

20   allow that to come in.

21             So please state your question,

22   Ms. Miers.

23   Q.   (BY MS. MIERS)  Dr. Parrott, when you were

24   making your damages calculations, did you back out

25   any time from the P1 time for time in which

                                        Page 635

1    Mr. Barysas was offering transportation services

2    outside of the Uber driver app?

3                    MR. STANLEY:  My objection is

4    foundation.  Assumes facts not in evidence.

5                    JUDGE SOUSSAN:  Overruled.  Now,

6    Dr. Parrott, you can answer if you can.

7         A.   I didn't back out any data that I didn't

8    know existed.

9         Q.   (BY MS. MIERS)  Okay.  Let's take a look at

10   Page 3, and we're going to focus on the last sentence

11   in the first paragraph.  You state here that

12   "Generally the company discourages drivers from

13   refusing a dispatch, and at times a certain number of

14   trip refusals has resulted in warnings or actual

15   driver deactivation," right?  That's in your report?

16        A.   Yes.

17        Q.   You don't have firsthand knowledge of

18   anyone who was deactivated for not accepting trip

19   offers, right?

20        A.   I actually do.  I've talked with drivers in

21   New York City for whom that's the case.

22        Q.   So have you talked to them since you

23   testified under oath in the Gachie matter?

24        A.   Yes.

25        Q.   So between the time that you talked to --

                                        Page 636

```
 1    testified in the Gachie matter and now, you're
 2    claiming that you have firsthand knowledge of someone
 3    who was deactivated for not accepting trip offers?
 4         A.   Yes.
 5              MR. STANLEY:  Asked and answered.
 6         Q.   (BY MS. MIERS)  Do you have any personal
 7    knowledge that Mr. Barysas was deactivated for not
 8    accepting trip offers?
 9         A.   I do not.
10         Q.   Okay.  How many people for whom do you have
11    firsthand knowledge of them being deactivated for not
12    accepting trip offers?
13         A.   One.
14         Q.   Okay.  And what is that person's name?
15         A.   I don't have that person's name.
16         Q.   Okay.  Well, do you remember the first
17    name?
18         A.   No.  I'm sorry.
19         Q.   Last name?
20         A.   No.
21         Q.   Male, female?
22         A.   Male.
23         Q.   What color was this person's hair?
24         A.   I don't remember.
25         Q.   Did you talk to this person on the phone or
```

Page 637

1    in person?

2         A.    I talked to the person on a Zoom call.

3         Q.    And when you say you have firsthand

4    knowledge of the person being deactivated for

5    accepting trips, that's through hearsay from this

6    individual?

7              MR. STANLEY:  Objection.  Calls for a

8    legal conclusion.

9              JUDGE SOUSSAN:  I'm getting the gist.

10   Ask the question a different way.

11             MS. MIERS:  I can move on.

12        Q.    (BY MS. MIERS)  Your report doesn't cite to

13   any evidence that Mr. Barysas was deactivated,

14   correct?

15        A.    That's correct.

16        Q.    But you included that statement in your

17   report anyway?

18        A.    Yes, because I understand from --

19        Q.    Thank you.  If Mister --

20             MS. MIERS:  I'm going to object as

21   nonresponsive.

22             JUDGE SOUSSAN:  Sustained.

23   Dr. Parrott, just answer the question because

24   Mr. Stanley is right above you on my screen, and he

25   can take you back on questions.  So just please

                                      Page 638

1    answer the question.

2                   THE WITNESS:  All right.  Yes, ma'am.

3         Q.    (BY MS. MIERS)  If Mr. Barysas had received

4    warnings for refusing a dispatch, that wouldn't have

5    impacted your calculations, right?

6         A.    That's right.

7         Q.    And your report doesn't cite to warnings

8    received by Mr. Barysas?

9         A.    That's right.

10        Q.    But you felt it was important to include a

11   statement about alleged warnings from Uber anyway?

12        A.    Yes.

13        Q.    Okay.  Let's take a look at the last

14   sentence on Page 6.  You talked about this with

15   Mr. Stanley.  It states, "We estimated vehicle

16   expenses using the IRS business mileage allowance for

17   each year."

18                   Do you remember talking about that

19   just a few minutes ago?

20        A.    Yes.

21        Q.    So you didn't calculate Mr. Barysas' actual

22   expenses, right?

23        A.    That's correct.

24        Q.    And then the last sentence of Page 6, you

25   state, "The IRS business mileage is a widely-used

                                          Page 639

```
 1    metric to compensate for vehicle use," right?
 2         A.   That's right.
 3         Q.   And you dropped a footnote there.  And if
 4    we could go to that footnote.  It won't let you?
 5              You've got your report in front of
 6    you, right?
 7         A.   Yes.
 8         Q.   The footnote identifies the IRS mileage
 9    rates for the relevant years?
10         A.   That's correct.
11         Q.   So it doesn't cite these two articles that
12    you just told Mr. Stanley about?
13         A.   That's right.
14         Q.   And it doesn't cite to any evidence or
15    legal authority that shows that the IRS mileage rates
16    are used to calculate FLSA damages?
17         A.   That's right.
18         Q.   All right.  The IRS rate, you'll agree with
19    me, is a national average?
20         A.   That's right.
21         Q.   It's not localized?
22         A.   It's an average for all vehicles in use.
23         Q.   And you agree with me that the IRS rate is
24    not localized, correct?
25         A.   That's right.
```

Page 640

1      Q.   You even agree that it's likely to be

2   inflated in some areas of the country and deflated in

3   other areas of the country?

4      A.   And it's likely to be higher for a luxury

5   vehicle, as well.

6             MS. MIERS:   Objection.   Nonresponsive.

7      Q.   (BY MS. MIERS)  Do you agree with me that

8   it's likely to be inflated in some areas and deflated

9   in other areas?

10      A.   Yes.

11      Q.   Okay.  It's also, to your point, not

12   specific to any vehicle?

13      A.   That's right.

14      Q.   Then on Page 7 of your report, you discuss

15   the two studies that you prepared, one in New York

16   and one in Seattle.  And you talked about that just a

17   few minutes ago, right?

18      A.   Yes.

19      Q.   And in those studies, you didn't apply the

20   IRS rate?

21      A.   That's right.

22      Q.   Instead, you estimated expenses based on

23   carefully building from the ground up, item by item,

24   the relevant expenses?

25      A.   That's right.

1      Q.   You looked at maintenance?

2      A.   Yes.

3      Q.   Fuel costs?

4      A.   Yes.

5      Q.   Depreciation?

6      A.   Yes.

7      Q.   Automobiles in use?

8      A.   Yes.

9      Q.   And insurance costs?

10     A.   That's right.

11     Q.   And this research didn't have anything to

12   do with data or drivers in the Houston area, right?

13     A.   That's right.

14     Q.   And you did not go through this same

15   process for Mr. Barysas?

16     A.   That's right.

17     Q.   So you don't have any way of knowing

18   whether the IRS rate is either inflated or deflated

19   in comparison to Mr. Barysas' actual expenses, right?

20     A.   I think it's likely to understate his

21   expenses.

22               MS. MIERS:   Objection.   Nonresponsive.

23     Q.   (BY MS. MIERS)   You don't know one way or

24   the other, right?

25     A.   I know that he drove a luxury car with

Page 642

1    higher -- much higher cost, depreciation,

2    maintenance, and fuel costs.

3                    MS. MIERS:  Objection.  Nonresponsive.

4                    JUDGE SOUSSAN:  Please proceed.  I'm

5    listening.

6                    MR. STANLEY:  Argumentative.

7                    JUDGE SOUSSAN:  I'm listening.  Please

8    proceed.

9         Q.   (BY MS. MIERS)  Do you know one way or the

10   other whether the IRS national, non-localized mileage

11   rate is inflated or deflated in comparison to

12   Mr. Barysas' actual expenses?

13                   MR. STANLEY:  Objection.  Asked and

14   answered.

15                   JUDGE SOUSSAN:  Overruled.

16   Dr. Parrott, can you answer the question?

17                   MR. STANLEY:  He's answered it three

18   times.

19                   JUDGE SOUSSAN:  Thank you,

20   Mr. Stanley.  Maybe now he'll answer it a fourth

21   time.

22                   THE WITNESS:  No.

23                   JUDGE SOUSSAN:  Thank you, sir.

24        Q.   (BY MS. MIERS)  Let's take a look at

25   Appendix C.  We talked about this earlier, and you

                                        Page 643

1      talked about the fact that you take great care in

2      analyzing the data.

3                   Do you remember saying that?

4          A.   Yes.

5          Q.   You said, "We didn't find great

6      inconsistencies with on-line time versus P1 through

7      P3 time," right?

8          A.   Right.

9          Q.   Let's kind of focus in on the first column

10     so we can see what they are, right?  So -- and you've

11     got two sheets, right?  One is for time in Houston,

12     and one is time for New York?

13         A.   That's right.

14         Q.   And this one is for Houston, right?

15         A.   Yes.

16         Q.   Okay.  So I just want to establish what

17     some of these Columns are.  There's a column that's

18     the third column over, On-line Time Hours, right?

19         A.   Yeah.  I guess it's not lined up exactly

20     with the column below it, but I see from -- yes.

21         Q.   That's why I wanted to go over this.  The

22     fourth column is the sum of P times?

23         A.   That's right.

24         Q.   When you say that, that means it's P1 plus

25     P2 and P3?

                                            Page 644

1          A.    That's correct.

2          Q.    There's not supposed to be a difference, in

3    your opinion, between on-line time and sum of P time?

4          A.    I said in theory they should be the same.

5          Q.    Okay.  So if we look just at that first

6    line -- if we could blow it up -- the number for

7    on-line time in this first row is 7.49, and it's 7.48

8    for sum of P times, right?  So it's just a little

9    off, right?

10          A.    That's correct.

11          Q.    Then Column O where it says Working Hours

12    Used in Pay Analysis --

13          A.    That's right.

14          Q.    Do you see that?

15          A.    Right.

16          Q.    Where does that number come from?

17          A.    So that is the same as Column D, the sum

18    of --

19          Q.    The sum of P times?

20          A.    Yes.

21          Q.    So let's take a look at Weeks 21 through

22    28.  I appreciate everyone bearing with us on this

23    because I know it's hard to read.

24               So we can see here that if we compare

25    the sum of P times, it's the same as the number in

Page 645

1    Column O.  Am I correct about that?

2         A.   Yes.

3         Q.   Okay.  Did you do that for all of the

4    weeks?

5         A.   Well, now that I'm looking at it more

6    carefully, I see that there were several weeks in

7    which there were discrepancies.  I would call them

8    significant discrepancies between the sum of P times

9    and on-line time hours.

10        Q.   Why don't you go ahead and go to Week 36?

11   So, for example, Week 36, on-line time says 22.74?

12        A.   Right.

13        Q.   But total P2 time says 67.92?

14        A.   That's right.

15        Q.   So how did you decide -- let's look at

16   Column O -- which number to use?

17        A.   Give me a second to --

18        Q.   Dr. Parrott, do you agree with me that when

19   these reports are provided to us that they are

20   provided in PDF format and we don't get the actual

21   Excel files?

22        A.   Yes.

23        Q.   So you would agree with me that we can't go

24   in and determine if there's a calculation error on

25   your part, right?

Page 646

1          A.    Well, most of the columns are -- it's
2     just -- they are a result of simple arithmetic being
3     applied to other columns.  So you could check the
4     math on the calculations.  So that's pretty easy to
5     do with the PDF version.
6          Q.    You think it's easier to go in and hand
7     calculate each and every one of these lines rather
8     than looking at a spreadsheet?
9          A.    I didn't say it was easier.  I said it was
10    possible.
11         Q.    All right.  You have a Twitter account,
12    right?
13         A.    I do.
14         Q.    Your Twitter handle is JParrott1007?
15         A.    That's correct.
16         Q.    Your profile says that you favor high
17    minimum wage and full employment, right?
18         A.    That's right.
19         Q.    On that Twitter account, you regularly
20    tweet about the gig economy?
21                    MR. STANLEY:  Judge, improper
22    impeachment evidence.  There's been no evidence here
23    that he's been untruthful or done anything dishonest.
24    I don't know where this goes to the impeachment of
25    this witness.

                                        Page 647

1           MS. MIERS:  We're trying to establish

2     that this witness is an improper expert due to his

3     bias.

4           JUDGE SOUSSAN:  Overruled.

5     Q.   (BY MS. MIERS)  You regularly tweet about

6     the gig economy, don't you?

7     A.   I tweet about many things, including the

8     gig economy.

9     Q.   And including Uber?

10    A.   Yes.

11    Q.   In fact, you've tweeted dozens and dozens

12    of times about the gig economy and Uber?

13    A.   Well, I haven't counted them recently.

14    Q.   Fair to say that your tweets have been

15    critical of Uber and similar entities?

16    A.   I am critical of a company whose practices

17    I believe result in workers not being paid fairly.

18    Q.   Is it fair to say that you've re-tweeted

19    several tweets advocating gig economy drivers like

20    Mr. Barysas to be classified as employees?

21    A.   Yes.

22    Q.   Let's take a look at Respondent's Exhibit

23    46.  This is an exhibit that's your Twitter account,

24    and we pulled it on August 17th, 2021.

25           Do you recognize it?

Page 648

1        A.   Yes.

2              MS. MIERS:   Okay.   We move to admit

3    Respondent's Exhibit 46 into evidence.

4        A.   Excuse me a second.   Sorry.   I'll turn that

5    off.   What was your question?

6              MS. MIERS:   Actually, I was making a

7    motion to the judge.   Respondent moves to admit

8    Respondent's Exhibit 46 into evidence.

9              MR. STANLEY:   Judge, we would object

10   to this being admitted as evidence.   They can talk

11   with him about it, but there's no reason this is

12   evidence in the case.   Again, they have not shown any

13   reason that this should bias him in any way from

14   looking at the numbers and applying them to numbers.

15              Whether you decide P1 or P2 is

16   included, looking at this Facebook or the tweets is

17   nothing that matters when he's doing straight

18   arithmetic.   It's improper impeachment evidence to

19   show bias all the way around.

20              JUDGE SOUSSAN:   Overruled.   It will be

21   admitted as proper cross-examination and impeachment.

22        Q.   (BY MS. MIERS)   Dr. Parrott, do you receive

23   payments from labor unions?

24        A.   When I work in arbitration cases, yes.

25              MS. MIERS:   Respondent passes the

                                        Page 649

```
 1    witness.
 2                     FURTHER EXAMINATION
 3        Q.   (BY MR. STANLEY)  Okay.  Dr. Parrott, let's
 4    look at the appendix that you were just looking at.
 5    That's Appendix C.  If we go to the second page of
 6    Appendix C --
 7                     JUDGE SOUSSAN:  Whoever is rustling a
 8    lot of papers, it comes across very loud to the rest
 9    of us.
10                     MR. STANLEY:  It's me.  I'm right by
11    the speaker.  I apologize.
12                     JUDGE SOUSSAN:  I don't think you're
13    the only one, so I appreciate it.  Thank you,
14    Mr. Stanley.
15                     MS. MIERS:  That may have been me.  I
16    apologize.
17        Q.   (BY MR. STANLEY)  Let's go back one step,
18    okay?  Let's look at Appendix B.
19                     Can you tell me the sum of the total
20    hours that you included in your analysis if we look
21    at straight time in New York City and Houston and
22    also overtime?
23        A.   Are you asking what's the sum of the hours
24    for straight time in both areas and the Houston
25    overtime hours?
```

Page 650

1          Q.    Right.  So the reason why I'm asking is I

2     just want to find out which number you used in

3     calculating your shortfall analysis for Mr. Barysas.

4     I thought we did this earlier.

5          A.    Yes.  So I did use the sum of the hours

6     presented in Appendix B here.  And in the pay

7     analysis in Appendix C, I used Column O.  I may have

8     misspoken.  You'll have to forgive me for this

9     because I have worked on a number of cases.  I don't

10    do this work full-time, so -- and this analysis was

11    done a few weeks ago.

12                    In this case, the -- the working time

13    that we used was the sum of the P segments in some

14    cases, and it was the on-line time in other cases.

15    What we used for the pay analysis was the figure in

16    Column O, which for the first several weeks is the

17    sum of the P segments and then for the remaining

18    weeks it was the on-line time, generally because the

19    sum of the P segments figure in some cases was

20    higher -- much higher than the sum of the on-line

21    time hours.

22         Q.    Why did you use in some situations the sum

23    of the P segments and then the working time in other

24    situations?

25         A.    We didn't want to overstate his -- his --

                                          Page 651

1    what we characterized as his working hours.

2        Q.    And where did you get the data for the sum

3    of the P segments?

4        A.    The sum of the P segments was from the Uber

5    data that was provided.

6        Q.    Can you specifically tell us what the data

7    you're talking about is?

8        A.    So there were -- there's a separate file

9    for P1 time in miles, there's a separate file for P2

10   and P3 data together -- P2 and P3 time in miles.

11       Q.    What type of file is that?

12       A.    Those were Excel files.

13       Q.    And with the working time, where did you

14   get the data for that?

15       A.    So that was from -- from a third file, a

16   separate file, also Excel file.

17       Q.    Does the data from Appendix C also have

18   data for weeks that Mr. Barysas would have reached

19   the target pay?

20       A.    Yes.

21       Q.    And did you include the time for those

22   weeks in your analysis for --

23       A.    Yes.

24       Q.    Did you move the numbers in any way to make

25   it seem that Mr. Barysas had an overstated loss here?

                                        Page 652

1      A.    No.   In fact, I described the situation as

2    in the report where we didn't count his P1 time and

3    miles for 12 weeks that he didn't have a trip

4    dispatch -- didn't have a trip.

5      Q.    And you also discussed with counsel on your

6    cross-examination that the IRS rate may be

7    understated for the Barysas matter.

8                    Can you tell the judge why that might

9    be?

10     A.    For the entire period of time covered by

11   this arbitration, he drove an Infinity QX60, a luxury

12   vehicle which qualified him under Uber's standards to

13   provide premium-priced services.  So that's more

14   expensive.  That vehicle is more expensive than

15   average in every respect:  Purchase price,

16   depreciation, maintenance, fuel expenses, and so on.

17     Q.    And how does that compare to the IRS rate?

18     A.    You know, I haven't -- I didn't itemize,

19   you know, component by component his expenses, but I

20   would think, given the fact that it's a luxury car

21   with those higher cost factors that I cited, that it

22   would be higher than the IRS rate.

23     Q.    Does the IRS rate give analysis on a luxury

24   vehicle like this, or is it analysis on a regular

25   car, if you know?

Page 653

1      A.   It's an average for all of the cars in use

2   in any given year or for the year when the analysis

3   is done, and then it's applied to the following year.

4      Q.   In your two studies that you performed, one

5   in New York and in Seattle where you did similar

6   analysis, did it matter that you had thousands of

7   drivers to look at and look at surveys in coming up

8   with your expenses?

9      A.   Well, I mean, it mattered because they were

10  different.  We looked at the actual cars that were in

11  use and estimated the cost based on those cars and

12  then took an average across the entire fleet, so to

13  speak, of the cars in use.

14     Q.   And did some of those cars include luxury

15  vehicles?

16     A.   Yes.

17     Q.   Did some of those cars include a basic

18  sedan, like a Honda Civic?

19     A.   Most Uber services in cities are the UberX

20  service, the basic.  And for that, you can use a much

21  less expensive car than an Infinity QX60.

22     Q.   So in your analysis of the expenses in your

23  two papers that are published, did you look at

24  expenses associated to a regular vehicle, as well?

25     A.   Yes.

Page 654

1       Q.   A non-luxury vehicle?

2       A.   Yes.

3       Q.   And then did you do an estimate or an

4   average of what you found across the thousands of

5   drivers that you looked at?

6       A.   Yes.

7       Q.   And that included some drivers that had a

8   luxury vehicle and some drivers that didn't?

9       A.   That's right.

10      Q.   Did that include some drivers that drove

11  for Uber a lot, 40,000 miles, and some that drove for

12  Uber a little, 15,000 miles, for example?

13      A.   Yes.

14      Q.   And so, what did you seek to do in finding

15  the averages in those studies for expenses?

16      A.   We sought to come up with an average

17  expense that represented the average across all

18  drivers, you know, reflecting the fleet of vehicles

19  in use.

20      Q.   And did that have any impact on why you

21  used the IRS rate in this case?  Your prior

22  experience with dealing with those averages, did that

23  have any impact on you using the IRS rate here?

24      A.   Well, we used the IRS rate here because it

25  seemed to be a reasonable proxy, again, for an

Page 655

```
 1    average driver's expenses.  We didn't try and adjust

 2    the expenses given his luxury car.

 3         Q.   Have you seen any other expert reports in

 4    this case from any other economists similarly

 5    situated to you to rebut your opinions?

 6         A.   No.

 7              MR. STANLEY:  I will pass the witness.

 8              MS. MIERS:  I just have a few

 9    questions.

10                   FURTHER EXAMINATION

11         Q.   (BY MS. MIERS)  You just testified that you

12    didn't try to adjust expenses to account for

13    Mr. Barysas' luxury car, right?

14         A.   That's right.

15         Q.   Kind of to me at least, it seemed like you

16    were implying you might have done that otherwise.

17              You've never in any of the 10 matters

18    adjusted the mileage to account for the type of car

19    an individual drove, right?

20         A.   That's right.

21         Q.   Even when it was like an old Hyundai,

22    right?

23         A.   Well --

24              MR. STANLEY:  I object to the

25    relevance.
```

Page 656

1              MS. MIERS:  That's fine.  I've made my

2      point.

3          Q.   (BY MS. MIERS)  Dr. Parrott, did you

4      actually do these calculations, or did someone else

5      perform these calculations?

6          A.   I worked with an assistant on these -- the

7      final calculations, I did myself.  Some of the data

8      preparation, I worked with an associate.

9          Q.   On Page 6 of your report, you write in your

10     expert report that "The key variables we focused on

11     included the number of trips, the sum of P time

12     segments, total mileage, and adjusted driver payout,"

13     right?

14         A.   That's correct.

15         Q.   You don't state that in this particular

16     instance you used on-line miles or that you found a

17     discrepancy and decided to use on-line miles instead

18     of total P time, right?

19         A.   You're right.  That was probably an

20     oversight on my part.

21              MS. MIERS:  I'll pass the witness

22     back.

23              MR. STANLEY:  I have no further

24     questions.

25              JUDGE SOUSSAN:  All right.  May this

                                        Page 657

```
 1    witness be excused?

 2                    MR. STANLEY:  He can.

 3                    JUDGE SOUSSAN:  Thank you very much,

 4    Dr. Parrott.  You are excused.

 5                    Okay.  Are there any other witnesses

 6    from either side?

 7                    MR. STANLEY:  Not from claimant.

 8                    MS. MIERS:  Not from respondent.

 9                    JUDGE SOUSSAN:  The claimant had

10    rested and respondent rests?

11                    MS. MIERS:  Yes, Judge.

12                    JUDGE SOUSSAN:  Now, are we going to

13    proceed to closing arguments?

14                    MR. STANLEY:  We can.  I may need a

15    few minutes.

16                    JUDGE SOUSSAN:  We're going to take a

17    break.  How much time do you-all need to collect your

18    thoughts?

19                    MR. STANLEY:  30 minutes?

20                    JUDGE SOUSSAN:  30 minutes is fine.

21    Is that okay with the respondent?

22                    MS. MIERS:  30 minutes is fine.

23                    JUDGE SOUSSAN:  Let's resume at 3:30,

24    okay?

25                    (Recess from 2:57 p.m. to 3:34 p.m.)
```

Page 658

```
 1                    JUDGE SOUSSAN:  Let's get started.
 2                    CLOSING STATEMENT
 3                    MR. STANLEY:  Thank you, Judge.  Can
 4      you bring up the PowerPoint here?
 5                    Judge, throughout this arbitration, we
 6      have sought to present evidence in paper so that you
 7      can see the control that exists and how the economic
 8      realities are that Dainius Barysas relied on Uber as
 9      an employee for payment.  And we've gone through this
10      painstakingly so that we can show you that this
11      evidence exists.  And oftentimes we've challenged you
12      throughout this process because we need you to see --
13                    JUDGE SOUSSAN:  I can agree with that.
14                    MR. STANLEY:  We need you to see that
15      oftentimes there is no basis for the evidence
16      provided.  It's based solely on testimony that cannot
17      be corroborated in any way by Uber.  They are things
18      that are just said, and that matters here.  If you
19      can't back it up through documents, then you can say
20      whatever you want, and we see that happening over and
21      over and over with Uber's witnesses.
22                    And so, we sought to show you
23      documents of how there's control and documents of
24      what Uber's done through their policies during the
25      relative period, not a policy that's on the website
```

Page 659

1    now from 2021.  And I urge you to look at the dates

2    on these documents.  There may be 2018 on some of

3    these documents that Uber tried to show earlier.

4    There's 2021 that came in after the fact.

5              So there's reason for you to look at

6    this and not take what you hear from their corporate

7    representative unless he's showing you additional

8    documents to back it up.

9              So if we look at the time worked, we

10   know that Dainius Barysas worked for a long time,

11   2014 to 2019.  And you are going to hear from Uber

12   that he had freedom and opportunity and flexibility

13   and choice, but we've shown you so many times that he

14   didn't have the freedom and opportunity or

15   flexibility or choice when he was logged into the

16   app.

17             Uber is going to tell you over and

18   over he could log on and log off when he wanted to.

19   The facts show that when he was logged on for those

20   five years and inside the statutory period for the

21   three years that they controlled all of it.  We

22   showed that over and over on documents.

23             The freedom to log on and log off does

24   not qualify the relationship as independent.  Just

25   because he worked and logged in and logged off

Page 660

1    different times, that doesn't mean it's an

2    independent relationship.  You have to look to more

3    under the FLSA.

4              The FLSA is clear that when weighing

5    these evidence -- if you look at all of this through

6    the preponderance of the evidence, these factors

7    weigh in claimant Barysas' favor.

8              We talked a lot about the FLSA and the

9    economic realities test.  This is the test that is in

10   play in the Fifth Circuit.  The test provides

11   guidance to differentiate an employee from an

12   independent contractor.

13             You're going to see case law, you're

14   going to see different information on these five

15   factors.  We planned our case out to go so that you

16   could see from the totality of the circumstances that

17   there is an employment relationship here.

18             The first factor is the degree of

19   control exercised by the alleged employer.  If you

20   recall, we showed evidence on paper of all of these,

21   that Uber unilaterally set the rate for all three

22   components of every fare:  The base fare, the per

23   mile fair, and the per minute fair.

24             Mr. Barysas could not change those

25   amounts if he wanted to.  He could not take those up

Page 661

1  and go higher or lower on those.  He was stuck with
2  what Uber gave him.
3              Why does that matter?  It matters
4  because he can't control the rate of his services.
5  Don't go down the rabbit hole of well, he did have
6  control because it was based on a moving number that
7  if there were less drivers on the road at a certain
8  time, the supply and demand change would occur.  That
9  is hogwash.  He couldn't change the number at any
10  time.
11             And if he wanted to get properly
12  reimbursed, which we showed you, he would have to go
13  back to Uber and say, "Uber, I didn't get paid
14  appropriately.  Look at this."  And what would Uber
15  do?  Based on evidence that we showed you, documents
16  we showed you, Uber would look at their fare estimate
17  calculated on their distance and give him an update
18  to that.
19             He couldn't go to the rider directly
20  and get that if he wanted to.  He had to go through
21  Uber, right?  Uber had the sole discretion to change
22  that fare amount at any time.  We showed you
23  documents over time where the fare did change, but it
24  wasn't based on Barysas' input.  It was based on
25  Uber's control.

Page 662

```
 1              We know that Uber controlled the
 2   amount of services that it charged -- the amount of
 3   the service fee that it charged against the fares
 4   that -- that Dainius generated.  Uber would move the
 5   service fee up and down.  Uber would move the
 6   percentages that they would take from any fare.  And
 7   even when Dainius would go back to them and say,
 8   "Hey, Uber, why are you taking so much more than you
 9   used to?  That's not right.  That's not the way it
10   should be," what did they do?  They said, "This is up
11   to us.  We get to decide.  This is the amount we're
12   going to take for every fare."  There was no
13   negotiation there at all.
14              We also talked about that Uber
15   unilaterally decided that Dainius Barysas was not
16   compensated for Period 1 and Period 2.  We'll talk
17   about this a little bit later in the closing slides,
18   but Dainius could not work for Uber unless he was
19   logged on waiting for Uber to give him a request.  It
20   was impossible.  He could not get a request on the
21   Uber app during Period 1 and Period 2 in order to
22   drive for Uber unless he was there waiting and
23   accepting and moving on, right?
24              Uber determined that Dainius Barysas
25   was not paid for the two minutes when he arrived at
```

Page 663

1    the pickup point.  We talked a little bit about this.

2    You heard about the wait time, and the wait time did

3    not start until Dainius showed up at the rider's

4    location.  Well, he had to wait two minutes.  That

5    was totally at Uber's control.  Then after that, Uber

6    decided how much Dainius would be paid for the wait

7    time that he had.

8                    There are more facts here that we went

9    through.  We talked about that Uber unilaterally

10   controlled the ride requests that come to him.  You

11   heard an anecdote from the corporate representative

12   that if Dainius wanted to plan a trip at the airport,

13   all he had to do was know a rider, have that rider

14   get in his car at the airport, and then turn on the

15   app and request a trip.

16                    That is completely unsupported by any

17   of the documents.  First of all, we know that they

18   were required to go to the staging lot in order to

19   get airport trips.  We know that they were required

20   to wait there to get an airport trip in the queue.

21   And even if Dainius was at the airport waiting and

22   went outside of that, broke the rule there -- if that

23   were to occur based on the anecdote provided by the

24   corporate representative, that he would go and

25   somehow have the rider get in his car and request and

Page 664

1    be ready to accept, there would be so many drivers at

2    the airport at the time, Uber can't tell you that

3    that request would have gone straight to Dainius.  It

4    could have gone to anyone in the area.  So that idea

5    that you could pre-arrange a trip with a rider is

6    ridiculous.  Not supported by any document.

7            What is shown is that he has to wait

8    on Uber to provide him the rider.  Uber decides which

9    ride request would come.  If you have a driver in one

10   location and there are two riders in similar

11   locations that are asking for trips, Uber's going to

12   pair that ride with Dainius.  Dainius can't decide

13   that.

14           Uber exclusively controlled its

15   proprietary algorithm which guided and monitored

16   Dainius the entire way.  Uber was watching Dainius

17   the entire time that he was on the app, whether it

18   was Period 1, Period 2, or Period 3.  They were

19   taking evidence and information the entire time,

20   watching him on GPS, looking at how fast he was

21   driving, recording that information in their system.

22   Uber also would take information from riders and

23   unilaterally use that information to negatively

24   impact Dainius.  We've seen that over and over.

25           Uber, as we've talked about,

Page 665

```
 1    controlled the collection of riders' payment and
 2    fares.  Uber did not allow Dainius ever go directly
 3    to the rider to get payment.  There is not an
 4    independent contract relationship on this planet
 5    where that occurs.  If I am a pool builder, I can go
 6    straight to the homeowner that I'm building a pool
 7    for and get that money.  Now we've got to go through
 8    Uber in order to get that.  That fact weighs in our
 9    favor, as well.
10              The star rating, they use that star
11    rating to punish drivers.  When you hear an anecdote
12    of "Well, this never occurs," look at their policies.
13    The policies say, "We set the star rating.  We will
14    tell you if you get close.  We're not going to tell
15    you what the rating is in the city, but if you get
16    close, we'll let you know."  So that's something
17    totally controlled by Uber.
18              Acceptance rate.  You see that in the
19    documents, as well, where Uber does negatively impact
20    you for not accepting rides.  They kick you off the
21    app.  You can no longer be on the app if you're not
22    accepting rides.  Before the statutory period, Uber
23    changed their community guidelines where they would
24    log you off for an undetermined time.  They would
25    never tell you how long that log-off time will last.
```

Page 666

```
 1    Even when the policies update over time, they don't
 2    tell you how long that time lasts that they will log
 3    you off.  Brad just says, "Well, you'll just get
 4    logged off the app.  Log back on if you want to."
 5    Uber is controlling that.  If he doesn't want to log
 6    off the app, Uber logs him off the app.
 7              The second factor in the economic
 8    realities test is the extent of relative investments
 9    that Dainius Barysas had.  Two of the things that we
10    really would like you to focus on based on the case
11    law are the capital risks and upfront money to start.
12              The capital risk.  What risk of loss
13    did Dainius have if driving for Uber didn't work out
14    versus what risk of loss did Uber have if the driving
15    portal doesn't work out?  So you've got to look at
16    that and the upfront money to start.
17              We know that the Dainius Barysas
18    investments -- and you'll hear this from Uber -- were
19    his car and his smartphone.  The facts are in.  He
20    chose his car, he chose his smartphone.  He had to
21    have a car to drive for Uber, of course.  He had to
22    have a smartphone to drive for Uber, of course.
23    However, if he were to stop or get fired from driving
24    for Uber, he would still have that car.  He would
25    still have that smartphone.  These are not risks that
```

Page 667

1    he invested in that would suddenly go away, that

2    would suddenly be a loss of money that he invested

3    for use on the app.

4              Meanwhile, Uber talked about its

5    investments, it's millions, hundreds of millions over

6    time, billions of dollars its invested in the driver

7    app.  If the driver app would not have worked out,

8    their capital investment would have been lost,

9    billions of dollars.  It cannot be said otherwise

10   that these investments are upside down when you

11   compare the two.

12             We look at the third factor, the

13   degree to which Uber determined Dainius Barysas'

14   opportunities for profit and loss.  We talked about

15   some of these already in the control element.  They

16   go here, right?

17             You heard evidence that Dainius is not

18   able to build a book of business on the Uber app.  He

19   can't have preferred riders on the Uber app and

20   contact them through the app to give driving services

21   through the app.  That's not something he could do.

22   If he could, he could control his opportunity for

23   profit or loss in that way.

24             Additionally, Uber unilaterally

25   decides the fare price and service fees.  This goes

                                        Page 668

1   directly to how much Dainius can make on every single

2   trip.  And so, if they control that, there's no way

3   that he can control his opportunity for profits and

4   loss because he can't control what he makes on any

5   individual trip and doesn't know what he's going to

6   make on any individual trip.

7               Uber controls the algorithm that

8   dispatches riders.  This is similar to the control

9   factor, but it also applies in this element under the

10  economic realities test because if Dainius wanted to

11  say, "I only want to receive rides that are $20 or

12  more in my pocket or $40 or more in my pocket," he

13  can't say that.  Uber controls that.  Uber controls

14  what comes to him.  There is no function in the app

15  that Dainius can control the level of riders, trips,

16  and how far and how much he's going to make in the

17  app.

18              Uber controls the 15 seconds.  So that

19  means Dainius must accept within that time, within 15

20  seconds, given the limited information, right, must

21  accept or it goes by and he loses that ability in 15

22  seconds.  So that impacts his opportunity for profits

23  and loss.

24              Certainly Uber markets and advertises

25  to riders.  Dainius -- when you compare the two, his

Page 669

1    marketing and advertising to riders doesn't exist.

2    He does have a business card, but you've seen from

3    that based on the facts in evidence that he did not

4    have off-app rides other than two different people,

5    one in Houston, one in New York City.  And so, it

6    wasn't as if he was using his Uber -- his Uber

7    opportunity to get all of this side business.

8    There's no facts that are relevant to that fact.

9              More things.  Uber sets the cleaning

10   fee, the lost item fee, the cancellation fee.  All

11   these things impact the amount that Dainius can make

12   while on the Uber app.  You've seen evidence of that.

13   You've seen documents that show that.

14             Uber doesn't pay for all periods.

15   That impacts the amount that he makes.  He should be

16   paid for Period 1.  He cannot receive a ride in

17   Period 3 unless he's in Period 1.  He is engaged to

18   wait.  He's not on call.  He's engaged to wait for

19   Uber to give him a ride.

20             Uber doesn't pay expenses.  We've

21   given you a reasonable approximation of expenses,

22   which we'll talk about in just a moment.

23             The fourth factor is skill and

24   initiative required to perform the work.  All you

25   have to do to drive for Uber is have a regular

Page 670

```
 1    driver's license.  That's it.  You send in your
 2    driver's license, you sign their agreement, you can
 3    drive.  There is no barrier to entry that requires a
 4    skill in order to drive for Uber.  You heard about
 5    some of the skill that Dainius received later when he
 6    started driving commercially, but there's no skill
 7    needed.  Anyone with a license can get behind the
 8    wheel and drive for Uber.
 9              The Fifth Circuit clearly says that
10    routine work that requires efficiency is not
11    indicative of independence.  You will hear from Uber
12    that his skill was deciding where he was going to
13    work, but that routine work of driving is not -- that
14    requires efficiency is not indicative of
15    independence.  That's where he went to gets rides
16    from Uber.  He had to be logged on, he had to be
17    ready to accept a trip, and he had to take the trip.
18              The fifth test is the permanency of a
19    relationship.  You've heard evidence that he drove
20    for Uber for many years, including inside the
21    statutory period for three years.  So he drove from
22    September 2014 to August 2019 consistently for Uber.
23    Since 2014, he completed 2,346 trips.  The evidence
24    shows inside the statutory period, he completed over
25    1100 trips for Uber.  He was driving all the time.
```

Page 671

1    The Fifth Circuit has said that even 10 months is

2    enough to satisfy the permanency requirement.  That's

3    clearly met here.  He has driven far more for Uber

4    than 10 months.  The evidence shows it on the

5    documents.

6                  There's been a lot of talk of the

7    regulation code, Title 14, the TNC statute in Texas.

8    It's interesting how Uber plays to that when it

9    benefits them but doesn't play to that when it

10   doesn't.  They claim, "Oh, we follow these items

11   because it's in the TNC statute."  But when you see

12   that under the statute itself a driver is not an

13   independent contractor if the company limits the

14   territory within which the driver may provide

15   digitally pre-arranged services, they don't want to

16   talk about that anymore.

17                  Is this a factor under the FLSA?  No,

18   but it's indicative of their control.  It's

19   indicative of what Uber did.  And in Texas, this

20   would make this guy not an independent contractor

21   because they did limit the territory, which we've

22   heard about.  They did prevent him from driving

23   inside Houston at the airport.

24                  This brings us up to Exhibit C7.  You

25   have no evidence in the record that Dainius Barysas

Page 672

1    was geo-spoofing or committing fraud related to

2    geo-spoofing.  No evidence.  So they go and they tell

3    us that Dainius is being removed from his ability to

4    complete airport trips due to manipulation of the GPS

5    and then they stopped him from being able to get

6    rides.

7                   Why is this important?  If he can't

8    get rides at the airport, his testimony is that it

9    would be devastating for him.  The documents show

10   that it would be a, quote, death sentence because he

11   so relies on those trips.  That's why this is

12   important.  If they are going to have the power and

13   have the ability to limit Dainius from getting those

14   airport trips, it shows all of the factors because of

15   his economic reliance on those trips, the control,

16   the ability for opportunity for profit and loss, all

17   of that weighs in our favor, and they don't want to

18   talk about that.

19                   They did do that inside the statutory

20   period, and that created, as testimony showed, a

21   ripple effect that led Dainius down the path of going

22   towards a different opportunity, of driving for

23   somewhere else.  So you have that evidence.  You've

24   seen it.  It's important.  They didn't even talk

25   about this today with their corporate rep because

Page 673

1      they know that there's no facts that they can point

2      to that he was geo-spoofing, and yet they still

3      removed his ability to take airport trips and rides.

4                  On damages -- you've heard about

5      damages.  You've only heard from one expert on

6      damages.  Uber could have brought somebody to discuss

7      damages, and they didn't.  You've heard from our

8      expert, who is well-qualified, who has given you

9      numbers based on Period 1, Period 2, and Period 3,

10     and he's tabulated that based on Uber's documents and

11     submitted the report to you.

12                 We ask that you look at it, that you

13     see how credentialed he is, that you look at the bare

14     numbers of what we claim:  The shortfalls, that he

15     was not paid -- that Dainius was not paid the minimum

16     wage over the course of his driving for Uber both in

17     New York and in Texas when he drove for Houston.

18     That shortfall over the entire period is $27,207.66.

19     This is the only evidence you have of damages where

20     actual evidence from Uber has been looked at, has

21     been calculated, and has been given to you.

22                 It's important to talk about Period 1

23     because Period 1 is compensable.  29 CFR 785.15

24     discusses on-duty time within the FLSA context, and

25     it says, "If the employee is unable to use the time

                                        Page 674

1    effectively for his own purposes, it belongs and is

2    controlled by the employer."

3                    In order to be logged on and receive

4    trips through the Uber app, you must be logged on in

5    Period 1.  In order to get trips at the airport, you

6    must be in the airport lot waiting for them to be

7    given to you.  He must be there.  He can't go and run

8    a different business.  He can't be anywhere else

9    doing work otherwise.  He has to be waiting on Uber

10   to give him the trip.  There's no evidence that's

11   been given to you that he was doing that.

12                   You've required in other situations in

13   this arbitration for a witness to marshal evidence,

14   to foster evidence, and there have been no witnesses

15   brought by Uber to discuss the time that Dainius used

16   during Period 1 to do something else.  Nobody.

17                   Also important for compensable time

18   and engaged to wait, you see a stenographer --

19   there's examples in the CFR that they give, right?

20   I'm sure Ms. Foreman can appreciate this.  A

21   stenographer who reads a book while waiting for

22   dictation is considered engaged to wait, and that

23   time is compensable.

24                   We know based on our occupation that

25   it's not uncommon for stenographers to have to wait

Page 675

 1    long periods of time for pre-trial matters that are
 2    off the record, for juries to be impaneled, for
 3    delays in the process at trial.   It happens all the
 4    time, but that time is still compensable for the
 5    stenographer who is waiting to start.
 6                   Once the time starts, she is on duty
 7    and working, but she can read a book.  This is
 8    similar to surfing the internet, similar to playing
 9    games.  You heard evidence that Dainius would walk
10    around the airport lot.  Well, that's time that he's
11    engaged to wait, right?  Also, a messenger who works
12    crossword puzzles, a fireman who plays checkers while
13    waiting for alarms, all these things.  The examples
14    are given there.  That's similar and the same to an
15    Uber driver waiting to receive an Uber trip.
16                   Expenses.  This is something you'll
17    see in our briefing.  Neither the FLSA nor the
18    regulations require the employee to prove actual or
19    precise cost of employment-related expenses incurred.
20    Such costs may be reasonably approximated.
21                   The evidence that we've presented to
22    you is that the IRS expenses associated with the IRS
23    rate are a reasonable approximation for Dainius'
24    expenses.  There's no evidence presented to you
25    otherwise by anyone or any other source that they are

                                                Page 676

```
 1    unreasonable.  You have argument by counsel, but you
 2    don't have any evidence or any other opinion that
 3    those are not reasonable.  In fact, they are employed
 4    by the United States government, and they are
 5    employed by people everywhere because they are
 6    reasonable.  They are a reasonable approximation.
 7              To close, to try to save a couple of
 8    minutes, this is the slide that I left you with in
 9    our opening.  FLSA is to apply in as many instances
10    as possible.  It's not a narrow law.  It's supposed
11    to be open.  It's supposed to provide protection to
12    employees like Dainius, to allow him to be paid
13    appropriately.
14              Whether the employee or employer
15    relationship exists turns on dependency.  We've shown
16    dependency in multiple, multiple, ways.  The five
17    factors weigh in the claimant's favor when you look
18    at the preponderance of the evidence.
19              Uber did not claimant a proper minimum
20    wage, as we've shown through expert testimony, and no
21    witnesses have marshaled evidence to support -- there
22    have been many witnesses, and none of them have
23    marshaled some of the evidence to support contentions
24    on facts brought by Uber.  You have many anecdotes,
25    you have things that might happen.  But when we look
```

Page 677

```
 1   at the documents, they show you that dependency was
 2   there, and the FLSA factors should weigh in the favor
 3   of Dainius Barysas.
 4              Based on my calculation, I have four
 5   minutes and 20 seconds left.  Thank you.
 6              JUDGE SOUSSAN:  Okay.
 7              CLOSING STATEMENT
 8              MS. MIERS:  All right.  All right.  So
 9   as many times as I've heard the term "red herring,"
10   I've never actually looked into its origin until
11   recently.  What I learned is during the 18th and 19th
12   centuries if someone wanted to sabotage a fox hunt,
13   what they would do is they would drag red herrings
14   along the ground in order to confuse the fox hounds
15   and send them in the wrong direction.
16              I looked it up because there have been
17   a lot of red herrings dragged through this final
18   hearing.  We know you're quite capable of recognizing
19   the red herrings for exactly what they are.  We do
20   think it's worth noting that the heavy reliance on
21   delay and distraction tactics only serves to
22   emphasize that claimant is simply unable to meet his
23   burden.
24              It's also worth noting that
25   Mr. Rosenthal is imputed with Uber's knowledge.  His
```

Page 678

```
1   testimony is evidence, and Uber obviously isn't

2   required to admit a document that supports each and

3   every statement made by Uber, just like claimant

4   isn't.  To be clear, Uber produced a lot of data and

5   a lot of documents, some of which have been

6   pre-admitted here.

7                In addition, claimant still has access

8   to the app and the information contained in the app.

9   He should still have access to his phone and e-mail,

10  which would have communications from Uber.  He still

11  has access to the internet, including uber.com.

12               So claimant's trouble here isn't a

13  lack of evidence.  It's a lack of evidence to support

14  his claims.  And that's all I'm going to say about

15  the red herrings because I want to spend the rest of

16  our time talking about what's actually relevant here.

17               What's actually relevant, what's at

18  the heart of this case, is whether Mr. Barysas was

19  economically dependent on Uber or whether he was in

20  business for himself.

21               The Fifth Circuit's explained that

22  economic dependence isn't an evaluation of whether

23  Mr. Barysas' use of the Uber driver app was his

24  primary source of income -- we know it wasn't -- or

25  even whether claimant used his earnings to pay bills.
```

Page 679

1    The test of economic dependence requires you to

2    consider all five factors to determine whether

3    claimant was dependent on Uber for his continued work

4    in providing transportation services.

5              Well, what we know is that the

6    evidence shows that claimant wasn't economically

7    dependent on Uber.  He was actually in business for

8    himself.  He owned and operated a company called DB

9    Pedicabs, LLC.  And among other things, that company

10   provided on-line bike rentals.  It ran a website.  It

11   provides trucking and car hauling services and livery

12   services.

13             Claimant had the freedom, flexibility,

14   opportunity, and choice to control his transportation

15   services business, just like Mr. Stanley predicted we

16   would tell you.  Claimant was in business for

17   himself.

18             Now, running through the Fifth

19   Circuit's five factors, the evidence demonstrates

20   that Uber didn't exercise control over claimant.

21   Mr. Barysas chose to generate business leads for his

22   livery service by using the Lyft and the Uber driver

23   apps.  He could have chosen to put out advertisements

24   for his livery services business or use other

25   lead-generation apps.  It was entirely up to him.

Page 680

1   What's important is that he didn't have to use the
2   Uber driver app to generate leads at all.
3                  Mr. Barysas also chose to generate
4   business leads for his livery services by providing
5   his business cards, the business cards that he
6   created, the business cards that he invested in, and
7   the business cards that he used to build a customer
8   base.
9                  Claimant didn't have to use the Uber
10  driver app to facilitate rider payments either.  He
11  chose to do that, and he chose to do that because he
12  determined that using the app was beneficial to his
13  business.
14                  He also used the Lyft app and, as we
15  heard, he used a credit card payment system to
16  process rider payments outside the Uber app, and he
17  did this so many times that he incurred $1100 in
18  credit card payment fees just in one year.
19                  Looking at Claimant's Exhibit 44, the
20  pink line here represents all the time that claimant
21  chose to use the Lyft app.  And even though claimant
22  testified that he only used the Lyft app on rare
23  occasions, claimant's own exhibit shows that he
24  completed 247 trips using the Lyft app, and that was
25  just from July 2017 to August 2019.  We know there

Page 681

1    were trips beyond the statutory period.

2              Not only did claimant provide

3    transportation services using the Lyft app at least

4    247 times during the relevant time period, you can

5    see on their exhibit that during the first quarter of

6    2018, he used the Lyft app more than he used the Uber

7    app.  And we know from his testimony and this

8    document that he started using the Uber app more than

9    the Lyft app around the second quarter of 2018, and

10   you heard why.  Mr. Barysas determined that the Uber

11   app provided more leads, so he made the strategic

12   business decision to use the Uber app in order to

13   maximize his profits.

14              And I want you to note here -- you'll

15   see why it matters in a minute -- that according to

16   claimant's demonstrative stiff here, he only

17   completed six trips using the Lyft app in 2017.  Now,

18   despite claimant's testimony that he primarily used

19   the Uber driver app over other lead-generation

20   services and despite his testimony that Uber was the

21   sole source of his income, claimant provided most of

22   his livery services outside of the Uber driver app.

23              For example, based on this document of

24   the $50,892 in livery services that were in income

25   reported to the IRS by claimant in 2017, only $13,000

                                        Page 682

1    of that income was derived from his use of the Uber

2    driver app.  That's only 26 percent of his total

3    transportation services income in 2017.

4                    And remember, we just -- I just told

5    you I would make this make sense.  Claimant only

6    provided six rides in 2017 through the Lyft app.  So

7    that means that at least -- at least $35,000 of

8    claimant's livery income in 2017 was from providing

9    transportation services outside the app.  The Uber

10   driver app was not his sole source of income, yet

11   Mr. Barysas testified that he only provided

12   transportation services outside the Uber and Lyft

13   apps once or twice.  And you just heard his attorney

14   say that, as well.

15                   If there remains any doubt as to

16   whether Mr. Barysas provided transportation services

17   outside the Uber and Lyft apps, his federal tax

18   returns should clear up that doubt.  In 2017, you can

19   see here claimant admitted in testimony, as well,

20   that he incurred $1100 in credit card fees for his

21   livery services in 2017.  And keep in mind this isn't

22   his income.  This is just the credit card fees for

23   processing payments.  We actually don't know the

24   precise amount of income received for livery services

25   provided outside the apps because that evidence was

Page 683

1    withheld from us in this matter.

2              In addition to choosing how to

3    generate leads for his transportation business, when

4    he chose to use the Uber driver app, he set his own

5    schedule.  He used his discretion to determine when

6    to log on and off the app for his own economic

7    advantage, not Uber's economic advantage.

8              Claimant's days fluctuated, the times

9    fluctuated, and even the amount of time he spent on

10   the app fluctuated.  He was in control, and it was

11   completely up to claimant as to how much time and how

12   often he wanted to interact with the app.

13             And he didn't just have freedom to use

14   the Lyft app.  He had freedom to use the Lyft app

15   while he was logged onto the Uber app while he was

16   also allegedly working for Uber.  In other words, he

17   was logged into the Uber driver app during P1 time

18   while he was transporting one of his drivers [sic]

19   through the Lyft app on 153 different days.

20             Claimant's testimony regarding his use

21   of the Lyft app wasn't credible.  It just wasn't.  At

22   his deposition, he testified that he didn't use the

23   Uber and Lyft apps at the same time because he

24   thought it would impact his good standing and rating

25   on the Uber app; but then yesterday he testified that

Page 684

1    he used the Uber and Lyft apps simultaneously many

2    times.  And we actually know that's true from the

3    data and the exhibits, from the contractual

4    agreements between the parties, and from

5    Mr. Rosenthal.

6            Claimant had the freedom to reject

7    trip requests, and he could even cancel a trip once

8    he agreed to accept it.  And despite claimant's

9    testimony that he feared deactivation if he declined

10   too many trips -- remember, he testified he read the

11   community guidelines and the deactivation policy

12   numerous times and he depended on those policies.

13   Those policies expressly state that declining trips

14   doesn't automatically lead to deactivation.  By the

15   way, if he didn't want to accept trips, all he had to

16   was log off the app.  It was as simple as that.

17           Claimant actually understood all this.

18   His testimony shows that he controlled whether to

19   accept or decline rides.  He didn't want short trips,

20   so he declined them.  He wanted long trips.

21           Claimant also had the freedom to

22   engage in other business or employment activities,

23   like on-line bike rentals, Dainius Trucking, TC

24   Transportation, Carolina Logistics.  Uber was not

25   claimant's sole source of income.

                                            Page 685

1           As we told you it would, the evidence
2    shows that Uber requires its customers, both riders
3    and drivers, to adhere to their community guidelines.
4    They are absolutely within their right to do this.
5    And as claimant recognized, they have very good
6    reasons for doing this.  Just as riders can be
7    deactivated for certain conduct, claimant could be
8    deactivated for things like quality, fraud, safety,
9    discrimination.  We talked about this at length
10   yesterday.
11          Claimant understood the deactivation
12   policy and he claimed he read it, again, numerous
13   times, and he clearly didn't have a fear of violating
14   it.  Well, at least we know he didn't have a fear of
15   violating it at least 37 times that we know of.
16          As the case law makes clear, Uber's
17   quality and safety standards don't demonstrate
18   control over the economic realities analysis.  In
19   fact, you'll see here courts routinely hold that
20   quality control and safety standards don't
21   demonstrate the level and control over the manner and
22   method of work necessary to support employee status.
23          Other courts instruct that quality
24   control procedures aren't indicative of control when
25   they stem from the need to provide reliable service

                                            Page 686

```
1    to their customers, just like Uber needs to provide
2    reliable service to its customers.  And again,
3    claimant understood this.  He understood that the
4    reliability of the Uber app impacted his ability to
5    earn income when he was using the app.  He understood
6    this.
7                    In addition to the freedom he had to
8    control his use of the Uber app, he had tremendous
9    flexibility in his work.  Claimant was free to stop
10   working for two months, and he didn't need Uber's
11   permission to do that.  He testified about leaving
12   the country for two months, and that was perfectly
13   fine.  It was also up to him as to whether he would
14   maintain his commercial insurance or place his
15   account on hold.
16                   Courts, including the Fifth Circuit,
17   as you can see here, consistently recognize this
18   level of flexibility as demonstrating an independent
19   contractor relationship.  In this case, you see
20   here -- we'll certainly send you the link with our
21   briefing -- the Fifth Circuit affirmed a jury verdict
22   finding that satellite TV installers were independent
23   contractors, noting that the plaintiffs control their
24   own schedules.
25                   In this case here, the court
```

Page 687

1    determined that a taxi driver was an independent

2    contractor and found it very persuasive that

3    defendants had little control over when the plaintiff

4    drove, how much he drove, and how frequently he

5    drove.

6                    Claimant's control extended to his

7    opportunity to pursue pricing, potential promotions,

8    and incentives.  Now, in his particular case,

9    claimant made the business decision not to pursue

10   surge opportunities.  That was his decision to make.

11   If Uber was in control, it obviously would have

12   chosen for claimant to drive in high-demand areas

13   during peak times.

14                   Claimant's control included other

15   meaningful choices about his transportation services

16   business.  He chose, among other things, what

17   services to provide, which vehicle to purchase.  He

18   chose to obtain a limo license and commercial

19   insurance, which phone to buy, and what service plan

20   to use.  He chose what to wear, what city to drive

21   in.  First he was in New York, then he drove in

22   Houston.  That was his choice.  He chose when to

23   drive.  He chose when to log off.  And he made other

24   crucial decisions that we'll get to when we cover his

25   opportunity for profit and loss.

Page 688

```
 1                    During opening statement and closing,
 2      we heard that claimant only had control when he chose
 3      to log on and chose to log off the app, but the
 4      credible evidence shows otherwise.  Once logged into
 5      the app, Mr. Barysas continued to control his
 6      transportation services business.  He chose whether
 7      to accept a ride that might be through the Uber app,
 8      the Lyft app, or outside the app.  He chose whether
 9      to cancel a ride.  He chose -- if you look in Joint
10      Exhibit 5, you can sort by Column H and see all the
11      times that he chose to cancel a ride.
12                    Claimant wasn't required to use the
13      route guidance in the Uber driver app.  He had
14      control over which guidance app to use and whether to
15      use one at all, even though claimant testified he
16      didn't use Waze and stuck to the Uber mapping app.
17      We saw an e-mail from claimant to Uber informing Uber
18      he used Waze and, of course, he wasn't penalized for
19      that.
20                    Claimant was able to rate each of his
21      riders on a scale of one to five.  He chose to give a
22      one star about 20 to 30 times when he thought the
23      rider was being obnoxious or engaged in conduct that
24      was not consistent with the community guidelines.
25      One thing that was consistent, though, was that it
```

Page 689

1    was always his choice and his discretion to rate the

2    riders.

3                    A D.C. court actually looked at this

4    issue of star ratings and found that the star rating

5    system doesn't evidence control needed to establish

6    an employment relationship.

7                    Now, once logged into the app,

8    claimant also chose whether to provide amenities,

9    whether to use the destination feature, to assist

10   with luggage, whether and when to take lunch breaks.

11   He chose whether to wait for a rider, and he chose

12   how long to wait for a rider.  You heard him.  He

13   testified he often waited four to five hours for a

14   ride and sometimes even up to eight hours.  That

15   seems like a really bad business decision to make,

16   but it was his decision to make.  If there were

17   hundreds of cars in line at the airport as claimant

18   testified, it certainly wouldn't benefit Uber for

19   claimant to play video games and surf the net for

20   eight hours at a time when riders were seeking

21   transportation elsewhere outside the airport.

22                   With respect to the relative

23   investments of the Uber and claimant, claimant's

24   testimony confirms that he made all of the

25   investments in his livery business.  Uber's

Page 690

```
 1    investment in its proprietary and genius app isn't an
 2    investment in claimant's business.  It's an
 3    investment in the app that Uber allows claimant to
 4    use in exchange for a fee.  Uber didn't invest in
 5    claimant's transportation services business any more
 6    than TMobile did when it allowed him to use their
 7    cell service in exchange for a fee.  And again,
 8    claimant didn't have to use a lead-generation app,
 9    but he and he alone made the decision to do that.
10              Next is the degree of opportunity for
11    profit and loss.  Claimant made the decisions that
12    determined whether he made a profit or a loss.  Uber
13    had no control over claimant's earnings because
14    claimant decided whether, when, where, and how often
15    he worked.  He decided to use the Uber app more than
16    the Lyft app because that was his strategy and, to
17    use his words, for maximizing profits.
18              Uber had no control over claimant's
19    expenses because claimant decided which car to
20    purchase, which phone to use, what amenities to
21    provide, which platform to use.  And even though it
22    required a 638-dollar limo license and commercial
23    insurance, Mr. Barysas made the decision to invest in
24    those things because he and he alone determined it
25    would improve his opportunity for profit.  His
```

Page 691

1    opportunity, not Uber's.

2              When claimant sold his Infinity, he

3    retained the 15 to $16,000, not Uber.  When he

4    received a payout for the transmission for his car,

5    he got the payout, not Uber, because it wasn't Uber's

6    vehicle.  It wasn't Uber's investment.  And let's not

7    forget that claimant, not Uber, benefited from the

8    extensive IRS expense deductions that he took.

9              Claimant's testimony also demonstrates

10   that he used skill and initiative to maximize

11   profitability.  Mr. Barysas and Mr. Barysas alone

12   decided whether, when, where, how frequently, and how

13   long to work.  Claimant, not Uber, had the initiative

14   to obtain a limo license.  He had the initiative to

15   obtain a commercial license.  He had the initiative

16   to design his own business cards and the initiative

17   to find so many ride opportunities outside the Uber

18   app that he incurred $1100 in credit card fees in

19   just one year for livery services, according to his

20   federal tax returns.

21              Last factor -- Judge, we're almost

22   there.  Considerations that bear on the permanency

23   factor include whether or not claimant could work as

24   little or as much as he desired.

25              Another one of the considerations is

Page 692

1    the length of the relationship.  Here, Uber and

2    claimant had a trip-by-trip relationship.  After each

3    trip, claimant made the decision whether to continue

4    the business relationship each and every time he

5    logged back onto the app.

6                    Other considerations that you'll see

7    on this slide are whether claimant had freedom to use

8    other apps or pursue other business opportunities.

9    And, of course, claimant had the freedom to terminate

10    the relationship whenever he wanted, and he did do

11    that.

12                    As claimant didn't meet his burden of

13    proof to establish an employment relationship,

14    damages are simply not an issue in this arbitration.

15    But if they were, claimant failed to meet his burden

16    to prove damages.  It's actually an element of his

17    claim.

18                    First, claimant's calculations are

19    significantly inflated because the calculations

20    improperly include P1 time.  And Dr. Parrott, you

21    heard, he just refuses to provide any alternative

22    calculations that exclude P1 time, which further

23    results in claimant's failure to prove damages in

24    this arbitration.  They simply haven't presented you

25    with the proper calculation.

Page 693

1           I want to go over this issue regarding

2    P1 time very briefly.  The issue is whether claimant

3    was waiting to be engaged, which is not compensable,

4    or engaged to be waiting, which is compensable.

5           Claimant here was waiting to be

6    engaged because he was free to use that time however

7    he wished.  We talked about that, right?  But most

8    importantly, he could decide to stop waiting at any

9    time he wanted by simply turning off the app.

10          On the other hand, like Mr. Stanley

11   noted, someone who is engaged to wait doesn't have

12   the opportunity or the option to be unavailable

13   during on-call time.  For example, a stenographer

14   can't leave and not finish the job, and a factory

15   worker can't leave the building and not finish his

16   work once the equipment is repaired.  There's a big

17   difference.

18          P1 time isn't compensable, and it's a

19   clear matter of law because claimant used that time

20   to do other things that were wholly unrelated to his

21   use of the Uber app.  And this makes sense, right,

22   because otherwise claimant would be getting paid for

23   time he spent playing games on his phone, surfing the

24   net, taking walks, providing trips through the Lyft

25   app, and providing trips outside the Uber and Lyft

Page 694

1    apps, among who knows what else.

2              Just like claimant was an independent

3    contractor with TC Transport and Carolina Logistics,

4    he was an independent contractor with Uber.  Claimant

5    entered into several agreements with Uber over the

6    years, and in each agreement he acknowledged and

7    agreed that he was an independent contractor and he

8    held himself out an independent contractor.  Year

9    after year, he filed Schedule Cs with the IRS

10   identifying DB Pedicabs as a sole proprietor and

11   claiming deductions for business expenses.

12             When it benefited him, claimant agreed

13   he was an independent contractor.  You may recall the

14   communication to Uber in which he stated he was an

15   independent contractor.  And you heard why he said

16   that, because he found it on the internet from

17   another user of the Uber driver app who apparently

18   understands that the relationship with Uber is one of

19   an independently contracting nature.

20             What this e-mail really goes to is

21   claimant's credibility.  Claimant testified that even

22   though he typed this communication, he believes he's

23   an employee.  In other words, Judge, he's willing to

24   say something that isn't true if it will benefit him

25   to do so.

                                        Page 695

1          That wasn't the only testimony that

2   called claimant's credibility into question, though.

3   At his deposition, he testified that his company, DB

4   Pedicabs, had a home office, but yesterday he

5   testified he didn't.  He couldn't remember whether he

6   ever received a warning for having a low star rating

7   yesterday, but he testified at his deposition that he

8   didn't.

9          Yesterday he didn't know whether he

10  was ever deactivated for not accepting trips, but

11  testified at his deposition that he didn't.

12  Yesterday he couldn't remember whether he was

13  required to take quality improvement courses, but

14  testified at his deposition that he didn't.

15          We already covered his inconsistent

16  testimony regarding his simultaneous use of the Uber

17  and Lyft apps.  He testified he earned income from TC

18  Transport and Carolina Logistics, but he failed to

19  identify these companies in sworn interrogatory

20  responses not once, not twice, but three times.

21          Claimant even admitted he lied.

22  "There are a few times that I lied because I didn't

23  want to get a cancellation."  So according to

24  claimant, he's willing to lie if it benefits him.

25  But even his confession wasn't truthful because we

Page 696

```
 1    know he falsely represented to riders information a
 2    lot more than six or seven times that he was trying
 3    to call but it was going to voicemail, he tried to
 4    cancel the ride but the system wouldn't let him, he
 5    was currently pulled over by the police and the rider
 6    should cancel and wouldn't be charged.
 7              Now, you may recall Mr. MacLeod's
 8    statement yesterday that this arbitration is a
 9    credibility fight, but what you may not recall is
10    what he said during opening statement, and I'll quote
11    him.  "You just met Mr. Barysas for the first time
12    and, as a former judge and now someone who judges all
13    the time from a different perspective, you know that
14    there are some of those cases where they can be won
15    or lost based on the credibility of the claimant."
16    Mr. MacLeod went on to say, "I think our greatest
17    strength in this case without a doubt -- and I say
18    this as a, quote/unquote, officer of the court -- is
19    Mr. Barysas."
20              Cases can be won or lost on the
21    credibility of the claimant.  We agree.  Claimant had
22    the flexibility, the freedom, the opportunity, and
23    the choice to run DB Pedicabs in order to maximize
24    his opportunity for profit and loss.  He was in
25    business for himself, and the evidence makes that
```

Page 697

```
 1   clear.
 2                  Judge, we look forward to submitting
 3   our post-hearing brief, which will include a request
 4   for costs.  Thank you for your time, Judge.
 5                  JUDGE SOUSSAN:  Thank you.
 6   Mr. Stanley -- and I would like copies of the
 7   PowerPoints from both of you.
 8                  MS. MIERS:  Understood.
 9                  JUDGE SOUSSAN:  Mr. Stanley?
10                FURTHER CLOSING STATEMENT
11                  MR. STANLEY:  I'm low on time here.
12   Cases are also won and lost on evidence presented
13   that you have in your file.
14                  Uber talks a lot about IRS documents.
15   There's no evidence they have given you about the tax
16   implications.  There's no expert that they have
17   brought to discuss how the IRS documents impact the
18   earnings and the tax implications.
19                  Uber discussed just a moment ago that
20   he filed as an independent contractor, but he had no
21   option other than to file as an independent
22   contractor because Uber makes him do that.  They give
23   him a 1099.  They classify him as an independent
24   contractor.  He may only file as an independent
25   contractor.
```

Veritext Legal Solutions
346-293-7000

```
 1                  There was discussion of the fees from
 2      the credit card, but there was no discussion of what
 3      those fees were.  Uber speculates when they talk
 4      about it being swipes from a Cube or -- or whatever
 5      it is.  That's speculation on Uber's part, so I would
 6      like you to remember that, that testimony.
 7                  All discussion of Lyft should be
 8      disregarded by you.  Uber brought no one in to look
 9      at the Lyft data, to show you the Lyft data.  Uber
10      shows you a demonstrative, but they don't discuss
11      what that means, and they didn't bring an expert to
12      show you what data they had on Lyft, when he was
13      driving/when he wasn't driving for Lyft.  All that
14      should be disregarded by you.
15                  Uber looked only in their closing at
16      2017 but didn't discuss what other money was earned
17      and where that came from.  They gave you a gross
18      number and then gave you a smaller number from Uber
19      there, but they didn't discuss where that other came
20      from, right?  We know that he relied on Uber during
21      the entire statutory period.  We know that he must
22      stay driving for Uber in the statutory period or,
23      quote, it would be a death sentence to him.  That's
24      in the document.  He relied on them economically the
25      entire way.
```

Page 699

 1              There's no evidence that Uber has
 2   brought to you on the amount of money that was made
 3   from TC Transport, which was a small period inside
 4   the statutory period.  They have not shown that there
 5   was economic reliance that would shift the
 6   preponderance of the evidence here that Dainius
 7   relied on Uber during the time and that the economic
 8   realities shift in his favor.
 9              Carolina Logistics keeps getting
10   brought up, but that was outside the statutory
11   period.  We would ask you to disregard that.  It's
12   not included in the time that he drove for Uber at
13   all.
14              Uber has not shown you based on the
15   evidence that Dainius didn't stop driving for two
16   months during any period consecutively.  They keep
17   saying that, but there's no evidence based on the pay
18   records that they have shown you of that.
19              And then finally, as I said earlier,
20   Uber keeps telling that you Dainius could shut off
21   the app whenever he wanted, but he relied on them to
22   such an extent for his livelihood that that was not
23   practical.  He could not shut off the app when he
24   wanted.  He had to continue to drive in order to
25   provide for his family.

```
 1              We would ask you to look at the
 2    evidence that's been presented to you and rule in
 3    favor of the claimant.  Based on a preponderance of
 4    the evidence, the economic realities test weighs in
 5    the claimant's favor.  Thank you, Judge.
 6              JUDGE SOUSSAN:  Thank you.  I thank
 7    everyone.  I especially thank our court reporter.
 8    You did an excellent job.  I think the last
 9    arbitration I had, the court reporter kept on
10    interrupting saying she couldn't understand, she
11    couldn't understand.  So you did a fabulous job, and
12    I thank you so very, very much.  I know all the
13    attorneys thank you, as well.
14              To the clients, you are
15    well-represented.  You may have seen some spine back
16    and forth.  I certainly saw it.  I'm not generally
17    used to that, but we made it, we got through it.  And
18    I guarantee you, as I did when we started this back
19    in April, that the way I make up my mind is based on
20    the evidence presented by way of testimony, by way of
21    documents, and I make that promise and pledge to you
22    that I will do just that and I will make the decision
23    based on what I feel is appropriate based on the law
24    and based on the evidence.
25              So I thank you very much, and I look
```

Page 701

1   forward to your final briefs.  Anything from anyone?

2              MR. STANLEY:  Nothing from the

3   claimant, Judge.

4              MS. MIERS:  No, Judge.  Thank you.

5        (Whereupon at 4:32 p.m. the

6        arbitration was adjourned.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 702

```
 1
 2   DAINIUS BARYSAS,            )
     Claimant                    )
 3                               )
     vs.                         )  CASE NO. HON. SUSAN SOUSSAN
 4                               )  ARBITRATOR
     UBER TECHNOLOGIES, INC.,    )
 5   Respondent                  )
 6
 7                 REPORTER'S CERTIFICATE
 8                  ARBITRATION DAY 3
 9                     May 3, 2022
10
11        I, Shauna Foreman, Certified Shorthand Reporter
12   in and for the State of Texas, hereby certify to the
13   following:
14        That the foregoing transcript of ARBITRATION DAY
15   2 is a true record of the proceedings;
16        That the original transcript was delivered
17   to Kimberly R. Miers.
18        That a copy of this certificate was served on
19   all parties and/or the witness shown herein on
20   _____.
21        I further certify that pursuant to FRCP Rule
22   30(f)(1), the signature of the deponent:
23        _____was requested by the deponent or a party
24   before the completion of the deposition and that the
25   signature is to be before any notary public and returned
```

Page 703

1   within 30 days (or _____ days, per agreement of counsel)

2   from date of receipt of the transcript.  If returned, the

3   attached Changes and Signature page contains any changes

4   and the reasons therefor;

5       __x___was not requested by the deponent or a

6   party before the completion of the deposition;

7       I further certify that I am neither counsel for,

8   related to, nor employed by any parties or attorneys

9   in the action in which this testimony is taken, and

10  further that I am not financially or otherwise interested

11  in the outcome of this action.

12      Certified to by me on this the 13th day

13  of May, 2022.

14

15

16                          Shauna Foreman, CSR

                            Texas CSR 3786

17                          Expiration:  10/31/2023

                            Veritext Legal Solutions

18                          300 Throckmorton Street

                            Suite 1600

19                          Fort Worth, Texas  76102

                            Tel. (817)336-3042

20                          Firm No. 571

21

22

23

24

25

                                           Page 704

**[1 - 30]**

**1**

**1**   500:11 527:3
535:5 562:25
584:14 613:12
663:16,21 665:18
670:16,17 674:9
674:22,23 675:5
675:16 703:22
**1,162.85**   617:20
**1.12**   560:21
**1.6.**   558:12
**10**   515:10 516:9
549:7,8 581:19
595:23 596:11
618:11 630:17
656:17 672:1,4
**10,000**   498:15
**10/31/2023**   704:17
**100**   526:1
**103**   627:16 628:25
**1099**   698:23
**10:00**   494:13
**10:33**   523:14
**10:36**   523:14
**10:54**   537:9
**11**   551:17 557:17
557:19
**1100**   671:25
681:17 683:20
692:18
**1162.85**   617:2
**11:05**   537:9
**12**   585:2 616:11
653:3
**12:15**   596:8
**12:18**   596:12
**12:30**   596:12
**12:33**   599:17
**13**   550:20
**13,000**   682:25

**13,235**   498:18
**1301**   495:12
**13th**   704:12
**14**   672:7
**14131**   704:15
**15**   504:19 559:3
595:23 623:15
669:18,19,21
692:3
**15,000**   655:12
**153**   684:19
**1560**   495:7
**16**   549:11
**16,000**   692:3
**1600**   704:18
**175**   539:12
**17th**   648:24
**18**   602:9
**18,000**   623:15
**18th**   678:11
**1900**   495:12
**196**   563:4
**197**   558:11 560:21
**198**   558:21
**1985**   600:25
**199**   562:21 564:15
**19th**   678:11
**1:30**   598:1,7
599:17
**1st**   550:12

**2**

**2**   497:20,24 584:16
584:19 612:5
613:12 629:9,11
629:25 630:2
663:16,21 665:18
674:9 703:15
**2,346**   671:23
**2.2**   558:20,21
**2.3**   527:9

**2.3x**   527:9
**2.3x.**   527:9
**2.4**   564:14,23
565:21 566:7
**2.4.**   562:20
**2.6**   566:13
**2.6.2**   566:14
**2.8**   567:6 568:17
**20**   595:23 669:11
678:5 689:22
**2014**   622:5 660:11
671:22,23
**2015**   551:17
557:17,19
**2016**   622:5
**2017**   497:22,25
498:6,12,16
513:21,21 525:17
533:20 535:1
546:17,19,24
554:14 617:1
618:22 681:25
682:17,25 683:3,6
683:8,18,21
699:16
**2018**   546:20
554:14 585:20
606:10 607:10
660:2 682:6,9
**2019**   535:2 536:23
546:22,25 554:14
557:20 603:5
660:11 671:22
681:25
**202**   567:6
**2020**   603:9 607:9
**2021**   550:12 551:8
577:17 578:9
580:15,24 581:25
582:6,15,20 583:6
583:11,21 584:1

**584:23 585:4
586:3 648:24
660:1,4
**2022**   494:9,13
589:16,20 703:9
704:13
**203**   573:15
**204**   576:24
**21**   645:21
**22**   601:3
**22.74**   646:11
**23rd**   581:25 583:6
**24**   582:15
**24,556.14**   627:18
**24/7**   528:19,22
**247**   681:24 682:4
**24th**   583:21
584:22
**25th**   577:17 617:1
**26**   683:2
**27**   585:20
**27,207.66.**   611:3
674:18
**28**   645:22
**29**   674:23
**2925**   495:6
**2:57**   658:25

**3**

**3**   494:8,9,11
539:12 553:4
582:4 584:15,17
584:19 606:4
612:14 632:17
636:10 665:18
670:17 674:9
703:8,9
**3.1**   569:1
**30**   580:5 582:14
658:19,20,22
689:22 703:22
704:1

Veritext Legal Solutions
346-293-7000

**[300 - acknowledged]**

**300**  704:18
**3200**  498:13
**336-3042**  704:19
**35**  583:6
**35,000**  683:7
**36**  583:20 646:10
  646:11
**37**  580:13 686:15
**3786**  704:16
**38**  584:14
**39**  577:15 578:13
**3:00**  532:4
**3:30**  658:23
**3:34**  658:25
**3rd**  494:12

**4**

**4**  499:15 573:14
  611:5,6,7,12
  612:16 619:21
**4.1**  574:2,10
**4.2**  574:8 575:18
**4.3**  575:21
**4.4**  576:23
**40**  620:14,17
  621:13 626:14,19
  626:20,21,23
  627:6 669:12
**40,000**  655:11
**41,384**  610:19
**43,998.8**  627:9
**44**  681:19
**45.3**  616:12
**450**  612:12
**46**  648:23 649:3,8
**497**  496:4
**4:00**  613:5
**4:32**  494:13 702:5

**5**

**5**  505:23,25 585:3
  586:16 595:22

**611**:7,12 612:16
  614:5 619:21
  689:10
**50**  512:24
**50,892**  682:24
**500**  534:6,11
**517**  616:13
**537**  496:4
**571**  704:20
**596**  496:5
**599**  496:7

**6**

**6**  580:5 621:2
  639:14,24 657:9
**600**  612:13
**62**  553:20
**629**  496:7
**638**  691:22
**65**  555:21
**650**  496:8
**656**  496:8
**659**  496:11
**67,356**  610:24
**67.92**  646:13
**678**  496:13
**698**  496:15

**7**

**7**  594:13 641:14
**7.48**  645:7
**7.49**  645:7
**7.65**  627:24
**75**  623:7
**76102**  704:19
**77010**  495:13
**77098**  495:7
**785.15**  674:23

**8**

**8**  539:13 550:21
**80,000**  630:24

**817**  704:19
**839**  581:24
**85,000**  623:7

**9**

**9**  499:17
**9,000**  623:8,17
  624:5

**a**

**a.m.**  494:13
  523:14,14 537:9,9
  613:5
**abilities**  530:18
**ability**  504:9
  518:18 524:22
  528:24 538:16
  553:23 579:21
  609:21 669:21
  673:3,13,16 674:3
  687:4
**able**  506:17
  507:16 510:12
  523:2 525:9 534:1
  556:8 569:15
  609:9 614:12
  622:13 668:18
  673:5 689:20
**absolutely**  530:19
  564:9 587:6 686:4
**academic**  604:10
**accelerate**  531:12
**accept**  504:9,16
  506:25 509:2
  527:12 559:4
  563:19,20,22
  665:1 669:19,21
  671:17 685:8,15
  685:19 689:7
**acceptable**  566:17
  633:24

**acceptance**  506:22
  507:4 560:10
  666:18
**accepted**  505:7
  520:25 545:15,16
  559:22
**accepting**  505:1
  506:20 509:1
  596:20 636:18
  637:3,8,12 638:5
  663:23 666:20,22
  696:10
**accepts**  509:6
  512:4 513:10
  558:23
**access**  512:9
  534:21 535:3
  553:21 554:19
  555:6 565:6
  566:15 567:1
  592:9 679:7,9,11
**accessed**  596:19
  596:22
**accessible**  594:19
**accessing**  564:18
  564:24 565:24
  566:2,5 572:10
**account**  498:22
  503:15,20,23
  535:9 553:22
  554:2,20 555:7,24
  572:25 573:7
  585:6,11,15,21
  589:10 647:11,19
  648:23 656:12,18
  687:15
**accrued**  498:11
**accurate**  630:11
**acknowledged**
  695:6

Page 2

[acquired - amounts]

**acquired** 550:2
**act** 511:18 528:13
  630:9,14
**action** 704:9,11
**actively** 508:2
**activities** 572:16
  685:22
**activity** 605:15
  606:25 619:12
**acts** 531:3
**actual** 523:24,25
  559:14 561:3
  620:3 628:10,14
  628:19,21 629:4
  636:14 639:21
  642:19 643:12
  646:20 654:10
  674:20 676:18
**actuals** 516:22
**acwilliams** 495:13
**add** 628:3
**addendum** 572:13
**adding** 626:24
  627:1 628:5
**addition** 560:14
  568:11 679:7
  684:2 687:7
**additional** 504:4
  516:24 660:7
**additionally**
  668:24
**address** 501:18,19
**adhere** 686:3
**adjourned** 702:6
**adjust** 532:24
  575:22 656:1,12
**adjusted** 516:24
  517:3,8,10 518:1
  656:18 657:12
**adjustment**
  575:21

**adjusts** 516:22
**admission** 609:19
**admit** 649:2,7
  679:2
**admitted** 600:3
  609:25 649:10,21
  679:6 683:19
  696:21
**admonishes**
  604:18
**advantage** 531:24
  684:7,7
**advertisements**
  680:23
**advertises** 669:24
**advertising** 670:1
**advocating** 648:19
**affairs** 602:14
  603:21 604:4,23
  606:10
**affiliates** 568:12
**affirmed** 687:21
**aflci** 601:20
**afternoon** 599:24
  629:21
**agency** 555:11
**agent** 511:19,23
  528:14 538:21,23
  538:24 540:9
  553:15 554:4,6,10
  555:15,16 568:20
  572:17,19,21
**aggregate** 607:3
**aggregated** 627:13
**ago** 530:9 589:16
  594:16 619:20
  639:19 641:17
  651:11 698:19
**agree** 517:7
  537:24 572:3
  576:1 577:6

591:15,18 631:3
  632:11 640:18,23
  641:1,7 646:18,23
  659:13 697:21
**agreed** 685:8
  695:7,12
**agreement** 551:18
  557:16 558:1,2,8
  559:11 560:8
  561:9 562:23
  563:10,12,14,16
  563:17,20,24
  564:20 566:23
  570:4 572:12
  596:16,21 617:25
  671:2 695:6 704:1
**agreements** 501:5
  501:5 561:17
  685:4 695:5
**agrees** 576:24
**ahead** 587:12
  593:6 594:2
  633:25,25 646:10
**airport** 507:13
  511:7 521:3 529:7
  538:2,17,25 539:5
  539:16 547:9,19
  547:25 556:8
  564:25 566:3,6,9
  585:23,24 589:13
  592:8 664:12,14
  664:19,20,21
  665:2 672:23
  673:4,8,14 674:3
  675:5,6 676:10
  690:17,21
**airports** 547:17
**al** 510:10
**alarms** 676:13
**alert** 554:23

**algorithm** 504:12
  665:15 669:7
**alleged** 564:20
  633:21 634:7,10
  639:11 661:19
**allegedly** 684:16
**allison** 495:11
**allocated** 613:7
**allow** 538:1 539:3
  539:14 589:25
  635:20 666:2
  677:12
**allowance** 621:6
  639:16
**allowed** 519:5
  590:2,14 691:6
**allowing** 564:25
  595:21
**allows** 522:17
  691:3
**alternative** 693:21
**alto** 507:24
**amenities** 518:21
  519:3 626:2 690:8
  691:20
**amenity** 518:22
**america** 550:11
**american** 601:8
**amherst** 600:25
**amount** 506:6
  512:15,19 521:17
  526:8,9,9 527:25
  529:6 533:24
  552:17,24 608:18
  611:1 620:24
  662:22 663:2,2,11
  670:11,15 683:24
  684:9 700:2
**amounts** 526:7,10
  526:10 527:10,21
  527:23 574:17,25

Page 3

[amounts - appreciate]

627:25 661:25

**analogy** 540:11

**analysis** 602:10
604:24 605:6,12
605:14,16 606:7
606:13,17,19
608:21 609:12
610:4,12,14
611:13 612:12
613:10,24 614:12
614:19 616:15,17
616:23 617:21
618:8,10 623:5,6
623:19,22 624:4
628:4,12,15,18,23
629:6 630:13,20
633:11 645:12
650:20 651:3,7,10
651:15 652:22
653:23,24 654:2,6
654:22 686:18

**analyze** 603:1,14
607:1 609:21
610:7 612:1
614:11 615:1
630:8

**analyzed** 607:4
610:18 612:19
615:12 625:6

**analyzing** 616:1
644:2

**anecdote** 664:11
664:23 666:11

**anecdotes** 677:24

**angela** 495:17
498:1

**anomalies** 616:3

**anomalous** 615:15

**answer** 501:12
517:15 530:22
537:20 539:25

541:14,15,16,17
541:25 543:14,15
545:17 546:21
547:5 548:21
551:12 556:22
557:13 560:3
561:21 562:8,13
562:14 564:8
565:16 578:18,19
579:13,18,20
581:6 585:19
586:15 588:23,25
589:2,6,7 590:13
590:16,22 591:18
591:20 592:2,5,11
592:16,19,19
593:2 594:2,7
604:17 605:22,24
617:19 635:19
636:6 638:23
639:1 643:16,20

**answered** 504:18
543:6 544:3 564:4
565:3 579:4 590:6
593:5,19 634:2
637:5 643:14,17

**answering** 562:10
564:10 635:18

**answers** 515:20

**anticipate** 598:9

**anymore** 672:16

**anyway** 638:17
639:11

**apologize** 650:11
650:16

**app** 498:25 499:8
499:15,22,23
501:25 502:3,9
504:6 506:3 507:7
507:19,20,24
508:3,8,10,20,21

508:23,24 509:18
510:16,21,23,25
511:9,14 512:2,10
515:24 516:3,7,18
517:5 518:15,17
523:18 525:10,13
525:16,25 526:25
528:8 532:15
534:21 535:3
536:23,24 537:1
538:2,17 539:5,15
543:23 544:12,17
544:25 545:3,8
546:8,12 548:8
554:7 558:15
559:1 561:1
564:19,25 565:6
566:3,9,15 567:1
567:10 568:14
569:14 572:10
577:20 578:2
580:20 585:7,16
585:24 586:22
596:20,22 606:7
614:23 632:25
634:12,14,21
635:4 636:2
660:16 663:21
664:15 665:17
666:21,21 667:4,6
667:6 668:3,7,7,18
668:19,20,21
669:14,17 670:4
670:12 675:4
679:8,8,23 681:2
681:10,12,14,16
681:21,22,24
682:3,6,7,8,9,11
682:12,17,19,22
683:2,6,9,10 684:4
684:6,10,12,14,14

684:15,17,19,21
684:25 685:16
687:4,5,8 689:3,5
689:7,8,8,13,14,16
690:7 691:1,3,8,15
691:16 692:18
693:5 694:9,21,25
695:17 700:21,23

**apparently** 695:17

**appealable** 538:5
556:7

**appear** 616:3

**appearances**
495:1

**appears** 584:20

**appendix** 618:11
618:13 619:7,23
619:25 620:1
626:8 643:25
650:4,5,6,18 651:6
651:7 652:17

**applicable** 582:12
583:1,16 618:18

**application** 499:1
521:7 537:18
543:10 545:12,20
545:24 546:17
557:23 558:16
589:22

**applications**
500:12

**applied** 620:8
647:3 654:3

**applies** 618:4
669:9

**apply** 641:19
677:9

**applying** 649:14

**appreciate** 537:20
538:19 540:4
615:8 645:22

Page 4

[appreciate - averages]

650:13 675:20
**approach**  612:1
**approaching**
  554:24
**appropriate**  501:2
  569:3,9 596:11
  614:13 619:3
  620:9 701:23
**appropriately**
  662:14 677:13
**approval**  500:8,10
  521:23 522:6
**approximated**
  676:20
**approximation**
  670:21 676:23
  677:6
**apps**  507:22 508:1
  607:6 625:16
  634:18 680:23,25
  683:13,17,25
  684:23 685:1
  693:8 695:1
  696:17
**april**  701:19
**arbitration**  494:8
  494:11 536:4,8,12
  536:18 539:4,15
  542:24 545:9
  548:13 552:21
  559:21 582:9
  583:14 584:5
  587:24 591:9
  612:4 615:21
  618:3,6 649:24
  653:11 659:5
  675:13 693:14,24
  697:8 701:9 702:6
  703:8,14
**arbitrations**  550:5

**arbitrator**  494:4
  495:20 548:25
  589:24 592:25
  631:24 633:19,23
  634:5 703:4
**area**  528:2 604:1
  610:22 618:16,16
  618:19,20,22
  619:2 620:15,19
  642:12 665:4
**areas**  527:3,3,19
  528:5 532:1
  560:24 625:11
  641:2,3,8,9 650:24
  688:12
**arguing**  557:8
**argument**  588:5
  598:13,16,21
  599:12 677:1
**argumentative**
  643:6
**arguments**  658:13
**arithmetic**  647:2
  649:18
**arrange**  510:12,15
  511:4 665:5
**arranged**  510:24
  511:14 552:4,25
  573:21,25 574:5
  672:15
**arranging**  510:21
**arrived**  634:15
  663:25
**article**  603:18
  623:4,10,17,18
  624:5
**articles**  604:12
  606:17 609:14
  611:22 622:3
  640:11

**aside**  516:15
  544:14
**asked**  504:17
  506:19 523:16
  537:17 539:11,21
  543:5,8 544:2
  557:8 561:24
  562:7 565:2
  570:12,15 576:9
  579:3 581:16
  585:4 590:6 593:4
  593:18 596:15
  597:3,4 607:5
  633:15 635:15,17
  637:5 643:13
**asking**  523:11
  539:8 542:2
  543:12 545:6,8
  552:6,8,12 556:23
  556:24 563:13
  565:11 576:5
  579:15 581:12,14
  584:9,11 593:24
  632:8,11 650:23
  651:1 665:11
**assess**  610:8
**assessment**  606:8
**assigned**  622:19
**assignment**  501:4
  610:3,6
**assist**  690:9
**assistant**  601:25
  657:6
**associate**  657:8
**associated**  611:14
  611:18 619:2
  620:23 626:5
  654:24 676:22
**association**  601:8
  601:11,11

**assumed**  598:2
**assumes**  635:6
  636:4
**attached**  494:17
  704:3
**attempting**  632:13
**attended**  601:14
**attorney**  631:15
  683:13
**attorneys**  701:13
  704:8
**august**  648:24
  671:22 681:25
**authority**  640:15
**auto**  518:13,14
**automatically**
  685:14
**automobile**  621:23
  622:22
**automobiles**
  624:18 642:7
**availability**
  504:10 614:23
**available**  503:14
  504:23 507:22,23
  507:24 581:9,10
  594:22 597:25
  608:10 610:16
  613:16
**avenue**  495:6
**average**  533:11
  534:5,10 566:16
  566:17,20 567:2,3
  620:10 622:21
  623:21 624:1
  625:6 627:19
  640:19,22 653:15
  654:1,12 655:4,16
  655:17 656:1
**averages**  655:15
  655:22

Page 5

[avoid - bills]

**avoid**  524:13
564:10
**avoidance**  585:12
**award**  515:9,11
**aware**  506:7 519:9
520:2 526:24
529:25 531:2,22
532:7 533:11,19
534:20 535:2
536:7,11,15,17,21
548:18 549:1,4
554:12 555:11,17
560:4 568:1,23
597:6,9,13 632:7

**b**

**b**  569:2 580:5
619:23,25 626:8
650:18 651:6
**back**  503:13 505:9
506:6 511:11
513:8 523:13
551:7 555:21
556:1 558:20
560:20 565:15
584:25 585:3
589:6 590:19
600:2,5 611:6
619:22 621:2
626:8 634:10,16
635:2,16,24 636:7
638:25 650:17
657:22 659:19
660:8 662:13
663:7 667:4 693:5
701:15,18
**background**
601:17
**backseat**  511:9
**bad**  690:15
**balance**  573:9

**bank**  525:4,5,7
572:23,25 573:2,7
**bare**  674:13
**barrier**  671:3
**barysas**  494:2
495:18 498:16
508:1 515:14
518:24 519:16,20
526:2 536:4 549:9
586:22 596:25
608:1 609:2 610:8
611:19 615:6
616:12 626:14,17
629:15 633:3,21
634:7,11,17 635:2
636:1 637:7
638:13 639:3,8,21
642:15,19 643:12
648:20 651:3
652:18,25 653:7
656:13 659:8
660:10 661:7,24
662:24 663:15,24
667:9,17 668:13
672:25 678:3
679:18,23 680:21
681:3 682:10
683:11,16 689:5
691:23 692:11,11
697:11,19 703:2
**base**  516:20 521:5
523:23 526:8
574:16,24 661:22
681:8
**based**  516:19,22
523:22,24 526:11
527:12 534:14
543:24 559:10
567:7 577:10
591:3,8 593:2
594:24 595:1

603:19 605:14
606:7 609:10,12
617:10 622:10,10
629:6 631:17
633:11 641:22
654:11 659:16
662:6,15,24,24
664:23 667:10
670:3 674:9,10
675:24 678:4
682:23 697:15
700:14,17 701:3
701:19,23,23,24
**basic**  654:17,20
**basically**  509:4
619:25 626:15
**basis**  517:18,20
542:13,16 546:15
573:5 577:1
578:23 581:6,16
592:16,18,19
607:16,24 610:18
613:8 620:21,22
626:23 627:6
628:13,19 659:15
**bear**  692:22
**bearing**  645:22
**becoming**  601:17
**beer**  532:4
**began**  618:4
630:21
**beginning**  603:5
618:5
**begins**  498:24
499:7 613:5
**behalf**  512:2
586:15 589:25
597:1 610:10
**belabor**  520:15
**belief**  593:3

**believe**  505:13
540:2 547:2,18,19
551:24 557:12,24
563:1,1,15 564:4
566:12 567:19
573:4,8 578:4
587:8,9 591:12
594:15 595:5,13
597:2 598:2
609:20 611:17,23
619:21 630:18
631:7 633:12
634:20,22 648:17
**believes**  695:22
**belongs**  675:1
**beneficial**  681:12
**benefit**  573:8
690:18 695:24
**benefited**  692:7
695:12
**benefits**  672:9
696:24
**benjamin**  495:10
**berkeley**  602:25
603:7 604:6
**best**  544:10 579:21
630:23
**better**  531:15
588:18
**beyond**  619:6
625:12 682:1
**bias**  632:13 648:3
649:13,19
**big**  594:11 694:16
**bigger**  529:20
573:19
**bike**  680:10
685:23
**billions**  668:6,9
**bills**  536:16
679:25

[bit - car]

**bit** 497:19 504:1
518:20 526:2
553:3 596:9
600:21 601:16
622:25 624:3,11
663:17 664:1
**black** 529:16
617:10
**block** 554:2
**blocked** 553:22
555:13
**blocks** 526:13
**blow** 497:19 645:6
**blurs** 593:9
**board** 501:6
**book** 668:18
675:21 676:7
**bottled** 626:2
**bottom** 528:1
554:19 564:16
582:5 584:15
588:23 605:3
627:22 629:11
630:2
**box** 513:8
**brad** 495:17 496:3
497:10,13 667:3
**brake** 531:13
**brand** 528:17
**branding** 568:8
**break** 537:4 596:6
596:9,11 598:7
599:8,10,16
658:17
**breaks** 690:10
**bret** 495:4 597:22
**brief** 598:13,17,20
619:9 698:3
**briefed** 587:2
590:8

**briefing** 587:2
676:17 687:21
**briefly** 694:2
**briefs** 702:1
**bring** 501:6
505:16 659:4
699:11
**brings** 509:13
672:24
**broad** 531:5
**broader** 617:25
**broadly** 605:16
**broke** 664:22
**brought** 674:6
675:15 677:24
698:17 699:8
700:2,10
**budget** 602:5
**build** 668:18 681:7
**builder** 666:5
**building** 513:13
641:23 666:6
694:15
**built** 622:9
**burden** 580:7
678:23 693:12,15
**bush** 585:22
589:12
**business** 507:12
519:16,18 533:7
535:16,19,20,22
535:23,24,25
540:15 541:19,22
542:1 563:5,14
572:20 613:20
621:6,11,16,18
622:1 633:8
639:16,25 668:18
670:2,7 675:8
679:20 680:7,15
680:16,21,24

681:4,5,5,6,7,13
682:12 684:3
685:22 688:9,16
689:6 690:15,25
691:2,5 692:16
693:4,8 695:11
697:25
**businesses** 555:18
**button** 504:8
505:10 506:16
509:20,21 510:1
563:19,22,25
**buy** 688:19

## c

**c** 495:11 619:7
643:25 650:5,6
651:7 652:17
**c41** 631:1
**c7** 672:24
**calculate** 627:22
639:21 640:16
647:7
**calculated** 534:9
577:1,10 595:3
662:17 674:21
**calculating** 634:9
651:3
**calculation** 520:14
523:3,22 526:6
574:8,10 575:14
575:15 576:20,22
577:2 646:24
678:4 693:25
**calculations**
633:14,20 634:6
634:15 635:24
639:5 647:4 657:4
657:5,7 693:18,19
693:22
**california** 602:25
603:7 604:5

**call** 597:20 638:2
646:7 670:18
694:13 697:3
**called** 507:24
524:23 527:1,5
583:22 601:10
680:8 696:2
**calls** 511:7,15
638:7
**cancel** 512:4 576:3
576:14 685:7
689:9,11 697:4,6
**canceling** 512:7,10
512:15,17,24
514:3
**cancellation**
512:21,23 514:7
514:10,11,12
522:4,7,17 670:10
696:23
**cancels** 513:23
514:6
**candidate** 500:20
500:22
**candidates** 500:17
500:18
**capable** 678:18
**capacities** 601:2
**capital** 667:11,12
668:8
**car** 515:4 519:17
529:10 530:8
612:23 624:16
625:4,17,22
642:25 653:20,25
654:21 656:2,13
656:18 664:14,25
667:19,20,21,24
680:11 691:19
692:4

[card - claimant]

**card** 511:20 525:6
527:7 670:2
681:15,18 683:20
683:22 692:18
699:2
**cards** 507:12
519:17,18 681:5,5
681:6,7 692:16
**care** 569:6,20
616:1 644:1
**career** 602:17
**carefully** 614:10
616:5 641:23
646:6
**carolina** 685:24
695:3 696:18
700:9
**carry** 619:10
**carrying** 608:13
613:19
**cars** 625:7 626:6
654:1,10,11,13,14
654:17 690:17
**case** 494:3 539:3
540:18 541:23
543:25 574:21
589:8 590:15
600:4 607:2 608:4
611:15 615:5,19
615:25 616:23
617:12 623:2,14
625:4 626:13
628:15 631:18
632:8 636:21
649:12 651:12
655:21 656:4
661:13,15 667:10
679:18 686:16
687:19,25 688:8
697:17 703:3

**cases** 540:19,21
612:8 615:21
622:9,11,23,25
630:14 649:24
651:9,14,14,19
697:14,20 698:12
**cause** 494:12
**cell** 625:15 691:7
**center** 602:14
603:21 604:3,23
606:9
**centuries** 678:12
**certain** 506:5
514:8 519:24
528:20,25 530:6
532:7 539:19
558:25 589:2
590:25 636:13
662:7 686:7
**certainly** 616:20
669:24 687:20
690:18 701:16
**certificate** 703:7
703:18
**certified** 494:14
703:11 704:12
**certify** 703:12,21
704:7
**cfr** 674:23 675:19
**challenged** 659:11
**challenger** 567:25
**change** 513:20
574:9,17,24
575:10,14 590:1
661:24 662:8,9,21
662:23
**changed** 512:13
571:25 588:10,13
666:23
**changes** 533:23
574:8,16 575:6

**cases** 576:20 620:8
704:3,3
**changing** 533:22
586:14 587:8
**characterized**
617:2,4 652:1
**charge** 521:20,24
525:7 552:3
573:20 574:4
**charged** 663:2,3
697:6
**chargers** 518:25
530:6 546:4,6
**charges** 525:5
**check** 547:18
615:4 647:3
**checkers** 676:12
**checking** 513:7
614:6
**checks** 614:20
616:6
**chicago** 603:13
**chief** 602:2
**choice** 598:20
660:13,15 680:14
688:22 690:1
697:23
**choices** 528:25
529:3 688:15
**choose** 527:13
598:18
**choosing** 684:2
**chose** 667:20,20
680:21 681:3,11
681:11,21 684:4
688:16,18,20,22
688:23 689:2,3,6,8
689:9,11,21 690:8
690:11,11
**chosen** 680:23
688:12

**circuit** 661:10
671:9 672:1
687:16,21
**circuit's** 679:21
680:19
**circuitous** 521:12
**circumstances**
517:2 625:13
661:16
**cite** 638:12 639:7
640:11,14
**cited** 653:21
**cities** 654:19
**city** 519:24 520:3
520:3,5 526:13
527:4 546:18
547:11,16,20
554:13 560:24
577:23 582:16,25
601:23 602:1,4,8
602:11,14,16,25
603:2,8,10,16,21
604:3,7,7,23 605:5
606:9,10,23 607:3
607:14 610:22
618:16,19,20,21
618:23,25 620:14
622:7,12,14 623:4
623:17 624:4,14
624:20 626:9,13
636:21 650:21
666:15 670:5
688:20
**city's** 520:10
604:21 606:6,23
**civic** 654:18
**claim** 672:10
674:14 693:17
**claimant** 494:2
495:3 497:23
498:10,11 507:7

[claimant - compare]

516:5 536:9,13,19
536:22 539:4,14
543:16 549:9
550:24 551:5
552:16 585:7,13
585:16 589:14
590:4,18 592:3
596:19 658:7,9
661:7 677:19
678:22 679:3,7,25
680:3,6,13,16,20
681:9,20,21 682:2
682:21,25 683:5
683:19 684:11
685:6,17,21 686:5
686:7,11 687:3,9
688:9,12 689:2,12
689:15,17,20
690:8,17,19,23
691:3,8,11,14,19
692:2,7,13,23
693:2,3,7,9,12,15
694:2,5,19,22
695:2,4,12,21
696:21,24 697:15
697:21,21 701:3
702:3 703:2
**claimant's** 498:5
549:7,8 553:3
560:1 585:6,11,15
585:21,23 589:10
631:1 677:17
679:12 681:19,23
682:16,18 683:8
684:8,20 685:8,25
688:6,14 690:23
691:2,5,13,18
692:9 693:18,23
695:21 696:2
701:5

**claimed** 686:12
**claiming** 637:2
695:11
**claims** 550:24
679:14
**clarify** 556:23
562:4,8 632:10
**classified** 536:5,20
648:20
**classify** 698:23
**clean** 625:22
**cleaning** 614:6
625:19,24 626:5
670:9
**clear** 548:19,20
561:11,20 591:12
623:2 629:9 661:4
679:4 683:18
686:16 694:19
698:1
**clearly** 608:3
671:9 672:3
686:13
**click** 509:4 563:19
563:19,19 595:6
595:12
**clicked** 563:22
**client** 517:17
542:8,23 543:10
543:24 544:5,12
544:17 546:24,25
548:8,13,22 550:9
557:4 561:18
**client's** 542:13
**clients** 507:14,15
528:12 701:14
**clinton** 530:10
**close** 666:14,16
677:7
**closing** 496:10,11
496:12,13,14,15

598:12,16 658:13
659:2 663:17
678:7 689:1
698:10 699:15
**closings** 598:9
**code** 672:7
**colleague** 603:6,12
603:21
**collect** 522:22
577:9 658:17
**collecting** 522:20
**collection** 511:18
511:23 528:14
538:20,23,24
540:9 553:15
554:4,6,9 555:10
555:15,16 568:20
572:17,19,21
594:12 666:1
**collectively** 623:19
**collects** 523:17
572:22
**color** 527:4 637:23
**column** 644:9,17
644:18,20,22
645:11,17 646:1
646:16 651:7,16
689:10
**columns** 644:17
647:1,3
**come** 505:6 506:23
513:13 558:20
607:13 611:5,14
613:2 622:14
623:10,19 626:11
626:25 627:17
635:20 645:16
655:16 664:10
665:9
**comes** 532:2 554:7
615:2 650:8

669:14
**coming** 542:5
553:14 611:8
614:7 654:7
**comment** 543:12
**commercial**
624:15 687:14
688:18 691:22
692:15
**commercially**
671:6
**commission** 520:5
603:1 606:9,24
**commission's**
520:11
**committing** 673:1
**common** 519:10
519:12,14 584:22
**communicate**
499:22
**communication**
575:1 695:14,22
**communications**
679:10
**community**
505:11,14,20,25
506:9 516:13
666:23 685:11
686:3 689:24
**companies** 540:9
550:1 568:1,7,9
604:22 605:17
625:21 696:19
**company** 507:17
541:5 563:2,5,7,8
568:11 636:12
648:16 672:13
680:8,9 696:3
**compare** 499:25
501:24 540:8
645:24 653:17

[compare - copyright]

668:11 669:25
**compared** 607:9
　613:9 615:13
　622:23 624:10
**comparison**
　642:19 643:11
**compel** 586:7
**compensable**
　631:20 633:13,20
　634:6 674:23
　675:17,23 676:4
　694:3,4,18
**compensate**
　617:25 621:7
　640:1
**compensated**
　632:24 633:4
　663:16
**compensation**
　499:11 500:23
　602:20 603:4,11
　605:4 610:7
　612:10,11
**compiles** 621:14
**complaining** 536:5
**complete** 673:4
**completed** 574:18
　575:7,13 603:9
　671:23,24 681:24
　682:17
**completely** 664:16
　684:11
**completes** 524:17
**completion** 703:24
　704:6
**complex** 541:5
**component** 653:19
　653:19
**components**
　622:20 661:22

**comptroller's**
　602:3
**computer** 501:15
**computerized**
　494:15
**con** 510:10
**concepts** 575:17
　587:19,22
**concerning** 585:5
**concluded** 610:19
　611:2
**conclusion** 638:8
**conduct** 570:9
　586:20 686:7
　689:23
**conducted** 628:13
**conducting** 541:22
**conducts** 540:14
　541:18
**conferences**
　601:15 604:10
**confession** 696:25
**confidential** 501:4
**confidentiality**
　501:3
**confirm** 552:10
　594:21
**confirms** 690:24
**conflating** 575:16
　587:18,21
**confuse** 678:14
**connect** 619:3
**connected** 616:24
**connection** 621:24
　625:8
**consecutively**
　700:16
**consensual** 510:8
**consequence**
　516:1,11 520:20

**consequences**
　505:1 506:20,21
　512:6 521:15
**consider** 535:15
　535:18 680:2
**consideration**
　604:13
**considerations**
　692:22,25 693:6
**considered** 516:12
　675:22
**consistent** 572:16
　689:24,25
**consistently**
　671:22 687:17
**constantly** 533:22
**constructed**
　528:15
**contact** 510:3,8,10
　511:5 514:23,25
　515:5 668:20
**contacting** 510:4
**contained** 679:8
**contains** 704:3
**contemplated**
　565:21
**contemplates**
　566:7
**contentions**
　677:23
**contested** 631:19
**context** 674:24
**continue** 497:8
　566:15 596:1
　693:3 700:24
**continued** 496:4
　497:12 680:3
　689:5
**continuing** 497:4
　602:15

**contract** 562:23
　603:23 605:11
　666:4
**contracting**
　695:19
**contractor** 536:6
　661:12 672:13,20
　687:19 688:2
　695:3,4,7,8,13,15
　698:20,22,24,25
**contractors**
　687:23
**contractual** 685:3
**contradict** 560:7
**control** 528:24
　532:21 534:17
　659:7,23 661:19
　662:4,6,25 664:5
　668:15,22 669:2,3
　669:4,8,15 672:18
　673:15 680:14,20
　684:10 686:18,20
　686:21,24,24
　687:8,23 688:3,6
　688:11,14 689:2,5
　689:14 690:5
　691:13,18
**controlled** 660:21
　663:1 664:10
　665:14 666:1,17
　675:2 685:18
**controlling** 667:5
**controls** 669:7,13
　669:13,18
**coordinate** 511:8
　514:21 515:6
**copies** 698:6
**copy** 600:10
　703:18
**copyright** 578:9
　580:24 582:6,20

[copyright - dainius]

583:10 584:1
**corner** 509:5
577:16
**corporate** 545:10
550:4 570:23
571:4 576:5 577:6
580:1 588:7 660:6
664:11,24 673:25
**correct** 497:5
522:19 537:18,22
538:2,6,17,22,25
541:23 545:22
547:6,21 549:22
550:5,12,13 551:8
551:10,16,23
552:4,14,15 553:9
553:16,24 554:16
554:20 555:8,9
556:17 557:24
559:4,5,16 560:17
567:10,11 569:6
569:16 572:5,13
572:24 573:21,25
574:11 575:25
576:3 582:2,21
583:11,17 586:1
589:14 590:25
593:2 595:12,24
600:16,19 612:5
626:3 630:16
631:12,16 632:20
633:1,2 638:14,15
639:23 640:10,24
645:1,10 646:1
647:15 657:14
**corrected** 616:9
**correctly** 561:13
566:22 595:13
**corresponding**
527:20

**corridan** 495:17
**corroborated**
659:17
**cost** 529:12,23
622:19 624:17
625:3,12,14 643:1
653:21 654:11
676:19
**costs** 524:3 624:21
624:21 625:5,6,10
625:19,24 642:3,9
643:2 676:20
698:4
**counsel** 520:14
537:16 539:2,13
539:21 540:17
542:21 543:5
544:2 551:19
562:3 565:10
570:12 578:3,4
579:12 580:10
588:6 592:7,18
593:7,10,23 594:9
614:3,4 635:14
653:5 677:1 704:1
704:7
**counsel's** 539:8
548:6
**count** 617:22
628:22 653:2
**counted** 628:24
648:13
**counting** 615:18
**country** 641:2,3
687:12
**couple** 501:7
514:18 526:12
543:22 577:14
596:5 625:11
677:7

**course** 520:8
556:3,12 590:10
667:21,22 674:16
689:18 693:9
**courses** 554:25
555:20 696:13
**court** 565:12
605:22 635:12
687:25 690:3
697:18 701:7,9
**courtesy** 572:5
**courts** 686:19,23
687:16
**cover** 590:20
688:24
**covered** 502:8
590:20 653:10
696:15
**covid** 501:7
**create** 500:8,9
507:12 519:5
624:6
**created** 591:4,7,11
591:14 673:20
681:6
**creating** 519:9
**creation** 498:22
**credentialed**
674:13
**credibility** 695:21
696:2 697:9,15,21
**credible** 684:21
689:4
**credit** 511:20
528:16 681:15,18
683:20,22 692:18
699:2
**critical** 648:15,16
**cross** 542:9 544:8
565:7 609:24
614:6 616:6

629:18 632:2
635:10 649:21
653:6
**crossword** 676:12
**crucial** 688:24
**cs** 695:9
**csr** 704:16,16
**cube** 699:4
**culminating**
619:14
**current** 569:3,9
**currently** 551:4
603:20 697:5
**curriculum** 600:5
600:15
**customer** 528:19
530:1,3 531:9,15
531:16 551:6
552:18,24 560:25
562:24,25 563:4
564:17 565:24
572:11 573:18,19
574:3,15 575:5
576:24 681:7
**customer's** 562:21
564:15 573:23
**customers** 541:9
541:19 686:2
687:1,2
**cut** 525:18,21
**cute** 530:11
**cv** 606:4

**d**

**d** 495:10 645:17
**d.c.** 690:3
**dainius** 494:2
495:18 537:21
538:10 539:4
543:9 545:2,9,11
545:19,25 546:3,8
546:12 547:8

Page 11

[dainius - demonstrate]

548:22 549:1,9,17
552:2,23 556:7
557:22 559:2,13
559:20 564:24
566:1,9 568:21
569:8 572:4
574:24 575:2,12
577:7 580:19
586:22 587:23
589:17,21 593:17
595:4 659:8
660:10 663:4,7,15
663:18,24 664:3,6
664:12,21 665:3
665:12,12,16,16
665:24 666:2
667:9,13,17
668:13,17 669:1
669:10,15,19,25
670:11 671:5
672:25 673:3,13
673:21 674:15
675:15 676:9,23
677:12 678:3
685:23 700:6,15
700:20 703:2
**damages** 609:22
630:8,13 633:21
634:7,10 635:24
640:16 674:4,5,6,7
674:19 693:14,16
693:23
**data** 522:21,22
523:17 567:20
588:2 589:14,21
590:4,18 592:3,10
593:15,17 605:14
605:18 606:22,23
607:3,5,7,8,12,15
607:20 608:2,3
609:1 610:13,15

610:16,18 611:18
611:24 612:2,16
612:19 613:3
614:1,3,6,7,9,11
614:18 615:2,15
615:24 616:2,4,5,7
616:8,19,21 618:8
619:17,19,25
620:4 622:7,10
624:24 625:1,15
626:1 627:10,10
634:13 636:7
642:12 644:2
652:2,5,6,10,14,17
652:18 657:7
679:4 685:3 699:9
699:9,12
**date** 585:4 600:16
600:19 704:2
**dates** 660:1
**day** 494:8,11,12
503:24 520:8
590:6 595:18,19
703:8,14 704:12
**days** 501:7 684:8
684:19 704:1,1
**db** 680:8 695:10
696:3 697:23
**deactivate** 510:7
510:20 554:2
564:17 567:1
572:9
**deactivated**
506:10 510:3
512:15,17,20
516:5,14 519:2
535:9 553:23
555:13,25 585:7
585:12,16 597:11
636:18 637:3,7,11
638:4,13 686:7,8

696:10
**deactivation**
506:12,13 555:22
636:15 685:9,11
685:14 686:11
**deal** 517:22 555:4
**dealing** 557:6
655:22
**death** 673:10
699:23
**debit** 525:5
**deborah** 495:16
**december** 551:17
557:17,19 607:9
**decide** 521:20
592:1 631:24
646:15 649:15
663:11 665:12
694:8
**decided** 575:9
657:17 663:15
664:6 691:14,15
691:19 692:12
**decides** 510:9
513:23 525:1
535:6 665:8
668:25
**deciding** 671:12
**decision** 513:16
525:2 529:9
536:25 537:17,21
537:24,25 538:3,4
538:16,25 539:1,6
554:1 556:7,16,18
556:20 559:3
561:4 566:25
576:2,13,14
595:21,23,25
682:12 688:9,10
690:15,16 691:9
691:23 693:3

701:22
**decisions** 688:24
691:11
**declare** 550:9
**decline** 505:4
685:19
**declined** 685:9,20
**declining** 685:13
**deductions** 692:8
695:11
**default** 518:18
524:19,21 526:7,8
526:9,10 527:10
**defendants** 688:3
**defense** 538:11
**defensive** 520:8
**define** 550:6
561:15 572:20
**defined** 514:12
560:22 562:25
563:4 566:20
574:10
**defining** 561:12
**definitely** 632:14
**definition** 558:12
613:13
**definitions** 558:21
**deflated** 641:2,8
642:18 643:11
**degree** 661:18
668:13 691:10
**delay** 678:21
**delays** 676:3
**delivered** 703:16
**demand** 526:11,13
526:15 528:18
532:6 662:8
688:12
**demonstrate**
632:13 686:17,21

Page 12

[demonstrates - document]

**demonstrates**
680:19 692:9
**demonstrating**
687:18
**demonstrative**
682:16 699:10
**deny**  552:10
**department**
601:21,22
**depended**  685:12
**dependence**
679:22 680:1
**dependency**
677:15,16 678:1
**dependent**  679:19
680:3,7
**depends**  613:21
631:10
**deponent**  703:22
703:23 704:5
**deposition**  580:5
684:22 696:3,7,11
696:14 703:24
704:6
**depot**  541:10
**depreciation**
529:19 642:5
643:1 653:16
**derived**  620:5
622:24,25 624:19
683:1
**describe**  534:8
554:5 568:20
**described**  498:15
506:8 523:4
528:16 538:21
553:15 554:3
555:14 653:1
**describes**  515:20
522:14 527:17,18
527:19 532:13

**description**  500:14
**design**  692:16
**designed**  553:7
**desired**  692:24
**despite**  682:18,20
685:8
**destination**  509:25
582:2,11 608:13
690:9
**details**  585:10
**detection**  589:13
590:3,17 592:2
593:16
**determination**
611:8
**determine**  527:11
588:9 608:24
612:18 615:5
616:6 646:24
680:2 684:5
**determined**  527:4
577:2 589:17,20
663:24 668:13
681:12 682:10
688:1 691:12,24
**determines**  633:19
634:5
**devastating**  673:9
**development**
602:2 603:3
**deviations**  512:22
**device**  568:14
**dictate**  503:23
**dictation**  675:22
**difference**  531:9
628:19 645:2
694:17
**different**  507:20
507:22 508:21
511:21 514:18
516:17 517:3,7,7

521:9 544:3
552:17 575:15
587:16 609:14
615:2 618:18,23
620:15 627:4
638:10 654:10
661:1,14 670:4
673:22 675:8
684:19 697:13
**differentiate**
661:11
**differently**  614:16
**difficult**  562:10
**digitally**  672:15
**diligence**  569:6,24
**direct**  542:21
564:8
**directed**  517:17
544:9 589:2
**direction**  512:25
678:15
**directly**  510:4,13
510:16 514:21
550:25 551:5
587:10 606:24
662:19 666:2
669:1
**director**  549:21
602:13
**directs**  551:17
**discourages**
636:12
**discovery**  578:21
583:4 587:14,18
**discrepancies**
646:7,8
**discrepancy**
657:17
**discretion**  558:17
566:20,25 572:8
574:11 576:2,4,9

576:11,19 662:21
684:5 690:1
**discrimination**
686:9
**discuss**  641:14
674:6 675:15
698:17 699:10,16
699:19
**discussed**  598:9
653:5 698:19
**discusses**  674:24
**discussing**  540:14
631:5
**discussion**  537:8
587:2 590:10
699:1,2,7
**discussions**  593:7
593:10,22,25
594:9
**dishonest**  647:23
**dispatch**  608:10
612:22 613:17
616:20 636:13
639:4 653:4
**dispatches**  669:8
**disregard**  700:11
**disregarded**  699:8
699:14
**distance**  523:24,25
662:17
**distraction**  678:21
**divided**  612:21
**dmitri**  603:13
604:15
**doc**  572:6,14
**doctor**  600:10
604:16
**document**  552:13
552:20 559:7
560:6 574:21
575:1 576:7,10

[document - drivers]

578:5,13,16,24
579:8,10,15,24
580:14,15 581:13
581:17 582:13,23
582:24 583:3,14
584:16 665:6
679:2 682:8,23
699:24
**documentary**
563:21 582:8
584:11
**documents** 501:2
579:22 580:10
584:22 585:25
589:3 592:10
593:14 597:5,7,10
659:19,23,23
660:2,3,8,22
662:15,23 664:17
666:19 670:13
672:5 673:9
674:10 678:1
679:5 698:14,17
701:21
**docusign** 550:17
550:19 585:1
**doing** 516:11,14
521:15 532:7
558:12 564:9
602:9 603:16
632:5 649:17
675:9,11 686:6
**doled** 573:2
**dollar** 527:23,25
627:25 691:22
**dollars** 668:6,9
**don** 495:15 503:9
505:15 518:8
534:12
**door** 531:13

**double** 615:18
**doubt** 585:13
683:15,18 697:17
**dozens** 648:11,11
**dr** 496:6 597:21,25
599:4,5,10,18,21
600:2 605:21
609:9,24 610:1
615:7 617:21
623:3 630:12
635:7,13,19,23
636:6 638:23
643:16 646:18
649:22 650:3
657:3 658:4
693:20
**drag** 678:13
**dragged** 678:17
**drawing** 573:1,11
**drive** 528:5 529:9
531:12 546:16
582:16,25 663:22
667:21,22 670:25
671:3,4,8 688:12
688:20,23 700:24
**driven** 546:18
608:20 610:17
613:9 627:13
672:3
**driver** 498:14,24
498:25,25 499:7,8
499:14,21 501:25
502:3,9,22,22
503:6,20,22,24
504:5,6,6,8,13,15
504:20,23,25
505:4,6,6,7,9
506:5,6,25 507:1,7
507:19 508:2,4,9
508:10,11,16,19
508:20 509:2,6,8

509:10,11,13,17
510:16,23 511:3,5
511:7,8,10,11,13
511:24 512:3,4,7,9
512:9 513:1,2,5,10
513:11,12,16,17
513:18,21,23,24
514:1,16,17,18,19
514:20,23 515:3,5
515:21,24 516:2,3
516:7,9,13,16,18
517:3,5,7,11 518:2
518:12,16,16,17
519:2 520:23,25
521:1,2,3,3,4,11
521:12,13,16,18
521:20,23 522:1,3
522:14 524:4,5,8
524:10,13,17,20
524:21,22,23
525:6,10,13,25
527:2,6,10 528:8
528:25 529:4
530:9,11 531:1
532:15,17 534:15
534:21 535:3,6,13
535:15,17 536:23
537:1,2 539:5,15
543:17 546:16
547:24 553:22
554:7 555:5
558:15,23 559:1,1
559:13 561:1
564:18,18,25
565:22,24 566:3
566:15,16 567:1
567:10 568:14
569:1,14,14 572:2
572:3,9,10,11,13
572:23 573:3,8
574:3 582:1,11

585:7,16,24
594:19 595:6,11
596:20 604:21
606:13,18,19
607:16 608:4,9
609:5 612:21
613:16 614:22
617:2 622:17
625:4,14 632:23
636:2,15 657:12
665:9 668:6,7
672:12,14 676:15
679:23 680:22
681:2,10 682:19
682:22 683:2,10
684:4,17 688:1
689:13 695:17
**driver's** 507:3
511:20 514:15
525:2 530:17
534:17 535:7
559:2 567:1,2,8,13
567:23 568:2,13
568:24 656:1
671:1,2
**drivers** 499:14,21
501:24 502:2,6,9
502:12,16,18,19
502:20 503:13,13
503:14,17 506:22
507:11,15,18,19
510:2,3,7,8,12,15
510:20,23 512:2
512:14,20 515:7
515:23 518:5,21
519:5,9,17,25
520:6,17,21
521:14 522:6,21
522:25 523:19
525:10,12,25
526:14,23 528:4,7

Veritext Legal Solutions
346-293-7000

[drivers - encountering]

528:9,21,23 529:7
529:8,9,10,11,12
529:15,22,25
530:2,5,6 531:2,8
531:11,13,15,17
531:22,25 532:5,7
532:19,21 533:8
533:12 534:21
535:2,18 547:12
547:17 553:8,21
560:25 571:10
587:11 604:21
605:4,7,13,18
606:7 607:1,5,14
607:19,23 608:25
611:24 613:24
618:1 622:11,18
623:4,7,9,13,14
624:14,16 625:19
625:22 636:12,20
642:12 648:19
654:7 655:5,7,8,10
655:18 662:7
665:1 666:11
684:18 686:3
**driving** 520:8
531:10,11 537:18
557:22 585:6,11
585:15 587:24
605:15 606:25
608:15 619:12
620:18 665:21
667:13,14,23
668:20 671:6,13
673:22 674:16
699:13,13,22
700:15
**drop** 538:1 556:8
565:1 566:4,10
585:22 589:12

**dropped** 509:16
509:17 640:3
**drove** 544:12
580:20 608:14
626:14 642:25
653:11 655:10,11
656:19 671:19,21
674:17 688:4,4,5
688:21 700:12
**drunk** 529:10
**due** 569:6,16
585:23 589:13
590:17 624:13
648:2 673:4
**duly** 497:11
599:22
**duty** 674:24 676:6

**e**

**e** 495:8,13 501:17
501:19 502:18,19
502:23 503:8,11
528:19 583:22
584:6 679:9
689:17 695:20
**earlier** 514:20
523:4 526:7
528:16 554:12
570:6 571:9
576:18 631:7
643:25 651:4
660:3 700:19
**early** 521:11,13,16
548:23 549:2
603:5
**earn** 529:6,17
553:23 687:5
**earned** 630:19
696:17 699:16
**earning** 530:17
531:3 606:6

**earnings** 498:9,10
498:17 531:18
532:8 623:6
679:25 691:13
698:18
**easier** 620:2 647:6
647:9
**easy** 647:4
**eating** 519:10,11
**economic** 529:24
601:4,8,20 602:2
602:10,13,18
606:7 621:19
622:2 659:7 661:9
667:7 669:10
673:15 679:22
680:1 684:6,7
686:18 700:5,7
701:4
**economical** 529:13
**economically**
679:19 680:6
699:24
**economics** 600:24
601:18 604:1
621:22
**economist** 601:1
602:2,24 609:9
**economists** 601:12
656:4
**economy** 602:5,23
604:1 647:20
648:6,8,12,19
**education** 600:22
**effect** 559:11
566:24 579:2
673:21
**effective** 558:2
**effectively** 675:1
**effects** 538:15
604:21

**efficiency** 671:10
671:14
**eight** 529:8 690:14
690:20
**either** 514:3 579:8
579:10 622:14
642:18 658:6
681:10
**election** 530:8
**electric** 529:14
**element** 668:15
669:9 693:16
**emphasize** 678:22
**employed** 620:25
677:3,5 704:8
**employee** 500:13
536:20 570:5,8,17
571:6,15,16 586:4
659:9 661:11
674:25 676:18
677:14 686:22
695:23
**employees** 500:1,3
501:20 503:10
570:9,18 648:20
677:12
**employer** 661:19
675:2 677:14
**employment** 499:9
601:10,12 602:15
647:17 661:17
676:19 685:22
690:6 693:13
**en** 608:11
**enable** 528:17
561:4,4
**enabled** 561:1
**encountered**
615:22 616:8
**encountering**
615:14

[ended - exhibit]

**ended**  549:1
**ends**  521:13,16
**engage**  685:22
**engaged**  589:17
  670:17,18 675:18
  675:22 676:11
  689:23 694:3,4,6
  694:11
**engines**  529:20
**enjoyable**  553:6
**ensure**  553:7
  615:14
**entered**  563:11
  695:5
**entire**  551:22
  558:3 559:12
  566:24 618:21
  653:10 654:12
  665:16,17,19
  674:18 699:21,25
**entirely**  680:25
**entirety**  632:24,25
**entities**  648:15
**entitled**  588:6
  604:20
**entity**  561:3,12,13
  561:24 562:7
**entry**  671:3
**equal**  614:25
**equals**  612:24
  632:18
**equipment**  694:16
**eric**  495:4
**error**  629:13,15
  646:24
**especially**  701:7
**esq**  495:4,4,5,5,10
  495:10,11
**essential**  625:22
  633:6

**essentially**  527:4
  528:11,18
**establish**  644:16
  648:1 690:5
  693:13
**established**  519:22
  552:4,25 566:18
**estimate**  543:9
  619:14 620:11
  621:16,23 622:19
  624:6 655:3
  662:16
**estimated**  608:14
  620:7,22 621:4,5
  622:19 625:7
  639:15 641:22
  654:11
**estimates**  619:13
  625:12
**evaluation**  679:22
**event**  564:19
  574:15 575:6
**events**  531:23,24
  532:3
**evidence**  538:7,11
  538:18 540:22
  543:24 544:15
  545:1 552:21
  556:9 559:14,20
  563:21,23 578:12
  581:5 582:8 584:4
  584:5,8,11 590:10
  590:14,25 591:3
  591:11,25 592:6
  592:13 600:4
  609:8,11 611:7,11
  635:6 636:4
  638:13 640:14
  647:22,22 649:3,8
  649:10,12,18
  659:6,11,15 661:5

661:6,20 662:15
  665:19 668:17
  670:3,12 671:19
  671:23 672:4,25
  673:2,23 674:19
  674:20 675:10,13
  675:14 676:9,21
  676:24 677:2,18
  677:21,23 679:1
  679:13,13 680:6
  680:19 683:25
  686:1 689:4 690:5
  697:25 698:12,15
  700:1,6,15,17
  701:2,4,20,24
**exact**  517:21 591:9
  624:2
**exactly**  525:21
  541:18,21,24
  543:1,16,18 544:9
  548:20 564:22,23
  566:8 593:11
  598:1 628:12
  644:19 678:19
**examination**  496:4
  496:4,5,7,7,8,8
  497:12 537:14
  542:21 596:13
  599:23 629:20
  649:21 650:2
  653:6 656:10
**examine**  544:8
**examined**  542:9
**example**  571:14
  595:15 646:11
  655:12 682:23
  694:13
**examples**  575:24
  675:19 676:13
**exceed**  628:14

**exceeded**  628:22
  629:4
**exceeding**  627:6
**exceeds**  566:17
**excel**  646:21
  652:12,16
**excellent**  701:8
**excess**  626:23
  627:5
**excessive**  512:15
  512:19
**exchange**  691:4,7
**exclude**  693:22
**excluded**  590:25
  591:4,11,25 592:5
  592:13 612:7
  616:14,17 618:6
**excluding**  610:20
**exclusively**  665:14
**excuse**  557:1
  562:11 579:12
  594:1 649:4
**excused**  658:1,4
**executed**  550:12
**executive**  601:24
**exercise**  503:17
  680:20
**exercised**  576:15
  661:19
**exhibit**  497:16
  498:8 503:3
  505:18 515:16,18
  518:8,11 522:9,10
  527:14,16 532:11
  533:25 534:15
  577:14 580:13
  581:19 582:14
  583:5,20 584:13
  594:13 609:19
  631:1 648:22,23
  649:3,8 672:24

[exhibit - fee]

681:19,23 682:5
689:10
exhibits  577:14
685:3
exist  670:1
existed  636:8
exists  659:7,11
677:15
expect  571:4
expense  608:24
623:10 655:17
692:8
expenses  498:12
498:13 536:14
608:15,19 609:5
610:9 613:11
620:7,11 621:5,16
621:24,24 622:10
622:15,16,18
623:20 624:6,24
625:8 626:5 628:6
639:16,22 641:22
641:24 642:19,21
643:12 653:16,19
654:8,22,24
655:15 656:1,2,12
670:20,21 676:16
676:19,22,24
691:19 695:11
expensive  529:18
653:14,14 654:21
experience  504:25
530:1 569:4,10
612:4 655:22
expert  600:3 608:6
609:7,9,16,25
630:3,8,13 648:2
656:3 657:10
674:5,8 677:20
698:16 699:11

expertise  569:4,10
expiration  704:17
explain  518:10
532:14 589:24
explained  505:11
535:25 679:21
explaining  523:18
explains  590:9
explanation
617:12
expressly  685:13
extend  500:23
extended  688:6
extensive  587:1
631:18 692:8
extent  503:7
504:23 505:5
508:7 510:5
518:16 520:25
521:11 526:13
527:8 533:8 539:8
539:18 592:13
667:8 700:22
extra  527:23,25

**f**

f  703:22
fabulous  701:11
facebook  649:16
facilitate  681:10
fact  587:25 624:13
630:2 644:1
648:11 653:1,20
660:4 666:8 670:8
677:3 686:19
factor  661:18
667:7 668:12
669:9 670:23
672:17 692:21,23
factored  625:18
625:23

factors  653:21
661:6,15 673:14
677:17 678:2
680:2,19
factory  694:14
facts  636:4 660:19
664:8 667:19
670:3,8 674:1
677:24
factual  593:1
failed  693:15
696:18
fails  572:11
failure  693:23
fair  526:6 573:11
573:13 578:17
583:13,18 630:9
630:14 648:14,18
661:23,23
fairly  617:14
624:13 648:17
fake  589:14,21
590:4,18 592:3
593:17
falls  567:2
false  559:24 561:7
565:1,10,11,17,18
566:11 567:4
falsely  697:1
familiar  519:23
540:23 541:25
571:22
family  566:2
700:25
far  571:15 669:16
672:3
fare  510:24 514:12
516:10,16,19,20
516:22 517:2,8,8
520:14 521:2,5,6,9
521:14,17 523:3

523:22,23 524:20
524:24 548:9,14
548:23 550:25
551:5,14,15 552:3
552:4,17,23,25
573:20,21,24,25
574:4,5,8,9,16,18
574:24 575:6,11
575:14,15,16,21
575:22 576:3,15
576:20,22 577:2,2
577:3,8,9,10 595:7
597:8,11 661:22
661:22 662:16,22
662:23 663:6,12
668:25
fares  498:10
517:10 518:1
520:13,17,21,24
522:7,17 523:5,20
524:21 548:6
550:22 575:10
597:4 663:3 666:2
fashion  607:22
fass  495:6
fast  665:20
favor  647:16
661:7 666:9
673:17 677:17
678:2 700:8 701:3
701:5
fear  686:13,14
feared  685:9
feature  518:14,14
690:9
federal  540:21
620:25 683:17
692:20
fee  507:17 514:7
514:10,11,12
522:4 525:3,4,8

[fee - fraud]

528:9,13 576:24
576:25 577:10
595:3,7,17,18,22
663:3,5 670:10,10
670:10 691:4,7
**feedback** 526:18
526:20
**feel** 562:4 701:23
**fees** 498:12,12
522:7,17 524:3
529:18 668:25
681:18 683:20,22
692:18 699:1,3
**felt** 561:15 639:10
**female** 637:21
**fest** 532:4
**field** 621:19 622:2
**fifth** 661:10 671:9
671:18 672:1
679:21 680:18
687:16,21
**fight** 697:9
**figure** 532:2
560:13 587:25
593:13 594:23
624:2 627:8
651:15,19
**figures** 521:4
**figuring** 626:19
**file** 652:8,9,11,15
652:16,16 698:13
698:21,24
**filed** 695:9 698:20
**files** 614:10,20
619:20 646:21
652:12
**filing** 498:14
**fill** 499:15,17
**filling** 500:13
**final** 516:16 538:5
556:7 599:12

618:10 657:7
678:17 702:1
**finally** 700:19
**finance** 500:10
**financial** 551:23
552:1 573:14
**financially** 704:10
**find** 507:7,14,15
528:11 542:3,4,16
609:11 615:24
633:23 644:5
651:2 692:17
**finding** 549:12
655:14 687:22
**findings** 607:13
**finds** 514:16,17
**fine** 615:9 657:1
658:20,22 687:13
**finish** 565:14
605:21 694:14,15
**finished** 537:4
565:8 617:19
**fired** 667:23
**fireman** 676:12
**firm** 704:20
**first** 500:5,7
522:23 545:13
549:10 552:12
553:5,20 556:14
559:2,3,15 563:3
569:9 589:2 590:6
594:16 596:20
599:22 600:5
601:19 602:7
604:20 610:2
612:2 621:10
636:11 637:16
644:9 645:5,7
651:16 661:18
664:17 682:5
688:21 693:18

697:11
**firsthand** 636:17
637:2,11 638:3
**fiscal** 602:7,10,13
**five** 529:13 532:18
537:6,7 553:8
602:12 603:22
660:20 661:14
677:16 680:2,19
689:21 690:13
**fleet** 654:12
655:18
**flexibility** 660:12
660:15 680:13
687:9,18 697:22
**flip** 553:19
**flsa** 640:16 661:3,4
661:8 672:17
674:24 676:17
677:9 678:2
**fluctuate** 526:10
526:15 595:18,22
**fluctuated** 684:8,9
684:10
**focus** 544:4 602:10
632:22 636:10
644:9 667:10
**focused** 657:10
**focuses** 602:17
**follow** 503:7
515:21,23 518:13
606:20 620:2
672:10
**followed** 520:8
**following** 516:2,6
654:3 703:13
**follows** 497:11
599:22
**footnote** 640:3,4,8
**foregoing** 550:11
703:14

**foreman** 494:14
675:20 703:11
704:16
**forget** 692:7
**forgive** 629:23
651:8
**form** 499:15,17
521:13
**format** 625:15
646:20
**former** 697:12
**fort** 704:19
**forth** 572:12
701:16
**forward** 500:22
526:22 615:11
632:15 698:2
702:1
**foster** 675:14
**found** 515:3 655:4
657:16 688:2
690:4 695:16
**foundation** 517:13
531:4 541:13
542:4 592:4
603:14 604:11
609:15 632:4
635:5 636:4
**four** 534:15
602:22 678:4
690:13
**fourth** 643:20
644:22 670:23
**fox** 678:12,14
**frameworks**
519:23
**francisco** 501:7
**frankly** 570:21
**fraud** 516:12
673:1 686:8

Page 18

[fraudulent - going]

**fraudulent** 585:23
586:21 597:1
**frcp** 703:21
**free** 687:9 694:6
**freedom** 660:12
660:14,23 680:13
684:13,14 685:6
685:21 687:7
693:7,9 697:22
**frequently** 688:4
692:12
**friday** 529:9
**friendly** 583:7,15
**front** 576:8 600:11
640:5
**frozen** 523:7,8
**fuel** 625:7,7 642:3
643:2 653:16
**full** 647:17 651:10
**function** 528:22
669:14
**functionality**
525:15 581:8
**functions** 572:18
**fundamental**
511:23 625:20
**funded** 603:14
**further** 496:5,8,8
496:14,15 537:11
551:13 589:10
596:13 597:16,18
599:11 650:2
656:10 657:23
693:22 698:10
703:21 704:7,10
**future** 513:9

**g**

**gachie** 636:23
637:1
**gallon** 529:21

**games** 676:9
690:19 694:23
**gaps** 616:8,9
**garcia** 495:6
630:21
**garment** 601:22
**gather** 599:11
**gathered** 619:18
619:19
**gears** 504:1 553:3
**general** 512:25
571:5 605:15
**generalized**
517:19
**generally** 529:19
543:23 581:10
594:21 608:5
615:2 636:12
651:18 701:16
**generate** 680:21
681:2,3 684:3
**generated** 603:17
663:4
**generation** 508:23
528:11 680:25
682:19 691:8
**genius** 691:1
**geo** 567:8,13,23
568:2,3,8,13,21,24
586:21 673:1,2
674:2
**george** 585:22
589:12
**getting** 503:13
510:2 526:17
532:4 555:21
586:24 590:14
594:6 638:9
673:13 694:22
700:9

**gig** 602:23 603:23
604:1,21 605:10
605:16 647:20
648:6,8,12,19
**gist** 638:9
**give** 501:15 542:22
609:9 619:9
646:17 653:23
662:17 663:19
668:20 670:19
675:10,19 689:21
698:22
**given** 503:24
575:12 612:19
617:13 626:19
653:20 654:2
656:2 669:20
670:21 674:8,21
675:7,11 676:14
698:15
**gives** 575:24
620:11
**giving** 557:12
**gloves** 515:3
**go** 497:20 499:19
500:7,8,17 502:9
504:8,21,22 505:4
505:10 506:14,16
507:1,13,14
508:11 509:1,14
509:20 516:9
520:23 526:21
529:5,5 532:5
540:1 544:10
547:8 549:3,5,10
549:15 550:20
551:2 552:13
558:11,12,20,21
560:12,20 562:21
563:3 566:13
567:6,7 569:1,2

571:15 572:23
573:14 574:7
576:12,13 577:25
577:25 578:6
580:23 581:19
582:4,14,19 583:5
583:19,25 584:25
585:2 587:12
590:19 593:6,20
594:2,16 596:9
599:6 605:1,19
606:3 610:2 611:5
611:6 615:10
619:6,22 621:2
626:8 632:15
633:25,25 640:4
642:14 644:21
646:10,10,23
647:6 650:5,17
661:15 662:1,5,12
662:19,20 663:7
664:18,24 666:2,5
666:7 668:1,16
673:2 675:7 694:1
**goes** 509:8 511:5
511:10 533:5
551:12 572:23
587:6,10 611:21
647:24 668:25
669:21 695:20
**going** 507:3 521:4
522:22 523:12
524:14 529:19
539:12,22 555:5
556:11 562:16
564:12 577:9
580:6 590:15,19
593:21 596:8
599:8 600:2,4
614:13 615:7
631:1 632:22

[going - hole]

636:10 638:20
658:12,16 660:11
660:17 661:13,14
663:12 665:11
666:14 669:5,16
671:12 673:12,21
679:14 697:3
**good**   497:13 530:3
531:8 557:9
597:19 599:24
616:7 629:21
684:24 686:5
**google**   518:18
**government**   677:4
**gps**   515:21,23
516:2 522:20,22
523:17 524:1
589:13,17 590:3
590:17 592:2
593:16 665:20
673:4
**great**   615:23 616:1
644:1,5
**greater**   611:1
**greatest**   697:16
**greenlight**   514:19
528:20
**gross**   498:9,16
699:17
**ground**   504:3
553:7,12 641:23
678:14
**growth**   528:18
**guarantee**   701:18
**guess**   504:10
515:20 523:12
524:19 531:23
580:5 630:23
644:19
**guidance**   661:11
689:13,14

**guided**   665:15
**guidelines**   505:12
505:14,21,25
506:9 516:13
666:23 685:11
686:3 689:24
**gum**   530:5 546:13
**guy**   672:20

**h**

**h**   689:10
**habit**   516:13
**hair**   637:23
**halfway**   606:5
**hand**   577:16 647:6
694:10
**handbook**   501:3
502:2,3 570:5,8,11
570:12,17,24
571:1,5,6,15,18
**handing**   519:18
**handle**   511:14
596:10 647:14
**handy**   630:22
**happen**   509:9,14
510:18 530:20
562:5 586:12,18
677:25
**happened**   565:20
**happening**   659:20
**happens**   504:20
509:6,12 514:15
516:15 545:7,14
676:3
**harassing**   543:12
**hard**   531:13
565:13 576:9
629:6 645:23
**harmonize**   614:14
**hauling**   680:11
**hawley**   495:4,6

**he'll**   643:20
**head**   549:4
**headquarters**
501:6
**hear**   519:14
597:23 599:10
635:17 660:6,11
666:11 667:18
671:11
**heard**   507:25
508:14 510:2
517:18 518:24
519:8,20 523:16
525:18 536:22
538:4,15 540:18
541:8 545:1
592:17 664:2,11
668:17 671:4,19
672:22 674:4,5,7
676:9 678:9
681:15 682:10
683:13 689:2
690:12 693:21
695:15
**hearing**   544:14
590:7,8 598:17,20
678:18 698:3
**hearsay**   638:5
**heart**   587:22,23
679:18
**heat**   527:2,5
**heavy**   678:20
**held**   633:9 695:8
**help**   515:19
522:13 526:21
528:11 531:13
532:12 545:25
555:1 560:13
581:10,13
**helpful**   552:10
618:11

**hereto**   494:17
**herring**   678:9
**herrings**   678:13
678:17,19 679:15
**hey**   515:3 663:8
**hide**   587:25
**hiett**   495:5
**high**   526:14
529:16 570:19,25
571:6,17 572:4
624:17 647:16
688:12
**higher**   529:17
530:4 552:3,23
574:4 624:15,20
624:20,21 641:4
643:1,1 651:20,20
653:21,22 662:1
**highest**   512:20,21
529:6
**highlighting**
505:24
**highly**   520:4
**hire**   603:1
**hired**   501:20
633:10
**hires**   501:15,17
**hiring**   499:25
500:2,6,19
**history**   499:9,12
**hit**   505:10 506:16
509:19,21 510:1
**hits**   504:8
**hogwash**   662:9
**hold**   502:15
540:16 541:20
544:1 560:3
635:11,11 686:19
687:15
**hole**   662:5

[home - independent]

**home** 527:24
528:1 541:10
696:4
**homeowner** 666:6
**hon** 494:3 495:21
703:3
**honda** 654:18
**honor** 497:6 537:3
537:10 539:24
543:11 580:4
586:23 590:5
592:12 596:4
**hot** 599:19
**hotels** 507:14
547:1,3,12
**hounds** 678:14
**hour** 520:9 599:6
599:16 607:17,23
609:5 612:12,13
**houred** 626:18
**hourly** 608:24
620:23
**hours** 528:21
529:8 543:22
608:18 616:12
620:5,14,14,16,17
620:19,22 626:9
626:10,14,15,18
626:21,22,22,23
627:5 644:18
645:11 646:9
650:20,23,25
651:5,21 652:1
690:13,14,20
**house** 541:11
**houston** 495:7,13
533:12 541:22
546:17,18 547:12
547:16,21 554:13
577:23,23 618:15
620:17,18 626:10

626:17 628:1,2
642:12 644:11,14
650:21,24 670:5
672:23 674:17
688:22
**hr** 500:10
**hubs** 514:19
528:20
**hundreds** 548:1
579:22 668:5
690:17
**hunt** 678:12
**hyperlink** 595:6,7
595:11
**hypothetical**
633:25
**hyundai** 656:21

**i**

**idea** 571:2,8,19
665:4
**identified** 585:10
630:2
**identifies** 640:8
**identify** 548:12
550:23 585:4
696:19
**identifying** 695:10
**ilgwu** 601:24
**immediately** 505:9
524:25
**impact** 507:3
514:3 528:25
530:17 535:7
655:20,23 665:24
666:19 670:11
684:24 698:17
**impacted** 531:3
639:5 687:4
**impacts** 669:22
670:15

**impaneled** 676:2
**impeachment**
647:22,24 649:18
649:21
**implementation**
603:15 604:8
**implications**
698:16,18
**implying** 656:16
**important** 567:19
605:20 614:14
639:10 673:7,12
673:24 674:22
675:17 681:1
**importantly** 694:8
**impossible** 663:20
**improper** 647:21
648:2 649:18
**improperly**
693:20
**improve** 529:25
530:1 555:1
691:25
**improvement**
554:25 555:20
556:3,12 696:13
**imputed** 678:25
**inappropriate**
519:13
**incentives** 688:8
**include** 604:24
605:6,12,14
606:13 613:12,24
616:23 625:25
626:4 629:2 633:1
633:15 639:10
652:21 654:14,17
655:10 692:23
693:20 698:3
**included** 534:17
617:21 623:5

628:25 629:1,5
633:13 638:16
649:16 650:20
655:7 657:11
688:14 700:12
**includes** 603:2
608:11
**including** 508:1
559:1,17,18 648:7
648:9 671:20
679:11 687:16
**income** 553:23
621:1 679:24
682:21,24 683:1,3
683:8,10,22,24
685:25 687:5
696:17
**inconsistencies**
615:23 616:4
644:6
**inconsistent**
615:15 696:15
**incorporated**
578:10 580:25
582:6,21 583:11
584:2
**increase** 516:10
531:17
**incur** 622:17
**incurred** 608:19
610:10 615:22
676:19 681:17
683:20 692:18
**incurs** 524:4,10
**independence**
671:11,15
**independent** 536:5
563:5 603:23
605:11 660:24
661:2,12 666:4
672:13,20 687:18

Veritext Legal Solutions
346-293-7000

[independent - jars]

687:22 688:1
695:2,4,7,8,13,15
698:20,21,23,24
**independently**
695:19
**index** 496:1
**indicated** 614:16
**indicates** 504:9
614:22 617:8,8
**indicating** 614:23
**indicative** 671:11
671:14 672:18,19
686:24
**indiscernible**
525:14
**indispensable**
613:14
**individual** 500:25
501:1 535:15,17
607:1,15 628:18
638:6 656:19
669:5,6
**industry** 603:2
**infinity** 653:11
654:21 692:2
**inflated** 641:2,8
642:18 643:11
693:19
**influence** 609:21
**information** 501:4
510:10 511:5
514:24 542:5
554:25 558:25
559:7,13 560:4,9
567:9 568:4,8,13
568:21 585:5,13
587:17 588:1
593:1,3,15 595:11
624:23 661:14
665:19,21,22,23
669:20 679:8

697:1
**informed** 592:7,18
**informing** 603:3
689:17
**initiative** 530:17
670:24 692:10,13
692:14,15,16
**initiatives** 531:1
**input** 517:10
518:1 662:24
**ins** 543:18
**inside** 660:20
671:20,24 672:23
673:19 700:3
**insofar** 541:24
**installers** 687:22
**instance** 541:8
556:6 570:20
574:18 575:7,12
575:23 585:5,9,14
657:16
**instances** 540:13
630:3 677:9
**instapay** 524:23
525:1,3
**institute** 602:8
**instituting** 603:10
**institution** 621:14
**instruct** 686:23
**instructed** 557:4
**insurance** 511:25
512:1 602:21
624:15,16,21
625:5 642:9
687:14 688:19
691:23
**integral** 535:16,18
535:21 613:21
631:10
**integrating** 550:1

**integration** 549:21
549:25
**interact** 684:12
**intercontinental**
585:23 589:12
**interest** 573:1,11
**interested** 704:10
**interesting** 672:8
**internal** 556:16,18
556:20 586:20
587:15
**international**
601:22
**internet** 676:8
679:11 695:16
**interrogatories**
549:10 552:14
585:1 586:8,10
591:17
**interrogatory**
550:21,23 551:1
585:3 586:5,16
587:8 588:9,12,12
696:19
**interrupted** 594:7
**interrupting**
701:10
**interview** 500:20
500:21 502:10
**interviews** 499:19
**invention** 501:4
**invest** 691:4,23
**invested** 668:1,2,6
681:6
**investigation**
586:21 587:10,15
588:9
**investment** 529:15
668:8 691:1,2,3
692:6

**investments** 667:8
667:18 668:5,10
690:23,25
**involve** 630:7
**involved** 500:2
615:21
**involving** 500:21
545:9
**irs** 620:7,10 621:6
621:11,18 622:1,7
622:8,24 623:1,24
624:3,10,12,24
625:2,12,25 626:4
639:16,25 640:8
640:15,18,23
641:20 642:18
643:10 653:6,17
653:22,23 655:21
655:23,24 676:22
676:22 682:25
692:8 695:9
698:14,17
**issue** 540:7 631:19
631:24 690:4
693:14 694:1,2
**issued** 604:2
**issues** 511:19
601:13 602:15,23
**item** 514:14,16,17
514:22 515:8,9,11
641:23,23 670:10
**itemize** 653:18
**items** 498:8 611:7
672:10

### j

**jacob** 495:16
549:14
**james** 496:6
599:21 600:1
**jars** 530:9

[jason - lastly]

**jason** 605:10
**jersey** 618:24
**job** 519:22 694:14
   701:8,11
**join** 501:1
**joint** 581:19 689:9
**journal** 622:4
**journals** 604:12
   621:22
**jparrott1007**
   647:14
**judge** 497:1,4,7
   501:13 511:17
   517:14,23 523:12
   526:19 530:15,22
   531:7,21 533:17
   534:25 537:5,13
   539:25 540:16,20
   540:23 541:14
   543:14 544:1,7,21
   557:1,3,7 560:2
   562:11,14,17,18
   564:4,6 565:4,12
   567:15,21 579:5
   579:12,20 580:8
   581:22 587:4,12
   588:11 590:12
   592:14 593:6,20
   594:1,6 596:7
   597:16,19,21,23
   598:5,12,19,23
   599:2,3,7,14,15,18
   600:21 601:16
   604:18 605:20
   606:2,18 608:5
   609:7,17,23 610:5
   611:7 612:15
   614:6 615:16
   616:16 617:3
   618:9 619:6,24
   623:23 624:9

625:1 626:11
629:12,17,19
632:1,6,15 633:24
634:25 635:11
636:5 638:9,22
643:4,7,15,19,23
647:21 648:4
649:7,9,20 650:7
650:12 653:8
657:25 658:3,9,11
658:12,16,20,23
659:1,3,5,13 678:6
692:21 695:23
697:12 698:2,4,5,9
701:5,6 702:3,4
**judge's** 612:3
**judges** 697:12
**july** 603:9 606:10
   607:10 618:22
   681:25
**jump** 630:25
**june** 577:17
   581:25 582:15
   583:6,21 584:22
   585:20
**juries** 676:2
**jury** 687:21
**justification** 500:9
**jx2** 505:16,18,25
**jx9** 497:16,21,24
   498:3

### k

**katherine** 495:5
**keep** 509:19
   683:21 700:16
**keeps** 700:9,20
**kept** 701:9
**key** 657:10
**kherkher** 495:6
   630:21

**kherkhergarcia.c...**
   495:8
**kick** 666:20
**kicked** 555:12
**kimberly** 495:10
   703:17
**kind** 502:8 519:8
   549:16 571:25
   590:7 593:9 644:9
   656:15
**kinds** 587:18
**know** 498:1
   506:19 507:13,23
   511:4 514:17
   517:15,17 523:1
   530:23 533:5
   537:21 540:12,24
   541:15,16 542:13
   543:1,16,18,19,21
   544:12 545:5,15
   545:17,21,22,23
   546:1,6,10,14
   547:2,4,5,10,23
   548:1,2,3,10,15,16
   548:24 550:6
   551:13 555:19
   556:15,22 560:8
   562:6 563:25
   564:12 567:17,18
   567:24 571:14,20
   571:23,23 573:4
   573:10,12 574:14
   578:19,19,21
   579:6,9,10,13,19
   579:24 580:22
   581:8,13 582:13
   583:18 588:7
   596:2,9 598:1,9
   608:16 614:10,20
   615:22 616:5
   617:13,15 621:13

621:25 622:3
623:1,2 625:20
632:7,8,12 636:8
642:23,25 643:9
645:23 647:24
653:18,19,25
655:18 660:10
663:1 664:13,17
664:19 666:16
667:17 669:5
674:1 675:24
678:18 679:24
680:5 681:25
682:7 683:23
685:2 686:14,15
696:9 697:1,13
699:20,21 701:12
**knowing** 541:21
   642:17
**knowledge** 551:4
   593:3 594:25
   595:2 612:3,8
   636:17 637:2,7,11
   638:4 678:25
**known** 601:14
**knows** 530:23
   541:15,16 635:14
   695:1
**koustas** 603:13
   604:15

### l

**labor** 601:10,10,12
   602:15,19,24
   630:9,14 649:23
**lack** 517:12
   679:13,13
**lacks** 531:4 541:12
**ladies** 601:22
**large** 625:15,15
**lastly** 584:13

[lasts - long]

lasts  667:2
launched  525:17
law  547:14 661:13
  667:11 677:10
  686:16 694:19
  701:23
laws  550:10
lawyers  558:6
lead  508:21,23,23
  528:11 680:25
  682:19 685:14
  691:8
leads  528:8 554:19
  680:21 681:2,4
  682:11 684:3
learn  551:3 555:6
  555:21
learned  531:23
  678:11
lease  624:21 625:5
leases  624:17
leasing  625:4
leave  514:14
  694:14,15
leaving  687:11
lecture  562:12,16
led  590:7 597:11
  603:10 673:21
left  497:14 577:16
  578:8 581:25
  582:15 584:21
  677:8 678:5
legal  547:24
  549:21,25 614:3,4
  631:19 632:4,5,7
  638:8 640:15
  704:17
legitimate  592:16
lena  605:9
length  520:13
  558:8,10 686:9

693:1
lengthy  562:2
lera  601:13
letter  500:24
level  526:12 569:3
  569:9 669:15
  686:21 687:18
levels  519:13
liability  512:1
license  520:7,12
  625:10 671:1,2,7
  688:18 691:22
  692:14,15
licenses  507:16
lie  696:24
lied  696:21,22
life  622:21
limit  503:19 505:3
  505:5 533:17
  538:16 554:24
  566:5 672:21
  673:13
limited  528:14
  531:5 533:15
  534:23 538:20,23
  538:24 540:8
  553:15 554:4,5,9
  555:14,16 556:10
  568:20 572:16,19
  572:20 669:20
limits  553:23
  672:13
limo  688:18
  691:22 692:14
limousine  520:5
  520:10 603:1
  606:9,24
line  504:8 505:10
  506:14,16 507:1,3
  508:8 509:20
  527:2 596:23

613:13 614:21,21
  614:25 615:3,18
  615:23,23 632:19
  644:6,18 645:3,6,7
  646:9,11 651:14
  651:18,20 657:16
  657:17 680:10
  681:20 685:23
  690:17
lined  644:19
lines  526:18
  535:25 539:12
  588:17 647:7
link  687:20
list  604:14 619:19
listed  612:4
listen  560:14
listening  519:12
  643:5,7
litany  551:2
literally  544:16
  557:3 587:7
little  504:1 509:5
  518:20 553:3
  567:7 569:2
  594:15 596:9
  600:21 601:16
  622:25 623:13
  624:3,11 645:8
  655:12 663:17
  664:1 688:3
  692:24
littler  495:11
littler.com  495:13
livelihood  566:2
  700:22
livery  507:15
  547:12,17,24
  680:11,22,24
  681:4 682:22,24
  683:8,21,24

690:25 692:19
llc  561:8,13,18,19
  561:25 562:5
  563:9 596:16
  680:9
local  532:1,1
localized  640:21
  640:24 643:10
location  511:6
  513:12 559:8,16
  567:7,8,13,23
  568:2,3,8,13,21,24
  589:14,21 590:4
  590:18 592:3
  593:17 664:4
  665:10
locations  665:11
log  506:6 523:13
  660:18,18,23,23
  666:24,25 667:2,4
  667:5 684:6
  685:16 688:23
  689:3,3
logged  506:3,8
  508:9 616:12
  660:15,19,25,25
  663:19 667:4
  671:16 675:3,4
  684:15,17 689:4
  690:7 693:5
logistics  685:24
  695:3 696:18
  700:9
logos  568:8
logs  667:6
long  548:2 581:9
  595:2 596:8 599:3
  626:18 660:10
  666:25 667:2
  676:1 685:20
  690:12 692:13

Veritext Legal Solutions
346-293-7000

[longer - manipulation]

**longer**  506:13,16
  512:14 513:9
  533:10 537:6,25
  666:21
**look**  505:13,15
  533:25 549:5,7
  550:20 551:25
  552:13 553:2,3
  554:11 555:20
  557:11 560:7
  576:10 577:13,13
  578:7 580:12
  584:13 585:25
  587:17 595:16,16
  595:17 600:5,14
  600:20 604:14
  605:18 609:4
  610:12,13 613:4
  614:25 616:5,10
  618:11 619:5,6
  621:3 627:17
  631:1 632:16
  635:1 636:9
  639:13 643:24
  645:5,21 646:15
  648:22 650:4,18
  650:20 654:7,7,23
  660:1,5,9 661:2,5
  662:14,16 666:12
  667:15 668:12
  674:12,13 677:17
  677:25 689:9
  698:2 699:8 701:1
  701:25
**looked**  512:22
  523:10 551:19
  580:14 592:8
  593:8 605:17
  607:6,9,15,22
  608:8,13,16
  610:15 612:16,18

613:8,8,10 618:9
  619:1,20 620:13
  620:20 622:8,16
  622:20 623:24
  625:3,5,5,9,14
  626:12 642:1
  654:10 655:5
  674:20 678:10,16
  690:3 699:15
**looking**  549:17
  578:13 581:24
  584:18 608:23
  609:1 618:17
  622:10 628:18
  646:5 647:8
  649:14,16 650:4
  665:20 681:19
**looks**  522:16
  600:18 616:2
**lose**  512:9 534:21
  553:21 555:6
**loses**  669:21
**losing**  554:19
**loss**  528:24 529:1
  588:5 652:25
  667:12,14 668:2
  668:14,23 669:4
  669:23 673:16
  688:25 691:11,12
  697:24
**lost**  515:8,9,11
  535:3 668:8
  670:10 697:15,20
  698:12
**lot**  517:18 532:6
  571:9 602:19,21
  622:10 650:8
  655:11 661:8
  664:18 672:6
  675:6 676:10
  678:17 679:4,5

697:2 698:14
**loud**  650:8
**low**  506:22 534:22
  535:3,10 555:25
  605:10 696:6
  698:11
**lowe's**  541:11
**lower**  573:24
  662:1
**luggage**  690:10
**lunch**  596:9 598:6
  599:8,9 690:10
**luxury**  641:4
  642:25 653:11,20
  653:23 654:14
  655:1,8 656:2,13
**lyft**  507:23 508:4
  508:24 603:2
  607:6 625:14
  634:12,14,18
  680:22 681:14,21
  681:22,24 682:3,6
  682:9,17 683:6,12
  683:17 684:14,14
  684:19,21,23
  685:1 689:8
  691:16 694:24,25
  696:17 699:7,9,9
  699:12,13

**m**

**m&a**  549:21
**ma'am**  639:2
**machine**  494:16
**macleod**  495:5
  496:4 501:10
  504:17 511:15
  517:12,16 523:9
  530:13,21 531:4
  531:19 533:15
  534:23 537:15
  539:10,21 540:3

540:20,24 541:1,3
  541:20 543:21
  544:4,7,11,23
  557:2,3,7,11 560:6
  562:12,16,19,20
  564:5,6,14 565:9
  565:16 567:16,17
  567:24 579:7,14
  579:25 580:9,12
  581:23 587:5,6,21
  588:19,22 590:21
  590:24 592:20
  593:12,21,24
  594:2,4,7,11
  597:17,18 697:16
**macleod's**  697:7
**magnitude**  605:10
**mail**  495:8,13
  501:17,19 528:19
  583:22 584:6
  679:9 689:17
  695:20
**mails**  502:18,19,23
  503:8,11
**maintain**  512:1
  566:16 570:19
  571:6,16 572:4
  687:14
**maintaining**
  570:25
**maintenance**
  625:6 642:1 643:2
  653:16
**making**  536:19
  588:6 635:24
  649:6
**male**  637:21,22
**manage**  501:8
**managers**  500:19
**manipulation**
  673:4

Page 25

[manner - minute]

**manner** 556:11
569:5,16,19,24
570:10 576:15,16
607:7 620:2
686:21
**map** 515:14 527:5
527:19
**mapping** 689:16
**maps** 515:13
518:18 527:2,18
**march** 586:8,10,20
587:9 588:8,13,16
588:21 589:5,9,16
589:20 590:3
618:22
**marked** 594:12
**market** 507:11
520:4 526:11
528:17
**marketing** 670:1
**markets** 669:24
**marshal** 675:13
**marshaled** 677:21
677:23
**massachusetts**
600:24
**massively** 541:5
**master's** 600:23
**match** 523:1,2
**matched** 504:15
511:12 513:9
**matches** 504:13
**matching** 504:11
**math** 647:4
**matter** 531:6
585:14 598:4
608:1 609:2,10
611:18 631:9
633:10 636:23
637:1 653:7 654:6
662:3 684:1

694:19
**mattered** 654:9
**matters** 630:7
649:17 656:17
659:18 662:3
676:1 682:15
**maximize** 625:23
682:13 692:10
697:23
**maximizing**
691:17
**maximum** 626:19
**mckinney** 495:12
**mean** 512:23
541:24 549:25
587:7 595:17
617:6 620:4
628:24 633:1
654:9 661:1
**meaning** 505:8
523:5 526:12
**meaningful**
528:12 688:15
**means** 558:15
560:24 644:24
669:19 683:7
699:11
**meant** 508:23
**measure** 621:12
**measures** 623:11
**meet** 526:14
572:11 678:22
693:12,15
**meetings** 502:15
**member** 601:4,9
601:13
**memorize** 560:18
**memorized** 563:1
570:11 571:21
572:1

**mendelson** 495:11
**mention** 527:22
**mentioned** 526:7
614:18
**message** 528:21
574:20
**messages** 502:20
503:8 538:10,13
**messenger** 676:11
**met** 672:3 697:11
**method** 686:22
**metric** 621:7
640:1
**metro** 560:24
**metropolitan**
618:21
**michael** 604:16
605:3 606:5
**micro** 526:12
**middle** 522:16
573:17 578:8
580:24 582:19
632:17
**miers** 495:10
496:7,8,13 539:13
550:8 598:15,22
609:18 617:17
629:19,21 632:10
632:16 634:2,24
635:1,7,22,23
636:9 637:6
638:11,12,20
639:3 641:6,7
642:22,23 643:3,9
643:24 648:1,5
649:2,6,22,25
650:15 656:8,11
657:1,3,21 658:8
658:11,22 678:8
698:8 702:4
703:17

**mile** 516:21,21
523:5,23 526:9
574:16,25 627:8
661:23
**mileage** 516:25
536:10 620:8,9,10
621:6,11,18 622:1
631:20 633:4,13
633:19 634:5
639:16,25 640:8
640:15 643:10
656:18 657:12
**miles** 516:9 529:20
608:14,15,20
610:17 613:8
616:13 619:2
620:6 627:7,11,13
627:15,19 628:25
629:1 652:9,10
653:3 655:11,12
657:16,17
**millions** 668:5,5
**mind** 600:7 604:18
611:14 612:15
614:13 683:21
701:19
**minimum** 502:12
533:7 554:13
566:17,20 567:2
602:21 603:4,10
603:15 605:3
610:9,21 618:18
618:23 619:4
620:15 647:17
674:15 677:19
**mints** 530:5
**minute** 516:20,21
523:5,23,24 526:8
532:9 574:16,25
596:11 619:20
661:23 682:15

Page 26

[minutes - normally]

**minutes** 513:19
537:6,7 546:9
639:19 641:17
658:15,19,20,22
663:25 664:4
677:8 678:5
**miscellaneous**
617:3,5,13
**mission** 571:23
**misspoken** 651:8
**misstatement**
632:5
**misstates** 539:18
544:20 560:1
632:4
**mister** 638:19
**mobile** 558:15
**model** 613:21
622:14
**models** 622:9
**modified** 558:17
**moe** 605:9
**moment** 670:22
698:19
**monday** 613:5
**money** 572:22
573:1,7,11 630:19
666:7 667:11,16
668:2 699:16
700:2
**monitor** 568:12
**monitored** 665:15
**monitoring** 567:19
568:18 587:7,11
587:16,23 588:4
588:10
**monitors** 602:4
**month** 502:13
594:16
**months** 501:23
589:16 672:1,4

687:10,12 700:16
**morning** 497:13
613:5
**motion** 586:7
649:7
**mouse** 563:20
**mouthful** 572:1
**move** 500:22
515:13 544:22
562:15,18 564:5
593:21 612:14
614:5 632:9,14
638:11 649:2
652:24 663:4,5
**moves** 649:7
**moving** 662:6
663:23
**multiple** 500:21
503:14,22 507:21
511:21 677:16,16
**multiplication**
627:19
**multiplier** 527:8
527:12 575:3
**music** 519:13
**mute** 526:20

**n**

**name** 548:7,8,12
550:18 559:3,15
563:7,14 568:6
599:25 637:14,15
637:17,19
**narrative** 501:11
**narrow** 585:14
677:10
**narrowly** 572:20
**national** 640:19
643:10
**nature** 597:13
695:19

**navigation** 518:6
518:13,14,15,19
577:20 578:1
**near** 541:11 582:4
**nearby** 504:13,23
504:24 511:10
**necessary** 625:16
634:19 686:22
**need** 500:6 507:8
521:23 522:6
523:1 537:6
542:12 561:15
562:4 573:15
578:22 590:19
599:10 614:10,16
658:14,17 659:12
659:14 686:25
687:10
**needed** 671:7
690:5
**needs** 515:21
539:20 544:9
595:12 687:1
**negative** 504:25
506:19,21 512:6
516:1 520:20
521:15
**negatively** 665:23
666:19
**negotiate** 500:25
520:17,21 521:2,5
521:8 548:23
551:13,15 552:17
552:23 573:23
**negotiated** 548:6,9
548:14,19 550:22
550:24 551:5
577:3,8,9 597:4,8
597:11
**negotiating** 520:23
521:14

**negotiation** 663:13
**neither** 676:17
704:7
**net** 498:13 690:19
694:24
**network** 507:17
**never** 564:11,11
656:17 666:12,25
678:10
**new** 501:15,17
519:21,24 520:3,3
520:5 582:16,25
601:23 602:1,4,8
602:10,11,14,14
602:16,16,25
603:2,15,21,24
604:3,4,7,20,23
605:11 606:6,8,10
606:22 607:14
608:2,22 610:22
618:16,19,20,21
618:23,24,24
620:14,19 622:6
622:11,14 623:4
623:17 624:4,14
624:20 626:9,13
628:1 636:21
641:15 644:12
650:21 654:5
670:5 674:17
688:21
**nights** 529:9
**nine** 631:18
**non** 643:10 655:1
**nonresponsive**
530:14 531:20
634:24 638:21
641:6 642:22
643:3
**normally** 518:3
545:7,13

Veritext Legal Solutions
346-293-7000

[notary - opinions]

**notary** 703:25
**note** 525:15
  609:19 682:14
**noted** 694:11
**notice** 568:10
  574:15 575:5,12
**notifying** 575:1
**noting** 678:20,24
  687:23
**november** 550:12
  551:7 557:20
  585:4 586:3,20
  587:9 588:8,16
  590:2
**number** 500:11
  502:13 503:19
  533:21 544:25
  550:21 577:14
  580:13 581:19
  582:14 583:5,20
  584:14 585:3
  586:16 594:13
  620:3,5 623:24
  626:11 627:1,18
  630:22 636:13
  645:6,16,25
  646:16 651:2,9
  657:11 662:6,9
  699:18,18
**numbered** 494:12
**numbers** 628:11
  629:6 649:14,14
  652:24 674:9,14
**numerous** 540:12
  550:4,6 557:4
  685:12 686:12

**o**

**o** 645:11 646:1,16
  651:7,16
**oath** 497:8 548:13
  589:1 591:25

592:23 636:23
**object** 501:10
  504:17 539:7,17
  543:11 544:19
  559:25 580:4
  586:23 590:5
  592:12 609:18
  638:20 649:9
  656:24
**objecting** 564:12
  632:3
**objection** 511:15
  517:12 530:13,21
  531:19 533:15
  534:23 541:12
  565:2 567:14
  579:3 593:4,18
  609:17 633:22
  634:24 635:5,16
  635:18 636:3
  638:7 641:6
  642:22 643:3,13
**objections** 551:2
  591:16
**obligation** 587:17
**obligations** 632:7
**obnoxious** 689:23
**obtain** 520:7,11
  688:18 692:14,15
**obtained** 552:22
  567:9 568:14
**obviously** 679:1
  688:11
**occasion** 621:22
**occasions** 614:15
  681:23
**occupation** 675:24
**occur** 662:8
  664:23
**occurs** 666:5,12

**offer** 500:24,24,25
  527:7,11 556:11
  609:8,15
**offering** 519:3
  636:1
**offers** 504:11
  525:5 636:19
  637:3,8,12
**office** 602:4,4,8
  696:4
**officer** 697:18
**offs** 538:1 556:8
  565:1 566:4,10
  585:22 589:12
**oftentimes** 517:6
  659:11,15
**oh** 517:19 672:10
**okay** 497:24
  506:19 518:5
  540:3 541:2,20
  545:19 547:8
  549:15 550:3,8
  552:5,6 554:18
  555:4,19 556:6,10
  556:14 557:11,25
  558:15 559:6,10
  564:2 566:13
  567:6,21 568:17
  573:14 574:7,14
  575:18,21 576:18
  577:25 581:5,23
  582:19 584:21,25
  585:2 589:9
  590:12 591:2
  594:23 595:9
  596:5 597:19
  598:23 599:13
  600:13 604:19
  605:1 606:1,3,16
  607:12 609:24
  610:1,25 612:10

612:14 616:10
  618:8 619:5,16,22
  629:24 630:11
  631:7,15,17
  632:10,15 633:9
  633:18 634:9
  636:9 637:10,14
  637:16 639:13
  641:11 644:16
  645:5 646:3 649:2
  650:3,18 658:5,21
  658:24 678:6
**old** 529:13 656:21
**once** 501:20 504:5
  504:15 509:2
  524:17,21 532:2
  590:21 676:6
  683:13 685:7
  689:4 690:7
  694:16 696:20
**ones** 519:14
**ongoing** 501:9
**ongwae** 629:10
**open** 500:11,15
  528:20 531:13
  677:11
**opened** 602:8
**opening** 539:22
  677:9 689:1
  697:10
**operate** 520:4
  555:18 625:21
**operated** 680:8
**operations** 542:1
**opine** 552:8
**opinion** 539:8,11
  613:2 631:13
  633:3,9 645:3
  677:2
**opinions** 611:15
  612:17 614:8

Veritext Legal Solutions
346-293-7000

[opinions - panels]

656:5
**opportunities**
668:14 688:10
692:17 693:8
**opportunity** 556:1
660:12,14 668:22
669:3,22 670:7
673:16,22 680:14
688:7,25 691:10
691:25 692:1
694:12 697:22,24
**opposed** 531:11
598:13
**opposing** 520:14
**opt** 502:22 503:7
503:11 524:22,24
525:1
**optimize** 529:23
532:8
**option** 525:19
529:17 532:17
551:14 552:17
694:12 698:21
**orange** 527:20
**order** 518:13
520:6,11 522:24
522:24 523:2,25
531:15,17 532:7
566:14 569:13
595:10 616:7
625:16,22 663:21
664:18 666:8
671:4 675:3,5
678:14 682:12
697:23 700:24
**ordinance** 547:19
548:1
**ordinances** 547:21
**organization**
602:9 604:5

**organizations**
602:7 604:3
**organized** 613:3
**origin** 678:10
**original** 588:25
703:16
**outcome** 611:14
704:11
**outs** 543:18
**outside** 507:17
510:13,16,21,25
534:16 634:18
635:3 636:2
664:22 681:16
682:22 683:9,12
683:17,25 689:8
690:21 692:17
694:25 700:10
**overall** 534:1,5,18
623:6,22
**overly** 531:5
**overruled** 501:13
511:17 531:7,21
560:3 565:4
567:21 636:5
643:15 648:4
649:20
**oversight** 657:20
**overstate** 633:20
634:6 651:25
**overstated** 652:25
**overstating** 616:22
**overtime** 620:19
620:21 626:22
627:3,5 628:2
650:22,25
**overview** 619:9
**owned** 680:8

**p**

**p** 612:24 613:6
615:1,12,24 620:6
627:14 632:18
644:22 645:3,8,19
645:25 646:8
651:13,17,19,23
652:3,4 657:11,18
**p.m.** 494:13 532:4
596:12,12 599:17
599:17 658:25,25
702:5
**p1** 508:14,16,19
612:21,21 613:15
613:20,21,24
614:1 616:22,24
626:24 627:12
631:11,20 632:18
633:1,4,12,13,15
633:19,19 634:5,5
634:10,16 635:2
635:25 644:6,24
649:15 652:9
653:2 684:17
693:20,22 694:2
694:18
**p2** 612:21,22
613:17,20,22,24
614:1 626:25
627:12 631:11
632:18 644:25
646:13 649:15
652:9,10
**p3** 612:21,22
613:19,20,22
614:2 626:25
627:12 631:11
632:18 644:7,25
652:10,10
**page** 496:2 497:20
497:24 505:23,25

515:19 522:13
532:12 539:12
549:11,11,15,16
550:20 551:3
558:11,21 560:21
562:21 563:4,18
564:15 567:6
573:15 576:13,24
578:1,6 580:23,24
581:13 582:4,5,20
583:10,25 584:14
584:15,16,19
585:2 600:20
605:19 606:4,4,5
610:2 611:5,6,7,12
612:5,14,16 614:5
618:11 619:23,23
621:2 629:9,11,25
630:2 632:17,17
636:10 639:14,24
641:14 650:5
657:9 704:3
**pages** 548:2
560:13 581:10
600:17 619:5,10
619:10,21
**paid** 513:17,22
524:5 605:10
607:16,23 610:19
610:21,23 611:2
613:10 619:14
648:17 662:13
663:25 664:6
670:16 674:15,15
677:12 694:22
**painstakingly**
659:10
**pair** 515:3 665:12
**paired** 513:2
**panels** 500:20

Page 29

[paper - period]

**paper** 605:12
606:5 607:9,10,13
659:6 661:20
**papers** 601:15
603:17,19 604:9
608:1,22 622:6
650:8 654:23
**paragraph** 505:24
522:16 527:23
553:5,20 554:19
563:3 616:11
621:3 632:21
636:11
**parrott** 496:6
597:21,25 599:4,5
599:10,18,21
600:1,2 605:21
609:9,24 610:1
615:7 617:21
623:3 630:12
635:7,13,19,23
636:6 638:23
649:22 650:3
657:3 658:4
693:20
**part** 515:19
528:12 532:12
535:16 543:3
555:4 573:16,17
574:12 577:22
617:24 633:5,8
646:25 657:20
699:5
**particular** 506:20
512:7 513:2
575:23 625:13
657:15 688:8
**particularly**
507:15 531:25

**parties** 510:9
515:6 533:2,8
567:12,22 568:13
568:19,23 685:4
703:19 704:8
**parts** 613:14
**party** 511:25
561:8 563:11
577:20 578:1
703:23 704:6
**party's** 514:3
**pass** 537:12 596:2
629:16 656:7
657:21
**passage** 539:23
**passed** 514:9
**passenger** 608:12
608:13 612:23
613:18,19 616:13
625:17
**passengers** 507:16
531:10 604:22
625:21
**passes** 649:25
**path** 673:21
**pause** 581:20
590:7
**pay** 524:12,20
528:7,9 529:19
576:25 594:17
603:15 604:8,21
606:14,18,19,25
607:17 608:16,25
609:5 613:4,4
614:19 617:2,5,7
618:17 620:3,20
620:25 627:25
628:1,2,6,8,9,10
628:10,14,14,16
628:19,20,21,22
629:4,4 645:12

651:6,15 652:19
670:14,20 679:25
700:17
**paying** 513:19
531:10 624:17
**payment** 511:18
511:19,22 524:18
524:19 528:14,15
538:23,24 540:8
553:15 554:4,6,9
555:15,16 568:20
572:16,19,20
594:12,22,24
595:2,5,16 611:2
617:1,3,5,10,13,14
617:22,24 618:2,4
619:12,14 620:24
629:2 659:9 666:1
666:3 681:15,18
**payments** 616:14
616:21 619:12
649:23 681:10,16
683:23
**payout** 657:12
692:4,5
**paypal** 540:7,10
540:11,14,18
541:3,5,6,9,10,10
541:18
**payroll** 620:22,24
627:21,23,23
628:7
**pays** 514:10,11
515:11 524:8
**pdf** 646:20 647:5
**peak** 688:13
**pedicab** 563:9
**pedicabs** 680:9
695:10 696:4
697:23

**peer** 603:18
604:12 609:14
**penalized** 689:18
**penalty** 550:10
592:1,22,24
**people** 500:21
517:6 523:2
529:10 545:7
555:12 601:12
621:15 623:25
637:10 670:4
677:5
**percent** 512:24
526:1 535:5
627:24 683:2
**percentage** 525:24
534:20 535:2
542:22,25 543:8
577:1
**percentages** 663:6
**perfect** 549:13
**perfectly** 687:12
**perform** 502:5
538:1,16 564:25
566:3,9 657:5
670:24
**performance**
501:21 502:5
**performed** 606:17
606:19 614:7
654:4
**period** 527:2
533:16 534:24
535:1 539:19
541:23 542:24
543:25 547:1
558:3 559:12
560:11 566:24
568:22 578:15
579:2,17,17
580:21 581:3,11

[period - preponderance]

582:12 583:2,17
584:7 613:12
618:3,6,22 620:12
653:10 659:25
660:20 663:16,16
663:21,21 665:18
665:18,18 666:22
670:16,17,17
671:21,24 673:20
674:9,9,9,18,22,23
675:5,16 682:1,4
699:21,22 700:3,4
700:11,16
**periods**  670:14
676:1
**perjury**  550:10
589:1 592:1,22,24
**permanency**
671:18 672:2
692:22
**permanent**  506:15
506:18
**permissible**
547:24
**permission**  515:5
687:11
**person**  500:21
528:20 549:18
561:4 564:9
565:14,15 620:25
637:25 638:1,2,4
**person's**  637:14
637:15,23
**personal**  551:4
637:6
**perspective**
697:13
**persuasive**  688:2
**pertaining**  586:22
**pet**  583:7,15

**ph.d.**  600:23,25
601:18
**phone**  518:25
530:6 536:16
546:4,5 625:15
626:1 637:25
679:9 688:19
691:20 694:23
**phones**  522:21
**phrase**  549:24
**pick**  497:14 509:8
523:21 524:11,14
608:12 613:18
**picked**  511:7
**picking**  521:8
**picks**  509:11
**pickup**  511:6
559:8,15 664:1
**pickups**  538:1
556:8 565:1 566:3
566:10 585:22
589:11
**piece**  559:7
**pieces**  618:15
**pink**  681:20
**place**  603:5 687:14
**places**  508:16
**plaintiff**  688:3
**plaintiffs**  687:23
**plan**  625:15 626:1
664:12 688:19
**planet**  666:4
**planned**  661:15
**platform**  498:11
507:18 526:5
529:5,24 532:8
691:21
**play**  661:10 672:9
690:19
**playing**  676:8
694:23

**plays**  672:8 676:12
**please**  497:8,20
515:18 518:9
526:20 533:18
543:15 544:6,22
549:8 557:1
562:15,18 565:14
565:17 580:12
585:10 599:19,25
605:24 606:21
610:2 617:17
621:3 634:1
635:21 638:25
643:4,7
**pledge**  701:21
**plenty**  565:10
**plug**  529:14
**plus**  628:6,6
632:18,18 644:24
**pocket**  669:12,12
**point**  513:20
575:11 586:13
591:23 592:21
641:11 657:2
664:1 674:1
**pointed**  550:8
**points**  522:22
523:17 524:1
**police**  697:5
**policies**  597:10
602:13 659:24
666:12,13 667:1
685:12,13
**policy**  602:7 606:7
659:25 685:11
686:12
**pool**  666:5,6
**portal**  594:19
667:15
**position**  601:19

**positive**  625:23
**possess**  569:3,9,12
**possible**  647:10
677:10
**post**  500:16
598:17,20 698:3
**posted**  582:11,25
584:6
**posting**  579:1
581:2 582:10,16
583:7,15,21
**potential**  688:7
**potentially**  521:18
549:5
**power**  673:12
**powerpoint**  659:4
**powerpoints**
698:7
**practical**  700:23
**practice**  628:11
632:5
**practices**  648:16
**pre**  501:7 510:12
510:15,21,24
511:14 552:4,25
573:21,25 574:5
665:5 672:15
676:1 679:6
**precise**  676:19
683:24
**predicted**  680:15
**prefer**  598:12
**preferred**  668:19
**premium**  653:13
**preparation**  657:8
**prepared**  580:3
597:20 598:24
641:15
**preponderance**
661:6 677:18
700:6 701:3

[present - published]

**present** 495:14
504:10 659:6
**presentation**
618:14
**presented** 509:3
543:24 583:14
584:5 601:15
603:19 604:9
620:1 651:6
676:21,24 693:24
698:12 701:2,20
**presenting** 612:13
**president** 601:25
**pressed** 563:25
**presumably** 509:8
509:13
**pretty** 519:10
526:12 615:3
647:4
**prevailing** 610:21
**prevent** 672:22
**previous** 499:9
560:15 615:20
618:1,4
**previously** 497:11
573:16 586:15
589:7
**price** 653:15
668:25
**priced** 653:13
**prices** 526:15
**pricing** 526:3,4,24
688:7
**primarily** 682:18
**primary** 679:24
**prior** 513:21
537:24 541:2
589:16,20 591:9
629:22 631:8
633:9 655:21

**private** 624:15
**probably** 558:5
581:4,6,15 657:19
**problem** 517:16
587:19
**procedures** 686:24
**proceed** 497:2,8
588:17 599:13
643:4,8 658:13
**proceeding** 564:11
629:22
**proceedings**
703:15
**process** 498:22
500:1 502:10
503:6 510:24
518:12 522:14
642:15 659:12
676:3 681:16
**processing** 683:23
**produced** 552:21
552:22 583:3
679:4
**production** 549:10
563:24 578:25
**professional** 569:5
569:16,19,23
570:10 601:11
**professionalism**
570:19,25 571:7
572:5
**professor** 601:17
601:18 603:6,12
604:4
**profile** 647:16
**profit** 528:24
529:1 668:14,23
673:16 688:25
691:11,12,25
697:24

**profitability**
692:11
**profits** 669:3,22
682:13 691:17
**program** 525:6
**promise** 701:21
**promotions** 688:7
**proof** 556:2
693:13
**proper** 649:21
677:19 693:25
**properly** 662:11
**proprietary**
518:15 588:3
665:15 691:1
**proprietor** 695:10
**protection** 677:11
**prove** 676:18
693:16,23
**provide** 499:3,9,11
501:17 502:1,2
518:21 528:10,13
528:19,22 530:3,5
530:5 531:8,15
533:10 538:10
546:8,12,13
553:18 556:2
558:25 569:4,10
569:15,18,22
574:15 575:5
582:9 584:8 585:5
585:10 593:1
596:23 611:13
615:4 630:13
653:13 665:8
672:14 677:11
682:2 686:25
687:1 688:17
690:8 691:21
693:21 700:25

**provided** 515:24
516:2,6 518:25
543:20,22 546:3
550:23 559:13,20
559:21 560:5,10
566:1 571:9
574:23 579:23
582:10 584:16
586:14,15 589:1,6
589:7 591:17,20
595:3 607:18
610:7 614:3 617:9
617:23 633:6
646:19,20 652:5
659:16 664:23
680:10 682:11,21
683:6,11,16,25
**provides** 661:10
680:11
**providing** 508:2
563:6 589:13,21
590:4,18 592:3
593:17 608:19,20
610:10 634:11,17
634:20,22 635:3
680:4 681:4 683:8
694:24,25
**provision** 558:22
**provisions** 494:16
**proximity** 522:25
523:18
**proxy** 655:25
**public** 621:14
703:25
**publication** 532:2
603:18 604:14
**published** 578:14
581:2 583:1,16
584:6 588:19
604:1,2 607:13
608:1,7 609:13,13

[published - reasonable]

611:22 613:23
621:25 622:6
654:23
**pull**   497:15 498:19
502:25 503:9
515:15 518:8
522:9 527:14
528:3 532:10
534:12 600:3
**pulled**   610:17
648:24 697:5
**punish**   666:11
**purchase**   625:3
653:15 688:17
691:20
**purpose**   585:17
603:3,8 609:3,4
**purposes**   498:14
568:15 621:13,16
675:1
**pursuant**   494:16
703:21
**pursue**   688:7,9
693:8
**put**   603:4 626:17
680:23
**puzzles**   676:12

**q**

**qualified**   653:12
674:8
**qualify**   660:24
**quality**   554:25
555:20,25 556:3
556:12 686:8,17
686:20,23 696:13
**quantify**   542:20
**quarter**   682:5,9
**question**   501:11
515:20 530:24
537:19 540:1
543:3,15 548:21

556:23 557:2,8,10
561:21,23 562:1,2
562:13,14 564:2,5
564:7 565:9,19
571:3 575:4,4,17
579:7,13,14,21
587:15 588:15
590:13,17,22
592:17 594:2,5,8
604:16 605:21,25
607:19 608:23
615:8,11 629:25
633:25 634:1,3
635:15,17,21
638:10,23 639:1
643:16 649:5
696:2
**questioning**
537:16 548:6
561:15 562:2
**questions**   498:23
504:4 520:16
537:11 541:25,25
542:2 543:6,6,7,8
544:2,3,4,5 556:23
557:13 562:10
564:9,10 565:11
596:1,5,15 606:21
638:25 656:9
657:24
**queue**   664:20
**quick**   553:4
629:25
**quite**   505:14
570:21 571:1,18
678:18
**quote**   617:5
673:10 697:10,18
699:23
**qx60**   653:11
654:21

**r**

**r**   495:10 703:17
**rabbit**   662:5
**raised**   540:7
**ran**   680:10
**range**   602:9
**rare**   681:22
**rasier**   561:18
**rate**   506:22 507:4
512:21,23 513:24
514:1 516:20,21
516:21,21 523:6
523:23 532:17,19
532:22 535:12
612:11 620:8,9,10
621:11,19 622:1,7
622:8,24 623:1,24
624:3,10,12,24
625:2,21,25 626:4
627:24 640:18,23
641:20 642:18
643:11 653:6,17
653:22,23 655:21
655:23,24 661:21
662:4 666:18
676:23 689:20
690:1
**rated**   534:11
**rates**   534:13
622:24,25 624:19
640:9,15
**rating**   514:4
532:13,14,15
533:3,9,11 534:5
534:15,17,18,22
535:7,10 554:13
554:23 555:8
566:16,18,21
567:2,3 666:10,11
666:13,15 684:24
690:4 696:6

**ratings**   532:9,25
534:6,8 535:4
554:11 556:1
566:13 625:7,23
690:4
**reach**   515:1,2
**reached**   652:18
**read**   532:1 534:2,3
555:5 566:22
571:18 573:15
576:7 645:23
676:7 685:10
686:12
**reads**   675:21
**ready**   497:1,9
513:11 598:10
599:1 665:1
671:17
**real**   553:4
**realities**   659:8
661:9 667:8
669:10 686:18
700:8 701:4
**really**   526:14
530:3 531:8 533:4
579:9 617:24
667:10 690:15
695:20
**realtime**   526:11
**reason**   506:14
511:24 523:20
534:16 539:19
575:10 585:11
608:21 618:7
649:11,13 651:1
660:5
**reasonable**   516:16
576:16 610:9
616:2 655:25
670:21 676:23
677:3,6,6

**reasonably** 676:20
**reasons** 511:21
  522:23 555:25
  623:2 686:6 704:4
**rebut** 656:5
**recall** 505:14
  546:5 554:10
  586:11,17 624:2
  630:5 661:20
  695:13 697:7,9
**recalled** 547:2
**receipt** 704:2
**receive** 501:20
  508:5 515:7
  524:18 525:12,25
  526:1 545:2,11,19
  561:1,5 566:15
  616:18,20,21
  649:22 669:11
  670:16 675:3
  676:15
**received** 525:24
  534:6 575:3 586:8
  588:20 600:25
  606:24 607:3
  608:16 609:2
  611:11 614:4,21
  616:13 617:1
  624:6 627:11
  628:9 629:7 639:3
  639:8 671:5
  683:24 692:4
  696:6
**receives** 534:15
**receiving** 502:23
  503:11 504:6
  585:21 589:11
  608:25
**recess** 523:14
  537:9 596:12
  599:17 658:25

**recognize** 503:2
  505:17 522:10
  648:25 687:17
**recognized** 686:5
**recognizing**
  678:18
**recommended**
  516:6,17 517:4
  574:18 575:6,10
**record** 494:17
  536:4,9,13,19
  537:8 539:12,24
  599:25 607:5
  631:2 632:11
  672:25 676:2
  703:15
**recording** 665:21
**records** 549:3,5
  615:15 700:18
**recruiters** 500:18
**recruiting** 500:15
**red** 527:20 678:9
  678:13,17,19
  679:15
**reduce** 521:17
  576:3,14
**refer** 526:16 527:1
  527:7 632:25
**reference** 540:14
  612:24 629:10
**references** 499:5
**referencing** 543:2
**referred** 508:14
**referring** 543:2
  556:18,21 594:21
**reflect** 506:2
  625:13
**reflecting** 624:20
  655:18
**refund** 522:1,3,7
  522:14,17

**refusals** 636:14
**refuses** 693:21
**refusing** 636:13
  639:4
**regarded** 621:14
**regarding** 606:25
  684:20 694:1
  696:16
**regardless** 577:3,8
**registration** 625:9
**regular** 653:24
  654:24 670:25
**regularly** 647:19
  648:5
**regulated** 520:4
**regulation** 672:7
**regulations** 676:18
**regulatory** 519:23
**reich** 603:6,12
  604:16 605:3
  606:6
**reich's** 604:4
**reimbursed**
  662:12
**reimbursement**
  536:9,13 626:1,5
**reject** 685:6
**related** 585:10
  591:10 621:16
  673:1 676:19
  704:8
**relates** 588:10
**relation** 608:17
  610:8 613:11
  618:17 619:2
  623:24
**relations** 601:13
**relationship**
  562:21 564:15
  660:24 661:2,17
  666:4 671:19

  677:15 687:19
  690:6 693:1,2,4,10
  693:13 695:18
**relative** 659:25
  667:8 690:22
**relatively** 622:4
**relevance** 567:14
  567:15 586:24
  588:15 590:9
  656:25
**relevant** 587:3,20
  622:18 640:9
  641:24 670:8
  679:16,17 682:4
**reliability** 687:4
**reliable** 609:20
  686:25 687:2
**reliance** 673:15
  678:20 700:5
**relied** 607:4 659:8
  699:20,24 700:7
  700:21
**relies** 522:25
  673:11
**rely** 524:1
**relying** 523:18
**remaining** 651:17
**remains** 551:10
  683:15
**remarks** 599:9
**remember** 537:15
  542:6,10,14
  544:13 551:20
  557:18 570:16,17
  570:21 579:23
  586:9,13 591:10
  593:7,11 594:10
  595:13 596:17
  629:13,22 637:16
  637:24 639:18
  644:3 683:4

[remember - reviewed]

685:10 696:5,12
699:6
**remind**  526:3
**remitted**  524:21
524:24
**remotely**  494:11
**remove**  532:24
**removed**  673:3
674:3
**rentals**  680:10
685:23
**rep**  673:25
**repair**  625:6
**repaired**  694:16
**repeat**  530:24
557:8
**report**  600:3,10
603:23 605:5
606:8,23 608:6
609:8,20 610:2
618:12 619:21
621:3 630:1,25
631:4 636:15
638:12,17 639:7
640:5 641:14
653:2 657:9,10
674:11
**reported**  494:15
682:25
**reporter**  494:14
523:8 565:12
605:22 635:12
701:7,9 703:11
**reporter's**  703:7
**reports**  604:2
646:19 656:3
**representative**
545:11 550:4
570:23 571:5
576:6 577:7 580:1
588:7 660:7

664:11,24
**represented**
617:15 655:17
697:1 701:15
**represents**  681:20
**request**  504:12,16
504:21,22 505:1
508:10 509:2,7
513:2,6,10 527:7
533:1 535:7
536:19 558:24
559:22 561:5
573:24 663:19,20
664:15,25 665:3,9
698:3
**requested**  703:23
704:5
**requests**  504:2,7
507:1 508:5 511:9
549:9 561:1
585:22 587:14,18
589:11 596:24
664:10 685:7
**require**  502:12
598:20 676:18
**required**  498:25
499:3,8,11,22,24
502:15 515:23
518:5,21 528:4
535:12 624:14
664:18,19 670:24
675:12 679:2
689:12 691:22
696:13
**requirement**
513:12 520:10,11
672:2
**requirements**
519:25 520:6
569:2 572:2,12

**requires**  519:22
671:3,10,14 680:1
686:2
**research**  601:10
601:20,21 603:19
604:10 612:12
630:20 642:11
**researchers**
621:23
**reserves**  572:7
574:9 575:22
**respect**  653:15
690:22
**respected**  512:21
**respond**  587:17
**respondent**  494:5
495:9 497:3
598:15,22 649:7
649:25 658:8,10
658:21 703:5
**respondent's**
577:14 578:13
580:13 582:14
583:5,20 584:13
594:13 648:22
649:3,8
**responding**  587:14
**response**  548:5
551:12 561:14
586:4 587:4,9,13
588:12,20 590:1,2
**responses**  549:8
557:13 591:16
623:8,12,16,18
624:5,7,22 696:20
**responsibilities**
632:12
**responsive**  594:4
**rest**  650:8 679:15
**restate**  590:21
634:1

**rested**  658:10
**restrict**  564:17
565:22,23 572:9
**restricted**  564:24
566:8 585:21
589:11 592:8
**restricting**  565:5
**restrictions**
508:11,13,15
**rests**  658:10
**result**  574:17
581:9 628:4 647:2
648:17
**resulted**  624:10
636:14
**results**  623:22
693:23
**resume**  499:3
500:19 600:15
658:23
**resumes**  500:12
**retained**  602:23
603:8 692:3
**retains**  564:16
**retread**  504:3
**return**  514:19,21
621:1
**returned**  623:25
703:25 704:2
**returning**  515:7
**returns**  683:18
692:20
**revenue**  529:4,6
529:11,23
**revenues**  530:1
**review**  500:12,19
593:14 594:15
603:25 609:10
611:13,23 623:10
**reviewed**  568:3
570:22 571:1

Page 35

[reviewed - route]

593:11 594:10
603:18 604:12
609:14 611:8,17
624:22
**reviews** 501:21
502:5
**richmond** 495:6
**ride** 510:24 511:4
521:21,24 524:17
548:12 553:8
559:4 560:10
664:10 665:9,12
670:16,19 689:7,9
689:11 690:14
692:17 697:4
**ridenour** 495:15
497:16,20 498:20
502:25 505:24
532:10
**rider** 504:16 508:3
508:20 509:9,11
509:13,17 511:4,6
511:9,13 513:1,3
513:11,13,19,24
514:1,6,11,14,21
514:24,25 515:2
515:12 517:6,11
518:1 521:1,4,8,20
521:24 522:1,15
524:5,9,11,12,14
524:20 528:18
532:16 534:13
535:12 548:8,14
548:19 550:25
552:24 572:22
577:8 662:19
664:13,13,25
665:5,8 666:3
681:10,16 689:23
690:11,12 697:5

**rider's** 504:12
509:24 511:6
515:4 516:10
522:3 535:9,11,11
664:3
**riders** 507:7 510:3
510:4,8,13,16,21
515:8 518:21
519:1,3,6,9 520:18
520:21,24 521:14
522:7,17,25
523:19 525:9
532:22 533:7
534:7 535:12,21
553:8 665:10,22
666:1 668:19
669:8,15,25 670:1
686:2,6 689:21
690:2,20 697:1
**rides** 506:22
510:12,15,21
535:20,23,24
546:2,3,7,11 547:1
547:9,12,17,25
583:7,15 634:11
666:20,22 669:11
670:4 671:15
673:6,8 674:3
683:6 685:19
**ridiculous** 665:6
**right** 498:19
503:17 505:22
506:4 509:1,5
522:18 526:21
534:20 536:1
537:20,23 539:5
540:2,5,7,10
545:18 547:7
548:3 549:12,19
549:20,23 550:25
551:9,11,15 552:3

552:18 553:12
554:4,17 555:22
555:23 556:4
557:21,23 558:4,9
559:8,9 560:22
562:20 564:17,20
564:21 565:22
566:8,21 568:15
569:18,20,24
570:1,3,6 572:8
573:18,20 574:4,9
575:7,22,24
576:16,21,22
577:11,20,21,22
577:23 578:3,8
579:7 580:3,17,25
582:17 583:8,19
583:23,24 584:2,3
584:15 585:17
586:5,6 589:3,4,7
591:5,21,24
595:15,19,20
598:2 599:7,14
600:11 626:2,7
630:22,25 631:15
631:21,22 632:19
633:10,14 636:15
636:19 638:24
639:2,5,6,9,22
640:1,2,6,13,17,18
640:20,25 641:13
641:17,21,25
642:10,12,13,16
642:19,24 644:7,8
644:10,11,13,14
644:18,23 645:8,9
645:13,15 646:12
646:14,25 647:11
647:12,17,18
650:10 651:1
655:9 656:13,14

656:19,20,22
657:13,18,19,25
662:21 663:9,23
668:16 669:20
675:19 676:11
678:8,8 686:4
694:7,21 699:20
**ripple** 673:21
**risk** 511:19,22
528:16 667:12,12
667:14
**risks** 667:11,25
**rmacleod** 495:8
**road** 524:16
555:22 556:2
662:7
**rochford** 605:10
**role** 500:1,8,9,11
500:13,16
**room** 498:2
581:21 617:18
**rosenthal** 495:17
496:3 497:5,7,10
497:17,21 498:21
501:14 503:2
505:17 515:17
518:10 522:9
523:15 527:15
528:4 532:11
536:3 537:11
543:4 550:16
590:13 592:17
594:3,8 596:14
617:18 678:25
685:5
**round** 594:16
**route** 515:22
516:2,6,17,17,23
517:4,4,7 521:12
608:11 689:13

Page 36

[routes - see]

**routes** 515:13,15
  515:23
**routine** 671:10,13
**routinely** 686:19
**row** 505:6 645:7
**rule** 664:22 701:2
  703:21
**rules** 519:6,8
  540:21 553:7,12
**ruling** 517:22
**run** 675:7 697:23
**running** 567:10
  680:18
**rural** 532:1
**rustling** 650:7
**rx29** 515:16,18
**rx31** 527:14,16
**rx34** 522:9,10
**rx36** 503:1,3
**rx37** 518:8,11
**rx38** 532:10,11
  533:25 534:15
**rx48** 551:19
  557:12,16
**ryan** 495:5

**s**

**sabotage** 678:12
**safe** 553:6
**safety** 568:14
  686:8,17,20
**san** 501:7
**sandahl** 495:10
  496:4,5 497:3,6,13
  498:1,3 501:14
  504:20 512:3
  517:24,25 523:7
  523:15 526:23
  530:16,25 531:22
  533:19 535:1
  537:3,7,10 539:7
  539:17 541:12

543:11 544:19
559:25 565:2
567:14 579:3
580:4 581:20
586:23 587:13
590:5 592:12
593:4,18 596:4,14
597:14
**satellite** 687:22
**satisfy** 672:2
**saturday** 532:5
**save** 677:7
**saw** 519:16 530:10
  538:14,18 628:4
  689:17 701:16
**saying** 542:3 547:3
  552:6 569:13
  571:16 575:19
  577:7 586:11,17
  594:18 595:10,22
  597:7 644:3
  700:17 701:10
**says** 550:14,23
  551:1,3,13 552:19
  553:5,7,10,13,25
  555:2,24 556:5
  558:16,23 559:17
  559:18 560:3
  563:2,24 564:16
  564:21,22 565:23
  566:14 567:8
  568:11,16 569:2,7
  569:21,22 570:2,3
  570:18 571:2,19
  572:3,6,7,14
  573:17,22,23
  574:1,3,7,8,12,14
  575:5,8 576:10,12
  576:13,17,24
  577:5,12,17,19,22
  577:24 578:1,9

580:15,24 581:1
581:25 582:3,5,7
582:18,22 583:9
583:10,12 584:22
584:24 585:9,12
585:18,19 586:2
589:15 616:11
645:11 646:11,13
647:16 667:3
671:9 674:25
**scale** 689:21
**scenarios** 509:9
**schedule** 684:5
  695:9
**schedules** 687:24
**school** 602:14
  604:4
**scope** 531:5
  533:16 534:24
**scrap** 611:18
**screen** 509:4
  527:24 528:1
  631:4 638:24
**scroll** 600:17
**searched** 578:20
**season** 530:9
**seat** 511:11 599:19
**seattle** 603:8,10
  604:7 605:4,5
  607:2,4,19 608:2
  608:22 622:7,11
  622:15 623:9,14
  623:18,23 641:16
  654:5
**second** 523:3,20
  525:18 527:19,22
  540:16 544:1,8
  545:14 549:9
  556:15 558:23
  581:21 600:20
  604:15 605:2

611:6 615:8
632:21,22 646:17
649:4 650:5 667:7
682:9
**seconds** 504:19
  559:4 669:18,20
  669:22 678:5
**secret** 588:4
**section** 522:13
  551:22 552:2
  554:18 560:21
  562:25 564:14,23
  565:21,23 566:7
  566:13,14 567:6
  569:1 572:2
  573:14 574:2,8
  575:18,21 576:8
  576:23
**sections** 551:24
**secured** 508:3,21
**security** 568:15
**sedan** 654:18
**see** 497:17 505:20
  505:23 527:3
  538:12 555:2
  556:9 558:13,16
  560:2 563:10,13
  563:17,23 564:2
  574:2,25 576:10
  577:4,16 578:8,9
  578:11 580:16
  582:5 584:1,18,21
  585:3,8 588:13,14
  588:22 590:22
  595:7 600:8 605:2
  606:11 607:16,22
  610:3 614:20,25
  616:25 621:8
  627:7,11,21 629:9
  631:7 634:19,22
  644:10,20 645:14

Page 37

[see - sign]

645:24 646:6
659:7,12,14,20
661:13,14,16
666:18 672:11
674:13 675:18
676:17 682:5,15
683:19 686:19
687:17,19 689:10
693:6
**seeing** 534:14
544:14
**seek** 616:9 655:14
**seeking** 536:9,13
624:23 625:2
690:20
**seeks** 585:13
**seen** 505:12
521:10 545:1
552:20 563:21
564:11 568:6
574:20 588:11
591:18,22 592:5
594:14 621:18
656:3 665:24
670:2,12,13
673:24 701:15
**sees** 527:7
**segment** 610:13
615:13 627:14
**segments** 612:20
612:24 613:2,7
615:1,19,24 620:6
626:24 627:12
651:13,17,19,23
652:3,4 657:12
**self** 620:25
**send** 500:24
502:18,19,20
671:1 678:15
687:20

**sense** 510:10
556:13,15 617:23
683:5 694:21
**sentence** 527:19
534:1,13 558:23
568:17,18 572:15
574:12 576:12
632:23 636:10
639:14,24 673:10
699:23
**separate** 652:8,9
652:16
**separated** 618:15
**separating** 608:17
**september** 671:22
**serious** 616:8
**serve** 550:3
**served** 630:3,12
703:18
**serves** 678:21
**service** 525:7
528:9,13 530:3
531:9,16,16
571:17 572:5
576:23,25 577:10
617:9 626:1 633:6
654:20 663:3,5
668:25 680:22
686:25 687:2
688:19 691:7
**services** 507:8
511:25 528:10,10
533:10 543:17,19
553:18 557:16
558:1,2,22,24,25
559:11,23 560:8
561:2,5 563:6,14
564:19 565:25
566:16 567:7,9
569:5,11,15,19,23
572:11 574:19

575:7,13,23 577:1
608:20 610:10
617:23 625:17
634:17,21 635:3
636:1 653:13
654:19 662:4
663:2 668:20
672:15 680:4,11
680:12,15,24
681:4 682:3,20,22
682:24 683:3,9,12
683:16,21,24
688:15,17 689:6
691:5 692:19
**serving** 630:7
**set** 572:12 582:10
586:9 615:2
661:21 666:13
684:4
**sets** 670:9
**setting** 516:15
582:1
**seven** 697:2
**share** 510:9
567:12,19,23
568:2,12,24
**shares** 615:13
**sharing** 568:21
**shauna** 494:14
599:19 703:11
704:16
**sheet** 573:9
**sheets** 644:11
**shift** 700:5,8
**short** 537:4 685:19
**shortfall** 611:3,9
619:15 628:4,5,16
628:17 629:2,4
651:3 674:18
**shortfalls** 674:14

**shorthand** 494:14
703:11
**show** 498:7 527:19
552:10 559:21
578:25 594:20
611:7 620:9
628:15 649:19
659:10,22 660:3
660:19 670:13
673:9 678:1 699:9
699:12
**showed** 578:4
629:3 660:22
661:20 662:12,15
662:16,22 664:3
673:20
**showing** 552:9
660:7
**shown** 498:8
527:23,25 578:2
580:9 592:10
609:12 611:12
627:25 649:12
660:13 665:7
677:15,20 700:4
700:14,18 703:19
**shows** 538:7 620:3
640:15 671:24
672:4 673:14
680:6 681:23
685:18 686:2
689:4 699:10
**shut** 700:20,23
**sic** 559:2 684:18
**side** 529:4,11,12
529:23 658:6
670:7
**sign** 498:22 501:2
505:9 550:18
596:25 671:2

[signature - speculation]

**signature** 550:15
550:17,19 585:2
703:22,25 704:3
704:15
**signatures** 596:15
**signed** 504:5 505:7
505:8 561:18
591:15 592:21,25
593:15
**significant** 646:8
**significantly**
693:19
**signifies** 613:16
**signs** 525:6
**similar** 603:8
607:8,19,22,25
608:6 609:4
615:20 624:23
625:2 633:11
648:15 654:5
665:10 669:8
676:8,8,14
**similarly** 656:4
**simple** 534:10
627:18 647:2
685:16
**simply** 545:17
678:22 693:14,24
694:9
**simultaneous**
565:7 632:2
635:10 696:16
**simultaneously**
685:1
**single** 548:7,12,12
548:25 552:20
561:14 562:5
574:20,21 578:24
580:19 582:23,24
583:13 595:18,19
669:1

**sir** 537:15 544:6
544:15 554:8
556:21 557:14
561:21 563:13
571:13,18 572:17
588:23 590:24
606:2 643:23
**sit** 572:25
**sits** 573:2,7,9
**situated** 656:5
**situation** 516:15
653:1
**situations** 509:15
571:11 606:16
651:22,24 675:12
**six** 501:23 530:9
682:17 683:6
697:2
**sizable** 617:14
**skill** 530:16
531:16 569:6,16
670:23 671:4,5,6
671:12 692:10
**skills** 530:25
**slide** 677:8 693:7
**slides** 663:17
**slightly** 510:1
**sloan** 603:14
604:11
**small** 497:18
700:3
**smaller** 699:18
**smartphone**
667:19,20,22,25
**smoking** 519:11
**smoother** 531:12
**societies** 601:5
**soh** 495:16
**sold** 692:2
**sole** 566:19,25
572:8 576:2,4,9,10

662:21 682:21
683:10 685:25
695:10
**solely** 554:3,4,5,9
659:16
**solicit** 547:1,9,12
547:17,24
**solutions** 704:17
**somebody** 674:6
**sorry** 510:13
525:22 556:24
565:8 629:14
637:18 649:4
**sort** 498:10 500:10
512:20 513:7
519:13 522:24
525:5 614:19
689:10
**sorted** 613:6
**sought** 655:16
659:6,22
**source** 500:17
676:25 679:24
682:21 683:10
685:25
**sourcers** 500:16
**soussan** 494:3
495:21 497:1,4,7
501:13 511:17
517:14,23 523:12
526:19 530:15,22
531:7,21 533:17
534:25 537:5,13
539:25 540:16,23
541:14 543:14
544:1,21 557:1,7
560:2 562:11,18
564:4 565:4,12
567:15,21 579:5
579:12,20 580:8
581:22 587:4,12

588:11 590:12
592:14 593:6,20
594:1,6 596:7
597:16,19,23
598:5,12,19,23
599:3,7,15,18
605:20 606:2
609:17,23 629:17
632:6,15 633:24
634:25 635:11
636:5 638:9,22
643:4,7,15,19,23
648:4 649:20
650:7,12 657:25
658:3,9,12,16,20
658:23 659:1,13
678:6 698:5,9
701:6 703:3
**speak** 500:18,19
635:13 654:13
**speaker** 650:11
**speaking** 523:16
635:14
**specific** 520:6
533:21 542:23
543:9 562:7
565:18 578:16
581:17 582:13
583:3 585:25
631:9 641:12
**specifically** 497:24
542:15 544:24
553:1 566:14
574:6 591:6 593:8
594:10 605:18
632:22 652:6
**speculates** 699:3
**speculation**
511:16 530:21
633:22 699:5

[spend - stuck]

**spend** 679:15
**spent** 550:21
  635:3 684:9
  694:23
**spine** 701:15
**spoke** 514:20
**spoken** 520:13
  522:20
**spoofing** 586:21
  589:13,18 590:4
  590:17 592:2
  593:17 673:1,2
  674:2
**spreadsheet** 647:8
**square** 525:23
  545:20
**staging** 664:18
**standard** 512:22
  571:17 603:4,11
  603:15 604:21
  605:4 606:6
**standards** 533:7
  570:19,25 571:7
  572:4 602:19
  604:8 630:9,14
  653:12 686:17,20
**standing** 595:2
  684:24
**standpoint** 568:19
**stanley** 495:4
  496:7,8,11,15
  597:21,22,24,25
  598:8,24 599:1,5
  599:14,24 605:21
  605:24 606:3
  609:7 610:1
  617:19,20 629:16
  630:1 631:5 632:1
  632:3 633:22
  635:5 636:3 637:5
  638:7,24 639:15

  640:12 643:6,13
  643:17,20 647:21
  649:9 650:3,10,14
  650:17 656:7,24
  657:23 658:2,7,14
  658:19 659:3,14
  680:15 694:10
  698:6,9,11 702:2
**stanley's** 635:18
**star** 514:4 532:9
  532:14,24 533:3
  533:11 534:5,6,8
  534:22 535:3,7,10
  553:8 554:11,13
  555:8,25 666:10
  666:10,13 689:22
  690:4,4 696:6
**stars** 532:18
  534:16
**start** 499:14,21
  504:6 510:14
  513:19 605:22
  664:3 667:11,16
  676:5
**started** 523:17
  586:25 659:1
  671:6 682:8
  701:18
**starting** 534:1
  621:4
**starts** 565:15
  676:6
**state** 494:15
  507:22 599:25
  602:3,11,16
  603:24 605:11
  610:21 632:17,23
  635:21 636:11
  639:25 657:15
  685:13 703:12

**stated** 494:16
  695:14
**statement** 496:10
  496:11,12,13,14
  496:15 542:12
  571:24 595:5
  615:12 617:2,5
  638:16 639:11
  659:2 678:7 679:3
  689:1 697:8,10
  698:10
**statements** 539:22
  594:12,17,22,24
  595:2,17 617:7
**states** 550:11
  551:4 552:16
  560:25 585:20
  589:10 639:15
  677:4
**status** 686:22
**statute** 581:11
  672:7,11,12
**statutory** 533:16
  534:24 541:22
  542:24 543:25
  547:1 558:3
  559:12 560:11
  566:24 568:22
  578:14 579:2,17
  579:17 580:20
  581:3 582:12
  583:2,16 584:7
  610:9 660:20
  666:22 671:21,24
  673:19 682:1
  699:21,22 700:4
  700:10
**stay** 699:22
**stem** 686:25
**stenographer**
  675:18,21 676:5

  694:13
**stenographers**
  675:25
**stenotype** 494:16
**step** 500:11 650:17
**stiff** 682:16
**stipulated** 539:3
**stipulates** 539:14
**stipulation** 539:18
  539:24
**stipulations** 539:9
**stolen** 511:21
**stonecipher**
  495:16
**stop** 519:17
  536:25 537:17
  564:12 617:16
  667:23 687:9
  694:8 700:15
**stopped** 536:23
  557:22 673:5
**straight** 620:13,16
  620:21 626:9,10
  626:15,18,21
  627:25 628:1,6
  649:17 650:21,24
  665:3 666:6
**straightforward**
  557:13
**strategic** 682:11
**strategy** 691:16
**street** 495:12
  704:18
**strength** 697:17
**stricken** 590:11
**strike** 574:21
  597:8
**structure** 528:15
  595:8 620:16
**stuck** 662:1
  689:16

Page 40

**[studies - talked]**

studies 641:15,19
654:4 655:15
study 601:12
603:9,25 607:2
styled 494:12
subject 587:1
589:1 592:1
609:24
subjects 542:17
submit 498:25
598:16
submitted 603:17
604:12 674:11
submitting 698:2
subpoena 552:22
substantial 550:21
subtracted 628:9
subtracting 628:7
suburbs 618:24
success 529:24
successful 547:3
successfully 556:3
succinct 606:20
suddenly 668:1,2
sufficient 607:17
suggest 544:5
581:15 582:10,24
583:15
suggested 521:6
605:24
suitcase 531:14
suitcases 545:25
suite 495:7,12
704:18
sum 612:24 613:1
615:1,24 620:5
626:15,21,22
627:14,15,15,24
628:18 632:18
644:22 645:3,8,17
645:19,25 646:8

650:19,23 651:5
651:13,17,19,20
651:22 652:2,4
657:11
summaries 497:15
summarized 620:4
summary 497:22
497:25 498:3,5
610:3,12 619:11
summed 613:6
supplement 592:2
supplemental
588:20,23 589:6
591:17
supply 526:11,13
526:14 546:4
662:8
support 515:2
528:19,22 538:9
538:12 574:20
581:5 592:11
604:7 677:21,23
679:13 686:22
supported 604:11
665:6
supports 579:16
679:2
supposed 580:2
645:2 677:10,11
sure 498:9 505:15
513:8 517:19
540:11 541:18
542:19 544:16,24
545:13 547:22
548:11 560:12
561:12,19 564:6
567:22 572:18
578:16 581:18,22
583:4 589:19,23
591:6,13 595:9
598:5,10 614:11

615:17,19 616:2
629:23 631:8
634:2 675:20
surf 690:19
surfing 676:8
694:23
surge 526:3,4,16
526:24 527:8,12
527:17,21 528:1,5
575:3,11 688:10
surging 527:3,9
survey 607:5
623:7,8,12,22,25
624:22
surveyed 622:17
surveying 622:11
surveys 624:5
654:7
susan 494:3
495:21 703:3
suspect 599:5
suspended 585:6
585:11,15
sustained 530:15
534:25 579:5
580:8 634:25
638:22
swear 599:19
swipes 699:4
switch 504:1 553:3
sworn 497:11
540:13,17 552:13
554:15 586:4
590:2 591:8
599:22 696:19
synchronize
614:17
system 518:6
522:24 526:16
532:13,15 533:3
665:21 681:15

690:5 697:4

**t**

tabulated 674:10
tactics 678:21
take 502:12
511:22 524:15
528:16 535:6
549:7 553:2
556:11 557:11
577:13 578:7
598:6 605:23
616:1 631:1
632:16 635:1
636:9 638:25
639:13 643:24
644:1 645:21
648:22 658:16
660:6 661:25
663:6,12 665:22
671:17 674:3
690:10 696:13
taken 494:11
516:23,25 531:2
531:24 556:3
598:3 704:9
takes 504:12
516:16
talk 518:20 524:2
526:19 532:9
539:23 558:6
565:7 580:6
590:15 632:2
635:10 637:25
649:10 663:16
670:22 672:6,16
673:18,24 674:22
699:3
talked 498:21
502:1 526:2 548:5
558:8 570:5 630:1
636:20,22,25

Page 41

[talked - things]

638:2 639:14
641:16 643:25
644:1 661:8
663:14 664:1,9
665:25 668:4,14
686:9 694:7
**talking** 506:2
525:9 526:20
527:18 528:23
540:17,19,25
550:22 556:25
558:3 580:16
592:14,15 594:18
598:21 639:18
652:7 679:16
**talks** 554:22
563:18 698:14
**tank** 601:2 602:7
**target** 628:8,10,14
628:20,22 629:4
652:19
**tax** 497:15,22
498:3,5,14 621:1
621:13,15 627:23
683:17 692:20
698:15,18
**taxes** 620:22,24
627:21,23 628:7
**taxi** 520:5,10
602:25 606:9,23
688:1
**tc** 685:23 695:3
696:17 700:3
**team** 500:15,23
515:2
**teams** 500:10
**technologies** 494:4
560:8 578:10
580:25 582:6,21
583:11 584:2
703:4

**technology** 557:16
558:1,2 559:11
563:14
**tel** 704:19
**tell** 515:17 527:15
548:7,25 549:24
551:14 552:2
555:10 568:18
570:8 579:1,9
580:19 592:25
600:15,21 601:7
601:16 605:1
606:18 608:5
610:5 612:15
614:5 615:16
616:16,19 617:3
618:8 619:23
623:23 624:9
625:1 626:10
629:12 650:19
652:6 653:8
660:17 665:2
666:14,14,25
667:2 673:2
680:16
**telling** 569:8
700:20
**tells** 541:9 555:11
559:7 566:23
585:25
**temporarily**
553:22 554:2
555:13
**temporary** 506:15
506:17
**term** 678:9
**terminate** 693:9
**terms** 530:24
551:23 552:1
573:15 588:8
593:9 596:20

608:19 612:20
**territory** 512:22
560:22,24 566:18
586:25 672:14,21
**test** 520:9 661:9,9
661:10 667:8
669:10 671:18
680:1 701:4
**testified** 497:11
504:2,14 515:14
540:21 544:16
547:20 570:13
573:16 599:22
631:25 636:23
637:1 656:11
681:22 683:11
684:22,25 685:10
687:11 689:15
690:13,18 695:21
696:3,5,7,11,14,17
**testify** 519:20
536:22 539:20
580:2 633:10
**testifying** 557:5
595:1 630:20
**testimony** 517:19
517:21 538:20
540:13,17 541:2
542:22 543:13,22
544:14,18,20,21
545:1 546:5,16
554:15 560:1,15
560:16 571:9
573:5 579:16
588:14 591:3,5,8
591:10 609:10
612:13 631:9
659:16 673:8,20
677:20 679:1
682:7,18,20
683:19 684:20

685:9,18 690:24
692:9 696:1,16
699:6 701:20
704:9
**texas** 494:15 495:7
495:13 507:23
610:22 618:18
672:7,19 674:17
703:12 704:16,19
**text** 497:18 502:20
503:7 521:2
528:21 583:22
584:6
**texts** 502:23 511:8
**thank** 498:19
537:10,13 540:24
548:21 549:14
565:15 597:14
599:15 600:13,18
606:2 611:4
615:10 618:13
619:16 621:2
629:17 638:19
643:19,23 650:13
658:3 659:3 678:5
698:4,5 701:5,6,6
701:7,12,13,25
702:4
**thanks** 503:9
**theory** 614:25
628:5 645:4
**therefor** 704:4
**thing** 500:5,7
530:11 598:8
689:25
**things** 502:8
514:18 518:25
523:23 524:3
526:25 528:21
529:11,22 530:6
531:14 532:7

Page 42

[things - told]

thousand 623:13
623:17,25
thousands 546:3,7
546:11 654:6
655:4
three 505:6 516:19
520:8 523:22
526:6 606:17
612:20 613:2
627:24 643:17
660:21 661:21
671:21 696:20
threshold 514:8
533:9
throckmorton
704:18
time 504:15 506:6
508:14,16,19
512:13 513:17,20
513:22 514:8
516:24 525:21
527:6,10 529:15
530:8 531:5
533:16 534:24
537:5,12 539:19
539:23 543:19
544:8 548:25
550:7,7,21 554:23
557:6,9 558:18,18
560:5 561:14
562:5,10 565:10
565:13,14 566:19
566:19 570:22
571:2,19,25 572:8
574:11 580:2,19
581:3,9 585:14
586:19 589:22
591:9 593:8,11,21
596:5,8 598:1,2
601:1,24 605:23
608:8,9,10,11,12

553:17 555:17
569:12 570:24
602:20 648:7
659:17 667:9
670:9,11 676:13
677:25 680:9
686:8 688:16
691:24 694:20
think 501:22
502:2 508:13
518:25 519:21
529:6 530:19
535:25 537:4
538:7 542:22,25
547:15 556:20
557:8,20 562:6,9
563:9 565:5
570:24 571:10
572:15 575:16,20
580:6 584:12
587:14,19 590:12
590:16 591:22
592:17 596:2,10
598:24 599:4
601:2 602:7
609:11 623:1
642:20 647:6
650:12 653:20
678:20 697:16
701:8
third 511:25 557:5
567:12,22 568:13
568:19,23 577:20
578:1 644:18
652:15 668:12
thought 581:16
651:4 684:24
689:22
thoughts 599:12
658:18

610:17 611:12
612:18,20,22,22
612:23,25 613:1,7
613:11,13,15,15
613:15,17,17,19
614:2,15,16,21,22
614:24,25 615:14
615:18,22,22
616:22,24 618:2
619:2 620:13,16
620:21 626:9,10
626:12,15,16,18
626:21 627:12,25
628:1,6 630:12
631:20 632:19,24
633:1,1,4,5,12,13
633:19 634:5,10
634:11,13,16,16
635:2,2,25,25,25
636:25 643:21
644:6,7,11,12,18
645:3,3,7 646:9,11
646:13 650:21,24
651:10,12,14,18
651:21,23 652:9
652:10,13,21
653:2,10 657:11
657:18 658:17
660:9,10 662:8,10
662:22,23 664:2,2
664:7 665:2,17,19
666:24,25 667:1,2
668:6 669:19
671:25 674:24,25
675:15,17,23
676:1,4,4,6,10
679:16 681:20
682:4 684:9,11,17
684:23 690:20
693:4,20,22 694:2
694:6,9,13,18,19

694:23 697:11,13
698:4,11 700:7,12
timeline 593:9
times 508:6 527:9
532:1 545:2,10,19
545:24 546:2,16
546:24,25 547:8
548:22 557:4
572:4 616:20
627:14,19,24
632:18 634:3
636:13 643:18
644:22 645:8,19
645:25 646:8
648:12 660:13
661:1 678:9
681:17 682:4
684:8 685:2,12
686:13,15 688:13
689:11,22 696:20
696:22 697:2
tip 525:10,16
526:1 530:9
tips 525:9,12,13
525:24 530:4,12
545:2,11,15,20
608:17 610:20
tissues 519:1
title 672:7
tlc 520:7,11 603:4
tmobile 691:6
tnc 605:4 672:7,11
today 497:14
540:5,6 551:10
578:25 580:6,11
595:1 598:13,21
598:25 673:25
told 541:1 552:13
552:16,23 576:18
640:12 683:4
686:1

[toll - two]

**toll**   524:4,6,8,16
**tolls**   524:10,12,14
   608:17 610:20
**top**   505:25 509:5
   549:4 573:16
   577:16 581:25
   582:15 583:21
   584:21 620:3
**topic**   497:14
**total**   608:9 610:19
   610:24 612:10
   613:14 616:12
   620:5 623:13
   627:14 628:17
   629:1,5 630:17
   646:13 650:19
   657:12,18 683:2
**totality**   541:6
   544:24 661:16
**totally**   664:5
   666:17
**touch**   521:1,5
   523:9
**track**   568:12
**tracking**   567:18
**trade**   588:4
**training**   519:21,25
   569:4,10
**transaction**   525:4
   577:1
**transcript**   703:14
   703:16 704:2
**translated**   607:16
**transmission**
   692:4
**transport**   507:16
   695:3 696:18
   700:3
**transportation**
   507:8,17 528:8
   529:17 558:22,24

559:22 561:2,5
563:2,6 569:5,11
569:15,18,23
574:19 575:7,13
575:23 576:25
596:23 621:24
622:4 634:17
635:3 636:1 680:4
680:14 682:3
683:3,9,12,16
684:3 685:24
688:15 689:6
690:21 691:5
**transporting**
   508:20 524:5
   684:18
**traveled**   523:25
   524:1
**traveling**   613:18
**tremendous**
   533:23 687:8
**trial**   676:1,3
**tried**   544:8 660:3
   697:3
**trip**   504:1,11,21
   504:22 505:1
   506:20,25 508:3,5
   508:10 509:2,6,21
   509:24 510:1
   511:8,14 512:4,4,7
   513:10,24 514:3,6
   514:13,15 521:11
   521:11,13,16
   522:1 527:7,12
   532:16 533:6
   535:6,13 548:23
   549:1 550:23
   574:23 585:21
   589:11 607:17,23
   616:24 619:3
   636:14,18 637:3,8

637:12 653:3,4
664:12,15,20
665:5 669:2,5,6
671:17,17 675:10
676:15 685:7,7
693:2,2,3
**trips**   502:13 504:9
   505:3 509:1
   512:10,16,18,24
   534:11 543:20
   548:18 610:16
   616:13 618:16,16
   619:1 620:4,5
   638:5 657:11
   664:19 665:11
   669:15 671:23,25
   673:4,11,14,15
   674:3 675:4,5
   681:24 682:1,17
   685:10,13,15,19
   685:20 694:24,25
   696:10
**trouble**   679:12
**trucking**   680:11
   685:23
**true**   540:4,6
   548:14 550:11
   551:7,10 552:7
   559:24 561:7,10
   565:1,9,11,16,18
   566:11,12 567:4,5
   569:11 581:15
   593:2 627:3 685:2
   695:24 703:15
**trump**   530:10
**truthful**   696:25
**try**   500:7 507:13
   507:14 519:17
   529:25 530:3,3
   531:17 542:16
   547:9 588:14

604:17 615:18
616:5 617:14
625:22 656:1,12
677:7
**trying**   542:3,4
   556:22,24 576:7
   576:10 587:22,25
   587:25 593:12
   594:23 617:18
   621:23 648:1
   697:2
**tsa**   551:18,22
   552:1
**turn**   505:23
   518:13,17 583:22
   584:5 614:24
   649:4 664:14
**turning**   694:9
**turns**   614:22
   677:15
**tv**   687:22
**tweet**   647:20
   648:5,7
**tweeted**   648:11,18
**tweets**   648:14,19
   649:16
**twice**   683:13
   696:20
**twitter**   647:11,14
   647:19 648:23
**two**   512:18 513:18
   515:5 520:9
   522:23 523:4
   526:25 530:9
   559:18 561:17
   587:19,21 589:16
   591:4 602:2,6
   603:17 618:15
   619:5 622:3
   640:11 641:15
   644:11 654:4,23

Veritext Legal Solutions
346-293-7000

[two - understand]

663:25 664:4
665:10 667:9
668:11 669:25
670:4 687:10,12
700:15
**type**  518:22 617:9
652:11 656:18
**typed**  523:10
695:22
**typographical**
629:13,14

**u**

**uber**  494:4 498:24
499:7,8,9,14,21,22
500:1,1 501:14,20
501:25 502:1,2,3,9
502:12,15,23
503:10,14,23
504:6 505:20
507:7,19 508:5,9
508:16,19 509:18
510:7,16,20,23
511:14 512:9
513:5 515:24
516:3,6,18 517:4
518:2 519:17
521:23 522:6,20
522:21,22 523:17
525:10,13,25
528:5,7,8 529:16
532:15,19,21,24
533:3 534:21
535:3 536:4,8,12
536:18,23,23
537:1,18,25 538:2
538:5,9,17,20,21
539:3,5,13,15
540:8,14 541:21
543:10,23 544:12
544:17 545:24
546:8,12,17 548:8

549:1,8 550:4,24
551:3 552:4,16,21
552:22,25 553:6,9
553:14,20,21
554:3,5,7 555:5,14
555:21 556:6,10
556:16 557:22
558:17,24 561:6,8
561:11,13,16,19
561:25,25 562:3,5
562:22 564:15,16
564:18,19,23,23
564:24 565:21,25
566:3,8,9,15,18,19
566:25 567:9,12
568:19 569:8,13
569:14,19,22
570:3,8,9,17,18
571:4,15,16 572:3
572:7,10,22 573:1
574:9,15 575:1,9
575:13,22 576:1
576:25 577:9,10
578:9 580:20,24
581:24 582:6,9,11
582:20,24 583:1
583:11,14 584:1,7
585:4,6,14,20,24
586:4,15,20,22
588:7 589:10,17
589:20,22,25
595:17,18,22,24
596:15,19 603:2
604:24 605:6,13
605:15,16,18
606:13,17,19,24
607:3,6,6,14,18
608:10 609:6
610:8,11 611:19
612:25 613:4,4,15
613:21 614:3,19

616:14 617:8,10
617:11,25 625:13
630:15,20 631:10
631:19 634:18,21
636:2 639:11
648:9,12,15 652:4
654:19 655:11,12
659:8,17 660:3,11
660:17 661:21
662:2,13,13,14,16
662:21,21 663:1,4
663:5,8,14,18,19
663:21,22,24
664:5,9 665:2,8,8
665:14,16,22,25
666:2,8,17,19,22
667:5,6,13,14,18
667:21,22,24
668:4,13,18,19,24
669:7,13,13,18,24
670:6,6,9,12,14,19
670:20,25 671:4,8
671:11,16,20,22
671:25 672:3,8,19
674:6,16,20 675:4
675:9,15 676:15
676:15 677:19,24
679:1,3,4,10,19,23
680:3,7,20,22
681:2,9,16 682:6,8
682:10,12,19,20
682:22 683:1,9,12
683:17 684:4,15
684:16,17,23,25
685:1,24 686:2
687:1,4,8 688:11
689:7,13,16,17,17
690:18,23 691:3,4
691:12,15,18
692:3,5,7,13,17
693:1 694:21,25

695:4,5,14,17,18
696:16 698:14,19
698:22 699:3,8,9
699:15,18,20,22
700:1,7,12,14,20
703:4
**uber's**  535:16,19
535:21 537:16
538:15 539:2,13
542:21 545:10
548:5 558:15
561:15 564:7
570:23,24 571:20
571:23 572:8,20
574:11 576:5,13
576:14,19 577:6
578:14 580:1,10
595:3 597:10
633:6 653:12
659:21,24 662:25
664:5 665:11
674:10 678:25
684:7 686:16
687:10 690:25
692:1,5,6 699:5
**uber.com.**  679:11
**uberx**  617:10
654:19
**unable**  674:25
678:22
**unavailable**
694:12
**unbiased**  609:21
**uncommon**  675:25
**underpaid**  611:19
611:25
**underpayments**
618:1,4
**understand**
517:25 539:2
541:3,6 543:4

Page 45

**[understand - vitae]**

546:15 553:11
556:24 557:25
558:11 565:20
570:14 571:12
573:6 575:18
581:12 588:5,15
590:24 614:11
617:15 631:17,23
632:11 633:18
634:4 638:18
701:10,11
**understanding**
517:18,20,23
542:13,17 551:25
558:5,7 578:23
581:7,17 588:18
591:2 594:25
**understands**
695:18
**understate** 642:20
**understated** 653:7
**understood**
508:25 539:11
579:25 631:8
632:9 685:17
686:11 687:3,3,5
698:8
**underwent** 519:21
**undetermined**
666:24
**unemployment**
602:20
**uniform** 618:21
**unilateral** 537:25
595:23
**unilaterally**
661:21 663:15
664:9 665:23
668:24
**union** 601:23,25

**unions** 649:23
**united** 550:10
560:25 677:4
**universal** 553:20
555:21
**universe** 623:14
**university** 600:24
602:24 603:7,13
604:5
**unquote** 697:18
**unreasonable**
580:7 677:1
**unrelated** 694:20
**unsupported**
664:16
**untruthful** 647:23
**unwanted** 510:5
**update** 603:22
662:17 667:1
**updated** 557:17,19
558:17 566:19
586:8,10
**updates** 583:22
584:6
**upfront** 667:11,16
**upside** 668:10
**urge** 660:1
**usa** 561:8,13,19,25
562:5 596:16
**use** 498:14 503:24
504:5 507:19,20
510:23 511:13
518:5,16,18 525:3
528:5 529:4,16
533:3 539:4,15
540:10 541:2,9,10
543:10 545:8
557:9 566:9
585:24 586:21
613:1 621:7,10,17
622:7 623:16,18

624:17 625:16
634:12 640:1,22
642:7 646:16
651:5,22 654:1,11
654:13,20 655:19
657:17 665:23
666:10 668:3
674:25 679:23
680:24 681:1,9,21
682:12 683:1
684:4,13,14,20,22
687:8 688:20
689:12,14,15,16
690:9 691:4,6,8,15
691:17,20,21
693:7 694:6,21
696:16
**useful** 615:3
622:21
**user** 558:25
559:12 695:17
**user's** 558:24
559:1,15,22
624:16
**users** 566:17
**uses** 553:11
**usually** 500:20
509:24 512:19
533:23

**v**

**vaguely** 571:22
**values** 571:20
**variable** 523:5,20
**variables** 516:20
523:4 526:6
559:18,19 657:10
**various** 601:1
602:23 614:10
622:16
**vehicle** 503:23
514:15 519:11

529:13,14,16,18
531:10 536:14
603:1 621:5,7,17
639:15 640:1
641:5,12 653:12
653:14,24 654:24
655:1,8 688:17
692:6
**vehicles** 503:14,20
503:22 529:20
640:22 654:15
655:18
**venmo** 525:14,19
525:20 545:3,8,12
545:16
**verdict** 687:21
**verification**
549:12,16,17
586:14 591:16
592:21,25 593:16
**verified** 549:18
585:1 586:4 590:1
590:1 592:23
**verify** 586:9
**verifying** 549:18
**veritext** 704:17
**version** 647:5
**versus** 644:6
667:14
**video** 590:19
591:19,22 592:15
690:19
**videos** 590:16
**viewed** 591:12,13
**violating** 686:13
686:15
**violation** 564:19
564:20
**vip** 617:11
**vitae** 600:5,15

[voicemail - witness]

**voicemail**  697:3
**volunteered**  545:7
**vs**  494:3 703:3

**w**

**w**  499:15
**wage**  602:21 610:9
  610:21 618:18,23
  619:4 620:15
  647:17 674:16
  677:20
**wait**  506:5 513:13
  513:16,20,22,23
  529:7 617:18
  664:2,2,4,6,20
  665:7 670:18,18
  675:18,22,25
  676:11 690:11,12
  694:11
**waited**  690:13
**waiting**  498:2
  508:10 513:18
  521:3 581:21
  612:22 613:17
  663:19,22 664:21
  675:6,9,21 676:5
  676:13,15 694:3,4
  694:5,8
**walk**  600:6 676:9
**walks**  694:24
**want**  498:22
  500:22 501:24
  504:1,3 506:25
  509:14,23 511:12
  515:13,15 518:20
  520:15,15 524:2
  527:11,13 529:5
  529:10,13 533:6
  533:10 534:3
  542:16 548:11
  550:20 553:2,6
  555:19 561:12,19

567:18 577:13
582:16,25 595:9
598:10 600:17
615:17 631:8
635:17 644:16
651:2,25 659:20
667:4,5 669:11
672:15 673:17
679:15 682:14
685:15,19 694:1
696:23
**wanted**  503:7
  517:17 573:10
  644:21 660:18
  661:25 662:11,20
  664:12 669:10
  678:12 684:12
  685:20 693:10
  694:9 700:21,24
**wants**  501:1
  502:22 511:6
  518:16 576:3
**warning**  696:6
**warnings**  636:14
  639:4,7,11
**washington**
  601:20
**watching**  665:16
  665:20
**water**  530:5 626:2
**waters**  519:1
**way**  503:10 514:24
  516:10 521:7
  524:11,13 533:4,5
  545:14,21,23
  547:23 573:10
  587:7 595:3
  598:10 606:20
  609:22 613:21
  625:20 628:12
  631:11 638:10

642:17,23 643:9
649:13,19 652:24
659:17 663:9
665:16 668:23
669:2 685:15
699:25 701:19,20
701:20
**ways**  507:6 525:13
  530:20 555:6,7
  566:1 677:16
**waze**  518:18
  689:16,18
**we've**  505:12
  510:2 517:18
  550:2 581:21
  590:20 596:7
  603:13,16 604:11
  609:12 615:21
  659:9,11 660:13
  665:24,25 666:7
  670:20 672:21
  676:21 677:15,20
**wear**  688:20
**web**  532:12
**website**  578:14
  579:1,2 581:2,24
  582:11 583:1
  584:7 659:25
  680:10
**week**  524:22 532:2
  591:4,13 610:18
  613:4,4 614:19
  615:13 620:14,17
  626:13,19 627:13
  629:3 646:10,11
**week's**  628:18
**weekend**  532:3
**weekly**  613:7
  626:23 627:6
  628:13,17,19

**weeks**  613:9
  616:11,14,17
  618:9 619:12
  626:14,18,20,21
  626:25 627:15,16
  628:13,15,21,22
  628:24,25,25
  645:21 646:4,6
  651:11,16,18
  652:18,22 653:3
**weigh**  661:7
  677:17 678:2
**weighing**  661:4
**weighs**  666:8
  673:17 701:4
**weighted**  620:10
  627:19
**went**  521:12 547:3
  625:12 664:8,22
  671:15 697:16
**wheel**  671:8
**wholly**  694:20
**wichita**  580:17,21
  582:2,16,25 583:7
  583:16,21
**widely**  621:7,12
  621:15 639:25
**williams**  495:11
**willing**  695:23
  696:24
**willingness**  615:10
**wished**  694:7
**withheld**  684:1
**witness**  526:17
  537:12 539:20
  544:2,9 557:5
  562:12 564:7,8
  579:20 596:3
  597:20 598:3
  599:4,20 606:1
  629:16 630:4,8,13

Page 47

[witness - zoom]

| | | | |
|---|---|---|---|
| 632:9,13 639:2 | **workers**  601:23 | 513:4 515:1,9 | 621:13 622:4 |
| 643:22 647:25 | 602:16,20 603:23 | 516:14 517:1,6,19 | 640:9 660:20,21 |
| 648:2 650:1 656:7 | 605:16 648:17 | 519:7 520:1 | 671:20,21 695:6 |
| 657:21 658:1 | **working**  511:20 | 521:19 524:15 | **yellow**  527:20 |
| 675:13 703:19 | 549:13 601:1 | 525:11 526:5 | **yep**  570:4 572:6 |
| **witnesses**  560:15 | 603:17,20 608:8 | 527:17 528:2 | **yesterday**  497:15 |
| 658:5 659:21 | 612:18,20,25 | 529:2 530:19,19 | 517:16 518:24 |
| 675:14 677:21,22 | 613:1,11,13,15 | 530:25 531:25 | 519:22 535:25 |
| **won**  697:14,20 | 626:12,16 627:12 | 532:16 534:4,10 | 541:1 542:2,8 |
| 698:12 | 630:21 632:24 | 535:11,20,23 | 550:9 551:19 |
| **word**  553:12 | 633:1,5 645:11 | 536:2 537:19 | 557:4 558:9 |
| 560:21 | 651:12,23 652:1 | 538:3,8,18,23 | 580:10 586:25 |
| **words**  564:8 588:5 | 652:13 676:7 | 539:1 542:1 | 684:25 686:10 |
| 598:17 684:16 | 684:16 687:10 | 547:13 548:4 | 696:4,7,9,12 697:8 |
| 691:17 695:23 | **works**  532:13,15 | 549:13 550:7,14 | **york**  519:21,24 |
| **work**  500:15,23 | 541:4,6 598:6 | 550:17,19 551:1 | 520:3,3,5 601:23 |
| 503:11 511:2 | 608:7 613:23 | 551:24 552:19 | 602:1,4,8,11,11,14 |
| 522:25 538:16 | 621:25 676:11 | 553:18 554:21 | 602:16,16,25 |
| 550:1 598:4,5 | **world**  555:11 | 557:24 558:6 | 603:2,16,21,24 |
| 599:9 602:15,19 | 564:7 601:2 | 559:17,17 560:18 | 604:3,7,20,23 |
| 602:21 604:11 | 602:18 | 560:23 566:6 | 605:11 606:6,9,10 |
| 605:11 609:13 | **worth**  678:20,24 | 569:12 570:4,7,15 | 606:22 607:14 |
| 610:21 611:21 | 704:19 | 571:13,21 572:14 | 608:2,22 610:22 |
| 614:23 628:11 | **write**  657:9 | 572:25 573:13 | 618:16,19,20,21 |
| 631:18 649:24 | **writing**  559:14 | 574:13 575:3 | 618:23,24 620:14 |
| 651:10 663:18 | **written**  520:9 | 580:18 581:4 | 620:19 622:7,12 |
| 667:13,15 670:24 | 563:15 568:7 | 583:9,12 584:24 | 622:14 623:4,17 |
| 671:10,13,13 | 571:20 | 589:8 594:21 | 624:4,14,20 626:9 |
| 675:9 680:3 | **wrong**  525:21 | 595:14,25 596:7 | 626:13 628:1 |
| 686:22 687:9 | 578:5 678:15 | 614:9 619:11 | 636:21 641:15 |
| 692:13,23 694:16 | **x** | 624:11 644:19 | 644:12 650:21 |
| **worked**  601:21 | | **year**  497:22 | 654:5 670:5 |
| 602:1,3,6,23 | **x**  509:5 704:5 | 501:23 620:8,9 | 674:17 688:21 |
| 608:18 609:6 | **y** | 621:6 639:17 | **z** |
| 610:17 616:12 | **yeah**  500:4,14 | 654:2,2,3 681:18 | **zero**  628:16 629:4 |
| 620:17 626:20 | 501:16,19,22 | 692:19 695:8,9 | 629:5 |
| 651:9 657:6,8 | 502:19 505:22 | **years**  529:13 | **zones**  614:15,16 |
| 660:9,10,25 668:7 | 507:9,21 508:7,8 | 530:9 543:18 | **zoom**  494:11 |
| 691:15 | 508:22 510:6 | 544:25 601:3,9,14 | 638:2 |
| **worker**  694:15 | 511:1,3 512:5,11 | 601:24 602:3,9,12 | |
| | 512:12,14,16 | 602:22 603:22 | |

Veritext Legal Solutions
346-293-7000

2022-67757 / Court: 133

# Exhibit A

RASIER, LLC / RASIER-CA, LLC / RASIER-PA, LLC / RASIER-DC, LLC / RASIER-MT, LLC / HINTER-NM

**TECHNOLOGY SERVICES AGREEMENT**

Last update: December 11, 2015

This Technology Services Agreement ("*Agreement*") constitutes a legal agreement between you, an individual ("*you*") and Rasier-CA, LLC if your Territory (as defined below) is within the State of California, Rasier-PA, LLC if your Territory is within the State of Pennsylvania, Rasier-DC, LLC if your Territory is within the State of Florida, Rasier-MT, LLC if your Territory is within the State of Montana, Hinter-NM if your Territory is within the State of New Mexico, or Rasier, LLC if your Territory is anywhere else within the United States (as applicable, "*Company*").

Company, a subsidiary of Uber Technologies, Inc. ("*Uber*"), provides lead generation to independent providers of rideshare or peer-to-peer (collectively, "*P2P*") passenger transportation services using the Uber Services (as defined below). The Uber Services enable an authorized transportation provider to seek, receive and fulfill requests for transportation services from an authorized user of Uber's mobile applications. You desire to enter into this Agreement for the purpose of accessing and using the Uber Services.

**You acknowledge and agree that Company is a technology services provider that does not provide transportation services.**

In order to use the Uber Services, you must agree to the terms and conditions that are set forth below. Upon your execution (electronic or otherwise) of this Agreement, you and Company shall be bound by the terms and conditions set forth herein.

**IMPORTANT: PLEASE NOTE THAT TO USE THE UBER SERVICES, YOU MUST AGREE TO THE TERMS AND CONDITIONS SET FORTH BELOW. PLEASE REVIEW THE ARBITRATION PROVISION SET FORTH BELOW CAREFULLY, AS IT WILL REQUIRE YOU TO RESOLVE DISPUTES WITH THE COMPANY ON AN INDIVIDUAL BASIS, EXCEPT AS PROVIDED IN SECTION 15.3, THROUGH FINAL AND BINDING ARBITRATION UNLESS YOU CHOOSE TO OPT OUT OF THE ARBITRATION PROVISION. BY VIRTUE OF YOUR ELECTRONIC EXECUTION OF THIS AGREEMENT, YOU WILL BE ACKNOWLEDGING THAT YOU HAVE READ AND UNDERSTOOD ALL OF THE TERMS OF THIS AGREEMENT (INCLUDING THE ARBITRATION PROVISION) AND HAVE TAKEN TIME TO CONSIDER THE CONSEQUENCES OF THIS IMPORTANT BUSINESS DECISION. IF YOU DO NOT WISH TO BE SUBJECT TO ARBITRATION, YOU MAY OPT OUT OF THE ARBITRATION PROVISION BY FOLLOWING THE INSTRUCTIONS PROVIDED IN THE ARBITRATION PROVISION BELOW.**

UBER_BARYSAS_0000229

1. **Definitions**

1.1    "*Affiliate*" means an entity that, directly or indirectly, controls, is under the control of, or is under common control with a party, where control means having more than fifty percent (50%) of the voting stock or other ownership interest or the majority of the voting rights of such entity.

1.2    "*City Addendum*" means an addendum or supplemental information to this Agreement setting forth additional Territory-specific terms, as made available and as updated by Company from time to time.

1.3    "*Company Data*" means all data related to the access and use of the Uber Services hereunder, including all data related to Users (including User Information), all data related to the provision of Transportation Services via the Uber Services and the Driver App, and the Driver ID.

1.4    "*Company Device*" means a mobile device owned or controlled by Company that is provided to you solely for your use of the Driver App to provide Transportation Services.

1.5    "*Device*" means a Company Device or Your Device, as the case may be.

1.6    "*Driver App*" means the mobile application provided by Company that enables transportation providers to access the Uber Services for the purpose of seeking, receiving and fulfilling on-demand requests for transportation services by Users, as may be updated or modified from time to time.

1.7    "*Driver ID*" means the identification and password key assigned by Company to you that enables you to use and access the Driver App.

1.8    "*Fare*" has the meaning set forth in Section 4.1.

1.9    "*Service Fee*" has the meaning set forth in Section 4.4.

1.10   "*Territory*" means the city or metro areas in the United States in which you are enabled by the Driver App to receive requests for Transportation Services.

1.11   "*Tolls*" means any applicable road, bridge, ferry, tunnel and airport charges and fees, including inner-city congestion, environmental or similar charges as reasonably determined by the Uber Services based on available information.

1.12   "*Transportation Services*" means your provision of P2P passenger transportation services to Users via the Uber Services in the Territory using the Vehicle.

1.13   "*Uber Services*" mean Uber's on-demand lead generation and related services licensed by Uber to Company that enable transportation providers to seek, receive and fulfill on-demand requests for transportation services by Users seeking transportation services; such Uber Services include access to the Driver App and Uber's software, websites, payment services as described in Section 4 below, and related support services systems, as may be updated or modified from time to time.

1.14   "*User*" means an end user authorized by Uber to use the Uber mobile application for the purpose of obtaining Transportation Services offered by Company's transportation provider customers.

1.15   "*User Information*" means information about a User made available to you in connection with such User's request for and use of Transportation Services, which may include the User's name, pick-up location, contact information and photo.

1.16  *"Vehicle"* means your vehicle that:  (a) meets the then-current Company requirements for a vehicle on the Uber Services; and (b) Company authorizes for your use for the purpose of providing Transportation Services.

1.17  *"Your Device"* means a mobile device owned or controlled by you:  (a) that meets the then-current Company specifications for mobile devices as set forth at www.uber.com/byod-devices; and (b) on which the Driver App has been installed as authorized by Company solely for the purpose of providing Transportation Services.

## 2.  Use of the Uber Services

2.1  **Driver IDs.** Uber will issue you a Driver ID to enable you to access and use the Driver App on a Device in accordance with this Agreement. Company reserves the right to deactivate your Driver ID if you have not fulfilled a request for Transportation Services using the Driver App at least once a month. **You agree that you will maintain your Driver ID in confidence and not share your Driver ID with any third party. You will immediately notify Company of any actual or suspected breach or improper use or disclosure of your Driver ID or the Driver App.**

2.2  **Provision of Transportation Services.** When the Driver App is active, User requests for Transportation Services may appear to you via the Driver App if you are available and in the vicinity of the User. If you accept a User's request for Transportation Services, the Uber Services will provide you with certain User Information via the Driver App, including the User's first name and pickup location. In order to enhance User satisfaction with the Uber mobile application and your Transportation Services, it is recommended that you wait at least ten (10) minutes for a User to show up at the requested pick-up location. You will obtain the destination from the User, either in person upon pickup or from the Driver App if the User elects to enter such destination via Uber's mobile application. You acknowledge and agree that once you have accepted a User's request for Transportation Services, Uber's mobile application may provide certain information about you to the User, including your first name, contact information, photo and location, and your Vehicle's make and license plate number. You shall not contact any Users or use any User's personal data for any reason other than for the purposes of fulfilling Transportation Services. As between Company and you, you acknowledge and agree that:  (a) you shall be solely responsible for determining the most effective, efficient and safe manner to perform each instance of Transportation Services; and (b) except for the Uber Services or any Company Devices (if applicable), you shall provide all necessary equipment, tools and other materials, at your own expense, necessary to perform Transportation Services. You understand and agree that you have a legal obligation under the Americans with Disabilities Act and similar state laws to transport Users with Service Animals (as defined by applicable state and federal law), including guide dogs for the blind and visually impaired Users, and there is no exception to this obligation for allergies or religious objections. Your knowing failure to transport a User with a Service Animal shall constitute a material breach of this Agreement. You agree that a "knowing failure" to comply with this legal obligation shall constitute either: (1) a denial of a ride where you state the denial was due to a Service Animal; or (2) there is more than one (1) instance in which a User or the companion of a User alleges that you cancelled or refused a ride on the basis of a Service Animal.

2.3  **Your Relationship with Users.** You acknowledge and agree that your provision of Transportation Services to Users creates a direct business relationship between you and the User. Company is not responsible or liable for the actions or inactions of a User in relation to you, your activities or your Vehicle. You shall have the sole responsibility for any obligations or liabilities to Users or third parties that arise from your provision of Transportation Services. You acknowledge and

agree that you are solely responsible for taking such precautions as may be reasonable and proper (including maintaining adequate insurance that meets the requirements of all applicable laws including motor vehicle financial responsibility laws) regarding any acts or omissions of a User or third party. You acknowledge and agree that Company may release your contact and/or insurance information to a User upon such User's reasonable request. You acknowledge and agree that, unless specifically consented to by a User, you may not transport or allow inside your Vehicle individuals other than a User and any individuals authorized by such User, during the performance of Transportation Services for such User. You acknowledge and agree that all Users should be transported directly to their specified destination, as directed by the applicable User, without unauthorized interruption or unauthorized stops.

2.4   **Your Relationship with Company**. You acknowledge and agree that Company's provision to you of the Driver App and the Uber Services creates a direct business relationship between Company and you. Company does not, and shall not be deemed to, direct or control you generally or in your performance under this Agreement specifically, including in connection with your provision of Transportation Services, your acts or omissions, or your operation and maintenance of your Vehicle. You retain the sole right to determine when, where, and for how long you will utilize the Driver App or the Uber Services. You retain the option, via the Driver App, to attempt to accept or to decline or ignore a User's request for Transportation Services via the Uber Services, or to cancel an accepted request for Transportation Services via the Driver App, subject to Company's then-current cancellation policies. With the exception of any signage required by local law or permit/license requirements, Company shall have no right to require you to:  (a) display Company's or any of its Affiliates' names, logos or colors on your Vehicle(s); or (b) wear a uniform or any other clothing displaying Company's or any of its Affiliates' names, logos or colors. You acknowledge and agree that you have complete discretion to provide services or otherwise engage in other business or employment activities.  For the sake of clarity, you understand that you retain the complete right to; (i) use other software application services in addition to the Uber Services; and (ii) engage in any other occupation or business. Company retains the right to deactivate or otherwise restrict you from accessing or using the Driver App or the Uber Services in the event of a violation or alleged violation of this Agreement, your disparagement of Company or any of its Affiliates, your act or omission that causes harm to Company's or its Affiliates' brand, reputation or business as determined by Company in its sole discretion.

2.5   **Ratings**.

2.5.1   You acknowledge and agree that:  (a) after receiving Transportation Services, a User will be prompted by Uber's mobile application to provide a rating of you and such Transportation Services and, optionally, to provide comments or feedback about you and such Transportation Services; and (b) after providing Transportation Services, you will be prompted by the Driver App to provide a rating of the User and, optionally, to provide comments or feedback about the User. You shall provide your ratings and feedback in good faith.

2.5.2   You acknowledge that Company desires that Users have access to high-quality services via Uber's mobile application. In order to continue to receive access to the Driver App and the Uber Services, you must maintain an average rating by Users that exceeds the minimum average acceptable rating established by Company for your Territory, as may be updated from time to time by Company in its sole discretion ("*Minimum Average Rating*"). Your average rating is intended to reflect Users' satisfaction with your

UBER_BARYSAS_0000232

Transportation Services rather than your compliance with any of Company's policies or recommendations. In the event your average rating falls below the Minimum Average Rating, Company will notify you and may provide you, in Company's discretion, a limited period of time to raise your average rating above the Minimum Average Rating. If you do not increase your average rating above the Minimum Average Rating within the time period allowed (if any), Company reserves the right to deactivate your access to the Driver App and the Uber Services. Additionally, you acknowledge that your repeated failure to accept User requests for Transportation Services while you are logged in to the Driver App creates a negative experience for Users of Uber's mobile application. If you do not wish to accept User requests for Transportation Services for a period of time, you agree that you will log off of the Driver App.

2.5.3   Company and its Affiliates reserve the right to use, share and display your and User ratings and comments in any manner in connection with the business of Company and its Affiliates without attribution to you or your approval. You acknowledge and agree that Company and its Affiliates are distributors (without any obligation to verify) and not publishers of your and User ratings and comments, provided that Company and its Affiliates reserve the right to edit or remove comments in the event that such comments include obscenities or other objectionable content, include an individual's name or other personal information, or violate any privacy laws, other applicable laws or Company's or its Affiliates' content policies.

2.6   **Devices**.

2.6.1   Company encourages you to use Your Device in providing Transportation Services. Otherwise, if you elect to use any Company Devices, Company will supply you upon request with Company Devices and provide the necessary wireless data plan for such Devices, provided that Company will require reimbursement from you for the costs associated with the wireless data plan of each Company Device and/or request a deposit for each Company Device. You agree that:  (a) Company Devices may only be used for the purpose of enabling your access to the Uber Services; and (b) Company Devices may not be transferred, loaned, sold or otherwise provided in any manner to any party other than you. Company Devices shall at all times remain the property of Company, and upon termination of this Agreement or your termination or deactivation, you agree to return to Company the applicable Company Devices within ten (10) days. You agree that failure to timely return any Company Devices, or damage to Company Devices outside of "normal wear and tear," will result in the forfeiture of related deposits.

2.6.2   If you elect to use Your Devices: (i) you are responsible for the acquisition, cost and maintenance of Your Devices as well as any necessary wireless data plan; and (ii) Company shall make available the Driver App for installation on Your Device. Company hereby grants you a personal, non-exclusive, non-transferable license to install and use the Driver App on Your Device solely for the purpose of providing Transportation Services.  You agree to not provide, distribute or share, or enable the provision, distribution or sharing of, the Driver App (or any data associated therewith) with any third party.  The foregoing license grant shall immediately terminate and you will delete and fully remove the Driver App from the Driver-Provided Device in the event that you cease to provide Transportation Services using Your Device. You agree that: (i) use of the Driver App on Your Device requires an active data plan with a wireless carrier associated with Your Device, which data plan will be provided by you at your own

UBER_BARYSAS_0000233

expense; and (ii) use of the Driver App on Your Device as an interface with the Uber Services may consume very large amounts of data through the data plan. **COMPANY ADVISES THAT YOUR DEVICE ONLY BE USED UNDER A DATA PLAN WITH UNLIMITED OR VERY HIGH DATA USAGE LIMITS, AND COMPANY SHALL NOT BE RESPONSIBLE OR LIABLE FOR ANY FEES, COSTS, OR OVERAGE CHARGES ASSOCIATED WITH ANY DATA PLAN.**

2.7     **Location Based Services**. You acknowledge and agree that your geo-location information must be provided to the Uber Services via a Device in order to provide Transportation Services. You acknowledge and agree that:  (a) your geo-location information may be obtained  by the Uber Services while the Driver App is running; and (b) the approximate location of your Vehicle will be displayed to the User before and during the provision of Transportation Services to such User. In addition, Company and its Affiliates may monitor, track and share with third parties Driver's geo-location information obtained by the Driver App and Device for safety and security purposes.

3.   **You and Your Vehicle**

3.1     **Your Requirements**. You acknowledge and agree that at all times, you shall:  (a) hold and maintain (i) a valid driver's license with the appropriate level of certification to operate your Vehicle, and (ii) all licenses, permits, approvals and authority applicable to you that are necessary to provide passenger transportation services to third parties in the Territory; (b) possess the appropriate and current level of training, expertise and experience to provide Transportation Services in a professional manner with due skill, care and diligence; and (c) maintain high standards of professionalism, service and courtesy. You acknowledge and agree that you may be subject to certain background and driving record checks from time to time in order to qualify to provide, and remain eligible to provide, Transportation Services. You acknowledge and agree that Company reserves the right, at any time in Company's sole discretion, to deactivate or otherwise restrict you from accessing or using the Driver App or the Uber Services if you fail to meet the requirements set forth in this Agreement.

3.2     **Vehicle Requirements**. You acknowledge and agree that your Vehicle shall at all times be:  (a) properly registered and licensed to operate as a passenger transportation vehicle in the Territory; (b) owned or leased by you, or otherwise in your lawful possession; (c) suitable for performing the passenger transportation services contemplated by this Agreement; and (d) maintained in good operating condition, consistent with industry safety and maintenance standards for a Vehicle of its kind and any additional standards or requirements in the applicable Territory, and in a clean and sanitary condition.

3.3     **Documentation**. To ensure your compliance with all requirements in Sections 3.1 and 3.2 above, you must provide Company with written copies of all such licenses, permits, approvals, authority, registrations and certifications prior to your provision of any Transportation Services. Thereafter, you must submit to Company written evidence of all such licenses, permits, approvals, authority, registrations and certifications as they are renewed. Company shall, upon request, be entitled to review such licenses, permits, approvals, authority, registrations and certifications from time to time, and your failure to provide or maintain any of the foregoing shall constitute a material breach of this Agreement. Company reserves the right to independently verify your documentation from time to time in any way Company deems appropriate in its reasonable discretion.

4.   **Financial Terms**

4.1   **Fare Calculation and Your Payment**. You are entitled to charge a fare for each instance of
completed Transportation Services provided to a User that are obtained via the Uber Services
(*"Fare"*), where such Fare is calculated based upon a base fare amount plus distance (as
determined by Company using location-based services enabled through the Device) and/or time
amounts, as detailed at www.uber.com/cities for the applicable Territory (*"Fare Calculation"*).
You acknowledge and agree that the Fare provided under the Fare Calculation is the only
payment you will receive in connection with the provision of Transportation Services, and that
neither the Fare nor the Fare Calculation includes any gratuity. You are also entitled to charge
User for any Tolls, taxes or fees incurred during the provision of Transportation Services, if
applicable. You: (i) appoint Company as your limited payment collection agent solely for the
purpose of accepting the Fare, applicable Tolls and, depending on the region and/or if requested
by you, applicable taxes and fees from the User on your behalf via the payment processing
functionality facilitated by the Uber Services; and (ii) agree that payment made by User to
Company (or to an Affiliate of Company acting as an agent of Company) shall be considered the
same as payment made directly by User to you. In addition, the parties acknowledge and agree
that as between you and Company, the Fare is a recommended amount, and the primary
purpose of the pre-arranged Fare is to act as the default amount in the event you do not
negotiate a different amount. You shall always have the right to: (i) charge a fare that is less
than the pre-arranged Fare; or (ii) negotiate, at your request, a Fare that is lower than the pre-
arranged Fare (each of (i) and (ii) herein, a *"Negotiated Fare"*). Company shall consider all such
requests from you in good faith. Company agrees to remit, or cause to be remitted, to you on at
least a weekly basis: (a) the Fare less the applicable Service Fee; (b) the Tolls; and (c) depending
on the region, certain taxes and ancillary fees. If you have separately agreed that other amounts
may be deducted from the Fare prior to remittance to you (*e.g.*, vehicle financing payments,
lease payments, mobile device usage charges, etc.), the order of any such deductions from the
Fare shall be determined exclusively by Company (as between you and Company).

4.2   **Changes to Fare Calculation**. Company reserves the right to change the Fare Calculation at any
time in Company's discretion based upon local market factors, and Company will provide you
with notice in the event of changes to the base fare, per mile, and/or per minute amounts that
would result in a change in the recommended Fare. Continued use of the Uber Services after
any such change in the Fare Calculation shall constitute your consent to such change.

4.3   **Fare Adjustment**. Company reserves the right to: (i) adjust the Fare for a particular instance of
Transportation Services (*e.g.*, you took an inefficient route, you failed to properly end a
particular instance of Transportation Services in the Driver App, technical error in the Uber
Services, etc.); or (ii) cancel the Fare for a particular instance of Transportation Services (*e.g.*,
User is charged for Transportation Services that were not provided, in the event of a User
complaint, fraud, etc.). Company's decision to reduce or cancel the Fare in any such manner
shall be exercised in a reasonable manner.

4.4   **Service Fee**. In consideration of Company's provision of the Driver App and the Uber Services for
your use and benefit hereunder, you agree to pay Company a service fee on a per
Transportation Services transaction basis calculated as a percentage of the Fare determined by
the Fare Calculation (regardless of any Negotiated Fare), as provided to you via email or
otherwise made available electronically by Company from time to time for the applicable
Territory (*"Service Fee"*). In the event regulations applicable to your Territory require taxes to be
calculated on the Fare, Company shall calculate the Service Fee based on the Fare net of such
taxes. Company reserves the right to change the Service Fee at any time in Company's discretion

based upon local market factors, and Company will provide you with notice in the event of such change. Continued use of the Uber Services after any such change in the Service Fee calculation shall constitute your consent to such change.

4.5 **Cancellation Charges**. You acknowledge and agree that Users may elect to cancel requests for Transportation Services that have been accepted by you via the Driver App at any time prior to your arrival. In the event that a User cancels an accepted request for Transportation Services, Company may charge the User a cancellation fee on your behalf. If charged, this cancellation fee shall be deemed the Fare for the cancelled Transportation Services for the purpose of remittance to you hereunder ("*Cancellation Fee*"). The parties acknowledge and agree that as between you and Company, this Cancellation Fee is a recommended amount, and the primary purpose of such Cancellation Fee is to act as the default amount in the event you do not negotiate a different amount. You shall always have the right to: (i) charge a cancellation fee that is less than the Cancellation Fee; or (ii) negotiate, at your request, a cancellation fee that is lower than the Cancellation Fee (each of (i) and (ii) herein, a "*Negotiated Cancellation Fee*"). If charged, the Cancellation Fee (regardless of any Negotiated Cancellation Fee) shall be deemed the Fare for the cancelled Transportation Services for the purpose of remittance to you hereunder.

4.6 **Receipts**. As part of the Uber Services, Company provides you a system for the delivery of receipts to Users for Transportation Services rendered. Upon your completion of Transportation Services for a User, Company prepares an applicable receipt and issues such receipt to the User via email on your behalf. Such receipts are also provided to you via email or the online portal available to you through the Uber Services. Receipts include the breakdown of amounts charged to the User for Transportation Services and may include specific information about you, including your name, contact information and photo, as well as a map of the route you took. Any corrections to a User's receipt for Transportation Services must be submitted to Company in writing within three (3) business days after the completion of such Transportation Services. Absent such a notice, Company shall not be liable for any mistakes in or corrections to the receipt or for recalculation or disbursement of the Fare.

4.7 **No Additional Amounts**. You acknowledge and agree that, for the mutual benefit of the parties, through advertising and marketing, Company and its Affiliates may seek to attract new Users to Uber and to increase existing Users' use of Uber's mobile application. You acknowledge and agree such advertising or marketing does not entitle you to any additional monetary amounts beyond the amounts expressly set forth in this Agreement.

4.8 **Taxes**. You acknowledge and agree that you are required to: (a) complete all tax registration obligations and calculate and remit all tax liabilities related to your provision of Transportation Services as required by applicable law; and (b) provide Company with all relevant tax information. You further acknowledge and agree that you are responsible for taxes on your own income arising from the performance of Transportation Services. Notwithstanding anything to the contrary in this Agreement, Company may in its reasonable discretion based on applicable tax and regulatory considerations, collect and remit taxes resulting from your provision of Transportation Services and/or provide any of the relevant tax information you have provided pursuant to the foregoing requirements in this Section 4.8 directly to the applicable governmental tax authorities on your behalf or otherwise.

5. **Proprietary Rights; License**

5.1 **License Grant**. Subject to the terms and conditions of this Agreement, Company hereby grants you a non-exclusive, non-transferable, non-sublicensable, non-assignable license, during the term of this Agreement, to use the Uber Services (including the Driver App on a Device) solely for the purpose of providing Transportation Services to Users and tracking resulting Fares and Fees. All rights not expressly granted to you are reserved by Company, its Affiliates and their respective licensors.

5.2 **Restrictions**. You shall not, and shall not allow any other party to:  (a) license, sublicense, sell, resell, transfer, assign, distribute or otherwise provide or make available to any other party the Uber Services, Driver App or any Company Device in any way; (b) modify or make derivative works based upon the Uber Services or Driver App; (c) improperly use the Uber Services or Driver App, including creating Internet "links" to any part of the Uber Services or Driver App, "framing" or "mirroring" any part of the Uber Services or Driver App on any other websites or systems, or "scraping" or otherwise improperly obtaining data from the Uber Services or Driver App; (d) reverse engineer, decompile, modify, or disassemble the Uber Services or Driver App, except as allowed under applicable law; or (e) send spam or otherwise duplicative or unsolicited messages. In addition, you shall not, and shall not allow any other party to, access or use the Uber Services or Driver App to:  (i) design or develop a competitive or substantially similar product or service; (ii) copy or extract any features, functionality, or content thereof; (iii) launch or cause to be launched on or in connection with the Uber Services an automated program or script, including web spiders, crawlers, robots, indexers, bots, viruses or worms, or any program which may make multiple server requests per second, or unduly burden or hinder the operation and/or performance of the Uber Services; or (iv) attempt to gain unauthorized access to the Uber Services or its related systems or networks.

5.3 **Ownership**. The Uber Services, Driver App and Company Data, including all intellectual property rights therein, and the Company Devices are and shall remain (as between you and Company) the property of Company, its Affiliates or their respective licensors. Neither this Agreement nor your use of the Uber Services, Driver App or Company Data conveys or grants to you any rights in or related to the Uber Services, Driver App or Company Data, except for the limited license granted above. Other than as specifically permitted by the Company in connection with the Uber Services, you are not permitted to use or reference in any manner Company's, its Affiliates', or their respective licensors' company names, logos, products and service names, trademarks, service marks, trade dress, copyrights or other indicia of ownership, alone and in combination with other letters, punctuation, words, symbols and/or designs (the "UBER Marks and Names") for any commercial purposes. You agree that you will not try to register or otherwise use and/or claim ownership in any of the UBER Marks and Names, alone or in combination with other letters, punctuation, words, symbols and/or designs, or in any confusingly similar mark, name or title, for any goods and services.

## 6. Confidentiality

6.1 Each party acknowledges and agrees that in the performance of this Agreement it may have access to or may be exposed to, directly or indirectly, confidential information of the other party ("*Confidential Information*"). Confidential Information includes Company Data, Driver IDs, User Information, and the transaction volume, marketing and business plans, business, financial, technical, operational and such other non-public information of each party (whether disclosed in writing or verbally) that such party designates as being proprietary or confidential or of which the other party should reasonably know that it should be treated as confidential.

6.2     Each party acknowledges and agrees that:  (a) all Confidential Information shall remain the exclusive property of the disclosing party; (b) it shall not use Confidential Information of the other party for any purpose except in furtherance of this Agreement; (c) it shall not disclose Confidential Information of the other party to any third party, except to its employees, officers, contractors, agents and service providers ("*Permitted Persons*") as necessary to perform under this Agreement, provided Permitted Persons are bound in writing to obligations of confidentiality and non-use of Confidential Information no less protective than the terms hereof; and (d) it shall return or destroy all Confidential Information of the disclosing party, upon the termination of this Agreement or at the request of the other party (subject to applicable law and, with respect to Company, its internal record-keeping requirements).

6.3     Notwithstanding the foregoing, Confidential Information shall not include any information to the extent it:  (a) is or becomes part of the public domain through no act or omission on the part of the receiving party; (b) was possessed by the receiving party prior to the date of this Agreement without an obligation of confidentiality; (c) is disclosed to the receiving party by a third party having no obligation of confidentiality with respect thereto; or (d) is required to be disclosed pursuant to law, court order, subpoena or governmental authority, provided the receiving party notifies the disclosing party thereof and provides the disclosing party a reasonable opportunity to contest or limit such required disclosure.

7.  **Privacy**

7.1     **Disclosure of Your Information**. Subject to applicable law, Company and its Affiliates may, but shall not be required to, provide to you, a User, an insurance company and/or relevant authorities and/or regulatory agencies any information (including personal information (*e.g.*, information obtained about you through any background check) and any Company Data) about you or any Transportation Services provided hereunder if:  (a) there is a complaint, dispute or conflict, including an accident, between you and a User; (b) it is necessary to enforce the terms of this Agreement; (c) it is required, in Company's or any Affiliate's sole discretion, by applicable law or regulatory requirements (*e.g.*, Company or its Affiliates receive a subpoena, warrant, or other legal process for information); (d) it is necessary, in Company's or any Affiliate's sole discretion, to (1) protect the safety, rights, property or security of Company or its Affiliates, the Uber Services or any third party; (2) to protect the safety of the public for any reason including the facilitation of insurance claims related to the Uber Services;  (3) to detect, prevent or otherwise address fraud, security or technical issues;  (4) to prevent or stop activity which Company or any of its Affiliates, in their sole discretion, may consider to be, or to pose a risk of being, an illegal, unethical, or legally actionable activity); or (e) it is required or necessary, in Company's or any Affiliate's sole discretion, for insurance or other purposes related to your ability to qualify, or remain qualified, to use the Uber Services. You understand that Company may retain your personal data for legal, regulatory, safety and other necessary purposes after this Agreement is terminated.

7.2     Company and its Affiliates may collect your personal data during the course of your application for, and use of, the Uber Services, or may obtain information about you from third parties. Such information may be stored, processed, transferred, and accessed by Company and its Affiliates, third parties, and service providers for business purposes, including for marketing, lead generation, service development and improvement, analytics, industry and market research, and such other purposes consistent with Company's and its Affiliates' legitimate business needs. You expressly consent to such use of personal data.

8.  **Insurance**

8.1     You agree to maintain during the term of this Agreement on all Vehicles operated by you under this Agreement automobile liability insurance that provides protection against bodily injury and property damage to third parties at levels of coverage that satisfy the minimum requirements to operate a private passenger vehicle on the public roads within the Territory. This coverage must also include any no-fault coverage required by law in the Territory that may not be waived by an insured. You agree to provide Company and its Affiliates a copy of the insurance policy, policy declarations, proof of insurance identification card and proof of premium payment for the insurance policy required in this Section 8.1 upon request. Furthermore, you must provide Company with written notice of cancellation of any insurance policy required by Company. Company shall have no right to control your selection or maintenance of your policy. You must be a named insured or individually rated driver, for which a premium is charged, on the insurance policy required in this Section 8.1 at all times.

8.2     **You agree to maintain during the term of this Agreement workers' compensation insurance as required by all applicable laws in the Territory. If permitted by applicable law, you may choose to insure yourself against industrial injuries by maintaining occupational accident insurance in place of workers' compensation insurance. Furthermore, if permitted by applicable law, you may choose not to insure yourself against industrial injuries at all, but do so at your own risk.**

8.3     You understand and acknowledge that your personal automobile insurance policy may not afford liability, comprehensive, collision, medical payments, personal injury protection, uninsured motorist, underinsured motorist, or other coverage for the Transportation Services you provide pursuant to this Agreement. If you have any questions or concerns about the scope or applicability of your own insurance coverage, it is your responsibility, not that of Company, to resolve them with your insurer(s).

8.4     Company may maintain during the term of this Agreement insurance related to your provision of Transportation Services as determined by Company in its reasonable discretion or as described in a City Addendum, provided that Company and its Affiliates are not required to provide you with any specific insurance coverage for any loss to you or your Vehicle. You are required to promptly notify Company of any accidents that occur while providing Transportation Services and to cooperate and provide all necessary information related thereto.

9.  **Representations and Warranties; Disclaimers**

9.1     **By You**. You hereby represent and warrant that: (a) you have full power and authority to enter into this Agreement and perform your obligations hereunder; (b) you have not entered into, and during the term will not enter into, any agreement that would prevent you from complying with this Agreement; and (c) you will comply with all applicable laws in your performance of this Agreement, including holding and complying with all permits, licenses, registrations and other governmental authorizations necessary to provide (i) Transportation Services using the Vehicles pursuant to this Agreement, and (ii) passenger transportation services to third parties in the Territory generally.

9.2     **Disclaimer of Warranties**. COMPANY AND ITS AFFILIATES PROVIDE, AND YOU ACCEPT, THE UBER SERVICES, DRIVER APP AND THE COMPANY DEVICES ON AN "AS IS" AND "AS AVAILABLE" BASIS. COMPANY AND ITS AFFILIATES DO NOT REPRESENT, WARRANT OR GUARANTEE THAT YOUR ACCESS TO OR USE OF THE UBER SERVICES, DRIVER APP OR THE COMPANY DEVICES: (A) WILL BE UNINTERRUPTED OR ERROR FREE; OR (B) WILL RESULT IN ANY REQUESTS FOR TRANSPORTATION

SERVICES. COMPANY AND ITS AFFILIATES FUNCTION AS AN ON-DEMAND LEAD GENERATION AND RELATED SERVICE ONLY AND MAKE NO REPRESENTATIONS, WARRANTIES OR GUARANTEES AS TO THE ACTIONS OR INACTIONS OF THE USERS WHO MAY REQUEST OR RECEIVE TRANSPORTATION SERVICES FROM YOU, AND COMPANY AND ITS AFFILIATES DO NOT SCREEN OR OTHERWISE EVALUATE USERS. BY USING THE UBER SERVICES AND DRIVER APP, YOU ACKNOWLEDGE AND AGREE THAT YOU MAY BE INTRODUCED TO A THIRD PARTY THAT MAY POSE HARM OR RISK TO YOU OR OTHER THIRD PARTIES. YOU ARE ADVISED TO TAKE REASONABLE PRECAUTIONS WITH RESPECT TO INTERACTIONS WITH THIRD PARTIES ENCOUNTERED IN CONNECTION WITH THE USE OF THE UBER SERVICES OR DRIVER APP.NOTWITHSTANDING COMPANY'S APPOINTMENT AS THE LIMITED PAYMENT COLLECTION AGENT OF YOU FOR THE PURPOSE OF ACCEPTING PAYMENT FROM USERS ON YOUR BEHALF AS SET FORTH IN SECTION 4 ABOVE, COMPANY AND ITS AFFILIATES EXPRESSLY DISCLAIM ALL LIABILITY FOR ANY ACT OR OMISSION OF YOU, ANY USER OR OTHER THIRD PARTY.

9.3     **No Service Guarantee**. COMPANY AND ITS AFFILIATES DO NOT GUARANTEE THE AVAILABILITY OR UPTIME OF THE UBER SERVICES OR DRIVER APP. YOU ACKNOWLEDGE AND AGREE THAT THE UBER SERVICES OR DRIVER APP MAY BE UNAVAILABLE AT ANY TIME AND FOR ANY REASON (*e.g.*, DUE TO SCHEDULED MAINTENANCE OR NETWORK FAILURE). FURTHER, THE UBER SERVICES OR DRIVER APP MAY BE SUBJECT TO LIMITATIONS, DELAYS, AND OTHER PROBLEMS INHERENT IN THE USE OF THE INTERNET AND ELECTRONIC COMMUNICATIONS, AND COMPANY AND ITS AFFILIATES ARE NOT RESPONSIBLE FOR ANY DELAYS, DELIVERY FAILURES, OR OTHER DAMAGES, LIABILITIES OR LOSSES RESULTING FROM SUCH PROBLEMS.

10.    **Indemnification**. You shall indemnify, defend (at Company's option) and hold harmless Company and its Affiliates and their respective officers, directors, employees, agents, successors and assigns from and against any and all liabilities, expenses (including legal fees), damages, penalties, fines, social security contributions and taxes arising out of or related to:  (a) your breach of your representations, warranties or obligations under this Agreement; or (b) a claim by a third party (including Users, regulators and governmental authorities) directly or indirectly related to your provision of Transportation Services or use of the Uber Services. This indemnification provision shall not apply to your breach of any representations regarding your status as an independent contractor.

11.    **Limits of Liability.**  COMPANY AND ITS AFFILIATES SHALL NOT BE LIABLE UNDER OR RELATED TO THIS AGREEMENT FOR ANY OF THE FOLLOWING, WHETHER BASED ON CONTRACT, TORT OR ANY OTHER LEGAL THEORY, EVEN IF A PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES:  (i) ANY INCIDENTAL, PUNITIVE, SPECIAL, EXEMPLARY, CONSEQUENTIAL, OR OTHER INDIRECT DAMAGES OF ANY TYPE OR KIND; OR (ii) YOUR OR ANY THIRD PARTY'S PROPERTY DAMAGE, OR LOSS OR INACCURACY OF DATA, OR LOSS OF BUSINESS, REVENUE, PROFITS, USE OR OTHER ECONOMIC ADVANTAGE. EXCEPT FOR COMPANY'S OBLIGATIONS TO PAY AMOUNTS DUE TO YOU PURSUANT TO SECTION 4 ABOVE, BUT SUBJECT TO ANY LIMITATIONS OR OTHER PROVISIONS CONTAINED IN THIS AGREEMENT WHICH ARE APPLICABLE THERETO, IN NO EVENT SHALL THE LIABILITY OF COMPANY OR ITS AFFILIATES UNDER THIS AGREEMENT EXCEED THE AMOUNT OF SERVICE FEES ACTUALLY PAID TO OR DUE TO COMPANY HEREUNDER IN THE SIX (6) MONTH PERIOD IMMEDIATELY PRECEDING THE EVENT GIVING RISE TO SUCH CLAIM.

12.    **Term and Termination**

12.1     **Term**.  This Agreement shall commence on the date accepted by you and shall continue until terminated as set forth herein.

12.2 **Termination**. Either party may terminate this Agreement:  (a) without cause at any time upon seven (7) days prior written notice to the other party; (b) immediately, without notice, for the other party's material breach of this Agreement; or (c) immediately, without notice, in the event of the insolvency or bankruptcy of the other party, or upon the other party's filing or submission of request for suspension of payment (or similar action or event) against the terminating party. In addition, Company may terminate this Agreement or deactivate your Driver ID immediately, without notice, with respect to you in the event you no longer qualify, under applicable law or the standards and policies of Company and its Affiliates, to provide Transportation Services or to operate the Vehicle, or as otherwise set forth in this Agreement.

12.3 **Effect of Termination**. Upon termination of the Agreement, you shall:  (a) promptly return to Company all Company Devices; and (b) immediately delete and fully remove the Driver App from any of Your Devices. Outstanding payment obligations and Sections 1, 2.3, 2.5.3, 4.7, 4.8, 5.3, 6, 7, 9, 10, 11, 12.3, 13, 14 and 15 shall survive the termination of this Agreement.

13. **Relationship of the Parties**

13.1 **Except as otherwise expressly provided herein with respect to Company acting as the limited payment collection agent solely for the purpose of collecting payment from Users on your behalf, the relationship between the parties under this Agreement is solely that of independent contracting parties. The parties expressly agree that: (a) this Agreement is not an employment agreement, nor does it create an employment relationship, between Company and you; and (b) no joint venture, partnership, or agency relationship exists between Company and you.**

13.2 You have no authority to bind Company or its Affiliates and you undertake not to hold yourself out as an employee, agent or authorized representative of Company or its Affiliates. Where, by implication of mandatory law or otherwise, you may be deemed an agent or representative of Company, you undertake and agree to indemnify, defend (at Company's option) and hold Company and its Affiliates harmless from and against any claims by any person or entity based on such implied agency or representative relationship.

14. **Miscellaneous Terms**

14.1 **Modification**.  In the event Company modifies the terms and conditions of this Agreement at any time, such modifications shall be binding on you only upon your acceptance of the modified Agreement. Company reserves the right to modify any information referenced at hyperlinks from this Agreement from time to time. You hereby acknowledge and agree that, by using the Uber Services, or downloading, installing or using the Driver App, you are bound by any future amendments and additions to information referenced at hyperlinks herein, or documents incorporated herein, including with respect to Fare Calculations. Continued use of the Uber Services or Driver App after any such changes shall constitute your consent to such changes. Unless changes are made to the arbitration provisions herein, you acknowledge and agree that modification of this Agreement does not create a renewed opportunity to opt out of arbitration.

14.2 **Supplemental Terms**. Supplemental terms may apply to your use of the Uber Services, such as use policies or terms related to certain features and functionality, which may be modified from time to time ("*Supplemental Terms*"). You may be presented with certain Supplemental Terms from time to time. Supplemental Terms are in addition to, and shall be deemed a part of, this Agreement. Supplemental Terms shall prevail over this Agreement in the event of a conflict.

UBER_BARYSAS_0000241

14.3 **Severability**. If any provision of this Agreement is or becomes invalid or non-binding, the parties shall remain bound by all other provisions hereof. In that event, the parties shall replace the invalid or non-binding provision with provisions that are valid and binding and that have, to the greatest extent possible, a similar effect as the invalid or non-binding provision, given the contents and purpose of this Agreement.

14.4 **Assignment**. Neither party shall assign or transfer this Agreement or any of its rights or obligations hereunder, in whole or in part, without the prior written consent of the other party; provided that Company may assign or transfer this Agreement or any or all of its rights or obligations under this Agreement from time to time without consent:  (a) to an Affiliate; or (b) to an acquirer of all or substantially all of Company's business, equity or assets.

14.5 **Entire Agreement**. This Agreement, including all Supplemental Terms, constitutes the entire agreement and understanding of the parties with respect to its subject matter and replaces and supersedes all prior or contemporaneous agreements or undertakings regarding such subject matter. In this Agreement, the words "including" and "include" mean "including, but not limited to." The recitals form a part of this Agreement.

14.6 **No Third Party Beneficiaries**. There are no third party beneficiaries to this Agreement, except as expressly set forth in the Arbitration Provision in Section 15.3. Nothing contained in this Agreement is intended to or shall be interpreted to create any third-party beneficiary claims.

14.7 **Notices**.  Any notice delivered by Company to you under this Agreement will be delivered by email to the email address associated with your account or by posting on the portal available to you on the Uber Services. Any notice delivered by you to Company under this Agreement will be delivered by contacting Company at http://partners.uber.com in the "Contact Us" section. Additional Territory-specific notices may be required from time to time.

## 15. Governing Law; Arbitration

15.1 The choice of law provisions contained in this Section 15.1 do not apply to the arbitration clause contained in Section 15.3, such arbitration clause being governed by the Federal Arbitration Act. Accordingly, and except as otherwise stated in Section 15.3, the interpretation of this Agreement shall be governed by California law, without regard to the choice or conflicts of law provisions of any jurisdiction.  Any disputes, actions, claims or causes of action arising out of or in connection with this Agreement or the Uber Services that are not subject to the arbitration clause contained in Section 15.3 shall be subject to the exclusive jurisdiction of the state and federal courts located in the City and County of San Francisco, California. However, neither the choice of law provision regarding the interpretation of this Agreement nor the forum selection provision is intended to create any other substantive right to non-Californians to assert claims under California law whether that be by statute, common law, or otherwise. These provisions, and except as otherwise provided in Section 15.3, are only intended to specify the use of California law to interpret this Agreement and the forum for disputes asserting a breach of this Agreement, and these provisions shall not be interpreted as generally extending California law to you if you do not otherwise reside or provide services in California. The foregoing choice of law and forum selection provisions do not apply to the arbitration clause in Section 15.3 or to any arbitrable disputes as defined therein.  Instead, as described in Section 15.3, the Federal Arbitration Act shall apply to any such disputes.  The failure of Company to enforce any right or provision in this Agreement shall not constitute a waiver of such right or provision unless

acknowledged and agreed to by Uber in writing.

15.2    Other than disputes regarding the intellectual property rights of the parties and other claims identified in Section 15.3.ii, any disputes, actions, claims or causes of action arising out of or in connection with this Agreement or the Uber Services shall be subject to arbitration pursuant to Section 15.3.

**15.3    Arbitration Provision**

Important Note Regarding this Arbitration Provision:

- Except as provided below, arbitration does not limit or affect the legal claims you may bring against the Company.  Agreeing to arbitration only affects where any such claims may be brought and how they will be resolved.

- Arbitration is a process of private dispute resolution that does not involve the civil courts, a civil judge, or a jury.  Instead, the parties' dispute is decided by a private arbitrator selected by the parties using the process set forth herein.  Other arbitration rules and procedures are also set forth herein.

- Unless the law requires otherwise, as determined by the Arbitrator based upon the circumstances presented, you will be required to split the cost of any arbitration with the Company.

- IMPORTANT: This Arbitration Provision will require you to resolve any claim that you may have against the Company or Uber on an individual basis, except as provided below, pursuant to the terms of the Agreement unless you choose to opt out of the Arbitration Provision.  Except as provided below, this provision will preclude you from bringing any class, collective, or representative action (other than actions under the Private Attorneys General Act of 2004 ("PAGA"), California Labor Code § 2698 et seq. ("PAGA")) against the Company or Uber, and also precludes you from participating in or recovering relief under any current or future class, collective, or representative (non-PAGA) action brought against the Company or Uber by someone else.

  o *Cases have been filed against Company or Uber and may be filed in the future involving claims by users of the Service, including by drivers.  You should assume that there are now, and may be in the future, lawsuits against the Company or Uber alleging class, collective, and/or representative (non-*

*PAGA) claims on your behalf, including but not limited to claims for tips, reimbursement of expenses, and employment status.  Such claims, if successful, could result in some monetary recovery to you.  (THESE CASES NOW INCLUDE, FOR EXAMPLE, YUCESOY ET AL. V. UBER TECHNOLOGIES, INC., ET AL., CASE NO. 3:15-CV-00262(NORTHERN DISTRICT OF CALIFORNIA); IN RE UBER FCRA LITIGATION, CASE NO. 14-CV-05200-EMC (NORTHERN DISTRICT OF CALIFORNIA); AND O'CONNOR  V. UBER TECHNOLOGIES, INC., ET AL., CASE NO. CV 13-03826-EMC (NORTHERN DISTRICT OF CALIFORNIA).The contact information for plaintiffs' counsel in the O'Connor matter is as follows: Shannon Liss-Riordan, Lichten & Liss-Riordan, P.C., 100 Cambridge Street, 20th Floor, Boston, MA 02114, Telephone: (617) 994-5800, Fax: (617) 994-5801, email: sliss@llrlaw.com.)*

o   The mere existence of such class, collective, and/or representative lawsuits, however, does not mean that such lawsuits will ultimately succeed.  But if you do agree to arbitration with the Company, you are agreeing in advance, except as otherwise provided, that you will not participate in and, therefore, will not seek to recover monetary or other relief under any such class, collective, and/or representative (non-PAGA) lawsuit, except as provided below.

o   However, as discussed above and except as provided below, if you agree to arbitration, you will not be precluded from bringing your claims against the Company or Uber in an individual arbitration proceeding. If successful on such claims, you could be awarded money or other relief by an arbitrator (subject to splitting the cost of arbitration as mentioned above).

WHETHER TO AGREE TO ARBITRATION IS AN IMPORTANT BUSINESS DECISION. IT IS YOUR DECISION TO MAKE, AND YOU SHOULD NOT RELY SOLELY UPON THE INFORMATION PROVIDED IN THIS AGREEMENT AS IT IS NOT INTENDED TO CONTAIN A COMPLETE EXPLANATION OF THE CONSEQUENCES OF ARBITRATION.  YOU SHOULD TAKE REASONABLE STEPS TO CONDUCT FURTHER

UBER_BARYSAS_0000244

**RESEARCH AND TO CONSULT WITH OTHERS — INCLUDING BUT NOT LIMITED TO AN ATTORNEY — REGARDING THE CONSEQUENCES OF YOUR DECISION, JUST AS YOU WOULD WHEN MAKING ANY OTHER IMPORTANT BUSINESS OR LIFE DECISION.**

  i.  <u>How This Arbitration Provision Applies</u>.

This Arbitration Provision is governed by the Federal Arbitration Act, 9 U.S.C. § 1 et seq. (the "FAA") and evidences a transaction involving interstate commerce.  This Arbitration Provision applies to any dispute arising out of or related to this Agreement or termination of the Agreement and survives after the Agreement terminates.  Nothing contained in this Arbitration Provision shall be construed to prevent or excuse you from utilizing any informal procedure for resolution of complaints established in this Agreement (if any), and this Arbitration Provision is not intended to be a substitute for the utilization of such procedures.

**Except as it otherwise provides, this Arbitration Provision is intended to apply to the resolution of disputes that otherwise would be resolved in a court of law or before any forum other than arbitration, with the exception of proceedings that must be exhausted under applicable law before pursuing a claim in a court of law or in any forum other than arbitration.  Except as it otherwise provides, this Arbitration Provision requires all such disputes to be resolved only by an arbitrator through final and binding arbitration on an individual basis only and not by way of court or jury trial, or by way of class, collective, or representative action.**

Except as provided in Section 15.3(v), below, regarding the Class Action Waiver, such disputes include without limitation disputes arising out of or relating to interpretation or application of this Arbitration Provision, including the enforceability, revocability or validity of the Arbitration Provision or any portion of the Arbitration Provision.  All such matters shall be decided by an Arbitrator and not by a court or judge. However, as set forth below, the preceding sentences shall not apply to disputes relating to the interpretation or application of the Class Action Waiver or PAGA Waiver below, including their enforceability, revocability or validity.

Except as it otherwise provides, this Arbitration Provision also applies, without limitation, to all disputes between You and the Company or Uber, as well as all disputes between You and the Company's or Uber's fiduciaries, administrators, affiliates, subsidiaries, parents, and all successors and assigns of any of them, including but not limited to any disputes arising out of or related to this Agreement and disputes arising out of or related to your relationship with the Company, including termination of the relationship.  This Arbitration Provision also applies, without limitation, to disputes regarding any city, county, state or federal wage-hour law, trade secrets, unfair competition, compensation, breaks and rest periods, expense reimbursement, termination, harassment and claims arising under the Uniform Trade Secrets Act, Civil Rights Act of 1964, Americans With Disabilities Act, Age Discrimination in Employment Act, Family Medical Leave Act, Fair Labor Standards Act, Employee Retirement Income Security Act (except for individual claims for employee benefits under any benefit plan sponsored by the Company and covered by the Employee Retirement Income Security Act of 1974 or funded by insurance), Genetic Information Non-Discrimination Act, and state statutes, if any, addressing the same or similar subject matters, and all other similar federal and state statutory and common law claims.

This Agreement is intended to require arbitration of every claim or dispute that lawfully can be arbitrated, except for those claims and disputes which by the terms of this Agreement are expressly excluded from the Arbitration Provision.

Uber Technologies, Inc. is an intended, third party beneficiary of this Agreement.

ii.    Limitations On How This Agreement Applies.

The disputes and claims set forth below shall not be subject to arbitration and the requirement to arbitrate set forth in this Arbitration Provision shall not apply:

A representative action brought on behalf of others under the Private Attorneys General Act of 2004 ("PAGA"), California Labor Code § 2698 et seq., to the extent waiver of such a claim is deemed unenforceable by a court of competent jurisdiction;

Claims for workers compensation, state disability insurance and unemployment insurance benefits;

Regardless of any other terms of this Agreement, nothing prevents you from making a report to or filing a claim or charge with the Equal Employment Opportunity Commission, U.S. Department of Labor, Securities Exchange Commission, National Labor Relations Board, or Office of Federal Contract Compliance Programs, and nothing in this Agreement or Arbitration Provision prevents the investigation by a government agency of any report, claim or charge otherwise covered by this Arbitration Provision. Nothing in this Arbitration Provision shall be deemed to preclude or excuse a party from bringing an administrative claim before any agency in order to fulfill the party's obligation to exhaust administrative remedies before making a claim in arbitration;

Disputes that may not be subject to a predispute arbitration agreement pursuant to applicable Federal law or Executive Order are excluded from the coverage of this Arbitration Provision;

Disputes regarding your, the Company's, or Uber's intellectual property rights;

This Arbitration Provision shall not be construed to require the arbitration of any claims against a contractor that may not be the subject of a mandatory arbitration agreement as provided by section 8116 of the Department of Defense ("DoD") Appropriations Act for Fiscal Year 2010 (Pub. L. 111-118), section 8102 of the Department of Defense ("DoD") Appropriations Act for Fiscal Year 2011 (Pub. L. 112-10, Division A), and their implementing regulations, or any successor DoD appropriations act addressing the arbitrability of claims.

iii.    Selecting The Arbitrator and Location of the Arbitration.

The Arbitrator shall be selected by mutual agreement of the Company and you.  Unless you and the Company mutually agree otherwise, the Arbitrator shall be an attorney licensed to practice in the location where the arbitration proceeding will be conducted or a retired federal or state judicial officer who presided in the jurisdiction where the arbitration will be conducted.  If the Parties cannot agree on an Arbitrator, then an arbitrator will be selected using the alternate strike method from a list of five (5) neutral arbitrators provided by JAMS (Judicial Arbitration & Mediation Services).  You will have the option of making the first strike.  If a JAMS arbitrator is used, then the JAMS Streamlined Arbitration Rules & Procedures rules will apply; however, if there is a conflict between the JAMS Rules and this Agreement, this Agreement shall govern. Those rules are available here:

http://www.jamsadr.com/rules-streamlined-arbitration/

The location of the arbitration proceeding shall be no more than 45 miles from the place where you last provided transportation services under this Agreement, unless each party to the arbitration agrees in writing otherwise.

> iv.   Starting The Arbitration.

All claims in arbitration are subject to the same statutes of limitation that would apply in court.  The party bringing the claim must demand arbitration in writing and deliver the written demand by hand or first class mail to the other party within the applicable statute of limitations period.  The demand for arbitration shall include identification of the Parties, a statement of the legal and factual basis of the claim(s), and a specification of the remedy sought. Any demand for arbitration made to the Company or Uber shall be provided to Legal, Rasier, LLC, 1455 Market St., Ste. 400, San Francisco CA 94103.  The arbitrator shall resolve all disputes regarding the timeliness or propriety of the demand for arbitration. A party may apply to a court of competent jurisdiction for temporary or preliminary injunctive relief in connection with an arbitrable controversy, but only upon the ground that the award to which that party may be entitled may be rendered ineffectual without such provisional relief.

> v.   How Arbitration Proceedings Are Conducted.

In arbitration, the Parties will have the right to conduct adequate civil discovery, bring dispositive motions, and present witnesses and evidence as needed to present their cases and defenses, and any disputes in this regard shall be resolved by the Arbitrator.

**You and the Company agree to resolve any dispute that is in arbitration on an individual basis only, and not on a class, collective action, or representative basis ("Class Action Waiver"). The Arbitrator shall have no authority to consider or resolve any claim or issue any relief on any basis other than an individual basis. The Arbitrator shall have no authority to consider or resolve any claim or issue any relief on a class, collective, or representative basis.** Notwithstanding any other provision of this Agreement, the Arbitration Provision or the JAMS Streamlined Arbitration Rules & Procedures, disputes regarding the enforceability, revocability or validity of the Class Action Waiver may be resolved only by a civil court of competent jurisdiction and not by an arbitrator. In any case in which (1) the dispute is filed as a class, collective, or representative  action and (2) there is a final judicial determination that all or part of the Class Action Waiver unenforceable, the class, collective, and/or representative action to that extent must be litigated in a civil court of competent jurisdiction, but the portion of the Class Action Waiver that is enforceable shall be enforced in arbitration.

While the Company will not take any retaliatory action in response to any exercise of rights you may have under Section 7 of the National Labor Relations Act, if any, the Company shall not be precluded from moving to enforce its rights under the FAA to compel arbitration on the terms and conditions set forth in this Agreement.

**Private Attorneys General Act.**

Notwithstanding any other provision of this Agreement or the Arbitration Provision, to the extent permitted by law, (1) **You and Company agree not to bring a representative action on behalf of others under the Private Attorneys General Act of 2004 ("PAGA"), California Labor Code § 2698 et seq., in any court or in arbitration**, and (2) for any claim brought on a private attorney general basis—i.e., where

UBER_BARYSAS_0000247

you are seeking to pursue a claim on behalf of a government entity—both you and Company agree that any such dispute shall be resolved in arbitration on an individual basis only (i.e., to resolve whether you have personally been aggrieved or subject to any violations of law), and that such an action may not be used to resolve the claims or rights of other individuals in a single or collective proceeding (i.e., to resolve whether other individuals have been aggrieved or subject to any violations of law) ("PAGA Waiver"). Notwithstanding any other provision of this Agreement or the Arbitration Provision, the validity of the PAGA Waiver may be resolved only by a civil court of competent jurisdiction and not by an arbitrator. If any provision of the PAGA Waiver is found to be unenforceable or unlawful for any reason, (1) the unenforceable provision shall be severed from this Agreement; (2) severance of the unenforceable provision shall have no impact whatsoever on the Arbitration Provision or the Parties' attempt to arbitrate any remaining claims on an individual basis pursuant to the Arbitration Provision; and (3) any representative action brought under PAGA on behalf of others must be litigated in a civil court of competent jurisdiction and not in arbitration. To the extent that there are any claims to be litigated in a civil court of competent jurisdiction because a civil court of competent jurisdiction determines that the PAGA Waiver is unenforceable with respect to those claims, the Parties agree that litigation of those claims shall be stayed pending the outcome of any individual claims in arbitration.

vi.     Paying For The Arbitration.

Each party will pay the fees for his, her or its own attorneys, subject to any remedies to which that party may later be entitled under applicable law (i.e., a party prevails on a claim that provides for the award of reasonable attorney fees to the prevailing party).  In all cases where required by law, the Company will pay the Arbitrator's and arbitration fees. If under applicable law the Company is not required to pay all of the Arbitrator's and/or arbitration fees, such fee(s) will be apportioned equally between the Parties or as otherwise required by applicable law. However, you will not be required to bear any type of fee or expense that you would not be required to bear if you had filed the action in a court of law.  Any disputes in that regard will be resolved by the Arbitrator as soon as practicable after the Arbitrator is selected, and Company shall bear all of the Arbitrator's and arbitration fees until such time as the Arbitrator resolves any such dispute.

vii.    The Arbitration Hearing And Award.

The Parties will arbitrate their dispute before the Arbitrator, who shall confer with the Parties regarding the conduct of the hearing and resolve any disputes the Parties may have in that regard.  Within 30 days of the close of the arbitration hearing, or within a longer period of time as agreed to by the Parties or as ordered by the Arbitrator, any party will have the right to prepare, serve on the other party and file with the Arbitrator a brief.  The Arbitrator may award any party any remedy to which that party is entitled under applicable law, but such remedies shall be limited to those that would be available to a party in his or her individual capacity in a court of law for the claims presented to and decided by the Arbitrator, and no remedies that otherwise would be available to an individual in a court of law will be forfeited by virtue of this Arbitration Provision.  The Arbitrator will issue a decision or award in writing, stating the essential findings of fact and conclusions of law.  A court of competent jurisdiction shall have the authority to enter a judgment upon the award made pursuant to the arbitration.  The Arbitrator shall not have the power to commit errors of law or legal reasoning, and the award may be vacated or corrected on appeal to a court of competent jurisdiction for any such error.

viii.    **Your Right To Opt Out Of Arbitration.**

Arbitration is not a mandatory condition of your contractual relationship with the Company. If you do not want to be subject to this Arbitration Provision, you may opt out of this Arbitration Provision by notifying the Company in writing of your desire to opt out of this Arbitration Provision, either by (1) sending, within 30 days of the date this Agreement is executed by you, electronic mail to optout@uber.com, stating your name and intent to opt out of the Arbitration Provision or (2) by sending a letter by U.S. Mail, or by any nationally recognized delivery service (e.g, UPS, Federal Express, etc.), or by hand delivery to:

> Legal
> Rasier, LLC
> 1455 Market St., Ste. 400
> San Francisco CA 94103

In order to be effective, the letter under option (2) must clearly indicate your intent to opt out of this Arbitration Provision, and must be dated and signed. The envelope containing the signed letter must be received (if delivered by hand) or post-marked within 30 days of the date this Agreement is executed by you. Your writing opting out of this Arbitration Provision, whether sent by (1) or (2), will be filed with a copy of this Agreement and maintained by the Company. Should you not opt out of this Arbitration Provision within the 30-day period, you and the Company shall be bound by the terms of this Arbitration Provision. You have the right to consult with counsel of your choice concerning this Arbitration Provision. You understand that you will not be subject to retaliation if you exercise your right to assert claims or opt-out of coverage under this Arbitration Provision.

ix.    Full and Complete Agreement Related to Formal Resolution of Disputes; Enforcement Of This Agreement.

This Arbitration Provision is the full and complete agreement relating to the formal resolution of disputes arising out of this Agreement. Except as stated in subsection v, above, in the event any portion of this Arbitration Provision is deemed unenforceable, the remainder of this Arbitration Provision will be enforceable.

By clicking "I accept", you expressly acknowledge that you have read, understood, and taken steps to thoughtfully consider the consequences of this Agreement, that you agree to be bound by the terms and conditions of the Agreement, and that you are legally competent to enter into this Agreement with Company.

**UBER USA, LLC**

**TECHNOLOGY SERVICES AGREEMENT**

Last update: December 11, 2015

This Technology Services Agreement ("*Agreement*") constitutes a legal agreement between an independent company in the business of providing transportation services ("*Customer*" or "*You*") and Uber USA, LLC, a limited liability company ("*Uber*").

Uber provides the Uber Services (as defined below) for the purpose of providing lead generation to transportation services providers. The Uber Services enable an authorized transportation provider to seek, receive and fulfill requests for transportation services from an authorized user of Uber's mobile application.

Customer is authorized to provide transportation services in the state(s) and jurisdiction(s) in which it operates, and it desires to enter into this Agreement for the purpose of accessing and using the Uber Services to enhance its transportation business.

**Customer acknowledges and agrees that Uber is a technology services provider that does not provide transportation services, function as a transportation carrier, nor operate as a broker for the transportation of passengers.**

In order to use the Uber Services, Customer must agree to the terms and conditions that are set forth below. Upon Customer's execution (electronic or otherwise) of this Agreement, Customer and Uber shall be bound by the terms and conditions set forth herein.

**IMPORTANT: PLEASE NOTE THAT TO USE THE UBER SERVICES AND THE ASSOCIATED SOFTWARE, YOU MUST AGREE TO THE TERMS AND CONDITIONS SET FORTH BELOW. PLEASE REVIEW THE ARBITRATION PROVISION SET FORTH BELOW IN SECTION 15.3 CAREFULLY, AS IT WILL REQUIRE YOU TO RESOLVE DISPUTES WITH UBER ON AN INDIVIDUAL BASIS, EXCEPT AS PROVIDED IN SECTION 15.3, THROUGH FINAL AND BINDING ARBITRATION UNLESS YOU CHOOSE TO OPT OUT OF THE ARBITRATION PROVISION.  BY VIRTUE OF YOUR ELECTRONIC EXECUTION OF THIS AGREEMENT, YOU WILL BE ACKNOWLEDGING THAT YOU HAVE READ AND UNDERSTOOD ALL OF THE TERMS OF THIS AGREEMENT (INCLUDING SECTION 15.3) AND HAVE TAKEN TIME TO CONSIDER THE CONSEQUENCES OF THIS IMPORTANT BUSINESS DECISION.  IF YOU DO NOT WISH TO BE SUBJECT TO ARBITRATION, YOU MAY OPT OUT OF THE ARBITRATION PROVISION BY FOLLOWING THE INSTRUCTIONS PROVIDED IN SECTION 15.3 BELOW.**

UBER_BARYSAS_0000196

## 1. Definitions

1.1. *"Affiliate"* means an entity that, directly or indirectly, controls, is under the control of, or is under common control with a party, where control means having more than fifty percent (50%) of the voting stock or other ownership interest or the majority of the voting rights of such entity.

1.2. *"City Addendum"* means an addendum to this Agreement or supplemental information setting forth additional Territory-specific terms, as made available and as updated by Uber from time to time.

1.3. *"Device"* means an Uber Device or Driver-Provided Device, as the case may be.

1.4. *"Driver"* means a principal, employee or contractor of Customer: (a) who meets the then-current Uber requirements to be an active driver using the Uber Services; (b) whom Uber authorizes to access the Uber Services to provide Transportation Services on behalf of Customer; and (c) who has entered into the Driver Addendum.

1.5. *"Driver Addendum"* means the terms and conditions that Customer is required to enter into with a Driver prior to such Driver providing Transportation Services on behalf of Customer (as may be updated by Uber from time to time).

1.6. *"Driver App"* means Uber's mobile application that enables transportation providers to access the Uber Services for the purpose of seeking, receiving and fulfilling on-demand requests for transportation services by Users, as may be updated or modified by Uber at its discretion from time to time.

1.7. *"Driver ID"* means the identification and password key assigned by Uber to a Driver that enables a Driver to use and access the Driver App.

1.8. *"Driver-Provided Device"* means a mobile device owned or controlled by Customer or a Driver: (a) that meets the then-current Uber specifications for mobile devices as set forth at www.uber.com/byod-devices; and (b) on which the Driver App has been installed as authorized by Uber solely for the purpose of providing Transportation Services.

1.9. *"Fare"* has the meaning set forth in Section 4.1.

1.10. *"Service Fee"* has the meaning set forth in Section 4.4.

1.11. *"Taxi Services"* has the meaning set forth in Section 3.1.

1.12. *"Territory"* means the city or metro areas in the United States in which Customer and its Drivers are enabled by the Driver App to receive requests for Transportation Services.

1.13. *"Tolls"* means any applicable road, bridge, ferry, tunnel and airport charges and fees, including inner-city congestion, environmental or similar charges as reasonably determined by the Uber Services based on available information.

1.14. *"Transportation Services"* means the provision of passenger transportation services to Users via the Uber Services in the Territory by Customer and its Drivers using the Vehicles.

1.15. *"Uber Data"* means all data related to the access and use of the Uber Services hereunder, including all data related to Users (including User Information), all data related to the provision of Transportation Services via the Uber Services and the Driver App, and the Driver ID.

1.16. *"Uber Device"* means a mobile device owned or controlled by Uber that is provided to Customer or a Driver for the sole purpose of such Driver using the Driver App to provide Transportation Services.

1.17.   "*Uber Services*" mean Uber's on-demand lead generation and related services that enable transportation providers to seek, receive and fulfill on-demand requests for transportation services by Users seeking transportation services; such Uber Services include access to the Driver App and Uber's software, websites, payment services as described in Section 4 below, and related support services systems, as may be updated or modified by Uber at its discretion from time to time.

1.18.   "*User*" means an end user authorized by Uber to use Uber's mobile application for the purpose of obtaining Transportation Services offered by Uber's transportation provider customers.

1.19.   "*User Information*" means information about a User made available to Customer or a Driver in connection with such User's request for and use of Transportation Services, which may include the User's name, pick-up location, contact information and photo.

1.20.   "*Vehicle*" means any vehicle of Customer that:  (a) meets the then-current Uber requirements for a vehicle on the Uber Services; and (b) Uber authorizes for use by a Driver for the purpose of providing Transportation Services on behalf of Customer.

2.   **Use of the Uber Services**

2.1.   **Driver IDs**. Uber will issue Customer a Driver ID for each Driver providing Transportation Services to enable Customer and each Driver to access and use the Driver App on a Device in accordance with the Driver Addendum and this Agreement. Uber reserves the right to deactivate the Driver ID of those Drivers who have not fulfilled a request for Transportation Services using the Driver App at least once a month. **Customer agrees that it will, and that it will ensure that its Drivers will, maintain Driver IDs in confidence and not share Driver IDs with any third party other than the Driver associated with such Driver ID for the purpose of providing Transportation Services. Customer will immediately notify Uber of any actual or suspected breach or improper use or disclosure of a Driver ID or the Driver App.**

2.2.   **Provision of Transportation Services**. When the Driver App is active, User requests for Transportation Services may appear to a Driver via the Driver App if the Driver is available and in the vicinity of the User. If a Driver accepts a User's request for Transportation Services, the Uber Services will provide certain User Information to such Driver via the Driver App, including the User's first name and pickup location. In order to enhance User satisfaction with the Uber mobile application and a Driver's Transportation Services, it is recommended that Driver waits at least ten (10) minutes for a User to show up at the requested pick-up location. The Driver will obtain the destination from the User, either in person upon pickup or from the Driver App if the User elects to enter such destination via Uber's mobile application. Customer acknowledges and agrees that once a Driver has accepted a User's request for Transportation Services, Uber's mobile application may provide certain information about the Driver to the User, including the Driver's first name, contact information, Customer entity name, photo and location, and the Driver's Vehicle's make and license plate number. Customer shall not, and shall ensure that all Drivers do not, contact any Users or use any User's personal data for any reason other than for the purposes of fulfilling Transportation Services. As between Uber and Customer, Customer acknowledges and agrees that:  (a) Customer and its Drivers are solely responsible for determining the most effective, efficient and safe manner to perform each instance of Transportation Services; and (b) except for the Uber Services or any Uber Devices (if applicable), Customer shall provide all necessary equipment, tools and other materials, at Customer's own expense, necessary to perform Transportation Services. Customer understands and agrees that Customer and each Driver have a legal obligation under the Americans with Disabilities Act and

similar state laws to transport Users with Service Animals (as defined by applicable state and federal law), including guide dogs for the blind and visually impaired Users, and there is no exception to this obligation for allergies or religious objections. Customer's or any Driver's knowing failure to transport a User with a Service Animal shall constitute a material breach of this Agreement. Customer agrees that a "knowing failure" to comply with this legal obligation shall constitute either: (1) a denial of a ride where the Customer/Driver states the denial was due to a Service Animal; or (2) there is more than one (1) instance in which a User or the companion of a User alleges that the Customer/Driver cancelled or refused a ride on the basis of a Service Animal.

2.3.    **Customer's Relationship with Users**. Customer acknowledges and agrees that Customer's provision of Transportation Services to Users creates a direct business relationship between Customer and the User. Uber is not responsible or liable for the actions or inactions of a User in relation to Customer or any Driver, the activities of Customer, a Driver or any Vehicle. Customer shall have the sole responsibility for any obligations or liabilities to Users or third parties that arise from its provision of Transportation Services. Customer acknowledges and agrees that it and each Driver are solely responsible for taking such precautions as may be reasonable and proper (including maintaining adequate insurance that meets the requirements of all applicable laws including motor vehicle financial responsibility) regarding any acts or omissions of a User or third party. Customer acknowledges and agrees that Uber may release the contact and/or insurance information of Customer and/or a Driver to a User upon such User's reasonable request. Customer acknowledges and agrees that, unless specifically consented to by a User, neither Customer nor Driver may transport or allow inside any Vehicle individuals other than a User and any individuals authorized by such User during the performance of Transportation Services for such User. Customer acknowledges and agrees, and shall ensure that its Drivers agree, that all Users should be transported directly to their specified destination, as directed by the applicable User, without unauthorized interruption or unauthorized stops.

2.4.    **Customer's Relationship with Uber**. Customer acknowledges and agrees that Uber's provision to Customer of the Driver App and the Uber Services creates a direct business relationship between Uber and Customer. Uber does not, and shall not be deemed to, direct or control Customer or its Drivers generally or in their performance under this Agreement specifically, including in connection with the operation of Customer's business, the provision of Transportation Services, the acts or omissions of Drivers, or the operation and maintenance of any Vehicles. Customer and its Drivers retain the sole right to determine when, where, and for how long each of them will utilize the Driver App or the Uber Services. Customer and its Drivers retain the option, via the Driver App, to attempt to accept or to decline or ignore a User's request for Transportation Services via the Uber Services, or to cancel an accepted request for Transportation Services via the Driver App, subject to Uber's then-current cancellation policies. With the exception of any signage required by local law or permit/license requirements, Uber shall have no right to require Customer or any Driver to:  (a) display Uber's or any of its Affiliates' names, logos or colors on any Vehicle(s); or (b) wear a uniform or any other clothing displaying Uber's or any of its Affiliates' names, logos or colors. Customer acknowledges and agrees that it has complete discretion to operate its independent business and direct its Drivers at its own discretion, including the ability to provide services at any time to any third party separate and apart from Transportation Services. For the sake of clarity, Customer understands that Customer retains the complete right to provide transportation services to its existing customers and to use other software application services in addition to the Uber Services. Uber retains the right to deactivate or otherwise restrict Customer or any Driver from accessing or

using the Driver App or the Uber Services in the event of a violation or alleged violation of this Agreement, a violation or alleged violation of a Driver Addendum, Customer's or any Driver's disparagement of Uber or any of its Affiliates, Customer's or any Driver's act or omission that causes harm to Uber's or its Affiliates' brand, reputation or business as determined by Uber in its sole discretion.

2.5.     **Customer's Relationship with Drivers**. Customer shall have the sole responsibility for any obligations or liabilities to Drivers that arise from its relationship with its Drivers (including provision of Transportation Services). Customer acknowledges and agrees that it exercises sole control over the Drivers and will comply with all applicable laws (including tax, social security and employment laws) governing or otherwise applicable to its relationship with its Drivers. Notwithstanding Customer's right, if applicable, to take recourse against a Driver, Customer acknowledges and agrees that it is at all times responsible and liable for the acts and omissions of its Drivers vis-à-vis Users and Uber, even where such vicarious liability may not be mandated under applicable law. Customer shall require each Driver to enter into a Driver Addendum (as may be updated from time to time) and shall provide a copy of each executed Driver Addendum to Uber. Customer acknowledges and agrees that Uber is a third party beneficiary of each Driver Addendum, and that, upon a Driver's acceptance of the terms and conditions of the Driver Addendum, Uber will have the right (and will be deemed to have accepted the right) to enforce the Driver Addendum against the Driver as a third party beneficiary thereof.

2.6.     **Ratings**.

2.6.1.   Customer acknowledges and agrees that:  (a) after receiving Transportation Services, a User will be prompted by Uber's mobile application to provide a rating of such Transportation Services and Driver and, optionally, to provide comments or feedback about such Transportation Services and Driver; and (b) after providing Transportation Services, the Driver will be prompted by the Driver App to provide a rating of the User and, optionally, to provide comments or feedback about the User. Customer shall instruct all Drivers to provide ratings and feedback in good faith.

2.6.2.   Customer acknowledges that Uber desires that Users have access to high-quality services via Uber's mobile application. In order to continue to receive access to the Driver App and the Uber Services, each Driver must maintain an average rating by Users that exceeds the minimum average acceptable rating established by Uber for the Territory, as may be updated from time to time by Uber in its sole discretion ("*Minimum Average Rating*"). A Driver's average rating is intended to reflect Users' satisfaction with the Driver's Transportation Services rather than any such Driver's compliance with any of Uber's policies or recommendations. In the event a Driver's average rating falls below the Minimum Average Rating, Uber will notify Customer and may provide the Driver in Uber's discretion, a limited period of time to raise his or her average rating above the Minimum Average Rating. If such Driver does not increase his or her average rating above the Minimum Average Rating within the time period allowed (if any), Uber reserves the right to deactivate such Driver's access to the Driver App and the Uber Services. Additionally, Customer acknowledges and agrees that repeated failure by a Driver to accept User requests for Transportation Services while such Driver is logged in to the Driver App creates a negative experience for Users of Uber's mobile application. Accordingly, Customer agrees and shall ensure that if a Driver does not wish to accept User requests for Transportation Services for a period of time, such Driver will log off of the Driver App.

2.6.3.   Uber and its Affiliates reserve the right to use, share and display Driver and User ratings and comments in any manner in connection with the business of Uber and its Affiliates without attribution to or approval of Customer or the applicable Driver. Customer acknowledges that Uber and its Affiliates are distributors (without any obligation to verify) and not publishers of Driver and User ratings and comments, provided that Uber and its Affiliates reserve the right to edit or remove comments in the event that such comments include obscenities or other objectionable content, include an individual's name or other personal information, or violate any privacy laws, other applicable laws or Uber's or its Affiliates' content policies.

2.7.   **Devices**.

2.7.1.   Uber encourages Customer to use Driver-Provided Devices in providing Transportation Services.  Otherwise, if Customer elects to use any Uber Devices, Uber will supply Uber Devices upon request to each authorized Driver and provide the necessary wireless data plan for such Devices, provided that Uber will require reimbursement from Customer for the costs associated with the wireless data plan of each Uber Device and/or request a deposit for each Uber Device. Customer acknowledges and agrees that:  (a) Uber Devices may only be used for the purpose of enabling Driver access to the Uber Services; and (b) Uber Devices may not be transferred, loaned, sold or otherwise provided in any manner to any party other than the Driver assigned to use such Uber Device. Uber Devices shall at all times remain the property of Uber, and upon termination of this Agreement or the termination or deactivation of a Driver, Customer agrees to return to Uber the applicable Uber Devices within ten (10) days. Customer acknowledges and agrees that failure to timely return any Uber Devices, or damage to Uber Devices outside of "normal wear and tear," will result in the forfeiture of related deposits.

2.7.2.   If Customer elects to use any Driver-Provided Devices:  (i) Customer and/or its Drivers are responsible for the acquisition, cost and maintenance of such Driver-Provided Devices as well as any necessary wireless data plan; and (ii) Uber shall make available the Driver App for installation on such Driver-Provided Devices. Uber hereby grants the authorized user of any Driver-Provided Device a personal, non-exclusive, non-transferable license to install and use the Driver App on a Driver-Provided Device solely for the purpose of providing Transportation Services. Customer agrees to not, and shall cause each applicable Driver to not, provide, distribute or share, or enable the provision, distribution or sharing of, the Driver App (or any data associated therewith) with any third party. The foregoing license grant shall immediately terminate and Driver will delete and fully remove the Driver App from the Driver-Provided Device in the event that Customer and/or the applicable Driver ceases to provide Transportation Services using the Driver-Provided Device. Customer agrees, and shall inform each applicable Driver that:  (i) use of the Driver App on a Driver-Provided Device requires an active data plan with a wireless carrier associated with the Driver-Provided Device, which data plan will be provided by either Customer or the applicable Driver at their own expense; and (ii) use of the Driver App on a Driver-Provided Device as an interface with the Uber Services may consume very large amounts of data through the data plan. **UBER ADVISES THAT DRIVER-PROVIDED DEVICES ONLY BE USED UNDER A DATA PLAN WITH UNLIMITED OR VERY HIGH DATA USAGE LIMITS, AND UBER SHALL NOT BE RESPONSIBLE**

**OR LIABLE FOR ANY FEES, COSTS, OR OVERAGE CHARGES ASSOCIATED WITH ANY DATA PLAN.**

2.8.   **Location Based Services**. Customer acknowledges and agrees that each Driver's geo-location information must be provided to the Uber Services via a Device in order to provide Transportation Services. Customer acknowledges and agrees, and shall inform and obtain the consent of each Driver, that:  (a) the Driver's geo-location information may be obtained by the Uber Services while the Driver App is running; and (b) the approximate location of the Driver's Vehicle will be displayed to the User before and during the provision of Transportation Services to such User. In addition, Company and its Affiliates may monitor, track and share with third parties Driver's geo-location information obtained by the Driver App and Device for safety and security purposes.

3.   **Drivers and Vehicles**

3.1.   **Driver Requirements**. Customer acknowledges and agrees that each Driver shall at all times:  (a) hold and maintain (i) a valid driver's license with the appropriate level of certification to operate the Vehicle assigned to such Driver, and (ii) all licenses, permits, approvals and authority applicable to Customer and/or Driver that are necessary to provide passenger transportation services to third parties in the Territory; (b) possess the appropriate and current level of training, expertise and experience to provide Transportation Services in a professional manner with due skill, care and diligence; and (c) maintain high standards of professionalism, service and courtesy. Customer acknowledges and agrees that each Driver may be subject to certain background and driving record checks from time to time in order for such Driver to qualify to provide, and remain eligible to provide, Transportation Services. In addition if Customer and/or Driver are using the Uber App to provide Transportation Services in conjunction with operating a taxi (*"Taxi Services"*), such Customer and/or Driver shall comply with all applicable laws with respect thereto. Customer acknowledges and agrees that Uber reserves the right, at any time in Uber's sole discretion, to deactivate or otherwise restrict a Driver from accessing or using the Driver App or the Uber Services if Customer or such Driver fails to meet the requirements set forth in this Agreement or the Driver Addendum.

3.2.   **Vehicle Requirements**. Customer acknowledges and agrees that each Vehicle shall at all times be:  (a) properly registered and licensed to operate as a passenger transportation vehicle in the Territory; (b) owned or leased by Customer, or otherwise in Customer's lawful possession; (c) suitable for performing the passenger transportation services contemplated by this Agreement; and (d) maintained in good operating condition, consistent with industry safety and maintenance standards for a Vehicle of its kind and any additional standards or requirements in the applicable Territory, and in a clean and sanitary condition.

3.3.   **Documentation**. To ensure Customer's and each of its Drivers' compliance with all requirements in Sections 3.1 and 3.2 above, Customer must provide Uber with written copies of all such licenses, permits, approvals, authority, registrations and certifications prior to Customer's and the applicable Drivers' provision of any Transportation Services.  Thereafter, Customer must submit to Uber written evidence of all such licenses, permits, approvals, authority, registrations and certifications as they are renewed. Uber shall, upon request, be entitled to review such licenses, permits, approvals, authority, registrations and certifications from time to time, and Customer's failure to provide or maintain any of the foregoing shall constitute a material breach of this Agreement. Uber reserves the right to independently verify Customer's and any Driver's documentation from time to time in any way Uber deems appropriate in its reasonable discretion.

## 4. Financial Terms

4.1.   **Fare Calculation and Customer Payment.** Customer is entitled to charge a fare for each instance of completed Transportation Services provided to a User that are obtained via the Uber Services (*"Fare"*), where such Fare is calculated based upon a base fare amount plus distance (as determined by Uber using location-based services enabled through the Device) and/or time amounts, as detailed at www.uber.com/cities for the applicable Territory (*"Fare Calculation"*). Customer acknowledges and agrees that the Fare provided under the Fare Calculation is the only payment Customer will receive in connection with the provision of Transportation Services, and that neither the Fare nor the Fare Calculation includes any gratuity. Customer is also entitled to charge User for any Tolls, taxes or fees incurred during the provision of Transportation Services, and, if applicable, Customer: (i) appoints Uber as Customer's limited payment collection agent solely for the purpose of accepting the Fare, applicable Tolls and, depending on the region and/or if requested by Customer, applicable taxes and fees from the User on behalf of the Customer via the payment processing functionality facilitated by the Uber Services; and (ii) agrees that payment made by User to Uber (or to an Affiliate of Uber acting as an agent of Uber) shall be considered the same as payment made directly by User to Customer. In addition, the parties acknowledge and agree that as between Customer and Uber, the Fare is a recommended amount, and the primary purpose of the pre-arranged Fare is to act as the default amount in the event Customer does not negotiate a different amount. Customer shall always have the right to: (i) charge a fare that is less than the pre-arranged Fare; or (ii) negotiate, at Customer's request, a Fare that is lower than the pre-arranged Fare (each of (i) and (ii) herein, a *"Negotiated Fare"*). Uber shall consider all such requests from Customer in good faith. Uber agrees to remit, or cause to be remitted, to Customer on at least a weekly basis: (a) the Fare less the applicable Service Fee; (b) the Tolls; and (c) depending on the region, certain taxes and ancillary fees. If Customer has separately agreed that other amounts may be deducted from the Fare prior to remittance to Customer (*e.g.*, vehicle financing payments, lease payments, mobile device usage charges, etc.), the order of any such deductions from the Fare shall be determined exclusively by Uber (as between Customer and Uber). Notwithstanding anything to the contrary in this Section 4.1, if Customer is providing Taxi Services, the following shall apply: (x) the Fare is calculated pursuant to local taxi regulations in the Territory; (y) Customer or Driver agrees to enter the exact Fare amount (as indicated by the official taxi meter in the Vehicle) into the Driver App upon completion of an instance of Transportation Services; and (z) in some jurisdictions, Users will pay such Customer or Driver directly rather than through Uber's mobile application (Uber will notify Customer if (z) is applicable in its Territory).

4.2.   **Changes to Fare Calculation.** Uber reserves the right to change the Fare Calculation at any time in Uber's discretion based upon local market factors, and Uber will provide notice to Customer in the event of changes to the base fare, per mile, and/or per minute amounts that would result in a change in the recommended Fare for each instance of completed Transportation Services. Continued use of the Uber Services after any such change in the Fare Calculation shall constitute Customer's consent to such change.

4.3.   **Fare Adjustment.** Uber reserves the right to: (i) adjust the Fare for a particular instance of Transportation Services (*e.g.*, Driver took an inefficient route, Driver failed to properly end a particular instance of Transportation Services in the Driver App, technical error in the Uber Services, etc.); or (ii) cancel the Fare for a particular instance of Transportation Services (*e.g.*, a User is charged for Transportation Services that were not provided, in the event of a User

complaint, fraud, etc.). Uber's decision to reduce or cancel the Fare in any such manner shall be exercised in a reasonable manner.

4.4.    **Service Fee**. In consideration of Uber's provision of the Driver App and the Uber Services for the use and benefit of Customer and its Drivers hereunder, Customer agrees to pay Uber a service fee on a per Transportation Services transaction basis calculated as a percentage of the Fare determined by the Fare Calculation (regardless of any Negotiated Fare), as provided to Customer and/or a Driver via email or otherwise made available electronically by Uber from time to time for the applicable Territory ("*Service Fee*"). In the event regulations applicable to Customer's Territory require taxes to be calculated on the Fare, Uber shall calculate the Service Fee based on the Fare net of such taxes. Uber reserves the right to change the Service Fee at any time in Uber's discretion based upon local market factors, and Uber will provide notice to Customer in the event of such change. Continued use of the Uber Services after any such change in the Service Fee calculation shall constitute Customer's consent to such change. In addition, with respect to Taxi Services in the applicable Territory, Customer agrees to pay Uber a booking fee in consideration of Uber's provision of the Driver App and the Uber Services.

4.5.    **Cancellation Charges**. Customer acknowledges and agrees that Users may elect to cancel requests for Transportation Services that have been accepted by a Driver via the Driver App at any time prior to the Driver's arrival. In the event that a User cancels an accepted request for Transportation Services, Uber may charge the User a cancellation fee on behalf of the Customer. If charged, this cancellation fee shall be deemed the Fare for the cancelled Transportation Services for the purpose of remittance to Customer hereunder ("*Cancellation Fee*"). The parties acknowledge and agree that as between Customer and Uber, this Cancellation Fee is a recommended amount, and the primary purpose of such Cancellation Fee is to act as a default amount in the event Customer does not negotiate a different amount. Customer shall always have the right to:  (i) charge a cancellation fee that is less than the Cancellation Fee; or (ii) negotiate, at your request, a cancellation fee that is lower than the Cancellation Fee (each of (i) and (ii) herein, a "*Negotiated Cancellation Fee*"). If charged, the Cancellation Fee (regardless of any Negotiated Cancellation Fee) shall be deemed the Fare for the cancelled Transportation Services for the purpose of remittance to Customer hereunder.

4.6.    **Receipts**. As part of the Uber Services, Uber provides Customer a system for the delivery of receipts to Users for Transportation Services rendered. Upon the completion of Transportation Services for a User by a Driver, Uber prepares an applicable receipt and issues such receipt to the User via email on behalf of the Customer and applicable Driver. Such receipts are also provided via email or the online portal available to Customer through the Uber Services. Receipts include the breakdown of amounts charged to the User for Transportation Services and may include specific information about the Customer and applicable Driver, including the Customer's entity name and contact information and the Driver's name and photo, as well as a map of the route taken by the Driver. Customer shall inform Drivers that any corrections to a User's receipt for Transportation Services must be submitted to Uber in writing within three (3) business days after the completion of such Transportation Services. Absent such a notice, Uber shall not be liable for any mistakes in or corrections to the receipt or for recalculation or disbursement of the Fare.

4.7.    **No Additional Amounts**. Customer acknowledges and agrees that, for the mutual benefit of the parties, through advertising and marketing, Uber and its Affiliates may seek to attract new Users to Uber and to increase existing Users' use of Uber's mobile application. Customer

acknowledges and agrees such advertising or marketing does not entitle Customer to any additional monetary amounts beyond the amounts expressly set forth in this Agreement.

4.8.    **Taxes**. Customer acknowledges and agrees that it is required to:  (a) complete all tax registration obligations and calculate and remit all tax liabilities related to its and its Drivers' provision of Transportation Services as required by applicable law; and (b) provide Uber with all relevant tax information. Customer further acknowledges and agrees that it is responsible for taxes on its own income (and that of its Drivers) arising from the performance of Transportation Services. Notwithstanding anything to the contrary in this Agreement, Uber may in its reasonable discretion based on applicable tax and regulatory considerations, collect and remit taxes resulting from its or its Drivers' provision of Transportation Services and/or provide any of the relevant tax information provided by Customer or any Driver pursuant to the foregoing requirements in this Section 4.8 directly to the applicable governmental tax authorities on your behalf or otherwise.

5.    **Proprietary Rights; License**

5.1.    **License Grant**. Subject to the terms and conditions of this Agreement, Uber hereby grants Customer a non-exclusive, non-transferable, non-sublicensable, non-assignable license, during the term of this Agreement, to use (and allows its Drivers to use) the Uber Services (including the Driver App on a Device) solely for the purpose of providing Transportation Services to Users and tracking resulting Fares and Fees. All rights not expressly granted to Customer are reserved by Uber, its Affiliates and their respective licensors.

5.2.    **Restrictions**. Customer shall not, and shall not allow any other party to:  (a) license, sublicense, sell, resell, transfer, assign, distribute or otherwise provide or make available to any other party the Uber Services, Driver App or any Uber Device in any way; (b) modify or make derivative works based upon the Uber Services or Driver App; (c) improperly use the Uber Services or Driver App, including creating Internet "links" to any part of the Uber Services or Driver App, "framing" or "mirroring" any part of the Uber Services or Driver App on any other websites or systems, or "scraping" or otherwise improperly obtaining data from the Uber Services or Driver App; (d) reverse engineer, decompile, modify, or disassemble the Uber Services or Driver App, except as allowed under applicable law; or (e) send spam or otherwise duplicative or unsolicited messages. In addition, Customer shall not, and shall not allow any other party to, access or use the Uber Services or Driver App to:  (i) design or develop a competitive or substantially similar product or service; (ii) copy or extract any features, functionality, or content thereof; (iii) launch or cause to be launched on or in connection with the Uber Services an automated program or script, including web spiders, crawlers, robots, indexers, bots, viruses or worms, or any program which may make multiple server requests per second, or unduly burden or hinder the operation and/or performance of the Uber Services; or (iv) attempt to gain unauthorized access to the Uber Services or its related systems or networks.

5.3.    **Ownership**. The Uber Services, Driver App and Uber Data, including all intellectual property rights therein, and the Uber Devices are and shall remain the property of Uber, its Affiliates or their respective licensors. Neither this Agreement nor Customer's use of the Uber Services, Driver App or Uber Data conveys or grants to Customer any rights in or related to the Uber Services, Driver App or Uber Data, except for the limited license granted above. Customer is not permitted to use or reference in any manner Uber's, its Affiliates', or their respective licensors' company names, logos, product and service names, trademarks, service marks or other indicia of ownership, alone or in combination with other letters, punctuation, words, symbols and/or designs (the "*UBER Marks and Names*"). Customer will not try to register or otherwise claim

ownership in any of the UBER Marks and Names, alone or in combination with other letters, punctuation, words, symbols and/or designs or in any confusingly similar mark or name.

## 6. Confidentiality

6.1. Each party acknowledges and agrees that in the performance of this Agreement it may have access to or may be exposed to, directly or indirectly, confidential information of the other party ("*Confidential Information*"). Confidential Information includes Uber Data, Driver IDs, User Information, and the transaction volume, marketing and business plans, business, financial, technical, operational and such other non-public information of each party (whether disclosed in writing or verbally) that such party designates as being proprietary or confidential or of which the other party should reasonably know that it should be treated as confidential.

6.2. Each party acknowledges and agrees that:  (a) all Confidential Information shall remain the exclusive property of the disclosing party; (b) it shall not use Confidential Information of the other party for any purpose except in furtherance of this Agreement; (c) it shall not disclose Confidential Information of the other party to any third party, except to its employees, officers, contractors, agents and service providers ("*Permitted Persons*") as necessary to perform under this Agreement, provided Permitted Persons are bound in writing to obligations of confidentiality and non-use of Confidential Information no less protective than the terms hereof; and (d) it shall return or destroy all Confidential Information of the disclosing party, upon the termination of this Agreement or at the request of the other party (subject to applicable law and, with respect to Uber, its internal record-keeping requirements).

6.3. Notwithstanding the foregoing, Confidential Information shall not include any information to the extent it:  (a) is or becomes part of the public domain through no act or omission on the part of the receiving party; (b) was possessed by the receiving party prior to the date of this Agreement without an obligation of confidentiality; (c) is disclosed to the receiving party by a third party having no obligation of confidentiality with respect thereto; or (d) is required to be disclosed pursuant to law, court order, subpoena or governmental authority, provided the receiving party notifies the disclosing party thereof and provides the disclosing party a reasonable opportunity to contest or limit such required disclosure.

## 7. Privacy

7.1. **Disclosure of Customer or Driver Information**. Subject to applicable law and regulation, Uber may, but shall not be required to, provide to Customer, a Driver, a User, an insurance company and/or relevant authorities and/or regulatory agencies any information (including personal information (*e.g.*, information obtained about a Driver through any background check) and any Uber Data) about Customer, a Driver, or any Transportation Services provided hereunder if:  (a) there is a complaint, dispute or conflict, including an accident, between Customer or a Driver on the one hand and a User on the other hand; (b) it is necessary to enforce the terms of this Agreement; (c) it is required, in Uber's or any Affiliate's sole discretion, by applicable law or regulatory requirements (*e.g.*, Uber or its Affiliate receives a subpoena, warrant, or other legal process for information); (d) it is necessary, in Uber's or any Affiliate's sole discretion, to (1) protect the safety, rights, property or security of Uber or its Affiliates, the Uber Services or any third party; (2) protect the safety of the public for any reason including the facilitation of insurance claims related to the Uber Services; (3) detect, prevent or otherwise address fraud, security or technical issues; and/or (4) prevent or stop activity Uber or its Affiliates, in their sole discretion, may consider to be, or to pose a risk of being, an illegal, unethical, or legally actionable activity); or (e) it is required or necessary, in Uber's or any of its Affiliate's sole

discretion, for insurance or other purposes related to Customer's or any Driver's ability to qualify, or remain qualified, to use the Uber Services. Customer understands that Uber may retain and its Drivers' personal data for legal, regulatory, safety and other necessary purposes after this Agreement is terminated.

7.2. Uber and its Affiliates may collect personal data from Customer or a Driver during the course of Customer's or such Driver's application for, and use of, the Uber Services, or obtain information about Customer or any Drivers from third parties. Such information may be stored, processed, transferred, and accessed by Uber and its Affiliates,  third parties and service providers, for business purposes, including for marketing, lead generation, service development and improvement, analytics, industry and market research, and such other purposes consistent with Uber's and its Affiliates' legitimate business needs. Customer (or Driver, through the Driver Addendum) expressly consents to such use of personal data.

## 8. Insurance

8.1. Customer agrees to maintain during the term of this Agreement on all Vehicles operated by Customer or its Drivers commercial automobile liability insurance that provides protection against bodily injury and property damage to third parties at levels of coverage that satisfy all applicable laws in the Territory. This coverage must also include any no-fault coverage required by law in the Territory that may not be waived by an insured. Customer agrees to provide Uber and its Affiliates a copy of the insurance policy, policy declarations, proof of insurance identification card and proof of premium payment for the insurance policy required in this Section 8.1 upon request. Furthermore, Customer must provide Uber with written notice of cancellation of any insurance policy required by Uber. Uber shall have no right to control Customer's selection or maintenance of Customer's policy.

8.2. Customer agrees to maintain during the term of this Agreement commercial general liability insurance that provides protection against personal injury, advertising injury and property damage to third parties at levels of coverage required by all applicable laws in the Territory.

8.3. **Customer agrees to maintain during the term of this Agreement workers' compensation insurance for itself and any of its subcontractors as required by all applicable laws in the Territory. If permitted by applicable law, Customer may choose to insure itself against industrial injuries by maintaining occupational accident insurance in place of workers' compensation insurance. Customer's subcontractors may also, to the extent permitted by applicable law, maintain occupational accident insurance in place of workers' compensation insurance.  Furthermore, if permitted by applicable law, Customer may choose not to insure itself against industrial injuries at all, but does so at its own risk.**

8.4. Customer shall add Uber (or any Affiliate which may be designated by Uber from time to time) to Customer's insurance policies required in Sections 8.1 and 8.2 above as an additional insured, and shall, upon Uber's request, provide Uber with a copy of such insurance certificate(s) within seven (7) days of such request.

## 9. Representations and Warranties; Disclaimers

9.1. **By Customer**. Customer hereby represents and warrants that:  (a) it has full power and authority to enter into this Agreement and perform its obligations hereunder; (b) it is duly organized, validly existing and in good standing under the laws of the jurisdiction of its origin; (c) it has not entered into, and during the term will not enter into, any agreement that would prevent it from complying with this Agreement; (d) it will comply with all applicable laws in its performance of

UBER_BARYSAS_0000207

this Agreement, including holding and complying with all permits, licenses, registrations and other governmental authorizations necessary to provide (i) Transportation Services using the Drivers and Vehicles pursuant to this Agreement, and (ii) passenger transportation services to third parties in the Territory generally; and (e) it shall require all Drivers to comply with the Driver Addendum, the applicable terms and conditions set forth in this Agreement and all applicable laws.

9.2. **Disclaimer of Warranties**. UBER PROVIDES, AND CUSTOMER ACCEPTS, THE UBER SERVICES, DRIVER APP AND THE UBER DEVICES ON AN "AS IS" AND "AS AVAILABLE" BASIS. UBER DOES NOT REPRESENT, WARRANT OR GUARANTEE THAT CUSTOMER'S OR ANY DRIVER'S ACCESS TO OR USE OF THE UBER SERVICES, DRIVER APP OR THE UBER DEVICES: (A) WILL BE UNINTERRUPTED OR ERROR FREE; OR (B) WILL RESULT IN ANY REQUESTS FOR TRANSPORTATION SERVICES. UBER FUNCTIONS AS AN ON-DEMAND LEAD GENERATION AND RELATED SERVICE ONLY AND MAKES NO REPRESENTATIONS, WARRANTIES OR GUARANTEES AS TO THE ACTIONS OR INACTIONS OF THE USERS WHO MAY REQUEST OR RECEIVE TRANSPORTATION SERVICES FROM CUSTOMER OR ANY DRIVER HEREUNDER, AND UBER DOES NOT SCREEN OR OTHERWISE EVALUATE USERS. BY USING THE UBER SERVICES AND DRIVER APP, CUSTOMER ACKNOWLEDGES AND AGREES THAT CUSTOMER OR A DRIVER MAY BE INTRODUCED TO A THIRD PARTY THAT MAY POSE HARM OR RISK TO CUSTOMER, A DRIVER OR OTHER THIRD PARTIES. CUSTOMER AND DRIVERS ARE ADVISED TO TAKE REASONABLE PRECAUTIONS WITH RESPECT TO INTERACTIONS WITH THIRD PARTIES ENCOUNTERED IN CONNECTION WITH THE USE OF THE UBER SERVICES OR DRIVER APP. NOTWITHSTANDING UBER'S APPOINTMENT AS THE LIMITED PAYMENT COLLECTION AGENT OF CUSTOMER FOR THE PURPOSE OF ACCEPTING PAYMENT FROM USERS ON BEHALF OF CUSTOMER AS SET FORTH IN SECTION 4 ABOVE, UBER EXPRESSLY DISCLAIMS ALL LIABILITY FOR ANY ACT OR OMISSION OF CUSTOMER, ANY USER OR OTHER THIRD PARTY.

9.3. **No Service Guarantee**. UBER DOES NOT GUARANTEE THE AVAILABILITY OR UPTIME OF THE UBER SERVICES OR DRIVER APP. CUSTOMER ACKNOWLEDGES AND AGREES THAT THE UBER SERVICES OR DRIVER APP MAY BE UNAVAILABLE AT ANY TIME AND FOR ANY REASON (*e.g.*, DUE TO SCHEDULED MAINTENANCE OR NETWORK FAILURE). FURTHER, THE UBER SERVICES OR DRIVER APP MAY BE SUBJECT TO LIMITATIONS, DELAYS, AND OTHER PROBLEMS INHERENT IN THE USE OF THE INTERNET AND ELECTRONIC COMMUNICATIONS, AND UBER IS NOT RESPONSIBLE FOR ANY DELAYS, DELIVERY FAILURES, OR OTHER DAMAGES, LIABILITIES OR LOSSES RESULTING FROM SUCH PROBLEMS.

10. **Indemnification**

10.1. Customer shall indemnify, defend (at Uber's option) and hold harmless Uber and its Affiliates and their respective officers, directors, employees, agents, successors and assigns from and against any and all liabilities, expenses (including legal fees), damages, penalties, fines, social security contributions and taxes arising out of or related to: (a) Customer's breach of its representations, warranties or obligations under this Agreement; or (b) a claim by a third party (including Users, regulators and governmental authorities) directly or indirectly related to Customer's provision of Transportation Services or use of the Uber Services. This indemnification provision shall not apply to Customer's or any Drivers' breach of any representations regarding their status as independent contractors.

10.2. As between Customer and Uber, Customer is and shall be solely responsible for its Drivers' provision of Transportation Services. As such, Customer shall indemnify, defend (at Uber's option) and hold harmless Uber and its Affiliates and their respective officers, directors, employees, agents, successors and assigns from and against any and all liabilities, expenses

(including legal fees), damages, penalties, fines, social contributions and taxes directly or indirectly arising out of or related to its Drivers' provision of Transportation Services or use of the Uber Services.

11. **Limits of Liability**. UBER AND ITS AFFILIATES SHALL NOT BE LIABLE UNDER OR RELATED TO THIS AGREEMENT FOR ANY OF THE FOLLOWING, WHETHER BASED ON CONTRACT, TORT OR ANY OTHER LEGAL THEORY, EVEN IF A PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES:  (i) ANY INCIDENTAL, PUNITIVE, SPECIAL, EXEMPLARY, CONSEQUENTIAL, OR OTHER INDIRECT DAMAGES OF ANY TYPE OR KIND; OR (ii) CUSTOMER'S OR ANY THIRD PARTY'S PROPERTY DAMAGE, OR LOSS OR INACCURACY OF DATA, OR LOSS OF BUSINESS, REVENUE, PROFITS, USE OR OTHER ECONOMIC ADVANTAGE. EXCEPT FOR UBER'S OBLIGATIONS TO PAY AMOUNTS DUE TO CUSTOMER PURSUANT TO SECTION 4 ABOVE, BUT SUBJECT TO ANY LIMITATIONS OR OTHER PROVISIONS CONTAINED IN THIS AGREEMENT WHICH ARE APPLICABLE THERETO, IN NO EVENT SHALL THE LIABILITY OF UBER OR ITS AFFILIATES UNDER THIS AGREEMENT EXCEED THE AMOUNT OF SERVICE FEES ACTUALLY PAID TO OR DUE TO UBER HEREUNDER IN THE SIX (6) MONTH PERIOD IMMEDIATELY PRECEDING THE EVENT GIVING RISE TO SUCH CLAIM.

12. **Term and Termination**

12.1.    **Term**. This Agreement shall commence on the date accepted by Customer and shall continue until terminated as set forth herein.

12.2.    **Termination**. Either party may terminate this Agreement:  (a) without cause at any time upon seven (7) days prior written notice to the other party; (b) immediately, without notice, for the other party's material breach of this Agreement; or (c) immediately, without notice, in the event of the insolvency or bankruptcy of the other party, or upon the other party's filing or submission of request for suspension of payment (or similar action or event) against the terminating party. In addition, Uber may terminate this Agreement or deactivate Customer or a particular Driver immediately, without notice, with respect to Customer and/or any Driver in the event Customer and/or any Driver, as applicable, no longer qualifies, under applicable law or the standards and policies of Uber, to provide Transportation Services or to operate the Vehicle, or as otherwise set forth in this Agreement.

12.3.    **Effect of Termination**. Upon termination of the Agreement, Customer and all Drivers, as applicable, shall:  (a) promptly return to Uber all Uber Devices; and (b) immediately delete and fully remove the Driver App from any applicable Driver-Provided Devices. Outstanding payment obligations and Sections 1, 2.3, 2.5, 2.6.3, 4.7, 4.8, 5.3, 6, 7, 9, 10, 11, 12.3, 13, 14 and 15 shall survive the termination of this Agreement.

13. **Relationship of the Parties**

13.1.    **Except as otherwise expressly provided herein with respect to Uber acting as the limited payment collection agent solely for the purpose of collecting payment from Users on behalf of Customer, the relationship between the parties under this Agreement is solely that of independent contracting parties. The parties expressly agree that:  (a) this Agreement is not an employment agreement, nor does it create an employment relationship, between Uber and Customer or Uber and any Driver; and (b) no joint venture, partnership, or agency relationship exists between Uber and Customer or Uber and any Driver**.

13.2.    Customer has no authority to bind Uber and undertakes not to hold itself out, and to ensure that each Driver does not hold himself or herself out, as an employee, agent or authorized

UBER_BARYSAS_0000209

representative of Uber or its Affiliates. Where, by implication of mandatory law or otherwise, Customer or any Driver may be deemed an agent or representative of Uber, Customer undertakes and agrees to indemnify, defend (at Uber's option) and hold Uber and its Affiliates harmless from and against any claims by any person or entity based on such implied agency or representative relationship.

14. **Miscellaneous Terms**

14.1.   **Modification**. In the event Uber modifies the terms and conditions of this Agreement or Driver Addendum at any time, such modifications shall be binding on Customer only upon Customer's acceptance of the modified Agreement and/or Driver Addendum.  Uber reserves the right to modify any information referenced at hyperlinks from this Agreement from time to time. Customer hereby acknowledges and agrees that, by using the Uber Services, or downloading, installing or using the Driver App, Customer is bound by any future amendments and additions to information referenced at hyperlinks herein, or documents incorporated herein, including with respect to Fare Calculations.  Continued use of the Uber Services or Driver App after any such changes shall constitute Customer's consent to such changes. Unless changes are made to the arbitration provisions herein, Customer agrees that modification of this Agreement does not create a renewed opportunity to opt out of arbitration.

14.2.   **Supplemental Terms**. Supplemental terms may apply to Customer's and Driver's use of the Uber Services, such as use policies or terms related to certain features and functionality, which may be modified from time to time ("*Supplemental Terms*"). Customer may be presented with certain Supplemental Terms from time to time. Supplemental Terms are in addition to, and shall be deemed a part of, this Agreement. Supplemental Terms shall prevail over this Agreement in the event of a conflict.

14.3.   **Severability**. If any provision of this Agreement is or becomes invalid or non-binding, the parties shall remain bound by all other provisions hereof. In that event, the parties shall replace the invalid or non-binding provision with provisions that are valid and binding and that have, to the greatest extent possible, a similar effect as the invalid or non-binding provision, given the contents and purpose of this Agreement.

14.4.   **Assignment**. Neither party shall assign or transfer this Agreement or any of its rights or obligations hereunder, in whole or in part, without the prior written consent of the other party; provided that Uber may assign or transfer this Agreement or any or all of its rights or obligations under this Agreement from time to time without consent:  (a) to an Affiliate; or (b) to an acquirer of all or substantially all of Uber's business, equity or assets.

14.5.   **Entire Agreement**. This Agreement, including all Supplemental Terms, constitutes the entire agreement and understanding of the parties with respect to its subject matter and replaces and supersedes all prior or contemporaneous agreements or undertakings regarding such subject matter. In this Agreement, the words "including" and "include" mean "including, but not limited to." The recitals form a part of this Agreement.

14.6.   **No Third Party Beneficiaries**. There are no third party beneficiaries to this Agreement, except as expressly set forth in the Arbitration Provision in Section 15.3. Nothing contained in this Agreement is intended to or shall be interpreted to create any third party beneficiary claims.

14.7.   **Notices**. Any notice delivered by Uber to Customer under this Agreement will be delivered by email to the email address associated with Customer's account or by posting on the Customer portal available on the Uber Services. Any notice delivered by Customer to Uber under this

Agreement will be delivered by contacting Uber at http://partners.uber.com in the "Contact Us" section. Additional Territory-specific notices may be required from time to time.

## 15. Governing Law; Arbitration

15.1 The choice of law provisions contained in this Section 15.1 do not apply to the arbitration clause contained in Section 15.3, such arbitration clause being governed by the Federal Arbitration Act. Accordingly, and except as otherwise stated in Section 15.3, the interpretation of this Agreement shall be governed by California law, without regard to the choice or conflicts of law provisions of any jurisdiction. Any disputes, actions, claims or causes of action arising out of or in connection with this Agreement or the Uber Services that are not subject to the arbitration clause contained in this Section 15.3 shall be subject to the exclusive jurisdiction of the state and federal courts located in the City and County of San Francisco, California. However, neither the choice of law provision regarding the interpretation of this Agreement nor the forum selection provision is intended to create any other substantive right to non-Californians to assert claims under California law whether that be by statute, common law, or otherwise. These provisions, and except as otherwise provided in Section 15.3, are only intended to specify the use of California law to interpret this Agreement and the forum for disputes asserting a breach of this Agreement, and these provisions shall not be interpreted as generally extending California law to Customer if Customer does not otherwise operate its business in California. The foregoing choice of law and forum selection provisions do not apply to the arbitration clause in Section 15.3 or to any arbitrable disputes as defined therein. Instead, as described in Section 15.3, the Federal Arbitration Act shall apply to any such dispute. The failure of Uber to enforce any right or provision in this Agreement shall not constitute a waiver of such right or provision unless acknowledged and agreed to by Uber in writing.

15.2 Other than disputes regarding the intellectual property rights of the parties and other claims identified in Section 15.3.ii, any disputes, actions, claims or causes of action arising out of or in connection with this Agreement or the Uber Services shall be subject to arbitration pursuant to Section 15.3.

15.3 **Arbitration.**

Important Note Regarding this Section 15.3:

- Except as provided below, arbitration does not limit or affect the legal claims you may bring against Uber. Agreeing to arbitration only affects where any such claims may be brought and how they will be resolved.

- Arbitration is a process of private dispute resolution that does not involve the civil courts, a civil judge, or a jury. Instead, the parties' dispute is decided by a private arbitrator selected by the parties using the process set forth herein. Other arbitration rules and procedures are also set forth herein.

- Unless the law requires otherwise, as determined by the Arbitrator based upon the circumstances presented, you will be required to split the cost of any arbitration with Uber.

- IMPORTANT: This Arbitration Provision will require you to resolve any claim that you may have against Uber on an individual basis, except as provided below, pursuant to the terms of the Agreement unless you choose to opt out of the Arbitration Provision.  Except as provided below, this provision will preclude you from bringing any class, collective, or representative action (other than actions under the Private Attorneys General Act of 2004 ("PAGA"), California Labor Code § 2698 *et seq.* ("PAGA")) against Uber, and also precludes you from participating in or recovering relief under any current or future class, collective, or representative (non-PAGA) action brought against Uber by someone else.

  - *Cases have been filed against Uber and may be filed in the future involving claims by users of Uber Services and Software, including by drivers.  You should assume that there are now, and may be in the future, lawsuits against Uber alleging class, collective, and/or representative (non-PAGA) claims on your behalf, including but not limited to claims for tips, reimbursement of expenses, and employment status.  Such claims, if successful, could result in some monetary recovery to you.  (THESE CASES NOW INCLUDE, FOR EXAMPLE, YUCESOY ET AL. V. UBER TECHNOLOGIES, INC., ET AL., CASE NO. 3:15-CV-00262 (NORTHERN DISTRICT OF CALIFORNIA);  IN RE UBER FCRA LITIGATION, CASE NO. 14-CV-05200-EMC (NORTHERN DISTRICT OF CALIFORNIA); AND O'CONNOR  V. UBER TECHNOLOGIES, INC., ET AL., CASE NO. CV 13-03826-EMC (NORTHERN DISTRICT OF CALIFORNIA). The contact information for counsel in the O'Connor matter is as follows: Shannon Liss-Riordan, Lichten & Liss-Riordan, P.C., 100 Cambridge Street, 20th Floor, Boston, MA 02114, Telephone: (617) 994-5800, Fax: (617) 994-5801, email: sliss@llrlaw.com.)*

  - **The mere existence of such class, collective, and/or representative lawsuits, however, does not mean that such lawsuits will ultimately succeed.  But if you do agree to arbitration with Uber, you are agreeing in advance, except as otherwise provided, that you will not participate in and,**

UBER_BARYSAS_0000212

therefore, will not seek to recover monetary or other relief under any such class, collective, and/or representative (non-PAGA) lawsuit.

o   However, as discussed above and except as provided below, if you agree to arbitration, you will not be precluded from bringing your claims against Uber in an individual arbitration proceeding. If successful on such claims, you could be awarded money or other relief by an arbitrator (subject to splitting the cost of arbitration as mentioned above).

**WHETHER TO AGREE TO ARBITRATION IS AN IMPORTANT BUSINESS DECISION. IT IS YOUR DECISION TO MAKE, AND YOU SHOULD NOT RELY SOLELY UPON THE INFORMATION PROVIDED IN THIS AGREEMENT AS IT IS NOT INTENDED TO CONTAIN A COMPLETE EXPLANATION OF THE CONSEQUENCES OF ARBITRATION.  YOU SHOULD TAKE REASONABLE STEPS TO CONDUCT FURTHER RESEARCH AND TO CONSULT WITH OTHERS — INCLUDING BUT NOT LIMITED TO AN ATTORNEY — REGARDING THE CONSEQUENCES OF YOUR DECISION, JUST AS YOU WOULD WHEN MAKING ANY OTHER IMPORTANT BUSINESS OR LIFE DECISION.**

    i.    <u>How This Arbitration Provision Applies</u>.

This Arbitration Provision is governed by the Federal Arbitration Act, 9 U.S.C. § 1 et seq. (the "FAA") and evidences a transaction involving interstate commerce.  This Arbitration Provision applies to any dispute arising out of or related to this Agreement or termination of the Agreement and survives after the Agreement terminates.  Nothing contained in this Arbitration Provision shall be construed to prevent or excuse You from utilizing any informal procedure for resolution of complaints established in this Agreement (if any), and this Arbitration Provision is not intended to be a substitute for the utilization of such procedures.

**Except as it otherwise provides, this Arbitration Provision is intended to apply to the resolution of disputes that otherwise would be resolved in a court of law or before any forum other than arbitration, with the exception of proceedings that must be exhausted under applicable law before pursuing a claim in a court of law or in any forum other than arbitration. Except as it otherwise provides, this Arbitration Provision requires all such disputes to be resolved only by an arbitrator through final and binding arbitration on an individual basis only and not by way of court or jury trial, or by way of class, collective, or representative (non-PAGA) action.**

Except as provided in Section 15.3(v), below, regarding the Class Action Waiver, such disputes include without limitation disputes arising out of or relating to interpretation or application of this Arbitration Provision, including the enforceability, revocability or validity of the Arbitration

Provision or any portion of the Arbitration Provision.  All such matters shall be decided by an Arbitrator and not by a court or judge. However, as set forth below, the preceding sentences shall not apply to disputes relating to the interpretation or application of the Class Action Waiver or PAGA Waiver below, including their enforceability, revocability or validity.

Except as it otherwise provides, this Arbitration Provision also applies, without limitation, to all disputes between You and Uber, as well as all disputes between You and Uber's fiduciaries, administrators, affiliates, subsidiaries, parents, and all successors and assigns of any of them, including but not limited to any disputes arising out of or related to this Agreement and disputes arising out of or related to Your relationship with Uber, including termination of the relationship.  This Arbitration Provision also applies, without limitation, to disputes regarding any city, county, state or federal wage-hour law, trade secrets, unfair competition, compensation, breaks and rest periods, expense reimbursement, termination, harassment and claims arising under the Uniform Trade Secrets Act, Civil Rights Act of 1964, Americans With Disabilities Act, Age Discrimination in Employment Act, Family Medical Leave Act, Fair Labor Standards Act, Employee Retirement Income Security Act (except for individual claims for employee benefits under any benefit plan sponsored by Uber and covered by the Employee Retirement Income Security Act of 1974 or funded by insurance), Genetic Information Non-Discrimination Act, and state statutes, if any, addressing the same or similar subject matters, and all other similar federal and state statutory and common law claims.

This Agreement is intended to require arbitration of every claim or dispute that lawfully can be arbitrated, except for those claims and disputes which by the terms of this Agreement are expressly excluded from the Arbitration Provision.

Uber Technologies, Inc. is an intended, third party beneficiary of this Agreement.

    ii.   <u>Limitations On How This Agreement Applies</u>.

The disputes and claims set forth below shall not be subject to arbitration and the requirement to arbitrate set forth in Section 15.3 of this Agreement shall not apply:

A representative action brought on behalf of others under the Private Attorneys General Act of 2004 ("PAGA"), California Labor Code § 2698 *et seq.*, to the extent waiver of such a claim is deemed unenforceable by a court of competent jurisdiction;

Claims for workers compensation, state disability insurance and unemployment insurance benefits;

Regardless of any other terms of this Agreement, nothing prevents you from making a report to or filing a claim or charge with the Equal Employment Opportunity Commission, U.S. Department of Labor, Securities Exchange Commission, National Labor Relations Board, or Office of Federal Contract Compliance Programs, and nothing in this Agreement or Arbitration Provision prevents the investigation by a government agency of any report, claim or charge otherwise covered by this Arbitration Provision.  Nothing in this Arbitration Provision shall be deemed to preclude or excuse a party from bringing an administrative claim before any agency in order to fulfill the party's obligation to exhaust administrative remedies before making a claim in arbitration;

UBER_BARYSAS_0000214

Disputes that may not be subject to a predispute arbitration agreement pursuant to applicable Federal law or Executive Order are excluded from the coverage of this Arbitration Provision;

Disputes regarding the Intellectual Property Rights of the parties;

This Arbitration Provision shall not be construed to require the arbitration of any claims against a contractor that may not be the subject of a mandatory arbitration agreement as provided by section 8116 of the Department of Defense ("DoD") Appropriations Act for Fiscal Year 2010 (Pub. L. 111-118), section 8102 of the Department of Defense ("DoD") Appropriations Act for Fiscal Year 2011 (Pub. L. 112-10, Division A), and their implementing regulations, or any successor DoD appropriations act addressing the arbitrability of claims.

### iii.   Selecting The Arbitrator and Location of the Arbitration.

The Arbitrator shall be selected by mutual agreement of Uber and You.  Unless You and Uber mutually agree otherwise, the Arbitrator shall be an attorney licensed to practice in the location where the arbitration proceeding will be conducted or a retired federal or state judicial officer who presided in the jurisdiction where the arbitration will be conducted.  If the Parties cannot agree on an Arbitrator, then an arbitrator will be selected using the alternate strike method from a list of five (5) neutral arbitrators provided by JAMS (Judicial Arbitration & Mediation Services).  You will have the option of making the first strike.  If a JAMS arbitrator is used, then the JAMS Streamlined Arbitration Rules & Procedures rules will apply; however, if there is a conflict between the JAMS Rules and this Agreement, this Agreement shall govern.  Those rules are available here:

http://www.jamsadr.com/rules-streamlined-arbitration/

The location of the arbitration proceeding shall be no more than 45 miles from the place where You last provided transportation services under this Agreement, unless each party to the arbitration agrees in writing otherwise.

### iv.   Starting The Arbitration.

All claims in arbitration are subject to the same statutes of limitation that would apply in court. The party bringing the claim must demand arbitration in writing and deliver the written demand by hand or first class mail to the other party within the applicable statute of limitations period. The demand for arbitration shall include identification of the Parties, a statement of the legal and factual basis of the claim(s), and a specification of the remedy sought. Any demand for arbitration made to Uber shall be provided to General Counsel, Uber Technologies, Inc., 1455 Market St., Ste. 400, San Francisco CA 94103.  The Arbitrator shall resolve all disputes regarding the timeliness or propriety of the demand for arbitration.  A party may apply to a court of competent jurisdiction for temporary or preliminary injunctive relief in connection with an arbitrable controversy, but only upon the ground that the award to which that party may be entitled may be rendered ineffectual without such provisional relief.

v.    <u>How Arbitration Proceedings Are Conducted</u>.

In arbitration, the Parties will have the right to conduct adequate civil discovery, bring dispositive motions, and present witnesses and evidence as needed to present their cases and defenses, and any disputes in this regard shall be resolved by the Arbitrator.

**You and Uber agree to resolve any dispute that is in arbitration on an individual basis only, and not on a class or collective action basis ("Class Action Waiver"). The Arbitrator shall have no authority to consider or resolve any claim or issue any relief on any basis other than an individual basis. The Arbitrator shall have no authority to consider or resolve any claim or issue any relief on a class, collective, or representative basis.**  Notwithstanding any other provision of this Agreement, the Arbitration Provision or the JAMS Streamlined Arbitration Rules & Procedures, disputes regarding the enforceability, revocability or validity of the Class Action Waiver may be resolved only by a civil court of competent jurisdiction and not by an arbitrator. In any case in which (1) the dispute is filed as a class, collective, or representative action and (2) there is a final judicial determination that all or part of the Class Action Waiver is unenforceable, the class, collective, and/or representative action to that extent must be litigated in a civil court of competent jurisdiction, but the portion of the Class Action Waiver that is enforceable shall be enforced in arbitration.

While Uber will not take any retaliatory action in response to any exercise of rights You may have under Section 7 of the National Labor Relations Act, if any, Uber shall not be precluded from moving to enforce its rights under the FAA to compel arbitration on the terms and conditions set forth in this Agreement.

**<u>Private Attorneys General Act</u>.**

Notwithstanding any other provision of this Agreement or the Arbitration Provision, to the extent permitted by law, (1) **You and Uber agree not to bring a representative action on behalf of others under the Private Attorneys General Act of 2004 ("PAGA"), California Labor Code § 2698 et seq., in any court or in arbitration**, and (2) for any claim brought on a private attorney general basis—i.e., where you are seeking to pursue a claim on behalf of a government entity— both you and Uber agree that any such dispute shall be resolved in arbitration on an individual basis only (i.e., to resolve whether you have personally been aggrieved or subject to any violations of law), and that such an action may not be used to resolve the claims or rights of other individuals in a single or collective proceeding (i.e., to resolve whether other individuals have been aggrieved or subject to any violations of law) ("PAGA Waiver"). Notwithstanding any other provision of this Agreement or the Arbitration Provision, the validity of the PAGA Waiver may be resolved only by a civil court of competent jurisdiction and not by an arbitrator. If any provision of the PAGA Waiver is found to be unenforceable or unlawful for any reason, (1) the unenforceable provision shall be severed from this Agreement; (2) severance of the unenforceable provision shall have no impact whatsoever on the Arbitration Provision or the Parties' attempt to arbitrate any remaining claims on an individual basis pursuant to the Arbitration Provision; and (3) any representative action brought under PAGA on behalf of others must be litigated in a civil court of competent jurisdiction and not in arbitration. To the extent that there are any claims to be litigated in a civil court of competent jurisdiction because a civil court of competent jurisdiction determines that the PAGA Waiver is unenforceable with respect

to those claims, the Parties agree that litigation of those claims shall be stayed pending the outcome of any individual claims in arbitration.

vi.   Paying For The Arbitration.

Each party will pay the fees for his, her or its own attorneys, subject to any remedies to which that party may later be entitled under applicable law (i.e., a party prevails on a claim that provides for the award of reasonable attorney fees to the prevailing party). In all cases where required by law, Uber will pay the Arbitrator's and arbitration fees. If under applicable law Uber is not required to pay all of the Arbitrator's and/or arbitration fees, such fee(s) will be apportioned equally between the Parties or as otherwise required by applicable law. However, You will not be required to bear any type of fee or expense that You would not be required to bear if You had filed the action in a court of law. Any disputes in that regard will be resolved by the Arbitrator as soon as practicable after the Arbitrator is selected, and Uber shall bear all of the Arbitrator's and arbitration fees until such time as the Arbitrator resolves any such dispute.

vii.   The Arbitration Hearing And Award.

The Parties will arbitrate their dispute before the Arbitrator, who shall confer with the Parties regarding the conduct of the hearing and resolve any disputes the Parties may have in that regard. Within 30 days of the close of the arbitration hearing, or within a longer period of time as agreed to by the Parties or as ordered by the Arbitrator, any party will have the right to prepare, serve on the other party and file with the Arbitrator a brief. The Arbitrator may award any party any remedy to which that party is entitled under applicable law, but such remedies shall be limited to those that would be available to a party in his or her individual capacity in a court of law for the claims presented to and decided by the Arbitrator, and no remedies that otherwise would be available to an individual in a court of law will be forfeited by virtue of this Arbitration Provision. The Arbitrator will issue a decision or award in writing, stating the essential findings of fact and conclusions of law. A court of competent jurisdiction shall have the authority to enter a judgment upon the award made pursuant to the arbitration. The Arbitrator shall not have the power to commit errors of law or legal reasoning, and the award may be vacated or corrected on appeal to a court of competent jurisdiction for any such error.

viii.   **Your Right To Opt Out Of Arbitration.**

**Arbitration is not a mandatory condition of your contractual relationship with Uber. If You do not want to be subject to this Arbitration Provision, You may opt out of this Arbitration Provision by notifying Uber in writing of Your desire to opt out of this Arbitration Provision, which writing must be dated, signed and delivered by electronic mail to optout@uber.com, by U.S. Mail, or by any nationally recognized delivery service (*e.g,* UPS, Federal Express, etc.), or by hand delivery to:**

**General Counsel**
**Uber Technologies, Inc.**
**1455 Market St., Ste. 400**
**San Francisco CA 94103**

**In order to be effective, the writing must clearly indicate Your intent to opt out of this Arbitration Provision and the envelope containing the signed writing must be received (if delivered by hand) or post-marked within 30 days of the date this Agreement is executed by You.  Your writing opting out of this Arbitration Provision will be filed with a copy of this Agreement and maintained by Uber.  Should You not opt out of this Arbitration Provision within the 30-day period, You and Uber shall be bound by the terms of this Arbitration Provision.  You have the right to consult with counsel of Your choice concerning this Arbitration Provision.  You understand that You will not be subject to retaliation if You exercise Your right to assert claims or opt-out of coverage under this Arbitration Provision.**

ix. <u>Full And Complete Agreement Related To Formal Resolution Of Disputes; Enforcement Of This Agreement</u>.

This Arbitration Provision is the full and complete agreement relating to the formal resolution of disputes arising out of this Agreement.  Except as stated in subsection v, above, in the event any portion of this Arbitration Provision is deemed unenforceable, the remainder of this Arbitration Provision will be enforceable.

By clicking "I accept", Customer expressly acknowledge that Customer has read, understood, and taken steps to thoughtfully consider the consequences of this Agreement, that Customer agrees to be bound by the terms and conditions of the Agreement, and that Customer is legally competent to enter into this Agreement with Uber.

2022-67757 / Court: 133

# Exhibit B

In the Matter of Arbitration between:

**DAINIUS BARYSAS**

**Claimant**

**VS.**

**UBER TECHNOLOGIES, INC.**

**Respondent**

## FINAL AWARD

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with an agreement entered into between the above-named Parties which requires arbitration and having been duly sworn, and having duly heard the proofs and allegations of the Parties and based on the facts and the law, does hereby issue this Final Award:

I have examined all of the pleadings, all exhibits, the submissions, proof and allegations presented, applicable law, and received and considered the oral testimony of witnesses. Having determined that jurisdiction over the parties and claims exists, all issues and claims have been adjudicated and determined by the more credible evidence presented at the Final Hearing. Per the Initial Scheduling

1

Order, Texas substantive law governs this arbitration with the standard of proof being by a preponderance of the evidence.  As permitted by law the Arbitrator assessed the credibility of all witnesses.  *Xtria L.L.C. v. Intern'l. Ins. Alliance, Inc., 286 S.W.3d 583, 597 (Tex. App. – Texarkana 2009, pet. denied).*

The Arbitration Hearing was held via video conference on March 29, 2022 and May 2-3, 2022 in Houston, Texas.[1]

Claimant, Dainius Barysas, appeared on behalf of himself and was represented by attorneys Steve Kherkher, Bret Stanley, Eric Hawley, Kristen Hidalgo-Monroy, Ryan MacLeod, Katherine Hiett, Ben Bireley, and Kelli McDonald of Kherkher Garcia, LLP.  Respondent, Uber Technologies, Inc., appeared through its representative, Brad Rosenthal, and  was represented by its counsel Kimberly

---

[1] During the testimony on day one of the arbitration hearing, Mr. Brad Rosenthal, Respondent's corporate representative, testified that he had reviewed two (2) videos showing that Claimant was "spoofing his location at the airport." (Tr. 126) These videos had not been previously produced to Claimant even though Claimant's counsel stated Claimant had asked that all such documents be produced and had filed a Motion to Compel regarding same. That Motion was denied.  However, Claimant's counsel for the first time on day one of the Hearing learned that there were documents responsive to prior requests yet not produced (the videos).  Claimant's counsel stated he was moving for a mistrial and wanted to suspend the hearing in order to review these videos. (Tr. 150)  The Arbitrator ordered a short recess in the proceeding and ordered Respondent to tender these videos (Video 1 and Video 2) to Claimant.  Respondent complied.  The Arbitrator denied a mistrial.  However, Claimant's counsel argued that they were being "ambushed." (Tr. 157) Respondent's counsel argued that these videos did not exist in Respondent's files but were created by counsel's paralegal to assist with Mr. Rosenthal's testimony. (Tr. 150) Claimant's counsel also argued that they needed all the data that supported these videos in order for their experts to examine same and determine if indeed the videos represented what Respondent claimed they did. (Tr. 152, 158) Respondent's counsel argued that the videos were not something on which they would rely and furthermore the videos had no bearing on the issue before the Arbitrator: was Claimant an employee of Uber or an independent contractor. (Tr. 162-163) Noteworthy also is that Claimant never deposed Respondent's corporate representative prior to the Hearing.  After additional argument of counsel, the Arbitrator ordered a recess of the hearing until May 2-3, 2022, thus granting Claimant's counsel's request for a suspension of the Hearing so that they could review the videos .  Ultimately these videos were excluded from evidence as well as all testimony related thereto.

Miers, Benjamin Sandahl, and Allison Williams of Littler Mendelson, P.C.  The Arbitrator, all counsel, parties, witnesses, and the court reporter appeared by agreement remotely via Zoom with the assistance of Veritext Legal Solutions. Veritext Legal Solutions provided the official record which was transcribed by Shauna Foreman, Certified Shorthand Reporter in and for the State of Texas.

## I.      INTRODUCTION AND PROCEDURAL STATEMENT

1.      Dainius Barysas ("Claimant") filed his Commencement of Arbitration on October 28, 2020.  On January 15, 2021 Claimant filed his Specifications of Claims seeking damages under the application of the Fair Labor Standards Act ("FLSA"), failure to pay a minimum wage, failure to pay overtime wages, failure to record all work suffered or permitted, reimbursement for unlawfully retained tips, reimbursement for kickbacks, liquidated damages, unjust enrichment, and attorneys' fees and costs.  This is Claimant's operative pleading.

2.      On February 5, 2021 Uber Technologies, Inc., ("Respondent" or "Uber" herein) filed its Response to Claimant's Specification of Claims denying each and every allegation made by Claimant.

3.      On May 5, 2021 an agreed Confidentiality and Claw-Back Stipulation and Protective Order was filed by counsel for Claimant and Respondent and was signed by the Arbitrator.

4.     On May 19, 2021 Respondent filed its Amended Response to Claimant's Specification of Claims denying each and every allegation made by Claimant.  This is Respondent's operative pleading.

5.     On May 24, 2021 Claimant filed his First Motion to Compel Production. On May 25, 2021 Respondent filed its Motion for Protective Order to Prevent the Apex Deposition of Alex Rosenblat.  On June 2, 2021 Respondent filed its Response to Claimant's Motion to Compel Production.   On June 7, 2021 Claimant filed his Response to Respondent's Motion for Protective Order and Prevent the Deposition of Alex Rosenblat and his Motion to Compel the Deposition of Uber Employee Alex Rosenblat.  An oral argument via telephone conference was held on June 16, 2021. After reviewing the Motions and Responses thereto and having heard the oral arguments of counsel for the parties, the Arbitrator granted Claimant's First Motion to Compel Production and granted  Respondent's Motion for Protective Order to Prevent the Apex Deposition of Alex Rosenblat.

6.     On July 8, 2021 Claimant filed his Designation of Testifying Expert Witnesses.

7.     On August 17, 2021 Respondent filed its Motion to Compel Production of Documents and Information.  On August 26, 2021 Claimant filed his Response to Respondent's Motion to Compel.  On September 2, 2021 Order No. 2 was issued by

the Arbitrator ordering Claimant to respond to the designated Interrogatories and Requests for Production and to supplement his response to Interrogatory No. 6. The Arbitrator  denied Respondent's Motion to Compel Production of Documents No. 16.

8.      On August 30, 2021 Respondent filed its Request to File a Dispositive Motion.  On September 22, 2021, even though no response was received from Claimant, after a review of Respondent's Request, said Request was Denied.

9.      On November 9, 2021 a Notice of Appearance was filed by Benjamin Sandahl as additional counsel for the Respondent together with  its Motion for Permission for Benjamin Sandahl to Represent Respondent in this Arbitration.  Said Motion was granted.

10.      On November 30, 2021 a Joint Motion to Continue Arbitration Hearing and Amend the Scheduling Order with a Proposed Order was filed by counsel for the Claimant and Respondent.   Said Motion was granted on November 30, 2021.

11.      On March 11, 2022 Claimant filed his Motion to Compel Production. On March 16, 2021 Respondent filed its Response to same.  On March 17, 2022 pursuant to Order No. 5 the Motion was denied.

12.      On March 17, 2022 a status conference was held with counsel for Claimant and Respondent.  A request was made by Respondent's counsel that the

Final Hearing be bifurcated such that liability would be tried first and then if necessary the Hearing would later proceed on damages.  After oral argument by counsel, the Arbitrator issued Order No. 6 denying Respondent's request to bifurcate.

13.    On March 18, 2022 Claimant and Respondent filed their respective Pre-Hearing Briefs.

14.    On March 18, 2022 Respondent filed another Motion for Protective Order.  On March 18, 2022 Claimant filed his Brief in Support of Calling Fact Witness Alex Rosenblat.  On March 21, 2022 Order No. 7 was issued by the Arbitrator excluding the testimony of Alex Rosenblat.

15.    On March 30, 2022 Claimant filed a Request for Information on Video 1 and Video 2 as Ordered by the Arbitrator (*See* footnote 1 herein).  On April 1, 2022 Respondent filed its Response to Claimant's Request for Information on Video 1 and Video 2.   On April 4, 2022 Respondent filed its Motion for Protective Order.  On April 4, 2022 Claimant filed his Motion to Compel Production Concerning Video 1 and Video 2.  On April 7, 2022 Respondent filed its Supplement to its Motion for Protective Order.   On April 7, 2022 Order No. 8 was issued.   The videos were produced to Claimant.  Uber's objection to providing information about the inner workings of its proprietary software was Granted.  Discovery was concluded and

the continuation of the Final Arbitration Hearing was ordered to commence on May 2-3, 2022 at 10:00 a.m. CST.  Again, Video 1 and Video 2 were not admitted into evidence.  Any testimony regarding same was stricken for all purposes.

17.     Dainius Barysas, Brad Rosenthal and Dr. James Parrott were all called as live witnesses during the Hearing.     Both Claimant and Respondent proffered numerous exhibits which were admitted into evidence.

18.     On June 3, 2022 Claimant and Respondent filed their Post-Hearing Briefs.

## II.     FACTUAL BACKGROUND

Claimant brings this arbitration to "enforce his basic rights to minimum wage and overtime compensation as an Uber employee . . . because it misclassified him as an "independent contractor." (Claimant's Pre-Hearing Brief p. 2).   Claimant agrees that the "economic realities" of the relationship must be considered in order to determine if the FLSA is operative.  *Id.*  Claimant acknowledges that the Fifth Circuit considered at least five factors as relevant to this test.  *Id.*  If indeed Claimant was misclassified as an independent contractor rather than an employee, then Claimant claims past due minimum wages of $7.25/hour, reimbursement for employment-related expenses, overtime compensation, liquidated damages in an

amount equal to the unpaid minimum wages and overtime compensation due, reasonable attorneys' fees and costs.

Claimant worked as an Uber driver for approximately five (5) years. Claimant began driving for Respondent in 2014 in New York. In 2017 Claimant moved to Houston and continued as an Uber driver until May 5, 2019. Tr. 274. Claimant testified that from 2014 up until May 2019 Uber was his primary source of income. Tr. 275. Claimant maintained that Uber was a transportation business and Claimant provided rides to Uber's customers. Claimant showed, and the evidence supported his contentions, that Uber assigned each and every customer, Uber set the pricing for each driver, Uber processed all payments for the transportation service and, Claimant did not know the customer location, estimated fare amount and customer destination until Claimant accepted the work.

In order to receive a ride request from Uber, Claimant had to go on line and use the Uber Driver App. This period of time is referred to as P1 time. Uber then begins to collect actual data points to know the location of the driver. Tr. 203. P1 time is merely a waiting time for the driver in which the driver can do other tasks unrelated to driving for Uber. But having signed on to the App, the driver has let Uber know that he is available to pick-up a rider. Claimant contends he was "engaged to wait" during this P1 period which is compensable under the FLSA.

It is the driver's decision to accept or not accept the assignment which comes during the next period, called P2 time.  It is during this time that Uber assigns a passenger to the driver.  Once the passenger is with the Uber driver, the time period is referred to as P3 time.  It is this time for which a driver is compensated, when the passenger is in the car and on his/her way to the destination selected by the passenger.

During the testimony at the Arbitration Hearing, Claimant agreed that Uber is a technology company in which it has contributed significant funds.  It is through this technology based on sophisticated algorithms that allows Uber to connect drivers and riders.

In order to decide whether Claimant was an employee, as he insists, or an independent contractor, certain facts will be discussed.  The most important and material facts, critical to the legal analysis which is determinative of the issue presented herein, are uncontroverted.  Much of the heated discussions regarding alleged discovery abuses are irrelevant to the legal question at hand.  The Claimant testified on behalf of himself and Brad Rosenthal testified as the corporate representative for Respondent.[2]  Neither were "perfect" witnesses.  Some criticism can be levied against both witnesses as far as credibility is concerned.  But, there is

---

[2] Dr. Parrott testified as an expert for Claimant on  damages.

substantial and material evidence, oral and documentary, in which the Arbitrator can rely to make a Final Award in this matter.

Both parties agree that the Fifth Circuit's economic realities factors must be applied to the facts of this case.   The Department of Labor's Independent Contractor Rule (the "IC Rule") should also be considered.  But first an examination of the material facts:

1. Claimant was an Uber driver for approximately five (5) years.  Claimant started in New York and eventually came to Houston.  No application, resume, references, employment history was required.   Claimant did not fill out a Form W-4 or Form I-9 or interview with anyone at Uber.  Tr. 498.

2. Claimant established his own business, DB Pedicabs, LLC, and provided transportation services for which he received 1099-K statements. Tr. 346, 347.

3. Claimant did not have a supervisor at Uber.  He provided his own car, email account and provider, phone together with an appropriate data plan, and commercial insurance. Tr. 363-365.

4. Claimant bought a 2014 Infiniti QX 60 for approximately $60,000 to use with the Uber BLACK Platform and paid for commercial insurance coverage, maintenance and other fees. Tr. 302; 366

5. The commercial insurance was secured through Claimant's business, DB Pedicabs, LLC. Tr. 372.

6. Claimant got a limousine license in order to provide Uber BLACK services in Houston. This level of service provides a

higher fee.   Although Uber never required any sort of uniform, Claimant chose to wear business attire as a limousine-licensed driver.  Tr. 372, 372, 384.

7. Claimant made the decision to wait at Houston's George Bush Airport for ride assignments as he believed he could make the most money this way with the fewest amount of ride assignments.[3]  Tr. 374-376.

8. While logged on to the Uber app during P1 time, Claimant could do as he pleased, go on walks, play video games and browse the internet.  Tr. 376.

9. Claimant was the sole decision maker when and if to sign on to the Uber app.  No one at Uber set Claimant's schedule. Claimant even took a long vacation and was off the app for a period  of time.  When  he  came back from vacation, he signed back on, again at his total discretion. Tr. 380.  Claimant could accept or reject trips from Uber.  He was not required to accept trips.

10. Claimant also drove under the Lyft app.  Lyft was a direct competitor of Uber.  Uber never objected to Claimant also driving for Lyft.

11. Uber never required Claimant to attend a meeting.  Tr. 502.

---

[3] Uber eventually restricted Claimant's access to these airport trips.  This restriction was the majority of the dispute between Claimant and Respondent as to the control factor.  Uber maintained it had the right to, and did, restrict Claimant's ability to make airport trips in Houston through the Uber Driver App, though it did not restrict his other activity. (Hr'g Tr. 179:13-16; Cl.'s Ex. 3 at Uber_Universal_0000064; Cl.'s Ex. 7 at Barysas_954-57.)  Based on Houston regulations and airport requirements, Uber needed to ensure drivers were waiting in designated areas for riders. (Hou. Ord. 9-59, 9-60, Ord. No. 2014-1013; Hr'g Tr. 475:11-18.)   Uber detected fraudulent activity on Claimant's account, which could have included "GPS manipulation"-such that his location data may not have been accurate-or other fraudulent activities, so it restricted his ability to get trips to and from Houston airports. (Cl.'s Ex. 7 at Barysas_954.) Nothing stopped Claimant from continuing to provide such trips through means other than the Uber Driver App, including through his own business. (Hr'g Tr. 510:23-511:12.)

12. Claimant never received a performance review or was required to take a minimum number of trips per month. Tr. 502.

13. Although Claimant at times acknowledged he was an independent contractor, these statements do not drive the opinion herein as neither contract language nor subjective belief is controlling under the FLSA.

## III.   LEGAL ANALYSIS

A Fifth Circuit Opinion issued in May 2022, *Hargrave v. AIM Directional Services, LLC,* No. 21-40496, 2022 WL 1487020 is very instructive in the determination of whether Claimant is an employee or independent contractor of Uber. The Fifth Circuit instructs that focus should be on "economic reality rather than technical concepts." *Goldberg v. Whitaker House Co-op.,* 366 U.S. 28, 33 (1961). This opinion relies on other settled Fifth Circuit opinions.

> In making this assessment, our court generally uses 'five non-exhaustive factors,' known as the *Silk* factors, to "guide the analysis:" (1) the degree of control exercised by the alleged employer; (2) the extent of the relative investments of the worker and the alleged employer; (3) the degree to which the worker's opportunity for profit or loss is determined by the alleged employer; (4) the skill and initiative required in performing the job; and (5) the permanency of the relationship." *Parrish*, 917 F.3d at 379 (quotations omitted). These "factors should not be applied mechanically" and "no single factor is determinative." *Id.* at 380 (quotations omitted). *See also Thibault v. Bellsouth Telecommc'ns, Inc.* 612 F.3d 843, 846 (5th Cir. 2010).

Considering also the IC Rule in determining whether someone is an employee or independent contractor, there are two critical core factors: the nature and degree of control over the work; and the worker's opportunity for profit or loss. The IC Rule provides additional "non-exhaustive guidepost" factors that can be considered if the core factors are not determinative.  They are:

> (iii) the amount of skill required for the work that the potential employer does not provide;

> (iv) the degree of permanence of the working relationship between the individual and the potential employer; and

> (v)  whether the work is part of an integrated unit of production.

86 Fed. Reg. at 1176, 1246-47.  *See* Respondent's Post-Hearing Brief at p. 10.

### 1. CONTROL FACTOR

Claimant maintains that Uber does control the critical facets of Claimant's job because it controls all fares and commissions, assigns all work, dictates services fees, prohibits cash payments, mandates use of its payment system, enables GPS-tracking, limits territory, and enacts policies that threaten deactivation for noncompliance with various ground rules.  Claimant argues that these decisions have nothing to do with business standards and everything to do with profitability. Claimant's Post-Hearing Brief at p. 15.

Claimant maintained that Uber controlled the details of Claimant's work. It was Uber who chose not to share trip details with Claimant prior to the P3 period. Uber determined estimated fare amounts, estimated time, and distance of the trip. Uber had sole discretion to adjust fares, up or down, charge a cancellation fee and exclusively controlled all trip assignments, offered automatically by Uber's proprietary algorithm. Uber also collected Claimant's GPS data, if he was signed on to the Uber Driver App, every couple of seconds during P1 and P2 times. Uber used this information to provide ETAs to riders for a pick-up time without consulting Claimant. Claimant also argued that Uber published Community Guidelines and Deactivation Policy to Claimant which provided express standards for acceptance (of assignments) rates, cancellation rates, and star ratings (again, allegedly showing the utmost of control by Uber over Claimant's work).

Claimant argued that Uber had exclusive control over Claimant's right to work from Bush airport. Claimant chose to work primarily from the Bush airport because he could earn the most money with these rides. But Uber unilaterally prohibited Claimant from getting assignments at Bush airport. When Claimant asked to be reinstated, to Bush airport assignments, Claimant stated Uber refused without explanation. Claimant argued this limitation, this control, caused Claimant to quit as he could not make the profit he needed to make in order to continue as

an Uber driver.  *See* Claimant's Post-Hearing Brief at p. 18 citing to the official transcript.  To be clear, these facts do make the decision of employment status more difficult.

Uber argued that Claimant had the ability to "control if, whether, when, how frequently, and for how long he used the Uber Drive App."  These facts, under *Parrish v. Premier Directional Drilling, L.P.,* 917 F.3d 369, 382 (5th Cir. 2019) and *Hargrave, supra,* favor independent contractor status.  Moreover, Claimant was free to accept or reject assignments, much like the directional drillers in *Hargrave.* The Arbitrator finds it persuasive that Uber did not have control over when Claimant drove, how often he drove, where he drove or whether he drove for Uber's competitor, Lyft, while on the Uber Driver App.[4]

Moreover, Uber did not dictate the manner in which work had to be done. Claimant had discretion in selecting which platform to use (e.g. UBER XL or Uber BLACK), or how to dress, the time of day to work and which days to work.  Claimant also could use the Lyft app (Uber's competitor) while still on the Uber Drive App. Claimant owned and operated his own business providing transportation services at the same time he used the Uber Driver App.  Tr. 346.   Claimant's association

---

[4] It is undisputed that Uber did prohibit Claimant from rides at the Bush airport after it concluded Claimant was engaging in fraud in obtaining airport assignments.  Right or wrong Uber was entitled to believe what it believed based on the analysis it did.  This partial deactivation is not sufficient to hold that Uber controlled Claimant's work such that he was an employee and not an independent contractor.

with Uber was not his sole source of income.  Moreover, Uber's requiring that

Claimant comply with the law and safety standards does not constitute the type of

control that leans in favor of Claimant being an employee.  *See Hargrave, supra.*

The more credible evidence of "control" in this case, with these facts applied, is

that the "control factor" in the economic realities test does not favor employee

status for Claimant.

### 2.    THE OPPORTUNITY FOR PROFIT AND LOSS

This factor does not support Claimant's status as an employee.  Claimant

made the decision as to when and where to work.  Claimant decided how long to

stay logged into the Uber Driver App.  Claimant made the decision on the type of

rides (airport) he wanted and which Uber platform (Uber BLACK) would be more

lucrative.  It was Claimant's decision and his alone whether to accept particular

assignments or not.  It was Claimant's decision to be straightforward with potential

riders or not.  Uber did not provide Claimant with a vehicle.  The type of vehicle

was 100% the decision of Claimant.  Claimant could work for a competing business

or his own while still using the Uber Driver App when he wanted to do so.

> Workers, like Claimant, who control the amount of work they
> perform, and strategically choose where and when they are
> available to perform it, have the ability to exert significant
> influence over the extent to which they generate profits or incur
> losses.  *Herman,* 161 F.3d at 304; *see also Faludi v. U.S. Shale*

*Solutions, L.L.C.,* 950 F.3d 269, 275 (5th Cir. 2020) ("Faludi also controlled his opportunity for profit and loss because he could choose to accept any project[.]")

Respondent's Post-Hearing Brief at p. 17.

### 3.    THE EXTENT OF RELATIVE INVESTMENT OF WORKER

Much was said about the huge difference in investment made by Claimant in his business and that of Uber.  There is no question that Uber has spent millions of dollars in the development of its technology and its world-wide company while Claimant may have spent approximately $100,000.00 in his business.  Claimant bought his car, phone, clothing, commercial insurance, and paid expenses to support his livery service and the work he did for Uber and Lyft.  All of these decisions were made by Claimant.  Uber invested in its business.  Uber did not invest in Claimant's business, Claimant invested in his business.  In addressing a gig economy the Department of Labor has stated:

> The opportunity for profit or loss factor favors independent contractor status for the individual despite the substantial difference in the monetary value of the investments made by each party.  While the company may have invested substantially more in its business, the value of that investment is not relevant in determining whether the individual has meaningful opportunity for profit or loss through his initiative, investment, or both.

*See* Respondent's Post-Hearing Brief at p. 19.

### 4.   SKILL AND INITIATIVE REQUIRED IN PERFORMING THE JOB

The "greater the skill and more demonstrated initiative counsel in favor of independent contractor status." *Hargrave, supra* citing *Hobbs v. Petroplex Pipe & Constr., Inc.*, 946 F.3d 824 (5th Cir. 2020). It is difficult to say that particular skills are required to drive a car.[5] Therefore, the Arbitrator must look to the initiative required by Claimant. Did Claimant have the ability to exercise significant initiative in the business? *See Eberline,* 636 F. App'x at 229. The obvious answer is yes. It was Claimant's burden to show he could not exert initiative in the operation of the business. Claimant did not meet this burden. *Id.* Claimant decided when to work, day and time, where to work, whether to accept an assignment of a rider or not, what type of car to drive, which Uber platform to use (more profit with Uber BLACK), how to dress and how to engage with his rider. Uber could not make these decisions for Claimant. These were initiatives on the part of Claimant and support independent contractor status.

### 5.   PERMANENCY OF THE RELATIONSHIP

Claimant's relationship with Uber was non-exclusive. Indeed, Claimant also worked for Lyft and his personal livery services company. Claimant had the right

---

[5] In this regard, the "skill" required to merely drive a vehicle (which is minimal) can be distinguished from the "skill" required to operate one's own business which is substantial.

to work for others.  Claimant had the ability to terminate his relationship with Uber at any time.  Claimant's longevity driving under the Uber Driver App did not change his status from independent contractor to employee.  The above factors weigh in favor of Claimant's independent contractor status.  *See Parrish v. Premier Directional Drilling, L.P.,* 917 F.3d 369 (5th Cir. 2019).

## IV.   CONCLUSION

The material facts show that as a matter of economic realities, and the Department of Labor Guidelines, Claimant was an independent contractor in business for himself.  He was not Uber's employee.

Since Claimant is an independent contractor in business for himself, there can be no violation of the FLSA.  All of Claimant's claims under the FLSA against Uber are denied.  Claimant did not meet his burden to show he was an employee of Uber.  Therefore, there is no need to address his claims for damages, actual or willful, or attorneys' fees.

Since Claimant is an independent contractor and not an employee this Arbitrator need not address a claim for unjust enrichment against Uber; however, in any event it is denied.

## V.    FINAL AWARD

1.    Claimant, Dainius Barysas, has failed to meet his burden of proof on all causes of action and shall take nothing from Respondent, Uber Technologies, Inc.

2.    Uber made a claim for attorneys' fees and costs as the prevailing party pursuant to Fed. R. Civ. P. 54(d)(l).  However, this arbitration is operating under the JAMS Comprehensive Arbitration Rules and Procedures which do not require the assessment of such fees and costs.  Further, within the discretion of the Arbitrator, the compensation and expenses of the Arbitrator and arbitration shall be borne as incurred.

3.    All other claims and relief sought in this matter by any party not expressly granted in this Award are hereby **DENIED** and disposed of with prejudice.

4.    This AWARD is final and binding and is intended to be enforceable in any court of competent jurisdiction.

Signed this 19th day of July 2022.

_____

Honorable Susan S. Soussan - Arbitrator

2022-67757 / Court: 133

# Exhibit C

**62218**    Federal Register / Vol. 87, No. 197 / Thursday, October 13, 2022 / Proposed Rules

## DEPARTMENT OF LABOR

**Wage and Hour Division**

**29 CFR Parts 780, 788, and 795**

**RIN 1235–AA43**

**Employee or Independent Contractor Classification Under the Fair Labor Standards Act**

**AGENCY:** Wage and Hour Division, Department of Labor.

**ACTION:** Notice of proposed rulemaking.

**SUMMARY:** The U.S. Department of Labor (the Department) is proposing to modify Wage and Hour Division regulations to revise its analysis for determining employee or independent contractor classification under the Fair Labor Standards Act (FLSA or Act) to be more consistent with judicial precedent and the Act's text and purpose.

**DATES:** Submit written comments on or before November 28, 2022.

**ADDRESSES:** You may submit comments, identified by Regulation Identifier Number (RIN) 1235–AA43, by either of the following methods:

• *Electronic Comments:* Submit comments through the Federal eRulemaking Portal at *https:// www.regulations.gov.* Follow the instructions for submitting comments.

• *Mail:* Address written submissions to Division of Regulations, Legislation, and Interpretation, Wage and Hour Division, U.S. Department of Labor, Room S–3502, 200 Constitution Avenue NW, Washington, DC 20210.

*Instructions:* Please submit only one copy of your comments by only one method. Of the two methods, the Department strongly recommends that commenters submit their comments electronically via *https:// www.regulations.gov* to ensure timely receipt prior to the close of the comment period, as the Department continues to experience delays in the receipt of mail. All comments must be received by 11:59 p.m. ET on November 28, 2022, for consideration in this rulemaking; comments received after the comment period closes will not be considered.

Commenters submitting file attachments on *https:// www.regulations.gov* are advised that uploading text-recognized documents— *i.e.,* documents in a native file format or documents which have undergone optical character recognition (OCR)— enable staff at the Department to more easily search and retrieve specific content included in your comment for consideration. This recommendation applies particularly to mass comment

submissions, when a single sponsoring individual or organization submits multiple comments on behalf of members or other affiliated third parties. The Wage and Hour Division (WHD) posts such comments as a group under a single document ID number on *https:// www.regulations.gov.*

Anyone who submits a comment (including duplicate comments) should understand and expect that the comment will become a matter of public record and will be posted without change to *https://www.regulations.gov,* including any personal information provided. Accordingly, the Department requests that no business proprietary information, copyrighted information, or personally identifiable information be submitted in response to this notice of proposed rulemaking (NPRM).

*Docket:* For access to the docket to read background documents or comments, go to the Federal eRulemaking Portal at *https:// www.regulations.gov.*

**FOR FURTHER INFORMATION CONTACT:** Amy DeBisschop, Division of Regulations, Legislation, and Interpretation, Wage and Hour Division (WHD), U.S. Department of Labor, Room S–3502, 200 Constitution Avenue NW, Washington, DC 20210; telephone: (202) 693–0406 (this is not a toll-free number). Alternative formats are available upon request by calling 1– 866–487–9243. If you are deaf, hard of hearing, or have a speech disability, please dial 7–1–1 to access telecommunications relay services.

Questions of interpretation and/or enforcement of the agency's regulations may be directed to the nearest WHD district office. Locate the nearest office by calling WHD's toll-free help line at (866) 4US–WAGE ((866) 487–9243) between 8 a.m. and 5 p.m. in your local time zone, or logging onto WHD's website for a nationwide listing of WHD district and area offices at *https:// www.dol.gov/whd/america2.htm.*

**SUPPLEMENTARY INFORMATION:**

### I. Executive Summary

Congress enacted the FLSA in 1938 to eliminate "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers."[1] To this end, the FLSA generally requires covered employers to pay nonexempt employees at least the Federal minimum wage for all hours worked and at least one and one-half times the employee's regular rate of pay for every hour worked over 40 in a

workweek. The Act also requires covered employers to maintain certain records regarding employees and prohibits retaliation against employees who are discharged or discriminated against after, for example, inquiring about their pay or filing a complaint with the U.S. Department of Labor. However, the FLSA's minimum wage and overtime pay protections do not apply to independent contractors. As explained below, as used in this proposal, the term "independent contractor" refers to workers who, as a matter of economic reality, are not economically dependent on their employer for work and are in business for themselves. Such workers play an important role in the economy and are commonly referred to by different names, including independent contractor, self-employed, and freelancer. Regardless of the name or title used, the test for whether the worker is an employee or independent contractor under the FLSA remains the same. This proposed rulemaking is not intended to disrupt the businesses of independent contractors who are, as a matter of economic reality, in business for themselves.

Determining whether an employment relationship exists under the FLSA begins with the Act's definitions. Although the FLSA does not define the term "independent contractor," it contains expansive definitions of "employer," "employee," and "employ." "Employer" is defined to "include[] any person acting directly or indirectly in the interest of an employer in relation to an employee," "employee" is defined as "any individual employed by an employer," and "employ" is defined to "include[] to suffer or permit to work."[2]

For more than 7 decades, the Department and courts have applied an economic reality test to determine whether a worker is an employee or an independent contractor under the FLSA. The ultimate inquiry is whether, as a matter of economic reality, the worker is either economically dependent on the employer for work (and is thus an employee) or is in business for themself (and is thus an independent contractor). To answer this ultimate inquiry of economic dependence, the courts and the Department have historically conducted a totality-of-the-circumstances analysis, considering multiple factors to determine whether a worker is an employee or an independent contractor under the FLSA. There is significant and widespread uniformity among the circuit courts in

---

[1] 29 U.S.C. 202(a).

[2] 29 U.S.C. 203(d), (e)(1), (g).

the application of the economic reality test, although there is slight variation as to the number of factors considered or how the factors are framed. These factors generally include the opportunity for profit or loss, investment, permanency, the degree of control by the employer over the worker, whether the work is an integral part of the employer's business, and skill and initiative.

In January 2021, the Department published a rule titled "Independent Contractor Status Under the Fair Labor Standards Act" (2021 IC Rule), providing guidance on the classification of independent contractors under the FLSA applicable to workers and businesses in any industry.[3] The 2021 IC Rule identified five economic reality factors to guide the inquiry into a worker's status as an employee or independent contractor.[4] Two of the five identified factors—the nature and degree of control over the work and the worker's opportunity for profit or loss—were designated as "core factors" that are the most probative and carry greater weight in the analysis. The 2021 IC Rule stated that if these two core factors point towards the same conclusion, there is a substantial likelihood that it is the worker's accurate classification.[5] The 2021 IC Rule also identified three less probative non-core factors: the amount of skill required for the work, the degree of permanence of the working relationship between the worker and the employer, and whether the work is part of an integrated unit of production.[6] The 2021 IC Rule stated that it is "highly unlikely" that these three non-core factors can outweigh the combined probative value of the two core factors.[7] The 2021 IC Rule also limited consideration of investment and initiative to the opportunity for profit or loss factor in a way that narrows in at least some circumstances the extent to which investment and initiative are considered. The facts to be considered under other factors (such as control) were also narrowed, and the factor that considers whether the work is integral to the employer's business was limited

to whether the work is part of an integrated unit of production.[8] Finally, the 2021 IC Rule provided that the actual practice of the parties involved is more relevant than what may be contractually or theoretically possible and provided illustrative examples demonstrating how the analysis would apply in particular factual circumstances.[9]

The effective date of the 2021 IC Rule was March 8, 2021. On March 4, 2021, the Department published a rule delaying the effective date of the 2021 IC Rule (Delay Rule) and on May 6, 2021, it published a rule withdrawing the 2021 IC Rule (Withdrawal Rule). On March 14, 2022, in a lawsuit challenging the Department's delay and withdrawal of the 2021 IC Rule, a Federal district court in the Eastern District of Texas issued a decision vacating the Delay and Withdrawal Rules.[10] The district court concluded that the 2021 IC Rule became effective on the original effective date of March 8, 2021.

After further consideration, the Department believes that the 2021 IC Rule does not fully comport with the FLSA's text and purpose as interpreted by courts and departs from decades of case law applying the economic reality test. The 2021 IC Rule included provisions that are in tension with this case law—such as designating two factors as most probative and predetermining that they carry greater weight in the analysis, considering investment and initiative only in the opportunity for profit or loss factor, and excluding consideration of whether the work performed is central or important to the employer's business. These provisions narrow the economic reality test by limiting the facts that may be considered as part of the test, facts which the Department believes are relevant in determining whether a worker is economically dependent on the employer for work or in business for themself.

While the Department considered waiting for a longer period of time in order to monitor the effects of the 2021 IC Rule, after careful consideration, it has decided it is appropriate to move forward with this proposed regulation. The Department believes that retaining the 2021 IC Rule would have a confusing and disruptive effect on workers and businesses alike due to its departure from case law describing and applying the multifactor economic

reality test as a totality-of-the-circumstances test. Because the 2021 IC Rule departed from legal precedent, it is not clear whether courts will adopt its analysis—a question that could take years of appellate litigation in different Federal circuits to sort out and will result in more uncertainty as to the applicable test. The Department also believes that departing from the longstanding test applied by the courts may result in greater confusion among employers in applying the new analysis, which could in some situations place workers at greater risk of misclassification as independent contractors due to the new analysis being applied improperly, and thus may negatively affect both the workers and competing businesses that correctly classify their employees.

Therefore, the Department believes it is appropriate to rescind the 2021 IC Rule and set forth an analysis for determining employee or independent contractor status under the Act that is more consistent with existing judicial precedent and the Department's longstanding guidance prior to the 2021 IC Rule. While prior to the 2021 IC Rule the Department primarily issued subregulatory guidance in this area under the FLSA, it believes that its proposal to both rescind the 2021 IC Rule and replace it with detailed regulations addressing the multifactor economic reality test—in a way that more fully reflects the case law and provides the flexibility needed for application to the entire economy—would be helpful for both workers and employers. And as the 2021 IC Rule explained, workers and employers should benefit from affirmative regulatory guidance from the Department further developing the concept of economic dependence.

Accordingly, the Department is now proposing, in addition to rescinding the 2021 IC Rule, to again add part 795. Specifically, the Department proposes to modify the text of part 795 as published on January 7, 2021, at 86 FR 1246 through 1248, addressing whether workers are employees or independent contractors under the FLSA. As discussed below, the Department is not proposing the use of "core factors" but instead proposes to return to a totality-of-the-circumstances analysis of the economic reality test in which the factors do not have a predetermined weight and are considered in view of the economic reality of the whole activity. The Department is further proposing to return the consideration of investment to a standalone factor, provide additional analysis of the control factor (including detailed

---

[3] 86 FR 1168. The Office of the Federal Register did not amend the Code of Federal Regulations (CFR) to include the regulations from the 2021 IC Rule because, as explained elsewhere in this section, the Department first delayed and then withdrew the 2021 IC Rule before it became effective. A district court decision later vacated the Department's rules to delay and withdraw the 2021 IC Rule, and the Department has (since that decision) conducted enforcement in accordance with that decision.

[4] Id. at 1246–47 (§ 795.105(d)).

[5] Id. at 1246 (§ 795.105(c)).

[6] Id. at 1247 (§ 795.105(d)(2)).

[7] Id. at 1246 (§ 795.105(c)).

[8] Id. at 1246–47 (§ 795.105(d)(1) and (d)(2)(iii)).

[9] Id. at 1247–48 (§§ 795.110, 795.115).

[10] See Coalition for Workforce Innovation v. Walsh, No. 1:21–CV–130, 2022 WL 1073346 (E.D. Tex. Mar. 14, 2022).

discussions of how scheduling, supervision, price-setting, and the ability to work for others should be considered), and return to the longstanding interpretation of the integral factor, which considers whether the work is integral to the employer's business.

The Department recognizes that this return to a totality-of-the-circumstances analysis in which the economic reality factors are not assigned a predetermined weight and each factor is given full consideration represents a change from the 2021 IC Rule. As discussed below, however, it believes that this approach is the option that would be most beneficial for stakeholders because this proposal provides guidance that is aligned with the Department's decades-long approach (prior to the 2021 IC Rule) as well as circuit case law. The Department believes that this proposal, if finalized, will provide more consistent guidance to employers as they determine whether workers are economically dependent on the employer for work or are in business for themselves, as well as useful guidance to workers on whether they are correctly classified as employees or independent contractors. Accordingly, the Department believes this proposal will help protect workers from misclassification while at the same time recognizing that independent contractors serve an important role in our economy and providing a consistent approach for those businesses that engage (or wish to engage) independent contractors.

## II. Background

### A. Relevant FLSA Definitions

Enacted in 1938, the FLSA generally requires that covered employers pay nonexempt employees at least the Federal minimum wage (presently $7.25 per hour) for every hour worked,[11] and at least one and one-half times the employee's regular rate of pay for all hours worked beyond 40 in a workweek.[12] The FLSA also requires covered employers to "make, keep, and preserve" certain records regarding employees.[13]

The FLSA's wage and hour protections apply to employees. In relevant part, section 3(e) of the Act defines the term "employee" as "any individual employed by an employer." [14] Section 3(d) defines the term "employer" to "includ[e] any person acting directly or indirectly in

the interest of an employer in relation to an employee." [15] Finally, section 3(g) provides that the term "'[e]mploy' includes to suffer or permit to work." [16]

Interpreting these provisions, the U.S. Supreme Court has stated that "[a] broader or more comprehensive coverage of employees within the stated categories would be difficult to frame," and that "the term 'employee' had been given 'the broadest definition that has ever been included in any one act.'" [17] In particular, the Court has noted the "striking breadth" of section 3(g)'s "suffer or permit" language, observing that it "stretches the meaning of 'employee' to cover some parties who might not qualify as such under a strict application of traditional agency law principles." [18] Thus, the Court has repeatedly observed that the FLSA's scope of employment is broader than the common law standard often applied to determine employment status under other Federal laws.[19]

At the same time, the Supreme Court has recognized that the Act was "not intended to stamp all persons as employees." [20] Among other categories of workers excluded from FLSA coverage, the Court has recognized that "independent contractors" fall outside the Act's broad understanding of employment.[21] Accordingly, the FLSA does not require covered employers to pay an independent contractor the minimum wage or overtime pay under sections 6(a) and 7(a) of the Act, or to keep records regarding an independent contractor's work under section 11(c). However, merely "putting on an 'independent contractor' label does not take [a] worker from the protection of the [FLSA]." [22] Courts have thus recognized a need to delineate between employees, who fall under the

protections of the FLSA, and independent contractors, who do not.

The FLSA does not define the term "independent contractor." While it is clear that section 3(g)'s "suffer or permit" language contemplates a broader coverage of workers compared to what exists under the common law, "there is in the [FLSA] no definition that solves problems as to the limits of the employer-employee relationship under the Act." [23] Therefore, in articulating the distinction between FLSA-covered employees and independent contractors, courts rely on a broad, multifactor "economic reality" analysis derived from judicial precedent.[24] Unlike the control-focused analysis for independent contractors applied under the common law,[25] the economic reality test focuses more broadly on a worker's economic dependence on an employer, considering the totality of the circumstances.

### B. Judicial Development of the Economic Reality Test

#### 1. Supreme Court Development of the Economic Reality Test

In a series of cases from 1944 to 1947, the U.S. Supreme Court considered employee or independent contractor status under three different Federal statutes that were enacted during the 1930s New Deal Era—the FLSA, the National Labor Relations Act (NLRA), and the Social Security Act (SSA)—and applied an economic reality test under all three laws.

In the first of these cases, *NLRB v. Hearst Publications, Inc.*, 322 U.S. 111 (1944), the Court considered the meaning of "employee" under the NLRA, which defined the term to

---

[11] 29 U.S.C. 206(a).
[12] 29 U.S.C. 207(a).
[13] 29 U.S.C. 211(c).
[14] 29 U.S.C. 203(e)(1).

[15] 29 U.S.C. 203(d).
[16] 29 U.S.C. 203(g).
[17] *United States v. Rosenwasser*, 323 U.S. 360, 362, 363 n.3 (1945) (quoting 81 Cong. Rec. 7657 (statement of Senator Hugo Black)).
[18] *Nationwide Mut. Ins. v. Darden*, 503 U.S. 318, 326 (1992).
[19] *Id.* at 326; *see also, e.g., Walling v. Portland Terminal Co.*, 330 U.S. 148, 150–51 (1947) ("[I]n determining who are 'employees' under the Act, common law employee categories or employer-employee classifications under other statutes are not of controlling significance. This Act contains its own definitions, comprehensive enough to require its application to many persons and working relationships, which prior to this Act, were not deemed to fall within an employer-employee category.") [citation omitted].
[20] *Portland Terminal*, 330 U.S. at 152.
[21] *See, e.g., Rutherford Food Corp. v. McComb*, 331 U.S. 722, 729 (1947) (noting that "[t]here may be independent contractors who take part in production or distribution who would alone be responsible for the wages and hours of their own employees").
[22] *Id.*

[23] *Id.* at 728.
[24] Courts invoke the concept of "economic reality" in FLSA employment contexts beyond independent contractor status. However, as in prior rulemakings, this NPRM refers to the "economic reality" analysis or test for independent contractors as a shorthand reference to the independent contractor analysis used by courts for FLSA purposes.
[25] In distinguishing between employees and independent contractors under the common law, courts evaluate "the hiring party's right to control the manner and means by which the product is accomplished." *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 751 (1989). "Among the other factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party." *Id.* (footnotes omitted).

"include any employee." [26] In relevant part, the *Hearst* Court rejected application of the common law standard,[27] noting that "the broad language of the [NLRA's] definitions . . . leaves no doubt that its applicability is to be determined broadly, in doubtful situations, by underlying economic facts rather than technically and exclusively by previously established legal classifications." [28]

On June 16, 1947, the Supreme Court decided *United States* v. *Silk*, 331 U.S. 704 (1947), addressing the distinction between employees and independent contractors under the SSA. In that case, the Court favorably summarized *Hearst* as setting forth "economic reality," as opposed to "technical concepts" of the common law standard alone, as the framework for determining workers' classification.[29] But it also acknowledged that not "all who render service to an industry are employees." [30] Although the Court found it to be "quite impossible to extract from the [SSA] a rule of thumb to define the limits of the employer-employe[e] relationship," the Court identified five factors as "important for decision": "degrees of control, opportunities for profit or loss, investment in facilities, permanency of relation[,] and skill required in the claimed independent operation." [31] The Court added that "[n]o one [factor] is controlling nor is the list complete." [32] The Court went on to note that the workers in that case were "from one standpoint an integral part of the businesses" of the employer, supporting a conclusion that some of the workers in that case were employees.[33]

The same day that the Supreme Court issued its decision in *Silk*, it also issued *Rutherford Food Corp.* v. *McComb*, 331 U.S. 722, in which it affirmed a circuit court decision that analyzed an FLSA employment relationship based on its economic realities.[34] Describing the FLSA as "a part of the social legislation of the 1930s of the same general character as the [NLRA] and the [SSA]," the Court opined that "[d]ecisions that define the coverage of the employer-Employee relationship under the Labor and Social Security acts are persuasive in the consideration of a similar coverage under the [FLSA]." [35]

Accordingly, the Court rejected an approach based on "isolated factors" and again considered "the circumstances of the whole activity." [36] The Court considered several of the factors that it listed in *Silk* as they related to meat boners on a slaughterhouse's production line, ultimately determining that the boners were employees.[37] The Court noted, among other things, that the boners did a specialty job on the production line, had no business organization that could shift to a different slaughter-house, and were best characterized as "part of the integrated unit of production under such circumstances that the workers performing the task were employees of the establishment." [38]

On June 23, 1947, one week after the *Silk* and *Rutherford* decisions, the Court decided *Bartels* v. *Birmingham*, 332 U.S. 126 (1947), another case involving employee or independent contractor status under the SSA. Here again, the Court rejected application of the common law control test, explaining that, under the SSA, employee status "was not to be determined solely by the idea of control which an alleged employer may or could exercise over the details of the service rendered to his business by the worker." [39] Rather, employees under "social legislation" such as the SSA are "those who as a matter of economic reality are dependent upon the business to which they render service." [40] Thus, in addition to control, "permanency of the relation, the skill required, the investment [in] the facilities for work and opportunities for profit or loss from the activities were also factors" to consider.[41] Although the Court identified these specific factors as relevant to the analysis, it explained that "[i]t is the total situation that controls" the worker's classification under the SSA.[42]

Following these Supreme Court decisions, Congress responded with separate legislation to amend the NLRA and SSA's employment definitions. First, in 1947, Congress amended the NLRA's definition of "employee" to clarify that the term "shall not include any individual having the status of an independent contractor." [43] The

following year, Congress similarly amended the SSA to exclude from employment "any individual who, under the usual common-law rules applicable in determining the employer-employee relationship, has the status of an independent contractor." [44] The Supreme Court interpreted the amendments to the NLRA as having the same effect as the explicit definition included in the SSA, which was to ensure that employment status would be determined by common law agency principles, rather than an economic reality test.[45]

Despite its amendments to the NLRA and SSA in response to *Hearst* and *Silk*, Congress did not similarly amend the FLSA following the *Rutherford* decision. Thus, when the Supreme Court revisited independent contractor status under the FLSA several years later in *Goldberg* v. *Whitaker House Co-op., Inc.*, 366 U.S. 28 (1961), the Court affirmed that "'economic reality' rather than 'technical concepts'" remained "the test of employment" under the FLSA,[46] quoting from its earlier decisions in *Silk* and *Rutherford*. The Court in *Whitaker House* found that certain homeworkers were "not self-employed . . . [or] independent, selling their products on the market for whatever price they can command," but instead were "regimented under one organization, manufacturing what the organization desires and receiving the compensation the organization dictates." [47] Such facts, among others, established that the homeworkers at issue were FLSA-covered employees.[48]

Most recently, in *Nationwide Mutual Insurance Co.* v. *Darden*, 503 U.S. 318 (1992), the Court again endorsed application of the economic reality test to evaluate independent contractor status under the FLSA, citing to *Rutherford* and emphasizing the broad "suffer or permit" language codified in section 3(g) of the Act.[49]

**2. Application of the Economic Reality Test by Federal Courts of Appeals**

Since *Rutherford*, Federal courts of appeals have applied the economic

---

[26] 322 U.S. at 118–20; 29 U.S.C. 152(3).

[27] 322 U.S. at 123–25.

[28] *Id.* at 129.

[29] 331 U.S. at 712–14.

[30] *Id.* at 712.

[31] *Id.* at 716.

[32] *Id.*

[33] *Id.*

[34] 331 U.S. at 727.

[35] *Id.* at 723–24.

[36] *Id.* at 730.

[37] *See id.*

[38] *Id.* at 729–30.

[39] 332 U.S. at 130.

[40] *Id.*

[41] *Id.*

[42] *Id.*

[43] Labor Management Relations (Taft-Hartley) Act, 1947, Public Law 80–101, sec. 101, 61 Stat. 136, 137–38 (1947) (codified as amended at 29 U.S.C. 152(3)).

[44] Social Security Act of 1948, Public Law 80–642, sec. 2(a), 62 Stat. 438 (1948) (codified as amended at 26 U.S.C. 3121(d)).

[45] *See NLRB* v. *United Ins. Co. of Am.*, 390 U.S. 254, 256 (1968) (noting that "[t]he obvious purpose of" the amendment to the definition of employee under the NLRA "was to have the Board and the courts apply general agency principles in distinguishing between employees and independent contractors under the Act").

[46] 366 U.S. at 33 (quoting from *Silk*, 331 U.S. at 713, and *Rutherford*, 331 U.S. at 729).

[47] *Id.* at 32.

[48] *Id.* at 33.

[49] *Darden*, 503 U.S. at 325–26.

reality test to distinguish independent contractors from employees who are entitled to the FLSA's protections. Recognizing that the common law concept of "employee" had been rejected for FLSA purposes, courts of appeals followed the Supreme Court's instruction that " 'employees are those who as a matter of economic realities are dependent upon the business to which they render service.' " [50]

When determining whether a worker is an employee under the FLSA or an independent contractor, Federal circuit courts of appeals apply an economic reality test using the factors identified in *Silk*.[51] No court of appeals considers any one factor or combination of factors to predominate over the others in every case.[52] For example, the Eleventh Circuit has explained that some of the factors "which many courts have used as guides in applying the economic reality test" are: (1) the degree of the alleged employer's right to control the manner in which the work is to be performed; (2) the worker's opportunity for profit or loss depending upon their managerial skill; (3) the worker's investment in equipment or materials required for their task, or their employment of helpers; (4) whether the service rendered requires a special skill; (5) the degree of permanence of the working relationship; and (6) the extent to which the service rendered is an integral part of the alleged employer's business.[53] Like other circuits, the Eleventh Circuit repeats the Supreme Court's explanation from *Silk* that no one factor is controlling, nor is the list exhaustive.[54]

Some courts of appeals have applied the factors with some variations. For example, the Fifth Circuit typically does not list the "integral part" factor as one of the considerations that guides the analysis.[55] Nevertheless, the Fifth Circuit, recognizing that the listed factors are not exhaustive, has considered the extent to which a worker's function is integral to a business as part of its economic realities analysis.[56] The Second and D.C. Circuits vary in that they treat the employee's opportunity for profit or loss and the employee's investment as a single factor, but they still use the same considerations as the other circuits to inform their economic realities analysis.[57]

In sum, since the 1940s, Federal courts have analyzed the question of employee or independent contractor status under the FLSA by examining the economic realities of the employment relationship to determine whether the worker is economically dependent on the employer for work or is in business for themself, even if they have varied slightly in their articulations of the factors. Nevertheless, all courts have looked to the factors first articulated in *Silk* as useful guideposts while acknowledging that those factors are not exhaustive and should not be applied mechanically.[58]

## C. The Department's Application of the Economic Reality Test

The Department has applied a multifactor economic reality test since the Supreme Court's opinions in *Rutherford* and *Silk*. For example, on June 23, 1949, the Wage and Hour Division (WHD) issued an opinion letter distilling six "primary factors which the Court considered significant" in *Rutherford* and *Silk*: "(1) the extent to which the services in question are an integral part of the 'employer[']s' business; (2) the amount of the so-called 'contractor's' investment in facilities and equipment; (3) the nature and degree of control by the principal; (4) opportunities for profit and loss; . . . (5) the amount of initiative judgment or foresight required for the success of the claimed independent enterprise[;] and [(6)] permanency of the relation." [59] The guidance cautioned that no single factor is controlling, and "[o]rdinarily a definite decision as to whether one is an employee or an independent contractor under the [FLSA] cannot be made in the absence of evidence as to his actual day-to-day working relationship with his principal. Clearly a written contract does not always reflect the true situation." [60]

Subsequent WHD opinion letters addressing employee or independent contractor status under the FLSA have provided similar recitations of the *Silk* factors, sometimes omitting one or more of the six factors described in the 1949 opinion letter,[61] and sometimes adding (or substituting) a seventh factor: the worker's "degree of independent business organization and operation." [62] Numerous opinion letters have emphasized that employment status is "not determined by the common law standards relating to master and servant," [63] and that "[t]he degree of control retained by the principal has been rejected as the sole criterion to be applied." [64]

In 1962, the Department revised the regulations in 29 CFR part 788,[65] which generally provides interpretive guidance on the FLSA's exemption for employees in small forestry or lumbering operations, and added a provision addressing the distinction between employees and independent contractors.[66] Citing to *Silk*, *Rutherford*, and *Bartels*, the regulation advised that "an employee, as distinguished from a person who is engaged in a business of his own, is one who 'follows the usual path of an employee' and is dependent on the business which he serves." [67] To "aid in assessing the total situation," the regulation then identified a partial list of "characteristics of the two classifications which should be considered," including "the extent to

---

[50] *Usery v. Pilgrim Equip. Co.,* 527 F.2d 1308, 1311 (5th Cir. 1976) (quoting *Bartels,* 332 U.S. at 130).

[51] *See Brock v. Superior Care, Inc.,* 840 F.2d 1054, 1058–59 (2d Cir. 1988); *Donovan v. DialAmerica Mktg., Inc.,* 757 F.2d 1376, 1382–83 (3d Cir. 1985); *McFeeley v. Jackson Street Ent., LLC,* 825 F.3d 235, 241 (4th Cir. 2016); *Pilgrim Equip.,* 527 F.2d at 1311; *Acosta v. Off Duty Police Servs., Inc.,* 915 F.3d 1050, 1055 (6th Cir. 2019); *Sec'y of Labor, U.S. Dep't of Labor v. Lauritzen,* 835 F.2d 1529, 1534–35 (7th Cir. 1987); *Walsh v. Alpha & Omega USA, Inc.,* 39 F.4th 1076, 1082 (8th Cir. 2022); *Real v. Driscoll Strawberry Assocs., Inc.,* 603 F.2d 748, 754 (9th Cir. 1979); *Acosta v. Paragon Contractors Corp.,* 884 F.3d 1225, 1235 (10th Cir. 2018); *Scantland v. Jeffry Knight, Inc.,* 721 F.3d 1308, 1311–12 (11th Cir. 2013); *Morrison v. Int'l Programs Consortium, Inc.,* 253 F.3d 5, 11 (DC Cir. 2001).

[52] *See, e.g., Parrish v. Premier Directional Drilling, L.P.,* 917 F.3d 369, 380 (5th Cir. 2019) (stating that it "is impossible to assign to each of these factors a specific and mathematically applied weight") (quoting *Hickey v. Arkla Indus., Inc.,* 699 F.2d 748, 752 (5th Cir. 1983) (applying economic realities test in Age Discrimination in Employment Act case)); *Martin v. Selker Bros.,* 949 F.2d 1286, 1293 (3d Cir. 1991) ("It is a well-established principle that the determination of the employment relationship does not depend on isolated factors . . . neither the presence nor the absence of any particular factor is dispositive."); *Scantland,* 721 F.3d at 1312 n.2 (the relative weight of each factor "depends on the facts of the case") (quoting *Santelices v. Cable Wiring,* 147 F. Supp. 2d 1313, 1319 (S.D. Fla. 2001)).

[53] *Scantland,* 721 F.3d at 1311–12.

[54] *Id.* at 1312 n.2.

[55] *See Pilgrim Equip.,* 527 F.2d at 1311.

[56] *See Hobbs v. Petroplex Pipe & Constr., Inc.,* 946 F.3d 824, 836 (5th Cir. 2020).

[57] *See, e.g., Franze v. Bimbo Bakeries USA, Inc.,* 826 F. App'x 74, 76 (2d Cir. 2020); *Superior Care,* 840 F.2d at 1058–59. The D.C. Circuit has adopted the Second Circuit's articulation of the factors, including treating opportunity for profit or loss and investment as one factor. *See Morrison,* 253 F.3d at 11 (citing *Superior Care,* 840 F.2d at 1058–59).

[58] *See, e.g., Superior Care,* 840 F.2d at 1059.

[59] WHD Op. Ltr. (June 23, 1949).

[60] *Id.*

[61] *See, e.g.,* WHD Op. Ltr. FLSA–314 (Dec. 21, 1982) (discussing three of the *Silk* factors); WHD Op. Ltr. FLSA–164 (Jan. 18, 1990) (discussing four of the *Silk* factors).

[62] *See* WHD Op. Ltr. (Oct. 12, 1965); WHD Op. Ltr. (Feb. 16, 1969).

[63] *See, e.g.,* WHD Op. Ltr. (Feb. 16, 1969); WHD Op. Ltr. (Sept. 1, 1967); WHD Op. Ltr. FLSA–31 (Aug. 10, 1981); WHD Op. Ltr. (June 5, 1995).

[64] *See, e.g.,* WHD Op. Ltr. FLSA–106 (Feb. 8, 1956); WHD Op. Ltr. (July 20, 1965); WHD Op. Ltr. FLSA–31 (Aug. 10, 1981).

[65] *See* 27 FR 8032.

[66] *See* 29 U.S.C. 213(b)(28) (previously codified at 29 U.S.C. 213(a)(15)).

[67] 27 FR 8033 (29 CFR 788.16(a)).

which the services rendered are an integral part of the principal's business; the permanency of the relationship; the opportunities for profit or loss; the initiative, judgment or foresight exercised by the one who performs the services; the amount of investment; and the degree of control which the principal has in the situation." [68] Implicitly referring to the *Bartels* decision, the regulation advised that "[t]he Court specifically rejected the degree of control retained by the principal as the sole criterion to be applied." [69]

In 1972, the Department added similar guidance on independent contractor status at 29 CFR 780.330(b), in a provision addressing the employment status of sharecroppers and tenant farmers.[70] This regulation was nearly identical to the independent contractor guidance for the logging and forestry industry previously codified at 29 CFR 788.16(a), including an identical description of the same six economic reality factors.[71] Both provisions—29 CFR 780.330(b) and 788.16(a)—remained unchanged until 2021.

In 1997, the Department promulgated a regulation applying a multifactor economic reality analysis for distinguishing between employees and independent contractors under the Migrant and Seasonal Agricultural Worker Protection Act (MSPA),[72] which notably incorporates the FLSA's "suffer or permit" definition of employment by reference.[73] The regulation (which has not since been amended) advises that "[i]n determining if the farm labor contractor or worker is an employee or an independent contractor, the ultimate question is the economic reality of the relationship—whether there is economic dependence upon the agricultural employer/association or farm labor contractor, as appropriate." [74] The regulation elaborates that "[t]his determination is based upon an evaluation of all of the circumstances, including the following: (i) The nature and degree of the putative employer's control as to the manner in which the work is performed; (ii) The putative employee's opportunity for profit or loss

depending upon his/her managerial skill; (iii) The putative employee's investment in equipment or materials required for the task, or the putative employee's employment of other workers; (iv) Whether the services rendered by the putative employee require special skill; (v) The degree of permanency and duration of the working relationship; (vi) The extent to which the services rendered by the putative employee are an integral part of the putative employer's business." [75] This description of six economic reality factors was very similar to the earlier description of six economic reality factors provided in 29 CFR 780.330(b) and 788.16(a).

Also in 1997, WHD issued Fact Sheet #13, "Employment Relationship Under the Fair Labor Standards Act (FLSA)." [76] Like WHD opinion letters, Fact Sheet #13 advises that "an employee, as distinguished from a person who is engaged in a business of his or her own, is one who, as a matter of economic reality, follows the usual path of an employee and is dependent on the business which he or she serves." [77] The fact sheet identifies the six familiar economic realities factors, as well as consideration of the worker's "degree of independent business organization and operation." [78]

On July 15, 2015, WHD issued additional subregulatory guidance, Administrator's Interpretation No. 2015–1, "The Application of the Fair Labor Standards Act's 'Suffer or Permit' Standard in the Identification of Employees Who Are Misclassified as Independent Contractors" (AI 2015–1).[79] AI 2015–1 reiterated that the economic realities of the relationship are determinative and that the ultimate inquiry is whether the worker is economically dependent on the employer or truly in business for him or herself. It identified six economic realities factors that followed the six factors used by most Federal courts of appeals: (1) the extent to which the work performed is an integral part of the employer's business; (2) the worker's opportunity for profit or loss depending on his or her managerial skill; (3) the

extent of the relative investments of the employer and the worker; (4) whether the work performed requires special skills and initiative; (5) the permanency of the relationship; and (6) the degree of control exercised or retained by the employer. AI 2015–1 further emphasized that the factors should not be applied in a mechanical fashion and that no one factor was determinative. AI 2015–1 was withdrawn on June 7, 2017.[80]

In 2019, WHD issued an opinion letter, FLSA2019–6, regarding whether workers who worked for companies operating self-described "virtual marketplaces" were employees covered under the FLSA or independent contractors.[81] Like the Department's prior guidance, the letter stated that the determination depended on the economic realities of the relationship and that the ultimate inquiry was whether the workers depend on someone else's business or are in business for themselves.[82] The letter identified six economic realities factors that differed slightly from the factors typically articulated by the Department previously: (1) the nature and degree of the employer's control; (2) the permanency of the worker's relationship with the employer; (3) the amount of the worker's investment in facilities, equipment, or helpers; (4) the amount of skill, initiative, judgment, and foresight required for the worker's services; (5) the worker's opportunities for profit or loss; and (6) the extent of the integration of the worker's services into the employer's business.[83] Opinion Letter FLSA2019–6 was withdrawn on February 19, 2021.[84]

*D. The Department's 2021 Independent Contractor Rule*

On January 7, 2021, the Department published a final rule titled "Independent Contractor Status Under the Fair Labor Standards Act," with an effective date of March 8, 2021 (2021 IC

---

[68] *Id.*

[69] *27 FR 8033–34 (29 CFR 788.16(a)).*

[70] *See* 37 FR 12064, 12102 (introducing 29 CFR 780.330(b)).

[71] *Id.*

[72] *See* 62 FR 11734 (amending 29 CFR 500.20(h)(4)); *see also* 29 U.S.C. 1861 (explicitly providing that "[t]he Secretary may issue such rules and regulations as are necessary to carry out this chapter").

[73] *See* 29 U.S.C. 1802(5) ("The term 'employ' has the meaning given such term under section 3(g) of the [FLSA]").

[74] 29 CFR 500.20(h)(4).

[75] *Id.*

[76] *See* WHD Fact Sheet #13 (1997) *https://web.archive.org/web/19970112162517/http://www.dol.gov/dol/esa/public/regs/compliance/whd/whdfs13.htm).* WHD made minor revisions to Fact Sheet #13 in 2002 and 2008, before a more substantial revision in 2014. In 2018, WHD reverted back to the 2008 version of Fact Sheet #13, which remains the current version (available at *https://www.dol.gov/sites/dolgov/files/WHD/legacy/files/whdfs13.pdf*).

[77] *Id.*

[78] *Id.*

[79] AI 2015–1 is available at 2015 WL 4449086.

[80] *See* News Release 17–0807–NAT, "US Secretary of Labor Withdraws Joint Employment, Independent Contractor Informal Guidance" (June 7, 2017), *https://www.dol.gov/newsroom/releases/opa/opa20170607* (last visited June 30, 2022).

[81] *See* WHD Op. Ltr. FLSA2019–6, 2019 WL 1977301 (Apr. 29, 2019) (withdrawn Feb. 19, 2021).

[82] *See id.* at \*3.

[83] *See id.* at \*4. Opinion Letter FLSA2019–6's "extent of the integration" factor was a notable recharacterization of the factor traditionally considered by courts and the Department regarding the extent to which work is "an integral part" of an employee's business.

[84] *See* note at *https://www.dol.gov/agencies/whd/opinion-letters/search?FLSA* (last visited June 30, 2022).

Rule).[85] The 2021 IC Rule set forth regulations to be added to a new part (part 795) in title 29 of the Code of Federal Regulations titled "Employee or Independent Contractor Classification under the Fair Labor Standards Act," providing guidance on the classification of independent contractors under the FLSA applicable to workers and businesses in any industry.[86] The 2021 IC Rule also addressed the Department's prior interpretations of independent contractor status in 29 CFR 780.330(b) and 788.16(a)—both of which applied to specific industries—by cross-referencing part 795.[87]

The Department explained that the purpose of the 2021 IC Rule was to establish a "streamlined" economic reality test that improved on prior articulations described as "unclear and unwieldy." [88] It stated that the existing economic reality test applied by the Department and courts suffered from confusion regarding the meaning of "economic dependence" because the concept is "underdeveloped," a lack of focus in the multifactor balancing test, and confusion and inefficiency caused by overlap between the factors.[89] The 2021 IC Rule asserted that shortcomings and misconceptions associated with the economic reality test were more apparent in the modern economy and that additional clarity would promote innovation in work arrangements.[90]

The 2021 IC Rule explained that independent contractors are not employees under the FLSA and are therefore not subject to the Act's minimum wage, overtime pay, or recordkeeping requirements.[91] It adopted an economic reality test under which a worker is an employee of an employer if that worker is economically dependent on the employer for work.[92] By contrast, the worker is an independent contractor if the worker is in business for themself.

The 2021 IC Rule identified five economic realities factors to guide the inquiry into a worker's status as an employee or independent contractor,[93] while acknowledging that the factors are not exhaustive, no one factor is dispositive, and additional factors may be considered if they "in some way indicate whether the [worker] is in business for him- or herself, as opposed to being economically dependent on the potential employer for work." [94] But in contrast to prior guidance and contrary to case law, the 2021 IC Rule designated two of the five factors—the nature and degree of control over the work and the worker's opportunity for profit or loss— as "core factors" that should carry greater weight in the analysis. Citing the need for greater certainty and predictability in the economic reality test, and in an effort to sharpen the concept of economic dependence, the 2021 IC Rule determined that these two factors were more probative of economic dependence than the other economic realities factors. If both of those core factors indicate the same classification, as either an employee or an independent contractor, the 2021 IC Rule stated that there is a "substantial likelihood" that the indicated classification is the worker's correct classification.[95]

The 2021 IC Rule's first core factor is the nature and degree of control over the work, which indicates independent contractor status to the extent that the worker exercised substantial control over key aspects of the performance of the work, such as by setting their own schedule, by selecting their projects, and/or through the ability to work for others, which might include the potential employer's competitors.[96] The 2021 IC Rule provides that requiring the worker to comply with specific legal obligations, satisfy health and safety standards, carry insurance, meet contractually agreed upon deadlines or quality control standards, or satisfy other similar terms that are typical of contractual relationships between businesses (as opposed to employment relationships) does not constitute control.[97]

The 2021 IC Rule's second core factor is the worker's opportunity for profit or loss.[98] The Rule states that this factor indicates independent contractor status to the extent the worker has an opportunity to earn profits or incur losses based on either (1) their exercise of initiative (such as managerial skill or business acumen or judgment) or (2) their management of investment in or capital expenditure on, for example, helpers or equipment or material to further the work.[99] While the effects of the worker's exercise of initiative and management of investment are both considered under this factor, the worker does not need to have an opportunity for profit or loss based on both initiative and management of investment for this factor to weigh towards the worker being an independent contractor.[100] This factor indicates employment status to the extent that the worker is unable to affect his or her earnings or is only able to do so by working more hours or faster.[101]

The 2021 IC Rule also identified three other non-core factors: the amount of skill required for the work, the degree of permanence of the working relationship between the worker and the employer, and whether the work is part of an integrated unit of production (which it cautioned is "different from the concept of the importance or centrality of the individual's work to the potential employer's business").[102] The 2021 IC Rule provided that these other factors are "less probative and, in some cases, may not be probative at all" of economic dependence and are "highly unlikely, either individually or collectively, to outweigh the combined probative value of the two core factors." [103]

The 2021 IC Rule also stated that the actual practice of the parties involved is more relevant than what may be contractually or theoretically possible,[104] and provided five "illustrative examples" demonstrating how the analysis would apply in particular factual circumstances.[105] Finally, the 2021 IC Rule rescinded any "prior administrative rulings, interpretations, practices, or enforcement policies relating to classification as an employee or independent contractor under the FLSA" to the extent that such items "are inconsistent or in conflict with the interpretations stated in this part," [106] and explained that the 2021 IC Rule would guide WHD's enforcement of the FLSA.[107]

On January 19, 2021, WHD issued Opinion Letters FLSA2021–8 and FLSA2021–9 applying the Rule's analysis to specific factual scenarios. WHD subsequently withdrew those opinion letters on January 26, 2021, explaining that the letters were issued

---

[85] See 86 FR 1168. The Department initially published a notice of proposed rulemaking (NPRM) soliciting public comment on September 25, 2020. See 85 FR 60600. The final rule adopted "the interpretive guidance set forth in the [NPRM] largely as proposed." 86 FR 1168.

[86] 86 FR 1246–48.

[87] Id. at 1246.

[88] Id. at 1172, 1240.

[89] Id. at 1172–75.

[90] Id. at 1175.

[91] Id. at 1246 (§ 795.105(a)).

[92] Id. at 1168, 1246 (§ 795.105(b)).

[93] Id. at 1246 (§ 795.105(c)).

[94] Id. at 1246–47 (§ 795.105(c) and (d)(2)(iv)).

[95] Id. at 1246 (§ 795.105(c)).

[96] Id. at 1246–47 (§ 795.105(d)(1)(i)).

[97] Id. at 1247 (§ 795.105(d)(i)).

[98] Id. (§ 795.105(d)(1)(ii)).

[99] Id.

[100] Id.

[101] Id.

[102] Id. (§ 795.105(d)(2)).

[103] Id. at 1246 (§ 795.105(c)).

[104] Id. at 1247 (§ 795.110).

[105] Id. at 1247–48 (§ 795.115).

[106] Id. at 1246 (§ 795.100).

[107] Id.

prematurely because they were based on a rule that had yet to take effect.[108]

### E. Delay and Withdrawal of the 2021 Independent Contractor Rule

On February 5, 2021, the Department published a proposal to delay the 2021 IC Rule's effective date until May 7, 2021—60 days after the Rule's original March 8, 2001, effective date.[109] On March 4, 2021, after considering the approximately 1,500 comments received in response to that proposal, the Department published a final rule delaying the effective date of the 2021 IC Rule as proposed ("Delay Rule").[110]

On March 12, 2021, the Department published a notice of proposed rulemaking (NPRM) proposing to withdraw the 2021 IC Rule.[111] On May 5, 2021, after reviewing approximately 1,000 comments submitted in response to the NPRM, the Department announced a final rule withdrawing the 2021 IC Rule ("Withdrawal Rule").[112] In explaining its decision to withdraw the 2021 IC Rule, the Department stated that the Rule was inconsistent with the FLSA's text and purpose and would have had a confusing and disruptive effect on workers and businesses alike due to its departure from longstanding judicial precedent.[113] The Withdrawal Rule stated that it took effect immediately upon its publication in the Federal Register on May 6, 2021.[114]

### F. Litigation Over the 2021 Independent Contractor Rule

On March 14, 2022, in a lawsuit challenging the Department's Delay and Withdrawal Rules under the Administrative Procedure Act (APA), a district court in the Eastern District of Texas issued a decision vacating the Department's Delay and Withdrawal Rules.[115] While acknowledging that the Department engaged in separate notice-and-comment rulemakings in promulgating both of these rules, the district court concluded that the Department "failed to provide a meaningful opportunity for comment in promulgating the Delay Rule," [116] failed

to show "good cause for making the [Delay Rule] effective immediately upon publication," [117] and acted in an arbitrary and capricious manner in its Withdrawal Rule by "fail[ing] to consider potential alternatives to rescinding the Independent Contractor Rule." [118] Accordingly, the district court vacated the Delay and Withdrawal Rules and concluded that the 2021 IC Rule "became effective as of March 8, 2021, the rule's original effective date, and remains in effect." [119] The district court's ruling did not address the validity of the 2021 IC Rule; rather, the case was focused solely on the validity of the Delay and Withdrawal Rules.

The Department filed a notice of appeal of the district court's decision.[120] In response to a request by the Department informing the court of this rulemaking, the Fifth Circuit Court of Appeals entered an order staying the appeal until December 7, 2022 (subject to considering a further stay at that time).

### III. Need for Rulemaking

The Department recognizes that independent contractors and small businesses play an important role in our economy. It is fundamental to the Department's obligation to administer and enforce the FLSA, however, that workers who should be covered under the Act are able to receive its protections, as the misclassification of employees as independent contractors remains one of the most serious problems facing workers, businesses, and the broader economy. In the FLSA context, misclassified workers are denied basic workplace protections including rights to minimum wage and overtime pay.[121] Meanwhile, employers that comply with the law are placed at a competitive disadvantage compared to other businesses that misclassify employees, contravening the FLSA's goal of eliminating "unfair method[s] of competition in commerce." [122]

After further consideration, the Department believes that the 2021 IC Rule does not fully comport with the FLSA's text and purpose as interpreted by the courts. The Department believes that retaining the 2021 IC Rule would have a confusing and disruptive effect on workers and businesses alike due to its departure from decades of case law describing and applying the multifactor economic reality test as a totality-of-the-circumstances test. While the 2021 IC Rule recognized the need to further develop the concept of economic dependence, the rule includes provisions that are in tension with this longstanding case law—such as designating two factors as most probative and predetermining that they carry greater weight in the analysis, considering investment and initiative only in the opportunity for profit or loss factor, and excluding consideration of whether the work performed is central or important to the employer's business. These provisions narrow the economic reality test by limiting the facts that may be considered as part of the test, facts which the Department believes are relevant in determining whether a worker is economically dependent on the employer for work or in business for themself.

The 2021 IC Rule's elevation of certain factors and its preclusion of consideration of relevant facts under several factors may result in misapplication of the economic reality test and may have conveyed to employers that it might be easier than it used to be to classify certain workers as independent contractors rather than FLSA-covered employees. Elevating certain factors and precluding consideration of relevant facts may increase the risk of misclassification of employees as independent contractors. The 2021 IC Rule did not address the potential risks to workers of such misclassification.

Therefore, in light of the vacatur of the Withdrawal Rule, the Department believes it is appropriate to rescind the 2021 IC Rule and set forth an analysis for determining employee or independent contractor status under the Act that is more consistent with existing judicial precedent and the Department's longstanding guidance prior to the 2021 IC Rule. While prior to the 2021 IC Rule the Department primarily issued subregulatory guidance in this area, as explained in greater detail below, it believes that rescinding the 2021 IC

---

[105] See https://www.dol.gov/agencies/whd/opinion-letters/search?FLSA (last visited June 30, 2022), noting the withdrawal of Opinion Letters FLSA2021–8 and FLSA2021–9.

[108] 86 FR 8326.

[109] Id. at 12535.

[110] Id. at 14027.

[111] Id. at 24303.

[112] Id. at 24307.

[113] Id. at 24320.

[114] Coalition for Workforce Innovation, 2022 WL 1073346.

[115] Id. at *0. The court specifically faulted the Department's use of a shortened 19-day comment period in its proposal to delay of the 2021 IC Rule's original effective date (instead of 30 days), and for

failing to consider comments beyond its proposal to delay the 2021 IC Rule's effective date. Id. at *7–10.

[117] Id. at *11.

[118] Id. at *13.

[119] Id. at *20.

[120] See Fifth Circuit No. 22–40316 (appeal filed, May 13, 2022).

[121] Workers who are employees under the FLSA but are misclassified as independent contractors remain legally entitled to the Act's wage and hour protections and are protected from retaliation for attempting to assert their rights under the Act. See 29 U.S.C. 215(a)(3). However, many misclassified employees may not be aware that such rights and protections apply to them or face obstacles when asserting those rights.

[122] 29 U.S.C. 202(a)(3); see also Tony & Susan Alamo Found. v. Sec'y of Labor, 471 U.S. 290, 302 (1985) (noting that the misclassification of

employees "affect[s] many more people than those workers directly at issue . . . [because it] exert[s] a general downward pressure on wages in competing businesses").

Rule and replacing it with detailed regulations addressing the multifactor economic reality test—in a way that both more fully reflects the case law and continues to be relevant to the evolving economy—would be helpful for both workers and employers. The Department further believes that this proposal will protect workers from misclassification while at the same time providing a consistent approach for those businesses that engage (or wish to engage) with properly classified independent contractors, who the Department recognizes play an important role in the economy.

As noted in the 2021 IC Rule, the Department "without question has relevant expertise in the area of what constitutes an employment relationship under the FLSA, given its responsibility for administering and enforcing the Act and its decades of experience doing so." [123] The Department continues to believe, as it stated in the 2021 IC Rule, that "a clear explanation of the test for whether a worker is an employee under the FLSA or an independent contractor not entitled to the protections of the Act in easily accessible regulatory text is valuable to potential employers, to workers, and to other stakeholders." [124] Upon further consideration, however, the Department believes that the most valuable approach for stakeholders would be an accessible regulation that is more consistent with case law. As the 2021 IC Rule noted, rulemaking regarding employee or independent contractor status can have "great value regardless of what deference courts ultimately give to it." [125] The Department also believes, however, that this proposal is more likely to have such value because it is better aligned with judicial precedent and longstanding principles used by circuit courts and the Department.

The Department acknowledges that it is changing the approach taken in the 2021 IC Rule, and that this warrants further discussion of the rationale used in that rule and why the Department has carefully reconsidered that reasoning and determined that modifications are necessary. [126] As noted above, the Department identified in the 2021 IC Rule four reasons underlying the need to promulgate the rule: (1) confusion regarding the meaning of "economic dependence" because the concept is "underdeveloped"; (2) lack of focus in the multifactor balancing test; (3)

confusion and inefficiency due to overlapping factors; and (4) the shortcomings of the economic reality test that are more apparent in the modern economy. [127] Moreover, the Department suggested as a fifth reason for the 2021 IC Rule that legal uncertainty based on the concerns identified with the economic reality test hindered innovation in work arrangements. [128] The Department believes that this proposed rule's approach offers a better framework for understanding and applying the concept of economic dependence by explaining how the touchstone of whether an individual is in business for themself is analyzed within each of the six economic realities factors. The proposal's discussion of how courts and the Department's previous guidance apply the factors brings the multifactor test into focus, reduces confusion as to the overlapping factors, and provides a better basis for understanding how the test has the flexibility to be applied to changes in the modern economy, such that the Department no longer views the concerns articulated in the 2021 IC Rule as impediments to using the economic reality test formulated by the courts and the Department's longstanding guidance.

The Department continues to believe that the concept of economic dependence is underdeveloped in the case law. As noted in the 2021 IC Rule, a minority of courts have applied a "dependence-for-income" approach that considers whether the worker has other sources of income or wealth or is financially dependent on the employer instead of a "dependence-for-work" approach used by the majority of courts and the Department that appropriately considers whether the worker is dependent on the employer for work or depends on the worker's own business for work. [129] The Department is therefore proposing to continue to include its interpretation, as it did in the 2021 IC Rule, that economic dependence is the ultimate inquiry, and that an employee is someone who, as a matter of economic reality, is economically dependent on an employer for work—not for income. [130]

Rather than give primacy to only two factors as indicators of economic dependence, upon further consideration, the Department believes that developing the concept of economic dependence is better accomplished by, in addition to elaborating on the general meaning of economic dependence, sharpening the focus of each of the six factors' probative value as to the distinction between economic dependence on the employer for work and being in business for oneself. By focusing on that distinction in its discussion of each factor, this proposal would provide the further development of the concept of economic dependence that the 2021 IC Rule indicated would be welcomed by workers and employers, but would do so in a way that is generally consistent with case law and the Department's prior guidance.

To address what the Department viewed as a "lack of focus in the multifactor balancing test" that led to uncertainty as to how a court would balance the factors and which would be deemed more probative, the 2021 IC Rule identified two factors as more probative than the others. [131] The Department now finds that giving extra weight to two factors cannot be harmonized with decades of case law and guidance from the Department explaining that the economic reality test is a multifactor test in which no one factor or set of factors automatically carries more weight and that all relevant factors must be considered. Regardless of the rationale for elevating two factors, there is no legal support for doing so. [132] Moreover, elevating certain factors in such a predetermined fashion overlooks that each factor can be probative of the distinction between a worker who is economically dependent on the employer for work and a worker who is in business for themself. Thus, the Department believes that refining the factors with this distinction in mind and consistent with case law is a better approach to giving the multifactor test more focus than the novel approach of elevating two factors.

The Department believes upon further consideration that any purported "confusion and inefficiency due to overlapping factors" was overstated in the 2021 IC Rule and that, in any event, when each factor is viewed under the framework of whether the worker is economically dependent or in business

---

[123] 86 FR 1176 (internal citations omitted).

[124] Id.

[125] Id.

[126] See FCC v. Fox Television Stations, Inc., 556 U.S. 502, 515 (2009).

[127] 86 FR 1172–75.

[128] Id. at 1175.

[129] See id. at 1172–73.

[130] See id. at 1246 (§ 795.105(b) ("An employer suffers or permits an individual to work as an employee if, as a matter of economic reality, the individual is economically dependent on that employer for work.")); see also infra section V.B.; proposed § 795.105(b) ("An 'employee' under the Act is an individual whom an employer suffers, permits, or otherwise employs to work. . . . [This is] meant to encompass as employees all workers who, as a matter of economic reality, are

economically dependent on an employer for work. . . . Economic dependence does not focus on the amount of income earned, or whether the worker has other income streams.").

[131] 86 FR 1173.

[132] See infra section III.A.

for themself, the rationale for considering facts under more than one factor is clearer. The Department explains in more detail below why considering certain facts under more than one factor is consistent with the totality-of-the-circumstances approach of the economic realities analysis used by courts. And the Department provides guidance below regarding how to consider certain facts, such as the ability to work for others and whether the working relationship is exclusive, under more than one factor. The Department believes that this flexible approach is supported by the case law and preferable to rigidly and artificially limiting facts to only one factor, as the 2021 IC Rule did. Finally, in the 2021 IC Rule, the Department stated that "technological and social changes have made shortcomings of the economic realities test more apparent in the modern economy," thus justifying the 2021 IC Rule's characterization of the integral, investment, and permanence factors as less important in determining a worker's classification.[133] However, upon further consideration, the Department believes that the multifactor economic reality test relied on by courts where no one factor or set of factors is presumed to carry more weight remains a helpful tool when evaluating modern work arrangements. The test's vitality is confirmed by its application over seven decades that have seen monumental shifts in the economy. Modern work arrangements utilizing applications or other technology must be addressed, but the underlying economic reality test, which considers the totality of the circumstances in each working arrangement, offers the most flexible, comprehensive, and appropriately nuanced approach which can be adapted to disparate industries and occupations. It can also encompass continued social changes because it does not presume which aspects of the work relationship are most probative or relevant and leaves open the possibility that changed circumstances may make certain factors more important in certain cases or future scenarios.

*A. The 2021 IC Rule's Test Is Not Supported by Judicial Precedent or the Department's Historical Position and Is Not Fully Aligned With the Act's Text as Interpreted by the Courts*

Among other reasons the Department is proposing to rescind and replace the 2021 IC Rule, the Department does not believe that the Rule is fully aligned with the FLSA's text as interpreted by the courts or the Department's

longstanding analysis, as well as decades of case law describing and applying the multifactor economic reality test.

1. The 2021 IC Rule's Elevation of Control and Opportunity for Profit or Loss as the "Most Probative" Factors in Determining Employee Status Under the FLSA

The 2021 IC Rule set forth a new articulation of the economic reality test, elevating two factors (control and opportunity for profit or loss) as "core" factors above other factors, asserting that the two core factors have "greater probative value" in determining a worker's economic dependence.[134] Notably, the 2021 IC Rule further provides that if both core factors point towards the same classification—either employee or independent contractor—then there is a "substantial likelihood" that this is the worker's correct classification.[135] Although it identifies three other factors as additional guideposts and acknowledges that additional factors may be considered, it makes clear that non-core factors "are less probative and, in some cases, may not be dispositive at all, and thus are highly unlikely, either individually or collectively, to outweigh the combined probative value of the two core factors."[136] In justifying this stratified analysis, the 2021 IC Rule disagreed that, as a general matter, the economic reality test "requires factors to be unweighted or weighted equally,"[137] asserting that "[t]he Department's review of case law indicates that courts of appeals have effectively been affording the control and opportunity factors greater weight, even if they did not always explicitly acknowledge doing so."[138]

Upon further review of judicial precedent, the Department is not aware of any court that has, as a general and fixed rule, elevated any one economic reality factor or subset of factors above others, and there is no statutory basis for such a predetermined weighting of the factors. To the contrary, the Supreme Court has emphasized that employment status under the economic reality test turns upon "the circumstances of the whole activity," rather than "isolated factors."[139] Federal appellate courts

employee relationship) and determining employment status based on "the total situation").

[140] See, e.g., Superior Care, 840 F.2d at 1059 ("Since the test concerns the totality of the circumstances, any relevant evidence may be considered, and mechanical application of the test is to be avoided.").

[141] Parrish, 917 F.3d at 380 (quoting Hickey, 699 F.2d at 752); see also Scantland, 721 F.3d at 1312 n.2 (the relative weight of each factor "depends on the facts of the case" (quoting Santelices, 147 F. Supp. 2d at 1319)).

[142] See, e.g., Silk, 331 U.S. at 716 (explaining that "[n]o one [factor] is controlling" in the economic realities test); Selker Bros., 949 F.2d at 1293 ("It is a well-established principle that the determination of the employment relationship does not depend on isolated factors . . . neither the presence nor the absence of any particular factor is dispositive."); Morrison, 253 F.3d at 11 ("No one factor standing alone is dispositive and courts are directed to look at the totality of the circumstances and consider any relevant evidence."); Dole v. Snell, 875 F.2d 802, 805 (10th Cir. 1989) ("It is well established that no one of these factors in isolation is dispositive; rather, the test is based upon a totality of the circumstances."); Lauritzen, 835 F.2d at 1534 ("Certain criteria have been developed to assist in determining the true nature of the relationship, but no criterion is by itself, or by its absence, dispositive or controlling.").

[143] See McFeeley, 825 F.3d at 241 ("While a six-factor test may lack the virtue of providing definitive guidance to those affected, it allows for flexible application to the myriad different working relationships that exist in the national economy. In other words, the court must adapt its analysis to the particular working relationship, the particular workplace, and the particular industry in each FLSA case.").

[144] The 2021 IC Rule references on several occasions a review of appellate case law since 1975 to justify its elevation of two "core" factors. 86 FR 1196, 1198, 1202, 1240.

[145] See 86 FR 24309–10.

have repeatedly cautioned against a mechanical or formulaic application of the economic reality test,[140] and specifically warn that it "'is impossible to assign to each of these factors a specific and invariably applied weight.'"[141] The 2021 IC Rule's elevation of two "core factors" is also in tension with the position, expressed by the Supreme Court and Federal courts of appeals, that no single factor in the analysis is dispositive.[142] Thus, the Department recognizes that the 2021 IC Rule's predetermined and mechanical weighting of factors is not consistent with how courts have, for decades, applied the economic reality analysis.[143]

As explained in the Withdrawal Rule, the Department believes that the review of appellate cases[144] relied on to support the 2021 IC Rule's creation of "core factors" is not complete and makes assumptions about the reasoning behind the courts' decisions that are not clear from the decisions themselves.[145] For example, the 2021 IC Rule's discussion of the case law review did not provide full documentation or citations, did not make clear what the scope of the review entailed (e.g.,

---

[133] 86 FR 1175.

[134] 86 FR 1246 (§ 795.105(c) and (d)).

[135] Id. (§ 795.105(c)); see also id. at 1201 (advising that other factors would only outweigh the two core factors "in rare cases").

[136] Id. at 1246 (§ 795.105(c)).

[137] Id. at 1197.

[138] Id. at 1198.

[139] Rutherford, 331 U.S. at 730; see also Silk, 331 U.S. at 716, 719 (denying the existence of "a rule of thumb to define the limits of the employer-

whether it included only published circuit court decisions or all cases, whether it included cases that were simply remanded to the district court for any reason, etc.), and oversimplified the analysis provided by the courts because court decisions regarding classification under the FLSA generally emphasize the fact-specific nature of the totality-of-circumstances analysis. Mechanically deconstructing court decisions and considering what courts have said about only two factors—even when courts did present their analyses in this manner—ignores the broader approach that most courts have taken in determining worker classification.

In fact, many decisions explicitly deny assigning any predetermined weight to these factors, but instead state that they considered the factors as part of an analysis of the whole activity.[146] While there are many cases in which the classification decision made by the court aligns with the classification indicated by the control and opportunity for profit or loss factors, the 2021 IC Rule did not identify any cases stating that those two factors are "more probative" of a worker's classification than other factors. Moreover, the 2021 IC Rule concedes that there are cases in which the classification suggested by the control factor did not align with the worker's classification as determined by the courts.[147] It is necessarily the case that if any two factors of a multifactor balancing test point toward the same outcome, then that outcome becomes increasingly likely to be the ultimate outcome. However, the 2021 IC Rule did not address whether a different combination of factors would yield similar results. Particularly when viewed in the context of repeated statements from the courts that no one factor in the economic reality test is dispositive, the selective reading of an undefined set of cases to support the opposite conclusion is not persuasive.

In any event, the 2021 IC Rule significantly altered both these factors, changing what may be considered for each. For example, contrary to the approach taken by most courts, the 2021 IC Rule downplays the employer's right to control the work and recasts the opportunity for profit or loss factor as indicating independent contractor status based on the worker's initiative or investment. Thus, irrespective of whether control and opportunity for profit or loss were more frequently aligned with the ultimate result in prior appellate cases, the new framing of these factors, as redefined in the 2021 IC

Rule, sets forth a new standard for analysis without precedent.

Finally, the Department has concerns that prioritizing two "core factors" over other factors may not fully account for the Act's broad definition of "employ," as interpreted by the courts. For example, if facts relevant to the control and opportunity for profit or loss factors both point to independent contractor status for a particular worker but weakly so, those factors should not be presumed to carry more weight than stronger factual findings under other factors (e.g., the existence of a lengthy working relationship under the "permanence" factor and the performance of work that does not require specialized skills). Courts and the Department may focus on some relevant factors more than others when analyzing a particular set of facts and circumstances, but that does not mean that it is possible or permissible to derive from these fact-driven decisions universal rules regarding which factors deserve more weight than the others when the courts themselves have not set forth any such universal rules despite decades of opportunity. Numerous commenters responding to the Department's proposed withdrawal of the 2021 IC Rule voiced similar concerns.[148]

In sum, the Department believes that the 2021 IC Rule's elevation of the control and opportunity for profit or loss factors is in tension with the language of the Act as well as the position, expressed by the Supreme Court and in appellate cases from across the circuits, that no single factor is determinative in the analysis of whether a worker is an employee or an independent contractor and does not better determine who is in fact economically dependent on their employer for work as opposed to being in business for themself.

## 2. The Role of Control in the 2021 IC Rule's Analysis

As explained above, the 2021 IC Rule identifies "the nature and degree of control over the work" as one of two core factors given "greater weight" in the independent contractor analysis.[149] The 2021 IC Rule addressed and rejected comments which opined that focusing the analysis on two core factors—one of which would be control—would narrow the analysis to a common law control test.[150]

Although the 2021 IC Rule's standard for determining who is an employee and

who is an independent contractor is not the same as the common law control analysis, the Department continues to believe, as expressed in the Withdrawal Rule, that elevating the importance of control in every FLSA employee or independent contractor analysis brings the Rule closer to the common law control test that courts have rejected when interpreting the Act. As previously noted, section 3(g) of the FLSA expansively defines the term "employ" to include "to suffer or permit to work."[151] The Supreme Court has repeatedly stated that this provision establishes a broader scope of employment for FLSA purposes than under a common law (i.e., agency) analysis focused on control.[152] In light of this directive, the Department remains concerned that the outsized role of control under the 2021 IC Rule's analysis is contrary to the Act's text and case law interpreting the Act's definitions of employment.

## 3. The 2021 IC Rule Improperly Altered Several Factors by Precluding the Consideration of Relevant Facts

As previously discussed in the Withdrawal Rule, the Department remains concerned that the 2021 IC Rule's preclusion of certain facts from being considered under the factors improperly narrows the economic reality test and does not allow for a full consideration of all facts which might be relevant to determining whether a worker is economically dependent upon an employer for work or in business for themself. Examples include: (1) advising that "control" indicative of an employment relationship must involve an employer's "substantial control over key aspects of the performance of the work," excluding requirements "to comply with specific legal obligations, satisfy health and safety standards, carry insurance, meet contractually agreed-upon deadlines or quality control standards, or satisfy other similar terms;"[153] (2) making the "opportunity for profit or loss" factor indicate independent contractor status based on the worker's initiative or investment (not both);[154] (3) disregarding the employer's investments;[155] (4) disregarding the importance or

---

[146] See supra nn.139–142.

[147] See 86 FR 1197 n.45.

[148] Id. at 24307–11.

[149] Id. at 1246–47 (§ 795.105(c), (d)).

[150] Id. at 1200–01.

[151] 29 U.S.C. 203(g).

[152] See Darden, 503 U.S. at 324–26; Portland Terminal, 330 U.S. at 150–51; and Rutherford, 331 U.S. at 728.

[153] 86 FR 1246–47 (§ 795.105(d)(1)(i)).

[154] Id. at 1247 (§ 795.105(d)(1)(ii)).

[155] Id.; see also id. at 1188 ("[T]he Department reaffirms its position that comparing the individual worker's investment to the potential employer's investment should not be part of the analysis of investment.").

centrality of a worker's work to the employer's business; [156] and (5) downplaying the employer's reserved right or authority to control the worker.[157] In each of these ways—as explained in greater detail below—the 2021 IC Rule limits the scope of facts and considerations comprising the analysis of whether the worker is an employee or independent contractor.

As further explained below, the 2021 IC Rule's narrowing of certain economic realities factors by precluding consideration of certain facts provides another justification for the Rule's rescission and replacement.

### B. Confusion and Uncertainty Introduced by the 2021 IC Rule

One of the 2021 IC Rule's primary goals was to "significantly clarify to stakeholders how to distinguish between employees and independent contractors under the Act." [158] Although the stated intent was to provide clarity, it has introduced several concepts to the analysis that neither courts nor the Department have previously applied, as discussed above.[159] This rulemaking arises in part from a concern that these changes will not provide clarity because of the inconsistency with circuit court case law, and that the conflict between the 2021 IC Rule's analysis and circuit precedent will inevitably lead to greater uncertainty as well as lead to inconsistent outcomes, rather than increase clarity or certainty.

As a threshold matter, because the 2021 IC Rule departed from courts' longstanding precedent, if left in place, it is not clear whether courts would adopt its analysis—a question that could take years of appellate litigation in different Federal circuits to sort out. If some courts try to reconcile the 2021 IC Rule's analysis with their precedent and the statute and some courts do not, it will create conflicts among courts and between courts and the Department, resulting in more uncertainty as to the

applicable economic reality test. Businesses operating nationwide will have had to familiarize themselves with multiple standards for determining who is an employee under the FLSA across different jurisdictions.[160]

In addition to uncertainty resulting from the 2021 IC Rule's reception by courts, the Rule introduces several ambiguous terms and concepts into the analysis for determining whether a worker is an employee under the FLSA or an independent contractor. For example, courts and regulated parties now must grapple with what it means in practice for two factors to be "core" factors and entitled to greater weight. In addition, they must determine, in cases where the two "core" factors point to the same classification, how "substantial" the likelihood is that they point toward the correct classification if the additional factors point toward the other classification. Additionally, the 2021 IC Rule cautions that its list of factors is "not exhaustive," [161] but does not specify whether the "additional factors" referenced in § 795.105(d)(2)(iv) have less probative value (or weight) than the three "other factors" listed in § 795.105(d)(2)(i) through (iii).[162] Assuming that they do, the 2021 IC Rule has essentially transformed the analysis that courts and the Department have previously applied into a three-tiered multifactor balancing test, with "core" factors given more weight than enumerated "other" factors, and enumerated "other" factors given more weight than unspecified "additional" factors. Rather than weighing all factors against each other depending on the facts of a particular work arrangement, courts and the regulated community must evaluate factors within and across groups in a new hierarchical structure, which will likely cause confusion and inconsistency. Adding to the confusion, the Rule improperly collapses some factors into each other, so that investment and initiative are only considered as a part of the opportunity for profit or loss factor, requiring courts and the regulated community to reconsider how they have long applied those factors.[163]

The Department believes that the 2021 IC Rule has complicated rather than simplified the analysis for determining whether a worker is an

employee or independent contractor under the FLSA and does not provide clarity behind the meaning of economic dependence or reduce confusion.[164] For the reasons explained above, the Department believes that the 2021 IC Rule has introduced substantial confusion and uncertainty on the topic of independent contractor status, to the detriment of workers and businesses alike.

### C. Risks to Workers From the 2021 IC Rule

As part of its regulatory impact analysis, the 2021 IC Rule quantified some possible costs (regulatory familiarization) and some possible cost savings (increased clarity and reduced litigation).[165] It identified and discussed—but did not quantify—numerous other costs, transfers, and benefits possibly resulting from the 2021 IC Rule, including "possible transfers among workers and between workers and businesses." [166] The 2021 IC Rule "acknowledge[d] that there may be transfers between employers and employees, and some of those transfers may come about as a result of changes in earnings," but determined that these transfers cannot "be quantified with a reasonable degree of certainty for purposes of [the Rule]." [167] The 2021 IC Rule concluded that "workers as a whole will benefit from [the Rule], both from increased labor force participation as a result of the enhanced certainty provided by [the Rule], and from the substantial other benefits detailed [in the Rule]." [168]

The preliminary regulatory impact analysis for this proposed rule is provided below in section VII. As a general matter, the Department notes here that it does not believe that the 2021 IC Rule fully considered the likely costs, transfers, and benefits that could result from the Rule. This concern is premised in part on WHD's role as the agency responsible for enforcing the FLSA and its experience with cases involving the misclassification of employees as independent contractors.

---

[156] Id. at 1247 (§ 795.105(d)(2)(iii)); see also id. at 1248 (noting through an example in § 795.115(b)(6)(ii) that "[i]t is not relevant . . . that the writing of articles is the inherent part of producing newspapers"); accord id. at 1195 (responding to commenters regarding the Department's decision to shift to an "integrated unit of production" analysis).

[157] See id. at 1246–47 (advising, in § 795.105(d)(1)(i), that the control factor indicates employment status if a potential employer "exercises substantial control over key aspects of the performance of the work") (emphasis added); id. at 1247 (advising, in § 795.110, that "a business' contractual authority to supervise or discipline an individual may be of little relevance if in practice the business never exercises such authority"); see also id. at 1203–04 (same in response to commenters).

[158] Id. at 1168.

[159] See supra section III.A.

[160] See, e.g., 86 FR 1241 n.255 (noting, while rejecting the "ABC" test for worker classification, that companies operating "nationwide businesses[ ] are likely to comply with the most demanding standard if they wish to make consistent classification determinations").

[161] Id. at 1246 (§ 795.105(c)).

[162] Id. at 1247.

[163] Id. (§ 795.105(d)(1)(ii)).

[164] The 2021 IC Rule includes several important principles from the case law, such as that economic dependence is the ultimate inquiry, that the list of economic reality factors is not exhaustive and that no single factor is determinative—principles that the Department continues to agree with and has included in this NPRM. The 2021 IC Rule, however, also incorporates provisions that are in tension with these well-established judicial principles, such as the predetermined elevating of two factors. The Department is also concerned with this internal inconsistency in the 2021 IC Rule.

[165] 86 FR 1211.

[166] Id. at 1214–16.

[167] Id. at 1223.

[168] Id.

The consequence for a worker of being misclassified as an independent contractor is that the worker is excluded from the protections of the FLSA to which they are entitled. These protections include being paid at least the Federal minimum wage for all hours worked, overtime compensation for hours worked over 40 in a workweek, and protection against retaliation for complaining about, for example, a violation of the FLSA. The Department concludes that, to the extent the 2021 IC Rule results in the reclassification or misclassification of employees as independent contractors, the resulting denial of FLSA protections would harm the affected workers. To the extent that women and people of color are overrepresented in low-wage positions where misclassification as independent contractors is more likely, this result could have a disproportionate impact on these workers. In comments on the Withdrawal Rule, several commenters cited a study finding that seven of the eight occupations with the highest rate of misclassification were held disproportionately by women and/or workers of color, asserting that "misclassification is rampant in low-wage, labor-intensive industries where women and people of color, including Black, Latinx, and AAPI workers, are overrepresented."[169] These workers already experience multiple types of economic inequities in the labor force, including gender and racial wage gaps and occupational segregation. When comparing the median wages of women who worked full-time, year-round to the wages of men who worked full-time, year-round, women were paid 83 cents to every dollar paid to men.[170] For women of color, this wage gap is even greater—Black women were paid 64%, and Hispanic women (of any race) were paid 57% of what white non-Hispanic men were paid. The misclassification of these workers as independent contractors deprives them of the minimum wage and overtime protections that could help alleviate some of this inequality.

In sum, the Department's proposal to rescind and replace the 2021 IC Rule is motivated, in part, by an assessment that doing so will benefit workers as a whole, including those workers at risk of being misclassified as independent contractors as well as those who are appropriately classified as independent contractors.

*D. The Benefits of Replacing the Part 795 Regulations on Employee or Independent Contractor Status*

In its rulemaking last year to withdraw the 2021 IC Rule, the Department declined to propose alternative regulations.[171] The Department had not previously promulgated generally applicable regulations on independent contractor classification in the FLSA's 83 years of existence.[172] Particularly in light of the consistency of the economic reality test as adopted by the circuits, the Department had for decades relied on subregulatory documents to provide generally applicable guidance for the Department and the regulated community on determining employee or independent contractor status under the FLSA.[173]

In its decision invalidating the Withdrawal Rule, the Eastern District of Texas faulted the Department for failing to consider "less disruptive alternatives" to withdrawal, such as "promulgat[ing] a regulation that enumerated six factors instead of five" or "adopting the seven factors that the Department previously set forth in Fact Sheet #13 as the applicable economic realities test."[174] While the Department believes that its subregulatory guidance provided appropriate guidance to the regulated community, upon further consideration, it recognizes that publishing regulatory guidance on the distinction between FLSA-covered employees and independent contractors is beneficial for stakeholders, particularly because the Department published a regulation in 2021. In addition, detailed Federal regulations would be easier to locate and read for interested stakeholders than applicable circuit caselaw, potentially helping workers and businesses better understand the Department's interpretation of their rights and responsibilities under the law. In contrast to WHD's earlier opinion letters on independent contractor status and its prior regulations on the topic located in parts 780 and 788, new part 795 would also provide guidance to workers and businesses in any industry.

Adopting detailed regulations aligned with existing precedent that help workers and businesses to better understand their rights and responsibilities under the law could also better protect workers, who have been placed at a greater risk of misclassification as a consequence of the 2021 IC Rule. As described in sections III.A. and B., the 2021 IC Rule's elevation of certain factors and its preclusion of consideration of relevant facts under several factors may result in misapplication of the economic reality test and may have conveyed to employers that it might be easier than it used to be to classify certain workers as independent contractors rather than FLSA-covered employees. Elevating certain factors and precluding consideration of relevant facts may increase the risk of misclassification of employees as independent contractors. Because the Department has serious concerns about the 2021 IC Rule, it is proposing to rescind and replace it with regulations that are fully aligned with the text of the FLSA as interpreted by the courts, the Department's longstanding subregulatory guidance, and decades of court cases interpreting the Act while still providing additional clarity to workers and employers on the concept of economic dependence.

**IV. Alternatives Considered**

The Department assessed four regulatory alternatives to this proposed rule below in section VII.F. of the regulatory impact analysis. The Department previously considered and rejected, on legal viability grounds, the first two alternatives—codifying either a common law or ABC test for determining employee or independent contractor status—in the 2021 IC Rule.[175] The Department continues to believe that legal limitations prevent the Department from adopting either of those alternatives.

For the first alternative, the Department considered codifying the common law control test, which is used to distinguish between employees and independent contractors under other Federal laws, such as the Internal Revenue Code.[176] The focus of the

---

[169] *Id.* at 24312.

[170] U.S. Department of Labor, Women's Bureau. *Connecting the Dots: "Women's Work" and the Wage Gap* (2022) https://blog.dol.gov/2022/03/15/connecting-the-dots-womens-work-and-the-wage-gap?_ga=2.244062629.155756293.1655992165-662705877.1655982165.

[171] *See* 86 FR 24307.

[172] The FLSA was enacted in 1938. 29 U.S.C. 201. Until 2021, the Department had not promulgated generally applicable regulations regarding the classification of workers as employees or independent contractors.

[173] *See, e.g.,* 86 FR 24318–20.

[174] *Coalition for Workforce Innovation,* 2022 WL 1073346, at *18.

[175] *See* 86 FR 1238.

[176] *See* 26 U.S.C. 3121(d)(2) (generally defining the term "employee" under the Internal Revenue Code as "any individual who, under the usual common law rules applicable in determining the employer-employee relationship, has the status of an employee"). The Supreme Court has advised that the common law control test applies by default under Federal law unless a statute specifies an alternative standard. *See Darden,* 503 U.S. at 322–23 ("'[W]hen Congress has used the term 'employee' without defining it, we have concluded that Congress intended to describe the conventional

common law control test is "the hiring party's right to control the manner and means by which [work] is accomplished," [177] but the Supreme Court has explained that "other factors relevant to the inquiry [include] the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party." [178]

Although the common law control test considers some of the same factors as those identified in the proposed rule's "economic reality" test (e.g., skill, length of the working relationship, the source of equipment and materials, etc.), courts generally recognize that, because of its focus on control, the common law test is more permissive of independent contracting arrangements than the economic reality test, which examines the economic dependence of the worker.[179]

Codifying a common law control test for the FLSA could create a more uniform legal framework among Federal statutes, in the sense that entities would not, for example, have to understand and apply one employment classification standard for tax purposes and a different employment classification standard for FLSA purposes. However, the Department does not believe that adopting a common law control test for determining employee or independent contractor status under the FLSA would, in fact, simplify the analysis for the regulated community because courts and enforcement agencies applying a common law test for independent contractors have considered a greater number and different variation of factors than the six or so factors commonly considered under the economic reality test.[180]

Regardless, applying the common law test would be contrary to the "suffer or permit" language in section 3(g) of the FLSA, which the Supreme Court has interpreted as demanding a broader definition of employment than that which exists under the common law.[181] Accordingly, the Department believes it is legally constrained from adopting the common law control test and that the common law test is not sufficiently protective in assessing worker classification under the FLSA.

For the second alternative, the Department considered codifying an ABC test to determine independent contractor status under the FLSA, similar to the ABC test recently adopted under California's state wage and hour law.[182] As described by the California Supreme Court in Dynamex Operations W., Inc. v. Superior Court, "[t]he ABC test presumptively considers all workers to be employees, and permits workers to be classified as independent contractors only if the hiring business demonstrates that the worker in question satisfies each of three conditions: (a) that the worker is free from the control and direction of the hirer in connection with the performance of the work, both under the contract for the performance of the work and in fact; and (b) that the worker performs work that is outside the usual course of the hiring entity's business; and (c) that the worker is customarily engaged in an independently established trade, occupation, or business of the same nature as that involved in the work performed." [183]

Codifying an ABC test could establish a simpler and clearer standard for determining whether workers are employees or independent contractors. The ABC test only has three criteria, and no balancing of the criteria is required; all three prongs must be satisfied for a worker to qualify as an independent contractor. However, the Department believes it is legally constrained from adopting an ABC test because the Supreme Court has held that the economic reality test is the applicable standard for determining workers' classification under the FLSA as an employee or independent contractor.[184] Moreover, the Supreme Court has stated that the existence of employment relationships under the FLSA "does not depend on such isolated factors" as the three independently determinative factors in the ABC test, "but rather upon the circumstances of the whole activity." [185] Because the ABC test is inconsistent with Supreme Court precedent interpreting the FLSA, the Department believes that it could only implement an ABC test if the Supreme Court revisits its precedent or if Congress passes legislation that alters the applicable analysis under the FLSA.

For the third alternative, the Department considered a proposed rule that would not fully rescind the 2021 IC Rule and instead retain some aspects of that rule. As the Department has noted throughout this proposal, there are multiple instances in which this NPRM is consistent or in agreement with the 2021 IC Rule. Specifically, the Department has noted its agreement with the following aspects of the 2021 IC Rule: a totality of the circumstances test should be applied to appropriately determine classification as an employee or independent contractor; the concept of economic dependence needs further

---

master-servant relationship as understood by common-law agency doctrine.'") (quoting Reid, 490 U.S. at 739–40).

[177] Reid, 490 U.S. at 751.

[178] Id. at 751–52.

[179] See, e.g., Baker v. Flint Eng'g & Const. Co., 137 F.3d 1436, 1440 (10th Cir. 1998) (recognizing that the "economic realities" test is a more expansive standard for determining employee status than the common law test).

[180] See RESTATEMENT (THIRD) OF AGENCY sec. 7.07, Comment (f) (2006) (identifying 10 factors); IRS Tax Topic No. 762 Independent

Contractor vs. Employee (May 19, 2022), https://www.irs.gov/taxtopics/tc762 (explaining the common law analysis through three main categories: behavioral control, financial control, and the relationship of the parties); Reid, 490 U.S. at 751–52 (identifying 13 factors).

[181] See, e.g., Darden, 503 U.S. at 326; Portland Terminal, 330 at 150–51.

[182] See Dynamex Operations W., Inc. v. Superior Court, 416 P.3d 1 (Cal. 2018); Assembly Bill ("A.B.") 5, Ch. 296, 2019–2020 Reg. Sess. (Cal. 2019) (codifying the ABC test articulated in Dynamex); A.B. 2257, Ch. 38, 2019–2020 Reg. Sess. (Cal. 2020) (retroactively exempting certain professions, occupations, and industries from the ABC test that A.B. 5 had codified). The ABC test originated in state unemployment insurance statutes, but some state courts and legislatures have recently extended the test to govern employee/independent contractor disputes under state wage and hour laws. See Keith Cunningham-Parmeter, Gig-Dependence: Finding the Real Independent Contractors of Platform Work, 39 N. Ill. U. L. Rev. 379, 408–11 (2019) (discussing the origins and recent expansion of the ABC test).

[183] 416 P.3d at 34 (emphasis in original). California's ABC test is slightly different than versions of the ABC test adopted (or presently under consideration) in other states. For example, New Jersey provides that a hiring entity may satisfy the ABC test's "B" prong by establishing either: (1) that the work provided is outside the usual course of the business for which the work is performed, or (2) that the work performed is outside all the places

of business of the hiring entity. N.J. Stat. Ann. sec. 43:21–19(i)(6)(A–C). The Department has chosen to analyze California's ABC test as a regulatory alternative because businesses subject to multiple standards, including nationwide businesses, are likely to comply with the most demanding standard if they wish to make consistent classification determinations.

[184] See Tony & Susan Alamo, 471 U.S. at 301 ("The test of employment under the Act is one of 'economic reality.'"); Whitaker House, 366 U.S. at 33 ("'economic reality' rather than 'technical concepts' is . . . the test of employment" under the FLSA) (citing Silk, 331 U.S. at 713; Rutherford, 331 U.S. at 729). ABC tests are not the same as the FLSA economic realities test. For example, the ABC test does not consider the totality of the circumstances of the working relationship between the employer and the worker; instead, it considers three specific circumstances. In addition, the ABC test does not weigh or balance the various considerations; instead, the test results in a finding of employee status if any one factor is not met regardless how close the facts are on that factor and regardless what the other two factors indicate.

[185] Rutherford, 331 U.S. at 730.

development; and a clear explanation of the test for whether a worker is an employee or independent contractor in easily accessible regulatory text is valuable. This proposal also includes several other important principles from the case law that were included in the 2021 IC Rule: economic dependence is the ultimate inquiry; the list of economic reality factors is not exhaustive; and no single factor is determinative. Further, with respect to specific factors, this proposal reinforces certain aspects addressed in the 2021 IC Rule such as that an exclusivity requirement imposed by the employer is a strong indicator of control, and that issues related to scheduling and supervision over the performance of the work (including the ability to assign work) are relevant considerations under the control factor.

Despite these areas of agreement, the governing principle of the 2021 IC Rule is that two of the economic reality factors are predetermined to be more probative and therefore carry more weight, which may obviate the need to meaningfully consider the remaining factors. Upon further consideration, as discussed in this proposal, the Department believes that this departure from decades of case law and the Department's own longstanding position that no one factor or subset of factors should carry more or less weight would have a confusing and disruptive effect on employers and workers alike. The Department considered simply removing the problematic "core factors" analysis from the 2021 IC Rule and retaining the five factors as described in the rule. However, the Department rejected this approach because other aspects of the rule such as considering investment and initiative only in the opportunity for profit or loss factor and excluding consideration of whether the work performed is central or important to the employer's business are also in tension with judicial precedent and longstanding Department guidance. These provisions narrow the economic reality test by limiting the facts that may be considered as part of the test, facts which the Department believes are relevant in determining whether a worker is economically dependent on the employer for work or in business for themself. Therefore, after considering all of the common aspects of the 2021 IC Rule and whether to retain some portions of that rule, the Department has concluded that in order to provide clear, affirmative regulatory guidance that aligns with case law and is consistent with the text and purpose of the Act as interpreted by courts, a complete

rescission and replacement of the 2021 IC Rule is needed. For these reasons, the Department is not proposing a partial rescission of the 2021 IC Rule.

For the fourth alternative, the Department considered rescinding the 2021 IC Rule and providing guidance on employee or independent contractor classification through subregulatory guidance instead of through new regulations. To begin with, for the reasons set forth in this NPRM, the Department believes that rescission of the 2021 IC Rule is appropriate, regardless of the new content proposed for its replacement. Specifically, the Department believes that the 2021 IC Rule does not fully comport with the FLSA's text as interpreted by the courts, and that retaining the 2021 IC Rule would have a confusing and disruptive effect on workers and businesses alike due to its departure from decades of case law describing and applying the multifactor economic reality test as a totality-of-the-circumstances test. The 2021 IC Rule's provisions—such as designating two factors as most probative and predetermining that they carry greater weight in the analysis, considering investment and initiative only in the opportunity for profit or loss factor, and excluding consideration of whether the work performed is central or important to the employer's business—are in tension with this longstanding case law.

The Department recognizes that the 2021 IC Rule sought to "clarify and sharpen the contours of the economic reality test used to determine independent contractor classification under the FLSA." [186] However, as noted above, although the stated intent was to provide clarity, the 2021 IC Rule introduced several concepts to the analysis that neither courts nor the Department have previously applied. [187] The Department believes that these changes will not provide clarity because of the inconsistency with circuit court case law, and that the conflict between the 2021 IC Rule's analysis and circuit precedent will inevitably lead to greater uncertainty as well as lead to inconsistent outcomes, rather than increase clarity or certainty.

Given the substantial uniformity among the circuit courts in the application of the economic reality test prior to the 2021 IC Rule, the Department believes that rescinding the 2021 IC Rule would provide greater clarity than retaining the 2021 IC Rule. For more than 80 years prior to the 2021 IC Rule, the Department primarily

issued subregulatory guidance in this area and did not have generally applicable regulations on the classification of workers as employees or independent contractors. This subregulatory guidance was informed by the case law and set forth a multifactor economic reality test to answer the ultimate question of economic dependence. However, as explained in section III above, the Department believes that replacing the 2021 IC Rule with regulations addressing the multifactor economic reality test that more fully reflect the case law and continue to be relevant to the modern economy will be helpful for both workers and employers in understanding how to apply the law in this area. Specifically, issuing regulations allows the Department to provide in-depth guidance that is more closely aligned with circuit case law, rather than the regulations set forth in the 2021 IC Rule which have created a dissonance between the Department's regulations and judicial precedent. Additionally, issuing regulations allows the Department to formally collect and consider a wide range of views from stakeholders by electing to use the notice-and-comment process. Finally, because courts are accustomed to considering relevant agency regulations, providing guidance in this format may further improve consistency among courts regarding this issue. Therefore, the Department has decided not to rescind the 2021 IC Rule and provide only subregulatory guidance, but to instead propose these regulations.

## V. Discussion of Proposed Rule

In view of the foregoing concerns and considerations, the Department is proposing modifications to title 29 of the Code of Federal Regulations addressing whether workers are employees or independent contractors under the FLSA. In relevant part, and as discussed in greater detail below, the Department proposes:

• Not using "core factors" and instead returning to a totality-of-the-circumstances analysis of the economic reality test that has a refined focus on whether each factor shows the worker is economically dependent upon the employer for work versus being in business for themself, does not use predetermined weighting of factors, and that considers the factors comprehensively instead of as discrete and unrelated.

• Returning the consideration of investment to a standalone factor, focusing on whether the worker's investment is capital or entrepreneurial in nature, and considering the worker's

---

[186] 86 FR 1172.

[187] See supra sections III.A, B.

investments on a relative basis with the employer's investment.

• Providing additional analysis of the control factor, including detailed discussions of how scheduling, supervision, price-setting, and the ability to work for others should be considered when analyzing the degree of control over a worker, and not limiting control to control that is actually exerted.

• Returning to the longstanding Departmental interpretation of the integral factor, which considers whether the work is integral to the employer's business rather than whether it is exclusively part of an "integrated unit of production."

As in the 2021 IC Rule, the Department is proposing to include cross-references to the interpretations set forth in this proposed rule in 29 CFR 780.330(b) and 788.16(a); these provisions contain industry-specific guidance. Additionally, in the 2021 IC Rule, the Department declined to revise its regulation addressing employee or independent contractor status under MSPA in 29 CFR 500.20(h)(4), stating, in part, that the MSPA regulation and the 2021 IC Rule both applied an economic reality test in which the ultimate inquiry was economic dependence.[188] Although the Department has again considered revising the MSPA regulation, it proposes the same approach that it took in 2021—which is to not make any revisions at this time. The Department continues to recognize that MSPA adopts by reference the FLSA's definition of "employ,"[189] and that 29 CFR 500.20(h)(4) considers "whether or not an independent contractor or employment relationship exists under the Fair Labor Standards Act" to interpret employee or independent contractor status under MSPA.[190] The test contained in the MSPA regulation is substantially similar to the proposed test here, so the Department believes that there is not a need to revise the MSPA regulation at this time. The Department, however, welcomes comments regarding whether 29 CFR 500.20(h)(4) should be revised to more fully reflect the interpretation of employee or independent contractor status set forth in this proposed rule.

Finally, the Department is also proposing to formally rescind the 2021 IC Rule and to add a new part 795. In the Department's view, the operative effects of proposing to rescind the 2021 IC Rule follow. If finalized, the proposed rule would formally rescind the 2021 IC Rule. That rescission would operate independently of the new content in any new final rule, as the Department intends it to be severable from the substantive proposal for adding a new part 795. For the reasons set forth in this NPRM, the Department believes that rescission of the 2021 IC Rule is appropriate, regardless of the new content proposed in this rulemaking. Thus, even if the substantive provisions of a new final rule were invalidated, enjoined, or otherwise not put into effect, the Department would not intend that the 2021 IC Rule become operative.

Since the passage of the FLSA until the 2021 IC Rule, the Department primarily issued subregulatory guidance in this area and did not have generally applicable regulations addressing the classification of workers as employees or independent contractors. The Department's subregulatory guidance was informed by the case law and set forth a multifactor economic reality test to answer the ultimate question of economic dependence that is consistent with the analysis set forth in this proposal. Should the 2021 IC Rule be rescinded without any replacement regulations, the Department would rely on circuit case law and provide subregulatory guidance for stakeholders through existing documents (such as Fact Sheet #13) and new documents (for example, a Field Assistance Bulletin). As explained below, there is widespread uniformity among the circuit courts in the application of the economic reality test, with slight variation as to the number of factors considered or how the factors are framed.[191] The well-known multifactor, totality-of-the-circumstances analysis that had been in place prior to the 2021 IC Rule has been reflected in the Department's subregulatory guidance for many years and accurately represents this case law. Thus, the Department believes reliance on this case law and subregulatory guidance, rather than the 2021 IC Rule, would be preferable due to the 2021 IC Rule's divergence from well-established precedent and potential effects on workers, as previously discussed. In sum, should a new final rule adding a new part 795 not go into effect for any reason, reverting to reliance on circuit case law and subregulatory guidance consistent with that case law for determining whether a worker is an employee or independent contractor would accurately reflect the Act's text and purpose as interpreted by the courts and offer a standard familiar to most stakeholders.

The Department welcomes comments on all aspects of its proposal.

*A. Introductory Statement (Proposed § 795.100)*

Section 795.100 of the 2021 IC Rule generally explains that the interpretations in part 795 will guide WHD's enforcement of the FLSA and are intended to be used by employers, employees, workers, and courts to assess employment status under the Act.[192] The Department is proposing only clarifying edits to this section.

*B. Economic Reality Test (Proposed § 795.105)*

Section 795.105(a) of the 2021 IC Rule states that independent contractors are not employees under the FLSA. Section 795.105(b) explains that economic dependence is the ultimate inquiry in determining whether a worker is an independent contractor or employee under the Act, and § 795.105(c) addresses how to determine economic dependence, including the elevation of two "core" economic reality factors.[193] Section 795.105(d) discusses the economic reality factors.[194]

The Department is proposing to simplify paragraph (a) and make additional clarifying edits to paragraph (b). Proposed § 795.105(a) would continue to make clear that independent contractors are not "employees" under the Act. Proposed § 795.105(b) would affirm that economic dependence is the ultimate inquiry for determining whether a worker is an independent contractor or an employee and makes clear that the plain language of the statute is relevant to the analysis. This section focuses the analysis on whether the worker is in business for themself and clarifies that economic dependence does not focus on the amount the worker earns or whether the worker has other sources of income. The Department is proposing to delete § 795.105(c) because it believes, as previously discussed in section III.A.1. of this preamble, that the factors of the economic reality test should not be given a predetermined weight. The Department is also proposing to delete § 795.105(d) and move discussion of the economic reality test and the individual factors to § 795.110.

---

[188] See 86 FR 1177.

[189] 29 U.S.C. 1802(5).

[190] The MSPA regulations consider, for example, whether a worker is economically dependent upon an agricultural association or farm labor contractor. See 29 CFR 500.20(h)(4).

[191] See generally infra section V.C.

[192] 86 FR 1246.

[193] Id.

[194] Id. at 1246–47.

*C. Economic Reality Test and Economic Reality Test Factors (Proposed § 795.110)*

The Department is proposing to replace § 795.110 of the 2021 IC Rule (Primacy of actual practice) with a provision discussing the economic reality test and the economic reality factors. Proposed § 795.110(a) introduces the economic reality test, emphasizing that the economic reality factors are guides to be used to conduct a totality-of-circumstances analysis. It also explains that the factors are not exhaustive, and no single factor is dispositive. The Department is proposing to address the economic reality factors in § 795.110(b). Before addressing the specific changes proposed, the Department believes that it is helpful to discuss the overarching framework of the economic reality test and how it should be considered.

Determining whether an employment relationship exists under the FLSA begins with the Act's definitions. The Act's text is expansive, defining "employer" to "include[ ] any person acting directly or indirectly in the interest of an employer in relation to an employee," "employee" as "any individual employed by an employer," and "employ" to "include[ ] to suffer or permit to work." [195] In its 1947 brief before the Supreme Court in *Rutherford*, the Department explained that the Act " 'contains its own definitions, comprehensive enough to require its application to many persons and working relationships, which prior to this Act, were not deemed to fall within an employer-employee category.' " [196] The Department continued, stating that "[t]he purposes of this Act require a practical, realistic construction of the employment relationship . . . and the broad language of the statutory definitions is more than adequate to support such a construction." [197] The Supreme Court agreed, reiterating the breadth and reach of the Act's definitions to work relationships that were not previously considered to constitute employment relationships, and emphasizing that the determination of an employment relationship under the FLSA depends not on "isolated factors but rather upon the circumstances of the whole activity." [198] The same need for a practical, realistic construction of the employment

relationship under the FLSA exists today. As explained below, the long-standing economic reality test, applied in view of the statutory language of the Act, is nimble enough to continue to provide a useful analysis for the broad range of potential employment relationships that exist today.

Prior to the FLSA's enactment, the phrasing "suffer or permit" was commonly used in state laws regulating child labor. As the Eleventh Circuit explained in *Antenor* v. *D & S Farms*, "[t]he 'suffer or permit to work' standard derives from state child-labor laws designed to reach businesses that used middlemen to illegally hire and supervise children." [199] In other words, the standard was designed to ensure that an employer could be covered under the labor law even if they did not directly control a worker or used an agent to provide supervision. The Supreme Court has explicitly and repeatedly recognized that this "suffer or permit" language demonstrates Congress's intent for the FLSA to apply broadly and more inclusively than the common law standard. [200] This textual breadth reflects Congress's stated intent. Section 2 of the Act, Congress's "declaration of policy," states that the Act is intended to eliminate "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers." [201] Particularly relevant to misclassification, section 2 identifies "unfair method[s] of competition in commerce" as an additional condition "to correct and as rapidly as practicable . . . eliminate." [202]

For decades, the Department and courts have applied an economic reality test to determine whether a worker is an employee or an independent contractor under the Act. The test was developed by the Supreme Court in interpreting and applying the social legislation of the 1930s, including the Fair Labor Standards Act, which defines the employment relationship in broad and

comprehensive terms. [203] In 1947, the Supreme Court issued two decisions, *Silk* and *Rutherford*, that used an economic reality test to determine employment status. [204] As explained in *Rutherford*, the "economic reality" test is designed to bring within such legislation "persons and working relationships which, prior to this Act, were not deemed to fall within an employer-employee category." [205] In applying this economic reality test, it is essential to consider the Act's statutory language. The determination of whether a worker is covered under the FLSA must be made in the context of the Act's own definitions and the courts' expansive reading of its scope. [206] The

---

[195] 29 U.S.C. 203(d), (e)(1), (g).

[196] Brief for the Administrator at 10, *Rutherford Food Corp.* v. *McComb*, 331 U.S. 722 (1947) (No. 562), 1947 WL 43939, at *10 (quoting *Portland Terminal*, 330 U.S. at 152).

[197] *Id.*

[198] *Rutherford*, 331 U.S. at 728–30.

[199] 88 F.3d 925, 929 n.5 (11th Cir. 1996).

[200] *See, e.g., Darden*, 503 U.S. at 326 (noting that "employ" is defined with "striking breadth" (citing *Rutherford*, 331 U.S. at 728)); *Rosenwasser*, 323 U.S. at 362 ("A broader or more comprehensive coverage of employees . . . would be difficult to frame."); *Robicheaux* v. *Radcliff Material, Inc.*, 697 F.2d 662, 665 (5th Cir. 1983) ("The term 'employee' is thus used 'in the broadest sense "ever . . . included in any act.' " (quoting *Donovan* v. *Am. Airlines, Inc.*, 686 F.2d 267, 271 (5th Cir. 1982))).

[201] 29 U.S.C. 202(a).

[202] *See id.* at sec. 202(a), (b); *see also Rosenwasser*, 323 U.S. at 361–62; *Pilgrim Equip.*, 527 F.2d at 1311 ("Given the remedial purposes of the legislation, an expansive definition of 'employee' has been adopted by the courts.").

[203] *Rosenwasser*, 323 U.S. at 362.

[204] *See Silk*, 331 U.S. at 716–18 (applying the test under the Social Security Act); *Rutherford*, 331 U.S. at 730 (same under the FLSA).

[205] *Rutherford*, 331 U.S. at 729; *see also Whitaker House*, 366 U.S. at 31–32 (describing the same as it relates to homeworkers).

[206] The line of cases in which the Supreme Court has repeatedly recognized that the definitions of "employ," "employee," and "employer" that establish who is entitled to the FLSA's protections were written broadly and have appropriately been interpreted broadly are premised on the statutory text itself, not on any principle of how to interpret remedial legislation. Because these cases addressing the Act's definitions do not address exemptions from the Act's pay requirements, they have not been called into question by *Encino Motorcars* v. *Navarro*, 138 S. Ct. 1134 (2018), which overturned a rule of interpretation based on the FLSA's remedial purpose that applied to the Act's exemptions. In *Encino*, the Supreme Court addressed an exemption from the FLSA's overtime pay requirements and ruled that the "narrow construction" principle—that FLSA exemptions should be narrowly construed in favor of employee status—should no longer be used. The Court explained that instead, such exemptions should be given a fair reading, stating "[b]ecause the FLSA gives no textual indication that its exemptions should be construed narrowly, there is no reason to give [them] anything other than a fair (rather than a narrow) interpretation." *Encino*, 138 S. Ct. at 1142 (internal quotations and citation omitted). This decision did not apply to the Act's definitions, and, crucially, there is no need to rely on such an interpretive principle here because there is a clear textual indication in the Act's definitions, by the inclusion of the "suffer or permit" language, that broad coverage under the Act was intended. *See* 29 U.S.C. 203(g). Thus, the broad scope of who is an employee under the FLSA comes from the statutory text itself and not any "narrow-construction" principle. Moreover, *Encino* did not hold that the FLSA's remedial purpose may never be considered, it simply noted that the FLSA "pursues" its remedial purpose "at all costs.' " *Id.* at 1142 (quoting *American Express Co.* v. *Italian Colors Restaurant*, 570 U.S. 228, 234 (2013)) [emphasis added]. To the extent that the language in the 2021 IC Rule preamble implied that the Act's remedial purpose can never be considered, including when determining whether an individual is an employee or an independent contractor under the FLSA, the Department clarifies that it believes that this would be an unwarranted extension of the Supreme Court's decision. *See, e.g.,* 86 FR 1207–08 (discussing *Encino's* application in response to commenters' concerns that the 2021 IC Rule conflicted with the FLSA's remedial purpose). Finally, courts have not changed their application

FLSA's "particularly broad" definition of "employee" encompasses all workers who are, "as a matter of economic reality, . . . economically dependent upon the alleged employer." [207] Only a worker who "is instead in business for himself" is an independent contractor not covered by the Act.[208] The "focus" and "ultimate concept" of the determination of whether a worker is an employee or an independent contractor, then, is "the *economic dependence* of the alleged employee." [209] The statutory language thus frames the central question that the economic reality test asks—whether the worker is economically dependent on an employer who suffers or permits the work or whether the worker is in business for themself.

To aid in answering this ultimate inquiry of economic dependence, several factors have been considered by courts and the Department as particularly probative when conducting a totality-of-the-circumstances analysis of whether a worker is an employee or an independent contractor under the FLSA.[210] In *Silk*, the Supreme Court suggested that "degrees of control, opportunities for profit or loss, investment in facilities, permanency of relation and skill required in the claimed independent operation are important for decision." [211] The Court cautioned that no single factor is controlling and that the list is not exhaustive.[212] In *Rutherford*, the Court used a similar analysis considering "the circumstances of the whole activity," and relied on the fact that the workers' work was "a part of the integrated unit of production." [213] Since *Silk* and *Rutherford*, Federal courts of appeals have applied the economic reality test to distinguish independent contractors from employees who are entitled to the FLSA's protections. Federal appellate

courts considering employee or independent contractor status under the FLSA generally analyze the economic realities of the work relationship using the factors identified in *Silk* and *Rutherford*.[214] There is significant and widespread uniformity among the circuit courts in the application of the economic reality test, although there is slight variation as to the number of factors considered or how the factors are framed (for example, whether relative investment is considered within the investment factor, or whether skill must be used with business-like initiative).[215] As the 2021 IC Rule explained, "[m]ost courts of appeals articulate a similar test," and these courts consistently caution against the "mechanical application" of the economic reality factors, view the factors as tools to "gauge . . . economic dependence," and "make clear that the analysis should draw from the totality of circumstances, with no single factor being determinative by itself." [216] All of the circuit courts that have addressed employee or independent contractor status consider five of the same factors.[217] Briefly, these factors include the degree of control exercised by the employer over the worker, skill, permanency, opportunity for profit or loss, and investment, although the Second Circuit and the D.C. Circuit treat the worker's opportunity for profit or loss and the worker's investment as a single factor.[218] Nearly all circuit courts expressly consider a sixth factor, whether the work is an integral part of the employer's business. The Fifth Circuit has not adopted the integral factor but has at times assessed integrality as an additional relevant factor.[219]

Because the 2021 IC Rule focused on these slight variations among some of the factors or how to apply certain factors, it overlooked both the broader fact that the ultimate inquiry has

remained unchanged as well as the extent of the consistency in use of the economic reality test among the courts of appeals. The economic reality test, the case law, and the Department's position have remained remarkably consistent since the 1940's—the test's focus has remained on whether the worker is in business for themself, with the inquiry directed toward the question of economic dependence. It is not surprising that some courts and the Department may have used slightly different iterations of the factors over the last several decades, as the factors "are aids—tools to be used to gauge the degree of dependence of alleged employees on the business with which they are connected." [220] These factors are only guideposts, and "[i]t is dependence that indicates employee status. Each [factor] must be applied with that ultimate notion in mind." [221] This is why most courts, and the Department, have long made clear that additional factors may be relevant when applying the test to a particular case. It is also expected that outcomes may vary somewhat among workers in the same profession, for example, because the test demands a fact-specific analysis and facts like job titles may not be probative of the economic realities of the relationship. In undertaking this analysis, each factor is examined and analyzed in relation to one another and to the Act's definitions. The test should not be approached in a formulaic manner, neglecting to consider the statutory framework upon which the test is based. Importantly, "[n]one of these factors is determinative on its own, and each must be considered with an eye toward the ultimate question— the worker's economic dependence on or independence from the alleged employer." [222]

With this proposed rulemaking, the Department describes the economic reality factors that reflect the totality-of-the-circumstances approach that courts have taken for decades, and provides an analysis as to how the Department considers each factor in today's workplaces, based on case law and the Department's enforcement expertise in this area. For example, the proposed investment factor is returned to being a standalone factor, considers facts such as whether the investment is capital or entrepreneurial in nature, and considers the worker's investments relative to the employer's investments. Significant additional guidance is provided for the

---

of the economic reality test to determine employee status based on *Encino.*

[207] *Hopkins v. Cornerstone Am.,* 545 F.3d 338, 343 (5th Cir. 2008) (citing *Darden,* 503 U.S. at 326; *Herman v. Express Sixty-Minutes Delivery Serv., Inc.,* 161 F.3d 299, 303 (5th Cir. 1998)).

[208] *Id.* (citing *Express Sixty-Minutes,* 161 F.3d at 303).

[209] *Id.* (emphasis in the original); *see also Pilgrim Equip.,* 527 F.2d at 1311–12 ("[T]he final and determinative question must be whether the total of the testing establishes the personnel are so dependent upon the business with which they are connected that they come within the protection of [the] FLSA or are sufficiently independent to lie outside its ambit.").

[210] *See, e.g., Flint Eng'g,* 137 F.3d at 1441 (explaining that "[n]one of the factors alone is dispositive; instead, the court must employ a totality-of-the-circumstances approach").

[211] 331 U.S. at 716.

[212] *See id.*

[213] *Rutherford,* 331 U.S. at 729–30.

[214] *See generally supra* nn. 51–52.

[215] *See, e.g., Cornerstone Am.,* 545 F.3d at 344 (discussing relative investment); *Superior Care,* 840 F.2d at 1060 (discussing the use of skill as it relates to business-like initiative).

[216] 86 FR 1170; *see also Saleem v. Corporate Transp. Grp., Ltd.,* 854 F.3d 131,139–40 (2d Cir. 2020); *Cornerstone Am.,* 545 F.3d at 343; *Keller v. Miri Microsystems LLC,* 781 F.3d 799, 807 (6th Cir. 2015); *Flint Eng'g,* 137 F.3d at 1440–41.

[217] *Superior Care, Inc.,* 840 F.2d at 1058–59; *DialAmerica,* 757 F.2d at 1382–83; *McFeeley,* 825 F.3d at 241; *Off Duty Police,* 915 F.3d at 1055; *Lauritzen,* 835 F.2d at 1534–35; *Alpha & Omega,* 39 F.4th at 1082; *Driscoll,* 603 F.2d at 754–55; *Paragon,* 884 F.3d at 1235; *Scantland,* 721 F.3d at 1311–12; *Morrison,* 253 F.3d at 11.

[218] *See, e.g. Superior Care,* 840 F.2d at 1058–59; *Morrison,* 253 F.3d at 11 (citing *Superior Care,* 840 F.2d at 1058–59).

[219] *See, e.g., Hobbs,* 946 F.3d at 836.

[220] *Pilgrim Equip.,* 527 F.2d at 1311.

[221] *Id.*

[222] *Off Duty Police,* 915 F.3d at 1055 (alterations and internal quotations omitted).

proposed control factor, including detailed discussions of how scheduling, supervision, price-setting, and the ability to work for others should be considered when analyzing the degree of control exerted over a worker. And the proposed integral factor is returned to its longstanding Departmental and judicial interpretation, rather than the "integrated unit of production" approach that was included in the 2021 IC Rule.

This totality-of-the-circumstances analysis considers all factors that may be relevant and, in accordance with the case law, does not assign any of the factors a predetermined weight. While the 2021 IC Rule aspired to provide a clearer test, the Department believes, upon further consideration, that the weighted analysis in the 2021 IC Rule, which could have the effect of winnowing the test to two "core" factors—control and opportunity for profit or loss—sits in tension with decades of instruction from the Supreme Court and the circuit courts of appeals, as well as the Department's own longstanding position that no factor or subset of factors should carry more or less weight in all cases. The 2021 IC Rule also errs in bringing the test closer to the common law test, which is inconsistent with the plain text of the Act and the case law interpreting it.[223] Limiting and weighting the factors in such a predetermined manner undermines the very purpose of the test, which is to consider—based on the economic realities—whether a worker is economically dependent on the employer for work or is in business for themself.[224] Importantly, each factor, considered in isolation, does not determine whether a worker is economically dependent on an employer for work or in business for themself. Rather, the factors are merely tools or indicators and must be analyzed together in order to answer this ultimate inquiry.[225]

This is not to say that in a particular case one factor may not be more or less probative than others—this is to be expected in each fact-specific analysis.

One or more factors may be more probative than the other factors depending on the facts and circumstances of a case; the analysis, however, cannot be conducted like a scorecard or a checklist. For example, two factors that strongly indicate employment status in a particular case could possibly outweigh other factors that indicate independent contractor status. But to assign a predetermined and immutable weight to certain factors ignores the totality-of-the-circumstances, fact-specific nature of the inquiry that is intended to reach a multitude of employment relationships across occupations and industries and over time. Similarly, it is possible that not every factor will be particularly relevant in each case and that is also to be expected.[226]

Thus, the economic reality factors help determine whether a worker is in business for themself or is instead economically dependent on the employer for work.[227] "Ultimately, in considering economic dependence, the court focuses on whether an individual is 'in business for himself' or is 'dependent upon finding employment in the business of others.' "[228] Economic dependence, however, "does not concern whether the workers at issue depend on the money they earn for obtaining the necessities of life . . . . Rather, it examines whether the workers are dependent on a particular business or organization for their continued employment."[229] Additionally, consistent with the 2021 IC Rule, economic dependence does not mean that a worker who works for other employers, earns a very limited income from a particular employer, or is independently wealthy, cannot nevertheless be economically dependent on that employer for purposes of the

FLSA.[230] As the Fifth Circuit has explained, "it is not dependence in the sense that one could not survive without the income from the job that we examine, but dependence for continued employment."[231]

The 2021 IC Rule stated that one of the reasons for that rulemaking was to reduce "overlap" between factors.[232] In the effort to eliminate redundancy, the 2021 IC Rule limits full consideration of how the factors may interrelate or be more relevant in certain factual scenarios than others. Upon further consideration, the Department believes that emphasizing the discrete nature of each particular factor and evaluating each factor in a vacuum fails to analyze potential employment relationships in the manner demanded by the Act's text and accompanying case law. The Act's definitions envision a broad range of potential employment relationships— defining "employer" as including "any person acting directly or indirectly in the interest of an employer in relation to an employee" and using the "suffer or permit" standard—and the test needs to be applicable to all of those potential relationships.[233] The Department recognizes that there are a variety of bona fide independent contractor relationships that need to be adequately addressed by the test as well.[234]

Applying a formulaic or rote analysis that isolates each factor is contrary to decades of case law, decreases the utility of the economic reality test, and makes it harder to analyze the ultimate inquiry of economic dependence. Rather, the analysis needs to be flexible enough to work for all kinds of jobs, all kinds of workers, from traditional economy jobs to jobs in emerging business models. A multifactor, totality-of-the-circumstances test provides that flexibility, which is why it has been used for more than 75 years to determine which workers receive the Act's basic labor protections. Making the test facially simpler by, for example, limiting consideration of the employment relationship to only two "core" factors (as the 2021 IC Rule in

---

[223] See supra section III.A.2.

[224] See, e.g., Scantland, 721 F.3d at 1312 (quoting Mednick v. Albert Enters., Inc., 508 F.2d 297, 301–02 (5th Cir. 1975)); see also Saleem, 854 F.3d at 139–140; Brock v. Mr. W Fireworks, Inc., 814 F.2d 1042, 1054–55 (5th Cir. 1987).

[225] See, e.g., Scantland, 721 F.3d at 1312 (the economic reality factors "serve as guides, [and] the overarching focus of the inquiry is economic dependence"); Pilgrim Equip., 527 F.2d at 1311 (The economic reality factors "are aids—tools to be used to gauge the degree of dependence of alleged employees on the business with which they are connected. It is dependence that indicates employee status. Each test must be applied with that ultimate notion in mind.").

[226] See, e.g., Lauritzen, 835 F.2d at 1534 (referring to the economic reality factors and stating that "[c]ertain criteria have been developed to assist in determining the true nature of the relationship, but no criterion is by itself, or by its absence, dispositive or controlling.").

[227] See, e.g., Cornerstone Am., 545 F.3d at 343 ("To determine if a worker qualifies as an employee, we focus on whether, as a matter of economic reality, the worker is economically dependent upon the alleged employer or is instead in business for himself."); Flint Eng'g, 137 F.3d at 1440 (noting that the economic realities of the relationship govern, and the focal point is whether the individual is economically dependent on the business to which he renders service or is, as a matter of economic fact, in business for himself); Superior Care, 840 F.2d at 1059 ("The ultimate concern is whether, as a matter of economic reality, the workers depend upon someone else's business . . . or are in business for themselves.").

[228] Scantland, 721 F.3d at 1312 (quoting Mednick, 508 F.2d at 301–02).

[229] DialAmerica, 757 F.2d at 1385.

[230] See 86 FR 1173; see also McLaughlin v. Seafood, Inc., 861 F.2d 450, 452–53 (5th Cir. 1988) (reasoning that "[l]aborers who work for two different employers on alternate days are no less economically dependent than laborers who work for a single employer"); Halferty v. Pulse Drug Co., 821 F.2d 261, 267–68 (5th Cir. 1987) (rejecting the employer's argument that the worker's wages were too little to constitute dependence).

[231] See Halferty, 821 F.2d at 268.

[232] 86 FR 1202.

[233] See 29 U.S.C. 203(d), (g).

[234] Independent contractors are not "employees" for purposes of the FLSA. See generally Portland Terminal, 330 U.S. at 152 (stating that the "definition 'suffer or permit to work' was obviously not intended to stamp all persons as employees").

effect does in some cases), ranking all of the factors, or creating a checklist, is unfaithful to the text of the Act and decades of case law. It also ignores what the test is required to do, which is to provide a totality-of-the-circumstances analysis to determine, in a wide variety of settings, which workers are economically dependent on their employers for work and should receive the basic labor protections of the Act. The FLSA applies to an extremely broad scope of employment relationships, and only workers who are in business for themselves are excluded from its coverage as independent contractors. The economic reality test, applied in view of the Act's definitions and with a focus on economic dependence, is able to assess that scope of potential employment relationships.

The Department is providing a detailed analysis about the application of each factor in this NPRM based on case law and the Department's enforcement experience as a guide for employers and workers in determining whether a worker is an employee or an independent contractor. Each factor is reviewed with the ultimate inquiry in mind: whether the worker is economically dependent on the employer for work or in business for themself. The following discussion addresses each of the economic reality factors, including proposed revisions made to each to better reflect the weight of legal authority throughout the country.

### 1. Opportunity for Profit or Loss Depending on Managerial Skill (Proposed § 795.110(b)(1))

Section 795.105(d)(1)(ii) of the 2021 IC Rule states that the opportunity for profit or loss factor "weighs towards the individual being an independent contractor to the extent the individual has an opportunity to earn profits or incur losses based on his or her exercise of initiative (such as managerial skill or business acumen or judgment) or management of his or her investment in or capital expenditure on, for example, helpers or equipment or material to further his or her work." [235] The provision also states that, "[w]hile the effects of the individual's exercise of initiative and management of investment are both considered under this factor, the individual does not need to have an opportunity for profit or loss based on both for this factor to weigh towards the individual being an independent contractor." [236] Finally, the provision provides that "[t]his factor

weighs towards the individual being an employee to the extent the individual is unable to affect his or her earnings or is only able to do so by working more hours or faster." [237]

Proposed § 795.110(b)(1) focuses the opportunity for profit or loss factor on whether the worker exercises managerial skill that affects the worker's economic success or failure in performing the work. The 2021 IC Rule similarly considered managerial skill, as noted above. As discussed below, however, the Department is proposing to consider investment as a separate factor in the analysis, unlike the approach in the 2021 IC Rule. The proposed provision provides guidance on the application of this factor, including a non-exhaustive list of relevant facts to consider. And the proposed provision states that if a worker has no opportunity for a profit or loss, then that fact suggests that the worker is an employee. Similar to the 2021 IC Rule, the proposal states that some decisions by a worker that can affect the amount of pay that a worker receives, such as the decision to work more hours or take more jobs, generally do not reflect the exercise of managerial skill indicating independent contractor status under this factor. Compared to the 2021 IC Rule, proposed § 795.110(b)(1) more accurately reflects the consideration of the profit or loss factor in the case law and reflects the ultimate inquiry into the worker's economic dependence or independence.

Many circuit courts of appeals apply this factor with an eye to whether the worker is using managerial skill to affect the worker's opportunity for profit or loss. For example, the Third Circuit describes the factor as the opportunity for profit or loss depending on managerial skill. [238] In *Razak* v. *Uber Technologies, Inc.*, the Third Circuit reversed the district court's ruling that this factor indicated independent contractor status, holding that, because the employer "decides (1) the fare[,] (2) which driver receives a trip request[,] (3) whether to refund or cancel a passenger's fare[,] and (4) a driver's territory," "a reasonable fact-finder" could "rule in favor of" employee status on this factor.[239] In *Verma* v. *3001 Castor, Inc.*, the Third Circuit acknowledged that each exotic dancer "had some degree of control over her profits and losses" by attracting

followers to the club, but explained that managerial skill is "the relevant factor here." [240] After cataloguing the numerous ways in which the employer determined and managed the dancers' opportunity for profit or loss (such as determining the hours of operation, deciding whether to charge an admission fee, setting the length and price of dances on stage and in private rooms, and managing the club's atmosphere, operations, and advertising), the court ultimately found that any managerial skills exercised by the dancers had "minimal influence," and ruled that this factor weighed in favor of employee status.[241]

Other courts likewise consider whether the workers' opportunities for profit or loss depend on their managerial skill.[242] In *McFeeley* v. *Jackson Street Entertainment, LLC*, the Fourth Circuit found that the dancers' "opportunities for profit or loss depended far more on [the employer's] management and decision-making than on their own" because the employer controlled the client base, handled all advertising, managed the club's atmosphere, and determined pricing.[243] And in *Schultz* v. *Capital International Security, Inc.*, the court concluded that "[t]here is no evidence the agents could exercise or hone their managerial skill to increase their pay." [244] The Sixth Circuit likewise assesses whether the workers' opportunities for profit or loss depend on their managerial skill.[245] For example, in *Acosta* v. *Off Duty Police Services, Inc.*, the Sixth Circuit ruled that this factor favored employee status because the workers "earned a set hourly wage regardless of" the managerial skill they exercised, and the employer required them to work fixed hourly shifts "regardless of what skills they exercised, so workers could not complete jobs more or less efficiently than their counterparts." [246] The Seventh, Ninth, and Eleventh Circuits also describe this factor as the worker's

---

[235] 86 FR 1247.
[236] *Id.*

[237] *Id.*
[238] *See, e.g., Razak* v. *Uber Techs., Inc.*, 951 F.3d 137, 146 (3d Cir.), *amended*, 979 F.3d 192 (3d Cir. 2020), *and cert. denied*, 141 S. Ct. 2629 (2021); *Verma* v. *3001 Castor, Inc.*, 937 F.3d 221, 229 (3d Cir. 2019) (citing *Selker Bros.*, 949 F.2d at 1293).
[239] 951 F.3d at 146–47.

[240] 937 F.3d at 230–31.
[241] *Id.* at 231.
[242] *See, e.g., McFeeley*, 825 F.3d at 241 (citing *Schultz* v. *Capital Int'l Sec., Inc.*, 466 F.3d 298, 304–05 (4th Cir. 2006)).
[243] 825 F.3d at 243.
[244] 466 F.3d at 308.
[245] *See, e.g., Off Duty Police*, 915 F.3d at 1059; *Keller*, 781 F.3d at 812 (describing this factor as whether the worker "had an opportunity for greater profits based on his management and technical skills").
[246] 915 F.3d at 1059. In response to the employer's argument that the workers could accept or reject shifts, the court explained that "[w]hile the decision to accept or reject work is a type of managerial *action*, the relevant question is whether workers could increase profits through managerial *skill*." *Id.* (emphases in original).

opportunity for profit or loss depending on the worker's managerial skill.[247]

Other circuits do not articulate this factor by expressly using the words "managerial skill," but they nonetheless apply the factor in a very similar way by focusing on whether the worker has an opportunity to use "initiative" or "judgment" to affect profits or losses. For example, the Tenth Circuit has found that this factor favored employee status because the workers' "earnings did not depend upon their judgment or initiative, but on the [employer's] need for their work."[248] And when affirming a ruling that this factor indicated employee status in another case, the Tenth Circuit explained that the workers "exercise independent initiative only in locating new work assignments," and "[w]hile working on a particular assignment, there is little or no room for initiative (certainly none related to profit or loss)."[249] The Second Circuit, although it considers the workers' opportunities for profit or loss along with their investment as one factor,[250] similarly evaluates the extent to which the workers' business judgment or acumen affects their opportunity for profit or loss. In *Franze* v. *Bimbo Bakeries USA, Inc.*, the Second Circuit found this factor to favor independent contractor status because the workers purchased delivery territories that could ultimately be sold again and the overall value of their territories "primarily depended on their own business judgment and foresight in modifying their territories and managing day-to-day costs, suggesting that they bore the risks of their decisions."[251] And in *Saleem* v. *Corporate Transportation Group, Ltd.*, the Second Circuit found that the workers "possessed considerable independence in maximizing their income through a variety of means" and their profits increased through their initiative, judgment, and foresight—indicating independent contractor status.[252]

By concentrating on the degree to which the worker's opportunity for

profit or loss is determined by the employer,[253] the Fifth Circuit focuses on whether the worker exercises judgment or initiative vis-a-vis the employer to affect profit or loss and thus takes a related approach to this factor. In *Hobbs* v. *Petroplex Pipe & Construction, Inc.*, for example, the Fifth Circuit relied on the facts that the workers never negotiated their rates of pay (the employer set a fixed hourly rate) and "the work schedule imposed by [the employer] severely limited the [workers'] opportunity for profit or loss" (meaning that "it would have been unrealistic for them to have worked for other companies") to affirm a finding that this factor indicated employee status.[254] In *Hopkins* v. *Cornerstone America*, the Fifth Circuit found that this factor weighed in favor of employee status because "[t]he major determinants of the Sales Leaders' profit or loss were controlled almost exclusively by [the employer]," including "the hiring, firing, and assignment of subordinate agents," the "overwrite commissions," the "distribution of sales leads," which products they could sell, and their territories.[255] In *Parrish* v. *Premier Directional Drilling, L.P.*, the Fifth Circuit found that the workers had "enough control over their profits and losses to have this factor support [independent contractor] status," including by making "decisions affecting their expenses."[256] And in *Herman* v. *Express Sixty-Minutes Delivery Service, Inc.*, the Fifth Circuit affirmed the district court's finding that this factor favored independent contractor status because "a driver's profit or loss is determined largely on his or her skill, initiative, ability to cut costs, and understanding of the courier business."[257]

In AI 2015–1, the Department described this factor as whether the worker's managerial skill affects the worker's opportunity for profit or loss and explained that this factor focuses "on whether the worker has the ability to make decisions and use his or her managerial skill and initiative to affect opportunity for profit or loss."[258] Section 795.105(d)(1)(ii) of the 2021 IC Rule similarly considers the impact of the worker's initiative and managerial

skill on the opportunity for profits or losses, discussing the worker's "exercise of initiative (such as managerial skill or business acumen or judgment)."[259] It also considers the impact of the worker's "management of his or her investment in or capital expenditure on, for example, helpers or equipment or material to further his or her work" on the worker's opportunity for profit or loss.[260] For the reasons explained below, however, the Department is proposing that investment be a separate, standalone factor in the analysis.[261]

Focusing on managerial skill, proposed § 795.110(b)(1) sets forth the following facts, which among others, can be relevant to assessing the degree to which the worker's managerial skill affects the worker's economic success or failure in performing the work: whether the worker determines the charge or pay for the work provided (or at least can meaningfully negotiate it); whether the worker accepts or declines jobs or chooses or can meaningfully negotiate the order and/or time in which the jobs are performed; whether the worker engages in marketing, advertising, or other efforts to expand their business or secure more work; and whether the worker makes decisions to hire others, purchase materials and equipment, and/ or rent space (as opposed to the amount and nature of the worker's investment).

In addition to those facts, whether the worker actually has an opportunity for a loss should be considered. Consistent with the overall inquiry of determining whether a worker is economically dependent on the employer or in business for themself, the fact that a worker has no opportunity for a loss indicates employee status. On the other hand, workers who are in business for themselves face the possibility of experiencing a loss, and the risk of a loss as a possible result of the worker's managerial decisions indicates independent contractor status. Workers who incur little or no costs or expenses, simply provide their labor, and/or are paid an hourly or flat rate are unlikely to possibly experience a loss, and this factor may suggest employee status in those circumstances. The fact that workers may earn more or less at times (and their earnings may decline)

[247] See, e.g., Lauritzen, 835 F.2d at 1535; *Iontchev* v. *AAA Cab Serv., Inc.*, 685 F. App'x 548, 550 (9th Cir. 2017) (finding that the workers' "opportunity for profit or loss depended upon their managerial skill"); *Driscoll*, 603 F.2d at 754–55; *Scantland*, 721 F.3d at 1312. And the Eighth Circuit recently described this factor as "whether workers had control over profits and losses depending on their 'managerial skill.'" *Alpha & Omega*, 39 F.4th at 1084.

[248] Snell, 875 F.2d at 810.

[249] Flint Eng'g, 137 F.3d at 1441.

[250] See, e.g., Franze, 826 F. App'x at 76; *Superior Care*, 840 F.2d at 1058–59.

[251] 826 F. App'x at 77–78 (internal quotations omitted).

[252] 854 F.3d at 143–44.

[253] See, e.g., Hobbs, 946 F.3d at 832–34; *Parrish*, 917 F.3d at 384–85.

[254] 946 F.3d at 833–34.

[255] 545 F.3d 338, 344–45 (5th Cir. 2008).

[256] 917 F.3d at 384–85. The workers could also turn down work and negotiate their pay. *See id.* at 378.

[257] 161 F.3d at 304.

[258] AI 2015–1, 2015 WL 4449086, at *6 & n.7 (withdrawn June 7, 2017).

[259] 86 FR 1247.

[260] Id.

[261] See infra, section V.C.2. In addition to the explanation set forth *infra*, the Department is concerned by situations where workers are required to make a significant upfront payment in order to be allowed to perform work as non-employees but they exercise little, if any, managerial skill. In those situations, application of the opportunity for profit or loss factor should indicate employee status because of the lack of managerial skills affecting the opportunity for profit or loss.

depending on how much they work is not the equivalent of experiencing a financial loss.

For example, the Third Circuit has explained that certain workers whose earnings "derived primarily from their fixed commission" from the employer and "were not tied to price levels and resale profit margins" had "no meaningful opportunities for profit nor any significant risk of financial loss," indicating employee status.[262] Yet, a finding that workers "risked financial loss" indicates independent contractor status.[263] The Tenth Circuit has explained, in a case finding that this factor favored employee status, that the workers "did not undertake the risks usually associated with an independent business," "there was no way that [they] could experience a business loss," and "[a] reduction in money earned by the [workers] is not a 'loss' sufficient to satisfy the criteria for independent contractor status."[264] The Seventh Circuit has explained, in a case involving migrant farm workers, that they had no possibility of a loss and that "[a]ny reduction in earnings due to a poor pickle crop is a loss of wages, and not of an investment."[265] And the Sixth Circuit has explained in a case involving workers paid by the hour that they did not "appear to have been at risk of a loss based on their decision to work or not" and that "[d]ecreased pay from working fewer hours does not qualify as a loss."[266] Relatedly, the fact that an employer may impose fines, penalties, or chargebacks on a worker for faulty performance does not mean that the worker may experience a loss. The Eleventh Circuit has explained that the "argument that plaintiffs could control losses by avoiding chargebacks is unpersuasive," elaborating that "[c]hargebacks relate to the quality of a technician's skill, not his managerial or entrepreneurial prowess."[267]

Some decisions by a worker that may affect the worker's earnings do not necessarily reflect managerial skill. Accordingly, proposed § 795.110(b)(1) explains that a worker's decision to work more hours (when paid hourly) or work more jobs (when paid a flat fee per job) where the employer controls

assignment of hours or jobs is similar to decisions that employees routinely make and does not reflect managerial skill.

The Eleventh Circuit explained in a case involving cable installers that their "opportunity for profit was largely limited to their ability to complete more jobs than assigned, which is analogous to an employee's ability to take on overtime work or an efficient piece-rate worker's ability to produce more pieces."[268] The court further explained that a worker's "ability to earn more by being more technically proficient is unrelated to [the worker's] ability to earn or lose profit via his managerial skill, and it does not indicate that he operates his own business."[269] The Fourth Circuit similarly explained in a case involving security guards that the guards could not "exercise or hone their managerial skill to increase their pay" because the employer "paid [them] a set rate for each shift worked" and the customer's "schedule and security needs dictated the number of shifts available and the hours worked."[270] And the Sixth Circuit explained in a case involving workers paid by the hour that they "earned a set hourly wage regardless of the skill they exercised."[271] By comparison, the Eighth Circuit found in a case involving a process server that, because the worker decided where and how often to work and "decided which assignments he was willing to accept" based on the worker's own decisions regarding which jobs were more or less profitable and without any negative consequences imposed by the employer, this factor indicated independent contractor status.[272] Thus, where a worker is paid

by the job, the worker's decision to work more jobs and the worker's technical proficiency in completing each job are not the type of managerial skill that would indicate independent contractor status under this factor.

Proposed § 795.110(b)(1) is consistent on this point with 2021 IC Rule § 795.105(d)(1)(ii), which states that the opportunity for profit or loss factor "weighs towards the individual being an employee to the extent the individual is unable to affect his or her earnings or is only able to do so by working more hours or faster."[273] The Department likewise stated in AI 2015–1 that a "worker's ability to work more hours and the amount of work available from the employer have nothing to do with the worker's managerial skill and do little to separate employees from independent contractors—both of whom are likely to earn more if they work more and if there is more work available."[274] Thus, the Department's proposed regulation on this point is consistent with its prior guidance in addition to being supported by case law.[275]

The Department welcomes comments on all aspects of this factor.

Example: Opportunity for Profit or Loss Depending on Managerial Skill[276]

A worker for a landscaping company performs assignments only as determined by the company for its corporate clients. The worker does not independently choose assignments, solicit additional work from other clients, advertise their services, or endeavor to reduce costs. The worker regularly agrees to work additional hours in order to earn more. In this scenario, the worker does not exercise managerial skill that affects their profit or loss. Rather, their earnings may fluctuate based on the work available and their willingness to work more.

---

[262] Selker Bros., 949 F.2d at 1294 (emphasis added).

[263] DialAmerica, 757 F.2d at 1386.

[264] Snell, 875 F.2d at 810. See also Flint Eng'g, 137 F.3d at 1441 ("[P]laintiffs are hired on a per-hour basis rather than on a flat-rate-per-job basis. There is no incentive for plaintiffs to work faster or more efficiently in order to increase their opportunity for profit. Moreover, there is absolutely no risk of loss on plaintiffs' part.").

[265] Lauritzen, 835 F.2d at 1536.

[266] Off Duty Police, 915 F.3d at 1059.

[267] Scantland, 721 F.3d at 1317.

[268] Id. at 1316–17.

[269] Id. at 1317.

[270] Capital Int'l, 466 F.3d at 308.

[271] Off Duty Police, 915 F.3d at 1059. See also Snell, 875 F.2d at 810 (cake decorators' "earnings did not depend upon their judgment or initiative, but on the [employer's] need for their work"); Collinge v. IntelliQuick Delivery, Inc., No. 2:12-cv-00824 JWS, 2015 WL 1299369, at *4–5 (D. Ariz. Mar. 23, 2015) (workers could not increase profit by taking on more work, noting that "a worker's ability to simply work more is irrelevant" because "[m]ore work may lead to more revenue, but not necessarily more profit"); Solis v. Kansas City Transp. Grp., No. 10–0887–CV–W–REL, 2012 WL 3753736, at *9 (W.D. Mo. Aug. 28, 2012) ("The driver's ability to make more money by driving additional routes is akin to a waiter making more money by taking another shift."); Solis v. Cascom, No. 3:09-cv-257, 2011 WL 10501391, at *6 (S.D. Ohio Sept. 21, 2011) (explaining that there was no opportunity for increased profit based on the workers' managerial skills; although they could work additional hours to increase their income, they made no decisions regarding routes, acquisition of materials, "or any facet normally associated with operating an independent business").

[272] See Karlson v. Action Process Serv. & Priv. Investigation, LLC, 860 F.3d 1089, 1095 (8th Cir.

2017). See also Express Sixty-Minutes, 161 F.3d at 304 (opportunity for profit or loss factor indicated independent contractor status because the drivers could choose among "which jobs were most profitable").

[273] 86 FR 1247.

[274] 2015 WL 4449086, at *6 (withdrawn June 7, 2017).

[275] The Department notes, as it explains elsewhere in this proposal, that the fact that a worker has a business in an industry separate from the business in which the worker is working for the employer has little relevance when applying this factor.

[276] The Department is providing examples at the end of the discussion of each factor for the benefit of the public, and the addition or alteration of any of the facts in any of the examples may change the resulting analysis. Additionally, while the examples help illustrate the application of particular factors of the economic reality test, no one factor is determinative of whether a worker is an employee or independent contractor.

Because of this lack of managerial skill affecting opportunity for profit or loss, this factor indicates employee status.

In contrast, a worker provides landscaping services directly to corporate clients, including Company A. The worker produces their own advertising, negotiates contracts, decides which jobs to perform and when to perform them, and decides when and whether to hire helpers to assist with the work. This worker exercises managerial skill that affects their opportunity for profit or loss, indicating independent contractor status.

2. Investments by the Worker and the Employer (Proposed § 795.110(b)(2))

The Department is proposing to treat investment as a standalone factor in the economic reality analysis (consistent with the Department's approach prior to the 2021 IC Rule and with the approach of most courts) instead of considering investment within the opportunity for profit or loss factor (as § 795.105(d)(1)(ii) in the 2021 IC Rule does). Proposed § 795.110(b)(2) states that an investment borne by the worker must be capital or entrepreneurial in nature to indicate independent contractor status. Such investments, for example, generally support an independent business and serve a business-like function, such as increasing the worker's ability to do different types of or more work, reducing costs, or extending market reach, thus suggesting that the worker is in business for themself. Proposed § 795.110(b)(2) further notes that costs borne by the worker simply to perform their job (e.g., tools and equipment to perform a specific job and the worker's labor) are not evidence of capital or entrepreneurial investment. Finally, proposed § 795.110(b)(2) provides that the worker's investments should be evaluated on a relative basis with the employer's investments, a position taken by many circuit courts of appeals.

From its earliest applications of the economic reality analysis until the 2021 IC Rule, the Department consistently identified the worker's investment as a separate factor in the analysis.[277]

Beginning with the Supreme Court's decision in Silk,[278] courts with the exception of the Second and D.C. Circuits have almost universally identified the worker's investment as a separate factor.[279] Breaking from this longstanding approach, the 2021 IC Rule stated that investment is considered as part of the opportunity for profit or loss factor: "[T]he Department adopts its proposal, consistent with Second Circuit caselaw, to consider investment as part of the opportunity factor."[280] The Department further stated in the 2021 IC Rule that courts consider opportunity for profit or loss and investment to be related and combining them into one factor eliminates duplicative analyses.[281]

The Department believes that the 2021 IC Rule's approach of considering investment "as part of" the opportunity for profit or loss factor is flawed. Section 795.105(d)(1)(ii) of the 2021 IC Rule states that the opportunity for profit or loss factor indicates independent contractor status if the worker exercises initiative or if the worker manages their investment in the business.[282] Under the provision, the worker "does not need to have an opportunity for profit or loss based on both for this factor to weigh towards the individual being an independent contractor."[283] Thus, if either initiative or investment suggests independent contractor status, the other cannot change that outcome even if it suggests employee status. For example, under the 2021 IC Rule, if the worker makes no investment in the work but exercises initiative, then the opportunity for profit or loss factor indicates independent contractor status. In effect, that the

worker makes no capital or entrepreneurial investment (a fact that indicates employee status) is eliminated from the analysis under that rule. Put another way, if a worker has an opportunity for profit or loss based on initiative, the opportunity for profit or loss factor under the 2021 IC Rule indicates independent contractor status, and the investment factor cannot reverse or weigh against that finding even if it indicates employee status as a matter of economic reality because, for example, the worker makes no investment. The Department believes that the way in which 2021 IC Rule § 795.105(d)(1)(ii) considers investment as part of the opportunity for profit or loss factor may incorrectly tilt the analysis in favor of independent contractor outcomes. Moreover, although the 2021 IC Rule purported to adopt the Second Circuit's approach of considering investment as part of opportunity for profit or loss, Second Circuit case law does not support the Rule's position that this factor indicates independent contractor status if either investment or initiative indicates an opportunity for profit or loss even if the other indicates employee status.[284]

There is little basis for an approach that always considers the worker's investment within the worker's opportunity for profit or loss factor, which can have the effect in some cases of preventing investment from affecting the analysis. The worker's investment may be relevant to whether the worker is economically dependent on the employer separate and apart from the worker's opportunity for profit or loss. This is consistent with various circuit court decisions which have found both opportunity for profit or loss and investment to be independently probative. For example, the Fifth Circuit found in Parrish that the investment factor favored employee status (although it merited "little weight" given the nature of the work) and that the opportunity for profit or loss factor favored independent contractor status.[285] In Cromwell v. Driftwood Electrical Contractors, Inc., the Fifth Circuit conversely found that the investment factor indicated independent contractor status because the workers "invested a relatively substantial amount in their trucks, equipment, and tools" but that their opportunity for profit or loss was "severely limit[ed]."[286] In Nieman v. National Claims Adjusters, Inc., the Eleventh Circuit found that the

[277] See, e.g., WHD Op. Ltr. (Aug. 13, 1954); WHD Op. Ltr. FLSA–795 (Sept. 30, 1964); WHD Op. Ltr. (Oct. 12, 1985); WHD Op. Ltr. (Sept. 12, 1969); WHD Op. Ltr. WH–476, 1976 WL 51437, at *1 (Oct. 19, 1976); WHD Op. Ltr., 1986 WL 1171063, at *1 (Jan. 14, 1986); WHD Op. Ltr., 1986 WL 740454, at *1 (June 23, 1986); WHD Op. Ltr., 1995 WL 1032469, at *1 (Mar. 2, 1995); WHD Op. Ltr., 1995 WL 1032489, at *1 (June 5, 1995); WHD Op. Ltr., 1999 WL 1788137, at *1 (July 12, 1999); WHD Op. Ltr., 2000 WL 34444352, at *1 (July 5, 2000); WHD Op. Ltr., 2000 WL 34444342, at *3 (Dec. 7, 2000); WHD Op. Ltr., 2002 WL 32406602, at *2 (Sept. 5,

2002); WHD Fact Sheet #13, "Employment Relationship Under the Fair Labor Standards Act (FLSA)" (July 2008); A1 2015–1 (available at 2015 WL 4449086) (withdrawn June 7, 2017).

[278] 331 U.S. 704 (1947).

[279] See, e.g., DialAmerica, 757 F.2d at 1382; McFeeley, 825 F.3d at 241; Hobbs, 946 F.3d at 820; Off Duty Police, 915 F.3d at 1055; Lauritzen, 835 F.2d at 1534–35; Alpha & Omega, 39 F.4th at 1082; Driscoll, 603 F.2d at 754; Paragon, 884 F.3d at 1235; Scantland,721 F.3d at 1311. The Second Circuit and the D.C. Circuit are alone among the circuit courts of appeals in treating the worker's opportunity for profit or loss and the worker's investment as a single factor. See, e.g., Franze, 826 F. App'x at 76; Superior Care, 840 F.2d at 1058–59; Morrison, 253 F.3d at 11 (citing Superior Care, 840 F.2d at 1058–59).

[280] 86 FR 1186.

[281] Id. The 2021 IC Rule also cited Silk. Id. (citing Silk, 331 U.S. at 719). However, the Court in Silk merely decided that case based on its facts, 331 U.S. at 716–19, and in no way indicated that "opportunities for profit or loss" and "investment in facilities" must be combined into one factor separately, id. at 716.

[282] 86 FR 1247.

[283] Id.

[284] See generally Saleem, 854 F.3d at 141–46.

[285] 917 F.3d at 382–85.

[286] 348 F. App'x 57, 60–61 (5th Cir. 2009).

investment factor weighed in favor of independent contractor status while the opportunity for profit or loss factor did "not weigh in favor of either" independent contractor or employee status.[267] And in *Scantland* v. *Jeffry Knight, Inc.,* the Eleventh Circuit found that the opportunity for profit or loss factor "point[ed] strongly toward employee status" although the investment factor weighed slightly in favor of independent contractor status.[268] Thus, investment is relevant to the ultimate economic dependence inquiry separate and apart from opportunity for profit or loss.

For these reasons, the Department is proposing to return to treating the worker's investment as a separate factor from the opportunity for profit or loss factor.

The Department is also proposing, in addition to considering the amount and value of the worker's investment, that the nature and reason for the investment should be considered. Specifically, proposed § 795.110(b)(2) states that for a worker's investment to indicate independent contractor status, the investment must be capital or entrepreneurial in nature. The Department believes that the worker's investment should generally support an independent business or serve a business-like function, such as increasing the worker's ability to do different types of or more work, reducing costs, or extending market reach, to indicate independent contractor status.[269] On the other hand, as proposed § 795.110(b)(2) notes, costs borne by a worker to perform a particular job are not the type of capital/entrepreneurial investments that suggest independent contractor status. The Department believes that considering the investment factor in this manner is consistent with the overall inquiry of determining whether the worker is economically dependent on the employer for work or is in business for themself. The nature of the worker's investment illuminates that distinction: an investment that is capital in nature indicates that the worker is operating as

an independent business. Yet, an investment that is expedient to perform a particular job (such as tools or equipment purchased to perform the job and that have no broader use for the worker) does not indicate independence. The Department understands that independent contractors make both capital investments to generally support their business and investments to perform particular jobs; therefore, the existence of expenses to perform jobs will not prevent this factor from indicating independent contractor status so long as there are also investments that are capital in nature indicating an independent business.

Consistent with the proposed approach, many appellate court decisions have emphasized how the worker's investment must be capital in nature for it to indicate independent contractor status. For example, in *Secretary of Labor* v. *Lauritzen,* the Seventh Circuit found that migrant farm workers were not independent contractors, but employees, due in part to the lack of capital investments made by the workers.[290] As the court noted, investments that establish a worker's status as an independent contractor should "be large expenditures, such as risk capital, capital investments, and not negligible items or labor itself. . . . The workers here are responsible only for providing their own gloves [which] do not constitute a capital investment." [291] In *Acosta* v. *Paragon Contractors Corp.,* the Tenth Circuit explained that "[t]he mere fact that workers supply their own tools or equipment does not establish status as independent contractors; rather, the relevant 'investment' is 'the amount of large capital expenditures, such as risk capital and capital investments, not negligible items, or labor itself.' " [292]

Relatedly, the use of a personal vehicle that the worker already owns to perform work—or that the worker leases as required by the employer to perform work—is generally not an investment that is capital or entrepreneurial in nature. For example, in *Scantland,* the Eleventh Circuit explained that the "fact that most technicians will already own a vehicle suitable for the work" suggests that there is "little need for significant independent capital." [293] In *Off Duty Police,* the Sixth Circuit found that, because the workers' vehicles "could be used for any purpose, not just on the job," they did not indicate independent contractor status.[294] The Fifth Circuit likewise considers the purpose of the vehicle and how the worker uses it. For example, in *Express Sixty-Minutes,* it explained that, "[a]lthough the driver's investment of a vehicle is no small matter, that investment is somewhat diluted when one considers that the vehicle is also used by most drivers for personal purposes." [295] And in *Brock* v. *Mr. W Fireworks,* it noted that most of the workers in that case purchased vehicles for personal and family reasons, not business reasons.[296] This approach to considering a worker's use of a personal vehicle that the worker already owns to perform work is consistent with the overarching inquiry of examining the economic realities of the worker's relationship with the employer.

Proposed § 795.110(b)(2) additionally provides that the worker's investment be evaluated in relation to the employer's investment in its business. This approach is not only consistent with the totality-of-the-circumstances analysis that is at the heart of the economic reality test, but it would also provide factfinders with an additional tool to differentiate between a worker's economic dependence and independence based on the particular

---

[267] 775 F. App'x 622, 624–25 (11th Cir. 2019).

[268] 721 F.3d at 1316–18.

[269] The 2021 IC Rule suggested that a shift to a "knowledge-based economy" reduced the probative value of the investment factor because these types of workers can be in business for themselves "with minimal physical capital" investment. 86 FR 1175. That rule's suggestion would be addressed by this proposal's approach to the investment factor. By focusing on the capital or entrepreneurial nature of the worker's investment, the proposed investment factor would not be limited to considering investments in physical capital but would also consider entrepreneurial investments by a worker to develop marketable knowledge.

[290] *See* 835 F.2d at 1537.

[291] *Id.*

[292] 884 F.3d at 1236 (quoting *Snell,* 875 F.2d at 810). *See also, e.g., Off Duty Police,* 915 F.3d at 1056 (" 'The capital investment factor is most significant if it reveals that the worker performs a specialized service that requires a tool or application which he has mastered.' ") (quoting *Donovan* v. *Brandel,* 736 F.2d 1114, 1118–19 (6th Cir. 1984)); *Mr. W Fireworks,* 814 F.2d at 1052 ("The fact that a few [workers] engage in minimal investments has little legal relevance, when the overwhelming majority of the risk capital is supplied by [the employer]."); *Pilgrim Equip.,* 527 F.2d at 1314 [The employee's provision of "[a]ll investment or risk capital" and "all costly necessities" that the workers need to operate confirms the workers' "total dependency" on the employer.]; *cf. Nieman,* 775 F. App'x at 625 (investment factor indicated independent contractor status because the worker "had his own home office, a laptop, and iPad for field work and was equipped with a vehicle, ladder, measuring tools,

digital voice and photographic equipment, and 'other similar tools of the trade.' ").

[293] 761 F.2d at 1318.

[294] 915 F.3d at 1056. *See also Keller,* 781 F.3d at 810–11 (fact that equipment could be used "for both personal and professional tasks" weakens the indication of independent contractor status).

[295] 161 F.3d at 304.

[296] 814 F.2d at 1052; *see also Sigui* v. *M + M Commc'ns, Inc.,* 484 F. Supp. 3d 29, 39 (D.R.I. 2020) (discounting relevance of workers' investment in vehicles because they could be used for other purposes), *jury verdict for plaintiffs,* 1:14–CV–00442, Dckt. No. 172 (June 13, 2022); *Roeder* v. *DirecTV, Inc.,* No. C14–4091–LTS, 2017 WL 151401, at *17 (N.D. Iowa Jan. 13, 2017) (rejecting argument that "plaintiffs' purchase and/or use of personal vehicles [weighs] in favor of finding plaintiffs were independent contractors" because the "vehicles had been purchased prior to taking DIRECTV work orders" and the record does not indicate that the vehicles were purchased for any business purpose).

facts of the case. Comparing the worker's investment to the employer's investment can be a gauge of the worker's independence or dependence. If the worker's investment compares favorably to the employer's investment, then that fact suggests independence on the worker's part and the existence of a business-to-business relationship between the worker and the employer. If the worker's investment does not compare favorably to the employer's investment, then that fact suggests that the worker is economically dependent and an employee of the employer. The Department understands that a worker's investment need not be (and rarely ever is) of the same magnitude and scope as the employer's investment to indicate that the worker is an independent contractor. Thus, although a worker's investment need not be on par with the employer's investment, it should support an independent business for this factor to indicate independent contractor status.

The Department has previously, but not consistently, explained that a worker's investment should be considered in relation to the employer's investment in its business. For example, in the Withdrawal Rule, the Department questioned the 2021 IC Rule's preclusion of consideration of the employer's investment.[297] In AI 2015–1, the Department explained that a worker's investment "should not be considered in isolation" because "it is the relative investments that matter."[298] AI 2015–1 further explained that, in addition to "the nature of the investment," "comparing the worker's investment to the employer's investment helps determine whether the worker is an independent business."[299] The Department also compared the worker's and the employer's relative investments in opinion letters issued by the Wage and Hour Division.[300] However, in the 2021 IC Rule, the Department rejected any comparison of the worker's investment to the employer's investment in its

business.[301] Because of the Department's inconsistency on this point, it is important for the Department to address this point in this rulemaking.

Numerous circuit courts of appeals consider the worker's investment in the work in comparison to the employer's investment in its business. For example, the Fifth Circuit has explained that it "consider[s] the relative investments" and that, "[i]n considering this factor, 'we compare each worker's *individual* investment to that of the alleged employer.'"[302] The Tenth Circuit has similarly explained that, "[t]o analyze this factor, we compare the investments of the worker and the alleged employer."[303] The Sixth Circuit has explained that "[t]his factor requires comparison of the worker's total investment to the 'company's total investment, including office rental space, advertising, software, phone systems, or insurance.'"[304] And the Fourth Circuit has compared the employers' payment of rent, bills, insurance, and advertising expenses to the workers' "limited" investment in their work.[305]

A few circuits do not compare the worker's investment in the work to the employer's investment in its business. For example, the Second Circuit has recently focused on whether the worker

has made a significant investment, irrespective of the employer's investment. In *Saleem*, the Second Circuit stated (like many other courts) that under "the economic reality test, 'large capital expenditures'—as opposed to 'negligible items, or labor itself'—are highly relevant to determining whether an individual is an employee or an independent contractor.[306] The Second Circuit elaborated that the key is whether the worker's financial investment was made in order to generate a return on the investment.[307] The Eleventh Circuit has likewise focused on the nature of the worker's investment without comparing it to the employer's investment.[308] Neither the Second Circuit nor the Eleventh Circuit have expressly rejected comparing the investments, and as explained herein, the Department believes that comparing investments is consistent with the totality-of-the-circumstances analysis and is helpful in distinguishing between a worker's economic dependence and independence.

The usefulness of comparing the worker's investment to the employer's investment is not undermined because certain decisions from the Fifth and Eighth Circuits gave little weight to the comparison based on the facts and circumstances of the particular cases before them.[309] The Fifth Circuit decisions (*Parrish* and *Cornerstone America*) compared the relative investments as part of their analyses.[310] Although the *Parrish* decision accorded the relative investment factor "little weight in the light of the other summary-judgment-record evidence supporting IC-status,"[311] this does not support the conclusion that this factor is not useful. Instead, it simply reflects the Fifth Circuit's faithful application in that case of a totality-of-the-

---

[297] See 86 FR 24313–24314 (as explained in section II.E. *supra*, the Withdrawal Rule was vacated by a district court decision that is currently on appeal before the Fifth Circuit).

[298] 2015 WL 4449086, at *8 (withdrawn June 7, 2017).

[299] *Id.*

[300] See WHD Op. Ltr., 2002 WL 32406602, at *1–2 (Sept. 5, 2002) (workers' "hand tools, which can cost between $5,000 and $10,000," were "small in comparison to [the employer's] investment," but the "amount is none the less substantial" and "thus indicative of an independent contractor relationship"); WHD Op. Ltr., 2000 WL 34444342, at *4 (Dec. 7, 2000) (comparing "the relative investments" of the worker and the employer is the correct approach).

[301] See 86 FR 1188 ("comparing the individual worker's investment to the potential employer's investment should not be part of the analysis of investment"). See also WHD Fact Sheet #13 (July 2008) (describing the factor as "[t]he amount of the [worker's] investment in facilities and equipment" without any further discussion).

[302] *Hobbs*, 946 F.3d at 831–32 (quoting *Cornerstone Am.*, 545 F.3d at 344) (emphasis in quoted language).

[303] *Paragon*, 884 F.3d at 1236; *see also Flint Eng'g*, 137 F.3d at 1442 ("In making a finding on this factor, it is appropriate to compare the worker's individual investment to the employer's investment in the overall operation.").

[304] *Off Duty Police*, 915 F.3d at 1056 (quoting *Keller*, 781 F.3d at 810).

[305] *McFeeley*, 825 F.3d at 243. *See also Verma*, 937 F.3d at 231 (summarizing how courts have viewed this factor in cases examining the employment status of exotic dancers: "all concluded that 'a dancer's investment is minor when compared to the club's investment'") (quoting the district court's decision); *Lauritzen*, 835 F.2d at 1537 (disagreeing that "the overall size of the investment by the employer relative to that by the worker is irrelevant" and finding that "that the migrant workers' disproportionately small stake in the pickle-farming operation is an indication that their work is not independent of the defendants"); *Driscoll*, 603 F.2d at 755 (strawberry growers' investment in light equipment, including hoes, shovels, and picking carts was "minimal in comparison" with employer's total investment in land and heavy machinery); *see also Iontchev*, 685 F. App'x at 550 (noting that the drivers "invested in equipment or materials and employed helpers to perform their work" but concluding that the investment factor was "neutral" because the cab company "leased taxicabs and credit card machines to most of the [drivers]").

[305] 854 F.3d at 144 (quoting *Snell*, 875 F.2d at 810).

[307] *Id.* at 144–46; *see also Franze*, 826 F. App'x at 77–78 (purchasing delivery routes "without any financial assistance from Bimbo" constitutes a substantial financial outlay that weighs in favor of independent contractor status).

[308] *Scantland*, 721 F.3d at 1317–18; *see also Nieman*, 775 F. App'x at 625.

[309] The 2021 IC Rule cited these decisions from the Fifth and Eighth Circuits in rejecting the relative investments approach. See 86 FR 1188.

[310] See *Parrish*, 917 F.3d at 382–83 (explaining that "[o]ur court uses a side-by-side comparison method in evaluating this factor" and determining that the relative investments factor favors employee status); *Cornerstone Am.*, 545 F.3d at 344 (explaining that "we compare each worker's *individual* investment to that of the alleged employer" and determining that the employer's "greater overall investment in the business scheme convinces us that the relative-investment factor weighs in favor of employee status") (emphasis in original).

[311] 917 F.3d at 383.

circumstances approach considering many factors—no one of which was dispositive. Moreover, that the *Cornerstone America* decision "did not even mention the [employer's] larger investment" when "summing up the entirety of the facts and analyzing whether the workers were economically dependent on the [employer] as a matter of economic reality" as stated in the 2021 IC Rule,[312] likewise does not support the conclusion that the relative investment factor is not useful, but instead simply reflects the overwhelming evidence of employee status in that case. Indeed, the Fifth Circuit's recent decisions reflect a continued commitment to considering the worker's investment in relation to the employer's investment.[313]

In *Karlson v. Action Process Service & Private Investigations, LLC*, the Eighth Circuit affirmed the district court's decision to allow evidence of the worker's and the employer's relative investments but not allow the worker to ask the employer about the dollar amount of its investment because "allowing [the worker] to 'billboard large numbers' . . . would create the danger of unfair prejudice."[314] Thus, the Eighth Circuit simply affirmed a nuanced district court decision regarding how much evidence of the employer's investment to allow but did not preclude consideration of the worker's and the employer's relative investments. Moreover, the Eighth Circuit recently issued a decision articulating, as the jury instruction in *Karlson* had, the investment factor as "the relative investments of the alleged employer and the employee."[315]

For all of these reasons, the Department believes that the proposal to consider the worker's investment in relation to the employer's investment in its business is supported by prior WHD guidance and many appellate court decisions, is consistent with the overall totality-of-the-circumstances inquiry whether the worker is economically dependent on the employer or operating as an independent business and would

aid factfinders' analyses when applying that inquiry.

The Department welcomes comments on all aspects of this factor.

Example: Investments by the Worker and the Employer

A graphic designer provides design services for a commercial design firm. The firm provides software, a computer, office space, and all the equipment and supplies for the worker. The company invests in marketing and finding clients and maintains a central office from which to manage services. The worker occasionally uses their own preferred drafting tools for certain jobs. In this scenario, the worker's relatively minor investment in supplies is not capital in nature and does little to further a business beyond completing certain jobs. Thus, this factor indicates employee status.

A graphic designer occasionally completes design projects for a local design firm. The graphic designer purchases their own design software, computer, drafting tools, and rents an office in a shared workspace. The worker also spends money to market their services. These types of investments support an independent business and are capital in nature (*e.g.*, they allow the worker to do more work and extend their market reach). Thus, these facts indicate that the worker is in business for themself and may be a freelance graphic designer (*i.e.*, an independent contractor), not an employee of the local design firm.

3. Degree of Permanence of the Work Relationship (§ 795.110(b)(3))

The Department is proposing to modify § 795.105(d)(2)(ii) of the 2021 IC Rule, which describes the "degree of permanence of the working relationship between the individual and the potential employer," and address the permanency factor in proposed § 795.110(b)(3). This provision in the 2021 IC Rule states that this factor weighs in favor of the worker being an independent contractor where the work relationship is "by design definite in duration or sporadic" and that it weighs in favor of the worker being an employee where the work relationship is "by design indefinite in duration or continuous."[316] The 2021 IC Rule provision also recognizes that "the seasonal nature of work by itself would not necessarily indicate independent contractor classification."[317]

As the Department noted in the 2021 IC Rule, "courts and the Department

routinely consider this factor when applying the economic reality analysis under the FLSA to determine employee or independent contractor status."[318] Consistent with case law analyzing this factor, the Department is proposing to provide further specificity by noting that an indefinite or continuous relationship is consistent with an employment relationship, but that a worker's lack of a permanent or indefinite relationship with an employer is not necessarily indicative of independent contractor status if it does not result from the worker's own independent business initiative.[319] The Department is also proposing to continue to recognize that a lack of permanence can be inherent in certain jobs—such as temporary and seasonal work—and that this is not necessarily an indicator of independent contractor status because a lack of permanence does not necessarily mean that the worker is in business for themself instead of being economically dependent on the employer for work.

Courts typically describe this factor's relevance as follows: "'Independent contractors' often have fixed employment periods and transfer from place to place as particular work is offered to them, whereas 'employees' usually work for only one employer and such relationship is continuous and of indefinite duration."[320] For example, a typical employee often has an at-will work relationship with the employer and works indefinitely until either party decides to end that work relationship. Conversely, an independent contractor does not seek such a permanent or indefinite engagement with one entity. Because of these general characteristics of work relationships, the length of time or duration of the work relationship has long been considered under the "permanence" factor as an indicator of employee or independent contractor status.[321]

---

[312] 86 FR 1188 (citing *Cornerstone Am.*, 545 F.3d at 346).

[313] *See, e.g., Sanchez Oil & Gas Corp. v. Crescent Drilling & Prod., Inc.*, 7 F.4th 301, 313 n.17 (5th Cir. 2021); *Hobbs*, 946 F.3d at 829 (describing the investment factor as "'the extent of the relative investments of the worker and the alleged employer'") (quoting *Cornerstone Am.*, 545 F.3d at 343). Thus, the Fifth Circuit routinely considers the relative investments of the worker and the employer even if the factor may ultimately be accorded less weight in some cases depending on the facts and circumstances of the case.

[314] 860 F.3d at 1096.

[315] *Alpha & Omega*, 39 F.4th at 1082 (citing *Karlson*, 860 F.3d at 1093).

[316] 86 FR 1247.

[317] *Id.*

[318] 86 FR 1192 (citing a variety of circuit case law: *Razak*, 951 F.3d at 142; *Hobbs*, 946 F.3d at 829; *Karlson*, 860 F.3d at 1092–93; *McFeeley*, 825 F.3d at 241; *Keller*, 781 F.3d at 807; *Scantland*, 721 F.3d at 1312).

[319] *See, e.g., Superior Care*, 840 F.2d at 1060–61.

[320] *Snell*, 875 F.2d at 811 (citing *Donovan v. Sureway Cleaners*, 656 F.2d 1368, 1372 (9th Cir. 1981)); *see also Keller*, 781 F.3d at 807 (same); WHD Op. Ltr., 2002 WL 32405602, at *3 (Sept. 5, 2002) (same).

[321] *See, e.g., Parrish*, 917 F.3d at 386–87 (noting that one of the relevant considerations under the permanency factor is the total length of the working relationship between the parties); *Capital Int'l*, 466 F.3d at 308–09 (in analyzing the degree of permanency of the working relationship, the "more permanent the relationship, the more likely the worker is to be an employee"); *DialAmerica*, 757 F.2d at 1385 (finding that the "permanence-of-

Continued

However, the analysis under the "permanence" factor is not limited solely to the length or definiteness of the work relationship. Courts have also recognized that the temporary or seasonal nature of some jobs may result in a "lack of permanence . . . due to operational characteristics intrinsic to the industry rather than to the workers' own business initiative." [322] In such instances, a lack of permanence alone is not an indicator of independent contractor status. One industry where courts have recognized that the lack of permanence or indefiniteness in the work relationship does not preclude employee status is seasonal agricultural work, where workers often work solely for the duration of a harvest season and may return the following year.[323] Another seasonal example is the Fifth Circuit's analysis of the working relationship between a fireworks business that operated during specific periods of the year and the fireworks stand operators who sold the company's goods, where the district court found the relationship to be impermanent due to the 80 percent turnover rate between seasons.[324] The Fifth Circuit noted that "in applying the *Silk* factors courts must make allowances for those operational characteristics that are unique or intrinsic to the particular business or industry, and to the workers they employ." [325] The Fifth Circuit held that the "proper test for determining the permanency of the relationship" in such a seasonal industry is "not whether the alleged employees returned from season to season, but whether the alleged employees worked for the entire operative period of a particular season." [326]

Courts have also recognized that non-seasonal temporary work is common in some industries, and that a lack of permanence in these work relationships is also not indicative of independent contractor status. For example, in *Brock v. Superior Care, Inc.,* the Second Circuit found that nurses who were referred by a temporary health-care staffing agency to work for patients, hospitals, and nursing homes on a short-term basis were "transient" workers who did not have continuous or permanent work relationships with the staffing agency.[327] Citing the discussion in *Mr. W Fireworks* regarding operational characteristics that may be unique to certain industries and the workers they employ, the Second Circuit determined that the lack of permanence did not preclude the nurses from being employees because this reflected "the nature of their profession and not their success in marketing their skills independently." [328] Similarly, in *Baker v. Flint Engineering & Construction Co.,* the Tenth Circuit determined that temporary rig welders who worked no more than two months at a time for a gas pipeline contractor exhibited sufficient permanency in their work relationship to indicate employee status because such temporary work was intrinsic in the industry rather than a "choice or decision" by the workers.[329] Therefore, consistent with the applicable case law, the Department is proposing to revise the 2021 IC Rule provision's acknowledgement that the seasonal nature of work alone would not necessarily indicate independent contractor status to acknowledge more broadly that a lack of permanence may be due to operational characteristics that are unique or intrinsic to particular businesses or industries and the workers they employ rather than the workers' business initiative, in which case this factor would not weigh in favor of independent contractor classification.[330]

Case law discussing the permanence factor also commonly addresses whether the work relationship is exclusive and the extent to which the workers work for others.[331] The Department believes this analytical approach is appropriate, because working exclusively for a particular employer speaks to the permanence of the work relationship,[332] However, although an exclusive relationship is often associated with an employment relationship and a sporadic or project-based non-exclusive relationship is more frequently associated with independent contractor classification,[333] courts have explained that simply having more than one job or working irregularly does not remove a worker from employee status and the protections of the FLSA. For example, in *Silk,* the "unloaders" came to the coal yard "when and as they please[d] . . . work[ing] when they wish and work[ing] for others at will." [334] The Court determined that the unloaders were employees even though they had the ability to work for others: "That the unloaders did not work regularly is not significant. They did work in the course of the employer's trade or business. This brings them under the coverage of the Act." [335] Similarly, as the Second Circuit explained in *Superior Care,* the fact that the temporary nurses "typically work for several employers," was "not dispositive of independent contractor status" as "employees may work for more than one employer without losing their benefits under the FLSA." [336]

---

[322] *Superior Care,* 840 F.2d at 1061 (citing *Mr. W Fireworks,* 814 F.2d at 1053–54); *see also Flint Eng'g,* 137 F.3d at 1442 (finding short duration of work relationships in oil and gas pipeline construction work to be intrinsic to the industry rather than a "choice or decision" on the part of the workers).

[323] *See Paragon,* 884 F.3d at 1235 (permanence factor favored employee status because the worker was hired temporarily for the harvest season "[b]ut his employment was impermanent for the duration of each harvest season"); *Lauritzen,* 835 F.2d at 1537 (agricultural harvesters' relationship with employer was "permanent and exclusive for the duration of that harvest season" and permanency was also indicated by the fact that many of the same migrant workers returned for the harvest each year; the court noted that "[m]any seasonal businesses necessarily hire only seasonal employees, but that fact alone does not convert seasonal employees into seasonal independent contractors").

[324] *Mr. W Fireworks,* 814 F.2d at 1053.

[325] *Id.* at 1054.

[326] *Id.*

[327] *Superior Care,* 840 F.2d at 1060.

[328] *Id.* at 1061.

[329] *Flint Eng'g,* 137 F.3d at 1442.

[330] The 2021 IC Rule suggested that a trend in the modern economy that reduces the probative value of the permanence factor is that workers have shorter job tenures. *See* 86 FR 1175. However, as explained above, courts have developed ways to consider permanency that take into account the fact that some jobs and industries have shorter job tenures, yet can evidence the regularity consistent with an employment relationship.

[331] *See, e.g., Parrish,* 917 F.3d at 386–87 (noting that one of the relevant considerations under the permanency factor is whether any plaintiff worked exclusively for the potential employer); *Keller,* 781 F.3d at 807 (noting that "even short, exclusive relationships between the worker and the company may be indicative of an employee-employer relationship"); *Scantland,* 721 F.3d at 1319 (noting that "[e]xclusivity is relevant" to the permanency of the work relationship).

[332] *See, e.g.,* WHD Op. Ltr., 2002 WL 32406602, at *3 (Sept. 5, 2002) (considering exclusivity under permanence factor); WHD Op. Ltr., 2000 WL 34444342, at *5 (Dec. 7, 2000) (same).

[333] *See, e.g., Carrell v. Sunland Constr., Inc.,* 998 F.2d 330, 332 (5th Cir. 1993) (finding welders to be independent contractors where they worked for multiple employers on a project-by-project basis rather than exclusively for one employer).

[334] 331 U.S. at 706.

[335] *Id.* at 718.

[336] *Superior Care,* 814 F.2d at 1060; *see also Saleem,* 854 F.3d at 142 n.24 ("It is certainly not unheard of for an individual to maintain two jobs at the same time, and to be an 'employee' in each capacity."); *Keller,* 781 F.3d at 808 (agreeing with the Second Circuit that "employees may work for more than one employer without losing their benefits under the FLSA"); *Circle C Invs.,* 998 F.2d at 328–29 (noting that "[t]he transient nature of the work force is not enough here to remove the dancers from the protections of the FLSA"); *Seafood Inc.,* 867 F.2d at 877 ("The only question,

Relatedly, courts have also determined that the fact that a worker does not rely on the employer as their exclusive or primary source of income is not indicative of whether an employment relationship exists.[337] For example, the Sixth Circuit explained: "[W]hether a worker has more than one source of income says little about that worker's employment status. Many workers in the modern economy, including employees and independent contractors alike, must routinely seek out more than one source of income to make ends meet."[338]

Thus, the Department is proposing in § 795.110(b)(3) to include exclusivity as an additional consideration under the permanency factor while noting that working for others and having multiple jobs in which workers are economically dependent on each employer for work—as compared to a worker who is in business for themself and chooses to market their independent services or labor to multiple entities—does not weigh in favor of independent contractor status. While the 2021 IC Rule did not include exclusivity as part of the permanence analysis, this was not based on a view that exclusivity was inconsistent with circuit case law but, rather, was primarily based on the view that concepts should not apply to more than one factor. Including consideration of exclusivity under permanence is consistent with the case law, as the 2021 IC Rule acknowledged.[339] Because the

2021 IC Rule sought to avoid duplicating consideration of certain facts or concepts under more than one factor, however, it confined exclusivity and the ability to work for others under the control factor and excluded it from the permanence factor.[340]

The Department continues to believe that an exclusivity requirement imposed by the employer is a strong indicator of control, as discussed under the control factor. However, in this proposed rulemaking, the Department is prioritizing consideration of all facts that may be relevant to a particular factor, consistent with a totality-of-the-circumstances approach and the way courts analyze the factors. While some courts have focused on exclusivity (or the lack thereof) under the control factor rather than the permanence factor,[341] others have considered whether workers were able to work for other employers under both the control and permanency factors.[342] However, the weight of circuit authority appears to consider exclusivity and ability to work for others primarily under permanence, though it is certainly not the only relevant consideration under this factor.[343] As such, the Department believes it is appropriate to include

exclusivity under this factor as well as the control factor.[344]

Finally, the Department notes that where workers provide services under a contract that is routinely or automatically renewed, courts have determined that this indicates permanence and an indefinite working arrangement associated with employment.[345] The proposed regulation noting that work relationships that are indefinite in duration or continuous favor employee status is consistent with that case law.

The Department welcomes comments on all aspects of this factor.

Example: Degree of Permanence of the Work Relationship

A cook has prepared meals for an entertainment venue continuously for several years. The cook prepares meals as directed by the venue, depending on the size and specifics of the event. The cook only prepares food for the entertainment venue, which has regularly scheduled events each week. The relationship between the cook and the venue is characterized by a high degree of permanence and exclusivity. The permanence factor indicates employee status.

A cook has prepared specialty meals intermittently for an entertainment venue over the past 3 years for certain events. The cook markets their meal preparation services to multiple venues and private individuals and turns down

---

[337] Superior Care, 614 F.2d at 1060; see also Halferty, 821 F.2d at 267–68 ("it is not dependence in the sense that one could not survive without the income from the job that we examine, but dependence for continued employment"); DialAmerica, 757 F.2d at 1385 (noting that "[t]here is no legal basis" to say that work that constitutes a second source of income indicates a worker's lack of economic dependence on a job because the proper analysis is "whether the workers are dependent on a particular business or organization for their continued employment").

[338] Off Duty Police, 915 F.3d at 1050. The 2021 IC Rule correctly noted that a handful of cases improperly conflate having multiple sources of income with a lack of economic dependence on the potential employer. See 86 FR 1173, 1178. The 2021 IC Rule characterized such a "dependence-for-income" analysis as incorrect and a "dependence-for-work" analysis as correct. Id. at 1173. This critique continues to be valid, as is the observation that "[i]t is possible for a worker to be an employee in one line of business and an independent contractor in another." Id. at 1178 n.19.

[339] The 2021 IC Rule recognized that courts often analyze the exclusivity of the work relationship as part of the permanence factor, and the Department

considered in its NPRM for that rule to include exclusivity under the permanence factor "to be more accurate." 85 FR 60816.

[340] 86 FR 1192–93.

[341] See, e.g., Saleem, 854 F.3d at 141.

[342] See, e.g., 86 FR 1192 (noting the analysis in Freund v. Hi-Tech Satellite, Inc., 185 F. App'x 782, 783–84 (11th Cir. 2006), where the court found that "Hi-Tech exerted very little control over Mr. Freund," in part, because "Freund was free to perform installations for other companies" and that "Freund's relationship with Hi-Tech was not one with a significant degree of permanence . . . [because] Freund was able to take jobs from other installation brokers.").

[343] See, e.g., Parrish, 917 F.3d at 386–87 (noting that one of the relevant considerations under the permanency factor is whether any plaintiff worked exclusively for the potential employer); Keller, 781 F.3d at 806 (noting under permanency whether satellite-dish installer could work for other companies but that working for more than one employer does not necessarily result in independent contractor status); Scantland, 721 F.3d at 1319 (length of relationship and exclusivity was relevant insofar as workers' schedules and inability to refuse work prohibited them from actually working for other companies); Cornerstone Am., 545 F.3d at 346 (permanency factor weighed in favor of employee status because sales leaders worked exclusively for the potential employer, often for significant periods of time); Superior Care, 840 F.2d at 1060–61 (noting under permanency that nurses typically worked for several employers but that this did not weigh in favor of independent contractor status because it was inherent in the profession); Lauritzen, 835 F.2d at 1537 ("however temporary the relationship may be it is permanent and exclusive for the duration of that harvest season"); DialAmerica, 757 F.2d at 1384 (noting under permanency that home researchers generally did not perform services for other organizations and therefore did not "transfer their services from place to place, as do independent contractors").

[344] The 2021 IC Rule also supported its decision to reject consideration of exclusivity under permanence by referring to a dictionary definition of "permanent" that does not include exclusivity. 86 FR 1193 n.39. However, a dictionary definition should not override the longstanding case law applying exclusivity to the permanence factor. Additionally, the 2021 IC Rule viewed such case law as inconsistent with the Supreme Court's Silk decision. 86 FR 1192–93. However, upon further consideration, the decision does not clearly identify which factor the Court associated with the truck drivers' ability to work for others (leading to a decision that they were independent contractors, among other reasons), nor does it clearly identify which factor the Court associated with the coal unloaders' ability to work for others (leading to a decision that they were employees, among other reasons). See Silk, 331 U.S. at 717–19. Therefore, reliance on Silk for this proposition is not warranted.

[345] See, e.g., Scantland, 721 F.3d at 1318 (finding one-year contracts that were automatically renewed to "suggest substantial permanence of relationship"); Pilgrim Equip., 527 F.2d at 1314 (finding laundry operators' one-year contracts that were routinely renewed indicated employee status); Acosta v. Senvoy, LLC, No. 3:16–CV–2293–PK, 2018 WL 3722310, at *9 (D. Or. July 31, 2018) (noting that one-year contracts that automatically renew are "evidence that a worker is an employee"); Solis v. Velocity Exp., Inc., No. CV 09–864–MO, 2010 WL 3259917, at *9 (D. Or. Aug. 12, 2010) (the fact that package delivery drivers understood their contracts to be of indefinite duration and that contracts were routinely renewed without renegotiation indicated employee status).

work for any reason, including because the cook is too busy with other meal preparation jobs. The cook has a sporadic or project-based non-exclusive relationship with the entertainment venue. These facts indicate independent contractor status.

### 4. Nature and Degree of Control (Proposed § 795.110(b)(4))

The Department is proposing to modify 2021 IC Rule § 795.105(d)(1)(i), which considers control as a "core" factor in the economic reality test. This provision in the 2021 IC Rule assesses the employer's and the worker's "substantial control over key aspects of the performance of the work," which include setting schedules, selecting projects, controlling workloads, and affecting the worker's ability to work for others.[346] This 2021 IC Rule provision also states that "[r]equiring the individual to comply with specific legal obligations, satisfy health and safety standards, carry insurance, meet contractually agreed-upon deadlines or quality control standards, or satisfy other similar terms that are typical of contractual relationships between businesses . . . does not constitute control" for purposes of the economic reality test.[347]

As reflected in proposed § 795.110(b)(4), the Department continues to believe that issues related to scheduling, supervision over the performance of the work (including the ability to assign work), and the worker's ability to work for others are relevant considerations. The Department's proposal would also consider additional aspects of control in the workplace that have been identified in the case law and through the Department's enforcement experience—such as control mediated by technology or control over the economic aspects of the work relationship. However, as noted above, the Department's proposal would not elevate control as a "core" factor in the analysis.[348] For decades, courts and the Department have taken the view that the control factor represents one facet of the economic reality test.[349] As such, control should be analyzed in the same manner as every other factor, rather than take an outsized role when analyzing

whether a worker is an employee or independent contractor. As the Fifth Circuit noted in 2019, it "is impossible to assign to each of these factors a specific and invariably applied weight."[350]

In addition, as described in more detail below, and after taking relevant case law into account, an employer's compliance with legal obligations, safety or health standards, or requirements to meet contractual or quality control obligations, for example, may in some cases indicate that the employer is exerting control, suggesting that the worker is economically dependent on the employer. What follows is an overview of the Department's proposal regarding control as well as detailed descriptions of certain aspects of control such as scheduling, supervision, price setting, and the ability to work for others.

#### a. Overview of Control Factor

When analyzing this factor for purposes of applying the economic reality test, the control factor is one of several factors used to reach the ultimate determination of whether a worker is economically dependent on an employer or is in business for themself.[351] Control can be exerted directly in the workplace by an employer, such as when it sets a worker's schedule, compels attendance, or directs or supervises the work.[352] However, the absence of these more

---

[350] Parrish, 917 F.3d at 390 (internal citation omitted). The circuit courts have taken this position for decades. See also, e.g., Scantland, 721 F.3d at 1312 n.2 (the relative weight of each factor "depends on the facts of the case") (citation omitted); Selker Bros., 949 F.2d at 1293 ("It is a well-established principle that the determination of the employment relationship does not depend on isolated factors . . . [, and] neither the presence nor the absence of any particular factor is dispositive.").

[351] The control factor has its roots in the common law, where the inquiry was whether the "employer" had the "right to control the manner and means by which [work] is accomplished." Reid, 490 U.S. at 751. Employers that exercise such control could be held responsible for (or be in the best position to prevent) negligent actions affecting their workers. See Lauritzen, 835 F.2d at 1544 (describing how common law notions of control relate to findings of vicarious liability). Yet, the scope of employment under the FLSA is broader than the common law and is not concerned with assigning responsibility for negligent acts imputed to the employer. Rather, employment under the FLSA is determined by applying an economic reality analysis, which "does not depend on the common-law understanding of employment, which was based on limiting concepts of control." Antenor v. D & S Farms, 88 F.3d 925, 933 (11th Cir. 1996) (drawing this conclusion, in the context of evaluating possible joint employment, by relying on the FLSA's broad definition of employ which uses the term "suffer or permit to work").

[352] See, e.g., Scantland, 721 F.3d at 1314 (finding workers to be employees, in part, because they "were subject to meaningful supervision and monitoring by" their employer).

apparent forms of control does not invariably lead to the conclusion that the factor weighs in favor of independent contractor status.[353] Employers may also exercise control in other ways, such as by relying on technology to supervise a workforce, setting prices for services, or restricting a worker's ability to work for others— actions that can exert control without the traditional use of direct supervision, assignment, or scheduling.

The analysis focuses on whether the employer still retains control over meaningful economic aspects of the work relationship such that the control indicates that the worker does not stand apart as their own business, not simply whether the employer lacks control over discrete working conditions (e.g., scheduling) or whether the employer failed to exercise physical control over the workplace.[354] For example, even though dancers had some scheduling flexibility, the Third Circuit concluded that the control factor weighed in favor of employee status because the employer, and not the workers, controlled the economic aspects of the dancers' work, such as the price of services, the clientele to be served, and the operations of the club in which they worked.[355]

This analytical approach was applied by the Fifth Circuit in a case where an insurance sales firm not only "controlled the hiring, firing, assignment, and promotion of the [workers' subordinates]," but also

---

[353] See, e.g., Mr. W Fireworks, 814 F.2d at 1049 ("[T]he lack of supervision over minor regular tasks cannot be bootstrapped into an appearance of real independence.") (citation omitted); Antenor, 88 F.3d at 934 (noting in FLSA joint employment case that the Act reaches even those employers who "[do] not directly supervise the activities of putative employees") (emphasis in original). Indeed, this has been the perspective of the Department for almost six decades. See WHD Op. Ltr., FLSA–795, at 3 (Sept. 30, 1964) (determining that professional divers were employees of a diving corporation, despite the lack of control over their work, by noting "that persons may be employees within the meaning of the Act even though they are unsupervised in their work, are not required to devote any particular amount of time to their work, [and] are under no restriction not to work for competitors of the employer").

[354] See, e.g., Cornerstone Am., 545 F.3d at 343– 44 (finding that control weighs in favor of employee status even where the employer disclaims control over "day-to-day affairs" of the workers because the employer controlled the meaningful economic aspects of the work). Other elements may also be included in this examination of control, such as those identified by the Supreme Court in Whitaker House. These include whether the worker could sell their products or services "on the market for whatever price they can command;" whether the worker's compensation was dictated by the employer; and whether management could fire the worker for failure to obey its regulations. 366 U.S. at 32–33.

[355] Verma, 937 F.3d at 230.

---

[346] See 86 FR 1246–47.

[347] Id. at 1247.

[348] See supra section V.B.

[349] See, e.g., WHD Op. Ltr. (Aug. 13, 1954) (applying six factors, of which control was one, that are very similar to the six economic reality factors currently used by almost all courts of appeals); Shultz v. Hinojosa, 432 F.2d 259, 265 (5th Cir. 1970) (affirming judgment in favor of Secretary of Labor that slaughterhouse worker was an employee under the FLSA under a multifactor economic reality test of which control was one of the factors).

controlled how the workers priced the insurance products, received leads for sales, and defined the territory in which the agents could sell products.[356] These actions made it clear that the employer, and not the workers, retained meaningful control over the "economic aspects of the business," suggesting that the workers were employees.[357]

Finally, 2021 IC Rule § 795.105(d)(1)(i) states that an employer requiring a worker to "comply with specific legal obligations, satisfy health and safety standards, carry insurance, meet contractually agreed-upon deadlines or quality control standards, or satisfy other similar terms . . . does not constitute control that makes the [worker] more or less likely to be an employee." [358] In the 2021 IC Rule, however, the Department acknowledged "that some courts have found requirements that workers comply with specific legal obligations or meet quality control standards to be indicative of employee status." [359] Upon further consideration and a thorough review of relevant case law, the Department believes, as reflected in proposed § 795.110(b)(4), that certain instances of control should not be excluded as irrelevant to the economic reality analysis only because they are required by business needs, contractual requirements, quality control standards, or legal obligations. As the Eleventh Circuit explained in *Scantland*:

The economic reality inquiry requires us to examine the nature and degree of the alleged employer's control, *not why* the alleged employer exercised such control. . . . If the nature of a business requires a company to exert control over workers . . . then that company must hire employees, not independent contractors.[360]

The Department believes that the nature and degree of the employer's control should be fully assessed, and this assessment may, in some cases, include consideration of control that is due to an employer's compliance with legal, safety, or quality control obligations. As with all the economic reality factors, this control should be examined in view of the ultimate inquiry: is it probative of whether the worker is in business for themself or

economically dependent on the employer for work. For example, when an employer, rather than a worker, controls compliance with legal, safety, or other obligations, it may be evidence that the worker is not in fact in business for themself because they are not doing the entrepreneurial tasks that suggest that they are responsible for understanding and adhering to the legal and other requirements that apply to the work or services they are performing such that they are assuming the risk of noncompliance.[361]

While the case law is not uniform on this issue, the Department finds cases such as *Scantland* and others—which recognize that compliance with legal obligations or quality control may be relevant evidence of control—more persuasive and consistent with the totality-of-the-circumstances, economic reality analysis than the 2021 IC Rule's approach. For example, in *Badon v. Berry's Reliable Resources, LLC,* a district court, in granting the worker's summary judgment motion, rejected a home healthcare employer's argument that a state's plan of care for each consumer dictated the work performed by the workers.[362] In finding that the control factor weighed in favor of employee status, the court credited testimony that the employer had, in fact, hired, trained, supervised, and directed the work of the caregivers to ensure compliance with the state's requirements.[363] After taking these facts into consideration, the court found that the control factor weighed in favor of employee status.[364] Similarly, in *Molina v. South Florida Express Bankserv, Inc.,* a district court rejected the employer's argument that its monitoring of workers was at customers' behest and therefore

was not relevant to control, explaining that "[t]he Defendant's reasoning is circular" since "[a]ny employer's business is, in essence, directed by the needs of its customers." [365]

Among the FLSA cases cited by the 2021 IC Rule to support the provision excluding facts about compliance with specific legal, contractual, or quality control obligations from consideration— such as *Parrish, Iontchev v. AAA Cab Service, Inc., Mr. W Fireworks,* and *Chao v. Mid-Atlantic Installation Services, Inc.*[366]—none support the conclusion drawn by the 2021 IC Rule that the requirement to comply with, for example, legal obligations is never probative of employee status. In *Parrish,* for example, the Fifth Circuit concluded that "[a]lthough requiring safety training and drug testing is an exercise of control in the most basic sense of the word," the safety training and drug testing in this particular case was not dispositive of control "because of the nature of the employment" at an oil-drilling site.[367] There, the employer was responsible for providing a place of employment free from certain recognized hazards and ensuring that all people working at an oil-drilling site comply with relatively minimal safety training and drug testing as "required for safe operations," generally.[368] Thus, workers were not made more economically dependent on the employer because of these safety

---

[356] *Cornerstone Am.*, 545 F.3d at 343–44.

[357] *Id.* at 343.

[358] 86 FR 1247.

[359] 86 FR 1183.

[360] 721 F.3d at 1316 (emphasis added); *see also Schultz v. Mistletoe Express Serv., Inc.*, 434 F.2d 1267, 1271 (10th Cir. 1970) (noting that "arguments that an independent contractor relationship is shown by . . . the need to comply with the regulations of federal and state agencies do not persuade us" before affirming the conclusion that workers were employees under the FLSA).

[361] Case law further demonstrates that legal obligations imposed by the government can provide evidence of control. For example, in *Chao v. First National Lending Corp.*, loan officers were prohibited by state licensing requirements from working for more than one mortgage company at a time. 516 F. Supp. 2d 895, 900 (N.D. Ohio 2006), *aff'd,* 249 F. App'x 441 (6th Cir. 2007). This inability to work for others—albeit in compliance with state requirements—was determined to be further evidence that the loan officers "were economically dependent on [the employer] and, therefore, were employees and not independent contractors for purposes of the FLSA." *Id.* The Fifth Circuit reached a similar conclusion when it rejected an insurance sales company's argument that it "exerted little control beyond what insurance-industry regulations required." *Hopkins,* 545 F.3d at 343. Instead, the court found that the employer exerted significant control over the economics of the insurance sales work performed by the workers, which was dispositive on this factor. *Id.*

[362] Civil Action Nos. 19–12317 c/w 20–584 & 21–598, 2022 WL 2111341, at *3–4 (E.D. La. June 10, 2022).

[363] *Id.*

[364] *Id.* at *4.

[365] 420 F. Supp. 2d 1276, 1284 n.24 (M.D. Fla. 2006); *see also Ampersand v. DirecTV, LLC,* 278 F. Supp. 3d 1352, 1360 (N.D. Ga. 2017) (applying *Scantland* and finding genuine issues of material fact regarding control despite defendant's argument that "strict installation standards and quality metrics" were not indicative of control because such requirements "were aimed at customer satisfaction, not control of Plaintiffs"); *Crouch v. Guardian Angel Nursing, Inc.*, Civil Action No. 3:07-cv-00541, 2009 WL 3737897, at *18–20 (M.D. Tenn. Nov. 4, 2009) (finding a state law that required licensed practical nurses to work under the supervision and direction of doctors or registered nurses was strong evidence of control by the employer under the FLSA and rejecting defendants' argument "that because a certain amount of supervision is mandated by the state or by the home health agencies with which they contract, it . . . does not count toward the quantification of the degree of control exercised"); *Flores v. Velocity Express, LLC,* 250 F. Supp. 3d 468, 484 (N.D. Cal. 2017) ("undisputed indicia of control" included completing a Department of Transportation–required road test; obtaining certain insurance or enrolling in employer's insurance program and undergoing a criminal history background check); *see also Ruiz v. Affinity Logistics Corp.*, 754 F.3d 1093, 1101–02 (9th Cir. 2014) (evaluating control for the purpose of applying state wage and hour laws and rejecting the employer's assertion that control that is "driven by a need to comply with federal regulations or [customer] requirements").

[365] *See* 86 FR 1183.

[367] 917 F.3d at 382.

[368] *Id.*

requirements.[369] Moreover, in *Iontchev,* the Ninth Circuit determined that the employer had "relatively little control over the manner in which" the work was performed in part because "its disciplinary policy primarily enforced the Airport's rules and regulations" governing drivers; it did not say that the fact that government regulations applied to the work was not relevant at all to control.[370]

These cases are thus not inconsistent with the Department's proposed regulation that compliance with safety standards, for example, may be relevant in assessing the control factor, depending on the facts of the individual case, and that a complete bar to considering such facts is inappropriate under the economic reality test. The facts and circumstances of each case must be assessed, and the manner in which the employer chooses to implement such obligations will be highly relevant to the analysis. For example, if an employer requires all individuals to wear hard hats at a construction site for safety reasons, that is less probative of control; if an employer chooses a specific time and location for weekly safety briefings and requires all workers to attend, that is more probative of control. Similarly, if an employer requires workers to provide proof of insurance required by state law, that is less probative of control; if an employer mandates what insurance carrier workers must use, that is more probative of control.

Control exerted by the employer to achieve these ends therefore may be relevant to the underlying analysis of whether the worker is economically dependent on the employer, particularly where the employer dictates and enforces the manner and circumstances of compliance. Of course, such control may not be determinative of the worker's employee or independent contractor status (given the other factors included in the economic reality test) or probative of whether the control factor itself weighs in favor of employee status. This is merely one aspect of a multifactor test. Even if compliance with specific legal obligations or safety requirements is indicative of control in a specific case, this does not compel a particular conclusion as to that worker's

status under the Act.[371] Thus, the Department's proposal would not preclude a finding that a worker is an independent contractor where an employer obligates workers, for example, to comply with safety standards, after also considering other relevant factors in the economic reality analysis.

With these general principles in mind, the next sections address the Department's proposals regarding several aspects of control to be considered in determining whether the nature and degree of control indicates that the worker is an employee or an independent contractor. This discussion is intended to be an aid in assessing common aspects of control—including scheduling, supervision, price setting, and ability to work for others—but should not be considered an exhaustive list, given the various ways in which an employer may control a worker or the economic aspects of the work relationship.

b. Scheduling

As noted above, an employer's direct control over a worker's schedule can be evidence of employee status. For example, the Fifth Circuit, in *Cromwell,* concluded that workers were employees even though the workers "controlled the details of how they performed their work [and] were not closely supervised" because, in part, the employer had "complete control over [workers'] schedule[s]." [372] Yet the absence of direct scheduling control is not necessarily strong evidence that the employer lacks control for purposes of the economic reality test, particularly where other evidence demonstrates control.[373]

Independent contractor arrangements can include the ability to work at any time the contractor decides it is appropriate to begin and end work. Some courts have found such scheduling control by the worker to be indicative of an independent contractor relationship.[374] For example, the Eighth

Circuit affirmed a jury verdict finding a process server to be an independent contractor, in part, because the worker "was not required to report for work[,] . . . did not punch a time clock," and did not have a set schedule, report a daily schedule to the employer, or face discipline for not working.[375] Section 795.105(d)(1)(i) of the 2021 IC Rule suggests as much, noting that the ability to set their own schedule is evidence that weighs towards a worker being an independent contractor.[376]

However, after further consideration and review of the case law, the Department considers this framing to be too narrow because it does not take into account actions the employer may take that would limit the significance of the worker setting their own schedule. In fact, courts have concluded that the ability to set one's own schedule provides only minimal evidence that the worker is an independent contractor when considered in relation to other forms of control by the employer in the workplace.[377] If the ability to pick one's shift is offset by the limited hours provided by the employer,[378] or the employer purports to allow a worker an accommodating schedule, but arranges the work in a way that makes finding other clients impossible,[379] then meaningful scheduling flexibility may not exist. Moreover, employers may also exert so much control over the amount or pace of the work as to negate any meaningful scheduling flexibility.[380]

---

[369] *See id.* at 376.

[370] *See* 685 F. App'x at 550. Additionally, in *Mr. W Fireworks,* the Fifth Circuit found that a defendant company's requirement that plaintiffs work after ordinary business hours favored plaintiffs' employee status notwithstanding the company's attempt to link plaintiffs' work schedules to state regulatory requirements (finding, however, that state regulations did not require such after-hours work). *See* 814 F.2d at 1046.

[371] Additionally, even in cases in which a court did not consider control exerted over workers to comply with safety obligations as indicative of control, the court nevertheless concluded that such workers were employees under the FLSA. *See, e.g., Rick's Cabaret,* 967 F. Supp. 2d at 916, 922.

[372] 348 F. App'x 57, 61 (5th Cir. 2009); *see also Mr. W Fireworks,* 814 F.2d at 1048 (noting that compelled work schedules were evidence of control and thus employee status).

[373] *See, e.g., Pilgrim Equip.,* 527 F.2d at 1312 ("In the total context of the relationship neither the [worker's] right to hire employees *nor the right to set hours* indicates such lack of control by [the employer] as would show these operators are independent from it.") (emphasis added).

[374] *See, e.g., Franze,* 826 F. App'x at 77 (emphasizing that schedule flexibility "weigh[s] in

favor of independent contractor status"); *Express Sixty-Minutes,* 161 F.3d at 303 (determining that the employer "had minimal control" over the delivery drivers in part because the drivers "set their own hours and days of work" which was evidence that the worker was an independent contractor).

[375] *Karlson,* 860 F.3d at 1095–96.

[376] 86 FR 1246–47.

[377] *See, e.g., Verma,* 937 F.3d at 230 (finding the ability to set hours, select shifts, stay beyond a shift, and accept or reject work to be, in truth, "narrow choices" when evaluated against other types of control exerted by the employer); *DialAmerica,* 757 F.2d at 1384–86 (finding telephone survey workers who set their own hours and were free from supervision to be employees); *Sureway,* 656 F.2d at 1371 ("circumstances of the whole activity" show that laundry company "exercises control over the meaningful aspects of the cleaning [work]" despite the fact that workers could set their own hours).

[378] *Doty v. Elias,* 733 F.2d 720, 723 (10th Cir. 1984) ("Since plaintiffs could wait tables only during the restaurant's business hours, [the employer] essentially established plaintiffs' work schedules.").

[379] *See, e.g., Keller,* 781 F.3d at 814 ("[A] reasonable jury could find that the way that [the employer] scheduled [the worker's] installation appointments made it impossible for [the worker] to provide installation services for other companies.").

[380] *See, e.g., Flint Eng'g,* 137 F.3d at 1441 ("The record indicates rig welders cannot perform their work on their own schedule; rather, pipeline work has assembly line qualities in that it requires orderly and sequential coordination of various crafts and workers to construct a pipeline.").

As the Tenth Circuit observed in *Dole v. Snell*, "flexibility in work schedules is common to many businesses and is not significant in and of itself."[301] Thus, scheduling flexibility should not supplant a full evaluation of the control factor, nor the ultimate question of economic dependence guiding the analysis. For example, the Third Circuit reversed summary judgment in favor of the employer and found disputed issues of material fact about drivers' classification even where it was undisputed that drivers were free to choose their work schedules.[302] The Fifth Circuit has also found that the employer had "significant control" indicating employee status over dancers even though they had "input . . . as to the days that they wish to work."[303]

In fact, circuit courts have often evaluated scheduling flexibility relative to other forms of control by the employer; where the employer has more control in other ways, scheduling flexibility becomes less relevant. In *Verma*, the Third Circuit found the ability to set hours, select shifts, stay beyond a shift, and accept or reject work to be "narrow choices" when evaluated against other types of control by the employer, such as setting the price for services.[304] And multiple district courts have concluded that scheduling flexibility—including picking when to work or having the freedom to decline work—was not necessarily indicative of the overall control by an employer nor dispositive of a worker's independent contractor status.[305] Conversely, as the Second Circuit noted, where workers have greater scheduling flexibility and can use that flexibility to further their independent business, then that flexibility may be probative of their independent contractor status.[306]

Flexibility may also be an inherent component of a business model, which allows some workers the freedom to use time between tasks or jobs in any fashion, providing some evidence of the employer's lack of control. But flexible work arrangements that allow workers to, among other things, work for others, are not exclusive to independent contractors[307] and do not preclude a finding that an employer has sufficient control over a worker in other ways such that this factor weighs in favor of employee status.[308] Moreover, the power to decline work, and thus maintain a flexible schedule, is not alone persuasive evidence of independent contractor status when the employer can discipline a worker for doing so.[309]

In sum, case law on this issue demonstrates that scheduling control must be assessed in view of the total amount of control exerted by an employer. This is consistent with the economic realities, totality-of-the-circumstances approach. Thus, scheduling flexibility is not necessarily indicative of independent contractor status where other aspects of control are present, such as where an employer asserts that workers can work when and where they want but retains authority to discipline workers for declining work or imposes other methods of control that limit flexibility.

c. Supervision

Like the presence of a pre-defined work schedule, an employer's close supervision of a worker on the job may be evidence of employee status.[390] Conversely, the ability to work independently without close supervision may be evidence that a worker is an independent contractor.[391] However, traditional forms of in-person, continuous supervision are not required for a court to determine that this factor weighs in favor of employee status.[392] The form supervision takes can vary by type and method, and this should be part of any consideration of supervision under the control factor.

While it may be indicative of independent contractor status if a worker is free to work without close supervision, the lack of supervision is not alone indicative of independent contractor status.[393] For instance, the nature of an employer's business or the nature of the work may make direct supervision unnecessary. A lack of supervision in those circumstances, without further inquiry, does not compel a finding that the control factor

---

[301] 875 F.2d at 806; *see also Doty*, 733 F.2d at 723 ("A relatively flexible work schedule alone, however, does not make an individual an independent contractor rather than an employee."); *Lilley v. BTM Corp.*, 958 F.2d 746, 750 (6th Cir. 1992) (noting that even though a worker could "set [their] own hours and vacation schedule, such flexibility is not sufficient to negate control"); *Walling v. Twyeffort, Inc.*, 158 F.2d 944, 947 (2d Cir. 1946) (holding that workers who "are at liberty to work or not as they choose" were employees under FLSA).

[302] *Razak*, 951 F.3d at 146.

[303] *Circle C. Invs.*, 998 F.2d at 327.

[304] 937 F.3d at 230; *see also Paragon*, 884 F.3d at 1235–38 (finding that even though a worker could set his own schedule, he was an employee, in part, because his flat rate of pay did not allow him profit based on his performance).

[305] *See, e.g., Hill v. Cobb*, No. 3:13–CV–045–SA–SAA, 2014 WL 3810228, at *4–5 (N.D. Miss. Aug. 1, 2014) (holding that workers were employees even though they had no specific hours or schedule and could "come and go as [they] pleased"); *Wilson v. Guardian Angel Nursing, Inc.*, No. 3:07–0069, 2008 WL 2944661, at *12–17 (M.D. Tenn. July 31, 2008) (holding that nurses were employees, even though they could accept or reject shifts).

[306] *See Saleem*, 854 F.3d at 146 (finding drivers that were able to set schedules that "were entirely of their making" were properly found to be independent contractors where, among other factors, drivers could select routes, turn down jobs without penalty, and exercise business-like initiative); *see also Alpha & Omega*, 39 F.4th at 1083–84 (finding genuine disputes of fact under control regarding whether drivers could set their own hours and whether drivers were allowed to decline trips without penalization).

[307] Employers continue to offer even more flexibility in work arrangements while retaining workers as employees. *See, e.g.,* André Dua et al., *Americans are Embracing Flexible Work—and They Want More of It,* McKinsey & Company (June 23, 2022), *https://www.mckinsey.com/industries/real-estate/our-insights/americans-are-embracing-flexible-work-and-they-want-more-of-it* (finding, for example, that 58 percent of surveyed workers have the option to work remotely, either on a full-time or part-time basis; a flexibility that spans industries and occupations); Alicia Adamczyk, *Say Goodbye To 9-To-5: More and More, Corporate America is Letting People Work Whenever They Want,* Fortune (March 21, 2022, 10:36 a.m.), *https://fortune.com/2022/03/21/9-to-5-dead-flexible-schedules-more-popular/* (noting the shift in corporate culture that is allowing more workers to remain employees while also obtaining flexible working schedules).

[308] For example, in *Collinge*, the employer contended that the on-demand drivers were properly independent contractors because of the flexible nature of their work despite exercising significant control including training the drivers, disciplining them for violations of procedure, dispatching pick-ups, and setting schedules. 2015 WL 1290369, at *2–4. Importantly, the fact that on-demand "[d]rivers are free to wait at home for their first delivery of the day, and . . . are free to 'kill time' on a computer or run personal errands" in between jobs was "unavailing because they merely show that [the employer] is unable to control its drivers when they are not working, an irrelevant point." *Id.* at *4 (footnotes omitted).

[309] *Off Duty Police,* 915 F.3d at 1056 ("Although workers could accept or reject assignments, multiple workers testified that [the employer] would discipline them if they declined a job," which was evidence of the employer's ultimate control.).

[390] *See, e.g., Scantland,* 721 F.3d at 1314 (finding "meaningful supervision and monitoring" in part because the employer required cable installers to log in and out of a service on their cell phones to record when they arrived on a job and when they completed a job).

[391] *See, e.g., Chao v. Mid-Atlantic Installation Servs., Inc.,* 16 F. App'x 104, 106–06 (4th Cir. 2001) (agreeing with the district court's analysis that the ability to complete jobs in any order, conduct personal affairs, and work independently is evidence that leans toward identifying a worker as an independent contractor).

[392] *See, e.g., Superior Care,* 840 F.2d at 1060 ("An employer does not need to look over his workers' shoulders every day in order to exercise control."); *Driscoll,* 603 F.2d at 756 (farmworkers could be employees of a strawberry farming company even where the employer exercised little direct supervision over them); *Twyeffort,* 158 F.2d at 947 (rejecting an employer's contentions that its tailors are independent contractors because they are "free from supervision, are at liberty to work or not as they choose, and may work for other employers if they wish").

[393] The legislative history of the FLSA also supports this point directly, since the definition of "employ" was explicitly intended to cover as employment relationships those relationships where the employer turned a blind eye to labor performed for its benefit. *Antenor,* 88 F.3d at 934; *see supra* section V.C.4.a.

weighs in favor of independent contractor status. For example, the Sixth Circuit found that security officers were employees although they were "rarely if ever supervised" on the job, noting that "the actual exercise of control requires only such supervision as the nature of the work requires." [394] More directly, "the level of supervision necessary in a given case is in part a function of the skills required to complete the work at issue," and the officers in that case "had far more experience and training than necessary to perform the work assigned." [395] Moreover, an employer may develop training and hiring systems that make direct supervision unnecessary. This was the case in *Keller v. Miri Microsystems LLC*, where an employer relied on pre-hire certification programs and installation instructions when hiring their satellite dish installers. [396] The employer argued that it had little day-to-day control over the workers and did not supervise the performance of their work. Yet the court noted that a factfinder could "find that [the employer] controlled [the installer's] job performance through its initial training and hiring practices" in a way that would suggest that the workers were employees. [397] Conversely, the Eleventh Circuit affirmed a district court's conclusion that an insurance claims investigator was properly classified as an independent contractor, in part, because the investigator worked largely without supervision when setting up appointments, deciding where to work, and how and when to complete his assignments. [398]

In addition, the right of the employer to supervise at its discretion is evidence of control, even if the employer rarely

exerts supervision. [399] The Second Circuit, for example, affirmed a district court's rejection of a nursing referral company's argument that they did not supervise the nursing staff directly where the employer, in the court's judgment, "unequivocally expressed *the right* to supervise the nurses' work," even though the supervision "occurred only once or twice a month." [400]

Finally, the Department notes that supervision can also come in many different forms, which may not be immediately apparent. For example, supervision can be maintained remotely through technology instead of, or in addition to, being performed in person. For instance, employers may implement monitoring systems that can track a worker's location and productivity, and even generate automated reminders to check in with supervisors. [401] Additionally, an employer can remotely supervise its workforce, for instance, by using electronic systems to verify attendance, manage tasks, or assess performance. [402]

Simply put, consistent with a totality-of-the-circumstances analysis, the ways in which supervision can be accomplished without traditional in-person techniques requires thorough consideration. As the Fifth Circuit recently reiterated, the " 'lack of supervision [of the individual] over minor regular tasks cannot be bootstrapped into an appearance of real independence.' " [403] Control may be exercised through nontraditional means such as automated systems that monitor performance, but it can be found to be control nonetheless. Employers may also eliminate the need for close supervision because the structure of the job or the fact that little skill or discretion is envisioned or allowed. Thus, the lack of apparent in-person supervision (or even the lack of any in-person supervision) is not necessarily indicative of independent contractor status and additional consideration must be given to the ways in which an employer can implement supervision over a worker.

d. Setting a Price or Rate for Goods or Services

The ability to set a price or rate for the goods or services provided by the worker, or influence the price or rate, is relevant when examining the control factor under the economic realities analysis. This fact relates directly to whether the worker is economically dependent on the employer for work and helps answer the question whether the worker is in business for themself.

There is substantial case law supporting the relevance of price setting to the economic realities analysis under the FLSA, and workers in business for themselves are generally able to set (or at least negotiate) their own prices for services rendered. As the Supreme Court explained in *Whitaker House*, in concluding that workers for a cooperative were employees under the Act, such workers "are not self-employed; nor are they independent, selling their products on the market for whatever price they can command. They are regimented under one organization, manufacturing what the organization desires and receiving the compensation the organization dictates." [404] Circuit courts have similarly made clear that the employer's setting a price for goods or services provided by the worker is a form of

---

[394] *Off Duty Police*, 915 F.3d at 1061–62 (citation omitted). This dynamic is also present in cases where the work can be performed away from a single work site and without supervision. This was the precise situation faced by the Third Circuit in *DialAmerica*. There, the fact that the workers could control the hours during which they worked and that they were subject to little direct supervision was unsurprising given that such facts are typical of homeworkers and thus largely insignificant in determining their status. 757 F.2d at 1383–84; *see also McComb v. Homeworkers' Handicraft Coop.*, 176 F.2d 633, 636 (4th Cir. 1949) ("It is true that there is no supervision of [homeworkers'] work; but it is so simple that it requires no supervision.").

[395] *Off Duty Police*, 915 F.3d at 1061–62; *see also Antenor* 88 F.3d at 933 n.10 (explaining in an FLSA joint employment case that "courts have found economic dependence under a multitude of circumstances where the alleged employer exercised little or no control or supervision over the putative employees"); *Superior Care*, 840 F.2d at 1060 ("An employer does not need to look over his workers' shoulders every day in order to exercise control.").

[396] 781 F.3d at 814.

[397] *Id.*

[398] *Nieman*, 775 F. App'x at 624–25.

[399] *See infra* section V.D. (discussing this proposed rule's approach to the primacy of actual practice); *see also Herman v. RSR Security Servs.*, 172 F.3d 132, 139 (2d Cir. 1999) (noting, in a joint employment case, that supervisory control "may be restricted, or exercised only occasionally, without removing the employment relationship from the protections of the FLSA").

[400] *Superior Care*, 840 F.2d at 1060 (emphasis added); *see also Off Duty Police*, 915 F.3d at 1060 (describing the control analysis as an inquiry into "whether the company *retains the right* to dictate the manner of the worker's performance") (emphasis added and internal quotations omitted).

[401] *See, e.g., Ruiz*, 754 F.3d at 1102–03 (finding in a state wage-and-hour case that direct monitoring techniques used by an employer to monitor its furniture delivery drivers were a form of supervision that made it more likely that the worker was an employee; as the court noted, the employer supervised the drivers by "conducting 'follow-alongs;' requiring that drivers call their . . . supervisor after every two or three stops; monitoring the progress of each driver on the 'route monitoring screen'; and contacting drivers if . . . [they] were running late or off course"—all of which supported the conclusion that the workers were employees under state law). For a general discussion of trends regarding remote supervision accomplished via technological means, see Matthew Finnegan, *Rise in Employee Monitoring Prompts Calls for New Rules to Protect Workers*, Computerworld (Nov. 30, 2021, 3:01 a.m.), *https://www.computerworld.com/article/3642712/rise-in-employee-monitoring-prompts-calls-for-new-rules-to-protect-workers.html*; and Rakeen Mabud, *When the Real Threat Is Worker Surveillance—Not The Robot Apocalypse*, Forbes (Jan. 22, 2019, 9:26 a.m.), *https://www.forbes.com/sites/rakeenmabud/2019/01/22/when-the-real-threat-is-worker-surveillance-not-the-robot-apocalypse/?sh=11fdfe04602f*.

[402] The Department's enforcement experience in this area is informative. An employer's use of electronic visitor verification ("EVV") systems can be evidence of an employment relationship, especially in those instances where the employer uses the systems to set schedules, discipline staff, or run payroll systems, for example. *See Domestic Service Final Rule Frequently Asked Questions (FAQs)*, U.S. Department of Labor (May 24, 2022,

10:30 a.m.), *https://www.dol.gov/agencies/whd/direct-care/faq#g11* (discussing EVV systems at question #10 in relation to an FLSA joint employment analysis).

[403] *Parrish*, 917 F.3d at 381 (quoting *Pilgrim Equip.*, 527 F.2d at 1312) (alteration in original).

[404] 366 U.S. at 32.

control indicative of an employment relationship. For example, in *Martin* v. *Selker Bros.*, the court noted that, among other things, the fact that the employer set the price of cash sales of gasoline reflected the employer's "pervasive control" over the workers.[405] In *Off Duty Police*, the Sixth Circuit concluded that certain security guards were employees, in part, because "[the employer] set the rate at which the workers were paid."[406] The Fourth Circuit in *McFeeley*, affirmed that a nightclub owner was exercising significant control because, among other things, they set the fees for private dances.[407] And in *Verma*, the court identified, among other things, the employer's setting the price and duration of private dances as indicative of "overwhelming control" over the performance of the work.[408] Consistently, when a worker negotiates or sets prices, those facts weigh in favor of independent contractor status. For example, in *Eberline* v. *Media Net, LLC*, the court found that a jury had sufficient evidence to conclude that a worker exerted independent control over meaningful aspects of his business in part due to "testimony that installers could negotiate prices for custom work directly with the customer and keep that money without consequence."[409] The price of goods and services may sometimes be included in contracts between a business and an independent

contractor.[410] Such a contract, however, does not automatically alleviate the need for a full analysis of this factor in order to consider whether and if the employer has control over the economic realities of the job; for example, whether the worker had the opportunity to negotiate and alter the terms of the contract. As with the other economic reality factors, the particular facts and circumstances of each case must be examined and considered in the context of the totality of the circumstances. Accordingly, setting a price or rate for goods provided or services rendered is a form of control that must be carefully considered when undertaking an economic realities analysis. It is evidence of employee status when an entity other than the worker sets a price or rate for the goods or services offered by the worker, or where the worker simply accepts a predetermined price or rate without meaningfully being able to negotiate it.[411]

e. Ability To Work for Others

Another aspect of the control factor is the ability to work for others, which is reflected in 2021 IC Rule § 795.105(d)(1)(i). This provision states that the control factor weighs in favor of independent contractor status when the worker, as opposed to the employer, exercises substantial control, such as "through the ability to work for others, which might include the potential employer's competitors." The provision also states that the control factor weighs in favor of employee status where the employer, as opposed to the worker, exercises substantial control, such as "by directly or indirectly requiring the individual to work exclusively for the potential employer."

The Department continues to believe that where a worker has an exclusive work relationship with one employer and does not have the ability to work for others, this indicates employee status. Where the employer exercises control over a worker's ability to work for others—either by directly prohibiting other work, for example, through a contractual requirement,[412] or indirectly

by, for example, making demands on workers' time such that they are not able to work for other employers[413]—this is indicative of the type of control over economic aspects of the work associated with an employment relationship. For example, in *Scantland*, the Eleventh Circuit determined that even if the workers were not prohibited from working for others, the workers essentially had an exclusive work relationship with the employer because they were required to work five to seven days a week and could not decline work.[414] Thus, the employer controlled whether they could work for others, which suggested that they were economically dependent on the employer.[415]

The Department also recognizes that some courts find that less control is exercised by an employer where the worker can work for others, particularly competitors, and that this is indicative of an independent contractor relationship.[416] For example, in *Saleem*,

[405] 949 F.2d at 1294.

[405] 915 F.3d at 1060.

[407] 825 F.3d at 241–42.

[408] 937 F.3d at 230. Similarly, the Second Circuit in *Agerbrink* v. *Model Service, LLC*, 707 F. App'x 22, 25 (2d Cir. 2018), determined that there were material facts in dispute regarding the worker's "ability to negotiate her pay rate," which related to the degree of control exerted by the employer. The court also rejected the employer's contention that the worker had control over her pay rate simply because she could either work for the amount offered or not work for that amount, stating that this "says nothing of the power to negotiate a rate of pay." *Id.* at 26. *See also Cornerstone Am.*, 545 F.3d at 343–44 (finding employment where employer controlled "meaningful" aspects of the work, including pricing); *Karnes* v. *Happy Trails RV Park, LLC*, 361 F. Supp. 3d 921, 929 (W.D. Mo. 2019) (finding park managers to be employees in part because the park owners "set all the prices"); *Hurst* v. *Youngelson*, 354 F. Supp. 3d 1362, 1370 (N.D. Ga. 2019) (finding relevant to the control analysis that the plaintiff was not free to set the prices she charged customers and had no ability to waive or alter cover charges for her customers).

[409] 636 F. App'x 225, 227 (5th Cir. 2016); *see also Nelson* v. *Texas Sugars, Inc.*, 838 F. App'x 39, 42 (5th Cir. 2020) (concluding that because the dancers set their own schedule, worked for other clubs, chose their costume and routine, decided where to perform (onstage or offstage), kept all the money that they earned, and *even chose how much to charge customers for dances*, a reasonable jury could conclude that the Club did not exercise significant control over them") (emphasis added).

[410] *McFeeley*, 825 F.3d at 242–43 (observing that a worker doesn't "automatically become[] an employee covered by the FLSA the moment a company exercises any control over him. After all, a company that engages an independent contractor seeks to exert some control, whether expressed orally or in writing, over the performance of the contractor's duties . . . .").

[411] *See, e.g.*, *Scantland*, 721 F.3d at 1315 (reversing summary judgment for the employer based in part on evidence that the workers "could not bid for jobs or negotiate the prices for jobs").

[412] *See Parrish*, 917 F.3d at 382 (noting that the non-disclosure agreement did not require exclusive employment, and was therefore not an element of

[413] *See, e.g.*, *Keller*, 781 F.3d at 813–14 (although worker was not prohibited from working for other companies, "a reasonable jury could find that the way that [the employer] scheduled [the worker's] installation appointments made it impossible for [the worker] to provide installation services for other companies"); *Scantland*, 721 F.3d at 1313–15 (finding even if workers were not prohibited from working for other installation contractors their long hours and inability to turn down work suggested that the employer controlled whether they could work for others, which was in part why the control factor favored employee status); *Cromwell* v. *Driftwood Elec. Contractors, Inc.*, 348 F. App'x 57, 61 (5th Cir. 2009) ("Although it does not appear that [the workers] were actually prohibited from taking other jobs while working for [the employers], as a practical matter the work schedule established by [the employers] precluded significant extra work."); *Flint Eng'g*, 137 F.3d at 1441–42 (finding the hours the company required of the workers, coupled with driving time between home and remote work sites every day, made it "practically impossible for them to offer services to other employers").

[414] 721 F.3d at 1314–15.

[415] *Id.* at 1315.

[416] *See, e.g.*, *Razak*, 951 F.3d at 145–46 (discussing disputed facts regarding the control factor, including whether drivers could drive for other services); *Paragon*, 884 F.3d at 1235 (finding control factor favored independent contractor status in part because worker could and did work for other employers); *Saleem*, 854 F.3d at 141–43 (drivers' ability to work for business rivals and transport
Continued

the Second Circuit determined that black car drivers' ability to work for business rivals and transport personal clients showed less control by and economic dependence on the employer.[417] The Second Circuit distinguished the black car drivers' ability to shift their business operations from one entity to another in order to maximize their profits through the exercise of "initiative, judgment, or foresight" from the nurses in *Superior Care* who were dependent on the employer for referrals to job assignments with multiple health care entities.[418] The Second Circuit also noted that the black car drivers were able to seek out multiple sources of income by building their own long-term business relationships, creating business cards, and advertising their services.[419]

Consistent with the case law, the Department is proposing to address the ability to work for others in the control factor. The proposed regulation explains that where an employer either explicitly limits a worker's ability to work for others or places demands on a worker's time that effectively preclude them from working for others, these facts are relevant to the employer's control over the worker. The proposed regulation also states that more indicia of employer control favors employee status and more indicia of worker control favors independent contractor status. However, the regulation does not state that the ability to work for others is a form of control exercised by the worker. The Department is concerned that this framing, as reflected in the 2021 IC Rule, fails to distinguish between work relationships where a worker has multiple jobs in which they are dependent on each employer and do not exercise the control associated with being in business for oneself, and relationships where the worker has sought out multiple clients in furtherance of their business. For example, if one worker holds multiple lower-paying jobs for which they are dependent on each employer for work in order to earn a living, and a different worker services multiple clients due to their business acumen and entrepreneurial skills, there are qualitative and legally significant

differences in how these two scenarios should be evaluated under the economic reality test. Thus, the mere fact that an employer allows workers to work for others does not transform an employee into an independent contractor. As the Fifth Circuit stated, "[the] purposes [of the FLSA] are not defeated merely because essentially fungible piece workers work from time to time for neighboring competitors."[420]

Ultimately, "the question [a] court must resolve is whether a [worker's] freedom to work when she wants and for whomever she wants reflects economic independence, or whether those freedoms merely mask the economic reality of dependence."[421] For example, in *McLaughlin v. Seafood, Inc.*, the Fifth Circuit examined whether piece-rate workers who peeled and picked crabmeat and crawfish for a seafood processor, and who were allowed "to come and go as they please . . . and even to work for competitors on a regular basis" were, as a matter of economic reality, dependent on their employers and therefore employees under the Act.[422] The court determined that the workers' ability to work for others was not dispositive, and that "[l]aborers who work for two different employers on alternate days are no less economically dependent on their employers than laborers who work for a single employer" because "that freedom is hardly the same as true economic independence."[423]

Finally, the Department notes that courts frequently consider the exclusivity of the work relationship and workers' ability to work for others under the permanence factor as well, as discussed above in section V.C.3. The 2021 IC Rule elected to consider exclusivity and ability to work for others only under the control factor.[424] Upon further consideration, however, the Department is proposing to retain consideration of these issues under the control factor as well as considering exclusivity under the permanency factor. The Department does not believe that this leads to confusion, however, because courts often analyze workers' ability to work for others under both the control and permanence factors, demonstrating that these facts are relevant to both factors and aid factfinders' analyses when determining

whether the worker is economically dependent on the employer or operating as an independent business as part of the overall economic realities inquiry. Specifically, the case law reflects and the Department believes that exclusivity can be considered as it relates to the degree of control exercised by the employer—such as what an employer's actions allow a worker to do vis-à-vis other employers— and that it speaks to the permanency of the work relationship. While permanency is often associated with an exclusive work relationship, it may or may not be due to the employer's control.[425]

The Department welcomes comments on all aspects of this factor.

### Example: Nature and Degree of Control

A registered nurse provides nursing care for Alpha House, a nursing home. The nursing home sets the work schedule with input from staff regarding their preferences and determines where in the nursing home each nurse will work. Alpha House's internal policies prohibit nurses from working for other nursing homes while employed with Alpha House in order to protect its residents. In addition, the nursing staff are supervised by regular check-ins with managers, but nurses generally perform their work without direct supervision. While nurses at Alpha House work without close supervision and can express preferences for their schedule, Alpha House maintains control over when and where a nurse can work and whether a nurse can work for another nursing home. These facts related to the control factor indicate employee status.

Another registered nurse provides specialty movement therapy to residents at Beta House. The nurse maintains a website and was contacted by Beta House to assist its residents. The nurse provides the movement therapy for residents on a schedule agreed upon between the nurse and the resident, without direction or supervision from Beta House, and sets the price for services on the website. In addition, the nurse simultaneously provides therapy sessions to residents at Beta House as well as other nursing homes in the community. The facts related to the control factor—that the nurse markets their specialized services to obtain work for multiple clients, is not supervised by

---

personal clients showed less control by and economic dependence on the employer); *Express Sixty-Minutes*, 161 F.3d at 303 (control factor "point[ed] toward independent contractor status" in part because of drivers' ability to work for other courier delivery providers).

[417] 854 F.3d at 141–43.

[418] *Id.* at 143–44 (citing *Superior Care*, 840 F.2d at 1060 and *Keller*, 781 F.3d at 809) (internal quotation marks omitted).

[419] *Id.* at 143.

[420] *McLaughlin v. Seafood, Inc.*, 867 F.2d 875, 877 (5th Cir. 1989) (per curiam).

[421] *Reich v. Priba Corp.*, 890 F. Supp. 586, 592 (N.D. Tex. 1995) (citing *Mednick*, 508 F.2d at 300, 301–02).

[422] 861 F.2d 450, 451–53 (5th Cir. 1988), *modified on reh'g*, 867 F.2d 875 (5th Cir. 1989).

[423] *Seafood Inc.*, 867 F.2d at 877.

[424] 86 FR 1192–93.

[425] The Department noted in the 2021 IC Rule that it "disagree[d] with the interpretation suggested by various business commenters that only worker practices which are affirmatively coerced by a potential employer may indicate employee status." *Id.* at 1205. As noted, "[s]uch a reading conflicts with the definition of 'employ' in section 3(g) of the Act, which makes clear that the FLSA was intended to cover employers who passively 'suffer or permit' work from individuals." *Id.*

Beta House, sets their own prices, and has the flexibility to select a work schedule—indicate independent contractor status.

5. Extent to Which the Work Performed is an Integral Part of the Employer's Business (Proposed § 795.110(b)(5))

Section 795.105(d)(2)(iii) of the 2021 IC Rule addresses whether the worker's work "is part of an integrated unit of production" of the employer's business.[426] The 2021 IC Rule explained that "the relevant facts are the integration of the worker into the potential employer's production processes" because "[w]hat matters is the extent of such integration rather than the importance or centrality of the functions performed" by the worker.[427] Thus, § 795.105(d)(2)(iii) expressly rejects as irrelevant to this factor whether the work is important or central to the employer's business, and § 795.115(b)(6)(ii) similarly advises in an illustrative example involving a freelance journalist that "[i]t is not relevant . . . that the writing of articles is an important part of producing newspapers.[428]

In proposed § 795.110(b)(5), the Department returns to the framing of this factor as whether the worker's work is an "integral part" of the employer's business. The Department believes that this return to considering whether the work is critical, necessary, or central to the employer's business better reflects the economic reality case law and is more consistent with the totality-of-the-circumstances approach to determining whether a worker is an employee or an independent contractor.[429] For decades, courts have repeatedly found a worker's performance of work that is integral to the employer's business to be an indicator of employee status.[430] This judicial treatment reflects the understanding that a worker who performs work that is integral to an employer's business is more likely to be employed by the business, whereas a worker who performs work that is more peripheral to the employer's business is

more likely to be independent from the employer.[431]

The 2021 IC Rule suggested that, in the modern economy, this assumption "may not always be valid," because lower transaction costs make it easier for companies to contract for products and services.[432] Yet, a firm's economic decision to contract for more essential functions is not synonymous with their workers' proper classification as employees or independent contractors. Practices that lead to efficiency or cost savings for the employer do not diminish the role of a factor in the economic reality test. Of course, it is not always true that workers whose work is integral are employees.[433] The integral factor is just one part of the analysis. However, courts continue to find the factor useful for evaluating economic dependence or independence because of the insight it provides into whether a worker is in business for themself or is a part of the employer's business.[434]

Most courts adopt a common-sense approach to whether the work or service performed by the worker is an integral part of the employer's business. For

example, if the employer could not function without the service performed by the workers, then the service they provide is integral.[435] Such workers are more likely to be economically dependent on the employer because their work depends on the existence of the employer's principal business, rather than having an independent business that would exist with or without the employer.[436] Courts also look at whether the work is important, critical, primary, or necessary to the employer's business.[437] In most cases, if an employer's primary business is to make a product or provide a service, then the workers who are involved in making the product or providing the service are integral.[438]

The focus of the integral factor is on the work performed, not the individual worker.[439] This approach evaluates

---

[426] 86 FR 1247.

[427] 86 FR 1195.

[428] 86 FR 1247–48.

[429] In addition, the common law test considers "whether the work is part of the regular business of the hiring party" in distinguishing between employees and independent contractors. Reid, 490 U.S. at 752.

[430] See Silk, 331 U.S. at 716 (unloaders were "an integral part of the business[] of retailing coal"); see also Off Duty Police, 915 F.3d at 1055; McFeeley, 825 F.3d at 244; Scantland, 721 F.3d at 1319; Flint Eng'g, 137 F.3d at 1443; Superior Care, 840 F.2d at 1060–61; Lauritzen, 835 F.2d at 1537–39; DialAmerica, 757 F.2d at 1385; Driscoll, 603 F.2d at 755.

[431] See, e.g., Keller, 781 F.3d 799 at 815 ("The more integral the worker's services are to the business, then the more likely it is that the parties have an employer-employee relationship."); DialAmerica, 757 F.2d at 1385 ("workers are more likely to be 'employees' under the FLSA if they perform the primary work of the alleged employer").

[432] 86 FR 1194. The 2021 IC Rule's rejection of the "integral" factor relied in part on a criticism articulated by Judge Easterbrook in a concurring opinion. Id. (citing Lauritzen, 835 F.2d at 1541 (Easterbrook, J., concurring)). Judge Easterbrook argued that the factor was not useful, because "[e]verything the employer does is 'integral' to its business-why else do it?" Id. He argued that the cucumber-pickers in Lauritzen may be crucial to the employer's pickle business, but so would architects be to a building firm, or tires to Chrysler—but that does not imply the firms employ the architects or Chrysler employs tire makers. 835 F.2d at 1541. The Department believes, however, that although other factors may indicate that workers who provide important or central services are independent contractors, it is nevertheless the case that such services are more likely to be employees. Like any other factor, the integral factor provides only part of the analysis.

[433] See, e.g., Meyer v. U.S. Tennis Ass'n, 607 F. App'x 121, 123 (2d Cir. 2015) ("Although tennis umpires are an integral part of the U.S. Open," other factors supported determination that umpires were independent contractors); Perdomo v. Ask 4 Realty & Mgmt., Inc., No. 07–20089, 2007 WL 9706364, at *4 (S.D. Fla. Dec. 19, 2007) (construction worker's work was integral to remodeling business, but economic reality factors as a whole indicated independent contractor status).

[434] See, e.g., Sigui, 484 F. Supp. 3d at 41 (finding that this factor indicated employee status for cable installers after acknowledging that not all courts consider this factor but rejecting employer's argument that the factor "is not particularly important in the analysis" because, in this case, it "gives a complete picture of the business relationship") (quoting Pizzarelli v. Cadillac Lounge, LLC, No. 15–254, 2018 WL 2971114, at *6 (D.R.I. Apr. 13, 2018)).

[435] See, e.g., Off Duty Police, 915 F.3d at 1055 (rejecting employer's argument that it was merely an agent between its customers and the officers because the company "could not function without the services its workers provide"); McFeeley, 825 F.3d at 244 ("[E]ven the clubs had to concede the point that an 'exotic dance club could [not] function, much less be profitable, without exotic dancers.'") (quoting Secretary of Labor's Amicus Br. in Supp. of Appellees at 24); Capital Int'l, 466 F.3d at 309 (finding security guards were integral to a business where company "was formed specifically for the purpose of supplying" private security); cf. Johnson v. Unified Gov't of Wyandotte Cnty./Kansas City, 371 F.3d 723, 730 (10th Cir. 2004) (upholding jury verdict finding independent contractor status for security guards working for government housing authority and noting, with regard to integral factor, that the housing authority "had functioned for years before and after the program" under which security guards were hired).

[436] See, e.g., Brock v. Lauritzen, 624 F. Supp. 966, 969 (E.D. Wis. 1985), aff'd, 835 F.2d 1529 (7th Cir. 1987) (finding that cucumber harvesters were integral to cucumber farmer's business and were "economically dependent upon Lauritzen's business for their work during the cucumber harvest season").

[437] See, e.g., Alpha & Omega, 39 F.4th at 1085 (noting that this factor "turns 'on whether workers' services are a necessary component of the business'") (quoting Paragon, 884 F.3d at 1237); Flint Eng'g, 137 F.3d at 1443 (finding rig welders' work to be "an important, and indeed integral, component of oil and gas pipeline construction work" because their work is a critical step on every transmission system construction project); Lauritzen, 835 F.2d at 1537–38 ("It does not take much of a record to demonstrate that picking the pickles is a necessary and integral part of the pickle business[.]"); cf. Paragon, 884 F.3d at 1237 ("Because [the worker]'s management of the pecan grove was not integral to the bulk of Paragon's [construction] business, this factor supports consideration of [the worker] as an independent contractor").

[438] See, e.g., Superior Care, 840 F.2d at 1059 (for business that provided on-demand health care personnel, the nurses provided were themselves integral to the business).

[439] See, e.g., Montoya v. S.C.C.P. Painting Contractors, Inc., 589 F. Supp. 2d 569, 581 (D. Md. 2008) (explaining that "this factor does not turn on whether the individual worker was integral to the business; rather, it depends on whether the service

Continued

whether the worker performs work that is central to the employer's business, not whether the worker possesses some unique qualities that render them indispensable as an individual. An individual worker who performs the work that an employer is in business to provide but is just one of hundreds or thousands who perform the work (such as one operator among many at a call center) is nonetheless an integral part of the employer's business even if that one worker makes a minimal contribution to the business when considered among the workers as a whole.

As with the other components of the economic reality test, the integral part factor is just one area of inquiry and must be considered in relation to the other factors and to the extent that it contributes to the determination of economic dependence or independence. As such, it is unsurprising that, as noted in the 2021 IC Rule, there will be instances in which this factor "misaligns" with the ultimate result.[440] It is to be expected that not every factor will "align" with the ultimate result in many cases. With a multifactor analysis, it is common that some factors will indicate one result while others will indicate another. This difference shows that courts correctly weigh the factors against each other. A factor pointing in a different direction from other factors in any one case is not evidence that a factor is not useful in the run of situations.

In support of its rejection of the integral factor in favor of an "integrated unit" factor, the 2021 IC Rule relied on a rigid reading of *Rutherford* (which noted that the work was "part of an integrated unit of production" of the employer).[441] Upon further consideration, the Department finds that this rigid approach to the specific phrasing of *Rutherford* does not reflect Supreme Court or circuit court precedent. As the 2021 IC Rule acknowledged, the Supreme Court's contemporaneous decision in *Silk* determined that coal "unloaders" were employees of a retail coal company as a matter of economic reality in part because they were "*an integral part of the business*[] of retailing coal."[442] This language was interpreted in the 2021 IC

Rule as being part of the overall inquiry rather than a factor that is useful to guide the inquiry.[443] The Supreme Court's list of factors in *Silk* was not intended to be exhaustive, but instead consisted of factors the Court believed would be useful to courts and agencies applying the economic reality test in the future.[444] The Court noted that the workers were an "integral part" of the business, and later courts have likewise found this to be useful to the economic reality analysis—so much so that most circuit courts routinely list it as an enumerated factor, but no court uses "integrated unit" for this factor.[445]

For these reasons, the Department is proposing to eliminate the "integrated unit" factor as an enumerated factor and instead to restore the integral factor, understood by courts as being focused on whether the work is critical, necessary, or central to the employer's business.[446] The Department used this approach for decades prior to the 2021 IC Rule and found it a useful factor in the economic reality analysis.[447] No court has applied the "integrated unit" approach adopted by the 2021 IC Rule. Restoring the integral factor would avoid confusion and provide greater consistency with existing case law—the overwhelming majority of which includes an analysis of the integral factor as set forth in this proposed rule.

The Department welcomes comments on all aspects of this factor.

*Example: Extent To Which the Work Performed Is An Integral Part of the Employer's Business*

A large farm grows tomatoes that it sells to distributors. The farm pays workers to pick the tomatoes during the harvest season. Because picking tomatoes is an integral part of farming tomatoes, and the company is in the business of farming tomatoes, the tomato pickers are integral to the company's business. The integral factor indicates employee status.

Alternatively, the same farm pays an accountant to provide non-payroll

accounting support, including filing its annual tax return. This accounting support is not critical, necessary, or central to the principal business of the farm, thus the accountant is not integral to the business. Therefore, the integral factor indicates independent contractor status.

6. Skill and Initiative (Proposed § 795.110(b)(6))

The 2021 IC Rule includes an "amount of skill required for the work" factor and § 795.105(d)(2)(i) states that this factor "weighs in favor of the individual being an independent contractor to the extent the work at issue requires specialized training or skill that the potential employer does not provide."[448] That regulation further states that this factor "weighs in favor of the individual being an employee to the extent the work at issue requires no specialized training or skill and/or the individual is dependent upon the potential employer to equip him or her with any skills or training necessary to perform the job."[449]

The Department is proposing that this factor be described as the "skill and initiative" factor and consider whether a worker uses specialized skills to perform the work and whether those skills contribute to business-like initiative that is consistent with the worker being in business for themself instead of being economically dependent on the employer. The Department is proposing to reaffirm the longstanding principle that this factor indicates employee status where the worker lacks specialized skills. Proposed § 795.110(b)(6) states that where the worker brings specialized skills to the work relationship, it is the worker's use of those specialized skills in connection with business-like initiative that indicates that the worker is an independent contractor instead of an employee. The Department believes that the application of initiative in connection with specialized skills is useful in answering the overarching inquiry of whether the worker is economically dependent on the employer for work or is in business for themself, and is therefore proposing to reintegrate initiative into this factor and no longer exclude consideration of initiative when applying this factor, as provided in the 2021 IC Rule.

When applying this factor, many courts have recognized that a worker's lack of specialized skills to perform the work indicates that the worker is an employee. For example, courts have

---

the worker performed was integral to the business").

[440] 86 FR 1194. Although it asserted a "higher rate of misalignment" when the ultimate classification was independent contractor status, the 2021 IC Rule did not identify any cases where the "integral part" factor led to a result that was contrary to the totality of the evidence. *See id.*

[441] 86 FR 1193–94 (citing *Rutherford*, 331 U.S. at 729).

[442] 331 U.S. at 716 (emphasis added).

[443] 86 FR 1194.

[444] 331 U.S. at 716.

[445] *Id.; see supra* n. 430.

[446] Of course, if it is somehow relevant to the question of economic dependence or independence, the extent to which a worker is integrated into a business's production processes may be considered under any relevant factor or as an additional factor. For example, indicators that a worker is integrated into an employer's main production processes, such as whether the worker is required to work at the employer's main workplace or wear the employer's uniform, may be indicators of an employer's control over the work.

[447] *See, e.g.,* WHD Fact Sheet #13 (July 2008) (listing "[t]he extent to which the services rendered are an integral part of the principal's business" as a factor).

[448] 86 FR 1247.

[449] *Id.*

found that where the work of security guards and traffic control officers requires little skill, this lack of specialized skills indicates that the workers are employees instead of independent contractors.[450] Numerous courts have found that driving is not a specialized skill, indicating employee status.[451] Other courts have found that the skill factor favors employee status where janitorial work does not require specialized skills.[452] Courts have reached similar conclusions in cases involving landscape workers and call center workers, among other workers.[453]

As these cases make clear, the worker's lack of specialized skills when performing the work generally indicates employee status.[454] This is consistent with 2021 IC Rule § 795.105(d)(2)(i),[455] as noted above. It is also consistent with the position taken in an opinion letter issued by WHD in 2000, which stated that the fact that "the drivers appear to perform routine work that requires no prior experience" indicates employee status.[456]

That the work does not require prior experience, that the worker is dependent on training from the employer to perform the work, or that the work requires no training are indicators that the worker lacks specialized skills. Even if the worker possesses specialized skills, this factor may indicate employee status if the work does not require those skills. The Sixth Circuit explained that the skill factor favored employee status in a case because, although a subset of the workers possessed skill and prior experience, the work did not require skill and prior experience and the "workers [we]re required to attend only a four-hour training session before they begin work." [457] The Tenth Circuit has similarly explained in a case that, even if some workers had prior experience and training, the workers were not required "to have any specialized skills or prior experience when they start to work," indicating employee status.[458]

Consistent with the principle that no one factor is dispositive, however, workers who lack specialized skills may be independent contractors even if this factor is very unlikely to point in that direction in their circumstances. A landscaper, for example, may perform work that does not require specialized skills, but application of the other factors may demonstrate that the landscaper is an independent contractor (for example, the landscaper may have a meaningful role in determining the price charged for the work, make decisions affecting opportunity for profit or loss, determine the extent of capital investment, work for many clients, and/or perform work for clients for which landscaping is not integral).

Where the worker brings specialized skills to the work relationship, further analysis will determine whether this factor indicates employee and independent contractor status. Consistent with the approach of evaluating each factor in the context of the ultimate inquiry of whether the worker is economically dependent on the employer or in business for themself, proposed § 795.110(b)(6) states that the worker should use the specialized skills in connection with business-like initiative for this factor to suggest independent contractor status. Many circuit courts of appeals have expressly recognized that business-like initiative is at least part of the inquiry. For example, the Second Circuit has explained that "the fact that workers are skilled is not itself indicative of independent contractor status." [459] Although the workers in that case "possess[ed] technical skills," the court noted that "nothing in the record reveal[ed] that they used these skills in any independent way," which indicated that the workers' skill did not "weigh significantly in favor of independent contractor status." [460] The Third Circuit agreed that "the use of special skills is not itself indicative of independent contractor status, especially if the workers do not use those skills in any independent way." [461] The Third Circuit has further explained that if the workers use their skills in connection with "business-like initiative," the factor indicates independent contractor status: "Some distributors benefitted from their skill in persuading others to become distributees, and they certainly exercised business-like initiative in this regard." [462]

The Fifth Circuit describes this factor as evaluating the skill and initiative required in performing the work and considers initiative along with skill.[463] The Fifth Circuit has explained that, generally, "we look for some unique skill set, or some ability to exercise significant initiative within the business." [464] It has noted that "[g]reater skill and more demonstrated initiative counsel in favor of [independent contractor] status." [465] When the

---

[450] See, e.g., Off Duty Police, 915 F.3d at 1055–56 (noting that "[t]he skills required to work for ODPS are far more limited than those of a typical independent contractor" in finding that the skill factor weighed in favor of employee status for security guards and traffic control workers); Walsh v. Elm Protective Servs. LLC, No. 3:19–cv–00700, 2021 WL 3490040, at *7 (M.D. Tenn. Aug. 9, 2021) (traffic control officers require "relatively little skill" and security guards require "minimal skill," indicating employee status); Solis v. Int'l Detective & Protective Serv., Ltd., 819 F. Supp. 2d 740, 752 (N.D. Ill. 2011) (finding that the "vast majority of the Guards' work . . . did not require any special skills").

[451] See, e.g., Razak, 951 F.3d at 147 (noting that it "is generally accepted that 'driving' is not itself a 'special skill'" in determining that the skill factor weighs in favor of employee status); Iontchev, 685 F. App'x at 550 ("The service rendered by the [taxi drivers] did not require a special skill."); Campos v. Zopounidis, No. 3:09–cv–1138 (VLB), 2011 WL 2971298, at *7 (D. Conn. July 20, 2011) ("There is no evidence that Campos's job as a delivery person required him to possess any particular degree of skill. Campos did not need education or experience to perform his job. Although he needed a driver's license in order to legally drive his vehicle for deliveries, the possession of a driver's license and the ability to drive an automobile is properly characterized as a 'routine life skill' that other courts have found to be indicative of employment status rather than independent contractor status.").

[452] See, e.g., Perez v. Super Maid, LLC, 55 F. Supp. 3d 1065, 1077–78 (N.D. Ill. 2014) (noting, in finding that skill factor favored employee status, that "[m]aintenance work, such as cleaning, sweeping floors, mowing grass, unclogging toilets, changing light fixtures, and cleaning gutters, does not necessarily involve such specialized skills as would support independent contractor status," and that "cleaning services, although difficult and demanding, were even less complex than those maintenance services") (internal quotation marks omitted); Harris v. Skokie Maid & Cleaning Serv., Ltd., No. 11 C 8688, 2013 WL 3506149, at *6 (N.D. Ill. July 11, 2013) ("The maids' work may be difficult and demanding, but it does not require special skill," indicating employee status).

[453] See, e.g., Acosta v. New Image Landscaping, LLC, No. 1:18–cv–429, 2019 WL 6463512, at *6 (W.D. Mich. Dec. 2, 2019) (facts that "little or no skill was required" and "prior landscaping experience" was not required meant that skill factor favored employee status for landscapers); Acosta v. Wellfleet Commc'ns, LLC, No. 2:16–cv–02353–GMN–GWF, 2018 WL 4682316, at *7 (D. Nev. Sept. 29, 2018) (explaining that skill factor favored employee status for call center workers because "all that Defendants required was the ability to communicate well and read a script"), aff'd sub nom. Walsh v. Wellfleet Commc'ns, No. 20–16305, 2021 WL 4796537 (9th Cir. Oct. 14, 2021).

[454] As the Tenth Circuit, for example, has explained, "the lack of the requirement of specialized skills is indicative of employee status." Flint Eng'g, 137 F.3d at 1443 (quoting Snell, 875 F.2d at 811) (alteration omitted).

[455] 86 FR 1247.

[456] WHD Op. Ltr., 2000 WL 34444342, at *5 (Dec. 7, 2000).

[457] Off Duty Police, 915 F.3d at 1056 (citing Keller, 781 F.3d at 807, 809).

[458] Snell, 875 F.2d at 811; see also McFeeley, 825 F.3d at 244 ("As to the degree of skill required, the clubs conceded that they did not require dancers to have prior dancing experience.").

[459] Superior Care, 840 F.2d at 1060.

[460] Id.

[461] Selker Bros., 949 F.2d at 1295.

[462] DialAmerica, 757 F.2d at 1387.

[463] See, e.g., Hobbs, 946 F.3d at 834; Parrish, 917 F.3d at 385.

[464] Cornerstone Am., 545 F.3d at 345 (citations omitted).

[465] Parrish, 917 F.3d at 385; see also, e.g., Express Sixty-Minutes, 161 F.3d at 305 ("The district court did not discuss initiative during its evaluation of this factor. We agree with the Secretary that the skill and initiative factor points toward employee status."); Circle C. Invs., 998 F.2d at 328 ("The
Continued

worker's specialized skills are coupled with initiative, the Fifth Circuit has found that this factor indicates independent contractor status.[466] Similarly, in a case involving workers on a pickle farm, the Seventh Circuit explained that employees are skilled workers too, noting that although the workers in that case had "develop[ed] some specialized skill," "this development of occupational skills is no different from what any good employee in any line of work must do," and concluding that "[s]kills are not the monopoly of independent contractors."[467] The Tenth Circuit has explained that although the lack of specialized skills indicates employee status, "the use of special skills is not itself indicative of independent contractor status, especially if the workers do not use those skills in any independent way."[468] And the Eleventh Circuit has explained in a case where the workers were "clearly skilled workers" that "[t]he meaningfulness of this skill as indicating that plaintiffs were in business for themselves or economically independent, however, is undermined by the fact that [the employer] provided most technicians with their skills."[469]

The Department has previously stated in guidance that specialized skills should be coupled with business-like initiative for this factor to indicate independent contractor status. In AI 2015–1, the Department explained that "specialized skills do not indicate that workers are in business for themselves, especially if those skills are technical

and used to perform the work."[470] For that reason, application of this factor should not "overlook[] whether the worker is exercising business skills, judgment, or initiative."[471] The July 2008 version of WHD Fact Sheet #13 describes the factor as "[t]he amount of initiative, judgment, or foresight in open market competition with others required for the success of the claimed independent contractor."[472] The Department's May 2014 version of Fact Sheet #13 explained:

Both employees and independent contractors may be skilled workers. To indicate possible independent contractor status, the worker's skills should demonstrate that he or she exercises independent business judgment. Further, the fact that a worker is in open market competition with others would suggest independent contractor status. For example, specialized skills possessed by carpenters, construction workers, and electricians are not themselves indicative of independent contractor status; rather, it is whether these workers take initiative to operate as independent businesses, as opposed to being economically dependent, that suggests independent contractor status.

For all these reasons, there is strong support in the case law and the Department's prior guidance for not limiting this factor to an evaluation of whether the worker has specialized skills and for also considering whether the worker is exercising business-like initiative in relation to any specialized skills. Moreover, considering initiative in this manner would be consistent with evaluating each factor in the context of the ultimate inquiry of whether the worker is economically dependent on the employer or is an independent business. Considering only whether the worker has technical or specialized skills is not necessarily probative of the ultimate inquiry of economic dependence or independence because, as explained above, employees and independent contractors often both have specialized skills, and thus evaluating those skills is not particularly distinguishing. Whether a worker uses those specialized skills to exercise business-like initiative or in some other way that suggests that the worker is operating as an independent business is

more probative, as a matter of economic reality, of that distinction between economic dependence and independence.[473]

The 2021 IC Rule does not consider initiative in the context of this factor.[474] The 2021 IC Rule limited this factor to "focus solely on skill" to "clarif[y] the analysis"; the 2021 IC Rule acknowledged that initiative is an important consideration, but it confined consideration of initiative to the control and opportunity for profit or loss factors because, for purposes of that rule, those factors are the more probative factors.[475]

Upon further consideration, the Department believes that it is appropriate to consider initiative under the skill factor to the extent that workers exercise business-like initiative in the use of their specialized skills. For the reasons explained above, the worker's use of initiative in connection with any specialized skills is more probative of the ultimate inquiry of whether the worker is economically dependent on the employer or is an independent business. Both employees and independent contractors can be highly skilled,[476] so consideration of the worker's specialized skills alone can be less probative of that inquiry. On the other hand, consideration of the worker's initiative in connection with any specialized skills better assesses the economic realities of the work relationship and is more helpful in distinguishing between employees and independent contractors.

As explained above in this NPRM, types of initiative by a worker may also

---

[466] See, e.g., Thibault v. Bellsouth Telecommc'ns, Inc., 612 F.3d 843, 847 (5th Cir. 2010) (noting when considering this factor that "the splicers' success depended on their ability to find consistent work by moving from job-to-job"); Carrell, 998 F.2d at 333 (welders' work "requires specialized skills" and, although they exercised "limited" initiative "once on a job," a welder's "success depended on his ability to find consistent work by moving from job to job and from company to company"); cf. Hobbs, 946 F.3d at 834 (agreeing with the district court's finding that this factor was neutral because, although the workers "were highly skilled workers" and their work "required specialized skills," their work "did not require them to demonstrate significant initiative"); but see Parrish, 917 F.3d at 386 (although the employer's evidence that the workers showed initiative was not very compelling, the workers' "specialized skill weighs heavily in our analysis and persuades us to hold this factor leans in favor of [independent contractor] status").

[467] Lauritzen, 835 F.2d at 1537; see also Superior Maid, 55 F. Supp. 3d at 1077 (noting that "all jobs require some modicum of skill") (citing Lauritzen, 835 F.2d at 1537); Keller, 781 F.3d at 809 (noting that, "[t]o a certain extent, . . . every worker has and uses relevant skills to perform his or her job, but not everyone is an independent contractor").

[468] Flint Eng'g, 137 F.3d at 1443 (quoting Selker Bros., 949 F.2d at 1295).

[469] Scantland, 721 F.3d at 1318.

[470] 2015 WL 4449086, at *9 (citing Superior Care, 840 F.2d at 1060) (withdrawn June 7, 2017).

[471] Id.

[472] WHD Fact Sheet #13 (July 2008). This language from the July 2008 version of Fact Sheet #13 comes from Rutherford, which noted that the workers in that case did not exercise "the initiative, judgment or foresight of the typical independent contractor." 331 U.S. at 730.

[473] Some circuit court decisions have not considered the worker's initiative when evaluating the skill factor. See, e.g., Keller, 781 F.3d at 809–10 (focusing on the workers' skill and how they acquired it and contrasting carpenters, who have "unique skill, craftsmanship, and artistic flourish," with cable technicians, who do not need "unique skills" but rather are selected on the basis of availability and location); Mid-Atlantic Installation, 16 F. App'x at 107 (affirming district court's conclusion that the skills of installing cable are indicative of independent contractor status because the skills are "akin to those of carpenters, construction workers, and electricians, who are usually considered independent contractors"). For the reasons explained above, however, whether workers use those specialized skills to exercise business-like initiative is what makes this factor probative of the ultimate inquiry of whether the workers are in business for themselves. Thus, the skills of cable installers, carpenters, construction workers, and electricians, for example, even assuming that they are specialized, are not themselves indicative of independent contractor status. Carpenters, construction workers, electricians, and other workers who operate as independent businesses, instead of being economically dependent on their employer, are independent contractors. See generally AI 2015–1, 2015 WL 4449086, at *9–10.

[474] See 86 FR 1247 (§ 795.105(d)(2)(i)).

[475] 86 FR 1191.

[476] See, e.g., supra n. 467 and accompanying text.

be relevant when applying the control factor or the opportunity for profit or loss factor.[477] When evaluating the skill factor, the focus should be whether the worker uses any specialized skills to exercise business-like initiative. When applying the opportunity for profit or loss factor, for example, the focus is whether the worker uses managerial skill—a type of initiative—to affect the worker's opportunity for profit or loss. Thus, the focus of each factor is different, but some facts showing an exercise of initiative can nonetheless be relevant under the skill factor and another factor. Considering facts showing an exercise of initiative under more than one factor to the extent appropriate depending on the facts of a case is consistent with and furthers the totality-of-the-circumstances approach to assessing the economic realities of the work relationship.[478]

The Department welcomes comments on all aspects of this factor.

Example: Skill and Initiative

A highly skilled welder provides welding services for a construction firm. The welder does not make any independent judgments at the job site beyond the decisions necessary to do the work assigned. The welder does not determine the sequence of work, order additional materials, think about bidding the next job, or use those skills to obtain additional jobs, and is told what work to perform and where to do it. In this scenario, the welder, although highly skilled technically, is not using those skills in a manner that evidences business-like initiative. The skill and initiative factor indicates employee status.

A highly skilled welder provides a specialty welding service, such as custom aluminum welding, for a variety of area construction companies. The welder uses these skills for marketing purposes, to generate new business, and to obtain work from multiple companies. The welder is not only technically skilled, but also uses and markets those skills in a manner that evidences business-like initiative. The skill and initiative factor indicates independent contractor status.

7. Additional Factors (Proposed § 795.110(b)(7))

Section 795.105(d)(2)(iv) of the 2021 IC Rule states that additional factors may be considered if they are relevant to the ultimate question of whether the

workers are economically dependent on the employer for work or in business for themselves.[479] This reflects the necessity of considering all facts that are relevant to the question of economic dependence or independence, regardless of whether those facts fit within one of the enumerated factors. This approach is consistent with the Supreme Court's guidance in *Silk*, where it cautioned that its suggested factors are not intended to be exhaustive.[480] It is also consistent with the approach that courts and the Department have used in the decades since to determine whether workers are employees or independent contractors under the FLSA. The Department is proposing to move this provision to proposed § 795.110(b)(7) with minor editorial changes.

The 2021 IC Rule states that its list of factors is "not exhaustive."[481] In order to emphasize that point, the Department included an explicit provision recognizing that other potentially relevant factors may exist in some circumstances.[482] The 2021 IC Rule thus states that "[a]dditional factors may be relevant in determining whether an individual is an employee or independent contractor for purposes of the FLSA[.]"[483] The regulation further cautions that such additional factors are only relevant "if the factors in some way indicate whether the individual is in business for him- or herself, as opposed to being economically dependent on the potential employer for work."[484] The preamble to the Rule explained that "[f]actors that do not bear on this question, such as whether an individual has alternate sources of wealth or income and the size of the hiring company, are not relevant."[485]

The Department is proposing to retain § 795.105(d)(2)(iv) with only minor editorial changes. Retaining this provision reiterates that the enumerated factors are not to be applied mechanically but should be viewed along with any other relevant facts in light of whether they indicate economic dependence or independence. Retaining the provision also preserves the caution that only factors that are relevant to the overall question of economic dependence or independence should be considered. This language stresses that the economic reality is what matters, and not labels or formalities.

The Department is not proposing to identify any particular additional factors that may be relevant. The Department previously identified the "degree of independent business organization and operation" as a seventh factor that it considered in its analysis.[486] However, given the Department's focus in this proposed rulemaking on reflecting the economic reality factors commonly used by the circuit courts of appeals, the Department is not proposing to include the worker's "degree of independent business organization and operation" as a seventh factor. The Department is not aware of any court that has used this as a standalone factor. Moreover, the Department is concerned that facts that may relate to whether a worker has an independent business organization—such as whether the worker has incorporated or receives an Internal Revenue Service (IRS) Form 1099 from an employer—reflect mere labels rather than the economic realities and are thus not relevant. To the extent facts such as the worker having a business license or being incorporated may suggest that the worker is in business for themself, they may be considered either as an additional factor or under any enumerated factor to which they are relevant. However, consistent with an economic reality analysis, it is important to inquire into whether the worker's license or incorporation are reflective of the worker being in business for themselves as a matter of economic reality. For example, if an employer requires a worker to obtain a certain license or adopt a certain form of business in order to perform work for it, this may be evidence of the employer's control, rather than a worker who is independently operating a business. Indeed, even where "the parties structure[] the relationship as an independent contractor, . . . the caselaw counsels that, for purposes of the worker's rights under the FLSA, we must look beyond the structure to the economic realities."[487]

The Department welcomes comments on this provision.

*D. Primacy of Actual Practice (2021 IC Rule § 795.110)*

The Department is proposing to delete 2021 IC Rule § 795.110 and use this section for the discussion of the economic reality factors.

Section 795.110 of the 2021 IC Rule provides that in determining economic dependence "the actual practice of the parties involved is more relevant than

---

[477] *See supra* sections V.C.1. and 4., discussions of opportunity for profit or loss and control.
[478] *See supra* section V.C., discussion of economic reality test.

[479] 86 FR 1247.
[480] *Silk*, 331 U.S. at 716 ("No one [factor] is controlling nor is the list complete.").
[481] 86 FR 1246 (§ 795.105(c)).
[482] 86 FR 1196.
[483] 86 FR 1247 (§ 795.105(d)(2)(iv)).
[484] *Id.*
[485] 86 FR 1196.

[486] WHD Fact Sheet #13 (July 2008).
[487] *Safarian* v. *American DG Energy Inc.*, 622 F. App'x 149, 151 (3d Cir. 2015).

what may be contractually or theoretically possible."[488] This absolute rule, elevating actual practice over contractual authority that the employer may have reserved for exercise in the future, is overly mechanical and does not allow for appropriate weight to be given to contractual provisions in situations in which they are crucial to understanding the economic realities of a relationship. Instead, the Department believes that a less prescriptive approach is more faithful to the totality-of-circumstances economic reality analysis, such that contractual or other reserved rights should be considered like any other fact under each factor to the extent they indicate economic dependence.

The 2021 IC Rule stressed that "unexercised powers, rights, and freedoms" are "*less* relevant" than those that are actually exercised.[489] Section 795.110 of the 2021 IC Rule states that a worker's theoretical ability to control aspects of the work are less meaningful if the worker is prevented from exercising those rights, and that a business' contractual authority to exercise control may be of little relevance if it is never exercised.[490] Though it is true that contractual authority may in some instances be less relevant, the 2021 IC Rule's blanket statement that actual practice is always more relevant is incompatible with an approach that does not apply the factors mechanically but looks to the totality of the circumstances in evaluating the economic realities.[491] The focus is always on the economic realities rather than mere labels,[492] but contractual provisions are not always mere labels. They sometimes reflect and influence the economic realities of the relationship.

Every fact that is relevant to economic dependence should be considered in the analysis. Because the entirety of the economic reality must be considered, both the actual practices of the parties and the contractual possibilities must be considered. Within each factor of the test, there may be actual practices that

are relevant, and there may also be contractual provisions that are relevant. The significance of each in the overall analysis should be informed by their relevance to the economic realities. This examination will be specific to the facts of each economic relationship and cannot be predetermined.

It is often the case that the actual practice of the parties is more relevant to the economic dependence inquiry than contractual or theoretical possibilities. For example, where an employer theoretically permits its workers to decline work assignments, but in practice disciplines workers who decline assignments, the actual practice of the parties outweighs the theoretical rights of the workers.[493] However, in other cases the contractual possibilities may reveal more about the economic reality than the parties' practices. For example, a company may reserve the right to supervise workers despite rarely making supervisory visits.[494] Such reserved rights to control the worker may strongly influence the behavior of the worker in their performance of the work even without the company exercising its contractual rights. As a result, this contractual possibility may be more indicative of the reality of the economic relationship between the worker and the company than the company's apparent hands-off practice. That courts often refer to the control factor as the "right to control" the work suggests that even rarely exercised or unexercised rights can be informative in evaluating economic dependence.[495]

In response to comments asserting that prioritizing actual practice would make the economic reality test impermissibly narrower than the common law control test, the 2021 IC Rule asserted that "the common law control test does not establish an irreducible baseline of worker coverage for the broader economic reality test applied under the FLSA."[496] This understanding of the FLSA's scope of employment is inconsistent with the Supreme Court's observations that "[a]

broader or more comprehensive coverage of employees" than that contemplated under the FLSA "would be difficult to frame,"[497] and that the FLSA "stretches the meaning of 'employee' to cover some parties who might not qualify as such under a strict application of traditional agency law principles."[498] The 2021 IC Rule's blanket diminishment of the relevance of the right to control is inconsistent with the Supreme Court's observations that the FLSA's scope of employee coverage is exceedingly broad and broader than what exists under the common law. That the employer's right to control is part of the common law test shows that it is a useful indicator of employee status.[499] The 2021 IC Rule's dismissal of contractual rights as always less relevant than actual practice is inconsistent with the need to consider all facts relevant to the economic realities.[500]

In sum, the declaration in 2021 IC Rule § 795.110 that the parties' actual practices are invariably more relevant is inconsistent with how courts have evaluated employment relationships. It lacks the flexibility required by the economic reality test and is inconsistent with the FLSA's broad definition of employment. For these reasons, the Department is proposing to strike § 795.110, so that all facts relevant to the economic employment relationship may be evaluated according to their relevance to the question of economic dependence.

---

[488] 86 FR 1247.

[489] *Id.* at 1204.

[490] *Id.* at 1247.

[491] *See Flint Eng'g,* 137 F.3d at 1441 ("None of the factors alone is dispositive; instead, the court must employ a totality-of-the-circumstances approach."); *Superior Care,* 840 F.2d at 1059 ("Since the test concerns the totality of the circumstances, any relevant evidence may be considered, and mechanical application of the test is to be avoided.").

[492] *Rutherford,* 331 U.S. at 729 ("Where the work done, in its essence, follows the usual path of an employee, putting on an 'independent contractor' label does not take the worker from the protection of the Act.").

[493] *See Off Duty Police,* 915 F.3d at 1060–61 (finding that, among other things, officers' testimony that they were disciplined for turning down assignments, despite having the right to do so, supported employee status).

[494] *See Superior Care,* 840 F.2d at 1060 ("Though visits to the job sites occurred only once or twice a month, Superior Care unequivocally expressed the right to supervise the nurses' work, and the nurses were well aware that they were subject to such checks as well as to regular review of their nursing notes. An employer does not need to look over his workers' shoulders every day in order to exercise control.").

[495] *See, e.g., Off Duty Police,* 915 F.3d at 1060; *DialAmerica,* 757 F.2d at 1386; *Driscoll,* 603 F.2d at 754.

[496] 86 FR 1205.

[497] *Rosenwasser,* 323 U.S. at 362–63.

[498] *Darden,* 503 U.S. at 326.

[499] *Id.* at 323 (common-law employment test considers "the hiring party's right to control the manner and means by which the product is accomplished") (quoting *Reid,* 490 U.S. at 751–52); Restatement (Third) of Agency, sec. 7.07, Comment (f) (2006) ("For purposes of respondeat superior, an agent is an employee only when the principal controls or has the right to control the manner and means through which the agent performs work.").

[500] Though the economic reality test requires consideration of all relevant facts, and upon further consideration, the Department does not believe it is appropriate to maintain a regulatory provision that dismisses consideration of reserved rights that are not exercised where relevant to economic dependence, the Department does not intend to minimize or disregard the longstanding case law that looks to the actual behavior of the parties. See, e.g., *Parrish,* 917 F.3d at 387 ("[T]he analysis is focused on economic reality, not economic hypotheticals."); *Saleem,* 854 F.3d at 142 ("[P]ursuant to the economic reality test, it is not what [workers] *could* have done that counts, but as a matter of economic reality what they actually *do* that is dispositive.") (internal quotation marks and citation omitted); *Sureway,* 656 F.2d at 1371 ("[T]he fact that Sureway's 'agents' possess, in theory, the power to set prices, determine their own hours, and advertise to a limited extent on their own is overshadowed by the fact that in reality the 'agents' work the same hours, charge the same prices, and rely in the main on Sureway for advertising.").

The Department welcomes comments on the removal of this provision.

### E. Examples of Analyzing Economic Reality Factors (2021 IC Rule § 795.115)

Section 795.115 of the 2021 IC Rule provides examples of factors in the economic reality test. The Department is proposing to delete this section and instead include examples in the preamble. Real-world examples provide valuable information to the general public and regulated parties and help succinctly explain relevant issues in the analysis. The Department believes, however, that the examples best serve this explanatory function in preamble text, particularly considering how fact-dependent the analysis of each economic reality factor is. The preamble contains the most detailed description of each factor along with the case law and rationale for each interpretation proposed by the Department. Providing the examples after the discussion of each factor in the economic reality test thus provides an immediate application of the relevant interpretation.

The Department cautions that the examples are specific to the included facts and the addition or alteration of any of the facts in any of the examples may change the resulting analysis. Additionally, while the examples help illustrate the application of particular factors of the economic reality test, no one factor is determinative of whether a worker is an employee or an independent contractor.

### F. Severability (Proposed § 795.115)

Section 795.120 of the 2021 IC Rule contains a severability provision. The Department is proposing to move this provision to § 795.115 and is not proposing any edits to this section.

### VI. Paperwork Reduction Act

The Paperwork Reduction Act of 1995 (PRA), 44 U.S.C. 3501 *et seq.*, and its attendant regulations, 5 CFR part 1320, require the Department to consider the agency's need for its information collections, their practical utility, as well as the impact of paperwork and other information collection burdens imposed on the public, and how to minimize those burdens. The PRA typically requires an agency to provide notice and seek public comments on any proposed collection of information contained in a proposed rule. *See* 44 U.S.C. 3506(c)(2)(B); 5 CFR 1320.8. This NPRM does not contain a collection of information subject to OMB approval under the Paperwork Reduction Act. The Department welcomes comments on this determination.

### VII. Executive Order 12866, Regulatory Planning and Review; Executive Order 13563, Improved Regulation and Regulatory Review

Under Executive Order 12866, the Office of Management and Budget's (OMB) Office of Information and Regulatory Affairs (OIRA) determines whether a regulatory action is significant and, therefore, subject to the requirements of the Executive Order and OMB review.[501] Section 3(f) of Executive Order 12866 defines a "significant regulatory action" as a regulatory action that is likely to result in a rule that may: (1) have an annual effect on the economy of $100 million or more, or adversely affect in a material way a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or state, local, or tribal governments or communities (also referred to as economically significant); (2) create serious inconsistency or otherwise interfere with an action taken or planned by another agency; (3) materially alter the budgetary impact of entitlements, grants, user fees or loan programs or the rights and obligations of recipients thereof; or (4) raise novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles set forth in the Executive Order. OIRA has determined that this proposed rule is a "significant regulatory action" under section 3(f) of Executive Order 12866 and is economically significant.

Executive Order 13563 directs agencies to, among other things, propose or adopt a regulation only upon a reasoned determination that its benefits justify its costs; that it is tailored to impose the least burden on society, consistent with obtaining the regulatory objectives; and that, in choosing among alternative regulatory approaches, the agency has selected those approaches that maximize net benefits.[502] Executive Order 13563 recognizes that some costs and benefits are difficult to quantify and provides that, when appropriate and permitted by law, agencies may consider and discuss qualitatively values that are difficult or impossible to quantify, including equity, human dignity, fairness, and distributive impacts. The analysis below outlines the impacts that the Department anticipates may result from this proposed rule and was prepared pursuant to the above-mentioned executive orders.

### A. Introduction

In this NPRM, the Department is proposing to modify the regulations addressing the classification of workers as employees or independent contractors under the Fair Labor Standards Act (FLSA or Act) to be more consistent with judicial precedent and the Act's text and purpose as interpreted by the courts. For decades, the Department and courts have applied an economic reality test to determine whether a worker is an employee or an independent contractor under the FLSA. The ultimate inquiry is whether, as a matter of economic reality, the worker is economically dependent on the employer for work (and is thus an employee) or is in business for themself (and is thus an independent contractor). To answer this ultimate inquiry of economic dependence, the courts and the Department have historically conducted a totality-of-the-circumstances analysis, considering multiple factors to determine whether a worker is an employee or an independent contractor under the FLSA.

In January 2021, the Department published a rule titled "Independent Contractor Status Under the Fair Labor Standards Act" (2021 IC Rule) that provided guidance on the classification of independent contractors under the FLSA.[503] As explained in sections III, IV, and V above, the Department believes that the 2021 IC Rule does not fully comport with the FLSA's text and purpose as interpreted by the courts and will have a confusing and disruptive effect on workers and businesses alike due to its departure from decades of case law describing and applying the multifactor economic reality test as a totality-of-the-circumstances test. The 2021 IC Rule included provisions that are in tension with this longstanding case law—such as designating two factors as most probative and predetermining that they carry greater weight in the analysis, considering investment and initiative only in the opportunity for profit or loss factor, and excluding consideration of whether the work performed is central or important to the employer's business. These and other provisions in the 2021 IC Rule narrow the application of the economic reality test by limiting the facts that may be considered as part of the test, facts which the Department believes are relevant in determining whether a worker is economically dependent on the employer for work or in business for themself. The Department believes that retaining the 2021 IC Rule would have

---

[501] *See* 58 FR 51735, 51741 (Oct. 4, 1993).

[502] *See* 76 FR 3821 (Jan. 21, 2011).

[503] *See* 86 FR 1168.

a confusing and disruptive effect on workers and businesses alike due to its departure from case law describing and applying the multifactor economic reality test as a totality-of-the-circumstances test. Departing from the longstanding test applied by the courts also increases the risk of misapplication of the economic reality test, which the Department believes may result in increased misclassification of workers as independent contractors.

Therefore, the Department is proposing to rescind the 2021 IC Rule and replace it with an analysis for determining employee or independent contractor status under the Act that is more consistent with existing judicial precedent and the Department's longstanding guidance prior to the 2021 IC Rule. Specifically, the Department is not proposing the use of "core factors" and instead proposes to return to a totality-of-the-circumstances analysis of the economic reality test in which the factors do not have a predetermined weight and are considered in view of the economic reality of the whole activity. The Department is further proposing to return the consideration of investment to a standalone factor, provide additional analysis of the control factor (including detailed discussions of how scheduling, remote supervision, price-setting, and the ability to work for others should be considered), and return to the longstanding interpretation of the integral factor, which considers whether the work is integral to the employer's business. The Department believes this proposed rule is more grounded in the ultimate inquiry of whether a worker is in business for themself or is economically dependent on the employer for work. Workers, employers, and independent businesses should benefit from affirmative regulatory guidance from the Department further developing the concept of economic dependence and how each economic reality factor is probative of whether the worker is economically dependent on the employer for work or is in business for themself.

When evaluating the economic impact of this proposed rule, the Department has considered the appropriate baseline with which to compare changes. As discussed in section II.E., on March 14, 2022, in a lawsuit challenging the Department's delay and withdrawal of the 2021 IC Rule, a Federal district court in the Eastern District of Texas issued a decision vacating the delay and withdrawal of the 2021 IC Rule and concluded that the 2021 IC Rule became

effective on March 8, 2021.[504] Because the 2021 IC Rule is currently in effect, is being enforced and would continue to be in effect in the absence of this proposed rule, the Department believes that the 2021 IC Rule is the official baseline to compare against when estimating the economic impact of this proposed rule.[505] Compared to the 2021 IC Rule, the Department anticipates that this proposed rule would reduce misclassification of employees as independent contractors, because this rule is more consistent with existing judicial precedent and the Department's longstanding guidance. The 2021 IC Rule could increase misclassification because its elevation of certain factors and its preclusion of consideration of relevant facts under several factors may result in misapplication of the economic reality test and may have conveyed to employers that it might be easier than it used to be to classify certain workers as independent contractors rather than FLSA-covered employees. The issuance of this proposed rule could reduce or prevent this misclassification from occurring.

Because the Department does not have data on the number of misclassified workers and because there are inherent challenges in determining the extent to which the rule would reduce this misclassification, much of the analysis is presented qualitatively, aside from rule familiarization costs, which are quantified.[506] The Department has therefore provided a qualitative analysis of the transfers and benefits that could occur because of this reduced misclassification.

As discussed above, the 2021 IC Rule is the appropriate baseline to represent what the world could look like going forward in the absence of this proposed rule. However, this baseline may not reflect what the world looked like prior to this NPRM. Until March of 2022, the Department had not been using the framework for analysis from that rule when assessing independent contractor status in its enforcement and

⁵⁰⁴ See *Coalition for Workforce Innovation,* 2022 WL 1073346.

⁵⁰⁵ OMB Circular A–4 notes that when agencies are developing a baseline, "[it] should be the best assessment of the way the world would look absent the proposed action."

⁵⁰⁶ The Department uses the term "misclassification" throughout this analysis to refer to workers who have been classified as independent contractors but who, as a matter of economic reality, are economically dependent on their employer for work. These workers' legal status would not change under the 2021 IC Rule or this proposed rule—they would properly be classified as employees under both rules. The Department notes that sources cited in this in this analysis may use other misclassification standards which may not align fully with the Department's use of the term.

compliance assistance activities. The 2021 IC Rule baseline also may not reflect the current economic landscape, because the Department is not aware of any Federal district or appellate court that has relied on the substance of the 2021 IC Rule so far to resolve a dispute regarding the proper classification of a worker as an employee or independent contractor. Therefore, if the Department were to instead compare the proposed rule to the current economic and legal landscape, the economic impact would be much smaller, because this proposed rule is consistent with the longstanding judicial precedent and guidance that the Department was relying on prior to March of 2022. The Department still believes that the 2021 IC Rule is the appropriate baseline, but notes that the current economic landscape may not be the same as a future situation without this proposed rule.

The Department does not believe, as reflected in this analysis, that this proposed rule would result in widespread reclassification of workers. That is, for workers who are properly classified as independent contractors, the Department does not, for the most part, anticipate that this rule would result in these workers being reclassified as employees. Especially compared to the guidance that was in effect before the 2021 IC Rule, the test proposed in this NPRM would not make independent contractor status significantly less likely. Rather, impacts resulting from this rule would mainly be due to a reduction in misclassification. If the 2021 IC Rule is retained, the risk of misclassification could be increased. As noted previously, the 2021 IC Rule's elevation of certain factors and its preclusion of consideration of relevant facts under several factors, which is a departure from judicial precedent applying the economic reality test, may result in misapplication of the economic reality test and may have conveyed to employers that it might be easier than it used to be to classify certain workers as independent contractors rather than FLSA-covered employees. This NPRM could therefore help prevent this misclassification by providing employers with guidance that is more consistent with longstanding precedent. The Department welcomes comments and data on all of the analysis presented here.

*B. Estimated Number of Independent Contractors*

To provide some context on the prevalence of independent contracting, the Department first estimated the number of independent contractors. There are a variety of estimates of the

number of independent contractors spanning a wide range depending on methodologies and how the population is defined.[507] There is no data source on independent contractors that perfectly mirrors the definition of independent contractor in the Department's regulations. There is also no regularly published data source on the number of independent contractors and data from the current year does not exist, making it difficult to examine trends in independent contracting or to measure how regulatory changes impact the number of independent contractors.

The Department believes that the Current Population Survey (CPS) Contingent Worker Supplement (CWS) offers an appropriate lower bound for the number of independent contractors; however, there are potential biases in these data that will be noted. This is the estimation method used in the 2021 IC Rule, and the Department has not found any new data or analyses to indicate a need for any changes. Some recent data sources provide an indication of how COVID–19 may have impacted the number of independent contractors, but this is inconclusive. Additionally, estimates from other sources will be presented to demonstrate the potential range.

The U.S. Census Bureau conducts the CPS, and it is published monthly by the Bureau of Labor Statistics (BLS). The sample includes approximately 60,000 households and is nationally representative. Periodically since 1995, and most recently in 2017, the CPS included a supplement to the May survey to collect data on contingent and alternative employment arrangements. Based on the CWS, there were 10.6 million independent contractors in 2017, amounting to 6.9 percent of workers.[508] The CWS measures those who say that their independent contractor job is their primary job and that they worked at the independent contractor job in the survey's reference week.

The BLS's estimate of independent contractors includes "[w]orkers who are identified as independent contractors, independent consultants, or freelance workers, regardless of whether they are

self-employed or wage and salary workers." BLS asks two questions to identify independent contractors:[509]

• Workers reporting that they are self-employed are asked: "Are you self-employed as an independent contractor, independent consultant, freelance worker, or something else (such as a shop or restaurant owner)?" (9.0 million independent contractors.) We refer to these workers as "self-employed independent contractors" in the remainder of the analysis.

• Workers reporting that they are wage and salary workers are asked: "Last week, were you working as an independent contractor, an independent consultant, or a freelance worker? That is, someone who obtains customers on their own to provide a product or service." (1.6 million independent contractors.) We refer to these workers as "other independent contractors" in the remainder of the analysis.

It is important to note that independent contractors are identified in the CWS in the context of the respondent's "main" job (i.e., the job with the most hours).[510] Therefore, the estimate of independent contractors does not include those who may be an employee for their primary job, but may also work as an independent contractor.[511] For example, Lim et al. (2019) estimate that independent contracting work is the primary source of income for 48 percent of independent contractors.[512] Applying this estimate to

the 10.6 million independent contractors estimated from the CWS, results in 22.1 million independent contractors (10.6 million ÷ 0.48). Alternatively, a survey of independent contractors in Washington found that 66 percent of respondents reported that independent contract work was their primary source of income.[513] However, because this survey only includes independent contractors in one state, the Department has not used this data to adjust its estimate of independent contractors.

The CWS's large sample size results in small sampling error. However, the questionnaire's design may result in some non-sampling error. For example, one potential source of bias is that the CWS only considers independent contractors during a single point in time—the survey week (generally the week prior to the interview).

These numbers will thus underestimate the prevalence of independent contracting over a longer timeframe, which may better capture the size of the population.[514] For example, Farrell and Greig (2016) used a randomized sample of 1 million Chase customers to estimate prevalence of the Online Platform Economy.[515] They found that "[a]lthough 1 percent of adults earned income from the Online

---

[507] The Department uses the term "independent contractor" throughout this analysis to refer to workers who, as a matter of economic reality, are not economically dependent on their employer for work and are in business for themselves. The Department notes that sources cited in this analysis may use other definitions of independent contractors that may not align fully with the Department's use of the term.

[508] Bureau of Labor Statistics, "Contingent and Alternative Employment Arrangements—May 2017," USDL–18–0942 (June 7, 2018), https://www.bls.gov/news.release/pdf/conemp.pdf.

[509] The variables used are PES8IC=1 for self-employed and PES7=1 for other workers.

[510] While self-employed independent contractors are identified by the worker's main job, other independent contractors answered yes to the CWS question about working as an independent contractor last week. Although the survey question does not ask explicitly about the respondent's main job, it follows questions asked in reference to the respondent's main job.

[511] Even among independent contractors, failure to report multiple jobs in response to survey questions is common. For example, Katz and Krueger (2019) asked Amazon Mechanical Turk participants the CPS-style question "Last week did you have more than one job or business, including part time, evening, or weekend work?" In total, 39 percent of respondents responded affirmatively. However, these participants were asked the follow-up question "Did you work on any gigs, HITs or other small paid jobs last week that you did not include in your response to the previous question?" After this question, which differs from the CPS, 81 percent of those who indicated that they did not hold multiple jobs on the CPS-style question acknowledged that they failed to report other work in the previous week. As Katz and Krueger write, "if these workers are added to the multiple job holders, the percent of workers who are multiple job holders would almost double from 39 percent to 77 percent." See L. Katz and A. Krueger, "Understanding Trends in Alternative Work Arrangements in the United States," RSF: The Russell Sage Foundation Journal of the Social Sciences 5(5), p. 132–46 (2019).

[512] K. Lim, A. Miller, M. Risch, and E. Wilking, "Independent Contractors in the U.S.: New Trends

from 15 years of Administrative Tax Data," Department of Treasury, p. 61 (Jul. 2019), https://www.irs.gov/pub/irs-soi/19rpindcontractorinus.pdf. From table 5, the total number of independent contractors across all categories is 13.81 million. The number of independent contractors in the categories where these workers earn the majority of their labor income from independent contractor earnings is 6.63 million. 6.63 million ÷ 13.81 million = 0.48.

[513] Washington Department of Commerce, "Independent Contractor Study," p. 21 (Jul. 2019), https://deptofcommerce.app.box.com/v/independent-contractor-study.

[514] In any given week, the total number of independent contractors would have been roughly the same, but the identity of the individuals who do it for less than the full year would likely vary. Thus, the number of unique individuals who work at some point in a year as independent contractors would exceed the number of independent contractors who work within any one-week period as independent contractors.

[515] D. Farrell and F. Greig, "Paychecks, Paydays, and the Online Platform," JPMorgan Chase Institute (2016), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2911293. The authors define the Online Platform Economy as "economic activities involving online intermediaries." This includes "labor platforms" that "connect customers with freelance or contingent workers" and "capital platforms" that "connect consumers with individuals who rent assets or sell goods peer-to-peer." As such, this study encompasses data on income sources that the Department acknowledges might not be a one-to-one match with independent contracting and could also include work that is part of an employment relationship. However, the Department believes that including data on income earned through online platforms is useful when discussing the potential magnitude of independent contracting.

Platform Economy in a given month, more than 4 percent participated over the three-year period." Additionally, Collins et al. (2019) examined tax data from 2000 through 2016 and found that the number of workers who filed a form 1099 grew substantially over that period, and that fewer than half of these workers earned more than $2,500 from 1099 work in 2016. The prevalence of lower annual earnings implies that most workers who received a 1099 did not work as an independent contractor every week.[516]

The CWS also uses proxy responses, which may underestimate the number of independent contractors. The RAND American Life Panel (ALP) survey conducted a supplement in 2015 to mimic the CWS questionnaire but used self-responses only. The results of the survey were summarized by Katz and Krueger (2018).[517] This survey found that independent contractors comprise 7.2 percent of workers.[518] Katz and Krueger identified that the 0.5 percentage point difference in magnitude between the CWS and the ALP was due to both cyclical conditions, and the lack of proxy responses in the ALP.[519] Therefore, the Department believes a reasonable upper-bound on the potential bias due to the use of proxy responses in the CWS is 0.5 percentage points (7.2 versus 6.7).[520][521]

Another potential source of bias in the CWS is that some respondents may not self-identify as independent contractors. For example, Abraham et al. (2020) estimated that 6.6 percent of workers in their study initially respond that they are employees but were then determined (by the researcher) to be independent contractors based on their answers to follow-up questions.[522] Additionally, individuals who do what some researchers refer to as "informal work" may in fact be independent contractors though they may not characterize themselves as such.[523] This population could be substantial. Abraham and Houseman (2019) confirmed this in their examination of the Survey of Household Economics and Decision-making. They found that 28 percent of respondents reported doing "informal work" for money over the past month.[524]

Conversely, another source of bias in the CWS is that some workers who self-identify as independent contractors may misunderstand their status or may be misclassified by their employer. These workers may answer the survey in the affirmative, despite not truly being independent contractors. While precise and representative estimates of nationwide misclassification are unavailable, multiple studies suggest its prevalence in numerous sectors in the economy.[525] See section VII.D.2. for a more thorough discussion of the prevalence of misclassification.

Because reliable data on the potential magnitude of the biases discussed above are unavailable, and so the net direction of the biases is unknown, the Department has not attempted to calculate how these biases may impact the estimated number of independent contractors.

Because the CWS estimate represents only the number of workers who worked as independent contractors on their primary job during the survey reference week, the Department applied the research literature and adjusted this measure to include workers who are independent contractors in a secondary job or who were excluded from the CWS estimate due to other factors. As noted above, integrating the estimated proportions of workers who are independent contractors on secondary or otherwise excluded jobs produces an estimate of 22.1 million, representing the total number of workers working as independent contractors in any job at a given time. Given the prevalence of independent contractors who work sporadically and earn minimal income, adjusting the estimate according to these sources captures some of this population. It is likely that this figure is still an underestimate of the true independent contractor pool.

### 1. COVID–19 Adjustment to the Estimated Number of Independent Contractors

The Department's estimate of the number of independent contractors, 22.1 million, is based primarily on 2017 data. Because COVID–19 has had a substantial impact on the labor market, it is possible that this estimate is not currently appropriate. The Department conducted a search for more recent data to indicate any trends in the number of independent contractors since 2017. The findings are inconclusive but generally do not indicate an increase.

The Federal Reserve Board's annual Survey of Household Economics and Decisionmaking (SHED) provides measures of the economic well-being of U.S. households. The Federal Reserve Board publishes a report "Economic Well-Being of U.S. Households" summarizing the findings of each survey.[526] One subsection of the Employment section describes the results of the questions related to "The Gig Economy." While the survey questions about work in the "gig economy" include more types of work

---

[516] B. Collins, A. Carin, E. Jackson, D. Koustas, and M. Payne, "Is Gig Work Replacing Traditional Employment? Evidence from Two Decades of Tax Returns," IRS SOI Joint Statistical Research Program (2019) (unpublished paper), https://www.irs.gov/pub/irs-soi/19rpgigworkreplacingtraditionalemployment.pdf.

[517] See L. Katz and A. Krueger, "The Rise and Nature of Alternative Work Arrangements in the United States, 1995–2015," (2016].

[518] Id. at 49. The estimate is 9.6 percent without correcting for overrepresentation of self-employed workers or multiple job holders. Id. at 31.

[519] Id. at Addendum ("Reconciling the 2017 BLS Contingent Worker Survey").

[520] Note that they estimate 6.7 percent of employed workers as independent contractors using the CWS, as opposed to 6.9 percent as estimated by the BLS. This difference is attributable to changes to the sample to create consistency.

[521] In addition to the use of proxy responses, this difference is also due to cyclical conditions. The impacts of these two are not disaggregated for independent contractors, but if we applied the relative sizes reported for all alternative work arrangements, we would get 0.36 percentage point difference due to proxy responses. Additionally, it should be noted that this may not entirely be a bias. It stems from differences in independent contracting reported by proxy respondents and actual respondents. As Katz and Krueger explain, this difference may be due to a "mode" bias or proxy respondents may be less likely to be independent contractors. Id. at Addendum p. 4.

[522] K. Abraham, B. Hershbein, and S. Houseman, "Contract Work at Older Ages," NBER Working Paper 26612 (2020), http://www.nber.org/papers/w26612.

[523] The Department believes that including data on what is referred to in some studies as "informal work" is useful when discussing the magnitude of independent contracting, although not all informal work is done by independent contractors. The Survey of Household Economics and Decision-making asked respondents whether they engaged in informal work sometime in the prior month. It categorized informal work into three broad categories: personal services, on-line activities, and off-line sales and other activities, which is broader than the scope of independent contractors. These categories include activities like house sitting, selling goods online through sites like eBay or craigslist, or selling goods at a garage sale. The Department acknowledges that the data discussed in this study might not be a one-to-one match with independent contracting and could also include work that is part of an employment relationship, but it nonetheless provides some useful data for this purpose.

[524] K. Abraham, and S. Houseman, "Making Ends Meet: The Role of Informal Work in Supplementing Americans' Income," RSF: The Russell Sage Foundation Journal of the Social Sciences 5(5): 110–31 (2019), https://www.aeaweb.org/conference/2019/preliminary/paper/QroAaS2h.

[525] See, e.g., U.S. Gov't Accountability Off., GAO–09–717, Employee Misclassification: Improved Coordination, Outreach, and Targeting Could Better Ensure Detection and Prevention 10 (2009) ("Although the national extent of employee misclassification is unknown, earlier national studies and more recent, though not comprehensive, studies suggest that employee misclassification could be a significant problem with adverse consequences.").

[526] Consumer and Community Research Section of the Federal Reserve Board's Division of Consumer and Community Affairs, "Economic Well-Being of U.S. Households in 2021," Board of Governors of the Federal Reserve System (2022). Reports from all years available at https://www.federalreserve.gov/publications/report-economic-well-being-us-households.htm.

scenarios than just independent contracting, a decrease from 30 percent to 20 percent of adults answering "yes" from 2017 to 2020 may indicate that the number of independent contractors in this industry also decreased during that time period.[527] The report summarizing the 2021 data is available, but unfortunately the gig economy questions were revised substantially, so a comparable value is not available for 2021. Moreover, trends of potential independent contractors in one industry are not necessarily indicative of trends across the economy.

MBO Partners, a company with the goal of connecting enterprise organizations and top independent professionals, also conducts an annual survey and prepares a research report of the findings.[528] In all groups of "independent workers," MBO Partners similarly found a decrease in the number from 2017 to 2020. Conversely, in total, the 2021 report shows a large increase from 2020, enough that the number of independent workers in 2021 is larger than the 2017 number. However, this occurs only in the "occasional independent" workers category, described as those who work part-time and regularly, but without set hours. Comparing the number of part-time and full-time independent workers yields similar values in 2017 and 2021, so the Department believes that no adjustments are needed to the 2017 estimate of 22.1 million independent contractors.

2. Range of Estimates in the Literature

To further consider the range of estimates available, the Department conducted a literature review, the findings of which are presented in Table 1. Other studies were also considered but are excluded from this table because the study populations were broader than just independent contracting, limited to one state, or include workers outside of the United States.[529] The RAND ALP,[530] the Gallup Survey,[531] and the General Social Survey's (GSS's) Quality of Worklife (QWL)[532] supplement are widely cited alternative estimates. However, the Department chose to use sources with significantly larger sample sizes and/or more recent data for the primary estimate.

Jackson et al. (2017)[533] and Lim et al. (2019)[534] use tax information to estimate the prevalence of independent contracting. In general, studies using tax data tend to show an increase in prevalence of independent contracting over time. The use of tax data has some advantages and disadvantages over survey data. Advantages include large sample sizes, the ability to link information reported on different records, the reduction in certain biases such as reporting bias, records of all activity throughout the calendar year (the CWS only references one week), and inclusion of both primary and secondary independent contractors. Disadvantages are that independent contractor status needs to be inferred; there is likely an underreporting bias (i.e., some workers do not file taxes); researchers are generally trying to match the IRS definition of independent contractor, which does not mirror the scope of independent contractors under the FLSA; and the estimates include misclassified independent contractors.[535] A major disadvantage of using tax data for this analysis is that the detailed source data are not publicly available and thus the analyses cannot be directly verified or adjusted as necessary (e.g., to describe characteristics of independent contractors, etc.).

### TABLE 1—SUMMARY OF ESTIMATES OF INDEPENDENT CONTRACTING

| Source | Method [a] | Definition [b] | Percent of workers | Sample size | Year |
|---|---|---|---|---|---|
| CPS CWS ....... | Survey ............. | Independent contractor, consultant or freelance worker (main only). | 6.9% | 50,392 .... | 2017 |
| ALP ................. | Survey ............. | Independent contractor, consultant or freelance worker (main only). | 7.2% | 6,028 ...... | 2015 |
| Gallup .............. | Survey ............. | Independent contractor ......................................................... | 14.7% | 5,025 ...... | 2017 |
| GSS QWL ........ | Survey ............. | Independent contractor, consultant or freelancer (main only) .. | 14.1% | 2,538 ...... | 2014 |
| Jackson et al. .. | Tax data .......... | Independent contractor, household worker ............................. | 6.1% [c] | ~5.9 million [d]. | 2014 |

[527] The report defines gig work as including "three types of non-traditional activities: offline service activities, such as child care or house cleaning; offline sales, such as selling items at flea markets or thrift stores; and online services or sales, such as driving using a ride-sharing app or selling items online." Consumer and Community Research Section of the Federal Reserve Board's Division of Consumer and Community Affairs, "Economic Well-Being of U.S. Households in 2017," Board of Governors of the Federal Reserve System (May 2018).

[528] MBO partners, "The Great Realization: 11th Annual State of Independence," (2021). Annual reports are available at https://www.mbopartners.com/state-of-independence/previous-reports/.

[529] Including, but not limited to: McKinsey Global Institute, "Independent Work: Choice, Necessity, and the Gig Economy" (2016), https://www.mckinsey.com/featured-insights/employment-and-growth/independent-work-choice-necessity-and-the-gig-economy; Kelly Services, "Agents of Change" (2015), https://www.kellyservices.com/

global/siteassets/3-kelly-global-services/uploadedfiles/3-kelly_global_services/content/sectionless_pages/kocg1047720/freeagent 20whitepaper20210x21020final2.pdf; Robles and McCoo, "Exploring Online and Offline Informal Work: Findings from the Enterprising and Informal Work Activities (EIWA) Survey" (2016); Upwork, "Freelancing in America" (2019); Washington Department of Commerce, supra n. 513; Farrell and Greig, supra n. 515; MBO Partners, "State of Independence in America" (2018); Abraham et al., "Measuring the Gig Economy: Current Knowledge and Open Issues" (2018), https://www.nber.org/papers/w24950; Collins et al. (2019), supra n. 516; Gitis et al., "The Gig Economy: Research and Policy Implications of Regional, Economic, and Demographic Trends," American Action Forum (2017), https://www.americanactionforum.org/research/gig-economy-research-policy-implications-regional-economic-demographic-trends/#ixzz5IpbJp79a; Dourado and Koopman, "Evaluating the Growth of the 1099 Workforce," Mercatus Center (2015), https://www.mercatus.org/publication/evaluating-growth-1099-workforce.

[530] See Katz and Krueger (2016), supra n. 517.

[531] "Gallup's Perspective on The Gig Economy and Alternative Work Arrangements," Gallup (2018), https://www.gallup.com/workplace/240878/gig-economy-paper-2018.aspx.

[532] See Abraham et al. (2018), supra n. 529, Table 4.

[533] E. Jackson, A. Looney, and S. Ramnath, "The Rise of Alternative Work Arrangements: Evidence and Implications for Tax Filing and Benefit Coverage," OTA Working Paper 114 (2017), https://www.treasury.gov/resource-center/tax-policy/tax-analysis/Documents/WP-114.pdf.

[534] Lim et al., supra n. 512.

[535] In comparison to household survey data, tax data may reduce certain types of biases (such as recall bias) while increasing other types (such as underreporting bias). Because the Department is unable to quantify this tradeoff, it could not determine whether, on balance, survey or tax data are more reliable.

TABLE 1—SUMMARY OF ESTIMATES OF INDEPENDENT CONTRACTING—Continued

| Source | Method [a] | Definition [b] | Percent of workers | Sample size | Year |
|--------|-----------|----------------|--------------------|-------------|------|
| Lim et al. | Tax data ......... | Independent contractor ................................................ | 8.1% | 1% of 1099–MISC and 5% of 1099–K. | 2016 |

[a] The CPS CWS and the GSS QWL are nationally representative, and the ALP CWS is approximately nationally representative. The Gallup poll is demographically representative but does not explicitly claim to be nationally representative. Lastly, the two tax data sets are very large random samples and consequently are likely to be nationally representative, although the authors do not explicitly claim so.

[b] The survey data only identify independent contractors on their main job. Jackson et al. include independent contractors as long as at least 15 percent of their earnings were from self-employment income; thus, this population is broader. If Jackson et al.'s estimate is adjusted to exclude those who are primary wage earners, the rate is 4.0 percent. Lim et al. include independent contractors on all jobs. If Lim et al.'s estimate is adjusted to only those who receive a majority of their labor income from independent contracting, the rate is 3.9 percent.

[c] Summation of (1) 2,132,800 filers with earnings from both wages and sole proprietorships and expenses less than $5,000, (2) 4,125,200 primarily sole proprietorships and with less than $5,000 in expenses, and (3) 3,416,300 primarily wage earners.

[d] Estimate based on a 10 percent sample of self-employed workers and a 1 percent sample of W–2 recipients.

## 3. Demographics of Independent Contractors

The Department reviewed demographic information on independent contractors using the CWS, which, as stated above, only measures those who say that their independent contractor job is their primary job and that they worked at the independent contractor job in the survey's reference week. According to the CWS, these primary independent contractors are most prevalent in the construction and professional and business services industries. These two industries comprise 44 percent of primary independent contractors. Independent contractors tend to be older and predominately male (64 percent). Millennials (defined as those born 1981–1996) have a significantly lower prevalence of primary independent contracting than older generations; 4.2 percent for Millennials compared to 7.2 percent for Generation X (defined as those born 1965–1980) and 10.2 percent for Baby Boomers and Matures (defined as individuals born before 1965).[536] However, other surveys that capture secondary independent contractors, or those who did informal work as independent contractors show that the prevalence of informal work is lower among older workers. Abraham and Houseman (2019), find that among 18- to 24-year-olds, 41.3 percent did informal work over the past month. The rate fell to 25.7 percent for 45- to 54-year-olds, and 13.4 percent for those 75 years and older.[537] According to MBO partners, the COVID–19 pandemic may have accelerated this trend; when accounting for both primary and secondary independent work, 2021 marked the first year that Millennials and members of Generation Z (34 percent and 17 percent of independent workers respectively) outnumbered members of Generation X and Baby Boomers (23 percent and 26 percent respectively) as part of the independent workforce.[538]

According to the CWS, 64 percent of primary independent contractors are men. Additionally, Garin and Koustas (2021) find that men comprise both a larger share of independent contractors who perform work through traditional contracting arrangements and those who secure work through online platforms.[539] This study also found that a greater share of men than women who earn income in this way are primarily self-employed; women who perform online platform work are more likely to use that work to supplement other income.[540]

According to the CWS, white workers are somewhat overrepresented among primary independent contractors; they comprise 85 percent of this population but only 79 percent of the population of workers. Conversely, Black workers are somewhat underrepresented (comprising 8 percent and 13 percent, respectively).[541] The opposite trends emerge when evaluating the broader category of "informal work", where racial minorities participate at a higher rate than white workers.[542] Primary independent contractors are spread across the educational spectrum, with no group especially overrepresented. The same trend in education attainment holds for workers who participate in informal work.[543]

[536] The Department used the generational breakdown used in the MBO Partners 2017 report, "The State of Independence in America." "Millennials" were defined as individuals born 1981–1996, "Generation X" were defined as individuals born 1965–1980, and "Baby Boomers and Matures" were defined as individuals born before 1965.

[537] Abraham and Houseman (2019), supra n. 524. Note that this informal work may be broader than what would be considered independent contracting and includes activities like babysitting/housesitting and selling goods online through sites like eBay and Craigslist. See also Upwork (2019), supra n. 529.

[538] This data comes from the 2021 edition of the MBO Partners report, "The State of Independence in America." While maintaining the generational breakdown used in the 2017 edition, "Generation Z" was additionally defined as individuals born 1997–2012. https://info.mbopartners.com/rs/mbo/images/MBO_2021_State_of_Independence_Research_Report.pdf.

[539] Garin, A. and Koustas, D., "The Distribution of Independent Contractor Activity in the United States: Evidence from Tax Filings," (2021).

[540] Id.

[541] These numbers are calculated by the Department and based on the CWS respondents who state that their race is "white only" or "black only" as opposed to identifying as multi-racial.

[542] Abraham and Houseman (2019), supra n. 524.

[543] Id.

TABLE 2—CHARACTERISTICS OF WORKERS, ALL WORKERS AND INDEPENDENT CONTRACTORS

| Demographic | Number of workers (millions) | Percent of workers | Number of independent contractors (primary job) (millions) | Percent of independent contractors |
|---|---|---|---|---|
| Total ........................................................................ | 158.9 | 100 | 10.6 | 100 |
| **By Age** | | | | |
| 16–20 (Generation Z) ............................................. | 8.2 | 5.1 | 0.1 | 0.7 |
| 21–37 (Millennials) ................................................. | 59.2 | 37.3 | 2.5 | 23.4 |
| 38–52 (Generation X) .............................................. | 49.8 | 31.3 | 3.6 | 33.8 |
| 53+ (Baby Boomers and Matures) .......................... | 43.6 | 27.5 | 4.5 | 42.1 |
| **By Sex** | | | | |
| Female .................................................................... | 75.4 | 47.4 | 3.8 | 35.7 |
| Male ........................................................................ | 85.4 | 53.7 | 6.8 | 64.3 |
| **By Race** | | | | |
| White only ............................................................... | 125.6 | 79.1 | 9.0 | 84.6 |
| Black only ............................................................... | 20.3 | 12.8 | 0.9 | 8.3 |
| All other races ........................................................ | 14.9 | 9.4 | 0.8 | 7.1 |
| **By Ethnicity** | | | | |
| Hispanic .................................................................. | 27.0 | 17.0 | 1.6 | 14.8 |
| Not Hispanic ........................................................... | 133.8 | 84.2 | 9.0 | 85.2 |
| **By Industry** | | | | |
| Agr, forestry, fishing, and hunting ......................... | 2.6 | 1.6 | 0.2 | 2.0 |
| Mining ..................................................................... | 0.8 | 0.5 | 0.0 | 0.1 |
| Construction ............................................................ | 11.0 | 6.9 | 2.0 | 19.3 |
| Manufacturing ......................................................... | 16.5 | 10.4 | 0.2 | 2.2 |
| Wholesale and retail trade ..................................... | 20.5 | 12.9 | 0.8 | 7.9 |
| Transportation and utilities ..................................... | 8.0 | 5.1 | 0.6 | 5.7 |
| Information .............................................................. | 3.0 | 1.9 | 0.2 | 2.2 |
| Financial activities .................................................. | 10.9 | 6.9 | 1.0 | 9.6 |
| Professional and business services ....................... | 19.3 | 12.2 | 2.7 | 25.1 |
| Educational and health services ............................ | 36.2 | 22.8 | 1.0 | 9.6 |
| Leisure and hospitality ........................................... | 15.1 | 9.5 | 0.7 | 6.2 |
| Other services ........................................................ | 7.8 | 4.9 | 1.0 | 9.7 |
| Public administration .............................................. | 7.2 | 4.6 | 0.0 | 0.4 |
| **By Education** | | | | |
| Less than high school diploma ............................... | 14.3 | 9.0 | 1.0 | 9.3 |
| High school diploma or equivalent .......................... | 41.9 | 26.4 | 2.6 | 24.4 |
| Less than Bachelor's degree .................................. | 45.3 | 28.5 | 2.8 | 26.5 |
| Bachelor's degree ................................................... | 37.3 | 23.5 | 2.7 | 25.5 |
| Master's degree or higher ...................................... | 21.9 | 13.8 | 1.5 | 14.5 |

**Note:** Estimates based on the 2017 CPS Contingent Worker Survey.

*C. Costs*

1. Rule Familiarization Costs

Regulatory familiarization costs represent direct costs to businesses and current independent contractors associated with reviewing the new regulation. To estimate the total regulatory familiarization costs, the Department used (1) the number of establishments and government entities using independent contractors, and the current number of independent contractors; (2) the wage rates for the employees and for the independent

contractors reviewing the rule; and (3) the number of hours that it estimates employers and independent contractors will spend reviewing the rule. This section presents the calculation for establishments first and then the calculation for independent contractors.

Regulatory familiarization costs may be a function of the number of establishments or the number of firms.[544] Presumably, the headquarters

[544] An establishment is commonly understood as a single economic unit, such as a farm, a mine, a factory, or a store, that produces goods or services. Establishments are typically at one physical

of a firm will conduct the regulatory review for businesses with multiple locations and may require some locations to familiarize themselves with the regulation at the establishment level. Other firms may either review the rule to consolidate key takeaways for their affiliates or they may rely entirely on

location and engaged in one, or predominantly one, type of economic activity for which a single industrial classification may be applied. An establishment contrasts with a firm, or a company, which is a business and may consist of one or more establishments. *See* BLS, "Quarterly Census of Employment and Wages: Concepts," *https:// www.bls.gov/opub/hom/cew/concepts.htm.*

outside experts to evaluate the rule and relay the relevant information to their organization (*e.g.*, a chamber of commerce). The Department used the number of establishments to estimate the fundamental pool of regulated entities—which is larger than the number of firms. This assumes that regulatory familiarization occurs at both the headquarters and establishment levels.

To estimate the number of establishments incurring regulatory familiarization costs, the Department began by using the Statistics of U.S. Businesses (SUSB) to define the total pool of establishments in the United States.[545] In 2019, the most recent year available, there were 7.96 million establishments. These data were supplemented with the 2017 Census of Government that reports 90,075 local government entities, and 51 state and Federal government entities.[546] The total number of establishments and governments in the universe used for this analysis is 8,049,229.

This universe is then restricted to the subset of establishments that engage independent contractors. In 2019, Lim et al. used extensive IRS data to model the independent contractor market and found that 34.7 percent of firms hire independent contractors.[547] These data are based on annual tax filings, so the dataset includes firms that may contract for only parts of a year. Multiplying the universe of establishments and governments by 35 percent results in 2.8 million entities.

The Department assumes that a Compensation, Benefits, and Job Analysis Specialist (SOC 13–1141) (or a staff member in a similar position) will review the rule.[548] According to the Occupational Employment and Wage Statistics (OEWS), these workers had a median wage of $30.83 per hour in 2021 (most recent data available).[549]

[545] U.S. Census Bureau, 2019 SUSB Annual Datasets by Establishment Industry. *https://www.census.gov/data/datasets/2019/econ/susb/2019-susb.html.*

[546] U.S. Census Bureau, 2017 Census of Governments. *https://www.census.gov/data/tables/2017/econ/gus/2017-governments.html.*

[547] Lim et al., supra n. 512, Table 10: Firm sample summary statistics by year (2001–2015), *https://www.irs.gov/pub/irs-soi/19rpindcontractorinus.pdf.*

[548] A Compensation/Benefits Specialist ensures company compliance with Federal and state laws, including reporting requirements; evaluates job positions, determining classification, exempt or non-exempt status, and salary; plans, develops, evaluates, improves, and communicates methods and techniques for selecting, promoting, compensating, evaluating, and training workers. *See* BLS, "13–1141 Compensation, Benefits, and Job Analysis Specialists," *https://www.bls.gov/oes/current/oes131141.htm.*

[549] The 2021 IC Rule used the mean wage rate to calculate rule familiarization costs, but the

Assuming benefits are paid at a rate of 45 percent of the base wage,[550] and overhead costs are 17 percent of the base wage, the reviewer's effective hourly rate is $49.94. The Department assumes that it will take on average about 30 minutes to review the rule as proposed. The Department believes that 30 minutes, on average, is appropriate, because while some establishments will spend longer to review the rule, many establishments may rely on third-party summaries of the changes or spend little or no time reviewing the rule. Furthermore, the analysis outlined in this rule aligns with existing judicial precedent and previous guidance released by the Department, with which much of the regulated community is already familiar. Total regulatory familiarization costs to businesses in Year 1 are estimated to be $70.3 million ($49.94 × 0.5 hour × 2,817,230) in 2021 dollars.

For regulatory familiarization costs for independent contractors, the Department used its estimate of 22.1 million independent contractors and assumed each independent contractor will spend 15 minutes to review the regulation. The average time spent by independent contractors is estimated to be smaller than for establishments and governments. This difference is in part because the Department believes independent contractors are likely to rely on summaries of the key elements of the rule change published by the Department, worker advocacy groups, media outlets, and accountancy and consultancy firms, as has occurred with other rulemakings. This time is valued at $21.35, which is the median hourly wage rate for independent contractors in the CWS of $19.45 updated to 2021 dollars using the gross domestic product (GDP) deflator.[551] [552] Therefore,

Department has used the median wage rate here, because it is more consistent with cost analyses in other Wage and Hour Division rulemakings. The Department used the median wage rate in the Withdrawal Rule. Generally, the Department uses median wage rates to calculate costs, because the mean wage rate has the potential to be biased upward by high-earning outlier wage observations.

[550] Employer Costs for Employee Compensation, 2021 Annual Averages. *https://www.bls.gov/ncs/data.htm.*

[551] Based on Department calculations using the individual level data. The Department also calculated the mean hourly wage for independent contractors using the CWS data and found that the mean wage in 2017 was $27.29, which would be $29.97 updated to 2021 dollars using the GDP deflator.

[552] In the 2021 IC Rule the Department included an additional 45 percent for benefits and 17 percent for overhead. These adjustments have been removed here, because independent contractors do not usually receive employer provided benefits and generally have overhead costs built into their hourly rate.

regulatory familiarization costs to independent contractors in Year 1 are estimated to be $118 million ($21.35 × 0.25 hour × 22.1 million).

The total one-time regulatory familiarization costs for establishments, governments, and independent contractors are estimated to be $188.3 million. Regulatory familiarization costs in future years are assumed to be de minimis. Employers and independent contractors would continue to familiarize themselves with the applicable legal framework in the absence of the rule, so this rulemaking is not expected to impose costs after the first year. This amounts to a 10-year annualized cost of $26.0 million at a discount rate of 3 percent and $25.1 million at a discount rate of 7 percent.

### D. Benefits

#### 1. Increased Consistency

This proposed rule presents a detailed analysis for determining employee or independent contractor status under the Act that is more consistent with existing judicial precedent and the Department's longstanding guidance prior to the 2021 IC Rule. This analysis will provide more consistent guidance to employers in properly classifying workers as employees or independent contractors, as well as useful guidance to workers on whether they are correctly classified as employees or independent contractors. The analysis will provide a consistent approach for those businesses that engage (or wish to engage) independent contractors, who the Department recognizes play an important role in the economy. The proposed rule's consistency with judicial precedent could also help to reduce legal disputes.

#### 2. Reduced Misclassification

This proposed rule would provide consistent guidance to employers in properly classifying workers as employees or independent contractors, as well as useful guidance to workers on whether they are correctly classified as employees or independent contractors. This clear guidance could help reduce the occurrence of misclassification.

The prevalence of misclassification of employees as independent contractors is unclear, but the literature indicates it is substantial. A 2020 National Employment Law Project (NELP) report, for example, reviewed state audits and concluded that "these state reports show that 10 to 30 percent of employers (or more) misclassify their employees as independent contractors."[553] Similarly,

[553] NELP, *Independent Contractor Misclassification Imposes Huge Costs on Workers and Federal and State Treasuries,* (Oct. 2020),

a 2000 Department of Labor study also found that "between 10 percent and 30 percent of employers audited in 9 states misclassified workers as independent contractors."[554] This same report found that depending on the state, between 1 percent and 9 percent of workers are misclassified as independent contractors.

Misclassification disproportionately affects Black, indigenous, and people of color (BIPOC) because of the disparity in occupations affected by misclassification.[555] High incidence of misclassification of employees as independent contractors has been documented in agriculture, construction, trucking, housecleaning, in-home care, stagecraft, and 'sharing economy' companies.[556]

Misclassification violates one of the purposes of the FLSA: eliminating "unfair method[s] of competition in commerce."[557] When employers misclassify employees as independent contractors, they illegally cut labor costs, undermining law-abiding competitors.[558] While the services offered may be comparable at face value, the employer engaging in misclassification is able to offer lower estimates and employers following the rules are left at a disadvantage.

*E. Transfers*

1. Employer-Provided Fringe Benefits

Misclassification of independent contractors culminates in a reduced social safety net starting with the individual and cascading out through the local, state, and Federal programs.

Employees who are misclassified as independent contractors generally do not receive employer-sponsored health and retirement benefits, potentially resulting in or contributing to long-term financial insecurity.

Employees are more likely than independent contractors to have health insurance. According to the CWS, 75.4 percent of independent contractors have health insurance, compared to 84.0 percent of employees. This gap between independent contractors and employees is also true for low-income workers. Using CWS data, the Department compared health insurance rates for workers earning less than $15 per hour and found that 71.0 percent of independent contractors have health insurance compared with 78.5 percent of employees. Lastly, the Department considered whether this gap could be larger for traditionally underserved groups or minorities. Considering the subsets of independent contractors who are female, Hispanic, or Black, only the Hispanic independent contractors have a statistically significant difference in the percentage of workers with health insurance (estimated to be about 18 percentage points lower).[559]

Additionally, a major source of retirement savings is employer-sponsored retirement accounts. According to the CWS, 55.5 percent of employees have a retirement account with their current employer; in addition, the BLS Employer Costs for Employee Compensation (ECEC) found that in 2021 employers pay 5.1 percent of employees' total compensation in

retirement benefits on average ($2.03/ $39.46). A 2017 Treasury study found that in 2014, while forty two percent of wage earners made contributions to an individual retirement account (IRA) or employer plan, only eight percent of self-employed individuals made any retirement contribution.[560] Smaller retirement savings could result in a long-term tax burden to all Americans due to increased reliance upon social assistance programs.

To the extent that this proposed rule would reduce misclassification, it could result in transfers to workers in the form of employer-provided benefits like health care and retirement benefits. As shown in Table 3 below, using from BLS Employer Costs for Employee Compensation, the Department has calculated the average cost to employers for various benefits as a percentage of the average cost to employers for wages and salaries. This share was then applied to the median weekly wage of both full-time and part-time independent contractors to estimate the value of these benefits to an average independent contractor if they were to begin receiving these benefits. The Department estimated that the value of these benefits could average more than $15,000 annually for full-time independent contractors and almost $6,000 annually for part-time independent contractors. This example transfer estimate could be reduced if there is a downward adjustment in the worker's wage rate to offset a portion of the employer's cost associated with these new benefits.

TABLE 3—POTENTIAL TRANSFERS ASSOCIATED WITH EMPLOYER-PROVIDED FRINGE BENEFITS

| Employer-provided fringe benefit | Employer cost for benefit as a share of employer cost for wages and salaries (Q1 2022) [a] | Value of benefit for the median weekly wage of a full-time independent contractor ($980) [d] | Value of benefit for the median weekly Wage of a part-time independent contractor ($383) [d] |
|---|---|---|---|
| Health Insurance | 11.5% | $112.70 | $44.05 |
| Retirement [b] | 7.5% | 73.50 | 28.73 |
| Paid Leave [c] | 10.8% | 105.84 | 41.36 |

*https://www.nelp.org/publication/independent-contractor-misclassification-imposes-huge-costs-workers-federal-state-treasuries-update-october-2020.*

[554] Lalith de Silva, Adrian Millett, Dominic Rotondi, and William F. Sullivan, "Independent Contractors: Prevalence and Implications for Unemployment Insurance Programs" Report of Planmatics, Inc., for U.S. Department of Labor Employment and Training Administration (2000), *https://wdr.doleta.gov/owsdrr/00-5/00-5.pdf.*

[555] See NELP, *supra* n. 553.

[556] Carré, F. (2015). *(In)dependent contractor misclassification.* Economic Policy Institute. Briefing Paper #403, *https://www.epi.org/publication/independent-contractor-misclassification/.*

[557] 29 U.S.C. 202(a), (b).

[558] *Id.*

[559] To measure if the difference between these proportions is statistically significant, the Department used the replicate weights for the CWS. At a 0.05 significance level, the proportion of Hispanic independent contractors with any health

insurance is lower than the proportion for all independent contractors.

[560] Jackson, E., Looney, A., & Ramnath, S., Department of Treasury, *The Rise of Alternative Work Arrangements: Evidence and Implications for Tax Filing and Benefit Coverage,* Working Paper #114 (Jan. 2017), *https://home.treasury.gov/system/files/131/WP-114.pdf.* As discussed in the 2021 IC Rule, this study defines retirement accounts as "employer-sponsored plans," which may not encompass all of the possible long-term saving methods.

TABLE 3—POTENTIAL TRANSFERS ASSOCIATED WITH EMPLOYER-PROVIDED FRINGE BENEFITS—Continued

| Employer-provided fringe benefit | Employer cost for benefit as a share of employer cost for wages and salaries (Q1 2022) [a] | Value of benefit for the median weekly wage of a full-time independent contractor ($980) [d] | Value of benefit for the median weekly Wage of a part-time independent contractor ($383) [d] |
|---|---|---|---|
| Total Annual Value of Fringe Benefits .................................... | ...................... | 15,186.08 | 5,934.97 |

[a] The share for each benefit is calculated as the cost per hour for civilian workers divided by the wages and salaries cost per hour for civilian workers. Series IDs CMU1150000000000D, CMU1180000000000D, and CMU1040000000000D divided by Series ID 1020000000000D
[b] Includes defined benefit and defined contribution retirement plans
[c] Includes vacation, holiday, sick and personal leave
[d] Earnings data from the 2017 CWS (https://www.bls.gov/news.release/conemp.t13.htm) were inflated to Q1 2022 using GDP Deflator

### 2. Tax Liabilities

As self-employed workers, independent contractors are legally obligated to pay both the employee and employer shares of the Federal Insurance Contributions Act (FICA) taxes. Thus, if workers' classifications change from independent contractors to employees, there could be a transfer in Federal tax liabilities from workers to employers.[561] Although this proposed rule only addresses whether a worker is an employee or an independent contractor under the FLSA, the Department assumes in this analysis that employers are likely to keep the status of most workers the same across all benefits and requirements, including for tax purposes.[562] These payroll taxes include the 6.2 percent employer component of the Social Security tax and the 1.45 percent employer component of the Medicare tax.[563] In sum, independent contractors are legally responsible for an additional 7.65 percent of their earnings in FICA taxes (less the applicable tax deduction for this additional payment). Some of this increased tax liability may be partially or wholly paid for by the individuals and companies that engage independent contractors, to the extent that the compensation paid to independent contractors accounts for this added tax liability. However, changes in compensation are discussed separately below. Changes in benefits, tax liability, and earnings must be considered in tandem to identify how the standard of living may change.

In addition to affecting tax liabilities for workers, this proposed rule could have an impact on state tax revenue and budgets. Misclassification results in lost revenue and increased costs for states, because states receive less tax revenue than they otherwise would from payroll taxes, and they have reduced funds to unemployment insurance, workers' compensation, and paid leave programs.[564] Although it has not been updated more recently, the IRS conducted a comprehensive worker misclassification estimate in 1984. At the time, the IRS found misclassification resulted in an estimated total tax loss of $1.6 billion in Social Security taxes, Medicare taxes, Federal unemployment taxes, and Federal income taxes (for Tax Year 1984).[565] To the extent workers were incorrectly classified due to misapplication of the 2021 IC Rule, that could lead to reduced tax revenues.

Generally, employers are only required to contribute to unemployment insurance, disability insurance, or worker's compensation on behalf of employees therefore independent contractors do not have access to those benefits. Reduced unemployment insurance, disability insurance, and worker's compensation contributions result in reduced disbursement capabilities. Misclassification of employees as independent contractors thus impacts the funds paid into such state programs. Even if the misclassified worker is unaffected and needs no assistance, the state has diminished funds for those who require the benefits. In Tennessee, from September 2017 to October 2018, the Uninsured Employers Fund unit "assessed 234 penalties against employers for not maintaining workers' compensation insurance, for a total assessment amount of $2,730,269.60."[566] This amount represents only what was discovered by the taskforce in three months and in just one state. By rescinding the 2021 IC Rule, this proposed rule could prevent this increased burden on government entities.

### 3. FLSA-Protections

When workers are properly classified as independent contractors, the minimum wage, overtime pay, and other requirements of the FLSA no longer apply. The 2017 CWS data indicate that independent contractors are more likely than employees to report earning less than the FLSA minimum wage of $7.25 per hour (8 percent for self-employed independent contractors, 5 percent for other independent contractors, and 2 percent for employees). Concerning overtime pay, not only do independent contractors not receive the overtime pay premium, but the number of overtime hours worked by independent contractors is also higher. Analysis of the CWS data indicated that, before conditioning on covariates, primary self-employed independent contractors are more likely to work overtime (more than 40 hours in a workweek) at their main job than employees, as 29 percent of self-employed independent contractors reported working overtime versus just 17 percent for employees.[567]

---

[561] See 86 FR 1218.

[562] Courts have noted that the FLSA has the broadest conception of employment under Federal law. See, e.g., Darden, 503 U.S. at 326. To the extent that businesses making employment status determinations base their decisions on the most demanding Federal standard, a rulemaking addressing the standard for determining classification of worker as an employee or an independent contractor under the FLSA may affect the businesses' classification decisions for purposes of benefits and legal requirements under other Federal laws.

[563] Internal Revenue Service, "Publication 15, (Circular E), Employer's Tax Guide" (Dec 16, 2021), https://www.irs.gov/pub/irs-pdf/p15.pdf. The social security tax has a wage base limit of $137,700 in 2020. An additional Medicare Tax of 0.9 percent applies to wages paid in excess of $200,000 in a calendar year for individual filers.

[564] See, e.g., Lisa Xu and Mark Erlich, Economic Consequence of Misclassification in the State of Washington, Harvard Labor and Worklife Program, 2 (2019), https://lwp.law.harvard.edu/files/lwp/files/wa_study_dec_2019_final.pdf; Karl A. Racine, Issue Brief and Economic Report, Illegal Worker Misclassification: Payroll Fraud in the District's Construction Industry, 13 (September 2019), https://oag.dc.gov/sites/default/files/2019-09/OAG-Illegal-Worker-Misclassification-Report.pdf.

[565] Treasury Inspector General for Tax Inspection 2013, Employers Do Not Always Follow Internal Revenue Service Worker Determination Rulings, https://www.treasury.gov/tigta/auditreports/2013reports/201330058fr.pdf.

[566] NELP, supra n. 553.

[567] The Department based this calculation on the percentage of workers in the CWS data who

Additionally, independent contractors who work overtime tend to work more hours of overtime than employees. According to the Department's analysis of CWS data, among those who usually work overtime, the mean usual number of overtime hours for independent contractors is 15.4 and the mean for employees is 11.8 hours. Independent contractors are also not protected by other provisions in the FLSA that are centered on ensuring that women are treated fairly at work, including employer-provided accommodations for breastfeeding workers and protections against pay discrimination.

As discussed above, compared to the 2021 IC Rule, this proposed rule could result in reduced misclassification of employees as independent contractors. Any reduction in misclassification that occurs as a result of this proposed rule would lead to an increase in the applicability of these FLSA protections for workers and subsequently may result in transfers relating to minimum wage and overtime. Specifically, to the extent misclassified workers were not earning the minimum wage, reduced misclassification would increase hourly wages for these workers to the Federal minimum wage. Similarly, to the extent misclassified workers were not receiving the applicable overtime pay, reduced misclassification would increase overtime pay for any overtime hours they continued to work. However, compared to the economic landscape prior to the Department's enforcement of the 2021 IC Rule in March 2022, these transfers would be less likely to occur.

### 4. Hourly Wages, Bonuses, and Related Compensation

In addition to increased compliance with minimum wage and overtime requirements, potential transfers may also result from this rulemaking as a consequence of differences in earnings between employees and independent contractors.[568] Independent contractors are generally expected to earn a wage premium relative to employees who perform similar work to compensate for their reduced access to benefits and increased tax liability. However, this may not always be the case in practice. The Department compared the average hourly wages of current employees and independent contractors to provide some indication of the impact on wages of a worker who is reclassified from an independent contractor to an employee.

The Department used an approach similar to Katz and Krueger (2018).[569] Both regressed hourly wages on independent contractor status[570] and observable differences between independent contractors and employees (e.g., occupation, sex, potential experience, education, race, and ethnicity) to help isolate the impact of independent contractor status on hourly wages. Katz and Krueger used the 2005 CWS and the 2015 RAND American Life Panel (ALP) (the 2017 CWS was not available at the time of their analysis). The Department used the 2017 CWS.[571]

Both analyses found similar results. A simple comparison of mean hourly wages showed that independent contractors tend to earn more per hour than employees (e.g., $27.29 per hour for all independent contractors versus $24.07 per hour for employees using the 2017 CWS). However, when controlling for observable differences between workers, Katz and Krueger found no statistically significant difference between independent contractors' and employees' hourly wages in the 2005 CWS data. Although their analysis of the 2015 ALP data found that primary independent contractors earned more per hour than traditional employees, they recommended caution in interpreting these results due to the imprecision of the estimates.[572] The Department found no statistically significant difference between independent contractors' and employees' hourly wages in the 2017 CWS data.

Based on these inconclusive results, the Department believes it is inappropriate to conclude independent contractors generally earn a higher hourly wage than employees. The Department ran another hourly wage rate regression including additional variables to determine if independent contractors in underserved groups are impacted differently by including interaction terms for female independent contractors, Hispanic independent contractors, and Black independent contractors. The results indicate that in addition to the lower wages earned by Black workers in general, Black independent contractors also earn less per hour than independent contractors of other races; however, this is not statistically significant at the most commonly used significance level.[573]

In addition to the potential transfers discussed above, the Department welcomes comments on how the interaction of these transfer dynamics may be realized by workers and businesses.

### F. Analysis of Regulatory Alternatives

Pursuant to its obligations under Executive Order 12866,[574] the Department assessed four regulatory alternatives to this proposed rule. The Department welcomes comments on these regulatory alternatives, as well as suggestions regarding any other potential alternatives.

The Department previously considered and rejected the first two alternatives described below—codifying either a common law or ABC test for determining employee or independent contractor status—in the 2021 IC Rule.[575] Although the Department continues to believe that legal limitations prevent the Department from adopting either of those alternatives, the Department nonetheless presents them as regulatory alternatives, which is permissible under OMB guidance.[576]

For the first alternative, the Department considered codifying the common law control test, which is used to distinguish between employees and independent contractors under other Federal laws, such as the Internal

---

[568] The discussion of data on the differences in earnings between employees and independent contractors in the 2021 IC Rule was potentially confusing and included some evidence that was not statistically significant, so the findings and methodology are discussed again here.

respond to the PEHRUSL1 variable ("How many hours per week do you usually work at your main job?") with hours greater than 40. Workers who answer that hours vary were excluded from the calculation. The Department also applied the exclusion criteria used by Katz and Krueger (exclude workers reporting weekly earnings less than $50 and workers whose calculated hourly rate (weekly earnings divided by usual hours worked per week) is either less than $1 or more than $1,000).

[569] Katz and Krueger (2018), supra n. 517.

[570] On-call workers, temporary help agency workers, and workers provided by contract firms are excluded from the base group of "traditional" employees.

[571] In both Katz and Krueger's regression results and the Department's calculations, the following outlying values were removed: workers reporting earning less than $50 per week, less than $1 per hour, or more than $1,000 per hour. Choice of exclusionary criteria from Katz and Krueger (2018), supra n. 517.

[572] See top of page 20, "Given the imprecision of the estimates, we recommend caution in interpreting the estimates from the [ALP]." The standard error on the estimated coefficient on the independent contractor variable in Katz and Krueger's regression based on the 2015 ALP is more than 2.5 times larger than the standard error of the coefficient using the 2017 CWS.

[573] The coefficient for Black independent contractors was negative and statistically significant at a 0.10 level (with a p-value of 0.067). However, a significance level of 0.05 is more commonly used.

[574] E.O. 12866, section 6(a)(3)(C)(iii), 58 FR 51741.

[575] See 86 FR 1238.

[576] OMB Circular A–4 advises that agencies "should discuss the statutory requirements that affect the selection of a regulatory action. If legal constraints prevent the selection of a regulatory action that best satisfies the philosophy and principles of Executive Order 12866, [agencies] should identify these constraints and estimate their opportunity cost. Such information may be useful to Congress under the Regulatory Right-to-Know Act."

Revenue Code.[577] The focus of the common law control test is "the hiring party's right to control the manner and means by which [work] is accomplished," [578] but the Supreme Court has explained that "other factors relevant to the inquiry [include] the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party." [579]

Although the common law control test considers some of the same factors as those identified in the proposed rule's "economic reality" test (e.g., skill, length of the working relationship, the source of equipment and materials, etc.), courts generally recognize that, because of its focus on control, the common law test is more permissive of independent contracting arrangements than the economic reality test, which examines the economic dependence of the worker.[580]

Codifying a common law control test for the FLSA may create a more uniform legal framework among Federal statutes, in the sense that entities would not, for example, have to understand and apply one employment classification standard for tax purposes and a different employment classification standard for FLSA purposes. However, the Department does not believe that adopting a common law control test for determining employee or independent contractor status under the FLSA would otherwise simplify the analysis for the regulated community because courts and enforcement agencies applying a common law test for independent contractors have considered a greater number and different variation of factors than the six or so factors commonly considered under the economic reality test.[581] And as with the economic reality test, the Supreme Court has cautioned that "the common-law test contains 'no shorthand formula or magic phrase that can be applied to find the answer, [as] all of the incidents of the relationship must be assessed and weighed with no one factor being decisive.' " [582]

With respect to workers, replacing the FLSA's economic reality test with a common law control test would jeopardize the employment status of some economically dependent workers who have traditionally qualified as FLSA-covered employees. The Department believes that depriving economically dependent workers of the FLSA's wage and hour protections would be detrimental to such workers, for reasons explained earlier. Moreover, applying the common law test would be contrary to the "suffer or permit" language in section 3(g) of the FLSA, which the Supreme Court has interpreted as demanding a broader definition of employment than that which exists under the common law.[583] Accordingly, the Department believes it is legally constrained from adopting the common law control test absent Congressional legislation to amend the FLSA.

For the second alternative, the Department considered codifying an "ABC" test to determine independent contractor status under the FLSA, similar to the ABC test recently adopted under California's state wage and hour law.[584] As described by the California

Supreme Court in *Dynamex*, "[t]he ABC test presumptively considers all workers to be employees, and permits workers to be classified as independent contractors only if the hiring business demonstrates that the worker in question satisfies *each* of three conditions: (a) that the worker is free from the control and direction of the hirer in connection with the performance of the work, both under the contract for the performance of the work and in fact; *and* (b) that the worker performs work that is outside the usual course of the hiring entity's business; *and* (c) that the worker is customarily engaged in an independently established trade, occupation, or business of the same nature as that involved in the work performed." [585] In justifying the adoption of this test for independent contractors, the *Dynamex* court noted the existence of an "exceptionally broad suffer or permit to work standard" in California's wage and hour statute,[586] as well as "the more general principle that wage orders are the type of remedial legislation that must be liberally construed in a manner that serves its remedial purposes." [587]

Compared to either the common law or economic reality tests, codifying an ABC test would establish a far simpler and clearer standard for determining whether workers are employees or independent contractors. The ABC test only has three criteria, and no balancing of the criteria is required; all three prongs must be satisfied for a worker to

---

[577] See 26 U.S.C. 3121(d)(2) (generally defining the term "employee" under the Internal Revenue Code as "any individual who, under the usual common law rules applicable in determining the employer-employee relationship, has the status of an employee"); 42 U.S.C. 410(j)(2) (similarly defining "employee" under the Social Security Act); see also, e.g., Darden, 503 U.S. 318 (holding that "a common-law test" should resolve employee/ independent contractor disputes under ERISA); Reid, 490 U.S. at 751 (applying "principles of general common law of agency" to determine "whether . . . work was prepared by an employee or an independent contractor" under the Copyright Act of 1976). The Supreme Court has advised that the common law control test applies by default under Federal law unless a statute specifies an alternative standard. See Darden, 503 U.S. at 322–23 (" '[W]hen Congress has used the term 'employee' without defining it, we have concluded that Congress intended to describe the conventional master-servant relationship as understood by common-law agency doctrine.' ") (quoting Reid, 490 U.S. at 739–40).

[578] Reid, 490 U.S. at 751.

[579] Id. at 751–52.

[580] See, e.g., Flint Eng'g, 137 F.3d at 1440 (recognizing that the "economic realities" test is a more expansive standard for determining employee status than the common law test).

[581] See RESTATEMENT (THIRD) OF AGENCY sec. 7.07, Comment (f) (2006) (identifying 10 factors); IRS Tax Topic No. 762 Independent Contractor vs. Employee (May 19, 2022), https:// www.irs.gov/taxtopics/tc762 (explaining the common law analysis through three main categories: behavioral control, financial control, and the relationship of the parties); Reid, 490 U.S. at 751–52 (identifying 13 factors).

[582] Darden, 503 U.S. at 324 (quoting United Ins. Co. of America, 390 U.S. at 258).

[583] See, e.g., Darden, 503 U.S. at 326; Portland Terminal, 330 at 150–51.

[584] See Dynamex, 416 P.3d 1; Assembly Bill ("A.B.") 5, Ch. 296, 2019–2020 Reg. Sess. (Cal. 2019) (codifying the ABC test articulated in Dynamex); A.B. 2257, Ch. 38, 2019–2020 Reg. Sess. (Cal. 2020) (retroactively exempting certain

professions, occupations, and industries from the ABC test that A.B. 5 had codified). The ABC test originated in state unemployment insurance statutes, but some state courts and legislatures have recently extended the test to govern employee/ independent contractor disputes under state wage and hour laws. See Keith Cunningham-Parmeter, Gig-Dependence: Finding the Real Independent Contractors of Platform Work, 39 N. Ill. U. L. Rev. 379, 408–11 (2019) (discussing the origins and recent expansion of the ABC test).

[585] 416 P.3d at 34 (emphasis in original). California's ABC test is slightly different than versions of the ABC test adopted (or presently under consideration) in other states. For example, New Jersey provides that a hiring entity may satisfy the ABC test's "B" prong by establishing either: (1) that the work provided is outside the usual course of the business for which the work is performed, or (2) that the work performed is outside all the places of business of the hiring entity. N.J. Stat. Ann. sec. 43:21–19(I)(6)(A–C). The Department has chosen to analyze California's ABC test as a regulatory alternative because businesses subject to multiple standards, including nationwide businesses, are likely to comply with the most demanding standard if they wish to make consistent classification determinations.

[586] 416 P.3d at 31; see also Cal. Code Regs., tit. 8, sec. 11090, subd. 2(D) ("'Employ' means to engage, suffer, or permit to work."). The Dynamex court noted that California's adoption of the "suffer or permit to work" standard predated the enactment of the FLSA and was therefore "not intended to embrace the federal economic reality test" that subsequently developed. 416 P.3d at 35.

[587] Id. at 32.

qualify as an independent contractor. For this reason, adopting an ABC test may eliminate some of the uncertainty related to independent contracting under laws which apply different standards, and substantially reduce the risk of worker misclassification.[568] Though an ABC test would be clear and simple to use for regulated entities who use (or wish to use) independent contractors, it would also be more restrictive of independent contracting arrangements compared to the proposed rule.

In any event, the Department believes it is legally constrained from adopting an ABC test because the Supreme Court has held that the economic reality test is the applicable standard for determining workers' classification under the FLSA as an employee or independent contractor.[569] Moreover, the Supreme Court has stated that the existence of employment relationships under the FLSA "does not depend on such isolated factors" as the three independently determinative factors in the ABC test, "but rather upon the circumstances of the whole activity."[570] Because the ABC test is inconsistent with Supreme Court precedent interpreting the FLSA, the Department believes that it could only implement an ABC test if the Supreme Court revisits its precedent or if Congress passes legislation to amend the FLSA.

For the third alternative, the Department considered a proposed rule that would not fully rescind the 2021 IC Rule and instead retain some aspects of that rule. As the Department has noted throughout this proposal, there are multiple instances in which this NPRM is consistent or in agreement with the 2021 IC Rule. Specifically, the Department has noted its agreement with the following aspects of the 2021 IC Rule: a totality of the circumstances test should be applied to appropriately determine classification as an employee or independent contractor; the concept of economic dependence needs further development; and a clear explanation of the test for whether a worker is an employee or independent contractor in easily accessible regulatory text is

valuable. This proposal also includes several other important principles from the case law that were included in the 2021 IC Rule: economic dependence is the ultimate inquiry; the list of economic reality factors is not exhaustive; and no single factor is determinative. Further, with respect to specific factors, this proposal reinforces certain aspects addressed in the 2021 IC Rule such as that an exclusivity requirement imposed by the employer is a strong indicator of control, and that issues related to scheduling and supervision over the performance of the work (including the ability to assign work) are relevant considerations under the control factor.

Despite these areas of agreement, the governing principle of the 2021 IC Rule is that two of the economic reality factors are predetermined to be more probative and therefore carry more weight, which may obviate the need to meaningfully consider the remaining factors. Upon further consideration, as discussed in this proposal, the Department believes that this departure from decades of case law and the Department's own longstanding position that no one factor or subset of factors should carry more or less weight would have a confusing and disruptive effect on employers and workers alike. The Department considered simply removing the problematic "core factors" analysis from the 2021 IC Rule and retaining the five factors as described in the rule. However, the Department rejected this approach because other aspects of the rule such as considering investment and initiative only in the opportunity for profit or loss factor and excluding consideration of whether the work performed is central or important to the employer's business are also in tension with judicial precedent and longstanding Department guidance. These provisions narrow the economic reality test by limiting the facts that may be considered as part of the test, facts which the Department believes are relevant in determining whether a worker is economically dependent on the employer for work or in business for themself. Therefore, after considering all of the common aspects of the 2021 IC Rule and whether to retain some portions of that rule, the Department has concluded that in order to provide clear, affirmative regulatory guidance that aligns with the text and purpose of the Act as interpreted by courts, a complete rescission and replacement of the 2021 IC Rule is needed. For these reasons, the Department is not proposing a partial rescission of the 2021 IC Rule.

For the fourth alternative, the Department considered rescinding the 2021 IC Rule and providing guidance on employee or independent contractor classification through subregulatory guidance. For more than 80 years prior to the 2021 IC Rule, the Department primarily issued subregulatory guidance in this area and did not have generally applicable regulations on the classification of workers as employees or independent contractors. This subregulatory guidance was informed by the case law and set forth a multifactor economic reality test to answer the ultimate question of economic dependence. The Department considered rescinding the 2021 IC Rule and continuing to provide subregulatory guidance for stakeholders through existing documents (such as Fact Sheet #13) and new documents (for example a Field Assistance Bulletin). Rescinding the 2021 IC Rule without issuing a new regulation would lower the regulatory familiarity costs associated with the proposal. As explained in sections III, IV, and V above, however, the Department believes that replacing the 2021 IC Rule with regulations addressing the multifactor economic reality test that more fully reflects the case law and continues to be relevant to the modern economy will be helpful for both workers and employers. Specifically, issuing regulations allows the Department to provide in-depth guidance that is more closely aligned with circuit case law, rather than the regulations set forth in the 2021 IC Rule which have created a dissonance between the Department's regulations and judicial precedent. Additionally, issuing regulations allows the Department to formally collect and consider a wide range of views from stakeholders by electing to use the notice-and-comment process. Finally, because courts are accustomed to considering relevant agency regulations, providing guidance in this format may further improve consistency among courts regarding this issue. Therefore, the Department is not proposing to rescind the 2021 IC Rule and provide only subregulatory guidance but welcomes comments on the costs and benefits of this alternative.

## VIII. Initial Regulatory Flexibility Act (IRFA) Analysis

The Regulatory Flexibility Act of 1980 (RFA), 5 U.S.C. 601 *et seq.*, as amended by the Small Business Regulatory Enforcement Fairness Act of 1996, Public Law 104–121 (March 29, 1996), requires Federal agencies engaged in rulemaking to consider the impact of their proposals on small entities,

---

[568] *See id.* at 48 (observing that the ABC test "will provide greater clarity and consistency, and less opportunity for manipulation, than a test or standard that invariably requires the consideration and weighing of a significant number of disparate factors on a case-by-case basis").

[569] *See Tony & Susan Alamo,* 471 U.S. at 301 ("The test of employment under the Act is one of 'economic reality.'"); *Whitaker House,* 366 U.S. at 33 ("'economic reality' rather than 'technical concepts' is . . . the test of employment" under the FLSA) (citing *Silk,* 331 U.S. at 713; *Rutherford,* 331 U.S. at 729).

[570] *Rutherford,* 331 U.S. at 730.

consider alternatives to minimize that impact, and solicit public comment on their analyses. The RFA requires the assessment of the impact of a regulation on a wide range of small entities, including small businesses, not-for profit organizations, and small governmental jurisdictions. Agencies must perform a review to determine whether a proposed or final rule would have a significant economic impact on a substantial number of small entities.

### A. Why the Department Is Considering Action

As discussed in section II.E., on March 14, 2022, a district court in the Eastern District of Texas issued a decision vacating the Department's delay and withdrawal of the 2021 IC Rule and concluding that the 2021 IC Rule became effective on March 8, 2021.[591] The Department believes that the 2021 IC Rule does not fully comport with the FLSA's text and purpose as interpreted by the courts and will have a confusing and disruptive effect on workers and businesses alike due to its departure from decades of case law describing and applying the multifactor economic reality test. Therefore, the Department believes it is appropriate to rescind the 2021 IC Rule and set forth an analysis for determining employee or independent contractor status under the Act that is more consistent with existing judicial precedent and the Department's longstanding guidance prior to the 2021 IC Rule.

### B. Objectives of and the Legal Basis for the Proposed Rule

The Department is proposing to modify the regulations addressing whether workers are employees or independent contractors under the FLSA. Specifically, the Department is proposing to discontinue the use of "core factors" and instead proposing to return to a totality-of-the-circumstances analysis of the economic reality test in which the factors do not have a predetermined weight and are considered in view of the economic reality of the whole activity. The Department is further proposing to return the consideration of investment to a standalone factor, provide additional analysis of the control factor (including detailed discussions of how scheduling, remote supervision, price-setting, and the ability to work for others should be considered), and return to the longstanding interpretation of the integral factor, which considers whether the work is integral to the employer's

business. The Department is also proposing to formally rescind the 2021 IC Rule.

The Department believes that rescinding the 2021 IC Rule and replacing it with regulations addressing the multifactor economic reality test—in a way that both more fully reflects the case law and continues to be relevant to the evolving economy—would be helpful for both workers and employers. The Department believes this proposal will help protect workers from misclassification while at the same time providing a consistent approach for those businesses that engage (or wish to engage) independent contractors.

The Department's authority to interpret the Act comes with its authority to administer and enforce the Act. *See Herman* v. *Fabri-Centers of Am., Inc.,* 308 F.3d 580, 592–93 & n.8 (6th Cir. 2002) (noting that "[t]he Wage and Hour Division of the Department of Labor was created to administer the Act" while agreeing with the Department's interpretation of one of the Act's provisions); *Dufrene* v. *Browning-Ferris, Inc.,* 207 F.3d 264, 267 (5th Cir. 2000) ("By granting the Secretary of Labor the power to administer the FLSA, Congress implicitly granted him the power to interpret."); *Condo* v. *Sysco Corp.,* 1 F.3d 599, 603 (7th Cir. 1993) (same).

### C. Estimating the Number of Small Businesses Affected by the Rulemaking

The Department used the Small Business Administration (SBA) size standards, which determine whether a business qualifies for small-business status, to estimate the number of small entities.[592][593] The Department then applied these thresholds to the U.S. Census Bureau's 2017 Economic Census to obtain the number of establishments with employment or sales/receipts below the small business threshold in the industry.[594] These ratios of small to large establishments were then applied to the more recent 2019 Statistics of United States Businesses (SUSB) data on number of establishments.[595] Next, the Department estimated the number of small governments, defined as having

population less than 50,000, from the 2017 Census of Governments.[596] In total, the Department estimated there are 6.5 million small establishments or governments who could potentially have independent contractors, and who could be affected by this rulemaking. However, not all of these establishments will have independent contractors, and so only a share of this number will actually be affected. The impact of this rule could also differ by industry. As shown in Table 2 of the regulatory impact analysis, the industries with the highest number of independent contractors are the professional and business services and construction industries.

Additionally, as discussed in section VII.B., the Department estimates that there are 22.1 million independent contractors. Some of these independent contractors may be considered small businesses and may also be impacted by this rule.

The Department welcomes comments and data on any costs to small businesses.

### D. Compliance Requirements of the Proposed Rule, Including Reporting and Recordkeeping

This proposed rule lays out the framework for assessing employee or independent contractor status under the FLSA. It does not create any new reporting or recordkeeping requirements for businesses.

In the Regulatory Impact Analysis, the Department estimated regulatory familiarization to be one hour per entity and one-quarter hour per independent contractor. The per-entity cost for small business employers is the regulatory familiarization cost of $24.97, or the fully loaded median hourly wage of a Compensation, Benefits, and Job Analysis Specialist multiplied by 0.5 hour. The per-entity rule familiarization cost for independent contractors, some of whom would be small businesses, is $5.34, or the median hourly wage of independent contractors in the CWS multiplied by 0.25 hour. The Department welcomes comments and data on any costs to small businesses.

### E. Relevant Federal Rules Duplicating, Overlapping, or Conflicting With the Proposed Rule

The Department is not aware of any relevant Federal rules that conflict with this NPRM.

---

[591] *See Coalition for Workforce Innovation,* 2022 WL 1073346.

[592] SBA, Summary of Size Standards by Industry Sector, 2017, *https://www.sba.gov/sites/default/files/2019-08/Size_Standards_Table_2017.xlsx.*

[593] The most recent size standards were issued in 2022. However, the Department used the 2017 standards for consistency with the older Economic Census data.

[594] The 2017 data are the most recently available with revenue data.

[595] For this analysis, the Department excluded independent contractors who are not registered as small businesses, and who are generally not captured in the Economic Census, from the calculation of small establishments.

[596] 2017 Census of Governments. *https://www.census.gov/data/tables/2017/econ/gus/2017-governments.html.*

## F. Alternatives to the Proposed Rule

The RFA requires agencies to discuss "any significant alternatives to the proposed rule which accomplish the stated objectives of applicable statutes and which minimize any significant economic impact of the proposed rule on small entities."[597] As discussed earlier in section VII.F., the Department does not believe that it has the legal authority to adopt either a common law or "ABC" test to determine employee or independent contractor status under the FLSA, foreclosing the consideration of these alternatives for purposes of the RFA.

As explained in section VII.F., the Department considered two other regulatory alternatives: proposing a rule that would not fully rescind the 2021 IC Rule and instead retain some aspects of that rule in the new proposal; and completely rescinding the 2021 IC Rule and providing subregulatory guidance on employee or independent contractor classification through subregulatory guidance, as the Department had done for over 80 years prior to the 2021 IC Rule. The Department believes that the overall economic impact of retaining some portions of the 2021 IC Rule while issuing a proposed rule to revise other portions of the rule would not minimize the economic impact on small entities as they would incur costs to familiarize themselves with the new regulation. Similarly, the Department believes that the overall economic impact of fully rescinding the 2021 IC Rule and providing subregulatory guidance, would not necessarily minimize the economic impact on small entities as they would incur some costs to familiarize themselves with any subregulatory guidance. Moreover, as explained in sections III, IV, and V above, the Department believes that replacing the 2021 IC Rule with regulations addressing the multifactor economic reality test that more fully reflect the case law and continue to be relevant to the modern economy will be helpful for both workers and employers, particularly over the long term.

In addition to the alternatives discussed above, Section 603(c) of the RFA describes four categories of regulatory alternatives that might be appropriate for consideration in an IRFA analysis. The Department does not believe that the FLSA is best interpreted to encompass these categories of regulatory alternatives or that they are necessarily applicable to this proposal.

1. Differing Compliance or Reporting Requirements That Take Into Account the Resources Available to Small Entities

Nothing in the FLSA or the decades of court decisions interpreting it suggest that a worker's status as an employee or independent contractor should turn on the size of the entity that benefits from their labor. As described earlier, one of the primary goals of the FLSA is to curtail "unfair method[s] of competition in commerce" by establishing minimum labor standards that all covered employers must observe.[598] Providing differing compliance or reporting requirements for small businesses would undermine this important purpose of the FLSA. The Department makes available a variety of resources to employers for understanding their obligations and achieving compliance and, if this proposed rule is finalized, will prepare a small entity compliance guide, as required by the Small Business Regulatory Enforcement Fairness Act (SBREFA).[599] Therefore, the Department has not proposed differing compliance or reporting requirements for small businesses.

2. The Clarification, Consolidation, or Simplification of Compliance and Reporting Requirements for Small Entities

This proposed rule does not impose any new reporting requirements, and the Department makes available a variety of resources to employers for understanding their obligations and achieving compliance.

3. The Use of Performance Rather Than Design Standards

This proposed rule provides guidance regarding the factors that should be considered regarding a worker's employment status under the FLSA where no one factor is, in a predetermined manner, given more weight than the others and the weight given to the various factors may depend on the particular circumstances of the case.

4. An Exemption From Coverage of the Rule, or Any Part Thereof, for Such Small Entities

Creating an exemption from coverage of this proposed rule for businesses with as many as 500 employees, those defined as small businesses under SBA's size standards, would be inconsistent with the FLSA, which applies to all employers that satisfy the enterprise coverage threshold or employ

individually covered employees, regardless of the employer's number of employees. Further, as described above, case law interpreting the distinction between employees and independent contractors under the FLSA does not support such an exemption.

The Department welcomes comments on this IRFA's analysis of regulatory alternatives.

## IX. Unfunded Mandates Reform Act of 1995

The Unfunded Mandates Reform Act of 1995, 2 U.S.C. 1532, requires agencies to prepare a written statement, which includes an assessment of anticipated costs and benefits, before proposing any unfunded Federal mandate that may result in excess of $100 million (adjusted annually for inflation) in expenditures in any one year by State, local, and tribal governments in the aggregate, or by the private sector. Adjusting the threshold for inflation using the GDP deflator, using the most recent annual result (2021), yields a threshold of $165 million. Therefore, this rulemaking is expected to create unfunded mandates that exceed that threshold. See section VII for an assessment of anticipated costs and benefits.

## X. Executive Order 13132, Federalism

The Department has reviewed this proposed rule in accordance with Executive Order 13132 regarding federalism and determined that it does not have federalism implications. The proposed rule would not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government.

## XI. Executive Order 13175, Indian Tribal Governments

This proposed rule would not have tribal implications under Executive Order 13175 that would require a tribal summary impact statement. The proposed rule would not have substantial direct effects on one or more Indian tribes, on the relationship between the Federal Government and Indian tribes, or on the distribution of power and responsibilities between the Federal Government and Indian tribes.

## List of Subjects

### 29 CFR Part 780

Agriculture, Child labor, Wages.

### 29 CFR Part 788

Forests and forest products, Wages.

---

[597] 5 U.S.C. 603(c).

[598] 29 U.S.C. 202(a)(3).

[599] Small Business Regulatory Enforcement Fairness Act, Public Law 104–121, sec. 212.

*29 CFR Part 795*

Employment, Wages.

For the reasons set out in the preamble, the Department of Labor proposes to amend 29 CFR chapter V as follows:

## PART 780—EXEMPTIONS APPLICABLE TO AGRICULTURE, PROCESSING OF AGRICULTURAL COMMODITIES, AND RELATED SUBJECTS UNDER THE FAIR LABOR STANDARDS ACT

■ 1. The authority citation for part 780 continues to read as follows:

**Authority:** Secs. 1–19, 52 Stat. 1060, as amended; 75 Stat. 65; 29 U.S.C. 201–219. Pub. L. 105–78, 111 Stat. 1467.

■ 2. Amend § 780.330 by revising paragraph (b) to read as follows:

### § 780.330  Sharecroppers and tenant farmers.

\*      \*      \*      \*      \*

(b) In determining whether such individuals are employees or independent contractors, the criteria set forth in §§ 795.100 through 795.110 of this chapter are used.

\*      \*      \*      \*      \*

## PART 788—FORESTRY OR LOGGING OPERATIONS IN WHICH NOT MORE THAN EIGHT EMPLOYEES ARE EMPLOYED

■ 3. The authority citation for part 788 continues to read as follows:

**Authority:** Secs. 1–19, 52 Stat. 1060, as amended; 29 U.S.C. 201–219.

■ 4. Amend § 788.16 by revising paragraph (a) to read as follows:

### § 788.16  Employment relationship.

(a) In determining whether individuals are employees or independent contractors, the criteria set forth in §§ 795.100 through 795.110 of this chapter are used.

\*      \*      \*      \*      \*

■ 5. Add part 795 to read as follows:

## PART 795—EMPLOYEE OR INDEPENDENT CONTRACTOR CLASSIFICATION UNDER THE FAIR LABOR STANDARDS ACT.

Sec.
795.100   Introductory statement.
795.105   Determining employee or independent contractor classification under the FLSA.
795.110   Economic reality test to determine economic dependence.
795.115   Severability.

**Authority:** 29 U.S.C. 201–219.

### § 795.100  Introductory statement.

This part contains the Department of Labor's (the Department) general interpretations for determining whether workers are employees or independent contractors under the Fair Labor Standards Act (FLSA or Act). *See* 29 U.S.C. 201–19. These interpretations are intended to serve as a "practical guide to employers and employees" as to how the Department will seek to apply the Act. *Skidmore* v. *Swift & Co.*, 323 U.S. 134, 138 (1944). The Administrator of the Department's Wage and Hour Division will use these interpretations to guide the performance of their duties under the Act, unless and until the Administrator is otherwise directed by authoritative decisions of the courts or the Administrator concludes upon reexamination of an interpretation that it is incorrect. To the extent that prior administrative rulings, interpretations, practices, or enforcement policies relating to determining who is an employee or independent contractor under the Act are inconsistent or in conflict with the interpretations stated in this part, they are hereby rescinded. The interpretations stated in this part may be relied upon in accordance with section 10 of the Portal-to-Portal Act, 29 U.S.C. 251–262, notwithstanding that after any act or omission in the course of such reliance, the interpretation is modified or rescinded or is determined by judicial authority to be invalid or of no legal effect. 29 U.S.C. 259.

### § 795.105  Determining employee or independent contractor classification under the FLSA.

(a) *Relevance of independent contractor or employee status under the Act.* The Act's minimum wage, overtime pay, and recordkeeping obligations apply only to workers who are covered employees. Workers who are independent contractors are not covered by these protections. Labeling employees as "independent contractors" does not make these protections inapplicable. A determination of whether workers are employees or independent contractors under the Act focuses on the economic realities of the workers' relationship with the employer and whether the workers are either economically dependent on the employer for work or in business for themselves.

(b) *Economic dependence as the ultimate inquiry.* An "employee" under the Act is an individual whom an employer suffers, permits, or otherwise employs to work. 29 U.S.C. 203(e)(1), (g). The Act's definitions are meant to encompass as employees all workers who, as a matter of economic reality, are economically dependent on an employer for work. A worker is an independent contractor, as distinguished from an "employee" under the Act, if the worker is, as a matter of economic reality, in business for themself. Economic dependence does not focus on the amount of income earned, or whether the worker has other income streams.

### § 795.110  Economic reality test to determine economic dependence.

(a) *Economic reality test.* (1) In order to determine economic dependence, multiple factors assessing the economic realities of the working relationship are used. These factors are tools or guides to conduct a totality-of-the-circumstances analysis. This means that the outcome of the analysis does not depend on isolated factors but rather upon the circumstances of the whole activity to answer the question of whether the worker is economically dependent on the employer for work or is in business for themself.

(2) The six factors described in paragraphs (b)(1) through (6) of this section should guide an assessment of the economic realities of the working relationship and the question of economic dependence. Consistent with a totality-of-the-circumstances analysis, no one factor or subset of factors is necessarily dispositive, and the weight to give each factor may depend on the facts and circumstances of the particular case. Moreover, these six factors are not exhaustive. As explained in paragraph (b)(7) of this section, additional factors may be considered.

(b) *Economic reality factors*—(1) *Opportunity for profit or loss depending on managerial skill.* This factor considers whether the worker exercises managerial skill that affects the worker's economic success or failure in performing the work. The following facts, among others, can be relevant: whether the worker determines or can meaningfully negotiate the charge or pay for the work provided; whether the worker accepts or declines jobs or chooses the order and/or time in which the jobs are performed; whether the worker engages in marketing, advertising, or other efforts to expand their business or secure more work; and whether the worker makes decisions to hire others, purchase materials and equipment, and/or rent space. If a worker has no opportunity for a profit or loss, then this factor suggests that the worker is an employee. Some decisions by a worker that can affect the amount of pay that a worker receives, such as the decision to work more hours or take more jobs, generally do not reflect the

exercise of managerial skill indicating independent contractor status under this factor.

(2) *Investments by the worker and the employer.* This factor considers whether any investments by a worker are capital or entrepreneurial in nature. Costs borne by a worker to perform their job (*e.g.,* tools and equipment to perform specific jobs and the workers' labor) are not evidence of capital or entrepreneurial investment and indicate employee status. Investments that are capital or entrepreneurial in nature and thus indicate independent contractor status generally support an independent business and serve a business-like function, such as increasing the worker's ability to do different types of or more work, reducing costs, or extending market reach. Additionally, the worker's investments should be considered on a relative basis with the employer's investments in its overall business. The worker's investments need not be equal to the employer's investments, but the worker's investments should support an independent business or serve a business-like function for this factor to indicate independent contractor status.

(3) *Degree of permanence of the work relationship.* This factor weighs in favor of the worker being an employee when the work relationship is indefinite in duration or continuous, which is often the case in exclusive working relationships. This factor weighs in favor of the worker being an independent contractor when the work relationship is definite in duration, non-exclusive, project-based, or sporadic based on the worker being in business for themself and marketing their services or labor to multiple entities. This may include regularly occurring fixed periods of work, although the seasonal or temporary nature of work by itself would not necessarily indicate independent contractor classification. Where a lack of permanence is due to operational characteristics that are unique or intrinsic to particular businesses or industries and the workers they employ, rather than the workers' own independent business initiative, this factor is not indicative of independent contractor status.

(4) *Nature and degree of control.* This factor considers the employer's control, including reserved control, over the performance of the work and the economic aspects of the working relationship. Facts relevant to the employer's control over the worker include whether the employer sets the worker's schedule, supervises the performance of the work, or explicitly limits the worker's ability to work for others. Additionally, facts relevant to the employer's control over the worker include whether the employer uses technological means of supervision (such as by means of a device or electronically), reserves the right to supervise or discipline workers, or places demands on workers' time that do not allow them to work for others or work when they choose. Whether the employer controls economic aspects of the working relationship should also be considered, including control over prices or rates for services and the marketing of the services or products provided by the worker. Control implemented by the employer for purposes of complying with legal obligations, safety standards, or contractual or customer service standards may be indicative of control. More indicia of control by the employer favors employee status; more indicia of control by the worker favors independent contractor status.

(5) *Extent to which the work performed is an integral part of the employer's business.* This factor considers whether the work performed is an integral part of the employer's business. This factor does not depend on whether any individual worker in particular is an integral part of the business, but rather whether the function they perform is an integral part. This factor weighs in favor of the worker being an employee when the work they perform is critical, necessary, or central to the employer's principal business. This factor weighs in favor of the worker being an independent contractor when the work they perform is not critical, necessary, or central to the employer's principal business.

(6) *Skill and initiative.* This factor considers whether the worker uses specialized skills to perform the work and whether those skills contribute to business-like initiative. This factor indicates employee status where the worker does not use specialized skills in performing the work or where the worker is dependent on training from the employer to perform the work. Where the worker brings specialized skills to the work relationship, it is the worker's use of those specialized skills in connection with business-like initiative that indicates that the worker is an independent contractor.

(7) *Additional factors.* Additional factors may be relevant in determining whether the worker is an employee or independent contractor for purposes of the FLSA, if the factors in some way indicate whether the worker is in business for themself, as opposed to being economically dependent on the employer for work.

### § 795.115   Severability.

If any provision of this part is held to be invalid or unenforceable by its terms, or as applied to any person or circumstance, or stayed pending further agency action, the provision shall be construed so as to continue to give the maximum effect to the provision permitted by law, unless such holding shall be one of utter invalidity or unenforceability, in which event the provision shall be severable from this part and shall not affect the remainder thereof.

Martin J. Walsh,
*Secretary of Labor.*
[FR Doc. 2022–21454 Filed 10–11–22; 8:45 am]
BILLING CODE 4510–27–P

2022-67757 / Court: 133

# Exhibit D

DAINIUS BARYSAS,                          §
                                         §
                                         §
          Claimant,                      §
                                         §          HON. SUSAN SOUSSAN,
vs.                                      §          ARBITRATOR
                                         §
UBER TECHNOLOGIES, INC.,                 §
                                         §
          Respondent.                    §
                                         §

## CLAIMANT'S RESPONSE TO RESPONDENT'S MOTION FOR PROTECTIVE ORDER TO PREVENT THE DEPOSITION OF ALEX ROSENBLAT AND CLAIMANT'S MOTION TO COMPEL THE DEPOSITION OF UBER EMPLOYEE ALEX ROSENBLAT

TO THE HONORABLE KATIE KENNEDY, ARBITRATOR:

Claimant, Dainius Barysas, files this Response to Respondent's Motion to Quash the Deposition of Alex Rosenblat and Motion to Compel the Deposition of Alex Rosenblat, and will respectfully show the Court as follows:

I.      **SUMMARY OF POSITION**

Alex Rosenblat is not an Apex Witness.

Alex Rosenblat is one of the world's foremost researchers of Uber and its practices pertaining to Uber Drivers. Alex Rosenblat was hired by Uber as Head of Marketplace Policy, Fairness & Research based on her experience investigating Uber and Uber's practices pertaining to its Uber Drivers.  Alex Rosenblat was hired by Uber to implement change as it relates to Uber's treatment of its Uber Drivers. Alex Rosenblat's testimony sought by deposition is relevant, discoverable, and should be compelled.

II.     **AUTHORITIES**

1

Pursuant to Federal Rule of Civil Procedure 26(b)(1), a party may obtain discovery of any nonprivileged matter "relevant to any party's claim or defense." FED. R. CIV. P. 26(b)(1). "A discovery request is relevant when the request seeks admissible evidence or 'is reasonably calculated to lead to the discovery of admissible evidence.'" *Crosby v. La. Health Serv. & Indem. Co.*, 647 F.3d 258, 262 (5th Cir. 2011) (citations omitted). A party may, by oral questions, depose any person, including a party, without leave of court except as provided in Rule 30(a)(2). FED. R. CIV. P. 30(a)(1).

Federal courts permit the depositions of high-level executives, also known as apex executives, when conduct and knowledge at the highest levels of the corporation are relevant to the case. See, e.g., *Kimberly-Clark Corp. v. Cont'l Cas. Co.*, No. 3:05-CV-0475-D, 2006 U.S. Dist. LEXIS 86469, 2006 WL 3436064, at *2 (N.D. Tex. Nov. 29, 2006). However, "the Fifth Circuit has recognized the need for first utilizing less-intrusive means before taking an apex deposition, **by way of deposing lesser-ranking employees."** *Schmidt v. Goodyear Tire & Rubber Co.*, 2003 U.S. Dist. LEXIS 28130, at *3 (E.D. Tex. Jan. 7, 2003) (citing Salter v. Upjohn Co., 593 F.2d 649 (5th Cir. 1979)). (Emphasis added here.)

- *Barysas* **Scheduling Order**

On December 14, 2020, the Initial Scheduling Order was signed that allows the Claimant to take 4 fact witness depositions:

7.  <u>Discovery Permitted</u>

    A.  <u>Depositions</u>:  The named party may take the deposition of the other named party.  The party that is a corporation or business entity shall make available to its party-opponent, if requested, one or more corporate representatives having knowledge of those matters as may be specified in a Notice of Deposition.  The party shall also be permitted to depose, without obtaining further leave from the Arbitrator, not more than 4 other fact witnesses, as well as any expert witness designated by a party-opponent.  Each oral deposition shall not exceed 7 hours' duration.  With respect to all depositions, there shall be no speaking objections or interference with the ability of counsel to elicit testimony from a witness subject to privilege objections and instructions.

2

*See* Initial Scheduling Order at 7(A), p. 3.

### III.   FACTS

#### a.   **Uber's High-Level Executives**

Uber's website maintains a "Leadership" tab that identifies its executive team. *See* Exhibit 1, Printout taken from  https://www.uber.com/newsroom/leadership/).   According to Uber's website. members of the Uber's Executive Team include:

1. Dara Khosrowshahi - Chief Executive Officer;
2. Nelson Chai - Chief Financial Officer;
3. Jill Hazelbaker - Senior Vice President, Marketing & Public Affairs;
4. Nikki Krishnamurthy - Chief People Officer;
5. Tony West - Chief Legal Officer;
6. Gus Fuldner - Vice President, Safety & Core Services;
7. Pierre-Dimitri Gore-Coty - Senior Vice President, Delivery;
8. Sundeep Jain - Chief Product Officer;
9. Bo Young Lee - Chief Diversity and Inclusion Officer;
10. Andrew Macdonald - Senior Vice President, Mobility & Business Operations; and
11. Sukumar Rathnam - Chief Technology Officer.

*See* Exhibit 1, Uber Executives and Board of Directors.

Ubers Leadership tab also identifies Uber's Board of Directors as:

1. David Trujillo – Partner, TPG Capital
2. Yasir Al-Rumayyan - Managing Director Saudi Arabia's Public Investment Fund
3. Wan Ling Martello - Former Executive Vice President Nestlé
4. Dara Khosrowshahi - CEO Uber
5. Ursula Burns - CEO and Chairman VEON
6. John Thain - Former Chairman and CEOCIT Group
7. Robert Eckert - Chairman Emeritus Mattel
8. Ronald Sugar (Chair) - Former Chairman and CEO Northrop Grumman
9. Mandy Ginsberg - Former CEO Match Group
10. Revathi Advaithi – CEO Flex
11. Alexander Wynaendts - Former CEO and Chairman Aegon NV

*See* Exhibit 1, Uber Executives and Board of Directors.

#### b.   **Uber's Position: Head of Marketplace Policy, Fairness & Research**

On or about October 10, 2020, Uber posted on its website a new job posting for the position of "Head of Policy, Marketplace, & Fairness." *See* Exhibit 2, Head of Policy, Marketplace & Fairness job posting. The posting **does not** seek an executive for the position.  This new Uber position sought an applicant who could "orchestrate the integration of policy considerations into product development, and strengthen the integrity and transparency of [Uber's] practices." *Id.* at 1, Para. 2.

Uber sought an applicant that could "work with cross functional partners to develop marketplace principles, as well as participate in processes that improve the operational functionality of [Uber's] pricing, matching and positioning." *Id,* Ex. 2 at p. 1, Para 2.  The position seeks an individual to "partner with product, legal, finance, compliance, comms, and policy teams to coordinate engaging tactics, and drive awareness of [Uber's] marketplace initiatives including current and future commitments." *Id* at 1, Para. 4.  Uber goes on to specifically bullet point four important objectives for the Head of Marketplace Policy, Fairness & Research.  Uber desires the applicant who accepts the position to:

- Develop and lead the policy strategy to drive trust, fairness, accountability and transparency into our marketplace product team;
- Work to deliver on Uber's principles and commitments as well as initiate new releases to build more credibility;
- Lead product counsel on policy issues in relation to marketplace, including coordinating efforts across the Central policy and local government relations/public affairs teams; and
- Own external communications with the policy and academic community broadly and specifically in the areas of focus. In this capacity, you might (1) facilitate a recurring publication, webinar series or roundtable highlighting specific success stories, use cases and/or future product functionality, or (2) develop a panel of leading specialists to contribute their findings and key insights to Uber's marketplace.

*See* Exhibit 2 at p. 1, Bulleted List.

In January of 2021, Uber hired Alex Rosenblat for the position of Head of Marketplace Policy, Fairness, & Research.

### c.   <u>Who is Alex Rosenblat?</u>

Alex Rosenblat is a social scientific researcher, an academic author, and journalistic writer/blogger who authored the book *Uberland: How Algorithms are Rewriting the Rules of Work. See* Exhibit 3, Cover of Alex Rosenblat, *Uberland: How Algorithms are Rewriting the Rules of Work* (2018); *See also* Exhibit 4, *Uberland: How Algorithms are Rewriting the Rules of Work* (2018) Appendix 1, Methodology, p. 209. In authoring *Uberland*, Ms. Rosenblat used a qualitative ethnography methodology, performing participant-observations with over four hundred drivers by riding as a passenger. *See* Ex. 4, *Uberland,* Appendix 1, Methodology at 210. Additionally, Ms. Rosenblat conducted research through online driver forums, which Ms. Rosenblat considered to be 'virtual field sites." *See Uberland,* Appendix 1, Methodology at 213. As part of Ms. Rosenblat's research for *Uberland*, "[t]he field sites that are subjects of deeper ethnographic and investigative analysis include Austin, Texas; Dallas and Forth Worth area in Texas… New York City and portion of New Jersey close to the city…" Appendix 1, Methodology at 212. Additionally, Ms. Rosenblat actively followed and researched Uber Driver forum groups, blogs, digital chats, and websites which had a combined total of three-hundred thousand members. *See Uberland,* Appendix 1, Methodology at 213-214.

To write *Uberland,* Alex Rosenblat studied Uber drivers from mid-2014 through the winter of 2018. *See* Exhibit 5, Excerpt from Alex Rosenblat, *Uberland*, Introduction, p. 6.

A simple review of the table of contents of Alex Rosenblat's *Uberland* identifies the relevance of Rosenblat's research to the Claimant's Claims. Rosenblat's research in *Uberland* tackles Uber's treatment of drivers in chapters 1-3, Uber's management of the money exchange

between it and the Drivers in Chapter 4, Uber's use of algorithm to manage drivers in Chapter 5, and Uber's public policy / political tactics in Chapter 6. *See Uberland*, Table of Contents. *See* Exhibit 6, Excerpt from Alex Rosenblat, *Uberland*, Table of Contents.

According to Ms. Rosenblat's website (https://alexrosenblat.com/), in addition to her book *Uberland*, Ms. Rosenblat has authored the following Uber and/or Gig Economy works and participated in Uber related speeches:

- Authored or Co-Authored 17 published articles on Uber and/or Gig Economy;
- Authored or Co-Authored 7 Academic papers and Working Papers on Uber / Gig Economy,
- Lead dozens of "Talks" and/or Keynote Speeches related to Uber / Gig Economy at law schools universities / conferences / conventions;

*See* Alex Rosenblat's website, https://alexrosenblat.com/, Media tab; Articles tab; Working Papers tab; Academic tab; Talks tab.

Ms. Rosenblat has provided testimony relating to her ethnographical research of Uber to the United Nations. (*See* link of video of Ms. Rosenblat's Testimony at UN General Assembly, Second Committee, 74th Session – October 24, 2019 - *https://youtu.be/eOfBhvCFv4Q.)* According to her testimony given to the U.N. General Assembly Alex Rosenblat is a technology ethnographer who studied Uber Drivers over the course of several years. *See* U.N. General Assembly Testimony, *https://youtu.be/eOfBhvCFv4Q* at :01-:20.  Alex Rosenblat is a technology ethnographer and for four years she studied how Uber Drivers experience technology at work. *Id.*  In her research, Alex Rosenblat went across more than 25 cities in the United States and Canada and observed about 300,000 Uber Drivers online and in online forums. *See* U.N. General Assembly Testimony, *https://youtu.be/eOfBhvCFv4Q*, :20 – :43.) Ms. Rosenblat's research found that, "although Uber Driver's are promoted as entrepreneurs, they are actually managed by algorithms that enact the

rules and policies that Uber sets for how drivers should behave on the job." *See* U.N. General Assembly Testimony, *https://youtu.be/eOfBhwCFv4Q*, :20 – :43.)

When Ms. Rosenblat was hired by Uber, she posted the following on her Twitter social media platform:



Twitter Post, Alex Rosenblat, January 13, 2021.

Likewise, in February of 2021, media outlets learned that Alex Rosenblat was hired by Uber.  In an article from the Seattle Times (that was also published by Bloomberg), it is reported that, "[i]n an emailed statement, Uber said it hired Rosenblat because the company wants "people at Uber who care about driver issues and who aren't afraid to challenge our thinking on any given issue."" *See*  Exhibit 7, Bloomberg, *Uber hires prominent critic to focus on treatment of drivers*, Seattle Times, Feb. 17, 2021, https://www.seattletimes.com/business/uber-hires-prominent-critic-to-focus-on-treatment-of-drivers/). According to the article, Rosenblat is quoted that she changed her mind about joining Uber and accepted the position because, "[t]here are new ways I can use my expertise now, inside the company." *Id.*

## IV.   ARGUMENT

Dainius Barysas drove for Uber from 2014 to 2019. From 2014 – 2017, Mr. Barysas drove in New York City.  In 2017 Mr. Barysas moved to Houston and continued driving for Uber until 2019.

Alex Rosenblat is one of the world's foremost researchers of Uber and its practices pertaining to Uber Drivers. Indeed, Ms. Rosenblat has performed methodical and scientific based research of Uber's practices and polices concerning Uber Drivers since at least 2014.   Alex Rosenblat's book *Uberland* is based on her ethnographical research of Uber from 2014-2018. Additionally, Alex Rosenblat has been published many times over relating to Uber's practices with Uber Drivers.

Ms. Rosenblat clearly maintains specific and unique, relevant knowledge and information pertaining to Uber Drivers like Dainius Barysas.  The periods that Alex Rosenblat researched Uber overlap completely with the period of time that Dainius Barysas drove for Uber. Additionally, Alex Rosenblat's research includes drivers from both New York and Texas, which is particularly

relevant because Claimant Barysas drove in both New York and Texas.  Finally, according to Alex Rosenblat, she was hired **during the pendency of Barysas's claims** to "bring research into practice around core fairness concerns" written about in *Uberland* by Rosenblat.

Ms. Rosenblat's research experience is highly unique and relevant to the claim here.  It is clear that Ms. Rosenblat was hired based on her knowledge as it relates to Uber's practices.

### a.  Rosenblat is not an Apex Witness.

Uber's Motion for Protective Order relies on Alex Rosenblat receiving protections provided to a corporation's highest-level employees. In those circumstances, the so called "Apex Witness" is offered *some* protection from deposition unless it can be shown that the witness has unique and specific personal knowledge of discoverable information. **Uber offers zero evidence that Rosenblat is an Apex witness.**

Uber's executives and Board of Directors are identified on their website. *See* Exhibit 1, Uber Executives and Board of Directors. Alex Rosenblat is not listed as part of Uber's executive team and is not an employee at the "highest levels of the corporation." Indeed, Alex Rosenblat is not listed anywhere on Uber's website and a search of the "Uber Newsroom" for "Alex Rosenblat" generates zero results. *See* Exhibit 8 - Uber Newsroom Search Results.  But for the public statements made by both Uber and Alex Rosenblat when the initial hiring took place, the public would not know that Alex Rosenblat even works for Uber.

Finally, Uber's Job Posting for Head of Marketplace Policy, Fairness & Research (Exhibit 2) does not indicate that the position is for an executive position or high-level corporate official. As shown in the Job Posting, the position specifically seeks a "public policy manager" that performs cross functional tasks with other departments such as the product department, legal department, finance department, compliance department, comms department, and policy

department.  *See* Exhibit 2, Job Posting for Head of Marketplace Policy, Fairness & Research at 1.

> **b.  *In arguendo*, even if Rosenblat were an Apex witness, she maintains unique and specific personal knowledge relevant to Claimant Barysas's claims.**

As stated above, Alex Rosenblat is not an Apex Witness; however, even if she were, it is clear that Alex Rosenblat maintains a wealth of unique and specific personal knowledge of discoverable information relevant to the claims made by Claimant Barysas.  Both Alex Rosenblat's and Uber's public statements clearly show that Alex Rosenblat was hired based on her knowledge and research related to Uber with a goal to initiate change.

As the Arbitrator is well aware, in order for the Claimant to prove that he was misclassified as an independent contractor, he must show that Uber's right to control and exertion of actual control by Uber during the course and scope of employment renders the contractual classification of the Claimant as an independent contractor a sham.

Uber's right to control and exertion of actual control is exhibited by the way they treat their drivers.  Alex Rosenblat has spent a considerable amount of her career studying Uber's control.

Alex Rosenblat's research of Uber from 2014 up until she was hired by Uber in early 2021 provide unique and specific knowledge pertaining to Uber and Uber's practices.  Moreover, discovery related to Alex Rosenblat's position as Head of Marketplace Policy, Fairness & Research at Uber is relevant to the case.

Both Uber and Ms. Rosenblat acknowledge that she was hired because of her unique experience in studying Uber to "challenge [Uber's] thinking." *See* Exhibit 7 Seattle Times Article. Also, Ms. Rosenblat claims she was hired to "bring [her] research into practice around core fairness concerns [she] wrote about for years in *Uberland*."  *See supra* Rosenblat Twitter entry. In her

tweet, Ms. Rosenblat hoped her hiring would leverage her insights to "make things better." *See supra*, Rosenblat Twitter entry.

Alex Rosenblat's testimony related to her experience prior to and after being hired by Uber is highly relevant to the claims and defenses in the current arbitration.

> **c. Uber's claim that testimony of Alex Rosenblat is not obtainable because she does not know Claimant Barysas is unsupported.**

Uber finally attempts to shield Ms. Rosenblat from deposition because she has no specific knowledge of Dainius Barysas and did not interview Barysas for her book *Uberland*.

The Federal Rules of Civil Procedure do not require a showing that a corporate fact witness have personal knowledge of a claimant/plaintiff or require a corporate fact witness to have met the claimant/plaintiff in order to be deposed.  If this were the standard, corporate fact witnesses would rarely be deposed and the corporation would be unreasonably protected from tendering corporate fact witnesses.

As stated, Uber's treatment of Uber Drivers is central to the claims made by Claimant Barysas.  Alex Rosenblat's research over her career concerning Uber's treatment of Uber Drivers is overwhelmingly relevant to the claims made by Claimant Barysas. Additionally, the work done by Alex Rosenblat since being hired by Uber is overwhelmingly relevant as it directly impacts Uber's policies and procedures that were in practice when Barysas drove for Uber.

**V.     Conclusion**

For the reasons stated herein, Claimant Barysas respectfully requests that the Arbitrator deny Respondent Uber's motion for protection and compel Alex Rosenblat's deposition to go forward on a date to be determined by the parties. Plaintiff further requests all other relief, in law or equity, to which she may be justly entitled.

11

KHERKHER GARCIA, LLP

By:     _____/s/ Bret Stanley_____
Bret Stanley
Steve Kherkher
Kathryn Hiett

2925 Richmond Ave., Suite 1560
Houston, TX  77098
(713) 333-1030 / (713) 333-1029 (fax)
BStanley@KherkherGarcia.com
skherkher@kherkhergarcia.com
khiett@kherkhergarcia.com

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document has been forwarded via certified mail, return receipt requested, on this the 7th day of June, 2021, to the following counsel:

Kimberly R. Miers
Allison Williams
Nicole S. LeFave
Abby Bochenek
Collin Quigley
LITTLER MENDELSON, P.C.
kmiers@littler.com
acwilliams@littler.com
nlefave@littler.com
abochenek@littler.com
cquigley@littler.com
sbehnia@littler.com
smendoza@littler.com
scornell@littler.com
preyes@littler.com

By:     _____/s/ Bret Stanley_____
Bret Stanley

# Exhibit E



| DAINIUS BARYSAS, | § | |
| --- | --- | --- |
| | § | |
| Claimant, | § | |
| | § | |
| vs. | § | HON. SUSAN SOUSSAN, |
| | § | ARBITRATOR |
| UBER TECHNOLOGIES, INC., | § | |
| | § | |
| Respondent. | § | |
| | § | |
| | § | |

## RESPONDENT UBER TECHNOLOGIES, INC.'S MOTION FOR PROTECTIVE ORDER TO PREVENT THE APEX DEPOSITION OF ALEX ROSENBLAT

Respondent Uber Technologies, Inc. ("Uber") hereby files this Motion for Protective Order to Prevent the Apex Deposition of Alex Rosenblat (the "Motion"), and respectfully states as follows:

## I.
## SUMMARY OF ARGUMENT

Rather than obtaining information from a corporate representative deposition or the deposition of a witness who has personal knowledge of facts that are relevant to the claims and defenses asserted in this arbitration, Claimant sent Uber a deposition notice for Uber's newly hired Head of Marketplace Policy, Fairness and Research, Alex Rosenblat. Respondent moves for a protective order because as a high-level executive, Ms. Rosenblat does not possess unique and specific personal knowledge of Claimant's claims in this matter.

Notably, Ms. Rosenblat has never met Claimant, and she did not work at Uber during the relevant time period.  In fact, Ms. Rosenblat did not, at any time, work for Uber when Claimant was utilizing the Uber App for transportation opportunities. Ms. Rosenblat is not identified as someone with knowledge in Claimant's discovery responses, nor is she being identified by Uber as a corporate representative.  Her knowledge is wholly irrelevant.  Even if Claimant could show relevance (which he cannot), he is required to first utilize less intrusive means to obtain the

information sought, which he has not done.  On May 11, 2021, Claimant served a *proposed* corporate representative deposition notice identifying 50 proposed topics of testimony.  The parties are in the process of conferring on the scope of those topics – which eclipse the issues presented in this single-claimant arbitration.  Seeking Ms. Rosenblat's deposition in this matter is a highly intrusive and burdensome strategy that serves no purpose other than to harass Respondent and Ms. Rosenblat.[1]

Rather than requesting the Arbitrator's assistance, Counsel for Claimant unilaterally noticed Ms. Rosenblat's deposition knowing that Uber opposes it and that Uber recently quashed Ms. Rosenblat's deposition in another pending arbitration.  Because Ms. Rosenblat has no personal knowledge of Claimant or his claims and because Claimant has yet to depose Uber's corporate representative, Uber respectfully requests that the Arbitrator grant its Motion, quash the deposition notice for Ms. Rosenblat, and issue an order protecting Uber from Claimant's intrusive, harassing discovery practices.

## II.
## FACTUAL BACKGROUND

In this arbitration, Claimant brings claims for compensation pursuant to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.* and Texas common law.  Specifically, Claimant brings three claims under the FLSA: (1) failure to pay minimum wage; (2) failure to pay overtime wages for hours worked over forty in a workweek; and (3) failure to maintain records as required by the FLSA. Claimant also brings claims for alleged unjust enrichment, unlawful retention of tips, and improper "kickbacks."  The relevant time period is March 12, 2017 to July 19, 2018, or

---

[1] Pursuant to the terms of the 2015 Raiser Technology Services Agreement that Claimant accepted, arbitration proceeds pursuant to the JAMS Streamlined Arbitration Rules and Procedures. *See* Exh. 4, Raiser Technology Services Agreement dated December 11, 2015, § 15.3 (iii). Pursuant to Rule 13 of the JAMS Rules, the necessity for additional information beyond the initial disclosure exchanges "shall be determined by the Arbitrator based upon the reasonable need for the requested information, the availability of other discovery options, and the burdensomeness of the request on the opposing Parties and the witness." *Id.*

the last date that Claimant used the Uber app to generate leads.[2]

Claimant served Uber with his Arbitration Demand via letter dated March 12, 2020. The present action was initiated before Arbitrator Susan Soussan on October 29, 2020. An initial conference was held before the Arbitrator on December 7, 2020. The Arbitrator entered a Scheduling Order on December 14, 2020, which permits each party to take up to four fact witness depositions.   Claimant filed his Specification of Claims on January 15, 2021. Uber filed its response on February 5, 2021.

To date, the parties have engaged in extensive written discovery. Relevant to this Motion, Uber has continuously raised Claimant's failure to specify by name any witnesses other than himself and "various witnesses connected to Respondent Uber." On April 29, 2021, Uber deposed Claimant. During his deposition, Claimant did not disclose meeting with or speaking to Ms. Rosenblat.

Nonetheless, on May 11, 2021, Claimant informed Uber that he intended to depose Ms. Rosenblat as a fact witness. **Exhibit 1**, E-mail from B. Stanley dated May 11, 2021.  Despite successfully quashing the deposition notice of Ms. Rosenblat in another pending arbitration, Claimant's counsel almost immediately thereafter unilaterally noticed Ms. Rosenblat's deposition for June 14, 2021 via ZOOM in this arbitration. **Exhibit 2**, Claimant's Notice of Oral and Videotaped Deposition of Alex Rosenblat; **Exhibit 3**, E-mail from B. Stanley dated May 20, 2021.

Ms. Rosenblat has been an employee of Uber for approximately four months, or since January 2021. She is currently located in California. Claimant stopped utilizing the Uber App to obtain transportation opportunities in July 2018, approximately 2 ½ years _before_ Ms. Rosenblat started working for Uber.  Any knowledge that Ms. Rosenblat has as the Head of Marketplace

---

[2] Uber does not concede that a three-year statute of limitations applies, but acknowledges for purposes of discovery only that the relevant time period extends to three years prior to when Claimant filed his Arbitration Demand.

Policy, Fairness, and Research in her short tenure with Uber has no bearing on Claimant's contractual relationship with Uber that ended 2 ½ years prior.

As Head of Marketplace Policy, Fairness and Research, Ms. Rosenblat is a high-level executive. Her time is sought via numerous daily meetings and on high-profile projects, severely limiting her availability. Prior to working for Uber, Ms. Rosenblat worked as a labor researcher and author, writing a 2018 book entitled "Uberland: How Algorithms Are Rewriting the Rules of Work." Ms. Rosenblat interviewed drivers for her book. There is no evidence that Ms. Rosenblat met, much less interviewed, Claimant nor does Claimant make any arguments or even suggest that Ms. Rosenblat has personal knowledge of Claimant or his claims in this arbitration.

As demonstrated below, serving the Notice is a blatant fishing expedition and thinly veiled effort to harass Uber. Ms. Rosenblat's testimony would be wholly irrelevant to Claimant's Arbitration Demand, Claimant's Specification of Claims, and Respondent's Response to Claimant's Specification of Claims. Accordingly, Uber moves for a protective order protecting Uber from presenting Ms. Rosenblat.

### III.
### ARGUMENT & AUTHORITIES

**A.**    **Claimant's Attempt to Depose Alex Rosenblat Violates the Parties' Agreement and the Arbitrator's Order.**

Pursuant to the terms of the 2015 Raiser Technology Services Agreement that Claimant accepted, arbitration proceeds pursuant to the JAMS Streamlined Rules and Procedures. **Exhibit 4**, Raiser Technology Services Agreement ("Agreement") dated December 11, 2015, § 15.3 (iii). Pursuant to Rule 13 of the JAMS Rules, the necessity for additional information beyond the initial disclosure exchanges "shall be determined by the Arbitrator based upon the reasonable need for the requested information, the availability of other discovery options, and the burdensomeness of the request on the opposing Parties and the witness." *Id.* Here, while the Arbitrator's Order

4

permits four fact witnesses, Ms. Rosenblat is not a proper fact witness.  It is evident that Claimant

seeks to unreasonably expand the discovery contemplated in the Agreement and the Order for no

purpose other than to harass Uber and increase defense costs.

Pursuant to the Agreement, the parties agreed to streamline the dispute resolution

procedure.  Claimant should not be permitted to abuse the discovery process by requesting

frivolous apex depositions that will have no bearing on the outcome of this arbitration.

**B.**     **Uber Has Good Cause And A Specific Need To Protect Ms. Rosenblat From Deposition.**

1.     <u>Legal Standard</u>

While Federal Rule of Civil Procedure ("Rule") 26(b)(1) provides that "[p]arties may

obtain discovery regarding any non-privileged matter that is relevant to any party's claim or

defense," it also specifies that discovery must be "proportional to the needs of the case, considering

the importance of the issues at stake in the action, the amount in controversy, the parties' relative

access to relevant information, the parties' resources, the importance of the discovery in resolving

the issues, and whether the burden or expense of the proposed discovery outweighs its likely

benefit." FED. R. CIV. P. 26(b)(1).  The Arbitrator may limit discovery if the discovery sought is

"unreasonably cumulative or duplicative," or is obtainable "from some other source that is more

convenient, less burdensome, or less expensive." FED. R. CIV. P. 26(b)(2)(C) (i). The Arbitrator

may also limit discovery when "the proposed discovery is outside the scope permitted by Rule

26(b)(1)," including when the discovery sought is irrelevant to any party's claim or defense. FED

R. CIV. P. 26(b)(2)(C)(iii).

Relating to protective orders:

Under Federal Rule of Civil Procedure 26(c), the Court may, for good cause, issue
an order to protect a party or person from annoyance, embarrassment, oppression,
or undue burden or expense.  The burden is upon the party seeking the protective
order to show the necessity of its issuance, which contemplates a particular and

specific demonstration of fact as distinguished from stereotyped and conclusory statements.  A protective order is warranted in those instances in which the party seeking it demonstrates good cause and a specific need for protection.  The Court has broad discretion in determining whether to grant a motion for a protective order.

*Oyekwe v. Rsch. Now Grp., Inc.*, No. 3:19-CV-1085-S-BN, 2020 WL 1064868, at *1 (N.D. Tex. Mar. 4, 2020) (omitting internal citations, quotations and alliterations) (granting protective order under Rule 26(c) preventing the depositions of high-level executives).

2.       Claimant Must First Utilize Less-Intrusive Means Before Deposing Ms. Rosenblat

While the JAMS Rules apply, the Arbitrator may also be guided by the federal rules and federal precedent. "[F]ederal courts permit the depositions of high-level executives, sometimes referred to as apex executives,[3] when conduct and knowledge at the highest levels of the corporation are relevant to the case" and when the high-level executive has unique personal knowledge of the plaintiff's claims. *Oyekwe*, 2020 WL 1064868 at *2-3.  However, the Fifth Circuit mandates using a less-intrusive means before taking a high-level executive deposition, recognizing the special burdens imposed by such depositions and their potential for harassment and abuse. *See Salter v. Upjohn Co.*, 593 F.2d 649 (5th Cir. 1979).  Therefore, "[u]nless the executive possesses 'unique personal knowledge' about the controversy, the court should regulate the discovery process to avoid 'oppression, inconvenience, and burden' to the executive and the corporation." *Oyekwe*, 2020 WL 1064868 at *2 (quoting *Robinson v. Nexion Health at Terrell, Inc.*, No. 3:12-cv-3853-L-BK, 2014 WL 12915533, at *2 (N.D. Tex. Apr. 16, 2014)).  The proper means to regulate such discovery is via a protective order. *Id.*

---

[3] If operating under Texas state law, the apex doctrine would apply and mandate quashing Ms. Rosenblat's deposition. *In re Alcatel USA, Inc.*, 11 S.W.3d 173, 175 (Tex. 2000) ("We held that the apex deposition guidelines apply '[w]hen a party seeks to depose a corporate president or other high level corporate official.'" (quoting *Crown Cent. Petroleum Corp. v. Garcia*, 904 S.W.2d 125, 128 (Tex. 1995)).

a.  *Ms. Rosenblat Does Not Have Unique, Personal Knowledge Relevant To The Case*

Claimant cannot demonstrate that Ms. Rosenblat has unique, personal knowledge of his claims in this arbitration.  "[U]nique personal knowledge must be truly unique—the deposition [will] not be allowed where the information could be had through interrogatories, deposition of a designated spokesperson, or deposition testimony of other persons." *Baine v. Gen. Motors Corp.*, 141 F.R.D. 332, 336 (M.D. Ala.1991) (granting defendant's motion for protective order concerning deposition of vice president of General Motors).  Here, Ms. Rosenblat began working for Uber in California in January 2021 as the Head of Marketplace Policy, Fairness and Research.  Claimant's claims involve his time as a rideshare driver generating leads via Uber's app in the Houston market, from March 2017 to July 2018.  Ms. Rosenblat will therefore have <u>no personal knowledge</u> of what occurred "at the highest levels" of Uber during the relevant time period because she did not work there until approximately 2 ½ years later.  It is further uncontested that Ms. Rosenblat and Claimant never met or interacted in any way.  As such, Ms. Rosenblat will also have <u>no personal knowledge</u> of any facts specific to his claims in this case.

Likely, Claimant seeks Ms. Rosenblat's deposition because of cynical statements she made regarding Uber prior to her employment. These statements are not unique or specific to Claimant, and to the extent Claimant believes that Ms. Rosenblat has knowledge of his experience as a driver based on her pre-2021 research related to Uber drivers generally, this belief still fails to establish that her knowledge is unique and specific to Claimant's claims.  There is no evidence that Ms. Rosenblat interviewed or otherwise interacted with Claimant for her research.  Any testimony concerning such research would, therefore, be outside of Ms. Rosenblat's role as an Uber employee and would be purely speculative and ultimately irrelevant to this arbitration.

Tellingly, throughout four months of discovery, Claimant did not even identify Ms. Rosenblat as an individual with knowledge of his claims, despite numerous requests by Uber seeking exactly that information. Uber's Interrogatory No. 1, for example, seeks the "[i]dentity of each person known or believed by you to have knowledge or information related to any of the allegations in your Arbitration Demand." **Exhibit 5**, Respondent's First Set of Interrogatories to Claimant dated January 22, 2021, at 12.  In his answer to this interrogatory, Claimant identifies "Claimant Barysas and various witnesses connected to Respondent Uber." **Exhibit 6**, Claimant's Responses to Respondent's First Set of Interrogatories dated February 22, 2021, at 16.  Respondent subsequently followed up seeking the identity of these "various witnesses connected to Respondent Uber" in a meet and confer letter, e-mails, and a telephonic meet and confer conference; Claimant did not identify Ms. Rosenblat in any supplemental interrogatory answers.

Ms. Rosenblat is not a proper fact witness given her lack of knowledge regarding Claimant and Uber's policies and practices during the relevant time period.  Rather, the proper witness for the information Claimant seeks is a corporate representative via Rule 30(b)(6).

  b. *Claimant Must First Seek To Obtain Information Through Less Burdensome Means*

The Fifth Circuit and lower courts are clear that before noticing a high-level executive deposition, a party must first attempt to seek information through less burdensome means of discovery. *Salter*, 593 F.2d at 651 (affirming district court judgment granting protective order, opining that plaintiff would "very likely" abandon the request to take the executive's deposition after taking the depositions of individuals with direct knowledge of the relevant facts); *Robinson*, 2014 WL 12915533 at *3 (issuing protective order and recognizing that while the executive may have relevant knowledge, plaintiffs must first utilize less intrusive means); *Gauthier v. Union Pac. R. Co.,* No. CIVA1:07CV12(TH/KFG), 2008 WL 2467016, at *5 (E.D. Tex. June 18, 2008)

(quashing the deposition of defendant's executives because plaintiff did not "first attempt to [seek] information through less burdensome means of discovery . . .," including taking a Rule 30(b)(6) deposition); *c.f. Baine,* 141 F.R.D. at 335 (granting motion for protective order, stating that "deposing [the executive] at this time would be oppressive, inconvenient, and burdensome inasmuch as it has not been established that the information necessary cannot be had from [other individuals], interrogatories, or the corporate deposition.").

Here, Claimant noticed Ms. Rosenblat's deposition without first seeking information through less burdensome means.  Deposing Ms. Rosenblat would prove incredibly burdensome given her work demands, and would impose significant costs both via her time and monetarily on Uber. *See, e.g., Motion Games, LLC v. Nintendo Co.*, No. 6:12-CV-878-JDL, 2015 WL 11143486, at *2 (E.D. Tex. Mar. 18, 2015) (denying motion to compel executive deposition in part because deponent had limited availability and because key business planning and decision-making for the company would be negatively affected in his absence, with defendant incurring costs). Importantly, while Claimant has served Uber with a Rule 30(b)(6) notice, the parties are still conferring over Claimant's proposed 50 topics and Uber will designate an individual(s) deponent once the parties resolve the disputed topics through their meet and confer efforts.  Claimant should be required to first take the Rule 30(b)(6) deposition before deposing Ms. Rosenblat because Uber's corporate representative will presumably have the requisite knowledge of Uber that Claimant seeks from Ms. Rosenblat.  Only then, "should alternative discovery methods prove inadequate, the [arbitrator] may revisit the issue to determine whether the deposition of a high-ranking executive remains necessary." *Oyekwe*, 2020 WL 106868 at *2 (quoting *Robinson*, 2014 WL 12915533 at *2).

Therefore, because of Ms. Rosenblat's extremely tenuous connection to the Arbitration and

because Claimant has failed to exhaust less burdensome means, the deposition notice imposes an undue burden and annoyance on Uber and Ms. Rosenblat. *See* FED. R. CIV. P. 26(c)(1).  In addition, Ms. Rosenblat and counsel are not available on the date and time for which opposing counsel noticed Ms. Rosenblat's deposition. Uber therefore requests that the Arbitrator grant its Motion, protecting Uber from presenting Ms. Rosenblat for deposition.

**IV.**
**<u>CONCLUSION</u>**

In light of the foregoing, Uber respectfully asks the Arbitrator to order that Uber is entitled to a protective order and need not present Ms. Rosenblat for deposition.

Dated:  May 25, 2021

Respectfully submitted,

/s/ Nicole S. LeFave

Kimberly R. Miers
Texas State Bar No. 24041482
Nicole S. LeFave
Texas State Bar No. 24085432
LITTLER MENDELSON, P.C.
A PROFESSIONAL CORPORATION
100 Congress Avenue
Suite 1400
Austin, Texas  78701
512.982.7250 (Telephone)
512.982.7248 (Telecopier)
kmiers@littler.com
nlefave@littler.com

ATTORNEYS FOR DEFENDANT
UBER TECHNOLOGIES, INC.

Of Counsel:

Allison Clara Williams
State Bar No. 24075108
LITTLER MENDELSON, P.C.
A PROFESSIONAL CORPORATION
1301 McKinney Street, Suite 1900
Houston, Texas  77010
713.951.9400 (Telephone)
713.951.9212 (Facsimile)
acwilliams@littler.com

Collin Quigley
Texas State Bar No. 24100928
Abby Bochenek
Texas State Bar No. 24122709
LITTLER MENDELON, P.C.
A PROFESSIONAL CORPORATION
2001 Ross Avenue
Suite 1500, Lock Box 116
Dallas, Texas  75201-2931
214.880.8100 (Telephone)
214.880.0181 (Facsimile)
cquigley@littler.com
abochenek@littler.com

11

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the above and foregoing document has been forwarded via electronic service pursuant to the Parties' Electronic Service Agreement, on this the 25th day of May, 2021, to the following counsel:

Bret Stanley
Kherkher Garcia, LLP.
2925 Richmond Ave., Ste. 1560
Houston, TX 77098
Telephone: 713.333.0862
bstanley@kherkhergarcia.com
khiett@kherkhergarcia.com
khidalgo-monroy@kherkhergarcia.com.

# EXHIBIT 1

| | |
|---|---|
| **From:** | Bret Stanley |
| **To:** | Williams, Allison C.; Miers, Kim Rives |
| **Cc:** | Steve Kherkher; Kathryn Hiett; Kristen Hidalgo-Monroy; Quigley, M. Collin; LeFave, Nicole; Bochenek, Abby; Eric Hawley; Behnia, Sophia |
| **Subject:** | Barysas v. Uber Technologies, Inc. - Request for Deposition of Alex Rosenblat |
| **Date:** | Tuesday, May 11, 2021 2:57:49 PM |
| **Attachments:** | image001.png |
| | image002.png |

Allison and Kim,

On behalf of Claimant Barysas, we request to depose Alex Rosenblat in this matter as one of the four fact witness depositions allowed to the Claimant.

Please provide dates that Ms. Rosenblat is available for deposition.  Hearing nothing by May 17, 2021, we'll notice the deposition.

Sincerely,


Bret Stanley | Partner
**Kherkher Garcia, LLP**
2925 Richmond Ave., Suite 1560
Houston, Texas  77098
832.856.6486 - Direct
713.333.1030 - Main
713.333.1029 – Fax
BStanley@KherkherGarcia.com

Unless expressly stated otherwise, nothing contained in this message should be construed as a digital or electronic signature, nor is it intended to reflect an intention to make an agreement by electronic means.

NOTICE OF CONFIDENTIALITY:  The information contained in and transmitted with this electronic message is: (1) SUBJECT TO THE ATTORNEY-CLIENT PRIVILEGE; (2) ATTORNEY WORK PRODUCT; OR (3) CONFIDENTIAL.  It is intended only for the individual or entity designated above. You are hereby notified that any dissemination, distribution, copying or use of or reliance upon the information contained in and transmitted with this electronic message by or to anyone other than the recipient designated above by the sender is unauthorized and strictly prohibited.  If you have received this electronic message in error, please notify us at (713) 333-1030 immediately.  Any electronic message erroneously transmitted to you should be immediately deleted without copying or reading it.  Any dissemination, distribution, copying or other reproduction of this electronic message is strictly prohibited.

**From:** vicki@soussan-adr.com <vicki@soussan-adr.com>
**Sent:** Wednesday, May 5, 2021 1:34 PM
**To:** 'Quigley, M. Collin' <CQuigley@littler.com>; susan@soussan-adr.com
**Cc:** Bret Stanley <bstanley@kherkhergarcia.com>; Steve Kherkher <skherkher@kherkhergarcia.com>; Kathryn Hiett <khiett@kherkhergarcia.com>; Kristen Hidalgo-Monroy <khidalgo-monroy@kherkhergarcia.com>; 'Miers, Kim Rives' <KMiers@littler.com>; 'Williams, Allison C.' <ACWilliams@littler.com>; 'LeFave, Nicole' <NLeFave@littler.com>; 'Bochenek, Abby' <ABochenek@littler.com>
**Subject:** RE: Barysas v. Uber Technologies, Inc. & Harts v. Uber Technologies, Inc. - Proposed Protective Order

Counsel,

Attached is the Protective Order which has been signed by Judge Soussan.

Thank you,
Vicki

Vicki Aven
Administrative Assistant to Judge Susan S. Soussan
1330 Post Oak Blvd., Suite 2880
Houston, TX 77056
Telephone:  713-961-2880
Fax:  713-961-2886
Vicki@soussan-adr.com
www.soussan-adr.com

*Confidentiality Notice: The information contained in this email and any attachments is intended only for the recipient[s] listed above and may be privileged and confidential. Any dissemination, copying, or use of or reliance upon such information by or to anyone other than the recipient[s] listed above is prohibited. If you have received this message in error, please notify the sender immediately at the email address above and destroy any and all copies of this message.*

**From:** Quigley, M. Collin <CQuigley@littler.com>
**Sent:** Tuesday, April 27, 2021 11:21 AM
**To:** vicki@soussan-adr.com; susan@soussan-adr.com
**Cc:** 'Bret Stanley' <bstanley@kherkhergarcia.com>; 'Steve Kherkher' <skherkher@kherkhergarcia.com>; khiett@kherkhergarcia.com; 'Kristen Hidalgo-Monroy' <khidalgo-monroy@kherkhergarcia.com>; Miers, Kim Rives <KMiers@littler.com>; Williams, Allison C. <ACWilliams@littler.com>; LeFave, Nicole <NLeFave@littler.com>; Bochenek, Abby <ABochenek@littler.com>
**Subject:** Barysas v. Uber Technologies, Inc. & Harts v. Uber Technologies, Inc. - Proposed Protective Order

Judge Soussan,

Attached for your review and consideration is the Parties' proposed protective order for this matter.

Please let us know if you have any questions or comments.

Thank you,
Collin

**M. Collin Quigley**
Attorney at Law
214.880.8159 direct, 469.503.8455 mobile
CQuigley@littler.com



Fueled by ingenuity. Inspired by you.

Labor & Employment Law Solutions | Local Everywhere
2001 Ross Avenue, Suite 1500, Lock Box 116, Dallas, TX 75201-2931

-------------------------
This email may contain confidential and privileged material for the sole use of the intended recipient(s). Any review, use, distribution or disclosure by others is strictly prohibited. If you are not the intended recipient (or authorized to receive for the recipient), please contact the sender by reply email and delete all copies of this message.

Littler Mendelson, P.C. is part of the international legal practice Littler Global, which operates worldwide through a number of separate legal entities. Please visit www.littler.com for more information.

# EXHIBIT 2

DAINIUS BARYSAS, §
§
§
Claimant, §
§          HON. SUSAN SOUSSAN,
vs. §          ARBITRATOR
§
UBER TECHNOLOGIES, INC., §
§
Respondent. §
§

## CLAIMANT'S NOTICE OF ORAL AND VIDEOTAPED DEPOSITION OF ALEX ROSENBLAT

TO:     Uber Technologies, Inc., by and through its attorneys of record, Ms. Kimberly Miers, Ms. Nicole LeFave, Ms. Allison Williams, and Ms. Abby Bochenek, Littler Mendelson, P.C., 100 Congress Avenue, Suite 1400, Austin, TX 78701.

Pursuant to Rule 199 of the Texas Rules of Civil Procedure, Claimant hereby serves this Notice to Take the Oral and Videotaped Deposition of Alex Rosenblat starting at **11:00 a.m. Central Standard Time on Wednesday, June 14, 2021 via ZOOM** hosted by U.S. Legal Support. The Zoom Link will be provided by U.S. Legal Support 24 hours prior to the Deposition.

The witness will participate in the deposition remotely by videoconference. The witness shall participate in the Remote Deposition from a quiet, well-lit, indoor location, while seated in front of a neutral background, and facing the camera being used to record the witness.   At least 24 hours before the Remote Deposition is scheduled to start, counsel, the witness, and the Remote Deposition Vendor shall conduct a test of the system and equipment that will be used to conduct the Remote Deposition (the "Remote Deposition Technology").  The witness noticed for a Remote Deposition must have webcam-equipped tablet, desktop or laptop computer with appropriate audio, visual, webcam, and Wi-Fi connectivity needed to participate in the deposition.   To the

extent the witness does not have the appropriate audio, visual, webcam, and Wi-Fi connectivity, attorney representing the witness will notify the noticing attorney.

The deposition will be video recorded and transcribed by a court reporter who will participate in the deposition by remote video from another location.  The deposition will continue from day to day until completed.

U.S. Legal Support will provide a duly authorized court reporter and videotaping services for the deposition.

Respectfully submitted,

KHERKHER GARCIA, LLP

By: _____/s/ Bret Stanley_____
Bret Stanley
State Bar No. 24075116
BStanley@KherkherGarcia.com
2925 Richmond Ave., Suite 1560
Houston, TX  77098
(713) 333-1030 / (713) 333-1029 (fax)

*Attorney for Claimant*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the above and foregoing document has been forwarded via electronic mail on this the 20th day of May 2021, to the following counsel:

LITTLER MENDELSON, P.C.

Kimberly R. Miers
Allison Williams
Nicole S. LeFave
Abby Bochenek
Collin Quigley

kmiers@littler.com
acwilliams@littler.com
nlefave@littler.com
abochenek@littler.com
cquigley@littler.com
sbehnia@littler.com
smendoza@littler.com
scornell@littler.com
preyes@littler.com
mbrantley@littler.com
hheckel@littler.com

_____ */s/ Bret Stanley* _____

EXHIBIT 3

| From: | Bret Stanley |
|---|---|
| To: | Williams, Allison C.; Miers, Kim Rives |
| Cc: | skherkher@kherkhergarcia.com; khiett@kherkhergarcia.com; khidalgo-monroy@kherkhergarcia.com; Quigley, M. Collin; LeFave, Nicole; Bochenek, Abby; ehawley@kherkhergarcia.com; Behnia, Sophia; Mendoza, Sandra A.; Cornell, Staci; Reyes, Pia; Brantley, Maikieta; Heckel, Harriet T. |
| Subject: | Barysas v. Uber Technologies, Inc. - Notice of Deposition of Alex Rosenblat |
| Date: | Thursday, May 20, 2021 5:01:51 PM |
| Attachments: | ATT00001.png |
| | ATT00002.png |
| | 2021.05.18 Barysas Depo Notice to Alex Rosenblat.pdf |

Allison and Kim,

Please see the attached Notice of Deposition of Uber employee Alex Rosenblat.

Bret Stanley | Partner
**Kherkher Garcia, LLP**
2925 Richmond Ave., Suite 1560
Houston, Texas  77098
832.856.6486 - Direct
713.333.1030 - Main
713.333.1029 – Fax
BStanley@KherkherGarcia.com

Unless expressly stated otherwise, nothing contained in this message should be construed as a digital or electronic signature, nor is it intended to reflect an intention to make an agreement by electronic means.

NOTICE OF CONFIDENTIALITY:  The information contained in and transmitted with this electronic message is: (1) SUBJECT TO THE ATTORNEY-CLIENT PRIVILEGE; (2) ATTORNEY WORK PRODUCT; OR (3) CONFIDENTIAL.  It is intended only for the individual or entity designated above. You are hereby notified that any dissemination, distribution, copying or use of or reliance upon the information contained in and transmitted with this electronic message by or to anyone other than the recipient designated above by the sender is unauthorized and strictly prohibited.  If you have received this electronic message in error, please notify us at (713) 333-1030 immediately.  Any electronic message erroneously transmitted to you should be immediately deleted without copying or reading it.  Any dissemination, distribution, copying or other reproduction of this electronic message is strictly prohibited.

**From:** Bret Stanley
**Sent:** Tuesday, May 11, 2021 2:58 PM
**To:** 'Williams, Allison C.' <ACWilliams@littler.com>; 'Miers, Kim Rives' <KMiers@littler.com>
**Cc:** Steve Kherkher <sKherkher@KherkherGarcia.com>; Kathryn Hiett <khiett@kherkhergarcia.com>; Kristen Hidalgo-Monroy <khidalgo-monroy@kherkhergarcia.com>; 'Quigley, M. Collin' <CQuigley@littler.com>; 'LeFave, Nicole' <NLeFave@littler.com>; 'Bochenek, Abby' <ABochenek@littler.com>; Eric Hawley <ehawley@KherkherGarcia.com>; Behnia, Sophia <SBehnia@littler.com>
**Subject:** Barysas v. Uber Technologies, Inc. - Request for Deposition of Alex Rosenblat

Allison and Kim,

On behalf of Claimant Barysas, we request to depose Alex Rosenblat in this matter as one of the four fact witness depositions allowed to the Claimant.

Please provide dates that Ms. Rosenblat is available for deposition.  Hearing nothing by May 17, 2021, we'll notice the deposition.

Sincerely,

Bret Stanley | Partner
**Kherkher Garcia, LLP**
2925 Richmond Ave., Suite 1560
Houston, Texas  77098
832.856.6486 - Direct
713.333.1030 - Main
713.333.1029 – Fax
BStanley@KherkherGarcia.com

Unless expressly stated otherwise, nothing contained in this message should be construed as a digital or electronic signature, nor is it intended to reflect an intention to make an agreement by electronic means.

NOTICE OF CONFIDENTIALITY:  The information contained in and transmitted with this electronic message is: (1) SUBJECT TO THE ATTORNEY-CLIENT PRIVILEGE; (2) ATTORNEY WORK PRODUCT; OR (3) CONFIDENTIAL.  It is intended only for the individual or entity designated above. You are hereby notified that any dissemination, distribution, copying or use of or reliance upon the information contained in and transmitted with this electronic message by or to anyone other than the recipient designated above by the sender is unauthorized and strictly prohibited.  If you have received this electronic message in error, please notify us at (713) 333-1030 immediately.  Any electronic message erroneously transmitted to you should be immediately deleted without copying or reading it.  Any dissemination, distribution, copying or other reproduction of this electronic message is strictly prohibited.

**From:** vicki@soussan-adr.com <vicki@soussan-adr.com>
**Sent:** Wednesday, May 5, 2021 1:34 PM
**To:** 'Quigley, M. Collin' <CQuigley@littler.com>; susan@soussan-adr.com
**Cc:** Bret Stanley <bstanley@kherkhergarcia.com>; Steve Kherkher <skherkher@kherkhergarcia.com>; Kathryn Hiett <khiett@kherkhergarcia.com>; Kristen Hidalgo-Monroy <khidalgo-monroy@kherkhergarcia.com>; 'Miers, Kim Rives' <KMiers@littler.com>; 'Williams, Allison C.' <ACWilliams@littler.com>; 'LeFave, Nicole' <NLeFave@littler.com>; 'Bochenek, Abby' <ABochenek@littler.com>
**Subject:** RE: Barysas v. Uber Technologies, Inc. & Harts v. Uber Technologies, Inc. - Proposed Protective Order

Counsel,

Attached is the Protective Order which has been signed by Judge Soussan.

Thank you,
Vicki

Vicki Aven
Administrative Assistant to Judge Susan S. Soussan
1330 Post Oak Blvd., Suite 2880
Houston, TX 77056
Telephone:  713-961-2880
Fax:  713-961-2886
Vicki@soussan-adr.com
www.soussan-adr.com

*Confidentiality Notice: The information contained in this email and any attachments is intended only for the recipient[s] listed above and may be privileged and confidential. Any dissemination, copying, or use of or reliance upon such information by or to anyone other than the recipient[s] listed above is prohibited. If you have received this message in error, please notify the sender immediately at the email address above and destroy any and all copies of this message.*

**From:** Quigley, M. Collin <CQuigley@littler.com>
**Sent:** Tuesday, April 27, 2021 11:21 AM
**To:** vicki@soussan-adr.com; susan@soussan-adr.com
**Cc:** 'Bret Stanley' <bstanley@kherkhergarcia.com>; 'Steve Kherkher' <skherkher@kherkhergarcia.com>; khiett@kherkhergarcia.com; 'Kristen Hidalgo-Monroy' <khidalgo-monroy@kherkhergarcia.com>; Miers, Kim Rives <KMiers@littler.com>; Williams, Allison C. <ACWilliams@littler.com>; LeFave, Nicole <NLeFave@littler.com>; Bochenek, Abby <ABochenek@littler.com>
**Subject:** Barysas v. Uber Technologies, Inc. & Harts v. Uber Technologies, Inc. - Proposed Protective Order

Judge Soussan,

Attached for your review and consideration is the Parties' proposed protective order for this matter.

Please let us know if you have any questions or comments.

Thank you,
Collin

**M. Collin Quigley**
Attorney at Law
214.880.8159 direct, 469.503.8455 mobile
CQuigley@littler.com



Fueled by ingenuity. Inspired by you.

Labor & Employment Law Solutions | Local Everywhere
2001 Ross Avenue, Suite 1500, Lock Box 116, Dallas, TX 75201-2931

-------------------------
This email may contain confidential and privileged material for the sole use of the intended recipient(s). Any review, use, distribution or disclosure by others is strictly prohibited. If you are not the intended recipient (or authorized to receive for the recipient), please contact the sender by reply email and delete all copies of this message.

Littler Mendelson, P.C. is part of the international legal practice Littler Global, which operates worldwide through a number of separate legal entities. Please visit www.littler.com for more information.

# EXHIBIT 4

RASIER, LLC / RASIER-CA, LLC / RASIER-PA, LLC / RASIER-DC, LLC / RASIER-MT, LLC / HINTER-NM

**TECHNOLOGY SERVICES AGREEMENT**

Last update: December 11, 2015

This Technology Services Agreement ("*Agreement*") constitutes a legal agreement between you, an individual ("*you*") and Rasier-CA, LLC if your Territory (as defined below) is within the State of California, Rasier-PA, LLC if your Territory is within the State of Pennsylvania, Rasier-DC, LLC if your Territory is within the State of Florida, Rasier-MT, LLC if your Territory is within the State of Montana, Hinter-NM if your Territory is within the State of New Mexico, or Rasier, LLC if your Territory is anywhere else within the United States (as applicable, "*Company*").

Company, a subsidiary of Uber Technologies, Inc. ("*Uber*"), provides lead generation to independent providers of rideshare or peer-to-peer (collectively, "*P2P*") passenger transportation services using the Uber Services (as defined below). The Uber Services enable an authorized transportation provider to seek, receive and fulfill requests for transportation services from an authorized user of Uber's mobile applications. You desire to enter into this Agreement for the purpose of accessing and using the Uber Services.

**You acknowledge and agree that Company is a technology services provider that does not provide transportation services.**

In order to use the Uber Services, you must agree to the terms and conditions that are set forth below. Upon your execution (electronic or otherwise) of this Agreement, you and Company shall be bound by the terms and conditions set forth herein.

**IMPORTANT: PLEASE NOTE THAT TO USE THE UBER SERVICES, YOU MUST AGREE TO THE TERMS AND CONDITIONS SET FORTH BELOW. PLEASE REVIEW THE ARBITRATION PROVISION SET FORTH BELOW CAREFULLY, AS IT WILL REQUIRE YOU TO RESOLVE DISPUTES WITH THE COMPANY ON AN INDIVIDUAL BASIS, EXCEPT AS PROVIDED IN SECTION 15.3, THROUGH FINAL AND BINDING ARBITRATION UNLESS YOU CHOOSE TO OPT OUT OF THE ARBITRATION PROVISION.  BY VIRTUE OF YOUR ELECTRONIC EXECUTION OF THIS AGREEMENT, YOU WILL BE ACKNOWLEDGING THAT YOU HAVE READ AND UNDERSTOOD ALL OF THE TERMS OF THIS AGREEMENT (INCLUDING THE ARBITRATION PROVISION) AND HAVE TAKEN TIME TO CONSIDER THE CONSEQUENCES OF THIS IMPORTANT BUSINESS DECISION.  IF YOU DO NOT WISH TO BE SUBJECT TO ARBITRATION, YOU MAY OPT OUT OF THE ARBITRATION PROVISION BY FOLLOWING THE INSTRUCTIONS PROVIDED IN THE ARBITRATION PROVISION BELOW.**

1. **Definitions**

1.1    "*Affiliate*" means an entity that, directly or indirectly, controls, is under the control of, or is under common control with a party, where control means having more than fifty percent (50%) of the voting stock or other ownership interest or the majority of the voting rights of such entity.

1.2    "*City Addendum*" means an addendum or supplemental information to this Agreement setting forth additional Territory-specific terms, as made available and as updated by Company from time to time.

1.3    "*Company Data*" means all data related to the access and use of the Uber Services hereunder, including all data related to Users (including User Information), all data related to the provision of Transportation Services via the Uber Services and the Driver App, and the Driver ID.

1.4    "*Company Device*" means a mobile device owned or controlled by Company that is provided to you solely for your use of the Driver App to provide Transportation Services.

1.5    "*Device*" means a Company Device or Your Device, as the case may be.

1.6    "*Driver App*" means the mobile application provided by Company that enables transportation providers to access the Uber Services for the purpose of seeking, receiving and fulfilling on-demand requests for transportation services by Users, as may be updated or modified from time to time.

1.7    "*Driver ID*" means the identification and password key assigned by Company to you that enables you to use and access the Driver App.

1.8    "*Fare*" has the meaning set forth in Section 4.1.

1.9    "*Service Fee*" has the meaning set forth in Section 4.4.

1.10    "*Territory*" means the city or metro areas in the United States in which you are enabled by the Driver App to receive requests for Transportation Services.

1.11    "*Tolls*" means any applicable road, bridge, ferry, tunnel and airport charges and fees, including inner-city congestion, environmental or similar charges as reasonably determined by the Uber Services based on available information.

1.12    "*Transportation Services*" means your provision of P2P passenger transportation services to Users via the Uber Services in the Territory using the Vehicle.

1.13    "*Uber Services*" mean Uber's on-demand lead generation and related services licensed by Uber to Company that enable transportation providers to seek, receive and fulfill on-demand requests for transportation services by Users seeking transportation services; such Uber Services include access to the Driver App and Uber's software, websites, payment services as described in Section 4 below, and related support services systems, as may be updated or modified from time to time.

1.14    "*User*" means an end user authorized by Uber to use the Uber mobile application for the purpose of obtaining Transportation Services offered by Company's transportation provider customers.

1.15    "*User Information*" means information about a User made available to you in connection with such User's request for and use of Transportation Services, which may include the User's name, pick-up location, contact information and photo.

1.16   "*Vehicle*" means your vehicle that:  (a) meets the then-current Company requirements for a vehicle on the Uber Services; and (b) Company authorizes for your use for the purpose of providing Transportation Services.

1.17   "*Your Device*" means a mobile device owned or controlled by you:  (a) that meets the then-current Company specifications for mobile devices as set forth at www.uber.com/byod-devices; and (b) on which the Driver App has been installed as authorized by Company solely for the purpose of providing Transportation Services.

## 2.   Use of the Uber Services

2.1   **Driver IDs.** Uber will issue you a Driver ID to enable you to access and use the Driver App on a Device in accordance with this Agreement. Company reserves the right to deactivate your Driver ID if you have not fulfilled a request for Transportation Services using the Driver App at least once a month. **You agree that you will maintain your Driver ID in confidence and not share your Driver ID with any third party. You will immediately notify Company of any actual or suspected breach or improper use or disclosure of your Driver ID or the Driver App.**

2.2   **Provision of Transportation Services**. When the Driver App is active, User requests for Transportation Services may appear to you via the Driver App if you are available and in the vicinity of the User. If you accept a User's request for Transportation Services, the Uber Services will provide you with certain User Information via the Driver App, including the User's first name and pickup location. In order to enhance User satisfaction with the Uber mobile application and your Transportation Services, it is recommended that you wait at least ten (10) minutes for a User to show up at the requested pick-up location. You will obtain the destination from the User, either in person upon pickup or from the Driver App if the User elects to enter such destination via Uber's mobile application. You acknowledge and agree that once you have accepted a User's request for Transportation Services, Uber's mobile application may provide certain information about you to the User, including your first name, contact information, photo and location, and your Vehicle's make and license plate number. You shall not contact any Users or use any User's personal data for any reason other than for the purposes of fulfilling Transportation Services. As between Company and you, you acknowledge and agree that:  (a) you shall be solely responsible for determining the most effective, efficient and safe manner to perform each instance of Transportation Services; and (b) except for the Uber Services or any Company Devices (if applicable), you shall provide all necessary equipment, tools and other materials, at your own expense, necessary to perform Transportation Services. You understand and agree that you have a legal obligation under the Americans with Disabilities Act and similar state laws to transport Users with Service Animals (as defined by applicable state and federal law), including guide dogs for the blind and visually impaired Users, and there is no exception to this obligation for allergies or religious objections. Your knowing failure to transport a User with a Service Animal shall constitute a material breach of this Agreement. You agree that a "knowing failure" to comply with this legal obligation shall constitute either: (1) a denial of a ride where you state the denial was due to a Service Animal; or (2) there is more than one (1) instance in which a User or the companion of a User alleges that you cancelled or refused a ride on the basis of a Service Animal.

2.3   **Your Relationship with Users**. You acknowledge and agree that your provision of Transportation Services to Users creates a direct business relationship between you and the User. Company is not responsible or liable for the actions or inactions of a User in relation to you, your activities or your Vehicle. You shall have the sole responsibility for any obligations or liabilities to Users or third parties that arise from your provision of Transportation Services. You acknowledge and

agree that you are solely responsible for taking such precautions as may be reasonable and proper (including maintaining adequate insurance that meets the requirements of all applicable laws including motor vehicle financial responsibility laws) regarding any acts or omissions of a User or third party. You acknowledge and agree that Company may release your contact and/or insurance information to a User upon such User's reasonable request. You acknowledge and agree that, unless specifically consented to by a User, you may not transport or allow inside your Vehicle individuals other than a User and any individuals authorized by such User, during the performance of Transportation Services for such User. You acknowledge and agree that all Users should be transported directly to their specified destination, as directed by the applicable User, without unauthorized interruption or unauthorized stops.

2.4     **Your Relationship with Company**. You acknowledge and agree that Company's provision to you of the Driver App and the Uber Services creates a direct business relationship between Company and you. Company does not, and shall not be deemed to, direct or control you generally or in your performance under this Agreement specifically, including in connection with your provision of Transportation Services, your acts or omissions, or your operation and maintenance of your Vehicle. You retain the sole right to determine when, where, and for how long you will utilize the Driver App or the Uber Services. You retain the option, via the Driver App, to attempt to accept or to decline or ignore a User's request for Transportation Services via the Uber Services, or to cancel an accepted request for Transportation Services via the Driver App, subject to Company's then-current cancellation policies. With the exception of any signage required by local law or permit/license requirements, Company shall have no right to require you to:  (a) display Company's or any of its Affiliates' names, logos or colors on your Vehicle(s); or (b) wear a uniform or any other clothing displaying Company's or any of its Affiliates' names, logos or colors. You acknowledge and agree that you have complete discretion to provide services or otherwise engage in other business or employment activities.  For the sake of clarity, you understand that you retain the complete right to; (i) use other software application services in addition to the Uber Services; and (ii) engage in any other occupation or business. Company retains the right to deactivate or otherwise restrict you from accessing or using the Driver App or the Uber Services in the event of a violation or alleged violation of this Agreement, your disparagement of Company or any of its Affiliates, your act or omission that causes harm to Company's or its Affiliates' brand, reputation or business as determined by Company in its sole discretion.

2.5     **Ratings**.

2.5.1     You acknowledge and agree that:  (a) after receiving Transportation Services, a User will be prompted by Uber's mobile application to provide a rating of you and such Transportation Services and, optionally, to provide comments or feedback about you and such Transportation Services; and (b) after providing Transportation Services, you will be prompted by the Driver App to provide a rating of the User and, optionally, to provide comments or feedback about the User. You shall provide your ratings and feedback in good faith.

2.5.2     You acknowledge that Company desires that Users have access to high-quality services via Uber's mobile application. In order to continue to receive access to the Driver App and the Uber Services, you must maintain an average rating by Users that exceeds the minimum average acceptable rating established by Company for your Territory, as may be updated from time to time by Company in its sole discretion ("*Minimum Average Rating*"). Your average rating is intended to reflect Users' satisfaction with your

Transportation Services rather than your compliance with any of Company's policies or recommendations. In the event your average rating falls below the Minimum Average Rating, Company will notify you and may provide you, in Company's discretion, a limited period of time to raise your average rating above the Minimum Average Rating. If you do not increase your average rating above the Minimum Average Rating within the time period allowed (if any), Company reserves the right to deactivate your access to the Driver App and the Uber Services. Additionally, you acknowledge that your repeated failure to accept User requests for Transportation Services while you are logged in to the Driver App creates a negative experience for Users of Uber's mobile application. If you do not wish to accept User requests for Transportation Services for a period of time, you agree that you will log off of the Driver App.

2.5.3   Company and its Affiliates reserve the right to use, share and display your and User ratings and comments in any manner in connection with the business of Company and its Affiliates without attribution to you or your approval. You acknowledge and agree that Company and its Affiliates are distributors (without any obligation to verify) and not publishers of your and User ratings and comments, provided that Company and its Affiliates reserve the right to edit or remove comments in the event that such comments include obscenities or other objectionable content, include an individual's name or other personal information, or violate any privacy laws, other applicable laws or Company's or its Affiliates' content policies.

2.6   **Devices**.

2.6.1   Company encourages you to use Your Device in providing Transportation Services. Otherwise, if you elect to use any Company Devices, Company will supply you upon request with Company Devices and provide the necessary wireless data plan for such Devices, provided that Company will require reimbursement from you for the costs associated with the wireless data plan of each Company Device and/or request a deposit for each Company Device. You agree that: (a) Company Devices may only be used for the purpose of enabling your access to the Uber Services; and (b) Company Devices may not be transferred, loaned, sold or otherwise provided in any manner to any party other than you. Company Devices shall at all times remain the property of Company, and upon termination of this Agreement or your termination or deactivation, you agree to return to Company the applicable Company Devices within ten (10) days. You agree that failure to timely return any Company Devices, or damage to Company Devices outside of "normal wear and tear," will result in the forfeiture of related deposits.

2.6.2   If you elect to use Your Devices: (i) you are responsible for the acquisition, cost and maintenance of Your Devices as well as any necessary wireless data plan; and (ii) Company shall make available the Driver App for installation on Your Device. Company hereby grants you a personal, non-exclusive, non-transferable license to install and use the Driver App on Your Device solely for the purpose of providing Transportation Services.  You agree to not provide, distribute or share, or enable the provision, distribution or sharing of, the Driver App (or any data associated therewith) with any third party.  The foregoing license grant shall immediately terminate and you will delete and fully remove the Driver App from the Driver-Provided Device in the event that you cease to provide Transportation Services using Your Device. You agree that: (i) use of the Driver App on Your Device requires an active data plan with a wireless carrier associated with Your Device, which data plan will be provided by you at your own

expense; and (ii) use of the Driver App on Your Device as an interface with the Uber Services may consume very large amounts of data through the data plan. **COMPANY ADVISES THAT YOUR DEVICE ONLY BE USED UNDER A DATA PLAN WITH UNLIMITED OR VERY HIGH DATA USAGE LIMITS, AND COMPANY SHALL NOT BE RESPONSIBLE OR LIABLE FOR ANY FEES, COSTS, OR OVERAGE CHARGES ASSOCIATED WITH ANY DATA PLAN.**

2.7     **Location Based Services**. You acknowledge and agree that your geo-location information must be provided to the Uber Services via a Device in order to provide Transportation Services. You acknowledge and agree that:  (a) your geo-location information may be obtained  by the Uber Services while the Driver App is running; and (b) the approximate location of your Vehicle will be displayed to the User before and during the provision of Transportation Services to such User. In addition, Company and its Affiliates may monitor, track and share with third parties Driver's geo-location information obtained by the Driver App and Device for safety and security purposes.

3.   **You and Your Vehicle**

3.1     **Your Requirements**. You acknowledge and agree that at all times, you shall:  (a) hold and maintain (i) a valid driver's license with the appropriate level of certification to operate your Vehicle, and (ii) all licenses, permits, approvals and authority applicable to you that are necessary to provide passenger transportation services to third parties in the Territory; (b) possess the appropriate and current level of training, expertise and experience to provide Transportation Services in a professional manner with due skill, care and diligence; and (c) maintain high standards of professionalism, service and courtesy. You acknowledge and agree that you may be subject to certain background and driving record checks from time to time in order to qualify to provide, and remain eligible to provide, Transportation Services. You acknowledge and agree that Company reserves the right, at any time in Company's sole discretion, to deactivate or otherwise restrict you from accessing or using the Driver App or the Uber Services if you fail to meet the requirements set forth in this Agreement.

3.2     **Vehicle Requirements**. You acknowledge and agree that your Vehicle shall at all times be:  (a) properly registered and licensed to operate as a passenger transportation vehicle in the Territory; (b) owned or leased by you, or otherwise in your lawful possession; (c) suitable for performing the passenger transportation services contemplated by this Agreement; and (d) maintained in good operating condition, consistent with industry safety and maintenance standards for a Vehicle of its kind and any additional standards or requirements in the applicable Territory, and in a clean and sanitary condition.

3.3     **Documentation**. To ensure your compliance with all requirements in Sections 3.1 and 3.2 above, you must provide Company with written copies of all such licenses, permits, approvals, authority, registrations and certifications prior to your provision of any Transportation Services. Thereafter, you must submit to Company written evidence of all such licenses, permits, approvals, authority, registrations and certifications as they are renewed. Company shall, upon request, be entitled to review such licenses, permits, approvals, authority, registrations and certifications from time to time, and your failure to provide or maintain any of the foregoing shall constitute a material breach of this Agreement. Company reserves the right to independently verify your documentation from time to time in any way Company deems appropriate in its reasonable discretion.

4.   **Financial Terms**

4.1   **Fare Calculation and Your Payment**. You are entitled to charge a fare for each instance of completed Transportation Services provided to a User that are obtained via the Uber Services (*"Fare"*), where such Fare is calculated based upon a base fare amount plus distance (as determined by Company using location-based services enabled through the Device) and/or time amounts, as detailed at www.uber.com/cities for the applicable Territory ("*Fare Calculation*"). You acknowledge and agree that the Fare provided under the Fare Calculation is the only payment you will receive in connection with the provision of Transportation Services, and that neither the Fare nor the Fare Calculation includes any gratuity. You are also entitled to charge User for any Tolls, taxes or fees incurred during the provision of Transportation Services, if applicable. You:  (i) appoint Company as your limited payment collection agent solely for the purpose of accepting the Fare, applicable Tolls and, depending on the region and/or if requested by you, applicable taxes and fees from the User on your behalf via the payment processing functionality facilitated by the Uber Services; and (ii) agree that payment made by User to Company (or to an Affiliate of Company acting as an agent of Company) shall be considered the same as payment made directly by User to you. In addition, the parties acknowledge and agree that as between you and Company, the Fare is a recommended amount, and the primary purpose of the pre-arranged Fare is to act as the default amount in the event you do not negotiate a different amount. You shall always have the right to: (i) charge a fare that is less than the pre-arranged Fare; or (ii) negotiate, at your request, a Fare that is lower than the pre-arranged Fare (each of (i) and (ii) herein, a "*Negotiated Fare*"). Company shall consider all such requests from you in good faith. Company agrees to remit, or cause to be remitted, to you on at least a weekly basis:  (a) the Fare less the applicable Service Fee; (b) the Tolls; and (c) depending on the region, certain taxes and ancillary fees. If you have separately agreed that other amounts may be deducted from the Fare prior to remittance to you (*e.g.*, vehicle financing payments, lease payments, mobile device usage charges, etc.), the order of any such deductions from the Fare shall be determined exclusively by Company (as between you and Company).

4.2   **Changes to Fare Calculation**. Company reserves the right to change the Fare Calculation at any time in Company's discretion based upon local market factors, and Company will provide you with notice in the event of changes to the base fare, per mile, and/or per minute amounts that would result in a change in the recommended Fare. Continued use of the Uber Services after any such change in the Fare Calculation shall constitute your consent to such change.

4.3   **Fare Adjustment.** Company reserves the right to:  (i) adjust the Fare for a particular instance of Transportation Services (*e.g.*, you took an inefficient route, you failed to properly end a particular instance of Transportation Services in the Driver App, technical error in the Uber Services, etc.); or (ii) cancel the Fare for a particular instance of Transportation Services (*e.g.*, User is charged for Transportation Services that were not provided, in the event of a User complaint, fraud, etc.). Company's decision to reduce or cancel the Fare in any such manner shall be exercised in a reasonable manner.

4.4   **Service Fee**. In consideration of Company's provision of the Driver App and the Uber Services for your use and benefit hereunder, you agree to pay Company a service fee on a per Transportation Services transaction basis calculated as a percentage of the Fare determined by the Fare Calculation (regardless of any Negotiated Fare), as provided to you via email or otherwise made available electronically by Company from time to time for the applicable Territory ("*Service Fee*"). In the event regulations applicable to your Territory require taxes to be calculated on the Fare, Company shall calculate the Service Fee based on the Fare net of such taxes. Company reserves the right to change the Service Fee at any time in Company's discretion

based upon local market factors, and Company will provide you with notice in the event of such change. Continued use of the Uber Services after any such change in the Service Fee calculation shall constitute your consent to such change.

4.5     **Cancellation Charges**. You acknowledge and agree that Users may elect to cancel requests for Transportation Services that have been accepted by you via the Driver App at any time prior to your arrival. In the event that a User cancels an accepted request for Transportation Services, Company may charge the User a cancellation fee on your behalf. If charged, this cancellation fee shall be deemed the Fare for the cancelled Transportation Services for the purpose of remittance to you hereunder ("*Cancellation Fee*"). The parties acknowledge and agree that as between you and Company, this Cancellation Fee is a recommended amount, and the primary purpose of such Cancellation Fee is to act as the default amount in the event you do not negotiate a different amount. You shall always have the right to:  (i) charge a cancellation fee that is less than the Cancellation Fee; or (ii) negotiate, at your request, a cancellation fee that is lower than the Cancellation Fee (each of (i) and (ii) herein, a "*Negotiated Cancellation Fee*"). If charged, the Cancellation Fee (regardless of any Negotiated Cancellation Fee) shall be deemed the Fare for the cancelled Transportation Services for the purpose of remittance to you hereunder.

4.6     **Receipts**. As part of the Uber Services, Company provides you a system for the delivery of receipts to Users for Transportation Services rendered. Upon your completion of Transportation Services for a User, Company prepares an applicable receipt and issues such receipt to the User via email on your behalf. Such receipts are also provided to you via email or the online portal available to you through the Uber Services. Receipts include the breakdown of amounts charged to the User for Transportation Services and may include specific information about you, including your name, contact information and photo, as well as a map of the route you took. Any corrections to a User's receipt for Transportation Services must be submitted to Company in writing within three (3) business days after the completion of such Transportation Services. Absent such a notice, Company shall not be liable for any mistakes in or corrections to the receipt or for recalculation or disbursement of the Fare.

4.7     **No Additional Amounts**. You acknowledge and agree that, for the mutual benefit of the parties, through advertising and marketing, Company and its Affiliates may seek to attract new Users to Uber and to increase existing Users' use of Uber's mobile application. You acknowledge and agree such advertising or marketing does not entitle you to any additional monetary amounts beyond the amounts expressly set forth in this Agreement.

4.8     **Taxes**. You acknowledge and agree that you are required to:  (a) complete all tax registration obligations and calculate and remit all tax liabilities related to your provision of Transportation Services as required by applicable law; and (b) provide Company with all relevant tax information. You further acknowledge and agree that you are responsible for taxes on your own income arising from the performance of Transportation Services. Notwithstanding anything to the contrary in this Agreement, Company may in its reasonable discretion based on applicable tax and regulatory considerations, collect and remit taxes resulting from your provision of Transportation Services and/or provide any of the relevant tax information you have provided pursuant to the foregoing requirements in this Section 4.8 directly to the applicable governmental tax authorities on your behalf or otherwise.

5.   **Proprietary Rights; License**

5.1     **License Grant**. Subject to the terms and conditions of this Agreement, Company hereby grants you a non-exclusive, non-transferable, non-sublicensable, non-assignable license, during the term of this Agreement, to use the Uber Services (including the Driver App on a Device) solely for the purpose of providing Transportation Services to Users and tracking resulting Fares and Fees. All rights not expressly granted to you are reserved by Company, its Affiliates and their respective licensors.

5.2     **Restrictions**. You shall not, and shall not allow any other party to:  (a) license, sublicense, sell, resell, transfer, assign, distribute or otherwise provide or make available to any other party the Uber Services, Driver App or any Company Device in any way; (b) modify or make derivative works based upon the Uber Services or Driver App; (c) improperly use the Uber Services or Driver App, including creating Internet "links" to any part of the Uber Services or Driver App, "framing" or "mirroring" any part of the Uber Services or Driver App on any other websites or systems, or "scraping" or otherwise improperly obtaining data from the Uber Services or Driver App; (d) reverse engineer, decompile, modify, or disassemble the Uber Services or Driver App, except as allowed under applicable law; or (e) send spam or otherwise duplicative or unsolicited messages. In addition, you shall not, and shall not allow any other party to, access or use the Uber Services or Driver App to:  (i) design or develop a competitive or substantially similar product or service; (ii) copy or extract any features, functionality, or content thereof; (iii) launch or cause to be launched on or in connection with the Uber Services an automated program or script, including web spiders, crawlers, robots, indexers, bots, viruses or worms, or any program which may make multiple server requests per second, or unduly burden or hinder the operation and/or performance of the Uber Services; or (iv) attempt to gain unauthorized access to the Uber Services or its related systems or networks.

5.3     **Ownership**. The Uber Services, Driver App and Company Data, including all intellectual property rights therein, and the Company Devices are and shall remain (as between you and Company) the property of Company, its Affiliates or their respective licensors. Neither this Agreement nor your use of the Uber Services, Driver App or Company Data conveys or grants to you any rights in or related to the Uber Services, Driver App or Company Data, except for the limited license granted above. Other than as specifically permitted by the Company in connection with the Uber Services, you are not permitted to use or reference in any manner Company's, its Affiliates', or their respective licensors' company names, logos, products and service names, trademarks, service marks, trade dress, copyrights or other indicia of ownership, alone and in combination with other letters, punctuation, words, symbols and/or designs (the "UBER Marks and Names") for any commercial purposes. You agree that you will not try to register or otherwise use and/or claim ownership in any of the UBER Marks and Names, alone or in combination with other letters, punctuation, words, symbols and/or designs, or in any confusingly similar mark, name or title, for any goods and services.

## 6.   Confidentiality

6.1     Each party acknowledges and agrees that in the performance of this Agreement it may have access to or may be exposed to, directly or indirectly, confidential information of the other party ("*Confidential Information*"). Confidential Information includes Company Data, Driver IDs, User Information, and the transaction volume, marketing and business plans, business, financial, technical, operational and such other non-public information of each party (whether disclosed in writing or verbally) that such party designates as being proprietary or confidential or of which the other party should reasonably know that it should be treated as confidential.

6.2     Each party acknowledges and agrees that:  (a) all Confidential Information shall remain the exclusive property of the disclosing party; (b) it shall not use Confidential Information of the other party for any purpose except in furtherance of this Agreement; (c) it shall not disclose Confidential Information of the other party to any third party, except to its employees, officers, contractors, agents and service providers ("*Permitted Persons*") as necessary to perform under this Agreement, provided Permitted Persons are bound in writing to obligations of confidentiality and non-use of Confidential Information no less protective than the terms hereof; and (d) it shall return or destroy all Confidential Information of the disclosing party, upon the termination of this Agreement or at the request of the other party (subject to applicable law and, with respect to Company, its internal record-keeping requirements).

6.3     Notwithstanding the foregoing, Confidential Information shall not include any information to the extent it:  (a) is or becomes part of the public domain through no act or omission on the part of the receiving party; (b) was possessed by the receiving party prior to the date of this Agreement without an obligation of confidentiality; (c) is disclosed to the receiving party by a third party having no obligation of confidentiality with respect thereto; or (d) is required to be disclosed pursuant to law, court order, subpoena or governmental authority, provided the receiving party notifies the disclosing party thereof and provides the disclosing party a reasonable opportunity to contest or limit such required disclosure.

7.  **Privacy**

7.1     **Disclosure of Your Information**. Subject to applicable law, Company and its Affiliates may, but shall not be required to, provide to you, a User, an insurance company and/or relevant authorities and/or regulatory agencies any information (including personal information (*e.g.*, information obtained about you through any background check) and any Company Data) about you or any Transportation Services provided hereunder if:  (a) there is a complaint, dispute or conflict, including an accident, between you and a User; (b) it is necessary to enforce the terms of this Agreement; (c) it is required, in Company's or any Affiliate's sole discretion, by applicable law or regulatory requirements (*e.g.*, Company or its Affiliates receive a subpoena, warrant, or other legal process for information); (d) it is necessary, in Company's or any Affiliate's sole discretion, to (1) protect the safety, rights, property or security of Company or its Affiliates, the Uber Services or any third party; (2) to protect the safety of the public for any reason including the facilitation of insurance claims related to the Uber Services;  (3) to detect, prevent or otherwise address fraud, security or technical issues;  (4) to prevent or stop activity which Company or any of its Affiliates, in their sole discretion, may consider to be, or to pose a risk of being, an illegal, unethical, or legally actionable activity); or (e) it is required or necessary, in Company's or any Affiliate's sole discretion, for insurance or other purposes related to your ability to qualify, or remain qualified, to use the Uber Services. You understand that Company may retain your personal data for legal, regulatory, safety and other necessary purposes after this Agreement is terminated.

7.2     Company and its Affiliates may collect your personal data during the course of your application for, and use of, the Uber Services, or may obtain information about you from third parties. Such information may be stored, processed, transferred, and accessed by Company and its Affiliates, third parties, and service providers for business purposes, including for marketing, lead generation, service development and improvement, analytics, industry and market research, and such other purposes consistent with Company's and its Affiliates' legitimate business needs. You expressly consent to such use of personal data.

8.  **Insurance**

8.1     You agree to maintain during the term of this Agreement on all Vehicles operated by you under this Agreement automobile liability insurance that provides protection against bodily injury and property damage to third parties at levels of coverage that satisfy the minimum requirements to operate a private passenger vehicle on the public roads within the Territory. This coverage must also include any no-fault coverage required by law in the Territory that may not be waived by an insured. You agree to provide Company and its Affiliates a copy of the insurance policy, policy declarations, proof of insurance identification card and proof of premium payment for the insurance policy required in this Section 8.1 upon request. Furthermore, you must provide Company with written notice of cancellation of any insurance policy required by Company. Company shall have no right to control your selection or maintenance of your policy. You must be a named insured or individually rated driver, for which a premium is charged, on the insurance policy required in this Section 8.1 at all times.

8.2     **You agree to maintain during the term of this Agreement workers' compensation insurance as required by all applicable laws in the Territory. If permitted by applicable law, you may choose to insure yourself against industrial injuries by maintaining occupational accident insurance in place of workers' compensation insurance. Furthermore, if permitted by applicable law, you may choose not to insure yourself against industrial injuries at all, but do so at your own risk.**

8.3     You understand and acknowledge that your personal automobile insurance policy may not afford liability, comprehensive, collision, medical payments, personal injury protection, uninsured motorist, underinsured motorist, or other coverage for the Transportation Services you provide pursuant to this Agreement. If you have any questions or concerns about the scope or applicability of your own insurance coverage, it is your responsibility, not that of Company, to resolve them with your insurer(s).

8.4     Company may maintain during the term of this Agreement insurance related to your provision of Transportation Services as determined by Company in its reasonable discretion or as described in a City Addendum, provided that Company and its Affiliates are not required to provide you with any specific insurance coverage for any loss to you or your Vehicle. You are required to promptly notify Company of any accidents that occur while providing Transportation Services and to cooperate and provide all necessary information related thereto.

9.     **Representations and Warranties; Disclaimers**

9.1     **By You**. You hereby represent and warrant that:  (a) you have full power and authority to enter into this Agreement and perform your obligations hereunder; (b) you have not entered into, and during the term will not enter into, any agreement that would prevent you from complying with this Agreement; and (c) you will comply with all applicable laws in your performance of this Agreement, including holding and complying with all permits, licenses, registrations and other governmental authorizations necessary to provide (i) Transportation Services using the Vehicles pursuant to this Agreement, and (ii) passenger transportation services to third parties in the Territory generally.

9.2     **Disclaimer of Warranties**. COMPANY AND ITS AFFILIATES PROVIDE, AND YOU ACCEPT, THE UBER SERVICES, DRIVER APP AND THE COMPANY DEVICES ON AN "AS IS" AND "AS AVAILABLE" BASIS. COMPANY AND ITS AFFILIATES DO NOT REPRESENT, WARRANT OR GUARANTEE THAT YOUR ACCESS TO OR USE OF THE UBER SERVICES, DRIVER APP OR THE COMPANY DEVICES:  (A) WILL BE UNINTERRUPTED OR ERROR FREE; OR (B) WILL RESULT IN ANY REQUESTS FOR TRANSPORTATION

SERVICES. COMPANY AND ITS AFFILIATES FUNCTION AS AN ON-DEMAND LEAD GENERATION AND RELATED SERVICE ONLY AND MAKE NO REPRESENTATIONS, WARRANTIES OR GUARANTEES AS TO THE ACTIONS OR INACTIONS OF THE USERS WHO MAY REQUEST OR RECEIVE TRANSPORTATION SERVICES FROM YOU, AND COMPANY AND ITS AFFILIATES DO NOT SCREEN OR OTHERWISE EVALUATE USERS. BY USING THE UBER SERVICES AND DRIVER APP, YOU ACKNOWLEDGE AND AGREE THAT YOU MAY BE INTRODUCED TO A THIRD PARTY THAT MAY POSE HARM OR RISK TO YOU OR OTHER THIRD PARTIES. YOU ARE ADVISED TO TAKE REASONABLE PRECAUTIONS WITH RESPECT TO INTERACTIONS WITH THIRD PARTIES ENCOUNTERED IN CONNECTION WITH THE USE OF THE UBER SERVICES OR DRIVER APP.NOTWITHSTANDING COMPANY'S APPOINTMENT AS THE LIMITED PAYMENT COLLECTION AGENT OF YOU FOR THE PURPOSE OF ACCEPTING PAYMENT FROM USERS ON YOUR BEHALF AS SET FORTH IN SECTION 4 ABOVE, COMPANY AND ITS AFFILIATES EXPRESSLY DISCLAIM ALL LIABILITY FOR ANY ACT OR OMISSION OF YOU, ANY USER OR OTHER THIRD PARTY.

9.3    **No Service Guarantee**. COMPANY AND ITS AFFILIATES DO NOT GUARANTEE THE AVAILABILITY OR UPTIME OF THE UBER SERVICES OR DRIVER APP. YOU ACKNOWLEDGE AND AGREE THAT THE UBER SERVICES OR DRIVER APP MAY BE UNAVAILABLE AT ANY TIME AND FOR ANY REASON (*e.g.*, DUE TO SCHEDULED MAINTENANCE OR NETWORK FAILURE). FURTHER, THE UBER SERVICES OR DRIVER APP MAY BE SUBJECT TO LIMITATIONS, DELAYS, AND OTHER PROBLEMS INHERENT IN THE USE OF THE INTERNET AND ELECTRONIC COMMUNICATIONS, AND COMPANY AND ITS AFFILIATES ARE NOT RESPONSIBLE FOR ANY DELAYS, DELIVERY FAILURES, OR OTHER DAMAGES, LIABILITIES OR LOSSES RESULTING FROM SUCH PROBLEMS.

10.  **Indemnification**. You shall indemnify, defend (at Company's option) and hold harmless Company and its Affiliates and their respective officers, directors, employees, agents, successors and assigns from and against any and all liabilities, expenses (including legal fees), damages, penalties, fines, social security contributions and taxes arising out of or related to:  (a) your breach of your representations, warranties or obligations under this Agreement; or (b) a claim by a third party (including Users, regulators and governmental authorities) directly or indirectly related to your provision of Transportation Services or use of the Uber Services. This indemnification provision shall not apply to your breach of any representations regarding your status as an independent contractor.

11.  **Limits of Liability.**  COMPANY AND ITS AFFILIATES SHALL NOT BE LIABLE UNDER OR RELATED TO THIS AGREEMENT FOR ANY OF THE FOLLOWING, WHETHER BASED ON CONTRACT, TORT OR ANY OTHER LEGAL THEORY, EVEN IF A PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES:  (i) ANY INCIDENTAL, PUNITIVE, SPECIAL, EXEMPLARY, CONSEQUENTIAL, OR OTHER INDIRECT DAMAGES OF ANY TYPE OR KIND; OR (ii) YOUR OR ANY THIRD PARTY'S PROPERTY DAMAGE, OR LOSS OR INACCURACY OF DATA, OR LOSS OF BUSINESS, REVENUE, PROFITS, USE OR OTHER ECONOMIC ADVANTAGE. EXCEPT FOR COMPANY'S OBLIGATIONS TO PAY AMOUNTS DUE TO YOU PURSUANT TO SECTION 4 ABOVE, BUT SUBJECT TO ANY LIMITATIONS OR OTHER PROVISIONS CONTAINED IN THIS AGREEMENT WHICH ARE APPLICABLE THERETO, IN NO EVENT SHALL THE LIABILITY OF COMPANY OR ITS AFFILIATES UNDER THIS AGREEMENT EXCEED THE AMOUNT OF SERVICE FEES ACTUALLY PAID TO OR DUE TO COMPANY HEREUNDER IN THE SIX (6) MONTH PERIOD IMMEDIATELY PRECEDING THE EVENT GIVING RISE TO SUCH CLAIM.

12.  **Term and Termination**

12.1   **Term**.  This Agreement shall commence on the date accepted by you and shall continue until terminated as set forth herein.

12.2 **Termination**. Either party may terminate this Agreement:  (a) without cause at any time upon seven (7) days prior written notice to the other party; (b) immediately, without notice, for the other party's material breach of this Agreement; or (c) immediately, without notice, in the event of the insolvency or bankruptcy of the other party, or upon the other party's filing or submission of request for suspension of payment (or similar action or event) against the terminating party. In addition, Company may terminate this Agreement or deactivate your Driver ID immediately, without notice, with respect to you in the event you no longer qualify, under applicable law or the standards and policies of Company and its Affiliates, to provide Transportation Services or to operate the Vehicle, or as otherwise set forth in this Agreement.

12.3 **Effect of Termination**. Upon termination of the Agreement, you shall:  (a) promptly return to Company all Company Devices; and (b) immediately delete and fully remove the Driver App from any of Your Devices. Outstanding payment obligations and Sections 1, 2.3, 2.5.3, 4.7, 4.8, 5.3, 6, 7, 9, 10, 11, 12.3, 13, 14 and 15 shall survive the termination of this Agreement.

## 13. Relationship of the Parties

13.1 **Except as otherwise expressly provided herein with respect to Company acting as the limited payment collection agent solely for the purpose of collecting payment from Users on your behalf, the relationship between the parties under this Agreement is solely that of independent contracting parties. The parties expressly agree that:  (a) this Agreement is not an employment agreement, nor does it create an employment relationship, between Company and you; and (b) no joint venture, partnership, or agency relationship exists between Company and you**.

13.2 You have no authority to bind Company or its Affiliates and you undertake not to hold yourself out as an employee, agent or authorized representative of Company or its Affiliates. Where, by implication of mandatory law or otherwise, you may be deemed an agent or representative of Company, you undertake and agree to indemnify, defend (at Company's option) and hold Company and its Affiliates harmless from and against any claims by any person or entity based on such implied agency or representative relationship.

## 14. Miscellaneous Terms

14.1 **Modification**.  In the event Company modifies the terms and conditions of this Agreement at any time, such modifications shall be binding on you only upon your acceptance of the modified Agreement. Company reserves the right to modify any information referenced at hyperlinks from this Agreement from time to time. You hereby acknowledge and agree that, by using the Uber Services, or downloading, installing or using the Driver App, you are bound by any future amendments and additions to information referenced at hyperlinks herein, or documents incorporated herein, including with respect to Fare Calculations. Continued use of the Uber Services or Driver App after any such changes shall constitute your consent to such changes. Unless changes are made to the arbitration provisions herein, you acknowledge and agree that modification of this Agreement does not create a renewed opportunity to opt out of arbitration.

14.2 **Supplemental Terms**. Supplemental terms may apply to your use of the Uber Services, such as use policies or terms related to certain features and functionality, which may be modified from time to time ("*Supplemental Terms*"). You may be presented with certain Supplemental Terms from time to time. Supplemental Terms are in addition to, and shall be deemed a part of, this Agreement. Supplemental Terms shall prevail over this Agreement in the event of a conflict.

14.3    **Severability**. If any provision of this Agreement is or becomes invalid or non-binding, the parties shall remain bound by all other provisions hereof. In that event, the parties shall replace the invalid or non-binding provision with provisions that are valid and binding and that have, to the greatest extent possible, a similar effect as the invalid or non-binding provision, given the contents and purpose of this Agreement.

14.4    **Assignment**. Neither party shall assign or transfer this Agreement or any of its rights or obligations hereunder, in whole or in part, without the prior written consent of the other party; provided that Company may assign or transfer this Agreement or any or all of its rights or obligations under this Agreement from time to time without consent:  (a) to an Affiliate; or (b) to an acquirer of all or substantially all of Company's business, equity or assets.

14.5    **Entire Agreement**. This Agreement, including all Supplemental Terms, constitutes the entire agreement and understanding of the parties with respect to its subject matter and replaces and supersedes all prior or contemporaneous agreements or undertakings regarding such subject matter. In this Agreement, the words "including" and "include" mean "including, but not limited to." The recitals form a part of this Agreement.

14.6    **No Third Party Beneficiaries**. There are no third party beneficiaries to this Agreement, except as expressly set forth in the Arbitration Provision in Section 15.3. Nothing contained in this Agreement is intended to or shall be interpreted to create any third-party beneficiary claims.

14.7    **Notices**.  Any notice delivered by Company to you under this Agreement will be delivered by email to the email address associated with your account or by posting on the portal available to you on the Uber Services. Any notice delivered by you to Company under this Agreement will be delivered by contacting Company at http://partners.uber.com in the "Contact Us" section. Additional Territory-specific notices may be required from time to time.

15.  **Governing Law; Arbitration**

15.1    The choice of law provisions contained in this Section 15.1 do not apply to the arbitration clause contained in Section 15.3, such arbitration clause being governed by the Federal Arbitration Act. Accordingly, and except as otherwise stated in Section 15.3, the interpretation of this Agreement shall be governed by California law, without regard to the choice or conflicts of law provisions of any jurisdiction.  Any disputes, actions, claims or causes of action arising out of or in connection with this Agreement or the Uber Services that are not subject to the arbitration clause contained in Section 15.3 shall be subject to the exclusive jurisdiction of the state and federal courts located in the City and County of San Francisco, California. However, neither the choice of law provision regarding the interpretation of this Agreement nor the forum selection provision is intended to create any other substantive right to non-Californians to assert claims under California law whether that be by statute, common law, or otherwise. These provisions, and except as otherwise provided in Section 15.3, are only intended to specify the use of California law to interpret this Agreement and the forum for disputes asserting a breach of this Agreement, and these provisions shall not be interpreted as generally extending California law to you if you do not otherwise reside or provide services in California. The foregoing choice of law and forum selection provisions do not apply to the arbitration clause in Section 15.3 or to any arbitrable disputes as defined therein.  Instead, as described in Section 15.3, the Federal Arbitration Act shall apply to any such disputes.  The failure of Company to enforce any right or provision in this Agreement shall not constitute a waiver of such right or provision unless

acknowledged and agreed to by Uber in writing.

15.2    Other than disputes regarding the intellectual property rights of the parties and other claims identified in Section 15.3.ii, any disputes, actions, claims or causes of action arising out of or in connection with this Agreement or the Uber Services shall be subject to arbitration pursuant to Section 15.3.

**15.3    Arbitration Provision**

Important Note Regarding this Arbitration Provision:

- Except as provided below, arbitration does not limit or affect the legal claims you may bring against the Company.  Agreeing to arbitration only affects where any such claims may be brought and how they will be resolved.

- Arbitration is a process of private dispute resolution that does not involve the civil courts, a civil judge, or a jury.  Instead, the parties' dispute is decided by a private arbitrator selected by the parties using the process set forth herein.  Other arbitration rules and procedures are also set forth herein.

- Unless the law requires otherwise, as determined by the Arbitrator based upon the circumstances presented, you will be required to split the cost of any arbitration with the Company.

- IMPORTANT: This Arbitration Provision will require you to resolve any claim that you may have against the Company or Uber on an individual basis, except as provided below, pursuant to the terms of the Agreement unless you choose to opt out of the Arbitration Provision.  Except as provided below, this provision will preclude you from bringing any class, collective, or representative action (other than actions under the Private Attorneys General Act of 2004 ("PAGA"), California Labor Code § 2698 et seq. ("PAGA")) against the Company or Uber, and also precludes you from participating in or recovering relief under any current or future class, collective, or representative (non-PAGA) action brought against the Company or Uber by someone else.

  o *Cases have been filed against Company or Uber and may be filed in the future involving claims by users of the Service, including by drivers.  You should assume that there are now, and may be in the future, lawsuits against the Company or Uber alleging class, collective, and/or representative (non-*

> ***PAGA) claims on your behalf, including but not limited to claims for tips, reimbursement of expenses, and employment status.  Such claims, if successful, could result in some monetary recovery to you.  (THESE CASES NOW INCLUDE, FOR EXAMPLE, YUCESOY ET AL. V. UBER TECHNOLOGIES, INC., ET AL., CASE NO. 3:15-CV-00262(NORTHERN DISTRICT OF CALIFORNIA); IN RE UBER FCRA LITIGATION, CASE NO. 14-CV-05200-EMC (NORTHERN DISTRICT OF CALIFORNIA); AND O'CONNOR  V. UBER TECHNOLOGIES, INC., ET AL., CASE NO. CV 13-03826-EMC (NORTHERN DISTRICT OF CALIFORNIA).The contact information for plaintiffs' counsel in the O'Connor matter is as follows: Shannon Liss-Riordan, Lichten & Liss-Riordan, P.C., 100 Cambridge Street, 20th Floor, Boston, MA 02114, Telephone: (617) 994-5800, Fax: (617) 994-5801, email: sliss@llrlaw.com.)***

- o **The mere existence of such class, collective, and/or representative lawsuits, however, does not mean that such lawsuits will ultimately succeed.  But if you do agree to arbitration with the Company, you are agreeing in advance, except as otherwise provided, that you will not participate in and, therefore, will not seek to recover monetary or other relief under any such class, collective, and/or representative (non-PAGA) lawsuit, except as provided below.**

- o **However, as discussed above and except as provided below, if you agree to arbitration, you will not be precluded from bringing your claims against the Company or Uber in an individual arbitration proceeding. If successful on such claims, you could be awarded money or other relief by an arbitrator (subject to splitting the cost of arbitration as mentioned above).**

**WHETHER TO AGREE TO ARBITRATION IS AN IMPORTANT BUSINESS DECISION. IT IS YOUR DECISION TO MAKE, AND YOU SHOULD NOT RELY SOLELY UPON THE INFORMATION PROVIDED IN THIS AGREEMENT AS IT IS NOT INTENDED TO CONTAIN A COMPLETE EXPLANATION OF THE CONSEQUENCES OF ARBITRATION.  YOU SHOULD TAKE REASONABLE STEPS TO CONDUCT FURTHER**

**RESEARCH AND TO CONSULT WITH OTHERS — INCLUDING BUT NOT LIMITED TO AN ATTORNEY — REGARDING THE CONSEQUENCES OF YOUR DECISION, JUST AS YOU WOULD WHEN MAKING ANY OTHER IMPORTANT BUSINESS OR LIFE DECISION.**

       i.      <u>How This Arbitration Provision Applies</u>.

This Arbitration Provision is governed by the Federal Arbitration Act, 9 U.S.C. § 1 et seq. (the "FAA") and evidences a transaction involving interstate commerce. This Arbitration Provision applies to any dispute arising out of or related to this Agreement or termination of the Agreement and survives after the Agreement terminates. Nothing contained in this Arbitration Provision shall be construed to prevent or excuse you from utilizing any informal procedure for resolution of complaints established in this Agreement (if any), and this Arbitration Provision is not intended to be a substitute for the utilization of such procedures.

**Except as it otherwise provides, this Arbitration Provision is intended to apply to the resolution of disputes that otherwise would be resolved in a court of law or before any forum other than arbitration, with the exception of proceedings that must be exhausted under applicable law before pursuing a claim in a court of law or in any forum other than arbitration. Except as it otherwise provides, this Arbitration Provision requires all such disputes to be resolved only by an arbitrator through final and binding arbitration on an individual basis only and not by way of court or jury trial, or by way of class, collective, or representative action.**

Except as provided in Section 15.3(v), below, regarding the Class Action Waiver, such disputes include without limitation disputes arising out of or relating to interpretation or application of this Arbitration Provision, including the enforceability, revocability or validity of the Arbitration Provision or any portion of the Arbitration Provision. All such matters shall be decided by an Arbitrator and not by a court or judge. However, as set forth below, the preceding sentences shall not apply to disputes relating to the interpretation or application of the Class Action Waiver or PAGA Waiver below, including their enforceability, revocability or validity.

Except as it otherwise provides, this Arbitration Provision also applies, without limitation, to all disputes between You and the Company or Uber, as well as all disputes between You and the Company's or Uber's fiduciaries, administrators, affiliates, subsidiaries, parents, and all successors and assigns of any of them, including but not limited to any disputes arising out of or related to this Agreement and disputes arising out of or related to your relationship with the Company, including termination of the relationship. This Arbitration Provision also applies, without limitation, to disputes regarding any city, county, state or federal wage-hour law, trade secrets, unfair competition, compensation, breaks and rest periods, expense reimbursement, termination, harassment and claims arising under the Uniform Trade Secrets Act, Civil Rights Act of 1964, Americans With Disabilities Act, Age Discrimination in Employment Act, Family Medical Leave Act, Fair Labor Standards Act, Employee Retirement Income Security Act (except for individual claims for employee benefits under any benefit plan sponsored by the Company and covered by the Employee Retirement Income Security Act of 1974 or funded by insurance), Genetic Information Non-Discrimination Act, and state statutes, if any, addressing the same or similar subject matters, and all other similar federal and state statutory and common law claims.

This Agreement is intended to require arbitration of every claim or dispute that lawfully can be arbitrated, except for those claims and disputes which by the terms of this Agreement are expressly excluded from the Arbitration Provision.

Uber Technologies, Inc. is an intended, third party beneficiary of this Agreement.

ii.      <u>Limitations On How This Agreement Applies</u>.

The disputes and claims set forth below shall not be subject to arbitration and the requirement to arbitrate set forth in this Arbitration Provision shall not apply:

A representative action brought on behalf of others under the Private Attorneys General Act of 2004 ("PAGA"), California Labor Code § 2698 et seq., to the extent waiver of such a claim is deemed unenforceable by a court of competent jurisdiction;

Claims for workers compensation, state disability insurance and unemployment insurance benefits;

Regardless of any other terms of this Agreement, nothing prevents you from making a report to or filing a claim or charge with the Equal Employment Opportunity Commission, U.S. Department of Labor, Securities Exchange Commission, National Labor Relations Board, or Office of Federal Contract Compliance Programs, and nothing in this Agreement or Arbitration Provision prevents the investigation by a government agency of any report, claim or charge otherwise covered by this Arbitration Provision. Nothing in this Arbitration Provision shall be deemed to preclude or excuse a party from bringing an administrative claim before any agency in order to fulfill the party's obligation to exhaust administrative remedies before making a claim in arbitration;

Disputes that may not be subject to a predispute arbitration agreement pursuant to applicable Federal law or Executive Order are excluded from the coverage of this Arbitration Provision;

Disputes regarding your, the Company's, or Uber's intellectual property rights;

This Arbitration Provision shall not be construed to require the arbitration of any claims against a contractor that may not be the subject of a mandatory arbitration agreement as provided by section 8116 of the Department of Defense ("DoD") Appropriations Act for Fiscal Year 2010 (Pub. L. 111-118), section 8102 of the Department of Defense ("DoD") Appropriations Act for Fiscal Year 2011 (Pub. L. 112-10, Division A), and their implementing regulations, or any successor DoD appropriations act addressing the arbitrability of claims.

iii.      <u>Selecting The Arbitrator and Location of the Arbitration</u>.

The Arbitrator shall be selected by mutual agreement of the Company and you.  Unless you and the Company mutually agree otherwise, the Arbitrator shall be an attorney licensed to practice in the location where the arbitration proceeding will be conducted or a retired federal or state judicial officer who presided in the jurisdiction where the arbitration will be conducted.  If the Parties cannot agree on an Arbitrator, then an arbitrator will be selected using the alternate strike method from a list of five (5) neutral arbitrators provided by JAMS (Judicial Arbitration & Mediation Services).  You will have the option of making the first strike.  If a JAMS arbitrator is used, then the JAMS Streamlined Arbitration Rules & Procedures rules will apply; however, if there is a conflict between the JAMS Rules and this Agreement, this Agreement shall govern. Those rules are available here:

http://www.jamsadr.com/rules-streamlined-arbitration/

The location of the arbitration proceeding shall be no more than 45 miles from the place where you last provided transportation services under this Agreement, unless each party to the arbitration agrees in writing otherwise.

      iv.    <u>Starting The Arbitration</u>.

All claims in arbitration are subject to the same statutes of limitation that would apply in court.  The party bringing the claim must demand arbitration in writing and deliver the written demand by hand or first class mail to the other party within the applicable statute of limitations period.  The demand for arbitration shall include identification of the Parties, a statement of the legal and factual basis of the claim(s), and a specification of the remedy sought. Any demand for arbitration made to the Company or Uber shall be provided to Legal, Rasier, LLC, 1455 Market St., Ste. 400, San Francisco CA 94103.  The arbitrator shall resolve all disputes regarding the timeliness or propriety of the demand for arbitration. A party may apply to a court of competent jurisdiction for temporary or preliminary injunctive relief in connection with an arbitrable controversy, but only upon the ground that the award to which that party may be entitled may be rendered ineffectual without such provisional relief.

      v.    <u>How Arbitration Proceedings Are Conducted</u>.

In arbitration, the Parties will have the right to conduct adequate civil discovery, bring dispositive motions, and present witnesses and evidence as needed to present their cases and defenses, and any disputes in this regard shall be resolved by the Arbitrator.

**You and the Company agree to resolve any dispute that is in arbitration on an individual basis only, and not on a class, collective action, or representative basis ("Class Action Waiver"). The Arbitrator shall have no authority to consider or resolve any claim or issue any relief on any basis other than an individual basis**. **The Arbitrator shall have no authority to consider or resolve any claim or issue any relief on a class, collective, or representative basis.**  Notwithstanding any other provision of this Agreement, the Arbitration Provision or the JAMS Streamlined Arbitration Rules & Procedures, disputes regarding the enforceability, revocability or validity of the Class Action Waiver may be resolved only by a civil court of competent jurisdiction and not by an arbitrator. In any case in which (1) the dispute is filed as a class, collective, or representative  action and (2) there is a final judicial determination that all or part of the Class Action Waiver unenforceable, the class, collective, and/or representative action to that extent must be litigated in a civil court of competent jurisdiction, but the portion of the Class Action Waiver that is enforceable shall be enforced in arbitration.

While the Company will not take any retaliatory action in response to any exercise of rights you may have under Section 7 of the National Labor Relations Act, if any, the Company shall not be precluded from moving to enforce its rights under the FAA to compel arbitration on the terms and conditions set forth in this Agreement.

**Private Attorneys General Act**.

Notwithstanding any other provision of this Agreement or the Arbitration Provision, to the extent permitted by law, (1) **You and Company agree not to bring a representative action on behalf of others under the Private Attorneys General Act of 2004 ("PAGA"), California Labor Code § 2698 et seq., in any court or in arbitration**, and (2) for any claim brought on a private attorney general basis—i.e., where

you are seeking to pursue a claim on behalf of a government entity—both you and Company agree that any such dispute shall be resolved in arbitration on an individual basis only (i.e., to resolve whether you have personally been aggrieved or subject to any violations of law), and that such an action may not be used to resolve the claims or rights of other individuals in a single or collective proceeding (i.e., to resolve whether other individuals have been aggrieved or subject to any violations of law) ("PAGA Waiver"). Notwithstanding any other provision of this Agreement or the Arbitration Provision, the validity of the PAGA Waiver may be resolved only by a civil court of competent jurisdiction and not by an arbitrator. If any provision of the PAGA Waiver is found to be unenforceable or unlawful for any reason, (1) the unenforceable provision shall be severed from this Agreement; (2) severance of the unenforceable provision shall have no impact whatsoever on the Arbitration Provision or the Parties' attempt to arbitrate any remaining claims on an individual basis pursuant to the Arbitration Provision; and (3) any representative action brought under PAGA on behalf of others must be litigated in a civil court of competent jurisdiction and not in arbitration. To the extent that there are any claims to be litigated in a civil court of competent jurisdiction because a civil court of competent jurisdiction determines that the PAGA Waiver is unenforceable with respect to those claims, the Parties agree that litigation of those claims shall be stayed pending the outcome of any individual claims in arbitration.

      vi.    <u>Paying For The Arbitration</u>.

Each party will pay the fees for his, her or its own attorneys, subject to any remedies to which that party may later be entitled under applicable law (i.e., a party prevails on a claim that provides for the award of reasonable attorney fees to the prevailing party). In all cases where required by law, the Company will pay the Arbitrator's and arbitration fees. If under applicable law the Company is not required to pay all of the Arbitrator's and/or arbitration fees, such fee(s) will be apportioned equally between the Parties or as otherwise required by applicable law. However, you will not be required to bear any type of fee or expense that you would not be required to bear if you had filed the action in a court of law. Any disputes in that regard will be resolved by the Arbitrator as soon as practicable after the Arbitrator is selected, and Company shall bear all of the Arbitrator's and arbitration fees until such time as the Arbitrator resolves any such dispute.

      vii.    <u>The Arbitration Hearing And Award</u>.

The Parties will arbitrate their dispute before the Arbitrator, who shall confer with the Parties regarding the conduct of the hearing and resolve any disputes the Parties may have in that regard. Within 30 days of the close of the arbitration hearing, or within a longer period of time as agreed to by the Parties or as ordered by the Arbitrator, any party will have the right to prepare, serve on the other party and file with the Arbitrator a brief. The Arbitrator may award any party any remedy to which that party is entitled under applicable law, but such remedies shall be limited to those that would be available to a party in his or her individual capacity in a court of law for the claims presented to and decided by the Arbitrator, and no remedies that otherwise would be available to an individual in a court of law will be forfeited by virtue of this Arbitration Provision. The Arbitrator will issue a decision or award in writing, stating the essential findings of fact and conclusions of law. A court of competent jurisdiction shall have the authority to enter a judgment upon the award made pursuant to the arbitration. The Arbitrator shall not have the power to commit errors of law or legal reasoning, and the award may be vacated or corrected on appeal to a court of competent jurisdiction for any such error.

**viii.    Your Right To Opt Out Of Arbitration.**

Arbitration is not a mandatory condition of your contractual relationship with the Company.  If you do not want to be subject to this Arbitration Provision, you may opt out of this Arbitration Provision by notifying the Company in writing of your desire to opt out of this Arbitration Provision, either by (1) sending, within 30 days of the date this Agreement is executed by you, electronic mail to optout@uber.com, stating your name and intent to opt out of the Arbitration Provision or (2) by sending a letter by U.S. Mail, or by any nationally recognized delivery service (*e.g*, UPS, Federal Express, etc.), or by hand delivery to:

> Legal
> Rasier, LLC
> 1455 Market St., Ste. 400
> San Francisco CA 94103

In order to be effective, the letter under option (2) must clearly indicate your intent to opt out of this Arbitration Provision, and must be dated and signed. The envelope containing the signed letter must be received (if delivered by hand) or post-marked within 30 days of the date this Agreement is executed by you.  Your writing opting out of this Arbitration Provision, whether sent by (1) or (2), will be filed with a copy of this Agreement and maintained by the Company.  Should you not opt out of this Arbitration Provision within the 30-day period, you and the Company shall be bound by the terms of this Arbitration Provision.  You have the right to consult with counsel of your choice concerning this Arbitration Provision.  You understand that you will not be subject to retaliation if you exercise your right to assert claims or opt-out of coverage under this Arbitration Provision.

ix.    Full and Complete Agreement Related to Formal Resolution of Disputes; Enforcement Of This Agreement.

This Arbitration Provision is the full and complete agreement relating to the formal resolution of disputes arising out of this Agreement.  Except as stated in subsection v, above, in the event any portion of this Arbitration Provision is deemed unenforceable, the remainder of this Arbitration Provision will be enforceable.

By clicking "I accept", you expressly acknowledge that you have read, understood, and taken steps to thoughtfully consider the consequences of this Agreement, that you agree to be bound by the terms and conditions of the Agreement, and that you are legally competent to enter into this Agreement with Company.

# EXHIBIT 5

DAINIUS BARYSAS,                          §
                                          §
     Claimant,                          §
                                          §
vs.                                       §          HON. SUSAN SOUSSAN,
                                          §          ARBITRATOR
UBER TECHNOLOGIES, INC.,                  §
                                          §
     Respondent.                        §
                                          §
                                          §

## RESPONDENT'S FIRST REQUESTS FOR PRODUCTION AND INTERROGATORIES TO CLAIMANT DAINIUS BARYSAS

TO:    Dainius Barysas, by and through his attorneys of record, Bret Stanley, Kherkher Garcia, LLP, 2925 Richmond Ave., Ste. 1560, Houston, TX 77098

Pursuant to Arbitrator Susan Soussan's Order dated December 14, 2020, Respondent serves the following First Requests for Production and Interrogatories (collectively "Requests") to Claimant Dainius Barysas. You are required to serve complete written responses to the following within thirty (30) days following service of these Requests. You have an affirmative duty to supplement your responses.

Dated:  January 22, 2021

Respectfully submitted,

_/s/ Allison C. Williams_
Kimberly R. Miers
Texas State Bar No. 24041482
Nicole S. LeFave
Texas State Bar No. 24085432
LITTLER MENDELSON, P.C.
A PROFESSIONAL CORPORATION
100 Congress Avenue
Suite 1400
Austin, Texas  78701
512.982.7250 (Telephone)
512.982.7248 (Telecopier)
kmiers@littler.com
nlefave@littler.com

Of Counsel:

Allison Clara Williams
State Bar No. 24075108
LITTLER MENDELSON, P.C.
A PROFESSIONAL CORPORATION
1301 McKinney Street, Suite 1900
Houston, Texas  77010
713.951.9400 (Telephone)
713.951.9212 (Facsimile)
acwilliams@littler.com

ATTORNEYS FOR DEFENDANT
UBER TECHNOLOGIES, INC.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document has been forwarded via email pursuant to the parties' Electronic Service Agreement, on January 22, 2021, to the following counsel:

Bret Stanley
Kherkher Garcia, LLP.
2925 Richmond Ave., Ste. 1560
Houston, TX 77098
Telephone: 713.333.0862
bstanley@kherkhergarcia.com

_/s/ Allison C. Williams_
Allison C. Williams

**Respondent's First Set of Requests for Production and Interrogatories to Claimant BARYSAS**          **2**

## **DEFINITIONS**

As used herein, the following terms shall have the meanings indicated below:

1.      "Documents," "Electronically Stored Information," and "Documents or Electronically Stored Information" shall mean any written, printed, typed, tape recorded or other graphic matter of any kind or nature, however produced or reproduced, whether or not sent or received, private or confidential, wherever located, including drafts and copies bearing notations or marks not found on the original and includes, but is not limited to, all memoranda, reports, financial reports, notes, transcripts, letters, facsimiles, envelopes, telegrams, telecopies, cables, telex messages, messages (including reports, notes, notations and memoranda of or relating to telephone conversations, telegrams, messages, conversations or any other oral communications), tabulations, studies, analyses, evaluations, projections, work papers, statements, summaries, opinions, journals, statistical records, calendars, appointment books, diaries, lists, comparisons, questionnaires, surveys, charts, graphs, books, articles, magazines, newspapers, booklets, circulars, bulletins, notices, instructions, manuals, minutes or transcriptions of meetings, written communications of any type, photographs, microfilms, punch cards, magnetic tapes, computers, computer printouts, computer diskettes, hard drives, devices capable of storing information electronically, electronic mail ("emails"), data cells, drums, printouts and other data compilations from which information can be obtained.

2.      The words "or" and "and" are to be construed as both disjunctive and conjunctive.

3.      "Communication" or "communications" means the transmission or transfer of information of any kind, orally, in writing, or in any other manner, at any time or place, and under any circumstances whatsoever, including without limitation telephone conversations, letters, memoranda, notes, summaries, telexes, photographs, motion pictures, audio tapes, video tapes, computer telecommunications, electronic or magnetic media, e-mail, voice-mail, instant messages, text messages, social media post, or other materials or memorials of communication, meetings or any occasion of joint or mutual presence, as well as the transfer of any document from one person to another.

4.      "Relate to," "related to," or "relates to" mean refer to, reflect, support, rebut, evidence, concern, describe, constitute, embody, identify, state, substantiate, or to be logically or factually connected with the matter discussed.

5.      "Claimant," "you," or "your," refers to the Claimant in the above-captioned matter, Dainius Barysas.

6.      "Arbitration Demand" means the Arbitration Demand served in the above-captioned matter on or about March 17, 2020 and any amendments thereto that either party contends are applicable to Claimant, including Claimant's Specification of Claims, served on January 15, 2021.

7.      "Respondent" or "Uber" refers to Respondent Uber Technologies, Inc., any of its subsidiaries, and its attorneys or agents.

8.      "Uber App" refers to the mobile software application developed by Uber to connect riders and third party transportation providers.

9.      Unless otherwise specified:

      a.      "Identification" or "identify" as applied to documents shall mean stating the date, author, addressee, signatory, number of pages, subject matter (which shall be stated with particularity), and giving the name and address of the custodian thereof and the location of the document.  Alternatively, a legible copy may be produced and you shall disclose the Bates/production number.

      b.      "Identification" or "identify" as applied to an individual person or entity, means to state, to the extent known, the person's full name, present or last known address, and when referring to a natural person, the present or last known place of employment.   Once a person has been identified in accordance with this subsection, only the person's name need be listed in response to subsequent discovery requesting the identification of that person.

      c.      "Identification" or "identify" as applied to a communication means to state the identity of all persons present at the time of the communication, the date, time and location of the communication, the method and/or manner of communication used (written, verbal, etc.), and the identity of all documents recording or summarizing the communication.

      d.      "Identification" or "identify" as applied to an incident or an occurrence, means to state its location; its date; and any witnesses who were present or who have knowledge of said incident or occurrence.

10.     "Time Period" means the period of time beginning on the date Claimant first signed up to provide transportation and/or delivery services using the Uber App through the present.

## INSTRUCTIONS

1.      You are required to produce not only those Documents, items of Electronically Stored Information and things in your own possession, custody, and control, but also those reasonably available to you, including those within your possession, custody or control or the possession, custody or control of attorneys, accountants, employees, subcontractors, family members, members of your household, agents and representatives acting on your behalf or retained by you.

2.      All information produced pursuant to these Requests For Production of Documents ("RFPs") must be Bates-stamped, branded for confidentiality pursuant to the Protective Order entered in this matter (if such designation is appropriate), and must indicate the custodian of record for each item being produced. If the original of a Document, item of Electronically Stored Information or thing is no longer extant or no longer in your possession, custody or control or is no longer reasonably available to you, you must produce the best copy or reproduction of that

Document, item of Electronically Stored Information or thing that is in your possession, custody or control or that is reasonably available to you.

3.      When producing documents responsive to the RFPs, indicate in your response to each RFP the Bates-stamp/production number of the document(s) that you contend is/are responsive to each RFP.

4.      If you properly object to the production of any information sought by one of the RFPs below, please indicate whether you are withholding documents subject to your objection(s) and produce all remaining information (or portions of information) called for by that RFP to which you do not object.

5.      If you claim that the attorney-client privilege, the attorney work product rule, or any other protection from disclosure is applicable to any information whose production is requested and which you are therefore withholding, in addition to producing any reasonably segregable part of that information, you are requested to expressly make that claim in writing, and describe the information being withheld with detail sufficient to allow Respondents, and the Arbitrator, to assess your claim that the withheld information is protected from disclosure.

6.      Each Document, item of Electronically Stored Information and thing requested herein of which Claimant has knowledge or information, but which is neither in Claimant's possession, custody or control nor reasonably available to Claimant must be described in your written response to these RFPs with detail sufficient to allow Respondents to identify the type, location, and custodian of the information and to assess its relevance.

7.      In answering Respondent's Interrogatories, you are requested to furnish all information available to you, not merely such information within your own personal knowledge. If you cannot answer the following Interrogatories in full after exercising due diligence to secure the information to do so, you are requested to answer to the extent possible.

8.      If an Interrogatory requires you to provide a date or number, and if you cannot recall the date or number, provide your best approximation and indicate that it is an approximation.

9.      Whenever a singular form of a word is used, it should be construed to include the plural, and vice versa. Likewise, if the masculine gender of a word is used, it should be construed to include the neuter and feminine.

10.     The words "or" and "and" are to be construed as both disjunctive and conjunctive.

11.     Identical information need not be produced in response to multiple RFPs below.

## REQUESTS FOR PRODUCTION

**REQUEST FOR PRODUCTION NO. 1:**

Any and all Documents that you received from Respondent.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 2:**

Any and all non-privileged Documents that relate to your alleged "employment" with Respondent.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 3:**

Any and all non-privileged Documents that relate to any services, including, but not limited to transportation and/or delivery services, you performed during your alleged "employment" with Respondent.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 4:**

Any and all non-privileged Documents that relate to any money you received from Respondent or riders and/or end-user consumers who use the Uber App in connection with your alleged "employment" with Respondent, including tips or gratuities.

**RESPONSE**:

**REQUEST FOR PRODUCTION NO. 5:**

Any and all non-privileged Documents that relate to any written, oral, or implied agreements between you and Respondent pertaining to your alleged "employment" with Respondent.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 6:**

Any and all non-privileged Documents and communications that relate to all duties that you allegedly performed for Respondent's benefit, including any Documents reflecting a requirement that you work on the Uber App at any specific location, a requirement that you work a minimum number of hours on the Uber App, a requirement that you notify Respondent of any vacations or "time-off," a requirement to notify Respondent of your availability to work, or a requirement that you log-in to the Uber App at the direction of Respondent at any time.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 7:**

Any and all non-privileged Documents that relate to your daily activities as Respondent's alleged "employee," including documents that show the number of hours that you allege you used the Uber App each day during the period you were allegedly "employed" by Respondent including, but not limited to, invoices, time sheets, activity logs, journals, notes, calendars, and agendas.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 8:**

Any and all Documents that relate to any business-related transportation expenses that you incurred during the Time Period, including, but not limited to, expenses related to vehicle maintenance, fuel, tolls, and mileage, regardless of whether those expenses were incurred in the course of performing services for Respondent or riders or end-user consumers who use the Uber App.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 9:**

Any and all Documents that relate to your acquisition, purchase, rent, or lease of vehicles you used to provide transportation services and/or delivery services at any time beginning one year prior to the first day of your alleged employment with Respondent through the present.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 10:**

Any and all Documents that relate to any policies, procedures, rules, instructions, directions, guidelines or directives you claim were applicable to you during the period you allegedly performed services in any capacity for and/or were allegedly employed by Respondent.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 11:**

Any and all non-privileged Documents that relate to any communications, whether written or oral, between you and Respondent and/or any agent of Respondent and/or any employee of Respondent regarding your status as an independent contractor or alleged "employee," the subject matter of this arbitration, the injuries claimed and/or damages sought in this lawsuit, and/or any of the allegations contained in the Arbitration Demand beginning one year prior to the first day of your alleged "employment" with Respondent.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 12:**

Any and all non-privileged Documents that relate to services you provided as an alleged "employee" or independent contractor to or on behalf of any individual or business entity, other than Respondent, during the Time Period, including but not limited to, your job duties, services performed, work experience, resumes and/or Curricula Vitae that you have prepared or sent to others, all communications sent to prospective employers, all employment applications you have completed with prospective employers, all Internet postings you have created (including any LinkedIn pages), and any applications you have made for loans or lines of credits or housing in which you describe your duties or responsibilities or services.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 13:**

Any and all Documents that relate to any payments or income you received from any individual or business entity, other than through the use of the Uber App, beginning one year prior to the first day of your alleged employment with Respondent through the present.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 14:**

Any and all state and federal income tax returns (including all forms, schedules, attachments, exhibits, 1099s, W2s, 1098s, worksheets and/or supporting documentation) for tax years 2017, 2018, 2019, and, when available, 2020.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 15:**

Any and all non-privileged Documents that refer to any application for unemployment or workers' compensation benefits from March 12, 2017 through the present.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 16:**

Any and all Documents that reflect the date and time of any activity you performed (whether or not related to your alleged employment with Respondents) while you were while logged into the Uber App, including, by way of example and not limitation, paper or electronic receipts reflecting the date and time of purchases, cell phone records reflecting the date, time, and duration of telephone calls, or records sufficient to demonstrate the date and time that you sent text messages and/or emails.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 17:**

Any and all non-privileged Documents that relate to communications between you and any other individual or entity, including any government agency, which discusses, references, or relates to the subject matter of the Arbitration Demand.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 18:**

Any and all non-privileged Documents that relate to your prayer for damages, including any damage calculations, as set forth in the Arbitration Demand.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 19:**

Any and all non-privileged Documents that you referred to, used, or relied upon when preparing the Arbitration Demand.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 20:**

Any and all non-privileged Documents that relate to any advertising or marketing you have done in conjunction with any services you have offered to the public as an independent contractor at any time.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 21:**

Any and all non-privileged Documents that relate to any products or services you have offered to the public and/or to any entity at any time March 12, 2017 through the present.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 22:**

Any and all business licenses you have obtained at any time, including documents that relate to your establishment of membership in, partnership in, funding of, or any form of participation in any business entity, including but not limited to, a corporation, limited liability company or partnership, or partnership.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 23:**

Any and all licenses or certifications that you have obtained from any state or local agency to provide transportation and/or delivery services, including by not limited to licenses issued by the City of Houston or the Texas Department of Transportation or the State of Texas.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 24:**

Any and all Documents that relate to the total amount of time that you spent using another lead generation source or delivery lead generation source other than the Uber App, including, but not limited to, Lyft, Sidecar, Flywheel, Caviar, DoorDash, Postmates, Shipt, Favor, or any other electronic or non-electronic booking platforms, where you were available to receive requests to provide transportation or delivery services to any user who requested your services beginning one year prior to the first day of your alleged employment with Respondent through the present.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 25:**

Any and all Documents that relate to your provision of transportation services for private clients at any time beginning one year prior to the first day of your alleged employment with Respondent through the present.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 26:**

Any and all Documents that relate to any statements you have made or writings you have submitted to a media outlet, or any posting you have made on Facebook, Twitter, Instagram, LinkedIn, etc., regarding (1) Uber; (2) your transportation and/or delivery services; and/or (3) your use of the Uber App as a transportation provider and/or delivery provider.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 27:**

Copies of any communications to riders, including but not limited to business cards, flyers, and signs or placards placed inside our affixed to the outside of any vehicle, used in your provision of transportation services at any time beginning one year prior to the first day of your alleged employment with Respondent through the present.

**RESPONSE:**

## INTERROGATORIES

**INTERROGATORY NO. 1:**

Identify each person known or believed by you to have knowledge or information related to any of the allegations in your Arbitration Demand, and for each such person generally describe their knowledge or information regarding the allegations in your Arbitration Demand and whether you have obtained a statement, affidavit, declaration or other recording from such person regarding any of the facts, claims, defenses, allegations or issues in the Arbitration Demand.

**ANSWER:**

**INTERROGATORY NO. 2:**

If you have applied for, requested, or received payments or benefits for unemployment, workers' compensation, or any disability or injury at any time from March 12, 2017 through the present, identify each such application, request, payment or benefit received, and duration of the payment or benefit.

**ANSWER:**

**INTERROGATORY NO. 3:**

Identify (a) any claim, complaint, charge, or grievance you have submitted to any government agency (whether local, state, or federal) concerning Respondent, and (b) any complaint submitted to Respondent concerning the subject matter of this lawsuit, and for each include: the date it was submitted; the entity to which it was submitted; and the names of all representatives with whom you have had any contact concerning the claim, complaint or grievance; the substance of the claim, complaint or grievance; and the status of the claim, complaint or grievance.

**ANSWER:**

**INTERROGATORY NO. 4:**

Identify each lawsuit, criminal case, bankruptcy case, immigration action, arbitration, or other court or legal proceeding in which you have participated as a party or a witness, including: the date the action was filed or initiated; the full title of the action, including the names of all parties, court, jurisdiction, venue, and cause number; the name, mailing address, and contact information for counsel for each party to the action; and a description of the nature of the action, its current status or disposition, your involvement, and a description of any criminal convictions that you have received. This Interrogatory includes, but is not limited to, identifying whether you have been convicted of any crime that was, in the convicting jurisdiction, punishable by death or by imprisonment for more than one year, or any crime, regardless of punishment, involving proof of

a dishonest act or false statement as an element of the crime.

**ANSWER:**

**INTERROGATORY NO. 5:**

From March 12, 2017 through the present, identify and describe each and every company or individual for whom you have provided transportation services and/or delivery services either as an employee or independent contractor, including the dates and times of every trip you made for each respective company other than Respondent.

**ANSWER:**

**INTERROGATORY NO. 6:**

From March 12, 2017 through the present, identify all employers for whom you have worked and your scheduled hours for each employer, including any self-employment.

**ANSWER:**

**INTERROGATORY NO. 7:**

Identify each social or business network computer site which you are a member, user, or subscriber (including but not limited to Facebook, MySpace, ClassMates.com, LinkedIn, Instagram, Twitter, etc.), the URL of the site(s), your user name(s) for each site, and your login name(s) for each site.

**ANSWER:**

**INTERROGATORY NO. 8:**

For each trip for which you assert Uber retained tips or gratuities to which you were entitled, please provide the following information:

(a)     Identification of each such trip, by the trip number and date and time of the trip;

(b)     The amount of the tip or gratuity;

(c)     Each person employed by Respondent who you notified of the improperly retained tip or gratuity;

(d)     Respondent's response to your notification, including identification of the person and the substance of the response.

**ANSWER:**

**INTERROGATORY NO. 9:**

For each alleged cost or expense that Claimant asserts he was not "reimburse[d] … [with respect to] the use of [Claimant's] personal vehicle", please provide the following information:

    (a)    Identification of the alleged cost or expense that Claimant alleges was incurred as a result of his use of the Uber App and to which Claimant further alleges requires reimbursement;

    (b)    Identify what documents, if any, support Claimant's claim of cost or expense;

    (c)    The amount paid by Claimant and the method of payment for each cost or expense (i.e. cash, credit card, check, debit card, etc.);

    (d)    The date and approximate time the expense and/or cost was incurred;

    (e)    Each person employed by Respondent who you notified of the cost or expense;

    (f)    The date you requested reimbursement for each cost or expense from Respondent;

    (g)    Respondent's response to your request for reimbursement, including identification of the person and the substance of the response.

**ANSWER:**

**INTERROGATORY NO. 10:**

For each trip for which Claimant asserts he was not "reimbursed" toll charges, please provide the following information:

    (a)    Identification of the trip by the trip number wherein Claimant claims he paid a toll expense or incurred a toll charge while providing transportation services while logged into the Uber App;

    (b)    The name of the toll road traveled;

    (c)    The amount paid for use of the toll road;

    (d)    The date and approximate time the toll charge was incurred;

    (e)    Each person employed by Respondent who you notified of the toll charge;

(f)      The date you requested reimbursement of the toll charge from Respondent;

(g)      Respondent's response to your request for reimbursement, including identification of the person and the substance of the response.

**ANSWER:**

4827-0012-9752.1 073208.1763

# EXHIBIT 6

DAINIUS BARYSAS,          §

        §

     Claimant,          §

         §

vs.          §      **HON. SUSAN SOUSSAN,**

         §      **ARBITRATOR**

UBER TECHNOLOGIES, INC.,          §

         §

     Respondent.          §

         §

## CLAIMANT BARYSAS'S RESPONSE TO
## RESPONDENT'S FIRST REQUESTS FOR PRODUCTION AND INTERROGATORIES

TO:     Uber Technologies, Inc., by and through its attorneys of record, Ms. Kimberly Miers, Ms. Nicole LeFave and Ms. Allison Williams, Littler Mendelson, P.C., 100 Congress Avenue, Suite 1400, Austin, TX 78701.

      COMES NOW, Claimant Dainius Barysas and herewith propounds in writing and under oath, Answers and Objections to Respondent's First Requests for Production and Interrogatories, pursuant to the provisions of Rules 196 and 197 of the Texas Rules of Civil Procedure.

                  Respectfully submitted,


                  KHERKHER GARCIA, LLP


                  By:        */s/ Bret Stanley*

                         Bret Stanley

                         State Bar No. 24075116

                         BStanley@KherkherGarcia.com

                         2925 Richmond Ave., Suite 1560

                         Houston, TX  77098

                         (713) 333-1030 / (713) 333-1029 (fax)

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the above and foregoing document has been forwarded via certified mail, return receipt requested, on this the 22nd day of February 2021, to the following counsel:

Kimberly R. Miers
Allison Williams
Nicole S. LeFave
Abby Bochenek
LITTLER MENDELSON, P.C.
kmiers@littler.com
acwilliams@littler.com
nlefave@littler.com
abochenek@littler.com
cquigley@littler.com
sbehnia@littler.com
smendoza@littler.com
scornell@littler.com
preyes@littler.com

## GENERAL OBJECTIONS

Claimant Barysas generally objects to any Request for Production and Interrogatory that seeks documents or information concerning any communication or information between Respondent Uber Technologies, Inc. (Uber) and Claimant Barysas. Respondent Uber primarily communicates with Claimant Barysas through its Driver App.  Respondent Uber exhibits total control over the Driver App and removes communications and information between Respondent Uber and Claimant Barysas on a rolling basis. Uber's removal of data prevents Claimant Barysas from accessing much of the communication and information sought by these requests and interrogatories. Respondent Uber, however, maintains all communications and information between the Parties electronically.

Claimant Barysas globally objects to Respondent Uber's requests for production and interrogatories to the extent they seek information Respondent Uber maintains in its electronic files on the grounds that Respondent Uber can be obtain the information through less intrusive means by searching their own files.

Subject to this general objection, and in response to these Requests for Production and Interrogatories, Claimant Barysas produces herewith his first production of documents, bates labeled **Barysas_001 – Barysas_861.**

## REQUESTS FOR PRODUCTION

**REQUEST FOR PRODUCTION NO. 1:**

Any and all Documents that you received from Respondent.

**RESPONSE:**

Claimant Barysas objects that this request fails to identify the categories of items it seeks with reasonable particularity, *see, e.g.*, *In re EOG Res. Inc.*, No. 10–10–00455–CV, 2011 WL 455280, at *2–3 (Tex. App.—Waco Feb. 9, 2011 orig. proceeding) (mem. op.) and objects that Respondent Uber seeks information that can be obtained through less intrusive means.

Respondent Uber uses its Driver App to exchange correspondence, documents, and information with Claimant Barysas. Respondent Uber exhibits control over the Driver App by causing correspondence, documents, and information transmitted between the Parties to be removed from the Driver App on a rolling basis. Claimant Barysas is dependent on Respondent Uber for the storage of the documents requested due to Respondent Uber's policy to remove the documents from the Driver App. Respondent Uber maintains the requested documents in its electronic database.

Subject to these objections, Claimant Barysas produces limited documents in his possession, Bates Labeled Barysas_001 – Barysas_058.

**REQUEST FOR PRODUCTION NO. 2:**

Any and all non-privileged Documents that relate to your alleged "employment" with Respondent.

**RESPONSE:**

Claimant Barysas objects that this request fails to identify the categories of items it seeks with reasonable particularity, *see, e.g.*, *In re EOG Res. Inc.*, No. 10–10–00455–CV, 2011 WL 455280, at *2–3 (Tex. App.—Waco Feb. 9, 2011 orig. proceeding) (mem. op.) and objects that Respondent Uber seeks information that can be obtained through less intrusive means.

Respondent Uber uses its Driver App to exchange correspondence, documents, and information with Claimant Barysas. Respondent Uber exhibits control over the Driver App by causing correspondence, documents, and information transmitted between the Parties to be removed from the Driver App on a rolling basis. Claimant Barysas is dependent on Respondent Uber for the storage of the documents requested due to Respondent Uber's policy to remove the documents from the Driver App. Respondent Uber maintains the requested documents in its electronic database.

Subject to these objections, Claimant Barysas produces the limited documents in his possession, Bates Labeled Barysas_001 – Barysas_854.

**REQUEST FOR PRODUCTION NO. 3:**

Any and all non-privileged Documents that relate to any services, including, but not limited to transportation and/or delivery services, you performed during your alleged "employment" with Respondent.

**RESPONSE:**

Claimant Barysas objects that this request fails to identify the categories of items it seeks with reasonable particularity, *see, e.g.*, *In re EOG Res. Inc.*, No. 10–10–00455–CV, 2011 WL 455280, at *2–3 (Tex. App.—Waco Feb. 9, 2011 orig. proceeding) (mem. op.) and objects that Respondent Uber seeks information that can be obtained through less intrusive means.

Claimant Barysas performed services in accordance with the training and policies required by Respondent Uber. Documents associated to these services are exchanged between the parties through the Driver App. Respondent Uber exhibits control over the Driver App by causing transportation and / or delivery service documents transmitted between the Parties to be removed from the Driver App on a rolling basis. Claimant Barysas is dependent on Respondent Uber for the storage of the documents requested due to Respondent Uber's policy to remove the documents from the Driver App. Respondent Uber maintains the requested documents in its electronic database.

Subject to these objections, Claimant Barysas produces the limited documents in his possession, Bates Labeled Barysas_001 – Barysas_854.

**REQUEST FOR PRODUCTION NO. 4:**

Any and all non-privileged Documents that relate to any money you received from Respondent or riders and/or end-user consumers who use the Uber App in connection with your alleged "employment" with Respondent, including tips or gratuities.

**RESPONSE**:

Claimant Barysas objects that this request fails to identify the categories of items it seeks with reasonable particularity, *see, e.g.*, *In re EOG Res. Inc.*, No. 10–10–00455–CV, 2011 WL 455280, at *2–3 (Tex. App.—Waco Feb. 9, 2011 orig. proceeding) (mem. op.) and objects that Respondent Uber seeks information that can be obtained through less intrusive means.

Respondent Uber requires all monetary exchanges between Respondent Uber, riders, and/or end-user consumers to occur through the Driver App. Respondent Uber exhibits control over Claimant Barysas by controlling all monetary exchanges. Respondent Uber causes the monetary documents requested here to be removed from the Driving App on a rolling basis. Claimant Barysas is dependent on Respondent Uber for the storage of the documents requested due to Respondent Uber's control the storage of these records. Respondent Uber maintains the requested documents in its electronic database.

Subject to this objection, Claimant Barysas produces the limited documents in his possession, Bates Labeled Barysas_038 – Barysas_058.

**REQUEST FOR PRODUCTION NO. 5:**

Any and all non-privileged Documents that relate to any written, oral, or implied agreements between you and Respondent pertaining to your alleged "employment" with Respondent.

**RESPONSE:**

Claimant Barysas objects that this request fails to identify the categories of items it seeks with reasonable particularity, *see, e.g.*, *In re EOG Res. Inc.*, No. 10–10–00455–CV, 2011 WL 455280, at *2–3 (Tex. App.—Waco Feb. 9, 2011 orig. proceeding) (mem. op.) and objects that Respondent Uber seeks information that can be obtained through less intrusive means.

Respondent Uber requires Claimant Barysas to execute all agreements, including Platform Access Agreements (and addenda thereto), electronically through the Driver App. Respondent Uber does not send Claimant Barysas executed copies of any agreements executed outside of the Driver App. Documents associated to these agreements are exchanged by Respondent Uber through the Driver App. Respondent Uber exhibits control over the Driver App by causing agreements transmitted between the Parties to be removed from the Driver App on a rolling basis. Claimant Barysas is dependent on Respondent Uber for the storage of the documents requested due to Respondent Uber's policy to remove the documents from the Driver App. Respondent Uber maintains the requested documents in its electronic database concerning written, oral, or implied agreements.

Subject to these objections, Claimant Barysas does not have possession of any written, oral, or implied agreements entered into with Respondent Uber.

**REQUEST FOR PRODUCTION NO. 6:**

Any and all non-privileged Documents and communications that relate to all duties that you allegedly performed for Respondent's benefit, including any Documents reflecting a requirement that you work on the Uber App at any specific location, a requirement that you work a minimum number of hours on the Uber App, a requirement that you notify Respondent of any vacations or "time-off," a requirement to notify Respondent of your availability to work, or a requirement that you log-in to the Uber App at the direction of Respondent at any time.

**RESPONSE:**

Claimant Barysas objects that this request fails to identify the categories of items it seeks with reasonable particularity, *see, e.g.*, *In re EOG Res. Inc.*, No. 10–10–00455–CV, 2011 WL 455280, at *2–3 (Tex. App.—Waco Feb. 9, 2011 orig. proceeding) (mem. op.) and objects that Respondent Uber seeks information that can be obtained through less intrusive means.

Documents and communications that relate to all duties that Claimant Barysas performed for Respondent's benefit are exchanged between the parties through the Driver App. Respondent Uber

exhibits control over the Driver App by causing documents transmitted between the Parties to be removed from the Driver App on a rolling basis. Claimant Barysas is dependent on Respondent Uber for the storage of the documents requested due to Respondent Uber's policy to remove the documents from the Driver App. Respondent Uber maintains the requested documents in its electronic database.

Subject to these objections, Claimant Barysas produces the limited documents in his possession, Bates Labeled Barysas_001 – Barysas_037.

## REQUEST FOR PRODUCTION NO. 7:

Any and all non-privileged Documents that relate to your daily activities as Respondent's alleged "employee," including documents that show the number of hours that you allege you used the Uber App each day during the period you were allegedly "employed" by Respondent including, but not limited to, invoices, time sheets, activity logs, journals, notes, calendars, and agendas.

## RESPONSE:

Claimant Barysas objects that this request fails to identify the categories of items it seeks with reasonable particularity, *see, e.g.*, *In re EOG Res. Inc.*, No. 10–10–00455–CV, 2011 WL 455280, at *2–3 (Tex. App.—Waco Feb. 9, 2011 orig. proceeding) (mem. op.) and objects that Respondent Uber seeks information that can be obtained through less intrusive means.

Documents that relate to all Claimant Barysas's daily activities as an Uber employee are exchanged between the parties through the Driver App. Respondent Uber exhibits control over the Driver App by causing documents transmitted between the Parties to be removed from the Driver App on a rolling basis. Claimant Barysas is dependent on Respondent Uber for the storage of the documents requested due to Respondent Uber's policy to remove the documents from the Driver App. Respondent Uber maintains the requested documents in its electronic database. Claimant Barysas did not maintain documents outside of the Driver App relating to the number of hours used on the Driver App each day.

Subject to this objection, Claimant Barysas produces herewith documents responsive to this request (*see* Bates Labeled Barysas_001 – Barysas_847). Additional communications and documents evidencing that Claimant was an employee of Uber have been requested for production from Respondent Uber.

## REQUEST FOR PRODUCTION NO. 8:

Any and all Documents that relate to any business-related transportation expenses that you incurred during the Time Period, including, but not limited to, expenses related to vehicle maintenance, fuel, tolls, and mileage, regardless of whether those expenses were incurred in the course of performing services for Respondent or riders or end-user consumers who use the Uber App.

## RESPONSE:

Claimant Barysas objects that "any and all documents that relate to business-related transportation and/or delivery expenses" fails to identify the categories of items it seeks with reasonable particularity. Claimant Barysas objects to this request on the grounds that it is unduly burdensome and not proportional to the needs of the case.  Further, Claimant Barysas objects to this request to the extent Respondent Uber is attempting to require Claimant to produce facts and evidence beyond what is required by law. Neither the FLSA nor other applicable law and regulations require Claimant Barysas prove the actual cost of employment related expenses incurred. The law allows Claimant to present a "reasonable approximate" of an employee's employment related expenses as damages.

Subject to this objection, Claimant Barysas produces the limited documents in his possession responsive to this request, *see* Bates Labeled Barysas_059 – Barysas_847.

**REQUEST FOR PRODUCTION NO. 9:**

Any and all Documents that relate to your acquisition, purchase, rent, or lease of vehicles you used to provide transportation services and/or delivery services at any time beginning one year prior to the first day of your alleged employment with Respondent through the present.

**RESPONSE:**

Claimant Barysas used a 2014 Infiniti QX60 in connection to his duties as an Uber Driver. Claimant Barysas purchased the Infiniti QX60 in 2014 and sold it in 2019. *See* documents Bates Labeled Barysas_834 – Barysas_847.

**REQUEST FOR PRODUCTION NO. 10:**

Any and all Documents that relate to any policies, procedures, rules, instructions, directions, guidelines or directives you claim were applicable to you during the period you allegedly performed services in any capacity for and/or were allegedly employed by Respondent.

**RESPONSE:**

Claimant Barysas objects that this request fails to identify the categories of items it seeks with reasonable particularity, *see, e.g., In re EOG Res. Inc.*, No. 10–10–00455–CV, 2011 WL 455280, at *2–3 (Tex. App.—Waco Feb. 9, 2011 orig. proceeding) (mem. op.) and objects that Respondent Uber seeks information that can be obtained through less intrusive means.

Respondent Uber's policies, procedures, rules, instructions, directions, guidelines or directives that apply to Claimant Barysas are <u>exclusively</u> exchanged between the parties through the Driver App. Respondent Uber exhibits control over the Driver App by causing documents transmitted between the Parties to be removed from the Driver App on a rolling basis. Claimant Barysas is dependent on Respondent Uber for the storage of the documents requested due to Respondent Uber's policy

to remove the documents from the Driver App. Respondent Uber maintains the requested documents in its electronic database.

Subject to this objection, Claimant Barysas produces the limited documents in his possession responsive to this request, *see* Bates Labeled Barysas_001 – Barysas_037.

**REQUEST FOR PRODUCTION NO. 11:**

Any and all non-privileged Documents that relate to any communications, whether written or oral, between you and Respondent and/or any agent of Respondent and/or any employee of Respondent regarding your status as an independent contractor or alleged "employee," the subject matter of this arbitration, the injuries claimed and/or damages sought in this lawsuit, and/or any of the allegations contained in the Arbitration Demand beginning one year prior to the first day of your alleged "employment" with Respondent.

**RESPONSE:**

Claimant Barysas objects that this request fails to identify the categories of items it seeks with reasonable particularity, *see, e.g., In re EOG Res. Inc.*, No. 10–10–00455–CV, 2011 WL 455280, at *2–3 (Tex. App.—Waco Feb. 9, 2011 orig. proceeding) (mem. op.) and objects that Respondent Uber seeks information that can be obtained through less intrusive means.

The documents and communications that relate to this request are exchanged between the parties through the Driver App. Respondent Uber exhibits control over the Driver App by causing documents transmitted between the Parties to be removed from the Driver App on a rolling basis. Claimant Barysas is dependent on Respondent Uber for the storage of the documents requested due to Respondent Uber's policy to remove the documents from the Driver App. Respondent Uber maintains the requested documents in its electronic database.

Subject to this objection, Claimant Barysas produces the limited documents in his possession responsive to this request, *see* Bates Labeled Barysas_001 – Barysas_037.

**REQUEST FOR PRODUCTION NO. 12:**

Any and all non-privileged Documents that relate to services you provided as an alleged "employee" or independent contractor to or on behalf of any individual or business entity, other than Respondent, during the Time Period, including but not limited to, your job duties, services performed, work experience, resumes and/or Curricula Vitae that you have prepared or sent to others, all communications sent to prospective employers, all employment applications you have completed with prospective employers, all Internet postings you have created (including any LinkedIn pages), and any applications you have made for loans or lines of credits or housing in which you describe your duties or responsibilities or services.

**RESPONSE:**

Claimant Barysas objects that this request is overbroad as to time and subject matter, and not reasonably calculated to lead to the discovery of admissible evidence.

Subject to this objection, Claimant Barysas does not maintain documents that relate to this request.

**REQUEST FOR PRODUCTION NO. 13:**

Any and all Documents that relate to any payments or income you received from any individual or business entity, other than through the use of the Uber App, beginning one year prior to the first day of your alleged employment with Respondent through the present.

**RESPONSE:**

Claimant Barysas objects that this request is overly broad, unduly burdensome, and fails to identify the categories of items it seeks with reasonable particularity, *see, e.g.*, *In re EOG Res. Inc.*, No. 10–10–00455–CV, 2011 WL 455280, at *2–3 (Tex. App.—Waco Feb. 9, 2011 orig. proceeding) (mem. op.), seeks attorney work product, *see Tex. Tech Univ. Health Scis. Ctr. v. Schild*, 828 S.W.2d 502, 504 (Tex. App.—El Paso 1992, orig. proceeding).

Claimant Barysas is open to confer with Respondent Uber on this request and produce documents that are reasonably available and proportional to the needs of this case.

**REQUEST FOR PRODUCTION NO. 14:**

Any and all state and federal income tax returns (including all forms, schedules, attachments, exhibits, 1099s, W2s, 1098s, worksheets and/or supporting documentation) for tax years 2017, 2018, 2019, and, when available, 2020.

**RESPONSE:**

In response to this request, Claimant Barysas produces tax documents that were located after a reasonable search. *See* documents Bates Labeled Barysas_038 – Barysas_058.

**REQUEST FOR PRODUCTION NO. 15:**

Any and all non-privileged Documents that refer to any application for unemployment or workers' compensation benefits from March 12, 2017 through the present.

**RESPONSE:**

Claimant Barysas objects that this request is overbroad as to subject matter and is not reasonably calculated to lead to the discovery of admissible evidence. Additionally, all Documents that refer to any "application for unemployment or workers' compensation benefits" is vague and ambiguous.

Subject to this objection, *see* document Bates Labeled Barysas_857.

**REQUEST FOR PRODUCTION NO. 16:**

Any and all Documents that reflect the date and time of any activity you performed (whether or not related to your alleged employment with Respondents) while you were while logged into the Uber App, including, by way of example and not limitation, paper or electronic receipts reflecting the date and time of purchases, cell phone records reflecting the date, time, and duration of telephone calls, or records sufficient to demonstrate the date and time that you sent text messages and/or emails.

**RESPONSE:**

Claimant Barysas objects that this request is overbroad as to time and subject matter, is not reasonably calculated to lead to the discovery of admissible evidence, fails to enumerate the information it seeks with specificity, and essentially requires Claimant to create documents. Additionally, "all Documents that reflect the date and time of any activity performed" is vague and ambiguous, is overbroad as to time and subject matter, and is not calculated to lead to the discovery of admissible evidence.

Further, the documents and communications that relate to this request are exchanged between the parties through the Driver App. Respondent Uber exhibits control over the Driver App by causing documents transmitted between the Parties to be removed from the Driver App on a rolling basis. Claimant Barysas is dependent on Respondent Uber for the storage of the documents requested due to Respondent Uber's policy to remove the documents from the Driver App. Respondent Uber maintains the requested documents in its electronic database.

The documents sought here have been requested by Claimant Barysas from Respondent Uber.

**REQUEST FOR PRODUCTION NO. 17:**

Any and all non-privileged Documents that relate to communications between you and any other individual or entity, including any government agency, which discusses, references, or relates to the subject matter of the Arbitration Demand.

**RESPONSE:**

Claimant Barysas objects that this request is overbroad as to time and subject matter, not proportional to the needs of the case, is not reasonably calculated to lead to the discovery of admissible evidence, fails to enumerate the information it seeks with specificity, and essentially requires Claimant to create documents. Additionally, "documents that relate to communications between you and any other individual or entity" is vague and ambiguous, overbroad as to time and subject matter, and is not calculated to lead to the discovery of admissible evidence.

Subject to this objection, and without any additional specificity provided by Respondent Uber, Claimant Barysas does not have the documents requested.

**REQUEST FOR PRODUCTION NO. 18:**

Any and all non-privileged Documents that relate to your prayer for damages, including any damage calculations, as set forth in the Arbitration Demand.

**RESPONSE:**

Documents and communications that relate to all damages will are primarily exchanged between the parties through the Driver App. Respondent Uber exhibits control over the Driver App by causing documents transmitted between the Parties to be removed from the Driver App on a rolling basis. Claimant Barysas is dependent on Respondent Uber for the storage of the documents requested due to Respondent Uber's policy to remove the documents from the Driver App. Respondent Uber maintains the requested documents in its electronic database.

*See* documents Bates Labeled Barysas_001 – Barysas_847 generally. As discovery unfolds, Claimant Barysas will supplement production and/or identify documents produced by Uber more specifically related to damages sought in this Arbitration

**REQUEST FOR PRODUCTION NO. 19:**

Any and all non-privileged Documents that you referred to, used, or relied upon when preparing the Arbitration Demand.

**RESPONSE:**

Claimant objects that this request fails to identify the categories of items it seeks with reasonable particularity, *see, e.g.*, *In re EOG Res. Inc.*, No. 10–10–00455–CV, 2011 WL 455280, at *2–3 (Tex. App.—Waco Feb. 9, 2011 orig. proceeding) (mem. op.), seeks attorney work product, *see Tex. Tech Univ. Health Scis. Ctr. v. Schild*, 828 S.W.2d 502, 504 (Tex. App.—El Paso 1992, orig. proceeding), and to the extent it seeks expert materials, *see* Tex. R. Civ. P. 195.1.  Additionally, this request is unduly burdensome and unreasonably overbroad.

Subject to these objections, *see* documents Bates Labeled Barysas_001 – Barysas_847 generally.

**REQUEST FOR PRODUCTION NO. 20:**

Any and all non-privileged Documents that relate to any advertising or marketing you have done in conjunction with any services you have offered to the public as an independent contractor at any time.

**RESPONSE:**

Claimant Barysas objects that this request is overbroad as to time and subject matter, is not reasonably calculated to lead to the discovery of admissible evidence, fails to enumerate the information it seeks with specificity, is vague and ambiguous pertaining to the terms "advertising

or marketing" and "services" and objects to any characterization that Claimant Barysas is an independent contractor.

Subject to this objection, and without additional specificity from Respondent Uber, Claimant Barysas does not have any documents requested.

**REQUEST FOR PRODUCTION NO. 21:**

Any and all non-privileged Documents that relate to any products or services you have offered to the public and/or to any entity at any time March 12, 2017 through the present.

**RESPONSE:**

Claimant Barysas objects that this request is overbroad as to time and subject matter, is not reasonably calculated to lead to the discovery of admissible evidence, fails to enumerate the information it seeks with specificity, and is vague and ambiguous pertaining to the terms "products" and "services."

Subject to this objection, and without additional specificity from Respondent Uber, Claimant Barysas does not have any documents requested.

**REQUEST FOR PRODUCTION NO. 22:**

Any and all business licenses you have obtained at any time, including documents that relate to your establishment of membership in, partnership in, funding of, or any form of participation in any business entity, including but not limited to, a corporation, limited liability company or partnership, or partnership.

**RESPONSE:**

Claimant Barysas objects that this request is overbroad as to time and subject matter, is not reasonably calculated to lead to the discovery of admissible evidence, fails to enumerate the information it seeks with specificity, and essentially requires Claimant to create documents. Additionally, "[a]ll Documents that relate to your establishment of membership in, partnership in, funding of, or any form of participation in any business entity" is vague and ambiguous, is overbroad as to time and subject matter, and is not calculated to lead to the discovery of admissible evidence.

Subject to these objections, *see* documents Bates Labeled Barysas_848 – Barysas_856.

**REQUEST FOR PRODUCTION NO. 23:**

Any and all licenses or certifications that you have obtained from any state or local agency to provide transportation and/or delivery services, including by not limited to licenses issued by the City of Houston or the Texas Department of Transportation or the State of Texas.

**RESPONSE:**

Claimant Barysas objects that this request is overbroad as to time and subject matter, is not reasonably calculated to lead to the discovery of admissible evidence, fails to enumerate the information it seeks with specificity, and essentially requires Claimant to create documents. Additionally, "[a]ny and all licenses or certifications that you have obtained from any state or local agency to provide transportation services" is vague and ambiguous, is overbroad as to time and subject matter, and is not calculated to lead to the discovery of admissible evidence.

Subject to these objections, *see* Bates Labeled Barysas_848 – Barysas_850.

**REQUEST FOR PRODUCTION NO. 24:**

Any and all Documents that relate to the total amount of time that you spent using another lead generation source or delivery lead generation source other than the Uber App, including, but not limited to, Lyft, Sidecar, Flywheel, Caviar, DoorDash, Postmates, Shipt, Favor, or any other electronic or non-electronic booking platforms, where you were available to receive requests to provide transportation or delivery services to any user who requested your services beginning one year prior to the first day of your alleged employment with Respondent through the present.

**RESPONSE:**

Claimant Barysas objects that this request is overbroad as to time and subject matter, is not reasonably calculated to lead to the discovery of admissible evidence, and essentially requires Claimant to create documents.

Claimant Barysas does not have any "Documents that relate to the total amount of time that you spent using another lead generation source or delivery lead generation source other than the Uber App". Much like Respondent Uber, documents from other lead generation or delivery lead generation sources that relate to total time on their platforms are maintained by the source.

Subject to this objection, *see* documents Bates Labeled Barysas_851 – Barysas_856.

**REQUEST FOR PRODUCTION NO. 25:**

Any and all Documents that relate to your provision of transportation services for private clients at any time beginning one year prior to the first day of your alleged employment with Respondent through the present.

**RESPONSE:**

Claimant Barysas objects that this request is overbroad as to time and subject matter, is not reasonably calculated to lead to the discovery of admissible evidence, and essentially requires Claimant to create documents.

Subject to this objection, *see* documents Bates Labeled Barysas_851 – Barysas_856.

**REQUEST FOR PRODUCTION NO. 26:**

Any and all Documents that relate to any statements you have made or writings you have submitted to a media outlet, or any posting you have made on Facebook, Twitter, Instagram, LinkedIn, etc., regarding (1) Uber; (2) your transportation and/or delivery services; and/or (3) your use of the Uber App as a transportation provider and/or delivery provider.

**RESPONSE:**

Claimant Barysas objects that this request is overbroad as to time and subject matter, is not reasonably calculated to lead to the discovery of admissible evidence, fails to enumerate the information it seeks with specificity, is vague and ambiguous pertaining to the documents it requests.

Subject to these objections, Claimant Barysas does not maintain documents related to this request.

**REQUEST FOR PRODUCTION NO. 27:**

Copies of any communications to riders, including but not limited to business cards, flyers, and signs or placards placed inside our affixed to the outside of any vehicle, used in your provision of transportation services at any time beginning one year prior to the first day of your alleged employment with Respondent through the present.

**RESPONSE:**

Claimant Barysas objects that this request is overbroad as to time and subject matter, is not reasonably calculated to lead to the discovery of admissible evidence, fails to enumerate the information it seeks with specificity, is vague and ambiguous pertaining to the documents it requests.

Subject to these objections, *see* documents Bates Labeled Barysas_851 – Barysas_852.

## INTERROGATORIES

### INTERROGATORY NO. 1:

Identify each person known or believed by you to have knowledge or information related to any of the allegations in your Arbitration Demand, and for each such person generally describe their knowledge or information regarding the allegations in your Arbitration Demand and whether you have obtained a statement, affidavit, declaration or other recording from such person regarding any of the facts, claims, defenses, allegations or issues in the Arbitration Demand.

### ANSWER:

Claimant Barysas and various witnesses connected to Respondent Uber.

Dainius Barysas
646-637-7154
Balticam@yahoo.com
info@newyorkpartybuslimos.com
EliteRide212@gmail.com

This is the only name and phone number used by Claimant Barysas in connection with his Uber Driving account. To his knowledge, Claimant Barysas used all three email addresses in connection with his Uber Driving account.

### INTERROGATORY NO. 2:

If you have applied for, requested, or received payments or benefits for unemployment, workers' compensation, or any disability or injury at any time from March 12, 2017 through the present, identify each such application, request, payment or benefit received, and duration of the payment or benefit.

### ANSWER:

Claimant Barysas applied for and received unemployment from March 22, 2020 through July 6, 2020. To this date, Claimant Barysas received a total amount of $11,505.00. Claimant Barysas has not sought unemployment benefits related to Uber employment.

Claimant Barysas has not applied for, requested, or received payments or benefits for worker's compensation, or any disability or injury at any time from March 12, 2017 to present. *See* Bates Labeled Barysas_857.

### INTERROGATORY NO. 3:

Identify (a) any claim, complaint, charge, or grievance you have submitted to any government agency (whether local, state, or federal) concerning Respondent, and (b) any complaint submitted to Respondent concerning the subject matter of this lawsuit, and for each include: the date it was

submitted; the entity to which it was submitted; and the names of all representatives with whom you have had any contact concerning the claim, complaint or grievance; the substance of the claim, complaint or grievance; and the status of the claim, complaint or grievance.

**ANSWER:**

None.

**INTERROGATORY NO. 4:**

Identify each lawsuit, criminal case, bankruptcy case, immigration action, arbitration, or other court or legal proceeding in which you have participated as a party or a witness, including: the date the action was filed or initiated; the full title of the action, including the names of all parties, court, jurisdiction, venue, and cause number; the name, mailing address, and contact information for counsel for each party to the action; and a description of the nature of the action, its current status or disposition, your involvement, and a description of any criminal convictions that you have received. This Interrogatory includes, but is not limited to, identifying whether you have been convicted of any crime that was, in the convicting jurisdiction, punishable by death or by imprisonment for more than one year, or any crime, regardless of punishment, involving proof of a dishonest act or false statement as an element of the crime.

**ANSWER:**

Claimant Barysas objects that this interrogatory is overbroad as to time and subject matter, and not reasonably calculated to lead to the discovery of admissible evidence. Additionally, Claimant objects on the grounds that this evidence is equally available to Uber as it is to the Claimant.

Subject to this objection, Claimant Barysas settled a breach of warranty claim against Nissan in August 2017. *See* Bates Labeled Barysas_858 – Barysas_861.

Claimant Barysas has not been convicted of a crime involving dishonest act or false statement within the last 10 years, nor has Claimant Barysas been convicted of a crime that is punishable by death or by imprisonment for more than one year.

**INTERROGATORY NO. 5:**

From March 12, 2017 through the present, identify and describe each and every company or individual for whom you have provided transportation services and/or delivery services either as an employee or independent contractor, including the dates and times of every trip you made for each respective company other than Respondent.

**ANSWER:**

Claimant Barysas objects that this interrogatory as overbroad as to subject matter, not reasonably calculated to lead to the discovery of admissible evidence and disproportionate to the needs of the case.

Subject to this objection, Claimant Barysas provided transportation services as the owner and operator of DB Pedicabs LLC from 2006 through the present.

Claimant Barysas provided transportation services on a for Lyft from 2014 through 2019.

Claimant Barysas provided transportation services on a for Respondent Uber from 2014 through 2019.

Claimant Barysas provided transportation services as the owner and operator of DSK Logistics LLC from May 2020 through the present.

**INTERROGATORY NO. 6:**

From March 12, 2017 through the present, identify all employers for whom you have worked and your scheduled hours for each employer, including any self-employment.

**ANSWER:**

Claimant Barysas objects that this interrogatory is ambiguous and confusing as written and overbroad in its request.

Subject to this objection, Claimant Barysas is the owner and operator of DB Pedicabs LLC in New York, New York. This business operates as both a bike rental referral business and as private chauffeur business from 2006 through the present. This business also operated as a trucking company from 2018 through end of 2020.

Claimant Barysas worked for Lyft in New York, New York as a driver from 2014 through August 2017.

Claimant Barysas worked for Respondent Uber in New York, New York as a driver from 2014 through August 2017.

Claimant Barysas worked for Lyft on limited basis in Houston, Texas as a driver from August 2017 through 2019.

Claimant Barysas worked for Respondent Uber in Houston, Texas as a driver from August 2017 through 2019.

Claimant Barysas is the owner and operator of DSK Logistics LLC in Houston, Texas from May 2020 through the present. This business operates as a trucking company.

**INTERROGATORY NO. 7:**

Identify each social or business network computer site which you are a member, user, or subscriber (including but not limited to Facebook, MySpace, ClassMates.com, LinkedIn, Instagram, Twitter, etc.), the URL of the site(s), your user name(s) for each site, and your login name(s) for each site.

**ANSWER:**

Claimant Barysas maintains a Facebook page under the name Dainius Barysas. The email address associated with Claimant Barysas's Facebook account is Balticam@yahoo.com.

Claimant Barysas maintains an Instagram account under the username danny_nyc_1982. The email address associated with Claimant Barysas's Facebook account is Balticam@yahoo.com.

**INTERROGATORY NO. 8:**

For each trip for which you assert Uber retained tips or gratuities to which you were entitled, please provide the following information:

     (a)    Identification of each such trip, by the trip number and date and time of the trip;

     (b)    The amount of the tip or gratuity;

     (c)    Each person employed by Respondent who you notified of the improperly retained tip or gratuity;

     (d)    Respondent's response to your notification, including identification of the person and the substance of the response.

**ANSWER:**

Claimant Barysas objects that this request is overly broad and unduly burdensome.

Uber maintains the information sought in this Interrogatory.  Claimant Barysas will supplement this response as discovery unfolds.

**INTERROGATORY NO. 9:**

For each alleged cost or expense that Claimant asserts he was not "reimburse[d] … [with respect to] the use of [Claimant's] personal vehicle", please provide the following information:

     (a)    Identification of the alleged cost or expense that Claimant alleges was incurred as a result of his use of the Uber App and to which Claimant further alleges requires reimbursement;

     (b)    Identify what documents, if any, support Claimant's claim of cost or expense;

     (c)    The amount paid by Claimant and the method of payment for each cost or expense (i.e. cash, credit card, check, debit card, etc.);

     (d)    The date and approximate time the expense and/or cost was incurred;

(e)     Each person employed by Respondent who you notified of the cost or expense;

(f)     The date you requested reimbursement for each cost or expense from Respondent;

(g)     Respondent's response to your request for reimbursement, including identification of the person and the substance of the response.

**ANSWER:**

Claimant Barysas objects that this request is overly broad and unduly burdensome.

Uber maintains the information sought in this Interrogatory.  Claimant Barysas will supplement this response as discovery unfolds.

**INTERROGATORY NO. 10:**

For each trip for which Claimant asserts he was not "reimbursed" toll charges, please provide the following information:

(a)     Identification of the trip by the trip number wherein Claimant claims he paid a toll expense or incurred a toll charge while providing transportation services while logged into the Uber App;

(b)     The name of the toll road traveled;

(c)     The amount paid for use of the toll road;

(d)     The date and approximate time the toll charge was incurred;

(e)     Each person employed by Respondent who you notified of the toll charge;

(f)     The date you requested reimbursement of the toll charge from Respondent;

(g)     Respondent's response to your request for reimbursement, including identification of the person and the substance of the response.

**ANSWER:**

Claimant Barysas objects that this request is overly broad and unduly burdensome.

Uber maintains the information sought in this Interrogatory.  Claimant Barysas will supplement this response as discovery unfolds.

2022-67757 / Court: 133

# Exhibit F

## IN THE ARBITRATION BETWEEN

| | |
|---|---|
| **DAINUS BARYSAS** | § |
| | § |
| **Claimant** | § |
| | § |
| **VS.** | § |
| | § |
| **UBER TECHNOLOGIES, INC.** | § |
| | § |
| **Respondent** | § |

### ORDER NO. 1

On June 16, 2021 an Oral Hearing was conducted via telephone conference.  Claimant appeared through his attorneys Steve Kherkher, Steve Stanley, Kathryn Hiett, and Ryan MacLeod. Respondent appeared through its attorneys Kim Miers and Nicole Lefave.  The following Motions and  Responses were heard:  Claimant's First Motion to Compel Production, Respondent Uber Technologies, Inc.'s Response to Claimant's Motion to Compel Production, Respondent Uber Technologies, Inc.'s Motion for Protective Order to Prevent the Apex Deposition of Alex Rosenblat, and Claimant's Response to Respondent's Motion for Protective Order to Prevent the Deposition of Alex Rosenblat and Claimant's Motion to Compel the Deposition of Uber Employee Alex Rosenblat.

After reviewing the Motions and Responses thereto and having heard oral argument, the Arbitrator makes the following rulings:  Claimant's First Motion to Compel Production is **GRANTED** in all respects.  Respondent's Motion for Protective Order to Prevent the Apex Deposition of Alex Rosenblat is **GRANTED** in all respects at this time.

Signed this 16th day of June 2021

Susan S. Soussan
Arbitrator

2022-67757 / Court: 133

# Exhibit G

DAINIUS BARYSAS,                          §
                                          §
         CLAIMANT,                        §
                                          §
VS.                                       §                HON. SUSAN SOUSSAN,
                                          §                ARBITRATOR
UBER TECHNOLOGIES, INC.,                  §
                                          §
         RESPONDENT.                      §
                                          §
                                          §

## CLAIMANT'S BRIEF IN SUPPORT OF CALLING FACT-WITNESS ALEX ROSENBLAT

Claimant identified Alex Rosenblat, a current employee of Uber with the title, Head of Marketplace Policy, Fairness and Research. Ms. Rosenblat took this position in January 2021 to improve the design of Uber products to create more equitable outcomes for drivers.[1] Ms. Rosenblat handles policy product mapping for Uber products.[2] Uber has argued that Ms. Rosenblat is an apex employee. However, contrary to Uber's hollow claims, Ms. Rosenblat testified that she **is not a member of Uber's Executive Team** and **does not manage a single employee**.[3]

When announcing that Ms. Rosenblat was being hired, Uber issued a press statement that they hired Rosenblat because they want "people at Uber who care about driver issues and who aren't afraid to challenge our thinking on any given issue."[4]

In summer 2021, while an employee for Uber, Ms. Rosenblat provided testimony in a separate but similar arbitration related to wage claims by an Uber driver. Accordingly, Uber should not be surprised or prejudiced by her identification as a witness here.

---

[1] *See* Ex. A, Alex Rosenblat Tweets
[2] *See* Ex. B, Testimony Excerpt of Alex Rosenblat at 29:3-9
[3] *See Id.* at 26:8-14
[4] *See* Ex. C. Brody Ford, *Uber Hires Prominent Critic to Focus on Treatment of Drivers*, BLOOMBERG, February 17, 2021, at 1.

During her testimony, Ms. Rosenblat confirmed that she stands by the statements and contents of "Uberland," a book she authored and published in 2018.[5] Uberland was the result of her studying and researching the relationship of Uber and Uber drivers between mid-2014 and winter 2018.[6] The research she published in Uberland is squarely within the time period Claimant Barysas drove for Uber.

Ms. Rosenblat's many ethnographic studies and published works concerning Uber occur before she was invited to join the inner workings of the company; however, now as an Uber employee, she is influencing, creating, and implementing Uber's company policies. Testimony regarding Uber's policies, both past and present, is particularly relevant because it impacts the daily life of Uber drivers like Dainius Barysas. Ms. Rosenblat maintains firsthand knowledge of Uber policies pertaining to drivers and whether those policies have changed or remained status quo since her Uber employment commenced.

Ms. Rosenblat employment with Uber has bolstered her knowledge of how the company operates, how it manages its relationships with drivers, and how exactly drivers are controlled by Uber through algorithms and informational asymmetry. Claimant should be entitled to question Ms. Rosenblat about her particularly relevant knowledge of Uber's practices and policies.

The Arbitrator must weigh evidence regarding the five factors of the economic realities test, which includes evidence of Uber's control over Claimant Barysas through their policies and procedures. Ms. Rosenblat was hired by Uber because of her prior research, knowledge, and experience with Uber Drivers.  Ms. Rosenblat implements this knowledge at Uber on a daily basis to reform old Uber Driver Policies and implement new Uber Driver policies. Just as a prior arbitrator found this testimony relevant and admissible, it should be allowed here.

---

[5] *See* Ex. B, at 19:19-24
[6] *See generally,* Rosenblat, A., *UBERLAND*, Univ. of California Press 2018

Respectfully submitted,

**KHERKHER GARCIA, LLP**

By:     */s/ Bret Stanley*
        **Bret Stanley**
        State Bar No. 24075116
        BStanley@KherkherGarcia.com
        Steven J. Kherkher
        State Bar No. 11375950
        SKherkher@KherkherGarcia.com
        Ryan MacLeod
        State Bar No. 24068346
        RMacLeod@KherkherGarcia.com
        Eric Hawley
        State Bar No. 24074375
        EHawley@KherkherGarcia.com
        Kathryn Hiett
        State Bar No. 24118411
        KHiett@KherkherGarcia.com
        2925 Richmond Ave., Suite 1560
        Houston, TX 77098
        (713) 333-1030 / (713) 333-1029 (fax)

**ATTORNEYS FOR CLAIMANT**

## <u>CERTIFICATE OF SERVICE</u>

On this the 18th day of March 2022, I hereby certify that a true and correct copy of the foregoing document has been served on all counsel of record:

Allison Williams
Kim Miers
Sophia Behnia
Nicole LeFave
Abby Bochenek
Collin Quigley
Maikieta Brantley
Ben Sandahl

acwilliams@littler.com
kmiers@littler.com
sbehnia@littler.com
nlefave@littler.com
abochenek@littler.com
cquigley@littler.com
mbrantley@littler.com
smendoza@littler.com
scornell@littler.com
preyes@littler.com
hheckel@littler.com
bsandahl@littler.com
dridenour@littler.com

*/s/ Bret Stanley*_____
**Bret Stanley**

# EXHIBIT A



← **Thread**

**Alex Rosenblat**
@mawnikr

I have some news to share: after 7 amazing years @datasociety, I'm moving into a new role heading up marketplace policy, fairness & research @Uber. For me, it's a rare opportunity to bring my research into practice around core fairness concerns I wrote about for years in Uberland

10:46 AM · Jan 13, 2021 · Twitter Web App

**7** Retweets   **5** Quote Tweets   **144** Likes

**Alex Rosenblat** @mawnikr · Jan 13
Replying to @mawnikr
I'm deeply curious to learn how products & policies are developed. And I'm excited to work with a group of folks at the company who are doing the work to design products for more equitable outcomes.

♡ 1          ⟲          ♡ 3

**Alex Rosenblat** @mawnikr · Jan 13
This is a big change for me as someone who has critically observed the company's impact on drivers (and society) for many years. I'm hopeful I can leverage my insights & what I learn from within the org to make things better. And I think this is going to be really interesting :-)

♡ 5          ⟲          ♡ 16

# EXHIBIT B

```
 1              AMERICAN ARBITRATION ASSOCIATION
 2
 3   GILBERT CHIBELENGA,        *
                                *
 4   CLAIMANT,                  *
                                * HON. ROBERT JENEVEIN,
 5   VS.                        * ARBITRATOR
                                *
 6   UBER TECHNOLOGIES, INC.,   *
                                *
 7   RESPONDENT.                *
 8
 9
10
11       *******************************************
             ARBITRATION PROCEEDINGS
12               AUGUST 30, 2021
                     DAY 1
13              (REPORTED REMOTELY)
         *******************************************
14
15
16          MET, pursuant to Agreement, on the on
17   AUGUST 30, 2021, from 10:34 A.M. to 5:39 P.M.,
18   reported remotely by stenographic means by AMY
19   PRIGMORE, Certified Shorthand Reporter in and for
20   the State of Texas.
21
22
23
24
25
                                          Page 1
```

```
 1              A P P E A R A N C E S
 2
 3   ARBITRATOR:
          HON. ROBERT JENEVEIN,
 4
 5
 6   FOR CLAIMANT:
          Ryan MacLeod
 7        Bret Stanley
          Steve Kherkher
 8        Kathryn Hiett
          KHERKHER GARCIA FASS HAWLEY, LLP
 9        2925 Richmond Avenue Suite 1560
          Houston TX 77098
10        skherkher@kherkhergarcia.com
          rmacleod@kherkhergarcia.com
11        khiett@kherkhergarcia.com
          bstanley@kherkhergarcia.com
12
13
14   FOR RESPONDENT:
          Kimberly R. Miers
15        LITTLER MENDELSON PC
          100 Congress Ave Suite 1400
16        Austin TX 78701
          kmiers@littler.com
17        214-880-8100
18        M. Collin Quigley
          LITTLER MENDELSON PC
19        2001 Ross Ave, Ste 1500
          Dallas TX 75201
20        cquigley@littler.com
          214-880-8100
21
22
     ALSO PRESENT:
23   Angela Corridan
     Brad Rosenthal
24   Deborah Soh
     Kristen Hidalgo-Monroy
25   Don Ridenour
```

                                        Page 2

KG-Universal_001325

```
1                         INDEX

                                              PAGE
2

3   REPORTER'S CERTIFICATE                     231

4

                    E X A M I N A T I O N S

5

                                              PAGE
6    ALEX ROSENBLAT
     DIRECT EXAMINATION                         15
7    BY MR. MacLEOD
     CROSS-EXAMINATION                          49
8    BY MS. MIERS
     GILBERT CHIBELENGA
9    DIRECT EXAMINATION                         52
     BY MR. STANLEY
10   CROSS-EXAMINATION                         177
     BY MS. MIERS

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                          Page  3
```

KG-Universal_001326

1    described.

2         Q.  And then you -- you have authored, and --

3    and Uberland tells us this.

4         But you have authored many different

5    articles and writings that have appeared in media

6    outlets such as the New York Times, the Harvard

7    Business Review, the Atlantic, Slate, Fast Company,

8    and others, correct?

9         A.  Correct.

10        Q.  One such article that you wrote was titled,

11   Algorithmic Labor and Information Asymmetries:  A

12   Case Study of Uber Drivers.  That was published in

13   2016, correct?

14        A.  Yes.  That's an academic publication.

15        Q.  And that was published as an academic

16   publication in the International Journal of

17   Communication, correct?

18        A.  Correct.

19        Q.  And -- and just like Uberland, you certainly

20   stand by the statements, and obviously the contents

21   of both Uberland, as well as that article,

22   Algorithmic Labor and Information Asymmetries,

23   correct?

24        A.  Correct.

25                  MR. MacLEOD:  Judge, at this time,

                                             Page 19

KG-Universal_001331

1    Your Honor.

2                    THE ARBITRATOR:  Overruled.

3        A.  Anne Laven.

4        Q.  (BY MR. MacLEOD)  And are you -- do you

5    manage a group?  Are you in charge of managing a

6    group?

7        A.  I am not.

8        Q.  Do you manage any employees at Uber that

9    you're aware of today?

10       A.  I do not.

11       Q.  And is it true that you are not a member of

12   Uber's executive team, as Uber has published that

13   team to the public?

14       A.  I am not a member of Uber's executive team.

15       Q.  All right.  Is it -- do you also have, and

16   maintain, a website known as www.AlexRosenblat.com?

17       A.  I don't really maintain it.  I don't think

18   it's been updated in a quite a while.  In fact, I

19   have -- a colleague of mine is the one who created

20   it for me.  But yes, it does exist today.  But it

21   has not been updated.

22       Q.  Ma'am, do you have a Twitter account?

23       A.  I do.

24       Q.  And I've seen Alex Rosenblat as the -- I

25   guess it's the handle.  Is that the Twitter handle?

Page 26

1    Q.  Right.

2    A.  But I am, indeed, curious.

3    Q.  And -- and let me just ask you.  Have you

4  been integral in developing policies relating to

5  what drivers, like Mr. Chibelenga, are able to see

6  in their driver app, since you started with Uber

7  earlier this year?

8    A.  I've primarily done policy product mapping

9  for products that are either --

10                  MS. MIERS:  Okay.  Wait.  I'm going

11  to stop.

12                  Just so you know, Ms. Rosenblat,

13  this -- this proceeding has not been sealed.  So

14  we're going to designate this as highly

15  confidential.

16                  If she's going to get into things

17  that are in the works, any strategies, or products,

18  or platforms, that are being developed, we believe

19  that that falls within our confidential information

20  and proprietary trade secrets.

21                  THE ARBITRATOR:  So I think you can

22  answer the question that was asked without getting

23  into that stuff, but Ms. Miers's warning is well

24  taken.  So you can answer the question.

25    A.  Okay.  It's worth noting that I have

Page 29

KG-Universal_001341

# EXHIBIT C

Technology

# Uber Hires Prominent Critic to Focus on Treatment of Drivers

*By*
*Brody Ford*
February 17, 2021, 7:00 AM CST

- The "Uberland" author will advocate for drivers internally
- The company has a strained relationship with academics



Alex Rosenblat Photographer: Rick Kern/Getty Images

Alex Rosenblat, an author and labor researcher, wrote for years about how Uber Technologies Inc. obscures pay structures, surveils drivers and creates systems that facilitate discrimination against those workers. Now she works for Uber.

The ride-hailing company hired Rosenblat last month as head of marketplace policy, fairness and research. Her appointment, which hasn't been previously reported, is part of an effort to reform Uber's treatment of, and relationship with, its drivers.

Rosenblat is best known for her 2018 book, "Uberland: How Algorithms Are Rewriting the Rules of Work," for which she interviewed hundreds of drivers about their working conditions. The book highlights driver stories of pay disparities, pervasive surveillance and the lopsided power dynamics in algorithm-mediated work.

As an Uber employee, Rosenblat said her responsibility is to "get the company to take into consideration the experiences and point of view of drivers, especially at the product level" and that her work will be informed by past research.

In an emailed statement, Uber said it hired Rosenblat because the company wants "people at Uber who care about driver issues and who aren't afraid to challenge our thinking on any given issue."

Before joining Uber, Rosenblat was a senior researcher at Data and Society, a nonprofit institute that seeks to "challenge the power and purpose of technology in society." Founded in 2014, the organization publishes research on artificial intelligence, the impact of technology on labor and health and online disinformation. The MacArthur Foundation and a philanthropic organization overseen by EBay co-founder Pierre Omidyar are among the 20 financial supporters named on the group's most recent annual report.

Uber has long had an adversarial relationship with many academics, who have criticized the company for restricting data access to select researchers. More than 70 gig economy academics wrote in an open letter after the publication of a 2020 study by Cornell University's Institute for Workplace Studies commissioned by Uber and Lyft Inc., calling its findings suspect.

What to know in tech
Get insights from reporters around the world in the Fully Charged newsletter.
Email
By submitting my information, I agree to the Privacy Policy and Terms of Service and to receive offers and promotions from Bloomberg.

Alexandrea Ravenelle was among those who signed the letter. In an interview, she expressed admiration for Rosenblat but a continued distrust of the company. Ravenelle, an assistant professor of sociology at the University of North Carolina at Chapel Hill, said she's concerned Uber will ignore Rosenblat's internal critiques and said the poor state of driver conditions has been public knowledge for years.

"When you interview the workers, the situation never seems to be improving for them," Ravenelle said. "If anyone can help them to make a difference, it will be Alex, but I think she's got a uphill battle ahead of her."

This isn't the first time Rosenblat considered trying to change things from the inside. In 2017, after three years of researching the company, Uber attempted to hire her. She pondered the offer but ultimately declined.

"This moment says a lot about what happens to experts: Once they know enough to be a threat, the companies they study will try to absorb them," Rosenblat wrote about the attempted recruitment in "Uberland."

That same year, Rosenblat co-authored a paper describing how Uber's use of customer reviews to evaluate performance could amount to workplace discrimination due to consumer biases. She is now working to apply these findings to service and policy design, as part of her goal to "encourage the company to assess product impact on drivers as individuals, rather than as part of an abstract group."

Rosenblat recently appeared at a speaker series about the ethics of algorithmic governance and co-authored a post about the disappearance of secure employment during recessions. She said she changed her mind about joining Uber because there are now many others conducting the kind of research she has championed and can carry her mantle.

"There are new ways I can use my expertise now, inside the company," Rosenblat said.

Have a confidential tip for our reporters?
GET IN TOUCH
Before it's here, it's on the Bloomberg Terminal.
LEARN MORE
LIVE ON BLOOMBERG
Watch Live TV Listen to Live Radio

## Most Read

1. markets

   Powell Holds Dovish Line as Fed Signals Zero Rates Through 2023

2. businessweek

   Combat Drones Made in China Are Coming to a Conflict Near You

3. markets

   Stocks Gain, Yields Pare Rise After Fed Stands Pat: Markets Wrap

4. technology

   Apple Nears Launch of New iPads After Stay-At-Home Sales Boost

5. markets

   ARKK Copycat Is Beating Cathie Wood's Original by 10-Fold

Terms of Service
Trademarks Privacy Policy ©2021 Bloomberg L.P. All Rights Reserved
Careers Made in NYC Advertise Ad Choices Contact Us Help

2022-67757 / Court: 133

# Exhibit H

## IN THE ARBITRATION BETWEEN

**DAINUS BARYSAS**                    §
                                      §
    **Claimant**    §
                                      §
**VS.**                               §
                                      §
**UBER TECHNOLOGIES, INC.**           §
                                      §
    **Respondent**  §

### ORDER NO. 7

Respondent submitted a Motion for Protective Order to exclude the arbitration hearing testimony of Alex Rosenblat. Claimant submitted a response to the same. After considering all submissions, the Arbitrator is of the opinion that the Motion for protection should be granted, Ms. Rosenblat was designated by Claimant as a fact witness. After review of the submissions the Arbitrator finds that any testimony by Ms. Rosenblat would be based on a time period in which Claimant was not associated with Uber. Furthermore Ms. Rosenblat does not have personal knowledge of the facts relevant to this particular arbitration. Her information was gathered from sources other than from Claimant; therefore, her testimony would likely be rank hearsay. Any information she could give regarding Uber during Claimant's association with Uber and after can be deduced from the witnesses who will testify. Claimant stopped using the Uber App in August 2019. Ms. Rosenblat was hired by Uber in January 2021. Ms. Rosenblat has no firsthand knowledge of relevant information.

It is therefore **Ordered** that Alex Rosenblat shall not testify during the arbitration hearing.

Signed this 21st day of March 2022.

_____
    Susan S. Soussan        Arbitrator

2022-67757 / Court: 133

# Exhibit I

1

DAINIUS BARYSAS,         )

2    Claimant           )

                           )

3    vs.              )  CASE NO. HON. SUSAN SOUSSAN

                           )  ARBITRATOR

4    UBER TECHNOLOGIES, INC.,  )

    Respondent         )

5

6

7                   ARBITRATION DAY 1

8                  March 29, 2022

9

10      ARBITRATION DAY 1, was taken remotely by Zoom in

11   the above-styled and numbered cause on the 29th day

12   of March, 2022, from 9:34 a.m. to 3:36 p.m., before

13   Shauna Foreman, Certified Shorthand Reporter in and

14   for the State of Texas, reported by computerized

15   stenotype machine, pursuant to the provisions stated

16   on the record or attached hereto.

17

18

19

20

21

22

23

24

25

                                            Page 1

```
 1                       A P P E A R A N C E S
 2
 3   FOR CLAIMANT:
 4        STEVE KHERKHER, ESQ.
          BRET STANLEY, ESQ.
 5        ERIC HAWLEY, ESQ.
          KRISTEN HIDALGO-MONROY, ESQ.
 6        RYAN MacLEOD, ESQ.
          KATHERINE HIETT, ESQ.
 7        BEN BIRELEY, ESQ.
          KELLI McDONALD, ESQ.
 8        KHERKHER GARCIA FASS HAWLEY
          2925 Richmond Avenue
 9        Suite 1560
          Houston, Texas  77098
10        E-mail: skherkher@kherkhergarcia.com
11   FOR RESPONDENT:
12        BENJAMIN D. SANDAHL, ESQ.
          KIMBERLY R. MIERS, ESQ.
13        ALLISON C. WILLIAMS, ESQ.
          LITTLER MENDELSON
14        80 South 8th Street
          Suite 1300
15        Minneapolis, Minnesota  55402
          E-mail: bsandahl@littler.com
16
     ALSO PRESENT:
17
          Don Ridenour
18        Deborah Soh
          Jacob Stoneciper
19        Jennie Smith
          Brad Rosenthal
20        Angela Corridan
          Joseph McGowin
21        Lindsey Cameron
22   ARBITRATOR:
23        Hon. Susan Soussan
24
25
```

Page 2

```
 1                          INDEX

 2                                              PAGE

 3   OPENING STATEMENT

 4   Opening Statement by Mr. MacLeod ................15

 5   OPENING STATEMENT

 6   Opening Statement by Mr. Sandahl ................53

 7   BRAD ROSENTHAL

 8   Examination by Mr. MacLeod ......................83

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Veritext Legal Solutions
346-293-7000

```
 1                    PROCEEDINGS
 2              MR. KHERKHER:  My name is Steve
 3   Kherkher.  I'm with the Kherkher Garcia law firm,
 4   Ms. Foreman.  All the lawyers will be with Kherkher
 5   Garcia.  My partner, Bret Stanley, Ryan MacLeod,
 6   Katherine Hiett.  There will be folks coming in and
 7   out.  You'll see Kelli McDonald, Eric Hawley.  And we
 8   represent Mr. Barysas, who is sitting next to
 9   Mr. Stanley.  He'll be our second witness of the day.
10   That's it, Judge.
11              JUDGE SOUSSAN:  Thank you, sir.
12   Ms. Miers?
13              MS. MIERS:  Good morning.  Kim Miers
14   with the law firm of Littler Mendelson, PC.  I have
15   here with me today my partner, Ben Sandahl, a
16   paralegal, Don Ridenour, both with Littler Mendelson,
17   PC.
18              In addition, we have Debra Soh, S-O-H,
19   who is a paralegal with Uber Technologies, Inc., the
20   respondent in this matter.  Joining us as soon as
21   possible will be Angela Corridan and Brad Rosenthal
22   with Uber Technologies, Inc.
23              JUDGE SOUSSAN:  Okay.  Thank you.  All
24   right.  I think we are ready to proceed.  If your
25   computers have your sound off, then we are ready to
```

                                              Page 4

1  proceed.

2              What do you-all want to take up first?

3              MS. MIERS:  Judge, from respondent's

4  perspective, I think it makes sense to let you know

5  which exhibits could be pre-admitted if you so desire

6  based on agreement with the parties.  It's basically

7  all the exhibits except for a handful of exhibits

8  that it might be easier just to identify for you

9  which ones are not pre-admitted.

10             THE COURT:  I'm ready to get those

11  numbers.

12             MS. MIERS:  All of claimant's exhibits

13  by agreement could be pre-admitted except for C11,

14  C20, C21, C22, and C23.  All of respondent's exhibits

15  could be pre-admitted by agreement except for --

16  Bret, here's where I'm going to need your help.

17             MR. STANLEY:  Let me pull that list

18  up.

19             MS. MIERS:  I've got 14 on the list.

20  RX15, RX16, RX17, RX18, and RX46.  And I think we've

21  got one more.  Is that correct, Bret?

22             MR. STANLEY:  I'm looking now.  So the

23  RX14 was the Uber on-line/off-line time, and that's

24  not one that we're going to dispute because of what

25  we discussed on our meet and confer.

Page 5

1        MS. MIERS:  Okay.

2        MR. STANLEY:  But 15, 16, 17 -- 18,

3   correct.  And the last one you said was 46?

4        MS. MIERS:  Which is the Tweets.

5        MR. STANLEY:  So we are not agreeing

6   to the pre-admission of RX15, RX16, RX17, RX18, and

7   RX46.

8        JUDGE SOUSSAN:  Okay.  And we'll take

9   up the objection to those to which there is an

10  objection at the time one party attempts to introduce

11  it into evidence.

12       MS. MIERS:  And, Judge, we would

13  actually like to use three of those exhibits in our

14  opening statement.  They are demonstrative exhibits.

15       If you're inclined to take that up

16  now, we can explain what we've done with RX15, 16,

17  and 17.  But -- may I proceed with --

18       JUDGE SOUSSAN:  Is there any objection

19  to them using them as demonstrative during the

20  opening?

21       MR. STANLEY:  Yes, Judge, we have an

22  objection to the use of the demonstratives, these

23  three specifically.

24       JUDGE SOUSSAN:  Overruled.  So you may

25  use them during your opening as demonstrative, but

Page 6

1    they will not be admitted unless you use them in your

2    testimony.

3              Okay.  Anything else?

4              MS. MIERS:  Not from respondent's

5    perspective.

6              MR. KHERKHER:  Judge, that's the --

7    that's the fortunate thing about where you're the

8    judge and the jury, is you're going to see it anyway

9    to make a decision on it, you know, the irony of it

10   all.  And I know in arbitration the worst thing you

11   can do is keep something out.  We get it.  But it's

12   frustrating with, you know, back-dooring evidence.

13             JUDGE SOUSSAN:  Okay.  I appreciate

14   your frustration.  I still will allow it.  It still

15   is arbitration.

16             MR. KHERKHER:  I know.  It's so

17   different.

18             JUDGE SOUSSAN:  It is very different.

19   I understand that.

20             Okay.  Is there anything else

21   pre-hearing that we need to discuss right now before

22   we do openings?

23             MR. KHERKHER:  Judge, I want to share

24   something with you.  What just transpired made me

25   think of something.  You know, this morning, my

                                              Page 7

1    4-year old threw up in the car on the way to school.

2    And while he was throwing up, he was smiling, happy,

3    you know, which was a good sign.  We took him home,

4    cleaned him up.  He wanted to go back to school.

5              Today we're off to not the best start,

6    you know, with delays and we've got feedback that we

7    need to figure out and, you know, I want you to know

8    that today our goal -- the claimant's goal is to

9    persuade you and convince you and challenge you to

10   that find that Mr. Barysas, our client, was an

11   employee of Uber.

12             And a fun fact, Judge, is the last

13   three arbitrators have ruled against us, and we

14   welcome you to read their opinions and their -- and

15   how they analyze this case.  And, of course, we're

16   critical of that analysis, and that's why we need to

17   challenge you.

18             Both sides agreed to choose you as our

19   arbitrator.  I know you've worked with the Littler

20   firm before and you work with them currently on other

21   matters.  We get that.  I chose you because I know

22   who you are.  I went to your invocation in the early

23   Nineties.  I heard you speak.  I heard you talk about

24   your faith, how your faith is a way of life also.  I

25   saw your little daughter there.  I looked at your

```
 1    website, and she's a young lawyer now.
 2                    And so, you have a challenge on your
 3    hands.  The good news is we're going to do everything
 4    we can to persuade you to show that Mr. Barysas is an
 5    employee of Uber, even though some of your best
 6    friends and colleagues have ruled against us
 7    because -- what it tells me is that same focus group
 8    that we've done in California and Massachusetts and
 9    even in New York that it's -- we get a different
10    result.  We win.  So that tells me a lot.
11                    And so, we have to challenge everybody
12    here, and we're not giving up because we obviously
13    believe in our heart and soul and, more importantly,
14    the evidence that Mr. Barysas is an employee of Uber.
15    So my colleagues and I are going to do our best today
16    to persuade you.
17                    JUDGE SOUSSAN:  Thank you,
18    Mr. Kherkher.  I welcome receipt of those opinions.
19    I will look at them if I'm asked to look at them.  So
20    if somebody hasn't sent them to me already, please
21    forward them to me.
22                    I can guarantee all of you that I make
23    up my own mind.  I don't rely on other opinions.  I
24    have sparred with Judge Ray arbitration panels before
25    when she gives her thoughts and opinions and then I
```

Page 9

1  give my thoughts and opinions.  So I don't think you

2  should have any concern whatsoever with regard to my

3  friendship with Judge Ray.  Obviously Katy Kennedy is

4  also a friend of mine.  I know she's handled one of

5  these or more.  I'm not certain.  And I don't know

6  who the other arbitrators are.  But even when I was

7  on the bench a hundred years ago, other judges'

8  opinions did not influence me.  I am my own person.

9  I make up my own mind, and my mind is made up on the

10  law and the facts.  That is how I will proceed in

11  this case.  The Littler firm knows that well.  I have

12  indeed conducted many mediations with the Littler

13  firm and also arbitrations, and you all know that.  I

14  am my own person.  I will always be my own person.  I

15  feel like I'm being interviewed for the Supreme Court

16  of the United States.

17            MR. KHERKHER:  We know that, Judge.

18  That's why we have faith in you.  And it's human

19  nature, you know, that inherent bias when you say,

20  "Oh, people I respect have already, you know, ruled

21  the other way," and that's how confident we are.

22  Everybody thinks differently.  Beauty is in the eye

23  of the beholder.  We're not asking for any handouts,

24  by any means.  But the frustrating thing is how one

25  thing in one state, you know, you get different

Page 10

1    results.  Maybe it's insanity.  Maybe we're doing the

2    same thing over and over again expecting a different

3    result in Texas, but that's how optimistic we are.

4                    JUDGE SOUSSAN:  Let me tell you a

5    little story.  I hate to waste time since we are

6    starting late.

7                    So this morning I was having a

8    conversation with my daughter, who is now a partner

9    in a big law firm, and we were talking about Texas

10   law -- oh, I had told her something last night when I

11   was over there with her 2-year-old running

12   everywhere, and we were talking about a

13   non-subscriber case.  And she was unaware -- she

14   goes, "Yeah, but what about contrib?"

15                   And I went, "Oh, no, no."

16                   "What about the negligence of the

17   individual?"

18                   "Oh, no, no, no."

19                   She goes, "You have got to be kidding

20   me."

21                   And I said, "No, I'm not kidding you."

22   And only is sole cause that would allow the company

23   to be successful.  So today she calls me up and goes,

24   "Do you know what the law in Alabama is?"

25                   I said, "No, I have not researched

                                                Page 11

1  that."

2          She says, "You have to have a hundred

3  percent agreeable on a jury.  There is no comparative

4  fault."  And she was going on and on about -- and she

5  goes, "How different that state's law is from Texas

6  law."

7          And I said, "Well, that doesn't

8  totally surprise me."

9          So we had that conversation just this

10  morning and -- and it was interesting because we

11  generally don't talk about the law, but it was

12  clearly different in Alabama, and I guess she gave

13  some thought to what we had talked about last night

14  in this non-subscriber case that I had had.

15          So anyway, let's go forward.  Let's

16  march on.  Everybody is going to put on their best

17  case.  One thing about me is I will follow the law.

18  The law drives cases, and facts drive that law.  But

19  the law is critical in these cases, and I will pay

20  attention to the law.

21          MR. KHERKHER:  Judge, you know, one of

22  our experts is going to discuss the law, and I hope

23  you're not such that -- you know, I personally always

24  get educated by my colleagues.  I hope this doesn't

25  offend you that we're bringing in a professor to give

Page 12

1    his opinion.  You can take it or leave it.  Some
2    arbitrators say, "Kherkher, I don't need that."  And
3    if you're inclined to do that, then you'll save us a
4    nickel and we won't call him; but we would like to
5    present that to you, Judge.
6                 JUDGE SOUSSAN:  Okay.  We'll take it
7    up when it comes.  I generally don't accept somebody
8    telling me what the law is, but let's not anticipate
9    problems before they happen.
10               MR. KHERKHER:  The only reason why I
11   do that is because I did so much reflecting on
12   arbitrations -- I've been through three of them
13   recently, and -- and so, I feel like it's a little
14   quasi voir dire, if you will, where I'm trying to ask
15   you what you want or what your beliefs are, opinions
16   are so I can tailor our evidence to you, if that
17   makes any sense.
18               JUDGE SOUSSAN:  It does, but I'm not
19   inclined to share all that with you either right now.
20   I think we should get started.  It is 9:47, so we're
21   almost an hour off.
22               MR. STANLEY:  Judge, the last thing
23   that I would say is if the court reporter and
24   videographer, could you please record time as the
25   parties discussed before?  Generally the videographer

                                              Page 13

1    helps us with that.

2              JUDGE SOUSSAN:  Okay.  And just for

3    your edification, I generally don't check chats.  So

4    if -- if you're trying to reach me, that's not really

5    the best way to reach me.  I don't generally look

6    down at my computer.  I'm looking at you-all.  So

7    keep that in mind.  And I do have realtime.  I just

8    got -- I have to get it going again.  I just booted

9    off.

10             Are there any other matters we need to

11   take up before we do opening and do you want your

12   opening recorded?

13             MR. KHERKHER:  We do.

14             JUDGE SOUSSAN:  How much time are you

15   going to be using?

16             MR. KHERKHER:  The plaintiffs are

17   going to go about an hour.  Ryan MacLeod is going to

18   go first and then Bret Stanley.  We're going to split

19   it.  And then our first witness is going to be the

20   corporate rep of Uber, and then our second witness

21   will be Mr. Barysas who -- there's Mr. Barysas.  Your

22   Honor, that's out -- Mr. Barysas, can you wave to the

23   judge and to Ms. Miers?  Okay.  Thank you.

24             MS. MIERS:  Good morning, Mr. Barysas.

25             JUDGE SOUSSAN:  Good morning.

                                        Page 14

1  Everyone, good morning.  All right.  Is everyone

2  present who we need present right now?

3                    MR. KHERKHER:  Yes, ma'am.

4                    JUDGE SOUSSAN:  Let's proceed with

5  opening, please.

6                    OPENING STATEMENT,

7                    MR. MacLEOD:  Thank you very much.  I

8  know you have lived with this case.  And really, it's

9  more than a case, and I'll talk about that more in a

10  minute.  But also thank you to Vicki.  I would be

11  remiss if I didn't thank her because I know she helps

12  behind the scenes.  So thank you on behalf of all the

13  parties.

14                    You just met Mr. Barysas for the first

15  time and, as a former judge and now someone who

16  judges all the time from a different perspective, you

17  know that there are some of those cases where they

18  can be won and lost based on the credibility of the

19  claimant.

20                    I think our greatest strength in this

21  case without a doubt -- and I say this as a,

22  quote/unquote, officer of the court -- is

23  Mr. Barysas.  He is an incredibly hard-working man.

24  He's a genuine man.  He comes from a long line of

25  immigrants, and he's very proud of his heritage and

Veritext Legal Solutions
346-293-7000

1    who he is.

2                    And so, just to help kind of guide the

3    discussion this morning, just so you know,

4    Mr. Barysas worked for Uber Technologies,

5    Incorporated -- I'm going to say Uber -- from

6    September 2014 until August of 2019.  And since that

7    time in 2014, importantly, he provided 2,346 trips

8    for Uber.  And specifically during the statutory

9    period that's applicable here, he drove an average of

10   45.2 hours per week for Uber through the Uber app.

11                   Judge, how did we get here, right?

12   That's a critical question.  It's a question that is

13   probably in your mind, and it's similar to when I go

14   to a Rockets game or a Texans game and I need to get

15   home or I need to go to the game, I get on my phone.

16   There's an Uber application.  I have to admit that,

17   quite frankly, it's genius.  What Uber has done from

18   a technology standpoint is nothing short of genius.

19                   You get on the Uber application -- and

20   I've never been an Uber driver.  I've certainly been

21   an Uber rider.  Very quickly, this is not driven by,

22   you know, a bunch of humans sitting in a room.  It's

23   really a complex, very, very expensive to build and

24   to maintain algorithm.

25                   And so, what Uber does is they have

Page 16

1    these public advertisements where they say, "Do you
2    want to become an Uber partner-driver?"  You will see
3    the term "Uber partner" frequently in some of Uber's
4    literature, some of their advertisements, their
5    brochures, and that's to soften the blow.  You know,
6    you're not just an employee, but you're a
7    partner-driver.  You can be your own boss.
8    Mr. Barysas and thousands of others have fallen for
9    that.  They have taken that to heart, and they have
10   poured their many hours and time to do just that.
11               They say with Uber you're your own
12   boss, and then what they also try to portray -- not
13   only through their publications, their lobbying
14   efforts, you name it, they also try to portray this
15   perception that as an Uber driver -- as a,
16   quote/unquote, partner -- you decide when and how
17   much you're working.
18               The problem with that, though, is the
19   facts show that even though Uber will portray
20   Mr. Barysas as an Uber partner and as his,
21   quote/unquote, own boss, Uber's control over its
22   drivers creates an employment relationship.
23               We understand as the claimant we have
24   a burden.  We accept that burden.  The preponderance
25   of the evidence burden is obviously what applies to

Veritext Legal Solutions
346-293-7000

 1    this arbitration, and specifically the Fifth Circuit

 2    has guided us on the Fair Labor Standards Act.  The

 3    preponderance of the evidence is -- is what is

 4    applicable here.

 5                   And so, I want to back up a little bit

 6    just so we understand what someone like Mr. Barysas

 7    encounters.  When you first start driving for Uber

 8    and recognizing that that was back in September 2014,

 9    you have what's called a technology services

10    agreement.  It's a TSA.  And there are terms,

11    definitions, that guide how Mr. Barysas is supposed

12    to act and interact through the Uber application.

13                   You will see this document, I trust,

14    many times over.  And we'll try not to do it ad

15    nauseam, but it is an important document.  It's the

16    initial terms and conditions that guide this

17    important relationship.

18                   We've seen time and again that Uber

19    will emphasize that drivers have freedom, that they

20    have opportunity, that they have flexibility, and

21    that they have choice.  And Uber will continue to

22    emphasize that.  I don't blame Uber, right?  That's

23    their role.  They are certainly not going to be

24    silent observers in this.

25                   The problem with that idea and with

                                              Page 18

1    that statement is that that only applies to when a

2    driver like Mr. Barysas logs on and then logs off of

3    the Uber application.  And obviously I'll be

4    challenged on this, but one of the things that I like

5    to explore and that I think will be important in this

6    is that this can be akin to when you log in, you're

7    clocking in to work and, when you log off, you're

8    clocking out of work.

9                  The reason why that's important -- and

10   Mr. Stanley, my partner, is going to touch on that

11   more -- is that in order for Mr. Barysas to even do

12   his job, he has got to be logged onto the Uber

13   application.  And during that time, he has a

14   15-second period by which he can accept a ride and

15   then that starts, right?  I mean, that could be the

16   start of your workday.  As Mr. Barysas is sitting in

17   a Starbuck's parking lot, he's logged on waiting for

18   that first ride of the day.  As soon as he gets that

19   initial alert, he then has 15 seconds.  His boss is

20   telling him, "You have a ride."  Dispatcher, here we

21   go.

22                  And at that point, the interesting

23   part of that, Judge, is he has no idea who his rider

24   is going to be.  He doesn't get to pick whose home

25   he's going to work on or which pool he wants to

Page 19

1  build.

2           He is told who his rider is going to

3  be.  He's also not told when he accepts a ride where

4  he is going.  So he has no idea where his final

5  destination will lead him.  He is literally following

6  the command of this faceless algorithm.

7           He also can't control the value of his

8  services.  You will hear -- and I don't think that

9  there will be any disagreement on this.  You will

10 hear that Uber unilaterally sets a base fare.  They

11 then set the time fare that's then multiplied through

12 the GPS application.  They calculate a distance fare

13 based on geopoints because Uber is constantly

14 tracking drivers like Mr. Barysas through the Uber

15 application.

16          Uber controls the wait time fare, and

17 also what you will hear about as surge fares, when

18 there are certain high-volume times when there may be

19 a supply and demand, that there's an imbalance.

20 There's not enough drivers to meet the demand of

21 riders.

22          And so, you you'll hear all about

23 that.  But at the end of the day -- bringing this

24 back to the point, Judge -- the freedom to simply log

25 on and log off of the Uber application when a driver

Page 20

1    wants to does not qualify this relationship as

2    independent.  The clocking in and the clocking out

3    does not do that.

4              One of the things that I would draw

5    your attention to here is the Portal to Portal Act.

6    One of the things that the Portal to Portal Act

7    speaks to -- actually, it was an amendment to the

8    Fair Labor Standards Act that came about.

9              And what they wanted to do, they

10   wanted to make a distinction -- they wanted to

11   distinguish the post-work and pre-work activities,

12   those that are preliminary or post-liminary from

13   those that are, quote/unquote, integral and

14   indispensable to the job.

15             I bring up the Portal to Portal Act

16   because it's something that no other arbitrator has

17   considered, no other arbitrator has opined upon, and

18   I do think that it does play a role here in your

19   award at the end of the day.

20             The heart of the arbitration is this

21   following question.  This is a question that both

22   parties are posing to you, Judge.  Are Uber drivers

23   independent contractors or employees, given the

24   control that Uber exercises and/or that Uber could

25   exercise over them?  That's the important

Veritext Legal Solutions
346-293-7000

 1    distinction, as well, is that it's not just the
 2    control that is exercised.  It's that Uber could
 3    exercise.
 4              And so, to get to that point,
 5    claimant, Mr. Barysas, must simply show that there is
 6    a preponderance of the evidence supporting a finding
 7    of an employer/employee relationship in the Fair
 8    Labor Standard Act context.
 9              And when we do that, the Fifth Circuit
10    economic realities test provides guidance to
11    differentiate an employer/employee relationship from
12    that of an independent contractor relationship.  And
13    what's very important is when you look at Fifth
14    Circuit law -- and we quoted to this in our
15    pre-hearing brief -- what we're looking at when we
16    talk about the economic realities test, that is a
17    very specific test to the Fifth Circuit.  In fact, if
18    you look to sister circuits -- for instance, Uber
19    likes to look at the Second Circuit.
20              When we look at the Second Circuit,
21    one of the things you'll see is the Second Circuit
22    applies different factors depending on different
23    circumstances.  That is not what the Fifth Circuit
24    does.  The Fifth Circuit has entirely adopted the
25    economic realities test.  I'm not going to lecture

1    you on that because, quite frankly, you know it

2    probably better than I do.

3                    But really what we're looking at here,

4    Judge, is whether or not -- what we're trying to

5    demonstrate to you is that Mr. Barysas had an

6    economic dependence on his employer here, that being

7    Uber.  And then what we also know is that the United

8    States Supreme Court has guided us over and over

9    again -- and Mitchell v. Loveland is what we've cited

10   to, which goes as far back as a 1959 case -- that the

11   FLSA is liberally to apply to as many -- and I think

12   that's important -- liberally to apply to as many

13   instances as possible consistent, of course, with

14   statutory provisions.

15                   And so, the other part that the Fifth

16   Circuit guides us on is that the evidence that is

17   presented to you through this arbitration, both

18   through testimony as well as the documentary evidence

19   that you will see that is admitted, is that the

20   evidence should be weighed by the totality of the

21   circumstances.  And it would go without saying, as

22   you know very well, that you have a significant

23   amount of discretion here.  The Fifth Circuit has

24   been liberal in its application just as guided by the

25   Supreme Court.

1              What the Fifth Circuit has told us is

2     that Factor Number 1 is the degree of control

3     exercised by the alleged employer.  What we argue

4     here is that the evidence, Judge, will show that Uber

5     had greater control over the meaningful parts of the

6     business.  I believe very strongly that we will show

7     you that Uber had the right to control its drivers

8     through its Uber management policies.

9              There are policies and procedures that

10    you will hear about today, Judge.  Pretty soon, I

11    imagine.  There's a driver deactivation policy.

12    There are Uber community guidelines.  You will hear

13    that from time to time Uber amended or supplemented

14    their community guidelines.  And that's important

15    because one of the things that we're going to talk

16    about in this arbitration is fraud and the threat of

17    deactivation surrounding areas of fraud and how the

18    Uber community guidelines changed over time to speak

19    to fraud and the potential deactivation of drivers

20    because of purported or alleged fraud through a

21    special team of Uber folks.  We'll talk more about

22    that.

23              But the fact that there was a right to

24    control is important here.  We will -- Uber will tell

25    you that they will alert you with notifications if

                                            Page 24

1    your rating is approaching a limit.  You will hear

2    that there were certain minimum star ratings, minimum

3    acceptance rates, maximum cancellation rates.

4    Drivers like Mr. Barysas from '14 to '19 was told

5    that if his average rating was still falling below

6    the minimum after notifications that your account

7    would be deactivated, could be deactivated.

8              You're going to hear that that

9    actually rang true with respect to Mr. Barysas.

10   We've had other drivers in other arbitrations who, in

11   fact, were never limited in terms of territory, never

12   limited in terms of geography, were never limited in

13   terms of being deactivated.  You will hear that this

14   is a very different scenario here.  Mr. Barysas

15   presents with very different facts than what I

16   believe you've heard, and I believe that that's one

17   of the reasons that Mr. Kherkher alluded to those

18   other opinions.  I do think that there are some

19   important distinctions here that Mr. Stanley will

20   make later on in this presentation.

21             Just to give you some of the lingo

22   that you're going to hear, a driver cancellation is

23   when a driver has accepted that trip within their

24   15-second allotted time and then subsequent to that

25   time after it's been accepted, they then cancel the

Page 25

1    trip.

2                    What drivers are told explicitly by

3    Uber is that cancellations create a poor rider

4    experience.  It also -- you will hear that -- during

5    this time period at least -- that if a cancellation

6    rate exceeded a maximum limit as determined --

7    unilaterally, again, by Uber -- a driver's account

8    may be deactivated.  Again, this is solely

9    unilaterally by Uber.

10                    We believe the facts will show that

11   Uber's community guidelines reflect Uber's control by

12   denying a driver access to the Uber app in deciding

13   whether a driver uses it again, if at all.  Now, you

14   may hear from Mr. Rosenthal.  He likes to talk about

15   his personal experience quite a bit.  And when he

16   does so -- and we'll do it again this morning -- we

17   want to have some foundation.  We want to have some

18   foundation.  We want to know what the facts are.

19   What are the documents that support?  And you may

20   hear that, "Well, these were veiled threats or veiled

21   suggestions."  Not if you're Mr. Barysas.  If you're

22   Mr. Barysas and putting food on the table depends on

23   it, these are your rules and your boss is giving you

24   the rules and you're going to follow them.  You'll

25   hear that that's exactly what Mr. Barysas did through

Page 26

```
 1   his time working for Uber.
 2                You're also going to hear the
 3   community guidelines speak to the idea that there
 4   will always be unforeseen events that may ultimately
 5   lead to you losing access to your driver account and
 6   that the policy will be updated.  I put that in there
 7   because I think it's very important, again, to show
 8   you that not only are the (indiscernible) of
 9   Mr. Barysas' services being unilaterally determined
10   by Uber, the customer list solely by Uber, the
11   assigning of the driver's work all done by Uber, the
12   customer volume per day, Uber, wait time,
13   cancellation rates.  Not only does Uber do that,
14   which all of that's in writing, they also do the
15   catch-all that if there are any unforeseen events, we
16   reserve our right respectively.
17                They also say in these Uber community
18   guidelines that the following categories are
19   sufficient causes for Uber to take action.  They
20   focus mainly on quality, safety, fraud, and
21   discrimination.
22                You're going to hear that Uber says
23   part of that is driven by, you know, some Texas law,
24   some Texas ordinance.  And some of that that's true,
25   and some of that's not.  We'll talk about the Texas
```

Page 27

1    network.  We'll get there shortly.

2              They also say in the Uber guidelines

3    that if you've been deactivated, you may have the

4    opportunity to get back on the road if you prove that

5    you have successfully taken a quality improvement

6    course.

7              So what that's doing -- if you think

8    about this in the actual reality of a workplace, if

9    I -- say, for example, my first job that I ever

10   worked was at Kroger.  And let's say that I was not

11   doing the job the way I was supposed to.  My manager

12   comes up and says, "You're going to be placed on

13   probation.  You're going to have to go back to the

14   Kroger school of training and learn how to do this."

15             That's exactly what Uber is doing

16   here.  They try to water it down, but you now have a

17   driver who has been threatened with deactivation, can

18   be deactivated at any point unilaterally by Uber, and

19   Uber says, "You may have the opportunity to get back

20   if you perform quality improvement courses."

21             I think that's important, to compare

22   what's being done here and put that side by side with

23   what you would expect from a normal form of

24   employment.  It does not meet what you would expect

25   of an independent contractor.  I'm not aware of

Page 28

1    independent contractors being threatened with

2    deactivation and then having to take quality

3    improvement courses.

4            Uber also told Mr. Barysas through

5    these guidelines that if you consistently decline

6    trip requests, we will assume you do not want to

7    accept more trips and you may be logged out of the

8    app.  Again, this is a unilateral decision by Uber

9    that you may be logged out of the app.

10            Uber's right to control Mr. Barysas is

11    just as important as Uber's exercise of control over

12    Mr. Barysas.  Bret will talk about this more.  It's

13    not just what Uber did.  It's what Uber could have

14    done and what Mr. Barysas knew from these policies

15    and procedures, from the contract, the technology

16    services agreement.  It's what he understood could be

17    done, and that's one of the very important parts of

18    this.

19            I hit on this earlier, and the app

20    is -- I don't want to say that it's complicated, but

21    the app has evolved.  The app as we know it today is

22    different today than it was in 2014.  It's also

23    different than it was in 2019.  There's -- certainly

24    between 2014 and 2019 and certainly during the

25    statutory period applicable here, there was a

1    significant information asymmetry between what

2    Mr. Barysas knew and what he could control versus

3    what Uber knew.

4                     For example, Mr. Barysas, he couldn't

5    say, "Well, I want the airport trip instead of the

6    1-mile trip to the gas station."  He could not say,

7    "Well, I want to increase the time fare" or "I want

8    to increase the distance fare" or "No, I don't want

9    to take that trip" or, "No, I only want to do airport

10   trips."  He could not make that decision.  Instead,

11   that decision was made through pre-arranged rides

12   through this faceless algorithm that we know today as

13   the Uber app.

14                    You'll see this, Judge, in the

15   evidence.  From the moment a driver goes on-line, it

16   truly is a faceless algorithm that controls the

17   actions of the driver.  I know that we're not going

18   to hear, obviously, from the very, very talented

19   young woman, Alex Rosenblatt who wrote Uber Land, but

20   one of the things that we learned, she talks a lot

21   about how algorithms are rewriting the rules of work

22   and talks about these middle managers that sit

23   between upper management and workers.  And -- and the

24   description is that these faceless algorithmic

25   managers are taking the place then of what we have

Page 30

1   traditionally known to be middle managers.

2              So at the end of the day, Judge -- I

3   hate, quite frankly, when we have slides that show

4   this much information, but the honest truth here is

5   there's a lot of information.  And so, when we're

6   talking about control, I think it's very important to

7   put this in front of you, that not only do we have

8   the facts on the left side -- and I'm sure that we

9   can agree with Uber to turn over our slides and Uber

10  can turn over theirs.

11             If you go down the right column and --

12  and all of these are areas of control in which what

13  we know as an independent contractor, what we hold

14  true as independent contractor as we have normally

15  known it, this is not what is reflected in these

16  facts and the type of control that's here.

17             The next slide, again, is a

18  continuation of the beginning -- the first slide.

19  Again, it talks about the unilateral decisions made

20  by Uber.  It talks about the control by Uber of

21  Mr. Barysas' method of work.  It talks about how the

22  payment arrangements -- the prepaid arrangements are

23  controlled by Uber.  Uber says that this has to be a

24  cashless app.  Uber says that you are not to accept

25  cash for rides.

Page 31

1          None of these would be anything that

2     we would traditionally see in the -- the normal

3     independent contractor context.  It's instead what we

4     would expect to see in an employer/employee

5     relationship.

6          The second factor here is the extent

7     of the relative investments of Uber and Dainius

8     Barysas.  One of the things that's very important --

9     and I think that you'll see when you -- when you read

10    some of the other opinions in this case -- is what

11    the focus has been on.

12         There has been a dearth.  There's been

13    a lack of focus on the actual Fifth Circuit law as it

14    applies to the second factor.  You will hear that

15    there's a multi-billion-dollar ongoing investment

16    into the overall business that was far greater than

17    Dainius Barysas' investment.

18         If you just do a basic investment

19    comparison chart, you can see that the investments by

20    Mr. Barysas are such that, well, you need a car.

21    What's interesting, though -- and when you read Fifth

22    Circuit law that we have cited for you and we will

23    continue to cite in our post-hearing brief -- is that

24    that car is not solely to perform work for Uber.  He

25    also can use it for personal use.  The same goes with

Page 32

1    all components of that car, whether we're talking

2    about tires, gas, oil.  It's a depreciating asset,

3    but it's also a depreciating asset that is a business

4    asset when used for business with Uber.  It also

5    becomes personal when used for personal.

6              Also, you have things like a

7    smartphone.  But also -- you have to have a

8    smartphone to use the Uber app, but that smartphone

9    can also be used for personal use.  So you've got

10   this dual purpose business and personal asset.

11             On the flip side, from the Uber

12   investments, before Mr. Barysas can even get on the

13   road and do his work, there's a capital investment

14   that has to be looked at.  The Fifth Circuit guides

15   us on that.  We'll brief it extensively, but the

16   truth is the capital here -- you have 4,000 software

17   engineers at least.  Significant,

18   multi-billion-dollar investment in the application

19   itself.  You have 24/7 driver support, both from a --

20   it's a messaging system, electronic, where you've got

21   folks who are in -- you know, all over the world who

22   are responding to driver questions and concerns on a

23   daily basis.  You've also got hubs that are in

24   person.  You'll see these Green Light hubs are brick

25   and mortar.  Mr. Barysas took advantage of both of

Page 33

1    those when he worked for Uber.  You'll see that

2    reflected in many of the support messages.  Then

3    there are also obviously global marketing campaigns.

4    You may yourself have even gotten e-mails about some

5    of these marketing campaigns, as I have in the recent

6    future.  So that's part of what we're talking about

7    in Factor 2.

8              Factor 3 is the degree to which Uber

9    determined the -- Mr. Barysas' opportunity or

10   opportunities for profit and loss.  And -- and what I

11   believe that the evidence will show you here, Judge,

12   is that Uber controlled all major determinants of

13   Dainius Barysas' profits and his losses.

14             One of the -- just to me -- the

15   instrumental reasons that I believe that that is true

16   here, Judge, is if you think about this:  Every

17   single time that Mr. Barysas got in his vehicle --

18   every single time -- he did not control the base

19   fare.  He didn't control the service fees that Uber

20   would charge.  He didn't even control the ride that

21   he would be given.  And, in fact, you will also see

22   that even when there was a cancellation of $10, Uber

23   still took out its charge.  I think it was $7.20 and

24   some change.

25             And so, the reality is that once

Page 34

1    Mr. Barysas is on this app, once he is clocked in

2    until he clocks out, Uber is controlling the profits

3    and the losses.  Uber pings the driver's phone when

4    it needs a driver to meet a rider.  When you're on

5    the Uber app, you're unable to build a book of

6    business because these all have to be pre-arranged

7    rides, right?  You can't say I'm an Uber driver and

8    flag someone down and say, "I want you to drive on

9    Uber."  That's not permitted.  You would be

10   deactivated.

11                Again, uber unilaterally decides the

12   fare price.  There's no way that Mr. Barysas can

13   control his profits and loss when he can't even

14   control the overall fare price.  He can't say, "Well,

15   I'm going to build you your pool, and I'm going to

16   charge you $50,000" or "Maybe I really need this job,

17   so I'm going to charge you $35,000."  That's not it.

18   Mr. Barysas gets in and the faceless algorithm tells

19   him exactly what he will be getting.

20                The Uber app also controls the

21   15-second period and decides whether or not is that

22   even enough time for him to get to that ride, for him

23   capture that ride, to be the person who takes on that

24   rider.

25                So the other part is when we're

Veritext Legal Solutions
346-293-7000

1    talking about profits and losses, you will see

2    support messages, which when Dainius was complaining

3    about needing his car cleaned -- people would vomit

4    in his car, people would have alcohol in his car,

5    would smoke.  He doesn't get to choose the cleaning

6    fee that he would charge.  Imagine any other

7    independent contractor that you've ever heard of who

8    doesn't get to control their own cleaning fee.  He

9    doesn't get to do that.  He does not get to say, you

10   know, "I'm this independent driver.  You just vomited

11   in my car.  It's $200."  It doesn't work like that.

12   In fact, he asked for certain amounts sometimes and

13   was denied that because Uber would say, "Well, That's

14   only a minor nastiness.  That's only a minor

15   inconvenience for your car."

16              There's also a lost item fee.  You're

17   not allowed to contact the rider and set your own

18   fee.  Instead, you have to go, again, through the

19   application.  So, again, that is a profit or a loss

20   that is definitely not controlled by Mr. Barysas.  In

21   fact, if he's going to take the lost item fee [sic]

22   to the person who lost it, he's not going to make any

23   money outside of $15 regardless of distance.

24              Cancellation fee -- and Bret will talk

25   to you about various periods involved.  And then

Page 36

1   Uber, as we know, does not pay -- does not reimburse

2   for expenses.

3            The Fifth Circuit economic realities

4   test Factor 4 focus on the skill and initiative

5   required to perform the job.  You will see that one

6   of the arbitrators, Judge Genevieve, agreed being an

7   Uber driver requires simply having a driver's

8   license.  There is nothing here that is special.  You

9   literally need to have a driver's license and a phone

10  and a vehicle and you, too, can drive for Uber.

11           I suspect that there may be some

12  insinuation here that, well, there was a limo

13  license.  Mr. Barysas had a limo license.  The

14  difference here is he couldn't even use that limo

15  license because the City of Houston requires you to

16  tell them what fares you're charging ahead of time.

17  And Mr. Barysas was never in a place to do that

18  because he can't set his own fares.  And not only can

19  he not set his own fares, there's no method through

20  the pre-arranged app that you can actually negotiate

21  the fares.  And Mr. Rosenthal has yet to demonstrate

22  to me or to any other arbitrator that there's a

23  function in this multi-billion-dollar invested

24  application that allows for a driver or a rider to

25  negotiate a fare.  It simply does not exist.  In

Page 37

1    fact, it gives you one option.  You take what Uber is

2    going to give you.

3                Driving a vehicle, again, does not

4    require a specialized skill or initiative.  Driving

5    for Uber is certainly not a specialized skill, and

6    the Fifth Circuit, when it comes to initiative, has

7    stated that routine work that requires efficiency is

8    not indicative of acceptance.

9                The last factor here, Factor 5, is the

10   permanence of the relationship.  As we've

11   demonstrated, Dainius Barysas worked for Uber for a

12   steady and reliable period of time.  I believe that

13   Uber will try to talk about other jobs from time to

14   time or other drive apps, whatever it may be, but

15   there is also nothing that prevents dual employers.

16   There's nothing to suggest that you can't have dual

17   employers.

18                It's also going to be very important

19   that Uber sends videos to their drivers, and they

20   tell them how alert they need to be in order to

21   accept rides.  You can't be in a movie theater.  You

22   can't be in a restaurant.  The rider is waiting on

23   you.  If you are late, if you don't do your job, the

24   algorithm -- the ap fails, our transportation service

25   fails.

Veritext Legal Solutions
346-293-7000

1              As you've heard, Judge, Dainius worked

2    for Uber from September 2014 until August 2019.

3    2,346 trips for Uber.  And the Fifth Circuit in

4    Carrell versus Sunland Construction, 1993 case, it

5    stated that even 10 months is enough to satisfy the

6    permanency requirement.

7              Again, I go back to some of the other

8    opinions that I know that you will read.  I know that

9    you're going to make your own decision.  I do

10   appreciate your candor, Judge.  I very much do.  It's

11   refreshing.  And one of the things that we've seen is

12   that there's been really no citation in the case law.

13   There's been no -- no really examination of this the

14   permanency requirement to any in-depth degree.  And I

15   don't fault anyone for that other than to say the

16   Fifth Circuit has been very clear.  I think what's

17   throwing some people off -- you know, we had one

18   gentleman who would have to go visit his family in

19   Africa.  So there was two months he would have to go

20   away.  One person needed to make a short move to see

21   family, and that happened.  I think you are going to

22   see that there are different facts here, and I know

23   that you're going to weigh this case on its own as it

24   is presented to you.

25              The last part that I want to talk

Veritext Legal Solutions
346-293-7000

1    about in terms of the law and as applies here is the

2    occupation code.  There's a section dedicated to the

3    regulation of motor vehicles and transportation.

4    This is -- it's one of the exhibits I know that Uber

5    has, and I expect that we'll talk about it this

6    morning with Mr. Rosenthal.  Chapter 2402 talks about

7    transportation network companies.  TNC is what it's

8    referred to.

9                    And what we learn is that drivers as

10   independent contractors -- and it says this.  It

11   says, "A driver who is authorized to log in to a

12   transportation network company's digital network is

13   considered an independent contractor for all purposes

14   and not an employee of the company in any manner

15   if" -- Number 1 is "The company does not" -- and in

16   C -- "limit the territory in which the driver may

17   provide digitally pre-arranged rides."

18                    I bring that up because I think that

19   that is going to be a critical distinction here.  I

20   think that you're going to see support messages that

21   are absolutely going to support a finding that the

22   territory here was limited for Dainius.  You won't

23   really have true documented evidence of why because

24   we haven't received it.  I believe that you will see

25   some support messages that do talk about the

Page 40

 1    limitation of the territory.

 2                  And so, Judge, Bret is going to talk

 3    about how this all applies specifically to a normal

 4    workday for Dainius Barysas when it comes to his work

 5    for Uber.

 6                  I will echo what Steve said in the

 7    very beginning.  The parties chose you and agreed

 8    upon you because we know that you know the law, we

 9    know that you have significant experience, and we

10    have faith that you're going to do the right thing

11    guided on whatever you find in the law and the facts.

12                  I appreciate you giving me this time,

13    and I'll turn the microphone over to Bret.

14                  JUDGE SOUSSAN:  Before you get

15    started, Mr. Stanley, does anyone need five minutes?

16    Most of us have been pretty much ready to roll at

17    9:00 a.m.  Should we take five minutes?  Let's take

18    five minutes.  Let's get back on at 10:30, please.

19                  (Recess from 10:25 a.m. to 10:32 a.m.)

20                  JUDGE SOUSSAN:  Please proceed.

21                  MR. STANLEY:  I'm planning to bring us

22    home in about 15 minutes on this opening statement.

23    And I just want to give you a little bit of

24    background information on the claimant.

25                  The claimant is from Lithuania.  As

Page 41

```
 1    you heard, he drove for Uber from September 2014
 2    until October of 2020.  He drove for Uber in two
 3    different cities.  He started in New York City, and
 4    then he moved to Houston and did the majority of his
 5    work during the statutory period here in Houston.
 6    There were only a few months that he would have
 7    driven during the statutory period, which we believe
 8    to be from March 2020 to present if you give us the
 9    three-year look-back because of Uber's willful and
10    knowing action of categorizing the claimant as a
11    contractor instead of an employee.  So with that
12    three-year look-back, we get back into some of his
13    time in New York and then the time in Houston that he
14    would have driven.
15              Generally, Mr. Barysas would have
16    started his day around 8:30 for Uber during the
17    statutory period after dropping off his child at
18    school and would have driven to the airport.  In that
19    time, he would have logged on and entered what is
20    known as Period 1.  There are three periods that Uber
21    has for these drivers.  And if you know those, bear
22    with me, and I'll just define them quickly.
23              Period 1 is when you log on and you
24    are waiting for Uber to provide you a ride request
25    from the rider.  Uber has complete control, as Mr.
```

Page 42

1    MacLeod alluded to, of the types of riders that they

2    will offer to a driver during Period 1.

3            Once a trip is offered to the driver

4    during Period 1, they have 15 seconds as required by

5    Uber to accept the trip.  If the trip is accepted by

6    the driver, they go into what is called Period 2.

7            Period 2 is the time at which the

8    driver is en route to the rider.  After acceptance,

9    before they reach the rider's location.  During that

10   period, the driver -- in neither Period 1 or 2 does

11   the driver get information about the final

12   destination.  At the time, the driver did not get a

13   fare estimate.  The driver did not know where he was

14   going to deliver the rider or how much he potentially

15   could make.  All of that was information withheld by

16   Uber and also information controlled by Uber.

17           Once Mr. Barysas reached the rider,

18   then Dainius would notify the rider that he is there.

19   The rider then would come to the car.  You'll hear

20   different things about wait time later and potential

21   payments for wait time during that period while

22   Dainius is waiting on the rider.

23           Once the rider enters the car, Dainius

24   hits "begin trip," and that's when he's told where to

25   go, and he goes and delivers the driver -- or the

Page 43

1    rider.  Once he gets to the rider's destination

2    drop-off, he immediately enters back into Period 1

3    engaged to wait on the next ride offered to Uber.

4              So that's the general day that Dainius

5    would -- would have.  Oftentimes, Dainius would go to

6    the airport -- start his day, drive directly to the

7    airport.  And there, you enter a queue in the Uber

8    and Lyft or rideshare staging lots.  Once you enter

9    that queue, you enter into the specified lot -- the

10   lot is controlled by GPS coordinates so that Uber

11   knows when you enter that lot, and it puts you in

12   line.

13             While you're waiting in the lot, the

14   Uber drive can see his line position change.  Maybe

15   it goes from 120 to 122, 120, 119.  As it goes down

16   and you get to the very first position, then it

17   routes you to the next waiting rider at the airport,

18   you pick the rider up, go to your destination.

19             During that time while you're waiting,

20   Dainius is not paid in any way by Uber, and he's

21   engaged to wait on Uber to provide a ride but unable

22   to get an airport ride otherwise.  That creates long

23   wait times generally because those wait times there

24   can add up, but those drives also are some of the

25   most lucrative because, as you know, IAH or Hobby is

Page 44

1    pretty far from some areas, and you might have an

2    hour long or longer drive for a rider during that

3    period.

4              So that's some of the elements that --

5    of a general day that he would have.  If not at the

6    airport, he holds himself open during Period 1 to

7    receive other rides.

8              So here -- what we're publishing again

9    is the TNC code that Mr. MacLeod showed earlier this

10   morning.  And it's important -- and one of the things

11   I want to emphasize here is the fraud -- the

12   allegation from Uber that makes this case a little

13   different than what others have heard.

14             Here's exhibit -- a piece of Exhibit

15   C7 that will be very important for this arbitration.

16   This is a final notice that Uber gave to Dainius.  As

17   you see, it says, "Final Notice:  Fraudulent or

18   illegitimate activities are inconsistent with Uber's

19   policies," and Uber says this may include certain

20   items.  "This may include GPS manipulation,

21   (indiscernible) your location, fraudulent

22   cancellations, support abuse, or remaining on-line in

23   the queue for reasons other than accepting trips."

24             Then this is the final notice, and you

25   see in the next paragraph it says, "You are no longer

Page 45

1    eligible to receive requests for pickups and

2    drop-offs at airports.  Moving forward, you will only

3    receive non-airport trips."

4              And this is a key factor here because

5    Uber -- solely on Uber's discretion -- limited

6    Mr. Barysas territory by preventing him to make

7    airport trips, either pickups or drop-offs.

8              Mr. Barysas corresponded back with

9    Uber, asking them to tell him exactly what he did

10   wrong.  He asked if it's a permanent decision.  He

11   wanted an appeal.  You can see the highlights.  He

12   wanted to speak to a supervisor.

13             And what Uber told back to Dainius was

14   "A specialized team has reviewed your request and

15   appeal and sent you their final decision.  The

16   decision was final and cannot be further appealed."

17             For the remainder of this period, 2018

18   forward, Dainius was unable to pick up rides at the

19   airport solely on the discretion of Uber, and Uber

20   never told him what they alleged he to have been

21   doing and what rules that he broke.  They just said

22   there was fraud or belief of fraud and gave this five

23   set laundry list as we saw in Exhibit C7.  So that's

24   a very important fact in this case we want you to be

25   aware of.

                                        Page 46

1                    Other important facts that Mr. MacLeod
2     alluded to earlier is Uber's ability to set the fare,
3     payment, and service fees.  This is an example of an
4     exhibit you'll see later.  This is from Exhibit C8,
5     which is a collection of support messages where
6     Dainius is asking Uber, "Why was 50 percent taken as
7     a fee-it's outrageous."  So he's going back to Uber
8     asking about the fee that was suggested -- that was
9     required by Uber to be removed.
10                   And Uber responds and gives the
11    breakdown of the fare, and they say the base fare is
12    1.44.  The distance, 14.52 miles, is calculated by
13    $1.3032 per mile.  That's 18.92.  The time, 25
14    minutes, is calculated at 18 cents a mile.  That's
15    4.62.  They give the grand total.
16                   Those distance and time fare amounts
17    are solely at the discretion of Uber and solely at
18    their -- their direction to require this amount to go
19    to the driver.  The driver can't change that.  The
20    driver can't set the fare.  The driver can't increase
21    their ability to make a profit because Uber controls
22    all of that.
23                   Again, another communication that
24    you'll see in Exhibit C8 about this fare, Dainius is
25    discussing with Uber why their service fee is over

Page 47

1    30 percent.  And as you see in the highlight there

2    below, it says, "Service fee amounts vary and there

3    is not a set percentage."

4              So Uber changes the service fee which

5    impacts the take-home or net of every driver.  Those

6    are a few documents that we anticipate to show you as

7    this arbitration unfolds.

8              Additional evidence that you will see,

9    as we discussed earlier, are on this bulletin list.

10   There are documents to support all of these items.

11   Uber requires claimant to wait in Period 1 for a trip

12   request.  There's no specialized skill, as you'll

13   hear from Dainius, to be an Uber driver because

14   you're waiting on Uber to provide the ride and then

15   Uber is directing you where to go.  And so, those are

16   items that we'll bring to you.

17             Uber never disclosed claimant's trip

18   fares before he could accept.  And so, you have this

19   blind acceptance, not knowing how much you're going

20   to make during any individual trip.

21             Uber never told the trip destination

22   before acceptance of a ride.  So you don't know where

23   you're going to make a cost benefit analysis.

24             Uber threatened claimant with

25   deactivation or suspension based on star rating,

Page 48

1   acceptance rate, cancellation.  These are items that

2   claimant was aware of and knew that he had to

3   maintain Uber's standard in order to continue on the

4   app and ultimately was deactivated from a portion of

5   the app or at least from a location.  So uber

6   exercised control in that moment.

7            The claimant drove in New York City

8   and in Houston.  He logged more than 5,000 hours on

9   the app.  And so, he was dedicated and drove for Uber

10  a lot during the statutory periods.

11           We will also see an expert report from

12  Dr. James Parrot.  Here's Appendix B, a summary of

13  the report which shows the total amount of trips that

14  he would have completed for Uber during the statutory

15  period.  You see that.  It's on the second line down.

16  1,061 trips.  The total amount that Dainius made was

17  just above $41,000, 43,000 -- almost 44,000 miles

18  driven, and 249.5 hours of straight time in New York

19  City, 2,966 hours of straight time in Houston.  And

20  when we say "straight time," that's time that is not

21  billed at overtime.  That's the time that he would

22  have been under during a weekly period 40 hours a

23  week.  So not the overtime figure.  You see the

24  overtime hours in Houston below at 1436.

25           There's also an assessment by

Page 49

1    Dr. Parrot of the payroll taxes and the expenses.

2    And if you look up midway through the top page at the

3    miles, we weight those expenses per mile at the IRS

4    mileage rate at 55 cents -- a little over 55 cents a

5    mile.  And that's common in industry around, that the

6    IRS mileage raised is used for expenses that include

7    gas, wear and tear, maintenance on your vehicle.

8                    Interestingly enough under the FLSA,

9    specific expenses aren't required, only a reasonable

10   approximation.  So Dr. Parrot uses the IRS rate as

11   his reasonable approximation for expenses.

12                   All in all, the shortfall for these --

13   for the claims that we're bringing is 27,207.  That

14   doesn't include liquidated damages or attorneys'

15   fees.  That's just the economic loss that we claim

16   associated to the driving shortfall that Uber failed

17   to pay Dainius.

18                   And so, to conclude, we've discussed a

19   lot of different law and areas today that -- the FLSA

20   was referenced earlier as to be -- was to be applied

21   to as many instances as possible in the Mitchell

22   case.  Whether an employee -- employer/employee

23   relation exists dependency nature of the

24   relationship.  That's the Haferty case.

25                   We're going to show you that the five

1    factors will weigh in the favor of the claimant.

2    Uber did not pay the claimant a proper minimum wage

3    or appropriate overtime.  So once we tip the scale in

4    favor of claimant, all those five factors, then we

5    look at the damages.  We presented that to you, as

6    well.

7             You will hear from experts on the

8    control and economic dependence that Uber drivers --

9    and specifically Dainius -- has undergone during this

10   time at Uber, and we believe that we'll show these

11   items and that the facts and the law weigh in our

12   favor on this.

13            If you have any other questions, we're

14   open to those.  If not, we will conclude our opening

15   statement at this point.

16            JUDGE SOUSSAN:  Thank you very much.

17   All right.  Any other part of opening on behalf of

18   claimant?  I don't think so.

19            MR. STANLEY:  No on behalf of the

20   claimant.

21            MS. MIERS:  Judge, before Mr. Sandahl

22   proceeds, I do want to clarify one thing on the

23   record.  We didn't want to do this without going back

24   and checking on the first break that we had today,

25   but we do want to make sure you understand that we

Page 51

1   received an order from you indicating today's hearing

2   would start at 10:00 a.m., and then the only other

3   communication we could find was an e-mail exchange

4   where there was a possibility that we may start

5   earlier on Wednesday, which is tomorrow, based on the

6   need to leave early.  So I just wanted to make

7   sure -- we didn't want to overstep and -- and we may

8   have missed an e-mail or something, but this is --

9               JUDGE SOUSSAN:  I apologize.  I was

10  totally unaware of that.  And if it's my mistake,

11  it's a big mistake on my part.

12              MS. MIERS:  We just wanted to make

13  sure you didn't think we were disregarding your

14  orders in any way.

15              JUDGE SOUSSAN:  No, I didn't think

16  that at the beginning.  And I will do the following

17  -- Vicki -- and she'll look at it, and I apologize.

18              MS. MIERS:  Thank you for hearing us

19  out on that.

20              JUDGE SOUSSAN:  We do need to correct

21  the start.  I was told that I had told them we would

22  start at 10:00 in my e-mail to them.  So if we could

23  just check that.

24              Okay.  We just need to make sure the

25  court reporter understands that we're going to start

Page 52

```
1    at 9:00 o'clock tomorrow, if not earlier, which we'll
2    find out at the end of today.  We'll double check the
3    start time each day.  I apologize.
4                    MS. MIERS:  Thank you, Judge.  I'm
5    going to go on mute so that Mr. Sandahl can take
6    over.
7                    MR. MacLEOD:  Will we still be going
8    until 6:00 p.m. today or is that different?
9                    JUDGE SOUSSAN:  I think we should.
10                    MR. MacLEOD:  Okay.  I just wanted to
11    make sure for witness scheduling.  That's fine for
12    claimant.  I just wanted to make sure.
13                    JUDGE SOUSSAN:  Mr. Sandahl?
14                     OPENING STATEMENT,
15                    MR. SANDAHL:  Thank you for your time
16    in preparing for this arbitration, as well.  We
17    appreciate it.
18                    Your Honor, this case hinges on one
19    reality, and that is that claimant is his own boss.
20    Let me share my screen to share this PowerPoint
21    presentation, please.
22                    Can you confirm that you can see that?
23                    JUDGE SOUSSAN:  And just to bring this
24    up, I would like a copy of each of your PowerPoints,
25    a hard copy of each.
```

Page 53

1            MR. SANDAHL:  We will get that to you.

2     Thank you, Your Honor.

3            Your Honor, the evidence in this case

4     will show a handful of bedrock, undisputed facts

5     demonstrating that claimant was his own boss.  When

6     he used the Uber driver app, he was free.  He was

7     free to do a lot more than just have control over

8     when he logged on and logged off.  He had a lot more

9     control than that.

10            He was free, of course, to drive when

11     he wanted or not drive when he didn't want to drive.

12     He could start early in the morning, late in the

13     evening, or at any time.  Of course, Mr. Barysas

14     could stop driving whenever he wanted to.  He never

15     had to miss a ballgame, he never had to miss a

16     vacation, or even a trip home to Lithuania, which he

17     took, because of work.  And he could control where he

18     wanted to work.

19            Now you've heard kind of what I think

20     of as a bit of distraction on the airport limitation.

21     He was limited because of some fraudulent activity

22     detected on his account from one area to not pick up,

23     and that was at the airport.  We'll address that in

24     more depth later, but it was certainly not any kind

25     of territory that he was limited to.  That was not

Page 54

1    dictated by Uber.  It was just a certain contractual

2    violation that he had done that then led to his --

3    that limitation.

4                In fact, in talking about where he

5    wanted to work, you heard that he worked in New York

6    City, and he also worked -- move on his own

7    initiative to Houston and he began using the Uber

8    driver app in Houston.

9                Mr. Barysas was also free to compete

10   with Uber.  Significantly, claimant owned and

11   operated his own business which was called DB

12   Pedicabs, LLC.  And this business was in the

13   transportation services business.  You heard

14   reference to a limo license that was in the DB

15   Pedicab's business name.  He got his -- some of his

16   pay statements or his tax was done through that, and

17   some of the tax statements issued by Uber were to DB

18   Pedicabs, LLC, not to Mr. Barysas as an individual.

19   He advertised with that business, he had a website,

20   and he used that business to contract with Uber to

21   provide the transportation services that he wanted.

22   On top of that, he competed with Uber by often using

23   the Lyft app at the same time he was using the Uber

24   driver app.

25                In addition to claimant being free to

1   do things, claimant was free from a lot of ordinary
2   markers of an employment relationship.  He didn't
3   have to apply to use the Uber driver app.  He wasn't
4   interviewed or selected to do so.  He never had to
5   undergo any training.  He never reported to a
6   supervisor at Uber.  He never had a performance
7   review from Uber, and he never had to attend any
8   meetings.  He was free from all of those constraints.
9   I think Mr. MacLeod even referenced the fact that
10  there wasn't any person at Uber that was overseeing
11  what he was doing.
12              He exercised his freedom.  He
13  exercised his freedom to seize opportunities for his
14  own business.  He invested heavily in the DB Pedicabs
15  business.  He drove an expensive Uber Black eligible
16  car, Uber Black being the more premium service.  And
17  he had his own limo license so he could provide
18  livery services in Houston.  Because of those
19  investments, he had an opportunity to win or lose.
20  He had an opportunity to make profits or losses.  But
21  at all times, claimant made his own choices in
22  running his businesses and using the Uber driver app.
23              Your Honor, I just want to address
24  some of the kind of preliminary comments that came
25  up.  Yeah, of course, you know, we anticipate that

Page 56

1    you will make up your mind on the law and the facts

2    in this case.  To the extent that the other

3    arbitrators made up -- have already made

4    determinations, they have all been in Uber's favor.

5              And I heard mention of kind of cases

6    or task groups or focus groups from California and

7    Massachusetts.  But as you mentioned, the case law in

8    Texas or the law in Texas in the Fifth Circuit is

9    from different from certain other states' laws.

10             And so, we trust that you will -- we

11   certainly agree that you can and should make up your

12   own mind on this case, but this case is actually

13   stronger than the other cases in which arbitrators

14   have already found Uber to be an independent

15   contracting company.

16             All of those bedrock facts really boil

17   down to four words:  Freedom, flexibility,

18   opportunity, and choice.  All are hallmarks of an

19   independent contractor's relationship with a company.

20   They're not the hallmarks of an employee/employer

21   relationship.  And because of that relationship, the

22   independent contractor relationship, each of

23   claimant's claims fails.  Uber didn't need to pay him

24   over time.  So when you hear that he worked for a

25   certain number of hours a week, that's not -- it's

Page 57

1    irrelevant because he wasn't an employee.  They

2    didn't need to pay him minimum wage.  Didn't need to

3    keep certain records related to him and couldn't be

4    liable for reimbursement of other tips and expenses.

5              So I just want to take a step back and

6    reintroduce you to our client.  Uber Technologies is

7    a respondent in this case.  The testimony in this

8    case will show that Uber is a technology company.

9    Uber designed and engineered -- you saw -- I think

10   the number was 4,000 -- several thousand software

11   engineers that are employees of Uber because that's

12   what they do.  They design the technology.

13             The Uber app is a digital marketplace

14   that enables individuals in need of services to

15   connect with people who are willing to provide those

16   services.

17             We're going to talk, of course, about

18   the app at length over the next few days.  But before

19   we go further, I just wanted to say thank you to Kim

20   Miers for being on the team.  We have our paralegal,

21   Don Ridenour, in the room.  I know that some of this

22   has already been introduced, but just to reiterate

23   who we are.  Angela Corridan is in-house counsel and

24   she's on, and we have Uber's corporate

25   representative, Brad Rosenthal.

Page 58

1           Brad Rosenthal knows quite a bit about
2    the company.  He'll be testifying both today and --
3    at least today, and we'll see when else he'll be
4    testifying.  In fact, he's been with the company for
5    a while.  His e-mail address is just brad@uber.com.
6           For purposes of this arbitration, the
7    service you're going to hear most about from the Uber
8    app is the ride service.  That's the service that
9    allows riders in need of transportation services to
10   connect with drivers who are willing to take them
11   where they want to go.  That connection is
12   facilitated by the Uber driver app in realtime
13   through smartphones.  I'm sure you're familiar with
14   the app.
15           When somebody wants to take a ride
16   somewhere, they pull out their smartphone, open the
17   app, and can request the ride with just a few clicks.
18   I think Mr. MacLeod described it as genius, and I can
19   agree with that certainly.  I know for myself I
20   started using it when I was living in Chicago, and it
21   was a real game-changer.  I didn't have to wait in
22   the rain for a cab.  I didn't have to run to an ATM
23   for cash because I was worried that the cab driver
24   would say, "Oh, my credit card machine is down."  I
25   was -- there was no more wondering when I was

Veritext Legal Solutions
346-293-7000

1    anywhere outside at the heart of the downtown would I

2    be able to get a ride.  I could sort of plan that in

3    advance.

4                Another thing I noticed, of course,

5    was that there was a lot more variety in the rides

6    that I got.  Taxis are all pretty much the same:  A

7    sedan with leather seats.  No amenities, maybe a

8    plexiglass screen.  With Uber, some rides I got were

9    bare bones and were just a small car and it worked

10   fine, but sometimes they went the extra mile.  I got

11   magazines, mints, waters, phone chargers, the works.

12   That was all up to the driver.  It was a service that

13   they chose to provide.  So that's kind of the rider

14   side of the app.

15               On the driver side, the driver logs on

16   and logs off whenever he feels like it -- or she.

17   When logged in, the driver will receive trip requests

18   from nearby riders.  They have 15 seconds to accept

19   the request, and it's completely up to the driver if

20   the trip isn't accepted.  The offer then just goes to

21   another driver.

22               Despite the kind of conversation about

23   it otherwise, nothing -- there's no negative

24   consequence to the driver if the driver doesn't

25   accept trips.  Now, if the driver doesn't accept

Veritext Legal Solutions
346-293-7000

```
 1    several trips in a row, the driver will automatically
 2    be logged off of the app under the assumption -- kind
 3    of like when you're watching Netflix, are you still
 4    watching -- the assumption that they are not wanting
 5    to take rides right now.  But if the driver wants to
 6    accept trips and that was a mistake, then they will
 7    just log back on.  It's not deactivation when they
 8    are logged off for not accepting trips.
 9                    And then even after a driver accepts a
10    trip, the driver has the discretion to cancel it.  I
11    think we saw some numbers about 2,400 or something
12    trips that Mr. Barysas had completed.  I believe the
13    number of cancellations is 238 that he had.  So he
14    certainly had discretion to cancel trips, as well.
15    There's no negative consequence for canceling a trip
16    after accepting it.  Now, if you accept so many trips
17    and cancel so many that you're impacting the
18    reliability of the marketplace, then Uber can take
19    action, but it's an extremely rare event.
20                    At any rate, all the talk about
21    deactivation, especially the cancelations, is an
22    irrelevant distraction.  Mr. Barysas was never
23    deactivated for canceling trips.  His business, DB
24    Pedicabs, was never deactivated for canceling trips
25    or for any other reason.
```

Page 61

1            If the driver doesn't cancel a trip,

2     once it's completed, the driver receives a fare.

3     That fare comes from the rider.  Uber does facilitate

4     the rider's payment to the driver by use of a payment

5     system, but Uber doesn't pay for the ride provided.

6     It's the rider.

7            JUDGE SOUSSAN:  Can you slow down just

8     a little bit?  I know that the court reporter is

9     going crazy right now.  Not that I've ever been a

10    court reporter, but you're taking very fast.  And I

11    see her nodding her head.  So if you could just slow

12    it down for a while.

13            MR. SANDAHL:  Yes, I will.  Thank you

14    for keeping me in check.

15            The driver -- Uber does not pay the

16    driver.  It comes from the rider.  Then the driver

17    pays Uber a fee for use of the app and the driver

18    then retains the rest of the fare.

19            As mentioned, this is a two-sided

20    digital marketplace, which you'll hear about quite a

21    bit over the next couple days.  And in order for

22    riders and drivers to take advantage of this

23    technology, they have to agree to digital services

24    agreements, both riders and drivers.

25            The terms of use require me as a rider

```
 1    to comply with business standards that are designed
 2    to ensure a pleasant and safe experience for everyone
 3    using the app, both riders and drivers.  If I don't
 4    want to agree to the terms, nothing requires me to do
 5    that.  And nothing, of course, requires me to use the
 6    app in the first place.  But I like using the app
 7    because it's convenient, and I agreed to the terms
 8    because I understand that Uber is only entitled to
 9    what should have minimum business standards designed
10    to ensure the reliability and stability of the app
11    for both riders and drivers.
12                Those minimum business standards I
13    think claimant refers to -- you know, talks about as
14    control, rules, but Uber and every other business
15    calls them business standards.  And many of those
16    standards are mandated by law, by the law that you
17    saw them highlighting, that Texas Transportation
18    Network, the TNC statute.  It's just compliance with
19    the law.
20                In any event, the evidence will show
21    that Uber deactivates even riders' apps if they
22    behave inappropriately, just as they would deactivate
23    a driver for behaving inappropriately.  They hold
24    both riders and drivers accountable to the same basic
25    minimum standards.
```

Page 63

1           Let's move into who is Mr. Barysas?

2   Mr. Barysas is a businessman.  You can see here his

3   limo license.  He's an entrepreneur.  You'll hear him

4   in his own words say that he has an entrepreneurial

5   spirit.  As we mentioned, he owns and operates DB

6   Pedicabs under which he's registered to use the Uber

7   app.

8           I just want to address the fact

9   that -- this allegation that he couldn't use his limo

10  license.  That's simply not the case.  He was able to

11  operate and did operate DB Pedicabs.  He advertised

12  when he was in Uber, handed out business cards, and

13  he could connect with people and provide

14  limo-licensed services of course outside of the Uber

15  app, as well.  And he knew how to do that because he

16  operated his own business.

17          Now, you may understand that

18  Mr. Barysas was not an ordinary driver out in sort of

19  the cheapest car he could get.  He invested

20  significantly in this upscale Infinity SUV, and he

21  made the choice to make a business investment in both

22  that SUV and in his limo license so that he could

23  provide upscale service under the Uber Black service.

24          As you can see in this picture, he

25  paid more than $600 just for the opportunity to have

Page 64

1    a limo license.  He owns and operates DB Pedicabs,

2    LLC, which has a bike and pedicab service, and it

3    also has a driving service.  He drove for Lyft at the

4    same time he was driving for Uber, and he now owns

5    and operates DSK Logistics, a whole another company

6    that's a trucking service.  So these are his own

7    individual business opportunities that he's seizing.

8    And to the extent he's using Uber, it's to invest in

9    his own businesses.

10              So I want to take a step back to 2014

11   when Mr. Barysas began to use the Uber driver app.

12   The evidence will show that just like riders, drivers

13   can't gain access to the driver app without entering

14   into an agreement with Uber -- or in Mr. Barysas'

15   case, it's a couple of agreements -- to use Uber's

16   lead generation services and the related services

17   that Uber provides.  Those services include access to

18   the driver app and Uber software, payment services,

19   and related support systems.

20              The evidence will show that by

21   entering into this agreement, this 2015 raiser

22   agreement, Section 274, Mr. Barysas agreed that his

23   use of the Uber driver app created a direct business

24   relationship with Uber and that he had the sole right

25   to determine when, where, and for how long he would

Page 65

1    utilize the driver app or the Uber services.

2              In fact, in Mr. Barysas' case, this

3    will be even more clear than some of the other

4    drivers that we've seen.  As a driver with a

5    limousine license and an independent business,

6    Mr. Barysas also entered into another group, the Uber

7    USA, LLC agreement with Uber to provide services.

8    That agreement, which as you can see, defines drivers

9    as customers, explicitly indicates that users of the

10   Uber driver app who enter into that agreement are an

11   independent company in the business of providing

12   transportation services, and it contemplates that

13   customers like Mr. Barysas and his business can have

14   employees of their own.  He could have, if he wanted

15   to and chose to, hired a fleet of drivers and a fleet

16   of cars.

17             In the same agreement -- just like the

18   agreement that we saw previously, by entering into

19   this Uber USA agreement, DB Pedicabs, Mr. Barysas,

20   agreed that the use of the Uber driver app created a

21   direct relationship with Uber.  In addition to that,

22   he had the right to determine -- and his drivers if

23   he so chose to hire them -- the sole right to

24   determine when, where, and for how long to use the

25   app.

1              And then you can see in the third

2     highlighted portion there that his company had the

3     complete discretion to operate its independent

4     business, direct its drivers as he saw fit, and to

5     provide services at any time to any third party

6     separate and apart from the services contemplated in

7     this agreement, which he did.  He did for Lyft, and

8     he operated his own business.

9              Both of the agreements -- this is

10    Section 13.1 from the raiser agreement.  Just to kind

11    of clarify, the raiser agreement is sort of the

12    individual -- and we'll get into the testimony about

13    it, but it is kind of -- if I can just simplify it,

14    it's more of the sort of individual, peer to peer

15    providing of services.  The Uber USA is more the

16    livery side of services.  So Mr. Barysas, because he

17    did both, he entered into both agreements.

18              This raiser agreement and the other

19    one, the Uber USA, both contain this provision that

20    says that the driver understands that you're only

21    using -- the company Uber is only acting as a payment

22    collection agent and that you are an independent

23    contracting party.

24              In exchange for these agreements,

25    Mr. Barysas and his business gained access to the

1    driver app.  That gave Mr. Barysas the freedom,

2    flexibility, opportunity, and choice to run his

3    transportation services business as he saw fit.

4    Again, I think we mentioned that he started using it

5    in 2014, and he unilaterally chose to stop using the

6    Uber driver app back in August 2019.

7              The evidence will demonstrate the

8    freedom -- the significant freedom that he had.  He

9    had freedom to use other lead-generation apps, to

10   engage in other business endeavors, to develop a

11   fleet of vehicles, to reject trip requests, to cancel

12   trip requests, to build his own book of business.  As

13   mentioned before, he was free from supervision,

14   training, all those constraints.

15             Now, to demonstrate -- and it's kind

16   of in a visual way -- the freedom that he had -- that

17   Mr. Barysas had to compete directly with Uber, this

18   chart shows that claimant did and could use the Lyft

19   app while he was logged into the Uber app.  In this

20   demonstrative, which is based on data from Uber and

21   Lyft, the time on the Lyft app is in pink on the top.

22   The time on the Uber app is in black on the bottom.

23             Claimant was on both apps at the same

24   time for -- let's see the number here -- more than

25   167,000 minutes.  Claimant was able -- and we heard

Page 68

1    some mention of P1, P2, P3 time -- was able during

2    that P1 time to do personal tasks.  And he could

3    also -- whenever he wasn't, you know, in P2/P3

4    time -- could be using the Lyft app, giving a ride in

5    Lyft.  And he did that.

6                 Claimant had the flexibility and

7    freedom to decide whether to work and when to work,

8    and claimant definitely took advantage of that

9    flexibility.  These next few slides -- you can see

10   they are kind of calendars or charts.  They show in

11   blue when claimant made the decision to operate his

12   business by using the driver app.  Each of these

13   boxes is a week, and then each line here is a day.

14   You can see -- so, for example, he didn't log on here

15   until about noon, and he logged off at 9:00 that

16   night.

17                 You'll see in each of these charts

18   that some weeks he decided not to provide any --

19   never logged on, decided not to go on-line at all,

20   and some weeks he worked a lot.  And he worked, I

21   think, seven days a week several times there.

22                 Now, claimant also had the flexibility

23   to decide what time to work, where he worked.  And

24   just to address the airport issue in just a little

25   more detail, you've heard about one single exception

Page 69

1    to the idea that he -- kind of suggesting that he
2    couldn't work wherever he wanted.  But you'll
3    understand from the testimony that he engaged in some
4    fraudulent behavior and that he couldn't take rides
5    to and from the airport based on -- based on -- based
6    on his agreements with Uber and based on the
7    limitations placed on Uber with respect to the
8    airport, that the airport put in place, because they
9    don't want people constantly driving around the
10   airport and just sort of -- you know, you can kind of
11   make loops around the airport.  They don't want
12   people doing that.  They want drivers like livery
13   drivers and Uber drivers to stay in a staging lot so
14   that the airport can have control over their traffic
15   situation and that -- those requirements then require
16   Uber not to just allow people to engage in fraudulent
17   behavior that makes it look like they are at the
18   airport when they are not.  You'll hear that
19   Mr. Barysas was GPS spoofing, which means that he
20   misstated his location.  He could control how long he
21   worked and how frequently he worked.
22                    Mr. Barysas also had the
23   opportunity -- he had a lot of opportunities to
24   pursue surge pricing.  So if he wanted to increase
25   his -- the amount that he took home, he could go to

                                              Page 70

1    where there were busier events, busier places in the
2    city.  He could pursue promotions and incentives to
3    get more -- more pay.  He could drive using the Uber
4    Black or Uber X service, either one, if he thought
5    that one would increase or decrease his -- what he
6    received.  He had control over that.  And, of course,
7    he could supplement his income with other earning
8    opportunities.
9              With all of these facts in mind, let's
10   look at the legal framework.  As a threshold matter,
11   I think the claimant agrees with this.  He bears the
12   burden of proof on all his claims.  And to the extent
13   that he's suggesting, you know, that there's a
14   three-year period that would apply that requires
15   willfulness, he also bears the burden on showing
16   willfulness.  And he's not going to -- and that
17   requires claimant to show that Uber knew or showed
18   reckless disregard for misclassifying claimant, and
19   he won't be able to meet that burden.
20             As you know, I mean, already in Texas
21   four arbitrators have decided that Uber properly --
22   so couldn't have willfully misclassified drivers as
23   independent contractors, but this is just a sample of
24   time and again where various tribunals and
25   governmental agencies have determined that drivers

1    using the driver app are independent contractors.

2    And we provided some of these to you in our

3    pre-hearing brief.

4              The Fifth Circuit does look to five

5    factors:  Degree of control, opportunity for profit

6    and loss, relative investment to the worker and

7    alleged employer -- sorry -- right, the skill and

8    initiative required, and the permanency of the

9    relationship.  You saw these.

10             And you might notice that I reordered

11   Numbers 2 and 3 from the way claimant presented them,

12   and that's because the Department of Labor in a

13   recent case just, oh, two weeks ago, from the Eastern

14   District of Texas -- it's called Coalition for

15   Workforce Innovation versus Walsh -- recently

16   reinstated an independent contractor test to be used

17   by the Department of Labor that really focuses on two

18   core factors.

19             Now, they are both in the Fifth

20   Circuit test.  I don't think it really changes the

21   calculus of time, but you start by looking at these

22   two factors:  Did the company -- what was the nature

23   and degree of control that the company had over the

24   work, and then you look at did the worker have an

25   opportunity for profit and loss?  Overwhelmingly,

Page 72

1     these factors weigh in Uber's favor in this case.

2               And then the question becomes -- after

3     you evaluate those two core factors, you then need to

4     look at other factors.  And if you do, you can look

5     at the amount of skill that's required for the work,

6     the degree of permanence of the working relationship

7     between the individual and the potential employer,

8     and whether the work is an integrated unit of

9     production.  And that is very similar to the Fifth

10    Circuit test.

11              And so, it doesn't -- either one that

12    you apply -- and, of course, the case law, since this

13    case is so new and the rule is newer, then the Fifth

14    Circuit hasn't had a chance to weigh in on it to say,

15    "Well, yeah, there's perfect overlap," but there is

16    obviously overlap between the two tests.  So either

17    one that you apply is going to result in a proper

18    classification.

19              And one thing I heard was that we had

20    focused apparently on Second Circuit case law and

21    that Fifth Circuit really weighs on the

22    employee/employer relationship status.  You can look

23    at the Hermann versus Express 60 Minutes Delivery

24    Services case.  That is the Fifth Circuit.  It's from

25    1998.  And, you know, this has, of course, a lot of

1    facts, but it was very similar to this case.  You

2    know, it involved drivers, "Whether the employer had

3    minimal control" -- I won't read the whole thing --

4    "over the drivers even though the drivers had no

5    input into how the business was conducted, the amount

6    that was charged customers, or the allocation or

7    frequency of deliveries."

8                This is one, I think when you hear all

9    of the supposed control that Uber exercises over the

10   drivers, these are very similar facts to what we have

11   in this case where they found an independent

12   contractor relationship -- the Fifth Circuit found

13   it -- because the driver sets their own hours, days

14   of work, and that weighed in favor of their

15   independent contractor status.  And just because --

16   well, the driver could decline an offer of rides and

17   they didn't have an obligation to accept a specific

18   number of rides during any given period.  And there

19   were a couple of other facts that I don't want to

20   belabor.  But there was a lack of control because the

21   drivers could work for other delivery systems, just

22   like here Mr. Barysas used Lyft, and there was no

23   non-compete.  And they received a commission for

24   their work determined -- which determined their own

25   profit or loss, depending on how much they wanted to

Page 74

1    work.  So this is a case that is very similar from

2    the Fifth Circuit -- not just the Second Circuit.

3    Also there's good case law in the Second Circuit

4    militating in a favor of independent contractor

5    status.

6             In contrast, claimant does not cite

7    any case law involving drivers in which the entity

8    was found to have misclassified the driver under the

9    FLSA.

10             So just the first -- the first of just

11    two core factors which are considered by the

12    Department of Labor tests -- and, of course, it's the

13    first factor in the economic realities test -- is the

14    degree of control.  And we will demonstrate that --

15    the evidence will show that claimant controlled

16    whether he wanted to work, when he wanted to work,

17    how frequently, how long, and how to conduct his

18    work.

19             The second of two core factors is the

20    opportunity for profit or loss.  The phrasing is just

21    a little bit different between the Fifth Circuit and

22    the DOL factor, but the concepts are the same.  And

23    we are going to show -- the evidence will show that

24    claimant, not Uber, made the decisions and the

25    choices that determined whether he made a profit or

Page 75

1     loss.  His own business decisions in operating his

2     own business make it quite clear.

3                    Now, another factor -- and this is one

4     that claimant highlighted -- is the relative

5     investments of the worker and the alleged employer.

6     Now, here you're going to see that Mr. Barysas

7     invested in his phone, his cell phone service, and

8     his own vehicle -- and he invested in not just the

9     cheapest vehicle he could find, but a higher scale

10    one -- his insurance and all the things listed here

11    that I don't need to belabor.

12                   And we will show that claimant and

13    claimant alone invested in his business.  He made the

14    decisions about those investments to make, including

15    his decision to use the Uber driver app, the

16    lead-generation app.

17                   Another factor -- and claimant's going

18    to testify about this himself -- has to do with the

19    skill and initiative to develop a profitable strategy

20    that.  It's not just -- it requires skill to drive,

21    but it's not just driving.  In order to be

22    profitable, in order to operate DB Pedicabs, in order

23    to operate a profitable business, Mr. Barysas made

24    his own decisions about providing charters, tissues,

25    waters, amenities to his drivers -- to his riders so

Page 76

1  that he could exercise skill and initiative in

2  operating his business.

3           The last of the Fifth Circuit factors

4  is the permanency of the relationship.  That weighs

5  in favor of independent contractor status, as well.

6  Now, the permanency factor does not depend on how

7  long a worker actually engaged in the business

8  relationship but instead rests on whether the worker

9  can work as little or as much as he or she desires,

10 the length of the relationship, and whether the

11 worker has a right to provide services to others and

12 whether the worker has the ability to terminate the

13 relationship.  In all of those cases, those weigh in

14 the independent contractors' favor.

15          And then the sixth or the last of the

16 Department of Labor factors which looks at the

17 integration and whether the work is part of an

18 integrated unit of production -- now, under the DOL

19 test, there's no reason to look at anything beyond

20 those first two factors, those core factors of

21 control and profit or loss.

22          But in any event, the evidence will

23 show that Mr. Barysas was not an integrated unit of

24 Uber's production.  The issue is not simply whether

25 the worker is integral to the company's business but

Page 77

1    whether the work he or she performed was -- and you

2    can see the phrasing here -- an integrated unit of

3    production.

4                    The Department of Labor has clarified

5    that what this means that the worker is performing

6    work similar to employees.  And as you saw in

7    claimant's own presentation, there are 4,000 software

8    engineers.  That's not similar work to drivers using

9    the Uber driver app.  The software engineers are the

10   employees of Uber.  The drivers are the independent

11   contractors who use it for their benefit.

12                   All of these factors, whether the DOL

13   tests or the Fifth Circuit test, weigh heavily in

14   favor of independent contractor status because

15   claimant was properly classified.

16                   And claimant does provide you with

17   some examples of alleged control exercised by Uber,

18   but many of those examples are required by law or

19   regulation.  We're going to walk you through that

20   statute, that Texas Transportation Network's --

21   company's law and Houston's regulations on vehicles

22   for hire, which I think was alluded to, as well.

23                   Once we do that, you'll see many of

24   those so-called rules that Uber puts in place are

25   really just legal or regulatory requirements.  Just

Page 78

1    as a way of example, uber requires the use of

2    four-door vehicles because the state requires that.

3                    I think you've heard already about P1,

4    P2, and P3 time.  I don't know that we need to talk

5    more about it except to say that when he was on P1

6    time, which is he has the app open but is not driving

7    to go pick someone up and is not actually providing a

8    ride for someone -- during that P1 time, he's free to

9    do whatever he wants.  He can be resting.  He can be

10   playing baseball.  He could be doing things like

11   using the Uber -- sorry -- the Lyft app at the exact

12   same time.  And that's not compensable time.  That's

13   clear from Fifth Circuit law.  If you're free to do

14   whatever you want, the fact that you have an app open

15   is not compensable time.

16                   This just describes P2 time is that

17   time between accepting a trip request and driving to

18   pick up the rider.  P3 is the time that the rider is

19   actually in the car.

20                   Now, with respect to expert testimony,

21   claimant has multiplied this proceeding, made it

22   probably longer than it needs to be, by designating

23   three people to testify as experts.  All of them

24   should be disregard, if not outright excluded.

25   That's because expert testimony is only admissible if

1    it assists you, the trier of fact, if it's based on

2    sufficient facts or data, if it uses reliable

3    principles and methods, and if it reliably applies

4    the principles and methods.  An expert can't be

5    biased, rely on subjective sources, be an advocate,

6    or rely on hearsay.

7              The first of the experts -- proffered

8    experts that you'll hear from for claimant is

9    Dr. Lindsey Cameron.  She'll provide biased testimony

10   based on her subjective beliefs and unreliable

11   research methods.  She'll admit that her research was

12   qualitative, not quantitative, and that her

13   semi-structured interviews of about 60 drivers in a

14   world where I think she says there's 1.6 million

15   users is not a statistically-significant sample.

16             We'll get into everything that she'll

17   testify, but they echo really what we've been saying.

18   Drivers control when and where they want to drive,

19   and they make their own choices to try and earn money

20   and be profitable.

21             Claimant's second proffered expert was

22   actually mentioned already, and I think there's

23   already a concern that he's just going to testify

24   about legal conclusions because that's what he is.

25   He's not licensed and has never practiced in the

Page 80

```
1    Fifth Circuit or Texas.  He's only been retained
2    in -- the last information we have anyway -- in cases
3    pending against Uber, and he's not going to provide
4    testimony that's going to be beneficial to you in
5    making your decision.  It's just legal conclusions
6    like this one:  The economic reality of Mr. Barysas'
7    relationship with Uber gave rise to an employment
8    relationship.  That's just an ultimate legal
9    conclusion that he's making for you.
10              The last of the claimant's witnesses
11   you'll hear from -- and you saw a summation of is
12   damages -- is Dr. Parrot.  His testimony will be
13   riddled with bias because he's evidence -- sorry --
14   he's outcome-oriented rather than providing a
15   reliable approach to evaluating claimant's earnings.
16   For example, rather than using claimant's actual
17   vehicle expenses to analyze earnings, he uses IRS
18   mileage rate, and that results in a grossly inflated
19   calculation of expenses which inflates the damages.
20              And even though the compensability of
21   P1 time is for you to decide -- P1 being that resting
22   time or that non-use time -- Dr. Parrot does not
23   provide a calculation that accounts for the
24   possibility that you could determine that P1 time
25   isn't compensable, and that results in extremely
```

Page 81

1    inflated damages evaluation.

2                    Do you want me to get into damages,

3    respectfully, Your Honor?  Because the evidence will

4    show that claimant had the freedom, flexibility,

5    opportunity, and choice that only an independent

6    contractor would have.  In other words, claimant is

7    his own boss.

8                    We look forward to presenting our case

9    to you.  Thank you.

10                   JUDGE SOUSSAN:  Thank you very much.

11   I would like to continue.  Are we in a position to

12   continue?

13                   MR. MacLEOD:  The only thing I would

14   ask is a five-minute break, just a coffee break, and

15   I'm ready to go.

16                   JUDGE SOUSSAN:  That is no problem.

17   And let me -- I apologize profusely.  It borders on a

18   Will Smith apology for my error on the timing of

19   today.  And obviously I've used that system in

20   another arbitration and I recalled it and I knew I

21   had people from California.  So that's why we had a

22   start -- a late time.  So, you know, the instructions

23   were a little off and that is all my fault and I

24   apologize.  I will give up my Oscar.

25                   Let's take five minutes.

Page 82

```
 1                (Recess from 11:25 a.m. to 11:33 a.m.)
 2                     BRAD ROSENTHAL,
 3    having been first duly sworn, testified as follows:
 4                        EXAMINATION
 5        Q.   (BY MR. MacLEOD)  Good morning, sir.  How
 6    are you?
 7        A.   Good morning.  Excellent.  Thanks.  How are
 8    you?
 9        Q.   Excellent.  And, Mr. Rosenthal, would you
10    please state your full name for Judge Soussan?
11        A.   Brad Rosenthal.
12        Q.   And, Mr. Rosenthal, are you there in
13    California this morning?
14        A.   I am.
15        Q.   I hope that you're doing well.  I know that
16    you're busy.  And it kind of feels like Groundhog
17    Day.  But since this is the first arbitration in
18    front of Judge Soussan, just so you understand where
19    we're going is I want to talk about the app and then
20    kind of get more into specifics about Mr. Barysas.
21                     Is that okay with you?
22        A.   Sounds good.
23        Q.   Now, backing up, in every case that I have
24    seen, at least every arbitration, whether it be in
25    California or in Texas, as we've handled a few of
```

Page 83

1    these now, you have been designated by Uber as its

2    corporate representative.

3                    Is that true?

4         A.    I don't know every case.  I've been

5    designated a number of times as a corporate

6    representative, but we have, you know, thousands of

7    litigation matters outstanding.  I've been designated

8    corporate rep in not all of them.

9         Q.    Okay.  When we talk the Fair Labor Standard

10   Act and this dispute about whether Uber drivers are

11   either employees or independent contractors,

12   certainly you agree that this is not your first

13   rodeo, correct?

14        A.    That is correct.

15        Q.    And in -- and I have to apologize.  During

16   opening statements, I can't see everyone, but were

17   you able to watch the -- at least a part of the

18   opening statements this morning?

19        A.    I saw part of yours and then I saw Bret's,

20   but I missed the beginning of yours.  Apologies.  I

21   had a conflict early in the morning my time.  The

22   earlier start kind of threw me off.

23        Q.    You didn't miss much, but did you see

24   Mr. Sandahl's opening?

25        A.    I did, yeah.

```
1          Q.   And in the way that Uber's counsel,
2    Mr. Sandahl, started off, as you'll recall he started
3    off by saying claimant -- that's Mr. Barysas -- is
4    his own boss.
5                    He started with that, and he ended
6    with that, correct?
7          A.   I believe that's correct, yeah.
8          Q.   And I want to ask you this.  This is a
9    quote.  Do you agree with this statement, that "Freed
10   from the necessity of layers of real bosses,
11   algorithms manage drivers directly according to the
12   rules that Uber lays out"?
13                   Mr. Rosenthal, do you believe that is
14   a true or false statement?
15         A.   I would have to hear the statement again.
16   There's a lot to unpack there.  On its surface, I
17   would say no.
18         Q.   Okay.  Just so -- because you asked, I want
19   to make sure.  The quote is "Freed from the necessity
20   of layers of real bosses, algorithms manage drivers
21   directly according to the rules that Uber lays out."
22                   And you believe, on behalf of Uber,
23   that that is a false statement, correct?
24         A.   Yeah, I don't -- I mean, I would have to,
25   like, really analyze that statement.  But, no, I
```

Page 85

```
 1    don't believe that algorithms manage anyone within

 2    the confines of Uber.

 3        Q.    What about this one?  This is another

 4    statement -- and I'll try to read it slow.  If you'll

 5    follow along with me.  "The autonomy celebrated by

 6    Uber stands in stark contrast to the everyday

 7    experiences of its drivers who are carefully

 8    monitored by an algorithmic boss."

 9              My first question is:  Do you believe

10    that drivers like Dainius are carefully monitored by

11    an algorithmic boss?

12        A.    No.

13        Q.    Do you believe that drivers like Dainius

14    when they are logged in, until they log out of the

15    Uber app, that evidence of control is scattered

16    everywhere?

17        A.    No.

18        Q.    And do you know who those quotes come from?

19        A.    I do not, no.

20        Q.    There's an employee who currently works for

21    Uber named Alex Rosenblatt.  You're familiar with

22    her?

23        A.    I am.

24        Q.    Have you ever met Ms. Rosenblatt?

25        A.    I have not.
```

Page 86

1        Q.    Does she still live and work in Montreal?

2        A.    No idea.

3        Q.    And you remember that in 2018, she

4   published what was called Uber Land, and it's Uber

5   Land:  How algorithms are Rewriting the Rules of

6   Work.

7                 Do you remember that?

8                 MR. SANDAHL:  Your Honor, I object to

9   this line of questioning.  You ruled to exclude

10  Ms. Rosenblatt and her testimony, and this is just an

11  end run to get her -- Mr. Rosenthal to adopt -- he's

12  not testifying about policies and procedures.  He's

13  testifying about what Ms. Rosenblatt has written.  So

14  I object to this line of questioning.

15                MR. MacLEOD:  Your Honor, may I

16  respond?

17                JUDGE SOUSSAN:  You may.

18                MR. MacLEOD:  I don't believe, A, that

19  that was a legal objection.  And then also, B, this

20  is cross-examination, and I'm asking him if he agrees

21  with a widely-published and widely-written-about book

22  called Uber Land written by an employee who now works

23  for Uber but studied Uber during the very same time

24  that Dainius was a driver.

25                JUDGE SOUSSAN:  I will tell you that I

                                            Page 87

```
 1    knew exactly what you were doing, okay, and I kind of
 2    felt that you were doing it -- an end run to go ahead
 3    and get before me what she had published even though
 4    that's been excluded.  I'm going to let you go a
 5    little ways on this, but understand my thought
 6    process because I already had that in my mind and I
 7    was, quite frankly, waiting for the objection.  I'm
 8    going to give you some -- some leeway here, okay?
 9              MR. MacLEOD:  Maybe I was confused.
10    My understanding was that Ms. Rosenblatt would not be
11    testifying, but I did not understand that her work or
12    published work could not be discussed.
13              JUDGE SOUSSAN:  You're not confused.
14              MR. MacLEOD:  I'm sorry?
15              JUDGE SOUSSAN:  I don't think you're
16    confused.  I understand what you're saying.  I'm
17    going to give you some leeway here, okay?
18              MR. MacLEOD:  I understand.
19         Q.   (BY MR. MacLEOD)  All right.  And -- and
20    so, we have just talked about some of the statements
21    about how these faceless algorithms manage drivers
22    like Dainius Barysas.
23              And you understand that that was at
24    least -- that's been published widely as to what
25    Uber's app is doing through these faceless
```

Page 88

1    algorithms.  And what I understand from your

2    testimony is that you squarely disagree with that,

3    correct?

4        A.   First of all, I don't understand it's been

5    published widely.  And then second of all, no, I

6    don't agree with the -- with the statement.

7        Q.   Okay.  So let's -- let's back up.

8                  My understanding as to the Uber

9    algorithm is that it's Uber's technology that makes a

10   match between both a driver and a rider.

11                 Is that true?

12       A.   So the technology --

13                 JUDGE SOUSSAN:  We have some

14   reverberation going on.

15                 (Discussion off the record)

16                 JUDGE SOUSSAN:  Well, let's continue

17   on.  I know that I'm not muted.  I'll mute myself,

18   and then somebody is going to have to remind me

19   probably during the day to unmute, but I'll mute

20   myself.

21       Q.   (BY MR. MacLEOD)  Okay.  You have

22   previously testified in both depositions as well as

23   arbitrations regarding the classification of drivers

24   as either being independent contractors or employees

25   of Uber, correct?

1     A.   I have testified in such arbitrations and

2  depositions, yeah.

3     Q.   And previously what you have testified is

4  that it is Uber's technology, the Uber algorithm,

5  that matches a driver like Dainius to a rider.

6                  Is that true?

7     A.   Yeah.  So our technology finds nearby

8  people and will take the request from the rider and

9  match that request to a nearby driver, and the driver

10  has the ability to accept or decline the request.

11                  (Discussion off the record)

12                  MR. MacLEOD:   Judge, we literally have

13  the same setup for this arbitration and many, many

14  others.  We've had no reverberation this morning.

15  We'll look at it again just to make sure, but I

16  don't -- we were fine until Mr. Rosenthal joined us.

17                  (Discussion off the record)

18     Q.   (BY MR. MacLEOD)  Here's the concept.

19  Because we're sort of starting at Square 1 here with

20  Judge Soussan -- not really.  She's got briefing.

21  But the way the algorithm works is it matches a

22  driver to a rider.  And that is done solely by Uber,

23  correct, sir?

24     A.   Yes.  It's up to the driver to accept that

25  match, but the technology does match the two parties.

Page 90

```
 1        Q.   Right.  Before we get to all the other

 2   explanations, what we know is there's a driver,

 3   there's a rider, they didn't pick each other.  Uber

 4   chose that they were going to be matched.

 5             Can we agree with that part?

 6        A.   Well, we present the match to the driver.

 7   It's up to the driver on whether or not to accept

 8   that match.

 9        Q.   Between 2014 and 2019, can you tell me a

10   single time that Dainius Barysas would have logged

11   into the Uber app and he literally could have gone on

12   a map or some customer listing and said, "This is the

13   rider that I want to drive right now," yes or no?

14        A.   Not through our application, no.

15        Q.   Right.  Because instead what would happen

16   is he would log into the app, and during that P1 time

17   he would sit there and wait and eventually Uber would

18   match him with a rider and he could accept or he

19   could just wait for another ride, correct?

20        A.   That is right.

21        Q.   Okay.  Now, my understanding is that Uber

22   tells their drivers, "Once you're on-line, you will

23   start to receive trip requests, so don't go on-line

24   if you're not ready to drive."

25             Have you heard Uber communicate that
```

Page 91

1    to drivers before?

2         A.   I have heard something along those lines.

3    I don't know if that's the exact quote.

4         Q.   So the statement was -- and Mr. Sandahl

5    alluded to this in his opening statement.  He said as

6    a driver, Dainius was free to do whatever he wants to

7    do during P1 time, including doing activities like

8    resting or playing baseball.

9              Do you remember that?

10        A.   I do.

11        Q.   Now, on one hand, we have Uber's counsel in

12   an arbitration saying he can rest, he can play

13   baseball.  On the other hand, while Dainius was

14   actually driving, you understand that he was told,

15   "Don't go on-line if you're not ready to drive,"

16   true?

17        A.   Well, first of all, I don't know if that

18   was a command.  You're framing it like a command.

19   Second of all, he could do whatever he wanted, and

20   some of your claimants have.  Some of them have

21   admitted that they have been doing other things while

22   they have been in Period 1.  And this driver, I

23   believe, used to sit there and watch movies sometimes

24   in Period 1.  So really, you can be doing other

25   things.

Page 92

```
 1            MR. MacLEOD:  I'm going to object as

 2    nonresponsive.

 3            JUDGE SOUSSAN:  Overruled.  Keep on

 4    going.

 5       Q.  (BY MR. MacLEOD)  So, Mr. Rosenthal, this

 6    is very simple.  There is a video -- and you and I

 7    can watch this -- that literally says, "Don't go

 8    on-line if you're not ready to drive."

 9            If I told you that right now, does

10    that sound like a command or a suggestion?

11       A.  Well, I would need to see the video.  What

12    you're saying sounds like a command.  I would need to

13    see the video as to whether or not the video said

14    word for word verbatim what you just said.

15       Q.  You're in luck because we're going to watch

16    the video.  Have you watched some of the Uber videos

17    before, sir?

18       A.  I've seen some of them, yeah.

19       Q.  Okay.  And so, there are different ways

20    that Uber can communicate with their drivers.  One is

21    through the actual app, correct?

22       A.  That is right.

23       Q.  And let's say, for example, that Dainius

24    had a problem with a toll issue or a fare issue.  One

25    thing he could do is he could communicate through the
```

Page 93

1    support feature in the app with some support person

2    he's never met before, correct?

3        A.    That's right.

4        Q.    The other way that he can communicate to

5    Uber is he can actually go in person to a hub,

6    correct?

7        A.    That is correct.

8        Q.    Okay.  One of the ways Uber communicates

9    its policies and procedures to drivers is through the

10   TSA, right, the initial driver agreement, right?

11       A.    Yeah.  That is the agreement that both

12   parties agree to, yeah.

13       Q.    Then there's also a driver deactivation

14   policy that would have been in effect during the time

15   that Dainius drove, correct?

16       A.    I don't know if that was in effect at the

17   time he used our app during the -- during the period

18   of limitations here, the statute.

19       Q.    What's the period of limitations as you

20   understand it?

21       A.    I thought it was 2017 to current.  I don't

22   have the exact -- the exact dates in front of me.

23       Q.    And just so we all know -- and more

24   importantly, so our arbitrator knows -- have you

25   reviewed the support messages that were exchanged

Veritext Legal Solutions
346-293-7000

1   between Dainius and folks with Uber for -- let's just

2   start with the statutory period as you understand it?

3        A.   I've reviewed some.  There were a lot of

4   communications.  I don't recall them all.  But we

5   produced a lot of documents and there's a lot of

6   exhibits and I tried to get through as many as I

7   could.

8        Q.   All right.  Have you reviewed his

9   deposition transcript?

10       A.   I have reviewed excerpts of it.

11       Q.   And what -- what excerpts?  Did you have a

12   highlighted version that you reviewed, or what are

13   you talking about?

14            MR. SANDAHL:  Object to the question

15   as seeking work product and attorney-client

16   privileged information.

17            JUDGE SOUSSAN:  Overruled right now.

18       Q.   (BY MR. MacLEOD)  So let me get into this

19   just real quick.  I'm very -- I'm very sensitive to

20   attorney-client privilege.  I would be for Dainius,

21   and I will be here for you.

22            But I do need to know:  As a corporate

23   representative, you understand that you're supposed

24   to get prepared for today just like you were supposed

25   to prepare for other arbitration testimony and

                                              Page 95

1    deposition testimony, right?

2         A.   I do.

3         Q.   And you understand that you're here in the

4    capacity of testifying on behalf of Uber, right?

5         A.   That is correct.

6         Q.   And were you provided with certain

7    documents by Uber or by Uber's counsel to review and

8    to prepare you to testify as a corporate

9    representative today?

10              MR. SANDAHL:  I'll object, Your Honor,

11   that this is not a deposition where we had topics to

12   prepare him on.  Of course, we did prepare as

13   appropriate for any kind of arbitration hearing, but

14   this line of questioning is really inappropriate for

15   someone who was really just generally prepared to

16   testify, not to speak to specific topics or specific

17   areas of information.

18              JUDGE SOUSSAN:  I don't disagree with

19   what you're saying, but I'm going to overrule your

20   objection.  It's arbitration.  Please proceed.

21        Q.   (BY MR. MacLEOD)  So in my understanding,

22   as part of the information that you received -- did

23   you receive a complete deposition transcript for

24   Dainius, or did you receive selected portions?

25        A.   I believe the deposition transcripts was

                                              Page 96

1    used -- was one of the exhibits that was produced by

2    one of the parties.  I can't quite recall, but I

3    believe I saw it in there and reviewed excerpts of

4    that, meaning, like, gone over specific -- specific

5    sections of that.

6         Q.   Did you take any notes as you did that,

7    sir?

8         A.   No.

9         Q.   And how did you know which specific

10   portions or excerpts that you were going to review to

11   prepare yourself as a corporate representative?  I'm

12   asking that not because of any specific topics but

13   just so I understand your knowledge base today before

14   we go too far.

15        A.   Reviewed with counsel.

16        Q.   Okay.  Now, did you see any testimony from

17   Dainius about videos, Uber videos?

18        A.   Not that I recall seeing.

19        Q.   Okay.  Let's take a look -- so in

20   Claimant's Exhibit Number 4, there are a set of

21   videos that were all prepared by Uber and my

22   understanding were sent to drivers.

23             Have you reviewed any of the videos

24   that were produced in this litigation involving

25   Mr. Barysas?

Veritext Legal Solutions
346-293-7000

1        A.    I did not, no.

2        Q.    Do you remember ever having reviewed a

3   video that is called How to Use the Uber Partner App?

4        A.    I've reviewed a video that has similar

5   substance.  I'm not sure whether it's the same exact

6   video that I recall reviewing in the past.

7        Q.    Okay.  If we -- so there's a transcript

8   that can be reviewed that's already in evidence, but

9   I want to go through the actual video with you.  And

10  the very beginning of the video -- just so we're

11  specific on the record, this will be -- Claimant's

12  Exhibit Number 4 is Bates labeled as Barysas 592.

13  The title of the video is How to Use the Uber Partner

14  App.

15            (Whereupon a video was played.)

16       Q.    (BY MR. MacLEOD)  So the first part that

17  the narrator tells us after "welcome to Uber" is

18  "Drivers are our most important partners, and we

19  appreciate all you do to keep Uber running smoothly."

20            First off, as Uber's corporate

21  representative, do you agree today that drivers are

22  the most important partners?

23       A.    I don't think they are the most important

24  partner, but they are users of our marketplace, as

25  are others.

1    Q.   Okay.  Do -- does Uber appreciate all that

2    the drivers do to keep Uber running smoothly?

3    A.   I agree with that.

4    Q.   Because one of the things that was

5    discussed by Uber's counsel, Mr. Sandahl, in the

6    opening was talking about the lack of integration or

7    an integrated unit.

8                Do you remember that, sir?

9    A.   I don't recall it specifically.

10   Q.   He was talking about integration, and then

11   we have a video directed at drivers that says,

12   "Drivers are our most important partners, and we

13   appreciate all you do to keep Uber running smoothly,"

14   correct?

15   A.   That's what this says, yes.

16   Q.   Okay.  Now, if we -- the transcript's on

17   the right -- we're going to play this, and then we're

18   going to stop after Line 13.  I just want to make

19   sure you can hear this.

20                MR. SANDAHL:  Could I just -- just ask

21   a clarifying question?  Is the transcript actually an

22   exhibit, or is it just the video that's an exhibit?

23                MR. MacLEOD:  The -- the video is an

24   exhibit.  The transcripts are also part of claimant's

25   portfolio, as well.

Page 99

1          MR. SANDAHL:  It's also in C4?

2          MR. MacLEOD:  It is.  If you look at

3    592, you will find a PDF as well as the video.

4          MR. STANLEY:  The transcripts are also

5    included in the binder he sent to the arbitrator.

6          MR. MacLEOD:  May I proceed?  I'm

7    sorry, Judge.  May I proceed?

8          JUDGE SOUSSAN:  Yes, sir, please.

9          (Whereupon a video was played.)

10     Q.   (BY MR. MacLEOD)  Okay.  So I was asking

11   you about this earlier, but now you can see that

12   Uber -- again, not me, not you, but Uber is saying,

13   "Drivers, once you're on-line, you will start to

14   receive trip requests, so don't go on-line if you're

15   not ready to drive."

16          Do you agree with that?

17     A.   I heard that, yeah.

18     Q.   Right.  If you're playing baseball, you're

19   squarely not ready to drive.  True, sir?

20     A.   You might be ready to drive, yeah.  You

21   could be.  I mean, you could be willing to drop the

22   baseball bat and then get in the car and drive.

23   "Getting ready to drive" is kind of a vague term.  So

24   someone could be ready to go, but they are not in the

25   car with the keys in the ignition.

                                        Page 100

1      Q.   If I'm napping, should I be logged into the

2   app?

3      A.   I don't see why not.  You could be napping

4   and as soon as you get a trip request, you hop in the

5   car and go.  People do that all the time.

6      Q.   And do you think your sworn testimony to

7   Judge Soussan would match what Uber is saying here

8   that says, "Don't go on-line if you're not ready to

9   drive"?

10            Do you -- do you feel that that

11   testimony jives with what this language is here, sir?

12      A.   Yeah, I do.  So people can be ready to

13   drive but not necessarily in their car, like, with

14   the keys in the ignition.  People can be ready to go

15   somewhere, but they are not essentially in the car.

16   So if you go on-line, once they get the trip request

17   and accept it, then they go in the car and drive.

18   That happens all of the time.

19      Q.   Sir, was your response as I heard it

20   "yeah"?

21      A.   Could you repeat it -- have the court

22   reporter repeat back what I had said?

23      Q.   I'm not going to waste her time.  I'm just

24   trying to figure out -- the next part is -- we'll get

25   to this paragraph, but it says -- if we go to Line 22

                                        Page 101

1    there, it says, "If you are on-line, you are expected
2    to accept most trip requests."
3                    Do you agree with that?
4        A.    That's what it says, yes.
5        Q.    No, I'm not asking if that's what it says.
6    Do you agree with that statement?
7        A.    I mean, a driver doesn't have to accept any
8    trip request.  The driver is on-line.  Sorry.  I was
9    just -- there's reverberation, and the reverberation
10   is coming from the tech backup.  When the video was
11   playing, I muted myself, and there was still feedback
12   coming through.  So I think there's feedback coming
13   through on the -- somehow on your end, Ryan.
14                   MR. MacLEOD:  Mr. Rosenthal, I don't
15   hear any of that, I just have to be frank with you.
16   I don't hear that.
17                   THE WITNESS:  Does anyone else hear a
18   bunch of feedback?
19                   JUDGE SOUSSAN:  I heard some, too.
20   I'm going to mute myself and see if it helps.
21                   THE WITNESS:  When the video was
22   playing, I muted myself and there was still feedback
23   coming through.  I think it's on -- somehow on the
24   claimant's end.  We can try to proceed, but I think
25   it's probably challenging for the court reporter, as

                                              Page 102

1    well as for me.

2              JUDGE SOUSSAN:  There's no question

3    it's challenging, but let's continue and see if it

4    happens again.

5         Q.   (BY MR. MacLEOD)  Okay.  The question here,

6    Mr. Rosenthal, was very -- I think very simple.  If

7    you are on-line, meaning you have logged onto the

8    app, you understand that Uber is saying that drivers

9    are expected to accept most trip requests?

10        A.   I understand that's what it says, yeah.

11        Q.   (BY MR. MacLEOD)  And is it your sworn

12   testimony that if I'm literally sleeping, taking a

13   nap, that I can abide by Uber's statement that I am

14   expected to accept most trip requests?

15        A.   You could, yeah.  The trip request comes in

16   and it makes a noise, and you could accept the trip

17   request and then complete the trip.

18        Q.   Okay.  Do you agree that all trips through

19   Uber must be pre-arranged?

20        A.   Per the regulations, there's definitions

21   around "pre-arranged ride."  So there's a whole

22   construct that deals with this and the --

23        Q.   Again, my question was very simple.  As

24   Uber's corporate representative, should all trips

25   through Uber be pre-arranged?

                                          Page 103

1        A.   I'm not sure how to answer any differently.

2    The regulations require trips be pre-arranged, and

3    they are.

4        Q.   Okay.  And so, is that a yes?

5        A.   I'm not sure how to answer any differently.

6    I just answered the question twice.  So the

7    regulations require trips to be pre-arranged suing

8    the TNC platform, and they are pre-arranged through

9    our platform.  That's how we constructed it to comply

10   with the regulations.

11       Q.   What about before the TNC was passed?

12   Before the TNC was passed, didn't Uber still tell its

13   drivers that all trips through Uber must be

14   pre-arranged?

15       A.   I don't know.  I don't recall what was --

16   what was -- what we had said prior to the -- the regs

17   being passed.

18       Q.   Do you agree that payments -- that all

19   payments are calculated automatically through Uber?

20       A.   They are.  That's right, yeah.

21       Q.   And that Dainius, as a driver, would have

22   had no control over how payments were calculated.

23   True?

24       A.   He could have provided input to that; but

25   insofar as the final decision, that was ours.

Page 104

1     Q.   But the final decision on how a payment

2   would be calculated rested solely unilaterally with

3   Uber?  Yes?

4     A.   That is right, yeah.

5     Q.   And during every drive -- every one of

6   those 2,000 plus drives that Dainius took, you would

7   agree with me that Uber unilaterally set the base

8   fare, correct?

9     A.   The default amount, yeah.  The actual base

10  fare, he would have input on, meaning that the base

11  fare isn't dynamic and moves around with the market

12  supply and demand forces at any given moment.

13    Q.   Sir, you've -- I really don't want to go

14  through every one of your prior depositions.  I

15  just -- I think that would be a terrible, tragic

16  waste of our time.  But are you telling us that

17  Dainius, as a driver, had some say in the base fare

18  that was to be charged by Uber?

19    A.   Yeah.  So as I've said multiple times in

20  testimony that would be consistent all my previous

21  testimony is that the base fare is dynamic.  It moves

22  around with market supply and demand forces.  So to

23  the extent if he did not accept a trip -- I guess he

24  could offer his services as the base fare increased

25  or decreased in price.  So he would have an impact on

Page 105

1    the base fare in which he offered his transportation

2    services at.

3        Q.   At any given time and in any supply

4    context, isn't it Uber that is actually determining

5    whether or not that base fare is constant, whether it

6    fluctuates?  Isn't than an Uber decision?

7        A.   Well, it's really based on supply and

8    demand in the market, just like a stock price trade.

9    Where a stock price moves around based on supply and

10   demands, similarly in our marketplace the supply --

11   the price moves around based upon market forces.

12       Q.   So can Dainius go in the app when he starts

13   driving that day and say, "All of my base fares

14   today, I want them to all have a base fare of $25"?

15   Can he do that?

16       A.   Well, the way he would do that is just not

17   accept any trips to the extent the base fare was less

18   than that.

19       Q.   That wasn't my question.  My question was

20   very --

21            JUDGE SOUSSAN:  Hold on, hold on, hold

22   on.  Mr. Rosenthal, you really do need to listen to

23   the question and answer the question that is being

24   asked of you as opposed to giving the answers you

25   would like to give because it's very obvious to me

```
 1    that you're giving the answer you want to give.  So
 2    please just answer his question.  It's almost as if I
 3    could answer that question for you.  So just answer
 4    the question that he's asking you, and we'll move
 5    along a lot quicker.
 6                      THE WITNESS:  Okay.
 7                      JUDGE SOUSSAN:  Thank you.
 8                      MR. MacLEOD:  May I proceed, Judge?
 9                      JUDGE SOUSSAN:  Yes, please do.
10                      MR. MacLEOD:  I keep asking that.  If
11    you don't want me to, I think for formality's sake, I
12    just do that.  So --
13                      JUDGE SOUSSAN:  I think you can go
14    ahead and continue on.  Please continue now.
15                      MR. MacLEOD:  I got you.  Thank you.
16    Understood.
17         Q.   (BY MR. MacLEOD)  So here's what I'm asking
18    you, okay?  We've got different fares.  The base
19    fare -- if Dainius get in -- he logs in one day and
20    he says, "I'm going to tell Uber to only send me
21    riders who are willing to pay a 25-dollar base fare."
22                      Is there a part of the app or a way
23    that he could do that?
24         A.   No.
25         Q.   Now, if -- if Dainius wanted to get in and
```

                                                    Page 107

1  he wanted to say, "You know what?  Today I want a

2  time fare of X, Y, or Z instead of whatever Uber is

3  going to set."

4           You would also agree that Dainius has

5  no input on the time fare, correct?

6       A.   Correct.

7       Q.   If Dainius wanted to go in and wanted to

8  change the distance fare that is charged to the rider

9  by Uber, you would also agree that Dainius cannot go

10  into the app and change the distance fare to be

11  whatever he wants.  True?

12       A.   Correct.

13       Q.   You would also agree that for wait time

14  fare that there's nothing that Dainius can do to go

15  into the app and say, "This is the wait time fare

16  that I want," correct?

17       A.   Right.

18       Q.   Now, the reality of the situation is so far

19  we've had a video that's told us that you need to --

20  you need to be ready to drive.  Don't go on-line if

21  you're not ready to drive.  You're expected to accept

22  most trip requests.

23           And then we move on -- if we go to

24  Page 4 -- I'm not going to play the video.  It's

25  already in evidence.  I'm just going to show you the

                                        Page 108

1    transcript so we don't have any reverberation.  If

2    it's on my end, then I apologize.

3                 On Page 4, Lines 15 through 17 -- no,

4    13 though 17.  It says -- it says, "We want to help

5    you provide the best experience possible, so here are

6    some tips on how to become a five-star driver.  Be on

7    time."  And then it says, "When you accept a trip

8    request, your rider gets an ETA or estimated time of

9    arrival," right?

10        A.    Yeah.

11        Q.    So let's go back to our example.  Let's say

12   that I am -- that I have been resting.  I'm literally

13   laying in bed.  I'm logged into the app, and I accept

14   the ride.  When I am laying in bed, accept the ride,

15   at that point that I accept, an estimated time of

16   arrival is going to be sent to a rider, correct?

17        A.    That's right.

18        Q.    And what Uber tells me is that the rider

19   will plan around that estimated time of arrival, so

20   it's important to be on time, correct?

21        A.    The rider plans around it?  I don't

22   necessarily see that, but I can infer that.

23        Q.    That's good, because in Line 17 -- the next

24   part that's not highlighted yet says, "Your rider

25   will plan around that ETA, so it's important to be on

1   time."

2                    Does that help, sir?

3        A.    It does, yeah.

4        Q.    Okay.  So now what we have is a scenario

5   that you've given to Judge Soussan whereby I'm

6   snoozing, I'm on the app, I press accept, and now

7   I've got to go get a rider and I've got to be there

8   on the estimated time of arrival because the rider's

9   planning around that ETA.

10                   You see this, that that's part of how

11  to use the Uber partner app?  Do you see that?

12       A.    I see that these are some tips on how to

13  become a five-star driver, yeah.

14       Q.    And what it also goes into is it says that

15  being late to a pickup -- it's the next sentence.

16  "Being late to a pickup often results in a lower

17  rating, so only accept a trip request if you are in

18  your car and ready to drive."

19                   Do you see that?

20       A.    I do see that, yep.

21       Q.    Have you ever played baseball in your car?

22       A.    I have not played baseball in my car.

23       Q.    Okay.  And my scenario whereby I'm snoozing

24  in the house, it's hard to do that if I am supposed

25  to only accept trip requests if I'm in my car and

                                              Page 110

1    ready to drive.  Yes, sir?

2         A.   I don't necessarily agree with it, but I

3    understand what you're saying.

4         Q.   Do you disagree with the published video,

5    then, by Uber?

6         A.   I think people use our app in all different

7    ways, and people are oftentimes not in their car and

8    they use our platform just fine.

9         Q.   Let me switch gears just a little bit on

10   you.

11             My understanding is that Uber is a

12   cashless app; is that right?

13        A.   That is right, yeah.

14        Q.   In fact, what Uber says is that "Please do

15   not ask the rider to pay for the trip in cash, that

16   it can create an uncomfortable experience for the

17   rider," correct?

18        A.   That is correct.

19        Q.   So let's say that I am -- and I think, "You

20   know what?  I need cash to give my kiddo tomorrow for

21   lunch money."  And so, I'm going to tell the riders

22   that I get that day that I want to take cash.

23             First off, I'm not supposed to do that

24   because Uber a cashless app, correct?

25        A.   Yeah.  That would be more or less right,

                                              Page 111

1    yep.

2         Q.   If we go to Page 7 of this just so we can

3    all see to it believe it, at the very bottom on

4    Line 25 of Page 7, it says, "Uber is a cashless app."

5              Do you see that?

6         A.   I do.

7         Q.   Okay.  Then if we flip over to Page 8, in

8    the middle of that first paragraph, it says, "Please

9    do not ask the rider to pay for the trip in cash.  It

10   goes against our terms of service agreement and your

11   contract with Uber.  It also creates an uncomfortable

12   experience for the rider."

13              And so, what Dainius is being told is

14   that you are not to negotiate and accept cash,

15   correct?

16        A.   I don't see where it says "negotiate" in

17   here, but it does say not accept cash, yeah, or not

18   ask the rider for cash is what it says.

19        Q.   And then it says, "Let Uber handle any

20   payment issues so you have more time to focus on

21   providing five-star service," right?

22        A.   That's what it says, yeah.

23        Q.   Now, here's the other thing.  You've

24   already told us that this is a -- this is a

25   pre-arranged deal.  So there's no way that Dainius

                                        Page 112

1    can say, "I'm an Uber driver.  I want to call the

2    other person I had earlier, this other rider, and I

3    want to take them on a ride through the Uber app,"

4    correct?

5         A.   Well, they could do that, and people do do

6    that.

7         Q.   Through the app can they do that?

8         A.   Say again.  Sorry.  I didn't hear your

9    question.

10        Q.   Can they do that through the Uber app?  Can

11   Dainius contact a former rider through the Uber app

12   and negotiate a future ride?

13        A.   Not through the Uber app, no.  But there's

14   a way to do it.

15        Q.   And that would involve having to contact

16   the former rider, which Uber's policies expressly

17   say, "Do not contact former riders," correct?

18        A.   I don't believe our policies would say

19   that, no.  I don't believe it would say that.

20        Q.   What about this, for example?  If I am a

21   rider who has lost an item, am I allowed to request

22   payment from the rider for the return of the lost

23   item?

24        A.   I know that we have a way to collect money

25   from the rider to the extent a lost item is returned,

Page 113

 1    but I don't believe there's anything preventing a

 2    driver to charge a rider or request some sort of

 3    money for a returned item.

 4         Q.   Can -- could Dainius go through the Uber

 5    app and request payment for the rider for the return

 6    of a lost item?  Is that a permissible action per

 7    Uber?

 8         A.   I'm assuming there is a way to do that

 9    through our app.

10         Q.   Okay.  You can find prior riders, correct?

11         A.   Through the app, you mean?

12         Q.   Let's say this.  Let's say that you got a

13    phone number for a rider when they were riding with

14    you.  You had a great conversation, and they gave you

15    their phone number.  At that point, they lose an

16    item.

17              Does Uber say that you then can

18    request payment from the rider for the return of that

19    lost item?

20         A.   I don't think there would be anything

21    preventing you from doing that if you had their phone

22    number.

23         Q.   Let's go down to Page 9.  Again, part of

24    the video, and this will be the end of the first full

25    paragraph here.

                                             Page 114

```
1                    MR. SANDAHL:  Your Honor, I will
2        object to the use of this transcript.  They were not
3        uploaded to us until yesterday morning.  I had to
4        check on some things to see about this transcript.
5        And so, this is not a transcript that we had a chance
6        to evaluate.  We don't agree to its admission.  If he
7        wants to show the video, I understand he can do that,
8        but the transcripts are not something that we -- we
9        do object to these transcripts.
10                   MR. MacLEOD:  Judge, if I may, these
11       were produced to Uber at least as of March 23rd.
12       That's the first point.  The second point is these
13       are transcripts of the videos.  I'm simply doing that
14       in lieu of trying to cause any sound issues that
15       we've been accused of.
16                   JUDGE SOUSSAN:  Overruled.  Please
17       proceed.
18                   THE WITNESS:  The sound issues, they
19       seem to have mitigated.
20           Q.   (BY MR. MacLEOD)  So here in the -- in the
21       last portion of the first paragraph here, it says,
22       "Please do not request payment from the rider for the
23       return of a lost item."
24                   Do you see that?
25           A.   I do, yeah.
```

Page 115

1          Q.   Let's take your scenario now.  I have a

2     phone number, and I'm going to go call them.  If I've

3     watched this video, Uber has told me, "Do not request

4     payment from the rider for the return of a lost

5     item."

6                    Do you understand that, sir?

7          A.   I understand that's what this says.

8          Q.   And not only am I not supposed to request

9     payment, but if I do, it says here the drivers who do

10    so will lose access to the Uber system, correct?

11         A.   That's what it says, yeah.

12         Q.   And that's not a suggestion.  That is

13    mandatory.  "Will lose access to the Uber system,"

14    correct?

15         A.   That's what this says.

16         Q.   Now, we can take that down for a moment.

17    One time we talked a little bit about a scenario in

18    which -- in which -- a scenario in which we have a

19    driver who logs onto the app -- so I want to walk you

20    through a simple, quick scenario that I have logged

21    onto the app and I'm waiting for a ride, okay, sir?

22         A.   Okay.

23         Q.   When I log in and I am on the app, I am

24    going to be matched to a specific rider by Uber,

25    correct?

                                             Page 116

1      A.    That is right.

2      Q.    And at that point, I cannot say, "Hold on,

3  Uber.  Today I am only going to take trips that go to

4  the airport because that's the sort of trips that I

5  want to do."

6                That is not permitted by Uber,

7  correct?

8      A.    There's no way to specifically do that

9  through our app.

10     Q.    Right.  If I'm an independent contractor

11  and I have my own business, you would agree that

12  there are many independent contractors who that is

13  their business?  They literally go to the airport,

14  pick people up, bring them back to the airport and

15  vice versa?  You know that, correct?

16     A.    That may be right.

17     Q.    You probably have used a service like that

18  before, correct?

19     A.    I don't -- I wouldn't know how that service

20  works, so I don't know.

21     Q.    Okay.  So -- so now we have a scenario by

22  which -- let's just say Dainius.  He logs in one

23  morning and he's at his home, and the closest rider

24  to him is literally going to go to a Starbuck's that

25  is half a mile away from his home.

                                            Page 117

1           Are you with me?

2      A.   Okay.

3      Q.   Now, there's another rider that's about a

4  mile away who is going to the airport.  If he is

5  assigned that first rider which is proximity-wise who

6  he is going to get -- let's say it's a 5-dollar ride,

7  but let's say the airport ride -- let's just say that

8  that would have been a 60-dollar ride.

9           Are you with me so far?

10     A.   Okay.

11     Q.   So that is a difference in profit of $55.

12 5-dollar ride or 60-dollar ride.  The difference in

13 the profit is $55?

14     A.   Revenue.  I wouldn't necessarily say

15 profit.  But revenue, sure.

16     Q.   It depends on some other revenue stream.  I

17 get that.  Let's say this.  Uber is the one who

18 ultimately is going to make that decision on whether

19 he gets driver for $5 or -- driver [sic] for $5 or

20 the rider for $60, correct?

21     A.   We would be the one that matches him -- or

22 we would be the one that provides the potential lead

23 for him to accept the match, yeah.

24     Q.   So in that scenario, the opportunity to

25 earn money, whether it's going to be $5 or $55 higher

                                        Page 118

1    at $60, that opportunity is being controlled by Uber.

2    Yes, sir?

3          A.   I don't know if it's being controlled by

4    us.  We are the ones to provide the potential lead.

5    He accepts it or not.

6          Q.   Uber makes the match, right?

7          A.   Yeah.

8          Q.   You have two riders, Rider 1 and Rider 2.

9    Depending on which match is made by Uber, there is

10   going to be a difference in $55 in the revenue or the

11   profit that could be realized by Dainius, correct?

12         A.   Can you repeat that?

13         Q.   Sure.  In that scenario, we've got two

14   riders, possible riders.  Whoever Uber matches

15   Dainius with, there's a potential that he could only

16   make $5 or he could make up to $60, right?

17         A.   In revenue, yeah.

18         Q.   That's right.  So the difference that's

19   being controlled there, $55, that's a difference

20   based upon whoever Uber makes through its algorithmic

21   match.  True?

22         A.   That's true, yeah.

23         Q.   Okay.  And then on that ride -- so let's

24   say he gets the 5-dollar ride.  He didn't get the

25   airport ride.  He got the 5-dollar ride.  At that

Page 119

1  point in that ride, the base fare, the time fare, the

2  distance fare, all of those fares that go into the

3  final calculation for the ride, those are all set by

4  Uber, correct?

5       A.   The default amounts are.  Then, as I said

6  earlier, it's kind of like a supply and demand

7  dynamic pricing based on what the actual base fare

8  per mile and per minute rate are.  And that he does

9  have influence on.

10      Q.   So at the end of the day, can Dainius

11  literally get on and influence the base fare, time

12  fare, or distance fare by doing anything through the

13  app?  Is there one thing that you could say that he

14  can go in the app and say, "Today I'm going to

15  influence the base fare, time fare, distance fare"?

16  Because earlier I thought you said no.

17      A.   Well, he could go drive to a spot that has

18  higher per minute, per mile, and base fare amounts.

19  He could go to areas like that if he wanted to.  So

20  he could influence the amount he makes -- the amount

21  he makes through that fare calculation components.

22      Q.   And who decides -- is it true that Uber

23  would be the entity that would decide whether or not

24  those certain areas would have higher fares at a

25  given time?

Page 120

1        A.    Well, it's based on supply and demand,

2    riders and drivers being on-line, demand and supply

3    of a trip.  As I said earlier, our stock -- our

4    software moves around the price just like a stock

5    trading, but it's really based on supply and demand.

6        Q.    Now, when -- so let's go back to our

7    hypothetical, our scenario here.  We've already

8    established, hopefully, that Uber decides the who,

9    the driver and rider that are matched, correct?

10       A.    Yeah.  We present the lead, right.  The

11   parties have the ability to accept or decline or

12   cancel those trips.

13       Q.    Right.  Back in 2014 and to the 2019 time

14   period, you know that on the Uber app that Dainius

15   before he's going to -- he has 15 seconds to accept a

16   ride.

17              He's not told what the fare is going

18   to be, correct?

19       A.    He's told whether it's surging or not, but

20   he won't actually know the actual fare because the

21   actual fare is based on time and distance.  The

22   answer to your question is no because no one knows

23   that.  It's based on the actual route he takes.

24       Q.    Did I say "surge" in any part of my

25   question?

Page 121

1        A.   I don't think I said "surge" in any answer,

2   did I?

3        Q.   You most certainly did.  But just getting

4   back to this -- this kind of very rudimentary -- the

5   basic concept here is we have 15 seconds.  And in

6   those 15 seconds, you would agree with me that

7   there's no way that Dainius knows what his fare --

8   what he's going to earn, correct?

9        A.   No one will know that, right.

10        Q.   Actually, though, you would agree with me

11   that the rider, when they log into the app -- and you

12   know this is true because you've given many examples

13   when you've logged in the app before -- the rider

14   will get an estimated fare, correct?

15        A.   Estimated.  That is right.  Estimated.

16        Q.   And that estimated fare that's provided to

17   the rider, that estimated fare is not even provided

18   to the driver, right?

19        A.   I think that is right, yeah.

20        Q.   And so, have you heard the phrase before

21   when we're talking about the Uber app "blind

22   acceptance"?

23        A.   I feel like I do recall this, yeah.

24        Q.   Okay.  And the theory behind that is a

25   driver, within 15 seconds, is having to make an

Page 122

1    accept or deny decision for a ride that that person

2    does not have information about, correct?

3         A.   Well, they have some information about the

4    ride, yeah.

5         Q.   No estimated fare or fare, correct?

6         A.   Well, they know whether or not it's going

7    to be surging, and they know the surge amounts.  So

8    they know the per minute, per mile, and base fare

9    amounts.  They won't know the actual fare because the

10   actual fare is based on time and distance -- of the

11   actual distance and time traveled.  So no one knows

12   the actual fare of the trip until it's complete.

13        Q.   And ultimately what happens is Uber

14   determines the final fare.  And the way that the time

15   and the distance is measured is through geo-mapping,

16   correct?

17        A.   I don't know what you mean by that.  It's

18   called geo-mapping?

19        Q.   Geo-mapping.  There's an Uber app, and Uber

20   will actually -- the way the distance is calculated

21   is through the Uber app.  How far from Point A to

22   Point B it was distance-wise, that is the geo-mapping

23   and the distance part that's used in the distance

24   fare calculation.  You certainly know that that is

25   true, correct?

                                        Page 123

```
 1        A.   Yeah.  The way it works just to clean up
 2    some of the -- actually how it works is we collect
 3    GPS points every couple of seconds from a driver's
 4    device that's produced by the software or hardware,
 5    and those -- you can track the actual route the
 6    device has taken, the phone.  And from there, we can
 7    calculate the actual distance that it's traveled, and
 8    then the time is the time from the time of the driver
 9    hitting "being trip" to the driver hitting "end
10    trip."  So that's how those variables are calculated.
11        Q.   For example, when you were reviewing some
12    of the support messages for Dainius' role as an Uber
13    driver, did you see some of those where -- the
14    calculation by Uber where the fare was reduced
15    because Uber believed that he took an inefficient or
16    the wrong route?  Did you see any of those?
17        A.   I don't recall specifically.
18        Q.   Okay.  Now, when you were preparing in this
19    particular instance to be Uber's corporate
20    representative, did you review any of the GPS point
21    data for Dainius?
22        A.   I don't recall specifically reviewing GPS
23    point data.
24        Q.   Did you ever ask anyone if you could review
25    GPS point data?
```

Page 124

1      A.   I didn't specifically ask anyone that, no.

2      Q.   Because you heard the term -- I think in

3    opening, Mr. Sandahl -- I think he referred to a

4    phrase called "geo-spoofing."

5               Do you remember that?

6      A.   I do, yeah.

7      Q.   And in this instance, we learned

8    recently -- very recently that Uber is claiming that

9    Dainius was engaged in fraudulent activity that it

10   has labeled as geo-spoofing.

11              Are you aware that that is Uber's

12   contention, sir?

13     A.   I am, yeah.

14     Q.   First off, that's a serious claim, right?

15     A.   Sure.

16     Q.   And it's actually a claim that resulted in

17   Uber -- despite begging numerous times from Dainius,

18   that Uber decided unilaterally that Dainius would no

19   longer be able to do airport trips.

20              Do you remember that?

21     A.   I do.

22     Q.   And so, if Dainius wanted to do airport

23   trips through the Uber application, he was told over

24   and over and over again, "No, you have been banned,

25   deactivated from doing airport trips," correct?

Page 125

1        A.    That is correct.  He was no longer allowed

2   to do airport trips.

3        Q.    Okay.  Now, if Judge Soussan hears

4   "geo-spoofing" or "airport spoofing," is there

5   documentary evidence that you are going to show us or

6   that you can show us to substantiate that claim?

7        A.    I don't know if there's documents.  That's

8   probably a better question for my counsel that we can

9   share --

10                 (Simultaneous cross-talk.)

11        A.    I'm not done with my answer.  Sorry.  I

12   thought we would try to finish speaking --

13        Q.    (BY MR. MacLEOD)  Well, you -- Judge

14   Soussan is the judge, so I'm not going to tell you

15   whether --

16                 JUDGE SOUSSAN:  Let him finish his

17   answer, please.

18        Q.    (BY MR. MacLEOD)  Go ahead, sir, please.

19        A.    Okay.  So it's probably a better question

20   for my counsel as to whether we can produce anything.

21   I have seen -- I have seen from counsel a video that

22   shows how he was spoofing his location at the

23   airport.  There's two different videos that I had

24   reviewed with counsel that showed that.

25                 MR. STANLEY:  This is Bret Stanley.

Page 126

```
 1    We've asked for all these documents to be produced.
 2    There's been no videos produced.  We would move for
 3    immediate production (indiscernible) corporate
 4    representative and so that we can cross-examine him
 5    on these files.
 6                 JUDGE SOUSSAN:  It was very hard to
 7    hear you.  Did the court reporter get that down?
 8                 MR. MacLEOD:  I can do it real quick.
 9    This is the problem.  We had a motion to compel -- so
10    recently we were told that our client engaged in this
11    geo-spoofing.  First time in my life that I've ever
12    heard of geo-spoofing.
13                 So what we did, as advocates, we said,
14    "We want to know what this is and what's the basis
15    for this?"  So we filed a motion to compel.  It was
16    denied, and now we have a corporate representative
17    telling us that his counsel showed him two videos to
18    review that somehow would prove that Dainius was
19    involved in geo-spoofing.
20                 It is absolutely absurd that we are
21    hearing about this on Day 1 of arbitration.  So I
22    would ask for one of two things.  One, either that we
23    take a break -- and I'm not sure how long they are
24    and how much time we're going to need.  It's an
25    inconvenience that was not caused by claimant, I can
```

Page 127

```
 1    assure you of that.  Or we're going to ask that they
 2    not be able to mention geo-spoofing at all or
 3    complain of him committing fraud.  Certainly we have
 4    to raise it because they deactivate him from the
 5    airport.  This is the first word we're hearing of
 6    videos, but this is exactly what we tried to avoid
 7    with the motion to compel.  The fact that he has seen
 8    what we asked for is -- I'm going to say problematic,
 9    but that's a kind term, I think, Judge.
10              JUDGE SOUSSAN:  Mr. Sandahl?
11              MR. SANDAHL:  Thank you for the
12    opportunity to respond, Your Honor.
13              We produced what we were obligated to
14    produce or was requested of us to produce.  We
15    produced information about why he was deactivated.
16    There were follow-up questions about appeals and
17    things of that nature, which we did not have.
18              We did -- as was disclosed in other
19    arbitrations, a prior arbitration, there was, I
20    believe, the phrase is GPS mapping, and that was
21    something that we had met and conferred about and
22    that was not subject to the motion to compel.  And
23    it's that sort of information that was -- that was
24    shown, but it's not -- it wasn't an issue that was
25    requested and rejected or anything like that.
```

Page 128

```
 1                    So this is not an issue where we were
 2      withholding something that was -- you know, it was
 3      information that they were previously aware of.
 4                    JUDGE SOUSSAN:  How long are these
 5      videos that Mr. Rosenthal said he saw?
 6                    MR. SANDAHL:  I believe they are a
 7      couple of minutes.
 8                    JUDGE SOUSSAN:  Are they easily
 9      accessible?
10                    MR. SANDAHL:  I don't know the answer
11      to that.  I can check.
12                    JUDGE SOUSSAN:  Okay.  During the
13      lunch break, would you please make them available to
14      claimant's counsel?
15                    MR. SANDAHL:  Yes, Your Honor.
16                    JUDGE SOUSSAN:  Thank you.  I think we
17      can proceed, Mr. MacLeod.
18          Q.    (BY MR. MacLEOD)  So we were talking --
19      before we got to the geo-spoofing issue we'll come
20      back to, we were talking about the who, right, the
21      driver and rider matching, correct?
22          A.    Okay.
23          Q.    And the next part becomes -- so let's say
24      that Dainius has logged into the Uber application.
25      He is in his car, and he is ready to drive as -- as
```

Page 129

1    dictated by Uber.  The "when" part, the when he will

2    get a ride to either accept or not accept, that is

3    dictated by Uber, correct?

4         A.   Well, it's dictated by riders who request a

5    ride, but he is matched through our -- through our

6    software.  So I do understand your point.  We are not

7    forcing riders to demand a trip request.

8         Q.   It's not like there's something that he can

9    say, "YOU know what?  It's been 10 minutes and, if I

10   don't have a rider, you know, within the next 15

11   minutes, somehow I can request money through Uber or

12   some sort of a wait fee."

13                 There's nothing like that, correct?

14        A.   Correct.

15        Q.   Now, the next part, the "where."  The where

16   he is going to have to go to pick up a rider, he

17   learns of that through the Uber app, correct?

18        A.   Through the app or he could contact the

19   rider directly.  Sometimes riders change their pickup

20   location and correspond to the driver through phone

21   or text.

22        Q.   Now, I'm going to go back to that.  But

23   just in a -- when we're going to talk about this

24   airport issue and the geo-spoofing, you have told

25   Judge Soussan that you reviewed two videos, correct?

                                            Page 130

1          A.    That's correct.

2          Q.    When did you review those videos?

3          A.    I don't recall specifically.  I think it

4    was last week.

5          Q.    And tell me specifically -- I mean, did

6    they show GPS points?  What is on the video so I can

7    get a preview of that?

8          A.    It shows where the driver actually was and

9    where the driver supposedly accepted the trip

10   request.  It showed him accepting the trip request in

11   the staging area and his car actually not in that

12   staging area.

13         Q.    And let me ask you this.  If you wanted to

14   for Uber driver today, can you get that video made

15   for any driver for any route that they are doing?

16         A.    I don't know.

17         Q.    How did those videos -- those two videos

18   that you saw for the first time last week, how did

19   those even come to be?

20         A.    I don't know.

21         Q.    Who do you know who made those videos?

22         A.    No, sir.

23         Q.    Had you ever seen videos like that before

24   outside the arbitration or litigation context?

25         A.    I don't think so.  I don't think so.

                                        Page 131

1        Q.    Are they saved in your file that you have

2    for this case?

3        A.    No.

4        Q.    In claimant's file -- if I looked at the

5    file within Uber on claimant that has information

6    about his car, his support messages, would those

7    videos have been contained there from September of

8    2014 until 2019?

9        A.    I don't have access to that, but -- I don't

10   know what sort of file you're referring to, but I

11   don't think so.

12       Q.    Do you understand that those videos were

13   created for arbitration, for litigation context?

14       A.    I have no idea how they were created.

15       Q.    Was there anything else -- before we go

16   there, is there anything else that you reviewed other

17   than the two videos last week that you are going to

18   tell Judge Soussan supports Uber's contention that

19   Dainius was engaged in geo-spoofing?

20       A.    That he was engaged in geo-spoofing?  Not

21   that I can think of.

22       Q.    And on how many trips does Uber contend

23   that Dainius engaged or was involved in this,

24   quote/unquote, geo-spoofing?

25       A.    I've seen the two.

Page 132

 1        Q.   So when I look at these videos during

 2    lunch, I'm going to see there are two single trips

 3    that are videos made for arbitration that I'm going

 4    to see what Uber claims to be geo-spoofing?

 5        A.   I believe that's right.

 6        Q.   And these are the first two geo-spoofing

 7    videos that you've ever seen?

 8        A.   I think so.  I don't think I've seen videos

 9    like that before, but I've been at the company a long

10    time.  I can't recall everything I've ever seen.

11        Q.   Now, getting back to some of the -- kind of

12    the more basic parts of this just because we have to

13    get some of this in evidence, there are

14    essentially -- what I understand, there are three

15    different periods of time when a driver is logged

16    into the Uber app, correct?

17        A.   That's right.

18        Q.   And the Period 1 time is when a driver like

19    Dainius is waiting to receive a ride request through

20    the Uber application, correct?

21        A.   Technically it's when they are on-line --

22    so they have hit the "go on-line" button, and they

23    are available to provide transportation services but

24    they have not yet been -- they have not yet accepted

25    a ride.

                                          Page 133

1     Q.   And during that P1 time, as the Uber video

2     tells us, you should be in your vehicle and ready to

3     drive, correct?

4     A.   That is what the video says.  I don't

5     necessarily agree with that.  I don't think that's

6     how drivers actually use the app.

7     Q.   Okay.  And so, then there's the P2 time,

8     which is where -- which is where we have accepted a

9     ride, and now we are actually going to -- to pick up

10    the rider, correct?

11    A.   Presumably the driver is going to pick up

12    the rider, but it is anywhere from accepts --

13    technically, it's anywhere from accepting the ride

14    when the driver hits the accept button on the way to

15    the driver hitting the begin trip button.  Whether or

16    not the driver is actually going to complete that

17    ride, when they are actually moving, is up to them.

18    Q.   And then the Period 3 time is when there's

19    actually the physical transport of the rider by the

20    Uber driver, correct?

21    A.   It is the time period between when a driver

22    hits "begin trip" and the driver hits "end trip"

23    within the sap.  Whether or not they are actually

24    transporting someone -- usually they are, but I

25    wouldn't say a hundred percent of the time.

Page 134

1      Q.   So are there rides in which you expect for

2   a driver to be paid for Period 3 time where they are

3   not actually transporting a rider?

4      A.   No.  Sometimes things happen where someone

5   could send a package, so it's not necessarily a

6   rider.  But, you know, things do happen.  I've sent a

7   package before.  I know other people have, as well.

8   But usually they are transporting a rider, so that's

9   mostly the case.

10     Q.   And the only period of those three periods

11  that Uber compensates a driver like Dainius is for

12  the Period 3 time, correct?

13     A.   Well, I wouldn't say we compensate drivers

14  during any period.

15     Q.   Well, who -- and so, let's say that Dainius

16  is going to get paid on a weekly basis.  That money

17  flows from Uber to Dainius, correct?

18     A.   It flows through a bank account that is

19  maintained for the benefit of drivers, but it's

20  not -- from my understanding, it's not on Uber's

21  balance sheet.  We don't pay drivers directly.  The

22  money is collected from riders, it sits in a bank

23  account for the benefit of drivers, and then the

24  drivers are remitted that money at least once a week,

25  sometimes more often.

Page 135

1        Q.   So are you saying that when I pay -- I pay

2    an employee from my Chase account that it's not Ryan

3    MacLeod paying them, it's Chase paying them?

4        A.   I don't know how you pay your employees.  I

5    have no idea how you do that.  But I'm saying the way

6    it works within the Uber platform is that we

7    collect -- act as a limited payment collection agent,

8    which the driver has appointed us to do.  That's one

9    of the services we provide them.  We collect the

10   money from the rider on behalf of the driver, and

11   that money sits in a bank account for the benefit of

12   the driver and is remitted to the driver at least

13   once a week, but the driver also has the option to

14   have that money remitted multiple times a day if they

15   would like to.

16       Q.   Okay.  Now, there is no compensation for

17   Period 1 or Period 2 time.  Is that true or false,

18   sir?

19       A.   For Period 1, that is true.  For Period 2,

20   I believe there started to be a time which riders

21   paid drivers for their waiting period, too.

22       Q.   I'm asking about from the actual statutory

23   period at play here as we understand it, you would

24   agree with me that Dainius was not compensated for

25   Period 1 or Period 2 time.  True or false?

Page 136

1        A.    Period 1 I can say is true.  I don't know
2     about Period 2.
3        Q.    So who would we talk to, then, within Uber
4     to find out if Dainius was compensated for Period 2
5     time?
6        A.    I don't know.  Presumably that would have
7     shown up in the data we would have provided you.
8        Q.    And what would have been instances between
9     2014 and 2019 that Uber would have made the decision
10    to compensate Dainius for Period 2 time?
11       A.    Well, my understanding is that in 2017 we
12    rolled out a -- features in which if drivers were
13    waiting for a rider -- so they had arrived at the
14    pickup location and they were waiting beyond two
15    minutes, then riders automatically started paying
16    drivers for that wait time.
17       Q.    Do you know how many times that actually --
18    that policy would have been in play with respect to
19    Dainius such that he would have received any
20    compensation for any of his Period 2 documented time?
21       A.    I don't know.  I didn't look at the payment
22    statements in detail for this, but presumably they
23    would be -- any -- any of that wait time compensation
24    that riders would have provided would have been
25    provided within the payment statements we provided or

                                              Page 137

1    that claimant had access to through his -- through

2    his account.

3         Q.   Now, you understand that Dainius at some

4    points drove for Uber Black, correct?

5         A.   I understand that most of the trips that he

6    completed were for using Uber Black and the SUV

7    product.

8         Q.   Right.  And you understand there's a

9    difference in the wait time, meaning the time -- so

10   let's say, for example, Dainius gets to a person's

11   home to pick them up.  You know that there's a

12   difference in the wait time for Uber Black as opposed

13   to Uber X or Uber XL, correct?

14        A.   What do you mean there's a difference

15   between the wait time?

16        Q.   So the original -- let's just say I go with

17   Uber X.  The driver starts getting paid after 2

18   minutes of wait time, correct?

19        A.   I believe that's correct, yes.

20        Q.   And you would agree with me that when

21   you're talking about Uber Black, one of the things

22   that Uber advertises is more flexible pickups,

23   correct?

24        A.   Perhaps.  I don't know.  I'm not that

25   familiar with it.  It probably has changed over time.

Page 138

1       Q.    Did you know that Uber has unilaterally set

2    a wait time instead of two minutes to a five-minute

3    time for Uber Black?

4       A.    I didn't know it was five minutes, but I'll

5    take your word for it, I guess.

6       Q.    And that there's no cancellation fee that's

7    charged to a rider through the Uber app until 15

8    minutes has expired.  Did you know that?

9       A.    I didn't know it was 15 minutes.  I believe

10   that number has likely changed over time.

11      Q.    Switching gears a little bit, the -- I want

12   to talk to you a little bit about some of the support

13   messages that I have seen and that you -- I take it

14   you have seen.  If we can go to a -- an exhibit.

15   It's Claimant's Exhibit Number 8.  I specifically

16   want to look at Barysas 138, for the record.  So

17   we'll make that bigger.

18               Sir, can you see that on your screen?

19      A.    I can, yeah.

20      Q.    Okay.  And -- and for Judge Soussan's

21   benefit, when we were talking about these Uber

22   support messages, this is what a printed version of

23   these support messages looks like.  True?

24      A.    Yeah.

25      Q.    Okay.  So we can see in the top right-hand

Page 139

1    corner that this is a message from Dainius Barysas

2    dated June 19th, 2018, correct?

3        A.    That's right.

4        Q.    And -- and what -- what he said -- it says,

5    "Why was 50 percent taken as fee-it's outrageous."

6              Do you see that?

7        A.    I do.

8        Q.    So before we get to the actual substance

9    here, you can see that the person here, Shantanu,

10   provided a breakdown of the fare for this trip where

11   it says, "Please review the breakdown of your fare"?

12       A.    I see that.

13       Q.    Now, do you know Shantanu?

14       A.    No.

15       Q.    Do you know where Shantanu is located?

16       A.    No idea.

17       Q.    Where are some of these people located that

18   respond to these support messages for Uber?

19       A.    All through the U.S. for the most part, my

20   understanding.  I don't know if there's any overseas

21   who answer U.S. support tickets, but we have large

22   amounts of employees in the U.S.

23       Q.    Okay.  So here's what we have.  We have the

24   base fare here was $1.44.  And as you told the judge,

25   that is a base fare that is set and established

                                            Page 140

1    through the Uber app, right?

2         A.   Yes.

3         Q.   Then we have the distance fare.  And that

4    14.52 miles, that is a distance that is measured

5    through the geopoints through the Uber application,

6    correct?

7         A.   Through the GPS points that we collect from

8    the driver's device, yeah.

9         Q.   Right.  And what I'm getting at is Uber is

10   tracking the driver through those GPS points through

11   the Uber application device?

12        A.   I wouldn't say we're tracking the driver.

13   These calculations are done automatically.  It's not

14   like I'm looking at the driver on a map or something

15   to see where the driver is going.  These are just --

16   these are GPS points that we collect and we can

17   reproduce and we can use it to calculate the distance

18   traveled.

19        Q.   And that time information, the 25.64

20   minutes, where does that information come from?

21        A.   That is the time where the driver hits the

22   "begin trip" button and the "end trip" button, and

23   there are time stamps when the driver hits those

24   buttons that are stored in our databases and are used

25   to calculate the time of the trip.

Page 141

1      Q.   Now, in the sentence after that, it says,

2   "The price we display to the rider includes fees paid

3   to Uber (the Uber service fee and booking fee)."

4              And again, the Uber service fee and

5   booking fee, those are unilaterally, solely

6   established by Uber, right?

7      A.   With input from drivers and riders, but we

8   are the final decision-maker, yeah.

9      Q.   "And in some cases, tolls and fees

10  collected by third parties (such as airports),"

11  right?

12     A.   That is correct.

13     Q.   And then it says, "We often provide

14  discounts to riders to encourage them to use our

15  service," correct?

16     A.   That's what it says, yep.

17     Q.   Have you seen any support messages in which

18  Dainius ever reached out to Uber and said, "I would

19  like to offer a discount to my riders"?

20     A.   Not that I have seen, no.

21     Q.   And you would agree with me that if a

22  discount is being provided to a rider here, that

23  discount -- I guess the decision to give the discount

24  is being solely made at Uber's discretion.  True?

25     A.   That would be right, yeah.

Page 142

1   Q. Nothing here -- do you see anything about

2 Dainius saying, "You know what?  I would like to give

3 away some of my money so that more people can use the

4 Uber service," right?

5   A. Well, a discount would be us using our

6 balance sheet to offer an incentive to the rider.  It

7 would not impact him.

8   Q. That's interesting because here we're

9 talking about a complaint about a fare, and in that

10 same e-mail Uber is telling Dainius that "We often

11 provide discounts to riders to encourage them to use

12 our service," correct?

13   A. That's correct.

14   Q. Okay.  If we stay with Claimant's Exhibit

15 Number 8, if we go to Barysas 1177, this is a message

16 at the top that -- starts at the top.  This is a

17 message that is April 10th, 2018, and it's from

18 Dainius to -- it looks like the person that was

19 responding was Keerti, correct?

20   A. That's right.

21   Q. And the question was, "Why did Uber take

22 such a high commission on this trip?  It's over 30

23 percent."

24     And Keerti responds -- internally, we

25 see -- because it says, "Via agent internal --

Page 143

1    "Please assist.  The partner said why did Uber take

2    such a high commission on this trip?  It's over

3    30 percent," right?

4         A.   That's right.

5         Q.   Now, the next day, shortly thereafter,

6    Sangbarta responds on behalf of Uber, right?

7         A.   That's correct.

8         Q.   And Sangbarta says, "Thanks for reaching

9    out."  And then says, "I would like to inform you

10   that service fee amounts vary per trip, and they are

11   not a set percentage," correct?

12        A.   That's what it says.

13        Q.   And again, the service fee amounts and

14   whether they vary up or they vary down, that is a

15   decision that ultimately is going to be made by Uber,

16   correct?

17        A.   That's right.

18        Q.   So let's say, for example, that you have a

19   trip where Dainius wants to make $10.  For whatever

20   reason, Uber decides the overall trip was, you know,

21   $13, and they are going to take a service fee of $5.

22             The fact that is Uber is making that

23   determination for a 5-dollar service fee, that's an

24   Uber determination, right?

25        A.   That's right.

Veritext Legal Solutions
346-293-7000

1          Q.    And based on that, based on the fact there
2     even though Dainius wanted to make $10 and control
3     his revenue, Uber has influenced that and reduced it
4     based on its decision to charge a 5-dollar service
5     fee.  True?
6          A.    We make a decision on the service fee, yep.
7          Q.    Yep.  We can go to one more, Claimant's
8     Exhibit Number 8.  This, for the record, will be
9     Barysas 1375.
10               Before we look at it, you would agree
11    with me that if there's a cancellation fee, Uber
12    takes a service fee, right?
13         A.    Per the technology services agreement, the
14    cancellation fee is thought to be fare of the trip,
15    definitional-ly.  So yep, we would still take a
16    service fee on that.
17         Q.    So you told us earlier that the Period 1
18    time and the Period 2 time, Dainius would not be
19    compensated for, right?
20         A.    That is not what I said on Period 2.  I
21    believe you misstated my testimony.
22         Q.    For period 2, you said that there may be
23    some instances, but as you sit here you cannot
24    identify a single first time in which Dainius would
25    have actually been compensated by Uber for Period 2

                                        Page 145

1    time.

2             Does that recite your testimony more

3    accurately?

4        A.   Well, I guess, number one, he never would

5    have been compensated by us, period, in any of the

6    periods.  Number two, yeah, that is correct.  I

7    didn't review all his payment statements in detail

8    for whether or not a rider had compensated him in

9    Period 2.

10       Q.   All right.  So now we have a situation

11   where a person cancels a ride and they never even got

12   in the car, correct?

13       A.   They might have gotten in the car

14   sometimes, but usually cancellation fees are when a

15   rider has not yet gotten in the car.  That is right.

16       Q.   So let's say, for example, that the Period

17   2 time -- for here.  So we now have -- we accept the

18   ride until Dainius gets to the rider's location.

19   That's our Period 2 time here, right?

20       A.   Correct.

21       Q.   Okay.  And on this ride, Dainius was not

22   being compensated by Uber during the Period 2 time,

23   correct?

24       A.   Correct.

25       Q.   And even despite that fact, Uber on here

Page 146

1    charges a cancellation fee of $10 but only gives a

2    total fare to Dainius of $7.20, right?

3        A.    That is right, yeah.

4        Q.    So Uber is now charging a service fee of

5    $2.80 even though Uber claims, "We did nothing.  We

6    had nothing to do with this," right?

7        A.    What do you mean we claim we had -- we did

8    nothing, had nothing to do with it?  What do you

9    mean?

10       Q.    Well, first off, the service fee is being

11   charged on what had so far only been P1 and P2 time,

12   right?

13       A.    The service fee is -- is charged on the

14   fare of the trip.  The cancellation fee is defined as

15   the fare of the trip.

16       Q.    But the trip never even actually started

17   because he was waiting for the customer and the

18   customer canceled after he waited for him and he had

19   to actually drive 4 miles to pick up that rider,

20   correct?

21       A.    That's what he says, yeah.

22       Q.    Okay.  And even despite the fact that Uber

23   is not going to compensate him because we never got

24   to P3 time, Uber still takes out a service fee of

25   $2.80, right?

Page 147

1          A.    For this ride, yeah.

2                MR. MacLEOD:  Judge, I'm about to

3      switch gears to some other documents.  I don't know

4      if now's a good time to break.

5                JUDGE SOUSSAN:  I think it is probably

6      a good time to break.  It is almost 1:00 o'clock, so

7      let's break until 2:00.

8                (Recess from 12:54 p.m. to 1:58 p.m.)

9                JUDGE SOUSSAN:  Mr. Sandahl, why don't

10     you repeat what you put in writing to me and argue

11     your point?

12                MR. SANDAHL:  With respect to the

13     videos that were discussed this morning, they were --

14     if I hadn't said it explicitly during the time we

15     were discussing it, they were created at the request

16     of counsel, and they were for the purpose of helping

17     provide testimony on Mr. Barysas' activities at the

18     airport.

19                Now, to be honest with you, they are

20     helpful, we think, to our case, but we don't want to

21     waive -- risk waiving any kind of privilege by

22     producing them.  They were created at the request of

23     counsel.

24                And so, we object to -- we continue to

25     object to producing them on that basis.

Page 148

1                   JUDGE SOUSSAN:  What do you mean

2      "created by the request of counsel"?  They were

3      created at your request?

4                   MR. SANDAHL:  That's correct.

5                   JUDGE SOUSSAN:  Okay.  When was that

6      done?

7                   MR. SANDAHL:  So there's been a pause

8      in some of the proceedings.  I think I did it in

9      December, because then there was a pause in the

10     discovery and then we came back to it.

11                  JUDGE SOUSSAN:  So your argument is

12     that it's work product?

13                  MR. SANDAHL:  That's correct, Your

14     Honor.

15                  JUDGE SOUSSAN:  What was the source?

16                  MR. SANDAHL:  As I understand it,

17     there's GPS points which have been discussed, and

18     it's kind of overlaid onto a map, and you can see

19     that the GPS points kind of jump from place to place.

20                  JUDGE SOUSSAN:  Okay.  So it was

21     actually created at the hands of lawyers?

22                  MR. SANDAHL:  At the hand of a

23     paralegal.

24                  JUDGE SOUSSAN:  Okay.

25                  MR. KHERKHER:  They are our client's

                                            Page 149

1    points.

2              JUDGE SOUSSAN:  Hold on, Mr. Kherkher.

3    I'm asking some questions, okay.  Hold on.

4              So the document did not exist in the

5    files of Uber?  It was actually created -- paralegal

6    or lawyer is one and the same to me, but it was a

7    document created by you?

8              MR. SANDAHL:  Yes, from the data

9    points -- the videos, the clips themselves, did not

10   exist in the file.

11             JUDGE SOUSSAN:  Okay.  All right.

12   I'll hear from the other side now, please, claimant.

13             MR. KHERKHER:  He's parsing with his

14   words.  The information that they got is from our

15   client, okay?  And so, we're moving for a mistrial.

16   We want to suspend this trial until we get all that

17   information.  And, Judge, I'm not trying to be ugly,

18   but if you rule against us, I will instruct my

19   lawyers not go forward and then tomorrow we'll file a

20   lawsuit and ask for judicial review.

21             This is a mockery.  They are playing

22   games with us and with you, and we demand all that

23   information, all that data that their corporate rep

24   has reviewed.

25             MR. SANDAHL:  I've never been accused

                                           Page 150

1  of playing games by withholding things on the basis

2  of privilege.

3            MR. STANLEY:  On December 3rd, we had

4  a meet and confer in which I sent an e-mail to Ben,

5  and I asked for all of the information about the

6  restriction.  And then included in that, as it goes

7  with another one of our requests for production, I

8  asked that they provide PNG files of map-matching

9  data, the GPS map-matching data for the period of

10  May 13th through May 23rd, 2018, which is the period

11  of which this -- this claim of geo-spoofing that Uber

12  alleges against our client occurred.

13            And so, my assumption is that's when

14  Mr. Sandahl goes and asks for them to create this

15  from the PNG, but they never produced that data.  The

16  data exists, and it's about our client.  We had

17  multiple meet and confers.  He even told you in front

18  of your face in a hearing that there was nothing else

19  on this issue because we brought it back up to you

20  again knowing there must be something else and, of

21  course, there is.

22            Now you have them saying it on the

23  record, you have them saying it in opening, you have

24  the corporate representative saying that our guy is

25  cheating them by GPS spoofing and we've got evidence

Page 151

```
 1   of it, and it totally impedes the whole system, the

 2   whole thing, right?

 3               It goes to the TNC statute where we

 4   claim that they limited the territory.  If you look

 5   in some of the agreements, it talks about the

 6   territory that the driver exists in and where he

 7   drives, and the TSA and the other agreements between

 8   the ride and Uber and the driver and Uber discussed

 9   the territory.  It absolutely limited the territory.

10   Absolutely.  And they have data.  Now they are

11   pointing a finger at our client and saying that he

12   cheated the system.

13               It's a credibility issue.  They are

14   claiming that our client doesn't have credibility,

15   right?  And now we need to get that data.  We need to

16   go and have it examined by an expert.  We need room

17   to have that expert testify on the data that they

18   have to see if it matches up.  They can't unpoison

19   this well.

20               JUDGE SOUSSAN:  Mr. Sandahl?

21               MR. SANDAHL:  No, Your Honor, when we

22   did have a meet and confer -- Mr. Stanley is right

23   about that, and we agreed to produce information

24   about the airport restriction, what we could find.

25   There's limited amount of information.  We did
```

Page 152

1  not agree -- specifically, they requested geo-mapping

2  documents, which I don't know for sure if this is a

3  geo-mapping document.  I don't want to make any

4  representation about that, but that would be in line

5  with what I'm thinking of here, and we did not agree

6  to produce those.  They did not move to compel that.

7            We produced information explaining why

8  he was -- in response to Interrogatory Number 5 why

9  he was restricted from taking airport trips, and

10  that's the information we produced.  There's nothing

11  shady, nothing disingenuous about anything we've said

12  at any point.

13            JUDGE SOUSSAN:  And to refresh my

14  memory, okay, Mr. Rosenthal testified that he saw

15  these videos, correct?

16            MR. SANDAHL:  Yes.

17            JUDGE SOUSSAN:  And there's how many

18  of them?

19            MR. SANDAHL:  There are two.

20            JUDGE SOUSSAN:  And they are short?

21            MR. SANDAHL:  Yes.

22            JUDGE SOUSSAN:  Okay.  And what do

23  they show?

24            MR. SANDAHL:  They show maps of an

25  airport -- do you want me to describe them in

Page 153

1    relative detail here?

2                 JUDGE SOUSSAN:  Not relative detail.

3    Just generally.

4                 MR. SANDAHL:  They show that

5    Mr. Barysas -- the data shows that Mr. Barysas was

6    at -- was at Point A, but his phone was sending a

7    signal signifying he was at Point B and he actually

8    jumped, kind of teleported.

9                 JUDGE SOUSSAN:  Okay.  And this is

10   what assisted your client in testifying today,

11   correct?

12                MR. SANDAHL:  We reviewed them to

13   provide an interrogatory response.  I don't think we

14   subsequently reviewed them to provide testimony.  I

15   don't recall.

16                JUDGE SOUSSAN:  Okay.  Well, you're

17   not going to be waiving any privilege by my ordering

18   that these videos be produced to the claimant, but I

19   am not going to further open up this hearing.  We

20   will go forward today, and I would hope that you'll

21   be present.  If you're not present, I will continue

22   to go forward with or without you.

23                MR. KHERKHER:  Ryan's going to make a

24   record, and we're going to shut it down because we

25   are highly prejudiced.  And I understand your ruling

                                          Page 154

1    and I respect it, but we are being blindsided, and

2    we're going to shut it down after Ryan makes a

3    record.

4                    MR. MacLEOD:  Here's the problem,

5    Judge.  We have dealt with Uber on geo-mapping issues

6    before.  This is not their first rodeo.  They know

7    it.  Now we've had a Uber corporate representative

8    say that he reviewed this as part of his depo --

9    testimony prep last week.  That's what he said, and

10   he said it under oath.  And the problem is it's not

11   just those videos.  The problem is there is data

12   underlying those.  They don't even have a witness who

13   can support those videos.  We don't know how the data

14   was stored.  We don't know where it came from.  And

15   as you well know, when we talked about arbitrations,

16   that there's a real problem when evidence comes in

17   without foundation and it's not authenticated.  They

18   literally have one witness on their entire witness

19   list -- we're hearing from the man today -- and he is

20   telling us he does not know who made these videos,

21   where they came from, what data was relied upon.

22                    And you know what makes this even

23   worse?  It's not just the conferral.  What makes it

24   even worse is that the first time that Uber ever

25   claims that this man engaged in what's called

                                              Page 155

1    geo-spoofing is the day that we filed the motion to

2    compel.  The very day we filed our motion to compel

3    is when Mr. Sandahl and his crew decides to amend

4    interrogatory responses and say geo-spoofing.  That

5    is when Bret, a good lawyer, says, "I'm going to need

6    all the evidence for that.  And specifically, I'm

7    going to need these files."

8                    They don't want to turn that over.

9    Why not?  Why can't we have that information?  Why

10   are we now going to watch these cartoon videos and we

11   don't know where the data is coming from?  Have you

12   ever been in a courtroom and thought that that was

13   okay?  You never would have let that happen in a

14   district court.  And if you were a litigator and this

15   was happening now, you would be losing your mind

16   because as a good advocate, you would be saying, "How

17   in the world am I going to let my client's

18   credibility be impugned when we're going to watch

19   cartoons and little things on a map that have never

20   been produced before today?"  That's not what we do

21   in a court of law.

22                    And then on top of that, we're going

23   to say that he's geo-spoofing, a term they don't even

24   understand what it is, a term that we heard the first

25   time when we filed the motion to compel.  But

Page 156

```
1    instead, you ruled against us.  We respected that.
2    We came forward today, and now we've got to listen to
3    Brad Rosenthal, who couldn't respond to a question
4    with a straight face, a straight answer to save his
5    life, tell us about reviewing these videos.
6                     There's no way that Mr. Sandahl can
7    say -- there's no claim on attorney-client privilege
8    or work product in any of their RFP responses and, in
9    fact, he didn't make it before the break.  Then he
10   send you -- or Ms. Miers sends you a lengthy e-mail
11   saying, "Oh, by the way, Judge, this is actually
12   attorney-client work product."  Whoever sent you the
13   e-mail.
14                     This -- it is just one thing after
15   another.  If we had done this to Uber, I promise you
16   they would be asking for monetary sanctions.  They
17   would be flipping out.  We have seen it time in and
18   time out.  They throw fits left and right.
19                     This is not a fit.  This is about what
20   is right and wrong as advocates.  We've got to
21   protect Mr. Barysas.  We're being ambushed.  It's
22   highly prejudicial.  There's nothing else that we can
23   do.  We literally cannot do anything else.  Our hands
24   are tied.
25                     JUDGE SOUSSAN:  What troubles me is
```

Page 157

1    that your client reviewed whatever we're talking

2    about -- excuse me.

3                    MR. MacLEOD:  We didn't.  It's never

4    been produced, Judge.

5                    JUDGE SOUSSAN:  I'm talking -- not

6    your client.  I'm talking to -- if it didn't look

7    like it, I'm talking to Mr. Sandahl.

8                    MR. MacLEOD:  Oh, I'm sorry.

9                    JUDGE SOUSSAN:  Your client reviewed

10   this and testified from it, and yet it was not

11   produced, and I'm troubled by that.  And I -- I don't

12   know.  You know, they are going to complain about the

13   source and what are the source documents that make up

14   the exhibit.

15                    So, you know, I see that this is a

16   problem.  It seems to me that it might be resolved by

17   taking a look at it and understanding it better, but

18   I don't have the answer to that question.

19                    MR. KHERKHER:  We're not going to go

20   forward unless we have those videos and we have time

21   for our experts to look at it.  And I respect you as

22   a judge and as a human being; but if you rule against

23   us, I'll take my medicine, but I'm shutting down my

24   proceeding, my client, and we're going to ask for

25   judicial review because we just agree to disagree.

                                            Page 158

1    But we're not -- we're not going forward.

2                    JUDGE SOUSSAN:  I'm going to order

3    that the videos be produced.  If you didn't glean

4    that earlier, I'm sorry.  But I am going to order

5    that they be produced.  And just because they are

6    being produced, there's no waiver of any future

7    attorney-client product at this time, but I am going

8    to order them produced, and your experts will have an

9    opportunity to review them tonight, but I also -- and

10   if you want to have 30 minutes to review them before

11   we resume, I don't mind that either so that you can

12   ask Mr. Rosenthal about it, but I'm not going to shut

13   down the proceeding.

14                    And I don't really understand what

15   kind of judicial review you could have in this

16   arbitration proceeding, but that's up to you.  That's

17   for you to make that decision.  I am going to order

18   it be produced.

19                    MR. MacLEOD:  It's not just the

20   videos.  We've been dealing with Uber long enough

21   that, I'm sorry, I cannot trust that company to save

22   my life.  I don't know where that data came from.  We

23   need the data.

24                    And what's so questionable to me is we

25   asked for 2018 geo-mapping data, and they said, "We

                                      Page 159

```
 1    don't have it."  So why do you not have 2018 data but
 2    you do have the data to make the video?  I have a lot
 3    of questions.  And the problem is if I knew that this
 4    information existed, I would have the right expert to
 5    combat it.  I don't.  Lindsey Cameron and Professor
 6    Parameter-Cunningham, they're professors.  One's a
 7    law school professor.  Another one of them is a
 8    sociology professor.  They are both great people, but
 9    they're not geo-mapping experts.  Then I've got an
10    economist also, Ph.D.  Wonderful person.  James
11    Parrot is also -- Dr. James Parrot is also not the
12    right type of expert.
13                I am very, very concerned, and I don't
14    think that we're going to cause -- well, let me back
15    up.
16                It will be a delay of justice.  It
17    will be inconvenient for the parties.  It will be
18    inconvenient for you, as well.  But what I'm asking
19    is that we suspend this, we allow for us to get the
20    data, review the data, see if we need the right
21    expert.  And I get that that's a big ask, Judge.  I
22    do.  And I apologize that that's what we're having to
23    do, but we did not create this bed.  We didn't make
24    the bed, and I don't want to lie in a bed that I
25    didn't make.  And I don't want for a second to be
```

Page 160

1   done with this, whether you rule for us or rule

2   against us, feel like we didn't do everything we need

3   to do for Mr. Barysas.  That's who I owe this

4   obligation to.

5              So what I'm asking is that you suspend

6   this.  I know it's going to be inconvenient.  I know

7   that.  I get it.  But Uber caused it.  We've asked

8   for this information.  We need the underlying data.

9   We may need an expert.  We may not.  But we need to

10  look at it, Judge.

11             And I get it.  It's a difficult

12  decision.  I understand that, and I appreciate that.

13  But I'm asking you respectfully on behalf of

14  Mr. Barysas that we need to do our jobs.  We just --

15  we do.  This is where we are.

16             JUDGE SOUSSAN:  Mr. Sandahl?

17             MR. KHERKHER:  Judge --

18             JUDGE SOUSSAN:  Just a second.  I

19  would like Uber to respond.  Yes.

20             MR. SANDAHL:  Yes, Your Honor.  So I

21  just want to say a few things.  One is this is not --

22  you know, we are happy to produce this information.

23  This is not something that we were going to rely on.

24  It's not something that we had designated, either the

25  videos themselves or even the interrogatory response.

Page 161

```
 1    It was just a matter of that's just -- we were trying
 2    to give them the information that we could give them,
 3    that it was GPS spoofing, and it just doesn't have
 4    any bearing really on the independent contractor
 5    issue.  And to suggest that there needs to be a
 6    forensic review of every piece of data that went into
 7    it or anything like that is not -- is not necessary.
 8    It's not even really important whether it was GPS
 9    spoofing.  It's that we understood him to be GPS
10    spoofing, which is what was made clear to him -- I'm
11    sorry.  It was made clear to him that he engaged in
12    some fraudulent behavior which could include GPS
13    manipulation.  That was made clear to him, and that's
14    what ended up in his restriction from taking the
15    airport trips.
16              MR. MacLEOD:  Judge, that cuts against
17    my client's credibility.  You are the sole judge, and
18    they just said it's fraud, it's fraud, it's fraud.
19    Our credibility is important.  Our client's
20    credibility is important.
21              JUDGE SOUSSAN:  Okay.  Okay.  Let me
22    think a minute.
23              Again, I'm going to order it produced.
24    That doesn't mean that you're going to have the
25    ability to turn Uber's algorithms upside down or
```

Page 162

1   their proprietary information which we've talked

2   about before upside down.

3                    I'll give you the opportunity to take

4   a look at this, and then -- I know what's going to

5   happen.  You're going to come back to me and argue

6   some more, and we're going to have those discovery

7   arguments.

8                    I'll give you that opportunity take a

9   look at that video and see if there is, indeed,

10  anything more that you would argue that you need.  I

11  don't know the answer to that question.  I've not

12  seen these videos.  But as far as -- I know you're

13  going to argue for the source information.

14                   Yes, Mr. Kherkher?

15                   MR. KHERKHER:  Exactly, Judge.  We're

16  going to need the source and the underlying documents

17  that they took from my client's phone and where they

18  got it from.  Was it from the Uber app or was it from

19  another app that he had on his phone?  Uber has that

20  power to see what else you're doing on your phone.

21  And so, we're going to need the underlying documents,

22  and it's going to take some time.

23                   MR. SANDAHL:  No, Your Honor.  It's

24  just not necessary.  We can -- we recognize that we

25  can deactivate -- that this is not really a case

Page 163

1    evaluating if we had just cause to deactivate him.

2    That seems to be really what the argument is about.

3    There's no dispute that, yes, we can deactivate

4    people or, you know, in this case limit people's

5    access in certain respects.

6              JUDGE SOUSSAN:  I know that this case

7    is -- is clearly about whether he's an employee or

8    independent contractor, and part of their argument is

9    the control factor.  And so, that's why I believe

10   they are going off and talking about this right now.

11             And in that regard, as long as it

12   pertains to a factor of the five factors or anything

13   else, I think that it's relevant discovery.  But

14   again, there's going to be a limit.  It's not going

15   to be blown wide open.

16             So with that in mind, I think that

17   that should be produced today.  And where we go from

18   there, I'm not so sure because I don't know what the

19   documents are.  I haven't seen them and I don't know

20   what they are about and I don't know what went into

21   the creating of the documents, the videos.  So --

22             MR. SANDAHL:  We'll produce them right

23   now.

24             JUDGE SOUSSAN:  Okay.  I think what we

25   should do is produce them right now, and then let's

Page 164

1    resume, if we could -- why don't we take a couple of

2    hours?  How long are these, two minutes each?

3                    MR. SANDAHL:  I think one is even less

4    than two minutes, and the other one is about two

5    minutes, I think.

6                    JUDGE SOUSSAN:  Okay.  Why don't you

7    produce them right now, and then let's resume in one

8    hour and let me get your thoughts on that, okay?

9                    MR. STANLEY:  I have a question on

10   what will be produced?  Is it video and the data?

11                   JUDGE SOUSSAN:  It's whatever we were

12   just talking about, which I assume are two videos.

13   So let's get those videos produced, and then let's

14   come back -- I don't even know if you need an hour,

15   but let's come back at 3:00 o'clock and discuss it.

16                   MR. STANLEY:  Understood, Judge.

17                   (Recess from 2:18 p.m. to 2:59 p.m.)

18                   JUDGE SOUSSAN:  All right.  Let's go

19   back on the record.  Mr. MacLeod, you've had time to

20   look at this?

21                   MR. MacLEOD:  Yes, Judge, I have.  And

22   a couple of issues that I would point out -- probably

23   more than a couple.

24                   One is this is created, it appears, by

25   a third-party entity, Chronicle.  My understanding

                                        Page 165

1    just from a quick web search is that this may be a

2    third-party entity that's somehow related to Uber.

3    Despite that fact, it is a third-party entity and

4    it's on a third-party entity's software, Chronicle.

5    In fact, it even advertises for hiring through this

6    third-party entity for software engineers.

7            So I'm concerned about the whole work

8    product, you know, whatever that may be.  My

9    understanding, this was created by a paralegal, but

10   maybe it was a paralegal for Chronicle but not Uber.

11   And so, that's one concern.

12           Number two is there are no data points

13   that are on these videos.  In fact, one of them has a

14   little car moving, the other one doesn't have a

15   little car moving.  And so, there's nowhere that I

16   can discern where these GPS data points come from.

17           Another problem is the iPhone that's

18   on there is an iPhone that my client has never owned,

19   has never had.  So that's another concern as to the

20   authenticity of the evidence.

21           Another issue that I have is these

22   were two rides of the 2,400 plus rides that my client

23   has been on.  And as I appreciate it, Mr. Rosenthal

24   has said he's never seen videos like this before in

25   his tenure with Uber until last week.  They were

Page 166

1    obviously created for arbitration, for litigation,
2    and the fact that they somehow went back and found
3    two sets of data points for two trips for the same
4    time period in which claimant's counsel requested
5    that data, was told that that data didn't exist, and
6    then later was told this was geo-spoofing and then
7    during the hearing said that they had produced
8    everything that they had is very concerning.  In
9    fact, it's alarming.
10                So I think that there is a significant
11   authentication issue.  I think there's a foundation
12   issue.  And not just to the concern of late
13   production or actually -- I don't think that they had
14   any intention of producing it all.  The cat's out of
15   the bag, and I appreciate Mr. Rosenthal for being
16   honest.  I mean, but on the flip side of this is this
17   should have absolutely been produced.
18                We believe that we do need the
19   underlying data.  I went to law school.  I didn't go
20   to GPS and tracking school.  I don't have an expert
21   who can look at this.  I'm asking, respectfully,
22   Judge, for a short recess.  I know that you're very
23   busy.  We understand that.  Very busy may be an
24   understatement.  Whether it's a few days, 60 days,
25   whatever it is so that we can make sure that this

Page 167

1    case is decided on its merits.

2              I have a concern that there may have

3    been fraud committed by Uber with these videos.

4    We've not seen the underlying data.  It even makes me

5    more concerned that there was fraud.  Uber has been

6    fined by the FDC, they have been fined in other

7    instances for other activities that are alarming to

8    me.  That's not to be brought up here because I don't

9    know what the underlying data shows.

10             JUDGE SOUSSAN:  Let me ask some

11   questions here.  Number one, evidence can be

12   excluded, okay?  Notwithstanding that you're going to

13   tell me it's arbitration, I've seen it anyway.

14   Evidence can be excluded, and it can be said that no

15   one can rely on these documents.

16             What I also want to do is get

17   everybody back into why we're here.  And the real

18   issue at hand is is he an employee or is he an

19   independent contractor.

20             So then I have -- because I looked at

21   the documents, too.  I have to ask -- and I do think

22   that Uber opened the door, okay?  So I hear you.  I

23   hear you.  But then again, I need to understand and

24   appreciate the relevance, okay, to whether he's an

25   independent contractor or not, not whether they

Page 168

1    denied him extra money because they should never have

2    told him not to go to the airport.

3                    I understand your point on control.  I

4    get that.  This is not the first type of case I've

5    handled like this.  But rather than blow all this up,

6    we've got to focus on what are the issues in this

7    case.  The issue is is he an independent contractor

8    or is he an employee?  And if he's an employee, what

9    are the damages, okay?

10                   So I need to kind of narrow the focus

11   of what you perceive this to be the failure to

12   produce documents that they should have produced or

13   information or anything that they should have

14   produced.  If this was just created in December -- I

15   don't know.  I don't know the answer to any of that,

16   but clearly the door has been opened.  But evidence

17   can be excluded.

18                   I need to appreciate from you why this

19   is so relevant on the issues before me to shut this

20   thing down.

21                   MR. MacLEOD:  Absolutely, Judge.  We

22   have a TNC statute in Texas.  It was obviously passed

23   in 2017, and this is the first instance that we've

24   seen that Uber has -- we would argue has limited the

25   territory in which the driver can operate in.  The

Page 169

```
1    whole reason that we've always wanted this GPS data
2    is because we need to see how that territory was
3    being limited.
4                  If we had that data in our hands,
5    Judge, we can show you that there are drivers, let's
6    say, 1 through 100 and that Uber is excluding Drivers
7    1, 8, 15, 24 because of territorial restrictions that
8    they're placing on Mr. Barysas.  We can't do that
9    with two videos.
10                 What we do glean from two videos is
11   that they are tracking him, and now we know that it's
12   there.  There's smoke, there's fire.  And so, that's
13   why it's crucial, because you're going to hear --
14   they weren't going to question Mr. Rosenthal today.
15   They were going to call him in their case in chief --
16   I know that -- and they were going to go all through
17   the TNT statute and talk about how you needed four
18   doors, you have to follow the law, and all that.
19                 They were also going to talk about how
20   that he's an independent contractor based on the TNC
21   statute, and I think that this GPS data is very
22   relevant.  The reason we're going to push so hard on
23   it now is because now we found out it does exist.
24                 The fact that they were able to go
25   after all of this -- you know, after the fact that
```

Page 170

1    we've had motions to compel -- I don't think they

2    have been candid with you because we had the motion

3    to compel and they said they had nothing else to

4    produce, yet now I have a third-party entity they

5    have collected data from -- and not just data, videos

6    from.

7              And so, it's very troubling to me.  I

8    need -- I need to see the data.  We need to lay our

9    eyes on the data.  Again, I do not think a 30- or

10   60-day -- we've already got some of this in the can.

11   I don't think we need to redo openings or redo what's

12   already been done.  This is not going to be the first

13   arbitration that I've seen suspended.  It's not

14   something --

15             JUDGE SOUSSAN:  I'm not so worried

16   about that.  I would like to hear from you what is

17   relevant, okay?  What is the relevance to the issues

18   before me?  What's your argument on that?

19             MR. MacLEOD:  If they were limiting

20   the territory of Mr. Barysas and we can actually show

21   it through the data points, then we can show even

22   under Texas law, under their own TNC statute that

23   they lobbied millions of dollars for, we can show

24   that he is, in fact, an employee.  Under their own

25   TNC statute, we can show that based on their

                                        Page 171

1    limitation of the territory in which he could operate

2    that he is, in fact, an employee.  And we don't just

3    have to rely on their support messages and -- and

4    lawyer talk.  We can actually look at the data.

5            That's why we want this data, is to

6    show that this man who was logging onto the Uber app

7    had limited options and limited territory and Uber

8    was controlling that.  This data will show that,

9    Judge?

10           JUDGE SOUSSAN:  Response?

11           MS. MIERS:  Yes, Your Honor.  I'm

12   going to weigh in here.  I want to start with the TNC

13   statute.  As you'll notice in our pre-hearing brief,

14   as well as our opening statement, we have not and are

15   not arguing that the independent contractor analysis

16   falls within the Texas TNC statute.  We rely on the

17   statute to explain that what they describe as rules

18   are really just Uber insisting that people who use

19   the Uber driver app comply with relevant state law.

20           So we think that we can stand behind

21   our pre-hearing brief and our opening statement in

22   rebutting Mr. MacLeod's misstatement that we will

23   argue that the TNC applies to the independent

24   contractor analysis.

25           On that note, we do not think it would

Page 172

1  be appropriate nor productive to get in a back and

2  forth with opposing counsel in your presence but do

3  note that misstatements about us as counsel and our

4  client, Uber, have been made on the record and we

5  would like an opportunity to submit in writing a

6  rebuttal to the misstatements that have been made on

7  the record here today.

8  We can reach out -- we can file a

9  motion after this hearing is concluded to do that,

10  but we do feel like it's incredibly important for us

11  to have an opportunity to locate evidence and present

12  it and put it on the record of the misstatements they

13  have made.

14  I think you clearly get that this

15  is -- the underlying data has absolutely no relevance

16  whatsoever to the ultimate issues in this case.  And

17  just in case it's not clear, we concede as Uber's

18  counsel and Uber concedes that Uber retains the right

19  to deactivate individuals who use their app, be it a

20  rider or a driver.  We do not dispute that.

21  We do not dispute that Uber did not

22  allow claimant to use their app at the airport.

23  Whatever their reason was for the decision is

24  irrelevant.  We concede that we retained that

25  discretion.  So the data will not clarify anything.

Page 173

```
 1                Regarding the third-party entity, I
 2     have no knowledge of that.  I can look into it and
 3     get back to you, but it would have still been at the
 4     direction of counsel.
 5                Oh, and I just want to point out that
 6     I think it's pretty clear this is a delay tactic, and
 7     we do not think that this hearing should be delayed.
 8     We are prepared to go forward.  We are prepared for
 9     Mr. Barysas to present to you his sworn testimony
10     under oath and for you to decide whether he's a
11     credible witness or not, and we don't think you will
12     have any trouble doing that.
13                JUDGE SOUSSAN:  My biggest concern --
14     I mean, you've got the document.  You're entitled to
15     the document.  The door was opened, okay?  As far as
16     who did what when and who said what, you know, why,
17     whatever, lawyers fight, and -- and I get all that.
18                But I'm going to say it again.  My
19     biggest concern is relevance.  Uber has said what it
20     has said, that they did deactivate, they retain that
21     right to deactivate, they didn't allow your client
22     assess to the airport.  They are not denying that.
23                And -- and so, your argument remains
24     is that, "See, they had control."  So I don't know
25     that this additional information, whether it's from
```

Page 174

 1    third parties or who, is so critical and relevant to

 2    this case.  That is my concern.

 3              MR. KHERKHER:  Is Uber stipulating

 4    that they restricted Mr. Barysas' territory?

 5              MS. MIERS:  No, we are not because

 6    that's not what happened.  Uber stipulates that it

 7    did not allow the claimant in this arbitration to use

 8    the Uber driver app at the airport.

 9              MR. KHERKHER:  We're not -- we're not

10    going forward.  I mean, you rule against it.  This is

11    not fast food justice.  The way I make my living is

12    by going to trial.  The last thing I want is a delay,

13    but I'm not going to jeopardize my case and my

14    client.  I need a full record.  I need the underlying

15    data.  I need my experts to review it to show that

16    Uber's committing fraud.

17              And we don't even know where this data

18    is coming from.  Is it coming from Mr. Barysas' Uber

19    app?  Is it coming from one of his other apps if he's

20    playing chess or something?  I mean, the fact that

21    they are even controlling him and big brother is

22    monitoring, you don't do that with an independent

23    contractor.  You do that to one of your employees to

24    see what he's doing while he's on your time -- while

25    he's on your dime.  That's why it's relevant.  I

Page 175

1   mean, you can ring the bell, Judge.  I want to go

2   forward, but I'm not going to go forward with my

3   hands tied behind my back.

4               JUDGE SOUSSAN:  Ms. Miers?

5               MS. MIERS:  Well, for starters, they

6   could get the GPS data from their own client's phone.

7   Again, it is not relevant.  This is a clear delay

8   tactic, and we will be seeking sanctions for the cost

9   associated with preparing for and attending a bogus

10  hearing that they clearly intended not to go forward

11  with.  So we will be seeking sanctions.

12              JUDGE SOUSSAN:  Did you -- hold on.  I

13  have a question.

14              Did you sue Uber for fraud?  I don't

15  think so.

16              MR. MacLEOD:  Here's the problem.

17              JUDGE SOUSSAN:  Hold on.  Hold on.

18  Your causes of action before me are solely whether

19  your client is an independent contractor or employee,

20  correct or not correct?

21              MR. KHERKHER:  Judge, fraud goes to

22  credibility.

23              JUDGE SOUSSAN:  I need that question

24  answered, please.

25              MR. KHERKHER:  As I said in the

                                      Page 176

1    beginning, yeah, if you want to narrow it down, it's

2    whether Mr. Barysas is an employee of Uber.  I

3    understand --

4                    JUDGE SOUSSAN:  I don't want to narrow

5    it down.  I'm asking you a question.  And I believe

6    that is the issue before me, and what you have told

7    me is you're not sued Uber for fraud.  You can argue

8    your points to me without shutting down this hearing.

9                    MR. KHERKHER:  Judge, no, I can't.

10   That's what I'm trying to tell you.  I'm looking at

11   underlying documents.  I want my experts to show that

12   they are restricting their territory.  I don't know

13   what I don't know.  Uber can't use this document,

14   these videos, these data points as a shield in the

15   storm.

16                    Am I missing something?  I mean, when

17   in the world, whether it's arbitration or trial, do

18   I -- does a plaintiff get blindsided with relevant

19   evidence and say, "Oh, Kherkher, let's keep going.

20   No big deal.  Nothing to see here.  Don't look behind

21   the curtain"?

22                    I'm not doing that, Judge.  And if

23   you've made up your mind, I respect that.  Then rule

24   against us and let me go forward.  I would rather

25   take my chances with a judicial review.  This is not

Page 177

```
1    right, Judge.  Uber has been beating on us and lying
2    to us.  You should know that.  You should do a little
3    research on them.  It's terrible.
4                    MS. MIERS:  Your Honor, may I respond
5    briefly?
6                    JUDGE SOUSSAN:  Yes, please.
7                    MS. MIERS:  They are not asserting
8    claims for independent contractor status under the
9    TNC statute, which is what they are relying on to
10   argue this point about whether territory was
11   restricted, so I want to make sure that's not getting
12   past anybody.
13                   But again, we concede that Uber did
14   not allow claimant to use their Uber driver app at
15   the airport.  I want to make that very clear.
16                   JUDGE SOUSSAN:  You have made that
17   very clear.
18                   MR. MacLEOD:  It seems to me that they
19   are now conceding that they limited the territory,
20   that they controlled him.  Are they -- if Uber will
21   stipulate to that or we can move for summary judgment
22   on at least that one factor of control -- I know
23   Ms. Miers is laughing now, but she said what she
24   said, so --
25                   MS. MIERS:  We're not going to stand
```

Page 178

1    in the shoes of the arbitrator.  That's not our

2    decision.

3              JUDGE SOUSSAN:  Stop, stop, stop.

4    They have said what they've said, Mr. MacLeod.  They

5    haven't said the words that you're using.  Those are

6    your arguments.  And I appreciate your argument and

7    I've heard your argument and I'm not making a ruling

8    on that argument or not.  But it goes to the elements

9    of employee or independent contractor, and what --

10   what you're seeking here, I don't know the relevance.

11   I've said that now at least three or four times.

12             They are not standing on the TNC.

13   They have said that.  They have said they retain the

14   right to deactivate, and they have it and they did

15   it, and they did not allow him to use the app at the

16   airport due to their belief.

17             So that's -- your argument is control.

18   They controlled where he can go and where he can't

19   go.  So therefore, we believe he's an employee.

20             I don't know that you need more time

21   to develop anything else for those particular issues.

22   Uber opened the door with these videos, and that's

23   why I said you got them.

24             MR. MacLEOD:  The problem, Judge, is

25   they were hiding the videos.  That's the worst part

                                        Page 179

1   about it.  They didn't just open the door.  They knew

2   they had these videos.  They were hiding the videos.

3   They were never going to turn them over to us.  We

4   know that.  The problem is I have to prove the degree

5   of control exercised by Uber.  They were tracking

6   this man all the time, and now they claim that they

7   have no GPS data other than two trips that they were

8   able to find?  That's very, very confounding to me.

9            I should be able to have a treasure

10  trove of GPS data that I can show to you -- just like

11  the love their Lyft and Uber brass that you let in

12  subject to our objection as demonstrative and

13  opening, I would love to have a demonstrative to you

14  to show that literally this man, every time he's on,

15  whether he's in P1 time, P2, or P3 time, the level

16  that they're exerting over him is great.  That's one.

17  They are tracing him.

18           The other one is it goes to the

19  relative investments.  Now, I've heard for the first

20  time that there's a third-party entity that Uber is

21  using, whether it's a related entity or not, that

22  they have invested in, and that is the third factor

23  that I've got to prove to you, Judge.

24           So again, now I'm learning about a new

25  entity that I've never heard of in my life that they

Page 180

1   have never raised an issue about.  And so, it is

2   concerning.  It's concerning, and I do think that

3   it's very relevant.  I think it's absolutely relevant

4   to at least two, if not more, of the FLSA factors.  I

5   do, Judge.  And you know what?  They can say that

6   they need to submit briefs and all that.  They are

7   the ones that had the video.  Not us.  We didn't make

8   this.  It is what it is.

9                    JUDGE SOUSSAN:  Any further arguments?

10                    MS. MIERS:  The GPS is on his phone.

11   They have access to the GPS data from their own

12   client's phone.

13                    MR. MacLEOD:  We don't.  I mean, we do

14   not have that.  We certainly don't have --

15                    MS. MIERS:  You should.

16                    MR. KHERKHER:  We are entitled to have

17   what they have that's relevant.  And what we ought to

18   be discussing is sanctions against Uber now and

19   putting this case off.  We're going to ask for a

20   mistrial if you order us to go forward.  We're not

21   going to go forward.  I will take my chances.  This

22   is not fast food justice.  This is a big case.  I

23   represent -- Judge, I represent 15,000 Uber drivers

24   across the United States.  We're getting beat up in

25   Texas for the wrong reason.  I should have started in

                                        Page 181

```
 1   California and then went to New York.  Do you know
 2   how much Uber offered us at mediation?  150 --
 3                   MS. MIERS:  Your Honor --
 4                   (Simultaneous cross-talk.)
 5                   JUDGE SOUSSAN:  Mr. Kherkher -- just a
 6   minute.  You're inappropriate, Mr. Kherkher.  So
 7   stop, please, okay?  Just stop.  You know I'm not
 8   supposed to hear any kind of settlement discussion.
 9   You know that.
10                   MR. KHERKHER:  Judge, the point is
11   Uber is a --
12                   MS. MIERS:  That's not the first time
13   he's done that, Your Honor.
14                   MR. KHERKHER:  Well, the other
15   arbitrators weren't supposed to hear about the
16   rulings, but they brought it up so I made a decision
17   just to tell you.
18                   (Simultaneous cross-talk.)
19                   (Reporter clarification.)
20                   MR. MacLEOD:  Judge, if I may, I
21   respect your time, I respect my client's time, the
22   parties' time.  That's why I'm asking for a recess.
23   That's why I'm asking that we suspend the hearing, we
24   come back, we get the data.  We will work very fast.
25   I get it.  It's inconvenient.  It's very inconvenient
```

Page 182

```
 1    that we didn't have the video.  And so, they can
 2    argue that we're inconveniencing and we're delaying.
 3    We are delaying.  We're asking for a delay because we
 4    didn't have what we need.  And you didn't have the
 5    full story at the motion to compel.  You just didn't.
 6    You didn't have the full story, and neither did we.
 7    Now we have a better idea, and that's why we're
 8    asking for a delay.  And it's not an easy thing to
 9    do, Judge, but I'm doing it.
10              MS. MIERS:  And we will seek sanctions
11    for the additional costs that are wholly unnecessary
12    to this process.  We will also be asking for all of
13    the GPS data on his phone if we're going to go down
14    this irrelevant road.  And, by the way, we don't have
15    a single text message from this gentleman.  And in
16    other matters, it's been gold in these cases.  And
17    allegedly there's not a single one.  So if this is
18    the road we're going to go down, then, you know,
19    we're prepared to go down it.  But we will be seeking
20    sanctions.
21              MR. KHERKHER:  That's what we're
22    dealing with, threats.  Like that's going to
23    intimidate us and we have to cow down to Uber.  She
24    says it with a smile on her face.  We're going to go
25    down -- that's not how you practice law.  We caught
```

Page 183

1    them, and so all of a sudden she's threatening more

2    discovery and sanctions.

3                    MS. MIERS:  We have done nothing

4    wrong.

5                    JUDGE SOUSSAN:  Stop, stop.  I

6    don't -- okay.  I don't need to hear from either one

7    of you anymore, okay?  You've said what you've said,

8    and I've heard every bit of it.

9                    The issue that I see is if we go and

10   have a short recess and we reschedule two days -- I

11   know you're going to come forward with a motion to

12   compel, you're going to have a response, and we're

13   going to have to have a hearing on that.  And it's

14   going to have to be very, very quick so that we can

15   go forward with this quickly.  If either one of you

16   brings any kind of sanction/motion to me, I'm going

17   to look at it, but I'm not going to rule today on

18   anything.

19                    Do I think in the long run this should

20   have continued today?  I'm just going to put it out

21   there.  I do.  Now, does that prejudice you in any

22   way?  No, it doesn't.  But I need you-all to stop the

23   name-calling and act professional.  I think I've got

24   good lawyers in the room, and all of you should act

25   professionally.  And that is what I hope for.

1          I'm going to go ahead and continue
2  this so that you can immediately -- and I'm talking
3  about immediately -- ask for what you want, and we're
4  going to set up a timeline for that so this doesn't
5  dilly-dally because I know that there's going to be a
6  response.  I know we're going to be talking about
7  relevancy.  I've told you I have concern, too, about
8  relevancy.  I know where you're going with this, the
9  elements, but you have not sued Uber for fraud.
10          So we've got to make sure that I
11  arbitrate the case before me and not arbitrate
12  something much more global.  The fact that you've got
13  cases against Uber all over the country, that's your
14  business.  It's not my business.  The only business
15  that I have is the case before me, and that is the
16  case that I will decide, not anything else.
17          In that regard, let's find two days
18  that all of us can agree on to complete the hearing,
19  and then I want to set deadlines on your request
20  for -- and the documents you want and a response to
21  the same -- because I know you're going to respond
22  that, you know, it's irrelevant, but I would
23  encourage you to do what you can.  I think some of it
24  may be proprietary.  So I expect that argument to be
25  made, but I don't know the answer to that question.

Page 185

1          So that said, let's see -- excuse me.

2     Let's see when we can continue this for two days.  I

3     don't think we need a third day, unless you-all think

4     we do.

5               MR. KHERKHER:  Judge, why would you

6     say you think it might be proprietary?

7               JUDGE SOUSSAN:  Because that argument

8     has been made before.

9               MR. KHERKHER:  But we already know

10    that it's not and they are showing it to their

11    corporate counsel, and we ought to be able to depose

12    him and get the underlying documents and data.  I

13    mean, I feel like --

14              JUDGE SOUSSAN:  I'm not talking about

15    that.  There's other documents that they have claimed

16    are proprietary that I have ruled is proprietary.

17    I'm not talking about that.

18              What's been -- the door was opened

19    today with documentation.  And if a third party made

20    those documents, then it's a different argument.

21    It's not proprietary.  But I know that some of the

22    information that Uber has with regard to its

23    algorithms and what have you that I've already looked

24    at is proprietary.

25              So I don't know.  I will handle it

                                        Page 186

```
 1    when it comes before me, okay?  I'm just anticipating
 2    what arguments I'm going to hear, and I want to make
 3    those -- have you-all make those arguments as soon as
 4    possible so that we can -- you can produce whatever
 5    documents you need to produce immediately, that
 6    deposition, if it needs to happen, be done
 7    immediately, and that we have this hearing continued
 8    as soon as practical.
 9              MS. MIERS:  Your Honor, one thing.
10    They did not depose a corporate representative
11    witness in this matter.  That deadline has passed.  I
12    just want that noted for the record.
13              And we -- I don't think it's going to
14    be practical for us to get you dates sitting right
15    here because we have to connect our dots.  Is there
16    any way we can do this via e-mail?  We can do it
17    today, but we've got a lot of moving parts.
18              JUDGE SOUSSAN:  Yes, you can
19    absolutely do that.  But in the meantime, at least
20    I've got my calendar here so I can tell you about my
21    availability because I've had some other arbitrations
22    settle so I've got some availability.  But as far as
23    getting your document requests out --
24              MR. KHERKHER:  The reason why we
25    didn't depose their corporate rep is because we've
```

Page 187

```
 1   been on auto pilot.  We weren't aware of this new --
 2   this new evidence that he's already testified to.  So
 3   we should be entitled to depose him on all this data
 4   and this new discovery that they are putting on us
 5   for the first time.
 6                   MR. MacLEOD:  Judge, we can brief all
 7   this for sure.  We will.  I have my calendar out.
 8                   JUDGE SOUSSAN:  Okay.  Let's look at
 9   our calendars, okay?  Right now I'm just talking
10   about getting your request out.
11                   Since we're not going to be in
12   hearing, I would assume that you could get that
13   request to them by end of day tomorrow, right?
14                   MR. MacLEOD:  Yes, Judge.
15                   JUDGE SOUSSAN:  That's Thursday,
16   5:00 p.m., March 31.  And if you can do it sooner,
17   the sooner the better.
18                   MR. MacLEOD:  You said tomorrow, but
19   then you said Thursday.  Do you want Wednesday or
20   Thursday?
21                   JUDGE SOUSSAN:  I'm ahead of myself.
22   I want it Wednesday.  Wednesday, tomorrow.
23                   MS. MIERS:  The 30th?
24                   JUDGE SOUSSAN:  Wednesday, the 30th,
25   to get your request.  And then I want a response from
```

Page 188

1    respondent on 3/31, the very next day.

2                    MR. MacLEOD:  Judge, do you want to be

3    copied on those requests?

4                    JUDGE SOUSSAN:  No.  I'll hear enough,

5    I'm sure, on a motion to compel or, you know, a

6    motion for protection.  And I know that there is a

7    protective order in place in this case already.  So

8    be judicious about what you send to me, okay?

9                    And any motion regarding this to me, I

10   would like to have that by Tuesday -- actually, no.

11   Monday -- we're putting this on a short fuse.

12   Monday, April 4, at 5:00 p.m.  So that's any kind

13   of -- any kind of motion for protection, I would

14   assume, because they are going to want it and you're

15   going to say, "We're not going to produce it."  We're

16   going to be on a short fuse for that.

17                   So Wednesday I'll hear from claimant,

18   Thursday I'll hear from respondent.  The following

19   Monday, I'll hear whatever kind of complaint you

20   have, why you don't want to produce it, and then I'm

21   going to want an immediate response on that, too.

22   And then you need to tell me who you want to depose,

23   if anyone.  I want to hear that.

24                   MR. STANLEY:  Judge, Bret Stanley.  Do

25   you want an immediate response?  Does that mean

                                        Page 189

1    April 5th, 6th?

2                    JUDGE SOUSSAN:  I can put down a date.

3    April 4th some sort of motion, I anticipate, from

4    respondent.  So the claimant response to that would

5    be April -- let's do that April 5.  So we're just

6    going to have it each day here.  April 5.

7                    All right.  And then if there's any

8    depositions you want, you let me know.  The claimant,

9    please let me know by -- I'm going to have to make a

10   ruling you.  Let me know in your response on April 5

11   who you want to depose so I can look at everything.

12                   Then as far as hearing this matter

13   again, do you think you need two or three days?

14                   MR. MacLEOD:  Two days, Judge.

15                   MS. MIERS:  We continue to believe two

16   days is plenty.

17                   JUDGE SOUSSAN:  Can we do that

18   April 20 and 21?  I also know you-all have other

19   trials, I'm sure.  I'll tell you what I have

20   available right now.  April 20 and 21, and then the

21   following week -- I had a whole arbitration just

22   settle on me.  So the week of April 25, I have

23   Tuesday, Wednesday, Thursday.  So that would be

24   April 26, 27, and 28 I have open.  Let me just give

25   you one more choice.  The following week, May 2, is

                                          Page 190

```
1    open.  I have a conference call on May 3 for an
2    arbitration, but that week is open the week of May 2.
3    That should be enough dates.
4              MR. KHERKHER:  The end of April, I'm
5    going to be with my daughter in Europe.  And so, I
6    really don't want to miss that.  It's a big trip with
7    my daughter.  So May -- May is better for me, but I'm
8    also fifth on the trial calendar with Judge Schaefer.
9    And I'm being specific because I hate those lawyers
10   that say I'm going to be in trial and they are really
11   not.  I actually am.
12             JUDGE SOUSSAN:  There's April 20 and
13   21.
14             MR. KHERKHER:  I'm also fine with
15   double booking, Judge, where you tell me, "Hey,
16   Kherkher, let's start May 2nd" and if for some reason
17   Judge Schaefer doesn't reach, then we tee it up.
18             JUDGE SOUSSAN:  What's wrong with
19   April 20 and 21?
20             MR. KHERKHER:  I'll be in Europe with
21   my daughter.
22             JUDGE SOUSSAN:  That's when you'll be
23   in Europe.
24             MR. KHERKHER:  I leave on the 19th,
25   and I'm coming back on the 27th.
```

Page 191

1          JUDGE SOUSSAN:  Oh, okay.  All right.

2     Then we're looking at the week of May 2, if that's

3     good for everybody.

4          MS. MIERS:  We'll have to check on our

5     end.

6          JUDGE SOUSSAN:  I get you.  I'm also

7     open --

8          MR. KHERKHER:  Let me do this.  If

9     they want to do it in April, they can.  I will stand

10    down -- Bret and Ryan can handle it.  I don't want to

11    be that guy.  Never mind.  The April dates are

12    available.  I don't need to be present.

13         JUDGE SOUSSAN:  So we have those two

14    days in April.

15         MS. MIERS:  Judge, I've got mediations

16    on the 20th and 21, unfortunately.

17         MR. KHERKHER:  I feel better.  It

18    wasn't me.

19         JUDGE SOUSSAN:  Well, mediations can

20    be moved.  I know that for sure.  Other people can

21    take them.  I'm telling you I've got the week of

22    May 2 open and I have May 11 -- Wednesday, May 11,

23    Thursday, May 12, and Friday, May 13 are all open.

24         MR. MacLEOD:  Judge, my only concern

25    about April is the time that it may take to get

Page 192

1   documents, if ordered, and take a deposition, if

2   ordered.  But obviously we'll work diligently.  I

3   think we can make the week of 5/2 or 5/11 work, but

4   obviously we'll wait to hear from Ms. Miers and her

5   team.

6                  JUDGE SOUSSAN:  Okay.

7                  MS. MIERS:  We'll get back to you

8   today.

9                  JUDGE SOUSSAN:  Thank you.  Just make

10  sure you copy everybody.  So -- and there will not be

11  a mistake on my part.  The next time we schedule

12  this, we will start at 9:00 o'clock.  And I know why

13  I did what I did.  Vicki reminded me.  I mean, it's

14  personal.  I have a new shoulder.  And so, I was

15  going through physical therapy, and it's healing so

16  fast and well that I'm not -- I decided not to have

17  physical therapy this week.  So that's why we were

18  starting at 10:00, and I totally forgot.  And I

19  apologize again.  We'll start at 9:00 o'clock the

20  next time we start up.

21                  MS. MIERS:  Judge, as a reminder, you

22  did also consider the fact that our in-house counsel

23  and corporate representative are in California.  So

24  9:00 o'clock start time is 7:00 o'clock their time.

25                  JUDGE SOUSSAN:  I'm happy to start at

Page 193

```
 1    10:00 o'clock.
 2              MS. MIERS:  We would be grateful.
 3              JUDGE SOUSSAN:  Okay.  I'm happy to
 4    start at 10:00 in the morning.  That's not -- that's
 5    not a problem.  I felt so badly about it because I
 6    thought it was my doing.  Maybe it wasn't my doing.
 7              MS. MIERS:  I think it was ours.  I
 8    think it was outs.
 9              JUDGE SOUSSAN:  I forgot.  I forgot.
10    I usually don't advertise my personal situation.  So
11    anyway.  Okay.  We know our deadlines, and I'll
12    review this as quickly as I possibly can because I
13    want us on a short fuse.  Be mindful I've given you a
14    lot of, you know, thoughts that I have in my head
15    already about what's going to happen going forward.
16              And as far as, you know, taking action
17    at a higher court, that's fine.  You-all do what you
18    want to do.  That doesn't scare me.  I'm still going
19    to rule the way I think I should rule, no matter what
20    situation I have.  So just take that and understand
21    where I'm coming from, okay?
22              MR. MacLEOD:  Understood, Judge.
23    Thank you.
24              Can we please get a rush of this
25    transcript because it's going to help us in
```

Page 194

 1    formulating our discovery requests, I trust.

 2                    MR. KHERKHER:  As soon as you can.

 3                    MS. MIERS:  Respondent would like one,

 4    too, please.

 5                    MR. MacLEOD:  My only concern is our

 6    requests are due by tomorrow at 5:00 p.m.  Obviously

 7    I want to respect that.  What time do you think

 8    tomorrow, Ms. Foreman?

 9                    THE REPORTER:  I'll have it first

10    thing in the morning.

11                    JUDGE SOUSSAN:  We're going to recess

12    now.  Does anybody have anything further?

13                    MR. KHERKHER:  The only thing I wanted

14    to say, Judge, is thank you.  This is -- I know I

15    raised my voice and I know you're not taking it

16    personal, but I feel very strongly about what's going

17    on, and I appreciate your patience.

18                    JUDGE SOUSSAN:  Mr. Kherkher, I've

19    known you for many years.  I do not take offense.

20    Thank you, everyone.

21         (Whereupon at 3:36 p.m. the

22         proceedings were recessed.)

23

24

25

                                            Page 195

```
1
2   DAINIUS BARYSAS,            )
    Claimant                    )
3                               )
    vs.                         )  CASE NO. HON. SUSAN SOUSSAN
4                               )  ARBITRATOR
    UBER TECHNOLOGIES, INC.,    )
5   Respondent                  )
6
7                 REPORTER'S CERTIFICATE
8                  ARBITRATION DAY 1
9                    March 29, 2022
10
11       I, Shauna Foreman, Certified Shorthand Reporter
12   in and for the State of Texas, hereby certify to the
13   following:
14       That the foregoing transcript of ARBITRATION DAY
15   1 is a true record of the proceedings;
16       That the original transcript was delivered
17   to Kimberly R. Miers.
18       That a copy of this certificate was served on
19   all parties and/or the witness shown herein on
20   _____.
21       I further certify that pursuant to FRCP Rule
22   30(f)(1), the signature of the deponent:
23       _____was requested by the deponent or a party
24   before the completion of the deposition and that the
25   signature is to be before any notary public and returned
```

Page 196

1  within 30 days (or _____ days, per agreement of counsel)

2  from date of receipt of the transcript.  If returned, the

3  attached Changes and Signature page contains any changes

4  and the reasons therefor;

5      __x___was not requested by the deponent or a

6  party before the completion of the deposition;

7      I further certify that I am neither counsel for,

8  related to, nor employed by any parties or attorneys

9  in the action in which this testimony is taken, and

10  further that I am not financially or otherwise interested

11  in the outcome of this action.

12      Certified to by me on this the 30th day

13  of March, 2022.

14

15                          *Shauna Foreman*

16                          Shauna Foreman, CSR

                            Texas CSR 3786

17                          Expiration:  10/31/2023

                            Veritext Legal Solutions

18                          300 Throckmorton Street

                            Suite 1600

19                          Fort Worth, Texas  76102

                            Tel. (817)336-3042

20                          Firm No. 571

21  TOTAL TIME:

22  Claimant:  2H/10M

23  Respondent:  36M

24

25

                                              Page 197

**[1 - 4]**

### 1

**1**   1:7,10 24:2 30:6
40:15 42:20,23
43:2,4,10 44:2
45:6 48:11 90:19
92:22,24 119:8
127:21 133:18
136:17,19,25
137:1 145:17
170:6,7 196:8,15
196:22
**1,061**   49:16
**1.3032**   47:13
**1.44.**   47:12 140:24
**1.6**   80:14
**10**   34:22 39:5
130:9 144:19
145:2 147:1
**10/31/2023**   197:17
**100**   170:6
**10:00**   52:2,22
193:18 194:1,4
**10:25**   41:19
**10:30**   41:18
**10:32**   41:19
**10m**   197:22
**10th**   143:17
**11**   192:22,22
**1177**   143:15
**119**   44:15
**11:25**   83:1
**11:33**   83:1
**12**   192:23
**120**   44:15,15
**122**   44:15
**12:54**   148:8
**13**   99:18 109:4
144:21 192:23
**13.1**   67:10
**1300**   2:14

**1375**   145:9
**138**   139:16
**13th**   151:10
**14**   5:19 25:4
**14.52**   47:12 141:4
**14131**   197:15
**1436**   49:24
**15**   3:4 6:2 19:14
19:19 25:24 35:21
36:23 41:22 43:4
60:18 109:3
121:15 122:5,6,25
130:10 139:7,9
170:7
**15,000**   181:23
**150**   182:2
**1560**   2:9
**16**   6:2,16
**1600**   197:18
**167,000**   68:25
**17**   6:2,17 109:3,4
109:23
**18**   6:2 47:14
**18.92.**   47:13
**19**   25:4
**1959**   23:10
**1993**   39:4
**1998**   73:25
**19th**   140:2 191:24
**1:00**   148:6
**1:58**   148:8

### 2

**2**   11:11 34:7 43:6
43:7,10 72:11
119:8 136:17,19
136:25 137:2,4,10
137:20 138:17
145:18,20,22,25
146:9,17,19,22
190:25 191:2
192:2,22

**2,000**   105:6
**2,346**   16:7 39:3
**2,400**   61:11 166:22
**2,966**   49:19
**2.80**   147:5,25
**20**   190:18,20
191:12,19
**200**   36:11
**2014**   16:6,7 18:8
29:22,24 39:2
42:1 65:10 68:5
91:9 121:13 132:8
137:9
**2015**   65:21
**2017**   94:21 137:11
169:23
**2018**   46:17 87:3
140:2 143:17
151:10 159:25
160:1
**2019**   16:6 29:23,24
39:2 68:6 91:9
121:13 132:8
137:9
**2020**   42:2,8
**2022**   1:8,12 196:9
197:13
**20th**   192:16
**21**   190:18,20
191:13,19 192:16
**22**   101:25
**238**   61:13
**23rd**   115:11
151:10
**24**   170:7
**24/7**   33:19
**2402**   40:6
**249.5**   49:18
**25**   47:13 106:14
107:21 112:4
190:22

**25.64**   141:19
**26**   190:24
**27**   190:24
**27,207**   50:13
**274**   65:22
**27th**   191:25
**28**   190:24
**29**   1:8 196:9
**2925**   2:8
**29th**   1:11
**2:00**   148:7
**2:18**   165:17
**2:59**   165:17
**2h**   197:22
**2nd**   191:16

### 3

**3**   34:8 72:11
134:18 135:2,12
191:1
**3/31**   189:1
**30**   48:1 143:22
144:3 159:10
171:9 196:22
197:1
**300**   197:18
**30th**   188:23,24
197:12
**31**   188:16
**336-3042**   197:19
**35,000**   35:17
**36m**   197:23
**3786**   197:16
**3:00**   165:15
**3:36**   1:12 195:21
**3rd**   151:3

### 4

**4**   8:1 37:4 97:20
98:12 108:24
109:3 147:19
189:12

Page 1

**[4,000 - admitted]**

**4,000** 33:16 58:10
78:7
**4.62.** 47:15
**40** 49:22
**41,000** 49:17
**43,000** 49:17
**44,000** 49:17
**45.2** 16:10
**46** 6:3
**4th** 190:3

**5**

**5** 38:9 118:6,12,19
118:19,25 119:16
119:24,25 144:21
144:23 145:4
153:18 190:5,6,10
**5,000** 49:8
**5/11** 193:3
**5/2** 193:3
**50** 47:6 140:5
**50,000** 35:16
**53** 3:6
**55** 50:4,4 118:11
118:13,25 119:10
119:19
**55402** 2:15
**571** 197:20
**592** 98:12 100:3
**5:00** 188:16
189:12 195:6
**5th** 190:1

**6**

**60** 73:23 80:13
118:8,12,20 119:1
119:16 167:24
171:10
**600** 64:25
**6:00** 53:8
**6th** 190:1

**7**

**7** 112:2,4
**7.20** 34:23 147:2
**76102** 197:19
**77098** 2:9
**7:00** 193:24

**8**

**8** 112:7 139:15
143:15 145:8
170:7
**80** 2:14
**817** 197:19
**83** 3:8
**8:30** 42:16
**8th** 2:14

**9**

**9** 114:23
**9:00** 41:17 53:1
69:15 193:12,19
193:24
**9:34** 1:12
**9:47** 13:20

**a**

**a.m.** 1:12 41:17,19
41:19 52:2 83:1,1
**abide** 103:13
**ability** 47:2,21
77:12 90:10
121:11 162:25
**able** 60:2 64:10
68:25 69:1 71:19
84:17 125:19
128:2 170:24
180:8,9 186:11
**absolutely** 40:21
127:20 152:9,10
167:17 169:21
173:15 181:3
187:19

**absurd** 127:20
**abuse** 45:22
**accept** 13:7 17:24
19:14 29:7 31:24
38:21 43:5 48:18
60:18,25,25 61:6
61:16 74:17 90:10
90:24 91:7,18
101:17 102:2,7
103:9,14,16
105:23 106:17
108:21 109:7,13
109:14,15 110:6
110:17,25 112:14
112:17 118:23
121:11,15 123:1
130:2,2 134:14
146:17
**acceptance** 25:3
38:8 43:8 48:19
48:22 49:1 122:22
**accepted** 25:23,25
43:5 60:20 131:9
133:24 134:8
**accepting** 45:23
61:8,16 79:17
131:10 134:13
**accepts** 20:3 61:9
119:5 134:12
**access** 26:12 27:5
65:13,17 67:25
116:10,13 132:9
138:1 164:5
181:11
**accessible** 129:9
**account** 25:6 26:7
27:5 54:22 135:18
135:23 136:2,11
138:2
**accountable** 63:24

**accounts** 81:23
**accurately** 146:3
**accused** 115:15
150:25
**act** 18:2,12 21:5,6
21:8,15 22:8
84:10 136:7
184:23,24
**acting** 67:21
**action** 27:19 42:10
61:19 114:6
176:18 194:16
197:9,11
**actions** 30:17
**activities** 21:11
45:18 92:7 148:17
168:7
**activity** 54:21
125:9
**actual** 28:8 32:13
81:16 93:21 98:9
105:9 120:7
121:20,21,23
123:9,10,11,12
124:5,7 136:22
140:8
**ad** 18:14
**add** 44:24
**addition** 4:18
55:25 66:21
**additional** 48:8
174:25 183:11
**address** 54:23
56:23 59:5 64:8
69:24
**admissible** 79:25
**admission** 6:6
115:6
**admit** 16:16 80:11
**admitted** 5:5,9,13
5:15 7:1 23:19

[admitted - app]

92:21
**adopt** 87:11
**adopted** 22:24
**advance** 60:3
**advantage** 33:25
62:22 69:8
**advertise** 194:10
**advertised** 55:19
64:11
**advertisements**
17:1,4
**advertises** 138:22
166:5
**advocate** 80:5
156:16
**advocates** 127:13
157:20
**africa** 39:19
**agencies** 71:25
**agent** 67:22 136:7
143:25
**ago** 10:7 72:13
**agree** 31:9 57:11
59:19 62:23 63:4
84:12 85:9 89:6
91:5 94:12 98:21
99:3 100:16 102:3
102:6 103:18
104:18 105:7
108:4,9,13 111:2
115:6 117:11
122:6,10 134:5
136:24 138:20
142:21 145:10
153:1,5 158:25
185:18
**agreeable** 12:3
**agreed** 8:18 37:6
41:7 63:7 65:22
66:20 152:23

**agreeing** 6:5
**agreement** 5:6,13
5:15 18:10 29:16
65:14,21,22 66:7,8
66:10,17,18,19
67:7,10,11,18
94:10,11 112:10
145:13 197:1
**agreements** 62:24
65:15 67:9,17,24
70:6 152:5,7
**agrees** 71:11 87:20
**ahead** 37:16 88:2
107:14 126:18
185:1 188:21
**airport** 30:5,9
42:18 44:6,7,17,22
45:6 46:3,7,19
54:20,23 69:24
70:5,8,8,10,11,14
70:18 117:4,13,14
118:4,7 119:25
125:19,22,25
126:2,4,23 128:5
130:24 148:18
152:24 153:9,25
162:15 169:2
173:22 174:22
175:8 178:15
179:16
**airports** 46:2
142:10
**akin** 19:6
**alabama** 11:24
12:12
**alarming** 167:9
168:7
**alcohol** 36:4
**alert** 19:19 24:25
38:20

**alex** 30:19 86:21
**algorithm** 16:24
20:6 30:12,16
35:18 38:24 89:9
90:4,21
**algorithmic** 30:24
86:8,11 119:20
**algorithms** 30:21
85:11,20 86:1
87:5 88:21 89:1
162:25 186:23
**allegation** 45:12
64:9
**alleged** 24:3,20
46:20 72:7 76:5
78:17
**allegedly** 183:17
**alleges** 151:12
**allison** 2:13
**allocation** 74:6
**allotted** 25:24
**allow** 7:14 11:22
70:16 160:19
173:22 174:21
175:7 178:14
179:15
**allowed** 36:17
113:21 126:1
**allows** 37:24 59:9
**alluded** 25:17 43:1
47:2 78:22 92:5
**ambushed** 157:21
**amend** 156:3
**amended** 24:13
**amendment** 21:7
**amenities** 60:7
76:25
**amount** 23:23
47:18 49:13,16
70:25 73:5 74:5
105:9 120:20,20

152:25
**amounts** 36:12
47:16 48:2 120:5
120:18 123:7,9
140:22 144:10,13
**analysis** 8:16
48:23 172:15,24
**analyze** 8:15 81:17
85:25
**angela** 2:20 4:21
58:23
**answer** 104:1,5
106:23 107:1,2,3,3
121:22 122:1
126:11,17 129:10
140:21 157:4
158:18 163:11
169:15 185:25
**answered** 104:6
176:24
**answers** 106:24
**anticipate** 13:8
48:6 56:25 190:3
**anticipating** 187:1
**anybody** 178:12
195:12
**anymore** 184:7
**anyway** 7:8 12:15
81:2 168:13
194:11
**ap** 38:24
**apart** 67:6
**apologies** 84:20
**apologize** 52:9,17
53:3 82:17,24
84:15 109:2
160:22 193:19
**apology** 82:18
**app** 16:10 26:12
29:8,9,19,21,21
30:13 31:24 33:8

35:1,5,20 37:20
49:4,5,9 54:6 55:8
55:23,24 56:3,22
58:13,18 59:8,12
59:14,17 60:14
61:2 62:17 63:3,6
63:6,10 64:7,15
65:11,13,18,23
66:1,10,20,25 68:1
68:6,19,19,21,22
69:4,12 72:1
76:15,16 78:9
79:6,11,14 83:19
86:15 88:25 91:11
91:16 93:21 94:1
94:17 98:3,14
101:2 103:8
106:12 107:22
108:10,15 109:13
110:6,11 111:6,12
111:24 112:4
113:3,7,10,11,13
114:5,9,11 116:19
116:21,23 117:9
120:13,14 121:14
122:11,13,21
123:19,21 130:17
130:18 133:16
134:6 139:7 141:1
163:18,19 172:6
172:19 173:19,22
175:8,19 178:14
179:15
**apparently**  73:20
**appeal**  46:11,15
**appealed**  46:16
**appeals**  128:16
**appearances**  2:1
**appears**  165:24
**appendix**  49:12

**applicable**  16:9
18:4 29:25
**application**  16:16
16:19 18:12 19:3
19:13 20:12,15,25
23:24 33:18 36:19
37:24 91:14
125:23 129:24
133:20 141:5,11
**applied**  50:20
**applies**  17:25 19:1
22:22 32:14 40:1
41:3 80:3 172:23
**apply**  23:11,12
56:3 71:14 73:12
73:17
**appointed**  136:8
**appreciate**  7:13
39:10 41:12 53:17
98:19 99:1,13
161:12 166:23
167:15 168:24
169:18 179:6
195:17
**approach**  81:15
**approaching**  25:1
**appropriate**  51:3
96:13 173:1
**approximation**
50:10,11
**apps**  38:14 63:21
68:9,23 175:19
**april**  143:17
189:12 190:1,3,5,5
190:6,10,18,20,22
190:24 191:4,12
191:19 192:9,11
192:14,25
**arbitrate**  185:11
185:11

**arbitration**  1:7,10
7:10,15 9:24 18:1
21:20 23:17 24:16
45:15 48:7 53:16
59:6 82:20 83:17
83:24 90:13 92:12
95:25 96:13,20
127:21 128:19
131:24 132:13
133:3 159:16
167:1 168:13
171:13 175:7
177:17 190:21
191:2 196:8,14
**arbitrations**  10:13
13:12 25:10 89:23
90:1 128:19
155:15 187:21
**arbitrator**  1:3
2:22 8:19 21:16
21:17 37:22 94:24
100:5 179:1 196:4
**arbitrators**  8:13
10:6 13:2 37:6
57:3,13 71:21
182:15
**area**  54:22 131:11
131:12
**areas**  24:17 31:12
45:1 50:19 96:17
120:19,24
**argue**  24:3 148:10
163:5,10,13
169:24 172:23
177:7 178:10
183:2
**arguing**  172:15
**argument**  149:11
164:2,8 171:18
174:23 179:6,7,8
179:17 185:24

186:7,20
**arguments**  163:7
179:6 181:9 187:2
187:3
**arranged**  30:11
35:6 37:20 40:17
103:19,21,25
104:2,7,8,14
112:25
**arrangements**
31:22,22
**arrival**  109:9,16
109:19 110:8
**arrived**  137:13
**asked**  9:19 36:12
46:10 85:18
106:24 127:1
128:8 151:5,8
159:25 161:7
**asking**  10:23 46:9
47:6,8 87:20
97:12 100:10
102:5 107:4,10,17
136:22 150:3
157:16 160:18
161:5,13 167:21
177:5 182:22,23
183:3,8,12
**asks**  151:14
**asserting**  178:7
**assess**  174:22
**assessment**  49:25
**asset**  33:2,3,4,10
**assigned**  118:5
**assigning**  27:11
**assist**  144:1
**assisted**  154:10
**assists**  80:1
**associated**  50:16
176:9

**[assume - beholder]**

**assume** 29:6
165:12 188:12
189:14
**assuming** 114:8
**assumption** 61:2,4
151:13
**assure** 128:1
**asymmetry** 30:1
**atm** 59:22
**attached** 1:16
197:3
**attempts** 6:10
**attend** 56:7
**attending** 176:9
**attention** 12:20
21:5
**attorney** 95:15,20
157:7,12 159:7
**attorneys** 50:14
197:8
**august** 16:6 39:2
68:6
**authenticated**
155:17
**authentication**
167:11
**authenticity**
166:20
**authorized** 40:11
**auto** 188:1
**automatically**
61:1 104:19
137:15 141:13
**autonomy** 86:5
**availability**
187:21,22
**available** 129:13
133:23 190:20
192:12
**avenue** 2:8

**average** 16:9 25:5
**avoid** 128:6
**award** 21:19
**aware** 28:25 46:25
49:2 125:11 129:3
188:1

**b**

**b** 49:12 87:19
123:22 154:7
**back** 7:12 8:4 18:5
18:8 20:24 23:10
28:4,13,19 39:7
41:18 42:9,12,12
44:2 46:8,13 47:7
51:23 58:5 61:7
65:10 68:6 89:7
101:22 109:11
117:14 121:6,13
122:4 129:20
130:22 133:11
149:10 151:19
160:14 163:5
165:14,15,19
167:2 168:17
173:1 174:3 176:3
182:24 191:25
193:7
**background** 41:24
**backing** 83:23
**backup** 102:10
**badly** 194:5
**bag** 167:15
**balance** 135:21
143:6
**ballgame** 54:15
**bank** 135:18,22
136:11
**banned** 125:24
**bare** 60:9
**barysas** 1:1 4:8
8:10 9:4,14 14:21

14:21,22,24 15:14
15:23 16:4 17:8
17:20 18:6,11
19:2,11,16 20:14
22:5 23:5 25:4,9
25:14 26:21,22,25
27:9 29:4,10,12,14
30:2,4 31:21 32:8
32:17,20 33:12,25
34:9,13,17 35:1,12
35:18 36:20 37:13
37:17 38:11 41:4
42:15 43:17 46:6
46:8 54:13 55:9
55:18 61:12,22
64:1,2,18 65:11,14
65:22 66:2,6,13,19
67:16,25 68:1,17
70:19,22 74:22
76:6,23 77:23
81:6 83:20 85:3
88:22 91:10 97:25
98:12 139:16
140:1 143:15
145:9 148:17
154:5,5 157:21
161:3,14 170:8
171:20 174:9
175:4,18 177:2
196:2
**base** 20:10 34:18
47:11 97:13 105:7
105:9,10,17,21,24
106:1,5,13,14,17
107:18,21 120:1,7
120:11,15,18
123:8 140:24,25
**baseball** 79:10
92:8,13 100:18,22
110:21,22

**based** 5:6 15:18
20:13 48:25 52:5
68:20 70:5,5,5,6
80:1,10 106:7,9,11
119:20 120:7
121:1,5,21,23
123:10 145:1,1,4
170:20 171:25
**basic** 32:18 63:24
122:5 133:12
**basically** 5:6
**basis** 33:23 127:14
135:16 148:25
151:1
**bat** 100:22
**bates** 98:12
**bear** 42:21
**bearing** 162:4
**bears** 71:11,15
**beat** 181:24
**beating** 178:1
**beauty** 10:22
**bed** 109:13,14
160:23,24,24
**bedrock** 54:4
57:16
**began** 55:7 65:11
**begging** 125:17
**beginning** 31:18
41:7 52:16 84:20
98:10 177:1
**behalf** 15:12 51:17
51:19 85:22 96:4
136:10 144:6
161:13
**behave** 63:22
**behaving** 63:23
**behavior** 70:4,17
162:12
**beholder** 10:23

Veritext Legal Solutions
346-293-7000

[belabor - calculate]

**belabor**  74:20
76:11
**belief**  46:22
179:16
**beliefs**  13:15 80:10
**believe**  9:13 24:6
25:16,16 26:10
34:11,15 38:12
40:24 42:7 51:10
61:12 85:7,13,22
86:1,9,13 87:18
92:23 96:25 97:3
112:3 113:18,19
114:1 128:20
129:6 133:5
136:20 138:19
139:9 145:21
164:9 167:18
177:5 179:19
190:15
**believed**  124:15
**bell**  176:1
**ben**  2:7 4:15 151:4
**bench**  10:7
**beneficial**  81:4
**benefit**  48:23
78:11 135:19,23
136:11 139:21
**benjamin**  2:12
**best**  8:5 9:5,15
12:16 14:5 109:5
**better**  23:2 126:8
126:19 158:17
183:7 188:17
191:7 192:17
**beyond**  77:19
137:14
**bias**  10:19 81:13
**biased**  80:5,9
**big**  11:9 52:11
160:21 175:21

177:20 181:22
191:6
**bigger**  139:17
**biggest**  174:13,19
**bike**  65:2
**billed**  49:21
**billion**  32:15 33:18
37:23
**binder**  100:5
**bireley**  2:7
**bit**  18:5 26:15
41:23 54:20 59:1
62:8,21 75:21
111:9 116:17
139:11,12 184:8
**black**  56:15,16
64:23 68:22 71:4
138:4,6,12,21
139:3
**blame**  18:22
**blind**  48:19 122:21
**blindsided**  155:1
177:18
**blow**  17:5 169:5
**blown**  164:15
**blue**  69:11
**bogus**  176:9
**boil**  57:16
**bones**  60:9
**book**  35:5 68:12
87:21
**booking**  142:3,5
191:15
**booted**  14:8
**borders**  82:17
**boss**  17:7,12,21
19:19 26:23 53:19
54:5 82:7 85:4
86:8,11
**bosses**  85:10,20

**bottom**  68:22
112:3
**boxes**  69:13
**brad**  2:19 3:7 4:21
58:25 59:1,5 83:2
83:11 157:3
**brass**  180:11
**break**  51:24 82:14
82:14 127:23
129:13 148:4,6,7
157:9
**breakdown**  47:11
140:10,11
**bret**  2:4 4:5 5:16
5:21 14:18 29:12
36:24 41:2,13
126:25 156:5
189:24 192:10
**bret's**  84:19
**brick**  33:24
**brief**  22:15 32:23
33:15 72:3 172:13
172:21 188:6
**briefing**  90:20
**briefly**  178:5
**briefs**  181:6
**bring**  21:15 40:18
41:21 48:16 53:23
117:14
**bringing**  12:25
20:23 50:13
**brings**  184:16
**brochures**  17:5
**broke**  46:21
**brother**  175:21
**brought**  151:19
168:8 182:16
**bsandahl**  2:15
**build**  16:23 20:1
35:5,15 68:12

**bulletin**  48:9
**bunch**  16:22
102:18
**burden**  17:24,24
17:25 71:12,15,19
**busier**  71:1,1
**business**  24:6
32:16 33:3,4,10
35:6 55:11,12,13
55:15,19,20 56:14
56:15 61:23 63:1
63:9,12,14,15
64:12,16,21 65:7
65:23 66:5,11,13
67:4,8,25 68:3,10
68:12 69:12 74:5
76:1,2,13,23 77:2
77:7,25 117:11,13
185:14,14,14
**businesses**  56:22
65:9
**businessman**  64:2
**busy**  83:16 167:23
167:23
**button**  133:22
134:14,15 141:22
141:22
**buttons**  141:24

| c |
|---|

**c**  2:13 40:16
**c11**  5:13
**c20**  5:14
**c21**  5:14
**c22**  5:14
**c23**  5:14
**c4**  100:1
**c7**  45:15 46:23
**c8**  47:4,24
**cab**  59:22,23
**calculate**  20:12
124:7 141:17,25

[calculated - cheapest]

**calculated** 47:12
47:14 104:19,22
105:2 123:20
124:10
**calculation** 81:19
81:23 120:3,21
123:24 124:14
**calculations**
141:13
**calculus** 72:21
**calendar** 187:20
188:7 191:8
**calendars** 69:10
188:9
**california** 9:8 57:6
82:21 83:13,25
182:1 193:23
**call** 13:4 113:1
116:2 170:15
191:1
**called** 18:9 43:6
55:11 72:14 78:24
87:4,22 98:3
123:18 125:4
155:25
**calling** 184:23
**calls** 11:23 63:15
**cameron** 2:21 80:9
160:5
**campaigns** 34:3,5
**cancel** 25:25 61:10
61:14,17 62:1
68:11 121:12
**cancelations** 61:21
**canceled** 147:18
**canceling** 61:15,23
61:24
**cancellation** 25:3
25:22 26:5 27:13
34:22 36:24 49:1
139:6 145:11,14

146:14 147:1,14
**cancellations** 26:3
45:22 61:13
**cancels** 146:11
**candid** 171:2
**candor** 39:10
**capacity** 96:4
**capital** 33:13,16
**capture** 35:23
**car** 8:1 32:20,24
33:1 36:3,4,4,11
36:15 43:19,23
56:16 60:9 64:19
79:19 100:22,25
101:5,13,15,17
110:18,21,22,25
111:7 129:25
131:11 132:6
146:12,13,15
166:14,15
**card** 59:24
**cards** 64:12
**carefully** 86:7,10
**carrell** 39:4
**cars** 66:16
**cartoon** 156:10
**cartoons** 156:19
**case** 1:3 8:15
10:11 11:13 12:14
12:17 15:8,9,21
23:10 32:10 39:4
39:12,23 45:12
46:24 50:22,24
53:18 54:3 57:2,7
57:12,12 58:7,8
64:10 65:15 66:2
72:13 73:1,12,13
73:20,24 74:1,11
75:1,3,7 82:8
83:23 84:4 132:2
135:9 148:20

163:25 164:4,6
168:1 169:4,7
170:15 173:16,17
175:2,13 181:19
181:22 185:11,15
185:16 189:7
196:3
**cases** 12:18,19
15:17 57:5,13
77:13 81:2 142:9
183:16 185:13
**cash** 31:25 59:23
111:15,20,22
112:9,14,17,18
**cashless** 31:24
111:12,24 112:4
**cat's** 167:14
**catch** 27:15
**categories** 27:18
**categorizing** 42:10
**caught** 183:25
**cause** 1:11 11:22
115:14 160:14
164:1
**caused** 127:25
161:7
**causes** 27:19
176:18
**celebrated** 86:5
**cell** 76:7
**cents** 47:14 50:4,4
**certain** 10:5 20:18
25:2 36:12 45:19
55:1 57:9,25 58:3
96:6 120:24 164:5
**certainly** 16:20
18:23 29:23,24
38:5 54:24 57:11
59:19 61:14 84:12
122:3 123:24
128:3 181:14

**certificate** 196:7
196:18
**certified** 1:13
196:11 197:12
**certify** 196:12,21
197:7
**challenge** 8:9,17
9:2,11
**challenged** 19:4
**challenging**
102:25 103:3
**chance** 73:14
115:5
**chances** 177:25
181:21
**change** 34:24
44:14 47:19 108:8
108:10 130:19
**changed** 24:18
138:25 139:10
**changer** 59:21
**changes** 48:4
72:20 197:3,3
**chapter** 40:6
**charge** 34:20,23
35:16,17 36:6
114:2 145:4
**charged** 74:6
105:18 108:8
139:7 147:11,13
**chargers** 60:11
**charges** 147:1
**charging** 37:16
147:4
**chart** 32:19 68:18
**charters** 76:24
**charts** 69:10,17
**chase** 136:2,3
**chats** 14:3
**cheapest** 64:19
76:9

[cheated - communicates]

cheated  152:12
cheating  151:25
check  14:3 52:23
    53:2 62:14 115:4
    129:11 192:4
checking  51:24
chess  175:20
chicago  59:20
chief  170:15
child  42:17
choice  18:21 57:18
    64:21 68:2 82:5
    190:25
choices  56:21
    75:25 80:19
choose  8:18 36:5
chose  8:21 41:7
    60:13 66:15,23
    68:5 91:4
chronicle  165:25
    166:4,10
circuit  18:1 22:9
    22:14,17,19,20,21
    22:23,24 23:16,23
    24:1 32:13,22
    33:14 37:3 38:6
    39:3,16 57:8 72:4
    72:20 73:10,14,20
    73:21,24 74:12
    75:2,2,3,21 77:3
    78:13 79:13 81:1
circuits  22:18
circumstances
    22:23 23:21
citation  39:12
cite  32:23 75:6
cited  23:9 32:22
cities  42:3
city  37:15 42:3
    49:7,19 55:6 71:2

claim  50:15
    125:14,16 126:6
    147:7 151:11
    152:4 157:7 180:6
claimant  1:2 2:3
    15:19 17:23 22:5
    41:24,25 42:10
    48:11,24 49:2,7
    51:1,2,4,18,20
    53:12,19 54:5
    55:10,25 56:1,21
    63:13 68:18,23,25
    69:6,8,11,22 71:11
    71:17,18 72:11
    75:6,15,24 76:4,12
    76:13 78:15,16
    79:21 80:8 82:4,6
    85:3 127:25 132:5
    138:1 150:12
    154:18 173:22
    175:7 178:14
    189:17 190:4,8
    196:2 197:22
claimant's  5:12
    8:8 48:17 57:23
    76:17 78:7 80:21
    81:10,15,16 97:20
    98:11 99:24
    102:24 129:14
    132:4 139:15
    143:14 145:7
    167:4
claimants  92:20
claimed  186:15
claiming  125:8
    152:14
claims  50:13 57:23
    71:12 133:4 147:5
    155:25 178:8
clarification
    182:19

clarified  78:4
clarify  51:22
    67:11 173:25
clarifying  99:21
classification
    73:18 89:23
classified  78:15
clean  124:1
cleaned  8:4 36:3
cleaning  36:5,8
clear  39:16 66:3
    76:2 79:13 162:10
    162:11,13 173:17
    174:6 176:7
    178:15,17
clearly  12:12
    164:7 169:16
    173:14 176:10
clicks  59:17
client  8:10 58:6
    95:15,20 127:10
    150:15 151:12,16
    152:11,14 154:10
    157:7,12 158:1,6,9
    158:24 159:7
    166:18,22 173:4
    174:21 175:14
    176:19
client's  149:25
    156:17 162:17,19
    163:17 176:6
    181:12 182:21
clips  150:9
clocked  35:1
clocking  19:7,8
    21:2,2
clocks  35:2
closest  117:23
coalition  72:14
code  40:2 45:9

coffee  82:14
colleagues  9:6,15
    12:24
collect  113:24
    124:2 136:7,9
    141:7,16
collected  135:22
    142:10 171:5
collection  47:5
    67:22 136:7
column  31:11
combat  160:5
come  43:19 86:18
    129:19 131:19
    141:20 163:5
    165:14,15 166:16
    182:24 184:11
comes  13:7 15:24
    28:12 38:6 41:4
    62:3,16 103:15
    155:16 187:1
coming  4:6 102:10
    102:12,12,23
    156:11 175:18,18
    175:19 191:25
    194:21
command  20:6
    92:18,18 93:10,12
comments  56:24
commission  74:23
    143:22 144:2
committed  168:3
committing  128:3
    175:16
common  50:5
communicate
    91:25 93:20,25
    94:4
communicates
    94:8

[communication - contractor]

**communication**
47:23 52:3
**communications**
95:4
**community** 24:12
24:14,18 26:11
27:3,17
**companies** 40:7
**company** 11:22
40:14,15 57:15,19
58:8 59:2,4 65:5
66:11 67:2,21
72:22,23 133:9
159:21
**company's** 40:12
77:25 78:21
**comparative** 12:3
**compare** 28:21
**comparison** 32:19
**compel** 127:9,15
128:7,22 153:6
156:2,2,25 171:1,3
183:5 184:12
189:5
**compensability**
81:20
**compensable**
79:12,15 81:25
**compensate**
135:13 137:10
147:23
**compensated**
136:24 137:4
145:19,25 146:5,8
146:22
**compensates**
135:11
**compensation**
136:16 137:20,23
**compete** 55:9
68:17 74:23

**competed** 55:22
**complain** 128:3
158:12
**complaining** 36:2
**complaint** 143:9
189:19
**complete** 42:25
67:3 96:23 103:17
123:12 134:16
185:18
**completed** 49:14
61:12 62:2 138:6
**completely** 60:19
**completion** 196:24
197:6
**complex** 16:23
**compliance** 63:18
**complicated** 29:20
**comply** 63:1 104:9
172:19
**components** 33:1
120:21
**computer** 14:6
**computerized**
1:14
**computers** 4:25
**concede** 173:17,24
178:13
**concedes** 173:18
**conceding** 178:19
**concept** 90:18
122:5
**concepts** 75:22
**concern** 10:2
80:23 166:11,19
167:12 168:2
174:13,19 175:2
185:7 192:24
195:5
**concerned** 160:13
166:7 168:5

**concerning** 167:8
181:2,2
**concerns** 33:22
**conclude** 50:18
51:14
**concluded** 173:9
**conclusion** 81:9
**conclusions** 80:24
81:5
**conditions** 18:16
**conduct** 75:17
**conducted** 10:12
74:5
**confer** 5:25 151:4
152:22
**conference** 191:1
**conferral** 155:23
**conferred** 128:21
**confers** 151:17
**confident** 10:21
**confines** 86:2
**confirm** 53:22
**conflict** 84:21
**confounding**
180:8
**confused** 88:9,13
88:16
**connect** 58:15
59:10 64:13
187:15
**connection** 59:11
**consequence**
60:24 61:15
**consider** 193:22
**considered** 21:17
40:13 75:11
**consistent** 23:13
105:20
**consistently** 29:5
**constant** 106:5

**constantly** 20:13
70:9
**constraints** 56:8
68:14
**construct** 103:22
**constructed** 104:9
**construction** 39:4
**contact** 36:17
113:11,15,17
130:18
**contain** 67:19
**contained** 132:7
**contains** 197:3
**contemplated** 67:6
**contemplates**
66:12
**contend** 132:22
**contention** 125:12
132:18
**context** 22:8 32:3
106:4 131:24
132:13
**continuation**
31:18
**continue** 18:21
32:23 49:3 82:11
82:12 89:16 103:3
107:14,14 148:24
154:21 185:1
186:2 190:15
**continued** 184:20
187:7
**contract** 29:15
55:20 112:11
**contracting** 57:15
67:23
**contractor** 22:12
28:25 31:13,14
32:3 36:7 40:13
42:11 57:22 72:16
74:12,15 75:4

Page 9

**[contractor - customers]**

77:5 78:14 82:6
117:10 162:4
164:8 168:19,25
169:7 170:20
172:15,24 175:23
176:19 178:8
179:9
**contractor's** 57:19
**contractors** 21:23
29:1 40:10 71:23
72:1 77:14 78:11
84:11 89:24
117:12
**contractual** 55:1
**contrast** 75:6 86:6
**contrib** 11:14
**control** 17:21 20:7
21:24 22:2 24:2,5
24:7,24 26:11
29:10,11 30:2
31:6,12,16,20
34:18,19,20 35:13
35:14 36:8 42:25
49:6 51:8 54:7,9
54:17 63:14 70:14
70:20 71:6 72:5
72:23 74:3,9,20
75:14 77:21 78:17
80:18 86:15
104:22 145:2
164:9 169:3
174:24 178:22
179:17 180:5
**controlled** 31:23
34:12 36:20 43:16
44:10 75:15 119:1
119:3,19 178:20
179:18
**controlling** 35:2
172:8 175:21

**controls** 20:16
30:16 35:20 47:21
**convenient** 63:7
**conversation** 11:8
12:9 60:22 114:14
**convince** 8:9
**coordinates** 44:10
**copied** 189:3
**copy** 53:24,25
193:10 196:18
**core** 72:18 73:3
75:11,19 77:20
**corner** 140:1
**corporate** 14:20
58:24 84:2,5,8
95:22 96:8 97:11
98:20 103:24
124:19 127:3,16
150:23 151:24
155:7 186:11
187:10,25 193:23
**correct** 5:21 6:3
52:20 84:13,14
85:6,7,23 89:3,25
90:23 91:19 93:21
94:2,6,7,15 96:5
99:14 105:8 108:5
108:6,12,16
109:16,20 111:17
111:18,24 112:15
113:4,17 114:10
116:10,14,25
117:7,15,18
118:20 119:11
120:4 121:9,18
122:8,14 123:2,5
123:16,25 125:25
126:1 129:21
130:3,13,14,17,25
131:1 133:16,20
134:3,10,20

135:12,17 138:4
138:13,18,19,23
140:2 141:6
142:12,15 143:12
143:13,19 144:7
144:11,16 146:6
146:12,20,23,24
147:20 149:4,13
153:15 154:11
176:20,20
**correspond**
130:20
**corresponded**
46:8
**corridan** 2:20 4:21
58:23
**cost** 48:23 176:8
**costs** 183:11
**counsel** 58:23 85:1
92:11 96:7 97:15
99:5 126:8,20,21
126:24 127:17
129:14 148:16,23
149:2 167:4 173:2
173:3,18 174:4
186:11 193:22
197:1,7
**country** 185:13
**couple** 62:21
65:15 74:19 124:3
129:7 165:1,22,23
**course** 8:15 23:13
28:6 54:10,13
56:25 58:17 60:4
63:5 64:14 71:6
73:12,25 75:12
96:12 151:21
**courses** 28:20 29:3
**court** 5:10 10:15
13:23 15:22 23:8
23:25 52:25 62:8

62:10 101:21
102:25 127:7
156:14,21 194:17
**courtroom** 156:12
**cow** 183:23
**crazy** 62:9
**create** 26:3 111:16
151:14 160:23
**created** 65:23
66:20 132:13,14
148:15,22 149:2,3
149:21 150:5,7
165:24 166:9
167:1 169:14
**creates** 17:22
44:22 112:11
**creating** 164:21
**credibility** 15:18
152:13,14 156:18
162:17,19,20
176:22
**credible** 174:11
**credit** 59:24
**crew** 156:3
**critical** 8:16 12:19
16:12 40:19 175:1
**cross** 87:20 126:10
127:4 182:4,18
**crucial** 170:13
**csr** 197:16,16
**cunningham**
160:6
**current** 94:21
**currently** 8:20
86:20
**curtain** 177:21
**customer** 27:10,12
91:12 147:17,18
**customers** 66:9,13
74:6

Veritext Legal Solutions
346-293-7000

[cuts - delay]

**cuts**  162:16

**d**

**d**  2:12
**daily**  33:23
**dainius**  1:1 32:7
  32:17 34:13 36:2
  38:11 39:1 40:22
  41:4 43:18,22,23
  44:4,5,20 45:16
  46:13,18 47:6,24
  48:13 49:16 50:17
  51:9 86:10,13
  87:24 88:22 90:5
  91:10 92:6,13
  93:23 94:15 95:1
  95:20 96:24 97:17
  104:21 105:6,17
  106:12 107:19,25
  108:4,7,9,14
  112:13,25 113:11
  114:4 117:22
  119:11,15 120:10
  121:14 122:7
  124:12,21 125:9
  125:17,18,22
  127:18 129:24
  132:19,23 133:19
  135:11,15,17
  136:24 137:4,10
  137:19 138:3,10
  140:1 142:18
  143:2,10,18
  144:19 145:2,18
  145:24 146:18,21
  147:2 196:2
**dally**  185:5
**damages**  50:14
  51:5 81:12,19
  82:1,2 169:9
**data**  68:20 80:2
  124:21,23,25

137:7 150:8,23
  151:9,9,15,16
  152:10,15,17
  154:5 155:11,13
  155:21 156:11
  159:22,23,25
  160:1,2,20,20
  161:8 162:6
  165:10 166:12,16
  167:3,5,5,19 168:4
  168:9 170:1,4,21
  171:5,5,8,9,21
  172:4,5,8 173:15
  173:25 175:15,17
  176:6 177:14
  180:7,10 181:11
  182:24 183:13
  186:12 188:3
**databases**  141:24
**date**  190:2 197:2
**dated**  140:2
**dates**  94:22 187:14
  191:3 192:11
**daughter**  8:25
  11:8 191:5,7,21
**day**  1:7,10,11 4:9
  19:18 20:23 21:19
  27:12 31:2 42:16
  44:4,6 45:5 53:3
  69:13 83:17 89:19
  106:13 107:19
  111:22 120:10
  127:21 136:14
  144:5 156:1,2
  171:10 186:3
  188:13 189:1
  190:6 196:8,14
  197:12
**days**  58:18 62:21
  69:21 74:13
  167:24,24 184:10

185:17 186:2
  190:13,14,16
  192:14 197:1,1
**db**  55:11,14,17
  56:14 61:23 64:5
  64:11 65:1 66:19
  76:22
**deactivate**  63:22
  128:4 163:25
  164:1,3 173:19
  174:20,21 179:14
**deactivated**  25:7,7
  25:13 26:8 28:3
  28:18 35:10 49:4
  61:23,24 125:25
  128:15
**deactivates**  63:21
**deactivation**  24:11
  24:17,19 28:17
  29:2 48:25 61:7
  61:21 94:13
**deadline**  187:11
**deadlines**  185:19
  194:11
**deal**  112:25
  177:20
**dealing**  159:20
  183:22
**deals**  103:22
**dealt**  155:5
**dearth**  32:12
**deborah**  2:18
**debra**  4:18
**december**  149:9
  151:3 169:14
**decide**  17:16 69:7
  69:23 81:21
  120:23 174:10
  185:16
**decided**  69:18,19
  71:21 125:18

168:1 193:16
**decides**  35:11,21
  120:22 121:8
  144:20 156:3
**deciding**  26:12
**decision**  7:9 29:8
  30:10,11 39:9
  46:10,15,16 69:11
  76:15 81:5 104:25
  105:1 106:6
  118:18 123:1
  137:9 142:8,23
  144:15 145:4,6
  159:17 161:12
  173:23 179:2
  182:16
**decisions**  31:19
  75:24 76:1,14,24
**decline**  29:5 74:16
  90:10 121:11
**decrease**  71:5
**decreased**  105:25
**dedicated**  40:2
  49:9
**default**  105:9
  120:5
**define**  42:22
**defined**  147:14
**defines**  66:8
**definitely**  36:20
  69:8
**definitional**
  145:15
**definitions**  18:11
  103:20
**degree**  24:2 34:8
  39:14 72:5,23
  73:6 75:14 180:4
**delay**  160:16
  174:6 175:12
  176:7 183:3,8

Veritext Legal Solutions
346-293-7000

[delayed - discussed]

delayed  174:7
delaying  183:2,3
delays  8:6
deliver  43:14
delivered  196:16
deliveries  74:7
delivers  43:25
delivery  73:23
74:21
demand  20:19,20
105:12,22 106:8
120:6 121:1,2,5
130:7 150:22
demands  106:10
demonstrate  23:5
37:21 68:7,15
75:14
demonstrated
38:11
demonstrating
54:5
demonstrative
6:14,19,25 68:20
180:12,13
demonstratives
6:22
denied  36:13
127:16 169:1
deny  123:1
denying  26:12
174:22
department  72:12
72:17 75:12 77:16
78:4
depend  77:6
dependence  23:6
51:8
dependency  50:23
depending  22:22
74:25 119:9

depends  26:22
118:16
depo  155:8
deponent  196:22
196:23 197:5
depose  186:11
187:10,25 188:3
189:22 190:11
deposition  95:9
96:1,11,23,25
187:6 193:1
196:24 197:6
depositions  89:22
90:2 105:14 190:8
depreciating  33:2
33:3
depth  39:14 54:24
describe  153:25
172:17
described  59:18
describes  79:16
description  30:24
design  58:12
designated  84:1,5
84:7 161:24
designating  79:22
designed  58:9 63:1
63:9
desire  5:5
desires  77:9
despite  60:22
125:17 146:25
147:22 166:3
destination  20:5
43:12 44:1,18
48:21
detail  69:25
137:22 146:7
154:1,2
detected  54:22

determinants
34:12
determination
144:23,24
determinations
57:4
determine  65:25
66:22,24 81:24
determined  26:6
27:9 34:9 71:25
74:24,24 75:25
determines  123:14
determining  106:4
develop  68:10
76:19 179:21
device  124:4,6
141:8,11
dictated  55:1
130:1,3,4
difference  37:14
118:11,12 119:10
119:18,19 138:9
138:12,14
different  7:17,18
9:9 10:25 11:2
12:5,12 15:16
22:22,22 25:14,15
29:22,23 39:22
42:3 43:20 45:13
50:19 53:8 57:9
75:21 93:19
107:18 111:6
126:23 133:15
186:20
differentiate  22:11
differently  10:22
104:1,5
difficult  161:11
digital  40:12 58:13
62:20,23

digitally  40:17
diligently  193:2
dilly  185:5
dime  175:25
dire  13:14
direct  65:23 66:21
67:4
directed  99:11
directing  48:15
direction  47:18
174:4
directly  44:6
68:17 85:11,21
130:19 135:21
disagree  89:2
96:18 111:4
158:25
disagreement  20:9
discern  166:16
disclosed  48:17
128:18
discount  142:19
142:22,23,23
143:5
discounts  142:14
143:11
discovery  149:10
163:6 164:13
184:2 188:4 195:1
discretion  23:23
46:5,19 47:17
61:10,14 67:3
142:24 173:25
discrimination
27:21
discuss  7:21 12:22
165:15
discussed  5:25
13:25 48:9 50:18
88:12 99:5 148:13
149:17 152:8

[discussing - drivers]

**discussing**  47:25
148:15 181:18
**discussion**  16:3
89:15 90:11,17
182:8
**disingenuous**
153:11
**dispatcher**  19:20
**display**  142:2
**dispute**  5:24 84:10
164:3 173:20,21
**disregard**  71:18
79:24
**disregarding**
52:13
**distance**  20:12
30:8 36:23 47:12
47:16 108:8,10
120:2,12,15
121:21 123:10,11
123:15,20,22,23
123:23 124:7
141:3,4,17
**distinction**  21:10
22:1 40:19
**distinctions**  25:19
**distinguish**  21:11
**distraction**  54:20
61:22
**district**  72:14
156:14
**document**  18:13
18:15 150:4,7
153:3 174:14,15
177:13 187:23
**documentary**
23:18 126:5
**documentation**
186:19
**documented**  40:23
137:20

**documents**  26:19
48:6,10 95:5 96:7
126:7 127:1 148:3
153:2 158:13
163:16,21 164:19
164:21 168:15,21
169:12 177:11
185:20 186:12,15
186:20 187:5
193:1
**doing**  11:1 28:7,11
28:15 46:21 56:11
70:12 79:10 83:15
88:1,2,25 92:7,21
92:24 114:21
115:13 120:12
125:25 131:15
163:20 174:12
175:24 177:22
183:9 194:6,6
**dol**  75:22 77:18
78:12
**dollar**  32:15 33:18
37:23 107:21
118:6,8,12,12
119:24,25 144:23
145:4
**dollars**  171:23
**don**  2:17 4:16
58:21
**door**  79:2 168:22
169:16 174:15
179:22 180:1
186:18
**dooring**  7:12
**doors**  170:18
**dots**  187:15
**double**  53:2
191:15
**doubt**  15:21

**downtown**  60:1
**dr**  49:12 50:1,10
80:9 81:12,22
160:11
**draw**  21:4
**drive**  12:18 35:8
37:10 38:14 44:6
44:14 45:2 54:10
54:11,11 71:3
76:20 80:18 91:13
91:24 92:15 93:8
100:15,19,20,22
100:23 101:9,13
101:17 105:5
108:20,21 110:18
111:1 120:17
129:25 134:3
147:19
**driven**  16:21
27:23 42:7,14,18
49:18
**driver**  16:20 17:2
17:7,15 19:2
20:25 24:11 25:22
25:23 26:12,13
27:5 28:17 30:15
30:17 33:19,22
35:4,7 36:10 37:7
37:24 40:11,16
43:2,3,6,8,10,11
43:12,13,25 47:19
47:19,20,20 48:5
48:13 54:6 55:8
55:24 56:3,22
59:12,23 60:12,15
60:15,17,19,21,24
60:24,25 61:1,5,9
61:10 62:1,2,4,15
62:16,16,17 63:23
64:18 65:11,13,18
65:23 66:1,4,10,20

67:20 68:1,6
69:12 72:1 74:13
74:16 75:8 76:15
78:9 87:24 89:10
90:5,9,9,22,24
91:2,6,7 92:6,22
94:10,13 102:7,8
104:21 105:17
109:6 110:13
113:1 114:2
116:19 118:19,19
121:9 122:18,25
124:8,9,13 129:21
130:20 131:8,9,14
131:15 133:15,18
134:11,14,15,16
134:20,21,22
135:2,11 136:8,10
136:12,12,13
138:17 141:10,12
141:14,15,21,23
152:6,8 169:25
172:19 173:20
175:8 178:14
**driver's**  26:7
27:11 35:3 37:7,9
124:3 141:8
**drivers**  17:22
18:19 20:14,20
21:22 24:7,19
25:4,10 26:2
38:19 40:9 42:21
51:8 59:10 62:22
62:24 63:3,11,24
65:12 66:4,8,15,22
67:4 70:12,13,13
71:22,25 74:2,4,4
74:10,21 75:7
76:25 78:8,10
80:13,18 84:10
85:11,20 86:7,10

[drivers - event]

86:13 88:21 89:23
91:22 92:1 93:20
94:9 97:22 98:18
98:21 99:2,11,12
100:13 103:8
104:13 116:9
121:2 134:6
135:13,19,21,23
135:24 136:21
137:12,16 142:7
170:5,6 181:23
**drives**   12:18 44:24
105:6 152:7
**driving**   18:7 38:3
38:4 50:16 54:14
65:3,4 70:9 76:21
79:6,17 92:14
106:13
**drop**   44:2 46:2,7
100:21
**dropping**   42:17
**drove**   16:9 42:1,2
49:7,9 56:15 65:3
94:15 138:4
**dsk**   65:5
**dual**   33:10 38:15
38:16
**due**   179:16 195:6
**duly**   83:3
**dynamic**   105:11
105:21 120:7

**e**

**e**   2:10,15 34:4 52:3
52:8,22 59:5
143:10 151:4
157:10,13 187:16
**earlier**   29:19 45:9
47:2 48:9 50:20
52:5 53:1 84:22
100:11 113:2
120:6,16 121:3

145:17 159:4
**early**   8:22 52:6
54:12 84:21
**earn**   80:19 118:25
122:8
**earning**   71:7
**earnings**   81:15,17
**easier**   5:8
**easily**   129:8
**eastern**   72:13
**easy**   183:8
**echo**   41:6 80:17
**economic**   22:10,16
22:25 23:6 37:3
50:15 51:8 75:13
81:6
**economist**   160:10
**edification**   14:3
**educated**   12:24
**effect**   94:14,16
**efficiency**   38:7
**efforts**   17:14
**either**   13:19 46:7
71:4 73:11,16
84:11 89:24
127:22 130:2
159:11 161:24
184:6,15
**electronic**   33:20
**elements**   45:4
179:8 185:9
**eligible**   46:1 56:15
**emphasize**   18:19
18:22 45:11
**employed**   197:8
**employee**   8:11 9:5
9:14 17:6 22:7,11
32:4 40:14 42:11
50:22,22 57:20
58:1 73:22 86:20
87:22 136:2 164:7

168:18 169:8,8
171:24 172:2
176:19 177:2
179:9,19
**employees**   21:23
58:11 66:14 78:6
78:10 84:11 89:24
136:4 140:22
175:23
**employer**   22:7,11
23:6 24:3 32:4
50:22 57:20 72:7
73:7,22 74:2 76:5
**employers**   38:15
38:17
**employment**   17:22
28:24 56:2 81:7
**en**   43:8
**enables**   58:14
**encounters**   18:7
**encourage**   142:14
143:11 185:23
**endeavors**   68:10
**ended**   85:5 162:14
**engage**   68:10
70:16
**engaged**   44:3,21
70:3 77:7 125:9
127:10 132:19,20
132:23 155:25
162:11
**engineered**   58:9
**engineers**   33:17
58:11 78:8,9
166:6
**ensure**   63:2,10
**enter**   44:7,8,9,11
66:10
**entered**   42:19 66:6
67:17

**entering**   65:13,21
66:18
**enters**   43:23 44:2
**entire**   155:18
**entirely**   22:24
**entitled**   63:8
174:14 181:16
188:3
**entity**   75:7 120:23
165:25 166:2,3,6
171:4 174:1
180:20,21,25
**entity's**   166:4
**entrepreneur**   64:3
**entrepreneurial**
64:4
**eric**   2:5 4:7
**error**   82:18
**especially**   61:21
**esq**   2:4,4,5,5,6,6,7
2:7,12,12,13
**essentially**   101:15
133:14
**established**   121:8
140:25 142:6
**estimate**   43:13
**estimated**   109:8
109:15,19 110:8
122:14,15,15,16
122:17 123:5
**eta**   109:8,25 110:9
**europe**   191:5,20
191:23
**evaluate**   73:3
115:6
**evaluating**   81:15
164:1
**evaluation**   82:1
**evening**   54:13
**event**   61:19 63:20
77:22

[events - facts]

**events**  27:4,15
71:1
**eventually**  91:17
**everybody**  9:11
10:22 12:16
168:17 192:3
193:10
**everyday**  86:6
**evidence**  6:11 7:12
9:14 13:16 17:25
18:3 22:6 23:16
23:18,20 24:4
30:15 34:11 40:23
48:8 54:3 63:20
65:12,20 68:7
75:15,23 77:22
81:13 82:3 86:15
98:8 108:25 126:5
133:13 151:25
155:16 156:6
166:20 168:11,14
169:16 173:11
177:19 188:2
**evolved**  29:21
**exact**  79:11 92:3
94:22,22 98:5
**exactly**  26:25
28:15 35:19 46:9
88:1 128:6 163:15
**examination**  3:8
39:13 83:4 87:20
**examine**  127:4
**examined**  152:16
**example**  28:9 30:4
47:3 69:14 79:1
81:16 93:23
109:11 113:20
124:11 138:10
144:18 146:16
**examples**  78:17,18
122:12

**exceeded**  26:6
**excellent**  83:7,9
**exception**  69:25
**excerpts**  95:10,11
97:3,10
**exchange**  52:3
67:24
**exchanged**  94:25
**exclude**  87:9
**excluded**  79:24
88:4 168:12,14
169:17
**excluding**  170:6
**excuse**  158:2
186:1
**exercise**  21:25
22:3 29:11 77:1
**exercised**  22:2
24:3 49:6 56:12
56:13 78:17 180:5
**exercises**  21:24
74:9
**exerting**  180:16
**exhibit**  45:14,14
46:23 47:4,4,24
97:20 98:12 99:22
99:22,24 139:14
139:15 143:14
145:8 158:14
**exhibits**  5:5,7,7,12
5:14 6:13,14 40:4
95:6 97:1
**exist**  37:25 150:4
150:10 167:5
170:23
**existed**  160:4
**exists**  50:23
151:16 152:6
**expect**  28:23,24
32:4 40:5 135:1
185:24

**expected**  102:1
103:9,14 108:21
**expecting**  11:2
**expenses**  37:2 50:1
50:3,6,9,11 58:4
81:17,19
**expensive**  16:23
56:15
**experience**  26:4
26:15 41:9 63:2
109:5 111:16
112:12
**experiences**  86:7
**expert**  49:11 79:20
79:25 80:4,21
152:16,17 160:4
160:12,21 161:9
167:20
**experts**  12:22 51:7
79:23 80:7,8
158:21 159:8
160:9 175:15
177:11
**expiration**  197:17
**expired**  139:8
**explain**  6:16
172:17
**explaining**  153:7
**explanations**  91:2
**explicitly**  26:2
66:9 148:14
**explore**  19:5
**express**  73:23
**expressly**  113:16
**extensively**  33:15
**extent**  32:6 57:2
65:8 71:12 105:23
106:17 113:25
**extra**  60:10 169:1
**extremely**  61:19
81:25

**eye**  10:22
**eyes**  171:9

**f**

**f**  196:22
**face**  151:18 157:4
183:24
**faceless**  20:6 30:12
30:16,24 35:18
88:21,25
**facilitate**  62:3
**facilitated**  59:12
**fact**  8:12 22:17
24:23 25:11 34:21
36:12,21 38:1
46:24 55:4 56:9
59:4 64:8 66:2
79:14 80:1 111:14
128:7 144:22
145:1 146:25
147:22 157:9
166:3,5,13 167:2,9
170:24,25 171:24
172:2 175:20
185:12 193:22
**factor**  24:2 32:6
32:14 34:7,8 37:4
38:9,9 46:4 75:13
75:22 76:3,17
77:6 164:9,12
178:22 180:22
**factors**  22:22 51:1
51:4 72:5,18,22
73:1,3,4 75:11,19
77:3,16,20,20
78:12 164:12
181:4
**facts**  10:10 12:18
17:19 25:15 26:10
26:18 31:8,16
39:22 41:11 47:1
51:11 54:4 57:1

Veritext Legal Solutions
346-293-7000

[facts - flsa]

57:16 71:9 74:1
74:10,19 80:2
**failed**  50:16
**fails**  38:24,25
57:23
**failure**  169:11
**fair**  18:2 21:8 22:7
84:9
**faith**  8:24,24 10:18
41:10
**fallen**  17:8
**falling**  25:5
**falls**  172:16
**false**  85:14,23
136:17,25
**familiar**  59:13
86:21 138:25
**family**  39:18,21
**far**  23:10 32:16
45:1 97:14 108:18
118:9 123:21
147:11 163:12
174:15 187:22
190:12 194:16
**fare**  20:10,11,12
20:16 30:7,8
34:19 35:12,14
37:25 43:13 47:2
47:11,11,16,20,24
62:2,3,18 93:24
105:8,10,11,17,21
105:24 106:1,5,14
106:17 107:19,21
108:2,5,8,10,14,15
120:1,1,2,7,11,12
120:12,15,15,15
120:18,21 121:17
121:20,21 122:7
122:14,16,17
123:5,5,8,9,10,12
123:14,24 124:14

140:10,11,24,25
141:3 143:9
145:14 147:2,14
147:15
**fares**  20:17 37:16
37:18,19,21 48:18
106:13 107:18
120:2,24
**fass**  2:8
**fast**  62:10 175:11
181:22 182:24
193:16
**fault**  12:4 39:15
82:23
**favor**  51:1,4,12
57:4 73:1 74:14
75:4 77:5,14
78:14
**fdc**  168:6
**feature**  94:1
**features**  137:12
**fee**  36:6,8,16,18,21
36:24 47:7,8,25
48:2,4 62:17
130:12 139:6
140:5 142:3,3,4,5
144:10,13,21,23
145:5,6,11,12,14
145:16 147:1,4,10
147:13,14,24
**feedback**  8:6
102:11,12,18,22
**feel**  10:15 13:13
101:10 122:23
161:2 173:10
186:13 192:17
195:16
**feels**  60:16 83:16
**fees**  34:19 47:3
50:15 142:2,9
146:14

**felt**  88:2 194:5
**fifth**  18:1 22:9,13
22:17,23,24 23:15
23:23 24:1 32:13
32:21 33:14 37:3
38:6 39:3,16 57:8
72:4,19 73:9,13,21
73:24 74:12 75:2
75:21 77:3 78:13
79:13 81:1 191:8
**fight**  174:17
**figure**  8:7 49:23
101:24
**file**  132:1,4,5,10
150:10,19 173:8
**filed**  127:15 156:1
156:2,25
**files**  127:5 150:5
151:8 156:7
**final**  20:4 43:11
45:16,17,24 46:15
46:16 104:25
105:1 120:3
123:14 142:8
**financially**  197:10
**find**  8:10 41:11
52:3 53:2 76:9
100:3 114:10
137:4 152:24
180:8 185:17
**finding**  22:6 40:21
**finds**  90:7
**fine**  53:11 60:10
90:16 111:8
191:14 194:17
**fined**  168:6,6
**finger**  152:11
**finish**  126:12,16
**fire**  170:12
**firm**  4:3,14 8:20
10:11,13 11:9

197:20
**first**  5:2 14:18,19
15:14 18:7 19:18
28:9 31:18 44:16
51:24 63:6 75:10
75:10,13 77:20
80:7 83:3,17
84:12 86:9 89:4
92:17 98:16,20
111:23 112:8
114:24 115:12,21
118:5 125:14
127:11 128:5
131:18 133:6
145:24 147:10
155:6,24 156:24
169:4,23 171:12
180:19 182:12
188:5 195:9
**fit**  67:4 68:3
157:19
**fits**  157:18
**five**  41:15,17,18
46:22 50:25 51:4
72:4 82:14,25
109:6 110:13
112:21 139:2,4
164:12
**flag**  35:8
**fleet**  66:15,15
68:11
**flexibility**  18:20
57:17 68:2 69:6,9
69:22 82:4
**flexible**  138:22
**flip**  33:11 112:7
167:16
**flipping**  157:17
**flows**  135:17,18
**flsa**  23:11 50:8,19
75:9 181:4

Page 16

[fluctuates - given]

fluctuates 106:6
focus 9:7 27:20
    32:11,13 37:4
    57:6 112:20 169:6
    169:10
focused 73:20
focuses 72:17
folks 4:6 24:21
    33:21 95:1
follow 12:17 26:24
    86:5 128:16
    170:18
following 20:5
    21:21 27:18 52:16
    189:18 190:21,25
    196:13
follows 83:3
food 26:22 175:11
    181:22
forces 105:12,22
    106:11
forcing 130:7
foregoing 196:14
foreman 1:13 4:4
    195:8 196:11
    197:16
forensic 162:6
forgot 193:18
    194:9,9
form 28:23
formality's 107:11
former 15:15
    113:11,16,17
formulating 195:1
fort 197:19
forth 173:2
fortunate 7:7
forward 9:21
    12:15 46:2,18
    82:8 150:19
    154:20,22 157:2

158:20 159:1
    174:8 175:10
    176:2,2,10 177:24
    181:20,21 184:11
    184:15 194:15
found 57:14 74:11
    74:12 75:8 167:2
    170:23
foundation 26:17
    26:18 155:17
    167:11
four 57:17 71:21
    79:2 170:17
    179:11
framework 71:10
framing 92:18
frank 102:15
frankly 16:17 23:1
    31:3 88:7
fraud 24:16,17,19
    24:20 27:20 45:11
    46:22,22 128:3
    162:18,18,18
    168:3,5 175:16
    176:14,21 177:7
    185:9
fraudulent 45:17
    45:21 54:21 70:4
    70:16 125:9
    162:12
frcp 196:21
free 54:6,7,10 55:9
    55:25 56:1,8
    68:13 79:8,13
    92:6
freed 85:9,19
freedom 18:19
    20:24 56:12,13
    57:17 68:1,8,8,9
    68:16 69:7 82:4

frequency 74:7
frequently 17:3
    70:21 75:17
friday 192:23
friend 10:4
friends 9:6
friendship 10:3
front 31:7 83:18
    94:22 151:17
frustrating 7:12
    10:24
frustration 7:14
full 83:10 114:24
    175:14 183:5,6
fun 8:12
function 37:23
further 46:16
    58:19 154:19
    181:9 195:12
    196:21 197:7,10
fuse 189:11,16
    194:13
future 34:6 113:12
    159:6

g

gain 65:13
gained 67:25
game 16:14,14,15
    59:21
games 150:22
    151:1
garcia 2:8 4:3,5
gas 30:6 33:2 50:7
gears 111:9
    139:11 148:3
general 44:4 45:5
generally 12:11
    13:7,25 14:3,5
    42:15 44:23 96:15
    154:3

generation 65:16
    68:9 76:16
genevieve 37:6
genius 16:17,18
    59:18
gentleman 39:18
    183:15
genuine 15:24
geo 123:15,18,19
    123:22 125:4,10
    126:4 127:11,12
    127:19 128:2
    129:19 130:24
    132:19,20,24
    133:4,6 151:11
    153:1,3 155:5
    156:1,4,23 159:25
    160:9 167:6
geography 25:12
geopoints 20:13
    141:5
getting 35:19
    100:23 122:3
    133:11 138:17
    141:9 178:11
    181:24 187:23
    188:10
give 10:1 12:25
    25:21 38:2 41:23
    42:8 47:15 82:24
    88:8,17 106:25
    107:1 111:20
    142:23 143:2
    162:2,2 163:3,8
    190:24
given 21:23 34:21
    74:18 105:12
    106:3 110:5
    120:25 122:12
    194:13

Page 17

[gives - guy]

**gives** 9:25 38:1
47:10 147:1
**giving** 9:12 26:23
41:12 69:4 106:24
107:1
**glean** 159:3
170:10
**global** 34:3 185:12
**go** 8:4 12:15 14:17
14:18 16:13,15
19:21 23:21 28:13
31:11 36:18 39:7
39:18,19 43:6,25
44:5,18 47:18
48:15 53:5 58:19
59:11 69:19 70:25
79:7 82:15 88:2,4
91:23 92:15 93:7
94:5 97:14 98:9
100:14,24 101:5,8
101:14,16,17,25
105:13 106:12
107:13 108:7,9,14
108:20,23 109:11
110:7 112:2 114:4
114:23 116:2
117:3,13,24 120:2
120:14,17,19
121:6 126:18
130:16,22 132:15
133:22 138:16
139:14 143:15
145:7 150:19
152:16 154:20,22
158:19 164:17
165:18 167:19
169:2 170:16,24
174:8 176:1,2,10
177:24 179:18,19
181:20,21 183:13
183:18,19,24

184:9,15 185:1
**goal** 8:8,8
**goes** 11:14,19,23
12:5 23:10 30:15
32:25 43:25 44:15
44:15 60:20
110:14 112:10
151:6,14 152:3
176:21 179:8
180:18
**going** 5:16,24 7:8
9:3,15 12:4,16,22
14:8,15,17,17,18
14:19 16:5 18:23
19:10,24,25 20:2,4
22:25 24:15 25:8
25:22 26:24 27:2
27:22 28:12,13
30:17 35:15,15,17
36:21,22 38:2,18
39:9,21,23 40:19
40:20,21 41:2,10
43:14 47:7 48:19
48:23 50:25 51:23
52:25 53:5,7
58:17 59:7 62:9
71:16 73:17 75:23
76:6,17 78:19
80:23 81:3,4
83:19 88:4,8,17
89:14,18 91:4
93:1,4,15 96:19
97:10 99:17,18
101:23 102:20
107:20 108:3,24
108:25 109:16
111:21 116:2,24
117:3,24 118:4,6
118:18,25 119:10
120:14 121:15,17
122:8 123:6 126:5

126:14 127:24
128:1,8 130:16,22
130:23 132:17
133:2,3 134:9,11
134:16 135:16
141:15 144:15,21
147:23 154:17,19
154:23,24 155:2
156:5,7,10,17,18
156:22 158:12,19
158:24 159:1,2,4,7
159:12,17 160:14
161:6,23 162:23
162:24 163:4,5,6
163:13,16,21,22
164:10,14,14
168:12 170:13,14
170:15,16,19,22
171:12 172:12
174:18 175:10,12
175:13 176:2
177:19 178:25
180:3 181:19,21
183:13,18,22,24
184:11,12,13,14
184:16,17,20
185:1,4,5,6,8,21
187:2,13 188:11
189:14,15,15,16
189:21 190:6,9
191:5,10 193:15
194:15,15,18,25
195:11,16
**gold** 183:16
**good** 4:13 8:3 9:3
14:24,25 15:1
75:3 83:5,7,22
109:23 148:4,6
156:5,16 184:24
192:3

**gotten** 34:4 146:13
146:15
**governmental**
71:25
**gps** 20:12 44:10
45:20 70:19 124:3
124:20,22,25
128:20 131:6
141:7,10,16
149:17,19 151:9
151:25 162:3,8,9
162:12 166:16
167:20 170:1,21
176:6 180:7,10
181:10,11 183:13
**grand** 47:15
**grateful** 194:2
**great** 114:14 160:8
180:16
**greater** 24:5 32:16
**greatest** 15:20
**green** 33:24
**grossly** 81:18
**groundhog** 83:16
**group** 9:7 66:6
**groups** 57:6,6
**guarantee** 9:22
**guess** 12:12
105:23 139:5
142:23 146:4
**guidance** 22:10
**guide** 16:2 18:11
18:16
**guided** 18:2 23:8
23:24 41:11
**guidelines** 24:12
24:14,18 26:11
27:3,18 28:2 29:5
**guides** 23:16 33:14
**guy** 151:24 192:11

Page 18

[h - houston]

| h | | | |
|---|---|---|---|
| **h** 4:18 | **hear** 20:8,10,17,22 | **hearsay** 80:6 | **hitting** 124:9,9 |
| **haferty** 50:24 | 24:10,12 25:1,8,13 | **heart** 9:13 17:9 | 134:15 |
| **half** 117:25 | 25:22 26:4,14,20 | 21:20 60:1 | **hobby** 44:25 |
| **hallmarks** 57:18 | 26:25 27:2,22 | **heavily** 56:14 | **hold** 31:13 63:23 |
| 57:20 | 30:18 32:14 43:19 | 78:13 | 106:21,21,21 |
| **hand** 92:11,13 | 48:13 51:7 57:24 | **help** 5:16 16:2 | 117:2 150:2,3 |
| 139:25 149:22 | 59:7 62:20 64:3 | 109:4 110:2 | 176:12,17,17 |
| 168:18 | 70:18 74:8 80:8 | 194:25 | **holds** 45:6 |
| **handed** 64:12 | 81:11 85:15 99:19 | **helpful** 148:20 | **home** 8:3 16:15 |
| **handful** 5:7 54:4 | 102:15,16,17 | **helping** 148:16 | 19:24 41:22 48:5 |
| **handle** 112:19 | 113:8 127:7 | **helps** 14:1 15:11 | 54:16 70:25 |
| 186:25 192:10 | 150:12 168:22,23 | 102:20 | 117:23,25 138:11 |
| **handled** 10:4 | 170:13 171:16 | **hereto** 1:16 | **hon** 1:3 2:23 196:3 |
| 83:25 169:5 | 182:8,15 184:6 | **heritage** 15:25 | **honest** 31:4 |
| **handouts** 10:23 | 187:2 189:4,17,18 | **hermann** 73:23 | 148:19 167:16 |
| **hands** 9:3 149:21 | 189:19,23 193:4 | **hey** 191:15 | **honor** 14:22 53:18 |
| 157:23 170:4 | **heard** 8:23,23 | **hidalgo** 2:5 | 54:2,3 56:23 82:3 |
| 176:3 | 25:16 36:7 39:1 | **hiding** 179:25 | 87:8,15 96:10 |
| **happen** 13:9 91:15 | 42:1 45:13 54:19 | 180:2 | 115:1 128:12 |
| 135:4,6 156:13 | 55:5,13 57:5 | **hiett** 2:6 4:6 | 129:15 149:14 |
| 163:5 187:6 | 68:25 69:25 73:19 | **high** 20:18 143:22 | 152:21 161:20 |
| 194:15 | 79:3 91:25 92:2 | 144:2 | 163:23 172:11 |
| **happened** 39:21 | 100:17 101:19 | **higher** 76:9 | 178:4 182:3,13 |
| 175:6 | 102:19 122:20 | 118:25 120:18,24 | 187:9 |
| **happening** 156:15 | 125:2 127:12 | 194:17 | **hop** 101:4 |
| **happens** 101:18 | 156:24 179:7 | **highlight** 48:1 | **hope** 12:22,24 |
| 103:4 123:13 | 180:19,25 184:8 | **highlighted** 67:2 | 83:15 154:20 |
| **happy** 8:2 161:22 | **hearing** 7:21 | 76:4 95:12 109:24 | 184:25 |
| 193:25 194:3 | 22:15 32:23 52:1 | **highlighting** 63:17 | **hopefully** 121:8 |
| **hard** 15:23 53:25 | 52:18 72:3 96:13 | **highlights** 46:11 | **hour** 13:21 14:17 |
| 110:24 127:6 | 127:21 128:5 | **highly** 154:25 | 45:2 165:8,14 |
| 170:22 | 151:18 154:19 | 157:22 | **hours** 16:10 17:10 |
| **hardware** 124:4 | 155:19 167:7 | **hinges** 53:18 | 49:8,18,19,22,24 |
| **hate** 11:5 31:3 | 172:13,21 173:9 | **hire** 66:23 78:22 | 57:25 74:13 165:2 |
| 191:9 | 174:7 176:10 | **hired** 66:15 | **house** 58:23 |
| **hawley** 2:5,8 4:7 | 177:8 182:23 | **hiring** 166:5 | 110:24 193:22 |
| **he'll** 4:9 59:2,3 | 184:13 185:18 | **hit** 29:19 133:22 | **houston** 2:9 37:15 |
| **head** 62:11 194:14 | 187:7 188:12 | **hits** 43:24 134:14 | 42:4,5,13 49:8,19 |
| **healing** 193:15 | 190:12 | 134:22,22 141:21 | 49:24 55:7,8 |
| | **hears** 126:3 | 141:23 | 56:18 |

**houston's** 78:21
**hub** 94:5
**hubs** 33:23,24
**human** 10:18
  158:22
**humans** 16:22
**hundred** 10:7 12:2
  134:25
**hypothetical**
  121:7

**i**

**iah** 44:25
**idea** 18:25 19:23
  20:4 27:3 70:1
  87:2 132:14 136:5
  140:16 183:7
**identify** 5:8
  145:24
**ignition** 100:25
  101:14
**illegitimate** 45:18
**imagine** 24:11
  36:6
**imbalance** 20:19
**immediate** 127:3
  189:21,25
**immediately** 44:2
  185:2,3 187:5,7
**immigrants** 15:25
**impact** 105:25
  143:7
**impacting** 61:17
**impacts** 48:5
**impedes** 152:1
**important** 18:15
  18:17 19:5,9
  21:25 22:13 23:12
  24:14,24 25:19
  27:7 28:21 29:11
  29:17 31:6 32:8
  38:18 45:10,15

46:24 47:1 98:18
98:22,23 99:12
109:20,25 162:8
162:19,20 173:10
**importantly** 9:13
  16:7 94:24
**improvement** 28:5
  28:20 29:3
**impugned** 156:18
**inappropriate**
  96:14 182:6
**inappropriately**
  63:22,23
**incentive** 143:6
**incentives** 71:2
**inclined** 6:15 13:3
  13:19
**include** 45:19,20
  50:6,14 65:17
  162:12
**included** 100:5
  151:6
**includes** 142:2
**including** 76:14
  92:7
**income** 71:7
**inconsistent** 45:18
**inconvenience**
  36:15 127:25
**inconveniencing**
  183:2
**inconvenient**
  160:17,18 161:6
  182:25,25
**incorporated** 16:5
**increase** 30:7,8
  47:20 70:24 71:5
**increased** 105:24
**incredibly** 15:23
  173:10

**independent** 21:2
  21:23 22:12 28:25
  29:1 31:13,14
  32:3 36:7,10
  40:10,13 57:14,19
  57:22 66:5,11
  67:3,22 71:23
  72:1,16 74:11,15
  75:4 77:5,14
  78:10,14 82:5
  84:11 89:24
  117:10,12 162:4
  164:8 168:19,25
  169:7 170:20
  172:15,23 175:22
  176:19 178:8
  179:9
**index** 3:1
**indicates** 66:9
**indicating** 52:1
**indicative** 38:8
**indiscernible** 27:8
  45:21 127:3
**indispensable**
  21:14
**individual** 11:17
  48:20 55:18 65:7
  67:12,14 73:7
**individuals** 58:14
  173:19
**industry** 50:5
**inefficient** 124:15
**infer** 109:22
**infinity** 64:20
**inflated** 81:18
  82:1
**inflates** 81:19
**influence** 10:8
  120:9,11,15,20
**influenced** 145:3

**inform** 144:9
**information** 30:1
  31:4,5 41:24
  43:11,15,16 81:2
  95:16 96:17,22
  123:2,3 128:15,23
  129:3 132:5
  141:19,20 150:14
  150:17,23 151:5
  152:23,25 153:7
  153:10 156:9
  160:4 161:8,22
  162:2 163:1,13
  169:13 174:25
  186:22
**inherent** 10:19
**initial** 18:16 19:19
  94:10
**initiative** 37:4
  38:4,6 55:7 72:8
  76:19 77:1
**innovation** 72:15
**input** 74:5 104:24
  105:10 108:5
  142:7
**insanity** 11:1
**insinuation** 37:12
**insisting** 172:18
**insofar** 104:25
**instance** 22:18
  124:19 125:7
  169:23
**instances** 23:13
  50:21 137:8
  145:23 168:7
**instruct** 150:18
**instructions** 82:22
**instrumental**
  34:15
**insurance** 76:10

Veritext Legal Solutions
346-293-7000

[integral - keep]

**integral** 21:13
77:25
**integrated** 73:8
77:18,23 78:2
99:7
**integration** 77:17
99:6,10
**intended** 176:10
**intention** 167:14
**interact** 18:12
**interested** 197:10
**interesting** 12:10
19:22 32:21 143:8
**interestingly** 50:8
**internal** 143:25
**internally** 143:24
**interrogatory**
153:8 154:13
156:4 161:25
**interviewed** 10:15
56:4
**interviews** 80:13
**intimidate** 183:23
**introduce** 6:10
**introduced** 58:22
**invest** 65:8
**invested** 37:23
56:14 64:19 76:7
76:8,13 180:22
**investment** 32:15
32:17,18 33:13,18
64:21 72:6
**investments** 32:7
32:19 33:12 56:19
76:5,14 180:19
**invocation** 8:22
**involve** 113:15
**involved** 36:25
74:2 127:19
132:23

**involving** 75:7
97:24
**iphone** 166:17,18
**irony** 7:9
**irrelevant** 58:1
61:22 173:24
183:14 185:22
**irs** 50:3,6,10 81:17
**issue** 69:24 77:24
93:24,24 128:24
129:1,19 130:24
151:19 152:13
162:5 166:21
167:11,12 168:18
169:7 177:6 181:1
184:9
**issued** 55:17
**issues** 112:20
115:14,18 155:5
165:22 169:6,19
171:17 173:16
179:21
**item** 36:16,21
113:21,23,25
114:3,6,16,19
115:23 116:5
**items** 45:20 48:10
48:16 49:1 51:11

**j**

**jacob** 2:18
**james** 49:12
160:10,11
**jennie** 2:19
**jeopardize** 175:13
**jives** 101:11
**job** 19:12 21:14
28:9,11 35:16
37:5 38:23
**jobs** 38:13 161:14
**joined** 90:16

**joining** 4:20
**joseph** 2:20
**judge** 4:10,11,23
5:3 6:8,12,18,21
6:24 7:6,8,13,18
7:23 8:12 9:17,24
10:3,17 11:4
12:21 13:5,6,18,22
14:2,14,23,25 15:4
15:15 16:11 19:23
20:24 21:22 23:4
24:4,10 30:14
31:2 34:11,16
37:6 39:1,10 41:2
41:14,20 51:16,21
52:9,15,20 53:4,9
53:13,23 62:7
82:10,16 83:10,18
87:17,25 88:13,15
89:13,16 90:12,20
93:3 95:17 96:18
100:7,8 101:7
102:19 103:2
106:21 107:7,8,9
107:13 110:5
115:10,16 126:3
126:13,14,16
127:6 128:9,10
129:4,8,12,16
130:25 132:18
139:20 140:24
148:2,5,9 149:1,5
149:11,15,20,24
150:2,11,17
152:20 153:13,17
153:20,22 154:2,9
154:16 155:5
157:11,25 158:4,5
158:9,22 159:2
160:21 161:10,16
161:17,18 162:16

162:17,21 163:15
164:6,24 165:6,11
165:16,18,21
167:22 168:10
169:21 170:5
171:15 172:9,10
174:13 176:1,4,12
176:17,21,23
177:4,9,22 178:1,6
178:16 179:3,24
180:23 181:5,9,23
182:5,10,20 183:9
184:5 186:5,7,14
187:18 188:6,8,14
188:15,21,24
189:2,4,24 190:2
190:14,17 191:8
191:12,15,17,18
191:22 192:1,6,13
192:15,19,24
193:6,9,21,25
194:3,9,22 195:11
195:14,18
**judges** 10:7 15:16
**judgment** 178:21
**judicial** 150:20
158:25 159:15
177:25
**judicious** 189:8
**jump** 149:19
**jumped** 154:8
**june** 140:2
**jury** 7:8 12:3
**justice** 160:16
175:11 181:22

**k**

**katherine** 2:6 4:6
**katy** 10:3
**keep** 7:11 14:7
58:3 93:3 98:19
99:2,13 107:10

[keep - lays]

177:19
**keeping** 62:14
**keerti** 143:19,24
**kelli** 2:7 4:7
**kennedy** 10:3
**key** 46:4
**keys** 100:25
101:14
**kherkher** 2:4,8 4:2
4:3,3,4 7:6,16,23
9:18 10:17 12:21
13:2,10 14:13,16
15:3 25:17 149:25
150:2,13 154:23
158:19 161:17
163:14,15 175:3,9
176:21,25 177:9
177:19 181:16
182:5,6,10,14
183:21 186:5,9
187:24 191:4,14
191:16,20,24
192:8,17 195:2,13
195:18
**kherkhergarcia.c...**
2:10
**kidding** 11:19,21
**kiddo** 111:20
**kim** 4:13 58:19
**kimberly** 2:12
196:17
**kind** 16:2 54:19,24
56:24 57:5 60:13
60:22 61:2 67:10
67:13 68:15 69:10
70:1,10 83:16,20
84:22 88:1 96:13
100:23 120:6
122:4 128:9
133:11 148:21
149:18,19 154:8

159:15 169:10
182:8 184:16
189:12,13,19
**knew** 29:14 30:2,3
49:2 64:15 71:17
82:20 88:1 160:3
180:1
**know** 5:4 7:9,10
7:12,16,25 8:3,6,7
8:7,19,21 10:4,5
10:13,17,19,20,25
11:24 12:21,23
15:8,11,17 16:3,22
17:5 23:1,7,22
26:18 27:23 29:21
30:12,17 31:13
33:21 36:10 37:1
39:8,8,17,22 40:4
41:8,8,9 42:21
43:13 44:25 48:22
56:25 58:21 59:19
62:8 63:13 69:3
70:10 71:13,20
73:25 74:2 79:4
82:22 83:15 84:4
84:6 86:18 89:17
91:2 92:3,17
94:16,23 95:22
97:9 104:15 108:1
111:20 113:24
117:15,19,20
119:3 121:14,20
122:9,12 123:6,7,8
123:9,17,24 126:7
127:14 129:2,10
130:9,10 131:16
131:20,21 132:10
135:6,7 136:4
137:1,6,17,21
138:11,24 139:1,4
139:8,9 140:13,15

140:20 143:2
144:20 148:3
153:2 155:6,13,14
155:15,20,22
156:11 158:12,12
158:15 159:22
161:6,6,22 163:4
163:11,12 164:4,6
164:18,19,20
165:14 166:8
167:22 168:9
169:15,15 170:11
170:16,25 174:16
174:24 175:17
177:12,13 178:2
178:22 179:10,20
180:4 181:5 182:1
182:7,9 183:18
184:11 185:5,6,8
185:21,22,25
186:9,21,25 189:5
189:6 190:8,9,10
190:18 192:20
193:12 194:11,14
194:16 195:14,15
**knowing** 42:10
48:19 151:20
**knowledge** 97:13
174:2
**known** 31:1,15
42:20 195:19
**knows** 10:11 44:11
59:1 94:24 121:22
122:7 123:11
**kristen** 2:5
**kroger** 28:10,14

**l**

**labeled** 98:12
125:10
**labor** 18:2 21:8
22:8 72:12,17

75:12 77:16 78:4
84:9
**lack** 32:13 74:20
99:6
**land** 30:19 87:4,5
87:22
**language** 101:11
**large** 140:21
**late** 11:6 38:23
54:12 82:22
110:15,16 167:12
**laughing** 178:23
**laundry** 46:23
**law** 4:3,14 10:10
11:9,10,24 12:5,6
12:11,17,18,18,19
12:20,22 13:8
22:14 27:23 32:13
32:22 39:12 40:1
41:8,11 50:19
51:11 57:1,7,8
63:16,16,19 73:12
73:20 75:3,7
78:18,21 79:13
156:21 160:7
167:19 170:18
171:22 172:19
183:25
**laws** 57:9
**lawsuit** 150:20
**lawyer** 9:1 150:6
156:5 172:4
**lawyers** 4:4
149:21 150:19
174:17 184:24
191:9
**lay** 171:8
**layers** 85:10,20
**laying** 109:13,14
**lays** 85:12,21

Page 22

[lead - look]

| | | | |
|---|---|---|---|
| **lead**  20:5 27:5 | **limitation**  41:1 | 117:13,24 120:11 | 122:11 |
| 65:16 68:9 76:16 | 54:20 55:3 172:1 | 155:18 157:23 | **logged**  19:12,17 |
| 118:22 119:4 | **limitations**  70:7 | 180:14 | 29:7,9 42:19 49:8 |
| 121:10 | 94:18,19 | **literature**  17:4 | 54:8,8 60:17 61:2 |
| **learn**  28:14 40:9 | **limited**  25:11,12 | **lithuania**  41:25 | 61:8 68:19 69:15 |
| **learned**  30:20 | 25:12 40:22 46:5 | 54:16 | 69:19 86:14 91:10 |
| 125:7 | 54:21,25 136:7 | **litigation**  84:7 | 101:1 103:7 |
| **learning**  180:24 | 152:4,9,25 169:24 | 97:24 131:24 | 109:13 116:20 |
| **learns**  130:17 | 170:3 172:7,7 | 132:13 167:1 | 122:13 129:24 |
| **leather**  60:7 | 178:19 | **litigator**  156:14 | 133:15 |
| **leave**  13:1 52:6 | **limiting**  171:19 | **little**  8:25 11:5 | **logging**  172:6 |
| 191:24 | **limo**  37:12,13,14 | 13:13 18:5 41:23 | **logistics**  65:5 |
| **lecture**  22:25 | 55:14 56:17 64:3 | 45:12 50:4 62:8 | **logs**  19:2,2 60:15 |
| **led**  55:2 | 64:9,14,22 65:1 | 69:24 75:21 77:9 | 60:16 107:19 |
| **leeway**  88:8,17 | **limousine**  66:5 | 82:23 88:5 111:9 | 116:19 117:22 |
| **left**  31:8 157:18 | **lindsey**  2:21 80:9 | 116:17 139:11,12 | **long**  15:24 44:22 |
| **legal**  71:10 78:25 | 160:5 | 156:19 166:14,15 | 45:2 65:25 66:24 |
| 80:24 81:5,8 | **line**  5:23,23 15:24 | 178:2 | 70:20 75:17 77:7 |
| 87:19 197:17 | 30:15 44:12,14 | **littler**  2:13 4:14,16 | 127:23 129:4 |
| **length**  58:18 77:10 | 45:22 49:15 69:13 | 8:19 10:11,12 | 133:9 159:20 |
| **lengthy**  157:10 | 69:19 87:9,14 | **littler.com**  2:15 | 164:11 165:2 |
| **level**  180:15 | 91:22,23 92:15 | **live**  87:1 | 184:19 |
| **liable**  58:4 | 93:8 96:14 99:18 | **lived**  15:8 | **longer**  45:2,25 |
| **liberal**  23:24 | 100:13,14 101:8 | **livery**  56:18 67:16 | 79:22 125:19 |
| **liberally**  23:11,12 | 101:16,25 102:1,8 | 70:12 | 126:1 |
| **license**  37:8,9,13 | 103:7 108:20 | **living**  59:20 | **look**  9:19,19 14:5 |
| 37:13,15 55:14 | 109:23 112:4 | 175:11 | 22:13,18,19,20 |
| 56:17 64:3,10,22 | 121:2 133:21,22 | **llc**  55:12,18 65:2 | 42:9,12 50:2 51:5 |
| 65:1 66:5 | 153:4 | 66:7 | 52:17 70:17 71:10 |
| **licensed**  64:14 | **lines**  92:2 109:3 | **lobbied**  171:23 | 72:4,24 73:4,4,22 |
| 80:25 | **lingo**  25:21 | **lobbying**  17:13 | 77:19 82:8 90:15 |
| **lie**  160:24 | **liquidated**  50:14 | **locate**  173:11 | 97:19 100:2 133:1 |
| **lieu**  115:14 | **list**  5:17,19 27:10 | **located**  140:15,17 | 137:21 139:16 |
| **life**  8:24 127:11 | 46:23 48:9 155:19 | **location**  43:9 | 145:10 152:4 |
| 157:5 159:22 | **listed**  76:10 | 45:21 49:5 70:20 | 158:6,17,21 |
| 180:25 | **listen**  106:22 | 126:22 130:20 | 161:10 163:4,9 |
| **light**  33:24 | 157:2 | 137:14 146:18 | 165:20 167:21 |
| **likes**  22:19 26:14 | **listing**  91:12 | **log**  19:6,7 20:24 | 172:4 174:2 |
| **liminary**  21:12 | **literally**  20:5 37:9 | 20:25 40:11 42:23 | 177:20 184:17 |
| **limit**  25:1 26:6 | 90:12 91:11 93:7 | 61:7 69:14 86:14 | 188:8 190:11 |
| 40:16 164:4,14 | 103:12 109:12 | 91:16 116:23 | |

Page 23

[looked - mean]

**looked**  8:25 33:14 132:4 168:20 186:23
**looking**  5:22 14:6 22:15 23:3 72:21 141:14 177:10 192:2
**looks**  77:16 139:23 143:18
**loops**  70:11
**lose**  56:19 114:15 116:10,13
**losing**  27:5 156:15
**loss**  34:10 35:13 36:19 50:15 72:6 72:25 74:25 75:20 76:1 77:21
**losses**  34:13 35:3 36:1 56:20
**lost**  15:18 36:16,21 36:22 113:21,22 113:25 114:6,19 115:23 116:4
**lot**  9:10 19:17 30:20 31:5 44:9 44:10,11,13 49:10 50:19 54:7,8 56:1 60:5 69:20 70:13 70:23 73:25 85:16 95:3,5,5 107:5 160:2 187:17 194:14
**lots**  44:8
**love**  180:11,13
**loveland**  23:9
**lower**  110:16
**luck**  93:15
**lucrative**  44:25
**lunch**  111:21 129:13 133:2

**ly**  145:15
**lyft**  44:8 55:23 65:3 67:7 68:18 68:21,21 69:4,5 74:22 79:11 180:11
**lying**  178:1

**m**

**ma'am**  15:3
**machine**  1:15 59:24
**macleod**  2:6 3:4,8 4:5 14:17 15:7 43:1 45:9 47:1 53:7,10 56:9 59:18 82:13 83:5 87:15,18 88:9,14 88:18,19 89:21 90:12,18 93:1,5 95:18 96:21 98:16 99:23 100:2,6,10 102:14 103:5,11 107:8,10,15,17 115:10,20 126:13 126:18 127:8 129:17,18 136:3 148:2 155:4 158:3 158:8 159:19 162:16 165:19,21 169:21 171:19 176:16 178:18 179:4,24 181:13 182:20 188:6,14 188:18 189:2 190:14 192:24 194:22 195:5
**macleod's**  172:22
**magazines**  60:11
**mail**  2:10,15 52:3 52:8,22 59:5 143:10 151:4

**157:10,13 187:16**
**mails**  34:4
**maintain**  16:24 49:3
**maintained**  135:19
**maintenance**  50:7
**major**  34:12
**majority**  42:4
**maker**  142:8
**making**  81:5,9 144:22 179:7
**man**  15:23,24 155:19,25 172:6 180:6,14
**manage**  85:11,20 86:1 88:21
**management**  24:8 30:23
**manager**  28:11
**managers**  30:22 30:25 31:1
**mandated**  63:16
**mandatory**  116:13
**manipulation**  45:20 162:13
**manner**  40:14
**map**  91:12 141:14 149:18 151:8,9 156:19
**mapping**  123:15 123:18,19,22 128:20 153:1,3 155:5 159:25 160:9
**maps**  153:24
**march**  1:8,12 12:16 42:8 115:11 188:16 196:9 197:13

**markers**  56:2
**market**  105:11,22 106:8,11
**marketing**  34:3,5
**marketplace**  58:13 61:18 62:20 98:24 106:10
**massachusetts**  9:8 57:7
**match**  89:10 90:9 90:25,25 91:6,8,18 101:7 118:23 119:6,9,21
**matched**  91:4 116:24 121:9 130:5
**matches**  90:5,21 118:21 119:14 152:18
**matching**  129:21 151:8,9
**matter**  4:20 71:10 162:1 187:11 190:12 194:19
**matters**  8:21 14:10 84:7 183:16
**maximum**  25:3 26:6
**mcdonald**  2:7 4:7
**mcgowin**  2:20
**mean**  19:15 71:20 85:24 100:21 102:7 114:11 123:17 131:5 138:14 147:7,9 149:1 162:24 167:16 174:14 175:10,20 176:1 177:16 181:13 186:13 189:25 193:17

Page 24

[meaning - moves]

meaning 97:4
103:7 105:10
138:9
meaningful 24:5
means 10:24 70:19
78:5
measured 123:15
141:4
mediation 182:2
mediations 10:12
192:15,19
medicine 158:23
meet 5:25 20:20
28:24 35:4 71:19
151:4,17 152:22
meetings 56:8
memory 153:14
mendelson 2:13
4:14,16
mention 57:5 69:1
128:2
mentioned 57:7
62:19 64:5 68:4
68:13 80:22
merits 168:1
message 140:1
143:15,17 183:15
messages 34:2
36:2 40:20,25
47:5 94:25 124:12
132:6 139:13,22
139:23 140:18
142:17 172:3
messaging 33:20
met 15:14 86:24
94:2 128:21
method 31:21
37:19
methods 80:3,4,11
microphone 41:13

middle 30:22 31:1
112:8
midway 50:2
miers 2:12 4:12,13
4:13 5:3,12,19 6:1
6:4,12 7:4 14:23
14:24 51:21 52:12
52:18 53:4 58:20
157:10 172:11
175:5 176:4,5
178:4,7,23,25
181:10,15 182:3
182:12 183:10
184:3 187:9
188:23 190:15
192:4,15 193:4,7
193:21 194:2,7
195:3 196:17
mile 30:6 47:13,14
50:3,5 60:10
117:25 118:4
120:8,18 123:8
mileage 50:4,6
81:18
miles 47:12 49:17
50:3 141:4 147:19
militating 75:4
million 80:14
millions 171:23
mind 9:23 10:9,9
14:7 16:13 57:1
57:12 71:9 88:6
156:15 159:11
164:16 177:23
192:11
mindful 194:13
mine 10:4
minimal 74:3
minimum 25:2,2,6
51:2 58:2 63:9,12
63:25

minneapolis 2:15
minnesota 2:15
minor 36:14,14
mints 60:11
minute 15:10
82:14 120:8,18
123:8 139:2
162:22 182:6
minutes 41:15,17
41:18,22 47:14
68:25 73:23 82:25
129:7 130:9,11
137:15 138:18
139:2,4,8,9 141:20
159:10 165:2,4,5
misclassified
71:22 75:8
misclassifying
71:18
missed 52:8 84:20
missing 177:16
misstated 70:20
145:21
misstatement
172:22
misstatements
173:3,6,12
mistake 52:10,11
61:6 193:11
mistrial 150:15
181:20
mitchell 23:9
50:21
mitigated 115:19
mockery 150:21
moment 30:15
49:6 105:12
116:16
monday 189:11,12
189:19

monetary 157:16
money 36:23
80:19 111:21
113:24 114:3
118:25 130:11
135:16,22,24
136:10,11,14
143:3 169:1
monitored 86:8,10
monitoring 175:22
monroy 2:5
months 39:5,19
42:6
montreal 87:1
morning 4:13 7:25
11:7 12:10 14:24
14:25 15:1 16:3
26:16 40:6 45:10
54:12 83:5,7,13
84:18,21 90:14
115:3 117:23
148:13 194:4
195:10
mortar 33:25
motion 127:9,15
128:7,22 156:1,2
156:25 171:2
173:9 183:5
184:11,16 189:5,6
189:9,13 190:3
motions 171:1
motor 40:3
move 39:20 55:6
64:1 107:4 108:23
127:2 153:6
178:21
moved 42:4
192:20
moves 105:11,21
106:9,11 121:4

[movie - obviously]

**movie**  38:21
**movies**  92:23
**moving**  46:2
    134:17 150:15
    166:14,15 187:17
**multi**  32:15 33:18
    37:23
**multiple**  105:19
    136:14 151:17
**multiplied**  20:11
    79:21
**mute**  53:5 89:17
    89:19 102:20
**muted**  89:17
    102:11,22

**n**

**name**  4:2 17:14
    55:15 83:10
    184:23
**named**  86:21
**nap**  103:13
**napping**  101:1,3
**narrator**  98:17
**narrow**  169:10
    177:1,4
**nastiness**  36:14
**nature**  10:19
    50:23 72:22
    128:17
**nauseam**  18:15
**nearby**  60:18 90:7
    90:9
**necessarily**  101:13
    109:22 111:2
    118:14 134:5
    135:5
**necessary**  162:7
    163:24
**necessity**  85:10,19
**need**  5:16 7:21 8:7
    8:16 13:2 14:10

15:2 16:14,15
32:20 35:16 37:9
38:20 41:15 52:6
52:20,24 57:23
58:2,2,14 59:9
73:3 76:11 79:4
93:11,12 95:22
106:22 108:19,20
111:20 127:24
152:15,15,16
156:5,7 159:23
160:20 161:2,8,9,9
161:14 163:10,16
163:21 165:14
167:18 168:23
169:10,18 170:2
171:8,8,8,11
175:14,14,15
176:23 179:20
181:6 183:4 184:6
184:22 186:3
187:5 189:22
190:13 192:12
**needed**  39:20
    170:17
**needing**  36:3
**needs**  35:4 79:22
    162:5 187:6
**negative**  60:23
    61:15
**negligence**  11:16
**negotiate**  37:20,25
    112:14,16 113:12
**neither**  43:10
    183:6 197:7
**net**  48:5
**netflix**  61:3
**network**  28:1 40:7
    40:12,12 63:18
**network's**  78:20

**never**  16:20 25:11
    25:11,12 37:17
    46:20 48:17,21
    54:14,15 56:4,5,6
    56:7 61:22,24
    69:19 80:25 94:2
    146:4,11 147:16
    147:23 150:25
    151:15 156:13,19
    158:3 166:18,19
    166:24 169:1
    180:3,25 181:1
    192:11
**new**  9:9 42:3,13
    49:7,18 55:5
    73:13 180:24
    182:1 188:1,2,4
    193:14
**newer**  73:13
**news**  9:3
**nickel**  13:4
**night**  11:10 12:13
    69:16
**nineties**  8:23
**nodding**  62:11
**noise**  103:16
**non**  11:13 12:14
    46:3 74:23 81:22
**nonresponsive**
    93:2
**noon**  69:15
**normal**  28:23 32:2
    41:3
**normally**  31:14
**notary**  196:25
**note**  172:25 173:3
**noted**  187:12
**notes**  97:6
**notice**  45:16,17,24
    72:10 172:13

**noticed**  60:4
**notifications**  24:25
    25:6
**notify**  43:18
**notwithstanding**
    168:12
**now's**  148:4
**number**  24:2
    40:15 57:25 58:10
    61:13 68:24 74:18
    84:5 97:20 98:12
    114:13,15,22
    116:2 139:10,15
    143:15 145:8
    146:4,6 153:8
    166:12 168:11
**numbered**  1:11
**numbers**  5:11
    61:11 72:11
**numerous**  125:17

**o**

**o**  4:18
**o'clock**  53:1 148:6
    165:15 193:12,19
    193:24,24 194:1
**oath**  155:10
    174:10
**object**  87:8,14
    93:1 95:14 96:10
    115:2,9 148:24,25
**objection**  6:9,10
    6:18,22 87:19
    88:7 96:20 180:12
**obligated**  128:13
**obligation**  74:17
    161:4
**observers**  18:24
**obvious**  106:25
**obviously**  9:12
    10:3 17:25 19:3
    30:18 34:3 73:16

Veritext Legal Solutions
346-293-7000

[obviously - owns]

82:19 167:1
169:22 193:2,4
195:6
**occupation** 40:2
**occurred** 151:12
**october** 42:2
**offend** 12:25
**offense** 195:19
**offer** 43:2 60:20
74:16 105:24
142:19 143:6
**offered** 43:3 44:3
106:1 182:2
**officer** 15:22
**offs** 46:2,7
**oftentimes** 44:5
111:7
**oh** 10:20 11:10,15
11:18 59:24 72:13
157:11 158:8
174:5 177:19
192:1
**oil** 33:2
**okay** 4:23 6:1,8
7:3,13,20 13:6
14:2,23 52:24
53:10 83:21 84:9
85:18 88:1,8,17
89:7,21 91:21
93:19 94:8 97:16
97:19 98:7 99:1
99:16 100:10
103:5,18 104:4
107:6,18 110:4,23
112:7 114:10
116:21,22 117:21
118:2,10 119:23
122:24 124:18
126:3,19 129:12
129:22 134:7
136:16 139:20,25

140:23 143:14
146:21 147:22
149:5,20,24 150:3
150:11,15 153:14
153:22 154:9,16
156:13 162:21,21
164:24 165:6,8
168:12,22,24
169:9 171:17
174:15 182:7
184:6,7 187:1
188:8,9 189:8
192:1 193:6 194:3
194:11,21
**old** 8:1 11:11
**once** 34:25 35:1
43:3,17,23 44:1,8
51:3 62:2 78:23
91:22 100:13
101:16 135:24
136:13
**one's** 160:6
**ones** 5:9 119:4
181:7
**ongoing** 32:15
**open** 45:6 51:14
59:16 79:6,14
154:19 164:15
180:1 190:24
191:1,2 192:7,22
192:23
**opened** 168:22
169:16 174:15
179:22 186:18
**opening** 3:3,4,5,6
6:14,20,25 14:11
14:12 15:5,6
41:22 51:14,17
53:14 84:16,18,24
92:5 99:6 125:3
151:23 172:14,21

180:13
**openings** 7:22
171:11
**operate** 64:11,11
67:3 69:11 76:22
76:23 169:25
172:1
**operated** 55:11
64:16 67:8
**operates** 64:5 65:1
65:5
**operating** 76:1
77:2
**opined** 21:17
**opinion** 13:1
**opinions** 8:14 9:18
9:23,25 10:1,8
13:15 25:18 32:10
39:8
**opportunities**
34:10 56:13 65:7
70:23 71:8
**opportunity** 18:20
28:4,19 34:9
56:19,20 57:18
64:25 68:2 70:23
72:5,25 75:20
82:5 118:24 119:1
128:12 159:9
163:3,8 173:5,11
**opposed** 106:24
138:12
**opposing** 173:2
**optimistic** 11:3
**option** 38:1 136:13
**options** 172:7
**order** 19:11 38:20
49:3 52:1 62:21
76:21,22,22 159:2
159:4,8,17 162:23
181:20 189:7

**ordered** 193:1,2
**ordering** 154:17
**orders** 52:14
**ordinance** 27:24
**ordinary** 56:1
64:18
**oriented** 81:14
**original** 138:16
196:16
**oscar** 82:24
**ought** 181:17
186:11
**outcome** 81:14
197:11
**outrageous** 47:7
140:5
**outright** 79:24
**outs** 194:8
**outside** 36:23 60:1
64:14 131:24
**outstanding** 84:7
**overall** 32:16
35:14 144:20
**overlaid** 149:18
**overlap** 73:15,16
**overrule** 96:19
**overruled** 6:24
93:3 95:17 115:16
**overseas** 140:20
**overseeing** 56:10
**overstep** 52:7
**overtime** 49:21,23
49:24 51:3
**overwhelmingly**
72:25
**owe** 161:3
**owned** 55:10
166:18
**owns** 64:5 65:1,4

Page 27

**p**

**p.m.** 1:12 53:8
148:8,8 165:17,17
188:16 189:12
195:6,21
**p1** 69:1,2 79:3,5,8
81:21,21,24 91:16
92:7 134:1 147:11
180:15
**p2** 69:1,3 79:4,16
134:7 147:11
180:15
**p3** 69:1,3 79:4,18
147:24 180:15
**package** 135:5,7
**page** 3:2 50:2
108:24 109:3
112:2,4,7 114:23
197:3
**paid** 44:20 64:25
135:2,16 136:21
138:17 142:2
**panels** 9:24
**paragraph** 45:25
101:25 112:8
114:25 115:21
**paralegal** 4:16,19
58:20 149:23
150:5 166:9,10
**parameter** 160:6
**parking** 19:17
**parrot** 49:12 50:1
50:10 81:12,22
160:11,11
**parsing** 150:13
**part** 19:23 23:15
27:23 34:6 35:25
39:25 51:17 52:11
77:17 84:17,19
91:5 96:22 98:16
99:24 101:24

107:22 109:24
110:10 114:23
121:24 123:23
129:23 130:1,15
140:19 155:8
164:8 179:25
193:11
**particular** 124:19
179:21
**parties** 5:6 13:25
15:13 21:22 41:7
90:25 94:12 97:2
121:11 142:10
160:17 175:1
182:22 196:19
197:8
**partner** 4:5,15
11:8 17:2,3,7,16
17:20 19:10 98:3
98:13,24 110:11
144:1
**partners** 98:18,22
99:12
**parts** 24:5 29:17
133:12 187:17
**party** 6:10 67:5,23
165:25 166:2,3,4,6
171:4 174:1
180:20 186:19
196:23 197:6
**passed** 104:11,12
104:17 169:22
187:11
**patience** 195:17
**pause** 149:7,9
**pay** 12:19 37:1
50:17 51:2 55:16
57:23 58:2 62:5
62:15 71:3 107:21
111:15 112:9
135:21 136:1,1,4

**paying** 136:3,3
137:15
**payment** 31:22
47:3 62:4,4 65:18
67:21 105:1
112:20 113:22
114:5,18 115:22
116:4,9 136:7
137:21,25 146:7
**payments** 43:21
104:18,19,22
**payroll** 50:1
**pays** 62:17
**pc** 4:14,17
**pdf** 100:3
**pedicab** 65:2
**pedicab's** 55:15
**pedicabs** 55:12,18
56:14 61:24 64:6
64:11 65:1 66:19
76:22
**peer** 67:14,14
**pending** 81:3
**people** 10:20 36:3
36:4 39:17 58:15
64:13 70:9,12,16
79:23 82:21 90:8
101:5,12,14 111:6
111:7 113:5
117:14 135:7
140:17 143:3
160:8 164:4
172:18 192:20
**people's** 164:4
**perceive** 169:11
**percent** 12:3 47:6
48:1 134:25 140:5
143:23 144:3
**percentage** 48:3
144:11

**perception** 17:15
**perfect** 73:15
**perform** 28:20
32:24 37:5
**performance** 56:6
**performed** 78:1
**performing** 78:5
**period** 16:9 19:14
26:5 29:25 35:21
38:12 42:5,7,17,20
42:23 43:2,4,6,7
43:10,10,21 44:2
45:3,6 46:17
48:11 49:15,22
71:14 74:18 92:22
92:24 94:17,19
95:2 121:14
133:18 134:18,21
135:2,10,12,14
136:17,17,19,19
136:21,23,25,25
137:1,2,4,10,20
145:17,18,20,22
145:25 146:5,9,16
146:19,22 151:9
151:10 167:4
**periods** 36:25
42:20 49:10
133:15 135:10
146:6
**permanence** 38:10
73:6
**permanency** 39:6
39:14 72:8 77:4,6
**permanent** 46:10
**permissible** 114:6
**permitted** 35:9
117:6
**person** 10:8,14,14
33:24 35:23 36:22
39:20 56:10 94:1

Veritext Legal Solutions
346-293-7000

[person - preparing]

94:5 113:2 123:1
140:9 143:18
146:11 160:10
**person's** 138:10
**personal** 26:15
32:25 33:5,5,9,10
69:2 193:14
194:10 195:16
**personally** 12:23
**perspective** 5:4
7:5 15:16
**persuade** 8:9 9:4
9:16
**pertains** 164:12
**ph.d.** 160:10
**phone** 16:15 35:3
37:9 60:11 76:7,7
114:13,15,21
116:2 124:6
130:20 154:6
163:17,19,20
176:6 181:10,12
183:13
**phrase** 122:20
125:4 128:20
**phrasing** 75:20
78:2
**physical** 134:19
193:15,17
**pick** 19:24 44:18
46:18 54:22 79:7
79:18 91:3 117:14
130:16 134:9,11
138:11 147:19
**pickup** 110:15,16
130:19 137:14
**pickups** 46:1,7
138:22
**picture** 64:24
**piece** 45:14 162:6

**pilot** 188:1
**pings** 35:3
**pink** 68:21
**place** 30:25 37:17
63:6 70:8 78:24
149:19,19 189:7
**placed** 28:12 70:7
**places** 71:1
**placing** 170:8
**plaintiff** 177:18
**plaintiffs** 14:16
**plan** 60:2 109:19
109:25
**planning** 41:21
110:9
**plans** 109:21
**platform** 104:8,9
111:8 136:6
**play** 21:18 92:12
99:17 108:24
136:23 137:18
**played** 98:15
100:9 110:21,22
**playing** 79:10 92:8
100:18 102:11,22
150:21 151:1
175:20
**pleasant** 63:2
**please** 9:20 13:24
15:5 41:18,20
53:21 83:10 96:20
100:8 107:2,9,14
111:14 112:8
115:16,22 126:17
126:18 129:13
140:11 144:1
150:12 176:24
178:6 182:7 190:9
194:24 195:4
**plenty** 190:16

**plexiglass** 60:8
**plus** 105:6 166:22
**png** 151:8,15
**point** 19:22 20:24
22:4 28:18 51:15
109:15 114:15
115:12,12 117:2
120:1 123:21,22
124:20,23,25
130:6 148:11
153:12 154:6,7
165:22 169:3
174:5 178:10
182:10
**pointing** 152:11
**points** 124:3 131:6
138:4 141:7,10,16
149:17,19 150:1,9
166:12,16 167:3
171:21 177:8,14
**policies** 24:8,9
29:14 45:19 87:12
94:9 113:16,18
**policy** 24:11 27:6
94:14 137:18
**pool** 19:25 35:15
**poor** 26:3
**portal** 21:5,5,6,6
21:15,15
**portfolio** 99:25
**portion** 49:4 67:2
115:21
**portions** 96:24
97:10
**portray** 17:12,14
17:19
**posing** 21:22
**position** 44:14,16
82:11
**possibility** 52:4
81:24

**possible** 4:21
23:13 50:21 109:5
119:14 187:4
**possibly** 194:12
**post** 21:11,12
32:23
**potential** 24:19
43:20 73:7 118:22
119:4,15
**potentially** 43:14
**poured** 17:10
**power** 163:20
**powerpoint** 53:20
**powerpoints**
53:24
**practical** 187:8,14
**practice** 183:25
**practiced** 80:25
**pre** 5:5,9,13,15 6:6
7:21 21:11 22:15
30:11 35:6 37:20
40:17 72:3 103:19
103:21,25 104:2,7
104:8,14 112:25
172:13,21
**prejudice** 184:21
**prejudiced** 154:25
**prejudicial** 157:22
**preliminary** 21:12
56:24
**premium** 56:16
**prep** 155:9
**prepaid** 31:22
**prepare** 95:25
96:8,12,12 97:11
**prepared** 95:24
96:15 97:21 174:8
174:8 183:19
**preparing** 53:16
124:18 176:9

Veritext Legal Solutions
346-293-7000

[preponderance - published]

**preponderance**
17:24 18:3 22:6
**presence** 173:2
**present** 2:16 13:5
15:2,2 42:8 91:6
121:10 154:21,21
173:11 174:9
192:12
**presentation**
25:20 53:21 78:7
**presented** 23:17
39:24 51:5 72:11
**presenting** 82:8
**presents** 25:15
**press** 110:6
**presumably**
134:11 137:6,22
**pretty** 24:10 41:16
45:1 60:6 174:6
**preventing** 46:6
114:1,21
**prevents** 38:15
**preview** 131:7
**previous** 105:20
**previously** 66:18
89:22 90:3 129:3
**price** 35:12,14
105:25 106:8,9,11
121:4 142:2
**pricing** 70:24
120:7
**principles** 80:3,4
**printed** 139:22
**prior** 104:16
105:14 114:10
128:19
**privilege** 95:20
148:21 151:2
154:17 157:7
**privileged** 95:16

**probably** 16:13
23:2 79:22 89:19
102:25 117:17
126:8,19 138:25
148:5 165:22
**probation** 28:13
**problem** 17:18
18:25 82:16 93:24
127:9 155:4,10,11
155:16 158:16
160:3 166:17
176:16 179:24
180:4 194:5
**problematic** 128:8
**problems** 13:9
**procedures** 24:9
29:15 87:12 94:9
**proceed** 4:24 5:1
6:17 10:10 15:4
41:20 96:20 100:6
100:7 102:24
107:8 115:17
129:17
**proceeding** 79:21
158:24 159:13,16
**proceedings** 4:1
149:8 195:22
196:15
**proceeds** 51:22
**process** 88:6
183:12
**produce** 126:20
128:14,14 152:23
153:6 161:22
164:22,25 165:7
169:12 171:4
187:4,5 189:15,20
**produced** 95:5
97:1,24 115:11
124:4 127:1,2
128:13,15 151:15

153:7,10 154:18
156:20 158:4,11
159:3,5,6,8,18
162:23 164:17
165:10,13 167:7
167:17 169:12,14
**producing** 148:22
148:25 167:14
**product** 95:15
138:7 149:12
157:8,12 159:7
166:8
**production** 73:9
77:18,24 78:3
127:3 151:7
167:13
**productive** 173:1
**professional**
184:23
**professionally**
184:25
**professor** 12:25
160:5,7,8
**professors** 160:6
**proffered** 80:7,21
**profit** 34:10 36:19
47:21 72:5,25
74:25 75:20,25
77:21 118:11,13
118:15 119:11
**profitable** 76:19
76:22,23 80:20
**profits** 34:13 35:2
35:13 36:1 56:20
**profusely** 82:17
**promise** 157:15
**promotions** 71:2
**proof** 71:12
**proper** 51:2 73:17
**properly** 71:21
78:15

**proprietary** 163:1
185:24 186:6,16
186:16,21,24
**protect** 157:21
**protection** 189:6
189:13
**protective** 189:7
**proud** 15:25
**prove** 28:4 127:18
180:4,23
**provide** 40:17
42:24 44:21 48:14
55:21 56:17 58:15
60:13 64:13,23
66:7 67:5 69:18
77:11 78:16 80:9
81:3,23 109:5
119:4 133:23
136:9 142:13
143:11 148:17
151:8 154:13,14
**provided** 16:7
62:5 72:2 96:6
104:24 122:16,17
137:7,24,25,25
140:10 142:22
**provides** 22:10
65:17 118:22
**providing** 66:11
67:15 76:24 79:7
81:14 112:21
**provision** 67:19
**provisions** 1:15
23:14
**proximity** 118:5
**public** 17:1 196:25
**publications** 17:13
**published** 87:4,21
88:3,12,24 89:5
111:4

**[publishing - record]**

**publishing** 45:8
**pull** 5:17 59:16
**purported** 24:20
**purpose** 33:10
148:16
**purposes** 40:13
59:6
**pursuant** 1:15
196:21
**pursue** 70:24 71:2
**push** 170:22
**put** 12:16 27:6
28:22 31:7 70:8
148:10 173:12
184:20 190:2
**puts** 44:11 78:24
**putting** 26:22
181:19 188:4
189:11

**q**

**qualify** 21:1
**qualitative** 80:12
**quality** 27:20 28:5
28:20 29:2
**quantitative** 80:12
**quasi** 13:14
**question** 16:12,12
21:21,21 73:2
86:9 95:14 99:21
103:2,5,23 104:6
106:19,19,23,23
107:2,3,4 113:9
121:22,25 126:8
126:19 143:21
157:3 158:18
163:11 165:9
170:14 176:13,23
177:5 185:25
**questionable**
159:24

**questioning** 87:9
87:14 96:14
**questions** 33:22
51:13 128:16
150:3 160:3
168:11
**queue** 44:7,9
45:23
**quick** 95:19
116:20 127:8
166:1 184:14
**quicker** 107:5
**quickly** 16:21
42:22 184:15
194:12
**quite** 16:17 23:1
26:15 31:3 59:1
62:20 76:2 88:7
97:2
**quote** 15:22 17:16
17:21 21:13 85:9
85:19 92:3 132:24
**quoted** 22:14
**quotes** 86:18

**r**

**r** 2:12 196:17
**rain** 59:22
**raise** 128:4
**raised** 50:6 181:1
195:15
**raiser** 65:21 67:10
67:11,18
**rang** 25:9
**rare** 61:19
**rate** 26:6 49:1 50:4
50:10 61:20 81:18
120:8
**rates** 25:3,3 27:13
**rating** 25:1,5
48:25 110:17

**ratings** 25:2
**ray** 9:24 10:3
**reach** 14:4,5 43:9
173:8 191:17
**reached** 43:17
142:18
**reaching** 144:8
**read** 8:14 32:9,21
39:8 74:3 86:4
**ready** 4:24,25 5:10
41:16 82:15 91:24
92:15 93:8 100:15
100:19,20,23,24
101:8,12,14
108:20,21 110:18
111:1 129:25
134:2
**real** 59:21 85:10
85:20 95:19 127:8
155:16 168:17
**realities** 22:10,16
22:25 37:3 75:13
**reality** 28:8 34:25
53:19 81:6 108:18
**realized** 119:11
**really** 14:4 15:8
16:23 23:3 35:16
39:12,13 40:23
57:16 72:17,20
73:21 78:25 80:17
85:25 90:20 92:24
96:14,15 105:13
106:7,22 121:5
159:14 162:4,8
163:25 164:2
172:18 191:6,10
**realtime** 14:7
59:12
**reason** 13:10 19:9
61:25 77:19
144:20 170:1,22

173:23 181:25
187:24 191:16
**reasonable** 50:9
50:11
**reasons** 25:17
34:15 45:23 197:4
**rebuttal** 173:6
**rebutting** 172:22
**recall** 85:2 95:4
97:2,18 98:6 99:9
104:15 122:23
124:17,22 131:3
133:10 154:15
**recalled** 82:20
**receipt** 9:18 197:2
**receive** 45:7 46:1,3
60:17 91:23 96:23
96:24 100:14
133:19
**received** 40:24
52:1 71:6 74:23
96:22 137:19
**receives** 62:2
**recess** 41:19 83:1
148:8 165:17
167:22 182:22
184:10 195:11
**recessed** 195:22
**recite** 146:2
**reckless** 71:18
**recognize** 163:24
**recognizing** 18:8
**record** 1:16 13:24
51:23 89:15 90:11
90:17 98:11
139:16 145:8
151:23 154:24
155:3 165:19
173:4,7,12 175:14
187:12 196:15

Veritext Legal Solutions
346-293-7000

**[recorded - respect]**

**recorded**  14:12
**records**  58:3
**redo**  171:11,11
**reduced**  124:14
  145:3
**reference**  55:14
**referenced**  50:20
  56:9
**referred**  40:8
  125:3
**referring**  132:10
**refers**  63:13
**reflect**  26:11
**reflected**  31:15
  34:2
**reflecting**  13:11
**refresh**  153:13
**refreshing**  39:11
**regard**  10:2
  164:11 185:17
  186:22
**regarding**  89:23
  174:1 189:9
**regardless**  36:23
**registered**  64:6
**regs**  104:16
**regulation**  40:3
  78:19
**regulations**  78:21
  103:20 104:2,7,10
**regulatory**  78:25
**reimburse**  37:1
**reimbursement**
  58:4
**reinstated**  72:16
**reintroduce**  58:6
**reiterate**  58:22
**reject**  68:11
**rejected**  128:25
**related**  58:3 65:16
  65:19 166:2

180:21 197:8
**relation**  50:23
**relationship**  17:22
  18:17 21:1 22:7
  22:11,12 32:5
  38:10 50:24 56:2
  57:19,21,21,22
  65:24 66:21 72:9
  73:6,22 74:12
  77:4,8,10,13 81:7
  81:8
**relative**  32:7 72:6
  76:4 154:1,2
  180:19
**relevance**  168:24
  171:17 173:15
  174:19 179:10
**relevancy**  185:7,8
**relevant**  164:13
  169:19 170:22
  171:17 172:19
  175:1,25 176:7
  177:18 181:3,3,17
**reliability**  61:18
  63:10
**reliable**  38:12 80:2
  81:15
**reliably**  80:3
**relied**  155:21
**rely**  9:23 80:5,6
  161:23 168:15
  172:3,16
**relying**  178:9
**remainder**  46:17
**remaining**  45:22
**remains**  174:23
**remember**  87:3,7
  92:9 98:2 99:8
  125:5,20
**remind**  89:18

**reminded**  193:13
**reminder**  193:21
**remiss**  15:11
**remitted**  135:24
  136:12,14
**remotely**  1:10
**removed**  47:9
**reordered**  72:10
**rep**  14:20 84:8
  150:23 187:25
**repeat**  101:21,22
  119:12 148:10
**report**  49:11,13
**reported**  1:14 56:5
**reporter**  1:13
  13:23 52:25 62:8
  62:10 101:22
  102:25 127:7
  182:19 195:9
  196:11
**reporter's**  196:7
**represent**  4:8
  181:23,23
**representation**
  153:4
**representative**
  58:25 84:2,6
  95:23 96:9 97:11
  98:21 103:24
  124:20 127:4,16
  151:24 155:7
  187:10 193:23
**reproduce**  141:17
**request**  42:24
  46:14 48:12 59:17
  60:19 79:17 90:8
  90:9,10 101:4,16
  102:8 103:15,17
  109:8 110:17
  113:21 114:2,5,18
  115:22 116:3,8

130:4,7,11 131:10
  131:10 133:19
  148:15,22 149:2,3
  185:19 188:10,13
  188:25
**requested**  128:14
  128:25 153:1
  167:4 196:23
  197:5
**requests**  29:6 46:1
  60:17 68:11,12
  91:23 100:14
  102:2 103:9,14
  108:22 110:25
  151:7 187:23
  189:3 195:1,6
**require**  38:4 47:18
  62:25 70:15 104:2
  104:7
**required**  37:5 43:4
  47:9 50:9 72:8
  73:5 78:18
**requirement**  39:6
  39:14
**requirements**
  70:15 78:25
**requires**  37:7,15
  38:7 48:11 63:4,5
  71:14,17 76:20
  79:1,2
**reschedule**  184:10
**research**  80:11,11
  178:3
**researched**  11:25
**reserve**  27:16
**resolved**  158:16
**respect**  10:20 25:9
  70:7 79:20 137:18
  148:12 155:1
  158:21 177:23
  182:21,21 195:7

Veritext Legal Solutions
346-293-7000

[respected - right]

**respected** 157:1
**respectfully** 82:3
  161:13 167:21
**respectively** 27:16
**respects** 164:5
**respond** 87:16
  128:12 140:18
  157:3 161:19
  178:4 185:21
**respondent** 1:4
  2:11 4:20 58:7
  189:1,18 190:4
  195:3 196:5
  197:23
**respondent's** 5:3
  5:14 7:4
**responding** 33:22
  143:19
**responds** 47:10
  143:24 144:6
**response** 101:19
  153:8 154:13
  161:25 172:10
  184:12 185:6,20
  188:25 189:21,25
  190:4,10
**responses** 156:4
  157:8
**rest** 62:18 92:12
**restaurant** 38:22
**rested** 105:2
**resting** 79:9 81:21
  92:8 109:12
**restricted** 153:9
  175:4 178:11
**restricting** 177:12
**restriction** 151:6
  152:24 162:14
**restrictions** 170:7
**rests** 77:8

**result** 9:10 11:3
  73:17
**resulted** 125:16
**results** 11:1 81:18
  81:25 110:16
**resume** 159:11
  165:1,7
**retain** 174:20
  179:13
**retained** 81:1
  173:24
**retains** 62:18
  173:18
**return** 113:22
  114:5,18 115:23
  116:4
**returned** 113:25
  114:3 196:25
  197:2
**revenue** 118:14,15
  118:16 119:10,17
  145:3
**reverberation**
  89:14 90:14 102:9
  102:9 109:1
**review** 56:7 96:7
  97:10 124:20,24
  127:18 131:2
  140:11 146:7
  150:20 158:25
  159:9,10,15
  160:20 162:6
  175:15 177:25
  194:12
**reviewed** 46:14
  94:25 95:3,8,10,12
  97:3,15,23 98:2,4
  98:8 126:24
  130:25 132:16
  150:24 154:12,14
  155:8 158:1,9

**reviewing** 98:6
  124:11,22 157:5
**rewriting** 30:21
  87:5
**rfp** 157:8
**richmond** 2:8
**riddled** 81:13
**ride** 19:14,18,20
  20:3 34:20 35:22
  35:23 42:24 44:3
  44:21,22 48:14,22
  59:8,15,17 60:2
  62:5 69:4 79:8
  91:19 103:21
  109:14,14 113:3
  113:12 116:21
  118:6,7,8,12,12
  119:23,24,25,25
  120:1,3 121:16
  123:1,4 130:2,5
  133:19,25 134:9
  134:13,17 146:11
  146:18,21 148:1
  152:8
**ridenour** 2:17
  4:16 58:21
**rider** 16:21 19:23
  20:2 26:3 35:4,24
  36:17 37:24 38:22
  42:25 43:8,14,17
  43:18,19,22,23
  44:1,17,18 45:2
  60:13 62:3,6,16,25
  79:18,18 89:10
  90:5,8,22 91:3,13
  91:18 108:8 109:8
  109:16,18,21,24
  110:7 111:15,17
  112:9,12,18 113:2
  113:11,16,21,22
  113:25 114:2,5,13

  114:18 115:22
  116:4,24 117:23
  118:3,5,20 119:8,8
  121:9 122:11,13
  122:17 129:21
  130:10,16,19
  134:10,12,19
  135:3,6,8 136:10
  137:13 139:7
  142:2,22 143:6
  146:8,15 147:19
  173:20
**rider's** 43:9 44:1
  62:4 110:8 146:18
**riders** 20:21 43:1
  59:9 60:18 62:22
  62:24 63:3,11,21
  63:24 65:12 76:25
  107:21 111:21
  113:17 114:10
  119:8,14,14 121:2
  130:4,7,19 135:22
  136:20 137:15,24
  142:7,14,19
  143:11
**rides** 30:11 31:25
  35:7 38:21 40:17
  45:7 46:18 60:5,8
  61:5 70:4 74:16
  74:18 135:1
  166:22,22
**rideshare** 44:8
**riding** 114:13
**right** 4:24 7:21
  13:19 15:1,2
  16:11 18:22 19:15
  24:7,23 27:16
  29:10 31:11 35:7
  41:10 51:17 61:5
  62:9 65:24 66:22
  66:23 72:7 77:11

Page 33

**[right - says]**

88:19 91:1,13,15
91:20 93:9,22
94:3,10,10 95:8,17
96:1,4 99:17
100:18 104:20
105:4 108:17
109:9,17 111:12
111:13,25 112:21
117:1,10,16 119:6
119:16,18 121:10
121:13 122:9,15
122:18,19 125:14
129:20 133:5,17
138:8 139:25
140:3 141:1,9
142:6,11,25 143:4
143:20 144:3,4,6
144:17,24,25
145:12,19 146:10
146:15,19 147:2,3
147:6,12,25
150:11 152:2,15
152:22 157:18,20
160:4,12,20
164:10,22,25
165:7,18 173:18
174:21 178:1
179:14 187:14
188:9,13 190:7,20
192:1
**ring**  176:1
**rise**  81:7
**risk**  148:21
**road**  28:4 33:13
183:14,18
**rockets**  16:14
**rodeo**  84:13 155:6
**role**  18:23 21:18
124:12
**roll**  41:16

**rolled**  137:12
**room**  16:22 58:21
152:16 184:24
**rosenblatt**  30:19
86:21,24 87:10,13
88:10
**rosenthal**  2:19 3:7
4:21 26:14 37:21
40:6 58:25 59:1
83:2,9,11,12 85:13
87:11 90:16 93:5
102:14 103:6
106:22 129:5
153:14 157:3
159:12 166:23
167:15 170:14
**route**  43:8 121:23
124:5,16 131:15
**routes**  44:17
**routine**  38:7
**row**  61:1
**rudimentary**
122:4
**rule**  73:13 150:18
158:22 161:1,1
175:10 177:23
184:17 194:19,19
196:21
**ruled**  8:13 9:6
10:20 87:9 157:1
186:16
**rules**  26:23,24
30:21 46:21 63:14
78:24 85:12,21
87:5 172:17
**ruling**  154:25
179:7 190:10
**rulings**  182:16
**run**  59:22 68:2
87:11 88:2 184:19

**running**  11:11
56:22 98:19 99:2
99:13
**rush**  194:24
**rx14**  5:23
**rx15**  5:20 6:6,16
**rx16**  5:20 6:6
**rx17**  5:20 6:6
**rx18**  5:20 6:6
**rx46**  5:20 6:7
**ryan**  2:6 4:5 14:17
102:13 136:2
155:2 192:10
**ryan's**  154:23

**s**

**s**  4:18
**safe**  63:2
**safety**  27:20
**sake**  107:11
**sample**  71:23
80:15
**sanction**  184:16
**sanctions**  157:16
176:8,11 181:18
183:10,20 184:2
**sandahl**  2:12 3:6
4:15 51:21 53:5
53:13,15 54:1
62:13 85:2 87:8
92:4 95:14 96:10
99:5,20 100:1
115:1 125:3
128:10,11 129:6
129:10,15 148:9
148:12 149:4,7,13
149:16,22 150:8
150:25 151:14
152:20,21 153:16
153:19,21,24
154:4,12 156:3
157:6 158:7

161:16,20 163:23
164:22 165:3
**sandahl's**  84:24
**sangbarta**  144:6,8
**sap**  134:23
**satisfy**  39:5
**save**  13:3 157:4
159:21
**saved**  132:1
**saw**  8:25 46:23
58:9 61:11 63:17
66:18 67:4 68:3
72:9 78:6 81:11
84:19,19 97:3
129:5 131:18
153:14
**saying**  23:21 80:17
85:3 88:16 92:12
93:12 96:19
100:12 101:7
103:8 111:3 136:1
136:5 143:2
151:22,23,24
152:11 156:16
157:11
**says**  12:2 27:22
28:12,19 31:23,24
40:10,11 45:17,19
45:25 48:2 67:20
80:14 93:7 99:11
99:15 101:8,25
102:1,4,5 103:10
107:20 109:4,4,7
109:24 110:14
111:14 112:4,8,16
112:18,19,22
115:21 116:7,9,11
116:15 134:4
140:4,11 142:1,13
142:16 143:25
144:8,9,12 147:21

[says - show]

156:5 183:24
**scale**  51:3 76:9
**scare**  194:18
**scattered**  86:15
**scenario**  25:14
  110:4,23 116:1,17
  116:18,20 117:21
  118:24 119:13
  121:7
**scenes**  15:12
**schaefer**  191:8,17
**schedule**  193:11
**scheduling**  53:11
**school**  8:1,4 28:14
  42:18 160:7
  167:19,20
**screen**  53:20 60:8
  139:18
**search**  166:1
**seats**  60:7
**second**  4:9 14:20
  19:14 22:19,20,21
  25:24 32:6,14
  35:21 49:15 73:20
  75:2,3,19 80:21
  89:5 92:19 115:12
  160:25 161:18
**seconds**  19:19
  43:4 60:18 121:15
  122:5,6,25 124:3
**section**  40:2 65:22
  67:10
**sections**  97:5
**sedan**  60:7
**see**  4:7 7:8 17:2
  18:13 22:21 23:19
  30:14 32:2,4,9,19
  33:24 34:1,21
  36:1 37:5 39:20
  39:22 40:20,24
  44:14 45:17,25

46:11 47:4,24
48:1,8 49:11,15,23
53:22 59:3 62:11
64:2,24 66:8 67:1
68:24 69:9,14,17
76:6 78:2,23
84:16,23 93:11,13
97:16 100:11
101:3 102:20
103:3 109:22
110:10,11,12,19
110:20 112:3,5,16
115:4,24 124:13
124:16 133:2,4
139:18,25 140:6,9
140:12 141:15
143:1,25 149:18
152:18 158:15
160:20 163:9,20
170:2 171:8
174:24 175:24
177:20 184:9
186:1,2
**seeing**  97:18
**seek**  183:10
**seeking**  95:15
  176:8,11 179:10
  183:19
**seen**  18:18 39:11
  66:4 83:24 93:18
  126:21,21 128:7
  131:23 132:25
  133:7,8,10 139:13
  139:14 142:17,20
  157:17 163:12
  164:19 166:24
  168:4,13 169:24
  171:13
**seize**  56:13
**seizing**  65:7

**selected**  56:4
  96:24
**semi**  80:13
**send**  107:20 135:5
  157:10 189:8
**sending**  154:6
**sends**  38:19
  157:10
**sense**  5:4 13:17
**sensitive**  95:19
**sent**  9:20 46:15
  97:22 100:5
  109:16 135:6
  151:4 157:12
**sentence**  110:15
  142:1
**separate**  67:6
**september**  16:6
  18:8 39:2 42:1
  132:7
**serious**  125:14
**served**  196:18
**service**  34:19
  38:24 47:3,25
  48:2,4 56:16 59:7
  59:8,8 60:12
  64:23,23 65:2,3,6
  71:4 76:7 112:10
  112:21 117:17,19
  142:3,4,15 143:4
  143:12 144:10,13
  144:21,23 145:4,6
  145:12,16 147:4
  147:10,13,24
**services**  18:9 20:8
  27:9 29:16 55:13
  55:21 56:18 58:14
  58:16 59:9 62:23
  64:14 65:16,16,17
  65:18 66:1,7,12
  67:5,6,15,16 68:3

73:24 77:11
105:24 106:2
133:23 136:9
145:13
**set**  20:11 36:17
  37:18,19 46:23
  47:2,20 48:3
  97:20 105:7 108:3
  120:3 139:1
  140:25 144:11
  185:4,19
**sets**  20:10 74:13
  167:3
**settle**  187:22
  190:22
**settlement**  182:8
**setup**  90:13
**seven**  69:21
**shady**  153:11
**shantanu**  140:9,13
  140:15
**share**  7:23 13:19
  53:20,20 126:9
**shauna**  1:13
  196:11 197:16
**she'll**  52:17 80:9
  80:11,16
**sheet**  135:21 143:6
**shield**  177:14
**shoes**  179:1
**short**  16:18 39:20
  153:20 167:22
  184:10 189:11,16
  194:13
**shortfall**  50:12,16
**shorthand**  1:13
  196:11
**shortly**  28:1 144:5
**shoulder**  193:14
**show**  9:4 17:19
  22:5 24:4,6 26:10

Page 35

[show - soussan]

27:7 31:3 34:11
48:6 50:25 51:10
54:4 58:8 63:20
65:12,20 69:10
71:17 75:15,23,23
76:12 77:23 82:4
108:25 115:7
126:5,6 131:6
153:23,24 154:4
170:5 171:20,21
171:23,25 172:6,8
175:15 177:11
180:10,14
**showed**  45:9 71:17
126:24 127:17
131:10
**showing**  71:15
186:10
**shown**  128:24
137:7 196:19
**shows**  49:13 68:18
126:22 131:8
154:5 168:9
**shut**  154:24 155:2
159:12 169:19
**shutting**  158:23
177:8
**sic**  36:21 118:19
**side**  28:22,22 31:8
33:11 60:14,15
67:16 150:12
167:16
**sided**  62:19
**sides**  8:18
**sign**  8:3
**signal**  154:7
**signature**  196:22
196:25 197:3,15
**significant**  23:22
30:1 33:17 41:9
68:8 80:15 167:10

**significantly**  55:10
64:20
**signifying**  154:7
**silent**  18:24
**similar**  16:13 73:9
74:1,10 75:1 78:6
78:8 98:4
**similarly**  106:10
**simple**  93:6 103:6
103:23 116:20
**simplify**  67:13
**simply**  20:24 22:5
37:7,25 64:10
77:24 115:13
**simultaneous**
126:10 182:4,18
**single**  34:17,18
69:25 91:10 133:2
145:24 183:15,17
**sir**  4:11 83:5 90:23
93:17 97:7 99:8
100:8,19 101:11
101:19 105:13
110:2 111:1 116:6
116:21 119:2
125:12 126:18
131:22 136:18
139:18
**sister**  22:18
**sit**  30:22 91:17
92:23 145:23
**sits**  135:22 136:11
**sitting**  4:8 16:22
19:16 187:14
**situation**  70:15
108:18 146:10
194:10,20
**sixth**  77:15
**skherkher**  2:10
**skill**  37:4 38:4,5
48:12 72:7 73:5

76:19,20 77:1
**sleeping**  103:12
**slide**  31:17,18
**slides**  31:3,9 69:9
**slow**  62:7,11 86:4
**small**  60:9
**smartphone**  33:7
33:8,8 59:16
**smartphones**
59:13
**smile**  183:24
**smiling**  8:2
**smith**  2:19 82:18
**smoke**  36:5 170:12
**smoothly**  98:19
99:2,13
**snoozing**  110:6,23
**sociology**  160:8
**soften**  17:5
**software**  33:16
58:10 65:18 78:7
78:9 121:4 124:4
130:6 166:4,6
**soh**  2:18 4:18
**sole**  11:22 65:24
66:23 162:17
**solely**  26:8 27:10
32:24 46:5,19
47:17,17 90:22
105:2 142:5,24
176:18
**solutions**  197:17
**somebody**  9:20
13:7 59:15 89:18
**soon**  4:20 19:18
24:10 101:4 187:3
187:8 195:2
**sooner**  188:16,17
**sorry**  72:7 79:11
81:13 88:14 100:7
102:8 113:8

126:11 158:8
159:4,21 162:11
**sort**  60:2 64:18
67:11,14 70:10
90:19 114:2 117:4
128:23 130:12
132:10 190:3
**soul**  9:13
**sound**  4:25 93:10
115:14,18
**sounds**  83:22
93:12
**source**  149:15
158:13,13 163:13
163:16
**sources**  80:5
**soussan**  1:3 2:23
4:11,23 6:8,18,24
7:13,18 9:17 11:4
13:6,18 14:2,14,25
15:4 41:14,20
51:16 52:9,15,20
53:9,13,23 62:7
82:10,16 83:10,18
87:17,25 88:13,15
89:13,16 90:20
93:3 95:17 96:18
100:8 101:7
102:19 103:2
106:21 107:7,9,13
110:5 115:16
126:3,14,16 127:6
128:10 129:4,8,12
129:16 130:25
132:18 148:5,9
149:1,5,11,15,20
149:24 150:2,11
152:20 153:13,17
153:20,22 154:2,9
154:16 157:25
158:5,9 159:2

Veritext Legal Solutions
346-293-7000

[soussan - structured]

161:16,18 162:21
164:6,24 165:6,11
165:18 168:10
171:15 172:10
174:13 176:4,12
176:17,23 177:4
178:6,16 179:3
181:9 182:5 184:5
186:7,14 187:18
188:8,15,21,24
189:4 190:2,17
191:12,18,22
192:1,6,13,19
193:6,9,25 194:3,9
195:11,18 196:3
**soussan's** 139:20
**south** 2:14
**sparred** 9:24
**speak** 8:23 24:18
27:3 46:12 96:16
**speaking** 126:12
**speaks** 21:7
**special** 24:21 37:8
**specialized** 38:4,5
46:14 48:12
**specific** 22:17 50:9
74:17 96:16,16
97:4,4,9,12 98:11
116:24 191:9
**specifically** 6:23
16:8 18:1 41:3
51:9 99:9 117:8
124:17,22 125:1
131:3,5 139:15
153:1 156:6
**specifics** 83:20
**specified** 44:9
**spirit** 64:5
**split** 14:18
**spoofing** 70:19
125:4,10 126:4,4

126:22 127:11,12
127:19 128:2
129:19 130:24
132:19,20,24
133:4,6 151:11,25
156:1,4,23 162:3,9
162:10 167:6
**spot** 120:17
**square** 90:19
**squarely** 89:2
100:19
**stability** 63:10
**staging** 44:8 70:13
131:11,12
**stamps** 141:23
**stand** 172:20
178:25 192:9
**standard** 22:8
49:3 84:9
**standards** 18:2
21:8 63:1,9,12,15
63:16,25
**standing** 179:12
**standpoint** 16:18
**stands** 86:6
**stanley** 2:4 4:5,9
5:17,22 6:2,5,21
13:22 14:18 19:10
25:19 41:15,21
51:19 100:4
126:25,25 151:3
152:22 165:9,16
189:24,24
**star** 25:2 48:25
109:6 110:13
112:21
**starbuck's** 19:17
117:24
**stark** 86:6
**start** 8:5 18:7
19:16 44:6 52:2,4

52:21,22,25 53:3
54:12 72:21 82:22
84:22 91:23 95:2
100:13 172:12
191:16 193:12,19
193:20,24,25
194:4
**started** 13:20
41:15 42:3,16
59:20 68:4 85:2,2
85:5 136:20
137:15 147:16
181:25
**starters** 176:5
**starting** 11:6
90:19 193:18
**starts** 19:15
106:12 138:17
143:16
**state** 1:14 10:25
79:2 83:10 172:19
196:12
**state's** 12:5
**stated** 1:15 38:7
39:5
**statement** 3:3,4,5
3:6 6:14 15:6 19:1
41:22 51:15 53:14
85:9,14,15,23,25
86:4 89:6 92:4,5
102:6 103:13
172:14,21
**statements** 55:16
55:17 84:16,18
88:20 137:22,25
146:7
**states** 10:16 23:8
57:9 181:24
**station** 30:6
**statistically** 80:15

**status** 73:22 74:15
75:5 77:5 78:14
178:8
**statute** 63:18
78:20 94:18 152:3
169:22 170:17,21
171:22,25 172:13
172:16,17 178:9
**statutory** 16:8
23:14 29:25 42:5
42:7,17 49:10,14
95:2 136:22
**stay** 70:13 143:14
**steady** 38:12
**stenotype** 1:15
**step** 58:5 65:10
**steve** 2:4 4:2 41:6
**stipulate** 178:21
**stipulates** 175:6
**stipulating** 175:3
**stock** 106:8,9
121:3,4
**stoneciper** 2:18
**stop** 54:14 68:5
99:18 179:3,3,3
182:7,7 184:5,5,22
**stored** 141:24
155:14
**storm** 177:15
**story** 11:5 183:5,6
**straight** 49:18,19
49:20 157:4,4
**strategy** 76:19
**stream** 118:16
**street** 2:14 197:18
**strength** 15:20
**stronger** 57:13
**strongly** 24:6
195:16
**structured** 80:13

Page 37

[studied - taxes]

**studied** 87:23
**styled** 1:11
**subject** 128:22
  180:12
**subjective** 80:5,10
**submit** 173:5
  181:6
**subscriber** 11:13
  12:14
**subsequent** 25:24
**subsequently**
  154:14
**substance** 98:5
  140:8
**substantiate** 126:6
**successful** 11:23
**successfully** 28:5
**sudden** 184:1
**sue** 176:14
**sued** 177:7 185:9
**sufficient** 27:19
  80:2
**suggest** 38:16
  162:5
**suggested** 47:8
**suggesting** 70:1
  71:13
**suggestion** 93:10
  116:12
**suggestions** 26:21
**suing** 104:7
**suite** 2:9,14 197:18
**summary** 49:12
  178:21
**summation** 81:11
**sunland** 39:4
**supervision** 68:13
**supervisor** 46:12
  56:6
**supplement** 71:7

**supplemented**
  24:13
**supply** 20:19
  105:12,22 106:3,7
  106:9,10 120:6
  121:1,2,5
**support** 26:19
  33:19 34:2 36:2
  40:20,21,25 45:22
  47:5 48:10 65:19
  94:1,1,25 124:12
  132:6 139:12,22
  139:23 140:18,21
  142:17 155:13
  172:3
**supporting** 22:6
**supports** 132:18
**supposed** 18:11
  28:11 74:9 95:23
  95:24 110:24
  111:23 116:8
  182:8,15
**supposedly** 131:9
**supreme** 10:15
  23:8,25
**sure** 31:8 51:25
  52:7,13,24 53:11
  53:12 59:13 85:19
  90:15 98:5 99:19
  104:1,5 118:15
  119:13 125:15
  127:23 153:2
  164:18 167:25
  178:11 185:10
  188:7 189:5
  190:19 192:20
  193:10
**surface** 85:16
**surge** 20:17 70:24
  121:24 122:1
  123:7

**surging** 121:19
  123:7
**surprise** 12:8
**surrounding**
  24:17
**susan** 1:3 2:23
  196:3
**suspect** 37:11
**suspend** 150:16
  160:19 161:5
  182:23
**suspended** 171:13
**suspension** 48:25
**suv** 64:20,22 138:6
**switch** 111:9 148:3
**switching** 139:11
**sworn** 83:3 101:6
  103:11 174:9
**system** 33:20 62:5
  82:19 116:10,13
  152:1,12
**systems** 65:19
  74:21

**t**

**table** 26:22
**tactic** 174:6 176:8
**tailor** 13:16
**take** 5:2 6:8,15
  13:1,6 14:11
  27:19 29:2 30:9
  36:21 38:1 41:17
  41:17 48:5 53:5
  58:5 59:10,15
  61:5,18 62:22
  65:10 70:4 82:25
  90:8 97:6,19
  111:22 113:3
  116:1,16 117:3
  127:23 139:5,13
  143:21 144:1,21
  145:15 158:23

163:3,8,22 165:1
  177:25 181:21
  192:21,25 193:1
  194:20 195:19
**taken** 1:10 17:9
  28:5 47:6 124:6
  140:5 197:9
**takes** 35:23 121:23
  145:12 147:24
**talented** 30:18
**talk** 8:23 12:11
  15:9 22:16 24:15
  24:21 26:14 27:25
  29:12 36:24 38:13
  39:25 40:5,25
  41:2 58:17 61:20
  79:4 83:19 84:9
  126:10 130:23
  137:3 139:12
  170:17,19 172:4
  182:4,18
**talked** 12:13 88:20
  116:17 155:15
  163:1
**talking** 11:9,12
  31:6 33:1 34:6
  36:1 55:4 95:13
  99:6,10 122:21
  129:18,20 138:21
  139:21 143:9
  158:1,5,6,7 164:10
  165:12 185:2,6
  186:14,17 188:9
**talks** 30:20,22
  31:19,20,21 40:6
  63:13 152:5
**task** 57:6
**tasks** 69:2
**tax** 55:16,17
**taxes** 50:1

Veritext Legal Solutions
346-293-7000

[taxis - think]

taxis 60:6

team 24:21 46:14
58:20 193:5

tear 50:7

tech 102:10

technically 133:21
134:13

technologies 1:4
4:19,22 16:4 58:6
196:4

technology 16:18
18:9 29:15 58:8
58:12 62:23 89:9
89:12 90:4,7,25
145:13

tee 191:17

tel 197:19

teleported 154:8

tell 11:4 24:24
37:16 38:20 46:9
87:25 91:9 104:12
107:20 111:21
126:14 131:5
132:18 157:5
168:13 177:10
182:17 187:20
189:22 190:19
191:15

telling 13:8 19:20
105:16 127:17
143:10 155:20
192:21

tells 9:7,10 35:18
91:22 98:17
109:18 134:2

tenure 166:25

term 17:3 100:23
125:2 128:9
156:23,24

terminate 77:12

terms 18:10,16
25:11,12,13 40:1
62:25 63:4,7
112:10

terrible 105:15
178:3

territorial 170:7

territory 25:11
40:16,22 41:1
46:6 54:25 152:4
152:6,9,9 169:25
170:2 171:20
172:1,7 175:4
177:12 178:10,19

test 22:10,16,17,25
37:4 72:16,20
73:10 75:13 77:19
78:13

testified 83:3
89:22 90:1,3
153:14 158:10
188:2

testify 76:18 79:23
80:17,23 96:8,16
152:17

testifying 59:2,4
87:12,13 88:11
96:4 154:10

testimony 7:2
23:18 58:7 67:12
70:3 79:20,25
80:9 81:4,12
87:10 89:2 95:25
96:1 97:16 101:6
101:11 103:12
105:20,21 145:21
146:2 148:17
154:14 155:9
174:9 197:9

tests 73:16 75:12
78:13

texans 16:14

texas 1:14 2:9 11:3
11:9 12:5 27:23
27:24,25 57:8,8
63:17 71:20 72:14
78:20 81:1 83:25
169:22 171:22
172:16 181:25
196:12 197:16,19

text 130:21 183:15

thank 4:11,23 9:17
14:23 15:7,10,11
15:12 51:16 52:18
53:4,15 54:2
58:19 62:13 82:9
82:10 107:7,15
128:11 129:16
193:9 194:23
195:14,20

thanks 83:7 144:8

theater 38:21

theirs 31:10

theory 122:24

therapy 193:15,17

therefor 197:4

thing 7:7,10 10:24
10:25 11:2 12:17
13:22 41:10 51:22
60:4 73:19 74:3
82:13 93:25
112:23 120:13
152:2 157:14
169:20 175:12
183:8 187:9
195:10,13

things 19:4 21:4,6
22:21 24:15 30:20
32:8 33:6 39:11
43:20 45:10 56:1
76:10 79:10 92:21
92:25 99:4 115:4

127:22 128:17
135:4,6 138:21
151:1 156:19
161:21

think 4:24 5:4,20
7:25 10:1 13:20
15:20 19:5 20:8
21:18 23:11 25:18
27:7 28:7,21 31:6
32:9 34:16,23
39:16,21 40:18,20
51:18 52:13,15
53:9 54:19 56:9
58:9 59:18 61:11
63:13 68:4 69:21
71:11 72:20 74:8
78:22 79:3 80:14
80:22 88:15 98:23
101:6 102:12,23
102:24 103:6
105:15 107:11,13
111:6,19 114:20
122:1,19 125:2,3
128:9 129:16
131:3,25,25
132:11,21 133:8,8
134:5 148:5,20
149:8 154:13
160:14 162:22
164:13,16,24
165:3,5 167:10,11
167:13 168:21
170:21 171:1,9,11
172:20,25 173:14
174:6,7,11 176:15
181:2,3 184:19,23
185:23 186:3,3,6
187:13 190:13
193:3 194:7,8,19
195:7

Veritext Legal Solutions
346-293-7000

[thinking - totally]

thinking  153:5

thinks  10:22

third  67:1,5
142:10 165:25
166:2,3,4,6 171:4
174:1 175:1
180:20,22 186:3
186:19

thought  12:13
71:4 88:5 94:21
120:16 126:12
145:14 156:12
194:6

thoughts  9:25 10:1
165:8 194:14

thousand  58:10

thousands  17:8
84:6

threat  24:16

threatened  28:17
29:1 48:24

threatening  184:1

threats  26:20
183:22

three  6:13,23 8:13
13:12 42:9,12,20
71:14 79:23
133:14 135:10
179:11 190:13

threshold  71:10

threw  8:1 84:22

throckmorton
197:18

throw  157:18

throwing  8:2
39:17

thursday  188:15
188:19,20 189:18
190:23 192:23

tickets  140:21

tied  157:24 176:3

time  5:23 6:10
11:5 13:24 14:14
15:15,16 16:7
17:10 18:18 19:13
20:11,16 24:13,13
24:18 25:24,25
26:5 27:1,12 30:7
34:17,18 35:22
37:16 38:12,13,14
41:12 42:13,13,19
43:7,12,20,21
44:19 47:13,16
49:18,19,20,20,21
51:10 53:3,15
54:13 55:23 57:24
65:4 67:5 68:21
68:22,24 69:1,2,4
69:23 71:24 72:21
79:4,6,8,12,12,15
79:16,17,18 81:21
81:22,22,24 82:22
84:21 87:23 91:10
91:16 92:7 94:14
94:17 101:5,18,23
105:16 106:3
108:2,5,13,15
109:7,8,15,19,20
110:1,8 112:20
116:17 120:1,11
120:15,25 121:13
121:21 123:10,11
123:14 124:8,8,8
127:11,24 131:18
133:10,15,18
134:1,7,18,21,25
135:2,12 136:17
136:20,25 137:5
137:10,16,20,23
138:9,9,12,15,18
138:25 139:2,3,10

141:19,21,23,25
145:18,18,24
146:1,17,19,22
147:11,24 148:4,6
148:14 155:24
156:25 157:17,18
158:20 159:7
163:22 165:19
167:4 175:24
179:20 180:6,14
180:15,15,20
182:12,21,21,22
188:5 192:25
193:11,20,24,24
195:7 197:21

timeline  185:4

times  18:14 20:18
44:23,23 56:21
69:21 84:5 105:19
125:17 136:14
137:17 179:11

timing  82:18

tip  51:3

tips  58:4 109:6
110:12

tires  33:2

tissues  76:24

title  98:13

tnc  40:7 45:9
63:18 104:8,11,12
152:3 169:22
170:20 171:22,25
172:12,16,23
178:9 179:12

tnt  170:17

today  4:15 8:5,8
9:15 11:23 24:10
29:21,22 30:12
50:19 51:24 53:2
53:8 59:2,3 82:19
95:24 96:9 97:13

98:21 106:14

108:1 117:3

120:14 131:14
154:10,20 155:19
156:20 157:2
164:17 170:14
173:7 184:17,20
186:19 187:17
193:8

today's  52:1

told  11:10 20:2,3
24:1 25:4 26:2
29:4 43:24 46:13
46:20 48:21 52:21
52:21 92:14 93:9
108:19 112:13,24
116:3 121:17,19
125:23 127:10
130:24 140:24
145:17 151:17
167:5,6 169:2
177:6 185:7

toll  93:24

tolls  142:9

tomorrow  52:5
53:1 111:20
150:19 188:13,18
188:22 195:6,8

tonight  159:9

top  50:2 55:22
68:21 139:25
143:16,16 156:22

topics  96:11,16
97:12

total  47:15 49:13
49:16 147:2
197:21

totality  23:20

totally  12:8 52:10
152:1 193:18

Veritext Legal Solutions
346-293-7000

touch 19:10
tracing 180:17
track 124:5
tracking 20:14
141:10,12 167:20
170:11 180:5
trade 106:8
trading 121:5
traditionally 31:1
32:2
traffic 70:14
tragic 105:15
training 28:14
56:5 68:14
transcript 95:9
96:23 98:7 99:21
109:1 115:2,4,5
194:25 196:14,16
197:2
transcript's 99:16
transcripts 96:25
99:24 100:4 115:8
115:9,13
transpired 7:24
transport 134:19
transportation
38:24 40:3,7,12
55:13,21 59:9
63:17 66:12 68:3
78:20 106:1
133:23
transporting
134:24 135:3,8
traveled 123:11
124:7 141:18
treasure 180:9
trial 150:16
175:12 177:17
191:8,10
trials 190:19

tribunals 71:24
tried 95:6 128:6
trier 80:1
trip 25:23 26:1
29:6 30:5,6,9 43:3
43:5,5,24 48:11,17
48:20,21 54:16
60:17,20 61:10,15
62:1 68:11,12
79:17 91:23
100:14 101:4,16
102:2,8 103:9,14
103:15,16,17
105:23 108:22
109:7 110:17,25
111:15 112:9
121:3 123:12
124:9,10 130:7
131:9,10 134:15
134:22,22 140:10
141:22,22,25
143:22 144:2,10
144:19,20 145:14
147:14,15,16
191:6
trips 16:7 29:7
30:10 39:3 45:23
46:3,7 49:13,16
60:25 61:1,6,8,12
61:14,16,23,24
103:18,24 104:2,7
104:13 106:17
117:3,4 121:12
125:19,23,25
126:2 132:22
133:2 138:5 153:9
162:15 167:3
180:7
trouble 174:12
troubled 158:11

troubles 157:25
troubling 171:7
trove 180:10
trucking 65:6
true 25:9 27:24
31:14 34:15 40:23
84:3 85:14 89:11
90:6 92:16 100:19
104:23 108:11
119:21,22 120:22
122:12 123:25
136:17,19,25
137:1 139:23
142:24 145:5
196:15
truly 30:16
trust 18:13 57:10
159:21 195:1
truth 31:4 33:16
try 17:12,14 18:14
28:16 38:13 80:19
86:4 102:24
126:12
trying 13:14 14:4
23:4 101:24
115:14 150:17
162:1 177:10
tsa 18:10 94:10
152:7
tuesday 189:10
190:23
turn 31:9,10 41:13
156:8 162:25
180:3
tweets 6:4
twice 104:6
two 39:19 42:2
62:19 72:13,17,22
73:3,16 75:11,19
77:20 90:25 119:8
119:13 126:23

127:17,22 130:25
131:17 132:17,25
133:2,6 137:14
139:2 146:6
153:19 165:2,4,4
165:12 166:12,22
167:3,3 170:9,10
180:7 181:4
184:10 185:17
186:2 190:13,14
190:15 192:13
type 31:16 160:12
169:4
types 43:1

## u

u.s. 140:19,21,22
uber 1:4 4:19,22
5:23 8:11 9:5,14
14:20 16:4,5,8,10
16:10,16,17,19,20
16:21,25 17:2,3,11
17:15,19,20 18:7
18:12,18,21,22
19:3,12 20:10,13
20:14,16,25 21:22
21:24,24 22:2,18
23:7 24:4,7,8,12
24:13,18,21,24
26:3,7,9,12 27:1
27:10,10,11,12,13
27:17,19,22 28:2
28:15,18,19 29:4,8
29:13,13 30:3,13
30:19 31:9,9,20,20
31:23,23,24 32:7
32:24 33:4,8,11
34:1,8,12,19,22
35:2,3,5,7,9,11,20
36:13 37:1,7,10
38:1,5,11,13,19
39:2,3 40:4 41:5

Veritext Legal Solutions
346-293-7000

[uber - unilaterally]

| | | | |
|---|---|---|---|
| 42:1,2,16,20,24,25 | 107:20 108:2,9 | 178:1,13,14,20 | 63:8 64:17 70:3 |
| 43:5,16,16 44:3,7 | 109:18 110:11 | 179:22 180:5,11 | 83:18 88:5,11,16 |
| 44:10,14,20,21 | 111:5,11,14,24 | 180:20 181:18,23 | 88:18,23 89:1,4 |
| 45:12,16,19 46:5,9 | 112:4,11,19 113:1 | 182:2,11 183:23 | 92:14 94:20 95:2 |
| 46:13,19,19 47:6,7 | 113:3,10,11,13 | 185:9,13 186:22 | 95:23 96:3 97:13 |
| 47:9,10,17,21,25 | 114:4,7,17 115:11 | 196:4 | 103:8,10 111:3 |
| 48:4,11,13,14,15 | 116:3,10,13,24 | **uber's**  17:3,21 | 115:7 116:6,7 |
| 48:17,21,24 49:5,9 | 117:3,6 118:17 | 26:11,11 29:10,11 | 130:6 132:12 |
| 49:14 50:16 51:2 | 119:1,6,9,14,20 | 42:9 45:18 46:5 | 133:14 136:23 |
| 51:8,10 54:6 55:1 | 120:4,22 121:8,14 | 47:2 49:3 57:4 | 138:3,5,8 149:16 |
| 55:7,10,17,20,22 | 122:21 123:13,19 | 58:24 65:15 73:1 | 154:25 156:24 |
| 55:23 56:3,6,7,10 | 123:19,21 124:12 | 77:24 85:1 88:25 | 159:14 161:12 |
| 56:15,16,22 57:14 | 124:14,15 125:8 | 89:9 90:4 92:11 | 167:23 168:23 |
| 57:23 58:6,8,9,11 | 125:17,18,23 | 96:7 98:20 99:5 | 169:3 177:3 |
| 58:13 59:7,12 | 129:24 130:1,3,11 | 103:13,24 113:16 | 194:20 |
| 60:8 61:18 62:3,5 | 130:17 131:14 | 124:19 125:11 | **understanding** |
| 62:15,17 63:8,14 | 132:5,22 133:4,16 | 132:18 135:20 | 88:10 89:8 91:21 |
| 63:21 64:6,12,14 | 133:20 134:1,20 | 142:24 162:25 | 96:21 97:22 |
| 64:23 65:4,8,11,14 | 135:11,17 136:6 | 173:17 175:16 | 111:11 135:20 |
| 65:17,18,23,24 | 137:3,9 138:4,6,12 | **uber.com.**  59:5 | 137:11 140:20 |
| 66:1,6,7,10,19,20 | 138:13,13,17,21 | **ugly**  150:17 | 158:17 165:25 |
| 66:21 67:15,19,21 | 138:22 139:1,3,7 | **ultimate**  81:8 | 166:9 |
| 68:6,17,19,20,22 | 139:21 140:18 | 173:16 | **understands**  52:25 |
| 70:6,7,13,16 71:3 | 141:1,5,9,11 142:3 | **ultimately**  27:4 | 67:20 |
| 71:4,17,21 74:9 | 142:3,4,6,18 143:4 | 49:4 118:18 | **understatement** |
| 75:24 76:15 78:9 | 143:10,21 144:1,6 | 123:13 144:15 | 167:24 |
| 78:10,17,24 79:1 | 144:15,20,22,24 | **unable**  35:5 44:21 | **understood**  29:16 |
| 79:11 81:3,7 84:1 | 145:3,11,25 | 46:18 | 107:16 162:9 |
| 84:10 85:12,21,22 | 146:22,25 147:4,5 | **unaware**  11:13 | 165:16 194:22 |
| 86:2,6,15,21 87:4 | 147:22,24 150:5 | 52:10 | **undisputed**  54:4 |
| 87:4,22,23,23 89:8 | 151:11 152:8,8 | **uncomfortable** | **unfolds**  48:7 |
| 89:25 90:4,22 | 155:5,7,24 157:15 | 111:16 112:11 | **unforeseen**  27:4 |
| 91:3,11,17,21,25 | 159:20 161:7,19 | **undergo**  56:5 | 27:15 |
| 93:16,20 94:5,8 | 163:18,19 166:2 | **undergone**  51:9 | **unfortunately** |
| 95:1 96:4,7 97:17 | 166:10,25 168:3,5 | **underlying**  155:12 | 192:16 |
| 97:21 98:3,13,17 | 168:22 169:24 | 161:8 163:16,21 | **unilateral**  29:8 |
| 98:19 99:1,2,13 | 170:6 172:6,7,18 | 167:19 168:4,9 | 31:19 |
| 100:12,12 101:7 | 172:19 173:4,18 | 173:15 175:14 | **unilaterally**  20:10 |
| 103:8,19,25 | 173:18,21 174:19 | 177:11 186:12 | 26:7,9 27:9 28:18 |
| 104:12,13,19 | 175:3,6,8,18 | **understand**  7:19 | 35:11 68:5 105:2 |
| 105:3,7,18 106:4,6 | 176:14 177:2,7,13 | 17:23 18:6 51:25 | 105:7 125:18 |

Veritext Legal Solutions
346-293-7000

[unilaterally - want]

139:1 142:5
**unit**  73:8 77:18,23
78:2 99:7
**united**  10:16 23:7
181:24
**unmute**  89:19
**unnecessary**
183:11
**unpack**  85:16
**unpoison**  152:18
**unquote**  15:22
17:16,21 21:13
132:24
**unreliable**  80:10
**updated**  27:6
**uploaded**  115:3
**upper**  30:23
**upscale**  64:20,23
**upside**  162:25
163:2
**usa**  66:7,19 67:15
67:19
**use**  6:13,22,25 7:1
32:25,25 33:8,9
37:14 56:3 62:4
62:17,25 63:5
64:6,9 65:11,15,23
66:20,24 68:9,18
76:15 78:11 79:1
81:22 98:3,13
110:11 111:6,8
115:2 134:6
141:17 142:14
143:3,11 172:18
173:19,22 175:7
177:13 178:14
179:15
**users**  66:9 80:15
98:24
**uses**  26:13 50:10
80:2 81:17

**usually**  134:24
135:8 146:14
194:10
**utilize**  66:1

**v**

**v**  23:9
**vacation**  54:16
**vague**  100:23
**value**  20:7
**variables**  124:10
**variety**  60:5
**various**  36:25
71:24
**vary**  48:2 144:10
144:14,14
**vehicle**  34:17
37:10 38:3 50:7
76:8,9 81:17
134:2
**vehicles**  40:3
68:11 78:21 79:2
**veiled**  26:20,20
**verbatim**  93:14
**veritext**  197:17
**versa**  117:15
**version**  95:12
139:22
**versus**  30:2 39:4
72:15 73:23
**vice**  117:15
**vicki**  15:10 52:17
193:13
**video**  93:6,11,13
93:13,16 98:3,4,6
98:9,10,13,15
99:11,22,23 100:3
100:9 102:10,21
108:19,24 111:4
114:24 115:7
116:3 126:21
131:6,14 134:1,4

160:2 163:9
165:10 181:7
183:1
**videographer**
13:24,25
**videos**  38:19 93:16
97:17,17,21,23
115:13 126:23
127:2,17 128:6
129:5 130:25
131:2,17,17,21,23
132:7,12,17 133:1
133:3,7,8 148:13
150:9 153:15
154:18 155:11,13
155:20 156:10
157:5 158:20
159:3,20 161:25
163:12 164:21
165:12,13 166:13
166:24 168:3
170:9,10 171:5
177:14 179:22,25
180:2,2
**violation**  55:2
**visit**  39:18
**visual**  68:16
**voice**  195:15
**voir**  13:14
**volume**  20:18
27:12
**vomit**  36:3
**vomited**  36:10
**vs**  1:3 196:3

**w**

**wage**  51:2 58:2
**wait**  20:16 27:12
43:20,21 44:3,21
44:23,23 48:11
59:21 91:17,19
108:13,15 130:12

137:16,23 138:9
138:12,15,18
139:2 193:4
**waited**  147:18
**waiting**  19:17
38:22 42:24 43:22
44:13,17,19 48:14
88:7 116:21
133:19 136:21
137:13,14 147:17
**waive**  148:21
**waiver**  159:6
**waiving**  148:21
154:17
**walk**  78:19 116:19
**walsh**  72:15
**want**  5:2 7:23 8:7
13:15 14:11 17:2
18:5 26:17,17,18
29:6,20 30:5,7,7,8
30:9 35:8 39:25
41:23 45:11 46:24
51:22,23,25 52:7
54:11 56:23 58:5
59:11 63:4 64:8
65:10 70:9,11,12
74:19 79:14 80:18
82:2 83:19 85:8
85:18 91:13 98:9
99:18 105:13
106:14 107:1,11
108:1,16 109:4
111:22 113:1,3
116:19 117:5
127:14 139:11,16
148:20 150:16
153:3,25 156:8
159:10 160:24,25
161:21 168:16
172:5,12 174:5
175:12 176:1

Veritext Legal Solutions
346-293-7000

[want - working]

177:1,4,11 178:11
178:15 185:3,19
185:20 187:2,12
188:19,22,25
189:2,14,20,21,22
189:23,25 190:8
190:11 191:6
192:9,10 194:13
194:18 195:7
**wanted**  8:4 21:9
21:10,10 46:11,12
52:6,12 53:10,12
54:11,14,18 55:5
55:21 58:19 66:14
70:2,24 74:25
75:16,16 92:19
107:25 108:1,7,7
120:19 125:22
131:13 145:2
170:1 195:13
**wanting**  61:4
**wants**  19:25 21:1
59:15 61:5 79:9
92:6 108:11 115:7
144:19
**waste**  11:5 101:23
105:16
**watch**  84:17 92:23
93:7,15 156:10,18
**watched**  93:16
116:3
**watching**  61:3,4
**water**  28:16
**waters**  60:11
76:25
**wave**  14:22
**way**  8:1,24 10:21
14:5 28:11 35:12
44:20 52:14 68:16
72:11 79:1 85:1
90:21 94:4 106:16

107:22 112:25
113:14,24 114:8
117:8 122:7
123:14,20 124:1
134:14 136:5
157:6,11 175:11
183:14 184:22
187:16 194:19
**ways**  88:5 93:19
94:8 111:7
**we've**  5:20 6:16
8:6 9:8 18:18 23:9
25:10 38:10 39:11
50:18 66:4 80:17
83:25 90:14
107:18 108:19
115:15 119:13
121:7 127:1
151:25 153:11
155:7 157:2,20
159:20 161:7
163:1 168:4 169:6
169:23 170:1
171:1,10 185:10
187:17,25
**wear**  50:7
**web**  166:1
**website**  9:1 55:19
**wednesday**  52:5
188:19,22,22,24
189:17 190:23
192:22
**week**  16:10 49:23
57:25 69:13,21
131:4,18 132:17
135:24 136:13
155:9 166:25
190:21,22,25
191:2,2 192:2,21
193:3,17

**weekly**  49:22
135:16
**weeks**  69:18,20
72:13
**weigh**  39:23 51:1
51:11 73:1,14
77:13 78:13
172:12
**weighed**  23:20
74:14
**weighs**  73:21 77:4
**weight**  50:3
**welcome**  8:14 9:18
98:17
**went**  8:22 11:15
60:10 162:6
164:20 167:2,19
182:1
**whatsoever**  10:2
173:16
**wholly**  183:11
**wide**  164:15
**widely**  87:21,21
88:24 89:5
**willful**  42:9
**willfully**  71:22
**willfulness**  71:15
71:16
**williams**  2:13
**willing**  58:15
59:10 100:21
107:21
**win**  9:10 56:19
**wise**  118:5 123:22
**withheld**  43:15
**withholding**  129:2
151:1
**witness**  4:9 14:19
14:20 53:11
102:17,21 107:6
115:18 155:12,18

155:18 174:11
187:11 196:19
**witnesses**  81:10
**woman**  30:19
**won**  15:18
**wonderful**  160:10
**wondering**  59:25
**word**  93:14,14
128:5 139:5
**words**  57:17 64:4
82:6 150:14 179:5
**work**  8:20 19:7,8
19:25 21:11,11
27:11 30:21 31:21
32:24 33:13 36:11
38:7 41:4 42:5
54:17,18 55:5
69:7,7,23 70:2
72:24 73:5,8
74:14,21,24 75:1
75:16,16,18 77:9
77:17 78:1,6,8
87:1,6 88:11,12
95:15 149:12
157:8,12 166:7
182:24 193:2,3
**workday**  19:16
41:4
**worked**  8:19 16:4
28:10 34:1 38:11
39:1 55:5,6 57:24
60:9 69:20,20,23
70:21,21
**worker**  72:6,24
76:5 77:7,8,11,12
77:25 78:5
**workers**  30:23
**workforce**  72:15
**working**  15:23
17:17 27:1 73:6

**[workplace - zoom]**

**workplace**  28:8
**works**  60:11 86:20
  87:22 90:21
  117:20 124:1,2
  136:6
**world**  33:21 80:14
  156:17 177:17
**worried**  59:23
  171:15
**worse**  155:23,24
**worst**  7:10 179:25
**worth**  197:19
**writing**  27:14
  148:10 173:5
**written**  87:13,21
  87:22
**wrong**  46:10
  124:16 157:20
  181:25 184:4
  191:18
**wrote**  30:19

**x**

**x**  71:4 108:2
  138:13,17 197:5
**xl**  138:13

**y**

**y**  108:2
**yeah**  11:14 56:25
  73:15 84:25 85:7
  85:24 90:2,7
  93:18 94:11,12
  100:17,20 101:12
  101:20 103:10,15
  104:20 105:4,9,19
  109:10 110:3,13
  111:13,25 112:17
  112:22 115:25
  116:11 118:23
  119:7,17,22
  121:10 122:19,23

123:4 124:1 125:6
  125:13 139:19,24
  141:8 142:8,25
  146:6 147:3,21
  148:1 177:1
**year**  8:1 11:11
  42:9,12 71:14
**years**  10:7 195:19
**yep**  110:20 112:1
  142:16 145:6,7,15
**yesterday**  115:3
**york**  9:9 42:3,13
  49:7,18 55:5
  182:1
**young**  9:1 30:19

**z**

**z**  108:2
**zoom**  1:10

2022-67757 / Court: 133

# Exhibit J

1   DAINIUS BARYSAS,                    )

    Claimant                           )

2                                       )

    vs.                                ) CASE NO. HON. SUSAN SOUSSAN

3                                       ) ARBITRATOR

    UBER TECHNOLOGIES, INC.,    )

4   Respondent                         )

5

6

7                   ARBITRATION DAY 2

8                    May 2, 2022

9

10       ARBITRATION DAY 2, was taken remotely by Zoom in

11   the above-styled and numbered cause on the 2nd day of

12   May, 2022, from 9:59 a.m. to 6:03 p.m., before Shauna

13   Foreman, Certified Shorthand Reporter in and for the

14   State of Texas, reported by computerized stenotype

15   machine, pursuant to the provisions stated on the

16   record or attached hereto.

17

18

19

20

21

22

23

24

25

                                          Page 198

```
 1                    A P P E A R A N C E S
 2
 3    FOR CLAIMANT:
 4         BRET STANLEY, ESQ.
           ERIC HAWLEY, ESQ.
 5         RYAN MacLEOD, ESQ.
           KATHERINE HIETT, ESQ.
 6         KHERKHER GARCIA FASS HAWLEY
           2925 Richmond Avenue
 7         Suite 1560
           Houston, Texas  77098
 8         E-mail: skherkher@kherkhergarcia.com
 9    FOR RESPONDENT:
10         BENJAMIN D. SANDAHL, ESQ.
           KIMBERLY R. MIERS, ESQ.
11         ALLISON C. WILLIAMS, ESQ.
           LITTLER MENDELSON
12         1301 McKinney Street
           Suite 1900
13         Houston, Texas  77010
           E-mail: acwilliams@littler.com
14
      ALSO PRESENT:
15
           Don Ridenour
16         Deborah Soh
           Jacob Stonecipher
17         Brad Rosenthal
           Angela Corridan
18         Lindsey Cameron
           Dainius Barysas
19
20    ARBITRATOR:
21         Hon. Susan Soussan
22
23
24
25
```

                                        Page 199

```
 1                         INDEX

 2                                             PAGE

 3    BRAD ROSENTHAL

 4    Examination Continued by Mr. MacLeod ...........201

 5    DAINIUS BARYSAS

 6    Examination by Mr. Stanley .....................272

      Examination by Ms. Miers .......................344

 7    Further Examination by Mr. Stanley .............433

      Further Examination by Ms. Miers ...............443

 8

 9    BRAD ROSENTHAL

10    Examination by Mr. Sandahl .....................457

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 200

1              MS. SOUSSAN:  Good morning, everybody.

2     I'm happy to see everyone.  Are there any preliminary

3     matters that we take up before we start back up with

4     testimony?

5              MR. MacLEOD:  No, ma'am.

6              MR. SANDAHL:  The only question I have

7     is we have -- in the realtime, it's showing up with

8     Ben Bireley and Kelli McDonald as perhaps being

9     there, and could we understand who all is in the

10    room?

11             (Discussion off the record)

12             MS. SOUSSAN:  As far as realtime, is

13    there something I need to pull it up?

14             (Discussion off the record)

15             MS. SOUSSAN:  Is everyone ready to

16    proceed?

17             MR. MacLEOD:  Claimant's ready.

18             MR. SANDAHL:  Respondent is ready.

19             BRAD ROSENTHAL,

20    having been previously duly sworn, testified as follows:

21             EXAMINATION (Continued)

22       Q.   (BY MR. MacLEOD)  Good morning,

23    Mr. Rosenthal.  How are you?

24       A.   Good morning.  Doing well.  Thanks.

25       Q.   The last time we spoke, if I remember

                                        Page 201

1    correctly, was in mid April -- I think it was

2    April 14th.

3                    Do you remember that?

4         A.   I do.  I don't remember the exact date;

5    but, yeah, I remember.

6         Q.   Just so we are kind of straight on the

7    record here, we are in another arbitration.  You

8    understand that we're continuing with your prior

9    testimony?

10        A.   I do, yeah.

11        Q.   And did you review your prior sworn

12   testimony that was recorded in this particular case?

13        A.   I did.

14        Q.   And when did you do that?

15        A.   I believe last week.

16        Q.   And before I go too far, just so I

17   understand the foundation and kind of your knowledge

18   base for this particular time to testify, did you

19   review any additional documents other than the

20   arbitration transcript to prepare for today's

21   testimony, sir?

22        A.   Did I review again some of the stuff that

23   we had produced?

24        Q.   Did you -- for example, did you review some

25   of the P1, P2, P3 data?

                                              Page 202

1        A.    No, I did not.

2        Q.    Did you review any of the support messages?

3        A.    I think I looked at -- through some of the

4    support messages, yeah.

5        Q.    And one of the things that we were talking

6    about last time was about how when a driver is logged

7    in or is on-line with the Uber app that Uber collects

8    GPS points -- I think what you've said is every

9    couple of seconds; is that right?

10       A.    That is right.  We collect every couple of

11   seconds.

12       Q.    And you have said that when a driver hits

13   the go on-line button until he hits the go off-line

14   button, Uber collects GPS points, correct?

15       A.    That is my understanding.

16       Q.    And Uber collects the actual data points in

17   P1 time, P2 time, and P3 time for drivers, correct?

18       A.    That is my understanding.

19       Q.    And what I want to try to figure out a

20   little bit better is how Uber does that.  First off,

21   is there a document -- you know, whether it's an

22   electronic document, a physical document -- whereby

23   Uber tells these Uber drivers what sort of monitoring

24   that Uber will be doing of the drivers?

25       A.    Well, I don't think collecting GPS points

Page 203

```
 1    every couple of seconds would be monitoring, but I
 2    believe --
 3         Q.   That's not my question.
 4         A.   -- services agreement we do say that we --
 5    that we will -- that a driver has to have their
 6    GPS -- their GPS on, or I forget -- the TSA outlines
 7    it.
 8         Q.   So my question was different than the one
 9    you answered, but let's go with your answer.
10              You said the technology services
11    agreement provides that drivers will provide Uber
12    with access to their phone's GPS, right?
13         A.   Something along those lines.
14         Q.   Well -- that's what I'm trying to figure
15    out.
16              When a driver logs into the app, I'm
17    trying to find out exactly what Uber has access to on
18    that driver's phone.  Are you with me?
19         A.   Okay.
20         Q.   Can Uber -- can Uber monitor drivers when
21    they are not using the Uber app?
22         A.   I don't believe so.
23         Q.   And what is your sworn testimony based on
24    that you do not believe so?
25              MR. SANDAHL:  Object, Your Honor, that
```

Page 204

1    the testimony is evidence by itself.  Mr. Rosenthal

2    is here as a corporate representative.  He's here to

3    testify about what the company knew, the company

4    knowledge imputed to him, and this assumption that

5    there's no basis for it is unfounded.

6                    MS. SOUSSAN:  Overruled.

7        A.   My understanding is based on the technology

8    service agreement and then my understanding of how

9    the app works.

10       Q.   (BY MR. MacLEOD)  Here's what I'm trying to

11   find out.

12                   Who within the Uber world would be

13   responsible for collecting and maintaining this GPS

14   data?  Let's start there.

15                   MR. SANDAHL:  Objection.  Relevance,

16   Your Honor.

17                   MS. SOUSSAN:  Overruled.

18       A.   I'm not sure exactly who would be

19   responsible for collecting it.  It's collected from

20   the driver's device, right?  It's not something we

21   have to do.  Within Apple and within Google, there's

22   a publicly-available developer site on the Google and

23   Apple enabling companies to do that.  It's not unique

24   that we do it.  Other companies do it, as well.

25                   And my understanding is we built

Page 205

1    out -- I don't know exactly which team built that

2    out, but we collect the GPS points and they sit in a

3    database.

4         Q.   (BY MR. MacLEOD)  I'm not deposing an Apple

5    or a Google corporate representative today.  You're

6    here for Uber, right?

7         A.   I am.

8         Q.   What we learned during the last time we

9    were all conveniently gathered together -- what we

10   learned was Uber was monitoring the GPS for my

11   client.

12                  You know that's true, right?

13                  MR. SANDAHL:  Objection.  Misstates

14   the evidence.

15                  MS. SOUSSAN:  If he can answer the

16   question, he can answer the question.  Yes, counsel

17   is clearly using his words.  So the witness can hear

18   it and he can listen and he can answer to the best of

19   his ability.

20        A.   I do not believe that to be true, no.

21        Q.   (BY MR. MacLEOD)  Okay.  Somehow many

22   years -- even after my client stopped driving -- Uber

23   was still able to go back and look at GPS data that

24   had been collected by Uber years ago, correct?

25        A.   That is right.

Page 206

1        Q.    And so, what I'm trying to find out, then,

2   is within the Uber world -- the vision team, whoever

3   it may be -- who is specifically responsible for

4   collecting that data that was previously pulled by

5   Uber?

6        A.    I'm not sure which team built out the API

7   integration between Apple and Google and the driver's

8   device to collect the GPS points.

9        Q.    So is that how it collected, through some

10  Apple or some Google joint algorithm with Uber?

11              MR. SANDAHL:  Objection, Your Honor.

12  This is getting into the proprietary nature of the

13  app.

14              MS. SOUSSAN:  If it is proprietary,

15  the objection is sustained.

16              MR. MacLEOD:  Here's the problem,

17  Judge.  We're in arbitration.  It's confidential.  It

18  is confidential.

19              MS. SOUSSAN:  I know that.  I've ruled

20  so many times that you do not have access to trade

21  secret or proprietary information.

22              MR. MacLEOD:  We're trying to

23  demonstrate how Uber is controlling these drivers,

24  and we can't go and talk about their monitoring of

25  GPS data and who is responsible for it?

                                        Page 207

1           MS. SOUSSAN:  Re-ask your question,

2    please.

3       Q.   (BY MR. MacLEOD)  Who within Uber is

4    actually collecting the GPS data from the drivers on

5    a daily basis?  Let's start there.

6       A.   To my understanding, no one.  Not one

7    person or not one team is just collecting this data.

8       Q.   So where -- who -- what -- is there a

9    device?  Is there a software?  What is actually

10   collecting this GPS from the drivers?

11      A.   So as I've described, there's information

12   that is publicly available on the Google and Apple

13   developer pages so that companies can go and build

14   and collect certain data from a driver's device or

15   from anyone's device.  Certain apps do this from our

16   devices on our phones, and we have built out the --

17   essentially the infrastructure to connect with the

18   Apple and Google developer pages and the -- and as a

19   result of that, the GPS data comes in and it sits in

20   our databases.  We collect it every two or three

21   seconds, GPS coordinate data, and the data sits in

22   our databases.

23      Q.   Let's say, for example, that Uber suspects

24   that there is a driver who is somehow manipulating

25   data or, you know, engaging in some type of fraud.

                                          Page 208

```
 1              Who within Uber would actually be
 2    looking at that data that's been collected and make
 3    that further determination?
 4         A.   I'm not sure specifically who.
 5         Q.   Do you know in this particular instance --
 6    I mean, you understand that there's an allegation
 7    that my client was engaging in some sort of
 8    geo-spoofing or fraud, right?
 9         A.   I do.
10         Q.   And so, without any input from him, without
11    him getting to make his case, Uber decided that --
12    that he would no longer be able to use the Uber
13    application at the airport, correct?
14         A.   We did make that decision, yeah.
15         Q.   And Uber retained that discretion to make
16    sure that my client could not use the Uber
17    application at the airport, correct?
18         A.   We did, yeah.
19         Q.   Now, are you familiar with an operating
20    program that was used by Uber that was in this case
21    named Hell?
22         A.   I'm not familiar with it, no.
23         Q.   Okay.  There was -- even the FBI stepped in
24    because they had to investigate this program, Hell,
25    because of the monitoring that --
```

Page 209

```
 1                    MR. SANDAHL:  Objection, Your Honor,
 2      to this whole line of questioning.
 3                    MS. SOUSSAN:  Sustained.  You're not
 4      the one who is testifying, Mr. MacLeod.
 5                    MR. MacLEOD:  This is
 6      cross-examination.
 7                    MS. SOUSSAN:  I know exactly what it
 8      is, sir.  He said he's not familiar with the program.
 9      You can ask him your next question and ask him if
10      he's familiar with the FBI stepping in.
11          Q.   (BY MR. MacLEOD)  Are you familiar with the
12      FBI stepping in to conduct an investigation of Uber
13      for using an operating program called Hell?
14                    MR. SANDAHL:  Objection.  Relevance.
15                    MS. SOUSSAN:  Overruled.
16          A.   I am not, no.
17          Q.   (BY MR. MacLEOD)  Were you aware that Uber
18      was monitoring the realtime locations of Uber drivers
19      who also drove for its competitor, Lyft?
20                    MR. SANDAHL:  Objection.  Lacks
21      foundation and relevance.
22                    MS. SOUSSAN:  Overruled.  He can
23      answer if he knows the answer.
24          A.   I was not, no.
25          Q.   (BY MR. MacLEOD)  Did you know that through
```

Page 210

1    the operating program Hell, Uber analyzed Lyft's

2    prices and used that information to undercut Lyft and

3    lure drivers over to the Uber application?

4                    MR. SANDAHL:  Same objections.

5                    MS. SOUSSAN:  Overruled.

6         A.    I'm not, no.

7         Q.    (BY MR. MacLEOD)  Now, through the Uber

8    monitoring -- through this GPS data collection, do

9    you understand that Uber can detect accelerations by

10   drivers?

11        A.    Yeah.  I don't know if it was through the

12   GPS collection that we were able to do that, but I

13   believe we were also collecting information from

14   gyroscope of a driver's device.

15        Q.    Can you explain?  What is gyroscope?

16        A.    It's something within a device, I believe,

17   that detects some sort of motion.  I'm not familiar

18   with the technicalities.  I'm not an engineer and I

19   don't have that sort of level of depth of knowledge

20   around that, but I do know that there is something

21   related to us collecting information from the

22   gyroscope.

23        Q.    And -- and where is that data that's

24   collected by the gyroscope maintained so that Uber

25   support or someone else with Uber can review that

                                          Page 211

1    information?

2                    MR. SANDAHL:  I'll object to this also

3    as being proprietary, Your Honor.

4                    MS. SOUSSAN:  The question is where is

5    the data.  I think he can answer that question if he

6    knows.

7         A.    I'm not sure -- it's just a program that we

8    had tested out.  I don't believe drivers found it

9    valuable, so I believe we stopped collecting the

10   data, to my knowledge.  I'm not exactly sure.

11        Q.    (BY MR. MacLEOD)  As Uber's corporate

12   representative, did you know that Uber also collected

13   data relating to when drivers would stop too quickly

14   instead of stopping gradually?

15        A.    That's part of the same data that was

16   collected around the accelerometer.  But, yeah, I

17   don't think we do it anymore.

18        Q.    Can you first off tell us when the

19   collection of that gyroscope -- the accelerometer

20   data was first collected by Uber?

21        A.    I don't know.

22        Q.    Can you tell us when Uber, in your words,

23   stopped collecting the gyroscope data that would

24   monitor acceleration, stopping, things like that?

25        A.    I don't know.

                                        Page 212

1     Q.   Okay.  Let's go to exhibit Claimant's 7,

2   please, and look at Barysas 954.

3               MS. SOUSSAN:  Claimant's Exhibit 7?

4               MR. MacLEOD:  It's going to be Barysas

5   954.

6               MS. SOUSSAN:  I have it.

7     Q.   (BY MR. MacLEOD)  All right, sir.  At the

8   very top here, this is from Uber.  Noreply@uber.com,

9   correct?

10    A.   It appears, yep.

11    Q.   Okay.  This message where it says

12  "fraudulent activity has been detected," where does

13  this message actually originate from?  Who is sending

14  this?

15    A.   I don't know who sends it.

16    Q.   Do you -- do you know if it -- if it's

17  within Uber support, if it's in Uber monitoring?  Do

18  you know, or do you just not have knowledge?

19    A.   I don't know where it comes from.

20    Q.   The subject line is "First notice.  Your

21  account has been flagged."

22               What does it mean when an Uber

23  driver's account has been flagged?

24    A.   Well, in this particular instance, it means

25  that there's some sort of -- the driver had some sort

Page 213

1    of fraud flag.

2        Q.    As you sit here today as Uber's corporate

3    representative, you have no evidence that Mr. Barysas

4    was actually engaging in any type of fraud.  We can

5    at least agree on that, correct?

6                    MR. SANDAHL:  Objection.  Relevance,

7    Your Honor.  This has been the subject of the motion

8    and the reasons for the deactivation.  We argued at

9    length about what the relevance was.

10                   MR. MacLEOD:  Judge, this goes again

11   to control.

12                   MS. SOUSSAN:  You're walking a fine

13   line.  I'll let you ask a couple of questions, and

14   then let's move on.

15       Q.    (BY MR. MacLEOD)  Yes, ma'am.

16   Mr. Rosenthal, can you please answer that question?

17       A.    Can you please re-ask?

18                   MR. MacLEOD:  Sorry.  Ms. Foreman, can

19   you please read the question back?

20                   (The record was read as requested.)

21       A.    I would not agree on that, no.

22       Q.    (BY MR. MacLEOD)  Okay.  And other than

23   evidence that has been specifically excluded in this

24   case -- and I trust you were advised by counsel on

25   that -- what evidence do you have, then, that my

                                        Page 214

1    client was engaged in fraud?

2         A.   I believe the text messages that your

3    client had with riders will show that he was engaging

4    in fraud as outlined in the first paragraph of this

5    document here.

6         Q.   Okay.  And so, specifically what text

7    messages is Uber relying upon today to -- to conclude

8    that Mr. Barysas was engaged in some sort of fraud?

9         A.   He was, if I remember correctly -- I think

10   this will come out later, but he -- he was at the

11   airport and he was accepting trips and then telling

12   riders he was pulled over by the police, and he was

13   doing so in an attempt to have riders to cancel their

14   trip because for whatever reason he did not want to

15   cancel.  That's sort of the first paragraph that this

16   document outlines.  He was engaging in some sort of

17   fraud.

18        Q.   What I want to make sure is -- before we go

19   too far -- is that the totality?  Is that everything

20   that Uber has today to conclude that Mr. Barysas was

21   engaged in fraud?

22        A.   Well, I mean, as you pointed out, there is

23   evidence that has been excluded from this matter that

24   also shows evidence of him engaging in fraud.

25              MR. MacLEOD:  We have an expert

                                        Page 215

```
 1    witness in the waiting room.  Can she please be
 2    admitted?
 3         Q.   (BY MR. MacLEOD)  Now, in the -- it says --
 4    here in the second paragraph, it says, "Additional
 5    fraudulent activities that violate Uber's policies or
 6    terms and conditions may result in loss of access to
 7    airport trip requests and/or deactivation of your
 8    Uber account," correct?
 9         A.   That's what it says.
10         Q.   All right.  And so, that was on May 22nd,
11    2018, right?
12         A.   That's correct.
13         Q.   Then if we fast forward and we go to
14    Barysas 956, now here we have -- there's a subject
15    line from a June 27th, 2018, e-mail that says, "Final
16    notice.  You are violating our policy," correct?
17         A.   That's what it says.
18         Q.   And -- and let me just, first off, say back
19    in June 27 of 2018, did Uber have copies or access to
20    any of Mr. Barysas' text messages?
21         A.   If he was texting using our application.
22         Q.   I'm asking you if during that time period
23    if you've seen any evidence that Uber either had them
24    or had access to Mr. Barysas' personal text messages.
25         A.   Outside of our app, no.
```

Page 216

1      Q.   And within the app, are there any text

2   messages within the driver app that Uber relies upon

3   here today in an arbitration that would conclude that

4   he was violating an Uber policy?

5              MR. SANDAHL:  I'll object, Your Honor.

6   At this point that we're getting into the same

7   territory.

8              MR. MacLEOD:  These are text messages,

9   my client's own text messages.

10             MS. SOUSSAN:  He can answer this

11  question if he knows the answer.

12     A.   All the text messages we have access to

13  have been produced.

14     Q.   (BY MR. MacLEOD)  Okay.  So then it says --

15  if we go down to the bottom -- the second paragraph

16  there, it says, "As a result of these activities,

17  you're no longer eligible to receive requests for

18  pickups and drop-offs at airports.  Moving forward,

19  you will only receive non-airport trip requests."

20             And that was a unilateral solely an

21  Uber decision, correct?

22     A.   I wouldn't know if it's solely an Uber

23  decision.  The airports require us, TNCs, to have a

24  policy preventing drivers from not being in a staging

25  area and accepting trip requests.  So we were

                                        Page 217

1    complying with the airport policy.

2        Q.   Okay.   The TNC also says that a person like

3    Mr. Barysas, a driver, is not an independent

4    contractor but instead an employee if Uber limits the

5    territory within which he may provide digitally

6    pre-arranged rides, correct?

7        A.   I don't have the statute in front of me.

8    If what you're saying is reading the statute, then

9    okay.

10       Q.   You know that's true.   You have previously

11   testified to the exact same.   You know that, right?

12            MR. SANDAHL:   Objection.

13   Argumentative.

14            MS. SOUSSAN:   Overruled.

15       A.   You are providing a quote, and I don't have

16   the exact verbatim language in front of me.   As I

17   said in my answer, if you're reading it from the

18   statute, then okay.   I do know vaguely it says

19   something along those lines.

20       Q.   (BY MR. MacLEOD)   Let me ask you this:

21   When Uber says, "You know what?   You're violating our

22   policy," does Uber send any evidence, any

23   information, any data to a driver before Uber says,

24   "You know what?   You violated our policy.   We're now

25   going to limit the territory in which you can provide

Page 218

1   these rides"?

2       A.   We might.  I'm not sure.

3       Q.   Well, let me ask you specifically for

4   Mr. Barysas.

5                Before Uber took the next step and

6   said "no more airport pickups or drop-offs," did Uber

7   provide any information or any data -- any GPS data,

8   anything -- to Mr. Barysas so that he could say,

9   "Wait, hold on.  That's not what happened here"?

10      A.   I believe we did inform him of this in the

11  support messages.

12      Q.   Sir, I'm not asking about the support

13  messages.  I'm asking whether or not he was given

14  access to this information, this data, whatever is

15  relied upon as evidence by Uber to say that he was

16  engaging in fraud.

17               Was anything like that provided?

18      A.   I don't think we provided him data, no.

19      Q.   Because when -- Mr. Barysas even reached

20  out and said, "I've been a top driver with high

21  ratings since 2014.  My family relies on my earnings

22  and, if I lose airport access, it's like a death

23  sentence to me."

24               Do you remember that?

25      A.   I don't remember the specific words.

                                          Page 219

```
 1          Q.   If we go to Uber_Barysas_1181 -- let's go
 2    to the middle first where there's a message from
 3    Princess -- perfect.  That's great.
 4                So Princess, on June 29th, 2018, says,
 5    "Hi, Dainius.  Thank you for reaching out about your
 6    airport access privileges.  I've escalated this issue
 7    to a specialized team.  They will review your request
 8    and follow up via e-mail within five business days."
 9                First off, when Princess said that to
10    Mr. Barysas, what's the specialized team?
11          A.   I don't know what team she was referring
12    to.
13          Q.   Are you -- are you personally aware as
14    Uber's corporate representative of a specialized team
15    within Uber support to which complaints or concerns
16    are escalated to for review?
17          A.   There are many different teams within our
18    support organization.  I don't know to which
19    specialized team this is referring.
20          Q.   And have you ever been involved in any
21    manner, in any capacity, with being on one of these
22    Uber specialized teams?
23          A.   Again, I don't know which specialized team
24    she's referring to.  I've been -- in 2014, some of
25    these issues were escalated to me.
```

Page 220

1          Q.    Now, if we go down to the next message, it

2     says, "Thanks for checking in on your airport access

3     status.  After a careful review of your account, we

4     have determined" -- when it says "we have

5     determined," that means Uber has determined, right?

6          A.    That's right.

7          Q.    "Uber has determined that your actions were

8     associated with improper use of the Uber app at the

9     airport.  As a result, your ability to receive trip

10    requests for pickups and drop-offs at the airport

11    will remain restricted."

12                And so, at that point or at least even

13    now, Mr. Barysas has that restriction that he cannot

14    do pickups and drop-offs at the airport, right?

15         A.    That's my understanding.

16         Q.    The next message down right below that one,

17    he literally -- Dainius reaches back out and says,

18    "Please tell me exactly what I did wrong."

19                Do you see he's wanting to find out

20    what's going on?

21         A.    That's what it seems like.

22         Q.    If we go to the very top of this document,

23    you see where there's a message from Dainius that

24    says that it's via in-app support?

25         A.    I do.

Veritext Legal Solutions
346-293-7000

1        Q.   And he was asking if there was a way to

2   escalate the message to a supervisor, some sort of

3   higher-up.

4                 Do you see that?

5        A.   I do.

6        Q.   He says, "I've been a top driver with high

7   ratings since 2014."

8                 Do you agree that he was a -- that he

9   was an excellent driver?

10       A.   I mean, I don't know how you're

11   characterizing "excellent."

12       Q.   Did Uber believe that he was an excellent

13   driver in this time period?

14       A.   I don't -- I don't know.

15       Q.   He even said, "I love working for Uber.  My

16   family relies on my earnings.  If I lose airport

17   access, it's like a death sentence to me.  Please

18   report my -- please restore my airport access,"

19   right?

20       A.   Yeah.

21       Q.   Okay.  Then if we go to the next page on

22   Page Uber_Barysas_1182, Dainius is asking if there's,

23   you know, anything to do.  And it says,

24   "Unfortunately" -- this is from Genesis James.

25   "Unfortunately, it appears that you have already

Page 222

1    requested a review of this issue once before.  A

2    specialized team" -- and you don't know anything

3    about the specialized team, right?

4         A.   I don't know to which team it's referring.

5         Q.   "-- have already reviewed your request for

6    appeal and sent you their final ruling"; is that

7    right?

8         A.   That's what it says.

9         Q.   Uber said the decision was final and cannot

10   be further appealed, correct?

11        A.   That's what it says.

12        Q.   And that decision to limit the ability for

13   Dainius to use the app for airport drop-offs and

14   pickups, that was a decision that was final and could

15   not be appealed that was made by Uber, right?

16        A.   That right, yeah.

17        Q.   And then he's told one more time by Genesis

18   James again, later that same day, on July 6th of

19   2018, "As discussed previously, the decision was

20   final and cannot be further appealed," right?

21        A.   That's what it says.

22        Q.   And that was July 6, 2018, right?

23        A.   That's right.

24        Q.   So then if we go forward three days to

25   Barysas 960 -- all right.  On the top of this, this

Page 223

1    is now e-mail@ET.uber.com.

2              Whose e-mail is that?

3         A.   It's a generic e-mail.  ET, I believe,

4    stands for exact target, which is an e-mail platform

5    that is owned by sales force.

6         Q.   And you see that this e-mail's subject,

7    "just checking in" was sent on July 9, 2018.  So

8    three days after Dainius was told that the airport

9    decision was final and would not be appealed?

10        A.   I do.

11        Q.   And then in the body of the e-mail from

12   Uber to Dainius, the first paragraph, it says, "It's

13   already been -- it's already been three years and

14   nine months since you started driving with Uber."

15             That's a significant amount of time,

16   right?

17        A.   Sure.

18        Q.   And it says, "Your rating speaks for

19   itself-your riders think you're an excellent driver,"

20   right?

21        A.   That's what it says.

22        Q.   And so, just three days after he is told,

23   "Nope, no more airport rides.  You're restricted,"

24   he's told, "Your riders think you're an excellent

25   driver," correct?

Page 224

1        A.    That's what it says.

2        Q.    At that point, you also know that Uber

3    believed that he was an incredible partner, right?

4        A.    I do know that?  Based on what?

5        Q.    Would you agree that Uber believed that at

6    this point, on July 9, 2018, three days after they

7    claimed that he was committing fraud, that Dainius

8    was an incredible partner?

9        A.    It's hard for me to say that without

10   looking at -- looking at anything.

11       Q.    Go to the next page.  You see there's a

12   name there, Janelle Sallenave.  Do you know her?

13       A.    I do.

14       Q.    Does she still work for Uber?

15       A.    No.

16       Q.    She was the head of Uber support back in

17   July of 2018, right?

18       A.    In North America.

19       Q.    Right.  And Janelle says to Dainius, "Thank

20   you for being an incredible partner," correct?

21       A.    That's what it says, yes.

22       Q.    And -- and it also -- what Ms. Sallenave is

23   saying is instead of just doing the phone support or

24   in-app support, you can also come visit us at your

25   local Greenlight hub for in-person support, right?

Page 225

1      A.    That's what it says, yeah.

2      Q.    And you understand that Dainius actually

3  did go visit a Greenlight hub to try to get the

4  airport restriction lifted?

5      A.    I don't recall that specifically.

6      Q.    And a Greenlight hub -- just so Judge

7  Soussan is with us here, there are about a hundred or

8  more Greenlight hubs, correct?

9      A.    Across the country, you mean?  Yeah, that

10  number sounds right in the U.S.

11      Q.    And that's where drivers like Dainius can

12  go and actually get person-to-person support from

13  Uber, correct?

14      A.    Drivers could go there, yeah.

15      Q.    And if we go to Uber_Barysas_1174, in the

16  top left-hand corner we have the title, "Your Uber

17  Greenlight Houston-North Visit," right?

18      A.    That's what it says.

19      Q.    And -- and Brandon, on July 30th, 2018, he

20  says, "Hi, Dainius.  Thanks for visiting Uber

21  Greenlight Houston-North today.  We appreciate your

22  partnership with Uber," right?

23      A.    That's what it says.

24      Q.    So you see that not only did Dainius engage

25  in discussions trying to get this restriction lifted,

Page 226

```
 1    trying to figure out why it was implemented in the
 2    first place, he also went in person to the Uber
 3    Greenlight Houston-North location, correct?
 4         A.   That's what it appears.
 5         Q.   If we go to the page before that,
 6    Uber_Barysas_1173, again, on July 9th, 2018, the day
 7    that he's told that his riders think he's excellent
 8    and Uber tells him "thank you for being an incredible
 9    partner," do you see where Dainius on the top of this
10    is again -- he's -- serious as he can, he says,
11    "Hello.  Today I received below e-mail from Uber
12    congratulating me on my seniority and excellent
13    ratings."
14                   Do you see that?
15         A.   That's what it says.
16         Q.   He says, "I need your help to remove a
17    restriction to work at Houston airports.  Please
18    reconsider banning me from the airports," right?
19         A.   That's what it says.
20         Q.   And then we know -- we go down, it looks
21    like Preshant -- it says, "tech issue," as well,
22    because it said there was a tech issue.  There's a
23    e-mail address that's team.uberinternal.com.
24                   What is that?
25         A.   Just an internal -- internal Wikipedia.
```

Page 227

1        Q.    Okay.  What's it used for?

2        A.    Employees to access information.

3        Q.    Then it comes -- if we go down to the next

4    one, it says, "Hi, Dainius.  Upon checking your

5    account, it appears that you have already requested a

6    review of this issue once before.  A specialized team

7    has already reviewed your request for appeal and sent

8    you their final decision via e-mail," correct?

9        A.    That's what it says.

10        Q.    So at this point, the second time now, on

11    July 9, 2018, Dainius is being told by Uber that his

12    freedom to use the driver app for airport drop-offs

13    and pickups has been restricted, correct?

14        A.    That's what hit seems like.

15        Q.    Uber is telling Dainius that he no longer

16    has the opportunity or the choice to do airport

17    drop-offs and pickups, correct?

18              MR. SANDAHL:  Objection.  Asked and

19    answered.

20              MS. SOUSSAN:  Overruled.

21        A.    That's what it seems like.

22        Q.    (BY MR. MacLEOD)  If we go forward to

23    Uber_Barysas_1435, again on July 30th, 2018, Dainius

24    reaches out again through the in-app support and

25    says, "I have been removed from the airports by

                                        Page 228

1   mistake.  Lately I've been getting messages that my

2   phone GPS is inaccurate and I've been deactivated for

3   a few times and I have no idea why.  I have an older

4   phone and a tablet, and I even upgraded software and

5   still kept getting inaccurate GPS messages."

6                Do you see that?

7        A.   I do.

8        Q.   And now, it says, "Hi, Dainius."  This is

9   from Jed, if we go down a little bit.  Jed says, "Hi,

10  Dainius.  Sorry to hear about the trouble here.  I've

11  reviewed your account, and it appears your account

12  has been flagged for violation of Uber's terms and

13  policies," correct?

14       A.   That's what it says.

15       Q.   And then it follows up with "it could."  It

16  could be this, or it could be that.

17                Do you see anywhere in these support

18  messages where Dainius is told specifically why Uber

19  decided that he can no longer do drop-offs or pickups

20  from the airport?

21       A.   Aside from the list of things that it could

22  be, no.

23       Q.   Right.  So -- that's what I'm saying.

24  There's a bunch of generalities, but no specific

25  action, correct?

                                          Page 229

1       A.    Not in this message, no.

2       Q.    Now, it continues on.  I mean, even in

3   February of 2019 -- if we look at Uber_Barysas_1388,

4   even in February -- this is February 11, 2019.

5   Dainius reaches out again and says, "Hello.  Please

6   forward this to a specialized department.  My airport

7   privileges have been suspended seven months ago.  I'm

8   an exemplary partner with the highest rating.  Please

9   reactivate my airport access, please.  Thanks,

10  Dainius."

11             And the response from Joan with Uber

12  support says, "Hi, Dainius.  Unfortunately, it

13  appears that you have already requested a review of

14  this issue once before.  A specialized team has

15  already reviewed your request for appeal and sent you

16  their final decision via e-mail.  The decision was

17  final and cannot be further appealed," right?

18      A.    That's what it says.

19      Q.    Okay.  Now, do you remember we talked

20  briefly about some of the videos that are published

21  by Uber, correct?

22      A.    We did.

23      Q.    And -- and I was asking you at one point if

24  those videos still existed in 2016, 2017, 2018, 2019,

25  and you said, "I'm not sure about that," correct?

                                        Page 230

```
 1        A.    I don't have the transcript in front of me.
 2        Q.    Let me just -- just so we're very clear, do
 3   you know specifically when those Uber videos would
 4   have been removed and no longer available to Uber
 5   drivers like Dainius?
 6        A.    I believe it's 2015 or 2016.
 7        Q.    And specifically do you have -- do you have
 8   an e-mail about that?  Do you have a document about
 9   that?  What is your testimony based on?
10        A.    Discussions with counsel.
11        Q.    Okay.  So the only -- and I don't want to
12   get into at all your discussions with counsel.
13              The only basis that you have for when
14   videos would have been taken down is through counsel,
15   correct?
16              MR. SANDAHL:  Objection.  Asked and
17   answered, and seeks to invade the attorney-client
18   privilege.
19              MR. MacLEOD:  I specifically tried to
20   not do that.
21              MS. SOUSSAN:  I understand that, but
22   it was asked and answered.  Sustained.
23        Q.    (BY MR. MacLEOD)  Okay.  This would have
24   been -- I'm asking you if there's any other
25   knowledge.  And I heard that it was through counsel,
```

Page 231

1    and I'm asking if there's anything else.

2        A.   Of the specific date when it was taken

3    down?  No.

4        Q.   Okay.  Do you know when these Uber

5    videos -- for example, if I wanted to know if an

6    Uber -- if an Uber driver says they can access these

7    videos still in 2017, do you have any evidence to the

8    contrary?

9        A.   With me or that I have seen produced, no.

10       Q.   What about in 2018?  Do you have any

11   evidence that you've seen that's been produced that

12   would contradict an Uber driver saying you could

13   still see these videos in 2018?

14       A.   With me or that I have seen, no.

15       Q.   Let's took a look at Claimant's 4 and a

16   transcript of one of these Uber videos.  That's

17   Uber_Barysas_592.

18               MR. SANDAHL:  What's the name of the

19   video?

20               MR. MacLEOD:  How to Use the Uber

21   Partner App.

22       Q.   (BY MR. MacLEOD)  If we go to Page 4, which

23   is -- the very last sentence there says -- I'm sorry.

24   The Lines 10 through 12.  I apologize.

25               If you're an Uber driver and you watch

                                              Page 232

1   this video, what you would hear Uber say is that if

2   your rating falls below your city standard, you may

3   lose access to the Uber system, correct?

4        A.   That's what it says.

5        Q.   Okay.  We also know that -- if we go to

6   Page 6, Lines 9 through 13.

7             Have you seen Uber give coaching and

8   training before on having a positive attitude as a

9   driver before, sir?

10       A.   Coaching or training?  Not specifically,

11  no.

12       Q.   So this video, if you're an Uber driver, it

13  says, "Being a professional also means maintaining a

14  positive attitude," correct?

15       A.   That's what it says.

16       Q.   Uber says that arguing with your rider is

17  never a good idea and can lead to low ratings, right?

18       A.   That's what it says.

19       Q.   Uber says the driver should try to stay

20  cheerful?

21       A.   Was that a question?

22       Q.   Does Uber say that drivers should try to

23  stay cheerful?

24       A.   That's what this video says.

25       Q.   And it says, "Both you and your rider will

Page 233

1    have a better experience," right?

2         A.   That's what it says.

3         Q.   Now, we talked about this a little bit last

4    time.  But you told us last time, as I appreciate it,

5    that Uber is a cashless app, right?

6         A.   Yes.  In 2014 and 2015, 2013, '12, yeah.

7         Q.   What evidence do you have that in 2016 Uber

8    was no longer a cashless app?

9              MR. SANDAHL:  Objection.  Misstates

10   evidence and testimony.

11             MS. SOUSSAN:  Let's get some support

12   for that question, please.

13             MR. MacLEOD:  He just said 2014 and

14   2013 and 2015, so I'm asking him if 2016 it was

15   different and that now all of a sudden Uber says, "We

16   do accept cash through the app."

17             MS. SOUSSAN:  He can answer that

18   question if he knows.

19        A.   In the U.S., I believe we piloted something

20   out around accepting cash, but I don't recall

21   specifically when, whether it was 2016 or '17.  But I

22   don't think the pilot was successful.  And we do that

23   in other countries.  We accept cash.  In the U.S., I

24   don't believe the pilot was successful and we didn't.

25        Q.   (BY MR. MacLEOD)  In Texas during the years

Page 234

1    2016, 2017, 2018, and 2019, isn't it true that Uber

2    was always a cashless app?

3        A.   There might have been a pilot; but for all

4    intents and purposes, I would say yeah, we were

5    cashless.

6               MR. MacLEOD:  I'm going to object as

7    nonresponsive.

8               MR. SANDAHL:  I think he answered the

9    question, Your Honor.

10              MS. SOUSSAN:  Overruled.

11       Q.   (BY MR. MacLEOD)  "I think that they

12   exercised a pilot."  How do you know that they

13   exercised a pilot, or why do you think that they did?

14       A.   I know we were piloting it in various

15   different parts of the country, so I answered your

16   question.  For all intents and purposes, I would say

17   yeah, we were cashless except for a pilot.

18       Q.   But you made the comment that you may have

19   been piloting, right?

20       A.   I know in those years we did pilot it

21   throughout various countries.  So yeah.

22       Q.   How long did the pilot last?

23       A.   I don't know exactly.

24       Q.   Did the pilot ever take place in Houston?

25       A.   I'm not sure.

                                        Page 235

1          Q.    Did the pilot ever take place in any part

2     of Texas?

3          A.    I don't know.

4          Q.    You agree that cashless means -- in the

5     Uber app world, cashless means that all transactions

6     are handled electronically through the application,

7     correct?

8          A.    Yeah.

9          Q.    And that Uber tells their drivers to let

10    Uber handle any payment issues, correct?

11                    MR. SANDAHL:  Object that this is

12    asked and answered at the first day of testimony,

13    Your Honor.

14                    MS. SOUSSAN:  Overruled.

15         A.    Specific language?  I don't know where

16    you're quoting it from, but we do act as the driver's

17    limited payment collection agent.

18         Q.    (BY MR. MacLEOD)  As a limited collection

19    agent, you set the service fee, correct?

20         A.    The service fee -- yeah, the service fee is

21    set by us.

22         Q.    Right.  As the, quote/unquote, limited

23    collection agent, you set the multiplier for the time

24    fare, correct?

25         A.    I mean, that is really done by market

                                        Page 236

1     forces, as we discussed last time we spoke.

2         Q.   Are you being serious right now that it's

3     set by market forces?

4              MR. SANDAHL:   Objection.

5     Argumentative, Your Honor.

6         Q.   (BY MR. MacLEOD)   I'm really asking.

7              MS. SOUSSAN:   Overruled.

8         A.   The last time we spoke, as I said, it's

9     kind of like a stock price trade.  So where the -- if

10    the demand goes up and the supply doesn't change the

11    same capacity, then the prices will increase.

12        Q.   (BY MR. MacLEOD)   So does Uber set that

13    supply and demand algorithm?

14        A.   It is our algorithm, yeah.

15        Q.   Right.  If we go -- if we go to Page 9,

16    Lines 14 through 21 -- Line 14.

17             When there are more requests for rides

18    coming in than the available drivers can accept,

19    prices go up to encourage drivers to go on-line,

20    right?

21        A.   That's what it says.

22        Q.   And it's not the drivers who can say

23    through the app, "Okay.  I was going to take 10, but

24    now I want $25."

25             Instead, that is a unilateral decision

                                          Page 237

1    from Uber.  True?

2        A.   There's no way for a driver to specifically

3    do that in the app.

4        Q.   That's because that is a function that Uber

5    controls, not the drivers, correct?

6        A.   Well, a driver doesn't have to accept a

7    trip.  So a driver can control whether or not they

8    want to accept a trip at a certain price.

9        Q.   Okay.  So let me get this straight.  So

10   let's say, for example, that I'm going to -- I'm a

11   driver, and I want to encourage drivers to go

12   on-line.

13              Are you with me so far?

14       A.   If you're a driver and you want to

15   encourage drivers to go on-line?

16       Q.   If I'm a driver and I want riders to go

17   on-line.

18       A.   I'm with you.

19       Q.   Okay.  And now there's more -- there are

20   more rides coming in than the available drivers can

21   accept.  And in order for me to take advantage of

22   that, first off, I need to know that myself, right,

23   as a driver, right?

24       A.   Sorry.  You lost me.  Can you --

25       Q.   Yeah.  What I'm getting at is:  In order

Page 238

```
 1    for me as a driver to say I want to charge more money
 2    because of supply and demand issues, I have to know
 3    what the actual supply and demands are.  I have to
 4    see that, right?
 5         A.   Yeah, okay.
 6         Q.   Drivers don't see the supply and demand.
 7    It's Uber that sees the supply and demand, correct?
 8         A.   Within our app, we display to drivers where
 9    there's areas of high demand so they can actually see
10    where they are and then where it's surging and
11    certain multipliers in specific areas.
12         Q.   Sir, do you have -- do you have a photo of
13    the app or something that you can show us that would
14    actually support your testimony?
15              MR. SANDAHL:  I'll object again, Your
16    Honor, that, for example, screen shots are things we
17    have objected to producing and you have sustained
18    those kind of objections.  He's testifying about the
19    use of his app, which he's more than familiar with.
20    I don't think that there's a need for a photo of the
21    app or other documentary evidence to demonstrate
22    that.
23              MR. MacLEOD:  I would object to
24    speaking objection.  What I'm trying to do is test
25    the foundation, the basis for his testimony.
```

Page 239

1    Otherwise, it's bare testimony that's unsupported by

2    any actual documentary evidence.

3                    MS. SOUSSAN:  I think I heard it

4    differently, Mr. MacLeod.  Why don't you re-ask your

5    question?

6         Q.   (BY MR. MacLEOD)  What I'm trying to find

7    out is:  Is there a screen grab, is there a photo of

8    an app, is there some document that we can actually

9    look at today, this group, here under oath, to

10   actually support your testimony?

11        A.   Again --

12                   MS. SOUSSAN:  Hold on a minute.  I

13   doubt that Mr. Rosenthal brought any documents for

14   production to this session today.

15                   MR. MacLEOD:  He usually has binders

16   in front of him, Judge.  They usually put binders

17   that they stack in front of him.

18                   MS. SOUSSAN:  Okay.  Mr. Rosenthal, I

19   see you shaking your head.  What are you trying to

20   say?

21                   THE WITNESS:  First of all, I don't

22   usually have binders in front of me.  Second, to your

23   point, I didn't bring any documents with me today.

24                   MS. SOUSSAN:  So if he doesn't have

25   any such documents with him today, is there another

Page 240

1    question that you could ask, Mr. MacLeod?

2              MR. MacLEOD:  Judge, this is a

3    credibility fight.  It's telling to me that there's

4    no way that I'm going to be allowed to test this

5    gentleman's credibility because so far he can tell

6    you whatever he wants to tell you.  Counsel will

7    object and say, "How's he supposed to prove that or

8    show that?"  He's just going to testify.  That's not

9    how this goes.  There's a "what is the basis," and

10   that's the part that's not being allowed to be

11   explored.

12             MS. SOUSSAN:  Well, I disagree with

13   you because I'm sure you've had ample opportunity to

14   request documents during this arbitration proceeding.

15   So please move on, Mr. MacLeod.

16             MR. MacLEOD:  How should I move on,

17   Judge?  I'm literally trying to ask questions, and he

18   just says, "It's supply and demand."  Now I want to

19   have evidence.  We've sent many document requests.

20   For instance, we asked for a lot of GPS data.  That

21   was denied.  We asked for documents that were relied

22   upon for fraud.  That was denied.

23             MS. SOUSSAN:  Mr. MacLeod, move on and

24   ask your next question, please.

25        Q.   (BY MR. MacLEOD)  So I was trying to ask

                                        Page 241

1   you a question about what a driver can see on the app

2   with respect to other drivers on the road, correct?

3        A.   I believe you were asking me about the

4   supply and demand and the -- the -- like whether or

5   not it's surging in various areas of the city.

6        Q.   I was.  Instead of responding to that, what

7   you wanted to do was you told me, "Well, I believe

8   the drivers could see other drivers and then they

9   could go to the surge area."

10            Do you remember that?

11       A.   No, I didn't say drivers could see other

12  drivers.

13            MS. SOUSSAN:  Excuse me.  I don't

14  believe that that was his testimony either.  I just

15  think if you ask your question, Mr. MacLeod, we're

16  going to eventually get an answer.

17            MR. MacLEOD:  We're not, Judge.

18  That's the problem.  I'm not going to get an answer

19  and counsel is going to object and we're going to

20  hear, "I doubt that he has anything."  I doubted he

21  was going to have videos last time, and he did.

22            MS. SOUSSAN:  Let's move on.  This

23  arguing just takes up your valuable time.  Ask your

24  question.

25            MR. MacLEOD:  It's not valuable

Page 242

```
 1    when --
 2                  MS. SOUSSAN:  It wasn't that drivers
 3    can see other drivers.
 4                  MR. MacLEOD:  If I was in a court
 5    right now and I objected to nonresponsive, at some
 6    point that would be sustained.  I've already learned
 7    that you're not going to make that ruling because I
 8    remember this.
 9                  MS. SOUSSAN:  Mr. MacLeod, you're not
10    gaining anything here by arguing with me.  I am
11    trying to listen diligently to your questions and to
12    the answers, and I have no preconceived idea of how
13    to rule on an objection before I hear the question
14    and the answer.  So rather than arguing with me,
15    which I think is not necessarily a good use of your
16    time, please move on, ask your question.
17                  MR. MacLEOD:  So I tried to ask a
18    question during the first time about Uber Land, and
19    you've never read that book, and you told me, "Don't
20    even go there."  You're not confused.  That's what
21    I'm dealing with.
22        Q.   (BY MR. MacLEOD)  Let's go, Mr. Rosenthal,
23    to Line 17.  Do you see where it says, "Adjusting
24    prices during times of high demand brings more
25    drivers onto the road"?
```

Page 243

1    A.    That's what it says.

2    Q.    The actual entity that makes that decision

3  on whether or not to increase prices or adjust

4  prices, that's an Uber decision, correct?

5    A.    It is.

6    Q.    Can Dainius -- in 2016, was there a feature

7  in the app that he could go into and say, "You know

8  what?  Today I'm going to drive with all my

9  flexibility and all my freedom, and I'm going to have

10  the opportunity that I want to charge all the

11  potential riders who ride in my car $50 per ride"?

12    A.    There is no way to do that in our app.

13    Q.    Could he have done that in any day that he

14  drove through the Uber application?

15    A.    Not to my knowledge.

16    Q.    Is there a single time in which Dainius

17  logged into the Uber app where he could have said,

18  "You know what?  I've driven a lot this week.  I want

19  to charge less.  I want to charge $10 a ride.  I want

20  to be gratuitous.  I want to be helpful."

21            Is there any way that he can do that

22  through the Uber application?

23    A.    Not automatically.  He would have to

24  negotiate with riders.

25    Q.    And so, can you tell Judge Soussan is there

Page 244

```
 1    a negotiation feature in the Uber application?

 2         A.   Not a button or feature, no.

 3         Q.   And so, what you're suggesting is that

 4    after every single ride, Dainius would reach out to

 5    someone with Uber support that he's never met before

 6    and say, "I want to negotiate with this rider,"

 7    correct?

 8         A.   It doesn't have to be at the end of the

 9    ride.  It could be before he even picked up a rider.

10         Q.   So let me walk through this.  There's an

11    estimated time of arrival that is provided to a

12    rider, correct?

13         A.   That is right, yeah.

14         Q.   And so, what you're suggesting here is that

15    to negotiate, somehow Dainius, as he's driving to try

16    to meet the ETA that's proceeded by Uber, is somehow

17    going to be negotiating the fare before he picks up

18    the rider?  Is that your sworn testimony, sir?

19         A.   You could do that, yeah.

20         Q.   And how would he do that?  Can you explain

21    how he's driving to pick up the rider that Uber's

22    told him to pick up and how is he negotiating during

23    that time period?  Explain to me a situation where

24    that's happened.

25         A.   So as you will see based on the documents
```

Page 245

1    that are produced that your claimant did text riders

2    oftentimes after he accepted a trip before he picked

3    them up.  He can text them and say, "I'll bring you

4    somewhere for whatever dollars."  You can do that.

5    That's nothing preventing that from happening.

6         Q.    How many times are you saying that Dainius,

7    during the thousands of trips he provided for Uber,

8    that he attempted -- negotiated with riders?

9         A.    I don't know how many times he did it.

10        Q.    Do you have an approximation?

11        A.    I don't know if he ever did it.

12        Q.    Okay.  So that's what I'm trying to make

13   sure.  You said that he could have done it, correct?

14        A.    You asked me to walk you through how he

15   could have done it, and that's exactly what I did.

16        Q.    My question is a situation where that has

17   actually happened.  Can you do that?

18        A.    I cannot do that with your claimant.

19        Q.    Can you tell me any Uber support message

20   that you've seen in this particular case involving

21   Dainius or any of the e-mails to Dainius where he was

22   ever encouraged to engage in direct negotiations with

23   the riders that he was assigned to by Uber?

24        A.    I haven't seen any.

25        Q.    Let me ask you this.  You were talking

                                        Page 246

1    about -- we were talking about distance and time

2    multipliers earlier.

3                     How often did distance and time

4    multipliers change based on market forces?

5         A.    All the time.

6         Q.    And -- and the actual changes that are made

7    in the Uber app system, are those distance and fare

8    multiplier changes -- those are not provided to

9    Dainius before he accepts or declines a ride.  True?

10        A.    They are provided.

11        Q.    Okay.  Again, now you're -- you're saying

12   that the market forces, these distance and time

13   multiplier that is going to change, that somehow in

14   the 15-second period that information is provided to

15   Dainius?

16        A.    Yeah.

17        Q.    Let me ask you this.  Who sets the

18   multiplier to begin the day?  Let's say the first

19   ride is at 6:00 a.m. that morning.

20                     Who sets the distance and time

21   multipliers for the very first ride of the day?

22        A.    It just happens.  It's our marketplace.

23   It's like a stock trade and the prices are all fluid.

24   So for any trip, there could be a surge multiplier in

25   effect.

                                        Page 247

1          Q.    Does the multiplier start -- start new or

2     fresh every day, or is it just always fluctuating

3     based upon Uber's marketplace?

4          A.    It's always fluctuating.

5          Q.    Let me -- if we could pull up Respondent's

6     51, which is the City of Houston ordinances, please.

7                As I appreciate it, this is a City of

8     Houston ordinance, Chapter 46, Vehicles for Hire.

9                Have you seen this before?

10         A.    Some of it.

11         Q.    Okay.  So we received what we were told was

12    a different version of this yesterday for the first

13    time from Uber and the City of Houston ordinances,

14    Chapter 46, Vehicles for Hire, right?

15         A.    That's what it says.

16         Q.    Okay.  If you go to Page 65 -- okay.  Let's

17    take a look at Section 46-243 there where it says

18    Schedule of Fares.

19                I know it's been some time now, but

20    Uber's counsel gave an opening statement in this case

21    where he talked about how Mr. Barysas was registered

22    by the City of Houston as a limousine driver.

23                Do you remember that?

24         A.    I do.

25         Q.    Do you see here it says, "Permittees shall

Page 248

1    file with the director of schedule of fares or rates

2    to be charged"?

3                    Do you see that?

4        A.   I do.

5        Q.   First off, in order to be -- do you

6    understand then that to be a limo driver in the City

7    of Houston, you have to file a schedule of fares or

8    rates to be charged with the City of Houston?

9        A.   Is that what -- is a permittee a limo

10   driver?  I don't know the definition of permittee

11   here.

12       Q.   As Uber's corporate representative who is

13   here, Uber's sole witness, and Uber's relying upon

14   this document, City of Houston ordinance, do you know

15   whether or not a limo driver has to file with the

16   director a schedule of fares or rates to be charged

17   or do you not know that, sir?

18                    MR. SANDAHL:  I'll object to the

19   statement that we're relying on it.  We provided it.

20   That doesn't imply that we're necessarily relying on

21   it.

22                    MS. SOUSSAN:  Sustained.

23       Q.   (BY MR. MacLEOD)  Sir, do you understand

24   that I received this document yesterday?

25                    MR. SANDAHL:  Just to clarify --

                                        Page 249

1           MR. MacLEOD:  I'm asking your witness.

2      A.   Is this document publicly available?

3           MS. SOUSSAN:  That wasn't the

4  question, Mr. Rosenthal.

5      Q.   (BY MR. MacLEOD)  Mr. Rosenthal, do you

6  understand that we received this document in PDF form

7  by e-mail from your counsel yesterday?

8      A.   I don't know when you received it.

9      Q.   All right.  Now, first off, if -- if

10  Dainius wanted to file his fares or rates to be

11  charged when driving with Uber Black -- first off,

12  that's an impossibility.  That's not something that

13  he can do, correct?

14      A.   I don't know if he can do that or not.

15      Q.   Well, sir, with Uber Black, he's not going

16  to be able to say, "Hey, Uber, every time I go from

17  NRG to -- let's say from NRG to the Toyota center,

18  that area that I want to take $150."

19           He can't do that, right?

20      A.   Within our app, no.

21      Q.   Also within the app, even if he's Uber

22  Black and not UberX or Uber Select, there's no way,

23  then -- because he has no control or knowledge of the

24  fares or rates that he's going to -- that he's going

25  to receive until he actually drives through the Uber

                                        Page 250

1    app on a daily basis, right?

2         A.   Until a trip is completed, he wouldn't know

3    the actual fare, that's right.

4         Q.   So he, therefore, cannot provide -- as a

5    permittee, you cannot provide the director a schedule

6    of fares or rates to be charged within the Uber Black

7    world, right?

8         A.   Presumably not.  I'm not sure exactly how

9    this document all ties together.

10        Q.   You can take that down.  So I want to hit

11   on just a few other things.  You remember how the

12   last time we talked you were discussing upfront

13   guaranteed minimum fares and when they were actually

14   provided to drivers like Dainius?

15        A.   I don't quite recall.

16        Q.   Do you remember how we were -- we were in

17   the middle of taking your testimony and all of a

18   sudden we received for the first time a screen grab

19   or screen shot of an Uber driver app?

20                  MR. SANDAHL:  Objection.

21                  (Simultaneous cross-talk.)

22        Q.   (BY MR. MacLEOD)  I didn't hear that.

23        A.   This arbitration?

24        Q.   During the Gilbert Washington.  I don't

25   want to talk about anything that was said during

                                            Page 251

```
 1    that, other than it was your sworn testimony.  But
 2    during that Mr. Washington arbitration, do you
 3    remember that for the first time we were provided
 4    with a screen grab from the Uber driver app?
 5        A.   I do recall that, yes.
 6        Q.   And in this particular instance, do you
 7    remember that Uber said that starting September 1st,
 8    2020 -- which is long after Dainius stopped driving
 9    for Uber, right?
10        A.   I don't know when he stopped.
11        Q.   As Uber's corporate representative, you do
12    not know when Dainius stopped driving?
13        A.   Specifically, no, I don't.
14        Q.   Well, you said "specifically."  Do you know
15    the year?
16        A.   I thought it was 2020, but maybe it was
17    2019.
18        Q.   Okay.  What -- what we knew and what we
19    found out was that the earning structure and upfront
20    trip information changed as of November 12th, 2019,
21    in the City of Houston, correct?
22        A.   I would have to see it.
23        Q.   We can pull it up.  This is from your
24    testimony on April 14th, 2022.
25                   MR. SANDAHL:  Object, Your Honor, that
```

Page 252

```
 1    this is improper impeachment with use of another
 2    unrelated arbitration.
 3                    MR. MacLEOD:  It's his sworn
 4    testimony.
 5                    MS. SOUSSAN:  I'm rather confused,
 6    Mr. MacLeod.  I'm unaware of any testimony in another
 7    arbitration.  I'm going to let you go with this for a
 8    little while since it's sworn testimony, but -- you
 9    know, every arbitration stands on its own, but I'm
10    going to give you some leeway here.
11                    MR. MacLEOD:  With all due respect, I
12    don't even have to show it.  I can just make it
13    easier.
14        Q.   (BY MR. MacLEOD)  You literally
15    testified -- we don't have to talk about whether it
16    was arbitration, deposition testimony.
17                    Do you remember in the month of
18    April 2022, sir, testifying about earning structure
19    and upfront trip information that was going to change
20    specifically in the City of Houston?
21        A.   I would have to see the context.  I don't
22    quite recall.
23        Q.   Do you remember that Uber told their
24    drivers that as of November 12th, 2019, in the City
25    of Houston, "Rather than publishing base fare rates
```

Page 253

 1   to explain earnings, we will be showing an upfront

 2   guaranteed minimum amount that is inclusive of your

 3   total trip earnings before you accept it"?

 4        A.   I don't recall this, but -- I can't recall

 5   the specifics of that arbitration, what was asked and

 6   what was shown.  It seems like you're --

 7        Q.   I'm just asking if you remember that.  I'm

 8   not asking you to go back to 2019.  I'm just asking

 9   from April if you remember that we discussed how

10   this -- this change was being made by Uber in

11   Houston.

12        A.   I don't recall.

13        Q.   Do you remember Uber communicating to

14   drivers in 2019 that Uber believed that that would

15   be -- the upfront minimum guaranteed amount,

16   publishing that before a driver has to accept or

17   decline a ride, that Uber believed that that was the

18   easiest way to understand how much drivers would earn

19   at the time of a request?

20             MR. SANDAHL:  Objection.  Asked and

21   answered.

22             MS. SOUSSAN:  Overruled.

23        A.   I would have to see what you're referring

24   to.

25        Q.   (BY MR. MacLEOD)  Let's take a look at

                                        Page 254

1    Claimant's 23.  Specifically, I want to look at

2    Uber_website_7520.  For the record, it ends at

3    Uber_Website_756.

4                Do you see where it says New Earnings

5    Structure and Upfront Trip Information?

6         A.    Okay.

7         Q.    It says, "Starting September 1st, 2020,

8    earnings structure and upfront trip information

9    changed in all U.S. cities," right?

10        A.    Yep.

11        Q.    Yes?

12        A.    That's what it says, yeah.

13        Q.    Okay.  If we go to the next page,

14   Uber_Website_753, at the bottom there in the last

15   full paragraph starting November 12th, it says,

16   "Starting November 12th, 2019, earnings structure and

17   upfront trip information changed," and it includes a

18   number of cities.  And one of those is Houston,

19   correct?

20        A.    That's what it says, yeah.

21        Q.    Now, if we go to Page 754 near the

22   bottom -- near the middle of the page, it says, "What

23   are my new base fare rates?  What are my new base

24   fare rates?  Rather than publishing base fare rates

25   to explain earnings, we will be showing an upfront

Page 255

1    guaranteed minimum amount that is inclusive of your

2    total trip earnings before you accept it," right?

3         A.    That's what it says.

4         Q.    And you would agree that if -- if someone

5    like Dainius is going to be called an independent

6    contractor, don't you believe that he should be told

7    what the upfront guaranteed minimum amount is for a

8    trip before he has to accept or decline it?

9                   MR. SANDAHL:  Objection.

10   Argumentative.

11                  MS. SOUSSAN:  Overruled.

12        A.    I wouldn't necessarily believe that, no.

13        Q.    (BY MR. MacLEOD)  Okay.  If we go to the

14   bottom of this, there's a section that says, "What is

15   a guaranteed minimum amount, and how is it

16   calculated?"  It says, "This is the amount you now

17   see upfront on the trip screen request [sic].  It is

18   the amount you will earn for a completed delivery,"

19   right?

20        A.    Yeah.  Is this Uber Eats?

21        Q.    That's what I'm trying to ask you.  Do you

22   think, first off, that as an Uber driver -- if an

23   Uber driver is going to have freedom and flexibility

24   that an Uber driver should see the amount upfront on

25   the trip request screen before having to accept or

Page 256

1    decline a ride?

2         A.   Not necessarily.

3         Q.   Okay.  Let me switch gears on you just a

4    little bit here.

5                   You would agree with me that you have

6    seen no evidence in this case that Dainius is a

7    medical doctor, correct?

8         A.   I have not, no.

9         Q.   You've seen no evidence in this case that

10   he is a nurse, correct?

11        A.   Correct.

12        Q.   You have seen no evidence that he was a

13   welder, correct?

14        A.   That's correct.

15        Q.   You have seen no evidence that Dainius at

16   any time while he used the Uber application was an

17   electrician?

18        A.   That's correct.

19        Q.   And you also have seen no evidence during

20   the time that he used the Uber app that he was

21   employed in any manner as a plumber, correct?

22        A.   That's correct.

23        Q.   I'm sorry?

24        A.   That's correct.

25        Q.   Just so I make sure, have you seen any

Page 257

1   documents produced in this particular matter during

2   the time that Dainius drove through the Uber app that

3   would show what information Dainius was provided with

4   by Uber in the 15 seconds he had before he either

5   accepted or denied a ride?

6        A.   I guess what are you looking for?

7        Q.   I'm just asking if there's any documents,

8   any screen grabs, any information that you've seen in

9   your review of documents in this matter that would

10  tell you what information Dainius had available to

11  him from Uber during the 15 seconds before he could

12  either accept or deny a ride.

13       A.   I would have to look through all of the

14  things we produced on our web page.  Some might list

15  out some things.  I have not seen a screen grab in

16  this particular matter, if that's what you're

17  referring to.

18       Q.   You said there were many people working to

19  develop the Uber application, correct?

20       A.   That's right.

21       Q.   I'm sorry.  I didn't hear you.

22       A.   That's right.

23       Q.   And you would agree that there was a

24  significant investment by Uber to develop that

25  algorithm?

                                        Page 258

1        A.    To develop the app, yeah.

2        Q.    And we can agree that the investment in

3   developing the algorithm, the initial investment,

4   we're talking hundreds of millions of dollars,

5   correct?

6        A.    The algorithm specifically, I don't know.

7   But the app and all the technology, yeah.

8        Q.    Okay.  And you've said over time we've

9   invested hundreds of millions of dollars, if not

10  more, into development of the Uber application

11  software, correct?

12       A.    Yeah, that's right.

13       Q.    We also know that Uber spends a significant

14  amount of money on TV advertising.  True?

15       A.    I don't know what our budget is for TV ads,

16  but we have done some in the past and they haven't

17  been cheap.

18       Q.    We know that Uber spends millions of

19  dollars on TV advertising relating to the Uber driver

20  and rider application, correct?

21       A.    What application specifically, I don't

22  know.  But the brand, yeah.

23       Q.    We know that Uber also spends millions of

24  dollars in on-line web-based advertising in

25  furtherance of the Uber rider/driver application,

                                        Page 259

1    correct?

2         A.   Brands, yeah.

3         Q.   Uber spends a significant amount of money

4    in sending both written brochures, materials, sales

5    information, as well as e-mail communications to

6    potential drivers and riders relating to use of the

7    Uber rider and driver app, correct?

8         A.   Yeah.

9         Q.   You talked before that there were at least

10   4,000 software engineers who were working at the time

11   to prepare the app and also who now help to maintain

12   the Uber rider/driver application, correct?

13        A.   4,000 is directionally correct, yeah.

14        Q.   You talked earlier about how Uber has the

15   physical locations, the Greenlight hubs, correct?

16        A.   Yeah.

17        Q.   You said you didn't know specifically about

18   how many of the Greenlight hubs were in the United

19   States, but you said that there were probably more

20   than a hundred, right?

21        A.   I believe that's what I said, yeah.

22        Q.   And each one of those is obviously invested

23   in by Uber in those Greenlight hubs, correct?

24        A.   Yeah.

25        Q.   You have to staff those Greenlight hubs.

Page 260

1    You have to invest in the real estate, whether it's

2    leased or owned, right?

3         A.    Correct.

4         Q.    We also know that there are a substantial

5    number of people who work in the Uber support

6    capacity, correct?

7         A.    There are.

8         Q.    My understanding was that as of

9    December 31st, 2021, that Uber had approximately

10   29,300 employees globally; is that right?

11        A.    Seems a bit high, but not far off.

12        Q.    And that Uber, at least as of the last day

13   of 2021, had operations in approximately 72 countries

14   and approximately 10,500 cities around the world.

15                   Is that also right?

16        A.    72 seems high, but directionally it's

17   close.

18        Q.    Now -- and every year have you seen that

19   Uber will -- will publish its annual report?

20        A.    I'm aware of that, yeah.  Well, I shouldn't

21   say every year.  But since being a public company,

22   yeah.

23        Q.    Okay.  And -- and that -- in 2021, Uber

24   said that they were experiencing and expected to

25   continue to experience driver supply constraints as a

                                          Page 261

1    result of the COVID-19 pandemic.  That's true?

2         A.   That is true generally, yeah.

3         Q.   As part of an operational risk, do you know

4    that Uber told their shareholders that Uber's

5    business would be adversely affected if drivers were

6    classified as employees, workers, or quasi-employees?

7         A.   I haven't seen the risk outline -- the risk

8    topics that you're referring to, but I would

9    understand that we would do that.

10        Q.   And that Uber communicated to its

11   shareholders that reclassification of drivers to

12   employees or workers where those statutes exist could

13   lead to groups of drivers becoming represented by

14   labor unions and similar organizations?

15        A.   Again, I don't have the risk factors that

16   you're referring to in front of me, but -- but I

17   don't dispute or confirm nor deny that.

18        Q.   And did you know that Uber told its

19   shareholders that any such reclassification from

20   independent contractor status to employee or worker

21   status would require Uber to fundamentally change its

22   business and could consequently have an adverse

23   affect on its business, results of operations, its

24   financial position, and cash flows?

25        A.   Again, I don't have the risk factors in

Page 262

```
 1    front of me, but that seems like a reasonable
 2    statement.
 3                    MR. MacLEOD:  May we take a quick,
 4    five-minute break?
 5                    MS. SOUSSAN:  Sure.  Let's go ahead
 6    and take our morning 15-minute break.  15 minutes,
 7    everyone.
 8                    (Recess from 11:24 a.m. to 11:41 a.m.)
 9        Q.   (BY MR. MacLEOD)  If we can take a look at
10    Claimant's Number 8.  It's going to be
11    Uber_Barysas_1386.  We'll start at the very top here
12    so we can get a flavor of what's going on.
13                    This is in June 8th of 2018.  This
14    is -- the title is "My driver refused my destination.
15    Details."  It says, "He sent me the following
16    message.  Hello, I was trying to call you, but it
17    goes straight to voicemail.  I've tried to cancel
18    this ride, but the system is not letting me.  I'm
19    currently pulled over by police.  You can cancel the
20    ride.  You will not get charged because I haven't
21    moved."
22                    So when you said earlier when you were
23    testifying about evidence that you had of fraud or
24    geo-spoofing, is this the, quote/unquote, text
25    message that you were talking about, sir?
```

Page 263

1       A.   If I recall correctly, he sent the same
2    exact text message about 27 times or something like
3    that to different riders.
4       Q.   And did you review all of those before
5    today's testimony?
6       A.   I have, yeah.
7       Q.   Okay.  And where did you review those?
8       A.   I can't recall.  Counsel was sharing them
9    with me.
10      Q.   And did you review actual snapshots of
11   actual text messages, or did you actually review
12   support messages like the one that we're looking at
13   here?
14      A.   It wasn't the one we're looking at here, I
15   don't believe.  I can't recall them.
16      Q.   I guess what I'm trying to find out is:
17   What format were the messages that you say there were
18   about 27 of that you reviewed before today?
19      A.   The format?  I think it was, like, a
20   spreadsheet or something.  I can't remember.
21           MR. MacLEOD:  Counsel, do you have
22   that spreadsheet that he's talking about,
23   Mr. Sandahl?
24           MR. SANDAHL:  Yeah.  It's been
25   produced.

                                        Page 264

```
 1                  MR. MacLEOD:  Do you have the Bates
 2      number?  Do you know?
 3                  MR. SANDAHL:  I don't have it in front
 4      of me.  Claimant's 5.
 5                  MS. SOUSSAN:  Do I have any witnesses
 6      that have entered the room?
 7                  (Discussion off the record)
 8          Q.   (BY MR. MacLEOD)  And so, this was the
 9      message from a rider to the in-app support, and then
10      the driver says something again on the same date.
11      And then at the bottom, we get the final result.  And
12      it says, "Thank you for taking the time to report
13      this situation, Dominic.  We want everyone to have a
14      safe and comfortable experience while using the Uber
15      app.  As a result of your report, we will be
16      conducting a review of our driver's account to
17      determine whether or not they should continue to have
18      an opportunity to partner with Uber.  Rest assured as
19      well that you are not charged for this trip request."
20                  Then if we go to Uber_Barysas_1179 --
21      okay.  Now we've got 1179, and it's "Hi, Dainius" at
22      the top.  "A rider claimed that you were stopped by
23      law enforcement during a recent trip.  Help us better
24      understand the situation.  Can you please reply to
25      this e-mail to provide any additional context or
```

Page 265

1    details on this incident?"

2              And so, Uber is asking Dainius whether

3    or not he can provide additional information, right?

4         A.   That's what it says.

5         Q.   Okay.  On that same day, you see on Friday,

6    June 8, 2018, Dainius responds.  "Hello, I was

7    stopped by IAH airport security personnel, and they

8    checked my airport permit, as well as my driver's

9    license."

10             So first off, we know that Dainius

11   didn't just blow this off.  He responded, right?

12        A.   Is that a question?

13        Q.   You can see here Dainius just didn't blow

14   this off and say, "I'm not going to respond."  He was

15   asked for additional context or details, and he was

16   providing them here, right?

17        A.   Looks like he provided some additional

18   details, yeah.

19        Q.   He says, "That happened before my client

20   was in the car.  The reason this happened is because

21   the drivers are forced to double park in the IAH

22   staging lot.  The staging lot is way too small to

23   handle all the drivers wanting to park there.  It's a

24   shame that Uber is disregarding this terrible issue.

25   Please ask upper management to provide a bigger

Page 266

1    staging lot for the drivers at IAH."  And then he

2    says his name, right?

3         A.   That's what it says.

4         Q.   Response from Uber same day.  "Thank you

5    for providing your perspective about this incident,

6    Dainius.  We will use this information to investigate

7    this matter."

8              First off, who specifically was tasked

9    with investigating this matter, if you know?

10        A.   I don't.

11        Q.   Then it says, "When we receive feedback of

12   this nature, for safety reasons we follow up and

13   gather as much information as possible to complete

14   our review," correct?

15        A.   That's what it says.

16        Q.   Do you have any personal knowledge or any

17   knowledge that you have -- any knowledge you've

18   gleaned preparing as Uber's corporate representative

19   about what information was collected by Uber?  You

20   know, they say, "as much as possible to complete

21   Uber's review."

22        A.   Aside from what we see here, I'm not aware

23   of anything.

24             MR. MacLEOD:  We'll pass the witness.

25             MS. SOUSSAN:  Thank you.

                                        Page 267

 1              MR. SANDAHL:  Your Honor, we would

 2    reserve our questioning of Mr. Rosenthal for our case

 3    in chief, please.

 4              MS. SOUSSAN:  Thank you.  Mr. MacLeod,

 5    are you ready for your next witness?

 6              MR. MacLEOD:  We are.  If I may just

 7    make a brief offer of proof.

 8              With respect to the cross-examination

 9    of Mr. Rosenthal, early on in the cross-examination,

10    my full intention was to ask questions about some of

11    the statements made by a now employee, Alex

12    Rosenblatt.  She wrote a book called Uber Land:  How

13    Algorithms are Rewriting the Rules of Work.  Chris

14    Hughes, co-founder of Facebook and co-chair of the

15    Economic Security Project said it was a must read.

16              Alex Rosenblatt was a researcher at

17    the Data and Society of Research Institute at the

18    time of the book publishing.  She -- in the statement

19    about the book on the back cover, it says, "Uber Land

20    upends our understanding of work in the digital age

21    and paints a future where any of us might be managed

22    by a faceless boss."

23              I think Ms. Rosenblatt has many

24    factual statements that cut directly against the

25    sworn testimony of Mr. Rosenthal, and I think it was

                                        Page 268

1    prejudicial not to be able to ask questions about

2    that, as well as being told that there was some

3    confusion about what we were doing or not doing.

4                    In addition, there was a lot of

5    questions about the GPS data.  The collection of that

6    GPS data to us is a form of monitoring.  Instead of

7    being able to delve into that more, A, the corporate

8    representative is not truly prepared about

9    geo-mapping or geo-spoofing in a case where that's a

10   large component of it, but we were told that it's

11   proprietary or calls for trade secret.

12                   I confide that there's nothing about

13   my client's GPS data -- his actual data that was

14   taken from his phone that was proprietary or trade

15   secret.  The fact that he's being monitored is not

16   proprietary or trade secret.  It's very, very

17   well-known and public knowledge.

18                   Part of that public knowledge stems

19   from an Uber operational program that's carried out

20   by some of their top execs called Operation Hell.  It

21   cuts against Uber's credibility -- and Uber's

22   credibility is at stake here -- and we were not

23   permitted to go in further about the monitoring and

24   the nature of monitoring because we were told it was

25   trade secret, even though I've been told many times

Page 269

 1   that arbitration is confidential, protective orders.

 2   There's no way that I presume that the people in this

 3   room -- and I certainly would not -- are going to go

 4   and compete or release any of this information about

 5   Uber.

 6              The last part is there were many times

 7   where it was clear that Mr. Rosenthal was willing to

 8   say whatever he wanted to say in response to

 9   questions.  Whether or not there was any

10   legally-admissible or competent evidence to support

11   those statements, he would say, "I think" or "I

12   believe."

13              We had filed motions to compel in this

14   case, including one after the start of the last

15   arbitration that was summarily denied except for the

16   videos that were created as part of this litigation.

17   And so, it hampers the ability to effectively

18   cross-examine a witness, especially in this case, an

19   Uber corporate representative, especially given that

20   he is the sole witness who has been presented here.

21              That ends my offer of proof.  Thank

22   you, Judge.

23              JUDGE SOUSSAN:  Response?

24              MR. SANDAHL:  I think the Alex

25   Rosenblatt issue, you've already ruled for all the

Page 270

1    reasons in our motion, but essentially she has no

2    personal knowledge of the issues.  We have someone

3    who can testify about the policies.  That is

4    Mr. Rosenthal.  He's certainly has been

5    cross-examined thoroughly, and you can make your own

6    judgments about his credibility and about whether his

7    testimony is credible.  There's no reason that

8    Ms. Rosenblatt needs to testify here.  They did not

9    depose Mr. Rosenthal at any point.

10                   And so, there's no -- you know, they

11   could have gotten this information, learned about

12   this information, the kind of answers he would give

13   at that point and decided not to do that.

14                   With respect to GPS data, we did

15   provide some GPS data, both prior to and after the

16   hearing last time.  The GPS data itself is not what

17   we've contended is proprietary.  Obviously you've

18   made the ruling, and it cuts a clear line of this

19   information is -- and you did this today.  This

20   information is proprietary and I'm not going to let

21   him testify about that.  This information is not

22   proprietary, and I will let him testimony about that.

23   A good, clear line has been drawn there.

24                   Project Hell is something that's been

25   brought up for the first time today.  There's no

Page 271

1   reason for that to be discussed in this arbitration.

2   Mr. Rosenthal didn't know anything about it.  Lack of

3   foundation.

4              And then the last piece just about

5   whether there's discovery issues and whether we

6   produced enough to sort of substantiate the

7   testimony.  His testimony is evidence.  You can

8   certainly give it the weight you want, evaluate the

9   credibility on your own.  You can make your own

10  decisions about whether to give credence to it.

11             MS. SOUSSAN:  Anything else,

12  Mr. MacLeod?

13             MR. MacLEOD:  Nothing further.

14  Mr. Stanley will call our next witness.

15             MR. STANLEY:  I would call Dainius

16  Barysas.  We're moving the microphone over now.

17             MS. SOUSSAN:  Are you going to join us

18  via video?

19             MR. SANDAHL:  Your Honor, Ms. Miers

20  will take the defense.

21             DAINIUS BARYSAS,

22  having been first duly sworn, testified as follows:

23                   EXAMINATION

24     Q.   (BY MR. STANLEY)  Can you please state your

25  name for the record?

1      A.    My name is Dainius Barysas.

2      Q.    And where are you from, Dainius?

3      A.    I'm originally was born in northern Europe.

4   I'm from Lithuania.

5      Q.    Can you tell the judge here about your life

6   and just -- when you came over here and when you

7   started, what you started to do once you came here?

8      A.    Well, I moved to the U.S. when I was 20.  I

9   came as an exchange student, decided to stay because

10  I met a girl.  Originally my plan was to come here

11  for the summer.  I had a job.  I had a contract.  I

12  was on a special visa.  And I didn't make any money

13  and decided to stay.  And then I got married, and --

14  and I've had numerous jobs throughout the years.  I

15  don't have a college degree.  I have a high school

16  diploma and I'm not a doctor, not an engineer.  So

17  I've had different jobs throughout my life from

18  driving, being an affiliate for a bike rental company

19  and, yeah, currently -- currently I have a trucking

20  company, one-man show, owner operator.  I drive all

21  across the country for a living delivering cars from

22  dealerships, from -- from dealership to dealership,

23  rail yards, bringing vehicles to dealerships.

24     Q.    Where did you move to when you moved to the

25  United States?

Page 273

```
1          A.    I've always lived in New York.  Different
2     addresses, different boroughs in New York City, and
3     in 2018 I moved to Houston.
4          Q.    What year did you move to New York?
5          A.    New York?  2003.
6          Q.    And at some point along the way, did you
7     start driving for Uber?
8          A.    Yes.  In 2014, I started driving for Uber.
9          Q.    And how long did you drive for Uber?
10         A.    Up until the time that I moved to Houston.
11    So 2014 sometime -- from 2014 to 2017.  Sometime
12    September 2017, I believe.
13         Q.    When did you move to Houston?
14         A.    2017, in August or September, one of those
15    months.  I don't remember exactly.
16         Q.    And did you continue to drive for Uber once
17    you moved to Houston?
18         A.    Yes.
19         Q.    And about how long, if you recall, did you
20    continue to drive for Uber after you moved to
21    Houston?
22         A.    Up until 2019 around May, I would say.
23         Q.    And once you stopped driving for Uber, what
24    then did you start doing?
25         A.    So I -- I started a trucking -- driving for
```

Page 274

1    a trucking company.  I initially worked for them.

2        Q.    What's the name of that company?

3        A.    It was -- I can't remember right now.  TC

4    Logistics, I believe, but that company is no longer

5    operational.

6        Q.    And you said you started your own company?

7        A.    Yes, I have.

8        Q.    What is the name of that company?

9        A.    So the name of the company is DSK

10   Logistics, LLC.

11       Q.    From 2014 up until August of 2019, what was

12   your primary form of making money?

13       A.    Uber -- Uber was my primary source of

14   income.  I relied on it.

15       Q.    And along that time, did you ever have the

16   ability to dictate how much you would make on any

17   individual ride for Uber?

18       A.    No, sir.

19       Q.    Did you ever have control of the value of

20   the base fare that you could charge when driving for

21   Uber?

22       A.    No.  No, sir.

23       Q.    Did you ever have control of the distance

24   fare that you could charge when driving for Uber?

25       A.    No, never.

Veritext Legal Solutions
346-293-7000

1    Q.    Did you ever have control of the time fare

2   that you could charge when driving for Uber?

3    A.    No, sir.

4    Q.    Did you ever have control of the percentage

5   Uber could take from any individual trip that you

6   completed for Uber?

7    A.    No, sir.

8    Q.    Have you ever been able to choose the rider

9   that you might receive inside the Uber app?

10   A.    No, sir.

11   Q.    Have you been able to -- or could you while

12   using the app -- develop a list of preferred Uber

13   riders that you could provide services to?

14   A.    No, sir.

15   Q.    How were you able to receive a ride request

16   once you log onto the Uber app?

17   A.    It would just be offered through the app.

18   Q.    Do you control or have you ever had control

19   of the amount of rides that you would be offered

20   throughout a day?

21   A.    No, sir.

22   Q.    If you wanted to start a day and say, "My

23   goal is to complete 50 Uber rides in one day," could

24   you -- could you guarantee that that would occur in

25   any given day?

Page 276

1        A.    No.

2        Q.    Why?

3        A.    Because Uber had control over the rides

4    offered to me.  I had no say in that.

5        Q.    How is a ride offered to you?

6        A.    In order to receive a ride request, you

7    would have to go on-line, on Uber's app, and you

8    would be offered a ride.  But my primary source of

9    income was the airport, and as soon as you enter the

10   staging lot, you would be put in a virtual queue.  So

11   it was never the same.  Some days you would wait, you

12   know, a lot longer than others, but most of the time

13   at the airport it would be hours and hours waiting

14   for one ride.  Then I guess when there's a customer,

15   it would be offered to you through the app and you

16   would hit accept and head to pick up the customer.

17       Q.    Can you tell the judge a little bit about

18   the information that would be shown to you before you

19   accept a ride request through Uber?

20       A.    So it would show the rating of the customer

21   and the name of the customer.

22       Q.    Were you able to set the level of customers

23   that you wanted to receive through the Uber app to

24   only receive a high-rated customer?

25       A.    No, sir.

Page 277

1      Q.    Were you able to set on the app any

2   function that would only allow you to receive trips

3   above $10?

4      A.    No, sir.

5      Q.    Was there any price function you could set

6   that would only make the Uber app send you requests

7   at a certain monetary level?

8      A.    No.

9               MR. STANLEY:   Jacob, could you bring

10   up Joint Exhibit 1, please?

11      Q.    (BY MR. STANLEY)   Dainius, do you know what

12   this document is?

13      A.    Yes, I do.

14      Q.    For purposes of the record, this is

15   Uber_Barysas_362.

16               Dainius, tell the judge what this

17   document is.

18      A.    I've read this document numerous times.

19   This is Uber's deactivation policy.

20      Q.    If we flip over to the very last page,

21   Jacob, the document says Last Updated -- tell the

22   judge when the document was last updated.

23      A.    July 26, 2016.

24      Q.    Were you driving at the time that this

25   policy came out?

1     A.    Yes, sir, I have full-time.

2     Q.    Okay.  And if we can go back to the first

3  page, Jacob, please.

4           Can you tell the judge about drivers'

5  star ratings?

6     A.    Yes.  Your Honor, a star rating is the way

7  Uber rates customers and drivers.  So after every

8  trip, you are given an opportunity to rate your

9  customer.  And the same opportunity is given to a

10  rider to rate a driver and -- yeah.

11     Q.    And if we look up a little bit above that,

12  the document under Quality says, "There's several

13  ways we measure driver quality, with the most

14  important being star ratings and cancellation rate."

15  And then at the bottom there under What Leads to

16  Deactivation, it says, "There's a minimum average

17  rating in each city."

18           Do you know what the minimum average

19  rating in New York City was for star rating?

20     A.    I don't because it varies by city.  It's --

21  I don't remember what the minimum average star rating

22  was in New York City.  I don't remember this, but I

23  followed this very closely because I knew that

24  certain ratings would lead to deactivation and

25  removal from the app, but I can't recall exact

Page 279

1    numbers right now.

2         Q.   Do you know if Uber ever told you what the

3    minimum average rating in New York City was?

4         A.   I don't remember this right now.

5         Q.   If we go over to the next page, Jacob, it

6    says, "If your average rating still falls below the

7    minimum after multiple notifications, your account

8    will be deactivated."

9                   What was your understanding at the

10   time of how your star rating could result in

11   deactivation?

12        A.   So there were numerous things that do lead

13   to deactivation, according to Uber.  If you -- if

14   your rating falls below a certain level or if you

15   don't accept all the trips that are given to you by

16   Uber, you would be deactivated.  That was my

17   understanding.

18        Q.   And if we move down to the next section on

19   cancellation rate, what is a cancellation, if you

20   know?

21        A.   So simple way to explain it, like, let's

22   say if I'm given 10 rides throughout the day and I

23   accept nine of those rides, it means my cancellation

24   would be, I believe, 10 percent.

25        Q.   It says, "A driver cancellation is when a

                                              Page 280

1    driver accepts a trip request and then cancels the

2    trip."

3                Does that line up with what your

4    understanding of what a cancellation was when you

5    drove for Uber?

6        A.   Yeah.  I mean, my understanding is that if

7    you cancel, you will be deactivated.  That's my

8    understanding in simple --

9        Q.   If we look down to What Leads to

10   Deactivation, it says, "Each city has a maximum

11   cancellation rate based on the average cancellation

12   rate of drivers in that area."

13               Were you ever told at this time when

14   you drove in New York City what the cancellation rate

15   was that would allow you to maintain access to the

16   Uber driver app?

17       A.   No.

18       Q.   It says, "If your cancellation rate

19   continues to exceed the maximum limit, your account

20   may be deactivated."

21       A.   Yes.

22       Q.   How did the maximum limits of cancellations

23   put in place by Uber impact the way that you drove

24   for Uber?

25       A.   Well, I tried to follow Uber's cancellation

                                        Page 281

1  policy, as well as the community guidelines.  I've

2  read this numerous times.  So I try not to cancel

3  rides.

4      Q.   A single canceled ride would not result in

5  you being deactivated, would it?

6      A.   No.

7      Q.   And so, do you believe you could freely

8  cancel rides without any limit and maintain access to

9  the Uber driver app?

10      A.   No.

11      Q.   And did that impact the way that you drove

12  for Uber while using the app?

13      A.   Yes, it has.

14      Q.   Can you tell the judge about that?

15      A.   So I wasn't free to do what I wanted

16  because I didn't want to lose access to the app.  It

17  was my only source of income.  And so, I would do

18  everything possible not to cancel rides.

19      Q.   If we look at the next section here, it

20  says On Acceptance Rates.  It says, "High acceptance

21  rates are a critical part of reliable, high-quality

22  service, but not accepting a trip request does not

23  lead to permanent deactivation."

24           The question is:  Tell the judge what

25  an acceptance rate is.

Page 282

1    A.   An acceptance rate is -- is kind of like

2    the cancellation rate.  It's the amount of rides

3    canceled to the rides accepted.  It's unclear the way

4    it's calculated.

5    Q.   "If you are consistently not accepting trip

6    requests, we will notify you that your ability to

7    remain on-line may be at risk.  If your acceptance

8    rate does not improve or you are declining more trips

9    than other drivers in your city, you may not be able

10   to go on-line for a short period of time."

11                How that did impact the way that you

12   would accept trips when offered to you?

13   A.   I would try to accept every trip given to

14   me.

15   Q.   Why?

16   A.   Because I didn't want to lose access to the

17   Uber app, like I mentioned.  I didn't want to be

18   deactivated.

19   Q.   If you had lost access to the Uber app for

20   a short period of time, would that have been

21   impactful to you?

22   A.   Yes, sir.  At the time when I moved to

23   Houston, Uber was my main source of income.  I had a

24   mortgage and other expenses, vehicle payment.  So

25   absolutely, it would.  I mean, I'm the only person

Page 283

1    working in my family, so it would absolutely impact.

2         Q.    What about before you moved to Houston?

3    Would losing access to the Uber app have been

4    impactful to you?

5         A.    Yes, sir.  Uber was my main source of

6    income while in New York and in Houston.

7         Q.    Okay.  Moving down to fraud.  Under the

8    fraud section, it says, "Fraudulent activity

9    undermines the trust on which Uber is built.  That's

10   why we are constantly on the lookout for fraud by

11   drivers and riders who are gaming our systems."

12                   And then What Leads to Deactivation?

13   "We will deactivate any account or accounts

14   (including permanently) associated with fraudulent

15   activity."

16                   Did you ever commit fraudulent

17   activity on the Uber app while you drove for Uber?

18        A.    No, sir.

19        Q.    What was your understanding of what could

20   result if you committed fraud on the Uber app?

21        A.    So my understanding is if the fraud is

22   committed, you would be deactivated and lose access

23   to the Uber platform.

24        Q.    And if we look under the same section What

25   Leads to Deactivation, it says, "This activity may

Page 284

```
 1   include deliberately increasing the time or distance

 2   of a trip."

 3                    Did you ever do that?

 4        A.   No, sir.

 5        Q.   Onto the next page, it says, "Accepting

 6   trips without the intention to complete, including

 7   provoking riders to cancel."

 8                    Did you ever accept trips without the

 9   intention to complete?

10        A.   No, sir.

11        Q.   Then it says, "Creating dummy rider or

12   driver accounts for fraudulent purposes."

13                    Do you see that?

14        A.   Yes, I do.

15        Q.   Did you ever do that?

16        A.   No, sir.

17        Q.   "Claiming fraudulent fees or charges."

18                    Do you see that?

19        A.   I do see this, yes.

20        Q.   Did you ever claim fraudulent fees or

21   charges?

22        A.   No, sir.

23        Q.   It says, "like false cleaning fees."

24                    Did you ever claim a false cleaning

25   fee?
```

Veritext Legal Solutions
346-293-7000

1        A.   I never claimed false cleaning fees, no.

2        Q.   Did you ever intentionally accept or

3   complete fraudulent or falsified trips?

4        A.   No, sir.

5        Q.   If we go down to Safety, the next section

6   says, "Uber uses technology to keep riders and

7   drivers safe.  For instance, GPS tracking every

8   ride."

9             Were you aware that Uber GPS tracked

10  every ride?

11       A.   Yes, sir.

12       Q.   How did that impact the way that you drove

13  for Uber?

14       A.   I mean, I just followed Uber's rules and, I

15  mean, I knew that they were tracking GPS -- GPS

16  tracking drivers.

17       Q.   Farther down on the deactivation policy

18  under Uber's community guidelines, at this time were

19  you aware that there were also a set of community

20  guidelines from Uber?

21       A.   Yes.

22       Q.   And did you follow those?

23       A.   Yes, sir.

24       Q.   It says, "What Leads to Deactivation?  Uber

25  may deactivate the account of any driver who does not

Page 286

1    follow the community guidelines."

2               Do you see that?

3       A.   Yes, I do.

4       Q.   What was your understanding of what could

5    happen if you didn't follow Uber's community

6    guidelines?

7       A.   Deactivation, losing access to Uber

8    platform.

9       Q.   If we go over to the next page, which is

10   365, at the bottom do you see the section that says

11   Unacceptable Activities?

12      A.   Give me a second.  Yes, I do see.  Yes,

13   yes.

14      Q.   It says, "To maintain the transparency and

15   the safety of the Uber platform for all users,

16   activities conducted outside of the monitored system

17   of the Uber app (like anonymous pickups) are

18   prohibited."

19               Do you see that?

20      A.   Yes, I do.

21      Q.   The next section, "Accepting illegal street

22   hails while using the Uber app."

23               Did you ever do that?

24      A.   No, sir.

25      Q.   It says, "Soliciting payment of fares

Page 287

1    outside the Uber system."

2                Did you ever attempt to do that?

3        A.   No, sir.

4        Q.   Were you able to -- what's your

5    understanding of what might occur if you solicited

6    cash from an Uber rider to pay for an Uber ride?

7        A.   This was clear to me from the get-go this

8    was against all the Uber rules and community

9    guidelines.  I had never done.  You would absolutely

10   lose access to Uber app.  I've never done that.

11       Q.   And when you drove for Uber, do you recall

12   watching videos from Uber?

13       A.   Yes.

14       Q.   And do you recall getting e-mails from Uber

15   that discussed your performance?

16       A.   Yes.

17       Q.   And how did you receive that information

18   and how did that impact the way that you drove for

19   Uber?

20       A.   I tried to follow everything they suggested

21   and the videos.  I was also trained at the Uber

22   headquarters in New York where we were -- we had to

23   watch the video in order to be activated.  So it

24   impacted me big-time because I tried to follow

25   everything that they told me to.

                                         Page 288

1          Q.   Can you please pull up Claimant's

2     Exhibit 1?  You know what this document is?

3          A.   It's Uber community guidelines.

4          Q.   If we go over to Page 10 of this document,

5     when does it say that it was last updated?

6          A.   December 8th, 2016.

7          Q.   And if we go to Uber_Universal_6, you see

8     Why Drivers Can Lose Access to Uber-U.S. Only.  For

9     purposes of the record, I'm not going to belabor this

10    a ton, but I want to point out a couple things as we

11    go so that you can see the facts and the evidence and

12    then try to get through it quickly.  So that's --

13               MS. MIERS:  I'm going to object to

14    counsel's testimony.  You have a witness on the stand

15    that can testify.

16               MS. SOUSSAN:  I'm not quite sure what

17    he's going to be testifying to.  He was just letting

18    me know what he's going to be doing, but -- I am

19    going to, you know, insist that you not testify, but

20    I'm not there yet with the objection.  So the

21    objection right now is overruled.

22          Q.   (BY MR. STANLEY)  Okay.  So if we look at

23    the quality section here on Page 6, the last sentence

24    of that section says, "There are several ways we

25    measure driver quality, with the most important being

                                        Page 289

1    star ratings and cancellation rate."

2              Do you see that?

3       A.   Yes, I do.

4       Q.   Is that similar to what we saw in the

5    driver deactivation policy?

6       A.   Yes, it is.

7       Q.   And then in this community guideline, if we

8    move over to Page 7., under Star Rating, it says,

9    "What leads to you losing access to your account?"

10             Do you see that?

11      A.   Yes, I do.

12      Q.   And in this section, again it says there's

13   a minimum average rating in each city.

14             Is that consistent with what you

15   recall the deactivation policy saying?

16      A.   Yes.

17      Q.   And when you say "cancellation," do you see

18   the cancellation rate section here?

19      A.   Yes, I do.  Yes.

20      Q.   And it says, "What leads to you losing

21   access to your account?  Each city has a maximum

22   cancellation rate."

23             Is that similar to what you recall

24   from the deactivation policy?

25      A.   Yes, sir.

Veritext Legal Solutions
346-293-7000

1      Q.   And the last sentence says, "If your

2  cancellation rate continues to exceed the maximum

3  limit, you may lose access to your account."

4            Do you see that?

5      A.   Yes, I do.

6      Q.   And while you drove for Uber, do you think

7  you had the freedom to cancel any trip that you

8  wanted?

9      A.   No, sir.

10     Q.   Why not?

11     A.   Because you would get deactivated.  You

12 would lose access to Uber app if you canceled too

13 many rides.

14     Q.   And the Acceptance Rate section below

15 that --

16     A.   Yes, I see it now.

17     Q.   Again, this document says, "But not

18 accepting trip requests does not lead to permanent

19 loss of your account."

20            Is that consistent with what you

21 recalled from the deactivation policy?

22     A.   Yes.

23     Q.   There is some language that says, "If you

24 consistently decline trips, we will assume that you

25 do not want to accept more trips and you may be

Page 291

1    logged out of the app."

2            Do you see that?

3        A.   Yes, I do.

4        Q.   Did you want to be logged out of the app by

5    Uber at any time?

6        A.   No, not at all.

7        Q.   When you started your day and logged into

8    the app for Uber, what was your desire for that day

9    when you worked?

10       A.   The desire would be to get maximum amount

11   of rides and to make the most money.

12       Q.   And if we go back to this document, Jacob,

13   it picks up on the bottom of Page 8 and carries over

14   to Page 9.  It says, "What leads to you losing access

15   for your account?"

16            Do you see that section, Dainius?

17       A.   I do see it.

18       Q.   And is that section similar to what we saw

19   in the deactivation policy?

20       A.   Yes, it is.

21       Q.   And below that, there's a fraud section.

22       A.   I do see it.

23       Q.   And do you see where it says, "What leads

24   to you losing access to your account"?

25       A.   I do see it.

Page 292

1      Q.    In reviewing this, does that look similar

2  to what was in the deactivation policy?

3      A.    Yes, sir.

4      Q.    Can you please pull up Claimant's 3?  If we

5  go to the back of Claimant's 3 -- this is already in

6  evidence -- we see that this document was last

7  updated April 6th.

8            Do you see when this document was

9  last --

10     A.    I do see it.  April 6, 2017.

11     Q.    And if we go over now to Page 62 of this

12 community guideline, do you see the section on

13 quality?

14     A.    Yes, I do.

15     Q.    Do you see that last sentence, "There are

16 several ways we measure driver quality, with the most

17 important being star ratings and cancellation rate"?

18     A.    I do see it.

19     Q.    Is that similar to what you've seen in the

20 previous policies?

21     A.    Yes, it is similar.

22     Q.    If we flip through, you see a section on

23 star ratings; is that right?

24     A.    That is correct.

25     Q.    You see a section on cancellation rate?

Page 293

1       A.   I do.

2       Q.   Do you see a section on acceptance rate?

3       A.   I do.

4       Q.   Can you blow those up, those three sections

5   on Page 62, Jacob?  "Star rating" is good.

6             Reviewing this, does this look similar

7   or consistent with what you've seen in the past three

8   policies?

9       A.   Yes, it does.

10      Q.   If we look at the cancellation rate, is

11  that similar to what you've seen in the past

12  policies?

13      A.   Yes, it is.

14      Q.   If we look at acceptance rates -- and it

15  carries over to the next page -- is that similar?

16      A.   Yes, it is similar.

17      Q.   If you decided to not accept rides over and

18  over while being logged into the Uber app, would you

19  be allowed to maintain your access to the Uber app?

20      A.   No, sir.  Not at all.

21            MS. MIERS:  Objection.  Speculation.

22            MS. SOUSSAN:  Overruled.

23      Q.   (BY MR. STANLEY)  Sorry?

24      A.   No, you would not be able to continue

25  driving for Uber.

Veritext Legal Solutions
346-293-7000

1      Q.    What would happen?

2      A.    You would be logged off and deactivated.

3      Q.    Well, if we go back -- just so the record's

4   clear because I know this will be asked later --

5   under Acceptance Rate, it says, "High acceptance

6   rates are a critical part of reliable, high-quality

7   service, but not accepting trip requests does not

8   lead to permanent loss of your account."

9      A.    I see it.

10     Q.    What's your understanding of what would

11  occur if you chose to not accept rides above the rate

12  that Uber set for acceptance rate?

13     A.    My understanding is only one.  You would be

14  deactivated, lose access to Uber app.

15     Q.    And do you know how long you might be

16  deactivated if you chose to do that?

17     A.    I'm not sure.  It's up to Uber to decide.

18  I have no say in this.

19     Q.    If we go over to Page 64, do you see

20  Unacceptable Activities?

21     A.    I do see it.

22     Q.    And again, these are similar to what we saw

23  in the previous two policies?

24     A.    Yes, it is similar.  Yes.

25     Q.    Then we see Fraud there.

Page 295

```
 1                    Do you see that?
 2         A.    I do see "fraud."
 3         Q.    Is that similar to what we saw in the past
 4   policies?
 5         A.    Yes, it is similar.
 6         Q.    If we go over to 65 here, under Getting
 7   Back on the Road After Deactivation --
 8         A.    Yes.
 9         Q.    It says, the last sentence, "In addition,
10   we are exploring ways to create an appeals process
11   for the most contentious cases.  We will update this
12   document as and when we have that process in place."
13                    Do you see that?
14         A.    Yes, I do.
15         Q.    Are you aware of Uber ever informing you of
16   an appeal process?
17         A.    I don't remember anything else except by
18   contacting support, which I did numerous times.
19         Q.    And the next exhibit we'll look at is Joint
20   Exhibit 2.  If we go over to the last page of this
21   community guideline, you'll see it's last updated
22   when?
23         A.    October 17, 2017.
24         Q.    And if we move over to Page 70, Why Drivers
25   Can Lose Access to Uber --
```

Page 296

1        A.    I do see it.

2        Q.    And again under Quality, the same sentence,

3   "There are several ways we measure driver quality,

4   with the most important being star rating and

5   cancellation rate"?

6        A.    I do see it, yeah.

7        Q.    And based on your knowledge of this

8   document, is this document similar to what you've

9   seen and what you followed in the previous policies

10  from Uber?

11       A.    Yes, sir, it is.

12       Q.    So we'll move off of this so we don't

13  belabor the point, but it is in evidence at Joint

14  Exhibit 2.

15            The final one I want to point to is

16  Joint Exhibit 3.  And if we look at the last page of

17  that, please, Jacob.

18            What's the date there?

19       A.    May 29, 2019.

20       Q.    And again, when did you stop driving for

21  Uber, if you recall?

22       A.    I stopped driving in 2019, at around May.

23       Q.    Okay.  And if the records show that it

24  might have been a little bit after that -- what

25  general time frame did you stop driving in 2019?

Page 297

```
 1        A.   Sometime in the middle of the year.  So
 2   could be June, July, maybe August.  One of those
 3   months.
 4        Q.   And what is this document, Dainius?
 5        A.   That is Uber's community guidelines again.
 6        Q.   And you know that this document -- let me
 7   ask you this.  I was going to lead you.
 8                  Does this document apply to riders
 9   also?
10        A.   I do believe Uber has community guidelines
11   for riders, as well, yes.
12        Q.   And as far as this document goes, why is it
13   important that you follow this document?
14        A.   Well, Uber wants me to follow their
15   community guidelines.  They provided that to their
16   drivers and also wanted us to follow the deactivation
17   policy, lots of things.  So we just do what they say.
18        Q.   If a rider were to breach a community
19   guideline, could that cause you to lose your driving
20   access?
21        A.   If my rider breached community guidelines?
22        Q.   Let me ask it again because it's a nuanced
23   question.
24        A.   Sure.
25        Q.   If a rider breaches the community
```

Page 298

1    guidelines, can that cause you, a driver, to lose

2    your access to the Uber app?

3         A.   No, sir.

4         Q.   If we flip over, then, to 164, you'll see a

5    fraud section.

6                   Do you see that?

7         A.   I do.

8         Q.   And based on the policies, what can happen

9    if you commit fraud on the system?

10        A.   Absolutely you would lose access to Uber

11   app.

12        Q.   And it says, "Fraud activity may include

13   but are not limited to" -- and some of these are

14   similar, right?  "Deliberately increasing the time or

15   distance of a trip for fraudulent purposes"?

16        A.   I see it.

17        Q.   Did you do that?

18        A.   No, sir.

19        Q.   "Accepting a trip order or delivery request

20   without intention to complete it."

21                   Did you ever do that?

22        A.   No, sir.

23        Q.   Did you ever provoke riders to cancel for

24   fraudulent purposes?

25        A.   No, sir.

Page 299

1          Q.    Creating dummy accounts for fraudulent

2     purposes, did you do that?

3          A.    No, sir.

4          Q.    Claiming fraudulent fees or charges, did

5     you do that?

6          A.    No.

7          Q.    Did you ever complete fraudulent or

8     falsified trips?

9          A.    No, sir.

10         Q.    And if we go over to the next page, you'll

11    see a section on unacceptable activities.  One of

12    them is "Riders and customers should not pay for

13    trips or deliveries in cash."

14                    Do you see that?

15         A.    I do see it.

16         Q.    Did you follow that rule?

17         A.    Yes, I had.

18         Q.    Why?

19         A.    Because that is the rule that Uber wanted

20    us to follow, so I did.

21         Q.    If we go over to the next page on 166, we

22    see Ratings, and it's the last full paragraph on the

23    page.  It says, "If your rating is lower than the

24    minimum average rating in the city, we will let you

25    know, and drivers, riders, delivery partners, or

                                              Page 300

1    restaurants that don't meet the minimum average

2    rating for their city may lose access to the app."

3                   Do you see that?

4         A.   Yes, I do.

5         Q.   Did that impact the way that you drove for

6    Uber in 2019?

7         A.   Yes, it did.

8         Q.   How?

9         A.   I tried to follow every rule that they

10   wanted me.

11        Q.   And how might not following the rules

12   impact your driver rating?

13        A.   You would lose access to Uber app.  It

14   would be deactivated.

15        Q.   If we go over to Page 168.  And picking up

16   here with "If we are made aware of potentially

17   problematic behavior, we may contact you so we can

18   look into it.  We may, at our sole discretion, put a

19   hold on your account or turn your account inactive

20   until our review is complete."

21                   Do you see that?

22        A.   Yes, I do.

23        Q.   Whose discretion were you at in order to

24   drive on the Uber app?

25        A.   Uber's discretion.

Veritext Legal Solutions
346-293-7000

```
 1        Q.    And do you believe Uber had the ability to

 2   suspend or deactivate you while you drove for Uber?

 3        A.    Absolutely, yes.

 4        Q.    And did that happen?

 5        A.    Yes.

 6        Q.    And we've seen documents already about you

 7   losing access to the airport.

 8        A.    Yes.

 9        Q.    How did that impact the way that you were

10   able to make money on the Uber system?

11        A.    It basically took my livelihood away.

12        Q.    Can you tell the judge a little more about

13   that?

14        A.    I relied on airport because I found it to

15   be most profitable for me.  I specifically bought a

16   vehicle for Uber, and airport was my, so to say,

17   bread and butter.  I would only work at the airport

18   because I didn't have enough business otherwise.  I

19   was doing Uber Black, which is a more luxury service

20   that Uber offered.  Of course, it was a lot more

21   expensive.  I found the only way for me was to do

22   Uber Black, which I did.  So taking that away from

23   me, it was -- it was -- I mean, I couldn't remain on

24   the job.  That's why I found a new one.

25        Q.    And when did you start -- you just said you
```

Page 302

1    couldn't remain on the job.  That's why you found a

2    new one?

3         A.   Yes.

4         Q.   Tell the judge about that.

5              MS. MIERS:  I've been giving a lot of

6    leeway here, Judge, but I'm objecting to the

7    narrative.

8              MS. SOUSSAN:  Q&A, please.

9         Q.   (BY MR. STANLEY)  Sure.  What did you do

10   next when you lost your access to the airport?  How

11   did that prompt your next action as it relates to

12   making money?

13        A.   You know, I contacted support many times,

14   and I was refused.  They refused to restore my

15   airport access, so I had no choice but to find a new

16   job.

17        Q.   So what -- what did you do?

18        A.   I got a commercial driver's license.  I

19   went to school, got a commercial driver's license.  I

20   got a new job as a truck driver.

21        Q.   And before you got the job as a truck

22   driver, did you have a commercial driver's license?

23        A.   No, sir.  I never had a commercial driver's

24   license or any experience driving a commercial

25   vehicle.

1    Q.   And while you were using the Uber app, what

2    type of license did you have to have?

3    A.   No special license is required.  No special

4    skill was required.

5    Q.   Do you believe that a special skill is

6    required to drive for Uber?

7    A.   No.  No, not at all.  Anybody can do it.

8    Q.   Do you believe a special skill is required

9    to move cars commercially?

10   A.   Absolutely, yes.

11   Q.   How so?

12   A.   There are numerous federal requirements,

13   all kinds of filings, and you have to have a skill.

14   You have to go to school.  It's a huge vehicle.  60,

15   70 feet.  You need to have a special skill, you need

16   to have a special license, and it's a lot of

17   liability.  So absolutely.

18   Q.   To drive for Uber, were you required to

19   prove how well you could operate a vehicle?

20   A.   No.

21   Q.   What were you required to do in order to

22   drive for Uber for the very first time?

23   A.   You were required to have just a regular

24   driver's license and any vehicle that is registered.

25   Q.   Can you pull up C16, please?  This is a

Page 304

1    document Bates labeled KG_Universal_1242, and it's

2    about getting a trip request.  It says, "When you

3    receive a trip request you'll see a box appear at the

4    bottom of the screen with a flashing blue button.  To

5    accept the trip, tap the button within 15 seconds."

6              Do you see that?

7    A.   I do.

8    Q.   Tell the judge about what the 15 seconds is

9    there and what Uber required you to do within the

10   system in order to accept a trip?

11   A.   So --

12             MS. MIERS:  Objection.  Compound and

13   narrative.

14             MS. SOUSSAN:  Overruled.

15   A.   So when you go on-line within the Uber app

16   and you're ready to take trip requests and one is

17   given to you, you only have 15 seconds to accept the

18   trip.  If you don't, it will count against you.  It

19   would count against you, basically meaning if you get

20   too many strikes, you can lose access to Uber

21   platform.

22   Q.   (BY MR. STANLEY)  At the time of this 15

23   seconds, are you given the destination to where the

24   trip will end?

25   A.   No.

                                        Page 305

1    Q.    Were you ever given a fare estimate of the

2    approximate amount you could make before accepting?

3    A.    No, sir.

4    Q.    Were you ever given the approximate total

5    miles of the destination?

6    A.    No, sir.

7    Q.    Were you even given the rider's exact

8    location before you accept?

9    A.    Exact location?  Yes, yes, you were.  Yes,

10   you were.  You were given the address where to pick

11   up a customer, but that sometimes would be inaccurate

12   either because there's a poor GPS signal or the

13   customer entered it wrong.  You are given the

14   address, yes, sir.

15   Q.    Beyond the address to pick up the rider, do

16   you recall what other information you were given by

17   Uber before accepting?

18   A.    It would be the rider's star rating.

19   Q.    Okay.  Jacob, you can pull that down.

20   We're going to now dip into some support messages.

21   So could you please go to Claimant's 8?  The first

22   support message I would like to look at is 138.  This

23   is a document the judge has seen already.

24         At the top, the title is "I had a

25   different issue with my fare," and this is a document

Page 306

1   from you on June 19th, 2018.  Can you tell the judge

2   about what happened here?

3        A.   So I definitely confirm that this was my

4   message.  So it looks like Uber has taken 50 percent

5   as a commission, and it looks like I was outraged.

6   Yes, I'm familiar with this.

7        Q.   And is this -- why were you outraged here

8   with the percentage?

9        A.   Because it looks like Uber has taken

10  50 percent of -- of the fare.  I was always under the

11  impression that the fee was, I believe, 20 percent,

12  and here it looks like they have taken 50.

13       Q.   And if we look at the response in the

14  support message, Uber support responds and they say,

15  "Thank you for reaching out," and then below they

16  review the breakdown of base fare?

17       A.   Yeah.

18       Q.   And then do you see where they give you the

19  distance of --

20       A.   Distance of 14.52 miles, yes, I do.

21       Q.   Were you ever able to manipulate that

22  $1.3032 per mile number?

23       A.   No.  Uber controls the fares and the

24  structure.  I was never able to do anything about

25  this.

1      Q.    Does the same go for the point 18 per

2   minute?

3      A.    Absolutely the same goes for that, the

4   time.

5      Q.    Can we go over to Page 1187 now, please?

6   "I have a different issue with my fare."  Do you see

7   that?  "Hello.  My account was recently transferred

8   from New York City, and it seems that I'm paying a

9   higher commission percentage to Uber.  Please let me

10  know the current percentage I'm paying to Uber.

11  Thanks, Dainius."

12              Do you see that?

13     A.    Yes, I do see it.

14     Q.    Can you tell the judge what happened here?

15     A.    Because I moved to Houston -- I did Uber

16  full-time in New York.  It was always unclear to me

17  how much Uber is actually charging, you know.  What's

18  the percentage?  Like, it was -- I never understood

19  it, actually, because at some point it changed.

20              So I'm asking -- you know, it seemed

21  to me like after I moved to Houston that Uber's

22  percentage was higher than what I'm used to it being

23  in New York.

24     Q.    How did that impact your bottom line?

25     A.    I was making less money.

Page 308

```
 1        Q.   It says that -- in the second paragraph of
 2   the response here from Swagata, it says, "Partner's
 3   earnings will always be calculated using the fare
 4   time and distance."
 5             Do you see that?
 6        A.   Yes.
 7        Q.   Does that include the percentage that's
 8   going to be removed by Uber?
 9        A.   Can you ask once again, please?  So partner
10   earnings will always -- does that include a
11   percentage?  I mean, it seems like the fare time and
12   distance is their percentage.
13        Q.   So does Uber take away from the fare that's
14   calculated by fare time and distance?
15             MS. MIERS:  Objection.  Foundation.
16        A.   Yes, they do.
17             MS. SOUSSAN:  Hold on.  Let's get that
18   foundation.
19        Q.   (BY MR. STANLEY)  Okay.
20             MS. SOUSSAN:  From this witness.
21        Q.   (BY MR. STANLEY)  What's your understanding
22   of how a fare is calculated?
23        A.   So Uber measures time and distance
24   traveled, then adds everything up and takes their
25   fee.  That's my understanding.
```

Page 309

1        Q.    And does that come from the -- each trip

2   that you take --

3        A.    Yes.

4        Q.    So let me finish the question.

5              Does that come from each trip that you

6   perform on the Uber platform?

7        A.    Yes, sir.

8        Q.    Did you have a problem with the fee that

9   Uber was applying to the rides that you were given on

10  the Uber app?

11       A.    Yes.

12       Q.    Tell the judge about that.

13       A.    Because it was always unclear, so I've

14  written numerous support messages about this.  And

15  because there was some variables like traffic and

16  sometimes, you know, Uber's community guidelines and

17  I'm being professional, I would listen to the

18  customer's demands of taking a different route which

19  wouldn't be the best.  And due to -- due to that, I

20  would end up wasting a lot more time and not always

21  would I be compensated, as per my numerous messages.

22       Q.    Could you we go to Uber_Barysas_1180?  And

23  this is your Uber Greenlight Houston-North visit.

24              Do you see that?

25       A.    I do.

1          Q.    This is a message from March 27, 2018.  And

2     below, it says, "Partner has a 20 percent service

3     fee, but I had to explain to him that XL and Select

4     fares belong under the 25 percent service fee.  He

5     also had several questions about Uber Black."

6                      Do you see that?

7          A.    I do see that.

8          Q.    Can you tell us about this occurrence at

9     the Greenlight hub?

10         A.    Sometimes I would get nowhere with support

11    because it would be a different rep.  I'm not sure if

12    they are U.S.-based or somewhere -- another country,

13    and I would be forced to go to a Greenlight hub to

14    actually talk to a real person.

15                    Again, it goes back to the same

16    confusion.  Here it states that my service fee was

17    20.  The other rep was telling me it's based on the

18    distance and time traveled.  So it's kind of

19    confusing.

20         Q.    Could you have changed that service fee

21    referenced below as it pertains to either XL or Uber

22    Select trips?

23         A.    No, sir.  Uber has full power of doing so,

24    not me.

25         Q.    What about Uber Black trips?  Could you

                                               Page 311

1     have changed or negotiated that service fee?

2         A.   No, sir.  I cannot do that.

3         Q.   And if we go now to 1271 -- before we get

4     into this, what did you have to do if you found out

5     there was a problem with the fare that was paid to

6     you on the Uber app?

7         A.   Yeah.  So you would have to go back on the

8     app and try to contact support.  There was a tab

9     where you can contact support, or you can always go

10    to a Greenlight hub.  Greenlight hub, there was one

11    that I used to go in Houston.  That usually takes

12    time because you have to make an appointment.

13        Q.   And if we look at this document from

14    April 3rd, 2017, can you review this message and tell

15    us about it?  So take a look at it and tell us about

16    it, please.

17        A.   Yes.  This looks like I was still in

18    New York before moving to Houston.  So looks like --

19    may I just read for a second?

20        Q.   Just read it to yourself.  Let me ask the

21    question so we're doing question/answer.

22             What were you asking Uber to do here?

23        A.   I wanted to be compensated properly

24    because, you know, I --

25        Q.   Did you feel like that you did not receive

Page 312

1    the fare that you should have received for this trip?

2        A.   Yes.  And it looks like I'm pretty upset

3    here.  There's got to be a reason for that.  Yes, I

4    was not compensated properly.

5                    MS. MIERS:  Objection.  Foundation.

6        Q.   (BY MR. STANLEY)  And if we look down --

7                    MS. SOUSSAN:  Overruled.

8        Q.   (BY MR. STANLEY)  If we look down at the

9    response, then, the response from Uber says, "Thanks

10   for letting us know, Dainius.  We're sorry to hear

11   your experience was less than excellent.  We've

12   reviewed your trip.  Based on the addresses you

13   provided, we've adjusted the fare to 48.77 to match

14   our estimate from pickup location to destination."

15                   Do you see that?

16       A.   I do.

17       Q.   So were you able to increase the fare in

18   this situation?

19       A.   No.

20       Q.   Do you know if you received the payment for

21   the time and distance that you undertook on the Uber

22   app?

23       A.   So in this situation, it looks like they

24   have adjusted it, but good that I caught it.  I'm not

25   sure how many trips I didn't catch it, but clearly I

Page 313

1    was compensated after that.

2        Q.   And where it says they have adjusted it to

3    match, quote, our estimate from pickup location to

4    destination, what does that mean to you?

5        A.   I mean, I don't know how they calculated

6    it, but clearly they compensated what it should have

7    been, but -- yeah.

8        Q.   Did you have any ability to increase the

9    fare with the rider under Uber's rules in order for

10   the rider to pay you directly at the time the

11   appropriate amount?

12       A.   No, sir.  No.  This was against the rules,

13   to collect any money from the customer, and I've

14   never done that.

15       Q.   Okay.  Can we go to 1560?  Here the title

16   of this document is "I had a different issue with my

17   fare."

18            Do you see that?

19       A.   I do.

20       Q.   Can you tell the judge why we see that and

21   how it is that you contact Uber when we see this sort

22   of message on a support message?

23       A.   Yeah.  So it's definitely my message.  I

24   don't remember if this was resolved or not.

25       Q.   I'm not asking about whether it was

                                            Page 314

1    resolved.

2              How did you make these requests to

3    Uber when we see them in this form?

4         A.    Oh, it was through the app.  I wrote the

5    support.

6         Q.    And when you click on support, what do you

7    see or what does that look --

8         A.    I see your question.  So when you go to the

9    menu of the driver app, you are given choices of

10   support.  It has different options to choose from,

11   like fare adjustment or no tolls paid to the driver,

12   different problems.  So I clicked one of them, and I

13   was -- I reached out to support, basically.

14        Q.    So here you reach out and say, "Hi.  Why is

15   there a service fee adjustment of minus 18.47?  What

16   does that mean?"

17             Do you see that?

18        A.    Yes, I do.

19        Q.    And the response that you get on

20   October 21st, 2018, is, "I would like to tell you

21   that service fee adjustments occur when your trip

22   earnings are greater than the rider payment excluding

23   taxes, surcharges, and fees.  Service fee adjustments

24   are not additional charges."

25             Do you see that?

Page 315

1          A.    I do see that.

2          Q.    And so, in this situation, based on the

3     response here, did you have to pay an additional

4     18.47 for a service fee?

5          A.    Yeah.  Looks like they charged me that,

6     yeah.

7          Q.    And -- and what is the response from Uber

8     about why that occurred?

9          A.    To this date, I don't understand this

10    response.  I don't understand what they mean.  All I

11    know is that I paid 18.47.  But I'm confused by this

12    to this day.  I don't understand.

13         Q.    Okay.  Can we move on to 1305?  Again, we

14    see a title "I had a different issue with my fare,"

15    and this is a January 18th, 2018, communication.  In

16    this situation, you say, "Hello.  I wanted to know if

17    I got paid for traveling approximately 20 miles to

18    pick up this customer in very dangerous, icy

19    conditions."

20                Do you see that?

21         A.    Yes, I do.

22         Q.    Do you remember this trip?

23         A.    Yes, I do.

24         Q.    Tell the judge what you recall about this

25    trip.

                                        Page 316

1      A.   So it was one of those days -- the reason I

2  remember also was because it was one of those nights

3  where Houston got a lot of snow and icy road

4  conditions.  And so, from the time I got a ride

5  request I accepted it, of course, and I had to travel

6  20 miles to pick up a customer.  And at the end, I

7  don't think I was compensated -- as a matter of fact,

8  I was not compensated for traveling 20 miles to pick

9  up a customer, which takes time -- in icy conditions,

10  that took me a while.  And I reached out to Uber, and

11  I was told that for Uber Black, which I was at that

12  time, I was an Uber Black ride, there's no fee that

13  is paid to me to travel 20 miles to pick up a

14  customer.  It would only apply to UberX and Uber pool

15  trips, which I was not.

16      Q.   So if we look at the response here from

17  Uber, it says, "Long pickup fees will only apply on

18  UberX and Uber pool trips.  Because this was neither

19  an UberX nor Uber pool trip, the fee did not apply."

20      A.   Yes, I see that.

21      Q.   Were you able to get along pickup fee for

22  this trip?

23      A.   No, sir.

24      Q.   Who controls whether or not a long pickup

25  fee is assessed?

Page 317

1        A.    Uber.

2        Q.    Driving for Uber Black, did you receive

3   long pickup fees?

4        A.    No, sir.

5        Q.    Okay.  Now we're going to move on to 1375.

6   Tell the judge about cancellation fees.  What is

7   that?

8        A.    Cancellation fee?  So I know on the rider

9   side of things if you cancel a ride that you

10  requested, they charge a cancellation fee.

11       Q.    Well, do you know how a driver is able to

12  qualify for a cancellation fee?  How does a driver

13  get a cancellation fee from the rider?

14       A.    Yes.  So if I recall correctly, the driver

15  gets paid a cancellation fee or receives a

16  cancellation fee from Uber after a certain time.  It

17  has to be a certain time.  So I don't remember now

18  how many minutes has to pass in order for you to

19  receive a fee, and it also depends on what kind of

20  tier you're in.  I believe Black or X.

21       Q.    Okay.  If we see Share Details, you say,

22  "Why didn't I receive the cancellation fee?  I

23  arrived and was waiting for the customer, but he

24  canceled after I waited for him."

25       A.    Yes, yes.  This is one of those frustrating

Page 318

1    moments where -- like I said, in my case, I would

2    wait at the airport sometimes four, five hours at a

3    time for one customer.  And if I go to pick him up

4    and he cancels, the least that I should receive is a

5    cancellation fee because I've lost my place in line.

6    That's the minimum that should be compensated by

7    that.  It looks like I wasn't paid a cancellation

8    fee.

9         Q.   If we go down to the next section, we see

10   from Uber support that "We have reviewed this trip

11   and can confirm that a cancellation of 7.20 has been

12   successfully applied to this trip."

13        A.   Yes.

14        Q.   Who do you rely on in order to receive a

15   cancellation fee?

16        A.   Uber, of course.  Uber.

17        Q.   Can you be paid a cancellation fee without

18   Uber's intervention?

19        A.   No, sir.  No.

20        Q.   Who sets the time required for a

21   cancellation fee to then be allowable to the driver?

22        A.   Uber does.

23             MR. STANLEY:  Judge, we are getting to

24   the 1:00 o'clock hour.  What's your choice here?  I

25   have more to go, but I know we have a schedule we try

Page 319

1    to stick to.

2                    MS. SOUSSAN:  I have from 1:15 to

3    2:15.  If it's convenient to break now, that's fine

4    with me.

5                    MR. STANLEY:  It's convenient now, if

6    you would like to.

7                    MS. SOUSSAN:  Okay.  Then let's break

8    now from 1:00 until 2:00 o'clock.

9                    (Recess from 1:00 p.m. to 1:59 p.m.)

10       Q.    (BY MR. STANLEY)  Jacob, can you continue

11   on in Claimant's Exhibit 8 to Page 1292?  Can you

12   blow up the top of that, please?

13                   So Dainius, this is a message you sent

14   to Uber back in 2016.  "Fare adjustment.  My rider

15   damaged my vehicle."

16                   Do you see that?

17       A.    I do see this.

18       Q.    Do you recall this?

19       A.    I do.

20       Q.    Can you tell the judge about this instance?

21       A.    I was trying to help the customer to load

22   his suitcase.  I think he was going to the airport, I

23   believe.  He wanted to do it himself, and he forced

24   the suitcase -- it was not one suitcase.  It was a

25   few suitcases, and he damaged the plastic handle,

                                            Page 320

1    requiring repairs.  I got the estimate from the

2    dealership.

3        Q.   So you can see there it says, "Repair cost

4    estimate," how much?

5        A.   Yep.  I believe it was a little over $300.

6    Close to 400.

7        Q.   What did you provide to Uber that the

8    repair cost estimate would be?

9        A.   I believe I provided the estimate to the

10   dealership, and it was around 400 bucks, I believe.

11       Q.   Okay.  And if we go over to 1294, you see a

12   response here.  It says, "Thanks so much for your

13   patience."  It's at the bottom, Jacob.

14            The response from Jennifer on May 7,

15   2016, says, "Thanks so much for your patience.

16   Again, I understand how important maintaining the

17   quality of your car is in this industry.  I have

18   approved the reimbursement and have put $215 to your

19   account.  No Uber fee is removed from this amount,

20   and it will be reflected in next week's payment

21   statement."

22            Do you see that?

23       A.   Yes, I do.

24       Q.   Were you able to get the amount of damage

25   that you thought you needed -- the amount of payment

Page 321

1    to reimburse for the damage that you thought you

2    needed in order to repair your car from Uber?

3        A.    No, sir.

4        Q.    And who decided how much you were going to

5    receive back for that damage?

6        A.    Uber.

7        Q.    And what was the amount?

8        A.    215.

9        Q.    Were you able to contact the rider directly

10   and demand payment for this -- this damage under

11   Uber's community guidelines?

12       A.    No, sir.  There's no way to contact the

13   rider after the ride is done.

14       Q.    What was the requirement --

15             MS. MIERS:  I'm sorry, Bret.  I'm

16   sorry to interrupt, but we've got Mr. Rosenthal and

17   Ms. Corridan waiting in the waiting room.

18       Q.    (BY MR. STANLEY)  Did you have the freedom

19   to contact the rider and receive what you thought the

20   repair estimate needed was in order to repair your

21   vehicle?

22       A.    No, sir.

23       Q.    We're going to move to 1493 in this same

24   exhibit.  Okay.  This is a June 17th -- sorry --

25   June 24th, 2017, correspondence from you titled "A

Page 322

```
1    Rider Made a Mess."  In the details, you say, "Riders
2    were drunk and refused to leave alcohol outside the
3    car and brought it in.  They left a mess" -- and the
4    word here is "employ" -- "alcohol cups you spell and
5    were very rude and aggressive.  I need to get
6    reimbursed for cleaning my vehicle."
7                  Do you see that?
8         A.   I do.
9         Q.   Do you recall this incident?
10        A.   Yes, I do.
11        Q.   Can you tell us about it?
12        A.   I remember the customers were super drunk
13   and I didn't want them to bring the alcohol inside
14   with all the cups, but they refused.  I tried to stay
15   professional and just continue on my way.  I didn't
16   want arguments or threats or stuff like that, so I
17   just didn't say anything and continued driving.  They
18   left a mess, yeah.
19        Q.   And what did you want to occur here?
20        A.   Just cleaning -- just to take it to get it
21   cleaned.
22        Q.   And if we go over to the next page, on
23   June 24th at the bottom there, 2017, Rodolfo says,
24   "Thank you for letting us know, Dainius.  We're sorry
25   to hear about this issue.  Safety for you and your
```

Page 323

1    vehicle is important to us.  Riders do occasionally

2    leave behind a minor mess.  Cleaning and damage fees

3    are reserved for specific messes left by a specific

4    rider."

5              Were you able to get a cleaning fee

6    out of this trip based on the mess that was left

7    behind by the riders?

8        A.   No, sir.

9        Q.   Who determined whether or not you should

10   receive a cleaning fee here?

11       A.   Uber did.

12       Q.   Did you have the ability to contact the

13   rider and demand a cleaning payment from them

14   directly under Uber's rules?

15       A.   No, sir.

16       Q.   What would be the result if you had done

17   that, if you know?

18       A.   I would have demanded a cleaning fee, taken

19   the vehicle, gotten the receipt, and that's the

20   amount that I would have asked to be reimbursed.

21       Q.   And would Uber allow that to occur between

22   you and the rider directly?

23       A.   No, sir.

24       Q.   Okay.  Can we pull up 1426, please?  And

25   this is an October 28th, 2018, correspondence you

Page 324

1    sent to Uber entitled "My Rider Made Me Feel Unsafe,"

2    and you send a message in to Uber and say, "I wanted

3    to report that this rider is a threat to society.

4    The rider threatened me and verbally abused me for no

5    reason at all, and it felt -- felt me feel unsafe.  I

6    have this incident recorded and time stamped on my

7    car's dash cam, which I can provide to you if

8    necessary."

9              Do you recall this incident?

10       A.   Yes.

11       Q.   And what happened?

12       A.   So I'm not sure if the customer was

13   mentally ill or something, but it was pretty bad.

14   The customer threatening me was just terrible.  I

15   understand minor annoyances sometimes.  I wouldn't

16   have complained if it would be something minor, but

17   this was pretty scary.  So I don't know what happened

18   to that customer.

19       Q.   And you request in that last sentence, "but

20   this person should be removed from the Uber platform

21   because I'm afraid that he can even physically hurt

22   someone."

23              Do you see that?

24       A.   Yes.  I do see that, yes.

25       Q.   Do you have any ability to remove someone

Page 325

1    from the pool of riders that you might receive a

2    request from?

3         A.   No, sir.  I don't have this ability.

4         Q.   And if we go to the bottom there, you

5    ask -- bottom of the page, Sunday, October 28, 2018.

6    "Can you please make sure I'm never paired with this

7    rider again?"

8         A.   I do see that, and I remember that.

9         Q.   Why did you ask that?

10        A.   Because I really felt unsafe, and I just

11   didn't want to be matched with this customer again.

12        Q.   And do you have the ability to make that

13   change where you're not matched with a customer?

14        A.   No, sir.  I don't have this ability.

15        Q.   And on the next page, it says, "No worries.

16   We've already taken measures to minimize the chances

17   of you being paired with this rider in the future."

18                  Do you see that?

19        A.   I do see this, yes.

20        Q.   Do you know what those measures were?

21        A.   No, I don't.

22        Q.   And do you know if these measures resulted

23   in that rider never being able to be paired with you

24   again?

25        A.   No, sir.  I have no way of knowing that.

Page 326

346-293-7000

1      Q.   Okay.  Can we go to 1382?  All right.  This

2  is another time you contacted Uber on April 5th,

3  2019.  You say, "Hello.  Please reactivate my

4  account.  My vehicle should remain eligible for Black

5  until January 1st, 2020, as explained here.  This

6  information can be found by clicking on the above

7  link and going to the vehicle shall remain active

8  until January 1st, 2021.  All my documents are active

9  and current, insurance, limo business license,

10  driver's license, registration.  Please escalate this

11  to the appropriate manager."

12               Do you see that?

13      A.   I do.

14      Q.   Do you recall this?

15      A.   Yes, I do.  Absolutely.

16      Q.   Can you tell the judge about it?

17      A.   Judge, this was an issue that I had

18  where -- so for Uber Black, the vehicle has to be a

19  certain year, make, and model and color to qualify to

20  be able to take Uber Black trips.  And I knew that

21  there was a limit, and -- where I would have to buy a

22  new vehicle, but my vehicle was still good enough

23  that I went to Uber's website and I clicked special

24  link where it would tell me that my vehicle is still

25  eligible until a certain date.  I wasn't ready to buy

Page 327

1    a new vehicle.

2              At some point, they took me off of

3    Uber Black platform and I was only able to take the

4    cheapest rides where anybody could do that.

5        Q.   Let me ask you a question.  So if we go

6    over to the next page, 1382, we see -- there's a C360

7    specialist there.

8              Do you see that?

9        A.   Give me one second.

10       Q.   It says, "Partner was erroneously wait

11   listed by another agent, and I have confirmed that

12   their documents are valid and active and partner

13   should not be wait listed."

14       A.   Yes, I see that.

15       Q.   It says, "I called the partner to inform

16   them of the activation."

17             Do you see that?

18       A.   Yes, I do.

19       Q.   So were you unable to accept Uber Black

20   trips during this portion of time?

21       A.   Yes, sir.  That is correct.

22       Q.   And what's your understanding of why that

23   was?

24       A.   It seems to me that from the beginning that

25   somebody made --

```
 1                MS. MIERS:  Objection.  Foundation.
 2                MS. SOUSSAN:  It's his understanding,
 3      and it would be helpful to understand how's he
 4      getting his understanding.
 5           Q.   (BY MR. STANLEY)  Okay.  So let's back up
 6      one.  It says -- Lily says here -- this is Lily with
 7      the Uber team.  "Thank you for taking the time to
 8      speak with me today."
 9                Did you call in, or did you send
10      support messages?  How did you get information about
11      this?
12           A.   I definitely sent support messages through
13      Uber app.  I can't recall at this time.  There is a
14      huge chance that I might have went to the Greenlight
15      hub, as well, because it affected my earnings for
16      sure because Uber Black was the only thing I was
17      doing.
18           Q.   Let me ask you another question.  Lily
19      says, "I have reviewed your account and documents and
20      have activated your account.  You should be able to
21      go on-line shortly."
22                Do you see that?
23           A.   I do see this.
24           Q.   Before this time, before Lily reactivated
25      your account, did you know why you had been
```

Page 329

1    deactivated?

2         A.   No.

3         Q.   Did you intend to accept Uber Black rides

4    during this period?

5         A.   Yes.

6         Q.   Were you able to do that?

7         A.   No.

8         Q.   And then Uber says here, "To show our

9    appreciation of your hard work, we want you to have

10   lunch on us.  I've gone ahead and added $15 to your

11   account."

12                  Do you see that?

13        A.   I do see that.

14        Q.   Do you know if that $15 -- first of all,

15   did you request the $15?

16        A.   No, I have not.

17        Q.   Did you lose income during this period

18   because you were unable to drive for Uber Black?

19        A.   Yes, sir.

20        Q.   Do you know if this $15 covered that?

21        A.   No.

22        Q.   Did you know at the time that your account

23   was erroneously wait listed by Uber?

24        A.   No.  I found out that through the support

25   messages because I was seeking help, and that's what

Page 330

1    it turned out to be.

2         Q.   Okay.  Jacob, could you please bring up

3    Claimant's 7?  We're going to look at 1181.

4    Actually, let's back up.  We're going to look at 956

5    just right in front.

6              So this was covered earlier with

7    Uber's corporate representative.  Is your e-mail

8    baltican@yahoo.com?

9         A.   Yes, that is correct.

10        Q.   Did you receive an e-mail from Uber

11   informing you that your -- that you would no longer

12   be eligible to receive requests for pickups and

13   drop-offs at the airport?

14        A.   Yes, I had.

15        Q.   If you go over to the next page on 1181,

16   you respond to Uber on June 29th, 2018.  "Hello.  Is

17   there a way to escalate this message to a supervisor

18   or higher up?  I want to be given another chance.  I

19   would like my airport access restored.  I've been a

20   top driver with high ratings since 2014, and I love

21   working for Uber.  My family relies on my earnings.

22   If I lose access, it's like a death sentence."

23              Why did you tell Uber that?

24        A.   That is true.  I relied on Uber earnings to

25   live.

Page 331

1        Q.    Then you go on to say, "The staging lot at

2    IAH is way too small, and we're constantly harassed

3    my police" -- is that what you meant there?

4        A.    I misspelled the word "my" or maybe iPhone

5    automatically corrected it.  I meant to say "by

6    police."

7        Q.    Okay.  You say, "We are constantly harassed

8    by police and security and told to leave the lot,

9    losing our place in line.  Please forward this

10   message to supervisors and manager."

11                Why did you tell them about the police

12   and security harassing you and told to leave the

13   line?

14       A.    Well, everybody who works at the airport

15   lot on a daily basis knows that the staging lot was

16   not meant for that.  It was really small.  And so,

17   waits are long.  If everybody is waiting for those

18   rides at the airport, it gets so crowded -- I'm

19   talking about hundreds of cars in a really small lot

20   that was not meant to be.

21                When it gets too crowded, airport

22   police come in and start kicking people out and you

23   lose access.  If you waited, like, three or four

24   hours in line, the moment you leave the line, you

25   lose your place in line.  I mean, security, police,

Page 332

1    they don't care about it.  They just kick you out.

2    Of course you come back because you want to earn

3    money, but then you'll be put in the back of the

4    line.  I shared that with Uber because it's a huge

5    issue.

6         Q.   At this time, did Uber ask you any more

7    about the staging lot or the police kicking you out

8    or the security kicking you out of that lot?

9         A.   Have they asked me about this before ever

10   again?  Have they asked me about this again?  No,

11   they have not.

12        Q.   Did they provide you with a specific reason

13   that you were losing your airport access?

14        A.   No, sir.

15        Q.   And so, when we go back on Page 954, Uber

16   says, "Fraudulent activity has been detected.  This

17   may include activities tied to GPS manipulation,

18   disabling your location, fraudulent cancellations,

19   support abuse, or remaining on-line in the queue for

20   reasons other than accepting transcripts at an

21   airport."

22             Do you see that?

23        A.   Yes, I do.

24        Q.   Did anybody at Uber ever tell you which of

25   those that they allege you were doing that caused you

                                        Page 333

1    to lose your access to the airport?

2         A.   No, sir.  I've asked this numerous times.

3    They never told me that.

4         Q.   Did anybody at Uber ever inform you what

5    each of these mean?

6         A.   No, sir.

7         Q.   And so, based on documents produced -- can

8    you now pull up Claimant's 5, Jacob?  It's a

9    spreadsheet, so -- just the top one.  Sorry.  Can

10   you -- oh, no.  Go to the next one.  That's not the

11   one.  Sorry.  Can you make Column C bigger, please?

12   Even bigger.  Okay.  Can you scroll down?  Stop right

13   there.  If we go up on Line 62 -- we need to be able

14   to see the whole thing.

15             MR. STANLEY:  Sorry about the sidebar,

16   Judge.

17        Q.   (BY MR. STANLEY)  So if we scroll through

18   this -- this is the second spreadsheet in Claimant's

19   Exhibit 5.  And we see several times where you send a

20   rider the text, "Hello.  I was trying to call you,

21   but it goes straight to voicemail.  I've tried to

22   cancel this ride, but the system is not letting me.

23   I am currently pulled over by the police.  You can

24   cancel the ride."

25             Why is it that we see this same text

Page 334

1    sent multiple times, the exact same language in the

2    spreadsheet?

3        A.   Well, a lot of times, you know, not once or

4    twice, we were kicked out of the staging lot.  That

5    happened.  And other times, there was a situation

6    where I would wait five hours in line for a customer

7    just to see that -- you know, once the rider request

8    comes in, it would show me that the customer is only

9    going a very short distance, and I didn't want to

10   cancel it -- accept it and cancel it because it would

11   affect my cancellation rate.  So that's why I would

12   ask the customer to do it.

13       Q.   Do you know if there were any penalties

14   associated with a customer canceling a ride for a

15   driver?

16       A.   Well, sometimes -- sometimes if the

17   customer cancels, they get charged a cancellation

18   fee.  Other times, they don't.  It depends on the

19   time.

20       Q.   Do you know if the customer was charged a

21   cancellation fee in these situations?

22       A.   I'm not sure.  Every time if I was given an

23   opportunity, I would choose the option not to charge

24   the customer.  Sometimes drivers have that

25   opportunity on the app.

Page 335

1    Q.   Why didn't you just cancel the ride

2    yourself?

3    A.   Because it would affect my cancellation

4    rate, and I didn't want to lose access to Uber app.

5    So --

6    Q.   And at times were you unable to cancel

7    rides yourself?

8    A.   There were many times where I was unable to

9    cancel rides because -- I'm not sure if it's because

10   of the crowded staging lot or what.  I mean, just

11   service was really bad.  So sometimes even if you try

12   to cancel or accept, the application would glitch.

13   It was a known issue.  I've changed phones.  I've

14   changed providers.  I've had better luck with Verizon

15   than TMobile, but service was bad.  Interference

16   maybe.  I don't know.  I can only guess.  I'm not an

17   engineer.  But there were times, yeah.

18   Q.   Were you intending to commit fraud when you

19   sent these messages?

20   A.   No, sir.

21   Q.   Did Uber ever tell you that this was a

22   fraudulent cancellation?

23   A.   No, sir.

24   Q.   Do you know what a fraudulent cancellation

25   is?

Page 336

1      A.    Not really.

2      Q.    Okay.  We're going to move on -- you can

3  pull that down -- to a little bit more about your

4  employment history, just to fill the judge in on it.

5      A.    Okay.

6      Q.    So can you tell me a little bit about DB

7  Pedicabs?

8      A.    Yeah.  So -- it was formed in 2006.  So DB

9  Pedicabs was an LLC -- single-member LLC that

10  belonged to me.  It's still active.  Like I said,

11  it's a New York entity, and I was basically a third

12  party -- I have a friend of mine who owns numerous

13  bicycle rental businesses in Central Park in

14  New York, and he was an affiliate.  I made a website.

15  I created it myself.  I advertised it on Google.  If

16  a customer wants to rent a bike or take a guided tour

17  of Central Park in New York City, he can go to my

18  website and the customer will be directed to the

19  payment page of my friend's business and I will get a

20  commission.  That's what it was.

21      Q.    Let me ask you this question.  Did you ever

22  give pedicab tours yourself in Central Park?

23      A.    I used to own a couple of pedicabs.  I used

24  to rent it out to other drivers.  Maybe on couple of

25  occasions, but that was not my main source of income,

Page 337

1    no.

2        Q.   When might you have done pedicabs in

3    Central Park?  Do you recall the years?

4        A.   I don't recall the years because it was

5    just, like, maybe one or two times that I drove one

6    myself.  I was leasing them to other drivers.

7        Q.   Between the years of 2017 and 2019, did you

8    complete any pedicab trips yourself?

9        A.   No, sir.  No, sir.  I don't have

10   any -- anymore, especially in Houston.  No.

11       Q.   In between the years 2017 and 2019, what

12   was the extent of the things you did as the sole

13   member of DB Pedicabs?

14       A.   So like I said, the LLC was still active.

15   So I was still an affiliate for a bike rental

16   company, as well as -- so I started doing trucking.

17   Before I formed DSK Logistics, I was advised by my

18   accountant to use DB Pedicabs for trucking to see how

19   it goes before I open a new company, but then it

20   became too complicated.  I don't know.  I just

21   followed his advice.

22       Q.   Okay.  We'll get to that part.

23       A.   Okay.

24       Q.   So for DB Pedicabs, when might you have

25   started using that entity for trucking?

Page 338

1        A.    So 2019, sometime in the -- sometime in the

2    beginning of 2019.

3        Q.    And how often did you use that entity for

4    trucking?

5        A.    So -- how often?  For the period that I was

6    employed with Carolina Logistics and TC Transports.

7    So that's probably around six months.

8        Q.    Okay.  Do you know when you started doing

9    work for TC transport?

10       A.    I would have to look at my e-mail, but, you

11   know, it was 2019.  Which month, I can't recall right

12   now.  I'm sorry.

13       Q.    Was it -- do you have any recollection of

14   the start date of TC --

15       A.    I should be able to find it through my

16   e-mail.  There was a contract that we signed at some

17   point.  I would have to go through my papers because

18   that's a requirement to be leased onto a company.

19       Q.    And how long did you offer services --

20   trucking services with TC Transport?

21       A.    It was for a period of three months

22   approximately before the company closed.

23       Q.    What's your understanding of the company

24   closing?

25       A.    They just decided to cease operations, and

Page 339

1    they moved on to other ventures.

2         Q.   Once TC Transport closed --

3         A.   Yes.

4         Q.   Once TC Transport closed, who did you work

5    with next?

6         A.   So at that point, I already had my truck

7    and trailer.  I didn't have my own company.  So FMC

8    rules, you have to get leased on in order to receive

9    jobs.  So I started working with Carolina Logistics

10   for about three months, as well, before I decided to

11   go completely on my own and form my own company that

12   is strictly trucking because I was advised by the new

13   account to do so.

14        Q.   What was the company name that you formed?

15        A.   DSK Logistics.

16        Q.   Do you recall when that was formed?

17        A.   It was around May 2020.

18        Q.   Were you still driving for Uber when you

19   formed DSK Logistics?

20        A.   No.

21        Q.   During the time that you drove for Uber,

22   did you also drive for Lyft?

23        A.   Yes, I have.

24        Q.   Do you have a sense of the amount that you

25   drove for Uber compared to the amount that you drove

Page 340

```
 1   for Lyft?
 2        A.   I worked a lot more for Uber.  I would say
 3   at least four times more Uber rides versus Lyft
 4   rides.
 5        Q.   When you say "Uber rides versus Lyft
 6   rides," what do you mean by that?
 7        A.   I must have -- through the entire period
 8   that I worked for Lyft, I probably did, like, 200 --
 9   over 200 Lyft rides and definitely over a thousand
10   Uber rides.
11        Q.   Okay.  And so, are you talking about
12   completed Lyft --
13        A.   Oh, absolutely completed, yes.  Right.
14        Q.   So let me ask it again.
15             As far as completed Lyft rides versus
16   completed Uber rides, do you have a sense of how much
17   you did for Uber as compared to Lyft?
18        A.   Four times more.  I would say four times
19   more.
20             MR. STANLEY:  Judge, I'm close to
21   passing.  I just need a couple minutes to look at my
22   notes, if you don't mind.
23             MS. SOUSSAN:  Okay.
24        Q.   (BY MR. STANLEY)  Did you rely on the money
25   that you made off Uber to pay the car note for the
```

Page 341

1  cars that you drove using the Uber app?

2       A.   Yes, sir.

3       Q.   Could you have paid those car notes without

4  the money from Uber?

5       A.   No.  I would have not chosen that type of

6  make and model vehicle to begin with.

7       Q.   Can you tell the judge about that?

8       A.   So I purchased a vehicle to do Uber.  I

9  spoke at my previous testimony -- I don't know --

10  about that, but I can repeat that again.

11            So there was advertisements in New

12  York City all over the place with a guaranteed amount

13  of money to make.  So rough calculations made sense

14  for me.  The vehicle is expensive.  It's a luxury

15  vehicle.  I would not have purchased it otherwise.

16  It was expensive and -- yeah.

17       Q.   And can you tell the judge the difference

18  between UberX and Uber Black and why that matters for

19  your car?

20       A.   Yes, I can.  So in most cities, Houston

21  included, for Uber Black you have to have a certain

22  make and model vehicle, usually commercial insurance

23  and, depending on the city -- like Houston, for

24  example -- you also have to have a chauffeur's

25  license.  The fares are more expensive to the rider,

Page 342

1    and, of course, the driver receives more money, as

2    well.  The downside to that is you have less -- less

3    rides.  Uber Black is luxury.  UberX is a regular

4    vehicle.

5         Q.   And --

6         A.   Yeah.

7         Q.   Why did you choose to spend your time at

8    the airport?

9         A.   Because, you know, there was not enough

10   work in Houston for Uber Black.  I mean, you could

11   sometimes wait for hours and hours and hours and you

12   would not get -- I've tried it all.  I've tried to

13   position myself at fancy hotels, and it was just not

14   worth it for me financially.  I figured if I work at

15   the airport, the rides are going to be longer, 20

16   plus miles usually, and I calculated that I'm going

17   to make more money at the end and that was the only

18   way I could actually do UberX.

19             In New York, it was different.

20   There's people everywhere, business people, fashion

21   people, all kinds of people.  I didn't have to work

22   at the airport.  As a matter of fact, I never did.

23   Here, it was the only way I could actually make it

24   work with Uber Black, is the airport.

25        Q.   Do you have a recollection on how you chose

Page 343

1    to drive for Uber Black in the beginning?

2        A.   Yeah.  Well, that's -- like I said, I've

3    done that in New York City, so I was familiar with

4    the platform, I was familiar with what it takes.  And

5    like I said, I don't have a college degree or

6    anything like that, so that was the only option for

7    me in Houston and that's why I did it.

8        Q.   Off the Uber app, did you also have a

9    limousine company?

10       A.   A limousine company?  No.

11       Q.   Did you -- did you do limo drives off the

12   Uber app?

13       A.   Uber Black -- I mean, Uber Black is

14   considered luxury service, right?  Uber was the only

15   provider of these rides for me.

16                  MR. STANLEY:  Judge, I'll pass the

17   witness.

18                  MS. SOUSSAN:  Thank you very much.

19   Ms. Miers?

20                  MS. MIERS:  Thank you, Judge.

21                  EXAMINATION

22       Q.   (BY MS. MIERS)  I'm going to start with

23   making sure that I can pronounce your name.  I tried

24   to write it down at the beginning when you pronounced

25   your name.  Barysas?

Page 344

1        A.   You did great.  Very good.

2        Q.   Thank you.  I'm going to try not to mess

3    that up.  Just a few minutes ago -- sorry.  I

4    shouldn't have talked over you.  My apologies.

5             Just a few minutes ago, you were

6    talking about whether you had a college degree or

7    not.  When you were in New York -- you did graduate

8    from high school, right?

9        A.   Yes.  Yes, I have.

10       Q.   And then you completed two years of college

11   before coming to the States?

12       A.   Yes, but I never graduated.  So, you know,

13   I moved to the States, and I never graduated.  Yeah.

14            MS. MIERS:  Object to nonresponsive

15   and strike everything after "yes."  Move to strike

16   after "yes."

17            MS. SOUSSAN:  Overruled.  Continue,

18   please.

19       Q.   (BY MS. MIERS)  So then you came to

20   America, and you tried out a lot of entrepreneurial

21   pursuits; is that right?

22       A.   Yes.

23       Q.   And you actually described yourself as

24   having an entrepreneurial spirit?

25       A.   Yeah.  I wanted to become one.

Page 345

1      Q.   We talked a little bit about your company

2   DB Pedicabs, and I'm going to try not to go over what

3   you've already said.  We'll just cover things that I

4   think that you haven't covered already.

5               You incorporated that company back in

6   2006; is that right?

7      A.   Yes, that is correct.

8      Q.   And you had 100 percent ownership in that

9   company?

10     A.   Yes, ma'am.

11     Q.   And is that company still active today?

12     A.   Yes, it is.

13     Q.   That's a business that you use and did use

14   back 2017 through 2019 for your different

15   entrepreneurial activities?

16     A.   Yes, ma'am.

17     Q.   For example, you mentioned this.  DB

18   Pedicabs has a business called Cycle Central Park?

19     A.   Yeah, it's just a website.  It's a domain,

20   yeah.  Correct.

21     Q.   And the domain is cyclecentralpark.com?

22     A.   That's correct.  Yes, ma'am.

23     Q.   And then in addition to bike rentals and

24   tour guides, you provided transportation services as

25   the owner and operator of DB Pedicabs, correct?

Page 346

1        A.    Yes.  You mean, like, through Uber?  That's

2   what you mean?

3        Q.    In addition to bike rentals and tour

4   guides, right, you provided transportation services

5   as the owner and operator of DB Pedicabs?

6        A.    Yes, that's correct.

7        Q.    And that was from 2016 --

8        A.    Yes.

9        Q.    That was from 2016 to August 2019?

10       A.    Yes.

11       Q.    All right.  Mr. Ridenour, if you would pull

12   up Respondent's Exhibit 49, please.

13             I think you were about to testify that

14   you also provided transportation services through the

15   Uber driver app.  Am I correct in guessing that?

16       A.    Yes, ma'am.

17       Q.    If you take a look at Respondent's Exhibit

18   49 -- this is already admitted into evidence.

19             Do you recognize this as your 1099K

20   for Uber?

21       A.    Yes, I do.

22       Q.    And payee name is DB Pedicabs, LLC, right?

23       A.    That is correct.

24       Q.    And then -- you can take that down.  Thank

25   you.

Page 347

1              For tax filings, you reported your

2    income from using the Uber and Lyft app through DB

3    Pedicabs, right?

4         A.   Yes.  I believe so, yes.

5         Q.   And when you lived in New York back during

6    that time, your residence was actually the business

7    address for DB Pedicabs?

8         A.   Yes, correct.

9         Q.   You had a home office that was dedicated to

10   that business?

11        A.   No.  No home office.

12        Q.   You didn't have a home office that was

13   dedicated to DB Pedicabs?

14        A.   It's just a one-man operation.  I don't

15   need a home office.  I mean, I guess you can call it

16   home office, but I don't know.

17        Q.   So do you agree with me that you had a home

18   office dedicated to DB Pedicabs when you lived in

19   New York?

20             MR. STANLEY:  Objection.  Asked and

21   answered.

22        A.   I disagree with you.

23        Q.   (BY MS. MIERS)  Okay.  Do you remember

24   having your deposition taken back in April of 2021?

25        A.   Yes.

Page 348

1      Q.   At the beginning of that deposition, just

2   like the beginning of your testimony today, you swore

3   to tell the truth?

4      A.   Yes, ma'am.

5      Q.   And you listened to the questions, and you

6   tried to answer them truthfully?

7      A.   Yes, ma'am.

8      Q.   And you understood you were under oath?

9      A.   Yes.

10      Q.   Let's take a look at your deposition from

11   that day.  Again, that was on April 29th in the Year

12   2021.  If we could take a look at Page 71.

13            Do you see you were asked, "Did you

14   have, like, a home office or a room that was

15   dedicated to the business?"  And you said yes,

16   correct?

17      A.   Correct.

18      Q.   Does that refresh your memory?

19      A.   Yes.

20      Q.   So did you have a home office for DB

21   Pedicabs in your residence?

22      A.   I guess you can call it that way.  I don't

23   know.

24      Q.   And you had office equipment that you

25   purchased?

 1          A.    Yes, yes.  There's computer and stuff,

 2     printer, yeah, just like everyone else has.

 3          Q.    And DB Pedicabs received PPP funds, right?

 4          A.    Yes, correct.

 5          Q.    Was it about $30,000?

 6          A.    Yes.

 7                MR. STANLEY:  Objection.  Foundation,

 8     first of all.

 9                MS. SOUSSAN:  I think he would know

10     whether PPP funds were received or not.  If he was

11     the --

12                MR. STANLEY:  Object to relevance.

13     Any funds that came were outside of the statutory

14     period of what claims could be made.  He stopped

15     driving in August of 2019 for Uber.

16                MS. SOUSSAN:  I agree with that.  I'll

17     sustain that objection.

18          Q.    (BY MS. MIERS)  Did DB Pedicabs receive an

19     economic injury disaster loan in the amount of

20     $78,000?

21                MR. STANLEY:  Same objection, Judge.

22                MS. SOUSSAN:  Hold on here.  I think

23     the point that's being made here is that the

24     testimony from -- I'm going to have a hard time

25     pronouncing your name because I've always said

                                              Page 350

1    Barysas -- that Uber was the sole -- that your income

2    was only from Uber.

3                    And so, I think what's coming out now

4    is that you received income from a PPP loan and

5    another type of loan.  And I'm not certain about the

6    time period for that, but it seems to me that that

7    must be the subject of the cross-examination.

8                    So if you could just clear that up,

9    Ms. Miers, that would help.

10       Q.    (BY MS. MIERS)  It's my understanding,

11   Mr. Barysas, that you provided transportation

12   services through the use of the Uber app by using the

13   name of an LLC called DB Pedicabs, LLC; is that

14   correct?

15       A.    Yes.

16       Q.    And that same company received an economic

17   injury disaster loan, correct?

18       A.    Yes, but the loan was --

19       Q.    It was about 78 --

20       A.    The loan was paid back in full immediately

21   after receiving because after I read the contract, I

22   said, "I don't want it," and I paid it back in full.

23   And I have a letter from SBA saying the loan was

24   immediately returned back.  It was never used.

25                    MR. STANLEY:  Judge, I'm still going

                                            Page 351

1   to object to any of the PPP stuff because it came

2   after.  He stopped driving in August of 2019.  He

3   already testified he did other things using the DB

4   Pedicabs, including trying to drive for a trucking

5   company after the fact.  All of this is not relevant.

6   It's after the fact he stopped driving for Uber.  His

7   last ride was August 25th, 2019.

8             MS. SOUSSAN:  What's your point here,

9   Ms. Miers?

10            MS. MIERS:  My point is that he had a

11  company, an LLC, in which he provided several

12  different types of transportation services and other

13  types of businesses, and we don't know he wasn't

14  trying to receive those funds on behalf of DB

15  Pedicabs, which is a company he controlled, not Uber.

16            MS. SOUSSAN:  For what time period are

17  you talking about?

18            MS. MIERS:  This would have been

19  during the pandemic in 2020 for a company he owned

20  and operated.

21            MS. SOUSSAN:  Okay.  Let's move on.

22       Q.   (BY MS. MIERS)  Let's move on.  I want to

23  talk to you, Mr. Barysas, about your use of the Uber

24  app in the way that you chose to use it.

25            I think we're in agreement that you

Page 352

```
 1    started to use the driver app in around 2014,

 2    correct?

 3         A.    That is correct, ma'am.

 4         Q.    The reason you made that decision was

 5    because you were looking to make a better living?

 6         A.    Yes, yes, yes.  And part of it, as I

 7    mentioned before, heavy advertising by Uber at that

 8    time on every New York City school bus in the back

 9    saying -- guaranteeing at that time to make -- I

10    forget -- a couple thousand dollars a week.  So,

11    yeah, that's what made me switch.

12              MS. MIERS:  I'm going to object as

13    nonresponsive.

14              MS. SOUSSAN:  Sustained.

15         Q.    (BY MS. MIERS)  So when you made the

16    decision to start using the Uber driver app, you were

17    in New York, but then you made the decision to start

18    using it in Houston, right?

19         A.    That is correct, ma'am.

20         Q.    One of the favorite things for you about

21    using the Uber driver app was that you could quit

22    using it at any time?

23         A.    Yes.

24         Q.    And when you first started using the driver

25    app, you signed some agreements with Uber?
```

Page 353

1      A.   Yes.

2      Q.   And then throughout the years that you

3  chose to use the Uber driver app, you signed various

4  other agreements with Uber, right?

5      A.   Yeah.   There were many agreements that

6  would pop up on the driver app forcing you to sign or

7  otherwise you wouldn't be able to go on-line.

8           MS. MIERS:   Your Honor, I'm going to

9  object as nonresponsive again.

10           MS. SOUSSAN:   Carefully listen to the

11  question and answer the question.   I know you're

12  anxious to get your words in, but please answer her

13  question.

14           THE WITNESS:   No problem.   I'm not

15  trying to avoid it.

16           MS. SOUSSAN:   I understand.   Just

17  answer her questions.

18      Q.   (BY MS. MIERS)   Mr. Barysas, in addition to

19  the contracts that you executed with Uber, you

20  received things that we talked about earlier, like

21  community guidelines and deactivation policies; is

22  that right?

23      A.   Yes, ma'am.

24      Q.   In fact, earlier you testified that if you

25  didn't accept all the trips that were given to you by

Page 354

1    Uber, you would be deactivated.  That was your

2    testimony earlier, right?

3         A.   Yes, ma'am.

4              MS. SOUSSAN:  Hold on.

5              (Discussion off the record)

6         Q.   (BY MS. MIERS)  I'm going to go back to my

7    question because I did interrupt the flow here.  I'm

8    referring to your testimony at 12:03 today.  Earlier

9    you testified that if you didn't accept all the trips

10   that were given to you by Uber, you would be

11   deactivated.

12             That was your testimony earlier,

13   right?

14        A.   Yes.

15        Q.   Okay.  Let's take a look at the community

16   guidelines.

17        A.   Okay.

18        Q.   That's Joint Exhibit 2, Mr. Ridenour.

19             While we're pulling that up, you also

20   testified to something similar to that at your

21   deposition, right?

22        A.   I believe so.

23        Q.   Okay.  So let's take a look at Bates 71 at

24   the very bottom of the page.  Do you see with me

25   where it says Acceptance Rates right there?

                                        Page 355

1        A.   Yes, I do, ma'am.

2        Q.   We're going to scroll down to the rest of

3   that section on the next page, Bates Page 72.  We're

4   going to highlight that.

5        A.   I see it perfectly.  Yeah.

6        Q.   You testified that you read these several

7   times, the community guidelines?

8        A.   Yes.

9        Q.   What the community guidelines actually say

10   are that not accepting trip requests does not lead to

11   permanent loss of your account, right?

12        A.   I see that.

13        Q.   And that's in the community guidelines?

14   You agree with me that that's a statement in the

15   community guidelines?

16        A.   I do.

17        Q.   So while we're looking at the community

18   guidelines, let's go to the top of Bates 68, if you

19   would.  I'm not going to go over what you've already

20   covered with your counsel.

21        A.   Okay.

22        Q.   You see at the top where it says, "We want

23   Uber" --

24        A.   I see.

25        Q.   It says, "We want Uber to be enjoyable and

Page 356

1    safe for everyone."

2             You understand that the community

3    guidelines apply to both drivers and riders, right?

4        A.   Yes.

5        Q.   And if we scroll to the bottom of that same

6    page in the Feedback Makes us Better section, you see

7    with me where it says, "Whether you are a rider or

8    driver, please rate your journey at the end of your

9    trip."

10            Do you see that?

11       A.   I do see it.

12       Q.   And you talked about with your counsel how

13   the star rating program works, so we won't go over

14   that.

15       A.   Okay.

16       Q.   You do recognize that you had -- it was up

17   to you how to rate your riders, right?

18       A.   Yes, ma'am.

19       Q.   And you understood that both drivers and

20   riders had the ability to rate each other?

21       A.   I understand that, yes.

22       Q.   All right.  And we already talked about how

23   drivers can lose access to the Uber app, but what we

24   didn't talk about earlier was why riders can lose

25   access to Uber.

1             MR. STANLEY:  Judge, I'm going to

2     object to relevance.  We're not bringing any claims

3     on behalf of any rider here.

4             MS. SOUSSAN:  Overruled.

5        Q.   (BY MS. MIERS)  You agree with me,

6     Mr. Barysas, that just like drivers can be

7     deactivated, riders can, too?  On here, you see some

8     of the reasons that riders can be deactivated, right?

9        A.   Yes, I believe so.  Yeah.  It's up to Uber

10     to decide.

11             MS. MIERS:  Objection.  Nonresponsive.

12             MS. SOUSSAN:  Overruled.  Please try

13     to answer the question, Mr. Barysas.

14             THE WITNESS:  Okay.

15        Q.   (BY MS. MIERS)  Reasons that riders can

16     lose access to the app are for -- if you could maybe

17     bring that up a little more in focus for us.

18             Riders can be deactivated for things

19     like damaging property, right?

20        A.   Yes.

21        Q.   Physical contact?

22        A.   I see it.

23        Q.   You agree with me that they can be

24     deactivated for physical contact?

25        A.   Yes.

                                        Page 358

1       Q.    And for abusive language, things like that?

2       A.    Yes.

3       Q.    If we go to the next page on Page 70, just

4    like drivers, riders can be deactivated for fraud,

5    right?

6       A.    Yes.

7       Q.    Okay.  Let's take a look at Joint Exhibit

8    1.  Mr. Barysas, this is the deactivation policy that

9    you testified about a little bit earlier?

10      A.    I'm familiar with this document.

11      Q.    Okay.  And you testified that you read this

12   document numerous times?

13      A.    Yes, ma'am.

14      Q.    Did you read it on your phone or on a

15   computer?  How was that?

16      A.    I read it on the phone and the computer,

17   both.

18      Q.    Did you download a copy to your computer?

19      A.    No, I think -- maybe -- I can't recall

20   this, actually.  Maybe at some point it was

21   downloaded to my computer, yes.

22      Q.    And do you still have that on your

23   computer?

24      A.    I doubt it.  I doubt it.

25      Q.    Did you look for it?

Page 359

1      A.    No, I have not, but I doubt it that I would

2   have it.  I wouldn't even know how to look.

3      Q.    All right.  I want to talk about star

4   ratings for a little bit longer here.

5                 During the time that you chose to use

6   the Uber driver app, you made the decision to give

7   your riders a one-star rating approximately 20, 30

8   times?

9      A.    Okay.  That's out of all the rides that I

10  have done?

11     Q.    Did you -- did you choose to give your

12  riders a one-star rating approximately 20 to 30 times

13  during the time that you used the Uber driver app?

14     A.    I wouldn't be surprised that I had, yes.  I

15  would agree with that.

16     Q.    In fact, that's how you testified at your

17  deposition, right?

18     A.    Yeah, sure.  I agree with that.

19     Q.    Generally when you made the decision to

20  rate one of your riders only a one star, it was

21  because you thought the rider was being obnoxious?

22     A.    Sure.

23     Q.    Sometimes because they left a mess in the

24  car?

25     A.    Yes, absolutely.

Page 360

1     Q.   Threw up in the car?

2     A.   Yes, absolutely.

3     Q.   Cursed?

4     A.   Yes.  I would give one star for that, yes.

5     Q.   When they felt like you were judging them?

6     A.   They were judging me?

7     Q.   Yes.

8     A.   Yes, absolutely.  One star guaranteed.

9     Q.   And also you would give them a one star

10    when you determined that their conduct was not

11    consistent with the community guidelines?

12    A.   Yes, ma'am.

13    Q.   And you could have chosen to give two- or

14    three-star ratings, but you didn't do that, right?

15    A.   Yes.

16    Q.   And around 90 percent of the time, you

17    rated your riders five stars?

18    A.   Yes, that's -- that's very accurate.  Yes,

19    ma'am.  That's me.

20    Q.   Regarding your own star ratings, you never

21    received an alert that your star rating was too low?

22    A.   I can't recall this right now.  I don't

23    remember.

24    Q.   Okay.  Let's see if we can refresh your

25    memory.

Page 361

1    A.    Okay.

2    Q.    If you wouldn't mind pulling up his

3  deposition, and we're going to go to Page 113.  We're

4  pulling that up for you.

5    A.    Thanks.

6    Q.    All right.  And if you'll start at Line 18

7  to 22, please.  You'll see here, "Have you ever

8  gotten an alert that said you were approaching the

9  minimum star rating for the area you were driving

10 in?"

11          You said, "I -- I don't think so, no.

12 I don't think.  No, I don't believe so.  Not for

13 that.  Not for that."

14          Does that refresh your memory?

15   A.    Yes.

16   Q.    Okay.  You understood that Uber didn't

17 require you to accept trips, right?

18   A.    They didn't require me, yes.  I do agree

19 with that.  But however --

20   Q.    Okay.  Thank you.

21          And we talked about the deactivation

22 policy having a section on fraud.  You recall that?

23   A.    Yes, ma'am.

24   Q.    And did you understand the deactivation

25 policy when you read it?  Did you have any trouble

Page 362

1    understanding the policy?

2         A.   No, I understood it.

3         Q.   Okay.  I'm going to switch gears a little

4    bit so we can keep this moving along.  I want to talk

5    about how you chose to run your transportation

6    business.

7         A.   Okay.

8         Q.   So when you began to use the Uber driver

9    app as part of your transportation services business,

10   you made the decision to use TMobile as your cell

11   phone provider, correct?

12        A.   Yes, ma'am.

13        Q.   Uber didn't tell you that that was the

14   phone service that you had to use?

15        A.   No.

16        Q.   They didn't tell you what data plan to use?

17        A.   No, ma'am.

18        Q.   Okay.  Now that you are a truck driver, you

19   choose instead to use Verizon, right?

20        A.   Correct.  May I add something that I just

21   remembered?  While I was --

22        Q.   Your counsel will have an opportunity to

23   ask you additional questions when I'm done, if we

24   could just keep going.  This way we'll get through

25   and you'll get off the hot seat sooner rather than

                                        Page 363

```
 1   later.
 2              So the Verizon plan is more expensive
 3   than TMobile, isn't it?
 4        A.   $20 a month extra, yes.
 5        Q.   But you chose to go ahead and spend that
 6   extra money because when you're driving a truck,
 7   you're driving in the middle of nowhere and, in your
 8   business judgment, you determined that Verizon
 9   offered more reliable services?
10        A.   Yes, ma'am.
11        Q.   Then when you -- you registered to use the
12   Uber driver app, you used at least three different
13   e-mails, correct?
14        A.   Yes.
15        Q.   They were business names, not your personal
16   name, right?
17        A.   Yeah.  They were -- one was a business
18   name.  Another one just random names that were
19   available.
20        Q.   Like New York Party Bus Limos?
21        A.   That's the one that I'm talking about.
22        Q.   And Elite 212?
23        A.   Gmail.com, yes.
24        Q.   Baltican@yahoo?
25        A.   These are all mine.
```

Page 364

1        Q.    Uber didn't assign any of those e-mail

2    addresses to you?

3        A.    No, ma'am.

4        Q.    You didn't create these e-mails in order to

5    use the Uber driver app?  You already had them?

6        A.    Yes, yes.  That is correct.  I already had

7    them.

8        Q.    Now, you personally made the decision to

9    use Uber's black platform.  We talked about that a

10   little bit?

11       A.    Yes, ma'am, I do agree with that.

12       Q.    You would agree with me that Uber didn't

13   require you to use that platform?

14       A.    I do agree with you on that.

15       Q.    When you were in New York, that meant that

16   up needed commercial insurance?

17       A.    Yes, yes.

18       Q.    And you needed a license from the New York

19   City tax and limousine commission?

20       A.    That is correct and accurate.

21       Q.    And you alluded to this at the very end

22   much your testimony with your counsel.  You provided

23   your own vehicle for the transportation services,

24   right?

25       A.    Yes, ma'am.

                                        Page 365

1    Q.   And you were the one who chose which

2    vehicle to purchase?

3    A.   Yes, ma'am, but I went on -- I chose the

4    vehicle based on the recommendation on their website

5    what qualifies for Black.  So I went from

6    approximately 10 cars that were eligible and, based

7    on that, I made my decision.

8              MS. MIERS:   Okay.  I'm going to object

9    as nonresponsive.

10             MS. SOUSSAN:   Overruled.  Keep going.

11   Q.   (BY MS. MIERS)  So you made the decision to

12   use the Uber Black platform and then you made the

13   decision which car to choose?

14   A.   Yes, ma'am.

15   Q.   The car you chose was a '24 [sic] Infinity

16   QX60?

17   A.   It's 2014 infinity QX60.

18   Q.   That's what I was meaning to say.  I

19   appreciate you listening carefully.

20             This was a car you purchased.  You

21   didn't lease it.  Somebody else didn't purchase it.

22   You purchased it?

23   A.   I financed the vehicle, yes.

24   Q.   You paid over $60,000?

25   A.   Sounds about right, yeah.

Veritext Legal Solutions
346-293-7000

1      Q.    Eventually you paid that loan off that you

2  took out?

3      A.    Yes.  I paid it off quickly.  We received

4  some help from my parents, in-laws.

5      Q.    Once you paid it -- sometime after you paid

6  it off, you sold that same car?

7      A.    Yes, ma'am.

8      Q.    And you made about 15 or $16,000?

9      A.    I made money?  There's no way to -- for me

10  to make money.  I mean, depreciation of the vehicle,

11  there's no way to make money.  I forgot what I sold

12  it for, but it was not 60,000.  It was, like, in the

13  20s.

14      Q.    You think you sold it for $20,000?

15      A.    Something like that.  I believe so.

16  Somewhere in that range, yeah.

17      Q.    Okay.

18      A.    Maybe a little less.  I don't remember

19  exactly.  I would have to --

20      Q.    What would you have to do?

21      A.    I would have to go try to -- I don't know

22  how I find it.  Maybe go to the bank statement or

23  something.  I don't remember.  But it was somewhere

24  around $20,000.  That's accurate.

25      Q.    Okay.  And then you paid commercial

Page 367

1    insurance for the Infinity?

2        A.   Yes.

3        Q.   While you were using the Uber driver app in

4    New York, you chose to have one of those light-up

5    Uber lights in your car, right?

6        A.   (Witness nods head affirmatively.)

7        Q.   Is that a yes?

8        A.   Yes, ma'am.

9        Q.   And you only used it when you chose to work

10   at night?

11       A.   Yes, correct.

12       Q.   One of the things that you liked about

13   using that light was that it was easy to take off

14   your car?

15       A.   Yes, yes, because -- correct, yes.

16       Q.   And then when you started driving in

17   Houston, though, you chose not to use the light?

18       A.   Correct, because that was a New York thing.

19   Yes.

20       Q.   You didn't have any kind of Uber logo on

21   your car when you drove in Houston?

22       A.   That is correct, yes.  The only thing that

23   I had which was required was the TNC permit at the

24   airport that went on the windshield, yes.

25       Q.   And your limo license, right?

Page 368

1       A.    Always in my pocket, of course.  But the

2  sticker had to be displayed on the windshield, which

3  I acquired at the airport.

4       Q.    The vehicle that you chose to purchase, at

5  some point you had an issue with the transmission,

6  right?

7       A.    Yes.

8       Q.    And you made the decision to contact a

9  lemon law firm, and they helped you get a payout on

10 that?

11      A.    Yeah, because they couldn't fix it and --

12 even though my vehicle was out of warranty, but the

13 breach of warranty -- I forgot.  We got, like, $5,000

14 for that.  It was never fixed.  It was a

15 manufacturing defect.  It was never fixed, but it was

16 usable still.

17           MS. MIERS:  Your Honor, I hate to keep

18 objecting.  Can we at least get some leeway on our

19 time constraints?

20           MR. STANLEY:  He did respond to the

21 question.

22           MS. SOUSSAN:  Let's tighten it up,

23 Mr. Barysas, okay?

24           THE WITNESS:  I'm not sure what you

25 mean, Judge.  I try to answer the questions

                                      Page 369

1    truthfully.

2              MS. SOUSSAN:  I understand.  I'm not

3    saying that you're not answering the questions

4    truthfully, but we need to narrow your response to

5    respond just to her question and not add anything to

6    it, okay?  Your lawyers are here to protect you.

7              THE WITNESS:  All right.

8         Q.   (BY MS. MIERS)  So in all this process of

9    you going and finding a lemon law firm and helping

10   you get a payout for the transmission issues, Uber

11   didn't have any involvement in that, correct?

12        A.   No, ma'am.

13        Q.   You also used your Infinity for personal

14   use?

15        A.   Yes, ma'am.

16        Q.   That was usually on Saturdays and Sundays?

17        A.   Yes, yes, because I -- yes.

18        Q.   You didn't have another car for personal

19   reasons?

20        A.   Not at that time.

21        Q.   Uber didn't prohibit you from using that

22   car for personal reasons either, did it?

23        A.   No, ma'am.

24        Q.   All right.  When you made the decision to

25   move to Houston and start using the Uber driver app

Page 370

1   there, you decided again to use the Uber Black

2   platform in Houston, right?

3        A.   Yes, ma'am.

4        Q.   And one of the reasons that you made that

5   business decision was that Houston is a large city

6   and you felt like you had the perfect car for the

7   Black platform?

8        A.   Yes.

9        Q.   Just like in New York, Houston also

10  requires a limo license?

11       A.   Yes.

12       Q.   So you went out and you got the City of

13  Houston limo license, right?

14       A.   Yes, ma'am.

15       Q.   All right.  Let's take a look at Claimant's

16  Exhibit 12.  Do you recognize Exhibit 12 as the limo

17  license that you chose to obtain in Houston?

18       A.   Yes, ma'am.

19       Q.   And you paid for this license?

20       A.   Yes, ma'am.

21       Q.   Not Uber?

22       A.   I paid for it.

23       Q.   If we could look at Respondent's Exhibit

24  11.  If you could highlight the cost.

25                      The cost of the Houston limousine

Page 371

1    license that you chose to get was $638.50, correct?

2        A.   Yes, ma'am.

3        Q.   Could you go ahead and make that where he

4    can confirm it?

5                Do you see that?

6        A.   I do see that, and I recognize it.

7        Q.   Thank you.

8                Just like in New York, you also needed

9    commercial insurance in order to use the Uber

10   platform in Houston?

11       A.   Yes, ma'am.

12       Q.   If we could pull up Respondent's Exhibit

13   50.  Let's just take a look at your commercial

14   insurance.  If you could highlight the name of the

15   insured, please.

16               On your commercial insurance card, the

17   name of the insured is your company name, DB

18   Pedicabs, LLC?

19       A.   That is correct.

20       Q.   Now, for just a short period of time in

21   Houston, you used the UberX platform?

22       A.   Yes.

23       Q.   Okay.  In your opinion, on the UberX

24   platform pretty much any vehicle will qualify?

25       A.   Yes, ma'am.  That is correct.

Page 372

1    Q.   The rates are lower?

2    A.   Yes.

3    Q.   In your opinion, more drivers choose to use

4    the UberX platform?

5    A.   Yes, ma'am.

6    Q.   And you think that's because they have

7    fewer qualifications?

8    A.   It's because there are less requirements

9    for the vehicle and no licensing requirements --

10   actual license is required from the City.

11   Q.   That's why once you got to Houston and you

12   began using the Uber Black platform instead of UberX,

13   you chose to continue using the Uber Black platform

14   95 percent or maybe even 100 percent of the time?

15   A.   Yes, ma'am.

16   Q.   But to be clear, both of those platforms

17   were available to you and you could choose to use

18   either?

19   A.   Yes, ma'am.

20   Q.   Okay.  You understood that your operating

21   expenses would be less if you chose to use the UberX

22   platform?

23   A.   Yes, ma'am.

24   Q.   But you decided not to use UberX because

25   you determined that the math didn't add up for you?

Page 373

1        A.    Yes, ma'am.

2        Q.    You also felt like UberX would take you to

3    neighborhoods you didn't really want to work in?

4        A.    Yes.

5        Q.    Then you also made the decision to obtain

6    the Houston airport systems permit?

7        A.    Yes, ma'am.

8        Q.    And that was so you could offer

9    transportation to riders to and from the airport?

10        A.    Yes.  And that was a requirement, as well,

11    if you wanted to work at the airport.  So, yes, I

12    acquired the permit.

13        Q.    But you weren't required to work at the

14    airport?

15        A.    No, ma'am.

16        Q.    Okay.  You chose to use the Uber driver app

17    at the airport because you made the business decision

18    that it was the way the business would work for you?

19        A.    Yes, ma'am.

20        Q.    During opening statement, do you recall

21    your attorney stating that you could not say, "No, I

22    only want to do airport trips"?

23        A.    I don't recall the certain moment.  Sorry.

24        Q.    That's okay.  You don't agree with that

25    statement anyway because your business strategy was

Page 374

1    to work strictly at the airport?

2        A.   Yes, correct.

3        Q.   Even more specifically, you chose the Bush

4    airport instead of Hobby about 99 percent of the

5    time?

6        A.   Yes, because it's close to my house.

7        Q.   And Uber didn't require you to choose Bush

8    over Hobby?

9        A.   No, ma'am.

10        Q.   I want to talk about the staging area and

11    waiting in the staging area.

12              Which staging area at the airport did

13    you use?  Did you use the one for Uber Black or the

14    one for UberX?

15        A.   There was only one staging area at that

16    time when I was employed by Uber.  The staging area

17    in question is on the corner of Lee Road and Will

18    Clayton Parkway.

19        Q.   And you chose to go to the airport even

20    though you're claiming that you sometimes had to wait

21    as long as seven or eight hours at the airport in

22    order to get a trip request?

23        A.   Yes, ma'am.  That is correct.

24        Q.   And I think you said you typically had to

25    wait four or five hours to get a trip?

1        A.    Yes.

2        Q.    The reason you made that decision is

3    because you determined that the trips were worth the

4    wait time?

5        A.    Yes.

6        Q.    At least for you?

7        A.    Yes.

8        Q.    And to use your own words, that's why you

9    chose that strategy?

10        A.    Yes.

11        Q.    To save gas, you also chose not to idle

12    your car while you were waiting?

13        A.    Yes.

14        Q.    And then you obviously had a lot of time to

15    kill during these wait times.  While you were waiting

16    for trips, you would take walks?

17        A.    Yeah.  Sometimes I would take walks,

18    correct, yeah.

19        Q.    Sometimes you would play video games?

20        A.    Yes.

21        Q.    Or browse the internet?

22        A.    Yes.

23        Q.    So when you were in New York, it was

24    completely different.  You rarely chose to go to the

25    airport?

Page 376

1      A.   Yes, ma'am.  That is correct.

2      Q.   You don't remember exactly what time of day

3  or what days you chose to work, but you think you

4  started later in the day and worked later at night?

5      A.   That's accurate, yeah.

6      Q.   In comparison to Houston?

7      A.   Yes.

8      Q.   All right.  Let's talk about how you

9  scheduled transportation services.  I'm going to talk

10  about Houston now.

11            You typically chose to turn the app on

12  around 8:00 a.m. after dropping your son off at

13  school?

14      A.   Yes.

15      Q.   Uber did not require you to do that?

16      A.   No.

17      Q.   You rarely chose to log off the Uber app

18  for lunchtime, right?

19      A.   Yes.

20      Q.   That's because you didn't want to pay to

21  park or lose your place in line at the airport?

22      A.   Yes, that's accurate.

23      Q.   And to use your own words, you found the

24  best strategy was to take your own food?

25      A.   Yes.

1      Q.   Most of the time when you chose to drive,

2  you would decide to turn the app off around 7:00 p.m.

3  because you had a family?

4      A.   Yes.

5      Q.   Uber didn't tell you what time to log off?

6      A.   No.

7      Q.   The app -- the Uber driver app had a

8  feature that you referred to as the destination

9  filter.

10              Do you remember that?

11      A.   I do.

12      Q.   Is that a yes?

13      A.   Yes, yes.

14      Q.   It would allow you to indicate that you

15  were kind of ready to head home.  And so, it would

16  make it possible for you to receive leads for trips

17  that were on the route back to your house, right?

18      A.   Yes.

19      Q.   And that's so that you could earn money on

20  your way home?

21      A.   Yes.

22      Q.   Now, you didn't choose to use that feature

23  because you thought it might take you to some of the

24  worst neighborhoods in Houston?

25      A.   Correct.

Page 378

1         Q.    And Uber didn't require you to drive in

2    certain areas?

3         A.    No.

4         Q.    Now, Uber would send you e-mails letting

5    you know where they expected high demand would be,

6    but you didn't have to go to those high demand areas?

7         A.    Correct.

8         Q.    Uber also didn't require you to drive on

9    any particular days?

10        A.    Correct.

11        Q.    Or certain hours?

12        A.    Yes, ma'am.

13        Q.    Uber didn't tell you when to log onto the

14   app?

15        A.    No, they have not.

16        Q.    They didn't tell you when to log off?

17        A.    Nope.

18        Q.    They didn't require you to spend a certain

19   amount of time logged onto the app?

20        A.    No.

21        Q.    Now, on the weekends, you chose not to work

22   during the day?

23        A.    Yeah.

24        Q.    But on Saturdays, sometimes you would kind

25   of cruise around the area where you lived and you

Page 379

1    might pick up a ride or two?

2         A.   It would depend.  Sometimes I have.

3         Q.   But rarely did you choose to use the Uber

4    driver app on Sundays?

5         A.   Correct.

6         Q.   Now, if you had doctor's appointments

7    during the week, you could stop using the app to go

8    to the doctor.  Your discretion, right?

9         A.   Yes.

10        Q.   And on those days, what you would typically

11   decide to do was just not use the Uber app at all on

12   those days?

13        A.   Yes.

14        Q.   There were even times when you chose not to

15   use the Uber app for a week or so at a time?

16        A.   Yes.

17        Q.   You didn't have to get approval from Uber

18   in order to do that?

19        A.   No.

20        Q.   In fact, in 2017 you went to Lithuania for

21   two to three weeks and you didn't use the app at all

22   during that time?

23        A.   Yes, ma'am.  That is correct.

24        Q.   You also took trips that were even longer

25   than two to three weeks, right?

```
 1        A.   Yes.
 2        Q.   Let's take a look at Claimant's Exhibit 8.
 3   So we've been through Claimant's Exhibit 8, and we're
 4   going to pull out some of these communications in the
 5   group of communications that your attorney went over
 6   with you earlier.  And we're looking at Bates 117,
 7   for the record, in Claimant's Exhibit 8.  If you look
 8   at your message, it's from you to Uber.
 9             Do you see that?
10        A.   Yes, I do.  I'm familiar with this e-mail.
11        Q.   Okay.  You stopped using the app for two
12   months, right?
13        A.   Yes.
14        Q.   And here you're stating that you're leaving
15   the country for two months and you want to cancel
16   your insurance?
17        A.   Yes.
18        Q.   So what's going on here is that you're
19   strategizing about how to reduce your loss during a
20   time when you were not going to be working?
21        A.   Yes.
22        Q.   So Uber gets your message, and they told
23   you that in order for your account to remain active,
24   you have to keep your insurance up to date and
25   active, right?
```

Veritext Legal Solutions
346-293-7000

1          A.    Yes.

2          Q.    Is that a yes?

3          A.    Yes, ma'am.  Yeah.

4          Q.    But they offered -- they could put a

5     temporary hold on your account?

6          A.    Yes.

7          Q.    It was up to you to decide whether your

8     account was placed on hold?

9          A.    Yes.

10         Q.    It states right there, "Please let me know

11    if you wish to proceed in temporarily placing your

12    account on hold"?

13         A.    Yes.

14         Q.    You can take that down.  Thank you.

15               But just generally speaking, you

16    decided when to use the app?

17         A.    Yes.

18         Q.    And Uber didn't set a schedule for you?

19         A.    No.

20         Q.    You didn't have a supervisor?

21         A.    No, ma'am.

22         Q.    You could just stop utilizing the app any

23    time you wanted?

24         A.    Yes.

25         Q.    In fact, that's actually what happened,

                                        Page 382

1    right?

2         A.    Yeah.

3         Q.    You stopped using the app in August of

4    2019?

5         A.    Yes.

6         Q.    Even though you could have chosen to offer

7    delivery services through the app, you made the

8    decision not to do that, right?

9         A.    Yes.

10        Q.    When I say -- do you understand I'm talking

11   about Uber Eats?

12        A.    Yes.  I do understand it, yes.

13        Q.    Okay.  Uber didn't require you to use the

14   Uber Eats platform?

15        A.    No, ma'am.

16        Q.    Okay.  So with respect to transportation

17   services, which is what you chose to offer, you have

18   a personal belief that good service is important?

19        A.    Yes, I do.

20        Q.    Because you're a business owner and you

21   think good service makes sense?

22        A.    I agree with that.

23        Q.    And as part of the good service that you

24   chose to provide to your riders, you provided

25   amenities to them?

```
 1        A.    Yes.
 2        Q.    Those amenities included keeping two
 3   chargers in the back of the car, in the rear?
 4        A.    Yes.
 5        Q.    And you had at least four bottles of water
 6   all the time?
 7        A.    Yes.
 8        Q.    And you provided tissues?
 9        A.    Yes.
10        Q.    Uber didn't make you do that.  That was
11   your choice to do that?
12        A.    Yes.
13        Q.    And that's because you believed that if you
14   offered your passengers chargers and waters and
15   tissues, they were probably more likely to give you a
16   tip?
17        A.    Yes.
18        Q.    You also made the decision to dress
19   professionally when you offered transportation
20   services.  You wore a dress shirt and nice clothes?
21        A.    Yes.
22        Q.    And you did this on your own?
23        A.    Yes.
24        Q.    Uber didn't have a dress code?
25        A.    No.
```

Page 384

1          Q.    Another one of your strategies was to have

2     business cards made for your transportation services,

3     right?

4          A.    Yes.

5          Q.    Let's take a look at Respondent's Exhibit

6     12.  Do you recognize this as a business card?

7          A.    Yes, ma'am.

8          Q.    All right.  And this is a business card

9     that you designed?

10         A.    Yes.  I designed them myself on-line.

11         Q.    The reason you designed it is because you

12     wanted to get more business?

13         A.    Yes.

14         Q.    And it's your personal opinion that

15     everyone should have a business card?

16         A.    Yes.

17         Q.    They cost you about 50 or $60, you think?

18         A.    Yes.  Somewhere in that range, total.

19         Q.    And then when you provided transportation

20     services to your riders, you handed these cards out

21     to your riders?

22         A.    No, ma'am.  I never handed the cards to my

23     riders.  They were in the back for everyone's taking

24     if they wanted.

25         Q.    You kept them in the back of your car?

1      A.    Yes.  Kind of like where the water was,
2  there's a little pocket there on the seat.
3      Q.    What if they asked you for a card?  Would
4  you hand them a card then?
5      A.    Yes.
6      Q.    Okay.  The business cards might have
7  generated more business for you, but you don't really
8  know?
9      A.    Well, I received one call over the entire
10 time I worked for Uber that came from business cards.
11 So at some point -- I still probably have some in my
12 house.  So I stopped using them.  I don't think they
13 generated a lot of extra income for me.
14     Q.    You made the decision to stop using them?
15     A.    Yes.
16     Q.    Now, this card that you created has your
17 phone number, not Uber's, right?
18     A.    Yes, that is correct.
19     Q.    It's got your business e-mail address, not
20 an Uber e-mail?
21     A.    That is correct.
22     Q.    It has Lyft on the card?
23     A.    Yes.
24     Q.    And Lyft is actually listed above Uber.
25 It's listed first, right?

Page 386

```
1          A.    Yeah.  It was a design choice, yes.

2          Q.    And then if we want to flip to the other

3    side of the card -- and if you could make that just a

4    little bit easier for us all to read.

5                      You designed this part of the card, as

6    well?

7          A.    Yes.  It was a two-sided business card,

8    yes.

9          Q.    And the back of the business card indicates

10   you offered luxury transportation?

11         A.    Yes, ma'am.

12         Q.    You used the Uber mapping app, right?

13         A.    While being provided a rider?

14         Q.    While you were using the Uber driver app,

15   you used the Uber mapping app, right, to figure out

16   where to go, to get directions?

17         A.    Yes, yes, yes.

18         Q.    You actually think Waze is known to get you

19   there quicker?

20         A.    Yes, I do believe that.

21         Q.    And you would actually choose Waze, but you

22   stuck to the Uber mapping app because you were afraid

23   Uber would penalize you?

24         A.    Yes.

25         Q.    Do you recall earlier when you were going
```

Page 387

1   over some exhibits with your attorney that you

2   specifically discussed using the Waze app for

3   directions?

4        A.   Yes, ma'am.

5        Q.   If someone had used the Uber Black

6   platform, you had the option to accept what were

7   called hourly trip requests, right?

8        A.   I believe this is a feature that was

9   introduced when I stopped working for Uber.  So I'm

10   not familiar with this.

11        Q.   Okay.  Let's just make sure.  We're going

12   to pull up -- this is Claimant's Exhibit 26.  We'll

13   make that bigger, if you would, please.

14             Does this ring a bell as to whether

15   you had the option to accept hourly trip requests?

16        A.   Yes, but I guess I've never done those

17   rides so that's why I don't remember.  I guess I can

18   say I remember, yes.

19        Q.   So taking a look at this, this --

20   basically, this document is showing you how to opt in

21   for hourly trips, right?

22        A.   Okay.  Yes.

23        Q.   And then if we look at the next page --

24   that's Bates 1368.  In the first paragraph, we're

25   going to take a look at the second sentence.  And it

1    says that the requests will show up as black hourly

2    on the offer card in the app.

3                  Do you see that?

4        A.   Yes, I do.

5        Q.   Then the rider's requested number of hours

6    and maximum trip mileage are shown at the bottom of

7    the offer card, right?

8        A.   Yes.

9        Q.   And then, finally, it states, "You can

10   cancel for any reason"?

11       A.   Yes.

12       Q.   Under the section that says Cities Where

13   Uber is Active, there's a question that asks, "How

14   long will Black/Premier hourly trips last?"

15                  Do you see that?

16       A.   Yes, I do.

17       Q.   It states, "That's between you and your

18   riders"?

19       A.   Yes.

20       Q.   We can take that down.  And if we could

21   replace it with Respondent's Exhibit 31.  Go to the

22   next page.  Actually, until you get to surge.

23                  So surge pricing is when the trip rate

24   goes up during the busiest times of the day because

25   the demands of drivers exceeds the supply, right?

                                              Page 389

1       A.    That's correct.

2       Q.    Okay.  Your strategy for maximizing profits

3  did not include intentionally driving to surge areas,

4  right?

5       A.    Yes.

6       Q.    You didn't try to avoid them either,

7  though?

8       A.    No.

9       Q.    In fact, you recall one New Year's Eve in

10 which you accidentally ended up in a surge area and

11 you felt like you basically got paid for doing

12 nothing?

13      A.    Yes.

14      Q.    At the end of the day, you weren't required

15 to provide services in surge areas?

16      A.    Correct.

17      Q.    All right.  We talked -- both me and

18 Mr. Stanley talked to you about the community

19 guidelines and we both talked to you about the

20 deactivated policies, but I want to talk to you --

21 just a few questions -- about how those policies

22 applied to you.

23      A.    Okay.

24      Q.    You understood that if a lot of drivers had

25 low acceptance rates, there would be fewer riders

                                        Page 390

1    because they wouldn't get reliable service?

2              MR. STANLEY:  Objection.  Speculation.

3         A.   Yes.

4         Q.   (BY MS. MIERS)  Okay.  And you understood

5    the reliability of the Uber app directly impacted

6    your ability to earn income when you were using the

7    Uber app?

8              MR. STANLEY:  Objection.  This calls

9    for speculation.

10             MS. SOUSSAN:  He can answer the

11   question if he knows the answer.

12        Q.   (BY MS. MIERS)  Would you like me to repeat

13   it?

14        A.   Yes, please.

15        Q.   You understood that the reliability of the

16   Uber app directly impacted your ability to earn

17   income when you were using the Uber app, right?

18        A.   Yes.

19        Q.   So you needed riders to want to use the

20   Uber app so that you could earn income as a driver

21   using the Uber app?

22        A.   Yes.

23        Q.   With respect to deactivation, you were

24   never deactivated for not accepting trips?

25        A.   Well, answer this question.  I'm not sure

Page 391

1   to this day because I've asked this question.  It was

2   never specified.  It was, like, general answer.  So

3   I'm not sure how to answer this.

4        Q.   Okay.  Let's take a look at your deposition

5   and see how you answered this question back in April

6   of 2021.  Let's start, Mr. Ridenour, with Page 117,

7   Lines 8 through 12.

8                  You were asked, "But you've never been

9   deactivated for not accepting trips, right?  You've

10  never lost your account because you didn't accept a

11  ride?"

12                 And you said, "No, I don't think I

13  have."

14                 Does that help you answer my question?

15                 MR. STANLEY:  I object.  This is

16  cumulative.  We've already talked about acceptance

17  rates not leading to permanent deactivation.  I even

18  covered that in my direct.

19                 MS. SOUSSAN:  Overruled.  Overruled.

20       Q.   (BY MS. MIERS)  Does that help refresh your

21  memory, Mr. Barysas?

22       A.   Yes.

23       Q.   So you -- we need to help Judge Soussan

24  understand.  You were never deactivated for not

25  accepting trips, right?

Page 392

```
 1        A.    No, I don't think so.
 2        Q.    You never lost access to the Uber app due
 3   to cancellation either?
 4        A.    No.
 5        Q.    You were never required to take any quality
 6   improvement courses?
 7        A.    I think at some point I went through
 8   something, but I can't recall.  I'm sorry.  My memory
 9   is terrible.  At some point, I watched some video.
10   And I forgot who -- if it was at Uber's headquarters
11   in New York or if it was a link they sent me.  I
12   think I watched something.
13        Q.    Do you agree with me that you testified
14   differently at your deposition, or do I need to
15   refresh your memory?
16        A.    Can we refresh?  It's one more question I'm
17   trying to remember.
18        Q.    Sure.  Okay.  We're going to go to
19   Page 130.  We're going to start at Line 17.
20              You see here you testified, "But if
21   he's deactivated, he has a chance of improving
22   himself by -- I think it was some sort of reading or
23   some sort of video."  I'm going to let you read it,
24   okay?  "Just better himself if he made a mistake.  I
25   think that's what it is.  I've never had one."
```

```
 1                    You were asked, "You never had to take
 2      them?"
 3                    You said, "i don't think so, no."
 4                    Does that help you?  Does that refresh
 5      your memory?
 6           A.   Yes.
 7           Q.   Okay.  We can take that down, Don.
 8                    Did you ever lie to riders in order to
 9      get them to cancel a trip so you wouldn't have to
10      cancel it?
11           A.   I did on a few occasions, yes.
12           Q.   How many?
13           A.   I can't recall right now.  It will be hard
14      for me.
15           Q.   At one point you became a premium driver
16      that allowed you access to a feature that would
17      indicate the length of a trip you accepted, right?
18           A.   Yes.
19           Q.   You did not like short trips?
20           A.   No, ma'am.
21           Q.   You wanted long trips?
22           A.   Yes.
23           Q.   If the trip was short, you wouldn't accept
24      it?
25           A.   Yes.
```

                                              Page 394

1        Q.   Did you ever try to cancel a ride but the
2    app just wouldn't let you?
3        A.   Yes.
4        Q.   How many times did that happen?
5        A.   I'm sorry.  It's hard for me to remember
6    this.  It happened a few times, quite a few times.
7        Q.   A few times?
8        A.   Yes.  Quite a few times.
9        Q.   When you say "quite a few times," what do
10   you mean?
11       A.   I would say at least 20 times.
12       Q.   But it could be more?
13       A.   Could be more.  Could be more.  I don't
14   think it -- I don't think it was less, but it could
15   be more.
16       Q.   Okay.  Let's go back to Claimant's
17   Exhibit 8, and we're going to take a look at Bates
18   1386.  You're going to recall going over this with
19   your attorney.  Do you remember going over this one
20   earlier?
21       A.   Yes, ma'am.
22       Q.   It's a rider complaining that you told the
23   rider that you were pulled over by the police.
24       A.   Yes.
25       Q.   The rider says, "he sent me the following

                                        Page 395

1    message:  Hello.  I was trying to call you, but it

2    goes straight to voicemail."

3                    Mr. Ridenour, could you make that

4    bigger, please?

5                    He says, "He sent me the following

6    message:  Hello.  I was trying to call you, but it

7    goes straight to voicemail.  I've tried to cancel

8    this ride, but the system is not letting me in.  I'm

9    currently pulled over by the police.  You can cancel

10   the ride.  You will not get charged because I haven't

11   moved."

12                    Do you understand that?

13        A.   Yes, I remember this.

14        Q.   Let's go two messages down.  The rider

15   says, "I am sure that his statement is not true

16   because the car was showing as being stationed at the

17   airport parking lot.  This is just another example of

18   drivers harassing customers to cancel rides.  I have

19   heard the whole lot at George Bush Airport -- tire

20   puncture, traffic jam, et cetera -- used by drivers

21   to make the customer cancel rides."

22        A.   Yes.

23        Q.   Did you ever send a message -- I think you

24   already said yes to this, so I'm going to change my

25   question.

                                        Page 396

1            How many times did you send a message
2  to one of your riders indicating that you were pulled
3  over by the police?
4       A.   I can't recall exactly how many times.
5  There were a few times.  And a lot of these times
6  that it happened, it actually happened.  It was not a
7  lie.  We were harassed by police.  There was no good
8  service.  There were a few times that I lied because
9  I didn't want to get a cancellation to be put back in
10 line, to be honest with you.
11      Q.   How many times were you actually pulled
12 over by the police?
13      A.   It was the police and -- sometimes it was
14 police and sometimes it was airport security.  I
15 guess, to answer your question, I don't know.
16 Probably, like, six times, seven times.
17      Q.   Six or seven times you were actually pulled
18 over by the police?
19      A.   Yes, ma'am.
20      Q.   Okay.  Do you have any documents showing
21 that you were pulled over by the police?
22      A.   Oh, no.  All they do is tell you to leave
23 the staging lot.
24      Q.   How long does that take?
25      A.   To leave the staging lot?

                                        Page 397

1          Q.    For the police to pull you over.

2          A.    Oh.  I mean, it depends.  I mean, usually

3     just very short.  They tell you to leave the staging

4     lot because it's too crowded.  So less than a minute,

5     I would say.

6                    MS. SOUSSAN:  Would you please find a

7     good place to break?

8                    MS. MIERS:  That is an absolutely

9     perfect time.  I actually started to suggest it.

10                    MS. SOUSSAN:  15 minutes.

11                    (Recess from 3:35 p.m. to 3:52 p.m.)

12                    MS. SOUSSAN:  Now, this is our long

13     period here.  So my intent is to go until 6:00.  But

14     if anyone needs, like, a five-minute break once we

15     get this -- including you, Shauna -- please raise

16     your hand.  Don't put it in the chat.  I never look

17     at my chat.  I'm looking at you guys and the

18     documents.  So let me know that you need a quick

19     break and we will do it, okay?

20                    Are we ready to continue?  Please

21     continue.

22          Q.    (BY MS. MIERS)  So we are really moving on

23     to another exhibit, but really quickly I just want to

24     refresh your memory, Mr. Barysas, that this e-mail

25     exchange that we were just talking about or this

Page 398

1    communication -- I want to focus on the date really

2    quickly.

3            A.    Okay.

4            Q.    That communication is dated June 8th, 2018,

5    okay?

6            A.    All right.

7            Q.    So now we're going to move to a different

8    exhibit.  We're going to move to your Exhibit 5,

9    Claimant's Exhibit 5.  And this should look familiar

10   to you because you discussed this a bit with your

11   attorney.  Let's take a look specifically at Line 47.

12              And we see that this is a

13   communication on September 19th, '18, and it's the

14   same exact communication to a rider that was in the

15   previous exhibit, right?

16           A.    Yes, that is correct.

17           Q.    All right.  Let's look at Lines 55, 56, and

18   57.  It's also the same exact message to a rider,

19   right?

20           A.    Yes, ma'am.

21           Q.    And you're representing to the rider that

22   you tried to call them and it goes to voicemail?

23           A.    Correct.

24           Q.    You tried to cancel, but the system won't

25   let you?

Page 399

```
 1          A.    Correct.
 2          Q.    You're currently pulled over by the police?
 3          A.    Yes.
 4          Q.    You're telling them that they can cancel
 5     the ride?
 6          A.    Yeah.
 7          Q.    And you're telling them, "You will not get
 8     charged because I haven't moved"?
 9          A.    Yes.
10          Q.    Let's take a look at the communication at
11     Line 60.  Here's another instance where you're
12     telling a rider that you aren't coming any time soon
13     because you got pulled over, correct?
14          A.    Yes.
15          Q.    Then let's look at 62 through 65.  Same
16     message, right?
17          A.    Yes.
18          Q.    Then 69 and 70, 74 through 76, 82 --
19                MS. MIERS:  Your Honor, I'm just
20     reading these in for the record.
21          Q.    (BY MS. MIERS)  Line 84 is the same
22     message, right?
23          A.    Yes.
24          Q.    87 is the same message?
25          A.    Yes.
```

Page 400

1      Q.   Lines 89 through 91?

2      A.   Correct.

3      Q.   Same exact message, right?

4      A.   Yes.

5      Q.   Line 93, Line 100, Lines 104 through 106,

6   Lines 108 through 110, Line 112.

7           You agree all of these say the same

8   exact message, right?

9      A.   Yes.

10      Q.   Line 114, Line 116, Lines 119 through 120.

11   All the same exact message?

12      A.   Correct.

13      Q.   We're almost there.  Hang in with me.  Line

14   129?

15      A.   Yes.

16      Q.   Line 132?

17      A.   Yeah.

18      Q.   Line 134?

19      A.   I see it, yes.

20      Q.   And then Line 117?

21      A.   Correct.

22      Q.   171 is saying you're pulled over by the

23   police, right?

24      A.   Correct.

25      Q.   So that's more than six times.  Would you

Page 401

1    agree with me there?

2         A.   Yes.

3         Q.   Is that a yes?

4         A.   Yes.

5         Q.   Now I want to take a look at some other

6    messages in here before I just bore the room to

7    death.  Let's go from Lines 181 up to 173.  In order

8    to understand the timing, you have to go from the

9    bottom up, Mr. Barysas, okay?

10        A.   Okay.

11        Q.   This is a communication between you and a

12   rider, right?

13        A.   Uh-huh.

14        Q.   You again are saying you got pulled over by

15   the police, right?

16        A.   Yep.

17        Q.   And that you can't cancel?

18        A.   Yep.

19        Q.   And then the rider says, "Well, I'll get

20   charged if I can't cancel.  Why did you accept?"

21        A.   Yep.

22        Q.   "Please cancel," right?

23        A.   Yes, I see it.

24        Q.   Let's go down to Lines 125 through 128.

25   We're going to again work backwards.

                                        Page 402

1           Here is another instance where you
2    told the rider you're not coming, right?
3        A.   Yes.
4        Q.   So you say, "I'm not coming."  And you
5    said, "Cancel the trip," and you said, "I can't.
6    It's been too long."
7        A.   Yep.
8        Q.   And you again represent that the rider
9    wouldn't be charged?
10       A.   Correct.
11       Q.   All right.  Let's look at Lines 149 through
12   157.  Here's an instance where you're telling the
13   rider that the rider needs to cancel because you're
14   not going there?
15       A.   Yeah.
16       Q.   Right?
17       A.   Correct.
18       Q.   You said, "I don't have a license to pick
19   up outside the airport"?
20       A.   Yeah.
21       Q.   And then the rider says, "Well, I'm not
22   going to cancel because I'm going to get charged.
23   You cancel"?
24       A.   Correct.
25       Q.   And again you tell the rider that the rider

Page 403

1    won't get charged?

2        A.   Yes.

3        Q.   The rider won't agree with you.  It says,

4    "I have in the past, so I'm not doing this."

5             The rider notes that it's a short

6    ride, the kind of ride that you didn't agree to take,

7    right?

8        A.   Correct.

9        Q.   Then the rider says, "We'll stay connected

10   until another Uber picks up your ride"?

11       A.   Correct.

12       Q.   All right.  Let's take a look at Claimant's

13   Exhibit 14.  And specifically, we're going to take a

14   look at Bates 1231.  And if we look at Number 2,

15   Number 2 states, "You'll receive a cancellation fee

16   if your rider cancels after more than two minutes

17   (down from five minutes previously)," right?

18       A.   Correct.

19       Q.   Earlier when you couldn't how many minutes

20   went by before you would be the recipient of a

21   cancellation fee, does that refresh your memory?

22       A.   Yes, ma'am.

23       Q.   So two minutes?

24       A.   Yes.

25       Q.   Now, we've talked a lot about Uber, so I'm

Page 404

1   going to give you a break for a little bit and let's

2   talk about Lyft.

3              Around the same time that you chose to

4   use the Uber driver app in 2014, you also started

5   using the Lyft app to provide transportation

6   services, right?

7        A.   Yes, ma'am.

8        Q.   You preferred actually to use the Uber app

9   rather than the Lyft app?

10       A.   Yes.

11       Q.   And that's because you received more ride

12  requests through the Uber app?

13       A.   Correct.

14       Q.   You were also happy using the Uber app and,

15  to use your words, that was your choice?

16       A.   Yes.

17       Q.   Okay.  There was a time where you tested

18  out an app called Juno?

19       A.   Yeah, I remember that.

20       Q.   But you didn't continue to use Juno?

21       A.   No.  That company, I believe, went

22  bankrupt.

23       Q.   And even though you also used the Lyft app

24  to provide transportation services to your riders,

25  you aren't suing Lyft?

                                          Page 405

1         A.    Correct.

2         Q.    Now, it's your sworn testimony that you

3    only used the Lyft app on rare occasions, right?

4         A.    Yes.

5         Q.    Okay.  Let's pull up Claimant's Exhibit 44.

6    I'm being told that we might be having some technical

7    difficulty, so this may take just a minute.  It looks

8    like the technical difficulties have been resolved.

9              We're going to pull up Claimant's

10   Exhibit 44.  I'll tell you what this is, Mr. Barysas.

11   This is what we call a demonstrative exhibit that

12   your attorneys submitted in this litigation.  It's

13   something I believe they created, okay?

14        A.    Okay.

15        Q.    And this shows trips that you completed.

16              Is there any way on the left-hand

17   side, the box with the numbers, that you could make

18   that bigger for us all?  We'll want the whole box.

19              All right.  Do you see how this shows

20   the trips that -- that you provided using either Lyft

21   or Uber?

22              MR. STANLEY:  Judge, I'm going to

23   object.  The witness lacks personal knowledge of this

24   document series.

25              MS. MIERS:  It's claimant's

                                        Page 406

1    demonstrative exhibit of underlying evidence that's
2    been admitted into evidence in this matter.  I'm not
3    seeking to admit this actual document into evidence.
4    I'm just seeking to assist Mr. Barysas in answering
5    questions regarding the number of trips he provided
6    through the Lyft and Uber apps.
7              MS. SOUSSAN:  He can answer the
8    questions if he knows.
9        Q.   (BY MS. MIERS)  So Mr. Barysas, in the
10   first quarter of 2018, do you recall whether you
11   completed 69 trips using the Lyft app?
12       A.   I would have to look at the history; but
13   it's possible, yes.
14       Q.   Okay.  Do you recall in the first quarter
15   of 2018 providing only 42 trips using the Uber driver
16   app?
17       A.   Yes.
18       Q.   Okay.  In April of 2018, did you complete
19   45 trips using the Lyft app?
20       A.   I guess that's right, yeah.
21       Q.   Okay.  You see that line?  And in that same
22   month, you completed 48 trips using the Uber driver
23   app?
24       A.   Yes.
25       Q.   You can take that down.

                                          Page 407

```
 1                    But it's your sworn testimony that you

 2      didn't use the Uber driver app and Lyft driver app

 3      simultaneously, right?

 4           A.   Well, I did actually use Uber and Lyft at

 5      the same time many times.

 6           Q.   You used the Uber driver app and the Lyft

 7      driver app simultaneously many times?

 8           A.   Yeah.  Sometimes I would do that, yes,

 9      while at the airport, yes.

10           Q.   All right.

11           A.   Of course, I cannot provide a ride on two

12      platforms at the same time, so I would log off of one

13      if I get a request on the other.

14           Q.   So when you testified at your deposition

15      that when you used both apps at the same time it was

16      by accident, is that incorrect?

17           A.   Yeah, it's possible maybe I misunderstood

18      the question.  I can tell you right now that I did

19      use Uber and Lyft at the same time.  How many times,

20      I cannot recall right now, but there were many times

21      where I would use both at the same time.

22           Q.   So when you testified at your deposition

23      that you weren't allowed to have both apps open at

24      the same time, was that truthful?

25           A.   I remember at some point Uber was tracking
```

Page 408

1    the Lyft app -- existence of Lyft app at the same

2    time.  So based on that, I gave that answer.  But

3    what year was it, I don't remember.

4         Q.   Let's do it this way.  Do you believe that

5    you're not allowed to have both apps open at the same

6    time?

7         A.   At that time, yes, I do believe that.  I

8    don't think it's no longer the case right now.

9         Q.   What about back when you provided your

10   deposition testimony?

11        A.   Yeah.  I believed when we're talking about

12   that period of time, I think there was a lawsuit of

13   some sort.  I don't know.

14        Q.   What period of time were you referring to?

15        A.   That's a good question.  I don't remember

16   the date exactly when that was an issue between Uber

17   and Lyft.

18        Q.   What period of time did you believe that

19   you weren't allowed to have both apps open?

20        A.   I don't remember right now.  I'm sorry.

21        Q.   Okay.  Was it a few weeks or a few years?

22        A.   It's definitely couple years back, yeah.

23   Years, yeah.

24        Q.   But how long of a time period was it that

25   you believed that you could not -- you were not

Page 409

1    allowed to have both apps open?

2         A.   It's less than a year.  It's probably

3    months.

4         Q.   Probably months?  You didn't provide this

5    level of detail at your deposition, right?

6         A.   Yes.

7         Q.   Meaning you did not provide that level of

8    detail?

9         A.   Yes.

10        Q.   In fact, at your deposition, you said you

11   cannot have two apps open, right?

12        A.   Yes.

13        Q.   And you said that that was exactly the rule

14   you followed?

15        A.   Okay.

16        Q.   Right?

17        A.   Yes.

18        Q.   Okay.  You also testified that you believed

19   that if you used the Uber and Lyft apps at the same

20   time, it would impact your good standing and rating

21   on the Uber app?

22        A.   Yes.

23        Q.   Do you still believe that today, or are you

24   changing your mind?

25        A.   No, I believe that.

Page 410

1      Q.   But you can't identify a rule stating you

2   could not use both apps at the same time, right?

3      A.   Correct.

4      Q.   And you can't identify an Uber employee who

5   told you that?

6      A.   No, I cannot.

7      Q.   You don't remember anyone telling you that

8   you couldn't use both apps at the same time?

9      A.   No, ma'am.

10      Q.   You do admit that you could switch back and

11   forth between the Uber and Lyft apps?

12      A.   Yes.

13      Q.   But it's your sworn testimony that you

14   didn't switch back and forth between the Uber and the

15   Lyft apps, right?

16      A.   Yes.

17      Q.   Okay.  You decided to just stick with Uber

18   because that was your strategy for maximizing your

19   profits?

20      A.   Yes.

21      Q.   That was completely at your own discretion?

22      A.   Yes.

23      Q.   Uber never prohibited you from using the

24   Lyft app?

25      A.   No.

Page 411

1      Q.    You did not have to pick one or the other?

2      A.    No.

3      Q.    Okay.  And you admit that there were times

4  when you were logged onto both apps at the same time?

5      A.    Yes.

6      Q.    In addition to using the Uber app and the

7  Lyft app to offer transportation services, you also

8  provided transportation services to one of your

9  customers in Houston without using either the Uber or

10 Lyft app, right?

11     A.    Yes, that is correct.  I had one customer.

12     Q.    Is that the instance you mentioned a few

13 minutes ago?

14     A.    Yes.

15     Q.    So in that instance, you took your customer

16 to the airport and he paid you cash?

17     A.    Yes.

18     Q.    How you got this customer was from another

19 one of your customers in New York?

20     A.    Yes, that is correct.

21     Q.    That customer in New York referred you to

22 the customer in Houston?

23     A.    Yes, that is correct.

24     Q.    And the customer in New York was someone

25 you also provided transportation services to?

Page 412

```
 1        A.   Yes, ma'am.

 2        Q.   And the transportation services business,

 3   you actually knew a lot of people?

 4        A.   In New York, yes.

 5        Q.   And you would get referrals from limo

 6   drivers who couldn't cover a transportation request?

 7        A.   Yes.

 8        Q.   And these are transportation customers that

 9   you didn't meet through using the lead-generation

10   services of the Uber driver app, right?

11        A.   That is correct.

12        Q.   That was actually the case in both New York

13   and Houston?

14        A.   Yes.

15        Q.   But it's your testimony that other than on

16   those one or two occasions, you didn't provide

17   transportation services to anyone outside of the Uber

18   and Lyft app?

19        A.   Yes.

20        Q.   Other than those two instances?

21        A.   Yes.

22        Q.   And that was your sworn testimony at your

23   deposition?

24        A.   Yes.

25        Q.   Okay.  You made the decision -- I think
```

Page 413

```
 1   we've clarified -- to stop using the driver app for
 2   Uber in August of 2019?
 3        A.   Yes, ma'am.
 4        Q.   And you've got your company called DSK
 5   Logistics, LLC?
 6        A.   Yes.
 7        Q.   When did you start transporting vehicles
 8   for DSK?
 9        A.   For DSK?  So shortly after the company was
10   established.  I would say when all the permits came
11   in, probably around September 2020.
12        Q.   September of 2020?
13        A.   Yes.
14        Q.   Okay.  And before that, I think that you --
15   well, actually, one more question on the DSK.
16             You're an independent contractor for
17   DSK?
18        A.   Yes, ma'am.
19        Q.   And that's what you believe?
20        A.   Yes.
21        Q.   Okay.  So before DSK, I believe earlier you
22   testified about two companies.  One was called -- is
23   it TC Transport?
24        A.   Yes, ma'am.
25        Q.   And one was called Carolina Logistics?
```

Page 414

1          A.   Yes, ma'am.

2          Q.   What did you do for TC Transport?

3          A.   It's the same thing as for Carolina

4     Logistics and same thing I'm currently doing.

5     Transporting vehicles.  The only difference was I

6     leased onto their company.  Basically, they were the

7     carrier responsible for safety.  They were the one

8     providing jobs.

9          Q.   Were you an employee of TC Transport?

10         A.   No.

11         Q.   You were an independent contractor?

12         A.   Yes.

13         Q.   You were an independent contractor for

14    Carolina Logistics?

15         A.   Yes, ma'am.

16         Q.   Did you earn income from these two

17    entities?

18         A.   Yes.

19         Q.   Okay.  Let's pull up Respondent's Exhibit

20    40.  So what we're pulling up are your discovery

21    responses in this litigation matter, okay?

22         A.   All right.

23         Q.   Does this look familiar to you?

24         A.   Yes, ma'am.

25         Q.   All right.  Let's scroll to the very last

                                        Page 415

```
 1    page, and if you could make that bigger for us all to

 2    see.

 3                    Is that your signature?

 4         A.   Yes, it is.

 5         Q.   All right.  And did you sign -- could you

 6    make that super big?

 7                    Under -- right above your signature,

 8    did you mean to represent that you were answering

 9    these questions and declared that the statements

10    contained are true and correct?

11         A.   Yes, ma'am.

12         Q.   This was under penalty of perjury?

13         A.   Yes.

14         Q.   All right.  Let's go to Interrogatory --

15    actually, let's go to the very top, and let's

16    highlight the title.

17                    So this was your response the first

18    time to discovery requests, correct?

19         A.   Yes.

20         Q.   Okay.  Let's go to Interrogatory Number 5.

21    Let's see what that one says.  So you see

22    Interrogatory Number 5 is a question, right?  It asks

23    you to identify every company or individual for whom

24    you provided transportation services or delivery

25    services, right?
```

Page 416

1       A.    Okay.

2       Q.    You see that?  You follow me with that?

3       A.    I do.

4       Q.    Either as employee or an independent

5  contractor.

6       A.    Okay.

7       Q.    Okay.  And you see at the very front it

8  says from March 12 to the present, right?

9       A.    Yes.

10       Q.    Now, if we could go to that -- the

11  objections.  If we could get to his answer at the top

12  of the -- there we go.

13            You didn't identify TC Transport or

14  Carolina Logistics?

15       A.    Correct.

16       Q.    Okay.  And I think you mentioned there was

17  a contract with TC Transport that you signed?

18       A.    Yes, I believe.  Yeah.

19       Q.    And you did not produce that in this

20  litigation, correct?

21       A.    Correct.

22       Q.    Okay.  Let's go to Respondent's Exhibit 41.

23  So, you know -- now, you know, how discovery goes,

24  Mr. Barysas, is, you know, you start to discover

25  things as the case move on, so sometimes you amend

Page 417

```
 1    your responses.  What we're looking at now is the
 2    first time you amended these responses, okay?  So now
 3    let's go to the very last page.
 4                   Is that your signature there?
 5    A.    Yes, ma'am.
 6    Q.    And under penalty of perjury, you were
 7    verifying that the responses were true?
 8    A.    Yep.
 9    Q.    All right.  Let's go take a look at
10    Interrogatory Number 5.
11                   Okay.  Do you see it's the same
12    question we looked at before?
13    A.    Yes.
14    Q.    Let's look at his answer.  Still no TC
15    Transport or Carolina Logistics identified?
16    A.    Yes, ma'am.
17    Q.    Okay.  Let's take a look at Respondent's
18    Exhibit 42.  What we're looking at now is the second
19    time you amended your responses.  So now this is the
20    third time you're providing discovery responses to
21    us.  Let's just go straight to Interrogatory 5.
22                   You see it's the same question?
23    A.    Yes.
24    Q.    Okay.  And let's take a look at the answer.
25    Still no TC Transport or Carolina Logistics?
```

Page 418

1      A.   Yes.

2      Q.   Okay.  Let's take a look at Respondent's

3  Exhibit 8.  What we're pulling up now are your tax

4  returns.

5      A.   Yep.

6      Q.   Mr. Ridenour, I'm going to go to the middle

7  part where the tax preparer has clicked those Xs.

8  Let's just make that a little bigger.

9           You authorized Alex Advice, LLC, to

10  file this?

11     A.   Yes, ma'am.

12     Q.   Let's go above that, Mr. Ridenour, and

13  there's a statement above it, that big long thing.

14           When you authorized Alex Advice, LLC,

15  to file your 2017 tax return, you declared under

16  penalty of perjury that your tax returns -- that you

17  reviewed them and that they were true and correct,

18  right?

19     A.   Yes.

20     Q.   Okay.  Let's look at Line 12 of the tax

21  return.  In Line 12, you show $27,399 in business

22  income, right?

23     A.   Okay.

24     Q.   Is that correct?

25     A.   Yes.

Page 419

1        Q.    Okay.  And in Line 27, you took a deduction

2   for self-employment tax.

3        A.    Okay.

4        Q.    Right?

5        A.    Yes.

6        Q.    Let's take a look at Bates 865 of

7   exhibit -- Respondent's Exhibit 8.

8                 And this is the Schedule C that you

9   filed, right?

10       A.    Yes.

11       Q.    And if we zoom in on the top quarter of the

12   thing -- let's do the whole top quarter.

13                 Okay.  You see the very top?  You are

14   listed as the proprietor, right?

15       A.    Yes, that is correct.

16       Q.    And the principal business listed is

17   on-line bike rentals and tours.

18       A.    Okay.

19       Q.    You agree with that?

20       A.    Yes.

21       Q.    Okay.  And then the business name is DB

22   Pedicabs, LLC?

23       A.    Correct.

24       Q.    You also filed another Schedule C, and

25   we'll go to Bates 867.  And this is also a Schedule C

Page 420

1    for DB Pedicabs petroleum cabs, LLC, right?

2         A.    Correct.

3         Q.    This one is for Dainius Livery Service,

4    right?

5         A.    That is correct.

6         Q.    And you're identified as the proprietor?

7         A.    Yes.

8         Q.    Because you were the proprietor of DB

9    Pedicabs, which offered livery services?

10        A.    Correct.

11        Q.    This is the Schedule C that reflects your

12   income received by using -- by providing

13   transportation services, right?

14        A.    Yes.

15        Q.    And if we look at Line 1 -- that's perfect.

16   Thank you.

17              You see that there's $50,892 in gross

18   receipts?

19        A.    Okay.

20        Q.    And that includes income from using the

21   Uber and Lyft apps, right?

22        A.    I believe so, yes.

23        Q.    And then there may be some other sources

24   that play into that, but you're not sure?

25        A.    Yes, that is correct.

                                        Page 421

1      Q.    Then if we go to Line 9, it shows a vehicle

2   deduction of $15,217?

3      A.    Yes.

4      Q.    Line 10 shows a deduction for commissions

5   and fees of $4,008?

6      A.    Yes.

7            MS. MIERS:   My apologies.   Shauna,

8   could we please let Ms. Corridan in?

9      Q.    (BY MS. MIERS)   So we saw Line 10 is $4,008

10  for commission and fees.   So what I want to do now is

11  scroll down to Bates 874, and I want to take a look

12  at what makes up that $4,008, 4008.   If you could

13  make that bigger.

14            We see $2,537 in Uber fees, right?

15     A.    Yes.

16     Q.    A black car fund of $283?

17     A.    Yes.

18     Q.    And credit card fees of $1,188?

19     A.    Yes.

20     Q.    Okay.   Do you have receipts for those

21  credit card fees?

22     A.    No, ma'am, I don't.

23     Q.    Did you have a -- one of those Square

24  things by which you could obtain credit card

25  payments?

                                        Page 422

1        A.   Yes.

2        Q.   So this is just the fees.  This is not the

3   income you collected, correct?

4        A.   I would assume so.  I don't remember

5   exactly.  I mean, to this day, I don't understand

6   this -- you know, taxes.  That's why I gave it to the

7   accountant.

8        Q.   A few minutes ago you testified under oath

9   that you offered one trip outside the app in New York

10   and one trip outside the app in Houston.

11             Was this the trip -- in 2017, was that

12   the trip in New York?

13        A.   I can't recall right now, ma'am.

14        Q.   Do you recall whether the trip was 1,000 --

15   was a 1,188-dollar trip?

16        A.   No, I don't think so.

17        Q.   It wouldn't make sense, would it?

18        A.   No.

19        Q.   Do you still have any evidence of the

20   credit card fees that you paid in 2017?

21        A.   No, ma'am, I don't.

22        Q.   Okay.  When did you destroy that evidence?

23             MR. STANLEY:  Object to the

24   characterization that he destroyed evidence.  Hold

25   on.

Page 423

1                    MS. SOUSSAN:   Sustained.   Rephrase

2     your question.

3          Q.   (BY MS. MIERS)   When did you dispose of the

4     receipts that support the credit card fees that you

5     paid in 2017 in the amount of $1,188?

6          A.   Never disposed, ma'am.   I never collected

7     them to begin with.

8          Q.   Are they with a certain service?

9          A.   I would assume so they were.   I don't know.

10    I don't have that service anymore.

11         Q.   What's the name of that service?

12         A.   Well, like you mentioned, I used Square

13    before.

14         Q.   Okay.   Is that account with Square still

15    active?

16         A.   No.

17         Q.   Do you still have the ability to access

18    information from Square?

19         A.   No.

20         Q.   And do you know that because you've tried?

21         A.   Yes.

22         Q.   When did you try?

23         A.   The last time I tried to accept a credit

24    card, it was, like, years ago, and it didn't work.

25    So -- I forgot for what exactly.   Years ago.   Years

                                             Page 424

1    ago.

2        Q.    In Line 20B -- we're going to go back up.

3    There's a deduction for business property, but you

4    don't know what that is?

5        A.    No idea.

6        Q.    Okay.   Then in 27A, you took a deduction

7    for clothing.

8        A.    Okay.

9        Q.    Is that right?

10       A.    Yeah, that's -- sure.

11       Q.    You did that so that you could look

12   professional?

13       A.    Yes, ma'am.

14       Q.    Line 28, the total expenses deducted for

15   your transportation services business was $25,105?

16       A.    Okay.   Yes.

17       Q.    And then Line 44, you deducted 21,960

18   business miles?

19       A.    You know, to be with you, I have no idea

20   what this is.   I'm sorry.   Is it miles?   Is it an

21   amount?   I don't know how things work really.

22       Q.    Do you see in Line 44 where it says, "The

23   total number of miles you drove your vehicle during

24   in 2017.   Enter the number of miles for your

25   vehicle"?

                                          Page 425

1                    Do you see that?

2         A.    Now I see that it says miles.

3         Q.    For the other, where it's listed in C,

4    5,450, you don't know what those are, right?

5         A.    No idea, no, ma'am.

6         Q.    Let's take a look at Respondent's Exhibit

7    9.  We're going to move through these faster.

8         A.    Okay.

9         Q.    Respondent's Exhibit 9 is your 2018 tax

10   return.

11        A.    Okay.

12        Q.    Same thing.  You reviewed it?

13        A.    Yes.

14        Q.    Okay.  Under penalty of perjury?

15        A.    Yes.

16        Q.    And if we go to Bates 927, this is a

17   Schedule C for DB Pedicabs --

18        A.    Okay.

19        Q.    -- LLC, right?

20        A.    Correct.

21        Q.    And now it's you and Kremena, delivery

22   service.  Is that your wife?

23        A.    Yes.

24        Q.    And the name of the company is DB Pedicabs?

25        A.    Yeah.

                                         Page 426

1      Q.    Kremena, when she used the Uber driver app,
2  she also used the Infinity that you used?
3      A.    Yes.
4      Q.    You don't know how many times she used the
5  app?
6      A.    No.
7      Q.    Okay.  For both of you, you identified this
8  Schedule C as livery service?
9      A.    Correct.
10     Q.    And then if we take a quick peek at Line 1,
11 you had gross receipts of 53,433, right?
12     A.    Yes.
13     Q.    All right.  Let's take a look at
14 Respondent's Exhibit 10.  This is your 2019 return.
15            Did you also review and approve the
16 filing of this under penalty of perjury?
17     A.    Yes, ma'am.
18     Q.    And if we go to Bates 903, once again we
19 see a Schedule C, and it's for Dainius and Kremena,
20 livery income, Lyft and Uber sources, right?
21     A.    Correct.
22     Q.    You identified Lyft first, right?
23     A.    Okay.  Yes.  Correct.
24     Q.    Well, you're getting close to being at the
25 finish line, Mr. Barysas, so hang in there with me.

Page 427

1    Let's talk about your specific claims against Uber.

2         A.   Okay.

3         Q.   You sued Uber because you want to get paid

4    for the time you spent waiting for customers?

5         A.   Yes.

6         Q.   Let's take a look at Claimant's Exhibit 41.

7    What we're going to take a look at here is your

8    expert's report, okay?  And I want to see if I

9    understand what you're asking for here.

10             If we go to the appendix that's got

11   the lines, I want to go to 49.  You're going to have

12   to flip it.  You're going to have to rotate it.

13   Line 49.  If you could make that as big as possible.

14   We're only going to do this once.  All right.  Now,

15   can you move that up to where he can see the

16   headings?

17             I know this is hard to read.  Can you

18   read this?

19        A.   Yes, I can see it.  Yes.

20        Q.   Move it a little to the left so they are

21   lined up.

22             Do you see where it says On-line Time

23   Hours?

24        A.   On-line Time Hours.  Yes, I do see that.

25        Q.   It says 114 hours, right?

Page 428

1                    Do you see that?

2        A.   I do see that, ma'am.

3        Q.   Then under P2 hours for that work week of

4   July 16th, 2018, through July 22nd, 2018, the P2 time

5   shows you have 2.63 hours of P2 time, right?

6        A.   Yes.

7        Q.   So that's when you are on your way to pick

8   up one of your riders?

9        A.   I guess so.  I'm not sure.

10       Q.   Okay.  Fair enough.

11                And then P3 time, it shows you were in

12   P3 time for 5.84 hours?

13       A.   I see that number.

14       Q.   Do you see you provided 13 trips that week?

15       A.   Yes.

16       Q.   Okay.  And what you're asking for in this

17   litigation is to be paid for 114.09 hours?

18       A.   Yes.

19       Q.   Okay.  You can take that down.

20                Just for that week, right; is that

21   correct?

22       A.   Correct.

23       Q.   But you don't think Uber should have to

24   reimburse you for your personal mileage?

25       A.   Personal mileage, no.

Page 429

1      Q.   Or for mileage related to your use of the

2  Lyft app?

3      A.   Yes, I agree with you on that.  They should

4  not.

5      Q.   Do you understand that you're bringing a

6  claim against Uber for unlawfully retained tips?

7      A.   Yes.

8      Q.   But you don't believe Uber owes you any

9  tips, right?

10      A.   Yes, I don't believe that.

11             MS. MIERS:  All right.  Judge, I know

12  it seems quick, but if I could have a brief break, I

13  think I've got just one last thing to cover and I'll

14  be in a position to pass the witness.  Is that okay?

15             MS. SOUSSAN:  Sure.  Let's take five

16  minutes.

17             (Recess from 4:30 p.m. to 4:36 p.m.)

18      Q.   (BY MS. MIERS)  Mr. Barysas, you understood

19  that Uber is a technology company that referred

20  passengers to you?

21      A.   Yes.

22      Q.   And under the contract you had with Uber,

23  you were of the opinion that Uber was your primary

24  recourse if you had an issue with one of your riders?

25      A.   Yes.

Page 430

1        Q.    And you acknowledge that you had a

2    contractual agreement with Uber?

3        A.    Yes.

4        Q.    That you could enforce the terms of the

5    agreement?

6        A.    Yes.

7        Q.    And Uber could also enforce the terms of

8    the agreement?

9        A.    Yes.

10       Q.    Let's take a look at Claimant's Exhibit 8,

11   and we'll go to Bates 8292.  Now, you've seen this

12   particular communication exchange before, so we're

13   not going to go back into what was already covered on

14   this message.

15             By looking at the pictures, do you

16   recall talking about this message earlier?

17       A.    Yes, I do remember.

18       Q.    You remember sending these messages?

19       A.    Yes, I do.

20       Q.    There were several that went back and

21   forth?

22       A.    Yes.

23       Q.    All right.  I want to go to Bates 1294.

24   And at the top of the page in the bold letter -- you

25   can just do the first top.

Page 431

1              Uber told you, "Please be advised that

2     being that you are a commercial partner, anything

3     above 250 should be hand by your commercial insurer,"

4     right?

5          A.   Okay.  Yes.

6          Q.   Do you remember that?

7          A.   Yes.

8          Q.   This was the instance earlier where you

9     were stating the fact that you thought that your loss

10    was more than the fee that you obtained from the

11    rider, correct?

12         A.   Correct.

13         Q.   And so, now we recognize that as a

14    commercial driver, rights as a business partner,

15    commercial driver, anything above $250 should be

16    handled by your commercial insurer, right?

17         A.   Yes.

18         Q.   Now I want to go back to Bates 1293, and

19    we're going to focus on the last message on this

20    page.

21         A.   Okay.

22         Q.   You see that it's -- it's from you to Uber,

23    right?

24         A.   Yes.

25         Q.   You say, "Dear Uber partner support, the

                                        Page 432

1    passenger that you as a technology company referred

2    to me" -- those are your words, right?

3         A.   Yes.

4         Q.   All right.  And then it says, "Under the

5    contract" -- do you see that?

6         A.   Yes.

7         Q.   "Under the contract with Uber, I agreed to

8    use you as my primary source of recourse."

9         A.   Yes.

10        Q.   Those are your words, right?  Those are

11   your words?

12        A.   Yes, ma'am.  Yes, yes.

13        Q.   And then following that, you state, "In the

14   event of a denial by Uber, I am entitled as an

15   independent contractor to make a secondary demand

16   upon the passenger in question."

17        A.   Yes.

18        Q.   Those were your words, right?

19        A.   Yes.

20             MS. MIERS:  All right.  I'll pass the

21   witness.

22                  FURTHER EXAMINATION

23        Q.   (BY MR. STANLEY)  Dainius, picking up right

24   there on that same exhibit, where did you get that

25   language?

                                        Page 433

1        A.   So this language -- so at some point, I
2    followed this guy on-line.  I forget his name.  He
3    has a website.  He was a former, like, Uber driver,
4    and it was just basic copy and pasted from the
5    website.
6        Q.   So do you believe that you're an
7    independent contractor for Uber, or do you believe
8    you're an employee?
9        A.   I believe I'm an employee.
10       Q.   And -- and that language that you had
11   there, do you recall the website that you got it
12   from?
13       A.   I don't remember right now, but -- no, I
14   don't remember right now the website.
15       Q.   Okay.  We're going to go back to the top
16   here to discuss some of the points that were covered
17   with you with respondent's counsel.
18            Do you remember talking about at the
19   very first the entrepreneurial spirit?
20       A.   Yes, I do.
21       Q.   When you first started driving for Uber --
22   before you started driving for Uber, did you believe
23   that Uber offered you the benefit to be an
24   entrepreneur under their system?
25       A.   No.

                                        Page 434

```
 1        Q.    And so, when you started driving for Uber,
 2   what was your hope?
 3        A.    To make as much money as possible and to --
 4   to have as much time -- a balance between time and
 5   money.
 6        Q.    Did you see advertisements in New York City
 7   before you started driving for Uber?
 8        A.    Yeah.  That's how it all started.  There
 9   was a guarantee of a certain amount of money and
10   freedom and stuff like that.
11        Q.    And you recall being asked about that by
12   Uber's counsel?
13        A.    Yes.
14        Q.    And did -- did you -- were you able to
15   receive a settlement because of the guarantee that
16   was made that enticed you to drive for Uber?
17              MS. MIERS:  Objection.  Relevance.
18        A.    Yes.
19              MS. MIERS:  Judge, you're muted.
20              MS. SOUSSAN:  The objection was
21   sustained.
22              MR. STANLEY:  Judge, she brought this
23   up, the reason why he started driving for Uber.  And
24   then the answer is -- well, okay.  I'll ask again and
25   then -- let me ask another question.
```

Page 435

1      Q.    (BY MR. STANLEY)   Dainius, did you believe

2   that you were going to make more money when you first

3   started driving for Uber than what you actually were

4   able to make?

5      A.    Yes.

6      Q.    And -- and why did you believe that?

7      A.    Because I saw advertising.   I mean, it was

8   a guarantee.   And I thought, you know, I'm going to

9   make as much money as they said I will.

10      Q.    And did that impact whether or not you were

11   going to choose to drive as an Uber Black driver or

12   as an UberX driver?

13      A.    Yes, it did.   That's why I chose Uber

14   Black.

15      Q.    Do you remember us looking at -- in

16   Claimant's Exhibit 8 the correspondence at 1426?   Can

17   you bring that up, please?   Just the top.

18              This is what I call the bad actor

19   rider correspondence.   Do you remember going over

20   this?

21      A.    Yes.

22      Q.    And there was a lot of talk with counsel

23   about riders being required to follow community

24   guidelines, as well?

25      A.    I remember that, yes.

Page 436

1       Q.   And -- and do you know if this rider was

2   ever punished for the actions that you brought to

3   Uber's attention and removed from the Uber rider

4   platform?

5       A.   I have no way of knowing that.  I mean, I

6   don't have access to Uber's documents, and nobody has

7   ever informed me if the -- if this rider was removed

8   from the platform.  I don't know.

9       Q.   I want to talk a little bit about the Uber

10  Black requirements now.

11                 What do you know about the

12  requirements that Uber has in place in order to drive

13  for Uber Black?

14      A.   So to drive for Uber Black, you have to

15  have a certain vehicle, meaning, you know, make and

16  model and year, have a certain star rating, and --

17  and also have -- depending on the city, you have to

18  have a commercial insurance and, like, a limousine

19  license.

20      Q.   Do Uber require you to have a professional

21  driver's commercial auto insurance policy to drive

22  Uber Black?

23      A.   Yes.

24      Q.   Does Uber require you to also sign up with

25  the City to operate a commercial livery -- under a

                                              Page 437

1  commercial livery license if you drive for Uber

2  Black?

3      A.   Yes.

4      Q.   Do you recall talking with counsel about

5  when you were in Period 1 time waiting that you might

6  take walks or play Video games or browse the

7  internet?

8      A.   Yes.

9      Q.   During that time, were you engaged on the

10  Uber app waiting to receive a trip?

11          MS. MIERS:   Objection.  Calls for a

12  legal conclusion.

13          MS. SOUSSAN:  Well, I know it goes to

14  an ultimate question, but he can answer the plain

15  understanding of "waiting."

16      A.   Can you please repeat the question one more

17  time?

18      Q.   (BY MR. STANLEY)  Were you waiting on Uber

19  to provide you a trip during that period that you may

20  have been walking or playing video games in the

21  parking lot?

22      A.   Yes, yes, yes.

23      Q.   Were you able to receive a trip from Uber

24  without waiting on them to provide it to you?

25      A.   No.

                                      Page 438

1        Q.    Can you bring up Claimant's 26, please?

2   Can you just show the whole page, please?

3              So this is a document that we included

4   in the exhibits, and do you recall talking with

5   Uber's counsel about Uber Black hourly trips?

6        A.    Yes, I remember that.  That's what I --

7        Q.    Let me ask the question.

8              Do you ever recall between 2014 up

9   until August of 2019 that hourly trips were an option

10  for an Uber Black driver?

11       A.    No, I really don't remember this.

12       Q.    Do you ever recall that being an option in

13  the Uber app up until August 2019?

14       A.    No, sir.

15       Q.    Do you ever recall a notice coming in on

16  the app informing you that hourly trips are not

17  available to Uber Black drivers?

18       A.    I don't recall that.  I don't remember.

19       Q.    When was the first time you learned that

20  hourly trips were an option on the Uber Black

21  platform?

22       A.    Actually, today.

23       Q.    There's been a lot of talk about you

24  canceling rides or asking riders to cancel rides.

25              Do you understand that?

Page 439

1        A.    Yes.

2        Q.    Were you scared to cancel rides on the Uber

3    platform?

4        A.    Yes.

5        Q.    Why?

6        A.    Because I know that there's a number --

7    there's a cancellation rate and, you know, it was my

8    job, basically.

9        Q.    If you had the option to cancel as many

10   rides as possible without being potentially

11   deactivated from the Uber driver app, would you have

12   wanted that option?

13       A.    Yes.

14       Q.    Were you ever given that option?

15       A.    No.

16       Q.    Can you pull up Claimant's Exhibit 44?

17   It's the demonstrative.  Just make the -- the left

18   side big, please.  We're just going to look at the

19   bottom, the very -- okay.  So scroll so we can see

20   what Columns B and C are.

21             So if we look at this, Column B is

22   completed trips for Lyft.  Column C is completed

23   trips for Uber.  Do those numbers, 247 for Lyft and

24   1134 for Uber, during the statutory period match up

25   with your recollection of about how many trips you

Page 440

```
 1    would have completed during this time period?
 2         A.    Yes, sir, it does.
 3         Q.    There was also discussion about TC
 4    Transport and your interrogatory responses.
 5                   Do you remember that?
 6         A.    Yes.
 7         Q.    Can you bring up, Jacob, his deposition
 8    transcript from April 2021?  Can you go to Page 239,
 9    please?  For purposes of the record, this is
10    Lines 239, 23 through Page 240, 18.  And the question
11    in here is, "When did you get that trucking job?"
12                   And so, you say, "So I started in
13    2019.  I believe in March sometime, if I'm not
14    mistaken."
15                   And the question was, "And what was
16    the company you were working for?"
17                   "So I was leased into a company called
18    TC Transport, and I just don't remember if it's
19    incorporated or LLC."
20                   "Okay.  Were you an employee or
21    independent contractor for TC Transport?"
22                   And you say, "I was an independent
23    contractor, yeah."
24                   So at your deposition, did you tell
25    Uber that you drove for TC Transport?
```

Page 441

1          A.   Yes.

2          Q.   And if you go down to the last area that's

3    highlighted, it says, "Got it.  And when did you --

4    you lost that job approximately March of 2020 or

5    sometime later?"

6               You say, "No.  I lost that job with

7    them approximately December or November of 2019."

8               Do you see that?

9          A.   Yes.

10         Q.   And when did you do any work for Carolina

11   Logistics?

12         A.   So after I -- the company shut down, TC

13   Transport, I found another one.  And so, a few months

14   after, like two months after, two or three months

15   after, I quit with DC transport.

16         Q.   Would that have been after August of 2019?

17         A.   Yes.

18         Q.   Did you ever work for Carolina Logistics

19   during the period that you drove for Uber?

20         A.   No.

21         Q.   There was talk also about providing a

22   customer in Houston trips.

23               Do you remember that?

24         A.   Yes.

25         Q.   How many times between March of 2017 and

                                          Page 442

```
 1   August of 2019 did you provide this Houston customer

 2   a trip outside -- a ride outside of the Uber

 3   platform?

 4        A.   Twice maybe.

 5        Q.   And same question.  When you were in

 6   New York, there was a customer that you provided

 7   off-app trips.

 8                  How many times did that happen?

 9        A.   That I can't recall exactly, but -- I don't

10   remember right now.

11        Q.   Was it all the time?

12        A.   No.

13                  MR. STANLEY:  Judge, I pass the

14   witness.

15                  MS. SOUSSAN:  Any further questions?

16                  MS. MIERS:  Just two.

17                    FURTHER EXAMINATION

18        Q.   (BY MS. MIERS)  Mr. Barysas, do you recall

19   that your deposition was on April 29th, 2021?

20        A.   Yes.

21        Q.   Okay.  And that you were under oath during

22   that deposition, correct?

23        A.   Yes.

24        Q.   Mr. Ridenour, could you please pull up

25   Respondent's Exhibit -- the first amended responses?
```

Page 443

1    Do you -- they are coming up.

2              Do you recall us speaking about these

3    just a few minutes ago, Mr. Barysas?

4         A.   Yes.

5         Q.   Let's scroll down to the next page, and if

6    you highlight the date.

7              These were submitted on September 7th,

8    2021, right?

9         A.   Yes.

10        Q.   Would you agree with me that that was after

11   your deposition?

12        A.   Yes.

13        Q.   All right.  And then go to the very last

14   page really quickly.

15             And that's your signature right above

16   the date, September 7th, correct?

17        A.   Yes, ma'am.

18        Q.   Thank you.

19             MS. MIERS:  I pass the witness back.

20             MS. SOUSSAN:  Anything further?  I

21   have a couple of questions.

22             At one point today, Mr. Barysas, you

23   said that Uber was your only source -- the Uber app

24   was your only source of income, and then later you

25   said it was your main source of income.  So I don't

                                      Page 444

1    know whether it was only or main, but that was your

2    testimony earlier.

3               And then -- I'm just asking a series

4    here.  I'm going to get to my question, so don't

5    object that it wasn't a question, okay?  All right.

6    Here's my -- what I don't understand.

7               You said that you wanted airport and

8    airport only, and that you drove between 8:00 a.m.

9    when you dropped your son off until 7:00 when you

10   went home.  And then you said, "but I would have to

11   hang around four or five hours."  Sometimes I think

12   you even said seven hours.

13              How much could you have possibly drove

14   if you had to wait at the airport for four to five

15   hours or seven hours for a trip?  How many trips

16   could you possibly do between 8:00 a.m. and 7:00?

17   That was your choice.

18              THE WITNESS:  Yes, ma'am.  Normally,

19   Your Honor, I would do two if I'm lucky, sometimes

20   three trips.  Of course, those trips were about a

21   hundred dollars.  So, you know, two or three trips

22   per day.  It's mainly waiting because the majority of

23   people would order the cheapest service, right?

24   That's what it was.  You could probably see that in

25   my statements and detail stuff.  Two or three trips

Page 445

1    per day maximum when I would work.  That's the entire

2    day.

3                    MS. SOUSSAN:  Okay.  So you would

4    average close to about a hundred dollars per trip?

5                    THE WITNESS:  Yes, ma'am.

6                    MS. SOUSSAN:  That's how that makes

7    sense.  And that was your decision to wait at the

8    airport like that, correct?

9                    THE WITNESS:  Yes, it was because I've

10   tried, you know, to hang out and to receive trips.

11   Where I live, I tried different areas.  I tried being

12   near expensive hotels thinking that it might work.

13   Sometimes you would get a short trip, 10, $15 after

14   Uber takes their fee, and I just couldn't survive

15   with that.

16                    MS. SOUSSAN:  I understand better,

17   sir.  Thank you for answering that question.

18                    Are you ready to call your next

19   witness, Mr. Stanley?  I think it's your expert, but

20   go ahead.

21                    MR. STANLEY:  Plaintiffs will rest

22   now.  We believe we've offered the testimony

23   necessary in this case.

24                    MS. SOUSSAN:  Okay.  You rest?  All

25   right.

                                        Page 446

1          MS. MIERS:  Your Honor, now is as good

2     a time as any to take this up, but we are going move

3     to strike the expert reports of the individuals who

4     are no longer going to testify during this

5     proceeding.

6          We agreed to the pre-admission of

7     those reports based on counsel's representation to us

8     that they would be presenting these folks as

9     witnesses.  In the alternative, we request to admit

10    the prior sworn testimony of the experts that will no

11    longer be testifying in this proceeding.

12         And just to be clear about the

13    gamesmanship here, we have asked three times whether

14    they still intended to present these experts, and the

15    first two times we didn't get an answer.  The third

16    time we were told that they were waiting to see how

17    much time they have.  Well, we have plenty of time.

18    That was this morning at, like, 9:30, our third

19    request.  So we are going to move to strike their

20    reports from the record.

21         MS. SOUSSAN:  Response?

22         MR. STANLEY:  Judge, these reports

23    have been in since March or April of 2021, I believe.

24    There's been plenty of time that they could have

25    deposed these.  They have also had these experts on

                                          Page 447

1    record many times, and we're fine with submitting all

2    prior sworn testimony.  That's no problem.  But

3    there's no reason for us to bring them in live when

4    the expert reports are already here and we can go on

5    the papers.

6              MS. MIERS:  From our perspective,

7    there is a need to bring him live.  Were they being

8    presented live, we would have the opportunity without

9    question to show you that none of the three experts

10   are proper experts.  They're all three biased.

11             Dr. Parrott's expert report is riddled

12   with errors that are inexplicable that will not

13   assist you in determining any alleged damages that

14   you may deem appropriate, which of course we don't

15   think are deserved here or warranted here anyway.

16   But there is testimony that we know we would elicit

17   that would demonstrate without question that their

18   testimony should bear no weight whatsoever in this

19   proceeding.  But we're happy to use their prior

20   testimony to do that.

21             MR. MacLEOD:  All of those comments

22   that counsel just made were purely gratuitous.  It's

23   not even worth responding.  It's just not worth it.

24             What she just provided was an

25   alternative.  She said either exclude them or we'll

Page 448

1    submit the testimony.  Bret just said we have no

2    problem at all with submitting their testimony.  The

3    reports are already in evidence.  They've been

4    admitted.  And so, we have the burden of proof.  We

5    believe we've already met that, but --

6                    MS. SOUSSAN:  I will take this up

7    under advisement.  Okay.  Is respondent ready to call

8    its next witness?

9                    MS. MIERS:  Yes, Your Honor.

10                   MS. SOUSSAN:  All right.  Who might

11   that be?

12                   MR. SANDAHL:  Your Honor, we call Brad

13   Rosenthal.

14                   MR. MacLEOD:  If you're saying that

15   you may -- you're taking it up on advisement, which

16   means you could exclude our experts, then we would

17   have to go ahead and call our experts.  We need a

18   ruling.  I don't think that I can rest, then -- I'm

19   just saying from a procedural standpoint, I'm not

20   sure we can rest until we have a ruling.  That's my

21   fear.

22                   MS. SOUSSAN:  I'm going to need it

23   briefed.  I'm going to need to know what

24   representations were made between you two, and I need

25   it briefed.  And I also need to -- I used to have a

                                            Page 449

1    rule that no exhibit would be admitted unless it was

2    identified during the hearing.  I didn't do that in

3    this case, and I should have.  Had I, your expert

4    would have had to testify, but I don't have that

5    here.

6                    I need to know if an expert report can

7    come in without the testimony.  Clearly, if you do

8    testimony via affidavit, which I've done before,

9    that's one thing, but that was not an agreement in

10   this case either.  So I want this issue briefed, and

11   I can't decide it without it being briefed.

12                   MR. MacLEOD:  When should we submit

13   briefs, then, Your Honor?

14                   MS. SOUSSAN:  I'm not going to delay

15   the hearing again.  And if you want, you can -- how

16   many pages do you-all need to brief it?  I want to

17   know specifically the conversation between you and

18   whether an expert report that was pre-admitted under

19   the -- if this is true -- under the expectation that

20   that expert would be testifying in order to allow

21   cross-examination and presentation to the arbitrator

22   can go forward if the expert's not called as a

23   witness.

24                   MR. MacLEOD:  Judge, we certainly will

25   look at it.  I'm not sure as to pages.  But one thing

                                              Page 450

1    I will say is there have been no oral

2    representations.  I can assure you of that.  What's

3    in writing was that we might call an expert, we might

4    not call an expert.  But at the same time, if we need

5    to brief that, then we'll brief it.  The problem is

6    we can't rest and then go on to respondent's case.

7              MS. SOUSSAN:  We can because you can

8    always reopen your case.  You know, that can happen.

9    We can reopen your case.  So that absolutely can

10   happen with no prejudice to you.

11             I need to know specifically whether

12   the expert report alone can be tendered as an exhibit

13   without the expert testifying and without the ability

14   of one side to cross-examine the expert.  So I do

15   need to know that, and I don't think there's any

16   prejudice to going forward and letting you reopen

17   your case if necessary.

18             I need a brief.  And if you-all want

19   to work on that tonight and get it to me tonight,

20   that's one thing.  You know, I'll read it as quickly

21   as I can.

22             MR. MacLEOD:  Judge, this is a

23   frequent theme with Uber.  This is what it is.

24             MS. SOUSSAN:  This is not Uber.  This

25   is Susan Soussan talking.  I am surprised that there

                                        Page 451

1    would be an expert report without the expert

2    testifying to explain the report.  I don't have that

3    before me.  I don't have the expert's testimony

4    before me.

5                 MR. MacLEOD:  They could have asked

6    for the depositions.  They never did once.  If they

7    wanted to depose any of our experts, they could have

8    done so.  They didn't object to any of the reports

9    coming into evidence.  They are now into evidence.

10   That's what we relied upon when we just said we

11   rested.  We have called two witnesses.  We believe

12   that we have proven our case.  And so, that's what we

13   are relying upon because the reports are already in

14   evidence.

15                 MS. SOUSSAN:  This morning I

16   understood that your expert was, you know, in the

17   waiting room and then was admitted to the main room.

18   I fully expected you to have your expert.

19                 MR. MacLEOD:  She was, and then we

20   heard the evidence from the corporate representative,

21   as well as our client, and decided that we had met

22   our burden.

23                 MS. MIERS:  Then they should be

24   willing to withdraw their report from evidence if

25   that's the case.  We didn't need to depose these

                                        Page 452

```
 1    experts.  We've cross-examined them at multiple
 2    hearings where we gained the admissions that we think
 3    are crucial for you to hear.  Crucial.  And that's
 4    why we object to the admissions of the reports
 5    without the opportunity to cross-examine them in your
 6    presence.
 7              MR. STANLEY:  Judge, they have the
 8    prior arbitrations where the testimony is allowed to
 9    come in from prior arbitrations and the expert
10    reports come in.
11              MS. MIERS:  That was not the agreement
12    here.
13              MR. STANLEY:  We didn't have the
14    agreement either way.
15              MS. SOUSSAN:  I'll go ahead and make a
16    ruling.  If the expert report is going to stay in
17    evidence, the expert will testify and be available
18    for cross-examination in this proceeding.  So if you
19    want the expert reports to remain in evidence, then
20    the expert will testify in the arbitration hearing.
21              And, honestly, that is from me.  That
22    is so that I can understand what your expert report
23    says, and I want to see the cross-examination.
24              So you have a ruling.  The expert
25    report will remain -- it will not be included in
```

Page 453

1    evidence unless your expert testifies in this

2    proceeding.

3                    MR. MacLEOD:  Understood.  Well, then

4    that's going to be -- obviously we have to plan

5    around that, Judge.  So we need to make a phone call.

6                    MS. SOUSSAN:  Okay.  Is your expert

7    ready to proceed, assuming you can reach the expert

8    by phone, or do we need to go ahead and let the

9    respondent proceed and then we can interrupt the

10   respondent's case when your expert's available

11   tomorrow?  Or we can go late tonight, but I need to

12   talk to the court reporter about that.  We've got

13   some options here.

14                   MR. MacLEOD:  If we can briefly

15   discuss, that would be great, Judge.

16                   MS. SOUSSAN:  Why don't you-all take

17   five minutes, if that's long enough.  Do you need 10

18   minutes?

19                   MR. MacLEOD:  Five minutes is long

20   enough.

21                   (Recess from 5:08 p.m. to 5:12 p.m.)

22                   MR. MacLEOD:  The only expert will be

23   Dr. Parrott, who is our economist.  He is only

24   available to testify tomorrow, but we will have him

25   ready to go.  I'm assuming it's 10:00 a.m., but --

                                            Page 454

1    MS. SOUSSAN:  We are starting at

2   10:00 a.m.  Let me -- you know, counsel for

3   respondent?

4              MS. MIERS:  I just want to make sure I

5   understand.  So you're withdrawing the expert reports

6   of Cameron and Cunningham-Parmeter?

7              MR. MacLEOD:  Based on Judge Soussan's

8   ruling, that's what we are doing.

9              MS. SOUSSAN:  May I have that in

10  writing, please?  You-all can just write something up

11  and send it over.

12             MR. MacLEOD:  Shauna just typed it,

13  but we will do that again, yes.

14             MS. SOUSSAN:  I would appreciate it.

15  Thank you.

16             MR. MacLEOD:  I'll tell you what.  You

17  cross-examined my client, Judge, and you also told

18  him to continue to answer questions.  You didn't do

19  that with Mr. Rosenthal.  So I'm just --

20             MS. SOUSSAN:  Hold on.  I don't know

21  what the issue is here.  I often question witnesses

22  when I feel a need to, and it doesn't matter who the

23  witness is and it doesn't show any preconceived

24  notions that I have.  And I just think it's not a

25  good use of your time to challenge me on that because

Page 455

1   all arbitrators will ask questions when they feel

2   that they need to.

3                    MR. MacLEOD:  Right.

4                    MS. SOUSSAN:  Understand that.  It's

5   not tit for tat.  It's when I have an issue that I'm

6   going to ask the question.  That's all.

7                    MR. MacLEOD:  The Uber opening was on

8   choice.  Mr. Barysas, you agree that was your choice

9   when you worked that day and what time you worked.

10  And so, it's troubling, but we're going to move

11  forward.  Dr. Parrott will be the only expert we

12  have, and we'll put it in writing.

13                    MS. SOUSSAN:  Thank you, sir.  Okay.

14  So as far as the respondent's case in chief, where do

15  we stand on -- you're going to call, I take it,

16  Mr. Rosenthal right now.  I would -- do you think we

17  can get through with him today?

18                    MR. SANDAHL:  I couldn't get through

19  with him tonight.  I will try and shorten up my

20  outline based on what we heard today.

21                    MS. SOUSSAN:  What I would think would

22  be the best way going forward, if all counsel would

23  agree with me, is that we finish with Mr. Rosenthal

24  on direct and cross and redirect and recross and then

25  allow the expert for claimant to testify and then --

                                        Page 456

```
 1    I don't know what else you have in your case.  I just

 2    don't know what else respondent has in its case, who

 3    else will testify.

 4                    MR. SANDAHL:  We just have one

 5    witness, Mr. Rosenthal.

 6                    MS. SOUSSAN:  So after Mr. Rosenthal,

 7    you're completed?

 8                    MR. SANDAHL:  That's right.

 9                    JUDGE SOUSSAN:  So let's finish with

10    Mr. Rosenthal today and tomorrow and then call

11    Dr. Parrott.  Is that okay with everyone?

12                    MR. STANLEY:  Yes.

13                    MS. SOUSSAN:  Okay.  Then let's go

14    forward.  Mr. Rosenthal, you continue to be sworn

15    under oath.

16                    THE WITNESS:  Understood.

17                    BRAD ROSENTHAL,

18    having been previously duly sworn, testified as follows:

19                            EXAMINATION

20        Q.   (BY MR. SANDAHL)  Good afternoon, Brad.

21    I'm just pulling up my outline here.  We all

22    understand you work for Uber.

23                    Would you just tell us the name of

24    your position with Uber now?

25        A.   Director of M&A integration.
```

Page 457

1      Q.   As the director of M&A integration, what
2    are your duties at Uber?
3      A.   We have acquired several companies in the
4    last 12, 24 months, and trying now to integrate those
5    companies into the Uber ecosystem.
6      Q.   Do you manage anyone at Uber?
7      A.   Right now, no.
8      Q.   Okay.  And how long have you been with
9    Uber?
10     A.   For a total of over seven years.
11     Q.   You talk about a total.  Can you tell us
12   your history with Uber over the years?
13     A.   Joined originally in January 2014 in Los
14   Angeles as an operations and logistics manager.  Did
15   that for about a year, and then I joined our
16   corporate risk team, which is where I stayed for two
17   and a half years.  And then in May 2017, took on a
18   role leading our international vehicle solutions
19   efforts.  Did that for six months.  Then I led our
20   business development efforts for Uber Health for
21   about a year.  And then in October 2018, I left Uber
22   for approximately 13 months.  And then I rejoined
23   Uber in November 2019 as a director of strategic
24   initiatives.  And then about seven months ago, I took
25   on a role as -- my current work on the M&A

Page 458

1    integration side.

2         Q.   When you left and came back, what made you

3    want to return to Uber?

4         A.   Ultimately, I enjoyed my experience the

5    first go-round.  I think the power of the platform is

6    unique in terms of it impacts a lot of people's

7    lives -- both riders, drivers, restaurants, delivery

8    people, et cetera -- and ultimately made a decision

9    to return to Uber.

10        Q.   Now, apparently Uber wanted you back

11   because you're back there now.

12             What is your understanding as to why

13   they wanted you to come back?

14        A.   They were -- I always was, I guess -- my

15   performance at Uber over my first stint was quite

16   strong and I have a pretty deep understanding of the

17   business, and they wanted me to come back to work on

18   various different issues.

19        Q.   Can you tell us some of the ways that Uber

20   has changed over your tenure since it began in 2014?

21             MR. MacLEOD:  Objection.  Vague and

22   ambiguous.

23             MS. SOUSSAN:  Okay.  You kind of

24   interrupted him.  What was your objection?

25             MR. MacLEOD:  Vague and ambiguous,

1    overly broad.  He asked him how Uber has changed over

2    a 10-year period of time.

3                   MS. SOUSSAN:  Why don't you re-ask

4    your question, Mr. Sandahl?

5         Q.   (BY MR. SANDAHL)  How has Uber grown in

6    terms of the number of people who work for Uber since

7    2014?

8         A.   When I started, there was about 600.  Now

9    there's over 25,000.

10        Q.   Okay.  And are you familiar with Uber's

11   business practices as it relates to drivers in

12   Houston, Texas, from 2017 to the present?

13        A.   I am.

14        Q.   All right.  So let's talk a little bit

15   about Uber's business generally.

16                   What type of business is Uber?

17        A.   We are a technology company that has built

18   software to enable digital marketplaces.  So a

19   digital marketplace such as our rides business that

20   connects buyers and sellers in transportation, as

21   well as a delivery business that connects consumers

22   with restaurants and delivery people to deliver the

23   food from the restaurant to the consumer, grocery,

24   alcohol, the Uber freight business which connects

25   commercial shippers with carriers to bring the goods

Page 460

1    to where they need to go.  And then over the years

2    we've had other platforms, as well, such as bikes,

3    scooters, yeah.  So technology that's enabled those

4    platforms to exist.

5         Q.   I think you said there's over 25,000

6    employees.  About how many of those are software

7    engineers?

8         A.   Yeah.  Several thousand.  4,000, I think

9    Mr. MacLeod mentioned earlier.  I think that's about

10   right.

11        Q.   Why do you have several thousand software

12   engineers working for Uber?

13        A.   The tech we have built out is pretty

14   robust, and at the heart we are a technology company.

15   So we have thousands of engineers developing

16   software.

17        Q.   Does Uber employ any drivers to provide

18   transportation services?

19        A.   No.

20        Q.   Would you call Uber a transportation

21   services company?

22        A.   No.

23        Q.   Other than technology -- actually, we just

24   talked about those different lines of business.  So

25   we're going to focus a bit on Uber's rides business

                                        Page 461

1    here because that's what Mr. Barysas did, but I do

2    want to touch a bit on the rider side of the rides

3    business, the Uber rider app.

4                 Can you tell us how the Uber rider app

5    works?

6        A.    Sure.  So riders would go to the Apple app

7    store or the Google Play store, and they would

8    download the rider version of the app.  Once they

9    have done that, they would enter in some personal

10   information:  Their name, their phone number, their

11   e-mail address.  It would open an account.  They also

12   have to enter in their payment information, so debit

13   or credit card, and then they also have to consent to

14   the terms and conditions with one of Uber's entities.

15       Q.    And what do people use the Uber rider app

16   for?

17       A.    So the -- once you have the app, they would

18   open the app and they would request a transportation

19   option to hopefully get matched with a driver to get

20   them from Point A to Point B.

21       Q.    Okay.  And are there different

22   transportation options in the app that the rider can

23   choose from?

24       A.    There are.

25       Q.    What are those called?

                                        Page 462

 1          A.    Uber Pool, which is kind of a shared ride

 2     in which if you're going one direction, you could get

 3     matched with another rider who is going in a similar

 4     direction.  There's UberX, Uber Select, UberX L, Uber

 5     Black, Uber SUV.  Uber Lux.  There's different

 6     options that are available to riders and drivers.

 7          Q.    We'll look at Exhibit RX22.  We'll pull

 8     that up.  It will be on the screen for you

 9     momentarily.

10              Mr. Rosenthal, can you tell us what --

11     if you can just sort of highlight the name up there

12     at the top.

13              Mr. Rosenthal, can you tell us what

14     Exhibit RX22 is, please?

15          A.    Yeah.  This is the terms of use, which is

16     the legal agreement which riders enter into with one

17     of the Uber entities.

18          Q.    All right.  Is part of the rider terms of

19     use a guaranteed connection to a driver every time?

20          A.    There's no guarantee, no.

21          Q.    Do sometimes rider requests for a ride go

22     unfulfilled?

23          A.    They do.

24          Q.    And what does that mean, to be an

25     unfulfilled request?

Page 463

1        A.    It means that there's no drivers available

2    on our platform to transport the rider to wherever it

3    is the rider wants to go.

4        Q.    How often do requests by riders go

5    unfulfilled?

6        A.    Usually it's a couple percentage points.

7    Sometimes it can be a fraction of a percent.  But the

8    busier times of the day, such as usually the evening

9    rush hour or the morning rush hour, it could be a

10   couple of percentage points.

11       Q.    When you talk about percentage points,

12   would you be able to estimate numbers just, say, in

13   the City of Houston how many it would be?

14       A.    1 or 2 percent.

15       Q.    Would that amount to hundreds of rides per

16   week that go unfulfilled?

17       A.    That's right.

18       Q.    Does Uber require drivers using the Uber

19   driver app to remain on standby in order to ensure

20   that all riders get matched with a driver?

21       A.    We do not, no.

22       Q.    If there's a shortage of drivers, does Uber

23   call drivers like Mr. Barysas and ask them to pick up

24   a rider looking for a ride?

25       A.    No, we do not.

Veritext Legal Solutions
346-293-7000

1        Q.    If there's a shortage of drivers, do they
2   e-mail drivers to ask them to pick up a ride?
3        A.    No.
4        Q.    You're an Uber employee; is that right?
5        A.    That's right.
6        Q.    Do you get called in to start giving riders
7   rides when there are too few drivers to complete the
8   trips?
9        A.    No.
10        Q.    What about other Uber employees?  Do Uber
11   employees get called in to give rides when there's no
12   drivers?
13        A.    No.
14        Q.    When a rider can't get matched with a
15   driver, does Uber have any drivers on its payroll to
16   assign to those riders?
17        A.    No.
18        Q.    Mr. Ridenour, can you --
19        A.    Give me one second.  I have a leaf blower
20   outside.  I have to shut the window.
21        Q.    We're looking at Joint Exhibit Number 2,
22   and we've seen these before.
23              What is Joint Exhibit Number 2,
24   Mr. Rosenthal?
25        A.    That is the community guidelines.

                                        Page 465

1      Q.   Do they apply only to drivers?

2      A.   No.  Riders as well, in addition, delivery

3  people and consumers that use the Eats or delivery

4  platform.

5      Q.   Let's take a look at Page 2.  You'll see

6  Why Riders Can Lose Access to the -- to Uber-US Only.

7           Do you see that?

8      A.   I do.

9      Q.   If you could call out the bullets there.

10          Mr. Rosenthal, can you tell us some of

11  the reasons why a rider could lose access to the Uber

12  app?

13      A.   Yeah.  They are spelled out here, but

14  damaging personal property, contact with the driver

15  or other riders.  Other riders would be during pool

16  trips mostly.  Inappropriate language or gestures,

17  unwanted contact with a fellow driver or -- with a

18  driver or a fellow passenger once a trip is

19  completed, and then breaking the law.

20      Q.   And if we could turn to Page 3 of Exhibit

21  JX2.  If you can highlight terms of use.

22          Mr. Rosenthal, can a rider also be --

23  lose access to the Uber app for violating the terms

24  of use?

25      A.   That's correct.

Page 466

1        Q.    And if we can kind of make that one smaller

2   and then bring up the next few.  Yeah, that's great.

3               Carrying firearms, is that a reason

4   why a rider could lose access to the Uber app?

5        A.    That's correct.

6        Q.    And could a rider lose access to the Uber

7   app for discriminating against other riders or

8   drivers?

9        A.    Yeah.

10       Q.    And then is there another reason why they

11   might --

12       A.    The fraudulent or illegitimate behavior,

13   yeah.

14       Q.    And are these similar reasons to why a

15   driver might lose access to the Uber driver app?

16       A.    Yes, similar.

17       Q.    So let's talk about the driver's side of

18   the rides business line.

19               How do drivers obtain access to the

20   Uber driver app?

21       A.    Similarly, in which they would go to the

22   Apple app store or Google Play store and download the

23   app.  Once they have done that, they would enter in

24   their personal information such as their name, phone,

25   e-mail, address, and the city they want the account

Page 467

1    associated with.  Once they have done that, they

2    would open the account, and then they would have to

3    provide some documentation to us that we are

4    obligated to collect per the state regulations.  That

5    information includes a driver's license, a proof of

6    vehicle registration, and that the driver is

7    allowed to -- I guess insured under that policy and

8    then a vehicle registration.

9              Once a driver has done that stuff, a

10   driver would then need to consent to the -- at the

11   time here, the technology services agreement with

12   Rasier, LLC, and then a driver would -- I forgot to

13   mention the background check.  The driver would need

14   to complete a background check and motor vehicle

15   record check, which are regulatory requirements.

16             Once those are all done, the driver

17   would then be able to go on-line and provide

18   transportation services.

19   Q.   You mentioned entering into a technology

20   services with Raisor, LLC.

21             Are there other technology services

22   agreements that some drivers might enter into?

23   A.   There is, yeah.  The sign-up flow process I

24   just outlined is for drivers that use our TNC

25   services.  Drivers that use the livery services, or

Page 468

1   also known as commercial, have some different steps

2   along the way, which are -- which are really

3   predicated upon the regulations that govern livery

4   drivers in any given jurisdiction.  Those might be --

5   some of those steps -- particularly, I guess, in

6   Texas -- would be to provide us with their commercial

7   livery license, as well as their commercial auto

8   insurance.  And then the driver would enter into an

9   agreement with -- I shouldn't say the driver, but the

10   company would enter into an agreement with Uber USA,

11   LLC, which is a different subsidiary of Uber

12   Technologies, Inc. than Raisor, LLC is.

13        Q.   You talked about kind of a division -- some

14   difference between TNC and livery services.

15             Could you explain that at a high

16   level?

17        A.   Sure.  The livery regulations are a

18   different set of regulations than TNC.  The livery

19   regulations have been around much longer than TNC

20   regulations, which the latter have been around since

21   2017, May or June or something like that.  Livery

22   regulations have been around for much longer.  The

23   City of Houston, I believe, has different set of

24   regulations specifically to livery drivers -- or I

25   guess livery companies is how we should think about

Page 469

1    it, whereas the TNC regulations are at a statewide

2    level.  There is differences in the requirements

3    for -- for the different -- different models.

4         Q.   All right.  And so, right now I want to

5    focus on TNC, okay?  Why are drivers required -- you

6    went through a list of things that drivers are

7    required to do.

8              Why are drivers required to provide

9    those things?

10        A.   It's part of the regulations or the

11   statute.  Texas Occupational code, I believe it's

12   called, which is the TNC regulations.  And those

13   regulations require drivers who use TNC services to

14   do certain things.  It requires TNCs to collect

15   certain documents from drivers utilizing their

16   services.

17        Q.   When you say the TNC law or TNC, does that

18   stand for transportation network companies?

19        A.   That's right.

20             MR. MacLEOD:  Objection.  Leading and

21   counsel testifying.

22             MS. SOUSSAN:  Overruled.

23        Q.   (BY MR. SANDAHL)  Can you tell us the

24   difference between just what a TNC is -- and maybe

25   you did this already, but what a TNC -- just in kind

Page 470

1   of layman's terms what the difference between

2   somebody driving TNC and somebody driving in a livery

3   vehicle would be doing?

4       A.   I mean, they would be doing something

5   fairly similar, which is transporting a person from

6   Point A to Point B.  The difference is that under the

7   TNC, it just has different definitions of the

8   for-hire transportation market.  And drivers who do

9   not have a livery license, normal people, they cannot

10  just go transport someone from Point A to Point B

11  unless you have a livery license or you're utilizing

12  TNC services.  So I'm a person in Texas.  I can't go

13  transport someone for a fee.  That's illegal, based

14  on my knowledge, in the State of Texas.  If someone

15  has a livery license, they can go ahead and do that,

16  or if someone is utilizing a TNC service, meaning a

17  driver has signed up with a TNC.  Taxis also can do

18  that.  That's a different set of regulations, from my

19  understanding.

20              MR. MacLEOD:  Nonresponsive.  He's

21  also providing expert testimony at this point.

22              MS. SOUSSAN:  Could you re-ask your

23  question, Mr. Sandahl?

24              MR. SANDAHL:  I just was trying to get

25  the difference between what somebody who is -- if

Page 471

```
 1    there's a division or a difference between TNC
 2    drivers and livery drivers.  I was really just trying
 3    to get at what the difference is.
 4                 MS. SOUSSAN:  Right.  He can testify
 5    to that if he has knowledge.
 6                 MR. SANDAHL:  I think we've gotten the
 7    information I want on it.
 8         Q.   (BY MR. SANDAHL)  Do livery drivers and TNC
 9    drivers -- might they drive different cars?
10         A.   They might, but they can also drive the
11    same cars.  It doesn't really matter.
12         Q.   Are livery drivers required to pick from a
13    certain level of car?
14         A.   They are not, no.
15         Q.   Okay.
16         A.   Well, take that back.  Per the regulations
17    to get a livery license, the City of Houston has an
18    approved vehicle list.  And I think that they set
19    parameters on vehicle age, as well.  I think the
20    vehicle has to be five years or newer.  So, yeah,
21    there is parameters that are established by the City
22    of Houston.
23         Q.   And do you understand that Mr. Barysas --
24    do you know if he was TNC or a livery driver?
25         A.   So he had two accounts with us.  Actually,
```

Page 472

1    I think he had three.  But he had a livery account,

2    and then he also, I believe, had two TNC accounts, if

3    I remember correctly.

4        Q.    Could Mr. Barysas -- Barysas get his own

5    clients without using the Uber driver app?

6        A.    Yeah, he could.

7        Q.    And with his livery license, could he have

8    had multiple vehicles as a part of a fleet?

9        A.    He could, yeah.

10       Q.    And is Uber Black an example of the livery

11   model?

12       A.    Yeah.  So within our system, livery drivers

13   can use or, I guess, provide transportation for any

14   of the options that I mentioned earlier -- Pool, X,

15   XL, Select, Black, or SUV.  So a livery driver could

16   perform transportation services for any of those

17   options.

18       Q.    Okay.  Are there potential benefits or

19   drawbacks to using a TNC versus the livery model for

20   drivers?

21       A.    The one big benefit a driver could have --

22   I guess there's a couple, but the ones that come to

23   mind are -- number one is that the company can then

24   go get clients outside of just using a TNC software

25   and can perform transportation for hire totally

Page 473

1    outside of TNCs and do so legally.

2              The other would be is they can go buy

3    multiple vehicles and hire drivers to work for them

4    starting a company, and you've got a whole fleet, say

5    10 different vehicles, and you have 15 different

6    drivers who use those 10 vehicles.  That is a real

7    benefit of being a livery company.  It enables those

8    companies to grow if they want to.

9         Q.   Are the booking fees the same for TNC

10   versus livery drivers that use the Uber driver app?

11        A.   The booking fee is the same.  However,

12   the -- so the booking fee is paid by the rider.

13   We --

14              MR. MacLEOD:  He's already answered

15   the question.  Nonresponsive.

16              JUDGE SOUSSAN:  You interrupted him,

17   so I need to -- what's your objection?

18              MR. MacLEOD:  He had already answered

19   the question, and then he flipped to "but" and he was

20   going to go on another one of his long narratives.

21   So he had already answered the question.  Just as

22   Ms. Miers did in cutting off my client many times, I

23   wanted to object nonresponsive so we didn't have to

24   get the whole narrative out.

25              MS. SOUSSAN:  Okay.  Ask another

                                        Page 474

1    question, Mr. Sandahl.

2         Q.    (BY MR. SANDAHL)   Sure.   So I think you

3    started saying the booking fee is the same, but is

4    there a difference in the way drivers get part of or

5    some of the booking fee when they drive as a TNC

6    driver versus a livery driver?

7         A.    Yeah.   The -- if a driver is a TNC driver,

8    that booking fee will come -- the driver will pay us

9    that booking fee.   If the driver is a livery driver,

10   the livery driver will keep that booking fee.

11        Q.    Now, are staging areas for livery drivers

12   at airports the same as TNC areas?

13        A.    It depends.   My understanding is that in

14   the City of Houston there was a separate staging area

15   as determined by IAH, the director of IAH.

16        Q.    Separate staging area?   One for livery, one

17   for TNC drivers?

18        A.    That is my understanding.

19        Q.    If we look at Exhibit RX18 -- and we'll go

20   to Section 2402.101.   This is a TNC statute that

21   we've been talking a little bit about.

22              Before I do that, are you generally

23   familiar with the statutory and regulatory framework

24   that Uber is subject to?   Sounds like you are.

25        A.    You mean the TNC Raisor or LLC?   Yeah.

Page 475

1       Q.    And how have you become familiar with those

2    regulatory frameworks?

3       A.    I have just over the years become familiar

4    with them and -- and what they consist of and how to

5    comply with them.

6       Q.    As part of your duties and responsibilities

7    with Uber?

8       A.    That's right.

9       Q.    And what is your understanding of who the

10   requirements of the TNC statutes of Texas apply to?

11      A.    TNCs, as well as TNC drivers.

12      Q.    Was Mr. Barysas required to have insurance?

13      A.    He was required to have insurance.

14      Q.    Was he required to have a four-door car?

15      A.    That is my understanding, yeah.

16      Q.    Do at least some of those requirements come

17   from the TNC?

18      A.    That is right.  Well, sorry.  Come from the

19   TNC or the TNC regulations?

20      Q.    Let's take a look at -- I think it's 101.

21   This is the TNC statute.

22             What does this require?

23      A.    That the driver have insurance.

24      Q.    Okay.  Clear that off, please.  Let's go to

25   2402.107 and pull up the driver requirements.

Page 476

1              What does this TNC statute require

2    TNCs to confirm drivers using their digital network

3    have?

4         A.   So a driver's license and then 18 years or

5    older and then registration, the vehicle

6    registration, and then financial responsibility for

7    each motor vehicle, which means -- financial

8    responsibility is auto insurance that meets the

9    state's minimum financial responsibility.

10        Q.   Could you clear this off and go to

11   Subsection C of 107?

12              What is this requirement of the TNC?

13        A.   That is the background check requirement.

14        Q.   I'm just scrolling through a couple of

15   things here.  Don, could you go down to

16   Section 111(a)(2)?

17              I guess I'm just drawing your

18   attention, Mr. Rosenthal, to the Subsection 2(a).

19   What does Section 2402.111(a)(2)(a) require?

20        A.   That a vehicle that a driver uses have four

21   doors and that the max capacity is no more than

22   eight.

23        Q.   Go to Section 112(a)(1).

24              Mr. Rosenthal, what does

25   Section 112(a)(1) require?

Page 477

1    A.   That we have a policy that prohibits a

2    driver from discriminating based on a rider's

3    location or destination, race, color, national

4    origin, religious belief or affiliation, sex,

5    disability, age.

6    Q.   We can go down to the next section there.

7    A.   And refusing service animals.

8    Q.   Okay.  Does Uber have a policy that

9    prohibits refusing service animals?

10   A.   Yeah.  It's in the technology services

11   agreement, as well as I believe it's on our community

12   guidelines.

13   Q.   Don, could you pull up Exhibit RX35,

14   please?  And just highlight the second half there or

15   call out --

16            Mr. Rosenthal, what is RX35?

17   A.   This is -- it's literature from our Uber

18   help page or help website that describes pet-friendly

19   rides, which are -- they are not service animals, but

20   drivers have the ability to opt -- opt out of rides

21   that -- where someone might be bringing a non-service

22   animal pet.

23   Q.   And can drivers opt out of providing rides

24   to service animal pets or service animals?

25   A.   No.  That would be illegal.

                                        Page 478

1      Q.    Okay.  But they can opt out of providing

2  pet-friendly rides?

3      A.    That's correct.

4      Q.    Could you turn to the second page and focus

5  in on how to opt out?  How Do I Opt Out?

6              Mr. Rosenthal, what does the called

7  out section of Exhibit RX35 here on the second page

8  of it show?

9      A.    It shows the process in which drivers can

10  follow to opt out of pet-friendly rides.

11      Q.    Does Uber -- does Uber prescribe specific

12  hours during which claimant would be required to be

13  logged into the app?

14      A.    No.

15      Q.    Can he log in whenever he wants?

16      A.    Yes.

17      Q.    Can he just decide not to log in some days

18  if he wants?

19      A.    Correct.

20      Q.    Does Uber restrict claimant -- or did Uber

21  restrict claimant when he was using the app from

22  using other apps like the Lyft app?

23      A.    No.

24      Q.    And did you see testimony today about

25  Mr. Barysas using the Lyft app?

                                          Page 479

1      A.   I did.

2      Q.   Let's take a look at JX4 again.  We're

3  going to turn to some agreements.  So this is one

4  that we've talked a little bit about the Rasier

5  agreement.  Is this something -- if you want to pull

6  up the top three lines there.

7           Can you explain generally what this

8  Exhibit 4 is?

9      A.   It is the agreement in which TNC drivers

10  enter into with Rasier, LLC.

11      Q.   Don, if you could pull up RX48.

12           And what is Exhibit RX48,

13  Mr. Rosenthal?

14      A.   That is the technology services agreement

15  in which livery drivers enter into with Uber USA,

16  LLC.

17      Q.   And I think based on your other testimony

18  you said that your understanding is that Mr. Barysas

19  or his company -- well, can you tell me who entered

20  into Exhibit RX48 with Uber in this case?

21      A.   So companies enter into the agreement.  And

22  then sometimes the company is the same as the driver,

23  but it's the company who enters into the agreement.

24      Q.   And in this case, is it your understanding

25  it was DB Pedicabs that entered into the Uber USA

                                        Page 480

1    agreement?

2              MR. MacLEOD:  Leading.

3        A.    That is my understanding.

4        Q.    (BY MR. SANDAHL)  So I do want to jump back

5    to Joint Exhibit 4 and talk to you a little bit about

6    that one.  Let's take a look at the definition of

7    transportation services under 1.12.

8              Mr. Rosenthal, how does this

9    agreement, JX4, define transportation services?

10       A.    "Your provision of P2P passenger

11   transportation services to users via the Uber

12   services in the territory using the vehicle."

13       Q.    And what does that phrase P2P mean?

14       A.    It's defined in the second paragraph of the

15   agreement, first or second agreement, but it means

16   peer to peer.

17       Q.    Is that roughly the same as TNC, or are

18   they different?

19       A.    Yes.  It's pretty much synonymous the way

20   we think about it.  This technology services

21   agreement was drafted in 2015 at a time in which --

22   in which TNC laws were not drafted or, I guess,

23   enacted in every state.  And also, not all states

24   call peer to peer transportation TNC.  Some states

25   have a different acronym or name for it.

1        Q.    Let's look at the definition of territory

2   under Section 110.

3        A.    It means the city or metro areas in the

4   United States in which you are enabled by the driver

5   app to receive requests for transportation services.

6        Q.    If claimant decided tomorrow that he wanted

7   to move to Arkansas and continue using the Uber

8   driver app, could he do that?

9        A.    He could.

10       Q.    And you may have heard that Mr. Barysas

11  moved from New York City to Houston in 2017, and I

12  just want to -- did you hear that?

13       A.    I did.

14       Q.    Okay.  Mr. Barysas also took a trip in 2017

15  to go to his home country.  Did he need to tell

16  anyone at Uber that he was going to be going away to

17  Lithuania for a while?

18       A.    No, he did not.

19       Q.    Don, if we can pull up RX33.

20             What is Exhibit RX33, Mr. Rosenthal?

21       A.    It's -- it describes the process in which a

22  driver would follow to the extent that they want to

23  switch their city.

24       Q.    Do drivers who want to drive in a new city

25  need approval from Uber?

Page 482

1        A.    Approval, no.

2        Q.    Let's go back now to JX4.  Kind of jumping

3   back and forth.  I want to focus a little bit more on

4   this.  Let's go to Section 2.4 of JX4.  And I want to

5   focus in on the sixth line down where it starts in

6   the middle of the line, "You retain the sole" --

7   where is that?  It's above that one.  You almost have

8   it.  You have it.  Right there.

9              What does this section of JX4 provide,

10  Mr. Rosenthal?

11       A.    It provides him with the sole right to

12  determine when, where, and for how long to utilize

13  the driver app or the Uber services.

14       Q.    Does Uber have any -- retain any

15  contractual control over when, where, and for how

16  long the claimant uses the driver app?

17       A.    It's in the sole right of you here, you

18  meaning driver.

19       Q.    All right.  Let's look nine lines from the

20  bottom.  This is going to be counting up.  It starts

21  with "You acknowledge and agree."  And does this

22  provision -- yeah, all the way through -- yeah, right

23  about there.

24              Does this provision -- well, what does

25  this provision allow Mr. Barysas to do?

                                        Page 483

1          A.    It allows him --

2                MR. MacLEOD:  Objection to the

3     document.  Speaks for itself, Judge.

4                MS. SOUSSAN:  We've been reading from

5     documents all day.  I don't think you were with us in

6     the morning, so I'm going to go ahead and allow this

7     type of testimony.

8                MR. MacLEOD:  Who was with us in the

9     morning?

10                MS. SOUSSAN:  I didn't see you this

11     morning, not all morning.  You were clearly here some

12     part of the day, but we've been reading from

13     documents.

14                MR. MacLEOD:  Right.  Now we've got

15     contracts, and we're taking a Uber corporate

16     representative and we're saying that a non-lawyer and

17     someone who has not been proven up as an expert is

18     going to talk about what contractual language means.

19     There's no foundation for this.  I've been sitting

20     here all day, Judge, just like these other lawyers,

21     like Ms. Miers who doesn't have the video on.  I've

22     been sitting here all day.

23                MS. SOUSSAN:  I apologize.  When I

24     don't see you, I don't know that you're with us.  I'm

25     going to allow Mr. Sandahl to continue this type of

Page 484

1    testimony and reading from the document.

2         Q.    (BY MR. SANDAHL)   So, Mr. Rosenthal, what

3    is this --

4              MR. MacLEOD:   He's asking what the

5    contractual language means.   It's not the reading

6    from the document.

7              MS. SOUSSAN:   He may testify to his

8    understanding of what the language means.

9         Q.    (BY MR. SANDAHL)   Mr. Rosenthal, can you

10   tell us what the highlighted portion of

11   Section 2.4 -- the lower part of that in JX4

12   provides?

13        A.    Allows the driver the complete discretion

14   to provide services or otherwise engage in other

15   businesses or employment activities and makes it sort

16   of for the same of clarity that they have the

17   complete right to use other software, application

18   services in addition to Uber services and engage in

19   any other occupation or business.

20        Q.    All right.   Let's take a look at now at

21   Uber USA transportation services agreement,

22   Section 2.4.   Sorry.   We'll go seven lines down,

23   Customer and Its Drivers.

24              Mr. Rosenthal, this one starts with

25   "customer and its drivers," and it provides pretty

Page 485

1    similar -- "retain the sole right."

2                  In this agreement, what does customer

3    mean or who is customer?

4        A.   So the company had -- it's defined on the

5    first page, the party that enters into the

6    agreement -- or the first couple paragraphs.  If my

7    recollection serves me, it's the company that enters

8    into the agreement.

9        Q.   We can look at the definition.  I don't

10   want to -- can we jump back to the first page.

11   Definition of customer.

12       A.   Very first page.  There you go.

13       Q.   Very first page of the technology

14   agreement.  Sorry.

15                  This is the definition of customer

16   that you were just talking about?

17       A.   It is.

18       Q.   And it says, "Independent company in the

19   business of providing transportation services"?

20       A.   That's correct.

21       Q.   Okay.  Going back to Section 2.4, Line 7 or

22   seven lines down, "Customer and its drivers retain

23   the sole right," what does "its drivers" mean when it

24   talks about customer and its drivers?

25       A.   It's the company and its drivers.  So the

Page 486

1    transportation company's drivers.

2         Q.   This also, like the Rasier agreement,

3    provides that the customer and its drivers have the

4    sole right to determine when, where, and for how long

5    to use the app; is that right?

6         A.   That is right.

7         Q.   Okay.  And again, nine lines up from the

8    bottom, "Customer acknowledge and agrees" -- is this

9    another provision that allows customer in this

10   agreement to provide other services other than the

11   use of the Uber driver app?

12        A.   That is right.

13        Q.   So setting the contractual agreements and

14   the TNC statute aside, does Uber consider drivers

15   like Mr. Barysas to be employees?

16        A.   No.

17        Q.   What does Uber consider drivers like

18   Mr. Barysas to be?

19             MR. MacLEOD:  Calls for a legal

20   conclusion.

21             MS. SOUSSAN:  I have to tell you,

22   Mr. MacLeod, but I think you already know this.  Your

23   client testified that he was an employee, not an

24   independent contractor.  So I'm going to allow like

25   questioning on the part of the respondent.

                                        Page 487

1          Q.   (BY MR. SANDAHL)  Mister --

2          A.   We consider them our customers or

3     independent businesses that utilize our services.

4          Q.   And when in the process of signing up would

5     claimant have accepted the agreements that we were

6     just looking at?

7          A.   Prior to being able to go on-line and

8     indicate his availability to provide transportation

9     services.

10         Q.   Do drivers who agree to these agreements

11    have the opportunity to review the agreements before

12    they enter into them?

13         A.   They do.

14         Q.   How much time do they have to review the

15    agreements?

16         A.   It is really unlimited.

17         Q.   Is there a deadline for them to accept

18    them?

19         A.   No.

20         Q.   Are they allowed to review them with an

21    attorney before accepting them?

22         A.   They could.

23         Q.   And after they accept the agreements, do

24    they receive a copy of them?

25         A.   There's a copy made available to them in

Page 488

1    their driver profile page, yeah.

2         Q.   Can they visit those whenever they want

3    when they are in the app?

4         A.   At any time, yeah.

5         Q.   Could they print a hard copy of the

6    agreements?

7         A.   They could, yeah.

8         Q.   And is there another way to get a hard copy

9    if a person doesn't have a printer or computer?

10        A.   They could go to our in-person Greenlight

11   hubs and ask for one there.  We have printers there.

12   They might not be open now, the Greenlight hubs, but

13   prior to COVID, they were.

14        Q.   I just have a couple more questions before

15   moving on to a new topic.

16             MS. SOUSSAN:  Okay.  It's 6:00

17   o'clock, so how much longer do you have?

18             MR. SANDAHL:  Two minutes.

19             JUDGE SOUSSAN:  Let's go.

20        Q.   (BY MR. SANDAHL)  What information do

21   drivers have access to in their driver portal in

22   addition to the agreements that they have entered

23   into?

24        A.   They have access to how they have -- like

25   their banking information and their tax information.

                                             Page 489

1   So information related to how they have signed up or,

2   I guess, what type of entity they have -- they would

3   like to utilize.  So it could be, like, a C corp, an

4   S corp, an LLC, the different types of LLCs, et

5   cetera.  There's, like, 10 different options.

6                They would also have the access to all

7   of their previous trip history.  And within that,

8   they could basically click on each trip and see the

9   breakdown of the fees the rider paid and the fees

10  that the driver paid us.

11               They would have access to quarterly

12  summaries of all of that your -- and annual summaries

13  of all of their trips.  There's more, but those are

14  the things that come to mind.

15      Q.   Could they see the number of miles that

16  they have driven?

17      A.   They could, yeah, in their year-end tax

18  summaries.  The year-end tax summaries are kept there

19  and include all of the miles that a driver has driven

20  while they are logged into our platform.  By "logged

21  in," I mean from hitting the go on-line button all

22  the way to the go off-line button.

23      Q.   Can they receive information about tips in

24  the driver portal?

25      A.   They do have access to that.

Page 490

1             MR. SANDAHL:  That's a natural

2    breaking point, if we could, Your Honor.

3             THE COURT:  Are there any issues that

4    we need to discuss before we end for the day?

5             Okay.  Tomorrow -- and you can share

6    this with your counsel -- whoever is going to be

7    participating, please have your video available so I

8    know who is in the room and who is not so we don't

9    have the problems that I had earlier.  I did not mean

10   to insult you by saying you were not here.  So if

11   you're going to be joining us, please have your video

12   on so I can see who is here and who is not.  All day.

13             All right.  If there's nothing else,

14   then we'll start tomorrow at 10:00 o'clock.

15        (Whereupon at 6:03 p.m. the

16        arbitration was recessed.)

17

18

19

20

21

22

23

24

25

                                        Page 491

```
 1
 2   DAINIUS BARYSAS,            )
     Claimant                    )
 3                               )
     vs.                         ) CASE NO. HON. SUSAN SOUSSAN
 4                               ) ARBITRATOR
     UBER TECHNOLOGIES, INC.,    )
 5   Respondent                  )
 6
 7                REPORTER'S CERTIFICATE
 8                 ARBITRATION DAY 2
 9                   May 2, 2022
10
11        I, Shauna Foreman, Certified Shorthand Reporter
12   in and for the State of Texas, hereby certify to the
13   following:
14        That the foregoing transcript of ARBITRATION DAY
15   2 is a true record of the proceedings;
16        That the original transcript was delivered
17   to Kimberly R. Miers.
18        That a copy of this certificate was served on
19   all parties and/or the witness shown herein on
20   _____.
21        I further certify that pursuant to FRCP Rule
22   30(f)(1), the signature of the deponent:
23        _____was requested by the deponent or a party
24   before the completion of the deposition and that the
25   signature is to be before any notary public and returned
```

Page 492

1    within 30 days (or _____ days, per agreement of counsel)

2    from date of receipt of the transcript.  If returned, the

3    attached Changes and Signature page contains any changes

4    and the reasons therefor;

5         __x___was not requested by the deponent or a

6    party before the completion of the deposition;

7         I further certify that I am neither counsel for,

8    related to, nor employed by any parties or attorneys

9    in the action in which this testimony is taken, and

10   further that I am not financially or otherwise interested

11   in the outcome of this action.

12        Certified to by me on this the 12th day

13   of May, 2022.

14

15                          _Shauna Foreman_

16                          Shauna Foreman, CSR

                            Texas CSR 3786

17                          Expiration:  10/31/2023

                            Veritext Legal Solutions

18                          300 Throckmorton Street

                            Suite 1600

19                          Fort Worth, Texas  76102

                            Tel. (817)336-3042

20                          Firm No. 571

21

22

23

24

25

                                              Page 493

**[1 - 2014]**

**1**

**1** 278:10 289:2
359:8 421:15
427:10 438:5
464:14 477:23,25
492:22
**1,000** 423:14
**1,188** 422:18
423:15 424:5
**1.12.** 481:7
**1.3032** 307:22
**10** 232:24 237:23
244:19 278:3
280:22,24 289:4
366:6 422:4,9
427:14 446:13
454:17 460:2
474:5,6 490:5
**10,500** 261:14
**10/31/2023** 493:17
**100** 346:8 373:14
401:5
**101** 476:20
**104** 401:5
**106** 401:5
**107** 477:11
**108** 401:6
**1099k** 347:19
**10:00** 454:25
455:2 491:14
**11** 230:4 371:24
**110** 401:6 482:2
**111** 477:16
**112** 401:6 477:23
477:25
**113** 362:3
**1134** 440:24
**114** 401:10 428:25
**114.09** 429:17
**116** 401:10

**117** 381:6 392:6
401:20
**1173** 227:6
**1174** 226:15
**1179** 265:20,21
**1180** 310:22
**1181** 220:1 331:3
331:15
**1182** 222:22
**1187** 308:5
**119** 401:10
**11:24** 263:8
**11:41** 263:8
**12** 232:24 234:6
371:16,16 385:6
392:7 417:8
419:20,21 458:4
**120** 401:10
**1231** 404:14
**1242** 305:1
**125** 402:24
**1271** 312:3
**128** 402:24
**129** 401:14
**1292** 320:11
**1293** 432:18
**1294** 321:11
431:23
**12:03** 355:8
**12th** 252:20
253:24 255:15,16
493:12
**13** 233:6 429:14
458:22
**130** 393:19
**1301** 199:12
**1305** 316:13
**132** 401:16
**134** 401:18
**1368** 388:24

**1375** 318:5
**138** 306:22
**1382** 327:1 328:6
**1386** 263:11
395:18
**1388** 230:3
**14** 237:16,16
404:13
**14.52** 307:20
**14131** 493:15
**1426** 324:24
436:16
**1435** 228:23
**149** 403:11
**1493** 322:23
**14th** 202:2 252:24
**15** 247:14 258:4,11
263:6,6 305:5,8,17
305:22 330:10,14
330:15,20 367:8
398:10 446:13
474:5
**15,217** 422:2
**150** 250:18
**1560** 199:7 314:15
**157** 403:12
**16,000** 367:8
**1600** 493:18
**164** 299:4
**166** 300:21
**168** 301:15
**16th** 429:4
**17** 234:21 243:23
296:23 393:19
**171** 401:22
**173** 402:7
**17th** 322:24
**18** 308:1 362:6
399:13 441:10
477:4

**18.47** 315:15 316:4
**18.47.** 316:11
**181** 402:7
**18th** 316:15
**19** 262:1
**1900** 199:12
**19th** 307:1 399:13
**1:00** 319:24 320:8
320:9
**1:15** 320:2
**1:59** 320:9
**1st** 252:7 255:7
327:5,8

**2**

**2** 198:7,8,10
296:20 297:14
355:18 404:14,15
464:14 465:21,23
466:5 477:16,18
477:19 492:8,9,15
**2,537** 422:14
**2.4** 483:4 485:11
486:21
**2.4.** 485:22
**2.63** 429:5
**20** 273:8 307:11
311:2,17 316:17
317:6,8,13 343:15
360:7,12 364:4
395:11
**20,000** 367:14,24
**200** 341:8,9
**2003** 274:5
**2006** 337:8 346:6
**201** 200:4
**2013** 234:6,14
**2014** 219:21
220:24 222:7
234:6,13 274:8,11
274:11 275:11
331:20 353:1

Veritext Legal Solutions
346-293-7000

**[2014 - 50,892]**

366:17 405:4
439:8 458:13
459:20 460:7
**2015** 231:6 234:6
234:14 481:21
**2016** 230:24 231:6
234:7,14,21 235:1
244:6 278:23
289:6 320:14
321:15 347:7,9
**2017** 230:24 232:7
235:1 274:11,12
274:14 293:10
296:23 312:14
322:25 323:23
338:7,11 346:14
380:20 419:15
423:11,20 424:5
425:24 442:25
458:17 460:12
469:21 482:11,14
**2018** 216:11,15,19
220:4 223:19,22
224:7 225:6,17
226:19 227:6
228:11,23 230:24
232:10,13 235:1
263:13 266:6
274:3 307:1 311:1
315:20 316:15
324:25 326:5
331:16 399:4
407:10,15,18
426:9 429:4,4
458:21
**2019** 230:3,4,24
235:1 252:17,20
253:24 254:8,14
255:16 274:22
275:11 297:19,22
297:25 301:6

327:3 338:7,11
339:1,2,11 346:14
347:9 350:15
352:2,7 383:4
414:2 427:14
439:9,13 441:13
442:7,16 443:1
458:23
**2020** 252:8,16
255:7 327:5
340:17 352:19
414:11,12 442:4
**2021** 261:9,13,23
327:8 348:24
349:12 392:6
441:8 443:19
444:8 447:23
**2022** 198:8,12
252:24 253:18
492:9 493:13
**20b** 425:2
**20s** 367:13
**21** 237:16
**21,960** 425:17
**212** 364:22
**215** 321:18 322:8
**21st** 315:20
**22** 362:7
**22nd** 216:10 429:4
**23** 255:1 441:10
**239** 441:8,10
**24** 366:15 458:4
**240** 441:10
**2402.101.** 475:20
**2402.107** 476:25
**2402.111** 477:19
**247** 440:23
**24th** 322:25
323:23
**25** 237:24 311:4

**25,000** 460:9 461:5
**25,105** 425:15
**250** 432:3,15
**25th** 352:7
**26** 278:23 388:12
439:1
**27** 216:19 264:2,18
311:1 420:1
**27,399** 419:21
**272** 200:6
**27a** 425:6
**27th** 216:15
**28** 326:5 425:14
**283** 422:16
**28th** 324:25
**29** 297:19
**29,300** 261:10
**2925** 199:6
**29th** 220:4 331:16
349:11 443:19
**2:00** 320:8
**2:15** 320:3
**2nd** 198:11

**3**

**3** 293:4,5 297:16
466:20
**30** 360:7,12 492:22
493:1
**30,000** 350:5
**300** 321:5 493:18
**30th** 226:19
228:23
**31** 389:21
**31st** 261:9
**336-3042** 493:19
**344** 200:6
**362** 278:15
**365** 287:10
**3786** 493:16
**3:35** 398:11

**3:52** 398:11
**3rd** 312:14

**4**

**4** 232:15,22 480:8
481:5
**4,000** 260:10,13
461:8
**4,008** 422:5,9,12
**40** 415:20
**400** 321:6,10
**4008** 422:12
**41** 417:22 428:6
**42** 407:15 418:18
**433** 200:7
**44** 406:5,10 425:17
425:22 440:16
**443** 200:7
**45** 407:19
**457** 200:10
**46** 248:8,14
**46-243** 248:17
**47** 399:11
**48** 407:22
**48.77** 313:13
**49** 347:12,18
428:11,13
**4:30** 430:17
**4:36** 430:17

**5**

**5** 265:4 334:8,19
399:8,9 416:20,22
418:10,21
**5,000** 369:13
**5,450** 426:4
**5.84** 429:12
**50** 244:11 276:23
307:4,10,12
372:13 385:17
**50,892** 421:17

[51 - acceptance]

**51**  248:6
**53,433**  427:11
**55**  399:17
**56**  399:17
**57**  399:18
**571**  493:20
**592**  232:17
**5:08**  454:21
**5:12**  454:21
**5th**  327:2

**6**

**6**  223:22 233:6
 289:7,23 293:10
**60**  304:14 385:17
 400:11
**60,000**  366:24
 367:12
**600**  460:8
**62**  293:11 294:5
 334:13 400:15
**638.50**  372:1
**64**  295:19
**65**  248:16 296:6
 400:15
**68**  356:18
**69**  400:18 407:11
**6:03**  198:12
 491:15
**6th**  223:18 293:7

**7**

**7**  213:1,3 290:8
 321:14 331:3
 486:21
**7.20**  319:11
**70**  296:24 304:15
 359:3 400:18
**71**  349:12 355:23
**72**  261:13,16 356:3
**74**  400:18

**7520**  255:2
**753**  255:14
**754**  255:21
**756**  255:3
**76**  400:18
**76102**  493:19
**77010**  199:13
**77098**  199:7
**78**  351:19
**78,000**  350:20
**7:00**  378:2 445:9
 445:16
**7th**  444:7,16

**8**

**8**  263:10 266:6
 292:13 306:21
 320:11 381:2,3,7
 392:7 395:17
 419:3 420:7
 431:10 436:16
**817**  493:19
**82**  400:18
**8292**  431:11
**84**  400:21
**865**  420:6
**867**  420:25
**87**  400:24
**874**  422:11
**89**  401:1
**8:00**  377:12 445:8
 445:16
**8th**  263:13 289:6
 399:4

**9**

**9**  224:7 225:6
 228:11 233:6
 237:15 292:14
 422:1 426:7,9
**90**  361:16

**903**  427:18
**91**  401:1
**927**  426:16
**93**  401:5
**95**  373:14
**954**  213:2,5 333:15
**956**  216:14 331:4
**960**  223:25
**99**  375:4
**9:30**  447:18
**9:59**  198:12
**9th**  227:6

**a**

**a.m.**  198:12
 247:19 263:8,8
 377:12 445:8,16
 454:25 455:2
**ability**  206:19
 221:9 223:12
 270:17 275:16
 283:6 302:1 314:8
 324:12 325:25
 326:3,12,14
 357:20 391:6,16
 424:17 451:13
 478:20
**able**  206:23
 209:12 211:12
 250:16 269:1,7
 276:8,11,15
 277:22 278:1
 283:9 288:4
 294:24 302:10
 307:21,24 313:17
 317:21 318:11
 321:24 322:9
 324:5 326:23
 327:20 328:3
 329:20 330:6
 334:13 339:15
 354:7 435:14

436:4 438:23
 464:12 468:17
 488:7
**absolutely**  283:25
 284:1 288:9
 299:10 302:3
 304:10,17 308:3
 327:15 341:13
 360:25 361:2,8
 398:8 451:9
**abuse**  333:19
**abused**  325:4
**abusive**  359:1
**acceleration**
 212:24
**accelerations**
 211:9
**accelerometer**
 212:16,19
**accept**  234:16,23
 237:18 238:6,8,21
 254:3,16 256:2,8
 256:25 258:12
 277:16,19 280:15
 280:23 283:12,13
 285:8 286:2
 291:25 294:17
 295:11 305:5,10
 305:17 306:8
 328:19 330:3
 335:10 336:12
 354:25 355:9
 362:17 388:6,15
 392:10 394:23
 402:20 424:23
 488:17,23
**acceptance**  282:20
 282:20,25 283:1,7
 291:14 294:2,14
 295:5,5,12 355:25
 390:25 392:16

[accepted - affidavit]

**accepted**  246:2
258:5 283:3 317:5
394:17 488:5
**accepting**  215:11
217:25 234:20
282:22 283:5
285:5 287:21
291:18 295:7
299:19 306:2,17
333:20 356:10
391:24 392:9,25
488:21
**accepts**  247:9
281:1
**access**  204:12,17
207:20 216:6,19
216:24 217:12
219:14,22 220:6
221:2 222:17,18
228:2 230:9 232:6
233:3 281:15
282:8,16 283:16
283:19 284:3,22
287:7 288:10
289:8 290:9,21
291:3,12 292:14
292:24 294:19
295:14 296:25
298:20 299:2,10
301:2,13 302:7
303:10,15 305:20
331:19,22 332:23
333:13 334:1
336:4 357:23,25
358:16 393:2
394:16 424:17
437:6 466:6,11,23
467:4,6,15,19
489:21,24 490:6
490:11,25

**accident**  408:16
**accidentally**
390:10
**account**  213:21,23
216:8 221:3 228:5
229:11,11 265:16
280:7 281:19
284:13 286:25
290:9,21 291:3,19
292:15,24 295:8
301:19,19 308:7
321:19 327:4
329:19,20,25
330:11,22 340:13
356:11 381:23
382:5,8,12 392:10
424:14 462:11
467:25 468:2
473:1
**accountant**  338:18
423:7
**accounts**  284:13
285:12 300:1
472:25 473:2
**accurate**  361:18
365:20 367:24
377:5,22
**acknowledge**
431:1 483:21
487:8
**acquired**  369:3
374:12 458:3
**acronym**  481:25
**act**  236:16
**action**  229:25
303:11 493:9,11
**actions**  221:7
437:2
**activated**  288:23
329:20

**activation**  328:16
**active**  327:7,8
328:12 337:10
338:14 346:11
381:23,25 389:13
424:15
**activities**  216:5
217:16 287:11,16
295:20 300:11
333:17 346:15
485:15
**activity**  213:12
284:8,15,17,25
299:12 333:16
**actor**  436:18
**actual**  203:16
239:3 240:2 244:2
247:6 251:3
264:10,11 269:13
373:10 407:3
**acwilliams**  199:13
**add**  363:20 370:5
373:25
**added**  330:10
**addition**  269:4
296:9 346:23
347:3 354:18
412:6 466:2
485:18 489:22
**additional**  202:19
216:4 265:25
266:3,15,17
315:24 316:3
363:23
**address**  227:23
306:10,14,15
348:7 386:19
462:11 467:25
**addresses**  274:2
313:12 365:2

**adds**  309:24
**adjust**  244:3
**adjusted**  313:13
313:24 314:2
**adjusting**  243:23
**adjustment**
315:11,15 320:14
**adjustments**
315:21,23
**admissible**  270:10
**admission**  447:6
**admissions**  453:2
453:4
**admit**  407:3
411:10 412:3
447:9
**admitted**  216:2
347:18 407:2
449:4 450:1,18
452:17
**ads**  259:15
**advantage**  238:21
**adverse**  262:22
**adversely**  262:5
**advertised**  337:15
**advertisements**
342:11 435:6
**advertising**  259:14
259:19,24 353:7
436:7
**advice**  338:21
419:9,14
**advised**  214:24
338:17 340:12
432:1
**advisement**  449:7
449:15
**affect**  262:23
335:11 336:3
**affidavit**  450:8

Page 4

[affiliate - answer]

**affiliate** 273:18
337:14 338:15
**affiliation** 478:4
**affirmatively**
368:6
**afraid** 325:21
387:22
**afternoon** 457:20
**age** 268:20 472:19
478:5
**agent** 236:17,19
236:23 328:11
**aggressive** 323:5
**ago** 206:24 230:7
345:3,5 412:13
423:8 424:24,25
425:1 444:3
458:24
**agree** 214:5,21
222:8 225:5 236:4
256:4 257:5
258:23 259:2
348:17 350:16
356:14 358:5,23
360:15,18 362:18
365:11,12,14
374:24 383:22
393:13 401:7
402:1 404:3,6
420:19 430:3
444:10 456:8,23
483:21 488:10
**agreed** 433:7
447:6
**agreement** 204:4
204:11 205:8
352:25 431:2,5,8
450:9 453:11,14
463:16 468:11
469:9,10 478:11
480:5,9,14,21,23

481:1,9,15,15,21
485:21 486:2,6,8
486:14 487:2,10
493:1
**agreements**
353:25 354:4,5
468:22 480:3
487:13 488:5,10
488:11,15,23
**agrees** 487:8
**ahead** 263:5
330:10 364:5
372:3 446:20
449:17 453:15
454:8 471:15
484:6
**airport** 209:13,17
215:11 216:7
217:19 218:1
219:6,22 220:6
221:2,9,10,14
222:16,18 223:13
224:8,23 226:4
228:12,16 229:20
230:6,9 266:7,8
277:9,13 302:7,14
302:16,17 303:10
303:15 319:2
320:22 331:13,19
332:14,18,21
333:13,21 334:1
343:8,15,22,24
368:24 369:3
374:6,9,11,14,17
374:22 375:1,4,12
375:19,21 376:25
377:21 396:17,19
397:14 403:19
408:9 412:16
445:7,8,14 446:8

**airports** 217:18,23
227:17,18 228:25
475:12
**alcohol** 323:2,4,13
460:24
**alert** 361:21 362:8
**alex** 268:11,16
270:24 419:9,14
**algorithm** 207:10
237:13,14 258:25
259:3,6
**algorithms** 268:13
**allegation** 209:6
**allege** 333:25
**alleged** 448:13
**allison** 199:11
**allow** 278:2
281:15 324:21
378:14 450:20
456:25 483:25
484:6,25 487:24
**allowable** 319:21
**allowed** 241:4,10
294:19 394:16
408:23 409:5,19
410:1 453:8 468:7
488:20
**allows** 484:1
485:13 487:9
**alluded** 365:21
**alternative** 447:9
448:25
**ambiguous** 459:22
459:25
**amend** 417:25
**amended** 418:2,19
443:25
**amenities** 383:25
384:2
**america** 225:18
345:20

**amount** 224:15
254:2,15 256:1,7
256:15,16,18,24
259:14 260:3
276:19 283:2
292:10 306:2
314:11 321:19,24
321:25 322:7
324:20 340:24,25
342:12 350:19
379:19 424:5
425:21 435:9
464:15
**ample** 241:13
**analyzed** 211:1
**angela** 199:17
**angeles** 458:14
**animal** 478:22,24
**animals** 478:7,9
478:19,24
**annoyances**
325:15
**annual** 261:19
490:12
**anonymous**
287:17
**answer** 204:9
206:15,16,18
210:23,23 212:5
214:16 217:10,11
218:17 234:17
242:16,18 243:14
312:21 349:6
354:11,12,17
358:13 369:25
391:10,11,25
392:2,3,14 397:15
407:7 409:2
417:11 418:14,24
435:24 438:14
447:15 455:18

Page 5

[answered - april]

| | | | |
|---|---|---|---|
| **answered** 204:9 | 276:16,17 277:7 | 430:2 438:10 | **apply** 298:8 |
| 228:19 231:17,22 | 277:15,23 278:1,6 | 439:13,16 440:11 | 317:14,17,19 |
| 235:8,15 236:12 | 279:25 281:16 | 443:7 444:23 | 357:3 466:1 |
| 254:21 348:21 | 282:9,12,16 | 462:3,4,6,8,15,17 | 476:10 |
| 392:5 474:14,18 | 283:17,19 284:3 | 462:18,22 464:19 | **applying** 310:9 |
| 474:21 | 284:17,20 287:17 | 466:12,23 467:4,7 | **appointment** |
| **answering** 370:3 | 287:22 288:10 | 467:15,20,22,23 | 312:12 |
| 407:4 416:8 | 291:12 292:1,4,8 | 473:5 474:10 | **appointments** |
| 446:17 | 294:18,19 295:14 | 479:13,21,22,25 | 380:6 |
| **answers** 243:12 | 299:2,11 301:2,13 | 482:5,8 483:13,16 | **appreciate** 226:21 |
| 271:12 | 301:24 304:1 | 487:5,11 489:3 | 234:4 248:7 |
| **anxious** 354:12 | 305:15 310:10 | **apparently** 459:10 | 366:19 455:14 |
| **anybody** 304:7 | 312:6,8 313:22 | **appeal** 223:6 | **appreciation** |
| 328:4 333:24 | 315:4,9 329:13 | 228:7 230:15 | 330:9 |
| 334:4 | 335:25 336:4 | 296:16 | **approaching** |
| **anymore** 212:17 | 342:1 344:8,12 | **appealed** 223:10 | 362:8 |
| 338:10 424:10 | 347:15 348:2 | 223:15,20 224:9 | **appropriate** |
| **anyone's** 208:15 | 351:12 352:24 | 230:17 | 314:11 327:11 |
| **anyway** 374:25 | 353:1,16,21,25 | **appeals** 296:10 | 448:14 |
| 448:15 | 354:3,6 357:23 | **appear** 305:3 | **approval** 380:17 |
| **api** 207:6 | 358:16 360:6,13 | **appearances** | 482:25 483:1 |
| **apologies** 345:4 | 363:9 364:12 | 199:1 | **approve** 427:15 |
| 422:7 | 365:5 368:3 | **appears** 213:10 | **approved** 321:18 |
| **apologize** 232:24 | 370:25 374:16 | 222:25 227:4 | 472:18 |
| 484:23 | 377:11,17 378:2,7 | 228:5 229:11 | **approximate** |
| **app** 203:7 204:16 | 378:7 379:14,19 | 230:13 | 306:2,4 |
| 204:21 205:9 | 380:4,7,11,15,21 | **appendix** 428:10 | **approximately** |
| 207:13 216:25 | 381:11 382:16,22 | **apple** 205:21,23 | 261:9,13,14 |
| 217:1,2 221:8,24 | 383:3,7 387:12,14 | 206:4 207:7,10 | 316:17 339:22 |
| 223:13 225:24 | 387:15,22 388:2 | 208:12,18 462:6 | 360:7,12 366:6 |
| 228:12,24 232:21 | 389:2 391:5,7,16 | 467:22 | 442:4,7 458:22 |
| 234:5,8,16 235:2 | 391:17,20,21 | **application** 209:13 | **approximation** |
| 236:5 237:23 | 393:2 395:2 405:4 | 209:17 211:3 | 246:10 |
| 238:3 239:8,13,19 | 405:5,8,9,12,14,18 | 216:21 236:6 | **apps** 208:15 407:6 |
| 239:21 240:8 | 405:23 406:3 | 244:14,22 245:1 | 408:15,23 409:5 |
| 242:1 244:7,12,17 | 407:11,16,19,23 | 257:16 258:19 | 409:19 410:1,11 |
| 247:7 250:20,21 | 408:2,2,6,7 409:1 | 259:10,20,21,25 | 410:19 411:2,8,11 |
| 251:1,19 252:4 | 409:1 410:21 | 260:12 336:12 | 411:15 412:4 |
| 257:20 258:2 | 411:24 412:6,7,10 | 485:17 | 421:21 479:22 |
| 259:1,7 260:7,11 | 413:10,18 414:1 | **applied** 319:12 | **april** 202:1,2 |
| 265:9,15 276:9,12 | 423:9,10 427:1,5 | 390:22 | 252:24 253:18 |

Veritext Legal Solutions
346-293-7000

[april - backwards]

254:9 293:7,10
312:14 327:2
348:24 349:11
392:5 407:18
441:8 443:19
447:23
**arbitration**  198:7
198:10 202:7,20
207:17 217:3
241:14 251:23
252:2 253:2,7,9,16
254:5 270:1,15
272:1 453:20
491:16 492:8,14
**arbitrations**  453:8
453:9
**arbitrator**  198:3
199:20 450:21
492:4
**arbitrators**  456:1
**area**  217:25 242:9
250:18 281:12
362:9 375:10,11
375:12,15,16
379:25 390:10
442:2 475:14,16
**areas**  239:9,11
242:5 379:2,6
390:3,15 446:11
475:11,12 482:3
**argued**  214:8
**arguing**  233:16
242:23 243:10,14
**argumentative**
218:13 237:5
256:10
**arguments**  323:16
**arkansas**  482:7
**arranged**  218:6
**arrival**  245:11

**arrived**  318:23
**aside**  229:21
267:22 487:14
**asked**  228:18
231:16,22 236:12
241:20,21 246:14
254:5,20 266:15
295:4 324:20
333:9,10 334:2
348:20 349:13
386:3 392:1,8
394:1 435:11
447:13 452:5
460:1
**asking**  216:22
219:12,13 222:1
222:22 230:23
231:24 232:1
234:14 237:6
242:3 250:1 254:7
254:8,8 258:7
266:2 308:20
312:22 314:25
428:9 429:16
439:24 445:3
485:4
**asks**  389:13
416:22
**assessed**  317:25
**assign**  365:1
465:16
**assigned**  246:23
**assist**  407:4
448:13
**associated**  221:8
284:14 335:14
468:1
**assume**  291:24
423:4 424:9
**assuming**  454:7,25

**assumption**  205:4
**assure**  451:2
**assured**  265:18
**attached**  198:16
493:3
**attempt**  215:13
288:2
**attempted**  246:8
**attention**  437:3
477:18
**attitude**  233:8,14
**attorney**  231:17
374:21 381:5
388:1 395:19
399:11 488:21
**attorneys**  406:12
493:8
**august**  274:14
275:11 298:2
347:9 350:15
352:2,7 383:3
414:2 439:9,13
442:16 443:1
**authorized**  419:9
419:14
**auto**  437:21 469:7
477:8
**automatically**
244:23 332:5
**availability**  488:8
**available**  205:22
208:12 231:4
237:18 238:20
250:2 258:10
364:19 373:17
439:17 453:17
454:10,24 463:6
464:1 488:25
491:7
**avenue**  199:6

**average**  279:16,18
279:21 280:3,6
281:11 290:13
300:24 301:1
446:4
**avoid**  354:15
390:6
**aware**  210:17
220:13 261:20
267:22 286:9,19
296:15 301:16

**b**

**b**  440:20,21
462:20 471:6,10
**back**  201:3 206:23
214:19 216:18
221:17 225:16
254:8 268:19
279:2 292:12
293:5 295:3 296:7
311:15 312:7
320:14 322:5
329:5 331:4 333:2
333:3,15 346:5,14
348:5,24 351:20
351:22,24 353:8
355:6 378:17
384:3 385:23,25
387:9 392:5
395:16 397:9
409:9,22 411:10
411:14 425:2
431:13,20 432:18
434:15 444:19
459:2,10,11,13,17
472:16 481:4
483:2,3 486:10,21
**background**
468:13,14 477:13
**backwards**  402:25

**bad** 325:13 336:11
336:15 436:18
**balance** 435:4
**baltican** 331:8
364:24
**bank** 367:22
**banking** 489:25
**bankrupt** 405:22
**banning** 227:18
**bare** 240:1
**barysas** 198:1
199:18 200:5
213:2,4 214:3
215:8,20 216:14
216:20,24 218:3
219:4,8,19 220:1
220:10 221:13
222:22 223:25
226:15 227:6
228:23 230:3
232:17 248:21
263:11 265:20
272:16,21 273:1
278:15 310:22
344:25 351:1,11
352:23 354:18
358:6,13 359:8
369:23 392:21
398:24 402:9
406:10 407:4,9
417:24 427:25
430:18 443:18
444:3,22 456:8
462:1 464:23
472:23 473:4,4
476:12 479:25
480:18 482:10,14
483:25 487:15,18
492:2
**base** 202:18
253:25 255:23,23

255:24 275:20
307:16
**based** 204:23
205:7 225:4 231:9
245:25 247:4
248:3 259:24
281:11 297:7
299:8 311:12,17
313:12 316:2
324:6 334:7 366:4
366:6 409:2 447:7
455:7 456:20
471:13 478:2
480:17
**basic** 434:4
**basically** 302:11
305:19 315:13
337:11 388:20
390:11 415:6
440:8 490:8
**basis** 205:5 208:5
231:13 239:25
241:9 251:1
332:15
**bates** 265:1 305:1
355:23 356:3,18
381:6 388:24
395:17 404:14
420:6,25 422:11
426:16 427:18
431:11,23 432:18
**bear** 448:18
**becoming** 262:13
**began** 363:8
373:12 459:20
**beginning** 328:24
339:2 344:1,24
349:1,2
**behalf** 352:14
358:3

**behavior** 301:17
467:12
**belabor** 289:9
297:13
**belief** 383:18
478:4
**believe** 202:15
204:2,22,24
206:20 211:13,16
212:8,9 215:2
219:10 222:12
224:3 231:6
234:19,24 242:3,7
242:14 256:6,12
260:21 264:15
270:12 274:12
275:4 280:24
282:7 298:10
302:1 304:5,8
307:11 318:20
320:23 321:5,9,10
348:4 355:22
358:9 362:12
367:15 387:20
388:8 405:21
406:13 409:4,7,18
410:23,25 414:19
414:21 417:18
421:22 430:8,10
434:6,7,9,22 436:1
436:6 441:13
446:22 447:23
449:5 452:11
469:23 470:11
473:2 478:11
**believed** 225:3,5
254:14,17 384:13
409:11,25 410:18
**bell** 388:14
**belong** 311:4

**belonged** 337:10
**ben** 201:8
**benefit** 434:23
473:21 474:7
**benefits** 473:18
**benjamin** 199:10
**best** 206:18 310:19
377:24 456:22
**better** 203:20
234:1 265:23
336:14 353:5
357:6 393:24
446:16
**beyond** 306:15
**biased** 448:10
**bicycle** 337:13
**big** 288:24 416:6
419:13 428:13
440:18 473:21
**bigger** 266:25
334:11,12 388:13
396:4 406:18
416:1 419:8
422:13
**bike** 273:18
337:16 338:15
346:23 347:3
420:17
**bikes** 461:2
**binders** 240:15,16
240:22
**bireley** 201:8
**bit** 203:20 229:9
234:3 257:4
261:11 277:17
279:11 297:24
337:3,6 346:1
359:9 360:4 363:4
365:10 387:4
399:10 405:1
437:9 460:14

Veritext Legal Solutions
346-293-7000

[bit - call]

461:25 462:2
475:21 480:4
481:5 483:3
**black**   250:11,15
250:22 251:6
302:19,22 311:5
311:25 317:11,12
318:2,20 327:4,18
327:20 328:3,19
329:16 330:3,18
342:18,21 343:3
343:10,24 344:1
344:13,13 365:9
366:5,12 371:1,7
373:12,13 375:13
388:5 389:1,14
422:16 436:11,14
437:10,13,14,22
438:2 439:5,10,17
439:20 463:5
473:10,15
**blow**   266:11,13
294:4 320:12
**blower**   465:19
**blue**   305:4
**body**   224:11
**bold**   431:24
**book**   243:19
268:12,18,19
**booking**   474:9,11
474:12 475:3,5,8,9
475:10
**bore**   402:6
**born**   273:3
**boroughs**   274:2
**boss**   268:22
**bottles**   384:5
**bottom**   217:15
255:14,22 256:14
265:11 279:15
287:10 292:13

305:4 308:24
321:13 323:23
326:4,5 355:24
357:5 389:6 402:9
440:19 483:20
487:8
**bought**   302:15
**box**   305:3 406:17
406:18
**brad**   199:17 200:3
200:9 201:19
449:12 457:17,20
**brand**   259:22
**brandon**   226:19
**brands**   260:2
**breach**   298:18
369:13
**breached**   298:21
**breaches**   298:25
**bread**   302:17
**break**   263:4,6
320:3,7 398:7,14
398:19 405:1
430:12
**breakdown**
307:16 490:9
**breaking**   466:19
491:2
**bret**   199:4 322:15
449:1
**brief**   268:7 430:12
450:16 451:5,5,18
**briefed**   449:23,25
450:10,11
**briefly**   230:20
454:14
**briefs**   450:13
**bring**   240:23
246:3 278:9
323:13 331:2
358:17 436:17

439:1 441:7 448:3
448:7 460:25
467:2
**bringing**   273:23
358:2 430:5
478:21
**brings**   243:24
**broad**   460:1
**brochures**   260:4
**brought**   240:13
271:25 323:3
435:22 437:2
**browse**   376:21
438:6
**bucks**   321:10
**budget**   259:15
**build**   208:13
**built**   205:25 206:1
207:6 208:16
284:9 460:17
461:13
**bullets**   466:9
**bunch**   229:24
**burden**   449:4
452:22
**bus**   353:8 364:20
**bush**   375:3,7
396:19
**busier**   464:8
**busiest**   389:24
**business**   220:8
262:5,22,23
302:18 327:9
337:19 343:20
346:13,18 348:6
348:10 349:15
363:6,9 364:8,15
364:17 371:5
374:17,18,25
383:20 385:2,6,8
385:12,15 386:6,7

386:10,19 387:7,9
413:2 419:21
420:16,21 425:3
425:15,18 432:14
458:20 459:17
460:11,15,16,19
460:21,24 461:24
461:25 462:3
467:18 485:19
486:19
**businesses**   337:13
352:13 485:15
488:3
**butter**   302:17
**button**   203:13,14
245:2 305:4,5
490:21,22
**buy**   327:21,25
474:2
**buyers**   460:20

| c |
|---|

**c**   199:11 334:11
420:8,24,25
421:11 426:3,17
427:8,19 440:20
440:22 477:11
490:3
**c16**   304:25
**c360**   328:6
**cabs**   421:1
**calculated**   256:16
283:4 309:3,14,22
314:5 343:16
**calculations**
342:13
**call**   263:16 272:14
272:15 329:9
334:20 348:15
349:22 386:9
396:1,6 399:22
406:11 436:18

Page 9

[call - change]

446:18 449:7,12
449:17 451:3,4
454:5 456:15
457:10 461:20
464:23 466:9
478:15 481:24
**called** 210:13
256:5 268:12
269:20 328:15
346:18 351:13
388:7 405:18
414:4,22,25
441:17 450:22
452:11 462:25
465:6,11 470:12
479:6
**calls** 269:11 391:8
438:11 487:19
**cam** 325:7
**cameron** 199:18
455:6
**cancel** 215:13,15
263:17,19 281:7
282:2,8,18 285:7
291:7 299:23
318:9 334:22,24
335:10,10 336:1,6
336:9,12 381:15
389:10 394:9,10
395:1 396:7,9,18
396:21 399:24
400:4 402:17,20
402:22 403:5,13
403:22,23 439:24
440:2,9
**canceled** 282:4
283:3 291:12
318:24
**canceling** 335:14
439:24

**cancellation**
279:14 280:19,19
280:23,25 281:4
281:11,11,14,18
281:25 283:2
290:1,17,18,22
291:2 293:17,25
294:10 297:5
318:6,8,10,12,13
318:15,16,22
319:5,7,11,15,17
319:21 335:11,17
335:21 336:3,22
336:24 393:3
397:9 404:15,21
440:7
**cancellations**
281:22 333:18
**cancels** 281:1
319:4 335:17
404:16
**capacity** 220:21
237:11 261:6
477:21
**car** 244:11 266:20
321:17 322:2
323:3 341:25
342:3,19 360:24
361:1 366:13,15
366:20 367:6
368:5,14,21
370:18,22 371:6
376:12 384:3
385:25 396:16
422:16 472:13
476:14
**car's** 325:7
**card** 372:16 385:6
385:8,15 386:3,4
386:16,22 387:3,5
387:7,9 389:2,7

422:18,21,24
423:20 424:4,24
462:13
**cards** 385:2,20,22
386:6,10
**care** 333:1
**careful** 221:3
**carefully** 354:10
366:19
**carolina** 339:6
340:9 414:25
415:3,14 417:14
418:15,25 442:10
442:18
**carried** 269:19
**carrier** 415:7
**carriers** 460:25
**carries** 292:13
294:15
**carrying** 467:3
**cars** 273:21 304:9
332:19 342:1
366:6 472:9,11
**case** 198:2 202:12
209:11,20 214:24
246:20 248:20
257:6,9 268:2
269:9 270:14,18
319:1 409:8
413:12 417:25
446:23 450:3,10
451:6,8,9,17
452:12,25 454:10
456:14 457:1,2
480:20,24 492:3
**cases** 296:11
**cash** 234:16,20,23
262:24 288:6
300:13 412:16
**cashless** 234:5,8
235:2,5,17 236:4,5

**catch** 313:25
**caught** 313:24
**cause** 198:11
298:19 299:1
**caused** 333:25
**cease** 339:25
**cell** 363:10
**center** 250:17
**central** 337:13,17
337:22 338:3
346:18
**certain** 208:14,15
238:8 239:11
278:7 279:24
280:14 318:16,17
327:19,25 342:21
351:5 374:23
379:2,11,18 424:8
435:9 437:15,16
470:14,15 472:13
**certainly** 270:3
271:4 272:8
450:24
**certificate** 492:7
492:18
**certified** 198:13
492:11 493:12
**certify** 492:12,21
493:7
**cetera** 396:20
459:8 490:5
**chair** 268:14
**challenge** 455:25
**chance** 329:14
331:18 393:21
**chances** 326:16
**change** 237:10
247:4,13 253:19
254:10 262:21
326:13 396:24

Veritext Legal Solutions
346-293-7000

[changed - collect]

changed  252:20
255:9,17 308:19
311:20 312:1
336:13,14 459:20
460:1
changes  247:6,8
493:3,3
changing  410:24
chapter  248:8,14
characterization
423:24
characterizing
222:11
charge  239:1
244:10,19,19
275:20,24 276:2
318:10 335:23
charged  249:2,8
249:16 250:11
251:6 263:20
265:19 316:5
335:17,20 396:10
400:8 402:20
403:9,22 404:1
chargers  384:3,14
charges  285:17,21
300:4 315:24
charging  308:17
chat  398:16,17
chauffeur's
342:24
cheap  259:17
cheapest  328:4
445:23
check  468:13,14
468:15 477:13
checked  266:8
checking  221:2
224:7 228:4
cheerful  233:20,23

chief  268:3 456:14
choice  228:16
303:15 319:24
384:11 387:1
405:15 445:17
456:8,8
choices  315:9
choose  276:8
315:10 335:23
343:7 360:11
363:19 366:13
373:3,17 375:7
378:22 380:3
387:21 436:11
462:23
chose  295:11,16
343:25 352:24
354:3 360:5 363:5
364:5 366:1,3,15
368:4,9,17 369:4
371:17 372:1
373:13,21 374:16
375:3,19 376:9,11
376:24 377:3,11
377:17 378:1
379:21 380:14
383:17,24 405:3
436:13
chosen  342:5
361:13 383:6
chris  268:13
cities  255:9,18
261:14 342:20
389:12
city  233:2 242:5
248:6,7,13,22
249:6,8,14 252:21
253:20,24 274:2
279:17,19,20,22
280:3 281:10,14
283:9 290:13,21

300:24 301:2
308:8 337:17
342:12,23 344:3
353:8 365:19
371:5,12 373:10
435:6 437:17,25
464:13 467:25
469:23 472:17,21
475:14 482:3,11
482:23,24
claim  285:20,24
430:6
claimant  198:1
199:3 246:1,18
456:25 479:12,20
479:21 482:6
483:16 488:5
492:2
claimant's  201:17
213:1,3 232:15
255:1 263:10
265:4 289:1 293:4
293:5 306:21
320:11 331:3
334:8,18 371:15
381:2,3,7 388:12
395:16 399:9
404:12 406:5,9,25
428:6 431:10
436:16 439:1
440:16
claimed  225:7
265:22 286:1
claiming  285:17
300:4 375:20
claims  350:14
358:2 428:1
clarified  414:1
clarify  249:25
clarity  485:16

classified  262:6
clayton  375:18
cleaned  323:21
cleaning  285:23
285:24 286:1
323:6,20 324:2,5
324:10,13,18
clear  231:2 270:7
271:18,23 288:7
295:4 351:8
373:16 447:12
476:24 477:10
clearly  206:17
313:25 314:6
450:7 484:11
click  315:6 490:8
clicked  315:12
327:23 419:7
clicking  327:6
client  206:11,22
209:7,16 215:1,3
231:17 266:19
452:21 455:17
474:22 487:23
client's  217:9
269:13
clients  473:5,24
close  261:17 321:6
341:20 375:6
427:24 446:4
closed  339:22
340:2,4
closely  279:23
closing  339:24
clothes  384:20
clothing  425:7
coaching  233:7,10
code  384:24
470:11
collect  203:10
206:2 207:8

Veritext Legal Solutions
346-293-7000

[collect - conditions]

208:14,20 314:13
468:4 470:14
**collected** 205:19
206:24 207:9
209:2 211:24
212:12,16,20
267:19 423:3
424:6
**collecting** 203:25
205:13,19 207:4
208:4,7,10 211:13
211:21 212:9,23
**collection** 211:8
211:12 212:19
236:17,18,23
269:5
**collects** 203:7,14
203:16
**college** 273:15
344:5 345:6,10
**color** 327:19 478:3
**column** 334:11
440:21,22
**columns** 440:20
**come** 215:10
225:24 273:10
310:1,5 332:22
333:2 450:7 453:9
453:10 459:13,17
473:22 475:8
476:16,18 490:14
**comes** 208:19
213:19 228:3
335:8
**comfortable**
265:14
**coming** 237:18
238:20 345:11
351:3 400:12
403:2,4 439:15
444:1 452:9

**comment** 235:18
**comments** 448:21
**commercial**
303:18,19,22,23
303:24 342:22
365:16 367:25
372:9,13,16 432:2
432:3,14,15,16
437:18,21,25
438:1 460:25
469:1,6,7
**commercially**
304:9
**commission** 307:5
308:9 337:20
365:19 422:10
**commissions**
422:4
**commit** 284:16
299:9 336:18
**committed** 284:20
284:22
**committing** 225:7
**communicated**
262:10
**communicating**
254:13
**communication**
316:15 399:1,4,13
399:14 400:10
402:11 431:12
**communications**
260:5 381:4,5
**community** 282:1
286:18,19 287:1,5
288:8 289:3 290:7
293:12 296:21
298:5,10,15,18,21
298:25 310:16
322:11 354:21
355:15 356:7,9,13

356:15,17 357:2
361:11 390:18
436:23 465:25
478:11
**companies** 205:23
205:24 208:13
414:22 458:3,5
469:25 470:18
474:8 480:21
**company** 205:3,3
261:21 273:18,20
275:1,2,4,6,8,9
338:16,19 339:18
339:22,23 340:7
340:11,14 344:9
344:10 346:1,5,9
346:11 351:16
352:5,11,15,19
372:17 405:21
414:4,9 415:6
416:23 426:24
430:19 433:1
441:16,17 442:12
460:17 461:14,21
469:10 473:23
474:4,7 480:19,22
480:23 486:4,7,18
486:25
**company's** 487:1
**compared** 340:25
341:17
**comparison** 377:6
**compel** 270:13
**compensated**
310:21 312:23
313:4 314:1,6
317:7,8 319:6
**compete** 270:4
**competent** 270:10
**competitor** 210:19

**complained**
325:16
**complaining**
395:22
**complaints** 220:15
**complete** 267:13
267:20 276:23
285:6,9 286:3
299:20 300:7
301:20 338:8
407:18 465:7
468:14 485:13,17
**completed** 251:2
256:18 276:6
341:12,13,15,16
345:10 406:15
407:11,22 440:22
440:22 441:1
457:7 466:19
**completely** 340:11
376:24 411:21
**completion** 492:24
493:6
**complicated**
338:20
**comply** 476:5
**complying** 218:1
**component** 269:10
**compound** 305:12
**computer** 350:1
359:15,16,18,21
359:23 489:9
**computerized**
198:14
**concerns** 220:15
**conclude** 215:7,20
217:3
**conclusion** 438:12
487:20
**conditions** 216:6
316:19 317:4,9

Page 12

[conditions - correct]

462:14
**conduct** 210:12
  361:10
**conducted** 287:16
**conducting** 265:16
**confide** 269:12
**confidential**
  207:17,18 270:1
**confirm** 262:17
  307:3 319:11
  372:4 477:2
**confirmed** 328:11
**confused** 243:20
  253:5 316:11
**confusing** 311:19
**confusion** 269:3
  311:16
**congratulating**
  227:12
**connect** 208:17
**connected** 404:9
**connection** 463:19
**connects** 460:20
  460:21,24
**consent** 462:13
  468:10
**consequently**
  262:22
**consider** 487:14
  487:17 488:2
**considered** 344:14
**consist** 476:4
**consistent** 290:14
  291:20 294:7
  361:11
**consistently** 283:5
  291:24
**constantly** 284:10
  332:2,7
**constraints** 261:25
  369:19

**consumer** 460:23
**consumers** 460:21
  466:3
**contact** 301:17
  312:8,9 314:21
  322:9,12,19
  324:12 358:21,24
  369:8 466:14,17
**contacted** 303:13
  327:2
**contacting** 296:18
**contained** 416:10
**contains** 493:3
**contended** 271:17
**contentious**
  296:11
**context** 253:21
  265:25 266:15
**continue** 261:25
  265:17 274:16,20
  294:24 320:10
  323:15 345:17
  373:13 398:20,21
  405:20 455:18
  457:14 482:7
  484:25
**continued** 200:4
  201:21 323:17
**continues** 230:2
  281:19 291:2
**continuing** 202:8
**contract** 273:11
  339:16 351:21
  417:17 430:22
  433:5,7
**contractor** 218:4
  256:6 262:20
  414:16 415:11,13
  417:5 433:15
  434:7 441:21,23
  487:24

**contracts** 354:19
  484:15
**contractual** 431:2
  483:15 484:18
  485:5 487:13
**contradict** 232:12
**contrary** 232:8
**control** 214:11
  238:7 250:23
  275:19,23 276:1,4
  276:18,18 277:3
  483:15
**controlled** 352:15
**controlling** 207:23
**controls** 238:5
  307:23 317:24
**convenient** 320:3
  320:5
**conveniently**
  206:9
**conversation**
  450:17
**coordinate** 208:21
**copies** 216:19
**copy** 359:18 434:4
  488:24,25 489:5,8
  492:18
**corner** 226:16
  375:17
**corp** 490:3,4
**corporate** 205:2
  206:5 212:11
  214:2 220:14
  249:12 252:11
  267:18 269:7
  270:19 331:7
  452:20 458:16
  484:15
**correct** 203:14,17
  206:24 209:13,17
  213:9 214:5 216:8

216:12,16 217:21
218:6 223:10
224:25 225:20
226:8,13 227:3
228:8,13,17
229:13,25 230:21
230:25 231:15
233:3,14 236:7,10
236:19,24 238:5
239:7 242:2 244:4
245:7,12 246:13
250:13 252:21
255:19 257:7,10
257:11,13,14,18
257:21,22,24
258:19 259:5,11
259:20 260:1,7,12
260:13,15,23
261:3,6 267:14
293:24 328:21
331:9 346:7,20,22
346:25 347:6,15
347:23 348:8
349:16,17 350:4
351:14,17 353:2,3
353:19 363:11,20
364:13 365:6,20
368:11,15,18,22
370:11 372:1,19
372:25 375:2,23
376:18 377:1
378:25 379:7,10
380:5,23 386:18
386:21 390:1,16
399:16,23 400:1
400:13 401:2,12
401:21,24 403:10
403:17,24 404:8
404:11,18 405:13
406:1 411:3
412:11,20,23

[correct - dainius]

413:11 416:10,18
417:15,20,21
419:17,24 420:15
420:23 421:2,5,10
421:25 423:3
426:20 427:9,21
427:23 429:21,22
432:11,12 443:22
444:14 446:8
466:25 467:5
479:3,19 486:20
**corrected** 332:5
**correctly** 202:1
215:9 264:1
318:14 473:3
**correspondence**
322:25 324:25
436:16,19
**corridan** 199:17
322:17 422:8
**cost** 321:3,8
371:24,25 385:17
**counsel** 206:16
214:24 231:10,12
231:14,25 241:6
242:19 248:20
250:7 264:8,21
356:20 357:12
363:22 365:22
434:17 435:12
436:22 438:4
439:5 448:22
455:2 456:22
470:21 491:6
493:1,7
**counsel's** 289:14
447:7
**count** 305:18,19
**counting** 483:20
**countries** 234:23
235:21 261:13

**country** 226:9
235:15 273:21
311:12 381:15
482:15
**couple** 203:9,10
204:1 214:13
289:10 337:23,24
341:21 353:10
409:22 444:21
464:6,10 473:22
477:14 486:6
489:14
**course** 302:20
317:5 319:16
333:2 343:1 369:1
408:11 445:20
448:14
**courses** 393:6
**court** 243:4
454:12 491:3
**cover** 268:19
346:3 413:6
430:13
**covered** 330:20
331:6 346:4
356:20 392:18
431:13 434:16
**covid** 262:1
489:13
**create** 296:10
365:4
**created** 270:16
337:15 386:16
406:13
**creating** 285:11
300:1
**credence** 272:10
**credibility** 241:3,5
269:21,22 271:6
272:9

**credible** 271:7
**credit** 422:18,21
422:24 423:20
424:4,23 462:13
**critical** 282:21
295:6
**cross** 210:6 251:21
268:8,9 270:18
271:5 351:7
450:21 451:14
453:1,5,18,23
455:17 456:24
**crowded** 332:18
332:21 336:10
398:4
**crucial** 453:3,3
**cruise** 379:25
**csr** 493:16,16
**cumulative** 392:16
**cunningham**
455:6
**cups** 323:4,14
**current** 308:10
327:9 458:25
**currently** 263:19
273:19,19 334:23
396:9 400:2 415:4
**cursed** 361:3
**customer** 277:14
277:16,20,21,24
279:9 306:11,13
314:13 316:18
317:6,9,14 318:23
319:3 320:21
325:12,14,18
326:11,13 335:6,8
335:12,14,17,20
335:24 337:16,18
396:21 412:11,15
412:18,21,22,24
442:22 443:1,6

485:23,25 486:2,3
486:11,15,22,24
487:3,8,9
**customer's** 310:18
**customers** 277:22
279:7 300:12
323:12 396:18
412:9,19 413:8
428:4 488:2
**cut** 268:24
**cuts** 269:21 271:18
**cutting** 474:22
**cycle** 346:18
**cyclecentralpark...**
346:21

**d**

**d** 199:10
**daily** 208:5 251:1
332:15
**dainius** 198:1
199:18 200:5
220:5 221:17,23
222:22 223:13
224:8,12 225:7,19
226:2,11,20,24
227:9 228:4,11,15
228:23 229:8,10
229:18 230:5,10
230:12 231:5
244:6,16 245:4,15
246:6,21,21 247:9
247:15 250:10
251:14 252:8,12
256:5 257:6,15
258:2,3,10 265:21
266:2,6,10,13
267:6 272:15,21
273:1,2 278:11,16
292:16 298:4
308:11 313:10
320:13 323:24

Page 14

[dainius - deliberately]

421:3 427:19
433:23 436:1
492:2
**damage** 321:24
322:1,5,10 324:2
**damaged** 320:15
320:25
**damages** 448:13
**damaging** 358:19
466:14
**dangerous** 316:18
**dash** 325:7
**data** 202:25
203:16 205:14
206:23 207:4,25
208:4,7,14,19,21
208:21,25 209:2
211:8,23 212:5,10
212:13,15,20,23
218:23 219:7,7,14
219:18 241:20
268:17 269:5,6,13
269:13 271:14,15
271:16 363:16
**database** 206:3
**databases** 208:20
208:22
**date** 202:4 232:2
265:10 297:18
316:9 327:25
339:14 381:24
399:1 409:16
444:6,16 493:2
**dated** 399:4
**day** 198:7,10,11
223:18 227:6
236:12 244:13
247:18,21 248:2
261:12 266:5
267:4 276:20,22
276:23,25 280:22

292:7,8 316:12
349:11 377:2,4
379:22 389:24
390:14 392:1
423:5 445:22
446:1,2 456:9
464:8 484:5,12,20
484:22 491:4,12
492:8,14 493:12
**days** 220:8 223:24
224:8,22 225:6
277:11 317:1
377:3 379:9
380:10,12 479:17
493:1,1
**db** 337:6,8 338:13
338:18,24 346:2
346:17,25 347:5
347:22 348:2,7,13
348:18 349:20
350:3,18 351:13
352:3,14 372:17
420:21 421:1,8
426:17,24 480:25
**dc** 442:15
**deactivate** 284:13
286:25 302:2
**deactivated** 229:2
280:8,16 281:7,20
282:5 283:18
284:22 291:11
295:2,14,16
301:14 330:1
355:1,11 358:7,8
358:18,24 359:4
390:20 391:24
392:9,24 393:21
440:11
**deactivation** 214:8
216:7 278:19
279:16,24 280:11

280:13 281:10
282:23 284:12,25
286:17,24 287:7
290:5,15,24
291:21 292:19
293:2 296:7
298:16 354:21
359:8 362:21,24
391:23 392:17
**deadline** 488:17
**dealership** 273:22
273:22 321:2,10
**dealerships**
273:22,23
**dealing** 243:21
**dear** 432:25
**death** 219:22
222:17 331:22
402:7
**debit** 462:12
**deborah** 199:16
**december** 261:9
289:6 442:7
**decide** 295:17
358:10 378:2
380:11 382:7
450:11 479:17
**decided** 209:11
229:19 271:13
273:9,13 294:17
322:4 339:25
340:10 371:1
373:24 382:16
411:17 452:21
482:6
**decision** 209:14
217:21,23 223:9
223:12,14,19
224:9 228:8
230:16,16 237:25
244:2,4 353:4,16

353:17 360:6,19
363:10 365:8
366:7,11,13 369:8
370:24 371:5
374:5,17 376:2
383:8 384:18
386:14 413:25
446:7 459:8
**decisions** 272:10
**declared** 416:9
419:15
**decline** 254:17
256:8 257:1
291:24
**declines** 247:9
**declining** 283:8
**dedicated** 348:9
348:13,18 349:15
**deducted** 425:14
425:17
**deduction** 420:1
422:2,4 425:3,6
**deem** 448:14
**deep** 459:16
**defect** 369:15
**defense** 272:20
**define** 481:9
**defined** 481:14
486:4
**definitely** 307:3
314:23 329:12
341:9 409:22
**definition** 249:10
481:6 482:1 486:9
486:11,15
**definitions** 471:7
**degree** 273:15
344:5 345:6
**delay** 450:14
**deliberately** 285:1
299:14

**[deliver - discretion]**

**deliver** 460:22
**delivered** 492:16
**deliveries** 300:13
**delivering** 273:21
**delivery** 256:18
299:19 300:25
383:7 416:24
426:21 459:7
460:21,22 466:2,3
**delve** 269:7
**demand** 237:10,13
239:2,6,7,9 241:18
242:4 243:24
322:10 324:13
379:5,6 433:15
**demanded** 324:18
**demands** 239:3
310:18 389:25
**demonstrate**
207:23 239:21
448:17
**demonstrative**
406:11 407:1
440:17
**denial** 433:14
**denied** 241:21,22
258:5 270:15
**deny** 258:12
262:17
**department** 230:6
**depend** 380:2
**depending** 342:23
437:17
**depends** 318:19
335:18 398:2
475:13
**deponent** 492:22
492:23 493:5
**depose** 271:9
452:7,25

**deposed** 447:25
**deposing** 206:4
**deposition** 253:16
348:24 349:1,10
355:21 360:17
362:3 392:4
393:14 408:14,22
409:10 410:5,10
413:23 441:7,24
443:19,22 444:11
492:24 493:6
**depositions** 452:6
**depreciation**
367:10
**depth** 211:19
**described** 208:11
345:23
**describes** 478:18
482:21
**deserved** 448:15
**design** 387:1
**designed** 385:9,10
385:11 387:5
**desire** 292:8,10
**destination** 263:14
305:23 306:5
313:14 314:4
378:8 478:3
**destroy** 423:22
**destroyed** 423:24
**detail** 410:5,8
445:25
**details** 263:15
266:1,15,18
318:21 323:1
**detect** 211:9
**detected** 213:12
333:16
**detects** 211:17
**determination**
209:3

**determine** 265:17
483:12 487:4
**determined** 221:4
221:5,5,7 324:9
361:10 364:8
373:25 376:3
475:15
**determining**
448:13
**develop** 258:19,24
259:1 276:12
**developer** 205:22
208:13,18
**developing** 259:3
461:15
**development**
259:10 458:20
**device** 205:20
207:8 208:9,14,15
211:14,16
**devices** 208:16
**dictate** 275:16
**difference** 342:17
415:5 469:14
470:24 471:1,6,25
472:1,3 475:4
**differences** 470:2
**different** 204:8
220:17 234:15
235:15 248:12
264:3 273:17
274:1,2 306:25
308:6 310:18
311:11 314:16
315:10,12 316:14
343:19 346:14
352:12 364:12
376:24 399:7
446:11 459:18
461:24 462:21
463:5 469:1,11,18

469:23 470:3,3
471:7,18 472:9
474:5,5 481:18,25
490:4,5
**differently** 240:4
393:14
**difficulties** 406:8
**difficulty** 406:7
**digital** 268:20
460:18,19 477:2
**digitally** 218:5
**diligently** 243:11
**dip** 306:20
**diploma** 273:16
**direct** 246:22
392:18 456:24
**directed** 337:18
**direction** 463:2,4
**directionally**
260:13 261:16
**directions** 387:16
388:3
**directly** 268:24
314:10 322:9
324:14,22 391:5
391:16
**director** 249:1,16
251:5 457:25
458:1,23 475:15
**disability** 478:5
**disabling** 333:18
**disagree** 241:12
348:22
**disaster** 350:19
351:17
**discover** 417:24
**discovery** 272:5
415:20 416:18
417:23 418:20
**discretion** 209:15
301:18,23,25

[discretion - driver]

380:8 411:21
485:13
**discriminating**
467:7 478:2
**discuss** 434:16
454:15 491:4
**discussed** 223:19
237:1 254:9 272:1
288:15 388:2
399:10
**discussing** 251:12
**discussion** 201:11
201:14 265:7
355:5 441:3
**discussions** 226:25
231:10,12
**display** 239:8
**displayed** 369:2
**dispose** 424:3
**disposed** 424:6
**dispute** 262:17
**disregarding**
266:24
**distance** 247:1,3,7
247:12,20 275:23
285:1 299:15
307:19,20 309:4
309:12,14,23
311:18 313:21
335:9
**division** 469:13
472:1
**doctor** 257:7
273:16 380:8
**doctor's** 380:6
**document** 203:21
203:22,22 215:5
215:16 221:22
231:8 240:8
241:19 249:14,24
250:2,6 251:9

278:12,17,18,21
278:22 279:12
289:2,4 291:17
292:12 293:6,8
296:12 297:8,8
298:4,6,8,12,13
305:1 306:23,25
312:13 314:16
359:10,12 388:20
406:24 407:3
439:3 484:3 485:1
485:6
**documentary**
239:21 240:2
**documentation**
468:3
**documents** 202:19
240:13,23,25
241:14,21 245:25
258:1,7,9 302:6
327:8 328:12
329:19 334:7
397:20 398:18
437:6 470:15
484:5,13
**doing** 201:24
203:24 215:13
225:23 269:3,3
274:24 289:18
302:19 311:23
312:21 329:17
333:25 338:16
339:8 390:11
404:4 415:4 455:8
471:3,4
**dollar** 423:15
**dollars** 246:4
259:4,9,19,24
353:10 445:21
446:4

**domain** 346:19,21
**dominic** 265:13
**don** 199:15 394:7
477:15 478:13
480:11 482:19
**door** 476:14
**doors** 477:21
**double** 266:21
**doubt** 240:13
242:20 359:24,24
360:1
**doubted** 242:20
**download** 359:18
462:8 467:22
**downloaded**
359:21
**downside** 343:2
**dr** 448:11 454:23
456:11 457:11
**drafted** 481:21,22
**drawbacks** 473:19
**drawing** 477:17
**drawn** 271:23
**dress** 384:18,20,24
**drive** 244:8 273:20
274:9,16,20
301:24 304:6,18
304:22 330:18
340:22 344:1
352:4 378:1 379:1
379:8 435:16
436:11 437:12,14
437:21 438:1
472:9,10 475:5
482:24
**driven** 244:18
490:16,19
**driver** 203:6,12
204:5,16 208:24
213:25 217:2
218:3,23 219:20

222:6,9,13 224:19
224:25 228:12
232:6,12,25 233:9
233:12,19 238:2,6
238:7,11,14,16,23
239:1 242:1
248:22 249:6,10
249:15 251:19
252:4 254:16
256:22,23,24
259:19,25 260:7
260:12 261:25
263:14 265:10
279:10,13 280:25
281:1,16 282:9
285:12 286:25
289:25 290:5
293:16 297:3
299:1 301:12
303:20,22 315:9
315:11 318:11,12
318:14 319:21
331:20 335:15
343:1 347:15
353:1,16,21,24
354:3,6 357:8
360:6,13 363:8,18
364:12 365:5
368:3 370:25
374:16 378:7
380:4 387:14
391:20 394:15
405:4 407:15,22
408:2,2,6,7 413:10
414:1 427:1
432:14,15 434:3
436:11,12 439:10
440:11 462:19
463:19 464:19,20
465:15 466:14,17
466:18 467:15,15

Veritext Legal Solutions
346-293-7000

[driver - eight]

467:20 468:6,9,10
468:12,13,16
469:8,9 471:17
472:24 473:5,15
473:21 474:10
475:6,6,7,7,8,9,9
475:10 476:23,25
477:20 478:2
480:22 482:4,8,22
483:13,16,18
485:13 487:11
489:1,21 490:10
490:19,24
**driver's** 204:18
205:20 207:7
208:14 211:14
213:23 236:16
265:16 266:8
303:18,19,22,23
304:24 327:10
437:21 467:17
468:5 477:4
**drivers** 203:17,23
203:24 204:11,20
207:23 208:4,10
210:18 211:3,10
212:8,13 217:24
226:11,14 231:5
233:22 236:9
237:18,19,22
238:5,11,15,20
239:6,8 242:2,8,8
242:11,12 243:2,3
243:25 251:14
253:24 254:14,18
260:6 262:5,11,13
266:21,23 267:1
279:4,7 281:12
283:9 284:11
286:7,16 289:8
296:24 298:16

300:25 335:24
337:24 338:6
357:3,19,23 358:6
359:4 373:3
389:25 390:24
396:18,20 413:6
439:17 459:7
460:11 461:17
463:6 464:1,18,22
464:23 465:1,2,7
465:12,15 466:1
467:8,19 468:22
468:24,25 469:4
469:24 470:5,6,8
470:13,15 471:8
472:2,2,8,9,12
473:12,20 474:3,6
474:10 475:4,11
475:17 476:11
477:2 478:20,23
479:9 480:9,15
482:24 485:23,25
486:22,23,24,25
487:1,3,14,17
488:10 489:21
**drives** 250:25
344:11
**driving** 206:22
224:14 245:15,21
250:11 252:8,12
273:18 274:7,8,23
274:25 275:20,24
276:2 278:24
294:25 297:20,22
297:25 298:19
303:24 318:2
323:17 340:18
350:15 352:2,6
362:9 364:6,7
368:16 390:3
434:21,22 435:1,7

435:23 436:3
471:2,2
**drop** 217:18 219:6
221:10,14 223:13
228:12,17 229:19
331:13
**dropped** 445:9
**dropping** 377:12
**drove** 210:19
244:14 258:2
281:5,14,23
282:11 284:17
286:12 288:11,18
291:6 301:5 302:2
338:5 340:21,25
340:25 342:1
368:21 425:23
441:25 442:19
445:8,13
**drunk** 323:2,12
**dsk** 275:9 338:17
340:15,19 414:4,8
414:9,15,17,21
**due** 253:11 310:19
310:19 393:2
**duly** 201:20
272:22 457:18
**dummy** 285:11
300:1
**duties** 458:2 476:6

### e

**e** 199:8,13 216:15
220:8 224:1,2,3,4
224:6,11 227:11
227:23 228:8
230:16 231:8
246:21 250:7
260:5 265:25
288:14 331:7,10
339:10,16 364:13
365:1,4 379:4

381:10 386:19,20
398:24 462:11
465:2 467:25
**earlier** 247:2
260:14 263:22
331:6 354:20,24
355:2,8,12 357:24
359:9 381:6
387:25 395:20
404:19 414:21
431:16 432:8
445:2 461:9
473:14 491:9
**early** 268:9
**earn** 254:18
256:18 333:2
378:19 391:6,16
391:20 415:16
**earning** 252:19
253:18
**earnings** 219:21
222:16 254:1,3
255:4,8,16,25
256:2 309:3,10
315:22 329:15
331:21,24
**easier** 253:13
387:4
**easiest** 254:18
**easy** 368:13
**eats** 256:20 383:11
383:14 466:3
**economic** 268:15
350:19 351:16
**economist** 454:23
**ecosystem** 458:5
**effect** 247:25
**effectively** 270:17
**efforts** 458:19,20
**eight** 375:21
477:22

Veritext Legal Solutions
346-293-7000

[either - examination]

either  216:23
242:14 258:4,12
306:12 311:21
370:22 373:18
390:6 393:3
406:20 412:9
417:4 448:25
450:10 453:14
electrician  257:17
electronic  203:22
electronically
236:6
elicit  448:16
eligible  217:17
327:4,25 331:12
366:6
elite  364:22
employ  323:4
461:17
employed  257:21
339:6 375:16
493:8
employee  218:4
262:20 268:11
411:4 415:9 417:4
434:8,9 441:20
465:4 487:23
employees  228:2
261:10 262:6,6,12
461:6 465:10,11
487:15
employment  337:4
420:2 485:15
enable  460:18
enabled  461:3
482:4
enables  474:7
enabling  205:23
enacted  481:23
encourage  237:19
238:11,15

encouraged
246:22
ended  390:10
ends  255:2 270:21
enforce  431:4,7
enforcement
265:23
engage  226:24
246:22 485:14,18
engaged  215:1,8
215:21 438:9
engaging  208:25
209:7 214:4 215:3
215:16,24 219:16
engineer  211:18
273:16 336:17
engineers  260:10
461:7,12,15
enjoyable  356:25
enjoyed  459:4
ensure  464:19
enter  277:9 425:24
462:9,12 463:16
467:23 468:22
469:8,10 480:10
480:15,21 488:12
entered  265:6
306:13 480:19,25
489:22
entering  468:19
enters  480:23
486:5,7
enticed  435:16
entire  341:7 386:9
446:1
entities  415:17
462:14 463:17
entitled  325:1
433:14
entity  244:2
337:11 338:25

339:3 490:2
entrepreneur
434:24
entrepreneurial
345:20,24 346:15
434:19
equipment  349:24
eric  199:4
erroneously
328:10 330:23
errors  448:12
escalate  222:2
327:10 331:17
escalated  220:6,16
220:25
especially  270:18
270:19 338:10
esq  199:4,4,5,5,10
199:10,11
essentially  208:17
271:1
established  414:10
472:21
estate  261:1
estimate  306:1
313:14 314:3
321:1,4,8,9 322:20
464:12
estimated  245:11
et  224:3 396:20
459:8 490:4
et.uber.com.
224:1
eta  245:16
europe  273:3
evaluate  272:8
eve  390:9
evening  464:8
event  433:14
eventually  242:16
367:1

everybody  201:1
332:14,17
everyone's  385:23
evidence  205:1
206:14 214:3,23
214:25 215:23,24
216:23 218:22
219:15 232:7,11
234:7,10 239:21
240:2 241:19
257:6,9,12,15,19
263:23 270:10
272:7 289:11
293:6 297:13
347:18 407:1,2,3
423:19,22,24
449:3 452:9,9,14
452:20,24 453:17
453:19 454:1
exact  202:4 218:11
218:16 224:4
264:2 279:25
306:7,9 335:1
399:14,18 401:3,8
401:11
exactly  204:17
205:18 206:1
210:7 212:10
221:18 235:23
246:15 251:8
274:15 367:19
377:2 397:4
409:16 410:13
423:5 424:25
443:9
examination  200:4
200:6,6,7,7,10
201:21 210:6
268:8,9 272:23
344:21 351:7
433:22 443:17

Veritext Legal Solutions
346-293-7000

[examination - fashion]

450:21 453:18,23
457:19
**examine** 270:18
451:14 453:5
**examined** 271:5
453:1 455:17
**example** 202:24
208:23 232:5
238:10 239:16
342:24 346:17
396:17 473:10
**exceed** 281:19
291:2
**exceeds** 389:25
**excellent** 222:9,11
222:12 224:19,24
227:7,12 313:11
**exchange** 273:9
398:25 431:12
**exclude** 448:25
449:16
**excluded** 214:23
215:23
**excluding** 315:22
**excuse** 242:13
**execs** 269:20
**executed** 354:19
**exemplary** 230:8
**exercised** 235:12
235:13
**exhibit** 213:1,3
278:10 289:2
296:19,20 297:14
297:16 320:11
322:24 334:19
347:12,17 355:18
359:7 371:16,16
371:23 372:12
381:2,3,7 385:5
388:12 389:21
395:17 398:23

399:8,8,9,15
404:13 406:5,10
406:11 407:1
415:19 417:22
418:18 419:3
420:7,7 426:6,9
427:14 428:6
431:10 433:24
436:16 440:16
443:25 450:1
451:12 463:7,14
465:21,23 466:20
475:19 478:13
479:7 480:8,12,20
481:5 482:20
**exhibits** 388:1
439:4
**exist** 262:12 461:4
**existed** 230:24
**existence** 409:1
**expectation**
450:19
**expected** 261:24
379:5 452:18
**expenses** 283:24
373:21 425:14
**expensive** 302:21
342:14,16,25
364:2 446:12
**experience** 234:1
261:25 265:14
303:24 313:11
459:4
**experiencing**
261:24
**expert** 215:25
446:19 447:3
448:4,11 450:3,6
450:18,20 451:3,4
451:12,13,14
452:1,1,16,18

453:9,16,17,19,20
453:22,24 454:1,6
454:7,22 455:5
456:11,25 471:21
484:17
**expert's** 428:8
450:22 452:3
454:10
**experts** 447:10,14
447:25 448:9,10
449:16,17 452:7
453:1
**expiration** 493:17
**explain** 211:15
245:20,23 254:1
255:25 280:21
311:3 452:2
469:15 480:7
**explained** 327:5
**explored** 241:11
**exploring** 296:10
**extent** 338:12
482:22
**extra** 364:4,6
386:13

## f

**f** 492:22
**facebook** 268:14
**faceless** 268:22
**fact** 269:15 317:7
343:22 352:5,6
354:24 360:16
380:20 382:25
390:9 410:10
432:9
**factors** 262:15,25
**facts** 289:11
**factual** 268:24
**fair** 429:10
**fairly** 471:5

**falls** 233:2 280:6
280:14
**false** 285:23,24
286:1
**falsified** 286:3
300:8
**familiar** 209:19,22
210:8,10,11
211:17 239:19
307:6 344:3,4
359:10 381:10
388:10 399:9
415:23 460:10
475:23 476:1,3
**family** 219:21
222:16 284:1
331:21 378:3
**fancy** 343:13
**far** 201:12 202:16
215:19 238:13
241:5 261:11
298:12 341:15
456:14
**fare** 236:24 245:17
247:7 251:3
253:25 255:23,24
255:24 275:20,24
276:1 306:1,25
307:10,16 308:6
309:3,11,13,14,22
312:5 313:1,13,17
314:9,17 315:11
316:14 320:14
**fares** 248:18 249:1
249:7,16 250:10
250:24 251:6,13
287:25 307:23
311:4 342:25
**farther** 286:17
**fashion** 343:20

Page 20

[fass - force]

fass  199:6
fast  216:13
faster  426:7
favorite  353:20
fbi  209:23 210:10
  210:12
fear  449:21
feature  244:6
  245:1,2 378:8,22
  388:8 394:16
february  230:3,4
  230:4
federal  304:12
fee  236:19,20,20
  285:25 307:11
  309:25 310:8
  311:3,4,16,20
  312:1 315:15,21
  315:23 316:4
  317:12,19,21,25
  318:8,10,12,13,15
  318:16,19,22
  319:5,8,15,17,21
  321:19 324:5,10
  324:18 335:18,21
  404:15,21 432:10
  446:14 471:13
  474:11,12 475:3,5
  475:8,9,10
feedback  267:11
  357:6
feel  312:25 325:1,5
  455:22 456:1
fees  285:17,20,23
  286:1 300:4
  315:23 317:17
  318:3,6 324:2
  422:5,10,14,18,21
  423:2,20 424:4
  474:9 490:9,9

feet  304:15
fellow  466:17,18
felt  325:5,5 326:10
  361:5 371:6 374:2
  390:11
fewer  373:7
  390:25
fight  241:3
figure  203:19
  204:14 227:1
  387:15
figured  343:14
file  249:1,7,15
  250:10 419:10,15
filed  270:13 420:9
  420:24
filing  427:16
filings  304:13
  348:1
fill  337:4
filter  378:9
final  216:15 223:6
  223:9,14,20 224:9
  228:8 230:16,17
  265:11 297:15
finally  389:9
financed  366:23
financial  262:24
  477:6,7,9
financially  343:14
  493:10
find  204:17 205:11
  207:1 221:19
  240:6 264:16
  303:15 339:15
  367:22 398:6
finding  370:9
fine  214:12 320:3
  448:1
finish  310:4
  427:25 456:23

457:9
firearms  467:3
firm  369:9 370:9
  493:20
first  203:20
  212:18,20 213:20
  215:4,15 216:18
  220:2,9 224:12
  227:2 236:12
  238:22 240:21
  243:18 247:18,21
  248:12 249:5
  250:9,11 251:18
  252:3 256:22
  266:10 267:8
  271:25 272:22
  279:2 304:22
  306:21 330:14
  350:8 353:24
  386:25 388:24
  407:10,14 416:17
  418:2 427:22
  431:25 434:19,21
  436:2 439:19
  443:25 447:15
  459:5,15 481:15
  486:5,6,10,12,13
five  220:8 263:4
  319:2 335:6
  361:17 375:25
  398:14 404:17
  430:15 445:11,14
  454:17,19 472:20
fix  369:11
fixed  369:14,15
flag  214:1
flagged  213:21,23
  229:12
flashing  305:4
flavor  263:12

fleet  473:8 474:4
flexibility  244:9
  256:23
flip  278:20 293:22
  299:4 387:2
  428:12
flipped  474:19
flow  355:7 468:23
flows  262:24
fluctuating  248:2
  248:4
fluid  247:23
fmc  340:7
focus  358:17 399:1
  432:19 461:25
  470:5 479:4 483:3
  483:5
folks  447:8
follow  220:8
  267:12 281:25
  286:22 287:1,5
  288:20,24 298:13
  298:14,16 300:16
  300:20 301:9
  417:2 436:23
  479:10 482:22
followed  279:23
  286:14 297:9
  338:21 410:14
  434:2
following  263:15
  301:11 395:25
  396:5 433:13
  492:13
follows  201:20
  229:15 272:22
  457:18
food  377:24
  460:23
force  224:5

Veritext Legal Solutions
346-293-7000

[forced - given]

**forced** 266:21
311:13 320:23
**forces** 237:1,3
247:4,12
**forcing** 354:6
**foregoing** 492:14
**foreman** 198:13
214:18 492:11
493:16
**forget** 204:6
353:10 434:2
**forgot** 367:11
369:13 393:10
424:25 468:12
**form** 250:6 269:6
275:12 315:3
340:11
**format** 264:17,19
**formed** 337:8
338:17 340:14,16
340:19
**former** 434:3
**fort** 493:19
**forth** 411:11,14
431:21 483:3
**forward** 216:13
217:18 223:24
228:22 230:6
332:9 450:22
451:16 456:11,22
457:14
**found** 212:8
252:19 302:14,21
302:24 303:1
312:4 327:6
330:24 377:23
442:13
**foundation** 202:17
210:21 239:25
272:3 309:15,18
313:5 329:1 350:7

484:19
**founder** 268:14
**four** 319:2 332:23
341:3,18,18
375:25 384:5
445:11,14 476:14
477:20
**fraction** 464:7
**frame** 297:25
**framework**
475:23
**frameworks** 476:2
**fraud** 208:25
209:8 214:1,4
215:1,4,8,17,21,24
219:16 225:7
241:22 263:23
284:7,8,10,20,21
292:21 295:25
296:2 299:5,9,12
336:18 359:4
362:22
**fraudulent** 213:12
216:5 284:8,14,16
285:12,17,20
286:3 299:15,24
300:1,4,7 333:16
333:18 336:22,24
467:12
**frcp** 492:21
**free** 282:15
**freedom** 228:12
244:9 256:23
291:7 322:18
435:10
**freely** 282:7
**freight** 460:24
**frequent** 451:23
**fresh** 248:2
**friday** 266:5

**friend** 337:12
**friend's** 337:19
**friendly** 478:18
479:2,10
**front** 218:7,16
231:1 240:16,17
240:22 262:16
263:1 265:3 331:5
417:7
**frustrating** 318:25
**full** 255:15 268:10
279:1 300:22
308:16 311:23
351:20,22
**fully** 452:18
**function** 238:4
278:2,5
**fund** 422:16
**fundamentally**
262:21
**funds** 350:3,10,13
352:14
**further** 200:7,7
209:3 223:10,20
230:17 269:23
272:13 433:22
443:15,17 444:20
492:21 493:7,10
**furtherance**
259:25
**future** 268:21
326:17

**g**

**gained** 453:2
**gaining** 243:10
**games** 376:19
438:6,20
**gamesmanship**
447:13
**gaming** 284:11

**garcia** 199:6
**gas** 376:11
**gather** 267:13
**gathered** 206:9
**gears** 257:3 363:3
**general** 297:25
392:2
**generalities**
229:24
**generally** 262:2
360:19 382:15
460:15 475:22
480:7
**generated** 386:7
386:13
**generation** 413:9
**generic** 224:3
**genesis** 222:24
223:17
**gentleman's** 241:5
**geo** 209:8 263:24
269:9,9
**george** 396:19
**gestures** 466:16
**getting** 207:12
209:11 217:6
229:1,5 238:25
288:14 296:6
305:2 319:23
329:4 427:24
**gilbert** 251:24
**girl** 273:10
**give** 233:7 253:10
271:12 272:8,10
287:12 307:18
328:9 337:22
360:6,11 361:4,9
361:13 384:15
405:1 465:11,19
**given** 219:13
270:19 276:25

Page 22

[given - gotten]

279:8,9 280:15,22
283:13 305:17,23
306:1,4,7,10,13,16
310:9 315:9
331:18 335:22
354:25 355:10
440:14 469:4
**giving**   303:5 465:6
**gleaned**   267:18
**glitch**   336:12
**globally**   261:10
**gmail.com**   364:23
**go**   202:16 203:13
203:13 204:9
206:23 207:24
208:13 213:1
215:18 216:13
217:15 220:1,1
221:1,22 222:21
223:24 225:11
226:3,12,14,15
227:5,20 228:3,22
229:9 232:22
233:5 237:15,15
237:19,19 238:11
238:15,16 242:9
243:20,22 244:7
248:16 250:16
253:7 254:8
255:13,21 256:13
263:5 265:20
269:23 270:3
277:7 279:2 280:5
283:10 286:5
287:9 288:7 289:4
289:7,11 292:12
293:5,11 295:3,19
296:6,20 300:10
300:21 301:15
304:14 305:15
306:21 308:1,5

310:22 311:13
312:3,7,9,11
314:15 315:8
319:3,9,25 321:11
323:22 326:4
327:1 328:5
329:21 331:15
332:1 333:15
334:10,13 337:17
339:17 340:11
346:2 354:7 355:6
356:18,19 357:13
359:3 362:3 364:5
367:21,22 372:3
375:19 376:24
379:6 380:7
387:16 389:21
393:18 395:16
396:14 398:13
402:7,8,24 416:14
416:15,20 417:10
417:12,22 418:3,9
418:21 419:6,12
420:25 422:1
425:2 426:16
427:18 428:10,11
431:11,13,23
432:18 434:15
441:8 442:2
444:13 446:20
448:4 449:17
450:22 451:6
453:15 454:8,11
454:25 457:13
459:5 461:1 462:6
463:21 464:3,4,16
467:21 468:17
471:10,12,15
473:24 474:2,20
475:19 476:24
477:10,15,23

478:6 482:15
483:2,4 484:6
485:22 486:12
488:7 489:10,19
490:21,22
**goal**   276:23
**goes**   214:10
237:10 241:9
263:17 298:12
308:3 311:15
334:21 338:19
389:24 396:2,7
399:22 417:23
438:13
**going**   213:4
218:25 221:20
235:6 237:23
238:10 241:4,8
242:16,18,19,19
242:21 243:7
244:8,9 245:17
247:13 250:15,24
250:24 253:7,10
253:19 256:5,23
263:10,12 266:14
270:3 271:20
272:17 289:9,13
289:17,18,19
298:7 306:20
309:8 318:5
320:22 322:4,23
327:7 331:3,4
335:9 337:2
343:15,16 344:22
345:2 346:2
350:24 351:25
353:12 354:8
355:6 356:2,4,19
358:1 362:3 363:3
363:24 366:8,10
370:9 377:9 381:4

381:18,20 387:25
388:11,25 393:18
393:19,23 395:17
395:18,18,19
396:24 399:7,8
402:25 403:14,22
403:22 404:13
405:1 406:9,22
419:6 425:2 426:7
428:7,11,12,14
431:13 432:19
434:15 436:2,8,11
436:19 440:18
445:4 447:2,4,19
449:22,23 450:14
451:16 453:16
454:4 456:6,10,15
456:22 461:25
463:2,3 474:20
480:3 482:16,16
483:20 484:6,18
484:25 486:21
487:24 491:6,11
**good**   201:1,22,24
233:17 243:15
271:23 294:5
313:24 327:22
345:1 383:18,21
383:23 397:7
398:7 409:15
410:20 447:1
455:25 457:20
**goods**   460:25
**google**   205:21,22
206:5 207:7,10
208:12,18 337:15
462:7 467:22
**gotten**   271:11
324:19 362:8
472:6

Veritext Legal Solutions
346-293-7000

[govern - hey]

**govern** 469:3
**gps** 203:8,14,25
204:6,6,12 205:13
206:2,10,23 207:8
207:25 208:4,10
208:19,21 211:8
211:12 219:7
229:2,5 241:20
269:5,6,13 271:14
271:15,16 286:7,9
286:15,15 306:12
333:17
**grab** 240:7 251:18
252:4 258:15
**grabs** 258:8
**gradually** 212:14
**graduate** 345:7
**graduated** 345:12
345:13
**gratuitous** 244:20
448:22
**great** 220:3 345:1
454:15 467:2
**greater** 315:22
**greenlight** 225:25
226:3,6,8,17,21
227:3 260:15,18
260:23,25 310:23
311:9,13 312:10
312:10 329:14
489:10,12
**grocery** 460:23
**gross** 421:17
427:11
**group** 240:9 381:5
**groups** 262:13
**grow** 474:8
**grown** 460:5
**guarantee** 276:24
435:9,15 436:8
463:20

**guaranteed**
251:13 254:2,15
256:1,7,15 342:12
361:8 463:19
**guaranteeing**
353:9
**guess** 258:6
264:16 277:14
336:16 348:15
349:22 388:16,17
397:15 407:20
429:9 459:14
468:7 469:5,25
473:13,22 477:17
481:22 490:2
**guessing** 347:15
**guided** 337:16
**guideline** 290:7
293:12 296:21
298:19
**guidelines** 282:1
286:18,20 287:1,6
288:9 289:3 298:5
298:10,15,21
299:1 310:16
322:11 354:21
355:16 356:7,9,13
356:15,18 357:3
361:11 390:19
436:24 465:25
478:12
**guides** 346:24
347:4
**guy** 434:2
**guys** 398:17
**gyroscope** 211:14
211:15,22,24
212:19,23

**h**

**hails** 287:22
**half** 458:17 478:14
**hampers** 270:17
**hand** 226:16 386:4
398:16 406:16
432:3
**handed** 385:20,22
**handle** 236:10
266:23 320:25
**handled** 236:6
432:16
**hang** 401:13
427:25 445:11
446:10
**happen** 287:5
295:1 299:8 302:4
395:4 443:8 451:8
451:10
**happened** 219:9
245:24 246:17
266:19,20 307:2
308:14 325:11,17
335:5 382:25
395:6 397:6,6
**happening** 246:5
**happens** 247:22
**happy** 201:2
405:14 448:19
**harassed** 332:2,7
397:7
**harassing** 332:12
396:18
**hard** 225:9 330:9
350:24 394:13
395:5 428:17
489:5,8
**hate** 369:17
**hawley** 199:4,6
**head** 225:16
240:19 277:16

368:6 378:15
**headings** 428:16
**headquarters**
288:22 393:10
**health** 458:20
**hear** 206:17
229:10 233:1
242:20 243:13
251:22 258:21
313:10 323:25
453:3 482:12
**heard** 231:25
240:3 396:19
452:20 456:20
482:10
**hearing** 271:16
450:2,15 453:20
**hearings** 453:2
**heart** 461:14
**heavy** 353:7
**hell** 209:21,24
210:13 211:1
269:20 271:24
**hello** 227:11 230:5
263:16 266:6
308:7 316:16
327:3 331:16
334:20 396:1,6
**help** 227:16
260:11 265:23
320:21 330:25
351:9 367:4
392:14,20,23
394:4 478:18,18
**helped** 369:9
**helpful** 244:20
329:3
**helping** 370:9
**hereto** 198:16
**hey** 250:16

Page 24

[hi - impossibility]

**hi** 220:5 226:20 228:4 229:8,9 230:12 265:21 315:14
**hiett** 199:5
**high** 219:20 222:6 239:9 243:24 261:11,16 273:15 277:24 282:20,21 295:5,6 331:20 345:8 379:5,6 469:15
**higher** 222:3 308:9,22 331:18
**highest** 230:8
**highlight** 356:4 371:24 372:14 416:16 444:6 463:11 466:21 478:14
**highlighted** 442:3 485:10
**hire** 248:8,14 471:8 473:25 474:3
**history** 337:4 407:12 458:12 490:7
**hit** 228:14 251:10 277:16
**hits** 203:12,13
**hitting** 490:21
**hobby** 375:4,8
**hold** 219:9 240:12 301:19 309:17 350:22 355:4 382:5,8,12 423:24 455:20
**home** 348:9,11,12 348:15,16,17 349:14,20 378:15

378:20 445:10 482:15
**hon** 198:2 199:21 492:3
**honest** 397:10
**honestly** 453:21
**honor** 204:25 205:16 207:11 210:1 212:3 214:7 217:5 235:9 236:13 237:5 239:16 252:25 268:1 272:19 279:6 354:8 369:17 400:19 445:19 447:1 449:9,12 450:13 491:2
**hope** 435:2
**hopefully** 462:19
**hot** 363:25
**hotels** 343:13 446:12
**hour** 319:24 464:9 464:9
**hourly** 388:7,15 388:21 389:1,14 439:5,9,16,20
**hours** 277:13,13 319:2 332:24 335:6 343:11,11 343:11 375:21,25 379:11 389:5 428:23,24,25 429:3,5,12,17 445:11,12,15,15 479:12
**house** 375:6 378:17 386:12
**houston** 199:7,13 226:17,21 227:3

227:17 235:24 248:6,8,13,22 249:7,8,14 252:21 253:20,25 254:11 255:18 274:3,10 274:13,17,21 283:23 284:2,6 308:15,21 310:23 312:11,18 317:3 338:10 342:20,23 343:10 344:7 353:18 368:17,21 370:25 371:2,5,9 371:13,17,25 372:10,21 373:11 374:6 377:6,10 378:24 412:9,22 413:13 423:10 442:22 443:1 460:12 464:13 469:23 472:17,22 475:14 482:11
**how's** 241:7 329:3
**hub** 225:25 226:3 226:6 311:9,13 312:10,10 329:15
**hubs** 226:8 260:15 260:18,23,25 489:11,12
**huge** 304:14 329:14 333:4
**hughes** 268:14
**huh** 402:13
**hundred** 226:7 260:20 445:21 446:4
**hundreds** 259:4,9 332:19 464:15
**hurt** 325:21

**i**

**iah** 266:7,21 267:1 332:2 475:15,15
**icy** 316:18 317:3,9
**idea** 229:3 233:17 243:12 425:5,19 426:5
**identified** 418:15 421:6 427:7,22 450:2
**identify** 411:1,4 416:23 417:13
**idle** 376:11
**illegal** 287:21 471:13 478:25
**illegitimate** 467:12
**immediately** 351:20,24
**impact** 281:23 282:11 283:11 284:1 286:12 288:18 301:5,12 302:9 308:24 410:20 436:10
**impacted** 288:24 391:5,16
**impactful** 283:21 284:4
**impacts** 459:6
**impeachment** 253:1
**implemented** 227:1
**imply** 249:20
**important** 279:14 289:25 293:17 297:4 298:13 321:16 324:1 383:18
**impossibility** 250:12

Page 25

[impression - investigate]

**impression** 307:11
**improper** 221:8
253:1
**improve** 283:8
**improvement** 393:6
**improving** 393:21
**imputed** 205:4
**inaccurate** 229:2,5
306:11
**inactive** 301:19
**inappropriate** 466:16
**incident** 266:1
267:5 323:9 325:6
325:9
**include** 285:1
299:12 309:7,10
333:17 390:3
490:19
**included** 342:21
384:2 439:3
453:25
**includes** 255:17
421:20 468:5
**including** 270:14
284:14 285:6
352:4 398:15
**inclusive** 254:2
256:1
**income** 275:14
277:9 282:17
283:23 284:6
330:17 337:25
348:2 351:1,4
386:13 391:6,17
391:20 415:16
419:22 421:12,20
423:3 427:20
444:24,25

**incorporated** 346:5 441:19
**incorrect** 408:16
**increase** 237:11
244:3 313:17
314:8
**increasing** 285:1
299:14
**incredible** 225:3,8
225:20 227:8
**independent** 218:3
256:5 262:20
414:16 415:11,13
417:4 433:15
434:7 441:21,22
486:18 487:24
488:3
**index** 200:1
**indicate** 378:14
394:17 488:8
**indicates** 387:9
**indicating** 397:2
**individual** 275:17
276:5 416:23
**individuals** 447:3
**industry** 321:17
**inexplicable** 448:12
**infinity** 366:15,17
368:1 370:13
427:2
**inform** 219:10
328:15 334:4
**information** 207:21 208:11
211:2,13,21 212:1
218:23 219:7,14
228:2 247:14
252:20 253:19
255:5,8,17 258:3,8
258:10 260:5

266:3 267:6,13,19
270:4 271:11,12
271:19,20,21
277:18 288:17
306:16 327:6
329:10 424:18
462:10,12 467:24
468:5 472:7
489:20,25,25
490:1,23
**informed** 437:7
**informing** 296:15
331:11 439:16
**infrastructure** 208:17
**initial** 259:3
**initially** 275:1
**initiatives** 458:24
**injury** 350:19
351:17
**input** 209:10
**inside** 276:9
323:13
**insist** 289:19
**instance** 209:5
213:24 241:20
252:6 286:7
320:20 400:11
403:1,12 412:12
412:15 432:8
**instances** 413:20
**institute** 268:17
**insult** 491:10
**insurance** 327:9
342:22 365:16
368:1 372:9,14,16
381:16,24 437:18
437:21 469:8
476:12,13,23
477:8

**insured** 372:15,17
468:7
**insurer** 432:3,16
**integrate** 458:4
**integration** 207:7
457:25 458:1
459:1
**intend** 330:3
**intended** 447:14
**intending** 336:18
**intent** 398:13
**intention** 268:10
285:6,9 299:20
**intentionally** 286:2 390:3
**intents** 235:4,16
**interested** 493:10
**interference** 336:15
**internal** 227:25,25
**international** 458:18
**internet** 376:21
438:7
**interrogatory** 416:14,20,22
418:10,21 441:4
**interrupt** 322:16
355:7 454:9
**interrupted** 459:24 474:16
**intervention** 319:18
**introduced** 388:9
**invade** 231:17
**invest** 261:1
**invested** 259:9
260:22
**investigate** 209:24
267:6

Page 26

[investigating - know]

**investigating**
267:9
**investigation**
210:12
**investment** 258:24
259:2,3
**involved** 220:20
**involvement**
370:11
**involving** 246:20
**iphone** 332:4
**issue** 220:6 223:1
227:21,22 228:6
230:14 266:24
270:25 306:25
308:6 314:16
316:14 323:25
327:17 333:5
336:13 369:5
409:16 430:24
450:10 455:21
456:5
**issues** 220:25
236:10 239:2
271:2 272:5
370:10 459:18
491:3

**j**

**jacob** 199:16
278:9,21 279:3
280:5 292:12
294:5 297:17
306:19 320:10
321:13 331:2
334:8 441:7
**jam** 396:20
**james** 222:24
223:18
**janelle** 225:12,19
**january** 316:15
327:5,8 458:13

**jed** 229:9,9
**jennifer** 321:14
**joan** 230:11
**job** 273:11 302:24
303:1,16,20,21
440:8 441:11
442:4,6
**jobs** 273:14,17
340:9 415:8
**join** 272:17
**joined** 458:13,15
**joining** 491:11
**joint** 207:10
278:10 296:19
297:13,16 355:18
359:7 465:21,23
481:5
**journey** 357:8
**judge** 207:17
214:10 226:6
240:16 241:2,17
242:17 244:25
270:22,23 273:5
277:17 278:16,22
279:4 282:14,24
302:12 303:4,6
305:8 306:23
307:1 308:14
310:12 314:20
316:24 318:6
319:23 320:20
327:16,17 334:16
337:4 341:20
342:7,17 344:16
344:20 350:21
351:25 358:1
369:25 392:23
406:22 430:11
435:19,22 443:13
447:22 450:24
451:22 453:7

454:5,15 455:7,17
457:9 474:16
484:3,20 489:19
**judging** 361:5,6
**judgment** 364:8
**judgments** 271:6
**july** 223:18,22
224:7 225:6,17
226:19 227:6
228:11,23 278:23
298:2 429:4,4
**jump** 481:4
486:10
**jumping** 483:2
**june** 216:15,19
220:4 263:13
266:6 298:2 307:1
322:24,25 323:23
331:16 399:4
469:21
**juno** 405:18,20
**jurisdiction** 469:4
**jx2** 466:21
**jx4** 480:2 481:9
483:2,4,9 485:11

**k**

**katherine** 199:5
**keep** 286:6 363:4
363:24 366:10
369:17 381:24
475:10
**keeping** 384:2
**kelli** 201:8
**kept** 229:5 385:25
490:18
**kg** 305:1
**kherkher** 199:6
**kherkhergarcia.c...**
199:8
**kick** 333:1

**kicked** 335:4
**kicking** 332:22
333:7,8
**kill** 376:15
**kimberly** 199:10
492:17
**kind** 202:6,17
237:9 239:18
271:12 283:1
311:18 318:19
368:20 378:15
379:24 386:1
404:6 459:23
463:1 467:1
469:13 470:25
483:2
**kinds** 304:13
343:21
**knew** 205:3
252:18 279:23
286:15 327:20
413:3
**know** 203:21
206:1,12 207:19
208:25 209:5
210:7,25 211:11
211:20 212:12,21
212:25 213:15,16
213:18,19 217:22
218:10,11,18,21
218:24 220:11,18
220:23 222:10,14
222:23 223:2,4
225:2,4,12 227:20
231:3 232:4,5
233:5 235:12,14
235:20,23 236:3
236:15 238:22
239:2 244:7,18
246:9,11 248:19
249:10,14,17

[know - license]

250:8,14 251:2
252:10,12,14
253:9 259:6,13,15
259:18,22,23
260:17 261:4
262:3,18 265:2
266:10 267:9,20
271:10 272:2
277:12 278:11
279:18 280:2,20
289:2,18,19 295:4
295:15 298:6
300:25 303:13
308:10,17,20
310:16 312:24
313:10,20 314:5
316:11,16 318:8
318:11 319:25
323:24 324:17
325:17 326:20,22
329:25 330:14,20
330:22 335:3,7,13
335:20 336:16,24
338:20 339:8,11
342:9 343:9
345:12 348:16
349:23 350:9
352:13 354:11
360:2 367:21
379:5 382:10
386:8 397:15
398:18 409:13
417:23,23,24
423:6 424:9,20
425:4,19,21 426:4
427:4 428:17
430:11 436:8
437:1,8,11,15
438:13 440:6,7
445:1,21 446:10
448:16 449:23

450:6,17 451:8,11
451:15,20 452:16
455:2,20 457:1,2
472:24 484:24
487:22 491:8
**knowing** 326:25
437:5
**knowledge** 202:17
205:4 211:19
212:10 213:18
231:25 244:15
250:23 267:16,17
267:17 269:17,18
271:2 297:7
406:23 471:14
472:5
**known** 269:17
336:13 387:18
469:1
**knows** 210:23
212:6 217:11
234:18 332:15
391:11 407:8
**kremena** 426:21
427:1,19

**l**

**l** 463:4
**labeled** 305:1
**labor** 262:14
**lack** 272:2
**lacks** 210:20
406:23
**land** 243:18
268:12,19
**language** 218:16
236:15 291:23
335:1 359:1
433:25 434:1,10
466:16 484:18
485:5,8

**large** 269:10 371:5
**late** 454:11
**lately** 229:1
**law** 265:23 369:9
370:9 466:19
470:17
**laws** 367:4 481:22
**lawsuit** 409:12
**lawyer** 484:16
**lawyers** 370:6
484:20
**layman's** 471:1
**lead** 233:17
262:13 279:24
280:12 282:23
291:18 295:8
298:7 356:10
413:9
**leading** 392:17
458:18 470:20
481:2
**leads** 279:15 281:9
284:12,25 286:24
290:9,20 292:14
292:23 378:16
**leaf** 465:19
**learned** 206:8,10
243:6 271:11
439:19
**lease** 366:21
**leased** 261:2
339:18 340:8
415:6 441:17
**leasing** 338:6
**leave** 323:2 324:2
332:8,12,24
397:22,25 398:3
**leaving** 381:14
**led** 458:19
**lee** 375:17

**leeway** 253:10
303:6 369:18
**left** 226:16 323:3
323:18 324:3,6
360:23 406:16
428:20 440:17
458:21 459:2
**legal** 438:12
463:16 487:19
493:17
**legally** 270:10
474:1
**lemon** 369:9 370:9
**length** 214:9
394:17
**letter** 351:23
431:24
**letting** 263:18
289:17 313:10
323:24 334:22
379:4 396:8
451:16
**level** 211:19
277:22 278:7
280:14 410:5,7
469:16 470:2
472:13
**liability** 304:17
**license** 266:9
303:18,19,22,24
304:2,3,16,24
327:9,10 342:25
365:18 368:25
371:10,13,17,19
372:1 373:10
403:18 437:19
438:1 468:5 469:7
471:9,11,15
472:17 473:7
477:4

Page 28

[licensing - long]

**licensing** 373:9
**lie** 394:8 397:7
**lied** 397:8
**life** 273:5,17
**lifted** 226:4,25
**light** 368:4,13,17
**lights** 368:5
**liked** 368:12
**lily** 329:6,6,18,24
**limit** 218:25
  223:12 281:19
  282:8 291:3
  327:21
**limited** 236:17,18
  236:22 299:13
**limits** 218:4
  281:22
**limo** 249:6,9,15
  327:9 344:11
  368:25 371:10,13
  371:16 413:5
**limos** 364:20
**limousine** 248:22
  344:9,10 365:19
  371:25 437:18
**lindsey** 199:18
**line** 203:7,13,13
  210:2 213:20
  214:13 216:15
  237:16,19 238:12
  238:15,17 243:23
  259:24 271:18,23
  277:7 281:3 283:7
  283:10 305:15
  308:24 319:5
  329:21 332:9,13
  332:24,24,25
  333:4,19 334:13
  335:6 354:7 362:6
  377:21 385:10
  393:19 397:10

399:11 400:11,21
401:5,5,6,10,10,13
401:16,18,20
407:21 419:20,21
420:1,17 421:15
422:1,4,9 425:2,14
425:17,22 427:10
427:25 428:13,22
428:24 434:2
467:18 468:17
483:5,6 486:21
488:7 490:21,22
**lined** 428:21
**lines** 204:13
  218:19 232:24
  233:6 237:16
  392:7 399:17
  401:1,5,6,10 402:7
  402:24 403:11
  428:11 441:10
  461:24 480:6
  483:19 485:22
  486:22 487:7
**link** 327:7,24
  393:11
**list** 229:21 258:14
  276:12 470:6
  472:18
**listed** 328:11,13
  330:23 386:24,25
  420:14,16 426:3
**listen** 206:18
  243:11 310:17
  354:10
**listened** 349:5
**listening** 366:19
**literally** 221:17
  241:17 253:14
**literature** 478:17
**lithuania** 273:4
  380:20 482:17

**litigation** 270:16
  406:12 415:21
  417:20 429:17
**little** 203:20 229:9
  234:3 253:8 257:4
  277:17 279:11
  297:24 302:12
  321:5 337:3,6
  346:1 358:17
  359:9 360:4 363:3
  365:10 367:18
  386:2 387:4 405:1
  419:8 428:20
  437:9 460:14
  475:21 480:4
  481:5 483:3
**littler** 199:11
**littler.com** 199:13
**live** 331:25 446:11
  448:3,7,8
**lived** 274:1 348:5
  348:18 379:25
**livelihood** 302:11
**livery** 421:3,9
  427:8,20 437:25
  438:1 468:25
  469:3,7,14,17,18
  469:21,24,25
  471:2,9,11,15
  472:2,8,12,17,24
  473:1,7,10,12,15
  473:19 474:7,10
  475:6,9,10,11,16
  480:15
**lives** 459:7
**living** 273:21
  353:5
**llc** 275:10 337:9,9
  338:14 347:22
  351:13,13 352:11
  372:18 414:5

419:9,14 420:22
421:1 426:19
441:19 468:12,20
469:11,12 475:25
480:10,16 490:4
**llcs** 490:4
**load** 320:21
**loan** 350:19 351:4
  351:5,17,18,20,23
  367:1
**local** 225:25
**location** 227:3
  306:8,9 313:14
  314:3 333:18
  478:3
**locations** 210:18
  260:15
**log** 276:16 377:17
  378:5 379:13,16
  408:12 479:15,17
**logged** 203:6
  244:17 292:1,4,7
  294:18 295:2
  379:19 412:4
  479:13 490:20,20
**logistics** 275:4,10
  338:17 339:6
  340:9,15,19 414:5
  414:25 415:4,14
  417:14 418:15,25
  442:11,18 458:14
**logo** 368:20
**logs** 204:16
**long** 235:22 252:8
  274:9,19 295:15
  317:17,24 318:3
  332:17 339:19
  375:21 389:14
  394:21 397:24
  398:12 403:6
  409:24 419:13

[long - ma'am]

454:17,19 458:8
474:20 483:12,16
487:4
**longer** 209:12
217:17 228:15
229:19 231:4
234:8 275:4
277:12 331:11
343:15 360:4
380:24 409:8
447:4,11 469:19
469:22 489:17
**look** 206:23 213:2
230:3 232:15
240:9 248:17
254:25 255:1
258:13 263:9
279:11 281:9
282:19 284:24
289:22 293:1
294:6,10,14
296:19 297:16
301:18 306:22
307:13 312:13,15
313:6,8 315:7
317:16 331:3,4
339:10 341:21
347:17 349:10,12
355:15,23 359:7
359:25 360:2
371:15,23 372:13
381:2,7 385:5
388:19,23,25
392:4 395:17
398:16 399:9,11
399:17 400:10,15
402:5 403:11
404:12,14,14
407:12 415:23
418:9,14,17,24
419:2,20 420:6

421:15 422:11
425:11 426:6
427:13 428:6,7
431:10 440:18,21
450:25 463:7
466:5 475:19
476:20 480:2
481:6 482:1
483:19 485:20
486:9
**looked** 203:3
418:12
**looking** 209:2
225:10,10 258:6
264:12,14 353:5
356:17 381:6
398:17 418:1,18
431:15 436:15
464:24 465:21
488:6
**lookout** 284:10
**looks** 227:20
266:17 307:4,5,9
307:12 312:17,18
313:2,23 316:5
319:7 406:7
**los** 458:13
**lose** 219:22 222:16
233:3 282:16
283:16 284:22
288:10 289:8
291:3,12 295:14
296:25 298:19
299:1,10 301:2,13
305:20 330:17
331:22 332:23,25
334:1 336:4
357:23,24 358:16
377:21 466:6,11
466:23 467:4,6,15

**losing** 284:3 287:7
290:9,20 292:14
292:24 302:7
332:9 333:13
**loss** 216:6 291:19
295:8 356:11
381:19 432:9
**lost** 238:24 283:19
303:10 319:5
392:10 393:2
442:4,6
**lot** 241:20 244:18
266:22,22 267:1
269:4 277:10,12
302:20 303:5
304:16 310:20
317:3 332:1,8,15
332:15,19 333:7,8
335:3,4 336:10
341:2 345:20
376:14 386:13
390:24 396:17,19
397:5,23,25 398:4
404:25 413:3
436:22 438:21
439:23 459:6
**lots** 298:17
**love** 222:15 331:20
**low** 233:17 361:21
390:25
**lower** 300:23
373:1 485:11
**luck** 336:14
**lucky** 445:19
**lunch** 330:10
**lunchtime** 377:18
**lure** 211:3
**lux** 463:5
**luxury** 302:19
342:14 343:3
344:14 387:10

**lyft** 210:19 211:2
340:22 341:1,3,5,8
341:9,12,15,17
348:2 386:22,24
405:2,5,9,23,25
406:3,20 407:6,11
407:19 408:2,4,6
408:19 409:1,1,17
410:19 411:11,15
411:24 412:7,10
413:18 421:21
427:20,22 430:2
440:22,23 479:22
479:25
**lyft's** 211:1

---

m

**m&a** 457:25 458:1
458:25
**ma'am** 201:5
214:15 346:10,16
346:22 347:16
349:4,7 353:3,19
354:23 355:3
356:1 357:18
359:13 361:12,19
362:23 363:12,17
364:10 365:3,11
365:25 366:3,14
367:7 368:8
370:12,15,23
371:3,14,18,20
372:2,11,25 373:5
373:15,19,23
374:1,7,15,19
375:9,23 377:1
379:12 380:23
382:3,21 383:15
385:7,22 387:11
388:4 394:20
395:21 397:19
399:20 404:22

[ma'am - meant]

405:7 411:9 413:1
414:3,18,24 415:1
415:15,24 416:11
418:5,16 419:11
422:22 423:13,21
424:6 425:13
426:5 427:17
429:2 433:12
444:17 445:18
446:5
**machine**  198:15
**macleod**  199:5
200:4 201:5,17,22
205:10 206:4,21
207:16,22 208:3
210:4,5,11,17,25
211:7 212:11
213:4,7 214:10,15
214:18,22 215:25
216:3 217:8,14
218:20 228:22
231:19,23 232:20
232:22 234:13,25
235:6,11 236:18
237:6,12 239:23
240:4,6,15 241:1,2
241:15,16,23,25
242:15,17,25
243:4,9,17,22
249:23 250:1,5
251:22 253:3,6,11
253:14 254:25
256:13 263:3,9
264:21 265:1,8
267:24 268:4,6
272:12,13 448:21
449:14 450:12,24
451:22 452:5,19
454:3,14,19,22
455:7,12,16 456:3
456:7 459:21,25

461:9 470:20
471:20 474:14,18
481:2 484:2,8,14
485:4 487:19,22
**mail**  199:8,13
216:15 220:8
224:1,2,3,4,11
227:11,23 228:8
230:16 231:8
250:7 260:5
265:25 331:7,10
339:10,16 365:1
381:10 386:19,20
398:24 462:11
465:2 467:25
**mail's**  224:6
**mails**  246:21
288:14 364:13
365:4 379:4
**main**  283:23 284:5
337:25 444:25
445:1 452:17
**maintain**  260:11
281:15 282:8
287:14 294:19
**maintained**
211:24
**maintaining**
205:13 233:13
321:16
**majority**  445:22
**making**  275:12
303:12 308:25
344:23
**man**  273:20
348:14
**manage**  458:6
**managed**  268:21
**management**
266:25

**manager**  327:11
332:10 458:14
**manipulate**
307:21
**manipulating**
208:24
**manipulation**
333:17
**manner**  220:21
257:21
**manufacturing**
369:15
**mapping**  269:9
387:12,15,22
**march**  311:1
417:8 441:13
442:4,25 447:23
**market**  236:25
237:3 247:4,12
471:8
**marketplace**
247:22 248:3
460:19
**marketplaces**
460:18
**married**  273:13
**match**  313:13
314:3 440:24
**matched**  326:11
326:13 462:19
463:3 464:20
465:14
**materials**  260:4
**math**  373:25
**matter**  215:23
258:1,9,16 267:7,9
317:7 343:22
407:2 415:21
455:22 472:11
**matters**  201:3
342:18

**max**  477:21
**maximizing**  390:2
411:18
**maximum**  281:10
281:19,22 290:21
291:2 292:10
389:6 446:1
**mcdonald**  201:8
**mckinney**  199:12
**mean**  209:6
213:22 215:22
222:10 226:9
230:2 236:25
281:6 283:25
286:14,15 302:23
309:11 314:4,5
315:16 316:10
332:25 334:5
336:10 341:6
343:10 344:13
347:1,2 348:15
367:10 369:25
395:10 398:2,2
416:8 423:5 436:7
437:5 463:24
471:4 475:25
481:13 486:3,23
490:21 491:9
**meaning**  305:19
366:18 410:7
437:15 471:16
483:18
**means**  213:24
221:5 233:13
236:4,5 280:23
449:16 464:1
477:7 481:15
482:3 484:18
485:5,8
**meant**  332:3,5,16
332:20 365:15

Page 31

[measure - monitoring]

**measure** 279:13 289:25 293:16 297:3
**measures** 309:23 326:16,20,22
**medical** 257:7
**meet** 245:16 301:1 413:9
**meets** 477:8
**member** 337:9 338:13
**memory** 349:18 361:25 362:14 392:21 393:8,15 394:5 398:24 404:21
**mendelson** 199:11
**mentally** 325:13
**mention** 468:13
**mentioned** 283:17 346:17 353:7 412:12 417:16 424:12 461:9 468:19 473:14
**menu** 315:9
**mess** 323:1,3,18 324:2,6 345:2 360:23
**message** 213:11,13 220:2 221:1,16,23 222:2 230:1 246:19 263:16,25 264:2 265:9 306:22 307:4,14 311:1 312:14 314:22,22,23 320:13 325:2 331:17 332:10 381:8,22 396:1,6 396:23 397:1 399:18 400:16,22

400:24 401:3,8,11 431:14,16 432:19
**messages** 203:2,4 215:2,7 216:20,24 217:2,8,9,12 219:11,13 229:1,5 229:18 264:11,12 264:17 306:20 310:14,21 329:10 329:12 330:25 336:19 396:14 402:6 431:18
**messes** 324:3
**met** 245:5 273:10 449:5 452:21
**metro** 482:3
**microphone** 272:16
**mid** 202:1
**middle** 220:2 251:17 255:22 298:1 364:7 419:6 483:6
**miers** 199:10 200:6,7 272:19 289:13 294:21 303:5 305:12 309:15 313:5 322:15 329:1 344:19,20,22 345:14,19 348:23 350:18 351:9,10 352:9,10,18,22 353:12,15 354:8 354:18 355:6 358:5,11,15 366:8 366:11 369:17 370:8 391:4,12 392:20 398:8,22 400:19,21 406:25 407:9 422:7,9

424:3 430:11,18 433:20 435:17,19 438:11 443:16,18 444:19 447:1 448:6 449:9 452:23 453:11 455:4 474:22 484:21 492:17
**mile** 307:22
**mileage** 389:6 429:24,25 430:1
**miles** 306:5 307:20 316:17 317:6,8,13 343:16 425:18,20 425:23,24 426:2 490:15,19
**millions** 259:4,9 259:18,23
**mind** 341:22 362:2 410:24 473:23 490:14
**mine** 337:12 364:25
**minimize** 326:16
**minimum** 251:13 254:2,15 256:1,7 256:15 279:16,18 279:21 280:3,7 290:13 300:24 301:1 319:6 362:9 477:9
**minor** 324:2 325:15,16
**minus** 315:15
**minute** 240:12 263:4,6 308:2 398:4,14 406:7
**minutes** 263:6 318:18 341:21 345:3,5 398:10 404:16,17,19,23

412:13 423:8 430:16 444:3 454:17,18,19 489:18
**misspelled** 332:4
**misstates** 206:13 234:9
**mistake** 229:1 393:24
**mistaken** 441:14
**mister** 488:1
**misunderstood** 408:17
**model** 327:19 342:6,22 437:16 473:11,19
**models** 470:3
**moment** 332:24 374:23
**momentarily** 463:9
**moments** 319:1
**monetary** 278:7
**money** 239:1 259:14 260:3 273:12 275:12 292:11 302:10 303:12 308:25 314:13 333:3 341:24 342:4,13 343:1,17 364:6 367:9,10,11 378:19 435:3,5,9 436:2,9
**monitor** 204:20 212:24
**monitored** 269:15 287:16
**monitoring** 203:23 204:1 206:10 207:24 209:25

[monitoring - new]

210:18 211:8
213:17 269:6,23
269:24
**month** 253:17
339:11 364:4
407:22
**months** 224:14
230:7 274:15
298:3 339:7,21
340:10 381:12,15
410:3,4 442:13,14
442:14 458:4,19
458:22,24
**morning** 201:1,22
201:24 247:19
263:6 447:18
452:15 464:9
484:6,9,11,11
**mortgage** 283:24
**motion** 211:17
214:7 271:1
**motions** 270:13
**motor** 468:14
477:7
**move** 214:14
241:15,16,23
242:22 243:16
273:24 274:4,13
280:18 290:8
296:24 297:12
304:9 316:13
318:5 322:23
337:2 345:15
352:21,22 370:25
399:7,8 417:25
426:7 428:15,20
447:2,19 456:10
482:7
**moved** 263:21
273:8,24 274:3,10
274:17,20 283:22

284:2 308:15,21
340:1 345:13
396:11 400:8
482:11
**moving** 217:18
272:16 284:7
312:18 363:4
398:22 489:15
**multiple** 280:7
335:1 453:1 473:8
474:3
**multiplier** 236:23
247:8,13,18,24
248:1
**multipliers** 239:11
247:2,4,21
**muted** 435:19

### n

**name** 225:12
232:18 267:2
272:25 273:1
275:2,8,9 277:21
340:14 344:23,25
347:22 350:25
351:13 364:16,18
372:14,17,17
420:21 424:11
426:24 434:2
457:23 462:10
463:11 467:24
481:25
**named** 209:21
**names** 364:15,18
**narrative** 303:7
305:13 474:24
**narratives** 474:20
**narrow** 370:4
**national** 478:3
**natural** 491:1
**nature** 207:12
267:12 269:24

**near** 255:21,22
446:12
**necessarily** 243:15
249:20 256:12
257:2
**necessary** 325:8
446:23 451:17
**need** 201:13
227:16 238:22
239:20 304:15,15
323:5 334:13
341:21 348:15
370:4 392:23
393:14 398:18
448:7 449:17,22
449:23,24,25
450:6,16 451:4,11
451:15,18 452:25
454:5,8,11,17
455:22 456:2
461:1 468:10,13
474:17 482:15,25
491:4
**needed** 321:25
322:2,20 365:16
365:18 372:8
391:19
**needs** 271:8
398:14 403:13
**negotiate** 244:24
245:6,15
**negotiated** 246:8
312:1
**negotiating** 245:17
245:22
**negotiation** 245:1
**negotiations**
246:22
**neighborhoods**
374:3 378:24

**neither** 317:18
493:7
**network** 470:18
477:2
**never** 233:17
243:19 245:5
275:25 277:11
286:1 288:9,10
303:23 307:24
308:18 314:14
326:6,23 334:3
343:22 345:12,13
351:24 361:20
369:14,15 385:22
388:16 391:24
392:2,8,10,24
393:2,5,25 394:1
398:16 411:23
424:6,6 452:6
**new** 248:1 255:4
255:23,23 274:1,2
274:4,5 279:19,22
280:3 281:14
284:6 288:22
302:24 303:2,15
303:20 308:8,16
308:23 312:18
327:22 328:1
337:11,14,17
338:19 340:12
342:11 343:19
344:3 345:7 348:5
348:19 353:8,17
364:20 365:15,18
368:4,18 371:9
372:8 376:23
390:9 393:11
412:19,21,24
413:4,12 423:9,12
435:6 443:6
482:11,24 489:15

[newer - okay]

**newer** 472:20
**nice** 384:20
**night** 368:10 377:4
**nights** 317:2
**nine** 224:14
  280:23 483:19
  487:7
**nods** 368:6
**non** 217:19 478:21
  484:16
**nonresponsive**
  235:7 243:5
  345:14 353:13
  354:9 358:11
  366:9 471:20
  474:15,23
**nope** 224:23
  379:17
**noreply** 213:8
**normal** 471:9
**normally** 445:18
**north** 225:18
  226:17,21 227:3
  310:23
**northern** 273:3
**notary** 492:25
**note** 341:25
**notes** 341:22 342:3
  404:5
**notice** 213:20
  216:16 439:15
**notifications** 280:7
**notify** 283:6
**notions** 455:24
**november** 252:20
  253:24 255:15,16
  442:7 458:23
**nrg** 250:17,17
**nuanced** 298:22
**number** 226:10
  255:18 261:5

263:10 265:2
307:22 386:17
389:5 404:14,15
407:5 416:20,22
418:10 425:23,24
429:13 440:6
460:6 462:10
465:21,23 473:23
490:15
**numbered** 198:11
**numbers** 280:1
  406:17 440:23
  464:12
**numerous** 273:14
  278:18 280:12
  282:2 296:18
  304:12 310:14,21
  334:2 337:12
  359:12
**nurse** 257:10

**o**

**o'clock** 319:24
  320:8 489:17
  491:14
**oath** 240:9 349:8
  423:8 443:21
  457:15
**object** 204:25
  212:2 217:5 235:6
  236:11 239:15,23
  241:7 242:19
  249:18 252:25
  289:13 345:14
  350:12 352:1
  353:12 354:9
  358:2 366:8
  392:15 406:23
  423:23 445:5
  452:8 453:4
  474:23

**objected** 239:17
  243:5
**objecting** 303:6
  369:18
**objection** 205:15
  206:13 207:11,15
  210:1,14,20 214:6
  218:12 228:18
  231:16 234:9
  237:4 239:24
  243:13 251:20
  254:20 256:9
  289:20,21 294:21
  305:12 309:15
  313:5 329:1
  348:20 350:7,17
  350:21 358:11
  391:2,8 435:17,20
  438:11 459:21,24
  470:20 474:17
  484:2
**objections** 211:4
  239:18 417:11
**obligated** 468:4
**obnoxious** 360:21
**obtain** 371:17
  374:5 422:24
  467:19
**obtained** 432:10
**obviously** 260:22
  271:17 376:14
  454:4
**occasionally** 324:1
**occasions** 337:25
  394:11 406:3
  413:16
**occupation** 485:19
**occupational**
  470:11
**occur** 276:24
  288:5 295:11

315:21 323:19
324:21
**occurred** 316:8
**occurrence** 311:8
**october** 296:23
  315:20 324:25
  326:5 458:21
**offer** 268:7 270:21
  339:19 374:8
  383:6,17 389:2,7
  412:7
**offered** 276:17,19
  277:4,5,8,15
  283:12 302:20
  364:9 382:4
  384:14,19 387:10
  421:9 423:9
  434:23 446:22
**office** 348:9,11,12
  348:15,16,18
  349:14,20,24
**offs** 217:18 219:6
  221:10,14 223:13
  228:12,17 229:19
  331:13
**oftentimes** 246:2
**oh** 315:4 334:10
  341:13 397:22
  398:2
**okay** 204:19
  206:21 209:23
  213:1,11 214:22
  215:6 217:14
  218:2,9,18 222:21
  228:1 230:19
  231:11,23 232:4
  233:5 237:23
  238:9,19 239:5
  240:18 246:12
  247:11 248:11,16
  248:16 252:18

[okay - overly]

255:6,13 256:13
257:3 259:8
261:23 264:7
265:21 266:5
279:2 284:7
289:22 297:23
306:19 309:19
314:15 316:13
318:5,21 320:7
321:11 322:24
324:24 327:1
329:5 331:2 332:7
334:12 337:2,5
338:22,23 339:8
341:11,23 348:23
352:21 355:15,17
355:23 356:21
357:15 358:14
359:7,11 360:9
361:24 362:1,16
362:20 363:3,7,18
366:8 367:17,25
369:23 370:6
372:23 373:20
374:16,24 381:11
383:13,16 386:6
388:11,22 390:2
390:23 391:4
392:4 393:18,24
394:7 395:16
397:20 398:19
399:3,5 402:9,10
405:17 406:5,13
406:14 407:14,18
407:21 409:21
410:15,18 411:17
412:3 413:25
414:14,21 415:19
415:21 416:20
417:1,6,7,16,22
418:2,11,17,24

419:2,20,23 420:1
420:3,13,18,21
421:19 422:20
423:22 424:14
425:6,8,16 426:8
426:11,14,18
427:7,23 428:2,8
429:10,16,19
430:14 432:5,21
434:15 435:24
440:19 441:20
443:21 445:5
446:3,24 449:7
454:6 456:13
457:11,13 458:8
459:23 460:10
462:21 470:5
472:15 473:18
474:25 476:24
478:8 479:1
482:14 486:21
487:7 489:16
491:5
**older**  229:3 477:5
**once**  223:1 228:6
230:14 273:7
274:16,23 276:16
309:9 335:3,7
340:2,4 367:5
373:11 398:14
427:18 428:14
452:6 462:8,17
466:18 467:23
468:1,9,16
**ones**  473:22
**open**  338:19
408:23 409:5,19
410:1,11 462:11
462:18 468:2
489:12

**opening**  248:20
374:20 456:7
**operate**  304:19
437:25
**operated**  352:20
**operating**  209:19
210:13 211:1
373:20
**operation**  269:20
348:14
**operational**  262:3
269:19 275:5
**operations**  261:13
262:23 339:25
458:14
**operator**  273:20
346:25 347:5
**opinion**  372:23
373:3 385:14
430:23
**opportunity**
228:16 241:13
244:10 265:18
279:8,9 335:23,25
363:22 448:8
453:5 488:11
**opt**  388:20 478:20
478:20,23 479:1,5
479:5,10
**option**  335:23
344:6 388:6,15
439:9,12,20 440:9
440:12,14 462:19
**options**  315:10
454:13 462:22
463:6 473:14,17
490:5
**oral**  451:1
**order**  238:21,25
249:5 277:6
288:23 299:19

301:23 304:21
305:10 314:9
318:18 319:14
322:2,20 340:8
365:4 372:9
375:22 380:18
381:23 394:8
402:7 437:12
445:23 450:20
464:19
**orders**  270:1
**ordinance**  248:8
249:14
**ordinances**  248:6
248:13
**organization**
220:18
**organizations**
262:14
**origin**  478:4
**original**  492:16
**originally**  273:3
273:10 458:13
**originate**  213:13
**outcome**  493:11
**outline**  262:7
456:20 457:21
**outlined**  215:4
468:24
**outlines**  204:6
215:16
**outraged**  307:5,7
**outside**  216:25
287:16 288:1
323:2 350:13
403:19 413:17
423:9,10 443:2,2
465:20 473:24
474:1
**overly**  460:1

Page 35

[overruled - payout]

**overruled** 205:6
205:17 210:15,22
211:5 218:14
228:20 235:10
236:14 237:7
254:22 256:11
289:21 294:22
305:14 313:7
345:17 358:4,12
366:10 392:19,19
470:22
**owes** 430:8
**owned** 224:5
261:2 352:19
**owner** 273:20
346:25 347:5
383:20
**ownership** 346:8
**owns** 337:12

**p**

**p.m.** 198:12 320:9
320:9 378:2
398:11,11 430:17
430:17 454:21,21
491:15
**p1** 202:25 203:17
**p2** 202:25 203:17
429:3,4,5
**p2p** 481:10,13
**p3** 202:25 203:17
429:11,12
**page** 200:2 222:21
222:22 225:11
227:5 232:22
233:6 237:15
248:16 255:13,21
255:22 258:14
278:20 279:3
280:5 285:5 287:9
289:4,23 290:8
292:13,14 293:11

294:5,15 295:19
296:20,24 297:16
300:10,21,23
301:15 308:5
320:11 323:22
326:5,15 328:6
331:15 333:15
337:19 349:12
355:24 356:3,3
357:6 359:3,3
362:3 388:23
389:22 392:6
393:19 416:1
418:3 431:24
432:20 439:2
441:8,10 444:5,14
466:5,20 478:18
479:4,7 486:5,10
486:12,13 489:1
493:3
**pages** 208:13,18
450:16,25
**paid** 312:5 315:11
316:11,17 317:13
318:15 319:7,17
342:3 351:20,22
366:24 367:1,3,5,5
367:25 371:19,22
390:11 412:16
423:20 424:5
428:3 429:17
474:12 490:9,10
**paints** 268:21
**paired** 326:6,17,23
**pandemic** 262:1
352:19
**papers** 339:17
448:5
**paragraph** 215:4
215:15 216:4
217:15 224:12

255:15 300:22
309:1 388:24
481:14
**paragraphs** 486:6
**parameters**
472:19,21
**parents** 367:4
**park** 266:21,23
337:13,17,22
338:3 346:18
377:21
**parking** 396:17
438:21
**parkway** 375:18
**parmeter** 455:6
**parrott** 454:23
456:11 457:11
**parrott's** 448:11
**part** 212:15 236:1
241:10 262:3
269:18 270:6,16
282:21 295:6
338:22 353:6
363:9 383:23
387:5 419:7
463:18 470:10
473:8 475:4 476:6
484:12 485:11
487:25
**participating**
491:7
**particular** 202:12
202:18 209:5
213:24 246:20
252:6 258:1,16
379:9 431:12
**particularly** 469:5
**parties** 492:19
493:8
**partner** 225:3,8,20
227:9 230:8

232:21 265:18
309:9 311:2
328:10,12,15
432:2,14,25
**partner's** 309:2
**partners** 300:25
**partnership**
226:22
**parts** 235:15
**party** 337:12
364:20 486:5
492:23 493:6
**pass** 267:24
318:18 344:16
430:14 433:20
443:13 444:19
**passenger** 433:1
433:16 466:18
481:10
**passengers** 384:14
430:20
**passing** 341:21
**pasted** 434:4
**patience** 321:13
321:15
**pay** 288:6 300:12
314:10 316:3
341:25 377:20
475:8
**payee** 347:22
**paying** 308:8,10
**payment** 236:10
236:17 283:24
287:25 313:20
315:22 321:20,25
322:10 324:13
337:19 462:12
**payments** 422:25
**payout** 369:9
370:10

Page 36

[payroll - platform]

**payroll** 465:15
**pdf** 250:6
**pedicab** 337:22
    338:8
**pedicabs** 337:7,9
    337:23 338:2,13
    338:18,24 346:2
    346:18,25 347:5
    347:22 348:3,7,13
    348:18 349:21
    350:3,18 351:13
    352:4,15 372:18
    420:22 421:1,9
    426:17,24 480:25
**peek** 427:10
**peer** 481:16,16,24
    481:24
**penalize** 387:23
**penalties** 335:13
**penalty** 416:12
    418:6 419:16
    426:14 427:16
**people** 258:18
    261:5 270:2
    332:22 343:20,20
    343:21,21 413:3
    445:23 459:8
    460:6,22 462:15
    466:3 471:9
**people's** 459:6
**percent** 280:24
    307:4,10,11 311:2
    311:4 346:8
    361:16 373:14,14
    375:4 464:7,14
**percentage** 276:4
    307:8 308:9,10,18
    308:22 309:7,11
    309:12 464:6,10
    464:11

**perfect** 220:3
    371:6 398:9
    421:15
**perfectly** 356:5
**perform** 310:6
    473:16,25
**performance**
    288:15 459:15
**period** 216:22
    222:13 245:23
    247:14 283:10,20
    330:4,17 339:5,21
    341:7 350:14
    351:6 352:16
    372:20 398:13
    409:12,14,18,24
    438:5,19 440:24
    441:1 442:19
    460:2
**perjury** 416:12
    418:6 419:16
    426:14 427:16
**permanent** 282:23
    291:18 295:8
    356:11 392:17
**permanently**
    284:14
**permit** 266:8
    368:23 374:6,12
**permits** 414:10
**permitted** 269:23
**permittee** 249:9
    249:10 251:5
**permittees** 248:25
**person** 208:7
    218:2 225:25
    226:12,12 227:2
    283:25 311:14
    325:20 471:5,12
    489:9,10

**personal** 216:24
    267:16 271:2
    364:15 370:13,18
    370:22 383:18
    385:14 406:23
    429:24,25 462:9
    466:14 467:24
**personally** 220:13
    365:8
**personnel** 266:7
**perspective** 267:5
    448:6
**pertains** 311:21
**pet** 478:18,22
    479:2,10
**petroleum** 421:1
**pets** 478:24
**phone** 204:18
    225:23 229:2,4
    269:14 359:14,16
    363:11,14 386:17
    454:5,8 462:10
    467:24
**phone's** 204:12
**phones** 208:16
    336:13
**photo** 239:12,20
    240:7
**phrase** 481:13
**physical** 203:22
    260:15 358:21,24
**physically** 325:21
**pick** 245:21,22
    277:16 306:10,15
    316:18 317:6,8,13
    319:3 380:1
    403:18 412:1
    429:7 464:23
    465:2 472:12
**picked** 245:9
    246:2

**picking** 301:15
    433:23
**picks** 245:17
    292:13 404:10
**pickup** 313:14
    314:3 317:17,21
    317:24 318:3
**pickups** 217:18
    219:6 221:10,14
    223:14 228:13,17
    229:19 287:17
    331:12
**pictures** 431:15
**piece** 272:4
**pilot** 234:22,24
    235:3,12,13,17,20
    235:22,24 236:1
**piloted** 234:19
**piloting** 235:14,19
**place** 227:2 235:24
    236:1 281:23
    296:12 319:5
    332:9,25 342:12
    377:21 398:7
    437:12
**placed** 382:8
**placing** 382:11
**plain** 438:14
**plaintiffs** 446:21
**plan** 273:10
    363:16 364:2
    454:4
**plastic** 320:25
**platform** 224:4
    284:23 287:8,15
    305:21 310:6
    325:20 328:3
    344:4 365:9,13
    366:12 371:2,7
    372:10,21,24
    373:4,12,13,22

Veritext Legal Solutions
346-293-7000

[platform - previously]

383:14 388:6
437:4,8 439:21
440:3 443:3 459:5
464:2 466:4
490:20
**platforms** 373:16
408:12 461:2,4
**play** 376:19
421:24 438:6
462:7 467:22
**playing** 438:20
**please** 208:2 213:2
214:16,17,19
216:1 221:18
222:17,18 227:17
230:5,8,9 234:12
241:15,24 243:16
248:6 265:24
266:25 268:3
272:24 278:10
279:3 289:1 293:4
297:17 303:8
304:25 306:21
308:5,9 309:9
312:16 320:12
324:24 326:6
327:3,10 331:2
332:9 334:11
345:18 347:12
354:12 357:8
358:12 362:7
372:15 382:10
388:13 391:14
396:4 398:6,15,20
402:22 422:8
432:1 436:17
438:16 439:1,2
440:18 441:9
443:24 455:10
463:14 476:24
478:14 491:7,11

**plenty** 447:17,24
**plumber** 257:21
**plus** 343:16
**pocket** 369:1
386:2
**point** 217:6 221:12
225:2,6 228:10
230:23 240:23
243:6 271:9,13
274:6 289:10
297:13,15 308:1
308:19 328:2
339:17 340:6
350:23 352:8,10
359:20 369:5
386:11 393:7,9
394:15 408:25
434:1 444:22
462:20,20 471:6,6
471:10,10,21
491:2
**pointed** 215:22
**points** 203:8,14,16
203:25 206:2
207:8 434:16
464:6,10,11
**police** 215:12
263:19 332:3,6,8
332:11,22,25
333:7 334:23
395:23 396:9
397:3,7,12,13,14
397:18,21 398:1
400:2 401:23
402:15
**policies** 216:5
229:13 271:3
293:20 294:8,12
295:23 296:4
297:9 299:8
354:21 390:20,21

**policy** 216:16
217:4,24 218:1,22
218:24 278:19,25
282:1 286:17
290:5,15,24
291:21 292:19
293:2 298:17
359:8 362:22,25
363:1 437:21
468:7 478:1,8
**pool** 317:14,18,19
326:1 463:1
466:15 473:14
**poor** 306:12
**pop** 354:6
**portal** 489:21
490:24
**portion** 328:20
485:10
**position** 262:24
343:13 430:14
457:24
**positive** 233:8,14
**possible** 267:13,20
282:18 378:16
407:13 408:17
428:13 435:3
440:10
**possibly** 445:13,16
**potential** 244:11
260:6 473:18
**potentially** 301:16
440:10
**power** 311:23
459:5
**ppp** 350:3,10
351:4 352:1
**practices** 460:11
**pre** 218:6 447:6
450:18

**preconceived**
243:12 455:23
**predicated** 469:3
**preferred** 276:12
405:8
**prejudice** 451:10
451:16
**prejudicial** 269:1
**preliminary** 201:2
**premier** 389:14
**premium** 394:15
**prepare** 202:20
260:11
**prepared** 269:8
**preparer** 419:7
**preparing** 267:18
**prescribe** 479:11
**presence** 453:6
**present** 199:14
417:8 447:14
460:12
**presentation**
450:21
**presented** 270:20
448:8
**presenting** 447:8
**preshant** 227:21
**presumably** 251:8
**presume** 270:2
**pretty** 313:2
325:13,17 372:24
459:16 461:13
481:19 485:25
**preventing** 217:24
246:5
**previous** 293:20
295:23 297:9
342:9 399:15
490:7
**previously** 201:20
207:4 218:10

Page 38

[previously - publish]

223:19 404:17
457:18
**price** 237:9 238:8
278:5
**prices** 211:2
237:11,19 243:24
244:3,4 247:23
**pricing** 389:23
**primary** 275:12
275:13 277:8
430:23 433:8
**princess** 220:3,4,9
**principal** 420:16
**print** 489:5
**printer** 350:2
489:9
**printers** 489:11
**prior** 202:8,11
271:15 447:10
448:2,19 453:8,9
488:7 489:13
**privilege** 231:18
**privileges** 220:6
230:7
**probably** 260:19
339:7 341:8
384:15 386:11
397:16 410:2,4
414:11 445:24
**problem** 207:16
242:18 310:8
312:5 354:14
448:2 449:2 451:5
**problematic**
301:17
**problems** 315:12
491:9
**procedural** 449:19
**proceed** 201:16
382:11 454:7,9

**proceeded** 245:16
**proceeding** 241:14
447:5,11 448:19
453:18 454:2
**proceedings**
492:15
**process** 296:10,12
296:16 370:8
468:23 479:9
482:21 488:4
**produce** 417:19
**produced** 202:23
217:13 232:9,11
246:1 258:1,14
264:25 272:6
334:7
**producing** 239:17
**production** 240:14
**professional**
233:13 310:17
323:15 425:12
437:20
**professionally**
384:19
**profile** 489:1
**profitable** 302:15
**profits** 390:2
411:19
**program** 209:20
209:24 210:8,13
211:1 212:7
269:19 357:13
**prohibit** 370:21
**prohibited** 287:18
411:23
**prohibits** 478:1,9
**project** 268:15
271:24
**prompt** 303:11
**pronounce** 344:23

**pronounced**
344:24
**pronouncing**
350:25
**proof** 268:7
270:21 449:4
468:5
**proper** 448:10
**properly** 312:23
313:4
**property** 358:19
425:3 466:14
**proprietary**
207:12,14,21
212:3 269:11,14
269:16 271:17,20
271:22
**proprietor** 420:14
421:6,8
**protect** 370:6
**protective** 270:1
**prove** 241:7
304:19
**proven** 452:12
484:17
**provide** 204:11
218:5,25 219:7
251:4,5 265:25
266:3,25 271:15
276:13 321:7
325:7 333:12
383:24 390:15
405:5,24 408:11
410:4,7 413:16
438:19,24 443:1
461:17 468:3,17
469:6 470:8
473:13 483:9
485:14 487:10
488:8

**provided** 219:17
219:18 245:11
246:7 247:8,10,14
249:19 251:14
252:3 258:3
266:17 298:15
313:13 321:9
346:24 347:4,14
351:11 352:11
365:22 383:24
384:8 385:19
387:13 406:20
407:5 409:9 412:8
412:25 416:24
429:14 443:6
448:24
**provider** 344:15
363:11
**providers** 336:14
**provides** 204:11
483:11 485:12,25
487:3
**providing** 218:15
266:16 267:5
407:15 415:8
418:20 421:12
442:21 471:21
478:23 479:1
486:19
**provision** 481:10
483:22,24,25
487:9
**provisions** 198:15
**provoke** 299:23
**provoking** 285:7
**public** 261:21
269:17,18 492:25
**publicly** 205:22
208:12 250:2
**publish** 261:19

Page 39

**[published - rates]**

published 230:20
publishing 253:25
  254:16 255:24
  268:18
pull 201:13 248:5
  252:23 289:1
  293:4 304:25
  306:19 324:24
  334:8 337:3
  347:11 372:12
  381:4 388:12
  398:1 406:5,9
  415:19 440:16
  443:24 463:7
  476:25 478:13
  480:5,11 482:19
pulled 207:4
  215:12 263:19
  334:23 395:23
  396:9 397:2,11,17
  397:21 400:2,13
  401:22 402:14
pulling 355:19
  362:2,4 415:20
  419:3 457:21
puncture 396:20
punished 437:2
purchase 366:2,21
  369:4
purchased 342:8
  342:15 349:25
  366:20,22
purely 448:22
purposes 235:4,16
  278:14 285:12
  289:9 299:15,24
  300:2 441:9
pursuant 198:15
  492:21
pursuits 345:21

put 240:16 277:10
  281:23 301:18
  321:18 333:3
  382:4 397:9
  398:16 456:12

**q**

q&a 303:8
qualifications
  373:7
qualifies 366:5
qualify 318:12
  327:19 372:24
quality 279:12,13
  282:21 289:23,25
  293:13,16 295:6
  297:2,3 321:17
  393:5
quarter 407:10,14
  420:11,12
quarterly 490:11
quasi 262:6
question 201:6
  204:3,8 206:16,16
  208:1 210:9 212:4
  212:5 214:16,19
  217:11 233:21
  234:12,18 235:9
  235:16 240:5
  241:1,24 242:1,15
  242:24 243:13,16
  243:18 246:16
  250:4 266:12
  282:24 298:23
  310:4 312:21,21
  315:8 328:5
  329:18 337:21
  354:11,11,13
  355:7 358:13
  369:21 370:5
  375:17 389:13
  391:11,25 392:1,5

392:14 393:16
396:25 397:15
408:18 409:15
414:15 416:22
418:12,22 424:2
433:16 435:25
438:14,16 439:7
441:10,15 443:5
445:4,5 446:17
448:9,17 455:21
456:6 460:4
471:23 474:14,19
474:21 475:1
questioning 210:2
  268:2 487:25
questions 214:13
  241:17 243:11
  268:10 269:1,5
  270:9 311:5 349:5
  354:17 363:23
  369:25 370:3
  390:21 407:5,8
  416:9 443:15
  444:21 455:18
  456:1 489:14
queue 277:10
  333:19
quick 263:3
  398:18 427:10
  430:12
quicker 387:19
quickly 212:13
  289:12 367:3
  398:23 399:2
  444:14 451:20
quit 353:21 442:15
quite 251:15
  253:22 289:16
  395:6,8,9 459:15
quote 218:15
  236:22 263:24

314:3
quoting 236:16
qx60 366:16,17

**r**

r 199:10 492:17
race 478:3
rail 273:23
raise 398:15
raisor 468:20
  469:12 475:25
random 364:18
range 367:16
  385:18
rare 406:3
rarely 376:24
  377:17 380:3
rasier 468:12
  480:4,10 487:2
rate 279:8,10,14
  280:19 281:11,12
  281:14,18 282:25
  283:1,2,8 290:1,18
  290:22 291:2,14
  293:17,25 294:2
  294:10 295:5,11
  295:12 297:5
  335:11 336:4
  357:8,17,20
  360:20 389:23
  440:7
rated 277:24
  361:17
rates 249:1,8,16
  250:10,24 251:6
  253:25 255:23,24
  255:24 279:7
  282:20,21 294:14
  295:6 355:25
  373:1 390:25
  392:17

Veritext Legal Solutions
346-293-7000

[rating - recross]

**rating**  224:18
230:8 233:2
277:20 279:6,17
279:19,19,21
280:3,6,10,14
290:8,13 294:5
297:4 300:23,24
301:2,12 306:18
357:13 360:7,12
361:21 362:9
410:20 437:16
**ratings**  219:21
222:7 227:13
233:17 279:5,14
279:24 290:1
293:17,23 300:22
331:20 360:4
361:14,20
**reach**  245:4
315:14 454:7
**reached**  219:19
315:13 317:10
**reaches**  221:17
228:24 230:5
**reaching**  220:5
307:15
**reactivate**  230:9
327:3
**reactivated**  329:24
**read**  214:19,20
243:19 268:15
278:18 282:2
312:19,20 351:21
356:6 359:11,14
359:16 362:25
387:4 393:23
428:17,18 451:20
**reading**  218:8,17
393:22 400:20
484:4,12 485:1,5

**ready**  201:15,17
201:18 268:5
305:16 327:25
378:15 398:20
446:18 449:7
454:7,25
**real**  261:1 311:14
474:6
**really**  236:25
237:6 326:10
332:16,19 336:11
337:1 374:3 386:7
398:22,23 399:1
425:21 439:11
444:14 469:2
472:2,11 488:16
**realtime**  201:7,12
210:18
**rear**  384:3
**reason**  215:14
266:20 271:7
272:1 313:3 317:1
325:5 333:12
353:4 376:2
385:11 389:10
435:23 448:3
467:3,10
**reasonable**  263:1
**reasons**  214:8
267:12 271:1
333:20 358:8,15
370:19,22 371:4
466:11 467:14
493:4
**recall**  226:5
234:20 251:15
252:5 253:22
254:4,4,12 264:1,8
264:15 274:19
279:25 288:11,14
290:15,23 297:21

306:16 316:24
318:14 320:18
323:9 325:9
327:14 329:13
338:3,4 339:11
340:16 359:19
361:22 362:22
374:20,23 387:25
390:9 393:8
394:13 395:18
397:4 407:10,14
408:20 423:13,14
431:16 434:11
435:11 438:4
439:4,8,12,15,18
443:9,18 444:2
**recalled**  291:21
**receipt**  324:19
493:2
**receipts**  421:18
422:20 424:4
427:11
**receive**  217:17,19
221:9 250:25
267:11 276:9,15
277:6,23,24 278:2
288:17 305:3
312:25 318:2,19
318:22 319:4,14
322:5,19 324:10
326:1 331:10,12
340:8 350:18
352:14 378:16
404:15 435:15
438:10,23 446:10
482:5 488:24
490:23
**received**  227:11
248:11 249:24
250:6,8 251:18
313:1,20 350:3,10

351:4,16 354:20
361:21 367:3
386:9 405:11
421:12
**receives**  318:15
343:1
**receiving**  351:21
**recess**  263:8 320:9
398:11 430:17
454:21
**recessed**  491:16
**recipient**  404:20
**reclassification**
262:11,19
**recognize**  347:19
357:16 371:16
372:6 385:6
432:13
**recollection**
339:13 343:25
440:25 486:7
**recommendation**
366:4
**reconsider**  227:18
**record**  198:16
201:11,14 202:7
214:20 255:2
265:7 272:25
278:14 289:9
355:5 381:7
400:20 441:9
447:20 448:1
468:15 492:15
**record's**  295:3
**recorded**  202:12
325:6
**records**  297:23
**recourse**  430:24
433:8
**recross**  456:24

Veritext Legal Solutions
346-293-7000

[redirect - representative]

**redirect** 456:24
**reduce** 381:19
**referenced** 311:21
**referrals** 413:5
**referred** 378:8
412:21 430:19
433:1
**referring** 220:11
220:19,24 223:4
254:23 258:17
262:8,16 355:8
409:14
**reflected** 321:20
**reflects** 421:11
**refresh** 349:18
361:24 362:14
392:20 393:15,16
394:4 398:24
404:21
**refused** 263:14
303:14,14 323:2
323:14
**refusing** 478:7,9
**regarding** 361:20
407:5
**registered** 248:21
304:24 364:11
**registration**
327:10 468:6,8
477:5,6
**regular** 304:23
343:3
**regulations** 468:4
469:3,17,18,19,20
469:22,24 470:1
470:10,12,13
471:18 472:16
476:19
**regulatory** 468:15
475:23 476:2

**reimburse** 322:1
429:24
**reimbursed** 323:6
324:20
**reimbursement**
321:18
**rejoined** 458:22
**related** 211:21
430:1 490:1 493:8
**relates** 303:11
460:11
**relating** 212:13
259:19 260:6
**release** 270:4
**relevance** 205:15
210:14,21 214:6,9
350:12 358:2
435:17
**relevant** 352:5
**reliability** 391:5
391:15
**reliable** 282:21
295:6 364:9 391:1
**relied** 219:15
241:21 275:14
302:14 331:24
452:10
**relies** 217:2
219:21 222:16
331:21
**religious** 478:4
**rely** 319:14 341:24
**relying** 215:7
249:13,19,20
452:13
**remain** 221:11
283:7 302:23
303:1 327:4,7
381:23 453:19,25
464:19

**remaining** 333:19
**remember** 201:25
202:3,4,5 215:9
219:24,25 230:19
242:10 243:8
248:23 251:11,16
252:3,7 253:17,23
254:7,9,13 264:20
274:15 275:3
279:21,22 280:4
296:17 314:24
316:22 317:2
318:17 323:12
326:8 348:23
361:23 367:18,23
377:2 378:10
388:17,18 393:17
395:5,19 396:13
405:19 408:25
409:3,15,20 411:7
423:4 431:17,18
432:6 434:13,14
434:18 436:15,19
436:25 439:6,11
439:18 441:5,18
442:23 443:10
473:3
**remembered**
363:21
**remotely** 198:10
**removal** 279:25
**remove** 227:16
325:25
**removed** 228:25
231:4 309:8
321:19 325:20
437:3,7
**rent** 337:16,24
**rental** 273:18
337:13 338:15

**rentals** 346:23
347:3 420:17
**reopen** 451:8,9,16
**rep** 311:11,17
**repair** 321:3,8
322:2,20,20
**repairs** 321:1
**repeat** 342:10
391:12 438:16
**rephrase** 424:1
**replace** 389:17
**reply** 265:24
**report** 222:18
261:19 265:12,15
325:3 428:8
448:11 450:6,18
451:12 452:1,2,24
453:16,22,25
**reported** 198:14
348:1
**reporter** 198:13
454:12 492:11
**reporter's** 492:7
**reports** 447:3,7,20
447:22 448:4
449:3 452:8,13
453:4,10,19 455:5
**represent** 403:8
416:8
**representation**
447:7
**representations**
449:24 451:2
**representative**
205:2 206:5
212:12 214:3
220:14 249:12
252:11 267:18
269:8 270:19
331:7 452:20
484:16

Page 42

**[represented - reviewed]**

**represented**
262:13
**representing**
399:21
**request** 220:7
223:5 228:7
230:15 241:14
254:19 256:17,25
265:19 276:15
277:6,19 281:1
282:22 299:19
305:2,3 317:5
325:19 326:2
330:15 335:7
375:22 408:13
413:6 447:9,19
462:18 463:25
**requested** 214:20
223:1 228:5
230:13 318:10
389:5 492:23
493:5
**requests** 216:7
217:17,19,25
221:10 237:17
241:19 278:6
283:6 291:18
295:7 305:16
315:2 331:12
356:10 388:7,15
389:1 405:12
416:18 463:21
464:4 482:5
**require** 217:23
262:21 362:17,18
365:13 375:7
377:15 379:1,8,18
383:13 437:20,24
464:18 470:13
476:22 477:1,19
477:25

**required** 304:3,4,6
304:8,18,21,23
305:9 319:20
368:23 373:10
374:13 390:14
393:5 436:23
470:5,7,8 472:12
476:12,13,14
479:12
**requirement**
322:14 339:18
374:10 477:12,13
**requirements**
304:12 373:8,9
437:10,12 468:15
470:2 476:10,16
476:25
**requires** 371:10
470:14
**requiring** 321:1
**research** 268:17
**researcher** 268:16
**reserve** 268:2
**reserved** 324:3
**residence** 348:6
349:21
**resolved** 314:24
315:1 406:8
**respect** 242:2
253:11 268:8
271:14 383:16
391:23
**respond** 266:14
331:16 369:20
370:5
**responded** 266:11
**respondent** 198:4
199:9 201:18
449:7 454:9 455:3
457:2 487:25
492:5

**respondent's**
248:5 347:12,17
371:23 372:12
385:5 389:21
415:19 417:22
418:17 419:2
420:7 426:6,9
427:14 434:17
443:25 451:6
454:10 456:14
**responding** 242:6
448:23
**responds** 266:6
307:14
**response** 230:11
267:4 270:8,23
307:13 309:2
313:9,9 315:19
316:3,7,10 317:16
321:12,14 370:4
416:17 447:21
**responses** 415:21
418:1,2,7,19,20
441:4 443:25
**responsibilities**
476:6
**responsibility**
477:6,8,9
**responsible**
205:13,19 207:3
207:25 415:7
**rest** 265:18 356:2
446:21,24 449:18
449:20 451:6
**restaurant** 460:23
**restaurants** 301:1
459:7 460:22
**rested** 452:11
**restore** 222:18
303:14

**restored** 331:19
**restrict** 479:20,21
**restricted** 221:11
224:23 228:13
**restriction** 221:13
226:4,25 227:17
**result** 208:19
216:6 217:16
221:9 262:1
265:11,15 280:10
282:4 284:20
324:16
**resulted** 326:22
**results** 262:23
**retain** 483:6,14
486:1,22
**retained** 209:15
430:6
**return** 419:15,21
426:10 427:14
459:3,9
**returned** 351:24
492:25 493:2
**returns** 419:4,16
**review** 202:11,19
202:22,24 203:2
211:25 220:7,16
221:3 223:1 228:6
230:13 258:9
264:4,7,10,11
265:16 267:14,21
301:20 307:16
312:14 427:15
488:11,14,20
**reviewed** 223:5
228:7 229:11
230:15 264:18
313:12 319:10
329:19 419:17
426:12

[reviewing - right]

**reviewing**  293:1
294:6
**rewriting**  268:13
**richmond**  199:6
**riddled**  448:11
**ride**  244:11,11,19
245:4,9 247:9,19
247:21 254:17
257:1 258:5,12
263:18,20 275:17
276:15 277:5,6,8
277:14,19 282:4
286:8,10 288:6
317:4,12 318:9
322:13 334:22,24
335:14 336:1
352:7 380:1
392:11 395:1
396:8,10 400:5
404:6,6,10 405:11
408:11 443:2
463:1,21 464:24
465:2
**ridenour**  199:15
347:11 355:18
392:6 396:3 419:6
419:12 443:24
465:18
**rider**  233:16,25
245:6,9,12,18,21
259:20,25 260:7
260:12 265:9,22
276:8 279:10
285:11 288:6
298:18,21,25
306:15 314:9,10
315:22 318:8,13
320:14 322:9,13
322:19 323:1
324:4,13,22 325:1
325:3,4 326:7,17

326:23 334:20
335:7 342:25
357:7 358:3
360:21 387:13
395:22,23,25
396:14 399:14,18
399:21 400:12
402:12,19 403:2,8
403:13,13,21,25
403:25 404:3,5,9
404:16 432:11
436:19 437:1,3,7
462:2,3,4,8,15,22
463:3,18,21 464:2
464:3,24 465:14
466:11,22 467:4,6
474:12 490:9
**rider's**  306:7,18
389:5 478:2
**riders**  215:3,12,13
224:19,24 227:7
238:16 244:11,24
246:1,8,23 260:6
264:3 276:13
284:11 285:7
286:6 298:8,11
299:23 300:12,25
323:1 324:1,7
326:1 357:3,17,20
357:24 358:7,8,15
358:18 359:4
360:7,12,20
361:17 374:9
383:24 385:20,21
385:23 389:18
390:25 391:19
394:8 397:2
405:24 429:8
430:24 436:23
439:24 459:7
462:6 463:6,16

464:4,20 465:6,16
466:2,6,15,15
467:7
**rides**  218:6 219:1
224:23 237:17
238:20 276:19,23
277:3 280:22,23
282:3,8,18 283:2,3
291:13 292:11
294:17 295:11
310:9 328:4 330:3
332:18 336:7,9
341:3,4,5,6,9,10
341:15,16 343:3
343:15 344:15
360:9 388:17
396:18,21 439:24
439:24 440:2,10
460:19 461:25
462:2 464:15
465:7,11 467:18
478:19,20,23
479:2,10
**right**  203:9,10
204:12 205:20
206:6,12,25 209:8
213:7 216:10,11
218:11 221:5,6,14
221:16 222:19
223:3,7,15,16,20
223:22,23,25
224:16,20 225:3
225:17,19,25
226:10,17,22
227:18 229:23
230:17 233:17
234:1,5 235:19
236:22 237:2,15
237:20 238:22,23
239:4 243:5
245:13 248:14

250:9,19 251:1,3,7
252:9 255:9 256:2
256:19 258:20,22
259:12 260:20
261:2,10,15 266:3
266:11,16 267:2
275:3 280:1,4
289:21 293:23
299:14 327:1
331:5 334:12
339:11 341:13
344:14 345:8,21
346:6 347:4,11,22
348:3 350:3
353:18 354:4,22
355:2,13,21,25
356:11 357:3,17
357:22 358:8,19
359:5 360:3,17
361:14,22 362:6
362:17 363:19
364:16 365:24
366:25 368:5,25
369:6 370:7,24
371:2,13,15 377:8
377:18 378:17
380:8,25 381:12
381:25 382:10
383:1,8 385:3,8
386:17,25 387:12
387:15 388:7,21
389:7,25 390:4,17
391:17 392:9,25
394:13,17 399:6
399:15,17,19
400:16,22 401:3,8
401:23 402:12,15
402:22 403:2,11
403:16 404:7,12
404:17 405:6
406:3,19 407:20

**[right - says]**

408:3,10,18,20
409:8,20 410:5,11
410:16 411:2,15
412:10 413:10
415:22,25 416:5,7
416:14,22,25
417:8 418:9
419:18,22 420:4,9
420:14 421:1,4,13
421:21 422:14
423:13 425:9
426:4,19 427:11
427:13,20,22
428:14,25 429:5
429:20 430:9,11
431:23 432:4,16
432:23 433:2,4,10
433:18,20,23
434:13,14 443:10
444:8,13,15 445:5
445:23 446:25
449:10 456:3,16
457:8 458:7
460:14 461:10
463:18 464:17
465:4,5 470:4,4,19
472:4 476:8,18
483:8,11,17,19,22
484:14 485:17,20
486:1,23 487:4,5,6
487:12 491:13
**rights** 432:14
**ring** 388:14
**risk** 262:3,7,7,15
262:25 283:7
458:16
**road** 242:2 243:25
296:7 317:3
375:17
**robust** 461:14

**rodolfo** 323:23
**role** 458:18,25
**room** 201:10
216:1 265:6 270:3
322:17 349:14
402:6 452:17,17
491:8
**rosenblatt** 268:12
268:16,23 270:25
271:8
**rosenthal** 199:17
200:3,9 201:19,23
205:1 214:16
240:13,18 243:22
250:4,5 268:2,9,25
270:7 271:4,9
272:2 322:16
449:13 455:19
456:16,23 457:5,6
457:10,14,17
463:10,13 465:24
466:10,22 477:18
477:24 478:16
479:6 480:13
481:8 482:20
483:10 485:2,9,24
**rotate** 428:12
**rough** 342:13
**roughly** 481:17
**round** 459:5
**route** 310:18
378:17
**rude** 323:5
**rule** 243:13 300:16
300:19 301:9
410:13 411:1
450:1 492:21
**ruled** 207:19
270:25
**rules** 268:13
286:14 288:8

301:11 314:9,12
324:14 340:8
**ruling** 223:6 243:7
271:18 449:18,20
453:16,24 455:8
**run** 363:5
**rush** 464:9,9
**rx18** 475:19
**rx22** 463:7,14
**rx33** 482:19,20
**rx35** 478:13,16
479:7
**rx48** 480:11,12,20
**ryan** 199:5

**s**

**s** 490:4
**safe** 265:14 286:7
357:1
**safety** 267:12
286:5 287:15
323:25 415:7
**sales** 224:5 260:4
**sallenave** 225:12
225:22
**sandahl** 199:10
200:10 201:6,18
204:25 205:15
206:13 207:11
210:1,14,20 211:4
212:2 214:6 217:5
218:12 228:18
231:16 232:18
234:9 235:8
236:11 237:4
239:15 249:18,25
251:20 252:25
254:20 256:9
264:23,24 265:3
268:1 270:24
272:19 449:12
456:18 457:4,8,20

460:4,5 470:23
471:23,24 472:6,8
475:1,2 481:4
484:25 485:2,9
488:1 489:18,20
491:1
**saturdays** 370:16
379:24
**save** 376:11
**saw** 290:4 292:18
295:22 296:3
422:9 436:7
**saying** 218:8
225:23 229:23
232:12 246:6
247:11 290:15
351:23 353:9
370:3 401:22
402:14 449:14,19
475:3 484:16
491:10
**says** 213:11 216:3
216:4,9,15,17
217:14,16 218:2
218:18,21,23
220:4 221:2,4,17
221:24 222:6,23
223:8,11,21
224:12,18,21
225:1,19,21 226:1
226:18,20,23
227:10,15,16,19
227:21 228:4,9,25
229:8,9,14 230:5
230:12,18 232:6
232:23 233:4,13
233:15,16,18,19
233:24,25 234:2
234:15 237:21
241:18 243:23
244:1 248:15,17

Veritext Legal Solutions
346-293-7000

[says - see]

248:25 255:4,7,12
255:15,20,22
256:3,14,16
263:15 265:10,12
266:4,19 267:2,3
267:11,15 268:19
278:21 279:12,16
280:6,25 281:10
281:18 282:20,20
284:8,25 285:5,11
285:23 286:6,24
287:10,14,25
289:24 290:8,12
290:20 291:1,17
291:23 292:14,23
295:5 296:9
299:12 300:23
305:2 309:1,2
311:2 313:9 314:2
317:17 321:3,12
321:15 323:23
326:15 328:10,15
329:6,6,19 330:8
333:16 355:25
356:22,25 357:7
389:1,12 395:25
396:5,15 402:19
403:21 404:3,9
416:21 417:8
425:22 426:2
428:22,25 433:4
442:3 453:23
486:18

**sba** 351:23

**scared** 440:2

**scary** 325:17

**schedule** 248:18
249:1,7,16 251:5
319:25 382:18
420:8,24,25
421:11 426:17

427:8,19

**scheduled** 377:9

**school** 273:15
303:19 304:14
345:8 353:8
377:13

**scooters** 461:3

**screen** 239:16
240:7 251:18,19
252:4 256:17,25
258:8,15 305:4
463:8

**scroll** 334:12,17
356:2 357:5
415:25 422:11
440:19 444:5

**scrolling** 477:14

**seat** 363:25 386:2

**second** 216:4
217:15 228:10
240:22 247:14
287:12 309:1
312:19 328:9
334:18 388:25
418:18 465:19
478:14 479:4,7
481:14,15

**secondary** 433:15

**seconds** 203:9,11
204:1 208:21
258:4,11 305:5,8
305:17,23

**secret** 207:21
269:11,15,16,25

**section** 248:17
256:14 280:18
282:19 284:8,24
286:5 287:10,21
289:23,24 290:12
290:18 291:14
292:16,18,21

293:12,22,25
294:2 299:5
300:11 319:9
356:3 357:6
362:22 389:12
475:20 477:16,19
477:23,25 478:6
479:7 482:2 483:4
483:9 485:11,22
486:21

**sections** 294:4

**security** 266:7
268:15 332:8,12
332:25 333:8
397:14

**see** 201:2 221:19
221:23 222:4
224:6 225:11
226:24 227:9,14
229:6,17 232:13
239:4,6,9 240:19
242:1,8,11 243:3
243:23 245:25
248:25 249:3
252:22 253:21
254:23 255:4
256:17,24 266:5
266:13 267:22
285:13,18,19
287:2,10,12,19
289:7,11 290:2,10
290:17 291:4,16
292:2,16,17,22,23
292:25 293:6,8,10
293:12,15,18,22
293:25 294:2
295:9,19,21,25
296:1,2,13,21
297:1,6 299:4,6,16
300:11,14,15,22
301:3,21 305:3,6

307:18 308:6,12
308:13 309:5
310:24 311:6,7
313:15 314:18,20
314:21 315:3,7,8
315:17,25 316:1
316:14,20 317:20
318:21 319:9
320:16,17 321:3
321:11,22 323:7
325:23,24 326:8
326:18,19 327:12
328:6,8,14,17
329:22,23 330:12
330:13 333:22
334:14,19,25
335:7 338:18
349:13 355:24
356:5,12,22,24
357:6,10,11 358:7
358:22 361:24
362:7 372:5,6
381:9 389:3,15
392:5 393:20
399:12 401:19
402:23 406:19
407:21 416:2,21
416:21 417:2,7
418:11,22 420:13
421:17 422:14
425:22 426:1,2
427:19 428:8,15
428:19,22,24
429:1,2,13,14
432:22 433:5
435:6 440:19
442:8 445:24
447:16 453:23
466:5,7 479:24
484:10,24 490:8
490:15 491:12

[seeking - sic]

**seeking** 330:25
407:3,4
**seeks** 231:17
**seen** 216:23 232:9
232:11,14 233:7
246:20,24 248:9
257:6,9,12,15,19
257:25 258:8,15
261:18 262:7
293:19 294:7,11
297:9 302:6
306:23 431:11
465:22
**sees** 239:7
**select** 250:22
311:3,22 463:4
473:15
**self** 420:2
**sellers** 460:20
**send** 218:22 278:6
325:2 329:9
334:19 379:4
396:23 397:1
455:11
**sending** 213:13
260:4 431:18
**sends** 213:15
**seniority** 227:12
**sense** 340:24
341:16 342:13
383:21 423:17
446:7
**sent** 223:6 224:7
228:7 230:15
241:19 263:15
264:1 320:13
325:1 329:12
335:1 336:19
393:11 395:25
396:5

**sentence** 219:23
222:17 232:23
289:23 291:1
293:15 296:9
297:2 325:19
331:22 388:25
**separate** 475:14
475:16
**september** 252:7
255:7 274:12,14
399:13 414:11,12
444:7,16
**series** 406:24
445:3
**serious** 227:10
237:2
**served** 492:18
**serves** 486:7
**service** 205:8
236:19,20,20
282:22 295:7
302:19 311:2,4,16
311:20 312:1
315:15,21,23
316:4 336:11,15
344:14 363:14
383:18,21,23
391:1 397:8 421:3
424:8,10,11
426:22 427:8
445:23 471:16
478:7,9,19,21,24
478:24
**services** 204:4,10
276:13 339:19,20
346:24 347:4,14
351:12 352:12
363:9 364:9
365:23 377:9
383:7,17 384:20
385:2,20 390:15

405:6,24 412:7,8
412:25 413:2,10
413:17 416:24,25
421:9,13 425:15
461:18,21 468:11
468:18,20,21,25
468:25 469:14
470:13,16 471:12
473:16 478:10
480:14 481:7,9,11
481:12,20 482:5
483:13 485:14,18
485:18,21 486:19
487:10 488:3,9
**session** 240:14
**set** 236:19,21,23
237:3,12 277:22
278:1,5 286:19
295:12 382:18
469:18,23 471:18
472:18
**sets** 247:17,20
319:20
**setting** 487:13
**settlement** 435:15
**seven** 230:7
375:21 397:16,17
445:12,15 458:10
458:24 485:22
486:22
**sex** 478:4
**shaking** 240:19
**shame** 266:24
**share** 318:21
491:5
**shared** 333:4
463:1
**shareholders**
262:4,11,19
**sharing** 264:8

**shauna** 198:12
398:15 422:7
455:12 492:11
493:16
**shippers** 460:25
**shirt** 384:20
**short** 283:10,20
335:9 372:20
394:19,23 398:3
404:5 446:13
**shortage** 464:22
465:1
**shorten** 456:19
**shorthand** 198:13
492:11
**shortly** 329:21
414:9
**shot** 251:19
**shots** 239:16
**show** 215:3 239:13
241:8 253:12
258:3 273:20
277:20 297:23
330:8 335:8 389:1
419:21 439:2
448:9 455:23
479:8
**showing** 201:7
254:1 255:25
388:20 396:16
397:20
**shown** 254:6
277:18 389:6
492:19
**shows** 215:24
406:15,19 422:1,4
429:5,11 479:9
**shut** 442:12
465:20
**sic** 256:17 366:15

Page 47

[side - soussan]

side  318:9 387:3
406:17 440:18
451:14 459:1
462:2 467:17
sidebar  334:15
sided  387:7
sign  354:6 416:5
437:24 468:23
signal  306:12
signature  416:3,7
418:4 444:15
492:22,25 493:3
493:15
signed  339:16
353:25 354:3
417:17 471:17
490:1
significant  224:15
258:24 259:13
260:3
signing  488:4
similar  262:14
290:4,23 292:18
293:1,19,21 294:6
294:11,15,16
295:22,24 296:3,5
297:8 299:14
355:20 463:3
467:14,16 471:5
486:1
similarly  467:21
simple  280:21
281:8
simultaneous
251:21
simultaneously
408:3,7
single  244:16
245:4 282:4 337:9
sir  202:21 210:8
213:7 219:12

233:9 239:12
245:18 249:17,23
250:15 253:18
263:25 275:18,22
276:3,7,10,14,21
277:25 278:4
279:1 283:22
284:5,18 285:4,10
285:16,22 286:4
286:11,23 287:24
288:3 290:25
291:9 293:3
294:20 297:11
299:3,18,22,25
300:3,9 303:23
306:3,6,14 310:7
311:23 312:2
314:12 317:23
318:4 319:19
322:3,12,22 324:8
324:15,23 326:3
326:14,25 328:21
330:19 333:14
334:2,6 336:20,23
338:9,9 342:2
439:14 441:2
446:17 456:13
sit  206:2 214:2
site  205:22
sits  208:19,21
sitting  484:19,22
situation  245:23
246:16 265:13,24
313:18,23 316:2
316:16 335:5
situations  335:21
six  339:7 397:16
397:17 401:25
458:19
sixth  483:5

skherkher  199:8
skill  304:4,5,8,13
304:15
small  266:22
332:2,16,19
smaller  467:1
snapshots  264:10
snow  317:3
society  268:17
325:3
software  208:9
229:4 259:11
260:10 460:18
461:6,11,16
473:24 485:17
soh  199:16
sold  367:6,11,14
sole  249:13 270:20
301:18 338:12
351:1 483:6,11,17
486:1,23 487:4
solely  217:20,22
solicited  288:5
soliciting  287:25
solutions  458:18
493:17
somebody  328:25
366:21 471:2,2,25
son  377:12 445:9
soon  277:9 400:12
sooner  363:25
sorry  214:18
229:10 232:23
238:24 257:23
258:21 294:23
313:10 322:15,16
322:24 323:24
334:9,11,15
339:12 345:3
374:23 393:8
395:5 409:20

425:20 476:18
485:22 486:14
sort  203:23 209:7
211:17,19 213:25
213:25 215:8,15
215:16 222:2
272:6 314:21
393:22,23 409:13
463:11 485:15
sounds  226:10
366:25 475:24
source  275:13
277:8 282:17
283:23 284:5
337:25 433:8
444:23,24,25
sources  421:23
427:20
soussan  198:2
199:21 201:1,12
201:15 205:6,17
206:15 207:14,19
208:1 210:3,7,15
210:22 211:5
212:4 213:3,6
214:12 217:10
218:14 226:7
228:20 231:21
234:11,17 235:10
236:14 237:7
240:3,12,18,24
241:11,23 242:13
242:22 243:2,9
244:25 249:22
250:3 253:5
254:22 256:11
263:5 265:5
267:25 268:4
270:23 272:11,17
289:16 294:22
303:8 305:14

Veritext Legal Solutions
346-293-7000

[soussan - state]

309:17,20 313:7
320:2,7 329:2
341:23 344:18
345:17 350:9,16
350:22 352:8,16
352:21 353:14
354:10,16 355:4
358:4,12 366:10
369:22 370:2
391:10 392:19,23
398:6,10,12 407:7
424:1 430:15
435:20 438:13
443:15 444:20
446:3,6,16,24
447:21 449:6,10
449:22 450:14
451:7,24,25
452:15 453:15
454:6,16 455:1,9
455:14,20 456:4
456:13,21 457:6,9
457:13 459:23
460:3 470:22
471:22 472:4
474:16,25 484:4
484:10,23 485:7
487:21 489:16,19
492:3
**soussan's** 455:7
**speak** 329:8
**speaking** 239:24
382:15 444:2
**speaks** 224:18
484:3
**special** 273:12
304:3,3,5,8,15,16
327:23
**specialist** 328:7
**specialized** 220:7
220:10,14,19,22

220:23 223:2,3
228:6 230:6,14
**specific** 219:25
229:24 232:2
236:15 239:11
324:3,3 333:12
428:1 479:11
**specifically** 207:3
209:4 214:23
215:6 219:3 226:5
229:18 231:3,7,19
233:10 234:21
238:2 252:13,14
253:20 255:1
259:6,21 260:17
267:8 302:15
375:3 388:2
399:11 404:13
450:17 451:11
469:24
**specifics** 254:5
**specified** 392:2
**speculation**
294:21 391:2,9
**spell** 323:4
**spelled** 466:13
**spend** 343:7 364:5
379:18
**spends** 259:13,18
259:23 260:3
**spent** 428:4
**spirit** 345:24
434:19
**spoke** 201:25
237:1,8 342:9
**spoofing** 209:8
263:24 269:9
**spreadsheet**
264:20,22 334:9
334:18 335:2

**square** 422:23
424:12,14,18
**stack** 240:17
**staff** 260:25
**staging** 217:24
266:22,22 267:1
277:10 332:1,15
333:7 335:4
336:10 375:10,11
375:12,15,16
397:23,25 398:3
475:11,14,16
**stake** 269:22
**stamped** 325:6
**stand** 289:14
456:15 470:18
**standard** 233:2
**standby** 464:19
**standing** 410:20
**standpoint** 449:19
**stands** 224:4 253:9
**stanley** 199:4
200:6,7 272:14,15
272:24 278:9,11
289:22 294:23
303:9 305:22
309:19,21 313:6,8
319:23 320:5,10
322:18 329:5
334:15,17 341:20
341:24 344:16
348:20 350:7,12
350:21 351:25
358:1 369:20
390:18 391:2,8
392:15 406:22
423:23 433:23
435:22 436:1
438:18 443:13
446:19,21 447:22
453:7,13 457:12

**star** 279:5,6,14,19
279:21 280:10
290:1,8 293:17,23
294:5 297:4
306:18 357:13
360:3,7,12,20
361:4,8,9,14,20,21
362:9 437:16
**stars** 361:17
**start** 201:3 205:14
208:5 248:1,1
263:11 270:14
274:7,24 276:22
302:25 332:22
339:14 344:22
353:16,17 362:6
370:25 392:6
393:19 414:7
417:24 465:6
491:14
**started** 224:14
273:7,7 274:8,25
275:6 292:7
338:16,25 339:8
340:9 353:1,24
368:16 377:4
398:9 405:4
434:21,22 435:1,7
435:8,23 436:3
441:12 460:8
475:3
**starting** 252:7
255:7,15,16 455:1
474:4
**starts** 483:5,20
485:24
**state** 198:14
272:24 433:13
468:4 471:14
481:23 492:12

Page 49

[state's - support]

**state's** 477:9
**stated** 198:15
**statement** 248:20
  249:19 263:2
  268:18 321:21
  356:14 367:22
  374:20,25 396:15
  419:13
**statements** 268:11
  268:24 270:11
  416:9 445:25
**states** 260:19
  273:25 311:16
  345:11,13 382:10
  389:9,17 404:15
  481:23,24 482:4
**statewide** 470:1
**stating** 374:21
  381:14 411:1
  432:9
**stationed** 396:16
**status** 221:3
  262:20,21
**statute** 218:7,8,18
  470:11 475:20
  476:21 477:1
  487:14
**statutes** 262:12
  476:10
**statutory** 350:13
  440:24 475:23
**stay** 233:19,23
  273:9,13 323:14
  404:9 453:16
**stayed** 458:16
**stems** 269:18
**stenotype** 198:14
**step** 219:5
**stepped** 209:23
**stepping** 210:10
  210:12

**steps** 469:1,5
**stick** 320:1 411:17
**sticker** 369:2
**stint** 459:15
**stock** 237:9 247:23
**stonecipher**
  199:16
**stop** 212:13
  297:20,25 334:12
  380:7 382:22
  386:14 414:1
**stopped** 206:22
  212:9,23 252:8,10
  252:12 265:22
  266:7 274:23
  297:22 350:14
  352:2,6 381:11
  383:3 386:12
  388:9
**stopping** 212:14
  212:24
**store** 462:7,7
  467:22,22
**straight** 202:6
  238:9 263:17
  334:21 396:2,7
  418:21
**strategic** 458:23
**strategies** 385:1
**strategizing**
  381:19
**strategy** 374:25
  376:9 377:24
  390:2 411:18
**street** 199:12
  287:21 493:18
**strictly** 340:12
  375:1
**strike** 345:15,15
  447:3,19

**strikes** 305:20
**strong** 459:16
**structure** 252:19
  253:18 255:5,8,16
  307:24
**stuck** 387:22
**student** 273:9
**stuff** 202:22
  323:16 350:1
  352:1 435:10
  445:25 468:9
**styled** 198:11
**subject** 213:20
  214:7 216:14
  224:6 351:7
  475:24
**submit** 449:1
  450:12
**submitted** 406:12
  444:7
**submitting** 448:1
  449:2
**subsection** 477:11
  477:18
**subsidiary** 469:11
**substantial** 261:4
**substantiate** 272:6
**successful** 234:22
  234:24
**successfully**
  319:12
**sudden** 234:15
  251:18
**sued** 428:3
**suggest** 398:9
**suggested** 288:20
**suggesting** 245:3
  245:14
**suing** 405:25
**suitcase** 320:22,24
  320:24

**suitcases** 320:25
**suite** 199:7,12
  493:18
**summaries** 490:12
  490:12,18,18
**summarily** 270:15
**summer** 273:11
**sunday** 326:5
**sundays** 370:16
  380:4
**super** 323:12
  416:6
**supervisor** 222:2
  331:17 382:20
**supervisors**
  332:10
**supply** 237:10,13
  239:2,3,6,7 241:18
  242:4 261:25
  389:25
**support** 203:2,4
  211:25 213:17
  219:11,12 220:15
  220:18 221:24
  225:16,23,24,25
  226:12 228:24
  229:17 230:12
  234:11 239:14
  240:10 245:5
  246:19 261:5
  264:12 265:9
  270:10 296:18
  303:13 306:20,22
  307:14,14 310:14
  311:10 312:8,9
  314:22 315:5,6,10
  315:13 319:10
  329:10,12 330:24
  333:19 424:4
  432:25

Veritext Legal Solutions
346-293-7000

[supposed - tc]

**supposed** 241:7
**surcharges** 315:23
**sure** 205:18 207:6
    209:4,16 212:7,10
    215:18 219:2
    224:17 230:25
    235:25 241:13
    246:13 251:8
    257:25 263:5
    289:16 295:17
    298:24 303:9
    311:11 313:25
    325:12 326:6
    329:16 335:22
    336:9 344:23
    360:18,22 369:24
    388:11 391:25
    392:3 393:18
    396:15 421:24
    425:10 429:9
    430:15 449:20
    450:25 455:4
    462:6 469:17
    475:2
**surge** 242:9
    247:24 389:22,23
    390:3,10,15
**surging** 239:10
    242:5
**surprised** 360:14
    451:25
**survive** 446:14
**susan** 198:2
    199:21 451:25
    492:3
**suspects** 208:23
**suspend** 302:2
**suspended** 230:7
**sustain** 350:17
**sustained** 207:15
    210:3 231:22

239:17 243:6
249:22 353:14
424:1 435:21
**suv** 463:5 473:15
**swagata** 309:2
**switch** 257:3
    353:11 363:3
    411:10,14 482:23
**swore** 349:2
**sworn** 201:20
    202:11 204:23
    245:18 252:1
    253:3,8 268:25
    272:22 406:2
    408:1 411:13
    413:22 447:10
    448:2 457:14,18
**synonymous**
    481:19
**system** 233:3
    247:7 263:18
    287:16 288:1
    299:9 302:10
    305:10 334:22
    396:8 399:24
    434:24 473:12
**systems** 284:11
    374:6

| t |
|---|

**tab** 312:8
**tablet** 229:4
**take** 201:3 235:24
    236:1 237:23
    238:21 248:17
    250:18 251:10
    254:25 263:3,6,9
    272:20 276:5
    305:16 309:13
    310:2 312:15
    323:20 327:20
    328:3 337:16

347:17,24 349:10
349:12 355:15,23
359:7 368:13
371:15 372:13
374:2 376:16,17
377:24 378:23
381:2 382:14
385:5 388:25
389:20 392:4
393:5 394:1,7
395:17 397:24
399:11 400:10
402:5 404:6,12,13
406:7 407:25
418:9,17,24 419:2
420:6 422:11
426:6 427:10,13
428:6,7 429:19
430:15 431:10
438:6 447:2 449:6
454:16 456:15
466:5 472:16
476:20 480:2
481:6 485:20
**taken** 198:10
    231:14 232:2
    269:14 307:4,9,12
    324:18 326:16
    348:24 493:9
**takes** 242:23
    309:24 312:11
    317:9 344:4
    446:14
**talk** 207:24 251:21
    251:25 253:15
    311:14 352:23
    357:24 360:3
    363:4 375:10
    377:8,9 390:20
    405:2 428:1
    436:22 437:9

439:23 442:21
454:12 458:11
460:14 464:11
467:17 481:5
484:18
**talked** 230:19
    234:3 248:21
    251:12 260:9,14
    345:4 346:1
    354:20 357:12,22
    362:21 365:9
    390:17,18,19
    392:16 404:25
    461:24 469:13
    480:4
**talking** 203:5
    246:25 247:1
    259:4 263:25
    264:22 332:19
    341:11 345:6
    352:17 364:21
    383:10 398:25
    409:11 431:16
    434:18 438:4
    439:4 451:25
    475:21 486:16
**talks** 486:24
**tap** 305:5
**target** 224:4
**tasked** 267:8
**tat** 456:5
**tax** 348:1 365:19
    419:3,7,15,16,20
    420:2 426:9
    489:25 490:17,18
**taxes** 315:23 423:6
**taxis** 471:17
**tc** 275:3 339:6,9
    339:14,20 340:2,4
    414:23 415:2,9
    417:13,17 418:14

[tc - things]

418:25 441:3,18
441:21,25 442:12
**team** 206:1 207:2
207:6 208:7 220:7
220:10,11,14,19
220:23 223:2,3,4
228:6 230:14
329:7 458:16
**team.uberintern...**
227:23
**teams** 220:17,22
**tech** 227:21,22
461:13
**technical** 406:6,8
**technicalities**
211:18
**technologies** 198:3
469:12 492:4
**technology** 204:10
205:7 259:7 286:6
430:19 433:1
460:17 461:3,14
461:23 468:11,19
468:21 478:10
480:14 481:20
486:13
**tel** 493:19
**tell** 212:18,22
221:18 241:5,6
244:25 246:19
258:10 273:5
277:17 278:16,21
279:4 282:14,24
302:12 303:4
305:8 307:1
308:14 310:12
311:8 312:14,15
314:20 315:20
316:24 318:6
320:20 323:11
327:16,24 331:23

332:11 333:24
336:21 337:6
342:7,17 349:3
363:13,16 378:5
379:13,16 397:22
398:3 403:25
406:10 408:18
441:24 455:16
457:23 458:11
459:19 462:4
463:10,13 466:10
470:23 480:19
482:15 485:10
487:21
**telling** 215:11
228:15 241:3
311:17 400:4,7,12
403:12 411:7
**tells** 203:23 227:8
236:9
**temporarily**
382:11
**temporary** 382:5
**tendered** 451:12
**tenure** 459:20
**terms** 216:6
229:12 431:4,7
459:6 460:6
462:14 463:15,18
466:21,23 471:1
**terrible** 266:24
325:14 393:9
**territory** 217:7
218:5,25 481:12
482:1
**test** 239:24 241:4
**tested** 212:8
405:17
**testified** 201:20
218:11 253:15
272:22 352:3

354:24 355:9,20
356:6 359:9,11
360:16 393:13,20
408:14,22 410:18
414:22 423:8
457:18 487:23
**testifies** 454:1
**testify** 202:18
205:3 241:8 271:3
271:8,21 289:15
289:19 347:13
447:4 450:4
453:17,20 454:24
456:25 457:3
472:4 485:7
**testifying** 210:4
239:18 253:18
263:23 289:17
447:11 450:20
451:13 452:2
470:21
**testimony** 201:4
202:9,12,21
204:23 205:1
231:9 234:10
236:12 239:14,25
240:1,10 242:14
245:18 251:17
252:1,24 253:4,6,8
253:16 264:5
268:25 271:7,22
272:7,7 289:14
342:9 349:2
350:24 355:2,8,12
365:22 406:2
408:1 409:10
411:13 413:15,22
445:2 446:22
447:10 448:2,16
448:18,20 449:1,2
450:7,8 452:3

453:8 471:21
479:24 480:17
484:7 485:1 493:9
**texas** 198:14 199:7
199:13 234:25
236:2 460:12
469:6 470:11
471:12,14 476:10
492:12 493:16,19
**text** 215:2,6
216:20,24 217:1,8
217:9,12 246:1,3
263:24 264:2,11
334:20,25
**texting** 216:21
**thank** 220:5
225:19 227:8
265:12 267:4,25
268:4 270:21
307:15 323:24
329:7 344:18,20
345:2 347:24
362:20 372:7
382:14 421:16
444:18 446:17
455:15 456:13
**thanks** 201:24
221:2 226:20
230:9 308:11
313:9 321:12,15
362:5
**theme** 451:23
**therefor** 493:4
**thing** 329:16
334:14 368:18,22
415:3,4 419:13
420:12 426:12
430:13 450:9,25
451:20
**things** 203:5
212:24 229:21

[things - times]

239:16 251:11
258:14,15 280:12
289:10 298:17
318:9 338:12
346:3 352:3
353:20 354:20
358:18 359:1
368:12 417:25
422:24 425:21
470:6,9,14 477:15
490:14
**think** 202:1 203:3
203:8,25 212:5,17
215:9 219:18
224:19,24 227:7
234:22 235:8,11
235:13 239:20
240:3 242:15
243:15 256:22
264:19 268:23,25
270:11,24 291:6
317:7 320:22
346:4 347:13
350:9,22 351:3
352:25 359:19
362:11,12 367:14
373:6 375:24
377:3 383:21
385:17 386:12
387:18 392:12
393:1,7,12,22,25
394:3 395:14,14
396:23 409:8,12
413:25 414:14
417:16 423:16
429:23 430:13
445:11 446:19
448:15 449:18
451:15 453:2
455:24 456:16,21
459:5 461:5,8,9

469:25 472:6,18
472:19 473:1
475:2 476:20
480:17 481:20
484:5 487:22
**thinking** 446:12
**third** 337:11
418:20 447:15,18
**thoroughly** 271:5
**thought** 252:16
321:25 322:1,19
360:21 378:23
432:9 436:8
**thousand** 341:9
353:10 461:8,11
**thousands** 246:7
461:15
**threat** 325:3
**threatened** 325:4
**threatening**
325:14
**threats** 323:16
**three** 208:20
223:24 224:8,13
224:22 225:6
294:4,7 332:23
339:21 340:10
361:14 364:12
380:21,25 442:14
445:20,21,25
447:13 448:9,10
473:1 480:6
**threw** 361:1
**throckmorton**
493:18
**tied** 333:17
**tier** 318:20
**ties** 251:9
**tighten** 369:22
**time** 201:25
202:18 203:6,17

203:17,17 206:8
216:22 222:13
223:17 224:15
228:10 234:4,4
236:23 237:1,8
242:21,23 243:16
243:18 244:16
245:11,23 247:1,3
247:5,12,20
248:13,19 250:16
251:12,18 252:3
254:19 257:16,20
258:2 259:8
260:10 265:12
268:18 271:16,25
274:10 275:15
276:1 277:12
278:24 279:1
280:10 281:13
283:10,20,22
285:1 286:18
288:24 292:5
297:25 299:14
304:22 305:22
308:4,16 309:4,11
309:14,23 310:20
311:18 312:12
313:21 314:10
317:4,9,12 318:16
318:17 319:3,20
325:6 327:2
328:20 329:7,13
329:24 330:22
333:6 335:19,22
340:21 343:7
348:6 350:24
351:6 352:16
353:8,9,22 360:5
360:13 361:16
369:19 370:20
372:20 373:14

375:5,16 376:4,14
377:2 378:1,5
379:19 380:15,22
381:20 382:23
384:6 386:10
398:9 400:12
405:3,17 408:5,12
408:15,19,21,24
409:2,6,7,12,14,18
409:24 410:20
411:2,8 412:4
416:18 418:2,19
418:20 424:23
428:4,22,24 429:4
429:5,11,12 435:4
435:4 438:5,9,17
439:19 441:1
443:11 447:2,16
447:17,17,24
451:4 455:25
456:9 460:2
463:19 468:11
481:21 488:14
489:4
**times** 207:20
229:3 243:24
246:6,9 264:2
269:25 270:6
278:18 282:2
296:18 303:13
334:2,19 335:1,3,5
335:18 336:6,8,17
338:5 341:3,18,18
356:7 359:12
360:8,12 376:15
380:14 389:24
395:4,6,6,7,8,9,11
397:1,4,5,5,8,11
397:16,16,17
401:25 408:5,7,19
408:20 412:3

Veritext Legal Solutions
346-293-7000

[times - tried]

427:4 442:25
443:8 447:13,15
448:1 464:8
474:22
**timing** 402:8
**tip** 384:16
**tips** 430:6,9
490:23
**tire** 396:19
**tissues** 384:8,15
**tit** 456:5
**title** 226:16 263:14
306:24 314:15
316:14 416:16
**titled** 322:25
**tmobile** 336:15
363:10 364:3
**tnc** 218:2 368:23
468:24 469:14,18
469:19 470:1,5,12
470:13,17,17,24
470:25 471:2,7,12
471:16,17 472:1,8
472:24 473:2,19
473:24 474:9
475:5,7,12,17,20
475:25 476:10,11
476:17,19,19,21
477:1,12 480:9
481:17,22,24
487:14
**tncs** 217:23 470:14
474:1 476:11
477:2
**today** 206:5 214:2
215:7,20 217:3
226:21 227:11
240:9,14,23,25
244:8 264:18
271:19,25 329:8
346:11 349:2

355:8 410:23
439:22 444:22
456:17,20 457:10
479:24
**today's** 202:20
264:5
**told** 223:17 224:8
224:22,24 227:7
228:11 229:18
234:4 242:7
243:19 245:22
248:11 253:23
256:6 262:4,18
269:2,10,24,25
280:2 281:13
288:25 317:11
332:8,12 334:3
381:22 395:22
403:2 406:6 411:5
432:1 447:16
455:17
**tolls** 315:11
**tomorrow** 454:11
454:24 457:10
482:6 491:5,14
**ton** 289:10
**tonight** 451:19,19
454:11 456:19
**top** 213:8 219:20
221:22 222:6
223:25 226:16
227:9 263:11
265:22 269:20
306:24 320:12
331:20 334:9
356:18,22 416:15
417:11 420:11,12
420:13 431:24,25
434:15 436:17
463:12 480:6

**topic** 489:15
**topics** 262:8
**total** 254:3 256:2
306:4 385:18
425:14,23 458:10
458:11
**totality** 215:19
**totally** 473:25
**touch** 462:2
**tour** 337:16
346:24 347:3
**tours** 337:22
420:17
**toyota** 250:17
**tracked** 286:9
**tracking** 286:7,15
286:16 408:25
**trade** 207:20
237:9 247:23
269:11,14,16,25
**traffic** 310:15
396:20
**trailer** 340:7
**trained** 288:21
**training** 233:8,10
**transactions** 236:5
**transcript** 202:20
231:1 232:16
441:8 492:14,16
493:2
**transcripts** 333:20
**transferred** 308:7
**transmission**
369:5 370:10
**transparency**
287:14
**transport** 339:9
339:20 340:2,4
414:23 415:2,9
417:13,17 418:15
418:25 441:4,18

441:21,25 442:13
442:15 464:2
471:10,13
**transportation**
346:24 347:4,14
351:11 352:12
363:5,9 365:23
374:9 377:9
383:16 384:19
385:2,19 387:10
405:5,24 412:7,8
412:25 413:2,6,8
413:17 416:24
421:13 425:15
460:20 461:18,20
462:18,22 468:18
470:18 471:8
473:13,16,25
481:7,9,11,24
482:5 485:21
486:19 487:1
488:8
**transporting**
414:7 415:5 471:5
**transports** 339:6
**travel** 317:5,13
**traveled** 309:24
311:18
**traveling** 316:17
317:8
**tried** 231:19
243:17 263:17
281:25 288:20,24
301:9 323:14
334:21 343:12,12
344:23 345:20
349:6 396:7
399:22,24 424:20
424:23 446:10,11
446:11

Page 54

**trip** 215:14 216:7
217:19,25 221:9
238:7,8 246:2
247:24 251:2
252:20 253:19
254:3 255:5,8,17
256:2,8,17,25
265:19,23 276:5
279:8 281:1,2
282:22 283:5,13
285:2 291:7,18
295:7 299:15,19
305:2,3,5,10,16,18
305:24 310:1,5
313:1,12 315:21
316:22,25 317:19
317:22 319:10,12
324:6 356:10
357:9 375:22,25
388:7,15 389:6,23
394:9,17,23 403:5
423:9,10,11,12,14
423:15 438:10,19
438:23 443:2
445:15 446:4,13
466:18 482:14
490:7,8
**trips** 215:11 246:7
278:2 280:15
283:8,12 285:6,8
286:3 291:24,25
300:8,13 311:22
311:25 313:25
317:15,18 327:20
328:20 338:8
354:25 355:9
362:17 374:22
376:3,16 378:16
380:24 388:21
389:14 391:24
392:9,25 394:19

394:21 406:15,20
407:5,11,15,19,22
429:14 439:5,9,16
439:20 440:22,23
440:25 442:22
443:7 445:15,20
445:20,21,25
446:10 465:8
466:16 490:13
**trouble** 229:10
362:25
**troubling** 456:10
**truck** 303:20,21
340:6 363:18
364:6
**trucking** 273:19
274:25 275:1
338:16,18,25
339:4,20 340:12
352:4 441:11
**true** 206:12,20
218:10 235:1
238:1 247:9
259:14 262:1,2
331:24 396:15
416:10 418:7
419:17 450:19
492:15
**truly** 269:8
**trust** 214:24 284:9
**truth** 349:3
**truthful** 408:24
**truthfully** 349:6
370:1,4
**try** 203:19 226:3
233:19,22 245:15
282:2 283:13
289:12 312:8
319:25 336:11
345:2 346:2
358:12 367:21

369:25 390:6
395:1 424:22
456:19
**trying** 204:14,17
205:10 207:1,22
226:25 227:1
239:24 240:6,19
241:17,25 243:11
246:12 256:21
263:16 264:16
320:21 334:20
352:4,14 354:15
393:17 396:1,6
458:4 471:24
472:2
**tsa** 204:6
**turn** 301:19
377:11 378:2
466:20 479:4
480:3
**turned** 331:1
**tv** 259:14,15,19
**twice** 335:4 443:4
**two** 208:20 295:23
338:5 345:10
361:13 380:1,21
380:25 381:11,15
384:2 387:7
396:14 404:16,23
408:11 410:11
413:16,20 414:22
415:16 442:14,14
443:16 445:19,21
445:25 447:15
449:24 452:11
458:16 472:25
473:2 489:18
**type** 208:25 214:4
304:2 342:5 351:5
460:16 484:7,25
490:2

**typed** 455:12
**types** 352:12,13
490:4
**typically** 375:24
377:11 380:10

**u**

**u.s.** 226:10 234:19
234:23 255:9
273:8 289:8
311:12
**uber** 198:3 203:7,7
203:14,16,20,23
203:23,24 204:11
204:17,20,20,21
205:12 206:6,10
206:22,24 207:2,5
207:10,23 208:3
208:23 209:1,11
209:12,15,16,20
210:12,17,18
211:1,3,7,9,24,25
212:12,20,22
213:8,17,17,22
215:7,20 216:8,19
216:23 217:2,4,21
217:22 218:4,21
218:22,23 219:5,6
219:15 220:1,15
220:22 221:5,7,8
222:12,15,22
223:9,15 224:12
224:14 225:2,5,14
225:16 226:13,15
226:16,20,22
227:2,6,8,11
228:11,15,23
229:18 230:3,11
230:21 231:3,4
232:4,6,6,12,16,17
232:20,25 233:1,3
233:7,12,16,19,22

Veritext Legal Solutions
346-293-7000

**[uber - uber's]**

| | | | |
|---|---|---|---|
| 234:5,7,15 235:1 | 289:3,7,8 291:6,12 | 352:6,15,23 353:7 | 437:22,24 438:1 |
| 236:5,9,10 237:12 | 292:5,8 294:18,19 | 353:16,21,25 | 438:10,18,23 |
| 238:1,4 239:7 | 294:25 295:12,14 | 354:3,4,19 355:1 | 439:5,10,13,17,20 |
| 243:18 244:4,14 | 295:17 296:15,25 | 355:10 356:23,25 | 440:2,11,23,24 |
| 244:17,22 245:1,5 | 297:10,21 298:10 | 357:23,25 358:9 | 441:25 442:19 |
| 245:16 246:7,19 | 298:14 299:2,10 | 360:6,13 362:16 | 443:2 444:23,23 |
| 246:23 247:7 | 300:19 301:6,13 | 363:8,13 364:12 | 446:14 451:23,24 |
| 248:13 250:11,15 | 301:24 302:1,2,10 | 365:1,5,12 366:12 | 456:7 457:22,24 |
| 250:16,21,22,25 | 302:16,19,20,22 | 368:3,5,20 370:10 | 458:2,5,6,9,12,20 |
| 251:6,19 252:4,7,9 | 304:1,6,18,22 | 370:21,25 371:1 | 458:21,23 459:3,9 |
| 253:23 254:10,13 | 305:9,15,20 | 371:21 372:9 | 459:10,15,19 |
| 254:14,17 255:2,3 | 306:17 307:4,9,14 | 373:12,13 374:16 | 460:1,5,6,16,24 |
| 255:14 256:20,22 | 307:23 308:9,10 | 375:7,13,16 | 461:12,17,20 |
| 256:23,24 257:16 | 308:15,17 309:8 | 377:15,17 378:5,7 | 462:3,4,15 463:1,4 |
| 257:20 258:2,4,11 | 309:13,23 310:6,9 | 379:1,4,8,13 380:3 | 463:4,5,5,17 |
| 258:19,24 259:10 | 310:10,22,23 | 380:11,15,17 | 464:18,18,22 |
| 259:13,18,19,23 | 311:5,21,23,25 | 381:8,22 382:18 | 465:4,10,10,15 |
| 259:25 260:3,7,12 | 312:6,22 313:9,21 | 383:11,13,14 | 466:6,11,23 467:4 |
| 260:14,23 261:5,9 | 314:21 315:3 | 384:10,24 386:10 | 467:6,15,20 |
| 261:12,19,23 | 316:7 317:10,11 | 386:20,24 387:12 | 469:10,11 473:5 |
| 262:4,10,18,21 | 317:12,14,17,18 | 387:14,15,22,23 | 473:10 474:10 |
| 263:11 265:14,18 | 317:19 318:1,2,16 | 388:5,9 389:13 | 475:24 476:7 |
| 265:20 266:2,24 | 319:10,16,16,22 | 391:5,7,16,17,20 | 478:8,17 479:11 |
| 267:4,19 268:12 | 320:14 321:7,19 | 391:21 393:2 | 479:11,20,20 |
| 268:19 269:19 | 322:2,6 324:11,21 | 404:10,25 405:4,8 | 480:15,20,25 |
| 270:5,19 274:7,8,9 | 325:1,2,20 327:2 | 405:12,14 406:21 | 481:11 482:7,16 |
| 274:16,20,23 | 327:18,20 328:3 | 407:6,15,22 408:2 | 482:25 483:13,14 |
| 275:13,13,17,21 | 328:19 329:7,13 | 408:4,6,19,25 | 484:15 485:18,21 |
| 275:24 276:2,5,6,9 | 329:16 330:3,8,18 | 409:16 410:19,21 | 487:11,14,17 |
| 276:12,16,23 | 330:23 331:10,16 | 411:4,11,14,17,23 | 492:4 |
| 277:3,19,23 278:6 | 331:21,23,24 | 412:6,9 413:10,17 | **uber's**   212:11 |
| 278:15 279:7 | 333:4,6,15,24 | 414:2 421:21 | 214:2 216:5 |
| 280:2,13,16 281:5 | 334:4 336:4,21 | 422:14 427:1,20 | 220:14 229:12 |
| 281:16,23,24 | 340:18,21,25 | 428:1,3 429:23 | 245:21 248:3,20 |
| 282:9,12 283:17 | 341:2,3,5,10,16,17 | 430:6,8,19,22,23 | 249:12,13,13 |
| 283:19,23 284:3,5 | 341:25 342:1,4,8 | 431:2,7 432:1,22 | 252:11 262:4 |
| 284:9,17,17,20,23 | 342:18,21 343:3 | 432:25 433:7,14 | 267:18,21 269:21 |
| 286:6,9,13,20,24 | 343:10,24 344:1,8 | 434:3,7,21,22,23 | 269:21 277:7 |
| 287:7,15,17,22 | 344:12,13,13,14 | 435:1,7,16,23 | 278:19 281:25 |
| 288:1,6,6,8,10,11 | 347:1,15,20 348:2 | 436:3,11,13 437:3 | 286:14,18 287:5 |
| 288:12,14,19,21 | 350:15 351:1,2,12 | 437:9,12,13,14,20 | 298:5 301:25 |

Veritext Legal Solutions
346-293-7000

[uber's - value]

308:21 310:16
314:9 319:18
322:11 324:14
327:23 331:7
365:9 386:17
393:10 435:12
437:3,6 439:5
460:10,15 461:25
462:14
**uber.com** 213:8
**uberx** 250:22
317:14,18,19
342:18 343:3,18
372:21,23 373:4
373:12,21,24
374:2 375:14
436:12 463:4,4
**uh** 402:13
**ultimate** 438:14
**ultimately** 459:4,8
**unable** 328:19
330:18 336:6,8
**unacceptable**
287:11 295:20
300:11
**unaware** 253:6
**unclear** 283:3
308:16 310:13
**undercut** 211:2
**underlying** 407:1
**undermines** 284:9
**understand** 201:9
202:8,17 209:6
211:9 226:2
231:21 249:6,23
250:6 254:18
262:9 265:24
316:9,10,12
321:16 325:15
329:3 354:16
357:2,21 362:24

370:2 383:10,12
392:24 396:12
402:8 423:5 428:9
430:5 439:25
445:6 446:16
453:22 455:5
456:4 457:22
472:23
**understanding**
203:15,18 205:7,8
205:25 208:6
221:15 261:8
268:20 280:9,17
281:4,6,8 284:19
284:21 287:4
288:5 295:10,13
309:21,25 328:22
329:2,4 339:23
351:10 363:1
438:15 459:12,16
471:19 475:13,18
476:9,15 480:18
480:24 481:3
485:8
**understood**
308:18 349:8
357:19 362:16
363:2 373:20
390:24 391:4,15
430:18 452:16
454:3 457:16
**undertook** 313:21
**unfortunately**
222:24,25 230:12
**unfounded** 205:5
**unfulfilled** 463:22
463:25 464:5,16
**unilateral** 217:20
237:25
**unions** 262:14

**unique** 205:23
459:6
**united** 260:18
273:25 482:4
**universal** 289:7
305:1
**unlawfully** 430:6
**unlimited** 488:16
**unquote** 236:22
263:24
**unrelated** 253:2
**unsafe** 325:1,5
326:10
**unsupported**
240:1
**unwanted** 466:17
**update** 296:11
**updated** 278:21,22
289:5 293:7
296:21
**upends** 268:20
**upfront** 251:12
252:19 253:19
254:1,15 255:5,8
255:17,25 256:7
256:17,24
**upgraded** 229:4
**upper** 266:25
**upset** 313:2
**usa** 469:10 480:15
480:25 485:21
**usable** 369:16
**use** 209:12,16
221:8 223:13
228:12 232:20
239:19 243:15
253:1 260:6 267:6
338:18 339:3
346:13,13 351:12
352:23,24 353:1
354:3 360:5 363:8

363:10,14,16,19
364:11 365:5,9,13
366:12 368:17
370:14 371:1
372:9 373:3,17,21
373:24 374:16
375:13,13 376:8
377:23 378:22
380:3,11,15,21
382:16 383:13
391:19 405:4,8,15
405:20 408:2,4,19
408:21 411:2,8
430:1 433:8
448:19 455:25
462:15 463:15,19
466:3,21,24
468:24,25 470:13
473:13 474:6,10
485:17 487:5,11
**users** 287:15
481:11
**uses** 286:6 477:20
483:16
**usually** 240:15,16
240:22 312:11
342:22 343:16
370:16 398:2
464:6,8
**utilize** 483:12
488:3 490:3
**utilizing** 382:22
470:15 471:11,16

**v**

**vague** 459:21,25
**vaguely** 218:18
**valid** 328:12
**valuable** 212:9
242:23,25
**value** 275:19

[variables - way]

**variables** 310:15
**varies** 279:20
**various** 235:14,21
242:5 354:3
459:18
**vehicle** 283:24
302:16 303:25
304:14,19,24
320:15 322:21
323:6 324:1,19
327:4,7,18,22,22
327:24 328:1
342:6,8,14,15,22
343:4 365:23
366:2,4,23 367:10
369:4,12 372:24
373:9 422:1
425:23,25 437:15
458:18 468:6,8,14
471:3 472:18,19
472:20 477:5,7,20
481:12
**vehicles** 248:8,14
273:23 414:7
415:5 473:8 474:3
474:5,6
**ventures** 340:1
**verbally** 325:4
**verbatim** 218:16
**verifying** 418:7
**veritext** 493:17
**verizon** 336:14
363:19 364:2,8
**version** 248:12
462:8
**versus** 341:3,5,15
473:19 474:10
475:6
**video** 232:19
233:1,12,24
272:18 288:23

376:19 393:9,23
438:6,20 484:21
491:7,11
**videos** 230:20,24
231:3,14 232:5,7
232:13,16 242:21
270:16 288:12,21
**violate** 216:5
**violated** 218:24
**violating** 216:16
217:4 218:21
466:23
**violation** 229:12
**virtual** 277:10
**visa** 273:12
**vision** 207:2
**visit** 225:24 226:3
226:17 310:23
489:2
**visiting** 226:20
**voicemail** 263:17
334:21 396:2,7
399:22
**vs** 198:2 492:3

**w**

**wait** 219:9 277:11
319:2 328:10,13
330:23 335:6
343:11 375:20,25
376:4,15 445:14
446:7
**waited** 318:24
332:23
**waiting** 216:1
277:13 318:23
322:17,17 332:17
375:11 376:12,15
428:4 438:5,10,15
438:18,24 445:22
447:16 452:17

**waits** 332:17
**walk** 245:10
246:14
**walking** 214:12
438:20
**walks** 376:16,17
438:6
**want** 203:19
215:14,18 231:11
237:24 238:8,11
238:14,16 239:1
241:18 244:10,18
244:19,19,20
245:6 250:18
251:10,25 255:1
265:13 272:8
282:16 283:16,17
289:10 291:25
292:4 297:15
323:13,16,19
326:11 330:9
331:18 333:2
335:9 336:4
351:22 352:22
356:22,25 360:3
363:4 374:3,22
375:10 377:20
381:15 387:2
390:20 391:19
397:9 398:23
399:1 402:5
406:18 422:10,11
428:3,8,11 431:23
432:18 437:9
450:10,15,16
451:18 453:19,23
455:4 459:3 462:2
467:25 470:4
472:7 474:8 480:5
481:4 482:12,22
482:24 483:3,4

486:10 489:2
**wanted** 232:5
242:7 250:10
270:8 276:22
277:23 282:15
291:8 298:16
300:19 301:10
312:23 316:16
320:23 325:2
345:25 374:11
382:23 385:12,24
394:21 440:12
445:7 452:7
459:10,13,17
474:23 482:6
**wanting** 221:19
266:23
**wants** 241:6
298:14 337:16
464:3 479:15,18
**warranted** 448:15
**warranty** 369:12
369:13
**washington**
251:24 252:2
**wasting** 310:20
**watch** 232:25
288:23
**watched** 393:9,12
**watching** 288:12
**water** 384:5 386:1
**waters** 384:14
**way** 222:1 238:2
241:4 244:12,21
250:22 254:18
266:22 270:2
274:6 279:6
280:21 281:23
282:11 283:3,11
286:12 288:18
301:5 302:9,21

[way - yeah]

322:12 323:15
326:25 331:17
332:2 343:18,23
349:22 352:24
363:24 367:9,11
374:18 378:20
406:16 409:4
429:7 437:5
453:14 456:22
469:2 475:4
481:19 483:22
489:8 490:22
**ways**  279:13
289:24 293:16
296:10 297:3
459:19
**waze**  387:18,21
388:2
**we've**  241:19
259:8 265:21
271:17 302:6
313:11,13 322:16
326:16 381:3
392:16 404:25
414:1 446:22
449:5 453:1
454:12 461:2
465:22 472:6
475:21 480:4
484:4,12,14
**web**  258:14 259:24
**website**  255:2,3,14
327:23 337:14,18
346:19 366:4
434:3,5,11,14
478:18
**week**  202:15
244:18 353:10
380:7,15 429:3,14
429:20 464:16

**week's**  321:20
**weekends**  379:21
**weeks**  380:21,25
409:21
**weight**  272:8
448:18
**welder**  257:13
**went**  227:2 303:19
327:23 329:14
366:3,5 368:24
371:12 380:20
381:5 393:7
404:20 405:21
431:20 445:10
470:6
**whatsoever**
448:18
**wife**  426:22
**wikipedia**  227:25
**williams**  199:11
**willing**  270:7
452:24
**window**  465:20
**windshield**  368:24
369:2
**wish**  382:11
**withdraw**  452:24
**withdrawing**
455:5
**witness**  206:17
216:1 240:21
249:13 250:1
267:24 268:5
270:18,20 272:14
289:14 309:20
344:17 354:14
358:14 368:6
369:24 370:7
406:23 430:14
433:21 443:14
444:19 445:18

446:5,9,19 449:8
450:23 455:23
457:5,16 492:19
**witnesses**  265:5
447:9 452:11
455:21
**word**  323:4 332:4
**words**  206:17
212:22 219:25
354:12 376:8
377:23 405:15
433:2,10,11,18
**wore**  384:20
**work**  225:14
227:17 261:5
268:13,20 302:17
330:9 339:9 340:4
343:10,14,21,24
368:9 374:3,11,13
374:18 375:1
377:3 379:21
402:25 424:24
425:21 429:3
442:10,18 446:1
446:12 451:19
457:22 458:25
459:17 460:6
474:3
**worked**  275:1
292:9 341:2,8
377:4 386:10
456:9,9
**worker**  262:20
**workers**  262:6,12
**working**  222:15
258:18 260:10
284:1 331:21
340:9 381:20
388:9 441:16
461:12

**works**  205:9
332:14 357:13
462:5
**world**  205:12
207:2 236:5 251:7
261:14
**worries**  326:15
**worst**  378:24
**worth**  343:14
376:3 448:23,23
493:19
**write**  344:24
455:10
**writing**  451:3
455:10 456:12
**written**  260:4
310:14
**wrong**  221:18
306:13
**wrote**  268:12
315:4

|  x  |
| --- |

**x**  318:20 473:14
493:5
**xl**  311:3,21 473:15
**xs**  419:7

|  y  |
| --- |

**yahoo**  364:24
**yahoo.com**  331:8
**yards**  273:23
**yeah**  202:5,10
203:4 209:14,18
211:11 212:16
222:20 223:16
226:1,9,14 234:6
235:4,17,21 236:8
236:20 237:14
238:25 239:5
245:13,19 247:16
255:12,20 256:20

Veritext Legal Solutions
346-293-7000

**[yeah - zoom]**

259:1,7,12,22
260:2,8,13,16,21
260:24 261:20,22
262:2 264:6,24
266:18 273:19
279:10 281:6
297:6 307:17
312:7 314:7,23
316:5,6 323:18
336:17 337:8
342:16 343:6
344:2 345:13,25
346:19,20 350:2
353:11 354:5
356:5 358:9
360:18 364:17
366:25 367:16
369:11 376:17,18
377:5 379:23
382:3 383:2 387:1
400:6 401:17
403:15,20 405:19
407:20 408:8,17
409:11,22,23
417:18 425:10
426:25 435:8
441:23 461:3,8
463:15 466:13
467:2,9,13 468:23
472:20 473:6,9,12
475:7,25 476:15
478:10 483:22,22
489:1,4,7 490:17

**year**  252:15
261:18,21 274:4
298:1 327:19
349:11 409:3
410:2 437:16
458:15,21 460:2
490:17,18

**year's**  390:9
**years**  206:22,24
224:13 234:25
235:20 273:14
338:3,4,7,11
345:10 354:2
409:21,22,23
424:24,25,25
458:10,12,17
461:1 472:20
476:3 477:4
**yep**  213:10 255:10
321:5 402:16,18
402:21 403:7
418:8 419:5
**yesterday**  248:12
249:24 250:7
**york**  274:1,2,4,5
279:19,22 280:3
281:14 284:6
288:22 308:8,16
308:23 312:18
337:11,14,17
342:12 343:19
344:3 345:7 348:5
348:19 353:8,17
364:20 365:15,18
368:4,18 371:9
372:8 376:23
393:11 412:19,21
412:24 413:4,12
423:9,12 435:6
443:6 482:11

**z**

**zoom**  198:10
420:11

2022-67757 / Court: 133

# Exhibit K

1

2    DAINIUS BARYSAS,              )
     Claimant                      )
3                                  )
     vs.                           ) CASE NO. HON. SUSAN SOUSSAN
4                                  ) ARBITRATOR
     UBER TECHNOLOGIES, INC.,      )
5    Respondent                    )

6

7

8                        ARBITRATION DAY 3

9                         May 3, 2022

10

11       ARBITRATION DAY 3, was taken remotely by Zoom in

12   the above-styled and numbered cause on the 3rd day of

13   May, 2022, from 10:00 a.m. to 4:32 p.m., before

14   Shauna Foreman, Certified Shorthand Reporter in and

15   for the State of Texas, reported by computerized

16   stenotype machine, pursuant to the provisions stated

17   on the record or attached hereto.

18

19

20

21

22

23

24

25

                                            Page 494

```
 1                    A P P E A R A N C E S
 2
 3   FOR CLAIMANT:
 4        BRET STANLEY, ESQ.
          ERIC HAWLEY, ESQ.
 5        RYAN MacLEOD, ESQ.
          KATHERINE HIETT, ESQ.
 6        KHERKHER GARCIA FASS HAWLEY
          2925 Richmond Avenue
 7        Suite 1560
          Houston, Texas  77098
 8        E-mail: rmacleod@kherkhergarcia.com
 9   FOR RESPONDENT:
10        BENJAMIN D. SANDAHL, ESQ.
          KIMBERLY R. MIERS, ESQ.
11        ALLISON C. WILLIAMS, ESQ.
          LITTLER MENDELSON
12        1301 McKinney Street
          Suite 1900
13        Houston, Texas  77010
          E-mail: acwilliams@littler.com
14
     ALSO PRESENT:
15
          Don Ridenour
16        Deborah Soh
          Jacob Stonecipher
17        Brad Rosenthal
          Angela Corridan
18        Dainius Barysas
19
20   ARBITRATOR:
21        Hon. Susan Soussan
22
23
24
25
```

Page 495

INDEX

PAGE

BRAD ROSENTHAL

Examination Continued by Mr. Sandahl ...........497

Examination by Mr. MacLeod .....................537

Further Examination by Mr. Sandahl .............596

DR. JAMES PARROTT

Examination by Mr. Stanley ....................599

Examination by Ms. Miers ......................629

Further Examination by Mr. Stanley ............650

Further Examination by Ms. Miers ..............656


CLOSING STATEMENT

Closing Statement by Mr. Stanley ...............659

CLOSING STATEMENT

Closing Statement by Ms. Miers ................678

FURTHER CLOSING STATEMENT

Further Closing Statement by Mr. Stanley .......698

Page 496

```
 1                    JUDGE SOUSSAN:  Is everyone ready to

 2      proceed?

 3                    MR. SANDAHL:  Respondent is, yes.

 4                    JUDGE SOUSSAN:  We are continuing with

 5      Mr. Rosenthal; is that correct?

 6                    MR. SANDAHL:  Yes, Your Honor.

 7                    JUDGE SOUSSAN:  Mr. Rosenthal, you

 8      continue to be under oath.  Let's please proceed.  I

 9      am ready.

10                    BRAD ROSENTHAL,

11      having been previously duly sworn, testified as follows:

12                    EXAMINATION (Continued)

13          Q.   (BY MR. SANDAHL)  Good morning, Brad.  So

14      today we'll pick up just with one topic that we left

15      off on yesterday, tax summaries.  If we can pull up

16      Exhibit JX9, Mr. Ridenour.

17                    And can you see this, Mr. Rosenthal?

18          A.   I can.  The text of it is small, so we may

19      have to blow it up a bit.

20          Q.   Can you go to Page 2, please, Mr. Ridenour?

21      Mr. Rosenthal, what is JX9?

22          A.   It is a tax summary for the year 2017 for

23      the claimant.

24          Q.   Okay.  And specifically, Page 2 of JX9 is

25      that 2017 summary.
```

                                                    Page  497

1          MR. SANDAHL:  I know Angela is in the

2     waiting room now, so if we could let her in.

3          Q.   (BY MR. SANDAHL)  And JX9 is a tax summary

4     for whom?

5          A.   This is the claimant's tax summary for

6     2017.

7          Q.   What does it show -- what are some of the

8     items shown on this exhibit?

9          A.   Sure.  So the gross earnings are the

10    earnings that the claimant -- sort of all the fares

11    that the claimant accrued while using our platform in

12    2017.  Then the fees and expenses are the fees and

13    expenses of $3200.  And then the net, which again the

14    driver could use for tax filing purposes, is

15    described as $10,000.

16         Q.   How much in 2017 were Mr. Barysas' gross

17    earnings?

18         A.   13,235.

19         Q.   All right.  Thank you.  You can pull that

20    one down, Mr. Ridenour.

21              Mr. Rosenthal, you've talked about

22    account creation and sign-up process.  I want to ask

23    you a few more questions about that.

24              Before a driver begins using the Uber

25    driver app, is a driver required to submit an

Page 498

1    application?

2         A.   No.

3         Q.   Are they required to provide a resume?

4         A.   No.

5         Q.   References?

6         A.   No.

7         Q.   Before an Uber -- before a driver begins

8    using the Uber driver app, are they required to

9    provide Uber with previous employment history?

10        A.   No.

11        Q.   Are they required to provide compensation

12   history?

13        A.   No.

14        Q.   When drivers start using the Uber driver

15   app, do they fill out a W-4 form?

16        A.   No.

17        Q.   Do they fill out an I-9 form?

18        A.   No.

19        Q.   Do they go through interviews?

20        A.   No.

21        Q.   Are drivers who start using the Uber driver

22   app required to communicate with anyone at Uber

23   before they begin using the app?

24        A.   Not required, no.

25        Q.   And let's compare that to the hiring

Page 499

1   process for Uber employees.  In your role with Uber,

2   have you been or are you involved in hiring

3   employees?

4        A.   I am and have been, yeah.

5        Q.   What's the first thing you do when you have

6   a hiring need?

7        A.   The first thing we do is try to go and get

8   approval for the role.  So we have to go create a

9   justification to create a role, and then we have to

10  get approval from our finance and HR teams to sort of

11  open the role.  That's Step Number 1.

12       Q.   Do you review applications and resumes when

13  you're filling an employee role?

14       A.   Yeah.  So after we get the description

15  open, we then have to work with our recruiting team

16  to post the role, and then we have sourcers that

17  would go out and source candidates and we have

18  recruiters who speak with the candidates and then

19  hiring managers review the resume, speak with the

20  candidate, and then we have usually interview panels

21  involving multiple people that interview the person.

22  If we want to move forward with the candidate, we

23  will work with our compensation team to extend an

24  offer and will send an offer letter.  And then we --

25  we will negotiate that offer with the individual.

Page 500

```
 1    And then if the individual wants to join, we will
 2    then have them sign all the appropriate documents
 3    such as the handbook, such as the confidentiality --
 4    confidential information and invention assignment
 5    agreements and other such agreements, and then we'll
 6    on-board them, bring them to our headquarters for a
 7    couple of days in San Francisco -- at least pre-COVID
 8    that's what we would do -- and then we would manage
 9    them ongoing.
10              MR. MacLeod:  I would object to the
11    narrative.  I would ask that we do question and
12    answer.
13              JUDGE SOUSSAN:  Overruled.
14         Q.   (BY MR. SANDAHL)  Mr. Rosenthal, does Uber
15    give new-hires a computer?
16         A.   We do, yeah.
17         Q.   Do they provide new-hires with an e-mail
18    address?
19         A.   We do have an e-mail address, yeah.
20         Q.   Once hired, do Uber employees receive
21    performance reviews?
22         A.   They do, yeah.  I think it used to be every
23    six months, and now it's every year.
24         Q.   And I want to compare that to drivers using
25    the Uber driver app.
```

Page 501

1              Does Uber provide -- you talked about

2      a handbook, I think.  Does Uber provide drivers using

3      the Uber driver app with a handbook?

4           A.   No.

5           Q.   Does it perform performance reviews on the

6      drivers?

7           A.   No.

8           Q.   And we kind of covered some of these things

9      already, but do drivers using the Uber driver app go

10     through an interview process?

11          A.   No.

12          Q.   Does Uber require drivers to take a minimum

13     number of trips per month?

14          A.   No.

15          Q.   Does Uber hold any required meetings with

16     drivers?

17          A.   No.

18          Q.   Does it send drivers e-mails?

19          A.   We do send drivers e-mails, yeah.

20          Q.   Does it send drivers text messages?

21          A.   We do.

22          Q.   If a driver wants to, can a driver opt out

23     of receiving e-mails and texts from Uber?

24          A.   They can.

25          Q.   And, Mr. Ridenour, if you would pull up

                                            Page 502

1    RX36.

2                    Mr. Rosenthal, do you recognize

3    Exhibit RX36?

4         A.    I do.

5         Q.    What is it?

6         A.    It is the process in which a driver would

7    follow to the extent they wanted to opt out of text

8    messages and e-mails from us.

9         Q.    You can pull that down.  Thanks, Don.

10                   Is there a way that employees of Uber

11   can opt out of receiving work e-mails?

12        A.    No.

13        Q.    And drivers -- getting back to drivers, can

14   drivers have multiple vehicles available on an Uber

15   account?

16        A.    They can.

17        Q.    Are there drivers who exercise that right?

18        A.    There are.

19        Q.    Is there any limit on the number of

20   vehicles a driver can have on their account?

21        A.    No.

22        Q.    When a driver has multiple vehicles on

23   their account, does Uber dictate which vehicle the

24   driver can use on a given day?

25        A.    We do not.

Page 503

1      Q.   I want to switch gears a little bit to trip

2    requests.  You've testified already some about this

3    so I don't want to retread all of that ground, but I

4    do have some additional questions.

5                 Once a driver is signed up to use the

6    Uber driver app, how does a driver start receiving

7    requests?

8      A.   A driver hits the go on-line button, and

9    that indicates their ability to accept trips or, I

10   guess, availability to -- for us to present them

11   offers for a trip.  So our -- we do have a matching

12   algorithm that takes a rider's request and then

13   matches it to a nearby driver.

14     Q.   You may have testified about this already,

15   but how much time once the driver is matched with a

16   rider do they have to accept the request?

17                 MR. MacLeod:  Object.  Asked and

18   answered.

19     A.   15 seconds.

20     Q.   (BY MR. SANDAHL)  What happens if a driver

21   just lets a trip request go?

22     A.   Then that trip request will go to another

23   nearby driver, to the extent there is one available

24   nearby.

25     Q.   Does a driver experience any negative

Page 504

1    consequences for not accepting a trip request?

2        A.   No.

3        Q.   Is there any limit on how many trips a

4    driver can let go or just decline?

5        A.   There's no limit, though to the extent a

6    driver -- if three in a row come along and the driver

7    hasn't accepted one, then the driver will be signed

8    out, meaning they will be -- they will just be signed

9    off.  That said, the driver can immediately sign back

10   on or hit the go on-line button.

11       Q.   Is that explained in the community

12   guidelines that we've seen?

13       A.   I believe it is.  I would have to look at

14   the community guidelines.  I don't quite recall.

15       Q.   Sure.  Let's look at those.  Don, would you

16   bring up JX2?

17            Mr. Rosenthal, do you recognize

18   Exhibit JX2?

19       A.   I do.

20       Q.   And you see it's the Uber community

21   guidelines?

22       A.   That's right, yeah.

23       Q.   We'll turn to Page 5.  And do you see the

24   paragraph that Mr. Ridenour is highlighting on the

25   community guidelines, JX2, at the top of Page 5?

Page 505

1          A.   I do.

2          Q.   Does that reflect what you're talking

3     about, that you'll be logged out of the app?

4          A.   That's right.

5          Q.   Does the driver have to wait a certain

6     amount of time before a driver can log back in?

7          A.   Not that I'm aware of.

8          Q.   And is being logged out as is described

9     here in the community guidelines the same as being

10    deactivated?

11         A.   No.

12         Q.   What's deactivation?

13         A.   Deactivation is when someone can no longer

14    go on-line for whatever reason.  It might be -- it

15    might be temporary.  It might be permanent.  But they

16    can no longer -- when they hit the go on-line button,

17    they would not be able to.  It could be a temporary

18    or a permanent.

19         Q.   Okay.  And I know I asked about negative

20    consequences for not accepting a particular trip.

21              Are there negative consequences for

22    drivers having low acceptance rate of the rides that

23    come to them?

24         A.   No.

25         Q.   If a driver doesn't want to accept trip

Page 506

1    requests, can the driver just go off-line?

2         A.    They can.

3         Q.    And does going off-line impact the driver's

4    acceptance rate?

5         A.    No.

6         Q.    Are there other ways other than using the

7    Uber driver app that claimant could find riders that

8    need transportation services?

9         A.    There are, yeah.

10        Q.    What are those of some?

11        A.    Well, drivers can -- can market themselves.

12   They can create business cards.  They could -- they

13   could, you know, just go by the airport and try to

14   find clients.  They could go to hotels and try to

15   find clients, particularly drivers with livery

16   licenses who are able to transport passengers for a

17   fee outside of a transportation network company

18   platform.  That's something drivers do and have done.

19        Q.    Could drivers who use the Uber driver app

20   use a different app?

21        A.    They could, yeah.  There are multiple

22   different apps available.  There are -- in the State

23   of Texas, I know Lyft is available.  There's another

24   app called Alto that's available.

25        Q.    Now, we have heard about some of those

Page 507

1    other apps, including through Mr. Barysas.

2              While a driver is actively providing a

3    trip to a rider that is secured through an app --

4    let's say through Lyft -- can that driver still

5    receive trip requests through Uber during those

6    times?

7         A.    Yeah.  To the extent they have -- they are

8    on-line on our app, yeah, they could.

9         Q.    And while a driver is logged into the Uber

10   driver app waiting for a trip request, are there any

11   restrictions on where the driver can go?

12        A.    No.

13        Q.    Are there any restrictions -- I think we

14   heard this referred to as P1 time.

15              Are there any restrictions at all on

16   what a driver can do during P1 time that Uber places

17   on them?

18        A.    No.

19        Q.    Can a driver be in P1 time on the Uber

20   driver app while also transporting a rider that they

21   secured through a different lead app?

22        A.    They could be, yeah.

23        Q.    I said "lead app."  I meant lead-generation

24   app like Lyft.

25        A.    Understood.

                                              Page 508

1      Q.    All right.  Let's go on to accepting trips.

2  How does a driver accept a trip request once it's

3  been presented to them?

4      A.    Basically click anywhere on the screen

5  except for one little X in the top right corner.

6      Q.    What happens after a driver accepts a trip

7  request?

8      A.    Well, presumably the driver goes to pick up

9  the rider.  That doesn't happen in all scenarios, but

10 it's up to the driver what to do next.

11     Q.    And after the driver picks up a rider, then

12 what happens?

13     A.    Presumably the driver brings the rider to

14 where they want to go, but that doesn't happen in all

15 situations.

16     Q.    And after they have dropped the -- after a

17 driver has dropped a rider off, what do they do with

18 the Uber app?

19     A.    They could keep it on or they could hit the

20 go off-line button.  It's up to them.

21     Q.    Do they hit an end trip button or anything

22 like that when it's done?

23     A.    They do.  So when they want to end the

24 trip -- it could be -- it's usually at the rider's

25 destination, but it could be before.  It could be

Page 509

1    slightly after -- they hit the end trip button.

2         Q.    And we've heard some about drivers getting

3    in contact with riders.  Can drivers be deactivated

4    for contacting riders directly?

5         A.    To the extent it's unwanted, they could,

6    yeah.

7         Q.    Would they -- does Uber deactivate drivers

8    for consensual contact between drivers and riders?

9         A.    If the parties decides to share their

10   contact information, then no.  If it's con sense Al,

11   then no.

12        Q.    Are drivers able to pre-arrange rides with

13   riders directly outside of the -- sorry.  Let me

14   start over.

15              Can drivers pre-arrange rides with

16   riders directly outside of the Uber driver app?

17        A.    They can.

18        Q.    Does that happen?

19        A.    It does.

20        Q.    And does Uber deactivate drivers for

21   pre-arranging rides with riders outside of the app?

22        A.    No.

23        Q.    And do some drivers use the Uber driver app

24   to process the fare of a ride that was pre-arranged

25   outside of the app?

1      A.    They could do that, yeah.

2      Q.    How would that work?

3      A.    Yeah.  So let's say that a driver and a

4    rider arrange a ride.  They know each other and have

5    the contact information.  Then the driver goes to

6    that rider's pickup location.  Say a rider wants to

7    be picked up from the airport and calls the driver or

8    texts the driver.  They coordinate the trip using our

9    app.  So the rider is in the backseat, requests, it

10   goes to a nearby driver, which is -- if you're in the

11   back seat, it's more often than not the driver they

12   want to get matched with.

13     Q.    Why would a driver and rider do that, use

14   the Uber app to handle a pre-arranged trip?

15                  MR. MacLeod:  Objection.  Calls for

16   speculation.

17                  JUDGE SOUSSAN:  Overruled.

18     A.    We act as though the payment collection

19   agent, so we're taking the risk on payment issues.

20   So if the driver's credit card isn't working or is

21   stolen -- or it could be multiple different reasons.

22   That's the risk that we take as the payment

23   collection agent.  So there's that fundamental

24   reason.  And also while -- while a driver is using

25   our services, we do have insurance, third-party

1    liability insurance, that -- that we maintain on

2    behalf of drivers using our -- our app.

3         Q.   (BY MR. SANDAHL)  And after a driver

4    accepts a trip, can a driver cancel the trip?

5         A.   Yeah, they can.

6         Q.   Are there any negative consequences to a

7    driver for canceling any particular trip?

8         A.   No, there are not.

9         Q.   Can a driver lose access to the Uber driver

10   app for canceling trips?

11        A.   They can, yeah, or they used to be at

12   least.  But yeah.

13        Q.   Has that changed over time?

14        A.   It has, yeah.  Drivers are no longer

15   deactivated for canceling an excessive amount of

16   trips; but they used to be, yeah.

17        Q.   Would they be deactivated for canceling one

18   or two trips?

19        A.   Usually it was an excessive amount within

20   the highest sort of -- drivers were deactivated at a

21   highest cancellation rate within their respected

22   territory.  We looked at standard deviations above

23   the mean, the cancellation rate, and it was something

24   like canceling 50 percent of trips or something

25   along -- something in that general direction.

Page 512

1       Q.   If a driver doesn't like a rider, can a

2  driver request not to be paired with a particular

3  rider?

4       A.   They do, yeah.

5       Q.   What does Uber do when a driver makes such

6  a request?

7       A.   On our end, we can -- sort of like checking

8  a box on the back end to make sure that they are no

9  longer matched again in the future.

10      Q.   When a driver accepts a trip request and

11 the rider isn't ready when the driver gets to the

12 location, is there any requirement that the driver

13 wait for the rider to come out of the building or

14 wherever they are?

15      A.   No.

16      Q.   If a driver makes a decision to wait, is

17 the driver paid for that time?

18      A.   The -- if a driver is waiting for over two

19 minutes then, yes, the rider will start paying them a

20 wait time.  That change was made at some point in

21 2017.  Prior to 2017, no, the driver would not have

22 been paid any wait time.

23      Q.   If a driver decides not to wait and cancels

24 a trip, can a driver then rate the rider?

25      A.   No.

Veritext Legal Solutions
346-293-7000

1      Q.    Could the rider rate the driver?

2      A.    No.

3      Q.    Does canceling a trip impact either party's

4  star rating?

5      A.    No.

6      Q.    If the rider cancels the trip, is there a

7  cancellation fee?

8      A.    There is if a certain time threshold has

9  passed.

10      Q.    And who pays the cancellation fee?

11      A.    The rider pays the cancellation fee, and

12  the cancellation fee is defined as the fare of the

13  trip.

14      Q.    And if a rider were to leave an item in the

15  driver's vehicle after a trip, what happens then?

16      A.    Well, if the driver finds that item or --

17  you know, if the driver finds the item, then the

18  driver could do a couple different things.  The

19  driver could return it to one of our Greenlight hubs

20  which we spoke about earlier.  A driver could also

21  coordinate directly with the rider to return the

22  item.

23      Q.    If the driver doesn't have the contact

24  information for the rider, is there a way that they

25  could get in contact with the rider?

Page 514

1      A.    Yeah.  They can reach out to us, and our

2    support team will then reach out to the rider and

3    say, "Hey, a driver found a pair of gloves in your

4    car," and we would ask them for the rider's

5    permission for the driver to contact them and the two

6    parties could then coordinate together.

7      Q.    Do drivers receive anything for returning a

8    lost item to riders?

9      A.    There is a lost item award, yeah.  It's

10    like $10 or something like that.

11      Q.    Who pays that lost item award?

12      A.    The rider does.

13      Q.    I want to move on to routes and maps that

14    are used.  Mr. Barysas has testified about the map

15    that he used for routes, and I want to pull up

16    Exhibit RX29.

17            Mr. Rosenthal, can you tell us what

18    Exhibit RX29 is, please?

19      A.    This is part of our help page that

20    describes or, I guess, answers the question of

21    whether or not a driver needs to follow the GPS

22    route.

23      Q.    Are drivers required to follow GPS routes

24    provided by the Uber driver app?

25      A.    No.

Veritext Legal Solutions
346-293-7000

1       Q.   Is there any negative consequence to a

2    driver for not following the GPS route provided on

3    the Uber driver app?

4       A.   No.

5       Q.   Was claimant ever deactivated for not

6    following the recommended route provided on the Uber

7    driver app?

8       A.   No.

9       Q.   If a driver were to go, say, 10 miles out

10   of his or her way to increase the rider's fare, would

11   there be a consequence for doing that?

12      A.   That could be considered fraud, per the

13   community guidelines.  If a driver has a habit of

14   doing that, they could be deactivated, yeah.

15      Q.   Setting that situation aside, what happens

16   to the final fare when a driver takes a reasonable

17   but different route from the recommended route on the

18   Uber driver app?

19      A.   The -- the fare is based on three

20   variables:  A base fare, a per minute rate, and per

21   mile rate.  The per mile rate and per minute rate are

22   based on actuals.  So the fare adjusts accordingly to

23   the route taken.

24      Q.   Is it adjusted for the additional time and

25   mileage that's taken, then?

Page 516

```
 1        A.    Yeah.

 2        Q.    Are there any circumstances when the fare

 3   would be adjusted because a driver took a different

 4   route other than the recommended route on the Uber

 5   driver app?

 6        A.    Yeah.  Oftentimes people -- rider and

 7   driver will agree to a different route or a different

 8   fare, and the -- the fare could get adjusted

 9   accordingly.

10        Q.    Are fares ever adjusted without input from

11   the rider or driver?

12              MR. MacLeod:  Objection to lack of

13   foundation.

14              JUDGE SOUSSAN:  He can ask.  If he

15   doesn't know, he can answer.

16              MR. MacLeod:  The problem is yesterday

17   my client was directed -- you wanted to know the

18   basis for his understanding.  We've now heard a lot

19   of generalized testimony about, "Oh, sure, yeah,

20   maybe," and there's no basis for his understanding or

21   for his testimony.  It's just -- it's the exact same

22   deal.  It's just -- you've made your ruling.

23              JUDGE SOUSSAN:  Ask his understanding,

24   Mr. Sandahl.

25        Q.    (BY MR. SANDAHL)  Do you understand whether
```

Page 517

1  fares are ever adjusted without input from the rider

2  or driver at Uber?

3      A.   It's not something that we would normally

4  do.

5      Q.   Okay.  Are drivers required to use a

6  navigation system at all?

7      A.   No, they are not.

8      Q.   Don, would you pull up Exhibit RX37,

9  please?

10          Mr. Rosenthal, can you explain to us

11  what Exhibit RX37 is?

12      A.   This is the process by which a driver would

13  follow in order to turn off the auto navigation

14  feature, which the auto navigation feature is within

15  our app.  We do have proprietary navigation to the

16  extent a driver wants to use it, but a driver could

17  turn it off.  Also within our app the driver has the

18  ability to use Waze and Google Maps as default rather

19  than using our navigation.

20      Q.   Now I want to talk a little bit about

21  amenities.  Are drivers required to provide riders

22  with any type of amenity?

23      A.   No.

24      Q.   We heard Mr. Barysas say yesterday that he

25  provided things, I think, like phone chargers,

Page 518

1    tissues, waters for riders.

2              Can a driver be deactivated for not

3    offering such amenities to riders?

4         A.    No.

5         Q.    Are drivers allowed to create their own

6    rules for riders?

7         A.    They can, yeah.

8         Q.    What kind of rules have you heard of or are

9    you aware of drivers creating for the riders?

10        A.    No eating would be a pretty common one.  No

11   eating in the vehicle.  Another one being no smoking.

12   That's another common one.  No listening to -- like,

13   no music that would be sort of inappropriate levels.

14   Those are some of the more common ones that I hear

15   of.

16        Q.    And we saw that Mr. Barysas had business

17   cards in his car.  Does Uber try to stop drivers from

18   handing out business cards?

19        A.    No, we do not.

20        Q.    We also heard Mr. Barysas testify that he

21   underwent some training in New York.  I think

22   yesterday we established that your job requires you

23   to be familiar with some regulatory frameworks.

24              Does New York City have certain

25   training requirements for drivers?

Page 519

1        A.    It does, yeah.

2        Q.    What are you aware of?

3        A.    So in New York City -- New York City is the

4    most highly-regulated market in which we operate, and

5    the New York City Taxi and Limousine Commission has

6    very specific requirements for drivers in order to

7    obtain a TLC license.  And among those are a

8    three-day defensive driving course, followed by a

9    two-hour written test.  So that is not our

10   requirement.  That is the city's Taxi and Limousine

11   Commission's requirement in order to obtain a TLC

12   license.

13       Q.    You've spoken at length about fares and

14   fare calculation with opposing counsel, so I don't

15   want to belabor it, but I do want to ask some more

16   questions on that.

17             Can drivers negotiate their fares with

18   riders?

19       A.    They can.

20       Q.    Is there any negative consequence to

21   drivers who negotiate their fares with riders?

22       A.    There is not.

23       Q.    How would a driver go about negotiating

24   fares with riders?

25       A.    Well, to the extent a driver has accepted a

                                              Page 520

1    trip, the driver could get in touch with that rider

2    to negotiate a fare.  So a driver could text the

3    driver, say, if the driver is waiting at the airport

4    and the driver figures out where the rider is going

5    because they touch base.  They could negotiate a fare

6    other than the fare that is suggested in our

7    application.  That's one way they could do it.  Or

8    upon picking a rider up, they could negotiate a

9    different fare.

10                   Sometimes what I've seen also is the

11   driver will end the trip early.  To the extent the

12   driver went on a circuitous route, sometimes the

13   driver ends the trip early.  That is a form of

14   negotiating the fare.  So drivers and riders do this.

15   There are negative consequences upon doing so.

16       Q.   If a driver ends a trip early, does that

17   reduce the amount of the fare then?

18       A.   That the driver could potentially get,

19   yeah.

20       Q.   Can a driver decide not to charge a rider

21   at all for a ride?

22       A.   They could.

23       Q.   Does a driver need approval from Uber to

24   not charge a rider for a ride?

25       A.   No, they do not.

Page 521

1      Q.    And can a driver refund a rider for a trip?

2      A.    They could.

3      Q.    Could a driver refund a rider's

4  cancellation fee?

5      A.    They could.

6      Q.    Do drivers need approval from Uber to

7  refund riders' fares or cancellation fees?

8      A.    No.

9      Q.    We'll pull up Exhibit RX34.  Mr. Rosenthal,

10  do you recognize Exhibit RX34?

11      A.    I do.

12      Q.    What is it?

13      A.    It is a section of our help page that

14  describes the process to a driver of how to refund a

15  rider.

16      Q.    In the middle paragraph, it looks like it

17  allows refund of riders' fares or cancellation fees;

18  is that right?

19      A.    That is correct.

20      Q.    And you've spoken about Uber collecting GPS

21  data from drivers' phones.  Why does Uber -- I'm

22  going -- why does Uber collect those GPS data points?

23      A.    There are two reasons.  The first is that

24  in order for us -- in order for our sort of system to

25  work, it relies upon proximity of riders and drivers

Page 522

1   to match them to each other.  So we need to know

2   where they are in order to be able to match people.

3                    The second is the fare calculation, as

4   I described earlier, it has two variables.  The

5   variable fares, meaning the per minute and per mile

6   rate --

7                    MR. SANDAHL:  Is it just me frozen?

8                    THE REPORTER:  No, he's frozen.

9                    MR. MacLeod:  Did you get in touch

10  with him?  It looked like you just typed something.

11  That's why I was asking.

12                   JUDGE SOUSSAN:  I guess he's going to

13  log back on.

14                   (Recess from 10:33 a.m. to 10:36 a.m.)

15      Q.   (BY MR. SANDAHL)  Mr. Rosenthal, when we

16  were speaking, we last heard -- I asked you about why

17  Uber collects GPS data points.  You started

18  explaining about the app relying on the proximity of

19  riders and drivers, and you also said there's a

20  second reason about variable fares.

21                   Could you pick up there?

22      A.   So the fare calculation is based on three

23  things:  Base fare, per minute, and per mile rate.

24  The per minute is based on the actual distance

25  traveled.  In order to get the actual distance

Page 523

1    traveled, we rely on the GPS points.

2         Q.    So I want to talk now about some other

3    costs and fees and things.

4                   If a driver incurs a toll while

5    transporting a rider, is the driver paid for that

6    toll?

7         A.    They are.

8         Q.    Who pays the driver for the toll?

9         A.    The rider will.

10        Q.    And what about tolls that a driver incurs

11   on the way to pick up a rider?

12        A.    The rider will not pay those tolls.

13        Q.    Is there a way that a driver can avoid

14   tolls when they are going to pick up a rider?

15        A.    They could, yeah.  They could just not take

16   a toll road.

17        Q.    Once a driver completes a ride, when do

18   they receive payment?

19        A.    So the payment by default -- I guess the

20   rider will pay the driver the fare, and then the

21   fares will be remitted to a driver by default once a

22   week.  That said, a driver has the ability to opt

23   into something called InstaPay in which a driver

24   could opt to have that fare remitted to them

25   immediately.

                                        Page 524

1      Q.    Who decides whether to opt into InstaPay?

2      A.    That's the driver's decision.

3      Q.    Is there a fee to use InstaPay?

4      A.    There is a transaction fee that the bank

5  charges, but the bank also offers some sort of debit

6  card program.  And if the driver signs up for that,

7  then there are -- the bank does not charge a service

8  fee.

9      Q.    And talking about tips, are riders able to

10  tip drivers through the Uber driver app?

11      A.    They can, yeah.

12      Q.    Can drivers receive tips only through the

13  Uber driver app or can they get tips in other ways?

14      A.    They -- (indiscernible) Venmo could be

15  something else.  I should note that the functionality

16  within our app to tip has not always been around.  We

17  launched that in 2017.

18      Q.    You cut out for a second.  I heard about

19  Venmo.  What was the other option?

20      A.    Venmo --

21      Q.    You cut out at exactly the wrong time.

22  Sorry.

23      A.    Square.

24      Q.    Got it.  What percentage of tips received

25  through the Uber driver app do drivers receive?

Page 525

1      A.    They receive 100 percent of the tip.

2      Q.    And both you and Mr. Barysas talked a bit

3 about surge pricing.  Would you just remind us what

4 is surge pricing?

5      A.    Yeah.  So the -- within our platform, there

6 are the three variables to the fair calculation I

7 mentioned earlier.  There are default amounts to

8 those.  There's a base amount, a default per minute

9 amount, and a default per mile amount.  And the

10 amounts fluctuate over that -- those default amounts

11 based on realtime supply and demand in the market

12 down to a pretty micro level, meaning, like, a couple

13 of city blocks.  To the extent supply or demand is

14 really high and the supply of drivers does not meet

15 that demand, prices will fluctuate.  And that's what

16 we in our system refer to as surge.

17              THE WITNESS:  I'm getting some

18 feedback on one of the lines.

19              JUDGE SOUSSAN:  Let's talk about that

20 feedback.  If you're not talking, please mute

21 yourselves.  That may help.  All right.  Let's go

22 forward.

23      Q.    (BY MR. SANDAHL)  How are drivers made

24 aware of surge pricing?

25      A.    Within the app, there are two things.

Page 526

1   There are something called -- what we refer to as

2   heat maps in which if a driver is on-line in Period

3   1, they can see areas where it's surging, areas of

4   the city.  So it's determined by, essentially, color.

5   That's why it's called a heat map.

6                And then also at the time a driver

7   sees a trip request, the offer card as we refer to it

8   will have a surge multiplier to the extent it's

9   surging.  Say it's 2.3X.  2.3X will be 2.3 times the

10  default amounts.  So at the time a driver has that

11  offer, they can determine whether or not they want to

12  accept the trip based on the -- the surge multiplier

13  if they want to choose to do that.

14       Q.   We'll pull up Exhibit RX31.

15                Mr. Rosenthal, can you tell us what

16  Exhibit RX31 is?

17       A.   Yeah.  This describes surge.  This also

18  describes the maps which I was talking about.  The

19  second sentence describes the map will show areas

20  that are yellow, orange, or red and corresponding

21  surge amounts.

22       Q.   Does it also mention in the second

23  paragraph extra dollar amounts being shown at the

24  home screen?

25       A.   The extra dollar amount will be shown at

                                          Page 527

1    the bottom of your home screen when you're in a surge

2    area, yeah.

3         Q.   You can pull that down.

4              Mr. Rosenthal, are drivers required by

5    Uber to drive towards or use surge areas?

6         A.   No, they are not.

7         Q.   And what do drivers pay Uber for

8    transportation leads through the Uber driver app for?

9         A.   Drivers pay us a service fee for the

10   services which we provide to them.  The services are

11   lead generation -- so we essentially help them find

12   clients, which is the -- which is a meaningful part

13   of that service fee.  We also provide -- we act as a

14   limited payment collection agent.  So we have

15   constructed a whole payment structure, as well.  We

16   do take the credit risk, as I described earlier.

17             We also market our brand to enable

18   growth of rider demand, essentially, and we also

19   provide customer support 24/7 by e-mail and we have

20   the in-person Greenlight hubs which are open certain

21   hours.  We text message drivers.  These are things

22   that we provide 24/7 as a support function.

23        Q.   And when we're talking about drivers and

24   their ability to control profit and loss, are there

25   certain choices a driver can make that will impact

Page 528

1    their profit and loss?

2         A.    There are, yeah.

3         Q.    What are some of those choices?

4         A.    On the revenue side, a driver can use our

5    platform to go where they want to go, where they

6    think they will earn the highest amount of revenue,

7    such as some drivers will wait at the airport for

8    eight hours.  Some drivers will not do that.  Some

9    drivers make the decision to drive on Friday nights.

10   Some drivers don't want drunk people in their car.

11   Those are things drivers can do on the revenue side.

12               On the cost side, some drivers might

13   want a more economical vehicle.  It's five years old

14   or maybe it's an electric vehicle or plug-in.  At the

15   same time, some drivers will make the investment in a

16   more high-end vehicle and use the Uber Black

17   transportation option because they can earn higher

18   fees, but then that vehicle is more expensive so they

19   are going to pay the depreciation.  Generally those

20   vehicles have bigger engines and will get less miles

21   per gallon.

22               Those are things drivers can do on

23   both the revenue and cost side to optimize the

24   economic success while using our platform.

25        Q.    Are you aware of drivers who try to improve

Page 529

1    customer experience to improve their revenues?

2         A.    That's another one, actually.  Drivers can

3    try to -- try to provide really good customer service

4    and get higher tips.  So there are -- there are some

5    drivers who provide water and mints and gum, provide

6    phone chargers.  Those are certain things drivers can

7    do.

8               I was in a car one time, election

9    season six years ago, when a driver had two tip jars,

10   one that said Trump and one that said Clinton.  I saw

11   that as a cute thing to do for a driver to get more

12   tips.

13              MR. MacLeod:  Objection as

14   nonresponsive.

15              JUDGE SOUSSAN:  Sustained.

16        Q.    (BY MR. SANDAHL)  What about skill or

17   initiative?  Can that impact a driver's earning

18   abilities?

19        A.    Yeah.  I think so, yeah.  Absolutely.

20        Q.    What are some ways that that could happen?

21              MR. MacLeod:  Objection.  Speculation.

22              JUDGE SOUSSAN:  He can answer if he

23   knows, but he must know.

24        A.    In terms of -- can you repeat the question?

25        Q.    (BY MR. SANDAHL)  Yeah.  What are skills or

                                        Page 530

1    initiatives that if a driver has them or that you are

2    aware of drivers having that they have taken that

3    have impacted their earning acts?

4              MR. MacLeod:  Lacks foundation, it's

5    overly broad, and it's not limited in time or scope

6    to this matter.

7              JUDGE SOUSSAN:  Overruled.

8         A.   So some drivers will provide really good

9    customer service.  There is a difference between

10   driving with paying passengers in your vehicle as

11   opposed to driving by yourself.  Some drivers will

12   drive much smoother and won't accelerate as much or

13   brake as hard.  Some drivers will open the door, help

14   you with your suitcase.  These are all things that

15   drivers can do in order to provide better customer

16   service, and customer service is a skill.  And that's

17   what drivers can do in order to try to increase their

18   earnings.

19             MR. MacLeod:  Objection.

20   Nonresponsive.

21             JUDGE SOUSSAN:  Overruled.

22        Q.   (BY MR. SANDAHL)  Are you aware of drivers

23   who are -- have learned of events or -- I guess

24   events that they have taken advantage of?

25        A.   Yeah.  Some drivers, particularly in more

                                          Page 531

1   rural areas, can read their local Times, their local

2   publication that comes out once a week, and figure

3   out where the events are on a weekend.  There might

4   be a beer fest getting out at 3:00 p.m. on a

5   Saturday.  Some drivers might go over to that because

6   there will be a lot of demand there.  Those are

7   certain things I'm aware of drivers doing in order to

8   optimize their own earnings in our platform.

9       Q.   Let's talk about star ratings for a minute.

10  Mr. Ridenour, if you could pull up RX38.

11              Mr. Rosenthal, what is Exhibit RX38?

12      A.   It is a -- it's part of our help web page

13  that describes how the rating system works.

14      Q.   Can you explain how the rating -- the star

15  rating system works on the Uber driver app?

16      A.   Yeah.  At the end of every trip, a rider

17  and driver have the option to rate each other one

18  through five stars.

19      Q.   Does Uber rate drivers?

20      A.   We do not, no.

21      Q.   Does Uber have control over how drivers and

22  riders rate each other?

23      A.   We do not.

24      Q.   Does Uber ever adjust or remove star

25  ratings?

Page 532

1      A.    Only at the request of one of the other

2   parties.

3      Q.    Why does Uber use a star rating system?

4      A.    Well, there's really no way -- so there's

5   no way for us to -- to know what goes on during a

6   trip.  So what we do is we -- we do want to have

7   minimum business standards for both riders and

8   drivers.  And to the extent one of those parties has

9   a rating that's below a threshold, then we would no

10  longer want to provide them with services.

11     Q.    Are you aware of the average star rating

12  for drivers in Houston?

13     A.    I am.

14     Q.    What is that?

15           MR. MacLeod:  Objection.  Not limited

16  to time and scope to the statutory period.

17           JUDGE SOUSSAN:  Can you limit it,

18  please?

19     Q.    (BY MR. SANDAHL)  Are you aware of what it

20  was in 2017?

21     A.    A specific number, no.

22     Q.    Is it constantly changing?

23     A.    It changes, but usually not a tremendous

24  amount.

25     Q.    Let's look at Exhibit RX38 with the

Page 533

1   sentence starting "your overall."  Are you able to

2   read that?

3        A.   I am.  Do you want me to read it?

4        Q.   Yeah, would you do that?

5        A.   "Your overall star rating is an average of

6   the 500 most recent star ratings you've received from

7   riders."

8        Q.   And does that describe how star ratings are

9   calculated?

10       A.   Yeah.  It's a simple average of the last

11  500 trips that are rated.

12       Q.   And then, Don, if you can pull up the next

13  sentence, "If a rider rates."

14            And based on what we're seeing here in

15  Exhibit RX38, if a driver receives a rating of four

16  stars or below for a reason that's outside the

17  driver's control, is that rating included in the

18  overall rating?

19       A.   No.

20       Q.   All right.  Are you aware of the percentage

21  of drivers that lose access to the Uber driver app

22  for having a low star rating?

23            MR. MacLeod:  Objection.  Not limited

24  to time in scope for the statutory period.

25            JUDGE SOUSSAN:  Sustained.

Page 534

1        Q.    (BY MR. SANDAHL)  For the period 2017 to

2    2019, are you aware of what percentage drivers have

3    lost access to the Uber driver app through low star

4    ratings?

5        A.    Less than 1 percent.

6        Q.    If a driver decides not to take a trip

7    request does that impact a driver's star rating?

8        A.    No.

9        Q.    Can a rider's account be deactivated for

10   having a low star rating?

11       A.    No.  Can a rider's?  Yeah, a rider's can.

12       Q.    A rider.  And are riders required to rate

13   their driver after every trip?

14       A.    No.

15       Q.    Do you consider any individual driver to be

16   an integral part of Uber's business?

17       A.    Any individual driver?  No.

18       Q.    Do you consider drivers as a whole integral

19   to Uber's business?

20       A.    Our rides business, yeah.

21       Q.    Are riders also integral to Uber's

22   business?

23       A.    Our rides business, yeah.

24       Q.    And the rides business is just one of many

25   business lines, I think you explained yesterday; is

                                          Page 535

1    that right?

2         A.   One of several, yeah.

3         Q.   Mr. Rosenthal, other than in this

4    arbitration, does Uber have any record of Mr. Barysas

5    complaining about being classified as an independent

6    contractor?

7         A.   Not that I'm aware of.

8         Q.   Other than in this arbitration, does Uber

9    have any record of claimant seeking any reimbursement

10   for mileage?

11        A.   Not that I'm aware of.

12        Q.   Other than in this arbitration, does Uber

13   have any record of claimant seeking reimbursement for

14   vehicle expenses?

15        A.   Not that I'm aware of.

16        Q.   For phone bills?

17        A.   Not that I'm aware of.

18        Q.   Other than in this arbitration, does Uber

19   have any record of claimant making a request that he

20   be classified as an employee?

21        A.   Not that I'm aware of.

22        Q.   And you heard claimant testify that he

23   stopped using the Uber app in 2019, the Uber driver

24   app.

25                    Who made the decision to stop using

                                        Page 536

1    the Uber driver app?

2        A.    It was the driver.

3                    MR. SANDAHL:  Your Honor, could I have

4    just a short break?  I think I may be finished.

5                    JUDGE SOUSSAN:  How much time do you

6    need?  Five minutes or longer?

7                    MR. SANDAHL:  Just five minutes.

8                    (Discussion off the record)

9                    (Recess from 10:54 a.m. to 11:05 a.m.)

10                   MR. SANDAHL:  Your Honor, thank you.

11   I have no further questions for Mr. Rosenthal at this

12   time.  I pass the witness.

13                   JUDGE SOUSSAN:  Thank you.

14                        EXAMINATION

15       Q.    (BY MR. MacLEOD)  Sir, you remember towards

16   the very end of questioning by Uber's counsel you

17   were asked about who made the decision to stop

18   driving through the Uber application, correct?

19       A.    That was a question, yeah.

20       Q.    Right.  And your answer, as I appreciate it

21   and as we know, was Dainius made that decision,

22   correct?

23       A.    That's right.

24       Q.    But prior to that decision, you would agree

25   that Uber made the unilateral decision to no longer

                                        Page 537

1    allow him to perform pickups and drop-offs through

2    the Uber app at the airport, correct?

3         A.   That is a decision we made, yeah.

4         Q.   And you heard that that was a decision that

5    was -- it was made final and not appealable by Uber,

6    correct?

7         A.   I think that's what the evidence shows,

8    yeah.

9         Q.   And there was nothing in the Uber support

10   messages that said that Dainius could provide his own

11   evidence or his own defense.

12              You didn't see that in the support

13   messages, did you?

14        A.   Not that I saw, no.

15        Q.   And you heard about the effects of Uber's

16   decision to limit his ability to perform work through

17   the Uber app at the airport, correct?

18        A.   I saw the evidence, yeah.

19        Q.   And as I appreciate it, it would be your

20   testimony that Uber then, as a limited collection

21   agent -- because that's how you described Uber,

22   correct?

23        A.   Limited payment collection agent, yeah.

24        Q.   A limited payment collection agent made

25   this decision about the airport, correct?

Page 538

1          A.    It is a decision we made, yeah.

2          Q.    And you understand that Uber's counsel in

3    this case has stipulated that Uber did not allow the

4    claimant, being Dainius, in this arbitration to use

5    the Uber driver app at the airport, right?

6          A.    We didn't -- we made a decision not --

7                MR. SANDAHL:  I'll object to the

8    extent that he's asking for his opinion on counsel's

9    stipulations.

10               MR. MacLEOD:  I didn't ask for an

11   opinion.  I asked if he understood that on the

12   record -- it's actually going to be Page 175, Lines 3

13   through 8, that Uber's counsel, Ms. Miers, said Uber

14   stipulates that it did not allow the claimant in this

15   arbitration to use the Uber driver app at the

16   airport.

17               MR. SANDAHL:  I'll object to the

18   extent it misstates the stipulation because it was

19   after a certain period of time and there's no reason

20   the witness needs to testify about it.

21               MR. MacLEOD:  He was asked by counsel

22   about statements made in opening, and now we're going

23   to talk about the passage of time?  It was a

24   stipulation on the record, Your Honor.

25               JUDGE SOUSSAN:  He can answer the

                                          Page 539

```
 1    question if he can.  Let's go on.
 2         A.   I believe that's right.
 3         Q.   (BY MR. MacLeod)  Okay.  And -- and that's
 4    still -- as you appreciate it, that's still true
 5    today, right?
 6         A.   That what is still true today?
 7         Q.   All right.  You raised the issue of PayPal.
 8    Sometimes you will compare Uber as a limited payment
 9    collection agent to other companies, and one of those
10    you use is PayPal, right?
11         A.   I'm not sure I made the analogy to PayPal.
12         Q.   Do you know that there are numerous
13    instances in your sworn testimony where you have made
14    reference to PayPal when discussing how Uber conducts
15    business?
16              JUDGE SOUSSAN:  Hold on a second.
17    Counsel, which sworn testimony are you talking about
18    because I have not heard PayPal in this case?  Are
19    you talking about in other cases?
20              MR. MacLeod:  Yes, Judge.  He has
21    testified in many cases.  Under the Federal Rules of
22    Evidence --
23              JUDGE SOUSSAN:  I'm familiar with
24    that, Mr. MacLeod.  Thank you.  I just didn't know
25    what you were talking about.
```

Page 540

1          MR. MacLeod:  Yesterday I was told I

2     could not use prior testimony, so that's why -- okay.

3          Q.   (BY MR. MacLeod)  You understand how PayPal

4     works?

5          A.   PayPal is a massively complex company.  I

6     cannot say I understand how PayPal works in totality,

7     no.

8          Q.   Have you ever heard of an instance where

9     PayPal tells one of its customers that they can use

10    PayPal at Home Depot but they can't use PayPal at the

11    Lowe's near their house?

12              MR. SANDAHL:  Objection.  Lacks

13    foundation.

14              JUDGE SOUSSAN:  He can answer if he

15    knows the answer.  If he doesn't know, then he

16    doesn't know.  But he can answer if he knows the

17    answer.

18         A.   I'm not sure exactly how PayPal conducts

19    its business with its customers.

20         Q.   (BY MR. MacLeod)  Okay.  But you would hold

21    yourself out as knowing exactly how Uber was

22    conducting business in Houston during the statutory

23    period in this case, correct?

24         A.   Exactly how?  I mean, insofar as I can

25    answer questions if you have questions.  I'm familiar

                                      Page 541

1    with our business operations, yeah.

2        Q.    Yesterday I was asking you questions, and I

3    was saying that I was trying to find out the

4    foundation.  I was trying to find out where the

5    information was coming from.

6                    Do you remember some of that?

7        A.    I do.

8        Q.    And you were here yesterday when my client

9    was being cross examined.

10                   Do you remember that?

11       A.    I do.

12       Q.    And there was a statement about how I need

13   to know the basis for your client's understanding.

14                   Do you remember that?

15       A.    Not specifically, no.

16       Q.    Well, I want to try to find out the basis

17   for your understanding on some of these subjects.

18   Can we do that?

19       A.    Sure.

20       Q.    Because if you had to quantify -- in the

21   direct examination by Uber's counsel, if you had to

22   give a percentage of your testimony that you think

23   was actually specific to my client in this

24   arbitration during the statutory period, what do you

25   think the percentage would be?

Page 542

1        A.    I don't know exactly what you're

2    referencing here, what you're referring to.

3        Q.    What part of the question do you not

4    understand, Mr. Rosenthal?

5        A.    Well, my counsel had asked me some

6    questions, and I answered those questions.

7        Q.    And out of all those questions you were

8    asked, how many of those questions -- what percentage

9    would you estimate were actually specific to Dainius,

10   my client, and his use of the Uber application?

11              MR. SANDAHL:  I'll object, Your Honor,

12   that this is harassing and asking him to comment on

13   his own testimony.

14              JUDGE SOUSSAN:  If he can answer, let

15   him answer the question, please.

16       A.    I don't know exactly how your claimant used

17   the -- used our services.  He was a driver for many

18   years.  I don't know exactly the ins and outs of

19   every time he used the services or the, you know,

20   the -- over the many trips he provided.

21       Q.    (BY MR. MacLeod)  Do you know why, then,

22   you have provided now a couple of hours of testimony

23   generally about the Uber app instead of what my

24   client actually did based upon the evidence presented

25   in this case during the statutory period?

Page 543

```
 1                    JUDGE SOUSSAN:  Hold on a second.  The
 2    witness was asked questions from counsel, and he
 3    answered those questions.  If you have different
 4    questions, Mr. MacLeod, that would focus in on your
 5    client, I suggest that you ask those questions,
 6    please, sir.
 7                    MR. MacLeod:  Judge, this is the
 8    second time now I've tried to cross-examine this
 9    witness and I'm being directed exactly how it needs
10    to go, but I will do my best.
11         Q.   (BY MR. MacLeod)  So you just said you
12    didn't know how my client drove through the Uber app.
13                    Do you remember that?
14         A.   Aside from hearing his testimony and seeing
15    the evidence, no, sir.
16         Q.   You literally just testified "I'm not sure
17    how your client used the Uber app."
18                    Is that your testimony?
19                    MR. SANDAHL:  I'll object that it
20    misstates the testimony.
21                    JUDGE SOUSSAN:  The testimony is what
22    it is.  Move on, please.
23         Q.   (BY MR. MacLeod)  Did you --
24         A.   I'm not sure specifically in totality on
25    how he used the app over the number of years.  I have
```

                                                Page 544

1    seen the evidence and have heard his testimony.

2        Q.   How many times did Dainius receive tips

3    through the Venmo app?

4        A.   You would have to ask him that.  I don't

5    know.

6        Q.   No, I'm asking you that because you

7    volunteered that that normally happens, that people

8    use the Venmo app.  I'm asking you because we're in

9    an arbitration involving Dainius.

10               How many times, as Uber's corporate

11   representative, did Dainius receive tips through the

12   Venmo application?

13       A.   First of all, I'm not sure that it normally

14   happens.  Second of all, there's no way that I would

15   know how many -- if he accepted any tips or how much

16   he accepted via Venmo.

17       Q.   So is your answer simply "I don't know"?

18       A.   That is right.

19       Q.   Okay.  How many times did Dainius receive

20   tips through the square application?

21       A.   There's no way for me to know.

22       Q.   I don't know, correct?

23       A.   There is no way for me to know.

24       Q.   How many times using the Uber application

25   did Dainius help with suitcases?

Page 545

1        A.    I don't know.

2        Q.    How many times -- how many rides out of the

3   thousands of rides that Dainius provided did he

4   supply phone chargers?

5        A.    I can't recall his testimony on phone

6   chargers.  I don't know.

7        Q.    How many of the thousands of rides that

8   Dainius did through the Uber app did he provide

9   minutes?

10       A.    I don't know.

11       Q.    How many of the thousands of rides did

12   Dainius provide -- through the Uber app did he

13   provide gum?

14       A.    I don't know.

15       Q.    Just so I understand the basis of your

16   testimony, how many times did you drive as a driver

17   through the Uber application in Houston during 2017?

18       A.    I have not driven in the City of Houston in

19   2017.

20       Q.    What about in 2018?

21       A.    Same answer.

22       Q.    What about in 2019?

23       A.    Same.

24       Q.    How many times did my client in 2017 to

25   2019 -- let's just say how many times did my client

Page 546

1    during the statutory period solicit rides at hotels?

2        A.    I don't know.  I believe I recalled him

3    saying he went to hotels, but it was not successful

4    for him.  So I don't know.

5        Q.    Your answer is, then, "I don't know,"

6    correct?

7        A.    That's right.

8        Q.    Okay.  How many times did Dainius go and

9    try to solicit rides at the airport?

10       A.    I don't know.

11       Q.    Let me ask you this.  In the City of

12   Houston, can livery drivers solicit rides at hotels?

13       A.    They can, yeah.

14       Q.    Is it against the law?

15       A.    No.  I don't think it is, no.

16       Q.    And what about in the City of Houston?  Can

17   livery drivers solicit rides at airports?

18       A.    I believe so.  I would have to check the

19   airport ordinance, but I believe so.

20       Q.    You've already testified about the City of

21   Houston ordinances, correct?

22       A.    Some of them, sure.

23       Q.    Do you know one way or another if it is

24   legal, permissible, for a livery driver to solicit

25   rides at an airport?

                                        Page 547

1      A.    I don't know.  The ordinance is hundreds of

2  pages long.  I don't know.

3      Q.    So you don't know.  That's it, right?

4      A.    That's what I just said, yeah.

5      Q.    Now, you also talked in response to Uber's

6  counsel's questioning about negotiated fares.

7              Can you tell us the name -- the single

8  name of any rider through the Uber app that my client

9  negotiated a fare with?

10     A.    I don't know.

11     Q.    I just want to make sure.  There's not a

12  single name or single ride that you can identify in

13  this arbitration under oath in which my client

14  negotiated a fare with the rider.  True?

15     A.    Again, I don't know.

16     Q.    So is "I don't know" the same as "no, I

17  cannot"?

18     A.    I'm not aware of -- of any trips that he

19  negotiated with a rider.  Is that more clear?

20     Q.    That's exactly more clear.  That was

21  question and answer.  Thank you.

22              How many times did my client, Dainius,

23  negotiate a fare by ending a trip early?

24     A.    I don't know.

25     Q.    Can you tell the arbitrator a single time

Page 548

1    in which Uber is aware that Dainius ended a trip

2    early?

3        A.   I would have to go through his records.

4    I'm not aware off the top of my head, but I would

5    have to go through the records and potentially look

6    at that.

7        Q.   So let's take a look at Claimant's 10,

8    please.  And Claimant's 10 are the Uber responses to

9    claimant Dainius Barysas' second requests for

10   production and first interrogatories.  If we go to

11   the very last page, we get to -- Page 16 is the

12   verification, right?  We're finding them.  He's

13   working through it.  Yeah, that's it.  Perfect.

14   Thank you, Jacob.

15            Okay.  So if we go to the last page,

16   there's the verification page, the same kind of

17   verification we were looking at when Dainius was

18   verifying.  And you're the person who verified,

19   right?

20       A.   That's right.

21       Q.   As the director M&A for legal integration,

22   correct?

23       A.   That's right.

24       Q.   Can you tell us, what is that -- the phrase

25   legal integration?  What does that mean?

Page 549

1        A.    They work on integrating the companies that

2    we've acquired.

3        Q.    Okay.  And then you also serve as a

4    corporate representative for Uber throughout numerous

5    arbitrations, correct?

6        A.    I don't know how you define "numerous," but

7    from time to time, yeah.

8        Q.    Okay.  And as Ms. Miers pointed out

9    yesterday with my client, you said, "I declare under

10   penalty of perjury under the laws of the United

11   States of America that the foregoing is true and

12   correct," and it's executed on November 1st, 2021,

13   correct?

14       A.    That's what it says, yeah.

15       Q.    Is that -- is that your signature,

16   Mr. Rosenthal?

17       A.    It's a DocuSign signature, yeah.

18       Q.    That's how you sign your name?

19       A.    It's a DocuSign signature, yeah.

20       Q.    If we go to Page 13, I want to look at

21   Interrogatory Number 8.  You spent a substantial time

22   talking about negotiated fares, and this

23   interrogatory says, "Identify each trip provided by

24   claimant wherein Uber claims that he negotiated the

25   fare directly with the rider," right?

Page 550

1      A.    That's what the interrogatory says, yeah.

2      Q.    After the litany of objections, if we go to

3  the next page, what we learn is -- it says, "Uber

4  states it currently has no personal knowledge of when

5  claimant negotiated a fare directly with his

6  customer."

7            And that was true back in November of

8  2021, correct?

9      A.    That's right.

10     Q.    And it remains true today, correct?

11     A.    That is right.

12     Q.    But this answer -- this response goes

13 further.  It says, we know he didn't negotiate a

14 fare, but we can tell you that he had the option to

15 negotiate a fare, right?

16     A.    That's correct.

17     Q.    And it directs us to the December 11, 2015,

18 TSA agreement, and it would be the -- the one we

19 looked at yesterday with your counsel, RX48.

20            Do you remember that?

21     A.    I do.

22     Q.    And in that TSA, there's an entire section

23 on financial terms, correct?

24     A.    I believe that's one of the sections, yeah.

25     Q.    In your understanding when we look at the

                                    Page 551

1    TSA under the financial terms, there is nothing in

2    that section that would tell Dainius that he had the

3    right to charge a fare that was higher than the

4    Uber-established pre-arranged fare, correct?

5        A.   Okay.

6        Q.   I'm not asking if it's okay.  I'm saying is

7    that true?

8        A.   You're asking me to opine on something

9    without showing it to me.  Perhaps it would be

10   helpful to show it to me so I can confirm or deny

11   that.

12       Q.   First off, I'm asking you -- this is the

13   document that you told us to go look at in your sworn

14   interrogatories, correct?

15       A.   That is correct.

16       Q.   You told us that Uber states that claimant

17   had the option to negotiate a different fare amount

18   with his customer, right?

19       A.   That's what it says here, yeah.

20       Q.   Have you seen a single document, any

21   evidence at all in this arbitration produced by Uber,

22   obtained by subpoena, or produced by us in which Uber

23   told Dainius that he could negotiate a higher fare

24   amount with a customer or a rider than the

25   pre-arranged fare established by Uber?

Veritext Legal Solutions
346-293-7000

1        A.    Specifically, no.

2        Q.    And if we take a look, then -- I want to

3    switch gears a little bit.  Let's look at Claimant's

4    3 real quick.

5              In the first paragraph here, it says,

6    "We want Uber to be enjoyable and safe for everyone."

7    It says, "These ground rules are designed to ensure

8    that riders and drivers have a five-star ride when

9    using Uber," correct?

10       A.    That's what it says.

11       Q.    And you understand that it actually uses

12   the word "ground rules," right?

13       A.    That's what it says.

14       Q.    And that is coming from Uber that you

15   described is a limited payment collection agent,

16   correct?

17       A.    That is one of the things -- one of the

18   services we provide, yeah.

19       Q.    So if we flip over, then, to

20   Uber_Universal_62, the first paragraph here, Why

21   Drivers Can Lose Access to Uber.  "If you are a

22   driver and your account is temporarily blocked or

23   deactivated, it limits your ability to earn income,"

24   correct?

25       A.    That's what it says.

Page 553

1          Q.    And the decision on whether or not to

2     temporarily block or deactivate an account is one

3     that is made solely by Uber that you described as

4     solely a limited payment collection agent, right?

5          A.    Did I solely describe Uber as a limited

6     payment collection agent?

7          Q.    When it comes to using the Uber driver app,

8     yes, sir, you did.

9          A.    I said solely a limited payment collection

10    agent?  I don't recall that.

11         Q.    Let's look at star ratings here.  And you

12    said earlier that you're not aware of what the

13    minimum star rating was for the City of Houston in

14    2017, 2018, or 2019.

15               That was your sworn testimony,

16    correct?

17         A.    That is right.

18         Q.    Okay.  And there's a section there, the

19    bottom paragraph, on What Leads to You Losing Access

20    to Your Account, correct?

21         A.    There is, yeah.

22         Q.    And -- and it talks about how -- how we

23    will alert you over time if your rating is

24    approaching this limit, and then you'll also get

25    information about quality improvement courses that

                                              Page 554

1    may help you improve.

2              Do you see where it says that?

3        A.   I do.

4        Q.   Okay.  So part of the deal here is that if

5    I'm an Uber driver and I read this, I'm going to

6    learn that there are ways in which I can lose access

7    to my account, and one of the ways is through the

8    star rating, correct?

9        A.   That is correct.

10       Q.   Can you tell me of another collection

11   agency in the world that you're aware of that tells

12   people that you can be kicked out, you can be

13   deactivated, you can be temporarily blocked other

14   than Uber that you have described as a limited

15   payment collection agent?

16       A.   Being a limited payment collection agent is

17   one of the things that we do.  I'm not aware of how

18   other businesses operate.

19       Q.   Okay.  And then, if we want to know more

20   about these quality improvement courses, we can look

21   at Uber_Universal_65, and we learn about getting back

22   on the road after deactivation, right?

23       A.   That's right.

24       Q.   It says that "If your account has been

25   deactivated for quality reasons like low star

                                        Page 555

1    ratings, you may have the opportunity to get back on

2    the road if you provide proof that you've

3    successfully taken a quality improvement course,"

4    right?

5         A.   That's what it says.

6         Q.   Okay.  Now, in this instance, Uber made a

7    final decision, not appealable, about Dainius not

8    being able to do airport pickups and drop-offs.

9              Did you see any evidence at all where

10   Uber said, "Okay.  You've been limited in that

11   manner, but now we're going to offer you to take a

12   quality improvement course"?

13        A.   That wouldn't make any sense.

14        Q.   Okay.  And first off, you said it didn't

15   make any sense.  But second off, you also don't know

16   who actually made that internal decision by Uber,

17   correct?

18        A.   Which internal decision are you referring

19   to?

20        Q.   Which internal decision do you think that

21   I'm referring to, sir?

22        A.   I don't know.  I'm trying to answer your

23   questions, but I'm asking a question to clarify.  I'm

24   sorry.  I'm trying to understand what you're asking.

25        Q.   What were we just talking about?

Veritext Legal Solutions
346-293-7000

```
 1            JUDGE SOUSSAN:  Excuse me.  Please ask
 2   your question again, Mr. MacLeod.
 3            MR. MacLeod:  Judge, you literally
 4   instructed my client yesterday numerous times.  This
 5   witness is now testifying before you for the third
 6   time, and this is what we're dealing with?
 7            JUDGE SOUSSAN:  Mr. MacLeod, I just
 8   asked you to repeat your question.  I think arguing
 9   with me is not a good use of your time.  Just re-ask
10   your question.  That's all.
11       Q.   (BY MR. MacLeod)  Okay.  Let's take a look
12   at RX48.  Do you believe that you have been giving
13   straightforward responses in answer to my questions,
14   sir?
15       A.   I do.
16       Q.   RX48 is the technology services agreement.
17   This one was updated December 11, 2015.
18            Do you remember when this was actually
19   updated after December 11, 2015?
20       A.   I think it was November 2019.
21       Q.   Right.  And that was after the -- after
22   Dainius had already stopped driving through the Uber
23   application, right?
24       A.   I believe that's correct, yeah.
25       Q.   Okay.  So you understand that this
```

Page 557

1    technology services agreement would have been the

2    effective technology services agreement for the

3    entire statutory period that we're talking about

4    here, right?

5         A.   That is my understanding.  I would probably

6    have to talk to the lawyers; but, yeah, that's my

7    understanding.

8         Q.   You talked about this agreement at length

9    yesterday, right?

10        A.   At length?

11        Q.   Let's go to Page 197.  I understand what

12   you're doing.  Let's go to definition 1.6.

13              Do you see that?

14        A.   I do.

15        Q.   Okay.  The driver app means Uber's mobile

16   application.  Do you see where it says, "as may be

17   updated or modified by Uber at its discretion from

18   time to time"?

19        A.   I do.

20        Q.   Now, if we go to 2.2 -- we'll come back to

21   these definitions.  If we go to 2.2 on Page 198, this

22   is the provision of transportation services.  In the

23   second sentence, it says, "If a driver accepts a

24   user's request for transportation services, the Uber

25   services will provide certain user information to

Page 558

1   such driver via the driver app, including the user's

2   first" -- so Dainius would get the driver's [sic]

3   first name after he has made the decision within 15

4   seconds to accept a ride, correct?

5       A.   That is correct.

6       Q.   Okay.  And you would also get -- the other

7   piece of information that this document tells us is

8   that he would also get the pickup location, right?

9       A.   That is right.

10      Q.   Okay.  And -- and as we have it, based on

11  this technology services agreement that was in effect

12  the entire statutory period, the only user

13  information that is provided to a driver like Dainius

14  that we have actual evidence of in writing is that he

15  would get the user's first name and their pickup

16  location, correct?

17      A.   Yeah.  It says including the -- yeah, it

18  says including those two variables.

19      Q.   There's no other variables that were

20  provided to Dainius that you have evidence that you

21  can show in this arbitration were provided to him

22  after he accepted a user's request for transportation

23  services.

24                  Is that true or false?

25                  MR. SANDAHL:  I'll object that it

                                        Page 559

1    misstates the claimant's own testimony.

2              JUDGE SOUSSAN:  Let me see what he

3    says.  Hold on.  Overruled.  He can answer if he can.

4         A.   I'm not aware of what other information we

5    provided at the time.

6         Q.   (BY MR. MacLeod)  Is there a document that

7    we can look at that would actually contradict this

8    technologies services agreement and say, "You know

9    what?  More information than this would have been

10   provided after acceptance of a ride during the

11   statutory period"?

12        A.   I'm not sure.  I would have to go through

13   all of our help pages to figure out if there's

14   anything there.  In addition, I would have to listen

15   to all the testimony from previous witnesses.

16        Q.   You've been here for all the testimony,

17   correct?

18        A.   I didn't memorize it.  But, yeah, I was

19   here for it.

20        Q.   So then we also have -- if we go back to

21   Section 1.12 in Page 197, we have the word

22   "territory" defined, right?

23        A.   Yeah, we do.

24        Q.   "Territory means a city or metro areas in

25   the United States in which customer and its drivers

Page 560

1   are enabled by the driver app to receive requests for

2   transportation services."

3            The actual entity that has to make the

4   decision on whether to enable or not enable a person

5   to receive a request for transportation services

6   would be Uber.

7            Is that true or false?

8       A.   Uber USA, LLC, which is the party to the

9   agreement.

10      Q.   Is that true, then?

11      A.   Just to be clear, you said was it Uber.  I

12  want to make sure we're defining the entity

13  correctly.  The entity is Uber USA, LLC.

14      Q.   Is there a single time in response to

15  Uber's questioning where you felt the need to define

16  Uber?

17      A.   Well, there's two agreements that your

18  client had signed.  There's one with Rasier, LLC, and

19  one with Uber USA, LLC.  I want to make sure that we

20  are very clear on that.

21      Q.   Sir, did you answer my question?

22      A.   I did, yes.

23      Q.   What was my question?

24      A.   You asked whether or not the entity is

25  Uber.  I said it is Uber USA, LLC.

Page 561

1       Q.   Actually, that wasn't my question at all.

2   My question was:  During the lengthy questioning by

3   your counsel when "Uber" was said over and over

4   again, did you ever feel a need to clarify and say

5   Uber USA, LLC?  Did that happen a single time?

6       A.   I don't know.  I don't think so.  But you

7   asked me for a specific entity, and I gave you the

8   answer just to clarify.

9       Q.   Well, I would say because I think you have

10  very -- a very difficult time answering questions.

11              JUDGE SOUSSAN:  Excuse me,

12  Mr. MacLeod.  You're not here to lecture the witness.

13  You're here to ask the question and get an answer,

14  and I'll be the judge of the question and answer.  So

15  please move on.

16              MR. MacLEOD:  Is he going to lecture

17  me, Judge?

18              JUDGE SOUSSAN:  Please move on,

19  Mr. MacLeod.

20      Q.   (BY MR. MacLEOD)  All right.  2.4.  Let's

21  go there, Page 199.  Customer's Relationship with

22  Uber.

23              Under this contract, this agreement,

24  who was the customer?

25      A.   The customer is defined in Section 1 as --

                                        Page 562

```
 1    I believe -- I don't have it memorized, but I believe
 2    it says transportation company.
 3         Q.   Let's go to the first paragraph again.
 4    It's on Page 196.  How is "customer" defined?
 5         A.   "Independent company in the business of
 6    providing transportation services."
 7         Q.   And what company -- what's the name of that
 8    company?
 9         A.   I think it was Pedicab, LLC.
10         Q.   Where do you see that in this agreement?
11         A.   That is the party that entered into the
12    agreement.
13         Q.   Sir, I'm asking you:  Where do you see that
14    business name in this technology services agreement?
15         A.   I don't believe it's written anywhere in
16    the agreement.
17         Q.   Do you see anywhere in this agreement --
18    the very last page talks about how you can -- you can
19    click accept -- so you just click a button, click a
20    mouse, and that you accept the agreement.
21              Have you seen any documentary evidence
22    that a button "I accept" was clicked and by who?
23         A.   I didn't see any evidence yet.  There might
24    be some in production that says when the agreement --
25    when the button was pressed.  I don't know by whom,
```

Page 563

1    though.

2        Q.   Okay.  My question was:  Did you see it?

3    Yes or no?

4             JUDGE SOUSSAN:  I believe he answered

5    the question.  Move on, Mr. MacLeod.

6             MR. MacLeod:  Judge, I'm not sure how

7    in the world you can question my witness using Uber's

8    own words and you can direct my witness to answer

9    questions.  This -- this person is doing absolutely

10   everything to avoid answering questions, and I've

11   never -- I've never seen a proceeding like this,

12   but -- I'm going to stop objecting because I know

13   what that does, and we'll get through this.

14       Q.   (BY MR. MacLeod)  In Section 2.4 on

15   Page 199, there's Customer's Relationship with Uber.

16   And at the very bottom, it says, "Uber retains the

17   right to deactivate or otherwise restrict customer or

18   any driver from accessing or using the Uber driver

19   app or the Uber services in the event of a violation

20   or alleged violation of this agreement," right?

21       A.   That is right.  That's what it says.

22       Q.   And exactly what it says here in

23   Section 2.4, that's exactly what Uber did.  Uber

24   restricted Dainius from accessing or using the Uber

25   driver app by not allowing him to perform airport

                                        Page 564

```
 1    drop-offs or pickups.  True or false?
 2                    MR. SANDAHL:  Objection.  Asked and
 3    answered.
 4                    JUDGE SOUSSAN:  Overruled.
 5         A.   I don't think it's the same as restricting
 6    his access to the app.
 7                    (Simultaneous cross-talk.)
 8         A.   Sorry.  I wasn't finished.
 9         Q.   (BY MR. MacLeod)  My question was true or
10    false?  Your counsel will have plenty of time to ask
11    you questions.  I'm asking you true or false?
12                    JUDGE SOUSSAN:  The court reporter has
13    a very hard time taking both of you down at the same
14    time, so please let one person finish before the
15    other person starts back up.  Thank you.
16         Q.   (BY MR. MacLeod)  Can you answer true or
17    false, please?
18         A.   True or false to -- what was the specific
19    question?
20         Q.   You understand here that what happened in
21    Section 2.4, what's contemplated is that Uber can
22    restrict a driver, right?
23         A.   Well, the section says, "Restrict a
24    customer or any driver from accessing or using the
25    Uber services."
```

Page 565

1      Q.    One of the ways in which Dainius provided

2   for his family, his livelihood, was accessing the

3   Uber driver app to perform airport pickups and

4   drop-offs?

5      A.    We did limit him from accessing the

6   airport, yeah.

7      Q.    Just as Section 2.4 contemplates, that is

8   exactly what Uber did when it restricted the right

9   for Dainius to use the Uber app to perform airport

10   pickups and drop-offs.

11              Is that true or false?

12      A.    I believe that's true.

13      Q.    Okay.  Section 2.6, Ratings.  If we go to

14   specifically Section 2.6.2, it says, "In order to

15   continue to receive access to the driver app and Uber

16   services, each driver must maintain an average rating

17   by users that exceeds the minimum average acceptable

18   rating established by Uber for the territory, as may

19   be updated from time to time by Uber in its sole

20   discretion," defined there as the minimum average

21   rating, right?

22      A.    You read that correctly.

23      Q.    And what this agreement tells us that was

24   in effect during the entire statutory period is that

25   Uber, in its sole discretion, could make the decision

Page 566

 1    to deactivate a driver's access to the driver app if

 2    a driver's average rating falls below the minimum

 3    average rating.

 4              Is that true or false?

 5        A.   It's true.

 6        Q.   Okay.  If we go to Page 202, Section 2.8,

 7    the Location-based Services.  Now, if we go to little

 8    A there, it says, "The driver's geo-location

 9    information may be obtained by Uber services while

10    the driver app is running," correct?

11        A.   That's correct.

12        Q.   What third parties does Uber share the

13    driver's geo-location with?

14              MR. SANDAHL:  Objection.  Relevance.

15              JUDGE SOUSSAN:  What is the relevance

16    with that, Mr. MacLeod.

17              MR. MacLEOD:  We know that they were

18    tracking him, and now I want to know through their

19    monitoring who they believe it's important to share

20    this data with.

21              JUDGE SOUSSAN:  Okay.  Overruled.

22        A.   I'm not sure what third parties, if any, we

23    share a driver's geo-location with.

24        Q.   (BY MR. MacLEOD)  Do you know if one of

25    them was Challenger?

                                            Page 567

1      A.    As I said, I'm not aware of any companies

2   that we may share a driver's geo-location with.

3      Q.    You've actually reviewed geo-location

4   information before, haven't you?

5      A.    I have.

6      Q.    And have you seen the name of those

7   companies that actually are written on the

8   geo-location information, the logos, the branding for

9   those companies?

10     A.    I didn't notice that, no.

11     Q.    And then it says, "In addition, company and

12  its affiliates may monitor, track, and share with

13  third parties driver's geo-location information

14  obtained by the driver app and device for safety and

15  security purposes," right?

16     A.    That's what it says.

17     Q.    Okay.  So under that sentence, under 2.8,

18  the last sentence, can you tell us from a monitoring

19  standpoint which third parties was Uber, that you

20  describe as a limited payment collection agent,

21  sharing the geo-location information of Dainius with

22  during the statutory period?

23     A.    Again, I'm not aware of any third parties

24  that we may or may not share driver's geo-location

25  with.

Veritext Legal Solutions
346-293-7000

1          Q.    If we go to Section 3.1 for Driver
2     Requirements -- if we go to little B there, it says,
3     "Possess the appropriate and current level of
4     training, expertise, and experience to provide
5     transportation services in a professional manner with
6     due skill, care, and diligence," correct?
7          A.    That's what it says.
8          Q.    Uber is telling Dainius that he must
9     possess, first off, the appropriate and current level
10    of training, expertise, and experience to provide
11    transportation services.   True?
12         A.    That he shall possess these things, yeah.
13         Q.    And Uber is also saying that in order to be
14    a driver through the Uber driver app, he has to be
15    able to provide those transportation services in a
16    professional manner with due skill, correct?
17         A.    That he shall do that.
18         Q.    Right.   He shall provide transportation
19    services in a professional manner, per Uber, with
20    care, right?
21         A.    That's what it says.
22         Q.    And that Uber also says he must provide
23    those transportation services in a professional
24    manner with diligence, right?
25         A.    That he shall.

                                        Page 569

1      Q.   He shall, right?

2      A.   That's what it says, shall.

3      Q.   And it's Uber that says he shall, right?

4      A.   Yeah.  That's the agreement, yep.

5      Q.   You talked about an employee handbook

6  earlier, right?

7      A.   I did, yeah.

8      Q.   In the Uber employee handbook, does it tell

9  Uber employees how they should conduct themselves in

10  a professional manner?

11      A.   I don't have the handbook memorized.

12      Q.   Your counsel asked you about the handbook,

13  and you testified about it.

14           Do you understand that?

15      A.   He asked if we had one.  Yeah, I do

16  remember.

17      Q.   Do you remember the Uber employee handbook

18  and whether or not it says that Uber employees should

19  maintain high standards of, like, professionalism,

20  for instance?

21      A.   Quite frankly, I don't remember.  I haven't

22  reviewed it in some time.

23      Q.   As Uber's corporate representative, do you

24  think Uber's handbook should say things that like

25  maintaining high standards of professionalism?

Page 570

1      A.   I haven't reviewed the handbook in quite

2   some time.  I have no idea what it says.

3      Q.   That wasn't my question.

4           Would you expect, as an Uber corporate

5   representative, that a handbook -- just a general

6   employee handbook would say you should maintain high

7   standards of professionalism?

8      A.   I have no idea what it would say.

9      Q.   You provided a lot of testimony earlier

10  about what you think other drivers do, other

11  situations.

12           Do you understand that?

13     A.   I do, sir, yeah.

14     Q.   What, for example, do you know whether or

15  not the Uber employee handbook would go so far as

16  saying that you, as an Uber employee, should maintain

17  a high standard of service?

18     A.   Sir, I haven't read the handbook in quite

19  some time.  I have no idea what it says.

20     Q.   Do you know Uber's written values?

21     A.   Yeah.  I don't have them memorized, but I'm

22  vaguely familiar with them.

23     Q.   You don't know?  Do you know Uber's mission

24  statement?

25     A.   It's changed over time.  It's kind of a

                                          Page 571

1    mouthful now.  I don't have it memorized, no.

2        Q.   In the driver requirements section, you

3    would agree with me that Uber says that a driver like

4    Dainius shall at all times maintain high standards of

5    professionalism, service, and courtesy, correct?

6        A.   That's what the doc says, yep.

7        Q.   And it also says that "Uber reserves the

8    right at any time in Uber's sole discretion to

9    deactivate or otherwise restrict a driver from

10   accessing or using the driver app or the Uber

11   services if customer or such driver fails to meet the

12   requirements set forth in this agreement or the

13   driver addendum," correct?

14       A.   That's what the doc says, yeah.

15       Q.   Do you think that that sentence is

16   consistent with the activities of a limited payment

17   collection agent, sir?

18       A.   I'm not sure all of the functions of a

19   limited payment collection agent.  I do not just

20   narrowly define Uber's business as a limited payment

21   collection agent.

22       Q.   When Uber collects money from a rider that

23   later you say will go to a driver, it goes to a bank,

24   correct?

25       A.   It does sit in a bank account, yeah.

1        Q.    Is Uber drawing interest off of that money

2   as it sits in the bank before it's doled out to a

3   driver?

4        A.    I do not believe so, but I do not know.

5        Q.    What's the basis of your testimony so we

6   can understand it?

7        A.    That the money sits in a bank account that

8   is for the benefit of the driver.  I do not believe

9   it sits in our balance sheet.

10        Q.    But if I wanted to know one way or another

11   if that money is drawing interest, is it fair to say

12   that you just do not know?

13        A.    That is fair, yeah.

14        Q.    Okay.  If we go to Section 4, Financial

15   Terms, on Page 203 -- and we don't need to read the

16   top part.  You testified about that previously.

17              In the middle part of this, it says,

18   "Customer shall always have the right to" -- we'll

19   make it bigger.  "Customer shall always have the

20   right to charge a fare that is less than the

21   pre-arranged fare," correct?

22        A.    That's what it says.

23        Q.    It also says, "or negotiate a customer's

24   request for a fare that is lower than the

25   pre-arranged fare," correct?

Page 573

1     A.    That's what it says.

2     Q.    Do you see anything here in Section 4.1

3   that says the customer or the driver shall always

4   have a right to charge a fare that is higher than the

5   pre-arranged fare?

6     A.    Nothing specifically, no.

7     Q.    Okay.  And then it says -- if we go to

8   Section 4.2, it says Changes to Fare Calculation.

9   "Uber reserves the right to change the fare

10  calculation," which is defined above in 4.1, "at any

11  time in Uber's discretion," correct?

12    A.    That's what this part of the sentence says,

13  yeah.

14    Q.    Okay.  And -- and we know that it says that

15  Uber will provide notice to customer in the event of

16  changes to the base fare, per mile, and/or per minute

17  amounts that would result in a change in the

18  recommended fare for each instance of completed

19  transportation services.

20          Have you seen a single support message

21  or a single document in this case -- actually, strike

22  that.

23          For every trip that was provided by

24  Dainius, if there was a change in the base fare or

25  the per mile and/or per minute amounts, did you see

1    any document or any communication from Uber notifying

2    Dainius of that?

3         A.   He received the surge multiplier, yeah.

4         Q.   That wasn't my question.  My question was:

5    It says it will provide notice to the customer in the

6    event of changes to the recommended fare for each

7    instance of completed transportation services, right?

8         A.   That's what it says.

9         Q.   So what if -- what if Uber decided to

10   change any of the recommended fares for a reason

11   other than surge fare?  At that point, was there any

12   notice given to Dainius for each instance of

13   completed transportation services where Uber had made

14   a change to the fare calculation?

15        A.   Well, the fare calculation is different

16   from the fare.  So I think you're conflating the

17   concepts here in your question.

18        Q.   Okay.  You understand what Section 4.2 is

19   saying, though?

20        A.   I think so.

21        Q.   Okay.  Section 4.3, then.  Fare Adjustment.

22   "Uber reserves the right to adjust the fare for a

23   particular instance of transportation services," and

24   then it gives some examples, right?

25        A.   Correct.

                                        Page 575

```
 1        Q.    And you would agree with me that Uber, in

 2   its sole discretion, will make a decision whether or

 3   not it wants to reduce or cancel any fare, correct?

 4        A.    Where does it say "sole discretion"?

 5        Q.    I'm asking you as Uber's corporate

 6   representative.

 7        A.    I'm just trying to read the document, and I

 8   don't have the whole section in front of me so it's

 9   hard for me.  You asked me "sole discretion," and I'm

10   trying to look to see if this document says "sole

11   discretion."

12        Q.    If we go to the next sentence, it says,

13   "Uber's decision" -- go to the next page.  It says

14   here that "Uber's decision to reduce or cancel the

15   fare in any such manner shall be exercised in a

16   reasonable manner," right?

17        A.    That's what it says.

18        Q.    Okay.  Is -- and you also told us earlier

19   that it was in Uber's discretion on whether or not

20   there were changes made to the fare calculation,

21   right?

22        A.    To the fare calculation, that's right.

23        Q.    Then in Section 4.4, we get to the service

24   fee on Page 204, and it says that "Customer agrees to

25   pay Uber a service fee on a per transportation
```

Page 576

1   services transaction basis calculated as a percentage

2   of the fare, determined by the fare calculation

3   regardless of any negotiated fare."

4                Do you see that?

5        A.   That's what it says.

6        Q.   You would agree with me as Uber's corporate

7   representative what that is saying is that if Dainius

8   had negotiated a fare with any rider, regardless of

9   that negotiated fare, Uber was going to collect its

10  service fee based on how Uber calculated the fare,

11  right?

12       A.   That's what it says.

13       Q.   I want to take a look at -- let's look at a

14  couple of exhibits here.  Respondent's Exhibit Number

15  39.

16                Do you see the top left-hand corner

17  there?  It says June 25th, 2021?

18       A.   I do.

19       Q.   Then next to it, it says Using a

20  Third-Party Navigation App, right?

21       A.   That's right.

22       Q.   And then right below that part, it says

23  Houston.  So City of Houston, right?

24       A.   That's what it says.

25       Q.   Okay.  Then if we go -- we can go to the

                                           Page 577

1    next page, and it says Using a Third-party Navigation

2    App, and that's what was shown to you by your

3    counsel, right?

4        A.   I don't believe my counsel showed me this

5    document.  I could be wrong.

6        Q.   He did, but we'll go to the next page.

7    Let's take a look at this.

8             At the middle left right there, we see

9    a copyright.  You see where it says 2021 Uber

10   Technologies, Incorporated?

11       A.   I see that.

12       Q.   So do you have any evidence that this

13   document that we're looking at as Respondent's 39 was

14   ever published on Uber's website during the statutory

15   period?

16       A.   This specific document, I'm not sure.

17       Q.   Is it fair to say that you do not?  The

18   answer is no?

19       A.   I don't know -- the answer is I don't know.

20   I didn't -- I wasn't the one who searched for

21   discovery, so I don't know.

22       Q.   Do you have, then -- I need to get to the

23   basis of your understanding.

24             Do you have a single document that you

25   can show us today in all of the production that would

Veritext Legal Solutions
346-293-7000

 1    tell us that this website and this posting on the

 2    website was in effect during the statutory period?

 3                    MR. SANDAHL:  Objection.  Asked and

 4    answered.

 5                    JUDGE SOUSSAN:  Sustained.  He said he

 6    didn't know.

 7                    MR. MacLEOD:  Right.  My question was

 8    does he have a document.  To me, it should either be

 9    a yes or no.  "I don't know" really doesn't tell us

10    that much.  You either know if you have a document or

11    you don't.  Is there something --

12                    JUDGE SOUSSAN:  Excuse me, Counsel.

13    "I don't know" is an answer to a question.

14                    MR. MacLEOD:  Is it a question to --

15    when we're asking about do you have a document that

16    supports your testimony of whether or not this was in

17    the statutory period or not in the statutory period,

18    the answer would be yes or no.  How is it "I don't

19    know"?

20                    JUDGE SOUSSAN:  The witness can answer

21    the question to the best of his ability.

22        A.    There are hundreds of documents that we

23    provided.  I don't remember all of them.  So,

24    therefore, I don't know if there's a document or not.

25        Q.    (BY MR. MacLeod)  And you understood that

                                          Page 579

1    as Uber's corporate representative, just like every

2    other time you testify, you're supposed to get

3    prepared, right?

4                MR. SANDAHL:  I'll object, Your Honor.

5    This is not a 30(b)(6) deposition.  To just guess at

6    what he was going to talk about today is, I think, an

7    unreasonable burden.

8                JUDGE SOUSSAN:  Sustained.

9                MR. MacLeod:  He was actually shown

10   these documents by Uber's counsel yesterday and

11   today.

12       Q.   (BY MR. MacLeod)  If we can please look at

13   Respondent's Exhibit Number 37.  This is another

14   document that you've looked at, and this is a

15   document -- another one that says 2021.

16                You see here now we're talking about

17   Wichita, right?

18       A.   I do, yeah.

19       Q.   Can you tell us a single time that Dainius

20   drove through the Uber app during the statutory

21   period in Wichita?

22       A.   I don't know.

23       Q.   And if we go to the last page, here in the

24   middle of the page, it says "Copyright 2021 Uber

25   Technologies, Incorporated," right?

                                        Page 580

1      A.    That's what it says.

2      Q.    Was this posting published on the website

3  during any time of the statutory period?

4      A.    Probably, yeah.

5      Q.    Okay.  What evidence do you have to support

6  your answer "probably" so that I can get the basis

7  for your understanding?

8      A.    Well, I know this functionality has been

9  available for a very long time.  As a result, our

10  help pages generally have been available throughout

11  the statute period.

12      Q.    You understand I was asking you for a

13  document, not some -- you know, there's a help page.

14  I'm asking you:  Do you have anything that would

15  actually suggest that "probably" is actually true?

16      A.    I thought you asked for my basis of

17  understanding, but I don't have a specific document.

18  I am not sure if we have one or not.

19      Q.    What if we go to Joint Exhibit Number 10?

20          MR. SANDAHL:  Can we pause just for a

21  second?  We've got someone in the waiting room.

22          JUDGE SOUSSAN:  Sure.

23      Q.    (BY MR. MacLeod)  Okay.  So now we're

24  looking at Uber_Website_839.  This one is -- at the

25  top left says June 23rd, 2021.

Page 581

1           This is for setting a driver
2   destination in Wichita, correct?
3       A.   That's what it says.
4       Q.   If we go over to Page 3 again, near the
5   bottom of the page, we see yet again that it says,
6   "Copyright 2021 Uber Technologies, Incorporated"?
7       A.   That's what it says.
8       Q.   Is there any documentary evidence that you
9   can provide in this arbitration or that Uber has
10  provided that would suggest that this posting, Set a
11  Driver Destination, was posted on the Uber website
12  during the applicable statutory period?
13      A.   A specific document, I don't know.
14      Q.   Let's go to Respondent's Exhibit Number 30.
15  Now we have top left, June 24, 2021.  This is a
16  posting of I Want to Drive in a New City in Wichita
17  again, right?
18      A.   That's what it says.
19      Q.   Okay.  If we go to the middle of the last
20  page here, again we have "Copyright 2021 Uber
21  Technologies, Incorporated," correct?
22      A.   That's what it says.
23      Q.   And do you have a single document -- does
24  Uber have a single document that would suggest that I
25  Want to Drive in a New city, Wichita, was posted or

                                        Page 582

1  published on the Uber website during the applicable

2  statutory period?

3      A.    A specific document that was produced in

4  discovery?  I'm not sure.

5      Q.    If we can go to Respondent's Exhibit Number

6  35.  Now we have, again, June 23rd, 2021.  And this

7  is a posting about pet-friendly rides for Wichita,

8  right?

9      A.    That's what it says, yeah.

10      Q.    And the very last page, it says, "Copyright

11  2021 Uber Technologies, Incorporated," correct?

12      A.    That's what it says, yeah.

13      Q.    Fair to say again you do not have a single

14  document that Uber has presented in this arbitration

15  to suggest that the pet-friendly rides posting for

16  Wichita was published during the applicable statutory

17  period, correct?

18      A.    It's fair to say that I don't know.

19      Q.    That's right.  If we could go to

20  Respondent's Exhibit Number 36.  This is now -- the

21  top, June 24th, 2021.  This is a posting for Wichita

22  again that's called Turn Off Text or E-mail Updates,

23  right?

24      A.    That is right.

25      Q.    Now, if we go to the next page, again what

                                        Page 583

1    we see here is a copyright with "2021 Uber

2    Technologies, Incorporated," right?

3         A.   That's right.

4         Q.   And do you have any evidence -- any

5    evidence presented in this arbitration that Turn Off

6    Text or E-mail Updates was posted or published on the

7    Uber website during the statutory period?

8         A.   I can provide evidence.

9         Q.   That's what I'm asking you.

10        A.   Say that again.

11        Q.   I'm asking you for documentary evidence.

12        A.   Not that I can think of.

13        Q.   Let's look, lastly, at Respondent's Exhibit

14   Number 38.  For this one, we don't have a Page 1, and

15   we also don't have a Page 3.  The bottom right here,

16   the only document that was provided was Page 2 out of

17   3.

18             You see that we're looking here at

19   Page 2 out of 3?

20        A.   That's what it appears.

21        Q.   Okay.  And do you see here at the top left,

22   common to the other documents, it says June 24th,

23   2021?

24        A.   That's what it says, yeah.

25        Q.   Okay.  Now, if we go back to your -- the

1    interrogatories that you verified with your DocuSign
2    signature -- okay.  If we go to Page 12,
3    Interrogatory Number 5, do you see here that back in
4    November of 2021 Uber was asked to identify by date
5    and provide information concerning every instance
6    Uber has suspended the claimant's driving account or
7    deactivated the claimant from the driver app?
8         A.   I see that.
9         Q.   And it also says, "For every instance
10   identified, please provide details related to the
11   reason the claimant's driving account was suspended
12   and/or deactivated."  It says, "For avoidance of
13   doubt, the claimant seeks information of any
14   instance, no matter how narrow in time, that Uber has
15   suspended the claimant's driving account or
16   deactivated the claimant from the driver app for any
17   purpose," right?
18        A.   That's what it says.
19        Q.   Then it says here -- the answer is that
20   "Uber states that on or about June 27, 2018,
21   claimant's account was restricted from receiving trip
22   requests for pickups and drop-offs at the George Bush
23   Intercontinental Airport due to claimant's fraudulent
24   use of the Uber driver app at that airport," and then
25   it tells us the specific documents to look at,

                                        Page 585

1    correct?

2        A.   That's what it says.

3        Q.   And as of November 2021, that was your

4    sworn response as the Uber employee who verified this

5    interrogatory, right?

6        A.   That's right.

7        Q.   And then there was a motion to compel, and

8    in March we received some updated interrogatories.

9             Do you remember having to verify a set

10   of updated interrogatories in March?

11       A.   I don't recall, but I'm not saying it

12   didn't happen.

13       Q.   Do you remember that at some point you

14   provided a verification whereby you were changing the

15   answer that you previously provided on behalf of Uber

16   to Interrogatory Number 5?

17       A.   I don't recall, but I'm not saying it

18   didn't happen.

19       Q.   Before I even get there, between the time

20   of November and March, did Uber conduct an internal

21   investigation about geo-spoofing or fraudulent use of

22   the Uber app pertaining to Dainius Barysas?

23             MR. SANDAHL:  I'll object, Your Honor,

24   to relevance.  Again, this is getting into the

25   territory that we started to get into yesterday

Page 586

1  that's already been the subject of extensive

2  discussion and briefing, and we have already briefed

3  why it's not relevant.

4           JUDGE SOUSSAN:  Any response,

5  Mr. MacLeod?

6           MR. MacLeod:  This absolutely goes to

7  monitoring.  I mean, there's literally no way to

8  believe that -- they are changing the interrogatory

9  response from November to March, and to believe that

10  it wasn't an investigation -- it goes directly to how

11  they are monitoring these drivers.

12           JUDGE SOUSSAN:  Well, I -- go ahead.

13           MR. SANDAHL:  My response would be

14  that responding to discovery requests -- I think the

15  question was about an internal investigation that has

16  to do with monitoring.  That's very different from

17  the obligation to look into information to respond to

18  the discovery requests.  So he's kinds of conflating

19  two concepts there.  So I think that's the problem

20  and why it's not relevant.

21           MR. MacLeod:  I'm not conflating two

22  concepts.  I'm trying to get at the heart of this.

23  The heart is they were monitoring Dainius when he was

24  driving.  Now that we're in arbitration, they are

25  trying to hide that fact, and I'm trying to figure

Page 587

1    out why it is, why we cannot get that information,

2    why we cannot get that data.

3                    There's nothing proprietary.  It is

4    not a trade secret that they are monitoring him.  I'm

5    at a loss for words to even understand the argument

6    that counsel is making that we would not be entitled

7    to know what this Uber corporate representative did

8    between November and March in terms of an

9    investigation to determine how this interrogatory was

10   changed as it relates to monitoring.

11                   JUDGE SOUSSAN:  I haven't seen the

12   interrogatory, the later interrogatory response in

13   March, to see how it was changed.  I would like to

14   see that and have testimony on that and then try to

15   understand the relevance of your question as to what

16   was done between November and March.

17                   So can we proceed along those lines so

18   I have a better understanding myself?

19                   MR. MacLEOD:  Yes.  We have published

20   here the supplemental response that we received in

21   March.

22        Q.   (BY MR. MacLEOD)  And do you see the

23   supplemental answer there at the bottom, sir?

24        A.   I do, yes.

25        Q.   So now, the original answer that you

                                              Page 588

1   provided under oath subject to perjury, was that

2   first answer above that directed us to these certain

3   documents, right?

4       A.   That's right.

5       Q.   And then what you did in March was you came

6   back and you provided a supplemental answer to the

7   answer that you had previously provided, right?

8       A.   Seems like that's the case, yeah.

9       Q.   Okay.  And what you said now in March was

10  that "Uber states further that claimant's account was

11  restricted from receiving trip requests for pickups

12  and drop-offs at the George Bush Intercontinental

13  Airport due to detection of GPS spoofing or providing

14  fake location data by claimant," correct?

15      A.   That's what it says.

16      Q.   Prior to March 2022, two months ago, had

17  Uber determined that Dainius had engaged in GPS

18  spoofing?

19      A.   I'm not sure.

20      Q.   Prior to March 2022, had Uber determined

21  that Dainius was providing fake location data during

22  the time that he was using the Uber application?

23      A.   I'm not sure.

24      Q.   Can you explain to the arbitrator here what

25  you did on behalf of Uber that would allow you to

Page 589

1    change your verified response to another verified

2    sworn response that allowed you, between November and

3    March, to now say that there was a detection of GPS

4    spoofing or providing fake location data by claimant?

5              MR. SANDAHL:  Object, Your Honor, that

6    this was asked and answered at the first day of the

7    hearing.  It's kind of what led to the whole pause in

8    the hearing, and everything that's been briefed on

9    this explains why there's no relevance to it.  And

10   also, of course, there was discussion about evidence

11   that's been stricken.

12             JUDGE SOUSSAN:  Okay.  I think that

13   Mr. Rosenthal can answer this question without

14   getting into any evidence that I have not allowed in

15   this case.  We're not going to talk about those

16   videos again, but I think he can answer this

17   question.  "Due to detection of GPS spoofing or

18   providing fake location data by claimant."  If this

19   is going to go back to the video, we don't need to

20   cover that again because we've already covered that

21   once, but I would like Mr. MacLeod to restate his

22   question again and see if we can get an answer.  So

23   let's do it.

24        Q.   (BY MR. MacLeod)  Sir, you understand that

25   certain evidence has been excluded, correct?

1          A.    I do.

2          Q.    Okay.  And my understanding was that

3    that -- based on your testimony, that evidence that

4    was excluded was created about a week or two before

5    your last testimony, right?

6          A.    I'm not sure specifically when it was

7    created.

8          Q.    Well, based on your sworn testimony in this

9    same exact arbitration, the prior time, do you

10   remember your testimony as it related to when the

11   excluded evidence was created?

12         A.    It was clear when I viewed it -- I believe

13   I viewed it about a week before.  I'm not sure when

14   it was created.

15         Q.    Can we agree that -- when you signed the

16   verification for these objections and responses to

17   interrogatories and you provided this supplemental

18   answer, can we agree that you had not seen that

19   video.

20         A.    When I had provided this answer here?

21         Q.    Right.

22         A.    I don't think I had seen the video at this

23   point.

24         Q.    That's right.  So taking that out -- taking

25   that excluded evidence out, how did you, under oath,

Page 591

1    subject to the penalty of perjury, decide to

2    supplement the answer with "detection of GPS spoofing

3    or providing fake location data by claimant"?

4                What was the foundation for this

5    answer before you had even seen that excluded

6    evidence?

7        A.   Counsel had informed me that they had

8    looked into why he had been restricted from airport

9    access.

10       Q.   Were you shown any documents, any data that

11   would support your answer?

12               MR. SANDAHL:  I'll object, Your Honor,

13   to the extent that it gets into excluded evidence.

14               JUDGE SOUSSAN:  No, we're not talking

15   about the video.  But we are talking about what was

16   the basis for this answer, and that is a legitimate

17   question.  I think I heard Mr. Rosenthal say, "My

18   counsel informed me."  And if that is the basis for

19   the answer, that's the basis for the answer.

20       Q.   (BY MR. MacLeod)  Did you have any -- at

21   this point when you signed the verification under

22   penalty of perjury under -- well, you didn't do it

23   under oath because it's not verified.

24               Under penalty of perjury when you

25   signed the verification, can you tell the arbitrator

Page 592

```
 1    what factual information that you had to provide that
 2    this answer was true and correct based on your own
 3    knowledge and/or information and belief?
 4                MR. SANDAHL:  Objection.  Asked and
 5    answered.
 6                JUDGE SOUSSAN:  Go ahead.
 7        A.   Discussions with counsel.  I can't remember
 8    specifically what I looked at at the time.  It all
 9    kind of blurs together in terms of the timeline.  But
10    I did have discussions with counsel, and I can't
11    remember exactly what I reviewed at the time.
12        Q.   (BY MR. MacLeod)  That's what I'm trying to
13    figure out.
14                Did you review any documents, any
15    data, any information before you signed this
16    verification to say that there was detection of GPS
17    spoofing or providing fake location data by Dainius?
18                MR. SANDAHL:  Objection.  Asked and
19    answered.
20                JUDGE SOUSSAN:  I'll let it go one
21    more time, Mr. MacLeod, then we're going to move on.
22        A.   As I said, I had discussions with
23    counsel --
24        Q.   (BY MR. MacLeod)  I'm not asking you about
25    discussions.
```

Page 593

```
 1                    JUDGE SOUSSAN:  Excuse me,
 2    Mr. MacLeod.  Let him answer the question.  Go ahead,
 3    Mr. Rosenthal.
 4                    MR. MacLEOD:  That's not responsive to
 5    the question at all.
 6                    JUDGE SOUSSAN:  He was getting to it.
 7    You interrupted him, Mr. MacLeod.  Answer the
 8    question, Mr. Rosenthal.
 9         A.   As I said, I had discussions with counsel.
10    I can't remember specifically what I reviewed.
11         Q.   (BY MR. MacLeod)  There is -- there's a big
12    collection of payment statements that are marked as
13    Respondent's Exhibit Number 7.
14                    Have you seen those before?
15         A.   I believe I did review them a little over a
16    month or so ago when we did this the first go-round.
17         Q.   Now, in these pay statements that you were
18    talking about, are these what you're saying were
19    accessible through the driver portal?
20         A.   You'll have to show me what you're
21    referring to so I can confirm.  But generally, yeah,
22    the payment statements are available.
23         Q.   Okay.  And -- and what I'm trying to figure
24    out -- in those payment statements, based on your own
25    knowledge and understanding -- because that's how
```

Page 594

1    you've been testifying today.  Based on your

2    long-standing knowledge, in those payment statements

3    is the way that Uber's fee is calculated provided to

4    Dainius?

5         A.   Within the payment statement, I believe

6    there's a hyperlink, and the driver can click on that

7    hyperlink and can see all of the fare and fee

8    structure.

9         Q.   Okay.  So that's what I want to make sure.

10              You're saying that in order to get

11   that information, there's a hyperlink that the driver

12   needs to click on, correct?

13        A.   I believe so.  If I remember correctly,

14   yeah.

15        Q.   All right.  And there are -- for example,

16   when we look at that, if we look at the payment

17   statements, the Uber fee -- I mean, if I look at a

18   single day, that Uber fee can fluctuate even in a

19   single day, right?

20        A.   That's right.

21        Q.   And -- and the decision on allowing that

22   Uber fee to fluctuate -- not just saying it's $5 or

23   $10 or $15 or $20 -- that is a unilateral decision

24   that Uber made, correct?

25        A.   That is a decision we make, yeah.

Page 595

1     Q.   I would continue to ask you questions, but

2   I think we know how this has gone, so I will pass the

3   witness.

4                 MR. SANDAHL:  Your Honor, I do have a

5   couple of questions.  Is this an okay time for a

6   break or --

7                 JUDGE SOUSSAN:  Yeah.  We've been

8   going for a long time.  It's 12:15.  I would like to

9   go -- you know, break for lunch a little bit later if

10  we can handle it, but I think taking another

11  10-minute break is appropriate.

12                 (Recess from 12:18 p.m. to 12:30 p.m.)

13                   FURTHER EXAMINATION

14     Q.   (BY MR. SANDAHL)  Mr. Rosenthal, you were

15  asked some questions about signatures to the Uber

16  USA, LLC agreement.

17                 Do you remember that?

18     A.   I do.

19     Q.   Could claimant have accessed the Uber

20  driver app without first accepting the terms of that

21  agreement?

22     A.   He could have accessed the app, but he

23  could not have gone on-line to provide transportation

24  requests.

25     Q.   If Barysas had had someone else sign on his

                                        Page 596

1    behalf, would that have been fraudulent?

2        A.   Yes, I believe so.

3        Q.   And then you were also asked about

4    negotiated fares, and you were asked about what the

5    documents said about that.

6             Is there anything that you're aware of

7    in the documents saying that he could not have

8    negotiated the fare up or down?  Strike that.

9             Is there anything you're aware of in

10   the documents or in Uber's policies that would have

11   led him be deactivated whether he negotiated a fare

12   up or down?

13       A.   I'm not aware of anything of that nature.

14            MR. SANDAHL:  Thank you.  That's all I

15   have.

16            JUDGE SOUSSAN:  Anything further,

17   Mr. MacLeod?

18            MR. MacLeod:  Nothing further.

19            JUDGE SOUSSAN:  Okay.  Very good.  Are

20   you prepared to call your next witness?

21            MR. STANLEY:  Judge, Dr. Parrott --

22   this is Bret Stanley.

23            JUDGE SOUSSAN:  I didn't hear what you

24   said, Mr. Stanley.

25            MR. STANLEY:  Dr. Parrott is available

                                      Page 597

```
 1    at 1:30.  We didn't know exactly what time, but
 2    assumed it would be right about that time.  I believe
 3    that's the last witness here to be taken in this
 4    matter.  Does that work?
 5              JUDGE SOUSSAN:  Sure.  Does that work
 6    for everyone?  It works for me.  Let's take our lunch
 7    break until 1:30.
 8              MR. STANLEY:  One more thing.  Do you
 9    anticipate closings or not?  I know we discussed this
10    before.  I just want to make sure we're ready one way
11    or the other.
12              JUDGE SOUSSAN:  I prefer a closing
13    brief as opposed to an argument today, but what would
14    you like to do?
15              MS. MIERS:  Respondent would like
16    closing argument.  We would also like to submit a
17    post-hearing brief.  In other words, if we have to
18    choose --
19              JUDGE SOUSSAN:  No, it would not be a
20    choice because I would require a post-hearing brief.
21    Are we talking about the argument today?
22              MS. MIERS:  Yes, for respondent.
23              JUDGE SOUSSAN:  Okay.  What do you
24    think about that, Mr. Stanley?  Are you prepared to
25    do that today?
```

Page 598

1          MR. STANLEY:  We can be ready, yes,

2     Judge.

3          JUDGE SOUSSAN:  And how long will you

4     be with your next witness?  I think it's Dr. Parrott.

5          MR. STANLEY:  I suspect Dr. Parrott

6     will go about an hour or so.

7          JUDGE SOUSSAN:  All right.  Then what

8     we can do is we're going to break for lunch now.

9     You-all can work on your remarks during lunch.  We'll

10    hear from Dr. Parrott.  And then, if we need to break

11    for a while so that you can gather your further

12    thoughts before final argument, we can do that and

13    we'll proceed, okay?

14         MR. STANLEY:  All right, Judge.

15         JUDGE SOUSSAN:  Thank you very much.

16    Let's break for an hour.

17              (Recess from 12:33 p.m. to 1:30 p.m.)

18         JUDGE SOUSSAN:  Then it is Dr. Parrott

19    in the hot seat.  Shauna, would you please swear in

20    the witness?

21              DR. JAMES PARROTT,

22    having been first duly sworn, testified as follows:

23                   EXAMINATION

24    Q.   (BY MR. STANLEY)  Good afternoon.  Could

25    you please state your name for the record?

Page 599

1        A.    James Parrott.

2        Q.    Let's back up.  Dr. Parrott, we're going to

3    pull up your expert report that's been admitted into

4    evidence in this case already, and we're going to

5    look at your curriculum vitae at the back first.  And

6    I would like you to walk us through that, if you

7    don't mind.

8                    Do you see this?

9        A.    I do.

10        Q.    Doctor, do you have a copy of your report

11    in front of you right now, as well?

12        A.    I do.

13        Q.    Okay.  Thank you.

14                    Can you look through your -- your

15    resume or curriculum vitae and tell us if this is up

16    to date and correct?

17        A.    If you want to scroll through the pages --

18    thank you.  Yes, that looks like it's -- it's up to

19    date and correct.

20        Q.    And so, if we look at the second page here,

21    can you tell the judge a little bit about your

22    education?

23        A.    So I have a master's and a Ph.D. in

24    economics from the University of Massachusetts at

25    Amherst.  I received the Ph.D. in 1985.  I have been

                                            Page 600

1    working as an economist since that time in various

2    capacities and have been in the think tank world for

3    the past 22 years.

4        Q.   Are you a member of any economic the

5    societies?

6        A.   Yes.

7        Q.   Can you tell us about that?

8        A.   The American Economic Association, where

9    I've been a member for many years, and it's now

10   called the Labor -- Labor and Employment Research

11   Association.  That's a professional association of

12   labor economists and people who study employment

13   relations and issues.  I've been a member of LERA, as

14   it's known, for many years, attended several

15   conferences and presented papers.

16       Q.   Can you tell the judge a little bit about

17   your background since becoming a professor -- not a

18   professor -- Ph.D. in economics?

19       A.   So the first position I had was at the

20   AFLCI in Washington in the economic research

21   department.  And then I worked in the research

22   department at the International Ladies Garment

23   Workers Union in New York City.  And in the last few

24   years of my time with the ILGWU, I was executive

25   assistant to the president of the union.

Page 601

1           I then worked for New York City as

2    chief economist for economic development for two

3    years.  Then worked for the state comptroller's

4    office in the office that monitors the New York City

5    economy and budget.

6           And since then, I've worked for two

7    think tank organizations, first the Fiscal Policy

8    Institute.  I opened the New York City office of that

9    organization and was there for 18 years doing a range

10   of economic and fiscal analysis with a focus on New

11   York City and New York State.

12          For the past five years, I've been the

13   director of economic and fiscal policies at the

14   Center for New York City Affairs at the New School,

15   continuing to work on labor and employment issues

16   affecting New York City and New York State workers.

17   Q.   Have you had any focuses in your career in

18   the economic world?

19   A.   I've done a lot of work on labor standards,

20   such things as workers' compensation, unemployment

21   insurance, a lot of work on the minimum wage.

22          For the past four years now, I've

23   worked on various gig economy issues.  I was retained

24   along with a labor economist from the University of

25   California at Berkeley by the New York City Taxi and

Page 602

1    Limousine Commission to analyze the for-hire vehicle
2    industry that includes Uber and Lyft in New York City
3    for the purpose of informing the development of a
4    minimum compensation standard that the TLC put in
5    place beginning in early 2019.
6                     Professor Reich, my colleague from
7    University of California Berkeley, and I were also
8    retained by the City of Seattle for a similar purpose
9    and a study that we completed in July of 2020 that
10   led also to the City of Seattle instituting a minimum
11   compensation standard.
12                    With Professor Reich and a colleague
13   at the University of Chicago, Dmitri Koustas, we've
14   been funded by the Sloan Foundation to analyze the
15   implementation of the minimum pay standard in New
16   York City, and we've been doing that and have
17   generated working papers and -- and submitted two of
18   those for peer-reviewed article publication, and I
19   presented papers based on that research.
20                    I am currently working with a
21   colleague at the Center for New York City Affairs,
22   where I've been the last five years, on an update
23   report on gig and independent contract workers in
24   New York State.
25        Q.   And have you in your review of -- and study

                                        Page 603

1    of gig economy published on this area of economics?

2         A.   So we issued reports that were published by

3    our organizations, the Center for New York City

4    Affairs at the New School and Professor Reich's

5    organization at the University of California at

6    Berkeley, and those have been used by the -- by the

7    City of New York and the City of Seattle to support

8    their implementation of those pay standards.

9              We presented papers at several

10   academic conferences on this research.  And most

11   recently the Sloan Foundation-supported work, we've

12   submitted articles for peer-reviewed journals that

13   are under consideration.

14        Q.   If we look at your publication list, the

15   second one down, the one with Dmitri Koustas and

16   Michael Reich -- Doctor, let me ask the question and

17   then just try to answer it so we can get through

18   this, if you don't mind, before the judge admonishes

19   me, okay?

20              So the first one is entitled New York

21   City's Gig Driver Pay Standard:  Effects on Drivers,

22   Passengers, and the Companies, and it's from the

23   Center for New York City Affairs.

24              Did this include analysis of Uber?

25        A.   Yes, it did.

                                        Page 604

1      Q.   Okay.  And tell me -- let me go through

2  these others, too.  The next one that I see is second

3  from the bottom with Michael Reich, A Minimum

4  Compensation Standard for Seattle TNC Drivers:

5  Report for the City of Seattle.

6            Did this include analysis of Uber

7  drivers?

8      A.   Yes, it did.

9      Q.   The next one below that is with Lena Moe

10  and Jason Rochford, The Magnitude of Low-paid Gig and

11  Independent Contract Work in New York State.

12            Did that paper include analysis of

13  Uber drivers?

14      A.   It didn't include analysis based on data

15  for Uber driving activity.  It was more general

16  analysis about gig workers more broadly.  So Uber was

17  one of the companies that was looked at, but we

18  didn't look specifically at data for Uber drivers.

19      Q.   If we go over to the next page --

20            JUDGE SOUSSAN:  It's very important,

21  Dr. Parrott, to let Mr. Stanley finish his question

22  before you start to answer because the court reporter

23  cannot take you both down at the same time.  And then

24  as Mr. Stanley suggested, please just answer his

25  question.

Page 605

1          THE WITNESS:  Okay.  Yes.

2          JUDGE SOUSSAN:  Thank you, sir.

3     Q.   (BY MR. STANLEY)  Okay.  If we go over to

4     the next page, Page 3 of your CV, there's another

5     paper that's halfway down the page with Michael

6     Reich, An Earning Standard for New York City's

7     App-Based Drivers:  Economic Analysis and Policy

8     Assessment, and that's from the report for the New

9     York City Taxi and Limousine Commission, Center for

10    New York City Affairs, July 2018.

11          Do you see that?

12    A.   Yes.

13    Q.   Did this include analysis of Uber driver

14    pay?

15    A.   Yes.

16    Q.   Okay.  And so, in these situations with the

17    three articles here that performed analysis of Uber

18    driver pay, can you tell the judge how it was that

19    you performed analysis on Uber driver pay in a

20    succinct way, and then I'll follow up with the

21    questions, please?

22    A.   So we had data for the -- for the New York

23    City report, we had data that the city's Taxi and

24    Limousine Commission had received from Uber directly

25    regarding the pay and the driving activity of

Page 606

1    individual drivers.  So we did analyze that.

2              In the case of the Seattle study, we

3    received some aggregate data from Uber via the City

4    of Seattle that we analyzed, but we also relied on a

5    survey of drivers where we asked them to record data

6    from their Uber and Lyft apps.  So we looked at Uber

7    data in that manner.

8         Q.   Was the data similar or the same that you

9    looked at in the December 2020 paper as compared to

10   the July 2018 paper?

11        A.   Yes.

12        Q.   Okay.  And what did you do with that data

13   to come to your findings in the published paper on

14   New York City Uber drivers?

15        A.   So we -- we looked at data on an individual

16   driver basis to see if what they were paid translated

17   into sufficient pay per hour and per trip that they

18   provided for Uber.

19        Q.   Similar question to the Seattle drivers.

20              What did you do with the data that you

21   had there?

22        A.   In a similar fashion, we looked to see what

23   the drivers were paid on a per trip and a per hour

24   basis.

25        Q.   Did you do something similar here in the

Page 607

1    Barysas matter as you did in the published papers

2    from New York and Seattle data?

3         A.   Yes, although clearly we just had data on

4    one driver in this case.

5         Q.   Can you generally tell the judge what you

6    did in your expert report here that is similar to

7    what was done in the published works?

8         A.   So we looked at the working time of the --

9    of the driver, the total time they were -- they were

10   available for dispatch by Uber, and the time -- which

11   includes the time that they were actually en route to

12   pick up a passenger and the time that they were

13   carrying a passenger to the destination.  We looked

14   at the miles that they drove and estimated what

15   expenses would be for driving those miles.  And, you

16   know, looked at the -- the pay that they received,

17   separating out tips and tolls from that, in relation

18   to the amount of hours that they worked and the

19   expenses incurred in providing -- in terms of the

20   miles driven providing those services.

21        Q.   What was the reason to do that analysis in

22   the New York and Seattle papers?  What were you

23   looking for is the question?

24        A.   To determine what the after-expense hourly

25   pay was that the drivers were receiving.

Page 608

1      Q.   And what was -- in looking at the data that

2   you received in the Barysas matter, what was the

3   purpose?

4      A.   It was a similar purpose to look at what

5   the pay after expenses was per hour that the driver

6   worked for Uber.

7              MR. STANLEY:  Judge, this expert

8   report is already in evidence, but I would offer

9   Dr. Parrott as an expert economist to be able to give

10  testimony in this matter based on the review of

11  evidence that he's done.  I think you'll find that

12  we've already shown that his analysis is based on

13  published -- work that's been published,

14  peer-reviewed, and different articles.  The

15  foundation is there, so we would offer him as an

16  expert.

17             JUDGE SOUSSAN:  Any objection?

18             MS. MIERS:  We don't object to the

19  admission of this as an exhibit, but we do note that

20  we do not believe that this report is reliable or

21  unbiased so as to influence your ability to analyze

22  damages in any way.

23             JUDGE SOUSSAN:  Well, that will be

24  subject to cross.  Okay.  Dr. Parrott will be

25  admitted as an expert.

1      Q.   (BY MR. STANLEY)  Okay.  Dr. Parrott, can

2   we go to the first page of your report, please?  So

3   we see that there's an assignment and a summary of

4   analysis.

5              Can you tell the judge what your

6   assignment was here?

7      A.   It was to analyze the compensation provided

8   by Uber to Mr. Barysas and assess its relation to the

9   statutory minimum wage and reasonable expenses that

10  he incurred in providing those services on behalf of

11  Uber.

12     Q.   And if we look at the summary of analysis,

13  what segment of data did you look at to make this

14  analysis?

15     A.   So we looked at all of the data that was

16  made available to us.  It was data on trips, on his

17  time worked, on his miles driven.  We pulled all of

18  this data together, analyzed it on a per-week basis,

19  and concluded that he was paid a total of $41,384

20  excluding tips and tolls, but that if he had been

21  paid the prevailing state minimum wage for his work,

22  whether in the New York City area or in Texas, that

23  he -- there was a -- that he would have been paid a

24  total of $67,356.

25     Q.   Okay.

Page 610

1      A.    That being greater than the amount he was

2   paid, we concluded that there was a -- a payment

3   shortfall of $27,207.66.

4      Q.    Thank you.

5            And if we go to Page 4 -- we'll come

6   back to that in a second.  If we go to Page 4, do the

7   items on Page 4 and 5 show the judge the evidence you

8   reviewed in coming to your determination of the

9   shortfall?

10     A.    Yes.

11     Q.    And when you received the evidence that's

12  shown on Page 4 and 5 -- before you had time to

13  review it and provide analysis on it, had you already

14  come up in your mind with any outcome associated with

15  your opinions on this case?

16     A.    No.

17     Q.    Did you believe before you had reviewed a

18  scrap of data in this matter associated to

19  Mr. Barysas that he was underpaid by Uber?

20     A.    No.

21     Q.    And same goes for the work that you did

22  otherwise in the other published articles.

23            Did you believe before review of any

24  of that data that any of those drivers had been

25  underpaid?

                                        Page 611

1        A.    No.  Our approach always was to analyze the

2    data first.

3        Q.    And just for the judge's knowledge, you

4    have listed your other experience in arbitration on

5    Page 2; is that correct?

6        A.    Yes.

7        Q.    Have you ever been excluded in any of these

8    cases, to your knowledge?

9        A.    No.

10       Q.    Okay.  And your total compensation -- or

11   your rate of compensation, what is that?

12       A.    $450 an hour for research analysis, and

13   $600 per hour while presenting testimony.

14       Q.    Okay.  So let's move on to Page 3 now, if

15   you don't mind.  And can you tell the judge what you

16   did with the data that we looked at on Page 4 and 5

17   and how you came to your opinions?

18       A.    So to determine the working time, we looked

19   at -- we analyzed the data that we were given in

20   terms of the three segments that working time is

21   divided into:  P1, P2, and P3.  P1 being the driver

22   waiting time, P2 being dispatch time, and P3 being

23   the time that the passenger is in the car.  So the

24   sum of these P segments, as we reference it, equals

25   the working time for Uber.

Page 612

1      Q.   How did you use this working time, the sum

2   of the three segments, to come to your opinion here?

3      A.   So we -- we organized the data so that we

4   could look at an Uber pay week.  The Uber pay week

5   begins at 4:00 a.m. on Monday morning.

6           So we sorted -- we summed up the P

7   segments and then allocated that time on a weekly

8   basis and looked at the -- also looked at the miles

9   driven for each of those weeks and compared -- and

10  did an analysis where we looked at what he was paid

11  in relation to his working time and expenses.

12     Q.   Why did you include Period 1 and 2 in your

13  on-line working time definition?

14     A.   Those are indispensable parts of the total

15  working time for Uber.  P1 time is the time during

16  which a driver signifies that they are available and

17  waiting for a dispatch.  P2 time is the time that

18  they are actually traveling to pick up the passenger.

19  P3 time is when they are carrying the passenger.  You

20  can't have P3 without P1 and P2, and the business

21  model of Uber depends in an integral way on P1 and

22  P2, as well as P3.

23     Q.   When you did your published works, did you

24  include analysis of your drivers of P1 and P2?

25     A.   Yes.

Page 613

1      Q.   And where did you get the data for P1, P2,

2   and P3 time?

3      A.   It was Uber data provided to legal counsel,

4   and we received it via legal counsel.

5      Q.   If we move over now to Page 5, can you tell

6   the judge about the data cleaning and cross-checking

7   that you performed on the data in coming to your

8   opinions?

9      A.   Yeah.  So we -- since the data came from

10  various files, we need to, you know, carefully

11  understand and analyze the data to make sure that

12  we're being able to -- that the analysis that we have

13  in mind is going to be appropriate.

14              So it's important to harmonize the

15  time zones that are used.  On some occasions, the

16  time zones may be indicated differently.  So we need

17  to synchronize those.

18              We -- as I mentioned, we the data and

19  sort it by Uber pay week for analysis.  And, you

20  know, we do checks on it to see -- one of the files

21  we received is the on-line -- off-line time, which

22  indicates the -- the time that a driver turns their

23  app on, indicating their availability for work, until

24  the time that they -- that they turn that off.  And

25  in theory, we look to see if on-line time is equal to

Page 614

```
 1    the sum of the P segments that we analyze.  So each
 2    of those comes from a different data set.  Generally
 3    those do line up pretty well, and that's a useful
 4    check that we provide.
 5                   We did determine in the case of
 6    Mr. Barysas that --
 7         Q.   Dr. Parrott, I'm going to get to the next
 8    question in a second.  I appreciate --
 9         A.   Fine.
10         Q.   Thank you for your willingness to go
11    forward.  Let me get the next question out.
12                   So this statement, "We analyzed the P
13    segment shares for each week and compared those over
14    time to ensure that we were not encountering a
15    anomalous or inconsistent data records."
16                   Tell the judge about that, if you can.
17         A.   Well, we want to make sure that we're not
18    double counting the time, so we try and line up the
19    segments to make sure that that's the case.
20                   In previous -- in some of the similar
21    arbitration cases we've been involved in, we have
22    from time to time, you know, incurred -- encountered
23    great inconsistencies between the on-line/off-line
24    data and the sum of the P segments.  We didn't find
25    that in this case.
```

Page 615

1              So we do take great care in analyzing

2     the data to make sure that it looks reasonable, that

3     there don't appear to be any anomalies or

4     inconsistencies in the data and so on.  So we do, you

5     know, try and look at the data carefully and -- and

6     do some cross-checks to determine that it seems to be

7     in good order and there aren't any data -- any

8     serious data gaps.  We have encountered those in the

9     past, and then we seek to get those gaps corrected.

10         Q.    Okay.  If we look here below, the very last

11    paragraph, it says, "There were 12 weeks during which

12    Mr. Barysas worked a total of 45.3 hours and logged

13    517 miles but had no passenger trips and received no

14    payments from Uber.  We excluded these weeks from

15    analysis."

16              Can you tell the judge why you

17    excluded those weeks from analysis?

18         A.    Well, because he didn't receive any -- at

19    least from the data that we could tell, he didn't

20    receive a dispatch during those times.  He certainly

21    didn't receive any payments that we had the data for.

22    So it seemed that it would be overstating his P1 time

23    in that case to include that in the analysis.  It was

24    P1 time not connected to a trip.

25         Q.    And then, again, we see that -- on

Page 616

 1    May 25th, 2017, there was another payment received of

 2    $1162.85 characterized on his driver pay statement as

 3    miscellaneous payment.  Tell the judge about that.

 4                So why does it say characterized on

 5    the pay statement as, quote, miscellaneous payment?

 6    What does that mean?

 7        A.   Well, so -- on the pay statements, it

 8    indicates whether it was for an Uber -- it indicates

 9    the type of service that was provided on which that

10    payment was based, so if it's UberX or Uber Black or

11    Uber VIP and so on.

12                In this case, the explanation was

13    miscellaneous payment.  So, you know -- and given

14    that it was a fairly sizable payment, we did try and

15    understand what that represented.  We do know --

16        Q.   Let me stop you there.

17                MS. MIERS:  Could we please let

18    Mr. Rosenthal into the room?  I was trying to wait,

19    Mr. Stanley, until he finished his answer.

20        Q.   (BY MR. STANLEY)  Was that $1,162.85

21    included in your analysis here, Dr. Parrott?

22        A.   We didn't count it as a payment against the

23    services that he provided.  And my sense was that it

24    was really a payment that was part of a -- of a

25    broader agreement that Uber had made to compensate

                                            Page 617

1    drivers for previous underpayments.

2              Since this payment was around the time

3    of the -- the period for which this arbitration

4    applies began, any payment for previous underpayments

5    would have been before the beginning of the

6    arbitration period.  So we excluded it for that

7    reason.

8        Q.   Okay.  And so, on the data analysis, tell

9    the judge how many weeks that you looked at and then

10   how you came to your final analysis.  It might be

11   helpful to look at the appendix on Page 10 of your

12   report for this.

13       A.   Appendix A.  Thank you.

14              So we have -- we have the presentation

15   here separated into two pieces, one for his Houston

16   area trips and one for the New York City area trips.

17   We're looking at his pay in relation to the -- to the

18   applicable minimum wage.  It's different in Texas

19   than it is in the New York City area.

20              In the New York City area, it's not

21   uniform across the entire New York City metropolitan

22   area.  For this period of March through July of 2017,

23   there was a different minimum wage in New York City

24   than in New Jersey than in the suburbs of New York

25   City.

                                        Page 618

1              So we looked at his trips and the

2    associated time and miles in relation to the area of

3    the trip so that we could connect the appropriate

4    minimum wage.

5         Q.   Okay.  And if we look to -- two pages

6    beyond this -- and the judge can go and look at this,

7    as well, in Appendix C?

8         A.   Yes.

9         Q.   Can you give a brief overview of what these

10   pages are that carry on for many pages after this?

11        A.   Yeah.  So this is a summary for each of the

12   payment weeks for his driving activity and payments

13   and then our estimates of what he should have been

14   paid, culminating in an estimate of the payment

15   shortfall.

16        Q.   Okay.  Thank you.

17             And so -- and where was all this data

18   gathered?

19        A.   So this data was gathered from the list of

20   files that we had looked at a minute ago on, I

21   believe, Pages 4 and 5 of my report.

22        Q.   Okay.  And if we -- if we go over -- back a

23   page, just one page, to Appendix B, can you tell the

24   judge what this is?

25        A.   So Appendix B has basically the same data

Page 619

1    as Appendix A, but it's presented in a more -- in a

2    manner that might be easier to -- to follow.  So it

3    shows the actual pay at the top, then number of

4    trips.  I mean, just the data is summarized here.

5    Number of trips, the total hours derived as the sum

6    of the P segments, the miles.

7              We estimated expenses using the IRS

8    mileage rate, which changes each year.  So we applied

9    the appropriate mileage rate each year.  What we show

10   here is the weighted average of the IRS mileage rate.

11   So that gives us an estimate of his expenses over

12   this period.

13             Then we looked at his straight-time

14   hours of 40 hours a week or less in the New York City

15   area -- again, because of the different minimum wage

16   structure there -- and straight-time hours in

17   Houston.  He only worked more than 40 hours a week

18   in -- when he was driving in Houston.  We didn't have

19   any overtime hours in the New York area.

20             So we looked at what his pay would

21   have been on a straight-time basis, on an overtime

22   hours basis, and then estimated the payroll taxes

23   that would have been associated with that hourly

24   payment.  The payroll taxes would be the amount a

25   self-employed person has to pay on their federal

Page 620

1    income tax return.

2        Q.    Thank you.  If we go back to Page 6 of your

3    report, please, and we look at that last paragraph

4    starting with "we estimated."

5              "We estimated vehicle expenses using

6    the IRS business mileage allowance for each year, a

7    widely-used metric to compensate for vehicle use."

8              Do you see that?

9        A.    Yes.

10       Q.    What -- first of all, why did you use the

11   IRS business mileage rate?

12       A.    It's a widely-used measure.  It's been used

13   for tax purposes for 40 years.  The -- you know, a

14   well-regarded public institution compiles this.

15   Again, it's widely used for people to -- for tax

16   purposes to estimate expenses related to the business

17   use of a vehicle.

18       Q.    Have you ever seen the IRS business mileage

19   rate used in the economic field?

20       A.    Yes.

21       Q.    When?

22       A.    It's used on occasion in economics journals

23   by researchers who are trying to estimate automobile

24   expenses in connection with transportation expenses.

25       Q.    Do you know of any published works that

                                        Page 621

1    have used the IRS business mileage rate in the

2    economic field?

3        A.   Yes.  I know of at least two articles in

4    Transportation Journal in relatively recent years.

5    One is 2014, and one is 2016.

6        Q.   In your papers that you published on New

7    York City and Seattle data, did you use the IRS rate?

8        A.   We looked at the IRS rate, but in both of

9    those cases we -- we built up our own models of

10   expenses based upon looking at a lot of data, based

11   upon surveying drivers in both cases, Seattle and New

12   York City.

13       Q.   Let me ask you this.  How were you able to

14   come up with your model in either New York City or

15   Seattle for expenses?

16       A.   Well, we looked at the various expenses

17   that a driver would -- would incur and surveyed

18   drivers about their relevant expenses and then

19   estimated -- then we assigned a cost estimate to each

20   of those components and looked at that, how that

21   would average out over the useful life of an

22   automobile.

23            So in both of those cases, we compared

24   the rates that we derived to the IRS rate.  In both

25   cases, the rates we derived were a little bit above

Page 622

1     the IRS rate.  And, you know, I think there were, you

2     know, clear reasons for that to be the case.

3          Q.   Let me ask you this, Dr. Parrott.  In the

4     New York City article, how many drivers were there

5     included in that analysis?

6          A.   Well, overall for the earnings analysis,

7     there were 75 to 85,000 drivers.  We did a survey,

8     and we had about 9,000 responses from the survey.

9          Q.   And for Seattle, how many drivers did you

10    review in that article to come up with your expense

11    measures there?

12         A.   Well, we had survey responses from about --

13    from a little over a thousand drivers, and the total

14    universe of drivers in the Seattle case was something

15    like 15 to 18,000.

16         Q.   Did you use those responses from -- the

17    9,000 in the New York City article and the thousand

18    in the Seattle article, did you use those responses

19    collectively to come up with your analysis for

20    expenses?

21         A.   Yes.  We took an average for all of the --

22    for the survey results and the analysis overall.

23         Q.   And for Seattle, tell the judge what that

24    number looked like in relation to the IRS rate for

25    the thousand people that returned the survey that you

                                              Page 623

1    took the average?

2        A.   Well, I don't recall the exact figure, but

3    it was a little bit above the IRS rate.

4        Q.   And in New York City for the analysis in

5    that article with the 9,000 responses to surveys you

6    received, did you also create an estimate of expenses

7    from those responses?

8        A.   Yes, we did.

9        Q.   And can you tell the judge what that

10   resulted in compared to the IRS rate?

11       A.   Yeah.  So that was also a little bit above

12   the IRS rate.  And there, it seemed that it was

13   fairly -- that it was likely due to the fact that

14   drivers in New York City were required to have

15   commercial insurance, which is higher than a private

16   user's car insurance.  And many of the drivers had

17   high cost leases that they were paying to use the

18   automobiles they used.

19            So -- so the -- the rates we derived

20   in New York City were higher, reflecting these higher

21   lease costs and higher insurance costs.

22       Q.   And when you reviewed the survey responses,

23   were you seeking similar information as what -- as

24   the data that makes up the IRS rate for expenses?

25       A.   Yes.

Page 624

1      Q.   Tell the judge about some of the data that

2   you were seeking that was similar to the IRS rate.

3      A.   So we looked at the purchase cost or in the

4   case of a driver who was leasing a car, what the

5   lease costs were.  We looked at insurance.  We looked

6   at maintenance and repair costs.  We analyzed average

7   fuel ratings for cars and estimated what their fuel

8   expenses would be in connection with that.  There

9   were -- and we looked at what their registration

10   and -- and license costs were.

11            There were a couple of areas where our

12   cost estimates went beyond the IRS, and these were to

13   reflect the particular circumstances of an Uber or

14   Lyft driver.  So we looked at the cost of having a

15   large-format cell phone with a large data plan, which

16   is necessary in order to use these apps for -- for

17   passenger car services.

18            So those were the -- and we factored

19   in cleaning costs because the drivers are -- you

20   know, it's -- it's fundamental to the way the

21   companies operate to have passengers rate the

22   drivers.  So a clean car is essential in order to try

23   and maximize the positive ratings.  So we factored in

24   cleaning costs, as well.

25      Q.   And so, the IRS rate does not include

Page 625

1    reimbursement for a data service plan for a phone or

2    for bottled water or other amenities; is that right?

3        A.   That's correct.

4        Q.   And the IRS rate does not include

5    reimbursement for expenses associated to cleaning the

6    cars?

7        A.   That's right.

8        Q.   So if we go back to Appendix B, when you

9    have your straight-time hours in New York City and

10   your straight-time hours in Houston, can you tell the

11   judge how you come up with that number?

12       A.   So we looked at the working time for each

13   week.  In the case of New York City, there were no

14   weeks that Mr. Barysas drove more than 40 hours.  So

15   the straight-time hours is basically the sum of all

16   of his working time.

17            In Houston, Mr. Barysas put in some

18   very long-houred weeks.  So the straight-time hours

19   was figuring a maximum of 40 in any given week.  So

20   for those weeks where he worked more than 40, the

21   straight-time hours was the sum of the weeks at 40

22   hours.  And then the overtime hours is the -- the sum

23   of all of the excess on a weekly basis over 40 hours.

24       Q.   Were you just adding up the segments of P1,

25   P2, and P3 during those weeks to come up with that

Page 626

1    number and then adding them all up?

2         A.   Yes.

3         Q.   And then is the same true for overtime, or

4    how is that different?

5         A.   Overtime is just the excess of hours on a

6    weekly basis exceeding 40.

7         Q.   And then we see that you have the miles

8    above.  Where did you get the mile figure of

9    43,998.8?

10        A.   So in the data that we -- in the data we

11   received, we could see his miles for each of the --

12   each of the segments of working time, P1, P2, and P3.

13   So for each week, we aggregated the miles driven

14   during the sum of the P segment times.  And the total

15   miles is the sum across all of the weeks, the sum

16   across the 103 weeks.

17        Q.   So when I look at this, to come up with the

18   number 24,556.14, is that just a simple

19   multiplication of miles times weighted average?

20        A.   Yes.

21        Q.   And then we see payroll taxes here at the

22   bottom.  How did you calculate those?

23        A.   So the payroll taxes was the payroll tax

24   rate of 7.65 percent times the sum of the three

25   dollar amounts shown above for the straight-time pay

Page 627

1    for New York, straight-time pay for Houston, and

2    overtime pay for Houston.

3         Q.   So when you add all of that up, what is the

4    shortfall that you saw result from your analysis?

5         A.   So in theory, the shortfall would be adding

6    up the expenses plus the straight-time pay plus the

7    payroll taxes and -- and then subtracting that -- so

8    that should have been his target pay.  That should

9    have been the pay he received, and then we subtracted

10   from that target pay the actual pay.

11             In practice, the numbers don't work

12   out exactly that way because this analysis is

13   conducted on a weekly basis and there were some weeks

14   in which his actual pay did exceed target pay.  And

15   in the case of those weeks, we show in the analysis

16   that there's zero pay shortfall.

17             So the total weekly shortfall is the

18   sum of the individual week's analysis looking at on a

19   weekly basis the difference between his actual pay

20   and what his target pay should have been.

21        Q.   And for those weeks where the actual pay

22   exceeded the target pay, did you count those weeks in

23   your analysis?

24        A.   We counted those weeks -- I mean, those

25   weeks are included in the 103 weeks.  The miles are

Page 628

1    included in the total miles here, and so on.  We

2    didn't include that in the payment shortfall because

3    there was -- we showed for a week like that where

4    actual pay exceeded target pay as a zero shortfall.

5    So we included the zero in the total.

6         Q.   Is your analysis based on the hard numbers

7    received?

8         A.   Yes.

9         Q.   On Page 2, just to clear this up, I see

10   that there's a reference to a Mr. Ongwae at the

11   bottom of Page 2.

12             Can you tell the judge what that is?

13   Is that an error, just a typographical remember?

14        A.   Yes, I'm sorry.  It's a typographical

15   error.  That should be Mr. Barysas.

16             MR. STANLEY:  I will pass the witness.

17             JUDGE SOUSSAN:  Thank you.  Who is

18   taking the cross?

19             MS. MIERS:  I will be, Judge.

20                  EXAMINATION

21        Q.   (BY MS. MIERS)  Good afternoon.  Do you

22   remember me from a prior proceeding?

23        A.   You'll forgive me, but I'm not sure I do.

24        Q.   That's okay.  It's been a while.

25             I have a quick question about Page 2

                                        Page 629

1     of your report.  With Mr. Stanley, you talked about

2     the fact that at the bottom of Page 2 you identified

3     some instances in which you served as an expert

4     witness.

5                    Do you recall that?

6          A.   Yes.

7          Q.   Do any of these matters involve you serving

8     as an expert witness to analyze damages under the

9     Fair Labor Standards Act?

10         A.   No.

11         Q.   Okay.  So is it accurate to say,

12    Dr. Parrott, that the only time that you've served as

13    an expert witness to provide damages analysis under

14    the Fair Labor Standards Act is in cases against

15    Uber?

16         A.   That's correct.

17         Q.   And there's a total of 10 of them?

18         A.   Yes, I believe so.

19         Q.   How much money have you earned for your

20    research, analysis, and testifying against Uber since

21    you began working with Kherkher Garcia?

22         A.   I don't have that number handy right now.

23         Q.   What's your best guess?

24         A.   $80,000.

25         Q.   Let's just jump right into your report.

Page 630

```
 1    We're going to take a look at Claimant's Exhibit C41,
 2    just for the record.
 3                   And do you agree with me that the
 4    report on the screen is the one that you were just
 5    discussing with Mr. Stanley?
 6         A.    Yes.
 7         Q.    Okay.  Let's see.  I believe earlier -- I
 8    just want to make sure I understood your prior
 9    testimony in this matter, to be specific.
10                   You said Uber depends in an integral
11    way on P1 and P2 as well as P3?
12         A.    That's correct.
13         Q.    That's your opinion?
14         A.    Yes.
15         Q.    Okay.  You aren't an attorney, right?
16         A.    That's correct.
17         Q.    Okay.  And you understand based on your
18    extensive work on this case and nine others against
19    Uber that there is a contested legal issue, which is
20    whether P1 time and the mileage are compensable,
21    right?
22         A.    That's right.
23         Q.    And you understand that that's actually an
24    issue for the arbitrator to decide?
25         A.    That is, but I testified --
```

Page 631

```
 1              MR. STANLEY:  Judge --
 2              (Simultaneous cross-talk.)
 3              MR. STANLEY:  I'm objecting to you.
 4    It misstates the legal foundation of what we're
 5    doing.  It's a misstatement of legal practice.
 6              JUDGE SOUSSAN:  Well, you-all should
 7    both know I'm well aware of what my legal obligations
 8    in this case are.  I know that you're asking if the
 9    witness understood, but let's move on.
10              MS. MIERS:  Okay.  Just to clarify for
11    the record, I'm asking -- I do agree and understand
12    that you know what your responsibilities are, but
13    we're attempting to demonstrate this witness' bias.
14    We'll definitely move on.
15              JUDGE SOUSSAN:  Okay.  Go forward.
16       Q.   (BY MS. MIERS)  Let's take a look at
17    Page 3.  Toward the middle of the page, you state the
18    sum of the P times -- P1 plus P2 plus P3 equals
19    on-line time, right?
20       A.   That's correct.
21       Q.   Then in the second-to-last paragraph --
22    we're going to specifically focus on the second
23    sentence.  You state, "Just as a driver should be
24    compensated for the entirety of their working time on
25    the app" -- and when you refer to entirety of their
```

Page 632

1    working time, you mean to include P1 time, correct?

2        A.   That's correct.

3        Q.   So it's your opinion that Mr. Barysas

4    should be compensated for P1 time and mileage?

5        A.   That is part of their working time, which

6    is essential for Uber's service to be provided, yes.

7        Q.   So that's a yes?

8        A.   It's part of the business, yes.

9        Q.   Okay.  And you've held this opinion prior

10   to being hired to testify in this matter, right?

11       A.   Yes.  It was based on similar analysis.

12       Q.   Because you believe that P1 time and

13   mileage are compensable, you included P1 time in your

14   calculations, right?

15       A.   I was asked to include P1.

16       Q.   Was that a yes?

17       A.   Yes.

18       Q.   Okay.  So do you understand that if the

19   arbitrator determines that P1 time and P1 mileage are

20   not compensable, that your calculations overstate

21   Mr. Barysas' alleged damages?

22            MR. STANLEY:  Objection to speculation

23   of what the arbitrator would find.

24            JUDGE SOUSSAN:  That's an acceptable

25   question.  Go ahead.  It's hypothetical.  Go ahead.

Page 633

1     A.    Could you restate the question, please?

2     Q.    (BY MS. MIERS)   Sure.   You've answered this

3   question for me several times before.

4             So do you understand that if the

5   arbitrator determines that P1 time and P1 mileage

6   aren't compensable, that your calculations overstate

7   Mr. Barysas' alleged damages?

8     A.    Yes.

9     Q.    Okay.   When you were calculating these

10   alleged damages, did you back out time from the P1

11   time when Mr. Barysas was providing rides through the

12   use of the Lyft app?

13     A.    I didn't have data on his time using the

14   Lyft app.

15     Q.    When you arrived at these calculations, did

16   you back out time from the P1 time for which

17   Mr. Barysas was providing transportation services

18   outside of the Uber or the Lyft apps?

19     A.    I don't see why that would be necessary

20   because I don't believe that he would be providing

21   services while he was on the Uber app.   I don't

22   believe he would be providing other -- I don't see

23   how he could do that.

24             MS. MIERS:   Objection.   Nonresponsive.

25             JUDGE SOUSSAN:   Sustained.

Page 634

```
 1          Q.    (BY MS. MIERS)  Did you take a look at the
 2    P1 time for Mr. Barysas and back out any time that he
 3    spent providing transportation services outside of
 4    the app?
 5                  MR. STANLEY:  Objection.  Foundation.
 6    It assumes that there's evidence.
 7          Q.    (BY MS. MIERS)  Was that a no, Dr. Parrott?
 8          A.    Well, it was a no because I didn't have
 9    any --
10                  (Simultaneous cross-talk.)
11                  JUDGE SOUSSAN:  Hold on.  Hold on.
12    Let me just say this.  The court reporter didn't get
13    any of that down.  Dr. Parrott, you cannot speak when
14    others are speaking.  Counsel knows this, as well.
15                  So there was a question asked, and
16    there was an objection.  Let's back up.  Let's get
17    the question asked, and then I want to hear
18    Mr. Stanley's objection without you answering,
19    Dr. Parrott, because you're not to answer until I
20    allow that to come in.
21                  So please state your question,
22    Ms. Miers.
23          Q.    (BY MS. MIERS)  Dr. Parrott, when you were
24    making your damages calculations, did you back out
25    any time from the P1 time for time in which
```

Page 635

1    Mr. Barysas was offering transportation services

2    outside of the Uber driver app?

3                    MR. STANLEY:  My objection is

4    foundation.  Assumes facts not in evidence.

5                    JUDGE SOUSSAN:  Overruled.  Now,

6    Dr. Parrott, you can answer if you can.

7         A.    I didn't back out any data that I didn't

8    know existed.

9         Q.    (BY MS. MIERS)  Okay.  Let's take a look at

10   Page 3, and we're going to focus on the last sentence

11   in the first paragraph.  You state here that

12   "Generally the company discourages drivers from

13   refusing a dispatch, and at times a certain number of

14   trip refusals has resulted in warnings or actual

15   driver deactivation," right?  That's in your report?

16        A.    Yes.

17        Q.    You don't have firsthand knowledge of

18   anyone who was deactivated for not accepting trip

19   offers, right?

20        A.    I actually do.  I've talked with drivers in

21   New York City for whom that's the case.

22        Q.    So have you talked to them since you

23   testified under oath in the Gachie matter?

24        A.    Yes.

25        Q.    So between the time that you talked to --

                                              Page 636

```
 1    testified in the Gachie matter and now, you're
 2    claiming that you have firsthand knowledge of someone
 3    who was deactivated for not accepting trip offers?
 4         A.   Yes.
 5              MR. STANLEY:  Asked and answered.
 6         Q.   (BY MS. MIERS)  Do you have any personal
 7    knowledge that Mr. Barysas was deactivated for not
 8    accepting trip offers?
 9         A.   I do not.
10         Q.   Okay.  How many people for whom do you have
11    firsthand knowledge of them being deactivated for not
12    accepting trip offers?
13         A.   One.
14         Q.   Okay.  And what is that person's name?
15         A.   I don't have that person's name.
16         Q.   Okay.  Well, do you remember the first
17    name?
18         A.   No.  I'm sorry.
19         Q.   Last name?
20         A.   No.
21         Q.   Male, female?
22         A.   Male.
23         Q.   What color was this person's hair?
24         A.   I don't remember.
25         Q.   Did you talk to this person on the phone or
```

Page 637

1    in person?

2         A.   I talked to the person on a Zoom call.

3         Q.   And when you say you have firsthand

4    knowledge of the person being deactivated for

5    accepting trips, that's through hearsay from this

6    individual?

7              MR. STANLEY:  Objection.  Calls for a

8    legal conclusion.

9              JUDGE SOUSSAN:  I'm getting the gist.

10   Ask the question a different way.

11             MS. MIERS:  I can move on.

12        Q.   (BY MS. MIERS)  Your report doesn't cite to

13   any evidence that Mr. Barysas was deactivated,

14   correct?

15        A.   That's correct.

16        Q.   But you included that statement in your

17   report anyway?

18        A.   Yes, because I understand from --

19        Q.   Thank you.  If Mister --

20             MS. MIERS:  I'm going to object as

21   nonresponsive.

22             JUDGE SOUSSAN:  Sustained.

23   Dr. Parrott, just answer the question because

24   Mr. Stanley is right above you on my screen, and he

25   can take you back on questions.  So just please

                                   Page 638

1    answer the question.

2              THE WITNESS:  All right.  Yes, ma'am.

3         Q.   (BY MS. MIERS)  If Mr. Barysas had received

4    warnings for refusing a dispatch, that wouldn't have

5    impacted your calculations, right?

6         A.   That's right.

7         Q.   And your report doesn't cite to warnings

8    received by Mr. Barysas?

9         A.   That's right.

10        Q.   But you felt it was important to include a

11   statement about alleged warnings from Uber anyway?

12        A.   Yes.

13        Q.   Okay.  Let's take a look at the last

14   sentence on Page 6.  You talked about this with

15   Mr. Stanley.  It states, "We estimated vehicle

16   expenses using the IRS business mileage allowance for

17   each year."

18              Do you remember talking about that

19   just a few minutes ago?

20        A.   Yes.

21        Q.   So you didn't calculate Mr. Barysas' actual

22   expenses, right?

23        A.   That's correct.

24        Q.   And then the last sentence of Page 6, you

25   state, "The IRS business mileage is a widely-used

                                          Page 639

```
 1    metric to compensate for vehicle use," right?
 2         A.   That's right.
 3         Q.   And you dropped a footnote there.  And if
 4    we could go to that footnote.  It won't let you?
 5                   You've got your report in front of
 6    you, right?
 7         A.   Yes.
 8         Q.   The footnote identifies the IRS mileage
 9    rates for the relevant years?
10         A.   That's correct.
11         Q.   So it doesn't cite these two articles that
12    you just told Mr. Stanley about?
13         A.   That's right.
14         Q.   And it doesn't cite to any evidence or
15    legal authority that shows that the IRS mileage rates
16    are used to calculate FLSA damages?
17         A.   That's right.
18         Q.   All right.  The IRS rate, you'll agree with
19    me, is a national average?
20         A.   That's right.
21         Q.   It's not localized?
22         A.   It's an average for all vehicles in use.
23         Q.   And you agree with me that the IRS rate is
24    not localized, correct?
25         A.   That's right.
```

Page 640

1      Q.    You even agree that it's likely to be
2  inflated in some areas of the country and deflated in
3  other areas of the country?
4      A.    And it's likely to be higher for a luxury
5  vehicle, as well.
6              MS. MIERS:    Objection.    Nonresponsive.
7      Q.    (BY MS. MIERS)    Do you agree with me that
8  it's likely to be inflated in some areas and deflated
9  in other areas?
10     A.    Yes.
11     Q.    Okay.   It's also, to your point, not
12 specific to any vehicle?
13     A.    That's right.
14     Q.    Then on Page 7 of your report, you discuss
15 the two studies that you prepared, one in New York
16 and one in Seattle.   And you talked about that just a
17 few minutes ago, right?
18     A.    Yes.
19     Q.    And in those studies, you didn't apply the
20 IRS rate?
21     A.    That's right.
22     Q.    Instead, you estimated expenses based on
23 carefully building from the ground up, item by item,
24 the relevant expenses?
25     A.    That's right.

Page 641

1      Q.   You looked at maintenance?

2      A.   Yes.

3      Q.   Fuel costs?

4      A.   Yes.

5      Q.   Depreciation?

6      A.   Yes.

7      Q.   Automobiles in use?

8      A.   Yes.

9      Q.   And insurance costs?

10     A.   That's right.

11     Q.   And this research didn't have anything to

12   do with data or drivers in the Houston area, right?

13     A.   That's right.

14     Q.   And you did not go through this same

15   process for Mr. Barysas?

16     A.   That's right.

17     Q.   So you don't have any way of knowing

18   whether the IRS rate is either inflated or deflated

19   in comparison to Mr. Barysas' actual expenses, right?

20     A.   I think it's likely to understate his

21   expenses.

22             MS. MIERS:   Objection.   Nonresponsive.

23     Q.   (BY MS. MIERS)  You don't know one way or

24   the other, right?

25     A.   I know that he drove a luxury car with

Page 642

```
 1   higher -- much higher cost, depreciation,

 2   maintenance, and fuel costs.

 3                   MS. MIERS:  Objection.  Nonresponsive.

 4                   JUDGE SOUSSAN:  Please proceed.  I'm

 5   listening.

 6                   MR. STANLEY:  Argumentative.

 7                   JUDGE SOUSSAN:  I'm listening.  Please

 8   proceed.

 9       Q.   (BY MS. MIERS)  Do you know one way or the

10   other whether the IRS national, non-localized mileage

11   rate is inflated or deflated in comparison to

12   Mr. Barysas' actual expenses?

13                   MR. STANLEY:  Objection.  Asked and

14   answered.

15                   JUDGE SOUSSAN:  Overruled.

16   Dr. Parrott, can you answer the question?

17                   MR. STANLEY:  He's answered it three

18   times.

19                   JUDGE SOUSSAN:  Thank you,

20   Mr. Stanley.  Maybe now he'll answer it a fourth

21   time.

22                   THE WITNESS:  No.

23                   JUDGE SOUSSAN:  Thank you, sir.

24       Q.   (BY MS. MIERS)  Let's take a look at

25   Appendix C.  We talked about this earlier, and you
```

                                             Page 643

1    talked about the fact that you take great care in

2    analyzing the data.

3                    Do you remember saying that?

4         A.    Yes.

5         Q.    You said, "We didn't find great

6    inconsistencies with on-line time versus P1 through

7    P3 time," right?

8         A.    Right.

9         Q.    Let's kind of focus in on the first column

10   so we can see what they are, right?  So -- and you've

11   got two sheets, right?  One is for time in Houston,

12   and one is time for New York?

13        A.    That's right.

14        Q.    And this one is for Houston, right?

15        A.    Yes.

16        Q.    Okay.  So I just want to establish what

17   some of these Columns are.  There's a column that's

18   the third column over, On-line Time Hours, right?

19        A.    Yeah.  I guess it's not lined up exactly

20   with the column below it, but I see from -- yes.

21        Q.    That's why I wanted to go over this.  The

22   fourth column is the sum of P times?

23        A.    That's right.

24        Q.    When you say that, that means it's P1 plus

25   P2 and P3?

                                        Page 644

1        A.    That's correct.

2        Q.    There's not supposed to be a difference, in

3   your opinion, between on-line time and sum of P time?

4        A.    I said in theory they should be the same.

5        Q.    Okay.  So if we look just at that first

6   line -- if we could blow it up -- the number for

7   on-line time in this first row is 7.49, and it's 7.48

8   for sum of P times, right?  So it's just a little

9   off, right?

10       A.    That's correct.

11       Q.    Then Column O where it says Working Hours

12  Used in Pay Analysis --

13       A.    That's right.

14       Q.    Do you see that?

15       A.    Right.

16       Q.    Where does that number come from?

17       A.    So that is the same as Column D, the sum

18  of --

19       Q.    The sum of P times?

20       A.    Yes.

21       Q.    So let's take a look at Weeks 21 through

22  28.  I appreciate everyone bearing with us on this

23  because I know it's hard to read.

24              So we can see here that if we compare

25  the sum of P times, it's the same as the number in

                                        Page 645

1    Column O.  Am I correct about that?

2        A.   Yes.

3        Q.   Okay.  Did you do that for all of the

4    weeks?

5        A.   Well, now that I'm looking at it more

6    carefully, I see that there were several weeks in

7    which there were discrepancies.  I would call them

8    significant discrepancies between the sum of P times

9    and on-line time hours.

10       Q.   Why don't you go ahead and go to Week 36?

11   So, for example, Week 36, on-line time says 22.74?

12       A.   Right.

13       Q.   But total P2 time says 67.92?

14       A.   That's right.

15       Q.   So how did you decide -- let's look at

16   Column O -- which number to use?

17       A.   Give me a second to --

18       Q.   Dr. Parrott, do you agree with me that when

19   these reports are provided to us that they are

20   provided in PDF format and we don't get the actual

21   Excel files?

22       A.   Yes.

23       Q.   So you would agree with me that we can't go

24   in and determine if there's a calculation error on

25   your part, right?

Page 646

1        A.    Well, most of the columns are -- it's

2    just -- they are a result of simple arithmetic being

3    applied to other columns.  So you could check the

4    math on the calculations.  So that's pretty easy to

5    do with the PDF version.

6        Q.    You think it's easier to go in and hand

7    calculate each and every one of these lines rather

8    than looking at a spreadsheet?

9        A.    I didn't say it was easier.  I said it was

10    possible.

11        Q.    All right.  You have a Twitter account,

12    right?

13        A.    I do.

14        Q.    Your Twitter handle is JParrott1007?

15        A.    That's correct.

16        Q.    Your profile says that you favor high

17    minimum wage and full employment, right?

18        A.    That's right.

19        Q.    On that Twitter account, you regularly

20    tweet about the gig economy?

21            MR. STANLEY:  Judge, improper

22    impeachment evidence.  There's been no evidence here

23    that he's been untruthful or done anything dishonest.

24    I don't know where this goes to the impeachment of

25    this witness.

Page 647

1              MS. MIERS:  We're trying to establish

2    that this witness is an improper expert due to his

3    bias.

4              JUDGE SOUSSAN:  Overruled.

5         Q.   (BY MS. MIERS)  You regularly tweet about

6    the gig economy, don't you?

7         A.   I tweet about many things, including the

8    gig economy.

9         Q.   And including Uber?

10        A.   Yes.

11        Q.   In fact, you've tweeted dozens and dozens

12   of times about the gig economy and Uber?

13        A.   Well, I haven't counted them recently.

14        Q.   Fair to say that your tweets have been

15   critical of Uber and similar entities?

16        A.   I am critical of a company whose practices

17   I believe result in workers not being paid fairly.

18        Q.   Is it fair to say that you've re-tweeted

19   several tweets advocating gig economy drivers like

20   Mr. Barysas to be classified as employees?

21        A.   Yes.

22        Q.   Let's take a look at Respondent's Exhibit

23   46.  This is an exhibit that's your Twitter account,

24   and we pulled it on August 17th, 2021.

25              Do you recognize it?

Page 648

1        A.   Yes.

2             MS. MIERS:   Okay.  We move to admit

3   Respondent's Exhibit 46 into evidence.

4        A.   Excuse me a second.  Sorry.  I'll turn that

5   off.  What was your question?

6             MS. MIERS:   Actually, I was making a

7   motion to the judge.  Respondent moves to admit

8   Respondent's Exhibit 46 into evidence.

9             MR. STANLEY:   Judge, we would object

10  to this being admitted as evidence.  They can talk

11  with him about it, but there's no reason this is

12  evidence in the case.  Again, they have not shown any

13  reason that this should bias him in any way from

14  looking at the numbers and applying them to numbers.

15             Whether you decide P1 or P2 is

16  included, looking at this Facebook or the tweets is

17  nothing that matters when he's doing straight

18  arithmetic.  It's improper impeachment evidence to

19  show bias all the way around.

20             JUDGE SOUSSAN:   Overruled.  It will be

21  admitted as proper cross-examination and impeachment.

22       Q.   (BY MS. MIERS)  Dr. Parrott, do you receive

23  payments from labor unions?

24       A.   When I work in arbitration cases, yes.

25             MS. MIERS:   Respondent passes the

Page 649

1    witness.

2                        FURTHER EXAMINATION

3         Q.   (BY MR. STANLEY)  Okay.  Dr. Parrott, let's

4    look at the appendix that you were just looking at.

5    That's Appendix C.  If we go to the second page of

6    Appendix C --

7                   JUDGE SOUSSAN:  Whoever is rustling a

8    lot of papers, it comes across very loud to the rest

9    of us.

10                  MR. STANLEY:  It's me.  I'm right by

11   the speaker.  I apologize.

12                  JUDGE SOUSSAN:  I don't think you're

13   the only one, so I appreciate it.  Thank you,

14   Mr. Stanley.

15                  MS. MIERS:  That may have been me.  I

16   apologize.

17        Q.   (BY MR. STANLEY)  Let's go back one step,

18   okay?  Let's look at Appendix B.

19                  Can you tell me the sum of the total

20   hours that you included in your analysis if we look

21   at straight time in New York City and Houston and

22   also overtime?

23        A.   Are you asking what's the sum of the hours

24   for straight time in both areas and the Houston

25   overtime hours?

                                        Page 650

1      Q.   Right.  So the reason why I'm asking is I

2   just want to find out which number you used in

3   calculating your shortfall analysis for Mr. Barysas.

4   I thought we did this earlier.

5      A.   Yes.  So I did use the sum of the hours

6   presented in Appendix B here.  And in the pay

7   analysis in Appendix C, I used Column O.  I may have

8   misspoken.  You'll have to forgive me for this

9   because I have worked on a number of cases.  I don't

10  do this work full-time, so -- and this analysis was

11  done a few weeks ago.

12              In this case, the -- the working time

13  that we used was the sum of the P segments in some

14  cases, and it was the on-line time in other cases.

15  What we used for the pay analysis was the figure in

16  Column O, which for the first several weeks is the

17  sum of the P segments and then for the remaining

18  weeks it was the on-line time, generally because the

19  sum of the P segments figure in some cases was

20  higher -- much higher than the sum of the on-line

21  time hours.

22      Q.   Why did you use in some situations the sum

23  of the P segments and then the working time in other

24  situations?

25      A.   We didn't want to overstate his -- his --

Page 651

1    what we characterized as his working hours.

2        Q.    And where did you get the data for the sum

3    of the P segments?

4        A.    The sum of the P segments was from the Uber

5    data that was provided.

6        Q.    Can you specifically tell us what the data

7    you're talking about is?

8        A.    So there were -- there's a separate file

9    for P1 time in miles, there's a separate file for P2

10   and P3 data together -- P2 and P3 time in miles.

11       Q.    What type of file is that?

12       A.    Those were Excel files.

13       Q.    And with the working time, where did you

14   get the data for that?

15       A.    So that was from -- from a third file, a

16   separate file, also Excel file.

17       Q.    Does the data from Appendix C also have

18   data for weeks that Mr. Barysas would have reached

19   the target pay?

20       A.    Yes.

21       Q.    And did you include the time for those

22   weeks in your analysis for --

23       A.    Yes.

24       Q.    Did you move the numbers in any way to make

25   it seem that Mr. Barysas had an overstated loss here?

Page 652

1      A.   No.  In fact, I described the situation as

2   in the report where we didn't count his P1 time and

3   miles for 12 weeks that he didn't have a trip

4   dispatch -- didn't have a trip.

5      Q.   And you also discussed with counsel on your

6   cross-examination that the IRS rate may be

7   understated for the Barysas matter.

8                Can you tell the judge why that might

9   be?

10      A.   For the entire period of time covered by

11   this arbitration, he drove an Infinity QX60, a luxury

12   vehicle which qualified him under Uber's standards to

13   provide premium-priced services.  So that's more

14   expensive.  That vehicle is more expensive than

15   average in every respect:  Purchase price,

16   depreciation, maintenance, fuel expenses, and so on.

17      Q.   And how does that compare to the IRS rate?

18      A.   You know, I haven't -- I didn't itemize,

19   you know, component by component his expenses, but I

20   would think, given the fact that it's a luxury car

21   with those higher cost factors that I cited, that it

22   would be higher than the IRS rate.

23      Q.   Does the IRS rate give analysis on a luxury

24   vehicle like this, or is it analysis on a regular

25   car, if you know?

Page 653

1     A.   It's an average for all of the cars in use

2   in any given year or for the year when the analysis

3   is done, and then it's applied to the following year.

4     Q.   In your two studies that you performed, one

5   in New York and in Seattle where you did similar

6   analysis, did it matter that you had thousands of

7   drivers to look at and look at surveys in coming up

8   with your expenses?

9     A.   Well, I mean, it mattered because they were

10  different.  We looked at the actual cars that were in

11  use and estimated the cost based on those cars and

12  then took an average across the entire fleet, so to

13  speak, of the cars in use.

14    Q.   And did some of those cars include luxury

15  vehicles?

16    A.   Yes.

17    Q.   Did some of those cars include a basic

18  sedan, like a Honda Civic?

19    A.   Most Uber services in cities are the UberX

20  service, the basic.  And for that, you can use a much

21  less expensive car than an Infinity QX60.

22    Q.   So in your analysis of the expenses in your

23  two papers that are published, did you look at

24  expenses associated to a regular vehicle, as well?

25    A.   Yes.

Veritext Legal Solutions
346-293-7000

1      Q.    A non-luxury vehicle?

2      A.    Yes.

3      Q.    And then did you do an estimate or an

4  average of what you found across the thousands of

5  drivers that you looked at?

6      A.    Yes.

7      Q.    And that included some drivers that had a

8  luxury vehicle and some drivers that didn't?

9      A.    That's right.

10     Q.    Did that include some drivers that drove

11  for Uber a lot, 40,000 miles, and some that drove for

12  Uber a little, 15,000 miles, for example?

13     A.    Yes.

14     Q.    And so, what did you seek to do in finding

15  the averages in those studies for expenses?

16     A.    We sought to come up with an average

17  expense that represented the average across all

18  drivers, you know, reflecting the fleet of vehicles

19  in use.

20     Q.    And did that have any impact on why you

21  used the IRS rate in this case?  Your prior

22  experience with dealing with those averages, did that

23  have any impact on you using the IRS rate here?

24     A.    Well, we used the IRS rate here because it

25  seemed to be a reasonable proxy, again, for an

Page 655

1      average driver's expenses.  We didn't try and adjust

2      the expenses given his luxury car.

3          Q.    Have you seen any other expert reports in

4      this case from any other economists similarly

5      situated to you to rebut your opinions?

6          A.    No.

7                MR. STANLEY:  I will pass the witness.

8                MS. MIERS:  I just have a few

9      questions.

10                   FURTHER EXAMINATION

11         Q.    (BY MS. MIERS)  You just testified that you

12     didn't try to adjust expenses to account for

13     Mr. Barysas' luxury car, right?

14         A.    That's right.

15         Q.    Kind of to me at least, it seemed like you

16     were implying you might have done that otherwise.

17                You've never in any of the 10 matters

18     adjusted the mileage to account for the type of car

19     an individual drove, right?

20         A.    That's right.

21         Q.    Even when it was like an old Hyundai,

22     right?

23         A.    Well --

24                MR. STANLEY:  I object to the

25     relevance.

                                        Page 656

1          MS. MIERS:  That's fine.  I've made my

2    point.

3          Q.   (BY MS. MIERS)  Dr. Parrott, did you

4    actually do these calculations, or did someone else

5    perform these calculations?

6          A.   I worked with an assistant on these -- the

7    final calculations, I did myself.  Some of the data

8    preparation, I worked with an associate.

9          Q.   On Page 6 of your report, you write in your

10   expert report that "The key variables we focused on

11   included the number of trips, the sum of P time

12   segments, total mileage, and adjusted driver payout,"

13   right?

14         A.   That's correct.

15         Q.   You don't state that in this particular

16   instance you used on-line miles or that you found a

17   discrepancy and decided to use on-line miles instead

18   of total P time, right?

19         A.   You're right.  That was probably an

20   oversight on my part.

21         MS. MIERS:  I'll pass the witness

22   back.

23         MR. STANLEY:  I have no further

24   questions.

25         JUDGE SOUSSAN:  All right.  May this

Page 657

1    witness be excused?

2                    MR. STANLEY:  He can.

3                    JUDGE SOUSSAN:  Thank you very much,

4    Dr. Parrott.  You are excused.

5                    Okay.  Are there any other witnesses

6    from either side?

7                    MR. STANLEY:  Not from claimant.

8                    MS. MIERS:  Not from respondent.

9                    JUDGE SOUSSAN:  The claimant had

10   rested and respondent rests?

11                   MS. MIERS:  Yes, Judge.

12                   JUDGE SOUSSAN:  Now, are we going to

13   proceed to closing arguments?

14                   MR. STANLEY:  We can.  I may need a

15   few minutes.

16                   JUDGE SOUSSAN:  We're going to take a

17   break.  How much time do you-all need to collect your

18   thoughts?

19                   MR. STANLEY:  30 minutes?

20                   JUDGE SOUSSAN:  30 minutes is fine.

21   Is that okay with the respondent?

22                   MS. MIERS:  30 minutes is fine.

23                   JUDGE SOUSSAN:  Let's resume at 3:30,

24   okay?

25                   (Recess from 2:57 p.m. to 3:34 p.m.)

                                            Page 658

```
1              JUDGE SOUSSAN:  Let's get started.
2                   CLOSING STATEMENT
3              MR. STANLEY:  Thank you, Judge.  Can
4    you bring up the PowerPoint here?
5                   Judge, throughout this arbitration, we
6    have sought to present evidence in paper so that you
7    can see the control that exists and how the economic
8    realities are that Dainius Barysas relied on Uber as
9    an employee for payment.  And we've gone through this
10   painstakingly so that we can show you that this
11   evidence exists.  And oftentimes we've challenged you
12   throughout this process because we need you to see --
13             JUDGE SOUSSAN:  I can agree with that.
14             MR. STANLEY:  We need you to see that
15   oftentimes there is no basis for the evidence
16   provided.  It's based solely on testimony that cannot
17   be corroborated in any way by Uber.  They are things
18   that are just said, and that matters here.  If you
19   can't back it up through documents, then you can say
20   whatever you want, and we see that happening over and
21   over and over with Uber's witnesses.
22                  And so, we sought to show you
23   documents of how there's control and documents of
24   what Uber's done through their policies during the
25   relative period, not a policy that's on the website
```

Page 659

1    now from 2021.  And I urge you to look at the dates

2    on these documents.  There may be 2018 on some of

3    these documents that Uber tried to show earlier.

4    There's 2021 that came in after the fact.

5              So there's reason for you to look at

6    this and not take what you hear from their corporate

7    representative unless he's showing you additional

8    documents to back it up.

9              So if we look at the time worked, we

10   know that Dainius Barysas worked for a long time,

11   2014 to 2019.  And you are going to hear from Uber

12   that he had freedom and opportunity and flexibility

13   and choice, but we've shown you so many times that he

14   didn't have the freedom and opportunity or

15   flexibility or choice when he was logged into the

16   app.

17             Uber is going to tell you over and

18   over he could log on and log off when he wanted to.

19   The facts show that when he was logged on for those

20   five years and inside the statutory period for the

21   three years that they controlled all of it.  We

22   showed that over and over on documents.

23             The freedom to log on and log off does

24   not qualify the relationship as independent.  Just

25   because he worked and logged in and logged off

                                          Page 660

 1    different times, that doesn't mean it's an

 2    independent relationship.  You have to look to more

 3    under the FLSA.

 4              The FLSA is clear that when weighing

 5    these evidence -- if you look at all of this through

 6    the preponderance of the evidence, these factors

 7    weigh in claimant Barysas' favor.

 8              We talked a lot about the FLSA and the

 9    economic realities test.  This is the test that is in

10    play in the Fifth Circuit.  The test provides

11    guidance to differentiate an employee from an

12    independent contractor.

13              You're going to see case law, you're

14    going to see different information on these five

15    factors.  We planned our case out to go so that you

16    could see from the totality of the circumstances that

17    there is an employment relationship here.

18              The first factor is the degree of

19    control exercised by the alleged employer.  If you

20    recall, we showed evidence on paper of all of these,

21    that Uber unilaterally set the rate for all three

22    components of every fare:  The base fare, the per

23    mile fair, and the per minute fair.

24              Mr. Barysas could not change those

25    amounts if he wanted to.  He could not take those up

                                        Page 661

1    and go higher or lower on those.  He was stuck with

2    what Uber gave him.

3              Why does that matter?  It matters

4    because he can't control the rate of his services.

5    Don't go down the rabbit hole of well, he did have

6    control because it was based on a moving number that

7    if there were less drivers on the road at a certain

8    time, the supply and demand change would occur.  That

9    is hogwash.  He couldn't change the number at any

10   time.

11             And if he wanted to get properly

12   reimbursed, which we showed you, he would have to go

13   back to Uber and say, "Uber, I didn't get paid

14   appropriately.  Look at this."  And what would Uber

15   do?  Based on evidence that we showed you, documents

16   we showed you, Uber would look at their fare estimate

17   calculated on their distance and give him an update

18   to that.

19             He couldn't go to the rider directly

20   and get that if he wanted to.  He had to go through

21   Uber, right?  Uber had the sole discretion to change

22   that fare amount at any time.  We showed you

23   documents over time where the fare did change, but it

24   wasn't based on Barysas' input.  It was based on

25   Uber's control.

Page 662

1              We know that Uber controlled the

2    amount of services that it charged -- the amount of

3    the service fee that it charged against the fares

4    that -- that Dainius generated.  Uber would move the

5    service fee up and down.  Uber would move the

6    percentages that they would take from any fare.  And

7    even when Dainius would go back to them and say,

8    "Hey, Uber, why are you taking so much more than you

9    used to?  That's not right.  That's not the way it

10   should be," what did they do?  They said, "This is up

11   to us.  We get to decide.  This is the amount we're

12   going to take for every fare."  There was no

13   negotiation there at all.

14             We also talked about that Uber

15   unilaterally decided that Dainius Barysas was not

16   compensated for Period 1 and Period 2.  We'll talk

17   about this a little bit later in the closing slides,

18   but Dainius could not work for Uber unless he was

19   logged on waiting for Uber to give him a request.  It

20   was impossible.  He could not get a request on the

21   Uber app during Period 1 and Period 2 in order to

22   drive for Uber unless he was there waiting and

23   accepting and moving on, right?

24             Uber determined that Dainius Barysas

25   was not paid for the two minutes when he arrived at

Page 663

1    the pickup point.  We talked a little bit about this.

2    You heard about the wait time, and the wait time did

3    not start until Dainius showed up at the rider's

4    location.  Well, he had to wait two minutes.  That

5    was totally at Uber's control.  Then after that, Uber

6    decided how much Dainius would be paid for the wait

7    time that he had.

8                    There are more facts here that we went

9    through.  We talked about that Uber unilaterally

10   controlled the ride requests that come to him.  You

11   heard an anecdote from the corporate representative

12   that if Dainius wanted to plan a trip at the airport,

13   all he had to do was know a rider, have that rider

14   get in his car at the airport, and then turn on the

15   app and request a trip.

16                   That is completely unsupported by any

17   of the documents.  First of all, we know that they

18   were required to go to the staging lot in order to

19   get airport trips.  We know that they were required

20   to wait there to get an airport trip in the queue.

21   And even if Dainius was at the airport waiting and

22   went outside of that, broke the rule there -- if that

23   were to occur based on the anecdote provided by the

24   corporate representative, that he would go and

25   somehow have the rider get in his car and request and

                                                Page 664

1    be ready to accept, there would be so many drivers at

2    the airport at the time, Uber can't tell you that

3    that request would have gone straight to Dainius.  It

4    could have gone to anyone in the area.  So that idea

5    that you could pre-arrange a trip with a rider is

6    ridiculous.  Not supported by any document.

7              What is shown is that he has to wait

8    on Uber to provide him the rider.  Uber decides which

9    ride request would come.  If you have a driver in one

10   location and there are two riders in similar

11   locations that are asking for trips, Uber's going to

12   pair that ride with Dainius.  Dainius can't decide

13   that.

14             Uber exclusively controlled its

15   proprietary algorithm which guided and monitored

16   Dainius the entire way.  Uber was watching Dainius

17   the entire time that he was on the app, whether it

18   was Period 1, Period 2, or Period 3.  They were

19   taking evidence and information the entire time,

20   watching him on GPS, looking at how fast he was

21   driving, recording that information in their system.

22   Uber also would take information from riders and

23   unilaterally use that information to negatively

24   impact Dainius.  We've seen that over and over.

25             Uber, as we've talked about,

Page 665

1   controlled the collection of riders' payment and

2   fares.  Uber did not allow Dainius ever go directly

3   to the rider to get payment.  There is not an

4   independent contract relationship on this planet

5   where that occurs.  If I am a pool builder, I can go

6   straight to the homeowner that I'm building a pool

7   for and get that money.  Now we've got to go through

8   Uber in order to get that.  That fact weighs in our

9   favor, as well.

10             The star rating, they use that star

11   rating to punish drivers.  When you hear an anecdote

12   of "Well, this never occurs," look at their policies.

13   The policies say, "We set the star rating.  We will

14   tell you if you get close.  We're not going to tell

15   you what the rating is in the city, but if you get

16   close, we'll let you know."  So that's something

17   totally controlled by Uber.

18             Acceptance rate.  You see that in the

19   documents, as well, where Uber does negatively impact

20   you for not accepting rides.  They kick you off the

21   app.  You can no longer be on the app if you're not

22   accepting rides.  Before the statutory period, Uber

23   changed their community guidelines where they would

24   log you off for an undetermined time.  They would

25   never tell you how long that log-off time will last.

Page 666

```
 1    Even when the policies update over time, they don't
 2    tell you how long that time lasts that they will log
 3    you off.  Brad just says, "Well, you'll just get
 4    logged off the app.  Log back on if you want to."
 5    Uber is controlling that.  If he doesn't want to log
 6    off the app, Uber logs him off the app.
 7              The second factor in the economic
 8    realities test is the extent of relative investments
 9    that Dainius Barysas had.  Two of the things that we
10    really would like you to focus on based on the case
11    law are the capital risks and upfront money to start.
12              The capital risk.  What risk of loss
13    did Dainius have if driving for Uber didn't work out
14    versus what risk of loss did Uber have if the driving
15    portal doesn't work out?  So you've got to look at
16    that and the upfront money to start.
17              We know that the Dainius Barysas
18    investments -- and you'll hear this from Uber -- were
19    his car and his smartphone.  The facts are in.  He
20    chose his car, he chose his smartphone.  He had to
21    have a car to drive for Uber, of course.  He had to
22    have a smartphone to drive for Uber, of course.
23    However, if he were to stop or get fired from driving
24    for Uber, he would still have that car.  He would
25    still have that smartphone.  These are not risks that
```

Page 667

 1    he invested in that would suddenly go away, that

 2    would suddenly be a loss of money that he invested

 3    for use on the app.

 4              Meanwhile, Uber talked about its

 5    investments, it's millions, hundreds of millions over

 6    time, billions of dollars its invested in the driver

 7    app.  If the driver app would not have worked out,

 8    their capital investment would have been lost,

 9    billions of dollars.  It cannot be said otherwise

10    that these investments are upside down when you

11    compare the two.

12              We look at the third factor, the

13    degree to which Uber determined Dainius Barysas'

14    opportunities for profit and loss.  We talked about

15    some of these already in the control element.  They

16    go here, right?

17              You heard evidence that Dainius is not

18    able to build a book of business on the Uber app.  He

19    can't have preferred riders on the Uber app and

20    contact them through the app to give driving services

21    through the app.  That's not something he could do.

22    If he could, he could control his opportunity for

23    profit or loss in that way.

24              Additionally, Uber unilaterally

25    decides the fare price and service fees.  This goes

                                          Page 668

1  directly to how much Dainius can make on every single

2  trip.  And so, if they control that, there's no way

3  that he can control his opportunity for profits and

4  loss because he can't control what he makes on any

5  individual trip and doesn't know what he's going to

6  make on any individual trip.

7           Uber controls the algorithm that

8  dispatches riders.  This is similar to the control

9  factor, but it also applies in this element under the

10  economic realities test because if Dainius wanted to

11  say, "I only want to receive rides that are $20 or

12  more in my pocket or $40 or more in my pocket," he

13  can't say that.  Uber controls that.  Uber controls

14  what comes to him.  There is no function in the app

15  that Dainius can control the level of riders, trips,

16  and how far and how much he's going to make in the

17  app.

18           Uber controls the 15 seconds.  So that

19  means Dainius must accept within that time, within 15

20  seconds, given the limited information, right, must

21  accept or it goes by and he loses that ability in 15

22  seconds.  So that impacts his opportunity for profits

23  and loss.

24           Certainly Uber markets and advertises

25  to riders.  Dainius -- when you compare the two, his

Page 669

1    marketing and advertising to riders doesn't exist.

2    He does have a business card, but you've seen from

3    that based on the facts in evidence that he did not

4    have off-app rides other than two different people,

5    one in Houston, one in New York City.  And so, it

6    wasn't as if he was using his Uber -- his Uber

7    opportunity to get all of this side business.

8    There's no facts that are relevant to that fact.

9                More things.  Uber sets the cleaning

10   fee, the lost item fee, the cancellation fee.  All

11   these things impact the amount that Dainius can make

12   while on the Uber app.  You've seen evidence of that.

13   You've seen documents that show that.

14               Uber doesn't pay for all periods.

15   That impacts the amount that he makes.  He should be

16   paid for Period 1.  He cannot receive a ride in

17   Period 3 unless he's in Period 1.  He is engaged to

18   wait.  He's not on call.  He's engaged to wait for

19   Uber to give him a ride.

20               Uber doesn't pay expenses.  We've

21   given you a reasonable approximation of expenses,

22   which we'll talk about in just a moment.

23               The fourth factor is skill and

24   initiative required to perform the work.  All you

25   have to do to drive for Uber is have a regular

Page 670

```
 1    driver's license.  That's it.  You send in your
 2    driver's license, you sign their agreement, you can
 3    drive.  There is no barrier to entry that requires a
 4    skill in order to drive for Uber.  You heard about
 5    some of the skill that Dainius received later when he
 6    started driving commercially, but there's no skill
 7    needed.  Anyone with a license can get behind the
 8    wheel and drive for Uber.
 9              The Fifth Circuit clearly says that
10    routine work that requires efficiency is not
11    indicative of independence.  You will hear from Uber
12    that his skill was deciding where he was going to
13    work, but that routine work of driving is not -- that
14    requires efficiency is not indicative of
15    independence.  That's where he went to gets rides
16    from Uber.  He had to be logged on, he had to be
17    ready to accept a trip, and he had to take the trip.
18              The fifth test is the permanency of a
19    relationship.  You've heard evidence that he drove
20    for Uber for many years, including inside the
21    statutory period for three years.  So he drove from
22    September 2014 to August 2019 consistently for Uber.
23    Since 2014, he completed 2,346 trips.  The evidence
24    shows inside the statutory period, he completed over
25    1100 trips for Uber.  He was driving all the time.
```

Page 671

1    The Fifth Circuit has said that even 10 months is

2    enough to satisfy the permanency requirement.  That's

3    clearly met here.  He has driven far more for Uber

4    than 10 months.  The evidence shows it on the

5    documents.

6                  There's been a lot of talk of the

7    regulation code, Title 14, the TNC statute in Texas.

8    It's interesting how Uber plays to that when it

9    benefits them but doesn't play to that when it

10   doesn't.  They claim, "Oh, we follow these items

11   because it's in the TNC statute."  But when you see

12   that under the statute itself a driver is not an

13   independent contractor if the company limits the

14   territory within which the driver may provide

15   digitally pre-arranged services, they don't want to

16   talk about that anymore.

17                  Is this a factor under the FLSA?  No,

18   but it's indicative of their control.  It's

19   indicative of what Uber did.  And in Texas, this

20   would make this guy not an independent contractor

21   because they did limit the territory, which we've

22   heard about.  They did prevent him from driving

23   inside Houston at the airport.

24                  This brings us up to Exhibit C7.  You

25   have no evidence in the record that Dainius Barysas

Page 672

1   was geo-spoofing or committing fraud related to

2   geo-spoofing.  No evidence.  So they go and they tell

3   us that Dainius is being removed from his ability to

4   complete airport trips due to manipulation of the GPS

5   and then they stopped him from being able to get

6   rides.

7           Why is this important?  If he can't

8   get rides at the airport, his testimony is that it

9   would be devastating for him.  The documents show

10  that it would be a, quote, death sentence because he

11  so relies on those trips.  That's why this is

12  important.  If they are going to have the power and

13  have the ability to limit Dainius from getting those

14  airport trips, it shows all of the factors because of

15  his economic reliance on those trips, the control,

16  the ability for opportunity for profit and loss, all

17  of that weighs in our favor, and they don't want to

18  talk about that.

19          They did do that inside the statutory

20  period, and that created, as testimony showed, a

21  ripple effect that led Dainius down the path of going

22  towards a different opportunity, of driving for

23  somewhere else.  So you have that evidence.  You've

24  seen it.  It's important.  They didn't even talk

25  about this today with their corporate rep because

Page 673

1    they know that there's no facts that they can point

2    to that he was geo-spoofing, and yet they still

3    removed his ability to take airport trips and rides.

4             On damages -- you've heard about

5    damages.  You've only heard from one expert on

6    damages.  Uber could have brought somebody to discuss

7    damages, and they didn't.  You've heard from our

8    expert, who is well-qualified, who has given you

9    numbers based on Period 1, Period 2, and Period 3,

10   and he's tabulated that based on Uber's documents and

11   submitted the report to you.

12            We ask that you look at it, that you

13   see how credentialed he is, that you look at the bare

14   numbers of what we claim:  The shortfalls, that he

15   was not paid -- that Dainius was not paid the minimum

16   wage over the course of his driving for Uber both in

17   New York and in Texas when he drove for Houston.

18   That shortfall over the entire period is $27,207.66.

19   This is the only evidence you have of damages where

20   actual evidence from Uber has been looked at, has

21   been calculated, and has been given to you.

22            It's important to talk about Period 1

23   because Period 1 is compensable.  29 CFR 785.15

24   discusses on-duty time within the FLSA context, and

25   it says, "If the employee is unable to use the time

Page 674

1    effectively for his own purposes, it belongs and is

2    controlled by the employer."

3                    In order to be logged on and receive

4    trips through the Uber app, you must be logged on in

5    Period 1.  In order to get trips at the airport, you

6    must be in the airport lot waiting for them to be

7    given to you.  He must be there.  He can't go and run

8    a different business.  He can't be anywhere else

9    doing work otherwise.  He has to be waiting on Uber

10   to give him the trip.  There's no evidence that's

11   been given to you that he was doing that.

12                   You've required in other situations in

13   this arbitration for a witness to marshal evidence,

14   to foster evidence, and there have been no witnesses

15   brought by Uber to discuss the time that Dainius used

16   during Period 1 to do something else.  Nobody.

17                   Also important for compensable time

18   and engaged to wait, you see a stenographer --

19   there's examples in the CFR that they give, right?

20   I'm sure Ms. Foreman can appreciate this.  A

21   stenographer who reads a book while waiting for

22   dictation is considered engaged to wait, and that

23   time is compensable.

24                   We know based on our occupation that

25   it's not uncommon for stenographers to have to wait

Page 675

 1    long periods of time for pre-trial matters that are

 2    off the record, for juries to be impaneled, for

 3    delays in the process at trial.  It happens all the

 4    time, but that time is still compensable for the

 5    stenographer who is waiting to start.

 6              Once the time starts, she is on duty

 7    and working, but she can read a book.  This is

 8    similar to surfing the internet, similar to playing

 9    games.  You heard evidence that Dainius would walk

10    around the airport lot.  Well, that's time that he's

11    engaged to wait, right?  Also, a messenger who works

12    crossword puzzles, a fireman who plays checkers while

13    waiting for alarms, all these things.  The examples

14    are given there.  That's similar and the same to an

15    Uber driver waiting to receive an Uber trip.

16              Expenses.  This is something you'll

17    see in our briefing.  Neither the FLSA nor the

18    regulations require the employee to prove actual or

19    precise cost of employment-related expenses incurred.

20    Such costs may be reasonably approximated.

21              The evidence that we've presented to

22    you is that the IRS expenses associated with the IRS

23    rate are a reasonable approximation for Dainius'

24    expenses.  There's no evidence presented to you

25    otherwise by anyone or any other source that they are

Page 676

1    unreasonable.  You have argument by counsel, but you

2    don't have any evidence or any other opinion that

3    those are not reasonable.  In fact, they are employed

4    by the United States government, and they are

5    employed by people everywhere because they are

6    reasonable.  They are a reasonable approximation.

7              To close, to try to save a couple of

8    minutes, this is the slide that I left you with in

9    our opening.  FLSA is to apply in as many instances

10   as possible.  It's not a narrow law.  It's supposed

11   to be open.  It's supposed to provide protection to

12   employees like Dainius, to allow him to be paid

13   appropriately.

14             Whether the employee or employer

15   relationship exists turns on dependency.  We've shown

16   dependency in multiple, multiple, ways.  The five

17   factors weigh in the claimant's favor when you look

18   at the preponderance of the evidence.

19             Uber did not claimant a proper minimum

20   wage, as we've shown through expert testimony, and no

21   witnesses have marshaled evidence to support -- there

22   have been many witnesses, and none of them have

23   marshaled some of the evidence to support contentions

24   on facts brought by Uber.  You have many anecdotes,

25   you have things that might happen.  But when we look

Page 677

1   at the documents, they show you that dependency was

2   there, and the FLSA factors should weigh in the favor

3   of Dainius Barysas.

4                Based on my calculation, I have four

5   minutes and 20 seconds left.  Thank you.

6                JUDGE SOUSSAN:  Okay.

7                     CLOSING STATEMENT

8                MS. MIERS:  All right.  All right.  So

9   as many times as I've heard the term "red herring,"

10   I've never actually looked into its origin until

11   recently.  What I learned is during the 18th and 19th

12   centuries if someone wanted to sabotage a fox hunt,

13   what they would do is they would drag red herrings

14   along the ground in order to confuse the fox hounds

15   and send them in the wrong direction.

16                I looked it up because there have been

17   a lot of red herrings dragged through this final

18   hearing.  We know you're quite capable of recognizing

19   the red herrings for exactly what they are.  We do

20   think it's worth noting that the heavy reliance on

21   delay and distraction tactics only serves to

22   emphasize that claimant is simply unable to meet his

23   burden.

24                It's also worth noting that

25   Mr. Rosenthal is imputed with Uber's knowledge.  His

                                          Page 678

1    testimony is evidence, and Uber obviously isn't

2    required to admit a document that supports each and

3    every statement made by Uber, just like claimant

4    isn't.  To be clear, Uber produced a lot of data and

5    a lot of documents, some of which have been

6    pre-admitted here.

7                    In addition, claimant still has access

8    to the app and the information contained in the app.

9    He should still have access to his phone and e-mail,

10   which would have communications from Uber.  He still

11   has access to the internet, including uber.com.

12                   So claimant's trouble here isn't a

13   lack of evidence.  It's a lack of evidence to support

14   his claims.  And that's all I'm going to say about

15   the red herrings because I want to spend the rest of

16   our time talking about what's actually relevant here.

17                   What's actually relevant, what's at

18   the heart of this case, is whether Mr. Barysas was

19   economically dependent on Uber or whether he was in

20   business for himself.

21                   The Fifth Circuit's explained that

22   economic dependence isn't an evaluation of whether

23   Mr. Barysas' use of the Uber driver app was his

24   primary source of income -- we know it wasn't -- or

25   even whether claimant used his earnings to pay bills.

Page 679

1   The test of economic dependence requires you to

2   consider all five factors to determine whether

3   claimant was dependent on Uber for his continued work

4   in providing transportation services.

5                    Well, what we know is that the

6   evidence shows that claimant wasn't economically

7   dependent on Uber.  He was actually in business for

8   himself.  He owned and operated a company called DB

9   Pedicabs, LLC.  And among other things, that company

10   provided on-line bike rentals.  It ran a website.  It

11   provides trucking and car hauling services and livery

12   services.

13                    Claimant had the freedom, flexibility,

14   opportunity, and choice to control his transportation

15   services business, just like Mr. Stanley predicted we

16   would tell you.  Claimant was in business for

17   himself.

18                    Now, running through the Fifth

19   Circuit's five factors, the evidence demonstrates

20   that Uber didn't exercise control over claimant.

21   Mr. Barysas chose to generate business leads for his

22   livery service by using the Lyft and the Uber driver

23   apps.  He could have chosen to put out advertisements

24   for his livery services business or use other

25   lead-generation apps.  It was entirely up to him.

Page 680

1    What's important is that he didn't have to use the

2    Uber driver app to generate leads at all.

3                     Mr. Barysas also chose to generate

4    business leads for his livery services by providing

5    his business cards, the business cards that he

6    created, the business cards that he invested in, and

7    the business cards that he used to build a customer

8    base.

9                     Claimant didn't have to use the Uber

10    driver app to facilitate rider payments either.  He

11    chose to do that, and he chose to do that because he

12    determined that using the app was beneficial to his

13    business.

14                     He also used the Lyft app and, as we

15    heard, he used a credit card payment system to

16    process rider payments outside the Uber app, and he

17    did this so many times that he incurred $1100 in

18    credit card payment fees just in one year.

19                     Looking at Claimant's Exhibit 44, the

20    pink line here represents all the time that claimant

21    chose to use the Lyft app.  And even though claimant

22    testified that he only used the Lyft app on rare

23    occasions, claimant's own exhibit shows that he

24    completed 247 trips using the Lyft app, and that was

25    just from July 2017 to August 2019.  We know there

Page 681

1    were trips beyond the statutory period.

2                    Not only did claimant provide

3    transportation services using the Lyft app at least

4    247 times during the relevant time period, you can

5    see on their exhibit that during the first quarter of

6    2018, he used the Lyft app more than he used the Uber

7    app.  And we know from his testimony and this

8    document that he started using the Uber app more than

9    the Lyft app around the second quarter of 2018, and

10   you heard why.  Mr. Barysas determined that the Uber

11   app provided more leads, so he made the strategic

12   business decision to use the Uber app in order to

13   maximize his profits.

14                    And I want you to note here -- you'll

15   see why it matters in a minute -- that according to

16   claimant's demonstrative stiff here, he only

17   completed six trips using the Lyft app in 2017.  Now,

18   despite claimant's testimony that he primarily used

19   the Uber driver app over other lead-generation

20   services and despite his testimony that Uber was the

21   sole source of his income, claimant provided most of

22   his livery services outside of the Uber driver app.

23                    For example, based on this document of

24   the $50,892 in livery services that were in income

25   reported to the IRS by claimant in 2017, only $13,000

                                          Page 682

1    of that income was derived from his use of the Uber

2    driver app.  That's only 26 percent of his total

3    transportation services income in 2017.

4                And remember, we just -- I just told

5    you I would make this make sense.  Claimant only

6    provided six rides in 2017 through the Lyft app.  So

7    that means that at least -- at least $35,000 of

8    claimant's livery income in 2017 was from providing

9    transportation services outside the app.  The Uber

10   driver app was not his sole source of income, yet

11   Mr. Barysas testified that he only provided

12   transportation services outside the Uber and Lyft

13   apps once or twice.  And you just heard his attorney

14   say that, as well.

15               If there remains any doubt as to

16   whether Mr. Barysas provided transportation services

17   outside the Uber and Lyft apps, his federal tax

18   returns should clear up that doubt.  In 2017, you can

19   see here claimant admitted in testimony, as well,

20   that he incurred $1100 in credit card fees for his

21   livery services in 2017.  And keep in mind this isn't

22   his income.  This is just the credit card fees for

23   processing payments.  We actually don't know the

24   precise amount of income received for livery services

25   provided outside the apps because that evidence was

Page 683

1    withheld from us in this matter.

2              In addition to choosing how to

3    generate leads for his transportation business, when

4    he chose to use the Uber driver app, he set his own

5    schedule.  He used his discretion to determine when

6    to log on and off the app for his own economic

7    advantage, not Uber's economic advantage.

8              Claimant's days fluctuated, the times

9    fluctuated, and even the amount of time he spent on

10   the app fluctuated.  He was in control, and it was

11   completely up to claimant as to how much time and how

12   often he wanted to interact with the app.

13             And he didn't just have freedom to use

14   the Lyft app.  He had freedom to use the Lyft app

15   while he was logged onto the Uber app while he was

16   also allegedly working for Uber.  In other words, he

17   was logged into the Uber driver app during P1 time

18   while he was transporting one of his drivers [sic]

19   through the Lyft app on 153 different days.

20             Claimant's testimony regarding his use

21   of the Lyft app wasn't credible.  It just wasn't.  At

22   his deposition, he testified that he didn't use the

23   Uber and Lyft apps at the same time because he

24   thought it would impact his good standing and rating

25   on the Uber app; but then yesterday he testified that

Page 684

1    he used the Uber and Lyft apps simultaneously many

2    times.  And we actually know that's true from the

3    data and the exhibits, from the contractual

4    agreements between the parties, and from

5    Mr. Rosenthal.

6            Claimant had the freedom to reject

7    trip requests, and he could even cancel a trip once

8    he agreed to accept it.  And despite claimant's

9    testimony that he feared deactivation if he declined

10   too many trips -- remember, he testified he read the

11   community guidelines and the deactivation policy

12   numerous times and he depended on those policies.

13   Those policies expressly state that declining trips

14   doesn't automatically lead to deactivation.  By the

15   way, if he didn't want to accept trips, all he had to

16   was log off the app.  It was as simple as that.

17           Claimant actually understood all this.

18   His testimony shows that he controlled whether to

19   accept or decline rides.  He didn't want short trips,

20   so he declined them.  He wanted long trips.

21           Claimant also had the freedom to

22   engage in other business or employment activities,

23   like on-line bike rentals, Dainius Trucking, TC

24   Transportation, Carolina Logistics.  Uber was not

25   claimant's sole source of income.

                                    Page 685

1              As we told you it would, the evidence

2   shows that Uber requires its customers, both riders

3   and drivers, to adhere to their community guidelines.

4   They are absolutely within their right to do this.

5   And as claimant recognized, they have very good

6   reasons for doing this.  Just as riders can be

7   deactivated for certain conduct, claimant could be

8   deactivated for things like quality, fraud, safety,

9   discrimination.  We talked about this at length

10  yesterday.

11             Claimant understood the deactivation

12  policy and he claimed he read it, again, numerous

13  times, and he clearly didn't have a fear of violating

14  it.  Well, at least we know he didn't have a fear of

15  violating it at least 37 times that we know of.

16             As the case law makes clear, Uber's

17  quality and safety standards don't demonstrate

18  control over the economic realities analysis.  In

19  fact, you'll see here courts routinely hold that

20  quality control and safety standards don't

21  demonstrate the level and control over the manner and

22  method of work necessary to support employee status.

23             Other courts instruct that quality

24  control procedures aren't indicative of control when

25  they stem from the need to provide reliable service

Page 686

```
 1    to their customers, just like Uber needs to provide
 2    reliable service to its customers.  And again,
 3    claimant understood this.  He understood that the
 4    reliability of the Uber app impacted his ability to
 5    earn income when he was using the app.  He understood
 6    this.
 7                 In addition to the freedom he had to
 8    control his use of the Uber app, he had tremendous
 9    flexibility in his work.  Claimant was free to stop
10    working for two months, and he didn't need Uber's
11    permission to do that.  He testified about leaving
12    the country for two months, and that was perfectly
13    fine.  It was also up to him as to whether he would
14    maintain his commercial insurance or place his
15    account on hold.
16                 Courts, including the Fifth Circuit,
17    as you can see here, consistently recognize this
18    level of flexibility as demonstrating an independent
19    contractor relationship.  In this case, you see
20    here -- we'll certainly send you the link with our
21    briefing -- the Fifth Circuit affirmed a jury verdict
22    finding that satellite TV installers were independent
23    contractors, noting that the plaintiffs control their
24    own schedules.
25                 In this case here, the court
```

Page 687

1  determined that a taxi driver was an independent

2  contractor and found it very persuasive that

3  defendants had little control over when the plaintiff

4  drove, how much he drove, and how frequently he

5  drove.

6           Claimant's control extended to his

7  opportunity to pursue pricing, potential promotions,

8  and incentives.  Now, in his particular case,

9  claimant made the business decision not to pursue

10 surge opportunities.  That was his decision to make.

11 If Uber was in control, it obviously would have

12 chosen for claimant to drive in high-demand areas

13 during peak times.

14          Claimant's control included other

15 meaningful choices about his transportation services

16 business.  He chose, among other things, what

17 services to provide, which vehicle to purchase.  He

18 chose to obtain a limo license and commercial

19 insurance, which phone to buy, and what service plan

20 to use.  He chose what to wear, what city to drive

21 in.  First he was in New York, then he drove in

22 Houston.  That was his choice.  He chose when to

23 drive.  He chose when to log off.  And he made other

24 crucial decisions that we'll get to when we cover his

25 opportunity for profit and loss.

Page 688

1            During opening statement and closing,

2    we heard that claimant only had control when he chose

3    to log on and chose to log off the app, but the

4    credible evidence shows otherwise.  Once logged into

5    the app, Mr. Barysas continued to control his

6    transportation services business.  He chose whether

7    to accept a ride that might be through the Uber app,

8    the Lyft app, or outside the app.  He chose whether

9    to cancel a ride.  He chose -- if you look in Joint

10   Exhibit 5, you can sort by Column H and see all the

11   times that he chose to cancel a ride.

12            Claimant wasn't required to use the

13   route guidance in the Uber driver app.  He had

14   control over which guidance app to use and whether to

15   use one at all, even though claimant testified he

16   didn't use Waze and stuck to the Uber mapping app.

17   We saw an e-mail from claimant to Uber informing Uber

18   he used Waze and, of course, he wasn't penalized for

19   that.

20            Claimant was able to rate each of his

21   riders on a scale of one to five.  He chose to give a

22   one star about 20 to 30 times when he thought the

23   rider was being obnoxious or engaged in conduct that

24   was not consistent with the community guidelines.

25   One thing that was consistent, though, was that it

Page 689

1  was always his choice and his discretion to rate the

2  riders.

3              A D.C. court actually looked at this

4  issue of star ratings and found that the star rating

5  system doesn't evidence control needed to establish

6  an employment relationship.

7              Now, once logged into the app,

8  claimant also chose whether to provide amenities,

9  whether to use the destination feature, to assist

10  with luggage, whether and when to take lunch breaks.

11  He chose whether to wait for a rider, and he chose

12  how long to wait for a rider.  You heard him.  He

13  testified he often waited four to five hours for a

14  ride and sometimes even up to eight hours.  That

15  seems like a really bad business decision to make,

16  but it was his decision to make.  If there were

17  hundreds of cars in line at the airport as claimant

18  testified, it certainly wouldn't benefit Uber for

19  claimant to play video games and surf the net for

20  eight hours at a time when riders were seeking

21  transportation elsewhere outside the airport.

22              With respect to the relative

23  investments of the Uber and claimant, claimant's

24  testimony confirms that he made all of the

25  investments in his livery business.  Uber's

Page 690

1     investment in its proprietary and genius app isn't an

2     investment in claimant's business.  It's an

3     investment in the app that Uber allows claimant to

4     use in exchange for a fee.  Uber didn't invest in

5     claimant's transportation services business any more

6     than TMobile did when it allowed him to use their

7     cell service in exchange for a fee.  And again,

8     claimant didn't have to use a lead-generation app,

9     but he and he alone made the decision to do that.

10                Next is the degree of opportunity for

11     profit and loss.  Claimant made the decisions that

12     determined whether he made a profit or a loss.  Uber

13     had no control over claimant's earnings because

14     claimant decided whether, when, where, and how often

15     he worked.  He decided to use the Uber app more than

16     the Lyft app because that was his strategy and, to

17     use his words, for maximizing profits.

18                Uber had no control over claimant's

19     expenses because claimant decided which car to

20     purchase, which phone to use, what amenities to

21     provide, which platform to use.  And even though it

22     required a 638-dollar limo license and commercial

23     insurance, Mr. Barysas made the decision to invest in

24     those things because he and he alone determined it

25     would improve his opportunity for profit.  His

Veritext Legal Solutions
346-293-7000

1    opportunity, not Uber's.

2                    When claimant sold his Infinity, he

3    retained the 15 to $16,000, not Uber.  When he

4    received a payout for the transmission for his car,

5    he got the payout, not Uber, because it wasn't Uber's

6    vehicle.  It wasn't Uber's investment.  And let's not

7    forget that claimant, not Uber, benefited from the

8    extensive IRS expense deductions that he took.

9                    Claimant's testimony also demonstrates

10   that he used skill and initiative to maximize

11   profitability.  Mr. Barysas and Mr. Barysas alone

12   decided whether, when, where, how frequently, and how

13   long to work.  Claimant, not Uber, had the initiative

14   to obtain a limo license.  He had the initiative to

15   obtain a commercial license.  He had the initiative

16   to design his own business cards and the initiative

17   to find so many ride opportunities outside the Uber

18   app that he incurred $1100 in credit card fees in

19   just one year for livery services, according to his

20   federal tax returns.

21                    Last factor -- Judge, we're almost

22   there.  Considerations that bear on the permanency

23   factor include whether or not claimant could work as

24   little or as much as he desired.

25                    Another one of the considerations is

Page 692

1   the length of the relationship.  Here, Uber and
2   claimant had a trip-by-trip relationship.  After each
3   trip, claimant made the decision whether to continue
4   the business relationship each and every time he
5   logged back onto the app.
6                Other considerations that you'll see
7   on this slide are whether claimant had freedom to use
8   other apps or pursue other business opportunities.
9   And, of course, claimant had the freedom to terminate
10  the relationship whenever he wanted, and he did do
11  that.
12               As claimant didn't meet his burden of
13  proof to establish an employment relationship,
14  damages are simply not an issue in this arbitration.
15  But if they were, claimant failed to meet his burden
16  to prove damages.  It's actually an element of his
17  claim.
18               First, claimant's calculations are
19  significantly inflated because the calculations
20  improperly include P1 time.  And Dr. Parrott, you
21  heard, he just refuses to provide any alternative
22  calculations that exclude P1 time, which further
23  results in claimant's failure to prove damages in
24  this arbitration.  They simply haven't presented you
25  with the proper calculation.

Page 693

1           I want to go over this issue regarding

2     P1 time very briefly.  The issue is whether claimant

3     was waiting to be engaged, which is not compensable,

4     or engaged to be waiting, which is compensable.

5           Claimant here was waiting to be

6     engaged because he was free to use that time however

7     he wished.  We talked about that, right?  But most

8     importantly, he could decide to stop waiting at any

9     time he wanted by simply turning off the app.

10          On the other hand, like Mr. Stanley

11    noted, someone who is engaged to wait doesn't have

12    the opportunity or the option to be unavailable

13    during on-call time.  For example, a stenographer

14    can't leave and not finish the job, and a factory

15    worker can't leave the building and not finish his

16    work once the equipment is repaired.  There's a big

17    difference.

18          P1 time isn't compensable, and it's a

19    clear matter of law because claimant used that time

20    to do other things that were wholly unrelated to his

21    use of the Uber app.  And this makes sense, right,

22    because otherwise claimant would be getting paid for

23    time he spent playing games on his phone, surfing the

24    net, taking walks, providing trips through the Lyft

25    app, and providing trips outside the Uber and Lyft

Page 694

1   apps, among who knows what else.

2              Just like claimant was an independent

3   contractor with TC Transport and Carolina Logistics,

4   he was an independent contractor with Uber.  Claimant

5   entered into several agreements with Uber over the

6   years, and in each agreement he acknowledged and

7   agreed that he was an independent contractor and he

8   held himself out an independent contractor.  Year

9   after year, he filed Schedule Cs with the IRS

10  identifying DB Pedicabs as a sole proprietor and

11  claiming deductions for business expenses.

12             When it benefited him, claimant agreed

13  he was an independent contractor.  You may recall the

14  communication to Uber in which he stated he was an

15  independent contractor.  And you heard why he said

16  that, because he found it on the internet from

17  another user of the Uber driver app who apparently

18  understands that the relationship with Uber is one of

19  an independently contracting nature.

20             What this e-mail really goes to is

21  claimant's credibility.  Claimant testified that even

22  though he typed this communication, he believes he's

23  an employee.  In other words, Judge, he's willing to

24  say something that isn't true if it will benefit him

25  to do so.

1             That wasn't the only testimony that
2    called claimant's credibility into question, though.
3    At his deposition, he testified that his company, DB
4    Pedicabs, had a home office, but yesterday he
5    testified he didn't.  He couldn't remember whether he
6    ever received a warning for having a low star rating
7    yesterday, but he testified at his deposition that he
8    didn't.
9             Yesterday he didn't know whether he
10   was ever deactivated for not accepting trips, but
11   testified at his deposition that he didn't.
12   Yesterday he couldn't remember whether he was
13   required to take quality improvement courses, but
14   testified at his deposition that he didn't.
15            We already covered his inconsistent
16   testimony regarding his simultaneous use of the Uber
17   and Lyft apps.  He testified he earned income from TC
18   Transport and Carolina Logistics, but he failed to
19   identify these companies in sworn interrogatory
20   responses not once, not twice, but three times.
21            Claimant even admitted he lied.
22   "There are a few times that I lied because I didn't
23   want to get a cancellation."  So according to
24   claimant, he's willing to lie if it benefits him.
25   But even his confession wasn't truthful because we

                                          Page 696

1    know he falsely represented to riders information a
2    lot more than six or seven times that he was trying
3    to call but it was going to voicemail, he tried to
4    cancel the ride but the system wouldn't let him, he
5    was currently pulled over by the police and the rider
6    should cancel and wouldn't be charged.
7                    Now, you may recall Mr. MacLeod's
8    statement yesterday that this arbitration is a
9    credibility fight, but what you may not recall is
10   what he said during opening statement, and I'll quote
11   him.  "You just met Mr. Barysas for the first time
12   and, as a former judge and now someone who judges all
13   the time from a different perspective, you know that
14   there are some of those cases where they can be won
15   or lost based on the credibility of the claimant."
16   Mr. MacLeod went on to say, "I think our greatest
17   strength in this case without a doubt -- and I say
18   this as a, quote/unquote, officer of the court -- is
19   Mr. Barysas."
20                   Cases can be won or lost on the
21   credibility of the claimant.  We agree.  Claimant had
22   the flexibility, the freedom, the opportunity, and
23   the choice to run DB Pedicabs in order to maximize
24   his opportunity for profit and loss.  He was in
25   business for himself, and the evidence makes that

                                        Page 697

1    clear.

2                   Judge, we look forward to submitting

3    our post-hearing brief, which will include a request

4    for costs.  Thank you for your time, Judge.

5                   JUDGE SOUSSAN:  Thank you.

6    Mr. Stanley -- and I would like copies of the

7    PowerPoints from both of you.

8                   MS. MIERS:  Understood.

9                   JUDGE SOUSSAN:  Mr. Stanley?

10                  FURTHER CLOSING STATEMENT

11                  MR. STANLEY:  I'm low on time here.

12   Cases are also won and lost on evidence presented

13   that you have in your file.

14                  Uber talks a lot about IRS documents.

15   There's no evidence they have given you about the tax

16   implications.  There's no expert that they have

17   brought to discuss how the IRS documents impact the

18   earnings and the tax implications.

19                  Uber discussed just a moment ago that

20   he filed as an independent contractor, but he had no

21   option other than to file as an independent

22   contractor because Uber makes him do that.  They give

23   him a 1099.  They classify him as an independent

24   contractor.  He may only file as an independent

25   contractor.

Page 698

```
 1                    There was discussion of the fees from
 2       the credit card, but there was no discussion of what
 3       those fees were.  Uber speculates when they talk
 4       about it being swipes from a Cube or -- or whatever
 5       it is.  That's speculation on Uber's part, so I would
 6       like you to remember that, that testimony.
 7                    All discussion of Lyft should be
 8       disregarded by you.  Uber brought no one in to look
 9       at the Lyft data, to show you the Lyft data.  Uber
10       shows you a demonstrative, but they don't discuss
11       what that means, and they didn't bring an expert to
12       show you what data they had on Lyft, when he was
13       driving/when he wasn't driving for Lyft.  All that
14       should be disregarded by you.
15                    Uber looked only in their closing at
16       2017 but didn't discuss what other money was earned
17       and where that came from.  They gave you a gross
18       number and then gave you a smaller number from Uber
19       there, but they didn't discuss where that other came
20       from, right?  We know that he relied on Uber during
21       the entire statutory period.  We know that he must
22       stay driving for Uber in the statutory period or,
23       quote, it would be a death sentence to him.  That's
24       in the document.  He relied on them economically the
25       entire way.
```

Page 699

```
 1                    There's no evidence that Uber has
 2     brought to you on the amount of money that was made
 3     from TC Transport, which was a small period inside
 4     the statutory period.  They have not shown that there
 5     was economic reliance that would shift the
 6     preponderance of the evidence here that Dainius
 7     relied on Uber during the time and that the economic
 8     realities shift in his favor.
 9                    Carolina Logistics keeps getting
10     brought up, but that was outside the statutory
11     period.  We would ask you to disregard that.  It's
12     not included in the time that he drove for Uber at
13     all.
14                    Uber has not shown you based on the
15     evidence that Dainius didn't stop driving for two
16     months during any period consecutively.  They keep
17     saying that, but there's no evidence based on the pay
18     records that they have shown you of that.
19                    And then finally, as I said earlier,
20     Uber keeps telling that you Dainius could shut off
21     the app whenever he wanted, but he relied on them to
22     such an extent for his livelihood that that was not
23     practical.  He could not shut off the app when he
24     wanted.  He had to continue to drive in order to
25     provide for his family.
```

Page 700

```
1              We would ask you to look at the
2    evidence that's been presented to you and rule in
3    favor of the claimant.  Based on a preponderance of
4    the evidence, the economic realities test weighs in
5    the claimant's favor.  Thank you, Judge.
6              JUDGE SOUSSAN:  Thank you.  I thank
7    everyone.  I especially thank our court reporter.
8    You did an excellent job.  I think the last
9    arbitration I had, the court reporter kept on
10   interrupting saying she couldn't understand, she
11   couldn't understand.  So you did a fabulous job, and
12   I thank you so very, very much.  I know all the
13   attorneys thank you, as well.
14              To the clients, you are
15   well-represented.  You may have seen some spine back
16   and forth.  I certainly saw it.  I'm not generally
17   used to that, but we made it, we got through it.  And
18   I guarantee you, as I did when we started this back
19   in April, that the way I make up my mind is based on
20   the evidence presented by way of testimony, by way of
21   documents, and I make that promise and pledge to you
22   that I will do just that and I will make the decision
23   based on what I feel is appropriate based on the law
24   and based on the evidence.
25              So I thank you very much, and I look
```

Page 701

1    forward to your final briefs.  Anything from anyone?

2             MR. STANLEY:  Nothing from the

3    claimant, Judge.

4             MS. MIERS:  No, Judge.  Thank you.

5        (Whereupon at 4:32 p.m. the

6        arbitration was adjourned.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 702

```
1

2    DAINIUS BARYSAS,              )

     Claimant                     )

3                                 )

     vs.                          )  CASE NO. HON. SUSAN SOUSSAN

4                                 )  ARBITRATOR

     UBER TECHNOLOGIES, INC.,     )

5    Respondent                   )

6

7                   REPORTER'S CERTIFICATE

8                   ARBITRATION DAY 3

9                       May 3, 2022

10

11       I, Shauna Foreman, Certified Shorthand Reporter

12   in and for the State of Texas, hereby certify to the

13   following:

14       That the foregoing transcript of ARBITRATION DAY

15   2 is a true record of the proceedings;

16       That the original transcript was delivered

17   to Kimberly R. Miers.

18       That a copy of this certificate was served on

19   all parties and/or the witness shown herein on

20   _____.

21       I further certify that pursuant to FRCP Rule

22   30(f)(1), the signature of the deponent:

23       _____was requested by the deponent or a party

24   before the completion of the deposition and that the

25   signature is to be before any notary public and returned
```

Page 703

1   within 30 days (or _____ days, per agreement of counsel)
2   from date of receipt of the transcript.  If returned, the
3   attached Changes and Signature page contains any changes
4   and the reasons therefor;
5       __x___was not requested by the deponent or a
6   party before the completion of the deposition;
7       I further certify that I am neither counsel for,
8   related to, nor employed by any parties or attorneys
9   in the action in which this testimony is taken, and
10  further that I am not financially or otherwise interested
11  in the outcome of this action.
12      Certified to by me on this the 13th day
13  of May, 2022.

14

15

16                          Shauna Foreman, CSR
                            Texas CSR 3786
17                          Expiration:  10/31/2023
                            Veritext Legal Solutions
18                          300 Throckmorton Street
                            Suite 1600
19                          Fort Worth, Texas  76102
                            Tel. (817)336-3042
20                          Firm No. 571

21

22

23

24

25

                                        Page 704

**[1 - 30]**

**1**

**1**  500:11 527:3
535:5 562:25
584:14 613:12
663:16,21 665:18
670:16,17 674:9
674:22,23 675:5
675:16 703:22
**1,162.85**  617:20
**1.12**  560:21
**1.6.**  558:12
**10**  515:10 516:9
549:7,8 581:19
595:23 596:11
618:11 630:17
656:17 672:1,4
**10,000**  498:15
**10/31/2023**  704:17
**100**  526:1
**103**  627:16 628:25
**1099**  698:23
**10:00**  494:13
**10:33**  523:14
**10:36**  523:14
**10:54**  537:9
**11**  551:17 557:17
557:19
**1100**  671:25
681:17 683:20
692:18
**1162.85**  617:2
**11:05**  537:9
**12**  585:2 616:11
653:3
**12:15**  596:8
**12:18**  596:12
**12:30**  596:12
**12:33**  599:17
**13**  550:20
**13,000**  682:25

**13,235**  498:18
**1301**  495:12
**13th**  704:12
**14**  672:7
**14131**  704:15
**15**  504:19 559:3
595:23 623:15
669:18,19,21
692:3
**15,000**  655:12
**153**  684:19
**1560**  495:7
**16**  549:11
**16,000**  692:3
**1600**  704:18
**175**  539:12
**17th**  648:24
**18**  602:9
**18,000**  623:15
**18th**  678:11
**1900**  495:12
**196**  563:4
**197**  558:11 560:21
**198**  558:21
**1985**  600:25
**199**  562:21 564:15
**19th**  678:11
**1:30**  598:1,7
599:17
**1st**  550:12

**2**

**2**  497:20,24 584:16
584:19 612:5
613:12 629:9,11
629:25 630:2
663:16,21 665:18
674:9 703:15
**2,346**  671:23
**2.2**  558:20,21
**2.3**  527:9

**2.3x**  527:9
**2.3x.**  527:9
**2.4**  564:14,23
565:21 566:7
**2.4.**  562:20
**2.6**  566:13
**2.6.2**  566:14
**2.8**  567:6 568:17
**20**  595:23 669:11
678:5 689:22
**2014**  622:5 660:11
671:22,23
**2015**  551:17
557:17,19
**2016**  622:5
**2017**  497:22,25
498:6,12,16
513:21,21 525:17
533:20 535:1
546:17,19,24
554:14 617:1
618:22 681:25
682:17,25 683:3,6
683:8,18,21
699:16
**2018**  546:20
554:14 585:20
606:10 607:10
660:2 682:6,9
**2019**  535:2 536:23
546:22,25 554:14
557:20 603:5
660:11 671:22
681:25
**202**  567:6
**2020**  603:9 607:9
**2021**  550:12 551:8
577:17 578:9
580:15,24 581:25
582:6,15,20 583:6
583:11,21 584:1

**584:23 585:4
586:3 648:24
660:1,4
**2022**  494:9,13
589:16,20 703:9
704:13
**203**  573:15
**204**  576:24
**21**  645:21
**22**  601:3
**22.74**  646:11
**23rd**  581:25 583:6
**24**  582:15
**24,556.14**  627:18
**24/7**  528:19,22
**247**  681:24 682:4
**24th**  583:21
584:22
**25th**  577:17 617:1
**26**  683:2
**27**  585:20
**27,207.66.**  611:3
674:18
**28**  645:22
**29**  674:23
**2925**  495:6
**2:57**  658:25

**3**

**3**  494:8,9,11
539:12 553:4
582:4 584:15,17
584:19 606:4
612:14 632:17
636:10 665:18
670:17 674:9
703:8,9
**3.1**  569:1
**30**  580:5 582:14
658:19,20,22
689:22 703:22
704:1

Page 1

**[300 - acknowledged]**

**300**  704:18
**3200**  498:13
**336-3042**  704:19
**35**  583:6
**35,000**  683:7
**36**  583:20 646:10
  646:11
**37**  580:13 686:15
**3786**  704:16
**38**  584:14
**39**  577:15 578:13
**3:00**  532:4
**3:30**  658:23
**3:34**  658:25
**3rd**  494:12

**4**

**4**  499:15 573:14
  611:5,6,7,12
  612:16 619:21
**4.1**  574:2,10
**4.2**  574:8 575:18
**4.3**  575:21
**4.4**  576:23
**40**  620:14,17
  621:13 626:14,19
  626:20,21,23
  627:6 669:12
**40,000**  655:11
**41,384**  610:19
**43,998.8**  627:9
**44**  681:19
**45.3**  616:12
**450**  612:12
**46**  648:23 649:3,8
**497**  496:4
**4:00**  613:5
**4:32**  494:13 702:5

**5**

**5**  505:23,25 585:3
  586:16 595:22

**611**:7,12 612:16
  614:5 619:21
  689:10
**50**  512:24
**50,892**  682:24
**500**  534:6,11
**517**  616:13
**537**  496:4
**571**  704:20
**596**  496:5
**599**  496:7

**6**

**6**  580:5 621:2
  639:14,24 657:9
**600**  612:13
**62**  553:20
**629**  496:7
**638**  691:22
**65**  555:21
**650**  496:8
**656**  496:8
**659**  496:11
**67,356**  610:24
**67.92**  646:13
**678**  496:13
**698**  496:15

**7**

**7**  594:13 641:14
**7.48**  645:7
**7.49**  645:7
**7.65**  627:24
**75**  623:7
**76102**  704:19
**77010**  495:13
**77098**  495:7
**785.15**  674:23

**8**

**8**  539:13 550:21
**80,000**  630:24

**817**  704:19
**839**  581:24
**85,000**  623:7

**9**

**9**  499:17
**9,000**  623:8,17
  624:5

**a**

**a.m.**  494:13
  523:14,14 537:9,9
  613:5
**abilities**  530:18
**ability**  504:9
  518:18 524:22
  528:24 538:16
  553:23 579:21
  609:21 669:21
  673:3,13,16 674:3
  687:4
**able**  506:17
  507:16 510:12
  523:2 525:9 534:1
  556:8 569:15
  609:9 614:12
  622:13 668:18
  673:5 689:20
**absolutely**  530:19
  564:9 587:6 686:4
**academic**  604:10
**accelerate**  531:12
**accept**  504:9,16
  506:25 509:2
  527:12 559:4
  563:19,20,22
  665:1 669:19,21
  671:17 685:8,15
  685:19 689:7
**acceptable**  566:17
  633:24

**acceptance**  506:22
  507:4 560:10
  666:18
**accepted**  505:7
  520:25 545:15,16
  559:22
**accepting**  505:1
  506:20 509:1
  596:20 636:18
  637:3,8,12 638:5
  663:23 666:20,22
  696:10
**accepts**  509:6
  512:4 513:10
  558:23
**access**  512:9
  534:21 535:3
  553:21 554:19
  555:6 565:6
  566:15 567:1
  592:9 679:7,9,11
**accessed**  596:19
  596:22
**accessible**  594:19
**accessing**  564:18
  564:24 565:24
  566:2,5 572:10
**account**  498:22
  503:15,20,23
  535:9 553:22
  554:2,20 555:7,24
  572:25 573:7
  585:6,11,15,21
  589:10 647:11,19
  648:23 656:12,18
  687:15
**accrued**  498:11
**accurate**  630:11
**acknowledged**
  695:6

[acquired - amounts]

**acquired** 550:2
**act** 511:18 528:13
  630:9,14
**action** 704:9,11
**actively** 508:2
**activities** 572:16
  685:22
**activity** 605:15
  606:25 619:12
**acts** 531:3
**actual** 523:24,25
  559:14 561:3
  620:3 628:10,14
  628:19,21 629:4
  636:14 639:21
  642:19 643:12
  646:20 654:10
  674:20 676:18
**actuals** 516:22
**acwilliams** 495:13
**add** 628:3
**addendum** 572:13
**adding** 626:24
  627:1 628:5
**addition** 560:14
  568:11 679:7
  684:2 687:7
**additional** 504:4
  516:24 660:7
**additionally**
  668:24
**address** 501:18,19
**adhere** 686:3
**adjourned** 702:6
**adjust** 532:24
  575:22 656:1,12
**adjusted** 516:24
  517:3,8,10 518:1
  656:18 657:12
**adjustment**
  575:21

**adjusts** 516:22
**admission** 609:19
**admit** 649:2,7
  679:2
**admitted** 600:3
  609:25 649:10,21
  679:6 683:19
  696:21
**admonishes**
  604:18
**advantage** 531:24
  684:7,7
**advertisements**
  680:23
**advertises** 669:24
**advertising** 670:1
**advocating** 648:19
**affairs** 602:14
  603:21 604:4,23
  606:10
**affiliates** 568:12
**affirmed** 687:21
**aflci** 601:20
**afternoon** 599:24
  629:21
**agency** 555:11
**agent** 511:19,23
  528:14 538:21,23
  538:24 540:9
  553:15 554:4,6,10
  555:15,16 568:20
  572:17,19,21
**aggregate** 607:3
**aggregated** 627:13
**ago** 530:9 589:16
  594:16 619:20
  639:19 641:17
  651:11 698:19
**agree** 517:7
  537:24 572:3
  576:1 577:6

591:15,18 631:3
  632:11 640:18,23
  641:1,7 646:18,23
  659:13 697:21
**agreed** 685:8
  695:7,12
**agreement** 551:18
  557:16 558:1,2,8
  559:11 560:8
  561:9 562:23
  563:10,12,14,16
  563:17,20,24
  564:20 566:23
  570:4 572:12
  596:16,21 617:25
  671:2 695:6 704:1
**agreements** 501:5
  501:5 561:17
  685:4 695:5
**agrees** 576:24
**ahead** 587:12
  593:6 594:2
  633:25,25 646:10
**airport** 507:13
  511:7 521:3 529:7
  538:2,17,25 539:5
  539:16 547:9,19
  547:25 556:8
  564:25 566:3,6,9
  585:23,24 589:13
  592:8 664:12,14
  664:19,20,21
  665:2 672:23
  673:4,8,14 674:3
  675:5,6 676:10
  690:17,21
**airports** 547:17
**al** 510:10
**alarms** 676:13
**alert** 554:23

**algorithm** 504:12
  665:15 669:7
**alleged** 564:20
  633:21 634:7,10
  639:11 661:19
**allegedly** 684:16
**allison** 495:11
**allocated** 613:7
**allow** 538:1 539:3
  539:14 589:25
  635:20 666:2
  677:12
**allowance** 621:6
  639:16
**allowed** 519:5
  590:2,14 691:6
**allowing** 564:25
  595:21
**allows** 522:17
  691:3
**alternative** 693:21
**alto** 507:24
**amenities** 518:21
  519:3 626:2 690:8
  691:20
**amenity** 518:22
**america** 550:11
**american** 601:8
**amherst** 600:25
**amount** 506:6
  512:15,19 521:17
  526:8,9,9 527:25
  529:6 533:24
  552:17,24 608:18
  611:1 620:24
  662:22 663:2,2,11
  670:11,15 683:24
  684:9 700:2
**amounts** 526:7,10
  526:10 527:10,21
  527:23 574:17,25

[amounts - appreciate]

627:25 661:25

**analogy** 540:11

**analysis** 602:10
604:24 605:6,12
605:14,16 606:7
606:13,17,19
608:21 609:12
610:4,12,14
611:13 612:12
613:10,24 614:12
614:19 616:15,17
616:23 617:21
618:8,10 623:5,6
623:19,22 624:4
628:4,12,15,18,23
629:6 630:13,20
633:11 645:12
650:20 651:3,7,10
651:15 652:22
653:23,24 654:2,6
654:22 686:18

**analyze** 603:1,14
607:1 609:21
610:7 612:1
614:11 615:1
630:8

**analyzed** 607:4
610:18 612:19
615:12 625:6

**analyzing** 616:1
644:2

**anecdote** 664:11
664:23 666:11

**anecdotes** 677:24

**angela** 495:17
498:1

**anomalies** 616:3

**anomalous** 615:15

**answer** 501:12
517:15 530:22
537:20 539:25

541:14,15,16,17
541:25 543:14,15
545:17 546:21
547:5 548:21
551:12 556:22
557:13 560:3
561:21 562:8,13
562:14 564:8
565:16 578:18,19
579:13,18,20
581:6 585:19
586:15 588:23,25
589:2,6,7 590:13
590:16,22 591:18
591:20 592:2,5,11
592:16,19,19
593:2 594:2,7
604:17 605:22,24
617:19 635:19
636:6 638:23
639:1 643:16,20

**answered** 504:18
543:6 544:3 564:4
565:3 579:4 590:6
593:5,19 634:2
637:5 643:14,17

**answering** 562:10
564:10 635:18

**answers** 515:20

**anticipate** 598:9

**anymore** 672:16

**anyway** 638:17
639:11

**apologize** 650:11
650:16

**app** 498:25 499:8
499:15,22,23
501:25 502:3,9
504:6 506:3 507:7
507:19,20,24
508:3,8,10,20,21

508:23,24 509:18
510:16,21,23,25
511:9,14 512:2,10
515:24 516:3,7,18
517:5 518:15,17
523:18 525:10,13
525:16,25 526:25
528:8 532:15
534:21 535:3
536:23,24 537:1
538:2,17 539:5,15
543:23 544:12,17
544:25 545:3,8
546:8,12 548:8
554:7 558:15
559:1 561:1
564:19,25 565:6
566:3,9,15 567:1
567:10 568:14
569:14 572:10
577:20 578:2
580:20 585:7,16
585:24 586:22
596:20,22 606:7
614:23 632:25
634:12,14,21
635:4 636:2
660:16 663:21
664:15 665:17
666:21,21 667:4,6
667:6 668:3,7,7,18
668:19,20,21
669:14,17 670:4
670:12 675:4
679:8,8,23 681:2
681:10,12,14,16
681:21,22,24
682:3,6,7,8,9,11
682:12,17,19,22
683:2,6,9,10 684:4
684:6,10,12,14,14

684:15,17,19,21
684:25 685:16
687:4,5,8 689:3,5
689:7,8,8,13,14,16
690:7 691:1,3,8,15
691:16 692:18
693:5 694:9,21,25
695:17 700:21,23

**apparently** 695:17

**appealable** 538:5
556:7

**appear** 616:3

**appearances**
495:1

**appears** 584:20

**appendix** 618:11
618:13 619:7,23
619:25 620:1
626:8 643:25
650:4,5,6,18 651:6
651:7 652:17

**applicable** 582:12
583:1,16 618:18

**application** 499:1
521:7 537:18
543:10 545:12,20
545:24 546:17
557:23 558:16
589:22

**applications**
500:12

**applied** 620:8
647:3 654:3

**applies** 618:4
669:9

**apply** 641:19
677:9

**applying** 649:14

**appreciate** 537:20
538:19 540:4
615:8 645:22

Page 4

[appreciate - averages]

650:13 675:20
**approach** 612:1
**approaching**
   554:24
**appropriate** 501:2
   569:3,9 596:11
   614:13 619:3
   620:9 701:23
**appropriately**
   662:14 677:13
**approval** 500:8,10
   521:23 522:6
**approximated**
   676:20
**approximation**
   670:21 676:23
   677:6
**apps** 507:22 508:1
   607:6 625:16
   634:18 680:23,25
   683:13,17,25
   684:23 685:1
   693:8 695:1
   696:17
**april** 701:19
**arbitration** 494:8
   494:11 536:4,8,12
   536:18 539:4,15
   542:24 545:9
   548:13 552:21
   559:21 582:9
   583:14 584:5
   587:24 591:9
   612:4 615:21
   618:3,6 649:24
   653:11 659:5
   675:13 693:14,24
   697:8 701:9 702:6
   703:8,14
**arbitrations** 550:5

**arbitrator** 494:4
   495:20 548:25
   589:24 592:25
   631:24 633:19,23
   634:5 703:4
**area** 528:2 604:1
   610:22 618:16,16
   618:19,20,22
   619:2 620:15,19
   642:12 665:4
**areas** 527:3,3,19
   528:5 532:1
   560:24 625:11
   641:2,3,8,9 650:24
   688:12
**arguing** 557:8
**argument** 588:5
   598:13,16,21
   599:12 677:1
**argumentative**
   643:6
**arguments** 658:13
**arithmetic** 647:2
   649:18
**arrange** 510:12,15
   511:4 665:5
**arranged** 510:24
   511:14 552:4,25
   573:21,25 574:5
   672:15
**arranging** 510:21
**arrived** 634:15
   663:25
**article** 603:18
   623:4,10,17,18
   624:5
**articles** 604:12
   606:17 609:14
   611:22 622:3
   640:11

**aside** 516:15
   544:14
**asked** 504:17
   506:19 523:16
   537:17 539:11,21
   543:5,8 544:2
   557:8 561:24
   562:7 565:2
   570:12,15 576:9
   579:3 581:16
   585:4 590:6 593:4
   593:18 596:15
   597:3,4 607:5
   633:15 635:15,17
   637:5 643:13
**asking** 523:11
   539:8 542:2
   543:12 545:6,8
   552:6,8,12 556:23
   556:24 563:13
   565:11 576:5
   579:15 581:12,14
   584:9,11 593:24
   632:8,11 650:23
   651:1 665:11
**assess** 610:8
**assessment** 606:8
**assigned** 622:19
**assignment** 501:4
   610:3,6
**assist** 690:9
**assistant** 601:25
   657:6
**associate** 657:8
**associated** 611:14
   611:18 619:2
   620:23 626:5
   654:24 676:22
**association** 601:8
   601:11,11

**assumed** 598:2
**assumes** 635:6
   636:4
**attached** 494:17
   704:3
**attempting** 632:13
**attended** 601:14
**attorney** 631:15
   683:13
**attorneys** 701:13
   704:8
**august** 648:24
   671:22 681:25
**authority** 640:15
**auto** 518:13,14
**automatically**
   685:14
**automobile** 621:23
   622:22
**automobiles**
   624:18 642:7
**availability**
   504:10 614:23
**available** 503:14
   504:23 507:22,23
   507:24 581:9,10
   594:22 597:25
   608:10 610:16
   613:16
**avenue** 495:6
**average** 533:11
   534:5,10 566:16
   566:17,20 567:2,3
   620:10 622:21
   623:21 624:1
   625:6 627:19
   640:19,22 653:15
   654:1,12 655:4,16
   655:17 656:1
**averages** 655:15
   655:22

Page 5

**avoid** 524:13
564:10
**avoidance** 585:12
**award** 515:9,11
**aware** 506:7 519:9
520:2 526:24
529:25 531:2,22
532:7 533:11,19
534:20 535:2
536:7,11,15,17,21
548:18 549:1,4
554:12 555:11,17
560:4 568:1,23
597:6,9,13 632:7

**b**

**b** 569:2 580:5
619:23,25 626:8
650:18 651:6
**back** 503:13 505:9
506:6 511:11
513:8 523:13
551:7 555:21
556:1 558:20
560:20 565:15
584:25 585:3
589:6 590:19
600:2,5 611:6
619:22 621:2
626:8 634:10,16
635:2,16,24 636:7
638:25 650:17
657:22 659:19
660:8 662:13
663:7 667:4 693:5
701:15,18
**background**
601:17
**backseat** 511:9
**bad** 690:15
**balance** 573:9

**bank** 525:4,5,7
572:23,25 573:2,7
**bare** 674:13
**barrier** 671:3
**barysas** 494:2
495:18 498:16
508:1 515:14
518:24 519:16,20
526:2 536:4 549:9
586:22 596:25
608:1 609:2 610:8
611:19 615:6
616:12 626:14,17
629:15 633:3,21
634:7,11,17 635:2
636:1 637:7
638:13 639:3,8,21
642:15,19 643:12
648:20 651:3
652:18,25 653:7
656:13 659:8
660:10 661:7,24
662:24 663:15,24
667:9,17 668:13
672:25 678:3
679:18,23 680:21
681:3 682:10
683:11,16 689:5
691:23 692:11,11
697:11,19 703:2
**base** 516:20 521:5
523:23 526:8
574:16,24 661:22
681:8
**based** 516:19,22
523:22,24 526:11
527:12 534:14
543:24 559:10
567:7 577:10
591:3,8 593:2
594:24 595:1

603:19 605:14
606:7 609:10,12
617:10 622:10,10
629:6 631:17
633:11 641:22
654:11 659:16
662:6,15,24,24
664:23 667:10
670:3 674:9,10
675:24 678:4
682:23 697:15
700:14,17 701:3
701:19,23,23,24
**basic** 654:17,20
**basically** 509:4
619:25 626:15
**basis** 517:18,20
542:13,16 546:15
573:5 577:1
578:23 581:6,16
592:16,18,19
607:16,24 610:18
613:8 620:21,22
626:23 627:6
628:13,19 659:15
**bear** 692:22
**bearing** 645:22
**becoming** 601:17
**beer** 532:4
**began** 618:4
630:21
**beginning** 603:5
618:5
**begins** 498:24
499:7 613:5
**behalf** 512:2
586:15 589:25
597:1 610:10
**belabor** 520:15
**belief** 593:3

**believe** 505:13
540:2 547:2,18,19
551:24 557:12,24
563:1,1,15 564:4
566:12 567:19
573:4,8 578:4
587:8,9 591:12
594:15 595:5,13
597:2 598:2
609:20 611:17,23
619:21 630:18
631:7 633:12
634:20,22 648:17
**believes** 695:22
**belongs** 675:1
**beneficial** 681:12
**benefit** 573:8
690:18 695:24
**benefited** 692:7
695:12
**benefits** 672:9
696:24
**benjamin** 495:10
**berkeley** 602:25
603:7 604:6
**best** 544:10 579:21
630:23
**better** 531:15
588:18
**beyond** 619:6
625:12 682:1
**bias** 632:13 648:3
649:13,19
**big** 594:11 694:16
**bigger** 529:20
573:19
**bike** 680:10
685:23
**billions** 668:6,9
**bills** 536:16
679:25

**[bit - car]**

**bit** 497:19 504:1
518:20 526:2
553:3 596:9
600:21 601:16
622:25 624:3,11
663:17 664:1
**black** 529:16
617:10
**block** 554:2
**blocked** 553:22
555:13
**blocks** 526:13
**blow** 497:19 645:6
**blurs** 593:9
**board** 501:6
**book** 668:18
675:21 676:7
**bottled** 626:2
**bottom** 528:1
554:19 564:16
582:5 584:15
588:23 605:3
627:22 629:11
630:2
**box** 513:8
**brad** 495:17 496:3
497:10,13 667:3
**brake** 531:13
**brand** 528:17
**branding** 568:8
**break** 537:4 596:6
596:9,11 598:7
599:8,10,16
658:17
**breaks** 690:10
**bret** 495:4 597:22
**brief** 598:13,17,20
619:9 698:3
**briefed** 587:2
590:8

**briefing** 587:2
676:17 687:21
**briefly** 694:2
**briefs** 702:1
**bring** 501:6
505:16 659:4
699:11
**brings** 509:13
672:24
**broad** 531:5
**broader** 617:25
**broadly** 605:16
**broke** 664:22
**brought** 674:6
675:15 677:24
698:17 699:8
700:2,10
**budget** 602:5
**build** 668:18 681:7
**builder** 666:5
**building** 513:13
641:23 666:6
694:15
**built** 622:9
**burden** 580:7
678:23 693:12,15
**bush** 585:22
589:12
**business** 507:12
519:16,18 533:7
535:16,19,20,22
535:23,24,25
540:15 541:19,22
542:1 563:5,14
572:20 613:20
621:6,11,16,18
622:1 633:8
639:16,25 668:18
670:2,7 675:8
679:20 680:7,15
680:16,21,24

681:4,5,5,6,7,13
682:12 684:3
685:22 688:9,16
689:6 690:15,25
691:2,5 692:16
693:4,8 695:11
697:25
**businesses** 555:18
**button** 504:8
505:10 506:16
509:20,21 510:1
563:19,22,25
**buy** 688:19

**c**

**c** 495:11 619:7
643:25 650:5,6
651:7 652:17
**c41** 631:1
**c7** 672:24
**calculate** 627:22
639:21 640:16
647:7
**calculated** 534:9
577:1,10 595:3
662:17 674:21
**calculating** 634:9
651:3
**calculation** 520:14
523:3,22 526:6
574:8,10 575:14
575:15 576:20,22
577:2 646:24
678:4 693:25
**calculations**
633:14,20 634:6
634:15 635:24
639:5 647:4 657:4
657:5,7 693:18,19
693:22
**california** 602:25
603:7 604:5

**call** 597:20 638:2
646:7 670:18
694:13 697:3
**called** 507:24
524:23 527:1,5
583:22 601:10
680:8 696:2
**calls** 511:7,15
638:7
**cancel** 512:4 576:3
576:14 685:7
689:9,11 697:4,6
**canceling** 512:7,10
512:15,17,24
514:3
**cancellation**
512:21,23 514:7
514:10,11,12
522:4,7,17 670:10
696:23
**cancels** 513:23
514:6
**candidate** 500:20
500:22
**candidates** 500:17
500:18
**capable** 678:18
**capacities** 601:2
**capital** 667:11,12
668:8
**car** 515:4 519:17
529:10 530:8
612:23 624:16
625:4,17,22
642:25 653:20,25
654:21 656:2,13
656:18 664:14,25
667:19,20,21,24
680:11 691:19
692:4

**[card - claimant]**

card   511:20 525:6
527:7 670:2
681:15,18 683:20
683:22 692:18
699:2
cards   507:12
519:17,18 681:5,5
681:6,7 692:16
care   569:6,20
616:1 644:1
career   602:17
carefully   614:10
616:5 641:23
646:6
carolina   685:24
695:3 696:18
700:9
carry   619:10
carrying   608:13
613:19
cars   625:7 626:6
654:1,10,11,13,14
654:17 690:17
case   494:3 539:3
540:18 541:23
543:25 574:21
589:8 590:15
600:4 607:2 608:4
611:15 615:5,19
615:25 616:23
617:12 623:2,14
625:4 626:13
628:15 631:18
632:8 636:21
649:12 651:12
655:21 656:4
661:13,15 667:10
679:18 686:16
687:19,25 688:8
697:17 703:3

cases   540:19,21
612:8 615:21
622:9,11,23,25
630:14 649:24
651:9,14,14,19
697:14,20 698:12
cause   494:12
cell   625:15 691:7
center   602:14
603:21 604:3,23
606:9
centuries   678:12
certain   506:5
514:8 519:24
528:20,25 530:6
532:7 539:19
558:25 589:2
590:25 636:13
662:7 686:7
certainly   616:20
669:24 687:20
690:18 701:16
certificate   703:7
703:18
certified   494:14
703:11 704:12
certify   703:12,21
704:7
cfr   674:23 675:19
challenged   659:11
challenger   567:25
change   513:20
574:9,17,24
575:10,14 590:1
661:24 662:8,9,21
662:23
changed   512:13
571:25 588:10,13
666:23
changes   533:23
574:8,16 575:6

576:20 620:8
704:3,3
changing   533:22
586:14 587:8
characterized
617:2,4 652:1
charge   521:20,24
525:7 552:3
573:20 574:4
charged   663:2,3
697:6
chargers   518:25
530:6 546:4,6
charges   525:5
check   547:18
615:4 647:3
checkers   676:12
checking   513:7
614:6
checks   614:20
616:6
chicago   603:13
chief   602:2
choice   598:20
660:13,15 680:14
688:22 690:1
697:23
choices   528:25
529:3 688:15
choose   527:13
598:18
choosing   684:2
chose   667:20,20
680:21 681:3,11
681:11,21 684:4
688:16,18,20,22
688:23 689:2,3,6,8
689:9,11,21 690:8
690:11,11
chosen   680:23
688:12

circuit   661:10
671:9 672:1
687:16,21
circuit's   679:21
680:19
circuitous   521:12
circumstances
517:2 625:13
661:16
cite   638:12 639:7
640:11,14
cited   653:21
cities   654:19
city   519:24 520:3
520:3,5 526:13
527:4 546:18
547:11,16,20
554:13 560:24
577:23 582:16,25
601:23 602:1,4,8
602:11,14,16,25
603:2,8,10,16,21
604:3,7,7,23 605:5
606:9,10,23 607:3
607:14 610:22
618:16,19,20,21
618:23,25 620:14
622:7,12,14 623:4
623:17 624:4,14
624:20 626:9,13
636:21 650:21
666:15 670:5
688:20
city's   520:10
604:21 606:6,23
civic   654:18
claim   672:10
674:14 693:17
claimant   494:2
495:3 497:23
498:10,11 507:7

[claimant - compare]

516:5 536:9,13,19
536:22 539:4,14
543:16 549:9
550:24 551:5
552:16 585:7,13
585:16 589:14
590:4,18 592:3
596:19 658:7,9
661:7 677:19
678:22 679:3,7,25
680:3,6,13,16,20
681:9,20,21 682:2
682:21,25 683:5
683:19 684:11
685:6,17,21 686:5
686:7,11 687:3,9
688:9,12 689:2,12
689:15,17,20
690:8,17,19,23
691:3,8,11,14,19
692:2,7,13,23
693:2,3,7,9,12,15
694:2,5,19,22
695:2,4,12,21
696:21,24 697:15
697:21,21 701:3
702:3 703:2
**claimant's** 498:5
549:7,8 553:3
560:1 585:6,11,15
585:21,23 589:10
631:1 677:17
679:12 681:19,23
682:16,18 683:8
684:8,20 685:8,25
688:6,14 690:23
691:2,5,13,18
692:9 693:18,23
695:21 696:2
701:5

**claimed** 686:12
**claiming** 637:2
695:11
**claims** 550:24
679:14
**clarify** 556:23
562:4,8 632:10
**classified** 536:5,20
648:20
**classify** 698:23
**clean** 625:22
**cleaning** 614:6
625:19,24 626:5
670:9
**clear** 548:19,20
561:11,20 591:12
623:2 629:9 661:4
679:4 683:18
686:16 694:19
698:1
**clearly** 608:3
671:9 672:3
686:13
**click** 509:4 563:19
563:19,19 595:6
595:12
**clicked** 563:22
**client** 517:17
542:8,23 543:10
543:24 544:5,12
544:17 546:24,25
548:8,13,22 550:9
557:4 561:18
**client's** 542:13
**clients** 507:14,15
528:12 701:14
**clinton** 530:10
**close** 666:14,16
677:7
**closing** 496:10,11
496:12,13,14,15

598:12,16 658:13
659:2 663:17
678:7 689:1
698:10 699:15
**closings** 598:9
**code** 672:7
**colleague** 603:6,12
603:21
**collect** 522:22
577:9 658:17
**collecting** 522:20
**collection** 511:18
511:23 528:14
538:20,23,24
540:9 553:15
554:4,6,9 555:10
555:15,16 568:20
572:17,19,21
594:12 666:1
**collectively** 623:19
**collects** 523:17
572:22
**color** 527:4 637:23
**column** 644:9,17
644:18,20,22
645:11,17 646:1
646:16 651:7,16
689:10
**columns** 644:17
647:1,3
**come** 505:6 506:23
513:13 558:20
607:13 611:5,14
613:2 622:14
623:10,19 626:11
626:25 627:17
635:20 645:16
655:16 664:10
665:9
**comes** 532:2 554:7
615:2 650:8

669:14
**coming** 542:5
553:14 611:8
614:7 654:7
**comment** 543:12
**commercial**
624:15 687:14
688:18 691:22
692:15
**commercially**
671:6
**commission** 520:5
603:1 606:9,24
**commission's**
520:11
**committing** 673:1
**common** 519:10
519:12,14 584:22
**communicate**
499:22
**communication**
575:1 695:14,22
**communications**
679:10
**community**
505:11,14,20,25
506:9 516:13
666:23 685:11
686:3 689:24
**companies** 540:9
550:1 568:1,7,9
604:22 605:17
625:21 696:19
**company** 507:17
541:5 563:2,5,7,8
568:11 636:12
648:16 672:13
680:8,9 696:3
**compare** 499:25
501:24 540:8
645:24 653:17

Page 9

[compare - copyright]

668:11 669:25
compared  607:9
  613:9 615:13
  622:23 624:10
comparison
  642:19 643:11
compel  586:7
compensable
  631:20 633:13,20
  634:6 674:23
  675:17,23 676:4
  694:3,4,18
compensate
  617:25 621:7
  640:1
compensated
  632:24 633:4
  663:16
compensation
  499:11 500:23
  602:20 603:4,11
  605:4 610:7
  612:10,11
compiles  621:14
complaining  536:5
complete  673:4
completed  574:18
  575:7,13 603:9
  671:23,24 681:24
  682:17
completely  664:16
  684:11
completes  524:17
completion  703:24
  704:6
complex  541:5
component  653:19
  653:19
components
  622:20 661:22

comptroller's
  602:3
computer  501:15
computerized
  494:15
con  510:10
concepts  575:17
  587:19,22
concerning  585:5
concluded  610:19
  611:2
conclusion  638:8
conduct  570:9
  586:20 686:7
  689:23
conducted  628:13
conducting  541:22
conducts  540:14
  541:18
conferences
  601:15 604:10
confession  696:25
confidential  501:4
confidentiality
  501:3
confirm  552:10
  594:21
confirms  690:24
conflating  575:16
  587:18,21
confuse  678:14
connect  619:3
connected  616:24
connection  621:24
  625:8
consecutively
  700:16
consensual  510:8
consequence
  516:1,11 520:20

consequences
  505:1 506:20,21
  512:6 521:15
consider  535:15
  535:18 680:2
consideration
  604:13
considerations
  692:22,25 693:6
considered  516:12
  675:22
consistent  572:16
  689:24,25
consistently
  671:22 687:17
constantly  533:22
constructed
  528:15
contact  510:3,8,10
  511:5 514:23,25
  515:5 668:20
contacting  510:4
contained  679:8
contains  704:3
contemplated
  565:21
contemplates
  566:7
contentions
  677:23
contested  631:19
context  674:24
continue  497:8
  566:15 596:1
  693:3 700:24
continued  496:4
  497:12 680:3
  689:5
continuing  497:4
  602:15

contract  562:23
  603:23 605:11
  666:4
contracting
  695:19
contractor  536:6
  661:12 672:13,20
  687:19 688:2
  695:3,4,7,8,13,15
  698:20,22,24,25
contractors
  687:23
contractual  685:3
contradict  560:7
control  528:24
  532:21 534:17
  659:7,23 661:19
  662:4,6,25 664:5
  668:15,22 669:2,3
  669:4,8,15 672:18
  673:15 680:14,20
  684:10 686:18,20
  686:21,24,24
  687:8,23 688:3,6
  688:11,14 689:2,5
  689:14 690:5
  691:13,18
controlled  660:21
  663:1 664:10
  665:14 666:1,17
  675:2 685:18
controlling  667:5
controls  669:7,13
  669:13,18
coordinate  511:8
  514:21 515:6
copies  698:6
copy  600:10
  703:18
copyright  578:9
  580:24 582:6,20

Page 10

[copyright - dainius]

583:10 584:1
**corner** 509:5
577:16
**corporate** 545:10
550:4 570:23
571:4 576:5 577:6
580:1 588:7 660:6
664:11,24 673:25
**correct** 497:5
522:19 537:18,22
538:2,6,17,22,25
541:23 545:22
547:6,21 549:22
550:5,12,13 551:8
551:10,16,23
552:4,14,15 553:9
553:16,24 554:16
554:20 555:8,9
556:17 557:24
559:4,5,16 560:17
567:10,11 569:6
569:16 572:5,13
572:24 573:21,25
574:11 575:25
576:3 582:2,21
583:11,17 586:1
589:14 590:25
593:2 595:12,24
600:16,19 612:5
626:3 630:16
631:12,16 632:20
633:1,2 638:14,15
639:23 640:10,24
645:1,10 646:1
647:15 657:14
**corrected** 616:9
**correctly** 561:13
566:22 595:13
**corresponding**
527:20

**corridan** 495:17
**corroborated**
659:17
**cost** 529:12,23
622:19 624:17
625:3,12,14 643:1
653:21 654:11
676:19
**costs** 524:3 624:21
624:21 625:5,6,10
625:19,24 642:3,9
643:2 676:20
698:4
**counsel** 520:14
537:16 539:2,13
539:21 540:17
542:21 543:5
544:2 551:19
562:3 565:10
570:12 578:3,4
579:12 580:10
588:6 592:7,18
593:7,10,23 594:9
614:3,4 635:14
653:5 677:1 704:1
704:7
**counsel's** 539:8
548:6
**count** 617:22
628:22 653:2
**counted** 628:24
648:13
**counting** 615:18
**country** 641:2,3
687:12
**couple** 501:7
514:18 526:12
543:22 577:14
596:5 625:11
677:7

**course** 520:8
556:3,12 590:10
667:21,22 674:16
689:18 693:9
**courses** 554:25
555:20 696:13
**court** 565:12
605:22 635:12
687:25 690:3
697:18 701:7,9
**courtesy** 572:5
**courts** 686:19,23
687:16
**cover** 590:20
688:24
**covered** 502:8
590:20 653:10
696:15
**covid** 501:7
**create** 500:8,9
507:12 519:5
624:6
**created** 591:4,7,11
591:14 673:20
681:6
**creating** 519:9
**creation** 498:22
**credentialed**
674:13
**credibility** 695:21
696:2 697:9,15,21
**credible** 684:21
689:4
**credit** 511:20
528:16 681:15,18
683:20,22 692:18
699:2
**critical** 648:15,16
**cross** 542:9 544:8
565:7 609:24
614:6 616:6

629:18 632:2
635:10 649:21
653:6
**crossword** 676:12
**crucial** 688:24
**cs** 695:9
**csr** 704:16,16
**cube** 699:4
**culminating**
619:14
**current** 569:3,9
**currently** 551:4
603:20 697:5
**curriculum** 600:5
600:15
**customer** 528:19
530:1,3 531:9,15
531:16 551:6
552:18,24 560:25
562:24,25 563:4
564:17 565:24
572:11 573:18,19
574:3,15 575:5
576:24 681:7
**customer's** 562:21
564:15 573:23
**customers** 541:9
541:19 686:2
687:1,2
**cut** 525:18,21
**cute** 530:11
**cv** 606:4

| d |
|---|

**d** 495:10 645:17
**d.c.** 690:3
**dainius** 494:2
495:18 537:21
538:10 539:4
543:9 545:2,9,11
545:19,25 546:3,8
546:12 547:8

Page 11

[dainius - demonstrate]

548:22 549:1,9,17
552:2,23 556:7
557:22 559:2,13
559:20 564:24
566:1,9 568:21
569:8 572:4
574:24 575:2,12
577:7 580:19
586:22 587:23
589:17,21 593:17
595:4 659:8
660:10 663:4,7,15
663:18,24 664:3,6
664:12,21 665:3
665:12,12,16,16
665:24 666:2
667:9,13,17
668:13,17 669:1
669:10,15,19,25
670:11 671:5
672:25 673:3,13
673:21 674:15
675:15 676:9,23
677:12 678:3
685:23 700:6,15
700:20 703:2
**damages** 609:22
630:8,13 633:21
634:7,10 635:24
640:16 674:4,5,6,7
674:19 693:14,16
693:23
**data** 522:21,22
523:17 567:20
588:2 589:14,21
590:4,18 592:3,10
593:15,17 605:14
605:18 606:22,23
607:3,5,7,8,12,15
607:20 608:2,3
609:1 610:13,15

610:16,18 611:18
611:24 612:2,16
612:19 613:3
614:1,3,6,7,9,11
614:18 615:2,15
615:24 616:2,4,5,7
616:8,19,21 618:8
619:17,19,25
620:4 622:7,10
624:24 625:1,15
626:1 627:10,10
634:13 636:7
642:12 644:2
652:2,5,6,10,14,17
652:18 657:7
679:4 685:3 699:9
699:9,12
**date** 585:4 600:16
600:19 704:2
**dates** 660:1
**day** 494:8,11,12
503:24 520:8
590:6 595:18,19
703:8,14 704:12
**days** 501:7 684:8
684:19 704:1,1
**db** 680:8 695:10
696:3 697:23
**deactivate** 510:7
510:20 554:2
564:17 567:1
572:9
**deactivated**
506:10 510:3
512:15,17,20
516:5,14 519:2
535:9 553:23
555:13,25 585:7
585:12,16 597:11
636:18 637:3,7,11
638:4,13 686:7,8

696:10
**deactivation**
506:12,13 555:22
636:15 685:9,11
685:14 686:11
**deal** 517:22 555:4
**dealing** 557:6
655:22
**death** 673:10
699:23
**debit** 525:5
**deborah** 495:16
**december** 551:17
557:17,19 607:9
**decide** 521:20
592:1 631:24
646:15 649:15
663:11 665:12
694:8
**decided** 575:9
657:17 663:15
664:6 691:14,15
691:19 692:12
**decides** 510:9
513:23 525:1
535:6 665:8
668:25
**deciding** 671:12
**decision** 513:16
525:2 529:9
536:25 537:17,21
537:24,25 538:3,4
538:16,25 539:1,6
554:1 556:7,16,18
556:20 559:3
561:4 566:25
576:2,13,14
595:21,23,25
682:12 688:9,10
690:15,16 691:9
691:23 693:3

701:22
**decisions** 688:24
691:11
**declare** 550:9
**decline** 505:4
685:19
**declined** 685:9,20
**declining** 685:13
**deductions** 692:8
695:11
**default** 518:18
524:19,21 526:7,8
526:9,10 527:10
**defendants** 688:3
**defense** 538:11
**defensive** 520:8
**define** 550:6
561:15 572:20
**defined** 514:12
560:22 562:25
563:4 566:20
574:10
**defining** 561:12
**definitely** 632:14
**definition** 558:12
613:13
**definitions** 558:21
**deflated** 641:2,8
642:18 643:11
**degree** 661:18
668:13 691:10
**delay** 678:21
**delays** 676:3
**delivered** 703:16
**demand** 526:11,13
526:15 528:18
532:6 662:8
688:12
**demonstrate**
632:13 686:17,21

[demonstrates - document]

**demonstrates**
680:19 692:9
**demonstrating**
687:18
**demonstrative**
682:16 699:10
**deny** 552:10
**department**
601:21,22
**depended** 685:12
**dependence**
679:22 680:1
**dependency**
677:15,16 678:1
**dependent** 679:19
680:3,7
**depends** 613:21
631:10
**deponent** 703:22
703:23 704:5
**deposition** 580:5
684:22 696:3,7,11
696:14 703:24
704:6
**depot** 541:10
**depreciation**
529:19 642:5
643:1 653:16
**derived** 620:5
622:24,25 624:19
683:1
**describe** 534:8
554:5 568:20
**described** 498:15
506:8 523:4
528:16 538:21
553:15 554:3
555:14 653:1
**describes** 515:20
522:14 527:17,18
527:19 532:13

**description** 500:14
**design** 692:16
**designed** 553:7
**desired** 692:24
**despite** 682:18,20
685:8
**destination** 509:25
582:2,11 608:13
690:9
**details** 585:10
**detection** 589:13
590:3,17 592:2
593:16
**determination**
611:8
**determine** 527:11
588:9 608:24
612:18 615:5
616:6 646:24
680:2 684:5
**determined** 527:4
577:2 589:17,20
663:24 668:13
681:12 682:10
688:1 691:12,24
**determines** 633:19
634:5
**devastating** 673:9
**development**
602:2 603:3
**deviations** 512:22
**device** 568:14
**dictate** 503:23
**dictation** 675:22
**difference** 531:9
628:19 645:2
694:17
**different** 507:20
507:22 508:21
511:21 514:18
516:17 517:3,7,7

521:9 544:3
552:17 575:15
587:16 609:14
615:2 618:18,23
620:15 627:4
638:10 654:10
661:1,14 670:4
673:22 675:8
684:19 697:13
**differentiate**
661:11
**differently** 614:16
**difficult** 562:10
**digitally** 672:15
**diligence** 569:6,24
**direct** 542:21
564:8
**directed** 517:17
544:9 589:2
**direction** 512:25
678:15
**directly** 510:4,13
510:16 514:21
550:25 551:5
587:10 606:24
662:19 666:2
669:1
**director** 549:21
602:13
**directs** 551:17
**discourages**
636:12
**discovery** 578:21
583:4 587:14,18
**discrepancies**
646:7,8
**discrepancy**
657:17
**discretion** 558:17
566:20,25 572:8
574:11 576:2,4,9

576:11,19 662:21
684:5 690:1
**discrimination**
686:9
**discuss** 641:14
674:6 675:15
698:17 699:10,16
699:19
**discussed** 598:9
653:5 698:19
**discusses** 674:24
**discussing** 540:14
631:5
**discussion** 537:8
587:2 590:10
699:1,2,7
**discussions** 593:7
593:10,22,25
594:9
**dishonest** 647:23
**dispatch** 608:10
612:22 613:17
616:20 636:13
639:4 653:4
**dispatches** 669:8
**disregard** 700:11
**disregarded** 699:8
699:14
**distance** 523:24,25
662:17
**distraction** 678:21
**divided** 612:21
**dmitri** 603:13
604:15
**doc** 572:6,14
**doctor** 600:10
604:16
**document** 552:13
552:20 559:7
560:6 574:21
575:1 576:7,10

Page 13

[document - drivers]

578:5,13,16,24
579:8,10,15,24
580:14,15 581:13
581:17 582:13,23
582:24 583:3,14
584:16 665:6
679:2 682:8,23
699:24
**documentary**
563:21 582:8
584:11
**documents** 501:2
579:22 580:10
584:22 585:25
589:3 592:10
593:14 597:5,7,10
659:19,23,23
660:2,3,8,22
662:15,23 664:17
666:19 670:13
672:5 673:9
674:10 678:1
679:5 698:14,17
701:21
**docusign** 550:17
550:19 585:1
**doing** 516:11,14
521:15 532:7
558:12 564:9
602:9 603:16
632:5 649:17
675:9,11 686:6
**doled** 573:2
**dollar** 527:23,25
627:25 691:22
**dollars** 668:6,9
**don** 495:15 503:9
505:15 518:8
534:12
**door** 531:13

**double** 615:18
**doubt** 585:13
683:15,18 697:17
**dozens** 648:11,11
**dr** 496:6 597:21,25
599:4,5,10,18,21
600:2 605:21
609:9,24 610:1
615:7 617:21
623:3 630:12
635:7,13,19,23
636:6 638:23
643:16 646:18
649:22 650:3
657:3 658:4
693:20
**drag** 678:13
**dragged** 678:17
**drawing** 573:1,11
**drive** 528:5 529:9
531:12 546:16
582:16,25 663:22
667:21,22 670:25
671:3,4,8 688:12
688:20,23 700:24
**driven** 546:18
608:20 610:17
613:9 627:13
672:3
**driver** 498:14,24
498:25,25 499:7,8
499:14,21 501:25
502:3,9,22,22
503:6,20,22,24
504:5,6,6,8,13,15
504:20,23,25
505:4,6,6,7,9
506:5,6,25 507:1,7
507:19 508:2,4,9
508:10,11,16,19
508:20 509:2,6,8

509:10,11,13,17
510:16,23 511:3,5
511:7,8,10,11,13
511:24 512:3,4,7,9
512:9 513:1,2,5,10
513:11,12,16,17
513:18,21,23,24
514:1,16,17,18,19
514:20,23 515:3,5
515:21,24 516:2,3
516:7,9,13,16,18
517:3,5,7,11 518:2
518:12,16,16,17
519:2 520:23,25
521:1,2,3,3,4,11
521:12,13,16,18
521:20,23 522:1,3
522:14 524:4,5,8
524:10,13,17,20
524:21,22,23
525:6,10,13,25
527:2,6,10 528:8
528:25 529:4
530:9,11 531:1
532:15,17 534:15
534:21 535:3,6,13
535:15,17 536:23
537:1,2 539:5,15
543:17 546:16
547:24 553:22
554:7 555:5
558:15,23 559:1,1
559:13 561:1
564:18,18,25
565:22,24 566:3
566:15,16 567:1
567:10 568:14
569:1,14,14 572:2
572:3,9,10,11,13
572:23 573:3,8
574:3 582:1,11

585:7,16,24
594:19 595:6,11
596:20 604:21
606:13,18,19
607:16 608:4,9
609:5 612:21
613:16 614:22
617:2 622:17
625:4,14 632:23
636:2,15 657:12
665:9 668:6,7
672:12,14 676:15
679:23 680:22
681:2,10 682:19
682:22 683:2,10
684:4,17 688:1
689:13 695:17
**driver's** 507:3
511:20 514:15
525:2 530:17
534:17 535:7
559:2 567:1,2,8,13
567:23 568:2,13
568:24 656:1
671:1,2
**drivers** 499:14,21
501:24 502:2,6,9
502:12,16,18,19
502:20 503:13,13
503:14,17 506:22
507:11,15,18,19
510:2,3,7,8,12,15
510:20,23 512:2
512:14,20 515:7
515:23 518:5,21
519:5,9,17,25
520:6,17,21
521:14 522:6,21
522:25 523:19
525:10,12,25
526:14,23 528:4,7

[drivers - encountering]

528:9,21,23 529:7
529:8,9,10,11,12
529:15,22,25
530:2,5,6 531:2,8
531:11,13,15,17
531:22,25 532:5,7
532:19,21 533:8
533:12 534:21
535:2,18 547:12
547:17 553:8,21
560:25 571:10
587:11 604:21
605:4,7,13,18
606:7 607:1,5,14
607:19,23 608:25
611:24 613:24
618:1 622:11,18
623:4,7,9,13,14
624:14,16 625:19
625:22 636:12,20
642:12 648:19
654:7 655:5,7,8,10
655:18 662:7
665:1 666:11
684:18 686:3
**driving**  520:8
531:10,11 537:18
557:22 585:6,11
585:15 587:24
605:15 606:25
608:15 619:12
620:18 665:21
667:13,14,23
668:20 671:6,13
671:25 672:22
673:22 674:16
699:13,13,22
700:15
**drop**  538:1 556:8
565:1 566:4,10
585:22 589:12

**dropped**  509:16
509:17 640:3
**drove**  544:12
580:20 608:14
626:14 642:25
653:11 655:10,11
656:19 671:19,21
674:17 688:4,4,5
688:21 700:12
**drunk**  529:10
**due**  569:6,16
585:23 589:13
590:17 624:13
648:2 673:4
**duly**  497:11
599:22
**duty**  674:24 676:6

**e**

**e**  495:8,13 501:17
501:19 502:18,19
502:23 503:8,11
528:19 583:22
584:6 679:9
689:17 695:20
**earlier**  514:20
523:4 526:7
528:16 554:12
570:6 571:9
576:18 631:7
643:25 651:4
660:3 700:19
**early**  521:11,13,16
548:23 549:2
603:5
**earn**  529:6,17
553:23 687:5
**earned**  630:19
696:17 699:16
**earning**  530:17
531:3 606:6

**earnings**  498:9,10
498:17 531:18
532:8 623:6
679:25 691:13
698:18
**easier**  620:2 647:6
647:9
**easy**  647:4
**eating**  519:10,11
**economic**  529:24
601:4,8,20 602:2
602:10,13,18
606:7 621:19
622:2 659:7 661:9
667:7 669:10
673:15 679:22
680:1 684:6,7
686:18 700:5,7
701:4
**economical**  529:13
**economically**
679:19 680:6
699:24
**economics**  600:24
601:18 604:1
621:22
**economist**  601:1
602:2,24 609:9
**economists**  601:12
656:4
**economy**  602:5,23
604:1 647:20
648:6,8,12,19
**education**  600:22
**effect**  559:11
566:24 579:2
673:21
**effective**  558:2
**effectively**  675:1
**effects**  538:15
604:21

**efficiency**  671:10
671:14
**eight**  529:8 690:14
690:20
**either**  514:3 579:8
579:10 622:14
642:18 658:6
681:10
**election**  530:8
**electric**  529:14
**element**  668:15
669:9 693:16
**emphasize**  678:22
**employed**  620:25
677:3,5 704:8
**employee**  500:13
536:20 570:5,8,17
571:6,15,16 586:4
659:9 661:11
674:25 676:18
677:14 686:22
695:23
**employees**  500:1,3
501:20 503:10
570:9,18 648:20
677:12
**employer**  661:19
675:2 677:14
**employment**  499:9
601:10,12 602:15
647:17 661:17
676:19 685:22
690:6 693:13
**en**  608:11
**enable**  528:17
561:4,4
**enabled**  561:1
**encountered**
615:22 616:8
**encountering**
615:14

Veritext Legal Solutions
346-293-7000

[ended - exhibit]

ended  549:1
ends  521:13,16
engage  685:22
engaged  589:17
  670:17,18 675:18
  675:22 676:11
  689:23 694:3,4,6
  694:11
engines  529:20
enjoyable  553:6
ensure  553:7
  615:14
entered  563:11
  695:5
entire  551:22
  558:3 559:12
  566:24 618:21
  653:10 654:12
  665:16,17,19
  674:18 699:21,25
entirely  680:25
entirety  632:24,25
entities  648:15
entitled  588:6
  604:20
entity  561:3,12,13
  561:24 562:7
entry  671:3
equal  614:25
equals  612:24
  632:18
equipment  694:16
eric  495:4
error  629:13,15
  646:24
especially  701:7
esq  495:4,4,5,5,10
  495:10,11
essential  625:22
  633:6

essentially  527:4
  528:11,18
establish  644:16
  648:1 690:5
  693:13
established  519:22
  552:4,25 566:18
estimate  543:9
  619:14 620:11
  621:16,23 622:19
  624:6 655:3
  662:16
estimated  608:14
  620:7,22 621:4,5
  622:19 625:7
  639:15 641:22
  654:11
estimates  619:13
  625:12
evaluation  679:22
event  564:19
  574:15 575:6
events  531:23,24
  532:3
evidence  538:7,11
  538:18 540:22
  543:24 544:15
  545:1 552:21
  556:9 559:14,20
  563:21,23 578:12
  581:5 582:8 584:4
  584:5,8,11 590:10
  590:14,25 591:3
  591:11,25 592:6
  592:13 600:4
  609:8,11 611:7,11
  635:6 636:4
  638:13 640:14
  647:22,22 649:3,8
  649:10,12,18
  659:6,11,15 661:5

661:6,20 662:15
665:19 668:17
670:3,12 671:19
671:23 672:4,25
673:2,23 674:19
674:20 675:10,13
675:14 676:9,21
676:24 677:2,18
677:21,23 679:1
679:13,13 680:6
680:19 683:25
686:1 689:4 690:5
697:25 698:12,15
700:1,6,15,17
701:2,4,20,24
exact  517:21 591:9
  624:2
exactly  525:21
  541:18,21,24
  543:1,16,18 544:9
  548:20 564:22,23
  566:8 593:11
  598:1 628:12
  644:19 678:19
examination  496:4
  496:4,5,7,7,8,8
  497:12 537:14
  542:21 596:13
  599:23 629:20
  649:21 650:2
  653:6 656:10
examine  544:8
examined  542:9
example  571:14
  595:15 646:11
  655:12 682:23
  694:13
examples  575:24
  675:19 676:13
exceed  628:14

exceeded  628:22
  629:4
exceeding  627:6
exceeds  566:17
excel  646:21
  652:12,16
excellent  701:8
excess  626:23
  627:5
excessive  512:15
  512:19
exchange  691:4,7
exclude  693:22
excluded  590:25
  591:4,11,25 592:5
  592:13 612:7
  616:14,17 618:6
excluding  610:20
exclusively  665:14
excuse  557:1
  562:11 579:12
  594:1 649:4
excused  658:1,4
executed  550:12
executive  601:24
exercise  503:17
  680:20
exercised  576:15
  661:19
exhibit  497:16
  498:8 503:3
  505:18 515:16,18
  518:8,11 522:9,10
  527:14,16 532:11
  533:25 534:15
  577:14 580:13
  581:19 582:14
  583:5,20 584:13
  594:13 609:19
  631:1 648:22,23
  649:3,8 672:24

[exhibit - fee]

681:19,23 682:5
689:10
**exhibits** 577:14
685:3
**exist** 670:1
**existed** 636:8
**exists** 659:7,11
677:15
**expect** 571:4
**expense** 608:24
623:10 655:17
692:8
**expenses** 498:12
498:13 536:14
608:15,19 609:5
610:9 613:11
620:7,11 621:5,16
621:24,24 622:10
622:15,16,18
623:20 624:6,24
625:8 626:5 628:6
639:16,22 641:22
641:24 642:19,21
643:12 653:16,19
654:8,22,24
655:15 656:1,2,12
670:20,21 676:16
676:19,22,24
691:19 695:11
**expensive** 529:18
653:14,14 654:21
**experience** 504:25
530:1 569:4,10
612:4 655:22
**expert** 600:3 608:6
609:7,9,16,25
630:3,8,13 648:2
656:3 657:10
674:5,8 677:20
698:16 699:11

**expertise** 569:4,10
**expiration** 704:17
**explain** 518:10
532:14 589:24
**explained** 505:11
535:25 679:21
**explaining** 523:18
**explains** 590:9
**explanation**
617:12
**expressly** 685:13
**extend** 500:23
**extended** 688:6
**extensive** 587:1
631:18 692:8
**extent** 503:7
504:23 505:5
508:7 510:5
518:16 520:25
521:11 526:13
527:8 533:8 539:8
539:18 592:13
667:8 700:22
**extra** 527:23,25

**f**

**f** 703:22
**fabulous** 701:11
**facebook** 649:16
**facilitate** 681:10
**fact** 587:25 624:13
630:2 644:1
648:11 653:1,20
660:4 666:8 670:8
677:3 686:19
**factor** 661:18
667:7 668:12
669:9 670:23
672:17 692:21,23
**factored** 625:18
625:23

**factors** 653:21
661:6,15 673:14
677:17 678:2
680:2,19
**factory** 694:14
**facts** 636:4 660:19
664:8 667:19
670:3,8 674:1
677:24
**factual** 593:1
**failed** 693:15
696:18
**fails** 572:11
**failure** 693:23
**fair** 526:6 573:11
573:13 578:17
583:13,18 630:9
630:14 648:14,18
661:23,23
**fairly** 617:14
624:13 648:17
**fake** 589:14,21
590:4,18 592:3
593:17
**falls** 567:2
**false** 559:24 561:7
565:1,10,11,17,18
566:11 567:4
**falsely** 697:1
**familiar** 519:23
540:23 541:25
571:22
**family** 566:2
700:25
**far** 571:15 669:16
672:3
**fare** 510:24 514:12
516:10,16,19,20
516:22 517:2,8,8
520:14 521:2,5,6,9
521:14,17 523:3

523:22,23 524:20
524:24 548:9,14
548:23 550:25
551:5,14,15 552:3
552:4,17,23,25
573:20,21,24,25
574:4,5,8,9,16,18
574:24 575:6,11
575:14,15,16,21
575:22 576:3,15
576:20,22 577:2,2
577:3,8,9,10 595:7
597:8,11 661:22
661:22 662:16,22
662:23 663:6,12
668:25
**fares** 498:10
517:10 518:1
520:13,17,21,24
522:7,17 523:5,20
524:21 548:6
550:22 575:10
597:4 663:3 666:2
**fashion** 607:22
**fass** 495:6
**fast** 665:20
**favor** 647:16
661:7 666:9
673:17 677:17
678:2 700:8 701:3
701:5
**fear** 686:13,14
**feared** 685:9
**feature** 518:14,14
690:9
**federal** 540:21
620:25 683:17
692:20
**fee** 507:17 514:7
514:10,11,12
522:4 525:3,4,8

Page 17

[fee - fraud]

528:9,13 576:24
576:25 577:10
595:3,7,17,18,22
663:3,5 670:10,10
670:10 691:4,7
**feedback** 526:18
526:20
**feel** 562:4 701:23
**fees** 498:12,12
522:7,17 524:3
529:18 668:25
681:18 683:20,22
692:18 699:1,3
**felt** 561:15 639:10
**female** 637:21
**fest** 532:4
**field** 621:19 622:2
**fifth** 661:10 671:9
671:18 672:1
679:21 680:18
687:16,21
**fight** 697:9
**figure** 532:2
560:13 587:25
593:13 594:23
624:2 627:8
651:15,19
**figures** 521:4
**figuring** 626:19
**file** 652:8,9,11,15
652:16,16 698:13
698:21,24
**filed** 695:9 698:20
**files** 614:10,20
619:20 646:21
652:12
**filing** 498:14
**fill** 499:15,17
**filling** 500:13
**final** 516:16 538:5
556:7 599:12

618:10 657:7
678:17 702:1
**finally** 700:19
**finance** 500:10
**financial** 551:23
552:1 573:14
**financially** 704:10
**find** 507:7,14,15
528:11 542:3,4,16
609:11 615:24
633:23 644:5
651:2 692:17
**finding** 549:12
655:14 687:22
**findings** 607:13
**finds** 514:16,17
**fine** 615:9 657:1
658:20,22 687:13
**finish** 565:14
605:21 694:14,15
**finished** 537:4
565:8 617:19
**fired** 667:23
**fireman** 676:12
**firm** 704:20
**first** 500:5,7
522:23 545:13
549:10 552:12
553:5,20 556:14
559:2,3,15 563:3
569:9 589:2 590:6
594:16 596:20
599:22 600:5
601:19 602:7
604:20 610:2
612:2 621:10
636:11 637:16
644:9 645:5,7
651:16 661:18
664:17 682:5
688:21 693:18

697:11
**firsthand** 636:17
637:2,11 638:3
**fiscal** 602:7,10,13
**five** 529:13 532:18
537:6,7 553:8
602:12 603:22
660:20 661:14
677:16 680:2,19
689:21 690:13
**fleet** 654:12
655:18
**flexibility** 660:12
660:15 680:13
687:9,18 697:22
**flip** 553:19
**flsa** 640:16 661:3,4
661:8 672:17
674:24 676:17
677:9 678:2
**fluctuate** 526:10
526:15 595:18,22
**fluctuated** 684:8,9
684:10
**focus** 544:4 602:10
632:22 636:10
644:9 667:10
**focused** 657:10
**focuses** 602:17
**follow** 503:7
515:21,23 518:13
606:20 620:2
672:10
**followed** 520:8
**following** 516:2,6
654:3 703:13
**follows** 497:11
599:22
**footnote** 640:3,4,8
**foregoing** 550:11
703:14

**foreman** 494:14
675:20 703:11
704:16
**forget** 692:7
**forgive** 629:23
651:8
**form** 499:15,17
521:13
**format** 625:15
646:20
**former** 697:12
**fort** 704:19
**forth** 572:12
701:16
**forward** 500:22
526:22 615:11
632:15 698:2
702:1
**foster** 675:14
**found** 515:3 655:4
657:16 688:2
690:4 695:16
**foundation** 517:13
531:4 541:13
542:4 592:4
603:14 604:11
609:15 632:4
635:5 636:4
**four** 534:15
602:22 678:4
690:13
**fourth** 643:20
644:22 670:23
**fox** 678:12,14
**frameworks**
519:23
**francisco** 501:7
**frankly** 570:21
**fraud** 516:12
673:1 686:8

Page 18

[fraudulent - going]

**fraudulent** 585:23 586:21 597:1
**frcp** 703:21
**free** 687:9 694:6
**freedom** 660:12 660:14,23 680:13 684:13,14 685:6 685:21 687:7 693:7,9 697:22
**frequently** 688:4 692:12
**friday** 529:9
**friendly** 583:7,15
**front** 576:8 600:11 640:5
**frozen** 523:7,8
**fuel** 625:7,7 642:3 643:2 653:16
**full** 647:17 651:10
**function** 528:22 669:14
**functionality** 525:15 581:8
**functions** 572:18
**fundamental** 511:23 625:20
**funded** 603:14
**further** 496:5,8,8 496:14,15 537:11 551:13 589:10 596:13 597:16,18 599:11 650:2 656:10 657:23 693:22 698:10 703:21 704:7,10
**future** 513:9

**g**

**gachie** 636:23 637:1
**gallon** 529:21

**games** 676:9 690:19 694:23
**gaps** 616:8,9
**garcia** 495:6 630:21
**garment** 601:22
**gather** 599:11
**gathered** 619:18 619:19
**gears** 504:1 553:3
**general** 512:25 571:5 605:15
**generalized** 517:19
**generally** 529:19 543:23 581:10 594:21 608:5 615:2 636:12 651:18 701:16
**generate** 680:21 681:2,3 684:3
**generated** 603:17 663:4
**generation** 508:23 528:11 680:25 682:19 691:8
**genius** 691:1
**geo** 567:8,13,23 568:2,3,8,13,21,24 586:21 673:1,2 674:2
**george** 585:22 589:12
**getting** 503:13 510:2 526:17 532:4 555:21 586:24 590:14 594:6 638:9 673:13 694:22 700:9

**gig** 602:23 603:23 604:1,21 605:10 605:16 647:20 648:6,8,12,19
**gist** 638:9
**give** 501:15 542:22 609:9 619:9 646:17 653:23 662:17 663:19 668:20 670:19 675:10,19 689:21 698:22
**given** 503:24 575:12 612:19 617:13 626:19 653:20 654:2 656:2 669:20 670:21 674:8,21 675:7,11 676:14 698:15
**gives** 575:24 620:11
**giving** 557:12
**gloves** 515:3
**go** 497:20 499:19 500:7,8,17 502:9 504:8,21,22 505:4 505:10 506:14,16 507:1,13,14 508:11 509:1,14 509:20 516:9 520:23 526:21 529:5,5 532:5 540:1 544:10 547:8 549:3,5,10 549:15 550:20 551:2 552:13 558:11,12,20,21 560:12,20 562:21 563:3 566:13 567:6,7 569:1,2

571:15 572:23 573:14 574:7 576:12,13 577:25 577:25 578:6 580:23 581:19 582:4,14,19 583:5 583:19,25 584:25 585:2 587:12 590:19 593:6,20 594:2,16 596:9 599:6 605:1,19 606:3 610:2 611:5 611:6 615:10 619:6,22 621:2 626:8 632:15 633:25,25 640:4 642:14 644:21 646:10,10,23 647:6 650:5,17 661:15 662:1,5,12 662:19,20 663:7 664:18,24 666:2,5 666:7 668:1,16 673:2 675:7 694:1
**goes** 509:8 511:5 511:10 533:5 551:12 572:23 587:6,10 611:21 647:24 668:25 669:21 695:20
**going** 507:3 521:4 522:22 523:12 524:14 529:19 539:12,22 555:5 556:11 562:16 564:12 577:9 580:6 590:15,19 593:21 596:8 599:8 600:2,4 614:13 615:7 631:1 632:22

[going - hole]

636:10 638:20 658:12,16 660:11 660:17 661:13,14 663:12 665:11 666:14 669:5,16 671:12 673:12,21 679:14 697:3
**good** 497:13 530:3 531:8 557:9 597:19 599:24 616:7 629:21 684:24 686:5
**google** 518:18
**government** 677:4
**gps** 515:21,23 516:2 522:20,22 523:17 524:1 589:13,17 590:3 590:17 592:2 593:16 665:20 673:4
**great** 615:23 616:1 644:1,5
**greater** 611:1
**greatest** 697:16
**greenlight** 514:19 528:20
**gross** 498:9,16 699:17
**ground** 504:3 553:7,12 641:23 678:14
**growth** 528:18
**guarantee** 701:18
**guess** 504:10 515:20 523:12 524:19 531:23 580:5 630:23 644:19
**guidance** 661:11 689:13,14

**guided** 665:15
**guidelines** 505:12 505:14,21,25 506:9 516:13 666:23 685:11 686:3 689:24
**gum** 530:5 546:13
**guy** 672:20

**h**

**h** 689:10
**habit** 516:13
**hair** 637:23
**halfway** 606:5
**hand** 577:16 647:6 694:10
**handbook** 501:3 502:2,3 570:5,8,11 570:12,17,24 571:1,5,6,15,18
**handing** 519:18
**handle** 511:14 596:10 647:14
**handy** 630:22
**happen** 509:9,14 510:18 530:20 562:5 586:12,18 677:25
**happened** 565:20
**happening** 659:20
**happens** 504:20 509:6,12 514:15 516:15 545:7,14 676:3
**harassing** 543:12
**hard** 531:13 565:13 576:9 629:6 645:23
**harmonize** 614:14
**hauling** 680:11
**hawley** 495:4,6

**he'll** 643:20
**head** 549:4
**headquarters** 501:6
**hear** 519:14 597:23 599:10 635:17 660:6,11 666:11 667:18 671:11
**heard** 507:25 508:14 510:2 517:18 518:24 519:8,20 523:16 525:18 536:22 538:4,15 540:18 541:8 545:1 592:17 664:2,11 668:17 671:4,19 672:22 674:4,5,7 676:9 678:9 681:15 682:10 683:13 689:2 690:12 693:21 695:15
**hearing** 544:14 590:7,8 598:17,20 678:18 698:3
**hearsay** 638:5
**heart** 587:22,23 679:18
**heat** 527:2,5
**heavy** 678:20
**held** 633:9 695:8
**help** 515:19 522:13 526:21 528:11 531:13 532:12 545:25 555:1 560:13 581:10,13
**helpful** 552:10 618:11

**hereto** 494:17
**herring** 678:9
**herrings** 678:13 678:17,19 679:15
**hey** 515:3 663:8
**hide** 587:25
**hiett** 495:5
**high** 526:14 529:16 570:19,25 571:6,17 572:4 624:17 647:16 688:12
**higher** 529:17 530:4 552:3,23 574:4 624:15,20 624:20,21 641:4 643:1,1 651:20,20 653:21,22 662:1
**highest** 512:20,21 529:6
**highlighting** 505:24
**highly** 520:4
**hire** 603:1
**hired** 501:20 633:10
**hires** 501:15,17
**hiring** 499:25 500:2,6,19
**history** 499:9,12
**hit** 505:10 506:16 509:19,21 510:1
**hits** 504:8
**hogwash** 662:9
**hold** 502:15 540:16 541:20 544:1 560:3 635:11,11 686:19 687:15
**hole** 662:5

[home - independent]

home 527:24
528:1 541:10
696:4
homeowner 666:6
hon 494:3 495:21
703:3
honda 654:18
honor 497:6 537:3
537:10 539:24
543:11 580:4
586:23 590:5
592:12 596:4
hot 599:19
hotels 507:14
547:1,3,12
hounds 678:14
hour 520:9 599:6
599:16 607:17,23
609:5 612:12,13
houred 626:18
hourly 608:24
620:23
hours 528:21
529:8 543:22
608:18 616:12
620:5,14,14,16,17
620:19,22 626:9
626:10,14,15,18
626:21,22,22,23
627:5 644:18
645:11 646:9
650:20,23,25
651:5,21 652:1
690:13,14,20
house 541:11
houston 495:7,13
533:12 541:22
546:17,18 547:12
547:16,21 554:13
577:23,23 618:15
620:17,18 626:10

626:17 628:1,2
642:12 644:11,14
650:21,24 670:5
672:23 674:17
688:22
hr 500:10
hubs 514:19
528:20
hundreds 548:1
579:22 668:5
690:17
hunt 678:12
hyperlink 595:6,7
595:11
hypothetical
633:25
hyundai 656:21

**i**

idea 571:2,8,19
665:4
identified 585:10
630:2
identifies 640:8
identify 548:12
550:23 585:4
696:19
identifying 695:10
ilgwu 601:24
immediately 505:9
524:25
impact 507:3
514:3 528:25
530:17 535:7
655:20,23 665:24
666:19 670:11
684:24 698:17
impacted 531:3
639:5 687:4
impacts 669:22
670:15

impaneled 676:2
impeachment
647:22,24 649:18
649:21
implementation
603:15 604:8
implications
698:16,18
implying 656:16
important 567:19
605:20 614:14
639:10 673:7,12
673:24 674:22
675:17 681:1
importantly 694:8
impossible 663:20
improper 647:21
648:2 649:18
improperly
693:20
improve 529:25
530:1 555:1
691:25
improvement
554:25 555:20
556:3,12 696:13
imputed 678:25
inappropriate
519:13
incentives 688:8
include 604:24
605:6,12,14
606:13 613:12,24
616:23 625:25
626:4 629:2 633:1
633:15 639:10
652:21 654:14,17
655:10 692:23
693:20 698:3
included 534:17
617:21 623:5

628:25 629:1,5
633:13 638:16
649:16 650:20
655:7 657:11
688:14 700:12
includes 603:2
608:11
including 508:1
559:1,17,18 648:7
648:9 671:20
679:11 687:16
income 553:23
621:1 679:24
682:21,24 683:1,3
683:8,10,22,24
685:25 687:5
696:17
inconsistencies
615:23 616:4
644:6
inconsistent
615:15 696:15
incorporated
578:10 580:25
582:6,21 583:11
584:2
increase 516:10
531:17
incur 622:17
incurred 608:19
610:10 615:22
676:19 681:17
683:20 692:18
incurs 524:4,10
independence
671:11,15
independent 536:5
563:5 603:23
605:11 660:24
661:2,12 666:4
672:13,20 687:18

Page 21

687:22 688:1
695:2,4,7,8,13,15
698:20,21,23,24
**independently**
695:19
**index** 496:1
**indicated** 614:16
**indicates** 504:9
614:22 617:8,8
**indicating** 614:23
**indicative** 671:11
671:14 672:18,19
686:24
**indiscernible**
525:14
**indispensable**
613:14
**individual** 500:25
501:1 535:15,17
607:1,15 628:18
638:6 656:19
669:5,6
**industry** 603:2
**infinity** 653:11
654:21 692:2
**inflated** 641:2,8
642:18 643:11
693:19
**influence** 609:21
**information** 501:4
510:10 511:5
514:24 542:5
554:25 558:25
559:7,13 560:4,9
567:9 568:4,8,13
568:21 585:5,13
587:17 588:1
593:1,3,15 595:11
624:23 661:14
665:19,21,22,23
669:20 679:8

697:1
**informed** 592:7,18
**informing** 603:3
689:17
**initiative** 530:17
670:24 692:10,13
692:14,15,16
**initiatives** 531:1
**input** 517:10
518:1 662:24
**ins** 543:18
**inside** 660:20
671:20,24 672:23
673:19 700:3
**insofar** 541:24
**installers** 687:22
**instance** 541:8
556:6 570:20
574:18 575:7,12
575:23 585:5,9,14
657:16
**instances** 540:13
630:3 677:9
**instapay** 524:23
525:1,3
**institute** 602:8
**instituting** 603:10
**institution** 621:14
**instruct** 686:23
**instructed** 557:4
**insurance** 511:25
512:1 602:21
624:15,16,21
625:5 642:9
687:14 688:19
691:23
**integral** 535:16,18
535:21 613:21
631:10
**integrating** 550:1

**integration** 549:21
549:25
**interact** 684:12
**intercontinental**
585:23 589:12
**interest** 573:1,11
**interested** 704:10
**interesting** 672:8
**internal** 556:16,18
556:20 586:20
587:15
**international**
601:22
**internet** 676:8
679:11 695:16
**interrogatories**
549:10 552:14
585:1 586:8,10
591:17
**interrogatory**
550:21,23 551:1
585:3 586:5,16
587:8 588:9,12,12
696:19
**interrupted** 594:7
**interrupting**
701:10
**interview** 500:20
500:21 502:10
**interviews** 499:19
**invention** 501:4
**invest** 691:4,23
**invested** 668:1,2,6
681:6
**investigation**
586:21 587:10,15
588:9
**investment** 529:15
668:8 691:1,2,3
692:6

**investments** 667:8
667:18 668:5,10
690:23,25
**involve** 630:7
**involved** 500:2
615:21
**involving** 500:21
545:9
**irs** 620:7,10 621:6
621:11,18 622:1,7
622:8,24 623:1,24
624:3,10,12,24
625:2,12,25 626:4
639:16,25 640:8
640:15,18,23
641:20 642:18
643:10 653:6,17
653:22,23 655:21
655:23,24 676:22
676:22 682:25
692:8 695:9
698:14,17
**issue** 540:7 631:19
631:24 690:4
693:14 694:1,2
**issued** 604:2
**issues** 511:19
601:13 602:15,23
**item** 514:14,16,17
514:22 515:8,9,11
641:23,23 670:10
**itemize** 653:18
**items** 498:8 611:7
672:10

### j

**jacob** 495:16
549:14
**james** 496:6
599:21 600:1
**jars** 530:9

[jason - lastly]

**jason**  605:10
**jersey**  618:24
**job**  519:22 694:14
  701:8,11
**join**  501:1
**joint**  581:19 689:9
**journal**  622:4
**journals**  604:12
  621:22
**jparrott1007**
  647:14
**judge**  497:1,4,7
  501:13 511:17
  517:14,23 523:12
  526:19 530:15,22
  531:7,21 533:17
  534:25 537:5,13
  539:25 540:16,20
  540:23 541:14
  543:14 544:1,7,21
  557:1,3,7 560:2
  562:11,14,17,18
  564:4,6 565:4,12
  567:15,21 579:5
  579:12,20 580:8
  581:22 587:4,12
  588:11 590:12
  592:14 593:6,20
  594:1,6 596:7
  597:16,19,21,23
  598:5,12,19,23
  599:2,3,7,14,15,18
  600:21 601:16
  604:18 605:20
  606:2,18 608:5
  609:7,17,23 610:5
  611:7 612:15
  614:6 615:16
  616:16 617:3
  618:9 619:6,24
  623:23 624:9

625:1 626:11
629:12,17,19
632:1,6,15 633:24
634:25 635:11
636:5 638:9,22
643:4,7,15,19,23
647:21 648:4
649:7,9,20 650:7
650:12 653:8
657:25 658:3,9,11
658:12,16,20,23
659:1,3,5,13 678:6
692:21 695:23
697:12 698:2,4,5,9
701:5,6 702:3,4
**judge's**  612:3
**judges**  697:12
**july**  603:9 606:10
  607:10 618:22
  681:25
**jump**  630:25
**june**  577:17
  581:25 582:15
  583:6,21 584:22
  585:20
**juries**  676:2
**jury**  687:21
**justification**  500:9
**jx2**  505:16,18,25
**jx9**  497:16,21,24
  498:3

### k

**katherine**  495:5
**keep**  509:19
  683:21 700:16
**keeps**  700:9,20
**kept**  701:9
**key**  657:10
**kherkher**  495:6
  630:21

**kherkhergarcia.c...**
  495:8
**kick**  666:20
**kicked**  555:12
**kimberly**  495:10
  703:17
**kind**  502:8 519:8
  549:16 571:25
  590:7 593:9 644:9
  656:15
**kinds**  587:18
**know**  498:1
  506:19 507:13,23
  511:4 514:17
  517:15,17 523:1
  530:23 533:5
  537:21 540:12,24
  541:15,16 542:13
  543:1,16,18,19,21
  544:12 545:5,15
  545:17,21,22,23
  546:1,6,10,14
  547:2,4,5,10,23
  548:1,2,3,10,15,16
  548:24 550:6
  551:13 555:19
  556:15,22 560:8
  562:6 563:25
  564:12 567:17,18
  567:24 571:14,20
  571:23,23 573:4
  573:10,12 574:14
  578:19,19,21
  579:6,9,10,13,19
  579:24 580:22
  581:8,13 582:13
  583:18 588:7
  596:2,9 598:1,9
  608:16 614:10,20
  615:22 616:5
  617:13,15 621:13

621:25 622:3
623:1,2 625:20
632:7,8,12 636:8
642:23,25 643:9
645:23 647:24
653:18,19,25
655:18 660:10
663:1 664:13,17
664:19 666:16
667:17 669:5
674:1 675:24
678:18 679:24
680:5 681:25
682:7 683:23
685:2 686:14,15
696:9 697:1,13
699:20,21 701:12
**knowing**  541:21
  642:17
**knowledge**  551:4
  593:3 594:25
  595:2 612:3,8
  636:17 637:2,7,11
  638:4 678:25
**known**  601:14
**knows**  530:23
  541:15,16 635:14
  695:1
**koustas**  603:13
  604:15

### l

**labor**  601:10,10,12
  602:15,19,24
  630:9,14 649:23
**lack**  517:12
  679:13,13
**lacks**  531:4 541:12
**ladies**  601:22
**large**  625:15,15
**lastly**  584:13

lasts 667:2
launched 525:17
law 547:14 661:13
  667:11 677:10
  686:16 694:19
  701:23
laws 550:10
lawyers 558:6
lead 508:21,23,23
  528:11 680:25
  682:19 685:14
  691:8
leads 528:8 554:19
  680:21 681:2,4
  682:11 684:3
learn 551:3 555:6
  555:21
learned 531:23
  678:11
lease 624:21 625:5
leases 624:17
leasing 625:4
leave 514:14
  694:14,15
leaving 687:11
lecture 562:12,16
led 590:7 597:11
  603:10 673:21
left 497:14 577:16
  578:8 581:25
  582:15 584:21
  677:8 678:5
legal 547:24
  549:21,25 614:3,4
  631:19 632:4,5,7
  638:8 640:15
  704:17
legitimate 592:16
lena 605:9
length 520:13
  558:8,10 686:9

693:1
lengthy 562:2
lera 601:13
letter 500:24
level 526:12 569:3
  569:9 669:15
  686:21 687:18
levels 519:13
liability 512:1
license 520:7,12
  625:10 671:1,2,7
  688:18 691:22
  692:14,15
licenses 507:16
lie 696:24
lied 696:21,22
life 622:21
limit 503:19 505:3
  505:5 533:17
  538:16 554:24
  566:5 672:21
  673:13
limited 528:14
  531:5 533:15
  534:23 538:20,23
  538:24 540:8
  553:15 554:4,5,9
  555:14,16 556:10
  568:20 572:16,19
  572:20 669:20
limits 553:23
  672:13
limo 688:18
  691:22 692:14
limousine 520:5
  520:10 603:1
  606:9,24
line 504:8 505:10
  506:14,16 507:1,3
  508:8 509:20
  527:2 596:23

613:13 614:21,21
  614:25 615:3,18
  615:23,23 632:19
  644:6,18 645:3,6,7
  646:9,11 651:14
  651:18,20 657:16
  657:17 680:10
  681:20 685:23
  690:17
lined 644:19
lines 526:18
  535:25 539:12
  588:17 647:7
link 687:20
list 604:14 619:19
listed 612:4
listen 560:14
listening 519:12
  643:5,7
litany 551:2
literally 544:16
  557:3 587:7
little 504:1 509:5
  518:20 553:3
  567:7 569:2
  594:15 596:9
  600:21 601:16
  622:25 623:13
  624:3,11 645:8
  655:12 663:17
  664:1 688:3
  692:24
littler 495:11
littler.com 495:13
livelihood 566:2
  700:22
livery 507:15
  547:12,17,24
  680:11,22,24
  681:4 682:22,24
  683:8,21,24

690:25 692:19
llc 561:8,13,18,19
  561:25 562:5
  563:9 596:16
  680:9
local 532:1,1
localized 640:21
  640:24 643:10
location 511:6
  513:12 559:8,16
  567:7,8,13,23
  568:2,3,8,13,21,24
  589:14,21 590:4
  590:18 592:3
  593:17 664:4
  665:10
locations 665:11
log 506:6 523:13
  660:18,18,23,23
  666:24,25 667:2,4
  667:5 684:6
  685:16 688:23
  689:3,3
logged 506:3,8
  508:9 616:12
  660:15,19,25,25
  663:19 667:4
  671:16 675:3,4
  684:15,17 689:4
  690:7 693:5
logistics 685:24
  695:3 696:18
  700:9
logos 568:8
logs 667:6
long 548:2 581:9
  595:2 596:8 599:3
  626:18 660:10
  666:25 667:2
  676:1 685:20
  690:12 692:13

Veritext Legal Solutions
346-293-7000

[longer - manipulation]

**longer**  506:13,16
512:14 513:9
533:10 537:6,25
666:21
**look**  505:13,15
533:25 549:5,7
550:20 551:25
552:13 553:2,3
554:11 555:20
557:11 560:7
576:10 577:13,13
578:7 580:12
584:13 585:25
587:17 595:16,16
595:17 600:5,14
600:20 604:14
605:18 609:4
610:12,13 613:4
614:25 616:5,10
618:11 619:5,6
621:3 627:17
631:1 632:16
635:1 636:9
639:13 643:24
645:5,21 646:15
648:22 650:4,18
650:20 654:7,7,23
660:1,5,9 661:2,5
662:14,16 666:12
667:15 668:12
674:12,13 677:17
677:25 689:9
698:2 699:8 701:1
701:25
**looked**  512:22
523:10 551:19
580:14 592:8
593:8 605:17
607:6,9,15,22
608:8,13,16
610:15 612:16,18

613:8,8,10 618:9
619:1,20 620:13
620:20 622:8,16
622:20 623:24
625:3,5,5,9,14
626:12 642:1
654:10 655:5
674:20 678:10,16
690:3 699:15
**looking**  549:17
578:13 581:24
584:18 608:23
609:1 618:17
622:10 628:18
646:5 647:8
649:14,16 650:4
665:20 681:19
**looks**  522:16
600:18 616:2
**lose**  512:9 534:21
553:21 555:6
**loses**  669:21
**losing**  554:19
**loss**  528:24 529:1
588:5 652:25
667:12,14 668:2
668:14,23 669:4
669:23 673:16
688:25 691:11,12
697:24
**lost**  515:8,9,11
535:3 668:8
670:10 697:15,20
698:12
**lot**  517:18 532:6
571:9 602:19,21
622:10 650:8
655:11 661:8
664:18 672:6
675:6 676:10
678:17 679:4,5

697:2 698:14
**loud**  650:8
**low**  506:22 534:22
535:3,10 555:25
605:10 696:6
698:11
**lowe's**  541:11
**lower**  573:24
662:1
**luggage**  690:10
**lunch**  596:9 598:6
599:8,9 690:10
**luxury**  641:4
642:25 653:11,20
653:23 654:14
655:1,8 656:2,13
**lyft**  507:23 508:4
508:24 603:2
607:6 625:14
634:12,14,18
680:22 681:14,21
681:22,24 682:3,6
682:9,17 683:6,12
683:17 684:14,14
684:19,21,23
685:1 689:8
691:16 694:24,25
696:17 699:7,9,9
699:12,13

**m**

**m&a**  549:21
**ma'am**  639:2
**machine**  494:16
**macleod**  495:5
496:4 501:10
504:17 511:15
517:12,16 523:9
530:13,21 531:4
531:19 533:15
534:23 537:15
539:10,21 540:3

540:20,24 541:1,3
541:20 543:21
544:4,7,11,23
557:2,3,7,11 560:6
562:12,16,19,20
564:5,6,14 565:9
565:16 567:16,17
567:24 579:7,14
579:25 580:9,12
581:23 587:5,6,21
588:19,22 590:21
590:24 592:20
593:12,21,24
594:2,4,7,11
597:17,18 697:16
**macleod's**  697:7
**magnitude**  605:10
**mail**  495:8,13
501:17,19 528:19
583:22 584:6
679:9 689:17
695:20
**mails**  502:18,19,23
503:8,11
**maintain**  512:1
566:16 570:19
571:6,16 572:4
687:14
**maintaining**
570:25
**maintenance**
625:6 642:1 643:2
653:16
**making**  536:19
588:6 635:24
649:6
**male**  637:21,22
**manage**  501:8
**managers**  500:19
**manipulation**
673:4

[manner - minute]

**manner** 556:11
569:5,16,19,24
570:10 576:15,16
607:7 620:2
686:21
**map** 515:14 527:5
527:19
**mapping** 689:16
**maps** 515:13
518:18 527:2,18
**march** 586:8,10,20
587:9 588:8,13,16
588:21 589:5,9,16
589:20 590:3
618:22
**marked** 594:12
**market** 507:11
520:4 526:11
528:17
**marketing** 670:1
**markets** 669:24
**marshal** 675:13
**marshaled** 677:21
677:23
**massachusetts**
600:24
**massively** 541:5
**master's** 600:23
**match** 523:1,2
**matched** 504:15
511:12 513:9
**matches** 504:13
**matching** 504:11
**math** 647:4
**matter** 531:6
585:14 598:4
608:1 609:2,10
611:18 631:9
633:10 636:23
637:1 653:7 654:6
662:3 684:1

694:19
**mattered** 654:9
**matters** 630:7
649:17 656:17
659:18 662:3
676:1 682:15
**maximize** 625:23
682:13 692:10
697:23
**maximizing**
691:17
**maximum** 626:19
**mckinney** 495:12
**mean** 512:23
541:24 549:25
587:7 595:17
617:6 620:4
628:24 633:1
654:9 661:1
**meaning** 505:8
523:5 526:12
**meaningful**
528:12 688:15
**means** 558:15
560:24 644:24
669:19 683:7
699:11
**meant** 508:23
**measure** 621:12
**measures** 623:11
**meet** 526:14
572:11 678:22
693:12,15
**meetings** 502:15
**member** 601:4,9
601:13
**memorize** 560:18
**memorized** 563:1
570:11 571:21
572:1

**mendelson** 495:11
**mention** 527:22
**mentioned** 526:7
614:18
**message** 528:21
574:20
**messages** 502:20
503:8 538:10,13
**messenger** 676:11
**met** 672:3 697:11
**method** 686:22
**metric** 621:7
640:1
**metro** 560:24
**metropolitan**
618:21
**michael** 604:16
605:3 606:5
**micro** 526:12
**middle** 522:16
573:17 578:8
580:24 582:19
632:17
**miers** 495:10
496:7,8,13 539:13
550:8 598:15,22
609:18 617:17
629:19,21 632:10
632:16 634:2,24
635:1,7,22,23
636:9 637:6
638:11,12,20
639:3 641:6,7
642:22,23 643:3,9
643:24 648:1,5
649:2,6,22,25
650:15 656:8,11
657:1,3,21 658:8
658:11,22 678:8
698:8 702:4
703:17

**mile** 516:21,21
523:5,23 526:9
574:16,25 627:8
661:23
**mileage** 516:25
536:10 620:8,9,10
621:6,11,18 622:1
631:20 633:4,13
633:19 634:5
639:16,25 640:8
640:15 643:10
656:18 657:12
**miles** 516:9 529:20
608:14,15,20
610:17 613:8
616:13 619:2
620:6 627:7,11,13
627:15,19 628:25
629:1 652:9,10
653:3 655:11,12
657:16,17
**millions** 668:5,5
**mind** 600:7 604:18
611:14 612:15
614:13 683:21
701:19
**minimum** 502:12
533:7 554:13
566:17,20 567:2
602:21 603:4,10
603:15 605:3
610:9,21 618:18
618:23 619:4
620:15 647:17
674:15 677:19
**mints** 530:5
**minute** 516:20,21
523:5,23,24 526:8
532:9 574:16,25
596:11 619:20
661:23 682:15

Veritext Legal Solutions
346-293-7000

[minutes - normally]

**minutes** 513:19
537:6,7 546:9
639:19 641:17
658:15,19,20,22
663:25 664:4
677:8 678:5
**miscellaneous**
617:3,5,13
**mission** 571:23
**misspoken** 651:8
**misstatement**
632:5
**misstates** 539:18
544:20 560:1
632:4
**mister** 638:19
**mobile** 558:15
**model** 613:21
622:14
**models** 622:9
**modified** 558:17
**moe** 605:9
**moment** 670:22
698:19
**monday** 613:5
**money** 572:22
573:1,7,11 630:19
666:7 667:11,16
668:2 699:16
700:2
**monitor** 568:12
**monitored** 665:15
**monitoring** 567:19
568:18 587:7,11
587:16,23 588:4
588:10
**monitors** 602:4
**month** 502:13
594:16
**months** 501:23
589:16 672:1,4

687:10,12 700:16
**morning** 497:13
613:5
**motion** 586:7
649:7
**mouse** 563:20
**mouthful** 572:1
**move** 500:22
515:13 544:22
562:15,18 564:5
593:21 612:14
614:5 632:9,14
638:11 649:2
652:24 663:4,5
**moves** 649:7
**moving** 662:6
663:23
**multiple** 500:21
503:14,22 507:21
511:21 677:16,16
**multiplication**
627:19
**multiplier** 527:8
527:12 575:3
**music** 519:13
**mute** 526:20

**n**

**name** 548:7,8,12
550:18 559:3,15
563:7,14 568:6
599:25 637:14,15
637:17,19
**narrative** 501:11
**narrow** 585:14
677:10
**narrowly** 572:20
**national** 640:19
643:10
**nature** 597:13
695:19

**navigation** 518:6
518:13,14,15,19
577:20 578:1
**near** 541:11 582:4
**nearby** 504:13,23
504:24 511:10
**necessary** 625:16
634:19 686:22
**need** 500:6 507:8
521:23 522:6
523:1 537:6
542:12 561:15
562:4 573:15
578:22 590:19
599:10 614:10,16
658:14,17 659:12
659:14 686:25
687:10
**needed** 671:7
690:5
**needs** 515:21
539:20 544:9
595:12 687:1
**negative** 504:25
506:19,21 512:6
516:1 520:20
521:15
**negatively** 665:23
666:19
**negotiate** 500:25
520:17,21 521:2,5
521:8 548:23
551:13,15 552:17
552:23 573:23
**negotiated** 548:6,9
548:14,19 550:22
550:24 551:5
577:3,8,9 597:4,8
597:11
**negotiating** 520:23
521:14

**negotiation** 663:13
**neither** 676:17
704:7
**net** 498:13 690:19
694:24
**network** 507:17
**never** 564:11,11
656:17 666:12,25
678:10
**new** 501:15,17
519:21,24 520:3,3
520:5 582:16,25
601:23 602:1,4,8
602:10,11,14,14
602:16,16,25
603:2,15,21,24
604:3,4,7,20,23
605:11 606:6,8,10
606:22 607:14
608:2,22 610:22
618:16,19,20,21
618:23,24,24
620:14,19 622:6
622:11,14 623:4
623:17 624:4,14
624:20 626:9,13
628:1 636:21
641:15 644:12
650:21 654:5
670:5 674:17
688:21
**nights** 529:9
**nine** 631:18
**non** 643:10 655:1
**nonresponsive**
530:14 531:20
634:24 638:21
641:6 642:22
643:3
**normally** 518:3
545:7,13

Veritext Legal Solutions
346-293-7000

[notary - opinions]

**notary**  703:25
**note**  525:15
  609:19 682:14
**noted**  694:11
**notice**  568:10
  574:15 575:5,12
**notifying**  575:1
**noting**  678:20,24
  687:23
**november**  550:12
  551:7 557:20
  585:4 586:3,20
  587:9 588:8,16
  590:2
**number**  500:11
  502:13 503:19
  533:21 544:25
  550:21 577:14
  580:13 581:19
  582:14 583:5,20
  584:14 585:3
  586:16 594:13
  620:3,5 623:24
  626:11 627:1,18
  630:22 636:13
  645:6,16,25
  646:16 651:2,9
  657:11 662:6,9
  699:18,18
**numbered**  494:12
**numbers**  628:11
  629:6 649:14,14
  652:24 674:9,14
**numerous**  540:12
  550:4,6 557:4
  685:12 686:12

**o**

**o**  645:11 646:1,16
  651:7,16
**oath**  497:8 548:13
  589:1 591:25

**592**:23 636:23
**object**  501:10
  504:17 539:7,17
  543:11 544:19
  559:25 580:4
  586:23 590:5
  592:12 609:18
  638:20 649:9
  656:24
**objecting**  564:12
  632:3
**objection**  511:15
  517:12 530:13,21
  531:19 533:15
  534:23 541:12
  565:2 567:14
  579:3 593:4,18
  609:17 633:22
  634:24 635:5,16
  635:18 636:3
  638:7 641:6
  642:22 643:3,13
**objections**  551:2
  591:16
**obligation**  587:17
**obligations**  632:7
**obnoxious**  689:23
**obtain**  520:7,11
  688:18 692:14,15
**obtained**  552:22
  567:9 568:14
**obviously**  679:1
  688:11
**occasion**  621:22
**occasions**  614:15
  681:23
**occupation**  675:24
**occur**  662:8
  664:23
**occurs**  666:5,12

**offer**  500:24,24,25
  527:7,11 556:11
  609:8,15
**offering**  519:3
  636:1
**offers**  504:11
  525:5 636:19
  637:3,8,12
**office**  602:4,4,8
  696:4
**officer**  697:18
**offs**  538:1 556:8
  565:1 566:4,10
  585:22 589:12
**oftentimes**  517:6
  659:11,15
**oh**  517:19 672:10
**okay**  497:24
  506:19 518:5
  540:3 541:2,20
  545:19 547:8
  549:15 550:3,8
  552:5,6 554:18
  555:4,19 556:6,10
  556:14 557:11,25
  558:15 559:6,10
  564:2 566:13
  567:6,21 568:17
  573:14 574:7,14
  575:18,21 576:18
  577:25 581:5,23
  582:19 584:21,25
  585:2 589:9
  590:12 591:2
  594:23 595:9
  596:5 597:19
  598:23 599:13
  600:13 604:19
  605:1 606:1,3,16
  607:12 609:24
  610:1,25 612:10

**612**:14 616:10
  618:8 619:5,16,22
  629:24 630:11
  631:7,15,17
  632:10,15 633:9
  633:18 634:9
  636:9 637:10,14
  637:16 639:13
  641:11 644:16
  645:5 646:3 649:2
  650:3,18 658:5,21
  658:24 678:6
**old**  529:13 656:21
**once**  501:20 504:5
  504:15 509:2
  524:17,21 532:2
  590:21 676:6
  683:13 685:7
  689:4 690:7
  694:16 696:20
**ones**  519:14
**ongoing**  501:9
**ongwae**  629:10
**open**  500:11,15
  528:20 531:13
  677:11
**opened**  602:8
**opening**  539:22
  677:9 689:1
  697:10
**operate**  520:4
  555:18 625:21
**operated**  680:8
**operations**  542:1
**opine**  552:8
**opinion**  539:8,11
  613:2 631:13
  633:3,9 645:3
  677:2
**opinions**  611:15
  612:17 614:8

Page 28

[opinions - panels]

656:5

**opportunities**
668:14 688:10
692:17 693:8

**opportunity** 556:1
660:12,14 668:22
669:3,22 670:7
673:16,22 680:14
688:7,25 691:10
691:25 692:1
694:12 697:22,24

**opposed** 531:11
598:13

**opposing** 520:14

**opt** 502:22 503:7
503:11 524:22,24
525:1

**optimize** 529:23
532:8

**option** 525:19
529:17 532:17
551:14 552:17
694:12 698:21

**orange** 527:20

**order** 518:13
520:6,11 522:24
522:24 523:2,25
531:15,17 532:7
566:14 569:13
595:10 616:7
625:16,22 663:21
664:18 666:8
671:4 675:3,5
678:14 682:12
697:23 700:24

**ordinance** 547:19
548:1

**ordinances** 547:21

**organization**
602:9 604:5

**organizations**
602:7 604:3

**organized** 613:3

**origin** 678:10

**original** 588:25
703:16

**outcome** 611:14
704:11

**outs** 543:18

**outside** 507:17
510:13,16,21,25
534:16 634:18
635:3 636:2
664:22 681:16
682:22 683:9,12
683:17,25 689:8
690:21 692:17
694:25 700:10

**overall** 534:1,5,18
623:6,22

**overly** 531:5

**overruled** 501:13
511:17 531:7,21
560:3 565:4
567:21 636:5
643:15 648:4
649:20

**oversight** 657:20

**overstate** 633:20
634:6 651:25

**overstated** 652:25

**overstating** 616:22

**overtime** 620:19
620:21 626:22
627:3,5 628:2
650:22,25

**overview** 619:9

**owned** 680:8

## p

**p** 612:24 613:6
615:1,12,24 620:6
627:14 632:18
644:22 645:3,8,19
645:25 646:8
651:13,17,19,23
652:3,4 657:11,18

**p.m.** 494:13 532:4
596:12,12 599:17
599:17 658:25,25
702:5

**p1** 508:14,16,19
612:21,21 613:15
613:20,21,24
614:1 616:22,24
626:24 627:12
631:11,20 632:18
633:1,4,12,13,15
633:19,19 634:5,5
634:10,16 635:2
635:25 644:6,24
649:15 652:9
653:2 684:17
693:20,22 694:2
694:18

**p2** 612:21,22
613:17,20,22,24
614:1 626:25
627:12 631:11
632:18 644:25
646:13 649:15
652:9,10

**p3** 612:21,22
613:19,20,22
614:2 626:25
627:12 631:11
632:18 644:7,25
652:10,10

**page** 496:2 497:20
497:24 505:23,25

515:19 522:13
532:12 539:12
549:11,11,15,16
550:20 551:3
558:11,21 560:21
562:21 563:4,18
564:15 567:6
573:15 576:13,24
578:1,6 580:23,24
581:13 582:4,5,20
583:10,25 584:14
584:15,16,19
585:2 600:20
605:19 606:4,4,5
610:2 611:5,6,7,12
612:5,14,16 614:5
618:11 619:23,23
621:2 629:9,11,25
630:2 632:17,17
636:10 639:14,24
641:14 650:5
657:9 704:3

**pages** 548:2
560:13 581:10
600:17 619:5,10
619:10,21

**paid** 513:17,22
524:5 605:10
607:16,23 610:19
610:21,23 611:2
613:10 619:14
648:17 662:13
663:25 664:6
670:16 674:15,15
677:12 694:22

**painstakingly**
659:10

**pair** 515:3 665:12

**paired** 513:2

**panels** 500:20

[paper - period]

**paper** 605:12
606:5 607:9,10,13
659:6 661:20
**papers** 601:15
603:17,19 604:9
608:1,22 622:6
650:8 654:23
**paragraph** 505:24
522:16 527:23
553:5,20 554:19
563:3 616:11
621:3 632:21
636:11
**parrott** 496:6
597:21,25 599:4,5
599:10,18,21
600:1,2 605:21
609:9,24 610:1
615:7 617:21
623:3 630:12
635:7,13,19,23
636:6 638:23
649:22 650:3
657:3 658:4
693:20
**part** 515:19
528:12 532:12
535:16 543:3
555:4 573:16,17
574:12 577:22
617:24 633:5,8
646:25 657:20
699:5
**particular** 506:20
512:7 513:2
575:23 625:13
657:15 688:8
**particularly**
507:15 531:25

**parties** 510:9
515:6 533:2,8
567:12,22 568:13
568:19,23 685:4
703:19 704:8
**parts** 613:14
**party** 511:25
561:8 563:11
577:20 578:1
703:23 704:6
**party's** 514:3
**pass** 537:12 596:2
629:16 656:7
657:21
**passage** 539:23
**passed** 514:9
**passenger** 608:12
608:13 612:23
613:18,19 616:13
625:17
**passengers** 507:16
531:10 604:22
625:21
**passes** 649:25
**path** 673:21
**pause** 581:20
590:7
**pay** 524:12,20
528:7,9 529:19
576:25 594:17
603:15 604:8,21
606:14,18,19,25
607:17 608:16,25
609:5 613:4,4
614:19 617:2,5,7
618:17 620:3,20
620:25 627:25
628:1,2,6,8,9,10
628:10,14,14,16
628:19,20,21,22
629:4,4 645:12

651:6,15 652:19
670:14,20 679:25
700:17
**paying** 513:19
531:10 624:17
**payment** 511:18
511:19,22 524:18
524:19 528:14,15
538:23,24 540:8
553:15 554:4,6,9
555:15,16 568:20
572:16,19,20
594:12,22,24
595:2,5,16 611:2
617:1,3,5,10,13,14
617:22,24 618:2,4
619:12,14 620:24
629:2 659:9 666:1
666:3 681:15,18
**payments** 616:14
616:21 619:12
649:23 681:10,16
683:23
**payout** 657:12
692:4,5
**paypal** 540:7,10
540:11,14,18
541:3,5,6,9,10,10
541:18
**payroll** 620:22,24
627:21,23,23
628:7
**pays** 514:10,11
515:11 524:8
**pdf** 646:20 647:5
**peak** 688:13
**pedicab** 563:9
**pedicabs** 680:9
695:10 696:4
697:23

**peer** 603:18
604:12 609:14
**penalized** 689:18
**penalty** 550:10
592:1,22,24
**people** 500:21
517:6 523:2
529:10 545:7
555:12 601:12
621:15 623:25
637:10 670:4
677:5
**percent** 512:24
526:1 535:5
627:24 683:2
**percentage** 525:24
534:20 535:2
542:22,25 543:8
577:1
**percentages** 663:6
**perfect** 549:13
**perfectly** 687:12
**perform** 502:5
538:1,16 564:25
566:3,9 657:5
670:24
**performance**
501:21 502:5
**performed** 606:17
606:19 614:7
654:4
**period** 527:2
533:16 534:24
535:1 539:19
541:23 542:24
543:25 547:1
558:3 559:12
560:11 566:24
568:22 578:15
579:2,17,17
580:21 581:3,11

[period - preponderance]

582:12 583:2,17
584:7 613:12
618:3,6,22 620:12
653:10 659:25
660:20 663:16,16
663:21,21 665:18
665:18,18 666:22
670:16,17,17
671:21,24 673:20
674:9,9,9,18,22,23
675:5,16 682:1,4
699:21,22 700:3,4
700:11,16
**periods** 670:14
676:1
**perjury** 550:10
589:1 592:1,22,24
**permanency**
671:18 672:2
692:22
**permanent** 506:15
506:18
**permissible**
547:24
**permission** 515:5
687:11
**person** 500:21
528:20 549:18
561:4 564:9
565:14,15 620:25
637:25 638:1,2,4
**person's** 637:14
637:15,23
**personal** 551:4
637:6
**perspective**
697:13
**persuasive** 688:2
**pertaining** 586:22
**pet** 583:7,15

**ph.d.** 600:23,25
601:18
**phone** 518:25
530:6 536:16
546:4,5 625:15
626:1 637:25
679:9 688:19
691:20 694:23
**phones** 522:21
**phrase** 549:24
**pick** 497:14 509:8
523:21 524:11,14
608:12 613:18
**picked** 511:7
**picking** 521:8
**picks** 509:11
**pickup** 511:6
559:8,15 664:1
**pickups** 538:1
556:8 565:1 566:3
566:10 585:22
589:11
**piece** 559:7
**pieces** 618:15
**pink** 681:20
**place** 603:5 687:14
**places** 508:16
**plaintiff** 688:3
**plaintiffs** 687:23
**plan** 625:15 626:1
664:12 688:19
**planet** 666:4
**planned** 661:15
**platform** 498:11
507:18 526:5
529:5,24 532:8
691:21
**play** 661:10 672:9
690:19
**playing** 676:8
694:23

**plays** 672:8 676:12
**please** 497:8,20
515:18 518:9
526:20 533:18
543:15 544:6,22
549:8 557:1
562:15,18 565:14
565:17 580:12
585:10 599:19,25
605:24 606:21
610:2 617:17
621:3 634:1
635:21 638:25
643:4,7
**pledge** 701:21
**plenty** 565:10
**plug** 529:14
**plus** 628:6,6
632:18,18 644:24
**pocket** 669:12,12
**point** 513:20
575:11 586:13
591:23 592:21
641:11 657:2
664:1 674:1
**pointed** 550:8
**points** 522:22
523:17 524:1
**police** 697:5
**policies** 597:10
602:13 659:24
666:12,13 667:1
685:12,13
**policy** 602:7 606:7
659:25 685:11
686:12
**pool** 666:5,6
**portal** 594:19
667:15
**position** 601:19

**positive** 625:23
**possess** 569:3,9,12
**possible** 647:10
677:10
**post** 500:16
598:17,20 698:3
**posted** 582:11,25
584:6
**posting** 579:1
581:2 582:10,16
583:7,15,21
**potential** 688:7
**potentially** 521:18
549:5
**power** 673:12
**powerpoint** 659:4
**powerpoints**
698:7
**practical** 700:23
**practice** 628:11
632:5
**practices** 648:16
**pre** 501:7 510:12
510:15,21,24
511:14 552:4,25
573:21,25 574:5
665:5 672:15
676:1 679:6
**precise** 676:19
683:24
**predicted** 680:15
**prefer** 598:12
**preferred** 668:19
**premium** 653:13
**preparation** 657:8
**prepared** 580:3
597:20 598:24
641:15
**preponderance**
661:6 677:18
700:6 701:3

Page 31

[present - published]

**present** 495:14
504:10 659:6
**presentation**
618:14
**presented** 509:3
543:24 583:14
584:5 601:15
603:19 604:9
620:1 651:6
676:21,24 693:24
698:12 701:2,20
**presenting** 612:13
**president** 601:25
**pressed** 563:25
**presumably** 509:8
509:13
**pretty** 519:10
526:12 615:3
647:4
**prevailing** 610:21
**prevent** 672:22
**previous** 499:9
560:15 615:20
618:1,4
**previously** 497:11
573:16 586:15
589:7
**price** 653:15
668:25
**priced** 653:13
**prices** 526:15
**pricing** 526:3,4,24
688:7
**primarily** 682:18
**primary** 679:24
**prior** 513:21
537:24 541:2
589:16,20 591:9
629:22 631:8
633:9 655:21

**private** 624:15
**probably** 558:5
581:4,6,15 657:19
**problem** 517:16
587:19
**procedures** 686:24
**proceed** 497:2,8
588:17 599:13
643:4,8 658:13
**proceeding** 564:11
629:22
**proceedings**
703:15
**process** 498:22
500:1 502:10
503:6 510:24
518:12 522:14
642:15 659:12
676:3 681:16
**processing** 683:23
**produced** 552:21
552:22 583:3
679:4
**production** 549:10
563:24 578:25
**professional** 569:5
569:16,19,23
570:10 601:11
**professionalism**
570:19,25 571:7
572:5
**professor** 601:17
601:18 603:6,12
604:4
**profile** 647:16
**profit** 528:24
529:1 668:14,23
673:16 688:25
691:11,12,25
697:24

**profitability**
692:11
**profits** 669:3,22
682:13 691:17
**program** 525:6
**promise** 701:21
**promotions** 688:7
**proof** 556:2
693:13
**proper** 649:21
677:19 693:25
**properly** 662:11
**proprietary**
518:15 588:3
665:15 691:1
**proprietor** 695:10
**protection** 677:11
**prove** 676:18
693:16,23
**provide** 499:3,9,11
501:17 502:1,2
518:21 528:10,13
528:19,22 530:3,5
530:5 531:8,15
533:10 538:10
546:8,12,13
553:18 556:2
558:25 569:4,10
569:15,18,22
574:15 575:5
582:9 584:8 585:5
585:10 593:1
596:23 611:13
615:4 630:13
653:13 665:8
672:14 677:11
682:2 686:25
687:1 688:17
690:8 691:21
693:21 700:25

**provided** 515:24
516:2,6 518:25
543:20,22 546:3
550:23 559:13,20
559:21 560:5,10
566:1 571:9
574:23 579:23
582:10 584:16
586:14,15 589:1,6
589:7 591:17,20
595:3 607:18
610:7 614:3 617:9
617:23 633:6
646:19,20 652:5
659:16 664:23
680:10 682:11,21
683:6,11,16,25
**provides** 661:10
680:11
**providing** 508:2
563:6 589:13,21
590:4,18 592:3
593:17 608:19,20
610:10 634:11,17
634:20,22 635:3
680:4 681:4 683:8
694:24,25
**provision** 558:22
**provisions** 494:16
**proximity** 522:25
523:18
**proxy** 655:25
**public** 621:14
703:25
**publication** 532:2
603:18 604:14
**published** 578:14
581:2 583:1,16
584:6 588:19
604:1,2 607:13
608:1,7 609:13,13

Veritext Legal Solutions
346-293-7000

[published - reasonable]

611:22 613:23
621:25 622:6
654:23
**pull** 497:15 498:19
502:25 503:9
515:15 518:8
522:9 527:14
528:3 532:10
534:12 600:3
**pulled** 610:17
648:24 697:5
**punish** 666:11
**purchase** 625:3
653:15 688:17
691:20
**purpose** 585:17
603:3,8 609:3,4
**purposes** 498:14
568:15 621:13,16
675:1
**pursuant** 494:16
703:21
**pursue** 688:7,9
693:8
**put** 603:4 626:17
680:23
**puzzles** 676:12

**q**

**qualified** 653:12
674:8
**qualify** 660:24
**quality** 554:25
555:20,25 556:3
556:12 686:8,17
686:20,23 696:13
**quantify** 542:20
**quarter** 682:5,9
**question** 501:11
515:20 530:24
537:19 540:1
543:3,15 548:21

556:23 557:2,8,10
561:21,23 562:1,2
562:13,14 564:2,5
564:7 565:9,19
571:3 575:4,4,17
579:7,13,14,21
587:15 588:15
590:13,17,22
592:17 594:2,5,8
604:16 605:21,25
607:19 608:23
615:8,11 629:25
633:25 634:1,3
635:15,17,21
638:10,23 639:1
643:16 649:5
696:2
**questioning**
537:16 548:6
561:15 562:2
**questions** 498:23
504:4 520:16
537:11 541:25,25
542:2 543:6,6,7,8
544:2,3,4,5 556:23
557:13 562:10
564:9,10 565:11
596:1,5,15 606:21
638:25 656:9
657:24
**queue** 664:20
**quick** 553:4
629:25
**quite** 505:14
570:21 571:1,18
678:18
**quote** 617:5
673:10 697:10,18
699:23
**qx60** 653:11
654:21

**r**

**r** 495:10 703:17
**rabbit** 662:5
**raised** 540:7
**ran** 680:10
**range** 602:9
**rare** 681:22
**rasier** 561:18
**rate** 506:22 507:4
512:21,23 513:24
514:1 516:20,21
516:21,21 523:6
523:23 532:17,19
532:22 535:12
612:11 620:8,9,10
621:11,19 622:1,7
622:8,24 623:1,24
624:3,10,12,24
625:2,21,25 626:4
627:24 640:18,23
641:20 642:18
643:11 653:6,17
653:22,23 655:21
655:23,24 661:21
662:4 666:18
676:23 689:20
690:1
**rated** 534:11
**rates** 534:13
622:24,25 624:19
640:9,15
**rating** 514:4
532:13,14,15
533:3,9,11 534:5
534:15,17,18,22
535:7,10 554:13
554:23 555:8
566:16,18,21
567:2,3 666:10,11
666:13,15 684:24
690:4 696:6

**ratings** 532:9,25
534:6,8 535:4
554:11 556:1
566:13 625:7,23
690:4
**reach** 515:1,2
**reached** 652:18
**read** 532:1 534:2,3
555:5 566:22
571:18 573:15
576:7 645:23
676:7 685:10
686:12
**reads** 675:21
**ready** 497:1,9
513:11 598:10
599:1 665:1
671:17
**real** 553:4
**realities** 659:8
661:9 667:8
669:10 686:18
700:8 701:4
**really** 526:14
530:3 531:8 533:4
579:9 617:24
667:10 690:15
695:20
**realtime** 526:11
**reason** 506:14
511:24 523:20
534:16 539:19
575:10 585:11
608:21 618:7
649:11,13 651:1
660:5
**reasonable** 516:16
576:16 610:9
616:2 655:25
670:21 676:23
677:3,6,6

Page 33

[reasonably - remember]

**reasonably** 676:20
**reasons** 511:21
  522:23 555:25
  623:2 686:6 704:4
**rebut** 656:5
**recall** 505:14
  546:5 554:10
  586:11,17 624:2
  630:5 661:20
  695:13 697:7,9
**recalled** 547:2
**receipt** 704:2
**receive** 501:20
  508:5 515:7
  524:18 525:12,25
  526:1 545:2,11,19
  561:1,5 566:15
  616:18,20,21
  649:22 669:11
  670:16 675:3
  676:15
**received** 525:24
  534:6 575:3 586:8
  588:20 600:25
  606:24 607:3
  608:16 609:2
  611:11 614:4,21
  616:13 617:1
  624:6 627:11
  628:9 629:7 639:3
  639:8 671:5
  683:24 692:4
  696:6
**receives** 534:15
**receiving** 502:23
  503:11 504:6
  585:21 589:11
  608:25
**recess** 523:14
  537:9 596:12
  599:17 658:25

**recognize** 503:2
  505:17 522:10
  648:25 687:17
**recognized** 686:5
**recognizing**
  678:18
**recommended**
  516:6,17 517:4
  574:18 575:6,10
**record** 494:17
  536:4,9,13,19
  537:8 539:12,24
  599:25 607:5
  631:2 632:11
  672:25 676:2
  703:15
**recording** 665:21
**records** 549:3,5
  615:15 700:18
**recruiters** 500:18
**recruiting** 500:15
**red** 527:20 678:9
  678:13,17,19
  679:15
**reduce** 521:17
  576:3,14
**refer** 526:16 527:1
  527:7 632:25
**reference** 540:14
  612:24 629:10
**references** 499:5
**referencing** 543:2
**referred** 508:14
**referring** 543:2
  556:18,21 594:21
**reflect** 506:2
  625:13
**reflecting** 624:20
  655:18
**refund** 522:1,3,7
  522:14,17

**refusals** 636:14
**refuses** 693:21
**refusing** 636:13
  639:4
**regarded** 621:14
**regarding** 606:25
  684:20 694:1
  696:16
**regardless** 577:3,8
**registration** 625:9
**regular** 653:24
  654:24 670:25
**regularly** 647:19
  648:5
**regulated** 520:4
**regulation** 672:7
**regulations** 676:18
**regulatory** 519:23
**reich** 603:6,12
  604:16 605:3
  606:6
**reich's** 604:4
**reimbursed**
  662:12
**reimbursement**
  536:9,13 626:1,5
**reject** 685:6
**related** 585:10
  591:10 621:16
  673:1 676:19
  704:8
**relates** 588:10
**relation** 608:17
  610:8 613:11
  618:17 619:2
  623:24
**relations** 601:13
**relationship**
  562:21 564:15
  660:24 661:2,17
  666:4 671:19

677:15 687:19
  690:6 693:1,2,4,10
  693:13 695:18
**relative** 659:25
  667:8 690:22
**relatively** 622:4
**relevance** 567:14
  567:15 586:24
  588:15 590:9
  656:25
**relevant** 587:3,20
  622:18 640:9
  641:24 670:8
  679:16,17 682:4
**reliability** 687:4
**reliable** 609:20
  686:25 687:2
**reliance** 673:15
  678:20 700:5
**relied** 607:4 659:8
  699:20,24 700:7
  700:21
**relies** 522:25
  673:11
**rely** 524:1
**relying** 523:18
**remaining** 651:17
**remains** 551:10
  683:15
**remarks** 599:9
**remember** 537:15
  542:6,10,14
  544:13 551:20
  557:18 570:16,17
  570:21 579:23
  586:9,13 591:10
  593:7,11 594:10
  595:13 596:17
  629:13,22 637:16
  637:24 639:18
  644:3 683:4

Page 34

[remember - reviewed]

685:10 696:5,12
699:6
**remind** 526:3
**remitted** 524:21
524:24
**remotely** 494:11
**remove** 532:24
**removed** 673:3
674:3
**rentals** 680:10
685:23
**rep** 673:25
**repair** 625:6
**repaired** 694:16
**repeat** 530:24
557:8
**report** 600:3,10
603:23 605:5
606:8,23 608:6
609:8,20 610:2
618:12 619:21
621:3 630:1,25
631:4 636:15
638:12,17 639:7
640:5 641:14
653:2 657:9,10
674:11
**reported** 494:15
682:25
**reporter** 494:14
523:8 565:12
605:22 635:12
701:7,9 703:11
**reporter's** 703:7
**reports** 604:2
646:19 656:3
**representative**
545:11 550:4
570:23 571:5
576:6 577:7 580:1
588:7 660:7

664:11,24
**represented**
617:15 655:17
697:1 701:15
**represents** 681:20
**request** 504:12,16
504:21,22 505:1
508:10 509:2,7
513:2,6,10 527:7
533:1 535:7
536:19 558:24
559:22 561:5
573:24 663:19,20
664:15,25 665:3,9
698:3
**requested** 703:23
704:5
**requests** 504:2,7
507:1 508:5 511:9
549:9 561:1
585:22 587:14,18
589:11 596:24
664:10 685:7
**require** 502:12
598:20 676:18
**required** 498:25
499:3,8,11,22,24
502:15 515:23
518:5,21 528:4
535:12 624:14
664:18,19 670:24
675:12 679:2
689:12 691:22
696:13
**requirement**
513:12 520:10,11
672:2
**requirements**
519:25 520:6
569:2 572:2,12

**requires** 519:22
671:3,10,14 680:1
686:2
**research** 601:10
601:20,21 603:19
604:10 612:12
630:20 642:11
**researchers**
621:23
**reserves** 572:7
574:9 575:22
**respect** 653:15
690:22
**respected** 512:21
**respond** 587:17
**respondent** 494:5
495:9 497:3
598:15,22 649:7
649:25 658:8,10
658:21 703:5
**respondent's**
577:14 578:13
580:13 582:14
583:5,20 584:13
594:13 648:22
649:3,8
**responding** 587:14
**response** 548:5
551:12 561:14
586:4 587:4,9,13
588:12,20 590:1,2
**responses** 549:8
557:13 591:16
623:8,12,16,18
624:5,7,22 696:20
**responsibilities**
632:12
**responsive** 594:4
**rest** 650:8 679:15
**restate** 590:21
634:1

**rested** 658:10
**restrict** 564:17
565:22,23 572:9
**restricted** 564:24
566:8 585:21
589:11 592:8
**restricting** 565:5
**restrictions**
508:11,13,15
**rests** 658:10
**result** 574:17
581:9 628:4 647:2
648:17
**resulted** 624:10
636:14
**results** 623:22
693:23
**resume** 499:3
500:19 600:15
658:23
**resumes** 500:12
**retained** 602:23
603:8 692:3
**retains** 564:16
**retread** 504:3
**return** 514:19,21
621:1
**returned** 623:25
703:25 704:2
**returning** 515:7
**returns** 683:18
692:20
**revenue** 529:4,6
529:11,23
**revenues** 530:1
**review** 500:12,19
593:14 594:15
603:25 609:10
611:13,23 623:10
**reviewed** 568:3
570:22 571:1

Page 35

[reviewed - route]

593:11 594:10
603:18 604:12
609:14 611:8,17
624:22
**reviews** 501:21
502:5
**richmond** 495:6
**ride** 510:24 511:4
521:21,24 524:17
548:12 553:8
559:4 560:10
664:10 665:9,12
670:16,19 689:7,9
689:11 690:14
692:17 697:4
**ridenour** 495:15
497:16,20 498:20
502:25 505:24
532:10
**rider** 504:16 508:3
508:20 509:9,11
509:13,17 511:4,6
511:9,13 513:1,3
513:11,13,19,24
514:1,6,11,14,21
514:24,25 515:2
515:12 517:6,11
518:1 521:1,4,8,20
521:24 522:1,15
524:5,9,11,12,14
524:20 528:18
532:16 534:13
535:12 548:8,14
548:19 550:25
552:24 572:22
577:8 662:19
664:13,13,25
665:5,8 666:3
681:10,16 689:23
690:11,12 697:5

**rider's** 504:12
509:24 511:6
515:4 516:10
522:3 535:9,11,11
664:3
**riders** 507:7 510:3
510:4,8,13,16,21
515:8 518:21
519:1,3,6,9 520:18
520:21,24 521:14
522:7,17,25
523:19 525:9
532:22 533:7
534:7 535:12,21
553:8 665:10,22
666:1 668:19
669:8,15,25 670:1
686:2,6 689:21
690:2,20 697:1
**rides** 506:22
510:12,15,21
535:20,23,24
546:2,3,7,11 547:1
547:9,12,17,25
583:7,15 634:11
666:20,22 669:11
670:4 671:15
673:6,8 674:3
683:6 685:19
**ridiculous** 665:6
**right** 498:19
503:17 505:22
506:4 509:1,5
522:18 526:21
534:20 536:1
537:20,23 539:5
540:2,5,7,10
545:18 547:7
548:3 549:12,19
549:20,23 550:25
551:9,11,15 552:3

552:18 553:12
554:4,17 555:22
555:23 556:4
557:21,23 558:4,9
559:8,9 560:22
562:20 564:17,20
564:21 565:22
566:8,21 568:15
569:18,20,24
570:1,3,6 572:8
573:18,20 574:4,9
575:7,22,24
576:16,21,22
577:11,20,21,22
577:23 578:3,8
579:7 580:3,17,25
582:17 583:8,19
583:23,24 584:2,3
584:15 585:17
586:5,6 589:3,4,7
591:5,21,24
595:15,19,20
598:2 599:7,14
600:11 626:2,7
630:22,25 631:15
631:21,22 632:19
633:10,14 636:15
636:19 638:24
639:2,5,6,9,22
640:1,2,6,13,17,18
640:20,25 641:13
641:17,21,25
642:10,12,13,16
642:19,24 644:7,8
644:10,11,13,14
644:18,23 645:8,9
645:13,15 646:12
646:14,25 647:11
647:12,17,18
650:10 651:1
655:9 656:13,14

656:19,20,22
657:13,18,19,25
662:21 663:9,23
668:16 669:20
675:19 676:11
678:8,8 686:4
694:7,21 699:20
**ripple** 673:21
**risk** 511:19,22
528:16 667:12,12
667:14
**risks** 667:11,25
**rmacleod** 495:8
**road** 524:16
555:22 556:2
662:7
**rochford** 605:10
**role** 500:1,8,9,11
500:13,16
**room** 498:2
581:21 617:18
**rosenthal** 495:17
496:3 497:5,7,10
497:17,21 498:21
501:14 503:2
505:17 515:17
518:10 522:9
523:15 527:15
528:4 532:11
536:3 537:11
543:4 550:16
590:13 592:17
594:3,8 596:14
617:18 678:25
685:5
**round** 594:16
**route** 515:22
516:2,6,17,17,23
517:4,4,7 521:12
608:11 689:13

Page 36

[routes - see]

**routes** 515:13,15
515:23
**routine** 671:10,13
**routinely** 686:19
**row** 505:6 645:7
**rule** 664:22 701:2
703:21
**rules** 519:6,8
540:21 553:7,12
**ruling** 517:22
**run** 675:7 697:23
**running** 567:10
680:18
**rural** 532:1
**rustling** 650:7
**rx29** 515:16,18
**rx31** 527:14,16
**rx34** 522:9,10
**rx36** 503:1,3
**rx37** 518:8,11
**rx38** 532:10,11
533:25 534:15
**rx48** 551:19
557:12,16
**ryan** 495:5

**s**

**sabotage** 678:12
**safe** 553:6
**safety** 568:14
686:8,17,20
**san** 501:7
**sandahl** 495:10
496:4,5 497:3,6,13
498:1,3 501:14
504:20 512:3
517:24,25 523:7
523:15 526:23
530:16,25 531:22
533:19 535:1
537:3,7,10 539:7
539:17 541:12

543:11 544:19
559:25 565:2
567:14 579:3
580:4 581:20
586:23 587:13
590:5 592:12
593:4,18 596:4,14
597:14
**satellite** 687:22
**satisfy** 672:2
**saturday** 532:5
**save** 677:7
**saw** 519:16 530:10
538:14,18 628:4
689:17 701:16
**saying** 542:3 547:3
552:6 569:13
571:16 575:19
577:7 586:11,17
594:18 595:10,22
597:7 644:3
700:17 701:10
**says** 550:14,23
551:1,3,13 552:19
553:5,7,10,13,25
555:2,24 556:5
558:16,23 559:17
559:18 560:3
563:2,24 564:16
564:21,22 565:23
566:14 567:8
568:11,16 569:2,7
569:21,22 570:2,3
570:18 571:2,19
572:3,6,7,14
573:17,22,23
574:1,3,7,8,12,14
575:5,8 576:10,12
576:13,17,24
577:5,12,17,19,22
577:24 578:1,9

580:15,24 581:1
581:25 582:3,5,7
582:18,22 583:9
583:10,12 584:22
584:24 585:9,12
585:18,19 586:2
589:15 616:11
645:11 646:11,13
647:16 667:3
671:9 674:25
**scale** 689:21
**scenarios** 509:9
**schedule** 684:5
695:9
**schedules** 687:24
**school** 602:14
604:4
**scope** 531:5
533:16 534:24
**scrap** 611:18
**screen** 509:4
527:24 528:1
631:4 638:24
**scroll** 600:17
**searched** 578:20
**season** 530:9
**seat** 511:11 599:19
**seattle** 603:8,10
604:7 605:4,5
607:2,4,19 608:2
608:22 622:7,11
622:15 623:9,14
623:18,23 641:16
654:5
**second** 523:3,20
525:18 527:19,22
540:16 544:1,8
545:14 549:9
556:15 558:23
581:21 600:20
604:15 605:2

611:6 615:8
632:21,22 646:17
649:4 650:5 667:7
682:9
**seconds** 504:19
559:4 669:18,20
669:22 678:5
**secret** 588:4
**section** 522:13
551:22 552:2
554:18 560:21
562:25 564:14,23
565:21,23 566:7
566:13,14 567:6
569:1 572:2
573:14 574:2,8
575:18,21 576:8
576:23
**sections** 551:24
**secured** 508:3,21
**security** 568:15
**sedan** 654:18
**see** 497:17 505:20
505:23 527:3
538:12 555:2
556:9 558:13,16
560:2 563:10,13
563:17,23 564:2
574:2,25 576:10
577:4,16 578:8,9
578:11 580:16
582:5 584:1,18,21
585:3,8 588:13,14
588:22 590:22
595:7 600:8 605:2
606:11 607:16,22
610:3 614:20,25
616:25 621:8
627:7,11,21 629:9
631:7 634:19,22
644:10,20 645:14

Veritext Legal Solutions
346-293-7000

[see - sign]

645:24 646:6
659:7,12,14,20
661:13,14,16
666:18 672:11
674:13 675:18
676:17 682:5,15
683:19 686:19
687:17,19 689:10
693:6
**seeing** 534:14
544:14
**seek** 616:9 655:14
**seeking** 536:9,13
624:23 625:2
690:20
**seeks** 585:13
**seen** 505:12
521:10 545:1
552:20 563:21
564:11 568:6
574:20 588:11
591:18,22 592:5
594:14 621:18
656:3 665:24
670:2,12,13
673:24 701:15
**sees** 527:7
**segment** 610:13
615:13 627:14
**segments** 612:20
612:24 613:2,7
615:1,19,24 620:6
626:24 627:12
651:13,17,19,23
652:3,4 657:12
**self** 620:25
**send** 500:24
502:18,19,20
671:1 678:15
687:20

**sense** 510:10
556:13,15 617:23
683:5 694:21
**sentence** 527:19
534:1,13 558:23
568:17,18 572:15
574:12 576:12
632:23 636:10
639:14,24 673:10
699:23
**separate** 652:8,9
652:16
**separated** 618:15
**separating** 608:17
**september** 671:22
**serious** 616:8
**serve** 550:3
**served** 630:3,12
703:18
**serves** 678:21
**service** 525:7
528:9,13 530:3
531:9,16,16
571:17 572:5
576:23,25 577:10
617:9 626:1 633:6
654:20 663:3,5
668:25 680:22
686:25 687:2
688:19 691:7
**services** 507:8
511:25 528:10,10
533:10 543:17,19
553:18 557:16
558:1,2,22,24,25
559:11,23 560:8
561:2,5 563:6,14
564:19 565:25
566:16 567:7,9
569:5,11,15,19,23
572:11 574:19

575:7,13,23 577:1
608:20 610:10
617:23 625:17
634:17,21 635:3
636:1 653:13
654:19 662:4
663:2 668:20
672:15 680:4,11
680:12,15,24
681:4 682:3,20,22
682:24 683:3,9,12
683:16,21,24
688:15,17 689:6
691:5 692:19
**serving** 630:7
**set** 572:12 582:10
586:9 615:2
661:21 666:13
684:4
**sets** 670:9
**setting** 516:15
582:1
**seven** 697:2
**share** 510:9
567:12,19,23
568:2,12,24
**shares** 615:13
**sharing** 568:21
**shauna** 494:14
599:19 703:11
704:16
**sheet** 573:9
**sheets** 644:11
**shift** 700:5,8
**short** 537:4 685:19
**shortfall** 611:3,9
619:15 628:4,5,16
628:17 629:2,4
651:3 674:18
**shortfalls** 674:14

**shorthand** 494:14
703:11
**show** 498:7 527:19
552:10 559:21
578:25 594:20
611:7 620:9
628:15 649:19
659:10,22 660:3
660:19 670:13
673:9 678:1 699:9
699:12
**showed** 578:4
629:3 660:22
661:20 662:12,15
662:16,22 664:3
673:20
**showing** 552:9
660:7
**shown** 498:8
527:23,25 578:2
580:9 592:10
609:12 611:12
627:25 649:12
660:13 665:7
677:15,20 700:4
700:14,18 703:19
**shows** 538:7 620:3
640:15 671:24
672:4 673:14
680:6 681:23
685:18 686:2
689:4 699:10
**shut** 700:20,23
**sic** 559:2 684:18
**side** 529:4,11,12
529:23 658:6
670:7
**sign** 498:22 501:2
505:9 550:18
596:25 671:2

[signature - speculation]

signature  550:15
550:17,19 585:2
703:22,25 704:3
704:15
signatures  596:15
signed  504:5 505:7
505:8 561:18
591:15 592:21,25
593:15
significant  646:8
significantly
693:19
signifies  613:16
signs  525:6
similar  603:8
607:8,19,22,25
608:6 609:4
615:20 624:23
625:2 633:11
648:15 654:5
665:10 669:8
676:8,8,14
similarly  656:4
simple  534:10
627:18 647:2
685:16
simply  545:17
678:22 693:14,24
694:9
simultaneous
565:7 632:2
635:10 696:16
simultaneously
685:1
single  548:7,12,12
548:25 552:20
561:14 562:5
574:20,21 578:24
580:19 582:23,24
583:13 595:18,19
669:1

sir  537:15 544:6
544:15 554:8
556:21 557:14
561:21 563:13
571:13,18 572:17
588:23 590:24
606:2 643:23
sit  572:25
sits  573:2,7,9
situated  656:5
situation  516:15
653:1
situations  509:15
571:11 606:16
651:22,24 675:12
six  501:23 530:9
682:17 683:6
697:2
sizable  617:14
skill  530:16
531:16 569:6,16
670:23 671:4,5,6
671:12 692:10
skills  530:25
slide  677:8 693:7
slides  663:17
slightly  510:1
sloan  603:14
604:11
small  497:18
700:3
smaller  699:18
smartphone
667:19,20,22,25
smoking  519:11
smoother  531:12
societies  601:5
soh  495:16
sold  692:2
sole  566:19,25
572:8 576:2,4,9,10

662:21 682:21
683:10 685:25
695:10
solely  554:3,4,5,9
659:16
solicit  547:1,9,12
547:17,24
solutions  704:17
somebody  674:6
sorry  510:13
525:22 556:24
565:8 629:14
637:18 649:4
sort  498:10 500:10
512:20 513:7
519:13 522:24
525:5 614:19
689:10
sorted  613:6
sought  655:16
659:6,22
source  500:17
676:25 679:24
682:21 683:10
685:25
sourcers  500:16
soussan  494:3
495:21 497:1,4,7
501:13 511:17
517:14,23 523:12
526:19 530:15,22
531:7,21 533:17
534:25 537:5,13
539:25 540:16,23
541:14 543:14
544:1,21 557:1,7
560:2 562:11,18
564:4 565:4,12
567:15,21 579:5
579:12,20 580:8
581:22 587:4,12

588:11 590:12
592:14 593:6,20
594:1,6 596:7
597:16,19,23
598:5,12,19,23
599:3,7,15,18
605:20 606:2
609:17,23 629:17
632:6,15 633:24
634:25 635:11
636:5 638:9,22
643:4,7,15,19,23
648:4 649:20
650:7,12 657:25
658:3,9,12,16,20
658:23 659:1,13
678:6 698:5,9
701:6 703:3
speak  500:18,19
635:13 654:13
speaker  650:11
speaking  523:16
635:14
specific  520:6
533:21 542:23
543:9 562:7
565:18 578:16
581:17 582:13
583:3 585:25
631:9 641:12
specifically  497:24
542:15 544:24
553:1 566:14
574:6 591:6 593:8
594:10 605:18
632:22 652:6
speculates  699:3
speculation
511:16 530:21
633:22 699:5

| | | | |
|---|---|---|---|
| **spend**  679:15 | 640:12 643:6,13 | **stated**  494:16 | 694:13 |
| **spent**  550:21 | 643:17,20 647:21 | 695:14 | **stenographers** |
| 635:3 684:9 | 649:9 650:3,10,14 | **statement**  496:10 | 675:25 |
| 694:23 | 650:17 656:7,24 | 496:11,12,13,14 | **stenotype**  494:16 |
| **spine**  701:15 | 657:23 658:2,7,14 | 496:15 542:12 | **step**  500:11 650:17 |
| **spoke**  514:20 | 658:19 659:3,14 | 571:24 595:5 | **stiff**  682:16 |
| **spoken**  520:13 | 680:15 694:10 | 615:12 617:2,5 | **stipulated**  539:3 |
| 522:20 | 698:6,9,11 702:2 | 638:16 639:11 | **stipulates**  539:14 |
| **spoofing**  586:21 | **stanley's**  635:18 | 659:2 678:7 679:3 | **stipulation**  539:18 |
| 589:13,18 590:4 | **star**  514:4 532:9 | 689:1 697:8,10 | 539:24 |
| 590:17 592:2 | 532:14,24 533:3 | 698:10 | **stipulations**  539:9 |
| 593:17 673:1,2 | 533:11 534:5,6,8 | **statements**  539:22 | **stolen**  511:21 |
| 674:2 | 534:22 535:3,7,10 | 594:12,17,22,24 | **stonecipher** |
| **spreadsheet**  647:8 | 553:8 554:11,13 | 595:2,17 617:7 | 495:16 |
| **square**  525:23 | 555:8,25 666:10 | **states**  550:11 | **stop**  519:17 |
| 545:20 | 666:10,13 689:22 | 551:4 552:16 | 536:25 537:17 |
| **staging**  664:18 | 690:4,4 696:6 | 560:25 585:20 | 564:12 617:16 |
| **standard**  512:22 | **stars**  532:18 | 589:10 639:15 | 667:23 687:9 |
| 571:17 603:4,11 | 534:16 | 677:4 | 694:8 700:15 |
| 603:15 604:21 | **start**  499:14,21 | **status**  686:22 | **stopped**  536:23 |
| 605:4 606:6 | 504:6 510:14 | **statute**  581:11 | 557:22 673:5 |
| **standards**  533:7 | 513:19 605:22 | 672:7,11,12 | **straight**  620:13,16 |
| 570:19,25 571:7 | 664:3 667:11,16 | **statutory**  533:16 | 620:21 626:9,10 |
| 572:4 602:19 | 676:5 | 534:24 541:22 | 626:15,18,21 |
| 604:8 630:9,14 | **started**  523:17 | 542:24 543:25 | 627:25 628:1,6 |
| 653:12 686:17,20 | 586:25 659:1 | 547:1 558:3 | 649:17 650:21,24 |
| **standing**  595:2 | 671:6 682:8 | 559:12 560:11 | 665:3 666:6 |
| 684:24 | 701:18 | 566:24 568:22 | **straightforward** |
| **standpoint**  568:19 | **starting**  534:1 | 578:14 579:2,17 | 557:13 |
| **stanley**  495:4 | 621:4 | 579:17 580:20 | **strategic**  682:11 |
| 496:7,8,11,15 | **starts**  565:15 | 581:3 582:12 | **strategy**  691:16 |
| 597:21,22,24,25 | 676:6 | 583:2,16 584:7 | **street**  495:12 |
| 598:8,24 599:1,5 | **state**  494:15 | 610:9 660:20 | 704:18 |
| 599:14,24 605:21 | 507:22 599:25 | 666:22 671:21,24 | **strength**  697:17 |
| 605:24 606:3 | 602:3,11,16 | 673:19 682:1 | **stricken**  590:11 |
| 609:7 610:1 | 603:24 605:11 | 699:21,22 700:4 | **strike**  574:21 |
| 617:19,20 629:16 | 610:21 632:17,23 | 700:10 | 597:8 |
| 630:1 631:5 632:1 | 635:21 636:11 | **stay**  699:22 | **structure**  528:15 |
| 632:3 633:22 | 639:25 657:15 | **stem**  686:25 | 595:8 620:16 |
| 635:5 636:3 637:5 | 685:13 703:12 | **stenographer** | **stuck**  662:1 |
| 638:7,24 639:15 | | 675:18,21 676:5 | 689:16 |

Veritext Legal Solutions
346-293-7000

[studies - talked]

studies  641:15,19
654:4 655:15
study  601:12
603:9,25 607:2
styled  494:12
subject  587:1
589:1 592:1
609:24
subjects  542:17
submit  498:25
598:16
submitted  603:17
604:12 674:11
submitting  698:2
subpoena  552:22
substantial  550:21
subtracted  628:9
subtracting  628:7
suburbs  618:24
success  529:24
successful  547:3
successfully  556:3
succinct  606:20
suddenly  668:1,2
sufficient  607:17
suggest  544:5
581:15 582:10,24
583:15
suggested  521:6
605:24
suitcase  531:14
suitcases  545:25
suite  495:7,12
704:18
sum  612:24 613:1
615:1,24 620:5
626:15,21,22
627:14,15,15,24
628:18 632:18
644:22 645:3,8,17
645:19,25 646:8

650:19,23 651:5
651:13,17,19,20
651:22 652:2,4
657:11
summaries  497:15
summarized  620:4
summary  497:22
497:25 498:3,5
610:3,12 619:11
summed  613:6
supplement  592:2
supplemental
588:20,23 589:6
591:17
supply  526:11,13
526:14 546:4
662:8
support  515:2
528:19,22 538:9
538:12 574:20
581:5 592:11
604:7 677:21,23
679:13 686:22
supported  604:11
665:6
supports  579:16
679:2
supposed  580:2
645:2 677:10,11
sure  498:9 505:15
513:8 517:19
540:11 541:18
542:19 544:16,24
545:13 547:22
548:11 560:12
561:12,19 564:6
567:22 572:18
578:16 581:18,22
583:4 589:19,23
591:6,13 595:9
598:5,10 614:11

615:17,19 616:2
629:23 631:8
634:2 675:20
surf  690:19
surfing  676:8
694:23
surge  526:3,4,16
526:24 527:8,12
527:17,21 528:1,5
575:3,11 688:10
surging  527:3,9
survey  607:5
623:7,8,12,22,25
624:22
surveyed  622:17
surveying  622:11
surveys  624:5
654:7
susan  494:3
495:21 703:3
suspect  599:5
suspended  585:6
585:11,15
sustained  530:15
534:25 579:5
580:8 634:25
638:22
swear  599:19
swipes  699:4
switch  504:1 553:3
sworn  497:11
540:13,17 552:13
554:15 586:4
590:2 591:8
599:22 696:19
synchronize
614:17
system  518:6
522:24 526:16
532:13,15 533:3
665:21 681:15

690:5 697:4

t

tabulated  674:10
tactics  678:21
take  502:12
511:22 524:15
528:16 535:6
549:7 553:2
556:11 557:11
577:13 578:7
598:6 605:23
616:1 631:1
632:16 635:1
636:9 638:25
639:13 643:24
644:1 645:21
648:22 658:16
660:6 661:25
663:6,12 665:22
671:17 674:3
690:10 696:13
taken  494:11
516:23,25 531:2
531:24 556:3
598:3 704:9
takes  504:12
516:16
talk  518:20 524:2
526:19 532:9
539:23 558:6
565:7 580:6
590:15 632:2
635:10 637:25
649:10 663:16
670:22 672:6,16
673:18,24 674:22
699:3
talked  498:21
502:1 526:2 548:5
558:8 570:5 630:1
636:20,22,25

Page 41

[talked - things]

638:2 639:14
641:16 643:25
644:1 661:8
663:14 664:1,9
665:25 668:4,14
686:9 694:7
**talking** 506:2
525:9 526:20
527:18 528:23
540:17,19,25
550:22 556:25
558:3 580:16
592:14,15 594:18
598:21 639:18
652:7 679:16
**talks** 554:22
563:18 698:14
**tank** 601:2 602:7
**target** 628:8,10,14
628:20,22 629:4
652:19
**tax** 497:15,22
498:3,5,14 621:1
621:13,15 627:23
683:17 692:20
698:15,18
**taxes** 620:22,24
627:21,23 628:7
**taxi** 520:5,10
602:25 606:9,23
688:1
**tc** 685:23 695:3
696:17 700:3
**team** 500:15,23
515:2
**teams** 500:10
**technologies** 494:4
560:8 578:10
580:25 582:6,21
583:11 584:2
703:4

**technology** 557:16
558:1,2 559:11
563:14
**tel** 704:19
**tell** 515:17 527:15
548:7,25 549:24
551:14 552:2
555:10 568:18
570:8 579:1,9
580:19 592:25
600:15,21 601:7
601:16 605:1
606:18 608:5
610:5 612:15
614:5 615:16
616:16,19 617:3
618:8 619:23
623:23 624:9
625:1 626:10
629:12 650:19
652:6 653:8
660:17 665:2
666:14,14,25
667:2 673:2
680:16
**telling** 569:8
700:20
**tells** 541:9 555:11
559:7 566:23
585:25
**temporarily**
553:22 554:2
555:13
**temporary** 506:15
506:17
**term** 678:9
**terminate** 693:9
**terms** 530:24
551:23 552:1
573:15 588:8
593:9 596:20

608:19 612:20
**territory** 512:22
560:22,24 566:18
586:25 672:14,21
**test** 520:9 661:9,9
661:10 667:8
669:10 671:18
680:1 701:4
**testified** 497:11
504:2,14 515:14
540:21 544:16
547:20 570:13
573:16 599:22
631:25 636:23
637:1 656:11
681:22 683:11
684:22,25 685:10
687:11 689:15
690:13,18 695:21
696:3,5,7,11,14,17
**testify** 519:20
536:22 539:20
580:2 633:10
**testifying** 557:5
595:1 630:20
**testimony** 517:19
517:21 538:20
540:13,17 541:2
542:22 543:13,22
544:14,18,20,21
545:1 546:5,16
554:15 560:1,15
560:16 571:9
573:5 579:16
588:14 591:3,5,8
591:10 609:10
612:13 631:9
659:16 673:8,20
677:20 679:1
682:7,18,20
683:19 684:20

685:9,18 690:24
692:9 696:1,16
699:6 701:20
704:9
**texas** 494:15 495:7
495:13 507:23
610:22 618:18
672:7,19 674:17
703:12 704:16,19
**text** 497:18 502:20
503:7 521:2
528:21 583:22
584:6
**texts** 502:23 511:8
**thank** 498:19
537:10,13 540:24
548:21 549:14
565:15 597:14
599:15 600:13,18
606:2 611:4
615:10 618:13
619:16 621:2
629:17 638:19
643:19,23 650:13
658:3 659:3 678:5
698:4,5 701:5,6,6
701:7,12,13,25
702:4
**thanks** 503:9
**theory** 614:25
628:5 645:4
**therefor** 704:4
**thing** 500:5,7
530:11 598:8
689:25
**things** 502:8
514:18 518:25
523:23 524:3
526:25 528:21
529:11,22 530:6
531:14 532:7

[things - told]

| | | | |
|---|---|---|---|
| 553:17 555:17 | **thousand**   623:13 | 610:17 611:12 | 694:23 697:11,13 |
| 569:12 570:24 | 623:17,25 | 612:18,20,22,22 | 698:4,11 700:7,12 |
| 602:20 648:7 | **thousands**   546:3,7 | 612:23,25 613:1,7 | **timeline**   593:9 |
| 659:17 667:9 | 546:11 654:6 | 613:11,13,15,15 | **times**   508:6 527:9 |
| 670:9,11 676:13 | 655:4 | 613:15,17,17,19 | 532:1 545:2,10,19 |
| 677:25 680:9 | **three**   505:6 516:19 | 614:2,15,16,21,22 | 545:24 546:2,16 |
| 686:8 688:16 | 520:8 523:22 | 614:24,25 615:14 | 546:24,25 547:8 |
| 691:24 694:20 | 526:6 606:17 | 615:18,22,22 | 548:22 557:4 |
| **think**   501:22 | 612:20 613:2 | 616:22,24 618:2 | 572:4 616:20 |
| 502:2 508:13 | 627:24 643:17 | 619:2 620:13,16 | 627:14,19,24 |
| 518:25 519:21 | 660:21 661:21 | 620:21 626:9,10 | 632:18 634:3 |
| 529:6 530:19 | 671:21 696:20 | 626:12,15,16,18 | 636:13 643:18 |
| 535:25 537:4 | **threshold**   514:8 | 626:21 627:12,25 | 644:22 645:8,19 |
| 538:7 542:22,25 | 533:9 | 628:1,6 630:12 | 645:25 646:8 |
| 547:15 556:20 | **throckmorton** | 631:20 632:19,24 | 648:12 660:13 |
| 557:8,20 562:6,9 | 704:18 | 633:1,1,4,5,12,13 | 661:1 678:9 |
| 563:9 565:5 | **time**   504:15 506:6 | 633:19 634:5,10 | 681:17 682:4 |
| 570:24 571:10 | 508:14,16,19 | 634:11,13,16,16 | 684:8 685:2,12 |
| 572:15 575:16,20 | 512:13 513:17,20 | 635:2,2,25,25,25 | 686:13,15 688:13 |
| 580:6 584:12 | 513:22 514:8 | 636:25 643:21 | 689:11,22 696:20 |
| 587:14,19 590:12 | 516:24 525:21 | 644:6,7,11,12,18 | 696:22 697:2 |
| 590:16 591:22 | 527:6,10 529:15 | 645:3,3,7 646:9,11 | **tip**   525:10,16 |
| 592:17 596:2,10 | 530:8 531:5 | 646:13 650:21,24 | 526:1 530:9 |
| 598:24 599:4 | 533:16 534:24 | 651:10,12,14,18 | **tips**   525:9,12,13 |
| 601:2 602:7 | 537:5,12 539:19 | 651:21,23 652:9 | 525:24 530:4,12 |
| 609:11 623:1 | 539:23 543:19 | 652:10,13,21 | 545:2,11,15,20 |
| 642:20 647:6 | 544:8 548:25 | 653:2,10 657:11 | 608:17 610:20 |
| 650:12 653:20 | 550:7,7,21 554:23 | 657:18 658:17 | **tissues**   519:1 |
| 678:20 697:16 | 557:6,9 558:18,18 | 660:9,10 662:8,10 | **title**   672:7 |
| 701:8 | 560:5 561:14 | 662:22,23 664:2,2 | **tlc**   520:7,11 603:4 |
| **third**   511:25 557:5 | 562:5,10 565:10 | 664:7 665:2,17,19 | **tmobile**   691:6 |
| 567:12,22 568:13 | 565:13,14 566:19 | 666:24,25 667:1,2 | **tnc**   605:4 672:7,11 |
| 568:19,23 577:20 | 566:19 570:22 | 668:6 669:19 | **today**   497:14 |
| 578:1 644:18 | 571:2,19,25 572:8 | 671:25 674:24,25 | 540:5,6 551:10 |
| 652:15 668:12 | 574:11 580:2,19 | 675:15,17,23 | 578:25 580:6,11 |
| **thought**   581:16 | 581:3,9 585:14 | 676:1,4,4,6,10 | 595:1 598:13,21 |
| 651:4 684:24 | 586:19 589:22 | 679:16 681:20 | 598:25 673:25 |
| 689:22 | 591:9 593:8,11,21 | 682:4 684:9,11,17 | **told**   541:1 552:13 |
| **thoughts**   599:12 | 596:5,8 598:1,2 | 684:23 690:20 | 552:16,23 576:18 |
| 658:18 | 601:1,24 605:23 | 693:4,20,22 694:2 | 640:12 683:4 |
| | 608:8,9,10,11,12 | 694:6,9,13,18,19 | 686:1 |

Veritext Legal Solutions
346-293-7000

[toll - two]

toll   524:4,6,8,16
tolls   524:10,12,14
　608:17 610:20
top   505:25 509:5
　549:4 573:16
　577:16 581:25
　582:15 583:21
　584:21 620:3
topic   497:14
total   608:9 610:19
　610:24 612:10
　613:14 616:12
　620:5 623:13
　627:14 628:17
　629:1,5 630:17
　646:13 650:19
　657:12,18 683:2
totality   541:6
　544:24 661:16
totally   664:5
　666:17
touch   521:1,5
　523:9
track   568:12
tracking   567:18
trade   588:4
training   519:21,25
　569:4,10
transaction   525:4
　577:1
transcript   703:14
　703:16 704:2
translated   607:16
transmission
　692:4
transport   507:16
　695:3 696:18
　700:3
transportation
　507:8,17 528:8
　529:17 558:22,24

559:22 561:2,5
563:2,6 569:5,11
569:15,18,23
574:19 575:7,13
575:23 576:25
596:23 621:24
622:4 634:17
635:3 636:1 680:4
680:14 682:3
683:3,9,12,16
684:3 685:24
688:15 689:6
690:21 691:5
transporting
　508:20 524:5
　684:18
traveled   523:25
　524:1
traveling   613:18
tremendous
　533:23 687:8
trial   676:1,3
tried   544:8 660:3
　697:3
trip   504:1,11,21
　504:22 505:1
　506:20,25 508:3,5
　508:10 509:2,6,21
　509:24 510:1
　511:8,14 512:4,4,7
　513:10,24 514:3,6
　514:13,15 521:1
　521:11,13,16
　522:1 527:7,12
　532:16 533:6
　535:6,13 548:23
　549:1 550:23
　574:23 585:21
　589:11 607:17,23
　616:24 619:3
　636:14,18 637:3,8

637:12 653:3,4
664:12,15,20
665:5 669:2,5,6
671:17,17 675:10
676:15 685:7,7
693:2,2,3
trips   502:13 504:9
　505:3 509:1
　512:10,16,18,24
　534:11 543:20
　548:18 610:16
　616:13 618:16,16
　619:1 620:4,5
　638:5 657:11
　664:19 665:11
　669:15 671:23,25
　673:4,11,14,15
　674:3 675:4,5
　681:24 682:1,17
　685:10,13,15,19
　685:20 694:24,25
　696:10
trouble   679:12
trucking   680:11
　685:23
true   540:4,6
　548:14 550:11
　551:7,10 552:7
　559:24 561:7,10
　565:1,9,11,16,18
　566:11,12 567:4,5
　569:11 581:15
　593:2 627:3 685:2
　695:24 703:15
trump   530:10
truthful   696:25
try   500:7 507:13
　507:14 519:17
　529:25 530:3,3
　531:17 542:16
　547:9 588:14

604:17 615:18
616:5 617:14
625:22 656:1,12
677:7
trying   542:3,4
　556:22,24 576:7
　576:10 587:22,25
　587:25 593:12
　594:23 617:18
　621:23 648:1
　697:2
tsa   551:18,22
　552:1
turn   505:23
　518:13,17 583:22
　584:5 614:24
　649:4 664:14
turning   694:9
turns   614:22
　677:15
tv   687:22
tweet   647:20
　648:5,7
tweeted   648:11,18
tweets   648:14,19
　649:16
twice   683:13
　696:20
twitter   647:11,14
　647:19 648:23
two   512:18 513:18
　515:5 520:9
　522:23 523:4
　526:25 530:9
　559:18 561:17
　587:19,21 589:16
　591:4 602:2,6
　603:17 618:15
　619:5 622:3
　640:11 641:15
　644:11 654:4,23

Veritext Legal Solutions
346-293-7000

**[two - understand]**

663:25 664:4
665:10 667:9
668:11 669:25
670:4 687:10,12
700:15
**type**   518:22 617:9
652:11 656:18
**typed**   523:10
695:22
**typographical**
629:13,14

**u**

**uber**   494:4 498:24
499:7,8,9,14,21,22
500:1,1 501:14,20
501:25 502:1,2,3,9
502:12,15,23
503:10,14,23
504:6 505:20
507:7,19 508:5,9
508:16,19 509:18
510:7,16,20,23
511:14 512:9
513:5 515:24
516:3,6,18 517:4
518:2 519:17
521:23 522:6,20
522:21,22 523:17
525:10,13,25
528:5,7,8 529:16
532:15,19,21,24
533:3 534:21
535:3 536:4,8,12
536:18,23,23
537:1,18,25 538:2
538:5,9,17,20,21
539:3,5,13,15
540:8,14 541:21
543:10,23 544:12
544:17 545:24
546:8,12,17 548:8

549:1,8 550:4,24
551:3 552:4,16,21
552:22,25 553:6,9
553:14,20,21
554:3,5,7 555:5,14
555:21 556:6,10
556:16 557:22
558:17,24 561:6,8
561:11,13,16,19
561:25,25 562:3,5
562:22 564:15,16
564:18,19,23,23
564:24 565:21,25
566:3,8,9,15,18,19
566:25 567:9,12
568:19 569:8,13
569:14,19,22
570:3,8,9,17,18
571:4,15,16 572:3
572:7,10,22 573:1
574:9,15 575:1,9
575:13,22 576:1
576:25 577:9,10
578:9 580:20,24
581:24 582:6,9,11
582:20,24 583:1
583:11,14 584:1,7
585:4,6,14,20,24
586:4,15,20,22
588:7 589:10,17
589:20,22,25
595:17,18,22,24
596:15,19 603:2
604:24 605:6,13
605:15,16,18
606:13,17,19,24
607:3,6,6,14,18
608:10 609:6
610:8,11 611:19
612:25 613:4,4,15
613:21 614:3,19

616:14 617:8,10
617:11,25 625:13
630:15,20 631:10
631:19 634:18,21
636:2 639:11
648:9,12,15 652:4
654:19 655:11,12
659:8,17 660:3,11
660:17 661:21
662:2,13,13,14,16
662:21,21 663:1,4
663:5,8,14,18,19
663:21,22,24
664:5,9 665:2,8,8
665:14,16,22,25
666:2,8,17,19,22
667:5,6,13,14,18
667:21,22,24
668:4,13,18,19,24
669:7,13,13,18,24
670:6,6,9,12,14,19
670:20,25 671:4,8
671:11,16,20,22
671:25 672:3,8,19
674:6,16,20 675:4
675:9,15 676:15
676:15 677:19,24
679:1,3,4,10,19,23
680:3,7,20,22
681:2,9,16 682:6,8
682:10,12,19,20
682:22 683:1,9,12
683:17 684:4,15
684:16,17,23,25
685:1,24 686:2
687:1,4,8 688:11
689:7,13,16,17,17
690:18,23 691:3,4
691:12,15,18
692:3,5,7,13,17
693:1 694:21,25

695:4,5,14,17,18
696:16 698:14,19
698:22 699:3,8,9
699:15,18,20,22
700:1,7,12,14,20
703:4
**uber's**   535:16,19
535:21 537:16
538:15 539:2,13
542:21 545:10
548:5 558:15
561:15 564:7
570:23,24 571:20
571:23 572:8,20
574:11 576:5,13
576:14,19 577:6
578:14 580:1,10
595:3 597:10
633:6 653:12
659:21,24 662:25
664:5 665:11
674:10 678:25
684:7 686:16
687:10 690:25
692:1,5,6 699:5
**uber.com.**   679:11
**uberx**   617:10
654:19
**unable**   674:25
678:22
**unavailable**
694:12
**unbiased**   609:21
**uncommon**   675:25
**underpaid**   611:19
611:25
**underpayments**
618:1,4
**understand**
517:25 539:2
541:3,6 543:4

Veritext Legal Solutions
346-293-7000

[understand - vitae]

546:15 553:11
556:24 557:25
558:11 565:20
570:14 571:12
573:6 575:18
581:12 588:5,15
590:24 614:11
617:15 631:17,23
632:11 633:18
634:4 638:18
701:10,11
**understanding**
517:18,20,23
542:13,17 551:25
558:5,7 578:23
581:7,17 588:18
591:2 594:25
**understands**
695:18
**understate**  642:20
**understated**  653:7
**understood**
508:25 539:11
579:25 631:8
632:9 685:17
686:11 687:3,3,5
698:8
**underwent**  519:21
**undetermined**
666:24
**unemployment**
602:20
**uniform**  618:21
**unilateral**  537:25
595:23
**unilaterally**
661:21 663:15
664:9 665:23
668:24
**union**  601:23,25

**unions**  649:23
**united**  550:10
560:25 677:4
**universal**  553:20
555:21
**universe**  623:14
**university**  600:24
602:24 603:7,13
604:5
**unquote**  697:18
**unreasonable**
580:7 677:1
**unrelated**  694:20
**unsupported**
664:16
**untruthful**  647:23
**unwanted**  510:5
**update**  603:22
662:17 667:1
**updated**  557:17,19
558:17 566:19
586:8,10
**updates**  583:22
584:6
**upfront**  667:11,16
**upside**  668:10
**urge**  660:1
**usa**  561:8,13,19,25
562:5 596:16
**use**  498:14 503:24
504:5 507:19,20
510:23 511:13
518:5,16,18 525:3
528:5 529:4,16
533:3 539:4,15
540:10 541:2,9,10
543:10 545:8
557:9 566:9
585:24 586:21
613:1 621:7,10,17
622:7 623:16,18

624:17 625:16
634:12 640:1,22
642:7 646:16
651:5,22 654:1,11
654:13,20 655:19
657:17 665:23
666:10 668:3
674:25 679:23
680:24 681:1,9,21
682:12 683:1
684:4,13,14,20,22
687:8 688:20
689:12,14,15,16
690:9 691:4,6,8,15
691:17,20,21
693:7 694:6,21
696:16
**useful**  615:3
622:21
**user**  558:25
559:12 695:17
**user's**  558:24
559:1,15,22
624:16
**users**  566:17
**uses**  553:11
**usually**  500:20
509:24 512:19
533:23

**v**

**vaguely**  571:22
**values**  571:20
**variable**  523:5,20
**variables**  516:20
523:4 526:6
559:18,19 657:10
**various**  601:1
602:23 614:10
622:16
**vehicle**  503:23
514:15 519:11

529:13,14,16,18
531:10 536:14
603:1 621:5,7,17
639:15 640:1
641:5,12 653:12
653:14,24 654:24
655:1,8 688:17
692:6
**vehicles**  503:14,20
503:22 529:20
640:22 654:15
655:18
**venmo**  525:14,19
525:20 545:3,8,12
545:16
**verdict**  687:21
**verification**
549:12,16,17
586:14 591:16
592:21,25 593:16
**verified**  549:18
585:1 586:4 590:1
590:1 592:23
**verify**  586:9
**verifying**  549:18
**veritext**  704:17
**version**  647:5
**versus**  644:6
667:14
**video**  590:19
591:19,22 592:15
690:19
**videos**  590:16
**viewed**  591:12,13
**violating**  686:13
686:15
**violation**  564:19
564:20
**vip**  617:11
**vitae**  600:5,15

Veritext Legal Solutions
346-293-7000

[voicemail - witness]

**voicemail** 697:3
**volunteered** 545:7
**vs** 494:3 703:3

**w**

**w** 499:15
**wage** 602:21 610:9
610:21 618:18,23
619:4 620:15
647:17 674:16
677:20
**wait** 506:5 513:13
513:16,20,22,23
529:7 617:18
664:2,2,4,6,20
665:7 670:18,18
675:18,22,25
676:11 690:11,12
694:11
**waited** 690:13
**waiting** 498:2
508:10 513:18
521:3 581:21
612:22 613:17
663:19,22 664:21
675:6,9,21 676:5
676:13,15 694:3,4
694:5,8
**walk** 600:6 676:9
**walks** 694:24
**want** 498:22
500:22 501:24
504:1,3 506:25
509:14,23 511:12
515:13,15 518:20
520:15,15 524:2
527:11,13 529:5
529:10,13 533:6
533:10 534:3
542:16 548:11
550:20 553:2,6
555:19 561:12,19

567:18 577:13
582:16,25 595:9
598:10 600:17
615:17 631:8
635:17 644:16
651:2,25 659:20
667:4,5 669:11
672:15 673:17
679:15 682:14
685:15,19 694:1
696:23
**wanted** 503:7
517:17 573:10
644:21 660:18
661:25 662:11,20
664:12 669:10
678:12 684:12
685:20 693:10
694:9 700:21,24
**wants** 501:1
502:22 511:6
518:16 576:3
**warning** 696:6
**warnings** 636:14
639:4,7,11
**washington**
601:20
**watching** 665:16
665:20
**water** 530:5 626:2
**waters** 519:1
**way** 503:10 514:24
516:10 521:7
524:11,13 533:4,5
545:14,21,23
547:23 573:10
587:7 595:3
598:10 606:20
609:22 613:21
625:20 628:12
631:11 638:10

642:17,23 643:9
649:13,19 652:24
659:17 663:9
665:16 668:23
669:2 685:15
699:25 701:19,20
701:20
**ways** 507:6 525:13
530:20 555:6,7
566:1 677:16
**waze** 518:18
689:16,18
**we've** 505:12
510:2 517:18
550:2 581:21
590:20 596:7
603:13,16 604:11
609:12 615:21
659:9,11 660:13
665:24,25 666:7
670:20 672:21
676:21 677:15,20
**wear** 688:20
**web** 532:12
**website** 578:14
579:1,2 581:2,24
582:11 583:1
584:7 659:25
680:10
**week** 524:22 532:2
591:4,13 610:18
613:4,4 614:19
615:13 620:14,17
626:13,19 627:13
629:3 646:10,11
**week's** 628:18
**weekend** 532:3
**weekly** 613:7
626:23 627:6
628:13,17,19

**weeks** 613:9
616:11,14,17
618:9 619:12
626:14,18,20,21
626:25 627:15,16
628:13,15,21,22
628:24,25,25
645:21 646:4,6
651:11,16,18
652:18,22 653:3
**weigh** 661:7
677:17 678:2
**weighing** 661:4
**weighs** 666:8
673:17 701:4
**weighted** 620:10
627:19
**went** 521:12 547:3
625:12 664:8,22
671:15 697:16
**wheel** 671:8
**wholly** 694:20
**wichita** 580:17,21
582:2,16,25 583:7
583:16,21
**widely** 621:7,12
621:15 639:25
**williams** 495:11
**willing** 695:23
696:24
**willingness** 615:10
**wished** 694:7
**withheld** 684:1
**witness** 526:17
537:12 539:20
544:2,9 557:5
562:12 564:7,8
579:20 596:3
597:20 598:3
599:4,20 606:1
629:16 630:4,8,13

Veritext Legal Solutions
346-293-7000

[witness - zoom]

632:9,13 639:2
643:22 647:25
648:2 650:1 656:7
657:21 658:1
675:13 703:19
**witnesses** 560:15
658:5 659:21
675:14 677:21,22
**won** 697:14,20
698:12
**word** 553:12
560:21
**words** 564:8 588:5
598:17 684:16
691:17 695:23
**work** 500:15,23
503:11 511:2
522:25 538:16
550:1 598:4,5
599:9 602:15,19
602:21 604:11
605:11 609:13
610:21 611:21
614:23 628:11
631:18 649:24
651:10 663:18
667:13,15 670:24
671:10,13,13
675:9 680:3
686:22 687:9
692:13,23 694:16
**worked** 601:21
602:1,3,6,23
608:18 609:6
610:17 616:12
620:17 626:20
651:9 657:6,8
660:9,10,25 668:7
691:15
**worker** 694:15

**workers** 601:23
602:16,20 603:23
605:16 648:17
**working** 511:20
549:13 601:1
603:17,20 608:8
612:18,20,25
613:1,11,13,15
626:12,16 627:12
630:21 632:24
633:1,5 645:11
651:12,23 652:1
652:13 676:7
684:16 687:10
**works** 532:13,15
541:4,6 598:6
608:7 613:23
621:25 676:11
**world** 555:11
564:7 601:2
602:18
**worth** 678:20,24
704:19
**write** 657:9
**writing** 559:14
**written** 520:9
563:15 568:7
571:20
**wrong** 525:21
578:5 678:15

| x |
|---|

**x** 509:5 704:5

| y |
|---|

**yeah** 500:4,14
501:16,19,22
502:19 505:22
507:9,21 508:7,8
508:22 510:6
511:1,3 512:5,11
512:12,14,16

513:4 515:1,9
516:14 517:1,6,19
519:7 520:1
521:19 524:15
525:11 526:5
527:17 528:2
529:2 530:19,19
530:25 531:25
532:16 534:4,10
535:11,20,23
536:2 537:19
538:3,8,18,23
539:1 542:1
547:13 548:4
549:13 550:7,14
550:17,19 551:1
551:24 552:19
553:18 554:21
557:24 558:6
559:17,17 560:18
560:23 566:6
569:12 570:4,7,15
571:13,21 572:14
572:25 573:13
574:13 575:3
580:18 581:4
583:9,12 584:24
589:8 594:21
595:14,25 596:7
614:9 619:11
624:11 644:19
**year** 497:22
501:23 620:8,9
621:6 639:17
654:2,2,3 681:18
692:19 695:8,9
**years** 529:13
530:9 543:18
544:25 601:3,9,14
601:24 602:3,9,12
602:22 603:22

621:13 622:4
640:9 660:20,21
671:20,21 695:6
**yellow** 527:20
**yep** 570:4 572:6
**yesterday** 497:15
517:16 518:24
519:22 535:25
541:1 542:2,8
550:9 551:19
557:4 558:9
580:10 586:25
684:25 686:10
696:4,7,9,12 697:8
**york** 519:21,24
520:3,3,5 601:23
602:1,4,8,11,11,14
602:16,16,25
603:2,16,21,24
604:3,7,20,23
605:11 606:6,9,10
606:22 607:14
608:2,22 610:22
618:16,19,20,21
618:23,24 620:14
620:19 622:7,12
622:14 623:4,17
624:4,14,20 626:9
626:13 628:1
636:21 641:15
644:12 650:21
654:5 670:5
674:17 688:21

| z |
|---|

**zero** 628:16 629:4
629:5
**zones** 614:15,16
**zoom** 494:11
638:2

Veritext Legal Solutions
346-293-7000

2022-67757 / Court: 133

# Exhibit L

DAINIUS BARYSAS,                          §
                                         §
    Claimant,                        §
                                         §
vs.                                      §          HON. SUSAN SOUSSAN,
                                         §          ARBITRATOR
UBER TECHNOLOGIES, INC.,                  §
                                         §
    Respondent.                      §
                                         §

## MOTION TO COMPEL PRODUCTION CONCERING VIDEO 1 AND VIDEO 2

TO THE HONORABLE JUDGE SOUSSAN

    Claimant Dainius Barysas moves the Arbitrator to Compel Respondent Uber to respond to Claimant's discovery requests on Video 1 and Video 2 and for the production of additional documents.

## PROCEDURAL HISTORY

    Uber wrongfully withheld discoverable information concerning Uber's fraud allegations against Claimant Barysas.

    Uber's Counsel made material misrepresentations to Claimant's Counsel in meet-and-confer discussions pertaining to evidence of Uber's fraud allegations against Claimant Barysas.

    Uber's Counsel made material misrepresentations to the Arbitrator pertaining to evidence of Uber's fraud allegations against Claimant Barysas.

    Uber's Counsel informed the Arbitrator and Claimant's Counsel that no additional information existed pertaining to Uber's allegation that Claimant Barysas committed fraud during the course and scope of his work for Uber. Simultaneously, Uber's Counsel were in the process of pulling videos that used alleged GPS Data to prepare their Corporate Representative on the Geo-spoofing / fraud allegation.

    Uber chose to wrongfully withhold this evidence, and yet Uber continually makes claims

that Claimant's Counsel seeks to "harass and impose an undue burden on Uber in an attempt to delay this matter." The Claimant urges the Arbitrator to ignore these tactless allegations. But for Uber's willful discovery abuse, we would not be here. Uber and Uber's Counsel chose to make these decisions.

## AUTHORITIES:

### Federal Rule of Civil Procedure – Rule 26(b) Discovery Scope and Limits

(b)(1) Scope in General. Unless otherwise limited by court order, the scope of discovery is as follows: **Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case**, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

Fed. R. Civ. P. 26(b)(1).

During the hearing, the Arbitrator questioned the relevancy of the data sought through the videos. Setting aside Uber's discovery abuse, the GPS Data and other information sought here are of paramount importance to the claim. In May of 2018, Uber wrongfully deactivated the Claimant from the ability to receive trips to or from the Airport. Uber claims it retained the right to deactivate the accounts of drivers who use the Uber App, including deactivation of the driver's ability to pick up or deliver riders at the Airport. In connection with this claimed "right," Uber has presented two videos they allege proves Claimant Barysas fraudulently manipulated the Driver App. Uber would have the Arbitrator believe it rightfully deactivated Claimant Barysas from the Uber Driver app, which is not true. In order to defend against these allegations, full discovery on this issue must be allowed.

Facts surrounding this suspension bear on at least four of the five factors of the Fifth Circuit's Economic Realties test.  As discussed during the Arbitration Hearing, Uber's deactivation of Claimant Barysas clearly shows Uber had an overwhelming degree of control over Claimant Barysas's daily work. Additionally, Uber's ability to manipulate the Driver App to prevent drivers from carrying out airport trips is evidence of Uber's relative investment in the Uber Driver App. Uber has invested millions of dollars into the Driver App to allow it to control all Driver functions, including control of the locations a driver can can pick riders up from or drop riders off to.  Next, facts surrounding Uber's deactivation of Claimant Barysas from all airport trips are relevant to the "opportunity for profits and losses" prong of the five factor test. Claimant Barysas financially depended on the airport trips to earn income for Uber.  Uber's actions are a clear sign that Uber impacts the driver's opportunity for profits and losses because restrictions to airport rides remove a significant revenue opportunity for Uber Drivers.  Finally, Uber's deactivation of Claimant Barysas from receiving airport trips is relative to the "skill and initiative" prong of the economic realities test. There is no skill or initiative that Claimant Barysas could have used or undertaken to acquire airport trips on the Uber Driver App. Clearly, Claimant Barysas was at the will of the Driver App, its algorithm, and Uber management concerning the ability to obtain airport trips on the Uber Driver App.

## DOCUMENT TO PRODUCE

Claimant Dainius Barysas moves the Court for an order compelling production of:

A. Information regarding the creation of the two videos (Request No. 1, 10 and 11);

B. The full screen depicting the tabs in the video; The definition, information, and all data associated to "State Changes"; The information concerning the 4 pins depicted in the video; Information on the "Reference: Colosseum (Venue Pickup)," "Pickup

Selection: Venue," and "Selection Method: Helix Venue Location."' depicted in the videos. (Request No. 5, 6, 7 and 9);

C. Information concerning why the videos produced are different, with one using a car moving on the map and one not (Request 8); and

D. All GPS data for all trips taken by Claimant through the Uber App from March 2017 to August 2019 in native format. (Request 12).

## DISCUSSION

Uber continues to withhold discoverable documents required for the prosecution of Claimant Barysas's claim.   As identified above, Uber has not fully responded to Claimant's Requests for Information No. 1, 5, 6, 7, 8, 9, 10, and 11.

### A. **Request No. 1, 10 and 11**

Claimant's Request No. 1 asked Uber to, [i]dentify the individual(s) manipulating the system at the beginning of each video when the hand appears and presses play." Claimant's Request No. 10 asked Uber to, "[i]dentify the Uber employee(s) who transferred the GPS data to Chronicle Trip for the two trips depicted in the videos." Claimant's Request No. 11 asked Uber to, "[i]dentify the person(s) who created the May 10, 2018 and May 16, 2018 videos."

According to Uber's response to Requests No. 1, 10, and 11,  Uber's in-house paralegal, Deborah Soh, did the following:

- Moved the mouse to push play, starting the recorded videos, at the beginning of each video. (*See* Response to Request 1.);
- Transferred the data into the Chronicle Trip platform to create the videos. (*See* Response to Request 10.)
- Created the May 10, 2018 and May 16, 2018 videos. (*See* Response to Request 11.)

It is an impossibility that Deborah Soh created Video 1 and Video 2. To do so, Ms. Soh would need unfettered access to the Chronicle Trip system and a specialized knowledge of GPS

data manipulation. In response to Claimant's request for GPS Data, Uber's Counsel produced seven (7) Excel Spreadsheet that contained the following type of data entries:

UBER_Barysas_0002460 at A1-12.

Based on the type of data Uber has produced, an Uber Employee, not Deborah Soh, created these videos and sent them to Ms. Soh for producing. If the Chronicle Trip system were truly a highly confidential trade-secret intended to remain top-secret, Deborah Soh would not have unfettered access to the system and to four-year old GPS data from Uber's files. Littler Mendelson, along with Uber, are intentionally withholding information about the person or persons who created these videos in order to prevent the Claimant from the discovery needed. Meanwhile, Uber intends to use the videos produced as evidence that Claimant Barysas committed fraud on the Uber System.

Uber must identify the people who moved and manipulated the GPS data to create the videos. Claimant's ask that Uber update their response to name the Uber Employees involved with these videos and produce a corporate representative prepared to testify concerning Uber's GPS Spoofing allegation.

**B. Request No. 5, 6, 7, and 9**

Claimant's Request No. 5 asked Uber to, "[s]how the full screen for each of the below tabs depicted on the video:



"

Uber's Counsel continues to withhold evidence and intentionally hide information concerning Claimant Barysas, including the system used for the videos. The Chronicle Trip system that displays Video 1 and Video 2 contains multiple tabs associated to these videos. Each of these tabs contains information about the two trips in question and should be produced.

Claimant's Request No. 6 asked Uber to, "[p]rovide a definition, information, and all data associated to "State Changes" listed in the Chronicle Trip system:

STATE CHANGES

Uber does not picture the full Chronicle Trip System but intentionally cuts the view of the screen at the "State Changes" section. Uber does not show what items are listed under State Changes. This section could represent changes made to the videos in question. Uber refused to provide information concerning "State Changes" and must be compelled to answer the question posed, including identifying all items under the "State Change" section.

Claimant's Request No. 7 asked Uber to, "[p]rovide information concerning the 4 pins depicted in the videos:

a.   Video 1 depicts:

 

b.  Video 2 depicts:

 

- Each of the four pins have descriptive letters (e.g. BT, AS, WC). Define pin acronym and provide information concerning each pin.
- One of the four pins is obscured due to the nature Uber's production of the video. Please make sure information for each of the four pins is provided."

Uber refuses to identify what each pin represents and must be compelled to provide information concerning these pins.

Claimant's Request No. 9 asked Uber to, "[p]rovide information on the "Reference: Colosseum (Venue Pickup)" section depicted in the videos:

> Reference: Colosseum (Venue Pickup) &
> Pickup Selection: Venue
> Selection Method: Helix Venue Location

- Define and/or provide information concerning "Reference Colosseum (Venue Pickup)."
- Define and/or provide information concerning "Pickup Selection: Venue."
- Define and/or provide information concerning "Selection Method: Helix Venue Location.""

Uber refuses to provide information pertaining to this section and must be compelled to supplement their response.

## C.  <u>Request No. 12</u>

Claimant's Request No. 12 asked Uber, "[a]s requested previously in Claimant's Request for Production, [to] produce all GPS data for all trips taken by Dainius Barysas through the Uber App from March 2017 to August 2019 in native format."

In response to these requests, Uber produced seven spreadsheets that contain data Uber had never produced previously. Those seven spreadsheets, however, only show the data used to create the two videos.

Furthermore, Claimant requested this data in Request for Production No. 1, 2 and RFP 27 (*see* Requests and Responses below) and Uber withheld mass amounts of data that we now know exists. See below RFP 27 and Uber's Response:

**REQUEST FOR PRODUCTION NO. 27:**

Produce all geo-location mapping (identified by Brad Rosenthal as "map matching") pertaining to the Claimant for all Period 3 time.

**RESPONSE:**

Uber objects to this request as overbroad in time and scope and unduly burdensome because it is not subject to any reasonable subject matter or temporal limitation. In particular, this request requires Uber to produce a map of the route Claimant drove to complete <u>every</u> one of Claimant's 3,346 trips over the five years Claimant utilized the Uber – Driver App. Uber does not keep "geo-location mapping" or "map matching" documents in the ordinary course of business. Instead, routes driven by Claimant are stored electronically on a per-trip basis. As such, to comply with the request as written, Uber would have to manually and individually search for and screenshot and save as a PNG file the mapped route for 2,321 transportation requests Claimant completed. Assuming it takes one minute to pull each route, that equates to over 38 hours of time. Claimant's driver portal, which he can access online, contains the mapped routes of every trip Claimant completed. Therefore, because it would take Uber over 38 hours to individually pull each map and because Claimant has access to the information via his driver portal, the burden and expense of Claimant's proposed discovery outweighs its likely benefit. As a result, this request seeks documents that are not relevant to Claimant's claims and Uber's defenses asserted in this matter. This request is therefore not reasonably calculated to lead to the discovery of admissible evidence.

By extension, this request is not proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' resources, the importance of this particular discovery in resolving the issues in this case, and because the burden and expense of the proposed discovery outweighs its likely benefits. *See* FED. R. CIV. P. 26(b); *see also Crosby v. La. Health Serv. & Indem. Co.*, 647 F.3d 258, 264 (5th Cir. 2011) (holding that a court can—and must—limit proposed discovery if it determines is not proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit—and the court must do so even in the absence of a motion).

Uber objects to this request because it seeks the creation of a document that is not readily available and/or regularly maintained by Uber in the ordinary course of business.

Pursuant to protective order, Uber produced in .CSV format, spreadsheets containing data related to Claimant's Period 3 time (i.e., the time period spent transporting a rider) limited to the maximum statute of limitations period for the claims asserted by Claimant (March 12, 2017 to August 25, 2019). *See* Uber_Barysas_001165, 001269, and 001312. Respondent stands on its objections to Claimant's request for "all geo-location mapping" or "map matching."

Uber maintains the GPS data sought and wrongfully withheld this data, claiming that the data was not readily available or maintained by Uber.  Clearly this data is readily available and maintained by Uber as evidenced by Uber's ability to access the data underlying Video 1 and Video 2.  Claimant requests that Uber be compelled to produce the data sought in Request for Production No. 27.

## PRAYER

After notice and Oral Hearing, Claimant requests the Arbitrator to Order Respondent Uber Technologies, Inc. to produce the document described on the terms and conditions specified in this motion or on such other terms and conditions as may be prescribed by the Court, and grant Claimant all other and further relief to which Claimant is entitled.

Respectfully submitted,

**KHERKHER GARCIA, LLP**

By:  /s/ Bret Stanley

Bret Stanley
State Bar No. 24075116
BStanley@KherkherGarcia.com
Steve Kherkher
Skherkher@kherkhergarcia.com
Ryan MacLeod
RMacLeod@kherkhergarcia.com
Eric Hawley
EHawley@kherkhergarcia.com
Kathryn Hiett
Khiett@kherkhergarcia.com
2925 Richmond Ave., Suite 1560
Houston, TX  77098
(713) 333-1030 / (713) 333-1029 (fax)

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a true and correct copy of the above and foregoing document has been

forwarded via certified mail, return receipt requested, on this the 4th day of April 2022, to the

following counsel:

LITTLER MENDELSON, P.C.
Allison Williams
Kim Miers
Sophia Collins
Nicole LeFave
Abby Bochenek
Collin Quigley
Maikieta Brantley

acwilliams@littler.com
kmiers@littler.com
scollins@littler.com
nlefave@littler.com
abochenek@littler.com
cquigley@littler.com
mbrantley@littler.com
smendoza@littler.com
scornell@littler.com
preyes@littler.com
hheckel@littler.com

/s/ Bret Stanley

2022-67757 / Court: 133

# Exhibit M

# IN THE ARBITRATION BETWEEN

| | |
|---|---|
| **DAINUS BARYSAS** | § |
| | § |
| **Claimant** | § |
| | § |
| **VS.** | § |
| | § |
| **UBER TECHNOLOGIES, INC.** | § |
| | § |
| **Respondent** | § |

## AMENDED ORDER NO. 8

On March 17, 2022, the Arbitrator ordered that the Final Hearing in this matter would commence on March 29, 2022, at 10:00 a.m. CST.  By error on the part of the Arbitrator, she believed the start time was 9:00 a.m. CST.  As a result, there was confusion caused by the Arbitrator.   Although the Hearing was scheduled to commence at 10:00 a.m. CST on March 29, 2022, counsel for Uber received an email at 9:03 a.m. that included a link to a Zoom created by Counsel for Claimant.   At 9:08 a.m., counsel for Uber received an email from the Arbitrator indicating that there was a problem with the court reporter.  Uber immediately joined the meeting wherein it was apparent that the Arbitrator believed the Hearing was supposed to commence at 9:00 a.m. instead of 10:00 a.m.  There was no ex-parte conference with Claimant's counsel and the Arbitrator.  In fact, the Arbitrator stopped any discussion on the part of Claimant's counsel, Bret Stanley, until Respondent's counsel could be joined in.  No other conversation took place until all parties were present.  Again, the start time confusion was caused by the Arbitrator with no fault on the part of anyone else.

Before the Arbitrator are Claimant's Request for Information on "Video 1" and "Video 2" as Ordered by the Arbitrator, Claimant's Motion to Compel Production Concerning Video 1 and Video 2, Respondent's Motion for Protective Order, Respondent's Response to Claimant's

Request for Information on "Video 1" and "Video 2", Respondent's Opposition to Claimant's Motion to Compel Production Concerning Video 1 and Video 2.

The Arbitrator ordered Uber to produce two videos identified by Uber's corporate representative, Mr. Brad Rosenthal, during his testimony on March 29, 2022. When he was asked ". . . Now, if Judge Soussan hears "geo-spoofing" or "airport spoofing," is there documentary evidence that you are going to show us or that you can show us to substantiate that claim?" (Hearing Tr. at 126:3-6), he responded ". . . I have seen from counsel a video that shows how he was spoofing his location at the airport. There's two different videos that I had reviewed with counsel that showed that." (Hearing Tr. at 126:21-24)   These videos had not been provided previously to Claimant. Uber stated that the videos were created for this arbitration at the direction of counsel and protected by the attorney work product doctrine. Nonetheless, without waiving its privilege objection, Uber immediately provided these videos to Claimant and the Arbitrator. Following the production of the videos, Claimant was further allowed to conduct additional limited discovery related to the videos.

Claimant issued twelve discovery requests to Uber, and Uber provided answers and materials in response to the requests seeking information about the videos, the GPS data underlying the videos, and information about Claimant. Uber claims that many of Claimant's requests seek proprietary and confidential information about the software depicted in the videos. Previous Orders by the Arbitrator have not allowed Claimant to receive Uber's proprietary and confidential information. Moreover, the Arbitrator previously cautioned that she would not allow Claimant to delve into Uber's proprietary information in line with her previous ruling that Uber did not have to provide similar information contained in screenshots of its software systems.

2

Claimant asserts six claims against Respondent for: (1) failure to pay minimum wage; (2) failure to pay overtime wages for hours worked over 40 in a workweek; (3) failure to maintain records required by the FLSA; (4) reimbursement for unlawfully retained tips; (5) reimbursement for kickbacks/expenses; and (6) unjust enrichment. The discovery deadline in this matter was February 25, 2022. During the yearlong discovery period, Claimant never deposed a corporate representative from Uber.

This case centers on whether Uber properly classified Claimant as an independent contractor under the Fair Labor Standards Act ("FLSA"). Uber is "not standing on the" Texas Transportation Network Company Law ("TNC Law"). Claimant argues that whether Uber limited the territory within which Claimant could provide digitally prearranged rides is relevant to the parties' respective control and other elements which would support his claim of employee status over DB Pedicabs, LLC – the company owned by Claimant and under which Claimant operated and provided transportation services. Respondent's Motion for Protective Order pg. 4.

Claimant's newly served discovery requests are based on the fact that in 2018, Uber determined that Claimant engaged in fraudulent behavior in violation of its policies or terms and conditions. As a result, Claimant's ability to use the Uber Driver App within the Houston Airport system was disabled. There is no dispute that Uber reserved the right and had the ability to restrict Claimant's ability to make airport trips through the Uber Driver App. Uber stipulated that it did restrict that ability. *Id.*

These discovery requests will now be examined in light of the subject matter and ultimate issues to be determined in this arbitration: was Claimant an employee of Respondent or an independent contractor. Allowing this additional discovery at this time, in the middle of the Arbitration Final Hearing, was never meant to open the door to unfettered access to Respondent's

3

proprietary information.  It was for the purpose of narrow examination of the two (2) videos mentioned in Mr. Rosenthal's Hearing testimony.

Important to note, Uber did not identify the videos at issue on its exhibit list, does not intend to rely on them to prove anything, and does not even intend to try to prove that Claimant engaged in fraudulent behavior.  Instead, Uber will only argue—and has only ever argued—that it "detect[ed]" fraudulent behavior by the Claimant to explain why it made the decision to disable Claimant's access to trips to and from the Houston Airport System in response to Claimant's discovery requests.  To be clear, Uber has no intention of trying to prove that it was correct in determining that Claimant engaged in fraudulent behavior for purposes of this arbitration. Respondent Uber Technologies, Inc.'s Response to Claimant's Motion to Compel Production Concerning Video 1 and Video 2 pg. 1.

Uber has responded and objected to Claimant Dainius Barysas' Request for Information on "Video 1" and "Video 2" as Ordered by the Arbitrator.  Uber argued that in spite of the Arbitrator's warning, Claimant issued onerous requests on such things as information contained in dropdown menus that could have no relevance to this case.  Claimant seeks Uber's confidential and proprietary information, as well as information that Uber previously objected to producing, and that Claimant never moved to compel.  Uber objects to several of Claimant's requests and seeks a Motion for Protective Order to prevent Uber from disclosing confidential trade secrets and proprietary materials that have no relevance to this matter.  Uber's Motion for Protective Order pg. 5.

Uber provided prompt responses to many of Claimant's requests.  Claimant sought the identity of the person who prepared the videos, and Uber provided that information.  Likewise, Uber provided identifiers for the trips and driver (the UUID) involved in the videos.  In addition,

Uber provided GPS data for the trips Claimant completed on May 10, 2018 and May 16, 2018—the dates of the trips depicted in the videos.  That data included the GPS data for the trips contained in the videos so Claimant can evaluate it.

It is therefore **ORDERED**:

1.      Uber's objection to providing information about the inner workings of its proprietary software is **GRANTED.**

2.      Uber's Motion for Protection is **GRANTED**.

3.      Claimant's Motion to Compel Production Concerning Video 1 and Video 2 is hereby **DENIED**.  The Arbitrator is of the opinion that Uber has responded to the new discovery requests appropriately.  Any and all objections to the same are **GRANTED** in all respects.  The requests have either been answered, seek trade secrets, confidential and proprietary information or seek irrelevant information to the issues before this Arbitrator.  Discovery is concluded.  The continuation of the Final Arbitration Hearing shall commence on May 2-3, 2022 at 10:00 a.m. CST.

4.      Video 1 and Video 2 will not be admitted into evidence.  Any testimony regarding same is hereby stricken for all purposes.


Signed this 7th day of April 2022.

_____
Susan S. Soussan
Arbitrator

2022-67757 / Court: 133

# Exhibit N

| DAINIUS BARYSAS, | § | |
| | § | |
| Claimant, | § | |
| | § | |
| vs. | § | HON. SUSAN SOUSSAN, |
| | § | ARBITRATOR |
| UBER TECHNOLOGIES, INC., | § | |
| | § | |
| Respondent. | § | |
| | § | |
| | § | |

## CONFIDENTIALITY AND CLAW-BACK STIPULATION AND PROTECTIVE ORDER

WHEREAS, disclosure and discovery activity in this action are likely to involve production of confidential, proprietary, or private information for which special protection from public disclosure and from use for any purpose other than arbitrating this claim may be warranted. Accordingly, Claimant Dainius Barysas ("Claimant") and Respondent Uber Technologies, Inc. ("Respondent" or "Uber") (collectively, "the Parties") hereby stipulate to the following Confidentiality, Claw-back Agreement and Protective Order ("Stipulation").

WHEREAS, the purpose of this Stipulation is to permit the Parties to discover such information pursuant to procedures designed to protect and preserve the confidentiality of that information;

WHEREAS, the Parties agreed to protect certain privileged, attorney work-product or otherwise protected information (including metadata where applicable), whether stored in electronic, paper, or other tangible form, in the event they are produced during the course of this arbitration whether pursuant to the Arbitrator's Order, a party's discovery request or informal production;

WHEREAS, all parties may be required to produce large volumes of information during discovery, and wish to comply with discovery deadlines and complete discovery as expeditiously as possible, while preserving and without waiving any evidentiary protections or privileges applicable to the information contained in the information produced, including as against third parties and/or in other proceedings (including, but not limited to, other arbitrations, mediations,

1

Federal and State proceedings), and in addition to their agreement, need the additional protections of the Arbitrator's order under FRE 502(d) and (e) to do so;

WHEREAS, because the purpose of this Stipulation is to protect and preserve Protected Information, the Parties agree they are bound as follows from and after the date their counsel have signed it, even if such execution occurs prior to the Arbitrator's approval.

THEREFORE, the Parties seek the entry of an Order, pursuant to Federal Rule of Civil Procedure 26(c), governing the disclosure of "Confidential Information" and "Highly Confidential – Attorneys' Eyes Only Information" on the terms set forth herein, as well as an Order, pursuant to FRE 502, governing the return of Protected Information and affording them the protections of FRE 502(d) and (e), on the terms set forth herein.

**IT IS HEREBY STIPULATED**, as follows:

This Stipulation will be entered pursuant to Rule 26(c) of the Federal Rules of Civil Procedure and Rule 502 of the Federal Rules of Evidence.

1.      **Definition of "Documents or Electronically Stored Information."**

The terms "Documents," "Electronically Stored Information" and "Documents or Electronically Stored Information" shall be synonymous in meaning and equal in scope to the usage of these terms in Rule 34 of the Federal Rules of Civil Procedure.

2.      **Definition of "Confidential Information."**

"Confidential Information" shall include sensitive research, development, financial, accounting, commercial, confidential, proprietary or private information in the possession of any party that is generally unavailable to others in the industry or to the public, and is not readily determinable from public sources. A party to this proceeding or a non-party to this proceeding may designate as "Confidential" any information produced in disclosures or in response to discovery requests or subpoenas by that party or by any other party that, in good faith, the Designating Party deems confidential, including without limitation any information concerning: (a) classified and proprietary human resources information of Respondent relating to any current or former employees, as well as information relating to any current or former transportation providers/drivers

2

or riders, including without limitation, Documents or Electronically Stored Information containing employee compensation-related information, transportation provider/driver earnings[1], and other personally identifiable information, health or medical-related information, home addresses, home telephone numbers, or email addresses; (b) Respondent's policies or procedures; (c) Respondent's financial, accounting, commercial, operations, training, or other proprietary or trade secret information of Respondent; (d) the financial, accounting, or other private or confidential information of any current, former, or prospective customer, business partner, or third-party vendor of Respondent; (e) business or marketing plans of Respondent; (f) proprietary business or pricing information; (g) written discovery, Documents, Electronically Stored Information and deposition testimony from any other proceedings against Respondent that contains any of the foregoing information, that is otherwise confidential (e.g., pursuant to statute or regulation), and/or that was previously marked "Confidential" in any other proceedings against Respondent, and (h) any portion of depositions (including audio or video) where information described in Sub-paragraphs (a)-(g) above is disclosed or used in an exhibit.

Nothing herein shall be construed to limit or expand the definition of Confidential Information as defined by Fed. R. Civ. P. 26(c) and applicable caselaw.

**3.     Designation and Use of Confidential Information.**

In designating materials as "Confidential Information" or "Highly Confidential Information" or "Highly Confidential Attorneys' Eyes Only Information", the Producing Party shall do so in good faith, consistent with the provisions of this Order. Nothing contained herein shall be construed to allow global designations of all materials or documents as "Confidential Information", "Highly Confidential Information", or "Highly Confidential Attorneys' Eyes Only Information."

---

[1] Nothing in this protective order is meant to waive arguments that Claimant and/or transportation providers were properly classified as independent contractors. Nothing in this protective order is meant to waive Claimant's arguments that Claimant was an employee of Respondent.

The "Confidential" designation shall be made by stamping or otherwise affixing a label or sticker stating "CONFIDENTIAL" to the information so designated at the time of production of the information. In the case of Electronically Stored Information, a party producing Confidential Information in an electronically-stored format shall stamp or otherwise affix a label or sticker to the physical medium by which the information is transmitted (e.g., computer disk, CD ROM, etc.) stating "CONFIDENTIAL." If the party to whom such "Confidential"-designated Electronically Stored Information is produced creates any readable report or output from such Confidential Information that is disclosed to another person or party authorized to review the information pursuant to Paragraph 5 below, that party shall prominently label each page of such output report as "CONFIDENTIAL." A party need not perform such labeling for any report or output that is reviewed solely by that party.

Information previously produced may be retroactively designated, by the party producing the information or by the party receiving the information, by written notice specifically identifying the information within thirty (30) days of the Arbitrator's Order approving this Stipulation. Information produced without designation or with improper designation may be retroactively designated in the same manner and shall be treated as Confidential Information from the date written notice of the designation is provided to the Receiving Party. In the event of any change in designation pursuant to this Paragraph, the party making the change shall promptly provide substitute copies of all information as to which confidential status is claimed, with the replacement information to bear a stamp, label, or sticker identifying the information as "Confidential." Thereafter, the original, incorrectly designated information (and all copies thereof) shall be promptly destroyed or returned to the Designating Party, with confirmation in writing.

Information disclosed or discussed in a deposition may be designated as "Confidential" by any party by so indicating on the record at the time of the deposition or, within thirty (30) days

4

after receipt by the party of the applicable deposition transcript, by notifying counsel for the other party in writing as to which portions of the deposition transcript contain Confidential Information.

Nothing contained in this Stipulation shall affect the right of a party to use or disclose information that such party has produced and designated "Confidential" as such party sees fit; however, if a party uses or discloses the information in a manner inconsistent with the designation of the information as Confidential Information, and such use or disclosure is not inadvertent or unintentional, and is left uncorrected upon discovery of such use or disclosure, the information will not be deemed Confidential Information for purposes of this Stipulation.  All Confidential Information obtained by any person or party shall be maintained carefully so as to preclude access by persons or parties who are not entitled to receive such information.

4.      **Designation and Use of Highly Confidential - Attorneys' Eyes Only Information.**

A party to this proceeding or non-party to this proceeding may designate as "Highly Confidential – Attorneys' Eyes Only" any documents or information produced or disclosed in response to informal or formal discovery requests, subpoenas and/or other exchanges of documents or information, which it in good faith believes could place it at a competitive disadvantage if produced or disclosed to individuals other than the receiving party's counsel of record in this proceeding because such documents or information contain commercially sensitive information, proprietary information, or trade secrets, the disclosure of which is likely to cause irreparable harm or significant injury to the competitive position of the designating party.  At the time of designation, the party or non-party designating any documents or information as Highly Confidential – Attorneys' Eyes Only shall provide the receiving party with the basis for such designation in writing.  Documents and information designated or treated as Highly Confidential – Attorneys' Eyes Only may only be disclosed to the receiving party's counsel of record in this proceeding.

In the event a party to this proceeding or non-party to this proceeding neglects to designate documents or information as Highly Confidential – Attorneys' Eyes Only prior to production or disclosure, it may do so after production or disclosure by sending written notice to the receiving party following the discovery that such documents or information were produced or disclosed without being designated as Highly Confidential – Attorneys' Eyes Only.  Such documents and information shall be treated as Highly Confidential – Attorneys' Eyes Only from the date written notice is received by the receiving party until further order of the Arbitrator.

5.     **Disclosure of Confidential Information.**

Other than at arbitration hearing, a deposition related to this proceeding, court or arbitration filings, or a hearing or conference regarding any motion in this proceeding, Confidential Information may not be disclosed or made available by a recipient of such information to any person or party other than:

(a)     a party to the arbitration, inside and outside counsel of any party to this proceeding, and the legal, clerical, paralegal, and secretarial staff of such counsel;

(b)     current employees of Respondent, whose assistance is needed in the prosecution or defense of this proceeding;

(c)     former employees of Respondent, whose assistance is needed in the prosecution or defense of this proceeding;

(d)     individuals, including non-parties, whom any party to this proceeding intends to call as witnesses at hearing, subject to the individual agreeing, in writing, to non-disclosure by executing Exhibit A;

(e)     any deponent in preparation for deposition, subject to the individual agreeing, in writing, to non-disclosure by executing Exhibit A;

(f)     outside experts or consultants who are engaged by a party expressly for the purpose of assisting in this proceeding, as well as commercial copy services, data entry and computer support organizations hired by and assisting outside counsel for a party,

6

subject to the individual agreeing, in writing, to non-disclosure by executing Exhibit A;

(g)     a mediator selected by mutual agreement of the parties to this proceeding; and

(h)     the Arbitrator, personnel of the Arbitrator or arbitration service provider, a court, court personnel, and any court or shorthand reporter or typist or videographer used to record or transcribe testimony.

Nothing herein shall prevent any person or party from seeking, by written agreement of the signatories hereto, or an order by the Arbitrator, further, greater or lesser protection with respect to the use of any Confidential Information in connection with this proceeding.

**6.     Disclosure of Highly Confidential Information.**

In the case of documents and the information contained therein, designation of Highly Confidential Information produced pursuant to this Stipulation shall be made by placing the following legend on the face of and/or in the title of the document or collection of documents: "HIGHLY CONFIDENTIAL." Upon such designation, all parties shall treat the identified information as highly confidential under this agreement until and unless it is otherwise agreed by all parties or ordered by the Arbitrator.  In the event a party to this proceeding or non-party to this proceeding neglects to identify any disclosed information as Highly Confidential, it may do so after disclosure by sending notice within 60 days following the discovery that Highly Confidential information was disclosed to all parties that clearly delineates the highly confidential information, which shall be treated as highly confidential from the date written notice of the designation is provided to the Receiving Party.

Highly Confidential Information may not be disclosed or made available by a recipient of such information to any person or party other than:

(a)     a party to the arbitration, inside and outside counsel of any party to this proceeding, and the legal, clerical, paralegal, and secretarial staff of such counsel;

(b)     individuals whom any party to this proceeding intends to call as witnesses at trial, provided that such party reasonably believes that the witness has knowledge concerning the highly confidential information, subject to the individual agreeing, in writing, to non-disclosure by executing Exhibit A;

(c)     any deponent in preparation for deposition provided that such party reasonably believes that the deponent has knowledge concerning the highly confidential information, subject to the individual agreeing, in writing, to non-disclosure by executing Exhibit A;

(d)     outside experts or consultants who are engaged by a party expressly for the purpose of assisting in this proceeding, that such party reasonably believes that the expert or consultant requires knowledge concerning the highly confidential information in order to assist in this proceeding, provided the expert or consultant agrees to be bound by the terms of this Confidentiality Order, by executing Exhibit A.  This provision does not permit any outside expert or consultant to disclose Highly Confidential Information to any other individual or entity, specifically including but not limited to commercial copy services, data entry and computer support organizations hired by and assisting outside experts or consultants;;

(e)     a mediator selected by mutual agreement of the Parties; and

(f)     the Arbitrator, any court or shorthand reporter or typist or videographer used to record or transcribe testimony.

Such disclosure shall only be made for purposes that are specifically and directly related to the reasonable conduct of this proceeding, and to no other persons or parties.  Such information shall be held in the highest confidence by each person or party to whom it is disclosed, shall be used only for purposes that are specifically and directly related to the conduct of this proceeding, and shall not be used for any business purpose.

The unauthorized disclosure of Highly Confidential Information shall give the Designating Party the right to seek and obtain immediate injunctive or other equitable relief to enjoin any unauthorized use or disclosure of its Highly Confidential Information in addition to any other rights or remedies that it may have at law or otherwise.

7. **Information Security Protections.**

Any person or party in possession of another party's Confidential Information shall maintain a written information security program that includes reasonable administrative, technical, and physical safeguards designed to protect the confidentiality of such Confidential Information, protect against any reasonably anticipated threats or hazards to the security of such Confidential Information, and protect against unauthorized access to or use of such Confidential Information. To the extent a person or party does not have an information security program they may comply with this provision by having the Confidential Information managed by and/or stored with e-discovery vendors or claims administrators who maintain such an information security program.

If the Receiving Party discovers a breach of security, including any actual or suspected unauthorized access, relating to another party's Confidential Information, the Receiving Party shall: (1) promptly provide written notice to Designating Party of such breach; (2) investigate and take reasonable efforts to remediate the effects of the breach, and provide Designating Party with assurances reasonably satisfactory to Designating Party that such breach shall not recur; and (3) provide sufficient information about the breach that the Designating Party can reasonably ascertain the size and scope of the breach.  If required by any judicial or governmental request, requirement or order to disclose such information, the Receiving Party shall take all reasonable steps to give the Designating Party sufficient prior notice in order to contest such request, requirement or order through legal means.  The Receiving Party agrees to cooperate with the Designating Party or law enforcement in investigating any such security incident.  In any event, the Receiving Party shall promptly take all necessary and appropriate corrective action to terminate the unauthorized access.

No copies of Confidential Information shall be made except as required for the conduct of this proceeding and by or on behalf of attorneys of record in this action. Any counsel making copies of such information shall maintain all copies within their possession or the possession of those entitled to access to such information under this Order. Exhibits containing Confidential Information that are attached to pleadings or motions filed with the Arbitrator or Court may be retained in counsel's file. Any other copies of Confidential Information shall be destroyed when no longer required for purposes of this proceeding.

All information produced in this matter shall be used by the Receiving Party solely for the purpose of prosecuting or defending this proceeding, and not for, or in connection with, any other cases or disputes, or for any business, commercial, competitive, personal or other purpose, unless specifically agreed to, in writing, by the Producing Party. Any information listing the names, addresses, or other identifying or contact information for transportation providers/drivers who have used the Uber App shall not be used by Receiving Parties or their counsel to solicit the participation of the identified individuals in any other complaint, lawsuit, or legal proceedings. Receiving Parties shall not disclose any information produced in this proceeding to persons other than those specified in Paragraph 5 and 6 of this Stipulation without the prior written consent of the Designating Party and a court order compelling such production. If a Receiving Party is served, at any time during or after the pendency of this matter, a subpoena or Arbitrator/court order seeking disclosure of information produced in this proceeding, Receiving Party shall immediately notify the Designating Party and await Designating Party's written consent before disclosing in any other proceeding any information produced by that Designating Party in this proceeding.

**8.     Signing of Declaration of Confidentiality.**

Each person to whom disclosure is made pursuant to Paragraphs 5(d), 5(e), 5(f), 6(b), 6(c), and 6(d) shall be given a copy of this Order and shall sign a declaration, a copy of which is attached hereto as <u>Exhibit A</u>, prior to receipt of any Confidential Information. Such declaration shall state that the Receiving Party agrees that he or she is bound by the terms of this Order. Nothing

10

contained herein shall limit the duty or obligation of a party to produce information in a timely manner pursuant to the Federal Rules of Civil Procedure or pursuant to any agreed extension by the opposing party's counsel of record.  Deponents may be shown Confidential and Highly Confidential Information during their deposition, but shall not be permitted to keep copies of said Confidential and Highly Confidential Information nor any portion of the deposition transcript reflecting the Confidential or Highly Confidential Information.

9.      **Return of Information.**

At the conclusion of this proceeding, all information covered by this Stipulation, and all copies of same, and all information or portions thereof containing information derived from information covered by this Stipulation including any readable reports or output from the physical medium by which Electronically Stored Information was transmitted, shall be returned as follows:

(a)      Within sixty (60) days of the conclusion of this proceeding, and subject to Sub-paragraphs (d) and (e) below, all Confidential Information, including any and all copies, abstracts, summaries, physical medium by which data was transmitted, and readable reports or output from the physical medium by which data was transmitted, shall be returned to the Producing Party.  In the alternative, within sixty (60) days of the conclusion of this proceeding, counsel for each party shall certify to counsel for the opposing party, in writing, that any and all such Confidential Information, including any and all copies, abstracts, summaries, physical medium by which data was transmitted, and readable reports or output from the physical medium by which data was transmitted, produced by the opposing party, has been destroyed.

(b)      If Confidential Information is furnished to outside experts or consultants pursuant to Paragraphs 5(h) or 6(d), the attorney for the party using such expert or consultant shall have the responsibility of ensuring that all such Confidential Information including any and all copies, abstracts, summaries, physical medium by which data was transmitted, and readable reports or output from the physical medium by which data was transmitted, is returned to the Producing Party or destroyed, and so certifying in writing as provided in Sub-paragraph (a) above.

(c)     If Confidential Information, Highly Confidential or Highly Confidential-Attorneys' Eyes Only Information has been loaded into any review database, the attorney for the party using such database shall have the responsibility of ensuring that all such information (including all associated images and native files), are extracted from such databases (including any associated staging databases) and destroyed.  "Destroyed" shall mean deletion of information from all databases, applications and/or file systems in a manner such that they are not readily accessible without the use of specialized tools or techniques typically used by a forensic expert.

(d)     Counsel of record for the Parties may retain copies of any part of the Confidential Information, Highly Confidential Information and Highly Confidential-Attorneys' Eyes Only Information produced by others that has become part of the official record of this proceeding as well as abstracts or summaries of information that reference Confidential Information, Highly Confidential Information and Highly Confidential-Attorneys' Eyes Only Information that contain counsel's mental impressions or opinions.  Such copies shall remain subject to the terms of this Stipulation.

(e)     The Parties, counsel of record for the Parties, and experts or consultants for a party shall not be required to return or to destroy any Confidential Information, Highly Confidential Information and Highly Confidential-Attorneys' Eyes Only Information to the extent such information is (i) stored on media that is generally considered not reasonably accessible, such as disaster recovery backup tapes, or (ii) only retrievable through the use of specialized tools or techniques typically used by a forensic expert; provided that to the extent any Confidential Information, Highly Confidential Information and Highly Confidential-Attorneys' Eyes Only Information is not returned or destroyed due to the foregoing reasons, such information shall remain subject to the confidentiality obligations of this Stipulation.

**10.     Disputes Regarding Designation of Confidential Information, Highly Confidential and Highly Confidential-Attorneys' Eyes Only Information.**

Where disputes arise as to the protected nature of any information, such disputes shall be resolved, if possible, by agreement by and among the Parties.  The party challenging a

confidentiality designation shall initiate the dispute resolution process by providing written notice of each designation it is challenging and describing the basis for each challenge. The Parties and the non-party who designated the information as confidential shall attempt to resolve each challenge in good faith and must begin the process by conferring directly (by oral dialogue; other forms of communication will not suffice) within 14 days of the date of service of notice. In conferring, the challenging party must explain the basis for its belief that the confidentiality designation was not proper and must give the Designating Party an opportunity to review the designated information, to reconsider the circumstances, and, if no change in designation is offered, to explain the basis for the chosen designation.

If an agreement cannot be reached that certain information not be designated as "Confidential," "Highly Confidential," or "Highly Confidential-Attorneys' Eyes Only Information," an appropriate motion requesting that certain information not be designated "Confidential," "Highly Confidential," or "Highly Confidential-Attorneys' Eyes Only Information" may be filed by the Receiving Party bringing the dispute before the Arbitrator. In any such dispute, the Designating Party shall bear the burden of persuasion. All motions challenging the designation of information as "Confidential," "Highly Confidential," or "Highly Confidential-Attorneys' Eyes Only Information" must be timely brought for hearing sufficiently in advance of the discovery deadline such that the dispute may be resolved prior to the close of the discovery period.

**11.    Challenge to Confidentiality Designations.**

(a)    A Receiving Party may challenge a Producing Party's designation of "Confidential Information," "Highly Confidential Information," or "Highly Confidential-Attorneys' Eyes Only Information" by notifying the Producing Party of its good faith belief that the designation was not proper. Such notice shall be in writing, however, it may be delivered orally on the record at a deposition or at an arbitration/court proceeding, promptly followed up in writing. The notification shall specifically identify each designated document or other material that is subject to the

Receiving Party's challenge with a brief description of the document and the document's Bates Number.

(b)      After receipt of this written notification, the Producing Party will have an opportunity to review the designated material, to reconsider the circumstances, and, if no change in the designation is offered, to explain, in writing within twenty-one (21) days of receiving such a challenge, the basis of the designation.

(c)      If that does not resolve the dispute over the designation:

(i)      The Receiving Party must file a Notice of Challenged Information with the Arbitrator identifying by Bates number the specific documents being challenged, with a short description of the document. The challenging party will use its best efforts to consolidate challenges into as few motions as practicable to save resources both for the Parties and the Arbitrator.

(ii)      Within twenty-one (21) days of the Notice of Challenged Information, the Producing Party must file a Motion to Protect Confidentiality and specify, if appropriate, which documents are no longer being maintained as confidential. This motion will be filed as a discovery motion and will be governed by any procedures governing discovery motions.

(iii)      Within fourteen (14) days of the Motion for Protect Confidentiality, the Receiving Party must file an opposition and specify, if appropriate, which documents are no longer being challenged as confidential.

(iv)      Within seven (7) days, the Producing Party must file a reply and specify, if appropriate, which documents are no longer being maintained as confidential.

(d)      This procedure shall also govern any challenges to whether Highly Confidential Information shall be designated as Highly Confidential Information.

(e)     The Burden of proof as to a designation of Confidential Information or Highly Confidential Information rests on the Producing Party to demonstrate that such designation is proper.  The document or information that is subject of the filing shall be treated as originally designated pending resolution of the dispute.

**12.     FRE 502 Privilege Protections.**

The Parties agree Rule 502 of the Federal Rules of Evidence shall apply to disclosure of a communication or information covered by the attorney-client privilege or work-product protection. The Parties agree to, and the Arbitrator orders, protection of privileged, work-product or otherwise protected Documents and Electronically Stored Information against claims of waiver (including as against third parties and in any other proceedings) in connection with FRE 502 and as follows:

(a)     If the Producing Party withholds information otherwise discoverable by claiming that the information is privileged or subject to protection as trial-preparation material, the Producing Party must:

(i)     Expressly make the claim; and

(ii)    Describe the nature of the documents, communications, or tangible things not produced or disclose – and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim.

(b)     If, during the course of this proceeding, a party determines it has inadvertently produced a communication or information covered by the attorney-client privilege or work-product protection ("Protected Information"):

(i)     Within 30 days following the discovery of the inadvertent production of the Protected Information, the Producing Party may notify the Receiving Party of such production in writing, and demand the return of such information. Such notice shall be in writing, however, it may be delivered orally on the

record at a deposition or at an arbitration/court proceeding, promptly followed up in writing. The Producing Party's written notice will identify the Protected Information produced by Bates Number range or hash value, the privilege or other protection claimed, and the basis for the assertion of the privilege or other protection consistent with the requirements of the Federal Rules of Civil Procedure. In the event that any portion of the identified information does not contain Protected Information, the Producing Party shall also provide to the Receiving Party a redacted copy of the Protected Information that omits the information that the Producing Party believes is subject to a claim of privilege or other protection.

(ii)    As applicable, the Producing Party shall produce corrected versions of the material to conform the document to the appropriate designation within twenty-one (21) days of the date they notified the Receiving Party of the inadvertent production.

(iii)    The Receiving Party must, within ten (10) days of receiving the Producing Party's written notification described above, return, sequester, or destroy the Protected Information and any copies, along with any notes, abstracts or compilations of the content thereof. To the extent that Protected Information has been loaded into a review database under the control of the Receiving Party, the Receiving Party shall have all electronic copies of the Protected Information extracted from the database.

(b)    To the extent that Protected Information has already been used or described in other information generated or maintained by the Receiving Party prior to the date of receipt of written notice by the Producing Party as set forth in Sub-paragraph (a)(i), the Receiving Party shall sequester such other information until the claim of privilege has been resolved. If the Receiving Party disclosed the Protected

Information before receiving notice pursuant to this Paragraph, the Receiving Party must take reasonable steps to retrieve the Protected Information.

(c)     The Receiving Party's return, sequestering or destruction of Protected Information as provided herein will not act as a waiver of the Receiving Party's right to move for the production of the returned, sequestered or destroyed information on the grounds that the information is not, in fact, subject to a viable claim of privilege or protection.  However, the Receiving Party is prohibited and estopped from arguing that:

(i)     the disclosure or production of the Protected Information acts as a waiver of an applicable privilege or evidentiary protection;

(ii)    the disclosure of the Protected Information was not inadvertent;

(iii)   the Producing Party did not take reasonable steps to prevent the disclosure of the Protected Information; and

(iv)    the Producing Party failed to take reasonable or timely steps to rectify the error pursuant to Federal Rule of Civil Procedure 26(b)(5)(B), or otherwise.

(d)     Either party may submit Protected Information to the Arbitrator under seal for a determination of the claim of privilege or other protection.  The Producing Party shall preserve the Protected Information until such claim is resolved.  The Receiving Party may not use the Protected Information for any purpose absent an order from this Arbitrator.

(e)     Upon a determination by the Arbitrator that the Protected Information is protected by the applicable privilege or evidentiary protection, and if the Protected Information has been sequestered rather than returned or destroyed by the Receiving Party, the Protected Information shall be returned or destroyed within 10 (ten) days of the Arbitrator's order.  The Arbitrator may also order the identification by the Receiving Party of Protected Information by search terms or other means.

(f)      Nothing contained herein is intended to, or shall serve to limit a party's right to conduct a review of information (including metadata where applicable), whether stored in electronic, paper, or other tangible form, for relevance and responsiveness, and for the segregation of privileged or otherwise protected information before such information is produced to another party.

**13.      Further Protective Orders.**

Nothing in this Stipulation shall affect any party's right to seek further protective orders under Rule 26(c).

**14.      Enforcement.**

The provisions of this Stipulation may be enforced like any other arbitration order.

**15.      Full Force and Effect.**

This Stipulation, until it is entered by the Arbitrator, and even if it is never entered by the Arbitrator, shall be deemed to be an enforceable agreement between the Parties, except to the extent that it is inconsistent with any order of the Arbitrator.  By operation of the Parties' Stipulation and Arbitrator's Order, the Parties are specifically afforded the full protections of FRE 502(d) and (e).

This Order will survive the termination of this proceeding and will continue to be binding upon all persons to whom Highly Confidential-Attorneys' Eyes Only Information, Confidential Information, or Protected Information is produced or disclosed.

The Arbitrator will retain jurisdiction over all persons subject to this Order to the extent necessary to enforce any obligations arising hereunder or to impose sanctions for any contempt thereof.

Dated: __April 27, 2021_____                    Kherkher Garcia, LLP


                                                     _/s/ Bret Stanley (w/ permission)_____
                                                     Bret Stanley
                                                     Attorneys for Claimant


Dated: __April 27, 2021_____                    LITTLER MENDELSON, P.C.


                                                     _/s/ Kimberly R. Miers_____
                                                     Kimberly R. Miers
                                                     LITTLER MENDELSON, P.C.
                                                     Attorneys for Respondent
                                                     UBER TECHNOLOGIES, INC.


**FOR GOOD CAUSE SHOWN, IT IS SO ORDERED** that the provisions of the

Stipulation signed by counsel of record for the parties are adopted as the Order of the Arbitrator.


Dated: __May 5, 2021_____          _____
                                                     Hon. Susan Soussan, Arbitrator