# EXHIBIT A-4

10/20/2022 12:34 PM
Marilyn Burgess - District Clerk Harris County
Envelope No. 69412931
By: cassie combs
Filed: 10/20/2022 12:34 PM

## RETURN OF SERVICE

| | | |
|---|---|---|
| **State of Texas** | **County of Harris** | **133rd District Court** |

Case Number: 202267757

Plaintiff:
**Dainius Barysas**

vs.

Defendant:
**Uber Technologies Inc.**

Received these papers on the 18th day of October, 2022 at 12:28 pm to be served on **Uber Technologies Inc. C/O C.T. Corporation System; Registered Agent, 1999 Bryan St., Suite 900, Dallas, Dallas County, TX 75201.**

I, Norman Lee Collins, do hereby affirm that on the **18th day of October, 2022** at **2:16 pm, I:**

Delivered to the within named Corporation a true copy of the Citation with Petition and Motion to Vacate Arbitration Award with the date of delivery endorsed thereon by me, to C.T. Corporation System as Registered Agent and personally delivered to their designated agent for acceptance of delivery of process George Martinez and informing said person of the contents thereof.

"My name is Norman Lee Collins. My date of birth is 10/11/1963. My address is 18601 LBJ Freeway, Suite 650, Mesquite, Texas 75150, USA. I declare under the penalty of perjury that the foregoing is true and correct. Executed in Dallas County, State of Texas, on the 19th day of October, 2022."

**Norman Lee Collins**
PSC360; EXP. 7/31/2024

Our Job Serial Number: PEL-2022003336

Copyright © 1992-2022 Database Services, Inc. - Process Server's Toolbox V8.2i

# EXHIBIT A-5

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **DAINIUS BARYSAS,** | § | |
| Plaintiff, | § | |
| | § | |
| **vs.** | § | **CIVIL ACTION NO.** _____ |
| | § | |
| **UBER TECHNOLOGIES, INC.** | § | |
| Defendant. | § | |

## LIST OF ALL COUNSEL OF RECORD

Pursuant to Local Rule 81.6, Defendant submits the following list of all counsel of record,

including addresses, telephone numbers, and parties represented:

| Counsel for Plaintiff: | Counsel for Defendant: |
|---|---|
| Bret Stanley<br>Eric Hawley<br>Ryan MacLeod<br>Steven J. Kherkher<br>Kherkher Garcia, LLP.<br>2925 Richmond Ave., Ste. 1560<br>Houston, TX 77098<br>Telephone: 713.333.0862<br>bstanley@kherkhergarcia.com<br>ehawley@kherkhergarcia.com<br>rmacleod@kherkhergarcia.com<br>skherkher@kherkhergarcia.com | Kimberly R. Miers<br>Nicole S. LeFave<br>LITTLER MENDELSON, P.C.<br>100 Congress Avenue, Suite 1400<br>Austin, Texas 78701<br>512.982.7250<br>512.982.7248 (Fax)<br>kmiers@littler.com<br>nlefave@littler.com<br><br>M. Collin Quigley<br>Abby Bochenek<br>LITTLER MENDELSON, P.C.<br>2001 Ross Avenue, Suite 1500<br>Dallas, Texas 75201-2931<br>214.880.8100<br>214.880.0181 (Fax)<br>cquigley@littler.com<br>abochenek@littler.com<br><br>Allison Clara Williams<br>LITTLER MENDELSON, P.C.<br>1301 McKinney Street, Suite 1900<br>Houston, Texas 77010<br>713.951.9400<br>713.951.9212 (Fax)<br>acwilliams@littler.com |

# EXHIBIT A-6

| | | |
|---|---|---|
| **DAINIUS BARYSAS,** | § | |
| | § | |
| **Claimant,** | § | **HON. SUSAN SOUSSAN,** |
| | § | **ARBITRATOR** |
| **vs.** | § | |
| | § | |
| **UBER TECHNOLOGIES, INC.,** | § | |
| | § | |
| **Respondent.** | § | |

---

## CLAIMANT DAINIUS BARYSAS'S POST-HEARING BRIEF

---

**SUBMITTED BY:**

**KHERKHER GARCIA, LLP**

Bret Stanley
BStanley@KherkherGarcia.com
Steven J. Kherkher
SKherkher@KherkherGarcia.com
Eric A. Hawley
EHawley@KherkherGarcia.com
Ryan MacLeod
RMacLeod@KherkherGarcia.com
Kathryn Hiett
KHiett@KherkherGarcia.com
Kelli MacDonald
KMacDonald@KherkherGarcia.com

2925 Richmond Ave., Suite 1560
Houston, TX  77098
(713) 333-1030 / (713) 333-1029 (fax)

**ATTORNEYS FOR CLAIMANT**

Claimant Barysas is the only driver making a claim here and only his personal experience with Uber is at issue. This arbitration's consequences—which are very real—solely affect him. No prior award has any bearing here. Uber has referred to, and selectively quoted, past awards as if they are precedent. They are not. Uber's reliance on awards involving other individuals is disrespectful to Claimant and considering such awards would be doing a disservice and injustice to him. Uber drivers, collectively, are not on trial here. Testimony as to how drivers might act, *generally*, is immaterial.[1] Only Claimant Barysas's case, and evidence pertaining to him, may be considered. Claimant asks the Arbitrator to take a close look at the legal, admissible, and competent evidence and the law in this matter. The Arbitrator should consider whether the testimony is objectively supported by credible evidence, or whether it consists of bare assertions based on subjective and biased opinions. Only *proper* legal precedent should be considered, and applied only to facts supported by *credible* evidence. Claimant submits that doing so—in an intellectually honest manner—will result in finding that he qualified as an employee under the FLSA.

### OBJECTIONS TO UBER'S EVIDENCE

Claimant objects to Exhibits **RX31-39 & J10**—Uber's website screenshots.

- As Rosenthal admitted, no evidence exists to support that these webpages were online during the statutory period or when these policies were in place. *See*

---

[1] Most of Brad Rosenthal's testimony on direct examination involved generalities without clarifying the time frame, location, type of driver, etc., even though Uber's policies and terms varied based on these factors. Such testimony is not probative as to the circumstances faced by Barysas, particularly Rosenthal's testimony about changes Uber made *after* the statutory period.

Reporter's Record ("RR") at 577:13-578:16, 580:12-581:1, 581:19-584:24. In fact, all of the webpages are dated **June 2021** with a copyright date of 2021.

- Also, most of those webpages indicate that they pertain to **Wichita**. *See* RX31-33, 35-37, J10. Only one pertained to Houston. *See* RX39.

- Thus, no foundation exists for Uber's contention that these documents were available during the statutory period or in Houston. This evidence (and any related testimony) is therefore not admissible, not probative, and should be given no weight. *See* RR 478:13-479:10, 482:19-483:1, 503:2-8, 518:8-19, 522:9-19, 527:14-528:2, 533:25-534:19 (all related testimony).

Claimant requests rulings on these evidentiary challenges in the Final Award.

## APPLICATION OF THE ECONOMIC REALITIES FACTORS

The Fifth Circuit's economic realities factors must be applied to the *individual facts* presented here.[2] The Fifth Circuit has never ruled on a case with facts like this. Uber contends that *Herman* should be blindly applied as controlling precedent because the court's majority found those delivery drivers to be independent contractors. *See Herman v. Express Sixty-Minute Del. Serv.*, 161 F.3d 299 (5th Cir. 1998). But the facts of *Herman* are not analogous simply because the case involved drivers. To start, the Fifth Circuit decided it in 1998, long before smartphones were invented or Uber was founded. None of the technology Uber uses to control drivers had been invented yet. The *Herman* drivers did not have GPS and had to rely on their own knowledge/experience to navigate. *Id*. at 302. They furnished their own biohazard bags, dry ice, dollies, MAPSCOs, tarps, and cords. *Id*. Like here, uniforms

---

[2] Uber admitted in opening statement that the reinstatement of the Department of Labor's guidance at 86 FR 1168-01, 2021 WL 51656, has little to no effect on the analysis. RR 72:19-22, 73:9-18.

were *not* required. *Id*. Unlike here, the *Herman* delivery drivers "knew which jobs were most profitable," were not penalized for rejecting work, and drivers could and did negotiate for increased commissions. *Id*. at 302-304. These distinctions all directly impact the "control" and "opportunities for profit and loss" factors, which were (barely) found to be in favor of independent contractor status. As to the other factors, the majority found ***two factors in favor of employment status***. *Id*. at 304-05.

Uber also relies heavily on the language of its Technology Services Agreement ("TSA"), and Claimant's statements regarding his status. *See* RR 695:2-25. **But contract language is not controlling under the FLSA, nor is subjective belief**. *Brock v. Mr. W. Fireworks*, 814 F.2d 1042, 1044 (5th Cir. 1987). The U.S. Supreme Court held that the FLSA must be "applied even to those who would decline its protections." *Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 305 (1985). In other words, **an individual may not waive application of the Act** through voluntary agreement. See *Barrentine v. Arkansas-Best Freight Sys.*, 450 U.S. 728, 740 (1981) ("FLSA rights cannot be abridged by contract or otherwise waived, because this would 'nullify the purposes' of the statute"); *Sec'y of Labor v. Lauritzen*, 835 F.2d 1529, 1544-45 (7th Cir. 1987) ("**The FLSA is designed to *defeat* rather than implement contractual arrangements.** If employees voluntarily contract to accept $2.00 per hour, the agreement is ineffectual.").

Additionally, Uber's challenge to Claimant's credibility rings hollow.

- First, Uber nit-picks at Claimant's exact wording and variances from his deposition testimony on insignificant details, such as whether he had a "home office" for DB Pedicabs. RR348:9-349:23. Claimant's credibility should not depend on memorizing the exact words of his deposition relating to minor details.

- Second, Uber faults Claimant for failing to remember certain facts as well as he did in his deposition. *See*  RR 696:5-14. But Claimant did not lie about his memory; instead, he welcomed Uber's counsel to refresh his recollection because more time had passed since then. RR 393:5-394:6. That shows his candor.

- Finally, Uber criticizes Claimant for his admission that while driving for Uber, he occasionally lied to riders to avoid cancellations. *See* RR 696:21-697:6; 397:1-10. But that testimony is further evidence of Claimant's truthfulness. His statements to riders were not made under oath. The moment he was placed under oath, he told the truth. This evidence supports Claimant's credibility.

## FACTOR 1: CONTROL

Uber contends this case is about choice. Uber is right. It is about choice—but not Claimant's choice, it is about Uber's choice. Claimant did not initiate arbitration because of choices he made, but because of choices Uber made. Uber chose not to pay Claimant minimum or overtime wages. Yet, Uber made the business decision to dictate all fares and commissions,[3] assign all work,[4] dictate service fees,[5] prohibit cash payments,[6] mandate use of its payment system,[7] enable GPS-tracking,[8] limit territory,[9] and enact policies that threaten deactivation for noncompliance with

---

[3] RR 140:23-141:25; 237:12-238:2, 243:22-244:15, 244:25-245:2, 275:15-276:3; C8 at 138; C9.
[4] RR 90:3-10, 90:21-25, 91:9-14; 116:24-117:9, 118:16-23, 119:6-7; 276:8-277:4.
[5] RR 142:4-8; 144:8-145:6; 236:18-21; 276:4-7.
[6] RR 111:13-112:18, 235:3-5; C24.
[7] RR 104:18-105:9, 107:17-108:17.
[8] RR 124:1-3, 203:8-18 (tracked in P1-P3), 208:20-22, 211:9-14 (tracking acceleration data), 212:11-17 (data relating to stopping too quickly); C3 at 63 ("by GPS-tracking every ride").
[9] RR 125:18-126:2, 173:21-25 (Uber counsel's stipulation), 175:3-8, 178:13-15, 209:10-18, 566:5-12 ("We did limit him from accessing the airport, yeah."); C7.

various ground rules.[10] Uber will claim these decisions were made as part of "minimum business standards." That is fiction. These decisions have nothing to do with business standards and everything to do with profitability. Uber decided to maximize its profits through automated algorithmic control of Claimant's work.

Evidence of Uber's control can be found everywhere—in Claimant's testimony, Uber's testimony, Uber's videos (C4), support messages (C8)[11], Community Guidelines (C1-3, J2-3), Deactivation Policy (J1), TSA (J4), and even in its business model. The platform's ability to perform its basic function—connecting customers to workers and serving them promptly—inherently depends on being able to exercise control. Uber's algorithm would not function if Claimant could undercut the prices of other drivers, assign his own work, turn off Uber's GPS-monitoring, accept different payment methods, negotiate fares, or ignore Uber's mandatory rating system. In other words, Uber *must* command a large amount of control over its drivers, or else the business fails. Still, Uber seeks to direct and restrict Claimant's work in these ways without being answerable to or responsible for Claimant. Uber cannot have it both ways—it cannot control the details of Claimant's work while avoiding the minimum responsibilities enshrined in statute.

Uber chose not to share trip details with Claimant prior to P3. The resulting

---

[10] RR 512:9-12, 555:4-9, 566:13-567:5; C1-3; J1-4; C8.

[11] *See also* Uber's communications: C9 (fare adjustment email), C14 (180 Days of Change—"we'll be making meaningful changes"), C23 (new earning structure imposed), C24 (cash prohibition), C25 (prohibition on other passengers in vehicle in P1-P3), and C27 (pick-up instructions).

information asymmetry gave Uber greater control over Claimant's work. When Uber presented Claimant an offer in P1 time, it did not provide him with the following data in its possession: the *estimated fare amount*, the *estimated time* of the trip, *estimated distance* of the trip, or the rider's *destination*. RR 121:17-122:19, 277:17-278:8; 305:22-306:18. Even *after* acceptance—in P2—Uber did not provide that data to Claimant. RR 558:20-560:1, RR559:19-560:12; RX48 at § 2.2. It was only during P3—after Claimant incurred expenses to arrive at the pickup location and after the rider physically entered the vehicle—that Uber provided that information.

Uber *admitted* it **unilaterally set Claimant's fares** for every trip it assigned, including default amounts for the base fare, per-minute rate, and per-mile rate. C8 at 138; RR140:23-141:25; 237:12-238:2, 243:22-244:15, 244:25-245:2, 275:15-276:3. Uber *admitted* it had *sole discretion* to adjust fares and to decide whether to charge a cancellation fee to the rider. *Id*.; C9 (unilaterally reducing fare by $23). Uber calculated all payments automatically and prohibited Claimant from accepting cash. RR 104:18-20, 111:13-112:18, 235:3-5; C24. Uber went beyond merely restricting Claimant's autonomy to control his prices and instead *directly set* all prices.

Uber *admitted* it **exclusively controlled all trip assignments** to Claimant, which were offered automatically by Uber's algorithm. RR 90:3-10, 90:21-25, 91:9-14; 116:24-117:9, 118:16-23, 119:6-7; 276:8-277:4. Uber controlled all the details: it dictated the terms on which Claimant was allocated customers, the prices that

Claimant could charge those customers, and the share that Claimant earned.

Uber *admitted* it surveilled Claimant's work in real-time by collecting GPS data every couple of seconds while logged into the app, *including in P1 and P2 time*. RR 124:1-3, 203:8-18, 208:20-22, 211:9-14, 212:11-17; C3 at 63. Uber used that data to provide ETAs to riders for a pickup time without Claimant's input. RR 109:11-17, 245:10-13. This act of monitoring a worker in real-time for the purpose of improving service to customers demonstrates the economic concept of control.

Uber published to Claimant its Community Guidelines and Deactivation Policy, providing express standards for acceptance rates, cancellation rates, and star-ratings. *See* C1-3, J1-3. The Community Guidelines told Claimant that if his star-rating fell below the minimum, "you *will* lose access to your account." J2 at 71; J3. Rosenthal admitted this is true. RR 555:4-9. Although Uber claims this does not constitute supervision, Uber relied on the customer rating system as a pretext for deactivation rather than direct supervision.  The controlling effect is the same.

Uber instructed its drivers that if they are online, they are expected to accept most trip requests. RR 91:21-92:2, 100:13-17, 102:1-4, 110:14-20; C4, "How to Use Uber Partner App" at 2:22-23; J2 at 71 ("If you don't want to accept trips, just log off."). The Community Guidelines told Claimant that if his cancellation rate exceeded the city's maximum rate, "you may lose access to your account." J2 at 71. And it instructed Claimant that he "may be logged out of the app" if "you

consistently decline trip requests." *Id*. at 72. It further stated, "We *will* deactivate any account or accounts associated with fraudulent activity, which may include… *accepting trips without the intention to complete*." *Id*. at 74. So, failing to accept trips may be considered a sign of fraud, and Uber could deactivate on that basis.

The Community Guidelines and Deactivation Policy state that their purpose is "to have clear policies that explain the circumstances in which you may be denied access to Uber." J2 at 70; J3. Claimant relied on these "clear policies" to avoid deactivation. RR278:9-19, 280:9-281:7, 281:18-282:18, 283:1-23, 440:2-8.

Rosenthal's testimony, however, directly contradicted Uber's "clear policies." He offered broad assertions that (1) there are no negative consequences for not accepting a trip, (2) there are no negative consequences for a low acceptance rate, and (3) there are no negative consequences for canceling a trip. RR 504:25-505:2, 506:21-24, 512:6-8. Rosenthal did not, however, provide any document substantiating his subjective contradictions of the objective evidence.[12] His uncorroborated testimony is not reliable and should not be given any weight.

Still, Uber contends that Claimant had broad freedom to accept, reject, or

---

[12] That was not the only time Rosenthal's sworn testimony contradicted Uber's written statements. Rosenthal did so many times. For example, Rosenthal admitted he was offering *personal* opinions, even though he knew they contradicted Uber's official statements to drivers. RR 134:1-6 ("That is what the video says. I don't necessarily agree with that."). Another example, when asked if Claimant could go through the app to request payment from the rider for the return of a lost item, Rosenthal said "I'm assuming there is a way to do that," and "I don't think there would be anything preventing you from doing that…" RR 114:4-21. But he then had to admit that Uber instructed its drivers the exact opposite: "do not request payment from the rider for the return of a lost item. Drivers who do so *will* lose access to the Uber system." RR 115:20-116:15; C4.

cancel rides. But even setting the deactivation policies aside, **Uber ignores that he had zero ability to make *informed* decisions during P1 and P2 time**. *See* J2-3; RR 121:17-122:19, 277:17-278:8; 305:22-306:18, 558:20-560:12; RX48 at § 2.2. If Claimant wanted to turn down work because it lacked profitability (*e.g.*, the trip was too short to justify the time, expense, or lost opportunity), he would have to cancel once the rider was already physically in the vehicle (during P3), which was not a realistic option. *Id*. Thus, *he had no way to make informed decisions prior to P3*.[13]

Uber's meaningful control over Claimant becomes even more conspicuous on review of its support messages to Claimant. *See* C8. Uber unilaterally re-calculated a fare (C8 at 1271; RR 313:8-19), it denied Claimant a long pickup fee for a 20-mile pickup (C8 at 1305; RR 316:13-318:1), it refused to pay a requested cleaning fee and prohibited a direct request to the rider (C8 at 1493-94; RR 322:23-324:23), and it mistakenly removed Claimant from the UberBlack platform, compensating him $15 for the lost time and income, which was insufficient (C8 at 1381-82; RR 327:1-330:21). These are the actions of an employer, not an independent business.

All the above indisputable facts prove that Uber controlled Claimant's work in meaningful ways. *See Brock*, 814 F.2d at 1049 ("Control is only significant when it shows an individual exerts such control over a meaningful part of the business that she stands as a separate economic entity"). Uber's reliance on Claimant's *trivial*

---

[13] Unlike California drivers, who, *according to Uber*, were provided "trip information upfront so you can make *informed* decisions," allowing them to "earn on your own terms." C20 at 2.

freedoms, on the other hand, should not be given the same weight. For example, Uber points to Claimant's freedom not to wear a uniform, his choice whether to accept non-service pets, his choice whether to display the Uber logo in his car, freedom to rate a rider any number of stars, and freedom to offer amenities to riders. These are not economically meaningful or substantially impactful. Such trivial freedoms are outweighed by Uber's *economically-significant* control.

Additionally, Uber points to Claimant's limited freedom to take a route other than the one prescribed by Uber's app. *See* RR 515:23-516:14. But that also did not *substantially* impact how Claimant performed his work. He could not increase his fare based on route because Uber considered such actions "fraudulent" and would deactivate for fraud. *Id.*; J2 at 74. Claimant therefore had no autonomy to influence his take-home pay through route-selection (which contrasts Uber drivers with taxi drivers, for example). Uber restricted his routes through threats of deactivation.

Uber also attempts to evade liability by arguing that Claimant had the freedom to work for other entities. But "[a]n ability to work at other establishments is not dispositive of the issue." *Martin v. Priba Corp.*, No. 3:91-CV-2786-G, 1992 WL 486911, *3 (N.D. Tex.) (mem. op.), *citing McLaughlin v. Seafood, Inc.*, 861 F.2d 450 (5th Cir. 1988). Moreover, the only other work that Claimant performed within the same industry was his work for Lyft. But Uber's Lyft data is not supported by any testimony from a Lyft representative as to its meaning, accuracy, or source. *See*

RX13. That data also was not analyzed by any expert and no expert was presented to explain its significance or reliability. Further, Claimant testified that he worked for Uber about 4x as much as he did for Lyft, and he did not switch back-and-forth between them. RR 340:21-341:19; 411:13-16. Uber points to the possibilities of what Claimant could do, rather than what he did in reality. "It is not significant, however, how one 'could have' acted under the contract terms. The controlling economic realities are reflected in the way one actually acts." *Usery v. Pilgrim Equip. Co. Inc.*, 527 F.2d 1308, 1312 (5th Cir. 1976).

Claimant testified that he only had two customers outside of Uber/Lyft. RR 412:6-413:21, 442:21-443:12. He did not work for any other business in the same industry.[14] Carolina Logistics and TC Transport were not ride-share or taxi services. RR 415:2-8. No evidence shows that Claimant made any money from TC Transport, which only applied to a small portion of the statutory period, and Claimant worked for Carolina Logistics outside the statutory period. RR 441:3-442:20.

Uber's *only* example of Claimant's non-trivial control over his own work is schedule flexibility. Or as Uber redundantly states, freedom to choose "when, where, how long and how often" he used the app. But schedule flexibility does not outweigh the litany of ways Uber exerted economically-significant control. While schedule

---

[14] According to the Department of Labor, work in other industries is "not relevant" to the economic realities test and has no bearing on his worker classification as an Uber driver. *See* 86 F.R. 1168, at 1248 (earnings from separate business in different industry is "not relevant").

flexibility offered Claimant *some* control of how much time he worked, it had no bearing on Uber's control over Claimant ***during*** the hours he worked.

As support for schedule flexibility being a significant consideration, Uber cites to *Saleem v. Corp. Transp. Grp., Ltd.*, 854 F.3d 131 (2d Cir. 2017). But that Second Circuit case—out of New York—does not apply here. *Saleem* is factually distinguishable on numerous grounds.[15] Also, the factors considered by the Second Circuit were different from the Fifth Circuit's factors. They were: (1) the manner and extent of the workers' affiliation with the defendant; (2) entrepreneurial opportunities, (3) investment & return, and (4) schedule flexibility. *Id*. at 140. The Arbitrator should not rely upon *Saleem* as support for any finding or conclusion.

Uber also cites to *Eberline* as support for the significance of schedule flexibility because the satellite installers in that case could adjust their own schedules without repercussions and were found to be independent contractors. *Eberline v. Media Net, L.L.C.*, 636 F.Appx. 225 (5th Cir. 2016); *see* Uber's Pre-Hearing Brief at 9. Schedule flexibility, however, was just one small piece of the control puzzle, and the rest of the pieces do not fit here. Notably, the court also considered that the satellite installers "could negotiate prices for custom work directly with the customer

---

[15] The *Saleem* plaintiffs had to rent or purchase costly franchises to operate; they negotiated various terms of the franchise agreements, and those terms varied greatly among the drivers; the renters paid a weekly fee to operate; the purchasers paid as much as $60,000 for the franchise; they required a special license to operate; they had the ability to negotiate rates; they could build a book of business through the franchise; and they could set up scheduled/pre-arranged rides.

and keep that money without consequence," the installers "were not required to inform [defendant] of any money they received for performing custom work," they "could hire other workers to assist them in completing installations," and the defendant "did not supervise installations, inspect the installers' work, or even assign installation jobs to specific installers." *Id*. at 227. Schedule flexibility alone is insufficient to demonstrate freedom from control.

Uber contends that its control was limited to that which was required by either the law, safety, or business standards. This is a strawman argument, as Claimant does not rely upon methods of control arising from law or safety requirements. Claimant presented evidence of Uber's exclusive control over the customer volume, exclusive price-fixing, mandatory payment processing, acceptance and cancellation rate standards, star-rating standards, unilaterally setting ETAs in P2 time, and real-time GPS-tracking in P1 and P2 time (when no rider is in the car), among other things. *See supra*, at n. 3-11. These are just some ways in which Uber meaningfully controls Claimant and *none* are based on safety protocols or legal requirements.

Based on the foregoing, the control factor weighs in favor of employment.

## FACTOR 2: RELATIVE INVESTMENTS

Uber offers only one argument on this factor—that the Arbitrator should completely ignore Uber's investments into the app and only consider Claimant's investments in his vehicle, cell phone, etc. Uber relies on this single point because

there is no doubt that upon considering Uber's investments, they vastly outweigh Claimant's. But Uber's analysis ignores the Fifth Circuit's plain holdings.

The Fifth Circuit uses "a side-by-side comparison method in evaluating this factor." *Parrish v. Premier Dir. Drilling*, 917 F.3d 369, 383 (5th Cir. 2019). It holds, ***"[the employer's] greater overall investment in the business scheme" must be considered***. *Id*. (where the pipeline company "invested more money at a drill site compared to each plaintiff's investments"). This law is well-established. *See id*. at 383 (it is "long-accepted methodology"); *Hopkins v. Cornerstone Am.*, 545 F.3d 338, 344 (5th Cir. 2008) (comparing the individual's investment to the employer's "*overall investment* in the business scheme"); *Brock*, 814 F.2d at 1054 (holding, "the [trial] court erred as a matter of law by failing to make findings as to the ***absolute and relative investment of [employer]*** compared to that of the operators"); *Hobbs v. Petroplex Pipe and Const.*, 360 F.Supp. 3d 571, 580 (W.D. Tex. 2019) ("the Court ***must*** consider [Defendant's] ***overall investment*** in the pipe construction project"), *aff'd* at 946 F.3d 824, 831; *Carrell v. Sunland Const.*, 998 F.2d 330 (5th Cir. 1993) (comparing company's "***overall investment*** in each pipeline construction project" to welders' ***overall investment*** in their trucks/ equipment). The Fifth Circuit therefore requires consideration of Uber's overall investment into the business.

Rosenthal admitted the extent of Uber's overall investments in the business. RR 258:23-259:12 ("hundreds of millions of dollars" for "the app and all the

technology" and "development of the Uber application software"); 259:13-260:8 ("millions of dollars" on tv, web, and written advertising): 260:9-13 (4,000 software engineers); 260:14-261:3 (hundreds of Greenlight hubs); 261:4-17 (29,300 employees in 72 countries); 511:18-23 ("we're taking the risk on payment issues"); 511:24-512:2 (Uber maintains third party liability insurance on drivers' behalf).

Uber's investment in the app must be considered here because it is an essential tool of the business. Uber's app provided Claimant with every trip assignment, calculated every fare, served as the communication platform for every message to Uber Support, operated as the default communication platform for Claimant and every rider, and processed every fare payment. *See supra* at n. 3-4, 7, 10, 11.

Claimant's investments, on the other hand, are diluted when made not just for business, but for personal use. *See Herman*, 161 F.3d at 304 (finding this factor ***favored employment*** because investment is "diluted when one considers that the vehicle is also used by most drivers for personal purposes"); *Brock*, 814 F.2d at 1052 ("These few, minor purchases, often for ***nonbusiness*** purposes, do ***not*** indicate ***legally significant investment*** by the operators."). Uber cannot bootstrap Claimant's personal purchases to the business to artificially inflate Claimant's investment.

Claimant's ongoing expenses also cannot inflate the amount of his relative investments. *See Usery*, 527 F.2d at 1313. The Fifth Circuit has repeatedly held that it looks to see what *capital* must be **placed *at risk* upfront on the part of the**

**worker**. *Id*. ("risk capital"); *Brock*, 814 F2d at 1052 ("risky capital investments" and "up-front" money); *Herman*, 161 F.3d at 304-05 ("capital risk," "risk of investment loss," "risky capital investment"); *Parrish*, 917 F.3d at 383 ("risk capital"). Ongoing expenses such as maintenance and gas are not capital risk investments, as they are only incurred as the business continues to operate. Rosenthal listed everything required to begin driving for Uber. RR 467:19-468:18. That list did not include any capital risk investment. There is no evidence of necessity to make an upfront investment placed at risk.[16] Uber only points to the cost of Claimant's vehicle(s) and his cell data plan as the investment costs, but those are diluted due to personal use. Regardless, these cannot compare to Uber's investments in the app.

In a "side-by-side comparison"—as required under Fifth Circuit jurisprudence—Uber's billion-dollar investments greatly outweigh that of Claimant.

## FACTOR 3: OPPORTUNITY FOR PROFIT AND LOSS

The Fifth Circuit has repeatedly held that the opportunity for profit and loss is considered by looking at who has greater influence over the "major determinants" of profit and loss. *See Usery*, 527 F.3d at 1312-13; *Brock*, 814 F.2d at 1050; *Reich*, 998 F.2d at 328; *Herman*, 161 F.3d at 310 (King, J. dissenting). Those determinants have been held to be ***prices***, ***customer volume***, ***location***, and ***advertising***. *Id*.

---

[16] Unlike in *Saleem*, where significant upfront capital investment was required because drivers had to either rent or purchase a franchise.  *See Saleem*, 854 F.3d at 135-36. Here, one can sign up for Uber and begin working as a driver without any investment, much like employees.

Prices:  Uber *admitted* that it set all fares, it had sole discretion to adjust all fares, and Claimant had no ability to manually change the fares.[17] This is price-fixing. Uber contends that the "market" influenced the pricing, not the company. RR 237:8-11. But the company remained in control of the algorithm, it controlled how the algorithm responded to market shifts, it withheld the market data from Claimant, and it is undisputed that Claimant could not change the algorithm. RR 237:12-238:3, 239:1-5. Thus, Uber had greater influence over this major determinant.

Customer Volume:  Uber has also *admitted* that it allocated *all* customers and Claimant had "zero control" over which trip he got. RR 90:3-10, 90:21-25, 91:9-14; 116:24-117:9, 118:16-23, 119:6-7; 276:8-277:4. While Claimant could choose when and where to log on, he could not make an informed decision because Uber did not provide him with the customer information it possessed. Uber therefore had greater influence over this major determinant of profit.

Advertising:  Claimant did not advertise to persuade riders to join the Rider App; he relied on Uber for that. Uber spent millions on advertising to riders every year. RR 259:13-260:8. Although Claimant had business cards, the business he received from that advertising was *de minimis*. RR 412:6-413:1, 413:15-21, 442:21-

---

[17] Uber contends that Claimant could "negotiate" the fares by (1) contacting Uber or (2) choosing not to charge the rider. RR 244:23-24, 521:20-25. But that is not negotiation. First, Uber still had the *final say* regarding the amount of the fare. RR 244:25-245:2; 574:7-13, 576:12-22. Second, the TSA states only that Claimant could negotiate the fare *downwards*, not upwards. J4 at 4.1; RR 573:14-574:13. Third, Uber withdrew its standard service fee  regardless of how he "negotiated" the fare. RR 577:6-12. Finally, the power to choose not to be paid is not equivalent to negotiation.

443:12. Uber therefore had greater influence over this major determinant of profits.

Location:  Claimant chose to work primarily out of the airport because that was the only way he could make a profit. RR 302:14-18. When Uber suddenly prohibited him from receiving airport rides, Claimant requested reinstatement, but Uber refused every request without explanation. C7; RR 303:13-16. It was not until this arbitration that Uber offered a reason for its limitation on his territory. Uber claims he was "geo-spoofing," but offered no evidence in support. RR 125:7-13. This limitation on Claimant's location effectively caused him to quit because he was unable to profit from Uber in any other way. RR 302:14-303:1, 303:13-16. Uber therefore had greater influence over this major determinant of profit.

Uber contends Claimant could influence his profits by choosing what times of day to work and how long to remain on the app. But Claimant's ability to decide when to begin and end work is not determinative of opportunity for profit and loss. In fact, the DOL guidance that Uber relies upon *expressly rejects Uber's argument*. *See* 86 F.R. at 1247 ("This factor weighs towards the individual being an *employee* to the extent the individual is unable to affect his or her earnings or *is only able to do so by working more hours or faster*."). In other words, that Claimant can affect his earnings by working more hours or more efficiently is not relevant.

Finally, Uber has suggested that Claimant could control his costs through tax deductions of business-related expenses. Uber relies on an unpublished opinion for

support. *See Gate Guard Svcs. L.P.*, No. V-10-91, 2013 WL 593418 (S.D. Tex. 2013) (mem. op.). In *Gate Guard*, the tax deduction was just one minor consideration among the many that the Court considered for this factor.[18] *Id*. at *9. Moreover, Uber provided no testimony, expert or otherwise, to explain the ramifications of any tax deduction taken by the Claimant through his tax service.

Uber's extensive influence over Claimant's profit is plainly illustrated through the example regarding the offer of a $60 ride versus a $5 ride. *See* RR 117:21-119:22. Uber admits it unilaterally decides whether Claimant gets the $60 ride or the $5 ride. *Id*. That $55 difference in revenue is exclusively determined by Uber. RR 119:18-22. Uber controlled that revenue differential for every one of Claimant's 2,346 trips.

Uber had greater influence over *major* determinants of profit and loss, so this economic realities factor indicates that Claimant was an employee.

## FACTOR 4: SPECIALIZED SKILL AND INITIATIVE

It is well-established that the Fifth Circuit looks for "some unique skill" or ability to exercise significant initiative within the business. *Eberline*, 636 F.Appx. at 228-229; *Hopkins*, 545 F.3d at 345 (inquiring whether the plaintiff had "some unique skill set"); *Halferty v. Pulse Drug Co., Inc.*, 821 F.2d 261, 267 (5th Cir. 1987)

---

[18] Also, the attendants in *Gate Guard*, unlike Claimant, had the ability to and did negotiate their daily rates, could pay relief workers at a rate they decided upon, could perform other work while at the well site while getting paid by the defendant, and the costs deducted involved items like utilities, propane, safety equipment expenses, contract labor, and legal and professional services, none of which are the types of expenses deducted by Claimant here. *Gate Guard*, at *4-9.

("Halferty needed no knowledge of any special equipment"); *Reich v. Priba Corp.*, 890 F.2d 586, 592 (5th Cir. 1995). Of course, ***driving a <u>personal</u> vehicle does not require any unique or specialized skill***. RR 304:1-24; *see Herman*, 161 F.3d at 305 (holding that driving a personal vehicle did not require specialized skill or initiative); RR 304:3-7 ("No special skill was required… Anybody could do it.").

With respect to "initiative," the inquiry is whether Claimant had "some ability to exercise *significant* initiative in the business." *Hopkins*, 545 F.3d at 345. The Fifth Circuit holds that where "routine work" is involved—like here—"industry and efficiency is ***not*** indicative of independence and nonemployee status." *See Usery*, 527 F.2d at 1314 ("***Customer rapport is not an initiative characteristic***"); *Brock*, 814 F.2d at 1053 ("we held that initiative, ***not efficiency***, determines independence and that customer rapport is not an initiative characteristic"); *Reich*, 890 F.Supp. at 593 ("The ***ability to converse*** with club clientele in an effort to generate a larger tip ***is not the type of initiative*** contemplated by *Silk*.").

Uber relies solely on Claimant's efficiency, industry, and customer rapport.[19] RR 530:25-532:8 ("customer service is a skill"). Uber presented no evidence of the type of significant initiative the Fifth Circuit considers, and certainly not enough to

---

[19] Uber also contends Claimant showed initiative by obtaining a commercial license. RR 692:14-15. But Claimant did not obtain that commercial license for Uber. RR 303:17-304:7. He acquired it *after* quitting Uber. Uber also points to Claimant's $1,100 in credit card fees listed on his tax return as evidence of having initiative due to "so many ride opportunities outside of Uber." RR 692:16-20. But that is mere speculation. Uber has no evidence as to the origin of those fees and it has no evidence that it is somehow related to Claimant's "initiative."

indicate he has the type of unique skill or initiative that would be expected of an independent contractor. *See* RR 530:25-532:8 (this is the full extent of Uber's testimony supporting the skill & initiative factor). Accordingly, Uber has no legal or factual authority to prevail on this factor. This factor weighs in favor of employment.

## FACTOR 5: PERMANENCE

The key consideration for this factor is the "total length of the relationship." *Parrish*, 917 F.3d at 387. The Fifth Circuit held that the following were sufficient:

- **10 months**. *Robicheaux v. Radcliff Material, Inc*., 697 F.2d 662 (5th Cir. 1983).

- **11 months**, where plaintiffs worked "on a steady and reliable basis for a substantial period of time." *Cromwell v. Driftwood Elec. Contractors, Inc*., 348 F. Appx. 57, 58 (5th Cir. 2009).

- **Several years**. *Hopkins*, 545 F.3d at 346 (also distinguishing *Hickey*).

- Where plaintiffs worked for **4 months**, **6 months**, **9 months**, and **3 years** each, and some "took several weeks off from work at a time," and there was a **14-month gap** in one worker's employment. *Hobbs*, 360 F.Supp. at 583 ("considering the totality of the circumstances," the plaintiffs worked on a "steady and reliable basis over a substantial period of time"), *aff'd* 946 F.3d 824.

- "**Indefinite**" relationship indicated employment. *Eberline*, 636 F.Appx. at 229.

The Claimant here worked for Uber for **5 years**. RR 275:11-14. Based on the foregoing law, this constituted work on a "steady and reliable basis over a substantial period of time." He also worked on an "indefinite" basis. *See Eberline*, at 229. Uber cannot dispute the length of time Claimant worked. Uber offered mere argument that Claimant took two months off, but there is no evidence, beyond a counsel-created

demonstrative, supporting its argument. And even if there was a gap, that alone does not outweigh the amount of time he spent working for Uber. *See Hobbs*, 360 F.Supp. at 583. The permanence factor therefore favors an employment relationship.

**OTHER FACTORS: CLAIMANT'S WORK WAS INTEGRAL TO THE BUSINESS**

The Fifth Circuit accepts consideration of a sixth factor, which is whether Claimant's work was integral to the business—*i.e.*, whether his type of work was the "main focus" of the business. *See Hobbs*, 946 F.3d at 836. Uber proclaims it is a "technology company," not a "transportation company." *See, e.g.*, RR 461:20-22. Considering that the entire goal of the Uber platform is to ensure transportation of people or things from Point A to Point B, the distinction is risible. Regardless, this "technology company" uses algorithms to automate transportation services to riders. To do so, it must harness the power of individual drivers. Until Uber can rely on autonomous vehicles, Uber needs individuals to operate its driving force. Its business cannot function otherwise. Uber even tells its drivers that they "are our most important partners." C4 ("How to Use the Uber Partner App" 2:1-2).

Claimant's work is therefore integral to Uber's business.

**ENGAGED-TO-WAIT VS. WAITING-TO-BE-ENGAGED:**

Based on all of the foregoing evidence and law, the economic realities factors, in totality, indicate that Claimant was as an "employee" under the FLSA. The next inquiry is how much of Claimant's time was compensable.

During P1, Claimant was activated but un-dispatched. P1 time was mandatory because Uber *only* dispatched assignments to him once he entered P1. *See* J4; RR 133:11-25. And he had no control over how much P1 time he would have—Uber solely provided the match. RR 90:21-24. Once he logged on to P1 time, Uber began tracking him in real-time. RR 203:8-18. Uber told him not to log on to P1 time unless he was ready to accept trips. RR 91:21-92:2, 100:13-17; J2; J3.

Uber admits it would deactivate Claimant during P1 time when he *declined* (not cancelled) three trips in a row during P1 time. RR 505:5-9. So, if Claimant was engaged in any personal activity that would interfere with his ability to accept trips, he would be *automatically* logged off and no longer in P1 time. **That must mean Claimant only stayed in P1 time when he was engaged-and-waiting to work**.

There is no question that P2 time is compensable. Uber unilaterally set an ETA for Claimant to arrive at the pickup spot. RR 109:11-17, 245:10-13. Claimant could not engage in *any* activity aside from working for Uber during P2. Uber presented no argument, law, or evidence as to why P2 would not be compensable.

Also, Uber charged Claimant a service fee from a cancellation that occurred in P2 time. *See* C8 at 1375; RR 146:10-148:1. Before Claimant entered P3 time— before any compensation for P3 time began—Uber charged Claimant a service fee. *Id*. So even though Uber refuses to pay Claimant for P1/P2 time, it will still take a fee for work performed in that time. P1 and P2 time should be compensable.

**WILLFULNESS**:

Claimant submitted with his Pre-Hearing Brief various decisions finding Uber to be an employer of its drivers based on the economic realities test. So, Uber *knows* its drivers may be employees under the FLSA. In opposition, Uber offers differing agency decisions and arbitration awards in its favor, while completely ignoring others not in its favor. But the fact that Uber has secured *some* favorable decisions does not change the fact that Uber is making the sober decision to classify drivers as contractors with ***full knowledge of the risk*** involved. If the Arbitrator finds a violation here, it was "willful," as defined by the FLSA.

**FLSA DAMAGES**:

Dr. James Parrott, Ph.D., analyzed Uber's compensation to Claimant and assessed its adequacy in relation to Texas' minimum wage law and reasonable expenses incurred during P1-P3 time. *See* **C41**. He relied upon the IRS expense rate, which is customarily used to determine expenses and is *per se* reasonable under 299 C.F.R. § 778.217(c)(2)(i).[20] Moreover, Courts and arbitrators have regularly found that, consistent with the Handbook, an employer *must* provide reimbursement at the IRS rate when they do not keep records of employees' actual vehicle

---

[20] *See* Department of Labor, <u>Field Operations Handbook</u>, 30c15(a) (2000) ("the IRS *standard business mileage rate* … may be used (in lieu of actual costs and associated recordkeeping) to determine or evaluate the employer's wage payment practices for FLSA purposes."); *available at* <u>https://www.dol.gov/sites/dolgov/files/WHD/legacy/files/FOH_Ch30.pdf</u>; *see also Orth v. J & J & J Pizza, Inc.*, No. 19-CV-10709-ADB, 2020 WL 1446735, at *3 (D. Mass. Mar. 25, 2020).

expenses. *See Burton v. DRAS Partners*, No. 19-cv-02949, 2019 WL 5550579, at *3 (N.D. Ill. Oct. 27, 2019) (collecting cases and awards). The FLSA does not require Claimant to prove the *actual* or *precise* cost of the employment-related expenses.

Uber offered no expert testimony to contradict Dr. Parrott, who testified that he examined the Uber-provided data without bias. RR 611:11-612:2. Where some subjective decisions had to be made, Dr. Parrott erred on the side of understating the shortfall, rather than overstating. RR 616:18-24, 616:12-23, 651:22-652:1, 652:24-653:22. So, where any subjectivity came into play, he erred in Uber's favor.

Dr. Parrott found a shortfall of **$27,207.66**. *See* C41. Claimant must also receive liquidated damages in an amount equal to the unpaid wages, unless Uber can show "good faith." *See* 29 U.S.C. § 216(b); 260; *Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 707 (1945). Thus, Claimant is entitled to an additional $27,207.66, which totals **$54,413.32**, plus attorney's fees and costs.

Kherkher Garcia's attorneys and staff spent 247.7 hours preparing for and litigating this arbitration, including the final hearing and post-hearing tasks. *See* **Ex. A** – Fee Ledger. All attorneys billed time at $400.00 or $200.00 per hour, and paralegals billed at $60.00 per hour. *Id*. Claimant incurred $37,940.00 in attorneys' fees. *Id*. The billable hours amassed are reasonable, customary, and necessary for the work. *See* **Ex. B** – Affidavit. Additionally, Claimant incurred $37,940.00 in reasonable, customary and necessary costs. *See* **Ex. C**, Expense Ledger.

## CONCLUSION

Claimant Barysas requests an award founded upon intellectual honesty that is supported by governing law and the actual facts presented. This should be a reasonable request.

# EXHIBIT A

**Barysas vs. Uber**

**Kherkher Garcia Attorneys' Fees**

| Date | Calendar Entry | Actual Time | Billable Rate | Attorney Fee | Attorney |
|---|---|---|---|---|---|
| 3/12/2020 | Drafted and Served Arbitration Demand | 1.00 | $400.00 | $400.00 | B. Stanley |
| 12/1/2020 | Claimant's Letter re Initial Arbitration Scheduling Order (Harts and Barysas) | 0.60 | $400.00 | $240.00 | B. Stanley |
| 12/7/2020 | Preliminary Hearing (Harts and Barysas) | 1.00 | $200.00 | $200.00 | K. Hiett |
| 12/7/2020 | Preliminary Hearing (Harts and Barysas) | 1.00 | $400.00 | $400.00 | B. Stanley |
| 12/14/2020 | Initial Scheduling Order | 1.00 | $400.00 | $400.00 | B. Stanley |
| 1/5/2021 | Reviewed Additional Disclosures for Judge Soussan | 0.10 | $400.00 | $40.00 | B. Stanley |
| 1/15/2021 | Drafted and Served Claimant's Specification of Claims | 1.00 | $200.00 | $200.00 | K. Hiett |
| 1/18/2021 | Drafted and Served Claimant RFPs to Uber | 1.00 | $200.00 | $200.00 | K. Hiett |
| 1/22/2021 | Received and Reviewed Uber's 1st RFPs and ROGs to Claimant | 1.50 | $400.00 | $600.00 | B. Stanley |
| 1/22/2021 | Received and Reviewed Uber's 1st RFPs and ROGs to Claimant | 2.00 | $200.00 | $400.00 | K. Hiett |
| 2/5/2021 | Reviewed Respondent's Response to Claimant's Specification of Claims | 1.00 | $400.00 | $400.00 | B. Stanley |
| 2/22/2021 | Compiled and Served Claimant Production of Barysas_001-861 | 0.60 | $200.00 | $120.00 | K. Hiett |
| 2/22/2021 | Drafted and Served Claimant Responses to Uber's 1st RFPs and ROGs | 2.00 | $200.00 | $400.00 | K. Hiett |
| 2/24/2021 | Drafted and Served Claimant Initial Disclosures | 1.00 | $200.00 | $200.00 | K. Hiett |
| 2/26/2021 | Received and Reviewed Uber's Initial Disclosures | 0.50 | $200.00 | $100.00 | K. Hiett |
| 3/10/2021 | Received and Reviewed Production UBER_BARYSAS_0000001-0000284 | 0.50 | $400.00 | $200.00 | B. Stanley |
| 3/10/2021 | Received and Reviewed Production UBER_BARYSAS_0000001-0000284 | 0.60 | $200.00 | $120.00 | K. Hiett |
| 3/10/2021 | Reviewed Respondent's Letter to Claimant re Document Production UBER_BARYSAS_000001-284 | 0.60 | $400.00 | $240.00 | B. Stanley |
| 3/25/2021 | Reviewed Respondent's Letter to Claimant re Claimant's Discovery Responses | 0.60 | $400.00 | $240.00 | B. Stanley |
| 4/23/2021 | Compiled and Served Claimant Production of Barysas_862-923 | 0.40 | $200.00 | $80.00 | K. Hiett |
| 4/27/2021 | Reviewed Respondent's Letter to Claimant re Document Production UBER_BARYSAS_000285-1161 | 0.60 | $400.00 | $240.00 | B. Stanley |
| 4/28/2021 | Compiled and Served Claimant Production of Barysas_924-972 | 0.40 | $200.00 | $80.00 | K. Hiett |
| 4/28/2021 | Received and Reviewed Production UBER_BARYSAS_0000285-0001161 | 2.00 | $200.00 | $400.00 | K. Hiett |
| 5/18/2021 | Received and Reviewed Production UBER_BARYSAS_0001162-0001562 | 0.80 | $200.00 | $160.00 | K. Hiett |
| 5/18/2021 | Reviewed Respondent's Letter to Claimant re Document Production UBER_BARYSAS_0001162-1562 | 0.50 | $400.00 | $200.00 | B. Stanley |
| 5/19/2021 | Reviewed Respondent's Amended Response to Claimant's Specification of Claims | 0.50 | $400.00 | $200.00 | B. Stanley |
| 5/24/2021 | Drafted and Served Claimant's Motion to Compel Production | 0.70 | $400.00 | $280.00 | K. Hiett |
| 5/24/2021 | Edits to Claimant's Motion to Compel Production | 0.30 | $400.00 | $120.00 | B. Stanley |
| 5/25/2021 | Reviewed Respondent's Motion for Protective Order to Prevent Deposition of Alex Rosenblat | 1.00 | $400.00 | $400.00 | B. Stanley |

**Barysas vs. Uber**

**Kherkher Garcia Attorneys' Fees**

| Date | Calendar Entry | Actual Time | Billable Rate | Attorney Fee | Attorney |
|------|----------------|-------------|---------------|--------------|----------|
| 6/3/2021 | Reviewed Respondent's Response to Claimant's Motion to Compel | 0.50 | $400.00 | $200.00 | B. Stanley |
| 6/7/2021 | Drafted Claimant's Response to Respondent's Motion for Protective Order to Prevent Deposition of Alex Rosenblat | 2.50 | $400.00 | $1,000.00 | B. Stanley |
| 6/15/2021 | Served Responses to Subpoena to DB Pedicabs | 0.20 | $200.00 | $40.00 | K. Hiett |
| 6/16/2021 | Hearing on Claimant's Motion to Compel Documents | 1.00 | $200.00 | $200.00 | K. Hiett |
| 6/16/2021 | Hearing on Claimant's Motion to Compel Documents | 1.00 | $400.00 | $400.00 | B. Stanley |
| 6/16/2021 | Reviewed Signed Order Granting Claimant's Motion to Compel and Denying Deposition of Alex Rosenblat | 0.20 | $400.00 | $80.00 | B. Stanley |
| 6/24/2021 | Reviewed Additional Disclosures for Judge Soussan | 0.10 | $400.00 | $40.00 | B. Stanley |
| 7/1/2021 | Received and Reviewed Production UBER_BARYSAS_0001563-0002215 | 2.00 | $200.00 | $400.00 | K. Hiett |
| 7/8/2021 | Edits to Claimant's Expert Witness Designations | 0.10 | $400.00 | $40.00 | B. Stanley |
| 7/16/2021 | Received and Reviewed Production UBER_BARYSAS_0002216-0002434 | 0.60 | $200.00 | $120.00 | K. Hiett |
| 8/5/2021 | Received and Reviewed Barysas_Third_Party_0000001-0000324 | 1.00 | $400.00 | $400.00 | B. Stanley |
| 8/5/2021 | Received and Reviewed Barysas_Third_Party_0000001-0000324 | 1.50 | $200.00 | $300.00 | K. Hiett |
| 8/9/2021 | Received and Reviewed Uber's 2nd RFPs to Claimant | 0.20 | $400.00 | $80.00 | B. Stanley |
| 8/9/2021 | Received and Reviewed Uber's 2nd RFPs to Claimant | 0.20 | $200.00 | $40.00 | K. Hiett |
| 8/16/2021 | Claimant's Expert Witness Reports Served | 0.20 | $400.00 | $80.00 | B. Stanley |
| 8/17/2021 | Reviewed Respondent's Motion to Compel Documents and Information | 0.60 | $400.00 | $240.00 | B. Stanley |
| 8/17/2021 | Reviewed Respondent's Motion to Compel Documents and Information | 1.00 | $200.00 | $200.00 | K. Hiett |
| 8/26/2021 | Edits to Claimant's Response to Respondent's Motion to Compel Documents and Information | 1.00 | $400.00 | $400.00 | B. Stanley |
| 8/26/2021 | Drafted Claimant's Response to Respondent's Motion to Compel Documents and Information | 3.00 | $200.00 | $600.00 | K. Hiett |
| 8/30/2021 | Reviewed Respondent's Request for Leave to File Dispositive Motion | 0.30 | $400.00 | $120.00 | B. Stanley |
| 9/7/2021 | Drafted and Served Claimant 1st Amended Responses to Uber's 1st RFPs and ROGs | 0.50 | $200.00 | $100.00 | K. Hiett |
| 9/8/2021 | Drafted and Served Claimant Responses to Uber's 2nd RFPs | 0.40 | $200.00 | $80.00 | K. Hiett |
| 9/13/2021 | Received and Reviewed Barysas_Third_Party_0000325-0000352 | 0.20 | $400.00 | $80.00 | B. Stanley |
| 9/13/2021 | Received and Reviewed Barysas_Third_Party_0000325-0000352 | 0.40 | $200.00 | $80.00 | K. Hiett |
| 10/1/2021 | Compiled and Served Claimant Production of Barysas_0973-1028 | 0.40 | $200.00 | $80.00 | K. Hiett |
| 10/1/2021 | Drafted and Served Claimant 2nd Amended Responses to Uber's 1st RFPs and ROGs | 0.50 | $200.00 | $100.00 | K. Hiett |
| 10/1/2021 | Served Responses to 2nd Subpoena to DB Pedicabs | 0.20 | $200.00 | $40.00 | K. Hiett |
| 10/1/2021 | Served Claimant 2nd RFPs and 1st ROGs to Uber | 2.00 | $200.00 | $400.00 | K. Hiett |
| 10/12/2021 | Compiled and Served Claimant Production of Barysas_1029-1046 | 0.30 | $200.00 | $60.00 | K. Hiett |

**Barysas vs. Uber**

**Kherkher Garcia Attorneys' Fees**

| Date | Calendar Entry | Actual Time | Billable Rate | Attorney Fee | Attorney |
|------|----------------|-------------|---------------|--------------|----------|
| 11/2/2021 | Reviewed Uber's Responses to Claimant's 2nd RFPs and 1st ROGs | 0.60 | $400.00 | $240.00 | B. Stanley |
| 11/2/2021 | Reviewed Uber's Responses to Claimant's 2nd RFPs and 1st ROGs | 1.00 | $200.00 | $200.00 | K. Hiett |
| 11/9/2021 | Received and Reviewed Uber's 3rd RFPs and 2nd ROGs to Claimant | 0.50 | $200.00 | $100.00 | K. Hiett |
| 11/30/2021 | Reviewed Order Granting Joint Motion to Continue | 0.10 | $400.00 | $40.00 | B. Stanley |
| 12/9/2021 | Drafted and Served Claimant Responses to Uber's 3rd RFPs and 2nd ROGs | 1.00 | $200.00 | $200.00 | K. Hiett |
| 1/25/2022 | Received and Reviewed Uber's 3rd ROGs to Claimant | 0.50 | $200.00 | $100.00 | K. Hiett |
| 3/11/2022 | Drafted and Served Claimant Responses to Uber's 3rd ROGs | 2.00 | $200.00 | $400.00 | K. Hiett |
| 3/11/2022 | Received and Reviewed Uber's Supplemental Response to Claimant's 1st ROGs | 0.10 | $200.00 | $20.00 | K. Hiett |
| 3/11/2022 | Drafted Claimant's Motion to Compel Production | 3.00 | $200.00 | $600.00 | K. Hiett |
| 3/11/2022 | Drafted Claimant's Motion to Compel Production | 1.00 | $400.00 | $400.00 | B. Stanley |
| 3/14/2022 | Reviewing deposition transcripts, potential exhibits, and revising prior draft of pre-hearing brief. | 1.90 | $400.00 | $760.00 | E. Hawley |
| 3/14/2022 | Drafted and Served Claimant's Witness List and Exhibit List | 3.00 | $200.00 | $600.00 | K. Hiett |
| 3/14/2022 | Reviewed Respondent's Witness List and Exhibit List | 1.00 | $400.00 | $400.00 | B. Stanley |
| 3/14/2022 | Reviewed Respondent's Witness List and Exhibit List | 1.00 | $200.00 | $200.00 | K. Hiett |
| 3/15/2022 | Reviewing deposition transcripts, potential exhibits, and revising prior draft of pre-hearing brief. | 7.10 | $400.00 | $2,840.00 | E. Hawley |
| 3/15/2022 | Meet and Confer with Respondent | 1.00 | $200.00 | $200.00 | K. Hiett |
| 3/15/2022 | Meet and Confer with Respondent | 1.00 | $400.00 | $400.00 | B. Stanley |
| 3/16/2022 | Revising Pre-Hearing Brief. | 2.70 | $400.00 | $1,080.00 | E. Hawley |
| 3/16/2022 | Reviewed Respondent's Response to Claimant's Motion to Compel | 0.70 | $400.00 | $280.00 | B. Stanley |
| 3/17/2022 | Finalizing Pre-Hearing Brief. | 0.30 | $400.00 | $120.00 | E. Hawley |
| 3/17/2022 | Reviewed Order Denying Bifurcation of Final Arbitration Hearing | 0.10 | $400.00 | $40.00 | B. Stanley |
| 3/17/2022 | Reviewed Order Denying Claimant's Motion to Compel | 0.10 | $400.00 | $40.00 | B. Stanley |
| 3/17/2022 | Pre-Hearing Conference | 1.00 | $200.00 | $200.00 | K. Hiett |
| 3/17/2022 | Pre-Hearing Conference | 1.00 | $400.00 | $400.00 | B. Stanley |
| 3/18/2022 | Drafted Claimant's Brief in support of Calling Alex Rosenblat | 1.50 | $200.00 | $300.00 | K. Hiett |
| 3/18/2022 | Edits to Claimant's Brief in support of Calling Alex Rosenblat | 0.50 | $400.00 | $200.00 | B. Stanley |
| 3/18/2022 | Reviewed Respondent's Pre-Hearing Brief | 2.00 | $400.00 | $800.00 | B. Stanley |
| 3/18/2022 | Reviewed Respondent's Motion for Protective Order re Alex Rosenblat | 1.00 | $400.00 | $400.00 | B. Stanley |
| 3/18/2022 | Reviewed Respondent's Witness List | 0.10 | $200.00 | $20.00 | K. Hiett |
| 3/21/2022 | Reviewed Order Denying Testimony of Alex Rosenblat | 0.10 | $400.00 | $40.00 | B. Stanley |
| 3/24/2022 | Reviewed Respondent's Amended Exhibit List | 0.20 | $200.00 | $40.00 | K. Hiett |

**Barysas vs. Uber**
**Kherkher Garcia Attorneys' Fees**

| Date | Calendar Entry | Actual Time | Billable Rate | Attorney Fee | Attorney |
|---|---|---|---|---|---|
| 3/24/2022 | Reviewed Respondent's Amended Exhibit List | 0.20 | $400.00 | $80.00 | B. Stanley |
| 3/25/2022 | Received and Reviewed Production UBER_BARYSAS_0002444-0002445 | 0.10 | $200.00 | $20.00 | K. Hiett |
| 3/25/2022 | Served Supplemental Expert Report of James Parrott for Claimant | 0.10 | $200.00 | $20.00 | K. Hiett |
| 3/25/2022 | Reviewed Respondent's Second Amended Exhibit List | 0.20 | $400.00 | $80.00 | B. Stanley |
| 3/25/2022 | Reviewed Respondent's Second Amended Exhibit List | 0.20 | $200.00 | $40.00 | K. Hiett |
| 3/29/2022 | Received and Reviewed Uber's Production of Videos | 0.50 | $400.00 | $200.00 | B. Stanley |
| 3/29/2022 | Received and Reviewed Uber's Production of Videos | 0.50 | $400.00 | $200.00 | R. MacLeod |
| 3/29/2022 | Received and Reviewed Uber's Production of Videos | 0.50 | $200.00 | $100.00 | K. Hiett |
| 3/29/2022 | Attending Arbitration Final Hearing. | 6.00 | $400.00 | $2,400.00 | E. Hawley |
| 3/29/2022 | Drafted and Served Claimant's First Amended Exhibit List with Preadmitted Exhibits | 0.20 | $200.00 | $40.00 | K. Hiett |
| 3/29/2022 | Final Arbitration Hearing - Day 1 | 6.00 | $400.00 | $2,400.00 | R. MacLeod |
| 3/29/2022 | Final Arbitration Hearing - Day 1 | 6.00 | $400.00 | $2,400.00 | B. Stanley |
| 3/29/2022 | Final Arbitration Hearing - Day 1 | 6.00 | $200.00 | $1,200.00 | K. Hiett |
| 3/30/2022 | Made Edits to Claimant's Information Request re Uber Videos | 0.30 | $200.00 | $60.00 | K. Hiett |
| 3/30/2022 | Drafted Claimant's Information Request re Uber Videos | 2.00 | $400.00 | $800.00 | R. MacLeod |
| 3/30/2022 | Drafted Claimant's Information Request re Uber Videos | 2.00 | $400.00 | $800.00 | B. Stanley |
| 4/1/2022 | Received and Reviewed Uber's Responses to Claimant's RFIs | 0.30 | $400.00 | $120.00 | B. Stanley |
| 4/1/2022 | Received and Reviewed Uber's Responses to Claimant's RFIs | 0.50 | $200.00 | $100.00 | K. Hiett |
| 4/1/2022 | Received and Reviewed Production UBER_BARYSAS_0002455-0002461 | 0.30 | $400.00 | $120.00 | B. Stanley |
| 4/1/2022 | Received and Reviewed Production UBER_BARYSAS_0002455-0002461 | 0.60 | $200.00 | $120.00 | K. Hiett |
| 4/4/2022 | Edits to Claimant's Motion to Compel Production Concerning Video 1 and Video 2 | 1.00 | $400.00 | $400.00 | B. Stanley |
| 4/4/2022 | Drafted Claimant's Motion to Compel Production Concerning Video 1 and Video 2 | 2.00 | $200.00 | $400.00 | K. Hiett |
| 4/4/2022 | Reviewed Respondent's Motion for Protective Order | 1.00 | $400.00 | $400.00 | B. Stanley |
| 4/5/2022 | Reviewed Respondent's Opposition to Claimant's Motion to Compel | 1.00 | $400.00 | $400.00 | B. Stanley |
| 4/5/2022 | Reviewed Respondent's Supplement to Motion for Protective Order | 0.30 | $400.00 | $120.00 | B. Stanley |
| 4/7/2022 | Reviewed Order Granting Respondent's Motion for Protection and Denying Claimant's Motion to Compel | 0.20 | $400.00 | $80.00 | B. Stanley |
| 4/26/2022 | Deposition Prep with Claimant Dainius Barysas | 3.00 | $200.00 | $600.00 | K. Hiett |
| 4/26/2022 | Deposition Prep with Claimant Dainius Barysas | 3.00 | $400.00 | $1,200.00 | B. Stanley |
| 4/28/2022 | Deposition Prep with Claimant Dainius Barysas | 3.00 | $200.00 | $600.00 | K. Hiett |
| 4/28/2022 | Deposition Prep with Claimant Dainius Barysas | 3.00 | $400.00 | $1,200.00 | B. Stanley |
| 4/29/2022 | Deposition of Claimant Dainius Barysas | 9.00 | $200.00 | $1,800.00 | K. Hiett |
| 4/29/2022 | Deposition of Claimant Dainius Barysas | 9.00 | $400.00 | $3,600.00 | B. Stanley |

**Barysas vs. Uber**

**Kherkher Garcia Attorneys' Fees**

| Date | Calendar Entry | Actual Time | Billable Rate | Attorney Fee | Attorney |
|------|----------------|-------------|---------------|--------------|----------|
| 5/2/2022 | Attending Arbitration Final Hearing. | 8.00 | $400.00 | $3,200.00 | E. Hawley |
| 5/2/2022 | Continuation of Final Arbitration - Day 2 | 8.00 | $400.00 | $3,200.00 | R. MacLeod |
| 5/2/2022 | Continuation of Final Arbitration - Day 2 | 8.00 | $400.00 | $3,200.00 | B. Stanley |
| 5/2/2022 | Continuation of Final Arbitration - Day 2 | 8.00 | $200.00 | $1,600.00 | K. Hiett |
| 5/3/2022 | Attending Arbitration Final Hearing. | 6.50 | $400.00 | $2,600.00 | E. Hawley |
| 5/3/2022 | Continuation of Final Arbitration - Day 3 | 8.00 | $400.00 | $3,200.00 | R. MacLeod |
| 5/3/2022 | Continuation of Final Arbitration - Day 3 | 8.00 | $400.00 | $3,200.00 | B. Stanley |
| 5/3/2022 | Continuation of Final Arbitration - Day 3 | 8.00 | $200.00 | $1,600.00 | K. Hiett |
| 5/20/2022 | Reviewing Transcripts to prepare for post-hearing briefing. | 1.30 | $400.00 | $520.00 | E. Hawley |
| 5/23/2022 | Reviewing Transcripts to prepare for post-hearing briefing. | 2.20 | $400.00 | $880.00 | E. Hawley |
| 5/24/2022 | Reviewing Transcripts to prepare for post-hearing briefing. | 3.50 | $400.00 | $1,400.00 | E. Hawley |
| 5/25/2022 | Reviewing Transcripts to prepare for post-hearing briefing; preparing draft of post-hearing brief. | 6.00 | $400.00 | $2,400.00 | E. Hawley |
| 5/31/2022 | Preparing draft of Post-hearing brief | 8.40 | $400.00 | $3,360.00 | E. Hawley |
| 6/1/2022 | Preparing draft of Post-hearing brief | 4.80 | $400.00 | $1,920.00 | E. Hawley |
| 6/2/2022 | Preparing draft of Post-hearing brief | 5.50 | $400.00 | $2,200.00 | E. Hawley |
| 6/3/2022 | Finalizing pre-hearing brief for service. | 1.50 | $400.00 | $600.00 | E. Hawley |
| | | | | $37,940.00 | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

# EXHIBIT B

| DAINIUS BARYSAS, | § | |
| | § | |
| Claimant, | § | |
| | § | |
| vs. | § | HON. SUSAN SOUSSAN, |
| | § | ARBITRATOR |
| UBER TECHNOLOGIES, INC., | § | |
| | § | |
| Respondent. | § | |
| | § | |
| | § | |

### AFFIDAVIT IN SUPPORT OF
### CLAIMANT'S ATTORNEYS' FEES

| THE STATE OF TEXAS | § | |
| | § | |
| COUNTY OF HARRIS | § | |

ON THIS DAY Bret Stanley appeared before me, the undersigned notary public.  After I administered an oath to him, upon his oath, he stated:

1.       My name is Bret Stanley.  I am over twenty-one years old, of sound mind, have never been convicted of a felony or a crime involving moral turpitude, and am fully competent to make this affidavit.  The facts stated in this affidavit are within my personal knowledge and are true and correct, and I know of no reason why I would be disqualified from providing this affidavit.

2.       I am counsel for Claimant, Dainius Barysas ("Claimant").

### Statement of Opinions

3.       As of May 11, 2022, Claimant incurred approximately $37,940.00 in attorneys' fees in this matter.  In my opinion, $37,940.00 is a reasonable, customary, and necessary amount for attorneys' fees for the work done at the time of this submission.  This amount was calculated using the lodestar method—multiplying the hourly fee by the number of hours spent on each task.

1

**Basis For Opinions**

4.      The above opinions are based on my experience and background, my familiarity with the legal services rendered to Claimant in connection with this action and also in consideration of the following factors:

(a) the time and labor required;

(b) the skill required to perform these services properly;

(c) the likelihood that representing the client would preclude other employment;

(d) the amount involved and the results obtained;

(e) the experience, reputation and ability of the attorneys;

(f) the type of fee arrangement involved;

(g) the awards in similar cases; and

(h) my experience in handling the same or similar cases.

5.      I am familiar with the usual and customary fees charged for cases such as this case in Harris County, Texas.  Counsel for Claimant has expended time in investigating the claims, drafting pleadings, preparing documents relating to discovery, reviewing supporting documents, preparing for and taking depositions, legal research, preparing motions and other court documents, preparing for and attending the final arbitration hearing, preparing pre-hearing and post-hearing briefing for the arbitrator, and various correspondence and other case administration.  The fee charged for these services is one customarily charged in this area for the same or similar services for attorneys with our experience, reputation, and ability, considering the type of controversy, and the time limitations imposed.

## Witness Qualifications

6.     I am an attorney with the law firm of Kherkher Garcia, L.L.P.  I am duly licensed to practice law in the State of Texas and has been continuously practicing in Texas since 2010. I am familiar with the usual and customary fees charged such as those incurred in the above-captioned and numbered cause.

## Compensation

7.     I am employed as an attorney for Claimant, thus I am not receiving any additional compensation for my testimony.

Bret Stanley
Attorney for Claimant

**SWORN TO AND SUBSCRIBED** on this the 3rd day of June , 2022 to certify which witness my hand and seal of office.

S S KHAN
Notary Public, State of Texas
Comm. Expires 09-25-2023
Notary ID 12420036-4

Notary Public in and for
The State of Texas

3

# EXHIBIT C

**Barysas vs. Uber**
**Khekher Garcia Expense Ledger**

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | **Date** | **Name** | **Source Name** | **Memo** | **Amount** | **Balance** |
| 2 | | | | | | |
| 3 | 10/28/2020 | Uber - Barysas | Susan S. Soussan, P.C. | Arbitration Commencement - Barysas | 400.00 | 400.00 |
| 4 | 07/08/2021 | Uber - Barysas | Veritext, LLC | Inv 5042358 - Uber/transcript of Dainius Barysas | 1,654.50 | 2,054.50 |
| 5 | 07/08/2021 | Uber - Barysas | FedEx | Barysas - delivery to Vicki Aven/Susan Soussan | 33.10 | 2,087.60 |
| 6 | 08/13/2021 | Uber - Barysas | Prescott Hidalgo-Monroy | Barysas - data entry | 100.00 | 2,187.60 |
| 7 | 08/30/2021 | Uber - Barysas | Keith Cunningham-Parmeter | Barysas vs. Uber - expert consultant/research/discovery/draft report | 8,625.00 | 10,812.60 |
| 8 | 09/02/2021 | Uber - Barysas | FedEx | Barysas - delivery to Lindsey Cameron | 64.69 | 10,877.29 |
| 9 | 09/15/2021 | Uber - Barysas | James A. Parrott | Inv of 9/6/21 - Barysas/expert consulting | 8,581.87 | 19,459.16 |
| 10 | 10/26/2021 | Uber - Barysas | Kristin McGuire | Barysas - report on Uber and Workplace Control | 400.00 | 19,859.16 |
| 11 | 01/18/2022 | Uber - Barysas | Lindsey D. Cameron | Inv 1/10/22 - Dainius Barysas v. Uber/doc review and report | 8,450.00 | 28,309.16 |
| 12 | 04/07/2022 | Uber - Barysas | Protiviti, Inc. | Inv 20603117 - Barysas/exhibit binders | 320.79 | 28,629.95 |
| 13 | 04/13/2022 | Uber - Barysas | Protiviti, Inc. | Inv 20604040 - Barysas/arbitration | 46.02 | 28,675.97 |
| 14 | 04/21/2022 | Uber - Barysas | BWA Video, Inc. | Inv 62495 - Barysas/trial tech for arbitration | 255.00 | 28,930.97 |
| 15 | 05/10/2022 | Uber - Barysas | Slowpokes | Barysas - lunch during arbitration | 70.35 | 29,001.32 |
| 16 | 05/17/2022 | Uber - Barysas | Lindsey D. Cameron | Inv 4/8/22 - Barysas v. Uber/arbitration prep | 7,800.00 | 36,801.32 |
| 17 | 05/17/2022 | Uber - Barysas | Keith Cunningham-Parmeter | Barysas vs. Uber - expert consultant | 2,127.00 | 38,928.32 |
| 18 | 06/02/2022 | Uber - Barysas | BWA Video, Inc. | Inv 62841 - Barysas v. Uber/trial tech | 2,424.00 | 41,352.32 |
| 19 | 06/03/2022 | Uber - Barysas | Veritext, LLC | Inv 5778217 - Barysas/arbitration day 2 | 4,275.00 | 45,627.32 |
| 20 | 06/03/2022 | Uber - Barysas | Veritext, LLC | Inv 5780401 - Barysas/arbitration day 3 | 3,180.57 | 48,807.89 |
| 21 | | | | | 48,807.89 | 48,807.89 |
| 22 | | | | | **48,807.89** | **48,807.89** |