# EXHIBIT A-7

| | | |
|---|---|---|
| **DAINIUS BARYSAS,** | § | |
| | § | |
| **Claimant,** | § | **HON. SUSAN SOUSSAN,** |
| | § | **ARBITRATOR** |
| **vs.** | § | |
| | § | |
| **UBER TECHNOLOGIES, INC.,** | § | |
| | § | |
| **Respondent.** | § | |

<u>**CLAIMANT DAINIUS BARYSAS'S PRE-HEARING BRIEF**</u>

## I.   INTRODUCTION

Claimant Barysas worked as an Uber driver for five years, serving the needs of Uber's transportation business by providing rides to Uber's customers. Although there was flexibility of schedule and low barrier to entry, Claimant's work as an Uber driver reflected all the hallmarks of an employment relationship. For example,

- Uber unilaterally assigned Claimant each and every customer,

- Uber unilaterally set the pricing for each and every ride,

- Uber withheld from Claimant essential information about each and every ride (such as customer location, estimated fare amounts, and customer destination) until he accepted the work, and

- Uber exclusively processed all payments for the transportation service.

All this was done through the Uber Driver App, which Uber had exclusive and proprietary control over. Claimant interfaced with the App by logging on and logging off, but once he logged on, Uber dictated all the meaningful terms of service, and its algorithm automatically functioned to operate the business. Claimant merely acted as Uber's surrogate for implementing its transportation business by physically driving a vehicle.

The Uber App is not, as Uber likes to characterize it, a "marketplace" for transportation services.  Drivers and riders cannot freely seek each other's services at prices negotiated between them. Drivers cannot even communicate with riders through the App unless and until they accept the individual ride Uber assigns to them. When drivers are assigned a rider, they can reject the assignment, but not without risk of penalization. Drivers also cannot accept payment for the Uber ride outside of the App. Uber's alleged "marketplace" is not transparent, not negotiable, and not free from penalization.

Claimant brings this arbitration seeking to enforce his basic rights to minimum wage and overtime compensation as an Uber employee.  Uber did not compensate him properly because it misclassified him as an "independent contractor."

This dispute therefore centers on whether Uber "employs" Claimant under the FLSA.  To determine whether an employment relationship exists under the FLSA, the Arbitrator must consider the "economic realities" of the relationship. The Fifth Circuit considers at least five factors as relevant to this test. Claimant will present evidence showing that these factors, on balance, demonstrate an employment relationship.

## II.    FLSA CLAIMS, GENERALLY

Uber pays its drivers substandard wages, which violates the Fair Labor Standards Act ("FLSA") because drivers should be considered employees.  Claimant filed this arbitration seeking compensation for unpaid wages owed under the FLSA.[1]

---

[1] The claims here fall under federal law, not Texas common law. The "common law concepts of

The purpose of the FLSA is to protect all covered workers from substandard wages and oppressive working hours. *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142 (2012). The statutory scheme makes the wage and hour provisions applicable to "employees." Employee is defined as one "employed," and "employ" is defined as "suffer or permit to work." 29 U.S.C. § 203(e) & (g). "Given the remedial purposes of the legislation, an expansive definition of 'employee' has been adopted by the courts." *Usery v. Pilgrim Equipment Co.*, 527 F.2d 1308, 1313 (5th Cir. 1993).

Here, Uber disputes that an employer-employee relationship existed. Accordingly, Claimant must simply show that there is a preponderance of the evidence supporting a finding of such relationship in the FLSA context. *See Johnson v. Heckmann Water Res. (CVR), Inc.*, 758 F.3d 627, 630 (5th Cir. 2014).

Determining whether a worker is an employee or independent contractor under the FLSA involves an assessment of the worker's ***economic dependence*** on his or her "employer." A worker that is economically dependent on the business is to be considered an employee for FLSA purposes. To be clear, "the dependence at issue is dependence on *that job* for *that income* to be continued and *not necessarily for complete sustenance*." *Halferty v. Pulse Drug Co.*, 821 F.2d 261, 267 (5th Cir. 1987), *opinion modified on reh'g,* 826 F.2d 2 (5th Cir. 1987) (emphasis added); *see also*

---

'employee' and 'independent contractor' have been specifically rejected as determinants of who is protected by the [FLSA]." *Usery v. Pilgrim Equipment Co.*, 527 F.2d 1308, 1311 (5th Cir. 1993). Thus, for the purposes of the claims in this case, the arbitrator should apply the tests set forth by federal courts interpreting the FLSA, rather than looking to Texas common law or statutes.

3

*Brock v. Mr. W. Fireworks, Inc.*, 814 F.2d 1042, 1054 (5th Cir. 1987) ("Economic dependence is not conditioned on reliance on an alleged employer for one's primary source of income, for the necessities of life."). **The Supreme Court has construed the FLSA liberally to apply to as many instances as possible, consistent with statutory provisions.** *Mitchell v. Lublin, McGaughy & Associates*, 358 U.S. 207, 211 (1959).

### III.    THE ECONOMIC REALITIES TEST

In determining whether a worker is sufficiently dependent to be considered an employee under the FLSA, the Fifth Circuit has applied a five-factor test called the "economic realities test." [2] The five factors considered by the Fifth Circuit in assessing economic dependence are:

1. The **degree of control** exercised by the alleged employer;
2. The extent of the **relative investments** of the employer and the alleged employee;
3. The degree to which the alleged employer determines the alleged employees' **opportunity for profits and losses**;
4. The **skill and initiative** required to perform on the job; and
5. The **permanence** of the relation.

*Halferty v. Pulse Drug Co., Inc.*, 821 F.2d at 265. No one particular factor is necessarily determinative, nor are the five factors the only ones that can be considered. *Id*. In fact, the Fifth Circuit has accepted the consideration of a sixth

---

[2] This test arose from the U.S. Supreme Court case, *United States v. Silk*, but different circuits apply the test in different ways by emphasizing different factors. 331 U.S. 704 (1957).

factor, where applicable, which is whether the work is **integral to the business**. *See Hobbs v. Petroplex Pipe & Constr., Inc.*, 946 F.3d 824, 836 (5th Cir. 2020) (holding that pipe welders were properly found to be employees).

The economic realities factors should not be mechanically applied; rather, they should be used as a guide to decide the ultimate issue of whether as a matter of "economic reality" a particular worker is an employee. *See Weisel v. Singapore Joint Venture, Inc.*, 602 F.2d 1185, 1189 (5th Cir. 1979). Uber tends to rely upon case law from other circuits to support its independent contractor classification—particularly, the *Saleem* case out of the Second Circuit—but all such out-of-circuit case law should be wholly disregarded as it relies upon different factors that are not applicable here. *See Saleem v. Corp. Transp. Grp., Ltd.*, 854 F.3d 131 (2d Cir. 2017); *see also Arena v. Delux Transp. Servs., Inc.*, 3 F.Supp. 3d 1 (E.D.N.Y. 2014) (stating that the Second Circuit applies different factors for FLSA wage-violation claims in different cases, depending on the type of case). In fact, as will be seen during the final hearing, all the case law relied upon by Uber is distinguishable because the ride share technology is so new and innovative that the legal system has not had a chance to adapt (especially considering that Uber sends nearly every case to arbitration).

The Fifth Circuit holds that the "economic reality" of whether an employer/employee relationship exists for purposes of the FLSA turns on the "dependency" of the person upon the business for employment. *Halferty*, 821 F.2d at 265. While applying this test, the court must keep in mind the ultimate question of

5

whether "the personnel are so dependent upon the business with which they are connected that they come within the protection of FLSA or are sufficiently independent to lie outside its ambit." *Halferty*, 821 F.2d at 265; *see also Castillo v. Givens,* 704F.2d 181, 190 (5th Cir. 1983) ("The determinative question is whether the person is 'dependent upon finding employment in the business of others.'").

Stated differently, in determining the worker's classification, the key part of the term "independent contractor" is *independent*, not contractor. **Federal courts look to the dependency of the worker,** *not* **the language of the contract**. In fact, whether a worker has a contract with the business stating that he or she is an independent contractor is *not relevant* to the economic realities test because the subjective belief of either party does not affect the reality of the relationship. *Brock*, 814 F.2d at 1044, 1049. Of course, the goal of the economic realities test is to look to the *reality* of the situation to determine the nature of the relationship, not the labels unilaterally drafted by Uber in a contract of adhesion. *See Brock*, 814 F.2d at 1044. Uber's reliance on the language of its own contract is misplaced because the contract is meaningless here.

Whether Claimant is an employee within the meaning of the FLSA is a mixed question of fact and law. *Brock*, 814 F.2d at 1044. First, there are historical findings of fact that underlie a finding as to one of the five economic realities test factors. *Id*. Second, there are those findings as to the economic realities test factors themselves, which are also questions of fact. *Id*. Finally, "the ultimate determination of employee status is a finding of law." *Id*. at 1045.

The questions of fact would be submitted to the jury in a jury trial; however, in this matter the arbitrator will decide fact questions. For an excerpt of FLSA Civil Pattern Jury Instructions from the Fifth Circuit published in 2020, *see* **Ex. A**, § 11.26.

## IV.    FACTS SUPPORTING LIABILITY

Claimant will put on evidence establishing the following facts, which indicate an employment relationship existed under the various "economic realities test" factors (some facts provide overlapping relevance to different factors):

- Claimant could not control the **value of his services**. Uber unilaterally set the base fare, time fare, distance fare, wait-time fare, and all surge fares.

- Uber had exclusive access to the **customer list** (the riders), customer locations, and the customer's destination requests, none of which was shared with Claimant prior to his acceptance of a trip.

- Uber **assigned all the driver's work** through driver/rider matching; Claimant could not select which riders to service in an area. Claimant could not even view Uber's list of riders to decide who to pick up.

- As a result, Uber had exclusive control of the **customer volume**. Uber decided who, when, where, and how many ride requests to assign Claimant.

- Uber did not pay Claimant upon logging in. Instead, he would log in *and then wait* for Uber to select a customer who required Uber's services. Then he had to *blindly* accept within 15 seconds or else lose the ability to earn compensation. Claimant was engaged to wait during this time ("Period 1").

- Uber monitored the Claimant's use of the App, the rate at which he accepted assignments, and the rate at which he canceled assignments, which Uber could use to **deactivate or suspend** Claimant.[3]

---

[3] *Cf. Parrish v. Pilgrim Equip. Co., Inc.*, 917 F.3d 369, 382 (5th Cir. 2019) (where workers could turn down projects *without* repercussion, the "control" factor favored independent contractor status).

- Uber exclusively maintained the right to deactivate or suspend the Claimant from the Driver App based on Uber's policies. Uber could therefore **unilaterally terminate** Claimant without notice or explanation.

- Even though Claimant was not paid outside of the time in which he was physically transporting a rider ("Period 3" time), he was **tracked by Uber at all times while logged on** the App ("Period 1" and "Period 2" time).

- Uber tracked at all times (while logged on) Claimant's location, routes, speed, and acceleration. If Claimant deviated from Uber's suggested route, Uber would make the **unilateral decision as to whether to adjust his pay** to reflect Uber's fare for an "estimated route."

- **Uber processed all payments** by the rider and distribution to the Claimant.

- Uber's "relative investments" in the overall business[4] greatly outweighed Claimant's individual investment. Uber has invested **hundreds of millions** into the development and ongoing maintenance of the App, which is the primary tool of Uber's business and essential for its services to riders.

- Uber had much greater influence over the "major determinants of profits," which the Fifth Circuit categorizes as pricing, customer volume, and advertising.[5]

- Claimant's work did not require any "specialized skill or initiative."[6] Claimant drove his own personal, non-commercial vehicle.

---

[4] *See Hobbs*, 946 F.3d at 831 (holding it was proper to consider employer's larger "***overall investment*** in the pipe construction projects," of which the worker's welding was an important part, as weighing against the worker's substantial individual investment in welding equipment); *see also Hopkins v. Cornerstone America*, 545 F.3d 338, 344 (5th Cir. 2008) (comparing individual worker's investment against the employer's "***overall investment in the business scheme***").

[5] *See Brock*, 814 F.2d at 1050 (finding this factor favored employment status—even though the worker could enhance his commission with greater experience and courtesy to customers—because the company still "unilaterally established the ***rate and means of compensation***," it controlled the ***pricing***, and it controlled, in large part, the ***advertising***); *see also Hobbs*, 946 F.3d at 831 (holding that even though workers controlled the costs of *their business equipment*, and took advantage of *tax deductions* for such business expenses, the "opportunities for profit and loss" factor weighed in favor of *employment status* because the employer ***exclusively set the rates of pay***).

[6] Uber's corporate representative has previously testified regarding the skill required, "I don't know if it's specialized or innovative, so to speak." Also, with respect to the level of "initiative" required to prove nonemployee status for routine work, the Fifth Circuit has expressly *rejected* mere industriousness, efficiency, or customer rapport—such qualities do not indicate independence. *See Usery*, 527 F.2d at 1314; *Reich v. Circle C Investments, Inc.*, 998 F.2d 324 (5th Cir. 1993).

- Claimant worked for Uber regularly and for a long period of time.

- Claimant's work was integral to Uber's business, as Uber cannot (yet) provide transportation services without drivers like Claimant.

Based on the foregoing facts, among others that will be presented in the final hearing, the economic realities test points in favor of an employment relationship.

## V.    THE DAMAGE PERIOD IS EXTENDED BY UBER'S WILLFUL VIOLATIONS

Under the FLSA, the damage period for an alleged violation is limited to **two years**. 29 U.S.C. § 255(a). If the wage violation is a reoccurring violation, the employee is entitled to damages for violations that occurred within two years prior to the date the claim is filed. *Id*. But, if the cause of action arises out of a "willful" wage violation, the statute of limitations is extended to **three years**. 29 U.S.C. § 255(a). A wage violation is considered "willful" if "the employer knew that its conduct was prohibited by [FLSA] or showed reckless disregard for the requirements of [the FLSA]." 29 C.F.R. §578.3(c)(1). (*see also McLaughlin v. Richland Shoe Co.*, 486 U.S. 128 (1988)). An employer's conduct is considered "knowing" if the employer received advice from the Wage and Hour Division that the conduct in question is not lawful. 29 C.F.R. § 578.3(c)(2). An employer's conduct showed "reckless disregard" if the employer should have inquired further into whether its conduct complied with the act but failed to do so. 29 C.F.R. § 578.3(c)(3).

Here, there is no question that Uber's violations were "willful" under the "reckless disregard" standard.  Uber has already been put on notice, as evidenced by

numerous orders attached. *See* **Exhibits B – H**. Though the Claimant recognizes the attached orders are not from the Fifth Circuit, these courts and administrative panels examined facts specifically related to Uber's control over its Uber drivers, considered the facts under the economic realities test, and ***found employment status***. These orders show that Uber is not acting out of ignorance. It made the sober decision to classify its workers as independent contractors with complete knowledge of the risks. Uber knows the law but attempted to evade it. Thus, Uber recklessly disregarded the FLSA.

Uber will likely argue that its misclassification is not willful because it has been justified by the Texas legislature through its enactment of Texas Occupations Code 2402.114. But that law does not apply here. *See Mednick v. Albert Enterprises, Inc.*, 508 F.2d 297, 299 (5th Cir. 1975) ("The terms 'independent contractor,' 'employee,' and 'employer' are not to be construed in their common law senses when used in federal social welfare legislation.").

The Texas statute declares that a transportation network company driver might be an independent contractor if the company does *not* "limit the territory within which the driver may provide digitally prearranged rides." Tex. Occ. Code § 2402.114. Here, that's exactly what Uber did. The evidence at arbitration will show that Uber, through its control of the Uber Driver App, ***prohibited Claimant from taking riders to the airport, and from picking riders up at the airport***. Without such geographical limitation, the airport would have been a part of Claimant's territory. Uber therefore expressly limited Claimant's territory, nullifying the application of the Texas statute

10

to Claimant Barysas. So, to the extent Uber attempts to justify its intentional misclassification by pointing to Texas law, such argument should be rejected.

## VI. COMPENSABLE TIME UNDER THE FLSA

The FLSA requires that employees be paid minimum and overtime wages for all compensable time.  Uber failed to pay Claimant for all his compensable time. Uber did not begin paying Claimant when he logged into the Uber Driver App to begin work (**"Period 1"** time). Uber did not even pay Claimant once he accepted a trip and began driving toward the rider's pickup location (**"Period 2"** time). Instead, Uber *only* compensated Claimant for the period in which he was physically transporting the rider from the pickup location to the final destination (**"Period 3"** time).[7] Claimant seeks compensation for Period 1 and 2 time because such time is compensable under the FLSA. *See* Department of Labor, Wage and Hour Division, "Off-the-clock references," https://www.dol.gov/agencies/whd/flsa/off-the-clock ("In general, 'hours worked' includes all time an employee *must be* on duty, or on the employer's premises or at any other prescribed place of work. Also included is any additional time the employee is allowed (i.e., suffered or permitted) to work." (emphasis added)).

### a. Portal-to-Portal Act

Claimant's time for Period 1 and Period 2 should be compensated under the Portal-to-Portal Act. *See* 29 U.S.C. § 251 *et seq*. Under the Portal-to-Portal Act, if pre-work and post-work activities are an "*integral and indispensable part*" of the

---

[7] Period 1, 2, and 3 times will be further explained at length in the Final Hearing.

"principal activity" of the employment, they are compensable. 29 U.S.C. § 254(a)(2); *see* 29 C.F.R. § 785.9(a); *IBP, Inc. v. Alvarez*, 546 U.S. 21 (2005); *Steiner v. Mitchell*, 350 U.S. 247, 254–256 (1956). The term "principal activity" includes activities performed as part of an employee's regular work in the ordinary course of business, and the work is necessary to the business and is performed primarily for the employer's benefit. *Flores v. Act Event Services, Inc.*, 55 F. Supp. 3d 928, 936 (N.D. Tex. 2014).

An activity is "integral and indispensable" if it is an intrinsic element of these principal activities and one with which the employee cannot dispense if the employee is to perform the principal activities. *Integrity Staffing Solutions, Inc. v. Busk*, 574 U.S. 27, 28 (2014). The "integral and indispensable" test is tied to the productive work that the employee is employed to perform, and not on whether the activity is for the employer's benefit or is required by the employer. *Id*.

An employee's travel time is not compensable unless it is an indispensable part of the employee's performance of his or her job. *Cantu v. Milberger Landscaping, Inc.*, 12 F. Supp. 3d 918, 922 (W.D. Tex. 2014). However, when an employee is *required* to report at a meeting place to receive instructions or to perform other work there, or to pick up and carry tools, the travel time from the designated place to the workplace is part of the day's work and is compensable. 29 C.F.R. § 785.38.

In interpreting these provisions, the Department of Labor has adopted the "continuous workday" or "whistle to whistle" rule, which means that the "workday"

is defined as "the period between the commencement and completion on the same workday of an employee's principal activity or activities." 29 C.F.R. § 790.6(b).

Based on the foregoing, Uber should be compensating Claimant for Period 1 and Period 2 time. These periods are integral and indispensable because (1) Uber will not assign Claimant a rider until he enters Period 1 time, (2) it is *impossible* to begin Period 3 time without incurring Period 1 and 2 time, and (3) Claimant cannot provide productive work for Uber without incurring Period 1 and Period 2 time.

### b.  On Duty / Off Duty

Uber did not compensate Claimant for time that he was "on duty" under the FLSA. Even when Claimant was in Period 1 time—waiting on Uber to assign him a rider—he was "on duty" because he was "engaged to wait." *See* 29 CFR § 785.15 (examples where workers were "on duty" because the waiting periods were "unpredictable," "usually of short duration," the employee is "unable to use the time effectively for his own purposes," and "waiting is an integral part of the job").

In Period 1 time, Claimant would log on and then wait for Uber to assign a ride request—whether driving around or parked in his car at the airport. Uber withholds where the rider is located, so Claimant would have no choice but to either wait or blindly seek out riders by guessing where they might be. Uber did not compensate for Period 1 time even though it was integral to the principal work. Period 1 is integral because Uber would not assign Claimant a ride request until he logged on in Period 1

time. In other words, it is a necessary and indispensable step to begin receiving ride requests and to begin performing the work for Uber.

Also, during Period 1, Claimant cannot choose which trip request is provided to him, but was required to blindly decide whether to accept a trip assignment within 15 seconds of receiving it. If he did not accept the assignment, he would face penalization by Uber. This penalization would come in the form of a decreased "acceptance rate" which results in loss of Uber benefits (Uber Pro) or could result in temporary deactivation. Further, if he rejected three assigned trips in a row, he would *automatically* be logged off the Uber Driver App. This is significant because it prevented him from having any substantial amount of Period 1 time unless he was *actively engaged* with the App. If he was inactive, he would automatically be logged off after three rejected or missed trip assignments. If he was logged into a different App—say, the Lyft App—and ignored the Uber App, then he would automatically be logged off the Uber App. Thus, **Uber's App did not allow Claimant to effectively engage in other activities while logged in, as doing so would lead to automatic logging out of the app**. Moreover, an Uber Driver cannot be given a ride by Uber unless he is logged in and waiting to accept a ride from Uber while in Period 1.  Period 1 is integral to the job.

Period 2 time began when Claimant accepted an assigned trip request and was driving toward the rider's pick-up location. During that time, Uber transmitted the rider's location to Claimant, then instructed him to go to the rider's location and arrive

within the estimated time of arrival determined by Uber. Claimant was obviously "on duty" while actively working and following instruction from Uber. During the time Claimant was waiting in Period 2 for the rider to enter the vehicle, he was not relieved of duty—he was actively waiting to begin the trip upon the moment the rider entered the vehicle. After two minutes of waiting, Uber automatically began charging the rider a "wait time" fare at an amount unilaterally set by Uber. Other than the wait-time fare, Uber did not compensate Claimant for Period 2 time or distance.

Period 3 time began when the rider physically stepped into Claimant's vehicle and it ended when reaching the rider's desired destination. It was only once this time began that the Uber algorithm first transmitted the rider's destination to Claimant.  The Uber algorithm then instructed Claimant with turn-by-turn directions to the destination location and provided an estimated time of arrival, solely determined by Uber. Uber's algorithm set the payment rates for base fare, time fare, distance fare, any applicable surge fare charged to the rider, and Uber processed all payments by the rider, which did not immediately accrue to Claimant. Uber prohibited Claimant from accepting cash for any fare, unless it was a tip.

From Period 1 through 3, Uber's algorithm automatically controlled every step of the process with very little input from Claimant. Claimant had only one decision point during those three periods that would impact his profitability—whether to accept an assigned ride. And even that was a constrained choice based on limited information.

Once the ride was over, Claimant then had no choice but to wait for Uber to send another match, or to log off.  Claimant was only "off-duty" once he logged off or when Uber deactivated him. "Periods during which an employee is completely relieved from duty and which are long enough to enable him to use the time effectively for his own purposes are not hours worked." 29 CFR § 785.16(a). When Claimant logged off, he was relieved from duty to accept rides and potential penalizations.

## VII. DAMAGES FOR FLSA VIOLATIONS

Uber's violations of the FLSA in misclassifying Claimant Barysas as a contractor instead of an employee entitles Claimant to damages in the amount of unpaid minimum wage, unpaid overtime pay, unlawfully kept tips, liquidated damages in an equal amount, and attorney's fees and costs. *See* 29 U.S.C § 216(b).

### a. Minimum Wage Violation

Texas has adopted the federal minimum wage of $7.25 per hour. TEX. LABOR CODE § 62.051;29 U.S.C. § 206. To be compliant with FLSA, an employer must pay any employee at least $7.25per hour. *Id*. If the employer does not pay an employee at least minimum wage, the employer has violated the FLSA, and the employee is entitled to damages. *Id*.; 29 U.S.C § 216(b).

### b. Reimbursement for Employment-Related Expenses and the Anti-Kickback Rule

When an employer fails to reimburse an employee for employment-related expenses, the expenses are essentially deducted from the employee's wage; therefore, if required employment expenses lower the employees wage below FLSA's minimum

16

wage requirements, the employer has violated the FLSA. 29 C.F.R. § 531.35. Additionally, under the Wage and Hour Division's anti-kickback rule, "'wages' cannot be considered to have been paid by the employer and received by the employee unless they are paid finally and unconditionally or 'free and clear.'" 29 C.F.R. § 531.35. Therefore, "the wage requirements . . . will not be met where the employee 'kicks-back' directly or indirectly to the employer or to another person for the employer's benefit the whole or part of the wage delivered to the employee." 29 C.F.R. § 531.35. "Kick-back" is impliedly defined as any expense incurred "for the employer's benefit." 29 C.F.R. § 531.35.

Here, Uber did not reimburse Claimant for any employment-related expenses. So, Claimant may apply such expenses as reducing his wage for purposes of calculating whether Uber violated the FLSA's minimum wage requirements. Indeed, with the inclusion of such expenses into the calculation of Claimant's wages, Uber failed to pay him minimum wage.

### c. Reimbursement of Reasonable Approximation of Expenses

Neither the FLSA nor the regulations require the employee prove the *actual* or *precise* cost of the employment-related expenses it incurred; such costs may be "reasonably approximate[d]." *See* 29 C.F.R. 778.217(a). As a general rule, where an employee incurs expenses on his employer's behalf or where he is required to expend sums by reason of action taken for the convenience of his employer, reimbursement for such expenses is allowable. *Id*. "Payments made by the employer to cover such

expenses are not included in the employee's regular rate (if the amount of the reimbursement *reasonably approximates* the expense incurred). Such payment is not compensation for services rendered by the employees during any hours worked in the workweek." *Id.* (emphasis added).

A reimbursement amount for an employee traveling on his or her employer's business is *per se* reasonable, and not disproportionately large, if it meets the requirements of 29 CFR 778.217. *See* 29 CFR 778.217 (c)(2)(i-ii).

Also, to the extent "an employee incurs *pre*-employment expenses that are primarily for the benefit of the employer, they are considered *de facto* deductions from the employee's wages during the first workweek and such deductions must be reimbursed to the extent that the costs incurred effectively reduce the employee's wages below the minimum wage." Wage and Hour Division, U.S. Dep't of Labor, Field Assistance Bulletin No. 2009–2 (2009), *available at* https://www.dol.gov/sites/dolgov/files/ebsa/employers-and-advisers/guidance/field-assistance- bulletins/2009-02.pdf.

### d. Overtime Violation

If an employee covered by the FLSA works more than 40 hours in any workweek, the employee must receive overtime compensation for the time over 40 hours at a rate of not less than one and one-half times the employee's regular pay rate. 29 U.S.C. § 207(a)(1); *Black v. Settlepou,P.C.*, 732 F.3d 492, 496 (5th Cir. 2013). An employee is entitled to overtime compensation for hours of which the employer had

actual or constructive knowledge that the employee was working. *Carman v. Meritage Homes Corp.*, 37 F. Supp. 3d 860, 867–868 (S.D. Tex. 2014). Although there are exemptions to the FLSA, these exemptions "are construed narrowly against the employer, and the employer bears the burden to establish a claimed exemption." *Allen v. Coil Tubing Servs., L.L.C.*, 755 F.3d 279, 283 (5th Cir. 2014); 29 U.S.C. § 207(a)(1).

In a misclassification case, once the finder of fact has established that the employee is due unpaid overtime, the proper determination of the regular rate of pay and overtime premium to which the employee is entitled is a question of law. *Black v. SettlePou, P.C.*, 732 F.3d 492, 496 (5th Cir. 2013).

### e. Liquidated Damages

Once Claimant proves Uber violated the FLSA, he is entitled to recover statutory liquidated damages in an amount equal to the unpaid minimum wages and overtime compensation due. *See* 29 U.S.C. § 216(b). Liquidated damages in this context are compensatory, not punitive, because they constitute compensation for the retention of the employee's pay which might result in damages that are too obscure and difficult to prove other than by liquidated damages. *Clark v. Centene Co. of Texas, L.P.*, 104 F. Supp. 3d 813, 833 (W.D. Tex. 2015). In other words, Claimant is entitled to first recover (a) the amount he should have been paid, and then (b) an additional amount of liquidated damages equal to the unpaid wages, essentially doubling the recovery. *See id.*; *Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 707, 65 S. Ct. 895, 902 (1945) ("double payment must be made in the event of delay in order to insure

restoration of the worker to that minimum standard of well-being."). Claimant does not need to prove Uber "willfully" violated the FLSA to receive the liquidated damages; a violation itself is enough to trigger liquidated damages. *Id*.

### f. Attorney's Fees and Costs

If a judgment is awarded in favor of an employee in a FLSA action, the court is required to award the employee reasonable attorney's fees and costs to be paid by the employer. 29 U.S.C. § 216(b). Claimant intends to submit his evidence of attorney's fees and costs in writing as part of his post-hearing brief, unless the Arbitrator instructs otherwise.

## VIII.   CONCLUSION

Based on the foregoing law, Claimant will show by a preponderance of the evidence that Uber misclassified him as an independent contractor, when the economic reality shows that in all meaningful respects, he was an employee under the FLSA. Uber is a sophisticated party that knows the law and sought to evade the law, meaning Uber's violations were willful. Following the final hearing on this matter, Claimant will ask the Arbitrator to award Claimant reimbursement for his unpaid minimum wages and overtime compensation for three years, liquidated damages in an equal amount, plus his attorney's fees and costs.

Respectfully submitted,

**KHERKHER GARCIA, LLP**

By: */s/   Bret Stanley*
   Bret Stanley
   BStanley@KherkherGarcia.com
   Steven J. Kherkher
   SKherkher@KherkherGarcia.com
   Eric A. Hawley
   EHawley@KherkherGarcia.com
   Ryan MacLeod
   RMacLeod@KherkherGarcia.com
   Kathryn Hiett
   KHiett@KherkherGarcia.com
   Kelli MacDonald
   KMacDonald@KherkherGarcia.com

   2925 Richmond Ave., Suite 1560
   Houston, TX  77098
   (713) 333-1030 / (713) 333-1029 (fax)

   **ATTORNEYS FOR CLAIMANT**

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this, the 18th day of March 2022, this document has been served via E-Mail on the following:

**Arbitrator**
Hon. Susan Soussan
Susan@Soussan-adr.com

**Counsel for Respondent Uber Technologies, Inc.**
Kim Rives Miers
KMiers@littler.com
Allison Williams
ACWilliams@littler.com
Abby Bochenek
ABochenek@littler.com
Collin M. Quigley
CQuigley@littler.com
Nicole LeFave
NLeFave@littler.com
Maikieta Brantley
MBrantley@littler.com
Ben Sandahl
BSandahl@littler.com
Sophia Collins
SCollins@littler.com
Sandra Mendoza
SMendoza@littler.com

scornell@littler.com
preyes@littler.com
hheckel@littler.com

By: /s/ *Bret Stanley*　　　　　　
Bret Stanley

# EXHIBIT A

# PATTERN
# JURY INSTRUCTIONS
# (Civil Cases)

Prepared by the

Committee on Civil Pattern

Jury Instructions

District Judges Association

Fifth Circuit

2020

with revisions through June 2020



*For Customer Assistance Call 1-800-328-4880*

Mat #42803135

KG-Universal_001174

KG-Universal_001175

**COMMITTEE ON CIVIL PATTERN JURY
INSTRUCTIONS
DISTRICT JUDGES ASSOCIATION
FIFTH CIRCUIT**

————————

**Judge Sidney A. Fitzwater, Chair**

**Judge Alan Albright**

**Judge Debra M. Brown**

**Judge John W. deGravelles**

**Judge Terry A. Doughty**

**Judge Elizabeth Erny Foote**

**Judge Jeremy D. Kernodle**

**Judge Mary Ann Vial Lemmon**

**Chief Judge Lee H. Rosenthal**

iii

KG-Universal_001176

KG-Universal_001177

# FOREWORD TO 2014 EDITION

———————

In July 2011, the Fifth Circuit District Judges Association formed the Pattern Jury Instruction Committee (Civil) including Judges Lee Rosenthal, Ron Clark, Elizabeth Foote, Sul Ozerden, Michael P. Mills, Stanwood Duval, Mary Ann Lemmon, Sarah Vance, Melinda Harmon and Dan Jordan. The Committee was charged with reviewing the existing pattern instructions and updating them where necessary.

After an initial review, the Committee determined that the time had come for a top-to-bottom examination for substantive accuracy. While many of the existing instructions remained valid, a significant number no longer reflected current law. This is no reflection on prior committees, which did an excellent job drafting prior patterns. The law is not stagnant; it was time to update. Accordingly, the 2014 edition of the Fifth Circuit Pattern Jury Instructions (Civil) will represent a substantial overhaul.

The Committee approached this project with a consistent mantra: present instructions that are as balanced, accurate, and user friendly as possible. Given the breadth of that undertaking, outside assistance was essential. And in the end, nearly one hundred judges, attorneys, law professors, and law students helped draft, vet, edit, and proofread the final product. In all, the instructions went through four rounds of review, each time by a different panel of reviewers.

In every case, the volunteer reviewers were recruited for their expertise in the chapters they helped produce. In most cases, the volunteers presided, practiced, or taught within the Fifth Circuit and possessed hands-on experience applying this circuit's standards, though some experts beyond this circuit were consulted.

Readers will note that the subject areas are not identical to previous editions. Chapter 6 on Antitrust and Chapter 8 on RICO have been deleted because the Committee concluded that the existing instructions were no longer trustworthy and that the issues arose too infrequently to justify revision. Chapter 9 on Patent Infringement has been deleted because the Committee learned that practitioners favored other pattern instructions for patent cases. Chapter 14 on statutes of

limitations was also deleted because such statutes generally involve state-law issues and Louisiana, Mississippi, and Texas all have variations that were not reflected in the old pattern instructions. For some of these chapters, the Committee has suggested other sources. The Committee also added instructions, including an instruction on electronic communications during trial and a new section on the Fair Labor Standards Act.

Those using the new instructions will also observe that they are heavily footnoted. There is simply no way to draft an instruction that covers every possible factual case. The patterns therefore address the most common factual scenarios, but the footnotes direct the reader to other potential issues and authorities. The notes also allow the reader to review the source to determine whether the instruction remains current.

Along these same lines, the Committee received a fair number of suggested instructions from attorneys and professors that represented novel legal theories. The Committee did not include these suggestions—though some were footnoted—concluding that pattern instructions are not the place to advance the law. Again, the patterns were designed to cover the most common issues.

This major undertaking lasted more than three years, and there are many to thank. The Committee offers its heartfelt appreciation to all who helped produce the 2014 edition, including our law clerks and summer externs. Special thanks are extended to Professor Lonny Hoffman, who served as our reporter and devoted countless hours to the project. His guidance and input were invaluable.

KG-Universal_001179

# TABLE OF CONTENTS

_____

|  |  | Page |
|---|---|---|
| Committee Members Page | | iii |
| Foreword | | v |

**Instruction**

## 1.  PRELIMINARY INSTRUCTIONS

| 1.1 | Instructions for Beginning of Trial | 1 |
|---|---|---|
| 1.2 | Preliminary Instructions to Jury | 4 |

## 2.  GENERAL INSTRUCTIONS

| 2.1 | First Recess | 8 |
|---|---|---|
| 2.2 | Stipulated Testimony | 9 |
| 2.3 | Stipulations of Fact | 10 |
| 2.4 | Judicial Notice | 11 |
| 2.5 | Discontinuance as to Some Parties | 12 |
| 2.6 | Limiting Instruction | 13 |
| 2.7 | Charts and Summaries | 14 |
| 2.8 | Demonstrative Evidence | 15 |
| 2.9 | Witness Not Called | 16 |
| 2.10 | Similar Acts | 17 |
| 2.11 | Impeachment by Witness's Inconsistent Statements | 18 |
| 2.12 | Impeachment by Witness's Felony Conviction | 19 |
| 2.13 | Deposition Testimony | 20 |
| 2.14 | Transcript of Recorded Conversation | 21 |
| 2.15 | Law-Enforcement Officer Testimony | 22 |
| 2.16 | Bias—Corporate Party Involved | 23 |
| 2.17 | Clear and Convincing Evidence | 24 |
| 2.18 | Civil Allen Charge | 25 |

## 3.  JURY CHARGE

| 3.1 | Jury Charge | 28 |
|---|---|---|
| 3.2 | Burden of Proof: Preponderance of The Evidence | 30 |
| 3.3 | Evidence | 31 |

KG-Universal_001180

# PATTERN JURY INSTRUCTIONS

| Instruction | | Page |
|---|---|---|
| 3.4 | Witnesses | 32 |
| 3.5 | Expert Witnesses | 33 |
| 3.6 | No Inference from Filing Suit | 34 |
| 3.7 | Duty to Deliberate; Notes | 35 |

## 4.  ADMIRALTY

| 4.1 | Seaman Status | 37 |
|---|---|---|
| 4.2 | Vessels | 41 |
| 4.3 | Jones Act—Unseaworthiness—Maintenance and Cure (Seaman Status Not Contested) | 42 |
| 4.4 | Jones Act—Negligence | 43 |
| 4.5 | Unseaworthiness | 45 |
| 4.6 | Causation | 47 |
| 4.7 | Contributory Negligence | 48 |
| 4.8 | Damages | 50 |
| 4.9 | Punitive Damages | 53 |
| 4.10 | Maintenance and Cure Claims and Their Relationship to Jones Act and Unseaworthiness Claims—Punitive Damages for Willful Withholding of Maintenance and Cure | 54 |
| 4.11 | Section 905(b) Longshore and Harbor Workers' Compensation Act Claim | 59 |

## 5.  RAILROAD EMPLOYEES

| 5.1 | FELA, 45 U.S.C. §§ 51 and 53 | 66 |
|---|---|---|
| 5.2 | Federal Safety Appliance Act, 49 U.S.C. § 20301 *et seq.* (2006) (Recodifying 45 U.S.C. §§ 1–16 (1988)) | 70 |

## 6.  ANTITRUST (15 U.S.C. §§ 1, *ET SEQ.*)

## 7.  SECURITIES ACT

| 7.1 | Securities Act—(Rule 10b-5) | 75 |
|---|---|---|

## 8.  RICO

## 9.  PATENT INFRINGEMENT (35 U.S.C. § 271, *ET SEQ.*)

## 10.  CIVIL RIGHTS — 42 U.S.C. § 1983

| 10.1 | 42 U.S.C. Section 1983 (Unlawful Seizure— Unlawful Search—Excessive Force) | 82 |
|---|---|---|
| 10.2 | Under Color of Law | 92 |

KG-Universal_001181

**TABLE OF CONTENTS**

| Instruction | | Page |
|---|---|---|
| 10.3 | Qualified Immunity | 93 |
| 10.4 | Liability of Supervisor | 96 |
| 10.5 | Municipal Liability | 98 |
| 10.6 | First Amendment Retaliation—Public Employees | 100 |
| 10.7 | Eighth Amendment (Excessive Force)—Convicted Prisoner | 105 |
| 10.8 | Eighth Amendment (Inadequate Medical Care — Convicted Prisoner) | 109 |
| 10.9 | Eighth Amendment (Conditions of Confinement — Convicted Prisoner)" | 113 |
| 10.10 | Eighth Amendment (Excessive Force—Pretrial Detainee) | 116 |
| 10.11 | Fourteenth Amendment (Inadequate Medical Care/ Conditions of Confinement — Pretrial Detainee)" | 119 |
| 10.12 | Fourteenth Amendment (Inadequate Medical Care/ Episodic Acts—Pretrial Detainee)" | 123 |
| 10.13 | Emotional Distress Damages | 127 |

## 11. EMPLOYMENT CLAIMS

| 11.1 | Title VII (42 U.S.C. § 2000e-2)—Discrimination Based on Race, Color, National Origin, Religion, or Sex (Disparate Treatment) | 132 |
| 11.1 | Pattern Jury Question, Title VII—Discrimination Based on Race, Color, National Origin, Religion or Sex (Disparate Treatment) | 136 |
| 11.2 | Title VII (42 U.S.C. § 2000E-2)—Supervisor Harassment Without Tangible Employment Action (Hostile Work Environment) | 137 |
| 11.2 | Pattern Jury Questions, Supervisor Sexual and Other Harassment without Tangible Employment Action (Hostile Work Environment) | 143 |
| 11.3 | Title VII (42 U.S.C. § 2000E-2)—Supervisor Sexual Harassment with Tangible Employment Action (Quid Pro Quo) | 145 |
| 11.3 | Pattern Jury Question, Supervisor Sexual Harassment with Tangible Employment Action (Hostile Work Environment—Quid Pro Quo) | 148 |
| 11.4 | Title VII (42 U.S.C. § 2000E-2) Coworker or Third-Party Harassment Without Tangible Employment Action (Hostile Work Environment—Negligence) | 149 |
| 11.4 | Pattern Jury Questions, Coworker or Third-Party Harassment without Tangible Employment Action (Hostile Work Environment—Negligence) | 154 |
| 11.5 | Title VII—Retaliation | 156 |
| 11.5 | Pattern Jury Question, Title VII—Retaliation | 160 |

KG-Universal_001182

## PATTERN JURY INSTRUCTIONS

| Instruction | | Page |
|---|---|---|
| 11.6 | Constructive Discharge | 161 |
| 11.6 | Pattern Jury Question, Constructive Discharge | 164 |
| 11.7 | Cat's Paw Theory of Employer Liability | 165 |
| 11.7 | Pattern Jury Questions, Title VII—Cat's Paw Theory of Employer Liability | 171 |
| 11.8 | Discrimination Based on Disability | 185 |
| 11.8 | Pattern Jury Question, Discrimination Based on Disability | 192 |
| 11.9 | Harassment Based on Disability (Hostile Work Environment—Negligence) | 193 |
| 11.9 | Pattern Jury Questions, Harassment Based on Disability (Hostile Work Environment—Negligence) | 198 |
| 11.10 | Failure to Accommodate a Disability | 200 |
| 11.10 | Pattern Jury Question, Failure to Accommodate Disability | 207 |
| 11.11 | ADA—Retaliation | 208 |
| 11.11 | Pattern Jury Question, ADA—Retaliation | 210 |
| 11.12 | Defenses to ADA Claim: Business Necessity, Direct Threat, or Transitory and Minor Condition | 211 |
| 11.12 | Pattern Jury Question, Defenses to ADA Claim—Business Necessity, Direct Threat, or Transient-and-Minor Condition | 215 |
| 11.13 | Mixed-Motive Affirmative Defense Instruction (Title VII and ADA) | 217 |
| 11.13 | Pattern Jury Question, Mixed-Motive Defense | 219 |
| 11.14 | Title VII and ADA Damages | 220 |
| 11.14 | Pattern Jury Questions, Title VII and ADA—Damages | 231 |
| 11.15 | Discrimination Based on Age (ADEA Disparate Treatment) | 234 |
| 11.15 | Pattern Jury Question, Discrimination Based on Age (Disparate Treatment) | 237 |
| 11.16 | Harassment Based on Age (ADEA Hostile Work Environment) | 238 |
| 11.16 | Pattern Jury Questions, Harassment Based on Age (ADEA Hostile Work Environment) | 243 |
| 11.17 | ADEA—Retaliation | 246 |
| 11.18 | ADEA Damages | 247 |
| 11.18 | Pattern Jury Questions, ADEA Damages | 251 |
| 11.19 | Interference With FMLA Leave | 253 |
| 11.19 | Pattern Jury Question—Interference with FMLA Leave | 259 |
| 11.20 | Interference with FMLA Benefits or Job Restoration | 260 |

x

## TABLE OF CONTENTS

| Instruction | | Page |
|---|---|---|
| 11.20 | Pattern Jury Question—Interference with FMLA Benefits or Job Restoration | 265 |
| 11.21 | Retaliation | 266 |
| 11.21 | Pattern Jury Question—FMLA Retaliation | 269 |
| 11.22 | FMLA Damages—Lost Wages | 270 |
| 11.22 | Pattern Jury Question—FMLA Damages, Lost Wages | 274 |
| 11.23 | FMLA Damages—Losses Other Than Wages | 275 |
| 11.23 | Pattern Jury Question—FMLA Damages, Losses Other Than Wages | 276 |
| 11.24 | Fair Labor Standards Act (FLSA) (29 U.S.C. §§ 201, et seq.) | 277 |
| 11.24 | Pattern Jury Questions, FLSA—Failure to Pay Minimum Wage or Overtime | 286 |
| 11.25 | FLSA Damages | 289 |
| 11.25 | Pattern Jury Questions, FLSA Damages | 291 |
| 11.26 | FLSA—Employee or Independent Contractor | 293 |
| 11.26 | Pattern Jury Question, FLSA—Employee or Independent Contractor | 297 |
| 11.27 | FLSA—Joint Employers | 298 |
| 11.27 | Pattern Jury Question, FLSA—Joint Employers | 301 |

## 12.  TAX REFUNDS

| 12.1 | Reasonable Compensation to Stockholder—Employee | 303 |
|---|---|---|
| 12.2 | Debt v. Equity | 306 |
| 12.3 | Employee v. Independent Contractor | 311 |
| 12.4 | Business Loss v. Hobby Loss | 314 |
| 12.5 | Real Estate Held Primarily for Sale | 316 |
| 12.6 | Section 6672 Penalty | 320 |
| 12.7 | Gifts in Contemplation of Death | 323 |

## 13.  MISCELLANEOUS FEDERAL CLAIMS

| 13.1 | Automobile Dealers Day-in-Court Act (15 U.S.C. § 1221) | 326 |
|---|---|---|
| 13.2 | Odometer Tampering, Motor Vehicle Information and Cost Savings Act (49 U.S.C. § 32701 et seq.) | 329 |
| 13.3 | Eminent Domain | 333 |
| 13.4 | Interstate Land Sales Full Disclosure Act (15 U.S.C. § 1709) | 336 |

## 14.  [RESERVED]

## 15.  DAMAGES

KG-Universal_001184

**PATTERN JURY INSTRUCTIONS**

| Instruction | | Page |
|---|---|---|
| 15.1 | Consider Damages Only If Necessary | 340 |
| 15.2 | Compensatory Damages | 341 |
| 15.3 | Injury/Pain/Disability/Disfigurement/Loss of Capacity for Enjoyment of Life | 343 |
| 15.4 | Property Damage | 344 |
| 15.5 | Mitigation of Damages | 345 |
| 15.6 | Nominal Damages | 346 |
| 15.7 | Punitive Damages | 347 |

xii

KG-Universal_001185

**11.24**

## 11.24  Fair Labor Standards Act (FLSA) (29 U.S.C. §§ 201, *et seq.*)

### A.  Committee Notes

This charge is for cases in which the plaintiff alleges a violation of the minimum-wage or overtime-pay requirements of the FLSA.

### 1.  Elements of an FLSA Case

To prevail in a FLSA action, the plaintiff must prove: (1) an employment relationship with the defendant; (2) coverage under the FLSA; and (3) a violation of the FLSA.

The FLSA applies only if the plaintiff was an employee of the defendant. If this issue is disputed, the instructions and jury questions should be adapted accordingly. If there is a dispute about whether the plaintiff is an employee or an independent contractor, see Pattern Jury Instruction 11.26. If there is a dispute about whether there were joint employers or a single employer, see Pattern Jury Instruction 11.27.

The plaintiff-employee must also prove FLSA coverage by proving either that he or she is individually covered or that his or her employer is covered as an enterprise. *Martin v. Bedell*, 955 F.2d 1029, 1032 (5th Cir. 1992). To prove individual coverage, the employee must establish that in working for the defendant, he or she was "engaged in commerce or the production of goods for commerce." 29 U.S.C. §§ 206(a), 207(a)(1), 212(c). To prove enterprise coverage, the employee must establish that he or she was "employed by an enterprise engaged in commerce that had annual gross sales of at least $500,000.00." 29 U.S.C. § 203(s)(1). For a discussion of these elements, see *Brock v. Cruz*, 357 F. Supp. 3d 581, 586–88 (S.D. Tex. Jan. 2019) ("enterprise"); and *Williams v. Henagan*, 595 F.3d 610, 621 (5th Cir. 2010) ("engagement in commerce").

277

## 2. Common Legal Issues

Recurring issues in FLSA cases include the classification of employees as exempt or nonexempt, record keeping, the number of hours worked, and limitations.

### a. Classification Issues: Exempt Status

The most common exemptions from the overtime-pay requirement are for employees in a "bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1); 29 C.F.R. § 541.0; *see also Belt v. EmCare, Inc.*, 444 F.3d 403, 407 (5th Cir. 2006). If the case involves a dispute about whether an employee is exempt from the FLSA's overtime requirement, the jury should be instructed on the elements of the claimed exemption. The elements of the exemptions are at 29 C.F.R. § 541.1 *et seq*. The employer has the burden of proving an overtime-pay exemption. *Olibas v. Barclay*, 838 F.3d 442, 448 (5th Cir. 2016).

In a misclassification case, whether an employee is nonexempt and eligible for overtime is a fact question. Once the fact finder has determined that the employer was misclassified and is due overtime pay, the trial court must determine the regular rate of pay and overtime premium, which are questions of law.[1] Dis-

---

[1]*Black v. SettlePou P.C.*, 732 F.3d 492, 496 (5th Cir. 2013); *Ransom v. M. Patel Enters., Inc.*, 734 F.3d 377 (5th Cir. 2013); *see also Singer v. City of Waco, Tex.*, 324 F.3d 813, 823 (5th Cir. 2003) (reviewing *de novo* the district court's determination of the regular rate of pay under the FLSA).

An hourly employee's "regular rate" for the purpose of determining proper overtime is determined by dividing the employee's "total remuneration for employment . . . in any workweek by the total number of hours actually worked by him in that workweek for which such compensation was paid." 29 C.F.R. § 778.109. The regular rate includes all of the employee's compensation except for eight specific types of payments set out in 29 U.S.C. § 207(e).

When an employee is compensated "solely on a weekly salary basis, the regular hourly rate of pay, on which time and a half must be paid, is computed by dividing the salary by the number of hours which the salary is intended to compensate." 29 C.F.R. § 778.113(a); *Singer*, 324 F.3d at

278

putes over the number of hours worked and damages are for the jury to decide.

### b. Recordkeeping

The FLSA requires employers to "make, keep and preserve records" of an employee's hours. 29 U.S.C. § 211(c). The employee has the burden of proving the hours worked for which he or she was not properly compensated. *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686–87 (1946), *superseded by statute on other grounds,* 29 U.S.C. § 251. When an employer's records are "inaccurate or inadequate," the employee may satisfy the burden by proving that he or she performed work that was improperly compensated and producing "sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Anderson*, 328 U.S. at 687. "The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negate the reasonableness of the inference to be drawn from the employee's evidence." *Anderson*, 328 U.S. at 687–88; *see also Johnson v. Heckmann Waster Res. (CVR), Inc.*, 758 F.3d 627, 630 (5th Cir. 2014) (citing *Harvill v. Westward Commc'ns, LLC*, 433 F.3d 428, 441 (5th Cir. 2005)).

### c. Hours Worked

The FLSA requires that employees be paid for all hours worked. "Work" is broadly defined as " 'physical

---

824. For overtime claims involving an employee who is paid a constant salary for a specific number of hours, the instruction should be based upon 29 C.F.R. § 778.113(a). For overtime claims involving an employee who is paid a constant weekly salary for fluctuating hours, it may be necessary to instruct on the "fluctuating workweek method." *See Hills v. Entergy Operations, Inc.*, 866 F.3d 610, 614–15 (5th Cir. 2017) (whether an employer and an employee agreed to a fixed weekly wage for fluctuating hours is a question of fact, and the employee has the burden to show that the fluctuating-workweek method is inapplicable) (citation omitted); *Lamonica v. Safe Hurricane Shutters, Inc.*, 711 F.3d 1299, 1310–11 (11th Cir. 2013); *see also* 29 C.F.R. § 778.114 (explaining how to use the fluctuating workweek method).

KG-Universal_001188

or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business.' " *Bridges v. Empire Scaffold, LLC*, 875 F.3d 222, 225–26 (5th Cir. 2017) (citing *Tenn. Coal, Iron & R. Co. v. Muscoda Local No. 123*, 321 U.S. 590, 598 (1944); *Integrity Staffing Sols., Inc. v. Busk*, 135 S. Ct. 513, 516–17 (2014); and *IBP, Inc. v. Alvarez*, 546 U.S. 21, 29–30 (2005)). Typical issues in "off-the clock" cases include whether unpaid and usually unrecorded hours for preparatory and concluding activities ("donning and doffing"), travel, waiting, and rest or meal periods are compensable.

To recover for overtime hours the employee claims he or she worked without proper compensation, the employee must demonstrate that the employer "had knowledge, actual or constructive, that he was working" overtime. *Fairchild v. All Am. Check Cashing, Inc.*, 815 F.3d 959, 964 (5th Cir. 2016) (quoting *Newton v. City of Henderson*, 47 F.3d 746, 748 (5th Cir. 1995)). Constructive knowledge exists if an employer "exercising reasonable diligence" would become aware that an employee is working overtime. *Brennan v. Gen. Motors Acceptance Corp.*, 482 F.2d 825, 827 (5th Cir. 1973). But if the "employee fails to notify the employer or deliberately prevents the employer from acquiring knowledge of the overtime work, the employer's failure to pay for the overtime hours is not a violation of § 207." *Newton*, 47 F.3d at 748.

### d.   Limitations

The statute of limitations for an unpaid-overtime FLSA claim is generally two years. 29 U.S.C. § 255(a). The limitations period is extended to three years for willful violations. 29 U.S.C. § 255(a). To prove willfulness and obtain the benefit of the three-year limitations period, an employee must establish that the employer "either knew or showed reckless disregard as to whether its conduct was prohibited by the [FLSA]." *Cox v. Brook-*

KG-Universal_001189

*shire Grocery Co.*, 919 F.2d 354, 356 (5th Cir. 1990) (citing *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988)).

## B.  Charge

Plaintiff [name] claims that Defendant [name] did not pay Plaintiff [name] the [minimum wage] [overtime pay] required by the federal Fair Labor Standards Act, also known as the FLSA.

Defendant [name] denies Plaintiff [name]'s claims and contends [specify contentions].

It is unlawful for an employer to require an employee covered by the FLSA to work [for less than minimum wage] [more than 40 hours in a workweek without paying overtime].

To succeed on [his/her] claim, Plaintiff [name] must prove each of the following facts by a preponderance of the evidence:

1.  Plaintiff [name] was an employee of Defendant [name] during the relevant period;

2.  Plaintiff [name] was engaged in commerce or in the production of goods for commerce or employed by an enterprise engaged in commerce or in the production of goods for commerce that had gross annual sales of at least $500,000.00 for [specify year]; and

3.  Defendant [name] failed to pay Plaintiff [name] the [minimum wage] [overtime pay] required by law.

Plaintiff [name] must prove by a preponderance of the evidence that [he/she] was an employee [engaged in commerce or in the production of goods for commerce]

281

**11.24** PATTERN JURY INSTRUCTIONS

[employed by an enterprise engaged in commerce or in the production of goods for commerce].[2]

The term "commerce" has a very broad meaning. It includes any trade, transportation, transmission, or communication among the several states, or between any state and any place outside that state. Plaintiff [name] was engaged in the "production of goods" if [he/she] was employed in producing, manufacturing, mining, handling, or transporting goods, or in any other manner worked on goods or any closely related process or occupation directly essential to the production of goods. [An "enterprise engaged in commerce or the production of goods for commerce" means a business that has employees engaged in commerce or the production of commercial goods for commerce and has annual gross sales of at least $500,000.00.]

**(For cases involving a minimum-wage claim)**

The minimum wage required by the FLSA during the period involved in this case was $[minimum wage] per hour. In determining whether an employer has paid the minimum wage, it is entitled to a credit for the reasonable costs of furnishing certain noncash items to Plaintiff [name] [unless those costs are excluded from Plaintiff [name]'s wages under the terms of a union contract that applies to Plaintiff [name]], such as meals and lodging for the employee's benefit, if the employee voluntarily accepts them.

**(For cases involving an overtime claim)**

The FLSA requires an employer to pay an employee at least one-and-one-half times the employee's "regular rate" for time worked over 40 hours in a workweek. A

---

[2]If there is no dispute about whether the plaintiff was an employee engaged in commerce or employed by an enterprise engaged in commerce, this paragraph and the next one need not be submitted.

282

KG-Universal_001191

EMPLOYMENT CLAIMS                    **11.24**

"workweek" is a regularly recurring period of seven days or 168 hours. The phrase "hours worked" includes all time spent by an employee that was primarily for the benefit of the employer or the employer's business. If an employee works more than 40 hours in one workweek, the employer must pay the employee the overtime rate of 1.5 times the regular rate for the time [he/she] worked after the first 40 hours. This is commonly known as "time-and-a-half pay" for overtime work.

To calculate how much overtime pay Plaintiff [name] earned in a particular week, multiply [his/her] regular rate of pay by one-and-one-half times the regular rate for all hours worked over 40 in that week.

**(For cases involving issues of inadequate records of hours worked)**

The law requires an employer to keep records of how many hours its employees work and the amount they are paid. In this case, Plaintiff [name] claims that Defendant [name] failed to keep and maintain adequate records of [his/her] hours and pay. Plaintiff [name] also claims that Defendant [name]'s failure to keep and maintain adequate records has made it difficult for Plaintiff [name] to prove the exact amount of [his/her] claim.

If you find that Defendant [name] failed to keep adequate time and pay records for Plaintiff [name] and that Plaintiff [name] performed work for which [he/she] should have been paid, Plaintiff [name] may recover a reasonable estimation of the amount of [his/her] damages. But to recover this amount, Plaintiff [name] must prove by a preponderance of the evidence a reasonable estimate of the amount and extent of the work for which [he/she] seeks pay.

**(For cases involving a contention that the**

283

**employer did not know or have reason to believe that the employee worked more than 40 hours in a workweek)**

To prevail on a claim for overtime under the Fair Labor Standards Act, a plaintiff must prove, by a preponderance of the evidence, that the employer failed to pay the plaintiff overtime for all hours worked in excess of 40 in one or more workweeks. A "workweek" is a regularly recurring period of seven days or 168 hours. The phrase "hours worked" includes all time spent by an employee that was primarily for the benefit of the employer or the employer's business. An employee's time spent primarily for the benefit of the employer or the employer's business is "hours worked" only if the employer knew or had reason to believe that the employee was doing the work. [When an employer has a policy that an employee is not to work overtime without prior authorization, an employee cannot perform overtime work without the employer's knowledge and contrary to its instructions and then assert a right to be paid.] At the same time, an employer who knows that an employee is working overtime and does not want the work to be done must make reasonable efforts to prevent it. If an employee in fact does overtime work and the employer knows or has reason to believe it, the employer cannot stand idly by and allow the employee to perform the work without proper compensation, even if the employee did not make a claim for the compensation at the time. An employer has the right to require an employee to adhere to its procedures for claiming overtime and an employee has a duty to notify his employer when [he/she] is working extra hours. If the employee fails to notify the employer of the overtime work or deliberately prevents the employer from acquiring knowledge of the overtime work, the employer's failure to pay for the overtime hours is not a violation of the statute. If the employer neither knew nor had reason to believe that overtime work was being performed, the time does not constitute "hours worked."

KG-Universal_001193

EMPLOYMENT CLAIMS                                    **11.24**

## (For cases involving the defendant's contention that the plaintiff was exempt from the FLSA)

In this case, Defendant [name] claims that it is exempt from the FLSA's overtime provisions. To establish that it is exempt, Defendant [name] must prove each of the following facts by a preponderance of the evidence: [specify essential elements of the claimed exemption].[3]

------

[3]The exemption elements set out in 29 C.F.R. § 541 may be used as a guideline.

285

KG-Universal_001194

**11.24**                    PATTERN JURY INSTRUCTIONS

## 11.24   Pattern Jury Questions, FLSA—Failure to Pay Minimum Wage or Overtime

### JURY QUESTIONS

### Question No. 1

Has Plaintiff [name] proved that [he/she] was an employee of Defendant [name] during the relevant period?

Answer "Yes" or "No."

_____

If your answer is "Yes," answer the next question. If your answer is "No," do not answer the next question.

### Question No. 2

Has Plaintiff [name] proved that [he/she] was engaged in commerce or in the production of goods for commerce or employed by an enterprise engaged in commerce or in the production of commercial goods?[1]

Answer "Yes" or "No."

_____

If your answer is "Yes," answer the next question. If your answer is "No," do not answer the next question.

_____

[1]If there is a dispute about whether the employer had annual gross sales of at least $500,000.00, the jury question should be adapted accordingly. If there is a dispute about employee/independent contractor status or about joint employers, see Pattern Jury Instructions 11.26 and 11.27.

KG-Universal_001195

EMPLOYMENT CLAIMS                                    **11.24**

## Question No. 3

Has Plaintiff [name] proved that Defendant [name] failed to pay [him/her] the [minimum wage] [overtime pay] required by law?

Answer "Yes" or "No."

_____

If your answer is "Yes," answer the next question. If your answer is "No," do not answer the next question.

**(For cases in which the defendant contends that the plaintiff was exempt from the FLSA's overtime requirement)**

## Question No. 4

Has Defendant [name] proved that Plaintiff [name] was exempt from the overtime-pay requirement as an [administrative] [executive] [specify other] employee?

Answer "Yes" or "No."

_____

If your answer is "Yes," answer the next question. If your answer is "No," do not answer the next question.

**(For cases involving allegations of willful violation)**

## Question No. 5

Has Plaintiff [name] proved that Defendant [name]

287

**11.24**  PATTERN JURY INSTRUCTIONS

knew that its conduct was prohibited by the FLSA or showed reckless disregard for whether the FLSA prohibited its conduct?

Answer "Yes" or "No."

_____

288

KG-Universal_001197

## 11.25   FLSA Damages

### A.   Committee Notes

This charge is for use in FLSA cases involving an alleged failure to pay overtime or minimum wage.

The FLSA provides for liquidated damages. The statute states that such damages are to be paid on a finding of an FLSA § 206 or § 207 violation unless the "employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act." 29 U.S.C. §§ 216(b), 260. If the employer makes this showing, "the court may, in its sound discretion, award no liquidated damages or award any amount thereof not to exceed the amount specified in section 216" of the FLSA. 29 U.S.C. § 260. This is a question for the court to determine, not the jury. The jury answers the willfulness question to determine the statute of limitations, not to determine willfulness for the purpose of deciding liquidated damages issues. *Black v. SettlePou, P.C.*, 732 F.3d 492, 501 (5th Cir. 2013) (citing *Singer v. City of Waco*, 324 F.3d 813, 822–23 (5th Cir. 2003)); *see also Mireles v. Frio Foods, Inc.*, 899 F.2d 1407, 1414–15 (5th Cir. 1990).

When the jury finds that an employer has violated the FLSA and assesses compensatory damages, the district court generally must add liquidated damages in an equal amount. 29 U.S.C. § 216(b) ("Any employer who violates the provisions of . . . section 207 of this title shall be liable to the employee or employees affected in the amount of . . . their unpaid overtime compensation . . . and in an additional equal amount as liquidated damages."); *Ransom v. M. Patel Enters., Inc.*, 734 F.3d 377, 387 & n.16 (5th Cir. 2013) (citing *Singer*, 324 F.3d at 822–23); *see also Black*, 732 F.3d at 501. The district court has discretion to reduce or deny liquidated damages if the employer " 'acted in good faith

KG-Universal_001198

**11.25**                    PATTERN JURY INSTRUCTIONS

and had reasonable grounds to believe that its actions complied with the FLSA.' " *Black*, 732 F.3d at 501 (quoting *Singer*, 324 F.3d at 822–23); *see also* 29 U.S.C. § 260. A district court must find that an employer acted reasonably and in good faith in violating the FLSA before it may award less than the full amount of liquidated damages. *See Black*, 732 F.3d at 501. If the jury finds that the employer acted willfully, then the court cannot find that the employer acted in good faith, and the court must award liquidated damages. *Singer*, 324 F.3d at 823.

### B.  Charge

If you find that Defendant [name] violated the FLSA, then you must determine the amount of any damages. You should not conclude from the fact that I am instructing you on damages that I have any opinion as to whether Plaintiff [name] has proved liability.

The amount of damages is the difference between the amount Plaintiff [name] should have been paid and the amount [he/she] was actually paid. Plaintiff [name] is entitled to recover lost wages for the two years before [he/she] filed this lawsuit, unless you find that Defendant [name] either knew or showed reckless disregard for whether the FLSA prohibited its conduct. If you find that Defendant [name] knew or showed reckless disregard for whether the FLSA prohibited its conduct, then Plaintiff [name] is entitled to recover lost wages for three years before the date [he/she] filed this lawsuit. Plaintiff [name] filed this lawsuit on _____.

KG-Universal_001199

## 11.25   Pattern Jury Questions, FLSA Damages

### <u>JURY QUESTIONS</u>

### <u>Question No. 1</u>

Has Plaintiff [name] proved that [he/she] is entitled to recover damages under the FLSA?

Answer "Yes" or "No."

_____

If your answer is "Yes," answer the next question. If your answer is "No," do not answer the next question.

### <u>Question No. 2</u>

Has Plaintiff [name] proved that Defendant either knew its conduct was prohibited by the FLSA or showed reckless disregard for whether its conduct was prohibited by the FLSA?

Answer "Yes" or "No."

_____

If your answer is "Yes," you should award damages for the three-year period from _____ to _____. If your answer is "No," you should award damages for the two-year period from _____ to _____.

### <u>Question No. 3</u>

What sum of money would fairly and reasonably compensate Plaintiff [name] for the damages, if any,

291

**11.25**                    **PATTERN JURY INSTRUCTIONS**

you have found Defendant [name] caused Plaintiff [name]? Answer in dollars and cents for the following items and no other:

[specify formula].[1]

$ _____

---

[1]If there is a dispute about whether certain amounts should be included in the regular rate of pay and overtime rate that are used to compute FLSA damages, the jury questions should be adapted accordingly, clarifying the underlying fact disputes that the jury is asked to decide, such as what statutory exclusions may apply.

KG-Universal_001201

## 11.26   FLSA—Employee or Independent Contractor

### A.   Committee Notes

This charge is for FLSA cases in which there are disputes about whether the plaintiff is an employee or an independent contractor. Such disputes are usually questions of fact for the jury. *See Campbell v. Keystone Aerial Surveys, Inc.*, 138 F.3d 996, 1006 (5th Cir. 1998) (Texas law); *McKee v. Brimmer*, 39 F.3d 94, 97 (5th Cir. 1994) (Mississippi law); *Brown v. Cities Serv. Oil Co.*, 733 F.2d 1156, 1161 (5th Cir. 1984) (Louisiana law).

The central issue in determining employee/independent contractor status is "whether the alleged employee so economically depends upon the business to which he renders his services, such that the individual, as a matter of economic reality, is not in business for himself." *Hobbs v. Petroplex Pipe & Constr., Inc.*, 946 F.3d 824, 829 (5th Cir. 2020) (quoting *Thibault v. Bellsouth Telecomms., Inc.*, 612 F.3d 843, 845 (5th Cir. 2010)). Courts use five "non-exhaustive" "economic reality" factors to guide the inquiry: "(1) the degree of control exercised by the alleged employer; (2) the extent of the relative investments of the worker and the alleged employer; (3) the degree to which the worker's opportunity for profit or loss is determined by the alleged employer; (4) the skill and initiative required in performing the job; and (5) the permanency of the relationship. *Id.* (quoting *Hopkins v. Cornerstone Am.*, 545 F.3d 338, 343 (5th Cir. 2008)). No single factor is determinative.[1] *Id.* "Rather, each factor is a tool used to gauge the *economic dependence* of the alleged employee,

---

[1]The Fifth Circuit has adopted a "hybrid economic realities/common law control test" to determine employee/independent contractor status under Title VII. *See Juino v. Livingston Par. Fire Dist. No. 5*, 717 F.3d 431, 434 (5th Cir. 2013); *Muhammad v. Dall. Cty. Cmty. Supervision & Corr. Dep't*, 479 F.3d 377, 380 (5th Cir. 2007). The "right to control [the] employee's conduct" is the most important component of the hybrid test. *Muhammad*, 479 F.3d at 480; *see also Juino*, 717 F.3d at 434 (courts "should emphasize" the "common law control portion of the test" "over the

**11.26**     PATTERN JURY INSTRUCTIONS

and each must be applied with this ultimate concept in mind." *Id.*

## B.  Charge

It is not always clear whether the law considers someone an "employee," and it is not always clear who the law considers someone's "employer." Some people perform services for others while remaining self-employed as independent contractors.

In this case, you must decide whether Plaintiff [name] was an employee of Defendant [name] or an independent contractor. You should answer this question in light of the economic realities of the entire relationship between the parties and in light of whether Plaintiff [name] economically depended on Defendant [name]. There are a number of factors you must consider, based on all the evidence in the case. The factors are as follows:

1. How much control Defendant [name] has over Plaintiff [name]'s work. In an employer/employee relationship, the employer has the right to control the employee's work, to set the means and manner in which the work is done, and to set the hours of work. In contrast, an independent contractor generally must accomplish a certain work assignment within a desired time, but the details, means, and manner by which the contractor completes that assignment are determined by the independent contractor, normally using special skills necessary to perform that kind of work.

---

economic realities portion"). The "hybrid" test results "in a narrower definition of employee than under a true economic-realities test." *Hopkins*, 545 F.3d at 347. The Fifth Circuit explained in *Hopkins* that "it is legally possible to be an employee for purposes of the FLSA and an independent contractor under most other statutes." *Id.* (citing *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992)).

KG-Universal_001203

2. The relative investments made by Plaintiff [name] compared to Defendant [name]. An independent contractor generally makes a greater investment in his or her work, but an employee's investment is usually less than the employer's investment. For example, an independent contractor usually provides the tools, equipment, and supplies necessary to do the job, but an employee usually does not.

3. How much risk or opportunity Plaintiff [name] has. An independent contractor is generally one who has the opportunity to make a profit or faces a risk of taking a loss. But an employee is generally compensated at a predetermined rate, has no risk of loss, and has social security taxes paid by the employer.

4. The amount of skill and initiative required of Plaintiff [name]. An independent contractor usually has a specialized skill and demonstrated initiative compared to an employee. An independent contractor may have more discretion over his or her daily tasks, and may have to take initiative to find consistent work.

5. The permanency of the relationship between Plaintiff [name] and Defendant [name]. This includes whether Plaintiff [name] worked exclusively for Defendant [name], the total length of the relationship, and whether the work was done on a project-by-project basis. An employee typically works exclusively for one employer, has a long-term relationship, and does not work on a project-by-project basis, while an independent contractor does.

You should consider all the circumstances surrounding the work relationship, and no single factor determines the outcome. An individual who performs

KG-Universal_001204

**11.26**                    PATTERN JURY INSTRUCTIONS

services for pay may be either an employee or an inde-
pendent contractor but cannot be both at the same time.

KG-Universal_001205

**EMPLOYMENT CLAIMS**                                    **11.26**

**11.26   Pattern Jury Question, FLSA—Employee
           or Independent Contractor**

## JURY QUESTION

## Question No. 1

Has Plaintiff [name] proved that [he/she] was an employee of Defendant [name]?

Answer "Yes" or "No."

_____

KG-Universal_001206

## 11.27  FLSA—Joint Employers

### A.  Committee Notes

This charge is for FLSA cases in which there is a fact issue about joint employment.

If an employee performs work that simultaneously benefits two or more employers, or works for two or more employers at different times during the workweek, a joint-employment relationship may arise. The common situations for finding a joint-employment relationship are:

> (1)  where there is an arrangement between the employers to share the employee's services, as, for example, to interchange employees; or

> (2)  where one employer is acting directly or indirectly in the interest of the other employer (or employers) in relation to the employee; or

> (3)  where the employers are not completely disassociated with respect to the employment of a particular employee and may be deemed to share control of the employee, directly or indirectly, by reason of the fact that one employer controls, is controlled by, or is under common control with the other employer.

29 C.F.R. § 791.2(b) (footnotes omitted).[1]

---

[1]In addition to the regulations, the U.S. Department of Labor has issued several opinion letters emphasizing that the ultimate question is one of economic dependence and suggesting additional factors to review in determining joint employment, including: the power to control or supervise the workers and work; power to hire, fire, or determine the permanency and duration of the relationship; the level of skill; whether the worker's activities are an integral part of overall business operations; where the

## B.  Charge

In this case, you must decide whether Plaintiff [name] was an employee of Defendant [name] as well as an employee of [name of alleged other employer]. You should answer this question in light of the economic realities of the entire relationship between the parties based on the evidence.

Consider the following factors to the extent you decide that each applies to this case: [specify applicable factors]:

(a)  the nature and degree of control over the employee and who exercises that control;

(b)  the degree of supervision, direct or indirect, over the employee's work and who exercises that supervision;

(c)  who exercises the power to determine the employee's pay rate or method of payment;

(d)  who has the right, directly or indirectly, to hire, fire, or modify the employee's employment conditions;

(e)  who is responsible for preparing the payroll and paying wages;

(f)  who made the investment in the equipment and facilities the employee uses; and

(g)  the employment's permanence and duration.

While no single factor is determinative, the extent of the right to control the means and manner of the

---

work is performed; the equipment used; who performs payroll for and pays the employees; and similar questions. Wage & Hour Op. Letter (May 11, 2001).

KG-Universal_001208

**11.27**                    **PATTERN JURY INSTRUCTIONS**

worker's performance is the most important factor.

KG-Universal_001209

# EXHIBIT B

# JAMS ARBITRATION
## CASE REFERENCE NO. 1220065725

**ANDRES CAMILO BOHORQUEZ**

    **Claimant,**

        **and**

**UBER TECHNOLOGIES, INC.**

    **Respondent.**

---

## ORDER NO. 6 GRANTING SUMMARY ADJUDICATION

By Order No. 3 dated March 31, 2021, and prior to any discovery being taken in this matter, Claimant was granted leave to file a dispositive motion on Uber's affirmative defense that it lawfully classified Claimant as an independent contractor under Part B of the ABC Test described below.  The Parties completed briefing on the motion on July 9. On July 19, the Arbitrator issued a Tentative Conclusions and Questions.  Claimant responded to the same on July 20.  (*See* Letter dated 7/20/21 from Rachel Bien to the Arbitrator.)  A telephonic hearing was held on July 21 and lasted approximately 90 minutes.  At the hearing and in part in response to Respondent's contention that further factual issues needed to be developed regarding Respondent's business and the work performed by Claimant, the Arbitrator gave Respondent the opportunity to comment on the accuracy and/or otherwise respond to the evidence cited in pages 11-13 of Claimant's motion.  On July 28, 2021, Respondent filed a letter indicating that it had nothing further to add.  (*See* Letter dated 7/28/21 from Mel M.C. Cole to the Arbitrator.)

### I.    Issue Presented

In *Dynamex Operations West, Inc. v. Superior Court*, the California Supreme Court adopted the so-called "ABC" test, which "presumptively considers all workers to be employees, and permits workers to be classified as independent contractors only if the hiring business demonstrates that the worker in question satisfies each of three conditions":

> (a) that the worker is free from the control and direction of the hirer in connection with the performance of the work, both under the contract for the performance of the work and in fact; and (b) that the worker performs work that is outside the usual course of the hiring entity's business; and (c) that the worker is customarily engaged in an independently established

trade, occupation, or business of the same nature as that involved in the work performed.

(4 Cal. 5th 903, 955-56 (2018).)

The gist of Claimant's motion is that "no reasonable trier of fact could conclude, based on the material facts, that Claimants' work transporting Uber customers from pick-up to drop-off is outside the usual course of Uber's business." (Claimant's Motion for Summary Adjudication of Part B of ABC Test ["Opening Brief"] at 9.) Through the motion, Claimant therefore seeks "resolution on the merits of one of Uber's affirmative defenses." (*Id*. at 2.) Claimant does not seek an adjudication of all elements of all of his claims.

A secondary issue is which of Claimant's claims are governed by Part B of the ABC Test. Respondent argues that only Claimant's Wage Order claims are governed by Part B and that their remaining claims are governed by a different, multi-factor test articulated in *S.G. Borello & Sons, Inc. v. Dep't of Indus. Relations*, 48 Cal. 3d 341 (1989). As to those claims, Respondent argues that summary adjudication is improper.

## II.    Analysis

### A.  Threshold requirement to prove that Respondent is a "Hiring Entity"

Respondent first argues that, before the ABC Test can be applied in this case, Claimant must establish that Respondent is a "hiring entity." In *People v. Uber*, the California Court of Appeal held as a matter of law that there is no threshold "hiring entity" requirement to the ABC Test. (56 Cal. App. 5th 266, 286-89 (2020).) The arbitration clause from which I derive my jurisdiction states that "The Arbitrator shall apply applicable controlling law and will issue a decision or award in writing, stating the essential findings of fact and conclusions of law." (Declaration of Rachel Bien in Support of Claimants' Motion for Summary Adjudication, Exhibit ["Exh."] 16 § 13.7.) I am therefore bound by the holding in *People v. Uber*.

Respondent counters that the holding in *People v. Uber* was in error and that Claimants are not even independent contractors of Uber; instead, they are independent "businesses" that transact with Uber, much like a seller of goods interfaces with eBay. Without some threshold showing of some type of work relationship, it argues, the ABC Test is wholly inapposite to these facts.

I find that even though the relationship between Claimant and Uber eludes easy definition, for some of the reasons explained below, Claimant was at least an independent contractor of Uber such that the ABC Test is applicable to these facts. As such, Uber is a "hiring entity." (*Dynamex*, 56 Cal. App. 5th at 288 (stating that the term "hiring entity" in *Dynamex* "covers both employment status and independent contractor status").)

KG-Universal_000073

## B.  Claimant worked in the usual course of Uber's business

California's "suffer or permit to work" definition of "to employ," which governs its wage and hour protections, "must be interpreted and applied broadly to include within the covered 'employee' category all individual workers who can reasonably be viewed as 'working in the [hiring entity's] business.'"  (*Dynamex*, 4 Cal. 5th at 953.)  Part B of the ABC Test considers whether the workers could be "reasonably viewed as providing services to the business in a role comparable to that of an employee, rather than in a role comparable to that of a traditional independent contractor."  (*Id*. at 959.)

For example, an outside plumber hired to repair a leak in the bathroom of a retail store would not be considered "part of the store's usual course of business and the store would not reasonably be seen as having suffered or permitted the plumber . . . to provide services to it as an employee."  (*Id*. at 959.)  However, cake decorators hired to work on a regular basis on a bakery's custom cakes "are part of the hiring entity's usual business operation and the hiring business can reasonably be viewed as having suffered or permitted the workers to provide services as employees."  (*Id*. at 960.)

Uber first argues that Claimants have failed to discharge their burden on summary adjudication to come forward with evidence that they provide transportation.  (Respondent Uber Technologies, Inc.'s Opposition to Claimants' Motion for Summary Adjudication of Part B of ABC Test ["Opposition"] at 29.)  Respondent might be correct that Claimants have not discharged their burden of production under applicable state or federal rules of civil procedure.  But those rules do not apply strictly in arbitration.  In any event, it is beyond reasonable dispute that, whatever other businesses Claimant may have been engaged in, he was a driver who transported riders from pick up to drop off; indeed, he is referred to as a "driver" in the Platform Access Agreement.[1]  (Exh. 16.)  The real issue is whether Uber's business is distinct from the service that Claimant provides.

Uber contends that Claimant has failed to show that "Uber is a transportation company *rather than* a technology company that develops software provided to users through multi-sided app-based platforms [emphasis added]."  (Opposition at 29.)  But I am not persuaded that Claimant must prove Uber is one or the other; Uber could be both. As long as providing rides is part of the "usual course" of—and not merely incidental to—one or more of Uber's business activities, Claimant has satisfied Prong B.  (*See Carey v. Gatehouse Media Mass. I, Inc.*, 92 Mass. App. Ct. 801, 808 (2018) ("[A] service need not be the sole, principal, or core product that a business offers its customers, or inherently essential to the economic survival of that type of business, in order to be furnished in the usual course of that business.").)

Uber next argues that it is not in the transportation business at all.  It claims that it "does not provide rides and that it does not guarantee that rides will be provided—it

---

[1] If Claimant had never transported riders using the Uber app, Respondent could and should have brought evidence of this fact to the arbitrator's attention.

KG-Universal_000074

merely offers a marketplace by which Uber uses large amounts of data to match participants on one side of the market to those on the other side, facilitating transactions between Drivers and Riders, and offering payment processing services." (Opposition at 29.) But the evidence from Uber's own documents and the deposition of Brad Rosenthal show otherwise. Unlike eBay or Angie's list, for example, Uber is not a neutral bystander that merely matches riders with drivers.

First, Uber engages in extensive screening of drivers and their vehicles. Drivers must submit to background checks and driving record checks and use a vehicle that meets specific physical and age requirements and is maintained "in a clean and sanitary condition." (Exh. 9 §§ 3.1-3.2; Exh. 11, at 12; Exh. 19, at 94-96, 99, 154.) "A driver . . . will lose access to their Uber account(s) if a routine motor vehicle record or background check uncovers a violation of Uber's Community Guidelines or other criteria required by local regulators." (Exh. 11, at 12-13.) During the COVID-19 pandemic, Uber required drivers to confirm that they are taking certain safety measures and to verify they are wearing a mask by taking a photo of themselves and sending it to Uber before they can provide a ride. (Exh. 13; Exh. 19, at 145-46.) Drivers who are not wearing a mask cannot provide rides with Uber. (*Id.*)

Second, Uber takes an active role in coordinating and limiting the interaction between riders and drivers. Customers request rides through Uber's App rather than by contacting drivers such as Claimant directly. Uber then matches riders with drivers by sending a rider's request to nearby drivers. (*See Dynamex*, 4 Cal. 5th at 965 (observing that Dynamex "notifies the drivers where to pick up and deliver the packages").) Uber's Community Guidelines further provide that "off-app pick ups are prohibited," drivers must "never solicit payment of fares outside the Uber system," and "[r]iders should not request trips from drivers outside of the Uber system." (Exh. 11, at 10.) Uber also limits the information that drivers receive about their riders and *vice versa*. (*See* Exh. 9 § 2.2; Exh. 19, at 69, 102-03.)

Uber also quotes the base fare and time and distance amounts that riders pay and determines the percentage of the fare that it takes as its Service Fee.[2] (Exh. 9, § 4; *see* Exh. 19, at 100-01.) It then collects the fare directly from the rider by charging the rider's credit card and prohibits drivers from using a rider's personal information for any reason other than providing the rider with a ride. (Exh. 9 §§ 2.2, 4; *see* Exh. 19, at 111-12.) It also uses a third-party service to mask phone numbers in the App, so drivers cannot see the actual phone numbers of their riders. (Exh. 19, at 165-66.)

Third, Uber monitors and regulates drivers to ensure the quality of service for its riders. It collects information about where riders are when they request rides, uses this information to match riders with drivers, and tracks rides to calculate charges and to address issues that arise during the ride. (Exh. 19, at 90-91; Exh. 15, at 2; *see Dynamex*,

---

[2] Although riders and drivers have the ability to negotiate a different fare, in practice, it is exceedingly rare for them to do so. (Exh. 19, at 107.)

KG-Universal_000075

4 Cal. 5th at 965 (observing that Dynamex "tracks the packages").)  It also tracks drivers' "acceptance rate" (*i.e.*, how frequently drivers accept and complete rides), cancellations, star ratings, and the number of miles they drive while using the Uber App.  (Exh. 19, at 25, 27, 53, 65, 107, 118-19, 176-78.)  It logs drivers off from the App who decline too many ride requests, sets standards for driver and rider interactions during rides, and instructs drivers on how to provide safe rides.  (Exh. 11, at 2-5, 12; Exh. 19, at 59, 61; *see* Exh. 9 § 2.5.2.)  Finally, it deactivates drivers for failing to meet its own requirements, including for having a star-rating below the average minimum as determined by Uber or for violating Uber's Community Guidelines.  (Exh. 9 §§ 2.5.2, 11.2; Exh. 11, at 1, 12; Exh. 19, at 49, 53, 57, 133-34.)

    Fourth, Uber is concerned about developing ridership business.  Uber buys advertisements and engages in marketing and promotions to attract riders.  (*See* Exh. 19, at 149-52.)  Uber has expressed a "desire that [riders] have access to high-quality services via Uber's mobile application," and reserves the right to take action against drivers who fail to provide such services.  (Exh. 9 § 2.5.2.)  Consistent with this desire, Uber sets standards of conduct for drivers regarding matters such as texting riders after a trip has been completed, delegating their services to third parties, transporting anyone other than the rider and the rider's guests, and other conduct that might be deemed discriminatory or harassing.  (Exh. 11, at 2-5.)  And it occasionally provides feedback to drivers if, for example, riders "felt uncomfortable with traffic maneuvers on a recent trip."  (Exh. 19, at 75-76.)  Finally, Uber earns a Service Fee from each ride that the driver provides—a fee that it alone determines.  Unlike the medallion owners in *Sebago v. Boston Cab Dispatch, Inc.*, 471 Mass. 321 (2015), who did not require drivers to remit a percentage of their revenue, Uber ordinarily earns a percentage of each fare and thus cannot be described as indifferent to the results of Claimant's operations.[3]  (Exh. 9, § 4; *see* Exh. 19, at 100-01, 111-12.)

    Fifth, courts interpreting Part B of the ABC Test under their state wage and hour laws also consider "the manner in which a business defines itself" publicly.  (*Carey*, 92 Mass. App. Ct. at 806-07; *see Vazquez v. Jan-Pro Franchising Int'l, Inc.*, 10 Cal. 5th 944, 1127 (2021) ("[C]ourts consider how the business describes itself").)  Uber presents itself as a ride-providing company.  For example, Uber's website invites customers to "Ride with Uber" and "[r]equest a ride, hop in, and go," and tells customers that Uber is "[a]lways the ride you want."  (Exh. 1.)

---

    [3] The one exception here is the flat-rate subscription product, which allowed drivers to pay a set amount upfront for a certain number of ride requests over a period of time.  (*See* Opposition at 12; Deposition of Brad Rosenthal ["Rosenthal Decl."] ¶ 21.)  However, the flat-rate option is an exception to Uber's normal pricing model, which is based on the number of rides accepted.  (*See* Rosenthal Decl. ¶ 21.)  It is more in the nature of a special offer rather than an indication that Respondent has no interest in the number of rides accepted or that it is not in the transportation business.  The Court of Appeal came to the same conclusion in *People v. Uber*.  (*See* 56 Cal. App. 5th at 298.)

KG-Universal_000076

Respondent may be correct that workers are not employees simply because they perform services that affect the same industry.  (Opposition at 31.)  However, Claimant has proven more than the simple fact of operating in the same industry as Uber.  And based largely on the foregoing facts, the Court of Appeal affirmed the trial court's finding in *People v. Uber* that Uber drivers "perform[] work" in the "usual course" of Uber's business.  (56 Cal. App. 5th, at 291-302.)  Although the case was decided at the preliminary injunction stage, I find the court's application of the governing law to the facts to be persuasive.  (*See id*. at 281 (noting that the trial court concluded that the People had shown an "overwhelming likelihood" of prevailing on the merits).)

For the foregoing reasons, I find that Claimants were not hired by Uber to perform short-term services that are unrelated to Uber's business offerings.  Regardless of whether it is the core, exclusive, or largest component of Uber's business (*see Carey*, 92 Mass. App. Ct. at 808), providing rides is part of the "usual course" of Uber's business.  All of the factors that *Dynamex* identified as relevant to this inquiry point to an employment relationship under California law.  (*See Dynamex*, 4 Cal. 5th at 959-61, 965-66.)

## C.  The absence of any genuine issues of material fact

Respondent argues that Claimant's motion should be denied because triable issues remain as to the facts considered above.  Although the procedural posture of this case is somewhat unusual, I am at a loss to see any remaining triable issues.

The relevant facts on which Claimant relied were drawn entirely from Respondent's own documents, publicly available documents, and from the deposition testimony of Brad Rosenthal, Director of Strategic Operational Initiatives at Uber.  (Rosenthal Depo. ¶ 2.)  Those facts—which were not controverted—are sufficient to enable me to conclude that (1) Claimant provided rides as a driver and that (2) this work was not "outside the usual course of" Uber's business.  In addition, Respondent has in its possession information about other facts that it claims need further development, such as whether Claimant ever used the Uber App and how often he opted into the flat-rate subscription plan.  (*See* Opposition at 28-29.)  Respondent could have brought such information to the Arbitrator's attention in order to substantiate any contention that triable issues remain as to those facts.

In any event, the determination I am being asked to make turns more on questions such as what it means for something to be in the "usual course" of Uber's business, or how to apply Part B to a company that does not exhibit the traditional indicia of a transportation provider because, in important respects, also functions as a technology company.  I am unable to appreciate—and Respondent has failed to explain—how more discovery or an evidentiary hearing will affect those questions.

For example, at the hearing, counsel was asked what additional evidence Uber would seek to introduce at an evidentiary hearing on the merits.  He answered that further information would be forthcoming about how Uber's business operates, Claimant's relationship to Uber, Claimant's other businesses, and to whom drivers such as Claimant

KG-Universal_000077

consider themselves to provide services.  He noted that there were also "conflicts" among the documents that created genuine issues of material fact.

But these additional facts are either cumulative or already in Uber's possession, or they go to other prongs of the ABC Test that are not at issue on this motion. Alternatively, they go to non-dispositive issues, such as whether Uber is a technology company or whether Uber provides services to drivers.  Even if Uber is a technology company or even if it provides services to drivers, this does not prevent the conclusion that Claimant performs work in the "usual course" of Uber's business.  The reason is that Uber can be a technology company *and* a provider of transportation, and its drivers can both receive services from *and* provide services to Uber.  Finally, Respondent has not described what purported "conflicts" exist in the documentation.  Without a threshold showing of those conflicts, I see no reason to deny summary adjudication.

Respondent also argued during the telephonic hearing that deciding this matter on summary adjudication solely by reference to Part B is improper because Part B must be analyzed holistically, in the context of all three prongs of the ABC Test.  I am more sympathetic to this argument because, of the three prongs, Part B seems to me the least relevant to the question of whether an individual is an employee or independent contractor.  Be that as it may, the governing law is that Respondent may not classify Claimant as an independent contractor if it fails to establish *any* one of the three prongs of the ABC Test, and I am required under the Parties' arbitration agreement to follow the law.  (Exh. 16 § 13.7.)  Nor has Respondent cited any authority for the proposition that Part B may not be considered in isolation.  Indeed, at least one court has granted summary judgment based solely on Part B.  (*See Carey*, 92 Mass. App. Ct. at 804.)

### D.  Wage and Non-Wage Order Claims

Claimants have asserted the following claims in this matter:

1. Unreimbursed expenses under Wage Order No. 9(9) and Lab. Code § 2802;

2. Unpaid minimum wages under Wage Order No. 9(4) and Lab. Code § 1194;

3. Unpaid overtime under Wage Order No. 9(3) and Lab. Code § 1197;

4. Unpaid meal and rest break pay under Wage Order No. 9(11) and (12) and Lab. Code §§ 512, 516;

5. Restitution under the Unfair Competition Law, Bus. & Prof. C. § 17200 ("UCL") based upon the above-referenced Wage Order and Labor Code violations;

6. Statutory penalties for failure to pay all wages due upon separation from employment under Lab. Code § 203;

KG-Universal_000078

7.   Statutory penalties for inaccurate wage statements under Wage Order No.
9(7) and Lab. Code § 226;

8.   Attorneys' fees and costs pursuant to Labor Code §§ 218.5, 226(e), 1194,
2802, and Civ. Proc. § 1021.5

(Letter dated 7/20/21 from Rachel Bien to the Arbitrator.)

In *Gonzales v. San Gabriel Transit, Inc.*, the Court of Appeal held that "the ABC Test applies to Labor Code claims which are either rooted in one or more wage orders, or predicated on conduct alleged to have violated a wage order," and that the California Supreme Court's holding in *Dynamex* "that the ABC Test should be applied to determine employee status under the wage orders can only mean that the same test applies to Labor Code claims seeking to enforce or advance the wage order requirements and their basic workplace protections." (40 Cal. App. 5th 1131, 1157-58 (2019).)

I find that Claimant's remaining claims are "rooted in" or "predicated on conduct alleged to have violated" a wage order. (*See id.*)  This is certainly the case for the first four and the seventh claims.  As the court in *Gonzales* observed:

[T]he failure to pay minimum wages under section 1194, which (according to section 1197), is established in the wage orders and governed by Wage Order No. 9(4).  Failure to provide meal or rest periods in violation of sections 512 and 516 is governed by Wage Order Nos. 9(11) and (12).  The failure to supply accurate wage statements and records of hours worked in violation of section 226 is encompassed by Wage Order No. 9(7), and failure to reimburse expenses and improper deductions in violation of section 2802 is encompassed by Wage Order Nos. 9(8) and (9).  Further, section 1198 makes unlawful "employment of any employee ... under conditions of labor prohibited by the [wage] order.

(*Id.*)  As to each of these claims, there is a close connection between the right protected by the applicable Wage Order provision and the relevant Labor Code section.  (*See* Claimant's Reply in Support of Motion for Summary Adjudication, at 15-18.)

Because these claims would serve as predicate violations for establishing a UCL claim, I find that Claimant's fifth claim is also rooted in or predicated on conduct allegedly violating a Wage Order.

Claimant's sixth claim based on Labor Code § 203 is likewise rooted in a Wage Order.  The Court of Appeal has held that "the ABC test articulated in *Dynamex* applies to equivalent or overlapping non-wage order allegations arising under the Labor Code." (*Gonzales*, 40 Cal. App. 5th, at 1160.)  Based on the facts and authorities presented to me, I find on balance that Section 203's purpose to ensure prompt payment of wages overlaps with the rights protected by the Wage Orders.  (*See* Opening Brief, at 10-20; *Futrell v. Payday Cal. Inc.*, 190 Cal. App. 4th 1419, 1425, 1428-31 (2011); Exh. 21.) Respondent has not offered any argument to the contrary.

KG-Universal_000079

The ABC Test also applies, where relevant, to Claimant's final claim for attorneys' fees and costs based on Labor Code §§ 218.5, 226(e), 1194, 2802, and Civ. Proc. § 1021.5. The purpose behind the provision for attorneys' fees and costs under these sections overlaps sufficiently with the rights protected in the various Wage Order provisions at issue in this case.

* * *

For the foregoing reasons, Claimant's motion for summary adjudication is GRANTED. As a result, Uber fails to establish Part B of the ABC Test and therefore also its affirmative defense that Claimant worked outside the usual course of Uber's business.

Claimant is requested to inform the Arbitrator within **two weeks** of the date hereof whether an Arbitration Management Conference should be scheduled to discuss further proceedings in this matter and, if not, what further action he proposes.

The further determinations to be made at any further hearing or based on written submissions will be embodied in a Final Award that will also incorporate the contents of this Order. It is not intended that this Order be subject to review either pursuant to 9 U.S.C. §§ 9, 10 or Cal. Code Civ. Proc. §§ 1284, 1285.

Dated: 30 August 2021

Hiro N. Aragaki
Arbitrator

KG-Universal_000080

# EXHIBIT C



24030388

F I L E D
ALAMEDA COUNTY

AUG 2 0 2021

CLERK OF THE SUPERIOR COURT
By_____
                                    Deputy

SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF ALAMEDA

| | |
|---|---|
| HECTOR CASTELLANOS, JOSEPH DELGADO, SAORI OKAWA, MICHAEL ROBINSON, SERVICE EMPLOYEES INTERNATIONAL UNION CALIFORNIA STATE COUNCIL, and SERVICE EMPLOYEES INTERNATIONAL UNION, | Case No. RG21088725

ORDER GRANTING PETITION FOR WRIT OF MANDATE |
|     Petitioners, | |
|     v. | |
| STATE OF CALIFORNIA and KATIE HAGEN, in her official capacity as Director of the California Department of Industrial Relations, | |
|     Respondents, | |
| PROTECT APP-BASED DRIVERS AND SERVICES; DAVIS WHITE and KEITH YANDELL, | |
|     Intervenors. | |

Petitioners Hector Castellanos, Joseph Delgado, Saori Okawa, Michael Robinson,

Service Employees International Union California State Council, and Service Employees

International Union petition the Court to issue a writ of mandate compelling Respondents State

1

KG-Universal_000120

of California and Katie Hagen not to enforce any provisions of the Protect App-Based Drivers and Services Act (Bus. & Prof. Code, §§ 7448 *et seq.*) as unconstitutional.  The act was adopted by the people of California directly as an initiative statute and is more popularly known as Proposition 22, as it was so denominated on the 2020 general election ballot.  The State opposes the petition, as do the proponents of Proposition 22, Protect App-based Drivers and Services, Davis White, and Keith Yandell, who have intervened as respondents in this case.  The matter came for hearing on August 20, 2021, and the Court now rules as follows.

## I.      WORKER'S COMPENSATION

The California Constitution vests in the Legislature the "plenary power, unlimited by any provision of this Constitution, to create, and enforce a complete system of workers' compensation." (Cal. Const. art. XIV, § 4.)  Petitioners argue that, by exempting workers previously classified as employees from workers' compensation, Prop 22 has infringed on the Legislature's plenary power to create a "complete" system of worker's compensation.

The Legislature has the power to include or exclude workers from the worker's compensation system.  (*See, e.g.*, Lab. Code, § 3352, subd. (a)(7) [excluding "person[s] . . . participating in sports" from worker's compensation coverage after Court of Appeal found them to be covered in *Graczyk v. Workers' Comp. App. Bd.* (1986) 184 Cal.App.3d 997].)  Before Proposition 22 went into effect, the Legislature passed an act adopting the "ABC test" for employment status, which was understood to reclassify app-based drivers as employees. (Stats. 2019, ch. 296 [hereafter "AB5"].)

The key provision of Proposition 22 provides that "[n]otwithstanding any other provision of law, including, but not limited to, the Labor Code, . . . , an app-based driver is an independent contractor and not an employee or agent with respect to the app-based driver's relationship with a network company if [certain] conditions are met." (Bus. & Prof. Code § 7451.)  This Section exempts "app-based drivers" from the "ABC" test of AB5 that would otherwise be applied to determine their status as employees or independent contractors.  As a result, app-based drivers

2

have been removed from participation in the worker's compensation system, as presently codified, because it protects only employees, not independent contractors. (*See* Lab. Code § 3600, subd. (a) ["Liability for the compensation provided by this division, . . . shall, without regard to negligence, exist against an employer for any injury sustained by his or her employees arising out of and in the course of the employment and for the death of any employee if the injury proximately causes death . . . ."].)

Proposition 22 is not an improper exercise by the people of a power entrusted only to the Legislature. The term "legislature" in Article XIV Section 4 includes the people acting through the initiative power. (*See Independent Energy Producers Assn. v. McPherson* (2006) 38 Cal.4th 1020, 1043 ["[L]ong-standing California decisions establish that references in the California Constitution to the authority of the Legislature to enact specified legislation generally are interpreted to include the people's reserved right to legislate through the initiative power . . . ."]; *Fair Political Practices Commn. v. Superior Court* (1979) 25 Cal.3d 33, 42 ["The people having reserved the legislative power to themselves as well as having granted it to the Legislature, there is no reason to hold that the people's power is more limited than that of the Legislature . . . ."].) Because the Legislature has the power to legislate in this area, the People of the State of California also have right to enact laws by statutory initiative. (*Jensen v. Franchise Tax Bd.* (2009) 178 Cal.App.4th 426, 440 ["The electorate's lawmaking powers 'are identical to the Legislature's.'"]; *see* Cal. Const., art. 4, § 1 ["The legislative power of this State is vested in the California Legislature which consists of the Senate and Assembly, but the people reserve to themselves the powers of initiative and referendum."].)

Proposition 22 is constitutionally problematic for another reason that defies such easy resolution. Petitioners and amici law professors also make the more subtle argument that the *Independent Energy Producers* case is distinguishable because the statutory initiative in that case increased the power to the Public Utilities Commission, whereas Proposition 22 limits a power vested in the state legislature by the Constitution. (*See Independent Energy Producers Assn.*,

KG-Universal_000122

*supra*, 38 Cal.4th at p.1044 fn.9.)  Article XIV, Section 4 also provides that the Legislature shall have the power to create worker's compensation laws "unlimited by any provision of this Constitution." (Cal. Const. art. XIV, § 4.)  However, the Constitution also provides that the Legislature may not act to amend or repeal an initiative statute without a subsequent vote of the people.  These two provisions are in conflict.  If the Legislature's authority is limited by an initiative statute, its authority is not "plenary" or "unlimited by any provision of [the] Constitution" (Cal. Const. art. XIV, § 4); rather, it would be limited by Article II, Section 10, subdivision (c).  The Supreme Court has held that, as an interpretive guide, the initiative power should be zealously protected and "any reasonable doubts" should be resolved "in favor of the exercise of this precious right." (*Kennedy Wholesale, Inc. v. State Bd. of Equalization* (1991) 53 Cal.3d 245, 250.)  But here, the plain language of Article XIV, Section 4 indicates that it is "unlimited by any provision of" the California Constitution.  (Cal. Const. art. XIV, § 4.)  When Section 4 was ratified in 1918, the statutory initiative power already existed in the Constitution.  The grant of plenary power to the Legislature conflicts with a limitation on its power to amend an initiative statute under Article II Section 10.  The grant of power is not "plenary" if the Legislature's power to include app-based drivers in the worker's compensation program is limited by initiative statute.  It is not "unlimited by any provision of this Constitution" if it is limited by an initiative statute.  The plain meaning of Article XIV, Section 4's plenary-and-unlimited clause governs over the more general limitation on amendment in Article II Section 10.  In short, if the People wish to use their initiative power to restrict or qualify a "plenary" and "unlimited" power granted to the Legislature, they must first do so by initiative constitutional amendment, not by initiative statute.

Proposition 22's Section 7451 is therefore an unconstitutional continuing limitation on the Legislature's power to exercise its plenary power to determine what workers must be covered or not covered by the worker's compensation system.  When the People adopted Proposition 22,

4

they expressed their intention that its provisions be severable, except that, if Section 7451 is held to be unconstitutional, the whole Act should be stricken.  (Bus. & Prof. Code, § 7467, subd. (b).)

## II.    AMENDMENTS

The California Constitution provides that the people of the state may enact laws through the initiative process.  (Cal. Const. art. II, § 8.)  When the people pass an initiative statute, the Legislature's power to amend that statute is limited by the California Constitution: "The Legislature may amend or repeal an initiative statute by another statute that becomes effective only when approved by the electors unless the initiative statute permits amendment or repeal without the electors' approval."  (Cal. Const., art. II, § 10, subd. (c).)  Because the voters have the power to limit or allow amendment to their initiative statutes, they also have the power, *a fortiori*, to attach conditions to permissible amendments.  (*See Howard Jarvis Taxpayers Assn. v. Newsom* (2019) 39 Cal.App.5th 158, 167.)

Proposition 22 also included an unusual provision allowing the Legislature to amend its provisions using an unusual procedure.  The legislature may amend Proposition 22 "by a statute passed in each house of the Legislature by rollcall vote entered into the journal, seven-eighths of the membership concurring, provided that the statute is consistent with, and furthers the purpose of, this chapter."  (Bus. & Prof. Code, § 7465, subd. (a).)  "Any statute that amends Section 7451 does not further the purposes of this chapter."  (*Id.*, subd. (c)(2).)  Proposition 22 also provides two additional specific definitions of what constitutes an amendment: "[a] statute that prohibits app-based drivers from performing a particular rideshare service or delivery service while allowing other individuals or entities to perform the same rideshare service or delivery service, or otherwise imposes unequal regulatory burdens upon app-based drivers based on their classification status" (id., subd. (c)(3)) and a "statute that authorizes any entity or organization to represent the interests of app-based drivers in connection with drivers' contractual relationships with network companies, or drivers' compensation, benefits, or working conditions" (*id.*, subd.

KG-Universal_000124

(c)(4).)  Petitioners argue that these substantive definitions of subsequent legislation as amendments is unconstitutional.

These provisions are ripe for a facial challenge.  A statute is ripe for facial challenge when it is passed and in effect.  (*Alliance for Responsible Planning v. Taylor* (2021) 63 Cal.App.5th 1072, — ["Nothing precludes resolution of the controversy, as the facial allegation does not depend on the application of the measure to a particular petitioner or future County interpretation."].)  In a facial challenge, the Court considers only the text of the statute. (*Today's Fresh Start, Inc. v. Los Angeles Cty. Off. of Educ.* (2013) 57 Cal.4th 197, 218 ["To resolve a facial challenge, we consider 'only the text of the measure itself, not its application to the particular circumstances' of this case"].)  The statute will be upheld unless the party asserting unconstitutionality shows that it is unconstitutional in any application.  (*See In re Marriage of Siller* (1986) 187 Cal.App.3d 36, 48-49.)

The Amici Curiae worker advocacy organizations separately argue that the issue is ripe because of two pieces of emergency legislation passed between October 29, 2019, and the effective date of Proposition 22.  The Legislature passed, and the Governor signed, two new laws governing working conditions and workers' compensation coverage for COVID-19 illness contracted on the job.  But no party to the case is currently challenging the constitutionality of these laws.  And the petition in this case does not challenge the constitutionality of Section 7465, subdivision (b) on the grounds that it retroactively invalidates laws duly adopted under the constitution and legislative rules then in force.  This issue is not properly before the Court and is expressly not litigated or decided by this petition.

The law professor Amici Curiae state that they have been unable in their research to find another initiative statute with amendment restrictions as stringent as Proposition 22's.  However interesting, this point is irrelevant to the legal analysis.  Everything in Section 7465 is in the nature of an exception to the default amendment rule in Article II, Section 10, Subdivision (c).  If Section 7465 had not been included, the Legislature could amend Proposition 22 by a simple

6

majority vote according to each house's rules, followed by a popular referendum.  With Section 7465 enacted, the Legislature can still amend Proposition 22 by a simple majority vote according to each house's rules, followed by a popular referendum.  (*See* Cal. Const. art. II, § 10., subd. (c).)  All Section 7465 provides is another way to amend the initiative statute, albeit one that is difficult to the point of near impossibility.

To the degree that Section 7465, subdivisions (a) and (b), attempt to apply conditions to amendments proceeding under Article II Section 10, subdivision (c)'s majority-vote-then-referendum procedure, they are unconstitutional.  To avoid the constitutional conflict, the Court should narrowly construe the "seven-eighths majority" and "consistency" requirements only to the non-referendum procedures in Section 7465, subdivisions (a) and (b).

Similarly, to the degree that Section 7465 purports to require 12 days of publication of bills amending Proposition 22, those rules may be unconstitutional to the degree they purport to apply to bills proceeding under the majority-vote-then-referendum procedure.  Each house of the Legislature is empowered to determine its own rules of proceedings.  (Cal. Const., art. 4, § 7, subd. (a).)  To avoid the constitutional conflict, the Court narrowly construes the publication rule to apply only to the non-referendum procedures in Section 7465, subdivisions (a) and (b).

Petitioners argue that Subdivisions (c)(3) and (c)(4) are unconstitutional because they interfere with the judiciary's power to say what is or is not an amendment under the California Constitution.  This is contrary to their plain language.  Both exceptions reference compliance with Section 7465, subdivisions (a) and (b), which describe an optional, no-popular-vote process for the Legislature to adopt amendments to Proposition 22.  Even if these subdivisions were susceptible to Petitioner's interpretation, the Court may avoid this constitutional conflict by construing them as clarifying definitions of the term "amendment" for that process only and not an attempt to change the definition of the term "amendment" as used in Article II, Section 10, subdivision (c).

7

KG-Universal_000126

As part of its power to allow amendment without a further vote of the people, an initiative statute can define the scope and conditions that must be met to adopt an amendment without a subsequent referendum. (*See People v. Superior Court (Pearson)* (2010) 48 Cal.4th 564, 568 ["The Legislature may not amend an initiative statute without subsequent voter approval unless the initiative permits such amendment, 'and then only upon whatever conditions the voters attached to the Legislature's amendatory powers.'"].)  There are two important constitutional limits on the people's power to limit future acts of the legislature.  Regardless of the conditions set by an initiative, it can be amended by a legislative statute if that statute is ratified by a vote of the people.  (*See* Cal. Const. art. II, § 10, subd. (c) ["The Legislature may amend or repeal an initiative statute by another statute that becomes effective only when approved by the electors . . . ."].)  The second limitation is implied by the initial grant of power: an initiative statute cannot limit subsequent legislation unless that subsequent legislation would constitute an "amendment" to the initiative, as that term is used in Article II, Section 10, subdivision (c).

A statute can constitute an amendment in several ways.  First, it can literally change or alter statutory language: "A statute amends an initiative when it is 'designed to change an existing initiative statute by adding or taking from it some particular provision.'" (*People v. Marquez* (2020) 56 Cal.App.5th 40, 46.)  But that is not the only way.  "[C]onflict with existing law is neither an essential, nor even a normal attribute of an amendment." (*Franchise Tax Bd. v. Cory* (1978) 80 Cal.App.3d 772, 776.)  A statute also constitutes an amendment if it "adds to or takes away from an existing statute is considered an amendment." (*Franchise Tax Bd.*, *supra*, 80 Cal.App.3d at p.776.)  "If its aim is to clarify or correct uncertainties which arose from the enforcement of the existing law, or to reach situations which were not covered by the original statute, the act is amendatory, *even though in its wording* it does not purport to amend the language of the prior act." (*Franchise Tax Bd.*, *supra*, 80 Cal.App.3d at p.777.)  "[T]he Legislature cannot indirectly accomplish, via the enactment of a statute which essentially amends

8

any formula adopted to implement an initiative's purpose, what it cannot accomplish directly by enacting a statute which amends the initiative's statutory provisions." (*Proposition 103 Enforcement Project v. Quackenbush* (1998) 64 Cal.App.4th 1473, 1487.)  "Any doubts should be resolved in favor of the initiative and referendum power, and amendments which may conflict with the subject matter of initiative measures must be accomplished by popular vote, as opposed to legislatively enacted ordinances, where the original initiative does not provide otherwise." (*Proposition 103 Enforcement Project*, *supra*, 64 Cal.App.4th at p.1486.)  But "The voters get only what they enacted, ' "not more and not less" '", and the Legislature "is free to address matters that are related to, but distinct from, the subjects covered by the initiative or which the initiative does not specifically permit or prohibit." (*People v. Marquez*, *supra*, 56 Cal.App.5th at p.46.)

      The briefs do not discuss the (c)(3) "unequal regulatory burdens" exception in any depth. Nevertheless, there are imaginable statutes that would constitute a direct or indirect amendment of Proposition 22.  If the Legislature, for example, passed a law requiring that an app-based driver must be an employee in order to pick up food from a restaurant, to pick up a passenger at the airport, or to drive on the public highways, it would take away from the rights guaranteed by Prop 22 even if it did not alter its language.  Resolving doubts in favor of the initiative power, Subdivision (c)(3) passes muster against a facial challenge.

      Subdivision (c)(4) is not so simple.  There is no other language in Proposition 22 that directly relates to labor representation or collective bargaining.  The Proposition proponents argue that independent contractor status is incompatible with collective bargaining: that "[o]ne of the *fundamental* issues Prop 22 addresses is the right of app-based drivers to work as independent contractors—a status that precludes them from collective bargaining under a century of state and federal law." (Proponents' Mem. P&A Opp. Pet. at p.24.)  They further argue that "[a]ny subsequent attempt by the Legislature to reimpose on app-based drivers traditional employment relationships like collective bargaining rights would 'undo' this choice." (*Ibid.*)

9

But the most maximal state law covered only by Subdivision (c)(4) would create a guild through which independent contractors would bargain collectively their contract terms and working conditions.  This may alter their bargaining power vis-à-vis the network companies they contract with, but the Court cannot find that it would diminish their "independence" or transmute them into employees.  The Court therefore finds that Subdivision (c)(4) unconstitutionally purports to limit the Legislature's ability to pass future legislation that does not constitute an "amendment" under Article II, Section 10, Subdivision (c).

Proposition 22 itself states that, to the degree that the provisions of Section 7465 are determined to be unenforceable, the People intended its remaining provisions to continue in full force and effect.  (Bus. & Prof. Code, § 7467, subd. (a).)

**III.     SINGLE-SUBJECT RULE**

Initiative statutes must be limited to a single "subject."  (Cal. Const. art. II, § 8(d) ["An initiative measure embracing more than one subject may not be submitted to the electors or have any effect."].)  Courts interpret the term "subject" liberally to uphold initiative statutes "which disclose a reasonable and common[-]sense relationship among their various components in furtherance of a common purpose."  (*Brosnahan v. Brown* (1982) 32 Cal.3d 236, 253.)  The general test is whether the parts of a statute are "reasonably germane to a common theme, purpose, or subject."  (*Brown v. Superior Court* (2016) 63 Cal.4th 335, 350.)

Proposition 22 itself tells us its purposes:  "(a) To protect the basic legal right of Californians to choose to work as independent contractors with rideshare and delivery network companies throughout the state[; ¶] (b) To protect the individual right of every app-based rideshare and delivery driver to have the flexibility to set their own hours for when, where, and how they work[; ] (c) To require rideshare and delivery network companies to offer new protections and benefits for app-based rideshare and delivery drivers, including minimum compensation levels, insurance to cover on-the-job injuries, automobile accident insurance, health care subsidies for qualifying drivers, protection against harassment and discrimination,

10

and mandatory contractual rights and appeal processes[; and ¶] (d) To improve public safety by requiring criminal background checks, driver safety training, and other safety provisions to help ensure app-based rideshare and delivery drivers do not pose a threat to customers or the public." (Bus. & Prof. Code, § 7450, subds. (a)-(d); *see also* Bus. & Prof. Code, § 746, subd. (c)(1) ["The purposes of this chapter are described in Article 1 (commencing with Section 7448)."].)

The common "theme, purpose, or subject" of Proposition 22, then, is protecting the opportunity for Californians to drive their cars on an independent contract basis, to provide those drivers with certain minimum welfare standards, and to set minimum consumer protection and safety standards to protect the public.  Worker's compensation is a benefit afforded only to employees.  (*See* Lab. Code § 3600, subd. (a) ["Liability for the compensation provided by this division, . . . shall, without regard to negligence, exist against an employer for any injury sustained by his or her employees arising out of and in the course of the employment and for the death of any employee if the injury proximately causes death . . . ."].)  The Proposition also provides different alternative insurance for on-the-job injury for app-based drivers.

No other part of Proposition 22 deals with collective bargaining rights other than Section 7465, subdivision (c)(4), and it does so only obliquely and indirectly, as a side effect of a contested construction of certain antitrust laws as barring independent contractors from bargaining collectively.  This is related to Proposition 22's subject but it is utterly unrelated to its stated common purpose.  A prohibition on legislation authorizing collective bargaining by app-based drivers does not promote the right to work as an independent contractor, nor does it protect work flexibility, nor does it provide minimum workplace safety and pay standards for those workers.  It appears only to protect the economic interests of the network companies in having a divided, ununionized workforce, which is not a stated goal of the legislation.

## IV.    FINDINGS AND ORDER

The Court finds that Section 7451 is unconstitutional because it limits the power of a future legislature to define app-based drivers as workers subject to workers' compensation law.

KG-Universal_000130

The Court finds that Section 7465, subdivision (c)(4) is unconstitutional because it defines unrelated legislation as an "amendment" and is not germane to Proposition 22's stated "theme, purpose, or subject."

Because Section 7451 is not severable from the remainder of the statute, the Court finds that the entirety of Proposition 22 is unenforceable.

The petition is therefore **GRANTED**.  Petitioners are **ORDERED** to serve and file a proposed judgment and form of writ consistent with this Order within 10 court days of service of notice of entry of this Order.

Dated: August 20, 2021

_____
Frank Roesch
Judge of the Superior Court

12

# EXHIBIT D

United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DOUGLAS O'CONNOR, et al., | Case No. 13-cv-03826-EMC |
| Plaintiffs, | Case No. 15-cv-00262-EMC |
| v. | **ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL** |
| UBER TECHNOLOGIES, INC., et al., | |
| Defendants. | *O'Connor*, Docket No. 518 *Yucesoy*, Docket No. 206 |
| HAKAN YUCESOY, et al., | |
| Plaintiffs, | |
| v. | |
| UBER TECHNOLOGIES, INC., et al., | |
| Defendants | |

## I.   INTRODUCTION

Plaintiffs brought the instant class action and putative class action against Defendant Uber

Technologies, Inc., alleging that Uber misclassifies drivers as independent contractors rather than

employees. *O'Connor v. Uber Techs., Inc.*, Case No. 13-cv-3826-EMC, Docket No. 330 (Second

Amended Complaint) (SAC) at ¶ 3; *Yucesoy v. Uber Techs., Inc.*, Case No. 15-cv-262-EMC,

Docket No. 198 (Fourth Amended Complaint) (FAC) at ¶ 2. Following three years of contentious

litigation, the parties entered into a Settlement Agreement shortly before the *O'Connor* trial was to

United States District Court
For the Northern District of California

1   begin. *O'Connor*, Docket No. 518; *Yucesoy*, Docket No. 206.[1]

2       Plaintiffs' motions for preliminary approval came on for hearing before the Court on June

3   2, 2016.  The Court has also reviewed the parties' briefing and supplemental briefing, as well as

4   the many objections challenging the adequacy of the Settlement Agreement.  It also invited and

5   considered the comments of the California Labor and Workforce Development Agency (LWDA).

6   While recognizing sizeable settlement sum and policy changes proposed by the Settlement

7   Agreement and the significant risk that drivers face in pursuing this litigation, for the reasons

8   explained below, the Court concludes that the Settlement as a whole is not fair, adequate, and

9   reasonable and therefore **DENIES** Plaintiffs' motion for preliminary approval.

10             **II.**   **BACKGROUND**

11   A.   Procedural History

12       The Settlement Agreement at issue covers two lawsuits pending before this Court.

13   *O'Connor v. Uber Technologies, Inc.* was brought on behalf of all individuals who worked as

14   Uber drivers in California.[2]  Docket No. 330 (*O'Connor* Second Amended Complaint) (SAC) at ¶

15   1.  *O'Connor* alleged that Uber misclassified its drivers as independent contractors rather than

16   employees.  As employees, drivers would be entitled to the protections of the California Labor

17   Code, including section 2802, which requires that employees be reimbursed for expenses such as

18   gas and use of their vehicle.  *Id.* at ¶¶ 3, 23.  Plaintiffs also contend that although Uber advertised

19   to customers that gratuity was included in the fare and that there was no need to tip drivers, drivers

20   did not receive the total proceeds of any such gratuity.  *Id.* at ¶¶ 1, 20.  By failing to remit the full

21   gratuity to drivers as required by California Labor Code section 351, Plaintiffs alleged that Uber

22   violated California's Unfair Competition Law prohibition on unlawful business practices, and they

23   sought to recover the portion of the gratuities that Uber withheld.  *Id.* at ¶ 34.  These claims, too,

24

25   [1] All subsequent docket numbers are based on the *O'Connor* docket, unless otherwise indicated.

26   [2] The *O'Connor* suit was originally brought on behalf of all individuals who worked as Uber
      drivers in the United States (except in Massachusetts).  *See* Docket No. 1 (Compl.) at ¶ 1.  After
27   the Court found that the California laws that the *O'Connor* Plaintiffs relied on did not apply
      extraterritorially, the *O'Connor* Plaintiffs amended their complaint to be limited to California
28   drivers.  *See* Docket No. 136 (Ord. on Motion for Judgment on the Pleadings) at 21.

KG-Universal_000086

1    are predicated on drivers being employees rather than independent contractors.

2         Uber has argued that because it exercises minimal control over how drivers set their own

3    hours and work schedule, its drivers cannot be considered employees.  Plaintiffs, on the other

4    hand, contend that Uber in fact exercised considerable control and supervision over the methods

5    and means of its drivers' provision of transportation services, making drivers employees.  *See id.*

6    at ¶ 21.

7         Over the course of contentious litigation, the Court has adjudicated a motion to dismiss, for

8    judgment on the pleadings, and for summary judgment, as well as numerous motions regarding

9    class certification, arbitration, and stays.  In its order denying Uber's motion for summary

10   judgment, the Court applied California's two-step process for determining whether a worker is an

11   employee or independent contractor.  Docket No. 251 (March 11, 2015 Summary Judgment Ord.)

12   at 6.  First, it found that drivers provide a service to Uber because Uber is ultimately a

13   transportation company, albeit a technologically sophisticated one.  *Id.* at 10-11.  The fact that

14   Uber's drivers render a service to Uber created a rebuttable presumption of employment status.

15   *Id.* at 15.  Second, the Court applied California's *Borello* multi-factor test, focusing in particular

16   on the most significant factor the putative employer's "'right to control work details.'"  *Id.* at 6

17   (quoting *S.G. Borello & Sons, Inc. v. Dep't of Indust. Relations*, 48 Cal. 3d 341, 350 (1989)).  It

18   concluded that the ultimate determination of employment status had to be decided by a jury

19   because there were disputes over material questions of fact, such as whether Uber has the right to

20   significantly control the "manner and means" of drivers' transportation services.  *Id.* at 20-25.  The

21   Court also found that a jury could reasonably find that the *Borello* test's secondary factors point in

22   opposing directions, such that the test did not yield an unambiguous result.  *Id.* at 25-27.

23        Following its denial of Uber's summary judgment motion, the Court certified the following

24   class:

25              All UberBlack, UberX, and UberSUV drivers who have driven for
                Uber in the state of California at any time since August 16, 2009,
26              and who (1) signed up to drive directly with Uber or an Uber
                subsidiary under their individual name, and (2) are/were paid by
27              Uber or an Uber subsidiary directly and in their individual name,
                and (3) did not electronically accept any contract with Uber or one
28              of Uber's subsidiaries which contains the notice and opt-out

United States District Court
For the Northern District of California

3

provisions previously ordered by this Court (including those contracts listed in the Appendix to this Order), *unless* the driver timely opted-out of that contract's arbitration agreement.

Docket No. 342 (September 1, 2015 Class Certification Ord.) at 7.  The primary effect of this order was to limit the class to individuals who did not sign the 2014 arbitration agreements, as the Court found that individualized inquiries would be needed to determine whether there was procedural unconscionability with respect to those later contracts.  *Id.* at 60-63.  The September 1, 2015 certified class included approximately 8,000 drivers out of the estimated 160,000 California drivers. *See* Docket No. 519 (April 21, 2016 Liss-Riordan Dec.) at ¶ 15; September 1, 2015 Class Certification Ord. at 5.  Further, the Court only permitted the class to pursue the gratuities claim; it did not certify the class to seek the expense reimbursement claim.  *See* September 1, 2015 Class Certification Ord. at 66-67.  Although Uber sought interlocutory review of this order, the Ninth Circuit denied Uber's petition for permission to appeal.  Docket No. 389.

The parties then filed extensive supplemental briefing concerning whether the class could be expanded to include other California drivers who signed the later arbitration agreements, as well as whether a class could be certified as to the claim for expense reimbursement under California Labor Code section 2802.  *See* Docket Nos. 359, 365.  During a hearing on an unrelated motion, Plaintiffs' counsel for the first time argued that, as to the arbitration agreements, no unconscionability analysis was necessary because the arbitration clauses included a non-severable waiver of claims brought under California's Private Attorneys General Act of 2004 (PAGA), which was invalid as a matter of public policy. *See* Docket No. 379 (Nov. 4, 2015 Trans.) at 34:9-35:15.

After further briefing on this matter and oral arguments, the Court certified the following subclass of drivers:

All UberBlack, UberX, and UberSUV drivers who have driven for Uber in the state of California at any time since August 16, 2009, and meet all the following requirements: (1) who signed up to drive directly with Uber or an Uber subsidiary under their individual name, and (2) are/were paid by Uber or an Uber subsidiary directly and in their individual name, and (3) electronically accepted any contract with Uber or one of Uber's subsidiaries which contain the notice and opt-out provisions previously ordered by this Court, and did not timely opt out of that contract's arbitration agreement.

4

Docket No. 395 (December 9, 2015 Class Certification Ord.) at 32.  This expanded the certified class to over 240,000 drivers.  *See* April 21, 2016 Liss-Riordan Dec., Exh. 1.  Both the September 1, 2015 class and December 9, 2015 subclass were certified to pursue the expense reimbursement claim, as well as the gratuities claim.  In certifying the December 9, 2015 subclass, the Court relied on *Iskanian v. CLS Transportation Los Angeles, LLC*, 59 Cal. 4th 348 (2014) and *Sakkab v. Luxottica Retail North America, Inc.*, 803 F.3d 425 (9th Cir. 2015), which had held that a waiver of PAGA claims was void as a matter of public policy.  December 9, 2015 Class Certification Ord. at 24.  The Court concluded that this PAGA waiver could not be severed from the remainder of the arbitration agreement, rendering the entire arbitration agreement void.  *Id.*  Because it relied on public policy rather than unconscionability, the Court did not engage in the procedural unconscionability analysis that defeated class certification in the original certification motion.  *Id.*[3]

Two days after the Court found that the arbitration agreement was invalid as a matter of public policy, Uber issued a new arbitration agreement (hereafter, the December 2015 Agreement) to all Uber drivers, including members of the certified subclass.  Plaintiffs in *O'Connor*, *Yucesoy*, and *In re Uber FCRA Litigation* filed separate motions to enjoin the December 2015 Agreement, arguing that it was an unauthorized communication designed to undermine or discourage participation in these and other pending cases against Uber.  *See* Docket No. 435 (Rule 23(d) Ord.)

---

[3] In analyzing the arbitration agreement, the Court noted its earlier ruling of procedural unconscionability warranted reconsideration:

> the California Supreme Court's ruling in *Sanchez v. Valencia Holding Co.*, 61 Cal. 4th 899 (2015), cast doubt on the viability of the aspects of *Gentry* on which this Court relied.  In *Sanchez*, the California Supreme Court held that the contract drafter "was under no obligation to highlight the arbitration clause of its contract, nor was it required to specifically call that clause to Sanchez's attention."  61 Cal. 4th at 914.  "Any state law imposing such an obligation would be preempted by the [Federal Arbitration Act]."  *Id.*  Thus, at the November 4, 2015 hearing on Plaintiff[s'] motion to file a Fourth Amended Complaint, the Court informed the parties that it was taking a second look at its procedural unconscionability analysis because *Gentry's* required disclosure of the disadvantages of arbitration was not necessarily consistent with *Sanchez's* ruling.  Docket No. 379 at 8:13-10:23.

December 9, 2015 Class Certification Ord. at 9-10.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    at 2.  The Court granted the motions pursuant to its Rule 23(d) "power to regulate the notice and

2    opt-out processes and to impose limitations when a party engages in behavior that threatens the

3    fairness of the litigation."  *Wang v. Chinese Daily News, Inc.*, 623 F.3d 743, 756 (9th Cir. 2010),

4    *judgment vacated on other grounds*, 132 S. Ct. 74 (2011).  The Court explained that its rulings on

5    Uber's motion for summary judgment and Plaintiffs' motions for class certification, including the

6    voiding of the arbitration clauses, created a "legal landscape [that] has become materially more

7    complicated for the drivers."  Rule 23(d) Ord. at 3-4.  While the Court explicitly declined to rule

8    on whether the December 2015 Agreement was enforceable, it did conclude that this increasingly

9    complex legal landscape required more robust notice to drivers, and ordered that the December

10   2015 Agreement could not be enforced without a revised cover letter and arbitration notice with a

11   simplified opt-out option.  *Id.* at 6-7.  Uber moved to stay the Court's order pending appeal,

12   arguing that the Rule 23(d) Order was unwarranted and burdened its First Amendment rights.

13   Docket No. 439 at 2-3.  This Court denied the motion; following an appeal of the order, the Ninth

14   Circuit also denied to motion to stay.  Docket No. 454; Case No. 16-15000, Docket No. 10.

15          Uber also moved to stay the case while it sought interlocutory review of the December 9,

16   2015 Class Certification Order, which this Court conditionally granted in part and denied in part.

17   Docket No. 411.  In that order, the Court ruled that the trial could proceed, but that it would not

18   enter a final judgment as to the December 9, 2015 subclass if the appeals were still pending.

19   Docket No. 429 at 9.  The Ninth Circuit denied Uber's motion to stay the trial proceedings

20   pending appeal.  Case No. 15-17420, Docket Nos. 5, 14.  However, on April 5, 2016, the Ninth

21   Circuit granted Uber's petition for permission to appeal the December 9, 2015 Class Certification

22   Order per Rule 23(f).  Docket No. 512 (Case No. 15-80220, Docket No. 9).  Uber immediately

23   filed a new motion for this Court to stay the case, which remains pending.

24          In the meantime, *Yucesoy* was filed on behalf of all Massachusetts drivers, bringing similar

25   claims for independent contractor misclassification, violation of the Massachusetts Tips law,

26   tortious interference with contractual and/or advantageous relations, unjust enrichment/*quantum*

27   *meruit*, breach of contract, and violation of the Massachusetts minimum wage and overtime law.

28   *Yucesoy*, Docket No. 27 (First Amended Complaint).  After the Court ruled on three motions to

6

1    dismiss, the remaining claims in *Yucesoy* are: (1) independent contractor misclassification (and

2    attendant failure to pay business expenses), (2) violation of the Massachusetts tips law, and (3)

3    tortious interference with advantageous relations. *Yucesoy*, Docket No. 198 (Fourth Amended

4    Complaint). No motion for class certification has been brought in the *Yucesoy* case.

5    B.      Settlement Agreement

6          1.      Monetary Terms

7         Shortly before the trial in *O'Connor* was scheduled to commence, the *Yucesoy* and

8    *O'Connor* Plaintiffs entered into a Settlement Agreement with Uber. Under this Agreement, Uber

9    has agreed to pay $84 million, plus an additional $16 million contingent on an initial public

10    offering (IPO) reaching one-and-a-half times Uber's most recent valuation (*i.e.*, about $93.75

11    billion). April 21, 2016 Liss-Riordan Dec., Exh. 6 (Settlement Agreement) at ¶¶ 58, 125. Of the

12    $84 million, $300,000 will be used for class administration, a maximum of $73,000 will be

13    allocated for enhancement payments to the named Plaintiffs and other Settlement Class members

14    who contributed to the litigation, and $8.7 million will be treated as wages reported on IRS Form

15    W-2. Settlement Agreement at ¶¶ 125, 129, 133. Plaintiffs' counsel is also permitted to seek a fee

16    and expense award of up to 25% of the Settlement Fund ($21 to $25 million), although Plaintiffs'

17    counsel has since informed the Court that she will reduce her fee request by $10 million.

18    Settlement Agreement at ¶ 134; Docket No. 699 at 2. The $10 million reduction is made

19    regardless of whether the $16 million contingency is triggered, thus resulting in an additional $10

20    million for distribution to the class. Docket No. 699 at 2 n.1.

21         The remaining Settlement Fund will be separated into two funds: approximately $5.5 to 6

22    million for the Massachusetts drivers, and $56 to 66.9 million for the California drivers.[4]

23    Settlement Agreement at ¶ 144. A driver must submit a claim form to receive a payment.

24    Settlement Agreement at ¶ 138. The driver's payment is based on the number of miles driven for

25    Uber. Settlement Agreement at ¶ 145. Drivers may also receive "double weight" for their

26    mileage if they opted out of Uber's 2013 and 2014 arbitration agreements, and if they are

27

28    [4] This amount does not include the $10 million that Plaintiffs' counsel has reduced her attorney's fee request by.

7

*United States District Court*
For the Northern District of California

United States District Court
For the Northern District of California

members of the *O'Connor* certified class.  Settlement Agreement at ¶ 144.  If a driver both opted

out and is a member of the *O'Connor* certified class, he or she will receive quadruple weight for

his or her mileage.  Docket No. 617 (May 20, 2016 Joint Supp. Briefing) at 4.  Assuming a 100%

claim rate, Plaintiffs' counsel estimates that California certified class members will receive an

average distribution of $24 to $1,950, California non-certified class members will receive an

average distribution of $10 to $836, and Massachusetts drivers will receive an average distribution

of $12 to $979.  April 21, 2016 Liss-Riordan Dec., Exh. 1.  For example, of the 243,320 California

drivers who were part of the certified class, if all drivers filed claims, the 122,297 drivers who

drove between 0-750 miles will receive an average distribution of $24, while the 42,074 drivers

who drove between 750-2,000 miles would receive an average distribution of $89.  On the higher

end of the scale, the 7,534 drivers who drove over 25,000 miles would receive an average

distribution of $1,950.  Of the 60,047 Massachusetts drivers, the 33,040 drivers who drove

between 0-750 miles would receive an average of $12, the 9,258 drivers who drove between 750-

2,000 miles would receive an average of $45, and the 1,489 drivers who drove over 25,000 miles

would receive an average of $979.  In sum, the vast majority of class members are slated to

receive less than $100 each from the settlement.

The parties expect a 40% claim rate, which would increase the monetary amount paid to

each claimant.  *See* May 20, 2016 Joint Supp. Briefing at 58.

2.    Non-Monetary Relief

In addition to the monetary payment, Uber has agreed to implement various forms of non-

monetary relief.  First, Uber has agreed to publish a comprehensive, written deactivation policy.

Settlement Agreement at ¶ 135(a).  Driver deactivation will only be allowed for sufficient cause,

and low passenger acceptance rates will not be grounds for deactivation (although it would subject

drivers to being logged out of the app for a limited period of time).  Settlement Agreement at ¶

135(a)(i); *see also Driver Deactivation Policy - US ONLY*, Uber,

https://www.uber.com/legal/other/driver-deactivation-us-english/ (last visited August 3, 2016)

(Uber Deactivation Policy).  A driver may still be deactivated for having a high rate of

cancellation, *i.e.*, where the driver initially accepted the fare but then canceled it (in contrast to

8

1   never accepting the fare to begin with).  *See* Uber Deactivation Policy.  Uber will also provide at

2   least two advance warnings before a driver is deactivated for reasons other than safety issues,

3   discrimination, fraud, or illegal conduct (each, an "excluded matter").  Settlement Agreement at ¶¶

4   135(a)(iii)-(iv).  If a driver is deactivated, Uber will provide the driver with an explanation for the

5   deactivation.  Settlement Agreement at ¶ 135(a)(v).  A deactivated driver may appeal the decision

6   to a Driver Appeal Panel, unless the deactivation resulted from certain circumstances such as low

7   star ratings, criminal activity, physical altercations, or sexual misconduct.  Settlement Agreement

8   at ¶ 135(a)(vi).  In addition, except for the excluded matters (*e.g.*, safety issues, discrimination,

9   fraud, or illegal conduct), drivers whose user accounts are deactivated will have the opportunity to

10  take a "quality improvement course" and be reactivated upon completion of the course.

11  Settlement Agreement at ¶ 135(a)(vii).

12          Second, Uber will provide more information regarding star ratings.  Settlement Agreement

13  at ¶ 135(d).  Uber will also "consider" changes such as informing drivers how they rank against

14  their peers, providing warnings when driver ratings go below a certain threshold, and warning

15  drivers when their user accounts are at risk of deactivation for going below a certain threshold.

16          Third, the parties stipulate to the enforceability of the December 2015 Agreement.

17  Settlement Agreement at ¶ 135(e).  In exchange, Uber will pay for the filing and administrative

18  arbitration fees in: (1) cases based on an alleged employment relationship between Uber and

19  drivers, and (2) cases arising out of a final deactivation of a driver in the event of an excluded

20  matter.  The parties also agree to stipulate to vacating (retrospectively) this Court's Rule 23(d)

21  Orders, and they agree that Uber has the option of voiding the Settlement Agreement should the

22  Court not vacate these orders.  Plaintiffs also agree to withdraw the charges filed with the National

23  Labor Relations Board (NLRB) on behalf of John Billington and Catherine London, challenging

24  the enforceability of the 2014 arbitration agreements as a violation of the National Labor Relations

25  Act, and will not further cooperate with the NLRB's investigation unless compelled by subpoena

26  or court order.  Settlement Agreement at ¶ 33.

27          Fourth, Uber will institute an internal process for drivers to raise concerns regarding the

28  payment of specific fares in California and Massachusetts.  Settlement Agreement at ¶ 135(f).

9

United States District Court
For the Northern District of California

Fifth, Uber will collaborate with Plaintiffs regarding the creation and funding of a driver association as a means of "opening a dialogue between Uber and Drivers." Settlement Agreement at ¶ 135(g). The association's leaders are to be elected by drivers, and the leaders will have the opportunity to meet quarterly with Uber management to discuss driver concerns. Settlement Agreement at ¶¶ 135(g)(iv)-(v). The driver association will not be a union, and will have no right to bargain collectively with Uber. Settlement Agreement at ¶¶ 135(g)(ii)-(iii). The parties provided little detail on how the driver association will work in practice (in part due to the expected autonomy of each driver association), including what obligations Uber will have to fund the driver association.

Finally, Uber will make good-faith efforts to clarify its messaging to riders regarding tipping, *i.e.* that tips are not included in fares (except for UberTAXI), but that they are neither expected nor required. Settlement Agreement at ¶ 135(h); May 20, 2016 Joint Supp. Briefing at 18. Drivers will be permitted to put up signs requesting tips, although the parties disagree on whether this actually constitutes a change in policy. *See* May 20, 2016 Joint Supp. Briefing at 18 n.24 ("Uber expressly disputes Plaintiffs' claim that Uber's policy with respect to tipping signage will change as a result of this settlement").

       3.    Scope of the Class and Released Claims

The Settlement Agreement covers "all Drivers in California and Massachusetts who have used the Uber App at any time since August 16, 2009, up to and including the Preliminary Approval Date." Settlement Agreement at ¶ 103. Thus, the settlement class releasing claims will not only include the *O'Connor* certified class, but (1) all California drivers for Uber including California drivers who had been excluded by the class definition, *i.e.*, drivers who drove for a third-party transportation company or who used fictitious or corporate names; and (2) all Massachusetts drivers.

Furthermore, although the *O'Connor* and *Yucesoy* cases were limited to claims based on expense reimbursement and the payment of tips, the Settlement Agreement contains an expansive release provision: it will require settlement class members – *all* drivers in California and Massachusetts – to release *all* claims based on or reasonably related to the employment

KG-Universal_000094

1    misclassification claim, *i.e.*, overtime, minimum wage, meal and rest breaks, and workers'

2    compensation. Settlement Agreement at ¶ 105.[5]  The Settlement Agreement requires that the

3    Plaintiffs file amended complaints expanding the causes of action to include all claims related to

4    the alleged misclassification of drivers as independent contractors. *See* Settlement Agreement at ¶

5    29 and Exhs. A (Proposed *Yucesoy* Fifth Amended Complaint), B (Proposed *O'Connor* Fifth

6    Amended Complaint).  As a result, the Settlement Agreement will cover claims that are brought in

7    at least fifteen other lawsuits currently pending in federal and California state courts, effectively

8    terminating those suits.[6]  Settlement Agreement at ¶ 28.  It could also affect proceedings pending

9    before various administrative bodies such as the NLRB.  *See NLRB v. Uber Techs., Inc.*, Board

10   Case Nos. 20-CA-160717, 20-CA-160720 (filed September 24, 2015) (complainants required by

11   Settlement Agreement to withdraw charges).[7]  The Settlement Agreement will also settle all civil

12   penalties potentially due under PAGA, ending in all likelihood all currently pending PAGA

13   litigation against Uber in the other lawsuits.  Settlement Agreement at ¶ 105.  Because PAGA is an

14   action on behalf of the State, the PAGA settlement included in the Settlement Agreement would

15   prohibit any other driver from bringing a PAGA claim (or obtaining relief through a PAGA

16

17   [5] Uber also contends that the release would also apply to "claims based on or reasonably relating

18   to the conduct alleged in the proposed settlement complaint, regardless of whether classification as
     an employee is technically a requirement of that claim." Docket No. 732 (July 15, 2016 Joint

19   Supp. Briefing) at 26.  For example, Uber would argue that a claim "based on or reasonably
     related to an alleged entitlement to a tip, even though that driver may or may not also allege she

20   was an Uber employee" would be released by the Settlement Agreement. *Id.* at 26-27.

21   [6] These lawsuits include: (1) *Price v. Uber Technologies, Inc.*, Case No. BC554512; (2) *Del Rio v.
     Uber Technologies, Inc.*, Case No. 3:15-cv-3667-EMC; (3) *Berger v. Uber Technologies, Inc.*,

22   Case No. 3:16-cv-41-MEJ; (4) *In re Uber FCRA Litigation*, Case No. 3:14-cv-5200-EMC; (5)
     *Ghazi v. Uber Technologies, Inc.*, Case No. CGC-15-545532; (6) *Richardson v. Uber*

23   *Technologies, Inc.*, Case No. RG15775562; (7) *Zine v. Uber Technologies, Inc.*, Case No.
     BC591351; (8) *Narsi v. Uber Technologies, Inc.*, Case No. BC599027; (9) *Tabola v. Uber*

24   *Technologies, Inc.*, Case No. CGC-16-550992; (10) *Barajas v. Uber Technologies, Inc.*, Case No.
     CGC-16-550198; (11) *Aquino v. Uber Technologies, Inc.*, Case No. BC608873; (12) *Adzhemyan*

25   *v. Uber Technologies, Inc.*, Case No. BC608874; (13) *Gollnick v. Uber Technologies, Inc.*, Case
     No. CGC-15-547878; (14) *Mokeddas v. Uber Technologies, Inc.*, Case No. RG16807483; and (15)

26   *Berwick v. Uber Technologies, Inc.*, Case No. CGC-15-546378 (appeal of Labor Commissioner
     award). *See* Settlement Agreement at ¶ 28.

27   [7] *See NLRB v. Uber Technologies, Inc.*, Case No. 16-80057-KAW (N.D. Cal.) Docket No. 31

28   (motion by Uber to stay NLRB's application for order enforcing subpoenas because of pendency
     of motion for preliminary approval of settlement herein).

11

United States District Court
For the Northern District of California

KG-Universal_000095

United States District Court
For the Northern District of California

1  representative suit) for the time period up to preliminary approval, even if that driver opts out of

2  the Settlement Agreement. *See* Docket No. 732 (July 15, 2016 Joint Supp. Briefing) at 23; Docket

3  No. 736 (Labor & Workforce Development Agency (LWDA) Resp.) at 2.

4         Finally, as noted above, the parties stipulate to the enforceability of the December 2015

5  Agreement, as well as to vacating the Court's December 2015 Rule 23(d) Order and January 19,

6  2016 Order regarding the arbitration agreement's notice provision and corrective cover letter

7  (collectively, the Rule 23(d) Orders). Settlement Agreement at ¶ 135(e). The effect of such

8  action, if agreed to by the Court, would be to retroactively strip drivers of the protections afforded

9  by this Court's Rule 23(d) order. If the Court does not agree to vacate these orders, Uber is

10  permitted to void the Settlement Agreement.

11                  **III.**   **DISCUSSION**

12  A.   Standard of Review

13         Pursuant to Federal Rule of Civil Procedure 23(e), "[t]he claims, issues, or defenses of a

14  certified class may be settled, voluntarily dismissed, or compromised only with the court's

15  approval." As the Ninth Circuit has explained, "[t]he purpose of Rule 23(e) is to protect the

16  unnamed members of the class from unjust or unfair settlements affecting their rights." *In re*

17  *Syncor ERISA Litig.*, 516 F.3d 1095, 1100 (9th Cir. 2008). Accordingly, before a court approves a

18  settlement, it must conclude that the settlement is "fundamentally fair, adequate, and reasonable."

19  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998); *see also Allen v. Bedolla*, 787

20  F.3d 1218, 1222 (9th Cir. 2015) (same). This inquiry:

21          requires the district court to balance a number of factors: the
        strength of the plaintiff's case; the risk, expense, complexity, and

22          likely duration of further litigation; the risk of maintaining class
        action status throughout the trial; the amount offered in settlement;

23          the extent of discovery completed and the stage of the proceedings;
        the experience and views of counsel; the presence of a government

24          participant; and the reaction of the class members to the proposed
        settlement.

25

26  *Hanlon*, 150 F.3d at 1026; *see also Churchill Vill. L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th

27  Cir. 2004) (same). "In determining whether the proposed settlement falls within the range of

28  reasonableness, perhaps the most important factor to consider is plaintiffs' expected recovery

KG-Universal_000096

United States District Court
For the Northern District of California

1    balanced against the value of the settlement offer." *Cotter v. Lyft, Inc.*, Case No. 13-cv-4065-VC,

2    -- F. Supp. 3d --, 2016 WL 1394236, at *4 (N.D. Cal. Apr. 7, 2016) (internal quotation omitted);

3    *see also Procedural Guidance for Class Action Settlements*, UNITED STATES DISTRICT COURT -

4    NORTHERN DISTRICT OF CALIFORNIA, http://cand.uscourts.gov/ClassActionSettlementGuidance

5    (last visited August 12, 2016).  While it is not necessarily unusual or improper for a class action

6    settlement agreement to release claims not originally brought by the plaintiff, the court must

7    consider the strength and value of those claims in deciding whether to approve the settlement.  *See*

8    *Cotter*, 2016 WL 1394236, at *4.

9         "[W]hether a settlement is fundamentally fair within the meaning of Rule 23(e) is different

10   from the question whether the settlement is perfect in the estimation of the reviewing court." *Lane*

11   *v. Facebook, Inc.*, 696 F.3d 811, 819 (9th Cir. 2012).  However, "when . . . the settlement takes

12   place before formal class certification, settlement approval requires a 'higher standard of

13   fairness.'" *Id.*; *see also Hanlon*, 150 F.3d at 1026 ("settlement approval that takes place prior to

14   formal class certification requires a higher standard of fairness [because t]he dangers of collusion

15   between class counsel and the defendant, as well as the need for additional protections when the

16   settlement is not negotiated by a court[-]designated class representative, weigh in favor of a more

17   probing inquiry than may normally be required under Rule 23(e)").  This more "exacting review"

18   is warranted "to ensure that class representatives and their counsel do not secure a disproportionate

19   benefit at the expense of the unnamed plaintiffs who class counsel had a duty to represent." *Lane*,

20   696 F.3d at 819 (internal quotation omitted).

21        In this case, because the Settlement Agreement covers the claims of both certified class

22   members and drivers who fall outside the class definition and thus have *not* been certified (for

23   example, all Massachusetts drivers and the California drivers who drove for a third-party

24   transportation company or under a corporate name), this Court must apply the more "exacting"

25   standard in determining whether this settlement is fair, adequate, and reasonable.  Further, with

26   respect to all of the drivers, the parties propose to release *all* claims related to misclassification,

27   including many which had not been brought in this case.  This not only results in the addition of

28   claims that Plaintiffs' counsel may not have fully investigated or reviewed, but would also

13

United States District Court
For the Northern District of California

1    eliminate at least fifteen other cases pending in California courts wherein the claims sought to be

2    added and waived herein are being litigated.  *See* Settlement Agreement at ¶ 28.  Thus, exacting

3    review is additionally warranted as newly added claims have not been subject to class

4    certification.  Moreover, as this Court has noted, the Court must be especially sensitive to the risk

5    of collusion or a less than full adversarial process where claims pending in other lawsuits are

6    released for minimal value, in order to induce the defendant to settle *this* case.[8]  *See* Docket No.

7    724 at 9.

8         Courts implementing Rule 23(e) have required a two-step process for the approval of class

9    action settlements: the Court first determines whether class action settlement deserves preliminary

10   approval and then, after notice is given to class members, whether final approval is warranted.  *In*

11   *re High-Tech Emp. Antitrust Litig.*, Case No. 11-CV-2509-LHK, 2014 WL 3917126, at *3 (N.D.

12   Cal. Aug. 8, 2014).  As a general matter, "there is relatively scant appellate authority regarding the

13   standard that a district court must apply in reviewing a settlement at the preliminary approval

14   stage."  *Id.*  Some district courts "have stated that the relevant inquiry is whether the settlement

15   'falls within the range of possible approval' or 'within the range of reasonableness,'" looking at

16   factors such as whether the settlement is the product of non-collusive negotiations, has no obvious

17   deficiencies, does not improperly grant preferential treatment to class representatives or segments

18   of the class, and falls within the range of possible approval.  *Id.*; *see also  Harris v. Vector Mktng.*

19   *Corp.*, Case No. C-08-5198-EMC, 2011 WL 1627973, at *7 (N.D. Cal. Apr. 29, 2011).  Although

20   the Ninth Circuit has not specified what standard should apply at the preliminary approval stage,

21   "district courts often state or imply that scrutiny should be more lax."  *Cotter v. Lyft*, Case No. 13-

22   cv-4065-VC, -- F. Supp. 3d --, 2016 WL 3561742, at *3 (N.D. Cal. June 23, 2016).

23        More recently, in *Cotter*, Judge Chhabria questioned this "lax review," finding that:

24             lax review makes little practical sense, from anyone's standpoint.  If
              the district court, by taking a quick look rather than a careful one,
25             misses a serious flaw in the settlement, the parties and the court will

26

27   ─────────────
     [8] This is not to suggest there is something inherently wrong with releases that are broader than the
     complaint; however, the reviewing court must examine, *inter alia*, the verdict value of all claims
28   released, not just those alleged in the complaint (and the benefit obtained by the defendant in
     averting existing litigation) in assessing the reasonableness of the suit.

                                              14

waste a great deal of money and time notifying class members of the agreement, only to see it rejected in the end, requiring the parties to start over. The same is true if the district court *does* identify a potentially serious flaw at the preliminary stage but waits until final approval to conclude that it's fatal. What's worse, if a court waits until the final approval stage to thoroughly assess the fairness of the agreement, momentum could have a way of slanting the inquiry, in a manner that deprives the class members of the court protection that Rule 23 demands.

*Id.* at *4. "[B]y scrutinizing the agreement carefully at the initial stage and identifying any flaws that can be identified, the court allows the parties to decide how to respond to those flaws (whether by fixing them or opting not to settle) before they waste a great deal of time and money in the notice and opt-out process." *Id.*

The Court finds Judge Chhabria's view persuasive, particularly where, as here, the class includes nearly 400,000 individuals, and thus a great deal of expense would be incurred and substantial confusion could ensue were the Settlement Agreement preliminarily approved but ultimately disapproved on final review. And, as noted above, close review is particularly warranted where Plaintiffs seek to add new claims and drivers not previously certified, and the settlement would settle not only the instant case but claims brought in at least fifteen other pending lawsuits for relatively modest value. Further, the Settlement Agreement at issue has already been the subject of numerous objections challenging its adequacy even at the preliminary approval stage. As Judge Chhabria explained, it makes little sense to apply a lax standard at the preliminary approval stage to factors already known and amenable to analysis. Instead, the Court finds it more prudent to apply with full force the factors articulated by the Ninth Circuit in *Hanlon* and *Churchill Village*, while recognizing that some of these factors – such as the reaction of class members – are not currently known and cannot be assessed at the stage of preliminary approval and thus would have to await the stage of final approval.

B.   *Hanlon* Approval Factors

    1.   Strength of the Plaintiffs' Case; the Risk, Expense, Complexity, and Likely Duration of Further Litigation; and the Risk of Maintaining Class Action Status

In considering the first three factors, the Court looks at the risks to both Plaintiffs and Uber in continuing this litigation.

15

United States District Court
For the Northern District of California

a.     Risks to Drivers

The most obvious risk to Plaintiffs is, of course, that the Ninth Circuit will uphold the validity of the arbitration provision contained in the 2013 and/or 2014 agreements, which this Court found was invalid as a matter of public policy in certifying the December 9, 2015 Subclass. *See* Ben Hancock, *Uber ADR Pact May Get Green Light*, THE RECORDER, June 16, 2016 ("A panel of federal appeals judges gave clear signs Thursday that it is ready to reverse a lower court decision finding the arbitration agreements that Uber Technologies Inc. circulated to its drivers were unenforceable"); Bonnie Eslinger, *9th Cir. Leans Toward Restoring Uber Arbitration Pacts*, LAW360, June 16, 2016.  This risk is heightened by the Ninth Circuit's decision to grant Uber's petition for permission to appeal the December 9, 2015 Class Certification Order.  *See* Docket No. 512.  A finding that one or both of the arbitration clauses is valid and enforceable would substantially change the scope and course of Plaintiffs' case, as it would likely require the vast majority of the class to go to arbitration on their non-PAGA claims, thus jeopardizing the scope and potential viability of the class action at bar.  Plaintiffs face a considerable risk that they will not proceed as a class action in any court, or at least be limited to a class action greatly reduced in size.  Even if the Ninth Circuit were to limit a finding of enforceability to the more recent contracts, and hold only the 2013 arbitration agreement not to be enforceable, this could substantially decrease the class from approximately 240,000 drivers to 8,000 drivers, dramatically lowering any class monetary recovery that Plaintiffs might obtain through the class action.  *See* April 21, 2016 Liss-Riordan Dec. at ¶ 15.  Requiring the drivers to arbitrate their claims individually will likely reduce by a substantial degree overall recovery for drivers, as typically only a fraction of individuals pursue arbitration.

In addition to this risk to maintaining class action status, as this Court has previously noted, Plaintiffs face risks on the merits of the case.  The fundamental question of whether Uber drivers are employees or independent contractors is not a simple one.  As this Court held in denying Uber's motions for summary judgment, there are factors under the *Borello* analysis that support each side's position.  While the Court found that drivers performed a service for Uber and were therefore presumptively employees, it found that questions of fact existed as to the primary

16

1   *Borello* inquiry of Uber's control over the drivers.  March 11, 2015 Class Certification Ord. at 15,

2   25.  For example, although drivers could choose their own days and hours or work, Uber

3   controlled certain aspects of driver performance; for instance, Uber could terminate individuals

4   with low acceptance rates.  *Id.* at 21-25.  Moreover, as to the secondary factors set forth in *Borello*,

5   the Court found that these factors cut both ways.  *Id.* at 25-26.  Several factors pointed in favor of

6   employment status, such as: (1) driving is an occupation that typically does not require close

7   supervision, (2) driving does not require a special skill, and (3) the drivers were performing a

8   regular and integral part of Uber's business.  *Id.* at 26.  On the other side, several factors favored

9   independent contractor status, including: (1) the drivers' use of their own vehicles, (2) the ability

10   of drivers to employ other drivers to drive on their own behalf, and (3) the drivers signing an

11   agreement stating no employment relationship was created.  *Id.*  As a result, should the issue of

12   employee versus independent contractor status proceed to trial, it would be up to the jury to make

13   the ultimate determination, the outcome of which cannot be predicted with any certainty.  *See id.*

14   at 27 (finding that "[t]he application of the traditional test of employment – a test which evolved

15   under an economic model very different from the new 'sharing economy' – to Uber's business

16   model creates significant challenges"); *Cotter*, 2016 WL 3561742, at *5 ("there is no straight

17   answer to the question whether those drivers must be classified as employees or independent

18   contractors under California law"); *cf. Alatraqchi v. Uber Techs., Inc.,*[9] Case No. 13-cv-3156-JSC,

19   Docket No. 9 at 6-9 (attaching California Labor Commissioner's August 1, 2012 decision, which

20   found that a driver was an independent contractor) *with Berwick v. Uber Techs., Inc.,* Case No. 11-

21   46739 EK (June 3, 2015), *available at*

22   http://digitalcommons.law.scu.edu/cgi/viewcontent.cgi?article=1988&context=historical (last

23   visited August 5, 2016) (performing *Borello* analysis and concluding that a driver was Uber's

24

25   [9] Of note, in *Alatraqchi*, the California Labor Commissioner found that Uber's "business was
engaged in technology and not in the transportation industry," and thus the services Alatraqchi
26   "provided were not part of the business operated by [Uber]."  *Alatraqchi v. Uber Techs., Inc.*, Case
No. 13-cv-3156-JSC, Docket No. 9 at 8.  This Court came to the oppose conclusion, finding that
27   "it is clear that Uber is most certainly a transportation company, albeit a technologically
sophisticated one.  In fact, as noted above, Uber's own marketing bears this out, referring to Uber
28   as 'Everyone's Private Driver,' and describing Uber as a "transportation system' and the 'best
transportation service in San Francisco.'"  March 11, 2015 Summary Judgment Ord. at 10-11.

17

United States District Court
For the Northern District of California

1    employee).

2            Moreover, even if drivers were determined at trial to be employees, Uber challenges

3    recovery on their claims.  For instance, with respect to the expense reimbursement claim,

4    Plaintiffs' counsel noted that Uber intended to argue that it already structured the fare to be "all-

5    inclusive that takes into account things like expenses."  April 21, 2016 Liss-Riordan Dec. at ¶ 31

6    (citing *Gattuso v. Harte-Hanks Shoppers, Inc.*, 42 Cal. 4th 554, 559 (2007) ("We conclude that an

7    employer may satisfy its statutory reimbursement obligation by paying employees enhanced

8    compensation in the form of increases in base salary or increases in commission rates, or both,

9    provided there is a means or method to apportion the enhanced compensation to determine what

10   amount is being paid for labor performed and what amount is reimbursement for business

11   expenses")).

12           Plaintiffs' counsel also notes that there is a risk as to which IRS mileage reimbursement

13   rate would apply.  Plaintiffs have argued for use of the fixed rate while Uber would likely

14   advocate for use of the variable rate, a potential reduction of 60%.  *Id.* at ¶¶ 33-34.  Further, as to

15   Massachusetts drivers, Plaintiffs perceive an additional risk because Massachusetts does not have

16   an express expense reimbursement statute, and thus recovery for expenses in Massachusetts may

17   be less likely.  Mot. at 23 n.25; May 20, 2016 Joint Supp. Briefing at 7 ("the law is not entirely

18   established in Massachusetts as to whether employees may recover unreimbursed business

19   expenses from their employers").  Similarly, Plaintiffs acknowledged risks to their tips claim,

20   should a jury find that Uber's communications indicating that "tip is included" in a fare were too

21   variable or not widespread enough to conclude that a tip was actually included.  April 21, 2016

22   Liss-Riordan Dec. at ¶ 45.

23           There are additional risks to the claims the parties seek to add to this case and for which

24   releases are sought.  First, as to meal and rest breaks, California courts have found liability for

25   failure to provide such breaks when the employer lacked a policy authorizing and permitting

26   breaks.  *E.g.*, *Benton v. Telecon Network Specialists, Inc.*, 220 Cal. App. 4th 701, 725-26 (2013).

27   But Uber states that it has set up a system in which "drivers log in and out whenever they want, so

28   that there can never be any circumstance in which a driver might feel pressure (even implicitly)

18

1   not to take a break.  In other words, Uber's entire system can be understood to constitute a policy

2   of 'permitting' or 'authorizing' breaks whenever a driver wants."  July 15, 2016 Joint Supp.

3   Briefing at 11.  There has been little argument that Uber drivers lack the freedom to choose their

4   days and hours of work (although there has been evidence of the control Uber exercises over

5   drivers when they *do* report to work), *see* March 11, 2015 Summary Judgment Ord. at 25, creating

6   a potential risk that a jury would find that Uber had not deprived its drivers of meal and rest

7   breaks.

8          Second, with respect to minimum wage and overtime, the primary question appears to be

9   whether drivers would be entitled to compensation for time spent waiting to perform a task.  *See*

10  Docket No. 724 at 11.  This Court previously dismissed with prejudice the minimum wage and

11  overtime claims in *Yucesoy*, finding that Plaintiffs had failed to plead specific facts to support their

12  claim that waiting time should be compensable.  *Yucesoy*, Docket No. 194 at 10-11.  For example,

13  there Plaintiffs did not explain how often ride requests came in, how many requests they had to

14  accept, and the magnitude of the risk of deactivation if requests were not accepted.  *Id.*  In so

15  finding, the Court looked to the Ninth Circuit's test in Fair Labor Standards Act cases, the same

16  test applied by California courts.  *Id.*; *Gomez v. Lincare, Inc.*, 173 Cal. App. 4th 508, 523 (looking

17  to the Ninth Circuit's test to determine whether an employee was free to engage in personal

18  activities while on call).[10]  While the Court does not conclude that drivers could not prevail on this

19  claim were sufficient allegations pleaded and evidence presented, there are significant risks.[11]

20         Finally, regarding the workers' compensation claims, the Court notes that the settlement is

21  not intended to release individual workers' compensation claims or personal injury claims against

22

23  [10] While the *Price* objectors cited the California Supreme Court's decision in *Mendiola v. CPS
    Security Solutions* for the proposition that "on-call or standby time may require compensation"
24  under California law, the California Supreme Court went on to explain that to determine whether
    on-call time constitutes compensable time requires a determination of the extent of the employer's
25  control.  60 Cal. 4th 833, 840 (2015).  To make this determination, the California Supreme Court
    applied the same FLSA factors that this Court used in *Yucesoy*.

26  [11] On the other hand, Uber could be found liable for waiting time given their prior policy of
    deactivating drivers for low acceptance rates, and their present policy of suspending drivers for
27  low acceptance rates.  *See* Uber Deactivation Policy.  Again, the problem with the pleadings in
    *Yucesoy* was that Plaintiffs had failed to plead sufficient facts in their complaint, despite it being
28  their fourth complaint in that action.  *Yucesoy*, Docket No. 194 at 10-11.

19

1    an employer who failed to carry workers' compensation insurance. July 15, 2016 Joint Supp.

2    Briefing at 14. Rather, what is at issue is a claim in which a driver challenges Uber's failure to

3    obtain workers' compensation insurance, and seeks to recover Uber's "savings" from not

4    obtaining such insurance under California's Unfair Competition Law (UCL). *See* Docket No. 592

5    (Ghazi Obj.) at 1-2. There is a risk that such a claim could not be enforced through the UCL, as

6    the California Supreme Court has generally found that the UCL cannot be used to recover money

7    in which the plaintiff does not have an ownership interest. *Korea Supply Co. v. Lockheed Martin*

8    *Corp.*, 29 Cal. 4th 1143-53 (2003). While the State has brought a similar claim under the UCL,

9    *see People ex rel. Harris v. Pac. Anchor Transp., Inc.*, 59 Cal. 4th 772, 775-76 (2014), it is not

10   clear that private individuals could recover under such a claim, in light of *Korea Supply Co.*[12]

11                  b.    Risks to Uber

12           While Plaintiffs thus face substantial risks both in their ability to maintain class

13   certification and on the merits, the Court reiterates that Uber also faces substantial risks of losing

14   on the misclassification question. As noted above, in its March 11, 2015 Summary Judgment

15   Order, this Court held, as a matter of law, "Uber's drivers render service to Uber, and thus are

16   Uber's presumptive employees." March 11, 2015 Summary Judgment Ord. at 15. Thus, the

17   burden is on Uber to disprove an employment relationship, both in California and in

18   Massachusetts. *Id.* at 16; *see also Sebago v. Boston Cab Dispatch, Inc.*, 471 Mass. 321, 327

19   (2015) ("an individual performing any service is presumed to be an employee[, and t]he purported

20   employer may rebut the presumption of employment by establishing . . . three indicia of an

21   independent contractor relationship") (internal quotations omitted). While Uber has emphasized

22   that drivers are free to pick and choose when they work, this Court has found that this freedom

23

---

24   [12] As for the remaining claims, some require a finding of willfulness (*e.g.*, Cal. Lab. Code § 203
25   ("[i]f an employer *willfully* fails to pay . . . any wages of an employee who is charged or who
     quits") (emphasis added); Cal. Lab. Code § 1174.5 ("Any person employing labor who *willfully*
26   fails to main the records required . . . shall be subject to a civil penalty of five hundred dollars
     ($500)") (emphasis added); Cal. Lab. Code § 226.8 (concerning "willful misclassification")) or
27   injury (*e.g.*, Cal. Lab. Code § 226(e)(1) (requiring injury for failure to furnish accurate wage
     statement to be entitled to recover damages or penalty), while other claims have problems of proof
28   (*e.g.*, April 21, 2016 Liss-Riordan Dec. at ¶ 75 (no evidence that Uber delays final payment to
     deactivated drivers).

*United States District Court*
For the Northern District of California

KG-Universal_000104

1    does not preclude a finding of an employment relationship, as the more relevant inquiry is how

2    much control Uber exercises over drivers *while* they are on duty for Uber.  March 11, 2015

3    Summary Judgment Ord. at 25.   Judge Chhabria recognized in *Cotter* that:

4              although a jury could be tempted to conclude that people who drove
               only sporadically for Lyft should be independent contractors, it
5              seems equally likely that the jury could analogize Lyft drivers to
               restaurant workers who work in multiple venues, but only
6              occasionally at each particular venue.  There is no dispute that,
               under California law, someone who picks up a couple of restaurant
7              shifts here and there is an 'employee' of that restaurant (along with
               any other restaurant where he works").

8

9    *Cotter*, 2016 WL 1394236 at *11.  And just as Judge Chhabria found that "if the jury reached a

10   similar conclusion about Lyft drivers, the consequences for Lyft would be enormous," the Court

11   concludes that the consequence for Uber of an adverse jury verdict would be substantial.  *Id.*

12          Next, even if Uber were to prevail on its argument that the 2013 and/or 2014 arbitration

13   agreements were enforceable, it would face substantial risks and costs absent settlement.  First,

14   PAGA claims[13] cannot be compelled to arbitration.  *See Iskanian*, 59 Cal. 4th at 360; *Sakkab*, 803

15   F.3d at 431-40.[14]  Thus, the employment classification question could still be decided by this or

16   another court in the adjudication of a PAGA claim.  *See* Docket No. 593 (Richardson Obj.).[15]

17   Should a court conclude that Uber drivers are, in fact, employees, both Plaintiffs and the LWDA

18   conclude the statutory penalty against Uber would exceed $1 billion.  *See* LWDA Resp. at 3.

19

20   [13] This Court has not ruled on whether Plaintiffs may bring PAGA claims for violations of
     California Labor Code sections 351 and 2802; the issue remains under submission in *O'Connor*.
21   *See* Docket No. 401 at 5.

22   [14] While Plaintiffs have suggested that there is a "significant risk" that the Supreme Court will
     determine that PAGA claims are arbitrable, *see* July 15, 2016 Joint Supp. Briefing at 27 n.26, the
23   Supreme Court has twice denied review of *Iskanian*'s holding.  *CLS Transp. L.A., LLC v.
     Iskanian*, 135 S. Ct. 1155 (2015) (denying petition for writ of certiorari); *Carmax Auto
24   Superstores Cal., LLC v. Areso*, No. 15-235, 2015 WL 5005244, at *1 (U.S. Dec. 14, 2015)
     (denying petition for writ of certiorari on the question of whether *Iskanian* is preempted by the
25   FAA).

26   [15] There is a substantial likelihood that a PAGA suit would not be stayed pending arbitration.  If
     the PAGA representative has opted out of arbitration, there is no obvious basis for a stay.  Even if
27   the representative has not opted out and thus has both nonarbitrable and arbitrable claims to
     prosecute, the decision to stay pending arbitration rests with the court's discretion.  *See ESAB
28   Grp., Inc. v. Zurich Ins. PLC*, 685 F.3d 376, 394-95 (4th Cir. 2012); *United Commc'ns. Hub, Inc.
     v. Qwest Commc'ns. Inc.*, 46 Fed. Appx 412, 415 (9th Cir. 2002).

                                    21

United States District Court
For the Northern District of California

1    Further, such a PAGA judgment could have an influential and perhaps even binding effect on

2    Uber in arbitration.  In *Arias v. Superior Court*, 46 Cal. 4th 969, 985 (2009), the defendants argued

3    that it would be unfair not to impose class action requirements for PAGA claims because "the

4    defendant would be a party to every lawsuit while each of the various plaintiffs would be a party

5    in only one lawsuit, [and therefore] the defendant would in later lawsuits be bound by any adverse

6    determination of the common issues, while none of the plaintiffs would be similarly bound by

7    prior determinations in the defendant's favor."  The California Supreme Court concluded,

8    however, there was no unfairness because a PAGA judgment would be "binding not only on the

9    named employee plaintiff but also on government agencies and any aggrieved employee not a

10   party to the proceeding."  *Id.*

11       Second, if one or more drivers were not bound by arbitration (*e.g.*, because like the class

12   representatives in *O'Connor*, they opted out of arbitration), they would be free to litigate the

13   merits of their claims, again raising the prospect that were Uber to lose on the merits of the

14   classification question, that judgment would affect the outcome of arbitrations.  Simply put,

15   without the benefit of the release and waiver conferred by the Settlement Agreement, Uber still

16   faces a substantial risk of litigation.

17       Further, even if the class were wholly or partially decertified and hundreds of thousands of

18   drivers were remitted to arbitration, if even a fraction of the 380,000 drivers invoked arbitration,

19   the mere transactional costs for Uber (in the absence of the broad release effected by the

20   Settlement Agreement) of arbitrating thousands of cases would be substantial, not to mention the

21   risks of findings of liability and imposition of damages (which for any driver could well be ten

22   times greater than the award scheduled under the Settlement Agreement) by the arbitrators.

23       2.    The Amount Offered in Settlement

24            a.    Monetary Amount

25       Under the Settlement Agreement, Uber has agreed to make an $84 million guaranteed

26   payment (including a $1 million payment for PAGA), as well as a $16 million payment contingent

27   on the success of an IPO.  As an initial matter, the Court cannot consider the $16 million

28   contingent payment as part of the settlement amount because there is no information on the

22

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    likelihood that this contingency will be triggered.  At the June 2, 2016 hearing, Uber stated that

2    the $16 million payment was "very likely" based on public reports about Uber's cash infusions

3    and analysts' reports.  *See* Docket No. 691 (June 2, 2016 Trans.) at 35:17-36:1.  However, when

4    the Court requested this public information, Uber stated that "it would not be proper for Uber to

5    provide such information."  July 15, 2016 Supp. Briefing at 25.  While Plaintiffs provide a number

6    of articles, none of the articles address the likelihood that an Uber IPO will yield an average

7    valuation of at least 1.5 times Uber's most recent valuation within 365 days from the closing of

8    the IPO.  *See* Docket No. 733 (July 15, 2016 Liss-Riordan Dec. at 10 n.4).  Thus, absent a

9    showing that there is a realistic likelihood that the additional $16 Million will be realized, the

10   Court will only consider the $84 million monetary amount in assessing the adequacy of the

11   Settlement Agreement.

12          By comparison, Plaintiffs have estimated that the verdict value of the non-PAGA claims

13   being released are:

| CLAIM: | VALUE: |
|---|---|
| Expense Reimbursement (Mileage)[16] | $700 million |
| Expense Reimbursement (Phones) | $30 million |
| Tips | $122 million |
| Overtime | $2.4 million |
| Total: | $854.4 million |

19   Mot. at 24; *see also* April 21, 2016 Liss-Riordan Dec. at ¶ 57.  For all other non-PAGA claims,

20   Plaintiffs' counsel attributes no value on the basis that "there would be a substantial risk of no

21   recovery on this claim."  As discussed above, the Court agrees with Plaintiffs that there were

22   substantial risks as to the breaks claims, minimum wage and overtime claims, and workers'

23

24   [16] The mileage provided for the expense reimbursement estimate were produced as a part of
25   discovery, prior to settlement discussions, and covered the period up to April 8, 2016.  July 15,
     2016 Joint Supp. Briefing at 9; April 21, 2016 Liss-Riordan Dec. at ¶ 35.  In responding to
26   discovery, the parties are required to be truthful, and counsel is ethically bound to ensure truthful
     responses.  July 15, 2016 Joint Supp. Briefing at 9.  Further, Plaintiffs' counsel represents that
27   they analyzed the total mileage recorded in the trip histories of Plaintiffs Manahan and Gurfinkel,
     compared these numbers to the mileage produced by Uber, and found that the figures lined up
28   "almost exactly," with differences of less than .2%.  *Id.* at 9 n.13; July 15, 2016 Liss-Riordan Dec.
     at ¶¶ 7-8.

KG-Universal_000107

1    compensation claims, and it was therefore reasonable for Plaintiffs' counsel to assign no or little

2    value to these claims when considering the overall full-verdict value. *Compare with Cotter*, 2016

3    WL 3561742, at *5 (finding that failure to assess value of a particular gratuity claim "does not

4    automatically invalidate the settlement they reached. If the unconsidered claims are not

5    particularly strong or valuable, such that they're not likely to have materially influenced the

6    overall settlement, counsel's failure to consider the claims would not be a basis for rejecting the

7    agreement").

8            After considering the information provided to the Court in response to the Court's order

9    for supplemental briefing, the Court concludes that the parties' assessment of the value of all the

10   non-PAGA claims is reasonably accurate. Thus, looking solely at the monetary relief, the

11   settlement of $84 million constitutes about 10% of the full verdict value of the non-PAGA claims

12   – *i.e.* a 90% discount off the verdict value of the non-PAGA claims. This substantial discount is

13   well illustrated by the case of Ms. Berwick, who drove 6,468 miles and was awarded $3,878.08 in

14   unreimbursed expenses by the California Labor Commissioner, would likely receive

15   approximately $455 if she was a California class member, or $195 if she was a California non-

16   class member. *See* Liss-Riordan Dec. Exh. 1 (average distributions); *Berwick v. Uber Techs., Inc.*,

17   Case No. 11-46739 EK.

18                   b.      Non-Monetary Relief

19           The Settlement Agreement is, of course, not limited to the $84 million payment, but

20   includes a number of non-monetary relief that also provide benefits to the class. However, much

21   of this non-monetary relief is not as valuable as the parties suggest, limiting their worth in

22   considering the amount being offered in settlement.

23           First, Uber has agreed to "promulgate a comprehensive written deactivation policy," which

24   will permit deactivation only for sufficient cause. Settlement Agreement at ¶ 135(a). Notably, a

25   driver can no longer be deactivated because of low acceptance rates. Settlement Agreement at ¶

26   135(a)(i); *see also* Uber Deactivation Policy. This is a significant change from prior contracts

27   which seemed to allow Uber to fire its drivers for any reason at any time. *See* March 11, 2015

28   Summary Judgment Ord. at 20. But while Uber will no longer deactivate drivers because of low

24

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1   acceptance rates, it will still exercise substantial control over a driver's ability to accept or decline

2   ride requests, as the deactivation policy still permits Uber to "temporarily . . . log[ a driver] out of

3   the app for a limited period of time" based on low acceptance rates.  Uber Deactivation Policy; *see*

4   *also* Travis Kalanick, *Growing and Growing Up*, UBER NEWSROOM (Apr. 21, 2016),

5   https://newsroom.uber.com/growing-and-growing-up/ ("As part of the settlement, Uber has agreed

6   not to deactivate drivers who regularly decline trips when they are logged into the app. . . .

7   [W]here drivers do have low acceptance rates . . . we will alert them to the issue.  If things don't

8   pick up, we may log them out of the app for a limited period of time").

9         Moreover, although Uber has added a Driver Appeal Panel to which a deactivated driver

10   can appeal a deactivation decision, as well as agreed to pay for the arbitration costs of a challenge

11   to a final deactivation decision in the event of an "excluded matter," both these avenues of review

12   leave out an important reason for deactivation – low star ratings.  Plaintiffs' counsel noted that star

13   ratings are "a frequent reason for deactivation." June 2, 2016 Trans. at 84:12-13.  While star

14   ratings based on customer reviews might seem to be a relatively objective basis upon which Uber

15   may deactivate a driver without an appeal process, but there may be value to such a process.  For

16   instance, Uber has expressed concern about bias and subjectivity on the part of passengers with

17   respect to tipping; deactivations based on star ratings could likewise be subject to the same bias

18   and subjectivity. *See* June 2, 2016 Trans. at 85:9-16.

19         Second, the Court is not convinced that the change to tipping policy will result in the

20   "substantially increased income" that Plaintiffs' counsel promises. *See* May 20, 2016 Joint Supp.

21   Briefing at 16.  Plaintiffs' counsel suggests that if passengers tip 5% on average, Uber drivers

22   would have earned an additional $125 million since 2009.  Docket No. 611 (Plaintiffs' Resp. at

23   21).  In support of this assertion, Plaintiffs cite Lyft's model, where customers have tipped drivers

24   more than $85 million since the company's founding.  May 20, 2016 Joint Supp. Briefing at 16.

25   Plaintiffs' $125 million valuation suffers a number of flaws.  As an initial matter, it relies on a

26   100% tipping rate, which is highly unlikely given that even Lyft, which includes an *in-app* tipping

27   function (thus making it clear to riders that tipping is not already included in the fare), only has a

28   70% tipping rate. *See* Plaintiffs' Resp. at 21 n.18.  By contrast, Uber has made it clear that it will

KG-Universal_000109

United States District Court
For the Northern District of California

1    not add an in-app tipping function, thus requiring riders to tip using cash (which many riders may

2    not have readily on-hand, given Uber's emphasis on the cashless transaction).[17]  Importantly,

3    while Uber has agreed to "clarify" its tipping policy to make clear that tips are not included in the

4    fare, it has also actively *discouraged* tipping, arguing that it is inconsistent with its business

5    model, drivers' interests, and a positive rider experience.  May 20, 2016 Joint Supp. Briefing; *see*

6    *also Our Approach to Tipping*, UBER UNDER THE HOOD (Apr. 28, 2016),

7    https://medium.com/uber-under-the-hood/our-approach-to-tipping-aa0074c0fddc#.wb66dqmuq.

8    In other words, Uber may be permitting tipping, but it is also telling riders *not* to tip, further

9    decreasing the amount of tips that riders are likely to give.  Given the lack of an in-app tipping

10   function and Uber's active dissuasion of tipping, the value of this tipping policy (which Uber

11   strenuously disputes is even a change, *see* May 20, 2016 Joint Supp. Briefing at 18) is, while not

12   meaningless, not nearly as valuable as Plaintiffs suggest.  The fact that no in-app tipping function

13   will be included will also make it difficult, if not impossible, to measure the effectiveness of the

14   new tipping policy.

15          Finally, the parties have stipulated to the enforceability of the December 2015 Agreement

16   and that this Court's Rule 23(d) Orders be vacated.  Settlement Agreement at ¶ 135(e).  Although

17   included as part of the non-monetary relief, this portion of the Settlement is an additional benefit

18   to Uber, not the class, and the Settlement Agreement is voidable at Uber's option should the Court

19   not vacate its prior orders.  By stipulating to the enforceability, drivers will be prevented from

20   challenging the validity of the December 2015 Agreement, even in cases unrelated to employment

21   misclassification such as whether arbitration would violate the National Labor Relations Act or on

22   the ground that it denies a class member a contractual right to effectual relief, a claim that has

23   been brought in *Congdon v. Uber Technologies, Inc.*, Case No. 16-cv-2499-YGR.  *See* July 15,

24   2015 Joint Supp. Briefing at 27.

25          Further, as expressed at the June 2, 2016 hearing, the Court is concerned about

26

27   ――――――――――――――――

28   [17] Furthermore, for safety reasons, drivers may not carry much cash with which to make change if
a rider decides to tip but does not have the appropriate denominations in hand.  Requiring drivers
to handle cash (or at least the public perception thereof) could also raise safety concerns.

KG-Universal_000110

United States District Court
For the Northern District of California

1   retroactively vacating its orders and the potential impact on the due process rights of drivers who

2   may not have opted out of the December 2015 Agreement in reliance on those orders. *See* June 2,

3   2016 Trans. at 117:2-25. This is because the Court's Rule 23(d) Order specifically held that Uber

4   could not enforce the December 2015 Agreement until it added more robust cover letter and notice

5   provisions, and thus a driver was not required to exercise his or her opt-out right until Uber

6   complied with Court's directives. Rule 23(d) Ord. at 6-7. Uber did not comply with the order. To

7   retroactively revoke the protection that this Court imposed to protect the rights of drivers without

8   affording drivers a right to now opt-out would be to put a driver in a worse position than if the

9   Court had not issued the Rule 23(d) Orders at all. Such retroactive elimination of protection

10   afforded by the Court could raise due process issues. *Cf. Gen. Motors Corp. v. Romein*, 503 U.S.

11   181, 191 (1992) ("Retroactive legislation presents problems of unfairness that are more serious

12   than those posed by prospective legislation, because it can deprive citizens of legitimate

13   expectations and upset settled transactions"); *Landgraf v. Usi Film Prods.*, 511 U.S. 244, 266

14   (1994) ("The Due Process Clause also protects the interests in fair notice and repose that may be

15   compromised by retroactive legislation; a justification sufficient to validate a statute's prospective

16   application under the Clause may not suffice to warrant its retroactive application") (internal

17   quotation omitted). Further, vacating this Court's Rule 23(d) would effectively circumvent and

18   nullify both this Court's and the Ninth Circuit's denial of Uber's motions to stay the Court's Rule

19   23(d) Orders on January 8 and January 13, 2016, respectively.

20          3.   <u>The Extent of Discovery Completed and the Stage of the Proceedings</u>

21        The parties entered into the Settlement Agreement shortly before the *O'Connor* case was

22   to go to trial, after having litigated two class certification motions and two summary judgment

23   motions, as well as submitted their trial plans in preparation for trial. During this time, the parties

24   conducted a significant amount of discovery, including a combined 326 Requests for Production,

25   216 interrogatories, 71 requests for production, and multiple depositions, including depositions of

26   Uber's Senior Vice President of Operations, Ryan Graves, and five named plaintiffs. April 21,

27   2016 Liss-Riordan Dec. at ¶ 4. In addition, the parties exchanged discovery prior to settlement

28   discussions. *Id.* at ¶ 25; *see also* July 15, 2016 Joint Supp. Briefing at 6.

27

4.    The Experience and Views of Counsel

This Court previously found that Plaintiff's counsel is a "capable advocate" and a leading practitioner in the field of employment misclassification.  September 1, 2015 Class Certification Ord. at 66.  Plaintiff's counsel has strongly advocated for preliminary approval of the Settlement Agreement, particularly after considering the risks of this Court's arbitration orders being overturned, and even offered to reduce her fees by $10 million so that these funds could be distributed to the class, regardless of whether the $16 million contingent payment is triggered. Docket No. 699 at 2.  However, as noted above, deference to the views of counsel must be tempered here where the Settlement Agreement at the eleventh hour folds in new claims and class members at the expense of litigation pending in other courts, while attributing almost no value to those claims, in order to induce Uber to settle the cases at bar.

5.    The Presence of a Governmental Participant

In general, there has been no governmental participant in this case.  However, as will be more fully discussed below, the California LWDA has, at the invitation of the Court, submitted a letter regarding the PAGA claim, in which it expresses serious reservation about the $1 million allocated to the newly added PAGA claim.  *See* LWDA Resp. at 3.

6.    The Reaction of the Class Members to the Proposed Settlement

Plaintiffs' counsel submits that since the announcement of the settlement, her firm has received feedback from more than 2,500 drivers; of these, 1,797 e-mails were from drivers wanting to confirm they were in the class or asking how to submit a claim.  71 class members expressed support for the Settlement Agreement, while 33 class members expressed negativity towards the Settlement Agreement.  Docket No. 613-1 (Mason Dec.) at ¶¶ 8, 12, 13, 15.  However, even at this preliminary state, this Court has received (and continues to receive) numerous objections, filed both by individuals and attorneys representing drivers in other California cases. *E.g.*, Docket No. 529, 536-540, 546-548, 551-553, 556, 559, 561, 567, 569-571, 579, 581, 582, 584, 592, 594, 599, 601-604, 626, 652, 662, 688, 675, 690, 737.  These objectives are in addition to five motions to intervene and one motion to disqualify Plaintiffs' counsel.  Docket Nos. 588, 591, 627, 637, 644, 677.

28

1      7.      Balancing the Factors

2           Balancing the *Hanlon* factors, the Court agrees with Plaintiffs' assessment that there is a

3  substantial risk on the arbitration question in light of the Ninth Circuit's actions thus far, a risk that

4  many of the objectors fail to appreciate.  This risk would have the effect of substantially altering –

5  if not effectively terminating – the class action in this Court, as well as in pending state court

6  cases.  These risks could well render a settlement providing for monetary relief reflecting a 90%

7  discount off the verdict value along with limited non-monetary relief fair and adequate.  Indeed,

8  while at the low end of reasonable recovery,[18] the Court would be inclined, after weighing the

9  *Hanlon* factors, to find the consideration afforded by the settlement to be adequate for release of

10  the non-PAGA claims.[19]  However, the parties' inclusion of waiver of PAGA claims as part of the

11  settlement considerably alters the Court's assessment of the fairness and adequacy of the

12  settlement as a whole.

13  C.     Private Attorneys General Act (PAGA)

14           In 2003, California enacted the Private Attorneys General Act of 2004.  *Arias*, 46 Cal. 4th

15  at 980.  As explained by the LWDA:

16           By creating a cause of action under which private plaintiffs may
17           recover civil penalties otherwise recoverable by the state, PAGA
               benefits the public by augmenting the state's enforcement
18           capabilities, encouraging compliance with Labor Code provisions,
               and deterring noncompliance.  This furthers the state's policy to
19           protect workers from substandard and unlawful conditions and also
               to protect employers "who comply with the law from those who

20

21  _____

    [18] *Compare Harris v. Vector Mktg. Corp.*, 2011 U.S. Dist. LEXIS 117927, at *15 (N.D. Cal. Oct.
22  12, 2011) (denying final approval of a settlement where the actual payout to the class was 6.56%
    of the maximum verdict value) and *Cotter*, 2016 WL 1394236, at *8, 11 (denying preliminary
23  approval of a settlement where the settlement was 8.82% of the reimbursement claim, and finding
    that the settlement must be increased to 17% of the value of the reimbursement claim); *with*
24  *Dunleavy v. Nadler (In re Mego Fi. Corp. Sec. Litig.)*, 213 F.3d 454, 458-59 (9th Cir. 2000)
    (finding that settlement for approximately 16.67% of the potential recovery was adequate where
25  the district court had "properly found that the Plaintiffs' case was weak and the risk, expense, and
    complexity of trial weighed against them").

26  [19] The Court's reservations would lay primarily with the stipulation that the Court vacate
27  retroactively its Rule 23(d) orders.  The Court also questions the parties' refusal to provide for an
    easier Rule 23 opt-out mechanism (*e.g.* using e-mail, opt out forms, or hyperlinks), which would
28  not require drivers to send a written letter by traditional mail to the administrator in order to opt
    out.

                                        29

United States District Court
For the Northern District of California

1    attempt to gain a competitive advantage at the expense of their
workers by failing to comply with minimum labor standards."

2    LWDA Resp. at 2 (quoting Cal. Lab. Code § 90.5(a)); *see also Arias*, 46 Cal. 4th at 980

3    (explaining that in passing PAGA, "[t]he Legislature declared that adequate financing of labor law

4    enforcement was necessary to achieve maximum compliance with state labor laws, that staffing

5    levels for labor law enforcement agencies had declined and were unlikely to keep pace with the

6    future growth of the labor market, and that it was therefore in the public interest to allow

7    aggrieved employees, acting as private attorney generals, to recover civil penalties for Labor Code

8    violations"). The California Supreme Court has also recognized that "PAGA was clearly

9    established for a public reason," such that a prohibition of a representative PAGA action would be

10   contrary to public policy. *Iskanian*, 59 Cal. 4th at 383; *see also id.* at 383 (explaining that a pre-

11   dispute PAGA waiver "serves to disable one of the primary mechanisms for enforcing the Labor

12   Code").

13        A plaintiff who brings a PAGA claim "does so as the proxy or agent of the state's labor

14   law enforcement agencies." *Arias*, 46 Cal. 4th at 986. Because the "plaintiff represents the same

15   legal right and interest as state labor law enforcement agencies," the California Supreme Court has

16   found that "a judgment in an employee's action under the act binds not only that employee but

17   also the state labor law enforcement agencies." *Id.* In short, because the employee's PAGA

18   action acts as a "substitute" for a governmental action, the judgment binds all those who would be

19   bound by an action brought by the government, *including* nonparty employees. *Id.* Thus, in a

20   lawsuit which asserts a PAGA claims and seeks class certification for labor/wage claims, even

21   class members who opt out of the class would be bound by an adverse PAGA judgment or

22   settlement. For that reason, the LWDA rightly has stressed that:

23        It is thus important that when a PAGA claim is settled, the relief
provided for under the PAGA be genuine and meaningful, consistent
24        with the underlying purpose of the statute to benefit the public and,
in the context of a class action, the court evaluate whether the
25        settlement meets the standards of being 'fundamentally fair,
reasonable, and adequate' with reference to the public policies
26        underlying the PAGA.

27   LWDA Resp. at 2-3.

28        Here, Plaintiffs seek formally to add the PAGA claim to the suit and settle it for $1 million,

30

1    despite having previously argued that the PAGA claim could result in penalties over $1 *billion*.

2    April 21, 2016 Liss-Riordan Dec. at ¶ 82. As noted above, the LWDA also concludes that the

3    verdict value of the PAGA claim in this case exceeds $1 billion. *See* LWDA Resp. at 3 ("LWDA

4    believes it is accurate to estimate the potential PAGA penalty exposure as in excess of $1

5    billion"). This $1 billion amount makes up more than half of the total verdict value of the case.

6    Plaintiffs propose settling the PAGA claim for **0.1%** of its estimated full worth. The Court is

7    cognizant that even if a verdict were rendered for PAGA plaintiff(s), a penalty of $1 billion could

8    well be reduced, as a court may reduce the penalty when "to do otherwise would result in an

9    award that is unjust, arbitrary and oppressive, or confiscatory." Cal. Lab. Code § 2699(e)(2).[20]

10   Nonetheless, as the LWDA concludes, there is "no rationale for allocating $1 million of the

11   proposed settlement fund to the PAGA claim . . . other than that this is a 'round' number and a

12   large figure in comparison to other PAGA settlements." *Id.* The parties have failed to

13   demonstrate how the *Hanlon* factors or any other coherent analysis justifies settling the PAGA

14   claim for such a relatively meager value.

15        It is important to note that where plaintiffs bring a PAGA representative claim, they take

16   on a special responsibility to their fellow aggrieved workers who are effectively bound by any

17   judgment. *See Iskanian*, 59 Cal. 4th at 381 ("When a government agency is authorized to bring an

18   action on behalf of an individual or in the public interest, and a private person lacks an

19   independent legal right to bring the action, a person who is not a party but who is represented by

20   the agency is bound by the judgment as through the person were a party"). Such a plaintiff also

21   owes responsibility to the public at large; they act, as the statute's name suggests, as a private

22   attorney general, and 75% of the penalties go to the LWDA "for enforcement of labor laws . . .

23   and for education of employers and employees about their rights and responsibilities under this

24   code." Cal. Lab. Code § 2699(i). This duty imposed upon the PAGA representative is especially

25

26   [20] *See also Cotter*, 2016 WL 3561742, at *5 (finding that "[a] significant reduction" of the PAGA
     claim "would be appropriate" because "[t]his is not a case where a company has deliberately
27   evaded a clear legal obligation to provide legally required pay and benefits to its employees[, n]or
     does this appear to be a case where a company negligently failed to learn about its obligations
28   under the wage and hour laws").

KG-Universal_000115

United States District Court
For the Northern District of California

1   significant given that PAGA does not require class action procedures, such as notice and opt-out

2   rights.  The Court must be cognizant of the risk that despite this responsibility, there may be a

3   temptation to include a PAGA claim in a lawsuit to be used merely as a bargaining chip, wherein

4   the rights of individuals who may not even be members of the class and the public may be waived

5   for little additional consideration in order to induce the employer to agree to a settlement with the

6   class.

7        This is not to suggest that the PAGA claim must comprise a disproportionate amount of

8   class settlements which include a PAGA claim, with the majority of funds going to the State

9   simply because the PAGA penalty has the potential to be larger than the actual claims.  Such a

10  requirement would come at the expense of the workers, who might otherwise benefit from a larger

11  non-PAGA settlement.  Rather, in reviewing a settlement that includes both a Rule 23 class and a

12  PAGA claim, the Court must closely examine *both* aspects of the settlement.  While a proposed

13  settlement must be viewed as a whole, *see In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934,

14  944 (9th Cir. 2015), the Court must evaluate the adequacy of compensation to the class *as well as*

15  the adequacy of the settlement in view of the purposes and policies of PAGA.  In doing so, the

16  court may apply a sliding scale.  For example, if the settlement for the Rule 23 class is robust, the

17  purposes of PAGA may be concurrently fulfilled.  By providing fair compensation to the class

18  members as employees and substantial monetary relief, a settlement not only vindicates the rights

19  of the class members as employees, but may have a deterrent effect upon the defendant employer

20  and other employers, an objective of PAGA.  Likewise, if the settlement resolves the important

21  question of the status of workers as employees entitled to the protection of the Labor Code or

22  contained substantial injunctive relief, this would support PAGA's interest in "augmenting the

23  state's enforcement capabilities, encouraging compliance with Labor Code provisions, and

24  deterring noncompliance."  LWDA Resp. at 2.  But where, as here, the compensation to the class

25  amounts is relatively modest when compared to the verdict value, the non-monetary relief is of

26  limited benefit to the class, and the settlement does nothing to clarify the status of drivers as

27  employees versus independent contractors, the settlement of the non-PAGA claims does not

28  substantially vindicate PAGA.  In these circumstances, the adequacy of settlement as a whole

KG-Universal_000116

1  turns in large part on whether the PAGA aspect of the settlement can stand on its own.

2          Here, the Court cannot find that the PAGA settlement is fair and adequate in view of the

3  purposes and policies of the statute.  Plaintiffs propose settling PAGA for only 0.1% of the

4  potential verdict value, a reduction that the LWDA has found has no rational basis.[21]  This 99.9%

5  reduction does not adequately reflect the parties' respective risks, particularly when the PAGA

6  claim would not be subject to the same arbitration risk that this Court has found justifies in part

7  the 90% discount in the verdict value of the non-PAGA claims.  Instead, the risks at issue rest

8  primarily on the merits of drivers' labor codes claims and the discretionary reduction of statutory

9  penalties, not on the risk of compelled arbitration.  However, as discussed above, those risks are

10  not limited to Plaintiffs; Uber also takes on a significant risk that should a representative PAGA

11  claim be litigated and adjudicated, it could lose on this question (especially given that this Court

12  has found a presumption of employee status, *see* March 11, 2015 Summary Judgment Ord. at 15),

13  and such an adverse judgment would carry not only a direct monetary penalty, but potentially

14  could affect other litigation including arbitrations.  Instead of adequately considering these risks to

15  Uber and the full value of the PAGA claim, in settling the PAGA claim herein, Plaintiffs appear to

16  treat the PAGA claim simply as a bargaining chip in obtaining a global settlement for Uber's

17  benefit, even though the PAGA claim alone is worth more than half of the full verdict value of all

18  claims being released.  The Court shares the LWDA's view that there is "no rationale for

19  allocating $1 million of the proposed settlement fund to the PAGA claim . . . other than that this is

20  a 'round' number and a large figure in comparison to other PAGA settlements," LWDA Resp. at

21  3.  Given the sweeping consequences of the proposed PAGA waiver, viewed in the context of a

22  relatively modest settlement of the non-PAGA claims, the Settlement Agreement is not as a whole

23  is fair, adequate and reasonable.

24          Even if the PAGA claim were not separately scrutinized, viewing all the claims combined

25

26  ───────────────

[21] Even if the Court was to add all $10 million from Plaintiffs' counsel's proposed reduction,
27  making the PAGA settlement $11 million, this would only represent 1.1% of the potential verdict
value.  Moreover, this would effectively take away $10 million that could otherwise have been
28  distributed to the *drivers*, putting the burden of supporting the public interest on the employee
rather than the employer.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    (PAGA and non-PAGA), the Settlement Agreement yields less than 5% of the total verdict value

2    of all claims being released.  Although the litigation risks to the plaintiffs are substantial, absent

3    the sweeping releases conferred by the Settlement Agreement, Uber faces significant risks and

4    costs, regardless of the outcome of pending interlocutory appeals.  The settlement as a whole as

5    currently structured is not fair, adequate, and reasonable.

6                              IV.    **CONCLUSION**

7          The Court therefore **DENIES** Plaintiffs' motion for preliminary approval.

8          Although the Court denies Plaintiffs' motions for preliminary approval and thus refuses to

9    vacate its Rule 23(d) orders pursuant to the parties' stipulation, it will **TERMINATE** its Rule

10   23(d) orders.  The legal landscape no longer requires the protection afforded by the Orders.  *See*

11   Docket No. 522; Case No. 14-5200, *In re Uber FCRA Litig.*, Docket No. 175.  Thus, Uber is

12   permitted to issue the December 2015 Agreement to new drivers without satisfying the enhanced

13   notice provisions required by the Court.  Uber may also re-issue the December 2015 Agreement to

14   current drivers, with the exception of the certified *O'Connor* class and claims (which, according to

15   Uber, they did not intend the December 2015 Agreement to affect to begin with, *see* Docket No.

16   408, Exh. C; Docket No. 410 at 4; Docket No. 428 at 38:24-39:7).  The Court will not, however,

17   retroactively vacate its Rule 23(d) orders, and thus it will not deem the December 2015 Agreement

18   effective as to drivers who did not timely opt out of the arbitration agreement during the pendency

19   of the Rule 23(d) orders; the Court does not rule on the enforceability of the December 2015

20   Agreement.

21   ///

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

KG-Universal_000118

1    Because the Court denies Plaintiffs' motion for preliminary approval, Uber's motion to

2    stay filed on April 6, 2016 remains pending.  Docket No. 506.  The parties are ordered to meet and

3    confer to discuss how they wish to proceed with that motion, as well as the general status of this

4    case in light of the Court's ruling and the pendency of the appeals pending in the Ninth Circuit.  A

5    joint status report will be due on September 8, 2016, and a Status Conference will be held at 10:30

6    a.m. on September 15, 2016.

7        This order disposes of *O'Connor*, Docket No. 518 and *Yucesoy*, Docket No. 206.

8

9    **IT IS SO ORDERED**.

10

11   Dated: August 18, 2016

12

13                                              EDWARD M. CHEN
                                               United States District Judge
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
For the Northern District of California

KG-Universal_000119

# EXHIBIT E



New York
Official Reports

189 A.D.3d 1863, 138 N.Y.S.3d 238, Unempl.Ins.Rep.
(CCH) P 13,034, 2020 N.Y. Slip Op. 07645

**1  In the Matter of the Claim
of Colin Lowry, Respondent.
Uber Technologies, Inc., Appellant.
Commissioner of Labor, Respondent.

Supreme Court, Appellate Division,
Third Department, New York
530395
December 17, 2020

CITE TITLE AS: Matter of Lowry (Uber
Tech., Inc.—Commissioner of Labor)

**HEADNOTE**

Unemployment Insurance

Contributions

Drivers Employed by Company Operating Digital Platform
for Vehicular Transportation Customers

Littler Mendelson PC, New York City (Andrew M. Spurchise
of counsel), for appellant.

Brooklyn Legal Services, New York City (Nicole Salk of
counsel), for Colin Lowry, respondent.

Letitia James, Attorney General, New York City (Mary
Hughes of counsel), for Commissioner of Labor, respondent.

Colangelo, J. Appeals from two decisions of the
Unemployment Insurance Appeal Board, filed April 29, 2019,
which ruled, among other things, that Uber Technologies,
Inc. was liable for additional unemployment insurance
contributions on remuneration paid to claimant and others
similarly situated.

Uber Technologies, Inc. operates a digital platform, accessed
via a smartphone app, that pairs customers in need of
vehicular transportation with an available driver who picks
them up and drives them to their final destination. Claimant
was engaged as a driver for Uber in its Upstate New
York market and he applied for unemployment insurance
benefits after he stopped participating on the platform. *
The Department of Labor issued initial determinations

finding that claimant was an employee of Uber and that
Uber was liable for additional unemployment insurance
contributions on remuneration paid to claimant and others
similarly situated. Uber objected and, following a hearing, an
Administrative Law Judge upheld the initial determinations.
The Unemployment Insurance Appeal Board affirmed, and
Uber appeals.

We affirm. "It is well settled that whether an employment
relationship exists within the meaning of the unemployment
insurance law is a question of fact, no one factor is
determinative and the determination of the . . . [B]oard,
if supported by substantial evidence on the record as a
whole, is beyond further judicial review even though there is
evidence in the record that would have supported a contrary
decision" (*Matter of Empire State Towing & Recovery
Assn., Inc. [Commissioner of Labor]*, 15 NY3d 433,
437 [2010] [internal quotation marks, brackets and citations
omitted]; *see Matter of Giampa [Quad Capital, LLC—
Commissioner of Labor]*, 181 AD3d 1129, 1129 [2020]).
"Although no single factor is determinative, the relevant
inquiry is whether the purported employer exercised control
over the results produced or the means used to produce
those results, with control over the latter being the more
important factor" (*Matter of Dwyer [Nassau Regional Off-
Track Corp.—Commissioner of Labor]*, 138 AD3d 1369,
1370 [2016] *1864 [citations omitted]; *accord Matter of
Sischo [Safeguard Props. LLC—Commissioner of Labor]*,
180 AD3d 1112, 1113 [2020], *lv denied* 35 NY3d 915 [2020]).

To become a driver, claimant was required to provide Uber
with a valid driver's license, vehicle registration and proof of
current auto insurance. A driver must also pass a background
check and a driving history check. Claimant was also required
to sign a Technology Services Agreement (hereinafter TSA).
Pursuant to the TSA, a driver must use his or her own vehicle
and the vehicle must be authorized by Uber as meeting its
"then-current" requirements. Uber requires that the vehicle be
less than 15 years old, have four doors, five factory installed
seats, five seat belts, working windows and air conditioning.
Once an individual has his or her vehicle approved by
Uber, and he or she passes the background checks **2  and
provides the required documentation, he or she is provided a
driver's identification and password that can be used to log on
as a driver to Uber's digital platform by way of a smartphone
app. A driver then may log on to the app when he or she
is available to provide transportation services. A driver has
no set schedule and may log on as often or as little as the
driver chooses, although, pursuant to the TSA, Uber reserves

KG-Universal_000082

Matter of Lowry (Uber Tech., Inc.—Commissioner of Labor), 189 A.D.3d 1863 (2020)

138 N.Y.S.3d 238, Unempl.Ins.Rep. (CCH) P 13,034, 2020 N.Y. Slip Op. 07645

the right to deactivate a driver's account if he or she fails to provide transportation services to a customer at least once a month.

When a customer requests transportation, he or she does not choose a particular driver. Rather, the Uber platform sends the customer's location solely to the logged-on driver who is closest in proximity to the customer's pickup location at the time, using its GPS navigation system. The driver has 15 seconds to accept the customer's request. If the driver rejects the request, Uber sends the request to the next closest driver. If all available drivers ultimately refuse the request, then the customer is informed that no ride is available. Drivers are not penalized for refusing a customer's request.

If the driver accepts the request, the customer is provided with the driver's location and the estimated fare. Uber unilaterally calculates the fare and collects the customer's payment through the app at the completion of the trip. Uber then subtracts a 20% to 30% service fee and pays the driver the remainder, plus any tip provided by the customer. Uber bears the loss if it cannot collect the fare and charges a cancellation fee if the customer cancels the trip more than two minutes after he or she had scheduled it or does not show up after the driver has waited five minutes at the pickup location. Uber pays the driver the cancellation fee. It is recommended by Uber **1865** that drivers wait at least 10 minutes for the customer to show up at the requested pickup location before leaving. A driver is not advised of the location where the customer wants to be dropped off until he or she accepts the request and picks up the customer. Drivers may cancel the trip without penalty at any time. Although Uber provides the drivers with its GPS navigation system, the drivers choose the route to take in transporting the customers and they may use other navigation systems or their personal knowledge in selecting the route taken. Pursuant to the TSA, however, Uber reserves the right to reduce the fare collected if the driver "took an inefficient route."

Drivers are responsible for fuel and vehicle maintenance costs. Uber offers drivers who complete a certain number of trips per month use of a gasoline credit card. Drivers are responsible for the charges on the card, but the card provides discounts on fuel and other items. If the transportation requires the payment of a toll, Uber adds that amount to the customer's fare and reimburses that amount to the driver. Uber will reimburse drivers for reasonable **3** costs related to repairing damage done to their vehicles by customers. A driver may not transport any individuals other than the customer and the customer's authorized passengers during the trip. Uber handles all complaints and, pursuant to the TSA, requires that drivers provide services "in a professional manner with due skill, care and diligence" and "maintain high standards of professionalism, service and courtesy." Further, a driver is prohibited from, among other things, physically contacting the customer during the trip, using inappropriate language or gestures and contacting the customer after the trip is over.

Uber employs an anonymous five-star rating system whereby both drivers and customers may rate each other after the trip is completed. Uber makes the ratings available on its digital platform. Drivers are informed on Uber's website that customers rely on a variety of factors when rating them, including navigation, vehicle cleanliness and the drivers' communication with them. If a driver falls below a 4.6 overall rating, Uber provides tips on how to improve. If the rating remains below the 4.6 threshold, the driver's account could be deactivated.

Based upon the record as a whole, we conclude that substantial evidence supports the Board's finding that Uber exercised sufficient control over the drivers to establish an employment relationship. Uber controls the drivers' access to their customers, calculates and collects the fares and sets the drivers' rate of compensation. Drivers may choose the route to take in **1866** transporting customers, but Uber provides a navigation system, tracks the drivers' location on the app throughout the trip and reserves the right to adjust the fare if the drivers take an inefficient route. Uber also controls the vehicle used, precludes certain driver behavior and uses its rating system to encourage and promote drivers to conduct themselves in a way that maintains "a positive environment" and "a fun atmosphere in the car." Considering the foregoing, we find no reason to disturb the Board's finding of an employment relationship (*see Matter of Vega [Postmates Inc.—Commissioner of Labor]*, 35 NY3d 131, 137-139 [2020]; *Matter of Rivera [State Line Delivery Serv. —Roberts]*, 69 NY2d 679, 682 [1986], *cert denied* 481 US 1049 [1987]; *Matter of Jung Yen Tsai [XYZ Two Way Radio Serv., Inc.—Commissioner of Labor]*, 166 AD3d 1252, 1254-1255 [2018]).

Lynch, J.P., Clark and Mulvey, JJ., concur. Ordered that the decisions are affirmed, without costs.

KG-Universal_000083

138 N.Y.S.3d 238, Unempl.Ins.Rep. (CCH) P 13,034, 2020 N.Y. Slip Op. 07645

### FOOTNOTES

Copr. (C) 2021, Secretary of State, State of New York

### Footnotes

\*     Uber also operates a separate New York City market. The decisions at issue herein, however, are limited to drivers in the Upstate New York market.

End of Document       © 2021 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.    3

KG-Universal_000084

Case 4:22-cv-03876   Document 1-4   Filed on 11/07/22 in TXSD   Page 124 of 229

In the Matter of the Claim of COLIN LOWRY,..., 2021 WL 1609365...

2021 N.Y. Slip Op. 65195(U)

2021 WL 1609365 (N.Y.A.D. 3
Dept.), 2021 N.Y. Slip Op. 65195(U)

**This motion is uncorrected and is not subject
to publication in the Official Reports.**

In the Matter of the Claim of COLIN
LOWRY, Respondent. DECISION AND
ORDER UBER TECHNOLOGIES, Appellant.
COMMISSIONER OF LABOR, Respondent.

**MOTION DECISION**
Supreme Court, Appellate Division,
Third Department, New York
Case # 530395

April 22, 2021

Lynch, J.P., Clark, Reynolds Fitzgerald and Colangelo, JJ.,
concur.
Motion for reargument or, in the alternative, for permission to
appeal to the Court of Appeals.

Upon the papers filed in support of the motion and the papers
filed in opposition thereto, it is

ORDERED that the motion is denied, without costs.

ENTER: Robert D. Mayberger Clerk of the Court

Copr. (C) 2021, Secretary of State, State of New York

**End of Document**                                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT F

This document is scheduled to be published in the
Federal Register on 05/06/2021 and available online at
**federalregister.gov/d/2021-09518**, and on **govinfo.gov**

: 4510-27-P

# DEPARTMENT OF LABOR

**Wage and Hour Division**

**29 CFR Parts 780, 788, and 795**

**RIN 1235-AA34**

**Independent Contractor Status under the Fair Labor Standards Act (FLSA): Withdrawal**

**AGENCY:** Wage and Hour Division, Department of Labor.

**ACTION:** Final rule; withdrawal.

**SUMMARY:** This action finalizes the Department of Labor's proposal to withdraw the rule
titled Independent Contractor Status under the Fair Labor Standards Act, which was published in
the Federal Register on January 7, 2021.

**DATES:** As of [INSERT DATE OF PUBLICATION IN THE FEDERAL REGISTER], the final
rule published January 7, 2021 at 86 FR 1168, and delayed on March 7, 2021 at 86 FR 12535 is
withdrawn.

**FOR FURTHER INFORMATION CONTACT:** Amy DeBisschop, Division of Regulations,
Legislation, and Interpretation, Wage and Hour Division, U.S. Department of Labor, Room S-
3502, 200 Constitution Avenue, NW, Washington, DC 20210; telephone: (202) 693-0406 (this is
not a toll-free number). Copies of this final rule may be obtained in alternative formats (Large
Print, Braille, Audio Tape or Disc), upon request, by calling (202) 693-0675 (this is not a toll-
free number). TTY/TDD callers may dial toll-free 1-877-889-5627 to obtain information or
request materials in alternative formats. Questions of interpretation or enforcement of the
agency's existing regulations may be directed to the nearest Wage and Hour Division ("WHD")
district office. Locate the nearest office by calling the WHD's toll-free help line at (866) 4US-
WAGE ((866) 487-9243) between 8 a.m. and 5 p.m. in your local time zone, or log onto WHD's
website at https://www.dol.gov/agencies/whd/contact/local-offices for a nationwide listing of
WHD district and area offices.

KG-Universal_000132

**SUPPLEMENTARY INFORMATION:**

**I.      Background**

*A.      Statutory and Legal Background*

The Fair Labor Standards Act ("FLSA" or "Act") requires all covered employers to pay nonexempt employees at least the federal minimum wage for every hour worked in a non-overtime workweek.[1] In an overtime workweek, for all hours worked in excess of 40 in a workweek, covered employers must pay a nonexempt employee at least one and one-half times the employee's regular rate.[2] The FLSA also requires covered employers to make, keep, and preserve certain records regarding employees.[3]

The FLSA's minimum wage and overtime pay requirements apply only to employees.[4] Section 3(e) generally defines "employee" to mean "any individual employed by an employer."[5] Section 3(d) of the Act defines "employer" to "include[] any person acting directly or indirectly in the interest of an employer in relation to an employee."[6] Section 3(g) defines "employ" to "include[] to suffer or permit to work."[7]

The Supreme Court, in interpreting these definitions, has stated that "[a] broader or more comprehensive coverage of employees within the stated categories would be difficult to frame," and that "the term 'employee' had been given 'the broadest definition that has ever been included in any one act.'"[8] The Supreme Court has further stated that the "striking breadth" of the FLSA's definition of "employ"—"to suffer or permit to work"—"stretches the meaning of 'employee' to cover some parties who might not qualify as such under a strict application of

---

[1] 29 U.S.C. 206(a).
[2] 29 U.S.C. 207(a).
[3] 29 U.S.C. 211(c).
[4] *See* 29 U.S.C. 206 (minimum wage) and 207 (overtime pay).
[5] 29 U.S.C. 203(e)(1).
[6] 29 U.S.C. 203(d).
[7] 29 U.S.C. 203(g).
[8] *United States v. Rosenwasser*, 323 U.S. 360, 362, 363 n.3 (1945) (quoting 81 Cong. Rec. 7657 (statement of Senator Black)).

traditional agency law principles."[9] Thus, the FLSA expressly rejects the common law standard for determining whether a worker is an employee.[10]

Though the FLSA's definition of employee is broader than the common law definition, the Supreme Court has also recognized that the Act was "not intended to stamp all persons as employees."[11] The Supreme Court has acknowledged that even a broad definition of employee "does not mean that all who render service to an industry are employees."[12] One category of workers that has been recognized as being outside the FLSA's broad definition of "employees" is "independent contractors."[13] Courts have thus recognized a need to delineate between employees, who fall under the protections of the FLSA, and independent contractors, who do not.

The Supreme Court has repeatedly emphasized that the test for whether an individual is an employee under the FLSA is one of "economic reality."[14] Under this test, the "technical concepts" used to label a worker as an employee or independent contractor do not drive the analysis, but rather it is the economic realities of the relationship between the worker and the employer that is determinative.[15]

---

[9] *Nationwide Mut. Ins. v. Darden*, 503 U.S. 318, 326 (1992).

[10] *See id.*; *Walling v. Portland Terminal Co.*, 330 U.S. 148, 150-51 (1947) ("But in determining who are 'employees' under the Act, common law employee categories or employer-employee classifications under other statutes are not of controlling significance. This Act contains its own definitions, comprehensive enough to require its application to many persons and working relationships, which prior to this Act, were not deemed to fall within an employer-employee category." (citation omitted)).

[11] *Portland Terminal*, 330 U.S. at 152; *see also Rutherford Food Corp. v. McComb*, 331 U.S. 722, 729 (1947) (workers may not be employees when their work does not "in its essence . . . follow[] the usual path of an employee").

[12] *United States v. Silk*, 331 U.S. 704, 712 (1947) (analyzing the definition of employee under the Social Security Act).

[13] *Rutherford Food*, 331 U.S. at 729 ("There may be independent contractors who take part in production or distribution who would alone be responsible for the wages and hours of their own employees.").

[14] *Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 301 (1985) (quoting *Goldberg v. Whitaker House Coop., Inc.*, 366 U.S. 28, 33 (1961)).

[15] *Goldberg*, 366 U.S. at 32-33.

KG-Universal_000134

In *United States v. Silk*, 331 U.S. 704, 712 (1947), an early case applying an economic realities test under the Social Security Act, the Supreme Court acknowledged that "[p]robably it is quite impossible to extract from the statute a rule of thumb" regarding the limits of the employment relationship.[16] The Court suggested that federal agencies and courts "will find that degrees of control, opportunities for profit or loss, investment in facilities, permanency of relation and skill required in the claimed independent operation are important for decision."[17] The Court cautioned that no single factor is controlling and that the list is not exhaustive.[18] The Court went on to note that the workers in that case were "from one standpoint an integral part of the businesses" of the employer, supporting a conclusion that some of the workers in that case were employees.[19]

The same day that the Supreme Court issued its decision in *Silk*, it also issued *Rutherford Food Corp. v. McComb*, 331 U.S. 722 (1947), in which it affirmed a circuit court decision that analyzed an FLSA employment relationship based on its economic realities.[20] The Court rejected an approach based on "isolated factors" and again considered "the circumstances of the whole activity."[21] The Court considered several of the factors that it listed in *Silk* as they related to meat boners on a slaughterhouse's production line, ultimately determining that the boners were employees.[22] The Court noted, among other things, that the boners did a specialty job on the production line, had no business organization that could shift to a different slaughter-house, and

---

[16] 331 U.S. at 716. At the time, the Supreme Court noted that "[d]ecisions that define the coverage of the employer-[e]mployee relationship under the Labor and Social Security acts are persuasive in the consideration of a similar coverage under the Fair Labor Standards Act." *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 723-23 (1947). However, Congress amended the Social Security Act in 1948.

[17] 331 U.S. at 716.

[18] *See id.*

[19] *Id.*

[20] *See Rutherford Food*, 331 U.S. at 727.

[21] *Id.* at 730.

[22] *See id.*

KG-Universal_000135

were best characterized as "part of the integrated unit of production under such circumstances that the workers performing the task were employees of the establishment."[23]

Since *Silk* and *Rutherford Food*, federal courts of appeals have applied the economic realities test to distinguish independent contractors from employees who are entitled to the FLSA's protections. Recognizing that the common law concept of "employee" had been rejected for FLSA purposes, courts of appeals followed the Supreme Court's instruction that "'employees are those who as a matter of economic realities are dependent upon the business to which they render service.'"[24]

All of the courts of appeals have followed the economic realities test, and nearly all of them analyze the economic realities of an employment relationship using the factors identified in *Silk*.[25] No court of appeals considers any factor or combination of factors to universally predominate over the others in every case.[26] For example, the Ninth Circuit has explained that some of the factors "which may be useful in distinguishing employees from independent contractors for purposes of social legislation such as the FLSA" are: (1) the degree of the employer's right to control the manner in which the work is to be performed; (2) the worker's

---

[23] *Id.* at 729-30.

[24] *Usery v. Pilgrim Equip. Co.*, 527 F.2d 1308, 1311 (5th Cir. 1976) (quoting *Bartels v. Birmingham*, 332 U.S. 126, 130 (1947)).

[25] *See Baystate Alternative Staffing, Inc. v. Herman*, 163 F.3d 668, 675 (1st Cir. 1998); *Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1058-59 (2d Cir. 1988); *Donovan v. DialAmerica Mktg., Inc.*, 757 F.2d 1376, 1382-83 (3d Cir. 1985); *McFeeley v. Jackson Street Entm't, LLC*, 825 F.3d 235, 241 (4th Cir. 2016); *Acosta v. Off Duty Police Services, Inc.*, 915 F.3d 1050, 1055 (6th Cir. 2019); *Secretary of Labor, U.S. Dep't of Labor v. Lauritzen*, 835 F.2d 1529, 1534 (7th Cir. 1987); *Karlson v. Action Process Service & Private Investigation, LLC*, 860 F.3d 1089, 1092 (8th Cir. 2017); *Real v. Driscoll Strawberry Associates, Inc.*, 603 F.2d 748, 754 (9th Cir. 1979); *Acosta v. Paragon Contractors Corp.*, 884 F.3d 1225, 1235 (10th Cir. 2018); *Scantland v. Jeffry Knight, Inc.*, 721 F.3d 1308, 1311 (11th Cir. 2013); *Morrison v. Int'l Programs Consortium, Inc.*, 253 F.3d 5, 11 (D.C. Cir. 2001).

[26] *See, e.g.*, *Parrish v. Premier Directional Drilling, L.P.*, 917 F.3d 369, 380 (5th Cir. 2019) (stating that it "is impossible to assign to each of these factors a specific and invariably applied weight" (citation omitted)); *Martin v. Selker Bros.*, 949 F.2d 1286, 1293 (3d Cir. 1991) ("It is a well-established principle that the determination of the employment relationship does not depend on isolated factors . . . neither the presence nor the absence of any particular factor is dispositive."); *Scantland*, 721 F.3d at 1312 n.2 (observing that the relative weight of each factor "depends on the facts of the case").

opportunity for profit or loss depending upon his or her managerial skill; (3) the worker's investment in equipment or materials required for his or her task, or employment of helpers; (4) whether the service rendered requires a special skill; (5) the degree of permanence of the working relationship; and (6) whether the service rendered is an integral part of the employer's business.[27] The Ninth Circuit repeated the Supreme Court's instruction that no individual factor is conclusive and that the ultimate determination depends upon the circumstances of the whole activity.[28]

Some courts of appeals have applied the factors with some variations. For example, the Fifth Circuit typically does not list the "integral" factor as one of the considerations that guides the analysis.[29] Nevertheless, the Fifth Circuit—recognizing that the listed factors are not exhaustive—has considered the extent to which a worker's function is integral to a business as part of its economic realities analysis.[30] The Second Circuit varies in that it treats the employee's opportunity for profit or loss and the employee's investment as a single factor, but it still uses the same considerations as the other circuits to inform its economic realities analysis.[31]

In sum, since the 1940s, federal courts have consistently analyzed the question of employee status under the FLSA by examining the economic realities of the employment relationship to determine whether the worker is dependent on the employer for work or is in business for him or herself.[32] In doing so, courts have looked to the six factors first articulated in *Silk* as useful guideposts while acknowledging that those factors are not exhaustive and should not be applied mechanically.[33]

B.     *Prior Wage and Hour Division Guidance*

---

[27] *Real*, 603 F.2d at 754.
[28] *See id.*
[29] *See Usery*, 527 F.2d at 1311.
[30] *See Hobbs v. Petroplex Pipe and Constr., Inc.*, 946 F.3d 824, 836 (5th Cir. 2020).
[31] *See*, *e.g.*, *Franze v. Bimbo Bakeries USA, Inc.*, 826 F. App'x 74, 76 (2d Cir. 2020).
[32] *See*, *e.g.*, *Franze*, 826 F. App'x at 76; *Razak v. Uber Techs., Inc.*, 951 F.3d 137, 142-43 (3d Cir. 2020) (cert. pet. filed Apr. 8, 2021); *Gilbo v. Agment, LLC*, 831 F. App'x 772, 775 (6th Cir. 2020).
[33] *See*, *e.g.*, *Superior Care*, 840 F.2d at 1054.

Since at least 1954, the Wage and Hour Division (WHD) has applied variations of this multifactor analysis when considering whether a worker is an employee under the FLSA or an independent contractor.[34] In a guidance document issued in 1964, WHD stated, "The Supreme Court has made it clear that an employee, as distinguished from a person who is engaged in a business of his own, is one who as a matter of economic reality follows the usual path of an employee and is dependent on the business which he serves."[35] Like the courts, WHD has consistently applied a multifactor economic realities analysis when determining whether a worker is an employee under the FLSA or an independent contractor.[36]

The Department's primary sub-regulatory guidance addressing this topic, WHD Fact Sheet #13, "Employment Relationship Under the Fair Labor Standards Act (FLSA)," similarly states that, when determining whether an employment relationship exists under the FLSA, the test is the "economic reality" rather than an application of "technical concepts," and that status "is not determined by common law standards relating to master and servant."[37] Instead, "it is the total activity or situation which controls," and "an employee, as distinguished from a person who is engaged in a business of his or her own, is one who, as a matter of economic reality, follows the usual path of an employee and is dependent on the business which he or she serves." The fact sheet identifies seven economic realities factors; in addition to factors that are similar to the six factors used by the federal courts of appeals and discussed above, it also identifies the worker's

---

[34] *See* WHD Opinion Letter (Aug. 13, 1954) (applying six factors very similar to the six economic realities factors currently used by courts of appeals).

[35] WHD Opinion Letter FLSA–795 (Sept. 30, 1964).

[36] *See, e.g.*, WHD Opinion Letter, 2002 WL 32406602, at *2 (Sept. 5, 2002); WHD Opinion Letter, 2000 WL 34444342, at *3 (Dec. 7, 2000); WHD Opinion Letter, 2000 WL 34444352, at *1 (Jul. 5, 2000); WHD Opinion Letter, 1999 WL 1788137, at *1 (Jul. 12, 1999); WHD Opinion Letter, 1995 WL 1032489, at *1 (June 5, 1995); WHD Opinion Letter, 1995 WL 1032469, at *1 (Mar. 2, 1995); WHD Opinion Letter, 1986 WL 740454, at *1 (June 23, 1986); WHD Opinion Letter, 1986 WL 1171083, at *1 (Jan. 14, 1986); WHD Opinion Letter WH–476, 1978 WL 51437, at *2 (Oct. 19, 1978); WHD Opinion Letter WH–361, 1975 WL 40984, at *1 (Oct. 1, 1975); WHD Opinion Letter (Sept. 12, 1969); WHD Opinion Letter (Oct. 12, 1965).

[37] WHD Fact Sheet #13 (July 2008) is available at https://www.dol.gov/sites/dolgov/files/WHD/legacy/files/whdfs13.pdf (last visited April 28, 2021).

"degree of independent business organization and operation." The fact sheet identifies certain other factors that are immaterial to determining whether a worker is an employee covered under the FLSA or independent contractor, including the place where work is performed, the absence of a formal employment agreement, and whether an alleged independent contractor is licensed by a State or local government.[38]

In 1969 and 1972, WHD promulgated regulations relevant to specific industries after Congress amended the FLSA to change the way it applied to those industries.[39] Those regulations applied a multifactor analysis under the FLSA for determining whether a worker is an employee or independent contractor in those specific contexts.[40] Further, WHD promulgated a regulation in 1997 applying a multifactor economic realities analysis for distinguishing between employees and independent contractors under the Migrant and Seasonal Agricultural Worker Protection Act (MSPA).[41]

On July 15, 2015, WHD issued Administrator's Interpretation No. 2015–1, "The Application of the Fair Labor Standards Act's 'Suffer or Permit' Standard in the Identification of

---

[38] WHD maintains additional sub-regulatory guidance addressing whether a worker is an employee or independent contractor under the FLSA. For example, WHD's Field Operations Handbook, in its section titled "Test of the employment relationship," cross-references Fact Sheet #13. *See* section 10b05 of Chapter 10 ("FLSA Coverage: Employment Relationship, Statutory Exclusions, Geographical Limits") of WHD's Field Operations Handbook, available at https://www.dol.gov/sites/dolgov/files/WHD/legacy/files/FOH_Ch10.pdf (last visited April 28, 2021); *see also* https://www.dol.gov/sites/dolgov/files/WHD/legacy/files/misclassification-facts.pdf (last visited April 28, 2021). And the section of WHD's elaws Advisor compliance-assistance materials addressing independent contractors provides guidance very similar to that of Fact Sheet #13. *See* https://webapps.dol.gov/elaws/whd/flsa/scope/ee14.asp (last visited April 28, 2021).

[39] *See* 37 FR 12084 (explaining that Part 780 was revised in order to adapt to the changes made by the Fair Labor Standards Amendments of 1966 (80 Stat. 830) and implementing 29 CFR 780.330(b) to apply a six-factor economic realities test to determine whether a sharecropper or tenant is an employee under the Act or an independent contractor); 34 FR 15794 (explaining that Part 788 was revised in order to adapt to the changes made by the 1966 Amendments and implementing 29 CFR 788.16(a) to apply a six-factor economic realities test to determine whether workers in certain forestry and logging operations are employees under the Act or independent contractors).

[40] *See id.*

[41] *See* 62 FR 11734 (amending 29 CFR 500.20(h)(4)).

Employees Who Are Misclassified as Independent Contractors" (AI 2015–1).[42] AI 2015–1 reiterated that the economic realities of the relationship are determinative and that the ultimate inquiry is whether the worker is economically dependent on the employer or truly in business for him or herself. It identified six economic realities factors that followed the six factors used by most federal courts of appeals: (1) the extent to which the work performed is an integral part of the employer's business; (2) the worker's opportunity for profit or loss depending on his or her managerial skill; (3) the extent of the relative investments of the employer and the worker; (4) whether the work performed requires special skills and initiative; (5) the permanency of the relationship; and (6) the degree of control exercised or retained by the employer. AI 2015–1 further emphasized that the factors should not be applied in a mechanical fashion and that no one factor was determinative. AI 2015–1 was withdrawn on June 7, 2017.[43]

In 2019, WHD issued an opinion letter, FLSA2019-6, regarding whether workers who worked for companies operating self-described "virtual marketplaces" were employees covered under the FLSA or independent contractors.[44] Like WHD's prior guidance, the letter stated that the determination depended on the economic realities of the relationship and that the ultimate inquiry was whether the workers depend on someone else's business or are in business for themselves.[45] The letter identified six economic realities factors that differed slightly from the factors typically articulated by WHD previously: (1) the nature and degree of the employer's control; (2) the permanency of the worker's relationship with the employer; (3) the amount of the worker's investment in facilities, equipment, or helpers; (4) the amount of skill, initiative, judgment, and foresight required for the worker's services; (5) the worker's opportunities for profit or loss; and (6) the extent of the integration of the worker's services into the employer's

---

[42] AI 2015–1 is available at 2015 WL 4449086.

[43] See News Release 17-0807-NAT, "US Secretary of Labor Withdraws Joint Employment, Independent Contractor Informal Guidance" (Jun. 7, 2017), *available at* https://www.dol.gov/newsroom/releases/opa/opa20170607 (last visited April 28, 2021).

[44] See WHD Opinion Letter FLSA2019-6, 2019 WL 1977301 (Apr. 29, 2019) (withdrawn February 19, 2021).

[45] See id. at *3.

business.[46] Opinion Letter FLSA2019-6 was withdrawn for further review on February 19, 2021.[47]

*C.      The January 2021 Independent Contractor Rule*

On January 7, 2021, the Department published a final rule titled "Independent Contractor Status Under the Fair Labor Standards Act" with an effective date of March 8, 2021 (Independent Contractor Rule or Rule).[48] The Independent Contractor Rule would have introduced into Title 29 of the Code of Federal Regulations a new part (Part 795) titled "Employee or Independent Contractor Classification under the Fair Labor Standards Act" that would have provided a new generally applicable interpretation of employee or independent contractor status under the FLSA.[49] The Rule would also have revised WHD's prior interpretations of independent contractor status in 29 CFR 780.330(b) and 29 CFR 788.16(a), both of which apply in limited contexts.[50]

The Independent Contractor Rule explained that its purpose was to establish an economic realities test that improved on prior articulations that the Rule viewed as "unclear and unwieldy."[51] It stated that the existing economic realities test applied by WHD and courts suffered from confusion regarding the meaning of "economic dependence," a lack of focus in the multifactor balancing test, and confusion and inefficiency caused by overlap between the factors.[52] The Rule explained that the shortcomings and misconceptions associated with the test were more apparent in the modern economy and that additional regulatory clarity would promote innovation in work arrangements.[53]

---

[46] *See id.* at *4.
[47] *See note at* https://www.dol.gov/agencies/whd/opinion-letters/search?FLSA (last visited April 28, 2021).
[48] *See* 86 FR 1168. WHD had published a notice of proposed rulemaking requesting comments on a proposal. *See* 85 FR 60600 (Sept. 25, 2020). The final rule adopted "the interpretive guidance set forth in [that proposal] largely as proposed." 86 FR 1168.
[49] *See* 86 FR 1168.
[50] *See id*.
[51] 86 FR 1172.
[52] 86 FR 1172-75.
[53] *See* 86 FR 1175.

The Independent Contractor Rule further explained that under the FLSA, independent contractors are not employees and are therefore not subject to the Act's minimum wage, overtime pay, or recordkeeping requirements.[54] The Rule would have applied an "economic dependence" test under which a worker is an employee of an employer if that worker is economically dependent on the employer for work and is an independent contractor if that worker is in business for him or herself.[55]

The Rule's new economic realities test would have identified five economic realities factors to guide the inquiry into a worker's status as an employee or independent contractor.[56] These factors would not have been exhaustive, and additional factors would have been considered if they "in some way indicate[d] whether the [worker was] in business for him- or herself, as opposed to being economically dependent on the potential employer for work."[57] Under the Rule's economic realities test, no one factor would have been dispositive, but two of the identified factors were designated as "core factors" that would have carried greater weight in the analysis. If both of those factors indicated the same classification, as either an employee or an independent contractor, there would have been a "substantial likelihood" that the classification indicated by those factors was the worker's correct classification.[58] In support of this elevation of two core factors, the Rule noted that the Department had conducted a review of appellate case law since 1975, and this review indicated that courts of appeals had effectively been affording the control and opportunity factors greater weight.[59]

The first core factor was the nature and degree of control over the work, which would have indicated independent contractor status to the extent that the worker exercised substantial control over key aspects of the performance of the work, such as by setting his or her own

---

[54] *See* 86 FR 1246 (§ 795.105(a)).
[55] *See* 86 FR 1246 (§ 795.105(b)).
[56] *See* 86 FR 1246 (§ 795.105(c)).
[57] 86 FR 1246-47 (§§ 795.105(c) & (d)(2)(iv)).
[58] 86 FR 1246 (§ 795.105(c)).
[59] 86 FR 1198.

KG-Universal_000142

schedule, by selecting his or her projects, and/or through the ability to work for others, which might include the potential employer's competitors.[60] Under the Rule's analysis, requiring the worker to comply with specific legal obligations, satisfy health and safety standards, carry insurance, meet contractually agreed upon deadlines or quality control standards, or satisfy other similar terms that are typical of contractual relationships between businesses (as opposed to employment relationships) would not have constituted control.[61]

The second core factor was the worker's opportunity for profit or loss.[62] This factor would have weighed towards the worker being an independent contractor to the extent the worker has an opportunity to earn profits or incur losses based on either his or her exercise of initiative (such as managerial skill or business acumen or judgment) or his or her management of investment in or capital expenditure on, for example, helpers or equipment or material to further the work.[63] While the effects of the worker's exercise of initiative and management of investment would both have been considered under this core factor, the worker did not need to have an opportunity for profit or loss based on both initiative and management of investment for this factor to have weighed towards the worker being an independent contractor.[64] This factor would have weighed towards the worker being an employee to the extent the worker is unable to affect his or her earnings or is only able to do so by working more hours or faster.[65]

The Rule would have also identified three other non-core factors: the amount of skill required for the work, the degree of permanence of the working relationship between the worker and the employer, and whether the work is part of an integrated unit of production (which is distinct from the concept of the importance or centrality of the worker's work to the employer's business).[66] The Rule would have provided that these other factors would be "less probative and,

---

[60] *See* 86 FR 1246-47 (§ 795.105(d)(1)(i)).
[61] *See id.*
[62] *See* 86 FR 1247 (§ 795.105(d)(1)(ii)).
[63] *See id.*
[64] *See id.*
[65] *See id.*
[66] *See* 86 FR 1247 (§ 795.105(d)(2)).

KG-Universal_000143

in some cases, [would] not be probative at all" and would be "highly unlikely, either individually or collectively, to outweigh the combined probative value of the two core factors."[67]

The Rule would have further provided that the actual practice of the parties involved is more relevant than what may be contractually or theoretically possible.[68] The Rule would also have provided five examples illustrating how different factors informed the analysis.[69]

After publication of the Rule, WHD issued Opinion Letters FLSA2021-8 and FLSA2021-9 on January 19, 2021 applying the Rule's analysis to specific factual scenarios, and then withdrew those opinion letters on January 26, 2021, explaining that the letters were issued prematurely because they were based on a Rule that had yet to take effect.[70]

D.     *Delay of Rule's Effective Date*

On February 5, 2021, the Department published a proposal to delay the Independent Contractor Rule's effective date until May 7, 2021, 60 days after the original effective date of March 8, 2021.[71] On March 4, 2021, after considering the approximately 1,500 comments received in response to that proposal, the Department published a final rule delaying the effective date of the Independent Contractor Rule as proposed.[72] The Department explained that the delay was consistent with a January 20, 2021 memorandum from the Assistant to the President and Chief of Staff, titled "Regulatory Freeze Pending Review."[73] The Department further explained that a delay would allow it additional time to consider "significant and complex" issues associated with the Rule, including whether the Rule effectuates the FLSA's purpose to broadly

---

[67] 86 FR 1246 (§ 795.105(c)).

[68] *See* 86 FR 1247 (§ 795.110).

[69] *See* 86 FR 1247-48 (§ 795.115).

[70] *See* https://www.dol.gov/agencies/whd/opinion-letters/search?FLSA (last visited April 28, 2021), noting the withdrawal of Opinion Letters FLSA2021-8 and FLSA2021-9.

[71] *See* 86 FR 8326.

[72] 86 FR 12535.

[73] *Id.* (citing January 20, 2021 memo from the Assistant to the President and Chief of Staff, titled "Regulatory Freeze Pending Review," 86 FR 7424).

cover workers as employees as well as the costs and benefits attributed to the Rule, including its effect on workers.[74]

E.      *Proposal to Withdraw*

On March 12, 2021, the Department published a notice of proposed rulemaking (NPRM) proposing to withdraw the Independent Contractor Rule.[75] The NPRM explained that the Department was considering withdrawing the Independent Contractor Rule for several reasons. First, the Rule's standard has never been used by any court or by WHD, and the Department questioned whether the Rule is fully aligned with the FLSA's text and purpose or case law describing and applying the economic realities test. In particular, the NPRM noted that no court has, as a general and fixed rule, elevated a subset of certain economic realities factors above others, and there is no clear statutory basis for such a predetermined weighting of the factors.[76] Moreover, the NPRM expressed concern that the Rule's emphasis on control and its recasting of other factors typically considered by courts would improperly narrow the facts to be considered in the application of the economic realities test, contrary to the FLSA's more expansive conception of the employment relationship contained in section 3(g) of the Act's definition of "employ" as including "to suffer or permit to work."[77] As a matter of policy, the NPRM expressed concern that the Rule's novel guidance would cause confusion or lead to inconsistent outcomes rather than provide clarity or certainty,[78] and asserted that the Rule failed to fully consider the likely costs, transfers, and benefits that could result from the Rule, particularly for affected workers who might no longer receive the FLSA's wage and hour protections as an

---

[74] *Id.* On March 26, 2021, a lawsuit was filed alleging that the Department's final rule delaying the Independent Contractor Rule's effective date did not comply with the Administrative Procedure Act. *See Coalition for Workforce Innovation v. Sec'y of Labor* (No. 1:21-cv-00130 E.D. Tex.).

[75] *See* 86 FR 14027.

[76] *See* 86 FR 14031-32.

[77] *See* 86 FR 14032-34.

[78] *See* 86 FR 14034.

independent contractor.[79] Finally, the NPRM stated that withdrawing the Independent Contractor Rule would not be disruptive because the Rule has not yet taken effect.[80]

The Department sought comment on its NPRM to withdraw the Independent Contractor Rule. The period for providing comment expired on April 12, 2021.

## II.      Comments and Decision

The Department received 1,010 comments in response to the NPRM.[81] Numerous state officials, members of Congress, labor unions, social justice organizations, worker advocacy groups, and individual commenters wrote in support of the Department's proposal to withdraw the Independent Contractor Rule, including several hundred commenters who submitted comments with similar template language. These commenters expressed opposition to the Independent Contractor Rule predominantly on the basis that, in their view, the Rule would have facilitated the exploitation of workers reclassified or misclassified as independent contractors as a consequence of the Rule. They also raised numerous other legal and policy criticisms of the Rule, discussed in greater detail below.

Numerous companies, trade associations, business advocacy organizations, law firms, and individual commenters submitted comments opposing the Department's proposal to withdraw the Independent Contractor Rule, including several commenters who identified themselves as current or former independent contractors. These commenters generally supported the Independent Contractor Rule for, in their view, providing a clearer and preferable analysis for determining employee or independent contractor status, and they raised numerous other legal and policy arguments in defense of the Rule (or in objection to the proposed withdrawal), discussed in greater detail below.

---

[79] *See* 86 FR 14034-35.
[80] *See* 86 FR 14035.
[81] This figure includes a number of duplicate comments (i.e., identical comments submitted by the same requester) which appear to have been submitted by mistake. The Department received approximately 1,000 non-duplicative comments.

The Department received a number of comments addressing issues that are beyond the scope of this rulemaking to withdraw the Independent Contractor Rule. For example, several commenters expressed opinions related to the legal analysis for independent contractors under state laws or federal laws other than the FLSA, such as the "ABC" test generally used to evaluate independent contractor status under California state law,[82] or the "PRO Act" bill that would establish a similar standard under National Labor Relations Act.[83] As noted in the NPRM, the Department did not propose regulatory guidance to replace the guidance that the Independent Contractor Rule would have introduced as Part 795, so commenter feedback addressing or suggesting such a replacement or otherwise requesting that the Department adopt any specific guidance if the Rule was withdrawn was considered outside the scope of this rulemaking.[84] Similarly, the Department received dozens of comments addressing the merits of labor unions; however, this rulemaking addresses whether to withdraw a rule that would have provided a new analysis for determining whether a worker is an employee or independent contractor for purposes of the FLSA, a wage and hour statute that has no direct effect on collective bargaining rights.

Having considered the comments submitted in response to the NPRM, the Department has decided to finalize the withdrawal of the Independent Contractor Rule. The Department believes that the Rule is inconsistent with the FLSA's text and purpose, and would have a confusing and disruptive effect on workers and businesses alike due to its departure from longstanding judicial precedent. The Department's response to commenter feedback on specific aspects of the proposed withdrawal is provided below.

A.   *The Rule's Standard Has Never Been Used by Any Court or by WHD, and Is Not Supported by the Act's Text or Purpose or Judicial Precedent.*

---

[82] *See* Assembly Bill ("A.B.") 5, Ch. 296, 2019–2020 Reg. Sess. (Cal. 2019) (codifying the ABC test for determining independent contractor status articulated in *Dynamex Operations W., Inc. v. Superior Court*, 416 P.3d 1 (Cal. 2018)); A.B. 2257, Ch. 38, 2019–2020 Reg. Sess. (Cal. 2020) (exempting certain additional professions, occupations, and industries from the ABC test that A.B. 5 had codified).

[83] *See* Protecting the Right to Organize Act of 2021, H.R. 842, 117th Cong. (2021) (introduced by Rep. Bobby Scott) and S. 420, 117th Cong. (2021) (introduced by Sen. Patty Murray).

[84] 86 FR 14035.

Upon further review and consideration of the Rule and having considered the public comments, the Department does not believe that the Independent Contractor Rule is fully aligned with the FLSA's text or purpose, or with decades of case law describing and applying the multifactor economic realities test. The Department fully describes below the rationale for its departure from the views expressed in the prior Rule.[85]

1.    *The Rule's Elevation of Control and Opportunity for Profit or Loss as the "Most Probative" Core Factors in Determining Employee Status under the FLSA*

For decades, WHD, consistent with case law, has applied a multifactor balancing test to assess whether the worker, as a matter of economic reality, is economically dependent on the employer or is in business for him or herself.[86] Courts universally apply this analysis as well and have explained that "economic reality" rather than "technical concepts" is the test of employment under the FLSA.[87] WHD and the U.S. Courts of Appeals generally consider and balance the following economic realities factors, derived from the Supreme Court's decisions in *Silk*, 331 U.S. at 716, and *Rutherford Food*, 331 U.S. at 729-30: the nature and degree of the employer's control over the work; the permanency of the worker's relationship with the employer; the degree of skill, initiative, and judgment required for the work; the worker's investment in equipment or materials necessary for the work; the worker's opportunity for profit or loss; whether the service rendered by the worker is an integral part of the employer's business; and the degree of independent business organization and operation.[88]

The Rule would have set forth a new articulation of the economic realities test, elevating two factors (control and opportunity for profit or loss) as "core" factors above the other factors,

---

[85] *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).
[86] *See*, *e.g.*, Fact Sheet #13 (July 2008), *supra* note 37.
[87] *Goldberg*, 366 U.S. at 33; *see also Tony & Susan Alamo*, 471 U.S. at 301 ("The test of employment under the Act is one of 'economic reality.'") (quoting *Goldberg*, 366 U.S. at 33).
[88] *See*, *e.g.*, *Razak*, 951 F.3d at 142-43; *Karlson*, 860 F.3d at 1092; *Keller v. Miri Microsystems LLC*, 781 F.3d 799, 807 (6th Cir. 2015); *Lauritzen*, 835 F.2d at 1534; *Real*, 603 F.2d at 754; Fact Sheet #13 (July 2008), available at https://www.dol.gov/sites/dolgov/files/WHD/legacy/files/whdfs13.pdf (last visited April 28, 2021).

and designating them as having greater probative value.[89] The Rule would have provided that only in "rare" cases would the other factors outweigh the core factors.[90] Notably, the Rule would have further provided that if both core factors point towards the same classification—that the worker is either an employee or an independent contractor—then there would be a "substantial likelihood" that this is the worker's correct classification.[91] In addition, the preamble to the Rule disagreed with court precedent that, as a general matter, the economic realities test "requires factors to be unweighted or equally weighted."[92] Although the Rule would have identified three other factors as additional guideposts, it made clear that these "other factors are less probative and, in some cases, may not be probative at all, and thus are highly unlikely, either individually or collectively, to outweigh the combined probative value of the two core factors."[93] Similarly, the Rule would have provided that unlisted additional factors may be considered, but that they are "unlikely to outweigh either of the core factors."[94] The Rule noted that "[w]hile all circumstances must be considered, it does not follow that all circumstances or categories of circumstance, *i.e.*, factors, must also be given equal weight."[95] Rather, the Rule would have emphasized the control and opportunity for profit or loss factors as more probative than other factors in determining whether an individual is in business for him or herself, and would have provided that "other factors are less probative and may have little to no probative value in some circumstances."[96]

In the proposal to withdraw the Rule, the Department expressed concern that no court has taken the Rule's approach in analyzing whether a worker is an employee or an independent contractor under the FLSA, that the Rule would mark a departure from WHD's own

---

[89] 86 FR 1246-47 (§ 795.105(c) & (d)).
[90] 86 FR 1201.
[91] *Id*. at 1246 (§ 795.105(c)).
[92] *Id*. at 1197.
[93] Id. at 1246 (§ 795.105(c)).
[94] Id. at 1197.
[95] Id. at 1201 (internal quotation marks omitted).
[96] Id. at 1202.

longstanding approach, and that the Rule was in tension with the Act's text and purpose.[97]

Among other things, the Department noted that the Rule's elevation of only two factors may be

inconsistent with the position, expressed by the Supreme Court and federal courts of appeals, that

no single factor in the analysis is dispositive and that the totality-of–the-circumstances must be

considered.[98]

Multiple commenters who supported withdrawal of the Rule criticized the Rule's focus

on only two factors as departing from the Act's text and purpose, as well as relevant case law.

The AFL-CIO, for example, noted that by focusing on control and opportunity for profit or loss,

the Rule "would, in practice, adopt the common law standard contrary to congressional intent

and Supreme Court precedent." The American Federation of State, County, and Municipal

Employees (AFSCME) agreed that there is no reason to elevate the "control" factor above

others, and a coalition of State Attorneys General and other officials ("State Officials")

commented that this prioritization of only two factors "jettisoned the definition of employment

that flexibly accounts for the full details of a working relationship, as decades of precedent

require." The Northwest Workers Justice Project asserted that the Department's Rule would

administratively amend the FLSA by placing "undue weight on two factors" and that the Rule

also narrowed those two factors in a way that would undermine the Act's statutory intent and

is in tension with judicial precedent; Rep. Grace Napolitano added that the Rule's weighting of

two factors conflicted with congressional intent. The Women's Law Project concurred that by

according greater weight to only two factors instead of allowing the economic realities test to

continue to be applied as a balancing test, the Rule was inconsistent with the intent of the Act

---

[97] *See* 86 FR 14032-33.

[98] *See, e.g.*, *Silk*, 331 U.S. at 716 (explaining that "[n]o one [factor] is controlling" in the
economic realities test, including "degrees of control"); *Parrish*, 917 F.3d at 380 (stating that it
"is impossible to assign to each of these factors a specific and invariably applied weight"
(citation omitted)); *Selker Bros.*, 949 F.2d at 1293 ("It is a well-established principle that the
determination of the employment relationship does not depend on isolated factors . . . neither the
presence nor the absence of any particular factor is dispositive."); *Dole v. Snell*, 875 F.2d 802,
805 (10th Cir. 1989) ("It is well established that no one of these factors in isolation is dispositive;
rather, the test is based upon a totality of the circumstances.").

and judicial and administrative precedent. Finally, the International Brotherhood of Teamsters stated that by giving these two factors "preeminent status" over the other factors, the Rule "would make it more difficult for workers to prove they are employees."

Commenters opposed to withdrawal of the Rule generally supported giving two core factors greater weight in the analysis. For example, the American Bakers Association noted approvingly the Rule's determination that the control and opportunity for profit or loss factors should be afforded greater weight because this weighting of the factors would be consistent with the outcomes of prior court decisions applying an economic realities analysis. The Owner-Operator Independent Drivers Association also shared its support of the Rule's "decision to afford the 'control' and 'opportunity for profit or loss' factors greater weight in the classification determination." Relatedly, commenters such as the Coalition to Promote Independent Entrepreneurs stated that the additional weight accorded to these two factors was not intended to alter the economic realities analysis but rather reflected the Department's review of prior court decisions applying the test, and thus there is no inconsistency between this position and the longstanding Supreme Court tenet that no single factor be dispositive. Other commenters supported the elevation of two core factors because it would improve clarity. Cambridge Investment Research, for instance, stated that "the enhanced focus on the two core factors elucidates the test review process, reduces inaccurate classifications and decreases associated litigation," and the Center for Workplace Compliance agreed that the use of two core factors would simplify the analysis. The Texas Policy Foundation similarly commented that "[r]ather than analyzing a non-exhaustive list of six factors, the Independent Contractor Rule allows employers to focus on two core factors regarding how workers should be classified."

After careful consideration of the comments received, the Department believes that elevating two factors of the multifactor economic realities analysis above all others is in conflict with the Act, congressional intent, and longstanding judicial precedent. The Department and courts recognize, as they have since the Act's inception, that the cornerstone of the FLSA is the

KG-Universal_000151

Act's broad definition of "employ," which provides that an employee under the Act includes any individual whom an employer suffers, permits, or otherwise employs to work.[99] Rather than being derived from the common law of agency, the FLSA's definition of "employ" and its "suffer or permit" language originally came from state laws regulating child labor.[100] This standard was intended to expand coverage beyond employers who control the means and manner of performance to include entities who "suffer" or "permit" work.[101] The FLSA's breadth in defining the employment relationship, as well as its clear remedial purpose, comes from the statutory text itself as well as the legislative history.[102] This standard "stretches the meaning of 'employee' [under the FLSA] to cover some parties who might not qualify as such under a strict application of traditional agency law principles."[103] The FLSA's overarching inquiry of economic dependence thus establishes a broader scope of employment than that which exists under the common law of agency and evinces Congress's intent to "protect all covered workers

---

[99] *See* 29 U.S.C. 203(e)(1), (g).

[100] *See Rutherford Food*, 331 U.S. at 728 & n.7.

[101] *See generally People ex rel. Price v. Sheffield Farms-Slawson-Decker Co.*, 225 N.Y. 25, 29-31 (N.Y. 1918).

[102] *See* 29 U.S.C. 202, 203(e)(1), (g); *Rosenwasser*, 323 U.S. at 362, 363 n.3 (quoting statement of Senator Black from 81 Cong. Rec. 7657 that "the term 'employee' had been given 'the broadest definition that has ever been included in any one act'"); *see also, e.g.*, *Parrish*, 917 F.3d at 378 ("Given the remedial purposes of the [FLSA], an expansive definition of 'employee' has been adopted by the courts." (citation omitted)); *Off Duty Police*, 915 F.3d at 1054-55 (noting, directly under the heading "Employment Relationship," that "[t]he FLSA is 'a broadly remedial and humanitarian statute ... designed to correct labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers'" (quoting *Donovan v. Brandel*, 736 F.2d 1114, 1116 (6th Cir. 1984) (some internal quotation marks omitted)). The FLSA's broad scope of employment, broader than the common law, was not changed by the Supreme Court's decision in *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134 (2018), which explained that the Act's statutory exemptions should be interpreted fairly because there is no textual indication that the exemptions should be construed narrowly. *See* 138 S. Ct. at 1142. Here, the Act's definition of "employ" as including "to suffer or permit to work" gives a clear textual basis for the breadth of employment under the FLSA. 29 U.S.C. 203(g); *see Off Duty Police*, 915 F.3d at 1062 ("[T]hese [economic reality] factors must be balanced in light of the FLSA's strikingly broad definition of employee." (quotations and citation omitted)).

[103] *Darden*, 503 U.S. at 326; *see also Portland Terminal*, 330 U.S. at 150 (in determining employee status under the FLSA, "common law employee categories or employer-employee classifications under other statutes are not of controlling significance").

KG-Universal_000152

from substandard wages and oppressive working hours."[104] Altering the focus of this analysis to two "core" factors—particularly the control factor, as discussed below—risks excluding or misclassifying workers whose FLSA employment status is established under other facts that demonstrate that they are economically dependent on an employer and not in business for themselves.

Moreover, upon further review of the case law, the Department is not aware of any court that has, as a general and fixed rule, elevated a subset of the economic realities factors above the other factors in all cases, and there is no clear statutory basis for such a predetermined weighting of the factors. Rather, the Department is cognizant of the voluminous case law that emphasizes that it "'is impossible to assign to each of these factors a specific and invariably applied weight.'"[105] Undeniably, courts have refused to assign universal and predetermined weights to certain factors; rather, courts stress that the analysis must consider the totality of the circumstances and neither the presence nor absence of any particular factor is dispositive.[106]

---

[104] *Barrentine v. Arkansas-Best Freight Sys., Inc*., 450 U.S. 728, 739 (1981).

[105] *Parrish*, 917 F.3d at 380 (quoting *Hickey v. Arkla Indus., Inc.*, 699 F.2d 748, 752 (5th Cir. 1983)); *see also Scantland*, 721 F.3d at 1312 n.2 (observing that the relative weight of each factor "depends on the facts of the case"); *Silk*, 331 U.S. at 716 (rejecting "a rule of thumb to define the limits of the employer-employee relationship" immediately before providing an incomplete list of factors considered "important for decision").

[106] *See Razak*, 951 F.3d at 143 (citing *DialAmerica Mktg.*, 757 F.2d at 1382); *see also McFeeley*, 825 F.3d at 241 ("While a six-factor test may lack the virtue of providing definitive guidance to those affected, it allows for flexible application to the myriad different working relationships that exist in the national economy. In other words, the court must adapt its analysis to the particular working relationship, the particular workplace, and the particular industry in each FLSA case."); *Ellington v. City of East Cleveland*, 689 F.3d 549, 555 (6th Cir. 2012) ("This 'economic reality' standard, however, is not a precise test susceptible to formulaic application. . . . It prescribes a case-by-case approach, whereby the court considers the 'circumstances of the whole business activity.'") (quoting *Brandel*, 736 F.2d at 1116); *Morrison v. Int'l Programs Consortium, Inc.*, 253 F.3d 5, 11 (D.C. Cir. 2001) ("No one factor standing alone is dispositive and courts are directed to look at the totality of the circumstances and consider any relevant evidence."); *Superior Care*, 840 F.2d at 1059 ("No one of these factors is dispositive; rather, the test is based on a totality of the circumstances. . . . Since the test concerns the totality of the circumstances, any relevant evidence may be considered, and mechanical application of the test is to be avoided."); *Lauritzen*, 835 F.2d at 1534 ("Certain criteria have been developed to assist in determining the true nature of the relationship, but no criterion is by itself, or by its absence, dispositive or controlling."); *Hickey*, 699 F.2d at 752 ("It is impossible to assign to each of these factors a specific and invariably applied weight."); *Usery*, 527 F.2d at 1311-12 ("No one of these

Regarding the Department's review of certain appellate case law in the Rule discussed by some commenters, the Department believes that upon further consideration, this summary of appellate case law is incomplete, oversimplifies the analysis provided by the courts, and makes assumptions about the reasoning behind the courts' decisions that are not necessarily clear from the decisions themselves.[107] The Rule's discussion of the review was incomplete because the Department did not provide full documentation or citations for its case law review. In addition, it was not made clear in the Rule what the scope of the review entailed (e.g., whether it included only published circuit court decisions or all cases, whether it included cases that were simply remanded to the district court for any reason, etc.).[108] The review oversimplified the analysis provided by the courts because court decisions regarding classification under the FLSA often emphasize the fact-specific nature of the totality of circumstances analysis and do not parse out each factor like a checklist.[109] As the Third Circuit, for example, recently reiterated, neither the presence nor absence of any particular factor is dispositive, and courts should examine the circumstances of the whole activity, which is how courts commonly approach this analysis.[110] Mechanically deconstructing court decisions and considering what courts have said about only two factors, even when courts did present their analyses in this manner, ignores the holistic approach that most courts have taken in determining worker classification.

---

considerations can become the final determinant, nor can the collective answers to all of the inquiries produce a resolution which submerges consideration of the dominant factor—economic dependence.").

[107] *See* 86 FR 1196-98.

[108] *See* 86 FR 1198 (stating "[a]mong the appellate decisions since 1975 that the Department reviewed…" and thus indicating that the universe may have been limited in some capacity that is not noted in the Rule).

[109] The economic realities factors ultimately assess whether the worker is economically dependent on the employer or in business for him/herself. *See*, *e.g.*, *Parrish*, 917 F.3d at 380 ("[T]he focus is on an assessment of the economic dependence of the putative employees, the touchstone for this totality of the circumstances test.") (internal quotation marks and citation omitted); *Keller*, 781 F.3d at 807 ("[W]e address each factor with an eye toward the ultimate question—[the worker's] economic dependence on or independence from [the employer].");  *Scantland*, 721 F.3d at 1312 (the economic realities factors "serve as guides, [and] the overarching focus of the inquiry is economic dependence").

[110] *See Razak*, 951 F.3d at 143 (citing *DialAmerica Mktg.*, 757 F.2d at 1382).

KG-Universal_000154

Most significantly, the Rule's assertion about the case law makes assumptions about the courts' decisions that are not part of the courts' reasoning—the Rule did not identify any court opinion that states that control and opportunity for profit or loss should be invariably prioritized over other factors as the Rule would have done, and there is therefore no basis to suggest that the case law endorses this "core factor" analysis. The Rule stated that "[t]he Department's review of case law indicates that courts of appeals have effectively been affording the control and opportunity factors greater weight, even if they did not always explicitly acknowledge doing so."[111] The Department should not have replaced the courts' analyses based on the theory that they were actually setting forth an unstated, different analysis, especially when courts expressly stated that they were applying a multifactor, holistic analysis. Ultimately, these cases were decided based on the application of the economic realities test to their facts, and different facts produce different results. As *Saleem*—a case relied upon heavily in the Rule—made clear, courts identify the most probative facts for that particular case and rely on them in reaching an outcome, and the factual differences do not need to be great to produce a different result.[112] The case law reflects that, rather than prioritizing certain factors as the Rule contended, courts have explicitly explained that the determination of the relationship depends on "the circumstances of the whole activity."[113]

While there are certainly many cases in which the classification decision made by the court aligns with the classification indicated by the control and opportunity for profit and loss factors, the Rule concedes that there are cases in which the classification suggested by the

---

[111] 86 FR 1198. The Rule further hypothesized that "[i]n those cases where the control factor and opportunity factor aligned, had the courts hypothetically limited their analysis to just those two factors, it appears to the Department that the overall results would have been the same." *Id*.

[112] *Saleem*, 854 F.3d at 149 ("We conclude only that assessing the totality of the circumstances here in light of each *Silk* factor, undisputed evidence makes clear as a matter of law that *these* Plaintiffs were not employees of *these* Defendants. In a different case, and with a different record, an entity that exercised similar control over clients, fees, and rules enforcement in ways analogous to the Defendants here might well constitute an employer within the meaning of the FLSA.") (emphasis in original).

[113] *Rutherford Food*, 331 U.S. at 730.

control factor did not align with the worker's classification as determined by the courts.[114] The Rule also stated in a footnote, regarding the opportunity factor, that "[t]his is not to imply that the opportunity factor necessarily aligns with the ultimate classification, but rather that the Department is not aware of an appellate case in which misalignment occurred."[115] The Rule did not, however, identify any cases stating that the opportunity for profit or loss factor should be determinative or more probative of a worker's classification than other factors. Additionally, it is necessarily the case that if any two factors of a multifactor balancing test point toward the same outcome, then that outcome becomes increasingly likely to be the ultimate outcome; however, there was no analysis provided in the Rule regarding whether a different combination of factors would yield similar results.

While the Department is always seeking to improve clarity for workers and employers, the Rule's formulaic and mechanical weighting of factors is precisely what courts have cautioned against for decades in applying an economic reality analysis.[116] This is because a true balancing test that properly considers the totality of circumstances by definition does not mechanically elevate certain factors, and doing so would impermissibly narrow the Act's broad definition of "employ." For example, if facts relevant to the control and opportunity for profit or loss factors both point to independent contractor status for a particular worker but weakly so, those factors should not be presumed to carry more weight than stronger factual findings under other factors (e.g., the existence of a lengthy and exclusive working relationship under the "permanence" factor, the performance of work at the very heart of the potential employer's business under the

---

[114] 86 FR 1197.

[115] *Id*. at 1197, n.44.

[116] The Supreme Court has been clear that there is no single factor that is determinative, *see Rutherford Food*, 331 U.S. at 730, nor is there any "mathematical formula" to be applied, *Antenor v. D & S Farms*, 88 F.3d 925, 933 (11th Cir. 1996). Furthermore, "courts have found economic dependence under a multitude of circumstances where the alleged employer exercised little or no control or supervision over the putative employees." *Antenor*, 88 F.3d at 933 (citations omitted). Courts of appeals have cautioned against any "mechanical application" of the economic reality factors. *See, e.g., Saleem*, 854 F.3d at 139. "Rather, each factor is a tool used to gauge the economic dependence of the alleged employee, and each must be applied with this ultimate concept in mind." *Hopkins v. Cornerstone America*, 545 F.3d 338, 343 (5th Cir. 2008).

"integral" factor, etc.). Courts and the Department may focus on some relevant factors more than others when analyzing a particular set of facts and circumstances, but that does not mean that it is possible or permissible to derive from these fact-driven decisions universal rules regarding which factors deserve more weight than the others when the courts themselves have not set forth any such universal rules despite decades of opportunity.

Further, the Rule's reliance on how courts assessed the control and opportunity for profit or loss factors in the past is inapposite here, because, as discussed below, the Rule would have significantly altered both of these factors, changing what may be considered for each. For example, the Rule would have downplayed the employer's right to control the work and recast the opportunity for profit or loss factor as indicating independent contractor status based on the worker's initiative or investment.[117] In other words, even if courts had generally relied upon control and opportunity for profit or loss in prior cases, the new framing of these factors, as redefined in the Rule, nevertheless sets forth a new analysis without precedent.

Accordingly, the Department agrees with the view expressed by numerous commenters that the Rule's elevation of the control and opportunity for profit or loss factors is in tension with the language and purpose of the Act as well as the position, expressed by the Supreme Court and in appellate cases from across the circuits, that no single factor is determinative in the analysis of whether a worker is an employee or independent contractor.

2.    *The Role of Control in the Rule's Analysis*

As explained above, the Independent Contractor Rule would have identified the nature and degree of control over the work as one of the two "core factors" meant to carry "greater weight in the analysis."[118] According to the Rule, "review of case law indicates that courts of appeals have effectively been affording the control and opportunity factors greater weight, even

---

[117] *See* 86 FR 1246-47 (§§ 795.105(d)(1)(i)-(ii), 795.110).
[118] *See* 86 FR 1246-47 (§ 795.105(d)(1)). The worker's opportunity for profit or loss would have been the other core factor.

KG-Universal_000157

if they did not always explicitly acknowledge doing so."[119] The Rule addressed and rejected comments which opined that focusing the analysis on two core factors—one of which would be control—would narrow the analysis to a common law control test.[120]

In the proposal to withdraw the Independent Contractor Rule, the Department expressed concern that "significant legal and policy implications could result from making control one of only two factors that would be ascribed greater weight" and cited several Supreme Court decisions stating that the FLSA's definition of "employ" means that the scope of employment under the Act is broader than under a common law control (*i.e.*, agency) analysis.[121] The Department questioned whether, in light of this Supreme Court "directive," "the outsized—even if not exclusive—role that control would have if the Rule's analysis were to apply may be contrary to the Act's text and case law."[122]

Several commenters who supported the proposed withdrawal of the Rule compared, and even equated, the Rule's elevation of control as a "core" factor with the adoption of a common law control test, a test which is inconsistent with the FLSA's "suffer or permit" standard. For example, AFSCME stated that, "by elevating consideration of day-to-day control as near-determinative, rather than one coequal factor among six, the Department has formulated a standard aligned with, and possibly more restrictive than, the common law employment test." The State Officials asserted that the Independent Contractor Rule "was wrong not only to elevate any one relevant factor over another in an assessment of a worker's economic reality, but also to elevate control in particular" because "the FLSA uses an intentionally broad definition of employment, which expands the statute's protections to a class of workers greater than just those who would satisfy a common law understanding of employment based largely on the degree of control." They added that the Rule's "emphasis on control reverts back to the common law

---

[119] *Id.* at 1198 (citing 85 FR 60619).
[120] *See id.* at 1200-01.
[121] 86 FR 14033 (citing 29 U.S.C. 203(g); *Darden*, 503 U.S. at 326; *Portland Terminal*, 330 U.S. at 150-51; *Rutherford Food*, 331 U.S. at 728; *Rosenwasser*, 323 U.S. at 362-63).
[122] *Id.*

standard" and that "this, too, requires withdrawal of the [Rule]." *See also* AFL-CIO ("Despite . . . clear Supreme Court instructions to construe the definition of employee in the FLSA more broadly than under the common law . . . , the [Rule] effectively collapses the FLSA's definition into the common law definition by giving primacy and controlling weight to the two factors of control and opportunity for profit and loss."); Representative Scott, *et al.* ("Giving the control factor outsized weight under the Rule's test is in direct conflict with congressional intent.").

Many commenters who opposed the proposed withdrawal of the Rule expressed general support for elevating control as a "core" factor along with opportunity for profit or loss. For example, Capital Investment Companies stated that the Rule "properly focuses on the control over the working relationship and the financial aspects of the relationship." The Intermodal Association of North America commended the Rule's adoption of a "revised economic reality test, with a focus on the nature and degree of the worker's control over their work and the worker's opportunity for profit or loss." Commenters who opposed the Rule's proposed withdrawal generally did not express concerns with elevating control as one of two core factors for determining employee or independent contractor status.

As an initial matter and as explained above, it is not legally supportable to elevate in a predetermined and universal manner two factors above the others. Moreover, having considered the issue and the comments received, it is the Department's position that, in particular, elevating control is contrary to the FLSA's text and its particular scope of employment. As noted, the FLSA defines "employ" to include "to suffer or permit to work."[123] The Supreme Court has explained that this FLSA definition was a rejection of the common law control standard for determining who is an employee under the Act in favor of a broader scope of coverage.[124]

---

[123] 29 U.S.C. 203(g).

[124] *See Darden*, 503 U.S. at 326 ("[T]he FLSA … defines the verb 'employ' expansively" and with "striking breadth" that "stretches the meaning of 'employee' to cover some parties who might not qualify as such under a strict application of traditional agency law principles.") (citations omitted); *Portland Terminal*, 330 U.S. at 150-51 ("But in determining who are 'employees' under the Act, common law employee categories or employer-employee

Although the Rule's test was not the same as the common law control test, the Rule's mandate that control have such an elevated role in every FLSA employee or independent contractor analysis brought the Rule too close to the common law test that the Act squarely rejects. Accordingly, the outsized role that control would have played in the analysis supports withdrawing the Rule.

3.      *The Rule's Narrowing of Several Factors*

In its proposal to withdraw the Independent Contractor Rule, the Department expressed concern that the ways in which the Rule would have redefined certain factors would improperly narrow the application of the economic realities test.[125] The Department identified four examples of such narrowing: (1) making the "opportunity for profit or loss" factor indicate independent contractor status based on the worker's initiative *or* investment; (2) disregarding the employer's investments; (3) disregarding the importance or centrality of a worker's work to the employer's business; and (4) downplaying the employer's right or authority to control the worker.[126] In each of these ways, the Rule would have narrowed the scope of facts and considerations comprising the analysis of whether the worker is an employee or independent contractor, eliminating several facts and concepts that have deep roots in both the courts' and WHD's application of the analysis.[127] Moreover, the Department expressed concern that, as a policy matter, the Rule's narrowing of the analysis would result in more workers being classified as independent contractors not entitled to the FLSA's protections, contrary to the Act's purpose of broadly covering workers as employees.[128]

---

classifications under other statutes are not of controlling significance. This Act contains its own definitions, comprehensive enough to require its application to many persons and working relationships, which prior to this Act, were not deemed to fall within an employer-employee category.") (citations omitted); *see also Rutherford Food*, 331 U.S. at 728 ("The definition of 'employ' is broad."); *Rosenwasser*, 323 U.S. at 362-63 ("A broader or more comprehensive coverage of employees … would be difficult to frame.").

[125] *See* 86 FR 14033-34.

[126] *See id.*

[127] *See id.* at 14034.

[128] *See id.*

A number of commenters who supported withdrawal agreed that the Rule would have impermissibly narrowed how the factors are applied. For example, the National Employment Lawyers Association (NELA) and the Women's Law Project stated that the "words of the FLSA are unrecognizable in [the Rule's] cramped reading of the law and its adoption of entirely irrelevant factors, twisting of the meaning of other factors, and narrowing of the measure of what it means to be an employee." According to AFSCME, the Rule would have "redefine[d]" the factors, "narrowing and confining the depth of each factor's inquiry." The State Officials added that the Rule would have "unreasonably exclude[d] relevant criteria from the determination of whether a worker is covered by the FLSA" and would not have considered "the full details of a working relationship, as decades of precedent require." The National Employment Law Project commented that the Rule "describe[d] a set of narrow 'core' factors taken from a cramped version of the narrowly-scoped common law, which is not the test for employment coverage under the FLSA, assert[ed] new factors never before considered relevant by the courts, and prevent[ed] consideration of factors that the Supreme Court has always deemed critical to determining whether an employment relationship exists."

Of the commenters who opposed the proposed withdrawal of the Rule, the National Association of Home Builders supported the Rule's "adopting a narrower 'economic reality' test to determine a worker's status as an FLSA employee or an independent contractor" and "reject[ed] the contention and justification offered as support for withdrawing the [Rule]." Other commenters disputed the Department's concern that the Rule would narrow the application or the factors and/or that any narrowing is a basis for withdrawing the Rule. For example, the Competitive Enterprise Institute disputed the concern, arguing among other things that "the underlying determining factors would remain the same" and that the Rule did "not prevent courts from weighing all factors," but instead "merely offer[ed] guidance, as a rulemaking should." The U.S. Chamber of Commerce characterized the proposal's concern that the Rule's narrowing of the analysis would result in more workers being classified as independent contractors as

"misguided and presum[ing] conclusions that the [Rule] does not guarantee." Other comments asserted that the Rule's explanation of the factors eliminated confusion and overlap among the factors. *See*, *e.g.*, Seyfarth Shaw on behalf of Coalition for Workforce Innovation (asserting that the Rule provided "clear guidance regarding . . . which facts fall within the various and sometimes blurred factors," "increas[ing] legal certainty in application of the economic realities test").

Having considered the comments and the issues further, the Department believes that, by removing from the analysis several facts and concepts that have a strong foundation in both the courts' and WHD's application of the analysis, the Rule would have improperly narrowed the scope of facts and considerations comprising the analysis of whether a worker is an employee for purposes of the FLSA or an independent contractor. Narrowing the facts and considerations that comprise the analysis would have been inconsistent with the court-mandated totality-of-the-circumstances approach to determining whether a worker is an employee or an independent contractor.[129] The Department elaborates on this below in its discussion of several examples of how the Rule would have narrowed application of the factors. In addition, upon further consideration, the Rule's narrowing of factors would, in the Department's view, have likely resulted in more workers being reclassified or misclassified as independent contractors not entitled to the FLSA's protections. Not only would such a result have been contrary to the Act's purpose of broadly covering workers as employees,[130] but to the extent that women and people of

---

[129] *See*, *e.g.*, *Ellington v. City of East Cleveland*, 689 F.3d 549, 555 (6th Cir. 2012) ("This 'economic reality' standard, however, is not a precise test susceptible to formulaic application . . . . It prescribes a case-by-case approach, whereby the court considers the 'circumstances of the whole business activity.'") (quoting *Donovan v. Brandel*, 736 F.2d 1114, 1116 (6th Cir. 1984)); *Morrison v. Int'l Programs Consortium, Inc.*, 253 F.3d 5, 11 (D.C. Cir. 2001) ("No one factor standing alone is dispositive and courts are directed to look at the totality of the circumstances and consider any relevant evidence."); *Snell*, 875 F.2d at 805 ("It is well established that no one of these factors in isolation is dispositive; rather, the test is based upon a totality of the circumstances."); *Superior Care*, 840 F.2d at 1059 (2d Cir. 1988) ("No one of these factors is dispositive; rather, the test is based on a totality of the circumstances . . . . Since the test concerns the totality of the circumstances, any relevant evidence may be considered, and mechanical application of the test is to be avoided.").

[130] *See*, *e.g.*, *supra* notes 8-10, and accompanying text.

color are overrepresented in low-wage independent contractor positions where misclassification

is more likely (as a number of commenters asserted), this result would have had a

disproportionate impact on these workers. Citing a study finding that seven of the eight high

misclassification occupations were held disproportionately by women and/or workers of color,

the National Women's Law Center, Kentucky Equal Justice Center, Center for Law and Social

Policy, Shriver Center on Poverty Law, and other commenters asserted that "it is no coincidence

that corporate misclassification is rampant in low-wage, labor-intensive industries where women

and people of color, including Black, Latinx, and AAPI workers, are overrepresented." These

commenters, as well as numerous individual commenters, added that the Rule would have

"inflict[ed] the most damage on workers of color who predominate in the low-paying jobs where

independent contractor misclassification is common." The Department agrees that if the Rule

had resulted in an increase in the use of independent contractors in low-wage industries where

independent contracting is common, it could have had a disproportionate effect on women and

workers of color.

In sum, the Rule's narrowing of the application of the economic realities factors, as

further described below, warrants withdrawal of the Rule.

a.   *Making the Opportunity for Profit or Loss Factor Indicate Independent Contractor Status Based on the Worker's Initiative or Investment*

The Independent Contractor Rule would have provided that the opportunity for profit or

loss factor indicates independent contractor status if the worker has that opportunity based on

either his or her exercise of initiative (such as managerial skill or business judgment) *or*

management of his or her investment in or capital expenditure on helpers or equipment or

material to further his or her work.[131] The worker "does not need to have an opportunity for

profit or loss based on both for this factor to weigh towards the individual being an independent

contractor."[132] In other words, the factor would have indicated independent contractor status if

---

[131] *See* 86 FR 1247 (§ 795.105(d)(1)(ii)).

[132] *Id.*

the worker either: (1) made no capital investment but exercised initiative or (2) had a capital investment but exercised no initiative. Most courts currently consider investment as its own factor in the analysis, but the Rule's change would have resulted in investment no longer being its own factor. In addition, courts may currently consider initiative as part of the skill factor, but the Rule's change would have resulted in initiative being considered only as part of the opportunity for profit or loss factor. The proposal to withdraw the Rule expressed the concern that, by articulating the factor in this manner, the Rule would completely remove investment or initiative from consideration in certain cases.[133] The proposal suggested that, for example, if the worker exercised initiative, the opportunity for profit or loss factor would indicate independent contractor status even if the worker made no capital investment.[134]

Few commenters addressed the Rule's exact articulation of the opportunity for profit or loss factor. AFSCME commented that although this factor was "initially formulated to determine whether an independent contractor can grow and expand their business through investment," the Rule would have "look[ed] only to whether a worker's success (or failure) in earnings can be attributable to individual initiative or management but need not involve both." The International Brotherhood of Teamsters objected to the Rule's "refram[ing]" of the opportunity for profit or loss factor, arguing that it would "overemphasiz[e] workers' theoretical ability to increase their earnings through minimal investment or personal initiative." Other commenters who supported the proposed withdrawal generally questioned whether the opportunity for profit or loss should be determinative. *See*, *e.g.*, AFL-CIO; Women's Law Project. On the other hand, commenters who opposed withdrawal of the Rule generally supported the Rule's articulation of the opportunity for profit or loss factor as being based on initiative or investment. *See*, *e.g.*, SHRM; Seyfarth Shaw on behalf of Coalition for Workforce Innovation; Associated General Contractors of America; *see also* American Society of Travel Advisors.

---

[133] *See* 86 FR 14033.

[134] *See id.*

Having considered the comments and the issue further, the Department believes that the Rule's articulation of the opportunity for profit or loss factor as indicating independent contractor status if the worker either exercises initiative or manages capital investment is not supported. No court articulates the opportunity for profit or loss factor as having these two prongs, only one of which need indicate independent contractor status for the factor as a whole to indicate independent contractor status. Moreover, this articulation would have erased from the analysis in certain situations the worker's lack of initiative or lack of capital investment—both of which are longstanding and well-settled indicators of employee status. Because the worker's initiative and investment would have been considered under the Rule only as the two prongs comprising the opportunity for profit or loss factor, if either one indicated an opportunity for profit or loss then the factor would have invariably indicated independent contractor status. The other prong need not be considered at all as it could not have reversed or weighed against that finding even if it indicated employee status as a matter of economic reality. In effect, the Rule's subordination of "initiative" and "investment" as alternative considerations within the "opportunity for profit or loss" factor would have favored independent contractor status even when evidence of employee status was present.

b.    *Disregarding the Employer's Investments*

The Independent Contractor Rule articulated investment as the worker's "management of his or her investment in or capital expenditure on, for example, helpers or equipment or material to further his or her work."[135] The Rule's preamble provided that "comparing the individual worker's investment to the potential employer's investment should not be part of the analysis of investment."[136] Thus, the Rule precluded consideration of the employer's investment. The proposal to withdraw the Rule questioned the basis for the Rule's limited consideration of investment.[137]

---

[135] 86 FR 1247 (§ 795.105(d)(1)(ii)).
[136] *Id.* at 1188.
[137] *See* 86 FR 14033.

Few commenters addressed the issue in response to the proposal. For example, Farmworker Justice commented that the Department was "correct" to identify the Rule's preclusion of consideration of "the worker's investment relative to the putative employer's investment" as "inconsistent with the law." The International Brotherhood of Teamsters opposed both the Rule's rejection of "prior precedent which held that in determining whether or not a worker's investment was significant, courts must compare it to the employer's investment" and the Rule's suggestion that "a minimal investment by a worker might be sufficient to find that a worker is an independent contractor even if the employer made much more significant investments." Representative Scott, *et al.*, when describing the factors "almost uniformly used in federal courts of appeal as indicators of economic dependence," articulated the investment factor as "the extent of the relative investments of the employer and the worker" and cited AI 2015-1.

Commenters who opposed withdrawal of the Rule generally did not share any concerns with the Rule's limiting of the investment factor to consideration of the worker's investment. The Center for Workplace Compliance, for example, commented that there is "significant overlap between the relative investment factor and the factor examining the opportunity for profit or loss" and that "not separately list[ing] the relative investment factor removes any confusion caused by the overlap yet does not prevent an analysis of relative investment where appropriate." These commenters generally approved of the Rule's articulation of the factors, including investment. *See, e.g.*, Seyfarth Shaw on behalf of Coalition for Workforce Innovation; U.S. Chamber of Commerce.

Having considered the comments and the issue further, the Department believes that the Rule's interpretation against considering the worker's investment as compared to the employer's investment was legally unsound. As support for the interpretation, the Rule cited decisions from the Fifth and Eighth Circuits in which courts gave little weight to the comparison of the employer's investment in its business to the worker's investment in the work in light of the facts

KG-Universal_000166

presented in those cases.[138] However, the decisions cited did make the comparison of the

investments a part of the analysis, but found that the comparison had little relevance or accorded

it little weight under those particular facts.[139] Numerous other courts of appeals have considered

the worker's investment in the work in comparison to the employer's investment in its

business,[140] as does WHD in enforcement actions. As the Fifth and Eighth Circuit decisions

demonstrate, courts may give the relative comparison of investments little weight in certain

factual circumstances or make nuanced decisions regarding how much evidence of the

employer's investment to allow. Accordingly, precluding consideration of the worker's and the

employer's relative investments would have very little legal support, would have been contrary

---

[138] *See* 86 FR 14033. The Fifth Circuit decisions cited were *Parrish*, 917 F.3d at 383, and
*Hopkins*, 545 F.3d at 344-46. The Eighth Circuit decision cited was *Karlson*, 860 F.3d at 1096.
[139] *See Parrish*, 917 F.3d at 383; *Hopkins*, 545 F.3d at 344-46. The Fifth Circuit recently again
articulated the investment factor as "'the extent of the relative investments of the worker and the
alleged employer.'" *Hobbs*, 946 F.3d at 829 (quoting *Hopkins*, 545 F.3d at 343). In *Hobbs*, the
Fifth Circuit affirmed the district court's finding that the relative investments – the potential
employer's "overall investment in the pipe construction projects" as compared to the workers'
individual investments – favored employee status. *Id.* at 831-32. The Fifth Circuit agreed with
the district court's conclusion to give the factor "little weight in its analysis" in that case given
the nature of the industry and work involved. *Id.* at 832 (citing *Parrish*, 917 F.3d at 383). In sum
and contrary to what the Rule would have provided, the Fifth Circuit routinely considers the
relative investments of the worker and the potential employer even if the factor may ultimately
be accorded little weight depending on the circumstances. And in the Eighth Circuit's decision in
*Karlson*, the court affirmed the district court's decision to allow some evidence of the worker's
and the employer's relative investments but not allow the worker to introduce evidence of the
employer's overall investment (i.e., large dollar figures) that "would create the danger of unfair
prejudice." 860 F.3d at 1096.
[140] *See, e.g.*, *McFeeley*, 825 F.3d at 243 (comparing the potential employers' payment of rent,
bills, insurance, and advertising expenses to the workers' "limited" investment in their work);
*Keller*, 781 F.3d at 810 ("We agree that courts must compare the worker's investment in the
equipment to perform his job with the company's total investment, including office rental space,
advertising, software, phone systems, or insurance."); *Baker v. Flint Eng'g & Constr. Co.*, 137
F.3d 1436, 1442 (10th Cir. 1998) ("In making a finding on this factor, it is appropriate to
compare the worker's individual investment to the employer's investment in the overall
operation."); *Lauritzen*, 835 F.2d at 1537 (disagreeing that "the overall size of the investment by
the employer relative to that by the worker is irrelevant" and finding that "that the migrant
workers' disproportionately small stake in the pickle-farming operation is an indication that their
work is not independent of the defendants"); *see also Iontchev v. AAA Cab Service, Inc.*, 685
Fed. Appx. 548, 550 (9th Cir. 2017) (noting that the drivers "invested in equipment or materials
and employed helpers to perform their work" but concluding that the investment factor was
"neutral" because the cab company "leased taxicabs and credit card machines to most of the
[drivers]").

to numerous courts of appeals decisions as well as the totality-of-the-circumstances approach applied by courts,[141] and would have been an unfounded limit on factfinders' ability to pursue inquires that best differentiate between a worker's economic dependence and independence based on the particular facts of the case.

c.    *Disregarding the Importance or Centrality of a Worker's Work to the Employer's Business*

The Independent Contractor Rule would have recast the factor examining whether the worker's work "is an integral part" of the employer's business as whether the work "is part of an integrated unit of production."[142] The Rule rejected as irrelevant to this factor whether the work is important or central (*i.e.*, integral) to the employer's business.[143] Instead, the Rule would have provided that "the relevant facts are the integration of the worker into the potential employer's production processes" because "[w]hat matters is the extent of such integration rather than the importance or centrality of the functions performed" by the worker.[144] The Rule asserted that this recast articulation was supported by *Rutherford Food* (which considered whether the work was "part of the integrated unit of production" of the employer),[145] but acknowledged that WHD and courts typically consider whether the work is important or central.[146] The proposal to withdraw the Rule identified this factor's redefinition to "integrated unit of production" as another example of how the Rule would eliminate from the economic realities analysis facts and concepts that have a strong foundation in the courts' and WHD's application of the analysis and would narrow the scope of the analysis.[147]

A number of commenters who supported the proposed withdrawal objected to the Rule's narrowing of the "integral" factor. For example, Farmworker Justice commented that the

---

[141] *See supra* note 106.
[142] *See* 86 FR at 1193-96, 1247 (§ 795.105(d)(2)(iii)).
[143] *See id.* at 1193-95.
[144] *Id.* at 1195.
[145] *See id.* at 1193-94 (citing *Rutherford Food*, 331 U.S. at 729).
[146] *See id.* at 1193.
[147] *See* 86 FR 14033-34.

Department was "correct" to identify the Rule's "remov[al of] consideration of the work's importance to the business purpose" as "inconsistent with the law." The State Officials stated that, "under well-established circuit court precedent, the relevant inquiry is whether the worker's work is 'an integral part of the business,' which could be satisfied by being part of an integrated unit, or by being integral to the business." Texas RioGrande Legal Aid asserted that, by "removing" consideration of whether "farmworkers perform tasks integral to the businesses of the growers to whom they provide services," the Rule would have "stacked the decks in favor of a narrower definition of farm-based employee." The AFL-CIO added that the Rule would have "narrow[ed] the meaning" of the integral factor and was "contrary to Congress' intent and otherwise unjustified for several reasons," including because it would have been inconsistent with Supreme Court and Circuit Court precedent and because it "appears to be intended to provide transportation network companies like Uber and Lyft with a regulatory basis for their argument that their drivers are not their employees." The International Brotherhood of Teamsters objected for similar reasons, arguing that the Rule's "bar[ring] any consideration of whether the work performed is important or otherwise integral to the employer's business [is] in direct contradiction of established precedent" and was undertaken to "facilitat[e] the recognition of gig workers as independent contractors."

Commenters who opposed the proposal to withdraw did not share concerns regarding this factor. The Center for Workplace Compliance stated that "many courts have found the former 'integral part' framing of the factor as overlapping with the ability to control work" and that "the 'integral part' factor can inappropriately be interpreted to focus on the importance of the work instead of integration." It agreed with the Rule that "reframing this factor to look at whether the work is part of an integrated unit of production . . . is much closer to how the factor has been historically interpreted by the Supreme Court." Other commenters who opposed the proposal generally objected to the proposal's assertion that the Rule would have narrowed the factors, *see*,

*e.g.*, U.S. Chamber of Commerce, or generally supported the Rule's articulation of the factors, including the "integrated unit" factor, *see*, *e.g.*, TechServe Alliance.

Having considered the comments and the issue further, the Department believes that the Rule's narrowing of the "integral part" factor to exclude consideration of whether the work is central or important was not supported. As the Rule acknowledged, WHD and courts have been applying the "integral part" factor for decades,[148] and it is a longstanding factor within the economic realities analysis. This is because a worker who performs work that is integral to the employer's business is more likely to be economically dependent on the employer;[149] whereas a worker who performs work that is more peripheral to the employer's business is more likely to be independent from the employer. Moreover, as with the other ways in which the Rule would have limited the analysis, the Rule's exclusion of whether the work is important or central to the employer's business is inconsistent with the court-mandated totality-of-the-circumstances approach to determining whether a worker is an employee or an independent contractor.[150] In addition, the Rule's reliance on *Rutherford Food*'s "integrated unit of production" language was overly rigid and incomplete. The Rule did not consider a passage from the Supreme Court's contemporaneous decision in *Silk* finding that "unloaders" were employees of a retail coal company as a matter of economic reality in part because they were "*an integral part* of the businesses of retailing coal or transporting freight." 331 U.S. at 716 (emphasis added). The Rule did not sufficiently credit courts' or WHD's longstanding treatment of *Rutherford Food*'s "integrated unit" language as tantamount to analyzing whether the work is an "integral part" of the employer's business.[151] Finally, the Rule stated that the "integral part" factor tended to indicate employee status and had a "higher rate of misalignment" with the ultimate result in

---

[148] *See* 86 FR at 1194 (citing WHD opinion letters and cases).
[149] See *DialAmerica Mktg.*, 757 F.2d at 1382-83.
[150] *See* footnote 106, *supra*.
[151] *See*, *e.g.*, AI 2015-1, 2015 WL 4449086, at *5 (relying on *Rutherford Food*'s "integrated unit of production" language in its discussion of the "integral" factor).

certain cases;[152] however, it did not identify any cases where the "integral part" factor led to a result that was contrary to the totality of the evidence. Accordingly, the Rule's narrowing of the "integral" factor is another reason in support of withdrawal.

d.      *Downplaying the Employer's Right or Authority to Control the Worker*

The Rule would also have stressed the primacy of the parties' actual practice by providing that "the actual practice of the parties involved is more relevant than what may be contractually or theoretically possible," and that "a business' contractual authority to supervise or discipline an individual may be of little relevance if in practice the business never exercises such authority."[153] In support, the Rule's preamble asserted that "the common law control test does not establish an irreducible baseline of worker coverage for the broader economic reality test applied under the FLSA," and that the FLSA "does not necessarily include every worker considered an employee under the common law."[154] The proposal to withdraw the Rule questioned whether this approach was consistent with Supreme Court precedent.[155]

Commenters who supported withdrawal objected to how the Rule would treat the employer's right or authority to control the worker. For example, the AFL-CIO commented that "discounting contractual or reserved control is inconsistent with congressional intent to expand the coverage of the FLSA beyond the narrow confines of common law employment and the Department provides a faulty basis for discounting reserved control." The State Officials stated that the Rule "unduly narrowed the existing factors when it emphasized that evaluating whether an employment relationship exists should rely heavily on actual practice." They added that how the Rule would have treated the employer's right or authority to control the worker "is contrary to law" and would have impermissibly "narrowed employment even further than it was

---

[152] *See* 86 FR at 1194.
[153] 86 FR at 1247 (§ 795.110).
[154] *Id.* at 1205.
[155] *See* 86 FR 14033-34.

understood at common law" (citing *New York v. Scalia*, 490 F. Supp.3d 748, 787-88 (S.D.N.Y. 2020)).

Commenters who opposed withdrawal generally agreed with how the Rule would have treated the employer's right or authority to control the worker. For example, the National Retail Federation commented that the Rule would have "appropriately focuse[d] the test on actual practice rather than contractual or theoretical possibilities." The Center for Workplace Compliance described this provision of the Rule as "consistent with historical interpretation of the economic reality test by federal courts and DOL."

Having considered the comments and the issue further, the Department believes that the actual practice of the employer is not invariably more relevant than the authority that the employer may have reserved for exercise in the future. As several commenters noted, the right to control is part of control at the common law, and the Rule's blanket diminishment of the relevance of the right to control seems inconsistent with the Supreme Court's observations that the FLSA's scope of employee coverage is exceedingly broad and broader than what exists under the common law.[156] Thus, an employer's right or authority to control a worker, for example, can be strong evidence suggesting the existence of an FLSA employment relationship, just as it is under the common law.[157] In sum, the Rule's simplistic declaration that the parties' actual practices are invariably more relevant is another reason to withdraw the Rule.

B.    *Whether the Rule Would Provide the Intended Clarity*

One of the Independent Contractor Rule's primary stated purposes was to "significantly clarify to stakeholders how to distinguish between employees and independent contractors under the Act."[158] Although the stated intent of the Rule was to provide clarity, it would also (as

---

[156] *See Rosenwasser*, 323 U.S. at 362 ("A broader or more comprehensive coverage of employees" than that contemplated under the FLSA "would be difficult to frame."); *Darden*, 503 U.S. at 326 (the FLSA "stretches the meaning of 'employee' to cover some parties who might not qualify as such under a strict application of traditional agency law principles").

[157] *See*, *e.g.*, *Razak*, 951 F.3d at 145 ("[A]ctual control of the manner of work is not essential; rather, it is the right to control which is determinative.").

[158] 86 FR 1168.

discussed above) have introduced several concepts to the analysis that neither courts nor WHD have previously applied. As explained in the NPRM, the Department's proposal to withdraw the Rule arose in part from a concern that these changes would cause confusion or lead to inconsistent outcomes rather than provide clarity or certainty, as intended.

Numerous commenters asserted that the Independent Contractor Rule would clarify the distinction between independent contractors and FLSA-covered employees, and that withdrawing the Rule would forfeit the benefits of this added clarity. For example, the U.S. Chamber of Commerce stated that "[under] the status quo ante … employers are uncertain how to classify a worker under the economic realities test because they can not [sic] know how WHD will evaluate the different factors … [which] puts employers at risk of WHD enforcement and private litigation, and can impede businesses from engaging many smaller businesses or sole proprietors." Several commenters specifically identified the Rule's elevation of two "core factors" as a clarifying feature that would reduce uncertainty and inconsistency in application of the economic realities test. *See, e.g.*, American Society of Travel Advisors ("[A]ssigning greater weight to any factor will necessarily reduce, to some degree, the element of subjectivity inherent in the test."); Competitive Enterprise Institute ("Increasing the number of factors that must be given equal weight would lead to more inconsistent outcomes in the courts and elsewhere."). Some commenters, such as Brownstein Hyatt Farber Schreck and the Washington Legal Foundation, praised the Independent Contractor Rule's inclusion of illustrative factual examples, while other commenters expressed appreciation for the Rule's guidance on common business practices that would not militate against independent contractor status, such as requiring individuals to comply with specific legal obligations, satisfy health and safety standards, carry insurance, meet contractually agreed-upon deadlines or quality control standards, or satisfy other similar terms. *See* American Trucking Association ("Without [such guidance], motor carriers and other companies in other industries will be more reluctant to engage with and require improved safety as a condition of working with them for their independent contractors."); New Jersey

KG-Universal_000173

Warehousemen & Movers Association (same). Numerous commenters asserted that these features of the Rule would reduce litigation over the FLSA employment status of alleged independent contractors. *See, e.g.*, Chauvel & Glatt, LLP; Society for Human Resource Management.

Some commenters supportive of the Independent Contractor Rule addressed the concern expressed in the NPRM that the novelty of the Rule's guidance would cause confusion or lead to inconsistent outcomes. The Competitive Enterprise Institute asserted that "[a]ll rule changes are initially unfamiliar and require courts and others to adjust," and that unfamiliarity "is not a rationale for leaving the rules unchanged when they become outdated." *See also* Melinda Spencer ("So what if this is a new definition? The country clearly needs a new, clearer definition."). Associated Builders and Contractors (ABC) and Littler Mendelson, P.C. disputed that the Rule's guidance was new or novel at all, asserting that its features were consistent with the way that most courts have been applying the economic realities test. Asserting differences in the ways that circuit courts describe the economic realities test, the Coalition to Promote Independent Entrepreneurs opined that "the Independent Contractor Rule provides an opportunity to conform all federal circuits to one unified explication of the test."

By contrast, many other commenters shared the concern expressed in the Department's NPRM that implementation of the Independent Contractor Rule would add confusion rather than clarity due to the Rule's deviation from established guidance and precedent. For example, AFSCME asserted that the Rule would "upset … settled understandings and relied-upon judicial precedent upon which millions of American workers and employers have ordered their relationships." A number of commenters, including the Center for Law and Social Policy (CLASP), the North Carolina Justice Center, and the Shriver Center on Poverty Law, characterized the Independent Contractor Rule as a "a radical departure from established agency and court interpretations of the FLSA." Farmworker Justice asserted that the Rule would "still require complex, fact-specific considerations of the unique circumstances of each employer-

worker relationship," but introduce "a whole set of new ambiguities and legal questions," such as "whether it matters at all that an activity is 'integral'—or important—to the business … how to weigh worker investment without comparing it to the investment made by the employer; what type of control is relevant when deciding the 'control' factor; when to weigh the secondary factors and so forth." The Signatory Wall and Ceiling Contractors Alliance (SWACCA) asserted that, if the Independent Contractor Rule were adopted, subsequent court decisions interpreting the Rule would "necessitate additional, ongoing familiarization costs." NELA, Pleval Law, and the International Brotherhood of Teamsters opined that implementation of the Rule would be discordant with state laws featuring more expansive worker coverage, increasing the likelihood that some workers might have different employment statuses under state and federal law.

Several commenters asserted that the lack of clarity regarding whether and to what extent courts would defer to the Independent Contractor Rule's guidance would result in uncertainty. *See* AFL-CIO; International Brotherhood of Teamsters; Northwest Workers Justice Project; SWACCA; Texas RioGrande Legal Aid. The United Brotherhood of Carpenters and Joiners of America stated that the Rule would itself be vulnerable to a successful legal challenge, invoking the "fate of the [Department's] equally flawed joint employer rule."[159] *See also* State Officials ("[F]rom its initial proposal to the present, the States and other commenters have consistently questioned [the Rule's] legality due to its departure from the FLSA and violation of [Administrative Procedure Act]-required procedures.").

Upon further reflection, including consideration of relevant comments, the Department does not believe that the Independent Contractor Rule would have achieved the added clarity it intended to provide to the regulated community. To the contrary, given how the Rule failed to account for the FLSA's broad "suffer or permit" language and the numerous ways in which it

---

[159] On September 8, 2020, the U.S. District Court for the Southern District of New York vacated most of the FLSA Joint Employer Final Rule issued by the Department and effective in March 2020, on the grounds that it is contrary to law and arbitrary and capricious. *See Scalia*, 490 F. Supp.3d 748. An appeal is currently pending before the Second Circuit Court of Appeals. *See New York v. Walsh*, No. 20–3806 (2d Cir. appeal docketed Nov. 6, 2020).

departed from courts' longstanding precedent, it is not clear whether courts would have deferred to the Rule's guidance. To the extent that some courts would have declined to apply the test set forth in the Independent Contractor Rule, this would have created conflicts among courts and between courts and the Department, resulting in more uncertainty as to the applicable economic realities test. Businesses operating nationwide would have had to familiarize themselves with multiple standards for determining who is an employee under the FLSA across different jurisdictions, continuing "to comply with the most demanding standard if they wish[ed] to make consistent classification determinations."[160]

In addition to uncertainty resulting from whether courts would defer to the Independent Contractor Rule given its departures from courts' own precedent, the Rule would have introduced several ambiguous terms and concepts into the analysis for determining the FLSA employment status of an alleged independent contractor. For example, courts and regulated parties would have had to grapple with what it would mean in practice for two factors to be "core" factors and entitled to greater weight. In addition, they would have had to determine, in cases where the two "core" factors pointed to the same classification, how "substantial" the likelihood is that they point toward the correct classification if the additional factors point toward the other classification. Perhaps most difficult of all, the Rule cautioned that its list of factors was "not exhaustive,"[161] but did not specify whether the "additional factors" referenced in § 795.105(d)(2)(iv) would have had less probative value (or weight) than the three "other factors" listed in § 795.105(d)(2)(i)-(iii) of the Rule.[162] Assuming that they did, the Rule would have essentially transformed the multifactor balancing test that courts and the Department currently apply into a three-tiered multifactor balancing test, with "core" factors given more weight than enumerated "other" factors, and enumerated "other" factors given more weight than unspecified "additional" factors. Rather than weighing all factors against each other in a holistic

---

[160] 86 FR 1241 n. 255.
[161] 86 FR 1246 (§ 795.105(c)).
[162] 86 FR 1247.

KG-Universal_000176

fashion depending on the facts of a particular work arrangement, courts and the regulated community would have had to evaluate factors within and across groups in a new hierarchical structure, which would have likely caused confusion and inconsistency. Adding to the confusion, the Rule collapses some factors into each other, so that investment and initiative are only considered as a part of the opportunity for profit or loss factor, requiring courts and the regulated community to reconsider how they have evaluated those factors.

In other words, the Independent Contractor Rule's guidance would complicate rather than simplify the analysis for determining whether a worker is an employee or independent contractor under the FLSA. Given the likelihood that many courts would ignore, reject, or not defer to the Rule's guidance for the reasons explained above, the Department believes that the Rule would have introduced substantial confusion and uncertainty on the topic of independent contractor status, to the detriment of workers and businesses alike.

C.    *Whether the Rule Would Have Benefitted Workers as a Whole*

As part of its analysis of possible costs, transfers, and benefits, the Independent Contractor Rule quantified some possible costs (regulatory familiarization) and some possible cost savings (increased clarity and reduced litigation).[163] The Rule identified and discussed—but did not quantify—numerous other costs, transfers, and benefits possibly resulting from the Rule, including "possible transfers among workers and between workers and businesses."[164] The Rule "acknowledge[d] that there may be transfers between employers and employees, and some of those transfers may come about as a result of changes in earnings," but determined that these transfers cannot "be quantified with a reasonable degree of certainty for purposes of [the Rule]."[165] The Economic Policy Institute (EPI) had submitted a comment during the rulemaking estimating that the annual transfers from workers to employers as a result of the Rule would be

---

[163] *See id.* at 1211.
[164] *Id.* at 1214-16.
[165] *Id.* at 1223.

$3.3 billion in pay, benefits, and tax payments.[166] The Rule discussed its disagreements with various assumptions underlying EPI's estimate and explained its reasons for not adopting the estimate.[167] The Rule concluded that "workers as a whole will benefit from [the Rule], both from increased labor force participation as a result of the enhanced certainty provided by [the Rule], and from the substantial other benefits detailed [in the Rule]."[168]

The Department's view, upon further consideration, of the value of EPI's analysis is addressed below in section IV, in the analysis of costs and benefits of this withdrawal. As a general matter, the Department notes here that it does not believe the Rule fully considered the likely costs, transfers, and benefits that could result from the Rule. This concern is premised in part on WHD's role as the agency responsible for enforcing the FLSA and its experience with cases involving the misclassification of employees as independent contractors. The consequence for a worker of being classified as an independent contractor is that the worker is excluded from the protections of the FLSA. Without the protections of the FLSA, workers need not be paid at least the federal minimum wage for all hours worked, and are not entitled to overtime compensation for hours worked over 40 in a workweek. Workers would also lose the FLSA's protection against retaliation for complaining about a violation of the FLSA. The Department concludes that, to the extent the Rule would result in the reclassification or misclassification of employees as independent contractors, the resulting denial of FLSA protections would harm the affected workers. The Department's decision to withdraw the Rule is the result in part of its belief that doing so will benefit workers as a whole.

The Washington Legal Foundation commented that the Department should not consider only the distributional effects of withdrawal. It argued that the Rule would still benefit workers even if it benefitted businesses more. As an initial matter, the Department believes that the distributional consequences of withdrawal are appropriate to consider. Moreover, it finds that the

---

[166] *See id.* at 1222.
[167] *See id.* at 1222-23.
[168] *Id.* at 1223.

Rule would not merely benefit workers less than business owners, but—for the reasons noted above and those explained below—would actually harm workers.

Many commenters expressed concerns that the Rule's effects would have harmed workers. For example, a number of individual commenters, including independent contractors, employees, and employers who supported withdrawing the Independent Contractor Rule believed that the Rule would give businesses more power to force workers to accept independent contractor status. As several commenters said in comments that used template language, "[i]n times of high unemployment like today, individual workers have even less market power than usual to demand fair conditions, especially in jobs that historically have been undervalued; they are forced to accept take-it-or-leave-it job conditions." Other of these commenters worried the Rule would "stack the deck against workers and enable employers to misclassify more and more employees as independent contractors." The Rule would, according to some, "fuel a race to the bottom." One commenter who self-identified as "an actual independent contractor" believed that the only effect of the Rule would be "to allow massive companies to deny workers the benefits of employment status and squeeze extra profits for shareholders," with the result that misclassified workers would "end up on public assistance for basic needs like healthcare, meaning corporations are passing the true cost of business on to taxpayers." Some commenters were also worried about the effect of the Rule on businesses. The Construction Employers of America commented that the Rule "will make it harder for employers providing middle class careers in our industry to compete and provide good wages, benefits, and the protections that have been part of the employer/employee relationship since the 1930s." Other commenters also said that the Rule "harms companies that play by the rules and treat workers fairly. Companies that take shortcuts are allowed under the rule to misclassify their employees, undercut responsible employers and drag down the wages and labor standards across essential industries."

Commenters opposed to the withdrawal saw independent contractor status in a more positive light. In particular, a number of individual commenters expressed a desire to maintain

their status as independent contractors, articulating general support for the concept of independent contractor status, especially the concept of flexible work schedules. The Department appreciates these commenters' perspective, however, these comments do not demonstrate the Rule's benefit to workers. A worker already properly classified as an independent contractor will retain that status because, with this withdrawal, the economic realities test the Department uses to determine who is an employee under the FLSA is not changing. Moreover, flexible work schedules can be made available to employees as well as independent contractors, so any determination of or shift in worker classification need not affect flexibility in scheduling.

Some other commenters stated that the Department "seems to take the position that independent contractors only exist to the extent that they are simply misclassified employees." They further stated that the proposal "fails to recognize that independent contractors exist separate and apart from employees who are misclassified as independent contractors by some employers." Similarly, a self-described "freelance writer and editor" commented that the proposal "appears to be part of a larger effort to significantly restrict or even eliminate the ability for employers to classify individuals as independent contractors." Some of these commenters worried that withdrawal would mean adopting a test similar to the "ABC Test" that generally applies under California state wage laws. These comments do not accurately characterize the proposal or the withdrawal of the Independent Contractor Rule. The Department recognizes, and has always recognized, that there are bona fide independent contractors that do not fall under the FLSA. In fact, soon after the FLSA was enacted, the Supreme Court stated that the Act was "not intended to stamp all persons as employees"[169] and recognized that independent contractors are not employees within the Act's broad scope of coverage.[170] The Department is withdrawing the Rule for the reasons described throughout this final rule, and is not creating a new test, but is

---

[169] *Portland Terminal*, 330 U.S. at 152.
[170] *See Rutherford Food*, 331 U.S. at 729.

instead leaving in place the current economic realities test which allows for determinations that some workers are independent contractors.

Commenters also assert that many independent contractors would prefer independent contracting arrangements. Fundamentally, however, "the purposes of the [FLSA] require that it be applied even to those who would decline its protections," as allowing workers who otherwise qualify as FLSA-covered employees to waive their rights "would affect many more people than those workers directly at issue … and would be likely to exert a general downward pressure on wages in competing businesses."[171] The Department also believes that this preference does not hold for a significant proportion of independent contractors. A survey cited by CWI found that in May 2020, 45 percent of workers preferred being an independent contractor to being fully employed. This is by no means a majority – the same survey finds that 53 percent of workers prefer being a full-time employee with benefits.[172] This survey—which was limited to users and potential users of one jobs platform—found a significant increase in workers who preferred being an independent contractor compared to the prior year, and also found that a lack of childcare was workers' largest obstacle to full-time employment.[173] These findings suggest that even this minority of workers who prefer being an independent contractor to full-time employment are motivated in part by temporary pressures created by the COVID-19 pandemic. The survey did not ask whether workers would prefer a flexible schedule combined with employee status. As this rule notes elsewhere, flexibility and FLSA employment are not mutually exclusive.

Other commenters suggested that the Independent Contractor Rule would harm workers in ways beyond the effects of a worker's classification on their individual compensation. The

---

[171] *Tony & Susan Alamo Found.*, 471 U.S. at 302.

[172] Wonolo, "COVID-19 economic fallout weighs heavily on blue collar gig workers," 2020. https://go.wonolo.com/rs/052-CZJ-953/images/Data-report-The-rise-of-blue-collar-gig-workers.pdf

[173] *Id.* (finding that workers preferred full-time employment to independent contractor status by a ratio of 71-to-29 percent in 2019, and that workers concerned about a lack of childcare increased from 12 percent to 23 percent).

AFL-CIO commented that all workers benefit from the FLSA's minimum wage requirements, even if those requirements do not apply to them directly, because the FLSA establishes a wage floor that prevents wages in general from being dragged downward. The NWLC commented that the FLSA's definition of "employ" governs other worker protections, including the provision of lactation breaks and spaces for breastfeeding mothers as well as anti-discrimination protections. The Department agrees that the Independent Contractor Rule failed to consider these issues.

D.    *Whether Withdrawing the Independent Contractor Rule Is Disruptive*

The Department explained in the NPRM that, because the Independent Contractor Rule had yet to take effect, withdrawing it would not be disruptive. The NPRM pointed out that, as remains the case, courts have not applied the Rule in deciding cases, and WHD has not implemented the Rule. For example, WHD's Fact Sheet #13, titled "Employment Relationship Under the Fair Labor Standards Act (FLSA)" and dated July 2008, does not contain the Rule's analysis for determining whether a worker is an employee or independent contractor.[174] WHD's Field Operations Handbook addresses independent contractor status by simply cross-referencing Fact Sheet #13 and likewise does not contain the Rule's new economic realities test.[175] WHD's elaws Advisor compliance-assistance information regarding independent contractors likewise does not contain the Rule's analysis.[176] On January 26, 2021, WHD withdrew two opinion letters issued on January 19, 2021 applying the Rule's analysis to several factual scenarios.[177] WHD explained that the letters were "issued prematurely because they are based on [a Rule] that ha[s] not gone into effect."[178] Accordingly, the NPRM asserted that the regulated community has been

---

[174] Fact Sheet #13 (July 2008), *supra* note 37.

[175] Chapter 10 of Wage and Hour's Field Operations Handbook, "FLSA Coverage: Employment Relationship, Statutory Exclusions, Geographical Limits," is available at https://www.dol.gov/sites/dolgov/files/WHD/legacy/files/FOH_Ch10.pdf (last visited April 28, 2021). The relevant provision, section 10b05 ("Test of the employment relationship"), is on page 6.

[176] *See* https://webapps.dol.gov/elaws/whd/flsa/scope/ee14.asp (last visited April 28, 2021).

[177] *See* https://www.dol.gov/agencies/whd/opinion-letters/search?FLSA (last visited April 28, 2021), noting the withdrawal of Opinion Letters FLSA2021-8 and FLSA2021-9.

[178] *Id*.

functioning under the current state of the law and the Department does not believe that it would be negatively affected by continuing to do so were the Rule to be withdrawn.

Several commenters agreed that withdrawing the Rule would not be disruptive. The State Officials agreed that, because the Rule has not taken effect, it "has not required the substantial expenditure of compliance resources from the regulated community" and "has not engendered substantial reliance interests." The State Officials explained that, to the contrary, failing to withdraw the Rule would be disruptive, as they believed the Rule "would have led employers to reclassify many employees as independent contractors overnight." The State Officials argued that such reclassification and misclassification would have disruptive consequences for workers and states who are already dealing with disruptions caused by the ongoing COVID-19 pandemic and resulting unemployment. The Department agrees that it is inappropriate to issue a rule during the pandemic that could increase the classification of workers as independent contractors, and therefore reduce the number of workers protected by the FLSA. Farmworker Justice likewise agreed that any disruption caused by withdrawal would be "minimal," because "no adjustments would need to be made by workers, employers, or courts. Instead, the regulated community would be free to continue applying the decades of case law built up around the FLSA." Texas RioGrande Legal Aid suggested that withdrawing the Rule before it went into effect would be far less disruptive than withdrawing it after it went into effect, because employers could simply refrain from reclassifying employees, whereas workers who were reclassified as a result of the Rule going into effect would be less likely to know if the Rule were later withdrawn and therefore less likely to insist on being reclassified again.

Some commenters disagreed with the Department, asserting that withdrawal of the Rule would be disruptive. Multiple commenters argued that "DOL did not consider the costs of compliance preparation many individuals and businesses have already undertaken in anticipation of the Final Rule becoming effective as scheduled." However, none of these commenters presented evidence of such costs or even described what kind of costs they incurred, so the

KG-Universal_000183

Department cannot assess the validity or significance of these claims, or quantify these possible costs. Moreover, the Department would expect any such costs to be minimal given that to the extent businesses had reason to incur costs in preparation for the Rule's becoming effective— even though the Rule imposed no new requirements on businesses—the Department announced on February 5, 2021 that it was proposing to delay the effective date of the Rule in order to reconsider the Rule,[179] putting businesses on notice that it was far from certain when the Rule would go into effect, or in what form. In addition, any costs of complying with the Independent Contractor Rule were created by the Rule and would not be increased by its withdrawal. The Rule's withdrawal does not impose new compliance costs on the regulated community, because it imposes no new requirements. Employers must continue to comply with the currently governing interpretations of the FLSA.

Some commenters confused the one-time costs of coming into compliance with the withdrawal of the Rule with the ongoing costs of complying with the FLSA, which may be higher under the current interpretation of the FLSA than under the interpretation contained in the Independent Contractor Rule. For example, Capital Investment Companies stated that the Department "should not be able to simply withdraw a rule that was developed after public notice and comment" because the regulated community "cannot be expected to be able to shift gears every two months." It argued that "DOL did not consider the costs to the current properly-classified independent contractors who may face a loss of business opportunities in the face of the uncertainties resulting from the DOL's actions." The Mercatus Center likewise argued that the Department's belief that withdrawal would not be disruptive was inaccurate, because "[a]ny valid analysis of the final rule's withdrawal must be measured in reference to the anticipated cost and benefits of the previous rule."

These comments incorrectly assert that the Department is ignoring the costs and benefits of not implementing the Independent Contractor Rule. The Department has considered

---

[179] See 86 FR 8326.

comments from the public, following the same procedures used to promulgate the Rule in the first instance. In doing so, the Department has measured the costs and benefits of retaining the current interpretation of the FLSA by withdrawing the Rule against the costs and benefits of enacting the Rule. The Department's determination that the Rule's withdrawal will not be disruptive does not mean that there will not be costs imposed on some employers. By its nature, the FLSA imposes costs on employers in the form of minimum wage and overtime pay requirements. However, the costs to come into compliance with the Department's decision to withdraw the Rule are minimal, because employers and businesses who engage independent contractors will only need to comply with the statutory interpretations that already apply. They will not need to "shift gears" or change anything about their business practices, so long as they are currently complying with the FLSA.

The Coalition to Promote Independent Entrepreneurs (CPIE) argued that the Rule's withdrawal will cause confusion in future enforcement actions brought by the Department, because a company accused of misclassifying workers as independent contractors "could respond by relying on DOL's own research findings that are published in the *Federal Register*." In other words, though the Independent Contractor Rule would not be in effect, the company could rely on the Department's reasoning behind the Rule. CPIE asked rhetorically, "If this were to occur, would DOL dispute its own published research findings?" Contrary to the implications of this comment, there should be no confusion about the Department's position. The Department is withdrawing the Rule because, as explained throughout this final rule, it believes that the Rule's justifications were insufficient to support such a departure from courts' well-established analysis and the Department's previous guidance. Accordingly, the Independent Contractor Rule does not reflect the Department's interpretation.

Finally, a few commenters argued that withdrawal would be disruptive if it occurred before the resolution of the pending lawsuit challenging the Department's delay of the

Independent Contractor Rule's original March 8, 2021 effective date.[180] The Coalition for Workforce Innovation (CWI), which brought that lawsuit, argued that the Department should avoid confusion by allowing that litigation to determine whether the delay of the Rule's effective date was lawful. CWI argued that the Department's "assumption" that the Independent Contractor Rule is not currently in effect is "faulty." Littler Mendelson argued that "insofar as the Department's arguments in support of withdrawal of the Rule rests [sic] on its status as not yet in effect, they are at best premature, and at worst, incorrect as a matter of fact and law."

The Department does not agree with these comments. The Independent Contractor Rule is not currently in effect and is not currently applied by the Department, courts, or others. The Department maintains that its delay of the Rule's original effective date was proper for the reasons explained in the final rule effectuating that delay,[181] but declines to comment on the ongoing litigation. Regardless of the outcome of the lawsuit, the result of this withdrawal of the Rule is that longstanding prior guidance, such as Fact Sheet #13, remains in effect. Even if the Department's delay of the Rule's effective date were vacated such that the Rule is deemed to have been in effect since March 8, 2021, any disruption caused by the short period in which the Rule was in effect would be outweighed by the reasons described in this final rule to withdraw the Independent Contractor Rule. In other words, the Department would withdraw the Independent Contractor Rule even if it were currently in effect. Therefore, businesses can, as of publication of this withdrawal of the Rule, continue to rely upon the prior, familiar guidance even if the delay is later vacated and the Rule is retroactively deemed to have been in effect from March 8 until the issuance of this final rule. The disruption caused by the withdrawal would accordingly remain limited.

After carefully considering commenter feedback, the Department maintains its belief that withdrawing the Independent Contractor Rule will not result in significant disruption to the

---

[180] *See Coalition for Workforce Innovation v. Sec'y of Labor* (No. 1:21-cv-00130 E.D. Tex.).
[181] *See* 86 FR 12535.

regulated community. In particular, any businesses currently engaging workers properly classified as independent contractors or individuals who now correctly consider themselves to be independent contractors will be able to continue to operate without any effect brought about by the absence of new regulations. Businesses that had taken steps in preparation for the Rule taking effect will not be precluded from adjusting their relationships with workers or paying for new services from workers, and can rely on past court decisions and WHD guidance to determine whether those workers are employees under the FLSA or independent contractors.

E.      Timing and Effect of Withdrawal

1.      Effective Date of Final Rule

Section 553(d) of the Administrative Procedure Act provides that substantive rules should take effect not less than 30 days after the date they are published in the Federal Register unless "otherwise provided by the agency for good cause found." 5 U.S.C. 553(d)(3). The Department finds that it has good cause to make this rule effective immediately upon publication. Allowing for a 30-day delay between publication and the effective date of this rulemaking would result in the Independent Contractor Rule taking effect for a short period before its withdrawal, which would cause confusion for regulated entities. The "Regulatory Freeze Pending Review" Memorandum described in section I(D) above, which directed the review that led the Department to propose withdrawing the Independent Contractor Rule, was issued on January 20, 2021. Even after delaying the Rule's original effective date of March 8, 2021 to May 7, 2021, the Department had less than 4 months to consider the significant and complex issues raised by the Independent Contractor Rule as directed by the Memorandum and subsequent guidance from the Office of Management and Budget[182] and to conduct notice-and-comment rulemaking based on that consideration as well as input from commenters.

---

[182] Memorandum M–21–14, Implementation of Memorandum Concerning Regulatory Freeze Pending Review, https://www.whitehouse.gov/wp-content/uploads/2021/01/M-21-14-Regulatory-Review.pdf (last visited April 28, 2021).

Withdrawing the Rule immediately ends employers' and workers' uncertainty about whether the Rule would go into effect at all following the Memorandum and the delay of the Rule's effective date. At least since the Memorandum, businesses have been unsure whether to expect to apply the Rule's analysis to their employment practices. Ending this uncertainty immediately benefits employers and workers alike. To delay the withdrawal by 30 days would mean that the Rule would be in effect from May 7, 2021, until the effective date approximately one month later. To require businesses to apply the Rule's analysis only to have them reassess the analysis when the Rule is withdrawn would impose unnecessary costs with no benefits. And, as pointed out by Texas RioGrande Legal Aid, it could have negative effects on workers—in particular, low-wage workers—whose employment status could be changed upon the Rule's taking effect, and would be unlikely to know that they were again entitled to FLSA protections. Because withdrawing the Rule will merely retain the status quo rather than impose any new requirements, immediate withdrawal will not require any reassessments of employment status. The regulated community does not require time to adjust to new requirements, because there are none imposed by withdrawal of the Rule. Because a delay of this rule's effective date would be impracticable and unnecessary, the Department finds it has good cause to make this withdrawal effective immediately upon publication.

2.    *Effect of Withdrawal*

For the reasons described above, the Department has decided to withdraw the Independent Contractor Rule, effective immediately. Accordingly, the guidance that the Rule would have introduced as part 795 of Title 29 of the Code of Federal Regulations will not be introduced and the revisions that the Rule would have made to 29 CFR 780.330(b) and 29 CFR 788.16(a) will not occur and their text will remain unchanged. The Department did not propose and is not now issuing regulatory guidance to replace the guidance that the Independent Contractor Rule would have introduced as part 795.

**III.    Paperwork Reduction Act**

The Paperwork Reduction Act of 1995 (PRA) and its attendant regulations require an agency to consider its need for any information collections, their practical utility, as well as the impact of paperwork and other information collection burdens imposed on the public, and how to minimize those burdens. The PRA typically requires an agency to provide notice and seek public comments on any proposed collection of information contained in a proposed rule. This final rule does not contain a collection of information subject to Office of Management and Budget approval under the PRA.

**IV.    Executive Order 12866, Regulatory Planning and Review; and Executive Order 13563, Improved Regulation and Regulatory Review**

*A.    Introduction*

Under Executive Order 12866, OMB's Office of Information and Regulatory Affairs determines whether a regulatory action is significant and, therefore, subject to the requirements of the Executive Order and OMB review.[183] Section 3(f) of Executive Order 12866 defines a "significant regulatory action" as a regulatory action that is likely to result in a rule that may: (1) have an annual effect on the economy of $100 million or more, or adversely affect in a material way a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or state, local or tribal governments or communities (also referred to as economically significant); (2) create serious inconsistency or otherwise interfere with an action taken or planned by another agency; (3) materially alter the budgetary impact of entitlements, grants, user fees or loan programs or the rights and obligations of recipients thereof; or (4) raise novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles set forth in the Executive Order. This final rule is economically significant under section 3(f) of Executive Order 12866 because it is withdrawing an economically significant rule.

Executive Order 13563 directs agencies to, among other things, propose or adopt a regulation only upon a reasoned determination that its benefits justify its costs; that it is tailored

---

[183] *See* 58 FR 51735 (Sept. 30, 1993).

to impose the least burden on society, consistent with obtaining the regulatory objectives; and that, in choosing among alternative regulatory approaches, the agency has selected those approaches that maximize net benefits.[184] Executive Order 13563 recognizes that some costs and benefits are difficult to quantify and provides that, when appropriate and permitted by law, agencies may consider and discuss qualitatively values that are difficult or impossible to quantify, including equity, human dignity, fairness, and distributive impacts. The analysis below outlines the impacts that the Department anticipates may result from the Rule's withdrawal and was prepared pursuant to the above-mentioned executive orders.

B.      *Background*

On January 7, 2021, WHD published a final rule titled "Independent Contractor Status Under the Fair Labor Standards Act" (Independent Contractor Rule or Rule).[185] In this final rule, the Department is withdrawing the Independent Contractor Rule, which has not taken effect. Aside from minimal rule familiarization costs, the Department also provides below a qualitative discussion of the transfers that may be avoided by withdrawing the Rule.

C.      *Costs*

1.      *Rule Familiarization Costs*

Withdrawing the Independent Contractor Rule will impose direct costs on businesses that will need to review the withdrawal. To estimate these regulatory familiarization costs, the Department determined: (1) the number of potentially affected entities, (2) the average hourly wage rate of the employees reviewing the withdrawal, and (3) the amount of time required to review the withdrawal. It is uncertain whether these entities would incur regulatory familiarization costs at the firm or the establishment level.[186] For example, in smaller businesses

---

[184] *See* 76 FR 3821 (Jan. 21, 2011).
[185] *See* 86 FR 1168. WHD had published a notice of proposed rulemaking requesting comments on a proposal. *See* 85 FR 60600 (Sept. 25, 2020). The final rule adopted "the interpretive guidance set forth in [that proposal] largely as proposed." 86 FR 1168.
[186] An establishment is a single physical location where one predominant activity occurs. A firm is an establishment or a combination of establishments.

there might be just one specialist reviewing the withdrawal, while larger businesses might review it at corporate headquarters and determine policy for all establishments owned by the business. To avoid underestimating the costs of the withdrawal, the Department uses both the number of establishments and the number of firms to estimate a potential range for regulatory familiarization costs. The lower bound of the range is calculated assuming that one specialist per firm will review the withdrawal, and the upper bound of the range assumes one specialist per establishment.

The most recent data on private sector entities at the time this NPRM was drafted are from the 2017 Statistics of U.S. Businesses (SUSB), which reports 5,996,900 private firms and 7,860,674 private establishments with paid employees.[187] Because the Department is unable to determine how many of these businesses are interested in using independent contractors, this analysis assumes all businesses will undertake review.

The Department believes ten minutes per entity, on average, to be an appropriate review time here. This rulemaking would withdraw the Independent Contractor Rule and would not set forth any new regulations in its place. Additionally, the Department believes that many entities do not use independent contractors and thus would not spend any time reviewing the withdrawal. Therefore, the ten-minute review time represents an average of no time for the entities that do not use independent contractors, and potentially more than ten minutes for review by some entities that might use independent contractors.

The Department's analysis assumes that the withdrawal would be reviewed by Compensation, Benefits, and Job Analysis Specialists (SOC 13-1141) or employees of similar status and comparable pay. The median hourly wage for these workers was $31.04 per hour in 2019, the most recent year of data available.[188] The Department also assumes that benefits are

---

[187] Statistics of U.S. Businesses 2017, https://www.census.gov/data/tables/2017/econ/susb/2017-susb-annual.html, 2016 SUSB Annual Data Tables by Establishment Industry.
[188] Occupational Employment and Wages, May 2019, https://www.bls.gov/oes/current/oes131141.htm.

paid at a rate of 46 percent[189] and overhead costs are paid at a rate of 17 percent of the base wage, resulting in a fully loaded hourly rate of $50.60.

The Department estimates that the lower bound of regulatory familiarization cost range would be $50,675,004 (5,996,900 firms × $50.60 × 0.167 hours), and the upper bound, $66,424,267 (7,860,674 establishments × $50.60 × 0.167 hours). The Department estimates that all regulatory familiarization costs would occur in Year 1.

Additionally, the Department estimated average annualized costs of this proposed withdrawal over 10 years. Over 10 years, it would have an average annual cost of $6.7 million to $8.8 million, calculated at a 7 percent discount rate ($5.8 million to $7.6 million calculated at a 3 percent discount rate). All costs are in 2019 dollars.

In their comment, the Financial Services Institute (FSI) asserted that the rule familiarization costs are understated because "they fail to consider the costs that will be imposed on stakeholders by repeating their activities of the very recent notice/comment period." However, they also acknowledged that there has been no change in law since the Independent Contractor Rule was announced. The Department notes that estimates of rule familiarization costs do not usually include the time it takes stakeholders to comment on the rule, and instead only include the time it takes to read and become familiar with the final rule.

2.    *Other Impacts*

In the Independent Contractor Rule, the Department estimated cost savings associated with increased clarity, as well as cost savings associated with reduced litigation. The Department does not anticipate that this withdrawal will increase costs in these areas, or result in greater costs as compared to the Rule. Although the intent of the Independent Contractor Rule was to provide clarity, it would also have introduced several concepts to the FLSA economic realities analysis that neither courts nor WHD have previously applied. Because the Rule would have

---

[189] The benefits-earnings ratio is derived from the Bureau of Labor Statistics' Employer Costs for Employee Compensation data using variables CMU1020000000000D and CMU1030000000000D.

been unfamiliar and could have led to inconsistent approaches and/or outcomes, and because withdrawal maintains the status quo, the Department does not believe that withdrawal of the Independent Contractor Rule will result in decreased clarity for stakeholders. As discussed above in section II(B), numerous commenters agreed that the Rule would not have increased clarity, and that there would have instead been increased litigation following the Rule due to uncertainty over whether and to what extent courts would adopt the Rule's complicated guidance.

Some commenters asserted that there would be significant costs associated with withdrawing the Independent Contractor Rule. For example, the National Retail Federation (NRF) and Littler Mendelson's Workplace Policy Institute (WPI) claimed that employers had already begun to implement the Rule, even though it had not yet gone into effect. WPI claimed that, in the withdrawal NPRM, the Department ignored the costs of compliance preparation that many businesses have already undertaken in anticipation of the rule becoming effective. The commenters did not provide information on the types of activities that businesses have taken to implement the Rule, or how much time they spent. The Department also did not receive any data on the number of businesses that have incurred implementation costs, or the magnitude of these costs, so the Department has not quantified them here. Any costs that were incurred by businesses in response to the publication of the Independent Contractor Rule are sunk costs, and would not be affected by the withdrawal. Commenters did not provide any information on what changes businesses would have to undo following the withdrawal.

In discussing the effects of the Independent Contractor Rule, many commenters referenced the analysis that the Economic Policy Institute (EPI) provided in their comment to the 2020 Independent Contractor NPRM. EPI itself commented to again explain the results of its study, which estimated that the Independent Contractor Rule would have cost workers more than $3.7 billion annually. This figure represents $400 million in new annual paperwork costs and a transfer to employers of at least $3.3 billion in the form of reduced compensation for employees

who are converted to independent contractors. EPI also estimated a loss of $750 million in employer contributions to social insurance funds such as Social Security, Medicare, Unemployment Insurance, and Workers' Compensation. The Department believes that although the magnitude of this estimate may be overstated, for reasons discussed in response to the comment on the Independent Contractor Rule, the discussion of impacts to workers is valid. EPI did not directly address the Department's criticisms of its estimates in the Independent Contractor Rule, but it agreed with the Department's statement in the NPRM that EPI's analysis may be useful in understanding the types of impacts the Rule would have had on workers.

Michael D. Farren and Liya Palagashvili of the Mercatus Center provided a detailed comment evaluating the Department's economic analysis. In their comment, they estimated the costs associated with withdrawing the Independent Contractor Rule, stating that the annual cost of withdrawing the Rule is approximately $1.85 billion. After thoroughly reviewing this analysis, the Department concludes that this cost estimate is not accurate, for the reasons described below.

Farren and Palagashvili note that their analysis is based on the framework provided by EPI, in order to allow their estimate to be comparable. They begin by estimating the own-wage elasticity of employment costs from a meta-analysis of literature, finding that "the average own-wage elasticity with respect to changes in employment costs is -0.66." They conclude that this suggests that workers capture 66 percent of the decrease in employer costs associated with reclassifying employees as independent contractors. The Department believes that this is not an accurate application of the findings of the meta-analysis. The studies indicate that on average, the impact of a 1.0% increase in taxes is a 0.66% decrease in wages for employees. It may be inappropriate to assume that this estimate for employees also applies to independent contractors. Additionally, it is unclear whether non-tax labor costs would have the same elasticity as taxes. The Department also notes that the studies referenced in their meta-analysis come from many different countries, some of which may reflect a different economic situation than that of the United States, and may not be applicable to an analysis of worker classification in the United

States. Although the Department recognizes that regulatory impacts are often experienced across both workers and employers (and, more generally, labor market outcomes are the result of tradeoffs made by both workers and employers), the Department's analysis on earnings does not find that independent contractors capture a large portion of the decrease in employer costs. As discussed in section IV(D)(4), when controlling for observable characteristics related to earnings, the data fail to show that independent contractors have an earnings premium over employees sufficient to cover the increased tax liability.

The Mercatus Center commenters also estimate the average willingness to pay for flexible work, by stating that a National Bureau of Economic Research (NBER) working paper finds that the average worker is willing to accept a salary that is 10.4 percent lower for a flexible job. Although the Department could not find this figure in the three papers that were cited in the comment, two of the three papers have a range of results that include approximately 10 percent.[190] The Department does not believe that the first paper cited is appropriate for applying to the analysis, because that study was a field experiment using a Chinese job board, and only looked at college-educated workers with 5-10 years of experience, all applying for professional/executive positions. The tradeoff between wages and flexibility for this population might not be comparable to that of the total population of workers in the United States. The authors of the paper also note that they "look at a narrow set of jobs (and at one employer), so the results may not generalize to different types of jobs and the workers searching for them."

The Mercatus Center assumed that workers would receive increased flexibility if they are reclassified as independent contractors, but this is not necessarily true. Many employees already

---

[190] The three papers cited were Haoran He, David Neumark, and Qian Weng, "Do Workers Value Flexible Jobs? A Field Experiment" (NBER Working Paper No. 25423, National Bureau of Economic Research, Cambridge, MA, July 2020), 26; Nicole Maestas et al., "The Value of Working Conditions in the United States and Implications for the Structure of Wages" (NBER Working Paper No. 25204, National Bureau of Economic Research, Cambridge, MA, October 2018). M. Keith Chen et al., "The Value of Flexible Work: Evidence from Uber Drivers," Journal of Political Economy 127, no. 6 (December 2019): 2735–94.

enjoy flexible work schedules[191]—and the share of employees with such flexible work arrangements is likely to increase as a result of the COVID-19 pandemic.[192] If an employee with a flexible work arrangement is converted to an independent contractor, that worker might or might not experience an increase in flexibility. Though the Mercatus Center stated that it would be illegal for an employer to convert an employee to an independent contractor without increasing their flexibility, this does not accurately reflect the Independent Contractor Rule or WHD's prior interpretations, because control over one's schedule is only one part of one factor in the analysis. The assumption that all workers converted to independent contractors would benefit from increased flexibility may be inaccurate.

These commenters then use these estimates to calculate the benefits to workers when employees are reclassified as independent contractors. The commenters first calculate the value of each worker's lost supplemental income, lost employment fringe benefits (paid leave, health insurance, and retirement benefits), and net change in FICA (Federal Insurance Contributions Act) tax liability.[193] They then calculate the amount that workers would capture of these employer cost savings using the average own-wage elasticity of 0.66.[194] From that amount, they subtract the amount that they claim workers are willing to forgo for greater flexibility. Comparing the net gains to the net losses, Farren and Palagashvili say that workers will receive a

---

[191] Flexible work schedules do not prevent courts from finding workers to be employees. *See, e.g.*, *Silk*, 331 U.S. at 706 (finding that coal unloaders were employees despite their ability to show up to work "when they wish and work for others at will"); *Verma v. 3001 Castor, Inc.*, 937 F.3d 221, 230 (3d Cir. 2019) (finding that dancers were employees and not independent contractors despite fact that they could select their own shifts and work for competitors); *DialAmerica Mktg.*, 757 F.2d at 1380 (finding that home researchers were employees even though they were "free to choose the weeks and hours they wanted to work").

[192] *See* Society for Human Resources Management, "Managing Flexible Work Arrangements," https://www.shrm.org/ResourcesAndTools/tools-and-samples/toolkits/Pages/managingflexibleworkarrangements.aspx (last visited April 28, 2021) ("Now that many employers have experienced how successful telecommuting can be for their organization or how work hours that differ from the normal 9-to-5 can be adopted without injury to productivity, offering flexible work arrangements may become even more commonplace.").

[193] The commenters calculate a sum of $6,185 using data in EPI's comment: Heidi Shierholz, EPI Comments on Independent Contractor Status, 5–6.

[194] $6,186 x 0.66 = $4,082.

net benefit of $414. The Department believes that the commenters misapplied the estimate of elasticity when calculating this benefit, because they multiplied 0.66 by total reduced costs. The Department believes it is more appropriate to find the percent reduction in cost, and apply that percentage to total wages. When adjusting for this change in the analysis, it would result in a net loss to workers. [195] Moreover, the short-hand term "total reduced costs" lumps together several types of impacts, some of which should not be used as inputs into the type of comparative statics analysis suggested by the commenters; for example, although legal tax liability shifts depending on whether workers are employees or independent contractors, the size of the tax wedge is unchanged.

Additionally, the Mercatus Center noted that its estimates excluded one cost from EPI's analysis: the cost of additional paperwork that independent contractors must do. EPI estimated this cost would average $777, which included an IRS estimate of an additional 13 hours of tax preparation, an average of half an hour a week of other, non-tax paperwork, and the cost of accounting and tax preparation software that independent contractors use. The Mercatus Center explained that it excluded these costs because "[t]hese costs are required only for business expense deductibility purposes, and workers would not engage in such paperwork if their expected return were not positive." However, workers would not know if their return would be positive until after they spent this time calculating their deductible expenses. The IRS estimate of additional time independent contractors spend on tax preparation is an average, so any independent contractors who do not spend extra time on taxes are already accounted for in that average. Moreover, only 13 of the 39 hours of additional paperwork estimated by EPI were tax-related, and the Mercatus Center analysis did not account for the time spent on non-tax paperwork. The $777 in paperwork expenses that the Mercatus Center excluded from its analysis

---

[195] Assuming the bare minimum employer costs of wages plus cost savings listed ($30,387), the Department calculates that of the cost savings, $3,251 would be passed along to employees. Even with the assumption that this amount would be paid to the independent contractor, and incorporating the flexibility benefits that the commenters claim independent contractors experience, it results in a net loss of $417 per worker.

KG-Universal_000197

would outweigh its conclusion of $414 in average net benefits to employees converted to independent contractors. Even a somewhat smaller paperwork burden would result in a net loss to workers.

In sum, the Department believes that the Mercatus Center's criticisms of EPI's study overestimate the benefits to employees converted to independent contractors in the form of higher wages and greater flexibility, while underestimating the costs imposed on such workers. Though it remains difficult to quantify the costs and benefits of the Rule precisely, and the Department believes that the magnitude of the costs in EPI's analysis may be overstated, the Department nonetheless believes that the EPI estimate correctly concluded that workers affected by the Independent Contractor Rule would suffer a net loss.

One of the main benefits discussed in the Rule was the increased flexibility associated with independent contractor status. The Department acknowledges that although many independent contractors report that they value the flexibility in hours and work, employment and flexibility are not mutually exclusive. Many employees similarly value and enjoy such flexibility.

Commenters such as the Mercatus Center and the Coalition for Workforce Innovation (CWI) also claim that DOL's analysis does not include the value of workplace flexibility, and that evidence does not show that employees also have flexibility. The Department believes that employment and flexibility are not mutually exclusive, and many employees do have flexibility. For example, a 2016 study found that 81 percent of U.S. employers allow employees some flexibility in schedule.[196] A 2019 USAToday article cites results from surveys indicating that a large percentage of companies offer flexibility and a large percentage of employees say that they have flexibility in their jobs.[197]

---

[196] Kenneth Matos, Ellen Galinsky and James T. Bond. 2016 National Study of Employers, 2017, https://www.familiesandwork.org/research/workplace-research-national-study-of-employers.
[197] Paul Davidson, "More employers offer flexible hours, but many grapple with how to make it succeed.," October 20, 2019. https://www.usatoday.com/story/money/2019/10/20/flexible-hours-jobs-more-firms-offer-variable-schedules/4020990002/.

KG-Universal_000198

Some commenters assert that the Department's analysis ignores the component of the workforce that like being independent contractors. For example, the Financial Services Institute (FSI) says that DOL "utterly ignores the possibility that true independent contractors exist" and that independent financial advisors are proud to be their "own boss."

Throughout their comment, CWI cites many surveys, some with questionable survey sampling procedures, showing that independent contractors like the flexibility of their work. For example, in opposition to the Department's withdrawal, CWI references a study on freelancing, which concludes that the freelance workforce contributes over a trillion dollars to the U.S. economy, freelance workers are highly skilled, and that freelancing increases earnings potential.[198] The Department appreciates the importance of freelance work, but believes that comments such as these lack evidence to show that these opportunities were restricted before the Independent Contractor Rule. Therefore, the withdrawal will not create further restrictions on independent contractor work beyond those imposed by existing guidance. Existing freelancers who are properly classified as independent contractors will not be affected by this withdrawal. Additionally, the data cited by CWI showing that freelancing increases earning potential is limited to freelancers who voluntarily left their employer to become freelancers. This population could be different from workers who would have been reclassified as independent contractors because of the Independent Contractor Rule.

D.    *Transfers*

The Department believes that it is important to provide a qualitative discussion of the transfers that would have occurred under the Independent Contractor Rule. In the economic analysis originally accompanying the Rule, the Department assumed that the Rule would lead to an increase in the number of independent contractor arrangements, and acknowledged that some of this increase could be due to businesses reclassifying employees as independent contractors.[199]

---

[198] https://www.upwork.com/i/freelance-forward
[199] *See* 86 FR 1225-27.

As discussed in the Rule and again below, an increase in independent contracting could have resulted in transfers associated with employer-provided fringe benefits, tax liabilities, and minimum wage and overtime pay.[200] By withdrawing the Rule, these transfers from employees (and, in some cases, from state or local governments and the recipients of government-operated unemployment insurance of worker's compensation programs) to employers are avoided.

1.    *Employer Provided Fringe Benefits*

        The reclassification of employees as independent contractors, or the use of independent contracting relationships as opposed to employment, decreases access to employer-provided fringe benefits such as health care or retirement benefits. According to the BLS Current Population Survey (CPS) Contingent Worker Supplement (CWS), 75.4 percent of independent contractors have health insurance, compared to 84 percent of employees.[201] This gap between independent contractors and employees is also true for low-income workers. Using CWS data, the Department compared health insurance rates for workers earning less than $15 per hour and found that 71.0 percent of independent contractors have health insurance compared with 78.5 percent of employees. Lastly, the Department considered whether this gap could be larger for traditionally underserved groups or minorities. Considering the subsets of independent contractors who are female, Hispanic, or Black, only the Hispanic independent contractors have a statistically significant difference in the percentage of workers with health insurance (estimated to be about 18 percentage points lower).[202]

        Additionally, a major source of retirement savings is employer-sponsored retirement accounts. According to the CWS, 55.5 percent of employees have a retirement account with their current employer; in addition, the BLS Employer Costs for Employee Compensation (ECEC)

---

[200] *See* 86 FR 1216-18, 1223-24.

[201] Bureau of Labor Statistics, "Contingent and Alternative Employment Arrangements – May 2017," USDL-18-0942 (June 7, 2018), https://www.bls.gov/news.release/pdf/conemp.pdf.

[202] To measure if the difference between these proportions is statistically significant, the Department used the replicate weights for the CWS. At a 0.05 significance level, the proportion of Hispanic independent contractors with any health insurance is lower than the proportion for all independent contractors.

found that employers pay 5.3 percent of employees' total compensation in retirement benefits on average ($1.96/$37.03). If a worker is reclassified from employee to independent contractor status, that worker would likely no longer receive employer-provided retirement benefits.

2.    *Tax Liabilities*

As self-employed workers, independent contractors are legally obligated to pay both the employee and employer shares of the Federal Insurance Contributions Act (FICA) taxes. Thus, as discussed in the Rule, if workers' classifications change from employees to independent contractors, there may be a transfer in federal tax liabilities from employers to workers.[203] Although the Rule only addressed whether a worker is an employee or an independent contractor under the FLSA, the Department assumes in this analysis that employers are likely to keep the status of most workers the same across all benefits and requirements, including for tax purposes.[204] These payroll taxes include the 6.2 percent employer component of the Social Security tax and the 1.45 percent employer component of the Medicare tax.[205] In sum, independent contractors are legally responsible for an additional 7.65 percent of their earnings in FICA taxes (less the applicable tax deduction for this additional payment). Some or all of this increased tax liability may ultimately be paid for by a business if it increases pay to compensate independent contractors for this tax liability, and changes in compensation are discussed separately below. Changes in benefits, tax liability, and earnings must be considered in tandem to identify how the standard of living may change.

---

[203] *See* 86 FR 1218.

[204] Courts have noted that the FLSA has the broadest conception of employment under federal law. *See, e.g.*, *Darden*, 503 U.S. at 326. To the extent that businesses making employment status determinations base their decisions on the most demanding federal standard, a rulemaking addressing the standard for determining whether a worker is an FLSA employee or an independent contractor may affect the businesses' classification decisions for purposes of benefits and legal requirements under other federal laws.

[205] Internal Revenue Service, "Publication 15, (Circular E), Employer's Tax Guide" (Dec. 23, 2019), https://www.irs.gov/pub/irs-pdf/p15.pdf. The social security tax has a wage base limit of $137,700 in 2020. An additional Medicare Tax of 0.9 percent applies to wages paid in excess of $200,000 in a calendar year for individual filers.

In addition to affecting tax liabilities for workers, some commenters claimed that the Rule would have an impact on state tax revenue and budgets. SWACCA noted that taxpayer costs would have increased following the Rule. They state that an increase in independent contractor arrangements leads to reduced tax revenues and increased costs to Federal, State, and local governments for programs like unemployment insurance and workers compensation. A comment from the State Officials also claimed that reclassification following the Independent Contractor Rule would disrupt States' efforts to administer their unemployment insurance programs, especially at a time when they have been processing record numbers of unemployment claims.

Because independent contractors do not receive benefits like health insurance, workers compensation, and retirement plans from an employer, the State Officials suggested that a rule that increases the prevalence of independent contracting could shift this burden to State and Federal governments.

3. *FLSA Protections*

When workers are classified as independent contractors, the minimum wage, overtime pay, and other requirements of the FLSA no longer apply. The 2017 CWS data indicate that independent contractors are more likely than employees to report earning less than the FLSA minimum wage of $7.25 per hour (8 percent for self-employed independent contractors, 5 percent for other independent contractors, and 2 percent for employees).[206] Research on drivers who are classified as independent contractors and work for online transportation companies in California and New York also finds that many drivers receive significantly less than the applicable state minimum wages.[207] Commenters asserted that because of the COVID-19

---

[206] In their comment, CWI noted that the CWS data that was cited by the Department does not include this data. These calculations cannot be found in the tables published by BLS, but are from the Department's own calculations of the CWS microdata.

[207] M. Reich, "Pay, Passengers and Profits: Effects of Employee Status for California TNC Drivers." University of California, Berkeley (October 5, 2020), https://irle.berkeley.edu/files/2020/10/Pay-Passengers-and-Profits.pdf; L. Moe, et al. "The

pandemic and the resulting economic fallout, there is an even greater need to ensure workers have access to FLSA protections. The Center for Law and Social Policy (CLASP) cited a study showing that minimum wage violations increased dramatically as unemployment rose during the Great Recession, disproportionately impacting Latinx, Black, and female workers.[208] They anticipate that the recent period of high unemployment could lead to similar violations.

Concerning overtime pay, not only do independent contractors not receive the overtime pay premium, but the number of overtime hours worked is also higher. Analysis of the CWS data indicated that, before conditioning on covariates, primary self-employed independent contractors are more likely to work overtime (more than 40 hours in a workweek) at their main job (29 percent for self-employed independent contractors and 17 percent for employees).[209]

Commenters referenced other FLSA protections that employees would lose if they were reclassified as independent contractors following the Rule. The National Women's Law Center points out that the FLSA also contains provisions that are centered on ensuring that women are treated fairly at work, including employer-provided accommodations for breastfeeding workers and protections against pay discrimination.

4.      *Hourly Wages, Bonuses, and Related Compensation*

Some commenters asserted that independent contractors are compensated better than employees, citing discussions of earnings from the Independent Contractor Rule. The

---

Magnitude of Low-Paid Gig and Independent Contract Work in New York State," The New School Center for New York City Affairs (February 2020), https://static1.squarespace.com/static/53ee4f0be4b015b9c3690d84/t/5e424affd767af4f34c0d9a9/1581402883035/Feb112020_GigReport.pdf.

[208] Fine et al., Maintaining effective U.S. labor standards enforcement through the coronavirus recession, Washington Center for Equitable Growth, Sept. 3, 2020, available at https://equitablegrowth.org/research-paper/maintaining-effective-u-s-labor-standards-enforcement-through-the-coronavirus-recession/.

[209] The Department based this calculation on the percentage of workers in the CWS data who respond to the PEHRUSL1 variable ("How many hours per week do you usually work at your main job?") with hours greater than 40. Workers who answer that hours vary were excluded from the calculation. The Department also applied the exclusion criteria used by Katz and Krueger (exclude workers reporting weekly earnings less than $50 and workers whose calculated hourly rate (weekly earnings divided by usual hours worked per week) is either less than $1 or more than $1,000).

Department is concerned that its discussion of data on the differences in earnings between employees and independent contractors in the Independent Contractor Rule was confusing and potentially inaccurate, so the findings and methodology are discussed again here. Independent contractors are often expected to earn a wage premium to compensate for reduced fringe benefits, increased tax liability and associated paperwork costs. However, due to asymmetric information, differences in bargaining power, or a willingness to trade earnings for increased flexibility, this may not hold. The Department compared the average hourly wages of current employees and independent contractors to provide some indication of the impact on wages of a worker who is reclassified from an employee to an independent contractor.

The Department used an approach similar to Katz and Krueger (2018).[210] Both regressed hourly wages on independent contractor status[211] and observable differences between independent contractors and employees (e.g., occupation, sex, potential experience, education, race, and ethnicity) to help isolate the impact of independent contractor status on hourly wages. Katz and Krueger used the 2005 CWS and the 2015 RAND American Life Panel (ALP) (the 2017 CWS was not available at the time of their analysis). The Department used the 2017 CWS.[212]

Both analyses found similar results. A simple comparison of mean hourly wages showed that independent contractors tend to earn more per hour than employees do (e.g., $27.29 per hour for all independent contractors versus $24.07 per hour for employees using the 2017 CWS). However, when controlling for observable differences between workers, Katz and Krueger found no statistically significant difference between independent contractors' and employees' hourly

---

[210] L. Katz and A. Krueger, "The Rise and Nature of Alternative Work Arrangements in the United States, 1995–2015," (2018).

[211] On-call workers, temporary help agency workers, and workers provided by contract firms are excluded from the base group of "traditional" employees.

[212] In both Katz and Krueger's regression results and the Department's calculations, the following outlying values were removed: workers reporting earning less than $50 per week, less than $1 per hour, or more than $1,000 per hour. Choice of exclusionary criteria from Katz and Krueger (2018), *supra* note 210.

KG-Universal_000204

wages in the 2005 CWS data. Although their analysis of the 2015 ALP data found that primary independent contractors earned more per hour than traditional employees do, they recommended caution in interpreting these results due to the imprecision of the estimates.[213] The Department found no statistically significant difference between independent contractors' and employees' hourly wages in the 2017 CWS data.

Based on these inconclusive results, the Department believes it is inappropriate to conclude independent contractors generally earn a higher hourly wage than employees do. Therefore, the Department does not assert that wages would be impacted due to the Rule or its withdrawal. The Department ran another hourly wage rate regression including additional variables to determine if independent contractors in underserved groups are impacted differently by including interaction terms for female independent contractors, Hispanic independent contractors, and Black independent contractors. The results did not find a statistically significant difference in earnings for these groups.[214]

The Mercatus Center commenters also claim that independent contractors earn supplemental compensation, which the Department believes is unsupported by widespread evidence for most independent contractors. They say that "[t]he analysis assumes that independent contractors do not receive supplemental compensation, despite widespread evidence to the contrary in the platform economy, such as signing and performance bonuses." The commenters cite one Wall Street Journal article to support their assertion, and this article also discusses the difficulty finding and retaining workers, including statements like, "turnover is driven by gig workers' unhappiness with their take-home pay," "a 2015 analysis found 45% of Uber's workforce left in their first year," and, "in any given month, an estimated 1 in six

_____

[213] See top of page 20, "Given the imprecision of the estimates, we recommend caution in interpreting the estimates from the [ALP]."
[214] The coefficient for Black independent contractors was negative and statistically significant at a 0.10 level (with a p-value of 0.067). However, a significance level of 0.05 is more commonly used.

participants in the gig economy is new, and more than half of such workers exit within a year."[215]

## V.    Regulatory Flexibility Act (RFA) Analysis

The Regulatory Flexibility Act of 1980 (RFA), 5 U.S.C. 601 *et seq*., as amended by the Small Business Regulatory Enforcement Fairness Act of 1996, Pub. L. No. 104-121 (1996), requires federal agencies engaged in rulemaking to consider the impact of their proposals on small entities, consider alternatives to minimize that impact, and solicit public comment on their analyses. The RFA requires the assessment of the impact of a regulation on a wide range of small entities, including small businesses, not-for-profit organizations, and small governmental jurisdictions. Accordingly, the Department examined this withdrawal to determine whether it will have a significant economic impact on a substantial number of small entities.

The most recent data on private sector entities at the time this NPRM was drafted are from the 2017 Statistics of U.S. Businesses (SUSB), which reports 5,996,900 private firms and 7,860,674 private establishments with paid employees.[216] Of these, 5,976,761 firms and 6,512,802 establishments have fewer than 500 employees. The per-entity cost for small business employers is the regulatory familiarization cost of $8.43, or the fully loaded mean hourly wage of a Compensation, Benefits, and Job Analysis Specialist ($50.60) multiplied by 1/6 hour (ten minutes). Because this cost is minimal for small business entities, and well below one percent of their gross annual revenues, which is typically at least $100,000 per year for the smallest businesses, the Department certifies that this withdrawal will not have a significant economic impact on a substantial number of small entities.

## VI.    Unfunded Mandates Reform Act of 1995

---

[215] Kelsey Gee, "In a Job Market This Good, Who Needs to Work in the Gig Economy?," *Wall Street Journal*, August 8, 2017.

[216] Statistics of U.S. Businesses 2017, https://www.census.gov/data/tables/2017/econ/susb/2017-susb-annual.html, 2016 SUSB Annual Data Tables by Establishment Industry.

The Unfunded Mandates Reform Act of 1995 (UMRA)[217] requires agencies to prepare a written statement for rules with a federal mandate that may result in increased expenditures by state, local, and tribal governments, in the aggregate, or by the private sector, of $165 million ($100 million in 1995 dollars adjusted for inflation) or more in at least one year.[218] This statement must: (1) identify the authorizing legislation; (2) present the estimated costs and benefits of the rule and, to the extent that such estimates are feasible and relevant, its estimated effects on the national economy; (3) summarize and evaluate state, local, and tribal government input; and (4) identify reasonable alternatives and select, or explain the non-selection, of the least costly, most cost-effective, or least burdensome alternative. This withdrawal is not expected to result in increased expenditures by the private sector or by state, local, and tribal governments of $165 million or more in any one year.

**VII.   Executive Order 13132, Federalism**

The Department has (1) reviewed this proposed withdrawal in accordance with Executive Order 13132 regarding federalism and (2) determined that it does not have federalism implications. The Independent Contractor Rule's withdrawal will not have substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government.

**VIII.   Executive Order 13175, Indian Tribal Governments**

This withdrawal will not have substantial direct effects on one or more Indian tribes, on the relationship between the Federal Government and Indian tribes, or on the distribution of power and responsibilities between the Federal Government and Indian tribes.

Signed this 30th day of April, 2021.

---

[217] *See* 2 U.S.C. 1501.
[218] Calculated using growth in the Gross Domestic Product deflator from 1995 to 2019. Bureau of Economic Analysis. Table 1.1.9. Implicit Price Deflators for Gross Domestic Product.

KG-Universal_000207

Jessica Looman,

Principal Deputy Administrator, Wage and Hour Division.

[FR Doc. 2021-09518 Filed: 5/5/2021 8:45 am; Publication Date:  5/6/2021]

KG-Universal_000208

# EXHIBIT G



JAYSON S. MYERS
CHIEF ADMINISTRATIVE LAW JUDGE
TERESA A. DEMEO
CHRISTOPHER M. TATE
MATTHEW J. TIERNEY
PRINCIPAL ADMINISTRATIVE LAW JUDGE

**STATE OF NEW YORK**
**UNEMPLOYMENT INSURANCE APPEAL BOARD**
ADMINISTRATIVE LAW JUDGE SECTION
P.O. BOX 29002
BROOKLYN NY 11202-9002
(718) 613-3500
FAX:(718) 613-3566

CAROL PROCOPIO
BENJAMIN H. REYES
DENNIS TORREGGIANI
NICOLE BEASON
RACHEL FREEMAN
SENIOR ADMINISTRATIVE LAW JUDGE

*DECISION AND NOTICE OF DECISION*
*DECISIÓN Y AVISO DE LA DECISIÓN TOMADA*

A.L.J. Case No. 016-23858

IN THE MATTER OF:

Mailed and Filed: June 9, 2017

**UBER TECHNOLOGIES INC**
**1455 MARKET ST STE 400**
**SAN FRANCISCO CA 94103-1331**

**NICOLE SALK**
**BROOKLYN LEGAL SERVICES**
**105 COURT ST 4TH FL**
**BROOKLYN NY 11201-**

**LITTLER MENDELSON PC.**
**900 THIRD AVE**
**NEW YORK NY 10022-3298**

**NY TAXI WORKERS ALLIANCE**
**ATTN: ZUBIN SOLEMANY**
**31-10 37TH AVE STE 300**
**LONG ISL CITY NY 11101-**

Department of Labor Office: 831

Hearing Requested: November 16, 2016

**A.S.O.-NYC-ATT: N. KATEHIS**

<u>**PLEASE TAKE NOTICE**</u> that this decision has been duly mailed on the date listed above. If you appeared at the hearing and are not satisfied with this decision, you may appeal within <u>**TWENTY DAYS**</u> from the date this decision was mailed. <u>**READ IMPORTANT INFORMATION ON REVERSE SIDE REGARDING YOUR RIGHT TO APPEAL.**</u> Any party who failed to appear at the hearing has the right to apply to reopen the case. For the application to be granted, the party must apply within a reasonable time and must establish good cause for its failure to appear.

<u>**POR FAVOR TOME NOTA**</u>: esta decisión ha sido debidamente enviada por correo en la fecha que aparece arriba. Si usted asistió a la audiencia y no está satisfecho con la decisión, puede apelar dentro de <u>**VEINTE DIAS**</u>contados a partir de la fecha en que esta decisión fue enviada por correo. <u>**LEA LA INFORMACIÓN IMPORTANTE AL REVERSO SOBRE SUS DERECHOS DE APELACIÓN**</u>. Cualquiera de las partes que falle en comparecer a la audiencia, tiene el derecho de solicitar que se reabra su caso. Para que dicha solicitud sea otorgada, la parte interesada debe solicitarlo dentro de un período de tiempo razonable y debe establecer buena causa por no haber comparecido a la audiencia.

**DOCUMENTO IMPORTANTE. PUEDE OBTENER UNA TRADUCCIÓN DEL MISMO LLAMANDO**
**AL 1-888-209-8124 (FUERA DEL ESTADO DE NUEVA YORK 1-877-358-5306)**

ISSUES:     Status of persons as employees as defined by the Law.
            Coverage of employment in base period.
            Employer's objection to claimant's entitlement.

**COMBINED WITH A.L.J. CASE NOS.: 016-23494; 016-20367;016-19369; 016-20726; 016- 19075**

AB 665-0 (10/06)

KG-Universal_001154

The Department of Labor issued the initial determinations holding claimants eligible to receive benefits, and issued the determinations holding the claimants, and all others similarly situated to claimants to be employees of the employer, UBER TECHNOLOGIES INC., and the employer liable for contributions for claimants and others similarly situated, as of January 1, 2014. The putative employer requested a hearing contending that the claimants and all others similarly situated were independent contractors.

Hearings were held at which testimony was taken. There were appearances by the claimants and on behalf of the employer, and the Commissioner of Labor. The claimant (JH) testified with the assistance of a Bengali language translator.

FINDINGS OF FACT: The putative employer, Uber Technologies, Inc. (hereinafter "Uber") is a corporation that holds proprietary interest in a smart phone accessible application (the "App"). This App is used, by Uber, to facilitate the connection between individuals who want transportation service (the "Riders") with persons who have agreed with Uber to provide such shuttle service, labelled by Uber as partner-drivers (the "Drivers"). Uber markets its App to potential Drivers through online and billboard advertisements. Uber also incentivizes current Drivers, with referral fees, to recommend their family and friends associate with Uber as Drivers.

The named claimants, AK, JH, and JS, who learned of Uber through referrals and its billboard advertising, were associated with Uber during the period under review as Drivers.[1] These claimants held no investment interest in Uber. There were thousands of other Drivers associated with Uber within New York State during the period in issue.

Uber's On-Boarding Process

Uber has what it terms an on-boarding process for new Drivers. In connection therewith, each of the claimants went to an Uber office where they presented certain documents, as required by Uber, to establish their eligibility to drive in New York State. These documents included, the claimants' driver's license; New York City Taxi & Limousine Commission (the "TLC") for-hire driver license; vehicle registration; and their certification of commercial automobile liability insurance policy. Uber did not subject the claimants to background checks. Uber's confirmation that the claimants held valid TLC license verified that they had already passed a background check, administered by the TLC. At Uber's office the claimants were shown a video that explains how the Uber App works; and depicts certain best practice guidelines—such as maintaining a clean vehicle; keeping water in the car for Riders; and, professional attire—that would be beneficial for the claimants to adopt. But, Uber did not impose a dress code on the claimants. This video includes the advisement, "this video has ESSENTIAL information for new Uber partners. You are responsible for understanding all information in the video before you accept your first trip."[2] During this on-boarding process, claimants AK and JS were also given a map test, by Uber, concerning their knowledge of New York City. Uber made its signage available to claimants at its office, but it did not mandate that claimants use said signs.

Uber published its Code of Conduct, which was made available to the Drivers. This Code enunciates the minimum standards of conduct to which Uber expects its Riders and Drivers to adhere; and advises Drivers that failure to maintain such standards risks deactivation of their access to its App. In 2016 Uber also published a Handbook, referred to as its Welcome Packet, which was made available to the Drivers. This Handbook's preamble read, "[t]this guide contains essential information for new Uber partners. Please read it carefully."[3] This Welcome Packet lists contact information to Uber for Drivers who have questions related to the transportation service. During the period in issue, Uber maintained online support resources for Drivers, accessible at partnersny@uber.com,[4] and also designated a support staff to field Drivers' questions.

---

[1] AK's association with Uber began in August, 2014 and continued until September 2015 when his TLC license expired; JH's association with Uber began in December, 2015 and continued through approximately April 2016 when Uber disabled his access to its App due to low Rider ratings; and, JS's association with Uber started in November 2015 and ended in or around August, 2016.

[2] See, CLT Ex. 22 (Emphasis in original).

[3] See, CLT Ex. 15.

[4] See, CLT Ex. 5.

KG-Universal_001155

In completing the on-boarding process Uber presented the three claimants with its adhesion-styled contracts[5] which required their execution in agreement to Uber's terms, as a pre-requisite for eligibility to access to its App. The claimants did not negotiate the terms of said contracts which designated the claimants as independent contractors. After executing the contracts, Uber issued the claimants' usernames to access its App. In 2016 Uber implemented an Uber App verification process to ensure that only Drivers registered with Uber were accessing its App.

Uber collected the claimants e-mail address to disseminate various correspondence during their association with Uber; for example, updates to its App; and instructions regarding the same; reminders for expiring licenses; notices regarding high-volume areas; or other communication regarding Driver and/or Rider concerns. At sometime during their association, claimants AK and JH opted out of receiving Uber e-mail notifications.

Uber contracted separately with Riders, to provide guaranteed, reliable ride service. When AK started in 2014 Uber then marketed itself as "Everyone's Private Driver."[6] The Riders provide Uber with their credit card for charges associated with the transportation service. The Drivers are not party to the contracts between Uber and the Riders.

## Fringe or Other Benefits

Uber did not provide claimants with paid vacation, sick leave, health insurance coverage, or other fringe benefits. Uber complies with TLC regulations, and understands it is required to do so as a condition of engaging in its ride-hailing App business. The TLC requires that all companies and/or individuals that provide for-hire transportation service must be affiliated with a TLC licensed car base, an entity that serves as a dispatcher. In compliance with this regulation, Uber's subsidiary, Unter LLC is one of its Black Car bases. The three claimants were all associated with Unter[7]. Further pursuant to TLC regulations, for-hire drivers of limousine, black car and luxury vehicles must have Black Car Fund Insurance—Workers' Compensation Insurance. In compliance with that regulation Unter withheld a small amount of each fare earned by the claimants. The withheld fares were submitted to New York State on a monthly basis, by Unter, on behalf of the claimants for their Black Car Fund insurance.

## Required Equipment and Associated Costs

Drivers must have a vehicle and smart phone to provide rides through the Uber App. The claimants assumed the cost of their leased or owned vehicles, fuel insurance and maintenance cost. The claimants were made aware of Uber's list of vehicles it deemed acceptable. In compiling this list, Uber considered TLC's comparable list of acceptable for-hire vehicles. But, Uber went beyond the TLC's regulation in this regard, deeming certain vehicles as unacceptable to use with the Uber App, that were otherwise acceptable by the TLC. The claimants were required to comply with Uber's list of acceptable vehicles. Uber categories its list of acceptable vehicles—as Uber X (the most basic acceptable vehicles); Uber XL; and, Uber Black (luxury vehicles). Uber's App is programmed to apply varying base fares, depending upon the vehicle a Driver uses to provide transportation service. AK owned vehicles in various categories that he used in providing rides under the App.

JH and JS leased their vehicles through an Uber affiliated third-party. Uber referred the claimants to that affiliate who allowed these claimants to lease vehicles despite their poor credit. Uber did not require that claimants use this leasing company. JS and JH contracted with that third-party leasing company for their vehicles. Uber was not a named party to those contracts. JS and JH then executed a Consent and Deduction Waiver; thereby, authorizing Uber to deduct and forward lease payments, from their fares and/or other

---

[5] See, Uber Exs. 11, 12, 13.

[6] See, CLT Ex. 36.

[7] AK was initially associated with a different Black Car base in connection with his prior employment as a livery driver before he joined Unter shortly after beginning his association with Uber.

A.L.J. Case No.016-23858                                                                Page 7

earnings, to the third-party lessor on behalf of claimants. After leasing a vehicle JS became delinquent in his payments. He stopped driving under the Uber App to avoid a lump sum deduction from his fares to pay the arrears. Uber intervened; negotiating, with the third-party lessor for an alternative payment schedule for JS which incentivized JS to resume providing ride service under Uber's App. Another Uber affiliated third-party offered claimants a Fuel Card Program, whereunder they would be issued credit cards to purchase fuel. JS opted to use the Fuel Card Program. JS agreed that Uber would withhold payments from his fares for those credit card payments.

When AK started, Uber's App was accessible only on certain devices. Uber provided AK with a smart phone that was compatible with its App version. Uber required AK limit his use of that phone to accessing its App. Uber withheld payments from AK's fares for costs associated with the smart phone. Uber also provided JH with a phone charger and cable, at no cost.

### Claimants' Provision of Ride Services under the Uber App

Uber does not impose a work schedule on the drivers. The claimants autonomously decide when, where and how long they will work providing ride services through the Uber App. The claimants were not required to notify, or seek Uber's approval to take time off. Claimant AK's contract read; however, that he agreed to utilize the App a least once per month to accept Uber App's ride requests.[8]

The claimants turned on the Uber App, and enter their username and password to indicate they were available to accept ride requests. The claimants also selected, on the App, the category of vehicle they were driving (Uber X, Uber XL, Uber Black) to alert the App to consider that component in calculating the fare. Drivers cannot select to provide transportation service only for certain riders. And, Riders cannot elect, through the App, to only ride with certain Drivers. When a rider requests shuttle service using their version of the Uber App, the Driver closest to that Rider is alerted of the ride request by a flashing indicator on the App. Uber allows that Driver fifteen seconds to accept the ride request. If that Driver fails to accept, Uber's App alerts the next closest Driver of the ride request.

If the Driver accepts the ride request, Uber then notifies them of the Rider's name, pick-up location, and gives an estimated time they should arrive for said pick-up. Concurrently, Uber notifies the Rider of the Driver's license plate number, their photograph, and estimated time of arrival. Upon arrival for the pick-up Uber requires Drivers to wait ten minutes for the Rider. If the Drivers comply with that wait-time requirement, and the Rider does not appear, Uber self-determines if that Rider should be charged a wait fee which it would pass to the Driver (less its fee from the overall fare). If the Driver does not comply with the required wait-time Uber considers them ineligible for any wait charge. If a Rider cancels the ride request after a driver accepts it, Uber decides in its sole discretion, if a cancellation fee should be charged to the Rider.

The Driver *first* learns of the Rider's requested destination and drop-off address when that Rider enters their vehicle. The Uber App suggests a route. But, the Driver is expected to follow the route suggested by the Rider, if given. The Riders are charged any tolls as part of their overall fare. When the Driver reaches the Rider's required destination, they indicate on the App that the ride request is completed. The Uber App's algorithm then calculates the fare based on current market factors, and displays said fare for the ride. At that time, the claimants had no input with respect to the amount of the fare charged for the transportation service they provided. The claimants were not allowed to collect cash for the fares under the Uber App. Uber instructed claimants that solicitation, or acceptance of gratuities is prohibited, unless the Rider insists. The fare displayed on the Uber App is charged to the Rider's credit card, by Uber. Uber then processed the Riders' bills.

After completion of the trip and payment by the Rider, the Driver is allowed to challenge the fare charged. Claimant AK submitted e-mails to Uber's online support to challenge that certain fares charged were too low. Uber unilaterally reviewed the disputed fares, and decided if an adjustment was warranted.

---

[8] *See*, Uber Ex. 13 (Uber Software License and Online Services Agreement ¶4.2.2).



## Uber's Corrective Actions

During the time period that Drivers are logged-in to the App, Uber has the capacity to collect and review data regarding the Drivers' activities. Uber analyzes the Driver's acceptance and cancellation of ride requests rates. Uber's "Driver Deactivation Policy"[9] places Drivers on notice of the types of conduct that can result in Uber's suspension or deactivation of their access to its App. This policy reads that "our goal at Uber is transportation as reliable as running water everywhere, and for everyone."[10] The policy alerts Drivers that Uber might deactivate access because of low Rider ratings, high cancellation rates, low acceptance rates. The policy advises, further, that "we will alert you over time if your rating is approaching this limit, and you'll also get information about quality improvement courses that may help you improve. If you're average rating still falls below this minimum after multiple notifications, you will be deactivated. You may be reactivated on the platform after you provide proof of the steps you've taken to improve. For example, by taking one of these quality improvement courses."[11] The Deactivation Policy also placed Drivers on notice that their access to its App might be deactivated if they allow others to use their account, or accept a trip request using an unapproved vehicle.

Uber advised claimants that, once logged-in to the App, they are expected to accept ninety percent of ride requests received. Uber takes corrective action if a Driver fails to meet that acceptance standard, by temporarily deactivating their access to the App. If the claimants failed to accept two consecutive ride requests Uber deactivated their App access for ten-minute periods. Uber logged-out JS from its App after he failed to accept certain of ride requests. JS was contacted, by Uber, and questioned about such refusals. After JS explained that the ride requests were outside of his work area, Uber reactivated his access to the App.

A Driver cancellation occurs where a Driver cancels a trip requests, after accepting the same. Uber determines the threshold for acceptable cancellation rates. Uber sends that Driver message notification that they were logged-out with the explanation that they, "rejected too many riders" and further comment about their acceptance history.[12] Uber determined that Claimant AK had excessive cancellations, and in October 2014 Uber deactivated AK's access to the App for twenty-four hours. Uber contacted and questioned AK about his cancellations. After an exchange of e-mails with Uber in which AK explained his reason for such cancellations, Uber decided to reactivate his access to the App.[13]

## Claimants' Rating/Performance Review

At the end of each ride, the Uber App prompts Riders to rate the Driver's performance and their ride experience, using Uber's five-star rating system. Uber notified the claimants that there is a minimum star rating they must maintain for continued use of the App. That minimum rating of at least a 4.7 is set, and subject to change, exclusively by Uber. Uber deems star-ratings below 4.3 unacceptable. Uber reviews the Driver's star-rating, and includes an anonymous sampling of Riders' comments on the Driver's weekly Pay Statements. Uber adds its own characterization to the Driver's rating, commenting for example on AK's and JS' Pay Statements, "nice work, your driver rating was above average."[14] When a Driver's star rating falls below Uber's minimum acceptable rating, Uber notifies said Driver by e-mail or other means, that their rating has caused concern and places them at risk of deactivation. If that Driver's maintains a persistent low-rating Uber will deactivate their access to its App. Uber deactivated HK's access to its App based on persistent low Rider ratings. HK contacted Uber to discuss the possible reasons for his low ratings, and to seek reactivation. At its office, Uber displays flyers for Quality Improvement Courses, provided by a third-party. HK was advised,

---

[9] See, Uber Ex. 15.

[10] *Id.*

[11] *Id.*

[12] *See,* CLT Ex. 19.

[13] See, CLT Ex. 7.

[14] See, CLT. Exs. 4, 17.

by Uber, that completion of that course might lead to his reactivation. HK completed the course, at his expense. Thereafter, his access to the App was reactivated. On April 27, 2016 Uber notified claimant JH, by e-mail, that his account was permanently deactivated. In deactivating his account Uber notified JH that "due to repeated issues with trip and service quality, your account has been deactivated. Providing quality trips to riders is extremely important to us; based on substantial amount of ratings and feedback received . . . it is apparent that you are not maintaining the level of quality we strive to provide."[15]

## Payment of Fares; Other Earnings; and, Reporting of Income Taxes

Drivers are paid on a per trip basis. Uber provided claimants with weekly direct deposit service, and issued claimants weekly Pay Statements. The Pay Statements reported the fares collected by claimants; less Uber's fee from each ride; and, any withholdings, if applicable (for example, withholdings by Uber for third-party vehicle lease payments, or fuel card usage for payment to such vendors on behalf of claimants). Uber unilaterally set its fee deducted from the Driver's fare—that fare varied from twenty to thirty percent per fare—and depended in part, on the type of vehicle the Drivers used in providing the transportation service. Uber, acting in its sole discretion, increased or decreased the base fares charged based on its market analysis. In 2016 Uber unilaterally lowered its fares.

Uber offered the claimants additional means of increasing their fare earnings through incentives or promotions. Claimants were not obliged to accept such incentives. At times Uber imposed surge pricing; thereby, increasing fares in certain geographic locations based on market demands. Claimants were alerted of the surge pricing by flashing sections of the map on the App, and they elected if they would take advantage of the surge pricing. JH accepted such promotions. In one instance JH accepted a promotion that promised he would earn $1,500.00 if he drove 1,500 hours in specified areas. After complying with the promotion's hours and area requirements, JH did not earn $1,500.00 in fares. Uber took steps to rectify this, by paying JH the difference of $556.94. Uber also designated certain Riders and Drivers as VIP. Those VIP Drivers, typically have high Rider ratings and low cancellations rates, are eligible for longer trips that realize higher fares. VIP Drivers are also eligible for certain Uber gift giveaways.

The claimants' weekly Pay Statements and summaries for the same, reported how long the claimants were online on the App on particular dates, and addresses their acceptance rate during those periods. It detailed if claimant met any accepted promotion requirements, and if not, why.[16] The Statement also explains why Uber might have made deductions to the claimant's fare disbursement; for example, for adverse Rider reports.[17] The Drivers reported any errors to their Pay Statements to Uber, for its review and correction. AK asked that Uber review his Statement for missing trips. In response Uber reviewed the issue to determine if a trip payment was missing; if the Rider should be charged; and if AK's fare disbursement should be adjusted.

Uber's Black Car base, Unter, issues claimants' IRS Form 1099 to report claimants fare-based income to the Internal Revenue Service, and Form 1099 Miscellaneous to report non-fare base earnings, such as incentive and promotion payments. JH was issued both tax forms to by Unter.

## Uber Considers Claimants' Requests for Clean-up and Repair Costs; and, other Reimbursement

Uber's App includes a feature that allows Drivers to request reimbursement from Uber for damages caused to their vehicle by Riders. Drivers submit photographic evidence of the damage, evidence of receipts for repair or clean-up cost attributable to the Rider, to Uber through its App. Uber reviews such requests for repair and/or reimbursement, and in its discretion, determines if the Rider should be charged and the monies recovered passed to the Driver; if Uber will cover the cost; or, if the damage does not meet its threshold for

---

[15] See, CLT Ex. 1.

[16] *See,* Uber Ex. 6 (JH's Pay Statement).

[17] *Id.*

repair or reimbursement. In 2015 AK notified Uber that a Rider soiled his vehicle with food. Uber reviewed AK's cleaning report and replied to claimant that while the mess left by the client was unfortunate Uber deemed it a minor mess that does not warrant a cleaning fee, and suggested that going forward, AK should politely ask riders not to eat in the car. In a series of e-mails claimant continued to protest he should be reimbursed for the cleaning costs, but Uber remained unpersuaded.[18] AK was not reimbursed.

Uber has also assumed the cost for certain traffic violations incurred by the Drivers. In January 2016 claimant JH was issued a Notice of Violation and Summons, and charged a $1,500.00 fine for operating Nassau County, without proper registration. Uber paid that fine for JH.

## Uber Addresses Complaints

Riders reported their complaints against Drivers to Uber.[19] The Uber App includes a feature that allows Riders to report complaints against Drivers. In one such instance, a rider complained that claimant AK took an inefficient route. Uber contacted AK to question him about the Rider's complaint and the route he took. AK and Uber then exchanged a series of e-mails about the Rider's inefficient route complaint.[20] Uber counselled AK that he should take the Rider's preferred route. Uber resolved the Rider's complaint by reducing the fare charged to the Rider; thereby reducing the fare earned by AK.[21] Uber deducted the fare charged for that ride without notifying or consulting with AK. In response to a Rider's complaint about JH's driving, Uber sent JH an admonition that "operating your vehicle in a dangerous or careless manner creates a negative rider experience and puts both you and the riders at risk. . . . Further feedback of this nature could result in permanent deactivation of your account. Please let me now if you have any questions or concerns."[22]

## Claimants Allowed to Procure Rides from Uber's competitors

Uber is aware, and does not prohibit, Drivers from also procuring rides from its competitors. Claimants JH and JS also accepted ride requests from Uber's competitors while simultaneously using the Uber App.

## Drivers Allowed to use Sub-Contractor Drivers

Uber allows Drivers to hire others to operate their vehicles. These Sub-Drivers must individually establish eligibility to drive in New York State, and secure their individual Uber App access. None of the named claimants had Sub-Drivers.

OPINION: Pursuant to Labor Law § 560 (1), any employer shall become liable for contributions under Labor Law, Article 18, if the employer has paid remuneration of $300 or more in any calendar quarter. Such liability shall commence on the first day of such calendar quarter. Pursuant to Labor Law § 517 (1), remuneration means every form of compensation for employment paid by an employer to an employee; whether paid directly or indirectly by the employer, including salaries, commissions and bonuses.

Pursuant to Labor Law § 511 (1a) Employment means any service under any contract of employment for hire, express or implied, written, or oral and any service by a person for an employer as a professional musician or a person otherwise engaged in the performing arts, and performing services as such for a television or radio station or network, a film production, a theatre, hotel, restaurant, night club or similar

---

[18] *See*, CLT Ex. 6.

[19] *See, e.g.*, Uber Exs. 4, 14.

[20] *See*, CLT Ex. 7.

[21] *See*, CLT Ex. 8.

[22] *See*, Hrg. Ex. 2.

establishment unless, by written contract, such musician or person is stipulated to be an employee of another employer covered by this chapter.

The credible evidence establishes that the three named claimants were associated with Uber as Drivers. In determining if an employee-employer relationship exist, the "pertinent inquiry is whether the purported employer retained control over the results produced or the means used to produce those results, with control over the latter being more important." *Matter of Watson*, 127 A.D.3d 1461 (3d Dep't 2015) The court instructed in *Matter of Concourse Ophthalmology Associates, P.C.*, 60 N.Y.2d 734, 736 (1983), that the analysis of whether an employment relationship exist for purposes of unemployment insurance benefits is not dependent on any one fact, but that such relationship may be found where the putative employer exerts control over important aspects of the services provided even where certain evidence would support a contrary conclusion. It is uncontested that claimants and Uber entered into certain contracts that designated claimants as independent contractors. These contracts, drafted solely by Uber, were adhesion contracts, the nature of which did not allow claimants to negotiate the terms of said agreements. The contractual designation of claimants as independent contracts, standing alone, does not end the inquiry. I note that Uber correctly asserts that claimants AK and JS identified themselves as independent contractors to the Department of Labor in pre-hearing questionnaires. But, the claimants' laymen designation of their employment status is not controlling. It remains necessary to consider the actual interactions and continuing relationship between claimants and Uber throughout their association. Certainly, it is significant that as the parties agree, claimants set their own work schedule; selected their work areas; were not obliged by Uber to report their absences or other leaves; and, were not provide fringe benefits by Uber—all factors indicative of an independent contractor status.[23]

The credible evidence also establishes; however, that during the time periods that claimants provided transportation service under its App, that Uber exercised sufficient supervision and control over substantial aspects of their work as Drivers. Uber's assertion that it is not a transportation company; but instead that, it is only a technology company that generates leads for Drives is a *non sequiter*. Uber determined that it must comply with the rules and regulations of the NYC TLC which governs the for-hire driver industry. Indeed, Uber acknowledges that compliance with TLC's regulations is a prerequisite for its continued operations with respect to monetizing its App. Uber holds the subsidiary, Unter LLC, which is its TLC licensed Black Car base that represents its dispatch, as required by the TLC. Moreover, Uber describes itself as a transportation company—advertising itself in 2014 as "Everyone's Private Driver", and more recently in its 2016 internal publication stating, "our goal at Uber is transportation as reliable as running water everywhere, and for everyone."[24] Uber is a transportation company. It is a *sine qua non* therefore, that as a transportation company, claimants' role as Drivers was a crucial aspect of Uber's operation. While Uber did not subject the claimants to background checks during its on-boarding process for new Drivers, Uber acknowledges that its confirmation the claimants held valid TLC licenses sufficed to verify claimants had passed the TLC's background check. Uber also showed the claimants a video that depicted how its App worked, and suggested best practices the Drivers should adopt for success. Additionally, Uber tested claimants AK and JS' knowledge of the city before they were allowed access to its App. I note Uber also informed the claimants of its online and other support services, delegated to field Drivers' inquiries.

Uber did not employ an arms' length approach to the claimants as would typify an independent contractor arrangement. Uber remained involved with the means by which claimants provided transportation services for its Riders. Claimants acknowledged they were responsible for their own vehicles and associated

---

[23] I note Uber posits that the claimants' ability to set their own work schedule should be dispositive, but in doing so it relies upon cases that are inapposite. In *Matter of Jarzabek*, 292 A.D. 668, *Matter of Rukh*, 208 A.D.2d 1105 (3 Dep't 1994); and, *Salem* v. *Corp. Transp. Gen. Ltd.*, 52 F.Supp. 3d 526 (S.D.N.Y. 2014) the courts determined that the putative employer/franchisor exercised only incidental control over the claimant/franchisees. The instant case does not involve a franchise agreement, and the rights and obligations that would attach thereto. Similarly, in *Matter of Pavan*, 173 A.D.2d 1037 (3d Dep't 1994) where the court held the claimant to be an independent contractor, that claimant purchased a membership, valued at $ 40,000.00, for access to the putative employer's frequency to procure rides—an arrangement decidedly different than that at issue here.

[24] *See*, *supra* notes 3, 6.

costs. It is notable that the claimants were restricted to use vehicles deemed acceptable by Uber—requiring compliance with a list that exceeded the governing TLC regulation concerning acceptable for-hire vehicles. Additionally, Uber dos not dispute that when claimants JS and JH lacked proper credit to secure their own vehicles, Uber not only referred them to their third-party affiliates to lease vehicles without credit; but also, Uber took the additional step of withholding monies from these claimants' fares and making lease payments on their behalf. Uber even intervened when claimant JS was delinquent in his lease payments to the third-party lessor, to arrange an alternate payment plan on behalf of JS to address his arrears.

The parties agree that claimants indicated they were available to accept ride requests when they signed-into the App with their Uber designated usernames. Uber agrees that when the claimants accepted a ride request they were informed *only* of the Rider's name and pick-up location, and that, the claimants *first* learned of the requested drop-off location after picking-up the Rider. This belies Uber's assertion that it serves only as a lead generator for rides for the Drivers. It would seem reasonable to assume that an independent Driver would be afforded information about the length of the requested trip, and drop-off site to autonomously decide if they should accept that lead. Additionally, the claimants testified, and Uber does not dispute, that they were expected to allow the Riders a ten-minute wait period before leaving the pick-up site; and that, if Riders failed to appear it was within Uber's sole discretion to determine if that Rider be charged a wait fee. Similarly, the parties agree that if a Rider cancels their trip after a Driver had accepted the ride request it was solely within Uber's discretion if the Rider should be charged a cancellation fee. Significantly, all claimants consistently testified that they had no input in determining the fare charged for the transportation services they provided; but instead, that fare was determined solely by Uber's App algorithm. Uber agrees that claimants were advised not to solicit or accept tips, unless the Riders insists; and that, the Drivers were not allowed to accept cash for the rides under its App. Riders' fares were charged to the credit cards they previously provided to Uber, and their bill processed by Uber, and fares passed to the Drivers. Uber's reliance on *Matter of Yoga Vida*, 28 N.Y.3d 1013 in support of its proposition that the putative employer's role in fee setting and payment collection and processing is not dispositive of an employer-employee relationship is not availing here. Unlike the instant case, in the context of *Yoga Vida*, the court's analysis that the instructors were independent contractors, and not employees, repeatedly referenced that the putative employer had its own staff of instructors, and that the claimants were part-time and not subject to the employment rules applicable of its employees. The claimants in *Yoga Vida* were not therefore, a crucial aspect of that putative employer's ongoing operations, as are the claimants here. Uber does not contend that it has its own staff of Drivers who could have provided services to those provided by the claimants.

I note, but do not accept Uber's assertion that it did not monitor the claimants. Uber took steps to modify the claimants' behavior, as typical in an employer-employee relationship. Uber published, and made available to claimants, its Code of Conduct that placed them on notice of what constituted acceptable behavior and what consequences might attach; for example, deactivation, if they engaged in unacceptable conduct. In 2016 Uber also published its Deactivation Policy, applicable to certain named claimants that notified them of the types of conduct that might result in deactivation from its App and suggested means to avoid such consequences. It is unrefuted that Uber advised claimants that they were expected to accept ninety percent of all ride requests, and that failure to meet such acceptance threshold would result in deactivation. To that end, Uber testified that Drivers who failed to accept two consecutive ride requests were logged-out of the App, by Uber, for ten-minute periods. Claimants AK and JS were so logged-out for refusal of ride requests. Uber agrees that Drivers were similarly deactivated for what it deemed excessive cancellations after they had accepted ride requests. Claimant AK was deactivated, by Uber, for twenty-four hours for cancellations. Uber also used its Riders' responses on its five-star rating system—which riders were prompted to complete at the end of each trip—to monitor and evaluate a Driver's performance in providing ride service; and, to determine if that Driver's rating was unacceptable such that he should be deactivated from is App. Uber unilaterally sets, and modifies the acceptable star rating based on its market analysis. In reviewing these Rider star-ratings, Uber determined that claimant JH's ratings were below its acceptable standard and his App access was deactivated.

Claimants testified that Uber provided them with weekly direct deposit services, and issued claimants weekly Pay Statements. These weekly Pay Statements, prepared by Uber, reported the fares claimant earned based on completed rides, and deductions from those fares for Uber's fee; and any withholdings (for Uber's

A.L.J. Case No.016-23858                                                          Page 19

payments to third-party vendors such as the above mentioned leasing company, on behalf of the claimants). Uber unilaterally set, and modified the base rates charged to the Riders; and in doing so, affected the claimants' earning potential. It is undisputed that Uber determined the amount of its fee which varied from twenty to thirty percent based on the type of vehicle claimant used to provide the transportation service.

Claimants did not negotiate the terms of Uber's fee. Uber offered claimants additional means to increase their earnings through various optional incentives and promotions. The parties agree that JK accepted such promotions. And, in one instance where JK drove the required number of hours without realizing the fares promised by the promotion, Uber paid JK the difference of $ 556.94.

Uber determines if Drivers should be compensated for damages caused to their vehicles by Uber Riders. AK testified that after a Rider soiled his car, he contacted Uber for clean-up costs. Uber agreed that following an extended conversation with claimant, it decided that any damages caused by the Rider did not warrant collection of clean-up costs and that AK was not compensated. Uber also agrees that it responds to Riders complaints against claimants. In connection therewith Uber acknowledged that in response to a Rider's complaint that AK took an inefficient route it decided to resolve the matter by reducing the fare collected for that trip; which tangentially reduced the fare/earnings AK collected from the transportation service he provided. Uber also agreed that in further response to that Rider's complaint, that AK was counselled about to follow the Rider's desired route. Moreover, Uber does not dispute that acting without notice to AK, it deducted that fare from AK's earnings.

Claimants JH and JS testified that while providing ride requests under Uber's App, they were also accepting rides from Uber's competitors. Uber testified they were aware of that this, and did not object. I find that the lack of any restrictive covenant here is not necessarily dispositive. Uber agrees that it has thousands of Drivers in New York City, and that if one Driver refuses a ride request, the request is relayed to the next closest Driver. Indeed, Uber testified that if a Driver does not accept a ride request within fifteen seconds, that request is relayed to a different Driver. As such, the Uber Rider is not left without ride service because a Driver did not accept the request. While the named claimants did not share mirrored experiences during their associations with Uber, I find a review of the record shows that they each subjected to substantial supervision and control by Uber. Based on these aforementioned factors and current New York Labor Law, I find that while there are some indicia of claimant's independence, the overriding evidence establishes that Uber exercised sufficient supervision, direction, and control over key aspects of the services rendered by claimants such that an employer-employee relationship was created.[25] I, conclude, therefore, that the claimants, and others similarly situated, are/were employees of the employer, Uber. Accordingly, I, conclude that the employer is liable for contributions under the Labor Law.

DECISION: The initial determinations holding claimants eligible to receive benefits, and issued the determinations holding the claimants, and all others similarly situated to claimants to be employees of the employer, UBER TECHNOLOGIES INC., and the employer liable for contributions for claimant and others similarly situated as of January 1, 2014, are sustained.

The employer's objection, contending that the claimants and all others similarly situated were independent contractors, is overruled.

The claimants are allowed benefits with respect to the issues decided herein.

/s/ Michelle Burrowes

**Administrative Law Judge**

---

[25] Uber's citation to *McGillis* v. *Dep't of Econ. Opportunity*, 210 So.3d 220 (3d DCA 2017) where the court, applying Florida Law, held that certain Uber drivers were independent contractors is non-controlling.

# EXHIBIT H



STATE OF NEW YORK
**UNEMPLOYMENT INSURANCE APPEAL BOARD**
PO Box 15126
Albany NY 12212-5126
(518) 402-0205
FAX:(518) 402-6208

SUSAN BORENSTEIN
EXECUTIVE DIRECTOR
JAYSON S. MYERS
CHIEF ADMINISTRATIVE LAW JUDGE
TERESA A. DEMEO
CHRISTOPHER M. TATE
MATTHEW J. TIERNEY
PRINCIPAL ADMINISTRATIVE LAW JUDGE

GERALDINE A. REILLY
CHAIRMAN
MICHAEL T. GREASON
RANDALL T. DOUGLAS
JUNE F. O'NEILL
MARILYN P. O'MARA
MEMBERS

*DECISION OF THE BOARD*
*DECISIÓN DE LA JUNTA*

IN THE MATTER OF:

Mailed and Filed: **JUL 12 2018**

Appeal Board No. 596727

NICOLE SALK, ESQ.
BROOKLYN LEGAL SERVICES
105 COURT STREET
BROOKLYN NY 11201

UBER TECHNOLOGIES INC
1455 MARKET ST STE 400
SAN FRANCISCO CA 94103-1331



NY TAXI WORKERS ALLIANCE
ZUBIN SOLEIMANY
31-10 37TH AVE STE 300
LONG ISLAND CITY NY 11101

LITTLER MENDELSON
ANDREW SPURCHISE, ESQ.
900 THIRD AVE
NEW YORK NY 10022-3298

A.S.O. - Appeals Section
Department of Labor Office: 831

A.L.J. Case No. 016-19369

PLEASE TAKE NOTICE that the commissioner, or any other party affected by this decision who appeared before the Appeal Board, may appeal questions of law involved in such decision to the Appellate Division of the Supreme Court, Third Department, by written notice mailed to the Unemployment Insurance Appeal Board, PO Box 15126, Albany, New York 12212-5126 within THIRTY DAYS from the date this decision was mailed.

POR FAVOR TOME NOTA que el comisionado o cualquier otra parte afectada por esta decision que haya comparecido ante la Junta de Apelaciones puede apelar aspectos legales de dicha decision a Appellate Division of the Supreme Court, Third Department, enviando un aviso escrito a Unemployment Insurance Appeal Board, PO Box 15126, Albany, New York 12212-5126 dentro de los TREINTA DIAS a partir de la fecha en que esta decision fue enviada por correo.

DOCUMENTO IMPORTANTE. PUEDE OBTENER UNA TRADUCCIÓN DEL MISMO LLAMANDO
AL 1-888-209-8124 (FUERA DEL ESTADO DE NUEVA YORK 1-877-358-5306)

Combined Appeal Board Nos. 596722, 596723, 596724, 596725, 596726 & 596727

AB 2 (10/06)

KG-Universal_001164

PRESENT: RANDALL T. DOUGLAS, MEMBER

By initial determination dated October 31, 2016, the Department of Labor held **UBER TECHNOLOGIES INC.** (hereinafter Uber) liable for contributions effective 1st quarter 2014 based on employee remuneration paid to **JS** (claimant-JS) and to any other individual similarly employed as a **driver** (Appeal Board No. 596722 and A.L.J. Case No. 016-23494). The Department of Labor deemed claimant-JS to be an employee and credited the claim for benefits effective July 18, 2016 with remuneration from Uber (Appeal Board No. 596725 and A.L.J. Case No. 016-23858).

By initial determination dated September 13, 2016, the Department of Labor held **UBER TECHNOLOGIES INC.** liable for contributions effective 1st quarter 2013 based on employee remuneration paid to **JH** (claimant-JH) and to any other individual similarly employed as a **driver** (Appeal Board No. 596723 and A.L.J. Case No. 016-20367). The Department of Labor deemed claimant-JH to be an employee and credited the claim for benefits effective May 2, 2016 with remuneration from Uber (Appeal Board No. 596726 and A.L.J. Case No. 016-20726).

By initial determination dated August 5, 2016, the Department of Labor held **UBER TECHNOLOGIES INC.** liable for contributions effective 1st quarter 2013 based on employee remuneration paid to **LA** (claimant-LA) and to any other individual similarly employed as a **driver** (Appeal Board No. 596724 and A.L.J. Case No. 016-19075). The Department of Labor deemed claimant-LA to be an employee and credited the claim for benefits effective September 14, 2015 with remuneration from Uber (Appeal Board No. 596727 and A.L.J. Case No. 016-19369).

Uber requested hearings, contending that the claimants and all other individuals similarly employed performed services as independent contractors.

The Administrative Law Judge held combined hearings at which testimony was taken. There were appearances on behalf of all three claimants, of Uber, and of the Commissioner of Labor. Claimant-JH testified with the help of a Bengali interpreter.

By combined decisions filed June 9, 2017, the Administrative Law Judge overruled Uber's objections and sustained the determinations. On June 29, 2017, Uber appealed the Judge's decisions to the Appeal Board.

The Board held further hearings at which all parties were accorded a full opportunity to be heard and at which testimony was taken. There were appearances on behalf of two claimants, of Uber, and of the Commissioner of Labor. Claimant-LA testified via telephone.

Following the Board hearings, by letter dated May 31, 2018, Uber applied to withdraw its appeal of the Administrative Law Judge's decision. The claimants and the Commissioner each submitted written opposition to the application to withdraw, and Uber submitted a written response to the opposition.

The Board considered the arguments contained in all the written statements.

Based on the record and testimony in this case, the Board makes the following

FINDINGS OF FACT: Uber has conducted operations in New York City since 2011. Drivers must be licensed pursuant to the NYC Taxi and Limousine Commission (TLC). Uber solicits Drivers by promoting a $500 sign-on reward for new Drivers and a $200 referral reward for Drivers who referred a new Driver. All three claimants

_____

AB 2 (10/06)

(JS, JH and LA) learned of Uber through its advertising and/or Drivers' referrals. One claimant saw advertisements claiming $1,500 per week in earnings. Each of the three claimants contacted Uber and visited a Greenlight Hub that provides in-person services to current and potential Drivers. They obtained assistance in procuring for-hire TLC licenses and TLC registered vehicles; they took Uber's roadmap test; they viewed Uber's onboarding video; and they received Uber's welcome packets, Uber's proprietary phones (Devices), Uber placards, and eventually Uber lights (U light) for vehicle display.

Uber outlines acceptable and unacceptable vehicles in Uber's "Full Vehicle List" that includes several categories such as standard-luxury (UberX), mid-luxury (UberXL), and high-luxury (UberBLACK and UberSUV). Uber further mandates UberBLACK and UberSUV vehicles to have black interiors and black exteriors (black-on-black). Based on the vehicle's luxury category, Uber sets the varying base fares charged to Riders. The claimants either owned an acceptable vehicle or leased a vehicle from several "Uber Vehicle Solutions Participating Dealerships". Uber had developed referral relationships with several leasing entities. Uber electronically deducted and remitted the Driver's weekly lease payments from collected fares.

Uber maintains a computerized communications platform to provide a medium for the public to electronically request rides. From at least the first quarter of 2013, Uber provided Drivers with its Devices to operate Uber's platform. Later, Uber developed Apps for Drivers ("Driver Apps") compatible with third-party smartphones that were used simultaneously with Uber's proprietary Devices. Drivers utilize Devices or download the Driver App onto their smartphones and enter their personal and bank information to accept rides and to receive direct deposit of their fares. Riders download onto their smartphones the Uber App for Riders ("Rider Apps") and enter their personal and credit card information to request rides and to pay for their fares. Uber activates Driver Apps once new Drivers complete the onboarding process, which includes taking Uber's map test to gauge knowledge of the roads of New York City, and completing TLC's application process to obtain for-hire Driver licenses and vehicle registrations.

From about February 2014, at Uber's Hub, Uber presented to interested Drivers the onboarding video that contains "*ESSENTIAL information for new Uber (Drivers). You are responsible for understanding all information in the video before you accept your first trip.*" The video demonstrated how to use the Driver App and how to maintain a high-performance rating including maintaining a clean vehicle, having water available, and wearing professional attire. From about April 2015, Uber emailed all interested Drivers an electronic link to preview a revised version of the onboarding video.

Uber also published and distributed to Drivers a written handbook, updated February 23, 2015, entitled "Welcome to Uber" with the preamble: "This guide contains essential information for new Uber partners. Please read it carefully." The handbook advises Drivers how to obtain email, text and in-person assistance, how to handle trip requests, how to use the in-app navigation system ("GPS"), and how to request a fare review to collect an additional fee for such instances when a Rider's address was incorrectly provided or a Rider made a mess. For example, a Driver may claim, and Uber may determine and collect, a cleaning fee from a Rider. The handbook also instructs Drivers how to cancel a trip request and to wait at least 10 minutes if the Rider is not at the pick-up location and to call the Rider twice within the 10-minute waiting period.

The handbook also instructs that "Riders rate you on a scale of 1 to 5 stars", with the average rating being "4.7 out of 5"; that "You're likely to be deactivated" with a rating below 4.5; and that "Riders tell us they give 1-star ratings" when Drivers:
- call a rider unnecessarily
- ask for a 5 Star Rating
- ask for tips
- take an inefficient route
- quote Uber prices

AB 2 (10/06)

KG-Universal_001166

The handbook further states that "Riders tell us they give 5-star ratings" when Drivers:

- open the door for a rider
- help with luggage
- politely greet the user and ask their name
- always ask for their preferred route
- engage in polite conversation

The handbook also instructs how to set up music to satisfy the Rider – "When you see a passenger with the [music note] next to their name, make sure to enable music and set your stereo to AUX so they can start playing their music right away." The handbook also contains fare pricing information and "Frequently asked iPhone Questions", as well as accessing the online dashboard and invoices, updating bank information, earning rewards, and using promo codes.

Uber also published and made available to Drivers its "CODE OF CONDUCT" that sets out Uber's "Standards so that everyone in the vehicle has a shared standard for respect, accountability, and common courtesy." This Code includes various subcategories, including non-discrimination, no aggressive behavior, human kindness, disabilities, following the rules, and emergencies.

When logging into Uber's Driver App, all Drivers must accept (electronically sign) Uber's terms and conditions, which include at least two agreements, i.e. *Software License and Online Services Agreement*, and *Technology Services Agreement*, and their addenda, as well as subsequent updated versions, that state,[1] in part, as follows:

- Uber shall own and have all rights in and to the Device (Uber's proprietary smartphone), the Software, the Uber Service, the Driver ID and the Data (§ 2.4)
- Driver shall safeguard, protect and keep the Rider Information received from Uber, and the details of any Ride, at all times confidential and shall not disclose it to any person or store the information in any manner (§ 3.7)
- Driver will immediately notify Uber of any actual or suspected security breach or improper use of the Device, the Driver App, the Driver ID, the Data or of the Rider Information (§ 3.8)
- Uber may suspend or revoke the Driver App if Drivers unlawfully, unfairly or in bad faith disparage Uber (§ 3.9); Uber will issue a Driver ID for each Driver to access and use the Driver App and the Device (§ 4.1.1)
- Upon accepting a trip request, Uber will provide to Driver the Rider Information (including Rider's location), and Uber will provide to Rider specific information (including the Driver's name, photo, geolocation, and phone number) (§§ 4.2.1 and 11.1)
- Driver shall accept a trip request at least once a month (§ 4.2.2)
- Rider must comment on and rate the Driver on the App, and Uber reserves the right to post these comments and ratings on the App or the Website (§ 4.3.1)
- Driver must comment on and rate the Rider on the Driver App (§ 4.3.1)
- Uber reserves the right to refuse, edit or remove unfavorable reviews (§ 4.3.2)
- Driver shall maintain a high standard of professional attire (§ 4.3.3)
- Driver must maintain Uber's minimum rating to continue to use the Driver App (§ 4.3.3)
- At Uber's sole discretion, Uber reserves the right to reclaim, prohibit, suspend, limit or otherwise restrict the Driver from accessing or using the Driver App or the Device (§§ 4.1.1 and 4.3.3)
- Uber reserves the right to advertise and market that tipping Drivers is "voluntary," "not required," and/or "included" in a Rider's fare (§ 5.1.3)

---

[1]      Of the various versions of the *Agreements* (Uber Exhibits 11, 12 and 13), the section citations are to the *Agreement* revised June 21, 2014 (Uber Exhibit 13).

AB 2 (10/06)

- Uber reserves the right to waive a Rider's cancellation fee (§ 5.1.4)
- Uber reserves the unilateral right to set its fee per ride charged to the Driver (§ 5.2.1)
- Driver must always keep the vehicle in a clean and good operating condition (§ 6.1.1.vii)
- Driver is an independent contractor (§ 7.1)
- Uber reserves the right to terminate this *Agreement* without notice when the Driver no longer qualifies under Uber's quality standards (§ 9.1)
- Uber shall monitor and trace the Driver's geolocation through the Driver App via GPS tracking (§ 11.1)
- Uber reserves the right to unilaterally modify the *Agreements* at any time (§ 12.1)
- Driver shall not assign, transfer, or encumber the *agreements*, but Uber may assign, transfer, or encumber the *Agreements* (§ 13.2)

Upon logging into the Driver App, a Driver becomes available to receive a dispatch. A Rider requests a trip by entering the pickup address and time, and the destination. Uber's platform locates and dispatches the Rider's trip request solely to the Driver closest to the Rider. That Driver's phone beeps with an animation alert. The Driver must accept the dispatch within 15 seconds. An unwilling Driver may actively decline the dispatch or merely let the 15 seconds pass. If the dispatched trip request is declined, then the Uber platform dispatches the trip request to the next closest logged-in Driver. Also, the Driver's app has the capacity to cancel an accepted trip request before the trip commenced.

After a Driver accepts a trip request, Uber reveals to the Driver the pickup location, the Rider's photo, the Rider's first name, and the Rider's rating. Uber simultaneously reveals to the Rider the Driver's photo, the Driver's first name, and the vehicle's make/model and license plate number. While the Driver proceeds to the pickup location, the Rider App's built-in map permits the Rider to observe the Driver's location, movement, and estimated time of arrival. Upon the Driver's arrival, Rider and Driver concurrently verify each other's identity.

On or about April 2015, Riders were provided the option to enter the destination when requesting a trip. On or about October 2016, the Rider App required Riders to enter the destination when requesting a trip. Uber withholds the Rider's destination information from the Driver until the Rider enters the vehicle and the Driver activates the start-meter. The Driver takes the route provided by the Driver App's GPS or third-party GPS application. Unless a Rider requests a specific route, the Driver must take the most efficient route or risk a complaint and/or deduction in pay. For example, on the basis that claimant LA transported a Rider via an "inefficient route", Uber imposed a "trip adjustment" in LA's pay in August 2014. Upon arriving at the destination, the Rider exits the vehicle and the Driver activates the end-meter.

Uber also permits Riders and Drivers to participate in carpooling (UberPOOL) by which a Rider may share a ride and split the cost with one or more strangers who are headed in the same direction with various pick-up and drop-off points. When participating in UberPOOL, Uber dictates the order in which the Driver must drop off Riders.

The Rider must rate the trip experience and the Driver's performance using Uber's five-star rating system. Uber then calculates the fare and charges the Rider's credit card on file. Simultaneously, the Driver must rate the Rider using the same five-star rating system. Thereafter, the Driver is free to logoff or remain logged-in for another trip dispatch.

Uber updated its Driver App to "receive helpful reminders and see safe-driving stats based on your past trips", including "Smooth Brakes" and "Smooth Accelerations". Further, when logging in, the Driver App periodically performs an "ID check" by prompting the Driver to take "a clear, well-lit photo of your face" and comparing the photo to the Driver's profile picture to "ensure you're the only one who can go online with your Uber account".

AB 2 (10/06)

Uber maintains numerous data points regarding the Drivers' logged-in activities, including their times that they log in and out, their acceptance and cancellation rates, their Rider ratings, their trip start and end times, their trip GPS location and mapped route, their Riders, their trip fares, etc. Uber uses these data points to process weekly Drivers' payments, to verify or otherwise resolve complaints from Riders and Drivers alike, to verify a potential cause for deactivating the Driver App, to ensure that Drivers are taking the best route every time, etc.

Uber's Operations and Logistics Managers manage a staff of employees who utilize Driver data points "to monitor driver behavior and ensure efficiency." Within the timeframe of one claimant's association with Uber, Uber commenced "a pilot program to verify feedback using smartphone technology. Gyrometers in phones can measure small movements, while GPS and accelerometers show how often a vehicle starts and stops, as well as its overall speed." Uber uses this technology to verify a Rider's complaint that a Driver "accelerated too fast and braked too hard". Verified complaints result in Uber's feedback to the Driver and affect the Driver's rating, while unverified complaints result in no feedback and do not affect the Driver's rating.

Uber's "Driver Deactivation Policy" places Drivers on notice of causes for suspension or deactivation of the Driver App, including low star ratings, high cancellation rates, low acceptance rates, use of a Driver's account by other individuals, use of an unapproved vehicle, etc. This Policy, in part, states that Uber "will alert you over time if your rating is approaching (the minimum) limit, and you'll also get information about quality improvement courses that may help you improve. If your average rating still falls below this minimum after multiple notifications, you will be deactivated. You may be reactivated on the platform after you provide proof of the steps you've taken to improve, for example by taking one of these quality improvement courses." Additionally, to maintain uninterrupted access to the Driver App, Uber expects Drivers to be polite and professional, to be neatly dressed, to have a clean vehicle with water and candy available for Riders, to promptly pick up Riders, and to safely transport Riders to their destination.

Uber communicates these expectations to Drivers in the onboarding video, as well as through additional informational videos and written communications available online and/or sent via emails. Uber repeatedly reminds Drivers to review videos (e.g. "USING A GPS Uber Driver Training: How to Get 5 Star Ratings"), to refrain from inappropriate conversations with riders, and to follow Uber's no-tip policy before accepting a monetary tip. For example, Uber emailed claimant LA a "Weekly Summary" on Monday, July 6, 2015, that provided the specific days and hours worked, the number of hours worked during Uber's calculated busiest hours, the current 4.94 Driver rating, Uber's commentary of "nice work, your Driver rating last week was above average", Uber's selected sample comment of a Rider's feedback, the methods to improve the rating (e.g., "Ask if the Rider has a preferred route"), the number of trips taken each of the last two weeks, the number of hours logged-in each of the last two weeks, the calculated fares per hour for each of the last two weeks, and the acceptance rate for each of the last two weeks. Also, within Uber's email congratulating a Driver for completing the first trip, Uber advises the Driver to not accept cash, to not harass a Rider, to not refuse a service animal, to contact Uber via email for non-urgent issues (24-48-hour response time), to contact Uber via text message for on-the-road urgent questions, to not fall below 4.5 stars to avoid the risk of deactivation, and to follow specific tips to maintain a high rating (e.g. open doors, offer water, keep car clean, use GPS, and wait patiently to pick up and not call or text the Rider right away).

Regarding claimant LA, Uber issued notices of potential deactivation for having a low rating. Unilaterally determining that his rating continued to be unsatisfactory, Uber deactivated his Driver App. Upon notice of Uber's distributed flyers for Quality Improvement Courses, LA paid for and took the requisite course provided by a third party. Within hours of completing the course, Uber reactivated his Driver App.

Drivers must inform Uber of accidents occurring during trips. Uber immediately deactivates the Driver App for a motor vehicle accident. Uber contacts the Rider soon after an accident. Uber verifies via submitted photos that the vehicle has been repaired and safe to drive before Uber reactivates the Driver App.

KG-Universal_001169

In addition to the foregoing reasons for deactivation, Uber suspends access to the Driver App for violation of other expectations. Uber expects Drivers to accept 90 percent of dispatched trips; if a Driver falls below this set standard, Uber temporarily deactivates access to the Driver App. Uber expects Drivers not to decline two consecutive dispatched trips. If a Driver does not meet this expectation, Uber temporarily deactivates the Driver App. For example, Uber deactivated claimant JS's access for 10-minute intervals for excessively declining dispatched trips. Uber expects Drivers not to cancel accepted trips; if a Driver's cancellation rate exceeds Uber's predetermined threshold, Uber temporarily deactivates the Driver App with a notice that you "rejected too many" accepted trips and an outline of the Driver's acceptance history. Uber deactivated claimant AK's access for 24 hours due to excessive cancellations.

Uber sets the prices of fares charged to the Riders. Approved by TLC, Uber has been utilizing a dynamic-pricing system where the fare prices fluctuate up and down almost instantly depending on the supply of Drivers and the demand by Riders. Occasionally, Uber provides incentives and promotions to Drivers and Riders alike. For example, Uber notified Drivers of surge pricing locations where sufficient demand increased the fares and informed Drivers to make themselves available at such locations to earn a higher income. Uber also notified Drivers of locations and/or time schedules at which to make themselves available in exchange for a promotional guaranteed income.

Uber handles all the marketing to get Riders to use its transportation services with the tagline "Everyone's Private Driver." Uber has developed the VIP program, which is like a customer loyalty program for top-rated frequent Drivers to have greater access to top-rated frequent Riders. Uber has further developed relationships with gasoline stations to provide fuel cards with $200 credit lines for Drivers to purchase gasoline, along with a host of available discount coupons, and for Uber to directly withhold fuel charges from fares to be turned over to these participating stations, Uber made available a support team to address Drivers' concerns.

Uber collects the fares from Riders. Before Uber made weekly direct-deposit payments to Drivers' personal bank accounts, Uber deducts various fees, including Uber's set fee, the Black Car Fund fee, the sales tax, the third-party vendor fee for accident insurance payments (if purchased), the third-party vendor fee for vehicle lease payments (if leased), fuel card purchases (if used), etc. Uber sets and collects cancellation fees if Riders cancel trips or fail to show at the pick-up location within Uber's established five-minute waiting period. The cancellation fee is passed along to the Driver like a collected fare. On one occasion, Uber reimbursed claimant JH for a $1,500 summons for operating in Nassau County without a local for-hire-vehicle registration. No governmental deductions are withheld from Drivers' earnings that were reported in their personal capacity as IRS *Miscellaneous Income* (1099-MISC) nonemployee compensation.

Claimant JS participated as an Uber Driver from about November 2015 through August 2016; claimant JH from about January through April 2016; and claimant LA from about August 2014 through September 2015. The claimants' relationships with Uber ended for various reasons. For example, on April 25, 2016, Uber emailed claimant JH to advise that he was "permanently deactivated" from the Driver App "due to repeated issues with low ratings or feedback received from riders. Providing quality trips to riders is extremely important. If you have a phone (Device) provided by Uber, please return your phone to us. Just fill out his form, put your device in a well-padded box, and click on this link to receive a paid shipping label."

OPINION: Neither the Labor Law nor the Appeal Board rules address whether a party has the right to withdraw its appeal of a decision of the Administrative Law Judge. Pursuant to 12 NYCRR 463.2(b), "The board may decide any case appealed to it on the basis of the record and of evidence previously submitted in such case, or in its discretion, may hear argument or hold a further hearing." Although the Board has granted parties' applications to withdraw their appeal on many prior occasions, the Board, in its discretion, has denied requests to withdraw appeals (*see e.g.* Appeal Board Nos. 557383 and 552492). Here, Uber's application to withdraw was made over 11 months after its appeal of the Judge's decision and after the Board garnered voluminous evidence at two further hearings. In the interest of justice, the Board concludes that a decision on the merits should be issued. Accordingly, Uber's application to withdraw its appeal should be denied.

While a determination that an employer-employee relationship exists may rest upon evidence that an employer exercises either control over the results produced or over the means used to achieve the results, control over the means is the more important factor to be considered (*Matter of Ted is Back Corp.*, 64 NY2d 725 [1984]). Incidental control over the results produced without further indicia of control over the means employed to achieve the results will not constitute substantial evidence of an employer-employee relationship (*Matter of 12 Cornelia St*, 56 NY2d 895 [1982]).

The credible evidence establishes that Uber exercises sufficient supervision, direction or control over the three claimants and other similarly situated Drivers. Uber exercises control through its in-person assistance at its Hubs where Drivers are screened, are required to view the orientation onboarding video of essential information, and are required to take Uber's roadmap test. Uber also provides Drivers with its handbook and signage, and refers Drivers to specific dealerships to lease TLC licensed vehicles.

Uber also exercises control through its Driver App. Uber provides the Driver App and sets up the information that appears on the Driver App; sets the fares charged to Riders; sets the rate of pay to Drivers and the occasional income guarantee; sets the various incentives and promotions; and sets the music, tipping and deactivation policies. Uber assigns the work by dispatching trip requests to the closest individual Driver who must accept the dispatch within Uber's 15-second mandate. Uber also provides the requisite tools, such as built-in maps on the Driver App and Uber signage. Uber further conducts an occasional "ID check" on the Driver App, and sets the order of Riders' drop off for UberPOOL.

Uber also exercises control by providing in-person support to Drivers and monitoring Drivers' performance, solely determining when and how long to deactivate Drivers for failing to meet Uber's performance standards. Uber fielded complaints and regularly communicated feedback to the Drivers, including the minimum threshold star rating to avoid suspension, and communicated the trip's most efficient route and the Drivers' acceleration, braking, and overall speed. Occasionally, Uber reimburses Drivers. Uber handles all the bookkeeping needs, including collecting from Riders, adjusting for mandatory pay deductions, and paying Drivers directly.

The Court has held that "it is incumbent on the Board to decide like cases the same way or explain the departure" (*Matter of Charles A. Field Delivery Service Inc.*, 66 NY2d 516 [1985], *rev'g* 112 AD2d 505 [3d Dept 1985]; *see also, Matter of Casey* [*Larkfield Lottery*], 140 AD2d 925 [3d Dept 1988]). The cases at hand are similar to others in which the Court found sufficient evidence of employment relationships regarding limousine and luxury car drivers (*see Matter of Kim* [*SUK Incorporated, DBA Rainbow Limousine*], 127 AD3d 1487 [3d Dept 2015]; *Matter of Khan* [*Mirage Limousine Service Inc.*], 66 AD3d 1098 [3d Dept 2009]; *Matter of Odyssey Transportation LLC*, 62 AD3d 1175 [3d Dept 2009]; *Matter of Automotive Service Systems Inc.*, 56 AD3d 854 [3d Dept 2008]; *Matter of Spectacular Limo Link Inc.*, 21 AD3d 1172 [3d Dept 2005]; and *Matter of Eliraky* [*Crosslands Transportation Inc.*], 21 AD3d 1197 [3d Dept 2005]).

The Court has also found sufficient evidence of employer-employee relationships involving other drivers (*see Matter of Crystal* [*Medical Delivery Services*], 150 AD3d 1595 [3d Dept 2017]; *Matter of Garbowski* [*Dynamex Operations East Inc.*], 136 AD3d 1079 [3d Dept 2016]; *Matter of Mitchum* [*Medifleet Inc.*], 133 AD3d 1156 [3d Dept 2015]; and *Matter of Youngman* [*RB Humphreys Inc.*], 126 AD3d 1225 [3d Dept 2015]).

Uber contends that the foregoing cases are not controlling because of the Court of Appeals' decision in *Matter of Yoga Vida NYC Inc.*, 28 NY3d 1013 (2016). However, unlike *Yoga Vida*'s distinct and different treatment between its staff and non-staff instructors, Uber engages only non-staff Drivers. And unlike non-staff instructors who were paid only if a certain number of students attended their classes, Uber not only guarantees payment for each trip, but occasionally guarantees a specified level of income. Also, unlike *Yoga Vida*, Drivers view the "essential" onboarding video; Uber provides Drivers with welcome packets, vehicle placards, and financial incentives and promotions; Uber maintains numerous Driver data and regularly communicates

expectations to the Drivers; Uber sets the minimum star-rating threshold performance and utilizes the performance scores and the Riders' feedback and complaints in deactivating Driver Apps as a result of inability to meet Uber's satisfactory level of quality; and Uber unilaterally determines whether to collect a Rider's cancellation fee.

With respect to several other cases cited by Uber, including *Saleem v. Corp. Transp. Group, Ltd.*, 854 F.3d 131 (2d Cir. 2017), aff'g *Saleem v. Corp. Transp. Group, Ltd.*, 52 F.Supp.3d 526 (SDNY 2014); *Matter of Jarzabek* (*Carey Limousine, NY Inc.*), 292 AD2d 668 (3d Dept 2002); *Matter of Rukh* (*Batter City Car & Limousine Service Inc.*), 208 AD2d 1105 (3d Dept 1994); and *Matter of Pavan* (*UTOG 2-Way Radio Association Inc.*), 173 AD2d 1036 (3d Dept 1991), these cases involved franchisors comprised of franchise owner-drivers, or a nonprofit corporation comprised of member-drivers, who imposed and enforced a set of rules on themselves. Although Uber contends that such distinction is insignificant, the Court has held otherwise (*see Matter of Odyssey Transportation LLC*, 62 AD3d 1175 [3d Dept 2009]; and *Matter of Freidenberg* (*Limousine Resources Management Corp.*), 235 AD2d 866 [3d Dept 1997]). Uber relies on *Saleem*, a decision unrelated to Unemployment Insurance Law, which is not binding on the Board (*see e.g. Matter of Bartenders Unlimited Inc.*, 289 AD2d 785 [3d Dept 2001]; *Matter of Enjoy the Show Management Inc., DBA Teasers*, 287 AD2d 822 [3d Dept 2001]; and *Matter of Simonelli* (*Adams Bakery Corp.*, 286 AD2d 805 [3d Dept 2001]).

The Board is mindful of the Court's recent decision in *Matter of Vega* (*Postmates Inc.*), ___ AD3d ___ (3d Dept June 21, 2018) holding on-demand delivery drivers not to be employees. In *Vega*, the Court relied on, in part, the driver's ability to reject or ignore a delivery request without penalty, the driver's freedom to choose the mode of transportation or the route to be taken, the driver's lack of a requirement to wear a uniform, the driver's lack of a provided logo, and the driver's lack of expense reimbursement. Here, however, Uber penalized the Driver if too many trip requests were rejected or ignored, Uber imposed a list of acceptable vehicles and the route requested by a Rider or the GPS route, Uber strongly suggested a route code, Uber supplied placards and lights with its logo, and Uber made an extensive reimbursement of $1,500 to one of the claimants. Additional factors absent from Postmates include Uber's mandate to view the onboarding video and to take a roadmap test, Uber's distribution of its handbook, Uber's imposed tipping and deactivation policies, Uber's policing of Drivers' performance, Uber's continuous feedback to the Drivers, and Uber's occasional "ID check", income guarantee, and various incentives or promotions.

Although Uber contends that it is merely a technology platform that connects Riders to Drivers, its business is similar in many respects to other more traditional car service companies. Here, the technology merely replaces much of the duties of an employee-dispatcher to dispatch a trip request solely to the nearest Driver who may accept the dispatched assignment. Moreover, the record demonstrates that Uber markets its transportation services to Drivers and Riders alike, selects only qualified Drivers, monitors and supervises Drivers' performance, rewards high performing Drivers, disciplines Drivers who fail to meet Uber's standards on a temporary or permanent basis, sets the fare prices charged to Riders, and sets the Driver's fee paid to Uber.

Significantly, Uber mandates each Rider to rate their Driver under Uber's 5-star rating and give written feedback of the Driver's performance, which is then utilized to monitor and discipline Drivers, including suspending or terminating their relationship. Effectively, Uber utilizes Riders' ratings and feedback as one of various tools with which to gauge and otherwise monitor Drivers' performance including cleanliness, professional attire, and driving manner. The direct consequences and implications of the mandated 5-star rating and feedback demonstrate control.

Uber also contends that all controls were mandated by the TLC. However, the record contains ample evidence demonstrating that Uber, once the Drivers report for duty (logged in), exercises or reserves the right to exercise sufficient control beyond regulatory mandates, including its 5-star rating system and list of acceptable cars (*see Matter of Crystal* [*Medical Delivery Svcs.*], 150 AD3d 1595 [3d Dept 2017]; and *Matter of Wilder* [*RB Humphreys Inc.*], 133 AD3d 1073 [3d Dept 2015]).

Also, written agreements characterizing drivers as independent contractors are not dispositive of employer-employee relationships, but merely just one of many factors to be considered. *See Matter of Isaacs* (*Speedy Media Associates LLC*), 125 AD3d 1077 (3d Dept 2015); *Matter of Wells* (*Madison Consulting Inc.*), 77 AD3d 993 (3d Dept 2010); *Matter of Chorba*, 54 AD3d 1091 (2008); and *Matter of Stuckelman* (*Blodnick, Gordon, Fletcher & Sibell PC*), 16 AD3d 882 (3d Dept 2005).

Finally, the Board is not persuaded by Uber's contention that the claimants had an opportunity to become a business owner who in turn could pay its engaged drivers, like that of Uber's driver-witness (AS). Such individual is not similarly situated to the instant three claimants. The record, as a whole, demonstrates that the claimants and other similarly situated drivers were covered employees for purposes of unemployment insurance.

DECISION: Uber's application to withdraw its appeal is denied.

The combined decisions of the Administrative Law Judge are affirmed.

The initial determination, holding **UBER TECHNOLOGIES INC.** liable for contributions effective 1st quarter 2014 based on employee remuneration paid to claimant-JS and to any other individual similarly employed as a **driver**, is sustained.
(Appeal Board No. 596722 and A.L.J. Case No. 016-23494)

Claimant-JS is deemed an employee of and is credited with remuneration from Uber regarding a claim for benefits effective July 18, 2016
(Appeal Board No. 596725 and A.L.J. Case No. 016-23858).

The initial determination, holding **UBER TECHNOLOGIES INC.** liable for contributions effective 1st quarter 2013 based on employee remuneration paid to claimant-JH and to any other individual similarly employed as a **driver**, is sustained.
(Appeal Board No. 596723 and A.L.J. Case No. 016-20367)

Claimant-JH is deemed an employee of and is credited with remuneration from Uber regarding a claim for benefits effective May 2, 2016.
(Appeal Board No. 596726 and A.L.J. Case No. 016-20726)

The initial determination, holding **UBER TECHNOLOGIES INC.** liable for contributions effective 1st quarter 2013 based on employee remuneration paid to claimant-LA and to any other individual similarly employed as a **driver**, is sustained.
(Appeal Board No. 596724 and A.L.J. Case No. 016-19075)

Claimant-LA is deemed an employee of and is credited with remuneration from Uber regarding a claim for benefits effective September 14, 2015.
(Appeal Board No. 596727 and A.L.J. Case No. 016-19369)

Uber's objection in each case is overruled.

Uber is liable with respect to the issues decided herein.

MB1:DK                                    RANDALL T. DOUGLAS, MEMBER

_____

AB 2 (10/06)

# EXHIBIT A-8

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **DAINIUS BARYSAS,** | § | |
| **Plaintiff,** | § | |
| | § | |
| **vs.** | § | **CIVIL ACTION NO.** _____ |
| | § | |
| **UBER TECHNOLOGIES, INC.** | § | |
| **Defendant.** | § | |

**<u>DECLARATION OF DEBORAH SOH IN SUPPORT OF REMOVAL</u>**

1.      I, Deborah Soh, am over the age of eighteen (18), am competent to give this Declaration, and have personal knowledge of the facts set forth in it.

2.      Uber Technologies, Inc. is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 1515 3rd Street, San Francisco, California 94158.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on November 3, 2022.

_Deborah Soh_ _____

# EXHIBIT A-9

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Dainius Barysas

**DEFENDANTS**

Uber Technologies, Inc.

**(b)** County of Residence of First Listed Plaintiff   Montgomery Co., TX
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   San Francisco Co., CA
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Kherkher Garcia, LLP, 2925 Richmond Ave., Ste. 1560, Houston, TX 77098, (713) 333-0862

Attorneys *(If Known)*

Littler Mendelson, P.C., 1301 McKinney Street, Suite 1900, Houston, TX 77010, (713) 951-9400

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1 U.S. Government Plaintiff
- [ ] 3 Federal Question *(U.S. Government Not a Party)*
- [ ] 2 U.S. Government Defendant
- [X] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [X] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [X] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane | [ ] 365 Personal Injury - Product Liability | [ ] 690 Other | [ ] 423 Withdrawal 28 USC 157 | [ ] 376 Qui Tam (31 USC 3729(a)) |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability | [ ] 367 Health Care/ | | | [ ] 400 State Reapportionment |
| [ ] 140 Negotiable Instrument | [ ] 320 Assault, Libel & Slander | Pharmaceutical Personal Injury | | **PROPERTY RIGHTS** | [ ] 410 Antitrust |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | [ ] 330 Federal Employers' | Product Liability | | [ ] 820 Copyrights | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | Liability | [ ] 368 Asbestos Personal Injury Product Liability | | [ ] 830 Patent | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans) | [ ] 340 Marine [ ] 345 Marine Product Liability | **PERSONAL PROPERTY** | | [ ] 835 Patent - Abbreviated New Drug Application | [ ] 460 Deportation [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | [ ] 350 Motor Vehicle | [ ] 370 Other Fraud | **LABOR** | [ ] 840 Trademark [ ] 880 Defend Trade Secrets Act of 2016 | [ ] 480 Consumer Credit (15 USC 1681 or 1692) |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle Product Liability | [ ] 371 Truth in Lending [ ] 380 Other Personal Property Damage | [ ] 710 Fair Labor Standards Act | | [ ] 485 Telephone Consumer Protection Act |
| [ ] 190 Other Contract | [ ] 360 Other Personal Injury | [ ] 385 Property Damage Product Liability | [ ] 720 Labor/Management Relations | **SOCIAL SECURITY** | [ ] 490 Cable/Sat TV |
| [ ] 195 Contract Product Liability | [ ] 362 Personal Injury - Medical Malpractice | | [ ] 740 Railway Labor Act | [ ] 861 HIA (1395ff) [ ] 862 Black Lung (923) | [ ] 850 Securities/Commodities/ Exchange |
| [ ] 196 Franchise | | | [ ] 751 Family and Medical Leave Act | [ ] 863 DIWC/DIWW (405(g)) [ ] 864 SSID Title XVI | [ ] 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | [ ] 790 Other Labor Litigation | [ ] 865 RSI (405(g)) | [ ] 891 Agricultural Acts |
| [ ] 210 Land Condemnation | [ ] 440 Other Civil Rights | **Habeas Corpus:** | [ ] 791 Employee Retirement Income Security Act | | [ ] 893 Environmental Matters |
| [ ] 220 Foreclosure | [ ] 441 Voting | [ ] 463 Alien Detainee | | **FEDERAL TAX SUITS** | [ ] 895 Freedom of Information Act |
| [ ] 230 Rent Lease & Ejectment | [ ] 442 Employment | [ ] 510 Motions to Vacate Sentence | | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | [X] 896 Arbitration |
| [ ] 240 Torts to Land | [ ] 443 Housing/ Accommodations | [ ] 530 General | | [ ] 871 IRS—Third Party 26 USC 7609 | [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| [ ] 245 Tort Product Liability | [ ] 445 Amer. w/Disabilities - Employment | [ ] 535 Death Penalty | **IMMIGRATION** | | |
| [ ] 290 All Other Real Property | [ ] 446 Amer. w/Disabilities - Other | **Other:** [ ] 540 Mandamus & Other | [ ] 462 Naturalization Application | | [ ] 950 Constitutionality of State Statutes |
| | [ ] 448 Education | [ ] 550 Civil Rights [ ] 555 Prison Condition [ ] 560 Civil Detainee - Conditions of Confinement | [ ] 465 Other Immigration Actions | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [ ] 1 Original Proceeding
- [X] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. § 1332

Brief description of cause:
Plaintiff seeks vacatur of arbitration award.

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $ 92,353.32

CHECK YES only if demanded in complaint:

JURY DEMAND:   [ ] Yes   [X] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____    DOCKET NUMBER _____

DATE: November 7, 2022

SIGNATURE OF ATTORNEY OF RECORD
Kimberly R. Miers

Date: 2022.11.07 14:19:24 -05'00'
Digitally signed by Kimberly R. Miers

**FOR OFFICE USE ONLY**

RECEIPT # _____    AMOUNT _____    APPLYING IFP _____    JUDGE _____    MAG. JUDGE _____

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)**   **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)**   **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)**   **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**   **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked**. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.**   **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.**   **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.**   **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.**   **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII.**   **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**   **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.